# **<u>Exhibit 3</u>**

1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF PUERTO RICO

2

3     In Re:                          )
                                      )
4     THE FINANCIAL OVERSIGHT AND     )
      MANAGEMENT BOARD FOR PUERTO RICO,
5                                     )
         as representatives of        )  No. 17 BK 3283-LTS
6                                     )
      THE COMMONWEALTH OF PUERTO      )
7     RICO, et al,                    )
                                      )
8              Debtors               )
      --------------------------- )  Pages 1 - 94
9     ----                           )
                                      )
10    THE BANK OF NEW YORK MELLON,    )
                                      )
11             Plaintiff             )
                                      )  Adv. Proc.
12             v.                    )  No. 17-133-LTS in
                                      )  17 BK 3284-LTS
13    PUERTO RICO SALES TAX           )
      FINANCING CORPORATION           )
14    (COFINA), et al,                )

15             Defendants

16

17                      **HEARING**

18        BEFORE THE HONORABLE JUDITH GAIL DEIN
             UNITED STATES MAGISTRATE JUDGE

19

20                    United States District Court
                      1 Courthouse Way, Courtroom 18
21                    Boston, Massachusetts  02210
                      August 22, 2017, 1:04 p.m.

22

23                    DEBRA D. LAJOIE
                   OFFICIAL COURT REPORTER
24              United States District Court
             1 Courthouse Way, Room 3-209
25                   Boston, MA  02210
                      (617)933-5266

1   A P P E A R A N C E S :

2        LUC A. DESPINS, ESQ., Paul Hastings, LLP, for
     Official Committee of Unsecured Creditors of the
3    Commonwealth of Puerto Rico.

4        MARTIN J. BIENENSTOCK, ESQ., Proskauer Rose LLP,
     for the Financial Management and Oversight Board for
5    Puerto Rico.

6        RICHARD LEVIN, ESQ., Jenner & Block LLP, for the
     Retirees' Committee.
7
         PETER FRIEDMAN, ESQ., O'Melveny & Myers, LLP, 7
8    Times Square, New York, NY  10036, for FOF and the
     Government Development Bank of Puerto Rico.
9
         ROBERT S. BRADY, ESQ., Young, Conaway, Stargatt &
10   Taylor, LLP, for Popular, Inc., Popular Securities,
     LLC, and Banco Popular of Puerto Rico.
11
         NICHOLAS P. CROWELL, ESQ., Sidley Austin, LLP, for
12   Santander Puerto Rico, Santander Asset Management and
     Santander Securities.
13
         KYLE J. KIMPLER, ESQ. Paul, Weiss, Rifkind,
14   Wharton & Garrison, LLP, for the Ad Hoc GIO Group.

15       MARTIN L. SEIDEL, ESQ., Willkie, Farr & Gallagher,
     LLP, 787 Seventh Avenue, New York, NY  10019-6099, for
16   the COFINA Agent.

17

18

19

20

21

22

23

24

25

1   22 AUGUST 2017 -- 1:04 P.M.

2           THE CLERK:  The United States District Court for

3   the District of Puerto Rico is now in session on

4   August 22nd, the year 2017, in the matter of In Re:

5   The Financial Oversight and Management Board of

6   Puerto Rico, as representative of the Commonwealth of

7   Puerto Rico, et al, Bankruptcy No. 17-3283-LTS.

8           THE COURT:  Good afternoon, everybody.  And as I

9   stated this morning, welcome to the latest seating of

10   the Puerto Rico District Court in Massachusetts, and

11   welcome to our friends in Puerto Rico.

12           All right.  So, we're here on a motion of the

13   Unsecured Creditors' Committee for Bankruptcy Rule 2004

14   examination.  Who's arguing?

15           MR. DESPINS:  I am, Your Honor.  Good afternoon,

16   Your Honor.  Luc Despins with Paul Hastings, Counsel

17   for the Creditors' Committee.

18           Your Honor, we're here on our motion, 2004

19   motion, for documentary production from three entities,

20   Banco Popular, Santander and GDB.  And this is a very

21   important motion, Your Honor, very important not

22   because it has been on the front page of all

23   Puerto Rico papers for the last few days but because

24   the people of Puerto Rico actually understand what's

25   going on.  When they hear two of the targets, GDB and

1    Santander, saying that it's okay to have an

2    investigation, but the Oversight Board should do it,

3    not the Creditors' Committee, these people may not be

4    lawyers or judges, but they get it, they understand

5    exactly what's going on.

6         So, let's start with the law, Your Honor.  And

7    this is, obviously, discovery, but it's much more than

8    that, Your Honor.  And, Your Honor, in a sense is going

9    to have to put aside all these years of learning the

10   Federal Rules of discovery because, as you know, 2004

11   examinations have been described as a fishing

12   expedition, so it's much broader than in the Federal

13   Rules.

14        But here, basically you're in the position as if

15   you were a Bankruptcy Court, and the way a Bankruptcy

16   Court would approach this is to say, Okay, is there a

17   good cause for the investigation, number one?  On that,

18   I don't think it's even close because people are not

19   arguing that there shouldn't be an investigation;

20   they're fighting over who should do it.  And they are

21   arguing that you should favor the Oversight Board's

22   recently announced decision to start an investigation

23   over the very concrete investigation that the Committee

24   is seeking.

25        I would say, though, on the issue of cause,

1    before I move on, is that, you know, we attached a

2    chart to our reply, which shows all the

3    inter-relationships during the crucial years between

4    Santander, GDB and Banco Popular and also members of

5    the Oversight Board.  They were not on the Oversight

6    Board then, but clearly at that time they were wearing

7    a different hat.  And I want to be clear.  This is just

8    the tip of the iceberg.  We could not fit all the other

9    names on the chart.  It's already very busy.  But we

10   could not list all of the other names, but there are

11   many other names of people that were involved in what

12   we refer to as the revolving doors.

13        But going back to the issue of, Can the Board's

14   own announced investigation, not commenced but

15   announced investigation, be a basis to deny 2004 relief

16   to the Committee?  I would say, and Your Honor knows

17   this, that Mr. Bienenstock is a scholar.  In his

18   objection, he said Your Honor should direct the

19   Committee to stand down in favor of the examination

20   that the Oversight Board will do, as is the case with

21   all other cases where this issue has come up, where an

22   examiner is appointed.  He cited no case for that

23   proposition, and we are aware of none.

24        And, in fact, this issue has come up time and

25   time again, and I want to be very clear before I go

1    into these cases that the issue here is not that an

2    examiner has been appointed.  There's no examiner

3    that's been appointed.  The examiner is somebody -- or

4    it's not technically, but the person they seek to hire

5    will not be identified for a good while now because

6    their requests for proposals are not due until

7    tomorrow.  And, therefore, they're asking you to deny

8    the 2004 motion in favor of an investigation that has

9    not even been commenced, so that already is

10   unprecedented.

11        But -- and this is an investigation where the

12   Board would be telling you, Look, we've been appointed

13   a year ago, we have the right to commence an

14   investigation from the minute we were appointed, and we

15   decided not to do it, but now we're really serious, we

16   will do it, we want to do it, so please tell the

17   Committee to stand down.  And that type of argument has

18   been made many, many times before.  Cases -- and it's

19   amusing because these are cases often that

20   Mr. Bienenstock and myself were in a similar position.

21        The first one is *Enron*, a very well-known case

22   involving Judge Gonzalez who's on the Oversight Board,

23   and there was a -- the argument was made forcibly by

24   the US Trustee, Please, Judge Gonzalez, shut down the

25   Committee process, the 2004 process, because there's an

1    examiner that's going to be looking into all of these

2    issues, and the Judge basically said, in so many words,

3    that's the nature of the beast.  The examiner has a

4    different goal than the Committee.  The examiner is

5    there to write a report, same thing has here, their

6    role is to write a report.  The Committee has a

7    different function, which is to do some basic blocking

8    and tackling in the case.  And in that context, the

9    Court basically rejected the argument that the

10   Committee should stand down, and the Committee

11   continued, because I remember that vividly, with its

12   full-blown investigation while the examiner was doing

13   its own investigation.

14          Same thing in *Lehman*.  I represented the

15   Committee for the first six, eight months of the case.

16   There was an examiner appointed.  He wrote a report,

17   just to give you an example, on the Barclays

18   transaction.  Well, the Barclays transaction was

19   investigated by the Committee, and the reason I know

20   this is because I was a witness myself at a deposition

21   on the Barclays transaction, and the Counsel for the

22   examiner was there, so clearly there were dual

23   investigations.  So, that's *Lehman*.

24          But there are many others that are cited in our

25   papers, and I think it's very important, Your Honor, to

1    go through some of the reasoning that Courts have used.

2    And just to give you a sense, Your Honor, there's a

3    more recent case, which is the *Caesars* case, where

4    Mr. Bienenstock represented one of the committees, and

5    an examiner was appointed, and he filed a motion for a

6    2004 examination, and it was objected to by the Debtor,

7    saying, Don't -- this is wasteful.  Don't let him

8    continue his investigation because we have an examiner.

9          And I think it's important just to cite from

10    Mr. Bienenstock's response, which is -- you know,

11    this is a public case, you know, Case 15-01145,

12    Document 655, Paragraph 21, where he stated, "One of

13    the central functions of the UCC is to investigate the

14    acts, conducts, assets and liabilities," et cetera.

15    "Neither the Bankruptcy Code nor the bankruptcy rules

16    qualify this authority in any respect.  As a result,

17    the possibility that a different party, e.g., an

18    examiner may be investigating the Debtor's conducts or

19    assets does not prohibit the UCC from conducting its

20    own investigation."  And as a matter of fact, the Judge

21    entered an order granting the 2004 examination.

22          And it's very important.  That order is

23    Document 675 in that same docket, Case 15-01145.  In

24    that order, the Judge stated -- this is Paragraph 8 --

25    "The examiner, the debtors, the creditors' committee

1    and the municipalities committee must use their best

2    efforts to coordinate their investigation and avoid

3    interference or needless duplication."

4         So, he doesn't say in that order that the

5    examiner will control and the others have to stand

6    down; it puts a burden on all the parties to work

7    together to minimize duplication, which is fine, by the

8    way.  I think Your Honor could do the same here.  That

9    doesn't stop the basic principle, which is that we can

10   be authorized to conduct our 2004 examination.

11        Another case that's key where, Your Honor, I

12   represented the Committee was *Refco.*  Same issue

13   there, the Committee wanted to do an investigation,

14   Judge Drain was faced with arguments by the US Trustee

15   that it would be wasteful, et cetera, et cetera, and

16   the Court entered an order.  This is at, you know, Case

17   No. 05-6006-RDD, Document 1487.  There the Court

18   said -- this is Paragraph 6 -- that the examiner and

19   the creditors' committee shall cooperate and coordinate

20   their efforts to assure, very important here, to the

21   extent possible, that their investigations are not

22   unduly duplicative, meaning it's recognized that

23   there's going to be some duplication, but he said that

24   it shouldn't be unduly duplicative, and of course how

25   can we not agree with that general principle?

1      THE COURT:  So -- I'm sorry.  I don't mean to

2   interrupt.  But I recognize that it has happened in a

3   lot of cases, and none of those settings are exactly

4   the same as this case, and I have reviewed the cases,

5   and I will let everybody argue their positions.

6      But I do have a big concern here on how to --

7   assuming I would allow an examination, in this case, we

8   also run into a lot of discovery in adversary

9   proceedings, and the topic, as you've defined it, is so

10   broad that I don't even -- I don't know how to get my

11   head around it.

12      MR. DESPINS:  Well, I think the best way is to

13   look at -- there are various categories of document

14   production requests.  I want to be clear, this is only

15   document production at this stage.  We would not

16   proceed with more than that without coming back to

17   Your Honor for approval.

18      And basically there are a bunch of topics.  One

19   of them is the Constitutional debt limits.  Puerto Rico

20   has a Constitution that says, among other things, that

21   you cannot exceed a certain amount of debt, it's based

22   on a percentage, a complicated formula, but basically

23   you're not -- you know, you're not supposed to exceed

24   that amount of debt.  Otherwise, you could just issue

25   debt for a hundred percent of your income, and that

1    would not be a good thing.

2         So, there's a 15 percent, 1-5, cap, and the way

3    it works is quite complex, but that's one of the

4    issues, which is very present in this case, which is,

5    Are some of the bonds, the billions of dollars of bonds

6    that were issued, were they issued in violation of that

7    cap?  So, we're asking the targets, GDB, Santander,

8    Banco Popular, for their documents regarding that

9    issue.

10        And, you know, there'll be e-mails that say,

11   Hey, we can't issue this, this exceeds the cap.  Well,

12   let me tell you what we're going to do, we're going to

13   create a new structure, which is not going to be in the

14   Commonwealth, we'll call it COFINA, and that will allow

15   us to bypass -- I'm making this up, Your Honor.  I'm

16   not saying there is such an e-mail.  I'm giving that as

17   an example.

18        THE COURT:  Thank you.

19        MR. DESPINS:  So, obviously, that is very

20   targeted, very relevant.  And the 15 percent cap is an

21   example.  There are many other provisions that are at

22   stake here.  So, you know, clearly there are two things

23   there.  It could affect the validity of that debt.  Of

24   course that's very important.  If there are billions of

25   dollars of debt that are not valid, that's -- people

1      need to know that.  That's one thing.

2           And, second, if in fact people were involved in

3      doing this and were getting paid billions -- this is

4      not an exagger -- billions of dollars in fees to

5      structure these transactions, their potential claims, I

6      emphasize the word "potential" because we don't know,

7      we don't know the facts -- or we don't know all the

8      facts, but there are potential claims against these

9      people, and obviously, that's also critical, and that's

10     the subject of this investigation.

11          So, that's just one of the examples that

12     Your Honor -- and I think that those are -- how shall I

13     say this?  If there are a lot of documents responsive

14     to that, then I think that the targets have problems,

15     if you know what I mean.  So, I think that it may sound

16     broad -- and, by the way, I want to be clear, we're not

17     here to argue scope and --

18          THE COURT:  Well, I have to say I know that

19     you're not, but I think that, under the good-cause

20     standard, I think there have to be some parameters, and

21     there have been very serious challenges to, Where do

22     some of the statements made in your briefs go?  You

23     know, are they more -- will they actually lead, or

24     potentially lead, to anything that benefits the estate,

25     or are they more political statements?  And I want to

1    make sure that we're dealing here in a fashion that

2    will move the whole process forward and not get bogged

3    down in a discovery dispute.

4         So -- and I think part of that has to do with --

5    you started off by saying, Is there good cause?  You

6    know, you need to establish good cause, and it has to

7    be good cause for what; right?

8         MR. DESPINS:  Yes.

9         THE COURT:  So, I think that maybe in this case

10   we need a little more specificity up front than in some

11   other more finite investigations, maybe phases, maybe

12   progressive discovery.  I don't know.  And those are

13   the kinds of things I would like to explore in addition

14   to recognizing that there's an argument that there

15   shouldn't be any examination at all.  So, I guess what

16   I'm telegraphing here is that I want discussion on

17   both, you know.

18        MR. DESPINS:  Okay.  So -- and I will do that,

19   Your Honor, I'll endeavor to do that.

20        So, putting aside for a second the issue of

21   whether we should stand down for the Oversight Board,

22   I'll come back to that, obviously, but I think the

23   issue of cause is easy because the Board issued a press

24   release saying, We need to investigate this, and their

25   press release is as broad or broader than what we're

1    seeking.  So, it's very hard to say on the one hand

2    that they recognize that this needs to be investigated,

3    it's fundamental.  And by the way, the targets say the

4    opposite, they just say, Don't let him investigate us,

5    have the Board investigate us.  So, I think --

6         THE COURT:  Well, you've stated, you've argued

7    that your investigation is broader than any

8    investigation that the Board would do.

9         MR. DESPINS:  No, that's not correct.  What we

10   argued is that statutorily we are granted broader

11   powers to investigate than what they have.

12        So, let me take you through you that.  They have

13   a section, they're relying on 104.0, and 104.0 of

14   PROMESA says that they may -- it doesn't say shall --

15   may investigate the disclosure and selling practices in

16   connection with the purchase of bonds issued by the

17   covered territory for or on behalf of any retail

18   investors; okay?  So, we're talking about disclosure

19   and selling practice to retail investors.  That is very

20   narrow in terms of a grant.  That's the argument we've

21   made.  And if you compare that to what we're entitled

22   to look at, which is the act, conduct, assets and any

23   matters relevant to the formulation of a plan, that is

24   as broad as you can get.  That was our argument.

25        I think they want to occupy the entire

1    territory, meaning of what we want to do, but what I'm

2    pointing out, and if we didn't do that well, I

3    apologize, but what we tried to point out in our reply

4    is that statutorily their grant is narrow, retail

5    selling practices and disclosures, compared to our

6    mandate, which is almost unlimited because it talks

7    about the conduct, assets and any matters relevant to

8    the formulation of a plan.

9         So, for example, the two examples that I give

10   you, Is the issue of whether some debt is valid or not

11   relevant to the formulation of a plan?  Absolutely.  Is

12   the issue of whether debt is valid or not covered by

13   retail selling practices?  I'm not so sure it is.  So,

14   that's very important, to go and to compare the two

15   statutes.  What we said is that we have a much broader

16   mandate.

17        But, Your Honor, I think that the only way -- I

18   did say that I didn't think today would be the day to

19   go into too broad -- you know, how many people are we

20   going to search, but I hear you, and I think that, if

21   we go through our document requests, other than the

22   fact that, from the time point of view, they sound

23   huge, and it's because the first time COFINA was

24   created was in 2006, so I apologize for that.  That's

25   the way the facts are, and yes, so from 2006 through

1    2014 is a long time, we understand that; and,

2    therefore, you may look at that and say, My god, this

3    is too broad, but that's -- you know, we're stuck with

4    those facts.  If they had finished in 2014, they would

5    be much narrower.  If Your Honor has concerns about

6    that, I hear that.

7         But there's one thing you said that actually

8    troubled me a little bit.  You mentioned political, and

9    if one thing I'm not, it's political, and people know

10   that and to my great disadvantage, and the Committee is

11   not a political animal at all in the sense that they

12   are looking at this, and it's not driven by any

13   political agenda; it's just the fact that these issues

14   do exist.

15        And by the way, in Detroit, the same issue about

16   the validity of some Detroit debt was raised, was

17   raised by the Debtor itself.  Detroit itself challenged

18   the validity of debt it had issued.  So, I just want to

19   make sure you know, so we're not completely crazy, this

20   was done in Detroit as well.

21        THE COURT:  And I don't want to be

22   misinterpreted.  I want to just make sure that what

23   we're doing here stays in the confines of what's

24   appropriate under the PROMESA statute.

25        MR. DESPINS:  Absolutely.

1    THE COURT:  That's where I want to be.  And I

2    recognize -- you started off by saying this is on the

3    front page of the paper.  I recognize that, but we're

4    here to deal with it within the confines of the law --

5    MR. DESPINS:  Yes, Your Honor.

6    THE COURT:  -- and statute.

7    MR. DESPINS:  But what I said is that it's very

8    important not because it's on the front page of the

9    newspapers.

10   THE COURT:  I recognize that it is important.

11   MR. DESPINS:  But it is on the front page.  We

12   can't ignore that dimension.

13   So, my point on the issue of, Should we be told

14   to stand down, there are tons of cases, I won't bore

15   you with them, but there are tons of cases that say,

16   No, you don't have to stand down.  And I have not heard

17   one to the contrary.

18   But let's assume for a second that

19   Mr. Bienenstock comes up with a case, a recent Supreme

20   Court decision from last week that says that.  These

21   are cases involving an examiner who is appointed by the

22   US Trustee and the Court, and it was answerable to no

23   one other than the Court.  This is not what we have

24   here.  What -- meaning -- I joke, I said it's kind of a

25   god-like creature because that person writes a report

1    and is not answerable to anyone.  In this case, that's

2    not what they're proposing.  They're proposing to hire

3    someone, a regular person, who will do an investigation

4    and report to this Board.  And, therefore, this

5    argument that we need to stand down is certainly not as

6    compelling as those cases.

7         And even if they said what he -- but they don't.

8    These precedents show that the Courts did look into

9    this, and I mention Judge Drain, but I think it's

10   really, Your Honor, two sentences.  Basically the Judge

11   said, "And, consequently, I can't ignore the fact that

12   we should not hamstring the Committee's separate and

13   independent obligation to investigate."  And this is in

14   response to US Trustee's attempts to shut down the

15   Committee in the *Refco* case.

16        So, now, let's -- so we've been through the

17   cases, and I think that we've been through 104 as well.

18   But let's now go through through the issue of, Okay,

19   the Board wants to do this -- by the way, I want to be

20   clear, we're not trying to stop this.  I hope this came

21   through clearly.  They can do whatever they want.  We

22   have no power to stop them.  They have the power to do

23   whatever investigation they want to do.

24        And I would say -- it's very important to say

25   this:  The Board members deserve kudos for the free

1    work they're doing.  They're volunteers, and we don't

2    take lightly criticism that we make of them in certain

3    cases because these people deserve a lot of credit for

4    spending all of their time on a volunteer basis to try

5    to fix this situation.  I want to make sure that's

6    clear and that there's no allegation of lack of

7    integrity, for example, on the part of Judge Gonzalez.

8    That's not the issue at all.

9         But we have to step back and look at the facts,

10   which is that they, in this instance, did not

11   distinguish themselves.  And what I mean by that is --

12   let's look at the first thing.  They have the power to

13   investigate this from day one.  Of course I'm not

14   saying they should have started on day one, but a year?

15   That's a long period of time.

16        And even if you're tempted to -- you might say,

17   Well, they've been very busy, and that's a very good

18   point.  But they're not going to get less busy; they're

19   going to get busier going forward, so that argument

20   about being busy doesn't cut it.  And if that were the

21   only point, I would sit down, Your Honor, but it's not

22   the only point.

23        They approved, in May, 2017, what I call the

24   form of subpoenas, procedures to investigate, so -- and

25   you might think, Wow, that shows you they want to go

1    forward.  But that was in May.  And, Your Honor, one

2    has to think about what happened at that meeting,

3    meaning they approved the form, presumably it's because

4    they wanted to do an investigation, but what happened

5    since then, until we filed our motion?  Nothing.  And

6    also presumably at that point, somebody said or should

7    have said, Hey, pointing to counsel, local counsel or

8    counsel for the Board, can you guys help us with this

9    investigation?  And presumably the answer, if that

10   question was asked, was, No, we can't, one counsel

11   wrote the opinions on these deals and represents

12   Santander, another counsel represents Santander on

13   other matters.

14          So, do I know that these discussions take place?

15   I don't know, Your Honor.  My point is, if they didn't,

16   that's really troubling because that was in May, and if

17   somebody said, No, we can't do it, then they should

18   have said, Let's hire somebody else right now.  But we

19   know now that, after we filed our motion, that's the

20   first thing that they did, to go and retain somebody

21   else.  So, that's the first point.

22          And the second point is that, in June,

23   Your Honor, you know, before we existed, meaning the

24   Committee did not exist, the motion did not exist,

25   Mr. Carrion came out of an Oversight Board meeting and

1  is quoted -- he doesn't dispute that -- as saying,

2  "It's a waste of time to do this investigation."  He is

3  the Chairman of that Board.  And you might say, Well,

4  it's just a declaration.  Who cares?  But the point is

5  that, again, two things happen:  Either other people

6  disagreed with him on the Board and said, No, we really

7  care about this, in this case, I don't know why that

8  wasn't expressed at all; or they did agree with him and

9  waited until we filed our motion to say, You know what,

10  we need to do something here because the Committee will

11  control the territory, and we don't want that to

12  happen.  And that's exactly what happened here.

13          And the last thing they did, Your Honor, is they

14  said, after we filed the motion, they said, Okay, now

15  we're going to do it, and they formed this Committee,

16  and the Committee is comprised of Mr. Carrion.  And,

17  again, two days after I meet with them and tell them,

18  How could you put Mr. Carrion on this Committee, given

19  that his father was on the Board of Banco Popular, that

20  his family founded the Bank, et cetera?  Mr. Carrion

21  resigns.  Okay.

22          So, you might think, Well, now they're okay.

23  But, Judge, the point is the Committee looks at this

24  and says, It's not because they have un-pure hearts,

25  that's not the point; the point is that they are really

1   busy with other things, and they're really not

2   motivated to do the investigation.  They're doing it

3   because we pushed them into it, which is not our role.

4   We're not interested in playing that role.

5          And that's why the Committee should not be told

6   to stand down, because we have no idea what could

7   happen, meaning they'll -- and here I want to draw on

8   your experience, Judge.  Let's assume today nobody's

9   been retained -- right? -- there are no professionals

10  retained for this investigation.  That's number one.

11  So, they need to retain those people.  That's going to

12  take some time.  I'm not going to try to guess, but

13  it's going to take some time.

14         They're going to have to do conflict checks,

15  waivers and all that.  Good luck, by the way, finding a

16  law firm in Puerto Rico that doesn't have a conflict

17  with Banco Popular and Santander, but putting that

18  aside, let's assume they do that.  Once they have that

19  team, it's going to take that team some time to get up

20  to speed, and then they're going to have to serve

21  subpoenas.  And Banco Popular and Santander are not

22  going to say, Oh, sure, come and get whatever documents

23  you want; they're going to be back right here, and

24  there's going to be some back-and-forth.

25         The point I want to draw, Your Honor, that's why

1    I want to draw on your experience on this, does anyone

2    believe they will get any documents out of Banco

3    Popular and Santander before January 1st, 2018?  I

4    don't buy that for a second because they're so far

5    behind.  And so you might say, So, who cares?  Well,

6    the Committee cares because we don't care about the

7    report, meaning if they want to issue that report in

8    2020 that nobody will write, that's their prerogative.

9         But there are things happening in the case.  You

10   heard this morning about this mediation.  We can't talk

11   too much about it, but as you know, that it's going

12   full bore, and the purpose of that mediation is not to

13   resolve the case in 2020; it's to resolve it

14   tomorrow -- I'm exaggerating -- you know, soon.

15        THE COURT:  Tomorrow would be good.

16        MR. DESPINS:  Well, tomorrow would be good.

17        THE COURT:  What timeframe are you thinking of?

18        MR. DESPINS:  Well, we already have the document

19   requests, meaning if Your Honor authorized us to do the

20   2004, we could have the meet-and-confer with Banco

21   Popular and Santander in the next two weeks, and I hope

22   we would agree on something, but if we don't, we can go

23   back -- we can be here by the first week of September,

24   and at that point they've had the document production

25   requests for a good two months, so it's not like they

1    can say they need two months to produce that.

2              THE COURT:  Well, we can assume that they're

3    going to tell me that they haven't done their document

4    search yet.  So, if you were going to start today, how

5    long would you contemplate?

6              MR. DESPINS:  I think we can easily have

7    documents from them by the beginning of October, not

8    all the documents but some documents.  And that's

9    crucial, Your Honor, because -- I'll give you an

10   example.  This is Docket No. -- in this case, it's

11   Docket No. 1056.  It's a 2019 statement, which

12   reflects that Santander has 2.5 billion in Commonwealth

13   bonds, $2.5 billion.  This is not a random number.

14   $2.5 billion.  So, these bonds may be all good.  I

15   don't know.  My point is that, clearly, this

16   investigation is relevant to that at the very least, so

17   I don't know how we're going to, you know, not get

18   documents until January and actually try to resolve the

19   case without addressing these issues head on.  And how

20   do we really deal with the case without knowing what

21   debt is valid?

22             THE COURT:  And that's my other question.  When

23   you raised the issue of the Constitutional debt limits,

24   is that being raised in any of the other adversary

25   proceedings?

1    MR. DESPINS:  That's a tough question because

2    there are 25 adversary proceedings.

3    THE COURT:  Yes.  That's why I'm asking you.

4    MR. DESPINS:  I'm at a pause for --

5    THE COURT:  Because I think, in this case, it's

6    not only coordination with any other investigation that

7    might be going on outside of the parameters of the

8    Title IIIs, but it's also coordination with what's

9    going on in connection with the numerous cases that

10   are --

11   MR. DESPINS:  That's a very good question, but

12   I -- it's always dangerous to answer a question like

13   this on the fly, but there are a bunch of

14   Constitutional issues that are being raised, for

15   example, by the GIO bonds in a lawsuit, that they want

16   to be deemed -- that was just transferred, Your Honor,

17   yesterday or the day before -- they want to be deemed

18   to be secured or have priority based on the

19   Constitution.

20   But that doesn't raise the issue of whether some

21   of their bonds are not valid because of the 15 percent

22   cap.  To my knowledge, I don't think that the issue of

23   Constitutional -- of violating the Constitution -- or

24   validity of a certain debt instrument I don't believe

25   has been hit head on to date, but people will correct

1      me if I'm wrong on that.

2            So, from a timing point of view, there is just

3      no way that this -- that we cannot deal with this

4      immediately, Your Honor.  Let me just -- sorry.

5      Flipping through my notes here for a second.

6            THE COURT:  In addition to the Constitutional

7      limits, if you were going to characterize your

8      requests, what other topics would you -- how would you

9      divide it into different topics?

10           MR. DESPINS:  Well, there is the issue of the

11     validity of the COFINA structure.  That's number two.

12     And that has many implications, Constitutional and

13     non-Constitutional, meaning, Why was COFINA created?

14     We know that, at that time, the Commonwealth was

15     hitting a wall, basically could not borrow any more in

16     2005 and 2006, and somebody came up with the idea of

17     creating COFINA.  How was that created?  Why was it

18     created?

19           THE COURT:  And that's in the context -- that's

20     also going to be the Unsecured Creditors' Committee's

21     investigation in the Commonwealth-COFINA dispute;

22     right?

23           MR. DESPINS:  Yes, and I'll -- yes, but it's

24     two -- it's hitting one bird with -- yeah -- two birds

25     with one stone -- sorry -- because there is that

1    investigation, which is, if in fact we can challenge

2    the COFINA structure, we will.  And so that's one

3    issue.

4        But the second issue is, if people were involved

5    in creating a structure that was designed to avoid some

6    law or Constitution in Puerto Rico, there should be --

7    or there could be claims asserted against these

8    entities that then turned around -- I'm not saying this

9    happened, but it could have happened -- turned around

10   and just sell those bonds to other parties.

11       So, the same e-mail can have two purposes:  One,

12   to be used in the adversary -- in the litigation

13   between Commonwealth and COFINA; and, two, to be used

14   to determine the validity of some of the claims of

15   these entities or whether there are claims against

16   those entities with respect to fees that were paid by

17   GDB or the like.

18       So, it's two separate issues.  And that's one of

19   the points we're making, which is the Oversight Board

20   took itself out, you know that, of the

21   COFINA-Commonwealth dispute, so they're out of that.

22   So, they -- because they're the agent for the

23   Commonwealth and Bettina-White is the agent for the

24   COFINA side, and the work we're going to do to review

25   that structure will be -- as I said, will have double

1    duty, meaning to look at whether there was some bad

2    conduct by people knowing that these transactions

3    should not have been done but also to determine whether

4    transactions are valid or not, so that -- and the

5    Oversight Board would only have single duty on that

6    type of discovery, and that's why we think we should be

7    allowed to go forward.

8          Then, I would say, Your Honor, even if the Court

9    were inclined to deny the 2004, which I think would be

10   very troubling to us, but if you're inclined to deny

11   it, we would still be entitled to get from Santander,

12   Banco Popular and GDB all the documents relevant to the

13   COFINA transaction because that litigation is -- not

14   the litigation, but that issue is teed up, it's a live

15   issue, and there's no argument that the Oversight Board

16   will say, No, we'll write a report on that.  The

17   Oversight Board is not going to write a report on the

18   validity of the COFINA structure.  They can't.  They

19   took themselves out of that by --

20         THE COURT:  But then I run into the principle

21   that, if the same discovery is being sought in an

22   adversary proceeding, it seems to be a pretty bright

23   line about having the discovery at least be governed by

24   the Rules of Civil Procedure for that category.

25         MR. DESPINS:  Your Honor is correct to the

1    extent that the target of the discovery is the

2    Defendant in that other proceeding.  So, I'll give you

3    an example.  If we were suing Santander tomorrow, let's

4    assume, you know, for some reason the Oversight Board

5    says, Okay, we'll give you the right to do that, we're

6    suing them tomorrow, we cannot seek 2004 discovery of

7    Santander in that context.  That's hornbook law.

8    That's what you just stated.

9          However, that's not what's happening here.  In

10   the context of the Commonwealth-COFINA dispute,

11   Santander and Banco Popular and GDB are not Defendants.

12   The Defendant is an entity called the COFINA because

13   the litigation will be over the issue of who owns that

14   money that's either COFINA or that could be deposited

15   in COFINA in the future.

16          So that -- the cases -- and we cite a decision

17   by Judge Walrath in -- I forgot the name of the case.

18   It involved insider trading.  It'll come back it me.

19   But we cite this case for that very proposition, which

20   is the Defendant has all the rights to say, Wait a

21   minute, I'm a Defendant in a litigation, you cannot

22   issue 2004s to me.  But Banco Popular and Santander and

23   GDB will never be Defendants in the COFINA-Commonwealth

24   litigation.  That litigation will have two parties, the

25   Commonwealth and COFINA.  The others are just

1    third-party targets, and they --

2         THE COURT:  But you would seek discovery from

3    them in the Commonwealth-COFINA --

4         MR. DESPINS:  Correct.  And, by the way, just so

5    you -- the party that could complain about this would

6    be the lawyer sitting right here who's the lawyer for

7    the COFINA agent, but they're happy to have us get the

8    documents because we've put in the proposed order that

9    they will get whatever we get from Santander, Banco

10   Popular and GDB on the COFINA dispute.  They're going

11   to get that directly, so there's not going to be any

12   games here at all.  Therefore, the only party that

13   could have an argument about this is not arguing this

14   because we put that in the order, that whatever we get

15   on the COFINA-Commonwealth dispute, we have to give to

16   them immediately.

17        THE COURT:  And is there any significance to the

18   fact that the Board's investigation would have to be

19   made public and yours does not?

20        MR. DESPINS:  No.  Actually, I'm glad you raised

21   that because it shows why other Courts have allowed

22   both to go forward at the same time, because, I mean,

23   objectively you might look at that and say, Wait a

24   minute.  Two investigations going on at the same time,

25   that sounds a bit too much.  But the reason why Courts

1    do that is because there are different goals here.

2         Their goal, they're mandated by Congress to make

3    their report public.  We have no such duty.  Our job is

4    to maximize recovery for unsecured creditors, and

5    therefore -- let me give you some concrete examples.

6    In *Enron*, for example, we conducted 2004 discovery of a

7    bunch of targets and got billions of dollars in claims

8    reduction or affirmative recovery against them.  At the

9    same time, the examiner was writing his report, but two

10   different, completely different roles, and that's why,

11   you know, I think Judge Gonzalez said it's the nature

12   of the beast in a sense that that's why Courts allow

13   the two to go forward.

14        And even for -- assuming for a second that we

15   find nothing, I'm not saying that's the case, but let's

16   assume that we do the investigation and there is no

17   problem, everybody is squeaky clean, and all these

18   billions were properly paid and all that.  The

19   investigation still needs to be done because we need to

20   know whether there's a challenge to their claims

21   because, as you can see, there are billions of dollars

22   of claims asserted by some of these entities; and also

23   in terms of -- that's the other point I make is that

24   2004 is not only to assert claims, this is very

25   important; it's also to the extent it involves or

1    affects the administration of the case, and what do I

2    mean by that?  We said that in our reply.

3         The Commonwealth does not have cash; it has some

4    cash, but it doesn't have $75 billion of cash; right?

5    Otherwise, we wouldn't be here.  What it has is future

6    income, and it can give that to creditors in the form

7    of bonds.  The future bondholders, the creditors we

8    represent who are going to take bonds or indebtedness

9    from the Commonwealth deserve to know, they need to

10   know whether there were any, for lack of a better term,

11   shenanigans going on or whether the same people are

12   still involved in that context.

13        THE COURT:  Then, how do they get that

14   investigation information if your investigation isn't

15   public?

16        MR. DESPINS:  It's not that we're precluded from

17   making it public because I'll give you an example.  If

18   we found -- I want to be clear here, there's no basis

19   to say this, but if we found that people who were

20   involved in the construction of the structures that

21   were illegal or that they knew were illegal are still

22   involved, I guarantee you that we would file something

23   with the Court to say that.  It's not because we don't

24   have an obligation to be public that we would not make

25   it public, but I know that creditors want to know who

1    they're dealing with, what the issues were, and the

2    problem is that the Board may not get to write its

3    report for several months.

4         And by the way, I want to be clear, I can't

5    blame them.  They're charged with saving the Island  --

6    I'm exaggerating slightly -- but to revitalize the

7    economy, to come up with a plan of adjustment.  They

8    have a lot of things on their plate, and that's where I

9    started, and that's where I'll end, Your Honor, subject

10   to a short reply in the end, which is that they are not

11   motivated or they don't have the tools now to do this,

12   and -- to do this investigation, so if they want to do

13   it and they do it on their own schedule, that's fine;

14   but there are too many things going on now for them to

15   handle this and an investigation that's, frankly,

16   overdue at this point.

17        Thank you.

18        THE COURT:  Thank you.

19        MR. FRIEDMAN:  Your Honor, good afternoon.

20   Peter Friedman on behalf of FOF and the Government

21   Development Bank of Puerto Rico.

22        I cannot emphasize enough that neither the

23   Committee nor Mr. Despins speak for the people of

24   Puerto Rico, which is how Mr. Despins started.  The

25   people of Puerto Rico are spoken for by their

1  Government and the Oversight Board, which was appointed

2  pursuant to PROMESA.  The Committee is not an ombudsman

3  or a roving party to spray pledge into every portion of

4  the Government's conduct.  That's not its job, it's not

5  its responsibility.

6        Now, one thing you did not hear anything about

7  was cost, the cost in the cases Mr. Despins mentioned,

8  *Enron*, *Washington Mutual*, *Refco*, *Lehman Brothers*,

9  et cetera, *Caesars*, it's hundreds of millions of

10  dollars to conduct investigations, and that money

11  goings into lawyers' pockets, including a FOF's lawyers

12  pockets.  Where won't it go?  It won't into two places.

13  It won't go into creditors' hands, and it won't go into

14  the people of Puerto Rico's expenditures going forward.

15  And that's just not acceptable, for that money to be

16  spent on a duplicative investigation because of course

17  that's what it'll be.  Now, also --

18        THE COURT:  Isn't that -- I mean, the Board's

19  investigation hasn't started yet, though; right?  So,

20  isn't the -- I'm concerned about the costs.  Let me

21  make that very clear.  I am concerned about the costs,

22  and I am concerned about making sure that people have

23  the time to devote themselves to the issues that need

24  to be resolved here.

25        On the other hand, I'm very aware of the need or

1    the ability of the Committee to conduct investigations

2    to see if there are appropriate other avenues to

3    pursue.  It's a balancing act.

4         But when you tell me cost, I don't have anything

5    going forward right now, so it seems to me it's a lot

6    in your control as to sort of where that cost gets

7    incurred.

8         MR. FRIEDMAN:  From FOF's perspective and the

9    Government's perspective, it's not at all in our

10   control; right?  We have the Oversight Board conducting

11   a statutorily designed investigation under 104 of

12   PROMESA.  I'm not sure it even needs 104 of PROMESA.  I

13   think, as a debtor's representative, it also has the

14   right to pursue any claims that belong to the debtors

15   well before the Committee ever gets the opportunity to

16   pursue those claims.  So, from FOF's perspective, one

17   investigation we recognize the need for, and that's --

18   that ought to be in the hands of those to whom Congress

19   specifically gave that responsibility.

20        And I note, Your Honor, that this is not a

21   typical Chapter 11 case, and the purposes of this case

22   are different; right?  This case, unlike a Chapter 11

23   where you have, you know, necessarily marshaling of

24   assets, that's not what this is about; and the cases

25   we've cited in our papers make really clear what a

1    Title IX -- or Chapter 9 or a Title III case is

2    supposed to be about, which is about maintaining the

3    balance of public services between creditors and a body

4    politician and a governmental entity.  Those appear in

5    our papers.  And that's what this is about.

6          So, you know, it's not about the kind of

7    investigation that you might typically have, and in

8    fact none of the cases cited involve a public entity.

9    I will note that, for example, though, Chief Judge

10   Morris of the Southern District of New York Bankruptcy

11   Court did, in *Dinegy*, let only one investigation go

12   forward when an examiner had been appointed and refused

13   let the creditors' committee tag along or conduct its

14   own investigation because she was so concerned about

15   cost issues.

16          And so, in fact I think that, for at least

17   purposes of this, both in terms of PROMESA 104 and the

18   Oversight Board's general powers, I think it's probably

19   most appropriately analogized to a trustee.  And when

20   you look at the *Buick* case, which we cite in our

21   papers, what did the Court say?  It said, "Rule 2004

22   investigations shouldn't be used to interfere with the

23   powers of a trustee."  And that's precisely what would

24   be done here.

25          Now, we don't have -- and, by the way, the

1    fishing-expedition cases that were cited, *Young*, *Suk*

2    and others, something was missing, and what's missing

3    is the extensive discussion in those cases, which the

4    Court hit on, which is that good cause is a balancing

5    test, and you measure the intrusiveness and the expense

6    against the benefit.  And Mr. Despins, you know, I

7    think tried to characterize as best he could the

8    document requests that the Committee has served as

9    narrow, but it's just not true.

10        Request 14 to GDB requests all communications

11   between GDB and Banco Popular and Santander since

12   2006, all documents concerning the claw-backs,

13   documents about the credit worthiness of the

14   Commonwealth, documents about -- you know, concerning

15   COFINA and the COFINA structure.  That's not narrow,

16   that's not circumscribed; that's massive.  That's

17   designed to impose massive burdens and run up massive

18   fees.  And so it's just not right to say that there's

19   any effort at a narrow -- at this being narrow.  And,

20   by the way, when you look at requests like all

21   documents concerning COFINA, I do think you run head on

22   into the parallel proceeding doctrine that the Court

23   discussed.

24        Now, if the point is that the COFINA agent has

25   already agreed that it will not seek different

1   documents or isn't going to try to whipsaw us with

2   specific requests in that matter, then, you know, we

3   can discuss, as the FOF and GDB, we can discuss those

4   requests in the context of a proceeding that has not

5   yet been started but we know will be soon starting.

6   We're happy to sit down with Counsel for the agents --

7   for the Commonwealth and the agents.

8           THE COURT:  Do you want to speak right now?

9           MR. SEIDEL:  I will await him.  Martin Seidel

10  from Willkie Farr & Gallagher.  We appeared, filed our

11  notices just yesterday, but we're Counsel to the COFINA

12  agent.  And I've now been spoken for twice by people

13  I'm not sure I'm prepared to have speak for me.

14          THE COURT:  So, have a seat.

15          MR. FRIEDMAN:  That's my point.  I can't speak

16  for Mr. Seidel.  What I can say is, though, that a

17  single set of requests -- we can't be whipsawed, and

18  that's what a unilateral commencement of Rule 2004

19  process on COFINA-related issues outside of the context

20  of actual litigation would do to us, which -- in any

21  event, litigation which we know to be coming.

22          Your Honor, I think that, in some ways, the

23  most -- or the best analogy to this is probably the

24  *MF Global* where the -- and it's not perfect; right?  In

25  some ways it's apples and oranges, but apples and

1    oranges both drop to the ground and both grow on trees

2    and both have juice if you squeeze them, so there are

3    some similarities.

4         And that's why there's a single trustee who's

5    given specific powers to do things and to look into

6    things and to report and to bring appropriate causes of

7    action, and there's no doubt that, if the Board chose

8    to, it could exercise that power here.  And the Court

9    said, Look, Judge Glen said, Look, there's a structure,

10   there's a statute in place that gives certain people

11   powers, and that's the horse we're going to ride for

12   discovery, and we're not going to allow 2004 discovery.

13   It's not a perfect analogy because that wasn't a -- I

14   don't believe that was a creditors' committee seeking

15   discovery, and I recognize there's things somewhat

16   different about a creditors' committee, but I think the

17   larger point is the important one, that the powers that

18   the Oversight Board has are important.

19        And, again, it is not correct to say, as was

20   alleged in the papers, that FOF or GDB support the

21   Oversight Board to do an investigation because we think

22   the Oversight Board will be lenient.  We don't.  We

23   expect them to be unsparing in whatever conclusions

24   they reach.  We just do not want to have to pay for it

25   twice.  I think that's the issue.

1        And, you know, is there some method or mechanism

2   proposed by the Oversight Board in its motion that

3   would permit the Committee to have some ability to look

4   at documents and submit questions or read transcripts

5   that might keep costs down while still letting the

6   Committee have some sense of what's going on?  You

7   know, I don't think we can object to that.  You know, I

8   think the Oversight Board made a proposal, and you

9   know, while I would prefer -- I know my clients would

10  strongly prefer to have no double-billing, we

11  understand that, that may be somewhat of an appropriate

12  compromise.

13        But two unfettered investigations is just -- you

14  know, has real repercussions when you look at the

15  dollar figures that have come up and -- as you know,

16  Your Honor already heard this morning, our clients are

17  constantly subject to mediation, as I think you know

18  because you got a list of them the other day, there's,

19  I mean, literally 19 adversary proceedings plus one

20  filed this morning.  I assume that may be referred to

21  you soon.  People have also jobs to do and, you know,

22  so balancing --

23        THE COURT:  But I solved all your problems this

24  morning.

25        MR. FRIEDMAN:  Thank you, Your Honor.

1    Hopefully, some of them will be solved again this

2    afternoon.  And so -- but, you know, it's a real issue

3    as to how we do that.  And I do think many of the

4    issues in discrete ways that are listed in this

5    document request may come up in different adversary

6    proceedings or in plan-confirmation proceedings, and if

7    they do, so be it.  But the fishing-expedition nature

8    of this is not justified under the good-cause standard.

9            THE COURT:  Can you tell me the scheduling of

10   the Oversight Board investigation?

11           MR. FRIEDMAN:  I can't, Your Honor.  I think

12   Mr. Bienenstock can speak to that.  And obviously, you

13   know, we'll work on that, and, you know, we'll address

14   with them how to move forward in an appropriate manner

15   on -- you know, on a schedule that I think balances

16   everybody's needs and particularly the most important

17   need, which is wrapping this case up in a plan

18   that maybe not everybody loves but provides appropriate

19   recoveries without, you know, the need for people

20   writing magnum opuses while the case is pending.

21           So, that's all I have.  I don't know if you have

22   any questions for me, Your Honor, but I'd happy to

23   concede the lectern to Mr. Bienenstock, if he'd like to

24   speak.

25           THE COURT:  Thank you.

1          MR. BIENENSTOCK:  Good afternoon, Judge Dein.

2     Martin Bienenstock of Proskauer Rose for the Oversight

3     Board, as representative of the Commonwealth and the

4     other Title III Debtors.

5          Your Honor, I'm going to try to restrict my

6     remarks to a comment Your Honor made early on, that

7     Your Honor knows there are some special facts that are

8     attributable to this matter, as opposed to the matters

9     that the Committee referred to in other cases.  And I

10    think the facts here and the statute here speak volumes

11    and also make the Court's decision much simpler than it

12    might appear.

13         So, I'd like to start by mentioning some of

14    the facts and laws that go to the big picture.  In

15    Chapter 11, as Your Honor no doubt knows, there are

16    some trustees in some cases, and where there are not

17    trustees, there are examiners in other cases.  When

18    there's a trustee, the trustee is allowed to both

19    operate the business and conduct conduct investigation.

20    When a trustee is not appointed and an examiner is

21    appointed instead, the examiner conducts the

22    investigation but does not run the business.

23         I say that to start because the Committee made

24    the point that, in this case, there's no examiner.

25    Well, that's not right.  Under Section 301(c)(7) of

1    PROMESA, the Debtor is deemed to be the Trustee, and

2    the Oversight Board is the representative of the

3    Debtor, as the Trustee.  It says, everywhere the

4    statute says "Debtor," it should be read -- or

5    everywhere the statute says "Trustee," it's the

6    Oversight Board.  We are the investigator and the

7    examiner.

8         And the issue that the Committee put to

9    Your Honor, whether it should be told to stand down, is

10   not the issue; the issue is whether it should be

11   allowed to stand up, and I don't say that because it's

12   a catchy phrase, which I'm not very good at normally --

13        THE COURT:  It's not a bad one, though.

14        MR. BIENENSTOCK:  -- but there's a significant

15   difference here.  The difference is this:  The reason

16   the Committee is front of Your Honor this afternoon

17   asking for relief and the Oversight Board and

18   Commonwealth are not is that the Commonwealth and

19   Oversight Board are already authorized by PROMESA, in a

20   few provisions I'll mention in a moment, to conduct

21   investigations.  The Committee is not.  The Committee

22   needs this Court's permission to be the second horse on

23   one track.  And the way I would put the issue to

24   Your Honor is whether Your Honor really wants to put

25   two horses on the same track.  It can get a little

1      crowded.

2              THE COURT:  Well, what in PROMESA eliminates the

3      2004 examination by the Committee?  I mean, that's the

4      problem.  You know, it's incorporated some provisions

5      and not others.  It doesn't eliminate this examination.

6      I mean, it doesn't say, You don't have this authority.

7      I have these bankruptcy rules that exist and are

8      enforceable in the context of PROMESA.

9              MR. BIENENSTOCK:  Right.  So, let me just start

10     by giving you the Oversight Board's authority, and then

11     I'll get to the Committee's contingent authority.

12             THE COURT:  Okay.

13             MR. BIENENSTOCK:  The Oversight Board's

14     authority is not what the Committee represented to

15     Your Honor a few moments ago, which is that we have the

16     narrow scope of investigation set forth in the PROMESA

17     Section 104.0 relating to selling practices of the

18     various banks of the Commonwealth's debt.  That is one

19     investigation that Congress singled out.

20             But to look at the Oversight Board's authority,

21     Your Honor would have to start with Section 104(a) of

22     PROMESA, which says, "The Oversight Board may hold

23     hearings, sit and act at times and places, take

24     testimony and receive evidence, as the Oversight Board

25     considers appropriate."  One cannot have a broader

1   charge to investigate anything that seems appropriate

2   than that.  And the 104.0 that the Committee points to

3   is simply one sub-set of the items that the Oversight

4   Board may investigate.

5        It is truly extraordinary, Your Honor, as

6   compared to the Bankruptcy Code, for PROMESA to

7   constitute the Oversight Board as an investigatory

8   body.  It literally says to the seven members, You may

9   sit and hold hearings, you may issue subpoenas, you may

10  take testimony, you may get documents, you may enforce

11  your subpoenas.  That's -- Congress could not have sent

12  a stronger message that it meant for the Oversight

13  Board to investigate.

14       Now, to answer Your Honor's question, What about

15  the Committee, the bankruptcy -- or PROMESA, as

16  Your Honor knows, incorporates the bankruptcy rules,

17  which include 2004, and the key to Rule 2004 is very

18  simple.  It's not self-operative; Your Honor has to

19  authorize it and to make the -- that's why I said the

20  issue is whether they get to stand up today.  And to

21  determine whether Your Honor should do that today, one

22  has to take into account the facts and circumstances of

23  the case and what Congress intended to happen.

24       There can be no argument that Congress did not

25  intend for the Board to conduct this investigation.

1    For gosh sakes, it empowered it to do it with powers

2    that no other board in bankruptcy has ever had before,

3    to our knowledge.  So --

4         THE COURT:  But it doesn't require it, does it?

5         MR. BIENENSTOCK:  No, it's not required.  The

6    Board is given a lot of discretion, but the Board in

7    this case has gone public and has basically said it has

8    exercised its discretion to do it.

9         And just as in the COFINA-Commonwealth dispute,

10   while the Board could have simply imposed a proposed

11   settlement and brought it to the Court and said, Please

12   find that it's in the zone of reasonableness, which is

13   the bankruptcy standard for approval of settlements,

14   the Board decided that, for the good of the process,

15   transparency, et cetera, there would be a Commonwealth

16   agent who we made the Committee and a COFINA agent who

17   the COFINA creditors decided on and the Board approved.

18        The Board, nevertheless, reserved in that

19   protocol the right, at any time, to do its own

20   settlement and to propose plans of adjustment.  But the

21   Board believed that, for the good of the process, and I

22   believe Judge Swain, at the first hearing, encouraged

23   this, encouraged us to defer to other agents selected

24   by creditors so that people would have confidence that

25   the COFINA-Commonwealth dispute was not being biased in

1   any way because Congress made the Board the

2   representative of COFINA but also made it the

3   representative of the Commonwealth, so we were on both

4   sides.

5          The investigations we're talking about here have

6   none of that.  These are investigations to determine

7   causes of action that the estate may have against third

8   parties -- the Board is not on both sides -- or that

9   creditors may have against third parties that they can

10  independently sue on.

11         Importantly, Your Honor, under bankruptcy law

12  and Supreme Court decisions, the Committee is not

13  allowed to sue in the name of creditors, and in this

14  case, one of the unique facts that I think Your Honor

15  was alluding to, consciously or unconsciously, earlier

16  is Section 305, which says that no one can interfere,

17  including the Court, with a Government's property

18  without the consent of the Oversight Board.

19         So, while, in Chapter 11 cases, committees

20  similar to the ones -- similar to the one here for the

21  general creditors, they often get, under a plan,

22  permission to have derivative standing to sue on the

23  estate's cause of action against third parties, and

24  they do that in the context of some type of litigation

25  trust that goes on after the plan is confirmed.

1    That's not happening here for a very simple

2    reason.  To the extent causes of action of the

3    Commonwealth are identified or of the other debtors,

4    the Commonwealth's instrumentalities, the Commonwealth

5    is not going to cede to a committee the right to

6    interfere and prosecute those.  The Commonwealth will

7    take care of it by itself.  And certainly the Committee

8    cannot be so presumptuous as to assume that the

9    Committee will get any type of derivative standing.

10    The Committee does point in its reply to PROMESA

11    Section 926 where derivative standing can be given, but

12    those are just to avoidance actions, those preferences,

13    fraudulent transfers and the like, which are not the

14    types of actions that people are talking about here, at

15    least for the most part.

16    Now, in my now 40 years of practice, I've heard

17    Judges consistently, without exception, say they don't

18    like to be told about orders in other cases because you

19    have to know what the facts were in the other cases to

20    make sense of the order.  That is probably illustrated

21    ideally here, unfortunately.  For instance, the

22    Committee says, Look at the order in *Enron* where the

23    Committee and an examiner and *Enron* itself could all

24    conduct investigations simultaneously.  The Committee

25    didn't give Your Honor a really important fact about

1    *Enron.*  The order appointing the examiner that allowed

2    for these three investigations was a settlement of a

3    creditors' request for the appointment of a Chapter 11

4    trustee.

5         Judge Gonzalez, who was the bankruptcy Judge in

6    *Enron*, did not decide that he wanted three

7    contemporaneous investigations; he was presented with a

8    settlement agreement that, as Your Honor knows, Judges

9    can't write the settlements, the parties have to either

10   settle or not, and they decide on the terms.  So, it

11   was not a judicial decision to allow for

12   contemporaneous investigations; it was the product of a

13   settlement agreement, which was embodied in the order

14   appointing the examiner.

15        And then they point to *Caesars Entertainment*.

16   In *Caesars Entertainment*, the Committee, the General

17   Creditors' Committee, was granted permission to conduct

18   Rule 2004 examinations before an examiner was ever

19   appointed.  And the Committee points Your Honor to the

20   order appointing the examiner, which, upon reading,

21   it's a fair reading of that order, that there were

22   going to be contemporaneous investigations.

23        But, there again, the Committee didn't give

24   Your Honor the most important fact.  After Judge Gerber

25   entered that order, he basically looked at Committee

1    Counsel, which I was one, and he basically said, You'd

2    better sit down with the examiner and agree as to how

3    this is going to unfold, or I will consider things like

4    injunctions.  And what did we do?  What we did was the

5    examiner went forward with both document production and

6    depositions and informal interviews and committed to

7    provide the -- there were two committees -- the

8    documents that it was allowed to provide.  Some were

9    marked with various confidentiality waivings and other

10   things.  We didn't get them all, but we got what the

11   examiner was allowed to give us.

12        So, there were not contemporaneous

13   investigations; there was the examiner's investigation,

14   and the Committees got the benefit of the examiner's

15   document discovery and depositions, deposition

16   transcripts, and some were redacted.

17        As the Retirees' Committee knows, and frankly,

18   as Mr. Despins knows also, we have told both Committees

19   that, as we do this investigation, we do want to both

20   consult with them and share discovery.  We have not

21   made hard-and-fast commitments because we believe that

22   the investigator, which will likely be a law firm, that

23   the Oversight Board retains should be at the table when

24   we make the final arrangements.

25        But overall, we want them both to be consulted

1    during the process, and that includes -- they can feed

2    questions to be asked to different witnesses, they can

3    get the discovery -- the documents we're allowed to

4    give them, and they can make suggestions as to

5    additional documents or witnesses that should be

6    deposed or interviewed.

7         THE COURT:  What's your schedule on this, on the

8    appointment of the investigator?

9         MR. BIENENSTOCK:  We are hopeful that the Board

10   will retain an investigator next week, and the

11   investigator would get to work immediately, and

12   there's -- it was very easy for the Creditors'

13   Committee earlier to talk about production starting in

14   October without the targets being present to object,

15   but there's no reason why whatever the timetable the

16   Committee would have would be any faster than the

17   timetable we have.  And in fact, the Oversight Board

18   basically has more at its disposal under PROMESA to get

19   documents and to compel testimony than they do.  So, we

20   would be no slower; we might be a little faster.

21        THE COURT:  And what's your impression as to the

22   scope of the examination that the Board would do, as

23   opposed to the Creditors' Committee?

24        MR. BIENENSTOCK:  Well, currently, what the

25   Committee have asked for is largely incorporated by

1    104.0 of PROMESA, and the Board is definitely covering

2    that.  But the Board is going to be interested in

3    basically two subjects:  One is anything that might

4    bring material assets to the creditors and the people;

5    and the other is anything necessary to create sunshine

6    about the causes of the losses, taking into account

7    some important factors, Your Honor.  Most of the

8    $74 billion of debt that we're restructuring was issued

9    more and, in most cases, a lot more than three and six

10   years ago, so there are serious statute of limitations

11   issues, except for the transactions in the last six

12   years, and it might be less than that.

13          Also, it's not as if the people of Puerto Rico

14   and most of the world don't know that the primary cause

15   of this situation is prior governments that simply

16   issued debt to fund deficits rather than make

17   structural changes to eliminate the deficits.  And

18   while there might have been improper selling methods or

19   not, that's yet to be investigated, in the context of

20   74 billion of bond debt and 50 billion of unfunded

21   pension debt, whether the cause of action we're talking

22   about can be materially -- will materially impact

23   recoveries is something we're going to find out, but

24   the numbers are so huge, if you compare it to the net

25   worth of Santander and Banco Popular, if you grabbed

1    everything they had in sight, if they have liability,

2    it's not as if it's going to pay creditors in full.

3         So, I think it has to be done -- the

4    investigation has to be done objectively, understanding

5    the upsides and the downsides and that the expense

6    could easily out-do the upsides if it's not done

7    carefully, which the Oversight Board intends to do.

8         The Committee made something of the fact that

9    the Board was appointed on August 31, 2016, and it's

10   now doing the investigation.  I don't know that, that

11   needs defense, Your Honor, but some facts ought to be

12   on the record in that connection.

13        The Board has certified fiscal plans for the

14   entire Commonwealth as well as several of its main

15   instrumentalities.  The Board did not have an Executive

16   Director and even a General Counsel until well into

17   2017.  The Board hired its first Deputy General Counsel

18   only in the last two months.  The Board now has a staff

19   to help the Oversight Board members who,

20   notwithstanding that they were uncompensated, were

21   working frequently as close to 24/7 as one can work,

22   and that included -- and this is something I have

23   personal knowledge of -- over every Thanksgiving,

24   Christmas and New Year's holiday one can think of.

25        This investigation, partly for the reasons I was

1    just mentioning, that one has to keep perspective in

2    mind as to how much of a difference it might make, was

3    not more important than getting fiscal plans done and

4    on the road to the restructure, and the Committee

5    acknowledged that.  In May, the Board announced how it

6    was going to go forward with the investigation.  It's

7    not as if it was at all in reaction to any Rule 2004

8    motion of the Committee.

9         As far as publishing the investigation, there

10   are always two reasons for an investigation in

11   bankruptcy, Your Honor:  One is to see if you can find

12   something that will help enlarge the pie for the

13   benefit of the stakeholders; the other is simply to

14   provide sunshine.  Creditors are suffering losses.

15   They should know why.  And the Board both has a

16   statutory obligation in connection with 104.0 to

17   publish the findings of that investigation, but the

18   Board also doesn't have a problem making public other

19   findings because the sunshine policy is important, and

20   the Board is in a perfect position to provide that

21   sunshine.  Also, you know, we keep a public website,

22   and contracts and letters to the Governor, sometimes

23   back and forth, are often put on that website.  The

24   Board has certainly been as transparent as possible;

25   whereas, the Committee acknowledged that's not its job.

1    But to the extent that we want to maximize the benefit

2    of the investigation, both the benefit of enlarging the

3    pie and to satisfy what I'll call the sunshine policy,

4    the Board is obviously in a much better position to do

5    that.

6          So, bottom line, what we're asking for is for

7    the Board to be able to progress on its investigation.

8    We want to provide both Committees the consultation

9    rights, the access to discovery that I described

10    earlier, also to get recommendations from them, and if

11    they think, for instance, we haven't asked for some

12    documents that would be useful, they can tell us what

13    they are and we can ask for them.  We will also end the

14    investigation, and if they think that there are things

15    we left uninvestigated that should be investigated,

16    they can come to this Court at any time before or after

17    we finish to see whether those things should be

18    separately investigated by them.

19          But we're not aware, at least I'm not aware, of

20    anything, of any case where there was not a strong

21    coordination emanating from the Court to prevent

22    simultaneous requests for documents or testimony from

23    the same witnesses at the same time.  It just doesn't

24    happen.  And usually it's done by what I've described

25    earlier, that if the examiner or the equivalent of the

1    examiner or trustee is going forward, the others do

2    not. Whether they get authority and they're ordered to

3    stand down or they don't get authority, that becomes a

4    distinction without a difference. The fact is they

5    can't do it while an examiner or a trustee is doing it

6    because it makes no sense.

7         And Your Honor can imagine, and it has more

8    experience than any of us here, the witnesses sought,

9    Your Honor can imagine what they're going to say when

10   they say, Oh, I got a subpoena from this committee and

11   from that committee and from the Oversight Board.

12   Which should I deal with first? Should I see if

13   there's overlap? Should I -- how should I -- who gets

14   my first time? How many hours do I have to spend in

15   deposition? Your Honor could probably add to my list

16   of horribles, but you don't even have to be a lawyer to

17   know that this is not a situation that anyone would

18   knowingly and intentionally create, and that's what the

19   Committee is asking Your Honor to do.

20        And now that Your Honor knows what really

21   happened in *Enron* and what really happened in *Caesars*,

22   it's not like any Court intentionally ever let two

23   investigators loose on the same witnesses at the same

24   time. It just doesn't happen.

25        And what we've recommended is a common-sense

1    approach that, frankly, the Retirees' Committee

2    virtually came up with by itself, perhaps

3    simultaneously with us because we had done it in other

4    situations, they've seen it as well in other

5    situations, and it didn't satisfy the General

6    Creditors' Committee, and I regret that, but it should

7    satisfy them for now.  Your Honor's not doing anything

8    permanent today; we just ask that, at this time, they

9    not be authorized to go forward with a contemporaneous

10   investigation.

11             THE COURT:  Thank you.

12             MR. LEVIN:  Good afternoon, Your Honor.

13   Richard Levin of Jenner & Block for the Retiree

14   Committee.

15             I want to first thank Mr. Bienenstock for that

16   kind of shout-out there at the end.  We did come up

17   with that proposal, and we support it.  We think the

18   investigation should take place in the first place by

19   the Oversight Board, and if that is inadequate, as

20   Mr. Bienenstock says, in the minds of the Retiree

21   Creditors' Committee or the General Creditors'

22   Committee, we would be back here seeking further

23   authority.

24             I'd like to start with just a couple of quick

25   answers to some questions that Your Honor had raised or

1    that were remarked on, and I have just a few points to

2    make.  There's been reference several times to the

3    *Enron* investigation.  In that case, there were two

4    examiners because there were two -- there was the

5    parent company, and there was Enron North America,

6    which was a somewhat separate company.

7         The examiner of the parent company, 15 years

8    ago, cost $100 million.  That's public record, and I

9    don't think anybody in this Courtroom would dispute

10   that.  So, when we're talking about cost, we ought to

11   have a kind of a sense of order of magnitude that we're

12   talking about here.  Other examinations have cost

13   substantial amounts, and as Your Honor is aware,

14   lawyers' rates have gone up at times, and these things

15   have gone up.  It's hard to imagine that the cost of an

16   examination would go down.

17        Second, Your Honor asked about whether the

18   Constitutional debt issue was being raised in any

19   litigation.  I believe that's one of the central issues

20   or one of the many central issues, if that's not an

21   oxymoron --

22        THE COURT:  We'll let it go.  Go ahead.

23        MR. LEVIN:  Yeah.  It's one of the central

24   issues in the COFINA litigation because, as Mr. Despins

25   said, the question of whether the COFINAs were legally

1    issued has a lot to do with whether they were a

2    work-around for the Constitutional debt limitation.

3         Third, there's been a -- well, let me go to the

4    few points I want to make, Your Honor.  Your Honor also

5    asked what eliminates Rule 2004 in PROMESA.  Nothing

6    does.  But 2004, as everyone here in the Courtroom

7    acknowledges, is discretionary; it's not mandatory,

8    it's not -- if a party in interest requests an

9    examination, the Court must grant authority.

10        It is in the Court's discretion, and so the

11   question is in this case:  Is it wise now, given the

12   Board's oversight and investigatory powers, to

13   authorize a second investigation?  And the Retiree

14   Committee believes that, by coat-tailing on the

15   Oversight Board's investigation, we think that's the

16   most efficient way to proceed and the wisest way to

17   proceed, rather than authorizing two or perhaps three,

18   because if the Court were to authorize the unsecured --

19   General Unsecured Creditors' Committee investigation,

20   there's nothing to distinguish the Retiree Creditors'

21   Committee.  We have the same status, the same standing,

22   the same duties, the same powers, and we actually have

23   a larger constituency in terms of dollars and in

24   numbers of creditors.

25        And the Retiree Committee Counsel is very

1    experienced and well-respected for its investigative

2    abilities, having been the Counsel to the examiner in

3    *Lehman*; having conducted the General Motors ignition

4    switch investigation, which was lauded by the Second

5    Circuit; having been the monitor for Credit Suisse

6    under the New York State Banking Commissioner and many

7    other confidential investigations as well.

8         But our point is:  As experienced as we are at

9    this, we don't think we should be competing on a

10   first-come, first-served basis, who gets here first, to

11   do an investigation.  It makes sense, as

12   Mr. Bienenstock said, for Congress to have authorized

13   the Oversight Board to lead this process.

14        THE COURT:  So, let me ask you this because you

15   always -- everybody always walks in here with new

16   information.  No matter how much I read, you have more

17   information for me.  What's your understanding of the

18   timeline of the Board's investigation, the scope and

19   your involvement in defining any of that?  If you've

20   reached an agreement or, at least in principle, you've

21   talked about how you're going to work with the

22   Oversight Board's investigation, what's your

23   understanding of the timeline of that investigation,

24   the scope of that investigation and your Committee's

25   role in it?  Just give me an overview.

1          MR. LEVIN:  We don't have a sense of the timing

2     yet.  I think we have to wait for the Board -- I hope

3     next week and -- the Board has been pretty quick in

4     selecting professionals in other contexts.  They put an

5     RFP out, the proposals come in a week or ten days, and

6     the Board, within the next week, typically selects.

7     And so they're due tomorrow.  I would expect they would

8     select sometime next week, and then we can get started

9     on that.  So, beyond that, I don't have a sense of the

10    timing.

11          As far as the scope goes, I think you heard

12    Mr. Bienenstock's statement about that, and we support

13    that.  But I want to go a little bit broader than what

14    Mr. Bienenstock said.  I'm sure he would agree with me,

15    having thought about it in the heat of the moment up

16    here.  It's not only a question of looking, in the

17    Board's investigation, looking at potential causes of

18    action against third parties, but one of the important

19    things that the Board must do in its role as the

20    Trustee in this case is object to claims.  Mr. Despins

21    said part of the investigation might be for the purpose

22    of objecting to claims.  That's the Board's

23    responsibility.

24          I'm not saying that nobody else may object to

25    claims.  The statute does permit that in certain

1    circumstances, but I think Congressional intent here is

2    clear that the Board's investigation has to include

3    that as well.

4         And in connection with our cooperation with the

5    Board's investigation, we would encourage that because,

6    if the amount of the claims get reduced because for

7    some reason they are objectionable or improper or

8    shouldn't be allowed under Section 502 of the

9    Bankruptcy Code, which is incorporated, then we

10   would -- then other creditors will fair better because

11   the limited pie would go a little bit further because

12   there will be fewer mouths to feed.  Sorry for the

13   metaphor.  So, we think the Board's investigative

14   authority is broad.  We would encourage it to use that

15   for all of those purposes, and that's how we think the

16   cooperation would work here with the Board's

17   investigative authority.

18        Now, the General Committee has also

19   authorized -- has offered to share results but has not

20   been so forthcoming as the Board has in terms of

21   consultation in advance of conducting the

22   investigation, and that's another reason we favor the

23   Board's leadership in this.  And the General Committee

24   has been offered that same participation in the

25   Oversight Board's investigation, and since one is

1    offering and the other is offering, it's more a

2    question of who should control, and I think it's pretty

3    clear, as Mr. Bienenstock said, that Congress intended

4    in PROMESA that the Board would lead this process, that

5    Congress gave the Board tremendous powers throughout

6    the case and especially on this one in the

7    investigatory role.

8         I'd also ask the question, Whom the General

9    Committee is trying to protect?  Section 1103(c)(2) of

10   the Bankruptcy Code on which the General Committee

11   relies gives the Committee investigative authority,

12   true.  Mr. Despins cites that correctly.

13        But Section 1103(c)(5), the last in the powers

14   given to the Committee, tells the Committee it has the

15   power to "perform such other services as are in the

16   interest of those represented."  So, other services in

17   the interest of those represented, such other -- seems

18   to be a limiting concept on the powers listed in

19   Paragraph 1 through 4.  I should note Paragraph 4 is

20   authority to request the appointment of a Trustee.

21   Obviously, that doesn't apply in this case, at least a

22   general Trustee.  So, I think the applicability of

23   Section 1103 in this context has to be read in the

24   context of PROMESA, not in the context of an ordinary

25   commercial Chapter 11 case.

1          And the Committee's authority is limited to

2     service for those that it represents, and that is, as I

3     said before, the general creditors, which, based on

4     Judge Swain's order last week on the GIO bondholders'

5     motion to expand the Committee, suggests that their

6     representation doesn't even include the GIO

7     bondholders.  It certainly doesn't include the COFINA

8     bondholders.  The Board has a much broader mandate than

9     the Creditors' Committee.

10          So, with those points, Your Honor, we favor

11     Mr. Bienenstock's approach and the Board's leadership,

12     and we urge the Court to deny the motion on that basis.

13          MR. BRADY:  Good afternoon, Your Honor.

14     Robert Brady of Young Conaway Stargatt & Taylor on

15     behalf of Popular, Inc.; Popular Securities, LLC; and

16     Banco Popular of Puerto Rico.

17          Your Honor, we filed two pleadings in connection

18     with this motion:  One, an objection and reservation of

19     rights with respect to the Committee's Rule 2004

20     motion; and we also join in certain aspects of the

21     Oversight Board's objection.  Your Honor, like many of

22     the objectors, the Popular entities agree that the

23     Oversight Board is the appropriate party to lead this

24     investigation.

25          Congress provided that important investigatory

1    power would be invested in the Oversight Board, and

2    Your Honor, we do not join in these objections because

3    somehow we believe that the Oversight Board will be

4    less thorough or take it easy on the financial

5    institutions; we raise the objection because there

6    should be one coordinated discovery process, not as

7    many as three separate investigations.

8            That, Your Honor, is more cost-effective and

9    efficient for the Commonwealth, and the Popular

10   entities are corporate citizens of Puerto Rico, they

11   are creditors of the Commonwealth, and, as such, they

12   have an interest in reducing costs in this case.  But a

13   coordinated process, Your Honor, also is more efficient

14   and cost-effective for the Popular entities.  And

15   both the rules of discovery and case law regarding

16   Rule 2004 make it clear that that's a valid

17   consideration for the Court to prevent burdensome and

18   unnecessary discovery.

19           Despite the Committee's assertions, Your Honor,

20   that multiple investigations on the same issues happen

21   all the time, that is not the norm in cases under the

22   Bankruptcy Code.  This to us really seems more about

23   control, who will control the investigation, and the

24   UCC is attempting to control it by being the first to

25   the Courthouse.  However, Congress has already spoken.

1       The Oversight Board was given this authority and the

2       power to conduct the investigation, and there's no

3       doubt, and you've heard it today, that they'll do so in

4       coordination with the Committees.  As you've heard,

5       Rule 2004 is discretionary, and we think the Court

6       should exercise its discretion to prevent duplication

7       of effort and expense.

8             The Popular entities recognize that an

9       investigation will happen.  Despite the inflammatory

10      tone and the innuendo in the UCC's motion and reply,

11      the Popular entities are confident that, after

12      discovery, it will be clear that my clients did nothing

13      wrong.  But that process should be one coordinated

14      process, and the Popular entities, as indicated, have

15      reserved their rights to raise objections to whatever

16      discovery is ultimately issued.

17            Now, if the Court is inclined to allow the

18      Committee to commence a Rule 2004 exam, we think

19      they've really put the cart before the horse here,

20      Your Honor.  They refused a meet-and-confer before

21      filing the motion and opted for a process where they

22      get authority and then meet and confer on the scope,

23      but as Judge Bernstein found recently in the *Sunedison*

24      case -- and this is 562 BR 243, it's a January, 2017,

25      opinion -- "The concept of proportionality and concerns

1  regarding the burden on the producing party are

2  relevant to the determination of cause under

3  Rule 2004."

4          So, again, if Your Honor is inclined to let the

5  Committee commence a 2004 exam, all rights need to be

6  reserved, including that any particular request, that

7  they have not established cause based on the

8  proportionality test. So, again, Your Honor, we ask

9  the Court to deny the motion, allow the Oversight Board

10 to lead a coordinated effort in this regard, and if the

11 Court is otherwise inclined to allow UCC to proceed,

12 that all rights be reserved for the parties who are the

13 target of the 2004.

14          THE COURT: Thank you.

15          MR. CROWELL: Good afternoon, Your Honor.

16 Nick Crowell from Sidney Austin for Santander Puerto

17 Rico, Santander Asset Management and Santander

18 Securities.

19          I'm not going to take long here because I think

20 most of the arguments I was going to make have already

21 been made repeatedly. We would just support the

22 investigation by the Board. We're not afraid of an

23 investigation by the Committee, as they suggest. We

24 think Mr. Bienenstock will be as painful as they would

25 be, and we think that there should only be one

1      investigation, however.

2              The Committee wants to be a free-ranging sheriff

3      here, looking for any wrongdoing, but really they're a

4      sheriff without any weapons because they cannot bring

5      any claims, they're not authorized to do so.  So, what

6      is the point of a feed-grab and a feed-grab that's

7      going to result in a lot of costs to the estate?  The

8      Oversight Board has the authority.  Let them proceed.

9      They say they're going to proceed.  We can always

10     re-visit later, Your Honor, if they haven't done

11     enough, if people don't think that they've done enough.

12             One other thing I would just point out that

13     makes us a little bit different than Popular is that my

14     client is also the subject of a class action from

15     bondholders, some of the very creditors that the

16     Committee purports to represent.  And I'm not asking

17     you to feel sorry for my client, but I do ask that you

18     recognize that resources are limited, and if we are

19     going to be subject to three or possibly four different

20     investigations by the Retiree Committee, it will make

21     their jobs that they actually have to do and get paid

22     for impossible.

23             So, again, we would agree with what has already

24     been said here today, which is:  Let the Oversight

25     Board do the investigation, let them coordinate it, let

1    there only be one investigation, though, Your Honor.

2       Thank you.

3       THE COURT:  I don't have to give your client my

4    lecture on securities litigation, which is you don't

5    have to review the same documents that are privileged

6    for each separate lawsuit?  You just review them once.

7       MR. BRADY:  Understood, Your Honor.

8       MR. SEIDEL:  Good afternoon, Your Honor.

9    Martin Seidel, Willkie Farr & Gallagher, for the COFINA

10    Agent.  I'll be very brief.

11       We take no position with regard to whether the

12    2004 investigation should take place, but I want to be

13    clear, since both Mr. Despins and the FOF Counsel used

14    me as a prop, if you will, used my client as a prop, if

15    an investigation takes place, to the FOF point, we're

16    not coordinated with them.  In fact, they're our

17    adversary.  They are the COFINA -- they are the GIO

18    Agents in the COFINA-GIO dispute.  So, we're not

19    coordinated with them on their 2004 investigation.  And

20    while they may give us everything, I don't want that to

21    prejudice our rights to discovery in the COFINA-GIO

22    dispute.

23       Second, to Mr. Despins' point about giving us

24    everything, given that the GDB, one of the targets

25    here, is the parent entity of COFINA, we want to make

1     sure that there's no waiver of privilege in anything

2     that's provided to Mr. Despins, should a 2004

3     investigation go forward.

4          Thank you very much.

5          THE COURT:  Okay.  Do you want to respond?  Let

6     me tell you -- let me give you some initial thoughts,

7     and then I'll let you all talk some more.

8          I feel like the motion was filed at a time when

9     the Board had really not made any efforts to go forward

10    with this investigation.  No blame on that.  Reality.

11    I feel like that it was also made at a time before the

12    COFINA-Commonwealth stipulation was entered into as to

13    how that would go forward.  And I think a lot has

14    been -- a lot has changed.

15         I'm balancing two very real concerns.  The

16    Board's investigation is not mandatory.  There are no

17    time limits, there are no defined objectives, and there

18    are no specific parameters that have to be met in the

19    Board's investigation, and I -- until the Board

20    actually has somebody who's doing this investigation,

21    all I've heard about legitimately is that the Board are

22    individuals who don't have time to do anything other

23    than, you know, what they're doing.

24         So, I think bringing in the investigator changes

25    the dynamics, but I still have the concerns that the

1   scope of the investigation is just -- I don't know

2   where that will actually fit in, in reality, other than

3   in goodwill.  I don't know how that would fit into the

4   investigation that the UCC actually wants to and should

5   be able to conduct.

6         I have a lot of concerns about the financial --

7   financial costs?  No?  Talk about a phrase that's

8   awful.  -- about the costs of this investigation and on

9   the burden of those who are going to be involved in it.

10  The need for cooperation is huge, but I don't want to

11  stall things while the Board is kind of getting its

12  investigation started.

13        So, I'm trying to figure out if there are topics

14  that can go forward.  Do I say to the UCC, You need to

15  coordinate in the COFINA-Commonwealth litigation, come

16  up with a plan on, How do you share that information

17  and go forward with that?  Because I gather that's

18  going forward regardless of the investigation; right?

19        So, it seems to me that that's assignment one,

20  is, How does the Commonwealth-COFINA discovery go

21  forward, both in the context of the adversary

22  proceeding as well as perhaps additional topics that

23  would be covered by the UCC just as a Creditors'

24  Committee?

25        I think the second task has to be at least an

1    effort by whoever is selected by the Board to see if

2    agreement can be reached on a way to coordinate an

3    investigation by the Board and the UCC and to determine

4    whether or not there are topics that are just easily

5    divisible or not, you know, dividing the

6    responsibility, making sure there's no overlap.  There

7    may be topics that the UCC is concerned with that the

8    investigator does not have a high priority for.  I just

9    don't know.  And I feel like that opportunity -- we

10   should take advantage of that opportunity.

11            Now, I do say that, but that's not in my notes

12   because this is new, that somebody is being actually

13   appointed.  You know, I mean, this is all happening

14   fast.  And you may very well come back, and I

15   understand some skepticism as to whether actually

16   somebody will be appointed soon and whether it will

17   happen soon, and so I think we need to set some dates

18   for this real coordination, and if it doesn't happen, I

19   guess my underlying order is that I don't see anything

20   in PROMESA that makes the Oversight Board's

21   investigation manditorily exclusive.  I think we all

22   agree with that, and I think we all agree that the UCC

23   2004 investigation is authorized by PROMESA, within my

24   discretion; okay?  So, I don't have, as a matter of

25   law, that either or both of them can -- is ruled out.

1          But on the other hand, neither of them is

2     mandatory, and I just don't have a sense of how real --

3     given that they have different overarching concerns, I

4     think there are different timelines that may be

5     involved, I think there may be different priorities

6     that are involved, and it may make sense to allow the

7     UCC Committee -- the Committee to go forward in certain

8     areas while the investigation of the Board goes forward

9     in others.  I just don't know.

10          So, I'm also -- I do have statute of limitation

11     issues here, and I don't quite know where they fit in,

12     which is sort of my big question mark on my paper

13     going, Where does the statute of limitations fit in on

14     this?  But maybe that comes up more in a specific

15     objection or not.  But I think that the Committee needs

16     to phase this proposed investigation even if you were

17     given free rein.  I think it's too big.  It's too big,

18     it's too amorphous; and, frankly, I can't tell where it

19     interferes with other adversary proceedings and,

20     frankly, the general proceedings of the whole PROMESA.

21          So, the problem with thinking out loud is you're

22     all writing it down, and I'm thinking about it, but

23     those are the -- I need to have a way of going forward

24     that makes sure that as much coordination as possible

25     happens, and I want to give the Board the opportunity

1    of engaging in that conversation with the UCC, but I

2    want the COFINA-Commonwealth discovery to go forward.

3    So, do I send you all -- because you all negotiate so

4    much better outside the room here.  Do I say to you, In

5    the next couple of weeks, you submit a schedule to me,

6    a proposal, in a week you do it?  All right.  That

7    having been said, now you can object to everything that

8    I've just said.

9         But I've not given you a lot of time to think

10   about all of those.

11        MR. DESPINS:  No.  So, let me -- I just want to

12   hit some points, and I will come back, I promise, on

13   all of your points.  But the first point is:  No one

14   has said that there's any case where a Court has

15   directed a -- or denied a 2004 based on an examiner

16   being appointed.  People have said that's not the norm,

17   and Mr. Bienenstock said, Yeah, but the Judge

18   threatened us, but there's -- at the end of the day, he

19   got his order that said, You're entitled to do your

20   2004 examination.  After that, people get together, and

21   they negotiate a protocol.  I'm all for that.  Of

22   course that should happen.  But he and the others did

23   get an order that said, Your 2004 is authorized, and

24   the Judge did say, You will coordinate, as you just

25   indicated.  So, that's just -- that's not disputed.

1          So, let me -- one thing I did not do and I

2     wanted to mention is that we focused on three entities,

3     GDB, Santander and Banco Popular, but there are many

4     other entities involved.  If you just want to Google

5     "UBS Puerto Rico," you'll find all sorts of SEC actions

6     involving these entities.

7          And there, it's possible that the Board has no

8     conflicts.  I mean, I wouldn't -- you've read our

9     papers, and you know why we are concerned about the

10    Board being involved.  It's not only because

11    Mr. Carrion, for example, his family founded Banco

12    Popular; it's also because there are two of the Board

13    members that are in that chart about the revolving

14    doors.  And when Mr. Friedman talks about FOF believes

15    this, FOF believes that, his clients are exactly --

16    they're not on that chart because we would have -- the

17    chart would be illegible, but his clients are in the

18    same position.  They are all former -- or not all; the

19    senior people are all former Santander people, Judge;

20    okay?  So, let's understand that.  It's either Banco

21    Popular, Santander, all the same.

22          So, my point is:  There are three entities that

23    are in the revolving-door business, these three, GDB,

24    Banco Popular, Santander.  There are others that also

25    sold bonds on the Island, and I don't want to single

1    UBS out, but there are many others.  So, you talked

2    about a potential outcome here.  Let the Board, you

3    know, hire a god next week.  Mr. Bienenstock said he

4    was hopeful.  We have no idea who that person is.  I'm

5    sure he doesn't have any idea either.

6         And Mr. Levin, on behalf of the Retiree

7    Committee, has signed off on that, but he has no idea

8    what the timeline is either.  Let them hire god, and

9    god can jump in and follow on what has been done with

10   the Banco Popular, Santander and GDB, and he can do

11   that for all the other institutions.  I am hereby

12   telling you, we will not do any of the other -- we'll

13   check to make sure they're thorough in what they are

14   doing, but we will not take the lead on that because

15   there is no conflict there, meaning the Board members

16   have a conflict on these three entities, and that's why

17   we started with that.

18        THE COURT:  But that's the conversation that I

19   want you to have with -- assuming that someone is

20   selected in the near future, because I do recognize

21   that it's not going to go on forever, but if somebody

22   was appointed next week and given a week to read the

23   papers, that is the kind of conversation that I would

24   expect that you would have, that you would say, For

25   these three entities, we really feel there's too big a

1    conflict for you to take the lead in this

2    investigation, but for these ten entities, go for it.

3    Maybe there would be agreement, maybe there wouldn't.

4    I don't know.

5         MR. DESPINS:  But you're assuming for a second

6    that those discussions did not take place.  All right.

7    I'm not going to say more than that.

8         THE COURT:  Well, I don't know.

9         MR. DESPINS:  But the point is we have been at

10   this for a while.  You know, the issue of objecting to

11   claims is key.  Mr. Levin lectured us about the

12   Bankruptcy Code, but 502 of the Bankruptcy Code says

13   any party in interest can object to a claim.  And there

14   are billions of dollars in claims at stake.  We need to

15   get the investigation yesterday, Judge, we need to --

16        THE COURT:  But you have the

17   COFINA-Commonwealth, which is a huge part of this

18   investigation, and there's no reason why that can't get

19   started.

20        MR. DESPINS:  That's discrete.  It deals with

21   the COFINA.  And by the way, you're right, we will do

22   that; but there's another part of this, which are the

23   GIO bonds, the general obligation bonds, which is

24   something like $17 billion.  And there are other bonds

25   as well, but I mean that --

1          THE COURT:  Right, and I don't under -- I don't

2     know, as I'm sitting here, what the scope of the

3     discovery is in that case or where that is or whether

4     the Committee's going to come and tell me they need to

5     do the discovery.

6          MR. DESPINS:  Well, there's --

7          THE COURT:  I mean, I take that back.  Where's

8     the issue?  When I asked you whether the issues that

9     you were raising were being held in -- were being

10     raised in -- like, the debt limit, is that going to

11     come up in the GIO proceeding?

12          MR. DESPINS:  No.  The GIO proceeding, they're

13     saying, I'm secured -- I'm speaking as a BIO bondholder

14     now -- I'm secured, I'm entitled to priority.

15          THE COURT:  So that they're -- but is somebody

16     going to challenge that?

17          MR. DESPINS:  Well, no, because -- I'm sure

18     somebody like the Board will say, No, you're not

19     secured; or, no, you're not entitled to priority for

20     the following reasons.  I don't know that, but I assume

21     that's going to take place.

22          But there's a totally different issue, which is,

23     Have some of these bonds been issued in violation of

24     the Constitution, debt limit and otherwise, and that

25     applies to other bonds as well, that, that

1     investigation should have happened two months ago.  And

2     so that's why waiting for god or waiting for a new --

3     somebody who they don't even know who that is, to be

4     appointed or fully -- Mr. Bienenstock was very honest,

5     he said hopefully.  Hopefully, I don't know what that

6     means.

7          And so I -- right now, I think the Court should

8     direct us to those three entities, to these parties to

9     meet and confer with us.  By the way, they'll be in

10    document production, they'll never have to produce it

11    twice, meaning the same document.  They say it's

12    burdensome.  They will not have to produce it twice.

13    And we will coordinate with the COFINA Agent to make

14    sure they're satisfied.  If they're not happy with the

15    document requests, we'll make sure that they don't have

16    to do that again, so I can represent that to the Court.

17         But as to those three entities, while we're

18    waiting for this god person to be appointed, we

19    should -- the Court should direct the parties to meet

20    and confer and to come back to Court with an agreed- or

21    not-agreed-upon order on the production of documents

22    only with respect to the issues we're seeking,

23    Your Honor.

24         And we know that the document production

25    requests are sometimes too broad, but that -- let's put

1    it this way:  When is the last time you've ever seen a

2    document request that was accepted by the target ever?

3    So, there's no -- you know, so therefore, this argument

4    that it's too broad, yes, I can make arguments that

5    it's too broad as well, but the point is the parties

6    should meet and confer.  This has started probably more

7    than a month ago at this point.  We filed our motion on

8    July 21st.  They've had this.  We can sit down with

9    them and come back to Court, and if god is found and

10   she or he can jump in and be involved and can convince

11   the Court that he or she should be doing all of it, so

12   be it.  But in the meantime, we don't want to waste

13   time, lose the momentum we have.  I think that's very

14   important, Your Honor.

15        THE COURT:  Thank you.

16        MR. KIMPLER:  Good afternoon, Your Honor.

17   Kyle Kimpler from Paul, Weiss, Rifkind, Wharton &

18   Garrison, on behalf of the Ad Hoc GIO Group.

19        I just wanted to quickly, if I could, respond to

20   a few of the comments.  You were asking about, What is

21   going on in the current GIO adversary proceedings, how

22   does that relate to the discovery that's being sought

23   here?

24        I just wanted to correct the record on two

25   points really quickly.  There were a couple of

1    references I think by other Counsel that perhaps the

2    Committee is representing bondholders or is

3    representing GIO holders.  That is not the case, and I

4    think that is obvious by what you just heard, which is

5    that they're actually looking to invalidate certain GIO

6    bonds based on a Government issue.

7         That's obviously an issue that's not for today

8    on the merits, but I would note that, as Mr. Despins

9    just suggested, the Oversight Board has, in the current

10   adversary proceeding going on between the GIO holders

11   and the Oversight Board, raised all types of issues

12   regarding the status of GIO debt, whether it is secured

13   or whether it has priority, et cetera.  They have not

14   raised this issue.  I will suggest that, that is a

15   target is not a valid argument, and our position is

16   that this would be nothing but a waste of money, to

17   look into these issues.

18        THE COURT:  Meaning the debt limit?

19        MR. KIMPLER:  The debt limit issues, yes.  I

20   would assume the Board, in preparing all of their

21   arguments, would have considered this one and has

22   decided not themselves to bring it; and, therefore, we

23   think it would be wasteful for the Committee to pursue

24   that.

25        THE COURT:  Okay.

1          MR. FRIEDMAN:  Thank you, Your Honor.

2     Your Honor, it's Peter Friedman from O'Melveny.

3          I just wanted to make two quick points.  The

4     issue was raised, that last issue was raised

5     pre-petition in the Lex Claims, which were subject to

6     the automatic stay as a defense by the people who are

7     in here this morning.  The COFINA seniors did challenge

8     the validity of some bond issuances, and so it's

9     certainly lurking out there and a matter of --

10         THE COURT:  Didn't I read it somewhere?

11         MR. FRIEDMAN:  Subject to the automatic stay.

12    And certainly we would be willing, as a party that will

13    clearly be the recipient of discovery requests at GDB,

14    to sit down with both Counsel for the Commonwealth and

15    COFINA Agents and come up with a discovery schedule

16    that involved -- in that matter as part of the overall

17    matter that will be litigated between the parties.

18         You know, we'll probably have some of the same

19    issues that have arisen already and have been before

20    you with respect to deliberative process, et cetera,

21    but we're certainly willing to do what we've done in

22    the past, which is negotiate appropriate schedules and,

23    you know, litigate in good faith where necessary and

24    compromise where appropriate on discovery connected to

25    a specific live controversy where both sides are

1      involved and we're not getting whipsawed.

2            Thank you, Your Honor.

3            THE COURT:  Thank you.

4            MR. BIENENSTOCK:  Your Honor, thank you.

5      Martin Bienenstock for the Oversight Board.

6            I just wanted to respond briefly to a few of the

7      comments made in response to Your Honor's suggestion.

8      First, as to the last comment by Paul-Weiss for the GIO

9      holders, in the adversary proceedings that are pending,

10     the current motion practice pertains to things that can

11     be done on the face of the papers.  I would not infer

12     from that any decision to forego defenses such as debt

13     limit, et cetera.  It's simply too early.

14           But the important fact, Your Honor, is what the

15     Committee said, which is basically that he'll take care

16     of the investigation, see you all later.  And

17     Your Honor may not think that from the way it was

18     portrayed, but that's what they were saying, and it's

19     wrong.

20           I didn't spend time earlier responding to the

21     mud that they threw into their papers because I didn't

22     want to dignify it.  But suffice it to say, it was mud.

23     The Oversight Board members were screened by the White

24     House, I'm talking about the Obama White House; they

25     were appointed in August, 2016.  As hard as they tried,

1    they could not come up with anything against any of

2    these seven members other than some of them worked for,

3    in prior years, some of the institutions involved.

4    None of them, though, were on the Board's special

5    committee, even though that would rightfully not

6    disqualify them.

7         But the important thing for Your Honor to know

8    is that all indications are that, if these

9    investigations are going to create meaningful sunlight

10   or create causes of action beneficial to the

11   Commonwealth, the two most promising are Banco Popular

12   and Santander, and there is no way that this Committee

13   should lead that investigation.  And what they've tried

14   to do is to throw mud as a reason to displace the Board

15   that Congress put there to lead that investigation.

16        All that said, we think Your Honor's suggestion

17   was the right one.  We will have an investigator out

18   front for this process.  He should meet with both

19   Committees and come back to Your Honor and report as to

20   whether they could agree on a protocol going forward or

21   what the snags are.

22        THE COURT:  And what kind of timeframe do you

23   think would be reasonable for that?

24        MR. BIENENSTOCK:  I think what Your Honor said

25   is right.  The Board can appoint someone next week, and

1  Your Honor said give them a week to read the papers.

2  So, if we come back here in three weeks, that should be

3  perfect.

4         THE COURT:  And do you have any comment on

5  whether the COFINA-Commonwealth discovery should go

6  forward?

7         MR. BIENENSTOCK:  Oh, it absolutely should go

8  forward, and the -- as Your Honor knows, the General

9  Creditors' Committee, the UCC, is the Commonwealth

10  Agent and should go forward.  I disagree entirely with

11  the Committee and agree with Your Honor about being

12  able to use Rule 2004 against third-party witnesses in

13  that litigation.

14         As Your Honor can imagine, if the Commonwealth

15  Agent, as a Plaintiff in that litigation, notices

16  discovery under Rule 2004, number one, the other

17  parties to that litigation aren't even invited to show

18  up; number two, except for contradictory statements,

19  that discovery cannot even be used in the adversary

20  proceeding.

21         So, the only thing the Commonwealth Agent can do

22  is take classic discovery under the Federal Rules of

23  Civil Procedure, not under Rule 2004.  If it tries to

24  use 2004, number one, the witness will object; number

25  two, the other parties will object, and so what was

1   said about they're allowed to do it for third-party

2   witnesses is demonstratively wrong.

3          THE COURT:  And what's the schedule of this --

4   I'm sorry.  I just don't remember the details of your

5   stipulation of how COFINA-Commonwealth is going

6   forward.

7          MR. BIENENSTOCK:  Well, the schedule was that,

8   by a date that's coming up within I think the next week

9   or two, the litigation has to be commenced, and it has

10  to be orchestrated so that a decision can be rendered

11  by December 15 unless Judge Swain sends it for cause.

12         THE COURT:  So, the litigation is expected to be

13  commenced soon?

14         MR. BIENENSTOCK:  Very soon.

15         THE COURT:  Very soon.  Okay.

16         MR. BIENENSTOCK:  Thank you.

17         MR. LEVIN:  I'd like to answer two or maybe two

18  and a half questions that the Court asked.  You'll see

19  why it's a half.

20         The first one is the statute of limitations

21  issue.  When it comes to objections to claims, the

22  statute of limitations issue is not relevant because a

23  claim can be objected to that it's --

24         THE COURT:  Right.

25         MR. LEVIN:  -- not enforceable at any time, as

1    provided in the Code.  So, it's not like an affirmative

2    cause of action against a third party where you worry

3    about a statute of limitations.

4          The other, as to affirmative causes of action

5    against third parties, Section 108 of the Bankruptcy

6    Code applies in PROMESA, and that provides a two-year

7    extension of any statute that hasn't expired by the

8    petition date.  So, in terms of getting the

9    investigation done, we've got until May, 2019, to bring

10   causes of action.  I think none of us in this room

11   wants to take that long, but at least expiring statute

12   of limitations is not a problem against third parties.

13   That's one question.

14         The second question, How does the COFINA

15   litigation discovery proceed at the same time as the

16   2004?  Mr. Bienenstock addressed that to a degree.

17   There is a tentative draft schedule.  Mr. Bienenstock

18   is correct, the stipulation contemplates a decision by

19   December 15 by the Court.  The draft schedule

20   contemplates discovery over the next 60 days.

21         The Committee, which is the general -- the

22   General Committee, which is going to be the

23   Commonwealth Agent -- is the Commonwealth Agent is

24   going to be very busy with that discovery, getting a

25   tremendous amount of information relating to the COFINA

1   bonds and their issuance and their Constitutional

2   validity and all of those matters.

3       If Your Honor is looking for one bite to take

4   that's digestible, that certainly is, for the next 60

5   or so days, while that discovery proceeds, without

6   needing to expand the Committee's duties into 2004

7   exams where the Oversight Board's investigation's

8   counsel will be up and running long before that time,

9   and the Committee will have plenty to keep it busy

10  between now and then.

11      Those are the two and a half questions.

12      MR. DESPINS:  Your Honor, the case I couldn't

13  remember two hours ago was *WaMu*.  In that case, the

14  Court held that the argument that Mr. Bienenstock made

15  that, when there's a pending proceeding, you can't use

16  2004, only works for the people who are the Defendants

17  in that litigation.  That's the *WaMu* case.  It's cited

18  in our reply.

19      As to the Retiree Committee, Your Honor, you

20  have to look at the objection they filed.  The

21  objection said, Oh, we don't like the main Committee to

22  do this.  We have asked them to be co-Plaintiffs, if

23  you will, and we said no, there's enough people, you

24  know, involved in this.  We'll give you everything we

25  get at the same time and all that.

1          And everything that they said since then has

2     been in furtherance of that, which is I think they

3     would be bizarrely happy if you denied the motion

4     because that means that our Committee would not take

5     the lead on this, and that's -- everything they're

6     doing has to be seen through that prism.

7          THE COURT:  Well, that's involving a level of

8     negotiation that's actually beyond --

9          MR. DESPINS:  Understood.  But just look at the

10    objection they filed, and you'll see what this is all

11    about.

12         THE COURT:  This is what I want to happen:  I

13    want the COFINA-Commonwealth litigation to be -- to go

14    forward as soon as possible and to be coordinated

15    between the adversary proceeding and any extra in the

16    2004 investigation of those issues.

17         I want the Board's investigator to coordinate

18    with -- to meet and confer with the Creditors'

19    Committee to determine whether or not there are a

20    protocol to go forward and coordinated efforts and

21    whether or not there are certain areas that should be

22    spun off to be pursued, for the lead to be either the

23    Creditors' Committee or the investigator.  You know,

24    are there certain areas that should be divided among

25    them, and is there a way to coordinate the

1    investigation?

2           That also requires for me some timeline of how I

3    see the investigation going.  In my head, this has to

4    be phased somehow, and I don't know the appropriate way

5    to do that.  I'm going to put that on the list of

6    things that should be discussed between the

7    investigator and the UCC, but if there's no agreement

8    on any of these, you can each tell me where you're

9    standing, and then I'll decide whether or not I require

10   coordination or not, but the report to me also has to

11   indicate whether or not discovery is being done in

12   connection with major adversary proceedings that this

13   would run into or not.

14          Does this make enough sense, or do I have to say

15   it again?

16          MR. LEVIN:  No.

17          THE COURT:  I will put it into something, or can

18   I ask you guys to put it into something?  What's the

19   best way to do this?  Do you want me to enter an order

20   that explains this, or should I ask I guess both of you

21   to submit me a proposed order of this agreement?

22   Everyone's staring at me.

23          MR. DESPINS:  I'm happy to work with

24   Mr. Bienenstock.

25          THE COURT:  Can you do that?

1          MR. BIENENSTOCK:  Sure.

2          MR. LEVIN:  Your Honor, in your reference to

3    what needs to be done in terms of coordinating, we'd

4    ask that the Retiree Committee be included with the

5    General Committee in that process and, obviously, the

6    COFINA Agent as well.

7          THE COURT:  The COFINA Agent needs to confer

8    with the Committee -- right? -- so that's a given.

9          MR. FRIEDMAN:  And we're actually in the process

10   of that already, Your Honor.

11         THE COURT:  So that's a given.

12         I think, for the Retirees' Committee, I have no

13   objection to you participating with them, but I think

14   that the dispute here is between the Board and the UCC

15   because you've agreed to either go with one or the

16   other, so...

17         MR. LEVIN:  Well, true, Your Honor.  But if

18   you're in effect authorizing the General Committee to

19   bring this discovery, then you're encouraging us to

20   file a singular motion so we get similar status, which

21   I don't think is constructive to the process, that's

22   why we didn't do it, but that's why we should be at the

23   table.

24         THE COURT:  I personally think you're very nice,

25   I'd love to have you by the table, but --

1          MR. LEVIN:  Thank you, Your Honor.

2          THE COURT:  -- I don't want to add another

3     requirement here.  The first thing I want is a proposed

4     order that says that the parties will meet and confer

5     and the like.  When it comes down to then having the

6     meeting between the Board and the UCC, I think that you

7     have -- the retirees have indicated that the Board is

8     really -- you're willing to go to with the Board's

9     description, so if the parties cannot reach an

10    agreement and they file with me their disputed

11    positions, you can file something --

12         MR. LEVIN:  Thank you, Your Honor.

13         THE COURT:  -- okay?  But you don't need to be

14    part of yet another late night phone call.

15         MR. LEVIN:  We will coordinate with the Board on

16    that, then.

17         THE COURT:  Okay.  So, I guess what I'm saying

18    is I would like a proposed order by the -- what's

19    today, Tuesday? -- so by -- in the next couple of days,

20    48 hours.  You're not flying far?  Everybody's flying

21    local.  Within three weeks, where does that take us?

22         THE CLERK:  September 12.

23         THE COURT:  So, by September 12th, I'd like a

24    status report.  I would prefer a joint status report

25    between the Board and the Committee on whether or not

1  you believe an agreement can be reached or has been

2  reached or whether or not you think I need to rule

3  further.  And if there are areas in dispute that you

4  would like me to focus on, you can do that.

5         I'm not ruling on the motion; I'm continuing the

6  motion.  Okay?

7         MR. DESPINS:  Understood.

8         THE COURT:  Everybody's kind of nodding, so I'm

9  going to say okay.

10        MR. LEVIN:  Yes, understood, Your Honor.

11        THE COURT:  I'm going to get off the bench

12  before I cause any more problems.

13        MR. FRIEDMAN:  Your Honor, we reserve our rights

14  with respect to a proposed form of order.

15        THE COURT:  Say that again.

16        MR. FRIEDMAN:  We just wanted to reserve our

17  rights on the record to any proposed form of order and

18  ask for the right to be heard in the future with

19  respect to cost issues, et cetera.

20        THE COURT:  No, this isn't waiving anybody's

21  rights.

22        MR. FRIEDMAN:  Thank you, Your Honor.

23        THE COURT:  And if you don't reach an agreement,

24  maybe in the status report, you can also -- I will

25  determine whether or not there should be an objection

1     period, depending on how much everybody has spelled out

2     their positions or not.

3          MR. FRIEDMAN:  Thank you, Your Honor.

4          THE COURT:  Okay?  All right.  Now should I go?

5     I'm going to go.

6          Thank you all.

7          THE CLERK:  Court is in recess.

8          (Adjourned, 3:16 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4

5

6

7

8

9            I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

10   hereby certify that the foregoing pages are a true and

11   accurate transcription of my stenographic notes in the

12   above-entitled case.

13

14

15

16

17

18                    /s/ Debra D. Lajoie

19

20

21

22

23                    8/23/17

24

25