| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO[1]<br><br><div align=center>Debtor</div><br>HERMANDAD DE EMPLEADOS DEL FONDO DEL SEGURO DEL ESTADO, INC ; UNIÓN DE MÉDICOS DE LA CORPORACIÓN DEL FONDO DEL SEGURO DEL ESTADO CORP; ASOCIACIÓN DE EMPLEADOS GERENCIALES DEL FONDO DEL SEGURO DEL ESTADO CORP<br><br><div align=center>Plaintiffs,</div><br><div align=center>v.</div><br>GOVERNMENT OF THE UNITED STATES OF AMERICA; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO;  COMMONWEALTH OF PUERTO RICO; RICARDO ANTONIO ROSSELLÓ NEVARES<br><br><div align=center>Defendants</div> | PROMESA<br>Title III<br><br>No. 17 BK-3283-LTS<br>(Jointly Administered)<br><br><br><br><br><br><br><br><br><br>Adv. Proc. No. 18- ___-LTS |

## ADVERSARY COMPLAINT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747).

Contents

I.   NATURE OF THIS ADVERSARY PROCEEDING ................................................. 3

II.   THE PARTIES ................................................................................................... 9

III.   JURISDICTION AND VENUE OF THIS HONORABLE COURT ................. 11

IV.   LEGAL AND FACTUAL BACKGROUND .................................................... 12

  A.   THE CFSE ...................................................................................................... 12

  B.   THE UECFSE, THE UMCFSE AND THE AEGFSE ..................................... 15

  C.   PUERTO RICO: HISTORY OF INEQUALITY AND COLONIALISM ....... 19

  i.   INVASION OF PUERTO RICO ...................................................................... 19

  ii.   MILITARY GOVERNMENT AND THE FORAKER ACT ............................ 20

  iii.   JONES-SHAFROTH ..................................................................................... 22

  iv.   ACT 600 AND THE COMMONWEALTH OF PUERTO RICO................... 23

  D.   PROMESA AND THE POLITICAL RIGHTS OF PLAINTIFFS'MEMBERS ........... 24

  E.   PROTECTIONS AND LEGAL STANDARDS OF THE 13th AND 15th
AMENDMENTS AND PUERTO RICO ............................................................... 30

  F.   INTERNATIONAL LAW ON HUMAN RIGHTS AND PUERTO RICO ....... 40

IX. RELIEF DEMANDED ........................................................................................ 54

2

TO THE HONORABLE COURT:

Come now Plaintiffs, Hermandad de Empleados del Fondo del Seguro del Estado, Inc., also known as Unión de Empleados de la Corporación del Fondo del Seguro del Estado, ("UECFSE" for its acronym in Spanish), Asociación de Empleados Gerenciales del Fondo del Seguro del Estado Corp. ("AEGFSE" for its acronym in Spanish), and Unión de Médicos de la Corporación del Fondo del Seguro del Estado Corp. ("UMCFSE" for its acronym in Spanish), through their attorneys, Bufete Emmanuelli, C.S.P., for this Adversary Complaint against defendants: the United States of America; the Financial Oversight and Management Board for Puerto Rico (the "FOMB"); the Commonwealth of Puerto Rico; and Hon. Ricardo Rosselló Nevares (collectively, the "Defendants"), and allege, state, pray, and request relief as follows:

## I.   NATURE OF THIS ADVERSARY PROCEEDING

1. In 1898, the United States illegally invaded Puerto Rico when it already had a national history of 405 years of political and economic development, taking away violently our country of the Autonomic Charter and with it, the right to vote and elect political representatives, granted by the Spanish regime, after a long and bloody anti-colonial struggle.

2. To make matters worse, the Supreme Court of the United States imposed the ignominious colonial judicial doctrine of the *Insular Cases*.[2] In these cases, the colonial system of the United States was strengthened and the unequal and immoral treatment of Puerto Rico was legitimized until this very day. Such cases determined that Puerto Rico is not a foreign country in relation to the United States, but an unincorporated territory, which belongs to, but

---

[2] *DeLima v. Bidwell*, 182 U.S. 1, 200 (1901); *Goetze v. United States*, 182 U.S. 221, 221-22 (1901); *Dooley v. United States*, 182 U.S. 222, 236 (1901); *Armstrong v. United States*, 182 U.S. 243, 244 (1901); *Downes v. Bidwell*, 182 U.S. 244, 287 (1901); *Huus v. New York & Porto Rico S.S. Co.*, 182 U.S. 392, 397 (1901); *Dorr v. United States*, 195 U.S. 138, 148 (1904).

3

is not part of, the United States, and to which only a few fundamental constitutional rights of the Federal Constitution apply. That imposed the abhorrent condition of the deprivation of fundamental human rights upon the Puerto Rican People.

3. Contradicting 122 years of a history of proclamations to the world regarding the values of equality and freedom,[3] the *Insular Cases* turned the United States into an empire as cruel as the kingdom from which they vigorously sought liberation with their war for independence.[4] These cases "stand at par with *Plessy v. Ferguson*[5] in permitting disparate treatment by the government of a discrete group of citizens."[6] *"The 'redeeming' difference is that Plessy is no longer the law of the land, while the Supreme Court remains aloof about the repercussions of its actions in deciding the Insular Cases as it did, including the fact that these cases are responsible for the establishment of a regime of de facto political apartheid, which continues in full vigor."*[7] This is a clear violation of the international regime of human rights.[8]

4. The *Insular Cases* reflect outdated theories of imperialism and racial inferiority that have outlived their usefulness.[9] The fact that race and alienage was a deciding factor in the rationale

---

[3] "The happy union of these states is a wonder: their Constitution a miracle: their example the hope of liberty throughout the world." James Madison (1829).

[4] *See* Nelson A. Denis, *War Against All Puerto Ricans: Revolution and Terror in America's Colony*, Nation Books (2015).

[5] 163 U.S. 537 (1896).

[6] Juan R. Torruella, *The Supreme Court and Puerto Rico, The Doctrine of Separate and Unequal*, Editorial de la Universidad de Puerto Rico (1985) p. 3.

[7] Juan R. Torruella, *The Insular Cases: The Establishment of a Regime of Political Apartheid*, 29:2 U. Pa. J. Int'l L. 283 (2007), p. 286.

[8] Article VI of the US Constitution: "This Constitution, and the laws of the United States which shall be made in pursuance thereof; **and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land**; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." [Emphasis added]

[9] In words of Judge Juan B. Torruella "the Insular Cases were wrongly decided because, at the time of their ruling, they squarely contradicted long-standing constitutional precedent. Their skewed outcome was strongly influenced by racially motivated biases and by colonial governance theories that were contrary to American territorial practice and experience. Further evidence of this contention… is the discriminatory manner in which the Supreme Court has thereafter applied the doctrines of the Insular Cases, even in more modern times." "[T]he dogma of the Insular Cases

of the *Insular Cases* is evident when Justice Brown -the same Justice that decided *Plessy*-observed that because the "**alien races**" that inhabited the new territories that the United States had acquired differed from other Americans in "religion, customs, laws, methods of taxation, and modes of thought, the administration of government and justice, according to Anglo-Saxon principles, may for a time be impossible." *Downes v. Bidwell*, 182 U.S. 244 (1901) at 287. **The *Insular Cases* were fundamentally based on the badges and incidents of slavery in the United States that were supposedly forbidden by the XIII, XIV and XV Amendments of the U.S. Constitution.**

5. All this shameful history is ostensibly based on the Territories Clause of Article IV of the Constitution of the United States. All this in a contradictory torrent and affront against some of the most important principles that justified the independence war against King George III of England on July 4, 1776. The founding fathers plead their case of war against the King stating that "[t]he history of the present King of Great Britain is a history of repeated injuries and usurpations, all having in direct object of the establishment of an absolute Tyranny over these States. To prove this, let Facts be submitted to a candid world."[10] As King George III did in the eighteenth century, Congress, through Acts Foraker, Jones-Shafroth and now PROMESA, "has refused his Assent to Laws, the most wholesome and necessary for the public good"; "has forbidden [our] Governors to pass Laws of immediate and pressing importance"; "has erected a multitude of New Offices, and sent hither swarms of Officers to

---

constitutes an outmoded anachronism when viewed within the framework of present-day constitutional principles and, additionally, that it contravenes international commitments entered into by the United States since then, which constitute superseding "Law of the Land." See Article VI of the US Constitution. Ultimately, the present legitimacy of the Insular Cases is untenable. The system of governance promoted thereunder can no longer be reconciled with a rule of law in which all citizens are entitled to equality." *Id. 286-287* [Citation omitted].

[10] *The Unanimous Declaration of the thirteen United States of America.*

harass our people and eat out their substance"; has "cut off our Trade with all parts of the world; has again, **"taken away our Charters abolishing our most valuable Laws and altering fundamentally the Forms of our Governments."** Notwithstanding those injuries, our People "have Petitioned for Redress in the most humble terms: [but] Our repeated Petitions have been answered only by repeated injury. A Prince, whose character is thus marked by every act which may define a Tyrant, is unfit to be the ruler of a free people."[11]

[Emphasis added]

6. Under the Territories Clause, the *Insular Cases* doctrine of discriminatory incorporation of fundamental constitutional rights, Puerto Rico continues to be a colony inhabited by 3.3 million second class American citizens who do not have political or economic rights as do the resident citizens of the other States. Puerto Rico has more resident citizens than 23 States including the District of Columbia. Also, it is the largest and most populated of the eight current colonies. Nevertheless, cannot vote in federal elections, we do not have the right to receive federal funds on equal terms, nor do we have the power to exercise our sovereign powers to free ourselves from the limitations of the federal Commerce Clause, the preemption doctrine, the control of the currency, telecommunications, transportation and diplomatic and commercial relations with other countries. Therefore, as Puerto Ricans we are unable to manage our political and economic destiny, and get out of this swamp in which we have stumbled because we do not have the most basic right to elect the representatives that control all the fundamental aspects of our life.

---

[11] *Id.*

6

7. Nowadays, to solve a major financial crisis in the United States municipal bond market, Congress called again upon these extraordinary and violent powers over 3.3 million second class American citizens, and added insult to injury, taking away our charters by enacting PROMESA, that imposes a supra-governmental and non-voted federal Oversight Board, not only striping away the rights of the already limited self-government of Public Law 600 of 1950[12] and the 1952 Constitution of the Commonwealth of Puerto Rico, but also, in violation of the Federal Constitution.

8. Neither Plaintiff's members nor any of the residents of Puerto Rico, who are able and willing to vote US citizens, had the opportunity to cast a single vote to select or appoint the members of the FOMB, much less, to vote in the elections of the federal officers and representatives that enacted PROMESA.

9. The FOMB has exercised many of the powers vested upon them by PROMESA. For example, they certified and imposed a Fiscal Plan as the "blueprint" that the Commonwealth's Government and other governmental instrumentalities shall follow in the next five fiscal years; certified and imposed the Commonwealth's FY18 budget against the political will of the Legislature of Puerto Rico; and has invalidated Laws of the Commonwealth. These actions invalidated the power of Plaintiffs' members and the People of Puerto Rico to elect representatives with all the powers conferred by the Constitution of the Commonwealth of Puerto Rico. Currently, the FOMB is even pressing the Commonwealth's Government to repeal Act 80-1976, which protects the private sector employees from terminations without just cause. Wherefore, they are the actual

---

[12] The Puerto Rico Federal Relations Act of 1950 (Pub.L. 81–600).

power that is deciding over public policy in Puerto Rico, sidestepping the elected Government in practically all fundamental issues.

10. The 13th Amendment states that neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, **or any place subject to their jurisdiction**.[13] Many scholars[14] now agree that the purpose of the 13th Amendment was not only to end chattel slavery, but to proclaim and implement the fundamental principles contained in the Declaration of Independence[15] and the Preamble of the Constitution[16] and to give said principles universal application to all under the flag. On the other hand, the 15th Amendment states that [t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

11. The rights to vote, to full political participation and to democracy are constitutionally and internationally recognized and protected as fundamental civil and human rights.

---

[13] Puerto Rico has been under the U.S. jurisdiction since the Treaty of Paris.

[14] See for example: Tsesis, Alexander, *The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment* (Columbia University Press, 2010); *For Liberty and Equality: The Life and Times of the Declaration of Independence* (Oxford University Press 2012); *The Thirteenth Amendment and American Freedom: A Legal History* (New York University Press 2004); Balkin, Jack M. and Levinson, Sanford, *The Dangerous Thirteenth Amendment*, Columbia Law Review, Essays - Archived, Issue 7, Volume 112 (2012); Balkin, Jack M., *Constitutional Redemption: Political Faith in an Unjust World* (Harvard University Press, 2011); Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (Yale Univ. Press 1999); tenBroek, Jacobus, *The Antislavery Origins of the Fourteenth Amendment*. University of California Press (1951).

[15] The Supreme Court has taken notice and used the Declaration of Independence as a source of historical context and substantive juridical basis in constitutional law and to interpret the U.S. Constitution. See for example: *Evenval v. Abbot*, 136 U.S. 1120 (2016); *Stern v. Marshall*, *131* S.Ct. 2594 (2011) *United States v Cabrales,* 524 U.S. 1 (1998) *Adarand v. Pena* 515 U.S. 200 (1995); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982); *Curtis Publishing v. Butts,* 388 U.S. 130 (1967); *Gray v. Sanders*, 372 US 368 (1963); *Cooper v. Aaron*, 358 U.S. 1 (1958); *Bute v. Illinois*, 333 U.S. 640 (1948); *Duncan v. Kahanamoku*, 327 U.S. 304 (1946); *United States v. Curtiss-Wright*, 299 U.S. 304 (1936); *Allgeyer v.Louisiana*, 165 U.S. 578 (1897); *Gulf v. Ellis*, 165 U.S. 150 (1897); *Monongahelan v. United States,* 148 U.S. 312 (1893); and *Powell v Pennsylvania*, 127 U.S. 678 (1888).

[16] We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defense, promote the general Welfare, and secure **the Blessings of Liberty to ourselves and our Posterity**, do ordain and establish this Constitution for the United States of America. [Emphasis added]

These civil and human rights are among the most important rights because, through them, people are able to hold their governments accountable and also are empowered to improve their lives. Through the exercise of these rights, individuals are able to assign to themselves all the privileges and the duties of citizenship. The validity of these rights is an acknowledgement that both individuals and people are entitled to be the owners of their own destinies by participating in the decisions that fundamentally affect their lives. In fact, these rights are the grounding for a system in which all other human and civil rights are respected.

12. The rights to vote, to participate in government, to democracy, and to the equal enjoyment and exercise of one's rights as equal citizens under the law, form the only legitimate basis for the exercise of power by governments in any place in the world.

13. PROMESA, based in the racist interpretation of the *Insular Cases* of the Territories Clause of the U.S. Constitution*,* took away Puerto Rico's self-government charters and constitutes a disenfranchisement of Plaintiffs' members and the Puerto Rican People, who are able and willing to vote US citizens, in a direct and flagrant violation to the Declaration of Independence, the Preamble of the Constitution and the 13th and 15th Amendments of the United States Constitution.

## II.  THE PARTIES

14. Plaintiff, Hermandad de Empleados del Fondo del Seguro del Estado, Inc., also known as Unión de Empleados de la Corporación del Fondo del Seguro del Estado, ("UECFSE"), is a labor union created as a corporation under the Laws of the Commonwealth of Puerto Rico, with its principal place of business at San Juan, Puerto Rico. UECFSE has the exclusive and unlimited prerogative to represent all of its members in matters related to their rights and

9

wellbeing. UECFSE represents approximately two thousand (2,000) members who are able and willing to vote US citizens.

15. Plaintiff, Asociación de Empleados Gerenciales del Fondo del Seguro del Estado Corp. ("AEGFSE"), is a *bona fide* labor association, created as a corporation under the Laws of the Commonwealth of Puerto Rico, with its principal place of business at San Juan, Puerto Rico. AEGFSE has the exclusive and unlimited prerogative to represent all of its members in matters related to their rights and wellbeing. AEGFSE represents approximately seven hundred and eighty (780) members who are able and willing to vote US citizens.

16. Plaintiff, Unión de Médicos de la Corporación del Fondo del Seguro del Estado Corp. ("UMCFSE"), is a labor union, created as a corporation under the Laws of the Commonwealth of Puerto Rico, with its principal place of business at San Juan, Puerto Rico. UMCFSE has the exclusive and unlimited prerogative to represent all of its members in matters related to their rights and wellbeing. UMCFSE represents approximately one hundred and seventy (170) members who are able and willing to vote US citizens.

17. UECFSE, AEGFSE and UMCFSE members' collective bargaining agreements and/or labor rights and benefits have been or are in imminent risk of being impaired by the actions of the Defendants.

18. Defendant, The United States of America ("U.S."), is a federal republic of fifty states organized pursuant to a government structure of three inter independent branches of government: an executive, legislative, and judicial branch.

10

19. Defendant the Financial Oversight and Management Board for Puerto Rico, (the "FOMB"), was created under Section 101(b)(1) of PROMESA[17] as an "entity within the [Commonwealth] government", acting in this Title III case of PROMESA as representative of the Commonwealth.[18]

20. Defendant the Commonwealth of Puerto Rico, (the "Commonwealth"), is a territory of the United States.

21. Defendant Hon. Ricardo Rosselló Nevares, ("Governor Rosselló"), is the Governor of the Commonwealth. Plaintiff sues Governor Rosselló in his official capacity.

### III. JURISDICTION AND VENUE OF THIS HONORABLE COURT

22. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under PROMESA and the U.S. Constitution.

23. In addition, this Court has jurisdiction under Section 106(a) of PROMESA, which grants jurisdiction to this Court over "any action against the Oversight Board, and any action otherwise arising out of [PROMESA], in whole or in part".[19]

24. Plaintiff seek a declaration and related relief pursuant to 28 U.S.C. §§ 2201 and 2202. An actual and justiciable controversy has arisen and exists between the parties with respect to the issues and claims alleged herein.

25. This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Section 310 of PROMESA, which provides "The Federal

---

[17] 48 U.S.C. § 2121(b)(1).
[18] 48 U.S.C. § 2121(c)(1).
[19] 48 U.S.C. § 2126(a).

11

Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all civil proceedings arising in or related to cases under [Title III of PROMESA]".[20]

26. Venue is proper in this District under Section 307 of PROMESA.[21]

27. Plaintiffs have standing to bring this adversary proceeding, as parties in interest in the above-captioned Title III case according to Section 301 of PROMESA [22] which incorporates Section 1109 of the Bankruptcy Code,[23] because their members, who are all able and willing to vote US citizens, suffered, are suffering or are in imminent danger of suffering an invasion of a legally protected interest, including a pecuniary interest, collective bargaining agreement and property (employment, salaries, bonuses, pensions and health plans), that is concrete and particularized, actual or imminent, not conjectural or hypothetical, and fairly traceable to the challenged conduct of defendants and likely to be redressed by a favorable judicial decision.

## IV.   LEGAL AND FACTUAL BACKGROUND

### A.  THE CFSE

28. The State Insurance Fund Corporation, (the "CFSE" for its acronym in Spanish) was created by Law No. 45 of April 18, 1935, as amended, known as the Workmen Compensation Insurance Act (the "Act"). On October 29, 1992, the Act was amended by Law No. 83-1992 to convert the CFSE into a governmental corporation.[24]

---

[20] 48 U.S.C. § 2170; Fed. R. Bankr. P. 7001.
[21] 48 U.S.C. § 2167.
[22] 48 U.S.C. §§ 2161.
[23] 11 U.S.C. 1109.
[24] State Insurance Fund Corporation, http://web.fondopr.com/es/la-corporacion/quienes-somos/trasfondo-historico
(accessed  October 12, 2017)

29. The CFSE's organic law constitutes, without a doubt, one of the most relevant pieces of the Puerto Rican labor legislation. Throughout its eighty decades of existence, more than a hundred amendments have been incorporated into the statute aimed at tempering its provisions to the social and economic transformations experienced by the country.[25]

30. The CFSE adopted a corporate structure in order to provide the operations and services it offers with agility and efficiency.[26]

31. The CFSE is the exclusive provider of insurance coverage for work related accidents, deaths, and illness suffered by workers in Puerto Rico.

32. The main purpose of the CFSE is to guarantee the constitutional right of every worker to be protected against risks to their health in employment.

33. Its main objective has been to promote the welfare of the working class by providing excellent medical services, prevention, rehabilitation and financial compensation in cases of work-related injuries, illness or death.[27]

34. The CFSE fulfills the social purpose of promoting the welfare of the working class of Puerto Rico through the fair provision of services to workers affected by accidents or occupational diseases.

35. The CFSE administers three basic areas:[28]

   a.  Compulsory employer insurance.

   b.  Medical and rehabilitation services.

---

[25] State Insurance Fund Corporation http://web.fondopr.com/es/la-corporacion/quienes-somos/ley-num-45 (accessed  October 12, 2017)
[26] *Id.*
[27] State Insurance Fund Corporation,  http://web.fondopr.com/es/la-corporacion/quienes-somos/trasfondo-historico (accessed October 12, 2017).
[28] *Id.*

13

c. The payment of economic compensation to the injured workers.

36. The Work Injury Compensation System offered by the CFSE is complete and has a great variety of medical specialists and subspecialists who attend to their patients exclusively through the nine regional offices, intermediate dispensaries and in the Industrial Hospital.[29]

37. Similarly, the CFSE has the important mission of offering the employer a comprehensive worker insurance cover and immunity, at the most economic cost, and at the same time, provide effective services, so that injured workers can return to their jobs in the shortest period of time possible.[30]

38. In addition, it seeks to ensure that employers compensate, through the payment of premiums, their workers or their beneficiaries due to illness or death resulting from the occupation, as well as other types of injuries or death. The CFSE provides the methods to make this duty more effective, through the regulation and administration of the employer's insurance.

39. The CFSE also provides a defense to the employer against exposure to the risk of accidents and occupational diseases sources of claim for damages. The employer charges the premiums paid as normal operating expenses of the company. This function of the CFSE is a contribution to the stability and economic growth of the country.

40. CFSE is an essential service that the FOMB should ensure according to PROMESA Section 201 (b)(1)(B).[31]

41. The CFSE is one of the Public Corporations covered by the Fiscal Plan of the Commonwealth, certified by the FOMB on April 19, 2018.[32]

---

[29] *Id.*
[30] *Id.*
[31] *Supra* § 2141.
[32] April 19, 2018, Commonwealth Fiscal Plan, page 118.

14

## B. THE UECFSE, THE UMCFSE AND THE AEGFSE

42. The UECFSE was founded in 1963. Its members are responsible for the general operation of the services the CFSE provides. Its members include, but are not limited to actuaries, buyers, system analysts, dietitians, physical and occupational therapists, pharmacy technicians, carpenters, electricians, nurses, pharmacists, etc.

43. The UECFSE's duty is to protect and defend CFSE's workers, as well as negotiate collective bargaining agreements on their behalf. The latest collective bargaining agreement (CBA) is from the 2011-2015 period. Even though it was enacted with a lifespan lasting from July 2011 through June 2015, it has a provision that establishes that it will continue dictating the labor relations between the CFSE and the UECFSE until a new collective bargaining agreement is negotiated and in effect. Since no new collective bargaining agreement has been negotiated and established, the CBA is still in force.

44. The UMCFSE was founded in 2001. Its members are responsible for providing medical services to the injured workers served at the CFSE.

45. The UMCFSE's duty is to protect and defend CFSE's medical doctors, as well as negotiate collective bargaining agreements on their behalf. The latest collective bargaining agreement (CBA) is from the 2002-2006 period. Even though it was enacted with a lifespan lasting from July 2002 through June 2006, it has a provision that establishes that it will continue dictating the labor relations between the CFSE and the UECFSE until a new collective bargaining agreement is negotiated and in effect. Since no new collective bargaining agreement has been negotiated and established, the CBA is still in force.

15

46. The AEGFSE was founded in 1942. On September 5th, 2017, the AEGFSE was registered in the Puerto Rico Department of State as a Non for Profit Corporation. Its members are part of the management team of the CFSE.

47. The AEGFSE's purpose is to promote and encourage the free association of the managerial employees of the CFSE. Since its inception, the AEGFSE is an effective instrument that achieves the recognition of the rights, faculties and prerogatives that correspond to each associate as an employee of the CFSE.

48. The CFSE is a service provider corporation. Therefore, the employees are an essential and indispensable part of its operations.

49. Despite the fact that the employees play a vital role in the CFSE´s operational and financial health, the Government enacted legislation directed at undermining and impairing their labor rights and benefits that provide for the health and well-being of these workers. Such legislation was incorporated by Defendants in the Commonwealth's Fiscal Plan, certified on April 19, 2018.[33]

---

[33] The "Government of the Commonwealth of Puerto Rico Special Fiscal and Operational Sustainability Act", Act Num. 66 of June 17, 2014. ("Act. Num. 66").[33] This law substantially alters the CBA by establishing a limit to the amount of vacation and illness days a member could accumulate and receive a monetary compensation for and eliminating numerous important economic and non-economic provisions of the CBA.

The "Act to Attend to the Economic, Fiscal, and Budget Crisis and to Guarantee the Functioning of the Government of Puerto Rico", Act Num. 3 of January 23, 2017, was enacted.[33] ("Act Num. 3"). It suspended all collective bargaining agreement provisions that were contrary to its clauses, suspended all non-economic clauses that had any economic impact, whether it be direct or indirect, on the corporation budget, eliminated monetary compensations, and imposed on public corporations the creation of a plan so employees would exhaust all excess vacation and sick leave balance. This Act extended the lifespan of applicable provisions of Act 66-2014, such as Sections 11 and 17.

The "Administration and Transformation of the Human Resources of the Government of Puerto Rico Act", Act Num. 8 of February 4, 2017.[33] ("Act Num. 8"). Its purpose is to make the Government the sole employer of all public employees, allowing it to consolidate services, eliminate those which it understands are no longer needed, create a unified system of job classifications, have a specific merit system applicable for all agencies and corporations, and facilitate the transfer or movement of employees between agencies, without regard to what agency or corporation an employee works for;

50. The Certified Fiscal Plan imposes a series of measures that impact all Plaintiffs' members. These include: instituting a payroll freeze; standardizing healthcare provided to government employees; asserting a hiring freeze with stringent requirements for backfilling positions left open by attrition or workforce reduction; limiting paid holidays to 15 days annually across all public employees; prohibiting carryover of sick and vacation days between fiscal years; prohibiting any future liquidation of sick and vacation days; eliminating the Christmas bonus for all public employees.[34]

51. The April 19th Fiscal Plan is based on the assumption that the provisions of these Acts and budget cuts will continue to be enforced through the duration of the New Fiscal Plan.[35]

52. The agency efficiency measures included in the April 19th Fiscal Plan imposes the CFSE a reduction of approximately 152 million personnel spend reduction out of a total of approximately 229 million costs reduction through the five years of the Certified Fiscal Plan.[36]These measures will imminently impair Plaintiffs members' labor rights and benefits.

53. The impairment of the labor rights and benefits holds severe and negative consequences for UECFSE, UMCFSE and AEGFSE's members, the CFSE, and the Commonwealth. It throws employees into a trustless, illegal, unsafe, and economically unstable environment. These governmental actions serve a harsh blow to the workforce that can

---

The, "Fiscal Plan Compliance Act", Act Num. 26 of April 29, 2017 ("Act Num. 26").[33] This Act impaired multiple important fringe benefits of employees. For example, it eliminates monetary compensation for excess vacation and illness days; reduces the amount of days an employee can accrue of vacation or illness; eliminates any and all monetary compensations; sets a time limit for the use of excess vacation or illness days. If this excess balance is not used by the established date, they will be lost.
[34] April 19, Commonwealth Fiscal Plan, pages 87-88.
[35] *Id*.
[36] *Id.*, page 132.

17

only result in the diminishment of labor productivity. Therefore, it will impair an essential service that should be ensured, as provided by §201 of PROMESA.

54. Targeting the employees and hurting what little income and benefits safety they have, has a domino effect on the economy. The repercussions of the mentioned measures are felt by the employees, which in turn, hurt the CFSE, the Commonwealth, its citizens and the Government. It has the devastating effect of stumping any much-needed fiscal stability or economic growth that all fiscal plans and budgets require.

55. Plaintiffs' members, who are able and willing to vote US citizens, did not have the opportunity to cast a vote to select or appoint the federal officers and representatives that enacted PROMESA.

56. Plaintiffs' members, who are able and willing to vote US citizens, did not have the opportunity to cast a vote to select or appoint the members of the FOMB.

57. Plaintiffs members' voting rights were severely impaired by the enactment of PROMESA and the enforcement of its provisions, since it obliterated the prerogatives of the Commonwealth's elected officials, rendering them as mere subordinates of the FOMB without any power to carry out any substantial political powers invested on them by the Constitution of the Commonwealth.

58. Plaintiffs members' rights and benefits were impaired by Defendants as a result of the enactment of PROMESA and the enforcement of its provisions without Plaintiffs' members having the right or power to elect the representatives and federal officials responsible for establishing public policy in Puerto Rico.

18

## C.  PUERTO RICO: HISTORY OF INEQUALITY AND COLONIALISM

### i.  INVASION OF PUERTO RICO

59. In 1897, after a long history of anti-colonial struggle, the government of Spain finally granted the Autonomic Charter to Puerto Rico. The Autonomic Charter granted the Puerto Rican People the right to elect fully empowered representatives to the Spanish Courts. The autonomous government that Spain conceded to Puerto Rico did not last long. On 1898, when the new cabinet was installed, in a very suspicious and questioned event, the ship Maine exploded in the bay of Havana, Cuba. The United States then used that unfortunate event as an excuse for starting the Spanish-American War. Eight days after the new Puerto Rican legislature met for the first time, on July 25th, 1898, United States troops landed in Guánica, Puerto Rico, an event that marked the end of the Puerto Rican experiment in self-government and inaugurated the American colonial rule. Although the Island had not participated in the war, its acquisition, as property, became part of a new geopolitical vision of hegemony in the Caribbean. The invasion was part of the process of an imperial expansion elicited by the Monroe Doctrine of "America for the Americans"[37] and the "Manifest Destiny".[38]

60. In December 1898, the Treaty of Paris was signed, and Spain formally ceded Puerto Rico to the United States.[39] Even though Puerto Rico had enjoyed attributes of sovereignty that made it a nation separate from Spain, it was ceded, as property, to the United States without its

---

[37] The Monroe Doctrine was articulated in President James Monroe's seventh annual message to Congress on December 2, 1823.

[38] Eric Foner and John A. Garraty, Editors, *The Reader's Companion to American History*, Houghton Mifflin Harcourt Publishing Company (1991). The term manifest destiny originated in the 1840s. It expressed the belief that it was Anglo-Saxon Americans' providential mission to expand their civilization and institutions across the breadth of North America. This expansion would involve not merely territorial aggrandizement but the progress of liberty and individual economic opportunity as well. The phrase was first employed by John L. O'Sullivan in an article on the annexation of Texas published in the July-August 1845 edition of the United States Magazine and Democratic Review, which he edited.

[39] December 10, 1898, definitively ratified on March 19, 1899.

19

consent. Therefore, the Treaty is considered null.[40] According to Eugenio M. Hostos "the Treaty of Paris could not involve Puerto Rico without the explicit agreement of its inhabitants who at that time were all Spanish citizens."[41]The transfer to the United States of the Puerto Rican territory and its inhabitants, as war booty, was executed with the immoral diligence of enslavers in the market, in fact treating Puerto Ricans as mere property.

61. According to Article IX of the Treaty, the civil rights and political status of the islanders would be determined by the United States Congress. After more than a century, our political status continues in the hands of Congress and we remain as subordinate, second class citizens without the right to elect the representatives that are vested with the power to control our destiny.[42]

### ii.  MILITARY GOVERNMENT AND THE FORAKER ACT

62. For nearly two years after the invasion, Puerto Rico suffered a military government until April 12, 1900, when Congress passed the Foraker Act,[43] creating a truncated and undemocratic civil government. During the military regime, the legal institutions of Puerto Rico were substantially eliminated or modified and the Federal Court was established.[44]

---

[40] Albizu Campos, Pedro, *"Nulidad del Tratado de Paris"*, Escritos, Publicaciones Puertorriqueñas Editores, (2007); Arraiza, Fermin. *Nulidad Tratado de París: ensayo antihistórico*. Bibliográficas (2007); Francisco Javier Díaz González, *Estudio Histórico-Jurídico de los Tratados de liquidación del Imperio Español de Ultramar: El Tratado de Paris de 10 de diciembre del 1898 y el de Madrid de 30 de junio de 1899*, AFDUA (2005); Fernos Lopez-Cepero, Antonio. *Ser Nosotros mismos. La angustiosa lucha del pueblo puertorriqueño por su soberanía nacional Puerto Rico*. Universidad de Puerto Rico (2003); Carrión, Juan Manuel. *La nación Puertorriqueña. Ensayos en torno a Pedro Albizu Campos*. Ed. de la Universidad de Puerto Rico (1993); Dr. José López Baralt, *Is the Paris Treaty Null Ab Initio? Revista Jurídica de la Universidad de Puerto Rico* (1937) p. 75.
[41] Alejandro Torres Rivera, *Perspectivas hostosianas*. Ed Calameo. 2009. [Translated from Spanish original text]
[42] *A Treaty of Peace Between the United States and Spain*, U.S. Congress, 55th Cong., 3d sess., Senate Doc. No. 62, Part 1 (Washington: Government Printing Office, 1899), 5-11, Article IX The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress.
[43] Pub.L. 56–191, 31 Stat. 77, enacted April 12, 1900.
[44] Pedro Malavet Vega, *Derechos y Libertades Constitucionales en Puerto Rico*, Ediciones Lorena, Ponce, Puerto Rico 2003 p. 125-126.

Under the Foraker Act, Congress reserved the power to annul the laws of Puerto Rico.[45] In addition, it extended the ignominy of the cabotage laws.[46] Congress approved the Foraker Act as a constitutional order and it represented another setback to what Puerto Rico had with the Autonomous Charter of 1897.[47]

63. Soon after the enactment of the Foraker Act, the Supreme Court defined the scope of this new constitutional order in the infamous *Insular Cases*.[48]

64. The *Insular Cases*, by interpreting the Territories Clause of the U.S. Constitution, U.S. Const. Art. IV, §3, clause 2,  as an unlimited power, determined that Puerto Rico is not a foreign country in relation to the United States, but an unincorporated territory, which belongs to, but is not part of, the United States, and to which only a few *personal* fundamental constitutional rights of the Federal Constitution apply. *Balzac v. Porto Rico*, 258 U.S. 298, 312–13 (1922). This unconstitutional and unjust colonial regime that is based upon race and alienage differences, has been criticized by many of the most illustrious minds of constitutionalism.[49] Judge Harlan, vigorously objected this double standard:

---

[45] *Id.* Art. 31; *see also*, Carmen Ramos De Santiago, *El Gobierno de Puerto Rico*, Editorial Universitaria, Universidad de Puerto Rico, 1978, p. 64.

[46] Pub.L. 56–191, *supra,* Art. 9; see also, Ramos De Santiago *supra,* p. 68.

[47] *Id.* p. 126.

[48] *DeLima v. Bidwell*, 182 U.S. 1, 200 (1901); *Goetze v. United States*, 182 U.S. 221, 221-22 (1901); *Dooley v. United States*, 182 U.S. 222, 236 (1901); *Armstrong v. United States*, 182 U.S. 243, 244 (1901); *Downes v. Bidwell*, 182 U.S. 244, 287 (1901); *Huus v. New York & Porto Rico S.S. Co.*, 182 U.S. 392, 397 (1901); *Dorr v. United States*, 195 U.S. 138, 148 (1904). Malavet Vega *Id.* P. 127.

[49] *Torres v. Puerto Rico*, 442 U.S. 465, 475-476 (1979) (Brennan, J., concurring in the judgment); *Igartúa v. United States*, 626 F.3d 592, 612–39 (1st Cir. 2010) (Torruella, J., dissenting in relevant part); *Igartúa De La Rosa v. United States*, 417 F.3d 145, 158–84 (1st Cir. 2005) (Torruella, J., dissenting); Efren Rivera Ramos, *The Insular Cases: What Is There to Reconsider?, in Reconsidering the Insular Cases: The Past and Future of the American Empire* p. 29, 29; Carlos Ivan Gorrin Peralta, *Puerto Rico and the United States at the Crossroads, in Reconsidering the Insular Cases: The Past and Future of the American Empire* 183, 183 (Gerald L. Neuman & Tomiko Brown-Nagin eds., 2015); Juan R. Torruella, *Ruling America's Colonies: The Insular Cases*, 32 Yale L. & Pol'y Rev. 57 (2013); Juan R. Torruella, *The Supreme Court and Puerto Rico, The Doctrine of Separate and Unequal*, Editorial de la Universidad de Puerto Rico (1985); José A. Cabranes, *Citizenship and The American Empire*, 127 U. Pa. L. Rev. 391 (1978); Marcos A. Ramírez, *Los casos insulares: Un estudio sobre el proceso judicial*, 16 REV. JUR. UPR 121

[E]ngraft[ing] upon our republican institutions, controlled by the supreme law of a written Constitution, **a colonial system entirely foreign to the genius of our Government and abhorrent to the principles that underlie and pervade the Constitution**. It will then come about that we will have two governments over the peoples subject to the jurisdiction of the United States, one, existing under a written Constitution, creating a government with authority to exercise only powers expressly granted and such as are necessary and appropriate to carry into effect those so granted; the other, existing outside of the written Constitution, in virtue of an unwritten law to be declared from time to time by Congress, which is itself only a creature of that instrument.[50] [Emphasis added.]

### iii. JONES-SHAFROTH

65. The Jones-Shafroth Act of March 2, 1917[51] imposed the American citizenship to all citizens of Puerto Rico and reformed the system of government in Puerto Rico. The imposed American citizenship is a mockery[52] when compared to the rights of the resident citizens of the States and there is no doubt that it was related to the intervention of the United States into the First World War. In that conflict, Puerto Rico fulfilled its first blood quota spilled in wars for which it did not have the faculty to decide if it was just or necessary to participate or not. Although the citizenship was established, that did not bring equal economic or political rights for Puerto Ricans. At some respects, the governmental structure paralleled that of a state of the United States. Powers were separated among executive, judicial, and legislative branches. The statute also recognized certain civil rights through a bill of rights to be observed by the government of Puerto Rico. Nevertheless, the inequality and discrimination established upon

---

(1946-1947); Simeon E. Baldwin, *The Constitutional Questions Incident to the Acquisition and Government by the United States of Island Territory*, 12 Harv. L. Rev. 393, 405 (1899); Carman F. Randolph, *Constitutional Aspects of Annexation*, 12 Harv. L. Rev. 291, 306 (1898).

[50] *Hawaii v. Mankichi*, 190 U.S. 197, 240 (1903) (Harlan, J., dissenting).

[51] Pub.L. 64–368 (1917).

[52] Puerto Rico is a nation that has more American citizens than 23 States including the District of Columbia. Also, it is the largest and most populated of the eight current colonies. We don't have equal economic, political nor democratic rights, neither participation in the colonial power governmental affairs. Thus, our citizenship was imposed, incomplete and meaningless.

22

Puerto Rico by the *Insular Cases* was maintained. Puerto Ricans continued without the right to elect the representatives that are vested with the power to control our destiny.

66. The Jones-Shafroth Act was amended in 1947 to, among other things, provide that the governor of Puerto Rico would be elected by the People of Puerto Rico.[53]

### iv.  ACT 600 AND THE COMMONWEALTH OF PUERTO RICO

67. The Jones-Shafroth Act was repealed by the *Federal Relations Act* (Act 600),[54] that established a new form of self-government known as the Commonwealth of Puerto Rico. This represented a "new pattern of government pursuant to the untrammeled power of Congress under the Federal Constitution."[55]

68. Despite the change, the law left intact the colonial relationship, maintaining several articles of the Jones-Shafroth Act, the Foraker Act, as well as the Treaty of Paris that ended the Spanish-American war.[56] Act 600 authorized the drafting of a constitution that was later approved with amendments by Congress in Act 447 of July 3, 1952. In that law, Congress again altered the democratic will of the Puerto Rican people by performing several unilateral changes and limiting its sovereign power to make amendments to the document.[57] Article I, Section 1 of the Constitution of the Commonwealth of Puerto Rico states that "[i]ts political power emanates from the People and shall be exercised in accordance with their will, within the terms of the compact agreed upon between the People of Puerto Rico and the United

---

[53] *An Act to Amend the Organic Act of Puerto Rico (Pub. L. No. 362 61 Stat. 770 (1947)).*
[54] P.L. 81-600.
[55] Hearings before the Committee on Public Lands. House of Representative Eighty-First Congress on H.R. 7674 and S. 3336 to Provide for the Organization of a Constitutional Government by the People of Puerto Rico. (1950), p. 54. Statement of A. Cecil Snyder, Associate Justice of the Supreme Court of Puerto Rico.
[56] Pub.L. 81–600 Sec. 4; *Commonwealth of Puerto Rico, et al v. Sanchez Valle*, 136 S. Ct. 1863 (2016).
[57] Pub.L. 82–447.

23

States of America."[58] The Defendants' actions by the enactment of PROMESA and the enforcement of its provisions sidestepped the People of Puerto Rico as the source of the political power over the Commonwealth.[59]

69. During the time that the Commonwealth's Constitution has been operative, federal courts continued using the *Insular Cases'* for the discriminatory incorporation of some fundamental constitutional rights of the Federal Constitution to singularize Puerto Rico and its citizens based upon race and alienage.[60]

70. Since 1917, or for the past 101 years of those 120 years since the invasion, the people of Puerto Rico have been citizens of the United States. Many of these citizens have served, fought, and died in wars. But, at the national level, their government deprives them of the vote and of the right to participate in their own development on equal terms by granting them only the right to send to their Congress a non-voting delegate to the House of Representatives, called the "Resident Commissioner," by denying them altogether the right to representation in their Senate, and by depriving them absolutely of the right to vote in Presidential/Vice Presidential elections.

### D. PROMESA AND THE POLITICAL RIGHTS OF PLAINTIFFS'MEMBERS

71. On June 30, 2016, the President of the United States signed the Puerto Rico Oversight Management and Economic Stability Act[61] (PROMESA) into law. Said legislation seeks to tackle the fiscal emergency in Puerto Rico and is designed to institute a "comprehensive approach to Puerto Rico's fiscal, management and structural problems and adjustments...

---

[58] L.P.R.A. Const. Art. I, § 1.
[59] Section 4 of PROMESA, 48 U.S.C §2103, states: "The provisions of this chapter shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this chapter."
[60] *See Harris v. Rosario*, 446 U.S. 651 (1980).
[61] 48 U.S.C. § 2101 et seq.

24

involving independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process."[62] The statute provides for the establishment of a seven-member (7) Oversight Board for Puerto Rico with the purpose of providing a method for the island to achieve fiscal responsibility and access to the capital markets.[63]

72. Congress enacted PROMESA pursuant to Article IV, §3 of the Constitution of the United States, which provides Congress the power to dispose of and make all needful rules and regulations for territories.[64]

73. According to PROMESA, the FOMB shall consist of seven members appointed by the President. The members must meet the following qualifications:[65]

> "(1) has knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government; and (2) prior to appointment, an individual is not an officer, elected official, or employee of the territorial government, a candidate for elected office of the territorial government, or a former elected official of the territorial government."[66]

74. The candidate must also be free of any conflict of personal financial interests and must submit personal financial statements.[67]

75. On August 31, 2016, José B. Carrión III, Andrew G. Biggs, Carlos M. García, Arthur J. González, José R. González, Ana J. Matosantos, and David A. Skeel, were appointed by former President, Barack Obama, as members of the FOMB.

---

[62] *Id. at* § 2194(m)(4).
[63] *Id*. at § 2121(b)(1).
[64] *Id*. at § 2121(b)(2).
[65] *Id*. at § 2121(e)(1)(A).
[66] *Id*. at § 2121(f).
[67] *Id*. at § 2129(a). Notwithstanding this provision, two of the members of the OB were presidents or directors of the Governmental Development Bank (GDB).

76. None of the members of the FOMB were required by the Law to be elected by the Puerto Rican People.

77. Among other things, PROMESA: (i) establishes a process for the FOMB to approve a fiscal plan governing the Commonwealth's future finances and budgets (Title II); (ii) establishes a process for the FOMB to file a bankruptcy petition on behalf of the Commonwealth or its instrumentalities (Title III); and (iii) provides for an alternative mechanism for adjusting the Commonwealth's bond debt outside of a bankruptcy proceeding by effectuating modifications with the substantial, but not necessarily unanimous, support of the affected bondholders.

78. Pursuant to PROMESA, "A Fiscal plan developed under this section shall, with respect to a territorial government or covered territorial instrumentality, provide a method to achieve fiscal responsibility and access to the capital markets…".[68]

79. The FOMB exercises substantial federal authority over Puerto Rico pursuant to the laws of the United States. They are empowered to make determinations that bind the territory without providing for direction or supervision by Commonwealth's officers.[69] They are required to report annually to the President, Congress, the Governor and the Legislature, on the territorial government progress in meeting PROMESA's objectives, the assistance provided by the FOMB, and recommendations to the President and Congress on changes to PROMESA, or other Federal laws or actions needed to comply with the Certified Fiscal Plan.[70] The scope of the supervision power of the FOMB includes designating the instrumentalities that will be covered by PROMESA; require from the Governor the

---

[68] 48 U.S.C. §§ 2141 (b)(1),(2).
[69] *See generally Association of American Railroads v. U.S. Dept. of Transp.,* 821 F.3d 19 (2016).
[70] 48 U.S.C. § 2148(a).

26

submission of Fiscal Plans and monthly or quarterly reports on budget of such instrumentalities, including instrumentalities that their budget is not subject to legislative approval if its designated as a covered territorial instrumentality.[71] Likewise, the FOMB has powers to hold hearings and sessions, where it can take testimony, and receive evidence; administer oaths or affirmations; obtain official data from both the Federal government and the Government of Puerto Rico; obtain creditor information; issue subpoenas; enter into contracts; and enforce the law and its powers under PROMESA.[72]

80. Under their responsibilities, the FOMB has the approval of Fiscal Plans and Budget, as mentioned above; require the submission of reports and act upon noncompliance with budget by the Government of Puerto Rico; review activities of the Government to ensure compliance with the fiscal plan, including the review and repeal on any law enacted or proposed; submit recommendations to the Governor or the Legislature on financial stability and management responsibility; issue a restructuring certification regarding a covered entity under PROMESA; exercise authority of approval related to debt issuance; make determinations on whether the pension system of the territorial government is materially underfunded; and intervene in any litigation filed against the territorial government to seek injunctive relief, including a stay of litigation.[73]

81. The FOMB has veto power over the Commonwealth's adoption of budgets,[74] authorization of bonds,[75] and legislation.[76] It also has unilateral power to rescind Puerto Rico laws,[77] approve or

---

[71] *Id.* at § 2121(d).
[72] *Id.* at § 2124.
[73] *Íd.* at §§ 2141-2152.
[74] *Íd.* § 2142.
[75] *Íd.* § 2147.
[76] *Íd* § 2147(a)(1), (5).

disapprove fiscal plans for the Commonwealth and its instrumentalities,[78] *and issue its own*
fiscal plan if it rejects the Commonwealth's plan,[79] to which the Governor and Legislature of
the Commonwealth *may not object*.[80]

82. The FOMB also can bind those outside the government.[81] For example, it has the authority
to rescind certain laws enacted by the Commonwealth that "alter[ed] pre-existing priorities of
creditors."[82] The Oversight Board may enter into contracts of its own,[83] and the Board's
authorization is required to permit the Commonwealth to issue or guarantee new debt, or to
exchange, modify, repurchase, redeem, or enter into any similar transactions with respect to
its debt.[84]

83. The FOMB may deploy these investigative powers to police "the disclosure and selling
practices" of Commonwealth and instrumentality bonds, including any "conflicts of interests
maintained by" brokers, dealers, or investment advisers, a power which extends the FOMB's
regulatory scope far beyond Puerto Rico's borders.[85]

84. PROMESA grants the FOMB the authority to assess and reorganize the fiscal affairs of the
Commonwealth, to bind third parties that are not government-related, and to initiate and direct
what is the largest and most complicated bankruptcy proceeding in the Nation's history.[86]

---

[77] *Íd.* § 2144(c)(3)(B).
[78] *Íd.* § 2141(c)(3).
[79] *Íd.* § 2141(d)(2).
[80] *Íd.* § 2141(e)(2).
[81] *See Officers of the United States within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 87 (2007).
[82] 48 U.S.C. § 2144(c)(3)(B)(ii).
[83] *Íd.* § 2124(g)
[84] *Íd.* § 2147
[85] *Íd.* 48 U.S.C. § 2124(*o*). As a matter of fact, the FOMB represented to Magistrate Judge Dein that their
investigative powers, "cannot have [been] broader," and extends to "anything that seems appropriate" to the
Oversight Board. Tr. 44–45, Docket No. 1153, case 17-03283 (Aug. 22, 2017).
[86] Fortune by Reuters (May 4, 2017), *Puerto Rico Has Filed for the Biggest-Ever U.S. Local Government
Bankruptcy*: http://fortune.com/2017/05/04/puerto-rico-bankruptcy-debt/

85. Under PROMESA, neither the Governor nor the Legislature may exercise *any* control, supervision, oversight, or review *over the FOMB or its activities*.[87] The government can't even enact, implement, or enforce any statute, resolution, policy or rule that would impair or defeat the purposes of PROMESA, *as determined by the Oversight Board*.[88] PROMESA has preempted all local executive and legislative control over Puerto Rico's fiscal matters.[89]

86. PROMESA also requires the territorial government to designate a dedicated funding source, *not subject to subsequent legislative appropriations*, sufficient to support the annual expenses of the Oversight Board *as determined in the FOMB's sole and exclusive discretion*.[90]

87. The FOMB is also the representative of the territorial government in the adjustment of debts process and proceedings under Title III of PROMESA, with the exclusive authority of filing the petition and the plan of adjustment.[91] The Oversight Board may also consent the Court interference with the political or governmental powers, the property or revenues, or the use or enjoyment of the income producing property of Puerto Rico.[92]

88. Neither Plaintiffs' members nor any of the residents of Puerto Rico had the opportunity to cast a vote to select or appoint the federal officers and representatives that enacted PROMESA.

89. Neither Plaintiffs' members nor any of the residents of Puerto Rico had the opportunity to cast a single vote to select or appoint the members of the FOMB.

---

[87] *Íd.* § 2128(a)(1).
[88] *Íd.* § 2128(a)(1).
[89] *Íd.* § 2128(a)(1).
[90] *Íd.* § 2127(b)(1).
[91] *Íd.* §§ 2164, 2172
[92] *Íd.* § 2165

90. Plaintiffs members' voting rights were severely impaired by the enactment of PROMESA and the enforcement of its provisions, since it obliterated the prerogatives of the Commonwealth's elected officials, rendering them as mere subordinates of the FOMB without any power to carry out any substantial political powers invested on them by the Constitution of the Commonwealth.

91. The rights to vote, to political participation, and to democracy are constitutionally and internationally recognized and protected fundamental civil and human rights.

92. These civil and human rights are among the most important rights because, through them, people are able to hold their governments accountable and also are empowered to improve their lives. Through the exercise of these rights individuals are able to assign to themselves all the privileges and the duties of citizenship.

93. Individuals and peoples are entitled to be the owners of their own destinies by participating in the decisions that fundamentally affect their lives. In fact, these rights are the grounding for a system in which all other human and civil rights are respected.

94. The rights to vote, to participate in government, to democracy, and to the equal enjoyment and exercise of one's rights as equal citizens under the law, form the only legitimate basis for the exercise of power by governments in any place in the world.

### E. PROTECTIONS AND LEGAL STANDARDS OF THE 13th AND 15th AMENDMENTS AND PUERTO RICO

95. In 1863 President Lincoln had issued the Emancipation Proclamation declaring "all persons held as slaves within any State, or designated part of a State, the people whereof shall then be in rebellion against the United States, shall be then, thenceforward, and

forever free." Nonetheless, the Emancipation Proclamation did not end slavery in the nation.

96. The 13th Amendment, which formally abolished slavery in the United States, passed the Senate on April 8, 1864, and the House of Representatives on January 31, 1865. On February 1, 1865, President Abraham Lincoln approved the Joint Resolution of Congress submitting the proposed amendment to the state legislatures. With the Confederacy's surrender and President Lincoln's assassination the following April, twenty-seven states ratified the amendment and it came into force by December 6, 1865. With the adoption of the 13th Amendment, the United States found a final constitutional solution to the issue of slavery. The 13th Amendment, along with the 14th and 15th, is one of the trio of Civil War amendments that greatly expanded the civil rights of Americans.

97. The 13th Amendment prohibits slavery and involuntary servitude, while extending power to Congress to enforce its provisions:

> Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, **or any place subject to their jurisdiction.**
>
> Section 2. Congress shall have power to enforce this article by appropriate legislation. (Emphasis added)

98. Although on its face, it appears that the 13th Amendment simply abolishes slavery and gives Congress power to enforce that abolition, the Supreme Court has clarified that Congress's

31

enforcement power under Section 2 also extends to **eradicating slavery's lingering effects**, or at least some of them.[93]

99. The 13th Amendment as an original matter had a broader focus and was "not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States."[94]

100. Beyond simply "nullifying all state laws which establish or uphold slavery," the Supreme Court reasoned that the 13th Amendment has **a reflex character** also, establishing and decreeing **universal civil and political freedom throughout the United States**; and it is assumed that the power vested in Congress to enforce the article by appropriate legislation, clothes Congress with power to pass all laws necessary and proper for abolishing **all badges and incidents of slavery** in the United States....[95]

101. Historically speaking, it bears noting that the contemporaneous meaning of "incidents of slavery," both before and soon after the adoption of the 13th Amendment, generally referred to the legal restrictions placed on slaves, as well as slave-owners' legal rights toward their slaves.[96]

102. "Badges of slavery", by contrast, had a somewhat looser meaning. In the antebellum years, it could refer literally to a badge worn by slaves, such as copper badges issued to

---

[93] *U.S. v. Hatch*, 722 F.3d 1193, 1197 (C.A.10 (N.M.), 2013).

[94] *See Civil Rights Cases*, 109 U.S. 3, 4, 3 S.Ct. 18, 27 L.Ed. 835 (1883).

[95] *See Civil Rights Cases*, 109 U.S. 3, 4, 3 S.Ct. 18, 27 L.Ed. 835 (1883).

[96] *See* George Rutherglen, *The Badges and Incidents of Slavery and the Power of Congress to Enforce the Thirteenth Amendment,* in *The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment* 163, 164–65 (Alexander Tsesis ed., 2010) ("Rutherglen, *Badges and Incidents* "); Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery,* 14 U. Pa. J. Const. L. 561, 570–75 (2012) ("McAward, *Defining the Badges* "). U.S. v. Hatch, 722 F.3d 1193, 1198 (C.A.10 (N.M.), 2013).

certain slaves in Charleston, South Carolina.[97] In addition, "badges of slavery" could refer to the psychological scars that slavery inflicted upon slaves,[98] or to any **"evidence of political subjugation".[99]**

103. Whatever "badges of slavery" and "incidents of slavery" meant in isolation, the compound phrase, "badges and incidents of slavery," first arose in the *Civil Rights Cases* and "quickly became the Supreme Court's standard gloss upon the powers of Congress under the 13th Amendment."[100] In other words, it is not clear the Supreme Court in the *Civil Rights Cases* intended "badges and incidents of slavery" as a reference to the phrase's component parts as contemporarily understood. It was, rather, "a new characterization of Congress's power."[101]

104. The *Civil Rights Cases* obviously interpreted this characterization narrowly. Following this narrow reading of what constitutes the badges and incidents of slavery, the Supreme Court later held that Congress's badges-and-incidents authority did not permit it to criminalize threats of violence used to deter black persons from obtaining gainful employment.[102] Even if "one of the disabilities of slavery, one of the *indicia* of its existence, was a lack of power to make or perform [employment] contracts,"[103] the Court believed that permitting Congress to criminalize threats of violence used to deter blacks from obtaining employment would permit

---

[97] *See* generally Harlan Greene et al., *Slave Badges and the Slave–Hire System in Charleston*, South Carolina 1783–1865 (2008); Rutherglen, *Badges and Incidents*, at 166 (noting that "badge," in antebellum legal discourse, was sometimes used as shorthand for "evidence permitting an inference from external appearances to legal status").

[98] McAward, *Defining the Badges*, at 577.

[99] Rutherglen, *Badges and Incidents*, at 166. *U.S. v. Hatch*, 722 F.3d 1193, 1198 (C.A.10 (N.M.), 2013).

[100] Rutherglen, *Badges and Incidents*, at 172.

[101] McAward, *Defining the Badges*, at 583. *U.S. v. Hatch*, 722 F.3d 1193, 1198–99 (C.A.10 (N.M.),2013).

[102] *Hodges v. United States*, 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65 (1906).

[103] *Id.* at 17, 27 S.Ct. 6.

33

Congress to legislate against nearly every wrong committed by one person against another.[104] This was so, said the Court, because the 13th Amendment extends its **protections to all races**, not just formerly enslaved races.[105]

105. In other words, the Court in *Hodges* reasoned that if badges-and-incidents extends to the type of conduct at issue there *and* if Congress's badges-and-incidents authority applies to all races, then Congress could legislate against "every act done to an individual which was wrong if done to a free man, and yet justified in a condition of slavery."[106]

106. Sixty years after *Hodges*, however, the Court adopted a more generous approach to Congress's 13th Amendment enforcement power, giving Congress relatively wide latitude both to determine what qualifies as a badge or incident of slavery and how to legislate against it.[107]

107. The Court concluded that Congress had enacted 42 U.S.C. § 1982, which declares that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property", under its "power to enforce [the 13th Amendment] by appropriate legislation."[108] Given that the 13th Amendment contains no language limiting its effect to government-caused or -supported conduct (unlike the 14th Amendment), the Supreme Court held that Congress could apply §1982 to private conduct, and that it intended to do so.[109]

---

[104] S*ee Id.* at 18–19, 27 S.Ct. 6
[105] *Id.* at 16–17, 27 S.Ct. 6.
[106] *Id.* at 19, 27 S.Ct.
[107] *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).
[108] *Jones*, 392 U.S. at 437–40, 88 S.Ct. 2186.
[109] *Id*. at 429–36, 88 S.Ct. 2186.

34

108. As to the question of whether Section 2 of the 13th Amendment authorized legislation such as § 1982, the Court returned to the badges-and-incidents language derived from the *Civil Rights Cases*. But far from the constricted view taken in the *Civil Rights Cases* (and *Hodges*), the Court emphasized a statement from one of the amendment's sponsors, Senator Trumbull of Illinois, declaring that "it is for Congress to adopt such appropriate legislation as it may think proper, so that it be a means to accomplish the end."[110]

109. "Surely Senator Trumbull was right," the Court concluded. "Surely Congress has the power under the [13[th]] Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation."[111] Applying this rational determination standard, the Court upheld §1982 as a constitutional expression of congressional power and overruled *Hodges* on this point.[112]

110. In sum, after these cases, the 13th Amendment can be seen as treating most forms of racial discrimination as badges and incidents of slavery, and that Congress not only has the power to enforce the amendment, but also to a certain extent to define its meaning.[113]

111. Pursuant to the authority created by § 2 of the 13th Amendment, Congress has enacted legislation to abolish both the conditions of involuntary servitude and the "badges and incidents of slavery." The exercise of that authority is not inconsistent with the view that the Amendment has self-executing force. As the Court noted in *Jones v. Alfred H. Mayer Co.*, 392

---

[110] *Id*. at 440, 88 S.Ct. 2186 (citing Cong. Globe, 39th Cong., 1st Sess., 322).
[111] *Id*.
[112] *Id*. at 441 n. 78, 88 S.Ct. 2186.
[113] *U.S. v. Hatch*, 722 F.3d 1193, 1199–200 (C.A.10 (N.M.),2013).

35

U.S., at 439, 88 S.Ct., at 2203: "'By its own unaided force and effect,' the Thirteenth

Amendment 'abolished slavery' and '**established universal freedom**.'[114][Emphasis added.]

112. The 13th Amendment has received considerable attention by legal scholars, courts and

the public. Many scholars now agree that the purpose of the 13th amendment was not only

to end chattel slavery, but to proclaim and implement the fundamental principles

contained in the Declaration of Independence and the Preamble of the Constitution and to

give said principles universal application to all under the flag. The amendment protects the

right to unobtrusive autonomy carrying out deliberation decisions and limits autonomy

whenever it arbitrarily interferes with other citizens' sense of purpose. The amendment not

only ended slavery, but also created a substantive assurance of freedoms, secures delineated

civil freedoms, such as those specifically enumerated by the Bill of Rights, but also secured

freedom from all arbitrary dominations.[115]

113. The Amendments liberty guarantee is expansive enough for each generation to abolish all

repressive conduct rationally intended to the impediments of freedom, not simply racist labor

practices.

114. The purpose of the 13th Amendment was to proclaim, implement and universalize the

fundamental principles of freedom. To deprive of the application of the principles is to

enslave.

---

[114] *Civil Rights Cases*, 109 U.S. 3, 20, 3 S.Ct. 18, 27, 27 L.Ed.2d 835.

[115] See for example: Tsesis, Alexander, *The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment* (Columbia University Press, 2010); *For Liberty and Equality: The Life and Times of the Declaration of Independence* (Oxford University Press 2012); *The Thirteenth Amendment and American Freedom: A Legal History* (New York University Press 2004); Balkin, Jack M. and Levinson, Sanford, *The Dangerous Thirteenth Amendment*, Columbia Law Review, Essays - Archived, Issue 7, Volume 112 (2012); Balkin, Jack M., *Constitutional Redemption: Political Faith in an Unjust World* (Harvard University Press, 2011); Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (Yale Univ. Press 1999); tenBroek, Jacobus, *The Antislavery Origins of the Fourteenth Amendment*. University of California Press (1951).

115. Very important is the self-executing nature of Section 1 of the Amendment and the cases in which it has come into question.[116] In city of *Memphis v. Greene*, 451 U.S. 100 (1981) the court emphasized the amendment's self-executing first section and indicated that the Court might allow a claim under Section 1, even absent congressional action.

116. The last part of Section 1 of the 13th Amendment confers Puerto Ricans these protections, since they are prohibited: "in any place under the jurisdiction [of the United States]". Puerto Rico has being, since the American invasion, and the time of the effective date of the Treaty of Paris, under the jurisdiction of the United States.

117. The Treaty of Paris came into effect on April 11, 1899. At that time Puerto Rico was fully "under the jurisdiction of the United States". The relevant parts of said treaty state that Puerto Rico was ceded to the United States and that "the civil rights and the political status of the natural inhabitants shall be determined by the congress."[117]

118. The Treaty of Paris, the *Insular Cases* and subsequent congressional Acts, like PROMESA, effectively violated the fundamental principles of the U.S. Republic and created a system of government based on political economic and judicial slavery. Since the proclamation of the Treaty of Paris, Puerto Rico has been rendered as an invisible political community without effective legal personhood. Puerto Rico has been treated as a chattel, a thing lacking legal personality, therefore legally invisible.

119. Two other amendments followed the 13th Amendment, forming a trilogy referred to as the Reconstruction Amendments. The 14th Amendment resulted in part from lingering

---

[116] Recent cases include *Jones v. H Mayer,* 392 U.S. 409 (1968)  and *Palmer v. Thompson* 403 U.S. 217 (1971).
[117] *A Treaty of Peace Between the United States and Spain*, *supra* Article IX.

doubts that the 13th Amendment authorized civil rights legislation enacted under its auspices.[118]

120. Congress, accordingly, proposed the 14th Amendment, which the states adopted in 1868. As is well known, the 14th Amendment protects persons against various state-sponsored intrusions and discriminations.

121. Added to the Constitution in 1870, in the wake of the Civil War, the 15th Amendment was the final of the three Reconstruction Amendments:[119]

> Section 1. The right of citizens of the United States to vote shall not be denied or abridged by **the United States** or by any State on account of race, color, or previous condition of servitude. [Emphasis Added.]

> Section 2. The Congress shall have power to enforce this article by appropriate legislation.

122. The command of the 15th Amendment is self-executing.[120]

123. Although "the immediate concern of the Amendment was to guarantee to the emancipated slaves the right to vote," it "is cast in fundamental terms, terms transcending the particular controversy," and "grants protection to all persons, not just members of a particular race."[121]

2. "The purpose and command of the [15[th]] Amendment are set forth in language both explicit and comprehensive. The National Government and the States may not violate a fundamental principle: They may not deny or abridge the right to vote on account of

---

[118] *See* Jennifer Mason McAward, *The Scope of Congress's Thirteenth Amendment Enforcement Power After City of Boerne v. Flores*, 88 Wash. U.L.Rev. 77, 115–16 (2010).
[119] U.S. Const. Amend. XV,
[120] *Guinn v. United States*, 238 U.S. 347, 362–63 (1915).
[121] *Rice v. Cayetano*, 528 U.S. 495 (2000).

race, [color and previous condition of servitude]."[122] The ban imposed by the 15th Amendment has been interpreted to include electoral qualification based on ancestry.[123]

124. The 15th Amendment confers a right "fundamental in purpose and effect and self-executing in operation".[124]

125. "The Amendment bans racial discrimination in voting by both state and nation. It thus establishes a national policy . . . not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local."[125]

126. In *Rice v. Cayetano*, 528 U.S. 495, 523 (2000), the U.S. Supreme Court stated:

> Race cannot qualify some and disqualify others from full participation in our democracy. All citizens, regardless of race, have an interest in selecting officials who make policies on their behalf, even if those policies will affect some groups more than others. Under the Fifteenth Amendment voters are treated not as members of a distinct race but as members of the whole citizenry.

127. The inability to vote for federal public officials and the political obliteration and disenfranchisement caused by PROMESA are the badges and incidents of slavery prohibited by the 13th and 15th Amendments. Those "burdens and disabilities" imposed upon Puerto Rico by the evidently racist *Insular Cases* restrain fundamental rights, which are the essence of civil freedom enshrined in the United States Constitution.

---

[122] *Id.*, at 511-12.
[123] *Rice v. Cayetano, supra.*
[124] *Id.*, at 512.
[125] *Id.*, at 514.

128. By enacting PROMESA, Congress detoured from that constitutional mandate established in the 13th and 15th Amendments by depriving the People of Puerto Rico of their constitutional protected rights of freedom. In fact, PROMESA generates the opposite effect to political freedom. The deprivation of rights imposed by PROMESA, must be considered and defined as *Badges and Incidents of Slavery* against Plaintiffs' members, the People of Puerto Rico, its governmental institutions and political structures.

129. "Badges and incidents of slavery" refers to public or widespread private action, aimed at any racial group or population for reasons related to race, that mimics the law of slavery and has significant potential to lead to the *de facto* re-enslavement or legal subjugation of the targeted group.[126]

130. PROMESA deprives the Government of Puerto Rico, Plaintiffs' members, who are able and willing to vote US citizens, and all its citizens of their political freedom by vesting upon the non-elected FOMB all powers and controls to obliterated Plaintiffs' members and the Puerto Rican People's political powers required to exercise the minimal freedoms to enable them to choose their destiny.

### F.   INTERNATIONAL LAW ON HUMAN RIGHTS AND PUERTO RICO

131. The colonial status of Puerto Rico and the racist determinations of the *Insular Cases* do not reflect the modern political standards of civil and human rights. In words of Judge Juan B. Torruella:

> …the Insular Cases were wrongly decided because, at the time of their ruling, they squarely contradicted long-standing constitutional

---

[126] Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery,* 14 U. Pa. J. Const. L. 561, 570–75 (2012) ("McAward, *Defining the Badges* ").

precedent. Their skewed outcome was strongly influenced by racially motivated biases and by colonial governance theories that were contrary to American territorial practice and experience. Further evidence of this contention… is the discriminatory manner in which the Supreme Court has thereafter applied the doctrines of the Insular Cases, even in more modern times.…

…[T]he dogma of the Insular Cases constitutes an outmoded anachronism when viewed within the framework of present-day constitutional principles and, additionally, that it contravenes international commitments entered into by the United States since then, which constitute superseding "Law of the Land." Ultimately, the present legitimacy of the Insular Cases is untenable. The system of governance promoted thereunder can no longer be reconciled with a rule of law in which all citizens are entitled to equality.[127]

132. To sustain the allegations that colonialism imposed through the Territories Clause as interpreted in the *Insular Cases* no longer represents the principles of freedom embodied in the 13th and 15th Amendments, Plaintiffs urge to look upon the following sources of international obligations for the United States that are the *Supreme Law of the Land*: the American Declaration of the Rights and Duties of Man,[128] the Universal Declaration of Human Rights,[129] the International Covenant on Civil and Political Rights,[130] the Organization of American States Charter,[131] the American Convention on Human Rights,[132] and the Inter-American Democratic Charter.[133]

---

[127] *Id*. 286-287 [Citation omitted].
[128] Adopted by the Ninth International Conference of American States, Bogotá, Colombia, 1948.
[129] Hereinafter, "Universal Declaration".
[130] Hereinafter, "International Covenant".
[131] Adopted in Bogotá, Colombia, in 1948.
[132] Adopted at the Inter-American Specialized Conference on Human Rights, San José, Costa Rica, 22 November 1969.
[133] Adopted in a special session of the General Assembly, Lima Perú, Lima, September 11, 2001.

133. Additionally, the decision in *Statehood Solidarity Committee v. United States*, issued on December 29, 2003, [134] to determine the corresponding rights and obligations of Plaintiffs' members and obligations of the United States. The facts in *Statehood Solidarity Committee*, where the Inter-American Commission on Human Rights ruled against the United States holding that denying the citizens of the District of Columbia the right to voting representation in the federal legislature violates both Article II (right to equality before law) and Article XX (right to vote and to participate in government) of the American Declaration.

### The American Declaration of the Rights and Duties of Man

134. The Inter-American system for the protection of human rights emerged with the adoption of the American Declaration in April 1948. The American Declaration is the first international-human-rights instrument of a general nature, in fact predating the Universal Declaration.

135. The American Declaration proclaims the will of the American States to protect and promote the essential rights of the individuals. Among those essential rights are the rights to equality, to vote, and to participate in one's own government.

136. Specifically, the American Declaration provides, in its Article II, that: "All persons are equal before the law and have the rights and duties established in this Declaration, without distinction as to race, sex, language, creed or any other factor."[135]

137. The American Declaration also provides, in its Article XX, that: "Every person having legal capacity is entitled to participate in the government of his country, directly or through his

---

[134] Inter-American Commission on Human Rights: *Statehood Solidarity Committee v. United States*, Case 11.204, Report No. 98/03, Inter-Am. C.H.R., OEA/Ser./L/V/II.114 Doc. 70 rev. 1 at 725 (2003).

[135] American Declaration, art. II.

representatives, and to take part in popular elections, which shall be by secret ballot, and shall be honest, periodic and free."[136]

138. Under the American Declaration, voting is not only a right but also a duty. This is specifically recognized by Article XXXII of the American Declaration, which provides: "It is the duty of every person to vote in the popular elections of the country of which he is a national, when he is legally capable of doing so."[137]

### The Universal Declaration of Human Rights

139. Similarly, the Universal Declaration was adopted and proclaimed by United Nations General Assembly Resolution on December 10, 1948.[138] The Universal Declaration recognizes that: "All human beings are born free and equal in dignity and rights."[139] The Universal Declaration also states that: "Everyone is entitled to the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."[140]

140. Of particular relevance to the U.S. citizens residing in Puerto Rico is the provision in the Universal Declaration that states: "no distinction shall be made on the basis of the political, jurisdictional or international status of the ... territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty."[141]

---

[136] *Id.* at art. XX.
[137] *Id.* at art. XXXII.
[138] *See* U.N. Res. 217 A (III).
[139] Universal Declaration, art. 1.
[140] *Id.* at art. 2(1).
[141] *Id.* at art. 2(2).

43

141. Specifically, the Universal Declaration recognizes that "[t]he will of the people ... [is] the basis of the authority of government...."[142] The Universal Declaration proclaims that everyone has the right to take part in the government of his country, directly or through freely chosen representatives." [143] The Universal Declaration requires that the will of the people "be expressed in periodic and genuine elections which shall be by universal and equal suffrage and shall be held by secret vote or by equivalent free voting procedures."[144] The Universal Declaration recognizes the fundamental nature of these rights and the importance of their protection by the rule of law "if man is not to be compelled to have recourse, as a last resort, to rebelling against tyranny and oppression...[145]

142. The Universal Declaration also provides that: "All are equal before the law and are entitled without any discrimination to the equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration...."[146]

### The International Covenant on Civil and Political Rights

143. The International Covenant was adopted by the United Nations General Assembly Resolution on December 16, 1966, and entered into force on March 23, 1976.[147]

144. Specifically, in the International Covenant, the States parties thereto, including the United States, which ratified the treaty in 1992, stated that their "recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation

---

[142] *Id.* at art. 21, ¶ 3.
[143] *Id.* at art. 21, ¶ 1.
[144] *Id.* at art. 21, ¶ 3.
[145] *Id.* at pmbl.
[146] *Id.* at art. 7.
[147] *See* U.N. Res. 2200A (XXI).

44

of freedom, justice and peace in the world."[148] The States parties to the International Covenant, including the United States, also made explicit in the document their recognition that the rights recognized therein "derive from the inherent dignity of the human person."[149] Under the International Covenant, the States parties thereto, including the United States, acknowledged their "obligation ... to promote universal respect for, and observance of, human rights and freedoms."[150] And under the International Covenant, the States parties thereto, including the United States, stated their realization that "the individual, having duties to other individuals and to the community to which he belongs, is under a responsibility to strive for the promotion and observance of the rights recognized in the [...] Covenant."[151]

145. In the International Covenant, each State party, including the United States, agreed to "undertake to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the […] Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."[152]

146. Under the International Covenant, each State party, including the United States, agreed to undertake:

> [w]here not already provided for by existing legislative or other measures ... the necessary steps, in accordance with its constitutional processes and with the provisions of the […] Covenant, to adopt such legislative or other measures as may be necessary to give effect to the rights recognized in the […] sent Covenant.[153]

---

[148] International Covenant, pmbl.
[149] *Id*.
[150] *Id*.
[151] *Id.*
[152] *Id.* at art. 2(1).
[153] *Id.* at art. 2(2).

45

147. Among those rights recognized in the International Covenant are those described in its Articles 25 and 26. Article 25 provides:

> Every citizen shall have the right and the opportunity, without any of the distinctions mentioned in Article 2 and without unreasonable restrictions:
> (a) To take part in the conduct of public affairs, directly or through freely chosen representatives;
> (b) To vote and to be elected at genuine periodic elections which shall be by universal and equal suffrage and shall be held by secret ballot, guaranteeing the free expression of the will of the electors; [and]
> (c) To have access, on general terms of equality, to public service in his country.[154]

148. Article 26 of the International Covenant provides, in relevant part that: "[a]ll persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground…"[155]

### The Charter of the Organization of American States

149. The OAS Charter, though containing only a few such references, also includes provisions specifically devoted to representative democracy, human rights, and equality. For example, in adopting the Charter, the Member States of the OAS explicitly affirmed their conviction that "representative democracy is an indispensable condition for the stability, peace and development of the region."[156]  Furthermore, one of the essential purposes for the establishment of the OAS itself, as identified in the Charter, was and remains: "[t]o promote and consolidate representative democracy..."[157] In the Charter, the Member States also reaffirmed the principle that: "The solidarity of the American States and the high aims which are sought through it require the

---

[154] *Id.* at art. 25.
[155] *Id.* at art. 26.
[156] OAS Charter, pmbl.
[157] *Id.* at art. 2(b).

political organization of those States on the basis of the effective exercise of representative democracy."[158] Lastly, "[t]he Member States agree[d in the Charter] that ... the full participation of their peoples in decisions relating to their own development are, among others, basic objectives of integral development."[159]

### The American Convention on Human Rights

150. The American Convention makes explicit the Hemispheric interest, "within the framework of democratic institutions," in consolidating "a system of personal liberty and social justice based on respect for the essential rights of man."[160] According to the American Convention, these essential rights "are not derived from one's being a national of a certain state, but are based upon attributes of the human personality, and that they therefore justify international protection...."[161]

151. The American Convention requires, similarly to the International Covenant, that "the rights and freedoms recognized [t]herein ... [be] ensure[d] to all persons subject to the [States parties] jurisdiction ... without any discrimination for reasons of race, color, sex, language, religion, political or other opinion, national or social origin, economic status, birth, or any other social condition."[162]

152. The American Convention, similarly to the International Covenant, requires that, "[w]here the exercise of any rights or freedoms [recognized therein] ... is not already ensured by legislative or other provisions, the States Parties undertake to adopt, in accordance with their

---

[158] *Id.* at art. 3(d).
[159] *Id.* at art. 34.
[160] American Convention, pmbl.
[161] *Íd.*
[162] *Id.* at art. 1(1).

47

constitutional processes and the provisions of [the] Convention, such legislative or other measures as may be necessary to give effect to those rights or freedoms."[163]

153. Article 23 of the American Convention provides:

> 1. Every citizen shall enjoy the following rights and opportunities:
>> (a) to take part in the conduct of public affairs, directly or through freely chosen representatives;
>> (b) to vote and to be elected in genuine periodic elections, which shall be by universal and equal suffrage and by secret ballot that guarantees the free expression of the will of the voters; and
>> (c) to have access, under general conditions of equality, to the public service of his country.
>
> 2. The law may regulate the exercise of the rights and opportunities referred to in the preceding paragraph only on the basis of age, nationality, residence, language, education, civil and mental capacity, or sentencing by a competent court in criminal proceedings.[164]

154. Article 24 of the American Convention provides: "All persons are equal before the law. Consequently, they are entitled, without discrimination, to equal protection of the law."[165]

155. Of particular relevance to the United States, which is constituted as a Federal State, the American Convention provides that: "the national government of such State Party shall implement all the provisions of the Convention over whose subject matter it exercises legislative and judicial jurisdiction."[166] "With respect to the provision over whose subject matter the constituent units of the federal state have jurisdiction," the American Convention provides that: "the national government shall immediately take suitable measures, in accordance with its constitution and its

---

[163] *Id.* at art. 2.
[164] *Id.* at art. 23.
[165] *Id.* at art. 24.
[166] *Id.* at art. 28(1).

48

laws, to the end that the competent authorities of the constituent units may adopt appropriate provisions for the fulfillment of this Convention."[167]

### The Inter-American Democratic Charter

156. The Democratic Charter, which (as mentioned) the OAS General Assembly adopted in 2001, also imposes international obligations on the United States.

157. In the Democratic Charter, the OAS General Assembly "recognize[d] that representative democracy is indispensable for the stability, peace, and development of the region, and that one of the purposes of the OAS is to promote and consolidate representative democracy."[168] Likewise, in the Democratic Charter the OAS General Assembly "recognize[ed] that all the rights and obligations of member states under the OAS Charter represent the foundation on which democratic principles in the Hemisphere are built."[169]

158. In the Democratic Charter, the OAS General Assembly recognized that "solidarity among and cooperation between American states require the political organization of those states based on the effective exercise of representative democracy, and that economic growth and social development based on justice and equity, and democracy are interdependent and mutually reinforcing."[170]

159. In the same Democratic Charter, the OAS General Assembly acknowledged that "the American Declaration on the Rights and Duties of Man and the American Convention on Human Rights contain values and principles of liberty, equality, and social justice that are intrinsic to

---

[167] *Id.* at art. 28(2).
[168] Democratic Charter, pmbl.; *see also* Democratic Charter, arts. 1 ("Democracy is essential for the social, political, and economic development of the peoples of the Americas.") and 11 ("Democracy and social and economic development are interdependent and are mutually reinforcing.").
[169] Democratic Charter, pmbl.
[170] *Id.*

democracy."[171] As such, one of the purposes of the Democratic Charter is simply to aid in the "progressive development of international law and ... clarify the provisions set forth in the OAS Charter and related basic instruments on the preservation and defense of democratic institutions, according to established practice."[172]

160. Moreover, in the Democratic Charter the OAS General Assembly reaffirmed "that the promotion and protection of human rights is a basic prerequisite for the existence of a democratic society, and recogni[zed] the importance of the continuous development and strengthening of the inter-American human rights system for the consolidation of democracy."[173]

161. In that manner, the Democratic Charter expressed the conviction of the OAS General Assembly that:

> the Organization's mission is not limited to the defense of democracy wherever its fundamental values and principles have collapsed, but also calls for ongoing and creative work to consolidate democracy as well as a continuing effort to prevent and anticipate the very causes of the problems that affect the democratic system of government.[174]

162. Specifically, in Article 1, the Democratic Charter declared that: "The peoples of the Americas have a right to democracy and their governments have an obligation to promote and defend it."[175]

163. In Article 2, the Democratic Charter provides that:

> The effective exercise of representative democracy is the basis for the rule of law and of the constitutional regimes of the [M]ember [S]tates of the Organization of American States. Representative democracy is strengthened and deepened by permanent, ethical, and responsible

---

[171] *Id.*
[172] *Id.*
[173] *Id.*
[174] *Id.*
[175] *Id.* at art. 1.

> participation of the citizenry within a legal framework conforming to the respective constitutional order.[176]

164. In Article 3, the Democratic Charter states:

> Essential elements of representative democracy include, inter alia, respect for human rights and fundamental freedoms, access to and the exercise of power in accordance with the rule of law, the holding of periodic, free, and fair elections based on secret balloting and universal suffrage as an expression of the sovereignty of the people...[177]

165. Of significance to Plaintiffs' members hereto, the Democratic Charter recognizes in its Article 6 that: "It is the right and responsibility of all citizens to participate in decisions relating to their own development. This is also a necessary condition for the full and effective exercise of democracy...."[178]

166. In its Article 7, the Democratic Charter states: "Democracy is indispensable for the effective exercise of fundamental freedoms and human rights in their universality, indivisibility and interdependence, embodied in the respective constitutions of states and in inter-American and international human rights instruments."

167. Furthermore, Article 9 of the Democratic Charter provides, in relevant part: "The elimination of all forms of discrimination, especially ... ethnic and race discrimination, as well as diverse forms of intolerance ... and respect for ethnic, cultural and religious diversity in the Americas contribute to strengthening democracy and citizen participation."[179]

---

[176] *Id.* at art. 2.
[177] *Id. at* art 3.
[178] *Id.* at art. 6.
[179] *Id.* at art. 9.

51

168. Finally, under Article 23 of the Democratic Charter, the OAS General Assembly imposed on its: "Member [S]tates ... [the] responsib[ility] for organizing, conducting, and ensuring free and fair electoral processes."[180]

169. The is no doubt that the universal consensus is that full voting right is an essential human right that should be preserved for Plaintiffs'' members and the Puerto Rican People. Those rights, as internationally recognized, are the ***Supreme law of the land***.

170. In sum, Plaintiffs' members rights have been impaired in different unbearable ways: 1) they cannot vote for the representatives that control the federal government that exerts full jurisdiction over Puerto Rico; 2) even though all the power that the FOMB has over the territory, its government and People, they cannot vote to choose the members of the FOMB; and 3) the only political representatives that Plaintiffs' members have are not vested with the power over their political and economic future. This prevents Plaintiff's members and the People of Puerto Rico to manage their political and economic destiny, submitting them to a condition of political subordination that violates the 13th and 15th Amendments of the Constitution of the United States.

## VI.     FIRST PRAYER FOR RELIEF

171. Plaintiffs repeat and allege once again, the allegations contained in paragraphs 1 through 170 hereof as if fully set forth herein.

172. An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims, and a declaratory judgment is necessary to resolve such controversy.

---

[180] *Id.* at art. 23.

52

173. Plaintiffs are entitled to an order declaring that PROMESA is unconstitutional because it violates the 13th Amendment of the Constitution of the United States of America.

## VII.    SECOND PRAYER FOR RELIEF

174. Plaintiffs repeat and allege once again, the allegations contained in paragraphs 1 through 173 hereof as if fully set forth herein.

175. An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims, and a declaratory judgment is necessary to resolve such controversy.

176. Plaintiffs are entitled to an order declaring that PROMESA is unconstitutional because it violates the 15th Amendment of the Constitution of the United States of America.

## VII. THIRD PRAYER FOR RELIEF

177. Plaintiffs repeat and allege once again, the allegations contained in paragraphs 1 through 176 hereof as if fully set forth herein.

178. Plaintiffs are entitled to an order declaring that all the Oversight Board's acts and determinations taken from the time of enactment of PROMESA to present are unconstitutional and null due to the fact that they are in open violation of the 13th Amendment the Constitution of the United States of America.

## VIII. FOURTH PRAYER FOR RELIEF

179. Plaintiffs repeat and allege once again, the allegations contained in paragraphs 1 through 178 hereof as if fully set forth herein.

180. Plaintiffs are entitled to an order declaring that all the Oversight Board's acts and determinations taken from the time enactment of PROMESA to the present are

unconstitutional and null due to the fact that they are in open violation of the 15th Amendment the Constitution of the United States of America.

## IX. FIFTH PRAYER FOR RELIEF

181. Plaintiffs repeat and allege once again, the allegations contained in paragraphs 1 through 180 hereof as if fully set forth herein.

182. An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims, and a declaratory judgment is necessary to resolve such controversy.

183. Plaintiffs are entitled to an order declaring that PROMESA infringes one or multiple conventions and international agreements on civil and human rights that are the "the supreme law of the land".

## VIII. SIXTH PRAYER FOR RELIEF

184. Plaintiffs repeat and allege once again, the allegations contained in paragraphs 1 through 183 hereof as if fully set forth herein.

185. Plaintiffs are entitled to an order declaring that Defendants should be enjoined and stayed from pursuing this and any Title III cases, holding hearings or sessions, obtaining official data or creditor information, issuing subpoenas, entering into contracts, enforcing any laws of the covered territory, recurring to judicial civil actions to enforce powers, conducting investigations or any other power or authority provided by PROMESA.

## IX. RELIEF DEMANDED

WHEREFORE, in view of the foregoing, Plaintiffs respectfully request from this Honorable Court to enter a judgment against Defendants as follows:

a.  An order that PROMESA is unconstitutional because it violates the 13th Amendment of the Constitution of the United States of America.

b.  An order declaring that PROMESA is unconstitutional because it violates the 15th Amendment of the Constitution of the United States of America.

c.  An order declaring that all the Oversight Board's acts and determinations taken from the time of their appointments to present are unconstitutional and null due to the fact that they are in open violation of the 13th Amendment of the Constitution of the United States of America.

d.  An order declaring that all the Oversight Board's acts and determinations taken from the time of their appointments to present are unconstitutional and null due to the fact that they are in open violation of the 15th Amendment of the Constitution of the United States of America.

e.  An order declaring that PROMESA infringes one or multiple conventions and international agreements on civil and human rights.

f.  An order declaring that Defendants should be enjoined and stayed from pursuing this and any Title III cases, holding hearings or sessions, obtaining official data or creditor information, issuing subpoenas, entering into contracts, enforcing any laws of the covered territory, recurring to judicial civil actions to enforce powers, conducting investigations or any other power or authority provided by PROMESA.

RESPECTFULLY SUBMITTED.

In Ponce, Puerto Rico, this 30th day of May, 2018.



472 Ave. Tito Castro
Edificio Marvesa, Suite 106
Ponce, PR 00716-4701
Tel: (787) 848-0666
Fax: (787) 841-1435

Tel: (787) 848-0666
Fax: (787) 841-1435

/s/Rolando Emmanuelli Jiménez
Rolando Emmanuelli Jiménez
USDC: 214105

/s/Yasmín Colón Colón
USDC: 230814

/s/Jessica E. Méndez Colberg
USDC: 302108

/s/Wilbert López Moreno
USDC: 202707

Emails: rolando@bufete-emmanuelli.com
yasmin@bufete-emmanuelli.com
jessica@bufete-emmanuelli.com
wilbert_lopez@yahoo.com
notificaciones@bufete-emmanuelli.com