```
 1                    UNITED STATES BANKRUPTCY COURT

 2                     DISTRICT OF PUERTO RICO

 3
        In Re:                     )        Docket No. 3:17-BK-3283(LTS)
 4                                  )
                                    )        Title III
 5      The Financial Oversight and )
        Management Board for        )
 6      Puerto Rico,                )        (Jointly Administered)
                                    )
 7      as representative of        )
                                    )
 8      The Commonwealth of         )
        Puerto Rico, et al.,        )        June 6, 2018
 9                                  )
                  Debtors.          )
10
       _____
11
        Siemens Transportation     )        Docket No. 3:18-AP-030(LTS)
12      Partnership Puerto Rico,    )
        S.E.                        )        in 17-BK-3567(LTS)
13                                  )
                  Plaintiff,        )
14      v.                          )
                                    )
15      Puerto Rico Highways and    )
        Transportation Authority,   )
16      et al.                      )
                                    )
17                  Defendants.     )
       _____
18

19                        OMNIBUS HEARING

20     BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

21              UNITED STATES DISTRICT COURT JUDGE

22       AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH DEIN

23          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

24     _____

25
```

```
 1      APPEARANCES:

 2

 3      For The Commonwealth
        of Puerto Rico, et al.:   Mr. Timothy Mungovan, PHV
 4                                Mr. Paul V. Possinger, PHV
                                  Mr. Brian Rosen, PHV
 5                                Mr. Ehud Barak, PHV

 6      For the U.S. Trustee
        Region 21:                Ms. Monsita Lecaroz Arribas, AUST
 7
        Fee Examiner:             Mr. Bradley Williamson, PHV
 8                                Ms. Katherine Stadler, PHV

 9      For Official Committee
        of Unsecured Creditors:   Mr. Luc Despins, PHV
10
        For Puerto Rico Fiscal
11      Agency and Financial
        Advisory Authority and
12      Puerto Rico Electric
        Power Authority:          Mr. Nathan Haynes, PHV
13                                Mr. Arturo Diaz, Esq.
                                  Ms. Katiuska Bolanos, PHV
14
        For Puerto Rico Fiscal
15      Agency and Financial
        Advisory Authority:       Ms. Suzzanne Uhland, PHV
16                                Mr. Luis Mariani Biaggi, Esq.
                                  Mr. William Sushon, PHV
17
        For Ad Hoc Retiree
18      Committee:                Mr. Robert Gordon, PHV
                                  Mr. Landon Raiford, PHV
19                                Mr. Hector Mayol Kauffman, Esq.

20      For the COFINA Agent:     Mr. Joseph Minias, PHV

21      For the Government
        Development Bank:         Mr. Oreste Ramos, Esq.
22                                Ms. Giselle Lopez Soler, Esq.

23      For Siemens
        Transportation
24      Partnership Puerto Rico: Ms. Claudia Springer, PHV
                                 Mr. Andrew Soven, PHV
25                               Mr. Albeniz Couret, PHV
```

```
1    APPEARANCES, CONTINUED:

2
     For Banco Popular de
3    Puerto Rico:              Mr. John Dorsey, PHV

4    For Santander:            Mr. Nicholas Crowell, PHV

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by stenography.  Transcript produced by
     CAT.
25
```

```
 1                        I N D E X

 2  WITNESSES:                                    PAGE

 3        None offered.

 4

 5  EXHIBITS:

 6        None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | San Juan, Puerto Rico |
| 2 | June 6, 2018 |
| 3 | At or about 9:39 AM |
| 4 | *     *     * |

5      THE COURT:  Again, buenos dias.  Welcome, counsel,

6  parties at interest, members of the public, press and those

7  observing here and in New York and the telephonic

8  participants.  It is always good to be back in San Juan.  I

9  look forward to hearing of progress in the Title III

10  proceedings and of the work of PREPA and other government

11  constituencies in strengthening the provisions of necessary

12  civic operations and services here in Puerto Rico in the

13  course of status reports and remarks in this hearing.

14      I remind all of you who are attending here or

15  listening to the proceedings that, consistent with court and

16  judicial policies and the Orders that have been issued, there

17  is to be no use of any electronic devices in the courtroom to

18  communicate with any person, source, or outside repository of

19  information, nor to record any part of the proceedings.

20      Thus, all electronic devices must be turned off

21  unless you are using a particular device to take notes or to

22  refer to notes or documents already loaded on the device.  All

23  audible signals, including vibration features, must be turned

24  off, and no recording or any transmission of the hearing is

25  permitted by any person, including but not limited to the

1   parties or the press.

2          Anyone who's observed or otherwise found to have been

3   texting, e-mailing, or otherwise communicating with a device

4   from a courtroom during a court proceeding will be subject to

5   sanctions, including but not limited to confiscation of the

6   device and denial of future requests to bring devices into the

7   courtroom.

8          Now, I was pleased to see from last night's motion

9   filing that there is a settlement in principle of the

10  Commonwealth-COFINA dispute.  This is an enormously

11  significant development that marks a great step forward in

12  these Title III proceedings.

13         Of course the settlement in principle is subject to

14  negotiation of documentation, and any settlement of this

15  dispute is subject to Court approval following disclosure,

16  notice, and full opportunities for objectors to make

17  themselves heard.  But the mediation team and the mediation

18  participants deserve our acknowledgment and thanks for this

19  very significant progress.

20         I assume that the case status reports will start on

21  this note.  And who will be speaking to this issue?

22         Thank you.

23         MR. ROSEN:  Thank you very much, Your Honor.  Brian

24  Rosen, Proskauer Rose, on behalf of the Oversight Board.

25         Your Honor, that was actually going to be about a

1   minute down the way, but if you'll allow me just to move

2   forward on some other things first.  Your Honor, on April 19th

3   and 20th, the Board certified fiscal plans for six entities;

4   the Commonwealth, PRASA, PREPA, GDB, HTA and UPR.

5         And such certifications were the culmination of

6   months of analysis and development of information by the Title

7   III debtors, the Oversight Board, the government and the

8   respective professionals.  The certifications were made during

9   public hearings with the full -- excuse me, the full

10   opportunity for people to be heard in discussion, and the

11   fiscal plan served is the foundation for the framework for the

12   plans of adjustment that are under development.

13         On May 16 and May 15, Your Honor, the mediators

14   hosted information sessions in New York which allowed for the

15   presentation of those fiscal plans, and for the Board and the

16   government to respond to any questions that creditors had.

17   This lasted two full days, Your Honor, and we believe that it

18   was quite productive.

19         Not withstanding those certifications, Your Honor,

20   and as the Board has, and its representatives have repeatedly

21   stated, the fiscal plans are living, breathing organisms which

22   are subject to change based upon facts and circumstances.

23         And as reported, Your Honor, the Board and the

24   Commonwealth continue to engage in dialogue with respect to

25   potential modifications to the fiscal plans so that the needs

1   of the government and the means for implementation to get to

2   the goals of the fiscal plans can be implemented.

3        As the Court is aware, the next step in this process

4   is the formulation of the respective budgets.  This is

5   currently being undertaken and the Board is very hopeful that

6   it will be completed in the near future.

7        The conclusion of or the certification of the fiscal

8   plan process has allowed us to recommence our discussions with

9   individual creditors, and through the use of the mediators, to

10  actually have a productive dialogue with respect to moving

11  forward on plans of adjustments or other qualifying

12  modifications in the Title III and the non-Title III entities.

13  We continue to work with the mediators to frame the issues,

14  and whether it is in a formal mediation process, Your Honor,

15  or something informal.

16       Your Honor, against the backdrop of this -- I

17  apologize -- there are several matters which remain in

18  litigation.  As the Court is aware, yesterday there were

19  several things heard by the First Circuit from this Court.

20  Two decisions, Your Honor.  Specifically, the Peaje decision,

21  as well as the Court's decision in connection with the PREPA

22  Relief from Stay Motion.

23       Likewise, there are other matters which the Court

24  still has under review, which will frame some of the issues

25  which will allow us to go forward in connection with those

1    discussions with the individual creditors.

2           Your Honor is correct, yesterday there was the

3    announcement of the preliminary resolution of the

4    COFINA-Commonwealth dispute.  And we applaud all of the

5    efforts of the mediators and the two Board agents in reaching

6    that preliminary understanding.

7           We support the urgent motion and the relief requested

8    in that, Your Honor, to allow the parties to try and reach

9    definitive documentation on a settlement so that the parties

10   can then consider how to move forward with respect to a plan

11   of adjustment for COFINA.

12          THE COURT:  Now, the urgent motion didn't include a

13   specific proposal as to objection and reply dates.  And so I

14   had in mind to enter an Order setting Monday as the objection

15   deadline and Wednesday as a reply deadline.  I'll ask you and

16   anyone else who wants to speak to this.

17          Mr. Despins, would you come to the podium?

18          MR. DESPINS:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MR. DESPINS:  Pleased to be here under these

21   circumstances.

22          THE COURT:  Yes.

23          MR. DESPINS:  So the committee, as the Commonwealth

24   agent, is a joint movant in that motion.  We did not put a

25   deadline, but the deadlines that you provide are absolutely

1   acceptable to us.  And I can speak for the COFINA agent, that

2   it will be acceptable to them as well.

3           THE COURT:  Thank you.  And I do have a note that

4   Mr. Minias and Ms. Uhland -- actually, Ms. Uhland wanted to

5   speak about GDB.  That Mr. Minias is in New York for the

6   COFINA agent and wanted to be heard.

7           MR. MINIAS:  Yes, Your Honor, Joe Minias from Willkie

8   Farr Gallagher on behalf of the COFINA agent.  Those dates for

9   the objection and reply are certainly fine with us.

10          We'd like to express our sincere gratitude to the

11  Court, to your clerks, to chambers and to the mediation team

12  for all the time and effort spent with us these past few

13  months, and of course to Mr. Despins and his constituents for

14  all of his hard work to get to this important stage in the

15  case.

16          THE COURT:  Thank you.

17          MR. ROSEN:  Your Honor, I will defer to Ms. Uhland a

18  little bit later on for a discussion of the GDB.

19          Your Honor, as you are aware, previously there was a

20  bar date set for May 29th.  And pursuant to an Order of the

21  Court, that was extended for a 30-day period to June 29.  And

22  subsequently, what we did, Your Honor, is we have included

23  additional radio spots, publication in local periodicals, and

24  we have kept open the collection centers throughout Puerto

25  Rico to allow for more proofs of claim to be filed.

1        And during the intervening week of May 29 to today,

2   approximately 3,000 more proofs of claim have been filed,

3   bringing us to a total of approximately 17,300 proofs of

4   claim.  With respect to those, they can easily be -- and they

5   total, Your Honor, approximately 46 billion dollars.

6        They can be, however, categorized into several main

7   categories, three specific, Your Honor:  Bonds that have been

8   filed of about 38 billion dollars, tax refunds of

9   approximately 400 million dollars, and pension related or

10  retiree related claims of about 3.4 billion dollars.

11       There are additional litigation claims, Your Honor,

12  of about an additional 2.8 billion dollars, but the lion's

13  share of the 46 billion dollars, Your Honor, are essentially

14  those three categories I referred to.  And we think,

15  therefore, they will be easily reconcilable, because they

16  will -- in the bond situation, we obviously know with the

17  bonds that have been issued, Your Honor, and the tax refund

18  situation, we believe that will be reconciled through the

19  administrative processes of the government, likewise with

20  respect to the pension retiree existing claims.

21       At the same time, Your Honor, the Board, together

22  with AAFAF, have been engaged in bringing on claims

23  reconciliation to assist us in that process.  We did an RFP,

24  Your Honor, and approximately ten people submitted interests.

25       We interviewed several of them, and we are about to

1    make a selection with respect to those claims agents.  And we

2    think that will greatly facilitate and expedite the process

3    with respect to the non-three categories that I referred to

4    previously.

5           I know that on a prior appearance, Your Honor,

6    Mr. Despins had mentioned about an ADR process for the

7    resolution of those additional claims.  We have been working

8    with Paul Hastings and the Creditors' Committee, as well as

9    with AAFAF, to develop a process that will fit into the

10   concept of the plan of adjustment, which will provide for a

11   low discovery, low litigation type of approach.  It will allow

12   for offers to be going back and forth, and if, in fact, there

13   is no resolution, an expedited consideration by an appropriate

14   tribunal to consider those claims.  But again, Your Honor, we

15   are anticipating that we will include that in the plan of

16   adjustment after approval by all the parties.

17          THE COURT:  Thank you.

18          MR. ROSEN:  Your Honor, the next item is -- I'll say

19   it with respect to the GDB that you've referred to.  Your

20   Honor, as you are aware, this is something that was before the

21   parties pre-hurricane.  And, in fact, there have been

22   discussions and, in fact, an RSA had been reached in 2017.

23          It had been subsequently amended or amendments have

24   been entered to extend the period pursuant to which it would

25   be considered.  However, based upon the facts and

1   circumstances, the parties then revisited the issue on the

2   merits, and they have agreed to additional terms which are

3   currently being documented.

4           And Ms. Uhland, who is sitting in the New York

5   courtroom, will address some of the specifics associated with

6   the GDB proposal.

7           THE COURT:  Thank you.

8           Ms. Uhland, would you come to the podium, please?

9           Oh, I'm sorry.  Well, after we talk about --

10  actually, it makes sense to talk about PREPA before we talk

11  about GDB, because then the Siemens issue is next after GDB.

12  So would you speak about PREPA --

13          MR. ROSEN:  I'm actually going to defer to Mr. Haynes

14  over here, Your Honor, from Greenberg, who will speak to the

15  specifics of PREPA.

16          THE COURT:  Thank you for your patience, Ms. Uhland.

17  Mr. Haynes.

18          MR. HAYNES:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MR. HAYNES:  Nathan Haynes from Greenberg Traurig for

21  AAFAF, and it's fiscal agent for PREPA.  Your Honor, since our

22  last update, while there is still much work to be done, PREPA

23  has made significant progress in its post-hurricane recovery

24  efforts.

25          Power has been restored to some 99 percent of the

1   customer base.  Generation is at levels that are at 90 percent

2   of those in 2017.  82 percent of the 103 larger transmission

3   lines are now back in service.  And as of May, billing has

4   been reestablished to approximately 87 percent of the

5   customers.

6        Your Honor, PREPA also continues to work to secure

7   FEMA financing and to access available insurance proceeds.  On

8   the liquidity side, PREPA has a cash balance of 240 million

9   dollars.  150 million of that is current borrowings under the

10  Commonwealth loan.

11       Since the initial February 300 million drawdown on

12  that loan, PREPA has made mandatory repayments of 149 million.

13  The revolving feature of this loan terminates in June, the end

14  of June, and so we expect to draw down that 149 available

15  liquidity in advance of that deadline.  Unless the revolver is

16  extended by further government action, any mandatory

17  prepayments after that date will be permanent prepays down on

18  the Commonwealth loan.

19       PREPA's operational cash receipts are currently

20  servicing the majority of its operational expenses.  The

21  average weekly collections over the past four weeks has been

22  64 million, which is above budget.

23       Your Honor, PREPA continues to assess its short and

24  medium term liquidity needs.  We're actively exploring

25  third-party financing options, and we expect proposals from

1  those parties in the coming weeks.  We continue to believe

2  that PREPA has sufficient operating liquidity in the near

3  term, and we don't anticipate seeking additional or

4  replacement financing within the current budget period ending

5  on August 10.  And that, Your Honor is the current update of

6  PREPA.

7         THE COURT:  Do you have anything to tell us about

8  PREPA's work to strengthen its own emergency response

9  capabilities now that we're going into the hurricane season?

10 Is there anything that we can use in this forum to let the

11 people know as they wonder what the weather is going to do?

12        MR. HAYNES:  Well, PREPA -- as a part of its annual

13 processes, PREPA annually prepares for the hurricane season.

14 Those preparations are well under way.  We are obviously

15 coordinating with FEMA and the Army Corps of Engineers with

16 respect to the processes that need to be put in place, but

17 PREPA is well on top of the situation.  And we are in

18 hurricane season again, and that fact is not lost on

19 management.

20        THE COURT:  So I would assume that there is a lot of

21 learning from the experience of last year and it's a different

22 order of magnitude and intensity of preparation?

23        MR. HAYNES:  That's correct, Your Honor.  And I think

24 also there's the added layer of complexity that we're still

25 fixing things and there's still damage we're fixing and

1   transmission lines we're fixing, so that adds another level of

2   complexity on it.  But we feel that that process is in hand

3   and being dealt with appropriately.

4              THE COURT:  Thank you.

5              MR. HAYNES:  Thank you, Your Honor.

6              THE COURT:  And now, Ms. Uhland, will you come to the

7   podium in New York?

8              MS. UHLAND:  Thank you, Your Honor.  This is Suzanne

9   Uhland from O'Melveny Myers on behalf of AAFAF.

10             THE COURT:  Good morning.

11             MS. UHLAND:  As Mr. Rosen noted, the GDB and AAFAF

12  submitted an RSA last May, May 17, for approval to the

13  Oversight Board as a qualifying modification and that was

14  certified.  That RSA has the support of approximately 2.6

15  billion in principal amount of claims out of approximately

16  four and a half billion of claims against GDB.

17             That group includes more than 300 on-island

18  bondholders, and an additional 50 on-island credit unions, as

19  well as the ad hoc group of GDB public bondholders, which hold

20  over a billion dollars of bond claims.

21             The GDB restructuring, if you will, really has two

22  parts.  First, it has the Title VI components, which were

23  restructuring bond claims, which include both public bonds and

24  certain deposit claims, which are loans under Puerto Rico law.

25             As I'll get to in a minute, the number of deposit

1  claims has been greatly reduced by virtue of the offsetting

2  mechanism that's part of the fourth amendment.  That's the

3  Title VI component.  In addition, there are claims of public

4  corporations against GDB for their deposits, and those are

5  being resolved through a settlement that is being effected

6  through legislation that's being enacted in Puerto Rico on the

7  GDB restructuring.

8         So first, the qualifying modification in the Title VI

9  process.  What the Title VI process provides is that the

10 current bond claims against GDB will be restructured through

11 an exchange where they will receive new bonds of approximately

12 55 percent of the face amount of their old bonds, and these

13 new bonds will be issued by a new entity to be formed under

14 the GDB Restructuring Act.  And it's going to be called the

15 GDB Debt Recovery Authority.

16        Separately, the public corporation deposit claims

17 that are being settled through the GDB restructuring act will

18 be issued beneficial interest in a newly formed entity called

19 the Public Entity Trust, and the primary asset of that trust

20 is the net claim of GDB against the Commonwealth.  In other

21 words, while the Commonwealth had deposits at GDB, its loans

22 from GDB exceeded the amount of its deposits.  So on a net

23 basis, there's a claim against the Commonwealth of about 905

24 million dollars.

25        As noted, the RSA was amended after the hurricanes

1    and really we needed to do two things:  First, we had to move

2    out the milestone dates because of the obvious disruption and

3    delay; and second, we wanted to provide some relief to the

4    municipal entities, the municipal depositors.

5          So one of the primary changes to the RSA that was

6    negotiated after the hurricane and is set forth in the fourth

7    amendment is to allow for the full offset of the

8    municipalities' deposits against their loans.  This is one

9    reason that there are very few municipality creditors left

10   holding deposit claims in this modification.  So there are

11   very few depositors remaining.

12         In order to implement these amendments to the RSA as

13   well and to make some other amendments, the GDB Restructuring

14   Act is currently being modified by the legislature in Puerto

15   Rico and we are awaiting its approval.  On May 8th, 2018, the

16   Oversight Board recertified this amended RSA as a qualifying

17   modification under Title VI.

18         So now, where do we go from here?  As I said, the

19   public entity settlement is conditioned on the effectiveness

20   of the Title VI, but is being addressed through the

21   legislation.  The Title VI itself is moving down the path

22   toward solicitation and court approval.

23         As we set out in the informative motion, we are

24   proposing, GDB and AAFAF are proposing to the other RSA

25   parties that we set forth the following dates for our path

1   forward with the RSA:  That we will submit substantially

2   complete drafts of the solicitation documents to the Oversight

3   Board by June 22nd; that we will launch the solicitation on

4   July 5th.

5        This means we will include an offering, an

6   informational document and the ballots will be mailed on July

7   5th.  We intend to initiate the Title VI proceeding the day

8   after launch, so -- sorry.  We're going to mail July 5th and

9   initiate the Title VI proceeding on July 6.  And then provide

10  that the votes come back on August 6.

11       The Court's role in Title VI is to determine whether

12  the requirements of PROMESA 601 have been satisfied, and to

13  focus on three things:  One, the pooling and classification,

14  including classification as to whether an unsecured claim is a

15  claim as opposed to a property right; the solicitation and the

16  tabulation.

17       Given that range of sort of a rather narrow focus of

18  the Court, we set out what we think is an appropriate schedule

19  in our informative motion, triggered off of the initiation

20  date of the Title III.  And that's again set forth -- our

21  assumption is that from the date that we file and initiate the

22  Title III, we will include a motion to approve the qualifying

23  modification.

24       THE COURT:  May I just interrupt you there with two

25  things?  As I read your proposed schedule, which doesn't have

1    at this point an outside date for court approval, but your

2    schedule would appear to contemplate the holding of hearings

3    and substantive work toward resolution in the latter part of

4    August, August 20th and forward.

5         The Court is not available for hearings and

6    proceedings between August 24th and Labor Day.  So we'll need

7    to deal with that scheduling.  That leads me to suggest that

8    we consider whether combining whatever hearing is necessary

9    with the September Omni, which is the week of September 10th,

10   might be an approach that would promote at least some

11   efficiency in terms of people coming together.  So I would

12   look for your thoughts on that.

13        The second thing is that as you know, we have with

14   Siemens the issue outstanding, which I'm assuming falls into

15   that category of property versus loan that you were talking

16   about.  And I'd be grateful for further explication of your

17   thinking as to whether that assumption is correct, whether you

18   would anticipate building into this process any necessary

19   discovery in anticipation of and adjudication of the loan

20   versus property issue on the basis of Puerto Rico contract,

21   property, banking law, local law, and the extent to which you

22   think there are any other parties that might be making similar

23   types of contentions and where we would put any evidentiary

24   proceedings that might be necessary.

25        MS. UHLAND:  So Your Honor, I think with that, with

1   the Court's schedule, we should revise the proposed timetable

2   to -- right now we have what I'll call a 45-day period.  And

3   so with the Court's schedule, it would be more like a 60-day

4   period.

5          THE COURT:  Yes.

6          MS. UHLAND:  60, 65.  So the way we envision the

7   resolution of these issues is similar to an either -- you

8   know, just consider it a contested matter with discovery or a

9   plan -- a confirmation hearing with discovery.  So we would

10  like to work in, within that 60-day period, an appropriate,

11  you know, period for discovery, if necessary.

12         What we would like to do, and it is our view, and you

13  are correct, we were looking to resolve any entity that

14  believes that they have a property claim instead of -- a

15  property right instead of a creditor claim, Siemens or any

16  other party that believes they are similarly situated.  We

17  would like them to address them in the context we believe

18  that's a classification issue that we believe should be

19  addressed in the context of the resolution of the Title VI.

20         So perhaps with those thoughts in mind and the

21  Court's comments, we can provide -- you know, we can work

22  through now or we can confer with the parties and try to come

23  up with a revised proposed timetable that incorporates some

24  limited discovery on that discrete issue.

25         THE COURT:  I think some work offline on a revised

1   proposed timetable would probably be an appropriate and

2   efficient response, although in the next agenda item, it will

3   be important to hear Siemens' conceptual response to this

4   framework that we've talked about.

5           But I think, and I just want to confirm with you,

6   that I hear you saying that you are -- you anticipate real

7   discussions leading to an appropriate structure for discovery

8   that the -- either that the parties agree is necessary or to

9   the extent there is a dispute about that, queuing up something

10  to manage so that a proper discovery process can be managed in

11  advance of the hearing in connection with the Title VI, and

12  that that hearing will include at a minimum a determination as

13  to whether the funds in question can be classified as a loan

14  and therefore be resolved through the Title VI.

15          And I think a corollary to that determination would

16  be what is the precise nature of the rights, if they're not a

17  loan, and that would subsume in your view the issues that have

18  been raised in the adversary as to GDB and that escrow

19  account?

20          MS. UHLAND:  Yes.  That is all correct, Your Honor.

21          THE COURT:  Thank you for clarifying that for me.

22          MS. UHLAND:  So with that, Your Honor, unless the

23  Court has any questions, you know, that completes what we

24  wanted to address with the Court today.

25          THE COURT:  Thank you.  Give me just one moment to

1    look at my notes.

2         That covered all the questions that I had for you.

3    Thank you, Ms. Uhland.

4         MS. UHLAND:  Thank you, Your Honor.

5         MR. DESPINS:  Your Honor.

6         THE COURT:  Yes, Mr. Despins.

7         MR. DESPINS:  If the debtors --

8         THE COURT:  I need you at a microphone.

9         MR. DESPINS:  Thank you, Your Honor.

10        I was asking the question, if the debtors are done

11   with their state of the union report, we just need to address

12   a few points on behalf of the Committee that have been

13   discussed.  One of them is to give you a report on the

14   tutorial sessions that we had on the claim process.

15        Remember that you had asked about these tutorial

16   sessions and the proof of claim process.  Just, I want to give

17   you a brief report on that.  And we -- in Puerto Rico, on the

18   island, they worked very well.  We did it in four cities, and

19   they were well attended.  Dozens of people showed up.  That

20   worked well.

21        On mainland, not so successful.  Meaning that we shut

22   it down after the first one because of lack of interest.  But

23   I wanted to make sure Your Honor knew that.

24        THE COURT:  Thank you for undertaking to make that

25   available.

1          MR. DESPINS:  And on COFINA, Your Honor, I just want

2    to spend two seconds on that to set the stage.  You will

3    remember that under that stipulation, Commonwealth-COFINA

4    dispute, that on the COFINA side of the house, the way the

5    settlement needs to be implemented is through a plan of

6    reorganization that the Board obviously is the only party that

7    can propose that.

8          So the purpose of the 60 days is to go through not

9    only with the Board, but with a number of people, the COFINA

10   creditors, obviously the Board, and of course the COFINA agent

11   will be centrally involved in that process as well to go over

12   all the execution issues.  As you can imagine, you're familiar

13   with -- obviously very familiar with the litigation in the

14   COFINA case --

15          THE COURT:  Yes.

16          MR. DESPINS:  -- regarding junior, senior

17   acceleration.  All of that is something that needs to be

18   addressed by the Board through this process.  So we wanted to

19   make sure you knew that.

20          THE COURT:  Yes.

21          MR. DESPINS:  That's why the 60 days to try to firm

22   up a lot of these issues is necessary.  Whether 60 days will

23   be enough or not, we hope so, but we -- I've learned a long

24   time ago in bankruptcy that you always have to underpromise

25   and overdeliver.

1          So there's a lot of work that remains to be done.  I

2     want to make sure that the constituents and the Court know

3     that.  We are not at the finish line yet.

4          The last point I want to address briefly, Your Honor,

5     is GDB.  Just a big yellow light on GDB.  I'm not going to

6     argue the points, Your Honor, but the Committee has been in

7     discussion obviously with -- discussion with AAFAF on this.

8          There are several issues as to whether this is a --

9     whether the committee would sign off on this.  And one of the

10    concerns is that there are multiple governmental entities

11    involved in this.  For example, Ms. Uhland described that the

12    Commonwealth was a depositor at GDB.  So was PREPA.  And the

13    question is who is deciding all these things.  It's a bit

14    reminiscent of the debt refinancing issues where you have one

15    group deciding the issues that affect all these debtors.

16         There are also releases that are sought in this GDB

17    plan or -- not plan, but proceeding, releases for directors

18    and officers.  And I don't want to be dramatic about this, but

19    I was reading in the press yesterday that the governor

20    described Puerto Rico in the past as a big Ponzi scheme.  Not

21    my quote, his quote.  And in that context, we have to be

22    really careful about all of that.

23         And therefore, what I'm saying is timing wise, Your

24    Honor, I don't want to remain silent and Your Honor to think

25    that this will be a very dry procedural matter.  It may be.

 1   And that's not what we want to do, but it may be that the

 2   committee will challenge the use of Title VI for this process,

 3   and that's going to be a much broader proceeding than just

 4   what was described, Your Honor.

 5        So I want to make sure you are aware of that.  We

 6   don't need to debate that now, but I want to make sure that's

 7   on your radar screen.

 8        THE COURT:  And you say you are directly in

 9   discussions with AAFAF about this?

10        MR. DESPINS:  Yes.

11        THE COURT:  And so I will assume that a revised

12   timing and procedural proposal will reflect, at a minimum, the

13   existence of those issues and appropriate management

14   techniques for the proper consideration of those issues.  If

15   Ms. Uhland wants to add anything, I would invite her to come

16   to the podium in New York.

17        And I see she's on her way, so we might as well just

18   have this confirmed here.  So stay at the podium please,

19   Mr. Despins.

20        MS. UHLAND:  Your Honor, we need to -- I think we

21   need -- we are having discussions with the Creditors'

22   Committee.  We would love to have the Creditors' Committee

23   support the GDB Title VI.

24        As a threshold issue, we don't know that the

25   Creditors' Committee, frankly, has standing to get into the

1   Title VI of the GDB.  That's something that we do not concede.

2   And so -- but we do want to continue to work with them.  We

3   would like their support.

4        As far as a mechanism to resolve the dispute and to

5   reflect their view on the -- their potential objection on the

6   timing of the schedule, what I would propose, Your Honor, is

7   why don't we continue our discussions to obtain their support

8   in the near term.  And if we can't do that, then come up with

9   a proposal for, you know, a schedule to resolve our issues in

10  front of this Court.

11        THE COURT:  Thank you.

12        MR. DESPINS:  Thank you, Your Honor.

13        MR. ROSEN:  Your Honor, Brian Rosen again on behalf

14  of the Board.  I rise only with respect to the comment about

15  the COFINA-Commonwealth dispute.

16        As I mentioned we, the Board and its advisors, are

17  actively engaged in discussions already with members of the

18  COFINA creditors' body, and we are looking forward to now

19  taking preliminary settlement and moving that towards a plan

20  of adjustment.  We do not anticipate waiting until the

21  expiration of the 60 days.  We want to use every day that's

22  available to us.

23        THE COURT:  I'm glad to hear that.

24        MR. ROSEN:  Thank you, Your Honor.

25        THE COURT:  Now, did counsel for Siemens wish to

1   speak to the Title VI structure versus Title III issue?

2           MR. SOVEN:  Sure.  Andrew Soven from Reed Smith for

3   Siemens.

4           Your Honor, it sounds like in the last week since we

5   were before Judge Dein, there may have been a little bit of

6   progress in terms of what's sort of being offered to us in the

7   context of the Title VI, but I still think we're not there

8   yet.

9           I mean, the case was filed in the Title III

10  proceeding.  It doesn't seem as if there is a compelling

11  argument that the case cannot be heard in the Title III

12  proceeding.  And although they've argued in a Motion to

13  Dismiss that the case belongs in a Title VI proceeding, it

14  would be our preference as of today to have that motion ruled

15  on to see if they're right or we're right, or if the motion is

16  ruled on in such a way so that a decision can't be made on the

17  initial -- you know, on a Rule 12(b)(6) motion.

18          But as it stands now, you know, I heard something

19  about lack of standing for the Creditors' Committee.  I heard

20  that there may be an opportunity for discovery and there may

21  be a hearing at some point in the Title VI process, but none

22  of that really has been -- has been put down specifically in

23  the motion to inform or in what I've heard today.

24          So I mean, we're here talking about this Title VI

25  issue because GDB, and to some extent the other parties to the

1    RSA, included Siemens' claim in the RSA, that was a choice

2    that they made, which they're entitled to make, but which

3    we're entitled to disagree with.  And I have not heard yet a

4    compelling reason for me as to why our position on that cannot

5    be heard in the Title VI.  At the same time -- in the Title

6    III.

7         At the same time, we have every interest, as I told

8    Judge Dein last week and I'm telling you today, in an

9    expeditious resolution no matter where the case is heard.  So

10   the schedule we proposed said, you know, briefing would

11   essentially be done in the next two or three weeks, by July

12   25th, by agreement.

13        If the Court wants, it can hear argument.  If the

14   Court doesn't want, it can decide the motion.  That argument,

15   they are now agreed in principle to some discovery.  We put

16   forth in the proposed orders submitted last night what exactly

17   that discovery should be, and it's quite limited.  And, you

18   know, under our -- you know, under our argument, the case in

19   the Title III proceeding can be decided 60 days, 90 days,

20   certainly by the end of the summer, if not before, and so that

21   remains our preference.

22        THE COURT:  Well, I hear you on that, and I saw that

23   reflected in your filing yesterday afternoon.  As you know, I

24   have -- there's one of me, and I have quite a queue of issues

25   that are urgent and/or perceived by their proponents to be

1   urgent, and so a concern that I have always is the most

2   efficient way of resolving an issue.

3         And to the extent anybody wants to jump to the front

4   of the queue, I have to ask myself and them, why should you be

5   in the front of the queue when other people have been waiting

6   for things.  I wish I could --

7         MR. SOVEN:  Yes.

8         THE COURT:  -- decide everything instantly, but I've

9   found that I can't, miraculously enough, and so I have to

10  organize my time properly.  And so since the -- there seems to

11  be very real momentum, both procedurally and for business,

12  governmental, restructuring reasons on the Title VI, it

13  certainly sounds to me as though that is very much on a track

14  to happen in the near term and in the time frame in which you

15  would put your aspirational accelerated decision of this issue

16  within the Title III.

17        And Ms. Uhland has recognized the need to provide for

18  a discovery process and for evidentiary proceedings in

19  connection with the issues, has acknowledged that local law

20  will govern the determination of the property and loan issue,

21  which is another concern that you raised in yesterday's

22  filing.

23        My request to you is to engage in very serious and

24  more concrete discussions with AAFAF to come up with a

25  sufficiently comprehensive process to do this within the Title

1   VI rather than trying to have a separate accelerated track for

2   your motion practice in the Title III while we're also queuing

3   up the Title VI.

4          And as I said to Ms. Uhland, late summer is not a

5   time when I can entertain and promise to turn around very

6   quick decisions.

7          MR. SOVEN:  Understood.  I mean, would Your Honor

8   anticipate that we would meet and confer again, and hopefully

9   maybe with greater success, and then -- what is the process in

10  terms of getting back to the Court?

11         THE COURT:  Well, what I spoke about with Ms. Uhland

12  was that she was going to organize the necessary

13  consultations, and then there would be a revised proposal both

14  in terms of timing and in terms of the particulars of

15  proceedings.

16         And so if you are not fully on board with that

17  proposal, I would expect that that would be accompanied by an

18  articulation of the objections that remain.

19         MR. SOVEN:  Thank you.

20         THE COURT:  Thank you.

21         And so I think procedurally and for housekeeping

22  purposes, since I am directing you to go down this procedural

23  track, I am going to enter an Order denying without prejudice

24  the pending Motion for Expedited Motion Practice on

25  segregation of the money within the Title III.  And I will

1    leave it to you and the other parties to the Title III to

2    decide whether you still want to keep to the briefing schedule

3    that was proposed for the motion to dismiss in the Title III,

4    or hold the conclusion of that in abeyance pending the Title

5    VI.  That might be a way to save some, you know, money and

6    effort.

7            MR. SOVEN:  Just one final point, we had filed a

8    motion to preserve the funds.

9            THE COURT:  Yes.

10           MR. SOVEN:  And as of last week, essentially what

11   constituted an oral order from Judge Dein about that, or at

12   least confirmation that the funds would have been preserved at

13   least through June 28, because at least as of last week, that

14   was an aspirational date for a resolution, even though that

15   didn't turn out to be realistic.  I mean, we would like that

16   extended, I guess, if that's the right word.  We would like

17   confirmation that the funds will be preserved and remain

18   intact pending final resolution of Siemens' claims, wherever

19   they're heard.

20           THE COURT:  So let me invite Ms. Uhland back to the

21   podium in New York for that.

22           Ms. Uhland, will there continue to be a standstill on

23   disbursements from the GDB and application of GDB funds

24   pending the final resolution of the RSA qualifying

25   modification motion practice?

1            MS. UHLAND:  Are we asking -- let me ask, is the

2    position -- I'm not quite understanding what I'm being asked

3    to confirm.  Can you repeat that?

4            THE COURT:  I heard Siemens' counsel saying that they

5    are concerned that there be a specific undertaking not to

6    divert or otherwise invade the 13 million dollars until the

7    property rights versus loan issue is resolved, particularly if

8    what we're looking at is resolving that in the context of the

9    Title VI.  And there had been a specific undertaking before

10   Judge Dein regarding the period from now until June 28.  And

11   so he's asking for a comparable undertaking through the

12   conclusion of the -- the resolution of the issue in the

13   context of the Title VI.

14           MS. UHLAND:  Why don't we say that it would be the

15   earlier of that date or September 10th, in case there's

16   some -- something goes off the res.

17           THE COURT:  All right.  Well, why don't you -- that's

18   the proposal, and if you will follow up on that with them in

19   your discussion of mechanisms, and if it's acceptable, include

20   that in the scheduling and mechanism proposal?

21           MS. UHLAND:  All right.  Will do, Your Honor.

22           THE COURT:  Thank you very much.

23           MS. LOPEZ:   Your Honor, briefly.  Giselle Lopez on

24   behalf of the GDB.  I was under the impression that you wanted

25   to discuss the merits of the preservation of funds request,

 1   but if you're only discussing calendar and briefing, then we

 2   don't have anything to add.

 3          THE COURT:  I did not expect to hear merits arguments

 4   on that motion.  And if the parties are content to push it out

 5   until September or earlier, preservation of the -- earlier

 6   resolution of the RSA, it seems to me it's not necessary.

 7          MS. LOPEZ:   Right.  That's what we wanted to make

 8   clear.  Thank you.

 9          THE COURT:  Thank you very much.

10          All right.  The next item on the agenda is the report

11   of the fee examiner.

12          MS. STADLER:  Judge, as you mentioned -- oh, I'm

13   Katherine Stadler of Godfrey & Kahn on behalf of the fee

14   examiner, Brady Williamson.

15          THE COURT:  Good morning, Ms. Stadler.

16          MS. STADLER:  Good morning.  As you know, we filed a

17   status report on the second interim fee applications covering

18   the period from October 2017 through January 2018.

19          There has been some progress since the filing of that

20   report about a week ago.  We are in productive talks with

21   counsel for the Board regarding resolution of issues

22   identified in their first interim fee application, and we have

23   a meeting scheduled next week with some of the applicants for

24   the second interim fee period that have been held over for

25   consideration at a later date.  So those are new developments.

1      I wanted to make a couple of notes.  On the

2  confidentiality issue, we have continued to have a number of

3  firms express concern that materials they submit to the fee

4  examiner are not protected.  In other words, that they could

5  be charged with violating mediation confidentiality by

6  submitting the materials in an unredacted form to the fee

7  examiner.

8      The fee examiner has taken the position that the

9  existing Orders prevent any kind of violation of mediation

10  confidentiality through the submission of materials to the fee

11  examiner, and that issue is continuing to be discussed among

12  the fee examiner and some of the applicants.

13      There have been no objections filed to the fee

14  applications recommended for approval today.  We filed and

15  submitted to chambers yesterday an Order that incorporates the

16  recommendations of the report.  That Order has been circulated

17  to all of the professionals and I am aware of no objections to

18  its entry.

19      The fee examiner would like to say a few words when

20  I'm finished, but I'm prepared to answer any questions you

21  have about the report or the fee process.

22      THE COURT:  Well, the questions that I have go to the

23  chronic concerns and cost containment issues that are flagged

24  in the fee examiner's report, which includes a component

25  anticipating a potential application by motion for specific

1  cost containment measure requirements.

2          I would like to hear a bit more about those potential

3  measures and the thinking at this point.  And there are some

4  additional potential measures that the Court would like to

5  have considered for possible formal proposal in that context,

6  because, as the report notes and as I've previously noted here

7  in open court, the careful use of resources is required as we

8  work through these unprecedented and highly complex problems.

9          And I've made some specific instructions to avoid

10  duplication on the record and to avoid overstaffing and

11  overattendance.  And I see in hearings that the attendance

12  issues have been taken to heart, to an extent, and that I

13  appreciate the current combined fees accrued so far I think do

14  warrant additional comment, and also the consideration of

15  compulsory cost control measures.

16          So are you the right person for me to have that

17  discussion with or is it Mr. Williamson?

18          MS. STADLER:  I think I can talk about them, and he

19  may have a few general concepts to address in that regard.

20          Your Honor, you're referring to the bullet point

21  items on pages 15 and 16 of the report?

22          THE COURT:  Yes.

23          MS. STADLER:  So those recommendations, and as you

24  know, backing up to the March 7th hearing and the reporting

25  cycle that led up to that, we had a couple of -- the fee

1  examiner had a couple of observations about the efficiency of

2  the process that he sort of previewed for the Court on March

3  7th, and then subsequently embodied in a motion to amend the

4  fee examiner Order which is now pending.

5       I would characterize that motion as cleanup and

6  perfection -- perfection to the extent that's possible of the

7  fee examiner Order now that we have had a chance to see how

8  the process plays out.

9       These measures that are suggested here in the report

10  on pages 15 and 16 are similarly suggestions, concepts, ideas

11  that the fee examiner would like to vet with the professionals

12  and continue to discuss.  I'm sure he would be happy to have

13  the Court's insight on any of them and any other measures that

14  the Court deems appropriate.

15       But this was in no -- by no means an attempt by the

16  fee examiner to start dictating new blanket -- or requirements

17  that were non-waivable or couldn't be -- you know, exceptions

18  could not be approved.  But he thinks that a couple of these

19  things have the potential for real cost savings, and to create

20  more incentives for the kind of conservative staffing measures

21  that he is hoping to see.

22       The intervention requirement, again, the concern

23  there, and Mr. Williamson, I'm sure, would be happy to discuss

24  it in a little more detail, but the concern there is

25  especially with the potential for another Creditors' Committee

1    or Retiree Committee for the PROMESA retirees -- I'm sorry,

2    for the PREPA retirees, the proliferation of interventions

3    chiming in, we agree, joining, and a concern that there is not

4    enough effort being made to consolidate arguments where that

5    is appropriate and allow parties who have similar positions on

6    issues to submit materials together, rather than each

7    individually having to submit their own unique perspective on

8    every single issue, that is a place where the fee examiner

9    thinks that there's a potential for cost savings.

10         The holdback suggestion, and I know this is a cause

11   for concern for a lot of professionals, so I want to soothe

12   everyone's concerns by saying this is a proposal that the fee

13   examiner has made primarily because he wants to make sure that

14   professionals are all filing interim fee applications, more or

15   less at the same time.

16         The reason for that is, speaking directly to the

17   issue of duplication and overlap, if the fee examiner is

18   looking at a specific case or issue or briefing cycle and

19   trying to determine if there was duplication and overlap in a

20   given fee period, it is very hard to do that without knowing

21   what everyone has charged for that particular activity or

22   brief or argument.  And so we really want to encourage people

23   to file their fee applications timely and keep up with the

24   schedule that's set forth in the Interim Compensation Order.

25   Because if that doesn't happen, we end up with issues that

1    have to be set over or deferred or kicked down the road.  And

2    then you have, you know, a period of time where more

3    problematic billing behaviors can occur in the interim.

4            So we want to make sure to get the application filed,

5    identify the issues, raise them with the professionals, and

6    come to an understanding about how those issues will be

7    handled going forward so we don't end up with a backlog of

8    unresolved issues that are worse than if we had addressed them

9    as they arose.

10           THE COURT:  So I understand that that is the goal.

11   And just for clarity for me on the mechanics, if such a

12   structure were put in place and a professional was

13   substantially in violation of the deadline set for submission

14   of the interim fee application, then for the following period,

15   the holdback would jump up to 20, 30, 40, 50, whatever the

16   percentage until the next submission is made timely, and then

17   can be trued up in connection with the following period?

18           MS. STADLER:  That sounds reasonable to me, but

19   again, I think I'm hearing a lot of grumbling.

20           THE COURT:  I'm just trying to ask how you're

21   thinking that would work.

22           MS. STADLER:  Yeah, something like that I think.

23           One thing I do want to mention, because I know people

24   in the room are very concerned about it, there have been a

25   number of professionals that have appealed to the fee examiner

1   counsel for assistance in facilitating payments.

2   And there are many professionals who are concerned

3   that not withstanding the existence of the Interim

4   Compensation Order, not withstanding the existence of the fee

5   examiner's reports and recommendations, that the Court's

6   Orders with respect to payment of fees on a interim basis,

7   either under the monthly compensation procedures or the

8   interim compensation procedures, are not being strictly

9   followed.

10   I want to reiterate to the professionals and for the

11   Court that the fee examiner does not view it as his role to

12   step into the payment queue issue, and that unless there is

13   some instruction from the Court to the contrary, his

14   involvement will end when the recommendations are made to the

15   Court and the Court has approved them through entry of a

16   Compensation Order.

17   And issues with regard to who is being paid what, at

18   what percentage, are going to have to be dealt with as an

19   administrative matter outside the fee examiner process,

20   because we simply don't have access to the records and

21   information necessary to determine or verify who has been paid

22   and who has not been paid.

23   THE COURT:  And as I recall, it's monthly payments

24   subject to a holdback that is then tied to these quarterly

25   interim --

1          MS. STADLER:  Correct.

2          THE COURT:  -- compensation determinations?

3          MS. STADLER:  Correct.

4          THE COURT:  So, I am not asking the fee examiner to

5    get involved in those cash flow issues.  However, to the

6    extent there are cash flow or payment issues that then

7    complicate the fee examiner's efforts to streamline the fee

8    examiner's processes with professionals and in providing input

9    to the Court, there has to be some direct and frank discussion

10   and work as between the payor entities and the professionals.

11         And I will say here that I would hope that I don't

12   have to see any applications about compliance with the

13   specifics of the payment provisions of the Orders in order to

14   clear those sorts of complicating issues off the table, but if

15   that's necessary, the entities and professionals involved on

16   either side are going to have to, you know, come up with an

17   appropriate application to put the issue before me.  I'll hear

18   it if I have to.  I encourage you not to make me have to hear

19   that.

20         MS. STADLER:  Thank you.

21         The last bullet point item that I might address

22   briefly was the limit on individual attendance at events and

23   also case monitoring.  We understand from ongoing discussions

24   with counsel for the Board and AAFAF and other interested

25   parties that there has been a concerted effort made since the

1    issuance of the first interim report to consolidate the

2    process of reviewing the voluminous docket on a daily basis,

3    digesting what's in there and disseminating information to the

4    necessary parties.

5          Because the fees we reviewed for this cycle ended in

6    January, we haven't had the benefit of seeing the results of

7    that effort, but we understand that it has been undertaken in

8    earnest, and are pleased to see that the docket monitoring

9    concern that was raised appears to be being addressed.

10         As for the hearing and mediation attendance, and

11   perhaps today's or yesterday's announcement means there is

12   less mediation attendance in the future that we will have to

13   worry about, but the attendance at hearings continues to be an

14   issue.

15         And the fee examiner has stated standards and

16   guidelines that are in the memoranda that he has issued to the

17   professionals and filed with the Court, and has continued to

18   apply those standards with some flexibility in recognizing

19   that there are always unique circumstances that come up and

20   there are always situations where a person's attendance at a

21   particular event or a person's participation in briefing or a

22   hearing may be justified even if it doesn't rigidly adhere to

23   a pre-established guideline.

24         So whether there are standards that are articulated

25   and enforced or monitored by the fee examiner or the Court,

1    the fee examiner would always understand that there is going

2    to be a case-by-case analysis of every single billing issue

3    that arises.  And that he would not endeavor to enforce or

4    apply any kind of standards or restrictions or cost-control

5    measures without regard to the realities of this very complex

6    case.

7              THE COURT:  Thank you.

8              And so to that, let me just air some ideas that I had

9    on my side along these lines.  And again, as you'll hear from

10   the way I'll try to articulate them, they're intended to have

11   some aspects of flexibility, and they also relate to the

12   issues that have been raised by the fee examiner.

13             And so, for instance, as to attendance, I understand

14   that there are principles in the guidelines and in the

15   memoranda that if we were going to take it up a notch, perhaps

16   we can look at it as a presumptive restriction on the number

17   of individuals expected and permitted to attend particular

18   types of activities.  And then to the extent any invoices

19   reflect billing above the presumptive limit, the billing

20   entity should provide a confidential submission to the fee

21   examiner with a specific justification for the overattendance.

22             Along the same lines, with respect to duplication of

23   briefing, that -- to impose a requirement that parties

24   expecting to take identical or substantially similar positions

25   on motion practice collaborate in advance of the submission of

1    papers and file joint pleadings with short supplemental

2    filings as necessary.  To the extent that parties determine

3    that they nonetheless have a need to file separate, full

4    pleadings, they certify that they did confer in advance and,

5    in connection with the billings, submit a confidential,

6    written justification to the fee examiner with the separate

7    pleadings.  And that can inform the fee examiner's

8    recommendations and communications to me, but let the party be

9    more candid with the fee examiner than the party could be with

10   me.

11          One thing that I'm aware of generally in the market

12   is that on electronic research, my understanding is that many,

13   if not most, firms have flat fee contracts with providers.

14   And I understand that there is substantial billing for

15   electronic research services.

16          And so one potential measure that has occurred to me

17   is requiring disclosure to the fee examiner where there is a

18   flat fee contract and having some presumptive limit of billing

19   for the electronic research to a specified percentage of the

20   monthly flat cost, perhaps capped at a calculable,

21   demonstrable, actual proportion of the costs incurred by the

22   firm.  So that if, for silly numbers, if the presumptive limit

23   were one one-thousandth of the monthly flat fee, but it turns

24   out that in actuality 20 percent of the traffic was

25   attributable to this matter, and that could be demonstrated by

1    a showing of research hours or whatever, that information

2    could be provided to the fee examiner.

3           And I understand that you're having discussions about

4    receipts as well and whether there's a de minimis threshold

5    below which the receipt concern is not heightened, but you're

6    talking about a concrete threshold at which the concern does

7    get heightened.  And so perhaps increasing the transaction

8    costs of not coming with a receipt might be an incentive to

9    coming with a receipt.

10          So those are the additional concerns that I have had.

11   And so what I would encourage the fee examiner to continue to

12   do is to have the discussions informally, but to also consider

13   formulating a motion after those discussions with specific

14   proposals that would then be subject to filing on the record

15   with a full process for objections, and reply.  And then the

16   Court would consider changes.

17          MS. STADLER:  Yes, we will do so.

18          THE COURT:  Thank you.

19          And so with that, I grant the motion for approval of

20   the recommended adjusted amounts and deferral of the

21   applications that are identified in the Proposed Order as

22   deferred.  And I will enter that Order.

23          MS. STADLER:  Thank you, Your Honor.

24          THE COURT:  Thank you, Ms. Stadler.

25          MS. STADLER:  Mr. Williamson will speak.

```
 1              THE COURT:  Yes.  Good morning, Mr. Williamson.

 2              MR. WILLIAMSON:  Good morning, Your Honor.  I will be

 3    brief.  Let me start first with the four specifics the Court

 4    just mentioned.  And I think it's important to note that in

 5    each of those, including the electronic research, presumptive

 6    attendance and the others the Court mentioned, they've already

 7    been long part of the dialogue with the professionals.  And I

 8    think the question which we'll continue to discuss is whether

 9    those should be more formalized.

10              But I think the Court's perception on overattendance

11    and duplication has been well communicated, and more important

12    than whatever we say in our report is what's said from the

13    bench.

14              THE COURT:  So may I just add one thing that I forgot

15    to add when I went through those measures?  Another part of my

16    thinking is that to the extent -- if and to the extent that we

17    do impose some specific measures, it would be helpful to the

18    Court, and I think also to the assembled, if the fee examiner

19    could do a demonstrative look back for information purposes at

20    a preceding period or periods to determine the order of

21    magnitude of difference that the measures would have made had

22    they been in place during, say, the first or second period, so

23    that can provide additional information and an incentive going

24    forward.

25              MR. WILLIAMSON:  Thank you, Your Honor.  And
```

1    actually, on that point, to be quite specific, we noted with

2    respect to electronic research, which can get into six

3    figures, that the amount done dropped precipitously from the

4    first period to the second period.  We all know how novel many

5    of the issues are, but with all respect to our colleagues at

6    Lexis and West and all those services, at some point learning

7    that there is no precedent stops.  And it's clear there is no

8    precedent for much.

9         So, Your Honor, we've been at this for two fee

10   periods, eight months, of more than 30 professionals.  And

11   while the nature of this process tends to focus on problems,

12   there really is much to be encouraged about.

13        And foremost I think is the cooperation and

14   consultation between our review process and the professionals'

15   willingness and openness to hear a different point of view, to

16   answer hard questions, sometimes to persuade us that the

17   services rendered were not only reasonable and necessary but

18   essential to making this process work.

19        So as a result, I hope the report embodied a couple

20   concepts.  One is that what we do is as much about prospective

21   practices as retrospective practices.  In other words, it's

22   imperfect.  We can always get better.  And we don't want to

23   simply dwell on the past without applying those lessons

24   prospectively, in which we all hope will be a brief case, but

25   may end up not being a brief case.

1          The other conceptual point Ms. Stadler and I wanted

2     to drive home I think this morning is that the comments from

3     the bench and the comments on our report are as much directed

4     at the clients as the counsel because ultimately counsel makes

5     suggestions, executes decisions, but ultimately the client

6     makes decisions about intervention, about separate briefs,

7     about cooperative behavior among the professionals.

8          Another note, if the Court looks at Exhibit A, it

9     will see in the very first line that there's an expense

10    adjustment for $7.86.  And the question may arise, why bother

11    with $7.86?  And the facile answer is because the rules

12    require it.  And that's true.  But I think the broader answer,

13    which goes to the review process generally, is that expenses

14    are a tree in a forest.  Duplicate attendance are trees in a

15    forest.  And our focus has to be both on the trees and the

16    forest.  And again, that's why we're looking at broader

17    concepts, like making the process more efficient.

18         I'll end on this point.  I think we've had more than

19    a dozen meetings with professionals.  As Ms. Stadler said, we

20    have at least one scheduled for next week.  I think we know

21    enough about the process to say that it is working, that it

22    could work better, and will, but we don't see significant

23    changes going forward.

24         The bullet point recommendations we made, like those

25    we made in the first report, were really a trial balloon.  And

1    we've gotten a response from the professionals and now from

2    the Court, and if and when those should ripen into a motion,

3    we will file it as we have done.

4            So thank you for your attention.

5            THE COURT:  Thank you very much, Mr. Williamson, and

6    thank you for your work.

7            And thank you, Ms. Stadler, as well.

8            And so the next item is the fee examiner's motion to

9    amend the Order with respect to flat fee arrangements and

10   certain other types of billing.  We've got 20 minutes

11   allocated on the calendar for that.  I will have some

12   questions and I'll be up front about my having some concerns

13   about that proposal.  And so there will be a need for

14   discussion.

15           Does anybody who's going to be involved in that

16   discussion want me to take the break now?  It's almost eleven

17   o'clock.  I can take a five-minute break if people would like

18   that before we go on to the next item?

19           I see no pleading for a break, so let's go on to the

20   next item.

21           MS. STADLER:  Thank you, Judge.

22           THE COURT:  Hello, Ms. Stadler.

23           MS. STADLER:  Hello again.  As Your Honor just

24   alluded to, as a result of some of the observations made in

25   the first interim reporting cycle, the fee examiner saw fit to

1    consider changes to the Order appointing him to address

2    inefficiencies in the process that he perceived as a result of

3    that first round.

4            They primarily fall into three categories:  There was

5    the issue of work performed prior to formal retention.  As you

6    know, in Chapter 11, professionals have a retention order and

7    their work starts as of the date of their retention, whether

8    it's concurrent or retrospective.  And there is a specific

9    start date to when billing may begin.

10           PROMESA, as you know, did not incorporate the

11   retention requirements, at least as for state professionals,

12   of the Bankruptcy Code.  And so we have a situation where some

13   professionals started billing on the petition date or on the

14   date of their formation in terms of the committee or

15   appointment.  But other professionals, and particularly those

16   working for the COFINA agent, began their work before the

17   Court formally appointed them.

18           And the fee examiner flagged that issue for the

19   Court, and then made this motion to clarify that he would go

20   ahead and review those pre-retention and pre-appointment fees

21   and make recommendations on them.  He has done that in his

22   second interim report.  That's not an issue that's expected to

23   reoccur, so I would characterize that as sort of a

24   housekeeping item.

25           THE COURT:  And I don't have an issue with that, and

1  there have been no objections filed to that.

2          MS. STADLER:  Right.

3          A little bit more broadly speaking, there is an issue

4  of Title III versus non-Title III work.  A really good example

5  of this is not in our motion, because we just learned about it

6  in talking to one of the professionals about the second

7  interim fee applications.  But one professional is very

8  engaged in the recovery effort with respect to utilities and

9  working with FEMA and seeking to get expenses reimbursed by

10 FEMA, and there is a very fuzzy line between where this

11 professional's Title III work ends and where the recovery

12 effort begins, or the privatization plan effort begins.  And

13 that's true for a lot of these professionals.  They're working

14 on matters that are in Title III and outside.

15         Ms. Uhland, for example, just gave a presentation

16 about the GDB, and one could argue that portions of the

17 colloquy were Title III and portions of the colloquy were not

18 Title III.  And the fee examiner has concluded that rather

19 than attempt to arbitrarily determine after the fact what is

20 or what is not a Title III service, and to carefully avoid

21 making any evaluation of non-Title III services, that he would

22 instruct his counsel to review and report on applications for

23 compensation that are filed in the Title III.

24         So, for example, Ms. Uhland's bill for today's

25 hearing will reflect her attendance and the discussion about

1    Title III and Title VI, but the bill presumably will come to

2    the fee examiner.  And the fee examiner will review that bill

3    without regard to whether those fees technically belong in one

4    bucket or the other.

5         And so this Order also just clarifies that the fee

6    examiner will have the authority and obligation to review and

7    report on any fee applications filed in the Title III,

8    regardless of whether the work performed was in the Title III.

9    That's sort of just a practical revision, and I also have

10   heard no real objection to that from any of the parties.

11        THE COURT:  And that seems, to me, salutary as well

12   and practical.

13        MS. STADLER:  Thank you.

14        The final issue that is addressed by the motion is

15   the issue of de minimis professionals.  We learned through --

16        THE COURT:  And McKinsey, which is not de minimis.

17        MS. STADLER:  And McKinsey.

18        THE COURT:  Not at all.

19        MS. STADLER:  Right.  Right.  So McKinsey is not de

20   minimis by any means.  But as you know, the fee examiner and

21   McKinsey sort of reached an impasse in the discussions about

22   the fee -- first interim fee period because the standards that

23   PROMESA borrows from the Bankruptcy Code with respect to

24   reasonableness and necessity hinge on an evaluation of the

25   time spent and services provided.

1        And the contract that McKinsey has with the Oversight

2   Board simply does not lend itself to that type of analysis.

3   So the fee examiner, after many discussions with the Board

4   professionals, with McKinsey and others, concluded that it

5   made the most sense to place the obligation for verifying

6   reasonableness and necessity of that particular professional's

7   services on the party most familiar with those services, which

8   would be the Board.

9        The mechanics of how that review and recommendation

10  and reporting process would work are obviously still open for

11  discussion.  There are no specifics about that in the Order --

12        THE COURT:  I noticed --

13        MS. STADLER:  -- other than to say that particular

14  professional does not fit in the fee examiner process as it's

15  complicated in the Orders creating it or in PROMESA, and we

16  have to deal with that.

17        THE COURT:  And so I will take that as an opening of

18  the discussion on this topic.  And I understand the dilemma

19  that's presented, but the standards to which the fee examiner

20  is seeking to work -- the PROMESA standards -- are the same

21  standards that would apply to the Court.

22        And so it is not obvious to me that kicking this

23  problem to me that has come to an impasse in consultations

24  without some further structural changes in what's submitted

25  will enhance at all my ability to make the determinations that

1    I would have to make ultimately under 316 and 317.

2         And so it certainly seems to me that some, you know,

3    input from the Oversight Board as to the reasonableness and

4    necessity of the services provided is essential, because

5    they're there on the ground.  But I can't simply delegate to

6    the Oversight Board the responsibility and authority to

7    approve McKinsey's flat fee arrangements.

8         And as you've noted, Section 328 is not incorporated

9    into PROMESA.  And so we have 316 and 317 which, even viewed

10   conceptually as opposed to a specific exclusive list of

11   factors, contemplates some metrics, some qualitative and

12   quantitative benchmarks.

13        And so to cut to the chase, what I want to see is a

14   process that still has the fee examiner involved, evaluating

15   on the basis of the fee examiner's wisdom, experience, and

16   contextual knowledge of all of the other professional, similar

17   professional work that is being done.

18        Meaningful input to the fee examiner in the first

19   instance by the Oversight Board and the development of

20   metrics, which don't necessarily have to go to 10th of an hour

21   timekeeping by McKinsey, but some metrics to be proffered in

22   supplemental data submissions by McKinsey that could go to

23   numbers of people involved in projects, in some sort of

24   meaningful numbers, the amount of time spent on particular

25   projects during particular periods, identifying deliverables.

1          There are various ways to get there so that the fee

2     examiner would have some benchmarks for evaluation and be able

3     to make some sort of recommendation to the Court on McKinsey's

4     flat fee application or anyone else's flat fee application.

5          Because otherwise I would be sitting in the dark with

6     the choice of deferring to the party that hired and signed

7     that contract in the first place, which obviously has, you

8     know, an appropriately built-in interest in saying that

9     everything's come out fine, but that's not sufficient from my

10    perspective.

11         MS. STADLER:  Your Honor, I think that that makes a

12    lot of sense.  And obviously in our discussions with the

13    professional, we didn't just throw up our hands and say, let's

14    let the Judge deal with this.  We had a long series of

15    discussions.

16         As you know, the Board itself has its own fee

17    examiner, Bob Keech, who is reviewing all of the Board

18    professionals bills, whether or not Title III.  And we spoke

19    to him about this issue, and he had reached a similar

20    conclusion, that there is just no way given the tools we have

21    and the information provided that we can provide the kind of

22    recommendation or assurance to the Court that these 316 and

23    317 requirements are met.

24         THE COURT:  And so that's where I come in with my

25    ability to sign under the words "so ordered".

```
 1              MS. STADLER:  Right.

 2              THE COURT:  I can change the game.  And it seems to

 3    me I need to change the game.

 4              MS. STADLER:  I wouldn't disagree with that.  If

 5    we're to do our job the way we have done it with respect to

 6    other professionals, I think that that's true.  And that also

 7    applies then to the de minimis category, although much less

 8    significantly in terms of financial impact.  The attempt with

 9    this proposal was to sort of co-opt the notion of ordinary

10    course professionals that exist in Chapter 11 cases.

11              Most Chapter 11 cases of significant size have

12    ordinary course orders that have specific procedures about

13    thresholds beneath which formal retention and formal fee

14    application are not required.  And during the first round of

15    reporting, we noted that there were a number of professionals,

16    some of them, you know, with modest, in this case anyway, flat

17    fees on a monthly basis, and others that simply were working

18    on such small and discrete matters that the fee examiner

19    concluded that his review and comment on them didn't make

20    sense in cost benefit analysis.

21              And so we floated the idea and discussed it with the

22    various interested parties and came up with a proposal in the

23    Order, but obviously are open to the Court's or any other

24    party's insight as to how to put a finer point on that.

25              The goal there is, again, not to kick the burden to
```

1    someone else, but merely to be cognizant of the fact that this

2    process also has a cost, and that for certain types of

3    professionals, flat fee being primarily among them, there's

4    not a lot of value a detailed fee review process can add.  So

5    that's the thinking behind that particular proposal.

6           THE COURT:  And I hear that.  I think that the

7    comments and structure that I suggest to be worked out in

8    connection with the large flat fee provider could also be

9    created in a proportionally appropriate way with respect to

10   smaller flat fee providers.

11          And as to de minimis non-flat-fee providers, I

12   honestly still don't want as a practical matter, given my very

13   limited resources on which there are many, many demands, to

14   have to devote my staff time to detailed review of billing

15   statements.  And to find the 10,000 dollar ones, and then look

16   at time and charges on those to be able to formulate a

17   recommendation for me, that's just not an efficient process in

18   my chambers.

19          And so perhaps, if you can develop something that's

20   almost, you know, algorithmic in its specificity for a -- I

21   don't want to call it a safe harbor, but some sort of a

22   template that small claims should fit that would make review

23   easy and, you know, able to sort of slot into your process,

24   that's something that I would prefer to a structure in which I

25   have to figure that out.  And also, you know, I just don't

1  have the ability to have that back and forth conversation with

2  the providers either.

3       MS. STADLER:  Yes.  We can certainly do that and have

4  done that in other engagements.  So we'll work on that again

5  in consultation with the professionals.

6       THE COURT:  Thank you.  I appreciate your candor and

7  your willingness to work with me, as well as with the

8  professionals, in finding ways to get me in a position to make

9  the appropriate determinations.  And so I think that does --

10  does that cover all of the categories?

11       MS. STADLER:   I think so.  Judge, do you want us to

12  submit a Proposed Order addressing the two issues that we had

13  agreed upon?  That is, the pre-appointment fees and the

14  non-Title III fees, and leave the other issues for a separate

15  Order to be negotiated and discussed?

16       THE COURT:  Yes.

17       MS. STADLER:  Okay.

18       THE COURT:  That would be very helpful.

19       And so to be clear, the application is granted as to

20  work performed prior to formal retention, and as to review by

21  the fee examiner of all applications submitted in the Title

22  III, even to the extent that they cover certain non-Title III

23  matters.

24       The motion is denied as to flat fee -- as to

25  relieving the fee examiner of responsibility in connection

```
 1   with flat fee and de minimis billing, with the expectation
 2   that there will be a proposal for a structure to cover those
 3   sorts of billings.
 4           MS. STADLER:   Understood.  We will submit a revised
 5   Order.
 6           THE COURT:  Thank you very much, Ms. Stadler.
 7           MS. STADLER:   Thank you.
 8           THE COURT:  All right.  And so the next item on the
 9   agenda is Roman III(3), PREPA's Motion for Entry of a Bridge
10   Order and Extension of Removal Period.
11           Mr. Haynes.
12           MR. HAYNES:  Hello again, Your Honor.  Nathan Haynes
13   from Greenberg Traurig for AAFAF, as fiscal agent for PREPA.
14           Your Honor, this is actually the Oversight Board's
15   motion, but I'll be speaking in support of it briefly today.
16   This is the third motion to enlarge the time frame for removal
17   of civil actions.  Your Honor, it's uncontested, but I did
18   want to take a moment to point out that we are asking for
19   relief that's a little bit different than the previous ones,
20   and I just want to make sure that the Court had the
21   opportunity to focus on that.
22           We're asking to extend through the confirmation of a
23   plan of adjustment at this time.  Given, just as a practical
24   matter, given PREPA's limited resources and the multiple
25   various work streams that PREPA's personnel are burdened with
```

1    on a daily basis, including current operations, the recovery,

2    the liquidity issues, the transformation plan, the day-to-day

3    issues in this bankruptcy or this restructuring case, we think

4    it makes sense to just move it to the end of the case so we

5    don't have to keep coming back to Your Honor.

6              Parties to these lawsuits have the ability to confer

7    with us to seek relief from the automatic stay where they

8    think appropriate, and we can make determinations at that

9    time.  And we have removed certain of the larger cases that

10   we've identified already to this Court.

11             So all by way of saying, Your Honor, we think it

12   makes sense to move it to the end of the case at this time.

13   If Your Honor is not inclined to do that, we'd ask for 180

14   days.

15             THE COURT:  At this point, I'm not inclined to move

16   it all to the end of the case.  And I think that the

17   suggestion of 180 days, which translates into November, would

18   be an appropriate time for an update and consideration perhaps

19   at that point of a more open-ended extension to the end of the

20   case.

21             What I would suggest, so that we can avoid the

22   necessity of a Bridge Order, would be an extension through

23   November 30th, with an Order providing for the ability to make

24   a further -- an application for a further extension that's

25   cued up in accordance with the CMO timetable for matters for

1    the November Omni.  And so then that should avoid the need to

2    have a Bridge Order from an expiry date to the Omni, since the

3    Order that we'd enter now would cover through the end of

4    November.

5              MR. HAYES:  Very well, Your Honor.

6              THE COURT:  So would you mind presenting a revised

7    proposed order to that effect?

8              MR. HAYNES:  Very well, Your Honor.  Thank you.

9              THE COURT:  Thank you very much.

10             And the next item is the motion of the Retiree

11   Committee for formation of a committee for PREPA.  That is

12   item IV.1. on the agenda.

13             Good afternoon.

14             MR. GORDON:  Good morning, Your Honor.

15             THE COURT:  Or morning.

16             MR. GORDON:  No problem.  We're close to the

17   afternoon.

18             THE COURT:  It's been a long morning.

19             MR. GORDON:  It has so far.  Exciting, but still

20   long.

21             For the record, Robert Gordon of Jenner & Block on

22   behalf of the Official Committee of Retired Employees of the

23   Commonwealth of Puerto Rico.

24             Your Honor, we have before you today a motion seeking

25   the appointment of a committee, or to at least address issues

1    of adequate representation of retirees in the Title III case

2    of the Puerto Rico Electric Power Authority.

3         Your Honor, the Retiree Committee filed this motion

4    for two basic reasons.  First, it certainly appeared to our

5    committee that the PREPA retirees needed to have or do need to

6    have representation, and that we needed to -- that we needed

7    to ensure that they have proper and adequate representation at

8    this point in the case.

9         This was driven in part by the fact that there are

10   approximately 18,500 participants in the PREPA retirement

11   system, of which there are 10,000, roughly 10,000 retirees.

12   The certified fiscal plan for PREPA certified in April

13   indicates that the retirement system is woefully underfunded.

14   It indicates an underfunding liability of 3.6 billion dollars,

15   which is based -- that calculation is based upon, among other

16   things, an assumption as to the return on investment of the

17   assets at 8.25 percent, which is conceded in the certified

18   plan as being robust or optimistic.

19        THE COURT:  Yes.

20        MR. GORDON:  So if that assumption was modified, the

21   underfunding liability could be significantly higher.  That

22   toggle is very sensitive because you're essentially

23   discounting the net present value liabilities over a 40 year

24   time frame, so those liabilities could be significantly

25   higher.

 1          The certified plan also indicates, Your Honor, that

 2    it contemplates a ten percent cut in accrued pension benefits.

 3    That is explicitly stated.  And the certified plan also

 4    contemplates privatization of various assets which certainly

 5    could create complex issues at the plan stage as to

 6    feasibility and the like.

 7          So for all those reasons, we felt that an official

 8    committee for the retirees made sense because we did not know,

 9    and we still do not know, whether there is adequate

10    representation of those retirees at this point, which is

11    really the ultimate issue for this Court to determine, which

12    leads to the second reason why we filed the motion.

13          There seemed to be some confusion, and maybe it still

14    exists, as to whether the existing Official Retiree Committee

15    is the representative of the PREPA retirees.

16          THE COURT:  From the U.S. Trustee's submission, it

17    seemed to me that the U.S. Trustee was saying that the U.S.

18    Trustee had decided not to appoint a retiree committee for

19    PREPA, which to me said from the U.S. Trustee's perspective,

20    it's not part of the current committee at this juncture.

21          Do you have a different understanding of their

22    positions?

23          MR. GORDON:  No, Your Honor.  Actually, our view is

24    absolutely the same as that.  There were indications, though,

25    at one point from various parties, inquiries from certain --

```
 1          THE COURT:  Would you hold on one moment?

 2          Did we lose the party?  Oh, someone just disconnected

 3   on the phone.  We can continue.

 4          MR. GORDON:  All right.  Our view is consistent with

 5   what has now been articulated by the U.S. Trustee's office,

 6   but there were indications at other points in time and

 7   inquiries from some PREPA retirees at our website as to

 8   whether we were representing the PREPA retirees.

 9          So we felt that clarity was very important, and we do

10   agree that it is our view that at that point we did not

11   represent PREPA retirees.  There was no appointment entered in

12   the PREPA case appointing our committee to represent those

13   retirees.

14          And you can contrast that, by the way, with what the

15   U.S. Trustee's office did for the Unsecured Creditors'

16   Committee where they specifically stated that the Unsecured

17   Creditors' Committee would be serving as the official

18   committee for the unsecured creditors in the PREPA case, as

19   well as the Commonwealth case.

20          So when you contrast that, it seemed very clear that

21   we were not the representatives.  So another reason why we

22   wanted to file the motion was to provide clarity on this

23   issue.

24          THE COURT:  And based on the discussions that you

25   have had with the U.S. Trustee, do you have any insight into
```

1   their reasoning in not appointing the Committee?

2           MR. GORDON:  Your Honor, no, I'm not sure I do know

3   the reasons why they have not.  I think I will defer to them

4   to explain that.  I'm not exactly sure.

5           THE COURT:  All right.

6           MR. GORDON:  Okay.  Thank you.

7           We did indicate, of course, in our pleadings that

8   while the thrust of our motion was simply to alert the Court

9   of our concern that someone or some committee should be

10  perhaps representing the retirees at PREPA, we also did point

11  out that should the Court determine that a committee should be

12  appointed, that our committee stood ready, willing, and able

13  to serve in that role, if that was deemed appropriate.  And

14  that we are in a sort of unique strategic position to provide

15  those services.  The Committee has hired seasoned

16  restructuring professionals who are intimately familiar at

17  this point with the facts and dynamics of these interdependent

18  Title III cases.

19          But again, the thrust was to make sure that whether

20  it was our committee or another committee or another entity,

21  that there be proper and adequate representation of the

22  retirees.

23          THE COURT:  Do you agree with the United States

24  Trustee that this Court's authority is limited to directing or

25  declining to direct the U.S. Trustee to appoint a committee,

```
 1    but that be -- selection of the membership of the committee,

 2    whether it's selecting your committee or some other

 3    configuration, is the sole province of the United States

 4    Trustee as opposed to the Court?

 5              MR. GORDON:  I would agree, with the addition of the

 6    words "in the first instance."  I think that in the first

 7    instance, the Court can direct the U.S. Trustee's office to

 8    appoint a committee or to change the composition of the

 9    committee under 1102(a)(2) or (a)(4).

10              THE COURT:  But since we don't have a committee,

11    there would be no PREPA committee for me to direct them to

12    change the composition of.

13              MR. GORDON:  That's correct.

14              THE COURT:  Sorry for that dangling preposition.

15              MR. GORDON:  It's quite all right.  But yes, it is

16    also certainly conceivable that when you sort of meld

17    1102(a)(2) and (a)(4), it could be directed that the U.S.

18    Trustee appoint a committee.  And if it is our committee, to

19    modify it as necessary to make sure that it adequately

20    represents PREPA retirees.

21              So, for example, our committee does not have a PREPA

22    retiree on it at this time.  We did note in our original

23    motion that there is a vacancy on our committee now.  There

24    was a resignation of one member in April, so we have an eight

25    member committee at this point.  So that's something to be
```

1    considered.

2          But I do agree that in the first instance, this Court

3    can determine that a committee should be appointed and/or that

4    a committee -- the composition of a committee should be

5    amended in some way to provide adequate representation.  And

6    then in the first instance, it would be the U.S. Trustee's

7    province to make that appointment or to change that

8    composition.

9          Clearly there could be some review process perhaps by

10   the Court to determine whether that's been done properly, but

11   it is certainly the province of the U.S. Trustee's office to

12   make those appointments.

13         THE COURT:  Thank you.

14         MR. GORDON:  So Your Honor, there were three

15   responses and one joinder with respect to the motion.  The

16   Oversight Board and the -- joined by AAFAF, and the Official

17   Unsecured Creditors' Committee filed responses to our motion

18   in which -- and at the risk of putting words in the mouths of

19   other lawyers, and they can certainly correct me if I'm wrong,

20   but the gist of their responses was that they did not take a

21   position on whether a committee should be appointed for the

22   PREPA retirees.  But if a committee were to be appointed,

23   their preference and desire is that the existing Official

24   Retiree Committee serve in that role.

25         The other response was an opposition filed by the

1    PREPA Retirement System, which is also known by its Spanish

2    acronym, SREAEE.  But I will refer to it as the Retirement

3    System, if I may.

4         And in that reply, the Retirement System indicates

5    that it is capable of representing the retirees of PREPA, and

6    that it is the proper representative of those retirees.  And

7    in particular, there was a mention in the Reply that certain

8    retiree associations had endorsed the Retirement System to

9    represent the retirees in these Title III cases.

10        And in our Reply, we indicate, among other things,

11   that we had not yet seen such an endorsement.  The Retirement

12   System then filed a Sur-reply, and I thank counsel for the

13   Retirement System for their efforts to respond to the issues

14   that we raised in our Reply.  And they did attach a resolution

15   that reflected an endorsement of the Retirement System to

16   represent the membership of those retiree associations.

17        I want to respond, though, to the Sur-reply a little

18   bit here.  And I want to make clear that I'm not trying to

19   create issues, but I think my duty of candor to the Court as

20   it tries to consider whether it is appropriate and necessary

21   to appoint a committee, I want to make sure that I've alerted

22   the Court to any number of considerations that may be

23   relevant.

24        THE COURT:  And so just before you go on there, I

25   want to underscore that the decision that I need to make

1    today, the decision that I will make today, is as to whether

2    or not to direct the United States Trustee's office to appoint

3    a committee.

4           I do not intend to -- well, I cannot direct the

5    United States Trustee's office to appoint a particular

6    representative.  That is for the United States Trustee's

7    office.  And so as not to be complicated, I'll adopt here "in

8    the first instance."  We don't have to talk about what might

9    conceivably happen down the road.

10           And so to the extent there is anything that you feel

11   you can articulate briefly that you think is essential for the

12   U.S. Trustee's office to hear, since their representative is

13   here in this courtroom, that's fine.  But you're principally

14   speaking to the U.S. Trustee's office when you're talking

15   about membership.

16           MR. GORDON:  Absolutely, Your Honor.  Thank you.

17           So the endorsement was -- it should be noted was

18   executed on May 28, just a few days ago.  It does not indicate

19   whether the individuals who are the members -- individual

20   retirees who are members of these associations had any vote in

21   the endorsement, or whether they or the retiree associations

22   were completely aware of their options, that they could have

23   had both the Retirement System representing their interest and

24   a Retirement Committee representing their interests.

25           I just throw that out as a suggestion of things that

1    may or may not have been aware to the people who signed the

2    endorsement.  The endorsement indicates that those retiree

3    associations cover, I believe, 7,500 beneficiaries.  There are

4    10,000 retirees, so it's not -- it's a robust number of

5    retirees that the associations represent, but it is not a

6    hundred percent of the retirees.

7         And so those are things that I think someone needs to

8    consider, you know, whether those endorsements are sufficient

9    to identify the Retirement System as the proper

10   representative.  And if they think that that is proper, then,

11   you know, certainly we respect that.  We will abide by that.

12        There are other issues though, as well.  The

13   Sur-reply attaches a set of regulations that were somewhat

14   ironically, I think, attached to indicate the independence of

15   the Retirement System and its ability to serve in this role as

16   the representative for retirees.  But if you -- and again, I'm

17   not trying to create issues, but I think it's important to at

18   least alert those who will be making the decision of these

19   things.

20        Paragraph 3 of Article 9 of the regulations indicates

21   that PREPA itself has the authority under certain

22   circumstances to terminate the function of the Retirement

23   System completely at any time.  And I believe that this issue,

24   this independence issue, is something that is already being

25   raised by PREPA and AAFAF in other pending litigation with

1    respect to certain members of the board of the Retirement

2    System.

3            So I don't think I'm alluding to something that isn't

4    already being addressed in some fashion, but that certainly, I

5    think, could raise concerns if the Retirement System could be

6    terminated at any point in time.  If it is -- that if there

7    are issues down the road where there is a dispute or

8    disagreement between the Retirement System and PREPA, and

9    PREPA's management, that PREPA could stand before this Court

10   perhaps and make the argument that the Retirement System is

11   nothing more than a part of PREPA and doesn't really have

12   standing to oppose what they are doing.

13           Or they might actually go ahead and terminate the

14   function under this Article 9, Paragraph 3, and suddenly

15   you're at a mature place in the case without, perhaps

16   arguably, proper representation of the retirees.  I think

17   that's at least something that, to me, is of some concern.

18           I also don't know, it hasn't been made clear, what

19   additional professionals have been hired by the Retirement

20   System to help them in the situation.  I know they have

21   counsel here today who's very capable, but I don't -- I'm not

22   aware that they have restructuring advisors.  I know that they

23   have the Cavanaugh firm as their auditors who are well

24   respected, but I do raise that issue as well.

25           And then finally, I just raised the question of, I

 1   just don't know why there would be a concern from the

 2   retirees' standpoint having additional representation and

 3   additional resources there for their interest.  There's

 4   nothing that would preclude the Retirement System and a

 5   retiree committee from weighing in on issues, working

 6   collaboratively and so forth.

 7        And again, as I mentioned, I think our committee has

 8   some resources that could be very helpful.  I think the

 9   response has been in the pleadings that there's a concern

10   about confusion for retirees if there's more than one party

11   sort of representing their interests.

12        I can tell you at least from Detroit, my experience

13   in the Detroit case representing the retirement systems there,

14   that I don't think there was confusion.  And if there were

15   different perspectives, and I don't even know if there would

16   be different perspectives between the two entities, between

17   the Retirement System and an Official Retiree Committee, I

18   don't think that that necessarily leads to the conclusion that

19   there is confusion.

20        I don't think that different perspectives necessarily

21   equal confusion.  I think that different perspectives could be

22   helpful in looking at the issues from different angles.  And

23   then at the end of the day, if there is a plan of adjustment

24   proposed at PREPA, you know, that plan is going to get voted

25   on by the retirees themselves.  It's not voted on by the

1    Retirement System.  It's not voted on by the committee.  So

2    it's not as if one or the other entity could ultimately decide

3    for those retirees how things should work.

4            So there is that safety net that at the end of the

5    day, it's the retirees who vote on matters, and then they can

6    subscribe to the views of the Retirement System, if they

7    believe that the Retirement System is articulating the better

8    viewpoint.  It's still possible.

9            Which just brings me back around again, Your Honor,

10   to just saying, again, I just want to reiterate that we

11   believe this is a matter as far as whether a committee should

12   be appointed or not, or whether the Retirement System provides

13   adequate representation is something for the Court to decide.

14   We raise it out of our general sense of responsibility to

15   retirees generally and our duty of candor to the Court.  So

16   thank you.

17           THE COURT:  Thank you, Mr. Gordon.

18           Did any other proponents of the Retiree Committees'

19   motion wish to be heard very briefly?

20           MR. ROSEN:  Thank you, Your Honor.

21           THE COURT:  Mr. Rosen.

22           MR. ROSEN:  Thank you very much, Your Honor.

23           Your Honor, as we included in our pleading, the

24   Oversight Board supports the motion to the limited extent that

25   the Court enters an Order expanding the scope of the Retiree

 1  Committee or seeks to expand the membership of the Retiree

 2  Committee to include additional PREPA retirees.

 3      We do oppose the motion, however, to the extent of it

 4  seeks the formation of another committee.  As stated

 5  previously by the fee examiner and by the Court -- we're very

 6  conscious of the costs associated with this, and we think that

 7  the duplication of the effort of having a separate PREPA

 8  retiree committee would be exponentially foisted upon the

 9  Title III estate, and we would hope that the Court would limit

10  any relief to the expansion or the designation of the existing

11  Retiree Committee.

12      THE COURT:  Do you believe I have statutory power to

13  do that or was that speech really for the U.S. Trustee?

14      MR. ROSEN:  No.  I believe you have the authority to

15  expand the scope as they requested it, yes, Your Honor, by

16  adding PREPA retirees to that committee.

17      THE COURT:  But that committee has only been

18  appointed in the Commonwealth case.  That committee hasn't

19  been appointed in the PREPA case.

20      MR. ROSEN:  Yes, Your Honor.  I don't know where

21  Mr. Gordon went, but -- I don't want to disagree with

22  Mr. Gordon, but through conversations that we had with the

23  U.S. Trustee, I think that the U.S. Trustee may have said that

24  the existing committee may have the right to represent those

25  PREPA retirees.  So perhaps the U.S. Trustee could give the

 1   Court a formal statement about that at this time.

 2            THE COURT:  Well, I was planning to call on Systema's

 3   counsel, and then on the Office of the U.S. Trustee.

 4            I'm sorry.  Mr. Despins.

 5            MR. DESPINS:  Two seconds.

 6            THE COURT:  Yes.

 7            MR. DESPINS:  Luc Despins with Paul Hastings for the

 8   Official Committee in the PREPA case.

 9            Frankly, we didn't see how this movie would unfold in

10   the sense that we did not know there was a group that took the

11   position that they represented these retirees.  And,

12   therefore, we had said we had no problems with the existing

13   committee being expanded to represent, basically the same

14   thing Mr. Rosen has stated.

15            But if there is a group there that says we are

16   representing those retirees, that -- the committee cannot

17   support a motion that could lead to the appointment of a

18   separate committee for PREPA, unless that's the other

19   committee.

20            So I'm not addressing Your Honor's question as to

21   whether you have the ability to do that, but I'm assuming that

22   you will find that you have no ability to do that.  And if

23   that's the case, the committee, in light of what has

24   transpired, would not support the appointment of the separate

25   committee for PREPA.

1          THE COURT:  Thank you.  Anyone else on the proponent

2     or semiproponent side?

3          Okay.  Counsel.  Thank you.

4          MR. EMMANUELLI JIMENEZ:  Good morning.  Thank you,

5     Your Honor.

6          THE COURT:  Good morning.

7          MR. EMMANUELLI JIMENEZ:  My name is Rolando

8     Emmanuelli Jimenez.  I represent PREPA's Retirement System or

9     PRS. PREPA's Retirement System has unique characteristics that

10    do not make it comparable with the Commonwealth retirement

11    systems that are under the umbrella of the Official Retiree

12    Committee.  That is, central government, teachers and judges.

13         PRS is an independent entity, with a Board of

14    Trustees with particular rules and regulations, separate

15    assets and funding source.  This board is regulated by voting

16    rules that guarantee a balance between the interest of the

17    different stakeholders.

18         The PRS is not under this Title III proceeding.

19    Therefore, the Board of Trustees maintains all its power to

20    control what is going to be with the system.

21         By the way, Article 9 mentioned by brother counsel

22    Gordon states that the Board of Trustees should consent to the

23    dissolution of the Retirement System, so it's not unilaterally

24    decided by PREPA.

25         There is also a trust agreement with the bondholders

1   with particularities that no other retiree system enjoys,

2   especially the provision that any payment to bondholders is

3   subordinated to the payment of PREPA's operational expenses,

4   including retirement obligations.  So there is no

5   underrepresented interest of the retirees in PREPA's Title III

6   case.

7        The U.S. Trustee declined to appoint an official

8   committee of PREPA retirees under the discretionary authority

9   given to him by the Section 1102(a)(1) of the code.  Any

10  motion seeking relief under either section 1102(a)(2), an

11  additional committee, or section 1102(a)(4), modification of

12  the retiree committee, must comply with the burden of section

13  1102 to establish that the relief is necessary to ensure

14  adequate representation.

15       The committee's motion does not meet the burden of

16  Section 1102 of the Code of establishing lack of adequate

17  representation.  On the contrary, PREPA's retirees are

18  represented by the Board of Trustees of the PRS.  The majority

19  of the retirees have expressed that wish to be represented by

20  the Board of Trustees.  You can see the resolution that is

21  attached to docket 3228 in the Commonwealth case.

22       Out of 10,000 PRS participants of whom are current

23  retirees, 7,522 express through the respective organizations

24  their wish to be represented by the Board of Trustees.  With

25  that crushing number, Your Honor, how come the committee would

1  hold their position that here is an issue of

2  misrepresentation?  There is no evidence that PREPA retirees

3  are alleging that they are not adequately represented.  This

4  is just a blanket statement in the committee's motion without

5  presenting facts to support it.

6          The intervention of the committee would be

7  disruptive, duplicative and unnecessary.  Based on the

8  differences between other retirement systems, there will

9  potentially be disputes between the committee and the PRS

10  regarding the course of action and communication and advice to

11  PREPA's retirees.

12          Having PREPA's retirees entrusted the Board of

13  Trustees of the system for the representation in this Title

14  III case, this will cause suspicion and mistrust regarding the

15  committee's actions and recommendations.  This could lead to

16  chaos and recklessness.

17          There will be two teams of attorneys, financial

18  advisors, actuaries, et cetera on behalf of PREPA's retirees.

19  This will cause unnecessary inefficiencies and delays.  This

20  also will increase the cost of this Title III case, leaving

21  less funding for retirees.

22          For those reasons, Your Honor, we understand that

23  there is no justification to either extend the jurisdiction of

24  the retiree committee, nor to appoint a new committee for the

25  PREPA's Title III case.  Thank you.

1            THE COURT:  Thank you.

2            And for the office of the United States Trustee --

3            ASSISTANT U.S. TRUSTEE LECAROZ ARRIBAS:   Good

4    morning, Your Honor.

5            THE COURT:  Good morning.

6            ASSISTANT U.S. TRUSTEE LECAROZ ARRIBAS:  Monsita

7    Lecaroz, Assistant U.S. Trustee.  With me is Michael Bujold

8    from our executive office in D.C.

9            THE COURT:  Good morning.

10           ASSISTANT U.S. TRUSTEE LECAROZ ARRIBAS:   Your Honor,

11   we tried to submit our position in writing for the Court's

12   benefit and for the parties' benefit.  It doesn't seem to have

13   done much in that regard.

14           We take no position on the merits of the Retiree

15   Committees' motion or the opposition to it, Your Honor.  If

16   the Court orders relief under (d)(2) -- under (a)(2) or

17   (a)(4), we will undertake our statutory duty and make the

18   appointments as ordered by the Court.

19           I don't want to rehash our motion, so if Your Honor

20   has any questions for me?

21           THE COURT:  Well, to the extent you're willing or

22   able to share your reasoning, I'd be grateful there.  I think

23   it is objectively obvious that there are serious issues for

24   retirees in connection with the Title III proceedings of

25   PREPA.

1          There are the provisions of the fiscal plan that had

2    been noted by Mr. Gordon.  There is pending litigation about

3    whether the plan is part of PREPA or not.  There may well be

4    issues like the individual benefit claim levels that go to

5    actuarial assumptions and things on which the Board of the

6    Retirement System and retirees might differ.  And until the

7    opposition was filed to this motion, there wasn't an

8    appearance in the Title III case for PREPA of a retiree

9    representative entity.

10          And so if you came to comfort with the notion that

11    there was no necessity, it would just help me to understand

12    that a bit more, if you're in a position to share?

13          ASSISTANT U.S. TRUSTEE LECAROZ ARRIBAS:  I'll tell

14    you what I can.  At the time of the formation of the -- and

15    the appointment of the Retiree Committee, we understood that

16    it covered all the retirees in Puerto Rico.  The Title III

17    filing of PREPA was later.

18          As to why we decided not to appoint a committee under

19    (d)(1) -- under (a)(1) in the PREPA case, I can't go into

20    that.  It's a deliberative process --

21          THE COURT:  Yes.

22          ASSISTANT U.S. TRUSTEE LECAROZ ARRIBAS:   -- that --

23    but as you know, we've given a lot of thought to all this in

24    every Title III case and through the first original

25    committees, so that was our decision at the time.

1          As to everything that you mentioned regarding the

2   actual controversy, we really don't take that position.  I

3   understand, Your Honor, that's part of the criteria that you

4   would need to analyze under the adequate representation

5   analysis that requires -- that it's required under the Retiree

6   Committee's request to Your Honor for a modification under

7   (a)(4) or an appointment of a committee under (a)(2).

8          And once Your Honor decides, based on that analysis,

9   then we would be able to decide whether to appoint or to

10  modify the committee.

11         THE COURT:  Yes.  Thank you.

12         ASSISTANT U.S. TRUSTEE LECAROZ ARRIBAS:   I'm sorry,

13  Your Honor.  You're welcome.

14         THE COURT:  Thank you for that input.

15         Mr. Gordon, did you have any remarks by the way of

16  reply?

17         MR. GORDON:  Your Honor, actually, to answer your

18  question, I don't think I have anything further to add.

19  Mr. Emmanuelli mentioned that he didn't think that we have

20  made a showing sufficient, and I just want to emphasize that

21  we don't necessarily -- we didn't view this as an evidentiary

22  hearing, and we also didn't view it as our role to argue

23  strenuously one way or the other on this matter.

24         We don't have a PREPA retiree on our committee.  We

25  are just trying to raise issues for the Court or whomever to

1    consider in that regard, and that's as much as I can tell you.

2    I can't think of anything else.

3              No, I have nothing further, Your Honor.

4              THE COURT:  Thank you.

5              MR. GORDON:  Thank you.

6              THE COURT:  Well, it seems clear to me that there

7    are, as I mentioned in my chat with Ms. Lecaroz, that there

8    are serious retiree-related issues within the PREPA Title III.

9    It is not clear to me on this record, though, that there is a

10   problem of inadequate representation of the PREPA retirees

11   requiring the appointment of a formal retiree committee now.

12   And that may just be as a practical matter, because there --

13   there hasn't been an inflection, a specific inflection point

14   for those issues to be engaged at this point with the very

15   recent certification of the fiscal plan and the development of

16   the privatization proposals.  And, you know, we are in a

17   fairly fluid situation.

18             And so I think it best for me and for frankly the

19   office of the United States Trustee, to have the opportunity

20   to observe and reflect for a little bit longer, and see how

21   things ripen and see what sorts of issues are or are not

22   raised and by which organizations or constituencies, whether

23   there are concerns raised by individual retirees of an order

24   of magnitude that would queue up the issue again.

25             And so I am denying without prejudice the Retiree

1  Committee's application that I construe as one for a court

2  direction to the office of the United States Trustee to

3  appoint a retiree committee for PREPA. So that is denied

4  without prejudice, and we will see how things develop.

5      MR. GORDON: Your Honor, I apologize, but just then,

6  for the record, just to make clear if we could, for the

7  comfort of the existing committee members and the existing

8  committee, we are not the official committee in PREPA's Title

9  III case. That's our understanding, and that has been

10  expressed as well now by the U.S. Trustee's office. I just

11  wanted to make sure that we were clear about that.

12      THE COURT: That is my understanding as well. And

13  I'm looking again to the United States Trustee's office end of

14  the table. The existing Retiree Committee has not been

15  appointed in the PREPA Title III case.

16      ASSISTANT U.S. TRUSTEE LECAROZ ARRIBAS: (Nodding

17  head up and down.)

18      THE COURT: And does not have responsibilities in the

19  PREPA Title III case.

20      MR. GORDON: Very good.

21      And you say, you're saying, you're denying the motion

22  without prejudice, and I understand that. I will just express

23  that it is somewhat again, I don't know if I would say the

24  word uncomfortable, but difficult for us to be -- I hope that

25  somehow the process -- someone will be vigilant about the

```
 1   process because you can understand that there is no one who

 2   has an incentive in the Title III case to say hey, those

 3   people are not well represented.

 4        And if those people, if there's a group of creditors

 5   who aren't being adequately represented, part of the reason

 6   for forming a committee is they don't have a voice

 7   necessarily.  They don't know how to reach out to the U.S.

 8   Trustee's office or to somebody to say we need representation.

 9   They may not know we need representation.

10        So I just -- you know, I guess this is my way of

11   saying that I hope that somehow there's a vigilance going

12   forward.  Because if things become complex and we get to a

13   mature point in the case, it becomes hard at that point to say

14   oh, now we need someone to get involved.  But I respect and

15   understand the position from the Court today.

16        THE COURT:  Well, I will say that I'm expecting in

17   the first instance, that the U.S. Trustee's office, which has

18   the statutory power to appoint committees, will be on the

19   front line of that vigilance in connection with its monitoring

20   of the case.

21        And I would also like to suggest in that connection

22   that to the extent there are questions raised by your retirees

23   to your committee, PREPA retirees to your committee, you might

24   direct them in the first instance to make their inquiries of

25   the U.S. Trustee's office as to whom they should direct their
```

1    questions to.

2          And if the United States Trustee's office has any

3    issue with these two observations, I invite Ms. Lecaroz to

4    come back to the podium.  But that would be my suggestion for

5    now, and I would be expecting that if the U.S. Trustee's

6    office perceives that things are inadequate or not properly

7    attended to, that the United States Trustee's office would

8    initiate a process.

9          MR. GORDON:  Thank you, Your Honor.

10          ASSISTANT U.S. TRUSTEE LECAROZ ARRIBAS:  Monsita

11    Lecaroz.  Yes, I want to assure the Court that we are

12    constantly monitoring the case and we are constantly

13    monitoring the committee composition, and we will continue to

14    do so.  And we are always able to, and willing to, receive any

15    communications from anybody regarding to the case.  Thank you.

16          THE COURT:  Thank you very much.

17          And so it is now five to 12:00, and we promised a

18    break from 12:00 to 1:00 for lunch.  And so we will begin the

19    lunch break now.

20          We will resume at one o'clock with the renewed 2004

21    motion before Judge Dein.  See you in an hour.  Thank you.

22          (At 11:55 AM, recess taken.)

23          (At 12:57 PM, proceedings reconvened.)

24          HONORABLE MAGISTRATE JUDGE DEIN:  You may be seated.

25          Good afternoon.  I've given you all of lunch to

1    resolve this.  How did you do?

2            MR. DESPINS:  I'm glad you haven't lost your sense of

3    humor.  That's good to hear.

4            HONORABLE MAGISTRATE JUDGE DEIN:  Talk to me later,

5    in an hour.  We'll see how I'm feeling.

6            MR. DESPINS:  So, Your Honor, I think we divided the

7    time -- I should say good afternoon, Judge Dein.  Luc Despins,

8    Paul Hastings on behalf of the Committee.  We're here on our

9    renewed motion for 2004 examination.

10           I think we had reserved 30 minutes for our time.  I'd

11   like to take 10 on opening, 10 for reply.  And let me jump

12   right in.

13           First, as a housekeeping matter, we are incorporating

14   here all our prior pleadings and the arguments.  We're not

15   going to repeat them.  No worries.  But I wanted to make sure

16   that that was there for the record.

17           And I'll say at the outset, because I know you will

18   get there in about two minutes, I will get to the following

19   questions, which is why now, why not wait, talk to me about

20   duplication.  So we'll cover all those points.

21           But first, I want to talk about just a little bit of

22   background, not a lot, but I think it's important to recall

23   the context.

24           And as I said before, I would not be making the

25   statement if it was not a quote from a newspaper article, but,

1   you know, the current governor has called the past Puerto

2   Rico, quote, a big Ponzi scheme.  And there's a sitting First

3   Circuit judge that has suggested that a grand jury

4   investigation -- a grand jury should be empanelled to look at

5   what happened in the past.  So this is a very serious matter.

6          When you contrast that, Your Honor, with the tenure

7   -- first let's look at the report that we've gotten so far

8   from the investigator, which is fine.  It is attached to the

9   pleadings, and it was filed in April.

10          And you can -- I'm not going to go through it, but I

11  think it shows that they're approaching things in a very

12  different way than needs to be approached, from the point of

13  view of recovery against bad actors.  Not from the point of

14  view of writing a report on measures that should be taken to

15  avoid similar things.  We're not interested in that.  We're

16  interested in dealing with claims against bad actors or

17  subordinated claims or challenging claims of people of that

18  ilk.

19          And, you know, the investigator has said many times

20  that he's not interested in a finger pointing exercise.  And

21  that's confirmed by the statement we put in our Reply.

22  Governor Vila, who was a former governor during the COFINA

23  period, said, one, that I can confirm that what the committee

24  says in the renewed motion is correct.

25          And what he means by that is that he met with the

1    investigator or somebody from his office, and the first thing

2    they told him is that they're not interested in pursuing

3    claims or guilty parties.  And that we're not, quote, we're

4    not doing any kind of investigation to say who is to blame or

5    anything.

6          And we probably will hear from Mr. Mungovan that they

7    are going to identify claims.  But everything we see from the

8    investigator and confirmed by witnesses that have been

9    interviewed is that, in fact, he is telling them that that's

10   not the case.

11         HONORABLE MAGISTRATE JUDGE DEIN:  So I'm not going to

12   stop you, but I do want you to focus for me in this intro on

13   what you're actually getting.

14         MR. DESPINS:  Yes.

15         HONORABLE MAGISTRATE JUDGE DEIN:  My point throughout

16   this whole thing was not that you would be using the materials

17   the same way as the independent investigator, but the question

18   was really is there a world of documents that are being

19   obtained that everyone can use differently --

20         MR. DESPINS:  Yes.

21         HONORABLE MAGISTRATE JUDGE DEIN:  -- but not having

22   to be searched for twice.

23         MR. DESPINS:  Okay.  So --

24         HONORABLE MAGISTRATE JUDGE DEIN:  And there seems to

25   be very different representations in the pleadings as to

1   what's actually been produced for the committee to have access

2   to.

3          MR. DESPINS: So let's start with that.  Until we

4   filed our motion, the only thing that was produced to us by

5   the investigator, and the source being Santander or Banco

6   Popular, were what I would call phonebooks, not -- of course,

7   not phonebooks, but public documents, deal documents, et

8   cetera.

9          The first custodial production occurred after we

10  filed our motion.  It was from Santander.  So when they say

11  they filed thousands of pages, yes, there are a lot of pages

12  in a prospectus or in a deal closing binder, but the custodial

13  production occurred after we filed our motion.

14         So you might say, so therefore you're getting it, so

15  you're happy.  No, Your Honor.  The problem we have is that we

16  have those documents, but we had asked the investigator for

17  what search terms were used, because as you know, I know you

18  do this every day, without search terms and custodians, it

19  could be meaningless.  Meaning, you could say to -- I'm

20  exaggerating.  You could say to a legal assistant at GDB,

21  please produce all documents regarding the financial crisis

22  and they'll be two pages.  But if that's directed to the right

23  person, it could produce thousands of pages.  So they have not

24  shared that, so we don't know.

25         Even worse than that, GDB has not produced a single

1   document.  Let me be more precise.  GDB may have produced

2   documents, we don't know the details, to the investigator, but

3   not one was produced to us.  Reason being, because we can't

4   apparently agree on an NDA, but we've been after them for

5   months, Your Honor, on this.  Literally for months.  And every

6   time, oh, yes.  We'll get back to you.  We'll get back to you.

7        And I think we should be rewarded for not having come

8   to court earlier, because we tried to figure it out and it was

9   never resolved.  I think we'll hear from counsel for AAFAF as

10  to whether that issue is resolved today.  I don't believe that

11  what he proposed is going to resolve the issue, but clearly

12  today we have zero documents.

13       And as you know, we know this from the GAO report,

14  which is a public report filed by a governmental organization

15  that talked about the financial crisis in Puerto Rico and the

16  debt issues and all that, and places GDB at the center of

17  this, you know, what the governor called a Ponzi scheme, as an

18  enabler of this whole system.  And that's in the GAO report.

19       So we know that GDB is critical to this, and we've

20  seen zero documents.  And you've heard this morning as to

21  what's -- why GDB is relevant today.  So that's the first

22  thing.

23       So we're not getting -- we certainly don't know.

24  We've given them the topics.  We did what Your Honor said.  We

25  gave them the request for production.  And as far as we know,

1  they did ask them to produce those documents.  So we're not

2  debating that.

3       The question is, we have no visibility into search

4  terms, custodians.  And, in fact, when we asked them for

5  custodians the first time this came up, you know, they had

6  left out the members of the Board that are -- that were

7  previously at Santander or Banco Popular and GDB, I forget

8  which one of these three entities, but certainly two of those

9  three.

10      And they never told us that they would until we filed

11  our motion.  And then they said, oh, yes, we've asked them for

12  documents.  We don't know who they asked, those members of the

13  Board or their former employers.  We don't know.

14      In any event, Your Honor, you're right that in an

15  ideal world, if we have all the documents, there is no

16  problem.  But right now they're only sharing with us

17  Santander, Banco Popular, and any other documents where the

18  producing party has agreed that we can see it.

19      Well, what do you think the producing parties are

20  doing?  They're not -- they're not agreeing that we can see

21  them.

22      HONORABLE MAGISTRATE JUDGE DEIN:  Is that true?  Do

23  you know that?

24      MR. DESPINS:  Yes, because we know that --

25      HONORABLE MAGISTRATE JUDGE DEIN:  We know GDB.

1          MR. DESPINS:  We know GDB, we haven't gotten one

2     document.  But we know from their response that they've said

3     they've received documents from dozens of people.  So I know,

4     I can count that Santander, Banco Popular, that's only two, so

5     they have other people.

6          And we don't have those documents except for Standard

7     & Poor's, again, you know, phonebooks, their rating reports

8     and all that, that are public documents anyway.  But we have

9     no documents from investment banks that were -- other

10    investment banks that were underwriters.  And there's a bunch

11    of those.

12         So either they have not received documents from them

13    or they're not sharing them with us because they have the

14    power not to share with us if the producing party says no.  So

15    that doesn't work.

16         And then the question becomes, Your Honor, why not

17    wait to see the report.  So that's very important to

18    understand what relief we're seeking.  Today, nothing would

19    happen.  Meaning, if you grant our relief, nobody would have

20    to lift a finger today.  Santander and Banco Popular would

21    have to -- would have to start conferring with us on August

22    15th as to any additional production.

23         You might say, well, if you get all the documents,

24    why do you need additional production?  Of course, we're not

25    going to have them produce the same documents twice.  So it's

1   going to be either very limited, because they will produce all

2   the responsive documents, or it won't, because the

3   investigator didn't get all the documents they should get.

4   That's the only relief you're granting today, meaning that it

5   would start on August 15.

6       And you might say well, why not wait for the report?

7   And my point on that is as follows:  There are two worlds we

8   live in.  Either -- actually, three.  The first one is the

9   report -- they say don't worry, the report's coming August 15,

10  so there's no problem.

11      And they told you before when we were not here but we

12  were in New York, or maybe we were in Boston.  I forget.  But

13  anyway, it was in New York.  They told you that the report

14  would be ready late March, early April.  Was that a binding

15  agreement?  No.  But that's certainly the guidance they gave

16  to everyone.  And they blew through that guideline without any

17  explanation, which is fine.

18      But the point is that now they're saying August 15,

19  but we don't know whether that's going to happen, because they

20  say that's subject to people producing.  And of course, you

21  have to know there's a symbiotic relationship between the

22  investigator and the targets, because the longer it takes for

23  them to produce, the more time he needs.  And then we're on

24  the sidelines.

25      So the point is either they will file that report --

1    let's start with number one.  They will not file that report

2    by August 15.  Well, then we'll be very glad that Your Honor

3    entered an Order today saying August 15 is when the clock

4    starts.  Or they will file a report, and then there are two

5    alternatives.

6          It will be, as they will tell you, that it will

7    contain all claims, they will identify all claims against

8    other parties, et cetera, which is contrary to what they've

9    said in their witness interviews.  And if that's the case,

10   then I'm not going to -- again, we have no interest in

11   duplicating stuff.

12         There's a fee examiner.  We've heard the discussion

13   this morning about how closely he's following professionals.

14   I'm sure they would be all over us if we did that.  No

15   incentive to duplicate.  They will take their report and use

16   it to the maximum extent possible.

17         And if the report is of the type we think it will be,

18   which is a Reader's Digest version of, you know what?  They

19   incurred too much debt.  Well, I think we know that.  Or

20   there's a lack of transparency.  We know that.  Congress has

21   already said that in the PROMESA Statute.

22         So if that's the report, then we'll be very glad that

23   we started on August 15.  Why August 15?  Why not wait until

24   September?  Well, the reason being is that there is a deadline

25   that's going to expire.

1          You might say, well, that's years away, but May 9,

2     2019, is just around the corner, because you have to file a

3     complaint by then.  And when you file a complaint, you have to

4     do discovery.

5          And the way these guys -- these guys -- what I mean

6     is targets generally produce documents.  It's not going to be

7     produced on September 15.  There's going to be a lot of back

8     and forth.  You know this from the other 2004 aspects of this

9     case where we're going at it now for months.  And therefore,

10    we cannot miss that deadline of May 2019.

11         But more importantly, there's the GDB proceeding

12    that's going full bore right now.  And the other part that's

13    going full bore are the plan negotiations.

14         You have people showing at the table and saying I

15    have four billion dollars of those bonds.  They're not going

16    to say well, by the way, they're subject to a challenge debt.

17    They exceeded the debt limits under the Constitution and all

18    that.  They're not saying that.  They are assuming their

19    claims are allowed.

20         There's nobody challenging that.  There's nobody

21    investigating that, as far as we know.  That has to happen now

22    because how can we have a settlement or a discussion with a

23    group of creditors that are allegedly owed billions of dollars

24    when their claims are subject to challenge?

25         But that's why, Your Honor, we think there's a need

1    to act now.  And also, that's why we made it very limited,

2    meaning the rope you're giving me really is from August 15.

3    The two banks have to meet and confer with us.  Very modest

4    exercise given that we filed our initial motion a year ago.

5         And then there's a check-in point in September where

6    you might say, well, committee, stand down.  We have a

7    beautiful report that explains all the claims and all that

8    and, therefore, there's no need to do any investigation.

9    That's an alternative.  Or no, go ahead, committee.  Keep

10   doing what you're doing.

11        But to start that argument in September, it's going

12   to be a waste of time.  And also, the investigator needs to

13   know that the Court is sending you a signal, which is we've

14   given you a year basically.  August 15 is -- they were

15   appointed September 1st.  Fine.  It's not a year, but almost a

16   year.

17        They're not giving you more time, meaning you can

18   keep going with your investigation.  If you want to take two

19   years for your report, that's fine, but the Court is not going

20   to put the process on hold for you to do your report.  And

21   that is why it's so important to rule on this today, Your

22   Honor.

23        HONORABLE MAGISTRATE JUDGE DEIN:  So let me just ask

24   you a few questions on very concrete facts.

25        As I understand it now, you are saying, though, that

1  you did propose document requests and that as you understand

2  it now, those were conveyed; is that correct?

3          MR. DESPINS:  That's correct, Your Honor.

4          HONORABLE MAGISTRATE JUDGE DEIN:  And that the issue

5  of the custodians is no longer -- you identified certain

6  custodians, I think it was Mr. Garcia, Mr. Gonzalez, and as

7  far as we understand now, they were -- those records were

8  searched?

9          MR. DESPINS:  No, we never heard back on that.

10         HONORABLE MAGISTRATE JUDGE DEIN:  You don't know?

11         MR. DESPINS:  We know from their response that

12  they've asked for documents from these gentlemen, but we don't

13  know how.  From the previous employer, from their current

14  files, we don't know.

15         HONORABLE MAGISTRATE JUDGE DEIN:  So the documents

16  you have from Santander and Banco Popular, you're satisfied

17  that you can review those in this time period between now and

18  August?

19         MR. DESPINS:  Yes, we --

20         HONORABLE MAGISTRATE JUDGE DEIN:  But you want to

21  know what the search terms were and you want to know who else

22  produced documents?

23         MR. DESPINS:  Correct.  And we want those documents

24  to be produced to us, regardless of whether these people

25  consent or not.

1          HONORABLE MAGISTRATE JUDGE DEIN:  You want those now,

2     not before August?

3          MR. DESPINS:  Correct.

4          HONORABLE MAGISTRATE JUDGE DEIN:  All right.

5          MR. DESPINS:  But I would say, Your Honor, the search

6     term -- you know this.  I don't know why I'm telling you

7     this.

8          HONORABLE MAGISTRATE JUDGE DEIN:  Unfortunately, I

9     know a lot about search terms, but that's okay.

10         MR. DESPINS:  I know.  I'm sorry.  But they're

11    critical.  And also meaning what follow up was made and all

12    that.  I mean, there are so many ways of dodging production,

13    as we know.  So it's very important to know that.

14         But again, the limited relief we're asking from

15    August 15 is the obligation to meet and confer.  If we have

16    everything, there'll be nothing to meet and confer about.

17         So we're -- my point is we're assuming we're in a

18    world where either the report won't be filed August 15, or the

19    report will be a Reader's Digest report, or there will be some

20    claims identified, not others, but that's why we're saying

21    let's start this process now.

22         HONORABLE MAGISTRATE JUDGE DEIN:  What I don't want

23    to do, though, is end up in September with a discussion about

24    what has been produced and what has not been produced.  And so

25    I will hear from everybody on that.  But that's really a

1    critical concern to me at the moment, because there seems to

2    be shifting representations as to what's been available and

3    what has not been available.

4            Okay.  And just for GDB, the August time schedule

5    doesn't fit the Title VI schedule.

6            MR. DESPINS:  No.  First of all, these documents

7    should have been produced months ago.

8            HONORABLE MAGISTRATE JUDGE DEIN:  Okay.

9            MR. DESPINS:  So they need to be produced now.  But

10   we will sit down with counsel for AAFAF, with Suzanne Uhland

11   and try to have a schedule that works both for the discovery

12   and the Title VI.

13           HONORABLE MAGISTRATE JUDGE DEIN:  Okay.  So you

14   expect that to be addressed in the whole Title VI briefing,

15   the new schedule?

16           MR. DESPINS:  But I want to be precise.  There are

17   two things going on with GDB.  GDB, there are issues about

18   whether the GDB folks should get a release under their --

19   because the Code, the Code PROMESA doesn't provide for that.

20           But putting that aside, whether there are facts and

21   circumstances that would say that these people should not get

22   a release, that's a very narrow issue.  But GDB was the bank

23   that structured all these transactions, so they're at the

24   center of all these.

25           So for example, the issue of whether the 2014 GO

1   bonds should be challenged and what knowledge people had as to

2   whether it violated the debt limit under the Constitution,

3   that's all within GDB.

4          That may or may not relate to the Title VI release

5   provisions, but it's broader.  So there are two things going

6   on at the same time there.

7          HONORABLE MAGISTRATE JUDGE DEIN:  Do you expect it to

8   participate in the schedule of the Title VI process, to

9   include discovery, or you don't?

10          MR. DESPINS:  No.  I think that we should deal with

11   GDB here because it's a broader request.  I'll give you

12   examples of documents we've asked of Ms. Uhland, for example.

13   We've asked her to give us copies of bank accounts and things

14   like that, or to see what the relationship was between the

15   depositors and GDB.  Very cut and dry, boring legal documents.

16   But we're not asking her to produce any e-mails or anything

17   like that.  That should be done in the context of this effort

18   here.

19          HONORABLE MAGISTRATE JUDGE DEIN:  Okay.  Thank you.

20          MR. DESPINS:  Thank you, Your Honor.

21          MR. MUNGOVAN:  Good afternoon, Your Honor.  Timothy

22   Mungovan from Proskauer Rose for the Oversight Board as the

23   representative of the Commonwealth and the Title III debtors.

24          Your Honor, let me just tell you up front what our

25   recommendation is, and then I can address Mr. Despins'

1    arguments and commentary.

2         For the Oversight Board, we believe that the motion

3    should be denied without prejudice subject to their ability to

4    come back and renew their motion once again in August or

5    September after the report has been finalized and completed,

6    all of the documents have been assembled.  And we can have a

7    process, and we're happy to work out with Mr. Despins a

8    process where he can identify to the Court what else he needs,

9    when he needs to get it by, and a path to do that.

10        Let me address specifically two items.  So the UCC's

11   motion gets a number of things wrong.  I'm just going to focus

12   on two, and I'm going to get right to the document issue.

13        But first, the UCC asserts repeatedly throughout its

14   motion papers, both its Motion and its Reply, that the

15   independent investigator is not going to identify potential

16   claims.

17        I communicated again yesterday with the independent

18   investigator.  I have no idea where the UCC comes to the

19   conclusion that claims will not be identified.  In the April

20   5th report, the independent investigator states specifically

21   that it will identify claims.  I can give you the page and

22   paragraph number.

23        HONORABLE MAGISTRATE JUDGE DEIN:  I have to admit

24   that I couldn't tell whether it was all kinds of claims or

25   regulatory claims or it was missing a comma.

1          MR. MUNGOVAN:  It's a fair point, Your Honor.

2          So I communicated directly with counsel for the

3   independent investigator yesterday, and I can tell you that

4   the independent investigator will provide a comprehensive

5   discussion of claims and avenues for value recovery in its

6   final report.

7          HONORABLE MAGISTRATE JUDGE DEIN:  Okay.

8          MR. MUNGOVAN:  So I think that --

9          HONORABLE MAGISTRATE JUDGE DEIN:  I understand

10  that -- I think the report wasn't as clear, but thank you.

11         MR. MUNGOVAN:  I wanted to be as crystal clear as I

12  could be.  That's precisely what I was told last night.  I

13  expect that the report will comply with the representation

14  that I just made to you on behalf of the independent

15  investigator.

16         Let me go to the second point, which is the

17  documents, and what's been provided and what hasn't.  Let me

18  try to simplify this.  As I was listening to Mr. Despins

19  present to the Court, I grouped the documents into three

20  categories, okay?

21         The first category are the documents from the Popular

22  and Santander entities.  That's category one.  Category two

23  are the documents at GDB, or the GDB related documents.  And

24  you can group categories one and two together to some degree,

25  because they are the Puerto Rico financial institutions that

1    are the subject of the UCC's motion.  I've segregated them for

2    a reason, which I'll explain in a minute.  And then there's a

3    third category, which are what we'll describe as the other

4    parties that have been the subject of the independent

5    investigator's investigation.

6         With respect to category one, which are the Popular

7    entities and the Santander entities, the UCC has all of the

8    documents that the independent investigator has obtained from

9    those parties.  Period.

10        HONORABLE MAGISTRATE JUDGE DEIN:  All right.  But

11   with -- so for those entities, his concern is the search terms

12   and the custodians?

13        MR. MUNGOVAN:  So with respect to that issue, Your

14   Honor, that issue has not been raised before today.  I do not

15   recall seeing it in the briefing.  I know that there are

16   regular calls between the investigator and both committees,

17   the Retiree Committee and the UCC.  And to my understanding,

18   that issue has not been an issue that the UCC has articulated

19   and said, we have a problem with this.

20        I'm more than happy to work with the independent

21   investigator and Mr. Despins to discuss search terms,

22   custodians and the like, and to see whether there's a basis to

23   bridge this apparent disagreement.  But when I tell you that

24   this is the first time I've heard of it, I've heard of it 15

25   minutes ago.

```
 1              HONORABLE MAGISTRATE JUDGE DEIN:  No -- well, I think
 2    it is in the briefing, but there's a lot of briefing.
 3              MR. MUNGOVAN:  If it is, I apologize, Your Honor.
 4              HONORABLE MAGISTRATE JUDGE DEIN:  But is it something
 5    that --
 6              MR. MUNGOVAN:  I think it's something that can be
 7    worked out.
 8              HONORABLE MAGISTRATE JUDGE DEIN:  -- you think can be
 9    worked out?
10              MR. MUNGOVAN:  I have no doubt that it can be worked
11    out, Your Honor.  As you know, we've appeared in front of you
12    on other cases, and search terms were an issue.  I understand
13    it intuitively.  I'm more than happy to help bridge the gap.
14              HONORABLE MAGISTRATE JUDGE DEIN:  So it's not
15    something you're claiming top secret on?
16              MR. MUNGOVAN:  I can't -- until I speak with the
17    independent investigator about it, I can't tell you that they
18    may not take that position.  I just don't know.  But I'm happy
19    to try to work it out.  And if it is an issue, I'm happy to
20    report back to the Court, and I'm sure Mr. Despins will.
21              HONORABLE MAGISTRATE JUDGE DEIN:  Okay.
22              MR. MUNGOVAN:  That's Popular and Santander.  That's
23    category one.  I think that we can resolve that.
24              With respect to the GDB, let me just tell you the
25    current state of play as I understand it.  Right now, the
```

1   independent investigator is working with AAFAF and GDB to

2   obtain documents, but right now the independent investigator's

3   itself receiving those documents on an attorneys' eyes only

4   basis, on a read only, attorneys' eyes only basis.  And so the

5   ability -- the independent investigator at this moment does

6   not have the ability to share those documents with the

7   committees.

8           If an agreement can be worked out with AAFAF, and I

9   expect that Mr. Sushon will be presenting to you next, whereby

10  a process can be developed and agreed upon through which the

11  documents can be shared by the independent investigator with

12  the committees, I'm sure that the independent investigator

13  will be willing to do that.

14          HONORABLE MAGISTRATE JUDGE DEIN:  That's a lot of

15  documents to have attorneys' eyes only for.

16          MR. MUNGOVAN:  I understand.

17          HONORABLE MAGISTRATE JUDGE DEIN:  I'm having a hard

18  time wrapping my head around that one.

19          MR. MUNGOVAN:  I understand.  I'm going to defer the

20  explanation of that position to Mr. Sushon.

21          HONORABLE MAGISTRATE JUDGE DEIN:  Okay.

22          MR. MUNGOVAN:  But I believe right now the

23  independent investigator is constrained by that restriction.

24  And in order for it to be able to accomplish its

25  investigation, it has to live within the restrictions that are

1  being placed upon it by the parties from whom it is seeking to

2  obtain documents, which is a good segue to category three.

3          Category three, first of all, is not technically the

4  subject of the UCC's motion, as I read their motion.  The

5  motion is directed toward the Puerto Rico financial

6  institutions, which are comprised of three effectively,

7  Popular, Santander and the GDB, as I read their motion.

8          With respect to the other parties, in an effort to

9  expedite the investigatory process, as I have been informed by

10 the independent investigator, they have sought to do things on

11 a voluntary basis with the parties, the third parties with

12 whom they are interacting and they're seeking information,

13 rather than serving a Subpoena.

14         If a Subpoena is served, there won't be a restriction

15 on the independent investigator to share documentation, or

16 they won't have to obtain the producing party's consent to

17 sharing.  The fact is, I believe, that many of the producing

18 parties, perhaps all of the parties in what I'll call the

19 third category, have not consented to the independent

20 investigator's request to share those documents with the

21 committees.

22         Here's -- I believe that there is a path forward with

23 respect to this, this particular issue, and maybe all of these

24 issues, Your Honor, which is that the independent investigator

25 expects to file its final report and an exit plan.  And as

 1    part of that exit plan, the independent investigator will

 2    indicate, I anticipate, that it has created a document

 3    repository.

 4          And that document repository is a resource that will

 5    be available to a party to request permission of the Court to

 6    obtain access to.  And to the extent that a party objects, a

 7    producing party objects to their documents being made

 8    available, that is an issue that will be joined before this

 9    Court.

10          In my view, Your Honor, giving the time scale that

11    we're talking about, which is a couple of months, first of

12    all, these documents aren't even subject to the UCC's motion I

13    believe fairly read.

14          And secondly, on a time scale basis, allowing this

15    process to play out where the independent investigator

16    finishes gathering documents from parties, particularly on a

17    voluntary basis, targeting August to complete that process,

18    targeting August to finalize that document to repository, and

19    making a process available with the Oversight Board and the

20    committees to allow the committees to pursue those documents

21    in that repository.  That to the Oversight Board, Your Honor,

22    is a far more efficient and effective and expedient path to

23    address the committee's concerns at this point in time.

24          HONORABLE MAGISTRATE JUDGE DEIN:  So why is that

25    different, though, than his request to sit down on August 15

1   and spell out exactly what you're producing, when you're

2   producing it, and what hasn't been produced?

3          MR. MUNGOVAN:  I think that there's room for both,

4   Your Honor.  I think that we can  -- for the Oversight Board,

5   we're more than happy to sit down and have sat down with

6   Mr. Despins and the committees.

7          But what I would say is the one sensitivity that I

8   have on this relates to the agreements that the independent

9   investigator has or may have with those parties, the third

10  category, who voluntarily produced the documents.  I don't

11  know what the terms of that voluntary production are.

12         And so I don't know whether there is a limitation

13  upon the independent investigator sharing with, or the

14  Oversight Board sharing with the committees the list of who

15  the producing parties are and the scope of the documents that

16  were produced with them.  I just don't know what those

17  restrictions are or may be.

18         HONORABLE MAGISTRATE JUDGE DEIN:  So this is my

19  problem.  As I understand it from some of the papers, there's

20  been a lot of discussion about who's producing documents,

21  about who's being interviewed.  I mean, all of that has been

22  discussed according to the representations, what the

23  independent investigator's doing.  But then the results of the

24  interviews, the results of the document requests are not being

25  shared.

1      So I don't want to end up in August with the

2  beginning of a fight over what should be produced or not.  The

3  report itself, assuming it comes out on August 15, and

4  assuming it identifies claims, if it hasn't allowed the

5  committee to see at least some of the substantive underlying

6  documents, then it doesn't have credibility.  And then we're

7  just stalling this for another couple of months.

8      And I accept the concern of the May 2019 date.  I

9  think that's real.

10      MR. MUNGOVAN:  Let me address both of those points.

11  First, the May 2019 date, that's an issue for the Oversight

12  Board, at least in the Oversight Board's position and view,

13  because those claims belongs to the debtors, not to the

14  Committee.

15      And secondly, with respect to your first issue, which

16  is the concern about having a disagreement in August, the

17  disagreement is not going to come from the Oversight Board I

18  don't anticipate, Your Honor.

19      To the extent that there is any disagreement about

20  access to the documents that are in the depository relating to

21  the third category, or potentially the GDB, depending on what

22  Mr. Sushon tells us, that will be an issue between the

23  Committee, or committees, and the producing party, as to

24  whether or not the producing party's documents should be made

25  available to the committees.

1            HONORABLE MAGISTRATE JUDGE DEIN:  But then I end up

2    on August 15 and I say okay, so issue a Subpoena.  I mean, how

3    do we make this conversation happen without that?

4            MR. MUNGOVAN:  That may be, Your Honor, but what I

5    would tell you is my understanding of the independent

6    investigator's concern is that if you mandate that -- if you

7    take the position that those documents must be turned over in

8    some way, it could interfere with that investigation.

9            And what I would say to you is that the independent

10   investigator needs to be free to pursue the path that it is

11   pursuing, unhindered by imposition by a committee to evaluate

12   the documents that the independent investigator has collected,

13   where the independent investigator has made the decision that

14   it is more expedient and more efficient and more cost

15   effective to work voluntarily with the producing parties to

16   produce documents on a voluntary basis.

17           HONORABLE MAGISTRATE JUDGE DEIN:  All right.  So your

18   proposal then is on August 15, we'll take that as a date there

19   would be an exit proposal that says that these are the

20   following materials that will be turned over that have not

21   been turned over as of now.  These are the materials that you

22   will not have access to because I couldn't get you access to

23   it.  And you, Committee, file a motion to compel or seek the

24   2004 authorization at that point.

25           MR. MUNGOVAN:  Yes.  I think something like that.

1   And depending on what Your Honor orders as a result of this

2   motion today, it will likely give guidance not only to the

3   committees, but also the producing parties as to what the --

4   what the most direct path is.

5           HONORABLE MAGISTRATE JUDGE DEIN:  Okay.  Thank you.

6           MR. MUNGOVAN:  Thank you, Your Honor.

7           MR. SUSHON:  Good afternoon, Your Honor.  Bill Sushon

8   from O'Melveny Myers on behalf of AAFAF.

9           I should start out by saying that we join in Mr.

10  Mungovan's arguments and we support the positions expressed by

11  the Oversight Board.

12          I want to start, if I may, by clearing up a

13  misapprehension that I believe the UCC and Retirees' Committee

14  are laboring under, which is this:  The documents from GDB are

15  GDB's documents.

16          They're not AAFAF's documents, and AAFAF has done

17  nothing to interfere with sharing those documents with the

18  investigator or with the committees.  AAFAF has been working

19  diligently to try to secure GDB's permission to share those

20  documents.  And that has borne fruit, although maybe not the

21  fruit that everyone would have liked.

22          As of right now, the investigator is receiving

23  documents from GDB on an attorneys' eyes only basis, subject

24  to execution of an NDA that will be acceptable to GDB and the

25  investigator.  I, today, while we were sitting here in court,

1    received permission from GDB to provide non-privileged

2    documents to share with the investigator, to the UCC and the

3    Retirees' Committee on an attorneys' eyes only basis, again,

4    pending execution of an NDA that's acceptable to GDB and to

5    the committees.

6         But that's all been work that AAFAF has been doing to

7    try to get cooperation and to try to get the information out

8    there, because as I've told this Court before, our position is

9    that transparency is precisely what's needed here, and we

10   support a transparent investigation.

11        HONORABLE MAGISTRATE JUDGE DEIN:  So what can I do to

12   make this NDA get signed sooner rather than later?

13        MR. SUSHON:  That I don't know, Your Honor, because I

14   don't represent GDB.  I don't know what the issues are that

15   are creating any concerns on their part.

16        HONORABLE MAGISTRATE JUDGE DEIN:  So who knows?  The

17   independent investigator knows what the issues are?

18        MR. SUSHON:  I don't believe so, Your Honor.  I think

19   that would have to be GDB.  I --

20        HONORABLE MAGISTRATE JUDGE DEIN:  I'm feeling a

21   little bit like I'm chasing my tail around.

22        MR. SUSHON:  I understand, Your Honor.  I'm just not

23   authorized to speak on behalf of GDB, and so I can't express

24   that.  But that is what we have been doing.  That is what we

25   can do today so we can at least get the committees the

1   documents that the investigator has that are non-privileged.

2         They can begin reviewing those documents.  It can

3   help them if they do think that there are deficiencies in

4   those document productions.  It can help them then begin to

5   work on whatever follow-up request they may have.  And they

6   can bring those through the investigator while the

7   investigation is ongoing.

8         If when the investigation is done they're still not

9   satisfied with the document productions, then they can take

10  whatever other steps they think are necessary to get the

11  documents that they need.  But this is at least a very good

12  first step to get beyond the log jam that we've been in and to

13  get them some of what they need.

14        HONORABLE MAGISTRATE JUDGE DEIN:  Just so I

15  understand, what you're saying is that the documents can be

16  produced tomorrow attorneys' eyes only, but you're --

17  somebody's negotiating a non-disclosure agreement which would

18  free up some of those documents beyond attorneys' eyes only?

19        MR. SUSHON:  That's correct, Your Honor.  And I

20  believe that needs to be approved by the GDB board.

21        HONORABLE MAGISTRATE JUDGE DEIN:  All right.  And

22  then do you know whether they're producing a privilege log?

23        MR. SUSHON:  There is not a privilege log as of now,

24  but they would be, I believe, willing to produce a privilege

25  log to the UCC.

1          HONORABLE MAGISTRATE JUDGE DEIN:  All right.  And as

2     I understand it, the other financial institutions did produce

3     a privilege log, and the privilege log was produced to the

4     committee?

5          MR. SUSHON:  I don't know the status of that.

6          MR. DESPINS:  No privilege logs were produced -- was

7     produced.

8          HONORABLE MAGISTRATE JUDGE DEIN:  Well, as I

9     understood -- I'm going to make you all file one brief just so

10    they all say the same thing.

11         MR. SUSHON:  That could be a real punishment, Your

12    Honor.

13         HONORABLE MAGISTRATE JUDGE DEIN:  I gather.  I think

14    that if there's a privilege log out there, it ought to be

15    produced to the Committee.

16         MR. SUSHON:  As of right now, there's not a privilege

17    log for GDB, Your Honor.  That I know.  But I believe that

18    they're willing to prepare and produce a privilege log.

19         HONORABLE MAGISTRATE JUDGE DEIN:  Okay.

20         MR. SUSHON:  I have only one other thing to add, and

21    that's this.  It wasn't raised today during argument, but in

22    the UCC's reply papers, they made insinuations about AAFAF

23    personnel and that AAFAF personnel are somehow incentive to

24    obstruct the investigation because of their prior employers

25    being potential targets of the investigation.

1           I feel obligated to say that, first of all, that's

2    completely speculative.  There are no facts offered.  There's

3    no evidence offered.  The concern is expressed specifically

4    about --

5           HONORABLE MAGISTRATE JUDGE DEIN:  Let me just suggest

6    that that's not a persuasive argument if you're not turning

7    over the documents.

8           MR. SUSHON:  Well, but again, they're not AAFAF's

9    documents, Your Honor.  And that's the other point, is that

10   the AAFAF executive director is named in particular, but his

11   former employer isn't GDB.  His former employer is one of the

12   other banks.

13          So what possible reason he could ever have to

14   interfere with the production of GDB documents to protect some

15   other bank that's not GDB is a mystery to me.  I don't

16   understand it.

17          In any event, again, AAFAF has been working very hard

18   to get this done, and will continue to do so.

19          HONORABLE MAGISTRATE JUDGE DEIN:  I appreciate that.

20   What I do need to help figure out, and I will hear from

21   everybody else as well though, everybody agrees the GDB

22   documents are critical.  I need to figure out how we get those

23   produced, how I get the right people in the room with

24   authority to negotiate whatever we need to negotiate.

25          And if the non-disclosure is too restrictive, I need

1   to weigh in on that and see what happens at that point.  But I

2   can't have everybody in front of me saying, I'm not the one

3   that has the authority to do that.  So I'm trying to figure

4   out the best way to get the right people in front of me.

5          MR. SUSHON:  At this point, Your Honor, I think one

6   possibility would be simply to have a status report at the

7   next Omnibus hearing, at which point if things haven't been

8   achieved, then, you know, some relief could be considered,

9   some motion, something that would get the right people in the

10  courtroom, if necessary.

11         HONORABLE MAGISTRATE JUDGE DEIN:  Okay.

12         MR. SUSHON:  Thank you, Your Honor.

13         HONORABLE MAGISTRATE JUDGE DEIN:  Anyone else?

14         Yes.

15         MR. DORSEY:  Good afternoon, Your Honor.  John Dorsey

16  of Young, Conaway, Stargatt & Taylor.  I'm here on behalf of

17  Banco Popular.

18         I don't want to belabor any of the arguments that

19  have already been made.  Obviously we filed our objection to

20  the motion, but I wanted to just assure the Court that we are

21  cooperating with the independent investigator.

22         We have been producing documents.  Our employees have

23  been interviewed.  We've been producing documents since

24  December of last year.  And there's an ongoing dialogue with

25  the independent investigator.  They continue to ask for

1    documents.

2         And we're in the process of reviewing additional

3    documents now that were prompted by the interviews that they

4    conducted of our employees.  So we just wanted to let the

5    Court know that we are cooperating completely.

6         HONORABLE MAGISTRATE JUDGE DEIN:  And as I read your

7    papers, you have no objection to those documents being turned

8    over to the committees?

9         MR. DORSEY:  That's correct, Your Honor.  We

10   understood they were being turned over to the committees.

11        HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

12        MR. RAIFORD:  Good morning, Your Honor.  Landon

13   Raiford of Jenner & Block for the Retiree Committee.  I think

14   the answer, as we see it, to the middle ground that we

15   advocate is require GDB today to make available to both

16   committees the documents they have made available to the

17   investigator.  And to the extent they have concerns over

18   sensitive issues or attorney eyes only and that sort of stuff,

19   we already have an agreement with the investigator that

20   governs how these documents can be used and based on various

21   labels that have been placed on them.

22         It's a little frustrating to hear that for months

23   now, every time we have these discussions, it's with AAFAF

24   about these very documents.  So now here today in court they

25   throw their hands up and say well, it's not us; what are we

1  supposed to do. If so, where is GDB's counsel today? Where

2  are they to explain their position if they're the only ones

3  who can push this forward?

4  We think this is some of the smoke and mirrors. We

5  have and the other committee has for weeks and months tried to

6  get an NDA agreement with AAFAF, and heaven and earth may pass

7  away, but AAFAF is never going to sign one without this Court

8  intervening.

9  So we think again, you don't have to give the UCC

10  committee or our committee full fledge authority to go pursue

11  Rule 2004 discovery. We believe that if we wait until the

12  report is issued in August, but yet we all have access to the

13  documents that were given to the investigator, and that are

14  governed by the NDA that we have already entered into with the

15  investigator, then pretty much all of these problems can be

16  resolved.

17  HONORABLE MAGISTRATE JUDGE DEIN: Do you make a

18  distinction between the third category of non-financial

19  institution documents and GDB?

20  MR. RAIFORD: We do a little, and the reason we're

21  not as concerned about the third category is because our

22  conversations with the investigator is that those documents,

23  the plan is that they will be put in a database, and that we

24  can, as soon as the report is issued, seek access to those

25  documents.

1          So we think that those -- again, things can change.

2    If I understand this presently, the way it's supposed to work

3    is those documents will be in the database and hopefully there

4    won't be a problem.

5          The problem we all admit we have is with GDB, who

6    refuses to let us see literally anything.

7          HONORABLE MAGISTRATE JUDGE DEIN:  So if I need to

8    find out information from the investigator as to really what's

9    going on with whether the documents will be put in the

10   database or not, how does that happen?  Who's going to

11   represent him?

12         MR. MUNGOVAN:  Good afternoon, Your Honor.  Timothy

13   Mungovan for the Oversight Board.

14         So I believe that the independent investigator

15   reports to the subcommittee of the Oversight Board.  I've told

16   you that based on my discussions with the independent

17   investigator yesterday, or counsel for the independent

18   investigator at Kobre & Kim, that their expectation is that

19   they plan to put the documents that they have collected and

20   gathered into the document repository, a data room.  And as

21   part of the exit plan, inform the Court that those documents

22   are in the repository.

23         HONORABLE MAGISTRATE JUDGE DEIN:  And identify the

24   restrictions on use on those documents?

25         MR. MUNGOVAN:  Meaning that the -- is the question

1   will the independent investigator identify which documents are

2   restricted in terms of use?  That seems like a reasonable

3   request.  I'm happy to communicate with the independent

4   investigator about that, but that seems like a reasonable

5   thing to do, or at least have segregated subrooms in the data

6   room, that these documents are available to the committees.

7         I don't think that there's any issue with respect to

8   at least two of the Puerto Rico financial institutions as that

9   term is defined.  It sounds like the GDB may be worked out, or

10  hopefully.

11        And we're talking about the third category, which is

12  the non-Puerto Rico financial institutions.  And I'm sure that

13  we can figure out a way to identify who those parties are and

14  the restrictions on access, so that the committees can make a

15  determination as to whether they want that information, and to

16  establish a basis to obtain it.

17        HONORABLE MAGISTRATE JUDGE DEIN:  It seems to me that

18  I need to know from the investigator, one, is there any

19  problem sharing search terms and having that conversation

20  about appropriate search terms?  Are there any custodians?

21        All right.  I need to know the status of the

22  negotiations with GDB, and I'm not going to wait until the

23  next Omni to have any non-disclosure agreement resolved.  So I

24  don't quite know the way to do it, but maybe it's the

25  investigator who needs to talk to the committees, because

 1   documents -- all right.  The Retiree Committee lawyer is now

 2   given permission to speak, even though you're not admitted pro

 3   hac vice.  Thank you.

 4          Is that enough?

 5          LAW CLERK:  And Santander.

 6          HONORABLE MAGISTRATE JUDGE DEIN:  All right.  And

 7   we'll need to hear from New York in a minute.

 8          MR. MUNGOVAN:  What I might suggest, Your Honor, and

 9   it just occurred to me that counsel for the Retirees'

10   suggestion with respect to GDB makes sense.

11          To be clear, in my view, I don't believe that it's

12   the burden of the independent investigator to act as an

13   intermediary with respect to the terms of the NDA.  I believe

14   that they're happy to facilitate that discussion between the

15   committees and GDB.  But the independent investigator is doing

16   its job under the context of PROMESA.

17          To be clear, the independent investigator is also

18   aware that their ability to share at the request of the

19   Oversight Board with the committees as a matter of efficiency

20   is something that makes sense to avoid having duplicative

21   discovery.  But I want to be careful with acknowledging or

22   accepting some burden on the part of the independent

23   investigator that I don't think I can do.

24          So I reiterate that maybe the path forward with

25   respect to GDB is for the committees to communicate directly

1    with GDB.  Perhaps the commentary from the bench today may act

2    as a catalyst to GDB to work together with the committees to

3    come to an acceptable NDA that I'm sure will also be

4    acceptable to the independent investigator, and we can report

5    back to the Court perhaps by the end of next week.

6              HONORABLE MAGISTRATE JUDGE DEIN:  Yes.  I think

7    what -- I think that makes sense, but I also think I'll

8    schedule something in Boston in about two weeks -- I don't

9    have my calendar with me -- that GDB will have to be present

10   at.  All right?

11             So it will be sort of the 2004 against GDB, and at

12   least I'll have the right parties there so that we can figure

13   out what to do with how fast those documents can be produced.

14   They're going to be produced.  I mean, you can tell GDB that.

15   I just want to make sure they're represented and have counsel

16   at the hearing, and then we will figure out how fast to get

17   them.

18             But I accept counsel's representation that at least

19   all the documents will be available to both committees on an

20   attorneys' eyes only basis tomorrow, okay?

21             I have some nods at me.

22             MR. SUSHON:  Yes, Your Honor.

23             HONORABLE MAGISTRATE JUDGE DEIN:  Do we have someone

24   in New York?

25             MR. CROWELL:  Yes, Your Honor.  This is Nick Crowell

1  from Sidley Austin representing Santander, and I'll be very

2  brief.

3        I just wanted the Court and the parties to know that

4  Santander is fully cooperating here.  It has nothing to hide.

5  It's produced tens of thousands of pages of documents.  We

6  provided current and former Santander employees for

7  interviews.  And I believe that all that information we

8  produced has already been made available to the UCC and the

9  Retirees' Committee of which we have NDAs.

10       We will continue to cooperate with the investigator

11  and we will probably be producing some more documents.  And

12  obviously when those documents are made available to the

13  investigator, my presumption is that they'll also be made

14  available to the UCC for their guidance.

15       Thank you, Your Honor.

16       HONORABLE MAGISTRATE JUDGE DEIN:  Okay.  Thank you.

17       MR. DESPINS:  Your Honor, just a few clarifying

18  points.  You have not heard a word about August 15 from

19  anyone.  Just make sure that's very clear.

20       That date, I've had to put some money on it, is not

21  happening.  I hope I'm wrong, but you have not heard a word

22  about that, and that was not an accident.

23       And on the issue of we have not raised the search

24  term, it's on page eight of our Reply.  We had various e-mail

25  communications with the investigator asking for search terms,

1   so that issue has been front and center for a long time.

2        Then the issue of -- you know, Mr. Sushon is playing

3   a very dangerous game.  He has been negotiating with us the

4   terms of that NDA for the last four months.  That is illusory.

5   I have e-mails going back and forth between me and him and

6   Mr. Friedman negotiating the terms of that GDB, and now he

7   says oh, we don't represent them.

8        By the way, why is there not a default judgment

9   against GDB?  Because we filed a motion.  They're not here.

10  Let's get the default judgment entered.  I mean, this is, Your

11  Honor, very troubling.

12       HONORABLE MAGISTRATE JUDGE DEIN:  So does it make

13  sense then to have a continuation of the hearing with GDB

14  present, and we just at that point wrap that up?

15       Mr. DESPINS:  Yes.  And if they're not there, then

16  whatever happens with that.  But the next point, Your Honor,

17  is the other parties.  And they're saying, well, we haven't

18  filed a motion about that.  We can do that.

19       We can also serve a Subpoena on the investigator

20  saying produce all the documents you've received.  And then he

21  can come to Court saying, I can't do that; I have a

22  confidentiality agreement.  And then Your Honor will resolve

23  that.

24       I can't believe that's the game we're playing,

25  because we have filed the motion, so -- there are other

1    entities, and by the way, they're numerous.  They're big banks

2    in New York that were involved in this.  And they're saying,

3    well, we're not going to give you those documents because

4    that's not covered by your motion.

5         The state is paying for that investigation.  We

6    should have access to it.  And if the third parties are

7    opposed to that, they can come to the Court and explain why we

8    should not have access to those documents.

9         And by the way, the fact that that would interfere

10   with their investigation, Judge, we're talking about

11   documents, not witnesses.  So how is it that us seeing the

12   documents will interfere with the investigator's

13   investigation?  We just don't see it.

14        But all in favor of keeping this on a short leash,

15   that's the only way this is going to move forward.

16        MR. MUNGOVAN:  Your Honor, two things.  First of all,

17   with respect to the scope of the motion, I'm just responding

18   to the motion as written with respect to the third category of

19   documents.  We're responding to the motion as written.

20        If the committee wants to seek categories of

21   documents from third parties, I think we've laid out a process

22   for them to get access to those documents.  Let's be

23   practical.

24        And then with respect to the search terms, I was

25   reviewing e-mail that I had received over the weekend in my

folder.  And what the note that I have from my team states is
that the independent investigator invited the committee to
provide proposed search terms for Popular and Santander, and
expressed a willingness to pose such search terms to these
witnesses.  The Committee never provided such terms.

So that's not necessarily responsive to the criticism
that has been levied now with respect to what search terms
were, in fact, used.  It's a fair point, Your Honor.

I will go back.  I will talk to the independent
investigator about that.  I hear you loud and clear that you
want, if possible, those search terms to be shared and the
custodians.  If there is a problem with doing that, I will
report back.

HONORABLE MAGISTRATE JUDGE DEIN:  Okay.  So why don't
we say within the next week, you will have that conversation
and somebody will file a status report with me to let me know.
I guess you will.

MR. MUNGOVAN:  (Nodding head up and down.)

HONORABLE MAGISTRATE JUDGE DEIN:  To let me know what
the status of that is.  I also want to know the status of this
third category.  Are there really -- I don't know what the
agreements are.  Are the agreements -- I guess by August 15,
I'm using that date, you're going to have to convince me it's
wrong, if it's wrong.

But by August 15, the committees need to know what's

1   in the room, what the form is.  I guess the investigator needs

2   to spell out the exit plan in a filing that we can actually

3   look at.

4           MR. MUNGOVAN:  That's my understanding, that there

5   will be an exit plan or an exit report that will be filed that

6   is separate from the final report.  I don't know that the exit

7   report will be filed by the 15th of August.

8           I am told -- I don't have personal control over it,

9   but I am told by counsel for the independent investigator that

10  they currently anticipate, as stated in our filings, that they

11  will file a final report by August 15, 2018.

12          HONORABLE MAGISTRATE JUDGE DEIN:  But I want the exit

13  plan by then.

14          MR. MUNGOVAN:  You want the exit plan by the same

15  date?

16          HONORABLE MAGISTRATE JUDGE DEIN:  I actually want to

17  know what's going to be in the exit plan before that, all

18  right?  I want to know that there's going to be a plan that

19  says that the documents will be in a room, when access will be

20  available to them.

21          The overarching thing that I wanted to say is that

22  the Committee is going to get these documents.  All right?

23  Because I'm not going to end up in a fight about whether

24  investigations are duplicative because the Committee doesn't

25  know what documents have already been produced.

1          The whole point of this was so that the financial

2     institutions didn't have to do the same searches multiple

3     times.  All right?  But the Committee can't be in a position

4     of saying I want these documents, and then not knowing whether

5     or not they've been produced.

6          So that's not a fight I'm willing to have.  And if I

7     have to just open the doors to make sure it doesn't happen, I

8     will do that.

9          MR. MUNGOVAN:  I understand, Your Honor.

10         THE COURT:  All right.  So I think the privilege logs

11    need to go over to the committees, to the extent they exist,

12    and there needs to be a privilege log from GDB.

13         You need to have these conversations about custodians

14    and search terms and make sure that that's done.  I need to

15    know what the status is of the third category.  Is it expected

16    that those documents will be released at the exit date, or is

17    it expected that they will still be confidential at that date?

18         MR. MUNGOVAN:  My understanding is that they will be

19    -- to the extent that they are restricted by the producing

20    party, they will be held as confidential.  The independent

21    investigator will be withdrawing, as I understand it, subject

22    to the exit plan.  And the Oversight Board presumably will

23    have control over those documents.

24         But my understanding is that there will be -- at

25    least in some instances, as of today, there are restrictions.

1   Whether those producing parties lift those restrictions

2   voluntarily remains to be seen.

3          HONORABLE MAGISTRATE JUDGE DEIN:  Is there any

4   concern that you have about disclosing the identity of the

5   parties that have produced the documents?

6          MR. MUNGOVAN:  I don't --

7          HONORABLE MAGISTRATE JUDGE DEIN:  That is something

8   that you need to talk to the investigator --

9          MR. MUNGOVAN:  I don't know, Your Honor.  Yes, let me

10  speak with the investigator's counsel.  I don't know.  To some

11  degree, I'm in a difficult position, to be honest with you,

12  because I'm functioning frankly as an intermediary as well.

13  But I'm trying to be as direct and honest with you as I can.

14          I don't know whether that is information that can be

15  shared.  If it can be, I will work to make that clear to you

16  and to the committees.

17          HONORABLE MAGISTRATE JUDGE DEIN:  All right.  So I

18  think the way that we're leaving this is you'll have the

19  conversation with the investigator and with the committees and

20  file a status report in the next week.  Does that make sense?

21          MR. MUNGOVAN:  Yes, Your Honor.

22          HONORABLE MAGISTRATE JUDGE DEIN:  And then in two

23  weeks, I will issue a continuation date for a hearing with GDB

24  to address those documents, all right?  And then I will take

25  the remainder of it under advisement based on what I have here

1    and formulate the next steps.

2         MR. MUNGOVAN:   Thank you, Your Honor.

3         HONORABLE MAGISTRATE JUDGE DEIN:   The goal will be,

4    though, that this is moving.   Okay?   And that the documents

5    will be reviewed.

6         On the other side, though, when we get to the I want

7    more stage, which I know will come, that's actually going to

8    have to be fairly identified as to what's needed, why, and

9    probably some budget on what the additional search will

10   involve.   Okay?   And I'll put that in an Order as I finalize

11   this.

12        But that's going to -- assuming that the committees

13   get all of the materials that have been -- or substantially

14   all the materials that have been produced, the more the

15   investigation is going to have to be targeted.   Okay?

16        And again, I understand that there may be very

17   different goals in the investigation, and I don't have a

18   problem with different goals, but I think there is a finite

19   world of information that people will use differently.

20        So the fact that the investigator's goals may be

21   different doesn't mean that an entirely new search takes

22   place, if the same documents have been produced, and just

23   focus -- the focus of the documents are different.   Okay?

24   Does that make sense?

25        I have sort of some nods on that note.

1        MR. SUSHON:  (Nodding head up and down.)

2        MR. ROSEN:  (Nodding head up and down.)

3        HONORABLE MAGISTRATE JUDGE DEIN:  And I think I

4   should leave.

5        Is there anything else?

6        MR. SUSHON:  (Shaking head from side to side.)

7        HONORABLE MAGISTRATE JUDGE DEIN:  Okay.  Thank you.

8        (At 2:10 PM, the Honorable U.S. District Court Judge

9   Swain took the bench.)

10        THE COURT:  Please be seated.

11        Our final contested agenda item is the joint

12   application for entry of an Order amending the Interim

13   Compensation Order.

14        Mr. Sushon.

15        MR. SUSHON:  Good morning, Your Honor.  Bill Sushon

16   of O'Melveny & Myers for AAFAF.

17        I'm happy to report that I think we can move this to

18   the uncontested category.  And I'll explain that in a moment,

19   but first I thought it would be helpful to get some background

20   on the reasons behind the proposed amendments.

21        Aside from housekeeping issues, the proposed

22   amendments are designed primarily to ensure that people

23   seeking payment from the Puerto Rico Government Treasury are

24   complying with Puerto Rico law.

25        The reason for that isn't that we think that the

1    Court's Order is insufficient to require payment to the

2    professionals.  It's really because we have taken to heart the

3    concerns that have been expressed over the timing of payments

4    and of payments being delayed.

5        Everyone has experienced delays in payments,

6    including my firm, you know, some of them very lengthy.  And a

7    big part of the reason for that, Your Honor, has been that the

8    Treasury, when it is processing payment requests from

9    professionals, has policies, procedures and systems that are

10   set up to ensure compliance with Puerto Rico law, because the

11   payments have to be made typically in compliance with Puerto

12   Rico law.

13       So as soon as you have a situation where there's a

14   variation from what is typically done in Puerto Rico, that

15   requires people to understand the reasons behind it, to get

16   themselves comfortable with it, for the employees to feel

17   comfortable that they're not going to be subject to criminal

18   prosecution for processing a payment that doesn't check the

19   boxes for Puerto Rico law.

20       We also think that providing the things complying

21   with Puerto Rico law provides greater transparency.  Given

22   that these payments are coming from Puerto Rico's Treasury, we

23   believe that the taxpayers and the people have a right to

24   transparency to see the arrangements that are in place and so

25   on.  So that is what motivated the amendments.

1    We had one objection from the UCC professionals, and

2  I believe that we have resolved their concerns in this way.

3  There was a concern about tax withholding, and that all of

4  their payments would be subject to automatic tax withholding

5  by Puerto Rico.

6    There is a process that -- we've spoken to the IRS.

7  There is a process that allows anyone who's making an

8  application for payment from the government, or to any other

9  part of the government, to certify to the payor that they are

10 not doing business -- the person seeking payment is not doing

11 business in Puerto Rico, at which point the payor no longer

12 has the obligation to withhold Puerto Rico tax.

13   So that would eliminate any withholding from the

14 professionals' payments.  The professionals could still be

15 liable for tax.  That's on them.  They need to figure that out

16 with their own tax professionals.

17   But if the government gets those certifications from

18 the professionals, then there will be no tax withholding from

19 their payments.  And with that, I believe that the UCC's

20 professionals will withdraw their objection.

21   THE COURT:  May I just ask a question just for

22 clarification?

23   MR. SUSHON:  Yes, Your Honor.

24   THE COURT:  So I may have overread the objection, but

25 there also seemed to be buried in the -- well, not so buried,

1    in the objection a contention that the retention arrangements

2    entitled those professionals to be grossed up for any actual

3    tax liability.  That it wasn't just a withholding issue that

4    was being raised at the end of the day, but a gross up issue.

5    Am I wrong about that or have you resolved that?

6         MR. SUSHON:  That issue was raised in the objection.

7    It isn't frankly squarely implicated by the amendments to the

8    interim compensation order, which merely provides that the

9    professionals need to be in compliance with Puerto Rico tax

10   law.

11        So, you know, that's the requirement, but I'll leave

12   it to Mr. Despins to explain their position and if there is

13   any continuing objection.

14        MR. SUSHON:  Thank you.

15        THE COURT:  Thank you.

16        MR. DESPINS:  Thank you, Your Honor.  Luc Despins

17   with Paul Hastings on behalf of ourselves and Zolfo Cooper and

18   the Casillas Torres firm.

19        But we don't need to pursue that issue now, meaning

20   that we can table that.  We're satisfied with that

21   representation that once we submit that certification, there

22   will be no withholding, and we remain subject to whatever tax

23   we have to pay.

24        The only clarification I would add is that they've

25   already withheld 29 percent from our fees.  And so upon

1    submitting that certification, that those fees would be paid

2    promptly by the government.  Subject to that, you know, I

3    think that resolves it.

4              MR. SUSHON:  Your Honor, just one further

5    clarification.  The certification would need to provide not

6    only that the payee is not doing business in Puerto Rico, but

7    also that the work was not performed in Puerto Rico.  So it's

8    a two stage --

9              THE COURT:  And so with that certification, it is

10   your expectation that it will be given retroactive effect so

11   that the monies that have previously been withheld will be

12   refunded?

13             MR. SUSHON:  Yes, as long as the certification is

14   given for past payments as well as for -- when each payment is

15   sought in the future.

16             THE COURT:  Very good.  I thank you and congratulate

17   you for having resolved the objection to this Order.

18             And there was an amended version of the Order that

19   was filed last night that seemed to be directed to PREPA

20   professionals in particular.

21             MR. SUSHON:  That's correct, Your Honor.

22             THE COURT:  And Mr. Despins had raised I think in his

23   objection an issue about the literal requirement of the filing

24   of an engagement letter saying that for professionals who are

25   retained pursuant to Orders, there's not an engagement letter.

1          So this is a roundabout way of saying, am I going to

2     get another proposed amended form of the Order with tweaks to

3     deal with that sort of issue, or can I go ahead and enter the

4     Form of Order that was filed yesterday?

5          MR. SUSHON:  You can enter the Form of Order that was

6     filed yesterday.

7          THE COURT:  Mr. Despins, you can just nod.

8          MR. DESPINS:  (Nodding head up and down.)  Yes.  Yes,

9     Your Honor.

10         THE COURT:  All right.  Mr. Despins has nodded and

11    said yes.  So I will do that and I thank you.

12         MR. SUSHON:  Thank you, Your Honor.

13         THE COURT:  And so in items Roman V and Roman VI of

14    the agenda, the matters that are adjourned and/or carried over

15    to the July Omni are specified.  And unless anyone else has an

16    issue to raise?  I see no hands here or in New York.

17         So this conclude today's agenda.  As of right now,

18    the next scheduled hearing date I believe is June 22nd in

19    Boston in connection with a 2004 application issue.  No?

20         LAW CLERK:  That one came off.

21         THE COURT:  That one came off, so it's not.

22         HONORABLE MAGISTRATE JUDGE DEIN:  Maybe we'll fill it

23    up again.  We'll see.

24         THE COURT:  Yes.  It will morph into something else.

25         So as of now, we'll be back here in San Juan for the

1    next Omnibus on July 25th.  And I want specifically and

2    wholeheartedly to thank the Court staff here in Puerto Rico

3    and in New York for their professionalism and all of the work

4    that they do constantly to support these proceedings, and

5    particularly the work that has been undertaken in preparation

6    and support of today's hearing.

7            I thank all of you for your presentations and

8    advocacy.  I wish you all well and safe travels for those who

9    are traveling.

10            We are adjourned.  Take care.

11            (At 2:19 PM, proceedings concluded.)

12                         *     *     *

13

14

15

16

17

18

19

20

21

22

23

24

25

1    U.S. DISTRICT COURT      )

2    DISTRICT OF PUERTO RICO)

3

4        I certify that this transcript consisting of 138 pages is

5    a true and accurate transcription to the best of my ability of

6    the proceedings in this case before the Honorable United

7    States District Court Judge Laura Taylor Swain and Honorable

8    United States District Court Magistrate Judge Judith Dein on

9    June 6, 2018.

10

11

12

13

14   S/ Amy Walker

15   Amy Walker, CSR 3799

16   Official Court Reporter

17

18

19

20

21

22

23

24

25

< Dates >
April 19th 7:2
April 5th 101:19
August 10 15:5
August 15 93:5,
    93:9, 93:18, 94:2,
    94:3, 94:23, 96:2,
    96:14, 98:15,
    98:18, 107:25,
    109:3, 110:2,
    110:18, 123:18,
    126:22, 126:25
August 15, 2018
    127:11
August 15th 92:21
August 24th 20:6
August 6 19:10
August, august 20:4
February 300 million
    14:11
January 2018 34:18
July 25th 29:11,
    137:1
July 5th 19:4, 19:6,
    19:8
July 6 19:9
June 22nd 19:3,
    136:18
June 28 32:13, 33:10
June 29 10:21
June 6, 2018 1:16,
    5:2, 138:9
March 7th 36:24,
    37:2
May 15 7:13
May 16 7:13
May 2019 95:10,
    109:8, 109:11
May 28 69:18
May 29 11:1
May 29th 10:20
May 8th, 2018 18:15
May 9, 2019 95:1
May, may 17 16:12
October 2017 34:18
September 15 95:7
September 1st 96:15
$7.86 48:11
$7.86. 48:10
.1. 61:12

< 0 >
000 57:15

< 1 >
10 57:15, 86:11
10,000 62:11, 70:4,
    77:22
103 14:2
10th 20:9, 33:15,
    54:20
11 50:6, 56:10,
    56:11
1102 77:13, 77:16
1102(a)(1 77:9
1102(a)(2 66:9,
    66:17, 77:10
1102(a)(4 77:11
11:55 85:22
12(b)(6 28:17
12:00 85:17, 85:18
12:57 85:23
13 33:6
138 138:4
149 14:12, 14:14
15 36:21, 37:10,
    103:24
150 14:9
15th 127:7
16 36:21, 37:10
17,300 11:3
17-BK-3283(LTS 1:6
17-BK-3567(LTS 1:24
18,500 62:10
18-AP-030(LTS 1:22
180 60:13, 60:17
1:00 85:18

< 2 >
2.6 16:14
2.8 11:12
20 39:15, 44:24,
    49:10
2004 85:20, 86:9,
    95:8, 110:24,
    118:11, 122:11,
    136:19

2014 99:25
2017. 12:22, 14:2
20th 7:3, 20:4
21: 2:11
240 14:8
29 134:25
2:10 131:8
2:19 137:11

< 3 >
3 70:20, 71:14
3,000 11:2
3.4 11:10
3.6 62:14
30 39:15, 47:10,
    86:10
30-day 10:21
300 16:17
30th 60:23
316 54:1, 54:9,
    55:22
317 54:9, 55:23
317. 54:1
3228 77:21
328 54:8
3799 138:15
38 11:8
3: 1:6, 1:22

< 4 >
40 39:15, 62:23
400 11:9
45-day 21:2
46 11:5, 11:13

< 5 >
50 16:18, 39:15
55 17:12

< 6 >
60 21:6, 24:8,
    24:21, 24:22,
    27:21, 29:19
60-day 21:3, 21:10
601 19:12
64 14:22

65. 21:6

< 7 >
7,500 70:3
7,522 77:23

< 8 >
8.25 62:17
82 14:2
87 14:4

< 9 >
9 70:20, 71:14,
  76:21
90 14:1, 29:19
905 17:23
99 13:25
9:39 5:3

< A >
a)(1 80:19
a)(2 79:16, 81:7
a)(4 66:9, 66:17,
  79:17, 81:7
AAFAF 11:22, 12:9,
  13:21, 16:9,
  16:11, 18:24,
  25:7, 26:9, 30:24,
  41:24, 59:13,
  67:16, 70:25,
  90:9, 99:10,
  105:1, 105:8,
  111:8, 111:16,
  111:18, 112:6,
  114:22, 114:23,
  115:8, 115:10,
  115:17, 117:23,
  118:6, 118:7,
  131:16
abeyance 32:4
abide 70:11
ability 53:25,
  55:25, 58:1, 60:6,
  60:23, 70:15,
  75:21, 75:22,
  101:3, 105:5,

105:6, 121:18,
  138:5
able 55:2, 57:16,
  57:23, 65:12,
  79:22, 81:9,
  85:14, 105:24
above 14:22, 43:19
Absolutely 9:25,
  63:24, 69:16
accelerated 30:15,
  31:1
acceleration 24:17
accept 109:8, 122:18
acceptable 10:1,
  10:2, 33:19,
  111:24, 112:4,
  122:3, 122:4
accepting 121:22
access 14:7, 40:20,
  89:1, 107:6,
  109:20, 110:22,
  118:12, 118:24,
  120:14, 125:6,
  125:8, 125:22,
  127:19
accident 123:22
accompanied 31:17
accomplish 105:24
accordance 60:25
according 108:22
account 22:19
accounts 100:13
accrued 36:13, 63:2
accurate 138:5
achieved 116:8
acknowledged 30:19
acknowledging 121:21
acknowledgment 6:18
acronym 68:2
Act 17:14, 17:17,
  18:14, 96:1,
  121:12, 122:1
action 14:16, 78:10
actions 59:17, 78:15
actively 14:24,
  27:17
activities 43:18
activity 38:21
actors 87:13, 87:16
actual 44:21, 81:2,

134:2
actuality 44:24
Actually 6:25, 8:10,
  10:4, 13:10,
  13:13, 47:1,
  59:14, 63:23,
  71:13, 81:17,
  88:13, 89:1, 93:8,
  127:2, 127:16,
  130:7
actuarial 80:5
actuaries 78:18
Ad 2:33, 16:19
add 26:15, 34:2,
  46:14, 46:15,
  57:4, 81:18,
  114:20, 134:24
added 15:24
adding 74:16
addition 17:3, 66:5
additional 10:23,
  11:11, 11:12,
  12:7, 13:2, 15:3,
  16:18, 36:4,
  36:14, 45:10,
  46:23, 71:19,
  72:2, 72:3, 74:2,
  77:11, 92:22,
  92:24, 117:2,
  130:9
address 13:5, 21:17,
  22:24, 23:11,
  25:4, 36:19,
  41:21, 50:1,
  61:25, 100:25,
  101:10, 107:23,
  109:10, 129:24
addressed 18:20,
  21:19, 24:18,
  39:8, 42:9, 52:14,
  71:4, 99:14
addressing 58:12,
  75:20
adds 16:1
adequate 62:1, 62:7,
  63:9, 65:21, 67:5,
  73:13, 77:14,
  77:16, 81:4
adequately 66:19,
  78:3, 84:5

adhere 42:22
adjourned 136:14,
    137:10
adjudication 20:19
adjusted 45:20
adjustment 7:12,
    9:11, 12:10,
    12:16, 27:20,
    48:10, 59:23,
    72:23
adjustments 8:11
Administered 1:11
administrative
    11:19, 40:19
admit 101:23, 119:5
admitted 121:2
adopt 69:7
ADR 12:6
advance 14:15,
    22:11, 43:25, 44:4
adversary 22:18
advice 78:10
advisement 129:25
advisors 27:16,
    71:22, 78:18
Advisory 2:21, 2:29
advocacy 137:8
advocate 117:15
affect 25:15
afternoon 29:23,
    61:13, 61:17,
    85:25, 86:7,
    100:21, 111:7,
    116:15, 119:12
Agency 2:20, 2:28
agenda 22:2, 34:10,
    59:9, 61:12,
    131:11, 136:14,
    136:17
Agent 2:38, 9:24,
    10:1, 10:6, 10:8,
    13:21, 24:10,
    50:16, 59:13
agents 9:5, 12:1
ago 24:24, 34:20,
    69:18, 96:4, 99:7,
    103:25
agree 22:8, 38:3,
    64:10, 65:23,
    66:5, 67:2, 90:4

agreed 13:2, 29:15,
    58:13, 91:18,
    105:10
agreeing 91:20
agreement 29:12,
    76:25, 93:15,
    105:8, 113:17,
    117:19, 118:6,
    120:23, 124:22
agreements 108:8,
    126:22
agrees 115:21
ahead 50:20, 71:13,
    96:9, 136:3
air 43:8
al 1:16, 1:31, 2:5
Albeniz 2:48
alert 65:8, 70:18
alerted 68:21
algorithmic 57:20
allegedly 95:23
alleging 78:3
allocated 49:11
allow 7:1, 8:25,
    9:8, 10:25, 12:11,
    18:7, 38:5, 107:20
allowed 7:14, 8:8,
    95:19, 109:4
allowing 107:14
allows 133:7
alluded 49:24
alluding 71:3
almost 49:16, 57:20,
    96:15
already 5:22, 27:17,
    46:6, 60:10,
    70:24, 71:4,
    94:21, 116:19,
    117:19, 118:14,
    123:8, 127:25,
    134:25
alternative 96:9
alternatives 94:5
although 22:2,
    28:12, 56:7,
    111:20
amend 37:3, 49:9
amended 12:23,
    17:25, 18:16,
    67:5, 135:18,

136:2
amending 131:12
amendment 17:2, 18:7
amendments 12:23,
    18:12, 18:13,
    131:20, 131:22,
    132:25, 134:7
among 35:11, 48:7,
    57:3, 62:15, 68:10
amount 16:15, 17:12,
    17:22, 47:3, 54:24
amounts 45:20
Amy 138:14, 138:15
analysis 7:6, 43:2,
    53:2, 56:20, 81:5,
    81:8
analyze 81:4
and/or 29:25, 67:3,
    136:14
Andrew 2:47, 28:2
angles 72:22
announcement 9:3,
    42:11
annual 15:12
annually 15:13
answer 35:20, 47:16,
    48:11, 48:12,
    81:17, 117:14
anticipate 15:3,
    20:18, 22:6,
    27:20, 31:8,
    107:2, 109:18,
    127:10
anticipating 12:15,
    35:25
anticipation 20:19
anybody 30:3, 49:15,
    85:15
anyway 56:16, 92:8,
    93:13
apologize 8:17,
    83:5, 104:3
apparent 103:23
apparently 90:4
appealed 39:25
appear 20:2
appearance 12:5,
    80:8
APPEARANCES 2:1, 3:3
appeared 62:4,

104:11
appears 42:9
applaud 9:4
applicants 34:23,
  35:12
application 32:23,
  34:22, 35:25,
  39:4, 39:14,
  41:17, 55:4,
  56:14, 58:19,
  60:24, 83:1,
  131:12, 133:8,
  136:19
applications 34:17,
  35:14, 38:14,
  38:23, 41:12,
  45:21, 51:7,
  51:22, 52:7, 58:21
applies 56:7
apply 42:18, 43:4,
  53:21
applying 47:23
appoint 63:18,
  65:25, 66:8,
  66:18, 68:21,
  69:2, 69:5, 77:7,
  78:24, 80:18,
  81:9, 83:3, 84:18
appointed 50:17,
  65:12, 67:3,
  67:21, 67:22,
  73:12, 74:18,
  74:19, 83:15,
  96:15
appointing 50:1,
  64:12, 65:1
appointment 50:15,
  61:25, 64:11,
  67:7, 75:17,
  75:24, 80:15,
  81:7, 82:11
appointments 67:12,
  79:18
appreciate 36:13,
  58:6, 115:19
approach 12:11,
  20:10
approached 87:12
approaching 87:11
appropriate 12:13,

19:18, 21:10,
  22:1, 22:7, 26:13,
  37:14, 38:5,
  41:17, 57:9, 58:9,
  60:8, 60:18,
  65:13, 68:20,
  120:20
appropriately 16:3,
  55:8
approval 6:15,
  12:16, 16:12,
  18:15, 18:22,
  20:1, 35:14, 45:19
approve 19:22, 54:7
approved 37:18,
  40:15, 113:20
approximately 11:2,
  11:3, 11:5, 11:9,
  11:24, 14:4,
  16:14, 16:15,
  17:11, 62:10
April 62:12, 66:24,
  87:9, 93:14
arbitrarily 51:19
arguably 71:16
argue 25:6, 51:16,
  81:22
argued 28:12
argument 28:11,
  29:13, 29:14,
  29:18, 38:22,
  71:10, 96:11,
  114:21, 115:6
arguments 34:3,
  38:4, 86:14,
  101:1, 111:10,
  116:18
arise 48:10
arises 43:3
Army 15:15
arose 39:9
around 31:5, 73:9,
  95:2, 105:18,
  112:21
arrangements 49:9,
  54:7, 132:24,
  134:1
ARRIBAS 2:11, 79:3,
  79:6, 79:10,
  80:13, 80:22,

81:12, 83:16,
  85:10
Article 70:20,
  71:14, 76:21,
  86:25
articulate 43:10,
  69:11
articulated 42:24,
  64:5, 103:18
articulating 73:7
articulation 31:18
Arturo 2:24
Aside 99:20, 131:21
aspects 43:11, 95:8
aspirational 30:15,
  32:14
assembled 46:18,
  101:6
asserts 101:13
assess 14:23
asset 17:19
assets 62:17, 63:4,
  76:15
assist 11:23
assistance 40:1
ASSISTANT 79:3,
  79:6, 79:7, 79:10,
  80:13, 80:22,
  81:12, 83:16,
  85:10, 89:20
associated 13:5,
  74:6
associations 68:8,
  68:16, 69:20,
  69:21, 70:3, 70:5
assume 6:20, 15:20,
  26:11
assuming 20:14,
  75:21, 95:18,
  98:17, 109:3,
  109:4, 130:12
assumption 19:21,
  20:17, 62:16,
  62:20
assumptions 80:5
assurance 55:22
assure 85:11, 116:20
attach 68:14
attached 70:14,
  77:21, 87:8

attaches 70:13
attempt 37:15,
   51:19, 56:8
attend 43:17
attendance 36:11,
   41:22, 42:10,
   42:12, 42:13,
   42:20, 43:13,
   46:6, 48:14, 51:25
attended 23:19, 85:7
attending 5:14
attention 49:4
attorney 117:18
attorneys 78:17,
   105:3, 105:4,
   105:15, 111:23,
   112:3, 113:16,
   113:18, 122:20
attributable 44:25
audible 5:23
auditors 71:23
August 97:18, 98:2,
   99:4, 101:4,
   107:17, 107:18,
   109:1, 109:16,
   118:12, 127:7
AUST 2:11
Austin 123:1
Authority 1:30,
   2:21, 2:23, 2:29,
   17:15, 52:6, 54:6,
   62:2, 65:24,
   70:21, 74:14,
   77:8, 115:24,
   116:3, 118:10
authorization 110:24
authorized 112:23
automatic 60:7,
   133:4
available 14:7,
   14:14, 20:5,
   23:25, 27:22,
   99:2, 99:3, 107:5,
   107:8, 107:19,
   109:25, 117:15,
   117:16, 120:6,
   122:19, 123:8,
   123:12, 123:14,
   127:20
avenues 102:5

average 14:21
avoid 36:9, 36:10,
   51:20, 60:21,
   61:1, 87:15,
   121:20
awaiting 18:15
aware 8:3, 8:18,
   10:19, 12:20,
   26:5, 35:17,
   44:11, 69:22,
   70:1, 71:22,
   121:18
away 95:1, 118:7


< B >
back 5:8, 12:12,
   14:3, 19:10,
   31:10, 32:20,
   46:19, 58:1, 60:5,
   73:9, 85:4, 90:6,
   95:7, 97:9, 101:4,
   104:20, 122:5,
   124:5, 126:9,
   126:13, 136:25
backdrop 8:16
background 86:22,
   131:19
backing 36:24
backlog 39:7
bad 87:13, 87:16
balance 14:8, 76:16
balloon 48:25
ballots 19:6
Banco 3:6, 89:5,
   91:7, 91:17, 92:4,
   92:20, 97:16,
   116:17
Bank 2:41, 99:22,
   100:13, 115:15
banking 20:21
Bankruptcy 1:1,
   24:24, 50:12,
   52:23, 60:3
banks 92:9, 92:10,
   96:3, 115:12,
   125:1
bar 10:20
Barak 2:8
base 14:1

Based 7:22, 12:25,
   62:15, 64:24,
   78:7, 81:8,
   117:20, 119:16,
   129:25
basic 62:4
basically 75:13,
   96:14
basis 17:23, 20:20,
   40:6, 42:2, 54:15,
   56:17, 60:1,
   103:22, 105:4,
   106:11, 107:14,
   107:17, 110:16,
   111:23, 112:3,
   120:16, 122:20
beautiful 96:7
become 84:12
becomes 84:13, 92:16
began 50:16
begin 50:9, 85:18,
   113:2, 113:4
beginning 109:2
begins 51:12
behalf 6:24, 10:8,
   16:9, 23:12,
   27:13, 33:24,
   34:13, 61:22,
   78:18, 86:8,
   102:14, 111:8,
   112:23, 116:16,
   134:17
behavior 48:7
behaviors 39:3
behind 57:5, 131:20,
   132:15
belabor 116:18
believes 21:14,
   21:16
belong 52:3
belongs 28:13,
   109:13
below 45:5
bench 46:13, 48:3,
   122:1
bench. 131:9
benchmarks 54:12,
   55:2
beneath 56:13
beneficial 17:18

beneficiaries 70:3
benefit 42:6, 56:20,
    79:12, 80:4
benefits 63:2
best 82:18, 116:4,
    138:5
better 47:22, 48:22,
    73:7
beyond 113:12,
    113:18
Biaggi 2:30
big 25:5, 25:20,
    87:2, 125:1, 132:7
Bill 51:24, 52:1,
    52:2, 111:7,
    131:15
billing 14:3, 39:3,
    43:2, 43:19,
    44:14, 44:18,
    49:10, 50:9,
    50:13, 57:14, 59:1
billings 44:5, 59:3
billion 11:5, 11:8,
    11:10, 11:12,
    11:13, 16:15,
    16:16, 16:20,
    62:14, 95:15
billions 95:23
bills 55:18
binder 89:12
binding 93:14
bit 10:18, 25:13,
    28:5, 36:2, 51:3,
    59:19, 68:18,
    80:12, 82:20,
    86:21, 112:21
blame 88:4
blanket 37:16, 78:4
blew 93:16
Block 61:21, 117:13
Bob 55:17
body 27:18
Bolanos 2:25
bond 11:16, 16:20,
    16:23, 17:10
bondholders 16:18,
    16:19, 76:25, 77:2
Bonds 11:7, 11:17,
    16:23, 17:11,
    17:12, 17:13,

95:15, 100:1
bore 95:12, 95:13
boring 100:15
borne 111:20
borrowings 14:9
borrows 52:23
Boston 93:12, 122:8,
    136:19
bother 48:10
boxes 132:19
Bradley 2:13
Brady 34:14
break 49:16, 49:17,
    49:19, 85:18,
    85:19
breathing 7:21
Brian 2:7, 6:23,
    27:13
Bridge 59:9, 60:22,
    61:2, 103:23,
    104:13
brief 23:17, 38:22,
    46:3, 47:24,
    47:25, 114:9,
    123:2
briefing 29:10,
    32:2, 34:1, 38:18,
    42:21, 43:23,
    99:14, 103:15,
    104:2
briefly 25:4, 33:23,
    41:22, 59:15,
    69:11, 73:19
briefs 48:6
bring 6:6, 113:6
bringing 11:3, 11:22
brings 73:9
broader 26:3, 48:12,
    48:16, 100:5,
    100:11
broadly 51:3
brother 76:21
bucket 52:4
budget 14:22, 15:4,
    130:9
budgets 8:4
buenos 5:5
building 20:18
built-in 55:8
Bujold 79:7

bullet 36:20, 41:21,
    48:24
bunch 92:10
burden 56:25, 77:12,
    77:15, 121:12,
    121:22
burdened 59:25
buried 133:25
business 30:11,
    133:10, 133:11,
    135:6


< C >
calculable 44:20
calculation 62:15
calendar 34:1,
    49:11, 122:9
call 21:2, 57:21,
    75:2, 89:6, 106:18
called 17:14, 17:18,
    87:1, 90:17
calls 103:16
candid 44:9
candor 58:6, 68:19,
    73:15
capabilities 15:9
capable 68:5, 71:21
capped 44:20
care 137:10
careful 25:22, 36:7,
    121:21
carefully 51:20
carried 136:14
case-by-case 43:2
cases 56:10, 56:11,
    60:9, 65:18, 68:9,
    104:12
cash 14:8, 14:19,
    41:5, 41:6
Casillas 134:18
CAT 3:50
catalyst 122:2
categories 11:7,
    11:14, 12:3, 50:4,
    58:10, 102:20,
    102:24, 125:20
categorized 11:6
Category 20:15,
    56:7, 102:21,

102:22, 103:3,
103:6, 104:23,
106:2, 106:3,
106:19, 108:10,
109:21, 118:18,
118:21, 120:11,
125:18, 126:21,
128:15, 131:18
cause 38:10, 78:14,
78:19
Cavanaugh 71:23
center 90:16, 99:24,
124:1
centers 10:24
central 76:12
centrally 24:11
certain 16:24,
49:10, 57:2,
58:22, 60:9,
63:25, 68:7,
70:21, 71:1, 97:5
certainly 10:9,
29:20, 30:13,
54:2, 58:3, 62:4,
63:4, 66:16,
67:11, 67:19,
70:11, 71:4,
90:23, 91:8, 93:15
certification 8:7,
82:15, 134:21,
135:1, 135:5,
135:9, 135:13
certifications 7:5,
7:8, 7:19, 133:17
certified 7:3,
16:14, 62:12,
62:17, 63:1, 63:3
certify 44:4, 133:9,
138:4
cetera 78:18, 89:8,
94:8
challenge 26:2,
95:16, 95:24
challenged 100:1
challenging 87:17,
95:20
chambers 10:11,
35:15, 57:18
chance 37:7
change 7:22, 56:2,

56:3, 66:8, 66:12,
67:7, 119:1
changes 18:5, 45:16,
48:23, 50:1, 53:24
chaos 78:16
Chapter 50:6, 56:10,
56:11
characteristics 76:9
characterize 37:5,
50:23
charged 35:5, 38:21
charges 57:16
chase 54:13
chasing 112:21
chat 82:7
check 132:18
check-in 96:5
chiming 38:3
choice 29:1, 55:6
chronic 35:23
Circuit 8:19, 87:3
circulated 35:16
circumstances 7:22,
9:21, 13:1, 42:19,
70:22, 99:21
cities 23:18
civic 5:12
civil 59:17
claim 10:25, 11:2,
11:4, 17:20,
17:23, 19:14,
19:15, 21:14,
21:15, 23:14,
23:16, 29:1, 80:4
claiming 104:15
clarification
133:22, 134:24,
135:5
clarifies 52:5
clarify 50:19
clarifying 22:21,
123:17
clarity 39:11, 64:9,
64:22
classification
19:13, 19:14,
21:18
classified 22:13
Claudia 2:46
cleanup 37:5

clear 34:8, 41:14,
47:7, 58:19,
64:20, 68:18,
71:18, 82:6, 82:9,
83:6, 83:11,
102:10, 102:11,
121:11, 121:17,
123:19, 126:10,
129:15
clearing 111:12
Clearly 67:9, 90:11
CLERK 121:5, 136:20
clerks 10:11
client 48:5
clients 48:4
clock 94:3
close 61:16
closely 94:13
closing 89:12
CMO 60:25
co-opt 56:9
Code 50:12, 52:23,
77:9, 77:16, 99:19
COFINA 2:38, 9:11,
10:1, 10:6, 10:8,
24:1, 24:4, 24:9,
24:10, 24:14,
27:18, 50:16,
87:22
Cofina-commonwealth
9:4, 27:15
cognizant 57:1
collaborate 43:25
collaboratively 72:6
colleagues 47:5
collected 110:12,
119:19
collection 10:24
collections 14:21
colloquy 51:17
combined 36:13
combining 20:8
comes 101:18, 109:3
comfort 80:10, 83:7
comfortable 132:16,
132:17
coming 15:1, 20:11,
45:8, 45:9, 60:5,
93:9, 132:22
comma 101:25

comment 27:14,
   36:14, 56:19
commentary 101:1,
   122:1
comments 21:21,
   48:2, 48:3, 57:7
Commonwealth 1:15,
   2:4, 7:4, 7:24,
   9:23, 14:10,
   14:18, 17:20,
   17:21, 17:23,
   25:12, 61:23,
   64:19, 74:18,
   76:10, 77:21,
   100:23
Commonwealth-cofina
   6:10, 24:3
communicate 5:18,
   120:3, 121:25
communicated 46:11,
   101:17, 102:2
communicating 6:3
communication 78:10
communications 44:8,
   85:15, 123:25
comparable 33:11,
   76:10
compel 110:23
compelling 28:10,
   29:4
Compensation 38:24,
   40:4, 40:7, 40:8,
   40:16, 41:2,
   51:23, 131:13,
   134:8
complaint 95:3
complete 19:2,
   107:17
completed 8:6, 101:5
completely 69:22,
   70:23, 115:2,
   117:5
completes 22:23
complex 36:8, 43:5,
   63:5, 84:12
complexity 15:24,
   16:2
compliance 41:12,
   132:10, 132:11,
   134:9

complicate 41:7
complicated 53:15,
   69:7
complicating 41:14
comply 77:12, 102:13
complying 131:24,
   132:20
component 17:3,
   35:24
components 16:22
composition 66:8,
   66:12, 67:4, 67:8,
   85:13
comprehensive 30:25,
   102:4
comprised 106:6
compulsory 36:15
Conaway 116:16
concede 27:1
conceded 62:17
conceivable 66:16
conceivably 69:9
concept 12:10
concepts 36:19,
   37:10, 47:20,
   48:17
conceptual 22:3,
   48:1
conceptually 54:10
concern 30:1, 30:21,
   35:3, 37:22,
   37:24, 38:3,
   38:11, 42:9, 45:5,
   45:6, 65:9, 71:17,
   72:1, 72:9, 99:1,
   103:11, 109:8,
   109:16, 110:6,
   115:3, 129:4,
   133:3
concerned 33:5,
   39:24, 40:2,
   118:21
concerns 25:10,
   35:23, 38:12,
   45:10, 49:12,
   71:5, 82:23,
   107:23, 112:15,
   117:17, 132:3,
   133:2
concerted 41:25

conclude 136:17
concluded 51:18,
   53:4, 56:19
concluded. 137:11
conclusion 8:7,
   32:4, 33:12,
   55:20, 72:18,
   101:19
concrete 30:24,
   45:6, 96:24
concurrent 50:8
conditioned 18:19
conducted 117:4
confer 21:22, 31:8,
   44:4, 60:6, 96:3,
   98:15, 98:16
conferring 92:21
confidential 43:20,
   44:5, 128:17,
   128:20
confidentiality
   35:2, 35:5, 35:10,
   124:22
configuration 66:3
confirm 22:5, 33:3,
   87:23
confirmation 21:9,
   32:12, 32:17,
   59:22
confirmed 26:18,
   87:21, 88:8
confiscation 6:5
confusion 63:13,
   72:10, 72:14,
   72:19, 72:21
congratulate 135:16
Congress 94:20
connection 8:21,
   8:25, 22:11,
   30:19, 39:17,
   44:5, 57:8, 58:25,
   79:24, 84:19,
   84:21, 136:19
conscious 74:6
consent 76:22,
   97:25, 106:16
consented 106:19
conservative 37:20
consider 9:10,
   12:14, 20:8, 21:8,

45:12, 45:16, 50:1, 68:20, 70:8, 82:1
consideration 12:13, 26:14, 34:25, 36:14, 60:18
considerations 68:22
considered 12:25, 36:5, 67:1, 116:8
consistent 5:15, 64:4
consisting 138:4
consolidate 38:4, 42:1
constantly 85:12, 137:4
constituencies 5:11, 82:22
constituents 10:13, 25:2
constituted 32:11
Constitution 95:17, 100:2
constrained 105:23
construe 83:1
consultation 47:14, 58:5
consultations 31:13, 53:23
contain 94:7
containment 35:23, 36:1
contemplate 20:2
contemplates 54:11, 63:2, 63:4
content 34:4
contention 134:1
contentions 20:23
contested 21:8, 131:11
context 21:17, 21:19, 25:21, 28:7, 33:8, 33:13, 36:5, 86:23, 100:17, 121:16
contextual 54:16
continuation 124:13, 129:23
continue 7:24, 8:13, 15:1, 27:2, 27:7,

32:22, 37:12, 45:11, 46:8, 64:3, 85:13, 115:18, 116:25, 123:10
CONTINUED 3:3, 35:2, 42:17
continues 14:6, 14:23, 42:13
continuing 35:11, 134:13
contract 20:20, 44:18, 53:1, 55:7
contracts 44:13
contrary 40:13, 77:17, 94:8
contrast 64:14, 64:20, 87:6
control 36:15, 76:20, 127:8, 128:23
controversy 81:2
conversation 58:1, 110:3, 120:19, 126:15, 129:19
conversations 74:22, 118:22, 128:13
conveyed 97:2
convince 126:23
Cooper 134:17
cooperate 123:10
cooperating 116:21, 117:5, 123:4
cooperation 47:13, 112:7
cooperative 48:7
coordinating 15:15
copies 100:13
corner 95:2
corollary 22:15
corporation 17:16
corporations 17:4
Corps 15:15
Correct 9:2, 15:23, 20:17, 21:13, 22:20, 41:1, 41:3, 66:13, 67:19, 87:24, 97:2, 97:3, 97:23, 98:3, 113:19, 117:9, 135:21

cost 35:23, 36:1, 36:15, 37:19, 38:9, 44:20, 56:20, 57:2, 78:20, 110:14
cost-control 43:4
costs 44:21, 45:8, 74:6
Counsel 5:5, 27:25, 33:4, 34:21, 40:1, 41:24, 48:4, 51:22, 68:12, 71:21, 75:3, 76:3, 76:21, 90:9, 99:10, 102:2, 118:1, 119:17, 121:9, 122:15, 122:18, 127:9, 129:10
count 92:4
couple 35:1, 36:25, 37:1, 37:18, 47:19, 107:11, 109:7
Couret 2:48
course 5:13, 6:13, 10:13, 24:10, 56:10, 56:12, 65:7, 78:10, 89:6, 92:24, 93:20
courtroom 5:17, 6:4, 6:7, 13:5, 69:13, 116:10
cover 58:10, 58:22, 59:2, 61:3, 70:3, 86:20
covered 23:2, 80:16, 125:4
covering 34:17
create 37:19, 63:5, 68:19, 70:17
created 57:9, 107:2
creating 53:15, 112:15
credibility 109:6
credit 16:18
creditor 21:15
Creditors 2:17, 7:16, 8:9, 9:1, 12:8, 18:9, 24:10,

26:21, 26:22,
26:25, 27:18,
28:19, 37:25,
64:15, 64:17,
64:18, 67:17,
84:4, 95:23
criminal 132:17
crisis 89:21, 90:15
criteria 81:3
critical 90:19,
98:11, 99:1,
115:22
criticism 126:6
Crowell 3:9, 122:25
crushing 77:25
crystal 102:11
CSR 138:15
cued 60:25
culmination 7:5
current 14:9, 15:4,
15:5, 17:10,
36:13, 60:1,
63:20, 77:22,
87:1, 97:13,
104:25, 123:6
currently 8:5, 13:3,
14:19, 18:14,
127:10
custodial 89:9,
89:12
custodians 89:18,
91:4, 91:5, 97:5,
97:6, 103:12,
103:22, 120:20,
126:12, 128:13
customer 14:1
customers 14:5
cut 54:13, 63:2,
100:15
cycle 36:25, 38:18,
42:5, 49:25


< D >
d)(1 80:19
d)(2 79:16
daily 42:2, 60:1
damage 15:25
dangerous 124:3
dangling 66:14

dark 55:5
data 54:22, 119:20,
120:5
database 118:23,
119:3, 119:10
date 10:20, 14:17,
19:20, 19:21,
20:1, 32:14,
33:15, 34:25,
50:7, 50:9, 50:13,
50:14, 61:2,
109:8, 109:11,
110:18, 123:20,
126:23, 127:15,
128:16, 128:17,
129:23, 136:18
dates 9:13, 10:8,
18:2, 18:25
Day 19:7, 20:6,
27:21, 72:23,
73:5, 89:18, 134:4
day-to-day 60:2
days 7:17, 24:8,
24:21, 24:22,
27:21, 29:19,
60:14, 60:17,
69:18
de 3:6, 45:4, 52:15,
52:16, 52:19,
56:7, 57:11, 59:1
deadline 9:15, 9:25,
14:15, 39:13,
94:24, 95:10
deadlines 9:25
deal 20:7, 53:16,
55:14, 89:7,
89:12, 100:10,
136:3
dealing 87:16
dealt 16:3, 40:18
debate 26:6
debating 91:2
Debt 17:15, 25:14,
90:16, 94:19,
95:16, 95:17,
100:2
Debtors 1:18, 7:7,
23:7, 23:10,
25:15, 100:23,
109:13

December 116:24
decide 29:14, 30:8,
32:2, 73:2, 73:13,
81:9
decided 29:19,
63:18, 76:24,
80:18
decides 81:8
deciding 25:13,
25:15
decision 8:20, 8:21,
28:16, 30:15,
68:25, 69:1,
70:18, 80:25,
110:13
decisions 8:20,
31:6, 48:5, 48:6
declined 77:7
declining 65:25
deemed 65:13
deems 37:14
default 124:8,
124:10
Defendants 1:33
defer 10:17, 13:13,
65:3, 105:19
deferral 45:20
deferred 39:1, 45:22
deferring 55:6
deficiencies 113:3
defined 120:9
definitive 9:9
degree 102:24,
129:11
delay 18:3
delayed 132:4
delays 78:19, 132:5
delegate 54:5
deliberative 80:20
deliverables 54:25
demands 57:13
demonstrable 44:21
demonstrated 44:25
demonstrative 46:19
denial 6:6
denied 58:24, 83:3,
101:3
denying 31:23,
82:25, 83:21
depending 109:21,

111:1
deposit 16:24,
   16:25, 17:16,
   18:10
depositor 25:12
depositors 18:4,
   18:11, 100:15
depository 109:20
deposits 17:4,
   17:21, 17:22, 18:8
describe 103:3
described 25:11,
   25:20, 26:4
deserve 6:18
designation 74:10
designed 131:22
desire 67:23
detail 37:24
detailed 57:4, 57:14
details 90:2
determination 22:12,
   22:15, 30:20,
   120:15
determinations 41:2,
   53:25, 58:9, 60:8
determine 19:11,
   38:19, 40:21,
   44:2, 46:20,
   51:19, 63:11,
   65:11, 67:3, 67:10
Detroit 72:12, 72:13
develop 12:9, 57:19,
   83:4
developed 105:10
Development 2:41,
   6:11, 7:6, 7:12,
   54:19, 82:15
developments 34:25
device 5:21, 5:22,
   6:3, 6:6
devices 5:17, 5:20,
   6:6
devote 57:14
dialogue 7:24, 8:10,
   46:7, 116:24
dias 5:5
Diaz 2:24
dictating 37:16
differ 80:6
difference 46:21

differences 78:8
different 15:21,
   47:15, 59:19,
   63:21, 72:15,
   72:16, 72:20,
   72:21, 72:22,
   76:17, 87:12,
   88:25, 107:25,
   130:17, 130:18,
   130:21, 130:23
differently 88:19,
   130:19
difficult 83:24,
   129:11
Digest 94:18, 98:19
digesting 42:3
dilemma 53:18
diligently 111:19
direct 41:9, 65:25,
   66:7, 66:11, 69:2,
   69:4, 84:24,
   84:25, 111:4,
   129:13
directed 48:3,
   66:17, 89:22,
   106:5, 135:19
directing 31:22,
   65:24
direction 83:2
directly 26:8,
   38:16, 102:2,
   121:25
director 115:10
directors 25:17
disagree 29:3, 56:4,
   74:21
disagreement 71:8,
   103:23, 109:16,
   109:17, 109:19
disbursements 32:23
disclosing 129:4
disclosure 6:15,
   44:17
disconnected 64:2
discounting 62:23
discovery 12:11,
   20:19, 21:8, 21:9,
   21:11, 21:24,
   22:7, 22:10,
   28:20, 29:15,

29:17, 30:18,
   95:4, 99:11,
   100:9, 118:11,
   121:21
discrete 21:24,
   56:18
discretionary 77:8
discuss 33:25,
   37:12, 37:23,
   46:8, 103:21
discussed 23:13,
   35:11, 56:21,
   58:15, 108:22
discussing 34:1
discussion 7:10,
   10:18, 25:7,
   33:19, 36:17,
   41:9, 49:14,
   49:16, 51:25,
   53:11, 53:18,
   94:12, 95:22,
   98:23, 102:5,
   108:20, 121:14
discussions 8:8,
   9:1, 12:22, 22:7,
   26:9, 26:21, 27:7,
   27:17, 30:24,
   41:23, 45:3,
   45:12, 45:13,
   52:21, 53:3,
   55:12, 55:15,
   64:24, 117:23,
   119:16
Dismiss 28:13, 32:3
dispute 6:10, 6:15,
   9:4, 22:9, 24:4,
   27:4, 27:15, 71:7
disputes 78:9
disruption 18:2
disruptive 78:7
disseminating 42:3
dissolution 76:23
distinction 118:18
District 1:3, 1:38,
   1:40, 131:8,
   138:1, 138:2,
   138:7, 138:8
divert 33:6
divided 86:6
Docket 1:6, 1:22,

42:2, 42:8, 77:21
document 19:6, 90:1,
    92:2, 97:1,
    101:12, 107:2,
    107:4, 107:18,
    108:24, 113:4,
    113:9, 119:20
documentation 6:14,
    9:9, 106:15
documented 13:3
dodging 98:12
doing 71:12, 88:4,
    91:20, 96:10,
    108:23, 112:6,
    112:24, 121:15,
    126:12, 133:10,
    135:6
dollar 57:15
dollars 11:5, 11:8,
    11:9, 11:10,
    11:12, 11:13,
    14:9, 16:20,
    17:24, 33:6,
    62:14, 95:15,
    95:23
done 13:22, 23:10,
    25:1, 29:11, 47:3,
    49:3, 50:21,
    54:17, 56:5, 58:4,
    67:10, 79:13,
    100:17, 111:16,
    113:8, 115:18,
    128:14, 132:14
doors 128:7
DORSEY 3:7, 116:15,
    117:9
doubt 104:10
down 7:1, 14:14,
    14:17, 18:21,
    23:22, 28:22,
    31:22, 39:1, 69:9,
    71:7, 96:6, 99:10,
    107:25, 108:5
down. 83:17, 126:18,
    131:1, 131:2,
    136:8
dozen 48:19
Dozens 23:19, 92:3
drafts 19:2
dramatic 25:18

draw 14:14
drawdown 14:11
drive 48:2
driven 62:9
dropped 47:3
dry 25:25, 100:15
Duplicate 48:14,
    94:15
duplicating 94:11
duplication 36:10,
    38:17, 38:19,
    43:22, 46:11,
    74:7, 86:20
duplicative 78:7,
    121:20, 127:24
during 6:4, 7:8,
    11:1, 46:22,
    54:25, 56:14,
    87:22, 114:21
duty 68:19, 73:15,
    79:17
dwell 47:23
dynamics 65:17


< E >
e-mail 123:24,
    125:25
e-mailing 6:3
e-mails 100:16,
    124:5
earlier 33:15, 34:5,
    90:8
early 93:14
earnest 42:8
earth 118:6
easily 11:4, 11:15
easy 57:23
effect 61:7, 135:10
effected 17:5
effective 107:22,
    110:15
effectively 106:6
effectiveness 18:19
efficiency 20:11,
    37:1, 121:19
efficient 22:2,
    30:2, 48:17,
    57:17, 107:22,
    110:14

effort 10:12, 32:6,
    38:4, 41:25, 42:7,
    51:8, 51:12, 74:7,
    100:17, 106:8
efforts 9:5, 13:24,
    41:7, 68:13
Ehud 2:8
eight 47:10, 66:24,
    123:24
Either 21:7, 22:8,
    40:7, 41:16, 58:2,
    77:10, 78:23,
    92:12, 93:1, 93:8,
    93:25, 98:18
Electric 2:22, 62:2
electronic 5:17,
    5:20, 44:12,
    44:15, 44:19,
    46:5, 47:2
eleven 49:16
eliminate 133:13
embodied 37:3, 47:19
emergency 15:8
Emmanuelli 76:4,
    76:7, 76:8, 81:19
empanelled 87:4
emphasize 81:20
Employees 61:22,
    116:22, 117:4,
    123:6, 132:16
employer 97:13,
    115:11
employers 91:13,
    114:24
enabler 90:18
enacted 17:6
encourage 38:22,
    41:18, 45:11
encouraged 47:12
end 14:13, 29:20,
    38:25, 39:7,
    40:14, 47:25,
    48:18, 60:4,
    60:12, 60:16,
    60:19, 61:3,
    72:23, 73:4,
    83:13, 98:23,
    109:1, 110:1,
    122:5, 127:23,
    134:4

endeavor 43:3
ended 42:5
ending 15:4
endorsed 68:8
endorsement 68:11,
    68:15, 69:17,
    69:21, 70:2
endorsements 70:8
ends 51:11
enforce 43:3
enforced 42:25
engage 7:24, 30:23
engaged 11:22,
    27:17, 51:8, 82:14
engagement 135:24,
    135:25
engagements 58:4
Engineers 15:15
enhance 53:25
enjoys 77:1
enlarge 59:16
enormously 6:10
enough 24:23, 30:9,
    38:4, 48:21, 121:4
ensure 62:7, 77:13,
    131:22, 132:10
enter 9:14, 31:23,
    45:22, 61:3,
    136:3, 136:5
entered 12:24,
    64:11, 94:3,
    118:14, 124:10
enters 73:25
entertain 31:5
entirely 130:21
entities 7:3, 8:12,
    18:4, 25:10,
    41:10, 41:15,
    72:16, 91:8,
    102:22, 103:7,
    103:11, 125:1
entitled 29:2, 29:3,
    134:2
Entity 17:13, 17:18,
    17:19, 18:19,
    21:13, 43:20,
    65:20, 73:2,
    76:13, 80:9
entrusted 78:12
Entry 35:18, 40:15,

59:9, 131:12
envision 21:6
equal 72:21
escrow 22:18
especially 37:25,
    77:2
Esq 2:24, 2:30,
    2:36, 2:41, 2:42
essential 47:18,
    54:4, 69:11
essentially 11:13,
    29:11, 32:10,
    62:22
establish 77:13,
    120:16
establishing 77:16
estate 74:9
et 1:16, 1:31, 2:5,
    78:18, 89:7, 94:8
evaluate 110:11
evaluating 54:14
evaluation 51:21,
    52:24, 55:2
event 42:21, 91:14,
    115:17
events 41:22
everybody 98:25,
    115:21, 116:2
Everyone 38:12,
    38:21, 88:19,
    93:16, 111:21,
    132:5
everything 30:8,
    55:9, 81:1, 88:7,
    98:16
evidence 78:2, 115:3
evidentiary 20:23,
    30:18, 81:21
exactly 29:16, 65:4,
    108:1
exaggerating 89:20
examination 86:9
example 25:11, 51:4,
    51:15, 51:24,
    66:21, 99:25,
    100:12
examples 100:12
exceeded 17:22,
    95:17
except 92:6

exceptions 37:17
exchange 17:11
Exciting 61:19
exclusive 54:10
excuse 7:9
executed 69:18
executes 48:5
execution 24:12,
    111:24, 112:4
executive 79:8,
    115:10
exercise 87:20, 96:4
Exhibit 48:8
EXHIBITS 4:9
exist 56:10, 128:11
existence 26:13,
    40:3, 40:4
existing 11:20,
    35:9, 63:14,
    67:23, 74:10,
    74:24, 75:12,
    83:7, 83:14
exists 63:14
exit 106:25, 107:1,
    110:19, 119:21,
    127:2, 127:5,
    127:6, 127:12,
    127:14, 127:17,
    128:16, 128:22
expand 74:1, 74:15
expanded 75:13
expanding 73:25
expansion 74:10
expect 14:14, 14:25,
    31:17, 34:3,
    99:14, 100:7,
    102:13, 105:9
expectation 59:1,
    119:18, 135:10
expected 43:17,
    50:22, 128:15,
    128:17
expecting 43:24,
    84:16, 85:5
expects 106:25
expedient 107:22,
    110:14
expedite 12:2, 106:9
Expedited 12:13,
    31:24

expeditious 29:9
expense 48:9
expenses 14:20,
 48:13, 51:9, 77:3
experience 15:21,
 54:15, 72:12
experienced 132:5
expiration 27:21
expire 94:25
expiry 61:2
explain 65:4, 103:2,
 118:2, 125:7,
 131:18, 134:12
explains 96:7
explanation 93:17,
 105:20
explication 20:16
explicitly 63:3
exploring 14:24
exponentially 74:8
express 10:10, 35:3,
 77:23, 83:22,
 112:23
expressed 77:19,
 83:10, 111:10,
 115:3, 126:4,
 132:3
extend 12:24, 59:22,
 78:23
extended 10:21,
 14:16, 32:16
Extension 59:10,
 60:19, 60:22,
 60:24
extent 20:21, 22:9,
 28:25, 30:3,
 36:12, 37:6, 41:6,
 43:18, 44:2,
 46:16, 58:22,
 69:10, 73:24,
 74:3, 79:21,
 84:22, 94:16,
 107:6, 109:19,
 117:17, 128:11,
 128:19
eyes 105:3, 105:4,
 105:15, 111:23,
 112:3, 113:16,
 113:18, 117:18,
 122:20

< F >
face 17:12
facile 48:11
facilitate 12:2,
 121:14
facilitating 40:1
fact 12:12, 12:21,
 12:22, 15:18,
 51:19, 57:1, 62:9,
 88:9, 91:4,
 106:17, 125:9,
 126:8, 130:20
factors 54:11
facts 7:22, 12:25,
 65:17, 78:5,
 96:24, 99:20,
 115:2
fair 102:1, 126:8
fairly 82:17,
 107:13, 130:8
fall 50:4
falls 20:14
familiar 24:12,
 24:13, 53:7, 65:16
far 27:4, 36:13,
 61:19, 73:11,
 87:7, 90:25,
 95:21, 97:7,
 107:22
Farr 10:8
fashion 71:4
fast 122:13, 122:16
favor 125:14
feasibility 63:6
feature 14:13
features 5:23
feel 16:2, 69:10,
 115:1, 132:16
feeling 86:5, 112:20
fees 36:13, 40:6,
 42:5, 50:20, 52:3,
 56:17, 58:13,
 58:14, 134:25,
 135:1
felt 63:7, 64:9
FEMA 14:7, 15:15,
 51:9, 51:10
few 10:12, 18:9,

18:11, 23:12,
 35:19, 36:19,
 69:18, 96:24,
 123:17
fight 109:2, 127:23,
 128:6
figure 57:25, 90:8,
 115:20, 115:22,
 116:3, 120:13,
 122:12, 122:16,
 133:15
figures 47:3
file 19:21, 38:23,
 44:1, 44:3, 49:3,
 64:22, 93:25,
 94:1, 94:4, 95:2,
 95:3, 106:25,
 110:23, 114:9,
 126:16, 127:11,
 129:20
files 97:14
filing 6:9, 29:23,
 30:22, 34:19,
 38:14, 45:14,
 80:17, 127:2,
 135:23
filings 44:2, 127:10
fill 136:22
final 32:7, 32:18,
 32:24, 52:14,
 102:6, 106:25,
 127:6, 127:11,
 131:11
finalize 107:18,
 130:10
finalized 101:5
finally 71:25
Financial 1:9, 2:20,
 2:28, 56:8, 78:17,
 89:21, 90:15,
 102:25, 106:5,
 114:2, 120:8,
 120:12, 128:1
financing 14:7,
 14:25, 15:4
find 57:15, 75:22,
 119:8
finding 58:8
Fine 10:9, 55:9,
 69:13, 87:8,

93:17, 96:15,
96:19
finer 56:24
finger 87:20, 92:20
finish 25:3
finished 35:20
finishes 107:16
finite 130:18
firm 24:21, 44:22,
71:23, 132:6,
134:18
firms 35:3, 44:13
Fiscal 2:19, 2:27,
7:3, 7:11, 7:15,
7:21, 7:25, 8:2,
8:7, 13:21, 59:13,
62:12, 80:1, 82:15
fit 12:9, 49:25,
53:14, 57:22, 99:5
five 85:17
five-minute 49:17
fixing 15:25, 16:1
flagged 35:23, 50:18
flat 44:13, 44:18,
44:20, 44:23,
49:9, 54:7, 55:4,
56:16, 57:3, 57:8,
57:10, 58:24, 59:1
fledge 118:10
flexibility 42:18,
43:11
floated 56:21
flow 41:5, 41:6
fluid 82:17
focus 19:13, 19:17,
47:11, 48:15,
59:21, 88:12,
101:11, 130:23
foisted 74:8
folder 126:1
folks 99:18
follow 33:18, 98:11
follow-up 113:5
followed 40:9
following 6:15,
18:25, 39:14,
39:17, 86:18,
94:13, 110:20
follows 93:7
foremost 47:13

forest 48:14, 48:15,
48:16
forget 91:7, 93:12
forgot 46:14
Form 35:6, 127:1,
136:2, 136:4,
136:5
formal 8:14, 36:5,
50:5, 56:13,
58:20, 75:1, 82:11
formalized 46:9
formally 50:17
formation 50:14,
61:11, 74:4, 80:14
formed 17:13, 17:18
former 87:22, 91:13,
115:11, 123:6
forming 84:6
formulate 57:16,
130:1
formulating 45:13
formulation 8:4
forth 12:12, 18:6,
18:25, 19:20,
29:16, 38:24,
58:1, 72:6, 95:8,
124:5
forum 15:10
forward 5:9, 6:11,
7:2, 8:11, 8:25,
9:10, 19:1, 20:4,
27:18, 39:7,
46:24, 48:23,
84:12, 106:22,
118:3, 121:24,
125:15
found 6:2, 30:9
foundation 7:11
four 14:21, 16:16,
23:18, 46:3,
95:15, 124:4
fourth 17:2, 18:6
frame 8:13, 8:24,
30:14, 59:16,
62:24
framework 7:11, 22:4
frank 41:9
Frankly 26:25, 75:9,
82:18, 129:12,
134:7

free 110:10, 113:18
Friedman 124:6
front 27:10, 30:3,
30:5, 49:12,
84:19, 100:24,
104:11, 116:2,
116:4, 124:1
fruit 111:20, 111:21
frustrating 117:22
full 6:16, 7:9,
7:17, 18:7, 44:3,
45:15, 95:12,
95:13, 118:10
fully 31:16, 123:4
function 70:22,
71:14
functioning 129:12
funding 76:15, 78:21
funds 22:13, 32:8,
32:12, 32:17,
32:23, 33:25
future 6:6, 8:6,
42:12, 135:15
fuzzy 51:10


< G >
Gallagher 10:8
game 56:2, 56:3,
124:3, 124:24
GAO 90:13, 90:18
gap 104:13
Garcia 97:6
gather 114:13
gathered 119:20
gathering 107:16
gave 51:15, 90:25,
93:15
general 36:19, 73:14
generally 44:11,
48:13, 73:15, 95:6
Generation 14:1
gentlemen 97:12
gets 101:11, 133:17
getting 31:10,
88:13, 89:14,
90:23
Giselle 2:42, 33:23
gist 67:20
Give 22:25, 23:13,

23:16, 74:25,
100:11, 100:13,
101:21, 111:2,
118:9, 125:3
Given 19:17, 38:20,
55:20, 57:12,
59:23, 59:24,
77:9, 80:23,
85:25, 90:24,
96:4, 96:14,
118:13, 121:2,
132:21, 135:10,
135:14
giving 96:2, 96:17,
107:10
glad 27:23, 86:2,
94:2, 94:22
goal 39:10, 56:25,
130:3
goals 8:2, 130:17,
130:18, 130:20
Godfrey 34:13
Gonzalez 97:6
GORDON 2:34, 61:14,
61:16, 61:19,
61:21, 62:20,
63:23, 64:4, 65:2,
65:6, 66:5, 66:13,
66:15, 67:14,
69:16, 73:17,
74:21, 74:22,
76:22, 80:2,
81:15, 81:17,
82:5, 83:5, 83:20,
85:9
gotten 49:1, 87:7,
92:1
govern 30:20
governed 118:14
Government 2:40,
5:10, 7:7, 7:16,
8:1, 11:19, 14:16,
76:12, 131:23,
133:8, 133:9,
133:17, 135:2
governmental 25:10,
30:12, 90:14
Governor 25:19,
87:1, 87:22, 90:17
governs 117:20

grand 87:3, 87:4
grant 45:19, 92:19
granted 58:19
granting 93:4
grateful 20:16,
79:22
gratitude 10:10
great 6:11
greater 31:9, 132:21
greatly 12:2, 17:1
Greenberg 13:14,
13:20, 59:13
gross 134:4
grossed 134:2
ground 54:5, 117:14
group 16:17, 16:19,
25:15, 75:10,
75:15, 84:4,
95:23, 102:24
grouped 102:19
grumbling 39:19
guarantee 76:16
guess 32:16, 84:10,
126:17, 126:22,
127:1
guidance 93:15,
111:2, 123:14
guideline 42:23,
93:16
guidelines 42:16,
43:14
guilty 88:3
guys 95:5

< H >
hac 121:3
half 16:16
hand 16:2
handled 39:7
hands 55:13, 117:25,
136:16
happen 30:14, 38:25,
69:9, 92:19,
93:19, 95:21,
110:3, 119:10,
128:7
happened 87:5
happening 123:21
happens 116:1,

124:16
happy 37:12, 37:23,
89:15, 101:7,
103:20, 104:13,
104:18, 104:19,
108:5, 120:3,
121:14, 131:17
harbor 57:21
hard 10:14, 38:20,
47:16, 84:13,
105:17, 115:17
Hastings 12:8, 75:7,
86:8, 134:17
HAYES 61:5
HAYNES 2:23, 13:13,
13:17, 13:18,
13:20, 15:12,
15:23, 16:5,
59:11, 59:12, 61:8
head 83:17, 105:18,
126:18, 131:1,
131:2, 131:6,
136:8
hear 22:3, 22:6,
27:23, 29:13,
29:22, 34:3, 36:2,
41:17, 41:18,
43:9, 47:15, 57:6,
69:12, 86:3, 88:6,
90:9, 98:25,
115:20, 117:22,
121:7, 126:10
heard 6:17, 7:10,
8:19, 10:6, 28:11,
28:18, 28:19,
28:23, 29:3, 29:5,
29:9, 32:19, 33:4,
52:10, 73:19,
90:20, 94:12,
97:9, 103:24,
123:18, 123:21
HEARING 1:37, 5:9,
5:13, 5:24, 20:8,
21:9, 22:11,
22:12, 28:21,
36:24, 39:19,
42:10, 42:22,
51:25, 81:22,
116:7, 122:16,
124:13, 129:23,

136:18, 137:6
hearings 7:9, 20:2,
   20:5, 36:11, 42:13
heart 36:12, 132:2
heaven 118:6
Hector 2:36
heightened 45:5,
   45:7
held 34:24, 128:20
Hello 49:22, 49:23,
   59:12
help 71:20, 80:11,
   104:13, 113:3,
   113:4, 115:20
helpful 46:17,
   58:18, 72:8,
   72:22, 131:19
hide 123:4
higher 62:21, 62:25
highly 36:8
Highways 1:29
hinge 52:24
hired 55:6, 65:15,
   71:19
Hoc 2:33, 16:19
hold 16:19, 32:4,
   64:1, 78:1, 96:20
holdback 38:10,
   39:15, 40:24
holding 18:10, 20:2
home 48:2
honest 129:11,
   129:13
honestly 57:12
hope 24:23, 41:11,
   47:19, 47:24,
   74:9, 83:24,
   84:11, 123:21
hopeful 8:5
hopefully 31:8,
   119:3, 120:10
hoping 37:21
hosted 7:14
hour 54:20, 85:21,
   86:5
hours 45:1
house 24:4
housekeeping 31:21,
   50:24, 86:13,
   131:21

HTA 7:4
humor 86:3
hundred 70:6
hurricane 15:9,
   15:13, 15:18, 18:6
hurricanes 17:25

< I >
idea 56:21, 101:18
ideal 91:15
ideas 37:10, 43:8
identical 43:24
identified 34:22,
   45:21, 60:10,
   97:5, 98:20,
   101:19, 130:8
identifies 109:4
identify 39:5, 70:9,
   88:7, 94:7, 101:8,
   101:15, 101:21,
   119:23, 120:1,
   120:13
identifying 54:25
identity 129:4
III(3 59:9
ilk 87:18
illusory 124:4
imagine 24:12
impact 56:8
impasse 52:21, 53:23
imperfect 47:22
implement 18:12
implementation 8:1
implemented 8:2,
   24:5
implicated 134:7
important 10:14,
   22:3, 46:4, 46:11,
   64:9, 70:17,
   86:22, 92:17,
   96:21, 98:13
importantly 95:11
impose 43:23, 46:17
imposition 110:11
impression 33:24
inadequate 82:10,
   85:6
incentive 45:8,
   46:23, 84:2,

94:15, 114:23
incentives 37:20
inclined 60:13,
   60:15
include 9:12, 12:15,
   16:23, 19:5,
   19:22, 22:12,
   33:19, 74:2, 100:9
included 10:22,
   29:1, 73:23
includes 16:17,
   35:24
including 5:23,
   5:25, 6:5, 19:14,
   46:5, 60:1, 77:4,
   132:6
incorporate 50:10
incorporated 54:8
incorporates 21:23,
   35:15
incorporating 86:13
increase 78:20
increasing 45:7
incurred 44:21,
   94:19
independence 70:14,
   70:24
indicate 65:7,
   68:10, 69:18,
   70:14, 107:2
indicates 62:13,
   62:14, 63:1, 68:4,
   70:2, 70:20
indications 63:24,
   64:6
individual 8:9, 9:1,
   41:22, 69:19,
   80:4, 82:23
individually 38:7
individuals 43:17,
   69:19
inefficiencies 50:2,
   78:19
inflection 82:13
inform 28:23, 44:7,
   119:21
informal 8:15
informally 45:12
information 5:19,
   7:6, 7:14, 40:21,

42:3, 45:1, 46:19,
46:23, 55:21,
106:12, 112:7,
119:8, 120:15,
123:7, 129:14,
130:19
informational 19:6
informative 18:23,
19:19
informed 106:9
initial 14:11,
28:17, 96:4
initiate 19:7, 19:9,
19:21, 85:8
initiation 19:19
input 41:8, 54:3,
54:18, 81:14
inquiries 63:25,
64:7, 84:24
insight 37:13,
56:24, 64:25
insinuations 114:22
instance 43:13,
54:19, 66:7, 67:2,
67:6, 84:17, 84:24
instance. 66:6, 69:8
instances 128:25
instantly 30:8
instead 21:14, 21:15
institution 118:19
institutions 102:25,
106:6, 114:2,
120:8, 120:12,
128:2
instruct 51:22
instruction 40:13
instructions 36:9
insufficient 132:1
insurance 14:7
intact 32:18
intend 19:7, 69:4
intended 43:10
intensity 15:22
interacting 106:12
interdependent 65:17
interest 5:6, 17:18,
23:22, 29:7, 55:8,
69:23, 72:3,
76:16, 77:5, 94:10
interested 41:24,

56:22, 87:15,
87:16, 87:20, 88:2
interests 11:24,
69:24, 72:11
interfere 110:8,
111:17, 115:14,
125:9, 125:12
Interim 34:17,
34:22, 34:24,
38:14, 38:24,
39:3, 39:14, 40:3,
40:6, 40:8, 40:25,
42:1, 49:25,
50:22, 51:7,
52:22, 131:12,
134:8
intermediary 121:13,
129:12
interrupt 19:24
intervening 11:1,
118:8
intervention 37:22,
48:6, 78:6
interventions 38:2
interviewed 11:25,
88:9, 108:21,
116:23
interviews 94:9,
108:24, 117:3,
123:7
intimately 65:16
intro 88:12
intuitively 104:13
invade 33:6
investigating 95:21
investigation 87:4,
88:4, 96:8, 96:18,
103:5, 105:25,
110:8, 112:10,
113:7, 113:8,
114:24, 114:25,
125:5, 125:10,
125:13, 130:15,
130:17
investigations
127:24
investigatory 106:9
investment 62:16,
92:9, 92:10
invite 26:15, 32:20,

85:3
invited 126:2
invoices 43:18
involve 130:10
involved 24:11,
25:11, 41:5,
41:15, 49:15,
54:14, 54:23,
84:14, 125:2
involvement 40:14
ironically 70:14
IRS 133:6
island 23:18
issuance 42:1
issued 5:16, 11:17,
17:13, 17:18,
42:16, 118:12,
118:24
item 12:18, 22:2,
34:10, 41:21,
49:8, 49:18,
49:20, 50:24,
59:8, 61:10,
61:12, 131:11
items 36:21, 101:10,
136:13
itself 18:21, 53:2,
55:16, 70:21,
105:3, 109:3
IV 61:12

< J >
jam 113:12
January 42:6
Jenner 61:21, 117:13
Jimenez 76:4, 76:7,
76:8
job 56:5, 121:16
Joe 10:7
John 3:7, 116:15
join 111:9
joinder 67:15
joined 67:16, 107:8
joining 38:3
joint 9:24, 44:1,
131:11
Jointly 1:11
Joseph 2:38
Juan 5:1, 5:8,

136:25
judges 76:12
judgment 124:8,
    124:10
judicial 5:16
Judith 1:39, 138:8
July 136:15
jump 30:3, 39:15,
    86:11
juncture 63:20
June 14:13, 14:14
junior 24:16
jurisdiction 78:23
jury 87:3, 87:4
justification 43:21,
    44:6, 78:23
justified 42:22

< K >
Kahn 34:13
Katherine 2:14,
    34:13
Katiuska 2:25
Kauffman 2:36
Keech 55:17
Keep 32:2, 38:23,
    60:5, 96:9, 96:18
keeping 125:14
kept 10:24
kick 56:25
kicked 39:1
kicking 53:22
Kim 119:18
kind 35:9, 37:20,
    43:4, 55:21, 88:4
kinds 101:24
knowing 38:20, 128:4
knowledge 54:16,
    100:1
known 68:1
knows 112:16, 112:17
Kobre 119:18

< L >
labels 117:21
Labor 32:6
laboring 111:14
lack 23:22, 28:19,

77:16, 94:20
laid 125:21
Landon 2:35, 117:12
large 57:8
larger 14:2, 60:9
last 6:8, 13:22,
    15:21, 16:12,
    25:4, 28:4, 29:8,
    29:16, 32:10,
    32:13, 41:21,
    102:12, 116:24,
    124:4, 135:19
lasted 7:17
late 31:4, 93:14
later 10:18, 34:25,
    80:17, 86:4,
    112:12
latter 20:3
launch 19:3, 19:8
Laura 1:38, 138:7
LAW 16:24, 20:21,
    30:19, 121:5,
    131:24, 132:10,
    132:12, 132:19,
    132:21, 134:10,
    136:20
lawsuits 60:6
lawyer 121:1
lawyers 67:19
layer 15:24
lead 75:17, 78:15
leading 22:7
leads 20:7, 63:12,
    72:18
learned 24:23, 51:5,
    52:15
learning 15:21, 47:6
leash 125:14
least 20:10, 32:12,
    32:13, 48:20,
    50:11, 61:25,
    70:18, 71:17,
    72:12, 109:5,
    109:12, 112:25,
    113:11, 120:5,
    120:8, 122:12,
    122:18, 128:25
leave 52:1, 58:14,
    131:4, 134:11
leaving 78:20,

129:18
Lecaroz 2:11, 79:3,
    79:6, 79:7, 79:10,
    80:13, 80:22,
    81:12, 82:7,
    83:16, 85:3,
    85:10, 85:11
led 36:25
left 18:9, 91:6
legal 89:20, 100:15
legislation 17:6,
    18:21
legislature 18:14
lend 53:2
lengthy 132:6
less 38:15, 42:12,
    56:7, 78:21
lessons 47:23
letter 135:24,
    135:25
level 16:1
levels 14:1, 80:4
levied 126:7
Lexis 47:6
liabilities 62:23,
    62:24
liability 62:14,
    62:21, 134:3
liable 133:15
lift 92:20, 129:1
light 25:5, 75:23
likely 111:2
Likewise 8:23, 11:19
limit 41:22, 43:19,
    44:18, 44:22,
    74:9, 100:2
limitation 108:12
limited 5:25, 6:5,
    21:24, 29:17,
    57:13, 59:24,
    65:24, 73:24,
    93:1, 96:1, 98:14
limits 95:17
line 25:3, 48:9,
    51:10, 84:19
lines 14:3, 16:1,
    43:9, 43:22
lion 11:12
liquidity 14:8,
    14:15, 14:24,

15:2, 60:2
list 54:10, 108:14
listening 5:15,
  102:18
literal 135:23
Literally 90:5,
  119:6
litigation 8:18,
  11:11, 12:11,
  24:13, 70:25, 80:2
little 10:18, 28:5,
  37:24, 51:3,
  59:19, 68:17,
  82:20, 86:21,
  112:21, 117:22,
  118:20
live 93:8, 105:25
living 7:21
loaded 5:22
loan 14:10, 14:12,
  14:13, 14:18,
  20:15, 20:19,
  22:13, 22:17,
  30:20, 33:7
loans 16:24, 17:21,
  18:8
local 10:23, 20:21,
  30:19
log 113:12, 113:22,
  113:23, 113:25,
  114:3, 114:14,
  114:17, 114:18,
  128:12
logs 114:6, 128:10
long 24:23, 46:7,
  55:14, 61:18,
  61:20, 124:1,
  135:13
longer 82:20, 93:22,
  97:5, 133:11
look 5:9, 20:12,
  23:1, 43:16,
  46:19, 57:15,
  87:4, 87:7, 127:3
looking 21:13,
  27:18, 33:8,
  38:18, 48:16,
  72:22, 83:13
looks 48:8
LOPEZ 2:42, 33:23,

34:7
lose 64:2
lost 15:18, 86:2
lot 15:20, 24:22,
  25:1, 38:11,
  39:19, 51:13,
  55:12, 57:4,
  80:23, 86:22,
  89:11, 95:7, 98:9,
  104:2, 105:14,
  108:20
loud 126:10
love 26:22
low 12:11
Luc 2:17, 75:7,
  86:7, 134:16
Luis 2:30
lunch 85:18, 85:19,
  85:25


< M >
magnitude 15:22,
  46:21, 82:24
mail 19:8
mailed 19:6
main 11:6
mainland 23:21
maintains 76:19
majority 14:20,
  77:18
manage 22:10
managed 22:10
Management 1:10,
  15:19, 26:13, 71:9
mandate 110:6
mandatory 14:12,
  14:16
March 93:14
Mariani 2:30
market 44:11
marks 6:11
materials 35:3,
  35:6, 35:10, 38:6,
  88:16, 110:20,
  110:21, 130:13,
  130:14
matter 21:8, 25:25,
  29:9, 40:19,
  44:25, 57:12,

59:24, 73:11,
  81:23, 82:12,
  86:13, 87:5,
  121:19
matters 8:17, 8:23,
  51:14, 56:18,
  58:23, 60:25,
  73:5, 136:14
mature 71:15, 84:13
maximum 94:16
Mayol 2:36
Mckinsey 52:16,
  52:17, 52:19,
  52:21, 53:1, 53:4,
  54:7, 54:21,
  54:22, 55:3
mean 28:9, 28:24,
  31:7, 32:15, 95:5,
  98:12, 108:21,
  110:2, 122:14,
  124:10, 130:21
Meaning 23:21,
  89:19, 92:19,
  93:4, 96:2, 96:17,
  98:11, 119:25,
  134:19
Meaningful 54:18,
  54:24
meaningless 89:19
means 8:1, 19:5,
  37:15, 42:11,
  52:20, 87:25
measure 36:1, 44:16
measures 36:3, 36:4,
  36:15, 37:9,
  37:13, 37:20,
  43:5, 46:15,
  46:17, 46:21,
  87:14
mechanics 39:11,
  53:9
mechanism 17:2,
  27:4, 33:20
mechanisms 33:19
mediation 6:17,
  8:14, 10:11, 35:5,
  35:9, 42:10, 42:12
mediators 7:13, 8:9,
  8:13, 9:5
medium 14:24

meet 31:8, 77:15,
  96:3, 98:15, 98:16
meeting 34:23
meetings 48:19
meld 66:16
member 66:24, 66:25
members 5:6, 27:17,
  69:19, 69:20,
  71:1, 83:7, 91:6,
  91:12
membership 66:1,
  68:16, 69:15, 74:1
memoranda 42:16,
  43:15
mention 39:23, 68:7
mentioned 12:6,
  27:16, 34:12,
  46:4, 46:6, 72:7,
  76:21, 81:1,
  81:19, 82:7
merely 57:1, 134:8
merits 13:2, 33:25,
  34:3, 79:14
met 55:23, 87:25
metrics 54:11,
  54:20, 54:21
Michael 79:7
microphone 23:8
middle 117:14
milestone 18:2
million 11:9, 14:8,
  14:9, 14:12,
  14:22, 17:24, 33:6
mind 9:14, 21:20,
  61:6
Minias 2:38, 10:4,
  10:5, 10:7
minimis 45:4, 52:15,
  52:16, 52:20,
  56:7, 57:11, 59:1
minimum 22:12, 26:12
minute 7:1, 16:25,
  103:2, 121:7
minutes 49:10,
  86:10, 86:18,
  103:25
miraculously 30:9
mirrors 118:4
misapprehension
  111:13

misrepresentation
  78:2
missing 101:25
mistrust 78:14
modest 56:16, 96:3
modification 16:13,
  17:8, 18:10,
  18:17, 19:23,
  32:25, 77:11, 81:6
modifications 7:25,
  8:12
modified 18:14,
  62:20
modify 66:19, 81:10
moment 22:25, 59:18,
  64:1, 99:1, 105:5,
  131:18
momentum 30:11
Monday 9:14
money 31:25, 32:5,
  123:20
monies 135:11
monitored 42:25
monitoring 41:23,
  42:8, 84:19,
  85:12, 85:13
Monsita 2:11, 79:6,
  85:10
monthly 40:7, 40:23,
  44:20, 44:23,
  56:17
months 7:6, 10:13,
  47:10, 90:5, 95:9,
  99:7, 107:11,
  109:7, 117:22,
  118:5, 124:4
morning 9:18, 9:19,
  13:18, 13:19,
  16:10, 34:15,
  34:16, 46:1, 46:2,
  48:2, 61:14,
  61:15, 61:18,
  76:4, 76:6, 79:4,
  79:5, 79:9, 90:20,
  94:13, 117:12,
  131:15
morph 136:24
motivated 132:25
mouths 67:18
movant 9:24

move 7:1, 9:10,
  18:1, 60:4, 60:12,
  60:15, 125:15,
  131:17
movie 75:9
moving 8:10, 18:21,
  27:19, 130:4
multiple 25:10,
  59:24, 128:2
municipal 18:4
municipalities 18:8
municipality 18:9
Myers 16:9, 111:8,
  131:16
myself 30:4
mystery 115:15

< N >
name 76:7
named 115:10
narrow 19:17, 99:22
Nathan 2:23, 13:20,
  59:12
nature 22:16, 47:11
NDA 90:4, 111:24,
  112:4, 112:12,
  118:6, 118:14,
  121:13, 122:3,
  124:4
Ndas 123:9
near 8:6, 15:2,
  27:8, 30:14
necessarily 54:20,
  72:18, 72:20,
  81:21, 84:7, 126:6
necessary 5:11,
  20:8, 20:18,
  20:24, 21:11,
  22:8, 24:22,
  31:12, 34:6,
  40:21, 41:15,
  42:4, 44:2, 47:17,
  66:19, 68:20,
  77:13, 113:10,
  116:10
necessity 52:24,
  53:6, 54:4, 60:22,
  80:11
needed 18:1, 62:5,

62:6, 112:9, 130:8
needs 7:25, 14:24,
    24:5, 24:17, 70:7,
    87:12, 93:23,
    96:12, 101:8,
    101:9, 110:10,
    113:20, 120:25,
    127:1, 128:12
negotiate 115:24
negotiated 18:6,
    58:15
negotiating 113:17,
    124:3, 124:6
negotiation 6:14
negotiations 95:13,
    120:22
net 17:20, 17:22,
    62:23, 73:4
New 5:7, 7:14, 10:5,
    13:4, 16:7, 17:11,
    17:13, 26:16,
    32:21, 34:25,
    37:16, 78:24,
    93:12, 93:13,
    99:15, 121:7,
    122:24, 125:2,
    130:21, 136:16,
    137:3
newly 17:18
newspaper 86:25
next 8:3, 12:18,
    13:11, 22:2,
    29:11, 34:10,
    34:23, 39:16,
    48:20, 49:8,
    49:18, 49:20,
    59:8, 61:10,
    105:9, 116:7,
    120:23, 122:5,
    124:16, 126:15,
    129:20, 130:1,
    136:18, 137:1
Nicholas 3:9
Nick 122:25
night 6:8, 29:16,
    102:12, 135:19
nobody 92:19, 95:20
nod 136:7
nodded 136:10
Nodding 83:16,

126:18, 131:1,
    131:2, 136:8
nods 122:21, 130:25
non-disclosure
    113:17, 115:25,
    120:23
non-financial 118:18
non-flat-fee 57:11
non-privileged
    112:1, 113:1
non-puerto 120:12
non-three 12:3
non-title 8:12,
    51:4, 51:21,
    58:14, 58:22
non-waivable 37:17
None 4:5, 4:11,
    28:21
nonetheless 44:3
nor 5:19, 78:24
notch 43:15
note 6:21, 10:3,
    46:4, 48:8, 66:22,
    126:1, 130:25
noted 16:11, 17:25,
    36:6, 47:1, 54:8,
    56:15, 69:17, 80:2
notes 5:21, 5:22,
    23:1, 35:1, 36:6
nothing 71:11, 72:4,
    82:3, 92:18,
    98:16, 111:17,
    123:4
notice 6:16
noticed 53:12
notion 56:9, 80:10
novel 47:4
November 60:17,
    60:23, 61:1, 61:4
number 16:25, 24:9,
    35:2, 39:25,
    43:16, 56:15,
    68:22, 70:4,
    77:25, 94:1,
    101:11, 101:22
numbers 44:22,
    54:23, 54:24
numerous 125:1

< O >
o'clock 49:17, 85:20
O'melveny 16:9,
    111:8, 131:16
objection 9:13,
    9:14, 10:9, 27:5,
    52:10, 116:19,
    117:7, 133:1,
    133:20, 133:24,
    134:1, 134:6,
    134:13, 135:17,
    135:23
objections 31:18,
    35:13, 35:17,
    45:15, 51:1
objectively 79:23
objectors 6:16
objects 107:6, 107:7
obligated 115:1
obligation 52:6,
    53:5, 98:15,
    133:12
obligations 77:4
observations 37:1,
    49:24, 85:3
observe 82:20
observed 6:2
observing 5:7
obstruct 114:24
obtain 27:7, 105:2,
    106:2, 106:16,
    107:6, 120:16
obtained 88:19,
    103:8
obvious 18:2, 53:22,
    79:23
Obviously 11:16,
    15:14, 24:6,
    24:10, 24:13,
    25:7, 53:10, 55:7,
    55:12, 56:23,
    116:19, 123:12
occur 39:3
occurred 44:16,
    89:9, 89:13, 121:9
offered 4:5, 4:11,
    28:6, 115:2, 115:3
offering 19:5
offers 12:12
Office 64:5, 64:15,

66:7, 67:11, 69:2,
69:5, 69:7, 69:12,
69:14, 75:3, 79:2,
79:8, 82:19, 83:2,
83:10, 83:13,
84:8, 84:17,
84:25, 85:2, 85:6,
85:7, 88:1
officers 25:18
Official 2:16,
61:22, 63:7,
63:14, 64:17,
67:16, 67:23,
72:17, 75:8,
76:11, 77:7, 83:8,
138:16
offline 21:25
offset 18:7
offsetting 17:1
Okay 58:17, 65:6,
76:3, 88:23, 98:9,
99:4, 99:8, 99:13,
100:19, 102:7,
102:20, 104:21,
105:21, 110:2,
111:5, 114:19,
116:11, 122:20,
123:16, 126:14,
130:4, 130:10,
130:15, 130:23,
131:7
old 17:12
Omni 20:9, 61:1,
61:2, 120:23,
136:15
Omnibus 1:37, 116:7,
137:1
on-island 16:17,
16:18
once 81:8, 101:4,
134:21
one-thousandth 44:23
one. 94:1, 102:22,
104:23
ones 57:15, 59:19,
118:2
ongoing 41:23,
113:7, 116:24
open 10:24, 36:7,
53:10, 56:23,

128:7
open-ended 60:19
opening 53:17, 86:11
openness 47:15
operating 15:2
operational 14:19,
14:20, 77:3
operations 5:12,
60:1
opportunities 6:16
opportunity 7:10,
28:20, 59:21,
82:19
oppose 71:12, 74:3
opposed 19:15,
54:10, 66:4, 125:7
opposition 67:25,
79:15, 80:7
optimistic 62:18
options 14:25, 69:22
oral 32:11
ordered 55:25, 79:18
Orders 5:16, 29:16,
35:9, 40:6, 41:13,
53:15, 56:12,
79:16, 111:1,
135:25
ordinary 56:9, 56:12
Oreste 2:41
organisms 7:21
organization 90:14
organizations 77:23,
82:22
organize 30:10,
31:12
original 66:22,
80:24
others 46:6, 53:4,
56:17, 98:20
otherwise 6:2, 6:3,
33:6, 55:5
ought 114:14
ourselves 134:17
outset 86:17
outside 5:18, 20:1,
40:19, 51:14
outstanding 20:14
overarching 127:21
overattendance
36:11, 43:21,

46:10
overdeliver 24:25
overlap 38:17, 38:19
overread 133:24
Oversight 1:9, 6:24,
7:7, 16:13, 18:16,
19:2, 53:1, 54:3,
54:6, 54:19,
59:14, 67:16,
73:24, 100:22,
101:2, 107:19,
107:21, 108:4,
108:14, 109:11,
109:12, 109:17,
111:11, 119:13,
119:15, 121:19,
128:22
overstaffing 36:10
owed 95:23
own 15:8, 38:7,
55:16, 133:16


< P >
PAGE 4:3, 101:21,
123:24
pages 36:21, 37:10,
89:11, 89:22,
89:23, 123:5,
138:4
paid 40:17, 40:21,
40:22, 135:1
papers 44:1, 101:14,
108:19, 114:22,
117:7
Paragraph 70:20,
71:14, 101:22
part 5:19, 15:12,
17:2, 20:3, 46:7,
46:15, 62:9,
63:20, 71:11,
80:3, 81:3, 84:5,
95:12, 107:1,
112:15, 119:21,
121:22, 132:7,
133:9
participants 5:8,
6:18, 62:10, 77:22
participate 100:8
participation 42:21

particular 5:21,
38:21, 42:21,
43:17, 53:6,
53:13, 54:24,
54:25, 57:5, 68:7,
69:5, 76:14,
106:23, 115:10,
135:20
particularities 77:1
particularly 33:7,
50:15, 107:16,
137:5
particulars 31:14
Partnership 1:23,
2:46
parts 16:22
party 21:16, 24:6,
44:8, 44:9, 53:7,
55:6, 56:24, 64:2,
72:10, 91:18,
92:14, 106:16,
107:5, 107:6,
107:7, 109:23,
109:24, 128:20
pass 118:6
past 10:12, 14:21,
25:20, 47:23,
87:1, 87:5, 135:14
path 18:21, 18:25,
101:9, 106:22,
107:22, 110:10,
111:4, 121:24
patience 13:16
Paul 2:6, 12:8,
75:7, 86:8, 134:17
pay 134:23
payee 135:6
paying 125:5
payment 40:6, 40:12,
41:6, 41:13, 77:2,
77:3, 131:23,
132:1, 132:8,
132:18, 133:8,
133:10, 135:14
payments 40:1,
40:23, 132:3,
132:4, 132:5,
132:11, 132:22,
133:4, 133:14,
133:19, 135:14

payor 41:10, 133:9,
133:11
Peaje 8:20
pending 31:24, 32:4,
32:18, 32:24,
37:4, 70:25, 80:2,
112:4
pension 11:9, 11:20,
63:2
people 7:10, 11:24,
15:11, 20:11,
23:19, 24:9, 30:5,
38:22, 39:23,
49:17, 54:23,
70:1, 84:3, 84:4,
87:17, 92:3, 92:5,
93:20, 95:14,
97:24, 99:21,
100:1, 115:23,
116:4, 116:9,
130:19, 131:22,
132:15, 132:23
perceived 29:25,
50:2
perceives 85:6
percent 13:25, 14:1,
14:2, 14:4, 17:12,
44:24, 62:17,
63:2, 70:6, 134:25
percentage 39:16,
40:18, 44:19
perception 46:10
perfection 37:6
performed 50:5,
52:8, 58:20, 135:7
Perhaps 21:20,
42:11, 43:15,
44:20, 45:7,
57:19, 60:18,
65:10, 67:9,
71:10, 71:15,
74:25, 106:18,
122:1, 122:5
Period 10:21, 12:24,
15:4, 21:2, 21:4,
21:10, 21:11,
33:10, 34:18,
34:24, 38:20,
39:2, 39:14,
39:17, 46:20,

46:22, 47:4,
52:22, 59:10,
87:23, 97:17,
103:9
periodicals 10:23
periods 46:20,
47:10, 54:25
permanent 14:17
permission 107:5,
111:19, 112:1,
121:2
permitted 5:25,
43:17
person 5:18, 5:25,
36:16, 42:20,
42:21, 89:23,
133:10
personal 127:8
personnel 59:25,
114:23
perspective 38:7,
55:10, 63:19
perspectives 72:15,
72:16, 72:20,
72:21
persuade 47:16
persuasive 115:6
petition 50:13
phone 64:3
phonebooks 89:6,
89:7, 92:7
PHV 2:5, 2:6, 2:7,
2:8, 2:13, 2:14,
2:17, 2:23, 2:25,
2:29, 2:31, 2:34,
2:35, 2:38, 2:46,
2:47, 2:48, 3:7,
3:9
place 15:16, 38:8,
39:12, 46:22,
53:5, 55:7, 71:15,
130:22, 132:24
placed 106:1, 117:21
places 90:16
Plaintiff 1:26
planning 75:2
plans 7:3, 7:12,
7:15, 7:21, 7:25,
8:2, 8:11
play 104:25, 107:15

playing 124:2,
    124:24
plays 37:8
pleading 49:19,
    73:23
pleadings 44:1,
    44:4, 44:7, 65:7,
    72:9, 86:14, 87:9,
    88:25
Please 13:8, 26:18,
    89:21, 131:10
Pleased 6:8, 9:20,
    42:8
PM 85:23, 131:8,
    137:11
podium 9:17, 13:8,
    16:7, 26:16,
    26:18, 32:21, 85:4
point. 36:3, 48:18,
    66:25, 110:24,
    116:1
pointing 87:20
points 23:12, 25:6,
    64:6, 86:20,
    109:10, 123:18
policies 5:16, 132:9
Ponzi 25:20, 87:2,
    90:17
pooling 19:13
Poor 92:7
Popular 3:6, 89:6,
    91:7, 91:17, 92:4,
    92:20, 97:16,
    102:21, 103:6,
    104:22, 106:7,
    116:17, 126:3
portions 51:16,
    51:17
pose 126:4
position 29:4, 33:2,
    35:8, 58:8, 65:14,
    67:21, 75:11,
    78:1, 79:11,
    79:14, 80:12,
    81:2, 84:15,
    104:18, 105:20,
    109:12, 110:7,
    112:8, 118:2,
    128:3, 129:11,
    134:12

positions 38:5,
    43:24, 63:22,
    111:10
possibility 116:6
possible 36:5, 37:6,
    73:8, 94:16,
    115:13, 126:11
Possinger 2:6
post-hurricane 13:23
potential 7:25,
    27:5, 35:25, 36:2,
    36:4, 37:19,
    37:25, 38:9,
    44:16, 101:15,
    114:25
potentially 78:9,
    109:21
Power 2:23, 13:25,
    62:2, 74:12,
    76:19, 84:18,
    92:14
practical 52:9,
    52:12, 57:12,
    59:23, 82:12,
    125:23
Practice 31:2,
    31:24, 32:25,
    43:25
practices 47:21
PRASA 7:4
pre-appointment
    50:20, 58:13
pre-established
    42:23
pre-hurricane 12:21
pre-retention 50:20
precedent 47:7, 47:8
preceding 46:20
precipitously 47:3
precise 22:16, 90:1,
    99:16
precisely 102:12,
    112:9
preclude 72:4
prefer 57:24
preference 28:14,
    29:21, 67:23
prejudice 31:23,
    82:25, 83:4,
    83:22, 101:3

preliminary 9:3,
    9:6, 27:19
preparation 15:22,
    137:5
preparations 15:14
prepare 114:18
prepared 35:20
prepares 15:13
prepayments 14:17
prepays 14:17
preposition 66:14
present 62:23,
    102:19, 122:9,
    124:14
presentation 7:15,
    51:15
presentations 137:7
presented 53:19
presenting 61:6,
    78:5, 105:9
presently 119:2
preservation 33:25,
    34:5
preserve 32:8
preserved 32:12,
    32:17
press 5:6, 6:1,
    25:19
presumably 52:1,
    128:22
presumption 123:13
presumptive 43:16,
    43:19, 44:18,
    44:22, 46:5
pretty 118:15
prevent 35:9
previewed 37:2
previous 59:19,
    97:13
previously 10:19,
    12:4, 36:6, 74:5,
    91:7, 135:11
primarily 38:13,
    50:4, 57:3, 131:22
primary 17:19, 18:5
principal 16:15
principally 69:13
principle 6:9, 6:13,
    29:15
principles 43:14

prior 12:5, 50:5,
  58:20, 86:14,
  114:24
privatization 51:12,
  63:4, 82:16
privilege 113:22,
  113:23, 113:24,
  114:3, 114:6,
  114:14, 114:16,
  114:18, 128:10,
  128:12
pro 121:2
probably 22:1, 88:6,
  123:11, 130:9
problem 53:23,
  61:16, 82:10,
  89:15, 91:16,
  93:10, 103:19,
  108:19, 119:4,
  119:5, 120:19,
  126:12, 130:18
problematic 39:3
problems 36:8,
  47:11, 75:12,
  118:15
procedural 25:25,
  26:12, 31:22
procedurally 30:11,
  31:21
procedures 40:7,
  40:8, 56:12, 132:9
proceeding 6:4,
  19:7, 19:9, 25:17,
  26:3, 28:10,
  28:12, 28:13,
  29:19, 76:18,
  95:11
Proceedings 3:49,
  5:10, 5:15, 5:19,
  6:12, 20:6, 20:24,
  30:18, 31:15,
  79:24, 85:23,
  137:4, 137:11,
  138:6
proceeds 14:7
processes 11:19,
  15:13, 15:16, 41:8
processing 132:8,
  132:18
produce 89:21,

89:23, 91:1,
  92:25, 93:1,
  93:23, 95:6,
  100:16, 110:16,
  113:24, 114:2,
  114:18, 124:20
producing 91:18,
  91:19, 92:14,
  93:20, 106:16,
  106:17, 107:7,
  108:1, 108:2,
  108:15, 108:20,
  109:23, 109:24,
  110:15, 111:3,
  113:22, 116:22,
  116:23, 123:11,
  128:19, 129:1
production 89:9,
  89:13, 90:25,
  92:22, 92:24,
  98:12, 108:11,
  115:14
productions 113:4,
  113:9
productive 7:18,
  8:10, 34:20
professional 39:12,
  51:7, 51:11, 53:6,
  53:14, 54:16,
  54:17, 55:13
professionalism
  137:3
proffered 54:21
progress 5:9, 6:19,
  13:23, 28:6, 34:19
projects 54:23,
  54:25
proliferation 38:2
PROMESA 19:12, 38:1,
  50:10, 52:23,
  53:15, 53:20,
  54:9, 94:21,
  99:19, 121:16
promise 31:5
promised 85:17
promote 20:10
prompted 117:3
promptly 135:2
proof 23:16
proofs 10:25, 11:2,

11:3
proper 22:10, 26:14,
  62:7, 65:21, 68:6,
  70:9, 70:10, 71:16
properly 30:10,
  67:10, 85:6
property 19:15,
  20:15, 20:20,
  20:21, 21:14,
  21:15, 30:20, 33:7
proponent 76:1
proponents 29:25,
  73:18
proportion 44:21
proportionally 57:9
proposal 9:13, 13:6,
  26:12, 27:9,
  31:13, 31:17,
  33:18, 33:20,
  36:5, 38:12,
  49:13, 56:9,
  56:22, 57:5, 59:2,
  110:18, 110:19
proposals 14:25,
  45:14, 82:16
propose 24:7, 27:6,
  97:1
Proposed 19:25,
  21:1, 21:23, 22:1,
  29:10, 29:16,
  32:3, 45:21,
  58:12, 61:7,
  72:24, 90:11,
  126:3, 131:20,
  131:21, 136:2
proposing 18:24
prosecution 132:18
Proskauer 6:24,
  100:22
prospective 47:20
prospectively 47:24
prospectus 89:12
protect 115:14
protected 35:4
provide 9:25, 12:10,
  18:3, 19:9, 21:21,
  30:17, 43:20,
  46:23, 55:21,
  64:22, 65:14,
  67:5, 99:19,

102:4, 112:1,
126:3, 135:5
provided 45:2,
52:25, 54:4,
55:21, 102:17,
123:6, 126:5
provider 57:8
providers 44:13,
57:10, 57:11, 58:2
provides 17:9,
73:12, 132:21,
134:8
providing 41:8,
60:23, 132:20
province 66:3, 67:7,
67:11
provision 77:2
provisions 5:11,
41:13, 80:1, 100:5
PRS 76:9, 76:13,
76:18, 77:18,
77:22, 78:9
Public 5:6, 7:9,
16:19, 16:23,
17:3, 17:16,
17:19, 18:19,
89:7, 90:14, 92:8
publication 10:23
punishment 114:11
purpose 24:8
purposes 31:22,
46:19
pursuant 10:20,
12:24, 135:25
pursue 107:20,
110:10, 118:10,
134:19
pursuing 88:2,
110:11
push 34:4, 118:3
put 9:24, 15:16,
20:23, 28:22,
29:15, 30:15,
39:12, 41:17,
56:24, 87:21,
96:20, 118:23,
119:9, 119:19,
123:20, 130:10
putting 67:18, 99:20

< Q >
qualifying 8:11,
16:13, 17:8,
18:16, 19:22,
32:24
qualitative 54:11
quantitative 54:12
quarterly 40:24
question 22:13,
23:10, 25:13,
46:8, 48:10,
71:25, 75:20,
81:18, 88:17,
91:3, 92:16,
119:25, 133:21
questions 7:16,
22:23, 23:2,
35:20, 35:22,
47:16, 49:12,
79:20, 84:22,
85:1, 86:19, 96:24
queue 29:24, 30:4,
30:5, 40:12, 82:24
queuing 22:9, 31:2
quick 31:6
quite 7:18, 29:17,
29:24, 33:2, 47:1,
66:15, 120:24
quote 25:21, 86:25,
87:2, 88:3

< R >
radar 26:7
radio 10:23
RAIFORD 2:35,
117:12, 117:13,
118:20
raise 39:5, 71:5,
71:24, 73:14,
81:25, 136:16
raised 22:18, 30:21,
42:9, 43:12,
68:14, 70:25,
71:25, 82:22,
82:23, 84:22,
103:14, 114:21,
123:23, 134:4,
134:6, 135:22

Ramos 2:41
range 19:17
rather 19:17, 31:1,
38:6, 51:18,
106:13, 112:12
rating 92:7
Re 1:6
reach 9:8, 84:7
reached 12:22,
52:21, 55:19
reaching 9:5
read 19:25, 105:4,
106:4, 106:7,
107:13, 117:6
Reader 94:18, 98:19
reading 25:19
ready 65:12, 93:14
real 22:6, 30:11,
37:19, 52:10,
109:9, 114:11
realistic 32:15
realities 43:5
really 16:21, 18:1,
25:22, 28:22,
38:22, 47:12,
48:25, 51:4,
63:11, 71:11,
74:13, 81:2,
88:18, 96:2,
98:25, 119:8,
126:21, 132:2
Reason 18:9, 29:4,
38:16, 63:12,
64:21, 84:5, 90:3,
94:24, 103:2,
115:13, 118:20,
131:25, 132:7
reasonable 39:18,
47:17, 120:2,
120:4
reasonableness
52:24, 53:6, 54:3
reasoning 65:1,
79:22
reasons 30:12, 62:4,
63:7, 65:3, 78:22,
131:20, 132:15
recall 40:23, 86:22,
103:15
receipt 45:5, 45:8,

45:9
receipts 14:19, 45:4
receive 17:11, 85:14
received 92:3,
   92:12, 112:1,
   124:20, 125:25
receiving 105:3,
   111:22
recent 82:15
recertified 18:16
recess 85:22
recklessness 78:16
recognized 30:17
recognizing 42:18
recommence 8:8
recommendation 53:9,
   55:3, 55:22,
   57:17, 100:25
recommendations
   35:16, 36:23,
   40:5, 40:14, 44:8,
   48:24, 50:21,
   78:15
recommended 35:14,
   45:20
reconcilable 11:15
reconciled 11:18
reconciliation 11:23
reconvened. 85:23
record 5:19, 36:10,
   45:14, 61:21,
   82:9, 83:6, 86:16
recorded 3:49
recording 5:24
records 40:20, 97:7
Recovery 13:23,
   17:15, 51:8,
   51:11, 60:1,
   87:13, 102:5
reduced 17:1
Reed 28:2
reestablished 14:4
refer 5:22, 68:2
referred 11:14,
   12:3, 12:19
referring 36:20
refinancing 25:14
reflect 26:12, 27:5,
   43:19, 51:25,
   82:20

reflected 29:23,
   68:15
refund 11:17
refunded 135:12
refunds 11:8
refuses 119:6
regard 36:19, 40:17,
   43:5, 52:3, 79:13,
   82:1
regarding 24:16,
   33:10, 34:21,
   78:10, 78:14,
   81:1, 85:15, 89:21
regardless 52:8,
   97:24
Region 2:11
regular 103:16
regulated 76:15
regulations 70:13,
   70:20, 76:14
regulatory 101:25
rehash 79:19
reimbursed 51:9
reiterate 40:10,
   73:10, 121:24
relate 43:11, 100:4
related 11:9, 11:10,
   102:23
relates 108:8
relating 109:20
relationship 93:21,
   100:14
release 99:18,
   99:22, 100:4
released 128:16
releases 25:16,
   25:17
relevant 68:23,
   90:21
Relief 8:22, 9:7,
   18:3, 59:19, 60:7,
   74:10, 77:10,
   77:13, 79:16,
   92:18, 92:19,
   93:4, 98:14, 116:8
relieving 58:25
remain 8:17, 25:24,
   31:18, 32:17,
   134:22
remainder 129:25

remaining 18:11
remains 25:1, 29:21,
   129:2
remarks 5:13, 81:15
Remember 23:15, 24:3
remind 5:14
reminiscent 25:14
Removal 59:10, 59:16
removed 60:9
rendered 47:17
renew 101:4
renewed 85:20, 86:9,
   87:24
reoccur 50:23
reorganization 24:6
repayments 14:12
repeat 33:3, 86:15
repeatedly 7:20,
   101:13
replacement 15:4
Reply 9:13, 9:15,
   10:9, 45:15, 68:4,
   68:7, 68:10,
   68:14, 81:16,
   86:11, 87:21,
   101:14, 114:22,
   123:24
reported 7:23
Reporter 138:16
reporting 36:24,
   49:25, 53:10,
   56:15
reports 5:13, 6:20,
   40:5, 92:7, 119:15
repository 5:18,
   107:3, 107:4,
   107:18, 107:21,
   119:20, 119:22
represent 64:11,
   64:12, 68:9,
   68:16, 70:5,
   74:24, 75:13,
   76:8, 112:14,
   119:11, 124:7
representation 62:1,
   62:6, 62:7, 63:10,
   65:21, 67:5,
   71:16, 72:2,
   73:13, 77:14,
   77:17, 78:13,

81:4, 82:10, 84:8,
84:9, 102:13,
122:18, 134:21
representations
88:25, 99:2,
108:22
representative 1:13,
63:15, 68:6, 69:6,
69:12, 70:10,
70:16, 80:9,
100:23
representatives
7:20, 64:21
represented 75:11,
77:18, 77:19,
77:24, 78:3, 84:3,
84:5, 122:15
representing 64:8,
65:10, 68:5,
69:23, 69:24,
72:11, 72:13,
75:16, 123:1
represents 66:20
request 30:23,
33:25, 81:6,
90:25, 100:11,
106:20, 107:5,
107:25, 113:5,
120:3, 121:18
requested 9:7, 74:15
requests 6:6, 97:1,
108:24, 132:8
require 48:12,
117:15, 132:1
required 36:7,
56:14, 81:5
requirement 37:22,
43:23, 134:11,
135:23
requirements 19:12,
36:1, 37:16,
50:11, 55:23
requires 81:5,
132:15
requiring 44:17,
82:11
res 33:16
research 44:12,
44:15, 44:19,
45:1, 46:5, 47:2

reserved 86:10
resignation 66:24
resolution 9:3,
12:7, 12:13, 20:3,
21:7, 21:19, 29:9,
32:14, 32:18,
32:24, 33:12,
34:6, 34:21,
68:14, 77:20
resolve 21:13, 27:4,
27:9, 86:1, 90:11,
104:23, 124:22
resolved 17:5,
22:14, 33:7, 90:9,
90:10, 118:16,
120:23, 133:2,
134:5, 135:17
resolves 135:3
resolving 30:2, 33:8
resource 107:4
resources 36:7,
57:13, 59:24,
72:3, 72:8
respected 71:24
respective 7:8, 8:4,
77:23
respond 7:16, 68:13,
68:17
responding 125:17,
125:19
response 15:8, 22:2,
22:3, 49:1, 67:25,
72:9, 92:2, 97:11
responses 67:15,
67:17, 67:20
responsibilities
83:18
responsibility 54:6,
58:25, 73:14
responsive 93:2,
126:6
restored 13:25
restricted 120:2,
128:19
restriction 43:16,
105:23, 106:14
restrictions 43:4,
105:25, 108:17,
119:24, 120:14,
128:25, 129:1

restrictive 115:25
restructured 17:10
Restructuring 16:21,
16:23, 17:7,
17:14, 17:17,
18:13, 30:12,
60:3, 65:16, 71:22
result 47:19, 49:24,
50:2, 111:1
results 42:6,
108:23, 108:24
resume 85:20
retained 135:25
retention 50:5,
50:6, 50:7, 50:11,
56:13, 58:20,
134:1
Retired 61:22
retiree-related 82:8
retroactive 135:10
retrospective 47:21,
50:8
return 62:16
review 8:24, 47:14,
48:13, 50:20,
51:22, 52:2, 52:6,
53:9, 56:19, 57:4,
57:14, 57:22,
58:20, 67:9, 97:17
reviewed 42:5, 130:5
reviewing 42:2,
55:17, 113:2,
117:2, 125:25
revise 21:1
revised 21:23,
21:25, 26:11,
31:13, 59:4, 61:6
revision 52:9
revisited 13:1
revolver 14:15
revolving 14:13
rewarded 90:7
RFP 11:23
rights 22:16, 33:7
rigidly 42:22
ripen 49:2, 82:21
rise 27:14
risk 67:18
road 39:1, 69:9,
71:7

Robert 2:34, 61:21
robust 62:18, 70:4
Rolando 76:7
role 19:11, 40:11,
    65:13, 67:24,
    70:15, 81:22
Roman 59:9, 136:13
room 39:24, 108:3,
    115:23, 119:20,
    120:6, 127:1,
    127:19
rope 96:2
Rose 6:24, 100:22
ROSEN 2:7, 6:23,
    6:24, 10:17,
    12:18, 13:13,
    16:11, 27:13,
    27:24, 73:20,
    73:21, 73:22,
    74:14, 74:20,
    75:14, 131:2
roughly 62:11
round 50:3, 56:14
roundabout 136:1
RSA 12:22, 16:12,
    16:14, 17:25,
    18:5, 18:12,
    18:16, 18:24,
    19:1, 29:1, 32:24,
    34:6
Rule 28:17, 96:21,
    118:11
ruled 28:14, 28:16
rules 48:11, 76:14,
    76:16

< S >
S/ 138:14
safe 57:21, 137:8
safety 73:4
salutary 52:11
San 5:1, 5:8, 136:25
sanctions 6:5
Santander 3:9, 89:5,
    89:10, 91:7,
    91:17, 92:4,
    92:20, 97:16,
    102:22, 103:7,
    104:22, 106:7,

121:5, 123:1,
    123:4, 123:6,
    126:3
sat 108:5
satisfied 19:12,
    97:16, 113:9,
    134:20
save 32:5
savings 37:19, 38:9
saw 29:22, 49:25
saying 22:6, 25:23,
    33:4, 38:12, 55:8,
    60:11, 63:17,
    73:10, 83:21,
    84:11, 93:18,
    94:3, 95:14,
    95:18, 96:25,
    98:20, 111:9,
    113:15, 116:2,
    124:17, 124:20,
    124:21, 125:2,
    128:4, 135:24,
    136:1
says 75:15, 87:24,
    92:14, 110:19,
    124:7, 127:19
scale 107:10, 107:14
schedule 19:18,
    19:25, 20:2, 21:1,
    21:3, 27:6, 27:9,
    29:10, 32:2,
    38:24, 99:4, 99:5,
    99:11, 99:15,
    100:8, 122:8
scheduled 34:23,
    48:20, 136:18
scheduling 20:7,
    33:20
scheme 25:20, 87:2,
    90:17
scope 73:25, 74:15,
    108:15, 125:17
screen 26:7
search 89:17, 89:18,
    91:3, 97:21, 98:5,
    98:9, 103:11,
    103:21, 104:12,
    120:19, 120:20,
    123:23, 123:25,
    125:24, 126:3,

126:4, 126:7,
    126:11, 128:14,
    130:9, 130:21
searched 88:22, 97:8
searches 128:2
season 15:9, 15:13,
    15:18
seasoned 65:15
seated 85:24, 131:10
second 18:3, 20:13,
    34:17, 34:24,
    46:22, 47:4,
    50:22, 51:6,
    63:12, 102:16
secondly 107:14,
    109:15
seconds 24:2, 75:5
secret 104:15
Section 54:8, 77:9,
    77:10, 77:11,
    77:12, 77:16
secure 14:6, 111:19
seeing 42:6, 103:15,
    125:11
seek 60:7, 110:23,
    118:24, 125:20
seeking 15:3, 51:9,
    53:20, 61:24,
    77:10, 92:18,
    106:1, 106:12,
    131:23, 133:10
seeks 74:1, 74:4
seem 28:10, 79:12
seemed 63:13, 63:17,
    64:20, 133:25,
    135:19
seems 30:10, 34:6,
    52:11, 54:2, 56:2,
    82:6, 88:24, 99:1,
    120:2, 120:4,
    120:17
seen 68:11, 90:20,
    129:2
segregated 103:1,
    120:5
segregation 31:25
segue 106:2
selecting 66:2
selection 12:1, 66:1
semiproponent 76:2

sending 96:13
senior 24:16
sense 13:10, 53:5,
   55:12, 56:20,
   60:4, 60:12, 63:8,
   73:14, 75:10,
   86:2, 121:10,
   121:20, 122:7,
   124:13, 129:20,
   130:24
sensitive 62:22,
   117:18
sensitivity 108:7
separate 31:1, 44:3,
   44:6, 48:6, 58:14,
   74:7, 75:18,
   75:24, 76:14,
   127:6
Separately 17:16
September 20:9,
   33:15, 34:5,
   94:24, 96:5,
   96:11, 98:23,
   101:5
series 55:14
serious 30:23,
   79:23, 82:8, 87:5
serve 65:13, 67:24,
   70:15, 124:19
served 7:11, 106:14
service 14:3, 51:20
services 5:12,
   44:15, 47:6,
   47:17, 51:21,
   52:25, 53:7, 54:4,
   65:15
servicing 14:20
serving 64:17,
   106:13
sessions 7:14,
   23:14, 23:16
set 10:20, 18:6,
   18:23, 18:25,
   19:18, 19:20,
   24:2, 38:24, 39:1,
   39:13, 70:13,
   132:10
setting 9:14
settled 17:17
settlement 6:9,

6:13, 6:14, 9:9,
   17:5, 18:19, 24:5,
   27:19, 95:22
several 8:17, 8:19,
   11:6, 11:25, 25:8
Shaking 131:6
share 11:13, 79:22,
   80:12, 92:14,
   105:6, 106:15,
   106:20, 111:19,
   112:2, 121:18
shared 89:24,
   105:11, 108:25,
   126:11, 129:15
sharing 91:16,
   92:13, 106:17,
   108:13, 108:14,
   111:17, 120:19
shifting 99:2
short 14:23, 44:1,
   125:14
showed 23:19
showing 45:1, 81:20,
   95:14
shows 87:11
shut 23:21
side 14:8, 24:4,
   41:16, 43:9, 76:2,
   130:6, 131:6
side. 131:6
sidelines 93:24
Sidley 123:1
Siemens 1:22, 2:44,
   13:11, 20:14,
   21:15, 22:3,
   27:25, 28:3, 29:1,
   32:18, 33:4
sign 25:9, 55:25,
   118:7
signal 96:13
signals 5:23
signed 55:6, 70:1,
   112:12
significant 6:11,
   6:19, 13:23,
   48:22, 56:11
significantly 56:8,
   62:21, 62:24
silent 25:24
silly 44:22

similar 20:22, 21:7,
   38:5, 43:24,
   54:16, 55:19,
   87:15
similarly 21:16,
   37:10
simplify 102:18
simply 40:20, 47:23,
   53:2, 54:5, 56:17,
   65:8, 116:6
sincere 10:10
single 38:8, 43:2,
   89:25
sit 99:10, 107:25,
   108:5
sitting 13:4, 55:5,
   87:2, 111:25
situated 21:16
situation 11:16,
   11:18, 15:17,
   50:12, 71:20,
   82:17, 132:13
situations 42:20
six 7:3, 47:2
size 56:11
slot 57:23
small 56:18, 57:22
smaller 57:10
Smith 28:2
smoke 118:4
sole 66:3
Soler 2:42
solicitation 18:22,
   19:2, 19:3, 19:15
somebody 84:8, 88:1,
   113:17, 126:16
somehow 83:25,
   84:11, 114:23
someone 57:1, 64:2,
   65:9, 70:7, 83:25,
   84:14, 122:23
sometimes 47:16
somewhat 70:13,
   83:23
soon 118:24, 132:13
sooner 112:12
soothe 38:11
Sorry 13:9, 19:8,
   38:1, 66:14, 75:4,
   81:12, 98:10

sort 19:17, 28:6,
    37:2, 50:23, 52:9,
    52:21, 54:23,
    55:3, 56:9, 57:21,
    57:23, 65:14,
    66:16, 72:11,
    117:18, 122:11,
    130:25, 136:3
sorts 41:14, 59:3,
    82:21
sought 25:16,
    106:10, 135:15
sounds 28:4, 30:13,
    39:18, 120:9
source 5:18, 76:15,
    89:5
SOVEN 2:47, 28:2,
    30:7, 31:7, 31:19,
    32:7, 32:10
Spanish 68:1
speaking 6:21,
    38:16, 51:3,
    59:15, 69:14
specific 9:13, 11:7,
    33:5, 33:9, 35:25,
    36:9, 38:18,
    43:21, 45:13,
    46:17, 47:1, 50:8,
    54:10, 56:12,
    82:13
Specifically 8:20,
    28:22, 64:16,
    101:10, 101:20,
    115:3, 137:1
specificity 57:20
specifics 13:5,
    13:15, 41:13,
    46:3, 53:11
specified 44:19,
    136:15
speculative 115:2
speech 74:13
spell 108:1, 127:2
spend 24:2
spent 10:12, 52:25,
    54:24
spoke 31:11, 55:18
spoken 133:6
spots 10:23
Springer 2:46

squarely 134:7
SREAEE 68:2
staff 57:14, 137:2
staffing 37:20
stage 10:14, 24:2,
    63:5, 130:7, 135:8
stakeholders 76:17
stalling 109:7
stand 71:9, 96:6
Standard 92:6
standards 42:15,
    42:18, 42:24,
    43:4, 52:22,
    53:19, 53:20,
    53:21
standing 26:25,
    28:19, 71:12
standpoint 72:2
stands 28:18
standstill 32:22
Stargatt 116:16
start 6:20, 37:16,
    46:3, 50:9, 89:3,
    92:21, 93:5, 94:1,
    96:11, 98:21,
    111:9, 111:12
started 50:13, 94:23
starts 50:7, 94:4
state 23:11, 50:11,
    104:25, 125:5
stated 7:21, 42:15,
    63:3, 64:16, 74:4,
    75:14, 127:10
statement 75:1,
    78:4, 86:25, 87:21
statements 57:15
States 1:1, 1:40,
    65:23, 66:3, 69:2,
    69:5, 69:6, 76:22,
    79:2, 82:19, 83:2,
    83:13, 85:2, 85:7,
    101:20, 126:1,
    138:7, 138:8
status 5:13, 6:20,
    34:17, 114:5,
    116:6, 120:21,
    126:16, 126:20,
    128:15, 129:20
Statute 94:21
statutory 74:12,

    79:17, 84:18
Stay 8:22, 26:18,
    60:7
stenography 3:49
step 6:11, 8:3,
    40:12, 113:12
steps 113:10, 130:1
stipulation 24:3
stood 65:12
stop 88:12
stops 47:7
strategic 65:14
streamline 41:7
streams 59:25
strengthen 15:8
strengthening 5:11
strenuously 81:23
strictly 40:8
structural 53:24
structure 22:7,
    28:1, 39:12, 57:7,
    57:24, 59:2
structured 99:23
stuff 94:11, 117:18
subcommittee 119:15
Subject 6:4, 6:13,
    6:15, 7:22, 40:24,
    45:14, 93:20,
    95:16, 95:24,
    101:3, 103:1,
    103:4, 106:4,
    107:12, 111:23,
    128:21, 132:17,
    133:4, 134:22,
    135:2
submission 35:10,
    39:13, 39:16,
    43:20, 43:25,
    63:16
submissions 54:22
submit 19:1, 35:3,
    38:6, 38:7, 44:5,
    58:12, 59:4,
    79:11, 134:21
submitted 11:24,
    16:12, 29:16,
    35:15, 53:24,
    58:21
submitting 35:6,
    135:1

subordinated 77:3,
    87:17
Subpoena 106:13,
    106:14, 110:2,
    124:19
subrooms 120:5
subscribe 73:6
subsequently 10:22,
    12:23, 37:3
substantial 44:14
substantially 19:1,
    39:13, 43:24,
    130:13
substantive 20:3,
    109:5
subsume 22:17
success 31:9
successful 23:21
suddenly 71:14
sufficient 15:2,
    55:9, 70:8, 81:20
sufficiently 30:25
suggest 20:7, 57:7,
    60:21, 84:21,
    115:5, 121:8
suggested 37:9, 87:3
suggestion 38:10,
    60:17, 69:25,
    85:4, 121:10
suggestions 37:10,
    48:5
summer 29:20, 31:4
supplemental 44:1,
    54:22
support 9:7, 16:14,
    26:23, 27:3, 27:7,
    59:15, 75:17,
    75:24, 78:5,
    111:10, 112:10,
    137:4, 137:6
supports 73:24
supposed 118:1,
    119:2
Sur-reply 68:12,
    68:17, 70:13
suspicion 78:14
Suzzanne 2:29, 16:8,
    99:10
Swain 1:38, 131:9,
    138:7

symbiotic 93:21
Systema 75:2
systems 72:13,
    76:11, 78:8, 132:9


< T >
table 41:14, 83:14,
    95:14, 134:20
tabulation 19:16
tail 112:21
taken. 85:22
talked 22:4, 90:15
talks 34:20
targeted 130:15
targeting 107:17,
    107:18
targets 93:22, 95:6,
    114:25
tax 11:8, 11:17,
    133:3, 133:4,
    133:12, 133:15,
    133:16, 133:18,
    134:3, 134:9,
    134:22
taxpayers 132:23
Taylor 1:38, 116:16,
    138:7
teachers 76:12
team 6:17, 10:11,
    126:1
teams 78:17
technically 52:3,
    106:3
techniques 26:14
telephonic 5:7
tells 109:22
template 57:22
ten 11:24, 63:2
tends 47:11
tens 123:5
tenure 87:6
term 14:24, 15:3,
    27:8, 30:14, 98:6,
    120:9, 123:24
terminate 70:22,
    71:13
terminated 71:6
terminates 14:13
terms 13:2, 20:11,

28:6, 31:10,
    31:14, 50:14,
    56:8, 89:17,
    89:18, 91:4,
    97:21, 98:9,
    103:11, 103:21,
    104:12, 108:11,
    120:2, 120:19,
    120:20, 121:13,
    123:25, 124:4,
    124:6, 125:24,
    126:3, 126:4,
    126:5, 126:7,
    126:11, 128:14
texting 6:3
thanks 6:18
themselves 6:17,
    72:25, 132:16
there'll 98:16
they'll 89:22,
    123:13
they've 28:12, 46:6,
    92:2, 92:3, 94:8,
    97:12, 128:5,
    134:24
thinking 20:17,
    36:3, 39:21,
    46:16, 57:5
thinks 37:18, 38:9
third 59:16, 103:3,
    106:11, 106:19,
    108:9, 109:21,
    118:18, 118:21,
    120:11, 125:6,
    125:18, 125:21,
    126:21, 128:15
third-party 14:25
though 30:13, 32:14,
    63:24, 68:17,
    70:12, 82:9,
    96:25, 98:23,
    107:25, 115:21,
    121:2, 130:4,
    130:6
thoughts 20:12,
    21:20
thousands 89:11,
    89:23, 123:5
three 11:7, 11:14,
    19:13, 29:11,

50:4, 67:14, 91:8,
    102:19, 106:3,
    106:6
three. 91:9, 93:8,
    106:2
threshold 26:24,
    45:4, 45:6
thresholds 56:13
throughout 10:24,
    88:15, 101:13
throw 55:13, 69:25,
    117:25
thrust 65:8, 65:19
tied 40:24
timekeeping 54:21
timely 38:23, 39:16
timetable 21:1,
    21:23, 22:1, 60:25
timing 25:23, 26:12,
    27:6, 31:14, 132:3
Timothy 2:5, 100:21,
    119:12
together 11:21,
    20:11, 38:6,
    102:24, 122:2
toggle 62:22
tomorrow 113:16,
    122:20
took 75:10, 131:9
tools 55:20
top 15:17, 104:15
topic 53:18
topics 90:24
Torres 134:18
total 11:3, 11:5
toward 18:22, 20:3,
    106:5
towards 27:19
track 30:13, 31:1,
    31:23
traffic 44:24
transaction 45:7
transactions 99:23
Transcript 3:49,
    138:4
transcription 138:5
transformation 60:2
translates 60:17
transmission 5:24,
    14:2, 16:1

transparency 94:20,
    112:9, 132:21,
    132:24
transparent 112:10
transpired 75:24
Transportation 1:22,
    1:30, 2:45
Traurig 13:20, 59:13
traveling 137:9
travels 137:8
Treasury 131:23,
    132:8, 132:22
tree 48:14
trees 48:14, 48:15
trial 48:25
tribunal 12:14
tried 79:11, 90:8,
    118:5
tries 68:20
triggered 19:19
troubling 124:11
true 48:12, 51:13,
    56:6, 91:22, 138:5
trued 39:17
Trust 17:19, 76:25
Trustees 76:14,
    76:19, 76:22,
    77:18, 77:20,
    77:24, 78:13
try 9:8, 21:22,
    24:21, 43:10,
    99:11, 102:18,
    104:19, 111:19,
    112:7
trying 31:1, 38:19,
    39:20, 68:18,
    70:17, 81:25,
    116:3, 129:13
turn 31:5, 32:15
turned 5:20, 5:23,
    110:7, 110:20,
    110:21, 117:7,
    117:10
turning 115:6
turns 44:23
tutorial 23:14,
    23:15
tweaks 136:2
twice 88:22, 92:25
type 12:11, 53:2,

94:17
types 20:23, 43:18,
    49:10, 57:2
typically 132:11,
    132:14


< U >
UCC 101:10, 101:13,
    101:18, 103:1,
    103:7, 103:17,
    103:18, 106:4,
    107:12, 111:13,
    112:2, 113:25,
    114:22, 118:9,
    123:8, 123:14,
    133:1, 133:19
ultimate 63:11
ultimately 48:4,
    48:5, 54:1, 73:2
umbrella 76:11
uncomfortable 83:24
uncontested 59:17,
    131:18
underfunded 62:13
underfunding 62:14,
    62:21
underlying 109:5
underpromise 24:24
underrepresented
    77:5
underscore 68:25
understanding 9:6,
    33:2, 39:6, 44:12,
    63:21, 83:9,
    83:12, 103:17,
    110:5, 127:4,
    128:18, 128:24
Understood 31:7,
    59:4, 80:15,
    114:9, 117:10
undertake 79:17
undertaken 8:5,
    42:7, 137:5
undertaking 23:24,
    33:5, 33:9, 33:11
underwriters 92:10
unfold 75:9
Unfortunately 98:8
unhindered 110:11

unilaterally 76:23
union 23:11
unions 16:18
unique 38:7, 42:19,
   65:14, 76:9
United 1:1, 1:40,
   65:23, 66:3, 69:2,
   69:5, 69:6, 79:2,
   82:19, 83:2,
   83:13, 85:2, 85:7,
   138:6, 138:8
Unless 5:21, 14:15,
   22:22, 40:12,
   75:18, 136:15
unnecessary 78:7,
   78:19
unprecedented 36:8
unredacted 35:6
unresolved 39:8
Unsecured 2:17,
   19:14, 64:15,
   64:16, 64:18,
   67:17
Until 27:20, 33:6,
   33:10, 34:5,
   39:16, 80:6, 89:3,
   91:10, 94:23,
   104:16, 118:11,
   120:22
update 13:22, 15:5,
   60:18
UPR 7:4
urgent 9:7, 9:12,
   29:25, 30:1
using 5:21, 88:16,
   126:23
utilities 51:8


< V >
vacancy 66:23
value 57:4, 62:23,
   102:5
variation 132:14
various 55:1, 56:22,
   59:25, 63:4,
   63:25, 117:20,
   123:24
verify 40:21
verifying 53:5

version 94:18,
   135:18
versus 20:15, 20:20,
   28:1, 33:7, 51:4
vet 37:11
vibration 5:23
vice 121:3
view 21:12, 22:17,
   27:5, 40:11,
   47:15, 63:23,
   64:4, 64:10,
   81:21, 81:22,
   87:13, 87:14,
   107:10, 109:12,
   121:11
viewed 54:9
viewpoint 73:8
views 73:6
vigilance 84:11,
   84:19
vigilant 83:25
Vila 87:22
violated 100:2
violating 35:5
violation 35:9,
   39:13
virtue 17:1
visibility 91:3
voice 84:6
voluminous 42:2
voluntarily 108:10,
   110:15, 129:2
voluntary 106:11,
   107:17, 108:11,
   110:16
vote 69:20, 73:5
voted 72:24, 72:25,
   73:1
votes 19:10
voting 76:15


< W >
wait 86:19, 92:17,
   93:6, 94:23,
   118:11, 120:22
waiting 27:20, 30:5
Walker 138:14,
   138:15
wanted 10:4, 10:6,

18:3, 22:24,
   23:23, 24:18,
   33:24, 34:7, 35:1,
   48:1, 64:22,
   83:11, 86:15,
   102:11, 116:20,
   117:4, 123:3,
   127:21
wants 9:16, 26:15,
   29:13, 30:3,
   38:13, 125:20
warrant 36:14
waste 96:12
ways 55:1, 58:8,
   98:12
weather 15:11
website 64:7
Wednesday 9:15
week 11:1, 20:9,
   28:4, 29:8, 32:10,
   32:13, 34:20,
   34:23, 48:20,
   122:5, 126:15,
   129:20
weekend 125:25
weekly 14:21
weeks 14:21, 15:1,
   29:11, 118:5,
   122:8, 129:23
weigh 116:1
weighing 72:5
Welcome 5:5, 81:13
West 47:6
whatever 20:8,
   39:15, 45:1,
   46:12, 113:5,
   113:10, 115:24,
   124:16, 134:22
whereby 105:9
wherever 32:18
whole 88:16, 90:18,
   99:14, 128:1
wholeheartedly 137:2
whom 77:22, 84:25,
   106:1, 106:12
whomever 81:25
William 2:31
Williamson 2:13,
   34:14, 36:17,
   37:23, 45:25,

46:1, 46:2, 46:25,
  49:5
willing 65:12,
  79:21, 85:14,
  105:13, 113:24,
  114:18, 128:6
willingness 47:15,
  58:7, 126:4
Willkie 10:7
wisdom 54:15
wise 25:23
wish 27:25, 30:6,
  73:19, 77:19,
  77:24, 137:8
withdraw 133:20
withdrawing 128:21
withheld 134:25,
  135:11
withhold 133:12
withholding 133:3,
  133:4, 133:13,
  133:18, 134:3,
  134:22
within 15:4, 21:10,
  30:16, 30:25,
  31:25, 82:8,
  100:3, 105:25,
  126:15
without 31:23,
  38:20, 43:5,
  47:23, 52:3,
  53:24, 71:15,
  78:4, 82:25, 83:4,
  83:22, 89:18,
  93:16, 101:3,
  110:3, 118:7
withstanding 7:19,
  40:3, 40:4
witness 94:9
WITNESSES 4:3, 88:8,
  125:11, 126:5
woefully 62:13
wonder 15:11
word 32:16, 83:24,
  123:18, 123:21
words 17:21, 35:4,
  35:19, 47:21,
  55:25, 66:6, 67:18
worked 23:18, 23:20,
  57:7, 104:7,

104:9, 104:10,
  105:8, 120:9
working 12:7, 48:21,
  50:16, 51:9,
  51:13, 56:17,
  72:5, 105:1,
  111:18, 115:17
works 99:11
world 88:18, 91:15,
  98:18, 130:19
worlds 93:7
worries 86:15
worry 42:13, 93:9
worse 39:8, 89:25
wrap 124:14
wrapping 105:18
writing 79:11, 87:14
written 44:6,
  125:18, 125:19

< Y >
year 15:21, 62:23,
  96:4, 96:14,
  96:15, 96:16,
  116:24
years 95:1, 96:19
yellow 25:5
yesterday 8:18, 9:2,
  25:19, 29:23,
  30:21, 35:15,
  42:11, 101:17,
  102:3, 119:17,
  136:4, 136:6
York 5:7, 7:14,
  10:5, 13:4, 16:7,
  26:16, 32:21,
  93:12, 93:13,
  121:7, 122:24,
  125:2, 136:16,
  137:3
Young 116:16

< Z >
zero 90:12, 90:20
Zolfo 134:17