# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGE-<br>MENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## AURELIUS'S INFORMATIVE MOTION REGARDING RECENT SUPREME COURT DECISIONS IN *ORTIZ v. UNITED STATES* AND *LUCIA v. SEC*

Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC ("Aurelius"), respectfully inform the Court as follows:

1. On June 21, 2018, the Supreme Court of the United States issued *Lucia v. SEC*, No. 17-130, 2018 WL 3057893 (U.S. June 21, 2018) (*Lucia* slip op.) (attached as Exhibit A), in which the Court held that a Securities and Exchange Commission (SEC) Administrative Law Judge (ALJ) is an inferior officer who must be appointed in conformity with the Appointments Clause. The next day, the Court issued *Ortiz v. United States*, No. 16-1423, 2018 WL 3073840 (U.S. June 22, 2018) (*Ortiz* slip op.) (attached as Exhibit B), in which it affirmed its appellate

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

jurisdiction to review decisions of the Court of Appeals for the Armed Forces (an Executive Branch military tribunal), and concluded that the Appointments Clause does not prevent a military judge from serving as an inferior officer on one court and a principal officer on another. These rulings directly impact several constitutional issues raised in the briefing over Aurelius's Objection and Motion to Dismiss the Title III Petition, Dkt. 913.

2. Aurelius's Objection and Motion to Dismiss is premised on the argument that the members of the Financial Oversight and Management Board for Puerto Rico (Board) "are Officers of the United States because they derive their authority from the federal government, are appointed by the federal government, are overseen by the federal government, and exercise significant executive authority under the laws of the United States."  Aurelius Obj. & Mot. to Dismiss at 11; *see also*, *e.g.*, Aurelius Reply to U.S. 12, Dkt. 2169 (arguing that the Board is a federal entity under the standard articulated in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 397–98 (1995), because the Board was "established and organized under federal law," it was "established 'for the very purpose of pursuing federal governmental objectives,'" Congress can "repeal, alter, or amend" the statute "at any time," and the Board's members are "appointed 'by the President'").  For this reason, Aurelius has argued, Congress violated the separation of powers and the Appointments Clause by allowing the Board members to be appointed without Senate confirmation and by usurping a substantial portion of the President's appointment power.

3. The Opposing Parties and the United States have defended the Board against this challenge chiefly by pointing to the Property Clause of the Constitution, which gives Congress the power to "make all needful Rules and Regulations respecting the Territory or other Property" of the United States.  U.S. Const., Art. IV, § 3, cl. 2.  For instance, the Board has contended that when Congress exercises its "plenary" power under the Property Clause, it is not "constrained by

constitutional separation-of-powers provisions" in general, and "[t]he Appointments Clause" in particular "does not govern Congress's exercise of its plenary municipal authority under Article IV to create territorial offices and designate the method of appointment."  Board Opp. at 8–9, Dkt. 1622; *see also* U.S. Br. 12, Dkt. 1929 ("[G]iven Congress's wide latitude in governing the territories, the Appointments Clause is inapplicable to the appointment of territorial officers like the Oversight Board members.").

4. *Ortiz v. United States* undermines this argument by equating the scope of Congress's power over the territories with its broad power over the military.  *Ortiz* held that the Supreme Court had appellate jurisdiction over cases arising from the Article I military Court of Appeals for the Armed Forces because that entity is a "court" for purposes of the Supreme Court's appellate jurisdiction.  *Ortiz* slip op. 5–19.  In coming to this conclusion, the *Ortiz* Court noted that "the Constitution grants Congress broad authority over the territories: to 'make all needful Rules and Regulations respecting' those areas."  *Id*. at 12–13 (quoting U.S. Const., Art. IV, § 3, cl. 2).  And the "court-martial system" at issue in *Ortiz* "stands on much the same footing" as the territories, where Congress has created a system of territorial courts, since it "rests on an expansive constitutional delegation," namely, the "legislative power '[t]o make Rules for the Government and Regulation of the land and naval Forces,'" which is "just like" Congress's territorial authority.  *Id.* at 10, 11, 14 (quoting U.S. Const., Art. I, § 8, cl. 14).  Thus, Congress possesses the same "plenary grant[ ] of power" over "the military" as it does over the "territories."  *Id.* at 14.

5. The *Ortiz* Court's confirmation that Congress's control over the territories is equivalent to its power over the military further demonstrates the error of the Opposing Parties' argument.  If the Opposing Parties were correct that plenary congressional authority was exempt from the Constitution's structural guarantees, including the Appointments Clause, then the *Ortiz*

Court's holding makes clear that this principle would necessarily also extend to the military.  But in fact it is absolutely clear that the Constitution's structural guarantees *do* constrain Congress despite its "plenary" power to structure the military.  In particular, there is no doubt that "the Appointments Clause applies to military officers," *Weiss v. United States*, 510 U.S. 163, 170 (1994), and the Supreme Court has repeatedly emphasized that "military trial and appellate judges are officers of the United States and must be appointed pursuant to the Appointments Clause," *Edmond v. United States*, 520 U.S. 651, 654 (1997); *see Ryder v. United States*, 515 U.S. 177 (1995).  Indeed, *Ortiz* itself involved an Appointments Clause challenge, which the Supreme Court resolved on the merits without any suggestion that the Appointments Clause applies any differently with respect to military judges than it does with respect to other federal officers. *Ortiz* slip op. 23–25.

6.  The *Ortiz* decision is thus irreconcilable with the Opposing Parties' view that Congress is free to legislate in connection with the territories without regard to the Appointments Clause.  As with congressional power over the military, Congress is also not immune from the Constitution's structural guarantees when it legislates pursuant to the Property Clause, which is "just like" the military clause.  *See Ortiz*, slip op. 14.  In fact, the *Ortiz* Court reached this conclusion even though the *amicus* in that case, in his motion to participate in oral argument (which the Court granted), brought these very proceedings to the Court's attention.  Mot. of Prof. Aditya Bamzai for Leave to Participate in Oral Argument as *Amicus Curiae* and for Divided Argument at 4–5, *Dalmazzi v. United States* et al., Nos. 16-967 et al. (U.S. Dec. 14, 2017).  The *amicus* cautioned the Court that "[i]f [it] accept[ed]" "the premise that Congress's authority to legislate for the court-martial system is coterminous with Congress's authority to legislate in the territories," then that "would have dramatic implications," because the United States is currently argu-

ing here that "Congress's authority over the territories is plenary and not subject to the complex distribution of powers that regulate the Federal Government." *Id.* (quoting U.S. Br. 4). And the *amicus* reiterated this concern at oral argument, warning that, if the Supreme Court were to hold that military courts are on the same footing as territorial courts, then that would lead to separation-of-powers difficulties, because "the government's position is that the appointments clause does not apply to the territories." Transcript of Oral Argument at 34, *Ortiz v. United States* (2018) (No. 16-1423). But the Supreme Court felt no concern about equating Congress's power over the military and the territories, thus suggesting that Congress is equally constrained by the separation of powers when it regulates either.

7.   *Lucia v. SEC*, meanwhile, is relevant to Aurelius's argument that the Board members exercise the "significant authority" (*Lucia* slip op. 6) that qualifies them as "officers of the United States" subject to the Appointments Clause. In *Lucia*, the Supreme Court held that, under a straightforward application of *Freytag v. Commissioner*, 501 U.S. 868 (1991), an SEC ALJ is an inferior officer who must be appointed in conformity with the Appointments Clause. *Lucia* slip op. 6. The SEC ALJs "have equivalent duties and powers as" the judges at issue in *Freytag*, and therefore are just as much "officers" as the *Freytag* judges. *Id.* at 9.

8.   This is the same argument that Aurelius has made with regard to the Board members. *See* Obj. & Mot. to Dismiss at 15. Like the SEC ALJs (and the judges at issue in *Freytag*), the Board "take[s] testimony," "receive[s] evidence," issues "subpoenas," and "administer[s] oaths" to "witnesses" at "hearings." *Compare Lucia* slip op. 9 *with* 48 U.S.C. § 2124(a), (f). Also just like the SEC ALJs, the Board exercises "significant discretion when carrying out" its "important functions," *Lucia* slip op. 8, as the Board undeniably is empowered to take numerous actions in its "sole discretion," *see, e.g.*, 48 U.S.C. §§ 2121(d)(1)(A)–(E); 2141(a); 2142(a); 2146(a).

9.  The *Lucia* Court also rejected the idea that ALJs are not officers simply because they do not have the authority to punish contempt.  *Lucia* slip op. 10.  Instead, the Court held that the power to exclude the wrongdoer from the proceedings was a powerful enough disincentive; the ALJs did not need an "especially muscular means of enforcement" such as "the power to toss malefactors in jail."  *Id*.  Here, the Board's power to implement its authority and to enforce a federal statute in federal court, *see* 48 U.S.C. § 2124(f)(2), (k), and its exclusive power to initiate Title III proceedings, *id.* § 2164(a), and act as the sole representative of, and decision-maker for, the Title III debtor, *id*. § 2175(b), are more than sufficient to satisfy this test—as demonstrated by Board Member José Carrión's recent statement urging "the governor to reconsider his" opposition to the Fiscal Plan and stating that the Board is "ready to go to court," warning that he "[did not] want anyone to be imprisoned," and that "[w]hat [the Board] would be doing is enforcing a federal law."  *See* Caribbean Business News Service, *Puerto Rico Fiscal Board Member: Too Much Pain with Too Little Promise* (Apr. 19, 2018), *available at* http://caribbeanbusiness.com/puerto-rico-fiscal-board-member-more-pain-will-come.

10.  Finally, the *Lucia* decision supports Aurelius's arguments regarding the appropriate remedy for a violation of the Appointments Clause.  Some parties have posited that the proper remedy for the Board's structural infirmities is to accord the Board's past actions *de facto* validity.  Board Opp. 33–34; *see* AAFAF Opp., Dkt. 1640, at 32 (arguing that this Court should "declare the Board's actions to date de facto valid, deny Aurelius's motion to dismiss, and issue a stay to permit statutory revision or the Board's reconstitution"); Unsecured Creditors' Comm. Opp., Dkt. 1631, at 27 ("[T]he Oversight Board's actions (including the title III cases) should be accorded *de facto* validity and the Court should permit this proceeding to continue unimpeded.").  But the *Lucia* decision confirms that an Appointments Clause violation demands a meaningful

remedy. As Aurelius has argued, *see* Obj. & Mot. to Dismiss at 34–35, a party that raises a timely Appointments Clause challenge is entitled to an appropriate remedy because "Appointments Clause remedies are designed not only to advance [the structural purposes of the Appointments Clause] directly, but also to create '[i]ncentive[s] to raise Appointments Clause challenges,'" *Lucia* slip op. 12 & n.5 (quoting *Ryder*, 515 U.S. at 183)).

11. For these reasons and all of those offered in its briefs, Aurelius respectfully submits that its Objection and Motion to Dismiss should be granted.

Dated: July 6, 2018                     Respectfully submitted,

 */s/ Luis A. Oliver-Fraticelli*          */s/ Theodore B. Olson*

Luis A. Oliver-Fraticelli                 Theodore B. Olson (admitted *pro hac vice*)
Katarina Stipec-Rubio                     Matthew D. McGill (admitted *pro hac vice*)
USDC-PR Bar Nos. 209204, 206611           Helgi C. Walker (admitted *pro hac vice*)
ADSUAR MUÑIZ GOYCO SEDA &                  Lucas C. Townsend (admitted *pro hac vice*)
    PÉREZ-OCHOA PSC                        Lochlan F. Shelfer (admitted *pro hac vice*)
208 Ponce de Leon Ave., Suite 1600        Jeremy M. Christiansen (admitted *pro hac vice*)
San Juan, P.R. 00918                      GIBSON, DUNN & CRUTCHER LLP
Phone: (787) 756-9000                     1050 Connecticut Avenue, N.W.
Fax: (787) 756-9010                       Washington, D.C. 20036
Email: loliver@amgprlaw.com               Phone: (202) 955-8500
kstipec@amgprlaw.com                      Fax: (202) 467-0539
                                          Email: tolson@gibsondunn.com
                                          mmcgill@gibsondunn.com
                                          hwalker@gibsondunn.com
                                          ltownsend@gibsondunn.com
                                          lshelfer@gibsondunn.com
                                          jchristiansen@gibsondunn.com

# EXHIBIT A

(Slip Opinion)  OCTOBER TERM, 2017  1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LUCIA ET AL. *v.* SECURITIES AND EXCHANGE COMMISSION

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 17–130.  Argued April 23, 2018—Decided June 21, 2018

The Securities and Exchange Commission (SEC or Commission) has statutory authority to enforce the nation's securities laws.  One way it can do so is by instituting an administrative proceeding against an alleged wrongdoer.  Typically, the Commission delegates the task of presiding over such a proceeding to an administrative law judge (ALJ).  The SEC currently has five ALJs.  Other staff members, rather than the Commission proper, selected them all.  An ALJ assigned to hear an SEC enforcement action has the "authority to do all things necessary and appropriate" to ensure a "fair and orderly" adversarial proceeding.  17 CFR §§201.111, 200.14(a).  After a hearing ends, the ALJ issues an initial decision.  The Commission can review that decision, but if it opts against review, it issues an order that the initial decision has become final.  See §201.360(d).  The initial decision is then "deemed the action of the Commission."  15 U. S. C. §78d–1(c).

  The SEC charged petitioner Raymond Lucia with violating certain securities laws and assigned ALJ Cameron Elliot to adjudicate the case.  Following a hearing, Judge Elliot issued an initial decision concluding that Lucia had violated the law and imposing sanctions.  On appeal to the SEC, Lucia argued that the administrative proceeding was invalid because Judge Elliot had not been constitutionally appointed.  According to Lucia, SEC ALJs are "Officers of the United States" and thus subject to the Appointments Clause.  Under that Clause, only the President, "Courts of Law," or "Heads of Departments" can appoint such "Officers."  But none of those actors had made Judge Elliot an ALJ.  The SEC and the Court of Appeals for the D. C. Circuit rejected Lucia's argument, holding that SEC ALJs are

Syllabus

not "Officers of the United States," but are instead mere employees—officials with lesser responsibilities who are not subject to the Appointments Clause.

*Held*: The Commission's ALJs are "Officers of the United States," subject to the Appointments Clause. Pp. 5–13.

(a) This Court's decisions in *United States* v. *Germaine,* 99 U. S. 508, and *Buckley* v. *Valeo,* 424 U. S. 1, set out the basic framework for distinguishing between officers and employees. To qualify as an officer, rather than an employee, an individual must occupy a "continuing" position established by law, *Germaine,* 99 U. S., at 511, and must "exercis[e] significant authority pursuant to the laws of the United States," *Buckley,* 424 U. S., at 126.

In *Freytag* v. *Commissioner,* 501 U. S. 868, the Court applied this framework to "special trial judges" (STJs) of the United States Tax Court. STJs could issue the final decision of the Tax Court in "comparatively narrow and minor matters." *Id.,* at 873. In more major matters, they could preside over the hearing but could not issue a final decision. Instead, they were to "prepare proposed findings and an opinion" for a regular Tax Court judge to consider. *Ibid.* The proceeding challenged in *Freytag* was a major one. The losing parties argued on appeal that the STJ who presided over their hearing was not constitutionally appointed.

This Court held that STJs are officers. Citing *Germaine,* the *Freytag* Court first found that STJs hold a continuing office established by law. See 501 U. S., at 881. The Court then considered, as *Buckley* demands, the "significance" of the "authority" STJs wield. 501 U. S., at 881. The Government had argued that STJs are employees in all cases in which they could not enter a final decision. But the Court thought that the Government's focus on finality "ignore[d] the significance of the duties and discretion that [STJs] possess." *Ibid.* Describing the responsibilities involved in presiding over adversarial hearings, the Court said: STJs "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Id.,* at 881–882. And the Court observed that "[i]n the course of carrying out these important functions," STJs "exercise significant discretion." *Id.,* at 882.

*Freytag*'s analysis decides this case. The Commission's ALJs, like the Tax Court's STJs, hold a continuing office established by law. SEC ALJs "receive[ ] a career appointment," 5 CFR §930.204(a), to a position created by statute, see 5 U. S. C. §§556–557, 5372, 3105. And they exercise the same "significant discretion" when carrying out the same "important functions" as STJs do. *Freytag,* 501 U. S., at 882. Both sets of officials have all the authority needed to ensure fair and orderly adversarial hearings—indeed, nearly all the tools of fed-

Cite as: 585 U. S. ____ (2018)          3

Syllabus

eral trial judges. The Commission's ALJs, like the Tax Court's STJs, "take testimony," "conduct trials," "rule on the admissibility of evidence," and "have the power to enforce compliance with discovery orders." *Id.,* at 881–882. So point for point from *Freytag*'s list, SEC ALJs have equivalent duties and powers as STJs in conducting adversarial inquiries.

Moreover, at the close of those proceedings, SEC ALJs issue decisions much like that in *Freytag*. STJs prepare proposed findings and an opinion adjudicating charges and assessing tax liabilities. Similarly, the Commission's ALJs issue initial decisions containing factual findings, legal conclusions, and appropriate remedies. And what happens next reveals that the ALJ can play the more autonomous role. In a major Tax Court case, a regular Tax Court judge must always review an STJ's opinion, and that opinion comes to nothing unless the regular judge adopts it. By contrast, the SEC can decide against reviewing an ALJ's decision, and when it does so the ALJ's decision itself "becomes final" and is "deemed the action of the Commission." 17 CFR §201.360(d)(2); 15 U. S. C. §78d–1(c). Pp. 5–11.

(b) Judge Elliot heard and decided Lucia's case without a constitutional appointment. "[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case" is entitled to relief. *Ryder* v. *United States,* 515 U. S. 177, 182. Lucia made just such a timely challenge. And the "appropriate" remedy for an adjudication tainted with an appointments violation is a new "hearing before a properly appointed" official. *Id.,* at 183, 188. In this case, that official cannot be Judge Elliot, even if he has by now received a constitutional appointment. Having already both heard Lucia's case and issued an initial decision on the merits, he cannot be expected to consider the matter as though he had not adjudicated it before. To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing. Pp. 12–13.

868 F. 3d 1021, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, ALITO, and GORSUCH, JJ., joined. THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined. BREYER, J., filed an opinion concurring in the judgment in part and dissenting in part, in which GINSBURG and SOTOMAYOR, JJ., joined as to Part III. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, J., joined.

Cite as:  585 U. S. ____ (2018)                    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–130

_____

### RAYMOND J. LUCIA, ET AL., PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 21, 2018]

JUSTICE KAGAN delivered the opinion of the Court.

The Appointments Clause of the Constitution lays out
the permissible methods of appointing "Officers of the
United States," a class of government officials distinct
from mere employees.  Art. II, §2, cl. 2.  This case requires
us to decide whether administrative law judges (ALJs) of
the Securities and Exchange Commission (SEC or Com-
mission) qualify as such "Officers."  In keeping with *Frey-
tag* v. *Commissioner*, 501 U. S. 868 (1991), we hold that
they do.

I

The SEC has statutory authority to enforce the nation's
securities laws.  One way it can do so is by instituting an
administrative proceeding against an alleged wrongdoer.
By law, the Commission may itself preside over such a
proceeding.  See 17 CFR §201.110 (2017).  But the Com-
mission also may, and typically does, delegate that task to
an ALJ.  See *ibid.*; 15 U. S. C. §78d–1(a).  The SEC cur-
rently has five ALJs.  Other staff members, rather than
the Commission proper, selected them all.  See App. to
Pet. for Cert. 295a–297a.

2                                    LUCIA *v.* SEC

Opinion of the Court

An ALJ assigned to hear an SEC enforcement action has extensive powers—the "authority to do all things necessary and appropriate to discharge his or her duties" and ensure a "fair and orderly" adversarial proceeding. §§201.111, 200.14(a). Those powers "include, but are not limited to," supervising discovery; issuing, revoking, or modifying subpoenas; deciding motions; ruling on the admissibility of evidence; administering oaths; hearing and examining witnesses; generally "[r]egulating the course of" the proceeding and the "conduct of the parties and their counsel"; and imposing sanctions for "[c]ontemptuous conduct" or violations of procedural requirements. §§201.111, 201.180; see §§200.14(a), 201.230. As that list suggests, an SEC ALJ exercises authority "comparable to" that of a federal district judge conducting a bench trial. *Butz* v. *Economou*, 438 U. S. 478, 513 (1978).

After a hearing ends, the ALJ issues an "initial decision." §201.360(a)(1). That decision must set out "findings and conclusions" about all "material issues of fact [and] law"; it also must include the "appropriate order, sanction, relief, or denial thereof." §201.360(b). The Commission can then review the ALJ's decision, either upon request or *sua sponte.* See §201.360(d)(1). But if it opts against review, the Commission "issue[s] an order that the [ALJ's] decision has become final." §201.360(d)(2). At that point, the initial decision is "deemed the action of the Commission." §78d–1(c).

This case began when the SEC instituted an administrative proceeding against petitioner Raymond Lucia and his investment company. Lucia marketed a retirement savings strategy called "Buckets of Money." In the SEC's view, Lucia used misleading slideshow presentations to deceive prospective clients. The SEC charged Lucia under the Investment Advisers Act, §80b–1 *et seq.*, and assigned ALJ Cameron Elliot to adjudicate the case. After nine

days of testimony and argument, Judge Elliot issued an
initial decision concluding that Lucia had violated the Act
and imposing sanctions, including civil penalties of
$300,000 and a lifetime bar from the investment industry.
In his decision, Judge Elliot made factual findings about
only one of the four ways the SEC thought Lucia's
slideshow misled investors.   The Commission thus re-
manded for factfinding on the other three claims, explain-
ing that an ALJ's "personal experience with the witnesses"
places him "in the best position to make findings of fact"
and "resolve any conflicts in the evidence."  App. to Pet. for
Cert. 241a.  Judge Elliot then made additional findings of
deception and issued a revised initial decision, with the
same sanctions.  See *id.,* at 118a.

On appeal to the SEC, Lucia argued that the administra-
tive proceeding was invalid because Judge Elliot had
not been constitutionally appointed.  According to Lucia,
the Commission's ALJs are "Officers of the United States"
and thus subject to the Appointments Clause.  Under that
Clause, Lucia noted, only the President, "Courts of Law,"
or "Heads of Departments" can appoint "Officers."   See
Art. II, §2, cl. 2.  And none of those actors had made Judge
Elliot an ALJ.  To be sure, the Commission itself counts as
a "Head[] of Department[]."   *Ibid.*; see *Free Enterprise
Fund* v. *Public Company Accounting Oversight Bd.,* 561
U. S. 477, 511–513 (2010).  But the Commission had left
the task of appointing ALJs, including Judge Elliot, to
SEC staff members.  See *supra,* at 1.  As a result, Lucia
contended, Judge Elliot lacked constitutional authority to
do his job.

The Commission rejected Lucia's argument.  It held that
the SEC's ALJs are not "Officers of the United States."
Instead, they are "mere employees"—officials with lesser
responsibilities who fall outside the Appointments
Clause's ambit.  App. to Pet. for Cert. 87a.  The Commis-
sion reasoned that its ALJs do not "exercise significant

4                            LUCIA *v.* SEC

                        Opinion of the Court

authority independent of [its own] supervision." *Id.,* at
88a.  Because that is so (said the SEC), they need no
special, high-level appointment.  See *id.,* at 86a.

   Lucia's claim fared no better in the Court of Appeals for
the D. C. Circuit.  A panel of that court seconded the
Commission's view that SEC ALJs are employees rather
than officers, and so are not subject to the Appointments
Clause.  See 832 F. 3d 277, 283–289 (2016).  Lucia then
petitioned for rehearing en banc.  The Court of Appeals
granted that request and heard argument in the case.  But
the ten members of the en banc court divided evenly,
resulting in a *per curiam* order denying Lucia's claim.  See
868 F. 3d 1021 (2017).  That decision conflicted with one
from the Court of Appeals for the Tenth Circuit.  See
*Bandimere* v. *SEC*, 844 F. 3d 1168, 1179 (2016).

   Lucia asked us to resolve the split by deciding whether
the Commission's ALJs are "Officers of the United States
within the meaning of the Appointments Clause."  Pet. for
Cert. i.  Up to that point, the Federal Government (as
represented by the Department of Justice) had defended
the Commission's position that SEC ALJs are employees,
not officers.  But in responding to Lucia's petition, the
Government switched sides.[1]  So when we granted the
petition, 583 U. S. ___ (2018), we also appointed an *amicus
curiae* to defend the judgment below.[2]  We now reverse.

   _____

   [1] In the same certiorari-stage brief, the Government asked us to add a
second question presented: whether the statutory restrictions on
removing the Commission's ALJs are constitutional.  See Brief in
Response 21.  When we granted certiorari, we chose not to take that
step.  See 583 U. S. ___ (2018).  The Government's merits brief now
asks us again to address the removal issue.  See Brief for United States
39–55.  We once more decline.  No court has addressed that question,
and we ordinarily await "thorough lower court opinions to guide our
analysis of the merits."  *Zivotofsky* v. *Clinton*, 566 U. S. 189, 201 (2012).
   [2] We appointed Anton Metlitsky to brief and argue the case, 583 U. S.
___ (2018), and he has ably discharged his responsibilities.

Opinion of the Court

## II

The sole question here is whether the Commission's ALJs are "Officers of the United States" or simply employees of the Federal Government. The Appointments Clause prescribes the exclusive means of appointing "Officers." Only the President, a court of law, or a head of department can do so. See Art. II, §2, cl. 2.[3] And as all parties agree, none of those actors appointed Judge Elliot before he heard Lucia's case; instead, SEC staff members gave him an ALJ slot. See Brief for Petitioners 15; Brief for United States 38; Brief for Court-Appointed *Amicus Curiae* 21. So if the Commission's ALJs are constitutional officers, Lucia raises a valid Appointments Clause claim. The only way to defeat his position is to show that those ALJs are not officers at all, but instead non-officer employees—part of the broad swath of "lesser functionaries" in the Government's workforce. *Buckley* v. *Valeo*, 424 U. S. 1, 126, n. 162 (1976) (*per curiam*). For if that is true, the Appointments Clause cares not a whit about who named them. See *United States* v. *Germaine*, 99 U. S. 508, 510 (1879).

Two decisions set out this Court's basic framework for distinguishing between officers and employees. *Germaine* held that "civil surgeons" (doctors hired to perform various physical exams) were mere employees because their duties were "occasional or temporary" rather than "continuing

_____

[3]That statement elides a distinction, not at issue here, between "principal" and "inferior" officers. See *Edmond* v. *United States*, 520 U. S. 651, 659–660 (1997). Only the President, with the advice and consent of the Senate, can appoint a principal officer; but Congress (instead of relying on that method) may authorize the President alone, a court, or a department head to appoint an inferior officer. See *ibid*. Both the Government and Lucia view the SEC's ALJs as inferior officers and acknowledge that the Commission, as a head of department, can constitutionally appoint them. See Brief for United States 38; Brief for Petitioners 50–51.

6                          LUCIA *v.* SEC

                       Opinion of the Court

and permanent." *Id.,* at 511–512.  Stressing "ideas of
tenure [and] duration," the Court there made clear that an
individual must occupy a "continuing" position established
by law to qualify as an officer.  *Id.,* at 511.  *Buckley*
then set out another requirement, central to this case.  It de-
termined that members of a federal commission were
officers only after finding that they "exercis[ed] significant
authority pursuant to the laws of the United States."  424
U. S., at 126.  The inquiry thus focused on the extent of
power an individual wields in carrying out his assigned
functions.

   Both the *amicus* and the Government urge us to elabo-
rate on *Buckley*'s "significant authority" test, but another
of our precedents makes that project unnecessary.  The
standard is no doubt framed in general terms, tempting
advocates to add whatever glosses best suit their argu-
ments.  See Brief for *Amicus Curiae* 14 (contending that
an individual wields "significant authority" when he has
"(i) the power to bind the government or private parties (ii)
in her own name rather than in the name of a superior
officer"); Reply Brief for United States 2 (countering that
an individual wields that authority when he has "the
power to bind the government or third parties on signifi-
cant matters" or to undertake other "important and dis-
tinctively sovereign functions").  And maybe one day we
will see a need to refine or enhance the test *Buckley* set
out so concisely.  But that day is not this one, because in
*Freytag* v. *Commissioner*, 501 U. S. 868 (1991), we applied
the unadorned "significant authority" test to adjudicative
officials who are near-carbon copies of the Commission's
ALJs.  As we now explain, our analysis there (sans any
more detailed legal criteria) necessarily decides this case.

   The officials at issue in *Freytag* were the "special trial
judges" (STJs) of the United States Tax Court.  The au-
thority of those judges depended on the significance of the
tax dispute before them.  In "comparatively narrow and

Opinion of the Court

minor matters," they could both hear and definitively resolve a case for the Tax Court. *Id.*, at 873. In more major matters, they could preside over the hearing, but could not issue the final decision; instead, they were to "prepare proposed findings and an opinion" for a regular Tax Court judge to consider. *Ibid.* The proceeding challenged in *Freytag* was a major one, involving $1.5 billion in alleged tax deficiencies. See *id.*, at 871, n. 1. After conducting a 14-week trial, the STJ drafted a proposed decision in favor of the Government. A regular judge then adopted the STJ's work as the opinion of the Tax Court. See *id.*, at 872. The losing parties argued on appeal that the STJ was not constitutionally appointed.

This Court held that the Tax Court's STJs are officers, not mere employees. Citing *Germaine*, the Court first found that STJs hold a continuing office established by law. See 501 U. S., at 881. They serve on an ongoing, rather than a "temporary [or] episodic[,] basis"; and their "duties, salary, and means of appointment" are all specified in the Tax Code. *Ibid.* The Court then considered, as *Buckley* demands, the "significance" of the "authority" STJs wield. 501 U. S., at 881. In addressing that issue, the Government had argued that STJs are employees, rather than officers, in all cases (like the one at issue) in which they could not "enter a final decision." *Ibid.* But the Court thought the Government's focus on finality "ignore[d] the significance of the duties and discretion that [STJs] possess." *Ibid.* Describing the responsibilities involved in presiding over adversarial hearings, the Court said: STJs "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Id.*, at 881–882. And the Court observed that "[i]n the course of carrying out these important functions, the [STJs] exercise significant discretion." *Id.*, at 882. That fact meant they were offi-

Opinion of the Court

cers, even when their decisions were not final.[4]

*Freytag* says everything necessary to decide this case.
To begin, the Commission's ALJs, like the Tax Court's
STJs, hold a continuing office established by law. See *id.*,
at 881. Indeed, everyone here—Lucia, the Government,
and the *amicus*—agrees on that point. See Brief for Peti-
tioners 21; Brief for United States 17–18, n. 3; Brief for
*Amicus Curiae* 22, n. 7. Far from serving temporarily or
episodically, SEC ALJs "receive[] a career appointment."
5 CFR §930.204(a) (2018). And that appointment is to a
position created by statute, down to its "duties, salary, and
means of appointment." *Freytag*, 501 U. S., at 881; see 5
U. S. C. §§556–557, 5372, 3105.

Still more, the Commission's ALJs exercise the same
"significant discretion" when carrying out the same "im-
portant functions" as STJs do. *Freytag*, 501 U. S., at 882.
Both sets of officials have all the authority needed to
ensure fair and orderly adversarial hearings—indeed,
nearly all the tools of federal trial judges. See *Butz*, 438
U. S., at 513; *supra,* at 2. Consider in order the four spe-
cific (if overlapping) powers *Freytag* mentioned. First, the

———————
[4]The Court also provided an alternative basis for viewing the STJs as
officers. "Even if the duties of [STJs in major cases] were not as signifi-
cant as we . . . have found them," we stated, "our conclusion would be
unchanged." *Freytag*, 501 U. S., at 882. That was because the Gov-
ernment had conceded that in minor matters, where STJs could enter
final decisions, they had enough "independent authority" to count as
officers. *Ibid.* And we thought it made no sense to classify the STJs as
officers for some cases and employees for others. See *ibid.* JUSTICE
SOTOMAYOR relies on that back-up rationale in trying to reconcile
*Freytag* with her view that "a prerequisite to officer status is the
authority" to issue at least some "final decisions." *Post*, at 5 (dissenting
opinion). But *Freytag* has two parts, and its primary analysis explicitly
rejects JUSTICE SOTOMAYOR's theory that final decisionmaking authority
is a *sine qua non* of officer status. See 501 U. S., at 881–882. As she
acknowledges, she must expunge that reasoning to make her reading
work. See *post,* at 5 ("That part of the opinion[] was unnecessary to the
result").

Opinion of the Court

Commission's ALJs (like the Tax Court's STJs) "take testimony." 501 U. S., at 881. More precisely, they "[r]eceiv[e] evidence" and "[e]xamine witnesses" at hearings, and may also take pre-hearing depositions. 17 CFR §§201.111(c), 200.14(a)(4); see 5 U. S. C. §556(c)(4). Second, the ALJs (like STJs) "conduct trials." 501 U. S., at 882. As detailed earlier, they administer oaths, rule on motions, and generally "regulat[e] the course of" a hearing, as well as the conduct of parties and counsel. §201.111; see §§200.14(a)(1), (a)(7); *supra*, at 2. Third, the ALJs (like STJs) "rule on the admissibility of evidence." 501 U. S., at 882; see §201.111(c). They thus critically shape the administrative record (as they also do when issuing document subpoenas). See §201.111(b). And fourth, the ALJs (like STJs) "have the power to enforce compliance with discovery orders." 501 U. S., at 882. In particular, they may punish all "[c]ontemptuous conduct," including violations of those orders, by means as severe as excluding the offender from the hearing. See §201.180(a)(1). So point for point—straight from *Freytag*'s list—the Commission's ALJs have equivalent duties and powers as STJs in conducting adversarial inquiries.

And at the close of those proceedings, ALJs issue decisions much like that in *Freytag*—except with potentially more independent effect. As the *Freytag* Court recounted, STJs "prepare proposed findings and an opinion" adjudicating charges and assessing tax liabilities. 501 U. S., at 873; see *supra*, at 7. Similarly, the Commission's ALJs issue decisions containing factual findings, legal conclusions, and appropriate remedies. See §201.360(b); *supra*, at 2. And what happens next reveals that the ALJ can play the more autonomous role. In a major case like *Freytag*, a regular Tax Court judge must always review an STJ's opinion. And that opinion counts for nothing unless the regular judge adopts it as his own. See 501 U. S., at 873. By contrast, the SEC can decide against reviewing

10                    LUCIA *v.* SEC

Opinion of the Court

an ALJ decision at all.  And when the SEC declines review
(and issues an order saying so), the ALJ's decision itself
"becomes final" and is "deemed the action of the Commis-
sion."  §201.360(d)(2); 15 U. S. C. §78d–1(c); see *supra,* at
2.  That last-word capacity makes this an *a fortiori* case: If
the Tax Court's STJs are officers, as *Freytag* held, then the
Commission's ALJs must be too.

The *amicus* offers up two distinctions to support the
opposite conclusion.  His main argument relates to "the
power to enforce compliance with discovery orders"—the
fourth of *Freytag*'s listed functions.  501 U. S., at 882.  The
Tax Court's STJs, he states, had that power "because they
had authority to punish contempt" (including discovery
violations) through fines or imprisonment.  Brief for *Ami-
cus Curiae* 37; see *id.,* at 37, n. 10 (citing 26 U. S. C.
§7456(c)).  By contrast, he observes, the Commission's
ALJs have less capacious power to sanction misconduct.
The *amicus*'s secondary distinction involves how the Tax
Court and Commission, respectively, review the factfind-
ing of STJs and ALJs.  The Tax Court's rules state that an
STJ's findings of fact "shall be presumed" correct.  Tax
Court Rule 183(d).  In comparison, the *amicus* notes, the
SEC's regulations include no such deferential standard.
See Brief for *Amicus Curiae* 10, 38, n. 11.

But those distinctions make no difference for officer
status.  To start with the *amicus*'s primary point, *Freytag*
referenced only the general "power to enforce compliance
with discovery orders," not any particular method of doing
so.  501 U. S., at 882.  True enough, the power to toss
malefactors in jail is an especially muscular means of
enforcement—the nuclear option of compliance tools.  But
just as armies can often enforce their will through conven-
tional weapons, so too can administrative judges.  As
noted earlier, the Commission's ALJs can respond to
discovery violations and other contemptuous conduct by
excluding the wrongdoer (whether party or lawyer) from

Opinion of the Court

the proceedings—a powerful disincentive to resist a court order.  See §201.180(a)(1)(i); *supra,* at 9.  Similarly, if the offender is an attorney, the ALJ can "[s]ummarily suspend" him from representing his client—not something the typical lawyer wants to invite.  §201.180(a)(1)(ii).  And finally, a judge who will, in the end, issue an opinion complete with factual findings, legal conclusions, and sanctions has substantial informal power to ensure the parties stay in line.  Contrary to the *amicus*'s view, all that is enough to satisfy *Freytag*'s fourth item (even supposing, which we do not decide, that each of those items is necessary for someone conducting adversarial hearings to count as an officer).

And the *amicus*'s standard-of-review distinction fares just as badly.  The *Freytag* Court never suggested that the deference given to STJs' factual findings mattered to its Appointments Clause analysis.  Indeed, the relevant part of *Freytag* did not so much as mention the subject (even though it came up at oral argument, see Tr. of Oral Arg. 33–41).  And anyway, the Commission often accords a similar deference to its ALJs, even if not by regulation. The Commission has repeatedly stated, as it did below, that its ALJs are in the "best position to make findings of fact" and "resolve any conflicts in the evidence."  App. to Pet. for Cert. 241a (quoting *In re Nasdaq Stock Market, LLC,* SEC Release No. 57741 (Apr. 30, 2008)).  (That was why the SEC insisted that Judge Elliot make factual findings on all four allegations of Lucia's deception.  See *supra,* at 3.)  And when factfinding derives from credibility judgments, as it frequently does, acceptance is near-automatic.  Recognizing ALJs' "personal experience with the witnesses," the Commission adopts their "credibility finding[s] absent overwhelming evidence to the contrary." App. to Pet. for Cert. 241a; *In re Clawson,* SEC Release No. 48143 (July 9, 2003).  That practice erases the constitutional line the *amicus* proposes to draw.

Opinion of the Court

The only issue left is remedial. For all the reasons we
have given, and all those *Freytag* gave before, the Com-
mission's ALJs are "Officers of the United States," subject
to the Appointments Clause. And as noted earlier, Judge
Elliot heard and decided Lucia's case without the kind of
appointment the Clause requires. See *supra,* at 5. This
Court has held that "one who makes a timely challenge to
the constitutional validity of the appointment of an officer
who adjudicates his case" is entitled to relief. *Ryder* v.
*United States*, 515 U. S. 177, 182–183 (1995). Lucia made
just such a timely challenge: He contested the validity of
Judge Elliot's appointment before the Commission, and
continued pressing that claim in the Court of Appeals and
this Court. So what relief follows? This Court has also
held that the "appropriate" remedy for an adjudication
tainted with an appointments violation is a new "hearing
before a properly appointed" official. *Id.*, at 183, 188. And
we add today one thing more. That official cannot be
Judge Elliot, even if he has by now received (or receives
sometime in the future) a constitutional appointment.
Judge Elliot has already both heard Lucia's case and
issued an initial decision on the merits. He cannot be
expected to consider the matter as though he had not
adjudicated it before.[5] To cure the constitutional error,

---

[5] JUSTICE BREYER disagrees with our decision to wrest further pro-
ceedings from Judge Elliot, arguing that "[f]or him to preside once
again would not violate the structural purposes [of] the Appointments
Clause." *Post*, at 13 (opinion concurring in judgment in part and
dissenting in part). But our Appointments Clause remedies are de-
signed not only to advance those purposes directly, but also to create
"[]incentive[s] to raise Appointments Clause challenges." *Ryder* v.
*United States*, 515 U. S. 177, 183 (1995). We best accomplish that goal
by providing a successful litigant with a hearing before a new judge.
That is especially so because (as JUSTICE BREYER points out) the old
judge would have no reason to think he did anything wrong on the
merits, see *post*, at 13—and so could be expected to reach all the same
judgments. But we do not hold that a new officer is required for every

Opinion of the Court

another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled.[6]

We accordingly reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

——————

Appointments Clause violation. As JUSTICE BREYER suggests, we can give that remedy here because other ALJs (and the Commission) are available to hear this case on remand. See *ibid.* If instead the Appointments Clause problem is with the Commission itself, so that there is no substitute decisionmaker, the rule of necessity would presumably kick in and allow the Commission to do the rehearing. See *FTC* v. *Cement Institute*, 333 U. S. 683, 700–703 (1948); 3 K. Davis, Administrative Law Treatise §19.9 (2d ed. 1980).

[6]While this case was on judicial review, the SEC issued an order "ratif[ying]" the prior appointments of its ALJs. Order (Nov. 30, 2017), online at https://www.sec.gov/litigation/opinions/2017/33-10440.pdf (as last visited June 18, 2018). Lucia argues that the order is invalid. See Brief for Petitioners 50–56. We see no reason to address that issue. The Commission has not suggested that it intends to assign Lucia's case on remand to an ALJ whose claim to authority rests on the ratification order. The SEC may decide to conduct Lucia's rehearing itself. Or it may assign the hearing to an ALJ who has received a constitutional appointment independent of the ratification.

Cite as: 585 U. S. ____ (2018)          1

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

————————

No. 17–130

————————

## RAYMOND J. LUCIA, ET AL., PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 21, 2018]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

I agree with the Court that this case is indistinguishable from *Freytag* v. *Commissioner*, 501 U. S. 868 (1991). If the special trial judges in *Freytag* were "Officers of the United States," Art. II, §2, cl. 2, then so are the administrative law judges of the Securities and Exchange Commission. Moving forward, however, this Court will not be able to decide every Appointments Clause case by comparing it to *Freytag*. And, as the Court acknowledges, our precedents in this area do not provide much guidance. See *ante*, at 6. While precedents like *Freytag* discuss what is *sufficient* to make someone an officer of the United States, our precedents have never clearly defined what is *necessary*. I would resolve that question based on the original public meaning of "Officers of the United States." To the Founders, this term encompassed all federal civil officials "'with responsibility for an ongoing statutory duty.'" *NLRB* v. *SW General, Inc.*, 580 U. S. ___, ___ (2017) (THOMAS, J., concurring) (slip op., at 4); Mascott, Who Are "Officers of the United States"? 70 Stan. L. Rev. 443, 564 (2018) (Mascott).[1]

————————

[1] I address only the dividing line between "Officers of the United States," who are subject to the Appointments Clause, and nonofficer

2                          LUCIA *v.* SEC

Thomas, J., concurring

The Appointments Clause provides the exclusive process for appointing "Officers of the United States." See *SW General*, *supra*, at ___ (opinion of Thomas, J.) (slip op., at 1). While principal officers must be nominated by the President and confirmed by the Senate, Congress can authorize the appointment of "inferior Officers" by "the President alone," "the Courts of Law," or "the Heads of Departments." Art. II, §2, cl. 2.

This alternative process for appointing inferior officers strikes a balance between efficiency and accountability. Given the sheer number of inferior officers, it would be too burdensome to require each of them to run the gauntlet of Senate confirmation. See *United States* v. *Germaine*, 99 U. S. 508, 509–510 (1879); 2 Records of the Federal Convention of 1787, pp. 627–628 (M. Farrand ed. 1911). But, by specifying only a limited number of actors who can appoint inferior officers without Senate confirmation, the Appointments Clause maintains clear lines of accountability—encouraging good appointments and giving the public someone to blame for bad ones. See The Federalist No. 76, p. 455 (C. Rossiter ed. 1961) (A. Hamilton); Wilson, Lectures on Law: Government, in 1 The Works of James Wilson 343, 359–361 (J. Andrews ed., 1896).

The Founders likely understood the term "Officers of the United States" to encompass all federal civil officials who perform an ongoing, statutory duty—no matter how important or significant the duty. See Mascott 454. "Officers of the United States" was probably not a term of art that the Constitution used to signify some special type of official. Based on how the Founders used it and similar terms, the phrase "of the United States" was merely a

---

employees, who are not. I express no view on the meaning of "Office" or "Officer" in any other provision of the Constitution, or the difference between principal officers and inferior officers under the Appointments Clause.

THOMAS, J., concurring

synonym for "federal," and the word "Office[r]" carried its
ordinary meaning. See *id.,* at 471–479. The ordinary
meaning of "officer" was anyone who performed a continu-
ous public duty. See *id.,* at 484–507; *e.g., United States* v.
*Maurice*, 26 F. Cas. 1211, 1214 (No. 15,747) (CC Va. 1823)
(defining officer as someone in "'a public charge or em-
ployment'" who performed a "continuing" duty); 8 Annals
of Cong. 2304–2305 (1799) (statement of Rep. Harper)
(explaining that the word officer "is derived from the Latin
word *officium*" and "includes all persons holding posts
which require the performance of some public duty"). For
federal officers, that duty is "established by Law"—that is,
by statute. Art. II, §2, cl. 2. The Founders considered
individuals to be officers even if they performed only
ministerial statutory duties—including recordkeepers,
clerks, and tidewaiters (individuals who watched goods
land at a customhouse). See Mascott 484–507. Early
congressional practice reflected this understanding. With
exceptions not relevant here,[2] Congress required all fed-
eral officials with ongoing statutory duties to be appointed
in compliance with the Appointments Clause. See *id.,* at
507–545.

Applying the original meaning here, the administrative
law judges of the Securities and Exchange Commission
easily qualify as "Officers of the United States." These
judges exercise many of the agency's statutory duties,
including issuing initial decisions in adversarial proceed-
ings. See 15 U. S. C. §78d–1(a); 17 CFR §§200.14, 200.30–
9 (2017). As explained, the importance or significance of
these statutory duties is irrelevant. All that matters is
that the judges are continuously responsible for perform-

_____

[2]The First Congress exempted certain officials with ongoing statu-
tory duties, such as deputies and military officers, from the requirements
of the Appointments Clause. But these narrow exceptions do not
disprove the rule, as background principles of founding-era law explain
each of them. See Mascott 480–483, 515–530.

4                          LUCIA *v.* SEC

                      THOMAS, J., concurring

ing them.

   In short, the administrative law judges of the Securities
Exchange Commission are "Officers of the United States"
under the original meaning of the Appointments Clause.
They have "'responsibility for an ongoing statutory duty,'"
which is sufficient to resolve this case. *SW General*, 580
U. S., at ___ (opinion of THOMAS, J.) (slip op., at 4).  Be-
cause the Court reaches the same conclusion by correctly
applying *Freytag*, I join its opinion.

Cite as: 585 U. S. ____ (2018)          1

Opinion of BREYER, J.

# SUPREME COURT OF THE UNITED STATES

————

No. 17–130

————

RAYMOND J. LUCIA, ET AL., PETITIONERS *v.*
SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 21, 2018]

JUSTICE BREYER, with whom JUSTICE GINSBURG and
JUSTICE SOTOMAYOR join as to Part III, concurring in the
judgment in part and dissenting in part.

I agree with the Court that the Securities and Exchange
Commission did not properly appoint the Administrative
Law Judge who presided over petitioner Lucia's hearing.
But I disagree with the majority in respect to two matters.
First, I would rest our conclusion upon statutory, not
constitutional, grounds. I believe it important to do so
because I cannot answer the constitutional question that
the majority answers without knowing the answer to a
different, embedded constitutional question, which the
Solicitor General urged us to answer in this case: the
constitutionality of the statutory "for cause" removal
protections that Congress provided for administrative law
judges. Cf. *Free Enterprise Fund* v. *Public Company
Accounting Oversight Bd.*, 561 U. S. 477 (2010). Second, I
disagree with the Court in respect to the proper remedy.

## I

The relevant statute here is the Administrative Proce-
dure Act. That Act governs the appointment of adminis-
trative law judges. It provides (as it has, in substance,
since its enactment in 1946) that "[e]ach agency shall
appoint as many administrative law judges as are neces-

2                    LUCIA *v.* SEC

Opinion of BREYER, J.

sary for" hearings governed by the Administrative Proce-
dure Act.  5 U. S. C. §3105; see also Administrative Proce-
dure Act, §11, 60 Stat. 244 (original version, which refers
to "examiners" as administrative law judges were then
called).  In the case of the Securities and Exchange Com-
mission, the relevant "agency" is the Commission itself.
But the Commission did not appoint the Administrative
Law Judge who presided over Lucia's hearing.  Rather, the
Commission's staff appointed that Administrative Law
Judge, without the approval of the Commissioners them-
selves.  See *ante,* at 1; App. to Pet. for Cert. 298a–299a.

I do not believe that the Administrative Procedure Act
permits the Commission to delegate its power to appoint
its administrative law judges to its staff.  We have held
that, for purposes of the Constitution's Appointments
Clause, the Commission itself is a "'Hea[d]'" of a "'De-
partmen[t].'"  *Free Enterprise Fund, supra,* at 512–513.
Thus, reading the statute as referring to the Commission
itself, and not to its staff, avoids a difficult constitutional
question, namely, the very question that the Court an-
swers today: whether the Commission's administrative
law judges are constitutional "inferior Officers" whose
appointment Congress may vest only in the President, the
"Courts of Law," or the "Heads of Departments."  Art. II,
§2, cl. 2; see *United States* v. *Jin Fuey Moy,* 241 U. S. 394,
401 (1916) ("A statute must be construed, if fairly possible,
so as to avoid not only the conclusion that it is unconstitu-
tional but also grave doubts upon that score").

I have found no other statutory provision that would
permit the Commission to delegate the power to appoint
its administrative law judges to its staff.  The statute
establishing and governing the Commission does allow the
Commission to "delegate, by published order or rule, any
of its functions to a division of the Commission, an indi-
vidual Commissioner, an administrative law judge, or an
employee or employee board."  15 U. S. C. §78d–1(a).  But

Opinion of BREYER, J.

this provision requires a "published order or rule," and the
Commission here published no relevant delegating order
or rule. Rather, Lucia discovered the Commission's ap-
pointment system for administrative law judges only when
the Commission's enforcement division staff filed an affi-
davit in this case describing that staff-based system. See
App. to Pet. for Cert. 295a–299a. Regardless, the same
constitutional-avoidance reasons that should inform our
construction of the Administrative Procedure Act should
also lead us to interpret the Commission's general delega-
tion authority as excluding the power to delegate to staff
the authority to appoint its administrative law judges, so
as to avoid the constitutional question the Court reaches
in this case. See *Jin Fuey Moy*, *supra,* at 401.

The analysis may differ for other agencies that employ
administrative law judges. Each agency's governing stat-
ute is different, and some, unlike the Commission's, may
allow the delegation of duties without a published order or
rule. See, *e.g.,* 42 U. S. C. §902(a)(7) (applicable to the
Social Security Administration). Similarly, other agencies'
administrative law judges perform distinct functions, and
their means of appointment may therefore not raise the
constitutional questions that inform my reading of the
relevant statutes here.

The upshot, in my view, is that for statutory, not consti-
tutional, reasons, the Commission did not lawfully appoint
the Administrative Law Judge here at issue. And this
Court should decide no more than that.

## II

### A

The reason why it is important to go no further arises
from the holding in a case this Court decided eight years
ago, *Free Enterprise Fund*, *supra*. The case concerned
statutory provisions protecting members of the Public
Company Accounting Oversight Board from removal

4                          LUCIA *v.* SEC

Opinion of BREYER, J.

without cause.  The Court held in that case that the Executive Vesting Clause of the Constitution, Art. II, §1 ("[t]he executive Power shall be vested in a President of the United States of America"), forbade Congress from providing members of the Board with "multilevel protection from removal" by the President.  *Free Enterprise Fund,* 561 U. S., at 484; see *id.,* at 514 ("Congress cannot limit the President's authority" by providing "two levels of protection from removal for those who . . . exercise significant executive power").  But see *id.,* at 514–549 (BREYER, J., dissenting).  Because, in the Court's view, the relevant statutes (1) granted the Securities and Exchange Commissioners protection from removal without cause, (2) gave the Commissioners sole authority to remove Board members, and (3) protected Board members from removal without cause, the statutes provided Board members with two levels of protection from removal and consequently violated the Constitution.  *Id.,* at 495–498.

In addressing the constitutionality of the Board members' removal protections, the Court emphasized that the Board members were "executive officers"—more specifically, "inferior officers" for purposes of the Appointments Clause.  *E.g., id.,* at 492–495, 504–505.  The significance of that fact to the Court's analysis is not entirely clear.  The Court said:

"The parties here concede that Board members are executive 'Officers', as that term is used in the Constitution.  We do not decide the status of other Government employees, nor do we decide whether 'lesser functionaries subordinate to officers of the United States' must be subject to the same sort of control as those who exercise 'significant authority pursuant to the laws.'"  *Id.,* at 506 (quoting *Buckley* v. *Valeo,* 424 U. S. 1, 126, and n. 162 (1976) (*per curiam*); citations omitted).

Opinion of BREYER, J.

Thus, the Court seemed not only to limit its holding to the Board members themselves, but also to suggest that Government employees who were not officers would be distinguishable from the Board members on that ground alone.

For present purposes, however, the implications of *Free Enterprise Fund*'s technical-sounding holding about "multilevel protection from removal" remain potentially dramatic.  561 U. S., at 484.  The same statute, the Administrative Procedure Act, that provides that the "agency" will appoint its administrative law judges also protects the administrative law judges from removal without cause.  In particular, the statute says that an

> "action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board."  5 U. S. C. §7521(a).

As with appointments, this provision constituted an important part of the Administrative Procedure Act when it was originally enacted in 1946.  See §11, 60 Stat. 244.

The Administrative Procedure Act thus allows administrative law judges to be removed only "for good cause" found by the Merit Systems Protection Board.  §7521(a).  And the President may, in turn, remove members of the Merit Systems Protection Board only for "inefficiency, neglect of duty, or malfeasance in office."  §1202(d).  Thus, Congress seems to have provided administrative law judges with two levels of protection from removal without cause—just what *Free Enterprise Fund* interpreted the Constitution to forbid in the case of the Board members.

The substantial independence that the Administrative Procedure Act's removal protections provide to administrative law judges is a central part of the Act's overall

6                       LUCIA *v.* SEC

                    Opinion of BREYER, J.

scheme.  See *Ramspeck* v. *Federal Trial Examiners Con-
ference*, 345 U. S. 128, 130 (1953); *Wong Yang Sung* v.
*McGrath*, 339 U. S. 33, 46 (1950).  Before the Administra-
tive Procedure Act, hearing examiners "were in a depend-
ent status" to their employing agency, with their classifi-
cation, compensation, and promotion all dependent on how
the agency they worked for rated them.  *Ramspeck*, 345
U. S., at 130.  As a result of that dependence, "[m]any
complaints were voiced against the actions of the hearing
examiners, it being charged that they were mere tools of
the agency concerned and subservient to the agency heads
in making their proposed findings of fact and recommen-
dations."  *Id.,* at 131.  The Administrative Procedure Act
responded to those complaints by giving administrative
law judges "independence and tenure within the existing
Civil Service system."  *Id.,* at 132; cf. *Wong Yang Sung*,
*supra,* at 41–46 (referring to removal protections as among
the Administrative Procedure Act's "safeguards . . . in-
tended to ameliorate" the perceived "evils" of commingling
of adjudicative and prosecutorial functions in agencies).

   *If* the *Free Enterprise Fund* Court's holding applies
equally to the administrative law judges—and I stress the
"if"—then to hold that the administrative law judges are
"Officers of the United States" is, *perhaps*, to hold that
their removal protections are unconstitutional.  This
would risk transforming administrative law judges from
independent adjudicators into *dependent* decisionmakers,
serving at the pleasure of the Commission.  Similarly, to
apply *Free Enterprise Fund*'s holding to high-level civil
servants threatens to change the nature of our merit-
based civil service as it has existed from the time of Presi-
dent Chester Alan Arthur.  See *Free Enterprise Fund*, 561
U. S., at 540–542 (BREYER, J., dissenting).

   I have stressed the words "if" and "perhaps" in the
previous paragraph because *Free Enterprise Fund*'s hold-
ing may not invalidate the removal protections applicable

Opinion of BREYER, J.

to the Commission's administrative law judges even if the judges are inferior "officers of the United States" for purposes of the Appointments Clause. In my dissent in *Free Enterprise Fund*, I pointed out that under the majority's analysis, the removal protections applicable to administrative law judges—including specifically the Commission's administrative law judges—would seem to be unconstitutional. *Id.*, at 542, 587. But the Court disagreed, saying that "none of the positions [my dissent] identifie[d] are similarly situated to the Board." *Id.*, at 506.

The *Free Enterprise Fund* Court gave three reasons why administrative law judges were distinguishable from the Board members at issue in that case. First, the Court said that "[w]hether administrative law judges are necessarily 'Officers of the United States' is disputed." *Id.,* at 507, n. 10. Second, the Court said that "unlike members of the Board, many administrative law judges of course perform adjudicative rather than enforcement or policymaking functions, see [5 U. S. C.] §§554(d), 3105, or possess purely recommendatory powers." *Ibid.* And, third, the Court pointed out that the civil service "employees" and administrative law judges to whom I referred in my dissent do not "enjoy the same significant and unusual protections from Presidential oversight as members of the Board." *Id.,* at 506. The Court added that the kind of "for cause" protection the statutes provided for Board members was "unusually high." *Id.,* at 503.

The majority here removes the first distinction, for it holds that the Commission's administrative law judges are inferior "Officers of the United States." *Ante,* at 1. The other two distinctions remain. See, *e.g., Wiener* v. *United States*, 357 U. S. 349, 355–356 (1958) (holding that Congress is free to protect bodies tasked with "'adjudicat[ing] according to law' . . . 'from the control or coercive influence, direct or indirect,' . . . of either the Executive or Congress") (quoting *Humphrey's Executor* v. *United States*,

Opinion of Breyer, J.

295 U. S. 602, 629 (1935)). But the Solicitor General has nevertheless argued strongly that we should now decide the constitutionality of the administrative law judges' removal protections as well as their means of appointment. And in his view, the administrative law judges' statutory removal protections violate the Constitution (as interpreted in *Free Enterprise Fund*), unless we construe those protections as giving the Commission substantially greater power to remove administrative law judges than it presently has. See Merits Brief for Respondent 45–55.

On the Solicitor General's account, for the administrative law judges' removal protections to be constitutional, the Commission itself must have the power to remove administrative law judges "for failure to follow lawful instructions or perform adequately." *Id.,* at 48. The Merit Systems Protection Board would then review only the Commission's factfinding, and not whether the facts (as found) count as "good cause" for removal. *Id.,* at 52–53. This technical-sounding standard would seem to weaken the administrative law judges' "for cause" removal protections considerably, by permitting the Commission to remove an administrative law judge with whose judgments it disagrees—say, because the judge did not find a securities-law violation where the Commission thought there was one, or vice versa. In such cases, the law allows the Commission to overrule an administrative law judge's findings, for the decision is ultimately the Commission's. See 15 U. S. C. §78d–1(b). But it does not allow the Commission to fire the administrative law judge. See 5 U. S. C. §7521.

And now it should be clear why the application of *Free Enterprise Fund* to administrative law judges is important. If that decision does not limit or forbid Congress' statutory "for cause" protections, then a holding that the administrative law judges are "inferior Officers" does not conflict with Congress' intent as revealed in the statute.

Opinion of BREYER, J.

But, if the holding is to the contrary, and more particularly if a holding that administrative law judges are "inferior Officers" brings with it application of *Free Enterprise Fund*'s limitation on "for cause" protections from removal, then a determination that administrative law judges are, constitutionally speaking, "inferior Officers" would directly conflict with Congress' intent, as revealed in the statute. In that case, it would be clear to me that Congress did not intend that consequence, and that it therefore did not intend to make administrative law judges "inferior Officers" at all.

### B

Congress' intent on the question matters, in my view, because the Appointments Clause is properly understood to grant Congress a degree of leeway as to whether particular Government workers are officers or instead mere employees not subject to the Appointments Clause. The words "by Law" appear twice in the Clause. It says that the President ("with the Advice and Consent of the Senate") shall appoint "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, . . . which shall be *established by Law*." Art. II, §2, cl. 2 (emphasis added). It then adds that "Congress may *by Law* vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Ibid.* (emphasis added).

The use of the words "by Law" to describe the establishment and means of appointment of "Officers of the United States," together with the fact that Article I of the Constitution vests the legislative power in Congress, suggests that (other than the officers the Constitution specifically lists) Congress, not the Judicial Branch alone, must play a major role in determining who is an "Office[r] of the United States." And Congress' intent in this specific

Opinion of BREYER, J.

respect is often highly relevant.  Congress' leeway is not, of course, absolute—it may not, for example, say that positions the Constitution itself describes as "Officers" are not "Officers."  But given the constitutional language, the Court, when deciding whether other positions are "Officers of the United States" under the Appointments Clause, should give substantial weight to Congress' decision.

How is the Court to decide whether Congress intended that the holder of a particular Government position count as an "Office[r] of the United States"?  Congress might, of course, write explicitly into the statute that the employee "is an officer of the United States under the Appointments Clause," but an explicit phrase of this kind is unlikely to appear.  If it does not, then I would approach the question like any other difficult question of statutory interpretation.  Several considerations, among others, are likely to be relevant.  First, as the Court said in *Freytag* v. *Commissioner*, 501 U. S. 868, 881 (1991), and repeats today, *ante*, at 6, where Congress grants an appointee "'significant authority pursuant to the laws to the United States,'" that supports the view that (but should not determinatively decide that) Congress made that appointee an "Office[r] of the United States."  *Freytag, supra,* at 881 (quoting *Buckley*, 424 U. S., at 126); see also *United States* v. *Germaine*, 99 U. S. 508, 511 (1879) (holding that the term "officer" "embraces the ideas of tenure, duration, emolument, and duties").  The means of appointment that Congress chooses is also instructive.  Where Congress provides a method of appointment that mimics a method the Appointments Clause allows for "Officers," that fact too supports the view that (but does not determinatively decide that) Congress viewed the position as one to be held by an "Officer," and vice versa.  See *id.*, at 509–511.  And the Court's decision in *Free Enterprise Fund* suggests a third indication of "Officer" status—did Congress provide the position with removal protections that would be unconstitutional if

Opinion of BREYER, J.

provided for an "Officer"? See 561 U. S., at 514. That fact
would support (but again not be determinative of) the
opposite view—that Congress did not intend to confer
"inferior Officer" status on the position.

As I said, these statutory features, while highly rele-
vant, need not always prove determinative. The vast
number of different civil service positions, with different
tasks, different needs, and different requirements for
independence, mean that this is not the place to lay down
bright-line rules. Rather, as this Court has said, "[t]he
versatility of circumstances often mocks a natural desire
for definitiveness" in this area. *Wiener*, 357 U. S., at 352.

No case from this Court holds that Congress lacks this
sort of constitutional leeway in determining whether a
particular Government position will be filled by an "Of-
fice[r] of the United States." To the contrary, while we
have repeatedly addressed whether particular officials are
"Officers," in all cases but one, we have upheld the ap-
pointment procedures Congress enacted as consistent with
the Appointments Clause. See, *e.g., Edmond* v. *United
States*, 520 U. S. 651, 666 (1997) (holding that Congress'
appointment procedure for military court judges "is in
conformity with the Appointments Clause of the Constitu-
tion"); *Freytag, supra,* at 888–891 (same as to special trial
judges of the Tax Court); *Rice* v. *Ames*, 180 U. S. 371, 378
(1901) (same as to district court "commissioners"); *Ex
parte Siebold*, 100 U. S. 371, 397–398 (1880) (same as
to "supervisors of election"). But see *Buckley, supra,* at
124–137.

The one exception was *Buckley*, 424 U. S., at 124–137, in
which the Court set aside Congress' prescribed appoint-
ment method for some members of the Federal Election
Commission—appointment by Congress itself—as incon-
sistent with the Appointments Clause. But *Buckley* in-
volved Federal Election Commission members with enor-
mous powers. They had "primary and substantial

Opinion of BREYER, J.

responsibility for administering and enforcing the" Federal
Election Campaign Act of 1971, *id.,* at 109, an "intricate
statutory scheme . . . to regulate federal election cam-
paigns," *id.,* at 12.  They had "extensive rulemaking and
adjudicative powers," *id.,* at 110; the power to enforce the
law through civil lawsuits, *id.,* at 111; and the power to
disqualify a candidate from running for federal office, *id.,*
at 112–113.  Federal Election Commissioners thus had
powers akin to the "principal Officer[s]" of an Executive
Department, whom the Constitution expressly refers to as
"Officers," see Art. II, §2, cl. 1.  It is not surprising that
Congress exceeded any leeway the Appointments Clause
granted when it deviated from the Clause's appointments'
methods in respect to an office with powers very similar to
those of the Officers listed in the Constitution itself.

Thus, neither *Buckley* nor any other case forecloses an
interpretation of the Appointments Clause that focuses
principally on whether the relevant statutes show that
Congress intended that a particular Government position
be held by an "Office[r] of the United States."  Adopting
such an approach, I would not answer the question whether
the Securities and Exchange Commission's administrative
law judges are constitutional "Officers" without first decid-
ing the pre-existing *Free Enterprise Fund* question—
namely, what effect that holding would have on the statu-
tory "for cause" removal protections that Congress provided
for administrative law judges.  If, for example, *Free Enter-
prise Fund* means that saying administrative law judges
are "inferior Officers" will cause them to lose their "for
cause" removal protections, then I would likely hold that
the administrative law judges are not "Officers," for to say
otherwise would be to contradict Congress' enactment of
those protections in the Administrative Procedure Act.  In
contrast, if *Free Enterprise Fund* does not mean that an
administrative law judge (if an "Office[r] of the United
States") would lose "for cause" protections, then it is more

Opinion of BREYER, J.

likely that interpreting the Administrative Procedure Act
as conferring such status would not run contrary to Con-
gress' intent.  In such a case, I would more likely hold
that, given the other features of the Administrative Proce-
dure Act, Congress did intend to make administrative law
judges inferior "Officers of the United States."

III

Separately, I also disagree with the majority's conclu-
sion that the proper remedy in this case requires a hearing
before a *different* administrative law judge.  *Ante,* at 12–
13.  The Securities and Exchange Commission has now
itself appointed the Administrative Law Judge in ques-
tion, and I see no reason why he could not rehear the case.
After all, when a judge is reversed on appeal and a new
trial ordered, typically the judge who rehears the case is
the same judge who heard it the first time.  The reversal
here is based on a technical constitutional question, and
the reversal implies no criticism at all of the original judge
or his ability to conduct the new proceedings.  For him to
preside once again would not violate the structural pur-
poses that we have said the Appointments Clause serves,
see *Freytag,* 501 U. S., at 878, nor would it, in any obvious
way, violate the Due Process Clause.

Regardless, this matter was not addressed below and
has not been fully argued here.  I would, at a minimum,
ask the Court of Appeals to examine it on remand rather
than decide it here now.  That is especially so because the
majority seems to state a general rule that a different
"Officer" must *always* preside after an Appointments
Clause violation.  In a case like this one, that is a relatively
minor imposition, because the Commission has other
administrative law judges.  But in other cases—say, a case
adjudicated by an improperly appointed (but since reap-
pointed) Commission itself—the "Officer" in question may
be the *only* such "Officer," so that no substitute will be

Opinion of BREYER, J.

available.  The majority suggests that in such cases, the
"rule of necessity" may excuse compliance with its new-
found different-"Officer" requirement.  *Ante,* at 12–13,
n. 5.  But that still does not explain why the Constitution
would require a hearing before a different "Officer" at all.

*          *          *

The Court's decision to address the Appointments
Clause question separately from the constitutional removal
question is problematic.  By considering each question in
isolation, the Court risks (should the Court later extend
*Free Enterprise Fund*) unraveling, step-by-step, the foun-
dations of the Federal Government's administrative adju-
dication system as it has existed for decades, and perhaps
of the merit-based civil-service system in general.  And the
Court risks doing so without considering that potential
consequence.  For these reasons, I concur in the judgment
in part and, with respect, I dissent in part.

Cite as: 585 U. S. ____ (2018)                    1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 17–130

————

## RAYMOND J. LUCIA, ET AL., PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 21, 2018]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, dissenting.

The Court today and scholars acknowledge that this Court's Appointments Clause jurisprudence offers little guidance on who qualifies as an "Officer of the United States." See, *e.g., ante,* at 6 ("The standard is no doubt framed in general terms, tempting advocates to add whatever glosses best suit their arguments"); Plecnik, Officers Under the Appointments Clause, 11 Pitt. Tax Rev. 201, 204 (2014). The lack of guidance is not without consequence. "[Q]uestions about the Clause continue to arise regularly both in the operation of the Executive Branch and in proposed legislation." 31 Opinion of Office of Legal Counsel 73, 76 (2007) (Op. OLC). This confusion can undermine the reliability and finality of proceedings and result in wasted resources. See *ante,* at 12–13 (opinion of the Court) (ordering the Commission to grant petitioners a new administrative hearing).

As the majority notes, see *ante,* at 5–6, this Court's decisions currently set forth at least two prerequisites to officer status: (1) an individual must hold a "continuing" office established by law, *United States* v. *Germaine*, 99 U. S. 508, 511–512 (1879), and (2) an individual must wield "significant authority," *Buckley* v. *Valeo*, 424 U. S. 1, 126 (1976) (*per curiam*). The first requirement is relatively

SOTOMAYOR, J., dissenting

easy to grasp; the second, less so. To be sure, to exercise "significant authority," the person must wield considerable powers in comparison to the average person who works for the Federal Government. As this Court has noted, the vast majority of those who work for the Federal Government are not "Officers of the United States." See *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 506, n. 9 (2010) (indicating that well over 90% of those who render services to the Federal Government and are paid by it are not constitutional officers). But this Court's decisions have yet to articulate the types of powers that will be deemed significant enough to constitute "significant authority."

To provide guidance to Congress and the Executive Branch, I would hold that one requisite component of "significant authority" is the ability to make final, binding decisions on behalf of the Government. Accordingly, a person who merely advises and provides recommendations to an officer would not herself qualify as an officer.

There is some historical support for such a requirement. For example, in 1822, the Supreme Judicial Court of Maine opined in the "fullest early explication" of the meaning of an "'office,'" that "'the term "office" implies a delegation of a portion of the sovereign power to, and possession of it by the person filling the office,'" that "'in its effects[,] . . . will bind the rights of others.'" 31 Op. OLC 83 (quoting 3 Greenl. (Me.) 481, 482). In 1899, a Report of the Judiciary Committee of the House of Representatives noted that "the creation and conferring of an office involves a delegation to the individual of . . . sovereign functions," *i.e.,* "the power to . . . legislate, . . . execute law, or . . . hear and determine judicially questions submitted." 1 A. Hinds, Precedents of the House of Representatives of the United States 607 (1907). Those who merely assist others in exercising sovereign functions but who do not have the authority to exercise sovereign pow-

SOTOMAYOR, J., dissenting

ers themselves do not wield significant authority. *Id.,* at 607–608. Consequently, a person who possesses the "mere power to investigate some particular subject and report thereon" or to engage in negotiations "without [the] power to make binding" commitments on behalf of the Government is not an officer. *Ibid.*

Confirming that final decisionmaking authority is a prerequisite to officer status would go a long way to aiding Congress and the Executive Branch in sorting out who is an officer and who is a mere employee. At the threshold, Congress and the Executive Branch could rule out as an officer any person who investigates, advises, or recommends, but who has no power to issue binding policies, execute the laws, or finally resolve adjudicatory questions.

Turning to the question presented here, it is true that the administrative law judges (ALJs) of the Securities and Exchange Commission wield "extensive powers." *Ante,* at 2. They preside over adversarial proceedings that can lead to the imposition of significant penalties on private parties. See *ante,* at 2–3 (noting that the proceedings in the present case resulted in the imposition of $300,000 in civil penalties, as well as a lifetime bar from the investment industry). In the hearings over which they preside, Commission ALJs also exercise discretion with respect to important matters. See *ante,* at 2 (discussing Commission ALJs' powers to supervise discovery, issue subpoenas, rule on the admissibility of evidence, hear and examine witnesses, and regulate the course of the proceedings).

Nevertheless, I would hold that Commission ALJs are not officers because they lack final decisionmaking authority. As the Commission explained below, the Commission retains "'plenary authority over the course of [its] administrative proceedings and the rulings of [its] law judges.'" *In re Raymond J. Lucia Companies, Inc. & Raymond J. Lucia, Sr.*, SEC Release No. 75837 (Sept. 3, 2015). Commission ALJs can issue only "initial" decisions. 5 U. S. C.

§557(b).  The Commission can review any initial decision
upon petition or on its own initiative.  15 U. S. C. §78d–
1(b).  The Commission's review of an ALJ's initial decision
is *de novo.*  5 U. S. C. §557(c).  It can "make any findings
or conclusions that in its judgment are proper and on the
basis of the record."  17 CFR §201.411(a) (2017).  The
Commission is also in no way confined by the record ini-
tially developed by an ALJ.  The Commission can accept
evidence itself or refer a matter to an ALJ to take addi-
tional evidence that the Commission deems relevant or
necessary.  See *ibid.*; §201.452.  In recent years, the Com-
mission has accepted review in every case in which it was
sought.  See R. Jackson, Fact and Fiction: The SEC's
Oversight of Administrative Law Judges (Mar. 9, 2018),
http://clsbluesky.law.columbia.edu/2018/03/09/fact-and-fiction-
the-secs-oversight-of-administrative-law-judges/  (as last
visited June 19, 2018).  Even where the Commission does
not review an ALJ's initial decision, as in cases in which
no party petitions for review and the Commission does not
act *sua sponte*, the initial decision still only becomes final
when the Commission enters a finality order.  17 CFR.
§201.360(d)(2).  And by operation of law, every action
taken by an ALJ "shall, for all purposes, . . . be deemed the
action of the *Commission.*"  15 U. S. C. §78d–1(c) (empha-
sis added).  In other words, Commission ALJs do not
exercise significant authority because they do not, and
cannot, enter final, binding decisions against the Govern-
ment or third parties.

  The majority concludes that this case is controlled by
*Freytag* v. *Commissioner*, 501 U. S. 868 (1991).  See *ante,*
at 6.  In *Freytag*, the Court suggested that the Tax Court's
special trial judges (STJs) acted as constitutional officers
even in cases where they could not enter final, binding
decisions.  In such cases, the Court noted, the STJs pre-
sided over adversarial proceedings in which they exercised
"significant discretion" with respect to "important func-

SOTOMAYOR, J., dissenting

tions," such as ruling on the admissibility of evidence and hearing and examining witnesses. 501 U. S., at 881–882. That part of the opinion, however, was unnecessary to the result. The Court went on to conclude that even if the STJs' duties in such cases were "not as significant as [the Court] found them to be," its conclusion "would be unchanged." *Id.,* at 882. The Court noted that STJs could enter final decisions in certain types of cases, and that the Government had conceded that the STJs acted as officers with respect to those proceedings. *Ibid.* Because STJs could not be "officers for purposes of some of their duties . . . , but mere employees with respect to other[s]," the Court held they were officers in all respects. *Ibid. Freytag* is, therefore, consistent with a rule that a prerequisite to officer status is the authority, in at least some instances, to issue final decisions that bind the Government or third parties.*

Because I would conclude that Commission ALJs are not officers for purposes of the Appointments Clause, it is not necessary to reach the constitutionality of their removal protections. See *ante,* at 1 (BREYER, J., concurring in judgment in part and dissenting in part). In any event, for at least the reasons stated in JUSTICE BREYER's opinion, *Free Enterprise Fund* is readily distinguishable from the circumstances at play here. See *ante,* at 3–9.

As a final matter, although I would conclude that Commission ALJs are not officers, I share JUSTICE BREYER's concerns regarding the Court's choice of remedy, and so I join Part III of his opinion.

For the foregoing reasons, I respectfully dissent.

———————

*Even the majority opinion is not inconsistent with such a rule, in that it appears to conclude, wrongly in my view, that Commission ALJs can at times render final decisions. See *ante,* at 10.

# EXHIBIT B

(Slip Opinion)          OCTOBER TERM, 2017                          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ORTIZ *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES

No. 16–1423.   Argued January 16, 2018—Decided June 22, 2018

Congress has long provided for specialized military courts to adjudicate
charges against service members**.**  Today, courts-martial hear cases
involving crimes unconnected with military service.  They are also
subject to several tiers of appellate review, and thus are part of an in-
tegrated "court-martial system" that resembles civilian structures of
justice.  That system begins with the court-martial itself, a tribunal
that determines guilt or innocence and levies punishment, up to life-
time imprisonment or execution.  The next phase occurs at one of four
appellate courts: the Court of Criminal Appeals (CCA) for the Army,
Navy-Marine Corps, Air Force, or Coast Guard.  They review deci-
sions where the sentence is a punitive discharge, incarceration for
more than one year, or death.  The Court of Appeals for the Armed
Forces (CAAF) sits atop the court-martial system.  The CAAF is a
"court of record" composed of five civilian judges, 10 U. S. C. §941,
which must review weighty cases and may review others.  Fi-
nally, 28 U. S. C. §1259 gives this Court jurisdiction to review the
CAAF's decisions by writ of certiorari.

  Petitioner Keanu Ortiz, an Airman First Class, was convicted by a
court-martial of possessing and distributing child pornography, and
he was sentenced to two years' imprisonment and a dishonorable dis-
charge.  An Air Force CCA panel, including Colonel Martin Mitchell,
affirmed that decision.  The CAAF then granted Ortiz's petition for
review to consider whether Judge Mitchell was disqualified from
serving on the CCA because he had been appointed to the Court of
Military Commission Review (CMCR).  The Secretary of Defense had
initially put Judge Mitchell on the CMCR under his statutory author-
ity to "assign [officers] who are appellate military judges" to serve on
that court. 10 U. S. C. §950f(b)(2).  To moot a possible constitutional

2                    ORTIZ *v.* UNITED STATES

Syllabus

problem with the assignment, the President (with the Senate's advice
and consent) also appointed Judge Mitchell to the CMCR pursuant to
§950f(b)(3). Shortly thereafter, Judge Mitchell participated in Ortiz's
CCA appeal.

Ortiz claimed that Judge Mitchell's CMCR appointment barred his
continued CCA service under both a statute and the Constitution.
First, he argued that the appointment violated §973(b)(2)(A), which
provides that unless "otherwise authorized by law," an active-duty
military officer "may not hold, or exercise the functions of," certain
"civil office[s]" in the federal government. Second, he argued that the
Appointments Clause prohibits simultaneous service on the CMCR
and the CCA. The CAAF rejected both grounds for ordering another
appeal.

*Held*:

1. This Court has jurisdiction to review the CAAF's decisions. The
judicial character and constitutional pedigree of the court-martial
system enable this Court, in exercising appellate jurisdiction, to re-
view the decisions of the court sitting at its apex.

An *amicus curiae*, Professor Aditya Bamzai, argues that cases de-
cided by the CAAF do not fall within Article III's grant of appellate
jurisdiction to this Court. In *Marbury* v. *Madison*, 1 Cranch 137,
Chief Justice Marshall explained that "the essential criterion of ap-
pellate jurisdiction" is "that it revises and corrects the proceedings in
a cause already instituted, and does not create that cause." *Id.,* at
175. Here, Ortiz's petition asks the Court to "revise and correct" the
latest decision in a "cause" that began in and progressed through mil-
itary justice "proceedings." Unless Chief Justice Marshall's test im-
plicitly exempts cases instituted in a military court, the case is now
appellate.

There is no reason to make that distinction. The military justice
system's essential character is judicial. Military courts decide cases
in strict accordance with a body of federal law and afford virtually
the same procedural protections to service members as those given in
a civilian criminal proceeding. The judgments a military tribunal
renders "rest on the same basis, and are surrounded by the same
considerations[, as] give conclusiveness to the judgments of other le-
gal tribunals." *Ex parte Reed*, 100 U. S. 13, 23. Accordingly, such
judgments have res judicata and Double Jeopardy effect. The juris-
diction and structure of the court-martial system likewise resemble
those of other courts whose decisions this Court reviews. Courts-
martial try service members for garden-variety crimes unrelated to
military service, and can impose terms of imprisonment and capital
punishment. Their decisions are also subject to an appellate process
similar to the one found in most States. And just as important, the

Syllabus

constitutional foundation of courts-martial is not in the least inse-
cure. See *Dynes* v. *Hoover*, 20 How. 65, 79. The court-martial is older
than the Constitution, was recognized and sanctioned by the Fram-
ers, and has been authorized here since the first Congress. Through-
out that history, courts-martial have operated as instruments of mili-
tary justice, not mere military command. They are bound, like any
court, by the fundamental principles of law and the duty to adjudi-
cate cases without partiality.

Bamzai argues that the Court lacks jurisdiction because the CAAF
is not an Article III court, but is instead in the Executive Branch.
This Court's appellate jurisdiction, however, covers more than the de-
cisions of Article III courts. This Court can review proceedings of
state courts. See *Martin* v. *Hunter's Lessee*, 1 Wheat. 304. It can also
review certain non-Article III judicial systems created by Congress.
In particular, the Court has upheld its exercise of appellate jurisdic-
tion over decisions of non-Article III territorial courts, see *United
States* v. *Coe*, 155 U. S. 76, and it has uncontroversially exercised ap-
pellate jurisdiction over non-Article III District of Columbia courts,
see *Palmore* v. *United States*, 411 U. S. 389. The non-Article III
court-martial system stands on much the same footing as territorial
and D. C. courts. All three rest on an expansive constitutional dele-
gation, have deep historical roots, and perform an inherently judicial
role. Thus, in *Palmore*, this Court viewed the military, territories,
and District as "specialized areas having particularized needs" in
which Article III "give[s] way to accommodate plenary grants of pow-
er to Congress." *Id.*, at 408.

Bamzai does not provide a sufficient reason to divorce military
courts from territorial and D. C. courts when it comes to defining this
Court's appellate jurisdiction. He first relies on the fact that territo-
rial and D. C. courts exercise power over discrete geographic areas,
while military courts do not. But this distinction does not matter to
the jurisdictional inquiry. His second argument focuses on the fact
that the CAAF is in the Executive Branch. In his view, two of the
Court's precedents—*Ex parte Vallandigham*, 1 Wall. 243, and *Mar-
bury*, 1 Cranch 137—show that the Court may never accept appellate
jurisdiction from any person or body within that branch. As to *Val-
landigham*, that case goes to show only that not every military tribu-
nal is alike. Unlike the military commission in *Vallandigham*, which
lacked "judicial character," 1 Wall., at 253, the CAAF is a permanent
court of record established by Congress, and its decisions are final
unless the Court reviews and reverses them. As to *Marbury*, James
Madison's failure to transmit William Marbury's commission was not
a judicial decision by a court. Here, by contrast, three constitution-
ally rooted courts rendered inherently judicial decisions. Pp. 5–19.

4                    ORTIZ *v.* UNITED STATES

Syllabus

    2. Judge Mitchell's simultaneous service on the CCA and the
CMCR violated neither §973(b)(2)(A) nor the Appointments Clause.
Pp. 19–25.

    (a) The statutory issue turns on two interlocking provisions.  Sec-
tion 973(b)(2)(A) is the statute that Ortiz claims was violated here.  It
prohibits military officers from "hold[ing], or exercis[ing] the func-
tions of," certain "civil office[s]" in the federal government, "[e]xcept
as otherwise authorized by law."  Section 950f(b) is the statute that
the Government claims "otherwise authorize[s]" Judge Mitchell's
CMCR service, even if a seat on that court is a covered "civil office."
It provides two ways to become a CMCR judge.  Under §950f(b)(2),
the Secretary of Defense "may assign" qualified officers serving on a
CCA to be judges on the CMCR.  Under §950f(b)(3), the President
(with the Senate's advice and consent) "may appoint" persons—
whether officers or civilians is unspecified—to CMCR judgeships.

    Ortiz argues that Judge Mitchell was not "authorized by law" to
serve on the CMCR after his appointment because §950f(b)(3) makes
no express reference to military officers.  In the circumstances here,
however, the express authorization to assign military officers to the
CMCR under §950f(b)(2) was the only thing necessary to exempt
Judge Mitchell from §973(b)(2)(A).  Once the Secretary of Defense
placed Judge Mitchell on the CMCR pursuant to §950f(b)(2), the
President's later appointment made no difference.  It did not negate
the Secretary's earlier action, but rather ratified what the Secretary
had already done.  Thus, after the appointment, Judge Mitchell
served on the CMCR by virtue of both the Secretary's assignment and
the President's appointment.  And because §950f(b)(2) expressly au-
thorized the Secretary's assignment, Judge Mitchell's CMCR service
could not run afoul of §973(b)(2)(A)'s general rule.  Pp. 20–23.

    (b) Ortiz also raises an Appointments Clause challenge to Judge
Mitchell's simultaneous service on the CCA and the CMCR.  That
Clause distinguishes between principal officers and inferior officers.
CCA judges are inferior officers.  Ortiz views CMCR judges as princi-
pal officers.  And Ortiz argues that, under the Appointments Clause,
a single judge cannot serve as an inferior officer on one court and a
principal officer on another.  But the Court has never read the Ap-
pointments Clause to impose rules about dual service, separate and
distinct from methods of appointment.  And if the Court were ever to
apply the Clause to dual-officeholding, it would not start here.  Ortiz
does not show how Judge Mitchell's CMCR service would result in
"undue influence" on his CCA colleagues.  Pp. 23–25.

76 M. J. 125 and 189, affirmed.

    KAGAN, J., delivered the opinion of the Court, in which ROBERTS,

Cite as:  585 U. S. ____ (2018)          5

Syllabus

C. J., and KENNEDY, THOMAS, GINSBURG, BREYER, and SOTOMAYOR, JJ.,
joined.  THOMAS, J., filed a concurring opinion.  ALITO, J., filed a dis-
senting opinion, in which GORSUCH, J., joined.

Cite as: 585 U. S. ____ (2018)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

─────────────

No. 16–1423

─────────────

## KEANU D. W. ORTIZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ARMED FORCES

[June 22, 2018]

JUSTICE KAGAN delivered the opinion of the Court.

This case is about the legality of a military officer serv-
ing as a judge on both an Air Force appeals court and the
Court of Military Commission Review (CMCR). The peti-
tioner, an airman convicted of crimes in the military jus-
tice system, contends that the judge's holding of dual
offices violated a statute regulating military service, as
well as the Constitution's Appointments Clause. The
Court of Appeals for the Armed Forces (CAAF) rejected
those claims, and we granted a petition for certiorari. We
hold first that this Court has jurisdiction to review deci-
sions of the CAAF, even though it is not an Article III
court. We then affirm the CAAF's determination that the
judge's simultaneous service was lawful.

I

In the exercise of its authority over the armed forces,
Congress has long provided for specialized military courts
to adjudicate charges against service members. Today,
trial-level courts-martial hear cases involving a wide
range of offenses, including crimes unconnected with
military service; as a result, the jurisdiction of those tri-
bunals overlaps substantially with that of state and federal

2                      ORTIZ *v.* UNITED STATES

Opinion of the Court

courts.  See *Solorio* v. *United States*, 483 U. S. 435, 436
(1987); *United States* v. *Kebodeaux*, 570 U. S. 387, 404
(2013) (ALITO, J., concurring in judgment).  And courts-
martial are now subject to several tiers of appellate re-
view, thus forming part of an integrated "court-martial
system" that closely resembles civilian structures of jus-
tice.  *United States* v. *Denedo*, 556 U. S. 904, 920 (2009);
see *Weiss* v. *United States*, 510 U. S. 163, 174 (1994).

That system begins with the court-martial itself, an
officer-led tribunal convened to determine guilt or inno-
cence and levy appropriate punishment, up to lifetime
imprisonment or execution.  See 10 U. S. C. §§816, 818,
856a.  The next phase of military justice occurs at one of
four appellate courts: the Court of Criminal Appeals (CCA)
for the Army, Navy-Marine Corps, Air Force, or Coast
Guard.  Those courts, using three-judge panels of either
officers or civilians, review all decisions in which the
sentence imposed involves a punitive discharge, incarcera-
tion for more than one year, or death.  See §§866(a)–(c).
Atop the court-martial system is the CAAF, a "court of
record" made up of five civilian judges appointed to serve
15-year terms.  §941; see §§942(a)–(b).  The CAAF must
review certain weighty cases (including those in which
capital punishment was imposed), and may grant petitions
for review in any others.  See §867.  Finally, this Court
possesses statutory authority to step in afterward: Under
28 U. S. C. §1259, we have jurisdiction to review the
CAAF's decisions by writ of certiorari.

Petitioner Keanu Ortiz's case has run the gamut of this
legal system.  Ortiz, an Airman First Class in the Air
Force, was charged with knowingly possessing and dis-
tributing child pornography, in violation of the Uniform
Code of Military Justice.  A court-martial found Ortiz
guilty as charged and imposed a sentence of two years'
imprisonment and a dishonorable discharge.  On appeal,
an Air Force CCA panel, including Colonel Martin Mitch-

Opinion of the Court

ell, summarily affirmed the court-martial's decision.  The
CAAF then granted Ortiz's petition for review to consider
whether Judge Mitchell was disqualified from serving on
the CCA, thus entitling Ortiz to an appellate do-over.

That issue arose from Judge Mitchell's simultaneous
service on the CMCR.  Congress created the CMCR as an
appellate tribunal to review the decisions of military
commissions, particularly those operating in Guantanamo
Bay.[1]  The Secretary of Defense put Judge Mitchell on that
court shortly after he became a member of the CCA, under
a statutory provision authorizing the Secretary to "assign
[officers] who are appellate military judges" to serve on
the CMCR as well.  10 U. S. C. §950f(b)(2).  Around the
same time, a military-commission defendant argued to the
Court of Appeals for the D. C. Circuit that the Appoint-
ments Clause requires the President and Senate (rather
than the Secretary) to place judges on the CMCR.  The
D. C. Circuit avoided resolving that issue, but suggested
that the President and Senate could "put [it] to rest" by
appointing the very CMCR judges whom the Secretary
had previously assigned.  *In re al-Nashiri*, 791 F. 3d 71, 86
(2015).  The President decided to take that advice, and
nominated each of those judges—Mitchell, among them—
under an adjacent statutory provision authorizing him to
"appoint, by and with the advice and consent of the Sen-
ate," CMCR judges.  §950f(b)(3).  The Senate then con-
firmed those nominations.  About a month later, Judge
Mitchell—now wearing his CCA robe—participated in the
panel decision rejecting Ortiz's appeal.

In Ortiz's view, Judge Mitchell's appointment to the
CMCR barred his continued service on the CCA under

――――――

[1] In contrast to courts-martial, military commissions have historically
been used to substitute for civilian courts in times of martial law or
temporary military government, as well as to try members of enemy
forces for violations of the laws of war.  See *Hamdan* v. *Rumsfeld*, 548
U. S. 557, 595–597 (2006) (plurality opinion).

4                    ORTIZ *v.* UNITED STATES

Opinion of the Court

both a statute and the Constitution. First, Ortiz invoked
10 U. S. C. §973(b). That statute, designed to ensure
civilian preeminence in government, provides that unless
"otherwise authorized by law," an active-duty military
officer like Judge Mitchell "may not hold, or exercise the
functions of," certain "civil office[s]" in the Federal Gov-
ernment. §973(b)(2)(A). According to Ortiz, a CMCR
judgeship is a covered civil office, and no other law allowed
the President to put Mitchell in that position: Thus, his
appointment to the CMCR violated §973(b). See Brief in
Support of Petition Granted in No. 16–0671 (CAAF),
pp. 17–22. And the proper remedy, Ortiz argued, was to
terminate Judge Mitchell's military service effective the
date of his CMCR appointment and void all his later ac-
tions as a CCA judge—including his decision on Ortiz's
appeal. See *ibid.* Second and independently, Ortiz relied
on the Appointments Clause to challenge Judge Mitchell's
dual service. See *id.,* at 27–40. The premise of his argu-
ment was that CMCR judges are "principal officers" under
that Clause, whereas CCA judges (as this Court has held)
are "inferior officers." *Edmond* v. *United States*, 520 U. S.
651, 666 (1997). Ortiz claimed that the Appointments
Clause prohibits someone serving as a principal officer on
one court (the CMCR) from sitting alongside inferior
officers on another court (the CCA). Because Judge Mitch-
ell had done just that, Ortiz concluded, the CCA's ruling on
his appeal could not stand.

The CAAF rejected both grounds for ordering another
appeal. See 76 M. J. 189 (2017). In considering the statu-
tory question, the court chose not to decide whether
§973(b) precluded Judge Mitchell from serving on the
CMCR while an active-duty officer. Even if so, the CAAF
held, the remedy for the violation would not involve ter-
minating the judge's military service or voiding actions he
took on the CCA. See *id.,* at 192. Turning next to the
constitutional issue, the CAAF "s[aw] no Appointments

Opinion of the Court

Clause problem." *Id.,* at 193.  Even assuming Judge
Mitchell was a principal officer when sitting on the CMCR,
the court held, that status in no way affected his service
on the CCA: "When Colonel Mitchell sits as a CCA
judge, he is no different from any other CCA judge." *Ibid.*
The CAAF thus upheld the CCA's affirmance of Ortiz's
convictions.

This Court granted Ortiz's petition for certiorari to
consider whether either §973(b) or the Appointments
Clause prevents a military officer from serving, as Judge
Mitchell did, on both a CCA and the CMCR.  582 U. S. ___
(2017).  We now affirm the decision below.[2]

## II

We begin with a question of our own jurisdiction to
review the CAAF's decisions.  Congress has explicitly
authorized us to undertake such review in 28 U. S. C.
§1259.  See *ibid.* ("Decisions of the [CAAF] may be re-
viewed by the Supreme Court by writ of certiorari").  Both
the Federal Government and Ortiz view that grant of
jurisdiction as constitutionally proper.  But an *amicus
curiae*, Professor Aditya Bamzai, argues that it goes be-
yond what Article III allows.  That position is a new one to
this Court: We have previously reviewed nine CAAF deci-
sions without anyone objecting that we lacked the power
to do so.[3]  Still, we think the argument is serious, and

---

[2]At the same time we issued a writ of certiorari in this case, we
granted and consolidated petitions in two related cases—*Dalmazzi* v.
*United States*, No. 16–961, and *Cox* v. *United States*, No. 16–1017.
Those cases raise issues of statutory jurisdiction that our disposition
today makes it unnecessary to resolve.  We accordingly dismiss
*Dalmazzi*, *post*, p. ___, and *Cox*, *post*, p. ___, as improvidently granted
in opinions accompanying this decision.

[3]See *United States* v. *Denedo*, 556 U. S. 904 (2009); *Clinton* v. *Gold-
smith*, 526 U. S. 529 (1999); *United States* v. *Scheffer*, 523 U. S. 303
(1998); *Edmond* v. *United States*, 520 U. S. 651 (1997); *Loving* v. *United
States*, 517 U. S. 748 (1996); *Ryder* v. *United States*, 515 U. S. 177

deserving of sustained consideration. That analysis leads us to conclude that the judicial character and constitutional pedigree of the court-martial system enable this Court, in exercising appellate jurisdiction, to review the decisions of the court sitting at its apex.

Bamzai starts with a proposition no one can contest—that our review of CAAF decisions cannot rest on our *original* jurisdiction. Brief for Aditya Bamzai as *Amicus Curiae* 11. Article III of the Constitution grants this Court original jurisdiction in a limited category of cases: those "affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party." §2, cl. 2. That list, of course, does not embrace Ortiz's case, or any other that the CAAF considers. And ever since *Marbury* v. *Madison*, 1 Cranch 137 (1803), this Court has recognized that our original jurisdiction cannot extend any further than the cases enumerated: If Congress attempts to confer more on us, we must (as Chief Justice Marshall famously did, in the pioneer act of judicial review) strike down the law. *Id.,* at 174–180. As a result, Bamzai is right to insist that §1259 could not authorize this Court, as part of its original jurisdiction, to hear military cases like Ortiz's.

The real issue is whether our *appellate* jurisdiction can cover such cases. Article III's sole reference to appellate jurisdiction provides no apparent barrier, but also no substantial guidance: Following its specification of this Court's original jurisdiction, Article III says only that in all "other Cases" that the Constitution comprehends (including cases, like this one, involving federal questions), "the supreme Court shall have appellate Jurisdiction, both as to Law and Fact." §2, cl. 2. The Constitution's failure

————————

(1995); *Davis* v. *United States*, 512 U. S. 452 (1994); *Weiss* v. *United States*, 510 U. S. 163 (1994); *Solorio* v. *United States*, 483 U. S. 435 (1987).

Opinion of the Court

to say anything more about appellate jurisdiction leads Bamzai to focus on Chief Justice Marshall's opinion in *Marbury*. See Brief for Bamzai 2–4, 12–14. In that case (as you surely recall), William Marbury petitioned this Court—without first asking any other—to issue a writ of mandamus to Secretary of State James Madison directing him to deliver a commission. After holding (as just related) that the Court's original jurisdiction did not extend so far, Chief Justice Marshall also rejected the idea that the Court could provide the writ in the exercise of its appellate jurisdiction. "[T]he essential criterion of appellate jurisdiction," the Chief Justice explained, is "that it revises and corrects the proceedings in a cause already instituted, and does not create that cause." 1 Cranch, at 175. Marbury's petition, Chief Justice Marshall held, commenced the cause—or, to use the more modern word, the case; hence, it was not a matter for appellate jurisdiction. Bamzai contends that the same is true of Ortiz's petition.

On any ordinary understanding of the great Chief Justice's words, that is a surprising claim. Ortiz's petition asks us to "revise and correct" the latest decision in a "cause" that began in and progressed through military justice "proceedings." *Ibid.* Or, as the Government puts the point, this case fits within Chief Justice Marshall's standard because "it comes to th[is] Court on review of the Court of Appeals for the Armed Forces' decision, which reviewed a criminal proceeding that originated in [a] court[]-martial." Tr. of Oral Arg. 47–48. So this Court would hardly be the first to render a decision in the case. Unless Chief Justice Marshall's test implicitly exempts cases instituted in a military court—as contrasted, for example, with an ordinary federal court—the case is now appellate.[4]

————————
[4] The dissent asserts that, in setting out that test, we have "basically proceed[ed] as though *Marbury* were our last word on the subject" and

Opinion of the Court

The military justice system's essential character—in a word, judicial—provides no reason to make that distinction.  Accord *post,* at 6–8 (THOMAS, J., concurring).  Each level of military court decides criminal "cases" as that term is generally understood, and does so in strict accordance with a body of federal law (of course including the Constitution).  The procedural protections afforded to a service member are "virtually the same" as those given in a civilian criminal proceeding, whether state or federal.  1 D. Schlueter, Military Criminal Justice: Practice and Procedure §1–7, p. 50 (9th ed. 2015) (Schlueter).  And the judgments a military tribunal renders, as this Court long ago observed, "rest on the same basis, and are surrounded by the same considerations[, as] give conclusiveness to the judgments of other legal tribunals."  *Ex parte Reed*, 100 U. S. 13, 23 (1879).  Accordingly, we have held that the "valid, final judgments of military courts, like those of any court of competent jurisdiction[,] have res judicata effect and preclude further litigation of the merits."  *Schlesinger* v. *Councilman*, 420 U. S. 738, 746 (1975).  In particular, those judgments have identical effect under the Double Jeopardy Clause.  See *Grafton* v. *United States*, 206 U. S.

─────────────

overlooked "two centuries of precedent."  *Post*, at 8 (opinion of ALITO, J.).  But the cases the dissent faults us for failing to cite stand for the same principle that we—and more important, *Marbury*—already set out.  They too say that our appellate jurisdiction permits us to review only prior judicial decisions, rendered by courts.  See, *e.g.*, *Ex parte Yerger*, 8 Wall. 85, 97 (1869) (Our "appellate jurisdiction" may "be exercised only in the revision of judicial decisions"); *The Alicia*, 7 Wall. 571, 573 (1869) ("[A]n appellate jurisdiction necessarily implies some judicial determination . . . of an inferior tribunal, from which an appeal has been taken"); *Cohens* v. *Virginia*, 6 Wheat. 264, 396 (1821) (In exercising appellate jurisdiction, we act as a "supervising Court, whose peculiar province it is to correct the errors of an inferior Court"); *Ex parte Bollman*, 4 Cranch 75, 101 (1807) (We exercise "appellate jurisdiction" in "revisi[ng] a decision of an inferior court"); *post*, at 4–6, 10, 12.  *Marbury*, then, remains the key precedent.

Opinion of the Court

333, 345 (1907).

The jurisdiction and structure of the court-martial system likewise resemble those of other courts whose decisions we review.  Although their jurisdiction has waxed and waned over time, courts-martial today can try service members for a vast swath of offenses, including garden-variety crimes unrelated to military service.  See 10 U. S. C. §§877–934; *Solorio*, 483 U. S., at 438–441; *supra,* at 1–2.  As a result, the jurisdiction of those tribunals overlaps significantly with the criminal jurisdiction of federal and state courts.  See *Kebodeaux*, 570 U. S., at 404 (ALITO, J., concurring in judgment).  The sentences meted out are also similar: Courts-martial can impose, on top of peculiarly military discipline, terms of imprisonment and capital punishment.  See §818(a); *post*, at 6 (THOMAS, J., concurring) ("[T]hese courts decide questions of the most momentous description, affecting even life itself" (quotation marks and ellipses omitted)).  And the decisions of those tribunals are subject to an appellate process—what we have called an "integrated system of military courts and review procedures"—that replicates the judicial apparatus found in most States.  *Councilman*, 420 U. S., at 758.  By the time a case like Ortiz's arrives on our doorstep under 28 U. S. C. §1259, it has passed through not one or two but three military courts (including two that can have civilian judges).

And just as important, the constitutional foundation of courts-martial—as judicial bodies responsible for "the trial and punishment" of service members—is not in the least insecure.  *Dynes* v. *Hoover*, 20 How. 65, 79 (1858).  The court-martial is in fact "older than the Constitution," 1 Schlueter §1–6(B), at 39; the Federalist Papers discuss "trials by courts-martial" under the Articles of Confederation, see No. 40, p. 250 (C. Rossiter ed. 1961).  When it came time to draft a new charter, the Framers "recogni[zed] and sanction[ed] existing military jurisdiction," W.

10          ORTIZ *v.* UNITED STATES

Opinion of the Court

Winthrop, Military Law and Precedents 48 (2d ed. 1920)
(emphasis deleted), by exempting from the Fifth Amend-
ment's Grand Jury Clause all "cases arising in the land or
naval forces."   And by granting legislative power "[t]o
make Rules for the Government and Regulation of the
land and naval Forces," the Framers also authorized
Congress to carry forward courts-martial.  Art. I, §8, cl. 14.
Congress did not need to be told twice.  The very first
Congress continued the court-martial system as it then
operated.  See Winthrop, *supra,* at 47.  And from that day
to this one, Congress has maintained courts-martial in all
their essentials to resolve criminal charges against service
members.  See 1 Schlueter §1–6, at 35–48.

Throughout that history, and reflecting the attributes
described above, courts-martial have operated as instru-
ments of military justice, not (as the dissent would have it)
mere "military command," *post,* at 18 (opinion of ALITO,
J.).  As one scholar has noted, courts-martial "have long
been understood to exercise 'judicial' power," of the same
kind wielded by civilian courts.  Nelson, Adjudication in
the Political Branches, 107 Colum. L. Rev. 559, 576 (2007);
see W. De Hart, Observations on Military Law 14 (1859)
(Military courts are "imbued or endowed with the like
essence of judicial power" as "ordinary courts of civil judi-
cature"); accord *post,* at 6–8 (THOMAS, J., concurring).
Attorney General Bates, even in the middle of the Civil
War, characterized a court-martial "proceeding, from its
inception, [a]s judicial," because the "trial, finding, and
sentence are the solemn acts of a court organized and
conducted under the authority of and according to the
prescribed forms of law."  *Runkle* v. *United States*, 122
U. S. 543, 558 (1887) (quoting 11 Op. Atty. Gen. 19, 21
(1864)).  Colonel Winthrop—whom we have called the
"Blackstone of Military Law," *Reid* v. *Covert,* 354 U. S. 1,
19, n. 38 (1957) (plurality opinion)—agreed with Bates.
He regarded a court-martial as "in the strictest sense" a

Opinion of the Court

"court of law and justice"—"bound, like any court, by the fundamental principles of law" and the duty to adjudicate cases "without partiality, favor, or affection."  Winthrop, *supra,* at 54.[5]

Despite all this, Bamzai claims that "*Marbury* bars th[is] Court from deciding" any cases coming to us from the court-martial system.  Brief for Bamzai 3.  He begins, much as we did above, by explaining that under *Marbury* the Court can exercise appellate jurisdiction only when it is "supervising an earlier decision by a lower court."  Brief for Bamzai 13.  The next step is where the argument gets interesting.  The CAAF, Bamzai contends, simply does not qualify as such a body (nor does any other military tribunal).  True enough, "the CAAF is called a 'court'"; and true enough, it decides cases, just as other courts do.  *Id.,* at 3; see *id.*, at 28.  But the CAAF, Bamzai notes, is "not an *Article III* court," *id.*, at 3 (emphasis added): As all agree,

---

[5] The independent adjudicative nature of courts-martial is not inconsistent with their disciplinary function, as the dissent claims, see *post*, at 18–26.  By adjudicating criminal charges against service members, courts-martial of course help to keep troops in line.  But the way they do so—in comparison to, say, a commander in the field—is fundamentally judicial.  Accord *post*, at 9 (THOMAS, J., concurring) ("While the CAAF is in the Executive Branch and its purpose is to help the President maintain troop discipline, those facts do not change the *nature* of the power that it exercises").  Colonel Winthrop stated as much: Even while courts-martial "enforc[e] discipline" in the armed forces, they remain "as fully a court of law and justice as is any civil tribunal."  W. Winthrop, Military Law and Precedents 49, 54 (2d ed. 1920).  And he was right.  When a military judge convicts a service member and imposes punishment—up to execution—he is not meting out extrajudicial discipline.  He is acting *as a judge*, in strict compliance with legal rules and principles—rather than as an "arm of military command."  *Post*, at 18.  It is in fact one of the glories of this country that the military justice system is so deeply rooted in the rule of law.  In asserting the opposite—that military courts are not "judicial" in "character"—the dissent cannot help but do what it says it would like to avoid: "denigrat[e the court-martial] system."  *Post*, at 27; see *post*, at 25.

Opinion of the Court

its members lack the tenure and salary protections that are the hallmarks of the Article III judiciary, see 10 U. S. C. §§942(b), (c). Congress established the CAAF under its Article I, rather than its Article III, powers, and Congress located the CAAF (as we have previously observed) within the Executive Branch, rather than the judicial one. See §941; *Edmond*, 520 U. S., at 664, and n. 2. Those facts, in Bamzai's view, prevent this Court from exercising appellate jurisdiction over the CAAF. "For constitutional purposes," Bamzai concludes, the members of the CAAF "stand on equal footing with James Madison in *Marbury*." Brief for Bamzai 4. (With variations here and there, the dissent makes the same basic argument.)

But this Court's appellate jurisdiction, as Justice Story made clear ages ago, covers more than the decisions of Article III courts. In *Martin* v. *Hunter's Lessee*, 1 Wheat. 304 (1816), we considered whether our appellate jurisdiction extends to the proceedings of state courts, in addition to those of the Article III federal judiciary. We said yes, as long as the case involves subject matter suitable for our review. *Id.,* at 338–352. For our "appellate power," Story wrote, "is not limited by the terms of [Article III] to any particular courts." *Id.,* at 338. Or again: "[I]t will be in vain to search in the letter of the [C]onstitution for any qualification as to the tribunal" from which a given case comes. *Ibid.* The decisions we review might come from Article III courts, but they need not.

The same lesson emerges from two contexts yet more closely resembling this one—each involving a non-Article III judicial system created by Congress. First, in *United States* v. *Coe*, 155 U. S. 76 (1894), this Court upheld the exercise of appellate jurisdiction over decisions of federal territorial courts, despite their lack of Article III status. We observed there that the Constitution grants Congress broad authority over the territories: to "make all needful Rules and Regulations respecting" those areas. Art. IV,

Opinion of the Court

§3, cl. 2; see *Coe*, 155 U. S., at 85.  And we recognized that Congress, with this Court's permission, had long used that power to create territorial courts that did not comply with Article III.  See *ibid.*  Chief Justice Marshall had held such a court constitutional in 1828 even though its authority was "not a part of that judicial power which is defined in the 3d article."  *American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 546 (1828); see *Coe*, 155 U. S., at 85 (describing that opinion as having "settled" that Article III "does not exhaust the power of Congress to establish courts").  The exception to Article III for territorial courts was thus an established and prominent part of the legal landscape by the time *Coe* addressed this Court's role in reviewing their decisions.  And so the Court found the issue simple.  "There has never been any question," we declared, "that the judicial action of [territorial courts] may, in accordance with the Constitution, be subjected to [our] appellate jurisdiction."  *Id.,* at 86.

Second, we have routinely, and uncontroversially, exercised appellate jurisdiction over cases adjudicated in the non-Article III District of Columbia courts.[6]  Here too, the Constitution grants Congress an unqualified power: to legislate for the District "in all Cases whatsoever."  Art. I, §8, cl. 17.  Under that provision, we long ago determined, "Congress has the entire control over the [D]istrict for every purpose of government," including that of "organizing a judicial department."  *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524, 619 (1838).  So when Congress in-

_____

[6]See, *e.g.*, *Artis* v. *District of Columbia*, 583 U. S. ___ (2018); *Turner* v. *United States*, 582 U. S. ___ (2017); *United States* v. *Dixon*, 509 U. S. 688 (1993); *Jones* v. *United States*, 463 U. S. 354 (1983); *Tuten* v. *United States*, 460 U. S. 660 (1983); *Whalen* v. *United States*, 445 U. S. 684 (1980); *United States* v. *Crews*, 445 U. S. 463 (1980); *Pernell* v. *Southall Realty*, 416 U. S. 363 (1974); *Palmore* v. *United States*, 411 U. S. 389 (1973).  In none of these or similar cases has anyone ever challenged our appellate jurisdiction.

14          ORTIZ *v.* UNITED STATES

Opinion of the Court

voked that authority to create a set of local courts, this Court upheld the legislation—even though the judges on those courts lacked Article III protections. See *Palmore* v. *United States*, 411 U. S. 389, 407–410 (1973). We relied on the Constitution's "plenary grant[] of power to Congress to legislate with respect to" the national capital. *Id.,* at 408. And several years later, we referred as well to the "historical consensus" supporting congressional latitude over the District's judiciary. *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 70 (1982) (plurality opinion); see *id.,* at 65, n. 16. To be sure, we have never explicitly held, as we did in the territorial context, that those same considerations support our appellate jurisdiction over cases resolved in the D. C. courts. But some things go unsaid because they are self-evident. And indeed, even Bamzai readily acknowledges that this Court can review decisions of the D. C. Court of Appeals. See Brief for Bamzai 23, 25.

The non-Article III court-martial system stands on much the same footing as territorial and D. C. courts, as we have often noted. The former, just like the latter, rests on an expansive constitutional delegation: As this Court early held, Article I gives Congress the power—"entirely independent" of Article III—"to provide for the trial and punishment of military and naval offences in the manner then and now practiced by civilized nations." *Dynes*, 20 How., at 79; see *supra,* at 9. The former has, if anything, deeper historical roots, stretching from before this nation's beginnings up to the present. See *supra,* at 9. And the former, no less than the others, performs an inherently judicial role, as to substantially similar cases. See *supra,* at 8–11. So it is not surprising that we have lumped the three together. In *Palmore*, the Court viewed the military, territories, and District as a triad of "specialized areas having particularized needs" in which Article III "give[s] way to accommodate plenary grants of power to Congress."

411 U. S., at 408. And in *Northern Pipeline*, the plurality said of all three that "a constitutional grant of power [as] historically understood" has bestowed "exceptional powers" on Congress to create courts outside Article III. 458 U. S., at 66, 70.[7] Given those well-understood connections, we would need a powerful reason to divorce military courts from territorial and D. C. courts when it comes to defining our appellate jurisdiction.

And Bamzai fails to deliver one. His initial attempt relies on a simple fact about territorial and D. C. courts: They exercise power over "discrete geographic areas." Brief for Bamzai 23. Military courts do not; they instead exercise power over discrete individuals—*i.e.*, members of the armed forces. So Bamzai gives us a distinction: places vs. people. What he does not offer is a good reason why that distinction should matter in our jurisdictional inquiry—why it is one of substance, rather than conven-

---

[7] In addition, several Justices in separate opinions have made the same linkage. See, *e.g., Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. ___, ___ (2015) (ROBERTS, C. J., dissenting) (slip op., at 3) (noting that "narrow exceptions permit Congress to establish non-Article III courts to exercise general jurisdiction in the territories and the District of Columbia [and] to serve as military tribunals"); *id.,* at ___–___ (THOMAS, J., dissenting) (slip op., at 7–8) (referring to territorial courts and courts-martial as "unique historical exceptions" to Article III); *Stern* v. *Marshall*, 564 U. S. 462, 504–505 (2011) (Scalia, J., concurring) (noting the "firmly established historical practice" of exempting territorial courts and courts-martial from Article III's demands).

The dissent must dismiss all this authority, from Justices both functionalist and formalist, to aver that "it is *only* when Congress legislates for the Territories and the District that it may lawfully vest judicial power in tribunals that do not conform to Article III." *Post*, at 16; see *post*, at 14–16. Not so, we have made clear, because (once again) of an exceptional grant of power to Congress, an entrenched historical practice, and (for some more functionalist judges) particularized needs. The result is "that Congress has the power [apart from Article III] to provide for the adjudication of disputes among the Armed Forces," just as in the territories and the District. *Wellness,* 575 U. S., at ___ (THOMAS, J., dissenting) (slip op., at 8).

Opinion of the Court

ience.  He mentions that the territorial and D. C. courts
are "functional equivalents of state courts."  *Id.,* at 24; see
Tr. of Oral Arg. 33, 35.  But for starters, that could be said
of courts-martial too.  As we have described, they try all
the "ordinary criminal offenses" (murder, assault, robbery,
drug crimes, etc., etc., etc.) that state courts do.  *Kebo-
deaux*, 570 U. S., at 404 (ALITO, J., concurring in judg-
ment); see *supra,* at 1–2, 9.  And more fundamentally, we
do not see why geographical *state*-likeness, rather than
historical *court*-likeness, should dispose of the issue.  As
we have shown, the petition here asks us to "revise[] and
correct[] the proceedings in a cause already instituted" in
a judicial system recognized since the founding as compe-
tent to render the most serious decisions.  *Marbury*, 1
Cranch, at 175; see *supra,* at 8–11.  That should make the
case an appeal, whether or not the domain that system
covers is precisely analogous to, say, Alabama.

So Bamzai tries another route to cleave off military
courts, this time focusing on their location in the Execu-
tive Branch. See Brief for Bamzai 26–30.  Bamzai actually
never says in what branch (if any) he thinks territorial
and D. C. courts reside.   But he knows—because this
Court has said—that the CAAF is an "Executive Branch
entity."  *Edmond*, 520 U. S., at 664, and n. 2; see *supra,* at
12.  And in Bamzai's view, two of our precedents show that
we may never accept appellate jurisdiction from any per-
son or body within that branch. See Brief for Bamzai 2–4.
The first case he cites is *Ex parte Vallandigham*, 1 Wall.
243 (1864), in which the Court held that it lacked jurisdic-
tion over decisions of a temporary Civil War-era military
commission.  See *id.*, at 251–252.  The second is *Marbury*
itself, in which the Court held (as if this needed repeating)
that it lacked jurisdiction to review James Madison's
refusal to deliver a commission appointing William Mar-
bury a justice of the peace.  See 1 Cranch, at 175–176;
*supra,* at 7.

Opinion of the Court

As to the first, *Vallandigham* goes to show only that not every military tribunal is alike.  The commission the Court considered there was established by General Ambrose Burnside (he of the notorious facial hair) for a time-limited, specialized purpose—to try persons within the military Department of Ohio (Burnside's then-command) for aiding the Confederacy.  See 1 Wall., at 243–244.  And the General kept firm control of the commission (made up entirely of his own field officers): After personally ordering Vallandigham's arrest, he (and he alone) also reviewed the commission's findings and sentence.  See *id.,* at 247–248; J. McPherson, Battle Cry of Freedom 596–597 (1988).  This Court therefore found that the commission lacked "judicial character."  1 Wall., at 253.  It was more an adjunct to a general than a real court—and so we did not have appellate jurisdiction over its decisions.[8]  But the

_____

[8] The dissent offers a different—and doubly misleading—explanation for *Vallandigham*.  First, it says that we found jurisdiction lacking because the commission was "was not one of the 'courts of the United States' established under Article III."  *Post*, at 11 (quoting *Vallandigham*, 1 Wall., at 251).  But the dissent is reading from the wrong part of the opinion.  *Vallandigham* contained two holdings—first (and relevant here), that Article III precluded the Court from exercising appellate jurisdiction over the commission's decisions, and second (and irrelevant here), that the Judiciary Act of 1789 had not authorized such jurisdiction.  The language the dissent quotes relates only to the irrelevant statutory holding: The Judiciary Act, the Court explained, confined our jurisdiction to decisions of Article III courts, and the commission did not fit under that rubric.  By contrast, the language we quote in the text formed the basis of the Court's constitutional holding—which is all that matters here.  Second, the dissent contends that *Vallandigham* "*recognized* that the military tribunal had 'judicial character,'" even as it found jurisdiction lacking.  *Post*, at 11.  Not so.  *Vallandigham* expressly *rejected* the argument that the commission had "judicial character."  1 Wall., at 253.  Though the Court understood that the commission pronounced guilt and imposed sentences, it did not think the commission was acting as a court in rendering its decisions.  See *ibid.* (citing *United States* v. *Ferreira*, 13 How. 40, 46–47 (1852), in which the Court held that a claims tribunal was without judicial

18                    ORTIZ *v.* UNITED STATES

Opinion of the Court

very thing that Burnside's commission lacked, the court-
martial system—and, in particular, the CAAF (whose
decision Ortiz asks us to review)—possesses in spades.
Once again, the CAAF is a permanent "court of record"
created by Congress; it stands at the acme of a firmly
entrenched judicial system that exercises broad jurisdic-
tion in accordance with established rules and procedures;
and its own decisions are final (except if we review and
reverse them). See *supra,* at 1–2, 8–11.[9]  That is "judicial
character" more than sufficient to separate the CAAF from
Burnside's commission, and align it instead with territorial
and D. C. (and also state and federal) courts of appeals.

And the differences between the CAAF's decisions and
James Madison's delivery refusal should have already
leaped off the page.  To state the obvious: James Madison
was not a court, either in name or in function.  He was the
Secretary of State—the head of a cabinet department
(and, by the way, the right arm of the President).  Like-
wise, Madison's failure to transmit Marbury's commission
was not a judicial decision; it was an enforcement action
(though in the form of non-action), pertaining only to the

_____

"character" and labeled its decisions the "award[s] of a commissioner,"
"not the judgment[s] of a court of justice").

[9]The dissent contends that the CAAF's decisions are not always final
because the President, relevant branch secretary, or one of his subordi-
nates must approve a sentence of death or dismissal from the armed
forces before it goes into effect.  See *post,* at 28–29.  But as the Govern-
ment has explained, the President's (or other executive official's)
authority at that stage extends only to punishment: It is "akin to relief
by commutation in the federal or state system."  Tr. of Oral Arg. 57; see
*Loving* v. *United States,* 62 M. J. 235, 247 (CAAF 2005) (likening the
approval authority to "executive clemency powers").  The President,
even when "mitigat[ing a] sentence[,]" cannot "upset[ ] the conviction"
or "the judgment of the CAAF."  Tr. of Oral Arg. 55–56.  Rather, as we
said above, the CAAF's judgment is final when issued (except if we
reverse it).  See 10 U. S. C. §871(c)(1) (stating that even when a sen-
tence is subject to an executive official's approval, the "judgment" is
"final" when judicial review is concluded).

Opinion of the Court

execution of law.  As Chief Justice Marshall saw, Secretary Madison merely triggered the case of *Marbury* v. *Madison*; he did not hear and resolve it, as a judicial body would have done.  See 1 Cranch, at 175.  The Chief Justice's opinion thus cleanly divides that case from this one, even if both (as Bamzai notes) formally involve executive officers.  Here, three constitutionally rooted courts, ending with the CAAF, rendered inherently judicial decisions— just as such tribunals have done since our nation's founding.  In reviewing, "revis[ing,] and correct[ing]" those proceedings, as Ortiz asks, we do nothing more or different than in generally exercising our appellate jurisdiction. *Ibid.*

But finally, in holding that much, we say nothing about whether we could exercise appellate jurisdiction over cases from other adjudicative bodies in the Executive Branch, including those in administrative agencies.  Our resolution of the jurisdictional issue here has rested on the judicial character, as well as the constitutional foundations and history, of the court-martial system.  We have relied, too, on the connections that our cases have long drawn between that judicial system and those of the territories and the District.  If Congress were to grant us appellate jurisdiction over decisions of newer entities advancing an administrative (rather than judicial) mission, the question would be different—and the answer not found in this opinion.

### III

We may now turn to the issues we took this case to decide.  Recall that Ortiz seeks a new appeal proceeding before the Air Force CCA, based on Judge Mitchell's participation in his last one.  See *supra,* at 2–4.  Ortiz's challenge turns on Judge Mitchell's simultaneous service on another court, the CMCR.  Originally, the Secretary of Defense had assigned Judge Mitchell to sit on that court.

Then, to moot a possible constitutional problem with Judge Mitchell's CMCR service, the President (with the Senate's advice and consent) appointed Judge Mitchell as well. A short time later, Judge Mitchell ruled on Ortiz's CCA appeal. Ortiz contends that doing so violated both a federal statute and the Appointments Clause. We disagree on both counts.

A

The statutory issue respecting Judge Mitchell's dual service turns on two interlocking provisions. The first is §973(b)(2)(A)—the statute Ortiz claims was violated here. As noted earlier, that law—in the interest of ensuring civilian preeminence in government—prohibits active-duty military officers like Judge Mitchell from "hold[ing], or exercis[ing] the functions of," certain "civil office[s]" in the Federal Government, "[e]xcept as otherwise authorized by law." See *supra,* at 4. The second is §950f(b)—a statute the Government claims "otherwise authorize[s]" Judge Mitchell's service on the CMCR, even if a seat on that court is a covered "civil office." As also noted above, §950f(b) provides two ways to become a CMCR judge. See *supra*, at 3. Under §950f(b)(2), the Secretary of Defense "may assign" qualified officers serving on a CCA to "be judges on the [CMCR]" as well. And under §950f(b)(3), the President (with the Senate's advice and consent) "may appoint" persons—whether officers or civilians is unspecified—to CMCR judgeships.

Against that statutory backdrop, Ortiz claims that Judge Mitchell became disqualified from serving on the CCA the moment his presidential appointment to the CMCR became final. See Brief for Petitioners 39–42. Notably, Ortiz has no statutory objection to Judge Mitchell's simultaneous service on those courts before that date—when he sat on the CMCR solely by virtue of the Secretary of Defense's assignment. See *id.,* at 40. Nor

Opinion of the Court

could he reasonably lodge such a complaint, for §950f(b)(2), in no uncertain terms, "otherwise authorize[s]" the Secretary to place a military judge on the CMCR—thus exempting such an officer from §973(b)(2)(A)'s prohibition.  But in Ortiz's view, the provision in §950f(b)(3) for presidential appointments contains no similar authorization, because it makes no "express[] or unambiguous[]" reference to military officers.  *Id*., at 20.  And so, Ortiz concludes, §973(b)(2)(A)'s general rule must govern.

In the circumstances here, however, the authorization in §950f(b)(2) was the only thing necessary to exempt Judge Mitchell from the civil office-holding ban—not just before but also after his presidential appointment.  That provision, as just noted, unambiguously permitted the Secretary of Defense to place Judge Mitchell on the CMCR, even if such a judgeship is a "civil office."  See *supra,* at 20. And once that happened, the President's later appointment of Judge Mitchell made not a whit of difference. Nothing in §950f (or any other law) suggests that the President's appointment erased or otherwise negated the Secretary's earlier action.  To the contrary, that appointment (made for purposes of protecting against a constitutional challenge, see *supra,* at 3) merely ratified what the Secretary had already done.  The nomination papers that the President submitted to the Senate reflect that fact. They sought confirmation of Judge Mitchell's appointment as a CMCR judge "[i]n accordance with [his] continued status as [a CMCR] judge pursuant to [his] assignment by the Secretary of Defense[,] under 10 U. S. C. Section 950f(b)(2)."  162 Cong. Rec. S1474 (Mar. 14, 2016).  So after the Senate approved the nomination, Judge Mitchell served on the CMCR by virtue of *both* the Secretary's assignment and the President's appointment.  And because §950f(b)(2) expressly authorized the Secretary's assignment, Judge Mitchell's service on the CMCR could

Opinion of the Court

not run afoul of §973(b)(2)(A)'s general rule.[10]

Ortiz argues in response that the President's appointment demanded its own clear authorization because only that appointment put Judge Mitchell into a "new office." Reply Brief 7. According to Ortiz, an officer who receives a secretarial assignment to the CMCR "exercise[s] additional duties"—but he does not hold a second position. Tr. of Oral Arg. 13. A presidential appointment alone, he says, effects that more dramatic change. And Ortiz contends that §973(b)(2)(A)'s rule cares about that difference. That law, Ortiz says, requires a legislative authorization when, and only when, a service member receives a whole new office—which is to say here when, and only when, the President appoints a judge to the CMCR. See Tr. of Oral Arg. 4–5 (stating that §973(b)(2)(A) "prohibit[s] military officers from holding [civil offices] absent express congressional authorization, while generally allowing military officers to be assigned to exercise the duties of such positions").

But that argument is contrary to §973(b)(2)(A)'s text, as well as to the purposes it reflects. The statute draws no distinction between secretarial assignees and presidential appointees, nor between those who exercise the duties of an office and those who formally hold it. True enough, we have sometimes referred to §973(b)(2)(A) as a rule about

———————

[10]We state no opinion on a broader argument the Government makes—that §950f(b)(2) would exempt Judge Mitchell from §973(b)(2)(A)'s office-holding ban even if the Secretary had not assigned him to the CMCR before the President's appointment. See Brief for United States 27–29. And because we hold that the Secretary's assignment authorized Judge Mitchell to serve on the CMCR while an active-duty military officer, we need not decide whether a CMCR judgeship is a covered "civil office" subject to §973(b)(2)(A). Neither need we address the remedial issue on which the CAAF ruled, see *supra*, at 4—*i.e.*, whether a violation of §973(b)(2)(A) would have immediately terminated Judge Mitchell's military service and voided later decisions he made (including in Ortiz's case) as a military judge.

Opinion of the Court

dual "office-holding," see *supra,* at 21, 22, n. 10—but that is mere shorthand.   In fact, §973(b)(2)(A)'s prohibition applies broadly, and uniformly, to any military officer who "hold[s], or exercise[s] the functions of," a covered civil office.   And the "except as otherwise authorized" caveat applies in the same way—to "hold[ing]" and "exercis[ing]" alike.   So the very distinction that Ortiz relies on, the statute rejects: Indeed, the law could not be clearer in its indifference.   That is because Congress determined that military officers threaten civilian preeminence in government by *either* "hold[ing]" *or* "exercis[ing] the functions of" important civil offices.   Except . . . if Congress decides otherwise and says as much.

And once again, here Congress did exactly that.   Judge Mitchell became a CMCR judge, while remaining in the military, because of a secretarial assignment that Congress explicitly authorized.   See *supra,* at 20–21.   After his presidential appointment, he continued on the same court, doing the same work, in keeping with the same congressional approval.   Even supposing he obtained a "new office" in the way Ortiz says, that acquisition is of no moment.   With or without that formal office, Judge Mitchell "h[e]ld, or exercise[d] the functions of," a CMCR judgeship, and so was subject to §973(b)(2)(A)'s ban.   But likewise, with or without that formal office, Judge Mitchell could receive permission from Congress to do the job—that is, to sit as a judge on the CMCR.   And §950f(b)(2) gave Judge Mitchell that legislative green light, from the date of his assignment through his ruling on Ortiz's case and beyond.

## B

Finally, Ortiz raises an Appointments Clause challenge to Judge Mitchell's simultaneous service on the CCA and the CMCR.   That Clause provides that the President "shall nominate, and by and with the Advice and Consent

24                        ORTIZ *v.* UNITED STATES

of the Senate, shall appoint" the "Officers of the United
States," but that "Congress may by Law vest the Ap-
pointment of such inferior Officers, as they think proper,
in the President alone, in the Courts of Law, or in the
Heads of Departments." Art. II, §2, cl. 2. Litigants usually
invoke the Appointments Clause when they object to how
a government official is placed in his office. A litigant may
assert, for example, that because someone is a principal
rather than an inferior officer, he must be nominated by
the President and confirmed by the Senate. (Recall that
just such an argument about CMCR judges led to Judge
Mitchell's presidential appointment. See *supra,* at 3.) But
Ortiz's argument is not of that genre. He does not claim
that the process used to make Judge Mitchell either a
CCA judge or a CMCR judge violated the Appointments
Clause. Instead, he claims to find in that Clause a princi-
ple relating to dual service. A CCA judge, Ortiz notes, is
an inferior officer. See *Edmond*, 520 U. S., at 666. But a
CMCR judge, he says (though the Government has argued
otherwise), is a principal officer. And in Ortiz's view, a
single judge cannot, consistent with the Appointments
Clause, serve as an inferior officer on one court and a
principal officer on another. He calls such dual office-
holding "incongru[ous]" and "functionally incompatible."
Brief for Petitioners 50. The problem, he suggests, is that
the other (inferior officer) judges on the CCA will be "un-
duly influenced by" Judge Mitchell's principal-officer
status on the CMCR. *Id.,* at 51.

    But that argument stretches too far. This Court has
never read the Appointments Clause to impose rules about
dual service, separate and distinct from methods of ap-
pointment. Nor has it ever recognized principles of "in-
congruity" or "incompatibility" to test the permissibility of
holding two offices. As Ortiz himself acknowledges, he can
"cite no authority holding that the Appointments Clause
prohibits this sort of simultaneous service." *Id.*, at 52.

Cite as: 585 U. S. ____ (2018)            25

Opinion of the Court

    And if we were ever to apply the Clause to dual office-holding, we would not start here. Ortiz tells no plausible story about how Judge Mitchell's service on the CMCR would result in "undue influence" on his CCA colleagues. The CMCR does not review the CCA's decisions (or vice versa); indeed, the two courts do not have any overlapping jurisdiction. They are parts of separate judicial systems, adjudicating different kinds of charges against different kinds of defendants. See *supra,* at 1–3, and n. 1. We cannot imagine that anyone on the CCA acceded to Judge Mitchell's views because he also sat on the CMCR—any more than we can imagine a judge on an Article III Court of Appeals yielding to a colleague because she did double duty on the Foreign Intelligence Surveillance Court of Review (another specialized court). The CAAF put the point well: "When Colonel Mitchell sits as a CCA judge, he is no different from any other CCA judge." 76 M. J., at 193; see *supra,* at 5. So there is no violation of the Appointments Clause.

IV

    This Court has appellate jurisdiction to review the CAAF's decisions. In exercising that jurisdiction, we hold that Judge Mitchell's simultaneous service on the CCA and the CMCR violated neither §973(b)(2)(A)'s office-holding ban nor the Constitution's Appointments Clause. We therefore affirm the judgment below.

*It is so ordered.*

Thomas, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1423

_____

## KEANU D. W. ORTIZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ARMED FORCES

[June 22, 2018]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full, which persuasively explains why petitioner's statutory and constitutional arguments lack merit. I also agree that the statute giving this Court appellate jurisdiction to review the decisions of the Court of Appeals for the Armed Forces (CAAF), 28 U. S. C. §1259, complies with Article III of the Constitution. I write separately to explain why that conclusion is consistent with the Founders' understanding of judicial power—specifically, the distinction they drew between public and private rights.[1]

## I

Article III vests "[t]he judicial Power of the United States" in this Court and any inferior courts that Congress chooses to establish. §1. The judicial power includes the power to resolve the specific types of "Cases" and "Controversies" listed in §2. Article III divides this Court's jurisdiction over those cases into two categories: "original Jurisdiction" and "appellate Jurisdiction." This Court has original jurisdiction in cases affecting ambassadors, other public ministers, and consuls, and cases in which a State is a party. This Court has appellate jurisdiction "[i]n all

_____

[1] I express no view on any other arguments that were not raised by the parties or *amicus* in this case, including any arguments based on Article II of the Constitution.

the other Cases before mentioned" in §2. Because all
agree that the CAAF decides "other Cases" that are not
reserved for this Court's original jurisdiction, we can
review its decisions only under our appellate jurisdiction.

The text of Article III imposes two important limits on
this Court's appellate jurisdiction. First, as mentioned,
this Court can review only the "other Cases" that are
"before mentioned"—*i.e.,* the subject matters of cases
listed in §2 that are not reserved for its original jurisdic-
tion. Second, this Court's "appellate Jurisdiction" cannot
be "original." As Chief Justice Marshall explained, "the
essential criterion of appellate jurisdiction" is that "it
revises and corrects the proceedings in a cause already
instituted, and does not create that cause." *Marbury* v.
*Madison*, 1 Cranch 137, 175 (1803). Thus, this Court
cannot exercise appellate jurisdiction unless it is review-
ing an already completed exercise of "judicial power." *In
re Sanborn*, 148 U. S. 222, 224 (1893); see also *The Alicia*,
7 Wall. 571, 573 (1869) ("An appellate jurisdiction neces-
sarily implies some judicial determination, some judg-
ment, decree, or order of an inferior tribunal, from which
an appeal has been taken"); 3 J. Story, Commentaries on
the Constitution of the United States §1755, p. 627 (1833)
(explaining that this Court can review only decisions "by
one clothed with judicial authority, and acting in a judicial
capacity").

Other than these two limits, the text of Article III im-
poses no other self-executing constraints on this Court's
appellate jurisdiction. Most notably, it does not require
appeals to come from any specific type of tribunal, such as
an Article III court. As Justice Story explained, "The
appellate power is not limited by the terms of the third
article to any particular courts. . . . It is the *case*, then, and
not *the court*, that gives the jurisdiction. If the judicial
power extends to the case, it will be in vain to search in
the letter of the constitution for any qualification as to the

tribunal." *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 338 (1816).  Hamilton made the same point years earlier: "The Constitution in direct terms gives an appellate jurisdiction to the Supreme Court in all the enumerated cases . . . , without a single expression to confine its operation to the inferior federal courts.   The objects of appeal, not the tribunals from which it is to be made, are alone contemplated."   The Federalist No. 82, pp. 493–494 (C. Rossiter ed. 1961); see also *id.,* No. 81, at 489 (A. Hamilton) (rejecting a "technical interpretation" of the word "appellate" and defining it to mean "nothing more than the power of one tribunal to review the proceedings of another").   This Court has relied on the lack of tribunal-specific limits in Article III to exercise appellate jurisdiction over several types of non-Article III courts, including state courts, see *Martin*, *supra*, at 338, and territorial courts, see *United States* v. *Coe*, 155 U. S. 76, 85–86 (1894); *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. ___–___, n. 2 (2015) (THOMAS, J., dissenting) (slip op., at 7–8, n. 2) (discussing *American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 546 (1828)).   In short, this Court's appellate jurisdiction requires the exercise of *a* judicial power, not necessarily "[*t*]*he* judicial Power of the United States" that Article III vests exclusively in the federal courts, §1 (emphasis added).

The Founders' understanding of judicial power was heavily influenced by the well-known distinction between public and private rights.  See *Spokeo, Inc.* v. *Robins*, 578 U. S. ___, ___–___ (2016) (THOMAS, J., concurring) (slip op., at 1–2); *Wellness*, *supra*, at ___–___ (opinion of THOMAS, J.) (slip op., at 6–11); Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 565 (2007) (Nelson).  Public rights "'belon[g] to the people at large,'" while private rights belong to "'each individual.'"  *Wellness*, 575 U. S., at ___ (opinion of THOMAS, J.) (slip op., at 9).  The three classic private rights—life, liberty, and

property—are "'unalienable'" and "'absolute,'" as they are "not dependent upon the will of the government." *Ibid.* The Founders linked the disposition of private rights with the exercise of judicial power. See *id.,* at ___ (slip op., at 10). They considered "the power to act conclusively against [private] rights [as] the core of the judicial power." *Ibid.*

A disposition of private rights did not amount to an exercise of judicial power, however, unless it also satisfied "some basic procedural requirements." Nelson 574. Stated differently, the disposition had to "assume such a form that the judicial power is capable of acting on it." *Osborn* v. *Bank of United States*, 9 Wheat. 738, 819 (1824). "[T]hat form generally required the presence (actual or constructive) of adverse parties who had been given some opportunity to be heard before the court rendered a final judgment that bound them." Nelson 574. Once a dispute took this form, judicial power is exercised by "'determin[ing] all differences according to the established law.'" *Wellness*, *supra*, at ___ (opinion of THOMAS, J.) (slip op., at 6) (quoting J. Locke, Second Treatise of Civil Government §125, p. 63 (J. Gough ed. 1947)).

## II

### A

So understood, the CAAF exercises a judicial power. As I explained in *Wellness*, military courts adjudicate core private rights to life, liberty, and property. See 575 U. S., at ___–___ (dissenting opinion) (slip op., at 6–7). That these courts adjudicate core private rights does not contradict the Vesting Clause of Article III, which permits only federal courts to exercise "the judicial Power of the United States." Like other provisions of the Constitution, this language must be read against "commonly accepted background understandings and interpretative principles in place when the Constitution was written," including the

principle that general constitutional rules could apply
"differently to civil than to military entities." Mascott,
Who Are "Officers of the United States"? 70 Stan. L. Rev.
443, 480–483 (2018) (citing Nelson 576); see also *Northern
Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S.
50, 64 (1982) (plurality opinion) (explaining that inter-
preting Article III to exclude military courts "simply
acknowledge[s] that the literal command of Art. III . . .
must be interpreted in light of . . . historical context . . .
and of the structural imperatives of the Constitution as a
whole"). Based on the "constellation of constitutional
provisions that [indicate] Congress has the power to pro-
vide for the adjudication of disputes among the Armed
Forces it creates," our precedents have long construed the
Vesting Clause of Article III to extend "only to *civilian*
judicial power." *Wellness*, 575 U. S., at ___ (opinion of
THOMAS, J.) (slip op., at 8) (citing *Dynes* v. *Hoover*, 20
How. 65, 78–79 (1858)). In other words, the powers that
the Constitution gives Congress over the military are "so
exceptional" that they are thought to include the power to
create courts that can exercise a judicial power outside the
confines of Article III. *Northern Pipeline, supra,* at 64.
Thus, military courts are better thought of as an "excep-
tion" or "carve-out" from the Vesting Clause of Article III,
rather than an entity that does not implicate the Vesting
Clause because it does not exercise judicial power in the
first place. See *Wellness, supra,* at ___–___ (opinion of
THOMAS, J.) (slip op., at 6–8).

No party in this case challenges the legitimacy of the
historical exception for military courts. And for good
reason: "At the time of the Framing, . . . it was already
common for nations to organize military tribunals that
stood apart from the ordinary civilian courts, and the
United States itself had done so." Nelson 576. As the
Court explains, military courts predate the Constitution,
were well-known to the Founders, were authorized by the

First Congress, and are expressly contemplated by the
Fifth Amendment. *Ante,* at 9. The crucial point for pre-
sent purposes, however, is that military courts are consid-
ered exempt from the structural requirements of Article
III "because of other provisions of the Constitution, not
because of the definition of judicial power." *Wellness,* 575
U. S., at ___ (opinion of Thomas, J.) (slip op., at 8) (citing
Nelson 576). They plainly fall within that definition.

Military courts "have long been understood to exercise
'judicial' power" because they "act upon core private rights
to person and property." *Id.,* at 576. "[C]lothed with
judicial powers," these courts decide "questions of the most
momentous description, affecting . . . even life itself." W.
De Hart, Observations on Military Law 14 (1859); see also
11 Op. Atty. Gen. 19, 21 (1864) (explaining that military
courts are "judicial" because they "pass upon the most
sacred questions of human rights . . . which, in the very
nature of things, . . . must be adjudged *according to law*").
Here, for example, the CAAF adjudicated the legality of
petitioner's child-pornography convictions and his sen-
tence of two years confinement—a classic deprivation of
liberty, see *Obergefell* v. *Hodges,* 576 U. S. ___, ___–___
(2015) (Thomas, J., dissenting) (slip op., at 4–6). "The
passing of judgment on the life and liberty of those con-
victed by the government in a military trial surely falls
within the judicial power." Willis, The Constitution, the
United States Court of Military Appeals and the Future,
57 Mil. L. Rev. 27, 84 (1972). This Court has acknowl-
edged that military courts adjudicate core private rights,
as it has repeatedly held that the prosecution of *non-*
servicemembers in these courts would violate Article III.
See *Northern Pipeline, supra,* at 66, n. 17 (plurality opin-
ion); *e.g., United States ex rel. Toth* v. *Quarles,* 350 U. S.
11 (1955) (former servicemembers); *Reid* v. *Covert,* 354

U. S. 1 (1957) (spouses of servicemembers).[2]

In addition to adjudicating private rights, the CAAF's cases "assume such a form that the judicial power is capable of acting on [them]."  *Osborn*, 9 Wheat., at 819.  The CAAF adjudicates cases involving "adverse parties who ha[ve] been given some opportunity to be heard."  Nelson 574.  It has independent authority to "prescribe" its own "rules of procedure," 10 U. S. C. §944, which provide for briefing, oral argument, and other procedures that mirror a federal court of appeals.  See generally CAAF Rules of Practice and Proc. (2017).  The CAAF also decides cases "'according to the established law.'"  *Wellness*, 575 U. S., at ___ (opinion of Thomas, J.) (slip op., at 6).  It can act "only with respect to matters of law," §867(c), and its civilian judges decide cases by independently interpreting the Constitution, the Uniform Code of Military Justice, and other federal laws.  Lastly, the CAAF renders "final judgment[s] that b[ind] [the parties]."  Nelson 574.  Its judgments are "final and conclusive" as soon as they are published and are "binding upon all departments, courts, agencies, and officers of the United States."  §876.  The Executive Branch has no statutory authority to review or modify the CAAF's decisions.[3]  In short, when it comes to

_____

[2]Servicemembers consent to military jurisdiction when they enlist.  While this consent might allow military courts to adjudicate a servicemember's private rights, it does not transform the nature of the power that the military courts exercise, or somehow transform the servicemember's private right to life, liberty, or property into a public right.  See *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. ___, ___, ___ (2015) (Thomas, J., dissenting) (slip op., at 6, 14).

[3]Unlike the CAAF's decisions, court-martial proceedings are not final until they are approved by the convening authority.  See 10 U. S. C. §876.  But the CAAF does not review court-martial proceedings until *after* they have been approved and have been reviewed by an intermediate Court of Criminal Appeals.  See §867(c).  Because "the [CAAF] reviews court-martial convictions after executive branch review ends," the "[r]eview of its decisions in the Supreme Court of the United States,

the CAAF, "'[t]he whole proceeding from its inception is
judicial.'" *Runkle* v. *United States*, 122 U. S. 543, 558
(1887) (quoting 11 Op. Atty. Gen., at 21).[4]

B

Professor Bamzai contends that the CAAF exercises an
executive, not a judicial, power. He notes that this Court
has described the CAAF as an "Executive Branch entity,"
*Edmond* v. *United States*, 520 U. S. 651, 664 (1997), and
he cites commentators who describe military courts as
"instrumentalities of the executive power" because they
help the President maintain discipline over the Armed
Forces, W. Winthrop, Military Law and Precedents 49 (2d
ed. 1920); G. Davis, Military Law of the United States 15
(2d ed. 1909). Professor Bamzai also compares the CAAF
to administrative agencies, which he contends exercise
executive power. If agencies exercised core judicial power,
he notes, they would be acting unconstitutionally because

---

by certiorari, . . . poses no finality problems" under Article III. Pfander,
Article I Tribunals, Article III Courts, and the Judicial Power of the
United States, 118 Harv. L. Rev. 643, 717, n. 327 (2004).

[4]Most of the statutes cited above are unique to the CAAF—the court
whose decision we are reviewing and, thus, the only one that matters
for purposes of our appellate jurisdiction. I express no view on whether
this Court could directly review the CAAF, absent these statutes. And
I express no view on whether this Court could directly review the
decisions of other military courts, such as courts-martial or military
commissions. Cf. *id.,* at 723, n. 358 (suggesting that this Court could
not directly review courts-martial and military commissions because
their proceedings are "summary" and "create no record to support writ
of error review"); Choper & Yoo, Wartime Process: A Dialogue on
Congressional Power to Remove Issues from the Federal Courts, 95 Cal.
L. Rev. 1243, 1283 (2007) (suggesting that the adjudication of the rights
of enemy aliens by law-of-war military commissions might be better
understood as exercising the President's power to conduct war, not
judicial power). And, of course, this Court's appellate jurisdiction does
not allow it to directly review decisions of the Executive Branch that do
not "assume such a form that the judicial power is capable of acting on
[them]." *Osborn* v. *Bank of United States*, 9 Wheat. 738, 819 (1824).

THOMAS, J., concurring

they do not enjoy the structural protections of Article III. See *Arlington* v. *FCC*, 569 U. S. 290, 304, n. 4 (2013).

These arguments miss the mark. While the CAAF is in the Executive Branch and its purpose is to help the President maintain troop discipline, those facts do not change the *nature* of the power that it exercises. See Brigadier General S. T. Ansell's Brief Filed in Support of His Office Opinion (Dec. 11, 1917), reprinted in Hearings on S. 64 before the Subcommittee of the Senate Committee on Military Affairs, 66th Cong., 1st Sess., 71, 76 (1919). And it is the nature of the power, not the branch exercising it, that controls our appellate jurisdiction:

> "The controlling question is whether the function to be exercised . . . is a judicial function . . . . We must not 'be misled by a name, but look to the substance and intent of the proceeding.' *United States* v. *Ritchie*, 17 How. 525, 534 [(1855)]. 'It is not important . . . whether such a proceeding was originally begun by an administrative or executive determination, if when it comes to the court, whether legislative or constitutional, it calls for the exercise of only the judicial power.'" *Federal Radio Comm'n* v. *Nelson Brothers Bond & Mortgage Co. (Station WIBO)*, 289 U. S. 266, 277–278 (1933) (some citations omitted).

As explained, the CAAF exercises a judicial power because it adjudicates private rights. That the Constitution permits this Executive Branch entity to exercise a particular judicial power—due to the political branches' expansive constitutional powers over the military—does not change the analysis.

Professor Bamzai's analogy to administrative agencies is flawed. Professor Bamzai assumes that, when administrative agencies adjudicate private rights, they are not exercising judicial power. But they are. See *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575 U. S. ___, ___–___

10 ORTIZ *v.* UNITED STATES

Thomas, J., concurring

(2015) (Thomas, J., dissenting) (slip op., at 11–12). In fact, they are unconstitutionally exercising "[t]he judicial Power of the United States," as agencies are not Article III courts and do not "enjoy a unique, textually based" carve-out from the Vesting Clause of Article III. *Wellness*, 575 U. S., at ___ (opinion of Thomas, J.) (slip op., at 14). The CAAF does enjoy such a carveout, as I explained in *Wellness*. But both it and administrative agencies exercise a judicial power when they adjudicate private rights. Contrary to the premise underlying Professor Bamzai's argument, questions implicating the separation of powers cannot be answered by arguing, in circular fashion, that whatever the Executive Branch does is necessarily an exercise of executive power.

\*  \*  \*

Because the CAAF exercises a judicial power, the statute giving this Court appellate jurisdiction over its decisions does not violate Article III. For these reasons, and the reasons given by the Court, I concur.

Cite as: 585 U. S. ____ (2018)    1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

No. 16–1423

————————

## KEANU D. W. ORTIZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ARMED FORCES

[June 22, 2018]

JUSTICE ALITO, with whom JUSTICE GORSUCH joins, dissenting.

I begin with a story that is familiar to students of constitutional law. After his Federalist Party was defeated in the pivotal election of 1800, outgoing President John Adams attempted to fill the Federal Judiciary with individuals favored by his party. The Senate confirmed Adams's nominees, and Adams diligently signed their commissions and sent them to the Secretary of State, one John Marshall, so that the Great Seal could be affixed and the commissions could be delivered. Most of the commissions were promptly sealed and dispatched, but a few were left behind, including the commission of William Marbury, who had been nominated and confirmed as a justice of the peace for the District of Columbia.

After Thomas Jefferson was sworn in as the Nation's third President, he was furious about Adams's eleventh-hour judicial appointments,[1] and his Secretary of State, James Madison, made a fateful decision. Evaluating the facts and the law as he saw them, Madison concluded that he was under no legal obligation to deliver the commissions that had been left in Marshall's office, and he decided not to do so.

————————

[1] Letter from Thomas Jefferson to Henry Knox (Mar. 27, 1801), in 33 Papers of Thomas Jefferson 465, 466 (B. Oberg ed. 2006.).

ALITO, J., dissenting

Outraged, Marbury filed suit directly in our Court, asking that Madison be ordered to deliver his commission. But we dismissed his case, holding, among other things, that it did not fall within our "appellate jurisdiction." *Marbury* v. *Madison*, 1 Cranch 137, 175–176, 180 (1803). Why? Because "appellate jurisdiction" means jurisdiction to review "the proceedings in a cause [*i.e.,* a case] already instituted" in another court. *Id*., at 175. Madison was an Executive Branch officer, not a court, and therefore Marbury's dispute with Madison did not become a "cause" or case until it was brought before this Court. As a result, review of Madison's decision did not fall within our "appellate" jurisdiction. *Id.,* at 175–176.

That conclusion was straightforward enough. But suppose that Madison's decisionmaking process had been more formal. Suppose that he had heard argument about his legal obligations—and perhaps even testimony about Marbury's qualifications. (After all, President Jefferson reappointed some of Adams's nominees, but not Marbury.[2]) Or suppose Madison had convened an Executive Branch committee to make an initial determination. Suppose that this entity was labeled the "Court of Commission Review." Suppose that the members wore robes and were called judges, held their meeting in a courthouse, and adopted court-like procedures. With all these adornments, would Madison's decision have fallen within our appellate jurisdiction? Would *Marbury* v. *Madison* have come out the other way?

The answer is no, and the reason is the same as before. Our appellate jurisdiction permits us to review one thing: the lawful exercise of *judicial* power. Lower federal courts exercise the judicial power of the United States. State courts exercise the judicial power of sovereign state gov-

---

[2] Prakash, The Appointment and Removal of William J. Marbury and When an Office Vests, 89 Notre Dame L. Rev. 199, 209 (2013).

ALITO, J., dissenting

ernments.  Even territorial courts, we have held, exercise
the judicial power of the territorial governments set up by
Congress.  Executive Branch officers, on the other hand,
cannot lawfully exercise the judicial power of *any* sover-
eign, no matter how court-like their decisionmaking pro-
cess might appear.  That means their decisions cannot be
appealed directly to our Court.

We have followed this rule for more than two centuries.
It squarely resolves this case.  Courts-martial are older
than the Republic and have always been understood to be
Executive Branch entities that help the President, as
Commander in Chief, to discipline the Armed Forces.  As
currently constituted, military tribunals do not comply
with Article III, and thus they cannot exercise the Federal
Government's judicial power.  That fact compels us to
dismiss Ortiz's petition for lack of jurisdiction.

Today's decision is unprecedented, and it flatly violates
the unambiguous text of the Constitution.  Although the
arguments in the various opinions issued today may seem
complex, the ultimate issue is really quite simple.  The
Court and the concurrence say that Congress may confer
part of the judicial power of the United States on an entity
that is indisputably part of the Executive Branch.  But
Article III of the Constitution vests "[t]he judicial Power
of the United States"—every single drop of it—in "one
supreme Court, and in such inferior Courts as the Con-
gress may from time to time ordain and establish" in
compliance with that Article.  A decision more contrary to
the plain words of the Constitution is not easy to recall.

I

Under Article III of the Constitution, the judicial power
of the United States may be vested only in tribunals
whose judges have life tenure and salary protection.  §1.
"There is no exception to this rule in the Constitution."
*Benner* v. *Porter*, 9 How. 235, 244 (1850); *Oil States Energy*

*Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S.
___, ___ (2018) (slip op., at 5–6); *Stern* v. *Marshall*, 564
U. S. 462, 503 (2011); *Martin* v. *Hunter's Lessee*, 1 Wheat.
304, 330–331 (1816) (Story, J.).

The Court of Appeals for the Armed Forces (CAAF) is
not such a tribunal. Its judges serve 15-year terms and
can be removed by the President for cause. 10 U. S. C.
§§942(b), (c). As the majority acknowledges, the CAAF is
an Executive Branch entity, and as such, it cannot be
vested with the judicial power conferred by Article III.
If the CAAF *were* to do something that either amounts to
or requires the exercise of judicial power, it would be
unconstitutional.

After specifying the only institutions that may exercise
the judicial power of the United States, Article III defines
the permissible scope of the jurisdiction of this Court.
Article III allows us to exercise both "original" and "appel-
late" jurisdiction. Our original jurisdiction is limited to
"Cases affecting Ambassadors, other public Ministers and
Consuls, and those in which a State shall be Party," §2, so
it is obvious that Ortiz's case does not fall within our
original jurisdiction. But what about our appellate juris-
diction? If we directly reviewed a decision of the CAAF,
would that be an exercise of "appellate" review in the
sense meant by Article III? The answer is no.

### A

The understanding of appellate jurisdiction embodied in
Article III has deep roots. Blackstone explained that a
"court of appeal" has jurisdiction only to "reverse or affirm
the judgment of the inferior *courts*." 3 W. Blackstone,
Commentaries on the Laws of England 411 (1768) (Black-
stone) (emphasis added). Echoing Blackstone, we have
held that our appellate jurisdiction permits us to act only
as "[a] supervising Court, whose peculiar province it is to
correct the errors of an inferior Court." *Cohens* v. *Vir-*

Cite as: 585 U. S. ____ (2018)            5

ALITO, J., dissenting

*ginia*, 6 Wheat. 264, 396 (1821) (Marshall, C. J.). And we have reiterated that "[a]n appellate jurisdiction necessarily implies some judicial determination, some judgment, decree, or order of an inferior tribunal, from which an appeal has been taken." *The Alicia*, 7 Wall. 571, 573 (1869); *Webster* v. *Cooper*, 10 How. 54, 55 (1850); 3 J. Story, Commentaries on the Constitution of the United States §916, p. 652 (1833) (Story).

Those principles make it easy to understand what *Marbury* meant when it held that "[i]t is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, and does not create that cause." 1 Cranch, at 175. The cause (or case) must have been created previously, somewhere else. And as Blackstone suggested, what "creates" a "case" in the relevant sense—that is, what transforms a dispute into a "case" that an appellate court has jurisdiction to resolve— is the prior submission of the dispute to a tribunal that is lawfully vested with judicial power.

We held exactly that not long after *Marbury*, and in a decision no less seminal. A dispute "becomes a case" for purposes of Article III, we held, only when it "assume[s] such a form that *the judicial power* is *capable of acting* on it. That power is capable of acting only when the subject is *submitted to it* by a party who asserts his rights in the form prescribed by law. It *then* becomes a case." *Osborn* v. *Bank of United States*, 9 Wheat. 738, 819 (1824) (Marshall, C. J.) (emphasis added). Hence, in order to create a "case" that Article III permits us to review on appeal, a litigant must have first "submitted" the dispute to another tribunal that was "capable" of exercising the "judicial power" of the government to which the tribunal belongs. As discussed, Executive Branch tribunals cannot fill that essential role.

We reiterated this principle in *Cohens*, another foundational precedent of the Marshall Court. "To commence a

suit," Chief Justice Marshall explained, "is to demand something by the institution of process *in a Court of justice*." 6 Wheat., at 408 (emphasis added). Courts of justice are those tribunals "erected by" the sovereign and properly vested with the sovereign's own "power of judicature." 1 Blackstone 257 (1765). When the sovereign is the Federal Government, that means only courts established under Article III, for only those courts may exercise the judicial power of the United States. See *Cohens*, *supra*, at 405; The Federalist No. 78, pp. 469–472 (C. Rossiter ed. 1961) ("the courts of justice" are those described in Article III).

This view of appellate jurisdiction explains why, in *Martin* v. *Hunter's Lessee*, Justice Story declared that "if . . . congress should not establish [inferior Article III] courts, the appellate jurisdiction of the supreme court would have nothing to act upon, unless it could act upon cases pending in the state courts." 1 Wheat., at 339–340. Without decisions of Article III courts or state courts to review, our appellate jurisdiction would have lain idle— but *not* because there were no Executive Branch tribunals, like the CAAF, deciding federal questions. To the contrary, executive agencies have "conduct[ed] adjudications"—often taking "'judicial' forms"—"since the beginning of the Republic." *Arlington* v. *FCC*, 569 U. S. 290, 304–305, n. 4 (2013); *Freytag* v. *Commissioner*, 501 U. S. 868, 910 (1991) (Scalia, J., concurring in part and concurring in judgment); see generally J. Mashaw, Creating the Administrative Constitution 34–35 (2012).

Such Executive Branch adjudications, however, do not give rise to "cases" that Article III grants us appellate jurisdiction to review, precisely because officers of the Executive Branch cannot lawfully be vested with judicial power. That is why Chief Justice Marshall declared, without qualification, that "[a] mandamus to an *officer* [of the Executive Branch] is held to be the exercise of original jurisdiction; but a mandamus to an *inferior court* of the

ALITO, J., dissenting

United States, is in the nature of appellate jurisdiction."
*Ex parte Crane*, 5 Pet. 190, 193 (1831) (emphasis added).
Time has not sown doubts about the truth of that rule.
*E.g., Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535
U. S. 635, 644, n. 3 (2002) ("judicial review of executive
action, including determinations made by a state adminis-
trative agency," involves the exercise of federal court's
"original jurisdiction" rather than its "appellate jurisdic-
tion," which covers only "state-court judgments"); L. Jaffe,
Judicial Control of Administrative Action 263, n. 5 (1965).

We have taken this same approach when deciding
whether we may assert appellate jurisdiction to review the
decision of a state tribunal: We look to state law to see
whether the tribunal in question was eligible to receive
the State's judicial power. *E.g., Betts* v. *Brady*, 316 U. S.
455, 458–460 (1942); cf. *Chicago, R. I. & P. R. Co.* v. *Stude*,
346 U. S. 574, 578–579 (1954) (federal courts cannot exer-
cise removal jurisdiction—which is appellate in nature,
*Martin, supra,* at 349—while a dispute is still in state
"administrative" proceedings; removal is proper only after
"the jurisdiction of the state district court is invoked");
*Verizon Md., supra*.

## B

This understanding of appellate jurisdiction bars our
review here. The dispute between Ortiz and the Federal
Government has been presented to four tribunals: the
initial court-martial, the Air Force Court of Criminal
Appeals, the CAAF, and this Court. Each of those tribu-
nals belongs to a branch of the Federal Government. Yet
only one of them—our Court—is capable, under the Con-
stitution, of exercising the Government's judicial power.
Thus, the dispute between Ortiz and the Federal Govern-
ment did not become an Article III "case" until Ortiz peti-
tioned our Court to hear it. That means our present adju-
dication—no less than our adjudication of the dispute

8                    ORTIZ *v.* UNITED STATES

ALITO, J., dissenting

between Marbury and Madison—lacks "the essential
criterion of appellate jurisdiction." 1 Cranch, at 175.

The majority does not question this framework; indeed,
it acknowledges that, per *Marbury,* we can assert jurisdic-
tion here only if the dispute before us blossomed into an
Article III "case" before it landed at our doorstep. *Ante,* at
6–7. Curiously, however, the majority basically proceeds
as though *Marbury* were our last word on the subject.
*Ante,* at 6–8. That is simply not right. As discussed, our
foundational precedents expressly delineate the prerequi-
sites to the formation of a constitutional case: The dispute
must, at a minimum, have been previously presented
to and decided by a tribunal lawfully vested with the judicial
power of the government to which it belongs. Nothing of
the sort occurred here; traversing a series of "proceedings"
internal to the Executive Branch, *ante,* at 7, does not
count. And while there undoubtedly are differences be-
tween this case and *Marbury,* even some that "lea[p] off
the page," *ante,* at 18, those distinctions are irrelevant to
our jurisdiction. The dispositive common ground is that,
just as in *Marbury,* we are here asked to resolve a dispute
that has been presented only to Executive Branch officers.
The present dispute thus lies beyond the "peculiar prov-
ince" of our appellate jurisdiction to review. *Cohens,* 6
Wheat., at 396.

C

If there were any doubt that Article III forbids us to
take appeals directly from the Executive Branch, two
centuries of precedent—almost all of it overlooked by the
majority—would put those doubts to rest.

1

First consider the history of our relationship with the
Court of Claims. Congress established that court in 1855
to adjudicate claims against the United States. §1, 10

ALITO, J., dissenting

Stat. 612.  Congress provided the court's judges with life tenure and salary protection, just as Article III requires. *Ibid.*  The Court of Claims was a court of record, and it followed all the procedures—and possessed all the ancillary powers (subpoena, contempt, etc.)—that one would expect to find in a court of justice. §§3–7, 10 Stat. 613; §4, 12 Stat. 765–766.  Its decisions had preclusive effect, and were appealable directly to our Court. §§7, 5, *id.*, at 766. If the court rendered judgment for a claimant, however, the Secretary of the Treasury could partially revise its decision by modifying the amount of the judgment to be paid (though not the court's legal conclusion that the claimant was in the right). §14, *id.*, at 768.

Under principles as old as *Hayburn's Case*, 2 Dall. 409 (1792), a court whose judgments are not self-executing no more complies with Article III than a tribunal whose judges are not life tenured.  For that reason alone, we dismissed for lack of jurisdiction the first time a party appealed a Court of Claims decision directly to our Court. *Gordon* v. *United States*, 2 Wall. 561 (1865), 117 U. S. Appx. 697 (1864).  It did not even matter that the court's decision in that case had been *against* the claimant, and was thus immune from revision, and would have been fully binding if we had affirmed.  All that mattered was that the Court of Claims, like the CAAF, lacked an attribute that Article III makes prerequisite to the vesting of judicial power.  *Id.,* at 704.  In words that apply as much here, we said that "the so-called judgments of the Court of Claims . . . could not be deemed an exercise of judicial power, and could not, therefore, be revised by this court." *In re Sanborn*, 148 U. S. 222, 224 (1893).  It was irrelevant how much the Court of Claims otherwise "resemble[d] . . . courts whose decisions we review." *Ante,* at 9.

The story does not end there, however.  In 1866 Congress did something it has never done with respect to courts-martial: It brought the Court of Claims into com-

pliance with Article III by repealing the provision that
made some of its decisions revisable by the Treasury
Secretary.  Ch. 19, §1, 14 Stat. 9.  We began hearing ap-
peals from it "immediately."  *United States* v. *Jones*, 119
U. S. 477, 478 (1886).  We now were able to "accep[t] ap-
pellate jurisdiction over what was, necessarily, an exercise
of the judicial power which *alone* [we] may review."  *Glid-
den Co.* v. *Zdanok*, 370 U. S. 530, 554 (1962) (plurality
opinion) (citing *Marbury*, *supra*, at 174–175; emphasis
added).

### 2

Next consider our practice in entertaining petitions for
writs of habeas corpus.

Four years after *Marbury*, we reaffirmed its core holding
in *Ex parte Bollman*, 4 Cranch 75 (1807) (Marshall, C. J.).
Two men were taken into federal custody, and their con-
finement was approved by an Article III court.  *United
States* v. *Bollman*, 24 F. Cas. 1189, 1190, 1196 (No.
14,622) (CC DC 1807).  They then petitioned our Court for
a writ of habeas corpus.  Applying *Marbury*, we held that
the jurisdiction "which the court is now asked to exercise
is clearly *appellate*.  It is the revision of a decision of an
inferior court."  4 Cranch, at 101.

Contrast *Bollman* with *Ex parte Barry*, 2 How. 65 (1844)
(Story, J.), and *In re Metzger*, 5 How. 176 (1847).  In *Barry*,
the petitioner sought relief in this Court without first
presenting his claim to an inferior federal court or a state
court, and so Justice Story explained that "[t]he case,
then, is one avowedly and nakedly for the exercise of
original jurisdiction by this court," and was required to be
dismissed.  2 How., at 65.  In *Metzger*, "the district judge"
had "heard and decided" the lawfulness of the petitioner's
custody, but the judge had done so only "*at his chambers*,
and not in court."  5 How., at 191 (emphasis added).  His
judgment was not provisional, like some early Court of

ALITO, J., dissenting

Claims decisions—but his status as a judge at chambers was still fatal to our jurisdiction. In a technical sense, a judge at chambers "exercises a special authority" distinct from the judicial power vested by Article III—which meant that the Constitution would permit us to review his decision in "[t]he exercise of an original jurisdiction only." *Id.,* at 191–192.

3

Finally, and especially pertinent here, we have adhered to the *Marbury* principle in the many instances in our Court's history in which we have been asked to review the decision of a military tribunal. First, in *Ex parte Vallandigham*, 1 Wall. 243 (1864), an Ohio resident had been tried and sentenced by a military commission, and its decision became final after being approved up the chain of command. Vallandigham sought relief directly from our Court, without first petitioning a lower federal court. We held that we lacked jurisdiction. *Id.,* at 254. The military commission, like the CAAF, was not one of the "courts of the United States" established under Article III, *id.,* at 251, and thus it could not exercise the judicial power of the Federal Government, but could exercise only "a special authority," *id.,* at 253—just like the Court of Claims, and just like a judge at chambers. Given that fact, we held it was "certain" that any review of its decisions could take place only in the exercise of our original, and not appellate, jurisdiction. *Id.,* at 251–252. And despite what the majority seems to think, see *ante,* at 17, n. 8, in *Vallandigham* we *recognized* that the military tribunal had "judicial character" in the sense that it had "the authority . . . to examine, to decide and sentence," but—in the same breath—we affirmed the crucial point, namely, that such character "'is not judicial . . . in the sense in which judicial *power* is granted to the courts of the United States.'" 1 Wall., at 253 (emphasis added).

Contrast *Vallandigham* with a pair of decisions we issued shortly thereafter. In *Ex parte Milligan*, 4 Wall. 2 (1866), and *Ex parte Yerger*, 8 Wall. 85 (1869), we again were asked to grant relief to petitioners who, just like Vallandigham (and just like Ortiz), were in custody under orders of a non-Article III military tribunal. But unlike Vallandigham and Ortiz, Milligan and Yerger first sought relief in a lower federal court. *Milligan*, *supra,* at 107–108; *Yerger*, 8 Wall., at 102–103. That fact made all the difference—again, because of the rule that we possess, "under the Constitution, an appellate jurisdiction, to be exercised only in the revision of judicial decisions." *Id.,* at 97. The decisions of non-Article III military courts do not qualify.

Similarly, after World War II we received "more than a hundred" habeas petitions from individuals in the custody of "various American or international military tribunals abroad," almost none of whom had "first sought [relief] in a lower federal court." R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 292 (7th ed. 2015). Consistent with *Marbury*, we denied review in every one. Fallon, *supra,* at 292–293. Thus, while it is surely true that "not every military tribunal is alike" in all respects, *ante,* at 17, before today, they were at least alike in this respect: Their decisions could not be reviewed directly here.

### D

The unbroken line of authorities discussed above vividly illustrates the nature and limits of our appellate jurisdiction as defined in Article III. Today's decision cannot be squared with those authorities, and the majority barely even tries. The majority says not a word about the Court of Claims, even though that tribunal surely had sufficient "court-likeness," *ante,* at 16 (emphasis deleted), to come within the scope of our appellate jurisdiction under today's

Cite as: 585 U. S. ____ (2018)            13

ALITO, J., dissenting

test. Nor does the majority acknowledge the slew of on-point habeas decisions—save for *Vallandigham,* which it waves away by emphasizing irrelevant factual details (like the commanding officer's facial hair). Despite its running refrain that the CAAF displays a "judicial *character,*" *ante,* at 6 (emphasis added); see also *ante,* at 8, 18, 19, the majority simply never comes to grips with the substance of our holdings: We may not hear an appeal directly from any tribunal that has not been lawfully vested with judicial *power.* That rule directly covers the CAAF, and it bars our review.

## II

Having said very little about a large body of controlling precedent, the majority says very much about the fact that we have long heard appeals directly from territorial courts and the courts of the District of Columbia. *Ante,* at 12–16. The majority claims to be looking for a "powerful reason" why our appellate jurisdiction should treat courts-martial any differently. *Ante,* at 15. A careful reading of our decisions shows that we have a good reason ready at hand—one that is fully consistent with *Marbury.*

The reason, as I explain below, is this: Congress enjoys a unique authority to create governments for the Territories and the District of Columbia and to confer on the various branches of those governments powers that are distinct from the legislative, executive, and judicial power of the United States. Thus, for example, the courts of the District of Columbia exercise the judicial power of the District, not that of the United States. The courts of the United States Virgin Islands exercise the judicial power of that Territory, not the judicial power of the United States. By contrast, the CAAF and other military tribunals are indisputably part of the Executive Branch of the Government of the United States. They exercise the power of the United States, not that of any other government, and since

ALITO, J., dissenting

they are part of the Executive, the only power that they
may lawfully exercise is executive, not judicial. Unless
they are removed from the Executive Branch and trans-
formed into Article III courts, they may not exercise any
part of the judicial power of the United States. Nor need
they exercise judicial power to carry out their functions, as
we have always understood.

### A

We have long said that Congress's authority to govern
the Territories and the District of Columbia stems as
much from its inherent sovereign powers as it does from
specific constitutional provisions in Articles IV and I. *Sere*
v. *Pitot*, 6 Cranch 332, 336–337 (1810) (Marshall, C. J.);
*American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 546
(1828) (Marshall, C. J.); *Late Corp. of Church of Jesus
Christ of Latter-day Saints* v. *United States*, 136 U. S. 1,
42 (1890); see also Art. IV, §3, cl. 2 (Territories); Art. I, §8,
cl. 17 (District). Perhaps reflecting that view, the found-
ing generation understood—and for more than two centu-
ries, we have recognized—that Congress's power to govern
the Territories and the District is *sui generis* in one very
specific respect: When exercising it, Congress is not bound
by the Vesting Clauses of Articles I, II, and III.

The Vesting Clauses impose strict limits on the kinds of
institutions that Congress can vest with legislative, execu-
tive, and judicial power. See generally *Department of
Transportation* v. *Association of American Railroads*, 575
U. S. ___, ___–___ (2015) (THOMAS, J., concurring in judg-
ment) (slip op., at 2–3). Those limits apply when Congress
legislates in every other area, including when it regulates
the Armed Forces. See *Loving* v. *United States*, 517 U. S.
748, 767–768, 771–774 (1996) (Article I nondelegation
doctrine applies to congressional regulation of courts-
martial). But it has been our consistent view that those
same limits do not apply when Congress creates institu-

ALITO, J., dissenting

tions to govern the Territories and the District. As we said in *Benner* v. *Porter*, 9 How. 235, 242 (1850), territorial governments set up by Congress "are not organized under the Constitution, nor subject to its complex distribution of the powers of government, as the organic law; but are the creations, exclusively, of the legislative department." Congress may therefore give territorial governments "a legislative, an executive, and a judiciary, with such powers as it has been their will to assign to those departments." *Sere, supra,* at 337. That is why we have often repeated that "[i]n legislating for [the Territories], Congress exercises the combined powers of the general, and of a state government." *American Ins. Co., supra,* at 546; *Palmore* v. *United States*, 411 U. S. 389, 403 (1973). Just as the Vesting Clauses do not constrain the States in organizing their own governments, *Dreyer* v. *Illinois*, 187 U. S. 71, 84 (1902), those Clauses do not constrain Congress in organizing territorial governments.

Thus, unlike any of its other powers, Congress's power over the Territories allows it to create governments in miniature, and to vest those governments with the legislative, executive, and judicial powers, not of the United States, but of the Territory itself. For that reason we have upheld delegations of legislative, executive, and judicial power to territorial governments despite acknowledging that each one would be incompatible with the Vesting Clauses of the Federal Constitution if those Clauses applied. See, *e.g., Dorr* v. *United States*, 195 U. S. 138, 153 (1904) (territorial legislature); *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 322–323 (1937); *Snow* v. *United States*, 18 Wall. 317, 321–322 (1873) (territorial executive); *American Ins. Co., supra* (territorial courts); *Sere, supra*; *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524, 619 (1838); *Keller* v. *Potomac Elec. Power Co.*, 261 U. S. 428, 442–443 (1923).

The Framers evidently shared this view. Thus, James

Madison took it for granted that Congress could create "a municipal legislature" for the District of Columbia, The Federalist No. 43, at 272–273, something that would otherwise violate the Vesting Clause of Article I, which prohibits Congress from delegating legislative powers to any other entity, *Wayman* v. *Southard*, 10 Wheat. 1, 42–43 (1825) (Marshall, C. J.). And Justice Story declared, without hesitation, that "[w]hat shall be the form of government established in the territories depends exclusively upon the discretion of congress. Having a right to erect a territorial government, they may confer on it such powers, legislative, judicial, and executive, as they may deem best." 3 Story §667, at 478.

The upshot is that it is *only* when Congress legislates for the Territories and the District that it may lawfully vest judicial power in tribunals that do not conform to Article III. And that, in turn, explains why territorial courts and those of the District—exercising the judicial power of their respective governments—may have their decisions appealed directly here. We said as much in *United States* v. *Coe*, 155 U. S. 76, 86 (1894), where we explained that *because* Congress's "power of government . . . over the Territories . . . includes the ultimate executive, legislative, and judicial power, it follows that the judicial action of all inferior courts established by Congress may, in accordance with the Constitution, be subjected to [our] appellate jurisdiction."

The rule of appellate jurisdiction we recognized in *Coe* is identical to the rule we have applied ever since *Marbury*: Our appellate jurisdiction is proper only if the underlying decision represents an exercise of judicial power lawfully vested in the tribunal below. Territorial courts and those of the District of Columbia have such power; the CAAF does not, and cannot be given it so long as it fails to comply with Article III. That is reason enough to treat these

ALITO, J., dissenting

tribunals differently.[3]

## B

The majority responds to this conclusion by suggesting, albeit without much elaboration, that just as the Constitution gives Congress the "exceptional" power to confer non-Article III judicial power on the courts of the Territories and the District of Columbia, the Constitution also gives Congress the "exceptional" power to vest military tribunals with non-Article III judicial power.  See *ante,* at 15, and n. 7.  But the Vesting Clauses are exclusive, which means that the Government's judicial power is not shared between Article II and Article III.  See *supra,* at 3–4 (collecting cases); see also, *e.g., Arlington*, 569 U. S., at 304–305, n. 4; *Ex parte Randolph*, 20 F. Cas. 242, 254 (No. 11,558) (CC Va. 1833) (Marshall, C. J.) (those whose "offices are held at the pleasure of the president . . . are, consequently, incapable of exercising any portion of the judicial power"); *Association of American Railroads*, 575 U. S., at ___, ___ (THOMAS, J., concurring in judgment) (slip op., at 2, 9); *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575

───────────

[3] It is true that our decisions concerning territorial governments, and territorial courts in particular, have had their share of critics.  See, *e.g.,* M. Redish, Federal Jurisdiction: Tensions in the Allocation of Judicial Power 36–39 (1980); Currie, The Constitution in the Supreme Court: The Powers of the Federal Courts, 1801–1835, 49 U. Chi. L. Rev. 646, 719 (1982); C. Wright, Law of Federal Courts 41 (4th ed. 1983); Fallon, Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv. L. Rev. 915, 972 (1988); Bator, The Constitution as Architecture: Legislative and Administrative Courts Under Article III, 65 Ind. L. J. 233, 240–242 (1990); G. Lawson & G. Seidman, The Constitution of Empire 149 (2004).  But the theory underlying our cases was widely shared at the founding; our decisions have never seriously questioned it; and, if taken at face value, it coheres with the rest of our jurisprudence.  Seeing no need to revisit these precedents, I would not disturb them.  I certainly would not do what the majority has done: stretch an arguably anomalous doctrine and export it (in mutated form) to other contexts where it can only cause mischief.

U. S. ___, ___ (2015) (THOMAS, J., dissenting) (slip op., at 11).  And neither the majority nor the concurrence ever explains how the Constitution's various provisions relating to the military, through their penumbras and emanations, can be said to produce a hybrid executive-judicial power that is nowhere mentioned in the Constitution's text, that is foreclosed by its structure, and that had gone almost entirely unnoticed before today.

Thus, to make the majority's argument parallel to the argument regarding the courts of the Territories and the District of Columbia, the majority would have to argue that the military, like the governments of the Territories and the District, is somehow not part of the Federal Government—"not organized under the Constitution, . . . as the organic law," *Benner*, 9 How., at 242—but is a government unto itself.  To set out that argument, however, is to expose its weakness, for nothing could be more antithetical to the Constitution and to our traditional understanding of the relationship between the military and civilian authority.  The military is not an entity unto itself, separate from the civilian government established by the Constitution.  On the contrary, it is part of the Executive Branch of the Government of the United States, and it is under the command of the President, who is given the power of Commander in Chief and is ultimately answerable to the people.

To appreciate the constitutional status of military tribunals, it is helpful to recall their origins.  Courts-martial are older than the Republic, and they have always been understood to be an arm of military command exercising executive power, as opposed to independent courts of law exercising judicial power.  Blackstone declared that the court-martial system of the British Empire was based solely on "the necessity of order and discipline" in the military.  1 Blackstone 400.  Indeed, Blackstone explained that courts-martial exercise a "discretionary power" to

ALITO, J., dissenting

"inflict" "punishment . . . extend[ing] to death itself,"
which was "to be guided by the directions of the crown," in
express contrast to "the king's courts" which dispense
"justice according to the laws of the land." *Id.,* at 402, 400.
The crown's "extensive" power over the military—
exercised, in part, through courts-martial—was "executive
power." *Id.,* at 408. Many others have echoed the point.
Thus, "[a]t the time of our separation [from Britain], . . . a
court-martial . . . was not a judicial body. Its functions
were not judicial functions. It was but an agency of the
power of military command to do its bidding." Ansell,
Military Justice, 5 Cornell L. Q. 1, 6 (1919).

When the United States declared its independence and
prepared for war with Britain, the leaders of the new
Nation were deeply impressed by the British court-martial
system and sought to replicate it. John Adams, who in
1776 drafted the Continental Articles for the Government
of the Army, was convinced that it would be "in vain" for
the American patriots to seek "a more complete system of
military discipline" than the existing British model. 3 The
Works of John Adams 68 (C. Adams ed. 1851). He and
Thomas Jefferson therefore proposed adopting "the British
articles of war, *totidem verbis.*" *Id.,* at 68–69. The Conti-
nental Congress agreed. *Id.,* at 69. And when the Consti-
tution and the Bill of Rights were adopted, no one sug-
gested that this required any alteration of the existing
system of military justice. On the contrary, as the majority
recounts, the First Congress continued the existing arti-
cles of war unchanged. *Ante,* at 10. Courts-martial fit
effortlessly into the structure of government established
by the Constitution. They were instruments of military
command. Under the Constitution, the President, as the
head of the Executive Branch, was made the Commander
in Chief. Art. II, §2. So the role of the courts-martial was
to assist the President in the exercise of that command
authority.

20                    ORTIZ *v.* UNITED STATES

The ratification of the Constitution and the Bill of Rights did naturally raise some constitutional questions. For example, founding-era courts-martial adjudicated a long list of offenses, some carrying capital punishment, including for crimes involving homicide, assault, and theft. American Articles of War of 1776, §13, in 2 W. Winthrop, Military Law and Precedents 1495–1498 (2d ed. 1896) (Winthrop); see also, *e.g.,* American Articles of War of 1806, Arts. 39, 51, 54, in *id.,* at 1514–1516. In civilian life, a person charged with similar offenses was entitled to protections, such as trial by jury, that were unavailable in courts-martial. Moreover, the Constitution entitled such persons to *judicial* process—which courts-martial, lacking the necessary structural attributes of Article III courts, could not afford. So how could they try serious crimes, including even capital offenses?

The simple answer goes back to the fundamental nature of courts-martial as instruments of command. As Blackstone recognized, the enforcement of military discipline, an essential feature of any effective fighting force, was viewed as an *executive* prerogative. It represented the exercise of the power given to the President as the head of the Executive Branch and the Commander in Chief and delegated by him to military commanders. Thus, adjudications by courts-martial are executive decisions; courts-martial are not courts; they do not wield judicial power; and their proceedings are not criminal prosecutions within the meaning of the Constitution. As we explained in *Milligan*, the need to maintain military order required those serving in the military to surrender certain rights that they enjoyed in civilian life and to submit to discipline by the military command. Although *Milligan* confirmed the general rule that "it is the birthright of every American citizen" to have the Federal Government adjudicate criminal charges against him only in an Article III court, 4 Wall., at 119, 122, we also stated that "[e]very one

Cite as: 585 U. S. ____ (2018)          21

ALITO, J., dissenting

connected with" "the military or naval service . . . while
thus serving, surrenders his right to be tried by the civil
courts," *id.,* at 123.   That is why the historical evidence
strongly suggests that the provisions of the Bill of Rights
were not originally understood to apply to courts-martial.
See Prakash, The Sweeping Domestic War Powers of
Congress, 113 Mich. L. Rev. 1337, 1346 (2015); Wiener,
Courts-Martial and the Bill of Rights: The Original Prac-
tice II, 72 Harv. L. Rev. 266, 290–291, 294 (1958); see also
1 Winthrop 54, 241, 430, 605; *Milligan, supra,* at 137–138
(Chase, C. J., concurring in judgment).[4]

Due to reforms adopted in the recent past, it is possible
today to mistake a military tribunal for a regular court
and thus to forget its fundamental nature as an instru-
ment of military discipline, but no one would have made
that mistake at the time of the founding and for many
years thereafter.   Notwithstanding modest reforms in
1874, a court-martial continued into the 20th century to
serve "primarily as a function or instrument of the execu-
tive department to be used in maintaining discipline in
the armed forces.   It was therefore not a 'court,' as that
term is normally used." Schlueter, The Court-Martial: An
Historical Survey, 87 Mil. L. Rev. 129, 150–153, 154–155
(1980).   Hence, Colonel Winthrop—whom we have called
"the 'Blackstone of Military Law,'" *Reid* v. *Covert,* 354
U. S. 1, 19, n. 38 (1957) (plurality opinion)—echoed the
original Blackstone in describing courts-martial as "simply
*instrumentalities of the executive power*, provided by Con-
gress for the President as Commander-in-chief, to aid him
in properly commanding the army and navy and enforcing

———————

[4]In fact, "for over half a century after the adoption of the Bill of
Rights, its provisions were never invoked in a military situation save in
a single instance," and in that case "the denial of its applicability to the
military . . . was approved by no less an authority than the father of the
Bill of Rights himself."  Wiener, Courts-Martial and the Bill of Rights:
The Original Practice II, 72 Harv. L. Rev. 266, 291 (1958).

22                           ORTIZ *v.* UNITED STATES

                              ALITO, J., dissenting

discipline therein."  1 Winthrop 54.

   Indeed, Brigadier General Samuel T. Ansell, who served
as acting Judge Advocate General from 1917 to 1919,
groused that the American system at the time of World
War I was still "basically . . . the British system as it
existed at the time of the separation," and described it as
one "arising out of and regulated by the mere power of
Military Command rather than Law."  Ansell, 5 Cornell
L. Q., at 1.  Around the same time, Edmund Morgan—who
would later help draft the Uniform Code of Military Jus-
tice (UCMJ)—declared it "too clear for argument that the
principle at the foundation of the existing system is the
supremacy of military command.  To maintain that princi-
ple, military command dominates and controls the pro-
ceeding from its initiation to the final execution of the
sentence.  While the actual trial has the semblance of a
judicial proceeding and is required to be conducted pursu-
ant to the forms of law, . . . [i]n truth and in fact, . . .
courts-martial are exactly what Colonel Winthrop has
asserted them to be."  Morgan, The Existing Court-Martial
System and the Ansell Army Articles, 29 Yale L. J. 52, 66
(1919).

   For instance, until 1920 the President and commanding
officers could disapprove a court-martial sentence and
order that a more severe one be imposed instead, for
whatever reason.  We twice upheld the constitutionality of
this practice, *Swaim* v. *United States,* 165 U. S. 553, 564–
566 (1897); *Ex parte Reed,* 100 U. S. 13, 20, 23 (1879),
which was widely used during World War I, see Wiener,
*supra,* at 273.  Similarly, until 1920 it was permissible for
the same officer to serve as both prosecutor and defense
counsel in the same case.  West, A History of Command
Influence on the Military Judicial System, 18 UCLA
L. Rev. 1, 14 (1970).  Congress discontinued such practices
by statute, but through the end of World War II, courts-
martial remained blunt instruments to enforce discipline.

ALITO, J., dissenting

Schlueter, *supra,* at 157–158; see also West, *supra,* at 8, n. 18.

It is precisely because Article II authorizes the President to discipline the military without invoking the judicial power of the United States that that the Constitution has always been understood to permit courts-martial to operate in the manner described above. Thus, in *Dynes* v. *Hoover*, 20 How. 65, 79 (1858), we said that the Constitution makes clear that the Government's power to "tr[y] and punis[h]" military offenses "is given without any connection between it and the 3d article of the Constitution defining the judicial power of the United States; indeed, that the two powers are entirely independent of each other."

Moreover, the principle that the Government need not exercise judicial power when it adjudicates military offenses accords with the historical understanding of the meaning of due process. In the 19th century, it was widely believed that the constitutional guarantee of due process imposed the rule that the Government must exercise its judicial power before depriving anyone of a core private right. See generally Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 562, 568–569, and n. 42 (2007); *e.g., Cohen* v. *Wright*, 22 Cal. 293, 318 (1863) ("The terms 'due process of law' have a distinct legal signification, clearly securing to every person . . . a judicial trial . . . before he can be deprived of life, liberty, or property"); *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 275, 280 (1856) (similar). Yet for most of our history we held that "[t]o those in the military or naval service of the United States the military law is due process." *Reaves* v. *Ainsworth*, 219 U. S. 296, 304 (1911); *United States ex rel. French* v. *Weeks*, 259 U. S. 326, 335 (1922); see also *Milligan*, 4 Wall., at 138 (Chase, C. J., concurring in judgment) ("the power of Congress, in the government of the land and naval forces and of the militia,

24                    ORTIZ *v.* UNITED STATES

ALITO, J., dissenting

is not at all affected by the fifth or any other amend-
ment"); Wiener, 72 Harv. L. Rev., at 279 (in the history of
courts-martial, "of due process of law as a constitutional
concept, there is no trace"); cf. 1 Blackstone 403–404
(explaining the basic due process rights soldiers surrender
upon entering the army).

This understanding of the power wielded by military
tribunals parallels our current jurisprudence regarding
the authority of other Executive Branch entities to adjudi-
cate disputes that affect individual rights. An exercise of
judicial power may be necessary for the disposition of
private rights, including the rights at stake in a criminal
case. *B&B Hardware*, 575 U. S., at ___–___ (THOMAS, J.,
dissenting) (slip op., at 12–13); see also *Wellness Int'l
Network, Ltd.* v. *Sharif*, 575 U. S. ___, ___ (2015) (THOMAS,
J., dissenting) (slip op., at 6). But the adjudication of
public rights does not demand the exercise of judicial
power. *Id.,* at ___–___ (slip op., at 6–7). Similarly, en-
forcement of military discipline is not a function that
demands the exercise of judicial power, either. *Dynes*,
*supra*; *Murray's Lessee*, *supra,* at 284.

In short, military offenses are "exceptions" to Article III
in the same way that true public rights disputes are ex-
ceptions to Article III: the Federal Government can adju-
dicate either one without exercising its judicial power.
This means that when Congress assigns either of these
functions to an Executive Branch tribunal—whether the
Patent Trial and Appeal Board, the Court of Claims, or the
CAAF—that does not imply that the tribunal in question
is exercising judicial power. And the point holds notwith-
standing the undoubted fidelity to "the rule of law" that
such officers bring to their tasks. *Ante,* at 11, n. 5. Con-
trary to the majority's odd suggestion, acting "in strict
compliance with legal rules and principles" is not a
uniquely judicial virtue. *Ibid.* The most basic duty of the
President and his subordinates, after all, is to "take Care

Cite as:  585 U. S. ____ (2018)          25

ALITO, J., dissenting

that the Laws be *faithfully executed*." Art. II, §3 (emphasis added).  Hence, acting with fidelity to law is something every executive officer is charged with doing, but those officers remain *executive* officers all the same.  For that reason, and in light of the history recounted above, the majority's suggestion that "[t]he military justice system's essential character" is "judicial," and has been "maintained" as such since the "very first Congress," *ante,* at 8, 10, simply does not square with the actual operation of the court-martial system or the consensus view of its place in our constitutional scheme.

### C

In response to this history, the majority tries to enlist Colonel Winthrop as an ally, *ante,* at 10–11, and n. 5, but Winthrop had a firmer grasp than the majority on the distinction between functions that can be described as "judicial" in a colloquial sense and functions that represent an exercise of "judicial power" in the constitutional sense.  Thus, while Winthrop observed that courts-martial resemble constitutional courts in certain respects, he made those observations "*[n]otwithstanding* that the court-martial is only an instrumentality of the executive power having no relation or connection, in law, with the judicial establishments of the country."  1 Winthrop 61 (emphasis added).  Nor was Winthrop the only military commentator who employed such terms casually from time to time.  *E.g.,* W. De Hart, Observations on Military Law 6 (1859) (describing an officer's authority to appoint members of a court-martial as "a legislative power"); *id.,* at 14 (describing courts-martial as "being clothed with judicial powers").  Indeed, our own Court has frequently described functions as "judicial" in a colloquial sense, despite knowing they are executive in the constitutional sense.  *E.g., Smelting Co.* v. *Kemp*, 104 U. S. 636, 640 (1882) (Land Department officers "exercise a judicial function" although

ALITO, J., dissenting

they are "part of the administrative and executive branch
of the government"); *Murray's Lessee*, 18 How., at 280–
281; *Vallandigham*, 1 Wall., at 253; *Arlington*, 569 U. S.,
at 304–305, n. 4.

The majority's reliance on Attorney General Bates is
even weaker. *Ante,* at 10. Bates wrote a memo to Presi-
dent Lincoln opining that when the President acts to
"approve and confirm the sentence of a court martial," or
to "revis[e] its proceedings," Congress intended him to "act
*judicially*—that is, [to] exercise the discretion confided to
him within the limits of law." 11 Op. Atty. Gen. 20–21
(1864). Bates was arguing that a President could not
revoke a court-martial sentence after it had been carried
into execution. He was describing an implicit limit on the
power of the President under the system of military justice
established by statute. His reference to certain Presiden-
tial actions as "judicial" had nothing to do with judicial
review, and in *Vallandigham*, *supra,* at 254, we rejected
the idea that "the President's action" in approving a court-
martial decision is an exercise of judicial power that we
can review directly.

In sum, the majority has done nothing to undermine the
overwhelming historical consensus that courts-martial
permissibly carry out their functions by exercising execu-
tive rather than judicial power.

III

What remains of the majority's analysis boils down to
the assertion that courts-martial "resemble" conventional
courts, *ante,* at 9, indeed, that "court-likeness" is the
dispositive issue, *ante,* at 16 (emphasis deleted).

The first thing to be said in response to this theory is
that we have "never adopted a 'looks like' test to deter-
mine if an adjudication" involves an exercise of judicial
power. *Oil States*, 584 U. S., at ___ (slip op., at 15). On
the contrary, we have frequently repudiated this mode of

ALITO, J., dissenting

analysis as utterly inadequate to police separation-of-powers disputes.  See, *e.g., INS* v. *Chadha,* 462 U. S. 919, 953, n. 16 (1983); *Arlington, supra*; *Gordon,* 117 U. S. Appx., at 699.  In fact, of all the cases on which the majority relies, not a single one suggests that our appellate jurisdiction turns on the extent to which the underlying tribunal looks like a court.

In any event, the majority's "looks like" test fails on its own terms.  It is certainly true that today's military justice system provides many protections for the accused and is staffed by officers who perform their duties diligently, responsibly, and with an appropriate degree of independence.  Nothing I say about the current system should be interpreted as denigrating that system or as impugning the dedication, professionalism, and integrity of the officers who serve in it, notwithstanding the majority's insistence to the contrary.  *Ante,* at 11, n. 5.  As explained above, military officers' undoubted fidelity to law has nothing to do with the court-martial system's status under our Constitution.  That status is what my point here concerns.  And that status has never changed.

Today's court-martial system was put in place in 1950, when Congress enacted the UCMJ in response to criticism following World War II.  64 Stat. 108.  Among its innovations, the UCMJ subjected courts-martial to more elaborate procedural rules than ever before.  It also created a system of internal appellate tribunals within the military chain of command.  Those entities—which we now call the Army, Navy-Marine Corps, Air Force, and Coast Guard Courts of Criminal Appeals and the Court of Appeals for the Armed Forces—did not exist before 1950.  Congress augmented this system in 1983, for the first time in American history providing for direct Supreme Court review of certain decisions of the highest military tribunal.  97 Stat. 1405–1406; 10 U. S. C. §867a; 28 U. S. C. §1259.

Such reforms, as I have indicated, are fully consistent

with the President's overriding duty to "faithfully ex-
ecut[e]" the laws. Art. II, §3. Hence, even after Congress
passed the UCMJ, we continued to recognize that the
court-martial system "has always been and continues to be
primarily an instrument of discipline," *O'Callahan* v.
*Parker*, 395 U. S. 258, 266 (1969), and that "courts-martial
are constitutional instruments to carry out congressional
and executive will," *Palmore*, 411 U. S., at 404; see also,
*e.g., Reid*, 354 U. S., at 36 (plurality opinion); *United
States ex rel. Toth* v. *Quarles*, 350 U. S. 11, 17 (1955);
*Chappell* v. *Wallace*, 462 U. S. 296, 300 (1983). For that
reason, even if the majority were to begin its analysis in
1950, and to confine it to the CAAF—which the majority
has *not* done—it would still be incorrect to perceive any-
thing other than executive power at issue here.

An examination of the CAAF confirms this point. The
CAAF's members are appointed by the President for a
term of years, and he may remove them for cause, 10
U. S. C. §§942(b), (c), under a standard we have recognized
as "very broad," *Bowsher* v. *Synar*, 478 U. S. 714, 729
(1986). These and other provisions of the UCMJ "make
clear that [the CAAF] is within the Executive Branch."
*Edmond* v. *United States*, 520 U. S. 651, 664, n. 2 (1997).
For instance, the CAAF is subject to oversight by the
Secretaries of Defense, Homeland Security, and the mili-
tary departments, and its members must meet annually to
discuss their work with members of the military and
appointees of the Secretary of Defense. 10 U. S. C. §946.
The CAAF must review any case a Judge Advocate Gen-
eral orders it to hear. §867(a)(2). And, contrary to the
majority's assertion, the CAAF's decisions are not "final
(except if we review and reverse them)." *Ante*, at 18.

In fact, in the most serious cases that the CAAF re-
views—those in which a court-martial imposes a sentence
of death or dismissal from the Armed Forces—the CAAF's
judgment cannot be executed until the President, the

ALITO, J., dissenting

relevant branch Secretary, or one of his subordinates
approves it.  10 U. S. C. §§871(a), (b).  That is why the
UCMJ provides that "[a]fter [the CAAF] has acted on a
case," the "convening authority [shall] take action in ac-
cordance with that decision," "*unless there is to be further
action by the President or the Secretary concerned.*"
§867(e) (emphasis added).  In such cases the "proceedings,
findings, and sentences" of the court-martial system—
including the CAAF's "appellate review"—are not final
until approved.  §876.[5]  Indeed, even if *our* Court affirms
such a judgment, it cannot be executed until the relevant
military authority approves it—a requirement that is not
subject to any timeframe or substantive standards.  See
Manual for Courts-Martial, United States Rule for Courts-
Martial 1205(b) (2016).[6]

Such revisory powers have always been a feature of the
court-martial system.  1 Winthrop 683.  And because the
UCMJ preserves the chain of command's historic revisory
power over the CAAF's most significant decisions, there is
no way for us to conclude that the CAAF is "judicial"
under any known definition of that term.  And it should
not matter that Ortiz's own sentence is not subject to

———————

[5] Thus, JUSTICE THOMAS is mistaken when he asserts that "[t]he Ex-
ecutive Branch has no statutory authority to review or modify the
CAAF's decisions." *Ante,* at 7 (concurring opinion).  And anyway, even
if the CAAF's decisions were final, it would not imply that they are
judicial.  Insofar as the Government can adjudicate military offenses
without exercising its judicial power, finality would be equally con-
sistent with executive as well as judicial power.

[6] For example, in 1996 we granted certiorari to the CAAF and af-
firmed the court-martial conviction and capital sentence of Dwight
Loving.  *Loving* v. *United States*, 517 U. S. 748 (1996).  Yet our judg-
ment could not be deemed final—and hence could not be carried out—
until the President approved it.  Neither President Clinton nor Presi-
dent Bush would do so.  *Loving* v. *United States*, 68 M. J. 1, 3 (CAAF
2009).  President Obama eventually commuted the sentence to life
without parole, https://www.justice.gov/pardon/obama-commutations
(as last visited June 21, 2018).

ALITO, J., dissenting

approval, just as it did not matter that the Court of Claims decision at issue in *Gordon* was not subject to review by the Treasury Secretary.  This point is elementary.  At least since *Hayburn's Case*, 2 Dall., at 411, n., 413, n., it has been firmly established that it is "radically inconsistent" with the "judicial power" for any court's judgments, "under any circumstances," to "be liable to a reversion, or even suspension," by members of the Executive or Legislative Branches.  Indeed, "[t]he award of execution is a part, and an essential part of every judgment passed by a court exercising judicial power."  *Gordon*, 117 U. S. Appx., at 702; *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 218–219 (1995).

Simply put, the CAAF's Executive Branch status is more than a label.  The CAAF is what we have always thought it to be: an agent of executive power to aid the Commander in Chief.  It follows that our appellate jurisdiction does not permit us to review its decisions directly.  That conclusion is unaffected by Congress's decision to give greater procedural protections to members of the military.  Nor would the conclusion be altered if Congress imported into the military justice system additional rights and procedures required in the civilian courts.  If Congress wants us to review CAAF decisions, it can convert that tribunal into an Article III court or it can make CAAF decisions reviewable first in a lower federal court—perhaps one of the regional Courts of Appeals or the Federal Circuit—with additional review available here.  But as long as the CAAF retains its current status as an Executive Branch entity, Congress cannot give our Court jurisdiction to review its decisions directly.

\*    \*    \*

The arguments in this case might appear technical, but important interests are at stake.  The division between our Court's original and appellate jurisdiction provoked

Cite as:  585 U. S. ____ (2018)          31

ALITO, J., dissenting

extended and impassioned debate at the time of the founding.  See Amar, *Marbury*, Section 13, and the Original Jurisdiction of the Supreme Court, 56 U. Chi. L. Rev. 443, 468–478 (1989).  The Framers well understood that the resolution of this dry jurisdictional issue would have practical effects, *ibid.*, and in a similar vein, the Court's holding that the CAAF exercises something akin to judicial power will have unavoidable implications for many important issues that may arise regarding the operation of the military justice system, not to mention judicial review of the many decisions handed down by administrative agencies.

The majority disclaims the latter possibility, *ante,* at 19, but its effort is halfhearted at best.  In reality there is no relevant distinction, so far as our appellate jurisdiction is concerned, between the court-martial system and the "other adjudicative bodies in the Executive Branch" that the majority tells us not to worry about.  *Ibid.*  The majority cites the "judicial character . . . of the court-martial system," as well as its "constitutional foundations and history," *ibid.*, but as I have explained, the constitutional foundations, history, and fundamental character of military tribunals show that they are Executive Branch entities that can only permissibly exercise executive power— just like civilian administrative agencies.

The Founders erected a high wall around our original jurisdiction, deliberately confining it to two classes of cases that were unlikely to touch the lives of most people.  See The Federalist No. 81, at 488.  Today's decision erodes that wall.  Because the Court ignores both the wisdom of the Founders, the clear, consistent teaching of our precedents, and the unambiguous text of the Constitution, I respectfully dissent.