

## MEMORANDUM

## LABOR REFORM AS A CATALYST FOR GROWTH

### I.   Introduction

Puerto Rico faces tremendous challenges. The economy has been shrinking for more than ten years and the Government has amassed over $70 billion in outstanding debt liabilities and over $50 billion in unfunded pensions liabilities. Hurricanes Irma and Maria made the situation even more unbearable.

As the Executive Summary of the New Fiscal Plan for the Commonwealth of Puerto Rico (the "New Fiscal Plan") outlines, the people of Puerto Rico need and deserve plentiful good jobs, a dynamic and prosperous economy, affordable and reliable electricity, and an efficient and responsive public sector—but have been deprived of such for more than a decade. Instead, since 2005, the number of people living under the poverty level has increased, the economy has shrunk, electricity has remained expensive and unreliable, labor market regulations have remained burdensome—hindering job creation for the people—and the public sector has provided declining levels of service at a high cost to citizens. These problems predate Hurricanes Irma and Maria and will continue to plague Puerto Rico long after it recovers from the storms unless the necessary actions are taken.

The Island faces immense challenges with labor force participation and preparedness.[1] As exemplified on **(Exhibit 1)**, the Island's formal labor force participation rate is only ~40%, far from the U.S. mainland average (63%) or even the lowest-ranked U.S. state (West Virginia, 53%), and well below other Caribbean islands. In fact, according to World Bank data, Puerto Rico's labor force participation rate is currently 7th lowest in the world and has never ranked higher than the bottom 20 out of more than 200 countries and territories surveyed.[2] Moreover, Puerto Rico's youth

---

[1] It is tempting to conclude that, due to Puerto Rico's large informal labor market, the true labor force participation rate is far higher than the official statistics that policymakers rely upon. However, research by Maria Enchautegui (University of Puerto Rico) and Richard Freeman (Harvard University) concludes that this is unlikely to be the case. Many individuals who participate in the informal labor market are likely described in household surveys as self-employed, and the self-employed are included when those survey data are used to calculate the labor force participation rate. For this reason, as well as based upon a survey conducted among male Puerto Rico residents, Enchautegui and Freeman conclude that the official labor force participation rate understates the true labor force participation rate by only a few percentage points. Enchautegui, Maria, and Richard B. Freeman. "*Why don't more Puerto Rican men work? The rich uncle (Sam) hypothesis*." Working paper No. w11751. National Bureau of Economic Research, 2005.

[2] Puerto Rico ranking has never surpassed 215th out of the 232 countries, states, and territories tracked by The World Bank Group since The World Bank Group began collecting data in 1990.



*Memorandum:* Labor Reform as a Catalyst for Growth
Page 2 of 35

unemployment rate is 23.8%, almost double the world average (13.8%) and more than double the U.S. average (10%).[3]

**Exhibit 1: Labor Force Participation and Unemployment Rates[4]**



Labor force participation rate and unemployment rates, %



Low labor force participation in Puerto Rico is a function neither of Hurricane Maria nor the economic downturn that began in 2006. The Statement of Motives of Act No. 4 of 2017 indicates that as of October 2016, the labor participation rate of Puerto Rico was at 39.8%, while it was at 62.8% for the United States. The reality in the Island contrasted dramatically with that prevailing in 1950, when the labor participation rate of Puerto Rico was 57.9% and that of the United States was 60%. Low rates of employment are a long-term structural problem that can be addressed only through significant changes to public policy. The PROMESA legislation expressed Congress's opinion that "any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms…" The labor and welfare reforms discussed herein form part of that commitment to fulfill the stated goals of PROMESA.

Low rates of employment contribute to Puerto Rico's low incomes and its high rate of poverty. As the studies and analyses provided below demonstrate, were Puerto Rico to increase its labor force

---

[3] The World Bank Group, 2017, via International Labour Organization, ILOSTAT database. Data retrieved in March 2017. https://data.worldbank.org/indicator/SL.UEM.1524.ZS.

[4] "Dominican Republic Unemployment Rate," Trading Economics, www.tradingeconomics.com/dominican-republic/unemployment-rate; "Unemployment Rates for States," U.S. Bureau of Labor Statistics, U.S. Bureau of Labor Statistics, www.bls.gov/web/laus/laumstrk.htm; "United States Unemployment," Trading Economics, www.tradingeconomics.com/united-states/unemployment-rate.



participation rate even to that of the lowest mainland state – West Virginia – household incomes would rise significantly, poverty would fall and many of the government's budget problems would be addressed. Approximately 60% of the gap in median household incomes in Puerto Rico and the poorest mainland state, Mississippi, is accounted for by Puerto Rico's far lower labor force participation rate.[5]

Since 2000, about 600,000 Puerto Ricans have relocated to the state of Florida, many in search of employment opportunities.[6] Florida is an at-will employment state and does not require employers to provide any paid vacation or sick days or Christmas bonus.[7]

About one-quarter of Puerto Ricans work informally. The informal labor market, which is far larger in Puerto Rico than anywhere in the rest of the United States, is driven in part by labor laws which make it uneconomical to hire employees with full benefits and job protections.[8] The informal economy diminishes Puerto Rico's tax base, from which the Government funds public services. More importantly, employees in the informal sector currently do not have access to legal employment rights and to Social Security for the future.

Unless Puerto Rico substantially increases its labor force participation and employment, incomes will always fall far below mainland states and outmigration will continue to draw Puerto Ricans away from the island of their birth. **While many other reforms are integral to making these improvements, increasing labor force participation may be the single most important objective for long-term economic well-being in Puerto Rico.**

---

[5] Calculated using Mississippi's (the poorest mainland state) labor force participation rate of 55.6% and Puerto Rico's labor force participation rate of 40%; and MS's median household income of $39,218 and PR's of $19,606. By multiplying PR's median household income by 55.6/40, the product is $27,252, leaving a cap of only $11,966.

[6] Rayer, Stefan and Ying Wang, *"Growth Of The Puerto Rican Population In Florida And On The U.S. Mainland,"* University of Florida, Bureau of Economic and Business Research, February 9, 2018. https://www.bebr.ufl.edu/population/website-article/growth-puerto-rican-population-florida-and-us-mainland.

[7] "The 2017 Florida Statutes," Florida Legislature. http://www.leg.state.fl.us/Statutes/index.cfm?App_mode=Display_Statute&URL=0400-0499/0448/0448PartIContentsIndex.html&StatuteYear=2017&Title=-%3E2017-%3EChapter%20448-%3EPart%20I; "Florida Leave Laws," Employment Law Handbook. https://www.employmentlawhandbook.com/leave-laws/state-leave-laws/florida/.

[8] Estimates of the size of the informal economy are 15-20% of GNP, correlating to $10-14 billion, pre-Maria. Rates derived from "Congressional Task Force on Economic Growth in Puerto Rico," U.S. Congress, December 20, 2016. https://www.finance.senate.gov/imo/media/doc/Bipartisan%20Congressional%20Task%20Force%20on%20Economic%20Growth%20in%20Puerto%20Rico%20Releases%20Final%20Report.pdf, p. 11; GNP is FY2016 projected ($70.1B) from "Statistical Appendix of the Economic Report for the Governor and Legislative Assembly," Government Development Bank for Puerto Rico, 2018. http://www.gdb.pr.gov/economy/statistical-appendix.html.



**The manner in which labor regulations are structured – and the costs and risks they impose as part of normal business transactions – harms Puerto Rico's ability to create good-paying jobs in the private sector. These costs and risk reduce the economic growth and future revenues projected in the New Fiscal Plan. Therefore, fostering a regulatory environment conducive to increasing labor participation rates is essential to fulfilling fiscal projections.** More importantly, higher employment levels and better-paying jobs are crucial to transforming Puerto Rico's economy from one that trends downward to one that has a brighter future.

On April 19, 2018, pursuant to 201(e)(2) of PROMESA, the Oversight Board voted to certify the fiscal plan for the Commonwealth of Puerto Rico, pursuant to Section 201(d)(2) of PROMESA (the "New Fiscal Plan"). On April 24, 2018, pursuant to Section 201(e)(2) of PROMESA, the Oversight Board delivered to the Government of Puerto Rico, a compliance certification for the New Fiscal Plan as well as copy of the New Fiscal Plan.

An integral component of the New Fiscal Plan is the adoption of certain limited changes to Puerto Rico's labor laws, the establishment of a local Earned Income Tax Credit (EITC), and the creation of certain work requirements and work bonuses for the participants in the Nutritional Assistance Program (PAN).

On May 21, 2018, the Board agreed to focus labor reform on transforming Puerto Rico into an "employment-at-will" jurisdiction, the establishment of a local Earned Income Tax Credit (EITC), and the creation of certain work requirements and work bonuses for the participants in the Nutritional Assistance Program (PAN). The adoption of these limited labor market reforms is projected to generate $319 million in additional revenues collected by the Government of Puerto Rico over the five-year period covered by the Plan. Moreover, by implementing labor reform, Puerto Rico will have access to reinvest over $700 million to promote further economic development and reduce the risk of reform implementation by investing in infrastructure projects and recovery, digital reform, implementation of ease of doing business reforms, and procurement reform. In addition, given the ongoing recovery after hurricanes, this reinvestment will include a Municipality Recovery Fund and into the UPR's needs-based scholarship fund. This reinvestment, along with the PAN work requirement and EITC, will bolster employment as well as ensure that those entering the workforce are more prepared to earn higher wages.

The Oversight Board's economist has scored the monetary value of the overall Labor Reform Package contained in the New Fiscal Plan at one (1) full percentage point of permanent growth, about half of which would come from the labor supply side through the EITC and limited work-requirement for PAN, and half from the labor demand side. Consistent with the Italian experience and the IMF study noted below, it was estimated that about 0.30% points would come from easing employment protection (*i.e.,* implementing an "employment-at-will" regime) and 0.20% points from eliminating benefit requirements, such as generous paid vacation, as exemplified in **(Exhibit 2)**. However, given the New Fiscal Plan accommodation agreed to with the Governor, the scoring of the labor reform package presently envisions a 0.80 percentage point of permanent growth



*Memorandum:* <u>Labor Reform as a Catalyst for Growth</u>
Page 5 of 35

considering the focus of the labor reform is on the EITC and the work requirement for PAN (0.50%) and employment at will (0.30%).[9]

**Exhibit 2: Estimated Incremental GNP Growth from Labor Reforms**

Estimated Incremental GNP Growth from Labor Reforms, %



**The Oversight Board believes the measures required in the Labor Package of the New Fiscal Plan will improve the vibrancy of the local labor market; make Puerto Rico more competitive and attractive for job-creating investments; promote more hiring within the formal economy; and produce more revenue to the government.**

*None* **of the provisions of the labor reform place workers in Puerto Rico at a disadvantage in comparison to workers on the mainland.** *None* **of the provisions of the labor reform strip workers in Puerto Rico of rights enjoyed by workers on the U.S. mainland.** *None* **of the provisions create incentives for workers to abandon the island seeking greater protections under state laws- since no state grants protections beyond what is contemplated by the labor reform.**

The reforms contained in the New Fiscal Plan have been used effectively to turn around economies in many countries. They provide a realistic and achievable blueprint for success, with proven methods for growth, restoring business confidence, improving competitiveness, ending the debt crisis, and attracting the investment needed to transform the Island. This roadmap for recovery will produce more jobs, better living conditions and improve educational and healthcare outcomes for Puerto Rico's residents.

---

[9] Wolfe, Andrew, "Derivation of 0.3%-point increase in growth from the implementation of "employment-at-will""



The analyses, data, and studies included in this memorandum intend to provide information supporting the adoption of human capital and labor reforms for the benefit of the people of Puerto Rico. **Given the recent accommodation to the New Fiscal Plan, the numbers reflected in this memorandum will be conformed to reflect final technical adjustments in the recertification of the New Fiscal Plan.**

## II.    Employment Laws Matter

Puerto Rico's historically low levels of formal labor force participation cannot be attributed to any single factor, but a range of public policies have served to reduce employment on the Island. Puerto Rico has by far the most generous mandated employer benefits in the U.S., which increase the cost of hiring employees. Unlike Puerto Rico, no mainland state mandates any paid vacation and few mandate even a modest amount of sick leave. No state requires employers to pay a Christmas bonus. Thus, it can be more expensive to employ a low-wage worker in Puerto Rico than on the mainland, making Puerto Rico less competitive in labor-intensive sectors such as tourism.

Economists have documented that when employers are required to provide an employee benefit, those employers will tend to recoup the costs of those benefits by reducing the wages paid to employees.[10] When employers are prevented from reducing wages to offset costs of mandated benefits, as may be the case with a minimum wage worker, they may choose to reduce the number of workers they hire. Thus, it is reasonable to assume that Puerto Rico's high levels of mandated employer-paid benefits reduce both wages and employment relative to a scenario in which such benefits were not required.

---

[10] This has been shown to be true with employer-paid Social Security taxes, health coverage, maternity leave, and other benefits. For instance, the Congressional Budget Office and the Social Security Administration both assume that an increase in Social Security payroll taxes levied on employers would result in a roughly dollar-for-dollar reduction in employee wages. Likewise, when the Affordable Care Act ("Obamacare") was projected to reduce the rate of growth of employer health care costs, the Social Security and Medicare Trustees assumed that this would be reflected in increased wages paid to employees. Gruber and Krueger (1991) found that employer costs for workers compensation insurance are largely shifted to employees via lower wages. Gruber (1994) found that when employers were required to provide maternity health benefits to employees, wages for employees declined by a similar amount. Prada et al (2017) found that when Chile required employers to provide free child care, wages for women declined by 9 to 20 percent. Kolstad and Kowalski (2016) found that when Massachusetts required employers to provide health insurance, wages for employees declined by an amount similar to the health premiums paid by employers. (Gruber, Jonathan, and Alan B. Krueger. *"The incidence of mandated employer-provided insurance: Lessons from workers' compensation insurance."* Tax Policy and the Economy 5 (1991): 111-143. Gruber, Jonathan. *"The incidence of mandated maternity benefits,"* The American Economic Review (1994): 622-641. Prada, María F., Graciana Rucci, and Sergio S. Urzúa. *The effect of mandated child care on female wages in Chile.* No. w21080. National Bureau of Economic Research, 2015. Kolstad, Jonathan T., and Amanda E. Kowalski. "Mandate-based health reform and the labor market: Evidence from the Massachusetts reform." Journal of Health Economics 47 (2016): 81-106.)

Likewise, there is evidence that employer benefit costs can increase the size of the informal labor market, where income is not reported, and such benefits need not be provided.[11] About one quarter of Puerto Rican workers participate in the informal economy according to Estudios Técnicos, substantially higher than any mainland state.[12] The informal economy is detrimental to the Island because it diminishes Puerto Rico's tax base, from which the Government funds public services. And more importantly, those working in the informal sector currently do not have access to certain legal, financial, and labor rights and to Social Security for the future.

Puerto Rico law imposes upon an employer costly mandatory employer-provided benefits that are not comparable to those prevailing in other jurisdictions under the U.S. flag. These compulsory benefits effectively increase labor costs. Moreover, the compulsory vacation and sick leave benefits constitute payments for time not worked.  In addition to these above market "labor cost" factors, Puerto Rico lacks "at-will employment," which would permit employers to manage their business and make non-discriminatory personnel decisions without being exposed to substantial monetary risks. While there are variations in labor laws among the 50 mainland states, 49 of them follow the "at-will employment" legal rule **(Exhibit 3)**.  This rule avoids court's "second guessing" the validity of legitimate and non-discriminatory discharge decisions. The only state that has departed from this regime is Montana, and that statute was enacted to *reduce* the monetary exposure Montana state courts had imposed in wrongful discharge claims.

---

[11] Kugler et al (2017) found that a reduction in employer payroll taxes in Colombia reduced the size of the country's informal labor market. Kugler, Adriana, Maurice Kugler, and Luis Omar Herrera Prada. *"Do payroll tax breaks stimulate formality? Evidence from Colombia's reform."* No. w23308. National Bureau of Economic Research, 2017

[12] Estudios Técnicos, Inc, "The Informal Economy in Puerto Rico," August 9, 2012



## Exhibit 3: Employment-at-will in the U.S. States and Puerto Rico

| State/Territory | Employment-at-will | State/Territory | Employment-at-will |
|---|---|---|---|
| Alaska | YES | Nevada | YES |
| Arizona | YES | New Hampshire | YES |
| Arkansas | YES | New Jersey | YES |
| California | YES | New Mexico | YES |
| Colorado | YES | New York | YES |
| Connecticut | YES | North Carolina | YES |
| Delaware | YES | North Dakota | YES |
| Florida | YES | Ohio | YES |
| Georgia | YES | Oklahoma | YES |
| Hawaii | YES | Oregon | YES |
| Idaho | YES | Pennsylvania | YES |
| Illinois | YES | Rhode Island | YES |
| Indiana | YES | South Carolina | YES |
| Iowa | YES | South Dakota | YES |
| Kansas | YES | Tennessee | YES |
| Kentucky | YES | Texas | YES |
| Louisiana | YES | Utah | YES |
| Maine | YES | Vermont | YES |
| Maryland | YES | Virginia | YES |
| Massachusetts | YES | Washington | YES |
| Michigan | YES | West Virginia | YES |
| Minnesota | YES | Wisconsin | YES |
| Mississippi | YES | Wyoming | YES |
| Missouri | YES | District of Columbia | YES |
| Montana | NO | Puerto Rico | NO |
| Nebraska | YES | | |

The impact of Puerto Rico's labor regulatory regime on future private sector economic growth has already been recognized by the Government of Puerto Rico with the enactment last year of the *Labor Transformation and Flexibility Act*, Law No. 4-2017. The *Statement of Intent* of Law No. 4 sets forth significant labor economic findings which justified the modification of several employment laws.

The extensive legislative findings contained in Law No. 4's *Statement of Intent*, coupled with the detailed Senate and the House of Representative's Committee *Reports*, unambiguously recognize the burden of certain Puerto Rico employment laws on efficient labor markets and job destructive effects of several of these laws. The present Administration's "Government Plan" also recognized the interrelation between Puerto Rico's low employment levels and its labor regulatory structure. All of these are in line with prior observations made by local and internationally recognized economists regarding the adverse impact of various Puerto Rico labor laws.[13]

---

[13] Law No. 4's *Statement of Intent*, expressly cites Dr. James Tobin (Nobel Prize in Economics, 1981); Dr. Anne Krueger (former first deputy managing director of the International Monetary Fund); Dr. Elías R. Gutiérrez and economist Gustavo Vélez.



The Government of Puerto Rico has recently made strides to improve labor market conditions with the *Labor Transformation and Flexibility Act* (Act 4-2017) in January 2017. Notwithstanding such reforms, Puerto Rico's labor laws remain by far the most burdensome in the U.S.

The question presented is *not* whether the level and structure of Puerto Rico's mandatory benefit and discharge laws adversely impact the island job creation ability. Rather, the question is whether the Law No. 4 implemented a sufficient degree of labor reform to achieve its stated objective of transforming Puerto Rico into "an attractive jurisdiction to establish business and create job opportunities; to foster growth in the level of jobs in the private sector; and to offer new job opportunities to unemployed people." *Statement of Intent*, p.3.   **The Oversight Board's estimation is that Law No. 4 did not implement the extent of labor reform required to alter the existing structural obstacles to job creation and retention. Accordingly, additional actions are necessary if Puerto Rico intends to compete with other jurisdictions within the United States to attract job-creating investments.**

Notwithstanding Law No. 4's reforms, Puerto Rico's labor laws remain by far the most burdensome in the U.S. The Island still requires yearly Christmas bonuses of $600 (or $300 for small employers); typically mandates up to 27 days of paid leave per year;[14] and exposes employers to substantial severance payouts, therefore imposing costs and regulatory burdens that reduce employment, wages and economic opportunity.

After little over a year of the approval of the *Labor Transformation and Flexibility Law*, a review of the impact of that legislation shows there is a need to make deeper structural reforms, in order to make Puerto Rico as attractive a location to create jobs as the continental states. In the Oversight Board's estimation, there is a reasonable basis to conclude that Puerto Rico's wrongful discharge statute, coupled with other mandatory benefit legislation that imposes labor costs beyond competitive levels, adversely impacts job growth and the Government's future revenue projections.

The Oversight Board invites the Puerto Rico Legislature to recognize that the private sector labor relations regime in the continental states has remained consistent on the principle that, except for reasons prohibited by law, hiring and employment tenure should be free from government control through dismissal laws. The *Employment-At-Will* system has been widely examined. At-will employment ensures that the employment tenure is based on productivity and good conduct and prevents any undue government intrusion in essential business decisions.

---

[14] Puerto Rico maintains a complex regimen of mandatory decrees that dictate different vacation and sick leave accrual rates, some of which establish up to 18 vacation and 18 sick leave days per year. In 1995 a law was passed to cap vacation and sick leave accrual rates at 15 and 12 days, respectively, but employees hired before August 1, 1995 were grandfathered if they previously were entitled to higher rates. Most employees in Puerto Rico are covered by mandatory decrees that grant 15 vacation and 12 sick leave days per year.



## III.    "Back to Work" Welfare Policies

In addition to the Island's labor laws, Puerto Rico residents may also face disincentives to participate in the formal labor market due to rules attached to various welfare benefits, including the Nutritional Assistance Program (PAN), Mi Salud (Medicaid), Section 8 public housing, TANF, WIC, and other programs.

These benefits are sometimes stereotyped with a claim that "welfare pays more than work." But the issue is really that working in the formal sector can cause punitive reductions in the transfer benefits the household would receive were it not to work in the formal sector. The problem occurs because when welfare beneficiaries work in the formal sector and receive earnings, this triggers a reduction in their benefits. The phase-out of government transfer benefits as earned income increases acts as a tax to disincentivize formal employment, as effective hourly wage (income received by working minus the loss of benefits) can be substantially lower than the formal hourly wage received.

In a 2015 report, the Congressional Budget Office noted that

> The effective marginal tax rate is the percentage of an additional dollar of earnings that is unavailable to an individual because it is paid in taxes *or offset by reduced benefits from government programs*. That rate affects people's incentives to work. In particular, when marginal tax rates are high, people tend to respond to the smaller financial gain from employment by working fewer hours, altering the intensity of their work, or not working at all.[15]

This is precisely the problem faced in Puerto Rico, but it is very likely to be worse on the Island than in mainland states.

While transfer benefits in Puerto Rico are not more generous than on the mainland in dollar terms, they *are* more generous relative to the wages generally available for individuals currently receiving transfer benefits. For instance, monthly food stamp benefit levels are similar in Puerto Rico and mainland, but the market wages available to a food stamp beneficiary in Puerto Rico are substantially lower. Thus, the trade-off between work and welfare in Puerto Rico is not as attractive as on the mainland. Thus, the effective marginal tax rate on low-income Puerto Rico residents from entering the workforce is likely to be higher, perhaps substantially so, than on the mainland.

It is difficult to quantify how large such disincentive effects may be due to limitations on the data available. Different individuals entitled to different sets of benefits face different incentives should they work. Still, it is reasonable to conclude that for many welfare beneficiaries, formal sector work may sometimes do little to increase household incomes.

For individuals receiving food stamps, Mi Salud, TANF and public housing, it often makes little financial sense to work at the minimum wage in the formal sector. For a full-time minimum wage

---

[15] Congressional Budget Office. "Effective Marginal Tax Rates for Low- and Moderate-Income Workers in 2016." November 19, 2015.



worker the loss of benefits will offset most or all income received from work, leaving the household no better off.[16] Add in the complications and costs for those with children to be working outside the home and the incentives for breadwinning family members to work in the informal sector only become magnified.

Though few Puerto Rico residents receive all these benefits,[17] even receipt of a single type of benefit can alter incentives to engage in the formal workforce. For instance, a single mother with two children and annual income below $4,900 is eligible to receive approximately $4,229 in annual PAN ("food stamp") benefits. But should that individual work 35 hours per week at the minimum wage, her annual earnings of $12,180 would cause her to lose eligibility for food stamps. Net of taxes on her earnings, working full-time would increase her household's annual income by only $7,002, equivalent to an hourly wage of only $3.86. Under those conditions, some individuals may choose not to work in the formal labor market, especially if they have to pay for child care

Even when TANF and Section 8 housing benefits are excluded, monthly income paid to a minimum wage worker with two children is only $329 greater than what he or she could receive from government benefits.[18] In this example, effective hourly pay (the amount received from working more than what the individual could receive from government benefits without working) is only about $2.35.

Mainland states face many of these same incentive problems, which they address in two ways. First, residents of mainland states are eligible for the Federal Earned Income Tax Credit (EITC), which provides a partial refund against Federal income taxes for eligible low-income workers. Many states supplement the Federal EITC to increase net incomes to individuals who work. By increasing the reward to work, the EITC has been shown to increase labor force participation.[19] However, because Puerto Rico residents do not pay Federal income taxes they are not currently eligible for the Federal EITC.

Likewise, the Federal Government requires that food stamp programs on the mainland (Supplemental Nutrition Assistance Program, "SNAP") contain a work requirement. In general, working-age SNAP beneficiaries on the mainland must register for work, cannot turn down a job if offered, and may be required by the state to attend education or work training classes. In addition, Federal law requires that non-disabled adults without dependents must work, attend education, or

---

[16] Burtless, Gary, and Orlando Sotomayor. "*Labor supply and public transfers,*" in The Economy of Puerto Rico: Restoring Growth (2006): 82-151.

[17] See Héctor R. Cordero-Guzmán, *"The Production and Reproduction of Poverty in Puerto Rico,*" in Nazario, Carmen R., ed. Poverty in Puerto Rico: A Socioeconomic and Demographic Analysis with Data from the Puerto Rico Community Survey (2014). Inter American University of Puerto Rico, Metro Campus, 2016. Cordero. Notes that the number of TANF beneficiaries in Puerto Rico is relatively modest and many, due to age or disability, are unlikely to work under any conditions

[18] Advantage Business Consulting. *"Beneficios de las Personas Elegibles al TANF vs. Escenario de Salario Mínimo Federal."* Prepared for the Universidad Interamericana, May 2015

[19] See Eissa, Nada, and Jeffrey B. Liebman. *"Labor supply response to the earned income tax credit."* The Quarterly Journal of Economics 111, no. 2 (1996): 605-637



volunteer at least 20 hours per week to maintain eligibility for benefits. Federal law requires that individuals who fail to satisfy these work requirements lose benefits for at least one month for the first instance, three months for the second instance and six months for the third violation. States are allowed to set more stringent penalties, up to and including permanent disqualification from benefit receipt. Roughly half the states adopt the federal penalties for violating work requirements and half have stronger penalties.

Puerto Rico's labor and welfare laws may help explain why, despite the Island's natural beauty, attractions and ease of access from the U.S. market, employment in tourism-related industries is low. According to the U.S. Bureau of Labor Statistics (BLS), Puerto Rico employs only 80,000 individuals in the leisure and hospitality industries – 10,000 fewer tourism-related jobs than the state of Nebraska, which lacks Puerto Rico's natural assets and has an overall population over one-third smaller than Puerto Rico.

But there is a positive aspect to these findings. **If Puerto Rico's labor and welfare policies contribute to low levels of employment, low incomes and high poverty rates, then adopting pro-employment policies can increase job availability and incomes in Puerto Rico.** The Board does not claim that labor and welfare reform by itself will fix all of Puerto Rico's myriad economic problems, and even less so that a single aspect of labor and welfare reform is a cure-all. But without higher labor force participation Puerto Rico is not a viable economic entity; its ability to service its debt and return to capital markets will be reduced, poverty will remain high and outmigration will continue to shrink the Island's population.

## IV.    Future Vision for the Puerto Rico Labor Market

Changes to labor and welfare laws are controversial and can be disruptive. Nevertheless, dramatic changes to Puerto Rico's labor market policies are necessary to provide opportunity for a greater standard of living at home, reversing the Island's history of high poverty, constrained budgets, and pressure for young Puerto Ricans to leave their home for the mainland.

To ensure Puerto Rico can provide opportunities for its people for years to come, structural reforms must make it easier to hire, encourage workforce participation, and enhance student outcomes and workforce development opportunities to ensure a pipeline of prepared and appropriately-skilled individuals.

If Puerto Rico were to aim to increase the labor force participation rate to 47% and reduce the youth unemployment rate to 20.2% by FY2023, Puerto Rico would close roughly half the current gap between Puerto Rico and the lowest U.S. state (West Virginia). By achieving these goals, the Government can increase household incomes, cut the poverty rate and reduce incentives to emigrate to the mainland. Moreover, successful labor market reforms are projected to yield approximately **$39 billion in additional revenues by FY2048 and over ~$319 million from FY2018-23 (Exhibit 4)**.



*Memorandum:* <u>Labor Reform as a Catalyst for Growth</u>
Page **13** of **35**

**Exhibit 4: Labor Reform Surplus in the New Fiscal Plan Period**

Labor Reform Surplus, $M



## V.  Structural Reform Initiatives to Change Labor Conditions

Labor market reforms will increase the availability of jobs while increasing incentives and preparedness to work. To accomplish this broad-based reform, the Government must implement flexible labor regulations, reform welfare including an EITC for low-income workers and a work requirement for able-bodied PAN beneficiaries, and implement programs to develop critical skills in the workforce.

### a.  Flexible labor regulations by becoming an employment "at-will" jurisdiction

Puerto Rico lacks "at-will employment." This is the regime that applies to job termination decisions in 49 mainland states. At-will employment regimes reduce the risks and operational costs when an employer needs to dismiss an employee for reasons of performance, conduct or workforce reduction.

While some employees benefit from Puerto Rico's lack of at-will employment, excessive employment protections make it more costly and risky to hire an employee. There is significant research backing this conclusion.

Both Puerto Rico and the U.S. Virgin Islands maintain wrongful discharge laws and both jurisdictions maintain unemployment levels that consistently exceed double the national unemployment rates. And Puerto Rico law is far more burdensome than U.S.V.I. law since it does not exempt small employers and it regulates dismissals resulting from workforce reductions due to economic hardship or the cessation of business operations.[20]

Puerto Rico's Law No. 80 *does not* prohibit any type of discharge. However, it is based on the premise that, even when a discharge decision is not motivated by illegal reasons, the government should be able to "second guess" an employer's managerial decision to terminate the employment of a worker for reasons of unsatisfactory conduct, substandard performance or lack of competence. Moreover, when due to periodic economic cycles the employer needs to reduce the size of its workforce, Law

---

[20] 24 V.I.C. §76(c).



*Memorandum:* <u>Labor Reform as a Catalyst for Growth</u>
Page 14 of 35

No. 80 dictates the manner in which an employer must select who should be laid off and who should be retained. This government intervention in important business decisions is accomplished through the imposition of steep monetary penalties.

Puerto Rico's Wrongful Discharge Law has an adverse effect on an employer's ability to operate efficiently. The law imposes significant costs, in terms of the monetary amount imposed as a severance payment, as well as litigation costs, in the event that non-payment of the severance is challenged in court. Ultimately, even when the "just cause" for termination is litigated, the uncertainty of the outcome in court tends to result in discharge payments and the imposition of attorney's fees.

In short, in Puerto Rico, every employment termination decision exposes a business to significant costs. And since an employer cannot know ahead-of-time which employees may in the future be dismissed, every hiring decision carries risks. Substantial research show that firms take those risks into account when hiring employees and react in ways that harm unemployed or less-skilled workers who most need jobs.

For over four decades the potential monetary exposure in wrongful discharge claims was the payment of one month's salary or less. This began to change in 1976, with the enactment of Law No. 80, which added one (1) week's salary per year of service to the severance payment. More significantly, Law No. 80 limited the reasons to justify a discharge without having to incur in the severance payment. Over the years, the monetary amount of the severance payment has increased. In the year 2005 the severance payment increased dramatically, as follows:

- During the first five (5) years of service: 2 month's salary, plus 1 weeks' salary for each year of service;
- From five (5), but less than fifteen (15) years of service: 3 month's salary, plus 2 weeks' salary for each year of service; and
- Fifteen (15) or more years of service: 6 months' salary, plus 3 weeks' salary for each year of service.

With the approval of *Labor Transformation and Flexibility Act* the Government of Puerto Rico recognized that the third tier of the severance formula (15 or more years of service) had a chilling effect on an employer's ability to operate its business and, therefore, was detrimental to Puerto Rico's competitiveness. Accordingly, a uniform severance payment was established, based on the *second tier* of the prior formula and subject to a cap of nine (9) month's salary. However, the Legislature limited this new severance formula to only employees hired *after* January 26, 2017.

If the new Law No. 80 compensation structure was deemed a better balance, it should have applied to all employees.

Further, by maintaining the prior compensation formula for employees hired before January 26, 2017, during the first five years of service new employees have *higher* severance payments. Accordingly, during the first years after the approval of Law No. 4, a discharge of a new employee entails a greater cost than the discharge of an employee hired shortly before the enactment of Law No. 4.



*Memorandum:* <u>Labor Reform as a Catalyst for Growth</u>
Page **15** of 35

Upon further review of the Law No. 4 amendments to Law No. 80, the Oversight Board finds they are insufficient to remedy the statute's adverse effect on the ability to do business and hire employees in Puerto Rico. The Oversight Board is confident that from a micro and macroeconomic perspective, the adoption of an "at-will" employment regime is the most efficient manner to address job termination decisions. By taking such legislative action businesses and employees in Puerto Rico would be subject to the same labor market rules that are applicable to their counterparts in the mainland states. Notwithstanding this change, employees in Puerto Rico will continue protected by multiple anti-discrimination laws, as are employees on the mainland.

Adopting in Puerto Rico the "at-will" employment regime that prevails in the U.S. mainland will assist in reducing long term unemployment in the private sector and increase the hiring of workers as permanent, rather than temporary employees. Moreover, adoption of this regime should assist in attracting job-creating investments.[21] This, in turn, will increase revenues to the Government.

This is not the first-time changes to the severance regime has been recommended. During recent years the adverse economic impact of Puerto Rico's general dismissal law has been subject to scrutiny. The Krueger Report, which was commissioned by the Government of Puerto Rico, recommended that Puerto Rico regulate discharge decisions with rules more similar to those prevailing in the U.S. mainland.[22] Subsequently, the *Working Group for the Fiscal and Economic Recovery of Puerto Rico Pursuant to Executive Order 2015-022*, recommended that Law No. 80 apply only to "non-exempt" employees and that the maximum compensation be limited to six (6) month's salary.[23]

While some employees benefit from Puerto Rico's lack of at-will employment, excessive employment protections make it more costly and risky not only to dismiss, but also to hire, an employee. There is evidence that such job protection laws lower employment opportunities.

---

[21] R. Di Tella & R. MacCulloch , *The Consequences of Labor Market Flexibility: Panel Evidence Based on Survey Data*, 49-5 European Economic Review, 1225-59 (2005); B.S. Javorcik & M. Spatareanu, *Do Foreign Investors Care About Labor Market Regulations?*, World Bank Policy Research Working Paper 3275, April 2004; H. Parcon, *Labor Market Flexibility as a Determinant of FDI Inflows*, Department of Economics, University of Hawaii- Working Paper No.08-07 (2008); J. Mogab, R. Kishan, D.E. Vacaflores, *Labor Market Rigidity And Foreign Direct Investment: The Case Of Europe*, Applied Econometrics and International Development, Vol. 13-1 (2013); Bellak, C. and M. Leibrecht (2009), '*Does the impact of employment protection legislation on FDI differ by skill-intensity of sectors? An empirical investigation*', GEP Discussion Paper 2009/21; W. W. Olney, *A Race to the Bottom? Employment Protection and Foreign Direct Investment*, Journal of International Economics, 91-2 (2013) pp. 191–203; Görg, Holger, "*Fancy a Stay at the 'Hotel California'? Foreign Direct Investment, Taxation and Firing Costs*" (December 2002). IZA Discussion Paper No. 665.

[22] Puerto Rico – A Way Forward (June 29, 2015). *Id*, at 6, 18.

[23] Puerto Rico Fiscal and Economic Growth Plan (September 9, 2015), at 22.



**Memorandum: Labor Reform as a Catalyst for Growth**
Page **16** of **35**

For example, studies have found that laws restricting an employer's ability to dismiss or imposing significant severance costs have the effect of reducing employment levels or increasing long term unemployment, particularly in labor-intensive industries.[24]

In U.S. states, a study found that expanding unfair dismissal protections caused employers to shift away from using less-skilled workers and toward greater use of capital investments and more-skilled labor.[25] Simply, the risks and costs related to dismissal decisions tend to chill an employer's inclination to hire new employees, particularly younger employees.[26] This results in higher periods of unemployment for those members of the workforce who are not employed.[27]

Other research finds that when firms cannot easily dismiss unsatisfactory employees, they will not hire employees who do not already have a job- as unemployed workers are seen as a greater risk.[28] Still other research concludes that stronger employment protections cause businesses to favor more educated employees, who are seen as less risky to hire than less educated workers.[29]

---

[24] RAND Corporation, 1992; H. Feldmann, "Labor Market Regulation and Labor Market Performance: Evidence Based on Surveys among Senior Business Executives." Kyklos, 56 (4), pp. 509-539 (2003);Verkerke, J., 2014. *What we know (and don't know) about employment protection law*, in Shishido, Z. (ed.) *Enterprise Law: Contracts, Markets, and Laws in the US and Japan*; Timothy Besley, Robin Burgess; *Can Labor Regulation Hinder Economic Performance? Evidence from India,* The Quarterly Journal of Economics, Volume 119, Issue 1, 1 February 2004, Pages 91–134.

[25] Dertouzos, J. & Karoly, L. A. 1993. *Employment Effects of Worker protection: Evidence from the United States,* in: Buechtemann, C. F. (ed.) Employment Security and Labor Market Behavior; Interdisciplinary Approaches and International Evidence.

[26] Scarpetta, S., 1996. *Assessing the role of labour market policies and institutional settings on unemployment: a cross-country study*. OECD Economic Studies 26 (1), 43-98.; Christensen, Darin & Wibbels, E., *Labor Standards, Labor Endowments, and the Evolution of Inequality,* International Studies Quarterly, Volume 58, Issue 2, 1 June 2014, Pages 362–379; Boeri, T. & Ours, Jan va. The Economics of Imperfect Labor Markets, Second Edition, sec. 10.3 (2013).

[27] Holt, Harlan and Hendrickson, Joshua R., *Turning Pink Slips into Red Tape: The Unintended Effects of Employment Protection Legislation* (July 26, 2016), Contemporary Economic Policy; Elmeskov, J., Martin, J. P. & Scarpetta, S. 1998. *Key lessons for labour market reforms: Evidence from OECD countries' experiences*. Swedish Economic Policy Review, 5 (2),205-52; Emerson, M., 1988. *Regulation or deregulation of the labour market: policy regimes for the recruitment and dismissal of employees in the industrialised countries*. European Economic Review 32 (4), 775-817; Hopenhayn, H. & Rogerson, R. 1993. *Job turnover and policy evaluation: A general equilibrium analysis. Journal of Political Economy*, 101 (5), 915-38; Rafael Di Tella and Robert MacCulloch , *The Consequences of Labor Market Flexibility: Panel Evidence Based on Survey Data*, 49-5 European Economic Review, 1225-59 (2005).

[28] Kugler, Adriana D., and Gilles Saint-Paul. "*How do firing costs affect worker flows in a world with adverse selection?.*" Journal of Labor Economics 22, no. 3 (2004): 553-584.

[29] Daniel, K. and Siebert, W.S., 2005. *Does employment protection reduce the demand for unskilled labour?*. International Economic Journal, 19(2), pp.197-222.



***Memorandum:*** <u>Labor Reform as a Catalyst for Growth</u>
Page **17** of 35

Moreover, there is significant evidence that employers, in order to avoid risks and costs related to dismissals laws, will increase outsourcing or utilization of temporary employees.[30]

Excessive employment protections may also reduce the productivity of businesses. A 2017 study of firms in Sweden found that smaller businesses that were exempt from a 2001 employment protection law were 2 to 7 percent more productive than firms that were subject to laws similar to Puerto Rico's Law 80.[31]

Di Tella and MacCulloch surveyed entrepreneurs from twenty-one OECD (Organization for Economic Cooperation and Development) countries, asking them to assess the impact of their countries' laws on their hiring and dismissal practices. This study found evidence that the increased flexibility in the rules applicable to employer authority in the hiring and firing process increases *both* employment levels and labor participation rates, even in periods of recession. The study also found evidence that greater flexibility in the hiring and firing stages leads to lower unemployment rates.   Providing a conservative estimate, they concluded that if France were to make its labor employment rules as flexible as those in the U.S., its employment rate would increase 1.6 percentage points, or 14% of the employment gap between the two countries.[32]

Other studies sponsored by the OECD have documented that excessive employment protections increase the rate and duration of unemployment and reduce rates of employment.[33] A second study examining 73 developed and developing countries found that protectionist labor regulations increase unemployment.[34] For example, the study suggests that if Italy (a country with extensive labor protectionist regulations) adopted the labor regulations of the U.S., the unemployment rate

---

[30] James A. Schmitz, Jr. ,Lee E. Ohanian, Alvaro Riascos, Harold L. Cole, *Latin America in the Rearview Mirror*, Journal of Monetary Economics (Vol. 52, No. 1, January 2005, pp. 69-107); Autor, David, H. "*Outsourcing at will: Unjust dismissal doctrine and the growth of temporary help employment.*" Working Paper No. w7557. National Bureau of Economic Research, 2000.

[31] Bjuggren, Carl Magnus. "*Employment Protection and Labor Productivity.*" *Journal of Public Economics* (2017).

[32] R. Di Tella & R. MacCulloch , *The Consequences of Labor Market Flexibility: Panel Evidence Based on Survey Data*, 49-5 European Economic Review, 1225-59 (2005).

[33] *See,* O. Blanchard & J. Wolfers, *The Role of Shocks and Institutions in the Rise of European Unemployment: The Aggregate Evidence*, 110 Economic Journal C1-C33 (2000);  J. C. Botero, S. Djankov, R. La Porta, F. Lopez-de-Silanes & A. Shleifer, *The Regulation of Labor*, 119 Quarterly Journal of Economics  1339 (2004);   Di Tella & McCulloch , *supra*, (2005); H. Feldmann, *Labor Market Regulation and Labor Market Performance: Evidence Based on Surveys among Senior Business Executives*, 56-4 Kyklos (2003);  K. Fialová & O. Schneider, *Labour Market Institutions and their Effect on Labour Market Performance in the New EU Member Countries*, 47-3 Eastern European Economic 57 (2009); Heckman & Pages-Serra, *The Cost of Job Security Regulation: Evidence from Latin American Labor Markets*, NBER Working Paper No. w7773 (2000);  y S. Nickell *Unemployment and Labor Market Rigidities: Europe versus North America*, 11-3 Journal of Economic Perspectives 55 (1997).'

[34] H. Feldmann, *The Unemployment Effects of Labor Regulation around the World*, 37-1 Journal of Comparative Economics  76  (2009).



*Memorandum:* <u>Labor Reform as a Catalyst for Growth</u>
Page 18 of 35

in Italy for the population in general would be reduced by 2.3% (and for young people, unemployment would be reduced by 5.6%). One of the reasons for this is that the rigidity of labor regulations negatively impacts domestic and foreign investments.

When Colombia reduced the cost of dismissing workers, unemployment fell, and the size of the informal labor force declined.[35]  In a 2004 book on labor laws in Latin America and the Caribbean, Nobel Prize-winning economist James Heckman concluded that

> "mandated benefits reduce employment and… job security regulations have a substantial impact on the distribution of employment and on turnover rates. The most adverse impact of regulation is on youth, marginal workers, and unskilled workers. Insiders and entrenched workers gain from regulation but outsiders suffer. As a consequence, job security regulations promote inequality among demographic groups."[36]

This review of the literature should make clear the costs that are imposed on residents of Puerto Rico by policies that, while well-intentioned, increase the costs and risks of hiring employees. The repeal of Law No. 80 will facilitate the entry of young or unemployed workers into active employment.

Properly implemented, a more open labor market can help attract new investors to Puerto Rico. Substantial research shows that multinational companies are increasingly taking labor laws into consideration when making business location decisions. Jurisdictions with lesser risks and costs are more attractive for job creating investors.[37]

---

[35] Kugler (2004). See Dertouzos, James N., and Lynn A. Karoly. *"Labor market responses to employer liability."* Rand Corporation, 1992; Autor, David H., William R. Kerr, and Adriana D. Kugler. "*Does Employment Protection Reduce Productivity? Evidence from U.S. States.*" The Economic Journal (2007): F189-F217; Heckman, James. Law and employment: Lessons from Latin America and the Caribbean. No. w10129. National Bureau of Economic Research, 2003; Kugler, Adriana D. *"The effect of job security regulations on labor market flexibility. Evidence from the Colombian Labor Market Reform."* in Law and Employment: Lessons from Latin America and the Caribbean, pp. 183-228. University of Chicago Press, 2004

[36] Heckman, J. & Pages, C., 2004. *Law and enforcement: Lessons from Latin America and the Caribbean,* edited by James Heckman and Carmen Pages, University of Chicago Press. *See also*, Heckman, J. & Pages Serra, C., 2000. *On the cost of job security regulation: Evidence from Latin American Labor Markets.* Economía, 1 (1), 147.

[37] B.S. Javorcik & M. Spatareanu, *Do Foreign Investors Care About Labor Market Regulations?,* World Bank Policy Research Working Paper 3275, April 2004; Nicoletti, G., S. Golub, D. Hajkova, D. Mirza, G. and K. Yoo (2003). *The Influence of Policies on Trade and Foreign Direct Investment*, OECD Economic Studies, No. 36; .H. Parcon, *Labor Market Flexibility as a Determinant of FDI Inflows*, Department of Economics, University of Hawaii- Working Paper No.08-07 (2008); J. Mogab, R. Kishan, D.E. Vacaflores, *Labor Market Rigidity And Foreign Direct Investment: The Case Of Europe*, Applied Econometrics and International Development, Vol. 13-1 (2013); Bellak, C. and M. Leibrecht (2009), '*Does the impact of employment protection legislation on FDI differ by skill-intensity of sectors? An empirical investigation'*, GEP Discussion Paper 2009/21; W. W. Olney, *A Race to the Bottom? Employment Protection and Foreign Direct Investment*, Journal of International Economics, 91-2 (2013) pp. 191–203; Kandilov, Ivan T. & Senses, Mine Zeynep, *The*



> b.  **The basis for the labor reform's projected impact is supported by case studies across a wide range of countries where similar reforms were successful in increasing growth.**

Labor market reforms taken in individual European countries have made the labor market more flexible, increased labor supply, and led to a long-run additional 3.5% annual growth in peripheral European countries, where economies are most similar to Puerto Rico. When excluding reforms not as relevant to Puerto Rican labor reform identified in the New Fiscal Plan, such as unemployment insurance and pension reform, the case studies still support an estimation of an additional 1.4% growth over the long-run, and key to the issue at hand is the finding that just the elimination of employment protection itself accounted for 0.5% of permanent growth.[38]

— For the EITC, in a study by the Central Bank of Malta (a country that is small and tied intimately to a very large neighbor in the EU, very much like the case of Puerto Rico), the EITC and welfare reform were linked to overall growth through increasing female labor force participation rates, which were found to result in an increase in growth of 0.8% per year.

— Spain's 2012 labor reform law, enacted in response to the recession, loosened many of Spain's restrictive employment protection policies, pushing it down below the OECD labor stringency average and potentially creating a 0.25% annual increase in business sector productivity, or 0.15% annual increase in GDP.[39]

— Estonia implemented reforms to ease hiring and dismissal procedures, as well as to allow the use of fixed-term contracts in all cases. These contracts are very similar to at-will employment. The reforms also cut severance payments. Estonia's unemployment rate fell 5.5 percentage points from 19.8% to 13.3% between 2008 and 2011.[40]

— Influenced by the financial crisis, total employment in Portugal fell by 15% over 2008 to 2013. In response, Portugal made a series of structural reforms to reduce excessive employment protections. These included reducing severance pay and relaxing the definition of fair dismissal, but there is still more to be done to bring Portugal closer to the OECD average. The OECD estimates that new labor reforms have already begun contributing to increased labor productivity,

---

*Effects of Wrongful Discharge Protection on Foreign Multinationals: Evidence from Transaction-Level Data,* Canadian Journal of Economics/Revue canadienne d'économique, Vol. 49, Issue 1, pp. 111-146, 2016.

[38] Derek Anderson et al, *"Assessing the gains from structural reforms for jobs and growth,"* International Monetary Fund.
https://www.imf.org/external/np/seminars/eng/2014/EURbook/pdf/7.pdf

[39] The 2012 Labour Market Reform in Spain: A Preliminary Assessment, OECD, December 2013.
https://www.oecd.org/els/emp/SpainLabourMarketReform-Report.pdf

[40] Brixiova, Zuzana and Balázs Égert, *"Labour Market Reforms and Outcomes in Estonia,"* William Davidson Institute, University of Michigan, February 2012.
https://deepblue.lib.umich.edu/bitstream/handle/2027.42/133043/wp1027.pdf?sequence=1. Pp. 2-4.



**Memorandum: Labor Reform as a Catalyst for Growth**
Page 20 of 35

and could lead to a 0.5% increase in GDP by 2020.[41] Portuguese employment rates have also been growing stronger than forecasted.

—   Comprehensive labor market reforms in Italy 2014 are expected to result in 0.6% GDP growth within 5 years, and 1.2% growth within 10 years. Reforms to trigger this growth include loosening employment protections, expanding active labor market policies, and increasing female workforce participation. These reforms will create an estimated 150,000 jobs in 5 years and 270,000 jobs in 10 years.[42]

—   Slovenia introduced reforms in 2013 to make the labor market more flexible and to increase employment opportunities for younger workers. The OECD expects these reforms to boost Slovenian GDP by 0.2% in the first five years and by 0.3% in the first 10 years.[43]

—   In Peru, a 10% increase in costs associated with employee dismissal reduced long-run employment rates by 11% between 1987 and 1990. The use of severance payments was also found to have a negative effect on employment levels.[44]

—   The *Pacta por Mexico* introduced labor reforms alongside education, healthcare, and judiciary reforms. The OECD estimates that employment protection initiatives specifically will have contributed to about an 0.05% increase in GDP over 5 years.[45]

—   Colombia reduced its employer payroll taxes, effectively making workers less expensive, and saw a decrease in the size of its informal labor market.[46]

—   A 2017 survey of prominent economists regarding France's labor laws – which are similar to those in Puerto Rico in mandating generous paid leave and strong employment protections –

[41] *"Labour Market Reforms in Portugal 2011-2015: A Preliminary Assessment."* OECD. http://www.oecd.org/employment/emp/Labour-market-reforms-in-Portugal-2011-2015-preliminary-assessment.pdf. P. 9.

[42] *"Italy Structural Reforms: Impact on Growth and Employment,"* OCED, February 2015. http://www.oecd.org/italy/structural-reforms-in-italy-impact-on-growth-and-employment.pdf

[43] "Slovenia: *The Growth Effects of Structural Reform*," OECD, May 2015. https://www.oecd.org/slovenia/slovenia-growth-effects-of-structural-reform-EN.pdf

[44] Coudouel, Aline and Pierella Paci, *"Selected Labor Market Reforms,"* Analyzing the Distributional Impact of Reforms. Hosted by the World Bank. http://siteresources.worldbank.org/INTPSIA/Resources/490023-1120845825946/3622-03_Ch03.pdf

[45] *Towards a Stronger and More Inclusive Mexico: An Assessment of Recent Policy Reforms*, OCED, December 12, 2017. https://www.oecd-ilibrary.org/economics/towards-a-stronger-and-more-inclusive-mexico_9789264189553-en

[46] Kugler et al (2017) found that a reduction in employer payroll taxes in Colombia reduced the size of the country's informal labor market. Kugler, Adriana, Maurice Kugler, and Luis Omar Herrera Prada. *"Do payroll tax breaks stimulate formality? Evidence from Colombia's reform."* No. w23308. National Bureau of Economic Research, 2017



*Memorandum:* <u>Labor Reform as a Catalyst for Growth</u>
Page **21** of **35**

found two-thirds believe that reducing these labor laws would improve the country's economy and reduce the unemployment rate. Less than 5% of the economists surveyed disagreed.[47]

— In India, a 2004 study found that states with strict labor laws experienced lower manufacturing growth by around 23% to 24%; while states with more flexible legislation experienced increases by a similar amount.[48]

The reforms aimed at flexible labor regulations are expected to be successful in Puerto Rico due to key characteristics of the Island's economy that overlap with selected case studies. While there are numerous case studies that clearly demonstrate the positive effects of labor reform, the specific case studies used to support the transformational nature of these reforms in Puerto Rico were conducted in countries with key similarities to Puerto Rico.

— **Currency union:** Case studies utilized to reach impact estimates for labor reform were all derived from countries within currency unions. As a result, none had the ability to enact monetary policy that would bolster the impact of labor reforms, and they were still quite effective. Similarly, Puerto Rico's monetary policies are driven by the U.S. Federal Reserve.

— **Large informal economy:** In the periphery of the European Union, multiple countries such as Greece and Spain have informal economies that represent 20 - 30% of GDP. Thus, in both cases, moving firms and workers into the formal economy contributes toward the positive economic and fiscal impact of labor reforms. Reducing the size of informal economy also has a critical impact of increasing upward mobility and skill acquisition for low-wage workers in Puerto Rico.

— **Ease of capital flow:** Puerto Rico's unique status as a U.S. territory significantly eases the flow of capital and business from the mainland United States. As a result, a more flexible labor market offers the opportunity for Puerto Rico to attract firms from the mainland to open or expand operations on the Island. For example, France, which can attract investments from across Europe through its membership in the EU, saw a major spike in interest from business executives looking to invest in the country after President Macron successfully implemented labor reform. 60% of executives saw the country as an attractive place for companies in 2017, nearly triple the 2014 figure of 23%.

— **Large short-term stimulus:** Over the next 10 years, the Fiscal Plan projects over $60 billion of disaster related funding to rebuild Puerto Rico. This funding is expected to produce an increase in demand, despite the long-term recession of Puerto Rico's economy. As a result, Puerto Rico will find itself at an opportune time to carry out such reforms (as opposed to countries that enacted labor reforms during major economic downturns, such as Greece and Spain). The reforms should have a synergistic impact to the additional

---

[47] *IGM Forum: France's Labor Market,* Chicago Booth, May 17, 2017.
http://www.igmchicago.org/surveys/frances-labor-market

[48] Besley, Timothy and Burgess, Robin, *"Can Labor Regulation Hinder Economic Performance? Evidence from India,"* Quarterly Journal of Economics, Volume 119, Issue 1, 1 February 2004, Pages 91–134.

stimulus and provide a sound basis for future investors to come to Puerto Rico to establish new businesses and hire workers. Change – even if necessary – can be disruptive, which is why it is best done during a time when the economy is expected to improve.

### c. Law No. 80 is part of the problem; not the only problem.

**The repeal of Law No. 80 will not by itself cure the economic woes of the island.   While significant, it is only one of the components of a Labor Reform Package that Puerto Rico needs to address.  The change in the regime that regulates discharge decisions is part of a strategy to attract job creating investments to the Island. Moreover, the economic literature is clear--rules like Law No. 80 skew investments to capital-intensive operations and reduce in relative terms the demand for labor, which means Puerto Rico will continue its pattern of fewer employment opportunities.**

Puerto Rico needs to get the economy moving today. This will require hiring people at the lower end of the wage spectrum and getting them out of the informal economy and into formal jobs.  This requires the effective implementation of the entire package of labor reform. Adopting the "at will" employment regime that has supported the substantially more successful economies of mainland states, is a necessary foundation to moving forward.

Much of the questioning in the public discourse has been around how the structural reforms, in particular labor, will positively impact Puerto Rico's residents. The reality is that a single reform, in isolation from the rest, is not likely to impact growth substantially. Rather, it is the whole program and package of structural reforms that truly change the competitiveness of an economy. Puerto Rico, now more than ever, needs to focus on transforming the economy into one that is competitive.

**By putting the Puerto Rico labor market on a competitive footing with other U.S. jurisdictions, this will make the investment environment in Puerto Rico more competitive with those same U.S. jurisdictions. It is from the increased investment that the demand for labor will find its biggest boost and begin a virtuous cycle of investment, employment, growth and further investment. By focusing on changing Puerto Rico's labor environment, new investors will be attracted to Puerto Rico given the confidence in a strong labor market that has flexible rules. By getting firms to invest, economic growth will be enabled.**

### d. Many employment protection laws will continue to apply

Adopting the "at-will" employment regime will not diminish labor standards for workers in Puerto Rico.  Moreover, they will continue to be protected by a very broad scope of antidiscrimination laws.  Remedies under these laws are typically greater than the relief under Law No. 80. Excluding all applicable federal laws, Puerto Rico law will continue to prohibit the discharge of an employee for the following reasons:

- Because of age, race, color, sex (gender), sexual orientation, gender identity, social origin or condition, national origin, political or religious beliefs or affiliation, disability, marriage to an employee of the employer, being a victim or being perceived as a victim of domestic violence, sexual aggression or stalking,

present or prior military service, or veteran status.[49]

- Retaliation for having opposed sexual harassment in the workplace; having filed a complaint, testified or collaborated or participated in any manner in an investigation, proceeding or hearing in connection with a sexual harassment complaint.[50]

- For providing or intending to provide verbal or written testimony or information to an administrative, judicial, or legislative body in Puerto Rico, or in accordance with the employer's established internal procedures or before an employer's representative with authority, provided the expressions are nondefamatory and do not disclose legally protected confidential or privileged information.[51]

- For having (a) disclosed his/her salary to other employees or asked other employees about their compensation; (b) objected to any practice prohibited by Puerto Rico's Equal Pay Act (PREPA); (c) submitted a grievance or complaint regarding PREPA rights in any forum, or (d) offered or tried to offer, verbally or in writing, any testimony or information in an investigatory procedure against the employer regarding PREPA violations.[52]

- Dismissal, without just cause, of a pregnant employee.[53]

- For refusing to enter an alternate weekly work schedule agreement (which includes compressed workweeks) or for requesting the modification of the schedule, number of hours, or place of work as authorized under Puerto Rico's

---

[49] Art. 1, Law No. 100 of June 30, 1959, as amended (Law No. 100), P.R. LAWS ANN. tit. 29, §146 (double damages and reinstatement); Art. 21, Law No. 69 of July 6, 1985, P.R. LAWS ANN. tit. 29, §1341 (double damages and reinstatement); Art. 13, Law No. 44 of July 2, 1985, as amended, P.R. LAWS ANN. tit. 1, §511 (double damages and reinstatement). A specific sexual harassment statute also provides a double damages remedy, which would be applicable in cases of sexual harassment discrimination, retaliation, or dismissals. *See* Art. 3 & 11, Law No. 17 of April 22, 1988, P.R. LAWS ANN. tit. 29, §§155b & 155j (double damages and reinstatement).

[50] Law No. 17 of April 22, 1988, P.R. LAWS ANN. tit. 29, §§155a *et seq.* (2017) (double damages and reinstatement).

[51] Law No. 115 of Dec. 20, 1991. P.R. LAWS ANN. tit. 29, §§194–194b (2016) (double damages and reinstatement). Article 2 of Law No. 80 has been amended on several occasions to provide a reinstatement and back pay remedy for wrongful discharges based on the same reasons. P.R. LAWS ANN. tit. 29, §185b (2016).

[52] Law No. 16-2017. P.R. LAWS ANN. tit. 29, §254 (2017).

[53] Art. 4, Law No. 3 of March 13, 1942, as amended, P.R. LAWS ANN. tit. 29, §469 (2017) (double damages and reinstatement).



overtime law.[54]

- Dismiss an employee working for the employer before the effective date of the "*Labor Transformation and Flexibility Act*" in or to hire a new employee at the lower vacation leave monthly accrual rates authorized for new hires.[55]

- Failing to reinstate, without just cause, a female employee returning from the statutory leave provided for maternity rest or after receiving a minor in her home for adoption.[56]

- For participating or having participated in jury duty or failing to reinstate an employee upon conclusion of such jury duty.[57]

- For providing or intending to provide verbal or written testimony or information to an administrative, judicial, or legislative body in Puerto Rico, provided the expressions are non-defamatory and does not disclose legally protected confidential or privileged information.[58]

- For refusing to lift objects that exceeds maximum weight limits established by law or regulation.[59]

- For refusing to grant payroll deduction authorization to support charitable institutions and/or community schools.[60]

- Interference with any military leave, discharge or failing to reinstate former

---

[54] Law No. 4-2017, Art. 3.8, amending the second paragraph of Art. 14 and renumbering same as Art. 10 of Law No. 379 of May 15, 1948, as amended. P.R. LAWS ANN. tit. 29, §282 (2017) (potential double damages and reinstatement).

[55] Law No. 4-2017, Art. 3.18, amending subparagraph (b) of Article 5 of Law 180-1998, as amended. P.R. LAWS ANN. tit. 29, §250c(b) (2017) (double damages).

[56] Art. 2 and 4, Law No. 3 of March 13, 1942, as amended, P.R. LAWS ANN. tit. 29, §§467 and 469 (2017) (double damages and reinstatement).

[57] Law No. 87 of June 26, 1964, as amended, P.R. LAWS ANN. tit. 29, §152 (2017) (double damages and reinstatement); Art. 7 and 13, Law No. 281 of September 27, 2003, P.R. LAWS ANN. tit. 34, §§1735e and 1735k (2017) (double damages and reinstatement).

[58] Law No. 115 of December 20, 1991. P.R. LAWS ANN. tit. 29, §§194–194b (2017) (double damages and reinstatement). Article 2 of Law No. 80 has been amended on several occasions to provide a reinstatement and back pay remedy for wrongful discharges based on the same reasons. P.R. LAWS ANN. tit. 29, §185b (2017).

[59] Art. 3-A, Law No. 49 of May 22, 1968, as amended, P.R. LAWS ANN. tit. 29, §355a (2017) (double damages and reinstatement).

[60] Art. 5(j)(5) of Law No. 17 of April 17, 1931, as amended. P.R. LAWS ANN. tit. 29, §175(j)(5) (2017) (double damages).

employee upon conclusion of the military duty.[61]

- Dismissing or refusing to reinstate an athlete or trainer certified by the Puerto Rico Olympic Committee as athletes or trainers participating in certain sports events that require leaves of absence.[62]

- For filing a complaint against the employer under the Puerto Rico Occupational Safety and Health Act (PROSHA), having caused an investigation, testifying or intending to testify regarding matters covered under the act or failing to reinstate the employee after participating in a required medical examination.[63]

- Dismissing an employee, without just cause, while legally protected leaves for work-related and non–work-related disabilities under the workers compensation and non-occupational disability programs, as well as refusing to reinstate the employee after being released from treatment in accordance with the provisions of such laws.[64]

### e. Welfare Structure Reforms

To implement the labor reform package, address labor market challenges and encourage residents to participate in the formal labor market, the Government must launch an Earned Income Tax Credit (EITC) program by January of 2019. The Government also must institute a work requirement for the Nutrition Assistance Program (PAN).

---

[61] Art.4(f)(1) and Art. 9, Law No. 203 of December 14, 2007, as amended, P.R. LAWS ANN. tit. 29, §§737(f)(1) and 742 (2017) (triple damages and reinstatement); Art. 233, Law No. 62 of June 23, 1969, as amended, P.R. LAWS ANN. tit. 25, §2085 (2017) (back pay and reinstatement).

[62] Art. 5, Law No. 24 of January 5, 2002, P.R. LAWS ANN. tit. 15, §1111 (2017) (double damages and reinstatement).

[63] Art. 10(d) and Art. 29, Law No. 16 of August 5, 1975, as amended, P.R. LAWS ANN. tit. 29, §§361i(d) and 361aa (2017) (back pay, reinstatement, and other injunctive relief).

[64] Art. 5-A, Law No. 45 of April 18, 1935, as amended, P.R. LAWS ANN. tit. 11, §7 (2017) (damages and reinstatement); Art. 3(q), Law No. 139 of June 26, 1968, as amended, P.R. LAWS ANN. tit. 11, §203(q) (2017) (damages and reinstatement). A worker who regularly drives a motor vehicle to perform his job duties is exempt from Law No. 139, but receives similar reinstatement protections for disability absences under Article 16 of Law No. 428 of May 15, 1950, P.R. LAWS ANN. tit. 29, §693a (2017) (damages and reinstatement). If a person is unable to work due to an accident suffered while legally driving a motor vehicle on the public highways, similar job reinstatement protections are also available in accordance with another statute. Art. 4, Law No. 138 of June 26, 1968, as amended, P.R. LAWS ANN. tit. 9, §2054 (2017) (damages and reinstatement).



*Memorandum:* <u>Labor Reform as a Catalyst for Growth</u>
Page **26** of 35

**Earned Income Tax Credit (EITC)**

The EITC is a benefit for working people with low-to-moderate income. To qualify, people must meet certain requirements and file a tax return, even if they do not owe any tax. The EITC reduces the amount of taxes owed and may result in a cash refund if the benefit is higher than owed taxes.

Since welfare reform in 1996, the EITC has become the cornerstone of anti-poverty policy in the U.S. It has refocused the U.S. safety net on working families, dramatically increasing employment among single women with children and removing more children from poverty than any other program. In the U.S., this translates to approximately 6.5 million people (half of whom are children) lifted out of poverty. Further, the EITC improves employment rates (a $1,000 increase in EITC benefit has been tied to a 7.3 percent increase in employment)[65] and provides increased opportunities for individuals to invest in their own futures with education, training, childcare, or other costs that improve longer-term outlook. It has proven a powerful incentive to transition into the formal labor force and file taxes.

From 2006 to 2014, Puerto Rico had a Worker's Tax Credit, which was later discontinued due to its ineffective application and as a cost-saving measure. This prior Work Credit applied to 45% of all tax filers at a cost of $152 million in its last year of implementation. It was smaller than Federal EITC programs ($150-450 versus ~$2,000 average credit) and did not eliminate high implicit tax rates on low-income employees or do enough to incentivize formal employment.[66]

In Puerto Rico, implementation of the new EITC should be similar to the Federal EITC but adjusted to the relative wages of the Island. Eligible recipients should receive credits according to their marital, family, and earned income. As earnings increase, the benefit should increase up to a specified cap; at the cap, it would plateau and eventually decrease at the phase-out income level until it reaches $0 **(Exhibit 5)**, resulting in an average benefit of $525.30 per individual per year. This structure diminishes the "benefits cliff" that many face as their earned income increases, rewarding citizens who participate in the formal economy.

[65]  Hoynes and Patel 2015, http://www.taxpolicycenter.org/briefing-book/how-does-eitc-affect-poor-families

[66]  New York Federal Reserve Bank, 2014



*Memorandum:* <u>Labor Reform as a Catalyst for Growth</u>
Page 27 of 35

## Exhibit 5: EITC Benefit Formula

EITC Benefit Formula, $

- Benefits begin with the first dollar of reported income. As income increases, **benefits also increase at the phase-in rate** (different depending on household size), **up to the maximum credit**
- When income **reaches the phase-in cap, the benefit increase ceases**. Benefits remain constant at income levels that fall between the phase-in cap and phase-out start
- When income **reaches the phase-out start, benefits begin decreasing at the phase-in rate** for each additional dollar earned, **until income reaches the income cap** (at which point benefits are $0)

| Number of Children | Phase-in rate, % | Phase-in cap, $ | Phase-out start, $ | Individual/ Single in-come cap, $ | Married income cap, $ | Maximum Credit, $ |
|---|---|---|---|---|---|---|
| 0 | 5.00% | 6,000 | 18,000 | 20,500 | 21,750 | 300 |
| 1 | 7.50% | 12,000 | 13,000 | 20,500 | 24,250 | 900 |
| 2 | 10.00% | 15,000 | 16,000 | 28,500 | 34,750 | 1,500 |
| 3 or more | 12.50% | 16,000 | 17,000 | 33,500 | 42,000 | 2,000 |

For example, a single mother with two children working at minimum wage for 35 hours per week earns approximately $12,180 annually. With EITC, she can qualify for up to $1,500 in additional take-home pay per year, effectively raising the minimum wage by more than 12%.

The EITC program would cost approximately $200 million per year, but the program will raise formal labor force participation significantly, providing a positive return on the investment. The EITC must be implemented no later than FY2019.

## PAN Work Requirement

While PAN, Puerto Rico's largest welfare program, is similar to the mainland SNAP, it is funded and administered separately and unlike the mainland program PAN does not include a work requirement. As part of the labor reform package that the Oversight Board projects will create substantial growth over the next 30 years, the New Fiscal Plan requires that the Government institute work requirements to qualify for PAN benefits.

In FY2019, able-bodied participants aged 18-59 will be subject to a work requirement (children, even if their parents do not work, will continue to receive the benefit). Like mainland SNAP, in full implementation this work requirement must become effective after the individual has collected PAN benefits for three months. General exceptions would include those under age 18 or over the age of 60, parents with dependents under age 18, as well as those who are medically certified as physically or mentally unfit for employment. Paid work, voluntary work, training and education, and job searching (under the time limit) must qualify as work.

Any program savings derived from the PAN work requirement must be redistributed to working beneficiaries, effectively increasing take-home pay for workers. The increased worker benefit shall



**Memorandum:** <u>Labor Reform as a Catalyst for Growth</u>
Page **28** of 35

take place through an expansion of the Earned Income Disregard, which will increase the amount of earned income eligible recipients can exclude in calculating the amount of benefits they can claim. For example, a family of four currently receiving PAN will lose the benefit after exceeding a maximum annual income of $5,904. By creating a sliding scale after this amount or allowing families to exclude a certain amount of earned income from this calculation, Puerto Rico can ensure no one is disadvantaged by seeking work in the formal economy and that no families lose benefits prematurely.

The increase in PAN benefits for workers combined with the EITC would improve conditions for low-income workers in the formal economy and reduce poverty.

The proposed PAN work requirements must be included in the new PAN annual plan submitted July 1, 2018 to Food and Nutritional Services. It will be phased in over two years. Beginning in FY2019, beneficiaries will be subject to the work requirement after 6 months of benefits. By FY2020, the full requirements will take effect, subjecting beneficiaries to the work requirement after 3 months of benefit collection.

### Workforce Development Programs

Labor and welfare reforms should increase supply and demand for jobs; to fully close the gap and implement the labor reform package, however, the Government must launch specific efforts to ensure that its future workforce is prepared with critical skills.

### Workforce Innovation and Opportunity Act (WIOA)

First, the Government must update the WIOA State Plan to focus its programs and incentives on high-priority sectors and capabilities. WIOA is the primary way in which the Federal Government invests in adult education and workforce development, and it is designed to help jobseekers access employment, education, and support services to succeed in the labor market, and to match employers with the skilled workers they need.

The Government must broaden the list of core industries that qualify under WIOA and focus on high impact economic sectors to provide a skilled workforce that meets the needs of employers in each specific region. It needs to integrate this WIOA program with the broader promotional efforts of the Department of Economic Development and Commerce (DDEC). For example, a MOE Agreement with the Puerto Rico Department of Labor and Human Resources must establish an apprenticeship program aiming to impact innovative industries and post-Maria labor market needs.

### Youth Development Initiatives

In addition to WIOA, the Government should help develop critical skills in the workforce through multiple proposed initiatives, including:

**Youth development:** Investment in STEM through targeted teacher professional development and related programs; apprenticeship programs through partnership with universities and local businesses; opportunities for work-based learning and business programs; occupational



opportunities and certification programs (funded through reinvestment in additional surplus achieved through comprehensive labor reform).

**Higher education:** Curriculum development grants and scholarships for UPR students focused on high-impact sectors, e.g., the IT industry and Computer Science.

**Current labor market:** Apprenticeship Programs through collaboration with the private sector; training & certification programs focused on the areas of reconstruction efforts; creation of a job council to coordinate development and employment opportunities for youth and the unemployed.

By pursuing aggressive reforms to incentivize job creation and formal labor market participation, and to improve the overall quality of human capital in Puerto Rico, the Government will fundamentally transform the Island's labor market for the better.


## VI.    Comprehensive Set of Structural Reforms

As previously mentioned, a single reform, in isolation from the rest, is not likely to impact growth substantially. Rather, it is the whole program and package of structural reforms that truly change the competitiveness of an economy. Puerto Rico, now more than ever, needs to focus on transforming the economy into one that is competitive. A sustainable fiscal and economic turnaround depends entirely on comprehensive structural reforms to the economy of Puerto Rico. Only such reforms can drive growth in the economy, reversing the negative trend growth over the last 10 years and enabling the Island to become a vibrant and productive economy going forward. To reverse the negative economic trends, reforms should be undertaken in the following areas:

**Human capital and workforce reforms** will improve workforce participation, well-being and self-sufficiency of welfare recipients, and preparedness of adults and youth for a long and fulfilling career, resulting in a cumulative GNP impact of 0.80% by FY2023. The impact is enhanced in the long-term as K-12 education reforms begin adding an additional 0.01% GNP impact per year, resulting in an additional 0.16% uptick by FY2048.

**Ease of doing business reforms** will improve conditions for economic activity and job creation, employment opportunities, and business vitality, resulting in cumulative GNP impact of 0.65% by FY2023.

**Power sector reforms** will improve availability and affordability of energy for families and businesses, resulting in 0.30% cumulative GNP impact by FY2023.

**Infrastructure reform and capital investment** will improve the flow of goods, services, and people across the Island. It has not been scored to provide a specific GNP uptick, yet is undoubtedly a consequential uptick in the Island's long-term development.

The timing and impact of structural reforms are based on work done by the IMF on similar reforms implemented in Europe, utilities reform in Latin America, and broadly accepted metrics for measuring improvement in the World Bank's Ease of Doing Business Rankings.

Structural reform benchmarks broadly come from nations or jurisdictions without monetary policy options, like Puerto Rico. Examples used include Eurozone nations, U.S. states, or countries that



*Memorandum:* Labor Reform as a Catalyst for Growth
Page 30 of 35

had currencies pegged to the United States Dollar – and therefore lack monetary flexibility as does Puerto Rico. If implemented effectively, labor, energy, and doing business, reforms are projected to increase GNP by 1.75% by FY2023. K-12 education reforms add an additional 0.01% annual impact beginning in FY2033, resulting in total GNP increase of 1.91% by FY2048 **(Exhibit 6)**.

**Exhibit 6: Macroeconomic Impact of Structural Reforms**



As shown below **(Exhibit 7)**, these reforms equal approximately $80-90 billion in increased Commonwealth revenues over 30 years. The reforms are crucial to placing Puerto Rico on a path to long-term structural sustainability.



*Memorandum:* <u>Labor Reform as a Catalyst for Growth</u>
Page **31** of **35**

### Exhibit 7: Impact of Structural Reforms Over 30 Years

Impact of structural reforms, $M



1 Structural reforms in the 30-year are estimated due to macroeconomic compounding and long-term projection uncertainty

The entire package of structural reforms presents a transformational path for Puerto Rico, in which the long-term trend of decline turns into growth. However, without such structural reforms, there would be deficits by FY2032 **(Exhibit 8)**. Similarly, this path ensures that the 1.91% impact from structural reforms by FY2023 will allow Puerto Rico to grow consistently thereafter; the path shown without the implementation of the reforms does not allow Puerto Rico to grow in the future **(Exhibit 9).** It is the full implementation of these reforms – human capital and labor, energy, and ease of doing business– that will allow the Island to achieve a sustainable economic future.