Reply Date: July 16, 2018, 4:00 PM (AST)

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| ASSURED GUARANTY CORP.; ASSURED GUARANTY MUNICIPAL CORP.; and FINANCIAL GUARANTY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY; HON. RICARDO ANTONIO ROSSELLÓ NEVARES; GERARDO PORTELA FRANCO; and HON. RAÚL MALDONADO GAUTIER,<br><br>Defendants. | Adv. No. 18-059-LTS |

---

[1]  The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID:  8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID:  3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID:  9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID:  3747).

**OBJECTION OF ASSURED GUARANTY CORP., ASSURED GUARANTY
MUNICIPAL CORP., AND FINANCIAL GUARANTY INSURANCE COMPANY TO
MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO STAY ALL
<u>LITIGATION RELATED TO ADVERSARY COMPLAINT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND AND PROCEDURAL HISTORY ................................................ 4

LEGAL STANDARD ............................................................................................... 6

ARGUMENT ............................................................................................................ 7

I.      THE STAY REQUESTED IS EXTRAORDINARY RELIEF  THAT SHOULD
        BE DENIED ................................................................................................. 7

II.     THE FIRST CIRCUIT IS UNLIKELY TO ADDRESS SECTIONS 106(E) AND
        201(B)  IN  THE  AMBAC  APPEAL,  BECAUSE  THESE  SECTIONS  OF
        PROMESA WERE NOT AT ISSUE IN THE AMBAC CASE ......................... 8

III.    PLAINTIFFS'  CLAIMS  DO  NOT  "SUBSTANTIALLY  OVERLAP"   WITH
        AMBAC'S CLAIMS. ..................................................................................... 9

        A.      Any Plan Based on the Revised Fiscal Plan Is Unconfirmable,  and the
                Court Should Not Hold a Confirmation Hearing  Based on a Patently
                Unconfirmable Plan (Counts 8 and 9). ................................................ 10

        B.      FOMB Exceeded its Statutory Authority by Developing a Facially Illegal
                Fiscal Plan, and the Court Has the Power to Review FOMB's *Ultra Vires*
                Actions (Count 1) ............................................................................... 12

        C.      PROMESA Is Unconstitutional if Section 106(e) Bars All Judicial Review
                of the Revised Fiscal Plan's Compliance With PROMESA (Count 14). ............. 14

                1.      Denying review of Plaintiffs' claims  would violate procedural due
                        process .......................................................................................... 14

                2.      Denying  review  of  Plaintiffs'  claims  would  violate  the
                        nondelegation principle ................................................................ 15

                3.      The  Court  should  promptly  review  Plaintiffs'  challenge  to
                        PROMESA's constitutionality ...................................................... 16

        D.      Plaintiffs' Allegations With Respect to the Contracts Clause (Count 10)
                and Takings Clause (Count 11) Are Different From the Ambac Case. ................ 17

                1.      Plaintiffs'  Contracts  Clause  claims  are  different  from  Ambac's
                        Contracts Clause claims (Count 10). ........................................... 17

        2.      Plaintiffs' Takings Clause claims are ripe (Count 11).............................. 20

    E.      Plaintiffs' Allegations That the Moratorium Orders Are "Unlawful
            Executive Orders" Are Different From Ambac's Allegations (Count 13). ...........22

    F.      Defendants Mischaracterize Plaintiffs' Other Claims. ..........................................23

        1.      The Revised Fiscal Plan does not qualify as a "Fiscal Plan"
                (Count 5). ............................................................................................. 23

        2.      The Revised Fiscal Plan constitutes a "Moratorium Law"
                preempted by Section 303(1) (Count 12)................................................ 24

        3.      The Revised Fiscal Plan Violates Section 407 (Count 6). ........................ 24

        4.      The Revised Fiscal Plan violates Section 928(a) (Count 7). .................... 25

IV.     THE COURT AND ALL PARTIES IN INTEREST BENEFIT FROM THE
        ADVERSARY PROCEEDING, AND THE RELEVANT INTERESTS WEIGH
        AGAINST IMPOSING A STAY. ....................................................................................26

    A.      Denying the Stay Serves the Court's Interests.........................................................26

    B.      Denying the Stay Does Not Prejudice Defendants. ................................................27

    C.      A Stay Would Prejudice Plaintiffs.........................................................................28

    D.      Denying the Stay Serves the Public Interest and the Interests of Non-
            Parties.....................................................................................................................30

    E.      The Proposed Stay Is Indefinite, and Is Immoderate Under the
            Circumstances. .......................................................................................................31

CONCLUSION...................................................................................................................31

## TABLE OF AUTHORITIES

**PAGE(S)**

### CASES:

Asociación De Subscripción Conjunta Del Seguro De Responsibilidad Obligatorio
   v. Flores Galarza,
   484 F.3d 1 (1st Cir. 2007) ................................................................................20, 21

Bernardo ex rel. M & K Eng'g, Inc. v. Johnson,
   814 F.3d 481 (1st Cir. 2016) ......................................................................................12

CFTC v. Chilcott Portfolio Mgmt., Inc.,
   713 F.2d 1477 (10th Cir. 1983) ...................................................................................7

Dart v. United States,
   848 F.2d 217 (D.C. Cir. 1988) ..................................................................................13

García-Rubiera v. Calderón,
   570 F.3d 443 (1st Cir. 2009) ..........................................................................15, 20, 21

Gonzalez v. Torres,
   915 F. Supp. 511 (D.P.R. 1996) ...............................................................................15

Hanauer v. Reich,
   82 F.3d 1304 (4th Cir. 1996) ....................................................................................12

In re Am. Cap. Equip., LLC,
   688 F.3d 145 (3d Cir. 2012) ......................................................................................10

In re ConAgra Foods, Inc.,
   No. CV1105379MMMAGRX, 2014 WL 12580052 (C.D. Cal. Dec. 29, 2014) ................7, 26

In re El Comandante Mgmt. Co.,
   359 B.R. 410 (Bankr. D.P.R. 2006) ...........................................................................10

Klein v. Adams & Peck,
   436 F.2d 337 (2d Cir. 1971) ........................................................................................7

Landis v. N. Am. Co.,
   299 U.S. 248 (Cardozo, J.) ..............................................................................6, 8, 26

Leak Surveys, Inc. v. Flir Sys., Inc.,
   No. 3:13-CV-02897-M, 2017 WL 5569196 (N.D. Tex. Nov. 13, 2017) ...................................7

**PAGE(S)**

Leedom v. Kyne,
 358 U.S. 184 (1958) ................................................................................................................13

Lepre v. Dep't of Labor,
 275 F.3d 59 (D.C. Cir. 2001) ...............................................................................................13

Lindahl v. Office of Pers. Mgmt.,
 470 U.S. 768 (1985) ...............................................................................................................13

Mach Mining, LLC v. EEOC,
 135 S. Ct. 1645 (2015) ..................................................................................................... 12-13

Mathews v. Eldridge,
 424 U.S. 319 (1976) ...........................................................................................................14, 15

Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente,
 125 F.3d 9 (1st Cir. 1997) .....................................................................................................19

Oestereich v. Selective Serv. Sys. Local Bd. No. 11,
 393 U.S. 233 (1968) ...............................................................................................................13

Pan. Ref. Co. v. Ryan,
 293 U.S. 388 (1935) ...............................................................................................................15

Puerto Rico v. Palo Seco Fruit Co.,
 136 F.2d 886 (1st Cir. 1943) .................................................................................................15

Rivera v. Puerto Rico Tel. Co.,
 No. CIV. 09-1723 (JP), 2009 WL 3160839 (D.P.R. Sept. 29, 2009) .........................................6

Touby v. United States,
 500 U.S. 160 (1991) ...............................................................................................................16

United Auto., Agric. Impl. Workers of Am. Int'l Union v. Fortuño,
 633 F.3d 37 (1st Cir. 2011) ...................................................................................................19

United States v. Bozarov,
 974 F.2d 1037 (9th Cir. 1992) ..............................................................................................16

**STATUTES & OTHER AUTHORITIES:**

11 U.S.C.:
 § 928.......................................................................................................................................25
 § 1129(b)(2)(B).....................................................................................................................10

**PAGE(S)**

48 U.S.C. §§ 2101-2241 (Supp. V 2016) ("PROMESA"):

§ 101(a) .................................................................................................................28

§ 202 .......................................................................................................... 11-12, 18

§ 204 .......................................................................................................................18

§ 204(a) ..................................................................................................................12

§ 303(3) ..................................................................................................................22

§ 314(b)(2) .............................................................................................................10

§ 314(b)(3) .............................................................................................................10

§ 314(b)(6) .............................................................................................................10

Plaintiffs Assured Guaranty Corp. and Assured Guaranty Municipal Corp.
(together, "Assured") and Financial Guaranty Insurance Company ("FGIC", and together with
Assured, "Plaintiffs") respectfully submit this objection (the "Objection") to the Memorandum
Of Law In Support Of Defendants' Motion To Stay All Litigation Related To Adversary
Complaint [ECF No. 14] (the "Motion"),[2] filed by the Financial Oversight and Management
Board ("FOMB") and other Defendants, and state as follows:

## PRELIMINARY STATEMENT

1.      This case is about the failure of the Revised Fiscal Plan certified by
FOMB to comply with the requirements of Section 201(b) of PROMESA.[3]  To the extent the
Court were to determine that the Revised Fiscal Plan complies with Section 201(b) or that other
PROMESA provisions preclude the Court from reviewing the Revised Fiscal Plan for
compliance with PROMESA, the Complaint alleges that substantial constitutional issues would
arise under the Due Process Clause and the nondelegation doctrine.  The compliance of the
Revised Fiscal Plan, *vel non*, with Section 201(b) is an issue of central importance to each of the
Title III cases now before the Court.  No other pending adversary proceeding squarely presents
these issues in a fully developed complaint.  Given the long-established doctrine favoring
reviewability of statutory compliance embedded in our jurisprudence and the potential for
constitutional controversy, there exists a strong presumption that the Court should be able to
review the claims raised in the Complaint, not just at confirmation of a Title III plan, but
immediately.

---

[2]   Capitalized terms not defined in this Objection shall have the meanings ascribed to them in (i) the
Motion or (ii) the Adversary Complaint [ECF No. 1] (the "Complaint") in this adversary proceeding, as
applicable.

[3]   48 U.S.C. §§ 2101-2241 (Supp. V 2016) ("PROMESA").

2.     Defendants seek to stay this case on the grounds that the adversary proceeding[4] brought by Ambac Assurance Corporation ("Ambac"), currently on appeal before the First Circuit (the "Ambac Appeal"),[5] raised essentially the same issues, but Ambac did not allege that the fiscal plan failed to comply with PROMESA Section 201(b).   Instead, the Ambac case concerned the treatment of tax and toll revenues pledged to secure bonds issued by the Puerto Rico Highways and Transportation Authority ("PRHTA").   The main focus of the case (and a companion case brought by Assured, FGIC, and National Public Finance Guarantee Corporation) was the meaning of the special revenue provisions of the Bankruptcy Code, as incorporated by PROMESA.   FOMB seized upon allegations that the fiscal plans for PRHTA and the Commonwealth failed to enforce the special revenue provisions to argue that Ambac was implicitly challenging compliance of the fiscal plans with Section 201(b), a challenge precluded, according to FOMB, by Section 106(e) of PROMESA.   However, Ambac did not, and never purported to, assert any Section 201(b) claims.   Accordingly, the Court's contingent, somewhat abbreviated discussion of Section 201(b) and Section 106(e) was unnecessary to its decision to dismiss Ambac's complaint.   Moreover, the parties disagree about the meaning of the Court's *dicta*, particularly with respect to the scope of review during a Title III confirmation hearing. Unlike the Ambac case, where the fiscal plan statutory compliance and reviewability issues were at best incidental, this case presents the questions squarely and will provide the Court the benefit of fully developed allegations and briefing directly on the subject.   Given their importance to the pending Title III cases, these issues deserve to be decided in a case where they were intentionally presented and fully developed.

---

[4]   See Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al., Adv. Proc. 17-00159-LTS (D.P.R.).

[5]   See Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al., Case No. 18-1214 (1st Cir.).

3.       Not surprisingly, Defendants concede in their own Exhibit B that many of Plaintiffs' central claims here have **"No corresponding count seeking this exact relief"** in the Ambac case.  Motion, Ex. B.   Moreover, both Ambac and Plaintiffs (via an *amicus* brief) have argued to the First Circuit that the Court of Appeals need not and should not address Sections 106(e) and 201(b) in the Ambac Appeal, because Ambac did not, in fact, assert any claims under Section 201(b).  The Ambac Appeal is therefore unlikely to decide, or even address, the claims forming the core of Plaintiffs' complaint.

4.       As explained in detail below, there are also many other material differences between the complaint in the Ambac case and the Complaint here.  Given these fundamental distinctions between Plaintiffs' case and the Ambac case, there is no legitimate basis to prejudice Plaintiffs by granting an unwarranted stay of their right to prompt adjudication of their claims.  Moreover, the differences mean that Defendants will sooner or later be required to respond to Plaintiffs' new and differing claims; and, conversely, to the extent Defendants believe the claims here are the same as in the Ambac case, they already have in hand their arguments on those points.

5.       Indeed, the balance of harms weighs decisively against imposing a stay, because Plaintiffs seek relief that will benefit the Court and all parties in interest by preventing the Court from holding a confirmation hearing based on a plan of adjustment that is patently unconfirmable.  Furthermore, as alleged in Plaintiffs' Complaint, Plaintiffs have already suffered hundreds of millions of dollars in economic losses as a result of Defendants' modifications of debt priorities and diversions of collateral pursuant to the Revised Fiscal Plan and the other actions challenged in this Adversary Proceeding (see Compl. ¶¶ 30, 41, 50, 57, 60 n.4).  Specifically, Assured has already paid over $747 million in aggregate claims by bondholders as a

result of defaults caused by the Revised Fiscal Plan and the other actions challenged in the Adversary Proceeding, and FGIC has already received aggregate claims totaling over $226 million and has made payments to bondholders in respect of such claims in accordance with FGIC's plan of rehabilitation.  Id.   Plaintiffs would be required to continue making payments under their insurance policies as bonds become due during the period a stay is in place, and therefore would suffer millions of dollars in additional losses as a result of the stay Defendants request in the Motion.

6.     For these and other reasons set forth below, the Motion must be denied.

## BACKGROUND AND PROCEDURAL HISTORY

7.     Plaintiffs are bond insurers who insure (i) general obligation bonds (the "GO Bonds") issued by the Commonwealth and (ii) revenue bonds (the "Authority Bonds") issued by certain Puerto Rico public authorities, including PRHTA.  The GO Bonds are entitled to payment on a first-priority basis from all of the Commonwealth's "available resources" pursuant to the Commonwealth Constitution, and the Authority Bonds are secured by enforceable, perfected liens on pledged special revenues (the "Pledged Special Revenues").  Plaintiffs' total exposure to Puerto Rico credits exceeds $6.0 billion.

8.     Beginning no later than November 2015, Defendant the Commonwealth of Puerto Rico (the "Commonwealth") has engaged in a pattern of evading the payment of its debts, including through the enactment of a series of moratorium laws (the "Moratorium Laws") and moratorium orders (the "Moratorium Orders") that (i) impaired Plaintiffs' right to first-priority payment of the GO Bonds and (ii) diverted the Pledged Special Revenues from which the Authority Bonds must be paid to other, illegal purposes.

9.     Following the appointment of FOMB in August 2016, FOMB worked to perpetuate the Commonwealth's modifications of debt payment priorities and diversions of Pledged Special Revenues through the development of a fiscal plan (the "Original Fiscal Plan") that assumed and continued the modifications of priorities and violations of liens reflected in the Moratorium Laws and Moratorium Orders.

10.     On May 3, 2017, Plaintiffs commenced an adversary proceeding (the "Original Adversary Proceeding")[6] seeking declaratory and injunctive relief with respect to the Original Fiscal Plan on the grounds that the Original Fiscal Plan violated PROMESA and the U.S. Constitution.

11.     In September 2017, in response to Hurricanes Irma and Maria, FOMB and the Commonwealth decided to revise the Original Fiscal Plan.   In light of the changed circumstances, and in the hope that FOMB would, given the chance, conduct a more open plan development process, Plaintiffs voluntarily dismissed the Original Adversary Proceeding without prejudice in October 2017.  See Adv. Proc. No. 17-00125-LTS, ECF No. 108.[7]

12.     Unfortunately, FOMB instead chose once again to formulate a Revised Fiscal Plan with no significant input from Plaintiffs or other creditors and that, on its face, violates PROMESA and the U.S. Constitution.  Thus it was FOMB, not the Plaintiffs, that chose to continue down the dark road of unending litigation by continuing to turn on their heads the lawful priorities of payment and constitutional protections for senior creditors.  FOMB made the

---

[6]     The Original Adversary Proceeding was originally filed under Case No. 3:13-cv-01584 in the United States District Court for the District of Puerto Rico.   The Original Adversary Proceeding was subsequently transferred to the docketing system of the United States Bankruptcy Court for the District of Puerto Rico as Adversary Proceeding No. 17-00125-LTS.  See Assured Guar. Corp. v. Puerto Rico, Adv. Proc. No. 17-00125-LTS (D.P.R.).

Revised Fiscal Plan public in April 2018.  In response to FOMB's development of yet another

fiscal plan that ignored the prescriptions of PROMESA, Plaintiffs commenced the present

Adversary Proceeding on May 23, 2018.  The Adversary Proceeding challenges the Revised

Fiscal Plan and a number of Defendants' other unlawful actions, including the Moratorium Laws

and Moratorium Orders, for violations of PROMESA and the U.S. Constitution.

13.     Following commencement of the Adversary Proceeding, Defendants

approached Plaintiffs requesting an extension of their time to respond to the Complaint.  See

Motion, Ex. D.  Plaintiffs agreed to effectively double Plaintiffs' response time from 30 to

60 days.  See id.; see also Adv. Proc. No. 18-00059-LTS, ECF No. 12 (extending briefing

schedule with consent of all parties).  Notwithstanding Plaintiffs' consent to this doubling of

Defendants' response time, Defendants filed the Motion on June 25, 2018, seeking to impose on

Plaintiffs a stay of indefinite duration.

## LEGAL STANDARD

14.     When a party asks the court to stay the instant case pending appeal of a

wholly separate action by other parties, the law is clear that "a court should only grant a stay in

rare circumstances."  Rivera v. Puerto Rico Tel. Co., No. CIV. 09-1723 (JP), 2009 WL 3160839,

at *1 (D.P.R. Sept. 2 9, 2009).  Those circumstances exist only if the outcome of another case

will settle a rule of law that truly defines the plaintiff's rights in the stayed case.  Landis v. N.

Am. Co., 299 U.S. 248, 255 (Cardozo, J.) ("Only in rare circumstances will a litigant in one

cause be compelled to stand aside while a litigant in another settles the rule of law that will

define the rights of both.").  In light of this rigorous standard, the "underlying principle clearly is

---

[7]    The hearing on Defendants' motion to dismiss in the Original Adversary Proceeding was cancelled by
the Court, *sua sponte*, following Hurricane Maria.  Plaintiffs dismissed shortly thereafter, and prior to the
rescheduled hearing date.

that 'the right to proceed in court should not be denied except under the most extreme circumstances.'" CFTC v. Chilcott Portfolio Mgmt., Inc., 713 F.2d 1477, 1484 (10th Cir. 1983) (quoting Klein v. Adams & Peck, 436 F.2d 337, 339 (2d Cir. 1971)).

15.     Accordingly, courts routinely weigh competing interests and determine that movants have failed to justify such extraordinary relief.  See, e.g., In re ConAgra Foods, Inc., No. CV1105379MMMAGRX, 2014 WL 12580052, at *1, *8-9 (C.D. Cal. Dec. 29, 2014) (weighing Landis factors and denying a party's motion to stay "pending resolution of an appeal in a separate case" because the movant failed to demonstrate that issues on appeal would directly impact the court's resolution, and finding that "merely being required to defend the suit does not constitute hardship" sufficient to justify a stay); Leak Surveys, Inc. v. Flir Sys., Inc., No. 3:13-CV-02897-M, 2017 WL 5569196, at *2 (N.D. Tex. Nov. 13, 2017) (denying a motion to stay that a party filed after the Supreme Court granted petition for *certiorari* on the same issue).

## ARGUMENT

I.     **THE STAY REQUESTED IS EXTRAORDINARY RELIEF THAT SHOULD BE DENIED.**

16.     The Motion is premised on the exaggerated notion that there is "substantial overlap" between Plaintiffs' claims and those currently on appeal in the Ambac Appeal.  See Motion ¶ 1.  As their primary example of overlap, Defendants point to Plaintiffs' "allegations that the Revised Fiscal Plan . . . violates various subsections of PROMESA § 201," noting that "[i]n Ambac, this Court expressly held that another provision of PROMESA, § 106(e), deprived it of jurisdiction to consider [FOMB]'s decision to certify any fiscal plan or challenges based on alleged violations of PROMESA § 201."  Motion ¶ 2.  Plaintiffs and Ambac itself have asked the First Circuit to vacate the portion of the Court's Ambac Opinion dealing

with Sections 106(e) and 201(b), on the grounds that Ambac did not actually assert any claims

under Section 201 in its complaint, and any statements regarding Sections 201 or 106(e) in the

Court's Ambac Opinion therefore constituted either *dicta* or an advisory opinion.    Indeed, the

possibility, if not probability, that the First Circuit will vacate the portion of the Ambac Opinion

addressing Sections 106(e) and 201(b) makes it all the more necessary for the Court to decide

that issue in this Adversary Proceeding.

17.     Defendants' case for a "substantial overlap" between the Ambac case and

Plaintiffs' constitutional claims is even weaker, because, as explained below, the Court's

grounds for dismissing Ambac's constitutional claims simply do not apply to the constitutional

claims alleged here.   Therefore, the First Circuit's reversal or affirmance of the Court's order

dismissing Ambac's action is unlikely to be dispositive, or even informative, with respect to

Plaintiffs' claims.    Accordingly, Defendants have failed to carry their "heavy" burden of

showing that the Adversary Proceeding should be stayed.  See Landis, 299 U.S. at 256 (holding

that "the burden of making out the justice and wisdom of a departure from the beaten track lay

heavily" on the party seeking a stay).

## II.    THE FIRST CIRCUIT IS UNLIKELY TO ADDRESS SECTIONS 106(e) AND 201(b) IN THE AMBAC APPEAL, BECAUSE THESE SECTIONS OF PROMESA WERE NOT AT ISSUE IN THE AMBAC CASE.

18.     Defendants point to Plaintiffs' *amicus curiae* brief in the Ambac Appeal,

attached hereto as "Exhibit A" (the "*Amicus* Brief"), as proof that Plaintiffs' case substantially

overlaps with Ambac's, but the *Amicus* Brief proves just the opposite.   See Motion ¶ 4.

Specifically, the *Amicus* Brief notes that the Court's statements about Sections 106(e) and 201(b)

in Ambac were "based on the assumption that Ambac had somehow 'implicitly' asserted claims

seeking decertification of the [Original Fiscal Plan] based on violations of Section 201(b)," but

that "Ambac, in fact, asserted no such Section 201(b) claims, explicitly, implicitly, or otherwise." Id. at 4. The *Amicus* Brief therefore asserts that "any statements [the Court] made about Section 106(e) as it relates to 201(b) . . . constituted either *dicta* or an impermissible advisory opinion." Id. at 12. Ambac itself takes essentially the same position in its opening brief in the Ambac Appeal. Ambac Br. at 65. Both Plaintiffs and Ambac therefore ask the First Circuit simply to vacate the portions of the Court's Ambac opinion dealing with Sections 106(e) and 201(b), without addressing those sections of PROMESA. See *Amicus* Br. at 4, 12-13; Ambac Br. at 66.

## III. PLAINTIFFS' CLAIMS DO NOT "SUBSTANTIALLY OVERLAP" WITH AMBAC'S CLAIMS.

19.     More generally, Defendants greatly exaggerate or outright manufacture the "substantial overlap" between Plaintiffs' claims and the claims in the Ambac case. In particular, Defendants concede in their Exhibit B that Ambac asserted "no corresponding count" overlapping with three claims that are absolutely central to Plaintiffs' Complaint, namely Plaintiffs' claims that: (i) any plan of adjustment based on the Revised Fiscal Plan would be unconfirmable (and the Court should not hold a confirmation hearing on such an unconfirmable plan) (Counts 8 and 9); (ii) FOMB exceeded its statutory authority in developing a fiscal plan that, on its face, violated the mandatory requirements of PROMESA (Count 1); and (iii) PROMESA is unconstitutional if Section 106(e) precludes judicial review of the Revised Fiscal Plan's compliance with PROMESA (Count 14). Motion, Ex. B at 1, 3 and 5.

20.     The lack of any "substantial overlap" with respect to these three central claims is itself sufficient grounds to deny the Motion. Further, Defendants greatly exaggerate the "overlap" between the claims in the Ambac case and Plaintiffs' other claims, particularly

Plaintiffs' constitutional claims, which rest on highly particularized factual allegations different than those made in the <u>Ambac</u> case.

**A.**   **<u>Any Plan Based on the Revised Fiscal Plan Is Unconfirmable,
and the Court Should Not Hold a Confirmation Hearing
Based on a Patently Unconfirmable Plan (Counts 8 and 9).</u>**

21.   Defendants expressly concede in their Exhibit B that the <u>Ambac</u> case has "**No overlap**" with Plaintiffs' Count 8, which seeks a declaration that no plan of adjustment based on the Revised Fiscal Plan can be confirmed because any such plan (i) would not satisfy the confirmation requirements[8] set forth in Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, and (ii) would effect a "substantive consolidation" in violation of Section 304(f) of PROMESA.  <u>See</u> Motion, Ex. B at 3; Compl. ¶¶ 283-88.  There is a close analogy between this request for relief and forms of relief routinely granted in the bankruptcy context, where it is well-established that a bankruptcy court can exercise its powers under Section 105 of the Bankruptcy Code to refuse to approve a disclosure statement or hold a confirmation hearing based on a plan that is patently unconfirmable.[9]

---

[8]   The confirmation requirements a plan of adjustment based on the Revised Fiscal Plan could not satisfy include (i) the requirement that the plan of adjustment "compl[y] with the provisions of [Title III]" (PROMESA § 314(b)(2)); (ii) the requirement that the debtor "not [be] prohibited by law from taking any action necessary to carry out the plan [of adjustment]" (PROMESA § 314(b)(3)); (iii) the requirement that the plan of adjustment be "feasible and in the best interests of creditors" (PROMESA § 314(b)(6)); and (iv) the "absolute priority rule" of Section 1129(b)(2)(B) of the Bankruptcy Code (11 U.S.C. § 1129(b)(2)(B)).

[9]   <u>See, e.g.</u>, <u>In re Am. Cap. Equip., LLC</u>, 688 F.3d 145, 154 (3d Cir. 2012) ("[T]he court's equitable powers under 11 U.S.C. § 105 'surely enable it to control its own docket' and thus, a '[c]ourt [should] not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan may not be confirmable because it does not comply with [confirmation requirements].'") (citation omitted); <u>In re El Comandante Mgmt. Co.</u>, 359 B.R. 410, 415 (Bankr. D.P.R. 2006) ("At the hearing on the approval of a disclosure statement, the court may consider issues pertaining to the plan, and may rule upon such issues, when the plan defects will make it unconfirmable, that is, when the" plan is so fatally, and obviously flawed that confirmation is impossible.'") (citations omitted).

22.     Count 8 in turn serves as one of the bases for Plaintiffs' Count 9, which seeks a declaration that the Court will not hold a confirmation hearing on a plan of adjustment based on the Revised Fiscal Plan.  See Compl. ¶¶ 289-93.  Count 9 also differs entirely from anything in the Ambac case, because Ambac sought "injunctive relief invalidating [FOMB]'s certification of the Fiscal Plan" and "prohibiting Defendants from" taking any action premised on a certified fiscal plan, including the filing of a plan of adjustment.  See Ambac Compl. ¶¶ 218, 226, 239.  By contrast, Count 9 seeks neither "invalidation of the certification of the Fiscal Plan" nor "prohibition of actions [by FOMB] that could not be taken under PROMESA absent such certification."  Cf.  Ambac Op. at 22.[10]  Instead, Count 9 merely asks the *Court* to declare that *it* will not do something, namely hold a confirmation hearing premised on an illegal, unconfirmable, and unconstitutional plan.  As Defendants concede in their Motion (see Motion ¶ 22), the Court has the power to control its own docket, so it can certainly refrain from holding a confirmation hearing if it determines that such a hearing would be a futile waste of resources.

23.     Defendants  claim that Count 9 somehow implicates Section 106(e), but this is erroneous.  Section 106(e) applies only to "*certification* determinations," and Count 9 does not implicate certification—and therefore does not implicate Section 106(e)—at all.  The relief Count 9 requests, if granted, would leave the Revised Fiscal Plan certified and in effect, including with respect to the many functions that a fiscal plan has *other* than serving as the basis for a plan of adjustment, such as serving as the basis for compliant budgets (see PROMESA

---

[10]   Plaintiffs do allege that Section 312(b) gives the Court unlimited authority to "set" the time at which FOMB may file a plan of adjustment, and that the Court therefore has ample authority to prohibit FOMB from filing a plan.  See Compl. ¶ 239.  Plaintiffs' actual prayers for relief do *not*, however, ask the Court to prohibit FOMB from filing a plan, and instead merely ask the Court to declare that it "will not hold a confirmation hearing" with respect to a plan of adjustment based on the Revised Fiscal Plan.  See Compl. ¶¶ 293, 316(i).

§ 202) and compliant legislation (see PROMESA § 204(a)).  Therefore, Defendants will be able to continue operating the Commonwealth government and implementing structural reforms on the basis of the Revised Fiscal Plan even if the relief requested in Count 9 is granted, and how FOMB reacts to such relief, if granted, is up to FOMB.  It may choose to certify a further revised fiscal plan, or it may not.  And, if it chooses the former course, the contents of that plan are not dictated to FOMB.  FOMB can attempt to meet the court's legal conclusions in any manner it sees fit.

>      **B.      FOMB Exceeded its Statutory Authority by Developing a Facially Illegal Fiscal Plan, and the Court Has the Power to Review FOMB's *Ultra Vires* Actions (Count 1).**

24.    Defendants likewise concede that there was "**No corresponding count**" in the Ambac case corresponding to Plaintiffs' Count 1, alleging that FOMB exceeded its statutory authority by developing a fiscal plan that, on its face, violates mandatory requirements of PROMESA.  This is highly significant, because as Plaintiffs point out in their Complaint, courts have long held that "even when . . . statutory language *bars* judicial review," an exception exists for claims—like Count 1—that an "'agency exceeded the scope of its delegated authority or violated a clear statutory mandate.'"  Compl. ¶ 243 (quoting Hanauer v. Reich, 82 F.3d 1304, 1307 (4th Cir. 1996)).  Therefore, even if the First Circuit were to address, or even affirm, the Court's statements about Section 106(e) in Ambac, that ruling would have no impact on Plaintiffs' Count 1.

25.    Count 1 is rooted in what the First Circuit has called "'a strong presumption in favor of judicial review.'"  Bernardo ex rel. M & K Eng'g, Inc. v. Johnson, 814 F.3d 481, 495 (1st Cir. 2016) (citation omitted).  As the Supreme Court has explained, "Congress rarely intends to prevent courts from enforcing its directives" to government entities.  Mach

Mining, LLC v. EEOC, 135 S. Ct. 1645, 1651 (2015).  Accordingly, the government "bears a 'heavy burden' in attempting to show that Congress 'prohibited all judicial review' of [an] agency's compliance with a legislative mandate." Id. at 1651 (citation omitted).  "Only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."  Lindahl v. Office of Pers. Mgmt., 470 U.S. 768, 778 (1985) (citations omitted).

26.     Furthermore, where, as in the case of Section 106(e), the wording of a provision restricting judicial review is "less than absolute" in the sense that it precludes only certain types of claims, "the presumption of judicial review also favors a particular *category* of . . . claims." Dart v. United States, 848 F.2d 217, 221 (D.C. Cir. 1988) (emphasis in original). Specifically, "[j]udicial review is favored when an agency is charged with acting beyond its authority" by violating a clear statutory mandate, which is the exact charge levelled against FOMB in Count 1.  Id.; see also Leedom v. Kyne, 358 U.S. 184, 188 (1958) (setting aside a determination made by the National Labor Relations Board "in excess of [the Board's] delegated powers and contrary to a specific prohibition in the [National Labor Relations Act]").  The presumption of reviewability is particularly strong in the case of such claims based on agency actions "taken in excess of delegated powers" because judicial oversight is "needed to protect against 'freewheeling agencies meting out their brand of justice in a vindictive manner.'" Lepre v. Dep't of Labor, 275 F.3d 59, 72 (D.C. Cir. 2001) (quoting Oestereich v. Selective Serv. Sys. Local Bd. No. 11, 393 U.S. 233, 237 (1968)).  Therefore, courts "cannot lightly infer that Congress did not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." Id. (quoting Leedom, 358 U.S. at 190).

-13-

27.     Here, Section 106(e) is much more limited than the relatively "general" preclusion provision at issue in <u>Dart</u>, and by its terms simply does not reach claims that a fiscal plan "facially" violated PROMESA or that FOMB acted outside of its authority by developing such a facially defective fiscal plan.  Therefore, neither Section 106(e) nor any statements made about Section 106(e) in the Ambac Opinion has any application to Count 1.

### C.     PROMESA Is Unconstitutional if Section 106(e) Bars All Judicial Review of the Revised Fiscal Plan's Compliance With PROMESA (Count 14).

28.     Most fundamentally, Defendants concede that there is "**No corresponding count**" in Ambac's complaint with respect to Plaintiffs' Count 14, which requests a declaration that PROMESA would be unconstitutional if Section 106(e) were found to bar all judicial review of a fiscal plan's compliance with mandatory statutory requirements, including those in Section 201(b).  <u>See</u> Compl. ¶¶ 310-15.  Ambac never made such a claim or asserted this type of challenge to the constitutionality of PROMESA itself, and the Court has never decided such a challenge.

### 1.     Denying review of Plaintiffs' claims would violate procedural due process.

29.     As set forth in Plaintiffs' Complaint, the Due Process Clause guarantees that an individual may not be deprived of a protected interest without some "meaningful opportunity" to challenge whether the deprivation satisfies the requirements of the statutory scheme under which it is carried out.  <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976); <u>see</u> Compl. ¶ 247.

30.     As further set forth in the Complaint, the Pledged Special Revenues confiscated by Defendants pursuant to the Revised Fiscal Plan constitute property of Plaintiffs in their capacity as holders of the Authority Bonds issued by PRHTA and other Puerto Rico

-14-

government authorities.  Compl. ¶ 248.  As Authority Bondholders, Plaintiffs also have liens on the Pledged Special Revenues, and a lien is a property interest protected by the Due Process Clause.  Id.; see also Puerto Rico v. Palo Seco Fruit Co., 136 F.2d 886, 887 (1st Cir. 1943) (acknowledging "the constitutional question which would arise under the due process clause if a court of equity should undertake to destroy a lien without compensation to the lienor").

31.     As holders of GO Bonds, Plaintiffs also are entitled under the Commonwealth Constitution to receive payment of the GO Bonds on a first-priority basis from all "available resources," and as Authority Bondholders, Plaintiffs are further entitled by statute to receive the Pledged Special Revenues.  See Compl. ¶ 216.  A constitutional or statutory entitlement to receive a benefit constitutes a property interest protected by the Due Process Clause.  See, e.g., García-Rubiera v. Calderón, 570 F.3d 443, 457 (1st Cir. 2009); Gonzalez v. Torres, 915 F. Supp. 511, 516 (D.P.R. 1996).

32.     The Revised Fiscal Plan deprives Plaintiffs of these and other protected property interests.  Accordingly, the Due Process Clause entitles Plaintiffs to a "meaningful opportunity" to challenge the Revised Fiscal Plan for compliance with the statutory limits set forth in PROMESA.  Mathews, 424 U.S. at 349.  If PROMESA prevents Plaintiffs from obtaining judicial review, then it violates the Due Process Clause.

**2.      Denying review of Plaintiffs' claims would violate the nondelegation principle.**

33.     If PROMESA forecloses meaningful review of the Revised Fiscal Plan, it also violates the nondelegation doctrine.  That doctrine protects the U.S. Constitution's choice to vest certain powers in the Legislative Branch by prohibiting Congress from making a wholesale delegation of its Article I powers to another entity.  Pan. Ref. Co. v. Ryan, 293 U.S. 388, 421 (1935).  Ambac never made any claim based on the nondelegation principle.  A statute complies

with the nondelegation doctrine only when it provides both an "intelligible principle" to guide

the implementing agency *and* some mechanism by which a "court [could] ascertain whether" the

agency has correctly adhered to that principle.  See Touby v. United States, 500 U.S. 160, 168-69

(1991); accord United States v. Bozarov, 974 F.2d 1037, 1041-42 (9th Cir. 1992).  The doctrine

therefore prevents Congress from granting FOMB the *unreviewable* authority to create a fiscal

plan that dictates the economic future of Puerto Rico and irrevocably affects the rights of Puerto

Rico's citizens and creditors.  Again, this issue was nowhere presented in the Ambac case.

**3.      The Court should promptly review Plaintiffs' challenge to
PROMESA's constitutionality.**

34.      Defendants have conceded the gravity of Plaintiffs' challenge to the

constitutionality of PROMESA in Count 14 by stating in their scheduling motion in this

Adversary Proceeding that "[b]ecause Plaintiffs seek a declaratory judgment that PROMESA

violates the Due Process Clause and Article I, Section 1 of the U.S. Constitution, the impact of

this Court's decision [in the Adversary Proceeding] has the potential to go far beyond [the

Adversary Proceeding]."  Adv. Proc. No. 18-00059-LTS, ECF No. 11 ¶ 3.  In spite of that

concession, Defendants now argue in the Motion that the Court should stay the Adversary

Proceeding and simply allow these Title III cases under PROMESA to continue—at the cost of

millions of dollars in legal fees and expenses to the parties in interest—without even bothering to

determine whether PROMESA itself is constitutional.  That defies logic and good order,

particularly in light of the complete lack of *any* overlap between Plaintiffs' constitutional

challenges to PROMESA and any claims in Ambac's complaint currently on review before the

First Circuit.

**D.      Plaintiffs' Allegations With Respect to the Contracts Clause (Count 10) and
Takings Clause (Count 11) Are Different From the Ambac Case.**

35.      In another attempt to exaggerate the "overlap" between the Adversary
Proceeding and the Ambac case, Defendants suggest that the Ambac Opinion is somehow
dispositive of Plaintiffs' claims because both Plaintiffs and Ambac alleged violations of the
Contracts Clause and Takings Clause of the U.S. Constitution.   See Motion ¶ 19.   This is
incorrect, because Plaintiffs' allegations are substantially different from those found insufficient
in Ambac, and the grounds for the Court's dismissal of Ambac's Contracts Clause and Takings
Clause claims simply do not apply to Plaintiffs' claims.   The First Circuit's review of the Ambac
Appeal is therefore unlikely to "shape," much less decide, the Court's adjudication of Plaintiffs'
claims.  Cf. Motion ¶ 19.

**1.      Plaintiffs' Contracts Clause claims are different from Ambac's
Contracts Clause claims (Count 10).**

36.      Defendants' attempt to equate Ambac's Contracts Clause claims with
Plaintiffs' Contracts Clause claims fails, because the Court dismissed Ambac's Contracts Clause
claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim based solely on
perceived *pleading* deficiencies.   See Ambac Op. at 23-31.   Plaintiffs have pled different, and
more detailed, factual allegations than Ambac did, and so the Court's holdings with respect to
what it perceived to be pleading deficiencies in Ambac's complaint have no application to
Plaintiffs' claims.

37.      Specifically, the Court dismissed Ambac's Contracts Clause claims with
respect to the Original Fiscal Plan on the grounds that Ambac "**fail[ed] to identify** any
delegation or exercise of state legislative authority" that would have qualified the Original Fiscal
Plan as a state "law" for purposes of the Contracts Clause.   Ambac Op. at 24 (emphasis added).

Plaintiffs, however, allege specific facts demonstrating that FOMB's development of a fiscal plan does in fact constitute an exercise of the Commonwealth's legislative authority. See Compl. ¶ 171. Among other things, the Complaint notes that "the Revised Fiscal Plan dictates to the Legislative Assembly what types of budgets (PROMESA § 202) and other legislation (PROMESA § 204) the Legislative Assembly may pass." Id. Plaintiffs also point to a specific example (Act No. 47 of 2017) to demonstrate that "FOMB has already exercised its powers under Section 204 of PROMESA to block legislation enacted by the Legislative Assembly on the grounds that such legislation was inconsistent with a fiscal plan." Id.; see also Compl. ¶ 226. In view of these specific factual allegations, the Court's ruling about Ambac's perceived failure "to identify any delegation or exercise of state legislative authority" has no bearing on Plaintiffs' claims. Cf. Ambac Op. at 24.

38.     Similarly, the Court dismissed Ambac's Contracts Clause claims with respect to the Moratorium Laws, the Moratorium Orders, and the Compliance Law based on Ambac's perceived failure to "**ple[ad] facts sufficient** to support an inference that the [Moratorium Laws], Moratorium Orders, and [Compliance Law] are unreasonable or unnecessary to effectuate an important governmental purpose." Ambac Op. at 27 (emphasis added). The Court's grounds for dismissing this aspect of Ambac's Contracts Clause claims has no bearing on Plaintiffs' claims for two reasons.

39.     *First*, to the extent that plaintiffs generally have an obligation to plead facts sufficient to show that a law challenged under the Contracts Clause is unreasonable and unnecessary,[11] this element of a Contracts Clause claim is based on the need to balance the

---

[11]   For the avoidance of doubt, Plaintiffs do not concede that plaintiffs alleging Contracts Clause violations ever bear the burden of pleading or proving that the challenged law is unreasonable or

dictates of the Contracts Clause against the state's police power.  See Ambac Op. at 25 (citing

United Auto., Agric. Impl. Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 41 (1st Cir.

2011)).[12]  Here, Plaintiffs have no obligation to plead this element, because Plaintiffs are alleging

impairments of contracts protected by the Constitutional Debt Priority Provision of the

Commonwealth Constitution, and the Commonwealth's police power cannot be used to override

the Commonwealth Constitution.  See Compl. ¶¶ 60, 174.  Plaintiffs therefore bear no burden of

pleading that the challenged laws are unreasonable and unnecessary.

40.    *Second*, even if Plaintiffs were required to plead facts demonstrating that

the challenged laws are unreasonable and unnecessary, Plaintiffs have carried that burden.[13]

Among other things, Plaintiffs have proffered "facts that undermine the Commonwealth officers'

and representatives' representations of the existence of a fiscal emergency" and facts that

"plausibly support an inference that the declarations of emergency conditions are mere

subterfuges[.]"  Cf. Ambac Op. at 28; see, e.g., Compl. ¶¶ 72, 181-98.  Plaintiffs similarly "plead

facts sufficient to support an inference that the [Moratorium Laws], Moratorium Orders, and

---

unnecessary, and instead contend that the government defendant should bear the burden of proving that a
contract impairment is reasonable and necessary.

[12]    The Court's Ambac Opinion quotes language from Fortuño about the need to reconcile the Contracts
Clause with the "sovereign power necessarily reserved by the States to safeguard the welfare of their
citizens."  Ambac Op. at 25.  Fortuño takes this language regarding reserved "sovereign power" from
Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente, 125 F.3d 9, 14 (1st Cir.
1997), which in turn accurately equates this reserved "sovereign power" with "the State's inherent police
power."

[13]    Defendants are expected to argue that the First Circuit's ruling in the Ambac Appeal is likely to be
relevant to the Adversary Proceeding because Ambac has asked the First Circuit to reverse the Court's
ruling that Ambac, rather than the government, bore the burden with respect to the issue of whether the
challenged contract impairments were "reasonable and necessary."  See Ambac Br. at 41-44.  However,
any ruling by the First Circuit on this issue is not relevant to Plaintiffs' claims, because, as noted above,
Defendants have no relevant police power that would have permitted them to override the
Commonwealth Constitution, and therefore there is no need or basis to assess whether Defendants'
actions in violation of the Commonwealth Constitution were "reasonable and necessary."  In any event,
even if Plaintiffs were to bear a burden of pleading that the Defendants' illegal actions are unreasonable

[Compliance Law] were enacted to protect 'particular individuals' rather than a 'a basic societal interest.'"  <u>Cf.</u> Ambac Op. at 29 (citation omitted); <u>see, e.g.</u>, Compl. ¶¶ 176-78.  Plaintiffs also plead extensive "factual content suggesting that 'other available alternatives with lesser impact to the paramount constitutional rights affected'" existed that would have been "'a more moderate course of action'" and yet would have "serve[d] the stated purposes of addressing the critical public health, safety, and welfare . . . as well as restoring the Commonwealth's, and its instrumentalities', access to the capital markets."  <u>Cf.</u> Ambac Op. at 29-30; <u>see, e.g.</u>, Compl. ¶¶ 180, 187-89, 199-208.  Plaintiffs therefore have satisfied whatever pleading burden the Court perceived Ambac not to have satisfied, and the Court's rationale for dismissing Ambac's Contracts Clause claims has no application to Plaintiffs' claims.

## 2.  <u>Plaintiffs' Takings Clause claims are ripe (Count 11).</u>

41.  Defendants' effort to equate Plaintiffs' Takings Clause claims with Ambac's Takings Clause claims also fails, because Plaintiffs' specific allegations differ from Ambac's, and because the Court's dismissal of Ambac's Takings Clause claims was based entirely on a "ripeness" standard that does not apply to Plaintiffs' claims as pled.  Specifically, the Court relied on a "ripeness" test it derived from two First Circuit cases, <u>Garcia-Rubiera</u>, 570 F.3d at 451, and <u>Asociación De Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza</u>, 484 F.3d 1, 15 (1st Cir. 2007).  Ambac Op. at 17.  However, those same two cases recognize at least two exceptions to the "ripeness" test employed in <u>Ambac</u>, both of which apply in Plaintiffs' case.

42.  First, "facial challenges" to a law "'are generally ripe the moment the challenged regulation or ordinance is passed.'"  <u>Garcia-Rubiera</u>, 570 F.3d at 453 (quoting <u>Flores</u>

---

and unnecessary, Plaintiffs have carried that burden, so any ruling by the First Circuit as to the exact

Galarza, 484 F.3d at 14).  Unlike Ambac's complaint, Plaintiffs' Complaint expressly states that "Plaintiffs' challenge to the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law is a facial challenge that became ripe immediately upon the enactment and effectiveness of the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law."  Compl. ¶ 222.  Ambac did not specifically allege or argue before the Court that its Takings Clause claims constituted a facial challenge, and the Court therefore had no opportunity in Ambac to consider this exception to the "ripeness" standard it applied in the Ambac Opinion.  Plaintiffs anticipate that, given the opportunity, the Court will recognize that Plaintiffs' Takings Clause claims constitute an immediately ripe "facial" challenge without the need for any additional guidance from the First Circuit.

43.     Second, the "ripeness" test applied in Ambac does not apply to "a 'taking that involves the direct appropriation of funds.'"  Garcia-Rubiera, 570 F.3d at 453 (quoting Flores Galarza, 484 F.3d at 19).  Plaintiffs' Complaint expressly alleges that "Defendants have directly appropriated and continue to directly appropriate funds . . . that belong to Plaintiffs and in which Plaintiffs have property interests."  Compl. ¶ 222.  Ambac did not specifically allege or argue before the Court that its Takings Clause claims fell within this exception to the "ripeness" standard applied in the Ambac Opinion, and the Court therefore had no opportunity in Ambac to consider this exception.  Plaintiffs anticipate that, given the opportunity, the Court will recognize the applicability of this exception to Plaintiffs' Takings Clause claims without the need for any additional guidance from the First Circuit.

44.     Because these two exceptions apply, the "ripeness" analysis employed in the Court's Ambac Opinion has no bearing on Plaintiffs' Takings Clause claims.  In any event, even if the Court were to conclude that it would benefit from additional guidance from the First

---

allocation of the burden is unlikely to be relevant to Plaintiffs' claims.

Circuit on the scope of the "ripeness" standard applied by the Court in its Ambac Opinion, any "overlap" on a legal issue related to a single count of Plaintiffs' multi-count Complaint is not a basis for staying the Adversary Proceeding.

**E.    Plaintiffs' Allegations That the Moratorium Orders Are "Unlawful Executive Orders" Are Different From Ambac's Allegations (Count 13).[14]**

45.    Both Plaintiffs and Ambac asserted claims that the Moratorium Orders constitute "unlawful executive orders" preempted by Section 303(3) of PROMESA,[15] but Plaintiffs' factual allegations in support of this claim differ entirely from Ambac's.

46.    Specifically, the Court dismissed Ambac's Section 303(3) claims because Ambac had premised the "unlawfulness" of the Moratorium Orders entirely on its Contracts Clause and Takings Clause claims.  As Defendants acknowledge in their Exhibit B, "The basis for [the Court's dismissal] of [Ambac's] [Section] 303(3) claim is derivative of its dismissal of [Ambac's] Contracts Clause, Takings Clause, and Due Process Clause Claims."  Motion, Ex. B at 4-5.  As set forth above, however, Plaintiffs' Contracts Clause and Takings Clause allegations are different from, and more detailed, than Ambac's.  The Court's rationale for dismissing

---

[14]  Finally, even Plaintiffs' claim that most directly overlaps with Ambac—Count 12, seeking a declaration that the Moratorium Laws and Moratorium Orders are preempted by Section 303(1) of PROMESA, which expressly preempts "moratorium law[s]" (see Compl. ¶¶ 302-05)—still significantly differs in that Plaintiffs' Complaint cites legislative history conclusively demonstrating that Congress (i) intended to preempt the specific Moratorium Laws and Moratorium Orders at issue in Plaintiffs' Complaint, and (ii) intended specifically to preempt those Moratorium Laws and Moratorium Orders while an automatic stay was in place.  These allegations demonstrate that, contrary to the Court's statements in Ambac, Congress did not intend to give Defendants "breathing space" to continue taking Plaintiffs' property under cover of what the legislative history calls the "harmful . . . debt moratorium."  Compl. ¶ 158. Plaintiffs anticipate that the Court would reconsider its earlier Section 303(1) ruling in light of this dispositive legislative history without any need for additional guidance from the First Circuit.

[15]  Section 303(3) provides that "unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by [PROMESA]."  PROMESA § 303(3).

Ambac's Contracts Clause and Takings Clause claims—and by extension its rationale for dismissing Ambac's Section 303(3) claims—therefore has no application to Plaintiffs' claims.

47.     In any event, unlike Ambac, Plaintiffs do not premise the unlawfulness of the Moratorium Orders entirely on their Contracts Clause and Takings Clause claims, but instead cite many *other* ways in which the Moratorium Orders are unlawful, including the fact that the Moratorium Orders (i) violate the Constitutional Debt Priority Provision in the Commonwealth Constitution (Compl. ¶ 165); (ii) violate the Excise Tax Statutes (Compl. ¶ 165); (iii) violate the Commonwealth's statutory covenants not to impair bondholders' rights (Compl. ¶ 166); and (iv) violate numerous other provisions of Commonwealth law (Compl. ¶ 167).   Therefore, in Plaintiffs' case, the Court will need to consider all of these additional forms of unlawfulness, and the Court cannot dismiss Plaintiffs' Section 303(3) claims on the same grounds it dismissed Ambac's.

**F.     Defendants Mischaracterize Plaintiffs' Other Claims.**

48.     Defendants simply mischaracterize most of Plaintiffs' other claims in an effort to exaggerate the "overlap" with Ambac.

**1.     The Revised Fiscal Plan does not qualify as a "Fiscal Plan" (Count 5).**

49.     Plaintiffs' Count 5 seeks a declaration that the Revised Fiscal Plan does not constitute a "Fiscal Plan" as defined in Sections 5(10) and 5(22) of PROMESA, because these definitions of the defined terms "Fiscal Plan" and "Territory Fiscal Plan," respectively, require a "Fiscal Plan" to be "in accordance with Section 201."  Defendants concede that Ambac involved **"No corresponding count seeking this exact relief."**  Motion, Ex. B at 2.  Defendants attempt to exaggerate the "overlap" with Ambac by suggesting that Section 106(e) somehow

-23-

applies to this claim, but Count 5 is not a claim challenging a "certification determination."  It is a claim about whether the Revised Fiscal Plan satisfies a definition in PROMESA (which it does not).  In any event, the Court has never ruled on claims under Sections 5(10) and 5(22), and none will be addressed in the Ambac Appeal.

2.       **The Revised Fiscal Plan constitutes a "Moratorium Law"
          preempted by Section 303(1) (Count 12).**

50.       Defendants misleadingly suggest that Plaintiffs' allegation that the Revised Fiscal Plan violates Section 303 of PROMESA is somehow "the same alleged violation[]" alleged by Ambac.  See Motion ¶ 20.  But Plaintiffs in fact allege that the Revised Fiscal Plan violates a completely *different subsection* of Section 303 than did Ambac.  Specifically, Plaintiffs allege that the Revised Fiscal Plan violates Section 303(1), which preempts "moratorium laws."  See Compl. ¶ 160.  By contrast, Ambac alleged that the Original Fiscal Plan violated Section 303(3), which preempts "unlawful executive orders."  See Ambac Compl. ¶¶ 187-90.   There is therefore no direct "overlap" between Plaintiffs' and Ambac's claims that the fiscal plans violate Section 303.

3.       **The Revised Fiscal Plan Violates Section 407 (Count 6).**

51.       Plaintiffs' Count 6 seeks a declaration "that the Revised Fiscal Plan violates Section 407 of PROMESA," which prohibits illegal transfers between different government entities, and that the Revised Fiscal Plan "is therefore unlawful."  Compl. ¶ 276.  Defendants misleadingly equate this with Ambac's claim seeking a declaration that any transferee of an illegal transfer between government entities is liable under Section 407 for the value of the transfer.  See Ambac Compl. ¶ 244.  However, Count 6 does not seek a declaration about the liability of transferees; rather, Count 6 seeks a declaration that the Revised Fiscal Plan

*itself* is unlawful because it violates the prohibition on illegal transfers embodied in Section 407.
The unlawfulness of the Revised Fiscal Plan under Section 407 in turn goes to issues such as
(i) whether FOMB had authority to develop an unlawful fiscal plan that violates Section 407
(Count 1; see Compl. ¶ 257), and (ii) whether the Court should hold a confirmation hearing
premised on such an unlawful fiscal plan (Count 9; see Compl. ¶ 291). Therefore, there is no
direct overlap between Count 6 and Ambac.

### 4. The Revised Fiscal Plan violates Section 928(a) (Count 7).

52. Plaintiffs' Count 7 seeks a declaration that "the Revised Fiscal Plan
violates Section 928(a) of the Bankruptcy Code"—which mandates that "special revenues
acquired by the debtor after the commencement of the case ***shall*** remain subject to any lien
resulting from any security agreement entered into by the debtor before the commencement of
the case" (11 U.S.C. § 928) (emphasis added)—and that the Revised Fiscal Plan "is therefore
unlawful." Compl. ¶ 281. Defendants seek to equate Count 7 with Ambac's claim that Section
928(a) requires Defendants "to remit [PR]HTA revenues to [PR]HTA bondholders." Motion,
Ex. B at 3. Count 7 does not seek a declaration about Defendants' obligation to remit revenues
to Plaintiffs and other PRHTA Bondholders, however. Instead, Count 7 seeks a declaration that
the Revised Fiscal Plan *itself* is unlawful because it violates the mandatory requirement in
Section 928(a) that the PRHTA revenues remain subject to prepetition liens. The unlawfulness
of the Revised Fiscal Plan under Section 928(a) in turn goes to issues such as (i) whether FOMB
had authority to develop an unlawful fiscal plan that violates Section 928(a) (Count 1; see
Compl. ¶ 257), and (ii) whether the Court should hold a confirmation hearing premised on such
an unlawful fiscal plan (Count 9; see Compl. ¶ 291). Therefore, there is no direct overlap
between Count 7 and Ambac.

IV. **THE COURT AND ALL PARTIES IN INTEREST BENEFIT FROM THE ADVERSARY PROCEEDING, AND THE RELEVANT INTERESTS WEIGH AGAINST IMPOSING A STAY.**

53.     As noted above, a stay of one case pending an appeal in a wholly separate action constitutes extraordinary relief that should only be granted "in rare circumstances." Rivera, 2009 WL 3160839, at *1.  Those circumstances exist only if the outcome of another case will "settle[] the rule of law that will define the rights" of the plaintiffs in both cases.  Landis, 299 U.S. at 255 (Cardozo, J.).  Defendants have failed to meet this rigorous standard here, because they have failed to establish that the First Circuit will decide any issues related to Sections 106(e) and 201(b) or any issues that will otherwise be dispositive of Plaintiffs' claims. For these reasons alone, the Court should deny the Motion.

54.     In addition, courts sometimes weigh competing interests in determining whether to grant such extraordinary relief.  See, e.g., ConAgra, 2014 WL 12580052, at *1, *8-9. Relevant factors in weighing these interests can include (1) the conservation of judicial resources, (2) the prejudice faced by Defendants if the stay is not entered, (3) the hardship faced by Plaintiffs if the stay is entered, (4) the public interest, and (5) the length of the stay.  See id.; see also Motion ¶ 21.  These factors weigh heavily against imposing a stay in this instance.

A.     **Denying the Stay Serves the Court's Interests.**

55.     Defendants argue that staying the Adversary Proceeding will save judicial resources based entirely on the false premise that a First Circuit ruling in the Ambac Appeal could "dispose of" or otherwise impact the Adversary Proceeding.  See Motion ¶ 23.  As demonstrated above, however, the Ambac Appeal is unlikely to have any material impact on Plaintiffs' claims.  At a minimum, Plaintiffs' claims are sufficiently different from Ambac's that the Court will need to consider and adjudicate Plaintiffs' claims on their own merits regardless of

how the Ambac Appeal is decided, and no material judicial resources will be saved by delaying that adjudication.

56.     Furthermore, a central purpose of the Adversary Proceeding is precisely to conserve judicial resources by requesting a declaration that the Court will not hold a confirmation hearing premised on a patently unconfirmable plan of adjustment (Count 9).  As noted in the Complaint, such a confirmation hearing premised on a patently unconfirmable plan would "constitute an enormous waste of the Court's own resources and of the time and resources of all parties in interest."  Compl. ¶ 240.  The Court's interests therefore weigh heavily against staying Plaintiffs' claims.

### B.     Denying the Stay Does Not Prejudice Defendants.

57.     Defendants argue that proceeding with the Adversary Proceeding will prejudice them, but this argument is again based on the false premise that the Ambac Appeal will impact the Adversary Proceeding, which is refuted above.  In this context, it is also worth noting that Defendants' response to the Complaint is due only *eleven* days from the date of the filing of this Objection, and that the due date for Defendants' reply to this Objection (July 16) is only *four* days before the due date for Defendants' response to the Complaint (July 20).  Therefore, Defendants most likely will have already drafted their response to the Complaint, and suffered any related "hardship," regardless of how this Motion is decided.  Furthermore, if the Adversary Proceeding really is as similar to the Ambac case as Defendants contend, then responding to the Complaint should not be burdensome, because Defendants can simply recycle the responses they made in the Ambac case.   The fact that Defendants nonetheless complain of "hardship" demonstrates that Plaintiffs' case is actually *different* from the Ambac case, such that Defendants

must develop new and *different* responses.  If Plaintiffs' case is different from the Ambac case, however, then the entire premise of the Motion falls away.

58.     Defendants also argue that a stay will somehow contribute to FOMB's long-neglected statutory mission of providing a method for Puerto Rico "to achieve fiscal responsibility and access to the capital markets."   Motion ¶ 23; see also PROMESA § 101(a). This argument turns reality on its head:   It is actually *the Revised Fiscal Plan* itself that constitutes the principal obstacle to Puerto Rico's achievement of fiscal responsibility and access to capital markets, because the Revised Fiscal Plan destroys the liens and priorities on which creditors relied when loaning billions of dollars to Puerto Rico and fails to reign in undisciplined government spending, thereby discouraging future investment in Puerto Rico.  Plaintiffs' legal challenge to the Revised Fiscal Plan is therefore a necessary first step towards putting Puerto Rico back on a path to fiscal responsibility and capital market access, and any stay of the Adversary Proceeding will only serve to delay the achievement of PROMESA's two primary objectives.

## C.     A Stay Would Prejudice Plaintiffs.

59.     Plaintiffs would be severely prejudiced if the Court granted a stay, because Defendants' entire strategy is to permanently deprive Plaintiffs of their property and contract rights by confirming a plan of adjustment before the underlying fiscal plan—which openly violates Plaintiffs' priorities and liens—can be subjected to judicial review.  Defendants know very well that the Revised Fiscal Plan could not withstand judicial scrutiny, and for that reason, their strategy depends on their ability to impede judicial review and due process by every means possible and at every opportunity.  The Motion is just another example of these obstructionist tactics.

60.     Plaintiffs appreciate that the Court is unlikely actually to confirm a plan of adjustment based on the blatantly illegal Revised Fiscal Plan—if nothing else, the confirmation requirements in Section 314(b) would prevent that.   Nonetheless, a major purpose of the Adversary Proceeding is to put Defendants on notice, sooner rather than later, that the Revised Fiscal Plan is not going to succeed and that, if Defendants desire Title III relief, they must instead start putting forward realistic, lawful, and constitutional restructuring proposals.   The longer Defendants persist in their apparent belief that their actions are immune from effective judicial scrutiny, the longer these cases will be heading in the wrong direction.   Time is therefore of the essence, and Plaintiffs should be permitted to proceed with their action immediately and free from the obstruction of any stay.

61.     In addition, as noted above, Plaintiffs have already suffered hundreds of millions of dollars in economic losses as a result of Defendants' modifications of debt priorities and diversions of collateral pursuant to the Revised Fiscal Plan and the other actions challenged in this Adversary Proceeding (see Compl. ¶¶ 30, 41, 50, 57, 60 n.4).   Specifically, Assured has already paid over $747 million in aggregate claims by bondholders as a result of defaults caused by the Revised Fiscal Plan and the other actions challenged in the Adversary Proceeding, and FGIC has already received aggregate claims totaling over $226 million and has made payments to bondholders in respect of such claims in accordance with FGIC's plan of rehabilitation.   Id. Plaintiffs would be required to continue making payments under their insurance policies as bonds become due during the period a stay is in place, and therefore would suffer millions of dollars in additional losses as a result of the stay Defendants request in the Motion.   These massive economic losses to Plaintiffs easily outweigh any purported prejudice to Defendants.

**D.**      **Denying the Stay Serves the Public Interest and the Interests of Non-Parties.**

62.     The interests of non-parties will be greatly enhanced by allowing the Adversary Proceeding to go forward, because, as alleged in the Complaint, the Revised Fiscal Plan is specifically designed to benefit particular individuals and special interest groups at the expense of the public interest and of creditors at large.  See Compl. ¶¶ 176-77.  The public interest, along with most segments of the creditor body, would therefore benefit from a declaration that the Revised Fiscal Plan is unlawful.

63.     Furthermore, the relief requested in the Adversary Proceeding includes a request that a confirmation hearing not be held with respect to a patently unconfirmable plan of adjustment (Count 9).  Whereas only a few parties (Plaintiffs and Defendants) are required to participate in this Adversary Proceeding, a much larger group of stakeholders would be forced to participate in such a confirmation hearing, notwithstanding that its futility would be foreordained.  Therefore, Plaintiffs are helping to conserve the resources of all other parties in interest by seeking, in a timely manner, to prevent a fruitless confirmation hearing from going forward.

64.     In addition, the Adversary Proceeding challenges the constitutionality of PROMESA itself, meaning that it is entirely possible that parties in interest have already expended millions of dollars on a process that was and is unconstitutional.  All parties in interest have a strong interest in the prompt adjudication of Plaintiffs' challenge to PROMESA's constitutionality so that they do not continue to commit resources to a process that has no constitutional basis and therefore no future.

E.    **The Proposed Stay Is Indefinite, and Is Immoderate Under the Circumstances.**

65.    Defendants also argue that the proposed stay is not "immoderate or indefinite" because it will last only until the First Circuit issues a decision in the Ambac Appeal. See Motion ¶ 26.  These reassurances ring hollow in the context of these Title III cases, where Defendants' entire strategy is based on delaying judicial review of their unlawful actions for as long as possible, and preferably forever.  In any event, no one knows when the First Circuit will rule in the Ambac Appeal, and so Defendants are in no position to make guarantees about the length of the delay they are seeking to impose on Plaintiffs.  Given the benefit to all parties in interest, including Defendants, of knowing as soon as possible whether the Revised Fiscal Plan is leading the restructuring process down a blind alley and whether PROMESA itself is constitutional, a delay of even a few months is immoderate under the circumstances.

## CONCLUSION

66.    For the foregoing reasons, the Court should deny the Motion. Alternatively, to the extent the Court concludes that the Ambac Appeal would have a direct bearing on any issues in the Adversary Proceeding, the Court should stay the Adversary Proceeding only with respect to those specific issues, and permit Plaintiffs' other claims to proceed.

Dated:   New York, New York
         July 9, 2018

CASELLAS ALCOVER & BURGOS P.S.C.

By: */s/ Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    USDC-PR 204809
    Ricardo F. Casellas-Sánchez
    USDC-PR 203114
    Diana Pérez-Seda
    USDC-PR 232014
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone:  (787) 756-1400
    Facsimile:  (787) 756-1401
    Email:  hburgos@cabprlaw.com
          dperez@cabprlaw.com

CADWALADER, WICKERSHAM & TAFT LLP

By: */s/ Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr.*
    Mark C. Ellenberg*
    Ellen V. Holloman*
    Ellen Halstead*
    Gillian Burns*
    Thomas J. Curtin*
    Casey J. Servais*
    200 Liberty Street
    New York, NY 10281
    Telephone:  (212) 504-6000
    Facsimile:  (212) 406-6666
    Email:  howard.hawkins@cwt.com
          mark.ellenberg@cwt.com
          ellen.holloman@cwt.com
          ellen.halstead@cwt.com
          gillian.burns@cwt.com
          thomas.curtin@cwt.com
          casey.servais@cwt.com

*Admitted *pro hac vice* in No. 17-BK-03283-LTS

*Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

-32-

REXACH & PICÓ, CSP

By: */s/ María E. Picó*　　　　　　　　　
    María E. Picó
    USDC-PR 123214
    802 Ave. Fernández Juncos
    San Juan PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    E-mail:    mpico@rexachpico.com

BUTLER SNOW LLP

By: */s/ Martin A. Sosland*　　　　　　　　
    Martin A. Sosland*
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    E-mail:    martin.sosland@butlersnow.com

    Stanford G. Ladner*
    1700 Broadway, 41st Floor
    New York, NY 10019
    Telephone: (646) 606-3996
    Facsimile: (646) 606-3995
    E-mail:    stan.ladner@butlersnow.com

    Christopher R. Maddux*
    J. Mitchell Carrington*
    1020 Highland Colony Parkway, Suite 1400
    Ridgeland, MS 39157
    Telephone: (601) 985-2200
    Facsimile: (601) 985-4500
    E-mail:    chris.maddux@butlersnow.com
            mitch.carrington@butlersnow.com

  *Admitted *pro hac vice* in No. 17-BK-03283-LTS

  *Attorneys for Financial Guaranty Insurance
  Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the

Court using the CM/ECF System, which will send notification of such filing to all parties of

record in the captioned case.  Further, I directed that the following counsel of record be served

by U.S. Mail:

| | |
|---|---|
| Office of the United States Trustee for Region 21<br>Edificio Ochoa<br>500 Tanca Street, Suite 301<br>San Juan, PR 00901-1922 | Gerardo J. Portela Franco<br>Puerto Rico Fiscal Agency and Financial<br>Advisory Authority (AAFAF)<br>De Diego Ave. Stop 22<br>San Juan, Puerto Rico 00907 |
| John J. Rapisardi, Esq.<br>O'Melveny & Myers LLP<br>7 Times Square<br>New York, New York 10036 | Luis C. Marini-Biaggi, Esq.<br>Marini Pietrantoni Muniz, LLC<br>MCS Plaza, Suite 500<br>255 Ponce de León Ave.<br>San Juan, PR 00917 |
| Martin J. Bienenstock, Esq.<br>Proskauer Rose LLP<br>Eleven Times Square<br>New York, New York 10036-8299 | Hermann D. Bauer, Esq.<br>O'Neill & Borges LLC<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813 |
| Nancy A. Mitchell, Esq.<br>Greenberg Traurig LLP<br>200 Park Avenue<br>New York, New York 10166 | Arturo Diaz-Angueira, Esq.<br>Cancio, Nadal, Rivera & Diaz, P.S.C.<br>403 Muñoz Rivera Ave.<br>San Juan (Hato Rey), PR 00918-3345 |
| Luc A. Despins, Esq.<br>Paul Hastings LLP<br>200 Park Avenue<br>New York, New York 10166 | Juan. J. Casillas Ayala<br>Casillas, Santiago & Torres LLC<br>El Caribe Office Building<br>53 Palmeras Street, Suite 1601<br>San Juan, PR 00901-2419 |
| Robert Gordon, Esq.<br>Jenner & Block LLP<br>919 Third Avenue<br>New York, New York 10022 | A.J. Bennazar-Zequeira<br>Bennazar, Garcia & Milian, C.S.P.<br>Edificio Union Plaza PH-A piso 18 Avenida<br>Ponce de Leon #416<br>Hato Rey, PR 00918 |

At New York, New York, this 9th day of July, 2018.

By: _/s/ Howard R. Hawkins, Jr._

Howard R. Hawkins, Jr.*

* Admitted *pro hac vice*