1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF PUERTO RICO

3

4    In Re:                          )
                                     )
5                                    )   PROMESA
     THE FINANCIAL OVERSIGHT AND     )   Title III
6    MANAGEMENT BOARD FOR PUERTO RICO, )
                                     )
7          as representative of      )
                                     )   No. 17-BK-3283-LTS
8    THE COMMONWEALTH OF PUERTO RICO, )
     et al,                          )
9                                    )
           Debtors.                  )
10

11                      **MOTION HEARING**

12

13

     BEFORE THE HONORABLE JUDITH GAIL DEIN
14
          UNITED STATES MAGISTRATE JUDGE
15

16
             United States District Court
17           1 Courthouse Way, Courtroom 8
             Boston, Massachusetts  02210
18           June 18, 2018
             1:34 p.m.
19

20

21
                 Debra D. Lajoie, RMR, FCRR, CRI
22               United States District Court
                 1 Courthouse Way, Room 3-209
23               Boston, Massachusetts  02210
                 lajoiedebra@gmail.com
24

25

1   A P P E A R A N C E S :

2       PETER FRIEDMAN, ESQ., and WILLIAM J. SUSHON,

3   ESQ., O'Melveny & Myers LLP, for Puerto Rico Fiscal

4   Agency and Financial Advisory Authority

5       MARGARET DALE, ESQ., and TIMOTHY MUNGOVAN, ESQ.,

6   Proskauer Rose LLP, for The Financial Oversight and

7   Management Board for Puerto Rico, as representative of

8   The Commonwealth of Puerto Rico

9       D. FARRINGTON YATES, ESQ., Kobre & Kim LLP,

10  Independent Investigator

11      LANDON RAIFORD, ESQ., and KERI L. HOLLEB

12  HOTALING, ESQ., Jenner & Block LLP, for The Official

13  Committee of Retired Employees of the Commonwealth of

14  Puerto Rico

15      LUC A. DESPINS, ESQ., and BRADLEY GRAY, ESQ.,

16  Paul Hastings LLP, for the Official Committee of

17  Unsecured Creditors

18

19

20

21

22

23

24

25

1    18 JUNE 2018 -- 1:34 P.M.

2            THE CLERK:  The United States District Court for

3    the District of Puerto Rico is now in session, the

4    Honorable Magistrate Judge Dein presiding, today is

5    June 18th, 2018.  In the matter of The Financial

6    Oversight and Management Board of Puerto Rico, as

7    representative of The Commonwealth of Puerto Rico,

8    et al, Bankruptcy No. 17-BK-3283.

9            Will counsel please identify themselves for the

10   record.

11           MR. FRIEDMAN:  Good morning, Your Honor.

12           Peter Friedman of O'Melveny & Myers on behalf of

13   AAFAF, as representative of GDB.

14            MR. SUSHON:  Good afternoon, Your Honor.

15           Bill Sushon of O'Melveny & Myers.

16           MS. DALE:  Good afternoon, Your Honor.

17           Margaret Dale from Proskauer Rose on behalf of

18   The Oversight Board, as the representative of the

19   Debtors.

20           MR. MUNGOVAN:  Good afternoon, Your Honor.

21   Timothy Mungovan from Proskauer for The Oversight

22   Board.

23           MR. YATES:  Good afternoon, Your Honor.

24           Farrington Yates with Kobre & Kim.  We're the

25   Independent Investigator.

1          MR. RAIFORD:  Good afternoon, Your Honor.

2          Landon Raiford, Jenner & Block, for the Retiree

3    Committee.

4          MS. HOLLEB HOTALING:  Good afternoon,

5    Your Honor.  Kelly Holleb Hotaling, Jenner & Block, on

6    behalf of the Retiree Committee.

7          MR. GRAY:  Good afternoon.  Brad Gray, with

8    Paul Hastings, on behalf of the Committee.

9          MR. DESPINS:  Good afternoon, Your Honor.

10   Luc Despins with Paul Hastings on behalf of the

11   Official Committee.

12         MR. DORSEY:  Good afternoon, Your Honor.

13   John Dorsey on behalf of Banco Popular.

14         THE COURT:  All right.  Welcome to everyone

15   here, long time no see, and welcome to everyone in

16   New York and Puerto Rico who are on the other end of

17   the phone.

18         I was pleased to see the status reports.  Thank

19   you.  Apparently everybody's taking this seriously.  So

20   let's see how much progress we can make.  Anything to

21   update?

22         MR. FRIEDMAN:  Your Honor, Peter Friedman.

23         THE COURT:  You know what?  And I think it's

24   easiest if you talk from the podium.

25         MR. FRIEDMAN:  Peter Friedman from O'Melveny &

1       Myers on behalf of AAFAF, as representative of GDB.

2              Your Honor, as we said in our status report, we

3       have already now I think a week plus a few days ago

4       produced to the two Committees on behalf of GDB the

5       documents that the independent investigator has

6       identified to AAFAF and GDB that it relies on in

7       connection with its report.

8              We have agreed to produce a categorical

9       privilege log to both Committees.  Our target to do

10      that is Wednesday of this week.

11             We've agreed to have further discussions if they

12      believe that, in this specific instance, a

13      document-by-document log is necessary.  You know, in

14      many instances, we don't think it's necessary.  We

15      think here, if it's useful, it's something we're

16      willing to discuss because it's not an enormous set of

17      documents.  So we think, if that's a useful exercise,

18      it's something we're willing to engage with the two

19      Committees on.

20             There are a very few limited issues with respect

21      to a non-disclosure agreement between the Committees

22      and AAFAF on behalf of GDB.  I think it's really down

23      to one very narrow issue.  And, you know, in our view,

24      we have complied, AAFAF on behalf of GDB and GDB

25      working together with the AAFAF, have complied with the

1    obligations set out by the Court.

2         You know, just this matter, this report, is of

3    great -- that the Independent Investigator will

4    eventually come out with, just to be clear, is of

5    extreme importance to AAFAF and GDB, and I just want

6    the Court to know that, that this was a report

7    originally in some ways that the Governor himself was

8    contemplating having Puerto Rico do on its own before

9    the Oversight Board announced that it would conduct

10   such an investigation under Rule 104 -- I'm sorry --

11   Section 104 of PROMESA.

12        The Governor and GDB and AAFAF are extremely

13   interested in the report, what the report will say

14   about historical practices, what the report will say

15   about issues which may have led to Puerto Rico's

16   financial crisis, what the report will say about future

17   recommendations as to how some issues that may have

18   contributed to Puerto Rico's financial crisis can be

19   avoided in the future.  It's something that -- just to

20   be very clear, and I don't know if this come through in

21   the past, this report is extremely important.

22        GDB's President, Christian Sobrino, who's here

23   in the Courtroom with me today.  Mr. Sobrino, right

24   there, who's also the Governor's ex officio

25   representative to the Oversight Board, is with me.  You

1    know, the Court required that a GDB person come here,

2    but Mr. Sobrino is happy to be here today, as he will

3    be happy to be interviewed by the Kobre & Kim special

4    investigative team.  He's also joined by GDB's General

5    Counsel, Belen Fornaris Alfaro, both of whom came up

6    today.

7         And so, you know, as I said, this report is

8    extremely important.  We look forward to reading it, we

9    look forward to continuing to cooperate with the

10   Special Investigator from Kobre & Kim.  You know, GDB

11   is not a Title III Debtor.  Hopefully it never will be.

12        As the Court has heard from previous issues, GDB

13   will be actually trying to do something that no other

14   Commonwealth territorial instrumentality has done to

15   this point, which is it has successfully entered into a

16   restructuring agreement with its creditors voluntarily,

17   has reached consensus, is going to ask for this --

18   for the District Court to hear a Title VI proceeding,

19   which I think is actually a pretty remarkable step in

20   Puerto Rico's restructuring and one that deserves a

21   tremendous amount of credit and praise for GDB having

22   reached out to its bondholders and come to an agreement

23   and is prepared to submit that to an appropriate level

24   of scrutiny, you know, in procedures that I know have

25   been discussed already with this Court that will be the

1    subject of informational motions, will be the subject

2    of a proceeding to be commenced sometime in July and

3    will seek approval of in the fall.

4         And I think it would be remiss not to note how

5    important that is and what an important step that is by

6    GDB.  And, Your Honor, to the extent there have been

7    some hiccups or disconnects in the discovery process to

8    this point, we will do our best to avoid those in

9    connection with a Title III, where we think discovery

10   should be -- Title VI, where we think discovery should

11   be extremely limited.  We will work our best to avoid

12   any hiccups in that discovery process.

13        That's all I have to say, Your Honor.  I'm sure

14   others will have things to say or characterizations to

15   make that I will be back to rebut if I need to, unless

16   you have any questions.

17        THE COURT:  Let me just ask you, on the NDA, is

18   it -- the remaining issue something you need me to be

19   involved in, or do you think it's going to get worked

20   out?

21        MR. FRIEDMAN:  I'm not sure.  It's on an

22   exceedingly narrow issue, Your Honor, and I'm hopeful,

23   since I believe what we have made is an eminently

24   reasonable proposal to the Committees as to how to

25   handle that issue, it can be worked out.  If it can't,

1    as I said, I'm happy to come back up and rebut anything

2    that's been said and explain why the approach we're

3    taking is the right one.

4          THE COURT:  All right.  So, before we end today,

5    we ought to have a schedule for that because I think it

6    ought to be resolved, and maybe we can do it on the

7    paper, maybe we can do it on phone.  I don't know that

8    everybody needs to come back, but if we're that close,

9    it ought to get done.

10         MR. FRIEDMAN:  We agree.  We'd be happy to have

11   a telephonic conference, if necessary.  Look, I'm sure,

12   Your Honor, that other people will have comments about,

13   you know, issues that they perceive.  And, frankly, I

14   don't think any of the issues that you may hear about

15   are actually ripe for decision today, so we'll -- you

16   know, to the extent we need to come back or have a

17   hearing, we'll do what we need to do.

18         THE COURT:  I'm here.  You're always welcome.

19         MR. FRIEDMAN:  Thank you, Your Honor.

20         THE COURT:  All right.

21         Oversight Board?  Anybody want to tell me what

22   the update is?

23         MR. YATES:  Your Honor, it's Farrington Yates

24   with Kobre & Kim in New York.  As a preliminary matter,

25   I'm not admitted in this District, so the Clerk asked

1    that I make that -- make you aware of that and seek

2    admission pro hac for purposes of the hearing today.

3            THE COURT:   Any objections?

4            We usually make you pay the fee before we allow

5    you to talk, but I think we'll allow you to talk today.

6            MR. YATES:   Thank you.   I appreciate the

7    courtesy, Your Honor.   I swear we're good for it.

8            So, in response to the order that was issued by

9    the Court from the last hearing, the Independent

10   Investigator has filed a statement addressing the

11   concerns that were raised by the Court and also

12   addressing with detail some of the very specific

13   requests that were made with respect to search terms,

14   custodians and where we are with respect to ongoing

15   productions vis-a-vis third parties currently.

16           I wanted to caution the Court, Your Honor, that,

17   as we filed this, we were careful to keep the

18   witnesses -- to keep from contaminating the witnesses.

19   So, with respect to Popular, they only saw the exhibit

20   that was relevant to them.   With respect to Santander,

21   they only saw the exhibit that was relevant to them,

22   Exhibit B.   Same with GDB/AAFAF, which was Exhibit C.

23   And then the Committees have seen all of the exhibits,

24   A through E.

25           So, with respect to the report, we have shared

1   with both Committees the search terms and custodians

2   that we have utilized when doing our document discovery

3   with respect to Santander, Popular and GDB.  So, we had

4   the opportunity to speak with counsel for both on

5   Friday after our filing to solicit any additional input

6   or further guidance in light of the filings as far as

7   what else they would suggest as far as what we need to

8   do going forward.

9         We also made clear that, even though we are

10  starting the process to file and prepare a final

11  report, there is time, where we are continuing to

12  receive documents from various witnesses.  We can go

13  back.  We intend to go back and interview some

14  witnesses again as the process has continued, and so we

15  do actively solicit their input with respect to any

16  remaining matters.  So, with respect to your order, I

17  believe that we have responded as you requested with

18  respect to Popular, Santander and GDB.

19        With respect to the fourth category, which is

20  productions that are coming from third parties, we are

21  subject to nondisclosure agreements with each.  We have

22  asked that they allow us to disclose to the Committees

23  any materials produced to us that have been identified

24  or characterized as confidential.  They have all

25  refused.  And so, we have the documents, and our intent

1   was -- you asked for our position -- we'll not disclose

2   the search terms or the custodians used in order to

3   generate that production absent their consent or absent

4   a Court order, and we may talk about that a little

5   later on when -- I know you asked specifically about an

6   exit plan.

7         Then, with respect to third parties that have

8   produced to us that have allowed us to produce to the

9   Committees, that is Exhibit E, and there is just a

10   handful, and it's mostly addressed towards documents

11   that have already been made public, so they're already

12   in the public domain.

13         So, with respect to the documents that are

14   housed with respect to the third parties, counsel for

15   the Oversight Board referenced at the last hearing an

16   exit plan, and the Court requested that we, the

17   Independent Investigator, comment on that, specifically

18   and particularly the timing.  And so what we stated and

19   what we intend to do is something that is fairly

20   customary with respect to examiners and bankruptcy

21   cases, even though we are not in the Title III case;

22   we're operating in Title I, but we thought that the

23   procedures provided guidance on how to proceed.

24         And so what we intend to do, because we really

25   don't have any sort of an issue or an interest in

1    keeping materials away from a particular party or

2    resolving any sorts of disputes about what needs to be

3    disclosed and what is not disclosed, and so our

4    intention was to file a procedure, motion, that would

5    authorize us to put these materials into a depository.

6    Subject to whatever NBAs or other agreements are in

7    place, they would be put there and preserved.

8         As part of that process, then any party or party

9    in interest, committees, creditors, et cetera, that

10   want access to those documents, they come to Court and

11   ask for them, and if there's any disputes about whether

12   they're entitled to them or not, then the Court can

13   address those issues then.

14        As part of the procedures as well, we talked

15   about confidentiality procedural process.  Although we

16   have NDAs that -- with all of these parties that

17   provide for the Independent Investigator broad

18   disclosure rights, if there is a particular specific

19   attribution to a witness or something that a witness

20   has identified as being particularly critical or

21   confidential, we would give them notice and give them

22   an opportunity to come in and ask that, that statement

23   not be published.

24        And we of course would be taking a position

25   consistent with our mandate, which would be we need to

1    publish a final report that talks about the issues that

2    have already been addressed here for the good of the

3    people of Puerto Rico so that they have the benefit of

4    our investigation of what may have happened in the past

5    and what sort of recommendations we will make for the

6    future.

7         THE COURT:  So, do you anticipate filing on

8    July 3rd a proposal for the -- what the exit plan would

9    look like, and then we would have some time before the

10   report is issued to sort of finalize that process as

11   well, or do you expect to negotiate with the others

12   before you file on July 3rd?

13        MR. YATES:  Sure.  I think it's a bit of both,

14   to be honest with you.  Our deadline for our purposes

15   is July 3rd so that we can have the relief granted and

16   procedures approved by the end of July.  That

17   corresponds with our publishing the final report, which

18   we said would be happening at the end of summer.

19        I know that the Committees have asked that they

20   provide input into any motion that we file.  Of course

21   we will be talking with them about the process.  In

22   bankruptcy cases and others, they are actively

23   involved, so it was always our intention to bring them

24   into the discussion.

25        What I would expect is the plan will be -- the

1    exit plan would be reflected in the motion, and from

2    the time it's filed until the time it's heard and

3    approved, there would be opportunity for parties to

4    come to us and ask for changes, modifications,

5    et cetera.  As we've stated, what our intention is with

6    respect to documents, et cetera, to the extent that

7    parties want access or if parties want to prevent

8    access, I assume that they will step forward as well.

9          So, what we're trying to do is corral the

10   process and all of these competing interests into one

11   process that will be resolved in July so that, when the

12   report is published, and we said at the end of summer,

13   it will all be in place.

14         THE COURT:  So, does it -- I guess one of the

15   things we'll talk about today is whether it makes sense

16   to aim for that final date at the omni, which is

17   July 24th, something like that?

18         MR. YATES:  That's right, Your Honor.  So, I

19   wanted -- that invites one issue.  So, the question is:

20   Where does the special -- the Independent Investigator

21   file the motion; right?

22         As I indicated previously, we're operating

23   in Title I under PROMESA, and everybody's here in

24   Title III in the restructuring case, and so our client

25   has not decided affirmatively whether we should file

1    here in the Title III proceeding or in the Title under

2    Title I.  I don't think it matters either way,

3    Your Honor, and I don't think it impacts the timing at

4    all, and here's the reason why:  So, if we file under

5    Title I, we would need to file the motion with the

6    District Court for Puerto Rico.  We would certainly

7    advise them of the related proceedings with respect to

8    the Title III restructuring, and then the Court would

9    decide what to do with the motion next.

10          So, we expect that, whatever that decision is,

11   we will have a hearing to resolve any and all of these

12   issues prior to July, the end of July, because we'll be

13   giving notice to all of the affected parties one way or

14   the other, so we don't think this affects timing.

15   We've stated in our Statement of Position that we're

16   committed to filing this by the 3rd of July, and we

17   intend to have it heard either in the District Court of

18   Puerto Rico or at the omnibus, if that's where it

19   ultimately winds up, prior to the conclusion of July.

20          THE COURT:  Okay.  I guess my -- I haven't

21   really thought about where it's appropriately filed,

22   and you'll have to make that initial decision, but I

23   guess for our purposes, it's a process that we need to

24   finalize around the time of the omni.  So, my guess is

25   it's going to be on the agenda one way or another.

1    Whether it's actually formalizing the exit plan or

2    dealing it within the context of a 2004, I don't know,

3    but I think we need to aim for that date as the final

4    and comments -- the comment period being before then.

5        MR. YATES: Absolutely, Your Honor. We hear

6    your -- we'll be sure to follow that schedule.

7        THE COURT: Okay. I'm good. I'm waiting for

8    the Committee to tell me all the things that we've

9    missed.

10        MR. YATES: I'll sit down, then. Thank you.

11        THE COURT: Thank you.

12        MR. DESPINS: Good afternoon, Your Honor.

13    Luc Despins with Paul Hastings on behalf of the

14    Official Committee. First, thank you very much for

15    modifying the start time of the hearing. Much

16    appreciated.

17        THE COURT: Is that for travel purposes?

18        MR. DESPINS: Yes.

19        THE COURT: Just so I know. I mean, it doesn't

20    matter to me, so in the future we'll keep it at 1:30.

21    That works better for everybody?

22        Okay.

23        MR. DESPINS: Sure.

24        Your Honor, the first thing -- so, you read the

25    landscape correctly. There are some issues remaining.

1   The entry of the order by Your Honor did facilitate the

2   process tremendously, and we appreciate that.  But let

3   me hit them one by one.

4        So, the first thing is that GDB says we've -- or

5   sorry -- the Investigator tells us that we have

6   received, the Committees have received production of

7   everything that's been produced to them by GDB.  And

8   that's not accurate technically, so let me explain why.

9        The way they proceeded is they -- GDB, or AAFAF,

10  gave access to their computer systems in a read-only

11  mode to the Investigator's lawyers.  So they went down

12  there, and they had tons of search terms, they ran

13  searches, and when you look at the documents that these

14  searches produced, it's hundreds of thousands of

15  documents.

16        They then reviewed those documents and decided,

17  We only need paper -- a subset in paper form of 5,700.

18  We'll take their number for granted for now.  But the

19  whole purpose of this is that the Committees could have

20  access to the same things that they had access to.  So

21  we're only having access to what they determine is

22  relevant.  So I'll give you -- to make this easy to

23  understand from a paper point of point of view, it's as

24  if there's a box with 100,000 pages of documents, they

25  selected what was of interest to them in that box, and

1      we're only seeing that second box.

2             So, obviously -- you know more about document

3      production than I do, but you know, a document is

4      produced if it's made available.  So, when they say

5      they've produced to us everything that has been

6      produced to them, that's not accurate because they saw

7      hundreds of thousands of documents more than what

8      they're giving us.

9             So, how do we fix that; right?  So I think that,

10     you know, we need to -- we'll work with them again

11     but -- to try to get access to other documents, not

12     only the ones they determine to be relevant, but that

13     needs to be fixed somehow because, otherwise, we're not

14     seeing the universe of documents they had, that were

15     technically produced to them.

16            THE COURT:  But what I don't want to have is a

17     total review of irrelevant materials.  And so part of

18     the rationale in my mind for ordering the production of

19     the search terms was to see if there was an appropriate

20     limitation.

21            The Commonwealth -- we just simply can't afford

22     to have hundreds of thousands of documents reviewed

23     multiple times if most of them are not relevant.  So

24     somehow we need to figure out the way that a review --

25     I understand what you're saying, that you don't want to

1   be limited to just the ones that were identified as

2   hard copy, but I'm not -- it doesn't make sense for us

3   to be reviewing hundreds of thousands of documents

4   again.

5          MR. DESPINS:  I understand that fully,

6   Your Honor.  If they had searched -- if they had shared

7   the search terms, you know, three months ago, as we

8   asked them, we wouldn't be in this predicament now.

9   But we'll try to find a way.  But it cannot be that

10   we're limited to the 5,700.  Oh, by the way, 60 percent

11   of the 5,700 are what I call phone books, meaning deal

12   documents that are -- most of them public, so if you

13   look at emails and all that, it's a very small portion

14   of that.  So, yes, we need to be cost-conscious.  We

15   can't review -- do the same review twice.

16          On the other hand, we can't be limited to what

17   they found of interest because there may be other

18   documents that are of interest.  So that's the first

19   issue, and I represent to the Court that we'll work on

20   that, but I think we need to continue the same concept

21   of the short leash that you've imposed, which is that

22   we need to be able to come back to Your Honor at some

23   point soon if we can't resolve that issue.  But that's

24   the first issue.

25          The second point is the exit plan, and we're

1    happy to see that they are on top of that issue, so it

2    is a kind of a TBD issue, but I need to address this

3    Title I versus Title III.  I understand where they're

4    coming from, but if this is filed in a Title I

5    proceeding, first of all, they would have to -- there's

6    no Title I proceeding pending anywhere -- right? -- as

7    opposed to the Title III proceedings are pending.

8    There's no Title I proceeding pending anywhere, so they

9    would have to start some kind of litigation.  We would

10   need to remove it to the Title III Court, and basically

11   we're setting up a morass of procedural motions that

12   will take forever.

13          I mean, I don't want to do what I am proposing

14   but there's a very easy way to do this, which is we

15   could serve a subpoena on the Investigator to say,

16   Produce everything you received, and of course he would

17   come back and say, No, I can't do that, I'm bound by

18   confidentiality, which is fine, and then the Title III

19   Court, which is you or Judge Swain, would resolve the

20   issue.

21          That's -- but to start some kind of proceeding

22   in another Puerto Rico District Court, because it

23   doesn't go to Judge Swain automatically or to you

24   automatically, will -- you know, in terms of fees,

25   that's going to create a lot of -- and I know what's

1    going to happen, they'll say, The Committees have no

2    standing in the Title I proceeding, and that's going to

3    take a life of its own.  So, I applaud the idea of an

4    exit plan, but to file this -- and I know they have not

5    made a final decision, I heard that, but to commence

6    this in a Title I fashion would be a procedural morass.

7         Next point, Your Honor:  There's an issue

8    floating, not for today, but I want to make sure

9    Your Honor has it, which is the issue of privileged

10   documents produced by the GDB to the Investigator.

11   There is an issue, we don't need to debate it, I'll

12   stipulate that GDB forcefully disagrees, but there's an

13   issue as to whether they waived the privilege by

14   producing it to the entity investigating them.  Not a

15   today issue, for later, but I want you to know that's

16   coming.

17        Now, let's talk about the NDA.  Assuming that

18   the issue that Mr. Friedman was referring to is what I

19   think it is, which is the issue that they want to

20   create a special category of documents that would not

21   be produced, that special category, and I've been

22   criticized for describing it in the past as the highly

23   damaging document category, so I will not use that, but

24   I'll quote from their language, which is that they

25   don't want to produce documents that would -- "if

1    necessary to prevent a risk of harm to the elected

2    Government of Puerto Rico in the exercise of its

3    political or governmental powers."  That's made out of

4    whole cloth.  There is no such privilege to withhold.

5         And what we've said about this is the following:

6    If you want to do that, which is a concept that does

7    not exist anywhere, we haven't heard of any case law to

8    that effect -- and by the way, you've been dealing for

9    the last four or five months with the other 2004

10   discovery; you remember that?  There's never been, to

11   my knowledge, ever a mention of that category of

12   documents that could be withheld, never.

13        And they're telling us here that they have not

14   identified any such document, but there could be some.

15   This is, like, August 15th.  I'll come back to it in a

16   second.  My gut tells me the reason they're fighting

17   for this is because there are such documents that are

18   problematic.  Do I know that?  No.  But the fact that

19   there has been no request for that special category in

20   the other 2004 tells me that there's something peculiar

21   about what we're going to find in this discovery.

22        So, that's the issue, Your Honor.  And the

23   Committee's view is there's no basis in law to withhold

24   documents like this.  We're sensitive to the issue, so

25   we're proposing that, in preliminary, they would have

1    to produce them "attorneys' eyes only" so that there's

2    no risk of leaks in Puerto Rico if there's something

3    really damaging because that means we would get them,

4    all these things, or Jenner & Block, and we would be

5    under strict instructions not to share it with our

6    clients as a stop-gap measure.

7         But the concept that somehow they can just

8    withhold, prepare a log, and then we have to duke it

9    out as to whether they have a right to withhold that

10   is, frankly, a concept I've never heard of before, and

11   I don't understand what would be the basis for that

12   here.  So that's the issue on the NDA.

13        THE COURT:  Let me just ask on that while it's

14   fresh in my mind.  Right now, there are no such

15   documents?

16        MR. FRIEDMAN:  Your Honor, Upton Sinclair once

17   said that it's difficult to get someone to understand

18   something if their livelihood depends on them or their

19   fees depends on them not understanding them, which is

20   what I think you just heard.

21        THE COURT:  No, no, no, no, I don't want that

22   kind of argument.

23        MR. FRIEDMAN:  The issue is -- the speculation

24   we just you just heard, Your Honor, is made up.  The

25   issue here, why there is a 2004 issue in this case, as

1    opposed to the financial disclosure information in the

2    other Rule 2004, is just very simple.  One conducts

3    an investigation -- one relates to an investigation of

4    past activity, which is going to -- potentially could

5    deal with claims against people, an investigation the

6    Puerto Rico Department of Justice was at one point

7    going to conduct.  It's just an entirely different kind

8    of investigation.

9         So, to speculate that because, in one kind of

10   investigation, you ask for a provision which would

11   permit Puerto Rico, if it believes it's necessary, to

12   deal with some sensitive investigative topic with a

13   co-equal branch of the Puerto Rico Government, as the

14   Oversight Board is, to not have to produce it to -- of

15   course, let's just remember, this is not the GDB

16   Creditors' Committee; this is the Commonwealth

17   Creditors' Committee -- so to a complete stranger to

18   GDB is not at all inappropriate.

19        In fact, it's entirely appropriate, Your Honor,

20   and as we've said, we've identified, in the 5,700

21   documents to this point, nothing.  There's a -- I don't

22   know how many more documents there are.  It's not our

23   intention to put anything on this log, but if we do,

24   we'll identify what it is in a log, and we will carry

25   the burden, before it goes to anybody outside the

1    Puerto Rico Government, of --

2         THE COURT:  So, it seems to me -- I hate

3    fighting over nonexisting documents, I really do, and I

4    seem to spend a lot of time doing in a lot of my cases.

5    So, let me make it clear.  You need to sign the NDA on

6    all the terms that you've agreed on.  If this is the

7    one that you haven't agreed on, then there's a

8    provision that says they reserve the right to fight

9    this out later.

10        But this shouldn't stop the production of the

11   documents under an agreed-upon NDA; all right?  I don't

12   want to make a ruling on the applicability of a

13   privilege that may or may not exist in an abstract.  So

14   why don't you just add that final paragraph that says,

15   GDB reserves the right to claim whatever, at which

16   point, the Court will determine whether it's

17   appropriately included in the NDA.

18        MR. DESPINS:  Well, it's their burden to come to

19   Court to seek a ruling from Your Honor that it is

20   privileged.

21        MR. FRIEDMAN:  Well, we haven't said privileged,

22   Your Honor.  We're not asserting necessarily a

23   privilege; we're asserting a condition we think is

24   appropriate under the circumstances, which, again, we

25   have not identified a document to which that would

1    apply.  But, yes, we would bear the burden of saying to

2    the Court, This is why the document should not go

3    outside the Government.

4              THE COURT:  So, put it in terms of they'll seek

5    a protective order for producing the --

6              MR. DESPINS:  For not producing.

7              THE COURT:  -- for not producing the documents;

8    all right?  But other than that, if you've agreed on

9    all the other terms of the NDA, it ought to be

10   signed --

11             MR. DESPINS:  Okay.  All right.

12             THE COURT:  -- okay?

13             MR. DESPINS:  We just don't want to create, you

14   know, categories that we don't believe exist under the

15   existing law, but okay.

16             THE COURT:  You may be right or not, I don't

17   know, but I'm not going to give you a ruling in the

18   abstract on almost anything but certainly not on this.

19             MR. DESPINS:  Okay.  Then, the next issue is the

20   issue of production by third parties, Your Honor, so

21   we're talking about non-GDB, non-Banco Popular and

22   non-Santander, and there are a bunch of issues there.

23   The first thing is the Investigator says that the

24   search terms they used for those parties may be

25   confidential.

1          You know, we don't know how that's the case, but

2     the point is that you wanted to avoid duplication, so

3     if we don't know what the search terms are, we don't

4     know how to give them -- or correct the search terms.

5     If the producing parties are willing to live with that,

6     you know, that's -- that doesn't bother us.  I think

7     it's going to delay the process, but we don't think

8     that giving us the search terms would breach an NDA

9     with a bank because we've seen the other search terms

10    as to -- so it's hard to believe that the use of, I

11    don't know, the term "insolvency" as a search term

12    somehow would violate an NDA.

13         But the point is the consequence of not forcing

14    them to give us the search terms on the third parties

15    is that we may be back here August 15th with -- you

16    know, it's not going to be as efficient as Your Honor

17    anticipated.  So that's the first point.

18         The second point is that it appears that a

19    number of third parties were not provided search terms,

20    meaning they were told, This is what we want

21    generically, so produce what you have on that, as

22    opposed to telling them, Go into your email system and

23    do the following search.  And, well, the problem with

24    that is of course we're relying a hundred percent on

25    the third party to do what's right, and you know, it is

1    what it is, but I think that's -- what I mean by that

2    is that, on August 15th, I don't think we're going to

3    be necessarily asking the same thing.  We may ask them

4    to run specific search terms, so they may say, We've

5    produced all of that already, which is fine, but the

6    point is that I want you to know there's a number of

7    them where no search terms were used.

8         The second part about this list of third parties

9    is that -- and you have that -- is that a number of

10   them, I count five of them, those are the folks --

11   right? -- who said, No, don't give it to the Committee,

12   don't -- to the Committees in plural, these are people

13   who are Court-retained in this case, meaning the first

14   one is local --

15        THE COURT:  I want to make sure that we're not

16   going into any sealed information right now.  So you

17   have concerns about some of the categories of people,

18   but let me go back a little bit more, though, to the

19   2004 motion.  That was to the banks.  I don't remember

20   them dealing with the third parties.

21        MR. DESPINS:  That's correct.  Yeah, but it

22   doesn't --

23        THE COURT:  No.  I just want to make sure that,

24   if we're focusing on the 2004 motion, that was to the

25   three financial institutions.

1        MR. DESPINS:  Correct, Your Honor, but --

2        THE COURT:  So now we're trying to make it

3   better so that, when the end of this report comes, it

4   comes as efficiently as possible.

5        MR. DESPINS:  This is the same thing as a

6   subpoena to the Investigator, meaning we can amend our

7   motion tomorrow and take that list and say, Give all

8   of -- it would be the same -- we can do that.  I mean,

9   I don't want to be tripped up in August by not having

10  amended our motion to include all those folks, but --

11       THE COURT:  You won't be tripped up in August.

12       MR. DESPINS:  Okay.

13       THE COURT:  I'm just trying to make sure that

14  we --

15       MR. DESPINS:  You're correct.

16       THE COURT:  -- move this as efficiently as

17  possible and that the big focus is on the three

18  financial --

19       MR. DESPINS:  You are correct.  But as to those

20  entities, the point I want to make, no need to mention

21  who they are, but there are five of them that are

22  Court-retained professionals getting paid in this case.

23  So those are the folks who are saying, No, I don't want

24  to share the documents that I have.  These are people

25  who were instrumental in structuring these transactions

1    in the past, and they're saying, No, I don't want to

2    share our documents with the Committee.

3         I mean, that's a bizarre set of facts,

4    Your Honor, that Court-retained professionals would

5    refuse to share the documents that they have from prior

6    relationships with the Government with the Committee.

7         THE COURT:  So, have you had the opportunity to

8    have this conversation with --

9         MR. DESPINS:  Well, we have, meaning that we've

10   asked for the documents, and you've heard Mr. Yates

11   saying basically, These people -- we've asked them,

12   those third parties, to provide -- to allow us to share

13   with the Committees, and they said no.  My point is

14   that those -- five of those at least are right before

15   this Court, or at least before Judge Swain, as

16   professionals getting paid by the estate, and they're

17   saying, No, I don't want to share documents.

18        That's bizarre, and that should not happen.  At

19   the very least, these people should be told that, you

20   know, if they want to continue their involvement in the

21   case, they should produce documents -- they should

22   allow the Investigator to share these documents.  As I

23   said, these are people who were instrumental in

24   structuring a lot of these documents pre-bankruptcy.

25   So, that's another issue with the third parties.

1          The next issue with the third parties is --

2     well, we've talked about this -- we don't have the

3     search terms.  There are some -- and we'll provide this

4     to Mr. Yates.  There are some banks that were involved

5     as underwriters and who are not on that list.  No need

6     to talk about that, but we'll give that to Mr. Yates

7     after the hearing.

8          And next item, Your Honor, is August 15th, and

9     I -- you know, I said at the last hearing nobody was

10    talking about August 15th, but Mr. Mungovan said,

11    Oh, no.  It's August 15th.  Now we're hearing the

12    end of the summer.  End of the summer is I think

13    September 21st.  So we have this -- I think that's

14    technically the end of the summer.

15         THE COURT:  I'm waiting for summer to start.

16         MR. DESPINS:  Okay.  So, the point here is that

17    we have this motion for asking the Court to make some

18    determination as of August 15th, and we're asking the

19    Court again to rule on that because September 21st is a

20    full month after that, plus it's just teeing up further

21    discovery fighting for the next month after that, so --

22    by the way, I'm not against the Investigator taking

23    their time to write the best report that they can, so

24    I'm not trying to rush them to September 21st, and they

25    have their own objective, I applaud that; but, on the

1    other hand, this doesn't work anymore in terms of

2    starting our own process.  So that's -- so there's the

3    August 15th date.

4         Now, the search terms and custodian, Your Honor,

5    we've made some comments on the Friday call with -- or

6    not we, I was not on the call, but some colleagues of

7    mine have made some suggestions.  We will have more.

8    There's a number of terms that should be researched,

9    and so that will happen.  But the bottom line,

10   Your Honor, is that we need to deal with August 15th,

11   we need -- the production by the other parties, we need

12   to somehow at least facilitate that with respect to

13   Court-retained professionals.  They shouldn't have any

14   discretion to withhold this from the Committee in the

15   case.

16        And then the other issues I raised, which is the

17   access to the GDB document, not the 5,700 that were

18   produced but another subset -- not subset -- another

19   set of the documents that's broader than that.  And on

20   that, we will work with the parties to come up with a

21   rational approach that's cost-effective, but I am

22   asking the Court to keep that on a short leash.

23   Otherwise, we'll be here August 15th arguing about the

24   same thing.

25        THE COURT:  All right.  Before I hear a response

1        to it, does the Retirees' Committee want to chime in?

2                MR. RAIFORD:  Please.

3                The beauty of going last is that I get the

4        benefit of what everyone else thought, but then I have

5        the burden of not repeating what everyone else just

6        said.  So I will start with this:  On last Friday, the

7        Retiree Committee had a nice call with Kobre & Kim, as

8        we usually do on Fridays, and we made some suggestions

9        later on in the afternoon via email, all designed to

10       achieve I think what Your Honor brought up originally

11       in November, which was, How can we do this where we're

12       not all doing the same thing over and over again?  It

13       doesn't make sense financially, and quite frankly, I

14       would pity the poor souls at Jenner who had to go and

15       look through millions of documents that the

16       Investigator already looked at.  We have no interest in

17       reinventing the wheel.

18               So, we made several suggestions.  One was to

19       make sure that the draft of the exit plan is given to

20       both Committees before July 3rd.  I heard -- Mr. Yates,

21       who's been very helpful throughout all this process,

22       said we'll be included in discussions, and that is

23       wonderful.  I just want to make sure that by that he

24       also means the Committees will see the actual document

25       before it's filed because I do think we can give some

1    insight that would be helpful.  Now, they may not agree

2    with everything we want, but I think there are some

3    things that they can live with, and I think it would

4    shorten the time that we would spend fighting over the

5    exact terminology and what is in the exit plan.

6         Other things that we wanted was that, at least

7    maybe in the data room that they're going to provide,

8    that they include the exact document request that they

9    made, not just for Santander, Popular and GDB, but

10   everyone; who are the custodians for everyone; and

11   other types of things, again, just to make sure that

12   the Committees have as much knowledge as they need to

13   figure out if -- what, if anything, else we think we

14   need to do.

15        And that -- and another point that we brought up

16   was, and it's been brought up a little earlier, is

17   there are tens of thousands of documents that have been

18   produced to the Investigator, and those individuals and

19   entities have refused to allow us or the other

20   Committee to look at them.

21        THE COURT:  So, these are the third-party

22   documents?

23        MR. RAIFORD:  These are the third parties.  And

24   we just want confirmation as well that all of those

25   documents will be in the database when it's produced on

1   July 3rd or whenever because, if it's not, then I think

2   that it really starts to minimize the effectiveness of

3   the investigation if the parties, not just the

4   Committees, but other parties in interest don't have an

5   opportunity to look at, quite frankly, a vast ocean of

6   information that at least the Investigator found to be

7   relevant to his investigation.

8        I won't beat to death the GDB issue, but I think

9   Your Honor's leaning to what you told us to do, which

10   is, Just sign the thing and then carve out this

11   confidential category, and GDB can come to Your Honor

12   if they ever want to label something like that, and

13   then we can decide then whether it should be withheld

14   or not is -- we gave GDB two options today, and I think

15   that was Plan B.  So the Retiree --

16        THE COURT:  It should have been Plan A.

17        MR. RAIFORD:  Yeah, right.  So the Retiree

18   Committee would support that compromise.

19        I think for -- that is it because, at some

20   point, my fellow attorneys have done an admirable job

21   hitting all the other other issues, so I'll shut up.

22        THE COURT:  Thank you.

23        Mr. Friedman.

24        MR. FRIEDMAN:  Thank you, Your Honor.

25   Peter Friedman from O'Melveny & Myers.

1          So, we agree that the NDA should be executed in

2     exact accordance with the way you've laid it out.  Just

3     so you know, Your Honor, one of the provisions that

4     we've agreed to in the NDA is that issues, bilateral

5     issues -- or I guess trilateral issues between

6     AAFAF/GDB on the one hand and the Retiree Committee and

7     the Creditors' Committee on the other hand should be

8     heard in the Title III case.  So, one way or another,

9     our issues will be resolved before you or Judge Swain,

10    as Your Honors see fit.

11          Your Honor, with respect to the documents, other

12    than those which have been relied upon by Kobre & Kim

13    in connection with the investigation, we have a real

14    issue with having those produced or made available to

15    the Unsecured Creditors' Committee and the Retirees'

16    Committee.  You have to understand, this production and

17    this document-sharing with the Oversight Board was done

18    not subject to a subpoena but subject to a statutory

19    right that's much broader than any subpoena.

20          Under 104(c) of PROMESA, which gives the

21    Oversight Board, when necessary to conduct its work,

22    the right to basically go to somebody like Mr. Sobrino,

23    the head of a territorial instrumentality and say, Let

24    us see all of your documents, let us essentially have

25    access to your servers.  Now, there are many

1    circumstances in which that might not be necessary or

2    appropriate, but it's clearly appropriate in the

3    context of this investigation, which was statutorily

4    mandated under PROMESA.

5         And so, to argue either that that's some sort of

6    waiver or that the Unsecured Creditors' Committee

7    should be entitled to all of those materials just

8    because we were complying with a statutory obligation

9    imposed by Congress I think creates all kinds of

10   problems.  For one, because of that and other reasons,

11   which, you know, we'll explain to you if necessary, you

12   know, the documents which Kobre & Kim don't have in

13   their 5,700 but may have otherwise looked at we didn't

14   do a privilege screen on because, as I said, for

15   multiple reasons, we didn't have to.  If we have to

16   provide those to the Committee, again, not GDB's

17   committee, but a different entity's creditors'

18   committee --

19        THE COURT:  Can you just back up for me for a

20   minute, though?  So, I understand that the Investigator

21   had full access to your records.

22        MR. FRIEDMAN:  Yes.

23        THE COURT:  I'm not talking about that.  But

24   then they did have search terms.  Did the search terms

25   end up with the 5,700, or is there a subsequent

1          production of documents?

2                  MR. FRIEDMAN:  My understanding is there was a

3          subsequent cut-down, but there are an extraordinarily

4          large number of general search term hits, which have

5          never been reviewed for privilege, which have never

6          been reviewed by GDB.  The cost of doing that and then

7          having two Committees look at them in the context of an

8          investigation -- remember what we're talking about.

9          We're talking about a potential investigation that the

10         Oversight Board can easily conduct itself if it so

11         chooses.

12                 So, to give the Unsecured Creditors' Committee

13         and the Retirees' Committee license to spend an

14         inordinate amount of additional money in terms of

15         investigation, which we don't even think is warranted

16         at this stage, you know, is, in our opinion, completely

17         inappropriate.  Remember, the Court has, as I'm sure

18         you know, the Court has denied the Rule 2004 motions

19         and said, A, let's see what happens with this

20         investigation, but we want you to basically be able to

21         follow along with what the Committee -- with what the

22         Special Investigative Committee, Kobre & Kim, is doing.

23                 And I think giving them -- giving the

24         Committees, the documents, other than privileged ones,

25         that are being actually relied upon more than -- is

1     more than sufficient for that purpose, and to let them

2     decide from a bunch of search terms what the Committees

3     think is relevant is tantamount to giving them their

4     own  Rule 2004 investigation, again, which -- for a

5     highly uncertain purpose; right?  Again, the Oversight

6     Board is the party that, in the Title III, is permitted

7     to object to claims in the first instance.  It's the

8     Oversight Board that's going to be pursuing causes of

9     action, if it's appropriate.

10          At this point, it's simply economically wasteful

11    to put on --  to force the Government to be required to

12    engage in additional document productions.  I mean, you

13    know all the other document productions that are going

14    on.  And so, you know, let the report come out, let the

15    Oversight Board decide what it wants to do with respect

16    to causes of action or objections to claims, let's see

17    what they ask for us in the context of pursuing any

18    causes of action or defenses to any claims, instead of

19    having to answer to multiple parties routing around in

20    the Government's documents and foisting more costs on

21    us.  You know, if I sound impassioned about this, I am.

22    I think it's -- at this point, forcing us to do more

23    with respect to those documents would be wasteful and

24    inefficient.

25          THE COURT:  So, the way I generally envision

1      this is that the Committees will be aware of the scope

2      of the information that has been produced, that they

3      would await the report, assuming we're dealing with

4      mid-August and not September 25th -- 21st, okay -- and

5      that, at that point, if the Committees required

6      additional document requests, they would need to

7      justify it and, as I talked about last time, some sort

8      of budget on it.

9            But I don't want to have that process derailed

10     with a fight over what was actually produced, like, I

11     don't want you to be able to say, I've already produced

12     that and then have the Committee say to me, I can't see

13     that, that was produced because I don't have the search

14     terms or whatever it is.  And that's the balance that

15     I'm trying to --

16           MR. FRIEDMAN:  Your Honor, we're okay with our

17     search terms being produced.  You know, maybe other

18     people have an issue with that.  We don't have an issue

19     with that.  We're fine with producing our search terms

20     to the Committee.  We are fine producing, you know, the

21     custodians whose inboxes we provided to the Oversight

22     Board's Special Investigator.  I don't have a problem

23     with that either.

24           You know, I'm willing to give the Committee the

25     knowledge as to how the -- you know, as to what we

1    gave.  Mr. Yates's client has given the search terms.

2    I assume -- I mean, Mr. Yates has told me he engages in

3    dialogue with the Committees before witness interviews

4    and otherwise so they can have insight into how they

5    got to the 5,700, why they believe those were relevant

6    and important.  And, you know, again, we were a little

7    on the late side in doing it, but I think we actually

8    have done what we're supposed to do and would ask that

9    the Court, at this point, not order anything more.

10            THE COURT:  Mr. Yates.

11            MR. YATES:  Thank you, Your Honor.

12            I won't address the issue about privilege

13   vis-a-vis GDB.  The statute, PROMESA, says what it

14   says, and so that is for others to argue.  I think the

15   key point that I wanted to make was to really refocus

16   the Court on the exit plan because a lot of the

17   disputes or issues or questions that are being raised,

18   we wanted to create a single forum whereby these issues

19   could be addressed.  And so things like, What happens

20   to the third-party documents?  I've already said we

21   intend to put them into the depository.  Will that

22   include search terms and custodians?  We can make that

23   part of the motion.  So this is, again, our attempt to

24   corral and collar all of these specific issues into one

25   process.

1          Now, the notion that filing in a District Court,

2     Federal District COURT of Puerto Rico, is going to

3     create some sort of procedural red herring, I think

4     that's misplaced.  We can start a miscellaneous

5     proceeding there, we could advise about these

6     proceedings, the Title III cases, and we want a

7     resolution to these issues.  And so, if we file with

8     the United States District Court, the need to remove or

9     any of these other procedural pathways really obviates

10    what we're trying to do, which is to, in an efficient

11    way and a timely way, address these issues, that they

12    are resolved by the end of July.

13         We put in our response that we're not talking

14    September 21st.  This is -- this date keeps getting

15    thrown up like it keeps moving, and we've been pretty

16    clear with our commitment on when this report will be

17    produced for everyone.

18         So, just to reiterate, we don't have kind of an

19    interest in trying to keep people from documents or

20    gaining access, et cetera.  That's not our job.  Our

21    job is to find facts, produce a report to benefit the

22    people of Puerto Rico, and then these fights over who

23    gets what is really for another day because they'll be

24    used in other ways, that this Court ultimately is going

25    to have to decide who gets what.

1     THE COURT:  Let me ask you this, though:  On

2     what goes into this document room, I hear part of the

3     fight being which GDB documents would be included --

4          MR. YATES:  Right.

5          THE COURT:  -- in what you believe has been

6     produced to be available to others, and I'm assuming

7     that's not their whole computer system.

8          MR. YATES:  That's correct, Your Honor.  So, to

9     explain our process, we provided search terms, we have

10    provided those search terms to both Committees.  We

11    asked for them to produce documents, paper documents to

12    us, which they did.  Some of them include privileged

13    documents.  That's already been addressed here.  And so

14    we have those, and I understand the non-privileged

15    documents have been produced to the Committees.

16         So, this undefined, We must have asked for

17    something within the million-five using these search

18    terms and reviewed and excluded as being irrelevant or

19    for whatever reason, those documents, I can -- we can

20    construct the process in order to give the Committees

21    comfort that they are getting what we relied on as we

22    produce and finalize our report.

23         So, the issue about how we're different under

24    PROMESA, as opposed to what the Committee may get or

25    what they say they're entitled to, is an issue that,

1    again, if it needs to be addressed, we thought it would

2    be addressed as part of this process, this exit plan,

3    to bring all of these issues together precisely so that

4    it's concluded and resolved by the end of July.

5          THE COURT:  So, does it make sense to say, You

6    need to meet and confer now, since July 3rd is coming

7    up, to at least ensure that the proposed exit plan

8    addresses all of the issues that the Committees have,

9    especially with respect to the third parties?

10         So, I'm not sure you're going to be able to come

11   to a resolution of what it is, but at least you will

12   have a proposal, and that is a good framework for

13   talking about I guess all of these things, sort of what

14   is the scope of the GDB documents and -- so, I guess

15   what I'm saying to the Committees is, using the exit

16   plan, the burden is kind of on you at this point to say

17   to the Investigator, We want the exit plan and the

18   objections process that the exit plan is going to come

19   up with to have room in it to address the following, be

20   it privilege, be it the scope of the documents, be it

21   third parties.

22         How do we deal with the third-party issues?  Or

23   do you say to him, I want the third parties to have --

24   these five categories should absolutely be produced,

25   and you can either say yes or no.  I mean, I think it

1    makes sense to have the exit plan be the process for

2    addressing things.

3        On the other hand, I don't want to wait until

4    August 15th to resolve some of these issues if they are

5    legal issues that could be resolved before then.  So,

6    now that I've said that, I don't actually know the

7    right way to do this.

8        MR. YATES:  So, Your Honor, I would suggest, if

9    I could, that we stick with what was envisioned, which

10    was we are committed to filing this motion by July 3rd.

11    That gives us an opportunity, because we've said we

12    always intended to consult with both Committees with

13    respect to the plan.  I can confirm to the Retiree

14    Committee that certainly both Committees would receive

15    drafts before filing, and in that way, hopefully, at

16    least identify for a Court what issues are extant and

17    what needs to be addressed as part of resolving any

18    remaining disputes about who gets access to what.

19        THE COURT:  So, does it make sense to say -- I

20    always like sending you home with homework -- coming up

21    with a schedule for -- first of all, you do need to

22    meet and confer about what's included in the plan, in

23    the exit plan.

24        The NDA with GDB I think we've resolved.  You

25    need to sign that, and you can have this category of --

1    to be presented to the Court in the form of a motion

2    for a protective order, if appropriate; okay?

3          MR. YATES:  Okay.

4          THE COURT:  So, why don't I ask you to report

5    back within a week on that, that that's been signed?

6    Is that okay?

7          MR. DESPINS:  Sure.

8          MR. FRIEDMAN:  Absolutely.

9          THE COURT:  July -- do you need a date for

10    meeting and conferring before July 3rd, or is -- let me

11    ask the Committees.

12          MR. YATES:  I don't think so, Your Honor.

13          MR. RAIFORD:  I don't think so.

14          THE COURT:  Is that just something that I can

15    just smile at you nice and say it'll get done?

16          MR. YATES:  We hear you loudly and clearly,

17    Your Honor.

18          THE COURT:  Okay, so that'll be done.  And

19    that'll identify the items in the exit plan.

20          For the Unsecured Creditors' Committee, do you

21    want a schedule for addressing some of these other

22    issues?  The privilege log is coming out -- what? --

23    Wednesday?

24          MR. FRIEDMAN:  Our anticipation -- yes,

25    Your Honor, we'll have a categorical log.

1    THE COURT:  Do you -- I guess I await a motion

2    to compel off the privilege log, if there are certain

3    waiver issues or specific documents or whatever.

4    Otherwise -- I mean, I'm ready to address it, but it

5    needs to be in the context of a motion.

6    The briefing on the privilege log, I will let

7    you all -- on the exit plan, I mean, you can come up

8    with a schedule, but the goal will be, whether you file

9    it in the Title I or the Title III, that this will be

10    on the omni, unless we all decide otherwise, so that's

11    the outside goal.  It may be in the context of the

12    2004, how do these documents get produced?

13    So, I'm not preventing you from filing the

14    Title I, I'm not taking an opinion one way or the other

15    on it, but I think that the production of those

16    documents is relevant to the resolution of the 2004

17    motion, so I think it's the same issue.  I'm not sure

18    where it comes up, but I think it does need to be

19    addressed in the context of our proceedings.

20    So, I need you all to come up with a briefing

21    schedule on that of there'll be an exit plan, there'll

22    be a response, I want some time to think about it, and

23    I want to see if we need discussion or if we can just

24    have it resolved before the omni or at -- or I'll hear

25    argument at the omni, if I need to; okay?

1          Who takes the lead on that?  Everybody's staring

2     at me.  The Committee?

3          MR. DESPINS:  Sure, we can do it.

4          THE COURT:  All right.  Would you do that?

5          So, what else -- a lot of your issues were to be

6     determined, as opposed to actually needing resolution.

7          Is there anything else that needs to be resolved

8     right now?

9          MR. DESPINS:  I would just say, Your Honor, that

10    I don't think the exit plan will resolve the issue of

11    us having access to what was produced.  I'm not talking

12    about paper produced but what they had access to.  That

13    issue, you know, we'll need to come back, Your Honor,

14    if we can't resolve it.  But I don't see how the -- you

15    know, how the Investigator can resolve that issue

16    through an exit plan because he can only give us the

17    documents that were -- that he actually -- the paper

18    documents that he has, which we have at this point, the

19    5,700 pages.

20         THE COURT:  So, the exit plan can have a

21    schedule in it for discussion of what should be

22    included in the room; all right?  And if that is a way

23    to join the issue, maybe that makes sense?

24         MR. DESPINS:  Okay.

25         MR. FRIEDMAN:  We'll talk it through,

1    Your Honor.

2          THE COURT:  But I do recognize that the exit

3    plan -- as part of the exit plan, there is an issue as

4    to which GDB documents are included.  I recognize -- I

5    hear that.  I'm leaving you to figure out the way to

6    present it to me.  I don't want to resolve it in an

7    abstract, nobody does, but the ultimate goal of this

8    is, again, that there will be an exit plan, and we'll

9    have that hopefully resolved by the end of the month

10   and that the next request for documents, I guess -- do

11   I leave this 2004 open?  Does that make the most sense?

12         MR. DESPINS:  Well, I think it should be

13   adjourned to the omnibus, Your Honor.

14         THE COURT:  All right.  I'll adjourn it till

15   then.

16         But then the next step would be what additional

17   discovery is necessary with support.  If there is a

18   change in the schedule, I'm hearing here that everybody

19   is still sort of aiming for -- are we saying

20   August 15th, or are we saying August 30th now?  What

21   are we saying?

22         MR. YATES:  We're saying August 15th,

23   Your Honor.

24         THE COURT:  All right.  If there is a change

25   from the August 15th, save everybody a lot of gray hair

1    and give notice -- all right? -- because, obviously, if

2    it's a day or two, it's one issue; if it's months, I

3    mean, I'm not ordering you to produce it, you do

4    whatever, but I think people need to know what it is,

5    and everybody is operating on the assumption right now

6    that we're in the August 15th timeframe --

7            MR. YATES:  Thank you, Your Honor.

8            THE COURT:  -- all right?

9            Anything else?  See you all in Puerto Rico?

10   Okay.  Thank you.

11           (Adjourned, 2:44 p.m.)

1

2                    C E R T I F I C A T I O N

3

4

5

6

7

8

9              I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

10    hereby certify that the foregoing pages are a true and

11    accurate transcription of my stenographic notes in the

12    above-entitled case.

13

14

15

16

17

18                    /s/ Debra D. Lajoie

19

20

21

22

23                    6/18/18

24

25