# GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

## Municipal Secondary Market Disclosure Information Cover Sheet
## Municipal Securities Rulemaking Board (MSRB)
## Electronic Municipal Market Access System (EMMA)

### Additional / Voluntary Event-Based Disclosure

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name:    **Government Development Bank for Puerto Rico (GDB)**

Other Obligated Person's Name (if any): 

Base CUSIP number(s):    **745177**

## TYPE OF INFORMATION PROVIDED:

A. ☐ **Amendment to Continuing Disclosure Undertaking**

B. ☐ **Change in Obligated Person**

C. ☐ **Notice to Investor Pursuant to Bond Documents**

D. ☐ **Communication from the Internal Revenue Service**

E. ☐ **Bid for Auction Rate and Other Securities**

F. ☐ **Capital or Other Financing Plan**

G. ☐ **Litigation / Enforcement Action**

H. ☐ **Change of Tender Agent.  Remarketing Agent or Other On-going Party**

I. ☐ **Derivative or Other Similar Transaction**

J. ☒ **Other Event-Based Disclosures:**  Enclosed is the draft Fourth Amendment (the "Fourth Amendment") to the Restructuring Support Agreement, dated May 15, 2017, by and among Government Development Bank for Puerto Rico ("GDB"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and the Supporting Bondholders party thereto ( the "RSA").  The draft Fourth Amendment attached hereto is supported by the GDB, AAFAF, and a significant portion of the creditors to the RSA.  The Fourth Amendment will be solicited for approval by all parties to the RSA and will not be effective until the Requisite Bondholders (as defined under the RSA) approve the Fourth Amendment.

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.

*/s/ Sebastián M. Torres Rodríguez*

Sebastián M. Torres Rodríguez
Puerto Rico Fiscal Agency and Financial Advisory Authority,
    as Fiscal Agent for the Commonwealth

Dated: March 26, 2018



**FOURTH AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT**, dated as of March [__], 2018 (this "**Amendment**"), is among the Government Development Bank for Puerto Rico ("**GDB**"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), and the Supporting Bondholders (as such term is defined in that certain Restructuring Support Agreement dated as of May 15, 2017, as amended by the First Amendment to Restructuring Support Agreement, dated October 20, 2017, and Second Amendment to Restructuring Support Agreement, dated December 20, 2017, and Third Amendment to Restructuring Support Agreement, dated March 20, 2018 (together with this Amendment, the "**Agreement**")).

Each of the signatories to the Agreement shall be referred to herein as a "**Party**" (and collectively referred to herein as the "**Parties**").

## RECITALS

**WHEREAS**, (a) at least a majority of the outstanding principal amount of the GDB Bonds held by Supporting Bondholders that are "cooperativas" insured by the Corporation for the Supervision and Insurance of Cooperatives in the Commonwealth of Puerto Rico as of the Amendment Effective Date (as defined below); (b) at least a majority of the outstanding principal amount of the GDB Bonds held by Supporting Bondholders domiciled in the Commonwealth of Puerto Rico of the Amendment Effective Date other than those described in the foregoing clause (a); (c) at least a majority of the outstanding principal amount of the GDB Bonds held by all Supporting Bondholders as of the Amendment Effective Date other than those described in the foregoing clauses (a) and (b); (d) GDB; and (e) AAFAF have agreed to amend the Agreement on the terms described in <u>Section 2</u> of this Amendment in accordance with Section 10 of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, by and through their undersigned counsel, hereto agree as follows:

SECTION 1.   <u>Certain Defined Terms</u>.  Capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the Agreement.

SECTION 2.   <u>Amendment to the Restructuring Support Agreement</u>.  On the Amendment Effective Date, the Agreement is hereby amended as follows:

(a)      Clauses 6(a)(iii) and 6(b)(v) of the Agreement are hereby amended and restated in their entirety to each read as follows:

"(iii) At 11:59 p.m. Eastern Time on June 8, 2018 unless solicitation of the Qualifying Modification has been completed in accordance with section 601(h)(1) of PROMESA."

(b)      Clauses 6(a)(iv) and 6(b)(vi) of the Agreement are hereby amended and restated in their entirety to each read as follows:

> "(iv) At 11:59 p.m. Eastern Time on June 28, 2018, unless the District Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to GDB, AAFAF, and the Requisite Bondholders."

(c)      the Restructuring Term Sheet attached as Exhibit A to the Agreement is hereby amended and replaced in its entirety by the Restructuring Term Sheet attached hereto as <u>Exhibit A</u>.

SECTION 3.   <u>Conditions Precedent to Effectiveness of This Amendment</u>.   This Amendment shall become effective as of the date (the "**Amendment Effective Date**") when GDB and AAFAF shall have received executed signature pages to this Amendment from the Requisite Bondholders.

SECTION 4.   <u>Representations and Warranties</u>.   Each of the Parties, by and through their undersigned counsel, hereby represents and warrants as to itself only that:

(a)      As of the date hereof and after giving effect to this Amendment, the representations and warranties made in the Agreement are true and correct in all material respects as if made on the date hereof (other any such representations and warranties that, by their terms, expressly refer to being made only as of a date other than the date hereof).

(b)      This Amendment has been duly executed and delivered by the advisors to each Material GDB Bondholder Group, GDB, and AAFAF, and is a legal, valid and binding obligation of each Party, enforceable against each Party in accordance with its terms, except as may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

SECTION 5.   <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)      This Amendment shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York and PROMESA, without giving effect to the conflict of laws principles thereof; provided that any issues addressing the fiduciary or statutory duties of GDB or its governing board shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Amendment (or the transactions contemplated hereby) brought by any Party or its successors or assigns shall be brought in any federal district court sitting in Puerto Rico and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereto (collectively, the "Puerto Rico Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Puerto Rico Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Amendment and the Restructuring. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in any federal district court sitting in Puerto Rico, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Puerto Rico Court. Each of the Parties further agrees that notice as provided in Section 24 of the Agreement shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties

hereby irrevocably and unconditionally waives and agrees not to assert that (i) a proceeding in any federal court sitting in the Puerto Rico district is brought in an inconvenient forum, (ii) the venue of such proceeding is improper or (iii) that any federal district court sitting in Puerto Rico and any appellate court from any thereof lacks jurisdiction over such proceeding or any party thereto. For the avoidance of doubt, the GDB Parties submit to the jurisdiction of any federal district court sitting in Puerto Rico and any appellate court from any thereof and irrevocably waive any immunity from suit in federal court that they may have for any action or proceeding arising out of or relating to this Amendment and the Restructuring.

(b)      Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Amendment or the transactions contemplated hereby (whether based on contract, tort or any other theory).

SECTION 6.  <u>Execution of Agreement</u>.  This Amendment may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Amendment, each individual executing this Amendment on behalf of a Party has been duly authorized and empowered to execute and deliver this Amendment on behalf of such Party.

SECTION 7.  <u>Headings</u>.  The headings of all sections of this Amendment are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

SECTION 8.  <u>Continuing Effectiveness, etc</u>.  After giving effect to this Amendment, the Agreement shall remain in full force and effect and is hereby ratified, approved and confirmed in each and every respect.  The amendments set forth herein are limited as written, and except as specifically provided in this Amendment, no other amendments, waivers, revisions or changes to the terms of the Agreement shall be made or permitted hereby. Upon the effectiveness of this Amendment, each reference in the Agreement to "this Agreement," "hereunder," "hereof," or words of similar import shall mean and be a reference to the Agreement as amended hereby.

*[Signature Pages Follow]*

## **Exhibit A**

Restructuring Term Sheet

**EXHIBIT A to**
**Restructuring Support Agreement**

**Government Development Bank for Puerto Rico**

**OUTLINE OF TRANSACTION STRUCTURE FOR RESTRUCTURING OF GDB LIABILITIES**

This term sheet (the "Term Sheet") is a summary of indicative terms and conditions for a proposed financial restructuring of certain financial obligations of the Government Development Bank for Puerto Rico ("GDB") through a Qualifying Modification (the "Restructuring" or the "Qualifying Modification") pursuant to Title VI of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA"). The financial obligations of GDB to be included in the Restructuring include (i) bonds issued and outstanding pursuant to (a) that certain trust indenture dated as of February 17, 2006, as amended or supplemented, between GDB and Wilmington Trust, National Association, as successor trustee, and (b) that certain trust indenture dated as of April 29, 2016, as amended or supplemented, between GDB and UMB Bank, National Association, as trustee (collectively, the "Existing GDB Public Bonds"), and (ii) certain deposits and other outstanding obligations of GDB identified below.

This Term Sheet is solely for the purposes set forth in the Restructuring Support Agreement (the "RSA"), dated May 15, 2017 (as amended pursuant to the terms thereof) among GDB and certain holders of the Existing GDB Public Bonds, and acknowledged and agreed to by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" by its Spanish acronym), or any other Qualifying RSA (as defined in the RSA). Except to the extent provided in the RSA or any Qualifying RSA, this Term Sheet does not constitute a commitment by any party and in any event is subject to the terms and conditions hereof, including, without limitation, requisite approvals under Title VI of PROMESA and execution and delivery of definitive agreements (the "Definitive Documents").

| Legislation | The Restructuring shall be carried out pursuant to Act No. 109-2017, also known as the Government Development Bank for Puerto Rico Debt Restructuring Act (the "GDB Restructuring Act")[1]; *provided* that notwithstanding any repeal, annulment, withdrawal, amendment or modification or other failure of the GDB Restructuring Act or any provision therein to remain in full force and effect, the terms and conditions identified in this Term Sheet shall remain in full force and effect as the terms and conditions of the Restructuring and shall be carried out in another manner, whether by alternative legislation or otherwise. |
|---|---|
| Issuer of New Bonds | *Issuer.* Pursuant to, or otherwise consistent with, Article 201 of the GDB Restructuring Act, a statutory public trust and governmental public instrumentality of the Commonwealth of Puerto Rico (the "Issuer") shall be created to issue the New Bonds (as defined below). The form of the Issuer shall be acceptable to the Requisite Bondholders, as defined in the RSA (the "RSA Requisite Bondholders"), *provided* that the form of the Issuer established pursuant to the GDB Restructuring Act, as in effect on August 24, 2017, is |

---

[1] References herein to the GDB Restructuring Act refer to the act as in effect on August 24, 2017 unless an amendment thereto reflects changes set forth in this Term Sheet or is otherwise in form and substance satisfactory to the RSA Requisite Bondholders (as defined below), except as otherwise specified.

| | deemed acceptable to the RSA Requisite Bondholders. |
|---|---|
| | *Indenture Trustee for New Bonds.*  An indenture trustee (the "Indenture Trustee") will act for the benefit of holders of New Bonds.  Upon the issuance of the New Bonds, pursuant to, or otherwise consistent with, Article 402 of the GDB Restructuring Act, as in effect on August 24, 2017, the New Bonds will be automatically secured by a perfected, valid and binding statutory lien on the New Bond Collateral (as defined below) in favor of the Indenture Trustee for the benefit of the holders of New Bonds.  The Indenture Trustee (or, if necessary for certain tasks the Indenture Trustee is unable or unwilling to perform, a designated calculation agent or other service provider) will perform administrative functions customary for transactions of this type. |
| | *Servicer and Collateral Monitor.*  The assets of the Issuer will be managed by a designated servicer (the "Servicer") pursuant to a servicing agreement with the Issuer (the "Servicing Agreement"). The identity of the initial Servicer and terms of the initial Servicing Agreement (including compensation) shall be acceptable to the RSA Requisite Bondholders.[2] The activities of the Servicer and the condition and performance of the New Bond Collateral (as defined below) will be monitored by a collateral monitor (the "Collateral Monitor") engaged by the Indenture Trustee, or another entity on behalf of the holders of New Bonds, pursuant to a monitoring agreement (the "Collateral Monitor Agreement"). The identity of the initial Collateral Monitor and the terms of the initial Collateral Monitor Agreement shall be acceptable to the RSA Requisite Bondholders, GDB and AAFAF.  The Collateral Monitor shall have reasonable access to the Servicer and all information necessary in order to carry out its duties. |
| | For more information regarding the structure of and governance of the Issuer and the Servicing Agreement, see *Structure and Governance of Issuer* below. |
| **Participating Bond Claims** | The holders ("Holders") of the liabilities of GDB set forth on Schedule 1 hereto (the "Participating Bond Claims") will be subject to and bound by the Qualifying Modification pursuant to Title VI of PROMESA, including: |
| | • All claims in respect of Existing GDB Public Bonds; |

---

[2] If the Servicer is provided with an incentive compensation arrangement based on asset recoveries, the position of incentive compensation arrangements in the distribution waterfall shall be acceptable to the RSA Requisite Bondholders.  The Servicer shall be a "qualified" and "independent" (as such terms are defined in the Definitive Documents) firm of recognized national standing with the requisite expertise and Spanish speaking capability, and which is acceptable to GDB, AAFAF, and the RSA Requisite Bondholders. The Servicer will be engaged on or before the Closing Date, on arms-length, market terms in form and substance satisfactory to GDB, AAFAF, and the RSA Requisite Bondholders.  The Servicer will be selected by a competitive RFP process prior to the solicitation of holders of Participating Bond Claims, and GDB shall use commercially reasonable efforts to effectuate the transition of its duties to the Servicer as soon as practicable.

#90008132v43

<table>
<tr>
<td></td>
<td>

- The claims against GDB identified on Schedule 1; and

- The claims in respect of the contingent and unliquidated claims on Schedule 2.[3]

For the avoidance of doubt, the liabilities of GDB that are not Participating Bond Claims will not be the subject of the Qualifying Modification, but the Qualifying Modification shall be subject to and conditioned upon the treatment of such claims to the extent specified below.

</td>
</tr>
<tr>
<td>

**Overview of Restructuring Transaction**

</td>
<td>

*Exchange of Participating Bond Claims for New Bonds*

GDB and the Holders of the Participating Bond Claims will undertake a financial restructuring of the Participating Bond Claims through a Qualifying Modification implemented under Title VI of PROMESA on the terms and conditions set forth herein.  Pursuant to such Qualifying Modification, on the date on which the conditions described under "Conditions" below have all been satisfied or waived by the RSA Requisite Bondholders (the "Closing Date"):

    i.    all Holders of Participating Bond Claims will exchange their Participating Bond Claims for new bonds (the "New Bonds") which shall be book-entry only bonds held by DTC; and

    ii.    GDB will transfer the Recovery Authority Assets to the Issuer in consideration for the Issuer's issuance of the New Bonds in connection with the exchange of the Participating Bond Claims as set forth above.

Upon a Holder of Participating Bond Claims exchanging such Participating Bond Claims for New Bonds, and execution of the Keepwell Agreement described below, the Holder of the Participating Bond Claim shall, immediately and forever, and without further actions or documentation, cease to have any right, interest or claim against GDB or any of its assets, or any successors or assigns thereof and the Participating Bond Claims shall be extinguished and canceled.  In connection with the Qualifying Modification, GDB shall enter into the Keepwell Agreement.  For more information, see "Keepwell Agreement" below.

The issue price of the New Bonds (as determined for U.S. federal income tax purposes) shall be allocated first to principal and then to accrued but unpaid interest.

For each $1,000 of Participating Bond Claims held by a Holder (which, for the avoidance of doubt, shall be calculated to include principal plus interest accrued up to but not including the Closing Date in respect of Existing GDB Public Bonds), such Holder shall receive New Bonds having a face amount equal to

</td>
</tr>
</table>

---

[3] No New Bonds will be issued at closing in respect of contingent and unliquidated claims as to which no claim has been made prior to the Closing Date. If, subsequent to the Closing Date, valid claims are made on any contingent and unliquidated claim specified in Schedule 2, the Holders of such claims will receive a pro rata distribution of the New Bonds.

| | |
|---|---|
| | $550. |
| | *Rounding* |
| | The aggregate principal amount of New Bonds issued to each Holder of Participating Bond Claims will be rounded up, if necessary, to $1 or the nearest whole multiple of $1 in excess thereof.  This rounded amount will be the principal amount of New Bonds a Holder will receive. |
| | *Payments from Available Cash* |
| | Payments of principal and interest to holders of New Bonds shall be made solely from Available Cash (as defined below) of the Issuer, as provided below. |
| | *Security* |
| | Pursuant to, or otherwise consistent with, Article 402 of the GDB Restructuring Act, as in effect on August 24, 2017, the New Bonds will be secured by a statutory lien on the New Bond Collateral, which statutory lien shall occur automatically and shall automatically be perfected, valid and binding from and after the Closing Date, in any case without any further act or agreement. |
| | The indenture for the New Bonds (the "<u>Indenture</u>") shall confirm such statutory lien and establish that the New Bonds will be secured on a first priority basis under the statutory lien. |
| | *End of Life Provisions* |
| | On or after the final scheduled payment date, the Servicer will be required to use its commercially reasonable efforts to liquidate all remaining New Bond Collateral, if any, as soon as reasonably practicable but in no event after December 31, 2040 unless either (i) all principal, interest and any other amounts owing under the New Bonds have been paid or (ii) the New Bond Requisite Holders instruct otherwise (subject to the economic feasibility of the Servicer continuing to service the remaining New Bond Collateral).  The net proceeds from such liquidation will constitute collections on the New Bond Collateral and, as such, will be distributed in accordance with the priority of payments under the Indenture.  Following either (i) the payment in full of all principal, interest and any other amounts owing under the New Bonds and the satisfaction and discharge of the Indenture or (ii) the liquidation of the New Bond Collateral and distribution of the proceeds thereof in accordance with the foregoing, the Public Entity Trust (as defined below) will succeed to all the rights of the Issuer with respect to any remaining assets of the Issuer, if any. |
| **Non-Municipal Government Entities** | The following terms and conditions (the "<u>Non-Municipal Government Entity Resolution</u>") relating to Non-Municipal Government Entities (as defined in the GDB Restructuring Act) shall be a condition of the Restructuring. |
| | *Determination of Liabilities Between Non-Municipal Government Entities and GDB* |
| | Pursuant to, or otherwise consistent with, Article 302 of the GDB Restructuring Act, as in effect on August 24, 2017, effective as of the Closing Date, the |

4

balance of liabilities owed between any Non-Municipal Government Entities and GDB as of the Closing Date shall be automatically determined by applying the outstanding balance of any deposit of a Non-Municipal Government Entity against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date (other than any loan, bond or note of a Non-Municipal Government Entity secured by a mortgage over real property), as set forth on Schedules 4, 5, 6, and 7, without the need for any further action.  Such application shall be effected by reducing any remaining installments of principal in inverse order of maturity and shall not otherwise affect the repayment schedule of the corresponding bond, note or loan.  For purposes hereof, all agencies, departments, offices and instrumentalities of the central government shall be deemed to be the same Government Entity (as defined in the GDB Restructuring Act).  The remaining balances of the bonds, notes or loans and of the deposits of the Non-Municipal Government Entities shall be those certified by AAFAF.

*Public Entity Trust*

Pursuant to, or otherwise consistent with, Article 301 of the GDB Restructuring Act, as in effect on August 24, 2017, GDB shall execute a deed of trust (the "Public Entity Deed of Trust") to create and establish a trust (the "Public Entity Trust") for the benefit of (a) those Non-Municipal Government Entities having claims in respect of funds on deposit at GDB as of the Closing Date, after giving effect to the transactions described above in "*Determination of Liabilities Between Non-Municipal Government Entities and GDB,*" identified on Schedule 6 hereto (such entities, the "Designated Depositors") and (b) those municipalities with federal funds deposited at GDB listed on Schedule 9. Pursuant to, or otherwise consistent with, Article 303 of the GDB Restructuring Act, as in effect on August 24, 2017, effective as of the Closing Date, GDB shall transfer the assets currently owned by GDB and identified on Schedule 7 hereto (the "Public Entity Trust Assets") to the Public Entity Trust.  A transfer of the Public Entity Trust Assets by GDB to the Public Entity Trust pursuant to the Public Entity Deed of Trust shall be treated as an irrevocable, non-voidable and absolute transfer of all of GDB's legal and equitable right, title and interest (as a true sale), and not a pledge or other financing, of the Public Entity Trust Assets.  Upon the transfer of the Public Entity Trust Assets to the Public Entity Trust and the assumption by the Public Entity Trust of the Designated Depositors' deposits, the Designated Depositors shall, immediately and forever, and without further actions or documentation, cease to have any right, interest or claim against GDB or any of its assets, or any successors or assigns thereof (other than the Public Entity Trust).

| **Certain Municipal Issues** | *Excess CAE Settlement* |
| | |

*Excess CAE Settlement*

If a municipality that has Excess CAE (as defined in the GDB Restructuring Act, as in effect on August 24, 2017) executes a settlement agreement with GDB providing a release (substantially similar to the release provided under Article 702 of the GDB Restructuring Act, as in effect on August 24, 2017, but effective as of the effective date of the settlement agreement) of all claims and causes of action (other than a claim for a Participating Bond Claim, if any) against GDB and the Issuer and agreeing not to challenge or otherwise take any action that is inconsistent with, or that would reasonably be expected to

#90008132v43

prevent, interfere with, delay or impede the consummation of, the Restructuring, then, promptly upon the effective date of such settlement agreement, if so provided pursuant to an amendment to the GDB Restructuring Act, GDB shall pay, in cash, to such municipality an amount equal to 55% of the undisbursed Excess CAE corresponding to such municipality.

In the case of such municipalities that have Excess CAE but which do not execute a settlement agreement with GDB prior to the Closing Date, pursuant to Article 502 of the GDB Restructuring Act, as in effect on August 24, 2017, GDB shall pay to such municipality on the Closing Date, in cash, an amount equal to 55% of the undisbursed Excess CAE corresponding to such municipality.

Upon the effective date of a settlement agreement entered into by a municipality as described above or, in the case of municipalities that do not execute such a settlement agreement, upon the Closing Date, the remaining portion of such municipality's undisbursed Excess CAE shall be discharged, and such municipality shall have no further rights or claims thereto, and GDB shall have no further liability or obligation to such municipality in respect of the Excess CAE.

*Recalculation of Certain Municipal Obligations*

The principal amount of any bond, note and/or loan of any municipality of Puerto Rico held by GDB as of the Closing Date shall be automatically reduced by operation of law, effective as of the Closing Date, without the need for any further action, by an amount equal to the balance of proceeds of such bond, note and/or loan that were not disbursed to such municipality and were held on deposit at GDB on the Closing Date pursuant to the Municipal Financing Act, Act 64-1996, as amended. Such application shall be effected by reducing any remaining installments of principal in inverse order of maturity and shall not otherwise affect the repayment schedule of the corresponding bond, note or loan.

Any remaining municipal deposits held at GDB as of the Closing Date shall be reduced, effective as of the Closing Date, on a dollar-for-dollar basis, from the outstanding principal amount of any corresponding bond, note and/or loan (excluding the loans that are collateral for the Secured Deposit Account), relative to the type of corresponding deposit (CAE deposits against CAE loans, IVU deposits against IVU loans, and all undesignated deposits against outstanding principal balance of other loans in the following order:  operational loans, revenue loans, IVU loans, then CAE loans). Such application will be effected in ascending order of outstanding loan balances.  In cases where deposits are not enough to pay a loan in full, the application shall be effected by reducing installments of principal in inverse order of maturity without affecting the repayment schedule of the bond, note or loan. The remaining balances of the municipal loans shall be those certified by AAFAF, and all future payments of interest on such bonds, notes and/or loans shall be computed based on such balances.

#90008132v43

| Terms of New Bonds | *Payment of Interest from Available Cash* |
|---|---|
| | 7.500% annual coupon rate, payable semiannually in cash; *provided* that, if on any "Determination Date" (a date not more than 10 business days prior to the related interest payment date) in respect of the related interest payment date, Available Cash is not sufficient to pay in full all interest then payable on the New Bonds (including paid in kind interest outstanding at such time), such interest on the New Bonds shall be paid in cash *pro rata* to the extent of Available Cash and any unpaid balance of accrued current interest shall be paid in kind.  All outstanding paid in kind interest (including any interest accrued thereon) shall be due and payable, together with other accrued interest on the New Bonds, on each interest payment date (subject to the above provisions if Available Cash is then insufficient to make such payments in cash) until such paid in kind interest is paid in full. |
| | *Amortization on Closing Date* |
| | Any Available Cash of the Issuer as of the Closing Date shall be paid to the holders of, and used to reduce, the principal balance of, the New Bonds on the Closing Date or as soon as practicable thereafter but in no event later than 5 business days following the Closing Date. |
| | *Amortization from Excess Available Cash* |
| | On each Determination Date in respect of the related interest payment date, if Available Cash of the Issuer exceeds the amount thereof to be used to pay interest, including all outstanding paid in kind interest, on the New Bonds on such interest payment date, such excess amount of Available Cash ("Excess Available Cash" on such interest payment date) shall be used to amortize the unpaid principal of the New Bonds. |
| | *Collateral Priority* |
| | The New Bonds will be automatically secured by a first priority perfected, valid and binding statutory lien on the New Bond Collateral. |
| | *Maturity* |
| | August 20, 2040 |
| New Bond Collateral | The "New Bond Collateral" shall include all legal and equitable right, title and interest in and to the Recovery Authority Assets (as defined below) (including, without limitation, the Beneficial Interest (as defined below) in property of GDB, the proceeds of which are required to be transferred to the Issuer) and all assets, collections, fees, charges, proceeds, revenues, rents, insurance payments, income or other funds generated by, or received by the Issuer, the Servicer or GDB in respect of, the Recovery Authority Assets, including in respect of the administration or reinvestment thereof. |
| | The "Recovery Authority Assets" shall include all legal and equitable right, title and interest in and to (i) all assets of GDB that are in existence as of the Closing Date (whether or not identified on the Closing Date), other than the Excluded Assets (as defined below), including, without limitation, (a) the |

#90008132v43

public sector and municipal loans, advances to the Municipal Administration Fund and Municipal Financing Corporation, and GDB assets and properties identified in Schedule 3 and Schedule 4 hereto and (b) all unrestricted cash and cash equivalents of GDB in excess of the Specified Cash Assets (as defined below); (ii) the Beneficial Interest (as defined below) in, and the proceeds of, the public entity loans listed on Schedule 5 held at GDB, (iii) upon the date on which GDB is required, or chooses at its option, to transfer any public entity loan listed on Schedule 5, such public entity loan to be transferred; (iv) the Beneficial Interest in, and the proceeds of, any causes of action (other than causes of action to enforce loans that constitute Public Entity Trust Assets), including contingent or unknown causes of action and (v) all proceeds of any of the foregoing.

"Excluded Assets" means (i) the public entity loans listed on Schedule 5 held at GDB, *provided* that the Beneficial Interest in, and the proceeds of, such public entity loans shall be Recovery Authority Assets, *provided further* that if GDB, at its option, transfers to the Issuer any such loans at any time, such transferred loans shall be deemed to be Recovery Authority Assets upon such transfer, and *provided further* that each of the Performing Additional Loans (as defined herein) shall be deemed to be Recovery Authority Assets on the date that is the earlier of (x) the effective date of a modification, restructuring or similar transaction in respect of such Performing Additional Loan and (y) eighteen months after the Closing Date; (ii) cash to pay any transaction costs of the Restructuring, including professional fees and expenses of GDB, AAFAF, and the professionals to be paid pursuant to the RSA; (iii) causes of action, including contingent or unknown, held by GDB as of the Closing Date, *provided* that the Beneficial Interest in, and the proceeds of, such causes of action shall be Recovery Authority Assets; (iv) Public Entity Trust Assets; (v) loans and funds that are collateral for the Secured Deposit Account (as defined below); (vi) the Specified Cash Assets, to be retained by GDB, *provided* that the Vendor Claim Reserve Residual shall not constitute Excluded Assets but shall constitute Recovery Authority Assets; and (vii) office furniture, equipment and other supplies owned by GDB and used in the ordinary course of GDB's business (excluding all such property relating to the real property assets that are Recovery Authority Assets).

The "Specified Cash Assets" shall equal the sum of (a) the Vendor Claim Reserve (as defined below), other than the Vendor Claim Reserve Residual, (b) restricted cash held by GDB,[4] and (c) $28.9 million or such other amount for operating cash requirements of GDB as may be acceptable to the RSA Requisite Bondholders; *provided* that the Vendor Claim Reserve Residual shall constitute Recovery Authority Assets and, once identified, such Vendor Claim Reserve Residual shall be delivered to the Issuer as set forth below.

The "Vendor Claim Reserve Residual" shall be the amount equal to any cash or cash equivalents remaining in the account in respect of the Vendor Claim

---

[4] Restricted cash includes cash held in a segregated account separate from Available Cash, in an aggregate amount of approximately $22 million, for (i) the Employee's Incentive, Retirement and Retraining Program established under Act 70-2010; (ii) employee benefits under the early retirement windows of 1994, 2000 and 2007; (iii) the Voluntary Pre-Retirement Program established under Act 211-2015; (iv) the voluntary separation program included in GDB's certified fiscal plan; and (v) AAFAF's Administrative Order OA-2017-05.

#90008132v43

Reserve after the payment of all Open or Disputed Vendor Claims (as defined below) determined by GDB to be valid.  Any cash or cash equivalents related thereto shall be transferred to the Issuer after such determination as part of the Recovery Authority Assets.

"Beneficial Interest" means the beneficial interest in, and the right to receive the proceeds (net of expenses associated with realizing such proceeds) of, in each case, after giving effect to the rights of GDB as set forth herein, as applicable, (i) causes of action, including contingent or unknown, held by GDB, *provided* that GDB shall have no duty to pursue any such causes of action and shall have the absolute discretion to settle, offset, or release such causes of action, or (ii) public entity loans listed on Schedule 5 held at GDB; *provided*, in the case of both (i) and (ii), that GDB shall have no duties in respect of the Issuer or the holders of the New Bonds except to the extent set forth in this Term Sheet or the Definitive Documents.

The Recovery Authority Assets shall be irrevocably assigned and transferred to the Issuer on the following dates in the following manner (for the avoidance of doubt, references below to "transfer" shall refer to an irrevocable assignment and transfer:

- All Recovery Authority Assets in existence on the Closing Date shall be transferred to the Issuer on the Closing Date.

- Any unknown assets that constitute Recovery Authority Assets in existence on the Closing Date shall be transferred to the Issuer on the Closing Date with all other Recovery Authority Assets then in existence, and upon discovery of any such unknown assets, GDB shall take any necessary steps to complete the transfer thereof to the Issuer within 15 days, pending which such assets shall be held in trust for the Issuer.

- Each of the Performing Additional Loans may be transferred to the Issuer at any time and shall be transferred to the Issuer upon the earlier of (a) the effective date of a modification, restructuring or similar transaction in respect of such loan and (b) eighteen months after the Closing Date.

- GDB may, at its option, transfer to the Issuer any of the public entity loans listed on Schedule 5, other than the Performing Additional Loans, at any time, at which time such transferred loans shall be deemed to be Recovery Authority Assets.

- To the extent that any cash that constitutes Excluded Assets remains at GDB after payment of the obligations provided for herein, such cash shall become Recovery Authority Assets and, as such, shall be transferred to the Issuer.

- Any other Recovery Authority Assets not transferred to the Issuer on the Closing Date and not otherwise provided for above, including, but not limited to, the Vendor Claim Reserve Residual and the proceeds of (i) any causes of action in existence on the Closing Date and (ii) the

public entity loans identified on Schedule 5 held at GDB (in each case, net of the expenses associated with obtaining such proceeds) shall be delivered to the Issuer within 15 days after such assets are received by GDB or otherwise become known and identifiable.

All proceeds of New Bond Collateral, whenever received and including without limitation cash payable to the Issuer in respect of loans and advances included in the New Bond Collateral, will remain in the ownership and control of the Issuer, subject to a perfected, valid and binding statutory lien securing the New Bonds.[5]

The Issuer (and the Servicer on behalf of the Issuer) and GDB shall be obligated, limited and empowered, as applicable, in respect of the management of the New Bond Collateral as follows:

- Neither the Issuer (nor the Servicer nor any other entity on behalf of the Issuer) may dispose of any municipal loans listed on Schedule 3 without the consent of AAFAF or any other agent designated by the Commonwealth, which entity may take into account the public policy goals of the Commonwealth, which consent shall not be unreasonably withheld (taking into account such goals).

- The Issuer (and the Servicer on behalf of the Issuer) shall have all rights and powers of GDB[6] in respect of the municipal loans listed on Schedule 3, other than as specified in the immediately foregoing bullet.

- The Issuer (and the Servicer on behalf of the Issuer) shall have the right to exercise remedies in respect of the public entity loans held by the Issuer listed on Schedule 4, but solely to the extent necessary to assure that funds from those entities that are available for debt service, in accordance with and pursuant to applicable loan documents, Oversight Board-approved fiscal plans (if any) and Oversight Board-approved budgets (if any), are applied to such loans in accordance with the legal priority, security or other pledge rights benefiting such loans. Furthermore, the Issuer (and Servicer on behalf of the Issuer) will be entitled to rights and remedies necessary to preserve, protect or defend any security or other pledge rights benefiting such loans. In furtherance of the foregoing, for any such loan where the obligor on such loan is in Title III or Title VI proceedings and such obligor has other creditors that have the same legal priority, security and pledge rights as the Issuer, the Issuer will be entitled to rights and remedies necessary to ensure that the Issuer receives treatment in such proceedings that is the

---

[5] This presumably will be arranged through accounts maintained by the trustee.  As noted above, proceeds of New Bond Collateral previously directed to GDB will have to be paid directly to the Issuer or the Servicing Agent pursuant to any necessary agreements or legislation.

[6] The current interest rates of the loans that are Recovery Authority Assets will not be changed prior to the Closing Date, and after the Closing Date, GDB's bestowed power, as the former fiscal agent to the Commonwealth, to make upward adjustments to the interest rates shall be retained and not be transferred upon the transfer of the Recovery Authority Assets to the Issuer.  For the avoidance of doubt, GDB agrees it will not make any downward adjustment in interest rates applicable to such loans, whether prior to or after the Closing Date.

#90008132v43

|  | same as that provided to other creditors that have the same legal priority, security and pledge rights. |
|  | • The Issuer (and the Servicer on behalf of the Issuer) may sell the assets listed on Schedule 4 if such sale is consistent with the servicing standards set forth in the Servicing Agreement. |
|  | • Any modification by GDB (or any entity on behalf of GDB) of the Center for Municipal Revenue Collection ($106 million) loan, the University Medical Services ($10 million) loan, and the Economic Development Bank (~$7 million, excluding ~$35 million deposit) loan, each as listed on Schedule 5 (collectively, the "Performing Additional Loans") shall (i) not include any provision that would result in the removal of any lien, security or other pledge rights benefiting such loan except to the extent required for the sale of any such collateral where the proceeds of that collateral will be immediately made available to the Issuer and (ii) be approved by the financial advisor to the Ad Hoc Group (as defined in the RSA) or, if such modification occurs after the Closing Date, the Servicer as commercially reasonable (provided, for the avoidance of doubt, that the Servicer's approval of such modification may only be given after the Collateral Monitor has received 10-days' notice of the approval of the modification and has not objected). |
|  | • In respect of the public entity loans listed on Schedule 5 held at GDB, GDB shall have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on such loans, *provided* that it shall not be required to bring any action seeking to obtain a judgment against such public entity or seeking to foreclose upon any of its assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such loans and (b) provide the Issuer, the Servicer and the Collateral Monitor with all material communications and other materials relating to any modification, restructuring or similar transaction in respect of such loans. |
|  | • In respect of the causes of action referenced in clause (iv) of the definition of "Recovery Authority Assets," none of the Issuer, the Servicer, the Indenture Trustee or any other party (other than GDB) shall have the right to commence or direct any litigation or other enforcement action in respect of, or sell, transfer or dispose of such causes of action. |
| **Events of Default / Acceleration** | "Events of Default" in respect of the New Bonds shall include the following: |
|  | • Failure by the Issuer to accrue any paid in kind interest as required or to make any required payment from Available Cash in respect of any of the New Bonds, on the date on which the same is due; |
|  | • After written notice by the Indenture Trustee or the holders of New Bonds holding not less than 25% of the aggregate principal amount of the New Bonds then outstanding, a failure by the Issuer to observe or perform any covenant or agreement contained in the Indenture, and |

#90008132v43

such failure continues or is not cured for a period of 60 days;

- Any insolvency, bankruptcy, reorganization, restructuring, receivership or any other form of debtor relief is sought by or against the Issuer, whether under federal or Puerto Rico law;

- Any legislation is enacted, governmental[7] action is taken, or any party (other than an obligor under the New Bond Collateral) is determined by a final, nonappealable order or admitted in writing by the Issuer to have rights that, in any such case, adversely affects (i) the receipt of current or future proceeds of the New Bond Collateral to which the Issuer is entitled (other than by reason of (A) a failure, delay or default of the obligor under such New Bond Collateral, (B) an obligor being subject to a proceeding under PROMESA or to any provision thereof, or (C) changes in taxation or restrictions on the enforcement of rights or remedies, so long as such changes or restrictions are not directed solely at the Issuer, the New Bond Collateral, the New Bonds or the holders of New Bond relative to any other entity, asset, security or security holder) in respect of assets having an aggregate value on the Closing Date of $25 million or more[8] or (ii) the binding effect or enforcement in accordance with their respective terms of the GDB Restructuring Act, the Qualifying Modification, Non-Municipal Government Entity Resolution, the Indenture, the New Bonds or the liens on the New Bond Collateral;

- Entry of a judgment against the Issuer in the amount of $10 million or more;

- The occurrence of a default by GDB under the transfer agreement pursuant to which GDB is to transfer to the Issuer the Recovery Authority Assets, which default is continuing and is not cured for a period of 10 days, after notice or discovery;

- The Issuer permits the validity or effectiveness of the Definitive Documents to be impaired or any person to be released from any covenants or obligations with respect to the New Bonds; and

- Other customary events of default.

If an Event of Default occurs and is continuing, at the request of holders of at least 25% in aggregate principal amount of all New Bonds, subject to customary provisions related to rights of the Indenture Trustee, the Indenture Trustee shall, by notice to the Issuer and the Servicer, declare the outstanding principal amount of all New Bonds to be immediately due and payable.

In addition, if an Event of Default occurs and is continuing, or the Issuer fails to

---

[7] Governmental action for these purposes shall include the government of Puerto Rico, its instrumentalities and any government-controlled or managed entities, including entities with directors or management controlled or appointed by the government of Puerto Rico.

[8] The value of an asset for this purpose is the face amount of such asset (in the case of loans) or the book value of such asset (in the case of other assets).

#90008132v43

| | |
|---|---|
| | pay all outstanding amounts on the New Bonds by the final scheduled payment date, the Indenture Trustee may, or upon the direction of holders of at least 25% in aggregate principal amount of all New Bonds, will, apply to any Commonwealth or Federal court of competent jurisdiction in Puerto Rico for the appointment of a receiver for the Issuer. Such receiver so appointed will have, hold, use, operate, manage, and control the New Bond Collateral for the benefit of the holders of the New Bonds and will exercise all the rights and powers of the Issuer with respect to such New Bond Collateral as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby. |
| **Covenants** | The Indenture shall contain covenants in form and substance acceptable to the RSA Requisite Bondholders, including covenants regarding the Servicer, information, budgeting, collateral management, negative pledge, further assurances, permitted business activities, limitation on assets sales, limitation on investments, limitations on indebtedness and other customary covenants.<br><br>Among other things, the covenants will provide that:<br><br>1. The Issuer shall enter into a continuing disclosure agreement that requires, no less than annually, the Issuer to provide or cause to be provided audited annual reports to the holders of New Bonds[9] regarding the assets, liabilities and cash flows of the Issuer, as well as other financial information, in each case in form and substance as specified in the continuing disclosure agreement (*provided*, *however*, that a breach of this covenant will not result in an Event of Default under the Indenture).<br><br>    a. The continuing disclosure agreement shall require the Issuer to provide or cause to be provided to the holders of New Bonds, not later than a specified date prior to the beginning of each fiscal year, a detailed annual operating budget indicating the Issuer's good faith projection of monthly operating expenditures of the Issuer for the upcoming fiscal year.<br><br>    b. In addition, the continuing disclosure agreement shall require the Issuer to provide or cause to be provided to the holders of New Bonds, (i) a quarterly update of the year's operating budget to show actual expenditures for the quarter(s) then ended, and projected expenditures for the remainder of the fiscal year, reconciled to the previously posted budget for such periods, (ii) a semiannual report of the Collateral Monitor regarding the Compliance Test (as defined below), the Servicer's performance and compliance with the applicable servicing standards, any material actions taken with regard to the New Bond Collateral and any actions taken with regard to non-performing loans and (iii) information as reasonably |

---

[9] The first audited reports of the Issuer shall be provided within 180 days after the end of the Issuer's first fiscal year ending after the Closing Date.  Reports to holders of New Bonds may be provided through appropriate web posting in a form to be agreed.

|  | requested by any holder of New Bonds for U.S. tax reporting purposes. |
|  | c. The continuing disclosure agreement will also require the Issuer to provide or cause to be provided any further disclosures, if any, required in connection with any required compliance with Rule 15c2-12 under the Securities Act as requested by the participating underwriter(s), if any. |
|  | 2. The Issuer shall not sell, transfer, encumber, exchange, otherwise dispose of, or waive any rights with respect to, any of the assets of the Issuer, including any of the New Bond Collateral, other than as directed by the Servicer. |
|  | 3. The Issuer shall not claim any credit on or make any deduction from the principal and interest payable in respect of the New Bonds or assert any claim against any present or former holder of the New Bonds because of the payment of taxes levied or assessed upon the Issuer. |
|  | 4. The Issuer shall not dissolve or liquidate in whole or in part. |
|  | 5. The Issuer shall not incur current expenses or any other obligations exceeding, in the aggregate, a cap to be agreed upon by the RSA Requisite Bondholders and AAFAF in any year other than, among other things to be agreed upon by the RSA Requisite Bondholders and AAFAF, (a) in respect of the New Bonds, (b) amounts to be paid to professionals pursuant to the Restructuring Support Agreement, (c) amounts owed to the Servicer, Indenture Trustee and Collateral Monitor and (d) expenses arising from (i) any bondholder solicitation required under the terms of the Indenture, (ii) any litigation or investigation, brought against or reasonably brought by the Issuer or the Board of Trustees (as defined below) (including any related indemnification costs) or (iii) any request by a holder of New Bonds for information for U.S. tax reporting purposes. Such cap shall be subject to customary annual inflation adjustments. |
|  | 6. The Issuer shall not permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance to be created on, or extend to or otherwise arise upon or burden, the assets of the Issuer or any part thereof, or any interest in the assets of the Issuer or the proceeds thereof other than the liens on the New Bond Collateral securing the Indenture and the obligations of the Issuer under the New Bonds, the Indenture and any related documents or instruments. |
|  | 7. The Issuer shall comply in all material respects with its obligations under the Definitive Documents, including the transfer agreement, the Servicing Agreement and the Collateral Monitor Agreement. |
| **Structure and Governance of Issuer** | *Approval of Structure and Governance of Issuer.* The structure and governance of the Issuer, the form of Indenture for the New Bonds and other related documents, and the identity and terms of employment of the initial Collateral Monitor and the initial Servicer shall be acceptable to the RSA Requisite |

14

Bondholders, AAFAF, and GDB.

*Board of Trustees of the Issuer*.  The Issuer shall be managed by a board of trustees (the "Board of Trustees") initially composed of David Pauker, Matthew Karp and Jorge Padilla.  Each member of the Board of Trustees is (i) appointed for a three-year term and may serve for consecutive terms as an appointed member, and (ii) entitled to one vote.  In the event of a vacancy, the Governor will appoint a successor that meets the independence and qualification standards set forth in the Definitive Documents, including that no member of the Board of Trustees may be an officer, employee or director of the government of Puerto Rico or any instrumentality thereof (other than the Issuer) and must have executive experience in finance or with respect to assets like the New Bond Collateral and be otherwise qualified to serve on the Board of Trustees.

*Cash Flow Tests for Compliance*.  GDB has delivered a schedule of contracted cash flows of municipal loan interest and amortization through 2040 (the "Cash Flow Schedule") exhibited hereto as Schedule 8.  The Servicer will provide a semiannual report to the Collateral Monitor with updated municipal loan interest collections and amortization collections to be used for testing purposes on a semiannual basis (the date of each such report, a "Test Date") for purposes of the Collateral Monitor's semiannual report of compliance with the Compliance Test, as provided above.  If the cumulative shortfall of the actual municipal loan portfolio cash flows as compared to the scheduled cash flows in the Cash Flow Schedule from the most recent payment date in respect of such municipal loans prior to the Closing Date through the Test Date is 10.0% or more (the "Compliance Test") as of any Test Date, a default by the Servicer under the Servicing Agreement shall have occurred.

*Collateral Monitor Consent Rights*.  The Collateral Monitor shall be given not less than ten days' prior written notice of any material modification, extension, accommodation or disposition of any New Bond Collateral, and such transaction may be entered into (or approved) by the Issuer (or the Servicer or any other entity on behalf of the Issuer) only if, after the end of such ten-day period, the Collateral Monitor has not reasonably objected to such transaction on the grounds that such transaction is not commercially reasonable. At the time of delivery of such written notice by the Servicer, the Collateral Monitor shall be provided with access to the Servicer and all information necessary in order to make a determination as to the commercial reasonableness of such modification, extension, accommodation or disposition, but the Collateral Monitor will have no right to participate in discussions or negotiations (in any form) with obligors under the New Bond Collateral.

*Replacement of the Servicer*.  Subject to the procedures set forth below, the Servicer may be removed and replaced by the holders of New Bonds upon the occurrence of a default under the Servicing Agreement that is material to the interests of holders of New Bonds (a "Servicer Replacement Event"). The Collateral Monitor shall notify the holders of the New Bonds when (a) the Collateral Monitor believes, in good faith, that a default by the Servicer under the Servicing Agreement has occurred and is continuing and (b) the Collateral Monitor believes, in its sole discretion, that such default is material to the interests of bondholders. Defaults under the Servicing Agreement shall include, without limitation, (i) cause, as set forth under the terms and conditions of the

#90008132v43

Servicing Agreement, (ii) failure to meet the Compliance Test, (iii) failure to timely deliver the information necessary to verify the Compliance Test, (iv) failure to use commercially reasonable efforts to maximize the value of the New Bond Collateral (subject to any restrictions included in the Servicing Agreement, as set forth in this Term Sheet) and (v) entering into any modifications, extensions or accommodations in respect of the New Bond Collateral that are, individually or in the aggregate, not commercially reasonable[10] (subject to any restrictions included in the Servicing Agreement, as set forth in this Term Sheet). Such notice from the Collateral Monitor shall give a detailed narrative and explanation of (i) the facts sustaining the evaluation of the Collateral Monitor, (ii) the possible effects to the interests of the holders of New Bonds, (iii) the recommendation of the Collateral Monitor regarding a possible Servicer Replacement Event and (iv), if the Board of Trustees chooses, the recommendation of the Board of Trustees regarding a possible Servicer Replacement Event. Concurrently with the notice of a possible Servicer Replacement Event, the Issuer shall issue a posting on the Electronic Municipal Market access website or other similar public posting and a bondholder vote shall be solicited regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced. If holders of one-third of the aggregate principal amount of the New Bonds then outstanding (or, if an event of default under the New Bonds has occurred and is continuing, holders of 25% of the aggregate principal amount of the New Bonds then outstanding) vote that a Servicer Replacement Event has occurred and the Servicer should be replaced, the Issuer shall initiate a competitive process, reasonably satisfactory to the Collateral Monitor, for the identification of a possible successor Servicer, who must be a "qualified" and "independent" (as such terms are defined in the Definitive Documents) successor Servicer of recognized national standing with the requisite expertise and Spanish speaking capability. The Issuer (or, if the Issuer fails to act within 45 days, the Collateral Monitor[11]) shall then designate a successor Servicer acceptable to the Collateral Monitor for a preliminary 60-day period on terms acceptable to the Collateral Monitor. Any approval of the successor Servicer or terms of its engagement required from the Collateral Monitor shall not be unreasonably withheld. The Collateral Monitor will then give notice to the bondholders of (i) the successor Servicer, (ii) the terms of the successor Servicer's engagement, (iii) any additional information the Collateral Monitor would like to provide and (iv) any additional information the Issuer would like to provide. If holders of one-third of the aggregate principal amount of the New Bonds then outstanding (or, if an event of default under the New Bonds has occurred and is continuing, holders of 25% of the aggregate principal amount of the New Bonds then outstanding) do not object to the identity or terms of the successor Servicer's engagement within 60 days, the successor Servicer's engagement shall become final, subject to the terms and conditions of such Servicer's Servicing Agreement.

---

[10] If the Collateral Monitor fails to object to a modification, extension or accommodation during the 10 day period described elsewhere herein, such modification, extension or accommodation will be presumed to be commercially reasonable and will not, individually, be the basis for a default under the Servicing Agreement.

[11] If, pursuant to the procedures described herein, the Collateral Monitor assumes the duty to appoint a successor Servicer, the Collateral Monitor will make reasonable efforts to consult with the Issuer in appointing such Successor.

#90008132v43

| | |
|---|---|
| | *Replacement of the Collateral Monitor.*  The Collateral Monitor may be removed and replaced by the Indenture Trustee for cause and must be removed and replaced by the Indenture Trustee at the direction of holders of 25% of the aggregate principal amount of the New Bonds then outstanding, in each case, which removal decision may be rescinded and annulled by the holders of a majority of the aggregate principal amount of the New Bonds then outstanding. The identity and terms of engagement of the successor Collateral Monitor must be acceptable to the holders of a majority of the aggregate principal amount of the New Bonds that vote in a solicitation nominating such successor.<br><br>In all events the Issuer will be structured so as to allow the New Bonds to constitute exempt securities under Section 3(a)(2) of the 1933 Act or any other applicable exemption. |
| **Vendor Claim Reserve** | The amount of cash equal to the aggregate amount of claims asserted against GDB by parties that provided goods and services to GDB in the ordinary course of business (such amount at any time, the "<u>Vendor Claim Reserve</u>"), which claims are disputed by GDB on the Closing Date or for which payment has not yet become due ("<u>Open or Disputed Vendor Claims</u>"), shall remain at GDB in a separate account subject to a perfected security interest in favor of the Issuer securing the obligation to transfer to the Issuer the Vendor Claim Reserve Residual.  Any cash or cash equivalents constituting Vendor Claim Reserve Residual remaining in the account in respect of the Vendor Claim Reserve after the payment of all Open or Disputed Vendor Claims determined by GDB to be valid shall be Recovery Authority Assets and as such shall be required to be transferred to the Issuer. |
| **Certain Definitions** | "<u>Available Cash</u>" of the Issuer on any Determination Date in respect of a related interest payment date means all cash and cash equivalents of the Issuer (whether arising from proceeds of New Bond Collateral or otherwise) at such time, other than amounts owed to the Servicer, the Indenture Trustee and the Collateral Monitor and the Issuer Expense Reserve (as defined below) at such time.<br><br>"<u>Issuer Expense Reserve</u>" of the Issuer on any Determination Date in respect of a related interest payment date means the amount of cash reasonably expected to be required to pay the operating expenses of the Issuer through the next Determination Date based on a good-faith projection prepared by the Servicer.[12]<br><br>"<u>Pro rata</u>" means, with respect to any cash distribution to holders of New Bonds or any vote of holders of New Bonds, a ratable distribution or vote based on the principal amount of the New Bonds outstanding at the time of such distribution or vote.<br><br>"<u>Secured Deposit Account</u>" means an account in the name of Asociación de Empleados del ELA (Account Number B6347044) in an amount of approximately $25.4 million. |

---

[12] A budget shall be prepared subject to the terms of the Servicing Agreement to be agreed upon and acceptable to the RSA Requisite Bondholders.

#90008132v43

| | |
|---|---|
| **Voting** | Unless otherwise specified, amendments, modifications and waivers of the governing documents of the New Bonds or other matters requiring the consent of the holders of the New Bonds shall generally require the consent of holders of not less than a majority of the aggregate principal amount of the New Bonds then outstanding; *provided* that amendments and modifications that customarily do not require bondholder consent shall be excluded from such consent requirement;[13] and *provided*, *further* that any amendments, modifications or waivers that would have the effect on any New Bond of reducing principal, extending maturity, reducing the interest rate payable, or adversely affecting lien priority or any other amendments, modifications or waivers customarily requiring the consent of each adversely affected holder shall require the consent of each holder of New Bonds adversely affected by such amendment, modification or waiver. |
| **Certification Order** | GDB shall submit an application to the United States District Court for the District of Puerto Rico (or any other court of competent jurisdiction pursuant to PROMESA) for an order pursuant to section 601(m)(1)(D) of PROMESA that the requirements of section 601 of PROMESA have been satisfied by the Qualifying Modification as set forth herein (the "Certification Order"), which order shall be in form and substance satisfactory to the RSA Requisite Bondholders, and shall provide, among other things, that: <br><br> • the Qualifying Modification is valid and binding on any person or entity asserting claims or other rights, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of Participating Bond Claims subject to the Qualifying Modification, any trustee, any collateral agent, any indenture trustee, any fiscal agent and any bank that receives or holds funds related to such Participating Bond Claims; <br><br> • the Recovery Authority Assets will vest free and clear of all claims of any other issuer pursuant to section 601(m)(2) of PROMESA; <br><br> • the Qualifying Modification is full, final, complete, binding, and conclusive as to GDB, the Issuer, the Government of Puerto Rico (as defined in PROMESA), any other Territorial Instrumentality (as defined in PROMESA) of the Government of Puerto Rico and any creditors of such entities, and is not be subject to any collateral attack or other challenge by any such entities in any court or other forum; and <br><br> • the release and exculpation of the Released Parties (as defined below) by all other Released Parties as provided below is fully-enforceable and shall not be subject to attack or avoidance in any other proceeding under PROMESA or otherwise. |
| **Conditions** | Conditions precedent to the Closing Date shall include, but not be limited to, |

---

[13] Such as to cure ambiguities or any defective provision in the governing documents, to comply with regulations related to the registration of beneficial ownership interests, or to modify or amend the indenture to permit the qualification under the Trust Indenture Act, in the case of any of the foregoing, only to the extent that the amendment has no adverse effect, whether or not material, on holders of the New Bonds.

#90008132v43

the following:

- Certification of the Restructuring as a Qualifying Modification pursuant to section 601(g)(1)(C) of PROMESA;

- Establishment of one or more Pools of Bond Claims (as defined in PROMESA) by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") in accordance with the requirements of section 601(d)(3) of PROMESA.

- Distribution of the required disclosure documents and voting instructions to the Holders by the Information Agent (as defined in PROMESA) pursuant to section 601(f) and (k) of PROMESA;

- Satisfaction of the voting requirements set forth in section 601(j) of PROMESA with respect to the Qualifying Modification;

- Passage of any additional legislation that may be necessary to enable the creation of the Issuer in form and substance satisfactory to the RSA Requisite Bondholders, and which includes such provisions as may be required for consummation of the transactions contemplated by the Restructuring and implementing the terms set forth herein, including, without limitation, any provisions necessary for (i) the Issuer to be treated as a municipal issuer under applicable securities laws, (ii) cash flows arising out of the New Bond Collateral to be paid directly (i.e., directly from CRIM or any other applicable collection entity) to the Issuer from and after the Closing Date, (iii) permitting the bond documents to contain remedies for breach as set forth herein, including confirming the ability of the holders of the New Bonds to have a receiver appointed in accordance with the remedies provisions set forth above, and (iv) providing the Issuer with the powers, authorities and remedies in respect of the New Bond Collateral as provided herein, and such legislation is in full force and effect;

- Certification pursuant to section 601(m) of PROMESA that (i) voting requirements have been satisfied, (ii) the Qualifying Modification complies with section 104(i)(1) of PROMESA, and (iii) any conditions on the effectiveness of the Qualifying Modification have been satisfied or waived;

- Entry of the Certification Order;

- The Non-Municipal Government Entity Resolution shall have been effectuated, pursuant to, or otherwise consistent with, Chapter 3 of the GDB Restructuring Act, and the Public Entity Trust, in form and substance satisfactory to GDB and the RSA Requisite Bondholders shall have been established and the Public Entity Trust Assets shall have been transferred to the trustee of the Public Entity Trust;

- The Issuer shall have been created pursuant to governing documents in form and substance satisfactory to GDB and the RSA Requisite Bondholders;

19

| | |
|---|---|
| | • The Public Entity Deed of Trust and Servicing Agreement shall have been executed and delivered, in form and substance satisfactory to GDB and the RSA Requisite Bondholders, and shall be in full force and effect; |
| | • All other Definitive Documents shall have been executed and delivered in form and substance satisfactory to GDB and the RSA Requisite Bondholders, and shall be in full force and effect;[14] |
| | • GDB shall have determined, and notified the relevant municipalities of, the recalculation of municipal obligations, in accordance with the provisions set forth above; |
| | • Legal opinions of counsel to GDB in form and substance acceptable to the RSA Requisite Bondholders shall have been delivered to the trustee or other applicable party regarding the Definitive Documents and the Restructuring; and |
| | • All professional fees and expenses required to be paid under the RSA on or prior to the Closing Date shall have been paid on or prior to the Closing Date. |
| **Keepwell Agreement** | Upon the exchange of the Participating Bond Claims for the New Bonds, GDB will transfer to the Issuer the Recovery Authority Assets and enter into a Keepwell Agreement with the Issuer, which will provide that if any New Bond Collateral is returned or conveyed to GDB for any reason, or if the transfer thereof to the Issuer is deemed invalid or void for any reason, GDB will take such steps as may be necessary to irrevocably retransfer or reconvey such New Bond Collateral to the Indenture Trustee to be applied to payments in respect of the New Bonds in accordance with the terms of the Definitive Documents (or if such retransfer or reconveyance violates any law or court order, to take such other actions as may be necessary such that the holders of the New Bonds receive the economic equivalent thereof), until payment in full of all principal, interest and any other amounts owing under the New Bonds with any remaining balance delivered to the Issuer. |
| | The Keepwell Agreement will further provide that GDB will indemnify and hold the holders of the New Bonds (collectively, the "Indemnified Parties") harmless from and against all damages and losses suffered or incurred by the Indemnified Parties as the result of any legislative action or determination by a court of competent jurisdiction causing the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the trustee and the holders of the New Bonds in respect of the New Bond Collateral or the New Bonds to be impaired, rescinded or avoided or otherwise rendered not enforceable in accordance with their terms (the "Covered Losses"); *provided*, that an Indemnified Party shall not be entitled to indemnification for Covered Losses if the circumstances giving rise to such Covered Losses result from the actions of such Indemnified Party. For the avoidance of doubt, it is the intention of the parties that such |

---

[14] The Definitive Documents shall include all documents relating to the engagement of the initial Servicer, specifying the compensation to which the Servicer will be entitled, all in form and substance acceptable to GDB and the RSA Requisite Bondholders.

#90008132v43

<table>
<tr>
<td></td>
<td>indemnification and hold harmless provision shall give rise to claims in favor of the Indemnified Parties against GDB in an amount such that, after giving effect to such claims and any distributions thereon, including in any bankruptcy, insolvency, receivership or similar proceedings in respect of GDB, the Indemnified Parties will be fully compensated for the Covered Losses, subject to the proviso in the foregoing sentence.

Under the terms of the Keepwell Agreement, the holders of the New Bonds and the Indenture Trustee, for the benefit of the holders of the New Bonds, shall be express third-party beneficiaries of the Keepwell Agreement and shall be entitled to the rights and benefits thereunder and may enforce the provisions thereof, as if they were parties thereto, notwithstanding (i) any waiver or other action by the Issuer or (ii) any legislative action or determination by a court resulting, in the case of (ii), in the rescission, avoidance or other unenforceability of the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee or the holders of the New Bonds in respect of the New Bond Collateral or the New Bonds.</td>
</tr>
<tr>
<td><strong>Releases</strong></td>
<td>To the extent permitted by applicable law, the Qualifying Modification shall provide for customary releases from GDB, AAFAF, and the Holders (solely in their capacity as creditors of GDB and not in their capacity as creditors of any other entity) for the benefit of each other and each of their respective current directors, managers, officers, affiliates, partners, subsidiaries, principals, employees, agents, managed funds, representatives, attorneys, and advisors, together with their successors and assigns (collectively, the "Released Parties").</td>
</tr>
<tr>
<td><strong>Governing Law; Jurisdiction; Remedies</strong></td>
<td>The New Bonds will be governed and construed in accordance with the laws of the State of New York.

Any legal action, suit, or proceeding arising out of or relating to the New Bonds brought by any party or its successors or assigns shall be brought in any federal district court sitting in Puerto Rico and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereto.

Remedies may not be exercised against GDB or Issuer in respect of a curable breach or violation of the Definitive Documents or the Qualifying Modification by such party unless 10 days' written notice and a request for cure is given to such party, and such party fails to cure; *provided, however*, with respect to defaults that are not able to be cured, such notice and opportunity to cure need not be given.</td>
</tr>
</table>

**Schedule 1**
**Title VI Bond Claims**

**GDB Senior Notes**

| CUSIP | Maturity | Principal Amount [1] | Coupon (%) |
|---|---|---|---|
| 745177CH | 12/1/2016 | $19,195,000 | 5.00 |
| 745177CJ | 12/1/2017 | 10,635,000 | 5.00 |
| 745177EN | 8/1/2020 | 433,702,000 | 5.50 |
| 745177EP | 8/1/2025 | 151,259,000 | 5.75 |
| 745177ET | 8/1/2019 | 217,715,000 | 5.40 |
| 745177EU | 8/1/2025 | 96,411,000 | 5.75 |
| 745177EX | 5/1/2016 | 360,009,671 | 4.70 |
| 745177FB | 8/1/2017 | 226,855,000 | 4.15 |
| 745177FC | 8/1/2019 | 174,545,000 | 4.50 |
| 745177FD | 8/1/2021 | 142,640,000 | 4.90 |
| 745177FE | 8/1/2022 | 47,465,000 | 4.95 |
| 745177FF | 8/1/2023 | 540,745,000 | 5.00 |
| 745177FH | 8/1/2026 | 126,820,000 | 5.20 |
| 745177FK | 8/1/2018 | 317,935,000 | 4.35 |
| 745177FM | 2/1/2017 | 250,000,000 | 3.88 |
| 745177FN | 2/1/2019 | 500,000,000 | 4.38 |
| 745177GG | 5/1/2017 | 39,990,329 | 4.70 |
| GDB Senior Guaranteed Notes | | 110,000,000 | 8.00 |
| | | **$3,765,922,000** | |

**Source:** Bloomberg

**Notes**

(1) Includes missed principal payments as of January 2018.

**Schedule 1**
**Title VI Bond Claims**

| Entity | Balance Post Set-Off |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Municipalities**[1] | |
| Carolina | $52,779,154 |
| Fajardo | 15,137,902 |
| Hatillo | 506,087 |
| Humacao | 9,489,880 |
| Lares | 1,477,679 |
| Rincon | 448,602 |
| **Total** | **$79,839,305** |
| | |
| **Other Deposits / Claims** | |
| Bank of New York Mellon as Beneficiary under Letter of Credit re: Puerto Rico Ports Authority | $190,630,000 |
| PR Science and Technology Trust | 95,945,159 |
| Municipal Administration Fund (FAM) | 21,746,574 |
| First Bank as Agent for Lenders to CCHPR Hospitality, LLC (Sheraton) | 13,630,000 |
| Commonwealth Employees Association (AEELA) [2] | 13,622,243 |
| PR Highways and Transportation Authority (HTA) [3] | 13,000,000 |
| Puerto Rico Development Fund | 11,000,000 |
| Cooperative Development and Investment Fund (FIDECOOP) | 7,899,509 |
| PREPA Pension System | 4,134,515 |
| Serralles / Costa Sur / Costa Caribe | 3,015,914 |
| MCS Advantage Inc. | 615,276 |
| Citibank | 612,372 |
| Medical Card System Inc | 410,899 |
| Caguas Coop | 200,000 |
| Cooperativa Dr. Manuel Zeno Gandia | 51,872 |
| Banco Cooperativo (Cooperative Bank) | 3,678 |
| A.T/V.Suarez | 3,121 |
| Poultry Products of the Caribbean | 275 |
| Indulac | 133 |
| Institutional Trust of Puerto Rico's National Guard | 2 |
| **Total** | **$376,521,540** |

**Notes**

(1)  Pursuant to the GDB Restructuring Act, deposits of municipalities are net of (1) Excess CAE (as defined in the GDB Restructuring Act) and (2) full municipal deposits are applied against municipal loans, after corresponding escrow deposits to escrow loans, relative to the type of corresponding deposit. (CAE Deposits against CAE Loans, IVU Deposits against IVU Loans, with all undesignated deposits applied to outstanding principal balances in order of Operational, Revenue, IVU, then CAE). Deposit balances are applied against the corresponding loan types in ascending order of outstanding balances.

(2)  Excludes $13.1 m in deposits secured by five municipal CAE loans excluded from the Issuer Collateral; refer to Schedule 3.

(3)  Account established at GDB in the name of HTA to deposit certain proceeds (the "Deposits") of a loan HTA requested to make certain payments to Siemens Transportation Partnership Puerto Rico, S.E. ("Siemens") and others pursuant to a Settlement Agreement dated May 29, 2010 between HTA, Siemens, Alternate Concepts, Inc., and J.R. Requena & Associates.  Siemens asserts entitlement to the Deposits, relying on a Second Settlement Amendment to Settlement Agreement between HTA and Siemens dated June 5, 2017 and/or a Guaranty Agreement by and between Siemens and GDB.  GDB reserves all rights to dispute Siemens' claims to the Deposits, including any portion thereof.

**Schedule 2**
**Contingent and Unliquidated Title VI Bond Claims**

| Entity |
| --- |
| |
| PR Public Finance Corporation Stand-By Letter of Credit[1] |
| Lehman Brothers Special Financing, Inc. - Debt Service Deposit Agreement[2] |

**Notes**

(1) Represents a stand-by letter of credit (the "Stand-by LOC") for the benefit of Puerto Rico Public Finance
Corporation 2011 Series A and B Bonds and 2012 Series A Bonds (the "Bonds"). The Stand-by LOC does not have an
impact on GDB's financial condition. The Trustee for the Bonds may only draw from the Stand-by LOC when the
following conditions exist: (i) a budget for a new fiscal year is not approved  and adopted, and (ii) a legislative
appropriation for the current fiscal year exists and is lower than the debt service payment due on the Bonds for
the next fiscal year for which a new budget is not adopted. In such an instance, the Stand-by LOC may be drawn in
the amount that the debt service on the Bonds for the upcoming fiscal year is higher than the appropriated
amount for debt service on the Bonds during the current fiscal year, if any.  The Stand-by LOC is not intended to
and does not cover the risk that no appropriation is made by the  Legislature of Puerto Rico for any particular fiscal
year, or that an appropriation is made in an amount  lower than the amount of debt service on the Bonds due with
respect to any fiscal year. If the budget for any fiscal year is adopted but no appropriation for the payment of the
Bonds is included in such budget, or an appropriation is made in an amount lower than the amount of debt
service on the Bonds, the Trustee may not make a drawing under the Stand-by LOC.

(2) The Commonwealth, GDB, and Lehman Brothers Special Financing, Inc. ("Lehman") are parties to a Debt Service
Deposit Agreement (the "DSDA").  Under the DSDA, the Commonwealth made deposits to a "Redemption Fund"
in an amount sufficient to make debt service payments on the Commonwealth's General Obligation Bonds.
If the DSDA is breached, the Commonwealth and GDB are jointly liable to Lehman for a termination amount,
calculated pursuant to the terms of the DSDA. However, the DSDA provides that Lehman must first pursue
remedies against the Commonwealth prior to pursuing remedies against GDB and that GDB shall not be required
to make a payment under the DSDA unless the Commonwealth has, among other things, repudiated the DSDA
or raised a defense of immunity.

**Schedule 3**
**Issuer Collateral - Municipal Loans**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Loans [2][3]** | |
| Adjuntas | $13,480,607 |
| Aguada | 1,717,479 |
| Aguadilla | 56,596,876 |
| Aguas Buenas | 3,979,597 |
| Aibonito | 4,626,704 |
| Anasco | 4,427,028 |
| Arecibo | 30,031,413 |
| Arroyo | 6,227,056 |
| Barceloneta | 30,717,150 |
| Barranquitas | 1,775,761 |
| Bayamon | 34,971,733 |
| Cabo Rojo | 20,526,442 |
| Caguas | 36,696,738 |
| Camuy | 6,776,207 |
| Canovanas | 13,299,631 |
| Catano | 2,427,940 |
| Cayey | 20,014,776 |
| Ceiba | 2,161,740 |
| Ciales | 6,140,752 |
| Cidra | 10,472,263 |
| Coamo | 12,626,790 |
| Comerio | 3,137,009 |
| Corozal | 6,254,090 |
| Culebra | 496,182 |
| Dorado | 35,551,253 |
| Florida | 2,998,098 |
| Guanica | 6,599,188 |
| Guayama | 11,887,715 |
| Guayanilla | 9,452,501 |
| Guaynabo | 98,324,452 |
| Gurabo | 18,891,524 |
| Hormigueros | 1,433,452 |
| Isabela | 5,394,600 |
| Jayuya | 7,875,498 |
| Juana Díaz | 11,044,960 |
| Juncos | 33,365,112 |
| Lajas | 7,235,992 |
| Las Marias | 4,768,345 |
| Las Piedras | 14,837,053 |
| Loiza | 5,649,773 |
| Luquillo | 5,364,011 |
| Manati | 37,293,323 |
| Maricao | 6,369,621 |

**Schedule 3**
**Issuer Collateral - Municipal Loans**

| Entity | Balance Post Set-Off [1] |
|---|---:|
| | *As of 12/31/2017, Unaudited* |
| **Loans (continued)** [2][3] | |
| Maunabo | $11,583,346 |
| Mayaguez | 12,124,932 |
| Moca | 8,299,227 |
| Morovis | 11,576,734 |
| Naguabo | 3,037,295 |
| Naranjito | 10,436,846 |
| Orocovis | 2,857,095 |
| Patillas | 8,558,106 |
| Penuelas | 12,715,328 |
| Ponce | 75,338,411 |
| Quebradillas | 5,538,012 |
| Rio Grande | 19,246,599 |
| Sabana Grande | 3,543,663 |
| Salinas | 11,559,736 |
| San German | 14,296,574 |
| San Juan | 243,182,332 |
| San Lorenzo | 13,674,914 |
| San Sebastian | 16,659,884 |
| Santa Isabel | 17,876,413 |
| Toa Alta | 13,365,888 |
| Toa Baja | 69,122,323 |
| Trujillo Alto | 27,781,421 |
| Utuado | 2,201,078 |
| Vega Alta | 5,255,342 |
| Vega Baja | 20,675,826 |
| Vieques | 7,748,261 |
| Villalba | 7,199,031 |
| Yabucoa | 13,036,371 |
| Yauco | 27,151,701 |
| **Total** | **$1,349,561,140** |

**Notes**

(1) Pursuant to Article 501 of the GDB Restructuring Act, loan balances of municipalities are net of undisbursed
municipal loan proceeds for the corresponding loans.

(2) Balances are as of 12/31/2017 as adjusted to reflect the application of all municipal deposits, against corresponding
loans. Municipal deposits applied against municipal loans, after corresponding escrow deposits to corresponding
loans, relative to the type of deposit. (CAE Deposits against CAE Loans, IVU Deposits against IVU Loans, with all
undesignated deposits applied to outstanding principal balances in order of Operational, Revenue, IVU, then CAE).
Deposit balances are applied against the corresponding loan types in ascending order of outstanding balances on
June 30, 2018, which date is subject to change.

(3) Arecibo, Cayey, Guaynabo, Manati, and Mayaguez balances reflect $13.1 million adjustment for loans that are
collateral for the AEELA deposit.

**Schedule 4**
**Issuer Collateral - Other Assets**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Loans or Other Obligations due from Public Corporations and Public Agencies** | |
| PR Highways and Transportation Authority (HTA) [2] | $1,925,186,798 |
| PR Ports Authority (PRPA) | 266,645,165 |
| Port of the Americas [3] | 227,233,700 |
| Government of Puerto Rico - General Obligation | 169,438,038 |
| PR Convention Center District Authority (PRCCDA) | 142,869,963 |
| PR Public Buildings Authority (PBA) | 140,883,605 |
| PR Aqueduct and Sewer Authority (PRASA) | 53,360,638 |
| PR Industrial Development Company (PRIDCO) | 53,326,121 |
| PR Solid Waste Management Authority (SWMA) | 44,176,601 |
| Municipal Advances | 43,436,782 |
| Port Authority of Ponce | 20,762,669 |
| PR Housing Finance Authority (Restructured Repurchase Agreement) | 19,330,527 |
| Comprehensive Fund for Agricultural Development of PR (FIDA) | 15,468,627 |
| Act 71 of 2010 - Interagency Committee | 995,449 |
| Private loans | 803,470 |
| **Total** | **$3,123,918,153** |

**Note**

(1)  Pursuant to Article 302 of the GDB Restructuring Act, the balance of liabilities owed between GDB and the Commonwealth of Puerto Rico or any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority of the Commonwealth other than a municipality of the Commonwealth (each a "**Non-Municipal Government Entity**") has been determined by applying the outstanding balance of any deposit of a Non-Municipal Government Entity against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date (other than any loan, bond or note of a Non-Municipal Government Entity secured by a mortgage over real property).

(2)  Balance includes approximately $1.7 billion in lines of credit owed to GDB and $200 million in 1998 Series A Variable Rate Revenue Bonds held by GDB.

(3)  Balance includes $225.5 million in bonds guaranteed by the Government of Puerto Rico and $1.7 million in an appropriation line of credit.

**Schedule 4**
**Issuer Collateral - Other Assets**

| Property |
| --- |
| **Real Estate Owned Assets** |
| North PR-177/South of El Polvorín Community and Jardines de Caparra Urban Train Station, Bayamón |
| Muñoz Rivera Ave., corner of Coll & Toste St. and Jesús T. Piñero Ave., San Juan |
| Southwest of Sagrado Corazón Urban Train Station, Martín Peña Sector, San Juan |
| Corner of Muñoz Rivera Ave., Esteves St. and Ponce de León Ave., San Juan |
| South of PR-199, East and South of Intersection Road PR-845, Trujillo Alto |
| Intersection of Road PR-10 and Emilio Fagot Ave., Ponce |
| Road 3, Km. 48, Fajardo; Parcel 1 |
| Road 3, Km. 48, Fajardo; Parcel 2 |
| Ruiz Soler Complex, North and Intersection of Km 8.2, Road PR-2, Bayamón |
| Rivera-Martínez Ave., Across from Puerto Rico Coliseum, Adjacent to Acuaexpreso Terminal, San Juan |
| West of Km 86.0, PR-10,  Arecibo |
| Northwest corner of Intersection of Las Cumbres and San Ignacio Ave., Guaynabo |
| North of Km 4, Road PR-906, Guayanés Ward, Yabucoa |
| PR-846 and West Marginal PR-181, Trujillo Alto |

**Schedule 5**
**Issuer Collateral - Loan Proceeds Assigned to Issuer**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Loan Proceeds Assigned to Issuer** | |
| PR Administration of Medical Services | $282,447,692 |
| Special Communities Perpetual Trust (SCPT) | 242,593,727 |
| PR Health Insurance Administration (ASES) | 182,196,327 |
| PR Comprehensive Cancer Center | 120,482,398 |
| Center for Municipal Revenue Collection (CRIM) | 105,904,465 |
| PR Tourism Development Fund (TDF) | 46,880,124 |
| Economic Development Bank | 42,305,218 |
| Cantera Peninsula Integral Development Company | 37,791,088 |
| PR Infrastructure Financing Authority (PRIFA) (World Plaza Building) | 37,361,150 |
| Municipal Revenues Collection Center (CRIM) | 26,860,126 |
| University Medical Services | 10,030,096 |
| Puerto Rico Public Private Partnership Authority | 6,159,248 |
| Puerto Rico Conservatory of Music Corporation | 189 |
| **Total** | **$1,141,011,848** |

**Note**

(1) Pursuant to Article 302 of the GDB Restructuring Act, the balance of liabilities owed between GDB and the Commonwealth of Puerto Rico or any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority of the Commonwealth other than a municipality of the Commonwealth (each a "**Non-Municipal Government Entity**") has been determined by applying the outstanding balance of any deposit of a Non-Municipal Government Entity against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date (other than any loan, bond or note of a Non-Municipal Government Entity secured by a mortgage over real property).

**Schedule 6**
**Public Entity Trust Claims**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Public Entity Deposits** | |
| PR Electric Power Authority (PREPA) | $114,108,631 |
| PR Housing Finance Authority (PRHFA) | 62,722,832 |
| Puerto Rico State Insurance Fund (SIF) | 43,266,388 |
| Land Administration | 39,029,569 |
| PR Tourism Company (PRTC) | 34,866,663 |
| Government Employees Retirement System | 32,948,612 |
| PR Infrastructure Financing Authority (PRIFA) | 31,307,999 |
| PR Sales Tax Financing Corporation (COFINA) | 26,096,175 |
| PR Public Finance Corporation (PFC) | 28,443,959 |
| The Children's Trust Fund (CTF) | 16,666,456 |
| University of Puerto Rico (UPR) | 16,542,930 |
| PR Land Authority | 11,456,426 |
| PR Development Fund | 9,673,622 |
| PR Integrated Transit Authority | 9,496,979 |
| PR Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority (AFICA) | 9,494,982 |
| PR Energy Commission | 6,000,319 |
| Municipal Finance Agency (MFA) | 4,913,899 |
| Agricultural Insurance Corporation | 2,812,262 |
| Puerto Rico Trade and Export Company | 2,818,297 |
| PR Maritime Shipping Authority | 1,231,009 |
| Corporation for the Development of Exports | 898,150 |
| Roosevelt Roads Local Development Authority | 671,440 |
| Telephones of Puerto Rico | 634,117 |
| Model Forrest Office of Puerto Rico | 331,297 |
| Metropolitan Bus Authority (MBA) | 216,400 |
| Consortium of the Northwest | 17,951 |
| Jose M. Berrocal Institute | 128,020 |
| Sugar Corporation of Puerto Rico | 92,716 |
| Public Corporation for the Supervision and Insurance of PR Cooperatives (COSSEC) | 66,233 |
| Corporation for the Musical Arts | 59,468 |
| Consortium of the Southeast | 20,041 |
| Hotel Development Corporation | 15,269 |
| Consortium of North Manati | 8,517 |

**Schedule 6**
**Public Entity Trust Claims**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Public Entity Deposits (continued)** | |
| Maritime Transport Authority | $4,897 |
| PR Art Museum | 1,341 |
| Consortium of the Southwest | 840 |
| Yo Si Puedo Inc. | 336 |
| Consortium of the South Central - ASIFAL | 106 |
| School of Plastic Arts | 2 |
| **Total** | **$507,065,148** |

**Notes**

(1) Pursuant to Article 302 of the GDB Restructuring Act, the balance of liabilities owed between GDB and the Commonwealth of Puerto Rico or any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority of the Commonwealth other than a municipality of the Commonwealth (each a "**Non-Municipal Government Entity**") has been determined by applying the outstanding balance of any deposit of a Non-Municipal Government Entity against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date (other than any loan, bond or note of a Non-Municipal Government Entity secured by a mortgage over real property).

**Schedule 7**
**Public Entity Trust Collateral**

| Entity | Balance Post Set-Off [1] |
|---|---:|
| | *As of 12/31/2017, Unaudited* |
| **Cash** | |
| **Total** | **TBD** |
| | |
| **Collateral - Public Entity Loans / Obligations** | |
| Government of Puerto Rico (including Public Agencies) | $905,491,922 |
| **Total** | **$905,491,922** |

**Notes**

(1) Pursuant to Article 302 of the GDB Restructuring Act, the balance of liabilities owed between GDB and the Commonwealth of Puerto Rico or any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority of the Commonwealth other than a municipality of the Commonwealth (each a "**Non-Municipal Government Entity**") has been determined by applying the outstanding balance of any deposit of a Non-Municipal Government Entity against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date (other than any loan, bond or note of a Non-Municipal Government Entity secured by a mortgage over real property).

**Schedule 8**
**Municipal Loan Portfolio Forecast**

| Forecasted Proceeds | | | Balance Post Set-Off ($) |
|---|---|---|---|
| **Date** | **New Interest** | **Amortization** | **Total** |
| 7/1/2018 | $45,391,552 | $65,059,601 | $110,451,153 |
| 1/1/2019 | 31,427,844 | - | 31,427,844 |
| 7/1/2019 | 31,427,844 | 66,561,513 | 97,989,358 |
| 1/1/2020 | 32,640,313 | - | 32,640,313 |
| 7/1/2020 | 32,640,313 | 69,292,726 | 101,933,039 |
| 1/1/2021 | 33,461,029 | - | 33,461,029 |
| 7/1/2021 | 33,461,029 | 72,928,154 | 106,389,183 |
| 1/1/2022 | 33,881,547 | - | 33,881,547 |
| 7/1/2022 | 33,881,547 | 74,015,569 | 107,897,116 |
| 1/1/2023 | 33,925,599 | - | 33,925,599 |
| 7/1/2023 | 33,925,599 | 77,542,597 | 111,468,196 |
| 1/1/2024 | 33,484,513 | - | 33,484,513 |
| 7/1/2024 | 33,484,513 | 81,812,819 | 115,297,333 |
| 1/1/2025 | 32,493,214 | - | 32,493,214 |
| 7/1/2025 | 32,493,214 | 83,392,923 | 115,886,138 |
| 1/1/2026 | 31,046,309 | - | 31,046,309 |
| 7/1/2026 | 31,046,309 | 82,432,166 | 113,478,475 |
| 1/1/2027 | 27,686,084 | - | 27,686,084 |
| 7/1/2027 | 27,686,084 | 82,222,845 | 109,908,929 |
| 1/1/2028 | 24,313,805 | - | 24,313,805 |
| 7/1/2028 | 24,313,805 | 81,683,617 | 105,997,422 |
| 1/1/2029 | 20,936,730 | - | 20,936,730 |
| 7/1/2029 | 20,936,730 | 79,119,505 | 100,056,235 |
| 1/1/2030 | 17,630,249 | - | 17,630,249 |
| 7/1/2030 | 17,630,249 | 77,811,975 | 95,442,224 |
| 1/1/2031 | 14,380,036 | - | 14,380,036 |
| 7/1/2031 | 14,380,036 | 76,804,289 | 91,184,326 |
| 1/1/2032 | 11,156,322 | - | 11,156,322 |
| 7/1/2032 | 11,156,322 | 66,268,457 | 77,424,779 |
| 1/1/2033 | 8,233,116 | - | 8,233,116 |
| 7/1/2033 | 8,233,116 | 52,787,706 | 61,020,822 |
| 1/1/2034 | 5,789,811 | - | 5,789,811 |
| 7/1/2034 | 5,789,811 | 44,508,578 | 50,298,390 |
| 1/1/2035 | 3,688,337 | - | 3,688,337 |
| 7/1/2035 | 3,688,337 | 32,491,264 | 36,179,601 |
| 1/1/2036 | 2,157,467 | - | 2,157,467 |
| 7/1/2036 | 2,157,467 | 22,812,441 | 24,969,908 |
| 1/1/2037 | 1,078,875 | - | 1,078,875 |
| 7/1/2037 | 1,078,875 | 12,813,452 | 13,892,327 |
| 1/1/2038 | 471,486 | - | 471,486 |
| 7/1/2038 | 471,486 | 9,523,174 | 9,994,660 |
| 1/1/2039 | 20,510 | - | 20,510 |
| 7/1/2039 | 20,510 | 372,411 | 392,921 |

**Schedule 8**
**Municipal Loan Portfolio Forecast**

| Forecasted Proceeds | | | Balance Post Set-Off ($) |
|---|---|---|---|
| **Date** | **New Interest** | **Amortization** | **Total** |
| 1/1/2040 | 4,258 | - | 4,258 |
| 7/1/2040 | 4,258 | 121,661 | 125,919 |

**Notes**

(1) Forecast is as of 12/31/2017 as adjusted to reflect the application of all municipal deposits against corresponding loans (for municipalities with more deposits than loans at GDB, excess deposits remain as Title VI Bond Claim in Schedule 1). Municipal deposits are applied against municipal loans, after corresponding escrow deposits to corresponding loans, relative to the type of corresponding deposit. (CAE Deposits against CAE Loans, IVU balances are applied against the corresponding loan types in ascending order of outstanding balances. Deposits against IVU Loans, with all undesignated deposits applied to outstanding principal balances in order of Operational, Revenue, IVU, then CAE). Deposit balances are applied against the corresponding loan type in ascending order of outstanding balances. Balances are adjusted for the July 1, 2018 payment assuming the application of deposits against corresponding municipal loans on June 30, 2018, which date is subject to change.

(2) Applied interest rates are based off a forward curve reaching an assumed interest rate ceiling in 2026 of 9.5%.

**Schedule 9**
**Federal Funds**

| Entity | Balance |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Municipal Federal Funds[1]** | |
| Barranquitas | $919,410 |
| Carolina | 799,060 |
| Aibonito | 635,797 |
| San Juan | 256,384 |
| Guaynabo | 249,728 |
| Maricao | 235,274 |
| Luquillo | 202,319 |
| Loiza | 197,877 |
| Santa Isabel | 186,607 |
| Morovis | 185,421 |
| Ciales | 180,465 |
| Coamo | 170,359 |
| Aguada | 168,714 |
| Anasco | 150,327 |
| Guanica | 113,376 |
| Las Piedras | 113,026 |
| Fajardo | 112,199 |
| Adjuntas | 112,096 |
| Culebra | 110,157 |
| Humacao | 97,539 |
| Aguas Buenas | 96,961 |
| Las Marias | 76,523 |
| Salinas | 74,352 |
| Trujillo Alto | 69,920 |
| Ceiba | 56,205 |
| Hormigueros | 54,908 |
| Juncos | 53,730 |
| Corozal | 50,918 |
| Camuy | 47,155 |
| Rio Grande | 46,102 |
| Toa Alta | 41,135 |
| San German | 37,646 |
| Isabela | 26,017 |
| Utuado | 19,340 |
| Ponce | 15,261 |
| Guayama | 15,019 |
| Arecibo | 9,654 |
| Lares | 7,841 |
| Naranjito | 6,443 |
| Villalba | 3,897 |
| Patillas | 3,494 |
| Gurabo | 3,492 |

**Schedule 9**
**Federal Funds**

| Entity | Balance |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Municipal Federal Funds (continued)[1]** | |
| Catano | $2,289 |
| Comerio | 1,648 |
| Guayanilla | 1,430 |
| Arroyo | 496 |
| Lajas | 131 |
| Aguadilla | 34 |
| Toa Baja | 4 |
| **Total** | **$6,018,179** |

**Notes**

(1)  In April, 2017, GDB communicated to all depositors requesting confirmation of balances of federal funds held at
      GDB, including identification of the sources of such funds. The balances presented are the result of such
      efforts and subsequent communications during calendar year 2017.

**Schedule 9**
**Federal Funds**

| Entity | Balance |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Other Federal Funds[1]** | |
| PR Highways and Transportation Authority (HTA) | $22,076,056 |
| PR Community Development Fund, LLC (PRCDF) | 20,944,478 |
| PR Treasury Department (Morales Feliciano Case) | 20,117,986 |
| Department of Labor and Human Resources | 11,704,711 |
| 9-1-1 Service Governing Board | 11,321,980 |
| Department of Housing | 7,987,153 |
| Family Socioeconomic Development Administration | 6,202,694 |
| Office of Management and Budget | 4,643,517 |
| PR Housing Finance Authority (PRHFA) (Multi-family - Section 8) | 1,701,547 |
| Institute of Puerto Rican Culture (IPRC) | 1,963,495 |
| PR Treasury Department (Hacienda) | 1,869,332 |
| PR Electric Power Authority (PREPA) | 1,806,981 |
| PR Land Authority | 1,171,068 |
| Public Housing Administration | 338,973 |
| Vocational Rehabilitation Administration | 231,820 |
| Department of Economic Development and Commerce | 204,219 |
| Superintendent of the Capitol | 189,732 |
| Consortium of the Northwest | 160,496 |
| Institutional Trust of Puerto Rico's National Guard | 155,990 |
| PR Solid Waste Management Authority (SWMA) | 154,154 |
| National Parks Company of Puerto Rico (NPCPR) | 147,157 |
| Office for the Improvement of Public Schools (OMEP) | 124,507 |
| Department of the Family | 110,680 |
| PR Aqueduct and Sewer Authority (PRASA) | 46,941 |
| Consortium of the Northeast | 37,883 |
| High Court of Aguadilla | 10,145 |
| PR Industrial Development Company (PRIDCO) | 3,231 |
| Puerto Rico Education Council | 203 |
| Consortium of La Montana | 50 |
| **Total** | **$117,128,727** |

**Notes**

(1) In April, 2017, GDB communicated to all depositors requesting confirmation of balances of federal funds held at
GDB, including identification of the sources of such funds. The balances presented are the result of such
efforts and subsequent communications.