IN THE UNITED STATES FEDERAL DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RECEIVED & FILED
2018 JUL -6 PM 1:39
CLERK'S OFFICE
U.S. DISTRICT COURT
SAN JUAN, P.R.

IN RE: THE FINANCIAL OVERSIGHT MANAGEMENT BOARD FOR PUERTO RICO

as representative of THE COMMONWEALTH OF PUERTO RICO

CASE NO. 17-BK-03283-LTS

TITLE III

## MOTION REQUESTING DECLARATORY RELIEFS REGARDING THE OWNERSHIP OF PUERTO RICO'S DEBT, LEAVE TO PROCEED IN DERIVATIVE STANDING AGAINST THIRD-PARTIES ON BEHALF OF THE BANKRUPTCY ESTATE, AND RELATED RELIEFS

Javier Mandry Mercado, pro se, respectfully requests this Court to: 1) Assign Legal Counsel to proceed with the requested derivative claims and Issue a declaratory relief regarding the obligation of the debt, both to the United States and to the bond funds; 2) Grant leave to file adversary complaints on behalf of the Estate and representing the movant and all who were wronged by the Automatic Stay, as well as against representing all who were affected by the bond funds.

### I – PRELIMINARY STATEMENT

Since this this movant's initial intervention in this case, my condition as pro se forced me to embark in the monumental task to analyze the ambiguous Promesa Act and the Bankruptcy Code, in search of two answers: My first inquiry was directed at whether the automatic stays were improperly applied by the Department of Justice of PR against third-parties, of which I was affected, affecting peoples' rights who have no interest in neither the property of the Estate, for they cannot be considered neither debtor, nor a creditor; In tandem, whether the state actors involved acted in collusion and for purposes of unjust enrichment; My second inquiry involved whether the debt of Puerto Rico can be proven is not a matter of merely local concern; If so, then

whether United States liable in whole or in part of the debt of Puerto Rico. These issues are suggested to involve core and related issues. As previously stated, I believe that the Puerto Rican people are not being represented in these proceedings. I opine that there is an issue conflict of interest, false presumptions, and manipulation of these proceedings. This motion includes a mandamus component to the Fiscal Control Board regarding the need to audit the debt as not being a discretionary matter; Even as the Oversight Board has ample latitude to exercise its discretion within the guidelines of the Promesa Act established guidelines, there are restrictions that lie outside of the Promesa Act that forces compliance as a contractual obligation. My intervention here lies in my understanding that these proceedings are in new point-of-view. Even as "truth is in the eye of the beholder", I consider that some facts may persuade a paradigm shift.

## II – CONSTITUTIONAL LIMITS OF THE DEBT OF THE COMMONWEALTH OF PUERTO RICO

### A) INTRODUCTION

Per José R. Nadal Power[1], currently a representative of the Puerto Rican Senate, summarized the problem in his article[2], describing how our Constitution, Article VI Section 2[3] of the Constitution of Puerto Rico requires that the debt to not exceed fifteen (15) percent of the annual income. However, he went on to describe how the Government circumvented a "rule of

---

[1] https://bit.ly/2MKxLIT
[2] Nadal-Power, Jose R. "Respect the Constitution" El Nuevo Dia Newspaper, April 29, 2016 link: https://goo.gl/zMvFfk
[3] Section 2 Constitution of PR states "The power of the Commonwealth of Puerto Rico to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. The power of the Commonwealth of Puerto Rico to 'contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly, but no direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year; and no such bonds or notes issued by the Commonwealth for any purpose other than housing facilities shall mature later than 30 years from their date and no bonds or notes issued for housing facilities shall mature later than 40 years from their date; and the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues. "

law" by creating an "extra-constitutional debt" through the Government Development Bank ["Banco Governmental de Fomento"], issue that the author claims occurred during a period of over twenty years. Even as the constitutional debt was surpassed, the bond funds continued to lend money. This movant remembers that Puerto Rican bonds were considered "safe" investments, although not an investor, I stand to be affected by the bond funds who marketed the bonds of "guaranteed debt" [ prioritized by the Constitution]. Although this movant is no expert in financial fraud or in negligent misrepresentation, it is a well-known fact that financial instruments are oftentimes valued by extrinsic means.

Per Llorens[4], the audit commission found that the bonds were issued in excess of the fifteen percent, and with expiration dates in excess of the thirty-year maximum, as a constitutional requirement. However, the author claims that Puerto Rico cannot use this argument in Court, because it would require performing an audit of the debt. In this movant's opinion, to not audit is not an option that the Oversight Board can consider on its own. Even as the Commonwealth of Puerto Rico may claim that I lack standing, I will point out that in a separate motion how the Commonwealth of Puerto Rico has incurred in violations fail the capacity test to be able to represent the People of Puerto Rico, as per the definitions of Promesa Sec. 301. Finally, I plan to demonstrate that if Congress is bound to the constitutional limits, as product of the Compact between Puerto Rico and the United States, then so is the Oversight Board. [For an overview of the topic, see: Adam W. McCall, *Why Congress Cannot Unilaterally Repeal Puerto Rico's Constitution*, 102 Cornell L. Rev. 1367 (2017) Available at: http://scholarship.law.cornell.edu/clr/vol102/iss5/4

B) <u>STANDING AND JURISDICTION</u>

<u>Per Re: Urohealth Systems, 252 F.3d 504 (1st Cir., 2001).</u> The Supreme Court has defined the parameters of the use of writs, holding them to be "extraordinary remedies . . . reserved for really extraordinary cases." *Will v. United States, 389 U.S. 90, 107 (1967)*; see also Boreri v. Fiat S.P.A., 763 F.2d 17, 26 (1st Cir. 1985). Furthermore, it is well-established that an extraordinary writ, such as a writ of certiorari or a writ of mandamus, may not be used as a substitute for an

---

[4] Llorens, Eva., *Will the U.S. government be held liable for Puerto Rico's debt?*, Caribbean Business, May 3-9, https://goo.gl/y392gT

appeal and will not lie if an appeal is an available remedy. See, e.g., Stauble v. Warrob, Inc., 977 F.2d 690, 693 (1st Cir. 1992) (mandamus is not a substitute for appeal and will not lie if the petitioner has a remedy through a direct appeal); In re Bushkin Assocs., Inc., 864 F.2d 241, 243 (1st Cir. 1989) (mandamus will not lie if there exist other adequate means to attain relief).

This movant asserts Traditional standing and taxpayer standing, pursuant to *Flast*, 392 U.S. 83, 103 (1968). [holding that a taxpayer has standing to challenge legislation enacted under the Taxing and Spending Clause if the taxpayer invokes any constitutional provision—be it structural or one that confers private rights— that limits Congress's taxing power. See id. at 102–04; cf. id. at 114 (Stewart, J., concurring) (basing standing on the conclusion that "every taxpayer can claim a personal constitutional right not to be taxed for the support of a religious institution")]; *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (explaining that the constitutional minimum of standing contains three elements: (1) an injury in fact (2) that is both fairly traceable to the defendant and (3) that a favorable decision will redress); accord Bennett v. Spear, 520 U.S. 154, 162 (1997)*.

To be able to demonstrate the underlying problem behind this case, it necessary focus on the 'annexation' of Puerto Rico to the United States, as the procedure that permits the United States to allow foreign territories into the union. The state of Texas was used as a guideline as to what occurred in Puerto Rico that did not occur in Texas. In Texas, the annexation[5] was a novel matter with many issues, even when it is not bound to the Territory Clause but to a Treaty. Despite the differences, both are contracts. Per the Jones Act of 1917, Congress granted to the residents of Puerto Rico irrevocable American citizenship; However, unlike Texas, Puerto Ricans did not propose their status. "Behind closed doors", Congress met with Luis Munoz-Marin[6], then Puerto Rico's first democratically elected governor who decided what relationship Puerto Rico, once a territory belonging to Spain, now to the United States. Congress recognized that the governor entered into a compact[7] which did not change that did not change the pre-compact fundamental relationship, as per the U.S. Supreme Court interpretation of *Harris v. Rosario,*446 U.S. 651, 651–

---

[5] Earl M. Maltz, THE CONSTITUTION AND THE ANNEXATION OF TEXAS Constitutional Commentary Vol. 23:381, https://goo.gl/gixxTE
[6] See: Article 1, infra.
[7] PR Ley Publica 600 (1951) https://bit.ly/2KstOFt

52 (1980). Even as President Truman considered[8] the possibility of Puerto Rico being a state in 1948, Puerto Ricans were never granted a referendum[9] to choose the status but rather to approve the first draft of the PR Constitution[10]. Because of pressure of the United Nations, the United States entered into a compact, which by its own accord-maintained Puerto Rico under congress' plenary governing power of the **Territory Clause** of the Constitution. U.S. Const. Art. IV, § 3, cl. 2. [It is assumed that Congress to have had the upper hand and could have decided on any other type arrangement.]; In consequence, Congress passed Public Law 600, finally authorizing Puerto Rico to approve their Constitution, with corrections. Congress rejected the first draft, requiring the elimination of a section.

### C) THE COMPACT WITH PUERTO RICO AND THE DUTIES THAT THIS ENTAILS FOR CONGRESS REGARDING THE TERRITORIAL DEBT

Public Law 447[11] per its text is "An Act to provide for the organization of a constitutional government by the people of Puerto Rico, approved July 3, 1950, was adopted by the Congress as a compact with the people of Puerto Rico, to become operative upon its approval by the people of Puerto Rico"

Per Mr. Byrd (Alabama)[12], during the June 2016 hearing, demonstrated that Congress already had prior knowledge that the debt was a concern, with a hint regarding the obligation of Congress to the territory: *"In this particular case, out of the blue, we have been told by the United States Treasury that it is our constitutional responsibility to do something to save a territory from years of its own fiscal irresponsibility. For years, the entire Federal Government was, essentially, asleep at the wheel as one of our territories ran up huge, unsustainable debts until the day arose when the territory could no longer pay.... According to the Treasury, this was even worse. It would represent an unprecedented expansion into the finances and solvency of a U.S. subsovereign. **Apparently, this administration doesn't like the Territories Clause of the Constitution** unless it is being used at the very last minute to save Puerto Rico.* [A full reading of page H3630 suggests

---

[8] http://www.presidency.ucsb.edu/ws/?pid=14089
[9] March 3, 1952 Referendum was to choose the First Draft of the Constitutyion of PR
https://en.wikipedia.org/wiki/Puerto_Rican_constitutional_referendum,_1952
[10] November 4, 1952 Referendum was a response to the order intertwined in Public Law 447
[11] https://goo.gl/mMZbYA

[12] Source: [Congressional Record June 2016, at H3630],

5

that the US Treasury has been negligent at supervising the Territories' debts.] By "not liking", it is suggested to mean knowledge of a fact, but the lack of recognition of another. However, it is not the duty of Congress to interpret the law, but that of the Courts to force compliance of the United States, if the need arises.

Per Luke Messer[13] *"PROMESA seeks to prevent impending Puerto Rican defaults and a full scale economic collapse in much the same way. According to the bill's sponsor, Rep. Norma Torres (D-CA) 'Years of disastrous polices have completely wrecked Puerto Rico's economy. As a result, the island and its millions of American citizens face a humanitarian crisis. That's why we must allow for a responsible restructuring for Puerto Rico's debt, **and do it without using Wisconsin taxpayer dollars for a bailout**.'*

Per Public Law 600, the United States Congress approved the second draft to the Constitution of PR Every provision, which included the provision for debt limitation and the maximum life of a loan. The US Supreme Court, in ***Torres v. Puerto Rico, 442 U.S. 465, 470-473 (1979).*** "…Congress may make constitutional provisions applicable to territories in which they would not otherwise be controlling." One of these provisions that Congress required involved the limitations of debt. [emphasis supplied]

### D) THE TERRITORIAL DEBT AND PROMESA-RELATED MATTERS

In <u>Limtiaco v. Camacho, 549 U.S. 483 (2007)</u> the Supreme Court held that a debt-limitation is not a matter of purely local concern provision protects both Guamanians, and in contradistinction to Puerto Rico's debt because it is likewise a territory] and the United States from the potential consequences of territorial insolvency. The Court also commented on other relevant topics such as of the debt as a tax to the People, and how Congress did not intend for the Governor to circumvent that requirement, as it happened in Puerto Rico.

Per Justice Thomas, in his summary of the majority opinion: *"The Legislature of Guam authorized Guam's Governor to issue bonds to fund the Territory's continuing obligations. Concluding that the bonds would violate the debt-limitation provision of the Organic Act of Guam, §11, 64 Stat. 387, as amended, 48 U. S. C. §1423a, the attorney general of Guam refused to sign contracts necessary to issue the bonds. In response, the Governor sought a declaration from the*

---

[13] H.R. 5278, PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT OF 2016 (PROMESA) https://policy.house.gov/legislative/bills/hr-5278-puerto-rico-oversight-management-and-economic-stability-act-2016-promesa

1  *Guam Supreme Court that issuance of the bonds would not violate the Organic Act's debt*
2  *limitation. The Guam Supreme Court held that §1423a limits Guam's allowed indebtedness to 10*
3  *percent of the appraised valuation, not the assessed valuation, of taxable property in Guam. We*
4  *granted certiorari to decide whether Guam's debt limitation must be calculated according to the*
5  *assessed or the appraised valuation of property in Guam. We hold that it must be calculated based*
6  *on the assessed valuation."*

7  In *Limtiaco*, supra, The US Supreme Court granted certiorari from the Guam Supreme Court precisely because the debt is not a matter of local concern, which is suggested to mean that the United States would be at least a co-guarantor of the debt. In the Promesa Act, however, Congress decided to set aside its fiscal responsibility, issue whose effect will be to motivate downwards spiral of the economy which has not hit bottom. The estimated costs associated to PROMESA is estimated in Four-Hundred Million Dollars. [This movant claims that this amount is grossly underestimated, later discussed.]

In *Limtiaco*, supra, (Souter, Op) **"I see no tie-breaker in comparing Guam's debt limitation with those of other Territories."** [This, as circumstantial evidence that the United States Congress imposed a provision regarding Referring to the Organic Law of Guam, similar to our Constitution, "The statute itself makes clear that what Congress meant to provide was a practical guarantee against crushing debt on the shoulders of future generations, and insolvency with the inevitable call for a bailout by Congress. See *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439, 455 (1993) (" '[L]ook to the [law's] ... object and policy' " (quoting *United States* v. *Heirs of Boisdoré*, 8 How. 113, 122 (1849))).

The costs associated to achieve that the expenditures made by the territorial government must not exceed the

SEC. 210 of Promesa "NO FULL FAITH AND CREDIT OF THE UNITED STATES. (a) IN GENERAL.—The full faith and credit of the United States is not pledged for the payment of any principal of or interest on any bond, note, or other obligation issued by a covered territory or covered territorial instrumentality. The United States is not responsible or liable for the payment of any principal of or interest on any bond, note, or other obligation issued by a covered territory or covered territorial instrumentality. (b) SUBJECT TO APPROPRIATIONS.—Any claim to which the United States is determined to be liable under this Act shall be subject to appropriations. **(c) FUNDING.—No Federal funds shall be authorized by this Act for the payment of any liability of the territory or territorial instrumentality."**

Regarding Sec 210(a), the Supreme Court in *Franchise Tax Board v. Hyatt*, 538 U.S. 488, 494 (2003), quoting *Baker v. General Motors*, 522 U. S. 222, 232 (1998). *"[o]ur precedent differentiates the credit owed to laws (legislative measures and common law) and to judgments."* [My point is that the legislation approved by the 82nd Congress should be considered in any issue

1 in which would not be in direct conflict with the compact and the Promesa Act]; Regarding Sec 210(B), the Promesa Act clearly states that the United States will not use federal funds to pay any part of the debt. However, it is suggested that in doing so violate the compact between the United States and Puerto Rico, formalized as per Public Law 600.

**Wherefore,** a declaratory relief is requested to declare Sec 210 (b) of the Promesa Act, for being in violation of Public Law 600, the Territories Clause, as the contrary would violate *Torres v. Puerto Rico*, supra, in terms of the discretion of Congress, and force compliance of the contractual obligation.

E) DISCUSSION OF LAW

The Promesa Act has been the tool that the United States used to prevent the debt problem from affecting the common treasury; However, the very reason that United States Congress intervened was because of their recognition to intervene. The problem with the Promesa Act is that does not establish the limits of the debt, how much the economy can sustain before it will collapse, or how much the Puerto Rican people can withstand the taxation of the debt. Other laws dictate the procedure for these issues; Even as many states do not want to be taxed for Puerto Rico's debt, the issue is suggested to involve a contract/compact where the United States Congress deliberated and determined the conditions of the agreement, which per McCall[14] was bilateral in nature. It is suggested that not considering the debt limitation would mean that Promesa Act would preempt *Public Law 600*, the Territory Clause of the US Constitution, and the relevant provisions of the PR Constitution. In *Limtiaco*, supra, the Supreme Court analyzed the inverse of the current situation of Puerto Rico, disproving of any intention to exceed the debt-limitation by creative means, with the primary goal being to prevent the effect of the territorial debt to the federal treasury. *"Once Congress approved that proposal—subject to several important conditions accepted by the convention—the Commonwealth of Puerto Rico, a new political entity, came into being."* Puerto Rico v. Sanchez Valle, 579 U.S. ___(2016)

On June 30, 2016, the United States enacted PROMESA to address the fiscal emergency in Puerto Rico. PROMESA establishes a seven-member Financial Oversight and Management

---

[14] Adam W. McCall, *Why Congress Cannot Unilaterally Repeal Puerto Rico's Constitution*, 102 Cornell L. Rev. 1367 (2017) Available at: https://scholarship.law.cornell.edu/clr/vol102/iss5/4

Board ("Oversight Board") for Puerto Rico. PROMESA §§ 101(b)(1), (e)(1)(A), 48 U.S.C.A. § 2121(b)(1), (e)(1)(A). "The purpose of the Oversight Board is to provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets." Id. § 101(a). The Oversight Board operates as an entity within the Puerto Rico Government, id. § 101(a), and is tasked with several responsibilities and endowed with several powers. PROMESA envisions that the Oversight Board will be fully appointed by September 15, 2016, and fully operational sometime thereafter. Id. §§ 101(e)(2)(G), (h). I would only wish that Puerto Rican politics were as honorable, as to allow a foreign entity to interfere. If it does, then the People would be the most impacted by the results of the internal feuds, issue why I claim that Congress[15] and the President considered that the Promesa Act should serve to the humanitarian crisis, and not just the debt crisis.

SEC. 209 of the Promesa Act aims to ensure that upon termination of the Oversight Board, that (1) the applicable territorial government has adequate access to short-term and long-term credit markets at reasonable interest rates to meet the borrowing needs of the territorial government; and for at least 4 consecutive fiscal years, that the territorial government has developed its Budgets in accordance with modified accrual accounting standards; and during four consecutive years the expenditures made by the territorial government during each fiscal year did not exceed the revenues of the territorial government during that year, as determined in accordance with modified accrual accounting standards. One of the major problems in Puerto Rico has been transparency, a problem that persists to this day, and unless the Oversight Board exercises its discretion, nothing is expected to change in this area. Per initial estimates, the costs associated to the Promesa Act are estimated in $370 million (Source: El Nuevo Día Newspaper, citing[16] the Congressional Budget Office) Because of the standstill that has been characteristic of the Governor and the Oversight Board, and in light to recent "Acts of God" or of those that might occur in the future, the "need" for the Oversight Board is expected to prolonged by its own discretion, thus exacerbating the debt with added expenses.

In the real world, neither people nor entities would openly admit to neither wrongdoing, nor their *ex jure* obligations such as Public Law 600, the Territories Clause, the Constitution of Puerto Rico, as would be the case of Congress. The adversarial process allows for opposing parties

---

[15] https://www.theatlantic.com/politics/archive/2016/05/congress-puerto-rico-bill-promise/483572/
[16] https://www.elnuevodia.com/noticias/politica/nota/boardwillcosthundredsofmillionsofdollars-2206625/

to use the Courts to make their allegations. However, parties that are generally opposing, but there are "reasons" why they would not be. My proposition proffers to include the People of Puerto Rico as a class, represented by this movant and the standing conferred to uphold the Constitution. Even with the scope of the powers that the Promesa Act has conferred to the Oversight Board [Eg. "...Broad authority over the Commonwealth and its instrumentalities, per § 101(c), to approve budgets per §§ 201-202, to enforce budget and fiscal plan compliance, §§ 203-204; to seek judicial enforcement of its authority, and to intervene in any litigation filed against the Commonwealth§ 101(d)(1)], all of these powers can be negated if the Oversight Board fails to exercise its discretion which is enclosed in its independent authority.

Different litigants and non-litigants alike have different agendas, and I am here to point out that without first addressing the torts and the *de jure* obligations, the Oversight Board will be forced to infringe upon a Constitutional provision regarding debt limitation; I suggest that the financial companies are alleged to have negligently misrepresented to "thousands" of people who "fell for" the effective marketing of these bonds, in false reliance that they were sound investments only because they were constitutionally guaranteed. The foreseeability of the bond fund managers for the bonds to defaulted should be assessed. If this Court were to determine that the financial crisis to the Commonwealth of PR as a result of these acts, then these firms should be held liable pursuant to the law of obligations; Also, having marketed the bonds of Puerto Rico as "constitutionally guaranteed" are alleged to have had a direct effect on the supply of funds used lend to the Commonwealth of Puerto Rico because it caused a false reliance upon the investors on its relative trustworthiness of the investment, thus creating a "financial bubble" as a result of the unsustainable debt that this created; In 1895 U.S. Supreme Court ruling, *Litchfield v. Ballou*, because Litchfield was a municipality in Illinois who had originally sold the bonds in violation of its legal debt limit, the ruling said the city did not have to pay that debt. A declaratory relief is requested to resolve this controversy.

The Promesa Act has been the tool that the United States used to prevent the debt problem from affecting the common treasury; However, it is suggested that what moved the United States Congress to pass the Promesa Act was because of their recognition that the Territories Clause required them to do so. However, the Promesa Act does not include nor how much the economy can sustain before it will collapse, or how much the Puerto Rican economy will sustain in debt

transferred to taxes; Also, because the People have no "real" representation in Congress, the fact that the Act does not foresee the macro-economic implications, such as the debt-per-capita, then the fact that "illegal debt" would be converted into a legal tax is suggested to be in conflict with the fact that many states do not want to be taxed for Puerto Rico's debt. Therefore it is suggested that this Court should review the provision in the Puerto Rican Constitution should be analyzed pursuant to Contract Law, in full recognition that it involves a contract/compact where the United States Congress deliberated and determined the conditions of the agreement.

**Wherefore**, this movant requests that this Court would grant leave to file adversary proceeding, on behalf of the bankruptcy estate, against the United States of America, to determine the extent which these parties are liable for the debt, against all creditors of the debt, how their actions led the bond funds to be self-inflicted with a debt that was foreseeably unsustainable.

### III- AUTOMATIC STAYS AGAINST THIRD-PARTY / NON-CREDITORS

A) THE CONSPIRACY TO PARALYZE ALL CASES TO NON-CREDITORS, WHICH IS ALLEGED TO HAVE INITIATED IN CASE JAC2008-0853 OF THE PONCE COURT (DOCKET 305). THE FACTS ARE AS FOLLOWS:

1. On May 22, 2017 - the Commonwealth of PR filed Request to paralyze case pursuant to Automatic Stay in case JAC2008-0853 of the Ponce Court.

2. On June 15, 2017, I filed a motion, and in the relevant part, I suggested that in light of the novel bankruptcy application, that the Commonwealth of PR should request a a Certified Question from the Promesa Court. At the time, I did not consider that I could be considered a creditor, per the bankruptcy definition. [See Appendix A]

3. On June 20, 2017, the state Court notified judgment to paralyze proceedings. On that same date, the plaintiffs of said case requested a relief of the automatic stay [without notifying me of the pending proceeding], as per Docket 305 of this case. The Court did not consider my allegations.

4. Per motion filed in Docket 305 on June 20, 2017, Maria Vicens, Esq. identified the movants as <u>creditors</u>. Per review of the docket before this date, this was the first time that a relief had identified the parties as creditors. I allege that the wording was intentional, to confuse the Court and other litigants who would follow suit on the idea that cases that did not involve the recovery of a debt

relevant to the Estate. The belief is based on knowledge of actual conspiracy between Cesar Hernandez-Colon (representing the movants in the state claim) and his manipulation of forced condemnation proceedings, in conjunction with Anita Cortes from the Highway Authority and other agencies. Per personal experience and belief, his tactics are those that liken racketeering, using his political contacts as brother of ex-Governor Rafael Hernández-Colon, so that the docket of the case would be too busy to handle other matters.

5. On December 5, 2017, Judge Rosado-Colomer, a judge that was assigned per the political affiliations of Cesar Hernandez-Colon, ordered for my motion dated June 12, 2017 to be stricken from the record, per motion by Mr. Hernandez to that effect, issue that had become his *modus operandi* to prevent any opposition. This included a threat to fine me $5000 and hold me in contempt of court. [See Appendix A, which includes the motion that the Court removed from the Court record, in alleged violation of due process.]

6. On February 14, 2018, the First Circuit Court issued an order to all parties to which the Court had jurisdiction to show cause as to why the appeal should or should not be subjected to the automatic stay. [See Appedix B]

7. On February 28, 2018, the Commonwealth of Puerto Rico replied by means of its Governor continued the same skewed argument that the automatic stay applied to third-parties, disregarding and misinterpreting all cited cases. [See Appendix C]

8. Luis-Roman Negron, the Solicitor General who answered for the Governor resigned on May 25, 2018, for matters that allegedly involved him in what was known as the "whatsapp conspiracy"[17] involving officials of all branches of government. This movant has the belief that one of the conspiracies involved in said conspiracy included the automatic stays against third-parties, as an added benefit to use assigned funds to cover state expenses and reduce attorney costs during this period.

9. On or about February 28, 2018, this movant replied to the order to show cause, raising an issue of due process violation to those third-parties who did not serve a

---

[17] https://bit.ly/2seNb99

legislative purpose. At the time, I had not considered the possibility of a conspiracy. [See Appendix D]

B) DISCUSSION OF LAW

First, there is nothing "automatic" about the automatic stay. In a standard bankruptcy, the debtors and the creditors are well defined. Although initially I did not recognize it as a conspiracy, there is only "so much" one can possibly consider as an error without it being intentional; As much as I recognize my relative inexperience, in hindsight, I also have had to presume that there are lawyers who are professionals. My analysis here involves logic to demonstrate a belief that the issue involves scienter and not mere negligence. Although my opinion as *pro se* is questionable, I have observed how Cesar Hernandez-Colon performs his "magic" during the last ten years. Ambiguity in laws creates opportunities, which I can attest by observing the before-mentioned individual, to have used the ambiguities despite multiple constitutional violations. Because of the manner in which he has colluded with officials of the state, most who were found been designated by the PPD party for which he is affiliated, I consider him and suggest that he is state actor.

Per Spero & Gordon[18], "Although only a debtor is entitled to the protections of the automatic stay under Section 362, a Bankruptcy Court may grant extraordinary relief and extend the stay to actions against a non-debtor using its authority under Section 105. Those extensions, however, are reserved for "'special circumstances', and typically apply to lawsuits which threaten serious risk to a [bankruptcy] reorganization in the form of immediate adverse economic consequences for the debtor's bankruptcy estate." A special circumstance was best demonstrated in *A.H. Robins Co. v. Piccinin 321 F.3d 282 (2d Cir. 2003)*, the Court held that the **debtor** has the burden [Eg. not the third party by means of a relief] to demonstrate the existence of "unusual circumstances" and must explain why the failure to extend the stay would pose a "serious threat" to the debtor's reorganization efforts. *A.H. Robins Co.*, at 282. In Another exception cited in the article, *Queenie, Ltd. v. Nygard Intern*, the U.S. Court of Appeals for the Second Circuit concluded that the automatic stay applied to an action commenced against, *inter alia*, a non-debtor corporation that was wholly owned by an individual Chapter 11 debtor. According to the Second

---

[18] MATTHEW V. SPERO, *The Reach of the Automatic Stay in Bankruptcy: Far, But Not that Far.* December 10, 2015 https://goo.gl/4gkZAa

13

Circuit, "the automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." Pursuant to the latter, the process should be the inverse of what happened.

Citing partly *Brigade*, infra, Thus, the PROMESA stay extends to actions that are about, concern, and relate to a "Liability." Nothing in PROMESA's statutory text indicates that claims have to "arise out of a Liability" to be included in the scope of the stay...PROMESA defines "Liability" as follows: The term "Liability" means a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, or obligations whether such rights, entitlements, or obligations arise from contract, statute, or any other source of law related to such a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness. PROMESA § 405(a)(1), 48 U.S.C.A. § 2194(a)(1) (emphasis added). **Thus, PROMESA automatically stays actions "with respect to" "rights, entitlements, or obligations ... related to ... a bond" issued by the Government of Puerto Rico before June 30, 2016.** Id. §§ 405(a)(1), (b). See: Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla, 2016 WL 4435660, at *2 (D.P.R. Aug. 22, 2016) [The Court held that bonds were subject to automatic stays, as the question was never whether third-parties would be subject to the automatic stay. ] The issue here is not just that the automatic stays against third parties were performed with scienter, and not mere negligence. determine that the act was performed with scienter, then it may be alleged that all cases were intentionally subjected to the automatic stay because the moneys that were designated would be used to compensate for other purposes.

PROMESA provides for an automatic stay of certain actions against the Government of Puerto Rico upon the act's enactment. § 405, 48 U.S.C.A. § 2194. The United States Congress deemed that an immediate—**but temporary**—stay is essential to stabilize the region for the purposes of resolving" Puerto Rico's fiscal crisis. Id. § 405(m)(5). The stay "allow[s] the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly **creditor lawsuits.**" Id. § 405(n)(2). The stay also gives the Oversight Board time "to determine whether to appear or intervene on behalf of the Government of Puerto Rico in any litigation." Id. § 405(m)(5)(A). ... The automatic stay remains in effect until the earlier of (1) February 15, 2017,

14

with a **possible extension of sixty or seventy-five days,** or (2) the date on which the Oversight Board files a petition on behalf of the Government of Puerto Rico or any of its instrumentalities to commence debt-adjustment proceedings pursuant to title III of PROMESA. PROMESA § 405(d), 48 U.S.C.A. § 2194(d). *See: Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*, 2016 WL 4435660, at *2 (D.P.R. Aug. 22, 2016) (citation omitted). [Although I am seeking a declaratory relief against all cases that I claim were improperly subjected to the automatic stay, this motion covers an issue that applies to all the true creditors of the bankruptcy estate. More sooner than later, this Court will be obliged to release all the automatic stays, at which point the Courts would be obliged to proceed with their claims. The issue regarding the obligation of the debt can be used to extend the period until the matter is resolved. A class-action claim regarding the matter of the obligation could prevent numerous claims against the Commonwealth of Puerto Rico which would force compliance of a debt; As a matter of strategy, this would avoid the multiplicity of claims, and render the debt collection as unripe, and all things considered, allow for a more just approach to the solution of the debt situation.

Currently, this Court's default definition of a "party of interest" is anyone who the Commonwealth of Puerto Rico, or its agents, decided would be subject to an automatic stay, without having to first prove that the third-party would hinder reorganization; Although I am not familiar with their reasoning, nothing that they do seems to be for the general benefit, but for the benefit of a few. If one is affected by the state's Eminent Domain Power, or if it involved a damage claim, whose right to execute on the obligation would become ripe after the declaration that the right exists, the automatic stay should occur upon the attempt to execute on a judgment, not before. However, it is the state would be forced to bear the burden of proof, ordinary citizens would not be affected by this automatic stay. Currently, I am a party to at least two forced condemnation claims that were subjected to an automatic stay, which involves the states eminent domain power. The Just Compensation Clause is a constitutional mandate because this is a forced condemnation claim. To make it subject to the automatic stay would necessarily mean that Promesa Act and the Bankruptcy Code preempt the Just Compensation Clause.

Per *In re: Skorich*, 482 F.3d 21 (1st Cir., 2007), the First Circuit Court clarified the Bankruptcy Code and some technical definitions: *"A "creditor" is any "entity that has a claim against the debtor" that arose before the bankruptcy petition was filed, 11 U.S.C. § 101(10); a*

15

*"debt means liability on a claim," id. § 101(12); and a "claim" is a: (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured Id. § 101(5)."*

Pursuant to the creditor definition, as party to the Inverse Condemnation claim (Docket 305) which was improperly and incorrectly subjected to the automatic stay, I suggest that am neither a creditor nor a debtor of the bankruptcy estate. However, the first motion of Docket 305 on this issue clearly states that the movants are creditors. Because Cesar Hernandez-Colon, the brother of ex-Governor Rafael Hernandez Colon, represents the movants of the relief of the stay (not including me), plus I have confirmed the manner in which he uses the political connections for purposes of collusion, I assert to have a basis to believe that the automatic stay to non-creditors involved an act that was intentional. Furthermore, it is suggested to violate the legislative intent of the automatic stay. Most courts would consider an injunctive remedy to include non-parties. See: **Ginsberg and Martin on Bankruptcy** *§3.02 Exceptions to Automatic Stay;* opinion in *Nelson, In re*, 994 F.2d 42 (C.A.1 (Mass.), 1993), citing *Martin-Trigona v. Champion Fed. Sav. & Loan Assoc.*, 892 F.2d 575, 577 (7th Cir.1989) "*[The purpose of the automatic stay] ...is to protect the bankrupt's estate from being eaten away by **creditors' lawsuits** and seizures of property before the trustee has had the opportunity to marshal the estate's assets and distribute them equitably among the creditors.*"

**Wherefore**, I request that this Court to order the Commonwealth of PR to identify and prove why the automatic stays against third-parties, such as this the movant as per Docket 305, fit the relevant bankruptcy law, and not because the automatic stay provides a "breathing room" from lawsuits.

IV - <u>REQUEST FOR ASSIGNMENT OF COUNSEL AND COMPENSATION</u>

Finally, I request that either the Court would appoint a firm, preferably from outside of Puerto Rico to represent me in the defense of this motion. In tandem or alternatively, I request that this Court would authorize the use of Commonwealth of PR funds, which may later be included in the overall obligations of the debt. Although I am not an attorney and cannot directly represent the

16

estate, my analysis of strategy of this case should be compensated, especially when its intention is to save millions of dollars. For reasons for which I can only imagine, there seems to be an interest to prevent that this declaratory relief from prospering; Nevertheless, because this issue involves the defense of the Commonwealth of PR as a legal entity and its bankruptcy estate should be primary to anyone's' desire to conceal wrongdoing. Sec 316 of Promesa provides the tools for this Court to compensate professionals. Even as the words SEC. 316. COMPENSATION OF PROFESSIONALS, at 316(a), states that the court may award to a professional person employed by the debtor **"in debtor's sole discretion"**. In light that the issues discussed in this motion are alleged to supersede the authority of the Oversight Board, the substitution for the business judgment rule is in this Court's discretion, and thus suggested to constitute a substitute for the debtor's discretion. Finally, for purposes of compensation for my work which would continue during the derivative action case, please consider that I am a professional, albeit not of law, please consider it as that the fact that I am working in the best interest of the juridical entity known as the "Commonwealth of Puerto Rico", as to be due a compensation pursuant to law.

V) <u>PRIOR MOTIONS RELATED TO THIS ONE</u>

There are no prior motions that have been filed that have direct relevance to this one, even though this motion does affect the retroactive determination of the relief of the stay granted as per Docket 305, et seq.

**Wherefore**, this movant requests that this Court would grant the foregoing declaratory reliefs, assign a specialized out-of-state attorney, and therefore grant leave to file the requested adversary complaints on behalf of the debtor's estate, and issue a declaratory relief regarding the request to grant this movant a) Grant attorney fees (42 U.S.C. 1988) and/or compensation for the preparation of this motion; b) Allow this movant to be able to be compensated for future work done in benefit of the debtor.

Dated: July 3, 2018

JAVIER MANDRY MERCADO
1326 CALLE SALUD APT 1101
PONCE, PR 00717
TEL 7874337395
MANDRYJ@YAHOO.COM