IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND | PROMESA Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS (Jointly |
| as representative of | Administered) |
| THE COMMONWEALTH OF PUERTO RICO, | BRIEF OF THE CIVIL RIGHTS |
| et al., | COMMISSION OF PUERTO RICO |
| Debtors[1] | AS AMICUS CURIAE |

**BRIEF OF AMICUS CURIAE ON THE NEED FOR A HUMAN RIGHTS BASED APPROACH TO THE GOVERNMENT OF PUERTO RICO DEBT RESTRUCTURING PROCESS**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808).

# TABLE OF CONTENTS

I.      INTRODUCTION

II.     CONTEXT AND CURRENT NORMATIVE FRAMEWORK: PROMESA AND
        THE FISCAL OVERSIGHT BOARD

   A. CONTEXT
   B. POWERS VESTED ON THE FISCAL OVERSIGHT AND MANAGEMENT
      BOARD
   C. ESSENTIAL SERVICES

III.    HUMAN RIGHTS FRAMEWORK FOR DEBT RESTRUCTURING

        A. CONTRIBUTION FROM BUSINESS AND HUMAN RIGHTS LAW
        B. THE INDEPENDENT EXPERT ON THE EFFECTS OF FOREIGN DEBT
           AND OTHER RELATED INTERNATIONAL FINANCIAL
           OBLIGATIONS

IV.     RECENT DEVELOPMENTS RELEVANT FOR DEBT RESTRUCTURING
        ADJUDICATION

V.      IMPACT OF DEBT RESTRUCTURING ON SPECIFIC HUMAN RIGHTS

VI.     GUIDING PRINCIPLES FOR DEBT RESTRUCTURING

        A. NON-DISCRIMINATION AND THE PROTECTION OF VULNERABLE
           GROUPS
        B. REAL AND EFFECTIVE PARTICIPATION
        C. ACCESS TO REMEDY

 VII. CONCLUSION

**TO THE HONORABLE COURT:**

Now comes the Civil Rights Commission of Puerto Rico (hereinafter Commission) and respectfully asks the Court to allow it to present arguments in favor of the adoption of a human rights approach to the Government of Puerto Rico debt restructuring process. Created by Act No. 102 of June 28, 1965,[2] the Commission operates with complete autonomy and independence from the government of Puerto Rico. As such, the views of the Commission are not representative of the Commonwealth of Puerto Rico or any other governmental entity. This entity constitutes what, under international human rights law, is considered the national Human Rights Institution (NHRI) of our jurisdiction and is vested with the responsibility to educate, investigate and seek redress for human rights violations.  As per Article 5 of the aforementioned Act, the Commission, after the approval of a majority of the Commissioners, is empowered to intervene in judicial processes as amicus curiae.[3] The Commission is faithful to its duties to:

(a)  educate the entire population on the significance of the fundamental rights and the means of respecting, protecting and exalting them;

(b) seek with individuals and before the government authorities protection of human rights and strict enforcement of the laws protecting such right;

[…]

 (e)  evaluate  the  laws,  standards  and  acts  of  the  Commonwealth  and  municipal governments in connection with the civil rights, and suggest reforms in respect to the same.

The Commission, concerned about the lack of discussion on the human rights standards applicable to public debt restructuring processes within Puerto Rico, with the best interest to promote adjudication practices that take into account this approach and following the express

---

[2] 1 LPRA §151 et seq.
[3] 1 LPRA §155.

unanimous mandate of its Commissioners[4], this entity respectfully requests leave to present an amicus curiae brief to this Court.

## I.      INTRODUCTION

The approval of the Puerto Rico Oversight, Management and Economic Stability Act (hereinafter PROMESA), has generated broad discussion on fiscal policies, austerity and debt adjustment. Whether these public debates take place within or outside the judicial arena, they have for the most part ignored human rights considerations that are critical to a debt adjustment process of this magnitude. Not taking fully into account human rights dimensions that are present in these circumstances creates an undue risk of downplaying or excluding from this debt adjustment process the effect that these procedures will have on the rights of most of the approximately 3.3 million inhabitants of Puerto Rico, particularly those that are impoverished and historically vulnerable.

As it has been the case with debt crises at in other jurisdictions, international human rights bodies have come forward to illuminate decision makers on the basic human rights guarantees, by developing standards and criteria to assess debt restructuring, adjustment and management. Debt restructuring analysis and adjudication cannot be carried out in purely financial terms. Just as the rights of creditors are to be protected, the consequences of unsustainable public debt and repayment policies on the living conditions of those affected by austerity measures must be prioritized.

This Amicus brief presents a succinct overview on how a human rights-based approach to debt restructuring, adjustment and management processes is urgently needed to guarantee the people in Puerto Rico dignified living conditions and the attention of their most pressing needs.

---

[4] Civil Rights Commission of Puerto Rico, Resolution 2018-1, of March 2, 2018.

## II. CONTEXT AND CURRENT NORMATIVE FRAMEWORK: PROMESA AND THE FISCAL OVERSIGHT MANAGEMENT BOARD

### A. Context

Puerto Rico has been affected by an economic recession that, according to conservative estimates, began on 2006. The outstanding debt owed by the Government of Puerto Rico surpassed $72,000,000, affecting the economies of the central government, its agencies, public corporations and other instrumentalities. Such economic crisis soon developed into a scenario of social and political instability, characterized by the imposition of harsh austerity measures, the looming menace of the privatization or shortage of essential services and increased poverty, inequality, unemployment and migration. Since then, and before the recent hurricanes struck Puerto Rico, more than 10% of the population migrated to the United States.[5]

On June 29, 2016 as a reaction to the Puerto Rico economic crisis and debt default, the United States Congress adopted the Puerto Rico Oversight, Management and Economic Stability Act, commonly known as PROMESA. Former President of the United States, Barack Obama, signed the bill into law on June 30, 2016.[6] The law establishes a Fiscal Oversight Board (hereinafter FOMB) of seven (7) members appointed by the President of the United States in consultation with Congress.[7] None of these officials are nominated or appointed by Puerto Rican authorities or elected by the people. The Governor of Puerto Rico, or his designee, is an *ex officio* member of the FOMB, but has no right to vote.[8]

---

[5] American Community Survey for Puerto Rico, (2016) Available at:
https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkmk
[6] Public Law 114-187, 48 U.S.C. §2101, et seq.
[7] 48 U.S.C. §2121 (e)(1)(A). It must be emphasized that the people in Puerto Rico does not have the right to vote for the President and its representation before Congress is limited to a Representative Commissioner, with no voting powers. Puerto Rico has been a territory of the United States since 1898.
[8] 48 U.S. C. §2121(E)(3).

The FOMB has the responsibility to approve a Fiscal Plan, jointly with the Puerto Rico government. As per the statute, this plan should comply with the following objectives, among others: "[to] provide a method to achieve fiscal responsibility and access to the capital markets" and "[to] ensure the funding of essential public services".[9] Since the appointment of the Board, the government of Puerto Rico has been engaged in negotiations for the development of the Fiscal Plan with the FOMB. The plan drafts that have been published mandate austerity measures, which will entail loss of labor rights, budget cuts, the closing of hundreds of public schools and plans to privatize essential public services.

On May 3, 2017, a civil claim was presented before this Honorable Court, under Title III of PROMESA, which provides a process of debt adjustment similar to bankruptcy.[10] Since then, several other claims have been presented to this Court, calling for the protection of creditors' rights and debt repayment. Other claims, such as the cases of the *Asociación de Profesores y Profesoras del Recinto Universitario de Mayagüez* (APRUM)[11] and *Rene Pinto Lugo et al*[12], have addressed issues regarding the impact of debt restructuring on human rights and the relationship between PROMESA and international law standards.

On September 20th, Puerto Rico was hit by Hurricane María, a major atmospheric event that had catastrophic impact on housing, infrastructure and the lives of those living in Puerto Rico. Two weeks prior to the impact of María, Hurricane Irma also affected Puerto Rico. As a consequence of these events, the totality of the electric infrastructure collapsed, as well as communications and water systems. Access to essential services and goods, such as health care,

---

[9] 48 U.S.C. § 2141 (1)(B).
[10] 48 U.S.C. § 2164.
[11] *In re: The Financial Oversight and Management Board for Puerto Rico as the representative of the Commonwealth of Puerto Rico, et al./ Asociación de Profesores del Recinto Universitario de Mayaguez, Inc. (APRUM) v. the Commonwealth of Puerto Rico*, et al . Docket Entry #44. Case 17-00197 (July 9, 2017).
[12] In re: *The Financial Oversight and Management Board for Puerto Rico as the representative of the Commonwealth of Puerto Rico, et al./ Rene Pinto Lugo et al*. Docket Entry #1. Case 18-00041, Adversary Proceeding. (April 24, 2010).

police protection, food and gas was, at least, precarious. Even now, nine months after Hurricane María, thousands of families remain without some of these services. According to experts on economics, poverty and development; the inequality and poverty rates in Puerto Rico have increased due to the economic situation and the hurricane created humanitarian emergency.[13] Outmigration has also worsened.[14] Claims regarding the inadequate response of both the governments of Puerto Rico and the United States to these crises have been presented before the Inter-American Commission on Human Rights.[15]

**B.  Powers vested on the Fiscal Oversight and Management Board**

The establishment of PROMESA and the implementation of the FOMB are the result of an exercise of the plenary powers vested upon the United States Congress by Art. IV, Sec. 3 of the United States Constitution.[16] This constitutional article grants to Congress the power "to dispose of and make all needful rules and regulations for territories".

According to PROMESA, Section 104, the FOMB has the power and authority to hold hearings and sessions, obtain official data from the United States and Puerto Rico governments, obtain creditor information, issue subpoenas, enter into contracts, enforce certain laws of the territory, recur to judicial civil actions to enforce its powers, and conduct investigations.[17] In addition the FOMB is empowered to engage in the "prompt enforcement of any applicable laws of the covered territory prohibiting public sector employees from participating in a strike or

---

[13] Centro de Información Censal de la Universidad de Puerto Rico en Cayey. "Proporción de Ingresos con respecto al nivel de pobreza". Universidad de Puerto Rico en Cayey, Núm. 25. Available at: http://online.pubhtml5.com/cbpt/jzur/.

[14] Instituto Caribeño de Derechos Humanos y Clínica Internacional de Derechos Humanos de la Facultad de Derecho de la Universidad Interamericana de Puerto Rico (coord.), *Justicia Ambiental, Desigualdad y Pobreza en Puerto Rico,* Informe Multisectorial sobre las violaciones de Derechos económicos, sociales y medio- ambientales tras el paso de los huracanes Irma y María en Puerto Rico. 7 de diciembre de 2017, pp. 23 y 223. Available at: https://www.scribd.com/document/378822943/Final-Informe-CIDH-Audiencia-PR-07-Dic-2017.

[15] Vista temática del Periodo de Sesiones 154 de la Comisión Interamericana de Derechos Humanos (CIDH) el 16 de marzo de 2015. OEA/Ser.L/V/II.162, 15 May 2017.

[16] 48 U.S.C. § 2121(b), US Const. Art. IV, Sec. 3.

[17] *Id.,* at § 2124.

lockout".[18] Regarding finances, the FOMB has the power to revise, reject, override and approve laws that may have fiscal impact.[19] It can also revise, reject and approve fiscal plans proposed by the Puerto Rico government and demand their enforcement.[20] As established in PROMESA, certifications of the FOMB regarding Fiscal Plans, government budget and any other related matters cannot be reviewed before any United States district court.[21] In addition, the statute grants immunity to FOMB members and employees. Section 105 states that "its members, and its employees shall not be liable for any obligation of or claim against the Oversight Board or its members or employees or the territorial government resulting from actions taken to carry out this Act."[22]

Another aspect of PROMESA is Sec. 301, which adopts sections 362 and 922 of the United States Bankruptcy Code providing an automatic stay of legal procedures against the Government of Puerto Rico that could result in the imposition of economic remedies or compensation.[23] This limits access to legal remedies for violations of human rights, even in those cases where Puerto Rican laws create specific legal actions and remedies for discriminatory, wrongful or negligent acts by public officials or employees.

## C. Essential Services

Section 201 of PROMESA states that any fiscal plan adopted to deal with the public debt crisis must ensure the availability of funding for the provision of essential public services.[24] Yet,

---

[18] *Id.,* at § 2124(h).

[19] *Id.,* at § 2144.

[20] *Id.,* at § 2141.

[21] *Id.,* at § 2126(e).

[22] *Id.,* at § 2125.

[23] *Id.,* at § 2161.

[24] *Id.,* at § 2141(b)(1)(B). Other requirements included are the following: the achievement of fiscal responsibility and access to capital markets; provide adequate funding for the public pension system; the elimination of structural deficits; provide a debt burden that is sustainable in cases where a stay under subchapters III and IV is not effective; the improvement of fiscal governance, accountability and internal controls; include a debt sustainability analysis, provide for capital expenditures and investments necessary to promote economic growth;  among others. (*Id* at § 2141 (b)(1)(from section A to N).

the law does not include a definition of the concept "essential services". Hints as to which services are protected by this category may be found elsewhere in the Act, such as: pension systems, infrastructure for energy, water, sewer, solid waste, highways or roads, ports, telecommunications.[25]

On several occasions, the FOMB has requested that the Puerto Rico government define essential services.[26] It was not until the presentation of the March 2017 Fiscal Plan to the FOMB that the Puerto Rico government enumerated five areas of "critical services": health, education, public safety, Department of Justice and public infrastructure. Yet, the Puerto Rico government has failed to define essential services in the "Fiscal Plan Compliance Law" adopted on April 26, 2017.[27] Similarly, the 2018 Fiscal Plan, titled "New Fiscal Plan for Puerto Rico" which is still being subjected to revisions, does not contain language referring to essential or critical services.[28] It repeatedly enumerates changes which will generate decreases in funding in areas such as education, health, family services, public safety and housing.

Under Title III of PROMESA, the Court needs to ensure that the adjustment plans "are feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and Constitution of the territory would result in a greater recovery for the creditors than is provided by such plan".[29] As it has been noted by the Center for a New Economy and others, one of the elements used to define whether an adjustment plan is "feasible" is its relationship to the provision of essential services.[30] Given that the concept

---

[25] See, for example, 40 USC § 2141 on pensions, § 2211 on electric infrastructure as well as sewers, solid waste disposal and roads.

[26] Letter from Jose Carrión III to Governor Ricardo Rosselló, (June 16, 2017) Available at: https://juntasupervision.pr.gov/documents/.

[27] *Fiscal Plan Complaint Act.* Act No. 26-2017 (H. B.938) (Approved on April 29,2017).

[28] New Fiscal Plan for Puerto Rico, (April 5, 2018). Available at at: http://www.aafaf.pr.gov/assets/newfiscalplanforpuerto-rico-2018-04-05.pdf

[29] 48 USC § 2174(b)(6).

[30] *Expert Report of Martha E.M. Kopacz Regarding the Feasibility of the City of Detroit Plan of Adjustment* filed before the United States Bankruptcy Court Eastern District of Michigan Southern Division in the case *City of Detroit,*

of "essential services" has a strong relationship to the protection of human rights, we sustain that a feasibility analysis cannot be strictly financial or mathematic. Thus, when considering whether an adjustment plan is "feasible" under section 314(a)(6) of PROMESA, this Court should take into account the human rights dimensions that are present when guaranteeing that essential services are provided for.

The respect for human rights must be prioritized as what it is: the responsibility of the state, which in this case includes both the United States and the Puerto Rico governments. The lack of a definition of the essential services may have terrible consequences upon a human-rights approach to debt restructuring. Acknowledging the urgency of bringing a human rights-based approach to debt restructuring, we propose defining essential services in the light of human rights standards and core rights recognized under the Constitution and statutes of Puerto Rico and international human rights law. These rights include housing, food, education, health, work and social security, among others.

## III.    HUMAN RIGHTS FRAMEWORK FOR DEBT RESTRUCTURING

Several international human rights law instruments and special procedures' reports have become building blocks for a human rights-based approach to public debt and debt restructuring. The Universal Declaration of Human Rights (hereinafter UDHR) and the United Nations two subsequent treaties, the International Covenant on Civil and Political Rights (hereinafter ICCPR)[31] and the International Covenant on Economic, Social and Cultural Rights (hereinafter ICESCR)[32] provide a basic framework for human rights principles to be advanced on public debt adjustment

---

Michigan (Debtor), Chapter 9 Case No. 13-53846. Also see Sergio Marxuach. *Servicios Esenciales*. (November 5, 2017). Available at http://grupocne.org/2017/11/05/servicios-esenciales/.

[31] International Covenant on Civil and Political Rights (adopted 16 December 1966, entered into force on 23 March 1976).

[32] International Covenant on Economic, Social and Cultural Rights (adopted 16 December 1966, entered into force on 3 January 1976).

processes. The international community has declared that the rights enshrined in these and other instruments, independently of the signature or ratification of state parties, are "universal, indivisible, interdependent and interrelated".[33]

The ICCPR, signed and ratified by the United States and hence law in our jurisdiction, recognizes the right to self-determination[34] and the right to non-discrimination to all individuals within the state party´s territory and subject to its jurisdiction.[35] The rights to equal protection and participation in public affairs and decision-making processes are also protected under this ICCPR.[36] The Covenant provides a comprehensive framework that is useful to address participation and restructuring under PROMESA regarding the Puerto Rico government debt. Article 2.3 of the ICCPR establishes the following state duties:

> (a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;
> (b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;
> (c) To ensure that the competent authorities shall enforce such remedies when granted.

Despite the United States not having ratified ICESCR, the principle that proclaims the indivisible nature of all human rights, permits considering claims based on this instrument. The indivisibility of human rights means that in order to fully guarantee civil and political rights, the government must also ensure economic, social and cultural rights (and vice versa). For example, in order to exercise the right to vote a person needs access to education, to be able to own property and exercise self-determination a person needs access to work and adequate pay.  The indivisibility

---

[33] Vienna Declaration and Program of Action, Adopted by the World Conference on Human Rights in Vienna on 25 June 1993, Art.I para 5.
[34] ICCPR, Art. 1.1
[35] ICCPR, Art. 2.1
[36] ICCPR, Arts. 14 and 25.

principle recognizes that if the government violates any right it necessarily affects people's ability to exercise other rights. A violation of the right to equal protection of the law may mean that a person can loose her work or business, thus the interconnection between civil and political rights with economic social and cultural rights. Moreover, many of the rights included in the ICESCR were incorporated into the Constitution of Puerto Rico[37] and are enshrined in several Puerto Rican statutes.[38]

The ICESCR provides a valuable framework to assess public debt. This instrument asserts that the state has a primary, non-delegable responsibility towards the progressive realization of rights within its territory and extends that responsibility to the international community.[39] Article 2.1 states that:

> Each State Party to the present Covenant undertakes to take steps, individually and through international assistance and co-operation, especially economic and technical, to the maximum of its available resources, with a view to achieving progressively the full realization of the rights recognized in the present Covenant by all appropriate means, including particularly the adoption of legislative measures.

The affirmative duty of the state to take the necessary steps to provide for social, economic and cultural rights "to the maximum of its available resources" should be seen as intricately tied to the requirement included in PROMESA that essential public services be provided for. Obligations to protect, respect and fulfill these rights subsist even at times of serious economic hardship. The Committee on Economic, Social and Cultural Rights (hereinafter CESCR), charged with the supervision of compliance with the ICESCR, has affirmed that "in order for a State party to be able to attribute its failure to meet at least its *minimum core obligations* to a lack of available

---

[37] Constitution of Puerto Rico, Article II, Sections 5, 16, 17, 18, 19, and 20;
[38] For example, laws adopted to establish a public school system, to create a special sub-secretariat at the Department of Education, to provide services to those in need of special education, to create a health insurance system for people living under condition of poverty, to create a housing administration and department in charge of facilitating public housing opportunities for low income families and many labor related laws that prohibit discrimination in employment, grant protection from unfair dismissal, maternity and sick leave, holiday leave as well as equal pay for comparable work, among others.
[39] ICESCR, Article 2.1.

resources it must demonstrate that every effort has been made to use all resources that are at its disposition in an effort to satisfy, as a matter of priority, those minimum obligations."[40]

Although a definition of "core human rights"[41] within international human rights law has been a matter of dispute, the advancement of a "social protection floor" framework has made it possible to specify guarantees that should be, at least, prioritized. Enshrined in the ICESCR, are the rights to food, housing, education, health, work and social security. The Committee on Economic, Social and Cultural Rights (CESCR) has emphasized state duties to respect, protect and fulfill a minimum standard in relation to rights such as primary health, basic shelter and housing, access to water and food.[42]

The CESCR has addressed the issue of indebtedness directly. The Committee acknowledged that though adjustment programs are often unavoidable and involve austerity, they require addressing and protecting the most basic economic, social and cultural rights, of the population, even when the latter seem less urgent.[43] This body has advocated for "adjustment with a human face" and has advised states to exercise the "most careful consideration" when designing austerity measures.[44] According to this Committee, adjustment measures, which result from debt management processes, should be temporary, legitimate, non-discriminatory, necessary, proportionate and respectful of a "minimum core of rights", among other criteria. They should also account for the impact to vulnerable individuals and groups.[45] Actions or policies that may hamper these rights and population sectors are considered impermissible retrogressive measures.

---

[40] CESCR, General Comment 3, *The Nature of States Parties' Obligations.* E/1991/23.(December 14, 1990), para 10, p. 4 (em*phasis added*).
[41] See the United Nations Office of the High Commissioner on Human Rights´ publication: "Core Human Rights in the Two Covenants", United Nations Office of the High Commissioner (September 2013). Available at: http://nhri.ohchr.org/EN/IHRS/TreatyBodies/Page%20Documents/Core%20Human%20Rights.pdf.
[42] *Id.*
[43] CESCR, General Comment 2, *International technical assistance measures*. E/1990/23. (February 2, 1990), para 9.
[44] CESCR, General Comment 3, supra, para. 9 and 12. Also see, CESCR, General Comment 12, E/C.12/2016/1.
[45] Letter dated 16 May 2012 addressed to State Parties to the International Covenant on Economic, Social and Cultural Rights from the Chairperson of the Committee on Economic, Social and Cultural Rights. (May 16 2012) UN CESCR/48th/SP/MAB/SW.

The Maastricht Guidelines on violations of economic, social and cultural rights, drafted by the International Commission of Jurists on January 22-26 of 1996, provide important criteria to adjudicate human rights violations amidst debt crises.[46] As per the Guidelines, states can fail to uphold social and economic rights by commission or omission. Acts of commission not only include the approval of regressive measures without regard to human rights, but also the removal or suspension of protective legislation, the denial of rights and discrimination against certain groups, the active support of measures and acts by third parties that could result in human rights harms and the reduction of public expenditure without providing safety nets.[47]

With this general framework, we turn to a brief exposition of two related aspects that further illuminate the human rights approach to debt restructuring: first, the relationship between private entities and the protection of human rights and, second, the role of the Independent Expert on the effects of foreign debt and in other related international financial obligations of States on the full enjoyment of all human rights, particularly economic, social and cultural rights.

### A.  Contribution from business and human rights law

The Guiding Principles on Business and Human Rights were developed by the Special Representative of the Secretary General of the United Nations and endorsed by the Human Rights Council in its resolution 17/4 of 16 June 2011.  On the issue of human rights and transnational corporations and other business enterprises, the Guiding Principles propose a three-pillar approach for the relationship between corporations and human rights: (1) states must respect, protect and fulfill human rights, (2) business must respect human rights and (3) victims must be granted effective remedies.[48] Although this document does not address debt directly, it assesses the

---

[46] International Commission of Jurists, 'Maastricht Guidelines on Violations of Economic, Social and Cultural Rights' (Maastricht Guidelines) (26 January 1997).

[47] *Id*. para 14.

[48] United Nations Human Rights Council (UNHRC), 'Guiding Principles on Business and Human Rights: Implementing the United Nations 'Protect, Respect and Remedy' Framework' (21 March 2011) A/HRC/17/31.

responsibility of the state towards the behavior of non-state actors, such as creditors, and their shared responsibility towards the rights of the people. The state's duty to protect includes the creation of policies, regulation and adjudication mechanisms to prevent, investigate and sanction violations caused by these actors. It links the principle of participation with access to remedy. While the corporate responsibility to protect may not be enough because it does not include the responsibility to guarantee the rights, it enables a requirement of due diligence, which should be guarded by non-state actors, and advances transparency as a fundamental right. Lastly, access to remedy refers to the state duty to provide venues that are state based judicial and non-judicial, as well as non-state grievance mechanisms.

Another important document related to business enterprises is the Principles on Promoting Responsible Sovereign Lending and Borrowing, a project of the United Nations Conference on Trade and Development (UNCTAD) to develop a set of internationally acknowledged principles to promote responsible sovereign lending and borrowing practices. These principles acknowledge that, while binding, debt arrangements depend on the *sui generis* character of these contracts, which can be limited by their impact on people: "governments are agents of the State and, as such, when they contract debt obligations, they have a responsibility to protect the interests of their citizens".[49]

The Third International Conference for Financing and Development, convened by the United Nations and celebrated on 13-16 July 2015 in Ethiopia is yet another international process regarding debt obligations was the. This Conference adopted the Addis Ababa Action Agenda,[50] which was endorsed by the General Assembly of the United Nations in its resolution 69/313 of 27 July 2015. The Addis Ababa Action Agenda considers the relationship of global financial practices

---

[49] United Nations Conference on Trade and Development (UNCTAD) 'Principles on Promoting Responsible Sovereign Lending and Borrowing', (Amended and Restated as of10 January 2012), Article 8.
[50] Addis Ababa Action Agenda of the Third International Conference for Financing and Development, convened by the United Nations and celebrated on 13-16 July 2015 in Ethiopia.

and economic, social and environmental challenges. It states that "[b]orrowing needs to be managed prudently",[51] and addresses the principles of nondiscrimination in the workplace, gender mainstreaming and transparency.[52]

## B.  The Independent Expert on the effects of foreign debt and other related international financial obligations

The Independent Expert on the effects of foreign debt and other related international financial obligations of States on the full enjoyment of all human rights, particularly economic, social and cultural rights (hereinafter Independent Expert), appointed by the Human Rights Council of the United Nations, studies and provides guidance on debt crises related developments, business and human rights law.  The Independent Expert´s authority as defined in its mandate from the United Nations is grounded on the entitlement "to a social and international order in which the rights and freedoms set forth in the Universal Declaration of Human Rights can be fully realized",[53] and in the definition of state responsibility established on ICESCR.[54]  In addition, its mission and approaches to debt are based in the Sustainable Development Goals[55] (former Millennium Development Goals) and the Declaration on the Right to Development[56].  The Independent Expert work emphasizes on the impact that foreign debt and related policies have on economic and social rights and on the capacity of States to respond to debt crisis while promoting social rights. It also considers the measures adopted by state and non-state actors, as well as international financial institutions in regard to debt and debt-impact relief.[57] The Independent Expert studies the adverse impact on human rights of economic reforms, structural adjustment programs and policies.

---

[51] *Id.*, para 93, p. 43.
[52] *Id.*, para 6, p. 3; para 41, p. 20; para 23, 26, p. 11, 12, 13.
[53] UDHR, Art. 28.
[54] ICESCR, Art. 2.1.
[55] Transforming our world: the 2030 Agenda for Sustainable Development; A/RES/70/1/15 (September 25, 2015).
[56] Declaration on the Right to Development; A/RES/41/128/86; (December 4, 1986).
[57] Human Rights Council (HRC), 'Mandate of the Independent Expert on the effects of foreign debt and other related international financial obligations of States on the full enjoyment of all human rights, particularly economic, social and cultural rights. A/HRC/RES/25/16 (April 15, 2014).

The Guidelines on Foreign Debt and Human Rights were drafted under the Independent Expert´s authority. The Guidelines "are designed to assist States and all relevant actors including private and public, national and international financial institutions, bilateral lenders and organized groups of bondholders in the conduct of their respective activities and pursuit of their respective interests relating to external debt."[58] The Independent Expert continuously attempts to establish a multilateral legal framework for debt restructuring processes and proposes the following six human rights benchmarks:[59]

1. Debt restructuring should be compatible with the human rights obligations of the debtor State and lending State(s), including when acting collectively through international organizations.
2. Risk assessments and debt sustainability analysis carried out prior to a debt restructuring need to include human rights impact assessments.
3. The multilateral framework on debt restructuring should address adequately negative human rights impacts caused by hold outs.
4. Debt restructuring should ensure that minimum essential levels of the enjoyment of economic, social and cultural rights can be satisfied even in contexts of financial crisis and retrogressive measures affecting the enjoyment of these rights should be avoided.
5. The human rights principles of impartiality, transparency, participation and accountability should be reflected in the legal framework for debt restructuring.
6. International and regional human rights protection mechanisms, national human rights institutions and civil society organizations should be able to play a role in the decision-making process of debt restructuring.[60]

The Independent Expert has the faculty to carry out country visits in order to conduct hearings with state and non-state stakeholders. Current Independent Expert, Juan Pablo Boholavsky, has attempted to visit Puerto Rico on several occasions, yet the United States has not granted the necessary authorization for this visit. Boholavsky issued two statements on the Puerto Rico public debt crisis. On the first one, published on January 9, 2017, the Independent Expert stated that:

---

[58] United Nations General Assembly, 'Guiding Principles on Foreign Debt and Human Rights' A/HR/20/23 (April 10, 2011).
[59] Juan Pablo Boholavsky, *Towards a multilateral legal framework for debt restructuring: Six human rights benchmarks States should consider* (January 26, 2015). Available at:
http://debt-and-finance.unctad.org/Documents/GA_Human_Rights_Benchmarks.pdf.
[60] *Id.* pp. 5-7.

[T]he Board must ensure that economic, social and cultural rights are not undermined by giving absolute priority to creditors' rights and by imposing excessive austerity. The economy should serve the people, not vice versa. The population in Puerto Rico cannot be held hostage to past irresponsible borrowing and lending. Losses need to be fairly distributed. This means that bond holders, including hedge fund investors, also need to take their fair share. Hedge fund investors – which hold a significant part of the territory's municipal debt – are also bound by the principles of good faith, debt sustainability, co-responsibility and human rights.[61]

The Independent Expert, in his January 2017 statement, addressed the impact of the debt crisis and austerity measures on the rights to housing, food and health, the care of persons with disability, the need to guarantee just and fair conditions of work and the right to participation in public affairs. His statement shows alarm regarding the massive outmigration and poverty that affects Puerto Rico. In regard to the debt restructuring process, the Independent Expert endorsed the efforts undertaken to carry out a reorganization of the debt, while emphasizing the need to ensure protection of core economic and social rights. He sustained how important it is to "ensure that members of the Financial Oversight and Management Board are fully independent and do not incur any conflict of interest".

The second statement by the Independent Expert was published on the aftermath of Hurricane María and dealt with the impact of that climate catastrophe on Puerto Rico and the human rights of its people. The statement was joined by the following United Nations experts: Leilani Farha, Special Rapporteur on adequate housing; Hilal Elver, Special Rapporteur on food; Dainius Pūras, Special Rapporteur on health; Leo Heller, Special Rapporteur on water and sanitation; Catalina Devandas Aguilar, Special Rapporteur on the rights of persons with disabilities; Cecilia Jimenez-Damary, Special Rapporteur on internally displaced persons, Dubravka Šimonović, Special Rapporteur on violence against women; Obiora C. Okafor,

---

[61] Juan Pablo Boholavsky. *Puerto Rico's debt crisis: UN expert warns human rights cannot be side-lined by Juan Pablo Bohoslavsky, Independent Expert on the effects of foreign debt on human rights.* (January 9, 2017). Available at http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=21060&LangID=E.

Independent Expert on human rights and international solidarity; Baskut Tuncak, Special Rapporteur on human rights and hazardous substances and wastes;  Saad Alfarargi, Special Rapporteur on the right to development.[62] The experts had previously expressed concerns regarding the crippling Puerto Rico public debt level and its impact on economic and social rights. But, they had not received any substantial response from the governments of the United States and Puerto Rico or the FOMB to their questions and concerns.  These international manifestations, as well as the benchmarks and standards developed for debt restructuring processes provide guidance and should be considered in formulating alternatives to deal with the situation in Puerto Rico.

## IV.  RECENT DEVELOPMENTS RELEVANT TO DEBT RESTRUCTURING ADJUDICATIONS

On December 20, 2017 the United Nations General Assembly adopted Resolution 72/204 on External Debt and Sustainability,[63] which incorporates the ideas integrated in the Guidelines and the Addis Ababa Action Agenda, mentioned above. Among other expressions, the Resolution states that debt sustainability is essential for underpinning growth, debt crises are costly and disruptive and debt management is central to the achievement of sustainable development. It encourages supportive global programs, measures and policies aimed at expanding the development opportunities of developing countries, while taking into account national conditions and ensuring respect for national ownership, strategies and sovereignty. The Resolution recognizes that severe natural disaster and social or economic shocks can undermine a country's debt sustainability. On the other hand, it stresses the dual responsibility of creditor and debtor countries

---

[62]  Juan Pablo Boholavsky. *Puerto Rico: Human rights concerns mount in absence of adequate emergency response*. (October 30, 2017). Available at:
 http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=22326&LangID=E.
[63] UNGA. 'External Debt Sustainability and Development'. (January 23, 2018) A/Res/72/204. It also incorporated the developments on UNGA 'Basic Principles on Sovereign Debt Restructuring Processes' (September 29, 2015) A/RES/69/319 where the UNGA adopted the Basic Principles of Debt Restructuring. These principles are the right to sovereign debt restructuring, good faith, transparency, equitable treatment, sovereign immunity, legitimacy, sustainability and the principle of majority restructuring.

to avoid a build-up of unsustainable debt; the need for timely and comprehensive data on the level

and composition of debt; building early warning systems and calls for debtor and creditor countries

to intensify their efforts to collect and release data. In addition, it invites creditors to provide

additional flexibility to developing countries affected by natural disasters so as to allow them to

address their national debt concerns, while taking into account their specific economic and social

situations and needs.   Finally, it encourages Governments to be mindful of the ability of non-

cooperative minority bondholders to block a restructuring of a debt-crisis country's obligations,

and encourages debtors and creditors to work together to draft bond agreements accordingly.

On March 2018, Juan Pablo Boholavsky, the Independent Expert presented to the United

Nations Human Rights Council a report on the Development of guiding principles for assessing

the human rights impact of economic reform policies.[64]   The report reaffirmed that

"[c]ountercyclical responses that invest in social development are both feasible and associated with

a more equitable and sustainable economic recovery".[65]  Therefore "[h]uman rights obligations

suggest social investments can serve as countercyclical tools to address economic downturns. They

require a departure from policies that focus solely on achieving short-term macroeconomic targets

regardless of the human rights impacts, or which only try to mitigate the most extreme social

impacts".[66]

This Independent Expert´s Report provides a summarized overview on the diverse

mechanisms of adjustment that are used in debt restructuring processes, such as: public

expenditure cuts, regressive tax changes, wage cuts and decrease in public sector jobs, pension

reforms, targeting of safety nets, privatization, reduction in food, energy, housing and other

---

[64] Human Rights Council, 'Report of the Independent Expert on the effects of foreign debt and other related international financial obligations of States on the full enjoyment of all human rights, particularly economic, social and cultural rights, Development of guiding principles for assessing the human rights impact of economic reform policies' A/HRC/37/54 (February 26- March 23 2018).
[65] *Id.*, para 5.
[66] *Id.*, para 10.

subsidies. It also mentions labor and other legal reforms.[67] The risk these mechanisms pose to human rights is often neglected. The approach suggested by the Independent Expert incorporates human rights based impact assessment strategies, which include: "(a) preparation and screening of possible human rights impacts in consultation with affected groups; (b) scoping; (c) evidence gathering and data collection using qualitative and quantitative methods; (d) analyzing impacts; (e)formulation of recommendations aimed at preventing adverse human rights impacts or ensuring that they are mitigated; (f) reporting and presentation of findings; and (g) ongoing evaluation and monitoring of actual impacts".[68]

At its minimum, this approach requires transparency and access to data.[69] While this analysis should be made as quickly as possible, there are no material obstacles to adopting an impact assessment perspective at any time in the process of debt restructuring. For example, the Independent Expert's report recommends that the analysis include: "(a) a review of all the policy options for tackling a crisis, including countercyclical measures; (b) an analysis of how policy changes and proposed budget cuts and other adjustment measures are likely to affect the population, in particular the most vulnerable groups, using a variety of quantitative and qualitative tools; (c) an analysis of the extent to which budget, policy, legislative and other changes may contribute to fulfilling the State's human rights obligations or potentially undermining them; and (d) a non-exhaustive list of preventive or mitigating measures are in line with the government's human rights obligations".[70]

The Independent Expert report provides a list of minimum steps, which are helpful in the adjudication of economic reform issues and debt treatment. These are applicable to the case of Puerto Rico and require actions such as: (i) identifying positive human rights impacts; (ii)

---

[67] *Id.,* para 20.
[68] *Id.,* para 46.
[69] *Id.,* para 70.
[70] *Id.,* para 66.

preventing or mitigating adverse impacts on the enjoyment of economic, social, cultural, civil and political rights; (iii) screening economic reform measures against discriminatory impacts in law and in practice that are incompatible with international human rights law; and (iv) identifying impermissible retrogression measures which may impact economic, social and cultural rights, based on the principles of necessity, proportionality, legitimacy and reasonableness.

## V.  IMPACT OF DEBT RESTRUCTURING ON SPECIFIC HUMAN RIGHTS

Under PROMESA, as discussed previously, the Puerto Rico government is required to develop a fiscal plan that must guarantee essential services. Although a definition of the concept essential services has not been provided, the idea of a minimum core of rights is useful to give meaning and content to it, as well as providing accountability to the restructuring plans. This section will briefly discuss five rights: the right to education, work, health, housing and social security. While these rights are protected under the ICESCR, it is important to remember the indivisibility of human rights as expressed on the Vienna Declaration issued by the Human Rights World Conference of 1993. Also, these rights are protected under Puerto Rico and United States laws, and the Constitution of Puerto Rico. All of these fundamental guarantees have been and will be affected through budget cuts, shutdowns of government instrumentalities or the privatization of services that may result from debt related adjustments.  Assessing the impact of austerity measures on specific human rights is essential.

The right to education has been recognized as a fundamental human right.[71] Primary education is part of the minimum core of human rights required by the ICESCR, in addition the state should take the necessary steps to guarantee accessible secondary and higher education. The

---

[71] ICESCR Arts. 13 and 14; UDHR Art. 26.

Constitution of Puerto Rico establishes the right to education and requires that it be provided free from discrimination.

The state duty to respect, protect and fulfill social rights is measured using the following indicators: availability, accessibility, acceptability and adaptability. These standards have been developed by the CECSR in its Comments 13, 14 and 19,[72] and are applicable to education in all its forms and at all levels.[73] Availability refers to the sufficient quantity of programs and institutions, including facilities such as library resources and technology. Accessibility refers to the principle of non-discrimination, physical and economic accessibility. Acceptability refers to the form and substance of education, including curriculum and methods, which have to be acceptable and follow minimum educational standards as may be approved by the state. Lastly, adaptability refers to the flexibility needed in education to be able to adapt itself to the needs of students, changing societies and diverse and cultural settings. [74]

Several statutes and regulations protect the right to education as a pivotal right in our democratic system. The right to education has constitutional standing in Puerto Rico; Section 5 Article II states the following:

> [e]very person has the right to an education which shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. There shall be a system of free and wholly non-sectarian public education. Instruction in the elementary and secondary schools shall be free and shall be compulsory in the elementary schools to the extent permitted by the facilities of the state. No public property or public funds shall be used for the support of schools or educational institutions other than those of the state. Nothing contained in this provision shall prevent the state from furnishing.to any child non-educational services established by law for the protection or welfare of children.[75]

---

[72] CESCR, General Comment No. 11: Plans of Action for Primary Education (Art. 14 of the Covenant) and General Comment No. 13: The right to education (article 13 of the Covenant) (both 1999).
[73] *Id.*, Comment No. 13, para 6.
[74] *Id.*,  6(a), (b), (c), (d).
[75] PR Constitution, Section 2, Article V.

Other norms, particularly relevant to the consequences of austerity on education, are related to the rights of children with special needs.[76] In regard to higher education and the budget cuts proposed by the FOMB, it is important to consider the provisions of the University of Puerto Rico Act.[77]

The right to work is defined on Articles 6 to 9 of the ICESCR and in other instruments developed by the International Labor Organization.[78] According to General Comment No. 18 of the CESCR, the right to work is essential for realizing other human rights, and is an inherent part of human dignity.[79] It includes the right to choose an occupation freely and to resign from any job, the right to equal pay for equal work, to a reasonable minimum salary, an 8-hour work day, and the right to organize and collective bargain, among other guarantees. The criteria to evaluate compliance with the state's duty to protect the right to work are those adopted by the CESCR for the analysis of social rights: availability, accessibility, acceptability and adaptability.[80]All these standards may be affected by debt restructuring processes.

Acceptability and quality are defined as "the right of the worker to just and favorable conditions of work, in particular to safe working conditions, the right to form trade unions and the right freely to choose and accept work".[81] These rights are guaranteed by the Puerto Rico's Constitution, Article II, Sections 16 to 18. Other guarantees ensuring the right to work and under attack by austerity measures and adjustments processes are protected under state laws. These laws

---

[76] Among others, these norms include Law 51 of June 7, 1996  as amended, also known as the "Integral Educational Services for Persons with Disabilities Act" 18 L.P.R.A. sec. 1351 et seq.; Law 195 of August 22 of 2012, as amended, also known as the "Students Bill of Rights", 18 L.P.R.A. § 3801, et seq; Public Law 105-17 of the United States also known as the Individuals with Disabilities Education Act, 20 U.S.C. §  1400 et seq; Public Law 101-336 of the United States, also known as the American with Disabilities Act, 42 U.S.C. § 12101 et seq; Public Law 93-112 of the United States also known as the Rehabilitation Act, 29 U.S.C. § 701 et seq.

[77] Law 1 of January 20, 1996, as amended, also known as the Law of the University of Puerto Rico, 18 L.P.R.A. § 601 et seq.

[78] See (ILO) Declaration on Fundamental Principles and Rights at Work (1998) and the Declaration on Social Justice for a Fair Globalization (2008). This right is also part on the UDHR, Arts. 23-24.

[79] CESCR General Comment No. 18. 'The Right to Work'. E/C.12/GC/18, (February 6, 2006), para 1.

[80] *Id.*, para 12.

[81] *Id.,* para 12(c).

have already been limited by retrogressive legislative actions such as the approval of the Labor
Transformation and Flexibility Act of January 26, 2018 and a labor reform project bill to eliminate
the Wrongful Termination Act (commonly known in Puerto Rico as Law 80), which protects
workers from arbitrary dismissals.[82]

Other rights affected by austerity measures are the right to housing, to social protection and
health, which are established on Article 25 of the Universal Declaration of Human Rights. The
right to housing is incorporated on Article 11(1) of the ICESCR and discussed on General
Comments 4,[83] and 7,[84] of the CESCR. This right is particularly relevant to the housing crisis
currently experienced in Puerto Rico, which may be aggravated by infrastructure developments
being implemented without consideration for the needs of diverse communities.  The criteria to
assess the state's duties toward the right to housing are: legal security of tenure, availability of
services, materials, facilities and infrastructure; habitability, accessibility and location. The
interdependent nature of the right to housing is stressed in the comments issued by CESCR; the
principle of non-discrimination is also emphasized.

The right to social security is protected by Article 9 of ICESCR. In accordance with
General Comment No. 19 of the CESCR, it encompasses the right to access and to maintain
benefits, whether in cash or in kind, without discrimination in order to secure protection from: (a)
lack of work-related income caused by sickness, disability, maternity, employment injury,
unemployment, old age, or death of a family member; (b) unaffordable access to health care; (c)
insufficient family support, particularly for children and dependent adults.[85] It includes, therefore,
workers' pensions.  It should be noted that the Report on austerity measures and economic and
social rights issued by the Office of the High Commissioner for Human Rights states that:

---

[82] Act No. 80 of May 30, 1976 as amended, 29 L.P.R.A. §185a, et seq.
[83] CESCR, General Comment 4, 'The Right to Adequate Housing" E/1992/23 (December 13, 1991).
[84] CESCR, General Comment 7, 'The Right to Adequate Housing" E/1998/22 (May 20, 1997).
[85] CESCR, General Comment 19, 'The Right to Social Security' E/C.12/GC/19 (February 4, 2008).

"[a]usterity measures endanger social protection schemes, including pensions, thereby dramatically affecting the enjoyment of the rights to social security and to an adequate standard of living."[86]

Article II, Section 20 of the Constitution of Puerto Rico recognized the right of every person to receive free elementary and secondary education, the right to obtain work, to a standard of living adequate for the health and well-being of every person and her family, especially to food, clothing, housing and medical care and to the necessary social services, social protection in the event of unemployment, sickness, old age or disability, the right of mothers and children to special care and attention.[87] During the process of approval of the Constitution of Puerto Rico, the United States Congress conditioned its acquiescence, to the elimination of Section 20 of Article II.[88] Yet, the recognition of these rights by the Constitutional Convention and by the people of Puerto Rico demonstrates a willingness to comply with the Universal Declaration of Human Rights. Section 20 of Article II incorporated economic, social and cultural rights to the Constitution of Puerto Rico and is part of the original text valued by many Puerto Ricans and reflected in several statutes, as well as cultural and customary practices still alive in the country.

## VI.      GUIDING PRINCIPLES FOR DEBT RESTRUCTURING

The human rights standards mentioned above permit convening essential principles that, may lead to ensure a human rights-based approach to debt restructuring in the case under consideration by this Honorable Court. Taking into account the current social and economic fragility of Puerto Rico, following these principles as guiding elements on the adjudication process of the many issues before the Court may make a difference between severe impoverishment and

---

[86] Office of the High Commissioner for Human Rights, 'Report of the United Nations High Commissioner for Human Rights on austerity measures and economic and social rights', E/2013/82 (May 7, 2013), para 36.
[87] Puerto Rico Constitution, Article II, Section 20.
[88] Resolution number 34, approved by the Constitutional Convention and ratified at the Referendum held on November 4, 1962.

outmigration and the enjoyment of a dignified life by most Puerto Ricans.  In light of the above, the Civil Rights Commission of Puerto Rico urges this Court to take into consideration the following three principles as it moves forward in considering this case.

### A.  Non-discrimination and the protection of vulnerable groups

Human rights standards foster the full enjoyment of rights on a non-discriminatory basis.[89] The principle of non-discrimination prohibits unjustified differential treatment and recognizes the direct or indirect disproportionate impact on vulnerable populations as problematic.[90]  Compliance with this *jus cogens*, non-derogable norm, is not dependent on the availability of resources.  It seeks to prevent actions or omissions that distinguish, exclude or provide disparate harmful treatment to particular sectors of the population or groups. The right to non-discrimination focuses on historically marginalized populations, the same that are usually more affected by austerity and debt adjustment programs developed without human rights considerations. In Puerto Rico, the most affected by the process before this court will be groups such as pensioners, children, students with special needs, impoverished communities, workers in precarious job arrangements and women.

Regarding the particular case before this Honorable Court, actions and omissions by both the United States and Puerto Rico governments could hinder the right to non-discrimination, especially given the failure to define essential services using the basic human rights standards discussed in this Amicus. Disparate treatment in the enactment of measures to restructure the Puerto Rico public debt may also undermine the rights of creditors who belong to vulnerable unprotected groups, such as pensioners and special education students, and may fail to give proper

---

[89] HRC 'Report by the Independent Expert on Foreign Debt' A/HRC/31/60, (12 January 2016), para 12.
[90] ICESCR Art.2.1; Universal Declaration of Human Rights (UDHR) (adopted 10 December 1948) UNGA A/RES/217(III)A Arts. 1-2; CESCR 'General Comment No. 20: Non-discrimination in economic, social and cultural *rights*' (2 July 2009) UN Doc E/C.12/GC/20.

attention to the enjoyment and protection of important human rights such as housing, health, social security, education and work.

### B. Real and effective participation

The right to real and effective participation refers to transparency, access to information and public participation. The principle of transparency requires the "full disclosure of all relevant information regarding loan agreements, debt repayments, debt management, outcomes of public debt audit and other matters".[91] Information without participation is insufficient. Defined as "the effective and meaningful input from all stakeholders (including project beneficiaries) in loan policy and resource utilization decisions," participation accounts for the "agency relationship" between the government and the people regarding the implications of debt contracts.[92] Participation is intertwined with development of a national strategy to deal with the debt crisis and, consequently, with sovereignty.

In the present case, actions and omissions that could hinder the right to information and participation include the violation of the right to self-determination of Puerto Rico in regard to the management of the sovereign debt, lack of participation of elected officials in decision-making processes on fiscal and political matters and the authority granted to the FOMB to override statutory and constitutional protections recognized in the Puerto Rico legal system, as well as resistance to conduct a public audit of the debt.

### C. Access to remedy

One of the main concerns created by the debt restructuring process under PROMESA is the lack of access to effective remedy. This right is related to due process and the equal protection

---

[91] UN Human Rights Council, G*uiding Principles on Foreign Debt and Human Rights*, A/HRC/20/23 (April 10 2011), para 28.
[92] UN Human Rights council, *Effects of foreign debt and other related international financial obligations of States on the full enjoyment of all human rights, particularly economic, social and cultural rights*, A/70/275 (August 4, 2015), para 39.

of the law, both recognized on international human rights law, the United States and Puerto Rico constitutions, statutes and regulations. Moreover, it is intrinsically related to the principles of equality and non-discrimination.

The case before this Honorable Court, involves actions and omissions that could hinder access to adequate remedies including the extension of almost absolute immunity to officials acting under PROMESA, as well as the provisions mandating an automatic stay on legal procedures against the Government of Puerto Rico that could result in the imposition of economic remedies.[93] The latter has detrimental consequences for civil rights complaints related, for example, to the right to education of children with special needs, sexual harassment disputes in public workplaces and police brutality, among others. It also disincentives further claims and judicial review of state actions that violate human rights.

## VII.   CONCLUSION

The Civil Rights Commission of Puerto Rico urges this Honorable Court to instill a human rights approach to the Puerto Rico public debt restructuring process as this framework is vital to our community.

RESPECTFULLY SUBMITTED, this 11th day of July, 2018, in San Juan, Puerto Rico.


Esther Vicente, Vicepresident                          Georgina Candal Segurola, President


Hiram Meléndez Juarbe, Commissioner            Patricia Otón Olivieri, Commissioner

---

[93] 48 USC § 2194.