UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

OPINION AND ORDER DENYING THE AURELIUS
MOTIONS TO DISMISS THE TITLE III PETITION AND FOR RELIEF FROM THE AUTOMATIC STAY

APPEARANCES:

ADSUAR MUÑIZ GOYCO SEDA &
PÉREZ-OCHOA PSC

By:     Luis A. Oliver-Fraticelli
        Katarina Stipec-Rubio
208 Ponce de Leon Ave., Suite 1600
San Juan, P.R. 00918

GIBSON, DUNN & CRUTCHER LLP

By:     Theodore B. Olson
        Matthew D. McGill
        Helgi C. Walker
        Michael R. Huston
        Lochlan F. Shelfer
        Jeremy M. Christiansen
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

O'NEILL & BORGES LLC

By:     Hermann D. Bauer
        Ubaldo M. Fernández
250 Muñoz Rivera Avenue, Suite 800
San Juan, P.R. 00918-1813

MUNGER, TOLLES & OLSON LLP

By:     Donald B. Verrilli, Jr.
        Ginger D. Anders
        Chad I. Golder
        Sarah G. Boyce
        Adele M. El-Khouri
1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357

PROSKAUER ROSE LLP
By:     Martin J. Bienenstock
        Stephen L. Ratner

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are (i) the Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("PRHTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747).

*Attorneys for Aurelius Investment, LLC,*
*Aurelius Opportunities Fund, LLC, and Lex*
*Claims, LLC (Aurelius)*

JIMÉNEZ, GRAFFAM & LAUSELL

By:     J. Ramón Rivera Morales
        Andrés F. Picó Ramírez
P.O. Box 366104
San Juan, P.R. 00936

ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP

By:     Lawrence S. Robbins
        Gary A. Orseck
        Kathryn S. Zecca
        Mark T. Stancil
        Ariel N. Lavinbuk
        Donald Burke
1801 K Street, N.W., Suite 411-L
Washington, D.C. 20006

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

By:     Andrew N. Rosenberg
        Richard A. Rosen
        Walter Rieman
        Kyle J. Kimpler
        Karen R. Zeituni
1285 Avenue of the Americas

New York, N.Y. 10019

*Counsel to the Ad Hoc Group of General*
*Obligation Bondholders*

Timothy W. Mungovan
Mark D. Harris
Chantel L. Febus
Eleven Times Square
New York, N.Y. 10036

*Attorneys for the Financial Oversight and*
*Management Board for Puerto Rico, as*
*representative of the Commonwealth of*
*Puerto Rico and the Puerto Rico Highways &*
*Transportation Authority*

THE LAW OFFICES OF ANDRÉS
W. LÓPEZ, P.S.C.
By:     Andrés W. López
902 Fernández Juncos Ave.
San Juan, P.R. 00918-1813

O'MELVENY & MYERS LLP
By:     John Rapisardi
        Suzzanne Uhland
        William J. Sushon
7 Times Square
New York, N.Y. 10036

        *and*

        M. Randall Oppenheimer
1999 Avenue of the Stars 8th Floor
Los Angeles, California 90067-6035

        *and*

        Walter Dellinger
        Peter Friedman
1625 Eye Street, NW
Washington, D.C. 20006

*Attorneys for the Puerto Rico Fiscal*
*Agency and Financial Advisory Authority*

U.S. DEPARTMENT OF JUSTICE, CIVIL
DIVISION
By:     Rosa E. Rodriguez-Velez
        Thomas G. Ward
        Jennifer D. Ricketts
        Christopher R. Hall
        Jean Lin

Cesar A. Lopez-Morales
Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20530

*Attorneys for the United States of America*


SAUL EWING ARNSTEIN & LEHR LLP

By:     Sharon L. Levine
        Dipesh Patel
1037 Raymond Blvd.
Suite 1520
Newark, N.J. 07102

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES
By:     Judith E. Rivlin
        Teague P. Paterson
        Matthew S. Blumin
1101 17th Street NW, Suite 900
Washington, D.C. 20011

        *and*

        Manuel A. Rodriguez Banchs
P.O. Box 368006
San Juan, P.R. 00936-8006

*Attorneys for the American Federation of
State, County and Municipal Employees*


BENNAZAR, GARCÍA & MILIÁN, C.S.P.
By:     A.J. Bennazar-Zequeira
Edificio Union Plaza
PH-A piso 18
Avenida Ponce de León #416
Hato Rey, San Juan, P.R. 00918

JENNER & BLOCK LLP
By:     Robert Gordon
        Richard Levin
919 Third Ave
New York, N.Y. 10022-3908

        *and*

        Catherine Steege
        Melissa Root

353 N. Clark Street
Chicago, I.L. 60654

*and*

Ian Heath Gershengorn
Lindsay C. Harrison
William Dreher
1099 New York Ave NW
Washington, D.C. 20001

*Counsel for the Official Committee of Retired
Employees of Puerto Rico*


CASILLAS, SANTIAGO & TORRES LLC
By:    Juan J. Casillas Ayala
       Diana M. Batlle-Barasorda
       Alberto J. E. Añeses Negrón
       Ericka C. Montull-Novoa
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, P.R. 00901-2419


PAUL HASTINGS LLP
By:    Luc A. Despins
       Andrew V. Tenzer
       Michael Comerford
       G. Alexander Bongartz
200 Park Avenue
New York, N.Y. 10166

*Attorneys for the Official Committee of
Unsecured Creditors*


REICHARD & ESCALERA LLC
By:    Rafael Escalera
       Sylvia M. Arizmendi
       Fernando Van Derdys
       Carlos R. Rivera-Ortiz
       Gustavo A. Pabón-Rico
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, P.R. 00917-1913

COOPER & KIRK, PLLC
By:    Charles J. Cooper
       Howard C. Nielson, Jr.
       Haley N. Proctor
1523 New Hampshire Ave., NW
Washington, D.C. 20036

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
By:    Susheel Kirpalani
       Eric Winston
       Daniel Salinas
       David Cooper
       Eric Kay
       Kate Scherling
       Brant Duncan Kuehn
51 Madison Avenue, 22nd Floor
New York, N.Y. 10010-1603

*Counsel for the COFINA Senior
Bondholders' Coalition*

LAURA TAYLOR SWAIN, United States District Judge

Before the Court are (I) the *Objection and Motion of Aurelius to Dismiss Title III Petition* (Docket Entry No.[2] 913, the "Motion to Dismiss"), and (II) the *Motion of Aurelius for Relief from the Automatic Stay* (Docket Entry No. 914, the "Lift Stay Motion" and, together with the Motion to Dismiss, the "Motions").  The movants are Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, "Aurelius").  Aurelius argues principally that the debt adjustment case filed for the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. § 2101 et seq. ("PROMESA"), must be dismissed as unauthorized.  Aurelius also argues that further PROMESA-related activity must be enjoined because the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), which filed the Title III proceeding on behalf of the Commonwealth, was appointed in a manner inconsistent with the requirements of the Appointments Clause of Article II, Section 2, Clause 2 of the Constitution of the United States (the "Constitution").  A submission supporting the position advanced by Aurelius was filed by the Ad Hoc Group of General Obligation Bondholders.  (Docket Entry No. 1627.)  Opposition submissions have been filed by the United States of America (the "United States"), the Oversight Board, the American Federation of State, County and Municipal Employees, the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, the Official Committee of Unsecured Creditors (the "Committee"), the COFINA Senior Bondholders' Coalition (the "COFINA Seniors"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF").  (Docket Entry Nos.

---

[2]      All docket entry references are to entries in Case No. 17-BK-3283-LTS, unless otherwise specified.

1610, 1622, 1623, 1629, 1631, 1634, 1638, 1640, 1929.)  The Court heard argument on the

instant Motions on January 10, 2018 (the "Hearing"), and has considered carefully all of the

arguments and submissions made in connection with the Motions.[3]  For the reasons that follow,

the Motion to Dismiss is denied in its entirety and the Lift Stay Motion is denied in light of the

determinations set forth below, for failure to show cause.

I.

BACKGROUND

The following summary reflects matters that are undisputed in the parties'

submissions, or of which the Court may take judicial notice.

As discussed in more detail below, Puerto Rico became a territory of the United

States under the Treaty of Paris, following the Spanish American War of 1898.  Treaty of Paris

art. 9, Dec. 10, 1898, 30 Stat. 1759.  In accordance with the Territories Clause of the

Constitution, U.S. Const. art. IV, §3, cl. 2, which provides that Congress "shall have Power to . .

. make all needful Rules and Regulations respecting the Territory or other Property belonging to

the United States," Congress has provided for military, and then civilian, local governance of

Puerto Rico.  Pursuant to a constitution developed by the people of Puerto Rico and approved by

Congress, Puerto Rico's status has been that of a Commonwealth since 1952, led by a popularly

elected Governor and Legislature.  See Act of July 3, 1952, 66 Stat. 327; P.R. Const. art. I, §§ 1,

2.

---

[3]     The Court also heard oral argument at the Hearing in connection with a motion to dismiss
the complaint in Union De Trabajadores De La Industria Electrica Y Riego (UTIER) v.
PREPA, et al., 17-AP-228-LTS (D.P.R.), an adversary proceeding filed in PREPA's Title
III case that raises issues substantially similar to those argued in this current motion
practice.  The Court will address that motion in a separate decision.

In 2016, in response to the longstanding and dire fiscal emergency of the Commonwealth, Congress enacted PROMESA "pursuant to article IV, section 3 of the Constitution of the United States, which provides Congress the power to dispose of and make all needful rules and regulations for territories."  48 U.S.C.A. § 2121(b)(2) (West 2017).  PROMESA established, among other things, federal statutory authority pursuant to which federal territories, including the Commonwealth, may restructure their debts.[4]  See Id. § 2194(n).

PROMESA created the Oversight Board as "an entity within the territorial government" of Puerto Rico.  Id. § 2121(c)(1).[5]  Funding for the Oversight Board is derived entirely from the Commonwealth's resources.  Id. § 2127.  The Oversight Board is tasked with developing "a method [for Puerto Rico] to achieve fiscal responsibility and access to the capital markets."  Id. § 2121(a).  In aid of that purpose, PROMESA empowers the Oversight Board to, among other things, approve the fiscal plans and budgets of the Commonwealth and its instrumentalities, override Commonwealth executive and legislative actions that are inconsistent with approved fiscal plans and budgets, and commence a bankruptcy-type proceeding in federal court on behalf of the Commonwealth or its instrumentalities.  Id. §§ 2141–2152; 2175(a).  In a Title III proceeding, the Oversight Board acts as the sole representative of the debtor and may "take any action necessary on behalf of the debtor to prosecute the case of the debtor."  Id. § 2175(a).  The Oversight Board is the only entity empowered to propose a plan of debt adjustment on behalf of the Commonwealth or a debtor instrumentality.  Id. § 2172(a).  In carrying out its

---

[4]     PROMESA is codified at 48 U.S.C. § 2101 et seq.  References to "PROMESA" provisions in the remainder of this Opinion are to the uncodified version of the legislation unless otherwise indicated.  Puerto Rico and its public instrumentalities are not authorized to seek debt relief under the United States Bankruptcy Code.

[5]     PROMESA further provides that the Oversight Board "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government."  48 U.S.C.A. § 2121(c)(2) (West 2017).

duties under PROMESA, the Oversight Board may hold hearings, take testimony, and receive

evidence; obtain data from the federal and territorial governments; obtain creditor information;

issue subpoenas; enter into contracts; enforce certain laws of the Commonwealth; and seek

judicial enforcement of its authority.  Id. § 2124(a), (c)-(d), (f)-(h), (k).  While it is created as an

entity within the government of Puerto Rico, it is not subject to supervision or control by the

Governor of Puerto Rico (the "Governor") or the Legislature of Puerto Rico (the "Legislature").

Id. § 2128(a).  It is, however, required to submit an annual report to the President of the United

States (the "President") and Congress of the United States ("Congress") and the Governor and

Legislature.  Id. § 2148.

The Oversight Board is composed of seven voting members, with the Governor or

his designee serving ex officio as an additional non-voting member.  Id. § 2121(e)(1), (3).[6]

PROMESA provides that the President "shall appoint" the seven voting members as follows: one

"may be selected in the President's sole discretion" and six "should be selected" from specific

lists of candidates provided by congressional leaders.[7]  Id. § 2121(e)(2)(A)-(B) (emphasis

added).  PROMESA does not require Presidential nomination and Senate confirmation for the

President's discretionary appointees and members chosen from the congressional lists.  Id. §

---

[6]      Congress modeled the Oversight Board's structure after an entity created by Congress in
1995 to address a fiscal crisis in the District of Columbia.  See 162 Cong. Rec. H3604
(daily ed. June 9, 2016) (statement of Rep. Lucas) (stating that, in 1995, Congress
"passed a bill very similar to [PROMESA].  We set up a supervisory board that took
control of [D.C.'s] finances to help right the ship."); see also District of Columbia
Financial Responsibility Management and Assistance Act of 1995 ("DCFRMAA"), Pub.
L. No. 104-8, 109 Stat. 97 (1995).  The Financial Responsibility and Management
Assistance Authority ("D.C. Control Board") was established within the District of
Columbia government, see DCFRMAA, § 101(a), and its members were appointed by the
President without Senate confirmation, id. § 101(b).

[7]      Under PROMESA, the lists may be supplemented upon the President's request.  48
U.S.C.A. § 2121(e)(2)(C).

2121(e)(2)(E).  However, in the event that the President appoints members that are not named on the congressional lists, Senate confirmation is required under PROMESA.[8]  Id.  On August 31, 2016, President Obama appointed the seven voting members, six members from the congressional lists and one member in his sole discretion.  (Docket Entry No. 1929, the "U.S. Mem. of Law," at 6.)  Board members are appointed to serve for a term of three years and until the appointment of their successors.  48 U.S.C.A. § 2121(e)(5) (West 2017).  As of the date hereof, all of the original appointees continue to serve on the Oversight Board.  Thus, to date, no appointment to the Oversight Board has been subject to Senate confirmation.  Oversight Board members can be removed only by the President, and only for cause prior to the end of the member's term.  Id. § 2121(e)(5)(B).

On May 3, 2017, the Oversight Board commenced a debt adjustment proceeding on behalf of the Commonwealth by filing a petition in this Court under Title III of PROMESA.[9] (See Docket Entry No. 1, the "Title III Petition").  Shortly thereafter, the Oversight Board commenced Title III proceedings on behalf of certain Puerto Rican government instrumentalities, including PREPA.

---

[8]      PROMESA also provides that if any of the seven voting members had not been appointed by September 1, 2016, the President was required to appoint an individual from the list associated with the vacant position by September 15, 2016.  48 U.S.C.A. § 2121(e)(2)(G).  Under PROMESA, any vacancies must be filled "in the same manner in which the original member was appointed."  Id. § 2121(e)(6).

[9]      See Id. §§ 2164, 2172-2174.

II.

<u>DISCUSSION</u>

**A. Motion to Dismiss**

    1. <u>Questions Presented</u>

        As noted above, Aurelius moves to dismiss the Commonwealth's Title III Petition

on the basis that the Oversight Board's membership was not properly appointed and therefore

lacked the power to properly invoke Title III of PROMESA by filing the Title III Petition on

behalf of the Commonwealth.  Section 304(b) of PROMESA provides that the Court, after notice

and a hearing, may dismiss a petition that "does not meet the requirements of" Title III of

PROMESA.[10]  48 U.S.C.A. § 2164(b) (West 2017).  Section 302 enumerates the statutory

prerequisites that a debtor must satisfy to avail itself of relief pursuant to Title III of PROMESA.

<u>Id.</u> § 2162.  Specifically, it provides that "[a]n entity may be a debtor" under Title III of

PROMESA if:

      (1)    the entity is—

           (A) a territory that has requested the establishment of an
           Oversight Board or has had an Oversight Board
           established for it by the United States Congress in
           accordance with section 2121 of [PROMESA]; or

           (B) a covered territorial instrumentality of a territory
           described in paragraph (1)(A);

      (2)    The Oversight Board has issued a certification under
           section 2146(b) of [PROMESA] for such entity; and

      (3)    the entity desires to effect a plan to adjust its debts.

---

[10]    Section 304(b) of PROMESA provides that a Title III petition may not be dismissed
during the first 120 days after the commencement of the case.  48 U.S.C.A. § 2164(b)
(West 2017).  The 120 day waiting period has expired.

Id. § 2162.  Aurelius argues that the requirements of Title III are not satisfied in this case because the Oversight Board, as currently constituted, is itself an unlawful entity.  Aurelius contends that the selection mechanism established under PROMESA for members of the Oversight Board is unconstitutional under the Appointments Clause, such that the existing Oversight Board could not lawfully make the requisite certifications and file the petition commencing the Commonwealth's Title III proceeding.

The Appointments Clause of Article II of the Constitution prescribes the method of appointment for "Officers of the United States" whose appointments are not otherwise provided for in the Constitution.  U.S. Const. art. II, § 2, cl. 2; see Buckley v. Valeo, 424 U.S. 1, 125–26, 132 (1976).  In Buckley, the Supreme Court held that the term "Officers of the United States," as used in Article II of the U.S. Constitution, is "intended to have substantive meaning" and must include "any appointee exercising significant authority pursuant to the laws of the United States."  424 U.S. 1, 125–26.  The Appointments Clause distinguishes between "principal officers," who must be nominated by President with advice and consent of the Senate, and "inferior officers," who may be appointed by the "President alone, Courts of Law, or Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.

Aurelius argues principally that the Appointments Clause procedures were mandatory notwithstanding PROMESA's statutory appointment provisions because the members of the Oversight Board are either (i) principal "Officers of the United States" who could only be validly appointed through presidential nomination and Senate confirmation or, in the alternative, (ii) inferior officers of the United States whose appointment was improperly delegated to the President.  (Mot. to Dismiss at 13.)  Aurelius requests that the Court dismiss the Title III Petition and terminate this proceeding.

The United States, which has exercised its statutory authority to intervene in these proceedings to defend PROMESA's constitutionality (see 28 U.S.C. § 2403(a)), argues that PROMESA's appointment mechanism is not subject to the Appointments Clause because (i) the Oversight Board members are territorial officers rather than "Officers of the United States," and (ii) the Appointments Clause does not govern the appointment of such territorial officers. (See generally U.S. Mem. of Law.) In support of its position, the United States cites historical practice and argues that Congress's plenary power over the territories is not subject to the distribution of powers provisions that regulate the federal government. (Id. at 8-15.) The Oversight Board primarily raises the same argument. (Docket Entry No. 1622, the "FOMB Opposition," at 7-21.) In addition, the Oversight Board contends that (i) the Appointments Clause does not constitute a "fundamental" constitutional provision and, as such, it does not apply to Puerto Rico, and (ii) even if the Appointments Clause is applicable, the Oversight Board members were properly appointed. (Id. at 23-31.) The other opponents raise substantially similar arguments to those advanced by the United States and the Oversight Board. (See generally, Docket Entry Nos. 1610, 1629, 1631, 1634, 1638, 1640.) The Oversight Board, the Committee and AAFAF further argue that the Court should hold the Oversight Board's past actions de facto valid in the event that the Court finds the Oversight Board's appointment unconstitutional. (FOMB Opp. at 32; Docket Entry No. 1631 at 27; Docket Entry No. 1640 at 31.)

The principal question thus presented for the Court on this motion practice is whether the Constitution required compliance with the Appointments Clause in the appointment of the Oversight Board members. If such compliance was required, the Court must examine whether the process that was undertaken pursuant to PROMESA was sufficient to meet the

constitutional requirement and, if the process was not compliant, whether the Petition must be dismissed as noncompliant with PROMESA.  The Court turns now to the principal question. Because Puerto Rico is a territory of the United States, rather than a state, or part of the federal government, and because Congress identified the Constitution's Territories Clause as the source of its authority in enacting PROMESA, the Court looks first to the text and historical interpretation and application of the Territories Clause.

> 2. Congress's Power Under the Territories Clause

The Territories Clause of Article IV of the Constitution vests Congress with the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Const., Art. IV, § 3, cl. 2.  The Supreme Court has long held that Congress's power under this clause is both "general and plenary."  Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States, 136 U.S. 1, 42 (1890) (reasoning that the people of the United States became the "sovereign owners" of the territory of Utah upon its acquisition, that the United States as their government exercises power over the territory subject only to the provisions of the Constitution, and that Congress therefore could supersede pre-acquisition legislative acts).  Acting under the Territories Clause, Congress may, for example, create local governments for the territories of the United States.  See, e.g., United States v. Wheeler, 435 U.S. 313, 321-22 (1978) (stating that "a territorial government is entirely the creation of Congress," while noting the unique status of Native American tribes, whose prior sovereignty is preserved in certain respects).  The constitutional division between state sovereignty over affairs within state borders and affairs ceded to the federal government pursuant to the Constitution is not applicable to territories, whose governments are "the creations, exclusively, of [Congress], and subject to its supervision and control."  Benner v. Porter, 50 U.S.

235, 242 (1850); see also Cincinnati Soap Co. v. United States, 301 U.S. 308, 323 (1937)

(explaining that "[i]n dealing with the territories . . . Congress in legislating is not subject to the

same restrictions which are imposed in respect of laws for the United States considered as a

political body of states in union").

   A federal territory's "relation to the general government is much the same as that

which counties bear to the respective States, and Congress may legislate for them as a State does

for its municipal organizations."  First Nat'l Bank v. Yankton Cty., 101 U.S. 129, 133 (1879).

Congress can thus amend the acts of a territorial legislature, abrogate laws of territorial

legislatures, and exercise "full and complete legislative authority over the people of the

Territories and all the departments of the territorial governments."  Id.  With respect to territorial

governance, Congress exercises the governance powers reserved under the Constitution to the

people in respect of state matters.  Id.  In this sense, Congress occupies a dual role with respect to

the territories of the United States: as the national Congress of the United States, and as the local

legislature of the territory.  See Cincinnati Soap Co., 301 U.S. at 317 ("A [territory] has no

government but that of the United States, except in so far as the United States may permit.  The

national government may do for one of its dependencies whatever a state might do for itself or

one of its political subdivisions, since over such a dependency the nation possesses the sovereign

powers of the general government plus the powers of a local or a state government in all cases

where legislation is possible."); see also Keller v. Potomac Elec. Power Co., 261 U.S. 428, 442–

43 (1923) (recognizing that, in exercising Congress's substantially identical power over the

District of Columbia, Congress had power to create courts "of the District, not only with the

jurisdiction and powers of federal courts in the several states, but with such authority as a state

may confer on her courts"); Am. Ins. Co. v. 356 Bales of Cotton, 26 U.S. (1 Pet.) 511, 546

(1828) (recognizing the power of Congress to create a territorial court with jurisdiction that could not otherwise have been constitutionally granted to a state court); United States v. McMillan, 165 U.S. 504, 510–11 (1897) (explaining that territorial courts are not "courts of the United States, and do not come within the purview of acts of Congress which speak of 'courts of the United States' only," although Congress exercises the combined powers of the general government, and of a state government with respect to territories and could directly legislate for any territory or "extend the laws of the United States over it, in any particular that congress may think fit.").[11]

Due to its unique role with respect to federal territories, Congress may act "in a manner that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it . . . ." Palmore v. United States,

---

[11]    On July 6, 2018, the Court received and reviewed a supplemental informative motion filed by Aurelius (Docket Entry No. 3451, the "Aurelius Supplement")  The Court subsequently received and reviewed informative motions filed by the Oversight Board, the United States, and the COFINA Seniors in response to the Aurelius Supplement. (Docket Entry Nos. 3494, 3495, 3500.)  In its submission, Aurelius cites the Supreme Court's June 22, 2018 decision in Ortiz v. United States, 138 S. Ct. 2165 (2018), for the propositions that military and territorial courts are created pursuant to similar powers, and if separation of powers concerns pertain to one they must necessarily pertain to the other. (Docket Entry No. 3451 at 5.)  The Ortiz Court's focus has no such implications, however.  The Court was examining the question of whether the military court rulings before it were within its appellate jurisdiction.  It cited past examples of judicial proceedings in state, military and territorial courts from which it had entertained appeals, emphasizing the judicial nature, as opposed to executive action or original determination, aspects of the matter that was before it in Ortiz.  Ortiz does not speak to the question of whether Congress can create a territorial court or any other entity that is not a court of the United States and is not subject to the Appointments Clause.  The Ortiz Court's treatment of the Appointments Clause is similarly inapposite, as the Court held that Congress was empowered to permit the challenged military officer to perform in the job in question and the appellant's Appointments Clause argument (which the Court rejected) concerned whether a single person could be both a principal and an inferior officer of the United States, an issue that is not raised here.  See Ortiz, 138 S. Ct. at 2183-84.  The supplemental informative brief also cites the Lucia case, which is similarly inapposite as it involved a distinction between an officer of the United States and an employee.  Lucia v. S.E.C., 138 S. Ct. 2044 (2018).

411 U.S. 389, 398 (1973) (upholding creation of criminal courts for District of Columbia whose judges are not life-tenured). For example, as discussed in more detail below, the Supreme Court has held that the non-delegation doctrine, which prohibits Congress from delegating its legislative authority to another branch of the Government, does not preclude Congress from delegating its legislative authority to a territorial government. See, e.g., District of Columbia v. John R. Thompson Co., 346 U.S. 100 (1953) (upholding delegation by Congress of legislative authority to District of Columbia in the context of a challenge to a District law prohibiting racial discrimination); Cincinnati Soap Co., 301 U.S. at 323 (rejecting argument that a revenue measure constituted an unlawful delegation and explaining that the "congressional power of delegation to a [territorial] government is and must be as comprehensive as the needs").

The Supreme Court's jurisprudence regarding territorial courts is instructive with respect to the distinction between territorial and federal entities. In American Insurance Co., the Supreme Court considered a challenge to the admiralty jurisdiction conferred on territorial courts of Florida by a territorial legislature established by congressional legislation. 26 U.S. 511. Chief Justice Marshall, writing for a unanimous Court, drew a distinction between "Constitutional" courts established pursuant to Article III of the Constitution, which, inter alia, commits admiralty jurisdiction to the life-tenured federal judiciary, and courts established pursuant to congressional legislation for the territory of Florida. The judges of the Florida territorial courts established by Congress were appointed only for terms of years. Because Congress had acted under "those general powers which that body possesses over the territories of the United States," the constitutional constraint on admiralty jurisdiction was inapplicable to the "legislative courts" created for the territory and the territorial court, unlike a non-"Constitutional" court situated within a state, could validly rule on admiralty matters. Id. at 546. Legislative Courts in

territories derive their power from Congress's ability to create courts under the Territories Clause

of the U.S. Constitution and are vested with jurisdiction by Congress.  Id.  Their structure and

jurisdiction need not comport with those prescribed by the Constitution for courts exercising the

"judicial power of the United States" pursuant to Article III.  "The jurisdiction with which they

are invested, is not a part of that judicial power, which is defined in the [third] article of the

Constitution, but is conferred by Congress in the execution of those general powers . . . over the

territories of the United States."  Id. at 546.  Chief Justice Marshall explained that:

> Although admiralty jurisdiction can be exercised in
> the states in those Courts, only, which are established
> in pursuance of the [third] article of the Constitution;
> the same limitation does not extend to the territories.
> In legislating for them, Congress exercises the
> combined powers of the general, and of a state
> government.

Id.

Subsequent Supreme Court decisions likewise recognized Congress's power to

create judicial structures within territories that have characteristics peculiar to those territories

and could not necessarily have been established as courts exercising power on behalf of the

United States.  See, e.g., Benner, 50 U.S. at 244-45 (holding that, upon admission of Florida as a

state, the prior legislative courts created by Congress "in the exercise of its powers in the

organization and government of the Territories" could not exercise jurisdiction of matters

invoking the judicial power of the United States under Article III of the Constitution and "[n]o

place was left unoccupied for the Territorial organization"); Clinton v. Englebrecht, 80 U.S. 434

(1871) (stating that "[t]he judges of the Supreme Court of the Territory [of Utah] are appointed

by the President under the act of Congress, but this does not make the courts they are authorized

to hold 'courts of the United States'").  Just as territorial courts can, if permitted by Congress,

exercise powers that Congress could not have granted to similar courts within the states of the

United States, the Constitution does not require Congress to incorporate the structural assurances

of judicial independence in Article III of the Constitution (e.g., life tenure and protection against

reduction in pay) in establishing such courts.  The Supreme Court so held in Palmore, a decision

concerning the Superior Court for the District of Columbia.  411 U.S. 389 (1973).  Upholding the

Superior Court's exercise of jurisdiction of federal criminal felony proceedings, the Court

reasoned that its approach was "consistent" with the "view of [the] Court" concerning territorial

courts.  Id. at 403.  Congress can thus create territorial entities that are distinct in structure,

jurisdiction, and powers from the federal government.

        Turning to Puerto Rico, Congress has long exercised its Article IV plenary power

to structure and define governmental entities for the island.  Puerto Rico became a territory of the

United States, under the Treaty of Paris, following the Spanish American War of 1898.  Treaty

of Paris, Art. 9, Dec. 10, 1898, 30 Stat. 1759.  The Treaty of Paris expressly committed to

Congress the task of determining "[t]he civil rights and political status" of the inhabitants of

Puerto Rico.  Id.  Shortly thereafter Congress, acting pursuant to its power under the Territories

Clause, enacted the Foraker Act and established a civilian government for Puerto Rico.  Organic

Act of 1900, ch. 191, 31 Stat. 77; see also Puerto Rico v. Sanchez Valle, 136 S. Ct. 1863 (2016).

        In 1917, Congress again addressed the governance of Puerto Rico by enacting the

Jones Act.  That federal statute granted United States citizenship to the people of Puerto Rico

and allowed the residents of Puerto Rico to elect a bicameral legislature by popular vote.  See

Organic Act of Puerto Rico, ch. 145, §§ 5, 26, 39 Stat. 951, 953, 958 (1917).  Then, in 1947,

Congress further shaped Puerto Rico's government by enacting the Elective Governor Act and

allowing the residents of Puerto Rico to elect their own governor.  See Act of Aug. 5, 1947, ch.

490, § 1, 61 Stat. 770, 771 (1947).  In 1950, Congress passed Public Law 600 and gave the

Puerto Rican people the right to form an elected self-government and adopt a constitution.  Act

of July 3, 1950, ch. 446, § 1, 64 Stat. 319 (1950).  Pursuant to Public Law 600, the people of

Puerto Rico approved a draft constitution and submitted it to Congress for its approval.  See id.

Congress revised and, on July 3, 1952, approved the Puerto Rico Constitution.  See Act of July 3,

1952, ch. 567, 66 Stat. 327 (1952).  On July 25, 1952, the Governor proclaimed the effectiveness

of the Puerto Rico Constitution and a new political entity was born, the Commonwealth of

Puerto Rico.  P.R. Const. art. I, §§ 1, 2.  In creating these governance structures for Puerto Rico,

Congress delegated its direct territorial governance authority to institutions it established for

Puerto Rico in a manner that would not have been permissible in the context of the exercise of its

powers within the federal government.

As the Supreme Court observed in John R. Thompson Co., "[t]he power of

Congress to delegate legislative power to a territory is well settled."  346 U.S. at 106.  The Court

went on to note that:

> [i]t would seem then that on the analogy of the delegation of powers
> of self-government and home rule both to municipalities and to
> territories there is no constitutional barrier to the delegation by
> Congress to the District of Columbia of full legislative power
> subject of course to constitutional limitations to which all
> lawmaking is subservient and subject also to the power of Congress
> at any time to revise, alter or revoke the authority granted.

Id. at 109.  In Cincinnati Soap Co., the Supreme Court held that the non-delegation doctrine did

not preclude Congress from delegating its legislative authority to the territorial government of

the Philippines.  301 U.S. 308.  The Court explained that Congress's plenary power over the

territories "is not subject to the same restrictions which are imposed in respect of laws for the

United States considered as a political body of states in union."  Id. at 323.  Similarly, in United

States v. Heinszen, the Supreme Court rejected the argument that Congress was unable to

delegate its legislative authority, under the Territories Clause, to the President.  206 U.S. 370,

384–85 (1907).

           In summary, Congress has plenary power under the Territories Clause to establish

governmental institutions for territories that are not only distinct from federal government

entities but include features that would not comport with the requirements of the Constitution if

they pertained to the governance of the United States.  It has exercised this power with respect to

Puerto Rico over the course of nearly 120 years, including the delegation to the people of Puerto

Rico elements of its plenary Article IV authority by authorizing a significant degree of local self-

governance.  Such territorial delegations and structures may, however, be modified by Congress.

John R. Thompson, 346 U.S. at 109.  Congress purported to do so in creating the Oversight

Board as an entity of the territorial government of Puerto Rico.  The Court now turns to the

question of whether the Oversight Board is a territorial entity and its members officers of the

territorial government, or whether its members are officers of the United States who must be

appointed pursuant to procedures consistent with the requirements of the Appointments Clause.

       3.   The Oversight Board

           Congress explicitly invoked the Territories Clause, and only the Territories

Clause, as its source of authority in enacting PROMESA:

> Constitutional Basis – The Congress enacts [PROMESA] pursuant
> to article IV, section 3 of the Constitution of the United States,
> which provides Congress the power to dispose of and make all
> needful rules and regulations for territories.

48 U.S.C.A. § 2121(b)(2) (West 2017).  Aurelius argues, nonetheless, that the appointment of

Oversight Board members is governed by Article II of the Constitution which, according to

Aurelius, requires unfettered nomination by the President and confirmation by the Senate of

Oversight Board members as principal officers of the United States. Aurelius urges this proposition on the basis of (i) the federal (as opposed to territorial) authority of the appointing institution, (ii) what Aurelius characterizes as federal control and supervision of the Oversight Board's operations, and (iii) Oversight Board authority that Aurelius contends extends beyond local territorial matters. (Mot. to Dismiss at 18.) The United States, the Oversight Board, and other opponents point to similar factors in arguing that the Oversight Board is territorial and its members lawfully appointed.[12] While neither the parties nor the Court's own research has identified a definitive set of factors relevant to the determination of whether an entity is territorial or federal, many of the factors argued by the parties have been considered in connection with controversies over whether congressionally created entities are private or governmental.[13]

Having examined the factors argued by the parties, the Court finds that Congress's invocation of the Territories Clause is consistent with the entity it purported to create, that the method of selection that Congress fashioned for the membership of the Oversight Board is consistent with the exercise of plenary congressional power under that Clause, and that neither

---

[12]     The United States argues that the Court should consider the "Oversight Board's creation, statutory objectives, authority, characteristics, and relationship with the Federal Government." (U.S. Mem. of Law at 21.) The Oversight Board argues that the Court should consider whether (i) Congress invoked its Article IV power in creating the entity and (ii) the entity's objectives and authority are local rather than national, or whether its responsibilities over local affairs are subordinate and incidental. (FOMB Opp. at 13.) Other parties-in-interest advance similar or alternative standards.

[13]     In the context of determining whether an entity is a federal instrumentality for constitutional purposes, the Supreme Court has looked at factors similar to those advanced by the parties. Specifically, in Lebron v. National Railroad Passenger Corporation, 513 U.S. 374, 383-400 (1995), and Department of Transportation v. Association of American Railroads, 135 S. Ct. 1225, 1231-33 (2015), the Supreme Court considered the creation, objectives, and practical operation of an entity in determining whether the nominally private entity should be treated as a federal government instrumentality for purposes of individual rights and separation of powers.

Presidential nomination nor Senate confirmation of the appointees to the Oversight Board is

necessary as a constitutional matter to legitimize the exercise of the Oversight Board's powers

under PROMESA because the members of the Oversight Board are not "Officers of the United

States" subject to the Appointments Clause.

### a. Authority for Creation of Board

As noted above, Congress explicitly stated that it was acting pursuant to the

Territories Clause when it enacted PROMESA, creating the Oversight Board as a new entity

within the Government of Puerto Rico. Congress is entitled to substantial deference when it acts

pursuant to its plenary Article IV power. See, e.g., Romeu v. Cohen, 265 F.3d 118, 124 (2d Cir.

2001) (upholding, "[g]iven the deference owed to Congress [under the Territories Clause]" and

in light of other constitutional provisions relating to voting rights, a statute providing that Puerto

Rican citizens who moved from mainland States to Puerto Rico could not vote in federal

presidential elections); Quiban v. Veterans Admin., 928 F.2d 1154, 1160 (D.C. Cir. 1991)

(stating that "[t]o require the government . . . to meet the most exacting standard of review . . .

would be inconsistent with Congress's '[l]arge powers' to 'make all needful Rules and

Regulations respecting the Territory . . .  belonging to the United States'" and thus applying a

rational basis test in evaluating the constitutionality of exclusion of veterans of Philippine armed

forces from certain federal benefits) (citations omitted).

Congress's determination that it was acting pursuant to its Article IV territorial

powers in creating the Oversight Board as an entity of the government of Puerto Rico is entitled

to substantial deference. Indeed, Supreme Court jurisprudence regarding Congress's governance

of the territories consistently looks to Congress's express declaration regarding whether it is

acting pursuant to its power under the Territory Clause of Article IV of the Constitution. See,

e.g., Cincinnati Soap Co., 301 U.S. at 323; Binns v. United States, 194 U.S. 486, 494 (1904).  As

shown above, those powers are plenary and include the power to create and shape the contours of

territorial governments.  Cf. Palmore, 411 U.S. at 407 (holding that courts in the District of

Columbia are local rather than federal because Congress "expressly created" the courts pursuant

to its plenary authority and created a body with authority over matters of "strictly local

concern").

This factor thus weighs in favor of the legitimacy of the Oversight Board as

currently constituted.

### b.  Can Congress Create an Entity that Is Not Inherently Federal?

Aurelius argues that a fundamental distinction exists between officials appointed

by the federal government and those who take their office by virtue of local, territorial authority.

(Mot. to Dismiss at 18.)  Specifically, Aurelius contends that individuals appointed to their office

by the federal government are federal officers, regardless of whether or not the office has federal

or national responsibilities.  (Id. at 19.)  Under the premise advanced by Aurelius, Congress is

incapable of both creating and filling a territorial office or entity.  Rather, the only officers who

may be considered "territorial" are those who are popularly elected by the residents of a federal

territory.  (Id. at 21.)

Aurelius' argument that only Puerto Rico itself could have created an entity that

was not effectively part of the federal government is unavailing because it ignores both the

plenary nature of congressional power under Article IV and the well-rooted jurisprudence,

discussed above, that establishes that any powers of self-governance exercised by territorial

governments are exercised by virtue of congressional delegation rather than inherent local

sovereignty.  Thus, creation of an entity such as the Oversight Board through popular election

would not change the Oversight Board's ultimate source of authority from a constitutional perspective.  Aurelius' argument is therefore meritless.  Popular elective authority in territories of the United States derives from Congress, which explicitly states in PROMESA that it has exercised its own power to create a territorial entity.

Aurelius relies principally on two decisions and historical practice in support of its argument.  (Id. at 18-19.)  It cites Wise v. Withers, in which the Supreme Court concluded that a justice of the peace in the District of Columbia was an "Officer of the United States" for purposes of a statute exempting such officers from military service.  7 U.S. (3 Cranch) 331, 335–37 (1806).  The Court did not, however, analyze whether the justice of the peace was an "Officer of United States" for constitutional purposes.[14]  Moreover, to the extent Wise can be read as establishing that presidential appointment or congressional creation of an office renders the appointee or the institution to which the person is appointed federal, the Supreme Court has deviated from this view in subsequent decisions.  See, e.g., Englebrecht, 80 U.S. at 447 (presidential appointment of territorial judges does not render their courts "courts of the United States" within the meaning of the Constitution).  Aurelius also relies on United States v. Hartwell, where the Supreme Court considered whether a clerk employed in the federal Treasury Department was an "officer" of the federal government for purposes of federal bank fidelity and embezzlement statutes.  73 U.S. 385, 397 (1867).  Although the Hartwell Court noted that the

---

[14]      The Wise Court appears to have relied on Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803), as settling the proposition that a justice of the peace for the District of Columbia is an officer of the United States.  Wise, 7 U.S. (3 Cranch) at 336 (stating that "[i]t has been decided in this court, that a justice of the peace is an officer").  However, the proposition that Marbury was an officer of the United States was not contested in that 1803 case and the Marbury Court's decision did not expressly address the significance of the identity of the appointing authority or the significance of the method of appointment for the determination of the officer status of the appointee.

defendant had been appointed by "the head of a department within the meaning of the constitutional provision upon the subject of the appointing power," the Court's focus was on the language of the statute and on the general nature of government office, rather than on the Constitutional status of the office held by the defendant.  See id.  at 393-95.  No issue was presented as to whether the defendant could have been an officer of any government other than that of the United States.

Turning to historical practice, Aurelius points to territorial offices that were established during the early years of the country's history, including positions with authority over the Northwest Territory.  (Mot. to Dismiss at 19.)  In the instances Aurelius cites, Congress provided for the government positions and required that the appointees be appointed by the President and confirmed by the Senate.  Aurelius argues that these historical examples evidence an "established" practice and general understanding that federally appointed positions are inherently federal offices.  (Id.)  Aurelius further argues that historical practice also indicates that officials who are elected by the people of a territory (or who are appointed by popularly elected representatives) are not officers of the federal government.  (Id. at 21-22.)

The Oversight Board, and various parties in interest, fundamentally disagree with Aurelius' position and, instead, argue that the source of an official's appointment is irrelevant in determining whether the office is territorial or federal.  (See, e.g., FOMB Opp. at 18.)  Noting that "there is no evidence . . . that Congress believed advice and consent was constitutionally required" in the past instances where Congress decided to require that certain territorial offices be filled through advice and consent (id. at 11), the Oversight Board contends that Aurelius putative distinction between a federally appointed and a popularly elected official is baseless because a territorial "official's authority always derives from Congress."  (Id. at 19 (emphasis in

original) (citing <u>Sanchez Valle</u>, 136 S. Ct. at 1875 ("[Behind] the Puerto Rican people and their

Constitution, the 'ultimate' source of prosecutorial power remains the U.S. Congress.")).)  The

Oversight Board argues that "any time Congress exercises its Article IV power to confer

authority on a territorial government, it does so by means of a federal statute."  (<u>Id.</u> at 20); <u>cf.</u>

<u>Barnes v. District of Columbia</u>, 91 U.S. 540 (1875) (holding that the board of public works for

the District of Columbia was a part of the municipal government.  Although its members were

"nominated by the President" with the "advice and consent of the Senate," the Court held that "it

is quite immaterial, on the question whether [the] board is a municipal agency, from what source

the power comes to these officers,—whether by appointment of the President, or by the

legislative assembly, or by election."); <u>Metro. R. Co. v. District of Columbia</u>, 132 U.S. 1, 8

(1889) ("The mode of appointing [] officers does not abrogate [an entity's] character as a

municipal body politic.  We do not suppose that it is necessary to a municipal government, or to

municipal responsibility, that the officers should be elected by the people.").

      The Court agrees with the Oversight Board that neither the case law nor the

historical practice cited by Aurelius compels a finding that federal appointment necessarily

renders an appointee a federal officer.  Any time Congress exercises its Article IV power it does

so by means of a federal statute, and all local governance in Puerto Rico traces back to Congress.

<u>See</u> <u>United States v. Sanchez</u>, 992 F.2d 1143, 1152 (11th Cir. 1993) (stating that although

"Congress has [] delegated more authority to Puerto Rico over local matters . . . . this has not

changed in any way Puerto Rico's <u>constitutional</u> status as a territory, or the source of power over

Puerto Rico.  Congress continues to be the <u>ultimate source of power</u> pursuant to the Territory

Clause of the Constitution") (citing <u>United States v. Lopez Andino</u>, 831 F.2d 1164, 1176 (1st

Cir. 1987) (Torruella, J, concurring)) (emphasis in original).  The fact that the Oversight Board's

members hold office by virtue of a federally enacted statutory regime and are appointed by the

President does not vitiate Congress's express provisions for creation of the Oversight Board as a

territorial government entity that "shall not be considered to be a department, agency,

establishment, or instrumentality of the Federal Government." 48 U.S.C.A. § 2121(c) (West

2017). The jurisprudence, historical practice, and Congress's express intention establish that

Congress can and has created a territorial entity in this case.

### c. Control and Supervision of the Oversight Board

Aurelius argues that a defining characteristic of an entity's territorial or federal

status is whether the federal government controls the ongoing operations of the entity. (Mot. to

Dismiss at 22.) Aurelius argues that the federal government continues to control and supervise

the Oversight Board because of the following:

(i)     The Oversight Board reports to the President and Congress under Section
        208 of PROMESA. 48 U.S.C.A. § 2148(a) (West 2017).

(ii)    The Oversight Board's ongoing ethics obligations are governed by federal
        conflicts of interest and financial disclosure statutes. Id. § 2129.

(iii)   The Oversight Board members may be removed by the President. Id. §
        2121(e)(5)(B).

(iv)    The Commonwealth's Governor may not remove Board members and
        "[n]either the Governor nor the Legislature may . . . exercise any control,
        supervision, oversight, or review over the Oversight Board or its
        activities." Id. § 2128(a).

(v)     The Oversight Board wields its authority pursuant to the provisions of a
        federal statute, PROMESA.

(Mot. to Dismiss at 22-23.) The Oversight Board argues, inter alia, that these qualities are not

determinative of whether the office is territorial or federal, because federal appointment and

removal have historically been common attributes of territorial offices due to Congress's unique

role in structuring local governance for federal territories. (FOMB Opp. at 20.) In fact, the

United States contends that "the nature of degree of the Federal Government's supervision of the Oversight Board is consistent with the Oversight's Board territorial character."  (U.S. Mem. of Law at 23.)  These points are well taken.

Furthermore, Aurelius reads excessive significance into the provisions of PROMESA upon which it relies.  Although Section 208 of PROMESA does require the "[Oversight] Board [to make] reports to the President and Congress" (Mot. to Dismiss at 22), such reports must simultaneously go to the Governor and Legislature.  48 U.S.C.A. § 2148 (West 2017).  They are no more indicative of supervision by federal authorities than of supervision by the territorial authorities.  Indeed, PROMESA's express prohibition of the exercise of control over the Oversight Board by the Governor and Legislature (see id. § 2128(a)) suggests that the reporting requirement is not an instrument of control or supervision at all.  Notably, the statute provides that the Oversight Board may use the reporting mechanism as an opportunity to provide "recommendations to the President and Congress on changes to [PROMESA] or other Federal laws . . . that would assist [Puerto Rico] in complying with any certified Fiscal Plan."  Id. § 2148(a)(3).  The fact that the President and Congress are included in the list of parties entitled to receive the Oversight Board's annual report does not mean that the Oversight Board is subject to the federal government's control.[15]  Nor is it unprecedented for Congress to require a territorial

---

[15]    In Association of American Railroads, the Supreme Court considered whether Amtrak constituted a federal entity rather than a private one for constitutional purposes.  135 S. Ct. 1225 (2015).  Specifically, the Association of American Railroads sued the Department of Transportation and others, claiming that the section of Passenger Rail Investment and Improvement Act of 2008 ("PRIIA") requiring Amtrak to jointly develop standards to evaluate performance of Amtrak's intercity passenger trains was unconstitutional.  In determining that Amtrak constituted a federal instrumentality for constitutional purposes, the Court cited the fact that Amtrak was required to submit various annual reports to Congress and the President, among many other factors.  Id. at 1232. The Court also considered Amtrak's creation, objectives, and practical operation.

officer to report to the federal government.  For example, under the Jones Act, the Governor was

required to report annually to Congress and the executive branch, despite the fact that the

Governor was elected by the people of Puerto Rico.  Jones Act § 12.

        The fact that members of the Oversight Board may not be removed by the

Governor or the Legislature and are, instead, only removable by the President "for cause" is

indicative of the autonomy and independence that Congress intended for the Oversight Board

rather than of control by the federal government.  See, e.g., Humphrey's Ex'r v. United States,

295 U.S. 602 (1935) (upholding a for cause removal provision in the context of the Federal

Trade Commission); Mistretta v. United States, 488 U.S. 361, 411 (1989) (Congress "insulated"

Sentencing Commission members from Presidential removal except for good cause "precisely to

ensure that they would not be subject to coercion.").  Some mechanism for removal was

obviously necessary as a practical matter.  Provision for removal by the territorial Governor or

Legislature would have undermined the express statutory preclusion of the exercise of control by

those authorities over the Oversight Board.  Removal by act of Congress would have raised

practical impediments to swift action when necessary.  Delegating removal authority to the

President, the most powerful executive officer in the nation, and limiting such removal to

circumstances where there is cause, appears to ensure that the power will not be used lightly and

is thus consistent with the intended independence of the Oversight Board.  The Court finds no

basis for interpretation of the removal provision as an indicator of federal control that would

render the board members officers of the United States rather than territorial officials.

--------

Although the Oversight Board in this case provides annual reports to the President and
Congress, that factor is not alone dispositive.

Aurelius is correct in asserting that the Oversight Board exercises authority that was "conferred by a federal statute" and that the nature of its work often requires the Oversight Board to turn to the requirements specified in a federal statute.  That is not, however, remarkable, since the Oversight Board was created as an instrumentality of a territory that is under the sovereign control of the federal government.  Congress is capable of operating only through the enactment of legislation.  As detailed above, Congress has established the structure of Puerto Rico's local governance on numerous instances and, in each instance, it has done so through the enactment of legislation.  Territorial governments are "the creations, exclusively, of the legislative department" and the local governance within a federal territory is necessarily derived from Congress.  Benner, 50 U.S. at 242.  For example, the Commonwealth's own constitution was subject to congressional approval prior to becoming effective.  The facts that the Oversight Board's authority was conferred upon it by a federal statute and that the statute delineates its duties do not of themselves render the Oversight Board a federal entity.

### d.   Oversight Board's Statutory Objectives and Scope of Authority

The parties generally agree that the Court should examine the objectives and authority of the Oversight Board to determine whether they are targeted towards purely local matters.  (See, e.g., Mot. to Dismiss at 18; FOMB Opp. at 14.)  The plain language of the statute indicates that the Oversight Board's objectives and authority are centered on Puerto Rico. PROMESA is specifically directed towards federal territories and the purpose of the Oversight Board is confined to an express territorial objective:  "provid[ing] a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets."  48 U.S.C.A. § 2121(a) (West 2017).  Pursuant to PROMESA, the Oversight Board is required to maintain an office in Puerto Rico.  Id. § 2122.  The Oversight Board's primary responsibilities are solely concentrated on

Puerto Rico's economic recovery.  See, e.g., id. §§ 2141 (approval of fiscal plans), 2164

(commencement of restructuring court proceedings).  The Oversight Board does not receive

funding from the federal government and is instead funded entirely by Puerto Rico.[16]  Id. § 2127.

The Oversight Board acts as Puerto Rico's representative in invoking the debt adjustment

authority of the federal government, just as a private debtor, trustee, or debtor in possession

would do in settling an estate or pursuing a reorganization under the federal Bankruptcy Code.

Puerto Rican law, as opposed to federal law, prescribes the Oversight Board's investigative

authority.  Id. § 2124(f).  PROMESA's express declaration that the Oversight Board is not a

federal agency exempts the Board from numerous federal laws that apply to federal agencies

(e.g., the Freedom of Information Act ("FOIA") and the Administrative Procedure Act (the

"APA")).  See 5 U.S.C.A. §§ 551(1)(c), 552(f) (2017) (FOIA applies to "each authority of the

Government of the United States," but not "the governments of the territories"); 5 U.S.C.A. §

701(b)(1)(c) (2017) (regarding the APA and providing the same exclusion).  While it is true that

Congress has chosen to apply federal ethics rules and requirements to the Oversight Board, the

invocation of that body of law does not change the substantive focus or nature of the exercise of

authority of the Oversight Board to purposes extraneous to Puerto Rico's economic health and

future prospects, nor does it expand PROMESA's reach beyond the affairs of covered territories.

The Oversight Board's statutory objectives and scope of authority thus mark its character as

territorial rather than federal.

---

[16]     Compare Ass'n of Am. R.Rs., 135 S. Ct. at 1232 (considering the fact that an entity was
dependent on federal financial support in considering whether such entity was "federal").

> ### e. Selection Mechanism

Given that the Oversight Board is a territorial entity and its members are territorial officers, Congress had broad discretion to determine the manner of selection for members of the Oversight Board.  Congress exercised that discretion in empowering the President with the ability to both appoint and remove members from the Oversight Board.  The President's role in the selection process does not change the fundamental nature of the Oversight Board, which is a territorial entity.  Nor does the manner of selection constitute an improper delegation of power[17] or encroachment on the President's general appointment authority, because Congress used its Article IV powers and did not attempt to allow the President to appoint the Board as a federal entity within the Executive Branch.  Cf. Brewer v. D.C. Fin. Responsibility & Mgmt. Assistance Auth., 953 F. Supp. 406, 410 (D.D.C. 1997) (rejecting a separation-of-powers challenge involving the D.C. Control Board because "[t]he Executive Branch has no constitutional role with respect to the District that corresponds or competes with that of

---

[17]    Aurelius cites Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc., 501 U.S. 252 (1991) ("MWAA"), in support of the proposition that Congress's Property Clause authority is subject to separation of powers.  In that case, an Act of Congress authorized the transfer of operating control of two airports from the Department of Transportation to the Metropolitan Washington Airports Authority (the "Authority").  The Authority was created pursuant to a compact between the state of Virginia and the District of Columbia.  The Act of Congress also authorized the creation of a board of review (the "Review Board"), consisting solely of congressional members and vested with the authority to veto decisions made by the Authority's board of directors.  The Supreme Court held that the Review Board was unconstitutional on separation of powers grounds, notwithstanding the fact that Congress was acting pursuant to the Property Clause.  MWAA, 501 U.S. at 270–71.  Specifically, through the Review Board, Congress either encroached on the Executive Branch by exercising executive power or failed to satisfy the bicameralism and presentment requirements by exercising legislative power.  Id. at 276.  Importantly, the Court's holding was premised on a finding that the Review Board was a federal entity wielding federal power.  In this case, the Oversight Board does not include members of Congress and, as explained above, the Oversight Board is an entity within the territorial government of Puerto Rico that exercises power delegated to it by Congress.

Congress"). Although historical practice, as detailed above, indicates that Congress has required

Senate confirmation for certain territorial offices, nothing in the Constitution precludes the use of

that mechanism for positions created under Article IV, and its use does not establish that

Congress was obligated to invoke it.

### f. Conclusion – Motion to Dismiss the Petition

Affording substantial deference to Congress and for the foregoing reasons, the

Court finds that the Oversight Board is an instrumentality of the territory of Puerto Rico,

established pursuant to Congress's plenary powers under Article IV of the Constitution, that its

members are not "Officers of the United States" who must be appointed pursuant to the

mechanism established for such officers by Article II of the Constitution, and that there is

accordingly no constitutional defect in the method of appointment provided by Congress for

members of the Oversight Board. Since the alleged defect in the appointment method is the only

ground upon which Aurelius argues that the Commonwealth's Title III Petition fails to comport

with the requirements of PROMESA, Aurelius' motion to dismiss the Petition is denied. In light

of the foregoing determinations, it is unnecessary to address the parties' remaining arguments.

## B.  Motion to Lift the Automatic Stay

In connection with its Motion to Dismiss, Aurelius filed a Lift Stay Motion

seeking either (i) clarification that the automatic stay under 11 U.S.C. §§ 362 and 922 (made

applicable to Title III proceedings generally by 48 U.S.C. § 2162(a)) does not apply to its effort

to invalidate the actions of the current Oversight Board, or, in the alternative, (ii) relief from the

stay so that Aurelius may pursue an independent action for declaratory and injunctive relief

outside the Title III case against the Oversight Board based on the same arguments that Aurelius

has advanced in support of its Motion to Dismiss. At the Hearing, counsel for Aurelius stated

that Aurelius filed the Lift Stay Motion as a precaution to ensure that it could obtain full scope injunctive relief if it were to prevail on its Appointments Clause challenge.  (Tr. P. 36, 16-24.) For the reasons detailed above, Aurelius has failed to demonstrate any prospect of entitlement to injunctive relief.  Accordingly, there is no cause for relief from the automatic stay to pursue an injunction and the Lift Stay Motion is denied in its entirety.

III.

CONCLUSION

For the foregoing reasons, the *Objection and Motion of Aurelius to Dismiss Title III Petition* (Docket Entry No. 913) is denied, and the *Motion of Aurelius for Relief from the Automatic Stay* (Docket Entry No. 914) is denied as well.  This Opinion and Order resolves docket entry nos. 913 and 914.

SO ORDERED.

Dated: July 13, 2018

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge