## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>**THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD OF PUERTO RICO**<br><br>As a representative of the **COMMONWEALTH OF PUERTO RICO**[1] | CASE NO.  17-BK-3283 (LTS)<br><br><br><br>PETITION UNDER TITLE III OF THE PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT |
| **HON. RAFAEL HERNÁNDEZ-MONTAÑEZ,** in his official capacity as Leader of the Popular Democratic Party Minority in the Puerto Rico House of Representatives; **HON. RAMÓN L. CRUZ-BURGOS,** in his official capacity as Alternate Leader of the Popular Democratic Party Minority in the Puerto Rico House of Representatives; **HON. LUIS R. VEGA-RAMOS**, in his capacity as an at Large Member of the Puerto Rico House of Representatives, elected on the Popular Democratic Party's Ticket; **HON. MANUEL NATAL-ALBELO**, in his official capacity as an at Large Member of the Puerto Rico House of Representatives, elected on the Popular Democratic Party's Ticket; **HON. BRENDA LÓPEZ-DE ARARRÁS**, in his | CASE NO. _____<br><br><br><br><br><br>DECLARATORY JUDGMENT; INJUNCTIVE AND OTHER EQUITABLE RELIEF |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567- LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780- LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

official capacity as an at Large Member of the Puerto Rico House of Representatives, elected on the Popular Democratic Party's Ticket; **HON. LUIS RAÚL TORRES-CRUZ**, as Representative for District 2, elected on the Popular Democratic Party's Ticket; **HON. CARLOS A. BIANCHI-ANGLERÓ**, as Representative for District 20, elected on the Popular Democratic Party's Ticket; **HON. LYDIA MÉNDEZ-SILVA**, as Representative for District 21, elected on the Popular Democratic Party's Ticket; **HON. JOSÉ A. DÍAZ-COLLAZO**, as Representative for District 29, elected on the Popular Democratic Party's Ticket; **HON. LUIS R. ORTIZ-LUGO**, as Representative for District 30, elected on the Popular Democratic Party's Ticket; **HON. JUSÚS SANTA-RODRÍGUEZ**, as Representative for District 31, elected on the Popular Democratic Party's Ticket; **HON. JOSÉ VARELA-FERNÁNDEZ**, as Representative for District 31, elected on the Popular Democratic Party's Ticket; **HON. JAVIER APONTE-DALMAU**, as Representative for District 38, elected on the Popular Democratic Party's Ticket; **HON. ROBERTO RIVERARUIZ-DE-PORRAS**, as Representative for District 39, elected on the Popular Democratic Party's Ticket; **HON. ÁNGEL MATOS-GARCÍA**, as Representative for District 40, elected on the Popular Democratic Party's Ticket; **HON. MIGUEL A. PEREIRA-CASTILLO**, as an at Large Senator, elected on the Popular Democratic Party's Ticket; **HON. CIRILO TIRADO-RIVERA**, as an at Large Senator, elected on the Popular Democratic Party's Ticket; **HON. ROSSANA LÓPEZ-LEÓN**, as an at Large Senator, elected on the Popular Democratic Party's Ticket; **HON. JOSÉ A. SANTIAGO-RIVERA**, in his official capacity as Mayor of Comerío; **HON.**

**MARCOS CRUZ-MOLINA**, in his official capacity as Mayor of Vega Baja; **HON. RAMÓN A. HERNÁNDEZ-TORRES**, in his official capacity as Mayor of Juana Díaz; **HON. JULIA M. NAZARIO-FUENTES**, in his official capacity as Mayor of Loíza; **HON. CARLOS DELGADO-ALTIERI**, in his official capacity as Mayor of Isabela; **HON. ISIDRO NEGRÓN-IRIZARRY**, in his official capacity as Mayor of San Germán; **HON. ROBERTO RAMÍREZ-KURTZ**, in his official capacity as Mayor of Cabo Rojo; **HON. ÁNGEL GONZÁLEZ-DAMUDT**, in his official capacity as Mayor of Río Grande; **HON. JESÚS MÁRQUEZ-RODRÍGUEZ**, in his official capacity as Mayor of Luquillo; **HON. HERIBERTO VÉLEZ-VÉLEZ**, in his official capacity as Mayor of Quebradillas; **HON. CARMEN MALDONADO**, in his official capacity as Mayor of Morovis; **HON. OSCAR SANTIAGO**, in his official capacity as Mayor of Vega Alta; **HON. PEDRO J. GARCÍA-FIGUEROA**, in his official capacity as Mayor of Hormigueros; **HON. JORGE L. GONZÁLEZ-OTERO**, in his official capacity as Mayor of Jayuya; **HON. SERGIO TORRES-TORRES**, in his official capacity as Mayor of Corozal

Plaintiffs

V.S.

**THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD OF PUERTO RICO**

Defendant

**COMPLAINT**

> In view, however, of the terms of the Organic Act, of the prior decisions recognizing that the purpose of Congress in adopting it was to follow the plan applied from the beginning to the organized Territories by creating a government conforming to the American system with defined and divided powers, legislative, executive and judicial, in further view of the fact that the exercise of the judicial power here claimed would be destructive of that system, we are of opinion that it cannot be supposed that Congress intended by the clause in question to destroy the government which it was its purpose to create.

Porto Rico v. Rossaly y Castillo, 227 U.S. 270, 276-277 (1913)

**TO THE HONORABLE COURT:**

**COME NOW** the above-captioned plaintiffs, through the undersigned counsels and very respectfully **SET FORTH** and **PRAY:**

## INTRODUCTION

After a two year military occupation that begun at the end of the Spanish-American War, Congress immediately began to enact legislation to organize a Government for the inhabitants of the territory. Each piece of legislation enacted by Congress beginning in 1900 sought to provide Puerto Ricans with a republican form of representative government. On 1917, Congress conferred U.S. citizenship on the People of Puerto Rico and vested them with increased authority to manage their internal affairs by allowing them to elect the members to both Houses of its Legislative Assembly. By 1947, Congress further expanded democratic governance in Puerto Rico by allowing its inhabitants to elect their own Governor. Between 1950-1952, Congress allowed Puerto Rico to enact its own Constitution to regulate its democratic government institutions while also adopting an exemplary Bill of Rights.

After more than a century of promoting democratic self-governance in Puerto

Rico, in the summer of 2016, Congress dramatically changed course and, for the first time since the ratification of the Treaty of Paris, legislated to diminish the authority of democratic institutions and assert greater control over the territory's internal affairs. After having enjoyed the blessings of electing the officers responsible of deciding public affairs such a long time, Puerto Ricans now struggle to make sense of Congress' decision to vest large swaths of traditional legislative and executive authority on a group of seven unelected individuals.

It is plaintiffs' contention that Congress' well-established authority to enact rules for the governance of territories, broad as it is, does not create a special extra-constitutional dimension that allows for the creation of schemes of government in an abstraction of other limits that the Constitution itself places on congressional authority. Hence, Congress cannot create legal entities such as the Oversight Board that operate outside of traditional republican form of government and separation of powers principles.   Likewise, while Congress has ample discretion to create positions for principal federal officers to exercise authority over the territories, it may not do so in a way that strips the Office of the President of the United States of its constitutional authority to effect those appointments without any legislative intervention other than the Senate's advice and consent prerogatives.  Finally, even where Congress vested the Oversight Board with authority over budgetary affairs, said entity cannot use those powers to impose its own public policy criteria by intimidating elected officers who must approve those policy changes.

We now state the relevant facts and law giving rise to the instant action.

## I.      JURISDICTION AND VENUE

1.1.    This Honorable Court has subject matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1331 and Section 106(b) of the Puerto Rico Oversight, Management and Economic Stability Act (hereinafter referred to as "PROMESA"), 48 U.S.C. § 2126(a), as it relates to the application and interpretation of said legislation. Jurisdiction is also proper under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq.

1.2.    Venue lies in the District of Puerto Rico pursuant to 28 U.S.C. § 1391(b)(2), as most, if not all of the facts giving rise to the averred causes of action occurred within this District.

## II.      THE PARTIES

2.1.    As duly elected members of the Puerto Rico House of Representatives and the Senate, all plaintiffs are part of the "Legislature", as defined in the relevant federal statute (48 U.S.C. § 2104(15) and, as such, exercise all of the authority and prerogatives set forth in Article III of the Constitution of the Commonwealth of Puerto Rico and applicable Puerto Rico legislation.  The other plaintiffs are duly elected mayors.  All plaintiffs appear in their respective official capacities.

2.2.    The Hon. Rafael Hernández-Montañez was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 11, as a candidate nominated by the Popular Democratic Party (hereinafter referred to as "PDP").  Upon being sworn into his office for the 2017-2020 term, he was elected by his peers as the leader of the PDP minority caucus.

2.3.    The Hon. Ramón Luis Cruz-Burgos was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 34, as a candidate nominated by the PDP.  Upon being sworn into his office for the 2017-2020 term, he was elected by his peers as the alternate or deputy leader of the PDP minority caucus.

2.4.    The Hon. Luis R. Vega-Ramos was reelected during the November 2016, as an at large member of the Puerto Rico House of Representatives[2], as a candidate nominated by the PDP.

2.5.    The Hon. Manuel Natal-Alvelo was elected during the November 2016, as an at large member of the Puerto Rico House of Representatives, as a candidate nominated by the PDP.

2.6.    The Hon. Brenda López-De Arrarás was reelected during the November 2016, as an at large member of the Puerto Rico House of Representatives, as a candidate nominated by the PDP.

2.7.    The Hon. Luis Raúl Torres-Cruz was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 2, as a candidate nominated by the PDP.

---

[2] Pursuant to Section 3 of Article III of the Puerto Rico Constitution, the House of Representatives is made up of 51 members, 40 of whom are elected to represent each of the 40 legislative districts and 11 at large (*"por acumulación"*) representatives that do not represent any particular district.  Similarly, the Senate is made up of 16 District Senators (2 for each of the 8 Senatorial Districts) and 11 at large senators.  In cases in which any particular party elects more than two thirds of the legislative seats, Sections 7 and 8 of Article III allow for the addition of minority members, selected among the candidates that did not garner enough electoral support for direct election.  This provision was activated in the Senate after the New Progressive Party elected 15 District Senators and 6 at large Senators, resulting in the addition of two PDP Senators for a total of 29 Senators.

2.8.    The Hon. Carlos A. Bianchi-Angleró was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 20, as a candidate nominated by the PDP.

2.9.    The Hon. Lydia Méndez-Silva was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 21, as a candidate nominated by the PDP.

2.10.   The Hon. José Aníbal Díaz-Collazo was elected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 29, as a candidate nominated by the PDP.

2.11.   The Hon. Luis R. Ortiz-Lugo was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 30, as a candidate nominated by the PDP.

2.12.   The Hon. Jesús Santa-Rodríguez was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 31, as a candidate nominated by the PDP.

2.13.   The Hon. José Varela-Fernández was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 32, as a candidate nominated by the PDP.

2.14.   The Hon. Javier A. Aponte-Dalmau was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 38, as a candidate nominated by the PDP.

2.15.   The Hon. Roberto Rivera-Ruiz de Porras was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 39, as a candidate nominated by the PDP.

2.16.   The Hon. Ángel Matos-García was reelected during the November 2016, as a member of the Puerto Rico House of Representatives for District Number 40, as a candidate nominated by the PDP.

2.17.   The Hon. Miguel A. Pereira-Castillo was reelected during the November 2016 General Election as a member of the Senate of Puerto Rico, as a candidate nominated by the Popular Democratic Party.

2.18.   The Hon. Cirilo Tirado-Rivera was reelected during the November 2016 General Election as a member of the Senate of Puerto Rico, as a candidate nominated by the Popular Democratic Party.

2.19.   The Hon. Rossana López-León was reelected during the November 2016 General Election as a member of the Senate of Puerto Rico, as a candidate nominated by the Popular Democratic Party.

2.20.   The Hon. José A. Santiago-Rivera is the mayor of Comerío a mountain small town in northern Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.21.   The Hon. Marcos Cruz-Molina is the mayor of Vega Baja a medium sized coastal town in northern Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.22.   The Hon. Ramón A. Hernández-Torres is the mayor of Juana Díaz a

medium sized coastal town in southern Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.23.   The Hon. Julia M. Nazario-Fuentes is the mayor of Loíza a very small coastal town in northeastern Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.24.   The Hon. Carlos Delgado-Altieri is the mayor of Isabela a small coastal town in northwestern Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.25.   The Hon. Isidro Negrón-Irizarry is the mayor of San Germán a small town in western Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.26.   The Hon. Roberto Ramírez-Kurtz is the mayor of Cabo Rojo a large town (albeit with a modest budget) in southwestern Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.27.   The Hon. Angel González-Damudt is the mayor of Río Grande a small town in northeastern Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.28.   The Hon. Jesús Márquez-Rodríguez is the mayor of Luquillo a small town in northeastern Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.29.   The Hon. Heriberto Vélez-Vélez is the mayor of Quebradillas a small town in northern Puerto Rico.  He was elected as a candidate nominated by the Popular

Democratic Party.

2.30.   The Hon. Carmen Maldonado is the mayor of Morovis a small coastal town in central Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.31.   The Hon. Oscar Santiago is the mayor of Vega Alta a small town in northern Puerto Rico.   He was elected as a candidate nominated by the Popular Democratic Party.

2.32.   The Hon. Pedro J. García-Figueroa is the mayor of Hormigueros a very small town in western Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.33.   The Hon. Jorge L. González-Otero is the mayor of Jayuya a very small town in central Puerto Rico.  He was elected as a candidate nominated by the Popular Democratic Party.

2.34.   The Hon. Sergio Torres-Torres is the mayor of Corozal a very small town in central Puerto Rico.   He was elected as a candidate nominated by the Popular Democratic Party.

2.35.   The Financial Oversight and Management Board for Puerto Rico was created under PROMESA to carry out the reorganization measures se forth in the act. To the extent that the Board has authority to file judicial actions (48 U.S.C. § 4124(k)), it follows that it may also be sued.

## III.    THE FACTS

### ENACTMENT OF PROMESA AND CONSTITUTION OF THE OVERSIGHT BOARD

3.1.    On June 30, 2016, in response to the uncontested financial crisis facing the Commonwealth of Puerto Rico and most of its public corporations, Congress invoked its authority under Section 3, Article IV of the U.S. Constitution to enact PROMESA.

3.2.    PROMESA established a very peculiar –and, as we will explain, unconstitutional- scheme of governance for Puerto Rico.

3.3.    Section 101 of PROMESA, 48 U.S.C. § 2121, created an entity known as the "Financial Oversight and Management Board for Puerto Rico".

3.4.    The act gave the President of the United States restricted nominating authority to appoint the seven members of the Oversight Board, 6 of them from lists of candidates submitted by Congressional majority and minority leadership.  48 U.S.C. § 2121(e).

3.5.    The Governor of Puerto Rico is authorized to select a representative before the Oversight Board, who in turn, is considered as a non-voting *ex-officio* member of that body.  48 U.S.C. § 2121(e)(3).

3.6.    Notwithstanding the utter exclusion of Puerto Rico elected representatives and the people of Puerto Rico in the selection of any of the board members, the statute considers said body as "an entity within the territorial government for which it is established in accordance with this title", further clarifying that the Board "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government".  48 U.S.C. § 2121(c).

3.7.    It was not until the end of August of 2016 that then President Hon. Barrack H. Obama appointed the seven members of the Oversight Board.

3.8.    The Oversight Board took many months to undertake basic actions such as establishing an office in Puerto Rico and appointing an Executive Director, as mandated by 48 U.S.C. § 2123(a).

3.9.    Among the powers vested on the Oversight Board that are relevant to the instant action are the authority to approve a Fiscal Plan (48 U.S.C. § 2141) and the power to certify budgets approved by the Commonwealth's Legislative Assembly (48 U.S.C. § 2142), provided that "[i]f the Legislature fails to adopt a Territory Budget that the Oversight Board determines is a compliant budget by the time specified in the notice delivered under subsection (a), the Oversight Board shall develop a revised Territory Budget that is a compliant budget and submit it to the Governor and the Legislature".  48 U.S.C. § 2142(d)(2).

### THE DEBATE OVER THE BUDGET FOR FISCAL YEAR 2018-2019

3.10.    The fiscal year in Puerto Rico runs from the 1st of July of each year until the 30th of June of the following year and, while the Governor submits a budget proposal to the House of Representatives[3], it is the Legislative Branch that has the final authority to approve the final budget for any particular fiscal year.  The Governor must either sign the budget approved by the Legislature or veto it, in which case the appropriations contained in the budget for the preceding fiscal year automatically come into effect.

---

[3] The House is the first legislative body to examine the budget because Section 17 of Article III of the Commonwealth's Constitution provides that any bill seeking to generate revenues must originate in that body.  The budget typically contains revenue-generating measures.

3.11.   The 2018-2019 budget is the second one approved in the post-PROMESA era and has been approached by the Oversight Board in a manner that markedly differs from the approach taken with regards to the 2017-2018 budget.

3.12.   Under PROMESA "[t]he Oversight Board may at any time submit **recommendations** to the Governor or the Legislature on actions the territorial government **may take** to ensure compliance with the Fiscal Plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency of the territorial government".  48 U.S.C. § 2145(a) (emphasis added).

3.13.   As part of the April 19, 2018 Amended Fiscal Plan, the Oversight Board recommended that Puerto Rico should adopt an at-will-employment approach that is similar to that found in 49 out of 50 states, a recommendation that was reiterated in the May 30, 2018 Revised Amended Fiscal Plan, which eliminated some of the most draconian austerity measures contained in the previous plan.

3.14.   It bears mentioning that, upon the publication of the May 2018 Fiscal Plan, it was announced that Governor Hon. Ricardo Rosselló-Nevares entered into an "understanding" with the Oversight Board stating that he would sign a repeal of Law 80.  The Puerto Rico Legislature was never part of this "understanding".

3.15.   In entering into an ultimately null and void "understanding" with the Oversight Board to sign a repeal of Law 80, the Governor acted *ultra vires* and well beyond his constitutional authority as, while the Governor may introduce bills and sign bills into law or otherwise veto them, he cannot compel the approval of any legislative

14

enactment, as that is an exclusive prerogative of the Legislative Branch.

3.16.   The Oversight Board's recommendation may only be implemented through the repeal of Puerto Rico Law Number 80 of May 30, 1976, as amended, 29 P.R. Laws Ann. § 185a, et seq. (hereinafter referred to as "Law 80"), which protects **private sector** employees from employment termination absent just cause, proving a severance payment where the employer fails to justify a firing decision.

3.17.   On April 24, 2018, the Oversight Board introduced a bill into the Puerto Rico Legislative Assembly which sought, *inter alia*, to advance its "recommendation" on the Law 80 repeal.

3.18.   Neither the succinctly stated recommendation contained in the April 2018 Amended Fiscal Plan, nor the aforementioned bill were accompanied by any empirical data that would even remotely suggest that stripping Puerto Rican workers of Law 80 protections would somehow result in economic growth, let alone in any significant way impact the 2018-2019 budget.

3.19.   There is no doubt that the continued existence of Law 80 vis-à-vis its repeal constitutes a clear example of competing public policies and economic philosophies.

3.20.   The repeal bill introduced by the Oversight Board was quickly put into the legislative mill and approved by the New Progressive Party (hereinafter referred to as "NPP") Senate majority, albeit with significant amendments the most notable of which making the repeal of Law 80 prospective.

3.21.   Upon the Senate's approval, the NPP majority in the House also buckled

15

under the political pressure being exerted by the Governor and the Oversight Board, and approved the Law 80 repeal, albeit with Amendments with which the Senate did not concur, thereby effectively sounding the death knell for the bill.

3.22.   Plaintiffs herein disagree with the Oversight Board's policy to eliminate employment security in Puerto Rico both as individual legislators and as a matter of party philosophy and therefore exercised their constitutional prerogative to vote against the Law 80 repeal.

3.23.   Had matters ended with the final disposition of the bill proposed by the Oversight Board, plaintiffs' constitutional prerogatives would have been respected and the matter would have been disposed of in accordance with the basic principles of a republican form of government.

3.24.   Simultaneously with the Law 80 repeal bill, the Legislature was discharging its constitutional duty to enact the 2018-2019 budget resolutions.

3.25.   It bears noting that, as stated in the original complaint, once the Law 80 repeal was amended in the Senate to provide for prospective effect, NPP Representative Jorge Suárez-Navarro received a letter from the Oversight Board, dated June 29, 2018, whereby it is advised that the defeat of the "recommendation" on employment rights constituted a deviation from the approved Fiscal Plan.

3.26.   A budget was approved on the very last day of session, June 30, 2018 and signed into law by Governor Rosselló-Nevares on July 2, 2018 and registered in the Puerto Rico Department of State, as required by law.  With plaintiffs favorable vote (and, of course, that of members of the legislative majority), the Legislature approved

an actual bill (not a joint resolution) containing directives regarding the management of budgetary appropriations for the 2018-2019 budget.  After the final approval of the Commonwealth's Budget on June 30th, 2018, there has never been any official meeting of the Puerto Rico's House of Representative or of the Senate to address the controversies between the Legislative Assembly and the Board regarding the 2018-19 budget.  No resolution or any kind of legislative vehicle has been approved by either chamber addressing this issue or setting forth an official position regarding the Oversight Board's actions.

3.27.   It should be stated that the budget is not comprised of a single document but is rather made up of a series of resolutions (in the case of the 2018-2019 fiscal year, the joint resolutions that were eventually approved were generated by bills identified as P.C. 1658; R.C.S. 268-270 and 273) that are voted on separately and, in the case of the current budget, an additional legislation. One of the plaintiffs voted for the complete set of resolutions while other plaintiffs voted for some of the budget resolutions and against certain others.

3.28.   Even before the legislative process established by the Puerto Rico Constitution had been completed, and before the Governor had a chance to approve or veto the budget approved by the legislature, the Oversight Board refused to certify the budget approved by the responsible elected officials and instead hammered through its own budget, which ironically allowed almost fifty million more dollars in public expenditures than the budget approved under the constitutional process.  So contemptuous was the Oversight Board of the Puerto Rico constitutional process that it

17

pushed through its version of the 2018-2019 budget immediately when the final voting was announced, without even allowing for the requisite formalities to go through, such as the final official certification of the approved joint resolutions and their delivery to the Office of the Governor of Puerto Rico. It should be noted that the Board's budgetary imposition also purports to set aside the separate bill that accompanied the joint resolutions, thereby setting aside a validly-approved law, something that PROMESA clearly does not allow. In re Fin. Oversight & Mgmt. Bd., 2017 U.S. Dist. LEXIS 221206, at * 14-15 (D.P.R. 2017).

3.29.   Notwithstanding the larger purse contained in the Oversight Board's budget imposition, said budget was clearly meant to punish Puerto Rico legislators for not bending to the Board's will to repeal an employment security statute that has been in place for over four decades and which has been reinforced by successive administrations of all mayor political parties in Puerto Rico and that has no relation with government revenue estimates or budgetary expenditures.

3.30.   Among the punitive measures contained in the Oversight Board's budget are significant cuts in the budgets of both chambers of the Legislative Assembly, which in the case of the House of Representatives, represents a cut of close to one fifth when compared with the budget for the previous fiscal year.

3.31.   More importantly, when making a side-by-side comparison between the resolutions approved by the Legislature and the Budget pushed through by the Oversight Board shows that said entity introduced significant restrictions to the transfer of budgetary appropriations; significantly restricts the statutory authority of the Puerto

Rico Treasury and its Office of Budgetary Management; forces the retention of a percentage of certain assignments; reductions in the assignment of funds to municipal governments; establishes review requirement for government contracts; and the elimination of the so-called Christmas bonus.

3.32.  In elimination the Christmas bonus, the Oversight Board is clearly exceeding its authority under PROMESA, as it such action effectively compels the Government of Puerto Rico to forego observance of a statutory mandate that has been in place since 1969.  See P.R. Laws Ann. § 757, et seq.; 29 P.R. Laws Ann. § 501, et seq. In the particular case of municipalities, said political subdivisions of the Commonwealth of Puerto Rico have traditionally been assigned funds from the central government's general budget both based on fixed formulas established by legislation as well as through special assignments generally effected through resolutions promoted by legislators elected in the representative or senatorial districts in which any particular municipality is located.  These funds are used both for permanent infrastructure, as well as to help subsidy day-to-day operations.  In Puerto Rico, municipalities are in charge of providing various essential services, most important of which is the collection and disposition of solid waste.  Needless to say, an inadequate waste collection service invariably results in a public health crisis.  The budget imposed by the Oversight Board reduces appropriations to municipalities in around $50,000,000.00.  Particularly in the case of small and medium sized municipalities, the reduction in assignments from the central government creates grave financial and fiscal difficulties as cities are forced to either enter into severe austerity measures (which may in some cases, entail layoffs) or

identify new sources of revenue.

3.33.   The only reasonable inference that may be drawn from the Oversight Board's actions is that said entity is overtly coercing all members of the Puerto Rico Legislative Assembly to forego their own personal policy views and those espoused by their constituents and instead surrender them to the Board's will.

3.34.   The Oversight Board's exercise of coercive measures against Puerto Rico legislators has the effect of disenfranchising the voters that elected them and depriving the Commonwealth of the Republican form of government that has been a core principle of the United States since the Declaration of Independence, was later enshrined in Section 4 of Article IV of the United States Constitution, and, as explained subsequently in the instant pleading, is always mandatory regardless of whether the jurisdiction at issue is a state or a territory.

3.35.   It is a practical certainty that the Oversight Board will not relent in its effort to impose the elimination of employment security in Puerto Rico, as well as other policy impositions to be announced in the future and to use its purported authority over budgetary allocations to coerce plaintiffs into doing its bidding.

3.36.   In fact, by imposing its own version of the budget as a retaliatory measure for a rejection of a suggested public policy change, the Board has usurped the Legislative Branch's authority to enact a budget and the Executive Branch's authority to sign it into law, thereby becoming a two-headed beast that wields authority in contravention to the well established Separation of Powers constitutional doctrine.

**INJURY TO THE PLAINTIFFS AS PER ARTICLE III STANDING REQUIREMENTS**

3.37.   Plaintiffs have lost or otherwise suffered a significant impairment to their constitutional prerogative to decide, as part of a legislative body, the fiscal and economic policy that will affect the lives of their constituents to a group of seven officials that were indirectly appointed by Congressional leadership, in violation of the so-called "Appointments Clause" contained in Section 2, Article II of the United States Constitution.

3.38.   Additionally, plaintiffs have suffered the usurpation of their legislative prerogatives, as well as those of the Executive Branch, from an entity that seeks to simultaneously exercise both, in a clear violation of basic separation of powers principles.  The Oversight Board's aggressive interjection in the budgetary process is purportedly justified by the content of the Fiscal Plan, a document that is prepared with no participation by the Puerto Rico Legislative Assembly.  As explained in more detail later in the instant document, the Board has abrogated for itself legislative authority in the establishment of budgetary appropriations, as well as the modification of such appropriations while exercising inherently executive attributions such as approving public contracts.

3.39.   Finally, in the alternative that the Court finds that the Oversight Board's appointment and actions pass constitutional scrutiny, plaintiffs have a legitimate interest to seek judicial relief against the Oversight Board's use of purported budgetary authority to coerce, intimidate and otherwise influence legislators into surrendering public policy to the whims of a body of seven non-elected private actors.  To the extent

that the Oversight Board retains the ultimate authority to decide on the content and administration of a budget and, as has happened, unilaterally altered what was decided through the constitutional process, plaintiffs' votes in favor of one or more of the budget resolutions becomes a charade and an exercise in futility.

3.40.   As direct representatives of the People of Puerto Rico, plaintiffs have a duty to petition redress for their constituents, whom are suffering the deprivation of their fundamental right to have public policy developed by their freely elected public officials and to have governmental authority reined in by the division of such power through a republican form of government composed of three separate branches and not through an illegally appointed body that purports to wield both executive and legislative prerogatives.

3.41.   Plaintiffs are well aware that the Presidents of both chambers of the Puerto Rico Legislature filed a related adversary proceeding that has been docketed as Adversary Proceeding No. 18-00081 (LTS), so much so that 15 of the 18 plaintiffs herein unsuccessfully attempted to intervene in that action[4].   The legislative leadership that filed the aforementioned action belongs to the New progressive Party, an organization that supports statehood as the final solution to Puerto Rico's political status and which has historically espoused arguments (both in the political stump and before the courts) that differ dramatically from those of the Popular Democratic Party.   In the absence of any formal parliamentary process to assess a legislative body's position on any particular judicial challenge, the views advanced by that body's leadership cannot said

---

[4] The three Senator plaintiffs were not involved in the attempt to intervene in the case filed by the legislative majority leadership.

to be representative of its members.

3.42.   In filing the action mentioned in the previous paragraph, the President of the Senate and the Speaker of the House purport to represent the interests of the entire Legislative Assembly notwithstanding the fact that neither of them presented their intention to sue during a legislative session in which House and Senate members could assert their respective positions on how to best seek judicial relief for usurpations of legislative authority.   Accordingly, this is not a case of the minority legislators having their positions on possible legal action being voted down by a majority but rather a case of those legislators never being heard on the matter.   This being the case, the content of the lawsuit filed by the legislative leadership, for all the public record shows, solely reflects the views of the administrative heads of those legislative bodies.   By definition, the House and the Senate are political collective bodies that constitutionally represent the different sectors of Puerto Rico's society.   By excluding the minority legislators from the decision making process, the legislative leadership has effectively silenced the voices of the large portions of society that those legislators represent.   The resolution of important constitutional questions should not be held hostage to the result of ay given electoral process.

3.43.   Moreover, substantively, the plaintiffs in this action cannot be adequately represented by the Speaker and the President.   With regard to the powers of the Board, based on their political views about the political relationship between Puerto Rico and the United States[5], the Speaker and the President –as per their political party's

_____

[5] Back in the year 2010, when the New Progressive Party, as it does now, controlled the Executive and Legislative Branches of government, the Commonwealth appeared as *amicus curiae* before the First Circuit to advance an

traditional positions- believe that Congress has unrestricted powers over Puerto Rico and its legislature and therefore would never challenge that absolute power view for reasons of political expediency. Plaintiffs, as alleged and substantively sustained in this complaint, firmly believe, that regardless of the territorial status of Puerto Rico, Congress does not have unrestrictive powers over Puerto Rico. For plaintiffs, "[t]he Constitution grants Congress and the President the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply." Boumediene v. Bush, 553 U.S. 723, 765 (2008). Based on these substantive political and ideological differences with the Speaker and the President of the Senate, - differences that go to the essence of the protections of the First Amendment – plaintiffs have standing to pursue this complaint regardless of the Speaker and President of the Senate legal arguments in other processes. In other words, important constitutional arguments cannot be shielded from judicial review solely because a parliamentary majority finds it politically convenient to refrain from bringing those arguments before the courts.

3.44. In the case of the defendant mayors whom, by appearing on their respective official capacities, appear on behalf of their cities receive the concrete injury of losing a significant amount of funds by virtue of a budget imposed by a body that unconstitutionally exercises both executive and legislative powers, whose members were appointment through an impermissible usurpation of the President's appointment authority and that imposed such a budget in retaliation for the rejection of a public

---

argument that is exclusive of that party's political orthodoxy, to wit: that Puerto Rico should be treated as a state for purposes of electing members to the U.S. House of Representatives. See Igartúa v. United States, 626 F.3d 592, 598-602 (1st Cir. 2010). In that occasion, the Commonwealth went as far as successfully seeking to change their status from that of a mere *amicus* to that of an intervenor and unsuccessfully petitioned review before the Supreme Court of the First Circuit's rejection of its very partisan argument. Igartúa v. United States, 636 F.3d 18 (1st Cir. 2011); Puerto Rico v. United States, 566 U.S. 986 (2012).

policy suggestion.  To the extent that the Court invalidates the Oversight Board's actions either on the constitutional or common law grounds asserted herein, the injuries suffered by the municipal plaintiffs are adequately redressed, as the budget approved under the appropriate constitutional process (which contains sufficient appropriations for the municipalities) is reinstated.

## IV.    CAUSES OF ACTION

### REPUBLICAN FORM OF GOVERNMENT/SEPARATION OF POWERS

4.1.    The sprit and ethos of the American Revolution was the rejection of absolute power, as embodied by the King of England in favor of a government that was not determined by bloodlines but rather by the will of the governed, from whom authority was derived.  As part of this driving force behind the birth of a nation was the notion espoused by Lord John Dalberg-Acton to the effect that "power tends to corrupt, and absolute power corrupts absolutely", which animated the decision to create a republican form of power comprised by three separate branches that operate on a system of checks and balances.

4.2.    The landmark July 4, 1776 letter to King George III of England known as the Declaration of Independence made it clear that it was a natural right of all people "to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness".  This was later fleshed out in the creation of a United States Government that followed the republican model with Legislative, Executive and Judicial Branches and an agreement that such republican form of government would be emulated by all

other governments within the union, with the Founding Fathers agreeing in Section 4, of Article IV of the Constitution that:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

4.3.    Needless to say that "a republican form of government is guaranteed to every State in the Union, and **the distinguishing feature of that form is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves**; but, while the people are thus the source of political power, their governments, National and State, have been limited by written constitutions, **and they have themselves thereby set bounds to their own power**, as against the sudden impulses of mere majorities".  In re Duncan, 139 U.S. 449, 461 (1891) (emphasis added).

4.4.    The First Circuit has unambiguously held that:

> **The United States guarantees Puerto Rico a republican form of government** and Puerto Rico is bound to respect the rights, privileges and immunities of all citizens.  48 U.S.C. §§ 731, 737.  Compare U.S. Const. art. IV, § 4;amend. XIV, § 1.

Trailer Marine Transport Corp. v. Rivera Vázquez, 977 F.2d 1, 7 (1st Cir. 1992) (emphasis added); see also Mercado v. Puerto Rico, 214 F.3d 34, 38-39 (1st Cir. 2000)[6]

---

[6] In this case the Court held that:

> Despite the syllogistic ease of this thesis, there is a rather large fly in the ointment. Puerto Rico became an American dependency in 1898, and the Supreme Court recognized its common-law sovereign immunity almost immediately thereafter. See Porto Rico v. Rosaly y Castillo, 227 U.S. 270, 273, 57 L. Ed. 507, 33 S. Ct. 352 (1913).  Congress subsequently gave the people of Puerto Rico a substantial measure of autonomy over their own affairs. See Rodriguez v. Popular Democratic Party, 457 U.S. 1, 8, 72 L. Ed. 2d 628, 102 S. Ct. 2194 (1982). This special treatment crested in 1953 when Puerto Rico

4.5.    The First Circuit's assertion that Puerto Rico has a federal right to a republican form of government and, consequently to the system of checks and balances that guarantee a true separation of powers is consistent with Supreme Court precedent regarding the federal rights of territories to be governed under a scheme that guarantees separation of powers.   For instance, in a rather recent Supreme Court decision that discussed the insular cases, it was reiterated that "[t]he Framers' inherent distrust of governmental power was the driving force behind the constitutional plan that allocated powers among three independent branches" further describing this as a "design [that] serves not only to make Government accountable but also to secure individual liberty" and elevating it to such a fundamental stature that "**[b]ecause the Constitution's separation-of-powers structure, like the substantive guarantees of the Fifth and Fourteenth Amendments ... protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-powers principles**"   <u>Bumediene</u>, 553 U.S. at 743 (emphasis added).

4.6.    The historical record supports the existence of the right to a republican form of government in the administration of territories, concretely, in the post-1898 administration of Puerto Rico.

4.7.    Prior to the acquisition of non-contiguous territories at the end of the

---

gained the option (promptly exercised) of drafting its own constitution, to take effect after being adopted by the people and approved by Congress. <u>See</u> 48 U.S.C. §§ 731b [**10] -731e. This overture was "in the nature of a compact" and, when accepted, **guaranteed "a republican form of government" for the island**. <u>Id</u>. §§ 731b-731c; <u>see generally</u> <u>Calero-Toledo v. Pearson Yacht Leasing Co.</u>, 416 U.S. 663, 671-73, 40 L. Ed. 2d 452, 94 S. Ct. 2080 (1974).

<u>Id</u>., at 38-39 (emphasis added)

Eighteenth Century, the issue of structure of territorial governments was not an issue of contention, as such territories were all eventually admitted as states of the union. In the early 1900's, it became apparent that newly acquired territories were not on the pipeline for annexation as states[7] and therefore more independent forms of governments needed to be legislated. The first such major legislation was the Foraker Act (31 Stat. 77), which provided for a republican form of government for Puerto Rico, if a woefully undemocratic one wherein only the members of the House of Representatives were chosen by the People. Congress reflected a consistent tendency to increase self-government within that initial scheme of republican government by making both houses of the Legislature elective offices (39 Stat. 951), followed by allowing Puerto Ricans to also elect their Governor (61 Sta. 770) and ending with enabling the enactment of a Constitution that "**shall provide a republican form of government** and shall include a bill of rights". See 64 Stat. 319; P.L. 81-600, Sec. 2 (emphasis added). Needless to say, for policy reasons that are not within the scope of judicial review, in 2016 Congress seems to have decided to turn back the clock on the issue of Puerto Rican's rights to elect the officers that rule over them, and thus the Oversight Board was imposed.

4.8.     The allocation of the power of more than one of the three branches on a single entity, be it directly or by delegation, creates the sort of autocratic regime that the

---

[7] This new approach to the administration of territories was thoroughly explained in Downes v. Bidwell, 182 U.S. 244 (1901). Of course, the reasons provided by the Court for limiting certain rights of territories are, on their face, untenable in the Twenty First Century as no one would today expect a Supreme Court Justice to consider as the basis for a decision that "possessions are inhabited by alien races, differing from us in religion, customs, laws, methods of taxation and modes of thought, the administration of government and justice, according to Anglo-Saxon principles". Id. at 287.

separation of powers doctrine seeks to prevent.  As expressed by Justice Brandeis, the purpose of the separation of powers doctrine was "not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, **to save the people from autocracy**".  Myers v. United States, 272 U.S. 52, 293 (1926) (Brandeis, J., Dissenting) (emphasis added).  Indeed, "[t]he men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, **who viewed the principle of separation of powers as a vital check against tyranny**".  Buckley, 424 U.S. at 121 (emphasis added); see also Mistretta v. United States, 488 U.S. 361, 381 (1989) (discussing "Madison's teaching that the greatest security against tyranny-- the accumulation of excessive authority in a single Branch -- lies not in a hermetic division among the Branches, but in a carefully crafted system of checked and balanced power within each Branch"); The Federalist No. 47, pp. 325-326 (J. Madison) (J. Cooke ed. 1961).  In fact, in Springer v. Government of the Philippine Islands, 277 U.S. 189, 201-205 (1928), the High Court, in the context of the organic act for a territorial government in the Philippines, held that basic separation of powers principles is a paramount interest that could not be discarded in the administration of a territory.

4.9.    Broad as Congress' authority to create schemes for the administration of territories may be, it may never be construed to allow it to delegate the power of more than one branch on any single entity, as the separation of powers doctrine permeates all aspects of the exercise of federal authority.  Pervasive as it is, the Territorial Clause cannot read to authorize the creation of an autocratic rule by Congress, as said body's

broad powers under the clause are exercised by the enactment of legislation.  For example, while Congress may theoretically decide to move Puerto Rico's seat of government from the City of San Juan to the City of Ponce, it may not do so by simply passing a resolution on both houses but must rather pass a bill and have the President sign in into law, subject of course to judicial review by the courts.  Hence, separation of powers permeates the very exercise of Congress' authority as "master" of the territories.

4.10.   It is simply impossible to conceive a scenario in which Congress may forsake the guarantee against tyranny that is separation of powers by creating a body such as the Oversight Board to usurp both executive and legislative powers, while at the same time enabling President Reagan's description of the United States as a "Shining City on a Hill" to which the world looks up to as a leader in matters of democracy and civil rights.  If anything, as observed by Judge Torruella, the very fact that American citizens living in Puerto Rico live under the Territorial Clause's Eighteenth Century regime should serve as a basis for particular vigilance by the courts, as "[g]iven the vulnerability of these citizens before the political branches of government, it is a special duty of the courts of the United States to be watchful in their defense".  Franklin Cal. Tax-Free Trust v. Puerto Rico, 805 F.3d 322, 355 (1st Cir. 2015) (Torruella, J., concurring).  Hence, even though plaintiffs firmly believe that the Insular Cases must be finally overturned by the Supreme Court, even under those cases, the constitutional mandate of a republican government of separation of powers cannot be disregard by Congress in dealing with territories, because that is one of the fundamental rights of every citizen and the very fabric of American constitutional

government.  The doctrine of separation of powers doctrine is more than a mere way of organizing a government, it essence is to protect the individual liberties of every citizen from the excesses that come from accumulating too much authority on any given government institution.

4.11.   The inclusion of separation of powers principles are part of the bare minimum required from Congress when discharging its powers under the Territorial Clause to enact governance schemes for territories.  This much is evident since the beginning of the development of legislation and jurisprudence regarding Puerto Rico and its relationship to.  The Supreme Court has always held that Congress is bound to guarantee at minimum that system of separation-of-powers.  Rossaly y Castillo, 227 U.S. at 275-277; see also Puerto Rico v. Shell Co., 302 U.S. 253, 262 (1937) ("By those acts [i.e., the 1900 and 1917 organic acts], **the typical American governmental structure, consisting of the three independent departments -- legislative, executive and judicial -- was erected**. "A body politic" -- a commonwealth -- was created. 31 Stat. 79, § 7, c. 191. The power of taxation, the power to enact and enforce laws, and other characteristically governmental powers were vested. And so far as local matters are concerned, as we have already shown in respect of the continental territories, **legislative powers were conferred nearly, if not quite, as extensive as those exercised by the state legislatures**.") (emphasis added).  With different limitations, that separation-of-powers principles was respected by Congress, and in 1952 where elevated to a new level, by allowing the People of Puerto Rico to enact and adopt a Constitution based on those very same principles.  All of that was destroyed by PROMESA.  As Chief Judge, Hon.

31

Gustavo A. Gelpí has expressed, "the republican form of government bestowed by Congress upon the Island's Government in 1952 has been the facto trumped via PROMESA". Gustavo A. Gelpí, <u>The Constitutional Evolution of Puerto Rico and other U.S. Territories (1898-Present)</u>, at p. 218 (Amazon Digital Services 2018). Judge Gelpí adds that, by bestowing upon the Board legislative and as well executive powers, "PROMESA eviscerates the rights of U.S. citizens residing in Puerto Rico to govern themselves via their elected leaders." <u>Id</u>. at 218-219. Our Chief Judge justifiably asks whether the Constitution allows for such actions on Congress' part. The answer compelled by Supreme Court and First Circuit precedent is NO.

4.12.   To the extent that Congress legislated the creation of an entity that usurps and exercises the powers of two of the branches of government, such exercise must bee decreed as unconstitutional and a republican form of government be restored in Puerto Rico.

4.13.   There are no checks and balances on the Board's exercised of both legislative and executive authority. The Oversight Board cannot be deemed to be constitutionally allowed to impose a fiscal plan, notwithstanding the fact that contains instructions to both the executive and legislative branches and to enforce that fiscal plan by unilaterally imposing a budget that allows it to modify appropriations. This are powers that the current constitutional Governor lacks and that past governors appointed by the President never enjoyed. The Oversight Board further seeks to simultaneously exercise the inherently legislative function of issuing spending directives to government agencies while also approving certain contracts, which is an

inherently executive function.

4.14.   To say that Congress's authority over territories allows it to impose a scheme of governance without any regard whatsoever to basic principles of a republican form of government and separation of powers would be akin to saying that the Constitution has a built into it a mechanism to subvert itself.  That is, it is hard to imagine that the Founding Father, having fought and defeated absolutism, as embodied by the English Crown would have nonetheless enabled Congress to establish a monarchy or any other autocratic form of government to rule over its territories.

### COERCION OF THE EXERCISE OF LEGISLATIVE PREROGATIVE; COMMON LAW DEFERENCE TO LEGISLATIVE INDEPENDENCE

4.15.   Since its appointment in 2016, the Oversight Board has sought to consistently push the limits of its legal authority and to supplant the policy-making role of Puerto Rico's elected government.  This Honorable Court has not hesitated to check such unwarranted power grabs.  See In re Financial Oversight & Management Board, 2017 U.S. Dist. LEXIS 221206 (D.P.R. 2017) (rejecting the Oversight Board's bold request to impose an Chief Transformation Officer to take full control of the Puerto Rico Electrical Power Authority).  In so doing, the Court has noted that PROMESA did not seek to abolish Puerto Rican constitutional government institutions but rather, the Court recognized that "**Congress did not grant the FOMB the power to supplant, bypass, or replace the Commonwealth's elected leaders and their appointees in the exercise of their managerial duties whenever the Oversight Board might deem such a change expedient**".  Id. at * 16 (emphasis added).

4.16.   Just like the Oversight Board once sought it fit to have Mr. Noel Zamot

assume full control over the operations of Puerto Rico's most important public corporation, it has now made it abundantly clear that for what appear to be purely philosophical reasons, it understands that Puerto Rican employees should not have employment security.  After having failed in its effort to have this Honorable Court validate its public policy imposition intentions with the Zamot appointment, the Board decided to attempt a new, more nuanced approach.

4.17.   The Oversight Board recommended, albeit it with no persuasive data to support its position, in its Fiscal Plans that Law 80 be repealed, thereby advancing an employment-at-will public policy.  The Board pushed a bill to this effect, which is the best evidence that said entity fully recognizes that it is not authorized to make such policy changes on its own.

4.18.   After failing to have its bill made into law, the Oversight Board resorted to using powers over budgetary matters that PROMESA does vest it with to abrogate itself policy-making powers that Congress withheld.  This was done by the scrapping of the budget approved pursuant to the constitutional process and the imposition of a new budget that punished legislators with a reduced pursed for the current fiscal year and adversely affected funds assigned for the provision of essential services to the People of Puerto Rico.

4.19.   As otherwise pled in the instant complaint and in the original action filed by NPP legislative leadership, at least since May 2018, while the budget preparation process was still ongoing, the Oversight Board, despite the lack of empirical evidence linking the viability of the 2018-2019 budget with the repeal of Law 80, defendants

made it clear to Puerto Rico's legislature that a failure to effect said repeal would affect the budget certification process.  The Oversight Board eventually came through on its announced intent.

4.20.   In order to preserve the purity of the legislative process, the so-called "Speeches and Debates Clause" (Art. I, Sec. 6, Cl. 1) provides a broad range of privileges and immunities which are designed to insulate legislators from the abuse of authority of the other two branches.  Gavel v. United States, 408 U.S. 606, 615-616 (1972).  The Puerto Rico Constitution contains a similar provision at Section 14 of its Article III.

4.21.   The Supreme Court has gone as far as to recognize a common law immunity from federal civil suits for damages or injunctive relief against state and local legislators for any violations imputed in the context of their legislative actions.  See Bogan v. Scott-Harris, 523 U.S. 44 (1998); Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 404-405 (1979); Supreme Court of Virginia v. Consumers Union of United States, Inc., 446 U.S. 719, 731-734 (1980).

4.22.   The preservation of legislative independence is, without a doubt, a federally-protected value which the Oversight Board may not interfere with.  Such independence is lost where legislators, such as plaintiffs herein, are pressured to vote in favor of a major policy change (the repeal of Law 80), under penalty of intervention with other, non-related legislation (the budget).  This places plaintiffs in the impossible position of having to choose between voting pursuant to their convictions and those of their constituents or relenting to the Board's pressure and preserving their prerogatives to participate in the elaboration of the budget.  It must be noted that in an Opinion

35

issued on July 13, 2018 by the U.S. Court of Claims in the case of <u>Altair Global Credit
Opportunities Fund (A), LLC, et al. v. United States</u>, Case No. 17-970C (Slip Op. July 13,
2018), one of the reasons why that court found that plaintiffs therein (creditors of the
Commonwealth of Puerto Rico) had standing in that case was that said parties pled that
"Congress authorized the Oversight Board to **design, approve, and direct** the
Legislature to enact Joint Resolution 188 and Act 106-2017, resulting in the
appropriation of Plaintiff's property, without just compensation" (emphasis added).
Hence, the appearing plaintiffs are not alone in recognizing the Board's exertion of
enormous (and in our view unwarranted) pressure on the Puerto Rico Legislative
Assembly.

4.23.   In the case of <u>Spallone v. United States</u>, 493 U.S. 265 (1990), the Court
reviewed a Second Circuit decision to allow the use of contempt sanctions against
legislators of the City of Yonkers, New York that refused to enact legislation that would
enable compliance with a consent decree entered into by the municipality in a housing
discrimination case.  In reversing the Second Circuit's decision, notwithstanding the fact
that the City of Yonkers was indeed failing to comply with a valid consent decree, the
Court held that stiff economic sanctions against the city and not a contempt order
against its legislators was the appropriate sanction "[t]he imposition of sanctions on
individual legislators is designed to cause them to vote, not with a view to the interest
of their constituents or of the city, but with a view solely to their own personal
interests" and therefore such a scheme of sanctions aimed at legislators "effects a much
greater perversion of the normal legislative process than does the imposition of

sanctions on the city for the failure of these same legislators to enact an ordinance". Id.
at 279-280.  The Court understood that crippling sanctions, at least as an initial means of
enforcement the consent decree, on the city would be a proper motivator to persuade
legislators to act.

4.24.  If the Spallone Court sought it fit to protect legislative independence even
where legislators were refusing to honor a consent decree to which the city had
voluntarily entered into, then the legislative independence of the appearing plaintiffs
should receive no less protection, particularly where, in that case, federal authority was
being exercised on a lawful basis (a consent decree judgment) and here the Oversight
Board has no valid basis under PROMESA or any other legal authority to impose its
budgetary criteria solely because the Legislature did not adopt a policy recommended
by the Board.

4.25.  Even if assuming, *in arguendo*, that the Oversight Board were to reinstate
the 2018-2019 budget approved under the Puerto Rico constitutional process, the instant
case would not be mooted out, as it would be highly probable that a new attempt
would be made to unduly pressure plaintiffs to agree with policy changes proposed by
the Board under penalty of affecting future budgets.

4.26.  Nothing in PROMESA allows the Oversight Board to extend its
prerogatives over budgets into the imposition of policies.  If there was any way in
which the statute allows the Oversight Board to make budget decisions based on the
rejection of policy recommendations (and we see none), at the very least the Board must
be required to cogently explain and to sustain with empirical data the cause and effect

relationship between the rejected public policy and the viability of the budget at issue. Certainly the Board's say-so is insufficient to connect its policy recommendations to its budgetary determinations.

4.27.   Plaintiffs have a right to be free from coercion in the exercise of their legislative prerogatives arising from the Board's misuse of its authority in an effort to expand it beyond the scope of the Congressional mandate.

APPOINTMENTS CLAUSE

4.28.   Plaintiffs are well aware that on July 13, 2018, this Honorable Court issued an Opinion & Order denied a motion to dismiss the instant Title III proceedings on an Appointments Clause theory.   The appearing parties assert this cause of action notwithstanding the aforementioned ruling for three reasons, to wit: 1) not being creditors or debtors of the Commonwealth of Puerto Rico, we are not parties for *res judicata* purposes; 2) the assertion of this argument is required in order to be able to be able to argue it on appeal as anything other than *amici curiae*; and 3) having had the benefit of carefully assessing the reasoning espoused by the Court in its July 13th ruling, we are able to specifically address said reasoning, while also analyzing the reasoning on relevant issues espoused in the Opinion issued by the U.S. Court of Claims on that same date.

4.29.   In denying the Appointments Clause argument advanced by a group of creditors, the Court essentially decided that Congress' powers under the so-called "Territorial Clause" (Art. IV, Sec. 3, Cl. 2) are broad enough that allowed them to create a non-federal entity that exercises significant authority under federal law without

having to comply with the strictures of the Appointments Clause.

4.30.   The second clause of Section 2, Article II of the Constitution, provides in relevant part that the President of the United States appoint all principal officers of the United States.

4.31.   The Supreme Court has explained that "the term 'Officers of the United States' as used in Art. II, defined to include 'all persons who can be said to hold an office under the government'" and that, therefore, "its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of that Article".  Buckley v. Valeo, 424 U.S. 1, 125-126 (1976).  Just as Congress has vested constitutional authority to enact rules of governance for territories, the Buckley Court recognized that said body also "explicit and plenary authority" to legislate on matters pertaining to federal elections but nonetheless applied the Appointments Clause in full force.  Id. at 133.

4.32.   The High Court has further clarified that "[b]y vesting the President with the **exclusive power to select** the principal (noninferior) officers of the United States, the Appointments Clause prevents congressional encroachment upon the Executive and Judicial Branches".   Edmond v. United States, 520 U.S. 651, 659 (1997) (emphasis added).  This Honorable Court's July 13, 2018 Opinion & Order is inconsistent with the above-stated operational analysis of the Appointments Clause.

4.33.   PROMESA impinges upon the President's exclusive authority to select officers by restricting the appointment of the majority of the members of the Oversight

Board to laundry lists generated by the Congressional leadership.  Indeed, once the applicability of the Appointments Clause is established it becomes absolutely untenable to deem the current Oversight Board members as lawful appointees.

4.34.   The Oversight Board cannot claim exemption from the application of the Appointments Clause solely on the basis of PROMESA's assertion that it is a Puerto Rico, rather than a federal entity and makes Puerto Ricans foot the bill for its operation. In any event, the standard for determining what constitutes a an "officer of the United States" is not subject to Congressional interpretation but rather, is a substantive and objective criterion, as outlined in the previously cited portion of Buckley, that centers on the exercise of "**significant authority pursuant to the laws of the United States**".  It is clear that not a single line in Puerto Rico law allows the Oversight Board to exercise any authority but that rather, said entity exercises significant authority under PROMESA, a major Congressional enactment.

4.35.   The hard fact is that the Oversight Board's authority emanates directly from Congress and not from any Puerto Rico institution nor does any Puerto Rico elected official get to weigh in the decision to appoint any of the Board members.  It is true that "[t]he line between 'inferior' and 'principal' officers is one that is far from clear, and the Framers provided little guidance into where it should be drawn". Morrison v. Olson, 487 U.S. 654, 671 (1988).  However, the members of the Board are not park rangers or postal workers but rather a body with significant authority over a United States Commonwealth that reports directly to Congress, for which reason it is impossible to say that they are not "principal" federal officers within the purview of the

Appointments Clause.  That the general standards to determine whether the Board's members are "officers of the United States" apply is the clear constitutional fact that Congress could not have appointed them unilaterally.  There was a need to pass a bill that had to be singed by the President in order to create the Board.  If the intention of the Founding Fathers had been to exclude the administration of a territory from all federal standards and constraint, they would have clearly said so and would have given the power to Congress to rule the territories by mere resolutions with no need for the President to intervene.

4.36.   It bears noting that Puerto Rico's Executive Branch has been headed by a Governor since the enactment of the first Organic Act in 1900 (31 Stat. 77) and up until 1947, when Congress designated the office as an elected one (61 Stat. 770), the President of the United States designated office holders under the auspices of the Appointments Clause, without any Congressional intervention beyond the Senate's advise and consent, which is contemplated in the Constitution.  This notwithstanding the fact that the Governor of Puerto Rico was an officer of the territory (misspelled in the 1900 act as the government of "Porto Rico") and not a member of the federal government but a member of the territorial government that exercised his authority under federal law. The few legal scholars that have pondered the matter agree that individuals exercising federal authority to rule over territories, such as appointed governors must be selected pursuant to the Appointments Clause.  See Gary Lawson & Guy Seidman, The Hobbesian Constitution: Governing without Authority, 95 Nw. U.L. Rev. 581, 588 (2001) (Observing that "Colonel Mason, as the chief executive of a large federal territory, was

**surely a principal officer within the meaning of Article II's Appointments Clause, which means that he could only validly serve as the civil governor if he was nominated by the President and confirmed by the Senate")** (emphasis added); Gary Lawson & Robert D. Sloane, The Constitutionality of Decolonization by Associated Statehood: Puerto Rico's Legal Status Reconsidered, 50 B.C. L. Rev. 1123, 1172 (2009) ("Because the governor of Puerto Rico exercises this and other substantial federal powers, there can be no question within the terms of this argument that he must be appointed in the manner prescribed by the Appointments Clause --as, indeed, was every territorial governor in the United States before 1947"), cited with approval by Mitu Gulati & Robert K. Rasmussen, Puerto Rico and the Netherworld of Sovereign Debt Restructuring, 91 S. Cal. L. Rev. 133, 154 (2017).

4.37.   In the context of the pre-PROMESA historical record, an appointed governor of a territory is the only officer that could fit the mold of a principal federal official in the context of the Appointments Clause.

4.38.   In legislating the appointment of the members of the Oversight Board in a manner that is contrary to the Appointments Clause, all actions performed by the currently, unconstitutionally appointed Board are null and void and may not be validated on a "*de facto* officer " theory, as "[t]he Clause is a bulwark against one branch aggrandizing its power at the expense of another branch". Ryder v. United States, 515 U.S. 177, 182 (1995).

4.39.   The fact that the Second Clause of Section 3, Article IV of the United States Constitution provides that "[t]he Congress shall have Power to dispose of and make all

needful Rules and Regulations respecting the Territory or other Property belonging to the United States" does not authorize Congress to forego the demands of the Appointments Clause when establishing a scheme for the selection of principal officers to engage in the administration of a territory. We would be remiss not to point out that, notwithstanding the ratification of the Thirteenth Amendment back in 1865, the Territorial Clause equates territories to property, regardless of the fact that human beings live on those territories and, in the case of Puerto Rico, those human beings happen to be U.S. citizens. In drafting PROMESA, Congress seems to have relied on the so-called "Insular Cases", a string of early 20th Century jurisprudence created mostly by a group of Supreme Court Justices that had just validated racial segregation in Plessy v. Ferguson, 163 U.S. 537 (1896), many of whom could still remember the days of slavery with differing degrees of fondness. If the same spirit of basic human dignity that animated decisions such as Obergefell. v. Hodges, 135 S. Ct. 2584 (2015) (striking state prohibitions against same sex marriage); Lawrence v. Texas, 539 U.S. 558 (2003) (striking prohibition against consented same sex relationships); Loving v. Virginia, 388 U.S. 1 (1967) (striking prohibition against interracial marriage); and most notably, Brown v. Board of Education of Topeka, 347 U.S. 483 (1954) (ending racial segregation), then the bones of the Insular Cases must be unceremoniously tossed into the same grave in which Plessy and Scott v. Sanford, 60 U.S. 393 (1857) uneasily rest.

4.40.  We note that Puerto Rico currently holds a unique place among U.S. Territories, since it is the one with the largest population, the longest history under a Western-European legal system (predating any of the states by at least a century) and is

the only territory with a Constitution enacted by its people.  The other U.S. Territories are either sparsely populated small islands in the Caribbean and the Pacific or the federal seat of government in the District of Columbia, which was created and designed as a city/municipality.   Indeed, the highest-ranking executive officer in the District of Columbia is its mayor.

4.41.   Congress' authority over territories is exercised in the same fashion as all of its other powers, through legislation.  While the Eighteenth Century oppressive relic that is the Territorial Clause gives Congress absolute discretion to legislate with respect to the administration of the territories, such legislation –as is the case in any other legislation- is necessarily constrained by constitutional limitations.  See Oklahoma v. Atchison, T. & S. F. R. Co., 220 U.S. 277, 285 (1911) (holding that, "the governmental power of Congress over the Territory and its inhabitants was exclusive and paramount, there being no restrictions upon the exercise of that power, **except such as were imposed by the Supreme Law of the Land**") (emphasis added); Binns v. United States, 194 U.S. 486, 489 (1904) ("It must be remembered that congress, in the government of the Territories as well as of the District of Columbia, has plenary power, **save as controlled by the provisions of the Constitution**, that the form of government it shall establish is not prescribed, and may not necessarily be the same in all the Territories") (emphasis added).  It should be noted that the cases of Palmore v. United States, 411 U.S. 389 (1973); District of Columbia v. John R. Thompson Co., 346 U.S. 100 (1953) and Cincinnati Soap Co. v. United States, 301 U.S. 308 (1937), cited in the Court's July 13, 2018 Opinion do not stand for the proposition that the so-called "plenary powers" that

Congress exercises over territories are somehow extra-constitutional and allow said Branch of Government to forego basic constitutional restraints.  <u>Palmore</u> involved a challenge to the exercise of jurisdiction of an Article I court created for the District of Columbia over a criminal defendant -which by definition, is a recognized congressional power- and has nothing to do with how the judges of that court are appointed.  The <u>John. R. Thompson</u> case merely discussed whether or not, in organizing territorial governments, Congress could validly allow self-rule to its territories under a theory similar to that which allows states to allow self-rule to municipalities.  Similarly, the <u>Cincinnati Soap Co.</u> Court merely reiterated the similarity between the Congress' authority to delegate powers to territorial governments and the States' authority to do likewise with municipal governments.  None of these cases however, support the proposition that the Territorial Clause creates an extra-constitutional dimension in which Congress may legislate without any regard to other limitations to its authority placed throughout the Constitution.

4.42.  There is no doubt that the Appointments Clause safeguards the President's authority to appoint principal federal officials and limits congressional power over such appointments to an advise and consent role to be carried out by the Senate.  Neither the constitutional provision on its face nor over two centuries worth of interpretative jurisprudence differentiate between a principal officer that is assigned authority over a territory and all other principal officers.  Besides the lack of supporting case law, the historical record supports the applicability of the Appointments Clause to the selection of members of the Oversight Board.

4.43.   To the extent that Section 101(e) of PROMESA, 48 U.S.C. § 2121(e) impinges upon the President's authority under the Appointments Clause to choose, at his discretion the nominees for principal United States officers, said portion of the legislation must be struck as unconstitutional and, as a consequence, all of the actions undertaken by the current, *ulta vires*, Oversight Board are null and void.

4.44.   As previously stated, on the same day in which this Honorable Court rejected Aurelius' Appointments Clause argument[8], the Hon. Susan G. Braden, Chief Judge for the United States Court of Claims issued an Opinion in the case of <u>Altair Global Credit Opportunities Fund (A), LLC, et al. v. United States</u>, Case No. 17-970C (Slip Op. July 13, 2018) in which said Court held that as argued by the appearing parties, under PROMESA, Congress retained appointment authority over Board members and that the Oversight Board is a federal entity rather than an instrumentality of the Commonwealth as stated in the statute's plain language.  <u>Id</u>. at 23-26.  The Court of Claims also seems to be in tune with our contention regarding the limitations of Congressional power, as evidenced by the following statement:

> The Government seeks to avoid the precedential effects of <u>Lebron</u> by arguing that PROMESA was enacted, pursuant to Congress' Article IV plenary authority over the territories. Gov't Mot. at 18–21. In <u>Lebron</u>, the United States Supreme Court considered the source of Congress' authority in enacting the Rail Passenger Service Act of 1970, but determined that the issue of federal control must be determined based on "practical reality." <u>See</u> <u>Ass'n Am. R.Rs.</u>, 135 S. Ct. at 1233 ("<u>Lebron</u> teaches that, for purposes of [the entity's] status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over Congress' disclaimer of [the entity's] governmental status."). Certainly, Congress has authority to determine which constitutional provisions or federal law apply in the territories. <u>See</u> <u>Torres v. Puerto Rico</u>, 442 U.S. 465 (1979) (holding that "the constitutional requirements of

---

[8] Aurelius has since filed a notice of appeal.

the Fourth Amendment apply to the Commonwealth."). But, the United
States Supreme Court has held that "fundamental" constitutional rights
apply in the territories. See Dorr v. United States, 195 U.S. 138, 146
("Congress, in legislating for the territories, [is] subject to those
fundamental limitations in favor of personal rights which are formulated
in the Constitution and its amendments[.]"). Therefore, even though
Congress has "broad latitude" in matters of territorial governance; *that
authority* does not supplant the role of federal courts in protecting
fundamental constitutional rights. See Puerto Rico v. Sanchez Valle, 136 S.
Ct. 1863, 1876 (2016) (holding that Congress has no capacity "to rewrite its
own foundational role").

Id. at 24

4.45.   If, as intimated by the Court in its July 13, 2018 Opinion, Congress'

authority over territories is so absolute that it allows for the exercise of authority

without regard to other constitutional restraints such a rule of construction would result

in the validation of Congressional appointments such as that of a life-tenured Governor.

In other words, it would mean that, through the Territorial Clause, the Constitution

would have built into it a mechanism to frustrate its own foundational principles.

## V.     RELIEF SOUGHT

5.1.   Plaintiffs respectfully request the issuance of a declaratory judgment

holding that the Oversight Board appointment provisions contained in PROMESA are

in violation of the Appointments Clause or, in the alternative declaratory judgment be

entered decreeing the delegation of executive and legislative authority to the Oversight

Board is in violation of the Separation of Powers doctrine or, in the alternative, issue a

declaratory judgment decreeing that the Board's exercise of authority over budgeting to

compel the adoption of its public policy constitutes an impermissible interference with

federally-protected legislative autonomy.

5.2. Shall plaintiffs prevail on their constitutional claims, it is hereby requested that defendants be enjoined from any further exercise of authority under PROMESA and, shall plaintiffs prevail in their coercion claim, they respectfully request that defendants be permanently enjoined from incurring in such improper interference with the legislative process.

**WHEREFORE** it is very respectfully requested from this Honorable Court that the remedies sought in the instant action be hereby **GRANTED**.

In San Juan, Puerto Rico this 25th day of July, 2018.

**RESPECTFULLY SUBMITTED,**

**LAW OFFICE ANÍBAL ACEVEDO VILÁ**
894 Muñoz Rivera Ave., Suite 202
San Juan, Puerto Rico 00927
Tel (787) 200-0676; 200-0678
Fax (787) 200-0679

*S/Aníbal Acevedo-Vilá*
**ANÍBAL ACEVEDO-VILÁ**
USDC-PR Number 201413
e-mail: acevedovila1@gmail

**M.L. & R.E. LAW FIRM**
513 Juan J. Jiménez St.
San Juan, Puerto Rico 00918
Tel (787) 999-2972
Fax (787) 751-2221

*S/Jorge Martínez-Luciano*
**JORGE MARTINEZ-LUCIANO**
USDC-PR Number 216312
e-mail: jorge@mlrelaw.com

*S/Emil Rodríguez-Escudero*
**EMIL RODRÍGUEZ-ESCUDERO**
USDC-PR Number 224312
e-mail: emil@mlrelaw.com