# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

Altair Global Credit Opportunities
Fund (A), L.L.C., et al.

Movants,

v.

Governor Alejandro García Padilla, et al.

Respondents.

Civil No. 16-2696 (FAB)

### RESPONDENTS' BRIEF IN OPPOSITION TO
### MOTION FOR RELIEF FROM THE PROMESA AUTOMATIC STAY

**TO THE HONORABLE COURT:**

COME NOW, respondents Hon. Alejandro García Padilla, in his official capacity as Governor of the Commonwealth of Puerto Rico; Juan Zaragoza-Gomez, in his official capacity as the Secretary of Treasury of the Commonwealth of Puerto Rico; and Luis F. Cruz Batista, in his official capacity as the Director of the Commonwealth's Office of Management and Budget (collectively "Respondents"), specially appearing and without submitting to the jurisdiction or venue of this Court, and hereby state and pray as follows:

### INTRODUCTION

The Commonwealth is in the midst of an unprecedented fiscal crisis. It is insolvent, it is no longer able to pay its debts as they become due, and it does not have sufficient resources to comply with debt service obligations as originally scheduled while still continuing to provide essential services to its people. As the Court in *Wal-Mart Puerto Rico* recently noted, the citizens of Puerto Rico have felt this "sad reality": "'The worsening fiscal and economic situation means real suffering for the people of Puerto Rico [as] basic healthcare, legal, and

education services have been impaired.'"  *Wal-Mart P.R., Inc. v. Zaragoza-Gomez*, No. 3:15-
CV-03018, 2016 WL 1183091, at *9 (D.P.R. Mar. 28, 2016).  In the midst of this economic
crisis, Congress passed legislation specifically designed to give the Commonwealth breathing
room from litigation brought by creditors.

Movants do not dispute that the PROMESA stay applies to the as-yet-unpled claims, but
instead they rely solely on adequate protection arguments to obtain relief from that stay.
Movants position is fatally flawed, however, because it ignores the fact that PROMESA
*excludes* key language from Section 362 in the Bankruptcy Code that provides for adequate
protection as a basis for lifting the automatic stay in bankruptcy.  Although certain parts of
PROMESA may be modeled on the Bankruptcy Code, it is a different statute, and the
distinctions represent a deliberate choice by Congress to remove adequate protection as a basis
for lifting the temporary, emergency stay established by § 405.  Movants' constitutional
argument also fails because it fails to engage with the Supreme Court's jurisprudence on
regulatory takings.  Properly analyzed under the rubric set forth in *Penn Central* and its progeny,
Movants' allegations do not constitute a "taking."  Moreover, although Movants claim that
statutory adequate protection is "derived from" the Fifth Amendment's protection of property
interest, they have identified no case in which any court has held, as a constitutional matter, that
an indefinite revenue stream like the one at issue here is subject to an adequate protection
requirement in the first place.  For these reasons and those that follow, Respondents respectfully
request that this Court deny the pending Motion for Relief from the PROMESA Automatic Stay.

## BACKGROUND

### A.    Act 21 and Executive Order 2016-31

Facing a looming fiscal crisis, the Commonwealth on April 6, 2016 acted to ensure the
protection of the "life, health and general welfare" of its people.  P.R. Const. art II, § 19.  To that

end, the Commonwealth enacted the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (P.R. Act 21-2016, hereinafter "Act 21"), which was designed "to enable the Commonwealth and its instrumentalities to continue providing essential services to Puerto Rico's residents." Act 21 pt. II.F. Act 21 empowered the Governor of Puerto Rico in specific, limited circumstances to declare by executive order a state of emergency for the Commonwealth and its instrumentalities and, during the state-of-emergency period, direct the prioritization of essential service payments. *See* Act 21 §§ 201, 202. In response to an unprecedented fiscal crisis, the Governor subsequently did just that.

On June 30, 2016, one day before debt service payments in excess of $1 billion were to become due, the Governor issued Executive Order 2016-31, Dkt. No. 1-6, which declared a state of emergency for, *inter alia*, the Commonwealth's Employees Retirement System ("ERS"). *See* E.O. 2016-31 [Dkt. 1-6] at 2. The ERS emergency period will expire, at the latest, on March 31, 2017. *See* Act 21 § 103(m) (terminating the "covered period" on January 31, 2017, but allowing a two-month extension by executive order of the Governor).

### B. PROMESA

Shortly after the Governor issued Executive Order 2016-31, President Obama signed into law the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), which also recognized Puerto Rico's fiscal crisis and stayed this action. *See* PROMESA § 405(b)(1). Congress built an automatic stay provision into PROMESA to provide the Commonwealth "with the resources and tools it needs to address [the] immediate existing and imminent crisis," *id.* § 405(n)(1), and to allow the Commonwealth "a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits," *id.* § 405(n)(2). The automatic stay, which will in all events terminate on or prior to February 15, 2017, also functions to "provide an oversight mechanism"

3

and "make available a Federal restructuring authority," *id.* § 405(n)(3)-(4), tasked with overseeing the fair and orderly provision of "[a] comprehensive approach to fiscal, management, and structural problems and adjustments that exempts no part of the Government of Puerto Rico." *Id.* §§ 405(n)(3)-(4), (m)(4); *see also id.* tit. I (providing for the establishment of an Oversight Board); *id.* tit. II (empowering the Oversight Board with expansive authority, including the authority to approve the fiscal plans and budgets of the Commonwealth, monitor the Commonwealth's activities, and intervene in litigation).

As of September 30, 2016, the Oversight Board has been appointed in full, has selected and announced its Chair, and has undertaken organizational steps to determine the scope of its authority. As of the date of this filing, the Oversight Board has appeared in four related cases[1] pending before this Court, *see Brigade*, Dkt. Nos. 124, 125 (Oct. 7, 2016), and has opposed the efforts of plaintiffs in those cases to lift the PROMESA stay, *see Brigade*, Dkt. No. 137 (Oct. 21, 2016), which is exactly the relief that Movants seek here.

## C. Movants' ERS Bonds

Movants in this litigation claim to be holders of bonds issued by the ERS, "one of three public retirement systems in Puerto Rico … broadly responsible for providing pension and other benefits to retired employees of the Commonwealth." Mot. at 3. These bonds were issued by the ERS pursuant to the Pension Funding Bond Resolution adopted by the Commonwealth on January 24, 2008. Under the terms of the Bond Resolution, the Commonwealth granted in favor of a Fiscal Agent a security interest and related lien in and over "Pledged Property"—consisting of, among other assets, ***all*** revenues of the ERS—pending the discharge and satisfaction of all

---

[1] *Brigade Leveraged Capital Structures Fund Ltd. v. García-Padilla*, No. 16-1610 (D.P.R.); *Nat'l Pub. Fin. Guarantee Corp. v. García-Padilla*, No. 16-2101 (D.P.R.); *Trigo-Gonzalez v. García-Padilla*, No. 16-2257 (D.P.R.); *U.S. Bank Trust Nat'l Ass'n v. Puerto Rico*, No. 16-2510 (D.P.R.).

outstanding principal and interest.  *See* Bond Resolution [Dkt. 1-4] § 501; *id.* Ex. B.  The security interest and lien in favor of ERS bondholders is indefinite, and ends only upon satisfaction of the ERS's outstanding debt obligations.

Pursuant to the terms of the Bond Resolution, ERS has until recently funded on a monthly basis several security accounts held in trust by the Fiscal Agent for the benefit of ERS bondholders, including a Debt Service Account, a Debt Service Reserve Account, and a General Reserve Account.  *See* Bond Resolution § 502; Mot. at 9.  On June 30, 2016, and pursuant to Act 21, the Governor prioritized the Commonwealth's essential services, suspended transfers of ERS revenues to the Fiscal Agent, and suspended the Commonwealth's obligations to make employer contributions to the ERS.  Even in light of these developments, however, as of August 1, 2016 and following the Fiscal Agent's payment of debt service amounts due on that date, the Fiscal Agent held over $113 million in the debt service and reserve accounts.  *See* Letter from Fiscal Agent [Dkt. 1-5] at 2.  Moreover, because the Governor's Executive Order explicitly kept intact the contribution obligations of non-Commonwealth employers, the ERS continues to receive those contributions on a monthly basis.  These ongoing contributions exceeded $75.5 million in total as of July 2016, and those funds are currently held in an ERS operating account at Banco Popular.

Given that the total monthly debt service payment due to ERS bondholders is $13.9 million, there is sufficient cash in the debt service and reserve accounts for the Fiscal Agent to cover all debt service payments through and including April 1, 2017—after the expiration of PROMESA's automatic stay and the Executive Order of June 30, 2016.  *See* Mot. at 9; *see also* Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary Information, June 30, 2014, at 60 (June 2,

2016), https://goo.gl/30qw0G.  Moreover, non-Commonwealth employers continue to transfer funds to the ERS on a monthly basis.  Nonetheless, Movants have sought relief from the PROMESA stay solely on the basis that they have not received adequate protection for the use of their cash collateral.

## ARGUMENT

### I.   MOVANTS' CLAIMS FOR RELIEF ARE NOT PROPERLY BEFORE THE COURT BECAUSE MOVANTS HAVE NOT FILED A COMPLAINT.

As a threshold matter, Movants have failed to take the steps necessary to present their claims for relief to this Court.  Movants have identified no basis for bringing a freestanding motion for relief from the PROMESA stay outside the context of a properly commenced civil action.  The Federal Rules of Civil Procedure make clear that "[a] civil action is commenced by filing a complaint with the court."  Fed. R. Civ. P. 3.  And rightly so, for a complaint provides the Court and the parties with an understanding of what claims are being asserted.  Such an understanding is particularly important in the context of the instant motion, where Movants are asking the Court to rule on the fact-specific question of whether "cause" exists for lifting the PROMESA stay with respect to their claims.  But Movants here have filed neither a complaint, nor a proposed complaint, leaving Respondents and this Court to guess at what cause(s) of action Movants intend to assert should they ultimately obtain relief from the PROMESA stay.  Respondents respectfully submit that the Court should require Movants to file a complaint before ruling on the instant motion in order to properly understand the context of the motion.  The failure of Movants to comply with basic requirements of the Federal Rules of Civil Procedure is, standing alone, sufficient grounds for denying Movants' request for relief from the stay.

## II. MOVANTS PROPERLY RECOGNIZE THAT THEIR ACTION IS COVERED BY PROMESA'S AUTOMATIC STAY.

Congress enacted PROMESA in response to "a fiscal emergency in Puerto Rico." PROMESA § 405(m)(1). In that legislation, Congress sought to provide "independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process." *Id.* § 405(m)(4). To that end, Congress found that "an immediate—but temporary—stay is ***essential*** to stabilize the region for the purposes of resolving this territorial crisis." *Id.* § 405(m)(5) (emphasis added). It therefore automatically stayed, "with respect to a Liability," "the commencement … of a judicial … proceeding against the Government of Puerto Rico that … could have been commenced before the enactment of this Act." *Id.* § 405(b)(1).

As Congress explained, "[t]he stay advances the best interests common to all stakeholders, including but not limited to a functioning independent Oversight Board created pursuant to this Act to determine whether to appear or intervene on behalf of the Government of Puerto Rico in any litigation that may have been commenced prior to the effectiveness or upon expiration of the stay." *Id.* § 405(m)(5)(A). Further, "[t]he stay is limited in nature and narrowly tailored to achieve the purposes of this Act, including to ensure all creditors have a fair opportunity to consensually renegotiate terms of repayment based on accurate financial information that is reviewed by an independent authority or, at a minimum, receive a recovery from the Government of Puerto Rico equal to their best possible outcome absent the provisions of this Act." *Id.* § 405(m)(5)(B). The stay provides the Commonwealth with breathing room to "focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits." *Id.* § 405(n)(2).

Movants properly recognize that their action is a "judicial … proceeding against the Government of Puerto Rico[2] that … could have been commenced before the enactment of this Act" and is related to a "Liability" and therefore stayed by PROMESA. *Id.* § 405(b)(1). Although Movants have not submitted a proposed complaint, the gravamen of their motion is that Act 21—which was enacted nearly three months before PROMESA—is unconstitutional, *see* Mot. at 4, and the motion names as respondents several Puerto Rico officials as well as ERS. Further, the motion is brought based on Movants' alleged status as holders of approximately $1.7 billion of ERS bonds—bonds that fall squarely within PROMESA's definition of "Liability," *see* PROMESA § 405(a)(1) (defining "Liability" to include "a bond … of which (A) the issuer, obligor, or guarantor is the Government of Puerto Rico; and (B) the date of issuance or incurrence precedes the date of enactment of this Act"). Because Movants satisfy all of the criteria for the PROMESA stay outlined in § 405(b)(1), the stay applies to this litigation.

## III. MOVANTS' ALLEGED LACK OF ADEQUATE PROTECTION IS NOT "CAUSE" FOR LIFTING THE PROMESA STAY.

Movants claim that a lack of adequate protection "necessarily constitutes 'cause'" sufficient to lift the PROMESA stay. Mot. at 14. As set forth in more detail below, *see infra* at V, Movants are indeed adequately protected for the pendency of both the Act 21 emergency period and the PROMESA stay by the ERS reserve accounts as well as the ERS revenue stream. Nevertheless, Movants are incorrect in claiming that a lack of adequate protection—if one even exists—satisfies the standard set forth in PROMESA Section 405 for lifting the stay.

Movants' arguments appear to be based on the text of Section 362 of the Bankruptcy Code, which is decidedly different—both in text and purpose—from Section 405 of PROMESA.

---

[2] The term "Government of Puerto Rico," as defined in PROMESA, includes Commonwealth officers sued in their official capacity, *see* PROMESA § 405(i)(1), as well as the Commonwealth's instrumentalities, *see* PROMESA § 5(11).

PROMESA contains key differences from Section 362 that Movants ignore but are critical to the analysis here. Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that: "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay … for cause, including lack of adequate protection of an interest in property." 11 U.S.C. § 362(d)(1). By contrast, the analogous provision in PROMESA, Section 405(e)(2), provides that: "On motion of or action filed by a party in interest and after notice and a hearing, the United States District Court for the District of Puerto Rico, for cause shown, shall grant relief from the stay." 48 U.S.C. § 2194(e)(2). Unlike Section 362, Section 405 makes no reference to adequate protection. That omission is neither accidental nor irrelevant, and it makes clear that Congress intended the PROMESA stay to operate differently from the automatic stay in the Bankruptcy Code.

In an attempt to dodge this issue, Movants state—*ipse dixit* in a single sentence—that when Congress drafted PROMESA, it "legislated on the premise that 'cause' to lift the automatic stay includes the lack of adequate protection." Mot. at 15-16. Nothing in law or logic supports that position. Had Congress sought to make "lack of adequate protection" a basis for lifting the PROMESA stay, it would have said so, just as it did in Section 362 of the Bankruptcy Code. *See, e.g.*, *Helmer v. Goodyear Tire & Rubber Co.*, 828 F.3d 1195, 1202 (10th Cir. 2016) ("[I]f a legislature models an act on another statute but does not include a specific provision in the original, a strong presumption exists that the legislature *intended* to omit that provision.") (emphasis added). Indeed, it is well settled that "where words differ as they differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Burlington N. & Santa Fe. Ry. v. White*, 548 U.S. 53, 62-63 (2006); *see also United States v. Azeem*, 946 F.2d 13, 17 (2d Cir. 1991) ("[C]ongressional consideration of an issue in one context, but not another,

9

in the same or similar statutes implies that Congress intends to include that issue only where it has so indicated.").  There can be no doubt that Congress explicitly enacted other provisions of PROMESA with Section 362 of the Bankruptcy Code expressly in mind.  *See, e.g.*, PROMESA § 301(a), 48 U.S.C. § 2161(a) (applying 11 U.S.C. § 362 to cases brought under PROMESA).  But that is simply not the case with respect to the temporary, emergency stay established in Section 405.  To argue, as Movants do, that the elimination of any reference to adequate protection in Section 405(e) has no effect is to ignore the text of PROMESA as well as the intent of Congress and to instead rewrite the statute to add language that Congress chose not to include.

Even beyond the text of Section 405 itself, other sections of PROMESA support the conclusion that Congress did not intend to condition the pendency of the PROMESA stay on a creditor's receipt of adequate protection.  Section 301 of PROMESA, for instance, incorporates numerous provisions of the Bankruptcy Code, but it does not incorporate Section 363, which provides, in relevant part, that "the court, with or without a hearing, shall prohibit or condition [the] use, sale, or lease [of an interest in property] as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Had Congress intended to graft the entire concept of adequate protection from the Bankruptcy Code onto PROMESA, it would have included this key provision imposing substantial adequate protection burdens on a debtor.  Congress's decision not to incorporate Section 363 supports the more sensible reading of Section 405 as not including some unstated reference to adequate protection.

The language of Section 407 of PROMESA similarly undercuts Movants' argument that the PROMESA stay is conditioned upon the provision of adequate protection.  Section 407(a) provides that: "[I]f any property of any territorial instrumentality of Puerto Rico is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or

10

lien on such property … then the transferee shall be liable for the value of such property."  48

U.S.C. § 2195(a).  Based on Movants' filing, they allege that such transfers have occurred and

argue that those transfers justify relief from the PROMESA stay.  *See* Mot. at 5.  Section 407(b),

however, makes clear that creditors (*e.g.*, Movants) "may enforce rights under [Section 407] by

bringing an action in the United States District Court for the District of Puerto Rico ***after the***

***expiration or lifting of the stay*** of section [405]."  48 U.S.C. § 2195(b).  If a violation of Section

407(a) were *per se* good cause for relief from the Section 405 stay, Congress would not have

written Section 407(b) as it did.  The violation itself would provide the requisite cause for lifting

the stay, and there would be no need for any creditor to wait for "expiration … of the stay"

before enforcing its rights.

To be sure, Respondents are not arguing, as Movants suggest, that Section 407 provides

"a substitute for adequate protection."  Mot. at 23.  Rather, the text of Section 407 makes clear

that Congress did not intend for adequate protection to be part of the lift-stay inquiry under

Section 405(d) in the first place.  That is so because, when applying Movants' proffered view of

good cause, the phrase "after expiration … of the stay of section 405" is rendered meaningless,

for no creditor would ever need to wait for the stay to expire if the debtor's use of its collateral

was sufficient to lift the stay in the first place.  Of course, it is well settled that a statute should be

construed to avoid surplusage and give effect to every term.  *See, e.g.*, *Ninigret Dev. Corp. v.*

*Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 30 (1st Cir. 2000); *Lopez-Soto v.*

*Hawayek*, 175 F.3d 170, 173 (1st Cir. 1999).  The far better reading of the statutory scheme—

one that is faithful to its text and does not violate the canon against surplusage—is that Congress

did not intend for a purported lack of adequate protection to constitute good cause justifying

relief from the PROMESA stay.

## IV. THE FIFTH AMENDMENT DOES NOT TRANSFORM LACK OF ADEQUATE PROTECTION INTO "CAUSE" FOR LIFTING THE PROMESA STAY.

As a fallback to their statutory argument, Movants assert that the definition of "cause" under Section 405(e) of PROMESA must include a lack of adequate protection because "adequate protection is derived from the Fifth Amendment's protection of property interests" and a failure to include it in PROMESA would render the statute unconstitutional. Mot. at 16. Movants' arguments are unavailing, however, and ignore the Supreme Court's jurisprudence on regulatory takings set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), and its progeny. There, the Supreme Court established a three-factor test for determining whether regulatory action by a government entity constitutes a "taking" within the meaning of the Fifth Amendment: a reviewing court must evaluate (i) "the economic impact of the regulation on the claimant"; (ii) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (iii) "the character of the governmental action," including whether "the interference with property can be characterized as a physical invasion by government" as opposed to "some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* at 124. Properly analyzed under that rubric, the Commonwealth's actions as alleged in Movants' papers do not constitute an actionable taking.

*First*, as to economic impact, the temporary withholding of ERS revenues does not affect the value of Movants' bonds because those bonds are secured by (i) a constantly replenishing revenue stream and (ii) reserve accounts that are sufficient to satisfy all debt service payments through the expiration of the PROMESA stay and the ERS emergency period. *See infra* at V. In this way, bondholders are and continue to be collateralized to exactly the same extent as they always have been. But even if the value of the ERS bonds is affected by the stay—which it is not—the lack of additional protection beyond that already provided by the revenue stream and

12

the reserve accounts simply does not "impair the value" of the bonds in any constitutionally

meaningful sense.  *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83 (1980); *see also*

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 332 (2002)

(holding that "a temporary restriction that merely causes a diminution in value is not" a taking);

*MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) ("Supreme

Court precedent has long established that mere diminution in the value of property, however

serious, is insufficient to demonstrate a taking.").

*Second*, for similar reasons, evaluating Movants' "investment-backed expectations"

makes clear that they have suffered no actionable taking.  When Movants purchased their ERS

bonds, they expected that their debt service payments would be secured by a lien on all ERS

revenues.  Nothing in PROMESA or Act 21 impairs that security interest.  Indeed, once the

temporary emergency period expires, Movants' lien will attach to every penny ERS receives

going forward until bondholders are repaid in full.  And, in any event, the reserve accounts are

sufficient to cover all debt service payments during the pendency of the emergency period.

Temporary limitations on a constantly replenishing revenue stream, combined with reserve

accounts sufficient to meet all debt service payments while those limitations exist, simply do not

undermine Movants' expectations as to their security interests in a way that raises constitutional

concerns under *Penn Central*.  *See, e.g.*, *MHC Fin. Ltd.*, 714 F.3d at 1127 ("[T]he 81%

diminution in value … would not have been sufficient economic loss or interference with

[Petitioner's] reasonable investment-backed expectations to constitute a taking.").

*Finally*, "the character of the governmental action" here counsels strongly against finding

that any taking has occurred.  As *Penn Central* itself acknowledged, a taking is unlikely "when

interference arises from some public program adjusting the benefits and burdens of economic life

to promote the common good." 438 U.S. at 124. That language aptly describes both PROMESA and Act 21. Faced with an unprecedented fiscal crisis that threatened the Commonwealth's ability to provide basic services for its people, Congress and the Commonwealth enacted PROMESA and Act 21, respectively, to "adjust[] the benefits and burdens of economic life" by allowing the Commonwealth to temporarily delay payments to creditors in order to fund essential services. These services—which run the gamut from law enforcement to health clinics to elementary schools—"promote the common good" by maintaining public order and avoiding further erosion of the Commonwealth's population base.

Rather than engage with the settled doctrine of *Penn Central*, Movants instead cite two Depression-era Supreme Court cases, *Wright v. Union Central Life Insurance Co.*, 311 U.S. 273 (1940) and *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935), but neither of those cases advances Movants' position. As an initial matter, *Wright* was a **statutory** decision interpreting the Bankruptcy Act in effect at that time. As Justice Douglas explained: "The narrow issue presented by this petition for certiorari and which moved us to grant it is whether under [Section 75 of the Bankruptcy Act], the debtor must be accorded an opportunity … to redeem the property … before the court may order a public sale." 311 U.S. at 275-76. *Wright* dealt with liens on a fixed asset—200 acres of land owned by a distressed farmer—that was to be sold at a public auction. The Supreme Court held that the Bankruptcy Act gave the debtor an opportunity to clear the lien before the property was sold. *Id.* at 281-82. To the extent the decision even addresses constitutional concerns, it does so on a limited basis in the context of the potential for a permanent taking. *See id.* at 278-79 ("Safeguards were provided to protect the rights of secured creditors … . There is no constitutional claim of the creditor to more than that."). The creditors in *Wright* were facing total elimination of their mortgage lien on real

property for payment below the mortgage value.  *See id.* at 277-78.  "[T]he character of the governmental action" there, *Penn Central*, 438 U.S. at 124, is not at all analogous to what Movants will experience under PROMESA and Act 21, which is payment in full of the interest payments on their bonds followed by a continued pledge of the entirety of the ERS revenue stream, which will continue indefinitely until ERS's outstanding debt obligations are satisfied.

Movants' invocation of *Radford* is similarly unavailing.  That case involved a challenge to the constitutionality of the Frazier-Lemke Act, a Depression-era statute that allowed bankrupt farmers to recover their mortgaged farms even if they could not obtain the consent of the requisite number of creditors for a full reorganization of their debts.  *Radford*, 295 U.S. at 575-76.  Under the statute, the debtor could, with the consent of the lienholder, purchase the property at a reduced value and make deferred payments on the mortgage.  *Id.* at 575.  If the lienholder refused to provide consent, that lienholder was prohibited from foreclosing on the mortgage for five years, leaving the debtor in possession and eligible to clear the lien at the end of the five-year period upon payment of the market value of the property, irrespective of the mortgage balance.  *Id.* at 575-76.  The Supreme Court held that the latter of these two provisions was unconstitutional because it required a non-consenting lienholder ***to relinquish its lien*** on real property prior to satisfaction of the associated debt.  *Id.* at 579.  This holding says nothing about adequate protection for a continuing lien on cash collateral, let alone that it is a requirement of the Fifth Amendment.  Rather, *Radford* deals with the extinguishing of the creditor's lien.  In this way, "the character of the governmental action" in *Radford* is entirely different from what Movants face here.  *Penn Central*, 438 U.S. at 124.  PROMESA and Act 21 ***preserve*** Movants liens on the revenues securing ERS bonds.

Movants' reliance on a litany of other cases to support their argument that the Fifth Amendment requires adequate protection, Mot. at 16 n.6, is similarly unavailing. Although these bankruptcy court cases allude to a connection with the Fifth Amendment, none of them rest on a constitutional holding, and none of them involve a security interest in a constantly replenishing revenue stream. For instance, *In re Aegean Fare, Inc.*, 33 B.R. 745 (Bankr. D. Mass 1983), addressed the meaning and requirements of adequate protection as that term is used in Sections 361 and 363 of the Bankruptcy Code. 33 B.R. at 747. There, the Commonwealth of Massachusetts seized the debtor's restaurant and perishable food inventory in satisfaction of a claimed sales tax delinquency. *Id.* Soon thereafter, the debtor filed for reorganization under Chapter 11 and requested an emergency turnover of its assets. *Id.* Because the property seized was essential to the debtor's reorganization efforts and in light of the perishable nature of some of the inventory, the court ordered the Commonwealth to turn over that which it had seized, *id.*, but ordered the debtor to provide weekly payments to the Commonwealth as a form of adequate protection, *id.* at 750. *Aegean Fare* decided a statutory issue—creditor rights under the Bankruptcy Code upon turnover of property that secures a debt—concerning a type of secured property that is not relevant to Movants' claims. Moreover, *Aegean Fare* presented precisely the type of government action that would constitute a taking under *Penn Central*: physical dominion over perishable property that would be left worthless without judicial intervention.

The other cases cited by Movants in Footnote 6 are similarly inapposite. *See Pa. State Emps. Ret. Fund v. Roane*, 14 B.R. 542, 546 (E.D. Pa. 1981) (analyzing adequate protection under § 362(d) for security interest in real property and denying relief from automatic stay); *In re Sweetwater*, 40 B.R. 733, 745 (Bankr. D. Utah 1984) (denying adequate protection to lessor of office and outdoor equipment under § 363(e)); *In re Lipply*, 56 B.R. 524, 526 (Bankr. N.D. Ind.

1986) (analyzing adequate protection under § 362(d) for security interest in real property); *In re*

*Planned Sys., Inc.*, 78 B.R. 852, 867 (Bankr. S.D. Ohio 1987) (analyzing adequate protection

under Bankruptcy Code § 362(d) for lawn care equipment); *In re DeSardi*, 340 B.R. 790, 796-98

(Bankr. S.D. Tex. 2006) (analyzing adequate protection under § 361 and § 363 for security

interest in motor vehicles); *In re Dispirito*, 371 B.R. 695, 697 (Bankr. D.N.J. 2007) (same); *In re*

*Young*, No. 7-11-12554, 2011 WL 3799245, at *6 (Bankr. D.N.M. Aug. 29, 2011) (analyzing

adequate protection under § 362(d) for oversecured creditor's security interest in real property,

inventory, and business accounts); *Graham v. Huntington Nat'l Bank*, 472 B.R. 444, 451, 454

(Bankr. N.D. Ohio 2012) (analyzing adequate protection under § 361 for improperly perfected

security interest in motor vehicles).[3]  Though each of these cases states in dicta that the statutory

concept of adequate protection was implemented in the Bankruptcy Code with an eye toward the

Fifth Amendment, Movants have not offered any authority, much less binding authority, holding

there to be a constitutional adequate protection requirement for security interests in revenue

streams.

## V.  MOVANTS HAVE NO FACTUAL BASIS FOR CLAIMING THAT THEY HAVE BEEN DENIED ADEQUATE PROTECTION IN ALL EVENTS.

### A.   Future ERS Revenues Provide Adequate Protection.

As set forth above, the Commonwealth granted ERS bondholders a first lien in and over

"Pledged Property"—consisting of, among other assets, ***all*** revenues of the ERS—pending the

discharge and satisfaction of all outstanding principal and interest.  *See* Bond Resolution [Dkt. 1-

4] § 501; *id.* Ex. B.  The ERS receives approximately $480 million in employer contributions

---

[3]  Moreover, many of these cases involved types of property that were—unlike the ERS revenue stream—subject to rapid and substantial depreciation, which emphasized the need for adequate protection payments.  *See, e.g.*, *In re Sweetwater*, 40 B.R. at 735 ("The personal property which is the subject of the leases … will rapidly depreciate in value.").

annually, *see* Mot. at 9-10, and the bondholders' security interest in those revenues continues indefinitely until satisfaction of the ERS's outstanding debt obligations. Given its size and indefinite duration, the security interest provides Movants with the adequate protection they purport is required to ensure payment on their bonds, certainly through the expiration of the PROMESA stay and, indeed, for as long as the bonds remain outstanding. *See, e.g.*, *In re SW Boston Hotel Venture LLC*, 449 B.R. 156, 176 (Bankr. D. Mass. 2011) ("If collateral securing a claim has value greater than the interest of the secured claim holder, the excess value, referred to as an equity cushion, constitutes adequate protection for the secured party's interest."). Indeed, courts have made clear that "[a]n oversecured creditor is not entitled to be compensated for an erosion in an equity cushion." *Id.*; *see also Baybank-Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995) ("A sufficient equity cushion is itself a recognized form of adequate protection."); *In re Jug End in the Berkshires, Inc.*, 46 B.R. 892, 899 (Bankr. D. Mass. 1985) ("[T]he classic protection for a secured debt justifying continuation of the stay is the existence of an 'equity cushion.'").

In an attempt to argue otherwise, Movants cite only a handful of cases from other jurisdictions that do not advance their position. *See* Mot. at 22. *Putnal*, for instance, decided a motion under Section 363 of the Bankruptcy Code (not applicable here, pursuant to Section 301(a) of PROMESA) for the individual debtor's use of cash collateral. *In re Putnal*, 483 B.R. 799, 800 (Bankr. M.D. Ga. 2012). The court there did recognize that using a revenue stream results in a "dollar-for-dollar reduction in the value of that collateral," *id.* at 805, but the case misses the mark for several reasons. *First*, the revenue stream at issue in *Putnal*, payments on a lease of commercial property to a pharmacy, was limited in duration. 483 B.R. at 801. Indeed, at the time of the court's decision, the lease was due to expire in less than three months, with

only the speculative possibility of renewal or extension.  *See id.*  Moreover, the principal balance on the loan exceeded the total value of the associated collateral.  *See id.* at 800.  That hardly compares to Movants' position here, where their collateral is an indefinite revenue stream that is subject to only temporary limitations.

*Second*, *Putnal* actually makes clear that use of a revenue stream is permissible without adequate protection when the funds "are used to protect the [collateral] or otherwise benefit [the creditor's] interest in the property."  *Id.* at 806.  For instance, the *Putnal* Court granted the debtor permission to use the limited lease payments there to pay costs and fees necessary for negotiating an extension of the lease because those efforts, if successful, would "benefit [the creditor] by extending the life and the value of the future income stream, thereby protecting [the creditor's] interest."  *Id.*  That is precisely what the Commonwealth is accomplishing here through Act 21, a statute that was designed "to enable the Commonwealth and its instrumentalities to continue providing essential services to Puerto Rico's residents."  Act 21 pt. II.F.  As the Court in *Wal-Mart Puerto Rico* recently noted: "The worsening fiscal and economic situation means real suffering for the people of Puerto Rico [as] basic healthcare, legal, and education services have been impaired."  2016 WL 1183091, at *9.  Without such basic government services, the Commonwealth faces increasingly rapid migration that will erode its tax base and jeopardize its economic future—which in turn will jeopardize the very collateral that Movants are seeking here.  By making use of the ERS revenue stream to protect the Commonwealth's essential services for a short time period while the Oversight Board becomes fully operational, Respondents are benefitting Movants by "extending the life and the value of the future income stream, thereby protecting [Movants'] interest."  *Putnal*, 483 B.R. at 806.

19

Movants also cite *In re Williams*, 61 B.R. 567, 575 (Bankr. N.D. Tex. 1986), in support of their argument that "there is a significant possibility that Movants will be unable to realize the value of their collateral at a later date." Mot. at 22. But that case, too, is inapposite. There, the collateral at issue consisted of two bank accounts, totaling just over $20,000, that served as security for the individual debtor's loan from the same bank for approximately $21,000. *In re Williams*, 61 B.R. at 569. The debtor used some of the funds for other purposes, *id.*, and the court disapproved, explaining (as Movants quote) that: "Once cash collateral has been dissipated and spent, court-fashioned sanctions such as retroactive adequate protection … can be hollow victories for a secured creditor." Mot. at 22 (quoting 61 B.R. at 575). In the very next sentence, however, the court emphasized that its statement was "especially true where … the cash which has been spent without permission cannot be replaced." 61 B.R. at 575. That reasoning makes clear precisely why *Williams* is inapposite. The instant case is not one in which there is some limited pool of cash collateral that barely suffices to pay Movants' lien but "cannot be replaced," as was the case in *Williams*. To the contrary, Movants' security interest in the ERS revenues continues indefinitely until satisfaction of the ERS's outstanding debt obligations.[4]

---

[4] Movants also cite *In re Jefferson County*, 474 B.R. 228 (Bankr. N.D. Ala. 2012) and *In re Builders Group & Development Corp.*, 502 B.R. 95 (Bankr. D.P.R. 2013), but those cases miss the mark as well. In *Jefferson County*, the collateral at issue was a revenue stream derived from fixed assets—sewer systems—and the court recognized that adequate protection issues arose because the revenues at issue were pledged well beyond the useful life of the assets generating those revenues. 474 B.R. at 239, 272 n.9. That is not a relevant issue here, where the ERS revenue stream is of indefinite duration and is generated in connection with an ever-changing pool of workers. And *Builders Group* involved a revenue stream, rent payments for commercial property, that was consistently insufficient to keep pace with the operating expenses associated with maintaining that property, leaving no revenues left for the lienholders. 502 B.R. at 123-24.

**B.    Reserve Accounts Held By The Fiscal Agent, As Well As Ongoing
Contributions to ERS, Provide Adequate Protection.**

Movants are also adequately protected by the reserve accounts held in trust and for their

benefit by the Fiscal Agent.  As of August 1, 2016, the Fiscal Agent had $113.8 million on

deposit for the benefit of ERS bondholders.  *See* Letter from Fiscal Agent [Dkt. 1-5] at 2.  The

total monthly debt service payment due to ERS bondholders is $13.9 million.  *See* Mot. at 9; *see*

*also* Employees' Retirement System of the Government of the Commonwealth of Puerto Rico,

Basic Financial Statements and Required Supplementary Information, June 30, 2014, at 60 (June

2, 2016), https://goo.gl/30qw0G.  There is no claim of any default on ERS bonds to date.  More

importantly, however, there is sufficient cash in the debt service and reserve accounts for the

Fiscal Agent to cover *all* debt service payments through and including April 1, 2017.[5]  Under

current law, following the expiration of the PROMESA stay on February 15, 2017 and the

expiration of the ERS emergency period on March 31, 2017, the indefinite stream of ERS

revenues will flow once again to the Fiscal Agent to be held in the reserve accounts for the

benefits of ERS bondholders.

Moreover, non-Commonwealth employers continue to make contributions to the ERS on

a monthly basis, even during the automatic stay and emergency periods.  These funds are held by

the ERS in an account at Banco Popular, and as of July 2016, exceeded $75.5 million in total.

The ERS will continue to accrue additional funds during the PROMESA stay and Act 21

---

[5]    Notwithstanding this security, Movants protest that they "are being stripped of their
collateral."  Mot. at 23.  That is flat wrong.  At most, the temporary limitations on the ERS
revenue stream is a "limited taking of [Movants'] rights" that is "essential to the financial
survival of [the Commonwealth]."  *Ropico, Inc. v. City of New York*, 425 F. Supp. 970, 977
(S.D.N.Y. 1976).  Indeed, Movants here are even better situation than the plaintiffs in
*Ropico*, for Movants will suffer no delay in receiving the actual payments due to them under
the terms of their bonds.

emergency periods, providing additional protection to Movants' security interests. In this way, Movants have—at all times—more than adequate protection to secure their collateral.

## VI. LIFTING THE STAY WOULD UNDERCUT THE GOALS OF PROMESA AND THE OVERSIGHT BOARD'S ONGOING EFFORTS TO RESOLVE THE COMMONWEALTH'S UNPRECEDENTED FISCAL CRISIS

As the Oversight Board has made clear in four cases similar to this one in which plaintiffs are seeking to lift the PROMESA stay, "ongoing litigation is a major distraction that interferes with the Oversight Board's congressional mandate and that all parties' time and resources would be better spent negotiating the fiscal plans required by PROMESA." *Brigade*, Dkt. No. 137 at 10 (Oct. 21, 2016). The Oversight Board opposed lifting the stay in those cases because it concluded that:

> It does not appear to the Oversight Board that any of the Plaintiffs would suffer irreparable or even material harm during the pendency of the stay: whatever damages the Plaintiffs incur would be quantifiable and could be dealt with as part of the negotiation process or in future restructuring proceedings under PROMESA. By contrast, forcing the Commonwealth to respond to multiple litigations (not just these four, but at least eight others as well) is a significant expense to the Commonwealth and a burdensome distraction to the Governor and the other public officials whose time would be better spent working with the Oversight Board to develop fiscal plans for the Commonwealth and its instrumentalities.

*Id.* at 10-11. That reasoning is equally applicable in this litigation. Movants here are asking for precisely the relief that plaintiffs sought in *Brigade* and the three cases consolidated with it. And as in *Brigade*, the damages that Movants will purportedly suffer if the stay remains in place are "quantifiable and could be dealt with as part of the negotiation process or in future restructuring proceedings in PROMESA." *Id.* There is simply no need to exacerbate "the disruptive effect that ongoing litigation will have on the Oversight Board's monumental task" by allowing Movants' suit to proceed. *Id.* at 2.

## CONCLUSION

WHEREFORE, Respondents respectfully request that the Court deny the Motion for Relief from the PROMESA Stay, Docket No. 1, and order the continuation of the stay of this action as provided by § 405 of PROMESA.


**RESPECTFULLY SUBMITTED.**

**I HEREBY CERTIFY** that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

In San Juan, Puerto Rico, this 26th day of October, 2016.

**ANTONETTI MONTALVO & RAMIREZ COLL**
P.O. Box 13128
San Juan, PR 00908
Tel: (787) 977-0303
Fax: (787) 977-0323

**s/ Salvador Antonetti-Zequeira**
SALVADOR ANTONETTI-ZEQUEIRA
USDC-PR No. 113910
santonet@amrclaw.com

**s/ José L. Ramírez-Coll**
JOSÉ L. RAMÍREZ-COLL
USDC-PR No. 221702
jramirez@amrclaw.com

and

**KIRKLAND & ELLIS LLP**
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: (202) 879-5000
Fax: (202) 879-5200

**s/ Michael F. Williams**
MICHAEL F. WILLIAMS
*Pro Hac Vice*
mwilliams@kirkland.com

**s/ Peter A. Farrell**
PETER A. FARRELL
*Pro Hac Vice*
peter.farrell@kirkland.com