# EXHIBIT E

Nos. 16-2377(L), 16-2430, 16-2431, 16-2433, 16-2435

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————

PEAJE INVESTMENTS LLC,

*Movant-Appellant*,

v.

ALEJANDRO GARCIA-PADILLA; JUAN C. ZARAGOZA-GOMEZ; LUIS G. CRUZ-BATISTA; CARMEN VILLAR-PRADOS; PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,

*Respondents-Appellees*,

*(Continued Caption on Inside Cover)*

————————

On Appeal from the United States District Court for the District of Puerto Rico, No. 3:16-cv-02365-FAB

————————

## BRIEF FOR RESPONDENTS-APPELLEES
## ALEJANDRO GARCIA-PADILLA, JUAN C. ZARAGOZA-GOMEZ, LUIS G. CRUZ-BATISTA, and CARMEN VILLAR-PRADOS

————————

MARGARITA LUISA MERCADO-ECHEGARAY
SOLICITOR GENERAL OF PUERTO RICO
OFFICE OF THE SOLICITOR GENERAL
DEPARTMENT OF JUSTICE
COMMONWEALTH OF PUERTO RICO
PO Box 9020192
San Juan, PR 00902

SUSAN MARIE DAVIES
MICHAEL F. WILLIAMS
ERIN E. MURPHY
 *Counsel of Record*
PETER A. FARRELL
MATTHEW D. ROWEN
KIRKLAND & ELLIS LLP
655 Fifteenth Street NW
Washington, DC 20005
(202) 879-5000
erin.murphy@kirkland.com

*Counsel for Respondents-Appellees Alejandro Garcia-Padilla,*
*Juan C. Zaragoza-Gomez, Luis G. Cruz-Batista, and Carmen Villar-Prados*

December 23, 2016

_____

## No. 16-2430

_____

PEAJE INVESTMENTS LLC,

*Movant-Appellee*,

v.

ALEJANDRO GARCIA-PADILLA; JUAN C. ZARAGOZA-GOMEZ; LUIS G. CRUZ-BATISTA; CARMEN VILLAR-PRADOS; PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,

*Respondents-Appellees*,

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD,

*Movant-Appellant.*

_____

## No. 16-2431

_____

ASSURED GUARANTY CORPORATION; ASSURED GUARANTY MUNICIPAL CORPORATION,

*Plaintiffs-Appellees*,

v.

COMMONWEALTH OF PUERTO RICO; PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; GOVERNMENT DEVELOPMENT BANK OF PUERTO RICO; HON. ALEJANDRO GARCIA PADILLA; CARMEN VILLAR-PRADOS; MELBA ACOSTA-FEBO; JUAN C. ZARAGOZA-GOMEZ; 1-4 DOES,

*Defendants-Appellees*,

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD,

*Movant-Appellant.*

_____

_____

**No. 16-2433**

_____

ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC, et al.,

*Movants-Appellants*,

CLAREN ROAD CREDIT MASTER FUND, LTD., et al.,

*Movants,*

v.

ALEJANDRO GARCIA-PADILLA, in his official capacity as the Governor of
Puerto Rico; JUAN C. ZARAGOZA-GOMEZ in his official capacity as the
Secretary of Treasury of Puerto Rico; LUIS G. CRUZ-BATISTA, in his official
capacity as the Director of the Commonwealth's Office of Management and
Budget; THE EMPLOYEES RETIREMENT SYSTEM OF THE
COMMONWEALTH OF PUERTO RICO,

*Respondents-Appellees*.

_____

**No. 16-2435**

_____

ATTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC, et al.,

*Movants-Appellees,*

v.

ALEJANDRO GARCIA-PADILLA, in his official capacity as the Governor of
Puerto Rico; JUAN C. ZARAGOZA-GOMEZ in his official capacity as the
Secretary of Treasury of Puerto Rico; LUIS G. CRUZ-BATISTA, in his official
capacity as the Director of the Commonwealth's Office of Management and
Budget; THE EMPLOYEES RETIREMENT SYSTEM OF THE
COMMONWEALTH OF PUERTO RICO,

*Respondents-Appellees*,

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,

*Movant-Appellant.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION .................................................................................... 1

JURISDICTION........................................................................................ 3

STATEMENT OF THE CASE AND THE FACTS ................................... 3

    A.    Factual and Statutory Background ..................................... 3

        1.    Puerto Rico's Fiscal Crisis and Act 21 ..................... 3

        2.    PROMESA ................................................................. 5

    B.    Proceedings Below ............................................................ 9

        1.    The *Peaje* Case......................................................... 10

        2.    The *Altair* Case ........................................................ 14

        3.    The *Brigade* Proceedings ......................................... 15

        4.    The District Court's Decision ................................... 18

STANDARD OF REVIEW ...................................................................... 22

SUMMARY OF ARGUMENT................................................................. 22

ARGUMENT ........................................................................................... 24

I.    The Court Lacks Jurisdiction Over These Appeals ...................... 24

II.    The District Court Did Not Abuse Its Discretion By Declining To Lift The Stay ............................................................................... 32

III.    The District Court Committed No Legal Error That Injured Appellants .................................................................................. 37

    A.    PROMESA's Stay May Be Lifted Only Upon a Showing of Irreparable Injury.............................................................. 38

    B.    Even Assuming "Adequate Protection" Is Necessary, Appellants' Interests Are Adequately Protected................................ 43

i

    C.    The District Court Did Not Err by Declining to Hold a
        Hearing ............................................................................................ 50

CONCLUSION ...................................................................................................... 54

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Barnes Freight Line, Inc. v. I.C.C.*,
   569 F.2d 912 (5th Cir. 1978) ...............................................................26

*Catlin v. United States*,
   324 U.S. 229 (1945) ................................................................... 24, 26

*Cohen v. Beneficial Indus. Loan Corp.*,
   337 U.S. 541 (1949) ............................................................ 24, 25, 31

*Dada v. Mukasey*,
   554 U.S. 1 (2008) ....................................................................39

*David v. City of Los Angeles*,
   307 F.3d 1143 (9th Cir. 2002) ...........................................................49

*De Fuertes v. Drexel, Burnham, Lambert, Inc.*,
   855 F.2d 10 (1st Cir. 1988) ..............................................................24

*Digital Equip. Corp. v. Desktop Direct, Inc.*,
   511 U.S. 863 (1994) ...................................................................26

*Donlon Industries, Inc. v. Forte*,
   402 F.2d 935 (2d Cir. 1968) .............................................................32

*In re Anchorage Boat Sales, Inc.*,
   4 B.R. 635 (Bankr. E.D.N.Y. 1980) ....................................................40

*In re Atlas IT Export Corp.*,
   761 F.3d 177 (1st Cir. 2014) ..................................... 27, 28, 29, 30

*In re Briggs Transp. Co.*,
   780 F.2d 1339 (8th Cir. 1985) ...................................... 43, 46, 48, 50

*In re Builders Grp. & Dev. Corp.*,
   502 B.R. 95 (Bankr. D.P.R. 2013) ....................................................47

*In re Buttermilk Towne Ctr., LLC*,
   442 B.R. 558 (B.A.P. 6th Cir. 2010) ...................................................44

iii

*In re Capitol Food Corp. of Fields Corner*,
  490 F.3d 21 (1st Cir. 2007) ...................................................................22

*In re Coe*,
  49 F. 481 (1st Cir. 1892) ......................................................................26

*In re Mullen*,
  172 B.R. 473 (Bankr. D. Mass. 1994) ......................................... 44, 45

*In re Pacific Lumber Co.*,
  584 F.3d 229 (5th Cir. 2009) ...............................................................46

*In re Putnal*,
  483 B.R. 799 (Bankr. M.D. Ga. 2012) ......................................... 44, 47

*Lauro Lines S.R.L. v. Chasser*,
  490 U.S. 495 (1989) .............................................................................31

*Molzof v. United States*,
  502 U.S. 301 (1992) .............................................................................39

*Plaintiff A v. Schair*,
  744 F.3d 1247 (11th Cir. 2014) ...........................................................26

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
  136 S. Ct. 1938 (2016) ...........................................................................4

*Reilly v. City of Atl. City*,
  532 F.3d 216 (3d Cir. 2008) ................................................................22

*Richardson-Merrell, Inc. v. Koller*,
  472 U.S. 424 (1985) .............................................................................25

*Russello v. United States*,
  464 U.S. 16 (1983) ...............................................................................39

*Sunshine Dev., Inc. v. FDIC*,
  33 F.3d 106 (1st Cir. 1994) .................................................................27

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
  535 U.S. 302 (2002) .............................................................................42

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365 (1988) ................................................................................ 44, 46

*United States v. Hayes*,
555 U.S. 415 (2009) .........................................................................................43

*Will v. Hallock*,
546 U.S. 345 (2006) .........................................................................................31

**Statutes**

11 U.S.C. §361 ............................................................................... 7, 39, 44

11 U.S.C. §362 ..................................................................................... 7, 39

11 U.S.C. §362(a) ...............................................................................................7

11 U.S.C. §362(c)(2) ........................................................................................41

11 U.S.C. §362(d) .......................................................................................9, 38

28 U.S.C. §1291 ...............................................................................................24

28 U.S.C. §1292 ...............................................................................................24

28 U.S.C. §1292(a)(1) ......................................................................................27

Law 74 of 1965, §2 ..........................................................................................10

Law 74 of 1965, §4(h) ......................................................................................10

Law 74 of 1965, §4(*l*) ......................................................................................10

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
Public Act 21-2016 ........................................................................................3

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
Public Act 21-2016, §103(*l*) .........................................................................4

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
Public Act 21-2016, §103(m) ........................................................................5

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
Public Act 21-2016, §108 ..............................................................................4

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
    Public Act 21-2016, §201(a) ...................................................................4

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
    Public Act 21-2016, §201(b) ...................................................................5

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
    Public Act 21-2016, §201(b)(iv) ...............................................................4

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
    Public Act 21-2016, §204 ................................................................ 35, 51

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
    Public Act 21-2016, §204(a) .............................................................. 5, 20

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, 130 Stat. 549 (2016) ...................................................1

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §101(a), 130 Stat. 549 (2016) ......................................6

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §101(d)(1)(A), 130 Stat. 549 (2016) .............................6

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §101(d)(2)(A), 130 Stat. 549 (2016) ........................ 6, 37

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §104(k), 130 Stat. 549 (2016) ......................................6

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §§201-202, 130 Stat. 549 (2016) ...............................6

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §201(d)(2), 130 Stat. 549 (2016) .................................37

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §§203-204, 130 Stat. 549 (2016) ...............................6

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §204(c)(3), 130 Stat. 549 (2016) .................................37

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §207, 130 Stat. 549 (2016) .......................................................6

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §212, 130 Stat. 549 (2016) .......................................................6

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §§301-307, 130 Stat. 549 (2016) ..............................................6

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §301(a), 130 Stat. 549 (2016) ........................................ 7, 9, 39

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §405(b), 130 Stat. 549 (2016) ..................................................6

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §405(d), 130 Stat. 549 (2016) ..................................................7

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §405(e)(1), 130 Stat. 549 (2016) ...........................................26

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §405(e)(2), 130 Stat. 549 (2016) ............................... 8, 26, 38

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §405(g), 130 Stat. 549 (2016) ................................................40

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §405(k), 130 Stat. 549 (2016) ......................................... *passim*

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §405(l), 130 Stat. 549 (2016) ............................................ 8, 42

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §405(m)(4), 130 Stat. 549 (2016) ............................................5

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §405(m)(5), 130 Stat. 549 (2016) .............................. 7, 30, 32

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. 114-187, §405(m)(5)(1), 130 Stat. 549 (2016) .....................................41

Puerto Rico Oversight, Management, and Economic Stability Act,
Pub. L. 114-187, §405(m)(5)(A), 130 Stat. 549 (2016) ......................................7

Puerto Rico Oversight, Management, and Economic Stability Act,
Pub. L. 114-187, §405(m)(5)(B), 130 Stat. 549 (2016)......................................7

Puerto Rico Oversight, Management, and Economic Stability Act,
Pub. L. 114-187, §405(n), 130 Stat. 549 (2016).......................................... 30, 32

Puerto Rico Oversight, Management, and Economic Stability Act,
Pub. L. 114-187, §405(n)(1), 130 Stat. 549 (2016) ............................................41

Puerto Rico Oversight, Management, and Economic Stability Act,
Pub. L. 114-187, §405(n)(2), 130 Stat. 549 (2016) ................................. 8, 9, 52

Puerto Rico Oversight, Management, and Economic Stability Act,
Pub. L. 114-187, §407, 130 Stat. 549 (2016) ................................................. 8, 37

Puerto Rico Oversight, Management, and Economic Stability Act,
Pub. L. 114-187, §407(a), 130 Stat. 549 (2016) .................................................49

## Other Authorities

2 Collier on Bankruptcy (15th ed. 1979) ...............................................................40

H.R. Rep. No. 114-602 (2016).......................................................................... 37, 41

H.R. Rep. No. 595, 95th Cong., 1st Sess., *reprinted in* 1978
U.S.C.C.A.N. 5787 ..............................................................................................43

Highways and Transportation Authority of Puerto Rico,
Resolution No. 68-16 (1968) ..............................................................................10

Highways and Transportation Authority of Puerto Rico,
Resolution No. 98-06 (1998) ..............................................................................10

# INTRODUCTION

The Commonwealth of Puerto Rico is in the midst of an unprecedented fiscal crisis. That crisis reached a tipping point this past spring, when the Commonwealth was forced to confront the reality that it could no longer continue paying all its debts without jeopardizing the health, safety, and welfare of its 3.5 million residents. Accordingly, the Government took extraordinary measures, authorizing the Governor to prioritize the provision of essential services and temporarily suspend payment of some debt obligations, which he did. Shortly thereafter, the United States Congress stepped in, enacting the statute that is the subject of these appeals, the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. L. 114-187, 130 Stat. 549 (2016). Among other things, PROMESA establishes an oversight board tasked with getting the Commonwealth on the road to fiscal recovery.

Congress recognized that neither the Commonwealth nor the board could get on with the critical business of resolving Puerto Rico's debt crisis if they were mired in costly and time-consuming creditor litigation challenging the extraordinary actions the Government was forced to take to avert a humanitarian crisis. Accordingly, Congress imposed a temporary stay of creditor litigation, to expire on February 15, 2017, and extendable by no more than 75 days. And

Congress authorized courts to lift that stay at the behest of an impacted party only "for cause."

Unfortunately, PROMESA's stay seems to have generated as much litigation as it temporarily halted. To date, nearly 100 creditors have filed motions seeking to lift the stay so they can litigate their claims against the Commonwealth or its instrumentalities even before the stay runs its course. This appeal involves two such consolidated cases, one involving a single creditor and another involving several dozen. Remarkably, appellants claim they are entitled to immediate relief from PROMESA's temporary stay even though all payments due on their bonds concededly have been made in full to date, and concededly will continue to be made in full for the duration of the stay. Appellants nonetheless claim they should be able to immediately commence the very litigation Congress sought to forestall simply because they believe that the actions the Commonwealth has taken to avert a humanitarian crisis *might* jeopardize their ability to continue receiving full and timely payment of their bonds at some unidentified point after the stay has lifted.

The district court correctly rejected those dubious claims, and this Court should decline appellants' invitation to reconsider that decision. Indeed, the Court does not even have jurisdiction over these interlocutory appeals. Even if the Court concludes otherwise, however, it should affirm the decision below, as appellants fall manifestly short of demonstrating the kind of cause necessary to warrant the

Case:14-20783-LTS Document#:64 Page:15 Date Filed:12/29/2016 Entry ID: 6067482

extraordinary relief of depriving the Commonwealth of the brief reprieve Congress has given it to try to restore solvency and reach a voluntary resolution with creditors that will obviate the need to devote even more scarce resources to costly creditor litigation.

## JURISDICTION

This Court lacks jurisdiction over these appeals. The district court order denying appellants' request to lift the automatic stay is not final under 28 U.S.C. §1291 or otherwise appealable. *See infra* Part I.

## STATEMENT OF THE CASE AND THE FACTS

### A. Factual and Statutory Background

#### 1. Puerto Rico's Fiscal Crisis and Act 21

The Commonwealth of Puerto Rico is in economic crisis. "Notwithstanding bold, unprecedented and comprehensive efforts … to return the Commonwealth … to a path of economic recovery and fiscal sustainability, the lack of access to the capital markets, high levels of indebtedness and relentless economic headwinds have brought the Government of Puerto Rico's fiscal crisis to a perilous tipping point." Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Public Act 21-2016 ("Act 21" or the "Act"), at 1. By April 2016, the Commonwealth found itself without "sufficient resources" to continue to satisfy all of its "debt service obligations" without jeopardizing its ability "to continue providing essential services to the people" of Puerto Rico. *Id.*

Those extraordinary circumstances demanded extraordinary measures. Unable to restructure pursuant to Chapter 9 of the Bankruptcy Code, *see Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938 (2016), the Commonwealth charted another course:  On April 6, 2016, the Legislative Assembly enacted legislation empowering the Government to "prioritize the payment of essential services over debt service." Act 21 §108.  As the Legislative Assembly explained, that extraordinary step was necessary "not only to provide for the health, safety and welfare of the residents of the Commonwealth but also to avoid a further economic downturn and fiscal and humanitarian crisis that would ultimately materially worsen [creditors'] recovery on their Puerto Rico bonds." *Id.*

Act 21 empowers the Governor, "by executive order," to declare the Commonwealth or any government entity "in a state of emergency" and, "as applicable," to declare a temporary moratorium of "covered obligations" for such entities during the designated emergency period.  *Id.* §201(a).  "Covered obligation[s]" are defined to include, among other things, "any interest obligation, principal obligation or enumerated obligation of a government entity that is due or becomes due during the emergency period."  *Id.* §103(*l*).  The Act further authorizes the Governor to "take any and all actions that are reasonable and necessary to preserve the Commonwealth's ability to continue providing essential public services." *Id.* §201(b)(iv).

4

A declaration of an emergency period as to any entity stays all "action[s] or proceeding[s] … related to any covered obligation" during the emergency period. *Id.* §201(b).  Act 21 specifically provides, however, that "nothing in this Act shall be construed to limit the rights of a holder to any collateral, security interest, or lien that secures such obligation, and nothing in this Act authorizes any government entity to compromise any obligation over the objection of a creditor." *Id.* §204(a).  Accordingly, a declaration of emergency under Act 21 does not eliminate or alter creditors' rights; it just temporarily stays their ability to enforce them.  The Governor's powers under the Act run only through January 31, 2017, though they may be extended for up to two months thereafter.  *Id.* §103(m).

Pursuant to Act 21, the Governor has issued several executive orders declaring that the Commonwealth itself and several Commonwealth entities are in a state of emergency.  While those actions have by no means solved the Commonwealth's fiscal crisis, they have served a critically important role in ensuring that the people of Puerto Rico continue to receive services as basic as healthcare, education, and police protection.

### 2.  PROMESA

On June 30, 2016, Congress enacted PROMESA, a statute designed to facilitate "[a] comprehensive approach to fiscal, management, and structural problems and adjustments" in Puerto Rico.  PROMESA §405(m)(4).  To that end,

PROMESA establishes the Financial Oversight and Management Board (the "Board"), an entity tasked with overseeing Puerto Rico's financial relief efforts. Congress vested the Board with authority to, *inter alia*, approve territorial and instrumentality fiscal plans and budgets (§§201-202); enforce budget and fiscal plan compliance (§§203-204); approve the Government's issuance, guarantee, or modification of debts (§207); and file petitions to adjust debts through proceedings analogous to Chapter 9 of the Bankruptcy Code (§§301-307).  The Board also may designate which instrumentalities are covered by PROMESA (§101(d)(1)(A), (d)(2)), seek judicial enforcement of its authority (§104(k)), and intervene in any litigation against the Commonwealth (§212).  All of those powers are in service of effectuating the Board's responsibility "to provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets."  *Id.* §101(a).

In enacting PROMESA, Congress was well aware that the emergency measures the Commonwealth was forced to enact were all but certain to generate an avalanche of costly and time-consuming creditor litigation.  And Congress concluded that if PROMESA is to achieve its intended objectives, both the Board and the Commonwealth would need a little breathing room.  Accordingly, PROMESA institutes a stay of all creditor litigation against Puerto Rico, to take effect upon the statute's enactment. §405(b).  That stay is only temporary; it lasts until the earlier of February 15, 2017, (with a possible extension of 60 or 75 days)

6

or the date on which the Board files a petition on behalf of the Government or any of its instrumentalities to commence debt-adjustment proceedings pursuant to Title III of PROMESA.  *Id.* §405(d).  If the Board files such a petition, then the PROMESA stay terminates, and the automatic stay provisions of the Bankruptcy Code kick in.  *See id.* §301(a) (incorporating 11 U.S.C. §§361 & 362 into Title III proceedings).[1]

In Congress's view, PROMESA's "immediate—but temporary—stay is essential to stabilize the region for the purposes of resolving this territorial crisis." *Id.* §405(m)(5).  As Congress explained, the stay "advances the best interests common to all stakeholders."  *Id.* §405(m)(5)(A).  It affords the Board an adequate opportunity "to determine whether to appear or intervene on behalf of the Government of Puerto Rico in any litigation that may have been commenced prior to the effectiveness or upon expiration of the stay."  *Id.*  It ensures that "all creditors have a fair opportunity to consensually renegotiate terms of repayment." *Id.* §405(m)(5)(B).  And it "allow[s] the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary

---

[1] Under Section 362 of the Bankruptcy Code, a bankruptcy application "operates as a stay, applicable to all entities, of," among other things, "the commencement or continuation … of a judicial … proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy case], or to recover a claim against the debtor that arose before the commencement of the [bankruptcy case]."  11 U.S.C. §362(a).

resolution with its creditors instead of defending numerous, costly creditor lawsuits." *Id.* §405(n)(2).

PROMESA expressly provides that its temporary stay "does not discharge an obligation of the Government of Puerto Rico or release, invalidate, or impair any security interest or lien securing such obligation." *Id.* §405(k). Moreover, Congress created additional remedies for creditors who may be injured during the stay, allowing a creditor to bring suit in federal court once the stay has expired if the creditor had "a valid pledge of, security interest in, or lien on" property that was "transferred in violation of applicable law." *Id.* §407. The Act also expressly contemplates payment of interest on debt payments that the Commonwealth or its instrumentalities may miss during the stay. *Id.* §405(*l*). Thus, like Act 21, PROMESA's temporary stay does not impair creditors' rights; it just temporarily suspends their ability to enforce them.

While PROMESA's temporary stay provision largely tracks the Bankruptcy Code's automatic stay provision, the two differ in important respects. Most notably for purposes of these appeals, the statutory provisions governing the circumstances under which a creditor may obtain relief from the two stays differ materially. Under PROMESA, "[o]n motion of or action filed by a party in interest and after notice and a hearing," the district court "shall grant relief from the stay" only "for cause shown." *Id.* §405(e)(2). Under Section 362 of the Bankruptcy

8

Code, by contrast, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay … for cause, *including the lack of adequate protection of an interest in property of such party in interest*." 11 U.S.C. §362(d) (emphasis added). Section 405 of PROMESA contains no comparable language incorporating the "adequate protection" standard that applies in the Section 362 context. That stands in stark contrast to Title III of PROMESA, where Congress incorporated wholesale both Section 362 and Section 361, which explains what "adequate protection" requires. PROMESA §301(a).

## B. Proceedings Below

Notwithstanding Congress's express goal to provide the Commonwealth with a temporary reprieve from "defending numerous, costly creditor lawsuits," *id.* §405(n)(2), PROMESA's stay has unfortunately had the opposite effect. Creditors have flooded the district courts with requests to lift the stay, in hopes of starting to litigate various challenges to Act 21 and the Executive Orders it produced even before the stay can run its course. To date, the Commonwealth has faced more than a half dozen stay-relief requests, brought by 89 creditors, three insurers, and one trustee. As a result, the Commonwealth has been forced to divert the very resources the stay was intended to free up for the critical task of solving its financial woes to instead litigating whether it is entitled to the temporary protection

9

Congress sought to afford.  This case involves the first—and, so far, only—appeals by creditors who were unsuccessful in their efforts to lift the stay.

### 1.   The *Peaje* Case

Peaje Investments LLC ("Peaje") is the beneficial owner of roughly $63 million of bonds issued by the Highways and Transportation Authority of Puerto Rico ("HTA").  HTA is "a public corporation and government instrumentality of the Commonwealth" charged with the responsibility, *inter alia*, "to provide the people [of Puerto Rico] with the best roads and means of transportation."  Law 74 of 1965, §2.  HTA is empowered to "make contracts and … execute all instruments necessary or incidental in the exercise of any of its powers."  *Id.* §4(h), (*l*).  Pursuant to that authority, HTA has issued bonds secured by a pledge of revenues generated by highway tolls, excise taxes on gasoline, vehicle license fees, and investment earnings.  Peaje Add.28-36 (HTA Resolution No. 98-06 (1998)); Peaje Add.37-47 (HTA Resolution No. 68-16 (1968)).   Under the terms of those resolutions, HTA deposits those revenues in an account held by a designated fiscal agent, who in turn distributes funds to bondholders in accordance with a waterfall protocol.  Peaje Add.28-36.  The resolutions further provide that any revenues in excess of HTA's obligations shall be deposited into a reserve account.  Peaje Add.40.  The reserve account effectively serves as a rainy-day fund from which HTA's debt may be serviced should present-day revenues prove insufficient.

By April 2016, HTA was one of many Commonwealth entities in dire straits. While the fiscal agent for the HTA bonds already "ha[d] received and … deposited … sufficient funds to cover the payments [on HTA bonds] coming due until next year," Peaje JA126, HTA faced a "liquidity crisis" that "threaten[ed] the continued provision of services essential for safeguarding the health, safety and welfare of residents of the Commonwealth and put[] at risk [its] eligibility … to receive Federal Highway Funds and Federal Transportation Funds." Peaje JA125.

To abate that impending crisis, on May 17, 2016, the Governor signed Executive Order 18, which declared a state of emergency at HTA "until June 30, 2016." Peaje JA126. Order 18 temporarily suspended HTA's obligation to deposit all pledged revenues with the fiscal agent, and instead authorized HTA to use those revenues "to continue to provide essential services to safeguard the health, safety and welfare of residents of the Commonwealth." Peaje JA126-27. Critically, however, Order 18 did "not impose a moratorium on any obligation of the HTA" to service its debts. Peaje JA126. To the contrary, the order states expressly that it "does *not* authorize [HTA] to use funds that were deposited" with the fiscal agent before the order issued, and is *not* "intended to impede the use of said already deposited funds to pay" HTA's debts as they come due. Peaje JA126-27 (emphasis added). Accordingly, while Order 18 temporary relieved HTA of its obligation to deposit all pledged revenues with the fiscal agent, the order in no way prevented

11

the fiscal agent from continuing to pay HTA bondholders out of the already-deposited funds.

On June 30, 2016, the Governor issued Executive Orders 30 and 31, which, in combination, extended the emergency period for HTA through the end of the "covered period" under Act 21 (*i.e.*, through January 31, 2017). Peaje JA138, 151. Like Order 18, those orders did not authorize HTA to claw back funds already deposited with the fiscal agent, or relieve the fiscal agent of its obligation to use those funds to continue servicing HTA debt. And the fiscal agent has continued to do exactly that: With one exception not relevant here, HTA bondholders have been paid as scheduled since the Governor declared the agency in an emergency period. Peaje JA183-84 ¶¶11-12.[2] There is also no dispute that the fiscal agent holds sufficient funds to continue making all payments that come due through the duration both of the executive orders (set to expire January 31, 2017, with an outer limit extension of two months) and of PROMESA's stay (set to expire February 15, 2017, with an outer limit extension of 75 days). Peaje JA183-84 ¶14.

---

[2] On July 1, 2016, HTA defaulted on a debt service payment of approximately $4.5 million on a series of 1998 bonds. Peaje JA183 ¶8. Those bonds are secured in part by funds deposited at the Government Development Bank for Puerto Rico, which did not release reserve funds for payment of the July 1 debt service. *Id.* Notwithstanding that default, the holders of those bonds still received payment in full through a reinsurer. Peaje JA183 ¶10. That default did not impact Peaje, which holds only 1968 bonds, and HTA has not defaulted on any other bond payments.

Nonetheless, Peaje sought to lift the stay so it could challenge Act 21 and the relevant Executive Orders immediately.

Peaje initiated its action in a peculiar manner: Rather than file a complaint challenging Act 21 and the orders, Peaje filed only a standalone motion to lift the PROMESA stay, attaching as an exhibit a complaint that it intended to file if it succeeded. Peaje JA14-38.[3] In claiming that it had "cause" to lift the stay, Peaje did not complain that it had been deprived of any money presently due. To the contrary, Peaje stipulated four months into the litigation that all "[p]ayments of principal and interest to Peaje on the [HTA] Bonds it beneficially owns have been made on time and in full." Peaje JA183 ¶11. Peaje also stipulated that the fiscal agent "holds sufficient funds to pay principal and interest on the 1968 Bonds through the §405 PROMESA temporary stay." Peaje JA183-84 ¶14. Peaje's only complaint was that HTA is not abiding by its obligation to deposit all pledged revenues with the fiscal agent during the stay. According to Peaje, while the use of HTA revenues to pay for essential services is not *presently* impairing its ability to receive payment, it creates the potential that there might not be enough money to service HTA's debts *in the future* should revenues alone prove insufficient once the orders expire and HTA's deposit obligation resumes.

---

[3] Respondents-appellees "reserve[d] their rights to contest" whether this unconventional procedure was permissible. Peaje JA155 n.1.

### 2.  The *Altair* Case

The facts underlying the *Altair* case are largely the same; they just involve a different Commonwealth instrumentality.  Through Order 31, the order that extended the initial emergency period for HTA, the Governor also declared emergency periods for several other entities, including the Employee Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS").  Peaje JA150-52.  ERS is an independent retirement system governed by an eleven-member Board of Trustees.  Altair JA239 ¶2.  In 2008, ERS issued pension fund bonds to increase the funds available to pay pension benefits and reduce its unfunded accrued actuarial pension liability.  Altair JA240 ¶8.  Those bonds are secured by a lien on "pledged property," principally including employer contributions to ERS.  Altair JA241 ¶12.

The mechanics of the ERS bonds are analogous to those of the HTA bonds:  Upon receiving contributions, ERS deposits revenues with a fiscal agent, who in turn credits accounts based on a specified protocol.  Altair JA242 ¶15.  Order 31 suspended ERS's obligation "to transfer contributions made by employers" to its fiscal agent.  Peaje JA150.  The order also suspended the Commonwealth's obligation to make employer contributions to ERS up to the amount of debt service payable by ERS during 2016 and 2017; non-Commonwealth employers, however, continue to make contributions to ERS on a monthly basis.  Altair JA246 ¶¶25-26.

The Altair movants are the beneficial owners of ERS bonds.  Altair JA240,
244-45 ¶¶6, 21.  They sought to challenge the suspension of ERS's requirement to
deposit revenues with its fiscal agent, and, like Peaje, they did so through a
standalone motion for relief from the PROMESA stay rather than a complaint
alleging substantive claims.  Altair JA26.[4]  Also like Peaje, the Altair movants
concededly are being paid in full and on time, and they stipulated that "the funds
on reserve with the Fiscal Agent will allow for payments on account of the ERS
bonds through April 2017"—*i.e.*, throughout the stay.  Altair JA243 ¶18.  They
nonetheless claim sufficient "cause" to justify lifting the stay because the
"diversion of employer contributions received by the ERS" from the fiscal agent
"diminished and impaired" the value of the accounts from which ERS's debts are
being fully serviced.  Altair JA45.

### 3.    The *Brigade* Proceedings

While appellants are the only creditors that have appealed a decision
denying relief from the PROMESA stay, they are certainly not the only creditors
who sought to lift the stay.  Nor were they the first.  The first set of stay-relief
motions to make their way through the district court came from a group of
creditors consolidated with a lead case of *Brigade Leveraged Capital Structures*

---

[4] The Altair movants did not, however, attach a complaint to their standalone
motion.  Respondents-appellees accordingly argued below that their claims were
not properly before the district court.  Altair JA205.

*Fund Ltd. v. The Government Development Bank for Puerto Rico*, No. 3:16-cv-01610-FAB.

On September 22 and 23, 2016, the district court held a two-day hearing during which it received both legal arguments and extensive testimony about the propriety of lifting the stay. Many of the issues covered in that hearing mirrored the issues in these cases. For example, one of the movants in *Brigade* was an insurer of the HTA bonds. *See Nat'l Pub. Fin. Guar. Corp. v. García Padilla*, No. 3:16-cv-02101-FAB (D.P.R.). To substantiate its claim that the stay put HTA at risk of default, which in turn risked triggering its insurance obligations, the movant supplied an expert who testified at length about the HTA bonds, the laws underlying them, and the revenue streams that secure them. *See Brigade* Dkt. No. 119 ("*Brigade* Tr.1"), at 77-142.

During his testimony, this expert agreed that there had been no payment default on the 1968 HTA bonds, *id.* at 116-17; that money not paid into a reserve account today could be paid into the account once the Executive Orders expire, *id.* at 142; and that HTA's "diversion" of revenues to pay for essential services would *help* HTA's creditors in the long run because future revenues (and thus the value of creditors' collateral) would fall precipitously if essential services were not maintained, *id.* at 127-28. The court also heard testimony that the value of the bonds would not be impaired during the emergency period, *see Brigade* Dkt. No.

16

120 ("*Brigade* Tr.2"), at 238-39, and received expert empirical analysis showing that HTA bondholders would not be irreparably harmed if the stay remained in place, *id.* 202-32.

On the other side of the balance, the Commonwealth produced multiple witnesses who explained the crisis that Puerto Rico continues to face, and the harms that will result if it is forced to devote even more of its scarce resources to immediate litigation. Yaime Rullan-Cabrera, the Assistant Secretary of the Treasury, explained the uses to which funds not presently deposited with fiscal agencies have been put, which include, *inter alia*, "[p]ayments to supply fuel for the police, payments for food for local jail and penal institutions, [and] payments for … emergency rooms." *Id.* at 73-74, 86-87. Ms. Rullan-Cabrera further explained how the ongoing stay litigation has forced those tasked with helping get the Commonwealth back on its feet to divert time and attention away from that critical task. *Id.* at 90. The Commonwealth also supplied testimony from the managing director of a financial advisory firm that focuses on restructuring transactions, who explained how allowing case-by-case exceptions to the stay would considerably undermine the Commonwealth's ability to achieve a consolidated resolution with all of its creditors. *Id.* at 95, 101-02.

Those concerns were echoed by the United States in a Statement of Interest it filed urging the district court to "ensur[e] that PROMESA's statutory purpose—

17

stemming the downward spiral of Puerto Rico's fiscal and economic condition—is not vitiated by a broad application of the 'for cause' provision." *Brigade*, Dkt. No. 116 ("U.S.St."), at 5.  The United States also urged the court to "consider the impact of its decision on the 3.5 million Americans living in Puerto Rico, whom PROMESA ultimately intends to benefit," as well as "the potential cascading effect that granting relief to one creditor may have on the overall scheme designed by PROMESA."  *Id.* at 6.  And the United States further explained that lifting the stay to allow challenges to Act 21 would be premature, as "the Board may review and rescind certain fund transfers undertaken by the Puerto Rico Government," thus potentially rendering such challenges moot.  *Id.* at 7.

### 4.    The District Court's Decision

Meanwhile, the district court consolidated the *Peaje* and *Altair* cases, along with one other case involving an insurer of HTA bonds, *Assured Guaranty Corp. v. Commonwealth Global Credit Opportunities Fund (A), LLC*, 16-cv-02384-FAB (D.P.R.), and scheduled a hearing for November 3, 2016.  Peaje JA11.  Shortly before that date, the parties submitted joint stipulations, including stipulations that neither HTA nor ERS had defaulted on any payments to Peaje or the Altair movants, and that the fiscal agents held sufficient funds to service both HTA and ERS debt throughout the stay.  Peaje JA183-84 ¶¶11, 12, 14; Altair JA243 ¶18.

The parties also designated hundreds of pages of testimony from the *Brigade* hearing, including most of the testimony about HTA.  Peaje JA193-95.

On the eve of the scheduled hearing, the *Altair* parties filed a joint motion informing the court that they were "engaging in constructive discussions" and asking the court to adjourn the hearing for 60 days.  Altair JA256-57, 263-64.  That motion was mooted, however, when the district court issued an opinion that same day denying the requests of all movants in the three consolidated cases to lift the stay.  Peaje Add.1-19.

The district court began by observing that PROMESA "leaves the task of defining the boundaries of" the phrase "for cause shown" "to the discretion of the Court."  Peaje Add.5.  The court then determined that the "general framework employed in the bankruptcy context is … applicable to these proceedings pursuant to PROMESA," and that "the Court's ultimate task" is thus "to perform a careful balancing of the equities involved," which requires "assess[ing] the hardships realistically borne by plaintiffs if their requested relief is denied and determin[ing] whether those outweigh the harm likely to be visited upon the Commonwealth defendants if that relief is granted."  Peaje Add.9.

Although the court acknowledged that, unlike the stay-relief provision in the Bankruptcy Code, Section 405(e) of PROMESA does *not* define "cause" to include "the lack of adequate protection of an interest in property," the court nonetheless

concluded that PROMESA should be interpreted to include lack of adequate protection as "cause." Peaje Add.10-11. But the court rejected the notion that "the concept of 'cause'" under PROMESA must "precisely mirror that adopted in the bankruptcy context." Peaje Add.11. Moreover, the court concluded that its analysis must be "mindful of the specific Congressional findings and the enumerated purposes of PROMESA's automatic stay," and that "any decision … to vacate the stay … should be consistent with these provisions and … the larger, overarching purposes for which PROMESA was enacted." Peaje Add.12.

Turning to the facts, the court first found that both Act 21 and PROMESA themselves protect creditors' interests, as Act 21 protects "the rights of a holder to any collateral, security interest or lien that secures" an obligation that "was otherwise or became due before or during an emergency period" and "becomes payable at the end of the covered period as a result of this Act," Act 21 §204(a), and PROMESA provides that the automatic stay "does not discharge an obligation of the Government of Puerto Rico or release, invalidate, or impair any security interest or lien securing such obligation," PROMESA §405(k). As the court explained, those provisions ensure that appellants' interests in HTA's and ERS's pledged revenues are fully preserved during the stay. Peaje Add.6-18. The court further found that appellants "face no financial harm as a result of the stay"

because, as they conceded, the fiscal agents have sufficient funds to service all bondholder debt during the stay.  Peaje Add.18 n.1, 13.[5]

Finally, the court also found that the stay will not impede appellants' ability to *continue* receiving payments once the stay lifts and the obligation to deposit all pledged revenues with the fiscal agents resumes.  As for Peaje, the court explained that HTA's "pledged revenues are constantly replenished by an ongoing stream of toll payments," and that this "recurring source of income" suffices to ensure that Peaje will face no "permanent loss" of any money it is owed.  Peaje Add.16.  The court applied much the same analysis to the Altair movants, concluding that "[t]heir interest in the ERS pledged property is … adequately protected" because the "enduring stream of ERS pledged property will once again flow to the fiscal agent" when the stay and Executive Orders expire.  Peaje Add.17.[6]

Although the PROMESA stay is set to expire on February 15, 2017, Peaje and the Altair movants nonetheless filed these consolidated appeals, which respondents-appellees agreed to expedite.

_____

[5] Indeed, the court concluded that Assured, the HTA bond insurer, could not even establish standing to seek relief from the stay because there was no risk of HTA defaulting on any bonds because of the stay.  Peaje Add.12-13.  Assured has not appealed.

[6] The Oversight Board sought to intervene in the consolidated cases pursuant to PROMESA §212(a), but the district court denied the Board's motion.  The Board has appealed that decision.  *See* Case Nos. 16-2430, 16-2431, 16-2435 (Dec. 12, 2016).  The Commonwealth supported the Board's intervention below and continues to support the Board's efforts to participate in these cases.

## STANDARD OF REVIEW

Jurisdictional questions are reviewed de novo. *Reilly v. City of Atl. City*, 532 F.3d 216, 223 (3d Cir. 2008). Although this Court has not confronted the question of what standard governs review of refusals to lift the PROMESA stay, the Court reviews refusals to lift the Bankruptcy Code's automatic stay for abuse of discretion. *In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 23 (1st Cir. 2007).

## SUMMARY OF ARGUMENT

Appellants identify no basis to disturb the district court's eminently correct conclusion that they are not entitled to relief from PROMESA's temporary stay. Indeed, they cannot even establish that this Court has jurisdiction over these interlocutory appeals. The decision below is not final under 28 U.S.C. §1291; nor is it appealable under Section 1292 or the collateral order doctrine.

Even if jurisdiction exists, this is an easy case on the merits. Appellants cannot come close to demonstrating that the district court abused its broad discretion by denying their motions to lift the stay. It is not even clear how the stay is causing appellants *any* concrete injury, let alone the kind of substantial injury that would justify lifting a stay designed to help abate an unprecedented fiscal crisis affecting the health, safety, and welfare of millions of individuals. Appellants concededly have received every penny they are owed to date, and they

concededly will continue to do so throughout the stay.  They will be free to litigate their claims as soon as the stay lifts, and should the HTA and ERS revenues from which their bonds will once again be serviced when the Executive Orders expire prove insufficient to continue servicing their bonds at some future date, PROMESA fully preserves—indeed, even enhances—their ability seek recourse.

Appellants fare no better with their efforts to charge the district court with legal error.  In fact, the only legal error the court committed inured to their benefit, as the court allowed them to try to prove "cause" under a more lenient "lack of adequate protection" standard that Congress chose not to import into PROMESA's temporary stay provisions.  But even under that standard, the district court correctly concluded that appellants' arguments fall far short, as their conceded ability to continue collecting payment in full throughout the stay, their ability to resume being paid out of constantly replenishing revenue streams after the stay lifts, and the preservation of their full rights to all the ordinary means of recourse should that situation ever change all combine to give them all the protection to which they can conceivably claim to be entitled.

Finally, the district court committed no error by declining to hold a hearing on appellants' motions.  The court had just conducted an extensive hearing that produced reams of testimony dealing with the same issues—much of which was designated by the parties to these cases—and was given no reason to believe that

appellants had anything different to offer.  Appellants did not inform the court of their plans to present additional testimony; nor did they seek reconsideration of the court's decision to cancel the hearing.  Accordingly, they cannot now complain that the court should have forced the Commonwealth to devote its scarce resources to a hearing that the court had no reason to believe would produce anything new.

## ARGUMENT

### I.   The Court Lacks Jurisdiction Over These Appeals.

Federal courts of appeals generally have jurisdiction over only three types of district court orders:  final decisions, 28 U.S.C. §1291; certain interlocutory orders that Congress has specifically designated appealable, *id.* §1292; and orders falling within the narrow "collateral order" doctrine, *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).  The decision below fits within none of those categories.

First, the order below is not a "final decision[]" within the meaning of 28 U.S.C. §1291 because it did not result in any "judgment determining the entire controversy between the parties."  *De Fuertes v. Drexel, Burnham, Lambert, Inc.*, 855 F.2d 10, 11 (1st Cir. 1988) (per curiam); *see also Catlin v. United States*, 324 U.S. 229, 233 (1945) ("A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.").  It resolved only whether the stay should be lifted (so appellants could immediately

litigate their underlying claims to final judgment), or should be left in place (so they could litigate their claims to final judgment only once the stay expires).  The decision below is thus not meaningfully different from a decision denying a motion to stay litigation, which is an interlocutory order not appealable as a final decision.

Appellants try to avoid that conclusion by pointing to their dubious decision to "commence a discrete civil action addressed to the single issue whether or not the stay should be lifted," Peaje Br.5; *accord* Altair Br.28-29, rather than filing a complaint and then filing a motion to lift the stay the complaint triggered.  In their view, because the only issue they asked the court to resolve is whether they are entitled to lift the automatic stay, the court's resolution of that issue is necessarily a final order.  They are mistaken.  Finality demands final resolution of the plaintiffs' *claims*, not just final resolution of the particular question the court was asked.  *See Cohen*, 337 U.S. at 546 (Section 1291 does not "permit appeals, even from fully consummated decisions, where they are but steps towards final judgment in which they will merge."); *see also Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 430 (1985).  Parties cannot get around that rule by asking the court to resolve something less than a claim.  Appellants' contrary argument would have the perverse effect of rendering an order denying relief from a stay "final" for the

movant who filed a standalone motion, but subject to a different analysis for the

movant who did not.[7]

Appellants fare no better with their contention that the decision below *must*

be a final decision because, otherwise, an appeal may come too late to matter. As

this Court long ago recognized, "[t]o say that [an order] is final because no appeal

could be taken from it is clearly inadmissible." *In re Coe*, 49 F. 481, 482 (1st Cir.

1892); *see also, e.g.*, *Plaintiff A v. Schair*, 744 F.3d 1247 (11th Cir. 2014) (order

lifting stay of sex trafficking claims not a final decision); *cf. Digital Equip. Corp. v.

Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). Nor is it enough that the decision

below "finally" resolves *the stay dispute*, as "[e]very order purports to do

something finally, if only to delay a 'final' decision." *Barnes Freight Line, Inc. v.

I.C.C.*, 569 F.2d 912, 919 (5th Cir. 1978). What matters is whether the district

court's order "ends the litigation on the merits and leaves nothing for the court to

do but execute the judgment." *Catlin*, 324 U.S. at 233. When, as here, there is no

---

[7] That result would be particularly troubling because it is not even clear that
PROMESA authorizes the procedural approach appellants took.  To be sure,
Congress gave the district court jurisdiction over "civil actions arising under or
related to" Section 405, and it authorized the court to lift the PROMESA stay "[o]n
motion of or action filed by a party in interest."  §405(e)(1)-(2).  But that hardly
confirms that Congress intended to authorize creditors to file standalone motions
seeking to lift the stay without first filing a claim that triggered it.  Instead, the
statute's reference to an "action filed by a party in interest" is most naturally read
to refer to an action that actually seeks some substantive relief beyond simply
lifting the stay.

judgment to execute (because no claim has been litigated), the decision below is an interlocutory, not a final, one.

The relevant question, then, is whether an order denying a motion to lift the PROMESA stay is appealable even though it is interlocutory. It is not. PROMESA does not grant jurisdiction over such appeals, and neither does Section 1292. To be sure, Section 1292 authorizes appeals of interlocutory orders granting, modifying, or refusing injunctions. *See* 28 U.S.C. §1292(a)(1). But an order declining to lift the PROMESA stay does none of those things. It is PROMESA itself, not the decision below, that precludes appellants from litigating their claims right now; the district court's order just declines to alter the status quo that Congress mandated. In that respect, it is akin to a decision declining to lift an automatic stay under the Bankruptcy Code. Because it is the "automatic stay [that] enjoins parties from acting," not the district court's decision declining to lift the stay, this Court has concluded that "the *automatic* stay's continued operation— thanks to the denial of stay relief—should not be treated for finality purposes like an injunction entered at the case's start." *In re Atlas IT Export Corp.*, 761 F.3d 177, 184-85 (1st Cir. 2014); *see also Sunshine Dev., Inc. v. FDIC*, 33 F.3d 106, 113 (1st Cir. 1994) ("Because the automatic stay is exactly what the name implies— 'automatic'—it operates without the necessity for judicial intervention.").

27

Appellants attempt to distinguish *Atlas* on the ground that it is not yet clear "[w]hether there will be any bankruptcy cases filed involving" the Commonwealth or its instrumentalities, Peaje Br.6, but that misses the point.  While the PROMESA stay is akin to the bankruptcy stay in that both are automatic, it is also different in (at least) one critical respect:  The PROMESA stay only delays litigation; it does not foreclose it.  Appellants will be free to litigate their claims as soon as the stay lifts.  In the bankruptcy context, by contrast, the automatic stay persists through the bankruptcy proceeding, meaning claims covered by the stay effectively will *never* be litigated, and instead will be subsumed into the restructuring or liquidation.  Courts thus have been more willing to entertain appeals of orders declining to lift the bankruptcy stay (although this Court has expressly rejected the "blanket-rule approach" some circuits employ, *Atlas*, 761 F.3d at 182-85), because even though such orders do not end the *bankruptcy* proceeding, they do effectively end the litigation between debtor and the creditor who sought to lift the stay.

Here, by contrast, the finality problem is not that the lift-stay motion is part of a "larger overarching *bankruptcy* 'case'" that has not yet concluded.  Peaje Br.6 (emphasis added).  It is that the motion is part of an overarching case *between appellants and appellees* that has not yet concluded (or even commenced)— namely, a dispute about whether the diversion of funds that Act 21 and the Executive Orders authorized is lawful.  The denial of appellants' motions to lift the

28

stay in no way concludes that dispute, as appellants are free to litigate their claims once the stay expires.  The concerns that have led some courts (but not this one) to permit appeals of all orders declining to lift the automatic bankruptcy stay thus do not translate to this context.

Moreover, even if *some* orders denying requests to lift the PROMESA stay might be appealable, *Atlas* would compel the conclusion that *this* order is not. Under *Atlas*, an order declining to lift the bankruptcy stay is appealable only if it "conclusively decided the fully-developed, unreviewable-elsewhere issue that triggered the stay-relief fight below."  761 F.3d at 185.  Appellants claim that what "triggered the stay-relief fight" here was whether they could show cause to justify lifting the stay.  But that dispute was not what *triggered* the stay-relief fight; it *was* the stay-relief fight.  What *triggered* the fight were appellants' contentions that Act 21 and the Executive Orders issued pursuant to it are unlawfully depleting the value of their collateral.  *See, e.g.*, Peaje JA16 ("Cause exists in this matter because Respondents, acting under color of law, are currently diverting funds in which Movant has a lawful property interest without any compensation whatsoever and are expending the same other than as required under the terms of certain bonds that Movant holds and the applicable governmental resolution governing Movant's rights.").  The district court did not resolve that issue, "conclusively" or otherwise.

Instead, it held only that any interests appellants may have are adequately protected during the stay.  Peaje Add.16-18.

Appellants' contrary argument would distort *Atlas* beyond reason.  By their logic, *every* order denying a stay-relief motion would be appealable, as every such order concludes one way or another that the movant failed to show cause.  Yet this Court rejected precisely that "blanket-rule approach," instead concluding that "[e]verything depends on the circumstances."  *Atlas*, 761 F.3d at 182-85. Appellants provide no reason why a different rule should obtain here.  Indeed, if anything, this Court should be even more reluctant to adopt a "blanket-rule approach" in this context, as the whole point of the PROMESA stay is to provide the Commonwealth with a temporary reprieve from "costly creditor lawsuits" while it works with the Board to abate the grave fiscal and humanitarian crisis to which the statute is addressed.  PROMESA §405(m)(5), (n).  Had Congress wanted to put the Commonwealth to the burden of defending not just against stay-relief requests, but also against appeals challenging their denial, it could have done so. In the absence of any express directive to allow that result, this Court should err on the side of protecting the interests PROMESA was intended to serve.

Finally, appellants do not suggest that the decision below fits within the narrow confines of the "collateral order" doctrine, and with good reason.  The collateral order doctrine reaches only "that small class [of decisions] which finally

determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen*, 337 U.S. at 546; *see also Will v. Hallock*, 546 U.S. 345, 350 (2006) (collateral order doctrine must not be applied to "overpower the substantial finality interests §1291 is meant to further"). The relief appellants sought is to open the gate blocking their ability to immediately litigate their claims. That relief cannot reasonably be described as "independent of the cause itself" or "separable from" the claims appellants seek to litigate.

Nor are the rights appellants assert so significant as to counsel in favor of allowing an immediate appeal. *See Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495, 502 (1989) (Scalia, J., concurring) ("The importance of the right asserted has always been a significant part of our collateral order doctrine"); *Hallock*, 546 U.S. at 352-53 (chronicling cases involving "some particular value of a high order" that necessitated collateral order treatment). Indeed, if any rights here rise to that level, they are the rights Congress vested in *the Commonwealth* to temporarily forestall the sort of litigation torrent appellants seek to unleash while the Government and

the Board work to abate Puerto Rico's fiscal and humanitarian crisis.[8] Accordingly, the Court should dismiss these appeals for lack of jurisdiction.

## II. The District Court Did Not Abuse Its Discretion By Declining To Lift The Stay.

The district court did not abuse its broad discretion in declining appellants' requests to lift PROMESA's stay. The Commonwealth is facing an unprecedented fiscal crisis that threatens the health, safety, and welfare of its people. To abate that crisis, Congress granted the Commonwealth a brief reprieve—extendable for, at most, 75 days—from the onslaught of creditor litigation that Congress knew it otherwise would face. As Congress explicitly found, that "immediate—but temporary—stay is essential to stabilize the region," "advances the best interests common to all stakeholders," and "is limited in nature and narrowly tailored to achieve [PROMESA's] purposes," which include giving the Commonwealth time both "to address an immediate existing and imminent crisis" and to "focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits." PROMESA §405(m)(5), (n).

---

[8] Nor would the public interest be furthered by allowing appeals from the class of discretionary decisions to which the district court's order belongs. *See Donlon Industries, Inc. v. Forte*, 402 F.2d 935, 937 (2d Cir. 1968) (Friendly, C.J.) (when an issue is reviewable only on an abuse-of-discretion basis, the "likelihood of reversal is too negligible to justify the delay and expense incident to an [immediate] appeal and the consequent burden on hard-pressed appellate courts").

On the other side of the balance, appellants have supplied nothing that differentiates them from any of the creditors—both secured and unsecured—to whom Congress plainly intended PROMESA's stay to apply. They do not and cannot claim that the stay is causing them any present-day fiscal injury. To the contrary, they expressly stipulated that they have continued to receive all payments in full and on time since emergency periods were declared for HTA and ERS, and that the relevant fiscal agents have sufficient funds to continue making all payments throughout the stay. Peaje JA183-84 ¶¶11, 12, 14; Altair JA243 ¶18. Their only complaint is that HTA and ERS are not presently abiding by their obligations to deposit all revenues with the relevant fiscal agents—in other words, that they are not ensuring that the funds from which their debts are serviced will continue to contain a surplus.

That argument suffers, first and foremost, from the problem that countless creditors could make exactly the same complaint, meaning that granting relief to appellants would require granting relief to all those creditors too. That outcome is flatly inconsistent with Congress's statutory scheme. It would make little sense to include a provision permitting courts to life the stay only "for cause shown" if creditors could make that showing simply by alleging that the Commonwealth or one of its entities is failing to live up to every single detail of its agreement with the creditor. Congress obviously intended the "cause" mechanism to address

unique circumstances that do not inhere to all of the Commonwealth's legion of
secured creditors.  Appellants have never even tried to show that they are special,
for the simple reason that they are not.  To grant them relief thus would have
exactly the kind of "cascading effect" that the United States has warned would
undermine "the overall scheme designed by PROMESA."  U.S.St.6.

But even setting aside that problem, appellants cannot explain how the
agencies' failure to abide by their depositing obligations is causing them any
meaningful injury—let alone any injury weighty enough to justify lifting a stay
"ultimately intend[ed]" to serve the vital end of protecting the health, safety, and
welfare of "the 3.5 million Americans living in Puerto Rico."  U.S.St.5-6.  To be
sure, appellants may be *contractually entitled* to have all revenues deposited in the
accounts from which their bonds are serviced, even if (as right now) those
revenues are not actually needed to ensure payment.  But even under the more
lenient stay standard on which appellants erroneously rely, *see infra* Part III.B, the
question is not whether the debtor is failing to live up to every detail of its bargain
with the creditor.  Of course the debtor is; otherwise, the creditor would have no
cause for complaint.  The question is whether the debtor's failure to live up to its
bargain in full is causing the creditor *injury*.

That is precisely what the district court correctly concluded appellants failed
to demonstrate.  Appellants concededly are being paid now, so the only injury they

34

can even plausibly claim is the wholly speculative fear that failure to deposit all revenues with the fiscal agents *right now* might injure them *in the future* should the HTA and ERS revenues ever prove insufficient to service their bonds once the entities' deposit obligations resume.   But the district court found those fears unsubstantiated, as the "pledged revenues" from which HTA and ERS debts ordinarily are serviced "are constantly replenished," and thus will suffice to continue servicing appellants' bonds once the Executive Orders lift.  Peaje Add.16-18.  And so long as those revenues remain sufficient to service debt once the orders lift, whether appellants are paid from a fund that contains a surplus is of no practical matter.

Moreover, even assuming appellants had some cause for immediate concern, their arguments "unjustifiably discount[] provisions of both [Act 21] and PROMESA that effectively preserve" the interests they assert.  Peaje Add.16.  Act 21 expressly provides that "nothing in this Act shall be construed to limit the rights of a holder to any collateral, security interest or lien that secures" an obligation that "was otherwise or became due before or during an emergency period."  Act 21 §204.  And PROMESA expressly provides that the automatic stay "does not discharge an obligation of the Government of Puerto Rico or release, invalidate, or impair any security interest or lien securing such obligation."  PROMESA §405(k).  As those provisions ensure, to the extent appellants can establish a contractual right

35

to insist that the accounts from which their bonds are serviced be replenished to pre-stay levels even if there has been no payment default, neither the stay nor the Executive Orders eliminates or alters that right.

In all events, the question here is not *whether* appellants will be able to litigate their claims that the temporary use of HTA and ERS revenues to pay for essential services is unlawful. It is whether they should be able to litigate those claims *right now*, or should have to wait along with all other creditors the few more months Congress set aside to give the Commonwealth and the Board the breathing room that this fiscal and humanitarian crisis demands. They should not. Appellants have identified nothing that differentiates them from any other secured creditor who must wait out the stay before resorting to litigation. And the supposed injuries they will suffer if forced to wait (at most) a few more months to litigate their claims pale in comparison to the harms that will befall the Commonwealth and its people if the Government is forced to deal with creditor litigation rather than focus its limited resources on getting the unprecedented fiscal crisis under control. *See Brigade* Tr.1, at 36-37, 65-66; *Brigade* Tr.2, at 98-99, 102, 106-08, 202-32. Worse still, lifting the stay would force the Commonwealth into litigation that not only is costly and time-consuming, but also may ultimately prove unnecessary, as the Board has not yet decided whether to exercise any of the

host of powers it possesses that would moot appellants' claims. *See* PROMESA §§101(d)(2), 201(d)(2), 204(c)(3), 407; *see also* U.S.St.7.

Those are precisely the kind of harms against which Congress sought to guard when it created a temporary stay "to ensure order while the Oversight Board establishes its foundational structure so that the Board may begin its monumental task of tackling the debt crisis." U.S.St.8; *see also, e.g.*, H.R. Rep. 114-602, pt. 1, at 52 ("[T]he stay [is] a critical component of the legislation.… [I]t preempts a rush to the courts by aggrieved creditors—an event that could increase the impact of and accelerate Puerto Rico's debt crisis."). The district court thus manifestly did not abuse its discretion in rejecting appellants' requests to make their claims the exception to the ordinary rule that Congress imposed.

## III. The District Court Committed No Legal Error That Injured Appellants.

Unable to demonstrate that the district court abused its discretion, appellants attempt to manufacture some sort of legal error. Their efforts fall short. Indeed, the only legal error the court committed actually *benefitted* appellants, as the court allowed them to try to demonstrate "cause" to lift the stay under a standard more lenient than Congress intended. Correctly interpreted, PROMESA requires a showing of irreparable injury for the stay to be lifted—a showing that appellants did not and cannot make. But appellants fare no better under the "adequate

37

protection" standard the district court applied, as that standard simply does not entitle creditors to what appellants seek.

## A. PROMESA's Stay May Be Lifted Only Upon a Showing of Irreparable Injury.

At the outset, appellants are mistaken in their contention that they are entitled to relief from the stay unless the Commonwealth can prove that it has provided them with "adequate protection" of their interests in their collateral (*i.e.*, in the HTA and ERS revenues that secure their bonds). Only a showing of irreparable injury suffices to demonstrate "cause" to lift PROMESA's stay.

That is clear from the text, structure, and history of the statute. While Congress modeled the text of PROMESA's stay-relief provision on the provision governing relief from the Bankruptcy Code's automatic stay, the two differ in (at least) one critical respect. Under Section 362 of the Bankruptcy Code, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under [Section 362(a)] … for cause, *including the lack of adequate protection of an interest in property of such party in interest.*" 11 U.S.C. §362(d) (emphasis added). Section 405(e)(2) of PROMESA, by contrast, omits that final clause: "On motion of or action filed by a party in interest and after notice and a hearing, the United States District Court for the District of Puerto Rico, *for cause shown*, shall grant relief from the stay provided under [Section 405(b)]." PROMESA §405(e)(2) (emphasis added). Congress thus tracked the

38

language of Section 362(d)(1) nearly to a T—with the conspicuous exception of excluding the language through which it had broadened the traditional equitable factors to include an "adequate protection" analysis in the Section 362(b) context.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). By the same token, when Congress patterns a new statute off of another statute in all respects save one, its omission must be given meaning. *See Molzof v. United States*, 502 U.S. 301, 307 (1992). That reasoning applies with all the more force here, as Congress expressly incorporated *all* of Section 362 into Title III of PROMESA, which governs any restructuring proceedings the Board may decide to initiate for the Commonwealth or its instrumentalities. *See* PROMESA §301(a) (incorporating by reference 11 U.S.C. §§361 & 362); *cf. Dada v. Mukasey*, 554 U.S. 1, 16 (2008) ("In reading a statute we must not 'look merely to a particular clause,' but consider 'in connection with it the whole statute.'"). Congress thus plainly knew how to incorporate the Bankruptcy Code *in toto* when that was its intention. That Congress explicitly declined to do so in Section 405(e)(2) confirms that it did not intend for Section 362(d)(1)'s "adequate protection" clause to carry over to that context.

To the extent there were any doubt on that score, Section 405(g) of PROMESA eliminates it. Section 405(g) empowers the district court to lift the temporary stay "with or without a hearing" in the exceptional circumstance where "such relief … is necessary to prevent *irreparable damage* to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing." PROMESA §405(g) (emphasis added). As that provision reflects, while Congress was cognizant that there might be unusual circumstances warranting relief from the stay (sometimes even before a hearing can be held), it intended such relief to be available only upon the traditional showing of "irreparable harm" that was required in the bankruptcy context before the "adequate protection" clause was added. *See In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 641 & n.6 (Bankr. E.D.N.Y. 1980) (noting that addition of "adequate protection" language "eliminate[ed] [the secured creditor's] initial burden to show irreparable harm"); 2 Collier on Bankruptcy ¶¶361.10, 363.06 (15th ed. 1979).[9] The House Report that accompanied PROMESA reflects the same understanding, explaining that "[i]f a party is determined to be subject to *irreparable damage*

---

[9] So understood, Sections 405(g) and 405(e)(2) work in tandem. Where the court must decide a stay-relief request without opportunity for notice and a hearing, it makes sense to relieve the court of its ordinary obligation to weigh the harms, as the court would not have a chance to hear the Commonwealth's side of the story. But in either instance, the movant still bears the initial burden to show irreparable harm; the only question is whether relief may be granted before the Commonwealth has an opportunity to fully respond.

40

because of the imposition of the stay, the District Court is authorized to grant relief from the stay to such party." H.R. Rep. No. 114-602, pt. 1, at 51 (2016) (emphasis added). Notably, the report did not cabin that explanation to pre-hearing requests governed by Section 405(g).

As the text, structure, and history of PROMESA thus confirm, Congress simply did not view efforts to lift PROMESA's temporary stay as synonymous with efforts to lift the stay that takes effect when a bankruptcy petition is filed. And for good reason, as there are important differences between the two. The PROMESA stay was animated by concerns very different from those that exist in the traditional bankruptcy context—namely, "an immediate existing and imminent crisis" that threatens the Commonwealth's ability to provide for the health, safety, and welfare of the 3.5 million American citizens who call the Island home. PROMESA §405(n)(1). The stay is designed, moreover, not just to protect the Commonwealth itself, but also to give the newly constituted Board time to get up and running and determine if, when, and how to participate in creditor litigation against the Commonwealth. *Id.* §405(m)(5)(1). There is simply no analogue for those unprecedented circumstances in the Section 362 context.

PROMESA's temporary stay also does not have the same impact on creditors as an automatic stay under Section 362. In the latter context, the stay ordinarily persists until the bankruptcy proceeding concludes. *See* 11 U.S.C. §362(c)(2).

41

Accordingly, the bankruptcy stay effectively extinguishes—or at least irreparably impairs the value of—the creditor's claim. Moreover, in the Section 362 context, the stay is triggered by the filing of a petition for bankruptcy, which typically means both that the debtor will no longer be paying its debts as they come due and that restructuring or liquidation is all but inevitable. In the PROMESA context, by contrast, the stay really is temporary; creditors will be free to litigate their claims against the Commonwealth (to the extent the Board does not moot them) as soon as the stay lifts. And the stay is triggered by the statute, not by a petition to restructure. As this case thus vividly illustrates, the existence of the stay does not necessarily mean either that creditors are not continuing to be paid or that creditors will not continue to be paid in the future.

In short, the equities in the PROMESA context differ markedly from those in the Section 362 context, which readily explains why Congress put creditors seeking to lift the PROMESA stay to a higher burden of proof.[10] As the United

---

[10] That also explains why any constitutional concerns animating the "adequate protection" analysis in the bankruptcy context do not carry over to PROMESA, as the PROMESA stay does not pose the same risk to secured creditors as the automatic bankruptcy stay. Moreover, in instances where (*unlike* here) the Commonwealth or its instrumentalities actually default on creditor payments during the stay, PROMESA authorizes the Board to order interest—in other words, to compensate the creditor for the delay in payment. PROMESA §405(*l*). Thus, even assuming the PROMESA stay raised any takings concerns, Congress has addressed them. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 332 (2002) ("a temporary restriction that merely causes a diminution in value is not" a taking).

States thus has explained, "a broad interpretation of the 'for cause' provision would 'frustrate Congress' manifest purpose' in enacting PROMESA." U.S.St.6 (quoting *United States v. Hayes*, 555 U.S. 415, 427 (2009)). Accordingly, this Court should reject appellants' efforts to import into PROMESA an "adequate protection" rule that Congress plainly did not intend to govern.

### B.  Even Assuming "Adequate Protection" Is Necessary, Appellants' Interests Are Adequately Protected.

Even assuming PROMESA incorporates the Bankruptcy Code's "adequate protection" rule, the district court correctly concluded that appellants' interests are adequately protected. "[A]dequate protection is a flexible concept which requires a court to make decisions on a case-by-case basis," taking into account "the particular characteristics of each proceeding." *In re Briggs Transp. Co.*, 780 F.2d 1339, 1348 (8th Cir. 1985). Under that flexible standard, appellants are receiving all the protection to which they can claim any entitlement—and then some.

The purpose of the adequate protection inquiry "is to insure that the secured creditor receives in value essentially what he bargained for." *Id.* at 1345 (citation omitted); *see* H.R. Rep. No. 595, 95th Cong., 1st Sess., *reprinted in* 1978 U.S.C.C.A.N. 5787, 5839). Of course, the creditor need not (and typically will not) get *exactly* what he bargained for to receive "adequate protection." That is clear from Congress's statutory explanation of "adequate protection," which explicitly contemplates alternatives such as "cash payments," "an addition or

43

replacement lien," or "other relief … equivalent" to the creditor's "interest in [the secured] property."  11 U.S.C. §361.  As that array of options reflects, the question is simply whether the debtor is providing the creditor with something that protects *the value* of the creditor's interest in the property that secures the debt.

There can be no dispute that appellants are currently "receiv[ing] *in value* essentially what [they] bargained for," as they concededly are being paid in full and on time out of the funds that were already deposited with the fiscal agents before the Executive Orders they seek to challenge issued.  *See* Peaje JA183 ¶11; Altair JA242-43 ¶¶17-18.  That readily distinguishes appellants from the creditors in the cases on which they rely, as those cases involve creditors whose debts *were not being paid*.  *See, e.g.*, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988); *In re Buttermilk Towne Ctr., LLC*, 442 B.R. 558 (B.A.P. 6th Cir. 2010); *In re Putnam*, 483 B.R. 799 (Bankr. M.D. Ga. 2012); *In re Mullen*, 172 B.R. 473 (Bankr. D. Mass. 1994).  Those creditors thus sought either to lift the stay so they could foreclose on their collateral or to prevent the debtor from keeping for its own use rents or other proceeds the collateral generated rather than using them to pay its creditors.  Here, by contrast, appellants have no need to resort to either measure, as they concededly are being paid precisely what they would be paid if HTA and ERS were depositing all revenues with the fiscal agents.

44

Nor can appellants demonstrate that they lack adequate protection of their interests in *continuing* to receive payment in full. Appellants have stipulated that the fiscal agents have enough funds on hand to make all payments that will come due throughout the stay. Peaje JA184 ¶¶14, 17; Altair JA243 ¶18. And by the time the stay lifts, the Executive Orders temporarily relieving HTA and ERS of their obligations to deposit all revenues with the fiscal agents will have expired. At that point, appellants will be able to resume receiving payment on their bonds in the manner that their agreements contemplate: through the "recurring source[s] of income" HTA and ERS revenues are generating. Peaje Add.16; *cf. Mullen*, 172 B.R. at 474 (creditor's security interest in rents adequately protected where "there is no suggestion [that the properties] or the rental streams they generate are declining in value"). As the district court thus correctly concluded, appellants are adequately protected for the full value of their interest in the revenues that serve as their collateral, as they are being paid now, and they will continue to be paid in the future.

According to appellants, even if the constantly replenished revenues will suffice to enable HTA and ERS to continue servicing their debts in the future, their interests still are not "adequately protected" because those future revenues may not suffice to bring the accounts from which those debts are serviced back to their pre-stay levels. In other words, in appellants' view, it is not enough that their interests

45

in continuing to receive debt payments on time and in full are adequately protected; they must also be given adequate protection for any diminution in the value of the accounts from which those debts are serviced—even if that diminution will not actually deprive them of a single cent they are owed.

Appellants do not and cannot point to any case that imposes such a demanding concept of adequate protection. In fact, the Supreme Court has expressly *rejected* the notion that creditors may demand adequate protection for any purported diminution in the value of their overarching bargain with the debtor, even if that diminution does not affect the value of their interest in the collateral. *United Sav.*, 484 U.S. at 370-72 (rejecting argument that adequate protection entitles creditors to interest payments to compensate for loss of ability to immediately foreclose on collateral); *see also In re Pacific Lumber Co.*, 584 F.3d 229, 247 (5th Cir. 2009) ("[i]f a creditor were over-secured, it could not demand to keep its collateral rather than be paid in full"). That is because the adequate protection analysis focuses on the narrower question of whether the "creditor's 'interest in property'" is protected "from any decrease in 'value' attributable to the stay," not on whether the creditor's interest in "the whole of [its] economic bargain with the debtor" is fully protected. *Briggs*, 780 F.2d at 1344; *see also, e.g.*, *United Sav.*, 484 U.S. at 370-72. Whether future HTA and ERS revenues will bring the accounts from which appellants' debts are serviced back to their pre-stay levels is

therefore immaterial, as accounts with a surplus are not necessary to ensure adequate protection of the value of appellants' interests in the HTA and ERS revenues that secure their bonds.

The cases on which appellants rely do not suggest otherwise.  Indeed, most of those cases deal with a different question entirely—namely, whether a creditor who is not *presently* being paid rents it is owed is adequately protected by "a replacement lien in *future* rents" when "the creditor's security interest already extends to those rents."  *Putnal*, 483 B.R. at 804 (emphasis added); *see also, e.g.*, *In re Builders Grp. & Dev. Corp.*, 502 B.R. 95 (Bankr. D. P.R. 2013).  In that context, some (but not all) courts have concluded that a promise of future rents to which the creditor is already entitled cannot make up for the loss of rents not presently being paid.  That is decidedly not the situation here, as appellants are presently *being paid* all the money they are due.  Their liens on *future* HTA and ERS revenues are not "replacement liens"—because there are no missing payments to "replace."  Those liens just confirm that they will be able to *continue* collecting payments in the future, notwithstanding the diminution in the value of the accounts from which their bonds are serviced.  Appellants' insistence that they are entitled to something more is akin to insisting that debtors protect their creditors' interests twice-over.  That position is understandably attractive to creditors, but makes no

sense for debtors—and certainly cannot be what Congress envisioned in PROMESA.[11]

Appellants fare no better with their strained analogy to Section 363 of the Bankruptcy Code.  *See* Peaje Br.41.  In fact, Section 363 only undermines their arguments, as that provision expressly allows a debtor to sell or use a creditor's collateral, so long as the value of the creditor's interest in that collateral is protected by the proceeds that its sale or use will generate.  Indeed, the whole point of Section 363 is to allow debtors to use collateral to generate more money to pay their creditors—which is akin to what the Commonwealth is doing here.  As the record confirms, using HTA and ERS revenues to pay for essential services inures to appellants' *benefit*, as the future HTA and ERS revenues from which their debts will be serviced once the Executive Orders expire would have fallen precipitously if those essential services were not maintained.  Brigade Tr.1, at 127-28.  If anything, then, Section 363 only reinforces the conclusion that appellants have no cause for complaint about the adequacy of their protection so long as their bonds

---

[11]  At any rate, even assuming there were some risk that revenues would prove insufficient to service debt in the future, *see* Altair Br.38-40, that is not a risk for which appellants could seek "adequate protection."  A creditor is not entitled to protection against the possibility that the value of its collateral may decline *after the stay* for reasons wholly independent of the stay; protection is required in the bankruptcy context only if *the stay* will harm the creditor's interest.  *See Briggs*, 780 F.2d at 1344.  And here, the stay is causing appellants no harm, as they have continued to receive every penny they are owed.

48

will continue to be serviced during the stay—which they concededly will. *See* Peaje JA184 ¶¶14, 17; Altair JA243 ¶18.

In all events, even assuming appellants are entitled to some form of protection for their purported interest in ensuring that the fiscal agents have more money on hand than they actually need to service appellants' debts, PROMESA itself adequately protects that interest. Not only does the statute expressly provide that the automatic stay "does not discharge an obligation of the Government of Puerto Rico or release, invalidate, or impair any security interest or lien securing such obligation," §405(k); it also creates a remedy for recovery of any collateral "transferred in violation of applicable law," *id.* §407(a). Accordingly, to the extent appellants are entitled to demand that the accounts from which their bonds are serviced return to the precise levels they would have been at without the Executive Orders, they will suffer no harm from having to wait a few more months to make that demand, as "a loss of money can normally be made up with more money." *David v. City of Los Angeles*, 307 F.3d 1143, 1149 (9th Cir. 2002) (Kozinski, J., dissenting), *rev'd on other grounds*, 538 U.S. 715 (2003). Particularly given the unique dynamic to which it is addressed, PROMESA cannot reasonably be understood to entitle them to anything more.

## C.     The District Court Did Not Err by Declining to Hold a Hearing.

Finally, the district court did not err by declining to hold a hearing on appellants' stay-relief motions.  While appellants proceed as if the court resolved their motions on no record at all, in fact the court had more than enough evidence from which to conclude that appellants were not entitled to the relief they sought. To the extent appellants believed otherwise, they should have asked the court to reconsider its decision to cancel the hearing so they could present additional evidence, rather than asking this Court to fault the district court for declining to hold a hearing when no party had suggested that it had anything more to offer.[12]

First, both Peaje and the Altair movants stipulated to the most critical facts— namely, that no default on any payment due to either of them has occurred and that no such default will occur during the stay.  Peaje JA183-84 ¶¶11, 12, 14; Altair JA243 ¶18.  That alone sufficed to prove that appellants' interests in HTA and ERS revenues are being protected "from any decrease in 'value' atrributable [sic] to the stay," which is all that the adequate protection standard embraced by the district court requires.  *Briggs*, 780 F.2d at 1344.  As the court noted, that is particularly true given the creditor protections PROMESA and Act 21 provide, *see* Act 21

---

[12] The Court should also reject appellants' argument that the district court's decision not to hold a hearing in this case entitles them to de novo review.  *See* Peaje Br.25.  The district court's findings, conclusions, and exercises of discretion are not deprived of the deference they would otherwise be due just because the court based them on stipulated facts and designated testimony rather than holding a hearing that no party suggested was necessary.

50

§204; PROMESA §405(k), as those provisions suffice to supply any additional protection to which appellants might claim to be entitled.

But that was hardly the only evidence the court had before it. The court also held a two-day hearing at which it received extensive testimony on the harms that maintaining the stay would impose on creditors and on the harms that lifting the stay would impose on the Commonwealth, including testimony from multiple witnesses who explained the financial condition of the Commonwealth and the need for breathing room. *See* Brigade Tr.2, at 77-90, 98-141, 192-231. While that hearing involved a different set of creditors, the issues it addressed were not meaningfully different from those in this case—as evidenced by the fact the parties designated hundreds of pages of testimony from those hearings. Peaje JA193-97. Those designations included, among other things, detailed expert testimony about whether the use of HTA revenues to pay for essential services was causing or would cause bondholders any material injury, irreparable or otherwise. *See Brigade* Tr.1, at 77-142. And the expert witness supplied by one of the insurers of those bonds effectively conceded that it would not—and, indeed, if anything was more likely to help creditors than to hurt them. *See id.* at 116-17, 127-28, 142, 202-39.

Appellants now claim that they intended to call additional expert witnesses who would have offered additional testimony to support their adequate protection

arguments. Peaje Br.43; Altair Br.44. But appellants filed nothing with the district court informing it of those intentions, either before or after the court issued its order denying their stay-relief motions. The court thus acted well within its discretion in concluding that it need not put the Commonwealth to the burden of another hearing, as the court had no reason at the time to believe that doing so would produce any information the court did not already have. To the extent appellants thought otherwise, they should have informed the district court of their desire to reinstate the hearing and present additional evidence, rather than asking this Court to fault the district court for a determination that was entirely reasonable given the information it had before it.

Implicitly recognizing as much, appellants suggest that PROMESA *requires* the district court to hold a hearing on every single stay-relief motion that is filed. *See* Altair Br.43. Nothing in the text of PROMESA compels that conclusion, and there is no reason to believe Congress intended to impose such an onerous requirement. The whole point of the PROMESA stay is to "allow the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits." PROMESA §405(n)(2). If every creditor were statutorily entitled to his own individual hearing—even if a similarly situated creditor had already presented extensive evidence on the same issues—the

Commonwealth would be left forced to duplicatively examine and cross-examine witnesses *ad infinitum* rather than using its precious resources where they are needed most: working to secure a comprehensive resolution to forestall the worst effects of the unrelenting economic crisis that has afflicted Puerto Rico and the 3.5 million American citizens who call it home. That is precisely the opposite of what Congress intended PROMESA to achieve. Accordingly, this Court should reject appellants' attempts to send this case back for yet another proceeding during which the Commonwealth will be forced to devote its scarce resources to litigating whether, notwithstanding Congress's plain intent to minimize litigation burdens, creditors are entitled to bypass the protections PROMESA provides and litigate their claims now rather than wait just a few more months.

## CONCLUSION

For the foregoing reasons, this Court should dismiss for lack of jurisdiction,

or, in the alternative, affirm the decision below.

Respectfully submitted,

s/Erin E. Murphy

MARGARITA LUISA MERCADO-ECHEGARAY
SOLICITOR GENERAL OF PUERTO RICO
OFFICE OF THE SOLICITOR GENERAL
DEPARTMENT OF JUSTICE
COMMONWEALTH OF PUERTO RICO
PO Box 9020192
San Juan, PR 00902

SUSAN MARIE DAVIES
MICHAEL F. WILLIAMS
ERIN E. MURPHY
 *Counsel of Record*
PETER A. FARRELL
MATTHEW D. ROWEN
KIRKLAND & ELLIS LLP
655 Fifteenth Street NW
Washington, DC 20005
(202) 879-5000
erin.murphy@kirkland.com

*Counsel for Respondents-Appellees Alejandro Garcia-Padilla,
Juan C. Zaragoza-Gomez, Luis G. Cruz-Batista, and Carmen Villar-Prados*

December 23, 2016

54

# CERTIFICATE OF COMPLIANCE
## WITH RULE 32(A)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,936 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman size 14-point font with Microsoft 2013.

Date: December 23, 2016

s/Erin E. Murphy
Erin E. Murphy

# CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system to the following e-mail addresses:

G. Eric Brunstad Jr. - eric.brunstad@dechert.com

Allan S. Brilliant - Allan.Brilliant@Dechert.com

Robert J. Jossen - robert.jossen@dechert.com

Andrew C. Harmeyer - andrew.harmeyer@dechert.com

Dora L. Monserrate Peñagarícano - dmp@monserratelaw.com

Alfredo Fernández-Martínez - afernandez@delgadofernandez.com

Beth Heifetz - bheifetz@jonesday.com

Geoffrey S. Stewart - gstewart@JonesDay.com

Sparkle L. Sooknanan - ssooknanan@jonesday.com

Bruce Bennett - bbennett@jonesday.com

Benjamin Rosenblum - brosenblum@jonesday.com

Michael Luskin - luskin@lsellp.com

Stephan E. Hornung - horning@lsellp.com

Richard A. Chesley - richard.chesley@dlapiper.com

s/Erin E. Murphy
Erin E. Murphy