## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>COMMONWEALTH OF PUERTO RICO, et al.,<br>Debtors.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

**OBJECTION OF THE GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO
AND THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY
AUTHORITY TO THE URGENT MOTION OF OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, PURSUANT TO BANKRUPTCY CODE SECTIONS
105(a) AND 362, FOR ENTRY OF ORDER ENFORCING AUTOMATIC STAY
AND COURT'S JUNE 29, 2017 ORDER CONFIRMING APPLICATION OF
AUTOMATIC STAY WITH RESPECT TO GDB RESTRUCTURING**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID:  3481); and (ii) The Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566) (Last Four Digits of Federal Tax ID:  9686).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................ 1

BACKGROUND ............................................................................. 4

    I.      The Puerto Rico Fiscal Crisis and GDB .................................. 4

    II.     Enactment of the GDB Restructuring Act ............................... 5

    III.    The GDB Restructuring ........................................................ 6

          A.     The Qualifying Modification ..................................... 7

          B.     Concurrent Transactions Pursuant to the GDB Restructuring Act ........... 8

               i.     The Public Entity Trust ................................ 8

               ii.    Municipal Setoff .................................... 9

          C.     The Launch of Solicitation and Commencement of the PROMESA Title VI Action. ........... 10

ARGUMENT .................................................................................. 10

    I.      THE AUTOMATIC STAY CANNOT BAR THE COMMONWEALTH AND GDB FROM EXERCISING GOVERNMENTAL POWER. ................... 10

          A.     The Commonwealth's Consent To The GDB Restructuring On Behalf Of Itself And All Governmental Entities Is An Exercise Of Sovereignty Protected By PROMESA Section 303 ............................... 12

          B.     Section 305 Protects The Right Of Each Title III Debtor To Control Its Property Through The GDB Restructuring. .......................... 16

    II.     EVEN IF THE STAY APPLIES TO THE GDB RESTRUCTURING, BANKRUPTCY CODE SECTION 362(B)(4) EXEMPTS THE GDB RESTRUCTURING FROM THE AUTOMATIC STAY. ................................. 20

CONCLUSION ................................................................................. 22

## TABLE OF AUTHORITIES

**Page**

### <u>CASES</u>

*ACP Master, Ltd. v. Commonwealth of Puerto Rico,*
    300 F. Supp. 3d 328 (D.P.R. 2018)................................................................................ 17, 18

*Ambac Assurance Corp. v. Commonwealth of Puerto Rico,*
    297 F. Supp. 3d 269 (D.P.R. 2018).................................................................................. 4, 17

*Amieiro Gozález v. Pinnacle Real Estata Home Team,*
    173 D.P.R. 363 (2008) ............................................................................................................ 13

*Assured Guar. Corp. v. Commonwealth of Puerto Rico,*
    582 B.R. 579 (D.P.R. 2018)................................................................................................ 17, 19

*Commoloco of Caguas, Inc. v. Benítez Díaz,*
    126 D.P.R. 478 (1990) ............................................................................................................ 13

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Ad Hoc Group of PREPA Bondholders,*
    --- F. 3d ---, 2018 WL 3751014 (1st Cir. Aug. 8, 2018)................................................. 10, 20

*In re Albion Disposal, Inc.,*
    217 B.R. 394 (W.D.N.Y. 1997) ............................................................................................. 19

*In re City of Stockton,*
    478 B.R. 8 (Bankr. E.D. Cal. 2012) ................................................................................. 11, 17

*In re City of Stockton,*
    486 B.R. 194 (Bankr. E.D. Cal. 2013) ........................................................................ 17, 18, 19

*In re City of Stockton,*
    499 B.R. 802 (Bankr. E.D. Cal. 2013) ........................................................................ 11, 12, 18

*In re City of Stockton,*
    526 B.R. 35 (Bankr. E.D. Cal. 2015) .................................................................................... 13

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
    583 B.R. 626 (D.P.R. 2017)............................................................................................... 10, 15

*In re Jefferson Cnty.,*
    474 B.R. 228 (Bankr. N.D. Ala. 2012) ................................................................................ 13

*In re Jefferson Cnty., Ala.,*
    484 B.R. 427 (Bankr. N.D. Ala. 2012) ................................................................................ 18

*In re McMullen,*
    386 F.3d 320 (1st Cir. 2004) ................................................................................................... 21

*In re New York City Off-Track Betting Corp.,*
    434 B.R. 131 (Bankr. S.D.N.Y. 2010) ................................................................................ 12

ii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Richmond Unified Sch. Dist.*,
133 B.R. 221 (1991) .................................................................................................. 19

*In re Sanitary & Improvement Dist. No. 7 of Lancaster Cnty.*,
96 B.R. 966 (Bankr. D. Neb. 1989) ........................................................................... 12

*In re Sanitary & Improvement Dist. No. 7 of Lancaster Cnty.*,
96 B.R. 967 (Bankr. D. Neb. 1989) ........................................................................... 19

*In re Valley Health Sys.*,
429 B.R. 692 (Bankr. C.D. Cal. 2010) ....................................................................... 18

*Jaarp Corp. v. Dep't of State*,
187 D.P.R. 730 (2013) .................................................................................................. 9

*Law v. Siegel*,
571 U.S. 415 (2014) ..................................................................................................... 11

*Lyda v. City of Detroit, Mich.*,
841 F.3d 684 (6th Cir. 2016) ...................................................................................... 18

*Parkview Adventist Med. Ctr. v. United States*,
842 F.3d 757 (1st Cir. 2016) ....................................................................................... 21

*Portilla v. Banco Popular de P.R.*,
75 D.P.R. 100 (1953) .................................................................................................... 9

*Rodríguez Román v. Banco Gubernamental de Fomento para Puerto Rico*,
151 D.P.R. 383 (2000) ................................................................................................. 13

*Santos de García v. Banco Popular de Puerto Rico*,
172 D.P.R. 759 (2007) .................................................................................................. 9

## **FEDERAL STATUTES**

11 U.S.C. § 362(a)(3) ..................................................................................................... 3

11 U.S.C. § 362(b)(4) .............................................................................................. 20, 21

11 U.S.C. § 903 .............................................................................................................. 1

11 U.S.C. § 904 .............................................................................................................. 1

48 U.S.C. § 2124(i)(1) ................................................................................................... 15

48 U.S.C. § 2141 ........................................................................................................... 14

## TABLE OF AUTHORITIES
### (continued)

**Page**

48 U.S.C. § 2141(e) ........................................................................................... 16

48 U.S.C. § 2163 ........................................................................................... passim

48 U.S.C. § 2164(i) ........................................................................................... 3, 20

48 U.S.C. § 2165 ........................................................................................... passim

48 U.S.C. § 2194(m)(6) ........................................................................................... 4

48 U.S.C. § 2194(n) ........................................................................................... 4

48 U.S.C. § 2194(n)(1) ........................................................................................... 14

48 U.S.C. § 2231(g) ........................................................................................... 16

48 U.S.C. §§ 2121–2152 ........................................................................................... 15

## <u>PUERTO RICO STATUTES</u>

7 L.P.R.A. § 1281 ........................................................................................... 9

7 L.P.R.A. § 552 ........................................................................................... 9

32 L.P.R.A. § 3351a ........................................................................................... 9

32 L.P.R.A. § 3352 ........................................................................................... 9

Act 21-2016 ........................................................................................... 5

Act 2-2017 ........................................................................................... 2

Act 109-2017 ........................................................................................... passim

Act 147-2018 ........................................................................................... 6, 13, 19

The Government Development Bank for Puerto Rico (the "**GDB**") and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**") respectfully submit this objection ("**Objection**") to the *Urgent Motion of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Sections 105(a) and 362, for Entry of Order Enforcing Automatic Stay and Court's June 29, 2017 Order Confirming Application of Automatic Stay With Respect to the GDB Restructuring* [Docket 3797] (the "**Motion**")[2] filed by the Official Committee of Unsecured Creditors (the "**Committee**").[3]  In support of this Objection, AAFAF and GDB state as follows:

## PRELIMINARY STATEMENT

1.      The Committee's Motion is entirely misplaced.  Put simply, nothing in Title III of PROMESA—including the automatic stay—applies to the GDB Restructuring, or hinders the Commonwealth and each of the Title III Debtors from exercising their governmental and political authority to approve of, and use their property to, complete GDB's restructuring.

2.      The Committee's Motion conspicuously fails to address Sections 303 and 305 of PROMESA.  These statutory provisions, modeled after Bankruptcy Code Sections 903 and 904,[4] reserve the exercise of government and political power to the Commonwealth as sovereign and to each Title III Debtor, through the elected representatives of the people of Puerto Rico.  PROMESA protects those powers from interference through use of any provision of Title III, including the automatic stay.  The purported stay violation the Committee complains of—the Government's determination of how best to address claims and causes of action among the Commonwealth and certain of its instrumentalities in the interests of the people of Puerto Rico—is the archetypal

---

[2] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion.

[3] GDB and AAFAF will be filing a separate pleading in the GDB Title VI action setting forth why the Committee lacks standing in that proceeding.  Accordingly, GDB and AAFAF reserve all rights with respect to that issue.

[4] *Compare* 48 U.S.C. §§ 2163, 2165 *with* 11 U.S.C. §§ 903, 904.

government conduct protected by PROMESA Sections 303 and 305. *See* 48 U.S.C. § 2163 (Title III does not "limit or impair . . . the exercise of the political or governmental powers of the territory or territorial instrumentality, including expenditures for such exercise. . . .), § 2165 (outside of the context of a plan of adjustment, court may not interfere with debtors' "political or governmental powers," "property or revenues," or "use or enjoyment . . . of any income-producing property" *unless the Oversight Board consents, which it has not done*).

3.      These provisions bar the Committee from leveraging any Debtor's Title III stay to thwart the decisions of the Commonwealth's legislative and executive branches to enact the GDB Restructuring Act and execute the related transactions. There is no statutory authority under PROMESA or otherwise, nor does the Committee cite any, that grants the Committee (purely a creature of Title III) the right to tell the Commonwealth and the Title III Debtors what they can do with their property (let alone any intergovernmental claims). And, while the Committee attempts to throw up roadblocks to GDB's restructuring, every Commonwealth entity or representative that arguably has a right to challenge the Title III Debtors' treatment under the GDB Restructuring Act or Title VI has endorsed the transaction:

- The Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") (i) certified the RSA as a Qualifying Modification under 601(g) of PROMESA; (ii) did not assert any opposition to the GDB Restructuring Act under PROMESA Title II, and (iii) certified a fiscal plan for GDB premised on the GDB Restructuring Act and RSA;

- The elected representatives of the people of Puerto Rico—the Puerto Rico Legislature and the Governor—enacted and signed into law the GDB Restructuring Act; and

- AAFAF, as the exclusive entity authorized by Puerto Rico law to negotiate and enter agreements with creditors to restructure public debts, and GDB entered into the RSA and launched solicitation of the Qualifying Modification.[5]

---

[5] *See* Act 2-2017 § 5(c).

Given the assent of all of these parties, the only actual stay violation is the Committee's attempt to appear on behalf of various Debtors in the GDB Title VI without authorization. *See* 11 U.S.C. 362(a)(3) (the stay applies to "any act to . . . exercise control over property of the estate").[6] AAFAF reserves all rights to seek a remedy for the Committee's stay violation to the extent any party other than the Oversight Board may do so.

4.       Moreover, Section 304(i) of PROMESA (which the Motion does not even mention) directly contradicts the Committee's flawed contention that the Title VI application violates the stay.  Section 304(i) dictates that no provision of Title III, including the automatic stay, "shall prevent the holder of a claim from voting on or consenting to a proposed modification" under Title VI.  *See* 48 U.S.C. § 2164(i).  PROMESA's specific authorization of a Title III Debtor to consent to a Qualifying Modification would be meaningless if a Title VI action violated the Title III automatic stay.

5.       In any event, assuming the automatic stay could apply (which it cannot), and assuming the Commonwealth's and other Title III Debtor's claims against GDB were subject to the Title VI proceeding or GDB Restructuring Act (which they are not), the commencement of the Title VI action would nevertheless be exempt from the stay as an exercise of the Commonwealth's regulatory and police power under Bankruptcy Code Section 362(b)(4).

6.       Finally, the Committee does not mask the fact that the Motion is a premature collateral attack on the GDB Restructuring.  *See* Mot. at ¶ 3 ("This motion is one of the various components of the Committee's opposition to the GDB Restructuring.").  In addition to the fact that there is no emergency basis for the motion, as demonstrated in this brief, and those which will

---

[6] This Court's June 29, 2017 order confirming the automatic stay has no relevance here because, for the reasons explained herein, the stay does not apply to the GDB Restructuring.  *Cf.* Dkt. 543.

be filed in response to the Committee's intrusions into the Title VI application, the Committee's position is totally without merit, and the Motion should be denied.

## BACKGROUND

### I.  THE PUERTO RICO FISCAL CRISIS AND GDB

7.  As the Court knows, Puerto Rico is in a state of fiscal emergency.  *See, e.g.*, *Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, 297 F. Supp. 3d 269, 277 (D.P.R. 2018) (acknowledging Puerto Rico's fiscal emergency).  Congress enacted PROMESA to provide the Commonwealth with the tools necessary to address the crisis and ensure future access to the capital markets.  *See* 48 U.S.C. §§ 2194(m)(6), 2194(n).

8.  GDB's over-borrowing and inability to pay its debts is a central part of Puerto Rico's fiscal crisis.  GDB has historically served two functions.  It was a banking institution and a depository of funds for the Commonwealth and its instrumentalities, public corporations and municipalities.  It also acted as fiscal agent, paying agent, and financial advisor to all of those entities.

9.  Over time, the Commonwealth sought to leverage GDB's strong access to the capital markets by requiring it to issue long-term and interim financing to the Commonwealth and its instrumentalities, public corporations, and municipalities.  This caused GDB's liquidity and financial condition to be dependent on those entities' ability to repay their loans from GDB.

10.  Due to the expansion of services, GDB found itself immersed in a fiscal and viability crisis.  After the loss of its investment grade rating (and corresponding market access) in 2014, and the decision by the Commonwealth to cease repaying its debts to GDB in 2015, GDB had significant non-performing assets, limited available liquidity, and no ability to repay its debts as they came due.

11.     As a result, on April 6, 2016, GDB's fiscal agent responsibilities were transferred to the newly created AAFAF under the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*, Act No. 21-2016 (the "**Moratorium Act**").  *See* Moratorium Act § 602.  Two days later, former Governor Alejandro J. García Padilla signed Executive Order 2016-10, which declared GDB to be in a state of emergency and prohibited most withdrawals and loan disbursements.  As a result, GDB essentially froze its bank functions and governmental entities stopped depositing funds at GDB.

12.     Early in 2017, GDB's leadership concluded that an orderly wind-down of its operations and consensual negotiations with its creditors would be the optimal path to mitigate further impact to its stakeholders.[7]

## II.     ENACTMENT OF THE GDB RESTRUCTURING ACT

13.     On August 24, 2017, Governor Ricardo Rosselló Nevares signed into law Act 109-2017, the GDB Debt Restructuring Act.  The Act was adopted to address GDB's "insolvency status" due to the "loss of cash flow from most of its loan portfolio and the activation of the 'claw back' of certain revenue streams of public corporations."  *See* Act 109-2017, Statement of Motives at 38.

14.     After "consider[ation of] the current circumstances" facing GDB, the Legislature concluded that the Act, and the transactions contemplated thereby, "enables the most practical option to resolve voluntarily, the Bank's restructuring with the objective of maximizing the recovery values for distribution to the corresponding stakeholders."  *Id*. at 39.  At its core, the Act "establish[es] the legal framework for [the GDB] restructuring" which "ensures compliance with

---

[7] These negotiations have included numerous meetings with the Committee and providing it with information and documents regarding GDB.  The Committee's allegations that GDB has acted in a non-transparent effort in connection with its restructuring or Title VI process are false and part of an unfortunate pattern of inaccurate claims and insinuations by the Committee set forth in virtually all of its filings regarding GDB.  (Mot. at ¶ 29.)

GDB's certified fiscal plan and protects the public interest, ensuring also that essential services from the [Commonwealth], municipalities, and other instrumentalities continue." *Id*.

15.     Following its review of the proposed GDB Restructuring, the Legislature found the GDB Restructuring:

- "has a public purpose and is in the best interests of the people of Puerto Rico,"

- "is fair and equitable for all creditors of GDB,"

- "is necessary to ensure compliance with the GDB Fiscal Plan,"

- "achieves fiscal responsibility for the people of Puerto Rico by providing for an orderly restructuring of the liabilities of GDB,"

- "settles and resolves potential claims between GDB and other Government Entities," and

- "permits the provision of essential public services by the Government of Puerto Rico and Other Government Entities."

*Id*. at art. 102.

16.     After Hurricanes Irma and María, the GDB Restructuring Act was amended to reflect the "significantly altered . . . fiscal and economic situation of the Government of Puerto Rico, its public corporations, instrumentalities, and municipalities." *See* Act 147-2018, Statement of Motives at 20.  The amendment was adopted to reflect changes to the RSA, which according to the Legislature resulted in a "new agreement with a majority of the financial creditors of the GDB, which is more favorable for the Government of Puerto Rico than that of last year." *Id*.

## III.     THE GDB RESTRUCTURING

17.     GDB's restructuring and wind-down will proceed on parallel paths.  First, under the Title VI Qualifying Modification, the claims of GDB's bondholders, municipal and private depositors, and certain other contingent creditors (collectively, the "**Participating Bond Claims**") will be resolved by exchanging such claims for new bonds issued by a governmental entity created

6

by the GDB Restructuring Act—the GDB Debt Recovery Authority (the "**Recovery Authority**"). Second, the Commonwealth has determined that claims the Commonwealth and other public entities have against GDB will be resolved pursuant to the terms of the GDB Restructuring Act and the creation of a separate trust—the Public Entity Trust (the "**PET**"). Both components of this transaction are contemplated by GDB's certified fiscal plan (and do not conflict with any other Debtor's fiscal plan).

### A.     The Qualifying Modification

18.     In the spring of 2017, GDB and AAFAF began negotiating with certain of their major creditor constituencies—including the ad hoc group of GDB bondholders (the "**Ad Hoc Group**"), a number of on-island credit unions or "cooperativas" (the "**Cooperativas**"), and Bonistas del Patio, Inc. ("**Bonistas**"), an organization that advocates for Puerto Rico residents who hold bonds of Commonwealth government issuers—regarding a Title VI modification. Those extensive negotiations resulted in the execution of the RSA on May 15, 2017. On July 12, 2017, the Oversight Board certified the Modification contemplated by the RSA, making it a "Qualifying Modification" under Title VI.

19.     Under the Qualifying Modification, each $1,000 of affected claims will be exchanged for new bonds having a face amount equal to $550 (the "**New Bonds**"). In consideration for the Recovery Authority's issuance of the New Bonds and the resulting cancellation of the Participating Bond Claims, GDB will transfer to the Recovery Authority its municipal loan portfolio, a portion of its public entity loan portfolio, its real estate owned assets, and its unencumbered cash (the "**Restructuring Property**").

20.     The New Bonds will be secured by a statutory lien on the Restructuring Property pursuant to the GDB Restructuring Act and will be paid solely from funds generated by the Restructuring Property. The New Bonds are special limited obligations of the Recovery Authority

and are not indebtedness or liabilities of GDB, AAFAF, the Commonwealth, or the Commonwealth's public instrumentalities or subdivisions other than the Recovery Authority.

### B.    Concurrent Transactions Pursuant to the GDB Restructuring Act

21.    Through the enactment of the GDB Restructuring Act, the Puerto Rico legislature authorized certain intra-government transactions between GDB, on one hand, and the Commonwealth and its public corporations and instrumentalities, on the other, in the exercise of its plenary control over the Commonwealth's instrumentalities.

#### i.    *The Public Entity Trust*

22.    Pursuant to the GDB Restructuring Act, on the Closing Date, the balance of liabilities owed between the Commonwealth and its agents, instrumentalities and affiliates (each a "**Non-Municipal Government Entity**") and GDB will be determined by applying the outstanding balance of any deposits held at GDB in a Non-Municipal Government Entity's name against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date.  Those Non-Municipal Government Entities having net claims against GDB, after giving effect to the foregoing adjustment, will receive their *pro rata* share of interests in the PET.

23.    Under the GDB Restructuring Act, the Commonwealth's deposit claims against GDB (totaling approximately $780 million) will be ultimately determined and may be subject to setoff or recoupment against the Commonwealth's debts owed to GDB (totaling approximately $1.6 billion), resulting in GDB holding a net claim against the Commonwealth in the amount of approximately $890 million.  Ironically, this potential setoff or recoupment is central to the

8

Committee's complaint, and yet would result in the Commonwealth obtaining a full recovery on account of its deposits at GDB.[8]

24.     The assets of the PET (the "**PET Assets**") will consist of this $890 million claim against the Commonwealth.  Under the GDB Restructuring Act, the transfer of the PET Assets by GDB to the PET will be an irrevocable, non-voidable, and absolute transfer of all of GDB's legal and equitable right, title, and interest in the PET Assets.

### ii.  *Municipal Setoff*

25.     The GDB Restructuring Act further provides that, upon the closing of the Qualifying Modification, the full amount of each municipality's deposits held at GDB will be automatically applied to the outstanding balance of any loan owed to GDB by that municipality.

---

[8] The Committee, citing 7 L.P.R.A. § 1281, states that funds deposited at GDB are "held in trust or in a fiduciary capacity." (Mot. at ¶ 27).  However, this provision does not provide that GDB holds the Title III Debtors' deposits in trust or in any other fiduciary capacity.  This statute merely authorizes the Secretary of Treasury to create trusts for the investment of public funds and authorizes GDB to act as trustee of such trusts.  In relevant part, 7 L.P.R.A. § 1281 provides that "[t]he Secretary of Treasury, as trustor, and GDB, as trustee, are *authorized* to create one or more trusts for the investment of [] public funds […]." (Emphasis added.) Trusts in Puerto Rico may be constituted either expressly by statute (for example, the GDB Restructuring Act expressly created the Recovery Authority as a trust under Puerto Rico law) or pursuant to the Puerto Rico Trusts Law through the execution of a public deed of trust.  *See* 32 L.P.R.A. § 3351a; 32 L.P.R.A. § 3352.  Because 7 L.P.R.A. § 1281 merely authorizes the constitution of a trust, creation of a trust would require satisfaction of the formalities required by the Puerto Rico Trusts Law, including the execution of a public deed of trust.  No trust was ever constituted with respect to the Title III Debtors' deposits at GDB–nor was the constitution of a trust required.  *See* 7 L.P.R.A. §552 (authorizing GDB to act as "depository *or* trustee" of public funds (emphasis added)).

The Committee also cites *Jaarp Corp. v. Dep't of State*, 187 D.P.R. 730, 739 (2013), in which the Puerto Rico Supreme Court stated that public funds must be managed with the "highest ethical and fiduciary standards."  This adds nothing to the Committee's argument.  The court made that statement explaining the rationale for its holding that the Department of State could not make payments under a contract that did not comply with applicable government procurement requirements. This in no way implies that GDB holds the Title III Debtors' deposits in trust.

Moreover, the Committee's statement shows a lack of understanding of the nature of a deposit account.  Under well-established Puerto Rico law, a bank deposit constitutes an unsecured loan.  *See, e.g.*, *Portilla v. Banco Popular de P.R.*, 75 D.P.R. 100, 113 (1953) ("[O]ur Civil Code defines the contract used to establish a checking account as a loan contract, not merely a deposit contract, since the depository bank has, in addition to its obligation to keep and return the money deposited, or its value, the authority to use the thing deposited."); *Santos de García v. Banco Popular de Puerto Rico*, 172 D.P.R. 759, 774 (2007) ("[T]he creditor-debtor relationship between a bank and a depositor is a loan agreement that is governed by the provisions of the Civil Code.").

Any remaining municipal deposit claim will constitute a Participating Bond Claim that will be restructured pursuant to the Qualifying Modification.

### C. The Launch of Solicitation and Commencement of the PROMESA Title VI Action.

26.    On August 9, 2018, following more than a year of extensive negotiations with GDB's key stakeholders, AAFAF and GDB launched solicitation of votes seeking creditor approval of the Qualifying Modification.  The following day, an application under Title VI of PROMESA for GDB was filed seeking approval of the Qualifying Modification pursuant to PROMESA Section 601(m)(1)(D).[9]

### ARGUMENT

### I. THE AUTOMATIC STAY CANNOT BAR THE COMMONWEALTH AND GDB FROM EXERCISING GOVERNMENTAL POWER.

27.    Sections 303 and 305 of PROMESA allow the Commonwealth, as sovereign, to control itself and its instrumentalities through legislation or "otherwise," and allow any debtor to use its property as it sees fit, notwithstanding any other provision of Title III.  These statutory provisions mean exactly what they say.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 583 B.R. 626, 635 (D.P.R. 2017) ("PROMESA section 303 reserves the territory's political and governmental powers to the territory or 'any territorial instrumentality thereof,' subject only to Titles I and II."); *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Ad Hoc Group of PREPA Bondholders*, --- F. 3d ---, 2018 WL 3751014, at *3 (1st Cir. Aug. 8, 2018) (Section 305 "makes clear that the Title III court cannot issue an order of interference. . . .").[10]

---

[9] *See* Application of the Government Development Bank for Puerto Rico and the Fiscal Agency and Financial Advisory Authority for Puerto Rico, Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act, for Approval of Qualifying Modification, Case. No 18-0156 [Docket No. 1] ("**Title VI Application**").

[10] Sections 303 and 305 do not independently immunize the GDB Restructuring Act and Title VI from review.  If a party has standing to pursue a challenge, it can do so in an appropriate forum.

28.     Section 303 protects the Commonwealth's sovereign authority to control its instrumentalities, including GDB and the Title III Debtors on whose behalf the Commonwealth has consented to the GDB Restructuring.  Section 305 reserves to each Debtor the right to make governmental and political decisions on its own behalf, and to use its property as it sees fit.  Both sections bar the Title III court from ordering that the automatic stay applies as the Committee demands.

29.     The enactment of the GDB Restructuring Act and consummation of the transactions related thereto (including the settlement of intergovernmental claims) represent precisely the type of political and governmental actions this Court cannot review.  Accordingly, for the reasons explained below, Sections 303 and 305 prevent the Committee from invoking the automatic stay to interfere with the Debtors' reserved sovereign powers.  *Cf., e.g.*, *In re City of Stockton*, 499 B.R. 802, 809 (Bankr. E.D. Cal. 2013) (*Stockton III*) (noting, in dicta, that "it would be strange if the automatic stay . . . were to be construed in a manner that would thwart" an exercise of governmental sovereignty).

30.     The Committee's attempt to rely on Bankruptcy Code Section 105 is equally meritless.  The Court's equitable powers embodied in Bankruptcy Code Section 105 cannot override the plain text of Sections 303 or 304 of PROMESA.  *In re City of Stockton*, 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012) (*Stockton I*); s*ee also Law v. Siegel*, 571 U.S. 415, 421 (2014) ("It is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.' Section 105(a) confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits.") (internal citations omitted).

A. **The Commonwealth's Consent To The GDB Restructuring On Behalf Of Itself And All Governmental Entities Is An Exercise Of Sovereignty Protected By PROMESA Section 303.**

31.     PROMESA Section 303 provides, with narrow exceptions, that Title III "does not limit or impair the power of a covered territory to control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise of the political or governmental powers of the territory or the territorial instrumentality, including expenditures for such exercise." 48 U.S.C. § 2163.

32.     Section 303 is unflinchingly clear: no provisions of Title III, including the automatic stay, prevent the Commonwealth from exercising its government powers. *See Stockton III*, 499 B.R. at 808 (regulating and providing for methods of seeking electoral approval for local taxes "represents state control of the exercise of political or governmental powers" under 903).

33.     Section 303 also reserves to the Commonwealth control over its municipalities and political subdivisions. *See, e.g.*, *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 144 (Bankr. S.D.N.Y. 2010) ("Section 903 of the Bankruptcy Code is the 'constitutional mooring' for municipal debt readjustment and makes clear that nothing in chapter 9 should be interpreted to limit a State's power to control its municipalities."); *In re Sanitary & Improvement Dist. No. 7 of Lancaster Cnty.*, 96 B.R. 966, 967 (Bankr. D. Neb. 1989) ("Section 903 precludes this Court from exercising any control over the expenditures of a municipality.").

34.     Through the GDB Restructuring Act, and consent to the GDB Restructuring, the Commonwealth's elected government is controlling itself, and all other Government Entities, including the other Title III Debtors and municipalities. *See Act No. 109-2017, art. 703* (depriving Government Entities of authority to challenge GDB Restructuring). This legislation, laying the foundational bricks for Puerto Rico's financial stability and future economic prosperity, represents a core exercise of the Commonwealth's political and governmental powers; it was not merely

12

"pecuniary" as the Committee suggests.  (*Cf.* Mot. at ¶ 37).  *Cf.*  *In re Jefferson Cnty.*, 474 B.R.

228, 276 (Bankr. N.D. Ala. 2012) (receiver, which was neither a sovereign nor a debtor, could not

invoke Section 903 or 904); *In re City of Stockton*, 526 B.R. 35, 53 (Bankr. E.D. Cal. 2015)

(*Stockton IV*) (state statute prohibiting rejection of executory contracts with CalPERS, but not

competing  private  municipal  pension  administrators,  was  not  an  exercise  of  "political  or

governmental powers" protected under Bankruptcy Code Section 903 because it was protecting

the profit-making ability of CalPERS).[11]  The protection of profit-making rights at issue in

*Jefferson County* and *Stockton IV* stands in stark contrast to the public purposes of the GDB

Restructuring Act.

35.    As the Legislature found, GDB, once the Government's financial advisor, principal

depositary of public funds, and financing source, was in a "precarious economic situation."  *See*

Act 147-2018, Statement of Motives at 20.  Accordingly, "after a careful analysis of all available

alternatives, [the Legislature] concluded that the best alternative to protect the interests of all

interested parties was to restructure GDB's debts through a consensual agreement with its creditors

and proceed with an orderly wind-down of the Bank."  Act 147-2018, Statement of Motives at 20.

In enacting the GDB Restructuring Act, the Legislature concluded that the GDB Restructuring

"achieves  fiscal  responsibility  for  the  people  of  Puerto  Rico  by  providing  for  an  orderly

restructuring of the liabilities of GDB, and . . . permits the provision of essential public services

by the Government of Puerto Rico and other Government entities."  Act 109-2017 art. 102.

---

[11]  As a matter of Puerto Rico law, the Commonwealth government has plenary control over its instrumentalities.  *See,
e.g.*, *Rodríguez Román v. Banco Gubernamental de Fomento para Puerto Rico*, 151 D.P.R. 383 (2000) (public
corporations are subject to creation or dissolution at the will of the legislature); *Commoloco of Caguas, Inc. v. Benítez
Díaz*, 126 D.P.R. 478 (1990) (acknowledging government control over public corporations through enabling acts);
*Amieiro Gozález v. Pinnacle Real Estata Home Team*, 173 D.P.R. 363 (2008) (to same effect).

36.     There can be no doubt that the resolution of the interrelated claims among the
Commonwealth, its instrumentalities, and GDB represents inherently "political" and
"governmental" action, and is not merely administrative or pecuniary in nature.  GDB was
originally created to "safeguard the fiscal stability of Puerto Rico and promote its competitiveness
to transform [its] economy into one of the most developed in the world, encouraging the social and
economic improvement of [the Puerto Rico] people" and over time, repeatedly, "had to play a key
role in the management of [the Government's fiscal and economic development] reform plans
while continuing to support those [governmental] entities that were dragging fiscal problems."  *See*
Act 147-2017, Statement of Motives at 37.  Ultimately, as the Legislature found, GDB—once the
Government's financial advisor, principal depositary of public funds, and financing source—was
in a "grave situation" as a result of "irresponsible policies" and "mistaken politics of the past."
*See* Act 109-2017, Statement of Motives at 37–39.

37.     The Act, by its express terms, also reflects an exercise in protecting public rights
within the Commonwealth's sovereign powers.  *See* Act 109-2017, art. 102 (Act has a public
purpose and is in the best interests of the people of Puerto Rico).

38.     The GDB Restructuring Act also "ensure[s] compliance with the GDB Fiscal Plan"
by establishing the legal foundation for an orderly wind down of GDB's operations and the
allocation of GDB's assets among its stakeholders.  *Id.* art 102; *see also id.* art. 203.  A fiscal plan
is one of the core "tools" Congress created to "address an immediate existing and imminent crisis"
in Puerto Rico.  48 U.S.C. § 2194(n)(1); *see also id.* § 2141 (requirements for fiscal plan, including
that the plan "provide a method to achieve fiscal responsibility," "ensure the funding of essential
public services," and "improve fiscal governance, accountability, and internal controls").
Legislative implementation of a certified fiscal plan serves a key governmental function in

addressing the Commonwealth's fiscal emergency.  *In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*, 583 B.R. at 632-33 (characterizing fiscal plans and budgets as "foundational documents [that] provide blueprints for revenues, expenses, debt, and capital resources, and [that] are used to substantiate methods for responsible financial management.").  The laudable cooperation reflected in the GDB Restructuring Act between the Legislature (and all branches of the Government) and the Oversight Board reflects a proper exercise of the Commonwealth's governmental and political powers, which is not subject to the automatic stay.

39.     For these reasons, the GDB Restructuring Act reflects an exercise by the Commonwealth of its governmental or political powers to control itself and the Title III Debtors, and is not subject to the automatic stay under PROMESA Section 303.

40.     While PROMESA Section 303 is subject to three narrow exceptions, none help the Committee for several reasons.  First, even when an exception to the Government's power exists, nothing in Section 303 makes the automatic stay applicable even to the exercises of governmental powers barred by Section 303(1), (2), or (3).  Second, none of the exceptions apply. [12]

41.     Section 303 is "[s]ubject to the limitations of [Titles I and II]" of PROMESA.  48 U.S.C. § 2163.  Titles I and II do not preclude the GDB Restructuring.  Title I establishes the Oversight Board and Title II sets forth its responsibilities.  *See* 48 U.S.C. §§ 2121–2152.  Here, the Oversight Board exercised the powers granted to it in Titles I and II to approve the GDB Restructuring.  In an exercise of its authority under Titles I and II, the Oversight Board approved the GDB Fiscal Plan, certified the GDB RSA as a voluntary agreement, and certified the RSA as a Qualifying Modification.  *See* 48 U.S.C. §§ 2124(i)(1) (power to certify voluntary agreements to

---

[12] The Committee has not argued that Sections 303(1)-(3) apply to the GDB Restructuring Act.  GDB and AAFAF reserve all rights to raise additional arguments in response to such a claim in the event it is made, including, but not limited to, that the GDB Restructuring Act is not a composition of indebtedness or a moratorium law, and that Section 303(1) cannot apply to GDB.

restructure bond claims), 2141(e) (power to certify Fiscal Plan); 48 U.S.C. § 2231(g) (power to certify proposed restructuring transactions as Qualifying Modifications); Title VI Application, Uhland Declaration, Ex. J, L, & N.

42.     None of the specific exceptions in Section 303(1)-(3) provide the Committee with any clearer path to either application of the stay or otherwise derailing of GDB's restructuring. Those exceptions state that (1) a territory law prescribing a composition of indebtedness or a moratorium law cannot bind a creditor without its consent, solely to the extent law prohibits payment of principal or interest by an entity not described in Section 109(b)(2) of Title 11; (2) a judgment under such a law is not binding without creditor consent; and (3) certain unlawful executive orders are preempted.  *Id.* § 2163.  Exceptions (2) and (3) are plainly inapplicable because no executive order or judgment is at issue.  Exception (1) does not apply because the "creditors" at issue in the Committee's motion are the Title III Debtors, who have consented to the GDB Restructuring.  *See* Act No. 109-2017, art. 703.[13]

43.     Thus, under any plausible interpretation of PROMESA Section 303, the GDB Restructuring Act and the actions taken in furtherance thereof, are not subject to the automatic stay.

**B.      Section 305 Protects The Right Of Each Title III Debtor To Control Its Property Through The GDB Restructuring.**

44.     PROMESA Section 305 also bars the Committee's requested relief as an order applying the automatic stay would interfere with the political or government powers and the property or revenues of the Title III Debtors.

---

[13] The nature of these exceptions limits in a very specific manner—but does not eliminate—the Commonwealth's powers to deal with creditors and instrumentalities.  By including these provisions in a section regarding the Commonwealth's governmental and political powers, Congress showed that such laws are fundamentally an exercise of political and governmental power.  This completely undermines the Committee's argument that an act that has pecuniary implications cannot be an exercise of governmental or political power.

45.     Section 305 provides that, unless the Oversight Board consents or a plan of adjustment so provides, "the court may not, by any *stay,* order, or decree, in the case or otherwise, interfere with—(1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the use or enjoyment by the debtor of any income-producing property."  48 U.S.C. § 2165 (emphasis added).  This language could not be clearer. No stay—including the automatic stay—can interfere with the Title III Debtors' use of their political or governmental powers or their property.

46.     Courts interpreting this language have unequivocally held that courts cannot interfere with a governmental debtor's ability to control its property and exercise governmental and political powers during bankruptcy:

> [Section 904] is so comprehensive that it can only mean that a federal court can use no tool in its toolkit—no inherent authority power, no implied equitable power, no Bankruptcy Code § 105 power, no writ, no stay, no order—to interfere with a municipality regarding political or governmental powers, property or revenues, or use or enjoyment of income-producing property.

*Stockton I*, 478 B.R. at 20.  Nor can this Court "prevent a chapter 9 debtor from spending its money for any reason, *even foolishly or in a manner that disadvantages other creditors*, unless the municipality consents to such judicial oversight." *In re City of Stockton*, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013) (*Stockton II*) (emphasis added).

47.     This Court has previously held that it cannot direct the Commonwealth to expend funds for a particular purpose.  *ACP Master, Ltd. v. Commonwealth of Puerto Rico*, 300 F. Supp. 3d 328, 340 (D.P.R. 2018) (Section 305 precluded court order requiring certain revenues to be applied to GO bond debt); *Assured Guar. Corp. v. Commonwealth of Puerto Rico*, 582 B.R. 579, 598-99 (D.P.R. 2018) (Section 305 precluded requiring HTA Reserve Account funds to be applied to HTA bond debt); *Ambac*, 297 F. Supp. 3d at 296 (same).  The converse must be true—if the

17

Court cannot require the Debtors to spend money in a specific manner without their consent, it also cannot use its power to prevent the Debtors from agreeing to use their assets to resolve potential claims. *Stockton II*, 486 B.R. at 198-99 (Section 904 dictates that debtor does not need to seek court approval for compromises because "[t]he power to approve a compromise implies the power to disapprove a compromise. And the power to disapprove is the power to interfere . . . [which] is precisely what Congress has withheld in chapter 9 cases.").

48.     Section 305 equally precludes the Title III court from entering an order that would declare illegal the Debtor's exercise of its political powers, or use of its property. *ACP Master*, 300 F. Supp. 3d at 340 ("[A] decree that the territorial government or its instrumentality must conduct its affairs in a manner different from the one it has chosen is necessarily one that would interfere within the meaning of the statute."); *Lyda v. City of Detroit, Mich.*, 841 F.3d 684, 696 (6th Cir. 2016) (declaration that billing practices are illegal precluded by Bankruptcy Code Section 904); *Stockton III*, 499 B.R. at 808 (proposing a local tax law for voter approval protected from interference). A Title III debtor "retains not just full title over its property, it also keeps the same degree of control over it . . . along with complete control over its property's operations without restrictions on the ability to sell, use or lease it." *In re Jefferson Cnty., Ala.*, 484 B.R. 427, 462-63 (Bankr. N.D. Ala. 2012) (*Jefferson Cnty. II*); *see also In re Valley Health Sys.*, 429 B.R. 692, 714 (to same effect).

49.     Here, under the GDB Restructuring, the Debtors and the Oversight Board have all agreed to the disposition of certain property of the Debtors in resolution of certain claims owed by the Debtors.[14]   The Governor, GDB, and AAFAF together negotiated the consensual solution memorialized in the RSA. The Legislature evaluated and approved the agreement and established

---

[14] This includes potential release of a number of claims, potential setoff, and having claims satisfied by the PET.

18

the legislative framework for implementing it.  *See generally* Act 109-2017; Act 147-2018.  The

Oversight Board consented to the GDB Restructuring when it certified the Qualifying

Modification and the GDB Fiscal Plan.[15]  *See* Title VI Application, Uhland Declaration, Exs. J, L,

& N.

50.     Absent consent by the Oversight Board, Section 305 precludes this Court from

interfering with that agreement, even if it adversely affects the Debtors, without the Oversight

Board's consent.  *See Stockton II*, 486 B.R. at 198 (Section 904 precludes a bankruptcy court from

preventing a government debtor from using its property, even "in a manner that disadvantages

other creditors"); *see also Assured*, 582 B.R. at 598-99 (dismissing claim seeking declaration that

funds in HTA Reserve Accounts belonged to HTA bondholders because "PROMESA Section

305's prohibitions on interference with Debtor property interests, revenues and use and enjoyment

of income-producing property deprive this Court of power to interfere with the Debtors' dealings

with the Reserve Fund property."); *In re Sanitary & Improvement. Dist. No. 7*, 96 B.R. 967, 972

(Bankr. D. Neb. 1989) ("The debtor is free to use its property and the bankruptcy court cannot

approve or disapprove such use."); *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (1991)

("Section 904 also prohibits the court from interfering with 'any of the property or revenues of the

---

[15] The Committee's reliance on *In re Albion Disposal, Inc.*, 217 B.R. 394, 408 (W.D.N.Y. 1997) is also misplaced. *Albion* involved a chapter 11 debtor seeking to prevent a town from enforcing a local zoning law on the basis that it disproportionately affected the debtor in violation of the automatic stay.  Here, the Commonwealth is the government entity that has, through its legislative and executive branches, enacted the legislation in question.  Unlike a chapter 11 debtor, a governmental debtor's enactment of legislation is specifically protected by the provisions of chapter 9 of the Bankruptcy Code (and in the Commonwealth's case, the provisions of PROMESA Sections 303 and 305).  Moreover, the town in *Albion* was alleged to be acting in a proprietary role in the bankruptcy proceedings, rather than in a governmental capacity.  For the reasons described above, this is not the case in the GDB Restructuring.

debtor' or with 'the debtor's use or enjoyment of any income producing property.").  Obviously,

the Oversight Board has not consented to this Court's interference with any Debtors' property.[16]

51.    The Committee also argues that commencement of the GDB Title VI action violates

the automatic stay on the theory that it is a legal proceeding against the Title III Debtors.  (Mot. at

13.)  This argument also fails not only because the Commonwealth's claims are not subject to the

Title VI Qualifying Modification, but also because it is directly contradicted by PROMESA

Section 304(i), which expressly provides that that Title III debtors can consent to the terms of a

Title VI modification even if the automatic stay might otherwise apply: "[n]otwithstanding any

provision in [Title III] to the contrary . . . nothing in this section shall prevent the holder of a claim

from voting on or consenting to a proposed modification of such claim under subchapter VI of this

chapter."  *See* 48 U.S.C. § 2164 (i).  If the automatic stay does not prohibit a Title III debtor from

consenting to a Qualifying Modification, it would make no sense at all to construe the filing of a

Title VI action as a stay violation.   The Motion does not even mention this provision of

PROMESA.

## II.    EVEN IF THE STAY APPLIES TO THE GDB RESTRUCTURING, BANKRUPTCY CODE SECTION 362(B)(4) EXEMPTS THE GDB RESTRUCTURING FROM THE AUTOMATIC STAY.

52.    Even if the automatic stay could apply to the GDB Restructuring notwithstanding

PROMESA Sections 303 and 305 (which it cannot), the restructuring would be exempt from the

stay as an exercise of the Commonwealth's police and regulatory power.   *See* 11 U.S.C. §

362(b)(4).  To determine whether the exemption applies, courts in the First Circuit consider "the

totality of the circumstances," and ask whether the governmental action was "designed primarily

---

[16] To the extent the Committee argues on reply that the Oversight Board has consented to the Title III Court's carte blanche interference in each Debtor's use of its property by filing a petition for relief, the First Circuit has rejected that argument.  *Ad Hoc Group of PREPA Bondholders*, 2018 WL 3751014, at *2.

to protect the public safety and welfare, *or* represents a governmental attempt to recover from property of the debtor estate, whether on its own claim, or on the nongovernmental debts of private parties." *In re McMullen*, 386 F.3d 320, 325 (1st Cir. 2004); *see also Parkview Adventist Med. Ctr. v. United States*, 842 F.3d 757, 764 (1st Cir. 2016).

53.     The Committee relies on *McMullen* for the proposition that actions with a purely financial purpose are not excepted from the stay under Section 362(b)(4).  (Mot. at ¶ 37 n.50.)  The GDB Restructuring does not fall into this category.  As the Court in *McMullen* acknowledged, the critical inquiry is whether the state power in question is "designed to advance a sufficiently important public policy so as to trump the competing interests fostered by the automatic stay." 386 F.3d at 325.  In *McMullen*, the Court found that the state power of licensure of real estate brokers, "which safeguards the public from wrongful future conduct of corrupt or incompetent professionals, falls squarely within the purview of the subsection 362(b)(4) exception to the automatic stay." *Id*.

54.     Similarly, the GDB Restructuring Act was enacted for a "public purpose" and was determined by the Legislature to be in the "best interests of the people of Puerto Rico" and designed to ensure that "essential services from the Government, municipalities, and other instrumentalities continue." *See* Act 109-2017 art. 102; Statement of Motives at 39.  Moreover, Title VI is part of the comprehensive toolkit that Congress gave to Puerto Rico to solve its fiscal crisis.  A more important exercise of state power is unimaginable.  The Committee's suggestion otherwise is profoundly mistaken.  The GDB Restructuring represents a critical step in resolving Puerto Rico's unprecedented fiscal crisis and is designed, above all else, to achieve an important public policy objective.  The Act and actions in furtherance thereof are accordingly exempt from the stay by operation of Bankruptcy Code 362(a)(4).

## CONCLUSION

55.     For the reasons discussed herein, the Motion should be denied.[17]

Dated:  August 29, 2018
          San Juan, Puerto Rico


Respectfully submitted,


*/s/ Luis C. Marini-Biaggi*
Luis C. Marini-Biaggi
USDC No. 222301
Carolina Velaz-Rivero
USDC No. 300913
**MARINI PIETRANTONI MUÑIZ LLC**
MCS Plaza, Suite 500
255 Ponce de León Ave.
San Juan, Puerto Rico 00917
Tel:  (787) 705-2171
Fax:  (787) 936-7494

          *- and -*

**O'MELVENY & MYERS LLP**
John J. Rapisardi
Suzzanne S. Uhland
Peter Friedman
(Admitted *Pro Hac Vice*)
7 Times Square
New York, NY 10036
Tel: (212) 326-2000
Fax: (212) 326-2061


*Attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority and the Government Development Bank for Puerto Rico*

---

[17] GDB and AAFAF reserve the right to join in any additional arguments set forth by the Oversight Board.