# RESTRUCTURING SUPPORT AGREEMENT

THIS RESTRUCTURING SUPPORT AGREEMENT (including the annexes, exhibits and schedules attached hereto and as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**" or "**RSA**"), dated as of May 15, 2017, is entered into by and among the Government Development Bank for Puerto Rico ("**GDB**") and the undersigned GDB Bondholders (as defined herein), and acknowledged and agreed to by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"). The GDB Bondholders who are party to this Agreement or execute a joinder to this Agreement in the form of Exhibit B will be referred to herein collectively as the "**Supporting Bondholders**." The Supporting Bondholders, together with GDB and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof, are referred to herein collectively as the "**Parties**" and each individually as a "**Party**."

**WHEREAS**, GDB is the issuer of certain bonds set forth on **Schedule A** attached hereto (including all series thereof, the "**GDB Bonds**") issued and outstanding pursuant to that certain trust indenture, dated as of February 17, 2006 (as amended or supplemented, the "**Trust Agreement**" and, together with the GDB Bonds, the resolutions approving the GDB Bonds, and any other agreements, supplements, amendments, or other documents executed or delivered in connection with the issuance or maintenance of the GDB Bonds, the "**Bond Documents**") between GDB and Wilmington Trust, National Association, as successor trustee (the "**Trustee**") that are beneficially owned or controlled by the holders thereof (referred to herein collectively as the "**GDB Bondholders**").

**WHEREAS**, as of the date hereof, the total outstanding principal amount of GDB Bonds that are beneficially owned by each of the Supporting Bondholders is set forth on its respective signature page hereto.

**WHEREAS**, the Parties have agreed to undertake a financial restructuring of GDB (the "**Restructuring**") which is anticipated to be effected through a Qualifying Modification pursuant to Title VI of the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016) ("**PROMESA**") (including any schedules and exhibits attached thereto, the "**Plan**") on terms and conditions set forth in the term sheet attached hereto as **Exhibit A** (including any schedules and exhibits attached thereto, the "**Restructuring Term Sheet**").

**WHEREAS** pursuant to the requirements of PROMESA, the Financial Oversight and Management Board for Puerto Rico established pursuant to PROMESA (the "**Oversight Board**") will be requested to issue certifications under sections 104 and 601(g)(2).

**WHEREAS**, AAFAF by Act 2-2017 of the Government of Puerto Rico has been given the sole responsibility to renegotiate, to restructure and/or to reach an agreement with creditors on all or part of the public debt or any other debt issued by any government entity and has expressed support for the Restructuring, including matters discussed in the Restructuring Term Sheet and herein.

**WHEREAS**, the Parties, which include a broad and diverse coalition of on-island and off-island Supporting Bondholders, desire to express to each other their mutual support and commitment in respect of the Restructuring, including matters discussed in the Restructuring Term Sheet and herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1. Certain Definitions.

Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Restructuring Term Sheet. As used in this RSA, the following terms have the following meanings:

(a) "**Claim**" has the meaning set forth in the definition of "Liability Claim" in section 405 of PROMESA.

(b) "**Confirmation Order**" means a court order pursuant to section 601(m)(1)(D) of PROMESA approving the Qualifying Modification as satisfying the requirements of section 601 of PROMESA, which must be in form and substance reasonably satisfactory to GDB and the Requisite Bondholders (as defined below).

(c) "**Definitive Documents**" means the documents (including any related agreements, instruments, schedules, or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Restructuring, including this RSA, the Plan (including any supplements thereto), any disclosure statement, any order approving such disclosure statement, any information materials required pursuant to section 601(f) of PROMESA, and the Confirmation Order, in each case on terms and conditions consistent with the Restructuring Term Sheet, PROMESA, and otherwise in form and substance reasonably satisfactory to GDB and the Requisite Bondholders (as defined below).

(d) "**District Court**" means the United States District Court for the District of Puerto Rico or any other federal district court of competent jurisdiction under PROMESA.

(e) "**Effective Date**" means the date upon which all the conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms.

(f) "**Effective Voluntary Agreement**" means a Voluntary Agreement (defined below) certified by the Oversight Board in accordance with section 104(i)(1) of PROMESA to which the Majority Bondholders (defined below) are party.

(g) "**Fiscal Plan**" means the Fiscal Plan for GDB certified by the Oversight Board on April 28, 2017.

#89334613v60

(h) "**Majority Bondholders**" means holders of at least a majority in amount of the Bond Claims (as defined in PROMESA) of GDB that are to be affected by the Voluntary Agreement (as defined below) providing for the Restructuring.

(i) "**Material GDB Bondholder Group**" means a group of GDB Bondholders represented by common legal counsel and holding more than $200 million in aggregate principal amount of GDB Bonds.

(j) "**Outstanding**" has the meaning set forth in section 601(a)(10) of PROMESA.

(k) "**Qualifying Modification**" has the meaning set forth in section 601(a)(13) of PROMESA.

(l) "**Qualifying RSA**" means a restructuring support agreement to support the Restructuring among holders of Participating Bond Claims (as defined in the Restructuring Term Sheet), GDB and AAFAF on substantially similar terms as those set forth herein.

(m) "**Qualifying Title III Plan**" has the meaning set forth in section 4(a) of this Agreement.

(n) "**Requisite Bondholders**" means, as of the date of determination, Supporting Bondholders collectively holding (a) at least a majority of the outstanding principal amount of the GDB Bonds held by Supporting Bondholders that are "cooperativas" insured by the Corporation for the Supervision and Insurance of Cooperatives in the Commonwealth of Puerto Rico ("**COSSEC**") as of such date, (b) at least a majority of the outstanding principal amount of the GDB Bonds held by Supporting Bondholders domiciled[1] in the Commonwealth of Puerto Rico other than those described in the foregoing clause (a), and (c) at least a majority of the outstanding principal amount of the GDB Bonds held by all Supporting Bondholders other than those described in the foregoing clauses (a) and (b).

(o) "**SEC**" means the United States Securities and Exchange Commission.

(p) "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(q) "**Solicitation**" means the solicitation of votes for the Plan pursuant to, and in compliance with, PROMESA or any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

(r) "**Support Effective Date**" means the date on which counterpart signature pages to this RSA shall have been executed and delivered by GDB and GDB Bondholders holding at least $1,750,000,000 in aggregate principal amount of outstanding GDB Bonds.

---

[1] For the purposes of this Agreement, the domicile of each Supporting Bondholder shall be presumed to be located at the notice address supplied with executed signature pages hereto until the Notice Parties (as defined below) receive written notice from such Supporting Bondholder that it is domiciled elsewhere.

3

(s)    "**Support Period**" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this RSA is terminated in accordance with Section 6 hereof and (ii) the Effective Date.

(t)    "**Voluntary Agreement**" means an agreement certified by the Oversight Board as satisfying the requirements of section 104(i)(1) of PROMESA.

2.    **Restructuring Term Sheet.**    The material terms and conditions of the Restructuring are set forth in the Restructuring Term Sheet; provided that the Restructuring Term Sheet is supplemented by the terms and conditions of this RSA.    In the event of any inconsistencies in the terms of the Restructuring between the Restructuring Term Sheet and this RSA, the terms of the Restructuring Term Sheet shall govern.    For any other inconsistency between the Restructuring Term Sheet and this RSA, this RSA shall govern.

3.    **Mutual Obligations and Acknowledgments.**

(a)    During the Support Period, each Party shall work collaboratively and in good faith with the other Parties to, finalize, document and implement the Plan incorporating the terms and conditions described on the Restructuring Term Sheet and such other terms, conditions and documents necessary to implement and effectuate the Plan based on, and consistent with, the Restructuring Term Sheet and this Agreement, including without limitation the Definitive Documents, which Definitive Documents shall (i) contain economic terms consistent in all material respects with the terms set forth in the Restructuring Term Sheet, (ii) be consistent with this Agreement in all material respects and (iii) not contain any material additional terms, elements or transactions that adversely affect any Supporting Bondholder in its capacity as a GDB Bondholder.

(b)    During the Support Period, each Party shall refrain from (i) promoting or supporting any bill or legislation or (ii) directly or indirectly promoting, supporting or entering into any agreement, in each case that is inconsistent with the Restructuring or this RSA, that would materially and adversely affect the ability of GDB to comply with its obligations under this RSA or the Definitive Documents, or that would materially and adversely affect any Supporting Bondholder in its capacity as a GDB Bondholder.

(c)    During the Support Period, each Party shall use reasonable best efforts to consummate the Restructuring pursuant to Title VI of PROMESA.    Notwithstanding the foregoing, if GDB, AAFAF and the Requisite Bondholders mutually agree (provided, that, for the purposes of this Section 3(c), the agreement of Supporting Bondholders in the group described in clause (a) of the definition of Requisite Bondholders collectively holding 66 and 2/3% of the outstanding principal amount of the GDB Bonds held by such group shall be required) that it is necessary or desirable to consummate the Restructuring pursuant to Title III of PROMESA rather than Title VI of PROMESA, such Parties shall work collaboratively and in good faith to amend any milestones and other relevant provisions set forth in this Agreement and the Restructuring Term Sheet to reflect the different requirements and expectations of such a proceeding, which amendments shall be binding on all Parties.

4

(d)     Notwithstanding the milestones set forth in <u>Sections 6(a)(ii)-(v)</u> and 6(b)(iv)-(vii) below, the Parties agree to use commercially reasonable efforts to consummate the Restructuring approximately on the timeline set forth on **Exhibit C** hereto.

(e)     Each Party acknowledges and agrees that upon the execution and delivery of counterpart signature pages to this RSA by GDB, AAFAF and the Supporting Bondholders, the RSA will become a Voluntary Agreement that can be submitted to the Oversight Board for certification pursuant to section 104(i)(1)(A) of PROMESA.

(f)     Each Party acknowledges and agrees that upon (i) certification of this RSA as a Voluntary Agreement by the Oversight Board and (ii) the execution and delivery of counterpart signature pages to the RSA or any other Qualifying RSA from the Majority Bondholders, the Voluntary Agreement providing for the Restructuring shall become an Effective Voluntary Agreement pursuant to section 104(i)(2), which can be submitted to the Oversight Board as a Qualifying Modification pursuant to the Voluntary Agreement Process, as set forth and defined in section 601(g)(2) of PROMESA.

(g)     Each Party acknowledges and agrees that solicitation of the Qualified Modification (as defined in PROMESA) will commence upon receipt of the certification by the Oversight Board required by section 601(g)(2) of PROMESA.

## 4.     <u>Agreements of the Supporting Bondholders.</u>

(a)     <u>Agreement to Vote.</u>  During the Support Period, subject to the terms and conditions hereof, each Supporting Bondholder agrees that it shall, subject to the receipt by such Supporting Bondholder of the disclosure statement and/or other solicitation materials in respect of the Plan:

(i)     vote or cause to be voted its Claims in respect of GDB Bonds to accept the Plan by delivering its duly executed and completed ballots accepting the Plan on a timely basis as soon as reasonably practicable after receiving the ballots; <u>provided that</u> such vote shall be immediately revoked by all Supporting Bondholders and deemed void *ab initio* upon termination of this RSA before the consummation of the Plan pursuant to the terms hereof;

(ii)     not change or withdraw (or cause to be changed or withdrawn) any such vote;

(iii)     act in good faith and use commercially reasonable efforts to support the Solicitation in accordance with the terms of this RSA;

(iv)     do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring and the transactions contemplated thereby in accordance with, and within the time frames contemplated by, this RSA (including within the deadlines set forth in <u>Section 6</u>), including considering actions reasonably requested by GDB and AAFAF;

(v)     not take any action directly or indirectly that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede (A) the approval contemplated by section 601(f) of PROMESA, (B) the Solicitation of votes on the Plan and/or (C) the confirmation and consummation of the Plan and the Restructuring, including soliciting or causing or allowing any of its agents or representatives to solicit any agreements relating to any voluntary restructuring transaction pursuant to Title VI of PROMESA or any other restructuring transaction other than the Restructuring (an "**Alternative Transaction**"); provided that, for the avoidance of doubt, the occurrence, in and of itself, of a voluntary or involuntary bankruptcy, insolvency or similar proceeding in respect of any Supporting Bondholder, where (1) any Transfer (as defined below) of GDB Bonds pursuant to such proceeding complies with Section 4(b) hereof and (2) such Supporting Bondholder is in compliance with all of its obligations under this Agreement, shall not be deemed to constitute any such interference with, delay or postponement;

(vi)     not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this RSA or delay, impede, appeal, or take any other negative action, directly or indirectly, or encourage any other entity to interfere with the acceptance or implementation of the Restructuring or delay the time frames contemplated by this RSA (including within the deadlines set forth in Section 6);

(vii)     for so long as the RSA has not been terminated, not (A) object to, delay, impede, or take any other action to interfere with acceptance or implementation of the Plan, (B) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, or plan of reorganization for GDB other than the Plan, (C) otherwise take any action that would interfere with, delay, or postpone the consummation of the Restructuring, including any action that would cause a GDB Termination Event, it being understood that any action permitted by Section 4(h) hereof shall not be construed to interfere with, delay, or postpone the consummation of the Restructuring, or (D) oppose a petition under Title III of PROMESA of GDB or any plan of adjustment under such Title III; provided that (i) such case has been filed in accordance with Section 3(c) above and (ii) the plan of adjustment filed with the petition or subsequently sought for approval incorporates all material terms of the Restructuring Term Sheet (a "**Qualifying Title III Plan**"); provided further that, for the avoidance of doubt, the occurrence, in and of itself, of a voluntary or involuntary bankruptcy, insolvency or similar proceeding in respect of any Supporting Bondholder, where (1) any Transfer (as defined below) of GDB Bonds pursuant to such proceeding complies with Section 4(b) hereof and (2) such Supporting Bondholder is in compliance with all of its obligations under this Agreement, shall not be deemed to constitute any such interference with, delay or postponement; and

(viii)     vote or cause to be voted its Claims in respect of GDB Bonds to accept the Qualifying Title III Plan by delivering its duly executed and completed ballots accepting the Qualifying Title III Plan on a timely basis as soon as reasonably practicable after receiving the ballots; provided that such vote shall be immediately revoked by all

Supporting Bondholders and deemed void *ab initio* upon termination of this RSA before the consummation of the Qualifying Title III Plan pursuant to the terms hereof.

      (b)   <u>Transfers.</u>

      (i)   During the Support Period, each Supporting Bondholder agrees, solely with respect to itself, that such Supporting Bondholder shall not sell, transfer, loan, issue, pledge, assign, or otherwise dispose of (each, a "**Transfer**"), directly or indirectly, in whole or in part, any of its GDB Bonds or its Claims in respect thereof (including grant any proxies, deposit any interest in the GDB Bonds Claims into a voting trust or enter into a voting agreement with respect to any such GDB Bonds or Claims), unless the transferee thereof either (A) is a Supporting Bondholder or (B) before such Transfer is effective, (1) agrees in writing for the benefit of the Parties to become a Supporting Bondholder and (2) agrees to be bound by all of the terms of this RSA applicable to Supporting Bondholders (including with respect to any and all GDB Bonds and Claims in respect thereof it already may hold before such Transfer) by executing a joinder agreement substantially in the form attached hereto as **Exhibit B** (a "**Joinder Agreement**"), and delivering an executed copy thereof by email within two (2) business days after such execution to (a) O'Melveny & Myers LLP ("**O'Melveny**"), counsel to GDB and AAFAF, authorized to act on behalf of GDB, (b) Davis Polk & Wardwell LLP ("**Davis Polk**"), counsel to the Ad Hoc Group of GDB Bondholders (the "**Ad Hoc Group**"), (c) Marichal, Hernández, Santiago & Juarbe, LLC, counsel to Grupo Encuentro Solidario ("**Grupo ES**"), (d) Nevares, Sánchez Alvarez and Cancel, PSC ("**Nevares**"), counsel to Alianza de Cooperativistas ("**Alianza**") and (e) Picó & Blanco LLC ("**Picó & Blanco**"), counsel to the Bonistas del Patio (the foregoing clauses (b) through (e), "**Creditor Notice Parties**" and, together with O'Melveny, the "**Notice Parties**" and, each individually, a "**Notice Party**"), in which event, upon compliance with the foregoing, (x) the transferee (including the Supporting Bondholder transferee, if applicable) shall be deemed to be a Supporting Bondholder hereunder to the extent of such transferred rights and obligations and shall be deemed to make all of the representations, warranties, and covenants of a Party, as applicable, set forth in this RSA and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this RSA to the extent of such transferred rights and obligations; <u>provided that</u> this <u>Section 4(b)(i)</u> shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Each Supporting Bondholder agrees that any Transfer of any GDB Bonds or related Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio* and shall not create any obligation or liability of any Party to the purported transferee, and GDB and each other Supporting Bondholder shall have the right to enforce the voiding of such Transfer. Any Supporting Bondholder that effectuates a Transfer in compliance with the foregoing shall have no liability under this RSA arising from or related to the failure of the transferee to comply with the terms of this RSA.

      (ii)   Notwithstanding <u>Section 4(b)(i)</u>: (A) a Supporting Bondholder may settle or deliver any GDB Bonds to settle any confirmed transaction pending as of

the date of such Supporting Bondholder's entry into this RSA (subject to compliance with applicable securities laws and it being understood that such GDB Bonds so acquired and held (*i.e.*, not as a part of a short transaction) shall be subject to the terms of this RSA); (B) a Supporting Bondholder may Transfer its GDB Bonds and related Claims to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party; <u>provided that</u> (1)(a) such Qualified Marketmaker must Transfer such right, title, or interest in such GDB Bonds before the Plan voting deadline and (b) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such GDB Bonds is to a transferee that is or becomes a Supporting Bondholder at the time of such transfer, or (2) the Qualified Marketmaker will be required to execute and deliver a Joinder Agreement; and (C) to the extent that a Supporting Bondholder is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title, or interest in GDB Bonds that the Qualified Marketmaker acquires from a GDB Bondholder who is not a Supporting Bondholder without the requirement that the transferee be or become a Supporting Bondholder or execute a Joinder Agreement.

For these purposes, a "**Qualified Marketmaker**" means an entity that (x) holds itself out to the public or applicable private markets as standing ready in the ordinary course of its business to purchase from customers and sell to customers GDB Bonds or Claims against GDB (including debt securities or other debt) or enter with customers into long and short positions in GDB Bonds or Claims against GDB (including debt securities or other debt), in its capacity as a dealer or market maker in such GDB Bonds or Claims against GDB, (y) is in fact regularly in the business of making a market in bonds or Claims against issuers or borrowers (including debt securities or other debt); and (z) is registered with the Securities and Exchange Commission ("**SEC**") and the Financial Institutions Regulatory Authority.

(iii) <u>Additional Claims.</u> This RSA shall in no way be construed to preclude any Supporting Bondholder from acquiring additional GDB Bonds or related Claims; <u>provided that</u> (A) any such acquired GDB Bonds or related Claims shall automatically and immediately upon acquisition by a Supporting Bondholder be deemed subject to all of the terms of this RSA (including the obligations of the Supporting Bondholders under this <u>Section 4</u>) and (B) after such acquisition, such Supporting Bondholder shall notify its counsel, if any, of the amount and types of GDB Bonds or Claims it has acquired (1) on no less than a monthly basis and (2) additionally, upon the reasonable request of its counsel, if any.

(c) In addition, no later than the first (1st) business day of each month, and upon the GDB's or AAFAF's reasonable request, each Material GDB Bondholder Group and Supporting Bondholder not part of a Material GDB Bondholder Group shall provide or cause its counsel to provide its holdings (aggregate holdings, in the case of a Material GDB Bondholder Group) to the Notice Parties.

(d) <u>Forbearance.</u>

(i)     During the period commencing on the date hereof and ending on the termination of this RSA in accordance with its terms, each Supporting Bondholder hereby agrees to forbear from exercising, or consenting to the exercise of, or directing or otherwise directly or indirectly causing the exercise of any of the rights and remedies available to the Supporting Bondholders (or any GDB Bondholder) or the Trustee under the Trust Agreement with respect to any defaults or events of default including, without limitation, any action to accelerate, or join in any request for acceleration of the GDB Bonds or commencing, prosecuting, joining, interceding in, supporting, or otherwise participating, in each case, directly or indirectly, in any way in any legal proceedings against GDB, AAFAF, the Government of Puerto Rico or any other agency, instrumentality, or municipality thereof, or any current or former officer or director of such Puerto Rico governmental bodies, in respect of the GDB Bonds ("**Remedial Action**").  The Supporting Bondholders hereby request that during the Support Period any applicable administrative agent or indenture trustee not take, and direct such administrative agent or indenture trustee not to take, any Remedial Action with respect to any defaults or events of default, and shall, upon request of GDB, provide such further direction to any administrative agent or indenture trustee as may be necessary to effectuate the intent of the foregoing.  The Supporting Bondholders further agree that if any applicable administrative agent or indenture trustee takes any action inconsistent with such Supporting Bondholders' obligations under this RSA, such Supporting Bondholder shall use its commercially reasonable efforts to require such administrative agent or indenture trustee to cease and refrain from taking any such action (including, by written notice to the indenture trustee, rescinding and canceling such acceleration to the fullest extent permitted under the Trust Agreement).

(ii)    The foregoing forbearance shall not be construed to impair the ability of the Supporting Bondholders or the indenture trustee to exercise any rights or remedies under the Trust Agreement or take any Remedial Action, without requirement for any notice, demand, or presentment of any kind, at any time after the Support Period, and, except as provided herein, nothing shall restrict, impair, or otherwise affect the exercise of the Supporting Bondholders' or the indenture trustee's rights under this RSA, the Trust Agreement or the GDB Bonds.

(iii)   For the avoidance of doubt, the forbearance set forth in this Section 4(d) shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Supporting Bondholders or the Trustee under the Trust Agreement or GDB Bonds and shall not, except as expressly set forth herein, alter, modify, amend, or in any way affect any of the terms, conditions, obligations, covenants, or agreements contained in the Trust Agreement or the GDB Bonds or any other provision of the Trust Agreement or the GDB Bonds, all of which are ratified and affirmed in all respects and shall continue in full force and effect.  The forbearance set forth in this Section 4(d) shall not bar any Supporting Bondholder from filing a proof of claim or taking action to establish the amount of its Claim.  If the transactions contemplated hereby are not consummated or if this RSA is terminated for any reason, the Parties fully reserve any and all of their rights.

(e)    The Supporting Bondholders agree to provide prompt written notice to the Notice Parties between the date hereof and the Effective Date of (i) receipt of any notice that is not publicly available of any judicial proceeding commenced, or, to the actual knowledge of any Supporting Bondholder, threatened in writing against any Supporting Bondholder, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the Restructuring, and (ii) any failure of any Supporting Bondholder to comply with or satisfy, in any material respect, any covenant, condition, or agreement hereunder.

(f)    The agreements of the Supporting Bondholders in this Section 4 shall be solely on such Supporting Bondholders' own behalf and not on behalf of any other Supporting Bondholders and shall be several and not joint.

(g)    Notwithstanding anything in this Agreement, each Supporting Bondholder is entitled to act to protect its interests as holders of other obligations issued by the Government of Puerto Rico or any of its instrumentalities (other than GDB).

(h)    During the period commencing on the date hereof and ending on the termination of this RSA in accordance with its terms, any Supporting Bondholder or the Trustee may take any action that is not a Remedial Action before any court, tribunal, or adjudicative agency, at law or in equity, that any such Supporting Bondholder or the Trustee deems necessary or appropriate to enforce, preserve, protect, or defend any rights, claims, defenses, security interests, collateral, pledges of assets, liens, property rights, privileges, or benefits under the Bond Documents, any other contract or agreement, or any source of law that any such Supporting Bondholder or Trustee may have (the "**Rights**") against any challenge, limitation, infringement, assertion of priority, or claim (a "**Permitted Action**").  For the avoidance of doubt, Permitted Actions do not include any Remedial Action or any other action otherwise barred by Section 4 of this Agreement, but may include, without limitation, (i) defending, intervening in or filing pleadings and other documents in any legal proceedings relating to any such Rights; (ii) sending notices to any persons, governmental authorities or entities concerning the existence of any such Rights; (iii) directing the Trustee to take any action to enforce, preserve, protect or defend any such Rights (other than by a Remedial Action); (iv) appearing and participating as a party in interest in any matter to be adjudicated or decided in any bankruptcy, insolvency or similar proceeding concerning GDB or the adjustment of Claims against GDB, the Government of Puerto Rico or any other agency, instrumentality or municipality thereof; (v) commencing or continuing any action (other than any Remedial Action or any other action otherwise expressly barred by Section 4 of this Agreement) in any court or tribunal against any person or entity asserting claims relating to the Rights or Bond Documents; or (vi) otherwise preserving any of the rights, remedies, positions or defenses of such Supporting Bondholder or the Trustee, all of which are hereby expressly reserved.  Notwithstanding the foregoing, the Supporting Bondholders shall not propose, file, support, or take any other action in furtherance of any restructuring, workout, plan of adjustment for GDB other than the Restructuring, including, for the avoidance of doubt, making or supporting any filings with the District Court in a Title III case or other tribunal, or any regulatory agency, or making or supporting any public statements with respect to any restructuring, workout, or plan of adjustment for GDB other than the Restructuring. Notwithstanding anything to the contrary in this Agreement, the plaintiffs in Brigade Leveraged Capital Structures Fund Ltd., et al. v. Garcia-Padilla et al., No. 16-CV-1610,

10

pending in the U.S. District Court for the District of Puerto Rico and <u>Trigo Gonzalez, et al. v. Garcia Padilla, et al.</u>, No. 16-CV-02257, pending in the U.S. District Court for the District of Puerto Rico shall be entitled to (i) seek to stay or to extend any pending deadline in such actions; (ii) to the extent such actions are not subject to a stay under 11 U.S.C. § 362 or 11 U.S.C. § 922 (in each case, as made applicable by Title III of PROMESA) or a stay ordered by the court upon stipulation or motion of the parties, take any action that is required to be taken under any pending deadline. For the avoidance of doubt, the plaintiffs in the foregoing litigations or any other Supporting Bondholder are not permitted to seek relief from the automatic stay in such litigations.

       (i)    Subject to the express terms of this Agreement, including <u>Section 13</u>, the Supporting Bondholder shall not be prohibited from taking any action that any such Supporting Bondholder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan or the Definitive Documents.

       (j)    Except as expressly provided herein, none of (i) the existence, execution, delivery or performance of any term or provision of this Agreement, (ii) any failure by any Supporting Bondholder to object to any document or action contemplated by or taken under or in connection with this Agreement, or (iii) any action taken under or in connection with this Agreement, including any approvals or consents to any action or document, shall (A) constitute a modification or relinquishment of any term or aspect of, or any right or remedy under or with respect to, the Bond Documents or any other document (other than this Agreement to the extent expressly provided herein) or under applicable law; (B) constitute a consent to, waiver of, or admission of any default or event of default (or the absence of a default or event of default) in any of the Bond Documents; (C) extend the due date of any obligations under the Bond Documents or otherwise affect the enforceability of such obligations; (D) give rise to any obligation to extend, amend, waive or otherwise modify any term or condition of any of the applicable Bond Documents, or in the case of the Supporting Bondholders, to direct the Trustee with respect to any of the foregoing; or (E) give rise to any defenses or counterclaims to the GDB Bonds or any Bond Document, or to any right of the Supporting Bondholders to direct the Trustee under the Bond Documents, to compel payment of the obligations under any of the applicable Bond Documents or to otherwise enforce rights or remedies thereunder or under applicable law. Except as expressly limited herein, each of the Supporting Bondholders and GDB hereby expressly reserves all of its rights, remedies, positions and defenses under or with respect to the Bond Documents and under applicable law, and waives none. From and after the termination of this Agreement as to any Supporting Bondholder, (x) each such Supporting Bondholder (each, a "**Terminated Bondholder**") shall be entitled to protect, defend, enforce and assert any of its rights, remedies, positions and defenses under or with respect to the Bond Documents, in accordance with their respective terms, or under applicable law, including without limitation, commencing legal proceedings and (y) GDB shall, subject to its obligations under this Agreement to the remaining Parties, be entitled to protect, defend, enforce and assert any of its rights, remedies, positions and defenses under or with respect to the Bond Documents, in accordance with their respective terms, or under applicable law, including without limitation, commencing legal proceedings, solely against the Terminated Bondholder, as applicable. GDB acknowledges that no Supporting Bondholder has made any representations as to what actions, if any, any Supporting Bondholder will take after this Agreement terminates as to such Supporting Bondholder (including by withdrawal).

(k)  Except as expressly provided in this Agreement, including the Plan and any Definitive Document, each Supporting Bondholder shall in no way be required as a result of this Agreement to expend any cash resources or assume any additional risk or liability (including, for the avoidance of doubt, indemnifying the Trustee) in support of the Plan or this Agreement.

## 5.  **Agreements of GDB.**

Prior to and during the Support Period, subject to the terms and conditions hereof, GDB agrees that it shall:

(a)  (i) act in good faith and use commercially reasonable efforts to support and complete successfully the Solicitation in accordance with the terms of this RSA, (ii) do all things reasonably necessary and appropriate, including considering actions reasonably requested by the Requisite Bondholders, in furtherance of confirming the Plan and consummating the Restructuring and the transactions contemplated thereby in accordance with, and within the time frames contemplated by, this RSA (including within the deadlines set forth in Section 6); provided that GDB shall not be obligated to agree to any modification of any document that is inconsistent with the Restructuring Term Sheet, (iii) not take any action directly or indirectly that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede (A) the approval contemplated by section 601(f) of PROMESA, (B) the Solicitation of votes on the Plan and (C) the confirmation and consummation of the Plan and the Restructuring, including, without limitation, soliciting or causing or allowing any of its agents or representatives to solicit an Alternative Transaction other than the Restructuring, or initiating any proceeding under any bankruptcy, insolvency or similar law or any other action or proceeding that seeks to adjust, extend or challenge the claims of the Supporting Bondholders pursuant to any federal, state or Puerto Rico statute, now or hereinafter enacted into law, except for any such proceeding to implement the Restructuring and (iv) not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this RSA, including any action that would cause a Bondholder Termination Event or delay, impede, appeal, or take any other negative action, directly or indirectly, or encourage any other entity to interfere with the acceptance or implementation of the Restructuring or delay the time frames contemplated by this RSA (including within the deadlines set forth in Section 6);

(b)  provide draft copies of all material motions, applications, and other documents (including the Plan and any disclosure statement, any proposed amended version of the Plan or any disclosure statement, and any first day pleadings, if applicable) GDB intends to file with the District Court to the Creditor Notice Parties, at least two (2) calendar days before the date when GDB intends to file any such motion, application, or other document (and, if not reasonably practicable, as soon as reasonably practicable before filing) and shall consult in good faith with such Creditor Notice Parties regarding the form and substance of any such proposed filing with the District Court and subject to Section 4(a), nothing in this RSA shall restrict, limit, prohibit, or preclude, in any manner not inconsistent with its obligations under this RSA, any of the Supporting Bondholders from appearing in the District Court with respect to any motion, application, or other documents filed by GDB and objecting to, or commenting upon, the relief requested therein;

12

(c) provide to the Supporting Bondholders and/or their respective professionals, upon reasonable advance notice to GDB, (i) reasonable access to the respective management and advisors of GDB for the purposes of evaluating GDB's finances and operations and participating in the planning process with respect to the Restructuring and (ii) timely and reasonable responses to all reasonable diligence requests; provided that the Supporting Bondholders understand and agree that GDB may refuse to provide a Supporting Bondholder with any confidential information if such Supporting Bondholder is not a party to a confidentiality agreement on substantially the same terms as a confidentiality agreement previously agreed to by such party or such other confidentiality agreement approved by GDB;

(d) operate its businesses without material change in such operations or disposition of material assets (unless in such instance, the Requisite Bondholders have consented thereto in writing) in accordance with its business judgment and the terms of the Fiscal Plan;

(e) use commercially reasonable efforts to preserve in accordance with the Fiscal Plan its business organization, keep available the services of its current officers and material employees (in each case, other than voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties and the Fiscal Plan), preserve in all material respects its relationships with depositors, vendors, representatives, government officials and others, in each case, having material business dealings with GDB (other than terminations for cause or consistent with applicable fiduciary duties and the Fiscal Plan); provided that nothing herein shall be construed to limit or cause GDB to operate in any manner that would violate the terms of the Fiscal Plan;

(f) provide, within two (2) business days, written notice to the Creditor Notice Parties between the date hereof and the Effective Date of (i) receipt of any notice that is not publicly available of any judicial proceeding commenced, or threatened in writing against GDB, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the Restructuring and (ii) any failure of GDB to comply with or satisfy, in any material respect, any covenant, condition, or agreement hereunder; and

(g) provide a copy of any written offer or proposal for an Alternative Transaction received to the Creditor Notice Parties within two (2) business days of GDB's or its advisors' receipt of such offer or proposal.

6.   **Termination of RSA.**

This RSA shall automatically terminate as to a Supporting Bondholder two (2) business days after the delivery of written notice to the other Parties (in accordance with Section 24) from such Supporting Bondholder (a "**Terminating Bondholder**") at any time after and during the continuance of any Bondholder Termination Event enumerated in Section 6(a); provided that this RSA shall be deemed to have been terminated only as to such Terminating Bondholder, and this RSA shall continue in full force and effect in respect to all other Supporting Bondholders, unless and until the remaining Supporting Bondholders party to this Agreement in addition to any other holders of Participating Bond Claims (as defined in the Restructuring Term Sheet) party to any other Qualifying RSA (collectively, the "**Supporting Holders of**

**Participating Bond Claims**") cease to constitute the Majority Bondholders (or such lower threshold as determined by the Requisite Bondholders) for a period of 30 consecutive calendar days, at which time this RSA shall terminate automatically as to all Parties.  No GDB Bondholder shall have any liability to any other GDB Bondholder arising from or related to the termination of this RSA pursuant to its terms.  In addition, this RSA shall automatically terminate two (2) business days after the delivery of notice from GDB to the Supporting Bondholders (in accordance with Section 24) at any time after the occurrence and during the continuance of any GDB Termination Event enumerated in Section 6(b).  This RSA shall terminate automatically without any further required action or notice on the Effective Date.

      (a)    A "**Bondholder Termination Event**" shall mean any of the following:

      (i)    The breach in any material respect by GDB of any of the undertakings, representations, warranties, or covenants of GDB set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 24 (as applicable) from holders of a majority of outstanding principal amount of GDB Bonds of any one of the groups described in clauses (A)-(C) of the definition of "Requisite Bondholders".

      (ii)    At 11:59 p.m. Eastern Time sixty (60) calendar days after the Support Effective Date, unless the Oversight Board on behalf of GDB has certified the Plan as a Qualifying Modification (as defined in PROMESA) pursuant to either section 601(g)(1) or 601(g)(2) of PROMESA (the date on which such commencement or certification occurs, as applicable, the "**Certification Date**").

      (iii)    At 11:59 p.m. Eastern Time one hundred (100) calendar days after the Certification Date, unless solicitation of the Qualifying Modification has been completed in accordance with section 601(h)(1) of PROMESA.

      (iv)    At 11:59 p.m. Eastern Time one hundred and twenty (120) calendar days after the Certification Date, unless the District Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to GDB, AAFAF, and the Requisite Bondholders.

      (v)    At 11:59 p.m. Eastern Time on the date that is thirty (30) calendar days after the date of entry of the Confirmation Order (the "**Outside Date**"), unless the Effective Date shall have occurred.

      (vi)    The Plan or disclosure statement is withdrawn, or GDB, or the Oversight Board or AAFAF, files any motion or pleading with the District Court that is not consistent with this RSA or the Restructuring Term Sheet in any material respect, and such motion or pleading has not been withdrawn before the earlier of (A) two (2) business days after GDB receives written notice from the Requisite Bondholders (in accordance with Section 24) that such motion or pleading is inconsistent with this RSA or the Restructuring Term Sheet in any material respect and (B) entry of an order of the District Court approving such motion or pleading.

14

(vii)   The District Court or any other applicable court of competent jurisdiction directs the appointment of a receiver or otherwise places GDB into receivership;

(viii)   The District Court grants relief that is (A) inconsistent with this RSA or the Restructuring Term Sheet in any respect that is materially adverse to the Supporting Bondholders or (B) would, or would reasonably be expected to, materially frustrate the purposes of this RSA, including by preventing the consummation of the Restructuring, unless GDB, or the Oversight Board or AAFAF, has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed, or vacated within ten (10) business days after the date of such issuance, except if such relief is granted pursuant to a motion by any Supporting Bondholder.

(ix)   GDB, or the Oversight Board or AAFAF, files, propounds, or otherwise supports any restructuring, plan or reorganization or plan of adjustment inconsistent with the Restructuring Term Sheet or fails to timely file with the District Court a statement that it does not support any such restructuring, plan or reorganization or plan of adjustment that has been filed with the District Court.

(x)   GDB, or the Oversight Board or AAFAF, files, propounds, or otherwise supports any motion, application or agreement seeking to sell all or a material portion of GDB's assets.

(xi)   GDB, or the Oversight Board or AAFAF, files, propounds, or otherwise supports or fails to timely object to any motion or pleading challenging the amount or validity of any GDB Bonds or any related Claim.

(xii)   GDB, or the Oversight Board or AAFAF on behalf of GDB, commences a proceeding under any applicable bankruptcy, insolvency or similar law other than a proceeding (including under Title III of PROMESA) to confirm and enforce the material terms of the Restructuring.

(xiii)   Any of the Definitive Documents shall have been modified in a manner adverse in any material respect to any Supporting Bondholder, without prior written consent of the Requisite Bondholders.

(xiv)   Parties other than the Supporting Bondholders foreclose on, attempt to seize or exercise remedies with respect to a lien on any assets of GDB having a fair market value in excess of $10 million in the aggregate.

(xv)   Any court of competent jurisdiction or other competent governmental or regulatory authority issues a ruling, judgment or order making illegal or otherwise preventing or prohibiting the consummation of the Restructuring, which ruling, judgment or order has not been reversed or vacated within thirty (30) business days after such issuance and is not subject to a stay.

(xvi)   The District Court or other court of competent jurisdiction enters an order denying confirmation of the Plan.

#89334613v60

Notwithstanding any provision in this RSA to the contrary, upon written consent of the Requisite Bondholders, each of the dates set forth in Section 6(a) may be extended prior to or upon such date and such later dates agreed to in lieu thereof and shall be of the same force and effect as the dates provided herein; provided that in the event that such a Supporting Bondholder ("**Non-Extending Bondholder**") does not consent to such an extension, but such extension receives the consent of the Requisite Bondholders, this RSA shall be deemed to have been terminated only as to such Non-Extending Bondholder, but this RSA shall continue in full force and effect in respect to all other Supporting Bondholders, unless and until the remaining Supporting Holders of Participating Bond Claims cease to constitute Majority Bondholders (or such lower threshold as determined by the Requisite Bondholders) for a period of 30 consecutive calendar days. No GDB Bondholder shall have any liability to any other GDB Bondholder arising from or related to any extensions pursuant to the terms of this RSA.

      (b)    A "**GDB Termination Event**" shall mean any of the following:

      (i)    The breach in any material respect by one or more of the Supporting Bondholders of any of the undertakings, representations, warranties, or covenants of the Supporting Bondholders set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to this Section 6 and Section 24 (as applicable), but only if the non-breaching Supporting Holders of Participating Bond Claims constitute less than the Majority Bondholders for a period of 30 consecutive calendar days.

      (ii)    The Supporting Bondholders fail to comply with Section 4(d) hereof.

      (iii)    The District Court grants relief that is inconsistent with this RSA or the Restructuring Term Sheet in any respect that is materially adverse to GDB, except if such relief is granted pursuant to a motion supported or encouraged by GDB, AAFAF or the Oversight Board.

      (iv)    At 11:59 p.m. Eastern Time sixty (60) calendar days after the Support Effective Date, unless the Certification Date shall have occurred

      (v)    At 11:59 p.m. Eastern Time one hundred (100) calendar days after the Certification Date, unless solicitation of the Qualifying Modification has been completed in accordance with section 601(h)(1) of PROMESA.

      (vi)    At 11:59 p.m. Eastern Time one hundred and twenty (120) calendar days after the Certification Date, unless the District Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to GDB, AAFAF, and the Requisite Bondholders.

      (vii)    At 11:59 p.m. Eastern Time on the date that is thirty (30) calendar days after the date of entry of the Confirmation Order, unless the Effective Date shall have occurred.

(viii)  The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment, or order has not been not stayed, reversed, or vacated within ten (10) business days after such issuance.

(ix)  Commencing on the Certification Date, and at any time thereafter, the Supporting Holders of Participating Bond Claims do not beneficially own or control at any time sufficient amount of GDB Bonds to constitute the Majority Bondholders for a period of 30 consecutive calendar days.

(x)  The District Court or other court of competent jurisdiction enters an order denying confirmation of the Plan.

(xi)  The governing board of directors of GDB adopts a resolution determining, after consultation with counsel, that materially changed circumstances exist creating a material impediment to effectuating the Restructuring as a Qualifying Modification under PROMESA or otherwise to consummating the Restructuring, thereby warranting a termination of this Agreement as a result of the board's fiduciary or statutory duties.

(c)  <u>Mutual Termination.</u>  This RSA may be terminated by mutual agreement of GDB and the Requisite Bondholders upon the receipt of written notice delivered in accordance with <u>Section 24</u>.

(d)  <u>Effect of Termination.</u>  Subject to the provisions contained in <u>Section 14</u>, upon the termination of this RSA in accordance with this <u>Section 6</u>, this RSA shall become void and of no further force or effect and each Party shall, except as otherwise provided in this RSA, be immediately released from its respective liabilities, obligations, commitments, undertakings, and agreements under or related to this RSA, shall have no further rights, benefits, or privileges hereunder, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this RSA and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; <u>provided that</u> in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder before the date of such termination.

(e)  <u>Automatic Stay.</u>  GDB acknowledges and agrees that the giving of notice of termination by any Party pursuant to this RSA shall not be a violation of the stay set forth in PROMESA; <u>provided that</u> nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not proper under the terms of this RSA.

7. **Definitive Documents; Good Faith Cooperation; Further Assurances.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation, and consummation of the Restructuring as well as the negotiation, drafting, execution, and delivery of the Definitive Documents. Upon written confirmation of an agreement (which confirmation may be by email) among the GDB Parties and the Requisite Bondholders on, and finalization of, the Definitive Documents, this RSA shall automatically be deemed amended to replace the Restructuring Term Sheet with the Definitive Documents as **Exhibit A** hereto and all references in this Agreement to the Restructuring Term Sheet shall be deemed to be references to the Definitive Documents, as applicable. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this RSA, and shall refrain from taking any action that would frustrate the purposes and intent of this RSA.

8. **Representations and Warranties.**

(a) Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true and correct as of the date hereof (or as of the date a Supporting Bondholder becomes a party hereto):

(ii) Except in the case of a Party that is an individual, such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and has all requisite corporate, partnership, limited liability company or similar authority to enter into this RSA and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder. The execution and delivery of this RSA and the performance of such Party's obligations hereunder have been duly authorized by any necessary corporate, limited liability company, partnership, or other similar action on its part.

(iii) The execution, delivery, and performance by such Party of this RSA does not and will not (A) violate any material provision of law, rule, or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party, except, in the case of GDB, for the filing of a Qualifying Modification with the District Court pursuant to Title VI of PROMESA.

(iv) The execution, delivery, and performance by such Party of this RSA does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except the filing of documents with the District Court as required by this RSA to effect the Restructuring and such filings as may be necessary or required by the SEC.

18

(v)     This RSA is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, concepts of reasonableness and general equitable principles.

(b)     Each Supporting Bondholder severally (and not jointly) represents and warrants to GDB that, as of the date hereof (or as of the date such Supporting Bondholder becomes a party hereto), such Supporting Bondholder (i) is the registered or beneficial owner of the aggregate principal amount of the GDB Bonds set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Supporting Bondholder that becomes a party hereto after the date hereof) and has (A) sole investment and voting discretion with respect to such GDB Bonds, (B) full power and authority to vote on and consent to matters concerning such GDB Bonds and to exchange, assign, and Transfer such GDB Bonds, and (C) full power and authority to bind or act on the behalf of any other beneficial owner(s) and (ii) is, and any other such other beneficial owner(s) is, an accredited investor as such term is defined in Rule 501(a) of Regulation D under the Securities Act.

9.     **Disclosure; Publicity.**     GDB shall endeavor to submit drafts to the Creditor Notice Parties of any press releases, public documents, and any and all filings with the SEC and/or any state or Commonwealth governmental agency regarding this RSA or any of the transactions contemplated hereunder at least two (2) business days before making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between GDB and any Supporting Bondholder, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Supporting Bondholder), other than advisors to GDB, the identity of any Supporting Bondholder and/or the principal amount or percentage of GDB Bonds held by the applicable Supporting Bondholder, in each case, without such Supporting Bondholder's prior written consent; provided that (a) if such disclosure is required by law, subpoena or other legal process or regulation, the disclosing Party shall afford the relevant Supporting Bondholder a reasonable opportunity to review and comment before such disclosure and shall take all reasonable measures to limit such disclosure, (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of GDB Bonds held by all Supporting Bondholders collectively and (c) any Party may disclose information requested by a U.S. federal or state regulatory authority with jurisdiction over its operations to such authority without limitation or notice to any Party or other person or entity.  Notwithstanding the provisions in this Section 9, any Party may disclose, to the extent consented to in writing by a Supporting Bondholder, such Supporting Bondholder's individual holdings.  Any public filing of this RSA, with the District Court or otherwise, which includes executed signature pages to this RSA shall include such signature pages only in redacted form with respect to the holdings of each Supporting Bondholder (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the District Court under seal).

10.     **Amendments and Modifications.**     Except as otherwise expressly set forth herein, this RSA (including the Restructuring Term Sheet and any exhibits or schedules hereto and thereto) and the Plan may not be waived, modified, amended, or supplemented except in a writing signed by GDB (or, if authorized, AAFAF on GDB's behalf) and the Requisite Bondholders; provided that (a) any modification, amendment or change to the definition of

"Supporting Bondholders" or "Requisite Bondholders" shall require the written consent of each Supporting Bondholder and (b) any waiver, change, modification, or amendment to this RSA, the Restructuring Term Sheet, or the Plan that adversely affects the treatment of any Supporting Bondholder compared to the treatment set forth in the Restructuring Term Sheet, or that provides more favorable treatment to any Supporting Bondholder compared to the treatment set forth in the Restructuring Term Sheet, may not be made without the written consent of each such materially adversely affected Supporting Bondholder. In the event that such an adversely affected Supporting Bondholder ("**Non-Supporting Bondholder**") does not consent to a waiver, change, modification, or amendment to this RSA requiring its consent, but such waiver, change, modification, or amendment receives the consent of the Requisite Bondholders, this RSA shall be deemed to have been terminated only as to such Non-Supporting Bondholder, but this RSA shall continue in full force and effect in respect to all other Supporting Bondholders, unless and until the remaining Supporting Holders of Participating Bond Claims cease to constitute the Majority Bondholders (or such lower threshold as determined by the Requisite Bondholders) for a period of 30 consecutive calendar days, at which time this RSA shall terminate automatically as to all Parties. No GDB Bondholder shall have any liability to any other GDB Bondholder arising from or related to any waivers, modifications, amendments or supplements pursuant to the terms of this RSA.

11. **Effectiveness.** This RSA shall become effective and binding upon each Party upon the Support Effective Date; provided that copies of signature pages executed by Supporting Bondholders shall be delivered to (a) other Supporting Bondholders in a redacted form that removes such Supporting Bondholders' holdings of the GDB Bonds and (b) O'Melveny and other advisors of either GDB or AAFAF in an unredacted form (to be held by O'Melveny and such other advisors on a professionals' eyes only basis).

12. **Governing Law; Jurisdiction; Waiver of Jury Trial.**

(a) This RSA shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York and PROMESA, without giving effect to the conflict of laws principles thereof; provided that any issues addressing the fiduciary or statutory duties of GDB or its governing board shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this RSA (or the transactions contemplated hereby) brought by any Party or its successors or assigns shall be brought in any federal district court sitting in Puerto Rico and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereto (collectively, the "**Puerto Rico Courts**"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Puerto Rico Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this RSA and the Restructuring. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in any federal district court sitting in Puerto Rico, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Puerto Rico Court. Each of the Parties further agrees that notice as provided in Section 24 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives and agrees not

20

to assert that (i) a proceeding in any federal court sitting in the Puerto Rico district is brought in an inconvenient forum, (ii) the venue of such proceeding is improper or (iii) that any federal district court sitting in Puerto Rico and any appellate court from any thereof lacks jurisdiction over such proceeding or any party thereto. For the avoidance of doubt, the GDB Parties submit to the jurisdiction of any federal district court sitting in Puerto Rico and any appellate court from any thereof and irrevocably waive any immunity from suit in federal court that they may have for any action or proceeding arising out of or relating to this RSA and the Restructuring.

(b)   Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this RSA or the transactions contemplated hereby (whether based on contract, tort or any other theory).

13.   **Specific Performance/Remedies.**   The Parties understand and agree that money damages would be an insufficient remedy for any breach of this RSA by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy. Specific performance and the right to terminate this Agreement in accordance with Section 6 of this Agreement shall be the sole and exclusive remedies for any breach of this RSA by any Party. Each Party hereby waives any requirement for security or the posting of any bond in connection with such remedies.

14.   **Survival.**   Notwithstanding the termination of this RSA pursuant to Section 6, Sections 9 and 12-24 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided that any liability of a Party for failure to comply with the terms of this RSA prior to the date of such termination shall survive such termination.

15.   **Headings.**   The headings of the sections, paragraphs, and subsections of this RSA are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this RSA.

16.   **Successors and Assigns; Severability.**   This RSA is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided that nothing contained in this Section 16 shall be deemed to permit Transfers of the GDB Bonds or any related Claims other than in accordance with the express terms of this RSA. If any provision of this RSA, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this RSA shall continue in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this RSA so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

17. **Several, Not Joint, Obligations.** The agreements, representations, warranties, and obligations of the Parties under this RSA are, in all respects, several and not joint.

18. **Relationship Among Parties.** Unless expressly stated herein, this RSA shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof. No Party shall have any responsibility for any trading by any other entity by virtue of this RSA. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement. Except as expressly set forth herein or in the Restructuring Term Sheet, nothing in this RSA or the Restructuring Term Sheet shall be construed to affect any actual or potential claims arising from any obligation of the Government of Puerto Rico or any of its instrumentalities other than GDB. Nothing in this RSA or the Restructuring Term Sheet shall constitute or be construed as a waiver or release of any claims or causes of action against GDB or any of its affiliates prior to the Effective Date.

19. **Collateral Preservation.** All Parties to this RSA agree to use commercially reasonable efforts to take all actions reasonably necessary and reasonably within such Party's control to preserve the value of the New Bond Collateral (as defined in the Restructuring Term Sheet).

20. **Fees & Expenses.** GDB shall pay all reasonable documented fees and expenses incurred in connection with or related to the Restructuring and the New Bonds (as defined in the Restructuring Term Sheet) of the following professionals: (a) Davis Polk, as legal advisor to the Ad Hoc Group (and the fees and expenses of local counsel to the Ad Hoc Group), (b) Ducera Partners LLC, as financial advisor to the Ad Hoc Group, (c) Marichal, Hernández, Santiago & Juarbe, LLC, as legal advisor to Grupo ES, (d) González Torres & Co., CPA, PSC, as accounting advisor to Grupo ES, (e) Nevares, as legal advisor to Alianza, (f) HRML & Asociados, LLC, as legal advisor to Alianza, (g) Atlas Asset Management, LLC, as financial advisor to Alianza, Grupo ES, and other agreed entities (h) Picó & Blanco, as legal advisor to Bonistas del Patio, (i) Jorge Irizarry, as financial advisor to Bonistas del Patio and (j) Carlos Rodriguez, as financial advisor to Bonistas del Patio.

21. **Preservation of Rights.** Except as expressly provided in this Agreement with respect to a Qualifying Title III Plan,[2] the Parties do not waive or relinquish any rights, defenses and remedies, contractual or otherwise, under Title III or any other provision of PROMESA or any other law or regulation. Upon termination of this RSA, (i) no Party shall be precluded, by virtue of having been a Party to this Agreement or otherwise having engaged in negotiations regarding the Restructuring, from exercising any and all rights, defenses and remedies, whether contractual or otherwise, in connection with any proceeding under Title III or under any other provision of PROMESA or any other law or regulation and (ii) no provision of

---

[2] For the avoidance of doubt, no Title III Plan shall constitute a Qualifying Title III Plan without the consent of holders of 66 and 2/3% of GDB Bonds held by Supporting Noteholders that are "cooperativas" insured by COSSEC, and any such Qualifying Title III Plan shall implement the Restructuring in accordance with the Restructuring Term Sheet attached as Exhibit A hereto.

this Agreement or other document related to the Restructuring, or statement made during the negotiations thereof, shall be used against any Party in any proceeding under Title III or any other provision of PROMESA or otherwise. Notwithstanding the generality of the foregoing and for the avoidance of doubt, no Party shall be placed in a worse position in a Title III proceeding that does not implement the Restructuring (by virtue of being a party hereto), and in particular no Party shall be precluded from asserting any claim, right or defense, and each Party shall preserve each of its rights and defenses and shall not be impeded by this Agreement from bringing before any applicable court any available averment, defenses and priority allegation, including the assertion of priority rights under Puerto Rico Law Num. 40 of 2016, or from challenging or contesting any such rights, defenses, averments, defenses, priority allegations, whether under such law or otherwise, on any grounds.

22. **Prior Negotiations; Entire Agreement.** This RSA, including the exhibits and schedules hereto (including the Restructuring Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements executed between GDB and each Supporting Bondholder before the execution of this RSA shall continue in full force and effect.

23. **Counterparts.** This RSA may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this RSA delivered by PDF shall be deemed to be an original for the purposes of this paragraph.

24. **Notices.** All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

     (a)    If to GDB, to:

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attention:   John Rapisardi and Suzanne Uhland
E-mail:      jrapisardi@omm.com; suhland@omm.com

     (b)    If to the Supporting Bondholders or the Creditor Notice Parties, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10170
Attention:   Don Bernstein, Brian Resnick and Jordan Weber
E-mail:      Donald.Bernstein@davispolk.com; Brian.Resnick@davispolk.com;
                Jordan.Weber@davispolk.com

Picó & Blanco LLC
P.O. Box 9479
San Juan, PR 00908-9479
Attention:    Ana M. del Toro Sabater
E-mail:       adtoro@pico-blanco.com

Nevares, Sánchez-Álvarez & Cancel, P.S.C.
Urb. Altamesa
1307 San Alfonso Ave.
San Juan, PR 00921-3622
Attention:    Andrés R. Nevares and Lemuel Cancel-Méndez
E-mail:       anevares@nsaclaw.com; lcancel@nsaclaw.com

Marichal, Hernández, Santiago & Juarbe, LLC
P.O. Box 190095
San Juan, PR 00919-0095
Attention:    Rafael M. Santiago Rosa and Vanessa Medina-Romero
E-mail:       rsantiago@mhlex.com; vmedina@mhlex.com

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission.

       **25.**    **Settlement Discussions.**   This RSA is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this RSA, the Restructuring Term Sheet and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the RSA's terms.

       **26.**    **No Solicitation; Adequate Information.**   This RSA is not and shall not be deemed to be a solicitation for consents to the Plan. The votes of the holders of Claims against GDB will not be solicited until such holders who are entitled to vote on the Plan have received the required solicitation from the Information Agent (as defined in PROMESA). In addition, this RSA does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

       **27.**    **Interpretation; Rules of Construction; Representation by Counsel.** When a reference is made in this RSA to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this RSA unless otherwise indicated. Unless the context of this RSA otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire RSA, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal

counsel during the negotiation and execution of this RSA and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

      **28.**   **<u>Treatment of Local Bondholders.</u>**  The Supporting Bondholders agree that each Supporting Bondholder will not seek to recover from other Supporting Bondholders or share any federal, state or Commonwealth tax credits or other benefits any of the Supporting Bondholders may realize as a result of losses on their investment in GDB; <u>provided,</u> <u>however,</u> <u>that</u> the foregoing prohibition shall not be applicable if such benefits are funded from assets belonging to GDB.

[*Signature pages follow*.]

25

*Signature Pages Omitted*

## EXHIBIT A

**Restructuring Term Sheet**

**EXHIBIT A to**
**Restructuring Support Agreement**

**Government Development Bank for Puerto Rico**

**OUTLINE OF TRANSACTION STRUCTURE FOR RESTRUCTURING OF GDB LIABILITIES**

This term sheet (the "Term Sheet") is a summary of indicative terms and conditions for a proposed financial restructuring of GDB through a Qualifying Modification (the "Restructuring" or the "Qualifying Modification") pursuant to Title VI of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA"), of certain financial obligations of the Government Development Bank for Puerto Rico ("GDB"), including (i) bonds issued and outstanding pursuant to that certain trust indenture dated as of February 17, 2006 between GDB and Wilmington Trust, National Association, as successor trustee (the "Existing GDB Public Bonds"), and (ii) certain deposits and other outstanding obligations of GDB identified below.

This Term Sheet is solely for the purposes set forth in the Restructuring Support Agreement (the "RSA") dated May __, 2017 among GDB and certain holders of the Existing GDB Public Bonds, and acknowledged and agreed to by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and, except to the extent provided in the RSA, does not constitute a commitment by any party, and in any event is subject to the terms and conditions hereof, including, without limitation, requisite approvals under Title VI of PROMESA and execution and delivery of definitive agreements (the "Definitive Documents").

| Issuer of New Bonds | *Special Purpose Entity.* The issuer of the New Bonds (as defined below) (the "Issuer") will be a special purpose entity created by Puerto Rico statute as an instrumentality of Puerto Rico and structured in a manner similar to a conventional securitization vehicle. The form of the Issuer shall be acceptable to the Requisite Bondholders, as defined in the RSA (the "RSA Requisite Bondholders").[1] |
|---|---|
| | *Trustee for New Bonds.* An indenture trustee will act for the benefit of holders of New Bonds and will be granted a lien on the New Bond Collateral (as defined below) for the benefit of the holders of New Bonds. The trustee (or, if necessary, a designated calculation agent or other service provider for certain tasks the trustee is unable or unwilling to perform) will perform administrative functions for the Issuer customary for transactions of this type. |
| | *Asset Manager and Collateral Monitor.* The assets of the Issuer will be managed by a designated asset manager or servicer (the "Asset Manager") pursuant to an asset management and servicing agreement with the Issuer (the "Servicing Agreement"). The identity of the initial Asset Manager and terms of the initial Servicing Agreement (including compensation) shall be acceptable to the RSA Requisite Bondholders.[2] A person satisfactory to the RSA Requisite |

---

[1] The type of entity used, its equity ownership and other structural elements of the Issuer will be subject to tax, Investment Company Act, accounting and other considerations. In the event that the proposed securitization structure cannot be implemented in a form that is acceptable to the RSA Requisite Bondholders, the New Bonds will be issued by GDB and secured so as to create for the benefit of the holders of the New Bonds as nearly as possible the same economic interests and protections provided for in this term sheet.

[2] If the Asset Manager is provided with an incentive compensation arrangement based on asset recoveries, the position of incentive compensation arrangements in the distribution waterfall shall be acceptable to the RSA

| | |
|---|---|
| | Bondholders (the "Collateral Monitor") will be engaged by the indenture trustee on terms acceptable to the RSA Requisite Bondholders to monitor the condition and performance of the New Bond Collateral and provide a certification report semiannually.[3]<br><br>For more information regarding the structure of and governance of the Issuer and the Servicing Agreement, see *Structure and Governance of Issuer* below. |
| **Participating Bond Claims** | The holders ("Holders") of the following liabilities of GDB (the "Participating Bond Claims"), together with the Designated Depositor Claims (as defined below), will be subject to and bound by the Qualifying Modification pursuant to Title VI of PROMESA:<br><br>• All claims for principal and accrued interest in respect of Existing GDB Public Bonds;<br><br>• The deposit claims against GDB identified in Schedule 1 hereto;<br><br>• The claims in respect of the outstanding letters of credit issued by GDB set forth on Schedule 2; and<br><br>• The claims in respect of the outstanding guarantees issued by GDB set forth on Schedule 3.[4]<br><br>For the avoidance of doubt, liabilities of GDB that are not Participating Bond Claims (except for the Designated Depositor Claims) will not be the subject of the Qualifying Modification, but the Qualifying Modification shall be subject to and conditioned upon the treatment of such claims to the extent specified below. |
| **Overview of Restructuring** | *Exchange of Participating Bond Claims for New Bonds*<br><br>GDB and the Holders of the Participating Bond Claims and the Holders of the |

Requisite Bondholders. GDB will act as initial Asset Manager for a period not to exceed twelve (12) months from the Closing Date (such period, the "Transition Period"). A designated back-up servicer (the "Back-Up Asset Manager"), which shall be a "qualified" and "independent" (as such terms are defined in the Definitive Documents) firm of recognized national standing with the requisite expertise and Spanish speaking capability, and which is acceptable to GDB, AAFAF and the RSA Requisite Bondholders, will be engaged not later than the Closing Date to assume the responsibilities of the Asset Manager as soon as practicable and in any event before the end of the Transition Period, on arms-length, market terms in form and substance satisfactory to GDB, AAFAF, and the RSA Requisite Bondholders. The Back-Up Asset Manager will be selected by a competitive RFP process prior to the solicitation of holders of Participating Bond Claims, and GDB shall use commercially reasonable efforts to effectuate the transition of its duties as Asset Manager to the Back-Up Asset Manager as soon as practicable.

[3] The terms of engagement of the Collateral Monitor shall be in form and substance satisfactory to the RSA Requisite Bondholders, GDB, and AAFAF.

[4] No New Bonds will be issued at closing in respect of L/Cs that are undrawn and guarantees as to which no claim has been made and that are Participating Bond Claims (as specified in Schedule 2 and Schedule 3, respectively), in each case prior to the Closing Date. If, subsequent to the Closing Date, valid claims are made on such L/Cs or Guarantees, Tranche C Bonds will be issued to such Holders at that time on account of such claims (subject to the Parties' (as defined in the RSA) ongoing review of certain guarantees).

| Transaction | Designated Depositor Claims will undertake a financial restructuring of the Participating Bond Claims and Designated Depositor Claims (as defined below) through a Qualifying Modification implemented under Title VI of PROMESA on the terms and conditions set forth herein.  Pursuant to such Qualifying Modification, on the date on which the conditions described under "Conditions" below have all been satisfied or waived by the RSA Requisite Bondholders (the "Closing Date"): |
|---|---|
|  | <ol><li value="1" type="i">all Holders of Participating Bond Claims will exchange their Participating Bond Claims for one or more of three tranches of new bonds issued by the Issuer, "Tranche A Bonds", "Tranche B Bonds", or "Tranche C Bonds", with terms as specified below (such bonds, the "New Bonds"), which New Bonds shall be book-entry only bonds held by DTC;[5] and</li><li value="2" type="i">GDB will transfer the New Bond Collateral to the Issuer in consideration for the Issuer's issuance of the New Bonds in connection with the exchange of the Participating Bond Claims as set forth above.</li></ol> Each Holder of Participating Bond Claims shall exchange such Holder's Participating Bond Claims into one or more tranches of New Bonds, as elected by each such Holder, in connection with the Qualifying Modification. <br><br>If a Holder fails to submit a timely election to participate in a tranche of New Bonds, such Holder will be deemed to have elected to exchange such Holder's Participating Bond Claims into Tranche C Bonds. <br><br>For each $1,000 of Participating Bond Claims held by a Holder (which, for the avoidance of doubt, shall include principal plus accrued interest up to but not including the Closing Date in respect of Existing GDB Public Bonds), such Holder shall receive, pursuant to such Holder's election as set forth above: <br><br> • Tranche A Bonds (Taxable) having a face amount equal to $550; <br><br> • Tranche B Bonds (Taxable) having a face amount equal to $600; or <br><br> • Tranche C Bonds (Taxable) having a face amount equal to $750. <br><br>*Payments from Available Cash* <br><br>In the absence of acceleration of the New Bonds, payments of principal and interest to holders of New Bonds shall be made solely from Available Cash (as defined below) of the Issuer, as provided below. <br><br>*Security* <br><br>The Tranche A Bonds and Tranche B Bonds will be secured on a *pari passu* |

---

[5] Holders of Participating Bond Claims will retain the balance of their Participating Bond Claim until the New Bond Collateral has been applied in its entirety to repayment of the New Bonds.  See "Residual Participating Bond Claim" below.

<table>
<tr><td></td><td>

basis by a first priority lien on the New Bond Collateral (as defined below) and the Tranche C Bonds will be secured by a second priority lien on the New Bond Collateral.

*Designated Depositor Settlement*

It is a condition to closing of the Qualifying Modification that certain agencies, instrumentalities, and affiliates of the Commonwealth that are set forth in Schedule 7 (the "Designated Depositors") shall have entered into a Settlement Agreement with respect to such Designated Depositor's deposit claims against GDB (each a "Designated Depositor Settlement Agreement"), and that each Designated Depositor Settlement Agreement shall have become binding and effective. Pursuant to the Designated Depositor Settlement Agreements, each Designated Depositor shall release all of its claims (the "Designated Depositor Claims") against GDB, the Issuer, and their respective assets and stakeholders in exchange for (i) GDB's release of any claims GDB may have against such Designated Depositor and (ii) a *pro rata* share of the beneficial interests in a trust (the "Public Entity Trust") that will hold the assets currently owned by GDB and identified in Schedule 8 hereto (the "Public Entity Trust Assets"). The Public Entity Trust Assets shall be transferred by GDB to the Public Entity Trust on the Closing Date or as promptly thereafter as practicable. The trustee of the Public Entity Trust will enter into a management agreement with GDB pursuant to which GDB will manage the assets of the Public Entity Trust.[6]

*Excess CAE Settlement*

All municipalities for which excess CAE deposits have not been disbursed for fiscal year 2015, 2016, and 2017 (estimated at $38 million in the aggregate) shall receive a 55 cents on the dollar recovery to be paid in cash by GDB on or after the Closing Date, *provided that* such Designated Depositors enter into a Settlement Agreement waiving the balance of any such claims and otherwise releasing GDB and the Issuer from any claims or causes of action related thereto.

</td></tr>
<tr><td>

**Terms of Tranche A Bonds**

</td><td>

*Payment of Interest from Available Cash*

7.500% annual coupon rate, payable semiannually[7] in cash; *provided that*, if on any "Determination Date" (a date not more than 10 business days prior to the related interest payment date) in respect of the related interest payment date Available Cash is not sufficient to pay in full all interest then payable on all tranches of the New Bonds (including paid in kind interest coming due and payable at such time), accrued interest on all tranches of New Bonds shall be paid in cash *pro rata* to the extent of Available Cash and any unpaid balance thereof shall be paid in kind. All outstanding paid in kind interest (including any interest accrued thereon) shall be due and payable, together with other accrued interest on the New Bonds, on the immediately following

</td></tr>
</table>

---

[6] Allocation of residual value of Issuer and Public Entity Trust shall take into account relevant tax and other considerations.

[7] Subject to confirmation of alignment with material cash flows.

| | interest payment date (subject to the above provisions if Available Cash is then insufficient to make such payments in cash).<br><br>*Amortization on Closing Date*<br><br>Any Available Cash of the Issuer as of the Closing Date shall be paid to the holders of, and used to reduce, on a *pro rata* basis, the principal balance of, the Tranche A Bonds and Tranche B Bonds on the Closing Date or as soon as practicable thereafter but in no event later than 5 business days following the Closing Date.<br><br>*Amortization from Excess Available Cash*<br><br>On each Determination Date in respect of the related interest payment date, if Available Cash of the Issuer exceeds the amount thereof to be used to pay interest on the New Bonds on such interest payment date, such excess amount of Available Cash ("Excess Available Cash" on such interest payment date) shall be used to amortize the unpaid principal of the Tranche A Bonds and Tranche B Bonds *pro rata*.<br><br>*Collateral Priority*<br><br>Tranche A Bonds will be secured by a first priority lien on the New Bond Collateral shared on a *pari passu* basis with Tranche B Bonds.<br><br>*Maturity*<br><br>July 1, 2040 |
|---|---|
| **Terms of Tranche B Bonds** | *Payment of Interest from Available Cash*<br><br>5.500% annual coupon rate, payable semiannually[8] in cash; *provided that*, if on any Determination Date in respect of the related interest payment date Available Cash is not sufficient to pay in full all interest then payable on all tranches of the New Bonds (including paid in kind interest coming due and payable at such time), accrued interest on all tranches of New Bonds shall be paid in cash *pro rata* to the extent of Available Cash and any unpaid balance thereof shall be paid in kind. All outstanding paid in kind interest (including any interest accrued thereon) shall be due and payable, together with other accrued interest on the New Bonds, on the immediately following interest payment date (subject to the above provisions if Available Cash is then insufficient to make such payments in cash).<br><br>*Amortization on Closing Date*<br><br>Any Available Cash of the Issuer as of the Closing Date shall be paid to the holders of, and used to reduce, on a *pro rata* basis, the principal of the Tranche A Bonds and Tranche B Bonds on the Closing Date or as soon as practicable thereafter but in no event later than 5 business days following the |

---

[8] Subject to confirmation of alignment with material cash flows.

| | Closing Date. |
|---|---|
| | *Amortization from Excess Available Cash* |
| | On each Determination Date in respect of the related interest payment date, all Excess Available Cash on such interest payment date shall be used to amortize the unpaid principal of the Tranche A Bonds and Tranche B Bonds *pro rata*. |
| | *Collateral Priority* |
| | Tranche B Bonds will be secured by a first priority lien on the New Bond Collateral shared on a *pari passu* basis with Tranche A Bonds. |
| | *Maturity* |
| | July 1, 2040 |
| **Terms of Tranche C Bonds** | *Payment of Interest from Available Cash* |
| | 3.500% annual coupon rate, payable semiannually[9] in cash; *provided that*, if on any Determination Date in respect of the related interest payment date Available Cash is not sufficient to pay in full all interest then payable on all tranches of the New Bonds (including paid in kind interest coming due and payable at such time), accrued interest on all tranches of New Bonds shall be paid in cash *pro rata* to the extent of Available Cash and any unpaid balance thereof shall be paid in kind. All outstanding paid in kind interest (including any interest accrued thereon) shall be due and payable, together with other accrued interest on the New Bonds, on the immediately following interest payment date (subject to the above provisions if Available Cash is then insufficient to make such payments in cash). |
| | *Amortization from Excess Available Cash* |
| | On each Determination Date in respect of the related interest payment date, all Excess Available Cash on such interest payment date shall be used to amortize the unpaid principal of the Tranche C Bonds, *provided that* such principal amortization shall occur only from Excess Available Cash on or after the interest payment date upon which principal of the Tranche A Bonds and Tranche B Bonds has been paid in full. |
| | *Collateral Priority* |
| | Tranche C Bonds will be secured by a second priority lien on the New Bond Collateral. |
| | *Maturity* |
| | July 1, 2040 |

---

[9] Subject to confirmation of alignment with material cash flows.

| New Bond Collateral | The "New Bond Collateral" shall include all assets held from time to time by the Issuer, including assets transferred by GDB to the Issuer on the Closing Date and thereafter pursuant to the Definitive Documents, and any future-acquired assets and any proceeds of the foregoing. |
|---|---|
| | On the Closing Date, all assets of GDB (whether or not identified on the Closing Date), other than the Excluded Assets (as defined below) will be irrevocably assigned and transferred to the Issuer, including, without limitation, (i) the public sector and municipal loans, advances to the Municipal Fund Administration and Municipal Financing Corporation, and GDB properties identified in Schedule 4 and Schedule 5 hereto, and (ii) all unrestricted cash and cash equivalents of GDB in excess of the Specified Cash Assets (as defined below). |
| | "Excluded Assets" means (i) the public entity loans listed on Schedule 6 held at GDB; *provided that* the right to receive the net proceeds, if any, from any such public entity loans shall be New Bond Collateral and GDB agrees that any such proceeds shall be transferred to the Issuer as soon as practicable but in no event later than 15 days after receipt thereof; (ii) cash to pay any transaction costs of the Restructuring, including professional fees and expenses of GDB, AAFAF, and the professionals to be paid pursuant to the RSA; (iii) causes of action, including contingent or unknown, held by GDB as of the Closing Date *provided that* the right to receive the net proceeds, if any, from any such causes of action or proceeds received by GDB in respect of other contingent or unknown assets, shall be New Bond Collateral and any such proceeds shall be transferred to the Issuer as soon as practicable but in no event later than 15 days after receipt thereof[10]; (iv) Public Entity Trust Assets, (v) loans and funds that are collateral for the Secured Deposit Account (as defined below) and (vi) certain Specified Cash Assets, to be retained by GDB. |
| | The "Specified Cash Assets" shall equal the sum of (a) the Vendor Claim Reserve (as defined below), (b) restricted cash held by GDB[11] and (c) $25 million minus fees payable to GDB as Asset Manager during the Transition Period or such other amount for operating cash requirements of GDB as may be acceptable to the RSA Requisite Bondholders; *provided that* the right of the Issuer to receive the Vendor Claim Reserve Residual shall constitute New Bond Collateral and, once identified, such Vendor Claim Reserve Residual shall be delivered to the Issuer as set forth below. |
| | The "Vendor Claim Reserve Residual" shall be the amount equal to any cash or cash equivalents remaining in the account in respect of the Vendor Claim Reserve after the payment of all Unresolved Disputed Vendor Claims (as defined below) determined by GDB to be valid. Any cash or cash equivalents related |

---

[10] Except for the Excluded Assets, any unknown assets shall be part of the New Bond Collateral transferred to the Issuer on the Closing Date, and upon discovery of any such unknown assets, GDB shall take any necessary steps to complete the transfer thereof to the Issuer, pending which such assets shall be held in trust for the Issuer.

[11] Restricted cash includes cash held in a segregated account separate from Available Cash , in an aggregate amount of approximately $27.5 million,for (i) the Employee's Incentive, Retirement and Retraining Program established under Act 70-2010; (ii) employee benefits under the early retirement windows of 1994, 2000 and 2007; (iii) the Voluntary Pre-Retirement Program established under Act 211-2015; and (iv) the voluntary separation program included in GDB's certified fiscal plan.

| | thereto shall be transferred to the Issuer after such determination as part of the New Bond Collateral. |
|---|---|
| | Any New Bond Collateral not transferred to the Issuer on the Closing Date, such as assets identified after the Closing Date, the Vendor Claim Reserve Residual, and the proceeds of settlement of any claims in existence on the Closing Date (net of the expenses associated with obtaining such settlement proceeds) shall be delivered to the Issuer within 15 days after it becomes known and identifiable.[12] |
| | All proceeds of New Bond Collateral, whenever received and including without limitation cash payable to the Issuer in respect of loans and advances included in the New Bond Collateral, will remain in the ownership and control of the Issuer, subject to a perfected security interest securing the New Bonds.[13] |
| | With respect to the public entity loans held at the Issuer listed on Schedule 5, if the Issuer is treated *pari passu* with other debt holders of the same legal priority, the Issuer and the Asset Manager shall not be permitted to pursue any collection or enforcement actions related to such loans, and the Asset Manager shall enforce any and all rights and remedies in a proceeding under Title III or Title VI of PROMESA of any such public entities only to the extent necessary and appropriate in order to ensure that the Issuer receives a distribution (if any) in such proceeding consistent with distributions to creditors holding claims with the same legal priority as the claims of the Issuer. |
| **Events of Default / Acceleration** | "<u>Events of Default</u>" in respect of the New Bonds shall include the following: <br><br> • Failure to make any required payment of principal or interest from Available Cash in respect of any of the New Bonds, on the dates on which the same are due; <br><br> • Any insolvency, bankruptcy, reorganization, restructuring, receivership or any other form of debtor relief is sought by or against the Issuer, whether under federal or Puerto Rico law; <br><br> • Any legislation is enacted, governmental[14] action is taken, or party (other than an obligor under the New Bond Collateral) is determined by a final nonappealable order or admitted in writing by the Issuer to have rights that, in any such case, adversely affects (i) the receipt of current or future proceeds of New Bond Collateral to which the Issuer is entitled (other than by reason of the default by the obligor under such New Bond |

---

[12] As noted above, the proceeds of retained public loans and the net proceeds of contingent causes of action will also be turned over to the Issuer upon receipt.

[13] This presumably will be arranged through accounts maintained by the trustee. As noted above, proceeds of New Bond Collateral previously directed to GDB will have to be paid directly to the Issuer or the Servicing Agent pursuant to any necessary agreements or legislation.

[14] Governmental action for these purposes shall include the government of Puerto Rico, its instrumentalities and any government-controlled or managed entities, including entities with directors or management controlled or appointed by the government of Puerto Rico.

| | Collateral) in respect of assets having an aggregate value on the Closing Date of $25 million or more[15] or (ii) the binding effect or enforcement in accordance with their respective terms of the Qualifying Modification, any Designated Depositor Settlement Agreement, the New Bonds or the liens on the New Bond Collateral;<br><br>• Entry of a judgment against the Issuer in the amount of $10 million or more; and<br><br>• Other customary events of default.<br><br>If an Event of Default occurs and is continuing, at the request of holders of at least 25% in aggregate principal amount of all New Bonds, subject to customary provisions related to rights of the trustee, the trustee shall, by notice to the Issuer and the Asset Manager, declare the outstanding principal amount of all the New Bonds to be immediately due and payable. Upon such a declaration, the outstanding principal amount of each tranche of the New Bonds shall be due and payable immediately. |
|---|---|
| **Covenants** | The indenture for the New Bonds (the "Indenture") shall contain covenants in form and substance acceptable to the RSA Requisite Bondholders, including covenants regarding the Asset Manager, information, budgeting, collateral management, negative pledge, further assurances, permitted business activities, limitation on assets sales, limitation on investments and other customary covenants.<br><br>Among other things, the covenants will provide that:<br><br>1. The Issuer shall enter into a continuing disclosure agreement that requires, no less than annually, the Issuer to provide or cause to be provided audited annual reports to the holders of New Bonds[16] regarding the assets, liabilities and cash flows of the Issuer, as well as other financial information, in each case in form and substance as specified in the continuing disclosure agreement.<br><br>2. The continuing disclosure agreement shall require the Issuer to provide or cause to be provided to the holders of New Bonds, not later than a specified date prior to the beginning of each fiscal year, a detailed annual operating budget indicating the Issuer's good faith projection of monthly operating expenditures of the Issuer for the upcoming fiscal year.<br><br>3. In addition, the continuing disclosure agreement shall require the issuer to provide or cause to be provided to the holders of New Bonds, (i) a |

---

[15] The value of an asset for this purpose is the face amount of such asset (in the case of loans) or the book value of such asset (in the case of other assets).

[16] The first audited reports of the Issuer shall be provided within 180 days after the end of the Issuer's first fiscal year ending after the Closing Date. Reports to holders of New Bonds may be provided through appropriate web posting in a form to be agreed.

| | quarterly update of the year's operating budget to show actual expenditures for the quarter(s) then ended, and projected expenditures for the remainder of the fiscal year, reconciled to the previously posted budget for such periods and (ii) a semiannual report of the Collateral Monitor regarding the Compliance Test (as defined below) and regarding any material actions taken with regard to the New Bond Collateral or any actions taken with regard to non-performing loans. |
|---|---|
| | 4. The continuing disclosure agreement will also require the Issuer to provide or cause to be provided any further disclosures, if any, required in connection with any required compliance with Rule 15c2-12 under the Securities Act as requested by the participating underwriter(s), if any. |
| | 5. Issuer's expenditures other than for debt service during any four consecutive fiscal quarters shall not exceed certain agreed amounts plus the fees and expenses payable to the trustee and the Asset Manager pursuant to the Indenture and the Servicing Agreement. |
| **Structure and Governance of Issuer** | *Approval by Requisite Bondholders.* The structure and governance of the Issuer, the form of indenture for the New Bonds and other related documents, and the identity and terms of employment of the Collateral Monitor and the Back-Up Asset Manager shall be acceptable with the RSA Requisite Bondholders.<br><br>*Cash Flow Tests for Compliance.* GDB has delivered a projection of municipal loan interest and amortization through 2040 (the "Cash Forecast") exhibited hereto as Schedule 9. The Asset Manager will provide a semiannual report to the Collateral Monitor with updated municipal loan interest collections and amortization collections to be used for testing purposes on a semiannual basis (the date of each such report, a "Test Date") for purposes of the Collateral Monitor's semiannual report of compliance with the Compliance Test, as provided above. New Bond Requisite Holders may request the replacement of the Asset Manager if the cumulative shortfall of the actual municipal loan portfolio cash flows as compared to the forecasted cash flows in the Cash Forecast from 7/1/17 through the Test Date is not less than 10.0% (the "Compliance Test") as of each applicable Test Date.<br><br>*Replacement of Asset Manager.* At the direction of the New Bond Requisite Holders, the Asset Manager may be removed and replaced by a "qualified" and "independent" (as such terms are defined in the Definitive Documents) successor Asset Manager of recognized national standing with the requisite expertise and Spanish speaking capability designated by the New Bond Requisite Holders on such terms as may be approved by such New Bond Requisite Holders (a) for cause (including if the Asset Manager enters into commercially unreasonable modifications, extensions or accommodations in respect of the New Bond Collateral) or (b) if (i) the Compliance Test is not met or (ii) information necessary to verify compliance with the Compliance Test as of any Test Date is not made available on a timely basis; *provided that* if GDB is replaced as Asset Manager, the Back-Up Asset Manager will be the replacement Asset Manager.<br><br>In all events Issuer will be structured so as to allow the New Bonds to constitute exempt securities under Section 3(a)(2) of the 1933 Act or any other applicable |

| | exemption. |
|---|---|
| **Vendor Claim Reserve** | The amount of cash equal to the aggregate amount of claims asserted against GDB by parties that provided goods and services to GDB in the ordinary course of business (such amount at any time, the "<u>Vendor Claim Reserve</u>"), which claims are disputed by GDB on the Closing Date ("<u>Unresolved Disputed Vendor Claims</u>") shall remain at GDB in a separate account subject to a perfected security interest in favor of the Issuer. Any cash or cash equivalents constituting Vendor Claim Reserve Residual remaining in the account in respect of the Vendor Claim Reserve after the payment of all Unresolved Disputed Vendor Claims determined by GDB to be valid shall be required to be transferred to the Issuer. |
| **Certain Definitions** | "<u>Available Cash</u>" of the Issuer on any Determination Date in respect of a related interest payment date means all cash and cash equivalents of the Issuer (whether arising from proceeds of New Bond Collateral or otherwise) at such time, other than the Issuer Expense Reserve (as defined below) at such time.<br><br>"<u>Issuer Expense Reserve</u>" of the Issuer on any Determination Date in respect of a related interest payment date means the amount of cash reasonably expected to be required to pay the operating expenses of the Issuer through the next Determination Date based on a good-faith projection prepared by the Asset Manager.[17]<br><br>"<u>pro rata</u>" means, with respect to any distribution to or vote of holders of New Bonds, a ratable distribution or vote based on the principal amount of the New Bonds outstanding at the time of such distribution or vote.<br><br>"<u>New Bond Requisite Holders</u>" means (i) if no Event of Default has occurred and is continuing, holders of New Bonds collectively holding one-third of the Voting Claims (as defined below) or (ii) if an Event of Default has occurred and is continuing, holders of the New Bonds collectively holding 25% of the Voting Claims.<br><br>"<u>Secured Deposit Account</u>" means an account in the name of Asociación de Empleados del ELA (Account Number B6347044) in an amount of approximately $25.4 million.<br><br>"<u>Voting Claims</u>" means the votes apportioned to New Bonds based on the aggregate original principal amount of all Participating Bond Claims exchanged for such New Bonds. |
| **Intercreditor Provisions** | The Definitive Documents shall provide for, among other things:<br><br>• Customary lien subordination and waterfall provisions binding on the holders of Tranche C Bonds in favor of the holders of Tranche A Bonds and Tranche B Bonds; |

---

[17] A budget shall be prepared subject to the terms of the Servicing Agreement to be agreed upon and acceptable to the RSA Requisite Bondholders.

| | |
|---|---|
| | • Lien sharing among the holders of Tranche A Bonds and Tranche B Bonds, in respect of the realization of New Bond Collateral following any default, in proportion to the outstanding principal amount of such New Bonds; <br><br> • Customary "silent second lien" provisions binding on the holders of Tranche C Bonds in favor of holders of Tranche A Bonds and Tranche B Bonds; and <br><br> • Other terms and conditions and intercreditor provisions customary in transactions of this type or otherwise in transactions with a similar lien and priority structure. <br><br> • Remedies with respect to the loan portfolio to be limited to replacement of the Asset Manager[18] and the appointment of a receiver. |
| **Voting** | Unless otherwise specified amendments, modifications and waivers of the governing documents of the New Bonds or other matters requiring the consent of the holders of the New Bonds shall generally require the consent of holders of not less than a majority in aggregate outstanding principal amount of each tranche of New Bonds; *provided that* amendments and modifications that customarily do not require bondholder consent shall be excluded from such consent requirement;[19] *provided, further* that amendments, modifications or waivers affecting only some but not all tranches of bonds shall require the consent of holders of not less than a majority in aggregate outstanding principal amount of each affected tranche only; and *provided, further* that any amendments, modifications or waivers that would have the effect on any New Bond of reducing principal, extending maturity, reducing the interest rate payable, or adversely affecting lien priority or any other amendments, modifications or waivers customarily requiring the consent of each adversely affected holder shall require the consent of each holder of New Bonds adversely affected by such amendment, modification or waiver. |
| **Certification Order** | GDB shall submit an application to the United States District Court for the District of Puerto Rico (or any other court of competent jurisdiction pursuant to PROMESA) for an order pursuant to section 601(m)(1)(D) of PROMESA that the requirements of section 601 of PROMESA have been satisfied by the Qualifying Modification as set forth herein (the "Certification Order"), which order shall be in form and substance satisfactory to the RSA Requisite |

---

[18] In connection with the exercise of remedies, New Bond Requisite Holders shall be entitled to remove and replace the Asset Manager by a "qualified" and "independent" (as such terms are defined in the Definitive Documents) successor Asset Manager of recognized national standing with the requisite expertise and Spanish speaking capability designated by the New Bond Requisite Holders on such terms as may be approved by such New Bond Requisite Holders; *provided that* if GDB is replaced as Asset Manager, the Back-Up Asset Manager will be the replacement Asset Manager.

[19] Such as to cure ambiguities or any defective provision in the governing documents, to comply with regulations related to the registration of beneficial ownership interests, or to modify or amend the indenture to permit the qualification under the Trust Indenture Act, in the case of any of the foregoing, only to the extent that the amendment has no adverse effect, whether or not material, on holders of the New Bonds.

|  | Bondholders, and shall provide, among other things, that: |
|--|--|
|  | • the Qualifying Modification is valid and binding on any person or entity asserting claims or other rights, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of Participating Bond Claims subject to the Qualifying Modification, any trustee, any collateral agent, any indenture trustee, any fiscal agent and any bank that receives or holds funds related to such Participating Bond Claims; |
|  | • the New Bond Collateral will vest free and clear of all claims of any other issuer pursuant to section 601(m)(2) of PROMESA; |
|  | • the Restructuring is full, final, complete, binding, and conclusive as to GDB, the Issuer, the Government of Puerto Rico (as defined in PROMESA), any other Territorial Instrumentality (as defined in PROMESA) of the Government of Puerto Rico and any creditors of such entities, and is not be subject to any collateral attack or other challenge by any such entities in any court or other forum; |
|  | • the release and exculpation by GDB of the Released Parties (as defined below) solely with respect to claims and causes of action in connection with, arising from or related to, the Restructuring is fully-enforceable and shall not be subject to attack or avoidance in any other proceeding under PROMESA or otherwise; and |
|  | • the Designated Depositor Settlement Agreements are fully-enforceable binding contracts that shall not be subject to attack or avoidance in any other proceeding under PROMESA or otherwise. |
| **Conditions** | Conditions precedent to the Closing Date shall include, but not be limited to, the following: |
|  | • Certification of the Restructuring as a Qualifying Modification pursuant to section 601(g)(1)(C) of PROMESA; |
|  | • Establishment of a Pool of Bond Claims (as defined in PROMESA) by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") consisting solely of the Participating Bond Claims; |
|  | • Distribution of the required disclosure documents and voting instructions to the Holders by the Information Agent (as defined in PROMESA) pursuant to section 601(f) and (k) of PROMESA; |
|  | • Satisfaction of the voting requirements set forth in section 601(j) of PROMESA with respect to the Qualifying Modification; |
|  | • Passage of any necessary legislation enabling the creation of the Issuer in form and substance satisfactory to the RSA Requisite Bondholders, including such provisions as may be required for consummation of the transactions contemplated by the Restructuring, including, without limitation, any provisions necessary for (i) the Issuer to be treated as a municipal issuer under applicable securities laws, (ii) cash flows arising |

13

out of the New Bond Collateral to be paid directly (i.e., directly from CRIM or any other applicable collection entity)[20] to the Issuer from and after the Closing Date and (iii) permitting the bond documents to contain remedies for breach as set forth herein[21];

- Certification pursuant to section 601(m) of PROMESA that (i) voting requirements have been satisfied, (ii) the Qualifying Modification complies with section 104(i)(1) of PROMESA, and (iii) any conditions on the effectiveness of the Qualifying Modification have been satisfied or waived;

- Entry of the Certification Order;

- The Designated Depositor Settlement Agreements, in form and substance satisfactory to GDB and RSA Requisite Bondholders, shall have been executed and delivered by GDB and each of the Designated Depositors, and shall have become binding and effective;

- The Public Entity Trust, in form and substance satisfactory to GDB and the RSA Requisite Bondholders shall have been established and the Public Entity Trust Assets shall have been transferred to the trustee of the Public Entity Trust;

- The Issuer shall have been created pursuant to governing documents in form and substance satisfactory to GDB and the RSA Requisite Bondholders;

- The Trust Agreement and Servicing Agreement shall have been executed and delivered, in form and substance satisfactory to GDB and the RSA Requisite Bondholders, and shall be in full force and effect;

- All other Definitive Documents shall have been executed and delivered in form and substance satisfactory to GDB and the RSA Requisite Bondholders, and shall be in full force and effect;[22]

- GDB shall have determined in a manner acceptable to RSA Requisite Bondholders and shall have notified all municipalities that are both depositors in and borrowers from GDB in respect of setoffs being applied to such depositors' deposits and loans (such application of setoff rights, the "Municipal Setoff" with respect to such depositor) and of the net amount of Residual Participating Bond Claim and loans outstanding after effectuating Municipal Setoff;

---

[20] Subject to diligence regarding flows of payments and changes in municipal finance structure.

[21] The legislation will confirm the ability of holders of New Bonds to have a receiver appointed in accordance with the remedies provisions set forth above.

[22] The Definitive Documents shall include all documents relating to engagement of GDB as Asset Manager, as well as the Back-Up Asset Manager, specifying the compensation to which those parties will be entitled in such capacities, all in form and substance acceptable to GDB and the RSA Requisite Bondholders.

| | |
|---|---|
| | • Customary legal opinions of counsel to GDB in form and substance acceptable to the RSA Requisite Bondholders shall have been delivered to the trustee or other applicable party regarding the Definitive Documents and the Restructuring, including, without limitation, opinions in respect of enforceability, no-registration, '40 Act, disclosure and tax opinions; and<br><br>• All professional fees and expenses required to be paid under the RSA shall have been paid on the Closing Date. |
| **Residual Participating Bond Claim** | Notwithstanding the Qualifying Modification and exchange and cancellation of the Participating Bond Claims in connection therewith, GDB will agree that, from and after the Closing Date, each Holder of a Participating Bond Claim on the Closing Date shall retain a claim (each a "Residual Participating Bond Claim") against GDB for the unsatisfied portion of such Holder's Participating Bond Claim until the proceeds of the New Bond Collateral have been applied to payments in respect of the New Bonds in accordance with the terms of the Definitive Documents, whereupon such Residual Participating Bond Claim shall be deemed forgiven and released in the event that, for any reason, the Qualifying Modification, the New Bonds or the rights and liens of the Issuer, the trustee and the New Bonds with respect to the New Bond Collateral are not enforced in accordance with their terms.[23] |
| **Releases** | To the extent permitted by applicable law, the Qualifying Modification shall provide for customary releases from GDB, AAFAF and the Holders (solely in their capacity as creditors of GDB and not in their capacity as creditors of any other entity) for the benefit of each other and each of their respective current directors, managers, officers, affiliates, partners, subsidiaries, principals, employees, agents, managed funds, representatives, attorneys and advisors, together with their successors and assigns (collectively, the "Released Parties"). |
| **Governing Law ; Remedies** | The New Bonds will be governed and construed in accordance with the laws of the State of New York.<br><br>Remedies may not be exercised against GDB or Issuer in respect of a curable breach or violation of the Definitive Documents or the Qualifying Modification by such party unless 10 days written notice and a request for cure is given to such party, and such party fails to cure; *provided, however*, with respect to defaults that are not able to be cured, such notice and opportunity to cure need not be given. |

---

[23] The Residual Participating Bond Claim will be designed to take into account securities law, tax, true sale and other considerations.

**Schedule 1**
**Issuer: Non-Public Entity Deposit Claims**

| Entity | Balance post setoff ($) |
|---|---|
| **Deposits by municipalities**[1] | |
| Adjuntas | $1,365,690 |
| Aguada | 3,160,883 |
| Aguadilla | 5,635,460 |
| Aguas Buenas | 1,652,565 |
| Aibonito | 3,506,136 |
| Anasco | 2,289,941 |
| Arecibo | 1,331,104 |
| Arroyo | 586,712 |
| Barceloneta | 1,256,978 |
| Barranquitas | 2,846,439 |
| Bayamon | 18,605,176 |
| Cabo Rojo | 2,389,732 |
| Caguas | 21,448,935 |
| Camuy | 1,038,493 |
| Canovanas | 86,726 |
| Carolina | 66,151,921 |
| Catano | 8,913,517 |
| Cayey | 7,902,535 |
| Ceiba | 948,454 |
| Ciales | 433,696 |
| Cidra | 4,883,682 |
| Coamo | 2,969,537 |
| Comerio | 1,073,256 |
| Corozal | 1,992,131 |
| Culebra | 1,587,080 |
| Dorado | 4,153,583 |
| Fajardo | 17,133,096 |
| Florida | 427,182 |
| Guanica | 782,813 |
| Guayama | 1,710,002 |
| Guayanilla | 502,431 |
| Guaynabo | 16,753,811 |
| Gurabo | 3,170,664 |
| Hatillo | 2,460,592 |
| Hormigueros | 1,587,437 |
| Humacao | 13,131,793 |
| Isabela | 2,384,189 |
| Jayuya | 555,348 |
| Juana Díaz | 1,443,115 |

**Schedule 1**
**Issuer: Non-Public Entity Deposit Claims**

| Entity | Balance post setoff ($) |
|---|---:|
| **Deposits by municipalities (cont'd)**[1] | |
| Juncos | 1,864,270 |
| Lajas | 914,168 |
| Lares | 2,949,084 |
| Las Marias | 725,703 |
| Las Piedras | 2,584,162 |
| Loiza | 550,287 |
| Luquillo | 3,480,595 |
| Manati | 1,542,244 |
| Maricao | 980,859 |
| Maunabo | 391,066 |
| Mayaguez | 21,444,379 |
| Moca | 1,062,564 |
| Morovis | 1,345,100 |
| Naguabo | 1,141,257 |
| Naranjito | 2,154,659 |
| Orocovis | 287,369 |
| Patillas | 560,514 |
| Penuelas | 1,653,667 |
| Ponce | 11,909,032 |
| Quebradillas | 1,122,156 |
| Rincon | 3,955,363 |
| Rio Grande | 1,790,973 |
| Sabana Grande | 119,665 |
| Salinas | 1,356,001 |
| San German | 2,099,601 |
| San Juan | 60,407,481 |
| San Lorenzo | 665,988 |
| San Sebastian | 722,345 |
| Santa Isabel | 2,913,037 |
| Toa Alta | 1,405,848 |
| Toa Baja | 1,824,808 |
| Trujillo Alto | 2,206,232 |
| Utuado | 1,912,619 |
| Vega Alta | 3,495,610 |
| Vega Baja | 1,947,119 |
| Vieques | 415,628 |
| Villalba | 449,625 |
| Yabucoa | 1,054,483 |
| Yauco | 208,100 |
| **Total** | **$377,866,492** |

**Schedule 1**
**Issuer: Non-Public Entity Deposit Claims**

| Entity | Balance post setoff ($) |
|---|---|
| **Deposits by non-public entities**[1] | |
| PR Science and Technology Trust | $92,311,874 |
| Municipal Administration Fund (FAM) | 27,917,429 |
| PR Housing Finance Authority (PRHFA) - Other Private | 22,879,005 |
| Escrow Deposit - Siemens | 13,000,000 |
| Commonwealth Employees Association (AEELA)[2] | 12,613,089 |
| Coooperative Development and Investment Fund (FIDECOOP) | 7,820,552 |
| Private Investment - Serralles / Costa Sur / Costa Caribe | 2,897,655 |
| Private Investment - MCS Advantage Inc. | 606,083 |
| Private Investment - Citigroup / Citibank | 604,247 |
| Private Investment - Medical Card System Inc | 405,270 |
| Private Investment - Caguas Coop | 200,000 |
| Institutional Trust of Puerto Rico's National Guard | 155,861 |
| Private Investment - Cooperativa Dr Manuel Zeno Gandia | 50,872 |
| Banco Cooperativo (Cooperative Bank) | 3,617 |
| Private Deposit - A.T/V.Suarez | 3,018 |
| Private Deposit - Poultry Products of the Caribbean | 275 |
| Private Deposit - Indulac | 133 |
| **Total** | **$181,468,979** |

**Notes**
(1) Certain deposits and loans are subject to further diligence and recategorization
(2) Excludes $13.8 m in deposits that are secured by five municipal loans excluded from
    the New Bond Collateral for the Issuer; refer to Schedule 4

**Schedule 2**
**Issuer: Claims Related To LOCs Issued By GDB**

---

**Entity**

---

**Letters of credit issued by GDB**

PR Infrastructure Financing Authority Revenue Bonds
 (Ports Authority Project) (the "PRIFA Bonds")

PR Public Finance Corporation Stand-By Letter of Credit

**Schedule 3**
**Issuer: Guarantees Issued by GDB**

| Entity |
| --- |
| **Guarantees issued by GDB** |
| Sheraton Puerto Rico Hotel and Casino (Convention Center) |
| Aerostar Airport Holdings, LLC – Termination Guaranty |
| Autopistas Metropolitanas de Puerto Rico, LLC –  Termination Guaranty |

**Schedule 4**
**Issuer: Collateral Detail - Municipal Loans**

| Entity | Balance post setoff ($) |
|---|---|
| **Loans to municipalities ($)[(1)(2)]** | |
| Adjuntas | $15,185,151 |
| Aguada | 5,596,552 |
| Aguadilla | 64,214,263 |
| Aguas Buenas | 5,833,716 |
| Aibonito | 7,453,213 |
| Anasco | 7,369,618 |
| Arecibo | 34,519,140 |
| Arroyo | 7,174,718 |
| Barceloneta | 35,371,711 |
| Barranquitas | 3,946,917 |
| Bayamon | 56,233,464 |
| Cabo Rojo | 24,932,530 |
| Caguas | 61,679,604 |
| Camuy | 8,312,214 |
| Canovanas | 15,436,138 |
| Carolina | 7,335,285 |
| Catano | 11,395,146 |
| Cayey | 29,194,630 |
| Ceiba | 3,662,947 |
| Ciales | 6,938,445 |
| Cidra | 17,133,540 |
| Coamo | 16,330,196 |
| Comerio | 4,592,941 |
| Corozal | 8,781,201 |
| Culebra | 2,057,079 |
| Dorado | 42,147,718 |
| Florida | 3,516,000 |
| Guanica | 8,436,923 |
| Guayama | 16,353,691 |
| Guayanilla | 10,413,120 |
| Guaynabo | 123,851,827 |
| Gurabo | 23,879,675 |
| Hatillo | 2,329,124 |
| Hormigueros | 3,190,361 |
| Humacao | 2,503,585 |
| Isabela | 8,447,176 |
| Jayuya | 9,033,720 |
| Juana Díaz | 13,156,925 |
| Juncos | 36,954,369 |
| Lajas | 8,525,266 |
| Lares | 1,494,000 |

**Schedule 4**
**Issuer: Collateral Detail - Municipal Loans**

| Entity | Balance post setoff ($) |
|---|---|
| **Loans to municipalities (cont'd)[1][2]** | |
| Las Marias | 5,729,372 |
| Las Piedras | 18,184,431 |
| Loiza | 6,822,900 |
| Luquillo | 9,162,373 |
| Manati | 40,761,702 |
| Maricao | 7,467,427 |
| Maunabo | 12,566,355 |
| Mayaguez | 39,826,029 |
| Moca | 10,059,694 |
| Morovis | 13,631,123 |
| Naguabo | 4,463,292 |
| Naranjito | 12,929,049 |
| Orocovis | 3,660,000 |
| Patillas | 9,607,453 |
| Penuelas | 15,056,177 |
| Ponce | 94,016,289 |
| Quebradillas | 7,187,828 |
| Rincon | 4,064,907 |
| Rio Grande | 23,219,811 |
| Sabana Grande | 4,419,420 |
| Salinas | 13,789,796 |
| San German | 16,372,224 |
| San Juan | 336,310,617 |
| San Lorenzo | 15,738,065 |
| San Sebastian | 18,250,572 |
| Santa Isabel | 21,454,124 |
| Toa Alta | 16,752,749 |
| Toa Baja | 75,777,619 |
| Trujillo Alto | 31,819,719 |
| Utuado | 4,515,625 |
| Vega Alta | 10,590,132 |
| Vega Baja | 24,621,142 |
| Vieques | 8,580,145 |
| Villalba | 7,952,924 |
| Yabucoa | 15,344,659 |
| Yauco | 28,471,706 |
| **Total** | **$1,764,091,287** |

**Notes**

(1) Certain deposits and loans are subject to further diligence and recategorization

(2) Arecibo, Cayey, Guaynabo, Manati, and Mayaguez balances reflect a total $13.8m adjustment
for loans that are collateral for the Commonwealth Employees Association (AEELA) deposit

**Schedule 5**
**Issuer: Collateral Detail - Other Assets**

| Entity | Balance post setoff ($) |
|---|---|
| **Loans to public corporations and public agencies ($)[1]** | |
| PR Highways and Transportation Authority (PRHTA) | $1,703,471,814 |
| PR Ports Authority (AP) | 266,828,873 |
| PR Public Buildings Authority (AEP) | 141,226,309 |
| Department of Treasury (General Obligation) | 169,438,038 |
| PR Convention Center District Authority (PRCC) | 142,872,116 |
| Municipal Finance Corporation (COFIM) | 57,251,415 |
| PR Industrial Development Company (PRIDCO) | 53,526,055 |
| PR Solid Waste Management Authority (SWMA) | 50,240,827 |
| PR Aqueduct and Sewer Authority (PRASA) | 54,241,973 |
| Comprehensive Fund for Agricultural Development of PR (FIDA) | 27,674,024 |
| Port Authority of Ponce | 20,762,752 |
| Port of the Americas | 1,700,000 |
| Act 71 of 2010 - Interagency Committee | 995,449 |
| **Total** | **$2,690,229,646** |
| **Other[1]** | |
| Port of the Americas Bonds (GO Guaranty) | $225,533,700 |
| HTA 1998 Series A Variable Rate Revenue Bonds | 200,000,000 |
| PR Housing Finance Authority Reverse Repo | 21,074,801 |
| Private loans | 986,178 |
| Cash | TBD |
| **Total** | **$447,594,680** |

| Property | Appraisal value ($) |
|---|---|
| **Real estate owned assets** | |
| Río Bayamón Norte Community | $19,600,000 |
| Former Sears | 16,600,000 |
| Parcel B Santurce Sur Ward | 13,525,000 |
| National Guard, Puerta de Tierra | 7,000,000 |
| Former Leprosarium | 6,020,000 |
| Property adjacent to San Lucas Hospital | 5,090,000 |
| Codremar | 4,400,000 |
| Josefa Farm Rural Property (Parcel A) | 3,825,000 |
| Ruiz Soler Hospital | 2,470,000 |
| Acuaexpreso (Parcel B) - Local Water Ferry Transport | 2,400,000 |
| Josefa Farm Rural Property (Parcel C-4) | 1,500,000 |
| Former Luchetti School | 1,360,000 |
| Parklane | 700,000 |
| Guayanés Ward | 260,000 |
| Former Golf Range (Golfito) | 185,000 |
| **Total** | **$84,935,000** |

**Note**
(1) Certain deposits and loans are subject to further diligence and recategorization

**Schedule 6**
**Loans with Proceeds Assigned to Issuer**

| Entity | Balance post setoff ($) |
|---|---:|
| **Loans**[1] | |
| Special Communities Perpetual Trust (SCPT) | $244,101,838 |
| Cantera Peninsula Integral Development Company | 37,791,088 |
| Center for Municipal Revenue Collection (CRIM) | 26,860,126 |
| **Total** | **$308,753,051** |

**Note**
(1) Certain deposits and loans are subject to further diligence and recategorization

**Schedule 7**
**Public Entity Trust: Public Entity Deposit Claims**

| Entity | Balance post setoff ($) |
|---|---:|
| **Public Entity Deposits[1]** | |
| Department of Treasury (General Obligation) | − |
| PR Infrastructure Financing Authority (PRIFA) | $180,824,482 |
| PR Tourism Development Fund (TDF) | 158,092,063 |
| PR Electric Power Authority (PREPA) | 114,108,013 |
| Special Communities Perpetual Trust | − |
| University of Puerto Rico (UPR) | 15,702,856 |
| Department of Labor and Human Resources | 81,532,322 |
| Special Fund for the Promotion of Health and Operational Safety | 48,510,039 |
| PR Highways and Transportation Authority (HTA)[2] | − |
| Puerto Rico State Insurance Fund (SIF) | 42,522,178 |
| Public Building Authority (PBA) | − |
| Land Administration | 38,491,359 |
| PR Tourism Company (PRTC) | 34,301,720 |
| Government Employees Retirement System | 32,909,266 |
| Comprehensive Fund for Agricultural Development of PR (FIDA) | − |
| Puerto Rico Public Private Partnerships Authority[3] | 20,341,824 |
| PR Sales Tax Financing Corporation (COFINA) | 26,113,021 |
| PR Industrial Development Company (PRIDCO) | − |
| PR Solid Waste Management Authority (SWMA) | − |
| PR Development Fund | 19,771,325 |
| PR Ports Authority (AP) | − |
| Public Finance Corporation (PFC) | 18,221,726 |
| The Children's Trust Fund (CTF) | 16,603,031 |
| Department of Agriculture | − |
| Department of Education | − |
| PR Land Authority | 13,682,621 |
| Institute of Puerto Rican Culture (IPRC) | 8,515,422 |
| 9-1-1 Service Governing Board | 11,312,586 |
| PR Aqueduct and Sewer Authority (PRASA) | − |
| Department of Housing | − |
| Department of Health | − |
| Electronic Lottery | 10,703,320 |
| AFICA | 9,493,214 |
| PR Integrated Transit Authority | 9,489,099 |
| Family Socioeconomic Development Administration | 6,325,525 |
| PR Energy Commission | 5,995,340 |
| Office of Management and Budget | − |
| Office for the Improvement of Public Schools (OMEP) | 5,071,300 |
| Municipal Finance Authority (MFA) | 4,796,689 |

**Schedule 7**
**Public Entity Trust: Public Entity Deposit Claims**

| Entity | Balance post setoff ($) |
|---|---|
| **Public Entity Deposits (cont'd)**[1] | |
| Higher Education Council | 4,390,073 |
| PREPA Pension System | 4,131,037 |
| Trade and Export Company | 3,085,482 |
| Telecommunications Regulatory Board | 2,898,608 |
| Department of Environmental and Natural Resources | 2,835,838 |
| Environmental Quality Board | 602,175 |
| PR Convention Center District Authority (PRCC) | – |
| Puerto Rico Higher Education Assistance Corporation | 2,394,595 |
| Department of Economic Development and Commerce | 1,933,888 |
| National Parks Company of Puerto Rico (NPCPR) | – |
| Office of Court Administration | – |
| Office for the Liquidation of the Accounts of the CRUV | 1,595,650 |
| Puerto Rico Senate | 1,572,533 |
| PR Maritime Shipping Authority | 1,242,664 |
| Department of the Family | 1,057,734 |
| Puerto Rico Health Insurance Administration (ASES) | – |
| Corporation for the Development of Exports | 897,405 |
| Roosevelt Roads Local Development Authority | 671,440 |
| Telephones of Puerto Rico | 633,558 |
| Puerto Rico National Guard | 460,064 |
| Puerto Rico Education Council | 446,196 |
| Family and Children's Administration | 438,151 |
| Consumer Protection Independent Office | 437,576 |
| Public Policy State Office of Energy Matters | 396,684 |
| Department of Justice | – |
| Public Housing Administration | 338,804 |
| Economic Development Bank | – |
| Model Forrest Office of Puerto Rico | 331,022 |
| Vocational Rehabilitation Administration | 231,820 |
| Child Care and Development Administration | 228,377 |
| Metropolitan Bus Authority (MBA) | 216,218 |
| Superintendent of the Capitol | – |
| Northwest Consortium | 178,362 |
| Institutional Trust of Puerto Rico's National Guard | 155,861 |
| Jose M. Berrocal Institute | 127,912 |
| Port Authority of Ponce | – |
| Sugar Corporation of Puerto Rico | 92,716 |
| State Elections Commission | 85,997 |
| Bayamon Judicial Center | 70,924 |
| Public Corporation for the Supervision and Insurance of PR Cooperatives | 66,177 |

Schedule 7
**Public Entity Trust: Public Entity Deposit Claims**

| Entity | Balance post setoff ($) |
|---|---|
| **Public Entity Deposits (cont'd)**[1] | |
| Carolina Judicial Center | 65,929 |
| Corporation for the Musical Arts | 59,467 |
| High Court of Caguas | 49,712 |
| Judicial Center of San Juan | 46,241 |
| PR Health Services Facilities Management | 40,185 |
| Northwest Consortium | 37,883 |
| Utuado Court | 28,014 |
| Court of First Instance of San Juan | 23,644 |
| Ponce Judicial Center | 22,231 |
| Court of Aibonito | 21,745 |
| General Court of Mayaguez | 20,184 |
| South East Consortium | 20,025 |
| Secretary of the Department | 18,873 |
| General Court of Guayama | 16,911 |
| Hotel Development Corporation | 15,017 |
| Office of the Comptroller of Puerto Rico | 14,019 |
| High Court of Aguadilla | 10,145 |
| Administration for the Training of Future Entrepreneurs and Workers | 9,956 |
| Court of First Instance | 9,748 |
| North Manati Consortium | 8,517 |
| Arecibo Judicial Center | 7,732 |
| Supreme Court of Puerto Rico | 7,238 |
| Maritime Transport Authority | 4,895 |
| A.T/V.Suarez | 3,018 |
| Office of the Panel on the Independent Prosecutor | 2,345 |
| Institute of Statistics of Puerto Rico | 1,814 |
| PR Art Museum | 1,340 |
| Southwest Consortium | 840 |
| Mayaguez Consortium - Las Marias | 481 |
| Yo Si Puedo Inc. | 336 |
| Poultry Products of the Caribbean | 275 |
| Indulac | 133 |
| South Central Consortium - ASIFAL | 106 |
| Center for Municipal Revenue Collection (CRIM) | – |
| Consortium La Montana | 50 |
| Integral Fund for Development | – |
| Equipco LLC | 3 |
| School of Plastic Arts | 2 |
| Puerto Rico Police | – |
| **Total** | **$1,023,142,067** |

**Schedule 7**
**Public Entity Trust: Public Entity Deposit Claims**

| Entity | Balance post setoff ($) |
| --- | --- |
| **Public Entity Deposits (cont'd)**[1] | |

**Notes**
(1) Certain deposits and loans are subject to further diligence and recategorization
(2) Includes $13m deposit in favor of Siemens pursuant to a guarantee from HTA
(3) Represents deposits held in escrow in connection with the Metropistas PR22/PR5 Public Private Partnership

**Schedule 8**
**Public Entity Trust: Collateral Detail**

| Entity | Balance post setoff ($) |
|---|---|
| **Cash** | |
| **Total** | **$50,000,000** |
| | |
| **Collateral - Public Entity Loans[1]** | |
| PR Administration of Medical Services | $282,447,692 |
| Office of Management and Budget | 260,332,550 |
| PR Treasury Department (Hacienda) | 211,465,445 |
| PR Health Insurance Administration (ASES) | 182,197,247 |
| PR Comprehensive Cancer Center | 120,482,398 |
| Center for Municipal Revenue Collection (CRIM) | 111,832,989 |
| Department of Education | 91,580,469 |
| Department of Transportation and Public Works | 82,869,714 |
| Department of Correction and Rehabilitation | 82,488,844 |
| Agricultural Enterprises Development Administration | 61,797,848 |
| Department of Agriculture | 50,294,124 |
| Department of Justice | 49,493,959 |
| Police of Puerto Rico[2] | 47,108,240 |
| Office of Courts Administration | 32,405,848 |
| Department of Health | 29,860,922 |
| State Capitol Superintendence | 27,299,047 |
| University Medical Services | 11,246,786 |
| Department of Recreation and Sports | 9,327,980 |
| Economic Development Bank | 7,499,798 |
| National Parks Company of Puerto Rico | 7,049,130 |
| Department of Housing | 6,080,003 |
| Catastrophic Diseases Fund | 3,274,708 |
| Veteran's Attorney's Office | 292,133 |
| **Total** | **$1,768,727,875** |

**Notes**
(1) Certain deposits and loans are subject to further diligence and recategorization
(2) Includes adjustment for $15.4m overdraft balance

**Schedule 9**
**Municipal Loan Portfolio Forecast**

| Forecasted Proceeds | | | Balance ($) |
|---|---|---|---|
| **Date** | **New Interest** | **Amortization** | **Total** |
| 7/1/2017 | $40,430,357 | $106,214,440 | $146,644,797 |
| 1/1/2018 | 38,460,176 | - | 38,460,176 |
| 7/1/2018 | 38,460,176 | 98,184,680 | 136,644,856 |
| 1/1/2019 | 37,848,497 | - | 37,848,497 |
| 7/1/2019 | 37,848,497 | 91,450,474 | 129,298,971 |
| 1/1/2020 | 39,034,647 | - | 39,034,647 |
| 7/1/2020 | 39,034,647 | 89,828,260 | 128,862,907 |
| 1/1/2021 | 39,878,262 | - | 39,878,262 |
| 7/1/2021 | 39,878,262 | 92,740,792 | 132,619,054 |
| 1/1/2022 | 40,280,176 | - | 40,280,176 |
| 7/1/2022 | 40,280,176 | 94,699,545 | 134,979,721 |
| 1/1/2023 | 40,156,791 | - | 40,156,791 |
| 7/1/2023 | 40,156,791 | 99,233,921 | 139,390,711 |
| 1/1/2024 | 39,393,398 | - | 39,393,398 |
| 7/1/2024 | 39,393,398 | 99,166,886 | 138,560,284 |
| 1/1/2025 | 38,179,901 | - | 38,179,901 |
| 7/1/2025 | 38,179,901 | 101,049,386 | 139,229,287 |
| 1/1/2026 | 36,411,416 | - | 36,411,416 |
| 7/1/2026 | 36,411,416 | 102,259,525 | 138,670,941 |
| 1/1/2027 | 32,261,723 | - | 32,261,723 |
| 7/1/2027 | 32,261,723 | 98,309,753 | 130,571,476 |
| 1/1/2028 | 28,261,514 | - | 28,261,514 |
| 7/1/2028 | 28,261,514 | 100,493,693 | 128,755,208 |
| 1/1/2029 | 24,124,545 | - | 24,124,545 |
| 7/1/2029 | 24,124,545 | 92,156,545 | 116,281,090 |
| 1/1/2030 | 20,331,523 | - | 20,331,523 |
| 7/1/2030 | 20,331,523 | 91,760,588 | 112,092,111 |
| 1/1/2031 | 16,572,138 | - | 16,572,138 |
| 7/1/2031 | 16,572,138 | 88,730,748 | 105,302,885 |
| 1/1/2032 | 12,902,609 | - | 12,902,609 |
| 7/1/2032 | 12,902,609 | 79,593,318 | 92,495,927 |
| 1/1/2033 | 9,477,828 | - | 9,477,828 |
| 7/1/2033 | 9,477,828 | 60,965,577 | 70,443,405 |
| 1/1/2034 | 6,661,748 | - | 6,661,748 |
| 7/1/2034 | 6,661,748 | 51,369,836 | 58,031,585 |
| 1/1/2035 | 4,239,098 | - | 4,239,098 |
| 7/1/2035 | 4,239,098 | 37,511,484 | 41,750,582 |
| 1/1/2036 | 2,469,767 | - | 2,469,767 |
| 7/1/2036 | 2,469,767 | 25,445,904 | 27,915,671 |
| 1/1/2037 | 1,274,065 | - | 1,274,065 |

**Schedule 9**
**Municipal Loan Portfolio Forecast**

| Forecasted Proceeds | | | Balance ($) |
|---|---|---|---|
| **Date** | **New Interest** | **Amortization** | **Total** |
| 7/1/2037 | 1,274,065 | 14,728,368 | 16,002,433 |
| 1/1/2038 | 575,717 | - | 575,717 |
| 7/1/2038 | 575,717 | 11,222,226 | 11,797,943 |
| 1/1/2039 | 44,036 | - | 44,036 |
| 7/1/2039 | 44,036 | 867,546 | 911,582 |
| 1/1/2040 | 4,265 | - | 4,265 |
| 7/1/2040 | 4,265 | 121,868 | 126,133 |

## EXHIBIT B

### FORM OF JOINDER AGREEMENT FOR SUPPORTING BONDHOLDERS

This Joinder Agreement to the Restructuring Support Agreement, dated as of [_____], 201[ ] (as amended, supplemented or otherwise modified from time to time, the "**Restructuring Support Agreement**"), between the Government Development Bank for Puerto Rico ("**GDB**") and the holders of the principal amounts outstanding under the Trust Agreement (together with their respective successors and permitted assigns, the "**Supporting Bondholders**" and each, a "**Supporting Bondholder**") is executed and delivered by _____ (the "**Joining Party**") as of _____, 201[ ]. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Restructuring Support Agreement.

1. **Agreement to Be Bound**. The Joining Party hereby agrees to be bound by all of the terms of the Restructuring Support Agreement, a copy of which is attached to this Joinder Agreement as **Annex I** (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof). The Joining Party shall hereafter be deemed to be a "Supporting Bondholder" and a "Party" for all purposes under the Restructuring Support Agreement and with respect to any and all Claims held by such Joining Party.

2. **Representations and Warranties**. With respect to the aggregate principal amount of GDB Bonds set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Supporting Bondholders set forth in Section 8 of the Restructuring Support Agreement to each other Party to the Restructuring Support Agreement.

3. **Governing Law**. This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[SUPPORTING BONDHOLDER]**


By:_____
Name:
Title:


[Principal Amount of [Series] GDB Bonds: $_____]


Notice Address:

_____

_____

_____
Fax: _____
Attention: _____
Email: _____

Acknowledged:

**GOVERNMENT DEVELOPMENT BANK
FOR PUERTO RICO**


By:_____
Name:
Title:

**Exhibit C**

**GDB Transaction - Target Timeline**

| Event | Description | Target Timeline | Total Elapsed Time | Target Date |
|---|---|---|---|---|
| Submission Date | GDB to submit all documents to the Oversight Board necessary for certification of the Plan as a Qualifying Modification. | 30 Days from signing of RSA | 30 days | June 15, 2017 |
| Certification Date | Oversight Board to consider certification of the Plan as a Qualifying Modification pursuant to section 601(g) of PROMESA. | 10 days from Submission Date | 40 days | June 25, 2017 |
| Solicitation Completion Date | GDB to complete solicitation of the Plan pursuant to section 601(h) of PROMESA. | 30 days from the Certification Date. | 70 days | July 25, 2017 |
| Board Approval Date | Oversight Board to consider the certification required under section 601(m)(1)(B) of PROMESA. | 5 days from the Solicitation Completion Date | 75 days | July 30, 2017 |
| District Court Approval Date | District Court to consider approving the Plan pursuant to section 601(m)(1)(D) of PROMESA. | 30 days from Board Approval Date | 105 days | August 30, 2017 |
| Effective Date of the Plan | Plan effective date. | 15 days from District Court Approval Date | 120 days | September 15, 2017 |

**Schedule A**

**CONFIDENTIAL**

**GDB CUSIP List**  **FOR SETTLEMENT PURPOSES ONLY**

| CUSIP | Maturity | Amount ($m)[1] | Coupon (%) |
|---|---|---|---|
| 745177CH | 12/1/2016 | $19.2 | 5.000 |
| 745177CJ | 12/1/2017 | 10.6 | 5.000 |
| 745177EN | 8/1/2020 | 433.7 | 5.500 |
| 745177EP | 8/1/2025 | 151.3 | 5.750 |
| 745177ET | 8/1/2019 | 217.7 | 5.400 |
| 745177EU | 8/1/2025 | 96.4 | 5.750 |
| 745177EX | 5/1/2016 | 360.0 | 4.704 |
| 745177FB | 8/1/2017 | 226.9 | 4.150 |
| 745177FC | 8/1/2019 | 174.5 | 4.500 |
| 745177FD | 8/1/2021 | 142.6 | 4.900 |
| 745177FE | 8/1/2022 | 47.5 | 4.950 |
| 745177FF | 8/1/2023 | 540.7 | 5.000 |
| 745177FH | 8/1/2026 | 126.8 | 5.200 |
| 745177FK | 8/1/2018 | 317.9 | 4.350 |
| 745177FM | 2/1/2017 | 250.0 | 3.875 |
| 745177FN | 2/1/2019 | 500.0 | 4.375 |
| 745177GG | 5/1/2017 | 40.0 | 4.704 |
| GDB Senior Guaranteed Notes | | 110.0 | 8.000 |
| | | **$3,765.9** | |

**Source:** Bloomberg
**Note:**
1) Includes missed principal payments

**THIS FIRST AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT**, dated as of October 20, 2017 (this "**Amendment**"), is among the Government Development Bank for Puerto Rico ("**GDB**"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), and the Supporting Bondholders (as such term is defined in that certain Restructuring Support Agreement dated as of May 15, 2017 (as amended by this Amendment and as amended or otherwise modified prior to the date hereof, the "**Agreement**")).

Each of the signatories hereto shall be referred to herein as a "**Party**" (and collectively referred to herein as the "**Parties**").

## RECITALS

**WHEREAS**, (a) at least a majority of the outstanding principal amount of the GDB Bonds held by Supporting Bondholders that are "cooperativas" insured by the Corporation for the Supervision and Insurance of Cooperatives in the Commonwealth of Puerto Rico as of the Amendment Effective Date (as defined below); (b) at least a majority of the outstanding principal amount of the GDB Bonds held by Supporting Bondholders domiciled in the Commonwealth of Puerto Rico of the Amendment Effective Date other than those described in the foregoing clause (a); (c) at least a majority of the outstanding principal amount of the GDB Bonds held by all Supporting Bondholders as of the Amendment Effective Date other than those described in the foregoing clauses (a) and (b); (d) GDB; and (e) AAFAF have agreed to amend the Agreement on the terms described in Sections 2 of this Amendment in accordance with Section 10 of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

SECTION 1.   Certain Defined Terms.  Capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the Agreement.

SECTION 2.   Amendment to the Restructuring Support Agreement.  On the Amendment Effective Date, the Agreement is hereby amended as follows:

(a)      Clause 4(b)(i) of the Agreement is hereby amended to add the following sentence to the end of the clause as the final sentence of the clause:

> "Notwithstanding the foregoing or anything to the contrary contained herein, any Transfer by any Supporting Bondholder, and any subsequent Transfer thereafter, prior to November 1, 2017 shall be valid and binding upon the parties thereto, and shall not be deemed void *ab initio*, so long as the ultimate transferee thereof, regardless of whether there were previous transferees in the chain of title thereof, has duly executed and delivered a Joinder Agreement to any of the Notice Parties prior to such date."

(b)      Clauses 6(a)(iii) and 6(b)(v) of the Agreement are hereby amended and restated in their entirety to each read as follows:

"(iii) At 11:59 p.m. Eastern Time on December 20, 2017 unless solicitation of the Qualifying Modification has been completed in accordance with section 601(h)(1) of PROMESA."

(c)      Clauses 6(a)(iv) and 6(b)(vi) of the Agreement are hereby amended and restated in their entirety to each read as follows:

"(iv) At 11:59 p.m. Eastern Time on January 9, 2018, unless the District Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to GDB, AAFAF, and the Requisite Bondholders."

(d)      The final paragraph at the end of Section 6(a) of the Agreement is hereby amended to add the following phrase immediately following the definition of Non-Extending Bondholder:

"provides written notice to the Notice Parties within five (5) business days after the effective date of such extension that such Supporting Bondholder"

(e)      Section 10 of the Agreement is hereby amended to add the following sentence to the end of the section as the final sentence of the section:

"Notwithstanding the foregoing, any amendment to any of Sections 6(a)(iii), 6(a)(iv), 6(a)(v), 6(b)(v), 6(b)(vi) and 6(b)(vii) of this Agreement shall be deemed accepted by the Requisite Bondholders upon the consent of each of the advisors of any Material GDB Bondholder Group."

SECTION 3.   <u>Conditions Precedent to Effectiveness of This Amendment</u>.   This Amendment shall become effective as of the date (the "**Amendment Effective Date**") when GDB and AAFAF shall have received executed signature pages to this Amendment from the Requisite Bondholders.

SECTION 4.   <u>Representations and Warranties</u>.  Each of the Parties hereby represents and warrants as to itself only that:

(a)      As of the date hereof and after giving effect to this Amendment, the representations and warranties made in the Agreement are true and correct in all material respects as if made on the date hereof (other than any such representations and warranties that, by their terms, expressly refer to being made only as of a date other than the date hereof).

(b)      This Amendment has been duly executed and delivered by each Party and is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

SECTION 5.  <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)     This Amendment shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York and PROMESA, without giving effect to the conflict of laws principles thereof; provided that any issues addressing the fiduciary or statutory duties of GDB or its governing board shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Amendment (or the transactions contemplated hereby) brought by any Party or its successors or assigns shall be brought in any federal district court sitting in Puerto Rico and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereto (collectively, the "Puerto Rico Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Puerto Rico Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Amendment and the Restructuring. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in any federal district court sitting in Puerto Rico, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Puerto Rico Court. Each of the Parties further agrees that notice as provided in Section 24 of the Agreement shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives and agrees not to assert that (i) a proceeding in any federal court sitting in the Puerto Rico district is brought in an inconvenient forum, (ii) the venue of such proceeding is improper or (iii) that any federal district court sitting in Puerto Rico and any appellate court from any thereof lacks jurisdiction over such proceeding or any party thereto. For the avoidance of doubt, the GDB Parties submit to the jurisdiction of any federal district court sitting in Puerto Rico and any appellate court from any thereof and irrevocably waive any immunity from suit in federal court that they may have for any action or proceeding arising out of or relating to this Amendment and the Restructuring.

(b)     Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Amendment or the transactions contemplated hereby (whether based on contract, tort or any other theory).

SECTION 6.  <u>Execution of Agreement</u>.  This Amendment may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Amendment, each individual executing this Amendment on behalf of a Party has been duly authorized and empowered to execute and deliver this Amendment on behalf of such Party.

SECTION 7.  <u>Headings</u>.  The headings of all sections of this Amendment are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

 SECTION 8. <u>Continuing Effectiveness, etc</u>. After giving effect to this Amendment, the Agreement shall remain in full force and effect and is hereby ratified, approved and confirmed in each and every respect. The amendments set forth herein are limited as written, and except as specifically provided in this Amendment, no other amendments, waivers, revisions or changes to the terms of the Agreement shall be made or permitted hereby. Upon the effectiveness of this Amendment, each reference in the Agreement to "this Agreement," "hereunder," "hereof," or words of similar import shall mean and be a reference to the Agreement as amended hereby.

[<em>Signature Pages Follow</em>]

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed and delivered by their respective duly authorized officers, solely in their respective capacities as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO**

By: _____
Name: Christian Sobrino Vega
Title:   President

**PUERTO RICO FISCAL AGENCY &
FINANCIAL ADVISORY AUTHORITY,**

By: _____
Name:  Gerardo José Portela Franco
Title:   Executive Director

*Signature Pages Omitted*

**THIS SECOND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT**, dated as of December 20, 2017 (this "**Amendment**"), is among the Government Development Bank for Puerto Rico ("**GDB**"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), and the Supporting Bondholders (as such term is defined in that certain Restructuring Support Agreement dated as of May 15, 2017, as amended by the First Amendment to Restructuring Support Agreement, dated October 20, 2017 (together with this Amendment, the "**Agreement**")).

Each of the signatories to the Agreement shall be referred to herein as a "**Party**" (and collectively referred to herein as the "**Parties**").

## RECITALS

**WHEREAS**, in accordance with Section 10 of the Agreement, any amendment to any of Sections 6(a)(iii), 6(a)(iv), 6(a)(v), 6(b)(v), 6(b)(vi) and 6(b)(vii) of the Agreement shall be deemed accepted by the Requisite Bondholders upon the consent of each of the advisors of any Material GDB Bondholder Group.

**WHEREAS,** the advisors to each Material GDB Bondholder Group, along with GDB and AAFAF, have agreed to amend the Agreement on the terms described in <u>Section 2</u> of this Amendment in accordance with Section 10 of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, by and through their undersigned counsel (as applicable), hereto agree as follows:

SECTION 1.  <u>Certain Defined Terms</u>.  Capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the Agreement.

SECTION 2.  <u>Amendment to the Restructuring Support Agreement</u>.  On the Amendment Effective Date, the Agreement is hereby amended as follows:

(a)    Clauses 6(a)(iii) and 6(b)(v) of the Agreement are hereby amended and restated in their entirety to each read as follows:

> "At 11:59 p.m. Eastern Time on March 20, 2018 unless solicitation of the Qualifying Modification has been completed in accordance with section 601(h)(1) of PROMESA."

(b)    Clauses 6(a)(iv) and 6(b)(vi) of the Agreement are hereby amended and restated in their entirety to each read as follows:

> "At 11:59 p.m. Eastern Time on April 9, 2018, unless the District Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to GDB, AAFAF, and the Requisite Bondholders."

SECTION 3.  <u>Conditions Precedent to Effectiveness of This Amendment</u>.    This Amendment shall become effective as of the date (the "**Amendment Effective Date**") when GDB

and AAFAF shall have received executed signature pages to this Amendment from the advisors of each Material GDB Bondholder Group.

SECTION 4.   Representations and Warranties.  Each of the Parties, by and through their undersigned counsel (as applicable), hereby represents and warrants as to itself only that:

(a)      As of the date hereof and after giving effect to this Amendment, the representations and warranties made in the Agreement are true and correct in all material respects as if made on the date hereof (other any such representations and warranties that, by their terms, expressly refer to being made only as of a date other than the date hereof).

(b)      This Amendment has been duly executed and delivered by the advisors to each Material GDB Bondholder Group, GDB, and AAFAF, and is a legal, valid and binding obligation of each Party, enforceable against each Party in accordance with its terms, except as may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

SECTION 5.   Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)      This Amendment shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York and PROMESA, without giving effect to the conflict of laws principles thereof; provided that any issues addressing the fiduciary or statutory duties of GDB or its governing board shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Amendment (or the transactions contemplated hereby) brought by any Party or its successors or assigns shall be brought in any federal district court sitting in Puerto Rico and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereto (collectively, the "Puerto Rico Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Puerto Rico Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Amendment and the Restructuring. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in any federal district court sitting in Puerto Rico, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Puerto Rico Court. Each of the Parties further agrees that notice as provided in Section 24 of the Agreement shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives and agrees not to assert that (i) a proceeding in any federal court sitting in the Puerto Rico district is brought in an inconvenient forum, (ii) the venue of such proceeding is improper or (iii) that any federal district court sitting in Puerto Rico and any appellate court from any thereof lacks jurisdiction over such proceeding or any party thereto. For the avoidance of doubt, the GDB Parties submit to the jurisdiction of any federal district court sitting in Puerto Rico and any appellate court from any thereof and irrevocably waive any immunity from suit in federal court that they may have for any action or proceeding arising out of or relating to this Amendment and the Restructuring.

(b)      Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or

relating to this Amendment or the transactions contemplated hereby (whether based on contract, tort or any other theory).

SECTION 6.  Execution of Agreement.  This Amendment may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Amendment, each individual executing this Amendment on behalf of a Party has been duly authorized and empowered to execute and deliver this Amendment on behalf of such Party.

SECTION 7.  Headings.  The headings of all sections of this Amendment are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

SECTION 8.  Continuing Effectiveness, etc.  After giving effect to this Amendment, the Agreement shall remain in full force and effect and is hereby ratified, approved and confirmed in each and every respect.  The amendments set forth herein are limited as written, and except as specifically provided in this Amendment, no other amendments, waivers, revisions or changes to the terms of the Agreement shall be made or permitted hereby. Upon the effectiveness of this Amendment, each reference in the Agreement to "this Agreement," "hereunder," "hereof," or words of similar import shall mean and be a reference to the Agreement as amended hereby.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed and delivered by their respective duly authorized officers, solely in their respective capacities as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**GOVERNMENT DEVELOPMENT BANK FOR
PUERTO RICO**

By: _____
Name: Christian Sobrino Vega
Title: President

**PUERTO RICO FISCAL AGENCY &
FINANCIAL ADVISORY AUTHORITY,**

By: _____

Name: Gerardo José Portela Franco

Title: Executive Director

DAVIS POLK & WARDWELL LLP ON BEHALF
OF THE AD HOC GROUP

By: _____

    Name:  Brian M Resnick
    Title:   Partner

**SIGNATURE PAGE TO SECOND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT**

**SUPPORTING BONDHOLDER**

NEVARES, SÁNCHEZ-ÁLVAREZ & CANCEL, P.S.C.,
ON BEHALF OF ALIANZA DE COOPERATIVISTAS

By: _____
Name:  Lemuel Cancel-Méndez
Title:   Legal Counsel

MARICHAL HERNÁNDEZ, SANTIAGO &
JUARBE, LLC, ON BEHALF OF GRUPO
ENCUENTRO SOLIDARIO

By: _____

    Name:   Vanessa Medina-Romero, Esq.
    Title:    Member

ANA M. DEL TORO SABATER, ON BEHALF
OF BONISTAS DEL PATIO

By: _____
      Name:  Ana M. del Toro Sabater
      Title:   *Representative*

**THIS THIRD AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT**, dated as of March 20, 2018 (this "**Amendment**"), is among the Government Development Bank for Puerto Rico ("**GDB**"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), and the Supporting Bondholders (as such term is defined in that certain Restructuring Support Agreement dated as of May 15, 2017, as amended by the First Amendment to Restructuring Support Agreement, dated October 20, 2017, and Second Amendment to Restructuring Support Agreement, dated December 20, 2017 (together with this Amendment, the "**Agreement**")).

Each of the signatories to the Agreement shall be referred to herein as a "**Party**" (and collectively referred to herein as the "**Parties**").

## RECITALS

**WHEREAS**, in accordance with Section 10 of the Agreement, any amendment to any of Sections 6(a)(iii), 6(a)(iv), 6(a)(v), 6(b)(v), 6(b)(vi) and 6(b)(vii) of the Agreement shall be deemed accepted by the Requisite Bondholders upon the consent of each of the advisors of any Material GDB Bondholder Group.

**WHEREAS,** the advisors to each Material GDB Bondholder Group, along with GDB and AAFAF, have agreed to amend the Agreement on the terms described in <u>Section 2</u> of this Amendment in accordance with Section 10 of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, by and through their undersigned counsel, hereto agree as follows:

SECTION 1.  <u>Certain Defined Terms</u>.  Capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the Agreement.

SECTION 2.  <u>Amendment to the Restructuring Support Agreement</u>.  On the Amendment Effective Date, the Agreement is hereby amended as follows:

(a)      Clauses 6(a)(iii), 6(a)(iv), 6(b)(v), 6(b)(vi) of the Agreement are hereby amended and restated in their entirety to each read as follows:

> "At 11:59 p.m. Eastern Time on a date to be agreed upon by the advisors of the Material GDB Bondholder Groups, GDB and AAFAF; provided that if no such date is agreed upon by 11:59 p.m. Eastern Time on March 30, 2018, a GDB Termination Event and Bondholder Termination Event shall be deemed to have occurred."

SECTION 3.  <u>Conditions Precedent to Effectiveness of This Amendment</u>.  This Amendment shall become effective as of the date (the "**Amendment Effective Date**") when GDB and AAFAF shall have received executed signature pages to this Amendment from the advisors of each Material GDB Bondholder Group.

SECTION 4.   Representations and Warranties.  Each of the Parties, by and through their undersigned counsel, hereby represents and warrants as to itself only that:

(a)     As of the date hereof and after giving effect to this Amendment, the representations and warranties made in the Agreement are true and correct in all material respects as if made on the date hereof (other any such representations and warranties that, by their terms, expressly refer to being made only as of a date other than the date hereof).

(b)     This Amendment has been duly executed and delivered by the advisors to each Material GDB Bondholder Group, GDB, and AAFAF, and is a legal, valid and binding obligation of each Party, enforceable against each Party in accordance with its terms, except as may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

SECTION 5.   Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)     This Amendment shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York and PROMESA, without giving effect to the conflict of laws principles thereof; provided that any issues addressing the fiduciary or statutory duties of GDB or its governing board shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Amendment (or the transactions contemplated hereby) brought by any Party or its successors or assigns shall be brought in any federal district court sitting in Puerto Rico and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereto (collectively, the "Puerto Rico Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Puerto Rico Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Amendment and the Restructuring. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in any federal district court sitting in Puerto Rico, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Puerto Rico Court. Each of the Parties further agrees that notice as provided in Section 24 of the Agreement shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives and agrees not to assert that (i) a proceeding in any federal court sitting in the Puerto Rico district is brought in an inconvenient forum, (ii) the venue of such proceeding is improper or (iii) that any federal district court sitting in Puerto Rico and any appellate court from any thereof lacks jurisdiction over such proceeding or any party thereto. For the avoidance of doubt, the GDB Parties submit to the jurisdiction of any federal district court sitting in Puerto Rico and any appellate court from any thereof and irrevocably waive any immunity from suit in federal court that they may have for any action or proceeding arising out of or relating to this Amendment and the Restructuring.

(b)     Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Amendment or the transactions contemplated hereby (whether based on contract, tort or any other theory).

SECTION 6.  <u>Execution of Agreement</u>.  This Amendment may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Amendment, each individual executing this Amendment on behalf of a Party has been duly authorized and empowered to execute and deliver this Amendment on behalf of such Party.

SECTION 7.  <u>Headings</u>.  The headings of all sections of this Amendment are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

SECTION 8.  <u>Continuing Effectiveness, etc</u>.  After giving effect to this Amendment, the Agreement shall remain in full force and effect and is hereby ratified, approved and confirmed in each and every respect.  The amendments set forth herein are limited as written, and except as specifically provided in this Amendment, no other amendments, waivers, revisions or changes to the terms of the Agreement shall be made or permitted hereby. Upon the effectiveness of this Amendment, each reference in the Agreement to "this Agreement," "hereunder," "hereof," or words of similar import shall mean and be a reference to the Agreement as amended hereby.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed and delivered by their respective duly authorized officers, solely in their respective capacities as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO**

By: _____

Name: Christian Sobrino Vega

Title: President

**PUERTO RICO FISCAL AGENCY &
FINANCIAL ADVISORY AUTHORITY,**

By: _____
Name: Gerardo José Portela Franco
Title:   Executive Director

DAVIS POLK & WARDWELL LLP ON BEHALF
OF THE AD HOC GROUP

By: _____

    Name:  Brian M. Resnick
    Title:   Partner

CARLOS RODRIGUEZ, ON BEHALF OF
BONISTAS DEL PATIO

By: _____
     Name:  Carlos Rodriguez
     Title:  Financial Advisor, Bonistas del Patio

ATLAS ASSET MANAGEMENT LLC, ON
BEHALF OF ALIANZA DE
COOPERATIVISTAS

By: _____
Name: Paul Hopgood
Title:

MARICHAL HERNÁNDEZ, SANTIAGO & JUARBE, LLC, ON BEHALF OF GRUPO ENCUENTRO SOLIDARIO

By:_____.

    Name:  Vanessa Medina-Romero
    Title:   Capital Member

**FOURTH AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT**, dated as of April 6, 2018 (this "**Amendment**"), is among the Government Development Bank for Puerto Rico ("**GDB**"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), and the Supporting Bondholders (as such term is defined in that certain Restructuring Support Agreement dated as of May 15, 2017, as amended by the First Amendment to Restructuring Support Agreement, dated October 20, 2017, and Second Amendment to Restructuring Support Agreement, dated December 20, 2017, and Third Amendment to Restructuring Support Agreement, dated March 20, 2018 (together with this Amendment, the "**Agreement**")).

Each of the signatories to the Agreement shall be referred to herein as a "**Party**" (and collectively referred to herein as the "**Parties**").

## RECITALS

**WHEREAS**, (a) at least a majority of the outstanding principal amount of the GDB Bonds held by Supporting Bondholders that are "cooperativas" insured by the Corporation for the Supervision and Insurance of Cooperatives in the Commonwealth of Puerto Rico as of the Amendment Effective Date (as defined below); (b) at least a majority of the outstanding principal amount of the GDB Bonds held by Supporting Bondholders domiciled in the Commonwealth of Puerto Rico of the Amendment Effective Date other than those described in the foregoing clause (a); (c) at least a majority of the outstanding principal amount of the GDB Bonds held by all Supporting Bondholders as of the Amendment Effective Date other than those described in the foregoing clauses (a) and (b); (d) GDB; and (e) AAFAF have agreed to amend the Agreement on the terms described in Section 2 of this Amendment in accordance with Section 10 of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, by and through their undersigned counsel, hereto agree as follows:

SECTION 1. Certain Defined Terms. Capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in the Agreement.

SECTION 2. Amendment to the Restructuring Support Agreement. On the Amendment Effective Date, the Agreement is hereby amended as follows:

(a) Clauses 6(a)(iii) and 6(b)(v) of the Agreement are hereby amended and restated in their entirety to each read as follows:

"(iii) At 11:59 p.m. Eastern Time on June 8, 2018 unless solicitation of the Qualifying Modification has been completed in accordance with section 601(h)(1) of PROMESA."

(b)    Clauses 6(a)(iv) and 6(b)(vi) of the Agreement are hereby amended and restated in their entirety to each read as follows:

"(iv) At 11:59 p.m. Eastern Time on June 28, 2018, unless the District Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to GDB, AAFAF, and the Requisite Bondholders."

(c)    the Restructuring Term Sheet attached as Exhibit A to the Agreement is hereby amended and replaced in its entirety by the Restructuring Term Sheet attached hereto as <u>Exhibit A</u>.

SECTION 3.  <u>Conditions Precedent to Effectiveness of This Amendment</u>.  This Amendment shall become effective as of the date (the "**Amendment Effective Date**") when GDB and AAFAF shall have received executed signature pages to this Amendment from the Requisite Bondholders.

SECTION 4.  <u>Representations and Warranties</u>.  Each of the Parties, by and through their undersigned counsel, hereby represents and warrants as to itself only that:

(a)    As of the date hereof and after giving effect to this Amendment, the representations and warranties made in the Agreement are true and correct in all material respects as if made on the date hereof (other any such representations and warranties that, by their terms, expressly refer to being made only as of a date other than the date hereof).

(b)    This Amendment has been duly executed and delivered by the advisors to each Material GDB Bondholder Group, GDB, and AAFAF, and is a legal, valid and binding obligation of each Party, enforceable against each Party in accordance with its terms, except as may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

SECTION 5.  <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)    This Amendment shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York and PROMESA, without giving effect to the conflict of laws principles thereof; provided that any issues addressing the fiduciary or statutory duties of GDB or its governing board shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Amendment (or the transactions contemplated hereby) brought by any Party or its successors or assigns shall be brought in any federal district court sitting in Puerto Rico and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereto (collectively, the "Puerto Rico Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Puerto Rico Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Amendment and the Restructuring. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in any federal district court sitting in Puerto Rico, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Puerto Rico Court. Each of the Parties further agrees that notice as provided in Section 24 of the Agreement shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties

hereby irrevocably and unconditionally waives and agrees not to assert that (i) a proceeding in any federal court sitting in the Puerto Rico district is brought in an inconvenient forum, (ii) the venue of such proceeding is improper or (iii) that any federal district court sitting in Puerto Rico and any appellate court from any thereof lacks jurisdiction over such proceeding or any party thereto. For the avoidance of doubt, the GDB Parties submit to the jurisdiction of any federal district court sitting in Puerto Rico and any appellate court from any thereof and irrevocably waive any immunity from suit in federal court that they may have for any action or proceeding arising out of or relating to this Amendment and the Restructuring.

(b)     Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Amendment or the transactions contemplated hereby (whether based on contract, tort or any other theory).

SECTION 6.  <u>Execution of Agreement</u>.  This Amendment may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Amendment, each individual executing this Amendment on behalf of a Party has been duly authorized and empowered to execute and deliver this Amendment on behalf of such Party.

SECTION 7.  <u>Headings</u>.  The headings of all sections of this Amendment are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

SECTION 8.  <u>Continuing Effectiveness, etc</u>.  After giving effect to this Amendment, the Agreement shall remain in full force and effect and is hereby ratified, approved and confirmed in each and every respect.  The amendments set forth herein are limited as written, and except as specifically provided in this Amendment, no other amendments, waivers, revisions or changes to the terms of the Agreement shall be made or permitted hereby. Upon the effectiveness of this Amendment, each reference in the Agreement to "this Agreement," "hereunder," "hereof," or words of similar import shall mean and be a reference to the Agreement as amended hereby.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed and delivered by their respective duly authorized officers, solely in their respective capacities as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO**

By: _____

Name: Christian Sobrino Vega

Title: President

PUERTO RICO FISCAL AGENCY &
FINANCIAL ADVISORY AUTHORITY,

By: _____

Name: Gerardo José Portela Franco

Title: Executive Director

*Supporting Bondholder Signature Pages Omitted*

## <u>Exhibit A</u>

Restructuring Term Sheet

**EXHIBIT A to**
**Restructuring Support Agreement**

**Government Development Bank for Puerto Rico**

**OUTLINE OF TRANSACTION STRUCTURE FOR RESTRUCTURING OF GDB LIABILITIES**

This term sheet (the "Term Sheet") is a summary of indicative terms and conditions for a proposed financial restructuring of certain financial obligations of the Government Development Bank for Puerto Rico ("GDB") through a Qualifying Modification (the "Restructuring" or the "Qualifying Modification") pursuant to Title VI of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA"). The financial obligations of GDB to be included in the Restructuring include (i) bonds issued and outstanding pursuant to (a) that certain trust indenture dated as of February 17, 2006, as amended or supplemented, between GDB and Wilmington Trust, National Association, as successor trustee, and (b) that certain trust indenture dated as of April 29, 2016, as amended or supplemented, between GDB and UMB Bank, National Association, as trustee (collectively, the "Existing GDB Public Bonds"), and (ii) certain deposits and other outstanding obligations of GDB identified below.

This Term Sheet is solely for the purposes set forth in the Restructuring Support Agreement (the "RSA"), dated May 15, 2017 (as amended pursuant to the terms thereof) among GDB and certain holders of the Existing GDB Public Bonds, and acknowledged and agreed to by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" by its Spanish acronym), or any other Qualifying RSA (as defined in the RSA). Except to the extent provided in the RSA or any Qualifying RSA, this Term Sheet does not constitute a commitment by any party and in any event is subject to the terms and conditions hereof, including, without limitation, requisite approvals under Title VI of PROMESA and execution and delivery of definitive agreements (the "Definitive Documents").

| Legislation | The Restructuring shall be carried out pursuant to Act No. 109-2017, also known as the Government Development Bank for Puerto Rico Debt Restructuring Act (the "GDB Restructuring Act")[1]; *provided* that notwithstanding any repeal, annulment, withdrawal, amendment or modification or other failure of the GDB Restructuring Act or any provision therein to remain in full force and effect, the terms and conditions identified in this Term Sheet shall remain in full force and effect as the terms and conditions of the Restructuring and shall be carried out in another manner, whether by alternative legislation or otherwise. |
|---|---|
| Issuer of New Bonds | *Issuer.* Pursuant to, or otherwise consistent with, Article 201 of the GDB Restructuring Act, a statutory public trust and governmental public instrumentality of the Commonwealth of Puerto Rico (the "Issuer") shall be created to issue the New Bonds (as defined below). The form of the Issuer shall be acceptable to the Requisite Bondholders, as defined in the RSA (the "RSA Requisite Bondholders"), *provided* that the form of the Issuer established pursuant to the GDB Restructuring Act, as in effect on August 24, 2017, is |

---

[1] References herein to the GDB Restructuring Act refer to the act as in effect on August 24, 2017 unless an amendment thereto reflects changes set forth in this Term Sheet or is otherwise in form and substance satisfactory to the RSA Requisite Bondholders (as defined below), except as otherwise specified.

| | |
|---|---|
| | deemed acceptable to the RSA Requisite Bondholders.<br><br>*Indenture Trustee for New Bonds.* An indenture trustee (the "<u>Indenture Trustee</u>") will act for the benefit of holders of New Bonds. Upon the issuance of the New Bonds, pursuant to, or otherwise consistent with, Article 402 of the GDB Restructuring Act, as in effect on August 24, 2017, the New Bonds will be automatically secured by a perfected, valid and binding statutory lien on the New Bond Collateral (as defined below) in favor of the Indenture Trustee for the benefit of the holders of New Bonds. The Indenture Trustee (or, if necessary for certain tasks the Indenture Trustee is unable or unwilling to perform, a designated calculation agent or other service provider) will perform administrative functions customary for transactions of this type.<br><br>*Servicer and Collateral Monitor.* The assets of the Issuer will be managed by a designated servicer (the "<u>Servicer</u>") pursuant to a servicing agreement with the Issuer (the "<u>Servicing Agreement</u>"). The identity of the initial Servicer and terms of the initial Servicing Agreement (including compensation) shall be acceptable to the RSA Requisite Bondholders.[2] The activities of the Servicer and the condition and performance of the New Bond Collateral (as defined below) will be monitored by a collateral monitor (the "<u>Collateral Monitor</u>") engaged by the Indenture Trustee, or another entity on behalf of the holders of New Bonds, pursuant to a monitoring agreement (the "<u>Collateral Monitor Agreement</u>"). The identity of the initial Collateral Monitor and the terms of the initial Collateral Monitor Agreement shall be acceptable to the RSA Requisite Bondholders, GDB and AAFAF. The Collateral Monitor shall have reasonable access to the Servicer and all information necessary in order to carry out its duties.<br><br>For more information regarding the structure of and governance of the Issuer and the Servicing Agreement, see *Structure and Governance of Issuer* below. |
| **Participating Bond Claims** | The holders ("<u>Holders</u>") of the liabilities of GDB set forth on Schedule 1 hereto (the "<u>Participating Bond Claims</u>") will be subject to and bound by the Qualifying Modification pursuant to Title VI of PROMESA, including:<br><br>• All claims in respect of Existing GDB Public Bonds; |

---

[2] If the Servicer is provided with an incentive compensation arrangement based on asset recoveries, the position of incentive compensation arrangements in the distribution waterfall shall be acceptable to the RSA Requisite Bondholders. The Servicer shall be a "qualified" and "independent" (as such terms are defined in the Definitive Documents) firm of recognized national standing with the requisite expertise and Spanish speaking capability, and which is acceptable to GDB, AAFAF, and the RSA Requisite Bondholders. The Servicer will be engaged on or before the Closing Date, on arms-length, market terms in form and substance satisfactory to GDB, AAFAF, and the RSA Requisite Bondholders. The Servicer will be selected by a competitive RFP process prior to the solicitation of holders of Participating Bond Claims, and GDB shall use commercially reasonable efforts to effectuate the transition of its duties to the Servicer as soon as practicable.

#90008132v43

| | |
|---|---|
| | • The claims against GDB identified on Schedule 1; and |
| | • The claims in respect of the contingent and unliquidated claims on Schedule 2.[3] |
| | For the avoidance of doubt, the liabilities of GDB that are not Participating Bond Claims will not be the subject of the Qualifying Modification, but the Qualifying Modification shall be subject to and conditioned upon the treatment of such claims to the extent specified below. |
| **Overview of Restructuring Transaction** | *Exchange of Participating Bond Claims for New Bonds*<br><br>GDB and the Holders of the Participating Bond Claims will undertake a financial restructuring of the Participating Bond Claims through a Qualifying Modification implemented under Title VI of PROMESA on the terms and conditions set forth herein.  Pursuant to such Qualifying Modification, on the date on which the conditions described under "Conditions" below have all been satisfied or waived by the RSA Requisite Bondholders (the "<u>Closing Date</u>"):<br><br>   i.    all Holders of Participating Bond Claims will exchange their Participating Bond Claims for new bonds (the "<u>New Bonds</u>") which shall be book-entry only bonds held by DTC; and<br><br>   ii.   GDB will transfer the Recovery Authority Assets to the Issuer in consideration for the Issuer's issuance of the New Bonds in connection with the exchange of the Participating Bond Claims as set forth above.<br><br>Upon a Holder of Participating Bond Claims exchanging such Participating Bond Claims for New Bonds, and execution of the Keepwell Agreement described below, the Holder of the Participating Bond Claim shall, immediately and forever, and without further actions or documentation, cease to have any right, interest or claim against GDB or any of its assets, or any successors or assigns thereof and the Participating Bond Claims shall be extinguished and canceled.  In connection with the Qualifying Modification, GDB shall enter into the Keepwell Agreement.  For more information, see "Keepwell Agreement" below.<br><br>The issue price of the New Bonds (as determined for U.S. federal income tax purposes) shall be allocated first to principal and then to accrued but unpaid interest.<br><br>For each $1,000 of Participating Bond Claims held by a Holder (which, for the avoidance of doubt, shall be calculated to include principal plus interest accrued up to but not including the Closing Date in respect of Existing GDB Public Bonds), such Holder shall receive New Bonds having a face amount equal to |

---

[3] No New Bonds will be issued at closing in respect of contingent and unliquidated claims as to which no claim has been made prior to the Closing Date. If, subsequent to the Closing Date, valid claims are made on any contingent and unliquidated claim specified in Schedule 2, the Holders of such claims will receive a pro rata distribution of the New Bonds.

3

| | |
|---|---|
| | $550. |
| | *Rounding* |
| | The aggregate principal amount of New Bonds issued to each Holder of Participating Bond Claims will be rounded up, if necessary, to $1 or the nearest whole multiple of $1 in excess thereof. This rounded amount will be the principal amount of New Bonds a Holder will receive. |
| | *Payments from Available Cash* |
| | Payments of principal and interest to holders of New Bonds shall be made solely from Available Cash (as defined below) of the Issuer, as provided below. |
| | *Security* |
| | Pursuant to, or otherwise consistent with, Article 402 of the GDB Restructuring Act, as in effect on August 24, 2017, the New Bonds will be secured by a statutory lien on the New Bond Collateral, which statutory lien shall occur automatically and shall automatically be perfected, valid and binding from and after the Closing Date, in any case without any further act or agreement. |
| | The indenture for the New Bonds (the "<u>Indenture</u>") shall confirm such statutory lien and establish that the New Bonds will be secured on a first priority basis under the statutory lien. |
| | *End of Life Provisions* |
| | On or after the final scheduled payment date, the Servicer will be required to use its commercially reasonable efforts to liquidate all remaining New Bond Collateral, if any, as soon as reasonably practicable but in no event after December 31, 2040 unless either (i) all principal, interest and any other amounts owing under the New Bonds have been paid or (ii) the New Bond Requisite Holders instruct otherwise (subject to the economic feasibility of the Servicer continuing to service the remaining New Bond Collateral). The net proceeds from such liquidation will constitute collections on the New Bond Collateral and, as such, will be distributed in accordance with the priority of payments under the Indenture. Following either (i) the payment in full of all principal, interest and any other amounts owing under the New Bonds and the satisfaction and discharge of the Indenture or (ii) the liquidation of the New Bond Collateral and distribution of the proceeds thereof in accordance with the foregoing, the Public Entity Trust (as defined below) will succeed to all the rights of the Issuer with respect to any remaining assets of the Issuer, if any. |
| **Non-Municipal Government Entities** | The following terms and conditions (the "<u>Non-Municipal Government Entity Resolution</u>") relating to Non-Municipal Government Entities (as defined in the GDB Restructuring Act) shall be a condition of the Restructuring. |
| | *Determination of Liabilities Between Non-Municipal Government Entities and GDB* |
| | Pursuant to, or otherwise consistent with, Article 302 of the GDB Restructuring Act, as in effect on August 24, 2017, effective as of the Closing Date, the |

<table>
<tr><td></td><td>

balance of liabilities owed between any Non-Municipal Government Entities and GDB as of the Closing Date shall be automatically determined by applying the outstanding balance of any deposit of a Non-Municipal Government Entity against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date (other than any loan, bond or note of a Non-Municipal Government Entity secured by a mortgage over real property), as set forth on Schedules 4, 5, 6, and 7, without the need for any further action. Such application shall be effected by reducing any remaining installments of principal in inverse order of maturity and shall not otherwise affect the repayment schedule of the corresponding bond, note or loan. For purposes hereof, all agencies, departments, offices and instrumentalities of the central government shall be deemed to be the same Government Entity (as defined in the GDB Restructuring Act). The remaining balances of the bonds, notes or loans and of the deposits of the Non-Municipal Government Entities shall be those certified by AAFAF.

*Public Entity Trust*

Pursuant to, or otherwise consistent with, Article 301 of the GDB Restructuring Act, as in effect on August 24, 2017, GDB shall execute a deed of trust (the "<u>Public Entity Deed of Trust</u>") to create and establish a trust (the "<u>Public Entity Trust</u>") for the benefit of (a) those Non-Municipal Government Entities having claims in respect of funds on deposit at GDB as of the Closing Date, after giving effect to the transactions described above in "*Determination of Liabilities Between Non-Municipal Government Entities and GDB*," identified on Schedule 6 hereto (such entities, the "<u>Designated Depositors</u>") and (b) those municipalities with federal funds deposited at GDB listed on Schedule 9. Pursuant to, or otherwise consistent with, Article 303 of the GDB Restructuring Act, as in effect on August 24, 2017, effective as of the Closing Date, GDB shall transfer the assets currently owned by GDB and identified on Schedule 7 hereto (the "<u>Public Entity Trust Assets</u>") to the Public Entity Trust. A transfer of the Public Entity Trust Assets by GDB to the Public Entity Trust pursuant to the Public Entity Deed of Trust shall be treated as an irrevocable, non-voidable and absolute transfer of all of GDB's legal and equitable right, title and interest (as a true sale), and not a pledge or other financing, of the Public Entity Trust Assets. Upon the transfer of the Public Entity Trust Assets to the Public Entity Trust and the assumption by the Public Entity Trust of the Designated Depositors' deposits, the Designated Depositors shall, immediately and forever, and without further actions or documentation, cease to have any right, interest or claim against GDB or any of its assets, or any successors or assigns thereof (other than the Public Entity Trust).

</td></tr>
<tr><td>**Certain Municipal Issues**</td><td>

*Excess CAE Settlement*

If a municipality that has Excess CAE (as defined in the GDB Restructuring Act, as in effect on August 24, 2017) executes a settlement agreement with GDB providing a release (substantially similar to the release provided under Article 702 of the GDB Restructuring Act, as in effect on August 24, 2017, but effective as of the effective date of the settlement agreement) of all claims and causes of action (other than a claim for a Participating Bond Claim, if any) against GDB and the Issuer and agreeing not to challenge or otherwise take any action that is inconsistent with, or that would reasonably be expected to

</td></tr>
</table>

#90008132v43

prevent, interfere with, delay or impede the consummation of, the Restructuring, then, promptly upon the effective date of such settlement agreement, if so provided pursuant to an amendment to the GDB Restructuring Act, GDB shall pay, in cash, to such municipality an amount equal to 55% of the undisbursed Excess CAE corresponding to such municipality.

In the case of such municipalities that have Excess CAE but which do not execute a settlement agreement with GDB prior to the Closing Date, pursuant to Article 502 of the GDB Restructuring Act, as in effect on August 24, 2017, GDB shall pay to such municipality on the Closing Date, in cash, an amount equal to 55% of the undisbursed Excess CAE corresponding to such municipality.

Upon the effective date of a settlement agreement entered into by a municipality as described above or, in the case of municipalities that do not execute such a settlement agreement, upon the Closing Date, the remaining portion of such municipality's undisbursed Excess CAE shall be discharged, and such municipality shall have no further rights or claims thereto, and GDB shall have no further liability or obligation to such municipality in respect of the Excess CAE.

*Recalculation of Certain Municipal Obligations*

The principal amount of any bond, note and/or loan of any municipality of Puerto Rico held by GDB as of the Closing Date shall be automatically reduced by operation of law, effective as of the Closing Date, without the need for any further action, by an amount equal to the balance of proceeds of such bond, note and/or loan that were not disbursed to such municipality and were held on deposit at GDB on the Closing Date pursuant to the Municipal Financing Act, Act 64-1996, as amended. Such application shall be effected by reducing any remaining installments of principal in inverse order of maturity and shall not otherwise affect the repayment schedule of the corresponding bond, note or loan.

Any remaining municipal deposits held at GDB as of the Closing Date shall be reduced, effective as of the Closing Date, on a dollar-for-dollar basis, from the outstanding principal amount of any corresponding bond, note and/or loan (excluding the loans that are collateral for the Secured Deposit Account), relative to the type of corresponding deposit (CAE deposits against CAE loans, IVU deposits against IVU loans, and all undesignated deposits against outstanding principal balance of other loans in the following order: operational loans, revenue loans, IVU loans, then CAE loans). Such application will be effected in ascending order of outstanding loan balances. In cases where deposits are not enough to pay a loan in full, the application shall be effected by reducing installments of principal in inverse order of maturity without affecting the repayment schedule of the bond, note or loan. The remaining balances of the municipal loans shall be those certified by AAFAF, and all future payments of interest on such bonds, notes and/or loans shall be computed based on such balances.

#90008132v43

| Terms of New Bonds | *Payment of Interest from Available Cash* |
|---|---|
| | 7.500% annual coupon rate, payable semiannually in cash; *provided* that, if on any "Determination Date" (a date not more than 10 business days prior to the related interest payment date) in respect of the related interest payment date, Available Cash is not sufficient to pay in full all interest then payable on the New Bonds (including paid in kind interest outstanding at such time), such interest on the New Bonds shall be paid in cash *pro rata* to the extent of Available Cash and any unpaid balance of accrued current interest shall be paid in kind. All outstanding paid in kind interest (including any interest accrued thereon) shall be due and payable, together with other accrued interest on the New Bonds, on each interest payment date (subject to the above provisions if Available Cash is then insufficient to make such payments in cash) until such paid in kind interest is paid in full. |
| | *Amortization on Closing Date* |
| | Any Available Cash of the Issuer as of the Closing Date shall be paid to the holders of, and used to reduce, the principal balance of, the New Bonds on the Closing Date or as soon as practicable thereafter but in no event later than 5 business days following the Closing Date. |
| | *Amortization from Excess Available Cash* |
| | On each Determination Date in respect of the related interest payment date, if Available Cash of the Issuer exceeds the amount thereof to be used to pay interest, including all outstanding paid in kind interest, on the New Bonds on such interest payment date, such excess amount of Available Cash ("Excess Available Cash" on such interest payment date) shall be used to amortize the unpaid principal of the New Bonds. |
| | *Collateral Priority* |
| | The New Bonds will be automatically secured by a first priority perfected, valid and binding statutory lien on the New Bond Collateral. |
| | *Maturity* |
| | August 20, 2040 |
| **New Bond Collateral** | The "New Bond Collateral" shall include all legal and equitable right, title and interest in and to the Recovery Authority Assets (as defined below) (including, without limitation, the Beneficial Interest (as defined below) in property of GDB, the proceeds of which are required to be transferred to the Issuer) and all assets, collections, fees, charges, proceeds, revenues, rents, insurance payments, income or other funds generated by, or received by the Issuer, the Servicer or GDB in respect of, the Recovery Authority Assets, including in respect of the administration or reinvestment thereof. |
| | The "Recovery Authority Assets" shall include all legal and equitable right, title and interest in and to (i) all assets of GDB that are in existence as of the Closing Date (whether or not identified on the Closing Date), other than the Excluded Assets (as defined below), including, without limitation, (a) the |

public sector and municipal loans, advances to the Municipal Administration Fund and Municipal Financing Corporation, and GDB assets and properties identified in Schedule 3 and Schedule 4 hereto and (b) all unrestricted cash and cash equivalents of GDB in excess of the Specified Cash Assets (as defined below); (ii) the Beneficial Interest (as defined below) in, and the proceeds of, the public entity loans listed on Schedule 5 held at GDB, (iii) upon the date on which GDB is required, or chooses at its option, to transfer any public entity loan listed on Schedule 5, such public entity loan to be transferred; (iv) the Beneficial Interest in, and the proceeds of, any causes of action (other than causes of action to enforce loans that constitute Public Entity Trust Assets), including contingent or unknown causes of action and (v) all proceeds of any of the foregoing.

"Excluded Assets" means (i) the public entity loans listed on Schedule 5 held at GDB, *provided* that the Beneficial Interest in, and the proceeds of, such public entity loans shall be Recovery Authority Assets, *provided further* that if GDB, at its option, transfers to the Issuer any such loans at any time, such transferred loans shall be deemed to be Recovery Authority Assets upon such transfer, and *provided further* that each of the Performing Additional Loans (as defined herein) shall be deemed to be Recovery Authority Assets on the date that is the earlier of (x) the effective date of a modification, restructuring or similar transaction in respect of such Performing Additional Loan and (y) eighteen months after the Closing Date; (ii) cash to pay any transaction costs of the Restructuring, including professional fees and expenses of GDB, AAFAF, and the professionals to be paid pursuant to the RSA; (iii) causes of action, including contingent or unknown, held by GDB as of the Closing Date, *provided* that the Beneficial Interest in, and the proceeds of, such causes of action shall be Recovery Authority Assets; (iv) Public Entity Trust Assets; (v) loans and funds that are collateral for the Secured Deposit Account (as defined below); (vi) the Specified Cash Assets, to be retained by GDB, *provided* that the Vendor Claim Reserve Residual shall not constitute Excluded Assets but shall constitute Recovery Authority Assets; and (vii) office furniture, equipment and other supplies owned by GDB and used in the ordinary course of GDB's business (excluding all such property relating to the real property assets that are Recovery Authority Assets).

The "Specified Cash Assets" shall equal the sum of (a) the Vendor Claim Reserve (as defined below), other than the Vendor Claim Reserve Residual, (b) restricted cash held by GDB,[4] and (c) $28.9 million or such other amount for operating cash requirements of GDB as may be acceptable to the RSA Requisite Bondholders; *provided* that the Vendor Claim Reserve Residual shall constitute Recovery Authority Assets and, once identified, such Vendor Claim Reserve Residual shall be delivered to the Issuer as set forth below.

The "Vendor Claim Reserve Residual" shall be the amount equal to any cash or cash equivalents remaining in the account in respect of the Vendor Claim

---

[4] Restricted cash includes cash held in a segregated account separate from Available Cash, in an aggregate amount of approximately $22 million, for (i) the Employee's Incentive, Retirement and Retraining Program established under Act 70-2010; (ii) employee benefits under the early retirement windows of 1994, 2000 and 2007; (iii) the Voluntary Pre-Retirement Program established under Act 211-2015; (iv) the voluntary separation program included in GDB's certified fiscal plan; and (v) AAFAF's Administrative Order OA-2017-05.

Reserve after the payment of all Open or Disputed Vendor Claims (as defined below) determined by GDB to be valid. Any cash or cash equivalents related thereto shall be transferred to the Issuer after such determination as part of the Recovery Authority Assets.

"Beneficial Interest" means the beneficial interest in, and the right to receive the proceeds (net of expenses associated with realizing such proceeds) of, in each case, after giving effect to the rights of GDB as set forth herein, as applicable, (i) causes of action, including contingent or unknown, held by GDB, *provided* that GDB shall have no duty to pursue any such causes of action and shall have the absolute discretion to settle, offset, or release such causes of action, or (ii) public entity loans listed on Schedule 5 held at GDB; *provided*, in the case of both (i) and (ii), that GDB shall have no duties in respect of the Issuer or the holders of the New Bonds except to the extent set forth in this Term Sheet or the Definitive Documents.

The Recovery Authority Assets shall be irrevocably assigned and transferred to the Issuer on the following dates in the following manner (for the avoidance of doubt, references below to "transfer" shall refer to an irrevocable assignment and transfer:

- All Recovery Authority Assets in existence on the Closing Date shall be transferred to the Issuer on the Closing Date.

- Any unknown assets that constitute Recovery Authority Assets in existence on the Closing Date shall be transferred to the Issuer on the Closing Date with all other Recovery Authority Assets then in existence, and upon discovery of any such unknown assets, GDB shall take any necessary steps to complete the transfer thereof to the Issuer within 15 days, pending which such assets shall be held in trust for the Issuer.

- Each of the Performing Additional Loans may be transferred to the Issuer at any time and shall be transferred to the Issuer upon the earlier of (a) the effective date of a modification, restructuring or similar transaction in respect of such loan and (b) eighteen months after the Closing Date.

- GDB may, at its option, transfer to the Issuer any of the public entity loans listed on Schedule 5, other than the Performing Additional Loans, at any time, at which time such transferred loans shall be deemed to be Recovery Authority Assets.

- To the extent that any cash that constitutes Excluded Assets remains at GDB after payment of the obligations provided for herein, such cash shall become Recovery Authority Assets and, as such, shall be transferred to the Issuer.

- Any other Recovery Authority Assets not transferred to the Issuer on the Closing Date and not otherwise provided for above, including, but not limited to, the Vendor Claim Reserve Residual and the proceeds of (i) any causes of action in existence on the Closing Date and (ii) the

public entity loans identified on Schedule 5 held at GDB (in each case, net of the expenses associated with obtaining such proceeds) shall be delivered to the Issuer within 15 days after such assets are received by GDB or otherwise become known and identifiable.

All proceeds of New Bond Collateral, whenever received and including without limitation cash payable to the Issuer in respect of loans and advances included in the New Bond Collateral, will remain in the ownership and control of the Issuer, subject to a perfected, valid and binding statutory lien securing the New Bonds.[5]

The Issuer (and the Servicer on behalf of the Issuer) and GDB shall be obligated, limited and empowered, as applicable, in respect of the management of the New Bond Collateral as follows:

- Neither the Issuer (nor the Servicer nor any other entity on behalf of the Issuer) may dispose of any municipal loans listed on Schedule 3 without the consent of AAFAF or any other agent designated by the Commonwealth, which entity may take into account the public policy goals of the Commonwealth, which consent shall not be unreasonably withheld (taking into account such goals).

- The Issuer (and the Servicer on behalf of the Issuer) shall have all rights and powers of GDB[6] in respect of the municipal loans listed on Schedule 3, other than as specified in the immediately foregoing bullet.

- The Issuer (and the Servicer on behalf of the Issuer) shall have the right to exercise remedies in respect of the public entity loans held by the Issuer listed on Schedule 4, but solely to the extent necessary to assure that funds from those entities that are available for debt service, in accordance with and pursuant to applicable loan documents, Oversight Board-approved fiscal plans (if any) and Oversight Board-approved budgets (if any), are applied to such loans in accordance with the legal priority, security or other pledge rights benefiting such loans. Furthermore, the Issuer (and Servicer on behalf of the Issuer) will be entitled to rights and remedies necessary to preserve, protect or defend any security or other pledge rights benefiting such loans. In furtherance of the foregoing, for any such loan where the obligor on such loan is in Title III or Title VI proceedings and such obligor has other creditors that have the same legal priority, security and pledge rights as the Issuer, the Issuer will be entitled to rights and remedies necessary to ensure that the Issuer receives treatment in such proceedings that is the

---

[5] This presumably will be arranged through accounts maintained by the trustee. As noted above, proceeds of New Bond Collateral previously directed to GDB will have to be paid directly to the Issuer or the Servicing Agent pursuant to any necessary agreements or legislation.

[6] The current interest rates of the loans that are Recovery Authority Assets will not be changed prior to the Closing Date, and, after the Closing Date, GDB's bestowed power, as the former fiscal agent to the Commonwealth, to make upward adjustments to the interest rates shall be retained and not be transferred upon the transfer of the Recovery Authority Assets to the Issuer. For the avoidance of doubt, GDB agrees it will not make any downward adjustment in interest rates applicable to such loans, whether prior to or after the Closing Date.

|  | same as that provided to other creditors that have the same legal priority, security and pledge rights. |
| --- | --- |
|  | • The Issuer (and the Servicer on behalf of the Issuer) may sell the assets listed on Schedule 4 if such sale is consistent with the servicing standards set forth in the Servicing Agreement. |
|  | • Any modification by GDB (or any entity on behalf of GDB) of the Center for Municipal Revenue Collection ($106 million) loan, the University Medical Services ($10 million) loan, and the Economic Development Bank (~$7 million, excluding ~$35 million deposit) loan, each as listed on Schedule 5 (collectively, the "Performing Additional Loans") shall (i) not include any provision that would result in the removal of any lien, security or other pledge rights benefiting such loan except to the extent required for the sale of any such collateral where the proceeds of that collateral will be immediately made available to the Issuer and (ii) be approved by the financial advisor to the Ad Hoc Group (as defined in the RSA) or, if such modification occurs after the Closing Date, the Servicer as commercially reasonable (provided, for the avoidance of doubt, that the Servicer's approval of such modification may only be given after the Collateral Monitor has received 10-days' notice of the approval of the modification and has not objected). |
|  | • In respect of the public entity loans listed on Schedule 5 held at GDB, GDB shall have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on such loans, *provided* that it shall not be required to bring any action seeking to obtain a judgment against such public entity or seeking to foreclose upon any of its assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such loans and (b) provide the Issuer, the Servicer and the Collateral Monitor with all material communications and other materials relating to any modification, restructuring or similar transaction in respect of such loans. |
|  | • In respect of the causes of action referenced in clause (iv) of the definition of "Recovery Authority Assets," none of the Issuer, the Servicer, the Indenture Trustee or any other party (other than GDB) shall have the right to commence or direct any litigation or other enforcement action in respect of, or sell, transfer or dispose of such causes of action. |
| **Events of Default / Acceleration** | "Events of Default" in respect of the New Bonds shall include the following: |
|  | • Failure by the Issuer to accrue any paid in kind interest as required or to make any required payment from Available Cash in respect of any of the New Bonds, on the date on which the same is due; |
|  | • After written notice by the Indenture Trustee or the holders of New Bonds holding not less than 25% of the aggregate principal amount of the New Bonds then outstanding, a failure by the Issuer to observe or perform any covenant or agreement contained in the Indenture, and |

such failure continues or is not cured for a period of 60 days;

- Any insolvency, bankruptcy, reorganization, restructuring, receivership or any other form of debtor relief is sought by or against the Issuer, whether under federal or Puerto Rico law;

- Any legislation is enacted, governmental[7] action is taken, or any party (other than an obligor under the New Bond Collateral) is determined by a final, nonappealable order or admitted in writing by the Issuer to have rights that, in any such case, adversely affects (i) the receipt of current or future proceeds of the New Bond Collateral to which the Issuer is entitled (other than by reason of (A) a failure, delay or default of the obligor under such New Bond Collateral, (B) an obligor being subject to a proceeding under PROMESA or to any provision thereof, or (C) changes in taxation or restrictions on the enforcement of rights or remedies, so long as such changes or restrictions are not directed solely at the Issuer, the New Bond Collateral, the New Bonds or the holders of New Bond relative to any other entity, asset, security or security holder) in respect of assets having an aggregate value on the Closing Date of $25 million or more[8] or (ii) the binding effect or enforcement in accordance with their respective terms of the GDB Restructuring Act, the Qualifying Modification, Non-Municipal Government Entity Resolution, the Indenture, the New Bonds or the liens on the New Bond Collateral;

- Entry of a judgment against the Issuer in the amount of $10 million or more;

- The occurrence of a default by GDB under the transfer agreement pursuant to which GDB is to transfer to the Issuer the Recovery Authority Assets, which default is continuing and is not cured for a period of 10 days, after notice or discovery;

- The Issuer permits the validity or effectiveness of the Definitive Documents to be impaired or any person to be released from any covenants or obligations with respect to the New Bonds; and

- Other customary events of default.

If an Event of Default occurs and is continuing, at the request of holders of at least 25% in aggregate principal amount of all New Bonds, subject to customary provisions related to rights of the Indenture Trustee, the Indenture Trustee shall, by notice to the Issuer and the Servicer, declare the outstanding principal amount of all New Bonds to be immediately due and payable.

In addition, if an Event of Default occurs and is continuing, or the Issuer fails to

---

[7] Governmental action for these purposes shall include the government of Puerto Rico, its instrumentalities and any government-controlled or managed entities, including entities with directors or management controlled or appointed by the government of Puerto Rico.

[8] The value of an asset for this purpose is the face amount of such asset (in the case of loans) or the book value of such asset (in the case of other assets).

#90008132v43

| | pay all outstanding amounts on the New Bonds by the final scheduled payment date, the Indenture Trustee may, or upon the direction of holders of at least 25% in aggregate principal amount of all New Bonds, will, apply to any Commonwealth or Federal court of competent jurisdiction in Puerto Rico for the appointment of a receiver for the Issuer. Such receiver so appointed will have, hold, use, operate, manage, and control the New Bond Collateral for the benefit of the holders of the New Bonds and will exercise all the rights and powers of the Issuer with respect to such New Bond Collateral as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby. |
|---|---|
| **Covenants** | The Indenture shall contain covenants in form and substance acceptable to the RSA Requisite Bondholders, including covenants regarding the Servicer, information, budgeting, collateral management, negative pledge, further assurances, permitted business activities, limitation on assets sales, limitation on investments, limitations on indebtedness and other customary covenants.

Among other things, the covenants will provide that:

1. The Issuer shall enter into a continuing disclosure agreement that requires, no less than annually, the Issuer to provide or cause to be provided audited annual reports to the holders of New Bonds[9] regarding the assets, liabilities and cash flows of the Issuer, as well as other financial information, in each case in form and substance as specified in the continuing disclosure agreement (*provided, however*, that a breach of this covenant will not result in an Event of Default under the Indenture).

    a. The continuing disclosure agreement shall require the Issuer to provide or cause to be provided to the holders of New Bonds, not later than a specified date prior to the beginning of each fiscal year, a detailed annual operating budget indicating the Issuer's good faith projection of monthly operating expenditures of the Issuer for the upcoming fiscal year.

    b. In addition, the continuing disclosure agreement shall require the Issuer to provide or cause to be provided to the holders of New Bonds, (i) a quarterly update of the year's operating budget to show actual expenditures for the quarter(s) then ended, and projected expenditures for the remainder of the fiscal year, reconciled to the previously posted budget for such periods, (ii) a semiannual report of the Collateral Monitor regarding the Compliance Test (as defined below), the Servicer's performance and compliance with the applicable servicing standards, any material actions taken with regard to the New Bond Collateral and any actions taken with regard to non-performing loans and (iii) information as reasonably |

---

[9] The first audited reports of the Issuer shall be provided within 180 days after the end of the Issuer's first fiscal year ending after the Closing Date. Reports to holders of New Bonds may be provided through appropriate web posting in a form to be agreed.

#90008132v43

|  | requested by any holder of New Bonds for U.S. tax reporting purposes.<br><br>    c.   The continuing disclosure agreement will also require the Issuer to provide or cause to be provided any further disclosures, if any, required in connection with any required compliance with Rule 15c2-12 under the Securities Act as requested by the participating underwriter(s), if any.<br><br>2.  The Issuer shall not sell, transfer, encumber, exchange, otherwise dispose of, or waive any rights with respect to, any of the assets of the Issuer, including any of the New Bond Collateral, other than as directed by the Servicer.<br><br>3.  The Issuer shall not claim any credit on or make any deduction from the principal and interest payable in respect of the New Bonds or assert any claim against any present or former holder of the New Bonds because of the payment of taxes levied or assessed upon the Issuer.<br><br>4.  The Issuer shall not dissolve or liquidate in whole or in part.<br><br>5.  The Issuer shall not incur current expenses or any other obligations exceeding, in the aggregate, a cap to be agreed upon by the RSA Requisite Bondholders and AAFAF in any year other than, among other things to be agreed upon by the RSA Requisite Bondholders and AAFAF, (a) in respect of the New Bonds, (b) amounts to be paid to professionals pursuant to the Restructuring Support Agreement, (c) amounts owed to the Servicer, Indenture Trustee and Collateral Monitor and (d) expenses arising from (i) any bondholder solicitation required under the terms of the Indenture, (ii) any litigation or investigation, brought against or reasonably brought by the Issuer or the Board of Trustees (as defined below) (including any related indemnification costs) or (iii) any request by a holder of New Bonds for information for U.S. tax reporting purposes. Such cap shall be subject to customary annual inflation adjustments.<br><br>6.  The Issuer shall not permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance to be created on, or extend to or otherwise arise upon or burden, the assets of the Issuer or any part thereof, or any interest in the assets of the Issuer or the proceeds thereof other than the liens on the New Bond Collateral securing the Indenture and the obligations of the Issuer under the New Bonds, the Indenture and any related documents or instruments.<br><br>7.  The Issuer shall comply in all material respects with its obligations under the Definitive Documents, including the transfer agreement, the Servicing Agreement and the Collateral Monitor Agreement. |
|---|---|
| **Structure and Governance of Issuer** | *Approval of Structure and Governance of Issuer.* The structure and governance of the Issuer, the form of Indenture for the New Bonds and other related documents, and the identity and terms of employment of the initial Collateral Monitor and the initial Servicer shall be acceptable to the RSA Requisite |

#90008132v43

Bondholders, AAFAF, and GDB.

*Board of Trustees of the Issuer.* The Issuer shall be managed by a board of trustees (the "Board of Trustees") initially composed of David Pauker, Matthew Karp and Jorge Padilla. Each member of the Board of Trustees is (i) appointed for a three-year term and may serve for consecutive terms as an appointed member, and (ii) entitled to one vote. In the event of a vacancy, the Governor will appoint a successor that meets the independence and qualification standards set forth in the Definitive Documents, including that no member of the Board of Trustees may be an officer, employee or director of the government of Puerto Rico or any instrumentality thereof (other than the Issuer) and must have executive experience in finance or with respect to assets like the New Bond Collateral and be otherwise qualified to serve on the Board of Trustees.

*Cash Flow Tests for Compliance.* GDB has delivered a schedule of contracted cash flows of municipal loan interest and amortization through 2040 (the "Cash Flow Schedule") exhibited hereto as Schedule 8. The Servicer will provide a semiannual report to the Collateral Monitor with updated municipal loan interest collections and amortization collections to be used for testing purposes on a semiannual basis (the date of each such report, a "Test Date") for purposes of the Collateral Monitor's semiannual report of compliance with the Compliance Test, as provided above. If the cumulative shortfall of the actual municipal loan portfolio cash flows as compared to the scheduled cash flows in the Cash Flow Schedule from the most recent payment date in respect of such municipal loans prior to the Closing Date through the Test Date is 10.0% or more (the "Compliance Test") as of any Test Date, a default by the Servicer under the Servicing Agreement shall have occurred.

*Collateral Monitor Consent Rights.* The Collateral Monitor shall be given not less than ten days' prior written notice of any material modification, extension, accommodation or disposition of any New Bond Collateral, and such transaction may be entered into (or approved) by the Issuer (or the Servicer or any other entity on behalf of the Issuer) only if, after the end of such ten-day period, the Collateral Monitor has not reasonably objected to such transaction on the grounds that such transaction is not commercially reasonable. At the time of delivery of such written notice by the Servicer, the Collateral Monitor shall be provided with access to the Servicer and all information necessary in order to make a determination as to the commercial reasonableness of such modification, extension, accommodation or disposition, but the Collateral Monitor will have no right to participate in discussions or negotiations (in any form) with obligors under the New Bond Collateral.

*Replacement of the Servicer.* Subject to the procedures set forth below, the Servicer may be removed and replaced by the holders of New Bonds upon the occurrence of a default under the Servicing Agreement that is material to the interests of holders of New Bonds (a "Servicer Replacement Event"). The Collateral Monitor shall notify the holders of the New Bonds when (a) the Collateral Monitor believes, in good faith, that a default by the Servicer under the Servicing Agreement has occurred and is continuing and (b) the Collateral Monitor believes, in its sole discretion, that such default is material to the interests of bondholders. Defaults under the Servicing Agreement shall include, without limitation, (i) cause, as set forth under the terms and conditions of the

Servicing Agreement, (ii) failure to meet the Compliance Test, (iii) failure to timely deliver the information necessary to verify the Compliance Test, (iv) failure to use commercially reasonable efforts to maximize the value of the New Bond Collateral (subject to any restrictions included in the Servicing Agreement, as set forth in this Term Sheet) and (v) entering into any modifications, extensions or accommodations in respect of the New Bond Collateral that are, individually or in the aggregate, not commercially reasonable[10] (subject to any restrictions included in the Servicing Agreement, as set forth in this Term Sheet). Such notice from the Collateral Monitor shall give a detailed narrative and explanation of (i) the facts sustaining the evaluation of the Collateral Monitor, (ii) the possible effects to the interests of the holders of New Bonds, (iii) the recommendation of the Collateral Monitor regarding a possible Servicer Replacement Event and (iv), if the Board of Trustees chooses, the recommendation of the Board of Trustees regarding a possible Servicer Replacement Event. Concurrently with the notice of a possible Servicer Replacement Event, the Issuer shall issue a posting on the Electronic Municipal Market access website or other similar public posting and a bondholder vote shall be solicited regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced. If holders of one-third of the aggregate principal amount of the New Bonds then outstanding (or, if an event of default under the New Bonds has occurred and is continuing, holders of 25% of the aggregate principal amount of the New Bonds then outstanding) vote that a Servicer Replacement Event has occurred and the Servicer should be replaced, the Issuer shall initiate a competitive process, reasonably satisfactory to the Collateral Monitor, for the identification of a possible successor Servicer, who shall be a "qualified" and "independent" (as such terms are defined in the Definitive Documents) successor Servicer of recognized national standing with the requisite expertise and Spanish speaking capability. The Issuer (or, if the Issuer fails to act within 45 days, the Collateral Monitor[11]) shall then designate a successor Servicer acceptable to the Collateral Monitor for a preliminary 60-day period on terms acceptable to the Collateral Monitor. Any approval of the successor Servicer or terms of its engagement required from the Collateral Monitor shall not be unreasonably withheld. The Collateral Monitor will then give notice to the bondholders of (i) the successor Servicer, (ii) the terms of the successor Servicer's engagement, (iii) any additional information the Collateral Monitor would like to provide and (iv) any additional information the Issuer would like to provide. If holders of one-third of the aggregate principal amount of the New Bonds then outstanding (or, if an event of default under the New Bonds has occurred and is continuing, holders of 25% of the aggregate principal amount of the New Bonds then outstanding) do not object to the identity or terms of the successor Servicer's engagement within 60 days, the successor Servicer's engagement shall become final, subject to the terms and conditions of such Servicer's Servicing Agreement.

---

[10] If the Collateral Monitor fails to object to a modification, extension or accommodation during the 10 day period described elsewhere herein, such modification, extension or accommodation will be presumed to be commercially reasonable and will not, individually, be the basis for a default under the Servicing Agreement.

[11] If, pursuant to the procedures described herein, the Collateral Monitor assumes the duty to appoint a successor Servicer, the Collateral Monitor will make reasonable efforts to consult with the Issuer in appointing such Successor.

#90008132v43

| | |
|---|---|
| | *Replacement of the Collateral Monitor.*  The Collateral Monitor may be removed and replaced by the Indenture Trustee for cause and must be removed and replaced by the Indenture Trustee at the direction of holders of 25% of the aggregate principal amount of the New Bonds then outstanding, in each case, which removal decision may be rescinded and annulled by the holders of a majority of the aggregate principal amount of the New Bonds then outstanding. The identity and terms of engagement of the successor Collateral Monitor must be acceptable to the holders of a majority of the aggregate principal amount of the New Bonds that vote in a solicitation nominating such successor.<br><br>In all events the Issuer will be structured so as to allow the New Bonds to constitute exempt securities under Section 3(a)(2) of the 1933 Act or any other applicable exemption. |
| **Vendor Claim Reserve** | The amount of cash equal to the aggregate amount of claims asserted against GDB by parties that provided goods and services to GDB in the ordinary course of business (such amount at any time, the "<u>Vendor Claim Reserve</u>"), which claims are disputed by GDB on the Closing Date or for which payment has not yet become due ("<u>Open or Disputed Vendor Claims</u>"), shall remain at GDB in a separate account subject to a perfected security interest in favor of the Issuer securing the obligation to transfer to the Issuer the Vendor Claim Reserve Residual.  Any cash or cash equivalents constituting Vendor Claim Reserve Residual remaining in the account in respect of the Vendor Claim Reserve after the payment of all Open or Disputed Vendor Claims determined by GDB to be valid shall be Recovery Authority Assets and as such shall be required to be transferred to the Issuer. |
| **Certain Definitions** | "<u>Available Cash</u>" of the Issuer on any Determination Date in respect of a related interest payment date means all cash and cash equivalents of the Issuer (whether arising from proceeds of New Bond Collateral or otherwise) at such time, other than amounts owed to the Servicer, the Indenture Trustee and the Collateral Monitor and the Issuer Expense Reserve (as defined below) at such time.<br><br>"<u>Issuer Expense Reserve</u>" of the Issuer on any Determination Date in respect of a related interest payment date means the amount of cash reasonably expected to be required to pay the operating expenses of the Issuer through the next Determination Date based on a good-faith projection prepared by the Servicer.[12]<br><br>"<u>Pro rata</u>" means, with respect to any cash distribution to holders of New Bonds or any vote of holders of New Bonds, a ratable distribution or vote based on the principal amount of the New Bonds outstanding at the time of such distribution or vote.<br><br>"<u>Secured Deposit Account</u>" means an account in the name of Asociación de Empleados del ELA (Account Number B6347044) in an amount of approximately $25.4 million. |

---

[12] A budget shall be prepared subject to the terms of the Servicing Agreement to be agreed upon and acceptable to the RSA Requisite Bondholders.

#90008132v43

| Voting | Unless otherwise specified, amendments, modifications and waivers of the governing documents of the New Bonds or other matters requiring the consent of the holders of the New Bonds shall generally require the consent of holders of not less than a majority of the aggregate principal amount of the New Bonds then outstanding; *provided* that amendments and modifications that customarily do not require bondholder consent shall be excluded from such consent requirement;[13] and *provided*, *further* that any amendments, modifications or waivers that would have the effect on any New Bond of reducing principal, extending maturity, reducing the interest rate payable, or adversely affecting lien priority or any other amendments, modifications or waivers customarily requiring the consent of each adversely affected holder shall require the consent of each holder of New Bonds adversely affected by such amendment, modification or waiver. |
|---|---|
| Certification Order | GDB shall submit an application to the United States District Court for the District of Puerto Rico (or any other court of competent jurisdiction pursuant to PROMESA) for an order pursuant to section 601(m)(1)(D) of PROMESA that the requirements of section 601 of PROMESA have been satisfied by the Qualifying Modification as set forth herein (the "Certification Order"), which order shall be in form and substance satisfactory to the RSA Requisite Bondholders, and shall provide, among other things, that:<br><br>• the Qualifying Modification is valid and binding on any person or entity asserting claims or other rights, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of Participating Bond Claims subject to the Qualifying Modification, any trustee, any collateral agent, any indenture trustee, any fiscal agent and any bank that receives or holds funds related to such Participating Bond Claims;<br><br>• the Recovery Authority Assets will vest free and clear of all claims of any other issuer pursuant to section 601(m)(2) of PROMESA;<br><br>• the Qualifying Modification is full, final, complete, binding, and conclusive as to GDB, the Issuer, the Government of Puerto Rico (as defined in PROMESA), any other Territorial Instrumentality (as defined in PROMESA) of the Government of Puerto Rico and any creditors of such entities, and is not be subject to any collateral attack or other challenge by any such entities in any court or other forum; and<br><br>• the release and exculpation of the Released Parties (as defined below) by all other Released Parties as provided below is fully-enforceable and shall not be subject to attack or avoidance in any other proceeding under PROMESA or otherwise. |
| Conditions | Conditions precedent to the Closing Date shall include, but not be limited to, |

---

[13] Such as to cure ambiguities or any defective provision in the governing documents, to comply with regulations related to the registration of beneficial ownership interests, or to modify or amend the indenture to permit the qualification under the Trust Indenture Act, in the case of any of the foregoing, only to the extent that the amendment has no adverse effect, whether or not material, on holders of the New Bonds.

the following:

- Certification of the Restructuring as a Qualifying Modification pursuant to section 601(g)(1)(C) of PROMESA;

- Establishment of one or more Pools of Bond Claims (as defined in PROMESA) by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") in accordance with the requirements of section 601(d)(3) of PROMESA.

- Distribution of the required disclosure documents and voting instructions to the Holders by the Information Agent (as defined in PROMESA) pursuant to section 601(f) and (k) of PROMESA;

- Satisfaction of the voting requirements set forth in section 601(j) of PROMESA with respect to the Qualifying Modification;

- Passage of any additional legislation that may be necessary to enable the creation of the Issuer in form and substance satisfactory to the RSA Requisite Bondholders, and which includes such provisions as may be required for consummation of the transactions contemplated by the Restructuring and implementing the terms set forth herein, including, without limitation, any provisions necessary for (i) the Issuer to be treated as a municipal issuer under applicable securities laws, (ii) cash flows arising out of the New Bond Collateral to be paid directly (i.e., directly from CRIM or any other applicable collection entity) to the Issuer from and after the Closing Date, (iii) permitting the bond documents to contain remedies for breach as set forth herein, including confirming the ability of the holders of the New Bonds to have a receiver appointed in accordance with the remedies provisions set forth above, and (iv) providing the Issuer with the powers, authorities and remedies in respect of the New Bond Collateral as provided herein, and such legislation is in full force and effect;

- Certification pursuant to section 601(m) of PROMESA that (i) voting requirements have been satisfied, (ii) the Qualifying Modification complies with section 104(i)(1) of PROMESA, and (iii) any conditions on the effectiveness of the Qualifying Modification have been satisfied or waived;

- Entry of the Certification Order;

- The Non-Municipal Government Entity Resolution shall have been effectuated, pursuant to, or otherwise consistent with, Chapter 3 of the GDB Restructuring Act, and the Public Entity Trust, in form and substance satisfactory to GDB and the RSA Requisite Bondholders shall have been established and the Public Entity Trust Assets shall have been transferred to the trustee of the Public Entity Trust;

- The Issuer shall have been created pursuant to governing documents in form and substance satisfactory to GDB and the RSA Requisite Bondholders;

| | |
|---|---|
| | • The Public Entity Deed of Trust and Servicing Agreement shall have been executed and delivered, in form and substance satisfactory to GDB and the RSA Requisite Bondholders, and shall be in full force and effect; |
| | • All other Definitive Documents shall have been executed and delivered in form and substance satisfactory to GDB and the RSA Requisite Bondholders, and shall be in full force and effect;[14] |
| | • GDB shall have determined, and notified the relevant municipalities of, the recalculation of municipal obligations, in accordance with the provisions set forth above; |
| | • Legal opinions of counsel to GDB in form and substance acceptable to the RSA Requisite Bondholders shall have been delivered to the trustee or other applicable party regarding the Definitive Documents and the Restructuring; and |
| | • All professional fees and expenses required to be paid under the RSA on or prior to the Closing Date shall have been paid on or prior to the Closing Date. |
| **Keepwell Agreement** | Upon the exchange of the Participating Bond Claims for the New Bonds, GDB will transfer to the Issuer the Recovery Authority Assets and enter into a Keepwell Agreement with the Issuer, which will provide that if any New Bond Collateral is returned or conveyed to GDB for any reason, or if the transfer thereof to the Issuer is deemed invalid or void for any reason, GDB will take such steps as may be necessary to irrevocably retransfer or reconvey such New Bond Collateral to the Indenture Trustee to be applied to payments in respect of the New Bonds in accordance with the terms of the Definitive Documents (or if such retransfer or reconveyance violates any law or court order, to take such other actions as may be necessary such that the holders of the New Bonds receive the economic equivalent thereof), until payment in full of all principal, interest and any other amounts owing under the New Bonds with any remaining balance delivered to the Issuer.

The Keepwell Agreement will further provide that GDB will indemnify and hold the holders of the New Bonds (collectively, the "Indemnified Parties") harmless from and against all damages and losses suffered or incurred by the Indemnified Parties as the result of any legislative action or determination by a court of competent jurisdiction causing the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the trustee and the holders of the New Bonds in respect of the New Bond Collateral or the New Bonds to be impaired, rescinded or avoided or otherwise rendered not enforceable in accordance with their terms (the "Covered Losses"); provided, that an Indemnified Party shall not be entitled to indemnification for Covered Losses if the circumstances giving rise to such Covered Losses result from the actions of such Indemnified Party. For the avoidance of doubt, it is the intention of the parties that such |

---

[14] The Definitive Documents shall include all documents relating to the engagement of the initial Servicer, specifying the compensation to which the Servicer will be entitled, all in form and substance acceptable to GDB and the RSA Requisite Bondholders.

#90008132v43

| | |
|---|---|
| | indemnification and hold harmless provision shall give rise to claims in favor of the Indemnified Parties against GDB in an amount such that, after giving effect to such claims and any distributions thereon, including in any bankruptcy, insolvency, receivership or similar proceedings in respect of GDB, the Indemnified Parties will be fully compensated for the Covered Losses, subject to the proviso in the foregoing sentence.

Under the terms of the Keepwell Agreement, the holders of the New Bonds and the Indenture Trustee, for the benefit of the holders of the New Bonds, shall be express third-party beneficiaries of the Keepwell Agreement and shall be entitled to the rights and benefits thereunder and may enforce the provisions thereof, as if they were parties thereto, notwithstanding (i) any waiver or other action by the Issuer or (ii) any legislative action or determination by a court resulting, in the case of (ii), in the rescission, avoidance or other unenforceability of the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee or the holders of the New Bonds in respect of the New Bond Collateral or the New Bonds. |
| **Releases** | To the extent permitted by applicable law, the Qualifying Modification shall provide for customary releases from GDB, AAFAF, and the Holders (solely in their capacity as creditors of GDB and not in their capacity as creditors of any other entity) for the benefit of each other and each of their respective current directors, managers, officers, affiliates, partners, subsidiaries, principals, employees, agents, managed funds, representatives, attorneys, and advisors, together with their successors and assigns (collectively, the "Released Parties"). |
| **Governing Law; Jurisdiction; Remedies** | The New Bonds will be governed and construed in accordance with the laws of the State of New York.

Any legal action, suit, or proceeding arising out of or relating to the New Bonds brought by any party or its successors or assigns shall be brought in any federal district court sitting in Puerto Rico and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereto.

Remedies may not be exercised against GDB or Issuer in respect of a curable breach or violation of the Definitive Documents or the Qualifying Modification by such party unless 10 days' written notice and a request for cure is given to such party, and such party fails to cure; *provided, however*, with respect to defaults that are not able to be cured, such notice and opportunity to cure need not be given. |

#90008132v43

**Schedule 1**
**Title VI Bond Claims**

**GDB Senior Notes**

| CUSIP | Maturity | Principal Amount [1] | Coupon (%) |
|---|---|---|---|
| 745177CH | 12/1/2016 | $19,195,000 | 5.00 |
| 745177CJ | 12/1/2017 | 10,635,000 | 5.00 |
| 745177EN | 8/1/2020 | 433,702,000 | 5.50 |
| 745177EP | 8/1/2025 | 151,259,000 | 5.75 |
| 745177ET | 8/1/2019 | 217,715,000 | 5.40 |
| 745177EU | 8/1/2025 | 96,411,000 | 5.75 |
| 745177EX | 5/1/2016 | 360,009,671 | 4.70 |
| 745177FB | 8/1/2017 | 226,855,000 | 4.15 |
| 745177FC | 8/1/2019 | 174,545,000 | 4.50 |
| 745177FD | 8/1/2021 | 142,640,000 | 4.90 |
| 745177FE | 8/1/2022 | 47,465,000 | 4.95 |
| 745177FF | 8/1/2023 | 540,745,000 | 5.00 |
| 745177FH | 8/1/2026 | 126,820,000 | 5.20 |
| 745177FK | 8/1/2018 | 317,935,000 | 4.35 |
| 745177FM | 2/1/2017 | 250,000,000 | 3.88 |
| 745177FN | 2/1/2019 | 500,000,000 | 4.38 |
| 745177GG | 5/1/2017 | 39,990,329 | 4.70 |
| GDB Senior Guaranteed Notes | | 110,000,000 | 8.00 |
| | | **$3,765,922,000** | |

**Source:** Bloomberg

**Notes**

(1) Includes missed principal payments as of January 2018.

**Schedule 1**
**Title VI Bond Claims**

| Entity | Balance Post Set-Off |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Municipalities**[1] | |
| Carolina | $52,779,154 |
| Fajardo | 15,137,902 |
| Hatillo | 506,087 |
| Humacao | 9,489,880 |
| Lares | 1,477,679 |
| Rincon | 448,602 |
| **Total** | **$79,839,305** |
| **Other Deposits / Claims** | |
| Bank of New York Mellon as Beneficiary under Letter of Credit re: Puerto Rico Ports Authority | $190,630,000 |
| PR Science and Technology Trust | 95,945,159 |
| Municipal Administration Fund (FAM) | 21,746,574 |
| First Bank as Agent for Lenders to CCHPR Hospitality, LLC (Sheraton) | 13,630,000 |
| Commonwealth Employees Association (AEELA) [2] | 13,622,243 |
| PR Highways and Transportation Authority (HTA) [3] | 13,000,000 |
| Puerto Rico Development Fund | 11,000,000 |
| Cooperative Development and Investment Fund (FIDECOOP) | 7,899,509 |
| PREPA Pension System | 4,134,515 |
| Serralles / Costa Sur / Costa Caribe | 3,015,914 |
| MCS Advantage Inc. | 615,276 |
| Citibank | 612,372 |
| Medical Card System Inc | 410,899 |
| Caguas Coop | 200,000 |
| Cooperativa Dr. Manuel Zeno Gandia | 51,872 |
| Banco Cooperativo (Cooperative Bank) | 3,678 |
| A.T/V.Suarez | 3,121 |
| Poultry Products of the Caribbean | 275 |
| Indulac | 133 |
| Institutional Trust of Puerto Rico's National Guard | 2 |
| **Total** | **$376,521,540** |

**Notes**

(1) Pursuant to the GDB Restructuring Act, deposits of municipalities are net of (1) Excess CAE (as defined in the GDB Restructuring Act) and (2) full municipal deposits are applied against municipal loans, after corresponding escrow deposits to escrow loans, relative to the type of corresponding deposit. (CAE Deposits against CAE Loans, IVU Deposits against IVU Loans, with all undesignated deposits applied to outstanding principal balances in order of Operational, Revenue, IVU, then CAE). Deposit balances are applied against the corresponding loan types in ascending order of outstanding balances.

(2) Excludes $13.1 m in deposits secured by five municipal CAE loans excluded from the Issuer Collateral; refer to Schedule 3.

(3) Account established at GDB in the name of HTA to deposit certain proceeds (the "Deposits") of a loan HTA requested to make certain payments to Siemens Transportation Partnership Puerto Rico, S.E. ("Siemens") and others pursuant to a Settlement Agreement dated May 29, 2010 between HTA, Siemens, Alternate Concepts, Inc., and J.R. Requena & Associates. Siemens asserts entitlement to the Deposits, relying on a Second Settlement Amendment to Settlement Agreement between HTA and Siemens dated June 5, 2017 and/or a Guaranty Agreement by and between Siemens and GDB. GDB reserves all rights to dispute Siemens' claims to the Deposits, including any portion thereof.

**Schedule 2**
**Contingent and Unliquidated Title VI Bond Claims**

| Entity |
| --- |
| |
| PR Public Finance Corporation Stand-By Letter of Credit[1] |
| Lehman Brothers Special Financing, Inc. - Debt Service Deposit Agreement[2] |

**Notes**

(1) Represents a stand-by letter of credit (the "Stand-by LOC") for the benefit of Puerto Rico Public Finance
Corporation 2011 Series A and B Bonds and 2012 Series A Bonds (the "Bonds"). The Stand-by LOC does not have an
impact on GDB's financial condition. The Trustee for the Bonds may only draw from the Stand-by LOC when the
following conditions exist: (i) a budget for a new fiscal year is not approved  and adopted, and (ii) a legislative
appropriation for the current fiscal year exists and is lower than the debt service payment due on the Bonds for
the next fiscal year for which a new budget is not adopted. In such an instance, the Stand-by LOC may be drawn in
the amount that the debt service on the Bonds for the upcoming fiscal year is higher than the appropriated
amount for debt service on the Bonds during the current fiscal year, if any.  The Stand-by LOC is not intended to
and does not cover the risk that no appropriation is made by the  Legislature of Puerto Rico for any particular fiscal
year, or that an appropriation is made in an amount  lower than the amount of debt service on the Bonds due with
respect to any fiscal year. If the budget for any fiscal year is adopted but no appropriation for the payment of the
Bonds is included in such budget, or an appropriation is made in an amount lower than the amount of debt
service on the Bonds, the Trustee may not make a drawing under the Stand-by LOC.

(2) The Commonwealth, GDB, and Lehman Brothers Special Financing, Inc. ("Lehman") are parties to a Debt Service
Deposit Agreement (the "DSDA").  Under the DSDA, the Commonwealth made deposits to a "Redemption Fund"
in an amount sufficient to make debt service payments on the Commonwealth's General Obligation Bonds.
If the DSDA is breached, the Commonwealth and GDB are jointly liable to Lehman for a termination amount,
calculated pursuant to the terms of the DSDA. However, the DSDA provides that Lehman must first pursue
remedies against the Commonwealth prior to pursuing remedies against GDB and that GDB shall not be required
to make a payment under the DSDA unless the Commonwealth has, among other things, repudiated the DSDA
or raised a defense of immunity.

**Schedule 3**
**Issuer Collateral - Municipal Loans**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Loans [2][3]** | |
| Adjuntas | $13,480,627 |
| Aguada | 1,717,479 |
| Aguadilla | 56,596,876 |
| Aguas Buenas | 3,979,597 |
| Aibonito | 4,626,704 |
| Anasco | 4,427,028 |
| Arecibo | 30,031,413 |
| Arroyo | 6,227,056 |
| Barceloneta | 30,717,150 |
| Barranquitas | 1,775,761 |
| Bayamon | 34,971,733 |
| Cabo Rojo | 20,526,442 |
| Caguas | 36,696,738 |
| Camuy | 6,776,207 |
| Canovanas | 13,299,631 |
| Catano | 2,427,940 |
| Cayey | 20,014,776 |
| Ceiba | 2,161,740 |
| Ciales | 6,140,752 |
| Cidra | 10,472,263 |
| Coamo | 12,626,790 |
| Comerio | 3,137,009 |
| Corozal | 6,254,090 |
| Culebra | 496,182 |
| Dorado | 35,551,253 |
| Florida | 2,998,098 |
| Guanica | 6,599,188 |
| Guayama | 11,887,715 |
| Guayanilla | 9,452,501 |
| Guaynabo | 98,324,452 |
| Gurabo | 18,891,524 |
| Hormigueros | 1,433,452 |
| Isabela | 5,394,600 |
| Jayuya | 7,875,498 |
| Juana Díaz | 11,044,960 |
| Juncos | 33,365,112 |
| Lajas | 7,235,992 |
| Las Marias | 4,768,345 |
| Las Piedras | 14,837,053 |
| Loiza | 5,649,773 |
| Luquillo | 5,364,011 |
| Manati | 37,293,323 |
| Maricao | 6,369,621 |

**Schedule 3**
**Issuer Collateral - Municipal Loans**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Loans (continued)** [2][3] | |
| Maunabo | $11,583,346 |
| Mayaguez | 12,124,932 |
| Moca | 8,299,227 |
| Morovis | 11,576,734 |
| Naguabo | 3,037,295 |
| Naranjito | 10,436,846 |
| Orocovis | 2,857,095 |
| Patillas | 8,558,106 |
| Penuelas | 12,715,328 |
| Ponce | 75,338,411 |
| Quebradillas | 5,538,012 |
| Rio Grande | 19,246,599 |
| Sabana Grande | 3,543,663 |
| Salinas | 11,559,736 |
| San German | 14,296,574 |
| San Juan | 243,182,332 |
| San Lorenzo | 13,674,914 |
| San Sebastian | 16,659,884 |
| Santa Isabel | 17,876,413 |
| Toa Alta | 13,365,888 |
| Toa Baja | 69,122,323 |
| Trujillo Alto | 27,781,421 |
| Utuado | 2,201,078 |
| Vega Alta | 5,255,342 |
| Vega Baja | 20,675,826 |
| Vieques | 7,748,261 |
| Villalba | 7,199,031 |
| Yabucoa | 13,036,371 |
| Yauco | 27,151,701 |
| **Total** | **$1,349,561,140** |

**Notes**

(1) Pursuant to Article 501 of the GDB Restructuring Act, loan balances of municipalities are net of undisbursed municipal loan proceeds for the corresponding loans.

(2) Balances are as of 12/31/2017 as adjusted to reflect the application of all municipal deposits, against corresponding loans. Municipal deposits applied against municipal loans, after corresponding escrow deposits to corresponding loans, relative to the type of deposit. (CAE Deposits against CAE Loans, IVU Deposits against IVU Loans, with all undesignated deposits applied to outstanding principal balances in order of Operational, Revenue, IVU, then CAE). Deposit balances are applied against the corresponding loan types in ascending order of outstanding balances on June 30, 2018, which date is subject to change.

(3) Arecibo, Cayey, Guaynabo, Manati, and Mayaguez balances reflect $13.1 million adjustment for loans that are collateral for the AEELA deposit.

**Schedule 4**
**Issuer Collateral - Other Assets**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Loans or Other Obligations due from Public Corporations and Public Agencies** | |
| PR Highways and Transportation Authority (HTA) [2] | $1,925,186,798 |
| PR Ports Authority (PRPA) | 266,645,165 |
| Port of the Americas [3] | 227,233,700 |
| Government of Puerto Rico - General Obligation | 169,438,038 |
| PR Convention Center District Authority (PRCCDA) | 142,869,963 |
| PR Public Buildings Authority (PBA) | 140,883,605 |
| PR Aqueduct and Sewer Authority (PRASA) | 53,360,638 |
| PR Industrial Development Company (PRIDCO) | 53,326,121 |
| PR Solid Waste Management Authority (SWMA) | 44,176,601 |
| Municipal Advances | 43,436,782 |
| Port Authority of Ponce | 20,762,669 |
| PR Housing Finance Authority (Restructured Repurchase Agreement) | 19,330,527 |
| Comprehensive Fund for Agricultural Development of PR (FIDA) | 15,468,627 |
| Act 71 of 2010 - Interagency Committee | 995,449 |
| Private loans | 803,470 |
| **Total** | **$3,123,918,153** |

**Note**

(1) Pursuant to Article 302 of the GDB Restructuring Act, the balance of liabilities owed between GDB and the Commonwealth of Puerto Rico or any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority of the Commonwealth other than a municipality of the Commonwealth (each a "**Non-Municipal Government Entity**") has been determined by applying the outstanding balance of any deposit of a Non-Municipal Government Entity against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date (other than any loan, bond or note of a Non-Municipal Government Entity secured by a mortgage over real property).

(2) Balance includes approximately $1.7 billion in lines of credit owed to GDB and $200 million in 1998 Series A Variable Rate Revenue Bonds held by GDB.

(3) Balance includes $225.5 million in bonds guaranteed by the Government of Puerto Rico and $1.7 million in an appropriation line of credit.

**Schedule 4**
**Issuer Collateral - Other Assets**

---

**Property**

---

| Real Estate Owned Assets |
|---|
| North PR-177/South of El Polvorín Community and Jardines de Caparra Urban Train Station, Bayamón |
| Muñoz Rivera Ave., corner of Coll & Toste St. and Jesús T. Piñero Ave., San Juan |
| Southwest of Sagrado Corazón Urban Train Station, Martín Peña Sector, San Juan |
| Corner of Muñoz Rivera Ave., Esteves St. and Ponce de León Ave., San Juan |
| South of PR-199, East and South of Intersection Road PR-845, Trujillo Alto |
| Intersection of Road PR-10 and Emilio Fagot Ave., Ponce |
| Road 3, Km. 48, Fajardo; Parcel 1 |
| Road 3, Km. 48, Fajardo; Parcel 2 |
| Ruiz Soler Complex, North and Intersection of Km 8.2, Road PR-2, Bayamón |
| Rivera-Martínez Ave., Across from Puerto Rico Coliseum, Adjacent to Acuaexpreso Terminal, San Juan |
| West of Km 86.0, PR-10, Arecibo |
| Northwest corner of Intersection of Las Cumbres and San Ignacio Ave., Guaynabo |
| North of Km 4, Road PR-906, Guayanés Ward, Yabucoa |
| PR-846 and West Marginal PR-181, Trujillo Alto |

**Schedule 5**
**Issuer Collateral - Loan Proceeds Assigned to Issuer**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Loan Proceeds Assigned to Issuer** | |
| PR Administration of Medical Services | $282,447,692 |
| Special Communities Perpetual Trust (SCPT) | 242,593,727 |
| PR Health Insurance Administration (ASES) | 182,196,327 |
| PR Comprehensive Cancer Center | 120,482,398 |
| Center for Municipal Revenue Collection (CRIM) | 105,904,465 |
| PR Tourism Development Fund (TDF) | 46,880,124 |
| Economic Development Bank | 42,305,218 |
| Cantera Peninsula Integral Development Company | 37,791,088 |
| PR Infrastructure Financing Authority (PRIFA) (World Plaza Building) | 37,361,150 |
| Municipal Revenues Collection Center (CRIM) | 26,860,126 |
| University Medical Services | 10,030,096 |
| Puerto Rico Public Private Partnership Authority | 6,159,248 |
| Puerto Rico Conservatory of Music Corporation | 189 |
| **Total** | **$1,141,011,848** |

**Note**

(1)  Pursuant to Article 302 of the GDB Restructuring Act, the balance of liabilities owed between GDB and the
Commonwealth of Puerto Rico or any agency, department, office, public corporation, trust, fund, system,
instrumentality, political subdivision, taxing authority of the Commonwealth other than a municipality of the
Commonwealth (each a "**Non-Municipal Government Entity**") has been determined by applying the outstanding
balance of any deposit of a Non-Municipal Government Entity against the outstanding balance of any loan of such
Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity
held by GDB as of such date (other than any loan, bond or note of a Non-Municipal Government Entity secured by a
mortgage over real property).

**Schedule 6**
**Public Entity Trust Claims**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Public Entity Deposits** | |
| PR Electric Power Authority (PREPA) | $114,108,631 |
| PR Housing Finance Authority (PRHFA) | 62,722,832 |
| Puerto Rico State Insurance Fund (SIF) | 43,266,388 |
| Land Administration | 39,029,569 |
| PR Tourism Company (PRTC) | 34,866,663 |
| Government Employees Retirement System | 32,948,612 |
| PR Infrastructure Financing Authority (PRIFA) | 31,307,999 |
| PR Sales Tax Financing Corporation (COFINA) | 26,096,175 |
| PR Public Finance Corporation (PFC) | 28,443,959 |
| The Children's Trust Fund (CTF) | 16,666,456 |
| University of Puerto Rico (UPR) | 16,542,930 |
| PR Land Authority | 11,456,426 |
| PR Development Fund | 9,673,622 |
| PR Integrated Transit Authority | 9,496,979 |
| PR Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority (AFICA) | 9,494,982 |
| PR Energy Commission | 6,000,319 |
| Municipal Finance Agency (MFA) | 4,913,899 |
| Agricultural Insurance Corporation | 2,812,262 |
| Puerto Rico Trade and Export Company | 2,818,297 |
| PR Maritime Shipping Authority | 1,231,009 |
| Corporation for the Development of Exports | 898,150 |
| Roosevelt Roads Local Development Authority | 671,440 |
| Telephones of Puerto Rico | 634,117 |
| Model Forrest Office of Puerto Rico | 331,297 |
| Metropolitan Bus Authority (MBA) | 216,400 |
| Consortium of the Northwest | 17,951 |
| Jose M. Berrocal Institute | 128,020 |
| Sugar Corporation of Puerto Rico | 92,716 |
| Public Corporation for the Supervision and Insurance of PR Cooperatives (COSSEC) | 66,233 |
| Corporation for the Musical Arts | 59,468 |
| Consortium of the Southeast | 20,041 |
| Hotel Development Corporation | 15,269 |
| Consortium of North Manati | 8,517 |

**Schedule 6**
**Public Entity Trust Claims**

| Entity | Balance Post Set-Off [1] |
|--------|---------------------------:|
| | *As of 12/31/2017, Unaudited* |
| **Public Entity Deposits (continued)** | |
| Maritime Transport Authority | $4,897 |
| PR Art Museum | 1,341 |
| Consortium of the Southwest | 840 |
| Yo Si Puedo Inc. | 336 |
| Consortium of the South Central - ASIFAL | 106 |
| School of Plastic Arts | 2 |
| **Total** | **$507,065,148** |

**Notes**

(1) Pursuant to Article 302 of the GDB Restructuring Act, the balance of liabilities owed between GDB and the Commonwealth of Puerto Rico or any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority of the Commonwealth other than a municipality of the Commonwealth (each a "**Non-Municipal Government Entity**") has been determined by applying the outstanding balance of any deposit of a Non-Municipal Government Entity against the outstanding balance of any loan of such Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity held by GDB as of such date (other than any loan, bond or note of a Non-Municipal Government Entity secured by a mortgage over real property).

**Schedule 7**
**Public Entity Trust Collateral**

| Entity | Balance Post Set-Off [1] |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Cash** | |
| **Total** | **TBD** |
| | |
| **Collateral - Public Entity Loans / Obligations** | |
| Government of Puerto Rico (including Public Agencies) | $905,491,922 |
| **Total** | **$905,491,922** |

**Notes**

(1) Pursuant to Article 302 of the GDB Restructuring Act, the balance of liabilities owed between GDB and the
Commonwealth of Puerto Rico or any agency, department, office, public corporation, trust, fund, system,
instrumentality, political subdivision, taxing authority of the Commonwealth other than a municipality of the
Commonwealth (each a "**Non-Municipal Government Entity**") has been determined by applying the outstanding
balance of any deposit of a Non-Municipal Government Entity against the outstanding balance of any loan of such
Non-Municipal Government Entity owed to GDB or of any bond or note of such Non-Municipal Government Entity
held by GDB as of such date (other than any loan, bond or note of a Non-Municipal Government Entity secured by a
mortgage over real property).

Schedule 8
**Municipal Loan Portfolio Forecast**

| Forecasted Proceeds | | | Balance Post Set-Off ($) |
|---|---|---|---|
| **Date** | **New Interest** | **Amortization** | **Total** |
| 7/1/2018 | $45,391,552 | $65,059,601 | $110,451,153 |
| 1/1/2019 | 31,427,844 | - | 31,427,844 |
| 7/1/2019 | 31,427,844 | 66,561,513 | 97,989,358 |
| 1/1/2020 | 32,640,313 | - | 32,640,313 |
| 7/1/2020 | 32,640,313 | 69,292,726 | 101,933,039 |
| 1/1/2021 | 33,461,029 | - | 33,461,029 |
| 7/1/2021 | 33,461,029 | 72,928,154 | 106,389,183 |
| 1/1/2022 | 33,881,547 | - | 33,881,547 |
| 7/1/2022 | 33,881,547 | 74,015,569 | 107,897,116 |
| 1/1/2023 | 33,925,599 | - | 33,925,599 |
| 7/1/2023 | 33,925,599 | 77,542,597 | 111,468,196 |
| 1/1/2024 | 33,484,513 | - | 33,484,513 |
| 7/1/2024 | 33,484,513 | 81,812,819 | 115,297,333 |
| 1/1/2025 | 32,493,214 | - | 32,493,214 |
| 7/1/2025 | 32,493,214 | 83,392,923 | 115,886,138 |
| 1/1/2026 | 31,046,309 | - | 31,046,309 |
| 7/1/2026 | 31,046,309 | 82,432,166 | 113,478,475 |
| 1/1/2027 | 27,686,084 | - | 27,686,084 |
| 7/1/2027 | 27,686,084 | 82,222,845 | 109,908,929 |
| 1/1/2028 | 24,313,805 | - | 24,313,805 |
| 7/1/2028 | 24,313,805 | 81,683,617 | 105,997,422 |
| 1/1/2029 | 20,936,730 | - | 20,936,730 |
| 7/1/2029 | 20,936,730 | 79,119,505 | 100,056,235 |
| 1/1/2030 | 17,630,249 | - | 17,630,249 |
| 7/1/2030 | 17,630,249 | 77,811,975 | 95,442,224 |
| 1/1/2031 | 14,380,036 | - | 14,380,036 |
| 7/1/2031 | 14,380,036 | 76,804,289 | 91,184,326 |
| 1/1/2032 | 11,156,322 | - | 11,156,322 |
| 7/1/2032 | 11,156,322 | 66,268,457 | 77,424,779 |
| 1/1/2033 | 8,233,116 | - | 8,233,116 |
| 7/1/2033 | 8,233,116 | 52,787,706 | 61,020,822 |
| 1/1/2034 | 5,789,811 | - | 5,789,811 |
| 7/1/2034 | 5,789,811 | 44,508,578 | 50,298,390 |
| 1/1/2035 | 3,688,337 | - | 3,688,337 |
| 7/1/2035 | 3,688,337 | 32,491,264 | 36,179,601 |
| 1/1/2036 | 2,157,467 | - | 2,157,467 |
| 7/1/2036 | 2,157,467 | 22,812,441 | 24,969,908 |
| 1/1/2037 | 1,078,875 | - | 1,078,875 |
| 7/1/2037 | 1,078,875 | 12,813,452 | 13,892,327 |
| 1/1/2038 | 471,486 | - | 471,486 |
| 7/1/2038 | 471,486 | 9,523,174 | 9,994,660 |
| 1/1/2039 | 20,510 | - | 20,510 |
| 7/1/2039 | 20,510 | 372,411 | 392,921 |

**Schedule 8**
**Municipal Loan Portfolio Forecast**

| Forecasted Proceeds | | | Balance Post Set-Off ($) |
|---|---|---|---|
| **Date** | **New Interest** | **Amortization** | **Total** |
| 1/1/2040 | 4,258 | - | 4,258 |
| 7/1/2040 | 4,258 | 121,661 | 125,919 |

**Notes**

(1) Forecast is as of 12/31/2017 as adjusted to reflect the application of all municipal deposits against corresponding loans (for municipalities with more deposits than loans at GDB, excess deposits remain as Title VI Bond Claim in Schedule 1). Municipal deposits are applied against municipal loans, after corresponding escrow deposits to corresponding loans, relative to the type of corresponding deposit. (CAE Deposits against CAE Loans, IVU balances are applied against the corresponding loan types in ascending order of outstanding balances. Deposits against IVU Loans, with all undesignated deposits applied to outstanding principal balances in order of Operational, Revenue, IVU, then CAE). Deposit balances are applied against the corresponding loan type in ascending order of outstanding balances. Balances are adjusted for the July 1, 2018 payment assuming the application of deposits against corresponding municipal loans on June 30, 2018, which date is subject to change.

(2) Applied interest rates are based off a forward curve reaching an assumed interest rate ceiling in 2026 of 9.5%.

**Schedule 9**
**Federal Funds**

| Entity | Balance |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Municipal Federal Funds**[1] | |
| Barranquitas | $919,410 |
| Carolina | 799,060 |
| Aibonito | 635,797 |
| San Juan | 256,384 |
| Guaynabo | 249,728 |
| Maricao | 235,274 |
| Luquillo | 202,319 |
| Loiza | 197,877 |
| Santa Isabel | 186,607 |
| Morovis | 185,421 |
| Ciales | 180,465 |
| Coamo | 170,359 |
| Aguada | 168,714 |
| Anasco | 150,327 |
| Guanica | 113,376 |
| Las Piedras | 113,026 |
| Fajardo | 112,199 |
| Adjuntas | 112,096 |
| Culebra | 110,157 |
| Humacao | 97,539 |
| Aguas Buenas | 96,961 |
| Las Marias | 76,523 |
| Salinas | 74,352 |
| Trujillo Alto | 69,920 |
| Ceiba | 56,205 |
| Hormigueros | 54,908 |
| Juncos | 53,730 |
| Corozal | 50,918 |
| Camuy | 47,155 |
| Rio Grande | 46,102 |
| Toa Alta | 41,135 |
| San German | 37,646 |
| Isabela | 26,017 |
| Utuado | 19,340 |
| Ponce | 15,261 |
| Guayama | 15,019 |
| Arecibo | 9,654 |
| Lares | 7,841 |
| Naranjito | 6,443 |
| Villalba | 3,897 |
| Patillas | 3,494 |
| Gurabo | 3,492 |

**Schedule 9**
**Federal Funds**

| Entity | Balance |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Municipal Federal Funds (continued)**[1] | |
| Catano | $2,289 |
| Comerio | 1,648 |
| Guayanilla | 1,430 |
| Arroyo | 496 |
| Lajas | 131 |
| Aguadilla | 34 |
| Toa Baja | 4 |
| **Total** | **$6,018,179** |

**Notes**

(1) In April, 2017, GDB communicated to all depositors requesting confirmation of balances of federal funds held at
GDB, including identification of the sources of such funds. The balances presented are the result of such
efforts and subsequent communications during calendar year 2017.

**Schedule 9**
**Federal Funds**

| Entity | Balance |
|---|---|
| | *As of 12/31/2017, Unaudited* |
| **Other Federal Funds**[1] | |
| PR Highways and Transportation Authority (HTA) | $22,076,056 |
| PR Community Development Fund, LLC (PRCDF) | 20,944,478 |
| PR Treasury Department (Morales Feliciano Case) | 20,117,986 |
| Department of Labor and Human Resources | 11,704,711 |
| 9-1-1 Service Governing Board | 11,321,980 |
| Department of Housing | 7,987,153 |
| Family Socioeconomic Development Administration | 6,202,694 |
| Office of Management and Budget | 4,643,517 |
| PR Housing Finance Authority (PRHFA) (Multi-family - Section 8) | 1,701,547 |
| Institute of Puerto Rican Culture (IPRC) | 1,963,495 |
| PR Treasury Department (Hacienda) | 1,869,332 |
| PR Electric Power Authority (PREPA) | 1,806,981 |
| PR Land Authority | 1,171,068 |
| Public Housing Administration | 338,973 |
| Vocational Rehabilitation Administration | 231,820 |
| Department of Economic Development and Commerce | 204,219 |
| Superintendent of the Capitol | 189,732 |
| Consortium of the Northwest | 160,496 |
| Institutional Trust of Puerto Rico's National Guard | 155,990 |
| PR Solid Waste Management Authority (SWMA) | 154,154 |
| National Parks Company of Puerto Rico (NPCPR) | 147,157 |
| Office for the Improvement of Public Schools (OMEP) | 124,507 |
| Department of the Family | 110,680 |
| PR Aqueduct and Sewer Authority (PRASA) | 46,941 |
| Consortium of the Northeast | 37,883 |
| High Court of Aguadilla | 10,145 |
| PR Industrial Development Company (PRIDCO) | 3,231 |
| Puerto Rico Education Council | 203 |
| Consortium of La Montana | 50 |
| **Total** | **$117,128,727** |

**Notes**

(1)  In April, 2017, GDB communicated to all depositors requesting confirmation of balances of federal funds held at
      GDB, including identification of the sources of such funds. The balances presented are the result of such
      efforts and subsequent communications.