Case:17-03283-LTS Doc#:3858-1 Filed:09/05/18 Entered:09/05/18 09:57:26 Desc:
Exhibit A Page 1 of 16

CERTIFIED TRANSLATION

2000 JTS 104, 151 D.P.R. 383, 2000
WL 975618 (P.R.), 2000 TSPR 93

MARITZA RODRÍGUEZ ROMÁN
et al, plaintiffs and appellants,
v.
PUERTO RICO GOVERNMENT DEVELOPMENT
BANK, PUERTO RICO HIGHER EDUCATION
ASSISTANCE CORPORATION et al, defendants
and appellees.

In the Supreme Court of Puerto Rico.
*Number:* AC-96-6

**Synopsis**
JUDGMENT issued by *Judge Ángel F. Rossy García, Judge José M. Aponte Jiménez* and *Judge Antonio J. Negroni Cintrón*, Judges of the Circuit Court of Appeals (Regional Circuit I), affirming a judgment issued by the Court of First Instance, Superior Court of San Juan, dismissing a torts and injunction action. *The judgment of the Circuit Court of Appeals is modified for the sole purpose of ordering the file to be returned to the Court of First Instance in order for the latter to hold a hearing that is consistent with the decision issued by the Supreme Court. The judgment of the Circuit Court of Appeals is affirmed as to such employees who were not employees of the Government Development Bank prior to the moment they began to provide services as employees of the Puerto Rico Superior Education Assistance Corporation.*

*Ebenecer López Ruyol*, attorney for appellants; *Rafael J. Vázquez González*, of *Nieto, Vázquez & Rodríguez Marxuach, Radamés A. Torruella* and *José A. Nolla Mayoral*, of *McConnell Valdés* attorneys for the Puerto Rico Superior Education Assistance Corporation and the Puerto Rico Government Development Bank. *391

CHIEF JUDGE ANDRÉU GARCÍA issued the opinion of the Court.

**1 We are tasked with considering whether there is a right to retain employment for employees of a public corporation which validly ceases its operations, while said corporation is a subsidiary of another public corporation but is independent and separate from it. We believe that they do not have a right to retain employment, for the reasons set forth below.

Let us examine the facts that give rise to this appeal.

**I**

On May 8, 1981, the Board of Directors of the Government Development Bank by resolution created, in accordance with the Charter of "the Bank," Art. 2 of Law No. 17 enacted on September 23, 1948 (7 L.P.R.A. sec. 552), 1 as amended, a subsidiary corporation known as the Puerto Rico Higher Education Assistance Corporation (hereinafter PRHEAC), the purpose of which was to guarantee loans issued to students by commercial banks. This corporation was made up of forty-seven (47) workers and was dissolved by a resolution of the Board. It ceased its operations on April 15, 1994, at which time all employees lost their jobs. It was stated that changes in federal regulations had made the operation of PRHEAC inefficient, and therefore they had been receiving fines for breach of said regulations. Due to this they were facing a financial crisis.

On February 22, 1994, twenty-two (22) union employees and five (5) managerial employees filed separate lawsuits, which were subsequently consolidated, in the Court of First Instance *392 against the Government Development Bank (hereinafter the Bank) and the Bank's employee Union, PRHEAC and Great Lakes Higher Education Corporation. They alleged that they were actually employees of the Bank assigned to a subsidiary, and that therefore they had the right to be reinstated in the bank's facilities and to compete with the other employees of said institution in accordance with the merit principle and the seniority principle, for any available positions and for positions held by employees of the Bank that had less seniority than them. They requested a temporary restraining order and a preliminary and permanent injunction to halt the imminent layoff of the employees which had been announced by the corporation, and their reinstatement in their regular duties; notice to each employee of a general layoff plan that covered the Bank and all of its departments and that said plan be published and approved by the Department of State in accordance with established rules. They also requested damages in the amount of one hundred thousand dollars ($100,000) for each of them.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Two (2) days later, the Court of First Instance denied the temporary restraining order and preliminary injunction, ordering plaintiffs to serve defendants through the ordinary procedure. As a consequence, on March 30, 1994, codefendants the Bank and PRHEAC filed a motion in which they requested that summary judgment be issued dismissing the complaint, based on the fact that PRHEAC and the Bank were separate and independent entities, that PRHEAC was exempt from the provisions of the Puerto Rico Public Service Personnel Act, and therefore, the plans to layoff union employees had to be governed by the collective bargaining agreement entered into by PRHEAC and the Government Development Bank Employee Union, and with regards to managerial employees, by the PRHEAC regulations. *393

**2 Codefendants, Employee Union of the Government Development Bank and Great Lakes Higher Education Corporation, also filed separate motions requesting dismissal of the complaint. The former argued lack of jurisdiction and of ripeness of the controversy and the latter was based on the claim that the complaint failed to state a claim upon which relief could be granted.

The Court of First Instance, granting codefendants' motions, dismissed the actions filed for the reasons indicated. As to the Bank and PRHEAC it also held that plaintiffs did not exhaust available administrative relief.

Plaintiffs appealed before us from said decision, and therefore, after careful analysis, we issue judgment, partially revoking the judgment as to codefendants Bank and PRHEAC. On that occasion we stated the following:

> We have repeatedly held that the doctrine that requires administrative remedies to be exhausted prior to turning to courts is a rule of judicial self-limitation intended to facilitate judicial review. It seeks to ensure that courts have the most accurate information as to the grounds of a governmental action, thus placing courts in a position to make the most informed decision possible as to the petition filed. It also seeks to free courts from matters that may be decided administratively. … It is not a rigid doctrine. Rather, it must be applied flexibly, enforcing it only when, in light of the circumstances of the case, it is clear that judicial intervention would be premature. … This is why we have decided that the requirement of exhausting administrative remedies may be ignored when the litigious matter is essentially a legal question, or when exhausting said remedies constitutes a useless or ineffective measure. ...

> In this case, requiring that administrative resources be exhausted, as the lower court decided, was not justified. The essential question raised by appellants before the Court of First Instance, as to which we do not render judgment in this decision, *394 was essentially a legal question, and deciding it did not require waiting for the administrative agency to contribute specialized knowledge. According to the appellants, the layoffs that were contemplated and then ordered by appellees [Government Development Bank and Puerto Rico Higher Education Assistance Corporation] were not due to the merit principle and the guiding principle of seniority and amount of time in service, as decided in *Calzada Quiñones v. D.A.C.O.*, 114 D.P.R. 757 (1983). Appellees alleged that they were actually employees of the Government Development Bank, and that as such they were entitled to compete with the other employees of the Bank for the remaining positions, according to the merit principle and the criteria of seniority. Since this was the main question raised by appellants, it was not necessary to exhaust administrative remedies in order to consider and decide it.

> **3 It should also be noted that when appellants filed their judicial action, it was clear that the decision of the Bank to cease the operation of the Puerto Rico Higher Education Assistance Corporation was final and not subject to delay. The steps and claims carried out by appellants before the Bank's upper management and other entities prior to filing the judicial action in question, and their response to said steps and claims clearly demonstrated that the possibility that the Bank cancel or modify its intention to layoff appellants immediately was remote. Under such circumstances, it made little sense and was pointless to require appellants to exhaust available administrative remedies prior to filing their judicial

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

action against the Bank and PRHEAC. (Citations omitted) Appendix, *Exhibit* 4, pp. 13.

Thus we decided that the file should be returned to the Court of First Instance to continue proceedings in accordance with our decision. The lower court interpreted our order *to mean that it only needed to decide the question of law, that is, whether plaintiff employees were entitled to compete with the other employees of the Government Development Bank for the positions existing in accordance with the merit principle and seniority criteria.* It gave the parties a period to submit memoranda in support of their positions, after which it **\*395** issued judgment, and *summarily* dismissed the actions filed. Petitioners filed an appeal before the Circuit Court of Appeals, which affirmed the Court of First Instance.

Petitioners appear before us through a so-called "appeal petition", 2 in which they argue that the Court of Appeals committed several errors; including that the Court erred in summarily dismissing the complaint, in deciding that plaintiffs were not employees of the bank, without allowing evidence to be submitted to decide the situation of each employee; intimately linked to this, whether the Bank can create public corporations that deprive employees who had already been hired by it prior to creating PRHEAC; whether it is appropriate to pierce the corporate veil between PRHEAC and the Bank; whether the Public Service Personnel Act and the retention right apply to employees of PRHEAC, and that the Court erred in not granting an equity remedy to avoid public policy violation and avoiding gross injustice.

In order to evaluate the petition, on February 23, 1996, we issued a decision in which we ordered the original files held by the Court of Appeals to be transferred to us. When said order was complied with on June 20, 1996, we mistakenly ordered petitioner to submit its appeal, as if it involved a writ that had already been issued. After said party complied with said order, appellee filed a brief opposing *issuance of the writ.*

**\*\*4** Having examined the file in its entirety as well as the positions of the parties, we proceed to issue our decision. **\*396**

II

[1–3] The Government Development Bank, instrumentality of the Government of Puerto Rico, was created by Law No. 17 enacted on September 23, 1948 (7 L.P.R.A. sec. 551 *et seq.*), in order to "help the State Government perform its fiscal duties and carry out its governmental duty to develop the economy of Puerto Rico and especially its industrialization more effectively." 7 L.P.R.A. sec. 551. Through Law No. 97 enacted on June 26, 1974, the legislature added section *Four* of Art. 2 of Law No. 17 (7 L.P.R.A. sec. 552), known as the Bank's Charter, sections (I) and (J). Section (J) granted the Bank the authority to create, through a resolution, subsidiary or affiliated companies that in turn would be government instrumentalities that were independent and separate from the Bank, with powers, rights, authority and duties granted to the Bank and delegated to them. 3

[4–5] In accordance with this section the Bank created, through Resolution No. 4530, the Puerto Rico Higher Education Assistance Corporation (PRHEAC), which in accordance with said section, came into legal **\*397** existence as a government instrumentality of the Commonwealth of Puerto Rico, that was independent and separate from the Bank. By provision of law, the Board of Directors of the Bank *is* the Board of Directors of each and every one of the subsidiaries so created. Art. 1(J) of Law No. 97, *supra.*

Appellants invoke the doctrine of alter ego, to argue that they are actually employees of the Bank and as such have the right to compete for the positions remaining in the Bank in accordance with the merit principle and the governing principle of seniority. In support of said argument they list a series of circumstances, that is, that both agencies share the same board of directors, that the employees of both public corporations have the same employment office, use the same form to verify employment, use the same identification card, use the same checks, have the same medical plan. They allege furthermore that the Association of Employees of the Commonwealth of Puerto Rico have them under the same employer identification number and the same account with the State Insurance Fund and they make transfers of personnel between both instrumentalities at their discretion.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[6–7] In Puerto Rico we have adopted the doctrines of piercing the corporate veil (alter ego), successorship and the doctrine of "single employer," developed as case law in federal courts and the Federal Labor Relations Board to protect the rights of workers. The single employer doctrine is generally used when there are companies that coexist. The doctrines of alter ego and successor employer are used when a company substitutes another company. *J.R.T. v. Asoc. Playa Azul I*, 117 D.P.R. 20, 29 (1986); See also, *Fugazy Continental Corp. v. N.L.R.B.*, 725 F.2d 1416, 1419 (D.C. Cir. 1984); *Penntech Papers, Inc. v. N.L.R.B.*, 706 F.2d 18, 24 (1st Cir. 1983). Specifically, the *398 alter ego doctrine, in the labor field, is used as a general rule when a corporation takes control of another entity, which usually disappears and that substitution is shown to have illegal purposes, to constitute a violation of public policy, to entail injustice or fraud, or to breach an obligation. The analysis under this doctrine requires proving purposes or intentions to commit illegal acts. *J.R.T. v. Asoc. Playa Azul I*, supra, p. 29.

**5 Having examined the entirety of the file we see that in effect both agencies share centralized administration which, according to the file that we have before us is explained by the fact that PRHEAC hired the administrative services and other personnel administration services with the Bank, since being a small agency it was not worth having its own administrative and Human Resource office. *PRHAEC paid the Bank for said services.* As part of these services of personnel administration and contracted support, Bank personnel were frequently sent to PRHEAC's offices. However, they were always kept under the Bank's payroll.

Furthermore, both agencies had different employer's identification numbers, different accounts with the State Insurance Fund and were represented in the union by different appropriate units certified by the Puerto Rico Labor Relations Board.

[8] It is also pointless to extend the alter ego doctrine to these two (2) agencies, since it is *by mandate of the law itself* that these are "separate and independent government instrumentalities of the Commonwealth of Puerto Rico". Art. 1(J) of Law No. 97, *supra*. The fundamental distinction for a public corporation to be considered a subsidiary of another public corporation consists of the statute by virtue of which the existence of the first arises to impart said characteristic upon it *399, in addition to its own legal personality. See *Torres Ponce v. Jiménez*, 113 D.P.R. 58, 6365 (1982). The enabling statute by virtue of which PRHEAC was created made it a public corporation independent of the Bank.

[9] Appellants argue that PRHEAC has not been incorporated in the Department of State. Appellants forget that the General Corporations Act, 14 L.P.R.A. ant. sec. 1101 *et seq.*, does not apply to public corporations, as said statute was conceived to specifically regulate the creation and operation of private corporations and it is as to these that Registration in the State Department is required. The organic statute that enabled the creation of the PRHEAC constituted it as a public corporation without requiring any sort of registration.

III

The constitutional validity of the delegation of powers that the Legislative Assembly makes to the public corporation for it to have the capacity to create or constitute governmental instrumentalities that are independent and separate is questioned.

During the development of administrative law, especially at its origin, the constitutional validity of the delegation to agencies of powers originally assigned to the three (3) governmental powers was challenged many times. The emphasis was at the moment of reconciliation of the constitutional tradition with that delegation of powers.

**6 Nowadays the validity of this type of delegation, which was the source of judicial decisions from the start of administrative law, is rarely doubted. From 1935, the year in which the Social Security Act was created, a great development began in the areas of social legislation through which administrative agencies became the *400 main purveyors of governmental services and the main emphasis of decisions that interpreted said legislation fell on the *administrative procedure.* B., Schwartz, *Administrative Law*, 3ra ed., Boston, Ed. Little, Brown & Co., 1991, Sec. 1.14.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**[10]** Currently, the validity of the delegation is upheld as long as the law that creates the agency establishes appropriate rules, guidelines, standards, criteria or intelligible principles or procedural and substantive safeguards or guarantees that guide the delegation and limit their powers to prevent the actions from the agency to be arbitrary and capricious. Said criteria do not need to be express; they can arise, in fact, from he legislative history and may be broad and general. If it has a public interest or purpose, generally this is sufficient justification to uphold the delegation. See: *Viajes Gallardo v. Clavell*, 131 D.P.R. 275 (1992); *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987); *Hernández Montero v. Montero Cuevas, Director*, 88 D.P.R. 785 (1963); *López v. Junta Planificación*, 80 D.P.R. 646 (1958); *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670 (1953); *Luce & Co. v. Junta de Salario Mínimo*, 62 D.P.R. 452 (1943); D. Fernández, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, Bogotá, Ed. Forum, 1993, Sec. 2.2.5; Schwartz, *op. cit.*, Sec. 2.102.30; 2 *Am. Jur. 2d Administrative Law* Sec. 56.

**[11]** The definition of what a public corporation is can be found in Art. 27 of the Civil Code, 31 L.P.R.A. sec. 101, which regulates legal persons in Puerto Rico. In that regard, Art. 27 of the Civil Code states the following:

> Sec. 101 Legal persons—Who shall be considered legal persons
>
> The following shall be legal persons:
>
> **(1)** Corporations and public interest associations with legally recognized legal personality. **\*401**
>
> Their personality starts from the very instant in which, under law, they would have been validly established.
>
> **\*\*7** (2) Corporations, companies, associations of particular interest, be they civil, commercial, or industrial, to which the law grants legal personality. 31 L.P.R.A. sec. 101.

**[12–14]** We have interpreted person, in the legal sense, to be any being capable of having rights and obligations and legal persons to be the community of people or collection of assets that are organized for carrying out a permanent goal and obtain the recognition of the state as a subject of law. *A legal person receives its personality directly from the law, therefore the limits to its powers, rights and responsibilities are established by the creating law.* Rivera Maldonado v. E.L.A., 119 D.P.R. 74, 81 (1987).

It has been interpreted similarly in Federal administrative law. "The jurisdictional principle is the root principle of administrative power. The statute is the source of agency authority as well as of its limits. If an agency act is within the statutory limits (or vires), its action is valid; if it is outside them (or ultra vires), it is invalid...." (Notations omitted.) Schwartz, *op. cit.*, Sec. 4.4, p. 171.

**[15]** Art. 29 of the Civil Code, 31 L.P.R.A. sec. 103, provides that the civil capacity of corporations, companies, and associations shall be regulated by *the laws that created or recognized them.* Art. 80 (31 L.P.R.A. sec. 30) establishes, in turn, that legal persons can acquire and possess assets of all kinds, and enter into obligations and exercise civil or criminal actions, in accordance with the laws and rules that create them.

**[16–17]** Sec. 1.3 of the Uniform Administrative Procedure Act of the Commonwealth of Puerto Rico, 3 L.P.R.A. sec. 2102, also characterizes the public corporation. "Agency", for purposes of said law, means any board, body, examining court, *public* **\*402** *corporation*, commission, independent office, division, administration, bureau, department, authority, employee, person, entity or any instrumentality of the Commonwealth of Puerto Rico or administrative entity legally authorized to carry out regulatory or investigative duties and or which can issue a decision or has authority to issue licenses, certificates, permits, concessions, accreditations, privileges, franchises, acknowledge or adjudicate. An exception is made for those entities mentioned in said law, for example, municipalities, its entities or corporations, the Legislative Branch, Judicial Branch, the office of the governor, among others.

**[18]** The public corporation is a governmental creature, the creation of which is according to the needs of the State.

> **\*\*8** … On the other hand, a public corporation, being an instrument or means of government, is subject to creation or dissolution at the will of the *legislative body or lawmaking power*, and in total disregard of the wishes

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

of the members who compose it. In the same manner its charter is subject to change or amendment.

While all corporations are public in the sense that they affect and are dependent upon the public to a greater or lesser extent, strictly speaking, a public corporation is one that is created for political purposes with political powers to be exercised for purposes connected with the public good in the administration of civil government. It is an instrument of the government subject to the control of the legislature, and its members are officers of the government appointed for the discharge of public duties; and where a corporation, exercises all of its franchises for public purposes, it is a public corporation.

Corporations in which the public is interested only in their objects and in which the whole interest is not in the government or the corporation is not created for administration of political power, are private. ...

Stated generally, a public corporation is a corporation created merely for purposes of government, as distinguished from a private corporation, which is one that is created for other purposes than those of government. Statutes may be found embodying the substance of this definition. (Emphasis added and notations *403 omitted.) I *Fletcher, Cyclopedia Corporation* Sec. 58, pp. 790792 (Perm ed. 1999).

Through Law No. 97, *supra*, 7 L.P.R.A. sec. 552, the legislature amended the law to add sections (I) and (J) to section *Four* of Art. 2, *supra*, known as the Bank's Charter, to authorize the Bank to create instrumentalities that are separate and independent from the Bank.

There is no doubt that the Bank was conferred the delegation of the legislative authority to create subsidiaries which were independent and separate; that is, to establish public interest corporations that were recognized in our laws as subjects of law.

[19] The Government Development Bank was created in 1942 and since then has had two (2) main duties.

First of all, it has been its responsibility and that of its subsidiaries to promote the development of the economy of Puerto Rico, providing sources of financing that were necessary to incentivize the development of the private, industrial, commercial and cooperative sector in such risks that private commercial banks have not been willing to assume, given that the latter evaluates a request for loan based on its recoverability and the payment capacity of the entity that requests it. The persons who benefit are those who have not been given loans by private banks due to the high risks. On many occasions, providing this financing has as a consequence that the investment in the loan is not recovered.

**9 [20] It was the Government's intention, with the Bank, to provide a source of financing to natural or legal persons who work in manufacture, commerce, agriculture or tourism (with an emphasis on small and medium businesspeople), through direct *404 loans, loan guarantees, as well as capital investments. It was intended, among other things, to develop a Puerto Rican economy that was more solid, promote activities that lead to substitution of importation of goods and services, generation of employment without having to depend as much on federal funds. See Legislative Debate in the House of Representatives, H.B. as to Law No. 22 enacted on July 24, 1985, p. 7; Joint report of the House of Representatives from July 20, 1985.

[21] Besides this role, the Government Development Bank provides financing to different governmental instrumentalities that need loans to comply with their public purposes, acts as a fiscal agent as well as a financial advisor to all of the government, both central and municipal and to the different public corporations of Puerto Rico. That is, one single entity combined both public and private financing duties. Id.

[22] As a main provider of *public* sector financing, it is often required to enter different fund markets to borrow money in substantial amounts or serve as guarantor to debt issues in said sector. This requires that its financial statements not reflect high-risk activity, which may jeopardize its payment of its obligations. See Legislative debate as to S. B. 807 from May 2, 1974, pp. 101106.

Puerto Rico faced one of the most difficult economic periods between 1973 and 1984, when the global oil crisis occurred, and the second great recession of the eighties. The unemployment index in Puerto Rico reached an unprecedented rate of 24.4 percent, causing

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

a halt in economic growth. The Bank, as a State tool, whose public policy it was to promote the country's economy, had to respond creatively to this historic moment. It was precisely in 1974 that the Bank Act ***405** was amended in order to authorize it to create instrumentalities that were separate and independent from it.

These were years of intense and complex activity in the BGF (Government Development Bank). In 1974 the BGF for the first time entered the market with a sale in competitive auction of Tax and Revenue Anticipation Notes for the Government of the Commonwealth of Puerto Ricowhich allowed fast access to temporary financing sources [...]. In 1975, when the doors of the United States municipal bond market closed, and in light of the growing resistance of commercial banks to continue financing short-term public debt, the BGF negotiated the first Promissory Note Purchase Agreement which allowed Puerto Rico to have access to financing. Also in 1975, the BGF for the first time entered the European market to sell Puerto Rican obligations. [...] In 1976 the BGF developed a completely new concept to gather funds for the government coffers: the concept of savings bonds.

**\*\*10** In 1977, the BGF established the Puerto Rico Development Fund, a subsidiary that could make capital stock investments and guarantee long term loans for private companies who could not obtain credit from other financial institutions. In 1978 the Development Fund issued obligations in an amount of $25 million to supplement its original capitalization of $5 million and to be able to make a greater contribution to the private sector. [...]

Also in 1977, the BGF actively promoted the creation of the Puerto Rico Housing Financing Corporation, the main duties of which were to finance construction, reconstruction, improvement, and rehabilitation of housing for low and moderate income families; to grant mortgage loans to help limited income families acquire a residence; and temporary financing guarantees for construction projects under the Mortgage Trusts that were created after 1985. [...]

The creation, also in 1977, of the Authority for Financing Industrial and Environmental Control Facilities (AFICA) was extremely important. AFICA would have the capacity to operate as an alternate mechanism for the public placement of limited obligation bonds of private issuers. [...]

In 1981 the Puerto Rico Higher Education Assistance Corporation was established to administer the Federal Guarantee Program for Loans to Students in Puerto Rico. Under this program, the subsidiary guaranteed the amount loaned by a commercial bank to a student and **\*406** also guaranteed the payment of the entirety of the debt in the event of the death of the borrower. During the past 12 years after its creation the CAES [PRHEAC] has guaranteed loans for over $434 million for the benefit of over 171,000 students in every area of study and in all university levels, including post-graduate specializations such as Law. The Government Development Bank also established the Puerto Rico Student Loan Association, created to offer loans at a low interest rate for students to undertake post-secondary studies. The intention of this subsidiary was to fill space that private banks had not yet filled. Through APE (SLA), the Bank issued loans in excess of $24 million and sold its portfolio in 1988, when the private banking sector had already learned the need for this type of loan and its profitability.

In general terms, these years were of great creativity and productivity for the Government Development Bank. They were years in which adversity, created as a reflection of the great oil crisis was, literally, the mother of invention. [...]. *Innovación, experiencia y solidez para Puerto Rico*, Publication of the Government Development Bank, pp. 109112 (1992).

**\*\*11** Clearly, a large part of these achievements would not have been possible if the Legislature had not given the Bank such broad powers and, on the contrary, had subjected it to its scrutiny, during the process of each creation of a subsidiary, in topics that the Legislature in full session would not have had either the expertise or elements of judgment, and would lack the dynamism, speed, and expertise that said activities required.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[23] As we can see, the power that the Legislature delegated to the Bank through legislative action is limited to creating separate and independent subsidiaries in such cases in which it is advisable, desirable or necessary to comply with the duties, powers, purposes and that they shall have, within the universe of powers, rights, authorities and duties of the Bank, those delegated by it. The Bank may never delegate more powers than it itself has and the powers of the Bank are established in **\*407** detail in its enabling law which limit the scope of its authority.

[24] The instrumentality is created to carry out a specific task that is limited within the multiple tasks of the Bank. Its attention is focused on the assigned task. Its Board of Directors is the Bank's Board of Directors, appointed by the Governor, which ensures the continuity of the public policy of the Executive.

[25] The Legislature does not surrender its control before said subsidiaries, since it is a legislative action which establishes the authority to create them by resolution, limits its powers to the universe of powers granted to the Bank by a legislative act, and ultimately, the Legislature can strip the Bank of the delegated authority.

[26] Certainly, "[p]ublic corporations '[a]re an important part of the administrative organization of the Modern State' [and t]hey occupy broad sectors of modern economic life. *The variety of forms and the enormous disparity of legal systems to which they can be subject*, have given rise to much discussion." (Emphasis added.) *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113, 126 (1989). See, also, A.R. Brewer Carías, *Las empresas públicas en el derecho comparado*, Caracas, Universidad Central de Venezuela, Pubs. Facultad de Derecho, 1967, Vol. XXXVII, p. 29. "In the great majority of cases, the various forms of public enterprise have developed as empirical responses to specific needs, *without any preconceived theory, and without much uniformity.*" (Emphasis added.) W. Friedmann, *The Public Corporation: A comparative Symposium*, Canada, Ed. The Carsell Co., 1954, p. 542.

[27] Given the variety of forms and functions that a public corporation can exercise, and that its creation, in the majority of cases, is a result of satisfying specific historic needs that constitute a **\*408** public purpose, the Legislature may, through law, delegate the role of creating them *in the manner it feels most efficiently serves these urgent needs that are sought to be met*, as long as the legislation that empowers them has adequate rules or criteria and intelligible principles that shall govern both their creation and their operation, to prevent their actions from being arbitrary or capricious. No statute or constitutional clause prevents the Legislature from delegating this role.

**\*\*12** [28–29] The universal requirement for the creation of a public corporation, 4 both in constitutional governments and in other types of governments, is that it be created by a governmental procedure. "*Creation of the Public corporation.* It appears to be a universal practice that public corporations are created by a *governmental procedure*, either a *special statute* or a *governmental ordinance.* Unlike the commercial company they do not automatically come into existence by fulfilling certain statutory requirements." (Emphasis added.) Fletcher, *op. cit.*, page 558.

> It should be noted that *in general* [public corporations] are *created or regulated* by a legislative act establishing their powers, duties and immunities, providing the manner in which they shall operate and shall be directed and, above all, regulating their relationship with the departments of the government. Brewer Carías, *op. cit.*, page 84.

[30] We have already estimated that on many occasions these public corporations are created as a result of emergency situations, and so in order to be able to handle them they are imbued by lawmakers with the flexibility and autonomy that are necessary **\*409** for success in a competitive environment. *McCrillis v. Aut. Navieras de P.R.*, supra, page 127.

> In the common law countries, where the government still enjoys considerable inmunities and privilegdes in the fields of legal responsabilities, taxation, or the binding force of statutes, other considerations played their part. It seemed necessary to create bodies which, if they where to compete on fair terms in the economic field, had to be separate and distinct from the government as regards inmunities

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case:17-03283-LTS Doc#:3858-1 Filed:09/05/18 Entered:09/05/18 09:57:20 Desc: CERTIFIED TRANSLATION
Exhibit A Page 9 of 16

Rodríguez Román v. Banco Gubernamental de Fomento par..., 2000 JTS 104 (2000)

151 D.P.R. 383, 2000 TSPR 93

and privileges. Friedmann, *op. cit.*, page 548.

We are talking about a fundamental change in the structure of the Puerto Rican government, having transcendental repercussions, whether to provide the Bank with the tools to compete under equal conditions with private banks, releasing it from restrictions and allowing for flexibility and dynamism, whether to make these corporations recipients of federal aid that they would not be able to receive as affiliates, or to allow for access to tax-exempt aid, or in order to avoid committing and divest ELA and Bank credit to high-risk financing, or based on all of the aforementioned reasons, the Legislature decided, precisely in 1974 and under the circumstances at that time, to give to the Bank the power to create, by way of resolution, public corporations that were also independent and separate. See, also, PUBLIC HEARING PC 56 "Create the Development Bank of Puerto Rico. Committees on Finance, on Government and on Socioeconomic Development. 18 June 1985." To question the soundness of said delegation of power, which promoted and continues to promote so much positive economic activity and on which an entire economic and social apparatus is still built, violates our constitutional power. Especially when the Legislature still has ultimate control over said corporations.

**\*\*13** It was within the power given by the Legislative Assembly that the Bank created and operated the PRHEAC, in accordance with the **\*410** end and purpose for which it was created. Its dissolution was also carried out in accordance with the law. Nothing in the record indicates that it was done for the purpose of committing or attempting to commit illegal acts. Therefore, appellants' arguments in relation to the discussed error are wrong.

## IV

The plaintiffs allege that the retention right applied to the employees of the PRHEAC subsidiary, as an essential part of the merit principle under the Puerto Rico Public Service Personnel Act, as well as under the doctrine established in *Calzada Quiñones v. D.A.C.O.*, 114 D.P.R. 757 (1983). They argue that by failing to accommodate the PRHEAC employees in the remaining positions or in positions currently occupied by temporary employees or employees with less seniority in the Bank, taking both the Bank and the PRHEAC as a whole, the provisions of the Puerto Rico Public Service Personnel Act were violated.

**[31–32]** The public policy of the Puerto Rico Public Service Personnel Act, 3 L.P.R.A. sec. 1301 *et seq.*, "[e]stablishes merit as the principle governing all public service, in order for the most competent people to serve the Government and for all employees to be selected, trained, promoted and retained in their jobs based on merit and capacity, without discriminating on the basis of race, color, sex, birth, age, social condition or origin, or political or religious ideas." 3 L.P.R.A. sec. 1311(1). A paradigm of this principle is the right of retention, namely, providing employment security to suitable career employees who meet the productivity and discipline requirements that must exist in public service. 3 L.P.R.A. sec. 1336.

**[33]** However, the law specifically excludes **\*411** certain branches or agencies to which its provisions shall not apply. In this regard, it provides:

> *1338. Exclusions*
>
> The provisions of this Chapter shall not apply to the following branches, agencies and instrumentalities of the Government:
>
> (1) Legislative Branch
>
> (2) Judicial Branch
>
> *(3) The employees of agencies or instrumentalities of the Government which operate as private businesses or companies*
>
> *(4) The employees of agencies or instrumentalities of the Government having the right to negotiate* collectively under special laws
>
> (5) The University of Puerto Rico
>
> (6) The Governor's Office and
>
> (7) The Puerto Rico State Elections Commission
>
> As to the Judicial Branch and the Legislative Branch, they shall be governed as regards administration of personnel by the current provisions specifically applicable to each of these Branches of Government. 5 (Emphasis added.) 3 L.P.R.A. sec. 1338.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**\*\*14** [34–35] Notwithstanding the aforementioned exclusions, which were a result, in relation to the branches of Government, of observing the principle of separation of powers and, in relation to public agencies, to avoid any conflict which may arise between the provisions of the law and the collective bargaining agreements which in relation to most employees applied to said agencies, 6 the public policy of the Commonwealth has been to extend the merit principle to all public service, including the agencies and instrumentalities excluded by the aforementioned personnel act. 7 For said purpose, the Legislative Assembly, when it **\*412** added Sec. 10.6 to the Puerto Rico Public Service Personnel Act, *supra*, specifically provided:

> The agencies and instrumentalities herein excluded under paragraphs (3) and (4) must adopt, with the advice of the Office of Personnel, and within 120 days from approval of this law, personnel regulations including the merit principle which shall govern the personnel rules applicable to employees who are not covered by collective bargaining agreements. A copy of the regulations so approved shall be sent to the Puerto Rico Legislative Assembly. 8

[36] In accordance with said mandate, the PRHEAC promulgated Personnel Regulations including the merit principle applicable to all managerial employees and employees not covered by any collective bargaining agreement. It also provided a collective bargaining agreement governing the labor relations between union employees and the PRHEAC. The effective period of said agreement was extended to June 30, 1994. Therefore, since the Public Service Personnel Act did not apply, the collective bargaining agreement applied to union employees and the promulgated Regulations applied to managerial and non-union employees. The case record reveals that the layoffs followed the procedures established in the Regulations and in the collective bargaining agreement.

The doctrine stated in *Calzada Quiñones v. D.A.C.O.*, supra, in which we decided that for a personnel reduction, based on lack of funds or elimination of programs in an agency, to comply with the provisions of the Personnel Act as to the merit principle, it must be done taking into consideration all of the divisions of the agency or instrumentality in question and using the seniority criterion as a retention element, does not apply to the present case. **\*413**

In *Calzada Quiñones v. D.A.C.O.*, supra, a career employee with twenty-six (26) years of service was laid off upon the elimination of an agency program based on economic reasons. The Consumer Affairs Department (D.A.CO., acronym in Spanish) is an agency of the Central Administration and, as a result, it is not excluded from the provisions of the Puerto Rico Public Service Personnel Act as to the merit principle and the retention right. The Board of Appeals of the Personnel System (J.A.S.A.P., acronym in Spanish) affirmed the validity of the layoffs, deciding that it was not necessary to submit employees to the competition based on seniority process since as a result of the elimination of the program all of the employees in it became unemployed. The J.A.S.A.P. considered each program within the agency as a separate and independent whole for purposes of the process to determine the order of priority in which said layoffs would be carried out and, therefore, [avoid] the competition based on seniority between employees under the same classification from other agency programs. After said decision was appealed, the then Superior Court denied the request for review of administrative decision. When revoking said decision, we then affirmed that, even though the Puerto Rico Public Service Personnel Act authorizes the separation of an employee from public service, without it implying a dismissal, among other reasons, based on lack of funds, 9 it was necessary for the agency to carry out the layoffs fully observing the law and the rules and regulatory procedures. Id., page 760.

**\*\*15** In the present case, it is clear that the PRHEAC cannot be taken as part of the Bank as a whole, because the PRHEAC enabling act provides otherwise. This case involves an instrumentality that is "independent and separate" from the Bank and, as a result, it would not be appropriate to relocate the employees from one independent **\*414** public corporation to another, with the serious consequence of laying off other employees validly hired by the Bank that would be displaced by employees with more seniority from another independent agency whose operations have ended. Given the fact that it was a total layoff, there was no possibility of relocating employees or retaining them in existing positions.

[37] In cases such as this one, in which all employees are laid off based on the closing of a subsidiary public corporation created by

Case:17-03283-LTS Doc#:3858-1 Filed:09/05/18 Entered:09/05/18 09:15:20 CERTIFIED TRANSLATION Desc
Exhibit A Page 11 of 16

Rodríguez Román v. Banco Gubernamental de Fomento par..., 2000 JTS 104 (2000)
151 D.P.R. 383, 2000 TSPR 93

another public corporation whose enabling statute has assigned to it a legal personality that is separate and independent from the one which created it, it is not appropriate to request placing, in the surviving corporation, the employees hired by the subsidiary corporation, in accordance with the merit principle and seniority criterion. The closing of the subsidiary corporation of the Bank, namely the PRHEAC, results in the automatic layoff of all of the employees hired by the latter, since said closing implies the disappearance of all union or managerial positions of the closing corporation.

**V**

Furthermore, the appellants allege that the Court of First Instance erred when it *summarily* dismissed the complaint, by deciding that the plaintiffs were not employees of the bank without allowing them to present evidence to establish their allegations to the effect that they were so.

A careful analysis of the entire record in this case reveals allegations to the effect that some of the plaintiffs were hired by the Bank *before the creation of the PRHEAC.* If the process for transferring these **\*415** employees was not carried out through a valid resignation from employment in the Bank, there is a possibility that said employees retained their Bank employee condition, and therefore may have the right to some kind of remedy. The judgment issued summarily is completely void of any determination in this regard. Furthermore, we have not found in the case record any evidence supporting the summary disposal of said allegation. Therefore, the court of first instance should have received evidence in cases of employees that were hired *before the creation of the subsidiary* that would allow it to determine who their actual employer was. To do so, it was important to establish whether at any time they validly resigned from the Bank to become part of the PRHEAC, *or whether they were simply transferred to the subsidiary retaining their job with the Bank.*

Based on the aforementioned grounds and considering the motion to appeal filed in this case as a Petition for *Certiorari,* since that is the appropriate petition, 10 *said writ shall be issued and the judgment of the Circuit Court of Appeals shall be modified for the sole purpose of ordering that it remand the case to the Court of First Instance for holding of hearing in accordance with this decision.* 11 *However, the judgment issued by said appellate court is affirmed in relation to the employees who were not employees of the Government Development Bank before they began to provide services as employees of the PRHEAC.* **\*416**

--O--

Concurring and dissenting opinion issued by Associate Judge Fuster Berlingeri.

**\*\*16** I concur with the decision of the majority of the Court in the present case to remand it to the court of first instance in order for the latter to receive evidence in relation to the employees of the Puerto Rico Higher Education Assistance Corporation (hereinafter the PRHEAC) that were hired by the Government Development Bank (hereinafter the Bank) *before* the PRHEAC was created, in order to determine who was the actual employer of said employees.

However, I do not agree with the dismissal of the action of the other employees of the PRHEAC who have filed an appeal in this Court. These other employees have alleged that they were also "hired, appointed, certified, paid and evaluated by the Government Development Bank". They have also alleged that in practice the PRHEAC was not an entity that was different and separate from the Bank since the latter actually closely directed and controlled the affairs of the PRHEAC. Lastly, the above-referenced employees have alleged that the Bank considered them as employees of the same, and so they had a reasonable expectation that they were in fact employees of the Bank. If said allegations are true, I think that it is evident that these other employees would have a right to some type of remedy against the Bank.

The majority of the Court dismisses the above-referenced employees' claim on grounds that said employees worked for a subsidiary of the Bank constituting an instrumentality that was independent and separate from the latter, and so they were automatically laid off upon the closing of said subsidiary. But the thing is that what the above-referenced employees are actually challenging is whether they were in fact employees of the aforementioned subsidiary of the **\*417** Bank, and not of the Bank itself. Said controversy *cannot be adjudicated* without a previous discovery procedure and presentation of evidence in order to decide based on the evidence whether or not the allegations of the above-referenced employees are valid and true.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

The majority of the Court dedicates most of its opinion to affirming the novel theory of the Bank that it received a valid delegation of Legislative Power that in fact allows it to become a "mini-legislature" as regards the creation of public corporations to exercise any of the broad and substantial powers of the Bank. After deciding that said extraordinary delegation of power is valid, the majority proceeds *ipso jure* to also affirm the allegations of the Bank to the effect that in this case a separate and independent corporation was created and that the above-referenced employees were employees of the same. All of it was affirmed based only on Bank resolutions whose validity is what is in fact being challenged.

The majority does not only give a dreadful "carte blanche" to the Bank to create the aforementioned public corporations at its discretion, but, for all practical purposes, *assumes* that in this case said corporation was actually created and the above-referenced employees are not employees of the Bank and cannot be considered as such. All of this is done *without any evidence*, even though said facts are precisely what is being challenged.

**\*\*17** In our jurisdiction it has been firmly established that a complaint cannot be summarily dismissed unless the petitioner does not have a right to any remedy under any factual situation that may be proven in support of its claim. The courts must consider a request for dismissal in the most favorable light for the plaintiff and must deny it if there is any doubt to the benefit of the petitioner. *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305 (1970); *Colón v. San Patricio Corporation* **\*418** , 81 D.P.R. 242 (1959). In this case, the meaning and purpose of said rule have not been observed. On the contrary, the allegations of the Bank have been considered as true without *evidence* to support them. The benefit of the doubt has been fully given to the powerful Bank, disregarding the claim of employees who were suddenly laid off. The fact that the PRHEAC is an entity that is different and separate from the Bank is accepted only based on the fact that the latter determined so, as if the reality of the PRHEAC only depended on the manner in which the Bank classifies it. It affirms the notion that even if the PRHEAC is actually a mere puppet of the Bank administered by the same at its discretion, if the Bank certifies that the PRHEAC is an entity that is different and separate from the same, said determination cannot be refuted. Since I cannot

agree with this other "carte blanche" which the majority gives to the Bank, I dissent.

--O--

Dissenting opinion issued by Associate Judge Negrón García.

In the end, the fair solution to this case introduces from the beginning a purely legal matter; namely, the constitutional validity of an exceptional delegation of powers by the Legislative Assembly, a matter that has not been adjudicated by the court of first instance, the Circuit Court and, now, by this Court, *as explained below*.

I

The Puerto Rico Higher Education Assistance Corporation (PRHEAC) is a *subsidiary* corporation of the Government Development Bank created on May 8, 1991, by Resolution No. 4530 of the Board of Directors of the Bank, in accordance with the powers given in Art. 2 of Law No. **\*419** 17 enacted on September 23, 1948, as amended, 7 L.P.R.A. sec. 552. It was dissolved on April 15, 1994 by resolution, the date on which the PRHEAC ceased operations and *terminated all of its employees.*

After the terminations were carried out, Maritza Rodríguez Román, twenty-one (21) union employees and five (5) managerial employees filed a complaint in the Court of First Instance, Superior Court of San Juan, against the Government Development Bank, the PRHEAC, the Union of Employees of the Government Development Bank (hereinafter the Government Bank) and the Great Lakes Higher Education Corporation (Great Lakes). In short, they alleged that they were employees of the Government Bank with the right to compete with the other employees of said corporation for the remaining positions, in accordance with the merit principle and the seniority criterion. [1]

**\*\*18** On the other hand, the Government Development Bank and the PRHEAC requested the summary dismissal of the complaint. They argued that the PRHEAC was a corporate entity that was different and independent from the Government Bank, and exempt from the provisions of the Puerto Rico Public Service Personnel Act. The codefendant, Union of Employees of the Government Bank, also requested dismissal based on lack of ripeness of the controversy and lack of jurisdiction. The other codefendant, Great Lakes, requested the same remedy arguing that the complaint failed to state a

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

claim that would justify granting a remedy. Upon considering said motions, **\*420** the court of first instance (Hon. Arnaldo López Rodríguez, Judge) dismissed the complaint in relation to the Government Bank and the PRHEAC, based on failure to exhaust the available administrative remedies. It dismissed it in relation to the Union and Great Lakes based on the stated grounds.

Said decision was appealed in this court. On November 2, 1994, we revoked it in relation to codefendants Government Development Bank and the PRHEAC because we believed that the controversy in question was essentially a legal controversy which did not justify requiring the exhaustion of administrative remedies. We remanded it for continuation of the proceedings.

In accordance with said order, the court of first instance ordered the parties to submit briefs to support their respective allegations. Maritza Rodríguez Román *et al.* argued that the PRHEAC was an alter ego of the Bank and invoked the application of the rule stated in *Calzada Quiñones v. D.A.C.O.*, 114 D.P.R 757 (1983). On the other hand, the defendants argued that the doctrine established in said case did not apply because the labor relations between union members and the PRHEAC were governed by the collective bargaining agreement. They also insisted that the PRHEAC was a corporation that was different and independent from the Bank by provision of law and was not covered by the Puerto Rico Public Service Personnel Act because the collective bargaining agreement which governed the labor conditions of the unionized plaintiffs "constitutes the exclusive regulations for purposes of layoffs".

The court of first instance decided that the PRHEAC was not an alter ego of the Government Bank *because Law No. 17 enacted on September 23, 1948 (7 L.P.R.A. sec. 551 et seq.) describes it as an entity that is completely independent from the Bank*. It decided that the closing of a subsidiary corporation results in the layoff of **\*421** all of the employees hired by the latter, and dismissed the complaint based on this.

Maritza Rodríguez Román *et al.* filed an appeal in the Circuit Court of Appeals, which affirmed it by concluding, among other things, that by "*express legislative mandate the PRHEAC is not part of the Government Development Bank*". Said decision was appealed in this Court. 2

## II

**\*\*19** The Government Bank is a public corporation validly and directly created by the Legislative Assembly for the purpose of assisting the State in the performance of its fiscal duties and in promoting the economy, especially its industrialization. 7 L.P.R.A. sec. 551. Its organic charter includes the following power:

> (J) *To create subsidiary or affiliate companies by resolution of its Board of Directors* when in the opinion of the latter said action is advisable, desirable or necessary for performance of the duties of the Bank or for compliance with its institutional purposes or for execution of its powers. The Bank may sell, lease, lend, donate or transfer any of its assets to the subsidiary companies so created. *The subsidiaries created by the Bank by virtue of the power given to it on this paragraph shall constitute government instrumentalities of the Commonwealth of Puerto Rico that are independent and separate from the Bank, and shall have all of the powers, rights, functions and duties that this law gives to the Bank and that are delegated by the Board of Directors of the same*. The Board of Directors of the Bank shall be the Board of Directors of each and every one of said subsidiaries, except for the subsidiary that shall be known as the Puerto Rico Tourism Development Fund, which shall have a Board of Directors composed of the President of the Government Development Bank for Puerto Rico, the Executive Director of the Tourism **\*422** Company and the Secretary of the Treasury. ... (Emphasis added.) 7 L.P.R.A. sec. 552(*Fourth*)(J).

Said precept clearly introduces the following question: can the Legislative Assembly delegate to a public corporation the creation of subsidiary or affiliate entities,



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

which are also independent and separate corporate government instrumentalities?

### III

A brief historical background would be appropriate. Public corporations were created based on the need to promote and maximize the efficacy of public work and comply with the new and numerous tasks of the State after the Second World War. *Torres Ponce v. Jiménez,* 113 D.P.R. 58, 6263 (1982). In Puerto Rico, with the beginning of the socioeconomic development program, they were created to reduce costs, provide infrastructure and improve the services offered by the State. *McCrillis v. Aut. Navieras de P.R.,* 123 D.P.R. 113, 127 (1989).

As such, it offers public social or socioeconomic services on behalf of the Government, *but as an independent legal entity.* Said characteristic gives it the legal and commercial attributes of a commercial company, allowing it to compete and achieve its objectives efficiently. *Commoloco of Caguas, Inc. v. Benítez Díaz,* 126 D.P.R. 478, 490492 (1990). The functions of public corporations are framed within the powers given by the Legislative Assembly in their enabling statutes, but we know that said powers and faculties delegated by legislation are limited by constitutional imperatives stemming from the separation of powers. 3 "The limitations stemming from the **\*423** constitution are introduced in light of the broad question as to whether a legislature may, and under which circumstances, delegate powers to an agency."
D. Fernández Quiñones, *Derecho Administrativo y Ley Uniforme de Procedimientos Administrativos*, Bogota, Ed. Forum, 1993, 1993, page 60.

**\*\*20** In the past, when adjudicating said questions, we have recognized the need to delegate taking into consideration our social and economic conditions. In *Viajes Gallardo v. Clavell,* 131 D.P.R. 275 (1992), we stated that given the complexity of the system of government, the Legislature cannot be required to directly detail and establish, and on a daily basis, its programs, and that its essential duty is to establish guidelines to direct the mandate and discretion of the administrative agencies. We also recognized, as grounds for it, the technical knowledge and specialized experience of the administrative bodies. See, also, *López v. Junta Planificación,* 80 D.P.R. 646, 661 (1958).

### IV

Based on the foregoing, there is no question that the Legislative Assembly may delegate regulatory or adjudicative functions. To legally evaluate said delegations we have made their validity contingent on the provision of adequate and sufficient criteria to guide the actions of the agency. *Luce & Co. v. Junta de Salario Mínimo,* 62 D.P.R. 452 (1943); *Hilton Hotels v. Junta Salario Mínimo,* 74 D.P.R. 670 (1953); *López Salas v. Junta de Planificación*, supra; *Consejo de Educación Superior v. U.I.A.,* 120 D.P.R. 224 (1987).

The Uniform Administrative Procedure Act of the Commonwealth of Puerto Rico incorporates the classical meaning recognized for regulatory delegation. It defines it as the process by which an agency formulates, adopts, amends or repeals rules or regulations. **\*424** 3 L.P.R.A. sec. 2102(m). A rule is any rule or group of rules of general application which implement or interpret public policy or the law or which regulate the requirements of the practices of an agency. 3 L.P.R.A. sec. 2102(l). Furthermore, an administrative adjudicative process determines facts and rights in particular cases or claims.

In the present case, the power given by the Legislative Assembly to the Government Bank is not contained within the traditional regulatory delegation *vis-à-vis* adjudicative delegation dichotomy. Clearly, the power via resolution to create a subsidiary, which is also a separate and independent instrumentality of the State, is not framed within the regulatory power or the adjudicative power.

Based on the foregoing, we must set aside the usual standard for court review regarding the adequacy of guidelines - which only applies to regulatory or adjudicative delegations- since it would be inadequate for the evaluation of the present delegation.

In the present novel case the nature and scope of the delegated duty must be analyzed.

**\*\*21** We recognize the important economic, social and political reasons that have made it necessary, for a better operation of the system of government, for the Legislative Assembly to create administrative bodies to which it delegates quasi-legislative and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

quasi-judicial functions. But, no matter how laudable it may be, to also allow the creation of public corporations to be delegated —whether or not they are described as subsidiaries— could go beyond the limits of the doctrine of separation of powers. Creating an agency, establishing the scope of its functions, and stating the public policy that it shall implement, are inherent duties of the Legislative Branch that cannot be delegated. Under *the governing principles limiting the Legislative Power, the latter may create public corporations, but "quaere" whether it may delegate said *425 prerogative*. Based on said perspective, if negative, giving the Government Bank the power to create separate and independent public corporations, in this case PRHEAC, would be unconstitutional.

In short, the Legislature could give and actually gave to the Government Bank the power to create subsidiaries if in the opinion of its Board of Directors it was advisable or necessary to fully perform the duties of the Bank. There is still the constitutional question regarding whether it could delegate its prerogative to make them independent from the Government Bank and create the PRHEAC as a separate and independent public corporation.

Said decision is vital for the right adjudication of the case. Of the life and death of a public corporation, subject only to the will of a Board of Directors, depends whether all or only some of the petitioners-employees are condemned to a purgatory, without the possibility of work or salary redemption.

Based on the aforementioned grounds we cannot join the opinion of the majority which leaves plaintiffs Maritza Rodríguez Román *et al.* completely defenseless, without adjudicating the above-referenced constitutional question.

What should have been done, via resolution, was to give the Secretary of Justice a period to, through the Attorney General, state his arguments in relation to the potential unconstitutionality of the power delegated to the Government Bank to create subsidiaries, which are also separate and independent corporate entities. 4

*426

Footnotes

1   7 L.P.R.A. sec. 552(*Fourth*)(J).
2   The petition that would actually be appropriate is a *certiorari* petition since the motion does not state any circumstance that would allow filing an appeal in this case. Art. 3.002 of the Puerto Rico Judiciary Act of 1994 (4 L.P.R.A. sec. 22i).
3   "(J) To create subsidiary or affiliate companies by resolution of its Board of Directors when in the opinion of the latter said action is advisable, desirable or necessary for performance of the duties of the Bank or for compliance with its institutional purposes or for execution of its powers. The Bank may sell, lease, lend, donate or transfer any of its assets to subsidiary companies so created. *The subsidiaries created by the Bank by virtue of the power given to it on this paragraph shall constitute government instrumentalities of the Commonwealth of Puerto Rico that are independent and separate from the Bank, and shall have all of the powers, rights, functions and duties which this law gives to the Bank and that are delegated by the Board of Directors of the same. The Board of Directors of the Bank shall be the Board of Directors of each and every one of said subsidiaries, except for the subsidiary that shall be known as the Puerto Rico Tourism Development Fund*, which shall have a Board of Directors composed of the President of the Government Development Bank for Puerto Rico, the Executive Director of the Tourism Company, and the Secretary of the Treasury. ... The provisions of sec. 558 of this title shall apply to all subsidiary companies so organized and which are subject to control by the Bank...." (Emphasis added.) 7 L.P.R.A. sec. 552(*Fourth*) (J).
4   See, to compare the different forms in which a public corporation can be "born," the experience in some countries with planned economy (or socialist) systems in which by way of a government action private companies were expropriated and nationalized. In other words, the public corporations were "born" from private law entities which already existed. A.R. Brewer Carías, *Las empresas públicas en el derecho comparado*, Caracas, Universidad Central de Venezuela, Pubs. Facultad de Derecho, 1967, Vol. XXXVII, page 59.
5   It is important to note that the aforementioned provision was amended in 1996 to ass an eighth exclusion, namely: "(8) The Human Resources and Occupational Development Council, attached to the Department of Labor and Human Resources". 3 L.P.R.A. sec. 1338.
6   *Reyes Coreano v. Director Ejecutivo,* 110 D.P.R. 40, 47 (1980); *Aut. de Puertos v. Mun. de San Juan,* 123 D.P.R. 496, 502 (1989).



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

7     *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113, 132 (1989); *Reyes Coreano v. Director Ejecutivo*, supra, page 47.

8     By way of Law No. 18 enacted on February 22, 1979 the aforementioned section was amended, eliminating the second to last paragraph, since said terms had been met in excess.

9     3 L.P.R.A. sec. 1336.

10    4 L.P.R.A. sec. 22j.

11 There is a possibility that the remedy to which those plaintiffs, who retained the Bank employee condition, may have a right, if so determined by the Court of First Instance after holding the above-referenced hearing, may be the right to be reinstated as employees of said entity. If said remedy implied the termination of other persons currently employed by the Bank due to having less seniority than the petitioners to be reinstated, said persons would have the right to intervene and be heard in the present litigation before the aforementioned remedy is issued. The Court of First Instance shall take the necessary measures to guarantee said right.

1     As a remedy they requested provisional, preliminary and permanent injunction orders to: stay a general layoff announced by the Puerto Rico Higher Education Assistance Corporation (PRHEAC) for all of its employees and create a relocation plan within all of the departments of the Government Development Bank (hereinafter the Government Bank); notify each employee of the existence of said plan; reinstate to their jobs all employees transferred, laid off or who resigned as a result of the imposition of the layoff process; and indemnify for alleged resulting harm, which was estimated at one hundred thousand dollars ($100,000) for each of them.

2     Several errors were alleged, including that the Circuit Court erred when it did not adjudicate *whether the Bank may create government instrumentalities.*

3     B. Schwartz, *Administrative Law*, 3rd ed., Boston, Ed. Little Brown & Co., 1991; 1 *Davis*, *Administrative Law Treatise* (3rd ed. 1991).

4     Depending on the answer to the constitutional question the Circuit Court of Appeals would or would not be affirmed. If revoked, the case would be remanded to the court of first instance for the opportune adjudication of the suitability of the claims and defenses presented by the parties.

**End of Document**          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.