# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
-------------------------------------------------------------------- x
                                                                     :
In re:                                                               :
                                                                     :
THE FINANCIAL OVERSIGHT AND                                          :  PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                    :  Title III
                                                                     :
         as representative of                                        :  Case No. 17-BK-3283 (LTS)
                                                                     :
THE COMMONWEALTH OF PUERTO RICO et al.,                              :  (Jointly Administered)
                                                                     :
         Debtors.¹                                                   :
-------------------------------------------------------------------- x
```

## CREDITORS' COMMITTEE'S INFORMATIVE MOTION REGARDING
## <u>KOBRE & KIM FINAL REPORT</u>

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

To the Honorable United States District Judge Laura Taylor Swain and the Honorable United States Magistrate Judge Judith Gail Dein:

The Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA) (the "Committee") hereby submits this *Informative Motion Regarding Investigator's Final Report* (the "Informative Motion"), seeking to inform the Court and parties in interest in these Title III cases of the Committee's various issues and concerns regarding the Final Investigative Report (the "Final Report")[1] issued by the Oversight Board's Investigator, Kobre & Kim LLP (the "Investigator"). The Committee feels duty-bound to make this filing in light of the fact that the Oversight Board and the government have already begun using the Final Report to argue that the Oversight Board fully satisfied any "duty" to investigate or that certain parties should not be investigated.[2]

## Introduction

1. The Committee appreciates the efforts undertaken by the Investigator. Indeed, the Committee is continuing its review of the Final Report and—consistent with the "Exit Plan Order" entered by the Court following the July Omnibus Hearing[3]—is actively requesting access

---

[1] FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO, Independent Investigator, *Final Investigative Report* (Aug. 20, 2018) (*available at* https://drive.google.com/open?id=19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf).

[2] *See* Oversight Board Motion to Dismiss, at 27-28, *Pinto-Lugo v. United States*, [Dkt. 36 in Adv. Proc. 18-00041-LTS] ("The Oversight Board has already conducted an investigation **that fulfills any 'duty' it could be found to have to conduct an audit**. . ."); *see also* Governor's Motion to Dismiss, at 8-9 [Dkt. 38 in Adv. Proc. 18-00041-LTS], at 8 ("As the FOMB explains in its motion to dismiss, **the FOMB's independent PROMESA investigation was thorough and transparent**, and it addressed (among other things) (i) the reasons behind Puerto Rico's financial crisis, (ii) whether there was any intention to evade Puerto Rico's constitutional debt limits, (iii) compliance with the federal securities laws, and (iv) potential claims against responsible parties for their role in the events, transactions, and occurrences under investigation."). While the Committee does not take any position with respect to the underlying merits of that adversary proceeding, it notes with concern statements like these that attempt to make the Final Report the law of the land.

[3] *See Order Approving Motion of the Independent Investigator for an Order: (I) Establishing Procedures for Resolving any Confidentiality Dispute in Connection with Publication of the Independent Investigator's Final Report; (II) Approving the Disposition of Certain Documents and Information; (III) Relieving the Independent Investigator from Certain Discovery Obligations; (IV) Exculpating the Independent Investigator in Connection with the Investigation and Publication of the Final Report; and (V) Granting Related Relief* (the "Exit Plan Order"), ¶ 14 [Dkt. 3744] (setting forth procedures to access document depository).

1

to the third-party documents collected by the Investigator. Nevertheless, at this early stage, the Court should be extremely skeptical of claims by the Oversight Board and the government that the Final Report "uncovered everything" and therefore should (a) serve to prevent further inquiry or investigations that may be appropriate or (b) affirmatively be used as evidence, conclusions, or otherwise in a manner that would support the release of claims. In particular, the Committee wishes to bring to all parties' attention the various concerns that would make such reverence inappropriate and unwarranted. These concerns, which are outlined in greater detail below, highlight that additional work remains necessary to ensure that claims are fully evaluated (and, in some cases, prosecuted)[4] and public trust and accountability are restored.[5]

2. One crucial observation that the Final Report **does** make, though, is that the GDB served as the epicenter and effectively controlled all of the Title III Debtors' borrowing practices. *See infra,* section III. In fact, when Puerto Rico was hitting the proverbial "wall" in early 2014 and needed to retain restructuring advisors, it was the **GDB**, not any other Puerto Rico entity, that signed the retention agreements with those advisors for advice regarding what was, in at least one case, creatively termed "potential liability management transactions," which really means bankruptcy and/or restructuring.

---

[4] In an August 29, 2018 press release, the Oversight Board announced that it created a "Special Claims Committee" to "pursue claims resulting from the results of the independent investigation conducted by Kobre & Kim into Puerto Rico's debt and its connection to the current fiscal crisis." *See* Ex. 1, Press Release, Financial Oversight & Management Board for Puerto Rico, *Oversight Board Establishes Special Claims Committee to Pursue Findings of Debt Investigation Report* (Aug. 29, 2018). However, there is no reason to expect the Special Claims Committee's approach to be any different than the approach undertaken by the Investigator—as three of the four members on that Special Claims Committee were the very three members of the "Special Investigative Committee" that oversaw and directed the Investigator's work and presumably approved the issuance of the Final Report.

[5] Indeed, these very issues appear to be undermining the Final Report's utility for its stated purpose—of restoring public trust in Puerto Rico's ability to return to the capital markets. *See* Joe Mysak, *No Conspirators or Smoking Gun in Puerto Rico Report,* BLOOMBERG (Aug. 21, 2018) (available at https://www.bloomberg.com/news/articles/2018-08-21/no-conspirators-smoking-gun-in-puerto-rico-report-joe-mysak) ("The report, prepared by independent investigator Kobre & Kim LLP, is critical of the island's leadership and lawmakers and processes, but only up to a point. It's the same with the bond lawyers and bankers, advisers and analysts. Everything, it seems, was done with the best of intentions.").

2

3. Given that background regarding the GDB's central role, the importance of viewing the Final Report with a wary eye is highlighted even more clearly by the government's recent efforts (with the Oversight Board's apparent approval) to steamroll any opposition to the GDB's Title VI restructuring and effectively bury the GDB as quickly as possible. Even though that restructuring process would result in a global release of the Title III Debtors' claims against the GDB and the GDB's current or former officers, directors, employees, agents, or representatives (the "<u>GDB Releasees</u>")[6] counsel to the Oversight Board has taken a dismissive position with regard to the need to analyze these claims. In fact, counsel for the Oversight Board has stated with absolute conviction that "**it is beyond credulity** that the Commonwealth, HTA, and PREPA can have meritorious claims against the governmental entity that loaned them money and kept them afloat at the request of the Puerto Rico government."[7]

4. In that context, the Committee further notes that, under well-established bankruptcy law, examiner reports or other "investigative" reports have no binding or preclusive effect on any pending or future matters.[8] Even more, courts have at times determined that the

---

[6] *See In re Government Development Bank for Puerto Rico*, Case No. 18-1561, Committee's Notice of Intention to Object Regarding Purported Qualifying Modification for Government Development Bank [Dkt. 59], at 2 n.5. It is unclear at this stage whether the government will take the position that the release applies to former counsel and other advisors to GDB—but that possibility alone highlights the heightened need to fully investigate potential claims before exonerating any such third parties.

[7] Oversight Board Obj. to Creditors' Comm.'s Automatic Stay Mot., ¶ 29, Aug. 31, 2018 [Dkt. 3845] (emphasis added); *see also* Oversight Board Obj. to Creditors' Comm.'s Notice of Intent to Object to Qualifying Modification for Gov't Dev. Bank, ¶ 48, *In re Gov't Dev. Bank for Puerto Rico*, No. 18-1561 (D.P.R. Sept. 1, 2018) [Dkt. 111] ("it is beyond credulity that the Commonwealth, HTA, and PREPA have meritorious claims against the governmental entity that loaned them money and kept them afloat at the request of the Puerto Rico government.").

[8] *See In re FiberMark, Inc.*, 339 B.R. 321, 327 (Bankr. D. Vt. 2006) ("The facts, as found by the Examiner, are not 'true' just because they are in the [r]eport. They explain and justify the Examiner's conclusions. That is all."); *In re Refco Inc. Sec. Litig.*, No. 07-MD-1902 (JSR), 2013 WL 12191891, at *7 (S.D.N.Y. Mar. 11, 2013) ("underlying facts [behind examiner's report] still need to be proven"); *Gordon Props., LLC v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.* (*In re Gordon Props., LLC*), 514 B.R. 449, 462 (Bankr. E.D. Va. 2013) ("[A]n examiner has no adjudicatory role, only an investigatory role. The examiner's report has no binding effect on the court.").

3

conclusions reached by bankruptcy examiners or investigators are incomplete in nature or even later proved wrong:

> The Court recognizes, as the Debtors and Silver Point argue, that the Examiner's Report is not evidence, and that the Examiner's conclusions are not based on a full factual record. . . . **In this case the Examiner's investigation was designed to assist the parties and the Court in analyzing a factual situation, determining what further record is required and in narrowing and focusing the issues, but many of its conclusions have been proved wrong by the evidence of record**.

*In re Granite Broad. Corp.*, 369 B.R. 120 n.10 (Bankr. S.D.N.Y. 2007) (emphasis added).

### I. WHAT FINAL REPORT DOES NOT ADDRESS

5. As a threshold matter, it is important to understand what the Final Report does **not** address. The Final Report itself states that it is not intended to be an exhaustive listing of causes of action (or analysis of such causes of action) and does not opine on the "likelihood of success" of any claims:

> The Report also provides a discussion and survey of potential causes of action that the Independent Investigator identified that may arise from the facts learned through the investigation. **That discussion is not intended to provide an exhaustive or definitive list and analysis of causes of action that may be available to investors, creditors, debtors, regulators and other parties. Indeed, we do not opine on the likelihood of success of any cause of action.**

Final Report, at 30 (emphasis added).

6. This fundamental limitation is reflected throughout the "causes of action" chapter of the Final Report. Although that chapter spends 52 pages providing a treatise-like overview of various types of claims that often arise in bankruptcy cases,[9] there is no serious application of the facts uncovered to those legal standards. *See* Final Report, at 476-528 (providing lengthy

---

[9] Indeed, the Final Report even dedicates multiple pages to the **legal** analysis of avoidance actions—claims the Investigator acknowledges it did not review as a factual matter. *See* Final Report, at 505–17.

4

overview of "legal framework" applicable in bankruptcy cases). In most cases, the Investigator does not apply the law to the facts and merely tosses a "jump ball"—offering the possibility that certain claims **may** exist in theory without meaningfully linking them to specific individuals, and supporting documentation. *See, e.g.,* Final Report, at 569 ("[A] **potential argument** could be made that GDB breached its fiduciary roles as the leading swap advisor.") (emphasis added). In stark contrast, other examiner reports have actually outlined the **likelihood** of any recoveries and the **values** of those recoveries to the debtors' estates, and have made express references to documents **or precise references to attributable witness statements as support**.[10]

7. In fact, the Final Report expressly acknowledges that it does not even address the question of whether any **avoidance actions (preferences and fraudulent transfers)** could be maintained by any of the Title III Debtors, including against any other government instrumentality. Even though the deadline to prosecute any such claims is fast approaching (May 2019) and these kinds of claims often result in some of the most lucrative recoveries in bankruptcy cases—providing for the "clawback" of amounts paid by an insolvent or undercapitalized entity—the Investigator notes that these issues were specifically carved out, **and that it did not seek or obtain "comprehensive discovery" relating to prepetition transfers because "[w]e have not been tasked" with this analysis and because the Investigator lacked a "solvency analysis."**[11]

---

[10] *See, e.g.*, Final Report of Examiner Richard J. Davis (Volume I – Introduction and Executive Summary), at 1, *In re Caesars Entm't Operating Co.*, No. 15-01145 (Bankr. N.D. Ill. Mar. 15, 2016) [Dkt. No. 3401] (highlighting that "claims of varying strength arise out of these transactions for constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary dut[ies]" and assessing that the "**potential damages from those claims considered reasonable or strong range from $3.6 billion to $5.1 billion**") (emphasis added); *see also* Report of Anton Valukas (Volume I), at 45 n.121, *In re Lehman Bros. Holdings Inc.*, , No. 08-13555 (Bankr. S.D.N.Y. Mar. 11, 2010) [Dkt. No. 7531] (showing, as an example, precise citations to page numbers of interview summaries and analyzing whether colorable claims exist).

[11] Final Report, at 535 ("**We have not been tasked with identifying or analyzing any payments or transfers made by the Debtors** . . . Also, we did not have the benefit of a solvency analysis for any of the Debtors . . .

5

8. The Final Report similarly does not directly address questions concerning whether the **constitutional debt limit** was ever exceeded—a gating issue for determining whether certain bonds are subject to challenge.[12] In every instance, the Final Report takes no position on whether a transaction actually caused Puerto Rico to exceed its constitutional debt limit.[13] Nor did the Investigator conduct a financial analysis of the Commonwealth's debt limit at any point in time, leaving the question entirely unanswered. Rather, the Investigator concludes only that certain transactions were not intended to "evade" the debt limit. *See infra,* ¶ 11. However, a transaction which causes the debt limit to be exceeded is not protected simply because its architects did not intend that result.

9. Moreover, with very limited exceptions, the Final Report avoids the question of whether **private financial institutions** should be held liable for their interactions with the Title III Debtors—instead focusing on process-oriented "fixes" or forward-looking prescriptions. For example, the Final Report mentions in passing the possibility that "aiding and abetting" liability could attach to certain financial institutions—but generally only in the context of certain ERS issuances, not any of the other varied complex and sometimes risky transactions undertaken by

---

."); *see id.*, at 502 ("In connection with the investigation, we were not tasked with identifying or analyzing every payment or transfer made by each of the Debtors before commencement of the Title III Cases. Further, we did not have the benefit of a solvency analysis for any of the Debtors or comprehensive discovery pertaining to discrete prepetition transactions between the Debtors and third parties (e.g., lists of payments to creditors, which is typically contained in a chapter 11 debtor's Statement of Financial Affairs)."); *id.* at 504 ("We have not been tasked with identifying or analyzing any preference payments or transfers made by the Debtors . . . .").

[12] Similarly, the Final Report spends only a half-page addressing the balanced budget clause—seeming to conclude that the matter is settled because of the existence of a 1974 legal opinion on the subject. *See* Final Report, at 91. In fairness, the Final Report does acknowledge that the opinion "cited no case law, no legal treatises, and no other legal authorities in support of this conclusion." *Id.*

[13] The Final Report analyzes the termination fees associated with the various swap agreements, and notes only that "[a]n argument could be made" that those termination fees should have counted toward the constitutional debt limit. Final Report, at 567; *see id.* ("As such, there does not seem to be a meaningful reason why one would be counted toward the Constitutional Debt Limit, while the other is not."). Yet, the Final Report is silent regarding the important question raised by this possibility—the notion that any debt issued after the debt limit was exceeded (as a result of swap expenses) also would be subject to challenge.

6

the Title III Debtors. *See* Final Report, at 558–59.[14] Likewise, despite characterizing the various derivative swaps that were entered into by the Title III Debtors as highly risky—and even possibly leading to a downgrade in the Commonwealth's credit rating in 2007—the Final Report does not thoroughly analyze whether private parties, including outside advisors, could be liable for these transactions, and instead discusses whether the swaps were in "the best interests of Puerto Rico." Final Report, at 569-71. While it is, of course, valuable to determine what was in Puerto Rico's "best interests" when analyzing past mistakes, the Final Report largely misses the mark when it comes to the most important focus of any investigation—the possibility of recoveries for the Title III Debtors' estates.[15] As would be expected in any bankruptcy case, those recoveries can be found by focusing on the conduct of the **solvent** entities (here, the private financial institutions) that profited from the insolvent debtors' mistakes.

## II.     FINAL REPORT'S OVERALL APPROACH IS TO EXONERATE

10.     Even where the Final Report attempts to address claims, it takes an approach that virtually ensures that responsibility will not be laid at any party's feet. For one, even though the Investigator states that it did not "opine" on the merits of any claims, *see* Final Report, at 30, in certain instances it volunteers conclusions and presumptions that give the impression that there was no wrongdoing. Indeed, as an example that can only be described as surreal, the Final Report goes out of its way to challenge the conclusions reached in a 2010 report issued by the

---

[14]   The Final Report does, however, contain discussion of the participation of Banco Popular-related entities in the 2014 GO bond issuance (despite recommending against its issuance), but notes—without expression of a view on the merits of such claims—that interested parties "could seek" equitable subordination or other relief. *See* Final Report, at 543.

[15]   The Investigator's lack of focus on claims maximization may have resulted from its view of the limited mandate provided by PROMESA section 104(o). That section provides the Oversight Board with authority to review **retail** selling issues such as the "disclosure and selling practices in connection with the purchase of bonds by a covered territory[.]"

7

well-known and reputable financial and consulting group, Conway MacKenzie.[16] That report previously determined that certain GDB and ERS officials[17] may have breached fiduciary duties to Commonwealth and ERS stakeholders in connection with the issuance of and "arbitrage" (i.e., gambling) with ERS bonds.[18] In fact, the Final Report takes direct aim at Conway's findings—spending nearly fifteen pages attempting to absolve GDB and ERS officials of any fiduciary claims and explaining why, in the Investigator's view, the Conway report was wrong. *See id*, at 543-557 (explaining, as an example, why it was acceptable for GDB and ERS officials to remain "optimistic" about market returns in June 2008).

11. In an apparent quest to exonerate, the Investigator appears to use "new" legal standards in order to reach these types of conclusions. For example:

- Rather than actually examining whether the constitutional debt limit was exceeded by a particular issuance, *see supra*, ¶ 8, the Investigator concluded that the "Puerto Rico employed a **reasonably robust process** for these Debt Limit Calculations," and the Final Report states that the myriad and convoluted financial structures utilized by the Commonwealth issuers **were not intended "to evade"** the debt limit.[19] The Committee is not familiar with the legal standard used by the Investigator here. **Either the constitutional debt limit was exceeded, or it was not; the "robustness" of the internal analysis is not relevant to that question, and it is apparent that the Investigator never analyzed whether the calculations were at all accurate.** Similarly, the fact that the Investigator did not find evidence of "knowledge" that the debt limit was being exceeded is not a sufficient reason to find that there are not viable claims—

---

[16] As the Final Report acknowledges, these conclusions were echoed by the Puerto Rico legislature in the Statement of Motives accompanying the 2011 legislation that prevented additional ERS bonds. At the time, the legislature concluded that ERS and GDB officials "failed the fiduciary duties imposed by the law over [a] board of directors." Final Report, at 197, 554.

[17] The Final Report discusses the conduct of officials at GDB and ERS, and refers to them collectively as the "ERS/GDB Decision-Makers." Final Report, at 543.

[18] In effect, the "arbitrage" strategy was conditioned on the hope that the funds obtained from ERS pension-obligated bonds could earn greater returns in the market than the total cost of debt service. *See* Final Report, at 548; *id.* at 217 (quoting the Conway report's findings that ERS management "ignored market conditions" and that the "lack of understanding is not reasonable an[d] may not fall within the general standards of fiduciary responsibilities expected by a Board of Trustees").

[19] Final Report, at 267; *id.* ("In addition, we did not find any evidence that Puerto Rico's government personnel believed that Puerto Rico's interpretation of the Constitutional Debt Limit was wrong or that Puerto Rico performed the Debt Limit Calculation Incorrectly.").

8

or that the individuals supervising an issuance were mistaken (or negligent) in that "knowledge";

- Similarly, the Final Report spends almost two pages discussing why GDB officials were "knowledgeable and well-credentialed"—an issue entirely irrelevant to whether those individuals breached any fiduciary duties or were negligent in their administration of GDB's role as a fiscal agent for the Commonwealth;[20]

- The Investigator largely ignores the necessary implications of the "revolving door"[21] issues—omitting such discussion from the "claims" chapter (Chapter XVI)—seemingly because the Investigator concluded in an earlier chapter that it did not find evidence of "bribery, kickbacks, or pay-to-play violations in connection with any Puerto Rico-related bond issuance." *See* Final Report, at 407. Of course, it is not necessary to prove that "bribes" or "kickbacks" were offered in order to establish that fiduciary duties were breached in the selection of financial advisors or underwriters based on potential favoritism (political or financial), and the Investigator's assumptions on this point preclude an in-depth analysis of potential recoveries. This is particularly troublesome given the government's efforts to grant global releases and immunity to the GDB Releasees in the context of the Title VI Restructuring of GDB; and

- The Investigator also states that its "investigation did not uncover **sufficient** evidence to conclude that the flow of talent [the "revolving door"] between GDB and the private sector resulted in any violations[.]" Final Report, at 98. In effect, the Investigator seems to admit that it may have found some evidence of potential violations—yet does not explain what that evidence was, or why it was insufficient.

12. In fact, even where these misguided standards were utilized, the Investigator premises many of its conclusions that "no evidence" existed to support certain claims on the fact

---

[20] *See* Final Report, at 73-74. Indeed, the use of anonymous references here to these individuals ("[a] former Chairman," "[a] former Executive Vice President") and their former employers ("various positions with prominent financial institutions") prevents a meaningful analysis of the question of whether those individuals' loyalties were split while they served the GDB. *Id.*

[21] As the Court will recall, one of the animating concerns behind the Committee's original Rule 2004 Motion was the possibility that individuals may have served the GDB while potentially suffering from conflicts of interest due to their "back to back" roles at private financial institutions—the very same private financial institutions who profited by serving as underwriters for the Title III Debtors. *See, e.g.*, Comm.'s Rule 2004 Mot., ¶ 23, July 21, 2017 [Dkt. 706]. While the Final Report addresses "conflict of interest" issues as they relate to potential breach of fiduciary claims in some respects, this discussion is focused primarily on "multiple fee-generating roles" in the issuance of ERS bonds—not the underlying "revolving door" issues. *See* Final Report, at 558-59

9

that individuals "denied" misconduct.[22] Obviously, individuals would never confess to knowledge that the financial structures they were utilizing were misguided, risky, or unconstitutional. And, none of the interviews were transcribed or under oath—giving the witnesses a free pass to say whatever they may please. *See* Final Report, at 27 ("we did not take testimony under oath, nor were the interviews transcribed"). As the former Treasury Secretary, Juan Zaragoza (who was interviewed by the Investigator), wrote in a recent newspaper column regarding the Final Report:

> Reading the tome in installments (because no one could tackle it in one go), we are confronted with conclusions and comments that are so vague that **they could only be the result of one of two things: the lack of cunning to unravel the scene of the crime or the attorneys' survival instinct that forced them to conclude that they could not conclude anything or point fingers at anyone**. . . . A perfect example of this [effort] is concluding that that they found no evidence that government officials ever thought that their interpretation of the constitutional limitation applicable to the issuance of debt was incorrect. **But what did they expect? A legal memorandum recommending finding a way around the Constitution?**[23]

### III. DESPITE ATTEMPTING TO EXONERATE INDIVIDUALS, FINAL REPORT CANNOT HELP BUT IDENTIFY HIGHLY TROUBLING CONDUCT MERITING FURTHER EXAMINATION, IF NOT ASSERTION, OF CLAIMS

13. Despite the Investigator's apparent effort to minimize negligent conduct, the findings with respect to GDB decision-makers reveal highly troubling conduct that highlights the need for further investigation and should work to discourage any efforts to prematurely provide global releases to GDB and the GDB Releasees.

---

[22] *See* Final Report, at 262 ("no evidence" that officials "believed" that PBA debt service payments violated constitutional debt limit); *see id.* at 332 ("no evidence" that credit agencies "circumvented or deviated from existing conflict-separation or other protections").

[23] Juan Zaragoza, *El Mamotreto de la Deuda (The Voluminous Report of the Debt)*, EL NUEVO DIA (Aug. 29, 2018) (available at https://www.elnuevodia.com/opinion/columnas/elmamotretodeladeuda-columna-2443911/), certified translation attached as Ex. 2 (emphasis added).

14. In fact, with respect to derivative swap transactions—one area where the Final Report does acknowledge that "interested parties" could conduct further inquiry and an "argument could be made" that fiduciary responsibilities were breached, *see* Final Report, at 569—the evidence is damning. In that section, the Investigator observes that:

- GDB was the entity "acting as the main advisor and agent" for the Title III Debtors with respect to all derivative swaps, and "took the lead" on all swap transactions—many of which were complicated and extremely risky. Final Report, at 568, 570–71;

- Even though GDB had this advisory responsibility (and promulgated an internal "Master Swap Policy"), GDB officials essentially had no idea what swaps had been entered into by the Title III Debtors. Indeed, in order to inventory its total exposure, GDB had to hire an outside swap advisor in 2009 who **literally called swap counterparties on the phone over the course of months to "ask[] if they had trades with Puerto Rico-Related Entities."** Final Report, at 569 (emphasis added); and

- GDB failed to meaningfully consider whether swap termination fees should be counted for the purposes of the constitutional debt limit. *See* Final Report, at 565-67 (noting that "there does not seem to be a meaningful reason" why termination fees were not counted toward debt limit and termination fees were not referenced in official statements until 2011).

15. The facts pertaining to GDB's role as fiscal agent were just as illustrative, establishing the near-complete dereliction of GDB's duties:

- The Final Report acknowledges that the GDB had **complete** control over every aspect of the Title III Debtors' various bond offerings, serving as the financial "brain trust" of the Commonwealth. *See* Final Report, at 43. It characterizes the GDB as a "traffic cop" that "intermediated **all of the [Title III Debtors'] bond issuances,**" deciding "which of the Puerto Rico-Related Entities would issue their bonds [] and when" and selecting underwriters and law firms for those issuances. *Id.* at 71 (emphasis added);

- GDB, as the fiscal agent for the Commonwealth, had the tools and ability to monitor the Title III Debtors' indebtedness yet effectively did not discharge those monitoring responsibilities. *See* Final Report, at 85 ("Despite its responsibility for helping the Puerto Rico-Related Entities to make sound financial decisions, we found no meaningful evidence that GDB had an effective process in place to oversee important aspects of their fiscal health, or to impose accountability for repayment of debts."). **Indeed, even despite the entry of "Fiscal Oversight Agreements" (FOAs), GDB did not verify "what the Puerto Rico-Related**

11

> **Entities actually did with those loan funds after they received them."** Final Report, at 86 (emphasis added); and

- GDB neglected to perform sufficient due diligence with respect to the loans it provided to certain instrumentalities, turning itself into a "piggy bank" for those instrumentalities and forcing itself into an eventual restructuring. Final Report, at 43. Indeed, the Investigator states that "GDB witnesses told us that **GDB evaluated and approved [multi-million dollar] HTA loan requests within hours**." Final Report, at 92 (emphasis added). In one instance, even, GDB officials approved PREPA's entry into an emergency $260 million line of credit with virtually no questions asked—even though PREPA sought approval just one month earlier for another $150 million line of credit without even mentioning the potential need for additional financing. *See* Final Report, at 87.[24]

16. In other words, GDB officials did not know whether bond issuances (or loans) were in the Title III Debtors' best interests and then, once those issuances occurred, had no idea how bond proceeds were being used or money was being spent. Troublingly, though, the Final Report does not analyze in sufficient detail whether any **private** actors should be liable as willing participants who profited off of GDB officials' negligence (or worse). *See supra*, ¶ 9.

17. Perhaps unsurprisingly, the Investigator stumbles upon highly troubling evidence in one area yet fails to recognize the significance of that evidence or its application to potential Title III Debtor (rather than creditor) causes of action. The Final Report examines how GDB officials hired restructuring counsel and restructuring financial advisors **before the issuance of the $3.5 billion GO bond offering in March 2014** and failed to disclose that fact to the general market.[25] While the Final Report focuses on "disclosure"-oriented claims by creditors that bought the 2014 GO bonds, it fails to even address the potential estate claims that could arise out of this situation not because of the lack of disclosure, but rather because GDB officials, who controlled the 2014 GO bond offering, (i) directed the Commonwealth to borrow additional debt

---

[24] The Final Report concludes that this was, "at the very least, [] a significant error," yet does not address whether any claims for breach of fiduciary duties would result from this specific transaction. *Id.*

[25] *See* Final Report, at 535-39.

12

even as they were plotting for a restructuring, and (ii) utilized proceeds of such offering to repay the GDB, so that GDB and its directors and officers would be off the hook from any liability—all of this at a time where both the Commonwealth and the GDB appeared to be at least undercapitalized, if not insolvent.[26] Of course, under the then-applicable version of the GDB Enabling Act, **criminal** liability attached for GDB accepting deposits while insolvent.[27] The Final Report indicates that these decisions may have been animated by the fear of such criminal liability, noting that "[e]vidence reflects that [in 2014] the GDB Board also became concerned that, under the criminal code, GDB Board members could be held responsible for negligence in the performance of their duties if an action or omission were to cause loss or damage to the public." Final Report, at 104. Analyzing the motivations that went into this transaction is an important element when considering the assertion of any claims against the GDB and/or the GDB Releasees.

18. As an example of the types of issues that should be investigated, the Investigator also noted that it engaged the financial advisory firm, Duff & Phelps, to track down the use of certain proceeds by PREPA from a number of bond issuances between 2010 and 2013.[28] **That analysis ultimately concluded that $430 million in bond proceeds may have been misspent (or possibly worse) from PREPA's accounts**. *See* Final Report, at 143-147 (discussing Duff & Phelps' methodology and how "the amount of bond proceeds [] earmarked for the Construction

---

[26] *See* Official Statement for 2014 GO Bonds (Mar. 11, 2014) (available at http://www.gdbpr.com/investors_resources/documents/CommonwealthPRGO2014SeriesA-FinalOS.PDF) ("The Commonwealth will use the proceeds of the Bonds to (i) **repay amounts due to Government Development Bank for Puerto Rico ('GDB') under certain lines of credit extended to the Commonwealth and Puerto Rico Public Buildings Authority ('PBA').**") (emphasis added).

[27] *See* GDB Enabling Act, 1948 P.R. Laws 17, § 15, as amended by 1957 P.R. Laws 3 (providing for imprisonment of one to five years); *see also* 2015 P.R. Laws 97 (amending Enabling Act to remove criminal penalties for accepting deposits while GDB is insolvent). The current version of this statute is at 7 L.P.R.A. § 563.

[28] This review tracked the usage of those proceeds over the course of fiscal years 2010 to 2015.

13

Fund exceed, by approximately $430 million, what PREPA reported as Net Additions and changes in ending restricted cash account balances."). **Although one would normally congratulate an Investigator on this "find," what is troubling to the Committee is that the Final Report does not explain why other bond issuances by all Title III Debtors were exempted from similar reviews, leading to the unavoidable conclusion that other "autopsies" remain necessary**.

### IV. FINAL REPORT IS OF LIMITED UTILITY, BECAUSE IT FAILS TO PROVIDE WITNESS OR DOCUMENT LINKS NECESSARY FOR FOLLOW-UP

19. To compound these problems, the Investigator chose to, in effect, cover tracks through its generous offerings of anonymity to the subjects in the Final Report. Unfortunately, though, this approach means that the Final Report may turn out to be of very limited utility. As the Court will recall, the Oversight Board argued that the Committee should be sidelined because, among other things, the "Committee will suffer no prejudice" and "the Oversight Board will establish a procedure for sharing with the Committee the documents uncovered in discovery and transcripts from depositions." *See* Oversight Board Obj. to Comm.'s Rule 2004 Request, ¶ 6, Aug. 3, 2017 [Dkt. 859]. Yet, contrary to these representations, none of the Investigator's interviews were conducted under oath or even transcribed—something that not only allows interviewees to evade crucial issues, but also frustrates any efforts to utilize the statements they gave. *See* Final Report, at 27. And, instead of laying out or summarizing any individual's viewpoints with specificity, each interviewee was generally identified only as a "witness" or a "high-ranking" official—even when that witness could be a target or the identity of the "high-ranking" official could be extremely useful in evaluating a potential claim.[29] Unless the

---

[29] *See, e.g.*, Final Report, at 78 (stating that "a witness told us" that underwriters, rather than GDB, would reach out and select law firms for issuances). The exceptions to this general rule were few and far between. For example, very limited statements were attributed to Governor Alejandro Garcia Padilla or Treasury Secretary

14

Investigator subsequently provides the Committee with additional detail regarding these statements—as was originally promised—the interviews conducted by the Investigator will ultimately be of limited value.

20. In that same vein, even though the Investigator has acknowledged that it had access to a treasure trove of millions of internal emails, the Final Report almost never cites to specific documents—resorting to citations only when documents were already in the public record, as was the case with the emails cited in the summary judgment briefing from the Commonwealth-COFINA litigation.[30] Even in the few isolated instances where the Investigator has referenced the contents of internal emails, the individuals behind those emails are almost never named.[31] **Perhaps most troubling, the Investigator's counsel recently confirmed that many of these emails themselves were never produced by the GDB to the Committee because they were either (a) withheld by GDB as privileged in nature; or (b) obtained directly by the Investigator from regulators (e.g., the SEC and FINRA).** With regard to the regulator documents, as the Court will recall, the Committee requested these very materials at the

---

Melba Acosta, *see* Final Report, at 536, or to restructuring advisor Jim Millstein. *Id.* at 537. Far from this practice, other well-received examiner reports regularly provide direct summaries or even **quote transcribed notes of witness interviews at length.** *See, e.g.*, Report of Kenneth N. Klee, *In re Tribune Co.*, No. 08-13141 (Bankr. D. Del. Aug. 3, 2010) [unsealed version of Volume I at Dkt. No. 5247] (citing throughout to sworn interviews and providing quotes).

[30] Final Report, at 165 n.34 (citing to exhibits and emails filed in Commonwealth-COFINA proceeding).

[31] *See, e.g.,* Final Report, at 105 (referring to GDB email chain in which a "**high-ranking official** within GDB suggested that the spokesperson's statement was 'false' and should be reframed"); *see also* Final Report, at 422 ("In another contemporaneous email exchange **between two other high-ranking members** of GDB's management in 2005, one expresses frustration at Goldman directly marketing Swaps to the Executive and Legislative Branches, and characterizes Goldman as going behind GDB's back to convince the Secretary of Treasury and the legislature that the proposed Basis Swap could be a means of providing budget relief."). In total, the Committee has identified **fewer than ten** similar examples of specific citations to internal documents that were not already made public in the Title III cases. (In some instances, the Final Report states merely that "correspondence" was reviewed without providing specific dates or other identifying information—for example, that "correspondence between that witness and GDB confirm this stated belief." *See* Final Report, at 212.).

15

July 25, 2018 Omnibus Hearing. At that hearing, the Court acknowledged that the Committee's concerns were real, stating:

> The documents to the regulators, though, what I'm – what I want to be able to address is that there were documents that were normally requested by the investigator, which would have been in the room if they had come directly from GDB. **But if they are not there because they came from the SEC, I think the committees have the right to those documents, because they fit within all the other types of documents that would have been—that have been in the room and have normally been produced to the committees**.

*See* Ex. 3, Transcript of July 25, 2018 Hearing, 70:10–18 (emphasis added).

21. Consequently, the Committee is left guessing and forced to attempt to determine who said what. For example, because the Final Report makes no express disclosure of whether individuals served at the GDB or inside the government at the same time they or their family members owned Puerto Rico bonds[32]—an issue that could be highly relevant to the question of whether conflicts of interest arose—and there is no indication the Investigator even asked that question of witnesses, and, if he asked, what the responses were.[33]

## CONCLUSION

The Committee wishes to reiterate that it is not dismissive of the work performed by the Investigator. Moreover, the Committee continues to study the Final Report, and, while

---

[32] The Final Report notes, however, that the Investigator found "no instances" of "deficiencies in mandatory financial disclosures," *see* Final Report, at 396 & 407, and that these financial disclosures—which are made public—contain information regarding a public servant's "investments in securities and other financial instruments." Final Report, at 400. Of course, as the Final Report also notes, the government agency responsible for monitoring these disclosures did not "exercis[e] the full scope of its authority" and "relied upon the cooperation of others to implement its mandate." *See* Final Report, at 405. With regard to other family connections, the Final Report also contained a very limited discussion in which it concluded that there was no evidence of impropriety in connection with "one political official who, to our knowledge, had a family member who worked for one of the financial institutions that was a swap counterparty" and "a GDB official who worked on Puerto Rico bond issuances during the same period whose family member worked for a financial institution that historically underwrote Puerto Rico-related debt." Final Report, at 407. The Investigator seemingly reached this conclusion with respect to the GDB official only because "**[t]he official told us** that he disclosed the relationship to OGEPR and implemented the screening recommendations" the agency recommended in an opinion letter. *See id.*

[33] It is unclear whether the Committee, parties in interest in these Title III cases, and the general public should assume that silence on this critical topic means that none of these officials or their families held Puerto Rico bonds.

16

attempting to minimize costs, will likely file another motion (or amend the Committee's prior Rule 2004 Motion) to the extent necessary to do so to cover areas of inquiry that were either completely ignored or partially covered by the Final Report. However, the Committee makes this filing only to highlight for the Court and the various parties that the Final Report is not the end of the matter, that its findings remain subject to question, and that—as the Final Report acknowledges—much more work remains necessary to obtain full transparency in these Title III cases.

[*Remainder of page intentionally left blank.*]

Dated: September 5, 2018 */s/ Luc A. Despins, Esq.*

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

– and –

*/s/ Juan J. Casillas Ayala, Esq.*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*