**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

------------------------------------------------------------------- X
                                                                    :
In re:                                                              :
                                                                    :
THE FINANCIAL OVERSIGHT AND                                         :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                   :   Title III
                                                                    :
         as representative of                                       :   Case No. 17-BK-3283 (LTS)
                                                                    :
THE COMMONWEALTH OF PUERTO RICO *et al.,*                           :   (Jointly Administered)
                                                                    :
         Debtors.[1]                                                :
------------------------------------------------------------------- X

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR ORDER
GRANTING DERIVATIVE STANDING TO ACT ON BEHALF OF TITLE III
DEBTORS FOR CERTAIN LIMITED PURPOSES AND OTHER RELATED RELIEF
WITH RESPECT TO RESTRUCTURING OF GOVERNMENT DEVELOPMENT BANK
<u>FOR PUERTO RICO</u>**

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

<u>**TABLE OF CONTENTS**</u>

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

JURISDICTION AND VENUE .......................................................................... 4

BACKGROUND ................................................................................................ 4

    A.    GDB and Its Creditors ...................................................... 4

    B.    The GDB Restructuring ..................................................... 6

    C.    The Binding Effect of the GDB Restructuring and Its Release of Claims ........... 8

    D.    Conflicts of Interest and the Roles of Former GDB Officers and Others in
        the GDB Restructuring ...................................................... 10

    E.    GDB's Title VI Application and Committee's Intent to Object ......................... 13

RELIEF REQUESTED ...................................................................................... 15

BASIS FOR RELIEF ....................................................................................... 16

    A.    This Court Has the Equitable Power to Grant Derivative Standing ................... 16

    B.    Interdebtor Claims Require Indepedent Representation and Cannot Be
        "Swept Under the Rug" ...................................................... 18

    C.    The Committee Should Be Granted Derivative Standing Because AAFAF
        and the Oversight Board Are Conflicted and Engaged in Self-Dealing ............. 22

    D.    The Court Should Confirm the Committee's Ability to Appear in the Title
        VI Case to Assert Its Direct Standing ................................... 26

CONCLUSION ................................................................................................. 29

NOTICE ........................................................................................................... 29

NO PRIOR REQUEST ..................................................................................... 29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005).........................................................................25

*In re Adelphia Commc'ns Corp.*,
    336 B.R. 610 (Bankr. S.D.N.Y.), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) ....................20, 21, 22

*Campana v. Pilavis (In re Pilavis)*,
    233 B.R. 1 (Bankr. D. Mass. 1999) ..................................................................................17

*Canadian Pac. Forest Prods., Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*,
    66 F.3d 1436 (6th Cir. 1995) ..........................................................................................17

*In re Cohen*,
    263 B.R. 724 (Bankr. D. N.J. 2001) ................................................................................18

*Commodity Futures Trading Comm'n v. Weintraub*,
    471 U.S. 343 (1985)..........................................................................................................19

*Crusius v. Ill. Gaming Bd.*,
    837 N.E.2d 88 (Ill. 2005)..................................................................................................28

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
Corp. v. Chinery*,
    330 F.3d 548 (3rd Cir. 2003) ..................................................................................16, 17, 18

*Official Comm. of Tort Claimants v. Dow Corning Corp. (In re Dow Corning
Corp.)*, 142 F.3d 433 (6th Cir. 1998) ................................................................................27

*EBC I, Inc. v. Goldman, Sachs & Co.*,
    832 N.E. 2d 26 (N.Y. 2005)..............................................................................................28

*In re Evergreen Valley Resort, Inc.*,
    27 B.R. 75 (Bankr. D. Me. 1983)......................................................................................17

*Flora Mir Candy Corp. v. R. S. Dickerson & Co. (In re Flora Mir Candy Corp.)*,
    432 F.2d 1060 (2d Cir. 1970)............................................................................................19

*Fogel v. Zell*,
    221 F.3d 955 (7th Cir. 2000) ............................................................................................17

*Hansen v. Finn (In re Curry v. Sorensen)*,
    57 B.R. 824 (B.A.P. 9th Cir. 1986)..................................................................................17

*Holmberg v. Armbrecht,*
    327 U.S. 392 (1946)..................................................................................................18

*Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.),*
    555 F.3d 231 (6th Cir. 2009) ..........................................................................17, 18

*Official Comm. of Unsecured Creditors of Integrated Health Servs. Inc. v. Elkins,*
    30 Del. J. Corp. L. 535 (Del. Ch. 2004)................................................................28

*In re iPCS, Inc.,*
    297 B.R. 283 (Bankr. N.D. Ga. 2003) ..................................................................16

*In re Jack Greenberg, Inc.,*
    189 B.R. 906 (Bankr. E.D. Pa. 1995) ...................................................................19

*In re Johns-Manville Corp.,*
    52 B.R. 879 (Bankr. S.D.N.Y. 1985), *aff'd*, 60 B.R. 892 (S.D.N.Y. 1986),
    *rev'd on other grounds*, 801 F.2d 60 (2d Cir. 1986)............................................27

*La. World Exposition v. Fed. Ins. Co.,*
    858 F.2d 233 (5th Cir. 1988) ................................................................................16

*In re LTV Steel Co., Inc.,*
    333 B.R. 397 (Bankr. N.D. Ohio 2005).................................................................25

*Marquis Theatre Corp. v. Condado Mini Cinema,*
    846 F.2d 86 (1st Cir. 1988)...................................................................................25

*Mitchell v. Robert DeMario Jewelry, Inc.,*
    361 U.S. 288 (1960)..............................................................................................18

*Morley v. Ontons, Inc. (In re Ontos, Inc.),*
    478 F.3d 427 (1st Cir. 2007).................................................................................17

*Official Comm. of Unsecured Creditors of Nat'l Forge Co. (In re Nat'l Forge Co.),*
    326 B.R. 532 (W.D. Pa. 2005)..............................................................................17

*Official Comm. of Unsecured Creditors v. Metzler,*
    2018 WL 2123558 (D. Me. May 8, 2018) ...........................................................17

*Portland Pipe Line Corp. v. City of S. Portland,*
    2017 WL 79948 (D. Me. Jan. 9, 2017) ................................................................16

*P.R. v. Franklin Cal. Tax-Free Tr.,*
    136 S. Ct. 1938, 195 L. Ed. 2d 298 (2016) ..........................................................12

*PW Enter., Inc. v. N. D. Racing Comm'n (In re Racing Services, Inc.)*,
   540 F.3d 892 (8th Cir. 2008) ........................................................................17

*In re Rodriguez*,
   2012 WL 112971 (Bankr. D.P.R. Jan. 12, 2012) ...........................................19

*In re Standard Brands Paint Co.*,
   154 B.R. 563 (Bankr. C.D. Cal. 1993)...........................................................20

*Unsecured Creditors Comm. of Debtor STN Enter., Inc. v. Noyes (In re STN Enter.)*,
   779 F.2d 901 (2d Cir. 1995)...........................................................................16

*Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*,
   860 F.2d 515 (2d Cir. 1988)...........................................................................19

*In re WHET, Inc.*,
   750 F.2d 149 (1st Cir. 1984)..........................................................................19

*Official Comm. of Unsecured Creditors of Wickes Inc. v. Wilson*,
   2006 WL 1457786 (N.D. Ill. 2006) ...............................................................28

*In re WM Distribution, Inc.*,
   571 B.R. 866 (Bankr. D.N.M. 2017) .............................................................20

**Statutes**

Bankruptcy Code ..................................................................................... *passim*
   § 105(a)..........................................................................................................17
   § 323 .............................................................................................................19
   § 362..............................................................................................................14
   § 503(b)..........................................................................................................17
   § 1103(c) ...............................................................................................16, 17, 27
   § 1109(b) .................................................................................................16, 17

Government Development Bank Enabling Act ("GDB Enabling Act") .............................. *passim*
   7 L.P.R.A. § 563 ............................................................................................26
   1948 P.R. Laws 17, § 15, as amended by 1957 P.R. Laws 3.................................26
   2015 P.R. Laws 97 .........................................................................................26

Government Development Bank for Puerto Rico Debt Restructuring Act ("GDB
   Restructuring Act")........................................................................................ *passim*
   Article 702 .............................................................................................9, 10, 24

PROMESA...............................................................................................*passim*
   § 4..................................................................................................................14
   § 5(18)..............................................................................................................9
   § 301(a)...........................................................................................................14
   § 303(1)...........................................................................................................13

§ 304(f) ........................................................................................................................18

§ 306(a) ..........................................................................................................................4

§ 307(a) ..........................................................................................................................4

§ 315(b) ........................................................................................................................19

§ 601(a)(8) ......................................................................................................................9

§ 601(a)(15) ....................................................................................................................9

§ 601(m)(2) ..........................................................................................................8, 9, 14

P.R. Emergency Moratorium and Financial Rehabilitation Act, No. 21-2016 ..........................4, 5

**Constitutions**

U.S. Const.

Bankruptcy Clause ..............................................................................................13

Contracts Clause ................................................................................................14

amend. V ..............................................................................................................13

amend. XIV ..........................................................................................................13

P. R. Const.

Due Process Clause ............................................................................................13

To the Honorable United States District Court Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA) (the "Committee") hereby files this motion (the "Motion") for entry of an order granting the Committee derivative standing to act on behalf of the Title III Debtors (other than COFINA) for certain very limited purposes with respect to the restructuring of the Government Development Bank for Puerto Rico (the "GDB"). If the order is granted, the Committee would object to and challenge the legality of the GDB Restructuring (defined below), including the purported "Qualifying Modification" for which GDB has filed an application for approval (the "Title VI Application" or the "Application") and the related transactions contemplated in the "GDB Restructuring Act" (defined below) (collectively, the "GDB Restructuring"). This Court should exercise its broad equitable powers and grant the Committee derivative standing to act on behalf of the Title III Debtors with respect to the GDB Restructuring for the limited purpose of maintaining the status quo and preserving their rights and claims. This Court should also confirm that, in addition to having derivative standing to act on behalf of the Title III Debtors, the Committee separately has the ability to appear in the Title VI case for the limited purpose of arguing that it has direct standing to be heard in that case on behalf of the Title III Debtors' unsecured creditors. Alternatively, and at a minimum, the Committee should be granted leave to file amicus briefs opposing the GDB Restructuring in these Title III cases and in the Title VI case. In support of this Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The GDB Restructuring amounts to an insider scheme to "bury" the GDB and bar claims against current and former insiders before a thorough autopsy can be conducted. As the government's fiscal agent and financial advisor, GDB was at the epicenter of Puerto Rico's profligate borrowing and was the mastermind, along with various financial institutions, of the

Commonwealth's various financing "structures" such as ERS and COFINA.  If the GDB

Restructuring is approved, GDB and its current and former officers, directors, employees, agents,

and representatives (collectively, the "GDB Releasees")—which will undoubtedly be argued to

include the investment banks, law firms, and others that facilitated and profited from Puerto

Rico's ruinous debt offerings—will be released from any potential liability to the Title III

Debtors for their roles in Puerto Rico's debt-fueled financial meltdown.

2.      Given the underdeveloped state of the record, handing out releases to dozens of

individuals and entities at this time would be the height of irresponsibility.  In fact, the GDB

Restructuring (if it is to contain broad releases) should be left until the full "GDB picture" is

known.[2]

3.      Even if no potential liability claims against GDB or the GDB Releasees were

being released, the GDB Restructuring effectively disallows any claims of the Title III Debtors

against GDB.  Indeed, not even the meager claims the Title III Debtors are allowed to assert

against GDB could be satisfied because GDB assets that could satisfy such claims today are

being transferred for the exclusive benefit of GDB's unsecured bondholders and favored

depositors.  In basic terms, the restructuring uses all of GDB's cash, performing loans, and real

estate assets (representing over a billion dollars of value) to pay the claims of certain favored

GDB creditors—its unsecured bondholders and municipal and private entity depositors—while

leaving the Title III Debtors, as creditors of GDB, holding a potentially empty bag.  What is

more, the cash being used to pay GDB's favored creditors includes the outstanding deposits of

the Title III Debtors, some of which are federal funds that were never used for their authorized

purposes and that the Commonwealth will end up having to repay out of its own pocket.

---

[2]     *See Creditors' Committee's Informative Motion Regarding Kobre & Kim Final Report*, [Docket No. 3866 in 17-
03283-LTS].

4.      The GDB Restructuring is so unfair and inequitable that it compels the question:
"Who was representing the interests of the Title III Debtors with respect to their claims against
GDB and the GDB Releasees?"  The answer is simple:  No one.  The GDB Restructuring
appears to have been orchestrated entirely by GDB and its functional successor, the Puerto Rico
Fiscal Agency and Financial Advisory Authority ("AAFAF"), which share the same officers,
some of whom were GDB officers before AAFAF was created, the same counsel, and the same
financial and restructuring advisor, which restructuring advisor employs a former GDB president
and other former GDB officers.  The complete lack of arms'-length negotiations here is not
unlike PREPA's efforts to obtain DIP financing from the Commonwealth—a transaction that had
been "negotiated" by the same advisors and representatives on both sides.  Clearly troubled by
the lack of arms'-length negotiations, the Court denied PREPA's DIP financing motion, noting
that the Debtors needed to show that the proposed financing was fair to PREPA's stakeholders
(not just that the transaction is rational from PREPA's business point of view).[3]

5.      When adversity arises between affiliated debtors which have their own creditors,
the same fiduciaries cannot stand on both sides of the dispute or take the side of one debtor over
the other.  Each debtor must be represented by independent fiduciaries charged with maximizing
value for each debtor.  Exercising their broad equitable powers, bankruptcy courts have dealt
with interdebtor disputes by conferring derivative standing on creditors' committees or creditors
to act on debtors' behalf.  Indeed, this Court did just that when it approved the Commonwealth-
COFINA dispute stipulation, which granted the Committee standing to litigate or settle the
dispute on the Commonwealth's behalf.

---

[3]     Feb. 15, 2018 Hr'g Tr. at 232:25-233:7 ("the Court concludes that a business judgment standard focused solely on
rationality from a PREPA business point of view is inappropriate and that fairness to the body of PREPA
stakeholders and, in particular, the bondholders, must be considered in light of the fact that this is a transaction in
which the parties to the proposed credit are closely related and in which the decision-making is intertwined").

## JURISDICTION AND VENUE

6.    The United States District Court for the District of Puerto Rico has subject matter

jurisdiction over this matter pursuant to section 306(a) of PROMESA.

7.    Venue is proper pursuant to section 307(a) of PROMESA.

## BACKGROUND

### A.    GDB and Its Creditors

8.    Historically, GDB served as a depository of funds for Puerto Rico government

entities and as the Puerto Rico government's fiscal agent, paying agent, and financial advisory

authority.[4]  GDB also served as a "financial advisor" in all government debt offerings,

controlling (from the government's perspective) practically every aspect of those offerings,

including the selection of underwriters and counsel.  According to a report of the U.S. General

Accountability Office (the "GAO"), GDB was responsible for "facilitating rising debt levels

[that] enabled Puerto Rico to continue to use debt to finance operations."[5]

9.    Over time, GDB also became an issuer of debt and a provider of inter-government

financing for the Commonwealth and its public corporations, instrumentalities, and

municipalities.[6]  According to the same GAO Report, the "GDB provided loans to government

entities valued at up to 60 percent of GDB's total assets."[7]

10.    On April 6, 2016, GDB's fiscal agent and financial advisor responsibilities were

transferred to AAFAF, which was created pursuant to the *Puerto Rico Emergency Moratorium*

---

[4]    *See Application of the Government Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and
Financial Advisory Authority, Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management,
and Economic Stability Act, for Approval of the Qualifying Modification for GDB* [Docket No. 1] ¶ 8 (the
"Application").

[5]    U.S. General Accountability Office, GAO-18-387, *Puerto Rico: Factors Contributing to the Debt Crisis and
Potential Federal Actions to Address Them*, 33-34 (May 2018), *available at*,
https://www.gao.gov/assets/700/691675.pdf ("GAO Report").

[6]    Application ¶ 9.

[7]    GAO Report, at 36-37.

*and Financial Rehabilitation Act*, Act No. 21-2016.[8]  Also in 2016, GDB stopped accepting

deposits and otherwise ceased performing banking functions.[9]  Until GDB wound down its

operations, the Title III Debtors were, upon information and belief, required to deposit all of their

funds with GDB.

11.     The creditors of GDB include (i) the holders of GDB bonds, all of which are

unsecured and more than $100 million of which were guaranteed by the Commonwealth (the

"GDB Bondholders"),[10] (ii) the municipalities that deposited funds with GDB (the "Municipal

Depositors"), (iii) certain private entities that deposited funds with GDB (the "Private Entity

Depositors"), and (iv) the Title III Debtors and other non-municipal government entities (the

"Non-Municipal Government Entities") that deposited public funds with GDB.

12.     GDB filed a proof of claim against the Commonwealth,[11] and the Title III

Debtors, in turn, hold various claims against GDB.  Although the Committee is still investigating

GDB's activities related to the Title III Debtors, the Title III Debtors hold claims for amounts on

deposit, and may also hold claims against GDB for the recovery of avoidable transfers, among

others.  The Committee has attempted for over a year to obtain discovery in order to investigate

the Title III Debtors' claims against GDB, but numerous requested documents have not been

provided.

13.     According to GDB's New Fiscal Plan, which was certified on April 20, 2018, as

of December 31, 2017, GDB received deposits of approximately $3.5 billion and owed

---

[8]     Application ¶ 10.

[9]     *Id.* ¶¶ 11-12.

[10]    Declaration of Suzzanne S. Uhland, Esq. In Support Of The Application Of The Government Development
        Bank For Puerto Rico And The Puerto Rico Fiscal Agency And Financial Advisory Authority, Pursuant To
        Section 601(M)(1)(D) Of The Puerto Rico Oversight, Management, And Economic Stability Act, For Approval
        Of The Qualifying Modification For GDB [Docket No. 1-19] ("Uhland Decl.") Ex. O [Docket No. 1-15] ("GDB
        Solicitation Statement"), at 30.

[11]    Application ¶ 38.

unsecured bond debt, including accrued interest, of over $4 billion.[12]  According to GDB's

Solicitation Statement, as of July 1, 2018, GDB held approximately $624.8 million in cash and

cash equivalents.[13]

**B.    The GDB Restructuring**

14.    To effectuate the GDB wind-down, AAFAF (which now employs many of the

former officers and other employees of GDB) proposed a scheme pursuant to the terms of the

Restructuring Support Agreement between AAFAF, GDB, and certain GDB creditors (the

"RSA"), as well as a legislative framework for that RSA that became the GDB Restructuring

Act.[14]  To implement the RSA and the GDB Restructuring, GDB filed its Title VI Application on

August 10, 2018.[15]

15.    The GDB Restructuring will be implemented in two parts.  First, the GDB

Bondholders, the Municipal Depositors, and Private Entity Depositors will be allowed to

participate in and vote on a Title VI "Qualifying Modification."[16]  Upon consummation of the

Title VI case, these favored, but thus far unsecured, creditor groups will exchange their old

claims for new notes with a face of value of 55%, secured by all the assets of a new

governmental entity called the GDB Debt Recovery Authority (the "Recovery Authority").[17]

The Recovery Authority will receive substantially all the liquid assets held by GDB, including

---

[12]   Government Development Bank for Puerto Rico, New Fiscal Plan, at 12, 38 (April 20, 2018), *available at*,
https://oversightboard.pr.gov/.

[13]   Uhland Decl, Ex. O [Docket No. 1-15], GDB Solicitation Statement, at 29.

[14]   Application ¶¶ 19-20.

[15]   *See* Application.

[16]   Application ¶¶ 44-45; *see also*, Uhland Decl, Ex. O [Docket No. 1-15], GDB Solicitation Statement, at 1-2.

[17]   Application ¶ 28.

6

GDB's municipal loan portfolio, a portion of its public entity loan portfolio, its real estate owned assets, and its unencumbered cash.[18]

16.     Second, the Commonwealth and its other instrumentalities, including the other Title III Debtors (referred to in the Title VI Application as "Non-Municipal Government Entities"), will not be able to participate in the Title VI case and will not be able to receive notes backed by the assets of the Recovery Authority.[19]  The disfavored Non-Municipal Government Entities (which hold claims of the same priority as the claims of the GDB Bondholders) will have any deposits held by GDB set off against purported loan balances owed to GDB, and those holding net claims against GDB will receive, pursuant to the GDB Restructuring Act, a pro rata share of interest in the "Public Entity Trust" that holds a single asset—GDB's alleged claim against the Commonwealth.[20]  This unliquidated interest in the Public Entity Trust (it may be worthless because neither the Commonwealth nor GDB's fiscal plan makes provision for payment of such yet-to-be-allowed claim) will be deemed to be in full satisfaction of any and all claims Non-Municipal Government Entities may have against GDB.[21]  In other words, the Title III Debtors' deposit claims against GDB are being subordinated to the claims of GDB's bondholders and other favored unsecured creditors.

17.     In addition, under the GDB Restructuring, the Commonwealth will be assuming approximately $312 million in liabilities on account of federal funds granted to the Commonwealth and municipalities pursuant to federal programs and deposited at GDB.[22]  The Title III Debtors' and other Non-Municipal Government Entity deposit claims with respect to

---

[18]     *Id.* ¶ 29.

[19]     *Id.* ¶¶ 35-36.

[20]     *Id.* ¶ 36.

[21]     *Id.*

[22]     Uhland Decl, Ex. O [Docket No. 1-15], GDB Solicitation Statement, at 30.

federal funds will also be eliminated in exchange for the potentially worthless interest in the

Public Entity Trust, leaving all federal funds to be paid from future appropriations by the

Commonwealth.  Consequently, any cash remaining at GDB from federal funds deposits will be

part of the assets allocated to the Recovery Authority or retained by GDB.  It will not, however,

be distributed to the intended beneficiary.  Thus the favored GDB creditors are allowed to

transfer their claims to the Recovery Authority and will not suffer any dilution as a result of the

"disappearance" of the federal funds.

18.    As a legal and practical matter, the purported Qualifying Modification and the

GDB Restructuring Act cannot be separated because the transactions relating to the purported

Qualifying Modification (e.g., the creation of the Recovery Authority, the irrevocable transfer to

that entity of GDB's cash, performing loans, and real estate, and the creation of statutory liens on

those assets) are also being effectuated solely pursuant to the GDB Restructuring Act.

19.    In addition, the provisions of the GDB Restructuring Act relating to the Public

Entity Trust become effective on the "Closing Date," which the Act defines as the effective date

of the "Restructuring Transaction," which, in turn, is defined as "the transactions contemplated

by, or in furtherance of, the Qualifying Modification," including the transactions relating to the

Recovery Authority and its issuance of bonds.  The "Effective Date" of those transactions is

defined as "the date on which the Qualifying Modification becomes conclusive and binding

pursuant to Section 601(m) of PROMESA," i.e., the date on which the purported Qualifying

Modification is approved.

C.    **The Binding Effect of the GDB Restructuring and Its Release of Claims**

20.    Once approved by the Court, the "Qualifying Modification will be full, final,

complete, binding, and conclusive as to the territorial government Issuer, other territorial

instrumentalities of the territorial government Issuer, and any creditors of such entities, and

should not be subject to any collateral attack or other challenge by any entities in any Court or other forum." In other words, it will bind the Title III Debtors and their creditors.[23]  Moreover, the GDB Restructuring Act purports to (i) release all the Title III Debtors' claims against GDB, the Recovery Authority and the Public Entity Trust, and the GDB Releasees, (ii) eliminate the standing of the Title III Debtors to challenge the GDB Restructuring or GDB Restructuring Act, and (ii) exculpate any person for actions in accordance with the GDB Restructuring Act or Qualifying Modification.

21.    Article 702 of the GDB Restructuring Act—entitled "Binding Effect of Restructuring Transaction on Government Entities"—provides that:

> [a]ll transactions effected pursuant to this Act (including, without limitation, pursuant to determinations made by AAFAF or GDB under this Act) shall be valid and binding with respect to all Government Entities as of the Closing Date.  Other than as expressly provided in this Act, in the Ancillary Agreements and the Public Entity Deed of Trust, no Government Entity shall have any further rights or claims against GDB, the Recovery Authority and the Public Entity Trust, and any officers, directors, employees, agents and other representatives thereof, of whatsoever nature and kind, whether now existing or hereinafter arising, based, in whole or in part, on facts, whether known or unknown, existing or occurring on or prior to the Closing Date.  Each Government Entity is hereby deemed to forever waive, release and discharge GDB, the Recovery Authority and the Public Entity Trust, and any officers, directors, employees, agents and other representatives thereof from any and all such claims.  (emphasis added).[24]

---

[23]    The term "territorial government" in section 601(m)(2) is defined in PROMESA as the "government of a covered territory."  PROMESA § 5(18).  Title VI of PROMESA defines "issuer" as, among other things, a "Territory Government Issuer" (PROMESA § 601(a)(8)), which, in turn, means the "Government of Puerto Rico."  PROMESA § 601(a)(15).  Moreover, approximately $110 million of aggregate principal amount and approximately $19 million in accrued and unpaid interest with respect to the GBCP benefits from a guarantee from the Commonwealth of Puerto Rico.  Thus, section 601(m)(2) means that any Title VI approval order entered by this Court will have preclusive and binding effect on the unsecured creditors of Puerto Rico.

[24]    Uhland Decl., Ex. K [Docket No. 1-11], GDB Restructuring Act, at Art. 702.

22.     Like the transactions relating to the Public Entity Trust, Article 702's release of rights and claims becomes effective on the "Closing Date," which, as set forth above, is the date on which the purported Qualifying Modification is approved by the Court.[25]

23.     Accordingly, if this Court approves the purported Qualifying Modification, any rights or claims of the Title III Debtors against GDB or its current or former officers, directors, employees, agents, or representatives relating to GDB's role in the Puerto Rico's financial crisis, including its role as financial advisor to the Title III Debtors, will be automatically extinguished.

24.     Furthermore, Article 703 of the GDB Restructuring Act provides that, "[n]otwithstanding any other law of the Government of Puerto Rico, no Government Entity shall have authority or standing to challenge [the] Act, the Restructuring Transaction, or the other transactions contemplated in this  Act in any local or federal court."[26]

25.     Thus, the GDB Restructuring eliminates the Title III Debtors' claims against GDB, eliminates the Title III Debtors' claims against the GDB Releasees, and subordinates the Title III Debtors' claims by transferring all of the valuable assets at GDB to the Recovery Authority, an entity which was created to shield GDB's assets from distribution to the Title III Debtors.

D.     **Conflicts of Interest and the Roles of Former GDB Officers and Others in the GDB Restructuring**

26.     The GDB Restructuring is pervaded by conflicts of interest.

27.     As far as the Committee is aware, the GDB Restructuring was orchestrated entirely by GDB and AAFAF, which took over GDB's fiscal agent and financial advisor functions and inherited all but six employees when GDB was operationally wound down in early

---

[25]   *Id.*

[26]   *Id.* at Art. 703.

2017.[27]  Indeed, the Oversight Board recognized that the GDB Restructuring Act reflected

"laudable cooperation . . . between the Legislature (and all branches of the Government) and the

Oversight Board."[28]

28.     GDB and AAFAF share the same officers, several of whom were GDB officers

prior to the creation of AAFAF in 2016.  GDB and AAFAF also share the same counsel, and the

same financial and restructuring advisor.

29.     Among the financial advisor personnel advising GDB and AAFAF are (i) a senior

managing director who was president of GDB from 2011 to 2012 and Senior Vice President and

Director of Investment Banking at Santander Securities Corporation, which advised GDB on

numerous government debt offerings, and (ii) a senior managing director who was Executive

Vice President-Financing and Treasury of GDB from 2009 to 2011 and then CEO and vice

chairman of Santander Securities LLC.  The financial advisor engagement team also includes a

managing director who served as a senior vice president and special advisor to the president of

GDB from 2013 to 2016.  All would get a release for their prior GDB role pursuant to the GDB

Restructuring.

30.     Furthermore, at the time the GDB Restructuring was being orchestrated, the

executive director of AAFAF was a former vice president of investment banking at Santander

Securities LLC, which acted as an underwriter in numerous Puerto Rico debt offerings, all of

which were controlled by GDB.

---

[27]   *See* Uhland Decl., Ex. O [Docket No. 1-15], GDB Solicitation Statement, at 27-36.

[28]   *Objection of the Government Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority to the Urgent Motion of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Sections 105(a) and 362, for Entry of Order Enforcing Automatic Stay and Court's June 29, 2017 Order Confirming Application of Automatic Stay with Respect to GDB Restructuring* [17-03283-LTS, Docket No. 3826], at 15 (the "GDB & AAFAF's Objection to Committee's Stay Motion").

11

31.     The Oversight Board, which certified the relevant terms of the RSA as a "Qualifying Modification," is also conflicted, as is its counsel.  The Oversight Board is conflicted because two of its members are former GDB presidents (who both would get a release pursuant to the GDB Restructuring) and because it is the statutory representative of the Title III Debtors.  And counsel to the Oversight Board was engaged by GDB starting in January 2014 "to provide specialized legal services with respect to the evaluation of potential liability management transactions as may be requested by the [GDB]."[29]  These "liability management transactions" (*i.e.*, restructuring and/or bankruptcy services) included drafting the Puerto Rico Corporation Debt Enforcement and Recovery Act[30]—the Commonwealth bankruptcy statute that was ultimately struck down by the U.S. Supreme Court.[31]  Such engagement, which was signed **prior** to the Commonwealth's $3.5 billion general obligation bond offering in 2014, was never disclosed to the general market.[32]

32.     Even the GDB Bondholders that are signatories of the RSA are tainted by conflict.  The executive director of Bonistas del Patio (the bondholder advocacy group that represented bondholders in the restructuring negotiations) was president of GDB from 2007 to 2008, and therefore would be getting a release pursuant to the GDB Restructuring.  He was also an executive director at Morgan Stanley, which played an instrumental role several Puerto Rico bond offerings with which he was directly involved.  Moreover, the board of directors of the

---

[29]   *See, e.g.*, Agreement For Professional Services Between The Government Development Bank For Puerto Rico And Proskauer Rose LLP, dated February 3, 2014 (2014-BGF090), at p. 2 (emphasis added).

[30]   *See* The Independent Investigator's Final Investigative Report, dated August 20, 2018 ("Final Report"), at p. 538 ("On June 28, 2014, the Recovery Act was enacted, establishing a restructuring regime for certain Issuers, including the public corporations.  Witnesses told us that Cleary and Proskauer helped draft this legislation.").  *See Creditors' Committee's Informative Motion Regarding Kobre & Kim Final Report*, [Docket No. 3866 in 17-03283-LTS] (regarding same).

[31]   *See P.R. v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 195 L. Ed. 2d 298 (2016).

[32]   *See* $3,500,000,000 Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, dated March 11, 2014 (*available at* http://www.gdbpr.com/investors_resources/documents/CommonwealthPRGO2014SeriesA-FinalOS.PDF); Final Report at 535-39.

12

Corporacion Publica para Supervision y Seguro de Cooperativas ("<u>COSSEC</u>"), which regulates and supervises the Cooperatives, authorized and encouraged them to buy GDB bonds in 2009 and then authorized them to buy more in 2012.  COSSEC's board of directors includes representatives of GDB and previously included two of the former GDB officers who have been advising GDB and AAFAF as financial advisors.

33.     If the purported Qualifying Modification is approved, **<u>the very people who orchestrated the GDB Restructuring will have succeeded in releasing themselves, GDB, and others of any liability to the Title III Debtors relating to GDB's role in Puerto Rico's financial crisis, including any liability based on "unknown" facts</u>**.

### E.     <u>GDB's Title VI Application and Committee's Intent to Object</u>

34.     On August 8, 2018, GDB, through its counsel, filed its Title VI Application seeking approval of the purported Qualifying Modification.[33]

35.     On August 22, 2018, the Committee filed its *Notice of Intention to Object Regarding Purported Qualifying Modification for Government Development Bank* (the "<u>Objection Notice</u>").[34]

36.     As set forth in the Objection Notice, the Committee intends to object to the Application because, among other reasons: (i) the GDB Restructuring constitutes an "unlawful application" of Title VI of PROMESA; (ii) the asset allocation scheme embodied in the GDB Restructuring, which uses all of GDB's valuable assets to satisfy the claims of some unsecured creditors at the expense of others, violates the Fifth and Fourteenth Amendments to the U.S. Constitution, the Bankruptcy Clause of the U.S. Constitution, and the Due Process Clause of the Puerto Rico Constitution; (iii) the GDB Restructuring violates section 303(1) of PROMESA and

---

[33]   *See* Application.

[34]   Docket No. 59, 3:18-cv-01561-LTS (D.P.R. Aug. 22, 2018).

the Contracts Clause of the U.S. Constitution because it is premised on a method of composition

of indebtedness or moratorium law (the GDB Restructuring Act) that purports to bind non-

consenting creditors.  The Committee also indicated that it intended to object in the Title III

cases to the GDB Restructuring insofar as it seeks to modify any rights that the Title III Debtors

or their unsecured creditors may have against GDB or the GDB Releasees.

37.     The Objection Notice expressly reserved the Committee's right to identify

additional grounds for objection and to "challenge the GDB Restructuring by other means,

including, but not limited to, through the commencement of an adversary proceeding and

motions filed in the Title III cases of the Commonwealth of Puerto Rico and its related Title III

debtors."[35]

38.     One such additional ground for objection is that, by operation of the supremacy

clause in section 4 of PROMESA, the release of claims in the GDB Restructuring Act is invalid

because it is inconsistent with several PROMESA provisions.  Among other things, it is

inconsistent with the express limitation on third-party releases in Section 601(m)(2) of

PROMESA, which provides that "no claim or right that may be asserted by any party in a

capacity other than holder of a Bond affected by the Qualifying Modification shall be satisfied,

released, discharged, or enjoined by this provision."  It is also inconsistent with the Bankruptcy

Code's automatic stay under Section 362, which is incorporated into Title III of PROMESA and

which is currently in effect as to the Title III Debtors because the GDB Restructuring Act

constitutes an attempt to exercise control over rights of the Title III Debtors.[36]

---

[35]   *Id.* at 4.

[36]   *See* PROMESA § 301(a).

## RELIEF REQUESTED

39.      The Committee requests an order granting it derivative standing to act on behalf of the Title III Debtors (other than COFINA) with respect to the GDB Restructuring for the limited purpose of preventing the extinguishment of the Title III Debtors' claims against GDB and the GDB Releasees.  Specifically, and in furtherance of this purpose, the Committee seeks derivative standing to object to the GDB Restructuring, including with respect to GDB's Title VI Application, and to otherwise challenge the legality of the purported Qualifying Modification. **In other words, the Committee seeks limited relief simply to ensure that the status quo is maintained with respect to the Title III Debtors' rights against GDB and the GDB Releasees**.  The Committee is not, at this time, seeking derivative standing to prosecute affirmative claims against GDB or the GDB Releasees.  The Committee also requests that the Title III Debtors be ordered to cooperate with all reasonable requests of the Committee in connection with any matters relating to the relief requested herein.

40.      To be clear, the Committee believes it has direct standing to challenge the GDB Restructuring, of which the Title VI Application is an integral component, and will set forth the basis for its standing in accordance with any scheduling order entered in the Title VI case.  In short, the Committee has direct standing because, among other things, the Commonwealth and its unsecured creditors will be directly and adversely affected if the GDB Restructuring is approved, not least because, as set forth above, the approval will be "full, final, complete, binding, and conclusive as to the territorial government Issuer, other territorial instrumentalities of the territorial government Issuer, and any creditors of such entities."  GDB, AAFAF, and the Oversight Board appear to be taking the position that the Committee has no ability to even **request confirmation** of its direct standing in the Title VI case on the grounds that the

15

Committee has no existence outside these Title III cases.[37]  The Committee believes this is

incorrect and would ask this Court to enter an order confirming that the Committee may at least

appear in the Title VI case for the limited purpose of requesting standing to be heard in that case.

41.     Alternatively, if this Court denies the Committee's request for derivative standing

and denies the Committee's request to appear in the Title VI case, the Committee should at least

be granted leave to file amicus briefs opposing the GDB Restructuring in these Title III cases and

in the Title VI case.[38]

## BASIS FOR RELIEF

### A.    This Court Has the Equitable Power to Grant Derivative Standing

42.     Virtually every court that has addressed the issue of derivative standing in the

bankruptcy context[39]—including the Second,[40] Third,[41] Fifth,[42] Sixth,[43] Seventh,[44] Eighth,[45] and

---

[37] *See Objection Of Financial Oversight And Management Board For Puerto Rico As The Administrative Supervisor Of The Government Development Board For Puerto Rico To The Official Committee Of Unsecured Creditors' Notice Of Intention To Object To Qualifying Modification For Government Development Bank* [Docket No. 111] at ¶¶ 24-30.

[38] *See Portland Pipe Line Corp. v. City of S. Portland*, No. 2:15-CV-00054-JAW, 2017 WL 79948, at *4 (D. Me. Jan. 9, 2017) (district courts have the inherent authority and discretion to permit amicus briefs).

[39] *See In re iPCS, Inc.*, 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("It would appear to the Court that an equally important 'result,' which the Code has been designed to obtain, is the recovery and collection of estate property, including the prosecution of causes of action held by the debtor that may result in an increase in the amount of money available for distribution to creditors.  To that aim, if a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead."); *see generally Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 576, 579 (3rd Cir. 2003) (rejecting the argument that alternatives to derivative standing render derivative standing "not as critical," and "conclud[ing] that, on balance, derivative standing is a valuable tool for creditors and courts alike in Chapter 11 proceedings, and we do not believe that any of the proffered alternatives could serve as a realistic substitute for that standing").

[40] *Unsecured Creditors Comm. of Debtor STN Enter., Inc. v. Noyes (In re STN Enter.)*, 779 F.2d 901, 904 (2d Cir. 1995) (reversing the district court and holding that "11 U.S.C. §§ 1103(c)(5) and 1109(b) imply a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court").

[41] *Cybergenics*, 330 F.3d at 579 (reversing the district court and holding that "on balance, derivative standing is a valuable tool for creditors and courts alike in Chapter 11 proceedings, and we do not believe that any of the proffered alternatives could serve as a realistic substitute for that standing").

[42] *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988) ("The law is well-settled that in some circumstances, a creditors' committee has standing under Title 11, United States Code, section 1103(c)(5) and/or section 1109(b) to file suit on behalf of a debtor-in-possession or a trustee.").

Ninth[46] Circuit Courts of Appeal—has endorsed the conferral of derivative standing where a trustee or debtor has unjustifiably failed to litigate a colorable claim of the estate or has otherwise abused its discretion in failing to act.[47,48]

43.    Courts have explained that a bankruptcy court's authority to confer derivative standing derives from sections 105(a), 503(b), 1103(c), and 1109(b) of the Bankruptcy Code[49]—all of which are incorporated into PROMESA.  Indeed, citing the Third Circuit's extensively reasoned decision in *Cybergenics*, this Court has already conferred derivative standing in the

---

[43]    *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.)*, 555 F.3d 231, 243-44 (6th Cir. 2009) (reversing the bankruptcy court and holding that "[w]hen the trustee is delinquent, the bankruptcy court—or the district court of which it is a unit—should be able to exercise its equitable powers to authorize a creditor to pursue recovery of fraudulently transferred property for the benefit of the estate"); *Canadian Pac. Forest Prods., Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*, 66 F.3d 1436, 1446 (6th Cir. 1995) (reversing the bankruptcy court and holding that "a creditor or creditors' committee may have derivative standing to initiate an avoidance action where [certain conditions are met]").

[44]    *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000) (reversing the district court and holding that "[i]f a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor [sic], the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee").

[45]    *PW Enter., Inc. v. N. D. Racing Comm'n (In re Racing Services, Inc.)*, 540 F.3d 892, 898-99 (8th Cir. 2008) (reversing the bankruptcy court and holding that "derivative standing is available to a creditor to pursue avoidance actions when it shows that a Chapter 7 trustee (or debtor-in-possession in the case of Chapter 11) is unable or unwilling to do so") (internal quotation marks omitted).

[46]    *Hansen v. Finn (In re Curry & Sorensen)*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986) ("The exclusive power to commence avoidance actions vested in trustees and debtors-in possession is permissive rather than mandatory . . . [T]he creditor may move to . . . gain court permission to institute the action itself.").

[47]    *See also Official Comm. of Unsecured Creditors v. Metzler*, 2018 WL 2123558, at *5, n.4 (D. Me. May 8, 2018) (denying motion for leave to appeal bankruptcy court's order granting creditors' committee derivative standing); *Official Comm. of Unsecured Creditors of Nat'l Forge Co. (In re Nat'l Forge Co.)*, 326 B.R. 532, 542 (W.D. Pa. 2005) ("The ability of a creditors' committee to obtain derivative standing is often critical to the preservation of estate assets and serves important interests, particularly in the context of a Chapter 11 reorganization . . . ."); *In re Evergreen Valley Resort, Inc.*, 27 B.R. 75, 76 (Bankr. D. Me. 1983) ("Where a creditors' committee seeks court authorization to sue on behalf of the debtor's estate, the Court, pursuant to 11 U.S.C. § 1103(c)(5), may authorize such an adversary proceeding . . . ."); *Campana v. Pilavis (In re Pilavis)*, 233 B.R. 1, 34 (Bankr. D. Mass. 1999) (holding that "[w]hen the trustee or debtor in possession unjustifiably refuses to act [] courts have allowed the official creditors' committee or other appropriately designated party to bring suit on behalf of the estate").  Neither the District of Puerto Rico (with the exception of the Stipulation) nor the Puerto Rico Bankruptcy Court has addressed the issue of derivative standing in the bankruptcy context.

[48]    While the First Circuit has not definitively addressed the issue of derivative standing for creditors, it has recognized that "creditors only have standing to pursue [] claims [that are property of the estate] during bankruptcy proceedings when a trustee or debtor in possession unjustifiably fails to pursue the claim."  *Morley v. Ontos, Inc. (In re Ontos, Inc.)*, 478 F.3d 427, 431-32 (1st Cir. 2007).

[49]    *See, e.g.*, *Cybergenics*, 330 F.3d at 559-67.

Title III context, having authorized the Committee to act on the Commonwealth's behalf in the

Commonwealth-COFINA dispute.[50]

44.      As the Third and Sixth Circuits have also recognized, "the ability to confer

derivative standing . . . is a straightforward application of bankruptcy courts' equitable

powers,"[51] which are most valuable when the system breaks down, e.g., when a trustee or debtor-

in-possession has failed to maximize the value of the estate.  The bankruptcy courts' equitable

powers are most valuable in such circumstances because "the courts are able to craft flexible

remedies that, while not expressly authorized by the Code, effect the result the Code was

designed to obtain."[52]  As the Supreme Court has noted, "[e]quity eschews mechanical rules; it

depends on flexibility,"[53] and "there is inherent in the Courts of Equity a jurisdiction to . . . give

effect to the policy of the legislature."[54]

### B.      Interdebtor Claims Require Indepedent Representation and Cannot Be "Swept Under the Rug"

45.      It is a bedrock bankruptcy policy that, absent substantive consolidation,[55] each

affiliated debtor in a multi-debtor case must be treated as a standalone entity.[56]  The trustee or

---

[50]   *See Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [Docket No. 996] (the "Stipulation") ¶2.

[51]   *Hyundai Translead*, 555 F.3d at 242; *Cybergenics*, 330 F.3d at 568 (same).

[52]   *Cybergenics*, 330 F.3d at 568.

[53]   *Holmberg v. Armbrecht,* 327 U.S. 392, 396 (1946).

[54]   *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292 (1960) (quoting *Clark v. Smith,* 13 Pet. (38 U.S.) 195, 203, 10 L.Ed. 123 (1839)).

[55]   Section 304(f) of PROMESA states that "[t]he Oversight Board, on behalf of debtors under this title, may file petitions or submit or modify plans of adjustment jointly if the debtors are affiliates," which was done here. However, while section 304(f) provides that "nothing in this title shall be construed as authorizing substantive consolidation of the cases of affiliated debtors," section 304(f) does not mean that substantive consolidation is prohibited by PROMESA.  Instead, this stands for the proposition that substantive consolidation cannot be presumed, and that until substantive consolidation is sought and ordered, the various debtors (and their assets) are separate, and the court is obligated to treat them as such.

[56]   *See In re Cohen*, 263 B.R. 724, 726 (Bankr. D. N.J. 2001) ("In joint cases each debtor presumptively has a separate estate . . . [e]ach of the joint estates, therefore, is a separate entity . . . .").

debtor-in-possession of each estate (or, in a case under PROMESA, the Oversight Board as the representative of a debtor) owes a fiduciary duty to that debtor's creditors and to those creditors alone.[57]  No debtor's recovery (and, by extension, the recoveries of its creditors) can be sacrificed for the overall good of the enterprise (or, in a case under PROMESA, the "covered Territory").

46.    Addressing exactly this temptation, the Second Circuit held in its seminal decision in *Augie/Restivo* that "a creditor cannot be made to sacrifice the priority of its claims against ***its*** debtor by fiat based on the bankruptcy court's speculation that it knows the creditor's interests better than the creditor itself."[58]  In so holding, the court drew on its earlier opinion in *In re Flora Mir Candy Corp.*[59]  In that case, a corporation and twelve subsidiaries filed for bankruptcy.  One of the subsidiaries held a valuable claim (arising from alleged

---

[57]    The Oversight Board has asserted that it is not a fiduciary owing duties to any beneficiary and, more specifically, that section 315(b) of PROMESA simply makes the Oversight Board the representative of the Debtor in a title III but does not make the Oversight Board a fiduciary.  *See* Motion of the Financial Oversight and Management Board for Puerto Rico to Dismiss Plaintiffs' First Amended Adversary Complaint Pursuant to Fed R. Civ. P. 12(B)(1) and 12(B)(6), at 30 n. 15, Docket No. 36. in Adv Proc. No. 18-041-LTS, *Pinto Lugo v. United States*. This is an incorrect statement of the law.  Indeed, the Supreme Court has recognized that a "trustee for a debtor out of possession" owes fiduciary obligations to creditors and shareholders.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("Respondents also ignore that if a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession.").  Moreover, courts have explained that these fiduciary obligations arise out of the trustee's appointment, pursuant to 11 U.S.C. 323, as the representative of the estate.  *See, e.g.*, *In re WHET, Inc.*, 750 F.2d 149, 149 (1st Cir. 1984) ("A trustee has been appointed.  He is a "representative of the estate," 11 U.S.C. § 323, and as such he owes a fiduciary duty to debtor and creditors alike to act fairly and protect their interests."); *see also In re Rodriguez*, 2012 WL 112971, at *3 (Bankr. D.P.R. Jan. 12, 2012) ("Under the Bankruptcy Code the trustee is the representative of the estate, in charge of administering the case, with capacity to sue and be sued.  11 U.S.C.A. §§ 323, 704.  A trustee has the duty to act in the best interest of the bankrupt's estate, to conserve the assets of the estate and to maximize distribution to creditors."); *In re Jack Greenberg, Inc.*, 189 B.R. 906, 910 (Bankr. E.D. Pa. 1995) ("Section 323 provides that the trustee is the representative of the estate. In that capacity the trustee is a fiduciary and intended to be independent.").  Here, section 315(b) of PROMESA provides that the Oversight Board "is the representative of the debtor."  Just as section 323 of the Bankruptcy Code makes the trustee a fiduciary, so too does section 315(b) of PROMESA.

[58]    *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 520 (2d Cir. 1988) (emphasis in original).

[59]    *Flora Mir Candy Corp. v. R. S. Dickerson & Co. (In re Flora Mir Candy Corp.)*, 432 F.2d 1060, 1063 (2d Cir. 1970).

misappropriation) against the parent company.  The debtors proposed a "quick and effective"
plan that would have eliminated this claim, thereby diminishing (if not eliminating) the
recoveries of the subsidiary's creditors.[60]  Writing for the court, Judge Friendly admonished that
a quick and effective reorganization "may indeed be desirable **but not at the cost of sacrificing
the rights of [the subsidiary's creditors]**."[61]

47.     A corollary and no less fundamental policy is that, when adversity arises between
affiliated debtors and their respective creditors, the same officers and counsel cannot represent
both sides.[62]  Rather, each debtor estate must be represented by independent fiduciaries, or else
other mechanisms must be established for resolving interdebtor disputes that cannot be resolved
consensually among the affected stakeholders.

48.     For example, in the Adelphia Communications Chapter 11 case, significant
interdebtor disputes arose between Adelphia Communications Corporation ("Adelphia Parent")
and Arahova Communications Inc. ("Arahova"), an intermediate subsidiary of Adelphia Parent
and one of 231 affiliated debtors.[63]  Adelphia Parent and its subsidiaries were managed by the
same officers and directors and were being advised by the same law firm.[64]  When it became
apparent that a negotiated resolution among affected creditors was unrealistic, and recognizing

---

[60]   *Id.* at 1061-62.

[61]   *Id.* at 1063 (emphasis in original).

[62]   *See generally, In re WM Distribution, Inc.*, 571 B.R. 866, 872 (Bankr. D.N.M. 2017) ("Simultaneous
representation of two related debtors presents a potential for an actual conflict of interest.  Often inter-company
transfers will exist, resulting in each debtor holding a claim against the other.  Courts often find such dual
representation a disqualifying actual conflict."); *see also In re Standard Brands Paint Co.*, 154 B.R. 563, 571
(Bankr. C.D. Cal. 1993) ("absent substantive consolidation, one debtor might need to object to the claims of other
debtors against it, and vice versa, or seek to collect on guarantees from one debtor to another [creating] a conflict
so that separate counsel would have to be employed for each of the five debtors . . . .").

[63]   *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 633 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006).

[64]   *Id.*

20

that the debtors' management and counsel were conflicted, the bankruptcy court approved a
mechanism that would allow the affected creditors to directly litigate the issues in dispute.[65]

49.     Not content with this dispute resolution mechanism, the Arahova Noteholders'
Committee moved, in relevant part, for an order (i) appointing a trustee for Arahova and its
operating subsidiaries or, alternatively, directing the recusal of the Arahova debtors' officers and
directors and the appointment of nonstatutory fiduciaries—independent officers and directors
and unconflicted counsel—to represent the Arahova debtors in the interdebtor disputes, and (ii)
disqualifying debtors' counsel from representing the Arahova debtors or any other debtor in the
interdebtor disputes.[66]

50.     In considering the motion, the bankruptcy court observed that "[i]nterdebtor
disputes are very common in large multi-debtor chapter 11 cases.  In most cases, they are
resolved by negotiations between or among the creditors whose recoveries are determined by the
outcome of those disputes—with a subcurrent underlying those negotiations that creditors have
the right to litigate them if agreement cannot be reached."[67]  After extensive fact-finding, the
court denied the motion as to the appointment of a trustee or nonstatutory fiduciaries, finding that
"[t]his is not a self-dealing case" and that "[c]onspicuously absent is any suggestion by the
Arahova Noteholders Committee that any director, officer, or employee of any of the Debtors
stands to gain anything from any outcome of any of the interdebtor disputes here."[68]  The court
also noted that "the Arahova Noteholders Committee's principal adversary—the Adelphia Parent
Noteholders Committee—likewise has the ability and motivation to litigate the Intercreditor

---

[65]   *Id.*

[66]   *Id.* at 616-17; 635-36.

[67]   *Id.* at 654.

[68]   *Id.* at 657, n.111.

Disputes, so there is no litigating ability vacuum to be filled.  This is not a case where claims or issues needing to be prosecuted or defended will have nobody to engage in the necessary effort."[69]

51.    While finding no basis for the appointment of a trustee or nonstatutory fiduciaries, the bankruptcy court ordered the recusal of the debtors' management and the disqualification of debtors' counsel from actively participating in the interdebtor disputes, thereby formalizing their self-imposed neutrality.  In so doing, the court emphasized that, "[having] provide[d] the necessary mechanism for resolving Interdebtor and Intercreditor Disputes . . . the Debtors must continue to avoid conflicts of interest and the appearance of impropriety."[70]  As the *Adelphia* court recognized, interdebtor disputes can be handled in a number of ways, but they cannot be "swept under the rug" for the sake of expediency or otherwise.[71]

### C.    The Committee Should Be Granted Derivative Standing Because AAFAF and the Oversight Board Are Conflicted and Engaged in Self-Dealing

52.    AAFAF and the Oversight Board are inherently conflicted and cannot stand on both sides of the interdebtor claims between GDB and Title III Debtors.  Moreover, unlike the *Adelphia* case, in which the need for neutrality was recognized even absent self-dealing, this **is** a "self-dealing case" with a "litigating vacuum to be filled" in that "claims or issues needing to be prosecuted . . . will have nobody to engage in the necessary effort" on the Title III Debtors' behalf.  Indeed, if the purported Qualifying Modification is approved, claims will be extinguished before anyone has even had the chance to engage in the necessary efforts, as the Qualifying Modification approval order will automatically render effective the GDB Restructuring Act and its broad releases.

---

[69]    *Id.* at 661.

[70]    *Id.* at 670.

[71]    *Id.* at 620.

53.     To date, nobody has engaged in the "necessary efforts" because of pervasive
conflicts and interest and self-dealing.  The current and former GDB officers of GDB, AAFAF,
and their shared financial and restructuring advisor, had every incentive to craft a restructuring
that would not just favor GDB over the Title III Debtors but foreclose any inquiry into GDB's
and the GDB Releasees' role in Puerto Rico's financial crisis, shield those involved from
potential liability to the greatest extent possible, and strip GDB of any valuable assets from
which liability claims could be satisfied.  To the Committee's knowledge, **no one** was
independently representing the Title III Debtors in their capacities as GDB creditors.

54.     As a result, while the focus was on the Commonwealth-COFINA dispute, ERS,
HTA, PREPA, and other pressing matters, GDB, AAFAF, and their shared officers and advisors
were able to craft a restructuring that, if approved, will (i) extinguish any claims of the Title III
Debtors against GDB Releasees, which will undoubtedly be argued to include the investment
banks and other advisors who facilitated and profited from Puerto Rico's ruinous debt offerings
(ii) use all of the GDB's cash, performing loans, and real estate assets (amounting to more than a
billion dollars of value) to primarily pay  the unsecured claims of the GDB Bondholders, (iii)
leave nothing to pay the claims of the Title III Debtors and the other Non-Municipal Government
Entities except GDB's alleged claim against the Commonwealth for approximately $890 million
in unpaid loans, which could be worthless because neither the Commonwealth's nor GDB's
fiscal plan provides for the payment of this yet-to-be-allowed claim, (iv) put the Commonwealth
(and, by extension, its unsecured creditors) on the hook for the repayment of federal funds that
were deposited with GDB by Title III Debtors and other instrumentalities and never used for
their authorized purposes, but which GDB is now proposing to use to pay professional fees and

other costs of the GDB Restructuring, and (v) grant GDB and AAFAF carte-blanche to make

binding "determinations" with respect to GDB Restructuring.[72]

55.     No restructuring so grossly unfair and inequitable could ever have emerged from

arms'-length negotiations among unconflicted representatives of adverse debtors.  Although the

RSA encompasses the deposit claims of the Title III Debtors (the possibility of liability claims is

not even acknowledged), they are not signatories to the agreement, except insofar as AAFAF

was purporting to sign on their behalf.[73]  To the extent AAFAF was purporting to represent the

Title III Debtors, it was hopelessly conflicted.  The Oversight Board is likewise conflicted, as

two of its seven members are former GDB presidents.  It is also the representative of the Title III

Debtors and thus cannot act adversely to their interests.

56.     In its Title VI Application, GDB does not even mention, let alone attempt to

justify, the broad release of rights and claims in the GDB Restructuring Act, which, by all

indications, amounts to a sheer abandonment of potential claims by the Title III Debtors.  On the

contrary, the Application invites the Court to approve the purported Qualifying Modification

without concern for what is really going on in the larger scheme of the GDB Restructuring.

57.     There has thus been a breakdown of the system that must be rectified.  The

recoveries of the Title III Debtors (and, by extension, their respective creditors) cannot be

sacrificed for GDB or certain preferred creditors or to accomplish what is expedient in the eyes

of AAFAF, the Oversight Board, or the Commonwealth government.  As courts have done in

other cases involving interdebtor conflicts, this Court should exercise its equitable powers to

confer derivative standing on the Committee to act on the Title III Debtors' behalf for the limited

purpose of maintaining the status quo and preserving their claims against GDB.

---

[72]   Uhland Decl., Ex. K [Docket No. 1-11], GDB Restructuring Act, at Art. 702.

[73]   *See* Uhland Decl., Ex. H [Docket No. 1-7], Fourth Amendment to RSA at 5-7.

58.     Granting such relief will not cause any detrimental delay because GDB is no longer operating in any meaningful sense and is not being reorganized.  At this point, it does little more than receive loan payments and pay certain expenses.  While the Committee understands that the Oversight Board and AAFAF are perhaps eager to show that progress is being made, there is no genuine urgency here.

59.     In light of the foregoing, the Committee's grounds for objecting to the GDB Restructuring are more than "colorable," which, in any event, is a "relatively easy [standard] to make."[74]  For example, in the case of an affirmative claim, it must simply be "plausible" or "not without merit."[75]  Moreover, in determining whether a claim is colorable, the court must consider the scope of the requested relief.[76]  At this point, the Committee seeks derivative standing for the limited purpose of maintaining the status quo and preserving the Title III Debtors' claims.  And while a demand that the trustee or debtor take action is generally required before seeking derivative standing, demand is excused when it would be futile because of a conflict of interest.[77]  Here, the Oversight Board and AAFAF are hopelessly conflicted for the reasons set forth above.

60.     Indeed, AAFAF effectively pre-judged the Title III Debtors' potential liability claims as worthless.[78]  Furthermore, in its objection to the Committee's notice of intention to object to the Qualifying Modification, the Oversight Board states that "PREPA owes GDB over

---

[74]   *In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005).

[75]   *In re LTV Steel Co., Inc.*, 333 B.R. 397, 406 (Bankr. N.D. Ohio 2005).

[76]   *See id.* (explaining that "[t]he 'colorable claim' requirement is met if the committee has asserted claims for relief that on appropriate proof would allow a recovery.").

[77]   *Cf. Marquis Theatre Corp. v. Condado Mini Cinema*, 846 F.2d 86, 90-91 (1st Cir. 1988) (holding in the shareholder derivative suit context that demand is excused where conflicts of interest render it futile).

[78]   July 25, 2018 Omnibus Hr'g Tr. at 68:18-69:13 (For example, in resisting discovery of the GDB's insurance policies, counsel took the position that "[w]e … know that the Commonwealth owes GDB, on a net basis, nearly 900 million dollars.  So there would have to be some kind of massive claim before you would ever get into a situation where the D&O policies could possibly be relevant.  [Discovery is] just not appropriate in these circumstances, Your Honor."

$324 million because notwithstanding section 562 of the GDB Enabling Act, a minimum of approximately $324 million was withdrawn by PREPA while GDB was insolvent."[79]  However, if such payments are recoverable against PREPA, then this implies that GDB was insolvent in 2014 and 2015, at a time when it was still receiving deposits.  If true, this would mean that GDB directors are subject to criminal liability.[80]  Moreover, because GDB continued to pay GDB bondholders after PREPA received the $324 million, the GDB bondholders are potential defendants as well.  As if this were not sufficient to establish the hopelessly conflicted position of the Oversight Board finds itself in, counsel for the Oversight Board (who also represented GDB from January 2014 through 2016) has stated with absolute conviction that "it is beyond credulity that the Commonwealth, HTA, and PREPA can have meritorious claims against the governmental entity that loaned them money and kept them afloat at the request of the Puerto Rico government.[81]

### D.   The Court Should Confirm the Committee's Ability to Appear in the Title VI Case to Assert Its Direct Standing

61.   As noted above, the Committee believes it has direct standing to be heard in the Title VI case on behalf of the Title III Debtors' unsecured creditors and has filed an Objection Notice in the Title VI case for that purpose.  The Oversight Board, AAFAF, and GDB have contested the Committee's standing on a variety of grounds, including by arguing that the Committee exists only within the Title III cases and therefore has no ability to appear in any external court or proceeding.  This argument is flawed, as it is based on inapposite case law and

---

[79]   Docket No. 59, at fn. 4, 3:18-cv-01561-LTS (D.P.R. Aug. 22, 2018).

[80]   *See* GDB Enabling Act, 1948 P.R. Laws 17, § 15, as amended by 1957 P.R. Laws 3 (providing for imprisonment of one to five years); *see also* 2015 P.R. Laws 97 (amending Enabling Act to remove criminal penalties for accepting deposits while GDB is insolvent).  The current version of this statute is at 7 L.P.R.A. § 563.

[81]   *See* Oversight Board Obj. to Creditors' Comm.'s Notice of Intent to Object to Qualifying Modification for Gov't Dev. Bank, ¶ 48, In re Gov't Dev. Bank for Puerto Rico, No. 18-1561 (D.P.R. Sept. 1, 2018) [Dkt. 111].

an overly restrictive interpretation of the rights of a statutory committee under section 1103 of the Bankruptcy Code.  Accordingly, the Committee believes the argument should be rejected in the Title VI case.  Nevertheless, in an abundance of caution, and to head off any argument by the Oversight Board, AAFAF, or GDB that the Committee needs permission from this Court, sitting in its Title III capacity, to appear in the Title VI case to seek confirmation of its direct standing, the Committee respectfully requests such permission by this Motion.

62.     The Oversight Board bases its argument that the Committee has no ability to appear in the Title VI case on a line of cases, including *In re Dow Corning Corp.*, in which some bankruptcy courts have held that official committees have no "blanket" authority to appear outside the bankruptcy court.[82]  None of these cases, however, stand for the proposition that a Committee may never, under any circumstances, act outside the case in which it was appointed. Indeed, the cases cited by the Oversight Board are all distinguishable.  For example, in *Dow Corning*, the Sixth Circuit affirmed the bankruptcy court's finding that allowing a committee to participate in legislative and administrative lobbying expanded the authority granted by section 1103(c)(5) "too greatly."[83]  Likewise, in *Johns-Manville Corp.*, the bankruptcy court found that "employment of other attorneys for the sole purpose of commencing shareholder actions in other courts" was outside the scope of section 1103.[84]  In contrast to the circumstances at issue in *Dow Corning* and *Johns-Manville Corp.*, the Committee here seeks to appear before the same court, in a related case pending pursuant to the same federal statute, for the limited purpose of defending

---

[82]     *See* Oversight Board Objection to Committee Notice of Intent to Object [Title VI Case Dkt. No. 111] at ¶¶ 24-30 (*citing In re Johns-Manville Corp.*, 52 B.R. 879, 884 (Bankr. S.D.N.Y. 1985), *aff'd*, 60 B.R. 892 (S.D.N.Y. 1986), *rev'd on other grounds*, 801 F.2d 60 (2d Cir. 1986); *In re Dow Corning Corp.*, 199 B.R. 896, 899 (Bankr. E.D. Mich. 1996); *Official Comm. of Tort Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 142 F.3d 433 (6th Cir. 1998)).

[83]     *In re Dow Corning Corp.*, 142 F.3d 433, *3 (6th Cir. 1998).

[84]     *In re Johns-Manville Corp.*, 52 B.R. 879, 883 (Bankr. S.D.N.Y. 1985), *aff'd*, 60 B.R. 892 (S.D.N.Y. 1986), *rev'd on other grounds*, 801 F.2d 60 (2d Cir. 1986).

27

the interests of the Title III Debtors' unsecured creditors in that case.  The Committee is not

asking to commence an action in some far-flung jurisdiction or to lobby Congress.

63.     Even if were true that the Committee has no absolute right to appear outside the

Title III Cases, it plainly may do so with this Court's blessing.  Indeed, there are numerous

examples of official committees appearing in state courts and other non-bankruptcy courts

pursuant to orders of derivative standing.  *See, e.g.*, *Official Committee of Unsecured Creditors*

*of Wickes Inc. v. Wilson*, 2006 WL 1457786, at *1 (N.D. Ill. 2006) (noting that committee, which

originally filed complaint in Illinois state court, had been granted authority to pursue claims by

bankruptcy court); *Official Committee of Unsecured Creditors of Integrated Health Servs. Inc. v.*

*Elkins*, 2004 WL 1949290, at *2 (Del. Ch. 2004) (noting that after bankruptcy court permissively

abstained from hearing committee's action, committee filed suit in Chancery Court); *EBC I, Inc.*

*v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 30 (N.Y. 2005) (noting that committee, which brought

suit in New York Supreme Court, was authorized by bankruptcy court to bring action on behalf

of EBC I, Inc.); *Crusius v. Ill. Gaming Bd.*, 837 N.E.2d 88, 92 (Ill. 2005) (noting that committee

was allowed to intervene in state court appeal as appellee); Complaint, *Official Committee of*

*Unsecured Creditors of RadioShack Corporation v. Kim*, No. 4:15-cv-00652-A, ECF No. 1, ¶ 17

(N.D. Tex., filed Aug. 31, 2015) (noting that committee that brought complaint in federal district

court had been granted standing as part of bankruptcy court's sale order).  There is no reason the

Court cannot enter a similar order authorizing the Committee to appear outside the Title III cases

on behalf of the unsecured creditors it represents.  Accordingly, the Committee respectfully

requests that the Court enter an order confirming that the Committee at least has the ability to

appear in the Title VI case for the purpose of seeking confirmation of its standing to be heard in

that case on behalf of unsecured creditors. The Court may grant this relief regardless of whether
it also grants the Committee derivative standing to appear on behalf of the Title III Debtors.

## CONCLUSION

64.     For all the foregoing reasons, the Committee respectfully requests that the Court
grant this Motion and enter the Proposed Order.

## NOTICE

65.     Notice of this Motion has been provided to the following entities, or their counsel,
if known: (i) the U.S. Trustee; (ii) the Office of the United State Attorney for the District of
Puerto Rico; (iii) the Oversight Board; (iv) the Puerto Rico Fiscal Agency and Financial
Advisory Authority; (v) the official committee of retirees; (vi) the insurers of the bonds issued or
guaranteed by the Debtors; (vii) counsel to certain ad hoc groups of holders of bonds issued or
guaranteed by the Debtors; and (viii) all parties that have filed a notice of appearance in the Title
III cases.

## NO PRIOR REQUEST

66.     No previous request for the relief requested herein has been made to this or any
other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Committee respectfully requests that the Court enter the Proposed

Order attached hereto as Exhibit A, granting the relief requested therein and granting such other

and further relief as the Court deems just and proper.


Dated:  September 6, 2018              */s/ Luc A. Despins*

                                       PAUL HASTINGS LLP
                                       Luc. A. Despins, Esq. *(Pro Hac Vice)*
                                       James R. Bliss, Esq. *(Pro Hac Vice)*
                                       James B. Worthington, Esq. *(Pro Hac Vice)*
                                       G. Alexander Bongartz, Esq. (*Pro Hac Vice*)
                                       200 Park Avenue
                                       New York, New York 10166
                                       Telephone:  (212) 318-6000
                                       lucdespins@paulhastings.com
                                       jamesbliss@paulhastings.com
                                       jamesworthington@paulhastings.com
                                       alexbongartz@paulhastings.com

                                       *Counsel to the Official Committee of Unsecured
                                       Creditors*

                                       - and -

                                       */s/ Juan J. Casillas Ayala*

                                       CASILLAS, SANTIAGO & TORRES LLC
                                       Juan J. Casillas Ayala, Esq., USDC - PR 218312
                                       Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
                                       Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
                                       Ericka C. Montull-Novoa, Esq., USDC - PR 230601
                                       El Caribe Office Building
                                       53 Palmeras Street, Ste. 1601
                                       San Juan, Puerto Rico 00901-2419
                                       Telephone: (787) 523-3434
                                       jcasillas@cstlawpr.com
                                       dbatlle@cstlawpr.com
                                       aaneses@cstlawpr.com
                                       emontull@cstlawpr.com

                                       *Local Counsel to the Official Committee of Unsecured
                                       Creditors*