*CERTIFIED TRANSLATION*                          BY: OLGA M. ALICEA, FCCI, NJITCE-S

**COMMONWEALTH OF PUERTO RICO**
**COURT OF FIRST INSTANCE**
**PONCE SUPERIOR COURT**

| | |
|---|---|
| MUNICIPALITY OF PONCE | CIVIL NO.:  J AC93-0485 |
| PLAINTIFF | |
| V. | RE: |
| HIGHWAYS AND TRANSPORTATION AUTHORITY, AQUEDUCTS AND SEWERS AUTHORITY, ELECTRIC POWER AUTHORITY, PTO. RICO TEL. COMPANY, PORTS AUTHORITY, PLANNING BOARD, AND THE COMMONWEALTH OF PUERTO RICO | CIVIL ACTION TO DEMAND COMPLIANCE WITH AGREEMENT |
| DEFENDANTS | |

González Roman, Appeals Court Judge

JUDGMENT

We are faced for the first time with a municipality that subscribes an agreement for the development of projects programed with the Central Government under the innovative provisions of Chapter 13 of the Autonomous Municipalities Act, 21 L.P.R.A. §§ 4001, *et seq.*, relative to land management plans.  Said agreement was executed in order to implement a management plan that said municipality prepared for the use and exploitation of its land.  The agreement details the infrastructure projects to be built by certain instrumentalities of the Central Government in a programmed manner.  We proceed to trace the decisional coordinates of this case making a scrupulous and dispassionate recount of the factual background from which this litigation originated.

On October 28, 1993, the Municipality of Ponce filed the civil action at issue in order to obtain specific performance of the aforementioned agreement and, consequently, to order six public corporations and two departments of the Central Government to build some of the

infrastructure projects comprised in the agreement that had not been done as programmed.  The defendant instrumentalities are the Highways and Transportation Authority, the Aqueducts and Sewers Authority, the Public Buildings Authority, the Electric Power Authority, the Ports Authority, the Department of Housing, the Department of Natural and Environmental Resources, the Puerto Rico Tourism Company, and the Planning Board.

As alleged in its complaint, in mid-1990 the Municipality of Ponce began gathering data for the preparation of a Master Plan aimed at encouraging optimum exploitation of its land. However, with the enactment of the Autonomous Municipalities Act, *supra*, the municipality redirected its efforts and prepared a Land Management Plan for the integral and strategic management of its land according to the novel postulates enunciated in said law.

It is alleged that the management Plan was prepared through multiple meetings among city hall officials and the Planning Board, as well as in coordination with various heads of the public agencies defendants herein.  Said plan contains a program of investment projects certified by each of the defendant public agencies to be carried out within a period of four years between January 1, 1993, and December 31, 1996.

Once the plan was approved by the Ponce Municipal Assembly and adopted by the Planning Board, the Mayor of Ponce and the Governor of Puerto Rico subscribed the agreement jointly with various agency heads.  It is alleged that once the management plan was approved by the Ponce Municipal Assembly on October 22, 1992, the Planning Board adopted it the following October 28.  It submits that on that date the agreement that contains said plan was subscribed, which was titled "Agreement for the Development of Projects Programmed between the Central Government and the Municipality of Ponce."

The defendant entities answered the allegations of the Municipality of Ponce and raised a series of affirmative defenses in common in order to justify their breach of the commitments that

appear in the agreement.  In the first place we must point out that the defendant agencies questioned that the agreement can be used as a source of obligation to demand the performance of works that the Municipality of Ponce claims for various reasons.  Among these, they indicate that the agreement is null because it has an illicit cause, because there was no valid consent at the time of its execution, because it did not concur with the public policies, laws, and regulations of the Central Government, and because it is contrary to the public order.  They also indicated that the agreement did not have the endorsement of the boards of directors of the public agencies and corporations that subscribed it and that the same has an impact on the discretion recognized of public agencies of investing their capital improvements funds.  It is alleged that the agreement is at odds with the public wellbeing since it unduly concentrates a large number of resources in a municipality in detriment to other regions of the country and that, consequently, the implementation ;thereof violates the soundest principles of public administration.  Moreover, the Aqueducts and Sewers Authority and the Puerto Rico Tourism Company formulated counterclaims against the Municipality of Ponce claiming investments in the projects that they had carried out under the Management Plan and the agreement.

The defendant agencies raise, also, individual defenses that we will point out hereinbelow.

The parties carried out extensive discovery that due to the importance and complexity of the litigation, we allowed extending for more than one year.

However, since an early stage of the litigation, the Municipality desisted from its claim against the Ports Authority.  On July 20, 1994, plaintiff filed a request for partial dismissal without prejudice (sic) against the Ports Authority given that the only project whose execution was requested of said public instrumentality was halted by reason of a lawsuit with the owners of the lands adjacent to where the project had been programmed.

*CERTIFIED TRANSLATION*                                      by: Olga M. Alicea, fcci, njitce-s

On December 1, 1995, the parties filed a first report on the pretrial conference among attorneys that they had carried out in preparation for the pretrial conference.   The parties stipulated the following facts:

1- In mid-1990, the Municipality of Ponce began gathering cartographical and socioeconomic data and to plot out the general lines of a Master Plan.

2- On December 12, 1990, the Mayor of Ponce, the Hon. Rafael Cordero Santiago, presented the idea of the Master Plan to a gathering that took place at the La Perla Theater in Ponce.

3- In January 1991, the Municipality created the Office of the Master Plan and in the following months it hired specialized technical personal for the preparation of the Master Plan.

4- On August 30, 1991, Law No. 81 entered into effect, known as the Autonomous Municipalities Act, which has been the object of various amendments since its enactment.

5- The Municipality of Ponce adopted the provisions of the Autonomous Municipalities Act to prepare instead of the Master Plan, the Land Management Plan contemplated by said law.

6- The Land Management Plan prepared by the Municipality has a term of eight (8) years and is comprised of the Report, the Program, and the Regulations.

7- The Municipality of Ponce's Land Plan Program has a term of (4) years.

8- With citizen participation, the Municipality held all of the public hearings required by the Law and notified the holding thereof to the Planning Board.

9- For purposes of preparing the Plan, the Municipality created the Community Boards required by the Law.

10- On October 22, 1992, the Municipality Assembly approved the Management Plan for the Municipality of Ponce.

11- On October 28, 1992, the Planning Board adopted the Management Plan.

12- The Commonwealth and all of the public agencies defendants herein with the exception of the Planning Board subscribed an agreement with the Municipality of Ponce, which they titled "Agreement for the Development of Projects Programmed between the Central Government and the Municipality of Ponce." This agreement is dated October 28, 1992, but some of those who subscribed it on dates subsequent to October 28, such dates that cannot be precisely identified falling between the months of November to December 1992.

*CERTIFIED TRANSLATION*                                      by: Olga M. Alicea, fcci, njitce-s

13- The Management Plan is today managed by the Municipality of Ponce, the latter extending to a great extend the development works permits, the recordation plans authorization, and other authorizations with respect to projects that were previously granted by the Plans Board or the Regulations and Permits Administration.

By the middle of the month of December 1995, several of the defendant entities filed requests for summary judgment whereby they requested the dismissal of the lawsuit. The Highways and Transportation Authority, the Department of Natural and Environmental Resources, and the Department of Housing, on the one hand, the Public Buildings Authority, on the other, and the Aqueducts and Sewers Authority filed various motions for summary judgment requesting the dismissal of the action pursuant to the provisions of Rule 36 of the Rules of Civil Procedure, 32 L.P.R.A. App. III, R.36. The same were denied through our January 17, 1996 resolution.

On January 22, 23, 24, 29, 30, 31, and February 5, 6, 7, 12, 13, 14, 20, 21, 22, 1996, the trial on the merits was held before this Court where the parties presented abundant testimonial and documentary evidence.[1] Pursuant to the evaluation of the evidence presented, the stipulations of the parties, and the credibility that the witnesses merited, the Court reaches the following:

FINDINGS OF FACTS

1- In the early 1990s, several officials of the Municipality of Ponce created an office for the preparation of a Master Plan that would guide the development of said municipality. Architect Javier Bonin was hired as director of that office together with several consultants in various areas. That office went about the task of compiling cartographical and socioeconomic

---

[1] During the trial a total of forty-three witnesses were presented, among which were public officials, former officials, and experts in various disciplines. In addition, the parties presented documentary evidence consisting in ten exhibits with extremely numerous subdivisions.

data for the preparation of a plan to gui9de the orderly development of its land in order to promote the social and economic wellbeing of the citizens of Ponce.

2- On August 30, 1991, Law No. 81, known as the Autonomous Municipalities Act, *supra*, entered into effect, which authorized the municipalities of the Commonwealth of Puerto Rico to prepare and adopt land management plans that contained the strategies and provisions for the organization of the urban land within an esthetic and compact functional plan.

3- With the enactment of said statute, the Municipality accepted its provisions for the preparation of a Land Management Plan that would substitute the Master Plan and it created a Land Management Office.  Said office used the directives and methodology of the Autonomous Municipalities Act, *supra*, to wit:  Report, Program, and Regulations.

4- With abundant citizen participation, the Municipality of Ponce held a series of public hearings for the preparation of the Management Plan.  The Municipality notified the Planning Board of such hearings as required by the law.[2]

5- From January 1991 until October 1992, the Municipality of Ponce, in close coordination with officials of the defendant public instrumentalities, prepared their Land Management Plan.  The parties communicated through a series of meetings, letters, and consultations that became intensified after April 1992.  Involved in those conversations were officials from the Land Management Office, the Mayor of Ponce, technical personnel from the agencies involved, as well as their Secretaries and Directors, the Secretary of State, Governor's aides, members of the Planning Board, and even the Governor himself.

6- Through a multiplicity of meetings and letters between officials from city hall, on the one hand, and from the Central Government, on the other, the projects that each of the

---

[2] See stipulation number 8.

instrumentalities would carry out were determined for purposes of the Land Management Plan projects program.  The majority of the projects that were included in the plan were previously in the respective permanent works programs of the defendant public entities.

7- In the cases of the defendant Public Corporation, the projects comprised in the plan were contained in their respective Permanent Works programs and, consequently, they had already been approved by their respective Boards of Directors.

8- The defendant Public Corporations determined their own financial capacity to undertake the projects within the programmed term.

9- The defendant departments, on their part, included the funds for the financing of the projects in the Four Years Investment Program (PICA, by its Spanish acronym) that the Planning Board submitted to the Legislature.

10- The projects relative to educational, health, and safety facilities were coordinated among officials from the Municipality of Ponce and the Departments of Health and Education as well as the Puerto Rico Police.  The projects that on these facilities were included in the Ponce Land Management Plan came from those agencies' own programs, which represented to the Public Buildings Authority that the intended to carry out those projects, and pursuant thereto arose the obligations that said agency contracted.  This way, it was agreed that the Public Buildings Authority would be the owner builder of the facilities and the agencies would occupy them under a lease regime until the bonds to be issued for their construction were paid.  Only then would dominion of the buildings be transferred to the pertinent public instrumentalities.

11- The projects that the parties agreed to were included in a list of projects by agency and they were made to appear in a table for purposes of the program.  The presentation of those tables in the Land Management Plan Program qualified the same as "the investment projects programs certified by the public agencies."

*CERTIFIED TRANSLATION*                                                by: Olga M. Alicea, fcci, njitce-s

12- Through Ordinance #601, 1992-93 Series, the Municipal Assembly of the Municipality of Ponce approved on October 22, 1992, the Land Management Plan.  Once the Land Management Plan was approved, the Municipality presented it for consideration by the Planning Board.

13- On October 23, 1992, the President of the Planning Board at that time, Engineer Patria Custodio, sent a letter to the defendant public instrumentalities so that prior to adopting said plan, each agency verify the information contained in the Certified Projects Program and certify the information contained therein as correct.  For that she included, in the tables of projects corresponding to each of the defendant agencies, a certification containing the following language:[3]

> I HEREBY CERTIFY:  I, _____, that this table reflects the investment agreements for the next four years for the implementation of the Ponce Land Plan.
>
> _____                    _____
> Date

 The blank space corresponds to the name of the Secretary of Executive Director of the corresponding instrumentality.

15- The Planning Board received back the certifications from each of the defendant public instrumentalities.  However, the Highways and Transportation Authority, the Aqueducts and Sewers Authority, and the Department of Natural and Environmental Resources subscribed the certifications with certain changes with respect to the projects contained in their tables.

16- The Highways and Transportation Authority varied the language of the certification so that it would read as follows:

---

[3] See the eight tables that include the respective certifications of projects in the attachments at the end of this judgment corresponding to the public instrumentalities defendants herein, with the exception of the Planning Board.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

     I HEREBY CERTIFY:  The programming of projects included herein is consonant with our Five Years Construction Program, with the exception of the project – El Tuque Intersection (Phase II)."  (See comments in the letter that is included.)"

The letter referred to in the afore-transcribed certification refers to a letter addressed to the Vice President of the Planning Board, Architect Lina Dueño, subscribed by Doctors Bigas and Ortiz[4] in which she is informed that with the exception of the El Tuque Intersection, Phase II project, the costs and investment recommended were consonant with the planning and availability of said agency's economic resources.

17- Just as is evident from said language, the certification confirms the need to introduce the variance relative to the El Tuque Intersection (Phase II) project.

18- On its part, the variances introduced by the Department of Natural and Environmental Resources to the projects table approved by the Ponce Legislative Assembly were the following:

     The Portugés *[sic]* River and Bucaná River channeling project the amounts were reduced to $3,500,000 for the years 94-95 and 95-96 and to $3,400,000 for 95-96.   The allocation of $3,600,000 for the year 92-93 was transferred to 93-94.  While the sum of $250,000 for the cutting of the Cerrillos Lake mountain was increased by the sum of $2,200,000 for the year 1993-94. The sum of $300,000 for the channeling of the Matilde, Pastillo, and Canas river for fiscal year 1993-94 was increased to $400,000 and the sums of $1,100,000 for the year 1993-94 and for the years 1994-95 and 1995-96 were reduced to $1,000,000 for each of those years.

19- On the other hand, the variance introduced by the Aqueducts and Sewers Authority consisted in eliminating a series of small projects that appear under the title of Improvements to the System and two projects relative to the Treatment Plant's ocean outfall.

20- When doing the aforementioned certifications it is presumed that the defendant public instrumentalities were aware that H.B. 1626 of 1992 had been approved by both legislative bodies and that those certifications were done to comply with the requirements imposed in that

---

[4] Hermenegildo Ortiz, former Secretary of the Department of Transportation and Public Works, and Jorge L. Bigas.

*CERTIFIED TRANSLATION*                           BY: OLGA M. ALICEA, FCCI, NJITCE-S

bill which took place just a few days after the certifications were issued.  H.B. 1626, which formulated a series of amendments to the Autonomous Municipalities Act, *supra*, and which was filed with the House of Representatives on April 14, 1992, sought to have the certifications of the projects of works contained in the Land Management Plan Program done on a mandatory basis.

21- On October 28, 1992, the Planning Board issued Resolution #JP-TP-61-1 adopting the Land Management Plan of the Municipality of Ponce, including in its file the certifications issued by the defendant public instrumentalities with the variances made by the Highways and Transportation Authority and the Aqueducts and Sewers Authority.

22- On November 6, 1992, the Governor of Puerto Rico, according to Administrative Bulletin #)E-1992-66, issued an Executive Order approving the Land Management Plan of Ponce as it had been adopted by the Planning Board.

23- The Commonwealth's Central Government together with the defendant public agencies subscribed the agreement with the Municipality of Ponce between October 28 and December 15, 1992.  The defendant public corporations were represented by their respective executive directors.  Said agreement was presented to the Registry of Contracts of the Municipality of Ponce on September 15, 1993, and to the Office of the Controller the following day.

24- In its pertinent clauses, the agreement reads as follows:

I.  APPEARANCE

As party of the first part, THE CENTRAL GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, hereinafter called "THE CENTRAL GOVERNMENT," represented by the Governor of the Commonwealth of Puerto Rico, the Hon. Rafael Hernández Colón, the Highways Authority represented by its Director, Engineer Jorge L. Bigas Mulero, the Aqueducts and Sewers Authority represented by its Director, Engineer Maria Margarita Irizarry, the Public Buildings Authority represented by its Director, Architect Luis Rafael Arias Albizu, the Ports Authority represented by its Director, General José Buitrago, the Electric Power Authority represented by its Director, Mr. José Al del Valle, the Department of Housing represented by its Administrator, Mr. Rigoberto Figueroa,

the Department of Natural Resources represented by its Secretary, Mr. Santos Rohena Betancourt, and the Puerto Rico Tourism Company represented by its Director, Engineer Ramón Arce, hereinafter called "THE AGENCIES."

As party of the second part, THE MUNICIPALITY OF PONCE, hereinafter called "THE MUNICIPALITY," represented by its Mayor, the Hon. Rafael Cordero Santiago.

The parties assure that they have the legal capacity and authority to execute this agreement, which stems from Law No. 81 of August 30, 1991, as amended, known as the Autonomous Municipalities Act.

II.  PREAMBLE

This agreement enforces the public policy of the Commonwealth of Puerto Rico established in the Autonomous Municipalities Act consisting in granting the municipalities the maximum autonomy possible in addition to providing them (sic) the powers and authorities that are necessary to assume a central and fundamental role in their urban, social, and economic development.

The Municipality of Ponce, in compliance with the provisions of the Autonomous Municipalities Act, has invested considerable economic and human resources and time in elaborating a Land Management Plan to provide for the best uses of the land within its territorial limits and to develop infrastructure projects for promotion through the adoption of a Land Management Plan.

The Management Plan contains the Investment Projects in the Municipality of Ponce Program, duly certified by the pertinent public agencies and by the Municipality, as pertinent, as required by the aforementioned Law No. 81, as amended.

The regional analysis allows knowing the social and economic characteristics of the population, as well as knowing the advantages, opportunities, and limitations that each region presents.  In turn, it allows having a diagnosis of the components of basic infrastructure and the systems' construction and rehabilitation needs.

This way the necessary analysis is provided that allows the identification of opportunities and conditions to stimulate a balanced development at the regional level and to optimize interregional competitiveness.

Among the certified investment projects are several to be developed by the herein appearing AGENCIES.  The aforementioned projects must be developed in their entirety to be able to give effect to the Management Plan and to effect the development of the Municipality according to the public policy stated in the cited Autonomous Municipalities Act.

In consideration of the counter-considerations mentioned above, the parties contract the following OBLIGATIONS:

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

1.    The AGENCIES shall complete the development of the following projects in the Municipality of Ponce.

     a.  Highways Authority – See Exhibit A
     b.  Aqueducts and Sewers Authority – See Exhibit B
     c.  Public Buildings Authority – See Exhibit C
     d.  Ports Authority – See Exhibit D
     e.  Electric Power Authority – See Exhibit E
     f.  Department of Housing – See Exhibit F
     g.  Department of Natural Resources – See Exhibit G
     h.  Puerto Rico Tourism Company – See Exhibit H

[The exhibits identified in the section transcribed above refer to the tables of the projects that the defendant public instrumentalities had certified to be incorporated into the Land Management Plan.]

2.    The Municipality of Ponce, on its part, shall offer the economic support that is within its budget to achieve the aforementioned projects.

    D.  TERM

This agreement will enter into effect immediately after it is signed by the herein appearing parties.  The projects described herein will be carried out as programed between January 1, 1993, and December 31, 1996.

25- Although the underground works of the historic zone began as agreed, by the end of the month of January 1993 these works, together with other projects, were halted.

26- During the month of April 1993, a meeting was held at Fortaleza among the recently names heads of the central government's departments, secretaries, and executive directors of the defendant public instrumentalities, the Chief of Staff, Alvaro Cifuentes, Esq., and the Mayor of Ponce.  At that time, the latter requesting fulfillment of the investment commitments contracted. However, the representatives of the public entities present indicated to him which projects would be carried out and which would not.

27- The defendant public instrumentalities did not make use of the mechanisms contemplated in the Autonomous Municipalities Act, *supra*, to request of the Municipality a partial revision of the land management plan, rather unilaterally they failed to comply with

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

several of the investment commitments contracts in the Land Management Plan and the agreement object of this litigation.

28- The projects that the Highways and Transportation Authority have not fulfilled are the following:

PR-2

South Bypass Extension, connector to Expressway (Phase I) and Construction of the North to South Marginal Streets, El Tuque Intersection (Phase II-A).  That project should have commenced in fiscal year 1992-93.

PR-9

From Tito Castro Ave. (PR-14) up to the vicinity of PR 503 (Phase II-A).  This project should have commenced in fiscal year 1993-94.

Close to PR 503 up to existing PR-10 Phase II-B  existing PR-10 up to PR-1323 and in Section 20.60m from PR-132 to PR-2.  The project should have commenced in fiscal year 1992-93.

Geometric improvements to PR-503 from the exit of PR_9 up to Mayor Cantera.

PR-10

Hostos Ave. (PR-10) improvements enable to four lanes and underground work from La Abolición to Las Américas Ave.  This project should have commenced in fiscal year 1992-93.

PR-14

Construction Intersection overpass between (PR-14) and (PR-133).  This project should have commenced in fiscal year 1992-93.  However, it did not commence until fiscal year 1994-95.

PR-139

From PR-14 to PR-139 (close to where the Cerrillos Reservoir is being built).  This project should have commenced in fiscal year 1992-93.

28- The execution of the above projects that were approved by the Board of Directors of the Highways and Transportation Authority are *[sic]* within said agency's financial capacity.  However, the reason that it now adduces for its breach is that said entity does not consider them priorities.

*CERTIFIED TRANSLATION*                    by: Olga M. Alicea, fcci, njitce-s

29- The non-performance of the projects to which we have referred in the previous two clauses represents $70,179,999 that the Highways and Transportation Authority failed to invest in the Municipality of Ponce.

30- On its part, the Aqueducts and Sewers Authority has not commenced within the term fixed by the agreement.  These projects are:

Aqueducts system, El Collado Sector, stage I-PMP-4-06-7050.  This project should have commenced in fiscal year 1992-93.

Design Cerrillos Filtration Plans, 10 MGD – PMP-4-09-6005.  This municipal project should have commenced in fiscal year 1992-93.

Acquisition Cerrillos Filtration Plant Lands – PMP-4-09-60007.  This project should have commenced in fiscal year 1992-93.

36 inch Transmission Line to Las Mojitas *[sic]* – PMP-4-09-6020.  This project should have commenced in fiscal year 1992-93 and it commenced in fiscal year 1994-95.

La Yuca Sector and El Paraíso, aqueducts, pipes, and pumps system. This project should have commenced in fiscal year 1992-93.

Complete underground limits of first order of the Historic Zone of the Playa de Ponce. This project should have commenced in fiscal year 1992-93.

Sanitary trunk line Road #14 from Fagot Avenue to the Inabón River Bridge – PMP-4-58-5000.  This project should have commenced in fiscal year 1992-93.

31- The projects identified in the preceding clause were budgeted in the Permanent Improvements program of the Aqueducts and Sewers Authority for fiscal years 1993-97.  On the other hand, with the exception of the projects identified in the La Yuca Sector and El Paraíso and the design and land acquisition projects for the Cerrillos Filtration Plant, they are still in the Permanent Improvements Program to be carried out for the years 1996-2000.

*CERTIFIED TRANSLATION*                               by: Olga M. Alicea, fcci, njitce-s

32- On September 13, 1993, the Governor of Puerto Rico issued an Executive Order declaring the Aqueducts and Sewers Authority in a state of emergency.[5]  That providence was based on a report rendered by a workgroup presided by Dr. Antonio Santiago Vázquez.[6]  Said report indicates that the construction of the Cerrillos Filtration Plans should be given priority. The pertinent part of the aforementioned report reads as follows:

> In the Ponce region, it is urgent that a filtration plant be built that allows maximizing the use of the new water reserve available in the Cerrillos Lake...  In order to use the current richness of the water resource in the Southern Region, it requires the building of a filtration plant.  This represents the solution to the problem of overloading and deterioration of the potable water system, making viable the sufficient and efficient production and distribution of the water resource in the Southern Region.

33- By not carrying out the projects as programmed, the Aqueducts and Sewers Authority failed to invest in the Municipality of Ponce the sum of $5,500,000.

34- The Public Buildings Authority, on its part, has not commenced the eight projects consigned in its certification for the Land Management Plan Program of Ponce.  These are:

The Family Health Center of the Coto *[sic]* Ward, which should have commenced in fiscal year 1993-94.

The Regional Hospital's Pediatric Center, which should have commenced in fiscal year 1993-94.

The regional Psychiatric Rehabilitation Center, which should have commenced in fiscal year 1993-94.

The Traffic Patrol Station and Stolen Vehicles Depository, which should have commenced in fiscal year 1992-93.

---

[5] See Executive Order of the Governor of the Commonwealth of Puerto Rico to Declare a State of Emergency at the Aqueducts and Sewers Authority and to Provide Urgent Measures to be Adopted. Administrative Bulleting No. OE-1993-41.

[6] Dr. Antonio Santiago Vázquez directed a workgroup designated by the Governor, the Hon. Pedro Roselló González, to devise a plan for the rehabilitation of the Aqueducts and Sewers Authority. Participating in said workgroup were the Director of the agency, Dr. Emilio Colón, the Assistant Director Mr. Benjamin Pomales, Engineer Carlos A. Mulero, Economist Nelson Soto Velazquez, Engineer Alfredo Heres González, Professor Jorge Rivera Santos, Engineer Serafin Acevedo, Engineer Alberto Hernández, and Hydrogeologist Dr. Nicolino Liberatori.

The building for the Maritime Unit, which should have commenced in fiscal year 1994-95.

The Police Station for the Drugs and Narcotics Division, which should have commenced in fiscal year 1994-95.

The El Tuque Rural High School, which should have commenced in fiscal year 1995-96.

The Special Education Elementary School, which should have commenced in fiscal year 1995-96.

35- The Municipality of Ponce has maintained the Family Health Center project in the Coto [sic] Ward in its program and has requested of the Public Buildings Authority that it commence the construction thereof.  However, said instrumentality has not commenced the construction of the project.

36- The rest of the projects were, as of the date the certification of the Public Buildings Authority's Investment Program was executed, in the schedule of the instrumentalities that would use the same to render their services.  However, these projects were unilaterally rescheduled by the Departments of Health and Education and by the Puerto Rico Police to commence construction during the next four year term with the exception of the Maritime Unit and the Drugs and Narcotics Division Police Station projects which were canceled by the corresponding entity.

37- By not carrying out these projects as scheduled, the Public Buildings Authority failed to invest in the plaintiff municipality the sum of $14,588,100.

38- The projects certified by the Department of Housing in the Land Management Plan have not been carried out.  The status of those projects is as follows:

Initiate Rehabilitation of 100 units.  Such rehabilitation forms part of donations or royalties that is known as "La Tablita" that the Housing Development and Improvements Administration offers to families that live in deteriorated housing. To avail oneself of this program and its benefits the participants must meet certain

requirements and go to the corresponding regional office to fill out an application for materials help.  The person does the project with materials and the ADMV[7] offers him the donation up to a maximum of $500 per family.  This program should have been made known to the families that can benefit from the same since fiscal year 1992-93 and separate for Ponce the funds corresponding to 100 units.

Continue construction streets, curbs, sanitary systems, potable and pluvial water.  Rd. 2, Canas Ward, Punta Diamante, Ponce.  These works were halted in the month of March 1993 and at present they have not been resumed.  In 1992, ADMV requested $2.5 million from the Office of Budget and Management to carry out this project, but the same was not recommended by the OBM and, consequently, it was not approved by the Legislature.  Funds were also requested from the OBM in 1993, 1994, and 1995, but it did not recommend them to the Legislature.

Pagán E.L.A. v. Eileen Mercado, case #R-88-418.  In this case there is a judgment and the money has been requested repeatedly from the O.B.M. [in] the years 1992, 1993, 1994, and 1995 without the latter having recommended it to the Legislature.  Such payment should have been made in fiscal year 1992-93.

Construction streets and internal network Com. Paraíso.  The ADMV manifested that once there is water for said project, it will request the funds to finish it.  This project should have commenced in fiscal year 1992-93.

Rehabilitation and new construction (*Ponce en Marcha*) – La Playa Ward, Puerto Viejo Sector, Salistral, Pabellones Sector.  Rehabilitation and construction (*Ponce en Marcha*) – Arenas Betances, San Felipe Sector.  These projects should have commenced in fiscal year 1992-93; the allocation for that year is the object of a litigation JAC-93-0233 between the Municipality of Ponce and the Governor of Puerto Rico, the Hon. Pedro Roselló.[8]

Allocation for privatized rehabilitation of 1,000 houses under the "Tu Ciudad Renace" program.  It consists in the creation of the construction or rehabilitation of structures in woods or in mixed materials for 1,000 units in the Ponce Historic Zone, within the broadest program aimed at the Traditional Centers existing in the Housing Bank.  The Bank has the funds available but only two families had requested the benefit of the funds as of December 26, 1995.

---

[7] [The Spanish acronym for] Housing Development and Improvements Administration.

[8] In that case, the Ponce Court of First Instance issued an "Interlocutory Partial Summary Judgment" on April 16, 1996.  Through said judgment, the validity of six delegation of competency agreements of several government agencies was decreed to the Municipality of Ponce (Civil No. JAC93-0233).  Said decree is before the consideration of Panel I of the Ponce and Aibonito Regional Circuit in the Circuit Court of Appeals under *certiorari* KLCE9600559.  On June 10, 1996, the Circuit Court of Appeals issued a resolution denying the motion in aid of jurisdiction that sought the stay of the proceedings.

CERTIFIED TRANSLATION                              by: Olga M. Alicea, fcci, njitce-s

Relocation of approx. 300 houses in high risk and greater needs zones.  At present there is no budgetary item to carry it out.  This project should have commenced in fiscal year 1992-93.

On-site rehabilitation of houses in economically depressed areas.  This is a program in which the participating families request funds for the rehabilitation of their houses.  This project does not have a budgetary item assigned to comply with the certification commitment.  This project should have commenced in fiscal year 1992-93.

Remodeling Ponce de Leon Hous. Proj. – For this housing project in the 1993 CGP there is an allocation of $613,171 (for the purpose of modernizing the housing projects).  In the 1995 CGP there is an allocation of $6,398,823 for a total allocation of $7,001,994.

Remodeling Lirios Hous. Proj. - For this housing project in the CGP 1992 there is an allocation (for the purpose of modernizing the housing projects) four million dollars.  In the 1993 CGP, $2,533,503 was allocated.  In the 1994 CGP, $12,497,062 was allocated, and in the 1995 CGP, $800,000 was allocated.

With respect to the remodeling of the Dr. Pila, Ramos Antonini, López Nussa, Caribe Ward, and Gándara housing projects and the demolition of the Las Terrazas Hous. Proj., these projects fall under the responsibility of the Public Housing Administration, which did not intervene in the consultations or meetings for the preparation of the Land Management Plan nor did it formulate an investment commitment for the Land Management Plan program, nor was it part of the agreement either.

The remodeling of housing projects was carried out with federal funds.  As of the date of including the López Nussa Hous. Proj. in the certified projects there was no federal budgetary item allocation for the modernization nor is there one now either.  The Barriada Caribe Hous. Proj. has a federal allocation for 1995 for design and supervision. The demolition of Law Terrazas has federal funds allocation for 1995.

39- By not carrying out the projects for the El Paraíso Community, the relocation of houses in high risk and major needs zones as well as the construction and sale of 200 barren lots in the urban area, the Department of Housing failed to invest in the Municipality of Ponce the sum of $19,000,000.

40- The Department of Natural Resources did not commence the projects that are itemized as follows:

*CERTIFIED TRANSLATION*                    BY: OLGA M. ALICEA, FCCI, NJITCE-S

Cerrillos Reservoir Recreational Area.   This regional project should have commenced in fiscal year 1992-93.

Bucaná Beach Park (Santa Cruz Cabuyones).   This project should have commenced in fiscal year 1992-93.

Channeling of the Matilde, Pastillo, and Canas rivers.  This project will continue in fiscal year 1997 with a contribution of $7,000,000.

Rehabilitation of Isla de Muertos Lighthouse.  This project will continue in fiscal year 1997 with a contribution of $100,000.   Regarding this project, the Department of Natural Resources transferred to the Municipality of Ponce the funds necessary to carry out the same.  Said municipality has not commenced the project because it understands that it needs the specifications from Natural Resources to carry it out.   However, the Department of Natural Resources determined that the municipality itself was the one responsible for preparing the plans.

National Park - Garden Center.  This project will continue in fiscal year 1997 with a contribution of $140,000.

Linear Park in the Portugués and Bucaná canals.   This project should have commenced in fiscal year 1994-93 *[sic]*.

Cerrillos Lakes (Mahogany Forest).

41- By not carrying out the preceding projects, with the exception of the channeling of the Matilde, Pastillo, and Canas rivers, as programmed, the Department of Natural and Environmental Resources failed to invest the sum of $13,787,000.

42- The Bucaná Beach Park, Cerrillos Reservoir Recreational Area, Cerrillos Lakes, Mahogany Forest, Channeling of the Matilde, Pastillo, and Canas rivers, require permits and contributions of supplementary funds from the United States Corps of Engineers.

43- The Department of Natural and Environmental Resources did not arrange for its inclusion in the Bucaná Beach Park, Cerrillos Reservoir Recreational Area, and Cerrillos Lakes Mahogany Forest in the Four Years Investment Program (PICA) and there are no funds in the Department's annual budget to carry them out.

44- On its part, the Electric Power Authority has not finished the projects that it committed to undertake.  Still pending completion is the underground work of the limit of first

order of the Historic Zone, of Hostos Avenue, and of the Playa de Ponce historic sector.  The Authority agrees to carry out one part, but not all of the underground work.  As to the project relative to the Playa de Ponce, it is not properly a total burying of cables, but a reordering of posts and electric lines combined with some underground work.  The work to be done between the Las Americas Avenue and the Playa village does not contemplate either the underground work of all of the Authority's electric cabling facilities, rather it consists in a reordering of such facilities to improve the area's esthetic aspect.  The project, as consigned in the Program, contemplated annual allocations commencing in fiscal year 1992-93.  The Authority worked on the underground works of the Historic Zone during the first semester of fiscal year 1992-93.  That is, until December 1992.  However, the works were halted in early January 1993.

45- The Electric Power Authority sustained conversations with the Municipality of Ponce in which it proposed completing part of the underground works that were under construction in late 1992 and whose construction was halted in the month of January 1993.  The Authority's proposal did not include the totality of the commitment contained in the Land Management Plan of burying its facilities in the totality of the limits of first order of the Historic Zone, nor did it include the installation of the lights nor did it comply with the provisions of regulations number 5 and 22 approved by the Planning Board for the installation of the infrastructure in open spaces and historic zones.  The municipality rejected the proposal as it understood that it was contrary to the Program contained in its Land Management Plan.

46- As to the burying of three lines within the crossroads of PR-52 with PR-1, the parties stipulated in open court that the Electric Power Authority would carry out the same in the month of July of this year.

47- Not carrying out the projects as programmed, the Electric Power Authority failed to invest in the plaintiff municipality the sum of $20,500,000.

BY: OLGA M. ALICEA, FCCI, NJITCE-S

48- On the other hand, the Puerto Rico Tourism Company has the projects that are certified in the Land Management Plan program within its expansion of improvements program. However, the projects have not been able to be carried out due to the halting of the underground works, they require coordination of the Municipality of Ponce, the Electric Power Authority, and the Aqueducts and Sewers Authority.

Underground Program

Historic Center; Hostos Ave. to Abolition up to Las Americas Ave.; Hostos Ave. from Las Americas Ave. up to Comercio Street; La Playa; Mayor Cantera and Aqueducts Streets; Ponce Port.

49- The first Four Years Investment Program (PICA) that the Planning Board approved subsequent to having adopted the Land Management Plan for the Municipality of Ponce was for the four years term that commenced with the year 1993-94 and it extends until the year 1996-97. Even though the Municipality of Ponce requested of the Planning Board that it include in such PICA all of the projects certified by the instrumentalities defendants herein and included in the Land Management Plan of the Municipality of Ponce, it only included the projects that the defendant public instrumentalities asked it to include.   The projects included in the PICA 1993-2996-97 are:

PR-2, South Bypass Extension, connector to Expressway (Phase I) and construction of the marginal streets (north-south).   Included for 1993-94, 1994-95, and 1995-96.

PR-2, North Detour or Baldorioty de Castro Bypass.  Included for 1993-94, 1994-95, and 1995-96.

PR-9, from existing PR-10 up to RR-52 and from PR-132 up to PR-2.  Included for 1993-94, 1994-95, 1995-96, and 1996-97.

PR-9, from PR-14 or Tito Castro Ave. up to PR-503 (Phase II-A) and from PR 503 to existing PR-10 (Phase II-B).  Included for 1993-94, 1994-95, 1995-96, and 1996-97.

PR-10, Hostos Ave. – Improve and enable to four lanes the tract between Abolition Ave. and PR-52.  Included for 1995-96, and 1996-97.

*CERTIFIED TRANSLATION*                                 BY: OLGA M. ALICEA, FCCI, NJITCE-S

PR-14 Malecón Ave. – Construction of intersection to overpass with Comercio Street, PR-133.  Included for 1993-94, 1994-95, and 1995-96.

PR-14, Tito Castro Ave. (Phase I) from Fagot Ave. up to the Int. with PR-9. Included for 1994-95 and 1995-96.

La Guadalupe Bridge – Architectural Finishings.  Included for 1993-94.

PR-139, From PR-14 up to the former PR-139.  Included for 1994-95 and 1995-96.

Acquisition of Cerrillos Filtration Plant Lands.  Included for 1994-95, 1995-96, and 1996-97.

36" Transmission Line to Las Monjitas.  Included for 1993-94, 1994-95, and 1995-96.

24" Diam. Sanitary Trunk Line.  Included for 1993-94.

Underground of the Historic Zone.  Included for 1993-94, 1994-95, and 1995-96.

Expansion of runway toward the west, Ponce Airport.  Included for 1993-94.

50- None of the defendant public instrumentalities requested the review of the Land Management Plan of the Municipality of Ponce according to the mechanisms established in the Autonomous Municipalities Act, *supra*.

51- The fact that the projects whose specific performance is requested have not been carried out has disrupted the implementation of the Land Management Plan of the Municipality of Ponce and makes it impossible for it to achieve its objectives.

52- The Municipality of Ponce has suffered damages as a result of the breach of the defendant agencies of their investment commitments agreed to in the "Agreement for the Development of Projects Programmed between the Central Government and the Municipality of Ponce."

53- The plaintiff municipality established its evidence of damages through the expert testimony of Economist Dr. Elias R. Gutierrez Sánchez.

CERTIFIED TRANSLATION                          by: Olga M. Alicea, fcci, njitce-s

54- Dr. Gutierrez estimated the losses suffered by the Municipality of Ponce in three municipal income items: construction taxes, municipal license taxes, and property taxes.

55- To estimate the loss in revenues for the concept of construction taxes the construction cost of the delayed or canceled projects was taken and multiplied by the rate established in the municipal ordinance that governs this tax and that establishes that those projects whose cost exceeds $25,000 pay 3% plus $300. Excluded from that computation are losses for the concept of construction taxes not collected from those projects that the agencies would carry out by administration – such as, for example, the works on the underground of the Historic Zone – which are exempt from the payment of those taxes. In the case of the projects that were commenced with delays, the revenues were deducted to take into account the effect of the delay on the present value of the revenues. Hence, the estimate of damages for this concept is reduced to the loss in present value of the tax and not to the totality thereof. That is, the loss from estimated construction taxes for projects commenced with delay is reduced to the discount for the time that the Municipality of Ponce has had to wait to realize the revenues since that time reduces the present value of such revenues.

56- The amount of loss from construction taxes from projects that are delayed or left unbuilt unjustifiably by the defendant agencies amounts to $3,309,308. The breakdown by agencies is as follows:[9]

---

[9] The tables included in findings of fact 56, 63, 65, 67, and 69 come from "Exhibit 7"of the Expert Report of the Autonomous Municipality of Ponce. The figures indicated in said "exhibit" were reduced by10%, since not included in the computations is the exhortation of the Executive Order of May 19, 1986, Administrative Bulletin Number 4686, "Executive Order of the Governor of the Commonwealth of Puerto Rico to Establish the Directives of the Ponce en Marcha Program for the Government Agencies and to Exhort the Public Corporations to Adhere to the Same."

*CERTIFIED TRANSLATION*                                       BY: OLGA M. ALICEA, FCCI, NJITCE-S

| AGENCY | PROJECT | INVESTMENT | NET LOSS IN REVENUES FROM TAXES |
|---|---|---|---|
| Public Buildings Authority | Family Health center, Cotto Ward | $ 4,751,000.00 | $142,239.00 |
| Public Buildings Authority | Pediatric Center Regional Hospital | 4,700,000.00 | 28,229.00 |
| Public Buildings Authority | Psychiatric Rehabilitation Center | 1,802,000.00 | 7,459.00 |
| Public Buildings Authority | Traffic patrol station and stolen vehicles depository | 1,158,000.70 | 4,779.00 |
| Public Buildings Authority | Maritime Unit | 255,000.30 | 551.00 |
| Public Buildings Authority | Drugs and Narcotics Division Police Station | 1,789,000.80 | 3,849.00 |
| Public Buildings Authority | El Tuque Rural High School | 1,419,000.50 | 3,041.00 |
| Public Buildings Authority | Special Education Elementary School or Ramón Marin Elementary School | 403,000.30 | 1,636.00 |
| Department of Housing | Construction rings and internal network Paraíso Community | 1,000,000.00 | 29,700.00 |
| Department of Housing | Rehabilitation and new construction (Ponce en Marcha); La Playa Ward, Puerto Viejo Sector, Salistral | 3,494,000.20 | 104,526.00 |
| Department of Housing | Relocation of approximately 300 houses in high risk and major needs areas | 6,000,000.00 | 179,700.00 |
| Department of Housing | On-site rehabilitation of houses in economically depressed areas | 10,770,000.00 | 322,800.00 |
| Department of Housing | Modernization of Housing Projects López Nussa | 7,000,000.00 | 209,700.00 |
| Department of Housing | Modernization of Housing Project: Caribe Ward | 1,500,000.00 | 44,700.00 |

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

| | | | |
|---|---|---|---|
| Department of Housing | Improvements Housing Projects:  Portugués Housing Project | 1,000,000.00 | 29,700.00 |
| Department of Housing | Improvements Housing Projects:  José N. Gándara Housing Project | 1,000,000.00 | 29,700.00 |
| Department of Housing | Demolition Las Terrazas Housing Project | 1,400,000.00 | 41,700.00 |
| Department of Natural Resources | National Park and Garden Center | 1,558,000.00 | 46,440.00 |
| Department of Natural Resources | La Matilde Natural Reserve | 1,670,000.00 | 49,800.00 |
| Department of Natural Resources | Linear parks along the Portugués and Bucaná canals | 3,300,000.00 | 98,700.00 |
| Highways and Transportation Authority | Highway PR-2, Extension South Bypass, Connector to Expressway (Phase I) | 7,000,000.00 | 209,700.00 |
| Highways and Transportation Authority | Highway PR-2, Construction of North and South Marginal Streets, El Tuque Intersection (Phase II) | 7,000,000.00 | 209,700.00 |
| Highways and Transportation Authority | Highway PR-9, from Tito Castro Ave. (PR-14) to the vicinity of PR-503 (Phase II-A) | 11,800,000.00 | 353,700.00 |
| Highways and Transportation Authority | Highway PR-9, close to PR-503 up to existing PR-10 (Phase II-B) | 11,900,000.00 | 356,700.00 |
| Highways and Transportation Authority | Highway PR-9, existing PR-10 up to PR-132 and in section 20.60m from PR-132 to PR-2 | 17,500,000.00 | 524,700.00 |
| Highways and Transportation Authority | Highway PR-10, Hostos Ave. (PR-10) improvements enable four lanes and underground from Abolición to Las Americas Ave. | 400,000.00 | 11,700.00 |

*CERTIFIED TRANSLATION*                                                  BY: Olga M. Alicea, fcci, njitce-s

| | | | |
|---|---|---|---|
| Highways and Transportation Authority | Highway PR-14 Construction intersection to overpass between PR-14 and PR-133 | 7,549,000.70 | 31,368.00 |
| Highways and Transportation Authority | Highway PR-14 (Reconstruction and Landscaping from Fagot Ave. to PR-9, Phase II | 5,100,000.00 | 52,700.00 |
| Highways and Transportation Authority | Highway PR-139, from PR-14 to the former PR-139 (Close to where the Cerrillos Reservoir is being built) | 2,680,000.00 | 80,100.00 |

57- To estimate the drop in revenues for the concept of municipal license taxes and property taxes, the plaintiff municipality's economic expert developed an econometric model bases on the premise that the investment commitments that defendants had to make according to the Land Management Plan and the agreement would have generated some direct, indirect, and induced effects on the economy of the city of Ponce.[10] The economic activity derived from the set of projects not carried out by the defendant entities produced that the expenses, revenues, and sales not be generated, thus the municipal revenues were not realized.

58- Such analysis was done using an input-product model through the use of the Input-Product matrix prepared for the economy of Puerto Rico by the Planning Board. This method of analysis is a method recognized for analyzing the effects of changes in different sectors of the economy.

---

[10] Dr. Elias R. Gutierrez, when questioned ;by Cesar Hernández Colón, Esq., testified as follows: "That direction of changes in the investment to the rise in employment, to the rise in revenues, to the rise in consumption, and the turn back that the different changes make represent indirect, and induced effects. For example, when employment rises and revenues, in turn, rise, revenues, in turn, generate additional sales and those additional sales produce the need for additional employment in certain sectors of the economy. That is known as an indirect effect. But when consumption, after all of the effects occur, also changes, that rise in consumption is a rise in a component of the final demand of the economy, that demand for products that are ultimately used, either by consumers or they are exported. And it generates additional revenues and additional jobs and that is known as induced effects."

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

59- Dr. Elias R. Gutierrez estimated that the costs suffered by the economy for the concept of the loss from production of revenues and job positions.  *[sic]*  The estimate of the fiscal damage suffered by the Municipality of Ponce's City Hall, for the concept of the cancellation or delay in the projects, was measured in terms of revenues not received.

60- To estimate the loss of revenues from the concept of municipal license taxes and property taxes, the average annual employment was used as instrument in an econometric model that was developed taking into consideration the data from the Municipality of Ponce on such revenues throughout a period of years.  The model's coefficients were estimated using series of jobs and revenues from license taxes during the fiscal period of 1985-1993.  The degree with which annual jobs have historically correlated with the revenues collected from municipal license taxes and property taxes was estimated.

61- It was found that more than 90% of the annual variance in revenues from municipal license taxes is explained by variances in economic activity.  The empirical relationship found allows reaching an estimate of the loss in revenues, derived from anticipated reductions in economic activity caused by the cancellation or postponement of projects.

62- Through the use of the coefficients derived from the Input-Product matrix, the number of jobs lost when the investment projects program was dislocated was obtained.[11]  Also

---

[11] The expert economist of the Highways and Transportation Authority, of the Department of Housing, and of the Department of Natural and Environmental Resources, Dr. Ramón J. Cao García, concurred in that the input product model can be used to analyze the economic effects that the investment in infrastructure projects would generate.  Also, he expressed his conformity that the equations developed by Dr. Gutierrez based on the correlation between the level of employment and the revenues from license taxes and property taxes are correct.  However, Dr. Cao disagreed with the number of jobs that the projects in the Municipality of Ponce would generate.  However, the Municipality of Ponce's expert indicated that according to Dr. Angel Ruiz, who is probably the most recognized person in Puerto Rico in the field of input product model analysis and who is a consultant of the Planning Board, carried out a work titled: "A Sectorial Analysis of the Economy of the Municipality of Ponce" in the year 1993, and that from that report it appears that the relationship of value of construction to direct jobs is thirty-two point five (32.5) persons per million dollars of construction for the year 1987.  The study shows thirty-five point five (35.5) persons per million dollars for the year 1994.

estimated was the direct jobs required and indirect and induced jobs that the construction of those projects would generate.  The technique applied to obtain the estimates in that case was as follows:

> The loss in potential anticipated jobs was translated to a percentage of change over the official job level reported by the Municipality of Ponce corresponding to fiscal year 1993, e.g., 50,242 persons.  Incorporating this datum, and the ones corresponding to subsequent years, the loss for the fiscal period 1993-97 was estimated.

63- The amount of the loss for the concept of municipal license taxes that would have been generated during the period of the construction of the projects left unjustifiably unbuilt by the defendant agencies amounts to $10,173,260.  The breakdown by agency is as follows:

| AGENCY | PROJECT | LICENSE TAXES NOT COLLECTED |
|---|---|---|
| Aqueducts and Sewers Authority | Installation of 24" Sanitary Trunk Line in Road #14 | $     90,082.00 |
| Aqueducts and Sewers Authority | Complete underground limit of first order in the historic zone and underground project of Hostos Ave. and historic sector of La Playa de Ponce | 102,951.00 |
| Aqueducts and Sewers Authority | 36" transmission line to Las Monjitas | 232,282.00 |
| Public Buildings Authority | Family Health Center Cotto Ward | 305,718.00 |
| Public Buildings Authority | Pediatric Center Regional Hospital | 302,417.00 |
| Public Buildings Authority | Psychiatric Rehabilitation Center | 116,000.00 |
| Public Buildings Authority | Traffic patrol station and stolen vehicles depository | 74,556.00 |
| Public Buildings Authority | Maritime Unit | 17,070.00 |
| Public Buildings Authority | Drugs and Narcotics Division Police Station | 115,163.00 |
| Public Buildings Authority | El Tuque Rural High School | 91,336.00 |
| Public Buildings Authority | Special Education Elementary School | 25,950.00 |

*CERTIFIED TRANSLATION*                           by: Olga M. Alicea, fcci, njitce-s

| | | |
|---|---|---|
| Electric Power Authority | Complete Underground Limit of first order of the historic zone, Hostos Ave. and Historic Sector at Playa de Ponce; and underground of three lines within the PR52 with PR1 crossroads | 1,582,866.00 |
| Department of Housing | Construction rings and internal network Paraíso Community | 64,344.00 |
| Department of Housing | Rehabilitation and new construction (Ponce en Marcha); La Playa Ward, Puerto Viejo Sector, Salistral | 224,831.00 |
| Department of Housing | Relocation of approximately 300 houses in high risk and major needs areas | 386,065.00 |
| Department of Housing | On-site rehabilitation of houses in economically depressed areas | 692,986.00 |
| Department of Housing | Modernization of Housing Projects López Nussa | 450,409.00 |
| Department of Housing | Modernization of Housing Project: Caribe Ward | 95,516.00 |
| Department of Housing | Improvements Housing Projects: Portugués Housing Project | 64,344.00 |
| Department of Housing | Improvements Housing Projects: José N. Gándara Housing Project | 64,344.00 |
| Department of Housing | Demolition Las Terrazas Housing Project | 90,082.00 |
| Department of Natural Resources | National Park and Garden Center | 100,248.00 |
| Department of Natural Resources | La Matilde Natural Reserve | 107,455.00 |
| Department of Natural Resources | Linear parks along the Portugués and Bucaná canals | 212,336.00 |
| Highways and Transportation Authority | Highway PR-2, Extension South Bypass, Connector to Expressway (Phase I) | 450,409.00 |

| | | |
|---|---|---|
| Highways and Transportation Authority | Highway PR-2, Construction of North and South Marginal Streets, El Tuque Intersection (Phase II) | 450,409.00 |
| Highways and Transportation Authority | Highway PR-9, from Tito Castro Ave. (PR-14) to the vicinity of PR-503 (Phase II-A) | 759,261.00 |
| Highways and Transportation Authority | Highway PR-9, close to PR-503 up to existing PR-10 (Phase II-B) | 765,695.00 |
| Highways and Transportation Authority | Highway PR-9, existing PR-10 up to PR-132 and in section 20.60m from PR-132 to PR-2 | 1,126,022.00 |
| Highways and Transportation Authority | Highway PR-10, Hostos Ave. (PR-10) improvements enable four lanes and underground from Abolición to Las Americas Ave. | 25,738.00 |
| Highways and Transportation Authority | Highway PR-14 Construction intersection to overpass between PR-14 and PR-133 | 485,778.00 |
| Highways and Transportation Authority | Highway PR-14 (Reconstruction and Landscaping from Fagot Ave. to PR-9, Phase II | 328,155.00 |
| Highways and Transportation Authority | Highway PR-139, from PR-14 to the former PR-139 (Close to where the Cerrillos Reservoir is being built) | 172,442.00 |

64- Dr. Elias R. Gutierrez estimated the fiscal damage for the Municipality of Ponce in two periods respectively.  The construction period and the post-construction period.  The post-construction period begins to run once the project that takes the longest to be completed is finished and it extends for a period of ten (10) years, that is, until the year 2006.[12]  Now then,

---

[12] When questioned by Cesar Hernández Colón, Esq., attorney for the Municipality of Ponce, the expert brought by the defendant agencies, Dr. Ramón Cao García, submitted that the 10-years term as post-construction period selected by Dr. Gutierrez is not an unreasonable period of time.

said expert based the fiscal loss suffered by the plaintiff municipality on the fact that its losses are not limited to the taxes for the concept of construction not collected, or the revenues for the concept of license taxes lost during the construction period that once built the permanent presence of the infrastructure projects comprised in the program would raise the future economic activity throughout the years.  This way, a reasonable expectation was established that the facilities built, operating together, would sustain a certain level of economic activity and, consequently, such economic activity translates into revenues, consumption, and sales that, in turn, generate revenues through license taxes.  To establish the future revenues for the concept of license taxes that the Municipality of Ponce did not receive, he departed from the estimate of jobs induced by the projects.  He applied the procedure used previously to estimate the revenues lost during the programmed construction period.  He assumed that the annual revenues remain constant, and the present value of the annual flow was established, for a period of ten (10) years using as discount factor a rate of 5% *per annum*.

65- The amount of the present value of the loss from the concept of municipal license taxes that would have been generated during the 10-years period after its construction amounts to $20,132,999.  The breakdown by agency is as follows:

| AGENCY | PROJECT | LICENSE TAXES NOT COLLECTED |
|---|---|---|
| Aqueducts and Sewers Authority | Installation of 24" Sanitary Trunk Line in Road #14 | 163,800.00 |
| Aqueducts and Sewers Authority | Complete underground limit of first order in the historic zone and underground project of Hostos Ave. and historic sector of La Playa de Ponce | $   187,201.00 |
| Aqueducts and Sewers Authority | 36" transmission line to Las Monjitas | 422,371.00 |
| Public Buildings Authority | Family Health Center Cotto Ward | 555,904.00 |

*CERTIFIED TRANSLATION*                      by: Olga M. Alicea, fcci, njitce-s

| | | |
|---|---|---|
| Public Buildings Authority | Pediatric Center Regional Hospital | 475,025.00 |
| Public Buildings Authority | Psychiatric Rehabilitation Center | 191,318.00 |
| Public Buildings Authority | Traffic patrol station and stolen vehicles depository | 122,964.00 |
| Public Buildings Authority | Maritime Unit | 29,562.00 |
| Public Buildings Authority | Drugs and Narcotics Division Police Station | 199,435.00 |
| Public Buildings Authority | El Tuque Rural High School | 158,173.00 |
| Public Buildings Authority | Special Education Elementary School  or Ramón Marin Elementary School | 42,799.00 |
| Electric Power Authority | Complete Underground Limit of first order of the historic zone, Hostos Ave. and Historic Sector at Playa de Ponce; and underground of three lines within the PR-52 with PR-1 crossroads | $2,878,208.00 |
| Department of Housing | Construction rings and internal network Paraíso Community | 117,000.00 |
| Department of Housing | Rehabilitation and new construction (Ponce en Marcha); La Playa Ward, Puerto Viejo Sector, Salistral | 408,823.00 |
| Department of Housing | Relocation of approximately 300 houses in high risk and major needs areas | 702,002.00 |
| Department of Housing | On-site rehabilitation of houses in economically depressed areas | 1,260,094.00 |
| Department of Housing | Modernization of Housing Projects  López Nussa | 819,002.00 |
| Department of Housing | Modernization of Housing Project:  Caribe Ward | 175,500.00 |
| Department of Housing | Improvements Housing Projects:  Portugués Housing Project | 117,000.00 |

*CERTIFIED TRANSLATION*                                   BY: OLGA M. ALICEA, FCCI, NJITCE-S

| | | |
|---|---|---|
| Department of Housing | Improvements Housing Projects:  José N. Gándara Housing Project | 117,000.00 |
| Department of Housing | Demolition Las Terrazas Housing Project | 163,800.00 |
| Department of Natural Resources | National Park and Garden Center | 182,287.00 |
| Department of Natural Resources | La Matilde Natural Reserve | 195,391.00 |
| Department of Natural Resources | Linear parks along the Portugués and Bucaná canals | 386,101.00 |
| Highways and Transportation Authority | Highway PR-2, Extension South Bypass, Connector to Expressway (Phase I) | 819,002.00 |
| Highways and Transportation Authority | Highway PR-2, Construction of North and South Marginal Streets, El Tuque Intersection (Phase II) | 819,002.00 |
| Highways and Transportation Authority | Highway PR-9, from Tito Castro Ave. (PR-14) to the vicinity of PR-503 (Phase II-A) | (Illegible) |
| Highways and Transportation Authority | Highway PR-9, close to PR-503 up to existing PR-10 (Phase II-B) | (Illegible) |
| Highways and Transportation Authority | Highway PR-9, existing PR-10 up to PR-132 and in section 20.60m from PR-132 to PR-2 | 2,047,506.00 |
| Highways and Transportation Authority | Highway PR-10, Hostos Ave. (PR-10) improvements enable four lanes and underground from Abolición to Las Americas Ave. | 46,800.00 |
| Highways and Transportation Authority | Highway PR-14 Construction intersection to overpass between PR-14 and PR-133 | 801,193.00 |
| Highways and Transportation Authority | Highway PR-14 (Reconstruction and Landscaping from Fagot Ave. to PR-9, Phase II | 596,702.00 |

*CERTIFIED TRANSLATION*                               by: Olga M. Alicea, fcci, njitce-s

| | | |
|---|---|---|
| Highways and Transportation Authority | Highway PR-139, from PR-14 to the former PR-139 (Close to where the Cerrillos Reservoir is being built) | 313,561.00 |

66- The procedure followed to estimate the loss incurred for the concept of property taxes due to the cancellation or postponement of the projects is methodologically similar to the one used to estimate the loss from the concept of license taxes.  Thus, it is necessary to use the level of employment as variable and instrument in a model that estimates the loss from the concept of property taxes.  Dr. Elias R. Gutierrez indicated that the model explains the 86.2% of the percentage variances in revenues of the Municipality of Ponce coming from real and personal property taxes.

67- The total loss for the concept of property taxes that would have been generated during the period of the construction of the projects left unbuilt amounts to $2,936,277.  The breakdown by agency is as follows:

| AGENCY | PROJECT | LICENSE TAXES NOT COLLECTED |
|---|---|---|
| Aqueducts and Sewers Authority | Installation of 24" Sanitary Trunk Line in Road #14 | (Illegible) |
| Aqueducts and Sewers Authority | Complete underground limit of first order in the historic zone and underground project of Hostos Ave. and historic sector of La Playa de Ponce | 26,916.00 |
| Aqueducts and Sewers Authority | 36" transmission line to Las Monjitas | 60,728.00 |
| Public Buildings Authority | Family Health Center Cotto Ward | 79,928.00 |
| Public Buildings Authority | Pediatric Center Regional Hospital | 79,065.00 |
| Public Buildings Authority | Psychiatric Rehabilitation Center | 30,327.00 |
| Public Buildings Authority | Traffic patrol station and stolen vehicles depository | 19,492.00 |

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

| | | |
|---|---|---|
| Public Buildings Authority | Maritime Unit | 4,463.00 |
| Public Buildings Authority | Drugs and Narcotics Division Police Station | 30,108.00 |
| Public Buildings Authority | El Tuque Rural High School | 23,879.00 |
| Public Buildings Authority | Elementary Education School *[sic]* or Ramón Marin Elementary School | 6,784.00 |
| Electric Power Authority | Complete Underground Limit of first order of the historic zone, Hostos Ave. and Historic Sector at Playa de Ponce; and underground of three lines within the PR-52 with PR-1 crossroads | 413,827.00 |
| Department of Housing | Construction rings and internal network Paraíso Community | 16,822.00 |
| Department of Housing | Rehabilitation and new construction (Ponce en Marcha); La Playa Ward, Puerto Viejo Sector, Salistral | 58,780.00 |
| Department of Housing | Relocation of approximately 300 houses in high risk and major needs areas | 100,933.00 |
| Department of Housing | On-site rehabilitation of houses in economically depressed areas | 181,176.00 |
| Department of Housing | Modernization of Housing Projects  López Nussa | 117,755.00 |
| Department of Housing | Modernization of Housing Project:  Caribe Ward | 25,233.00 |
| Department of Housing | Improvements Housing Projects:  Portugués Housing Project | 16,822.00 |
| Department of Housing | Improvements Housing Projects:  José N. Gándara Housing Project | 16,822.00 |
| Department of Housing | Demolition Las Terrazas Housing Project | 23,551.00 |
| Department of Natural Resources | National Park and Garden Center | 26,209.00 |

*CERTIFIED TRANSLATION*                                   by: Olga M. Alicea, fcci, njitce-s

| | | |
|---|---|---|
| Department of Natural Resources | La Matilde Natural Reserve | 28,093.00 |
| Department of Natural Resources | Linear parks along the Portugués and Bucaná canals | 55,512.00 |
| Highways and Transportation Authority | Highway PR-2, Extension South Bypass, Connector to Expressway (Phase I) | 117,756.00 |
| Highways and Transportation Authority | Highway PR-2, Construction of North and South Marginal Streets, El Tuque Intersection (Phase II) | 117,756.00 |
| Highways and Transportation Authority | Highway PR-9, from Tito Castro Ave. (PR-14) to the vicinity of PR-503 (Phase II-A) | 198,502.00 |
| Highways and Transportation Authority | Highway PR-9, close to PR-503 up to existing PR-10 (Phase II-B) | 200,185.00 |
| Highways and Transportation Authority | Highway PR-9, existing PR-10 up to PR-132 and in section 20.60m from PR-132 to PR-2 | 294,389.00 |
| Highways and Transportation Authority | Highway PR-10, Hostos Ave. (PR-10) improvements enable four lanes and underground from Abolición to Las Americas Ave. | 6,723.00 |
| Highways and Transportation Authority | Highway PR-14 Construction intersection to overpass between PR-14 and PR-133 | 127,003.00 |
| Highways and Transportation Authority | Highway PR-14 (Reconstruction and Landscaping from Fagot Ave. to PR-9, Phase II | 85,793.00 |
| Highways and Transportation Authority | Highway PR-139, from PR-14 to the former PR-139 (Close to where the Cerrillos Reservoir is being built) | 45,084.00 |

68- To obtain the estimate of future revenues for the concept of property taxes the same

procedure was used that was used to estimate the revenues lost for the concept of license taxes.

*CERTIFIED TRANSLATION*                          by: Olga M. Alicea, fcci, njitce-s

Under the assumption that the minimum annual revenues remains constant, the present value of the annual flow was obtained adding the discounted value for a period of ten (10) years.  With the previous case, he used as discount factor a rate of 5% *per annum*.  The estimate took into consideration that the construction of a number of projects had commenced.

69- The amount of present value of the loss from the concept of property taxes that would have been generated during the 10-years period after the construction of the projects not built by the defendant agencies amounts to $22,352,193.  The breakdown by agency is as follows:

| AGENCY | PROJECT | LICENSE TAXES NOT COLLECTED |
|---|---|---|
| Aqueducts and Sewers Authority | Installation of 24" Sanitary Trunk Line in Road #14 | 181,856.00 |
| Aqueducts and Sewers Authority | Complete underground limit of first order in the historic zone and underground project of Hostos Ave. and historic sector of La Playa de Ponce | 207,835.00 |
| Aqueducts and Sewers Authority | 36" transmission line to Las Monjitas | 468,928.00 |
| Public Buildings Authority | Family Health Center Cotto Ward | 617,179.00 |
| Public Buildings Authority | Pediatric Center Regional Hospital | 527,386.00 |
| Public Buildings Authority | Psychiatric Rehabilitation Center | 212,406.00 |
| Public Buildings Authority | Traffic patrol station and stolen vehicles depository | 136,518.00 |
| Public Buildings Authority | Maritime Unit | 32,821.00 |
| Public Buildings Authority | Drugs and Narcotics Division Police Station | 221,419.00 |
| Public Buildings Authority | El Tuque Rural High School | 175,608.00 |
| Public Buildings Authority | Elementary Education School *[sic]* or Ramón Marin Elementary School | 47,517.00 |

*CERTIFIED TRANSLATION*                                BY: OLGA M. ALICEA, FCCI, NJITCE-S

| Electric Power Authority | Complete Underground Limit of first order of the historic zone, Hostos Ave. and Historic Sector at Playa de Ponce; and underground of three lines within the PR-52 with PR-1 crossroads | $3,195,463.00 |
|---|---|---|
| Department of Housing | Construction rings and internal network Paraíso Community | 129,879.00 |
| Department of Housing | Rehabilitation and new construction (Ponce en Marcha); La Playa Ward, Puerto Viejo Sector, Salistral | 453,886.00 |
| Department of Housing | Relocation of approximately 300 houses in high risk and major needs areas | 779,381.00 |

CONCLUSIONS OF LAW

THE CONTRACT:

Experience advises that the courts, when passing judgment on the validity of an agreement in which the State intervenes as a contracting party, such situation should be interpreted in a manner similar to contracts that are produced among individuals.   Any interpretation as to the bearing that such agreement produces on the public interest and the exercise of the powers for its defense must be interpreted without prejudice or impairing the intimate philosophy of the figure of the contract.   If one does not act with deliberation in this type of case, the concept of the contract would vanish and the State would lose a magnificent instrument for the multiple purposes that such institution needs.   Thus, there is no more efficient

and transparent legal formula to regulate the voluntary relations in an agreement in which the State appears as a party than the figure of the contract.[13]  Let us see.

A firmly established principle in all civilized societies is the idea that human beings must be able to count on the fact that those with whom they contract in the social exchange will act in good faith and, therefore, will carry out the reasonable expectations that their promises or their conduct have reasonably created in others.  It is also a reiterated norm in our jurisdiction that, according to the provisions of Article 1213 of the Civil Code, 31 L.P.R.A. § 3391, no contract exists if three requirements do not concur, to wit: "1) the consent of the contracting parties; 2) a certain object that is the subject of the contract; and 3) a cause of obligation that is established." On the other hand, Article 1207 of the Civil Code, 31 L.P.R.A. 3372, establishes certain limitations to the autonomy of the will consecrating that the contracting parties may establish the pacts[,] clauses, and condition they deem convenient as long as they are not contrary to the laws, morals, or the public order.  Having complied with both legal provisions, the courts cannot, as a general rule, release a party from complying with what it committed to do through an agreement, when such contract is legally valid and does not contain any defect that invalidates it.[14]

As we indicated at the beginning of this judgment, the defendant public entities submit hat the agreement is null and void.  In support of such posture they allege defects in the consent and they attribute unlawfulness of cause.  Let us see.

The public instrumentalities involved, despite being an integral part of the State, do not have another legal personality than the one deduced from their representative function.

---

[13] In sound legal principles, the contractual act, even if administrative, cannot be an act of power, without being an attempt against its legal nature.  Pursuant thereto, the contracting of public services must be submitted to the legal regime of contracts.

[14] The execution of a valid contract entails that the commitments contained therein must be inexcusably fulfilled between the parties.  See, García v. World Wide Entertainment, 92 J.T.S. 177; Constructora Bauzá v. García López, 91 J.T.S. 99.

*CERTIFIED TRANSLATION*                                    BY: OLGA M. ALICEA, FCCI, NJITCE-S

Consequently, they draw on the personality of their constituents.  The mandate that our public officials receive legitimizes them to act and they are afforded precise attributes for the procurement of public ends.

From the language of the agreement itself it appears that the defendant public agencies contracted certain obligations in connection with the execution of the projects that appear in the tables that they attached to the aforementioned agreement.  The projects that are included in those tables fall under the entire jurisdiction of the instrumentalities that committed to carry them out, and as such, they are the entire responsibility of each particular agency.  The text of the agreement is clear in that the corresponding agencies would contract extremely particularized obligations within a clearly prescribed period of time.  Because the majority of the projects are contained in the respective programs of the defendant public agencies, it is not necessary for the respective boards of directors to give their acquiescence to the agreement.  Consequently, the appearance of the agency head or the secretary of the department at the execution of the agreement is sufficient to obligate the defendant instrumentalities.

In connection with the cause of the contract, such requirement is governed by Article 1227 of the Civil Code, 31 L.P.R.A. § 3432, and it establishes that "[c]ontracts without cause, or with an illicit cause, do not produce any effect.  A cause is illicit when it is opposed to the laws or the morals."  That is, our legal system is based on the inexorable premise that a contract does not exist without a cause or when the cause is illicit.  As a general rule, acts carried out against the law are null and void.  Under this principle, contracts executed in violation of a legal prescription or prohibition based on motives of public order are null and void and nonexistent.

In public contracts, the profound cause of the legal transaction is always the public interest.  It is necessary to point out that in the public arena, administrative organisms cannot

carry out acts or contract obligations that are not those authorized by the laws.  In this sense, the public officials who contract do not act as owners of the public interests, rather as their representatives and defenders.  For this reason, their acts must limit themselves to what the laws authorize.

On the other hand, the principles of sound administration imply a call or warning to the government bodies so that they do not form their acts only to law, but that, also, they seek an effective use for public purposes.  Consequently, the public instrumentalities must not merely comply with the norm; it is necessary to administrate well, to instill their finality of service to the citizens.  What is the point of a legally perfect act or contract if its object is useless or wrong.

The argument that the agreement operates in detriment and harm to the public and the general wellbeing of Puerto Rico and its inhabitants to the extent that it unduly concentrates important investments and resources, in a period of four years, in a specific area of the country in detriment to other areas that have urgent needs does not convince us.  Although it is true that the economic aspects relative to the budgets of the different agencies can on occasion divorce themselves or disturb the contractual endeavor that the State performs, the evidence presented in support of this defense is not sufficient to legally sever the contracting parties.

We recognize the prominence that the agreement at issue grants to the Municipality of Ponce in relation to the Island's other municipalities.  However, judicial power cannot be above a determination of the executive power, comprised within the scope of its constitutional prerogatives and authorities, which decided to decentralize the government and develop the southern area using the mechanisms that the Autonomous Municipalities Act, *supra*, provides.

The act of approving an agreement in which the State intervenes as a contracting party is identified through the investment projects programs certified by contracting government entities. These certifications prevent the budgetary allocations from overflowing due to the impulse of

contractual negotiation.   The importance of the investment certificates for the validity and execution of the agreement is based on the fact that the performance of the works depends, many times, on the credits available.   Consequently, assuring the existence and availability of the funds prevents the financial factor from distorting the agreement of wills contained in a covenant of this kind.

The truth is that the covenant, in addition to complying with the aforementioned investment certificates, coincides with an important public policy of our government of decentralizing the services that the State offers to its citizens and it was obtained through legislation that received the endorsement of all of the Island's municipalities.   This does not have to do with a patrimonial displacement of the contracting entities in favor of the municipality for free.   On the contrary, this has to do with the construction of certain projects that are the purview of the state which would have been carried out at a given time.   However, what the covenant does it fix a reasonable time frame for the execution thereof, within a concerted effort of integral planning initiated by a municipality that decided to avail itself of the benefits that our legal system provides.   The counter-consideration of the Municipality of Ponce consists in formulating a land management plan to achieve certain goals and objectives in its land according to the public policy on land use.

The convenience and need for the infrastructure projects in the Municipality of Ponce and in the region in which such municipality is located responds to the fact that certain deficiencies and needs for social, economic, physical, and environmental development have been identified in that area.   These determinations were the product of a complex administrative process lead by the very public instrumentalities defendants herein according to the needs of certain municipalities and regions of the Island and that, moreover, they included in their respective programs prior to the effectiveness of the Land Management Plan of the Municipality of Ponce.

*CERTIFIED TRANSLATION*                                        by: Olga M. Alicea, fcci, njitce-s

The evidence showed that the very entities sued herein passed judgment on the plan prepared by the municipality of Ponce.  Defendants certified their respective investment projects and remitted to the Planning Board the product of their own internal determinations.  In doing so, they found feasible and prudent that what would be invested in Ponce and in its region, according to the infrastructure requirements of the land management plan, represented a wise balance of public policy and sound administration.

The adoption of the plan by the Planning Board and finally by the Governor of Puerto Rico culminated the administrative process established by law, making official the public policy of the State.

This way, the determinations with respect to the magnitude of the investments in infrastructure facilities in the Municipality of Ponce are issues that have a bearing on the sound discretion recognized of the executive power within the scope of the constitutional prerogatives and authorities that are recognized of such government branch and it is not at the indiscriminate whim of this Court.

Nothing presented in the evidence of the defendant agencies shows that the construction of the projects contained in the Land Management Plan of the Municipality of Ponce are at odds with the public wellbeing.  Rather, on the contrary, the concurrence of wills contained in the covenant for the development of said plan that the public officials made in the instant case is vested with great public interest and they aspire to promote a sound and upright public administration, since it is aimed at giving the Municipality of Ponce the instruments necessary to guide its urban, social, and economic development.

The importance of that is based on the fact that even though the problems arising from the unfettered expansion of the urban centers represents a universal problem, in Puerto Rico such problem has alarming extent.  Considering our limited insular geography, the finality and

*CERTIFIED TRANSLATION*                                      by: Olga M. Alicea, fcci, njitce-s

purpose pursued in developing a land management plan plays an important role in the future of our Island.  The planning experts who testified during the trial unanimously indicated that one of the most important contributions that the Autonomous Municipalities Act, *supra*, makes for the improvement of planning in Puerto Rico is the obligatory nature of the certifications of infrastructure works included in the land management plan.  This way, the measures that the planners establish regarding the use of land taking into account the permanent improvements programs of the public agencies do not constitute, merely, superfluous declarations for the internal use of the officials.  On the contrary, they constitute wise determinations that are to be implemented with the force of law contrary to how it has been done in the past.

With the implementation of the land management plans of the Municipality of Ponce, this provides for said city hall to be able to guide its development in a coordinated fashion according to its current and future needs.  That prevents the uncontrolled exploitation of its resources, it produces better results of human cohabitation among the citizens of Ponce and of the neighboring municipalities, and it develops in an orderly fashion the southern area of the Island. These are the reasons that move us to conclude that the covenants whose specific performance is requested embodies fundamental principles of public policy and sound administration of public funds.

AUTONOMOUS MUNICIPALITIES ACT:

Having addressed the strictly contractual issues regarding the nullity of the agreement and before going on to the law that governs the issue before our consideration, it is necessary to offer a brief historical narration regarding the institution of the municipality in Puerto Rico.   In 1897, the Spanish Crown granted an autonomist constitution in which Puerto Ricans enjoyed ample self-governing authorities.  In Article 52 of the Autonomy Charter of 1897, the municipal organization was mandatory in all population groups with more than one thousand inhabitants.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

Said article provided that all legally constituted Municipalities had the authority to regulate public instruction, the land, fluvial, or maritime routes, local sanitation, the municipal budgets, and to appoint and separate freely its employees.

Two organic charters executed by the United States Congress in 1990 *[sic]* and 1917, respectively, conferred on the Legislature the authority to regulate everything relative to the municipalities.   The Organic Charter of 1900, known as the "Foraker Act" or "Foraker Law," enacted on April 12, 1900, establishes the Legislature's authority to create and consolidate and reorganize municipalities.   On the other hand, the Organic Charter of 1917, also known as the "Jones Act," expanded the legislative authority regarding local issues granted by the Foraker Act.

Even though during the proceedings and debates of the Puerto Rico Constitutional Convention there was discussion on the possibility of giving the municipalities autonomy regarding their internal issues, it was agreed to continue with the same system established since the beginning of the century.   The proposal to expand the municipal authorities was rejected by the members of the Constitutional Assembly as they understood that the municipalities did not have resources so they should continue being legal creatures of the Legislature.   Even though it was expressed that the policy of the State at that historic moment was the centralization of the government, there was emphasis on the fact that the provisions relative to the municipalities did not close the doors to the possibility that in the future the Central Government could, by law, authorize the municipalities to address the elimination of slums, planned urban development, the cleaning, rebuilding, rehabilitating, and development of their territory.

With the enactment of the Autonomous Municipalities Act, *supra*, a transcendental change occurred in Puerto Rican public administration.   This laudable legislation elevates to legal precept the policy of decentralization of authorities that the central government has transferring such authority and competency to the municipalities.   That is, by this legislation

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

recognizing the municipality as the basic unit of our government structure, it grants it the maximum possible autonomy providing it with financial tools so that it assumes a central and fundamental role in its urban, social, and economic development.   With this encompassing reform of the municipal system, the legislature restructures the municipal endeavor and converts the municipality into a protagonist.[15]

Article 13.004 of the Autonomous Municipalities Act, 21 L.P.R.A. § 4602, authorizes the municipalities to adopt Management Plans according to the directives that emanate from such legislation for the protection of their lands, to promote balanced, advantageous, and efficient use, and to encourage the thorough development of each municipality.

On the other hand, Article Article *[sic]* 13.005, 31 L.P.R.A. § 4603, provides:

> The Land Plan will be an instrument of integral and strategic management of the totality of the municipal lands.   The Plan will define the fundamental elements of such management and will establish the program for its development and execution as well as the term of its effectiveness.   One of its functions will be to divide the totality of the municipal land into three (3) basic categories:  urban land, developable land, and rural land.   This classification will be used to provide the management of the uses and structures on these lands.   The designation of developable land, if any, will be done according to the determination of the plan regarding the demand for urban land.   Once the Land Plan enters into effect, any decision regarding the use of the land will be done in accordance with the same.

The territorial plan will be developed by means of three (3) sets of documents: the Report, the Program, and the Regulations.

The Report will contain the following basic documents:

---

[15] In the year 1991, the Legislature enacted several laws to totally reform the constitution, administration, and functioning of the municipal government regime in Puerto Rico.  The fundamental law of this reform was the Autonomous Municipalities Act which substitutes and repeals the Puerto Rico Municipalities Organic Act, Law No. 146 of June 18, 1980, as well as other laws relative to the functioning of municipalities.  As part of this reform, also enacted was Law No. 80 of August 30, 1991, known as the Municipal Revenues Collection Center Act; Law No. 82 of August 30, 1991, which amends the Municipal License Tax Act; Law No. 83 of August 30, 1991, known as the Municipal Property Tax Act of 1991; and Law No. 73 of September 22, 1992, which created the Commission to Promote Municipal Autonomy. See, Hon. Julio Cesar López Gerena v. Hon. Iris N. Cofresi, ___ D.P.R. ___, 96 J.T.S. 55; Municipio de Sa Juan v. Banco Gubernamental de Fomento, ___ D.P.R. ___, 96 J.T.S. 73.

(a) A Report of the Plan, to include, among others, a description of the general contents of the Plan.

(b) A document to include an inventory, diagnosis, and the recommendations regarding the social, economic, and physical development of the municipality. The document will include, at least, the following specific design plans: infrastructure (main lines with real and residual capacity), use of the urban land, use and characteristics of the rural land, and demarcation of the urban, developable, and rural land.  The document will contain a narrative description regarding the historic behavior of the area and an analysis, among others, of the deficiencies and needs of the present social, economic, physical, and environmental development; the role of the municipality within its region; the housing needs; the characteristics and needs of the rural land; and the identification of the regulations, if any, of the Planning Board and the Regulations and Permits Administration that are deemed to be in need of revisions in order to adjust them to the requirements of the Plan.  Should the substitution or amendment of any of the regulations be intended, the grounds for the proposed action will be discussed.

(e) Documents detailing the policies of the Plan establishing goals and objectives, and the recommendations for the social, economic, and physical development of the municipality. This document is fundamental to the Plan and will establish and inc1ude the policy determinations for the Program and the Regulations.  The goals and objectives relative to the use of the land will be specifically set forth for each classification of the urban, developable, and rural land. This document will be accompanied by the design plans needed to graphically illustrate the physical and spatial development proposed by the Plan.

The program will contain the fol1owing basic documents:

(a) A program for general projects to inc1ude the identification, economic and financial evaluation, and the timetable for economic, social, and physical development projects for the municipal territory.   This identification of projects will be accompanied by the following conceptual or schematic design plans, among others:

(l)      Location and proposed capacity of the infrastructure, excluding the road system.

(2)      Location and proposed capacity of the road system.

(3)      Location and capacity of new general communal uses, additional to the infrastructure.

(b)      Affordable housing program including projects and programs to address these needs.

(c)      Support program for the conservation, protection, and use of rural land, free from the development process.

(d)      Expansion Program for the programmed developable land.  This Expansion Program will be required in order to prepare the Expansion Plan and to convert non-programmed developable land into programmed developable land. The Expansion Program will include the following documents, among others:

*CERTIFIED TRANSLATION*                          BY: OLGA M. ALICEA, FCCI, NJITCE-S

(e)     Investments Projects Program, certified by the4 corresponding public agencies.  This section formalizes the investment commitment agreed upon, through certification between the public agencies and the municipality.

The Regulations will contain the following basic documents:

(a)     Land Classification Plan, dividing the municipal territory from the urban land, developable land (programmed and non-programmed), and rural land (common and specially protected).

(b)     Regulations and Management Plans, and other land management determinations, with indications for the use, intensity levels, and characteristics of the structures and the public space.  The regulations will be done specifically for the urban, the developable, and the rural land, and may incorporate norms in effect of the Planning Board or of the Regulations and Permits Administration.  The substantive and procedural provisions of the new competencies to make viable the land management that are used in the Management Plan will form part of the Regulations and Management Plans."

Article 13.011 provides that Management Plans must be compatible with the laws, public policies, regulations, and other documents of the Central Government relative to land organization and construction.  To guarantee the compatibility of the management plans with the regional and insular public policies, the Central Government retains, through the Planning Board, the initial approval of management plans and the revisions of parts of those plans.

It must be pointed out that the amendments made to the Autonomous Municipalities Act, *supra*, on October 29, 1992, were made to clarify the scope of various of its provisions and so that the ends and purposes pursued by such legislation could be met with great effectiveness and certainty.  In order to make official the Management Plan that meets the statutory requirements transcribed above, Article 13.011 was amended to prescribe as follows:

Once approved by the Governor, the Management Plan will obligate the public agencies to comply with the works and projects programs included in the Investments Projects Program Section certified by the public agencies.  Te (sic) Planning Board will give priority consideration to said section in the preparation of its Four Year Investments Program provided in §§ 62, *et seq.* of Title 23, as will the Office of Budget and Management do in the Annual Budget that is submitted to the Legislature.  Public corporations will be bound by their own budgets.

by: Olga M. Alicea, fcci, njitce-s

In addition to this statutory background, we believe it is important to point out that the spirit of the Autonomous Municipalities Act, *supra*, expressly provides that the powers and authorities conferred to the municipalities by said legislation should be interpreted liberally, so that it encourage the development and implementation of the public policy enunciated of guarantee to the municipalities the necessary authorities in the legal, fiscal, and administrative order to effectively address the needs and wellbeing of their inhabitants.  See, <u>Municipality of San Juan v. Banco Gubernamental de Fomento</u>, ___ D.P.R. ___, 96 J.T.S. 73.

Without forgetting this statutory interpretation guide, and as we can conclude from the legal provisions that we have mentioned above, the basic requirements for the validity of the Land Management Plan may be listed as follows: (1) that they be compatible with the laws, public policies, and regulations of the Central Government (21 L.P.R.A. §§ 4602, 4609); (2) that they be prepared in close coordination with the Planning Board and with the public agencies involved (21 L.P.R.A. §§ 4606, 4609); (e) that there be citizen participation through public hearing in the preparation of the plan (21 L.P.R.A. § 4606); (4) that they be the result of consultation and coordination between the public agencies and the municipality (21 L.P.R.A. § 4609); (5) that they be approved by the Planning Board and approved by the Governor (21 L.P.R.A. § 4606); and (6) that they contain an investment projects program duly certified by the corresponding agencies (21 L.P.R.A. §§ 4603, 4604).  Once these requirements are met, the plan acquires the force of law.

The evidence presented in the case establishes that the Land Management Plan of the Municipality of Ponce fully meets the preceding statutory requirements.  As we stated previously, the same is compatible with the laws and public policy of the Commonwealth of Puerto Rico since the same was prepared in close coordination with the agencies defendants herein and both the Planning Board and the Ponce Municipal Assembly imparted their approval.

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

On the other hand, the certifications that defendants herein imparted to the Investment Projects Program imparted an obligatory nature to the projects contained therein.

Moreover, the agreement that contains said plan is governed by the legal provisions that determine the legal status of the government instrumentalities that appeared to subscribe it. [The] Autonomous Municipalities Act, *supra*, regulates the legal position of each of the parties that appeared to execute said agreement, since it establishes a procedure for the review of the projects that appear in the Management Plan.  This way, the parties who want any change in the Management Plan comprised in an agreement of this nature must go through the same process that the initial approval of the plan required as provided in Section 4606 of the law, *supra*.[16] From the evidence presented at trial it does not appear that the defendant instrumentalities made use of such mechanism.

Special Defenses of the Defendant Agencies:

Before commencing to discuss some of the special defenses that the defendant agencies presented, it is necessary to point out that the government instrumentalities or public corporations, as all administrative organisms, totally depend on the statutes that give them life, which regulate the operation and establish and limit their authorities, so that they can only exercise those powers that have been expressly conferred to them by the corresponding statutes, and that, necessarily and reasonably, are implicit therein.  With this doctrinal principle in mind,

---

[16] The Municipality of Ponce's planning expert, Dr. Hector López Pumarejo, testified during the trial about the importance represented for planning in Puerto Rico that the law allow the municipalities to prepare their own land management plans.  Regarding the flexibility that such plans should have he stated: "...no plan is written in stone..," but it is not there either to be struck "with a stone."  He also stated that when a land management plan is prepared, and certain processes are established to change or modify them, those processes must be followed, since planning responds to an integrated analytical process among different levels of government.  If an instrumentality is allowed to change the plan arbitrarily, planning disappears.

*CERTIFIED TRANSLATION*                           by: Olga M. Alicea, fcci, njitce-s

let us see some of the special defenses that the defendant agencies unsuccessfully submitted through the proceedings.

<u>Public Buildings Authority</u>:

Paragraph 29 of the amended complaint indicates that the Public Buildings Authority contractually agreed to develop a total of nine projects.  Eight of which corresponding to physical facilities to render education, health, and safety services that were requested by the corresponding agencies that offer such services to the community.  However, the "Cotto Ward Family Health Center" project was requested by the Municipality of Ponce itself.

The Public Buildings Authority adduced as special defense to breach the first eight projects to which we refer that its government function is that of developer of projects that other government agencies originate and that this being so, when other agencies cancel or reschedule their projects it is not obligated to carry them out.  We disagree.

Article 2 [of the] Organic Act of the Public Buildings Authority, 22 L.P.R.A. § 903, provides as follows:

> The Authority will do or order [the] preparing of plans and designs of buildings for schools,, "Health and Social Wellbeing Facilities,"  as such phrase is defined in §§ 331 to 333p of Title 24, offices, police stations, courts, warehouses, workshops, and any other physical facilities connected with government services in those locales and in the manner that the Authority deems necessary and desirable in such a way that it provides lodging facilities for schools, "Health and Social Wellbeing Facilities," offices[,] police stations, courts, warehouses, workshops, and any other physical facilities of the Commonwealth, any department, agency, instrumentality, or municipality, and it will acquire, lease, build, equip, repair, finance, and operate such facilities, and it will lease or otherwise contract the use of space in such facilities or parts thereof, but otherwise contract the use of space in such facilities or part thereof *[sic]*, but such leases will be only to and such contracts with the Commonwealth or any departments, agencies, instrumentalities, or municipalities..."

As is evident from the Public Buildings Authority's own organic act, such instrumentality performs multiple functions of a government nature under the primary ministry of providing the buildings or structures that the State needs for the multiple finalities needed.

On the other hand, Article 13.005 of the Autonomous Municipalities Act, 21 L.P.R.A. 4603, in the section relative to the program that governs the investment commitments agreed to through certification between the public agencies, provides that such program will establish: "(a) (3) the location and capacity for new general communal uses additional to the infrastructure." The communal uses are defined in Article 13.003, 21 L.P.R.A. 4601, as follows:

> (jj)   Communal use will mean any physical facility to provide a community with basic services for its development and general wellbeing.  These facilities may comprise, among others, establishments, schools or educational, cultural, recreational sports, health, safety, transportation facilities, maintenance of the foundations, the collection of solid wastes, and cleaning of public thoroughfares, as well as infrastructure services, such as water, sewers, roadways, telephone, or electricity.   Of these communal uses, those that address the needs of the municipality in general and that are identified as general communal uses are singled out.

In aligning the organic act of the Public Buildings Authority with the statutory provisions transcribed above, we can conclude that based on the certified investment commitments included in the Land Management Plan Program of Ponce and the representations made by the different agencies that originated the projects, they generate a new state of law.

Just as arose from the evidence that was presented during the trial, the Departments of Health and Education, as well as the Puerto Rico Police, intervened jointly with the Public Buildings Authority I concert to prepare the Land Management Plan of the Municipality of Ponce.  Even though the certifications of the projects of the facilities were only done by the Public Buildings Authority, said instrumentality counted on the fact that, at the time the agreement was signed, those projects were contained in the schedules of the Departments of Health and Education and the Puerto Rico Police and that such facilities would be occupied under a lease regime.   Consequently, the responsibility of these agencies with the Public Buildings Authority was to arrange for the funds for the payment of the lease with the Office of Budget and Management.

However, even though the Public Buildings Authority adduces as exculpatory allegation that the projects were rescheduled and canceled by the agencies that originated them, it did not use the mechanism of Rule 12.1 of the Rules of Civil Procedure, 32 L.P.R.A. App. III, R.12, to bring those agencies to the lawsuit as third party defendants.  We understand that in the context of a land management plan, subscribed under the Autonomous Municipalities Act, *supra*, such defense is not legally sufficient in the absence of the agencies that originated the projects respectively, since the certification of projects for general communal use of education, health, and safety was done by the Public Buildings Authority itself.  In doing so, it appeared, not only as the builder of the projects, but also in its capacity as owner of the facilities and that obligates it to carry out the projects included in its certification.  Since said agency is the one that is called upon to formulate the investment commitments for the construction of those projects, the fact that they were rescheduled or canceled cannot be used as a pretext or justification to breach an agreement that has the force of law.  The presence of the Departments of Health and Education and of the Puerto Rico Police is not necessary in the cause of action that the Municipality of Ponce exercises in the instant complaint since the aforementioned agencies do not carry out investments in their physical facilities nor did they appear in the agreement whose specific performance is requested.  What those agencies provide in their respective budgets is the rent to pay the Public Buildings Authority for the use of the edifices.

Notwithstanding the foregoing pronouncements, we understand that the Public Buildings Authority is not entirely devoid of remedies.  Said entity, after completing the construction of the projects it agreed to do, may demand that the Departments of Health and Education and the Puerto Rico Police assume their legal responsibilities.  Only then can it be pondered whether such instrumentalities were impeded from rescheduling the aforementioned projects pursuant to

the state of law that is entailed in a Land Management Plan approved by the Governor of Puerto Rico and the Planning Board.

Finally, with respect to the Cotto Ward Family Health Center, it clearly appears from the evidence that said project was not carried out.  The same was neither canceled nor rescheduled by any agency, since it has to do with a project of the Municipality of Ponce itself.

Highways and Transportation Authority, the Department of Housing, and the Department of Natural and Environmental Resources:

Certainly, many of the special defenses that these agencies raised to justify their breach of the projects that appear in the agreement have already been adjudicated by our January 17, 1996 resolution and by this judgment.  However, we proceed to make certain pronouncements with respect to some additional issues that have to do with these public agencies.

In connection with the certification formulated by the Highways and Transportation Authority that we transcribed in finding of fact number 16 and having weighed the evidence on this issue, we hold that definitely it was not the Highways and Transportation Authority's intention to express a reservation of powers of the agency to reschedule in the future the investment projects that it was certifying, just as it alleged during the course of the proceedings. The mere change in the language of the certification is due to what its text actually prescribes, to wit:  the need to introduce a variance relative to the project at the Intersection of El Tuque (Phase II).

With respect to the argument that attributes the nullity of the agreement for having been subscribed by the various representatives of the defendants on different dates, we hold that this does not contravene any legal precept.  Even though in our finding of facts number 23 we noted that the document was subscribed between October 28 and December 15, 1992, the foregoing does not produce the nullity of the agreement of wills.  The agreement object of this litigation was not perfected until the last signature was produced.  While the executing parties maintained

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

their obligatory will until the last of them signed, the agreement is perfectly valid especially when a claim is made among the parties that appeared to sign it.  The unity of act is required by our legal system in public documents where the appearance of witnesses is indispensable for the validity of the legal transaction.  See, Art. 24 of the Notarial Act, 4 L.P.R.A. 2042.

In connection with the argument that the agreement was filed tardily with the Office of the Controller and the Registry of Contracts of the Municipality, that also lacks merit.  Law No. 18 of October 30, 1975, 2 L.P.R.A. 97, reads, in pertinent part, as follows:

> The departments, agencies, instrumentalities, offices, and all organisms and municipalities of the Commonwealth of Puerto Rico, without exception, shall keep a record of all contracts executed, including amendments thereto, and they shall remit copies thereof to the Office of the Controller within fifteen (15) days following the date of execution of the contract or amendment.

Further on it provides:

> The term "instrumentality" shall include all public corporations, their subsidiaries, or any government entity that has its own legal personality, created by law or that may be created in the future, without exception.

From the foregoing legal provision it is extremely clear that the defendant entities, as well as the Municipality of Ponce itself, had the same legal obligation to file the agreement with the Office of the Controller.  Consequently, since that responsibility was shared, we understand that the defendant entities are barred from raising that defense.

Moreover, although it is true that the plaintiff municipality filed the contract tardily with the Office of the Controller, the delay does not produce the nullity of the contract.  We take note of a resolution issued on April 7, 1995, by the Supreme Court in the case of Departamento de la Vivienda y otros v. Municipio de Dorado, No. RE-95-68.  Through it, said superiority rules that the mere allegation of nullity of an agreement predicated on the breach of the provisions of the Autonomous Municipalities Act, *supra*, regarding the notification thereof is not legally sufficient to nullify the validity, consent, and obligatory nature of what was covenanted.

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

Also lacking merit are the allegations of the Departments of House and of Natural and Environmental Resources that no valid budgetary allocation exists to defray the expenses of the projects that they certified.  Although it is true that those departments are not autonomous entities insofar as the budget is concerned, their obligation according to the Autonomous Municipalities Act, *supra*, consists in having to request [that] the funds for the project be included in the Four Years Investment Program (PICA), the Planning Board being obligated, in turn, to submit them to the Office of Management and Budget and to be presented to the Legislature.

Nor do we find a valid defense for the breach of the projects that they certified that the totality of the funds come from federal funds or that they have to obtain permission or collaboration either from the Department of Transportation or form the Corps of Engineers or from the "Housing and Urban Department" better known as "HUD."  The availability of such funds, permits, or collaboration is a matter of allocations and federal public policy.  The evidence showed that [in] the case of the housing projects, the funds were available and the agency involved opted to use them in other projects other than those claimed herein.

Aqueducts and Sewers Authority:

The Aqueducts and Sewers Authority submits that the proceedings followed by plaintiff do not meet the provisions relative to costs and origin of funds of Art. 14002 of the Autonomous Municipalities Act, 21 L.P.R.A. 4652, and that also not met were the provisions of the Government's Accountability Act (Law No. 230 of July 23, 1974), 3 L.P.R.A. 283, in connection with the allocations and the annual establishment.  It further submits that the financial crisis it is enduring releases it from carrying out the projects.

Both legal provisions that the Aqueducts Authority alludes to are not applicable to its responsibilities under the agreement at issue.  Art. 14002 of the Autonomous Municipalities Act, *supra*, belong to Chapter 14 of said law which regulates contracts of Delegation of Competencies

between a municipality and the central government.  That is, it regulates the agreements under which the municipalities carry out projects for the central government agencies or vice versa.  In the instant case, the agreement whose performance is requested was carried out under Chapter 13 of the Autonomous Municipalities Act, *supra*, and through it the agencies of the central government agreed to carry out their own projects, by themselves, within a specific period of time.  On the other hand, the Government of Puerto Rico's Accountability Act, *supra*, regulates those public corporations whose organic acts specify that the Secretary of the Treasury exercises some control over the funds and financial transactions that they carry out.  We do not find in the Puerto Rico Aqueducts and Sewers Authority Act, 22 L.P.R.A. § 141, *et seq.*, any provision in this regard.

The Aqueducts and Sewers Authority's financial crisis does not impede the performance of the projects that said agency agreed to do.  Most of the projects were contained in the Permanent Works Program prepared during the crisis and, with the exception of the Cerrillos Plant, the rest represent a fraction of the budget that said instrumentality has.  In connection with the Cerrillos Filtration Plant, as is evident from our finding of facts number 32, its construction is necessary to alleviate to a great extent the crisis that the Authority is enduring.  The Aqueducts and Sewers Authority, as well as all of the public corporations defendants herein, cannot evade the clear mandate of Article 13.011 of the Autonomous Municipalities Act, *supra*, that the public corporations are obligated in their own budgets.

The other arguments of the Aqueducts and Sewers Authority do not merit any further discussion.

Underground of the Ponce Historic Zone, Aqueducts and Sewers Authority, Electric Power Authority, Puerto Rico Tourism Company, and the Municipality of Ponce.

As is evident from the evidence presented, the Underground of the Ponce Historic Center is an interagency project that consists in substituting an aerial infrastructure in the historic

center and of the historic zone of the beach of said municipality for an underground one.  After the Municipality of Ponce carries out the initial demolition and removal of pavement work, the project requires the concerted action of the agencies involved in the same.

To carry out said project, the Electric Power Authority and the Puerto Rico Tourism Company had subscribed an agreement titled "Works Contract" whereby both instrumentalities divided up the tasks of the underground of the area that had been determined by the Institute of Puerto Rican Culture.  Part of the work was to be rendered by the Right to Work Administration, which is not a party to this proceeding.

Now then, from the evidence presented it was established that practically all of the underground of the historic zone has been done and that the only thing left to be done are certain tracts.  Both the Puerto Rico Tourism Company and the Electric Power Authority maintained the willingness to complete the works.  In view of that, we ruled that the parties must complete the project as they agreed to do, and on its part, the Municipality of Ponce must facilitate the works necessary for the agencies involved herein to be able to finish the project, including the collaboration the project had from the Right to Work Administration.

Although almost all of the defendant public instrumentalities presented evidence aimed at showing that the agreement object of this litigation was not discussed in the transition committees when the new administration of Dr. Pedro Roselló González came in and that, moreover, they testified that they did not find a copy of the agreement in their respective administrative offices, that cannot be used as legal grounds to breach their contractual commitments.  A change in government does not necessarily mean the disapproval of the commitments that a particular government makes at a given time.  With respect to this issue we echo the words of our Supreme Court:  :The State is a contracting party like any other and it

must comply with what it agreed to, regardless of the changes in Government administration.["]

<u>Municipality of Ponce v. Hon. Pedro Roselló</u>, 138 D.P.R. ___, 94 J.T.S. 112, p. 72.

The arguments of incompatibility that the defendant public entities adduce the Autonomous Municipalities Act, *supra*, imposes on the flexibility that their respective organic acts recognize to dispose of their funds lacks merits in our current legal system.  It is well known that in our state of law the legislators are careful in the bulls that they enact and the same have the presumption of being correct.  The words that the legislature uses are not in the law by mere chance or through improvisation.  The arguments that the legislator makes respond to some particular reason and, therefore, everything he states should be given effect, making all efforts therefor.  The declaration of public policy that the Legislative Power establishes in the Autonomous Municipalities Act, *supra*, is diaphanous and it prescribes that our democratic political thought, at this stage of the 20th Century, requires that the decisional power regarding issues that affect the lives of the citizens fall on the officials who are closest to the citizens.  These are: the mayor and the municipal assemblypersons.  The powers and authorities that originally resided in the central government responded to a vision of the world that conceived the economic and social development on a uniform basis.  However, the high level of control and bureaucratization of the services that the State offers, as well as the poor quality with which the same are rendered, motivate this evolution in our collective political thinking.  This expansion of the framework of action of the municipalities to areas that up until now had been prohibited to them represents a democratization of our political process guaranteeing to the citizens an effective government responsive to their needs and aspirations.

There are other significant reasons that justify this course of statutory interpretation. When the Legislature enacts a law it is presumed that said body has taken into consideration all of the other statutes that are related to the subject matter that is being regulated.  Unless it

*CERTIFIED TRANSLATION*                              by: Olga M. Alicea, fcci, njitce-s

appears clearly that the legislative will is another, a special law prevails over a general one that covers the same subject matter.  However, we do not find that the organic or enabling acts of the different entities defendants herein are incompatible with the Autonomous Municipalities Act, *supra*, or with the Land Management Plan contained in the agreement object of this litigation. On the contrary, both precepts are attune with each other and can be interpreted together.

The legislative purpose of the Autonomous Municipalities Act, *supra*, is clear and leaves no room for doubts.  Although it is true that in our duty to impart justice we are autonomous and independent, our decisions must also correspond to a scrupulous framework of legality.  It is precisely, pursuant to this express legislative will, to the procedure followed for the inclusion and approval of the projects that appear in the agreement and to the consent given by the agency heads that, vested by their own authorities that are granted to them by the respective enabling acts of the entities that they represent, they appeared to subscribe the agreement that we recognize that the same constitutes the law between the parties.[17]  It is inconceivable to pretend to undermine the validity of such a recent expression of our Legislature adducing that the general provisions of [the] organic acts of the public entities defendants herein prevail.

In agreements of this kind where powers conferred to several branches of the government with diverse public interests are intertwined, the role of the protagonist is not necessarily held by the public instrumentalities involved, rather that it is the legislator himself who, through the different proceedings arranged for pursuant to the Autonomous Municipalities Act, *supra*, establishes, executes, and implements the government's public policy.  The sense of judicial self-discipline that drives the judge to apply the will of the legislator, spurning its own, is indispensable for the orderly functioning of a governmental organization system.  Validating the

---

[17] Dr. Salvador Padilla Escabí, Secretary of State at the time of the signing of the agreement whose specific performance is requested, declared that no agency was forced to do a specific project.

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

defenses adducted by the public agencies defendants herein would represent a disruption of the constitutional order and would unavoidably legally link to the Puerto Rican political order an archaic vision of extreme centralization of the services rendered by the State.

In granting the complaint, not only do we recognize the efficacy of the agreement and its binding force among the parties, but that we recognize that such agreement also behaves and entails a duty of observance on the part of the judges and courts.  In recognizing the validity thereof, we elevate the agreement to the category of legal precept among the parties and we grant total legal efficacy, since its effects are necessarily imposed by law.  Otherwise, we would be encouraging litigations of this nature every time there is a change in government that disapproves of the municipal endeavor that is able to avail itself of the benefits of the Autonomous Municipalities Act, *supra*.

The State is recognized to have executive authorities by reason of a tacit agreement that exists between the citizens and the governors that they elect.  Thus, when the State contracts it is understood that the agreement is executed by all of the citizens based on the common or public interests of which they themselves are the legitimate owners.

Damages:

The expert evidence presented has convinced us that in effect the Municipality of Ponce has suffered losses for the concept of a drop in revenues from construction taxes, municipal license taxes, and property taxes, just as we detailed in our findings of fact.  The discrepancies that arose between the experts who testified during the course of the trial revealed that they affect the amount of the losses, but not their existence.  The Puerto Rico Supreme Court has reiterated that the amount to be granted for losses of this nature cannot depend exclusively on mathematical equations or formulas and arithmetic computations since those equations or formulas are only some of the factors to be taken into consideration, together with the totality of

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

the circumstances of the case to determine what should be the reasonable quantity to be granted. If we were to adjudicate the damages according to the formulas rationally prepared by the Municipality of Ponce's expert, Dr. Elias R. Gutierrez, the total amount of the drop in the Municipality's fiscal revenues would come to $58,904,037.  However, in light of the totality of the circumstances that occurred in the case and given that through this judgment we order the performance of the projects whose specific performance is requested, the items corresponding to the post-construction period should be deducted and, consequently, we find that the Municipality of Ponce should be compensated in the total sum of $16,418,846.  Said sum must be paid by all of the defendant public instrumentalities in proportion to the amount of investment not made in the projects that were not built.  On its part, the Planning Board will be jointly liable in the proportion of the damages caused by the projects that it did not include in the Four Years Investment Program (PICA) of 1993-94 and 1996-97, of the ones that were included in the agreement, and that were not done as programmed.

The evidence also showed that a number of private investment projects could not be built due to the lack of infrastructure works that the defendant instrumentalities had to build as part of the investment commitments they assumed in the Land Management Plan.  The main infrastructure deficiencies refer to works that should have been done by the Aqueducts and Sewers Authority and the Highways and Transportation Authority in the northeastern sector of the city of Ponce, which, had they been built as programmed, would have allowed the following private projects that were undergoing development to be done:  "la Mallorquina" Development and Shopping Center, "Mansiones de Ponce" Development, Arjona Shopping Center, and "El Bronche" Expansion.  The Municipality's expert made an estimate of the losses caused from revenues not received for the concept of construction taxes, municipal license taxes, and property taxes for not having carried out those private projects.  On the other hand, the expert economist

*CERTIFIED TRANSLATION*                                    by: Olga M. Alicea, fcci, njitce-s

of several of the defendant entities, Dr. Ramón Cao García, submitted that estimating those losses separately would be equivalent to duplicating the damages since the same would be included within the effects induced from the public works.  The Court does not feel that the evidence presented by the Municipality of Ponce is sufficient to establish an adequate causal relationship between the breach of the defendant agencies and the fact that the private projects in question had not been built, thus, no compensation whatsoever will be granted for this item.

General Provisions:

Pursuant to the enormous complexity presented by the specific performance of the obligations arising from this judgment, such as the technical work that must be done to specify the contours and the content of many of the projects, permit procurement processes that must be followed in some cases, government endeavors that must be undertaken for the availability of funds, acquisition and relocation processes, the technical nature of the construction processes, the time it would take to carry them out, and the multiple difference that might arise, the Court, under Rule 41 of the Rules of Civil Procedure, 31 L.P.R.A. App. III, R.41,[18] will designate a Special Commissioner to conduct an audit of the development of the projects until the termination, delivery, and acceptance of each and every one of them.

The Special Commissioner's fees must be paid by each of the defendant entities in proportion to the amount of the value of the projects they ceased to build in the Municipality of Ponce.

The Special Commissioner will render quarterly reports to the Court with pertinent information regarding the development of each of the projects following the procedure

---

[18] Rule 41 of the Rules of Civil Procedure, *supra*, empowers the Court to appoint a Special Commissioner when the issues that are argued in a lawsuit are extremely technical and highly specialized expert knowledge is needed.  Also, Article 2.002 of the Puerto Rico Law of the Judiciary (4 L.P.R.A. § 22, *et seq.*) provides that the courts shall have authority, *inter alia*, to enforce their judgments, orders, and decisions, and to carry out or order any act that is necessary in order to fully comply with their duties.

established by Rule 41 of the Rules of Civil Procedure, *supra*.  The Commissioner may submit partial or special report when deemed necessary.

The Special Commissioner's first report must submit a program or schedule of the execution of each project according to their different stages.  Such schedule must be prepared initially by each of the defendant agencies within the established parameters.   If the Commissioner is not in agreement with the schedule proposed by the defendant agencies or if the Municipality of Ponce objects to it, the Commissioner will adjudicate the dispute formulating the pertinent recommendations to the court to be considered according to the procedure provided for the submission of reports in Rule 41 of the Rules of Civil Procedure, *supra*.

The Special Commissioner must take into consideration that the amounts consigned in the Land Management Plan Program of the Municipality of Ponce are estimated amounts and that when carrying out the construction projects they may exceed the estimated sums.

In the Commissioner's first report he must submit to the Court and to the parties the annual budget of his office for the fulfillment of the task assigned to him by the Court.  Such budget must be approved by the Court once the defendant entities have had the opportunity to express themselves thereon.  The budget may be reviewable annually.

Each of the parties involved in this instant litigation must propose at least three names that they believe can diligently and impartially discharge the responsibilities detailed herein once this judgment becomes final and unappealable.  The other directives that will guide the duties of the Special Commissioner will be detailed once the same is designated.

On the basis of the grounds stated above, the complaint is granted and, consequently, the public instrumentalities defendants herein are ordered to build the projects that the Municipality of Ponce requests in a manner that is compatible with the different orders contained herein.  Also, the Court denies the counterclaims filed by the Puerto Rico Tourism Company and by the

*CERTIFIED TRANSLATION*                                  BY: OLGA M. ALICEA, FCCI, NJITCE-S

Aqueducts and Sewers Authority.  Defendants are imposed the payment of the costs of the

litigation, on a pro rata basis.

BE IT REGISTERED AND NOTIFIED.

In San Juan, for Ponce, Puerto Rico, on June 24, 1996.


[Official Seal of the Court]                              (Signed)
                                          ANGEL GONZÁLEZ ROMAN
                                          APPEALS COURT JUDGE

**CERTIFICATION**

I, OLGA M. ALICEA, AN ENGLISH-SPANISH INTERPRETER AND TRANSLATOR CERTIFIED TO THAT EFFECT BY THE ADMINISTRATIVE OFFICE OF THE U.S. COURTS AND BY THE NATIONAL ASSOCIATION OF JUDICIARY INTERPRETERS & TRANSLATORS (NAJIT), DO HEREBY CERTIFY THAT I HAVE PERSONALLY TRANSLATED THE FOREGOING DOCUMENT FROM SPANISH TO ENGLISH AND THAT THE TRANSLATION IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE AND ABILITIES.

S/   OLGA M. ALICEA                                        SEPTEMBER 5, 2018
OLGA M. ALICEA, FCCI, NJITCE-S                                      DATE
FED. CERT. NO. 98-005

NOTE: PLEASE BE ADVISED THAT THIS CERTIFIED TRANSLATION DOES NOT INCLUDE THE EXHIBIT.  THE CERTIFIED TRANSLATOR WAS UNABLE TO DECIPHER THE TEXT AND NUMBERS INCLUDED IN SAID EXHIBIT, SO IT HAS NOT BEEN TRANSLATED.  IF THE CERTIFIED TRANSLATOR IS PROVIDED WITH A MORE LEGIBLE DOCUMENT, SHE WILL BE MORE THAN WILLING TO PROVIDE A CERTIFIED TRANSLATION OF THAT PART OF THE DOCUMENT. - OMA