```
 1                   UNITED STATES BANKRUPTCY COURT

 2                     DISTRICT OF PUERTO RICO

 3
     In Re:                     )      Docket No. 3:17-BK-3283(LTS)
 4                              )
                                )      PROMESA Title III
 5   The Financial Oversight and )
     Management Board for        )
 6   Puerto Rico,               )      (Jointly Administered)
                                )
 7   as representative of        )
                                )
 8   The Commonwealth of         )
     Puerto Rico, et al.,       )      September 13, 2018
 9                              )
                  Debtors.      )
10
     _____
11
     In Re:                     )
12                              )
                                )      Docket No. 3:18-CV-1561(LTS)
13   Government Development      )
     Bank, et al.,              )      PROMESA Title VI
14                              )
                  Movants.      )
15
     _____
16

17                        OMNIBUS HEARING

18    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

19              UNITED STATES DISTRICT COURT JUDGE

20   _____

21
     APPEARANCES:
22
     For The Commonwealth
23   of Puerto Rico, et al.:  Mr. Martin Bienenstock, PHV

24   For Official Committee
     of Unsecured Creditors:  Mr. Luc Despins, PHV
25                            Mr. Juan Casillas Ayala, Esq.
```

```
 1   APPEARANCES, CONTINUED:

 2   For Puerto Rico Fiscal
     Agency and Financial
 3   Advisory Authority and
     the Government
 4   Development Bank:          Mr. Peter Friedman, PHV
                                Ms. Suzzanne Uhland, PHV
 5
     For Ad Hoc Retiree
 6   Committee:                 Mr. Robert Gordon, PHV

 7   For COFINA Agent:          Mr. Joseph Minias, PHV

 8   For Financial Guaranty
     Insurance Company:         Mr. Martin Sosland, PHV
 9                              Ms. Maria Pico, PHV

10   For Siemens
     Transportation
11   Partnership:              Ms. Lady Cumpiano, Esq.

12   For COFINA Senior
     Bondholders' Coalition:   Mr. Susheel Kirpalani, PHV
13
     Fee Examiner:             Mr. Brady Williamson, PHV
14                             Ms. Katherine Stadler, PHV

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by stenography.  Transcript produced by
25   CAT.
```

```
 1                        I N D E X

 2   WITNESSES:                                    PAGE

 3          None offered.

 4

 5   EXHIBITS:

 6          None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                      San Juan, Puerto Rico

 2                                      September 13, 2018

 3                                      At or about 9:36 AM

 4                          *      *      *

 5           THE COURT:  Again, buenos dias.  Good morning and

 6   welcome to counsel, parties in interest, and members of the

 7   public and press here in San Juan, and those observing here

 8   and in New York and the telephonic participants.  It is, as

 9   always, good to be back in Puerto Rico.

10           I remind you, that consistent with court and judicial

11   conference policies and the Orders that have been issued,

12   there is to be no use of any electronic devices in the

13   courtroom to communicate with any person, source, or outside

14   repository of information, nor to record any part of the

15   proceedings.

16           Thus, all electronic devices must be turned off

17   unless you are using a particular device to take notes or to

18   refer to notes or documents that are already loaded on the

19   device.  All audible signals, including vibration features,

20   must be turned off.

21           No recording or retransmission of the hearing is

22   permitted by any person, including but not limited to the

23   parties or the press.  Anyone who is observed or otherwise

24   found to have been texting, e-mailing or otherwise

25   communicating with a device from the courtroom during the
```

1    court proceeding will be subject to sanctions, including but

2    not limited to confiscation of the device and denial of future

3    requests to bring devices into the courtroom.

4           So again, a gracious, warm welcome and good morning

5    to you all.  And we will begin today's proceedings with a

6    report from counsel for the Oversight Board.

7           Mr. Bienenstock.

8           MR. BIENENSTOCK:   Thank you, Your Honor, and good

9    morning.

10          THE COURT:  Good morning.

11          MR. BIENENSTOCK:  Martin Bienenstock of Proskauer

12   Rose for the Oversight Board.

13          Your Honor, if it's okay, I'm going to provide the

14   status report somewhat in the reverse order of the issues

15   listed because the components thereof will help me provide the

16   general status, which is the first topic.

17          So I'll start with COFINA.  On August 29, 2018, the

18   Oversight Board, AAFAF and COFINA entered into a Plan Support

19   Agreement with creditors of COFINA, including the three

20   monoline insurers and Bonistas del Patio with respect to terms

21   for a COFINA plan of adjustment.

22          Based on the creditors executing the PSA, the Plan

23   Support Agreement, the plan has the support of the holders of

24   all three classes of senior COFINA bond claims and the class

25   of insured junior bonds.  The compromise and settlement of the

1    Commonwealth-COFINA dispute reached in principle by the

2    respective Oversight Board agents was the premise or starting

3    point for the Plan Support Agreement and corresponding term

4    sheet and the securities which were designed by the Oversight

5    Board.

6          The parties are in the process of documenting the

7    understanding contained in the term sheet and the Plan Support

8    Agreement in accordance with the terms of the Plan Support

9    Agreement.  Unless otherwise extended by the parties, a plan

10   of adjustment, disclosure statement and settlement motion must

11   be filed with this Court by no later than October 15, 2018.

12         The Oversight Board continues to work with other

13   parties not included in the Plan Support Agreement, including

14   the Commonwealth agent, Bank of New York Mellon, and the

15   holder of a claim relating to an outstanding derivative.  The

16   Oversight Board hopes, and the parties to the Plan Support

17   Agreement hope, that confirmation of a plan of adjustment can

18   occur as early as December 2018.

19         And to be sure, Your Honor, much of the progress this

20   represents is due to the obviously extremely constructive help

21   and efforts of the judicial mediators.

22         THE COURT:  I'm very glad to hear this.

23         MR. BIENENSTOCK:  Next, Your Honor, with respect to

24   the debt investigation, on August 28, the Oversight Board

25   created a special investigations committee comprised of four

1    Board members to determine whether to bring any actions, which

2    parties are best positioned to bring them, and the process for

3    doing so based on the Kobre & Kim report and consultation with

4    counsel.

5        The Special Investigations Committee intends to

6    initiate any actions within the two-year anniversary of the

7    Title III petitions, which is largely in May 2019.  The

8    Special Investigations Committee will hold a public hearing in

9    San Juan this coming Tuesday, September 18, 2018, which will

10   also be live streamed online to provide more information.

11       The Special Investigations Committee is endeavoring

12   to determine the realistic magnitudes of the potential claims

13   reported by Kobre & Kim, and who has standing to bring them

14   and the best way forward.  These are not simple questions, but

15   all deliberate speed is being applied so that the benefits of

16   the report can be realized as efficiently and quickly as

17   possible.

18       THE COURT:  And as you know, there have been issues

19   raised throughout these proceedings, and particularly

20   recently, about the unusual statutory structure and

21   composition of the Oversight Board and its range of

22   responsibilities that cross various debtors.  And so, are

23   there procedures in place to ensure the appropriate evaluation

24   of these issues from the perspective of each debtor?

25       MR. BIENENSTOCK:   Well, in several ways, yes, Your

1    Honor.  And that's not to say that -- other steps may be taken

2    as things get more specific, but to start with, the Special

3    Investigations Committee, which is a subset of the Oversight

4    Board members, does not consist of any persons who were

5    formerly associated with the Government Development Bank or

6    other government instrumentalities.

7         In respect of whether these claims might impact or

8    advantage one debtor at the expense of the other, that's

9    something that would clearly be part of the analysis that the

10   Special Investigations Committee is doing.

11        And so Your Honor's concern will clearly be taken

12   into account, but it's -- I can't say now where that comes up

13   and how it would be dealt with, but we're very conscious of

14   it, as the Court obviously is.

15        One of the tricky issues embodied in the report is

16   that based on the PROMESA statute, the Kobre & Kim mandate for

17   its investigation was to find claims.  And these claims are

18   not only claims of debtors, but in some cases, claims of

19   individual bondholders or -- now we know, to start, that a

20   parade of different litigations by individual bondholders

21   would be probably the least efficient and most expensive

22   method of having these things resolved.

23        Whether, to the extent claims are meritorious, they

24   can be brought by an Oversight Board, or a debtor, or someone

25   else, or it can only be brought by bondholders is one of the

1   primary issues that the Special Investigations Committee is

2   going to be deliberating, because we have to know who has

3   standing to bring them before we start.

4          THE COURT:  Would I be -- I'm sorry.  I didn't mean

5   to interrupt.

6          MR. BIENENSTOCK:  I'm finished, Your Honor.

7          THE COURT:  Would I be correct in assuming that you

8   would be focusing only on claims that would bring value into

9   one or more of the estates, as opposed to claims for which a

10  bondholder would have standing that might be claims that would

11  benefit directly a successful bondholder in their capacity as

12  buyers, rather than benefiting the issuer, governmental

13  entities and their respective estates in Title III?

14         MR. BIENENSTOCK:  Well, yes, and a bit more.  From

15  the viewpoint of the Special Investigations Committee, I think

16  it's fair to say that they're clearly going to be mindful of

17  which claims move the needle most in favor of adding value to

18  the estates.  And that's for both the benefit of the people of

19  Puerto Rico and the creditors of different debtors.

20         There is a second objective, which in some cases, if

21  warranted, and we've made no judgments, for a deterrent

22  effect, if someone did something wrong, we would want to do

23  something about it to show going forward that it should not

24  happen again.  So that's separate than how much value would be

25  brought in.  Now --

1          THE COURT:  And could that include criminal referrals

2    or requests to prosecutorial authorities, if it's deemed

3    appropriate?

4          MR. BIENENSTOCK:  Sure.  Sure.  And clearly that's

5    not something the Oversight Board can do other than refer it

6    and make a request of the government.

7          And then finally, from the -- again, going back to

8    the statute, to the extent that the debtors or the Oversight

9    Board cannot or should not bring certain actions, there still

10   needs to be some light and identification of what actions

11   individual or groups of bondholders may want to bring on their

12   own behalf.

13         THE COURT:  And I believe that the last time we were

14   at a hearing, perhaps at the last Omni, there was a

15   representation that the Oversight Board had been privy to all

16   of the information to which Kobre & Kim had access, even such

17   information as is, you know, redacted or obscured or spoken

18   about in a more indirect manner in the report.

19         Am I correct in that?

20         MR. BIENENSTOCK:  Your Honor, I would have to check.

21   I -- personally, I know I haven't seen it, but the Board might

22   have access to it.

23         THE COURT:  Because there obviously have been

24   concerns raised about the extent to which, the manner in which

25   information was collected by Kobre & Kim.  And the manner in

```
 1   which Kobre & Kim speaks of the information gathered and its
 2   source is not necessarily useful by or transparent to someone
 3   who's only in the position of reading the report.
 4           MR. BIENENSTOCK:   I think currently we're having
 5   discussions with those, such as the committees that want
 6   access to all the information.  And I expect, you know, those
 7   things will be consensually resolved.
 8           THE COURT:  I'm glad to hear that.
 9           MR. BIENENSTOCK:  Because we do want to maximize
10   sunshine.
11           THE COURT:  I'm very glad to hear that.  Thank you.
12           MR. BIENENSTOCK:  Thank you.
13           Your Honor, moving on to PREPA, in respect to its
14   cash position as of August 31, 2018, operating cash balances
15   were approximately 299 million, inclusive of 174 million of
16   current borrowings under the Commonwealth loan.  The
17   Commonwealth loan converted into a term loan at the end of
18   June 2018, and any additional repayments in the future will
19   permanently reduce the loan balance.
20           PREPA's operational cash receipts currently service
21   the majority of cash expenditures for operations.  During the
22   month of August, average weekly cash collections from
23   customers were approximately 65 million.  PREPA, therefore,
24   should not require additional financing for operations in the
25   near term.
```

1    In respect to PREPA operations, PREPA is moving

2 forward with reviewing responses to several RFPs, requests for

3 proposals, for generation for different parts of the island.

4 PREPA continues to run the generation fleet as economically as

5 possible, while keeping in mind the overarching goal of

6 retaining grid resiliency.  Actively pursuing different

7 alternatives for generation resources or a conversion to

8 cleaner burning fuels is part of the search process.

9    Power has been restored to over 99.5 percent of

10 customers on the island.  Current average weekly generation

11 delivered to the power grid is approximately 95 percent of

12 2017 levels.  Approximately 84 percent of 103 larger

13 transmission lines are fully in service.

14    In respect of hurricane preparedness, PREPA's

15 emergency plan was approved during 2018 and has been updated

16 with the most recently available information.  The emergency

17 plan is in concert with government policies and based on the

18 same organization responses for all agencies.

19    In addition, PREPA conducted preparedness exercises

20 during the summer and implemented emergency procedures during

21 Tropical Storm Beryl.  Fortunately, Tropical Storm Beryl was

22 largely a non-event from a damage perspective.  However, it

23 provided an excellent opportunity for PREPA to activate its

24 response plan and debrief the activity.

25    In respect to PREPA RSA status, PREPA, the Oversight

1    Board and AAFAF entered into a preliminary restructuring

2    support agreement with an ad hoc group of uninsured

3    bondholders in July 2018 which contemplated a more

4    comprehensive restructuring support agreement by August 27.

5        The August 27 date has been continued to September

6    14, and we expect additional extensions while we work through

7    various structural issues.  To date, we have not reached an

8    agreement with any of the monoline insurers, but discussions

9    are ongoing to accomplish that.

10        In respect to the transformation process, the process

11    to transform the electric sector is proceeding on schedule in

12    accordance with the fiscal plan.  Following is a summary of

13    recent and updated milestones.

14        The market sounding process completed on schedule in

15    mid June 2018.  The process confirmed there was significant

16    industry interest and provided constructive feedback on how to

17    achieve a successful result.  Amendments to the public-private

18    partnership law facilitating the transformation were signed

19    into law in June 2018.  The IRP process is proceeding on

20    schedule as well pursuant to the fiscal plan.

21        The P3 Authority, that's the Public-Private

22    Partnership Authority, and PREPA have begun the necessary

23    tasks to move forward with the transformation.  Most recently,

24    the P3 Authority retained counsel to help prepare a request

25    for qualifications to solicit qualifications for private

1    operators to enter into a concession arrangement with PREPA to

2    run the transmission and distribution grid.

3           Your Honor, in sum, between COFINA, PREPA, and the

4    GDB Title VI, which I haven't mentioned, but as the Court

5    knows, it will come up in the context of the stay motion,

6    there's a proposed GDB Title VI plan that AAFAF is furthering

7    and soliciting votes for.

8           Between COFINA, PREPA, and the GDB Title VI,

9    restructuring is in firm respect -- is in firm prospect of

10   approximately 40 percent of the 74 billion of bond debt in

11   total.  This is progress based on mediation and litigation.

12          Over 70 complaints and motions naming the Oversight

13   Board as a defendant have been filed in this case to date.

14   Twenty-nine requested injunctions against the Oversight Board

15   in six cases against -- requested injunctions enjoining the

16   Oversight Board from negotiating plans of adjustment or

17   certifying fiscal plans.

18          In all those cases, the Oversight Board filed

19   approximately only three motions, putting aside routine fee

20   procedure and lease assumption motions, but three substantive

21   motions.  The litigation, whether it commenced by creditors or

22   the Oversight Board, has all contributed toward establishing

23   the rules of the road.

24          And we certainly don't criticize creditors who

25   brought litigation.  They have every right to zealously

1   protect their interests and they want to negotiate on a larger

2   pie, which was the logical economical reason for, you know,

3   asking to get involved and influence the fiscal plan process.

4          All of this has contributed to the rules of the road,

5   and to where we are today and being able not only to have the

6   40 percent of the debt -- the bond debt in prospect of being

7   restructured in the very near term, but we're also reaching

8   for the balance of the debt, the largest chunk of which is the

9   GO debt, approximately 18 billion dollars, plus five billion

10  of guaranteed GO debt.

11         Going back to the impetus for a lot of the

12  litigation, which was to influence the fiscal plan, because

13  creditors rationally wanted to negotiate for a larger pie,

14  that has been the objective of the Oversight Board as well;

15  and not only to help creditors, but for the people of Puerto

16  Rico, they also want a larger pie.  And they're deserving of

17  it, and that was really the impetus behind the Oversight

18  Board's urging the Governor and the legislature to adopt

19  employment at will.  That enlarges the pie greatly.

20         And while it has not been accomplished, we are hoping

21  that the legislature will come around and that it might be

22  accomplished in the future, primarily for the benefit of the

23  people of Puerto Rico, but what helps all the people also

24  helps creditors.

25         So I don't know what the Court was thinking coming up

1    to today, but the progress done both on the fiscal plan and

2    budget, half of the Oversight Board roles and the debt

3    restructuring has been largely under the radar, except when

4    there were litigation issues that surfaced for the Court.

5           Now, I hope and think that the Court and everyone

6    else has a picture that with the help of creditors, the

7    mediators, and the Oversight Board and AAFAF real progress has

8    been made.  And we're hoping to finish the job as quickly as

9    possible.

10          THE COURT:  Well, Mr. Bienenstock, I appreciate this

11   more comprehensive picture, and I was particularly concerned

12   that as much information about the big picture be brought

13   forward publicly in the context of this courtroom as possible

14   for those who are following these proceedings.  And so I thank

15   you --

16          MR. BIENENSTOCK:  Thank you.

17          THE COURT:  -- both for the progress and for the

18   report.

19          MR. BIENENSTOCK:  Thank you, Your Honor.

20          MR. DESPINS:  Your Honor.

21          THE COURT:  Mr. Despins.

22          MR. DESPINS:  Good morning, Your Honor.  Can we have

23   a few minutes for what I would call the minority report on

24   what was covered?

25          And by the way, it will not be that long, but I think

1    that it's important for the Court and for parties at interest

2    to understand the Committee's perspective on some of these

3    issues.  So let's start with the investigation subcommittee of

4    the Board.

5                THE COURT:  Yes, you may speak for a few minutes.

6                MR. DESPINS:  I apologize.  I should have waited.

7            So the investigation committee of the Board, of

8    course, is the -- are the same Board members that were in

9    charge of the Kobre & Kim investigation.

10           And I want to make sure the Court knows that there

11   was interactive process where we would tell the Board

12   representatives, the Committee would tell the Board

13   representatives, look, we need to look at these issues.  They

14   are huge issues that are looming.  And you know what?  They

15   are, because I've raised them many times in the case.

16           And the response was, hey, we have an investigator.

17   They will look at that and then we'll act appropriately.  The

18   problem we have is that the investigator just did not address

19   a bunch of issues.  So we were waiting for four, five, six

20   months trying to be constructive, not to jump the gun and not

21   to file objections or to start litigation in the hopes that we

22   would get an answer.

23           And so it's not that we're not happy with the answer.

24   On some topics, there are no answers on big, big, big picture

25   issues.  So we are a little bit concerned about that.

1          You raised one issue, which is how does the Board

2     deal with the inter-debtor, and I would expand that it's the

3     part that I'm -- we were really concerned about, in a selfish

4     way, is when there's a conflict between a debtor and a

5     non-debtor.  Perfect example, the GDB, because the Board is in

6     charge of GDB and they're in charge of other debtors as well.

7     As far as we know, there is no one really focusing on these

8     issues, and I think GDB is a perfect example of that.

9          So, Your Honor, what we're concerned about also is

10    that, for example, the GDB restructuring was signed up and

11    approved by the Board one year ago.  This is when they knew

12    they were going to do an investigation that could have said --

13    and that's not what they said, but could have said all these

14    people should go to jail.

15         Of course, the report didn't say that, but they could

16    have said it in theory.  But the Board approved the GDB

17    restructuring which gave releases to all these folks a year

18    before.

19         So we're a bit concerned, when we hear that the Board

20    is going to aggressively pursue this, that what their -- the

21    first act they do before the report is to give releases.

22    After the report --

23         THE COURT:  Well, they set up a proposed transaction

24    that would include certain releases.  And Mr. Bienenstock has

25    said generally that in all that they are doing, they are

1   considering not only whether -- and I'm paraphrasing here --

2   whether money would be left on the table improperly by virtue

3   of any transaction, and also whether or not the financial

4   impact would be significant to ensure that, you know, conduct

5   that needs light shined on it has light shined on it, and that

6   the authorities are encouraged to pursue anything that the

7   authorities ought to be pursuing in light of what's gone on in

8   the past.

9        Is that a fair paraphrase, Mr. Bienenstock?

10       MR. BIENENSTOCK:  Yes, Your Honor.

11       THE COURT:  Thank you.

12       MR. DESPINS:  And that is -- that is exactly what he

13   said.  The problem is, though, that they agreed to these

14   releases a year ago, meaning before they knew the results.

15       THE COURT:  They agreed to propose these releases in

16   a transaction that needed disclosures, voting, and ultimately

17   a court proceeding, which has not taken place yet.

18       MR. DESPINS:  Correct, but not voting by the party --

19   okay.  So now there is a report.  And the report says certain

20   things.  We -- as you know, you've seen our informative

21   motion, we have various concerns with the report.  But in some

22   instances it says, hey, there are issues here.  So you would

23   think the Board would say, wait a minute.  Hold the -- you

24   know, let's pause, and if we're going to investigate claims,

25   if we're going to pursue claims, we should look at that.  But

```
 1   no, we're going full steam ahead with this process.
 2            So the Committee, you know, that's a concern that the
 3   Committee has and that -- I wanted to make sure that that was
 4   expressed to the court.
 5            Now, on COFINA --
 6            THE COURT:  And you have filed an informative motion
 7   that details more specifically many of your concerns.
 8            MR. DESPINS:  Correct, Your Honor.
 9            THE COURT:  Yes.
10            MR. DESPINS:  Next, Your Honor, COFINA, very briefly.
11   Because Judge Dein signed the Order -- I don't know if you saw
12   the joint motion of the two agents to extend the abeyance
13   period?
14            THE COURT:  I did.
15            MR. DESPINS:  Okay.  So I will not repeat everything
16   that's in there, but you saw that there's --
17            THE COURT:  Yes.
18            MR. DESPINS:  -- obviously a different perspective.
19            THE COURT:  Yes.
20            MR. DESPINS:  And the Committee, as Commonwealth
21   agent, is really in a holding pattern right now.  We
22   understand the Board, they're not bound to do this, but
23   probably will issue a new certified fiscal plan in the next
24   ten days or so.
25            We're hoping that they will resolve this issue for
```

1  us, but we don't know.  And if they don't, obviously,

2  unfortunately it's likely that the Committee -- you know, the

3  Committee has not taken a final decision.  But I want to make

4  sure that the Court is aware that the Committee, and I think

5  it applies to the Retirees Committee as well, would not

6  support this and would also challenge the Board's ability to

7  bypass the Committee in that process.

8       THE COURT:  Yes.  And that was previewed in the

9  extension motion, and I gather contextually from other

10  statements that that is a prospect.  And I also gather from

11  your remarks and Mr. Bienenstock's remarks that there are

12  communications and there is work to try to bridge that issue,

13  which may or may not be successful.

14       Fair or no?  Not fair?

15       MR. DESPINS:  Well, we talk all the time, so let's

16  just be clear about this.  Mr. Bienenstock and I talk all the

17  time.  But the issue of the fiscal plan, that's determined by

18  the Board itself --

19       THE COURT:  Yes.

20       MR. DESPINS:  -- and its financial people, so I don't

21  think we've been involved in a back and forth into you should

22  increase this or that.  No, we have not.  But the concept, the

23  issues we're discussing, yes, I have had plenty of discussions

24  with Mr. Bienenstock over these issues.

25       THE COURT:  And you were very clear at the last Omni,

1    I think, about your issue with respect to projections and the

2    size of the pie in relation to the premise of the original

3    Commonwealth-COFINA agreement in principle.

4          MR. DESPINS:  Yes.  And there's a data point I want

5    to give the Court in closing, which I've never used before,

6    but, you know, the split in COFINA, that's what -- we refer to

7    it as the PSTBA box.  It's a set amount over the next 40 years

8    of SUT.  And that's being split 56 -- I'm sorry, 53, 46.

9    Forty-six and change for the Commonwealth, and the balance to

10   the COFINA folks.

11         The dollar amounts, we're talking nominal dollars.

12   We have to be careful because nominal dollars can be

13   misleading, but the problem is if we use present value

14   dollars, we get into a fight as to what the discount rate is.

15   But just nominal dollars, that interest in that box of the

16   Commonwealth is less than the amount of the deficit that would

17   apply under the current fiscal plan after COFINA has been

18   paid.

19         So just to grasp this, all of the money that the

20   Commonwealth would be getting under that structure is less

21   than the amount of the deficit that is currently projected.

22         We -- I want to be clear, we would love to have a

23   deal, Your Honor.  But that's such a -- this is not an

24   adjustment of a few percentage points.  We're talking about

25   the entire consideration being gone.

1          THE COURT:  Yes.

2          MR. DESPINS:  So I wanted to make sure that data

3   point was there.

4          Thank you, Your Honor.

5          THE COURT:  Thank you.  Yes, sir.

6          MR. GORDON:  Thank you, Your Honor.  Good morning.

7   Robert Gordon of Jenner & Block on behalf of the Official

8   Retirees' Committee.

9          THE COURT:  Good morning, Mr. Gordon.

10         MR. GORDON:  Thank you, Your Honor.

11         I just want to address briefly the comments regarding

12  the status of the COFINA plan of adjustment, if I may, and

13  some concerns that are somewhat similar to what has been

14  expressed on behalf of the Commonwealth agent.

15         Your Honor, when we, the Retirees' Committee, were

16  involved in the negotiations in the spring with the COFINA

17  agent and Commonwealth agent, which negotiations led to the

18  term sheet that was announced on June 5, I certainly expressed

19  along the way concerns about proceeding with a COFINA plan of

20  adjustment that was not linked in some way to a concurrent

21  plan of adjustment for the Commonwealth.

22         It is one thing to focus on a subset of the

23  Commonwealth debt and a subset of these cases to fix items and

24  to reduce the moving parts and open issues in the case.  It is

25  quite another thing to then proceed piecemeal toward plans of

1    adjustment.

2            The term sheet that was announced on June 5 was based

3    upon a May 30 certified fiscal plan and the projections

4    thereunder as to cash flow and surpluses.  As the Court knows,

5    in late June, the Oversight Board then certified a new fiscal

6    plan that dramatically reduced projections of cash flow and

7    made the COFINA term sheet now appear unaffordable relative to

8    the May 30 fiscal plan.

9            The fact is that the fiscal plan keeps getting

10   revised and in very substantial ways.  Right now, it is simply

11   a moving target.  The concern, Your Honor, that we have is

12   that the Oversight Board could, and I'm not ascribing any

13   nefarious intent at all here, but the Oversight Board could

14   certify a fiscal plan this fall, leading up to a plan of

15   adjustment confirmation hearing for COFINA that appears to

16   leave adequate resources at the Commonwealth, to then propose

17   a Commonwealth plan, not withstanding the COFINA plan, that

18   provides for the payment of essential services, and the

19   payment of pensions, and the reinvestment in the Commonwealth

20   and so forth.  But then, after the COFINA plan has been

21   confirmed, but before a Commonwealth plan has been confirmed,

22   due to new events or new analysis, the Commonwealth fiscal

23   plan is again revised downward, just like it was in June.

24           And then the Court would be facing a situation in

25   which the COFINA bondholders would be saying that their

1    claims -- that their rights have already been set in stone

2    under a confirmed plan, and that if there are inadequate

3    assets at that point, that the Commonwealth creditors and

4    pensioners, and indeed the Commonwealth itself, must suffer

5    the consequences and alone bear the brunt.

6           Put simply, it is hard to understand how a COFINA

7    plan, which can and will have such a significant impact on the

8    Commonwealth, and any plan of adjustment to be proposed for

9    the Commonwealth, can be considered and confirmed in a vacuum

10   in advance of a Commonwealth plan.

11          That doesn't mean I can't be convinced otherwise, but

12   I feel compelled to raise this concern today, Your Honor, and

13   reserve all rights on behalf of the Retirees' Committee.

14          I would also take this opportunity, in the interest

15   of efficiency, to just reference that there is obviously going

16   to be considered today moving forward with the GDB

17   restructuring RSA.  And of course the Retirees' Committee has

18   not weighed in on that restructuring for various reasons, but

19   the concerns about a piecemeal process apply there as well and

20   leave us a bit quizzical.

21          It is fairly clear that the GDB restructuring is not

22   an urgent matter.  And so the timing seems a bit odd to me.

23   It seems that there is a desire to report progress to this

24   Court, regardless of whether the sequencing of events makes

25   any sense.

1        And I would simply suggest, Your Honor, as the Court

2   knows, there are releases under the proposed restructuring for

3   GDB of various individuals.  Again, we have not weighed in on

4   any of that, but I would suggest to Your Honor that at a time

5   when 167,000 retirees of the Commonwealth do not know their

6   fate under an as yet to be proposed Commonwealth plan, it's a

7   bit tone-deaf and unseemly to be pushing forward and devoting

8   resources to pushing forward another deal that benefits

9   certain individuals while the retirees don't know their fate.

10       Thank you, Your Honor.

11       THE COURT:  Thank you, Mr. Gordon.

12       Mr. Bienenstock, these are some weighty issues.

13  Would you care to speak further?

14       MR. BIENENSTOCK:   Yes.  Thank you, Your Honor.

15  Martin Bienenstock from Proskauer Rose for the Oversight

16  Board.

17       Just very briefly, the Oversight Board does expect to

18  certify revised fiscal plans for the Commonwealth, COFINA, UPR

19  by the end of this month, and the process for revising fiscal

20  plans for other instrumentalities such as PREPA and HTA will

21  begin in October.

22       On August 21, the Governor has already submitted

23  draft fiscal plans to which the Oversight Board sent notices

24  of violation, and on September 7, the Governor submitted

25  revised draft fiscal plans.

 1          So that process is ongoing and will continue, because

 2   that's -- the Oversight Board has said from the outset that it

 3   will change fiscal plans to take into account new information

 4   and to fix mistakes, and that will always continue.

 5          I just want to respond very briefly to Mr. Gordon's

 6   comments.  First, in respect of the COFINA-Commonwealth deal,

 7   the Court will, of course, be able to consider all the pros

 8   and cons and arguments when the confirmation hearing is held.

 9   And --

10          THE COURT:  And there will be a companion 9019 in the

11   Commonwealth case; is that correct?

12          MR. BIENENSTOCK:  I'm not certain that's part of the

13   program, but perhaps it could be.

14          THE COURT:  I'm sorry.  Perhaps I misunderstood.  I

15   thought it was.

16          MR. BIENENSTOCK:  It could be, Your Honor.  I don't

17   want to say for sure.  But I think even before that, I think

18   probably if history in other large re-org cases is a guide, at

19   the disclosure hearing, the Court will get a dose of the

20   arguments pro and con.

21          But suffice it to say for now that the notion of how

22   much money will be projected, available to COFINA and to the

23   Commonwealth, which is a moving target and will hopefully

24   improve, but we can't in any way promise or assure that, is

25   only part of the equation.

```
 1              The Court has in front of it dueling summary judgment
 2     motions of the two agents.  And if the Court decides that, one
 3     of the litigants could be a hundred percent happy and the
 4     other could be zero percent.  And part of this deal is to
 5     eliminate the hundred-zero outcome, which would be a disaster
 6     for one of the litigants.
 7              So I don't want to get more into the pros and cons.
 8     The Court will get a lot of that.  But it provides, you know,
 9     some rationale for why the creditors are participating in the
10     mediation and the Plan Support Agreement, and the Board and
11     AAFAF are moving forward with that deal.
12              As far as the GDB restructuring, which the Court is
13     probably about to hear a lot more about in the context of the
14     Committee's Stay Motion, for the Retirees' Committee to say
15     that the GDB Title VI is being teed up because of a desire to
16     show progress to the Court is a highly irresponsible
17     statement.
18              To provide the Court some of the facts, the GDB
19     restructuring was probably the longest in formation before any
20     of the Title III cases even started.  The GDB bondholders were
21     in our offices at the outset of our retention to report on the
22     deals they had already cut with the government.
23              The GDB case involves, on a percentage basis,
24     probably more local bondholders, the Bonistas del Patios, than
25     some of the other cases.  And the consummation of a
```

1    restructuring there, which would provide certainty not only to

2    the bondholders on island, but also a lot of the lending

3    institutions on island also invested in the GDB debt is

4    critical to the Puerto Rico economy.

5            Now, that's not to say that other debtors don't have

6    affairs that are not critical.  They obviously are.  But to

7    paint GDB as a liquidating entity having no effect on

8    anything, that's being rushed to confirmation, is a completely

9    false picture.

10           It's a lot of money held by locals and involved in

11   the local financial economy, and it could bring down various

12   local banks and other institutions.  So in the Board's view,

13   it's at least as critical as any other entity, not

14   withstanding that operationally the Treasury functions that it

15   used to serve are now served by AAFAF.

16           And finally, the fiscal plan, which is being

17   referenced here in the negative because of its lesser debt

18   sustainability due to the absence of employment at will, et

19   cetera, nevertheless still provides the retirees 90 percent on

20   average of their entitlement.

21           And there's something very wrong, Your Honor, with a

22   statutory representative of the retirees being offered 90

23   percent, despite the hardship that we have to wrestle with,

24   and being angry and being -- and telling everybody else, we go

25   first.  We need ours in a higher percentage than anyone else

```
 1   is going to get before you should deal with things like GDB,

 2   which as I said, are critical to the island.

 3         And hopefully we will have more discussions with them

 4   and their priorities will get straight; but that was a very

 5   unfair shot at AAFAF and the Oversight Board, and I have to

 6   respond to it.

 7         Thank you, Your Honor.

 8         THE COURT:  Thank you, Mr. Bienenstock.

 9         Mr. Friedman.

10         MR. FRIEDMAN:  Peter Friedman from O'Melveny & Myers

11   on behalf of AAFAF and GDB.

12         I echo Mr. Bienenstock's remarks, but want to add one

13   very specific issue, which is that retirees live in

14   municipalities, and one of the major purposes of the GDB

15   restructuring is to help out Puerto Rico's municipalities.

16         So the idea that helping municipalities ought to wait

17   does not make sense, is not appropriate, and is a critical

18   component of the GDB restructuring deal, the Title VI, and the

19   GDB Restructuring Act.  It is just not proper to say that

20   relief to municipalities should wait to some long-dated,

21   distant, far out date.  It should happen, and it should happen

22   now.

23         Thank you, Your Honor.

24         THE COURT:  Thank you, Mr. Friedman.

25         Thank you all for those comments and that
```

1   interaction.  And I look forward to seeing appropriate actions

2   going forward, and I hope, I'll say, resolutions in the sense

3   of people coming closer together, rowing together toward the

4   goal of an appropriate platform for Puerto Rico to go forward

5   in the context of these proceedings.

6        All right.  So now, just one moment.  I'm sorry.  I

7   understand that there are individuals who wish to speak from

8   New York on these issues.

9        Mr. Kirpalani.  We're going to switch the camera in a

10   minute.  And Mr. Minias.

11        So first, we'll have Mr. Kirpalani -- I'm sorry.  Is

12   that Mr. Curtin?

13        MR. MINIAS:  Your Honor, I'll be very brief.

14   Joe Minias from Willkie Farr & Gallagher on behalf of the

15   COFINA agent.

16        We obviously disagree with what Mr. Gordon and

17   Mr. Despins said, so we want to make sure the record is clear

18   that we are reserving all rights.

19        Also, so the record is clear, the agreement of

20   principle reached by the agent, there was no direct tie

21   between a COFINA plan and a Commonwealth plan.  That was a

22   heavily-negotiated point.  I won't go into that further --

23        THE COURT:  I need you to speak a little slower and

24   more directly into the microphone, please.

25        MR. MINIAS:  Sure.

```
 1              THE COURT:  Thank you.
 2              MR. MINIAS:  Your Honor, just so the record is clear,
 3    there was no direct linkage or time in the agreement in
 4    principle between the Commonwealth plan and the COFINA plan.
 5    That was a heavily-negotiated point.  So I want to make sure
 6    the record is clear.
 7              And we reserve all rights with respect to the
 8    statements made by Mr. Gordon and Mr. Despins.  We believe
 9    that the Plan Support Agreement reached in August was a
10    watershed moment for these cases, and we should begin to
11    proceed forward.
12              THE COURT:  Thank you, Mr. Minias.
13              Mr. Kirpalani.
14              MR. KIRPALANI:  Good morning, Your Honor.  I'll also
15    be brief, and had not planned to say anything, but I told your
16    clerk here in New York that I might be compelled to do so,
17    depending on what the Commonwealth agent and others might say.
18              Suffice it to say that the Commonwealth agent's issue
19    that it's been raising in these informative motions and in ad
20    hoc statements during Omnibus hearings is something that we've
21    thought very hard about responding to formally, and I think
22    what we would prefer is to reserve only these issues certainly
23    until they're properly joined before the Court.  But I would
24    point out that the agreement in principle had three conditions
25    to it, none of them related to what would ultimately happen to
```

```
 1   the Commonwealth's fiscal plan.

 2           The issue that's being raised now is really a Monday

 3   morning issue, and it's not even something that the

 4   Commonwealth agent ever had scope to interfere with.  The

 5   development of a fiscal plan for the Commonwealth is

 6   exclusively within the purview of the Oversight Board, not the

 7   Commonwealth agent.

 8           And the last thing I'll say, Judge, is that at the

 9   end of the day, the Commonwealth agent and the Retirees'

10   Committee's role as a consulting party to the Commonwealth

11   agent are creatures of a stipulation.  That stipulation was

12   hard negotiated and signed by a multitude of parties.  And one

13   individual signatory's interpretation of that protocol

14   stipulation is not binding on everyone.

15           Also, at the end of the day, the Commonwealth agent,

16   and Your Honor will remember this, pursuant to the

17   stipulation, is a creature of derivative standing.  And

18   derivative standing in bankruptcy folklore at the circuit

19   level has its limitations.

20           And we firmly agree with the Oversight Board's

21   position that they should be marching forward for a plan of

22   adjustment for COFINA.  They have the statutory authority to

23   do it and they have the votes.  And that's on behalf of the

24   COFINA Senior Bondholders Coalition, Your Honor.

25           THE COURT:  Thank you, Mr. Kirpalani.
```

```
1            I see no further speakers in New York, and so we will
2    now turn to the report from AAFAF.
3            MS. UHLAND:  Good morning, Your Honor.
4            THE COURT:  Good morning, Ms. Uhland.
5            MS. UHLAND:  Suzanne Uhland of O'Melveny & Myers on
6    behalf of AAFAF and GDB.  Just briefly, not to weigh into the
7    last conversations, but I did want to note that the Board is
8    not in charge of GDB, the Oversight Board.  They certainly
9    will have a role in connection with the Title VI, but GDB is
10   not in Title III at this point, nor do we intend it to be in
11   Title III.
12           We have issued a press release this morning, so what
13   I'm going to tell you is public and very positive news.  We,
14   based on preliminary -- the preliminary information available
15   to AAFAF and GDB, we do have the requisite votes for
16   certification or for qualification of the Title VI.
17           We have, based on this information, 70 percent of
18   outstanding participating bond claims have voted and over 95
19   percent of those have accepted.  I would note that the Title
20   VI standards require both an outstanding amount of bonds to
21   vote, and then two-thirds amount of those voting.  So it's
22   different than Chapter Nine or Chapter 11.
23           And based on, you know, my experience in Chapter 11,
24   a 70 percent of outstanding participation is an impressive
25   participation level in this type of voting.
```

1          I would also note that these voting results need to

2    be verified, and then the voting results need to be certified

3    by the Oversight Board as part of this process and that has

4    not yet been done.

5          The accepting votes also included, based on our --

6    the information we have, the vote from BNY Mellon as Trustee

7    for the Puerto Rico Infrastructure Financing Authority Bonds.

8    Those bonds had been supported by an LC from GDB, and earlier

9    this week, they had sought direction from those bondholders.

10          So we can report that that was received and that vote

11   was cast in favor of the Title VI.  I'd also like to report

12   that five out of the six municipalities that hold

13   participating bond claims also voted in favor.

14          And finally, with respect to part of the municipal

15   relief that is part of the overall GDB restructuring,

16   municipalities that have certain funds in Excess CAE funds

17   were given the opportunity after the enactment of the

18   legislation to agree to obtain up-front cash of 55 cents on

19   the dollar on those particular deposit accounts, if they enter

20   into an agreement with GDB, and 26 percent -- or 26 of the 30

21   eligible municipalities have already entered into those Excess

22   CAE agreements.

23          And this is, again, part of the overall municipal

24   package, municipal relief package that's incorporated and that

25   Mr. Friedman will discuss more when he comes up to discuss,

```
 1  you know, the GDB Restructuring Act as part of this
 2  proceeding.
 3         So Your Honor, you know, good news, and we are -- the
 4  deadline for voting was last night at 5:00.  And so we believe
 5  we are -- we will be able to proceed, at least from the voting
 6  qualification requirements.
 7         THE COURT:  That is definitely a good news report on
 8  the returns on the voting.
 9         MS. UHLAND:  Yes.  Thank you, Your Honor.
10         THE COURT:  I thank you for that.
11         Now, I have some questions and concerns about the
12  form of Proposed Order that was filed on Monday.  Are you the
13  person for me to take those up with?
14         MS. UHLAND:  Yes.  Yes, I am.
15         THE COURT:  All right.  Did you want to make a
16  further report before I turned to that?
17         MS. UHLAND:  Yes, I did.  We have been in
18  discussions.  We've been -- certain creditor groups ahead of
19  the objection deadline have been reaching out to us with --
20  and we've been in discussions with them about ways to resolve
21  their potential objections through additional clarifications
22  to the Order.  So we have been in communication with them.
23         I have not heard back from the Department of Justice
24  since filing this, but we included language verbatim that we
25  had received from them in the Order.  So that is part of the
```

1    process of the Order development.

2           THE COURT:  Thank you.  The Order -- my overall

3    concern with the Order is that it's very general in language

4    and content and rather conceptual, even though it's proposed

5    to serve also as findings and conclusions.

6           And so to start out with a core concern, the form of

7    Proposed Order is appearing to ask the Court to generally

8    approve what's referred to as the qualifying modification, but

9    that isn't detailed within the Order, nor that I can find by

10   tracing back through cross references and footnotes as to

11   precisely what the Court's being asked to approve.

12          And that's particularly problematic from my

13   perspective, because the government parties are taking the

14   position that Court approval is neither required nor sought

15   for certain elements of the restructuring of GDB, its assets

16   and obligations.

17          And so one way to approach this, and my feeling is

18   that this should be the way, is that there should be a single

19   document that specifies the measures, the transactions, and

20   the documentation for which Court approval is being solicited.

21          And from my point of view, that would be the Proposed

22   Order spelling out precisely the elements of the restructuring

23   transaction that the Court's being asked to approve, the legal

24   determinations that are being sought, and the key factual

25   basis for those legal determinations so that we have a clear

1    record, and the parties and the public understand the scope

2    and the implications of the Court's Order.

3            The September 10th Proposed Order, as I said, speaks

4    in broad terms.  It refers to such concepts as judicial notice

5    of arguments and filings.

6            And the proposed findings and conclusions of law

7    don't provide a template that, in my view at this point, is

8    sufficiently indicative of the issues that the parties intend

9    to put before the Court, the standards that the parties will

10   argue apply, or the way in which the parties intend to

11   demonstrate that the standards have been met.

12           And at the risk of going on, I just want to put some,

13   you know, very specific issues out there.

14           MS. UHLAND:  Okay.

15           THE COURT:  So what is it exactly I'm being asked to

16   approve?  What is the qualifying modification as opposed to

17   aspects of the restructuring that I'm not being asked to

18   approve, should we end up with a form of order that's more

19   like a confirmation order, that specifically enumerates the

20   elements of the transaction that I'm being asked to approve?

21           And then, as to the releases issues that have been

22   raised in various ways around here, I would like to know what

23   AAFAF's understanding is of the scope of the term "agents and

24   other representatives" in Article 70 -- 702 of the

25   Restructuring Act; and whether that includes banks and

 1   underwriters; and whether there's any daylight between AAFAF's

 2   understanding and GDB's understanding on that.

 3          And then finally, in this list, whether the Court's

 4   being asked to approve any releases of claims by the

 5   Commonwealth or any Title III debtor, and where are those

 6   proposed releases.

 7          MS. UHLAND:  Okay.  Thank you, Your Honor.  We will

 8   revise.

 9          We had -- you know, given the -- what is Title VI,

10   all of ten pages?  You know, we were trying to strike a

11   balance.  Would it be presumptuous to have something that

12   looked more like a Chapter 11 Confirmation Order given the --

13   you know, we're all forging a new process here.

14          THE COURT:  Yes.

15          MS. UHLAND:  So we will take these into -- obviously

16   with this guidance, be able to reformulate the Order.  Also --

17          THE COURT:  I realize we're all walking in uncharted

18   territory --

19          MS. UHLAND:  Yes.  Yes.

20          THE COURT:  -- but I need to know what I'm

21   approving.

22          MS. UHLAND:  We understand.

23          THE COURT:  And if there's going to be litigation

24   about it, everybody needs to know what I'm being asked to

25   approve.

```
 1              MS. UHLAND:  Yes, Your Honor.

 2          And we will then resubmit a Revised Proposed Order,

 3  you know, so that the Court has adequate time to review.  What

 4  would be the timing, would the Court be looking for, for that?

 5          THE COURT:  Absolutely as soon as possible, since the

 6  filing of the Proposed Order was intended to give everybody,

 7  including potential objectors and the Court, an idea of what

 8  the target is, if you will.

 9              MS. UHLAND:  Okay.

10          THE COURT:  So can you do it within the week?

11              MS. UHLAND:  Yes.

12          THE COURT:  I prefer Monday, but if you want to go

13  out to next Wednesday or Thursday, I can live with that.

14              MS. UHLAND:  Yes, Your Honor.  We can deal with

15  that.

16          THE COURT:  All right.  So today is the 13th.  So

17  let's say next Thursday, the 20th.

18              MS. UHLAND:  Yes.  All right.

19          THE COURT:  Thank you.

20          I had a couple of questions related to this for the

21  Oversight Board's counsel as well, you know, given the issues

22  that have been raised in the Title III, and then before we

23  leave this reporting, I wanted to discuss the proposed -- the

24  scheduling proposals that came in yesterday.

25              MS. UHLAND:  That's right.
```

1            THE COURT:  And in aid of that, I have questions

2   principally for AAFAF's counsel.  So -- but if you don't mind,

3   I'd like to go -- after you've completed, Ms. Uhland, any

4   further remarks you'd like to make, I'd like to go to

5   Mr. Bienenstock and then to Mr. Friedman.

6            MS. UHLAND:  Yes.  Yes, I'm done, Your Honor.  Thank

7   you.

8            THE COURT:  Thank you.

9            MR. BIENENSTOCK:  Yes, Your Honor.

10           THE COURT:  And so Mr. Bienenstock, can you clarify

11  for me the role of the Oversight Board as representative of

12  the Title III debtors in the GDB restructuring transaction?

13           MR. BIENENSTOCK:  Sure.  The Oversight Board ended

14  up certifying the steps to date in the qualifying modification

15  and supports the trade-offs that were made.  So there was a --

16  I assume what Your Honor is referring to is that the

17  municipality and instrumentalities claims were dealt with

18  differently than the bondholder claims.

19           THE COURT:  Yes, and the Commonwealth claim itself,

20  and the Commonwealth deposits, as well as the

21  instrumentalities.

22           MR. BIENENSTOCK:  First, and again, this gets into

23  our pleading that will go to the next matter, we viewed the

24  Commonwealth, PREPA and HTA really as having liability to GDB

25  as opposed to being entitled to something based on their

1    demand and deposit claims.

2           In HTA's case, their loan liability to GDB dwarfed

3    the demand deposit.  In the Commonwealth's case, like by a

4    smaller degree it was dwarfed, but it was nevertheless

5    dwarfed.  And in PREPA's case, it had a huge preference

6    liability under Puerto Rico law that was much larger than the

7    demand deposit.

8           So it was really a matter of dealing with their

9    liabilities.  And in the -- in the actual deal, although this

10   is not on -- this is not among the headlines, AAFAF was very

11   careful in its negotiation of that deal to control how things

12   can be enforced against the instrumentalities and

13   municipalities.

14          And Mr. Friedman may get into this more later, but

15   suffice it to say they took steps to make sure that these

16   municipalities and instrumentalities could not be brought down

17   by the enforcement of GDB's net claims against them.

18          So overall, the Board thought this was a good deal.

19   It accomplished the objectives necessary for an ongoing

20   Commonwealth, the survival of all of the components, and it

21   was fair to the bondholders as well.

22          THE COURT:  And the Oversight Board has the ability,

23   under I guess it's Title II of PROMESA, to review legislation

24   and determine whether the Board considers the legislation

25   consistent with PROMESA.

1          Has the Board made a determination that the 2017 GDB

2     Restructuring Act, in all of its elements, is consistent with

3     PROMESA?

4          MR. BIENENSTOCK:   Okay.   We haven't -- the Board

5     hasn't issued any formal declaration, but some things are

6     plain.   Number one, the Commonwealth and AAFAF formulated the

7     legislation to implement the deal that had been done in

8     principle that we approved.

9          Second, in respect of the releases, which I know are

10    a topic of -- well, they were a topic earlier from Mr. Despins

11    and may come up again, there's going to be some clarification

12    as to what those releases really are at Tuesday's public

13    meeting that goes into the investigative report.

14         Suffice it to say for now that, number one, there is

15    indemnification of officers and directors, and they -- they

16    would not be released in the past for anything, not in good

17    faith.

18         Number two, there was a concern on the part of the

19    UCC at least, and perhaps others, that the phrase in the

20    legislation about releasing agents and representatives would

21    extend to financial institutions and other institutions in

22    addition to people.   That will be clarified on Tuesday, and I

23    think it will be clarified in a way that others will have more

24    comfort that claims are not being prematurely released.

25         THE COURT:   Thank you.   That gets to one of the

1    concerns that I'd wanted to raise with you.  And so I hear you

2    that the Board intends, and AAFAF intends to deal with that in

3    the public meeting on the 18th of September?

4              MR. BIENENSTOCK:   Yes, Your Honor.

5              THE COURT:  And that covers the questions that I had

6    for you at this point.

7              MR. BIENENSTOCK:  Thank you.

8              THE COURT:  Thank you, Mr. Bienenstock.

9              I am ready to turn to the litigation schedule counter

10   proposals.

11             So Mr. Friedman, could you approach?

12             MR. FRIEDMAN:  I'm sorry.  Your Honor, did you

13   indicate you had questions for me specifically with respect to

14   that?

15             THE COURT:  Well, I had -- I have questions for

16   whoever is willing to talk to me about the prejudice argument

17   being made by GDB in response to Mr. Despins' proposal that we

18   have a limited early Rule 12 motion practice in conjunction

19   with the derivative standing motion that's scheduled to be

20   heard and the standing objection that are scheduled to be

21   heard on October 3rd.  So if you're that person --

22             Mr. FRIEDMAN:  I think there's a couple of issues,

23   Your Honor.  Peter Friedman from O'Melveny & Myers.  One is a

24   timing issue.  I think it's -- you know, it's certainly

25   jamming us.  Second, I think it -- effectively, I think it's,

```
 1   to some extent, wasteful.

 2           We'll know what the -- under our proposal, we'll know

 3   what the Court says about standing, hopefully after the

 4   October 3rd hearing.  And then we can decide whether we need

 5   to invest resources and, you know, an additional set of

 6   briefing or not.

 7           I mean, it may well be the Court says to the

 8   Committee yes, you have derivative standing, and we don't know

 9   what will happen to the Complaint at that point.  Maybe it

10   becomes unnecessary, or maybe the Court issues rulings that

11   make it abundantly clear that there is going to be no standing

12   in the other case.

13           I think the other point, Your Honor, is as I read

14   their complaints, I haven't fully formulated my responses, but

15   I think that there are potentially standing issues that go

16   beyond those that have already been articulated.  At least two

17   of the accounts, to me, implicate completely separate standing

18   issues.

19           And I have not had a fulsome opportunity to work

20   those out yet, but I think they're there.  And I don't want to

21   be prejudiced to, you know, either prematurely put those in

22   play or else have to waive them.

23           So those are my concerns.  There are standing issues

24   that are distinct from Title III issues, from the issues that

25   we've briefed already and we'll be briefing next week that
```

1    relate to specific counts, where I think they just can't

2    establish standing even if they could on other ones, because

3    of flaws in relation to their reading of PROMESA or Chapter

4    Nine.

5           THE COURT:  Well, my concern is two rounds of

6    standing issues, you know, particularly if it's two rounds

7    that are variations on the Title III related standing issues.

8    And so my preference would be for, you know, at least the

9    cross-cutting standing issues that are in prospect now and

10   have started to be rehearsed, and will certainly be rehearsed

11   in the papers, to be rolled into that October 3rd event.

12          And as you know, subject matter jurisdiction is never

13   waived, and so that wouldn't preclude, to the extent the

14   adversary proceeding survives this, something with conceptual

15   potential, that wouldn't preclude rolling further subject

16   matter jurisdiction related issues into a 12(c) or summary

17   judgment phase.

18          And my inclination is to have a summary judgment

19   motion phase that follows the merits hearing that isn't

20   layered on top of the merits hearing.  So that November 12th

21   time frame, which for me would turn into a November 13th time

22   frame because of the federal court schedule, is acceptable.

23   But I don't want to have a situation where nothing has been

24   dealt with on the threshold standing front at the October 3rd

25   date.

```
 1            And then in thinking about the prejudice concern, I

 2   also, you know, looked at the Rule 12 waiver issues, and it

 3   seemed to me that the only things that would truly be waived

 4   by not raising them in an initial Rule 12 motion would be

 5   personal jurisdiction, venue, and process and service of

 6   process.  And it didn't seem to me that there'd be any serious

 7   concerns in those regards.

 8            MR. FRIEDMAN:  We've accepted service, and we

 9   certainly don't contest venue, et cetera.  So Your Honor, I

10   understand your ruling.  We will modify the schedule

11   accordingly.

12            THE COURT:  All right.  I have some specific language

13   suggestions, but there is one other thing.  On the -- with

14   respect to that second phase, your narrative description of

15   your proposal, as I read it, it indicated that you'd be

16   undertaking not to close an approved Title VI transaction, if

17   I were to approve the transaction, until after a hearing on

18   the summary judgment motion, as opposed to say after a

19   determination on the summary judgment motions.

20            And, you know, frankly, I'm just a little puzzled as

21   to how I could approve the Title VI with open issues about the

22   legality, constitutionality of that Title VI transaction,

23   without that being an advisory opinion.  And so I would just

24   like a little bit more insight into why the statement was

25   crafted that way, and whether you have a scenario in mind in
```

1   which I could approve a Title VI without addressing the merits

2   of claims in the adversary, if I have decided that there is

3   standing to pursue that adversary.

4            MR. FRIEDMAN:  You know, Your Honor, our thinking was

5   given the very limited nature of what we intend to seek in

6   Title VI, which we'd spell out if the Court were to conclude,

7   for example, because there were no actual objections to the

8   Title VI, because nobody had standing in the Title VI to

9   pursue an actual objection.  That if the Court were

10  comfortable in the absence of any actual Title VI objections,

11  that it were to approve on November 5th or 6th, whatever the

12  date is --

13           THE COURT:  The 6th, I think.

14           MR. FRIEDMAN:  That there being no objections, it

15  could grant approval, we would go ahead.  If the Court

16  obviously has held in abeyance its decision on approving the

17  Title VI until it addresses any adversary proceeding issues,

18  obviously we wouldn't be able to go ahead.

19           Our point was only if the Court were to have approved

20  the Title VI already, we would not otherwise want to be

21  impeded, if the Court could see a way to do that.  That's why

22  it was framed that way.

23           If the Court has obviously not approved the Title VI,

24  we can't close the Title VI.

25           THE COURT:  Thank you.  That was another possibility

1    in my mind, but I wanted to make sure that I understood you.

2              MR. FRIEDMAN:  Okay.

3              THE COURT:  And so I worked with -- since I don't

4    think you had proposed order language that covered that second

5    summary judgment phase, I worked with Mr. Despins'

6    submissions.

7              MR. FRIEDMAN:  Okay.

8              THE COURT:  And so do you have Mr. Despins' document

9    127-4 in front of you, which is the --

10             MR. FRIEDMAN:  I don't, Your Honor.

11             THE COURT:  Okay.  All right.  So let me just tell

12   you conceptually, you all were supposed to come prepared.

13             MR. DESPINS:  It happened while I was on the flight

14   here, so I apologize, Your Honor.

15             THE COURT:  All right.  Actually, what might be

16   helpful here, I've got these handy dandy books of documents,

17   if you'll bear with me for a minute -- no, actually, the handy

18   dandy book doesn't have it either.

19             Okay.  So he has broken it up into two Orders, one of

20   which is just the procedures Order, and the other is the Order

21   relating to the derivative standing and other adversary

22   related matters.  So --

23             MR. FRIEDMAN:  Your Honor, may I have permission to

24   retrieve my electronic device, which is not connected to the

25   internet, but does have a downloaded copy of the schedule?

```
 1              THE COURT:  Yes, please do.

 2              MR. FRIEDMAN:  Thank you, Your Honor.

 3              THE COURT:  And if you do have a connection and need

 4    to download filing 127, you have my permission to do that.

 5              MR. FRIEDMAN:  I don't.  But thank you, Your Honor.

 6              THE COURT:  Mr. Despins.

 7              MR. DESPINS:  So we can access the internet to do

 8    that?

 9              THE COURT:  Yes.

10              MR. DESPINS:  Thank you.

11              MR. FRIEDMAN:  So, Your Honor, the derivative

12    standing motion -- okay.  Sorry, Your Honor.

13              THE COURT:  We could print out copies for you.  So

14    I'm going to ask Ms. Tacoronte to print document 127-4, which

15    is Exhibit D to 127, and print 127-2, which is Exhibit B.

16    These are the blackline versions, because it was just easier

17    for me to work with those.

18              So if you would print two copies of each of those,

19    that would be great.

20              COURTROOM DEPUTY:  Just bear with me for a second,

21    Your Honor.

22              THE COURT:  Thank you.

23              MR. FRIEDMAN:  Your Honor, if it makes it easier,

24    just looking here, we can just accept the UCC's proposal in

25    total, if that's fine --
```

1          THE COURT:  I had some tweaks on the UCC's

2   proposal.

3          MR. FRIEDMAN:  -- okay, from our end.

4          THE COURT:  I'm glad to hear that, and they're not

5   extensive.  And I think -- well, so let me, since you have it

6   there electronically, this is actually language in 127-4 that

7   is picked up from the AAFAF proposal, paragraphs two and

8   three.  It's just the continuation, adjournment language that

9   I had a concern about where in paragraphs two and three, it

10  says that the hearings, the standing hearing and the

11  qualifying modification approval hearing can be continued at

12  any time by the Court or GDB or AAFAF without further notice.

13         Since things are moving so quickly, I want a motion

14  for a continuance.  So I would say, "Can be continued from

15  time to time by the Court," cross out "GDB or AAFAF," "without

16  further notice other than adjournments announced in open court

17  or Orders entered on the case docket."  And cross out the

18  ability to adjourn by just putting it in an agenda.

19         MR. FRIEDMAN:  Okay.  I apologize, Your Honor.  I

20  will probably have to get a transcript in order to get all of

21  that down correctly.  I'm just not fast enough to have

22  transcribed all that.  I apologize.

23         THE COURT:  That's fine.  And you do have a print-out

24  there next to you, if that's easier for you to follow along

25  with.  But the transcript will be prepared promptly, as

```
 1    always, so that's fine.

 2              And you'd need to make a parallel change in the

 3    hearing notice.  That's Exhibit B, I think, because that has

 4    that same sort of language.

 5              So that would be paragraphs two and three of 127-4,

 6    the parallel language in the hearing notice, which is 128-1,

 7    and also the parallel language in 127-2, which is the standing

 8    motion and adversary complaint schedule, and that's paragraph

 9    one of 127-2.

10              So going on with 127-4 -- actually, there's nothing

11    else in 127-4.  Then 127-2, which addresses rolling in the

12    12(b)(1) motion.  The first thing is I think it makes sense,

13    since this deals with scheduling for the adversary, to add the

14    adversary complaint caption as well so it can be filed in both

15    cases.

16              And then as I said, in paragraph one, the adjournment

17    language should be consistent across all of the Orders.  And I

18    think we should have a reply deadline.  And what I would be

19    comfortable with is October 1, which is a Monday, at 5:00 PM,

20    Atlantic Standard Time.

21              MR. FRIEDMAN:  Thank you, Your Honor.

22              THE COURT:  And so I suggest adding that to paragraph

23    three.

24              MR. FRIEDMAN:  Yes, Your Honor.

25              THE COURT:  But that would be the deadline.
```

1    And the hearing will be in New York on November 13th,

2    which is a Tuesday, at 11:00 AM, Atlantic Standard Time, which

3    will by then be 10:00 AM New York time because the time

4    changes, I think, in early November.

5    And there's adjournment language at the end of

6    paragraph five that needs to be conformed as well.

7    And in paragraph six, I suggest adding after -- in

8    the second line of that paragraph, after the words, "For any

9    party to," the words, "make any FRCP 12(c) motion and/or move

10   for summary judgment."  So you can back -- clean up there and

11   anything that's drafted to the complaint --

12   MR. FRIEDMAN:  Thank you, Your Honor.  And would it

13   be acceptable if we said 7012?

14   THE COURT:  I'm sorry.

15   MR. FRIEDMAN:  Bankruptcy Rule 7012 or FRCP 12 in

16   that paragraph --

17   THE COURT:  Well, one subsumes the other.  I've been

18   getting a lot of arguments and pleadings, and adversaries have

19   just referred to the Rules of Civil Procedure.  So whatever

20   you want in that regard is fine.

21   MR. FRIEDMAN:  Okay.  Thank you.

22   THE COURT:  And then because we are in paragraph

23   seven, because we are going back to the later hearing date,

24   the response deadline should be October 24th instead of 22nd,

25   which is what Mr. Despins had proposed in connection with the

1    more accelerated scheduling proposal.

2            And the Reply can be November 7th, rather than

3    October 30th.  If you all want to agree to earlier dates, as

4    long as I still get to November 13th for the hearing, that's

5    fine.

6            MR. FRIEDMAN:  Okay.  That will work for me.

7            THE COURT:  And those are my line edits.  Thank you

8    for your patience.

9            MR. FRIEDMAN:  Thank you, Your Honor.  We'll mark it

10   all up.

11           THE COURT:  Mr. Despins.

12           MR. DESPINS:  There was a colloquy between

13   Mr. Friedman and the Court regarding the GDB Title VI

14   proceeding being approved before the hearing on the 13th.  So

15   I'm not sure where that landed in the sense of that -- as Your

16   Honor questioned, I'm not sure how it's possible to approve it

17   when there's a lawsuit saying that it's illegal.  So I --

18           THE COURT:  Well, that was the -- that is the

19   question that I raised with Mr. Friedman.  And Mr. Friedman's

20   answer, I think, boiled down to, well, if the Court thinks

21   there's a way to do it, and the Court would be comfortable

22   with issuing that approval, then -- and the Court actually

23   issues the approval, they would go ahead.

24           I think I've made it clear that I, sitting here

25   today, don't really see that as a scenario that could come to

1    fruition if the adversary proceeding is still alive at that

2    point.

3         MR. DESPINS:  Understood.  I just didn't want my

4    silence to be read as agreeing to that.  Thank you, Your

5    Honor.

6         THE COURT:  All right.  Thank you both.

7         And so now we come to the fee examiner's motion to

8    impose the presumptive standards as modified by the

9    informative or certification of documents.

10         MS. STADLER:  Good morning, Your Honor.

11         THE COURT:  Good morning, Ms. Stadler.

12         MS. STADLER:  Judge, as you know, at the June 6th

13    Omnibus hearing, we discussed the possibility of imposing

14    certain presumptions to, in effect, place professionals on

15    notice or more formal notice of the reasonableness standards

16    that the fee examiner has been applying to interim fee

17    applications reviewed to date, and that will continue to apply

18    to his evaluation of the fee requests going forward.

19         We developed the list of presumption based on

20    standards that the fee examiner already has been applying in

21    his analysis, and we consulted with the professionals before

22    filing the motion in August.

23         After circulating a draft of the motion, we did have

24    back and forth with a number of professionals and made certain

25    changes to the Proposed Order before filing the motion.

1    Nonetheless, after the motion was filed, some professionals

2    voiced additional and formal objections to the form of Order

3    originally submitted, and we engaged again in fairly extensive

4    discussions regarding revisions to the Order that everyone

5    could live with.

6          We take seriously the Court's admonition in the Case

7    Management Order, that matters be resolved consensually

8    whenever possible, so we were trying to do that.   The primary

9    objections we received, although objecting parties can

10   certainly articulate them for themselves.

11         But just for context, the primary objections appear

12   to be related to what professionals characterized as the

13   advisory nature of the order.  The fee examiner doesn't share

14   that view.  We don't view the relief requested as any

15   different from any procedural administrative order.

16         Nonetheless, we wanted to be accommodating and

17   consistent with the law, and so we tried to make changes to

18   the Order that addressed that concern.  Obviously no ruling is

19   made until a fee application has been filed, an objection has

20   been raised, issue joined, and an appropriate hearing or

21   briefing of the issue, and then a ruling on that issue from

22   the Court.  And that, of course, would be the process with or

23   without this presumptive standard Order.

24         Again, the purpose of the Order is to more clearly

25   articulate than in informal communications or memos to the

1    professionals what the expectations are and the baseline

2    standards will be.  And also to allow the public to know what

3    standards are being applied by the fee examiner, and to have

4    some confidence that departures from those standards will need

5    to be justified and explained thoroughly.

6         The revisions then in the Order that we submitted as

7    a redline are our effort to balance these two considerations,

8    the professionals' concerns with the advisory purpose or the

9    notification purpose of the motion.

10        We think the compromise Order that we submitted

11   fairly places everyone on notice, while also recognizing that

12   the judgment about reasonableness of any fee is certainly not

13   made by this Order.  It is ultimately made only by the Court

14   after an application has been filed.

15        And of course, the filing or the -- the filing of an

16   objection to a fee application creates a contested matter,

17   which then affords all of the procedural protections that

18   parties are accustomed to in litigation.  So we are fairly

19   confident that that process is adequate to address the

20   advisory concerns of the professionals.

21        So with that, I will end my remarks.  I'm happy to

22   answer any questions about the Order, the motion, or anything

23   else fee related.

24        THE COURT:  Thank you for those remarks and that

25   context.  I do have a couple of questions.  One was triggered

```
 1   in particular by the change in the iteration or

 2   characterization of the presumptions in the certification.

 3          And so, in the revision, the language regarding

 4   introduction of presumptions is changed to characterize the

 5   presumptions as standards that have been employed from the

 6   outset.  And I understand now that you are seeking to respond

 7   to the sort of advisory opinion concerns --

 8          MS. STADLER:  Right.

 9          THE COURT:  -- that had been articulated.  For me, it

10   raised the question of to what extent, then, do these

11   presumptions represent change, and have the principles already

12   been implemented in a robust fashion?  To what extent can I

13   expect to see further economies in billing practices and a

14   reduction of the magnitude of fees billed going forward as a

15   result of entry of this Order?  Or should I be reading entry

16   of this Order as revised to say it's going to look the way

17   it's been looking?

18          MS. STADLER:  Yes.  And you're talking about

19   paragraph two?

20          THE COURT:  Yes, I believe so.

21          MS. STADLER:  Okay.  So the specific concern that

22   was articulated to us on paragraph two is related to the

23   advisory concern, but it was more particularly articulated as

24   a concern about retrospective application and all of the

25   procedural evils that follow from that.
```

1            In our discussions, in our reports to the Court, in

2    our letter reports to the professionals, we've been very clear

3    about articulating standards, many of which are outlined here,

4    some of which are standards that we have internally applied,

5    without particularly articulating.

6            I'll give you an example, because I think it will be

7    helpful for the professionals and for Your Honor to understand

8    the way the process has been working and will work going

9    forward, assuming the entry of this or some form of Order.

10           One issue that is frequently discussed in the context

11   of professional fees in Chapter 11 cases is the issue of to

12   what extent are the professionals' attempts to justify the

13   reasonableness of their fees compensable.

14           The fee examiner has always taken the position that

15   when we articulate fee examiner standards at the outset of the

16   case, professionals are expected to submit fee applications

17   that comply with those standards, and if they deviate from

18   those standards, they need to include in their fee application

19   an explanation of the deviation from the standard.

20           Not withstanding that hope, sometimes professionals

21   submit fee applications that don't explain deviations from the

22   articulated standards, which necessitates then the fee

23   examiner having to raise that issue, either informally or in a

24   report, the professional having to spend time gathering

25   information to respond, and often lots of time talking on the

1   phone and arguing about whether the explanation is or is not

2   sufficient.

3        The purpose of that mode of operation for us is to

4   ensure that to the extent we are imposing a burden on the

5   professionals with respect to their fee applications, they are

6   entitled to be compensated for that in connection with the

7   preparation and submission of their fee application, as the

8   Code requires.

9        Beyond that, we view it as a failure to appropriately

10   document or appropriately submit an application that addresses

11   the reasonableness criteria, and that the burden, the

12   financial burden then should be on the professionals

13   themselves of remedying deficiencies or defects in their

14   initial submissions.

15        That concept, that principle is not new to the fee

16   examiner or probably fee examiners in any other Chapter 11

17   case where there is one.  It's obviously been litigated.  It's

18   been litigated in the Supreme Court.  And everyone has their

19   own views upon that issue.  But the fee examiner's views are

20   well-established, have been articulated to the professionals,

21   and have been applied since the outset.

22        Now, the fee period that we're looking at right now

23   covers the period of time when we first began our work.  So

24   this third interim fee period, which covers February through

25   May, includes the time these professionals spent talking to me

1    and to Mr. Williamson and all of our colleagues about our

2    letter reports and fee issues.

3         So we have, in the reports that are drafted and ready

4    to go, raised this issue with respect to many professionals.

5    That was the case before we made this motion.  It would be the

6    case in the absence of this motion, and in the absence of an

7    Order.  And it would be the fee examiner's position if --

8    hopefully not, but if the issue were to be litigated in this

9    Court.

10        We don't view that as a retrospective application of

11   a standard.  We view that as articulating the standard that

12   has always been applied.  You won't -- Your Honor won't be

13   able on that particular issue to say, is this new, is this

14   more strict, because we didn't have this category of fees in

15   the first two fee applications.

16        Now, to the extent there are issues that did arise in

17   the first two fee applications, for example, hearing or

18   meeting attendance being two of the most contentious, we have

19   applied the standard articulated here.

20        With respect to hearings, it has always been the

21   speaker, a supporting person, and then nonspeakers need to be

22   monitoring intermittently by phone or not going at all.  And

23   we have departed from that standard, as you can imagine, in

24   many, many cases.

25        Obviously the Oversight Board is very uniquely

1      situated as the representative of the debtors in these cases

2      for certain matters.  AAFAF similarly is very uniquely

3      situated, given its role and the relationship between it and

4      the Oversight Board under PROMESA.

5            And there is obviously not one standard that is going

6      to be reasonable both in the context of a debtor participant,

7      like those two entities versus a single issue constituency,

8      for example, like the COFINA agent.  So you will not see

9      drastic reductions that wouldn't have been in place before,

10     but what I would say is as the case has gone on, as the

11     professionals have been given the opportunity to sort of

12     absorb and work with these standards, that they will

13     themselves begin to conform their behavior to the standards so

14     that we don't have to get to the point of arguing about them

15     in a fee application.

16           I think I've only been to three of these hearings,

17     but I think there are fewer people in here today than there

18     were in June, and fewer in June than there were in March.  And

19     I like to think that that is the result, in part, of the

20     prophylactic effect of these rulings.

21           And if it works that way, and I hope it does, we

22     believe it does, if it works that way, you won't see anything

23     different.  In fact, you might see fewer deductions in the fee

24     applications that are coming before you, because Your Honor

25     will obviously not have been asked to approve those fees in

1    the first place.

2            So I know that's not a very clear answer to your

3    question.  I think if I had to characterize it, I would say we

4    are going to put the pressure on a little bit more.  We are

5    going to tighten the belts a little bit more.

6            We're going to expect more accountability from these

7    professionals.  We're going to expect them to do a good job of

8    articulating why they need to be using the resources that

9    they're using, and that we're going to be fairly meticulous in

10   our application of the standard.

11           What that yields in the way of interim compensation

12   Orders and ultimately final compensation Orders remains to be

13   seen, but our hope is that either prophylactically or actively

14   the impact will be a lessening in duplication, waste, excess

15   in the professional fee realm.

16           THE COURT:  Thank you for that clarification and

17   reassurance.  As you know, it's not only the Court, but the

18   public who are looking very carefully at what's being spent

19   here.

20           MS. STADLER:   Yes.

21           THE COURT:  And it needs to be clear that the

22   expenditures are necessary and appropriate.

23           I did have a couple of additional clarification type

24   questions.  As I read paragraph 2-B, and this was not changed

25   in the certification revision, but it seems to make an

1    effective floor of two timekeepers per issue or motion, since

2    it says a speaker with significant responsibilities, plus one

3    additional timekeeper per speaker.

4         And so my question is whether that's intended and if

5    so, why are you convinced that that's necessary as a floor?

6         MS. STADLER:  Right.  Well, again, recognizing that

7    there are different types of professionals participating in

8    this proceeding, for a professional that's standing in the

9    shoes of a debtor for any given issue, the fee examiner

10   recognizes that questions, issues can be fine.

11        This morning we had an example of that with a

12   recently filed document and, you know, needing to make copies

13   and that sort of thing.  We view that in that situation, it

14   would be reasonable for a second person to be with the primary

15   speaker, to provide a support role.

16        We hope that that would be someone at a much lower

17   billing rate.  We hope it would be a paralegal or, you know, a

18   very junior associate, if necessary at all.  But there are

19   situations where we go back and look at a transcript and

20   think, wow, this attorney could not have performed the way he

21   or she performed in that transcript without having someone

22   sitting there helping them.  And it's not fair to penalize him

23   or her for that.  So that's where the standard comes from.

24        Now, we have said to other professionals and in the

25   process of reporting on fee applications, we have raised the

1    issue that not everybody who speaks needs a helper.  If I

2    stand up and make an appearance and sit down, question whether

3    I need to be here, much less whether I need to have a helper.

4            So every application of these principles, every

5    application of these standards is going to be framed by the

6    procedural context of the proceeding at issue.

7            And so it is not designed to say you may bring two

8    people to every hearing or every issue that comes up.  It's

9    designed to articulate the principle that I just did, that

10   there are some issues that are so significant and weighty that

11   it is simply unreasonable not to allow additional support in

12   the courtroom.

13           We think there are a lot more instances where there

14   are people here for just in case, or backup, or what if this

15   comes up, and we think there are more appropriate ways to deal

16   with those kind concerns than packing the courtroom.  But

17   there are certainly situations where professionals need to

18   have more than one person to handle a large, complex

19   proceeding, lots of issues, lots of exhibits, for example, and

20   we don't want to preclude professionals from being encouraged

21   to adequately staff their cases so that they can operate

22   efficiently in here and not waste everyone's time when they're

23   in the courtroom.

24           So again, it's a balancing.

25           THE COURT:  So it's a floor where it's objectively

1   necessary, and it's understood that where it's not objectively

2   necessary, it's not a guarantee of compensability of two

3   people per issue or speaker?

4        MS. STADLER:  Yes, that is correct.

5        THE COURT:  Thank you for clarifying that.

6        And the last question goes to something that we had

7   discussed at the July Omni, but was not reflected in the

8   motion, and so I just want to follow up on that.  And that is

9   that there had been some concerns raised regarding billing for

10  electronic research.

11       And so I notice that there wasn't a proposal or

12  effort to create some sort of template or principle for that,

13  where there are flat fee contracts but billing by the hour.

14  Are you comfortable that you have a handle on that with the

15  timekeepers?

16       MS. STADLER:  I would say we are comfortable with

17  that.  We have seen a significant dropoff in the legal

18  research bills.  I think either miraculously, there have been

19  fewer novel legal issues or people have been utilizing

20  resources when they can.

21       And so the dollar amounts for this issue in the first

22  interim fee period were much in excess of the dollar amounts

23  that we're seeing in the third interim fee period.

24       The other issue with that is we have had difficulty

25  with the electronic research providers and them having some

1   proprietary protection to their pricing issues.  So we have

2   really never been able to verify what this costs a law firm.

3        Now, whether right or wrong, given the -- our

4   perception that people have reigned it in in this area, it's

5   not worth our fighting with Westlaw or Lexus over their

6   proprietary pricing information, or serving discovery on

7   professionals and making them disclose it.  We don't think

8   that's necessary.

9        When an application comes through that has a legal

10  research bill that raises eyebrows, we raise it.  And most

11  often what we get in response is an explanation of the legal

12  research, why the person who was doing the research was doing

13  that research as opposed to someone else cheaper, and, you

14  know, why that particular issue needed to be researched in a

15  fee-for-service setting as opposed to on Findlaw.com.

16       And we have been very successful in, I think,

17  satisfying ourselves that the professionals are using those

18  resources judiciously and didn't see a need to put that or

19  other expense presumptions in the memorandum.  But it's

20  certainly, as with everything else, an expectation that

21  economies will be observed and that expensive research tools

22  will be used only when necessary.

23       THE COURT:  Thank you.  I have no further questions.

24       I understand that Mr. Williamson had requested a

25  speaking phone line, which has been provided.  So did

1   Mr. Williamson wish to speak before I rule on the motion?

2           MS. STADLER:   Well, that's the problem.

3           MR. WILLIAMSON:   No, Your Honor.   Ms. Stadler covered

4   all the points quite well.

5           THE COURT:   Thank you, Mr. Williamson.

6           And so for the reasons set forth in the original

7   submission and the fee examiner's certification, as augmented

8   and clarified on the record today, the fee examiner's motion

9   is granted, and the Court will enter the revised Proposed

10  Order which was filed as Exhibit A to docket entry number

11  3849.

12          Thank you, Ms. Stadler.

13          MS. STADLER:   Thank you.

14          THE COURT:   And so we have the contested matter on

15  the agenda.   I suggest that we take a ten-minute break and

16  then reconvene for that argument.   So let's be back in place

17  at 11:35 by the courtroom clock.   Thank you.

18          (At 11:22 AM, recess taken.)

19          (At 11:38 AM, proceedings reconvened.)

20          THE COURT:   The next agenda item is the contested

21  motion of the Creditors' Committee to enforce the automatic

22  stay and the Court's June 29, 2017, Order.   That's ECF docket

23  entry number 3797.

24          And Mr. Despins, will you and Mr. Sosland still be

25  splitting the first segment?

```
 1              MR. DESPINS:  No.

 2              THE COURT:  So please bring me up to speed.

 3              MR. DESPINS:  Yes, Your Honor.

 4         Things move very fast in these cases.  But I think --

 5    Mr. Sosland will speak for himself, but I don't think he is

 6    pursuing his objection anymore.

 7              THE COURT:  You'll have to be near a microphone,

 8    Mr. Sosland.

 9              MR. SOSLAND:  Your Honor, this morning FGIC's

10    participation in the motion filed by the UCC was resolved

11    after discussions with AAFAF and the Oversight Board.

12              Would you like to address it?

13              MS. UHLAND:  Yes.

14         Your Honor, I can confirm.  We're going to

15    investigate certain facts related to this, and our intent is

16    to enter into an arrangement based on the underlying

17    agreements to preserve the rights that Mr. Sosland's client is

18    concerned about and to hopefully reach an agreement by the

19    November 6th hearing with respect to that.

20              MR. SOSLAND:  That's correct, Your Honor.

21              THE COURT:  Thank you both.

22              MS. UHLAND:  Thank you.

23              MR. DESPINS:  Therefore, Your Honor, I have my 20

24    minutes in full back.  I will take 14 to start, and then

25    reserve six for rebuttal.
```

```
 1              THE COURT:  Very well.  So we'll start you off with

 2    14.

 3              MR. DESPINS:  Okay.  The first thing I'd like to say,

 4    Your Honor, is that we're not surprised that the creditors

 5    voted in favor of the restructuring.  They're getting all the

 6    assets of the company, so obviously they should and they have

 7    voted for the transaction.

 8              The first question I want to address -- because you

 9    asked me that at the last hearing and I was not as prepared as

10    I should have been, or didn't answer as well as I should have

11    -- is why is the Committee doing this?

12              We're dealing with cases involving billions of

13    dollars, et cetera, et cetera.  I will put the releases aside,

14    although I want to address them very briefly, but it's not the

15    main argument.  The releases, we believe that it's a billions

16    of dollars issue.  And the response you're getting on the

17    release is that, hey, these people have the right to be

18    indemnified.

19              And I know that seemed to resonate with Your Honor at

20    the last hearing.  And I want to make sure you know that

21    that's a self-inflicted wound in the sense that these people,

22    one, they have to be in good faith, so there's an assumption

23    they're in good faith.  But let's assume they're in good

24    faith, they're entitled to indemnification, that's a

25    pre-bankruptcy claim.
```

1          So if GDB were in Title III, these people would just

2     be getting pennies on the dollar like everybody else on their

3     indemnification claim, because the claim arises out of the

4     pre-petition transaction.

5          So the Board is saying, hey, they have a right to be

6     indemnified.  It could be millions of dollars.  But that's

7     within your control, the control of AAFAF and GDB, which has

8     put this entity in Title III.  And that will never be an

9     issue.

10         As a matter of fact, you never, never not pursue

11    claims because of indemnification because the people who are

12    indemnified, if they're entitled to indemnification, are

13    getting cents on the dollar in the indemnification claim as

14    opposed to affirmative recovery of millions of dollars that

15    need to be paid in full.

16         And on top of that, Section 510(B) of the Bankruptcy

17    Code subordinates on a mandatory basis all claims for

18    indemnification arising out of securities transactions, for

19    example, bond offerings.  So they would get zero on an

20    indemnification claim.

21         So this argument that somehow we're doing this

22    because they have an indemnification claim is really beside

23    the point.  So let's focus on dollars and cents.

24         THE COURT:  I am going to ask you to slow down just a

25    little bit.

1          MR. DESPINS:  It's because that clock is maddeningly

2    --

3          THE COURT:  It's just a beautiful green light.

4    What's the problem?

5          MR. DESPINS:  Yes, for now it's green.

6          Now, for dollars and cents, why is the Committee

7    doing this?  Forgetting about the releases for a second, which

8    we think is a huge issue, if the debtors that we are -- the

9    Committee were treated like the most favorite creditors, the

10   distribution to our debtors would be in the range of 50 to 75

11   million dollars.

12         And I know you might say, I guess we get jaded in

13   this case because we're talking billions here, billions there,

14   but 50 to 75 million dollars is a lot of money.  And that's

15   basically the task of the Committee, to protect these 50, 75

16   here, 50, 75 in the next deal.  Eventually it gets to real

17   money.  And that's why we're doing this, Your Honor, and

18   that's why we think the Committee has acted appropriately in

19   this matter.

20         Now, let me clear some of the underbrush regarding

21   the merits of the motion.  The first thing is I think there's

22   little doubt that there is a violation of the stay through the

23   setoff or through the exercise of control.  What they're

24   saying is that 303 -- 303, 305 insulate that, or that it's

25   exempt -- it's an exception to the stay under 362(B)(4), but

1   at the end of the day, there's no doubt that a setoff is

2   covered by the stay.

3            THE COURT:  Let me -- I want to interrogate that

4   notion a little bit more, because it seems to me that even in

5   a Chapter 11 case, the stay doesn't preclude the debtor from

6   pursuing deals to resolve claims by and against it.  Those, of

7   course, have to come before the Court if they're out of the

8   ordinary course of business in a 363 motion, or be rolled into

9   a plan that is submitted for approval or perhaps covered by a

10  9019 motion.

11           But in none of those scenarios do I recall ever

12  seeing or hearing of a debtor filing a motion for relief from

13  the automatic stay in order to be able to negotiate a

14  transaction that's going to ripen into a 363 application or be

15  part of a plan.  And similarly, if you have, you know, an

16  affiliated group of companies that have some intra or

17  intercompany obligations, under the theory that these broad

18  provisions of the automatic stay apply to debtor-initiated

19  situations, even debtor-initiated situations or

20  debtor-consented situations, it seems to me the filing of a

21  Chapter 11 petition for a group of companies is potentially

22  violative of the automatic stay, because by -- or if filing a

23  petition where you have a claim against somebody who's already

24  in bankruptcy, you know, how is that so different from the GDB

25  Title VI filing that's looking to modify its relationship with

1   a debtor in bankruptcy?

2           MR. DESPINS:  Well, first of all, the GDB

3   Restructuring Act disallows these claims.  These are claims

4   that -- there's no doubt that these claims are claims that are

5   asserted by the debtors and they're being disallowed through

6   the Act.  And the fact that --

7           THE COURT:  That is what the proposal is under GDB.

8           MR. DESPINS:  Correct.

9           THE COURT:  And there's a question of what they're

10  saying they're doing by legislation, and what they're saying

11  they're doing by the Title VI.  But leaving aside for a

12  minute, if it were being done by Title VI, they're queuing up

13  a court process for approval of that.

14          MR. DESPINS:  Well, no.  That's the point.  Their

15  whole structure is that you're not approving what's happening

16  in the GDB restructuring in a Title VI.  Unless they've

17  changed their views on that, they're saying it's separate.

18          In Title VI, you only approve -- did people vote

19  properly; did they -- were they solicited properly; was enough

20  time spent what I call checking the boxes?  That's all they

21  want you to do.

22          You're not approving in a Title VI, under their

23  theory, the disallowance of claims.  The Title III debtors are

24  completely absent from the Title VI the way they structured

25  it.

1          Of course, by approving the Title VI, you are

2    disallowing those claims, because the statute only becomes

3    effective when you sign the Order.  But clearly the claims

4    being disallowed here by a statute --

5          THE COURT:  By operation of the statute that was

6    enacted by the legislature of the debtor entity, by the

7    Commonwealth, of which the other debtors are

8    instrumentalities, and was approved, consented to, not

9    objected to by the Oversight Board that has PROMESA authority

10   to review legislation.

11         MR. DESPINS:  That's true, Your Honor, but these

12   debtors have not consented.  The structure they want to

13   describe, Your Honor, is there's been a settlement here.

14   There's been a quid pro quo.  These debtors -- there's been no

15   Board meeting of PREPA, of HTA, of ERS and all that approving

16   these transactions.  They did that on their -- through the

17   legislation.

18         So this is not a settlement context.  There's an Act

19   that disallows these claims.  And by the way, it doesn't

20   disallow only the claims of the Title III debtors.  It

21   disallows or freezes the claims of a bunch of other entities,

22   about two dozens of them that are all government entities.

23         Now, we don't represent them here.  We're not

24   involved with them.  But I want to make sure --

25         THE COURT:  Constitutionally, does a government at

1    the state or territory level have authority to pass laws that

2    determine and regulate the rights of its subdivisions and

3    instrumentalities, like states and municipalities?

4            MR. DESPINS:  They can do that, Your Honor, but

5    that's the whole-- the *Stockton* case where the Court said the

6    state, here the Commonwealth, cannot pass laws that are

7    designed to affect the bankruptcy result, the protection that

8    303 -- that's where we're heading, it's all intertwined, the

9    issues are intertwined, is there to protect.

10           For example, don't shut off the water, or do shut off

11    the water if you don't pay your bills.  You need to continue

12    or not continue to pay the pension.  These are political

13    decisions that clearly can be done, but a legislature cannot

14    pass a law that says, you know, now we have two sets of

15    creditors here.  I want these guys to get more than the other

16    guys.  And these entities are in bankruptcy, meaning it's

17    disallowing a claim of the debtor.

18           That, the legislature, cannot do.  And that's why

19    it's a bankruptcy -- what they're doing is a bankruptcy

20    statute, Your Honor.  So I think the stay itself is being

21    violated.  There's no such thing as consenting to the stay,

22    meaning the Second Circuit in -- I forgot the name of the case

23    -- I think it's *Osmoa*, basically says the debtor cannot

24    consent to lift the stay.  The Court can do that upon proper

25    application, but the debtor cannot.  And to me, there's no

1  doubt that there's a stay violation.

2           Now, the next issue very quickly is 362(B)(4).

3  There's no action or proceeding.  So that's very interesting.

4  You can say, well, what about the Title IV?  There's not an

5  action or proceeding.  But you see, that doesn't fit within

6  our structure, because they're saying in the Title VI, you

7  will not pass upon the setoff.  You will not pass upon the

8  disallowance.  You're not touching any of that.  That's why

9  I'm glad you're asking them to clarify in the Order exactly

10 what you're being asked to approve.

11          So therefore, they cannot argue 362(B)(4), because

12 there's no action or proceeding pending.  There's a law that

13 takes away rights of debtors, and that's not exempt by

14 362(B)(4).

15          The *McMullin* case in the First Circuit is very clear

16 that the exception is very narrow.  It's assuming there's an

17 action or proceeding, and it applies to actions to punish or

18 to condition the conduct of people.  This is purely a

19 financial restructuring.

20          Next, Your Honor, 304(I), same issue.  They cannot

21 find refuge in 304(I), because that would imply that the

22 proceeding in -- in Title VI encompasses the whole bowl of

23 wax, and that's not their theory.

24          The other issue is they say the stay protects

25 debtors, not creditors.  And Your Honor, that's not true.  The

1    cases they cite are cases where a creditor is getting sued and

2    saying, wait a minute, you should move to lift the stay.

3    That's not the issue we're arguing here.

4         We're talking about the creditors as a group being

5    beneficiaries of the stay.   That's the *Estano*, Second Circuit

6    decision, and *Suarez*, First Circuit decision.

7         Next, Your Honor, is because -- I want to address

8    this 303, 305.  You know, *Stockton* addressed that head on.   In

9    *Stockton,* there was a law that said these guys win, one group

10   of creditors win, these other guys don't win essentially.

11   That's the purpose of the law.

12        And the Court said, no, 303 -- in their case, it's

13   903, but the same statute -- does not protect against

14   avoidance action, doesn't protect against financial

15   relationship against the state and its instrumentalities.

16        In 305 -- Your Honor, I think they did consent to

17   305.  There was an Order entered by Your Honor in that

18   request.  There was no reservation of rights in that Order.

19        The Court has the power to implement and to interpret

20   that Order, and therefore, there's been a clear waiver of 305

21   on that issue only.

22        THE COURT:  As Mr. Bienenstock pointed out, the GDB

23   restructuring discussions and work predated the Stay Order in

24   the summer of 2017.  And so how -- if this restructuring was

25   in process, was the subject of work at that time, how can I

1    construe the application for that Stay Order as consent to the

2    thwarting of this transaction by that Order?  That seems kind

3    of illogical to me.

4            MR. DESPINS:  Because they recertified it in 2018,

5    twice.  So it's been recertified by the Board twice in 2018

6    after entry of the Stay Order.

7            THE COURT:  But I mean, it was something that they

8    had in mind to do, so why should I read the Stay Order as

9    consent to the notion that the automatic stay would preclude

10   further pursuit and consummation of the transaction?  Or maybe

11   we're talking about two different things.

12           MR. DESPINS:  No.  No.  What I'm saying is that they

13   agree that the Court has the power to enforce the stay and to

14   interpret that.

15           The next issue is, how you should interpret that

16   Order is a different issue.  I disagree that because this was

17   pending, that shows that they never intended that that be

18   covered.  That's pure speculation.  There's no discussion of

19   that anywhere in the record, so I don't see how that could be.

20           But in any event, Your Honor, I want to finish on

21   this.  The First Circuit in the *PREPA* case did not hold that

22   305 beats any other provisions of the Bankruptcy Code.  They

23   found an exit ramp by saying, hey, they didn't confront that

24   hard issue by saying, wait a minute, the Court isn't being

25   asked to do that.  The Court is being authorized to go to

```
 1   another court -- I'm not arguing the merits of that.  I'm

 2   arguing the cases that they cite.  *Detroit* and *Stockton* on

 3   these issues correctly held -- they just refer to them, and

 4   they say they take an expansive view.  But there's no such

 5   ruling by the First Circuit on that issue.

 6          And therefore, Your Honor, we believe that this is

 7   not covered by 303, not covered by 305, and that's why the

 8   Court should grant our motion.

 9          THE COURT:  Thank you.

10          MR. FRIEDMAN:  Good morning, Your Honor.  Peter

11   Friedman from O'Melveny & Myers  --

12          THE COURT:  Good morning.

13          MR. FRIEDMAN:  -- on behalf of AAFAF and GDB.  I

14   think the tell was the first word out of the Committee's mouth

15   that the creditors are getting all the assets of the company.

16   There's not a company here.  There's a government entity here,

17   regulated and controlled by another government entity.  I

18   think that gets to the critical issue of 303.

19          The Committee's papers basically say that the GDB

20   Restructuring Act has no impact on provision of services or

21   other governmental functions to the people of Puerto Rico, nor

22   does it have an impact on the organization and operation of

23   government because GDB has ceased banking operations.  Could

24   not be more wrong, Your Honor.

25          If you look at the GDB Restructuring Act amendments,
```

1    statement of motives, in particular it says, "the hurricane

2    Maria altered the fiscal and economic situation of Puerto

3    Rico -- government of Puerto Rico, its public corporations,

4    instrumentalities and municipalities."

5         The new agreement will provide significant financial

6    relief to municipalities.  This will result in a significant

7    reduction in municipalities' debts and will provide cash flow

8    relief to municipalities in the short term.

9         The fourth amendment to the GDB Restructuring Act

10   emphasizes this with respect to the CAE settle -- the Excess

11   CAE payments to municipalities.  It emphasized this by

12   reamortization schedules to municipalities.

13        And the reason we know that that's a public policy

14   matter, Your Honor, is, well, what's the alternative?  Imagine

15   that municipalities aren't getting relief through this

16   mechanism.  There are three possibilities:  One is

17   unthinkable, which is nobody picks up the tab for

18   municipalities and municipal services just go to waste.

19   That's unthinkable.

20        The second is the Commonwealth has to increase

21   appropriations to municipalities.  With the Oversight Board's

22   permission, I guess that would be possible.  Or the third is

23   the Commonwealth just has to increase direct service

24   provisions that municipalities can't afford because they're

25   all in contagion -- of Title III.  All of those are to be

1  avoided, and all of those are part of what the GDB

2  Restructuring Act and the Title VI are designed to avoid.

3  That is the epitome of a Title III -- of what's protected

4  under Title -- 303.

5      *Stockton* is just -- it's not even apples and oranges.

6  I think I've said it before, it's like pineapples and

7  concrete.  It's a situation where you're talking about no

8  balancing of public policy, no legitimate public policy goals,

9  no protecting municipal services.

10     The Court was really clear what's going on there.

11  There's one individual entity, Your Honor, that's being

12  preferred among all others for a private profit-making goal.

13  That's just simply not what's going on here.  And by the way,

14  all of these salutary municipal benefits are being done in

15  concert with overwhelming support from GDB's actual creditors

16  that have real life claims and lent three plus billions of

17  dollars to GDB.

18     And, Your Honor, I think the other component to 303

19  that really works together to emphasize, because remember the

20  GDB Restructuring Act, the GDB restructuring is consistent

21  with the fiscal plan of the Commonwealth.  What's leading to

22  303?  It talks about subject to Titles I and II, knowingly

23  submits the other power of the Commonwealth to regulate

24  itself.

25     And what did Titles I and II talk about?  Fiscal

1    plans and compliance with fiscal plans, and how the

2    Commonwealth and its sovereign entity and each of the debtors

3    have to comply with the fiscal plans.

4         I think the link to those two makes very clear, at

5    least to me, that Title III can't restrict compliance with a

6    fiscal plan by a Commonwealth entity, whether through

7    legislation or through entry into various agreements.

8         Your Honor, the -- and I think for those very

9    reasons, this is also -- this also falls within 362.  I don't

10   have it right offhand.  I believe in an ERS briefing, we've

11   articulated why a legislative act or a town's municipal

12   ordinance -- ordinance can also qualify as an action that is

13   protected.

14        THE COURT:  It falls into 362(B)(4) is what you --

15        MR. FRIEDMAN:  Yes.  Yes.  And I think, you know,

16   this is -- whether it's an exercise of police power or whether

17   it's an exercise of necessary provisioning of assets to

18   municipalities, you know, which is not really severable from

19   the remainder of the transaction, I think that is -- you know,

20   would clearly fall in the police power.

21        And we'd cite to *Faitoute Iron and Steel.*  You know,

22   it's classic police powers providing -- just making sure that

23   various instrumentalities have their assets.

24        THE COURT:  So you accept the proposition that but

25   for 303, 362(B)(4), 304(I), 362 is written broadly enough to

1   be applicable here, and so you need to be exempted or

2   protected from the operation of 362?

3          MR. FRIEDMAN:  So I don't, and I defer to

4   Mr. Bienenstock who articulated those points better than we

5   did.  I do think, though, that in my view, 305 -- I mean,

6   imagine 305, because I think 305 is an extraordinarily

7   powerful non-interference provision.  And I would add that to

8   the protections you discussed.

9          In my view, under 305, the Commonwealth repealed the

10  GDB Moratorium Act and went in and tried to get money out of

11  GDB.  It could either repay GDB's -- it could use that cash to

12  repay debts owed to -- that the Commonwealth owes GDB; it

13  could use that cash free from Court interference; or it could

14  add that money to its budget, and again, with the assent of

15  the Oversight Board, just appropriate it to municipalities.

16         And if it can do that, how can this violate the

17  automatic stay?  If it's protected from doing that under 305,

18  I don't see how this transaction is any different.

19         As 305 also says, this is, I think, consistent with

20  what you were saying, you know, if the -- you know, you don't

21  have to get approval of a 9019, which is not a stay issue.

22  It's an ordinary course issue.

23         One of the *Stockton* cases, I think it's *Stockton*

24  four, says, you don't need approval for a settlement.  So if

25  what the Commonwealth is doing here, and what HTA is doing and

1    what PREPA is doing and ERS is doing is settling with GDB,

2    that's not something that requires Court approval.

3            In some ways, I was heartened to hear Mr. Despins say

4    that the board of ERS and the board of every other entity

5    would have had to approve this on behalf of the debtors.  I

6    think that's a great idea.

7            I don't know that Mr. Bienenstock would agree that

8    the board of each one of those debtors is required to consent

9    to a settlement rather than the Oversight Board, both as

10   debtors' representative and as the gatekeeper under 305 to the

11   issues in which this Court is permitted to hear matters

12   relating to the debtors' property --

13           THE COURT:  Doesn't the legislation disable

14   instrumentalities and municipalities from contesting it, which

15   seems to me would obviate even the opportunity for --

16           MR. FRIEDMAN:  Yes, Your Honor.

17           THE COURT:  -- disapproval --

18           MR. FRIEDMAN:  Yes, Your Honor.  In our mind, it's a

19   completely appropriate exercise of the Commonwealth's

20   sovereign power over its instrumentalities.  And as this Court

21   has said, there certainly would have been a process under 204.

22           To the extent that there was an issue with whether

23   any of that legislation was inconsistent with a fiscal plan,

24   we would have had to score it; and the Oversight Board would

25   have had to say, sorry, you can't do that; and we would have

1    had to have a back and forth.

2          The Oversight Board didn't exercise a power to say,

3    this is inconsistent with anybody's fiscal plan, and nor -- so

4    I think those are, to me, the most important points to make.

5          I do think 304 immunizes certainly the Title VI

6    provisions and the Title VI proceeding, because the debtors

7    can consent to it.  You know, I agree that that doesn't

8    immunize the legislation, but I think the legislation is

9    immunized for a variety of additional reasons.

10          And again, I think Mr. Bienenstock is going to get

11    into a variety of other facts and legal arguments.  I will

12    reserve for, if necessary, a later time, further discussion of

13    releases and why overall this is actually an excellent

14    transaction from everybody's perspective, because I actually

15    don't think that's relevant to the issue of the stay.

16          But, you know, we have also heard some of the things

17    I think that the Court has expressed some concern about, and

18    we'll be working with Mr. Bienenstock and the Oversight Board

19    to clarify the scope of releases to ensure that, you know,

20    they're appropriate.

21          THE COURT:  Thank you, Mr. Friedman.

22          MR. FRIEDMAN:  Thank you.

23          MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

24    Bienenstock from Proskauer Rose, LLP, for the Oversight

25    Board.

```
1              THE COURT:  Good afternoon.

2              MR. BIENENSTOCK:  Good afternoon.

3         Your Honor, the General Creditors' Committee, which

4    we've all labeled the UCC, and the Retirees' Committee, have

5    certain constituencies.  The constituency of the UCC includes

6    vendors, has unions on it, so union claims.  The Retirees'

7    have clearly the retirees as their constituency.

8              And the Commonwealth has been paying vendor claims,

9    pre-petition vendor claims throughout the case.  The

10   Commonwealth has been paying the retirees.  Strange, we

11   haven't heard a peep from either committee about all these

12   stay violations going on all the time that benefit their

13   constituency.

14             How can that be that suddenly they had an epiphany

15   that not a payment but a future setoff to occur

16   contemporaneously with the Title VI approval suddenly

17   constitutes a stay violation when outright payments haven't

18   caused them to raise the same red flag in -- since these cases

19   have started.

20             And I think the answer is there are two answers:  One

21   is we're not talking about stay violations in the context of

22   Title III.  And the second is while they call this a stay

23   enforcement motion, I call it the UCC's motion to be Governor

24   for a term.  I was going to say Governor for a day, but they

25   would need more than a day.
```

1          They want to be Governor for a term, or they want to

2     be Oversight Board for a term.  And why do they want that?

3     Because they have a different business judgment as to how to

4     treat the assets and liabilities of GDB than the Oversight

5     Board and the Governor does.  And they would like to impose

6     their business judgment.

7          And we respect their thoughts and where they're

8     coming from, and perhaps it's something reasonable people

9     could differ on, although we think ours is far more

10    reasonable.  But essentially they're trying to find a way

11    through technicalities in Section 362 -- and I'll explain in a

12    moment why it's a technicality -- why they suddenly have an in

13    to become Oversight Board for a term, so they can change the

14    business judgment of the Title VI GDB deal.

15         In the -- going to the technicality issue, in Chapter

16    11, the reason why setoffs are stayed, setoffs against demand

17    deposits, are so that debtors can use the cash subject to

18    adequate protection and don't have to go out and borrow.  And

19    at the end of the day, because the setoff right creates a

20    secured claim, the debtor has to pay the secured claim in full

21    with interest; but during the case, the stay against setoffs

22    freezes the cash in place so they can use it subject to

23    adequate protection.  It doesn't mean -- it doesn't translate

24    a deficit position, as these Title III debtors have, into a

25    positive position.

1          So our pleadings explain why in the case of each of

2     the debtors, including ERS, PREPA, Commonwealth, HTA, they're

3     in a negative position versus GDB.  They're not in a positive

4     position.  And since GDB doesn't need cash to operate

5     day-to-day because it has other cash, the notion that the stay

6     against setoffs in Chapter 11 should be used here, it is a

7     technicality.

8          But I would say what I'm not saying is technically

9     they're right, there's a stay violation, but since there's no

10    monetary impact, the Court should disregard it.  What I'm

11    saying is at best, under their theories, they have a technical

12    stay violation.

13         Under our view, in Chapter Nine and Title III, where

14    the debtor, because of the absence of Section 363, because we

15    are allowed to use our cash as part of the government's powers

16    of governing and political powers protected by Section 303,

17    because we are allowed to do those things, we don't even have

18    a technical stay violation here.

19         As we explained in our pleading, under their theory,

20    if someone buys electricity from PREPA, they're violating the

21    stay because they're exercising control over PREPA's property,

22    the electricity, and they're paying money for it, but they

23    disregard the payment.

24         With or without the GDB Restructuring Act, Your

25    Honor, these are transactions that the Board and the

1    government want to do.  One of the many unique things I've

2    learned in Puerto Rico laws, and I'm by no means an expert on

3    them, but one thing I've observed is they love to have laws

4    that micromanage.

5          Take this revenue, put it in a general account, pay

6    certain expenses, move it to another account, then move it to

7    another account, then pay some more expenses, then pay the

8    debt.  They love to have micromanagement, and that's what

9    they've done here.  Take this debt and offset it against that

10    loan.

11          Okay.  We would do that without the statute.  That's

12    why this is not a stay violation.  These are commercial

13    transactions that, because it's GDB and it's not in Title III,

14    the Governor wants to do.  But on the counter-party side, the

15    Title III debtors, the Oversight Board wants to do these

16    transactions for the reasons I explained earlier.  Namely, we

17    see ourselves in a net deficit position, the Title III debtors

18    against GDB.

19          So we don't see it as giving up value.  We see it as

20    protecting what will happen to our liability side.  They've

21    protected against bringing down HTA by suing on the loan,

22    giving the bondholders the power to do that.  AAFAF will be in

23    control of that and the like.  And these are business

24    judgments.  These are the judgments that the UCC and perhaps

25    the Retirees' Committee would make differently if they could.

1    But this is not a case, especially in Title III, where the

2    Court can effectively make them trustee to make the

3    judgments, or make them Governor, or make them the Oversight

4    Board.

5         Now, I would -- I want to emphasize the threshold

6    issue.  Do they have standing to raise this in the first

7    place?  And I think looking at their own authorities, it's

8    clear that they don't.

9         So let's look at *Indian Motorcycle Company* that they

10   cite from the Bankruptcy Court in Massachusetts.  They cite it

11   for the authority that a creditor could raise a stay violation

12   and get relief.

13        Now, what actually happened in *Indian Motorcycle*?

14   What happened was for good or for bad, and it's a very

15   complicated position, but somehow it ended up that there was a

16   federal receivership in the District of Colorado, and there

17   was a bankruptcy in the Bankruptcy Court of Massachusetts, and

18   the two were vying over who's controlling the money and who

19   does it go to pay.

20        And the IRS was a big creditor of the debtor in

21   Massachusetts.  So after a lot of litigation, and the Tenth

22   Circuit ruling that the money was really money of the debtor,

23   a certain money they were arguing about and needed to be in

24   the Massachusetts bankruptcy estate, and the tax, the federal

25   tax needed to be determined under Bankruptcy Code 505 in the

1   Bankruptcy Court case, somehow it happened that the receiver

2   in Colorado was taking discovery of the IRS as if its tax

3   liability was going to be decided in the District of Colorado.

4   And when this was brought to the attention of the Bankruptcy

5   Court in Massachusetts, the Court said, oh, my gosh, the Tenth

6   Circuit has told me I have exclusive jurisdiction over this.

7   I have to carry out what the Tenth Circuit said.  The money

8   has to be here, and I have to decide the tax, so stop

9   litigating this issue in Colorado.

10          Now, they say that that's an example of a creditor

11   having standing to raise a stay violation.  Actually, they're

12   correct, the creditor raised it, but when you read the

13   decision, the Court was acting *sua sponte*.  The Court was

14   saying, to protect my exclusive jurisdiction over the tax

15   liability and the money that the Tenth Circuit told me I have,

16   I have to issue this Order.

17          Now, if they have to reach to a case like that to

18   show standing, I think that demonstrates what the First

19   Circuit has said, is we can't find a case where a creditor was

20   allowed to assert a stay violation.

21          I've run out of time.  So unless the Court has

22   questions, I'm finished.

23          THE COURT:  Give me just one moment.  Thank you.

24          MR. BIENENSTOCK:  Thank you, Your Honor.

25          MR. DESPINS:  Let me pick up quickly where

1    Mr. Bienenstock left off.  The *Indian Motorcycle* case is just

2    one case.  It cites itself, this is on page 11 of the

3    decision, six other decisions that stand for the proposition.

4              Basically, the Court says, you know, the question is

5    can the creditor raise a violation of the stay.  The courts

6    have answered that question clearly.  The automatic stay is

7    intended to both provide debtors breathing space from the

8    creditors and prevent unfair distribution of assets among

9    creditors.  And then they cite to six other decisions, or five

10   other decisions.

11         THE COURT:  So is it your representation that those

12   five other decisions stand for the principle that creditors

13   are granted standing as opposed to the principle that the

14   automatic stay has effects that are salutary with respect to

15   both the debtor and debtor's creditors, which I think nobody

16   here would dispute?

17         MR. DESPINS:  I think they stand for both

18   propositions, but let's assume they don't.  Your Honor, the

19   first rule that we find standing to intervene in an adversary

20   proceeding -- it would be bizarre if we could not be heard on

21   the issue of violation of the stay, because we have the right

22   to be heard on any issue in the case.

23         THE COURT:  But the First Circuit didn't hold that,

24   at least not directly, that you have through -- via 1109 the

25   right to initiate claims or causes of action.

1           MR. DESPINS:  No, but we're not initiating.  We're

2    asking the Court to enforce the automatic stay imposed by

3    Congress.

4           THE COURT:  You're initiating a request.  But we

5    could dance on the head of that pin for a while.

6           MR. DESPINS:  But I think it's important to remember,

7    Your Honor, this is an entity in liquidation.  This is all

8    about who's getting what out of that pie.  It's purely a

9    financial transaction.

10          There are no -- I know the statute says all these

11   beautiful things, but I hope you know these statutes are

12   drafted by lawyers that, you know -- so when they say, for

13   example, this provision is saying that none of the debtors

14   have standing to raise this issue, I would -- you know, let's

15   not speculate where that came from.

16          But maybe next time they want to say the Creditors'

17   Committee cannot appear in court to fight the issue.  The

18   point is these statutes are drafted with an angle, and there's

19   a spin on it.  And obviously that's what they did in the

20   statutes.

21          And the statement of motive, they say we're doing

22   this -- basically, it's not as if they were writing Section

23   303 in that statement of motive, Your Honor.  So we can't be

24   -- the Court cannot be bound by that.

25          Mr. Bienenstock raises the issue of, we can pay

1    vendor claims and all that.  That's not the point, Your Honor.

2    What's happening is that there's a global discharge being

3    given to this entity through a statute.  The discharge,

4    basically it's Section 702 of the GDB Act, it says that the

5    debtors -- any claims against this entity is limited to this

6    net amount.  That's it.  All of the other claims are

7    disallowed.

8          And that is in the nature of a bankruptcy discharge

9    and a bankruptcy statute.  And it doesn't apply only to Title

10   III debtors.  Even though I don't have standing, to be clear,

11   to raise those other entities -- this applies to about 30

12   other entities.  And the reason why the automatic stay is not

13   only technical -- Mr. Bienenstock says, hey, we know that we

14   are -- that the GDB is owed more money than it owes.  Wait a

15   minute.  What analysis has been done of that?

16         He said, for example, in his papers that PREPA has

17   received a preference under the GDB statute, because GDB was

18   insolvent, would receive the money.  Well, let's talk about

19   that for a second.

20         If that's the case, these payments were made in 2014,

21   2015, Your Honor, and you know that in the statute that

22   creates GDB, it is a felony for officers of GDB to receive

23   deposits while they're insolvent.  So they're all over the

24   place.  Meaning they're so intent on pushing the restructuring

25   through, they're hopelessly conflicted.

1          How can they put themselves in the position of a

2   judge to say there's a preference action?  They obviously

3   haven't thought of all the consequences of that.

4          The point is that they're on both sides of the

5   transaction.  That's why there has to be a process, because if

6   they move to lift the stay, there would be an issue about the

7   claims of GDB against the Commonwealth, would they be allowed,

8   because you can't set off a claim that's disallowed.  That's

9   why there's a court process to do this.  And that's what the

10  Court should do in this case, Your Honor.

11         THE COURT:  And so the Court should review or permit

12  you to review at every level of detail the business premises

13  of the judgments entered into by the Board, which was created

14  and structured by Congress to represent the debtor and the

15  various instrumentalities?

16         MR. DESPINS:  That's a loaded question, you see, in

17  every degree of detail.  No, but when they're conflicted like

18  this, there's no way of getting around this.  This is like

19  COFINA.

20         THE COURT:  This is a structural problem, like COFINA

21  --

22         MR. DESPINS:  Yes.

23         THE COURT:  This is the place where Congress put

24  them.

25         MR. DESPINS:  Correct.  But by the way, judges

1   appoint Chapter 11 Trustees in multiple debtor cases all the

2   time.  It doesn't mean that a judge is saying, oh, by the way,

3   you can steal from one debtor and give it to the other.  Of

4   course not.

5            So the fact they've been appointed for all of these

6   doesn't absolve them of being in a conflict position.  And

7   this case is so blatant.  When they say this debtor has some

8   exposure for a preference, of course not thinking of the

9   consequence of that statement --

10           THE COURT:  And Congress specifically said I can't

11  appoint examiners; I can't appoint operating trustees.

12           MR. DESPINS:  That's true, but --

13           THE COURT:  Unlike Chapter 11.

14           MR. DESPINS:  We understand that, but that has

15  nothing to do with the issue of whether the automatic stay

16  applies and whether it should be a process before Your Honor.

17           And of course you would be the ultimate decision

18  maker whether the stay should be lifted.

19           Look at the *Sonix* factor.  If they moved --

20           THE COURT:  So let's talk about that rather than

21  structural conflicts.  Let's talk about the automatic stay.

22           MR. DESPINS:  Okay.

23           THE COURT:  So if you have anything more to talk

24  about in terms of standing or the operation of the automatic

25  stay, I'd invite you to do that.

1              MR. DESPINS:  Well, Your Honor, I think we've made it

2     clear that we have standing to raise the automatic stay, so

3     I'm not going to go through that again.

4              I believe the stay is implicated.  It's not only a

5     technical violation.  If the stay were applied, there would be

6     a process before this Court to determine whether the claim of

7     GDB -- by the way, it's a filed claim in this case which

8     triggers the claims allowance process, whether that claim

9     should be disallowed or not, and then they can operate the

10    setoff.

11             They cannot, through this whole bankruptcy

12    legislation, accomplish that result.

13             Thank you, Your Honor.

14             THE COURT:  Thank you, Mr. Despins.

15             And thank you all for these arguments.  I will take

16    this motion under advisement, and decide it as promptly as

17    possible and issue a written decision on it.

18             So the remaining items that had been on the agenda

19    are adjourned to future Omnis.  Is there anything else that we

20    need to address together this afternoon?

21             Seeing no hands and having no notes from New York, I

22    will say that this concludes today's agenda.  The next

23    scheduled hearing date is October 3rd, 2018, in New York for

24    the GDB standing hearing.  And the usual video connection will

25    be available here in San Juan.

1              I thank the court staff in Puerto Rico, in Boston and

2    in New York for their work in preparing for and conducting

3    today's hearing, and for their superb ongoing support of the

4    administration of these very complex cases.

5              Keep well, everyone, and safe travels to all.  We are

6    adjourned.

7              (At 12:24 PM, proceedings concluded.)

8                                    *      *      *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    U.S. DISTRICT COURT      )

2    DISTRICT OF PUERTO RICO)

3

4         I certify that this transcript consisting of 100 pages is

5    a true and accurate transcription to the best of my ability of

6    the proceedings in this case before the Honorable United

7    States District Court Judge Laura Taylor Swain on July 25,

8    2018.

9

10

11   S/ Amy Walker

12   Amy Walker, CSR 3799

13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

< Dates >
August 21 26:22
August 27 13:4, 13:5
August 28 6:24
August 29, 2018 5:17
August 31, 2018
  11:14
December 2018 6:18
July 2018 13:3
July 25, 2018 100:7
June 2018 11:18,
  13:15, 13:19
June 29, 2017 68:22
June 5 23:18, 24:2
June 6th 55:12
May 2019 7:7
May 30 24:3, 24:8
November 5th 48:11
November 6th 69:19
November 7th 54:2
October 1 52:19
October 15, 2018
  6:11
October 24th 53:24
October 3rd 44:21,
  45:4, 46:11, 46:24
October 3rd, 2018
  98:23
September 13, 2018
  1:16, 4:2
September 14 13:5
September 18, 2018
  7:9
September 7 26:24


< 1 >
100 100:4
103 12:12
10:00 53:3
10th 38:3
11 34:23, 39:12,
  59:11, 60:16,
  73:5, 73:21,
  88:16, 89:6, 93:2,
  97:1, 97:13
11. 34:22
1109 93:24
11:00 53:2
11:22 68:18

11:35 68:17
11:38 68:19
12 44:18, 47:2,
  47:4, 53:15
12(b)(1 52:12
12(c 46:16, 53:9
127 50:4, 50:15
127-2 50:15, 52:7,
  52:11
127-2. 52:9
127-4 49:9, 50:14,
  51:6, 52:5, 52:10
127-4. 52:11
128-1 52:6
12:24 99:7
12th 46:20
13th 40:16, 46:21,
  53:1, 54:4, 54:14
14 69:24
14. 70:2
167,000 26:5
17-BK-3283(LTS 1:6
174 11:15
18 15:9
18-CV-1561(LTS 1:24
18th 44:3


< 2 >
2-B 63:24
20 69:23
2014 95:20
2015 95:21
2017 12:12, 43:1
2017. 78:24
2018 12:15, 79:4,
  79:5
204. 85:21
20th 40:17
22nd 53:24
26 35:20
299 11:15


< 3 >
30 35:20, 95:11
303 72:24, 76:8,
  78:8, 78:12, 80:7,
  82:18, 82:22,
  83:25, 89:16,

  94:23
303. 80:18, 82:4
304 86:5
304(I 77:20, 77:21,
  83:25
305 72:24, 78:16,
  78:20, 79:22,
  80:7, 84:5, 84:6,
  84:9, 84:17,
  84:19, 85:10
305. 78:8, 78:17
30th 54:3
362 83:25, 84:2,
  88:11
362(B)(4 72:25,
  77:2, 77:11,
  77:14, 83:14,
  83:25
362. 83:9
363 73:8, 73:14,
  89:14
3797. 68:23
3799 100:12
3849. 68:11
3: 1:6, 1:24


< 4 >
40 14:10, 15:6, 22:7
46. 22:8


< 5 >
50 72:10, 72:14,
  72:15, 72:16
505 91:25
510(B 71:16
53 22:8
55 35:18
56 22:8
5:00 52:19
5:00. 36:4


< 6 >
65 11:23
6th 48:11, 48:13


< 7 >

70 14:12, 34:17,
  34:24, 38:24
7012 53:13, 53:15
702 38:24, 95:4
74 14:10
75 72:10, 72:14,
  72:15, 72:16

< 8 >
84 12:12

< 9 >
90 29:19, 29:22
9019 27:10, 73:10,
  84:21
903 78:13
95 12:11, 34:18
99.5 12:9
9:36 4:3

< A >
AAFAF 5:18, 13:1,
  14:6, 16:7, 28:11,
  29:15, 30:5,
  30:11, 34:2, 34:6,
  34:15, 38:23,
  39:1, 41:2, 42:10,
  43:6, 44:2, 51:7,
  51:12, 51:15,
  62:2, 69:11, 71:7,
  80:13, 90:22
abeyance 20:12,
  48:16
ability 21:6, 42:22,
  51:18, 100:5
able 15:5, 27:7,
  36:5, 39:16,
  48:18, 61:13,
  67:2, 73:13
absence 29:18,
  48:10, 61:6, 89:14
absent 74:24
Absolutely 40:5
absolve 97:6
absorb 62:12
abundantly 45:11
accelerated 54:1

accept 50:24, 83:24
acceptable 46:22,
  53:13
accepted 34:19, 47:8
accepting 35:5
access 10:16, 10:22,
  11:6, 50:7
accommodating 56:16
accomplish 13:9,
  98:12
accomplished 15:20,
  15:22, 42:19
accordance 6:8,
  13:12
accordingly 47:11
account 8:12, 27:3,
  90:5, 90:6, 90:7
accountability 63:6
accounts 35:19,
  45:17
accurate 100:5
accustomed 57:18
achieve 13:17
across 52:17
Act 17:17, 18:21,
  30:19, 36:1,
  38:25, 43:2, 74:3,
  74:6, 75:18,
  80:20, 80:25,
  81:9, 82:2, 82:20,
  83:11, 84:10,
  89:24, 95:4
acted 72:18
acting 92:13
action 77:3, 77:5,
  77:12, 77:17,
  78:14, 83:12,
  93:25, 96:2
actions 7:1, 7:6,
  10:9, 10:10, 31:1,
  77:17
activate 12:23
Actively 12:6, 63:13
activity 12:24
actual 42:9, 48:7,
  48:9, 48:10, 82:15
Actually 49:15,
  49:17, 51:6,
  52:10, 54:22,
  86:13, 86:14,

91:13, 92:11
Ad 2:10, 13:2, 32:19
add 30:12, 52:13,
  84:7, 84:14
adding 9:17, 52:22,
  53:7
addition 12:19,
  43:22
additional 11:18,
  11:24, 13:6,
  36:21, 45:5, 56:2,
  63:23, 64:3,
  65:11, 86:9
address 17:18,
  23:11, 57:19,
  69:12, 70:8,
  70:14, 78:7, 98:20
addressed 56:18,
  78:8
addresses 48:17,
  52:11, 60:10
addressing 48:1
adequate 24:16,
  40:3, 57:19,
  88:18, 88:23
adequately 65:21
adjourn 51:18
adjourned 98:19,
  99:6
adjournment 51:8,
  52:16, 53:5
adjournments 51:16
adjustment 5:21,
  6:10, 6:17, 14:16,
  22:24, 23:12,
  23:20, 23:21,
  24:1, 24:15, 25:8,
  33:22
Administered 1:11
administration 99:4
administrative 56:15
admonition 56:6
adopt 15:18
advance 25:10
advantage 8:8
adversaries 53:18
adversary 46:14,
  48:2, 48:3, 48:17,
  49:21, 52:8,
  52:13, 52:14,

55:1, 93:19
advisement 98:16
Advisory 2:5, 47:23,
    56:13, 57:8,
    57:20, 58:7, 58:23
affairs 29:6
affect 76:7
affiliated 73:16
affirmative 71:14
afford 81:24
affords 57:17
afternoon 87:1,
    87:2, 98:20
agencies 12:18
Agency 2:4
agenda 51:18, 68:15,
    68:20, 98:18,
    98:22
Agent 2:13, 6:14,
    20:21, 23:14,
    23:17, 31:15,
    31:20, 32:17,
    32:18, 33:4, 33:7,
    33:9, 33:11,
    33:15, 62:8
agents 6:2, 20:12,
    28:2, 38:23, 43:20
aggressively 18:20
ago 18:11, 19:14
agree 33:20, 35:18,
    54:3, 79:13, 85:7,
    86:7
agreed 19:13, 19:15
agreeing 55:4
Agreement 5:19,
    5:23, 6:3, 6:8,
    6:9, 6:13, 6:17,
    13:2, 13:4, 13:8,
    22:3, 28:10,
    31:19, 32:3, 32:9,
    32:24, 35:20,
    69:18, 81:5
agreements 35:22,
    69:17, 83:7
ahead 20:1, 36:18,
    48:15, 48:18,
    54:23
aid 41:1
al 1:16, 1:26, 1:40
alive 55:1

allow 57:2, 65:11
allowance 98:8
allowed 89:15,
    89:17, 92:20, 96:7
alone 25:5
already 4:18, 25:1,
    26:22, 28:22,
    35:21, 45:16,
    45:25, 48:20,
    55:20, 58:11,
    73:23
altered 81:2
alternative 81:14
alternatives 12:7
although 42:9, 56:9,
    70:14, 88:9
amendment 81:9
Amendments 13:17,
    80:25
among 42:10, 82:12,
    93:8
amount 22:7, 22:16,
    22:21, 34:20,
    34:21, 95:6
amounts 22:11,
    66:21, 66:22
Amy 100:11, 100:12
analysis 8:9, 24:22,
    55:21, 95:15
and/or 53:9
angle 94:18
angry 29:24
anniversary 7:6
announced 23:18,
    24:2, 51:16
answer 17:22, 17:23,
    54:20, 57:22,
    63:2, 70:10, 87:20
answered 93:6
answers 17:24, 87:20
anybody 86:3
apologize 17:6,
    49:14, 51:19,
    51:22
appear 24:7, 56:11,
    94:17
appearance 65:2
APPEARANCES 1:37,
    2:1
appearing 37:7

appears 24:15
apples 82:5
applicable 84:1
application 56:19,
    57:14, 57:16,
    58:24, 59:18,
    60:7, 60:10,
    61:10, 62:15,
    63:10, 65:4, 65:5,
    67:9, 73:14,
    76:25, 79:1
applications 55:17,
    59:16, 59:21,
    60:5, 61:15,
    61:17, 62:24,
    64:25
applied 7:15, 57:3,
    59:4, 60:21,
    61:12, 61:19, 98:5
applies 21:5, 77:17,
    95:11, 97:16
apply 22:17, 25:19,
    38:10, 55:17,
    73:18, 95:9
applying 55:16,
    55:20
appoint 97:1, 97:11
appointed 97:5
appreciate 16:10
approach 37:17,
    44:11
appropriate 7:23,
    10:3, 30:17, 31:1,
    31:4, 56:20,
    63:22, 65:15,
    84:15, 85:19,
    86:20
appropriately 17:17,
    60:9, 60:10, 72:18
appropriations 81:21
approval 37:14,
    37:20, 48:15,
    51:11, 54:22,
    54:23, 73:9,
    74:13, 84:21,
    84:24, 85:2, 87:16
approve 37:8, 37:11,
    37:23, 38:16,
    38:18, 38:20,
    39:4, 39:25,

47:17, 47:21,
48:1, 48:11,
54:16, 62:25,
74:18, 77:10, 85:5
approved 12:15,
18:11, 18:16,
43:8, 47:16,
48:19, 48:23,
54:14, 75:8
approving 39:21,
48:16, 74:15,
74:22, 75:1, 75:15
Approximately 11:15,
11:23, 12:11,
12:12, 14:10,
14:19, 15:9
area 67:4
argue 38:10, 77:11
arguing 60:1, 62:14,
78:3, 80:1, 80:2,
91:23
argument 44:16,
68:16, 70:15,
71:21
arguments 27:8,
27:20, 38:5,
53:18, 86:11,
98:15
arise 61:16
arises 71:3
arising 71:18
around 15:21, 38:22,
96:18
arrangement 14:1,
69:16
Article 38:24
articulate 56:10,
56:25, 59:15, 65:9
articulated 45:16,
58:9, 58:22,
58:23, 59:22,
60:20, 61:19,
83:11, 84:4
articulating 59:3,
59:5, 61:11, 63:8
ascribing 24:12
aside 14:19, 70:13,
74:11
aspects 38:17
assent 84:14

assert 92:20
asserted 74:5
assets 25:3, 37:15,
70:6, 80:15,
83:17, 83:23,
88:4, 93:8
associate 64:18
associated 8:5
assume 41:16, 70:23,
93:18
assuming 9:7, 59:9,
77:16
assumption 14:20,
70:22
assure 27:24
Atlantic 52:20, 53:2
attempts 59:12
attendance 61:18
attention 92:4
attorney 64:20
audible 4:19
augmented 68:7
August 11:22, 32:9,
55:22
authorities 10:2,
19:6, 19:7, 91:7
Authority 2:5,
13:21, 13:22,
13:24, 33:22,
35:7, 75:9, 76:1,
91:11
authorized 79:25
automatic 68:21,
73:13, 73:18,
73:22, 79:9,
84:17, 93:6,
93:14, 94:2,
95:12, 97:15,
97:21, 97:24, 98:2
available 12:16,
27:22, 34:14,
98:25
average 11:22,
12:10, 29:20
avoid 82:2
avoidance 78:14
avoided 82:1
aware 21:4
away 77:13
Ayala 1:44

< B >
back 4:9, 10:7,
15:11, 21:21,
36:23, 37:10,
53:10, 53:23,
55:24, 64:19,
68:16, 69:24, 86:1
backup 65:14
bad 91:14
balance 11:19, 15:8,
22:9, 39:11, 57:7
balances 11:14
balancing 65:24,
82:8
Bank 1:26, 2:7,
6:14, 8:5
banking 80:23
Bankruptcy 1:1,
33:18, 53:15,
71:16, 73:24,
74:1, 76:7, 76:16,
76:19, 79:22,
91:10, 91:17,
91:24, 91:25,
92:1, 92:4, 95:8,
95:9, 98:11
banks 29:12, 38:25
Based 5:22, 7:3,
8:16, 12:17,
14:11, 24:2,
34:14, 34:17,
34:23, 35:5,
41:25, 55:19,
69:16
baseline 57:1
Basically 72:15,
76:23, 80:19,
93:4, 94:22, 95:4
basis 28:23, 37:25,
71:17
bear 25:5, 49:17,
50:20
beats 79:22
beautiful 72:3,
94:11
become 88:13
becomes 45:10, 75:2
began 60:23

begin 5:5, 26:21,
   32:10, 62:13
begun 13:22
behalf 10:12, 23:7,
   23:14, 25:13,
   30:11, 31:14,
   33:23, 34:6,
   80:13, 85:5
behavior 62:13
behind 15:17
believe 10:13, 32:8,
   36:4, 58:20,
   62:22, 70:15,
   80:6, 83:10, 98:4
belts 63:5
beneficiaries 78:5
benefit 9:11, 9:18,
   15:22, 87:12
benefiting 9:12
benefits 7:15, 26:8,
   82:14
Beryl 12:21
beside 71:22
best 7:2, 7:14,
   89:11, 100:5
better 84:4
Beyond 45:16, 60:9
big 16:12, 17:24,
   91:20
bill 67:10
billed 58:14
billing 58:13,
   64:17, 66:9, 66:13
billion 14:10, 15:9
billions 70:12,
   70:15, 72:13,
   82:16
bills 66:18, 76:11
binding 33:14
bit 9:14, 17:25,
   18:19, 25:20,
   25:22, 26:7,
   47:24, 63:4, 63:5,
   71:25, 73:4
bizarre 93:20
blackline 50:16
blatant 97:7
Block 23:7
BNY 35:6
boiled 54:20

bond 5:24, 14:10,
   15:6, 34:18,
   35:13, 71:19
bondholder 9:10,
   9:11, 41:18
Bondholders 2:24,
   8:19, 8:20, 8:25,
   10:11, 13:3,
   24:25, 28:20,
   28:24, 29:2,
   33:24, 35:9,
   42:21, 90:22
Bonds 5:25, 34:20,
   35:7, 35:8
Bonistas 5:20, 28:24
book 49:18
books 49:16
borrow 88:18
borrowings 11:16
Boston 99:1
bound 20:22, 94:24
bowl 77:22
box 22:7, 22:15
boxes 74:20
Brady 2:26
break 68:15
breathing 93:7
bridge 21:12
brief 31:13, 32:15
briefed 45:25
briefing 45:6,
   45:25, 56:21,
   83:10
briefly 20:10,
   23:11, 26:17,
   27:5, 34:6, 70:14
bring 5:3, 7:1, 7:2,
   7:13, 9:3, 9:8,
   10:9, 10:11,
   29:11, 65:7, 69:2
bringing 90:21
broad 38:4, 73:17
broadly 83:25
broken 49:19
brought 8:24, 8:25,
   9:25, 14:25,
   16:12, 42:16, 92:4
brunt 25:5
budget 16:2, 84:14
buenos 4:5

bunch 17:19, 75:21
burden 60:4, 60:11,
   60:12
burning 12:8
business 73:8, 88:3,
   88:6, 88:14,
   90:23, 96:12
buyers 9:12
buys 89:20
bypass 21:7

< C >
CAE 35:16, 35:22,
   81:10, 81:11
call 16:23, 74:20,
   87:22, 87:23
camera 31:9
capacity 9:11
caption 52:14
care 26:13
careful 22:12, 42:11
carefully 63:18
carry 92:7
cases 8:18, 9:20,
   14:15, 14:18,
   23:23, 27:18,
   28:20, 28:25,
   32:10, 52:15,
   59:11, 61:24,
   62:1, 65:21, 69:4,
   70:12, 78:1, 80:2,
   84:23, 87:18,
   97:1, 99:4
cash 11:14, 11:20,
   11:21, 11:22,
   24:4, 24:6, 35:18,
   81:7, 84:11,
   84:13, 88:17,
   88:22, 89:4, 89:5,
   89:15
Casillas 1:44
cast 35:11
CAT 2:49
category 61:14
caused 87:18
causes 93:25
ceased 80:23
cents 35:18, 71:13,
   71:23, 72:6

certain 10:9, 18:24,
    19:19, 26:9,
    27:12, 35:16,
    36:18, 37:15,
    55:14, 55:24,
    62:2, 69:15, 87:5,
    90:6, 91:23
certainly 14:24,
    23:18, 32:22,
    34:8, 44:24,
    46:10, 47:9,
    56:10, 57:12,
    65:17, 67:20,
    85:21, 86:5
certainty 29:1
certification 34:16,
    55:9, 58:2, 63:25,
    68:7
certified 20:23,
    24:3, 24:5, 35:2
certify 24:14,
    26:18, 100:4
certifying 14:17,
    41:14
cetera 29:19, 47:9,
    70:13
challenge 21:6
change 22:9, 27:3,
    52:2, 58:1, 58:11,
    88:13
changed 58:4, 63:24,
    74:17
changes 53:4, 55:25,
    56:17
Chapter 34:22,
    34:23, 39:12,
    46:3, 59:11,
    60:16, 73:5,
    73:21, 88:15,
    89:6, 89:13, 97:1,
    97:13
characterization
    58:2
characterize 58:4,
    63:3
characterized 56:12
charge 17:9, 18:6,
    34:8
cheaper 67:13
check 10:20

checking 74:20
chunk 15:8
Circuit 33:18,
    76:22, 77:15,
    78:5, 78:6, 79:21,
    80:5, 91:22, 92:6,
    92:7, 92:15,
    92:19, 93:23
circulating 55:23
cite 78:1, 80:2,
    83:21, 91:10, 93:9
cites 93:2
Civil 53:19
claim 6:15, 41:19,
    70:25, 71:3,
    71:13, 71:20,
    71:22, 73:23,
    76:17, 88:20,
    96:8, 98:6, 98:7,
    98:8
clarification 43:11,
    63:16, 63:23
clarifications 36:21
clarified 43:22,
    43:23, 68:8
clarify 41:10, 77:9,
    86:19
clarifying 66:5
class 5:24
classes 5:24
classic 83:22
clean 53:10
cleaner 12:8
clear 21:16, 21:25,
    22:22, 25:21,
    31:17, 31:19,
    32:2, 32:6, 37:25,
    45:11, 54:24,
    59:2, 63:2, 63:21,
    72:20, 77:15,
    78:20, 82:10,
    83:4, 91:8, 95:10,
    98:2
clearly 8:9, 8:11,
    9:16, 10:4, 56:24,
    75:3, 76:13,
    83:20, 87:7, 93:6
clerk 32:16
client 69:17
clock 68:17, 72:1

close 47:16, 48:24
closer 31:3
closing 22:5
Coalition 2:24,
    33:24
Code 60:8, 71:17,
    79:22, 91:25
Cofina-commonwealth
    27:6
colleagues 61:1
collected 10:25
collections 11:22
colloquy 54:12
Colorado 91:16,
    92:2, 92:3, 92:9
com 67:15
comes 8:12, 35:25,
    64:23, 65:8,
    65:15, 67:9
comfort 43:24
comfortable 48:10,
    52:19, 54:21,
    66:14, 66:16
coming 7:9, 15:25,
    31:3, 62:24, 88:8
commenced 14:21
comments 23:11,
    27:6, 30:25
commercial 90:12
committees 11:5
Commonwealth-cofina
    6:1, 22:3
communicate 4:13
communicating 4:25
communication 36:22
communications
    21:12, 56:25
companies 73:16,
    73:21
companion 27:10
Company 2:16, 70:6,
    80:15, 80:16, 91:9
compelled 25:12,
    32:16
compensability 66:2
compensable 59:13
compensated 60:6
compensation 63:11,
    63:12
Complaint 45:9,

52:8, 52:14, 53:11
complaints 14:12,
  45:14
completed 13:14,
  41:3
completely 29:8,
  45:17, 74:24,
  85:19
complex 65:18, 99:4
compliance 83:1,
  83:5
complicated 91:15
comply 59:17, 83:3
component 30:18,
  82:18
components 5:15,
  42:20
composition 7:21
comprehensive 13:4,
  16:11
comprised 6:25
compromise 5:25,
  57:10
con 27:20
concept 21:22, 60:15
concepts 38:4
conceptual 37:4,
  46:14
conceptually 49:12
concern 8:11, 20:2,
  24:11, 25:12,
  37:3, 37:6, 43:18,
  46:5, 47:1, 51:9,
  56:18, 58:21,
  58:23, 58:24,
  86:17
concerned 16:11,
  17:25, 18:3, 18:9,
  18:19, 69:18
concerns 10:24,
  19:21, 20:7,
  23:13, 23:19,
  25:19, 36:11,
  44:1, 45:23, 47:7,
  57:8, 57:20, 58:7,
  65:16, 66:9
concert 12:17, 82:15
concession 14:1
conclude 48:6
concluded. 99:7

concludes 98:22
conclusions 37:5,
  38:6
concrete 82:7
concurrent 23:20
condition 77:18
conditions 32:24
conduct 19:4, 77:18
conducted 12:19
conducting 99:2
conference 4:11
confidence 57:4
confident 57:19
confirm 69:14
Confirmation 6:17,
  24:15, 27:8, 29:8,
  38:19, 39:12
confirmed 13:15,
  24:21, 25:2, 25:9
confiscation 5:2
conflict 18:4, 97:6
conflicted 95:25,
  96:17
conflicts 97:21
conform 62:13
conformed 53:6
confront 79:23
Congress 94:3,
  96:14, 96:23,
  97:10
conjunction 44:18
connected 49:24
connection 34:9,
  50:3, 53:25, 60:6,
  98:24
cons 27:8, 28:7
conscious 8:13
consensually 11:7,
  56:7
consent 76:24,
  78:16, 79:1, 79:9,
  85:8, 86:7
consented 75:8,
  75:12
consenting 76:21
consequence 97:9
consequences 25:5,
  96:3
consider 27:7
consideration 22:25

considerations 57:7
considered 25:9,
  25:16
considering 19:1
considers 42:24
consist 8:4
consistent 4:10,
  42:25, 43:2,
  52:17, 56:17,
  82:20, 84:19
consisting 100:4
constituencies 87:5
constituency 62:7,
  87:5, 87:7, 87:13
constitutes 87:17
constitutionality
  47:22
Constitutionally
  75:25
constructive 6:20,
  13:16, 17:20
construe 79:1
consultation 7:3
consulted 55:21
consulting 33:10
consummation 28:25,
  79:10
contagion 81:25
contained 6:7
contemplated 13:3
contemporaneously
  87:16
content 37:4
contentious 61:18
contest 47:9
contested 57:16,
  68:14, 68:20
contesting 85:14
context 14:5, 16:13,
  28:13, 31:5,
  56:11, 57:25,
  59:10, 62:6, 65:6,
  75:18, 87:21
contextually 21:9
continuance 51:14
continuation 51:8
continue 27:1, 27:4,
  55:17, 76:11,
  76:12
CONTINUED 2:1, 13:5,

51:11, 51:14
continues 6:12, 12:4
contracts 66:13
contributed 14:22,
  15:4
control 42:11, 71:7,
  72:23, 89:21,
  90:23
controlled 80:17
controlling 91:18
conversations 34:7
conversion 12:7
converted 11:17
convinced 25:11,
  64:5
copies 50:13, 50:18,
  64:12
copy 49:25
core 37:6
corporations 81:3
Correct 9:7, 10:19,
  19:18, 20:8,
  27:11, 66:4,
  69:20, 74:8,
  92:12, 96:25
correctly 51:21,
  80:3
corresponding 6:3
costs 67:2
counsel 4:6, 5:6,
  7:4, 13:24, 40:21,
  41:2
counter 44:9
counter-party 90:14
counts 46:1
couple 40:20, 44:22,
  57:25, 63:23
course 17:8, 18:15,
  25:17, 27:7,
  56:22, 57:15,
  73:7, 73:8, 75:1,
  84:22, 97:4, 97:8,
  97:17
COURTROOM 4:13,
  4:25, 5:3, 16:13,
  50:20, 65:12,
  65:16, 65:23,
  68:17
courts 93:5
covered 16:24, 49:4,

68:3, 73:2, 73:9,
  79:18, 80:7
covers 44:5, 60:23,
  60:24
crafted 47:25
create 66:12
created 6:25, 96:13
creates 57:16,
  88:19, 95:22
creature 33:17
creatures 33:11
creditor 36:18,
  78:1, 91:11,
  91:20, 92:10,
  92:12, 92:19, 93:5
Creditors 1:43,
  5:19, 5:22, 9:19,
  14:21, 14:24,
  15:13, 15:15,
  15:24, 16:6, 25:3,
  28:9, 68:21, 70:4,
  72:9, 76:15,
  77:25, 78:4,
  78:10, 80:15,
  82:15, 87:3, 93:8,
  93:9, 93:12,
  93:15, 94:16
criminal 10:1
criteria 60:11
critical 29:4, 29:6,
  29:13, 30:2,
  30:17, 80:18
criticize 14:24
cross 7:22, 37:10,
  51:15, 51:17
cross-cutting 46:9
CSR 100:12
Cumpiano 2:21
Current 11:16,
  12:10, 22:17
currently 11:4,
  11:20, 22:21
Curtin 31:12
customers 11:23,
  12:10
cut 28:22

< D >
damage 12:22

dance 94:5
dandy 49:16, 49:18
data 22:4, 23:2
date 13:5, 13:7,
  14:13, 30:21,
  41:14, 46:25,
  48:12, 53:23,
  55:17, 98:23
dates 54:3
day 33:9, 33:15,
  73:1, 87:24,
  87:25, 88:18
day-to-day 89:5
daylight 39:1
days 20:24
deadline 36:4,
  36:19, 52:18,
  52:25, 53:24
deal 18:2, 22:23,
  26:8, 27:6, 28:4,
  28:11, 30:1,
  30:18, 40:14,
  42:9, 42:11,
  42:18, 43:7, 44:2,
  65:15, 72:16,
  88:14
dealing 42:8, 70:12
deals 28:22, 52:13,
  73:6
dealt 8:13, 41:17,
  46:24
debrief 12:24
debt 6:24, 14:10,
  15:6, 15:8, 15:9,
  15:10, 16:2,
  23:23, 29:3,
  29:17, 90:8, 90:9
debtor 7:24, 8:8,
  8:24, 18:4, 39:5,
  62:6, 64:9, 73:5,
  73:12, 74:1, 75:6,
  76:17, 76:23,
  76:25, 88:20,
  89:14, 91:20,
  91:22, 93:15,
  96:14, 97:1, 97:3,
  97:7
debtor-consented
  73:20
debtor-initiated

73:18, 73:19
debts 81:7, 84:12
decide 45:4, 92:8,
    98:16
decided 48:2, 92:3
decides 28:2
decision 21:3,
    48:16, 78:6,
    92:13, 93:3,
    97:17, 98:17
decisions 76:13,
    93:3, 93:9, 93:10,
    93:12
declaration 43:5
deductions 62:23
deemed 10:2
defects 60:13
defendant 14:13
defer 84:3
deficiencies 60:13
deficit 22:16,
    22:21, 88:24,
    90:17
definitely 36:7
degree 42:4, 96:17
Dein 20:11
del 5:20, 28:24
deliberate 7:15
deliberating 9:2
delivered 12:11
demand 42:1, 42:3,
    42:7, 88:16
demonstrate 38:11
demonstrates 92:18
denial 5:2
departed 61:23
Department 36:23
departures 57:4
depending 32:17
deposit 35:19, 42:1,
    42:3, 42:7
deposits 41:20,
    88:17, 95:23
DEPUTY 50:20
derivative 6:15,
    33:17, 33:18,
    44:19, 45:8,
    49:21, 50:11
describe 75:13
description 47:14

deserving 15:16
designed 6:4, 65:7,
    65:9, 76:7, 82:2
desire 25:23, 28:15
despite 29:23
detail 96:12, 96:17
detailed 37:9
details 20:7
determination 43:1,
    47:19
determinations
    37:24, 37:25
determine 7:1, 7:12,
    42:24, 76:2, 98:6
determined 21:17,
    91:25
deterrent 9:21
Detroit 80:2
developed 55:19
Development 1:25,
    2:7, 8:5, 33:5,
    37:1
deviate 59:17
deviation 59:19
deviations 59:21
device 4:17, 4:19,
    4:25, 5:2, 49:24
devices 4:12, 4:16,
    5:3
devoting 26:7
dias 4:5
differ 88:9
different 8:20,
    9:19, 12:3, 12:6,
    20:18, 34:22,
    56:15, 62:23,
    64:7, 73:24,
    79:11, 79:16,
    84:18, 88:3
differently 41:18,
    90:25
difficulty 66:24
direct 31:20, 32:3,
    81:23
direction 35:9
directly 9:11,
    31:24, 93:24
directors 43:15
disable 85:13
disagree 31:16,

79:16
disallow 75:20
disallowance 74:23,
    77:8
disallowed 74:5,
    75:4, 95:7, 96:8,
    98:9
disallowing 75:2,
    76:17
disallows 74:3,
    75:19, 75:21
disapproval 85:17
disaster 28:5
discharge 95:2,
    95:3, 95:8
disclose 67:7
disclosure 6:10,
    27:19
disclosures 19:16
discount 22:14
discovery 67:6, 92:2
discuss 35:25, 40:23
discussed 55:13,
    59:10, 66:7, 84:8
discussing 21:23
discussion 79:18,
    86:12
discussions 11:5,
    13:8, 21:23, 30:3,
    36:18, 36:20,
    56:4, 59:1, 69:11,
    78:23
dispute 6:1, 93:16
disregard 89:10,
    89:23
distant 30:21
distinct 45:24
distribution 14:2,
    72:10, 93:8
District 1:3, 1:33,
    1:34, 91:16, 92:3,
    100:1, 100:2,
    100:7
Docket 1:6, 1:24,
    68:10, 68:22
docket. 51:17
document 37:19,
    49:8, 50:14,
    60:10, 64:12
documentation 37:20

documenting 6:6
documents 4:18,
   49:16, 55:9
doing 7:3, 8:10,
   18:25, 67:12,
   70:11, 71:21,
   72:7, 72:17,
   74:10, 74:11,
   76:19, 84:17,
   84:25, 85:1, 94:21
dollar 22:11, 35:19,
   66:21, 66:22,
   71:2, 71:13
dollars 15:9, 22:12,
   22:14, 22:15,
   70:13, 70:16,
   71:14, 71:23,
   72:6, 72:11,
   72:14, 82:17
dollars. 22:11, 71:6
done 16:1, 35:4,
   41:6, 43:7, 74:12,
   76:13, 82:14,
   90:9, 95:15
dose 27:19
doubt 72:22, 73:1,
   74:4, 77:1
down 29:11, 42:16,
   51:21, 54:20,
   65:2, 71:24, 90:21
download 50:4
downloaded 49:25
downward 24:23
dozens 75:22
draft 26:23, 26:25,
   55:23
drafted 53:11, 61:3,
   94:12, 94:18
dramatically 24:6
drastic 62:9
dropoff 66:17
due 6:20, 24:22,
   29:18
dueling 28:1
duplication 63:14
During 4:25, 11:21,
   12:15, 12:20,
   32:20, 88:21
dwarfed 42:2, 42:4,
   42:5

< E >
e-mailing 4:24
earlier 35:8, 43:10,
   54:3, 90:16
early 6:18, 44:18,
   53:4
easier 50:16, 50:23,
   51:24
ECF 68:22
echo 30:12
economic 81:2
economical 15:2
economically 12:4
economies 58:13,
   67:21
economy 29:4, 29:11
edits 54:7
effect 9:22, 29:7,
   55:14, 62:20
effective 64:1, 75:3
effectively 44:25,
   91:2
effects 93:14
efficiency 25:15
efficient 8:21
efficiently 7:16,
   65:22
effort 57:7, 66:12
efforts 6:21
either 45:21, 49:18,
   59:23, 63:13,
   66:18, 84:11,
   87:11
electric 13:11
electricity 89:20,
   89:22
electronic 4:12,
   4:16, 49:24,
   66:10, 66:25
electronically 51:6
elements 37:15,
   37:22, 38:20, 43:2
eligible 35:21
eliminate 28:5
embodied 8:15
emergency 12:15,
   12:16, 12:20
emphasize 82:19,

91:5
emphasized 81:11
emphasizes 81:10
employed 58:5
employment 15:19,
   29:18
enacted 75:6
enactment 35:17
encompasses 77:22
encouraged 19:6,
   65:20
end 11:17, 26:19,
   33:9, 33:15,
   38:18, 51:3, 53:5,
   57:21, 73:1, 88:19
endeavoring 7:11
ended 41:13, 91:15
enforce 68:21,
   79:13, 94:2
enforced 42:12
enforcement 42:17,
   87:23
engaged 56:3
enjoining 14:15
enlarges 15:19
enough 51:21, 74:19,
   83:25
ensure 7:23, 19:4,
   60:4, 86:19
enter 14:1, 35:19,
   68:9, 69:16
entered 5:18, 13:1,
   35:21, 51:17,
   78:17, 96:13
entire 22:25
entities 9:13, 62:7,
   75:21, 75:22,
   76:16, 95:11,
   95:12
entitled 41:25,
   60:6, 70:24, 71:12
entitlement 29:20
entity 29:7, 29:13,
   71:8, 75:6, 80:16,
   80:17, 82:11,
   83:2, 83:6, 85:4,
   94:7, 95:3, 95:5
entry 58:15, 59:9,
   68:10, 68:23,
   79:6, 83:7

enumerates 38:19
epiphany 87:14
epitome 82:3
equation 27:25
ERS 75:15, 83:10,
  85:1, 85:4, 89:2
especially 91:1
Esq 1:44, 2:21
essential 24:18
essentially 78:10,
  88:10
establish 46:2
establishing 14:22
Estano 78:5
estate 91:24
estates 9:9, 9:13,
  9:18
et 1:16, 1:26, 1:40,
  29:18, 47:9, 70:13
evaluation 7:23,
  55:18
event 46:11, 79:20
events 24:22, 25:24
Eventually 72:16
everybody 29:24,
  39:24, 40:6, 65:1,
  71:2, 86:14
everyone 16:5,
  33:14, 56:4,
  57:11, 60:18,
  65:22, 99:5
everything 20:15,
  67:20
evils 58:25
exactly 19:12,
  38:15, 77:9
Examiner 2:26, 55:7,
  55:16, 55:20,
  56:13, 57:3,
  59:14, 59:15,
  59:23, 60:16,
  60:19, 61:7, 64:9,
  68:7, 68:8
examiners 60:16,
  97:11
example 18:5, 18:8,
  18:10, 48:7, 59:6,
  61:17, 62:8,
  64:11, 65:19,
  71:19, 76:10,

92:10, 94:13,
  95:16
excellent 12:23,
  86:13
except 16:3
exception 72:25,
  77:16
Excess 35:16, 35:21,
  63:14, 66:22,
  81:10
exclusive 92:6,
  92:14
exclusively 33:6
executing 5:22
exempt 72:25, 77:13
exempted 84:1
exercise 72:23,
  83:16, 83:17,
  85:19, 86:2
exercises 12:19
exercising 89:21
Exhibit 50:15, 52:3,
  68:10
EXHIBITS 3:9, 65:19
exit 79:23
expand 18:2
expansive 80:4
expect 11:6, 13:6,
  26:17, 58:13,
  63:6, 63:7
expectation 67:20
expectations 57:1
expected 59:16
expenditures 11:21,
  63:22
expense 8:8, 67:19
expenses 90:6, 90:7
expensive 8:21,
  67:21
experience 34:23
expert 90:2
explain 59:21,
  88:11, 89:1
explained 57:5,
  89:19, 90:16
explanation 59:19,
  60:1, 67:11
exposure 97:8
expressed 20:4,
  23:14, 23:18,

86:17
extend 20:12, 43:21
extended 6:9
extension 21:9
extensions 13:6
extensive 51:5, 56:3
extent 8:23, 10:8,
  10:24, 45:1,
  46:13, 58:10,
  58:12, 59:12,
  60:4, 61:16, 85:22
extraordinarily 84:6
extremely 6:20
eyebrows 67:10


< F >
facilitating 13:18
facing 24:24
fact 24:9, 62:23,
  71:10, 74:6, 97:5
factor 97:19
facts 28:18, 69:15,
  86:11
factual 37:24
failure 60:9
Fair 9:16, 19:9,
  21:14, 42:21,
  64:22
fairly 25:21, 56:3,
  57:11, 57:18, 63:9
faith 43:17, 70:22,
  70:23, 70:24
Faitoute 83:21
fall 24:14, 83:20
falls 83:9, 83:14
false 29:9
far 18:7, 28:12,
  30:21, 88:9
Farr 31:14
fashion 58:12
fast 51:21, 69:4
fate 26:6, 26:9
favor 9:17, 35:11,
  35:13, 70:5
favorite 72:9
features 4:19
February 60:24
federal 46:22,
  91:16, 91:24

fee-for-service
  67:15
feedback 13:16
feel 25:12
feeling 37:17
fees 58:14, 59:11,
  59:13, 61:14,
  62:25
felony 95:22
few 16:23, 17:5,
  22:24
fewer 62:17, 62:18,
  62:23, 66:19
FGIC 69:9
fight 22:14, 94:17
fighting 67:5
file 17:21
filed 6:11, 14:13,
  14:18, 20:6,
  36:12, 52:14,
  56:1, 56:19,
  57:14, 64:12,
  68:10, 69:10, 98:7
filing 36:24, 40:6,
  50:4, 55:22,
  55:25, 57:15,
  73:12, 73:20,
  73:22, 73:25
filings 38:5
final 21:3, 63:12
finally 10:7, 29:16,
  35:14, 39:3
Financial 1:9, 2:4,
  2:15, 19:3, 21:20,
  29:11, 43:21,
  60:12, 77:19,
  78:14, 81:5, 94:9
Financing 11:24,
  35:7
find 8:17, 37:9,
  77:21, 88:10,
  92:19, 93:19
findings 37:5, 38:6
Findlaw 67:15
fine 50:25, 51:23,
  52:1, 53:20, 54:5,
  64:10
finish 16:8, 79:20
finished 9:6, 92:22
firm 14:9, 67:2

firmly 33:20
First 5:16, 18:21,
  27:6, 29:25,
  31:11, 41:22,
  52:12, 60:23,
  61:15, 61:17,
  63:1, 66:21,
  68:25, 70:3, 70:8,
  72:21, 74:2,
  77:15, 78:6,
  79:21, 80:5,
  80:14, 91:6,
  92:18, 93:19,
  93:23
fit 77:5
five 15:9, 17:19,
  35:12, 53:6, 93:9,
  93:12
fix 23:23, 27:4
flag 87:18
flat 66:13
flaws 46:3
fleet 12:4
flight 49:13
floor 64:1, 64:5,
  65:25
flow 24:4, 24:6,
  81:7
focus 23:22, 71:23
focusing 9:8, 18:7
folklore 33:18
folks 18:17, 22:10
follow 51:24, 58:25,
  66:8
Following 13:12,
  16:14
follows 46:19
footnotes 37:10
Forgetting 72:7
forging 39:13
forgot 76:22
form 36:12, 37:6,
  38:18, 56:2, 59:9
formal 43:5, 55:15,
  56:2
formally 32:21
formation 28:19
formerly 8:5
formulated 43:6,
  45:14

forth 21:21, 24:20,
  55:24, 68:6, 86:1
Fortunately 12:21
Forty-six 22:9
forward 7:14, 9:23,
  12:2, 13:23,
  16:13, 25:16,
  26:7, 26:8, 28:11,
  31:1, 31:2, 31:4,
  32:11, 33:21,
  55:18, 58:14, 59:9
found 4:24, 79:23
four 6:25, 17:19,
  84:24
fourth 81:9
frame 46:21, 46:22
framed 48:22, 65:5
frankly 47:20
FRCP 53:9, 53:15
free 84:13
freezes 75:21, 88:22
frequently 59:10
front 28:1, 46:24,
  49:9
fruition 55:1
fuels 12:8
full 20:1, 69:24,
  71:15, 88:20
fully 12:13, 45:14
fulsome 45:19
functions 29:14,
  80:21
funds 35:16
furthering 14:6
future 5:2, 11:18,
  15:22, 87:15,
  98:19


< G >
Gallagher 31:14
gatekeeper 85:10
gather 21:9, 21:10
gathered 11:1
gathering 59:24
gave 18:17
General 5:16, 37:3,
  87:3, 90:5
generally 18:25,
  37:7

generation 12:3,
    12:4, 12:7, 12:10
gets 41:22, 43:25,
    72:16, 80:18
getting 22:20, 24:9,
    53:18, 70:5,
    70:16, 71:2,
    71:13, 78:1,
    80:15, 81:15,
    94:8, 96:18
Give 18:21, 22:5,
    40:6, 59:6, 92:23,
    97:3
given 35:17, 39:9,
    39:12, 40:21,
    48:5, 62:3, 62:11,
    64:9, 67:3, 95:3
giving 90:19, 90:22
glad 6:22, 11:8,
    11:11, 51:4, 77:9
global 95:2
goal 12:5, 31:4,
    82:12
goals 82:8
Gordon 2:11, 23:6,
    23:7, 23:9, 23:10,
    26:11, 27:5,
    31:16, 32:8
gosh 92:5
governing 89:16
Government 1:25,
    2:6, 8:5, 8:6,
    10:6, 12:17,
    28:22, 37:13,
    75:22, 75:25,
    80:16, 80:17,
    80:23, 81:3,
    89:15, 90:1
governmental 9:12,
    80:21
Governor 15:18,
    26:22, 26:24,
    87:23, 87:24,
    88:1, 88:5, 90:14,
    91:3
gracious 5:4
grant 48:15, 80:8
granted 68:9, 93:13
grasp 22:19
great 50:19, 85:6

greatly 15:19
green 72:3, 72:5
grid 12:6, 12:11,
    14:2
group 13:2, 73:16,
    73:21, 78:4, 78:9
groups 10:11, 36:18
guarantee 66:2
guaranteed 15:10
Guaranty 2:15
guess 42:23, 72:12,
    81:22
guidance 39:16
guide 27:18
gun 17:20
guys 76:15, 76:16,
    78:9, 78:10


< H >
half 16:2
handle 65:18, 66:14
hands 98:21
handy 49:16, 49:17
happen 9:24, 30:21,
    32:25, 45:9, 90:20
happened 49:13,
    91:13, 91:14, 92:1
happening 74:15,
    95:2
happy 17:23, 28:3,
    57:21
hard 25:6, 32:21,
    33:12, 79:24
hardship 29:23
head 78:8, 94:5
heading 76:8
headlines 42:10
hear 6:22, 11:8,
    11:11, 18:19,
    28:13, 44:1, 51:4,
    85:3, 85:11
heard 36:23, 44:20,
    44:21, 86:16,
    87:11, 93:20,
    93:22
HEARING 1:32, 4:21,
    7:8, 10:14, 24:15,
    27:8, 27:19, 45:4,
    46:19, 46:20,

47:17, 51:10,
    51:11, 52:3, 52:6,
    53:1, 53:23, 54:4,
    54:14, 55:13,
    56:20, 61:17,
    65:8, 69:19, 70:9,
    70:20, 73:12,
    98:23, 98:24, 99:3
hearings 32:20,
    51:10, 61:20,
    62:16
heartened 85:3
heavily-negotiated
    31:22, 32:5
held 27:8, 29:10,
    48:16, 80:3
help 5:15, 6:20,
    13:24, 15:15,
    16:6, 30:15
helper 65:1, 65:3
helpful 49:16, 59:7
helping 30:16, 64:22
helps 15:23, 15:24
higher 29:25
highly 28:16
history 27:18
Hoc 2:10, 13:2,
    32:20
Hold 7:8, 19:23,
    35:12, 79:21,
    93:23
holder 6:15
holders 5:23
holding 20:21
Honorable 1:33,
    100:6
hope 6:17, 16:5,
    31:2, 59:20,
    62:21, 63:13,
    64:16, 64:17,
    94:11
hopefully 27:23,
    30:3, 45:3, 61:8,
    69:18
hopelessly 95:25
hopes 6:16, 17:21
hoping 15:20, 16:8,
    20:25
hour 66:13
HTA 26:20, 41:24,

42:2, 75:15,
84:25, 89:2, 90:21
huge 17:14, 42:5,
72:8
hundred 28:3
hundred-zero 28:5
hurricane 12:14,
81:1


< I >
idea 30:16, 40:7,
85:6
identification 10:10
II 42:23, 82:22,
82:25
III 1:8, 7:7, 9:13,
28:20, 34:10,
34:11, 39:5,
40:22, 41:12,
45:24, 46:7, 71:1,
71:8, 74:23,
75:20, 81:25,
82:3, 83:5, 87:22,
88:24, 89:13,
90:13, 90:15,
90:17, 91:1, 95:10
illegal 54:17
illogical 79:3
Imagine 61:23,
81:14, 84:6
immunize 86:8
immunized 86:9
immunizes 86:5
impact 8:7, 19:4,
25:7, 63:14,
80:20, 80:22,
89:10
impeded 48:21
impetus 15:11, 15:17
implement 43:7,
78:19
implemented 12:20,
58:12
implicate 45:17
implicated 98:4
implications 38:2
imply 77:21
important 17:1,
86:4, 94:6

impose 55:8, 88:5
imposed 94:2
imposing 55:13, 60:4
impressive 34:24
improperly 19:2
improve 27:24
inadequate 25:2
inclination 46:18
include 10:1, 18:24,
59:18
included 6:13, 35:5,
36:24
includes 38:25,
60:25, 87:5
including 4:19,
4:22, 5:1, 5:19,
6:13, 40:7, 89:2
inclusive 11:15
inconsistent 85:23,
86:3
incorporated 35:24
increase 21:22,
81:20, 81:23
indemnification
43:15, 70:24,
71:3, 71:11,
71:12, 71:13,
71:18, 71:20,
71:22
indemnified 70:18,
71:6, 71:12
Indian 91:9, 91:13,
93:1
indicate 44:13
indicated 47:15
indicative 38:8
indirect 10:18
individual 8:19,
8:20, 10:11,
33:13, 82:11
individuals 26:3,
26:9, 31:7
industry 13:16
influence 15:3,
15:12
informal 56:25
informally 59:23
information 4:14,
7:10, 10:16,
10:17, 10:25,

11:1, 11:6, 12:16,
16:12, 27:3,
34:14, 34:17,
35:6, 59:25, 67:6
informative 19:20,
20:6, 32:19, 55:9
Infrastructure 35:7
initial 47:4, 60:14
initiate 7:6, 93:25
initiating 94:1,
94:4
injunctions 14:14,
14:15
insight 47:24
insolvent 95:18,
95:23
instances 19:22,
65:13
instead 53:24
institutions 29:3,
29:12, 43:21
instrumentalities
8:6, 26:20, 41:17,
41:21, 42:12,
42:16, 75:8, 76:3,
78:15, 81:4,
83:23, 85:14,
85:20, 96:15
insulate 72:24
Insurance 2:16
insured 5:25
insurers 5:20, 13:8
intend 34:10, 38:8,
38:10, 48:5
intended 40:6, 64:4,
79:17, 93:7
intends 7:5, 44:2
intent 24:13, 69:15,
95:24
inter-debtor 18:2
interaction 31:1
interactive 17:11
intercompany 73:17
interest 4:6, 13:16,
17:1, 22:15,
25:14, 88:21
interesting 77:3
interests 15:1
interfere 33:4
interference 84:13

interim 55:16,
  60:24, 63:11,
  66:22, 66:23
intermittently 61:22
internally 59:4
internet 49:25, 50:7
interpret 78:19,
  79:14, 79:15
interpretation 33:13
interrogate 73:3
interrupt 9:5
intertwined 76:8,
  76:9
intervene 93:19
intra 73:16
introduction 58:4
invest 45:5
invested 29:3
investigate 19:24,
  69:15
investigation 6:24,
  8:17, 17:3, 17:7,
  17:9, 18:12
Investigations 6:25,
  7:5, 7:8, 7:11,
  8:3, 8:10, 9:1,
  9:15
investigative 43:13
investigator 17:16,
  17:18
invite 97:25
involved 15:3,
  21:21, 23:16,
  29:10, 75:24
involves 28:23
involving 70:12
Iron 83:21
IRP 13:19
irresponsible 28:16
IRS 91:20, 92:2
island 12:3, 12:10,
  29:2, 29:3, 30:2
issued 4:11, 34:12,
  43:5
issuer 9:12
issuing 54:22
item 68:20
items 23:23, 98:18
iteration 58:1
itself 21:18, 25:4,

41:19, 76:20,
  82:24, 93:2
IV 77:4

< J >
jaded 72:12
jail 18:14
jamming 44:25
Jenner 23:7
job 16:8, 63:7
Joe 31:14
joined 32:23, 56:20
joint 20:12
Jointly 1:11
Joseph 2:13
Juan 1:44, 4:1, 4:7,
  7:9, 98:25
Judge 1:33, 1:34,
  20:11, 33:8,
  55:12, 96:2, 97:2,
  100:7
judges 96:25
judgment 28:1,
  46:17, 46:18,
  47:18, 47:19,
  49:5, 57:12, 88:3,
  88:6, 88:14
judgment. 53:10
judgments 9:21,
  90:24, 91:3, 96:13
judicial 4:10, 6:21,
  38:4
judiciously 67:18
July 66:7
jump 17:20
June 24:5, 24:23,
  62:18
junior 5:25, 64:18
jurisdiction 46:12,
  46:16, 47:5, 92:6,
  92:14
Justice 36:23
justified 57:5
justify 59:12

< K >
Katherine 2:27
Keep 99:5

keeping 12:5
keeps 24:9
key 37:24
Kim 7:3, 7:13, 8:16,
  10:16, 10:25,
  11:1, 17:9
kind 65:16, 79:2
Kirpalani 2:24,
  31:9, 31:11,
  32:13, 32:14,
  33:25
knowingly 82:22
knows 14:5, 17:10,
  24:4, 26:2
Kobre 7:3, 7:13,
  8:16, 10:16,
  10:25, 11:1, 17:9

< L >
labeled 87:4
Lady 2:21
landed 54:15
language 36:24,
  37:3, 47:12, 49:4,
  51:6, 51:8, 52:4,
  52:6, 52:7, 52:17,
  53:5, 58:3
large 27:18, 65:18
largely 7:7, 12:22,
  16:3
larger 12:12, 15:1,
  15:13, 15:16, 42:6
largest 15:8
last 10:13, 10:14,
  21:25, 33:8, 34:7,
  36:4, 66:6, 70:9,
  70:20
late 24:5
later 6:11, 42:14,
  53:23, 86:12
Laura 1:33, 100:7
law 13:18, 13:19,
  38:6, 42:6, 56:17,
  67:2, 76:14,
  77:12, 78:9, 78:11
laws 76:1, 76:6,
  90:2, 90:3
lawsuit 54:17
lawyers 94:12

layered 46:20
LC 35:8
leading 24:14, 82:21
learned 90:2
lease 14:20
least 8:21, 29:13,
  36:5, 43:19,
  45:16, 46:8, 83:5,
  93:24
leave 24:16, 25:20,
  40:23
leaving 74:11
led 23:17
left 19:2, 93:1
legal 37:23, 37:25,
  66:17, 66:19,
  67:9, 67:11, 86:11
legality 47:22
legislation 35:18,
  42:23, 42:24,
  43:7, 43:20,
  74:10, 75:10,
  75:17, 83:7,
  85:13, 85:23,
  86:8, 98:12
legislative 83:11
legislature 15:18,
  15:21, 75:6,
  76:13, 76:18
legitimate 82:8
lending 29:2
lent 82:16
less 22:16, 22:20,
  65:3
lessening 63:14
lesser 29:17
letter 59:2, 61:2
level 33:19, 34:25,
  76:1, 96:12
levels 12:12
Lexus 67:5
liabilities 42:9,
  88:4
liability 41:24,
  42:2, 42:6, 90:20,
  92:3, 92:15
life 82:16
lift 76:24, 78:2,
  96:6
lifted 97:18

light 10:10, 19:5,
  19:7, 72:3
likely 21:2
limitations 33:19
limited 4:22, 5:2,
  44:18, 48:5, 95:5
line 53:8, 54:7,
  67:25
lines 12:13
link 83:4
linkage 32:3
linked 23:20
liquidating 29:7
liquidation 94:7
list 39:3, 55:19
listed 5:15
litigants 28:3, 28:6
litigated 60:17,
  60:18, 61:8
litigating 92:9
litigation 14:11,
  14:21, 14:25,
  15:12, 16:4,
  17:21, 39:23,
  44:9, 57:18, 91:21
litigations 8:20
little 17:25, 31:23,
  47:20, 47:24,
  63:4, 63:5, 71:25,
  72:22, 73:4
live 7:10, 30:13,
  40:13, 56:5
LLP 86:24
loaded 4:18, 96:16
loan 11:16, 11:17,
  11:19, 42:2,
  90:10, 90:21
local 28:24, 29:11,
  29:12
locals 29:10
logical 15:2
long 16:25, 54:4
long-dated 30:20
longest 28:19
Look 17:13, 17:17,
  19:25, 31:1,
  58:16, 64:19,
  80:25, 91:9, 97:19
looked 39:12, 47:2
looking 40:4, 50:24,

58:17, 60:22,
  63:18, 73:25, 91:7
looming 17:14
lot 15:11, 28:8,
  28:13, 29:2,
  29:10, 53:18,
  65:13, 72:14,
  91:21
lots 59:25, 65:19
love 22:22, 90:3,
  90:8
lower 64:16
Luc 1:43

< M >
maddeningly 72:1
magnitude 58:14
magnitudes 7:12
main 70:15
major 30:14
majority 11:21
maker 97:18
Management 1:10,
  56:7
mandate 8:16
mandatory 71:17
manner 10:18, 10:24,
  10:25
March 62:18
marching 33:21
Maria 2:17, 81:2
mark 54:9
market 13:14
Martin 1:40, 2:16,
  5:11, 26:15, 86:23
Massachusetts 91:10,
  91:17, 91:21,
  91:24, 92:5
matter 25:22, 41:23,
  42:8, 46:12,
  46:16, 57:16,
  68:14, 71:10,
  72:19, 81:14
matters 49:22, 56:7,
  62:2, 85:11
maximize 11:9
Mcmullin 77:15
mean 9:4, 25:11,
  45:7, 79:7, 84:5,

88:23, 97:2
Meaning 19:14,
   76:16, 76:22,
   95:24
means 90:2
measures 37:19
mechanism 81:16
mediation 14:11,
   28:10
mediators 6:21, 16:7
meeting 43:13, 44:3,
   61:18, 75:15
Mellon 6:14, 35:6
members 4:6, 7:1,
   8:4, 17:8
memorandum 67:19
memos 56:25
mentioned 14:4
meritorious 8:23
merits 46:19, 46:20,
   48:1, 72:21, 80:1
met 38:11
method 8:22
meticulous 63:9
micromanage 90:4
micromanagement 90:8
microphone 31:24,
   69:7
mid 13:15
milestones 13:13
million 11:15,
   11:23, 72:11,
   72:14
millions 71:6, 71:14
mind 12:5, 41:2,
   47:25, 49:1, 79:8,
   85:18
mindful 9:16
Minias 2:13, 31:10,
   31:13, 31:14,
   31:25, 32:2, 32:12
minority 16:23
minute 19:23, 31:10,
   49:17, 74:12,
   78:2, 79:24, 95:15
minutes 16:23, 17:5,
   69:24
miraculously 66:18
misleading 22:13
mistakes 27:4

misunderstood 27:14
mode 60:3
modification 37:8,
   38:16, 41:14,
   51:11
modified 55:8
modify 47:10, 73:25
moment 31:6, 32:10,
   88:12, 92:23
Monday 33:2, 36:12,
   40:12, 52:19
monetary 89:10
money 19:2, 22:19,
   27:22, 29:10,
   72:14, 72:17,
   84:10, 84:14,
   89:22, 91:18,
   91:22, 91:23,
   92:7, 92:15,
   95:14, 95:18
monitoring 61:22
monoline 5:20, 13:8
month 11:22, 26:19
months 17:20
Moratorium 84:10
morning 4:5, 5:4,
   5:9, 5:10, 16:22,
   23:6, 23:9, 32:14,
   33:3, 34:3, 34:4,
   34:12, 55:10,
   55:11, 64:11,
   69:9, 80:10, 80:12
motions 14:12,
   14:19, 14:20,
   14:21, 28:2,
   32:19, 47:19
motive 94:21, 94:23
motives 81:1
Motorcycle 91:9,
   91:13, 93:1
mouth 80:14
Movants 1:28
move 9:17, 13:23,
   53:9, 69:4, 78:2,
   90:6, 96:6
moved 97:19
moving 11:13, 12:1,
   23:24, 24:11,
   25:16, 27:23,
   28:11, 51:13

multiple 97:1
multitude 33:12
municipal 35:14,
   35:23, 35:24,
   81:18, 82:9,
   82:14, 83:11
municipalities
   30:14, 30:15,
   30:16, 30:20,
   35:12, 35:16,
   35:21, 42:13,
   42:16, 76:3, 81:6,
   81:7, 81:8, 81:11,
   81:12, 81:15,
   81:18, 81:21,
   81:24, 83:18,
   84:15, 85:14
municipalities. 81:4
municipality 41:17
Myers 30:10, 34:5,
   44:23, 80:11


< N >
name 76:22
Namely 90:16
naming 14:12
narrative 47:14
narrow 77:16
nature 48:5, 56:13,
   95:8
near 11:25, 15:7,
   69:7
necessarily 11:2
necessary 13:22,
   42:19, 63:22,
   64:5, 64:18, 66:1,
   66:2, 67:8, 67:22,
   83:17, 86:12
necessitates 59:22
need 17:13, 29:25,
   31:23, 35:1, 35:2,
   39:20, 45:4, 50:3,
   52:2, 57:4, 59:18,
   61:21, 63:8, 65:3,
   65:17, 67:18,
   71:15, 76:11,
   84:1, 84:24,
   87:25, 89:4, 98:20
needed 19:16, 67:14,

91:23, 91:25
needing 64:12
needle 9:17
needs 10:10, 19:5,
   39:24, 53:6,
   63:21, 65:1
nefarious 24:13
negative 29:17, 89:3
negotiate 15:1,
   15:13, 73:13
negotiated 33:12
negotiating 14:16
negotiation 42:11
negotiations 23:16,
   23:17
neither 37:14
net 42:17, 90:17,
   95:6
nevertheless 29:19,
   42:4
New 4:8, 6:14,
   20:23, 24:5,
   24:22, 27:3, 31:8,
   32:16, 34:1,
   39:13, 53:1, 53:3,
   60:15, 61:13,
   81:5, 98:21,
   98:23, 99:2
news 34:13, 36:3,
   36:7
Next 6:23, 20:10,
   20:23, 22:7,
   40:13, 40:17,
   41:23, 45:25,
   51:24, 68:20,
   72:16, 77:2,
   77:20, 78:7,
   79:15, 94:16,
   98:22
night 36:4
Nine 34:22, 89:13
Nine. 46:4
nobody 48:8, 81:17,
   93:15
nominal 22:11,
   22:12, 22:15
non-debtor 18:5
non-event 12:22
non-interference
   84:7

None 3:5, 3:11,
   32:25, 73:11,
   94:13
Nonetheless 56:1,
   56:16
nonspeakers 61:21
nor 4:14, 34:10,
   37:9, 37:14,
   80:21, 86:3
note 34:7, 34:19,
   35:1
notes 4:17, 4:18,
   98:21
nothing 46:23,
   52:10, 97:15
notice 38:4, 51:12,
   51:16, 52:3, 52:6,
   55:15, 57:11,
   66:11
notices 26:23
notification 57:9
notion 27:21, 73:4,
   79:9, 89:5
novel 66:19
November 46:20,
   46:21, 53:1, 53:4,
   54:4
Number 43:6, 43:14,
   43:18, 55:24,
   68:10, 68:23


< O >
O'melveny 30:10,
   34:5, 44:23, 80:11
objected 75:9
objecting 56:9
objection 36:19,
   44:20, 48:9,
   56:19, 57:16, 69:6
objections 17:21,
   36:21, 48:7,
   48:10, 48:14,
   56:2, 56:9, 56:11
objective 9:20,
   15:14
objectively 65:25,
   66:1
objectives 42:19
objectors 40:7

obligations 37:16,
   73:17
obscured 10:17
observed 4:23,
   67:21, 90:3
observing 4:7
obtain 35:18
obviate 85:15
Obviously 6:20,
   8:14, 10:23,
   20:18, 21:1,
   25:15, 29:6,
   31:16, 39:15,
   48:16, 48:18,
   48:23, 56:18,
   60:17, 61:25,
   62:5, 62:25, 70:6,
   94:19, 96:2
occur 6:18, 87:15
October 26:21, 54:3
odd 25:22
offered 3:5, 3:11,
   29:22
offerings 71:19
offhand 83:10
officers 43:15,
   95:22
offices 28:21
Official 1:42, 23:7,
   100:13
offset 90:9
often 59:25, 67:11
Okay 5:13, 19:19,
   20:15, 38:14,
   39:7, 40:9, 43:4,
   49:2, 49:7, 49:11,
   49:19, 50:12,
   51:3, 51:19,
   53:21, 54:6,
   58:21, 70:3,
   90:11, 97:22
Omni 10:14, 21:25,
   66:7
Omnibus 1:32, 32:20,
   55:13
Omnis 98:19
one. 60:17
ones 46:2
ongoing 13:9, 27:1,
   42:19, 99:3

online 7:10
open 23:24, 47:21,
  51:16
operate 65:21, 89:4,
  98:9
operating 11:14,
  97:11
operation 60:3,
  75:5, 80:22, 84:2,
  97:24
operational 11:20
operationally 29:14
operations 11:21,
  11:24, 12:1, 80:23
operators 14:1
opinion 47:23, 58:7
opportunity 12:23,
  25:14, 35:17,
  45:19, 62:11,
  85:15
opposed 9:9, 38:16,
  41:25, 47:18,
  67:13, 67:15,
  71:14, 93:13
oranges 82:5
Orders 4:11, 49:19,
  51:17, 52:17,
  63:12
ordinance 83:12
ordinary 73:8, 84:22
organization 12:18,
  80:22
original 22:2, 68:6
originally 56:3
Osmoa 76:23
others 32:17, 43:19,
  43:23, 82:12
otherwise 4:23,
  4:24, 6:9, 25:11,
  48:20
ought 19:7, 30:16
ourselves 67:17,
  90:17
outcome 28:5
outlined 59:3
outright 87:17
outset 27:2, 28:21,
  58:6, 59:15, 60:21
outside 4:13
outstanding 6:15,

34:18, 34:20,
  34:24
overall 35:15,
  35:23, 37:2,
  42:18, 86:13
overarching 12:5
overwhelming 82:15
owed 84:12, 95:14
owes 84:12, 95:14
own 10:12, 60:19,
  91:7


< P >
P3 13:21, 13:24
package 35:24
packing 65:16
PAGE 3:3, 93:2
pages 39:10, 100:4
paid 22:18, 71:15
paint 29:7
papers 46:11, 80:19,
  95:16
parade 8:20
paragraph 52:8,
  52:16, 52:22,
  53:6, 53:7, 53:8,
  53:16, 53:22,
  58:19, 58:22,
  63:24
paragraphs 51:7,
  51:9, 52:5
paralegal 64:17
parallel 52:2, 52:6,
  52:7
paraphrase 19:9
paraphrasing 19:1
part 4:14, 8:9,
  12:8, 18:3, 27:12,
  27:25, 28:4, 35:3,
  35:14, 35:15,
  35:23, 36:1,
  36:25, 43:18,
  62:19, 73:15,
  82:1, 89:15
participant 62:6
participants 4:8
participating 28:9,
  34:18, 35:13, 64:7
participation 34:24,

34:25, 69:10
particular 4:17,
  35:19, 58:1,
  61:13, 67:14, 81:1
particularly 7:19,
  16:11, 37:12,
  46:6, 58:23, 59:5
parties 4:6, 4:23,
  6:6, 6:9, 6:13,
  6:16, 7:2, 17:1,
  33:12, 37:13,
  38:1, 38:8, 38:9,
  38:10, 56:9, 57:18
Partnership 2:21,
  13:18, 13:22
parts 12:3, 23:24
party 19:18, 33:10,
  53:9
pass 76:1, 76:6,
  76:14, 77:7
past 19:8, 43:16
patience 54:8
Patio 5:20
Patios 28:24
pattern 20:21
pause 19:24
pay 76:11, 76:12,
  88:20, 90:5, 90:7,
  91:19, 94:25
paying 87:8, 87:10,
  89:22
payment 24:18,
  24:19, 87:15,
  89:23
payments 81:11,
  87:17, 95:20
peep 87:11
penalize 64:22
pending 77:12, 79:17
pennies 71:2
pension 76:12
pensioners 25:4
pensions 24:19
people 9:18, 15:15,
  15:23, 18:14,
  21:20, 31:3,
  43:22, 62:17,
  65:8, 65:14, 66:3,
  66:19, 67:4,
  70:17, 70:21,

71:1, 71:11,
74:18, 77:18,
80:21, 88:8
per 64:1, 64:3, 66:3
percent 12:9, 12:11,
12:12, 14:10,
15:6, 28:3, 28:4,
29:19, 29:23,
34:17, 34:19,
34:24, 35:20
percentage 22:24,
28:23, 29:25
perception 67:4
Perfect 18:5, 18:8
performed 64:20,
64:21
Perhaps 10:14,
27:13, 27:14,
43:19, 73:9, 88:8,
90:24
period 20:13, 60:22,
60:23, 60:24,
66:22, 66:23
permanently 11:19
permission 49:23,
50:4, 81:22
permit 96:11
permitted 4:22,
85:11
person 4:13, 4:22,
36:13, 44:21,
61:21, 64:14,
65:18, 67:12
personal 47:5
personally 10:21
persons 8:4
perspective 7:24,
12:22, 17:2,
20:18, 37:13,
86:14
Peter 2:7, 30:10,
44:23, 80:10
petition 73:21,
73:23
petitions 7:7
phase 46:17, 46:19,
47:14, 49:5
phone 60:1, 61:22,
67:25
phrase 43:19

PHV 1:40, 1:43, 2:7,
2:8, 2:11, 2:13,
2:16, 2:17, 2:24,
2:26, 2:27
pick 92:25
picked 51:7
picks 81:17
Pico 2:17
picture 16:6, 16:11,
16:12, 17:24, 29:9
pie 15:2, 15:13,
15:16, 15:19,
22:2, 94:8
piecemeal 23:25,
25:19
pin 94:5
pineapples 82:6
place 7:23, 19:17,
55:14, 62:9, 63:1,
68:16, 88:22,
91:7, 95:24, 96:23
places 57:11
plain 43:6
planned 32:15
plans 14:16, 14:17,
23:25, 26:18,
26:20, 26:23,
26:25, 27:3, 83:1,
83:3
platform 31:4
play 45:22
pleading 41:23,
89:19
pleadings 53:18,
89:1
please 31:24, 50:1,
69:2
plenty 21:23
plus 15:9, 64:2,
82:16
PM 52:19, 99:7
point 6:3, 22:4,
23:3, 25:3, 32:24,
34:10, 37:21,
38:7, 45:13,
48:19, 55:2,
62:14, 94:18,
95:1, 96:4
point. 31:22, 32:5,
44:6, 45:9, 71:23,

74:14
pointed 78:22
points 22:24, 68:4,
84:4, 86:4
police 83:16, 83:20,
83:22
policies 4:11, 12:17
policy 81:13, 82:8
political 76:12,
89:16
position 11:3,
11:14, 33:21,
37:14, 59:14,
61:7, 88:24,
88:25, 89:3, 89:4,
90:17, 91:15,
96:1, 97:6
positioned 7:2
positive 34:13,
88:25, 89:3
possibilities 81:16
possibility 48:25,
55:13
possible 7:17, 12:5,
16:9, 16:13, 40:5,
54:16, 56:8,
81:22, 98:17
potential 7:12,
36:21, 40:7, 46:15
potentially 45:15,
73:21
Power 12:9, 12:11,
78:19, 79:13,
82:23, 83:16,
83:20, 85:20,
86:2, 90:22
powerful 84:7
powers 83:22, 89:15,
89:16
practice 44:18
practices 58:13
pre-bankruptcy 70:25
pre-petition 71:4,
87:9
precisely 37:11,
37:22
preclude 46:13,
46:15, 65:20,
73:5, 79:9
predated 78:23

prefer 32:22, 40:12
preference 42:5,
    46:8, 95:17, 96:2,
    97:8
preferred 82:12
prejudice 44:16,
    47:1
prejudiced 45:21
preliminary 13:1,
    34:14
prematurely 43:24,
    45:21
premise 6:2, 22:2
premises 96:12
PREPA 11:13, 11:20,
    11:23, 12:1, 12:4,
    12:14, 12:19,
    12:23, 12:25,
    13:22, 14:1, 14:3,
    14:8, 26:20,
    41:24, 42:5,
    75:15, 79:21,
    85:1, 89:2, 89:20,
    89:21, 95:16
preparation 60:7
prepare 13:24
prepared 49:12,
    51:25, 70:9
preparedness 12:14,
    12:19
preparing 99:2
present 22:13
preserve 69:17
press 4:7, 4:23,
    34:12
pressure 63:4
presumption 55:19
presumptions 55:14,
    58:2, 58:4, 58:5,
    58:11, 67:19
presumptive 55:8,
    56:23
presumptuous 39:11
prevent 93:8
previewed 21:8
pricing 67:1, 67:6
primarily 15:22
primary 9:1, 56:8,
    56:11, 64:14
principally 41:2

principle 6:1, 22:3,
    31:20, 32:4,
    32:24, 43:8,
    60:15, 65:9,
    66:12, 93:12,
    93:13
principles 58:11,
    65:4
print 50:13, 50:14,
    50:15, 50:18
print-out 51:23
priorities 30:4
private 13:25, 82:12
privy 10:15
pro 27:20, 75:14
probably 8:21,
    20:23, 27:18,
    28:13, 28:19,
    28:24, 51:20,
    60:16
problem 17:18,
    19:13, 22:13,
    68:2, 72:4, 96:20
problematic 37:12
procedural 56:15,
    57:17, 58:25, 65:6
Procedure 14:20,
    53:19
procedures 7:23,
    12:20, 49:20
proceed 23:25,
    32:11, 36:5
proceeding 5:1,
    13:11, 13:19,
    19:17, 23:19,
    36:2, 46:14,
    48:17, 54:14,
    55:1, 64:8, 65:6,
    65:19, 77:3, 77:5,
    77:12, 77:17,
    77:22, 86:6, 93:20
Proceedings 2:48,
    4:15, 5:5, 7:19,
    16:14, 31:5,
    68:19, 99:7, 100:6
produced 2:48
professional 59:11,
    59:24, 63:15, 64:8
professionals 55:14,
    55:21, 55:24,

56:1, 56:12, 57:1,
    57:8, 57:20, 59:2,
    59:7, 59:12,
    59:16, 59:20,
    60:5, 60:12,
    60:20, 60:25,
    61:4, 62:11, 63:7,
    64:7, 64:24,
    65:17, 65:20,
    67:7, 67:17
profit-making 82:12
program 27:13
progress 6:19,
    14:11, 16:1, 16:7,
    16:17, 25:23,
    28:16
projected 22:21,
    27:22
projections 22:1,
    24:3, 24:6
PROMESA 1:8, 1:26,
    8:16, 42:23,
    42:25, 43:3, 46:3,
    62:4, 75:9
promise 27:24
promptly 51:25,
    98:16
proper 30:19, 76:24
properly 32:23,
    74:19
property 85:12,
    89:21
prophylactic 62:20
prophylactically
    63:13
proposal 44:17,
    45:2, 47:15,
    50:24, 51:2, 51:7,
    54:1, 66:11, 74:7
proposals 12:3,
    40:24, 44:10
propose 19:15, 24:16
Proposed 14:6,
    18:23, 25:8, 26:2,
    26:6, 36:12, 37:4,
    37:7, 37:21, 38:3,
    38:6, 39:6, 40:2,
    40:6, 40:23, 49:4,
    53:25, 55:25, 68:9
proposition 83:24,

93:3
propositions 93:18
proprietary 67:1,
  67:6
pros 27:7, 28:7
prosecutorial 10:2
Proskauer 5:11,
  26:15, 86:24
prospect 14:9, 15:6,
  21:10, 46:9
protect 15:1, 72:15,
  76:9, 78:13,
  78:14, 92:14
protected 82:3,
  83:13, 84:2,
  84:17, 89:16,
  90:21
protecting 82:9,
  90:20
protection 67:1,
  76:7, 88:18, 88:23
protections 57:17,
  84:8
protects 77:24
protocol 33:13
provide 5:13, 5:15,
  7:10, 28:18, 29:1,
  38:7, 64:15, 81:5,
  81:7, 93:7
provided 12:23,
  13:16, 67:25
providers 66:25
provides 24:18,
  28:8, 29:19
providing 83:22
provision 80:20,
  84:7, 94:13
provisioning 83:17
provisions 73:18,
  79:22, 81:24, 86:6
PSA 5:22
PSTBA 22:7
public 4:7, 7:8,
  34:13, 38:1,
  43:12, 44:3, 57:2,
  63:18, 81:3,
  81:13, 82:8
Public-private
  13:17, 13:21
publicly 16:13

PUERTO 1:3, 1:11,
  1:16, 1:40, 2:3,
  4:1, 4:9, 9:19,
  15:15, 15:23,
  29:4, 30:15, 31:4,
  35:7, 42:6, 80:21,
  81:2, 81:3, 90:2,
  99:1, 100:2
punish 77:17
pure 79:18
purely 77:18, 94:8
purpose 56:24, 57:8,
  57:9, 60:3, 78:11
purposes 30:14
pursuant 13:20,
  33:16
pursue 18:20, 19:6,
  19:25, 48:3, 48:9,
  71:10
pursuing 12:6, 19:7,
  69:6, 73:6
pursuit 79:10
purview 33:6
pushing 26:7, 26:8,
  95:24
Put 25:6, 38:9,
  38:12, 45:21,
  63:4, 67:18,
  70:13, 71:8, 90:5,
  96:1, 96:23
putting 14:19, 51:18
puzzled 47:20


< Q >
qualification 34:16,
  36:6
qualifications 13:25
qualify 83:12
qualifying 37:8,
  38:16, 41:14,
  51:11
question 54:19,
  58:10, 63:3, 64:4,
  65:2, 66:6, 70:8,
  74:9, 93:4, 93:6,
  96:16
questioned 54:16
questions 7:14,
  36:11, 40:20,

41:1, 44:5, 44:13,
  44:15, 57:22,
  57:25, 63:24,
  64:10, 67:23,
  92:22
queuing 74:12
quickly 7:16, 16:8,
  51:13, 77:2, 92:25
quid 75:14
quite 23:25, 68:4
quizzical 25:20
quo 75:14


< R >
radar 16:3
raise 25:12, 44:1,
  59:23, 67:10,
  87:18, 91:6,
  91:11, 92:11,
  93:5, 94:14,
  95:11, 98:2
raised 7:19, 10:24,
  17:15, 18:1, 33:2,
  38:22, 40:22,
  54:19, 56:20,
  58:10, 61:4,
  64:25, 66:9, 92:12
raises 67:10, 94:25
raising 32:19, 47:4
ramp 79:23
range 7:21, 72:10
rate 22:14, 64:17
rather 9:12, 37:4,
  54:2, 85:9, 97:20
rationale 28:9
rationally 15:13
Re 1:6, 1:22
re-org 27:18
reach 69:18, 92:17
reached 6:1, 13:7,
  31:20, 32:9
reaching 15:7, 36:19
read 45:13, 47:15,
  55:4, 63:24, 79:8,
  92:12
reading 11:3, 46:3,
  58:15
ready 44:9, 61:3
real 16:7, 72:16,

82:16
realistic 7:12
realize 39:17
realized 7:16
really 15:17, 18:3,
  18:7, 20:21, 33:2,
  41:24, 42:8,
  43:12, 54:25,
  67:2, 71:22,
  82:10, 82:19,
  83:18, 91:22
realm 63:15
reamortization 81:12
reason 15:2, 81:13,
  88:16, 95:12
reasonable 62:6,
  64:14, 88:8, 88:10
reasonableness
  55:15, 57:12,
  59:13, 60:11
reasons 25:18, 68:6,
  83:9, 86:9, 90:16
reassurance 63:17
rebuttal 69:25
recall 73:11
receipts 11:20
receive 95:18, 95:22
received 35:10,
  36:25, 56:9, 95:17
receiver 92:1
receivership 91:16
recent 13:13
recently 7:20,
  12:16, 13:23,
  64:12
recertified 79:4,
  79:5
recess 68:18
recognizes 64:10
recognizing 57:11,
  64:6
reconvene 68:16
reconvened. 68:19
record 4:14, 31:17,
  31:19, 32:2, 32:6,
  38:1, 68:8, 79:19
recorded 2:48
recording 4:21
recovery 71:14
red 87:18

redacted 10:17
redline 57:7
reduce 11:19, 23:24
reduced 24:6
reduction 58:14,
  81:7
reductions 62:9
refer 4:18, 10:5,
  22:6, 80:3
reference 25:15
referenced 29:17
references 37:10
referrals 10:1
referred 37:8, 53:19
referring 41:16
refers 38:4
reflected 66:7
reformulate 39:16
refuge 77:21
regard 53:20
regarding 23:11,
  54:13, 56:4, 58:3,
  66:9, 72:20
regardless 25:24
regards 47:7
regulate 76:2, 82:23
regulated 80:17
rehearsed 46:10
reigned 67:4
reinvestment 24:19
relate 46:1
related 32:25,
  40:20, 46:7,
  46:16, 49:22,
  56:12, 57:23,
  58:22, 69:15
relating 6:15,
  49:21, 85:12
relation 22:2, 46:3
relationship 62:3,
  73:25, 78:15
relative 24:7
release 34:12, 70:17
released 43:16,
  43:24
releases 18:17,
  18:21, 18:24,
  19:14, 19:15,
  26:2, 38:21, 39:4,
  39:6, 43:9, 43:12,

70:13, 70:15,
  72:7, 86:13, 86:19
releasing 43:20
relevant 86:15
relief 30:20, 35:15,
  35:24, 56:14,
  73:12, 81:6, 81:8,
  81:15, 91:12
remainder 83:19
remaining 98:18
remains 63:12
remarks 21:11,
  30:12, 41:4,
  57:21, 57:24
remedying 60:13
remember 33:16,
  82:19, 94:6
remind 4:10
repay 84:11, 84:12
repayments 11:18
repealed 84:9
repeat 20:15
Reply 52:18, 54:2
report 5:6, 5:14,
  7:3, 7:16, 8:15,
  10:18, 11:3,
  16:18, 16:23,
  18:15, 18:21,
  18:22, 19:19,
  19:21, 25:23,
  28:21, 34:2,
  35:10, 35:11,
  36:7, 36:16,
  43:13, 59:24
reported 7:13
Reporter 100:13
reporting 40:23,
  64:25
reports 59:1, 59:2,
  61:2, 61:3
repository 4:14
represent 58:11,
  75:23, 96:14
representation
  10:15, 93:11
representative 1:13,
  29:22, 41:11,
  62:1, 85:10
representatives
  17:12, 17:13,

38:24, 43:20
represents 6:20
request 10:6, 13:24,
   78:18, 94:4
requested 14:14,
   14:15, 56:14,
   67:24
requests 5:3, 10:2,
   12:2, 55:18
require 11:24, 34:20
required 37:14, 85:8
requirements 36:6
requires 60:8, 85:2
requisite 34:15
research 66:10,
   66:18, 66:25,
   67:10, 67:12,
   67:13, 67:21
researched 67:14
reservation 78:18
reserve 25:13, 32:7,
   32:22, 69:25,
   86:12
reserving 31:18
resiliency 12:6
resolutions 31:2
resolve 20:25,
   36:20, 73:6
resolved 8:22, 11:7,
   56:7, 69:10
resonate 70:19
resources 12:7,
   24:16, 26:8, 45:5,
   63:8, 66:20, 67:18
respect 5:20, 6:23,
   8:7, 11:13, 12:1,
   12:14, 12:25,
   13:10, 14:9, 22:1,
   27:6, 32:7, 35:14,
   43:9, 44:13,
   47:14, 60:5, 61:4,
   61:20, 69:19,
   81:10, 88:7, 93:14
respective 6:2, 9:13
respond 27:5, 30:6,
   58:6, 59:25
responding 32:21
response 12:24,
   17:16, 44:17,
   53:24, 67:11,

70:16
responses 12:2,
   12:18, 45:14
responsibilities
   7:22, 64:2
restored 12:9
restrict 83:5
restructured 15:7
resubmit 40:2
result 13:17, 58:15,
   62:19, 76:7, 81:6,
   98:12
results 19:14, 35:1,
   35:2
retained 13:24
retaining 12:6
retention 28:21
Retiree 2:10
Retirees 21:5, 23:8,
   23:15, 25:13,
   25:17, 26:5, 26:9,
   28:14, 29:19,
   29:22, 30:13,
   33:9, 87:4, 87:6,
   87:7, 87:10, 90:25
retransmission 4:21
retrieve 49:24
retrospective 58:24,
   61:10
returns 36:8
revenue 90:5
reverse 5:14
review 40:3, 42:23,
   75:10, 96:11,
   96:12
reviewed 55:17
reviewing 12:2
revise 39:8
Revised 24:10,
   24:23, 26:18,
   26:25, 40:2,
   58:16, 68:9
revising 26:19
revision 58:3, 63:25
revisions 56:4, 57:6
Rfps 12:2
RICO 1:3, 1:11,
   1:16, 1:40, 2:3,
   4:1, 4:9, 9:19,
   15:16, 15:23,

29:4, 30:15, 31:4,
   35:7, 42:6, 80:21,
   81:3, 90:2, 99:1,
   100:2
rights 25:1, 25:13,
   31:18, 32:7,
   69:17, 76:2,
   77:13, 78:18
ripen 73:14
risk 38:12
road 14:23, 15:4
Robert 2:11, 23:7
robust 58:12
role 33:10, 34:9,
   41:11, 62:3, 64:15
roles 16:2
rolled 46:11, 73:8
rolling 46:15, 52:11
Rose 5:12, 26:15,
   86:24
rounds 46:5, 46:6
routine 14:19
rowing 31:3
RSA 12:25, 25:17
Rule 44:18, 47:2,
   47:4, 53:15, 68:1,
   93:19
Rules 14:23, 15:4,
   53:19
ruling 47:10, 56:18,
   56:21, 80:5, 91:22
rulings 45:10, 62:20
run 12:4, 14:2,
   92:21
rushed 29:8


< S >
S/ 100:11
safe 99:5
salutary 82:14,
   93:14
San 4:1, 4:7, 7:9,
   98:25
sanctions 5:1
satisfying 67:17
saw 20:11, 20:16
saying 24:25, 54:17,
   71:5, 72:24,
   74:10, 74:17,

77:6, 78:2, 79:12,
79:23, 79:24,
84:20, 89:8,
89:11, 92:14,
94:13, 97:2
says 19:19, 19:22,
45:3, 45:7, 51:10,
64:2, 76:14,
76:23, 81:1,
84:19, 84:24,
93:4, 94:10, 95:4,
95:13
scenario 47:25,
54:25
scenarios 73:11
schedule 13:11,
13:14, 13:20,
44:9, 46:22,
47:10, 49:25, 52:8
scheduled 44:19,
44:20, 98:23
schedules 81:12
scheduling 40:24,
52:13, 54:1
scope 33:4, 38:1,
38:23, 86:19
score 85:24
search 12:8
Second 9:20, 43:9,
44:25, 47:14,
49:4, 50:20, 53:8,
64:14, 72:7,
76:22, 78:5,
81:20, 87:22,
95:19
Section 71:16,
88:11, 89:14,
89:16, 94:22, 95:4
sector 13:11
secured 88:20
securities 6:4,
71:18
Seeing 31:1, 66:23,
73:12, 98:21
seek 48:5
seeking 58:6
seem 47:6
seemed 47:3, 70:19
seems 25:22, 25:23,
63:25, 73:4,

73:20, 79:2, 85:15
seen 10:21, 19:20,
63:13, 66:17
segment 68:25
self-inflicted 70:21
selfish 18:3
Senior 2:23, 5:24,
33:24
sense 25:25, 30:17,
31:2, 52:12,
54:15, 70:21
sent 26:23
separate 9:24,
45:17, 74:17
September 38:3, 44:3
sequencing 25:24
serious 47:6
seriously 56:6
serve 29:15, 37:5
served 29:15
service 11:20,
12:13, 47:5, 47:8,
81:23
services 24:18,
80:20, 81:18, 82:9
serving 67:6
set 18:23, 22:7,
25:1, 45:5, 68:6,
96:8
setoff 72:23, 73:1,
77:7, 87:15,
88:19, 98:10
setoffs 88:16,
88:21, 89:6
sets 76:14
setting 67:15
settle 81:10
settlement 5:25,
6:10, 75:13,
75:18, 84:24, 85:9
settling 85:1
seven 53:23
severable 83:18
several 7:25, 12:2
share 56:13
sheet 6:4, 6:7,
23:18, 24:2, 24:7
shined 19:5
shoes 64:9
short 81:8

shot 30:5
show 9:23, 28:16,
92:18
shows 79:17
shut 76:10
side 90:14, 90:20
sides 96:4
Siemens 2:19
sign 75:3
signals 4:19
signatory 33:13
signed 13:18, 18:10,
20:11, 33:12
significant 13:15,
19:4, 25:7, 64:2,
65:10, 66:17,
81:5, 81:6
silence 55:4
similar 23:13
similarly 62:2,
73:15
simple 7:14
simply 24:10, 25:6,
26:1, 65:11, 82:13
single 37:18, 62:7
sir 23:5
sit 65:2
sitting 54:24, 64:22
situated 62:1, 62:3
situation 24:24,
46:23, 64:13,
81:2, 82:7
situations 64:19,
65:17, 73:19,
73:20
six 14:15, 17:19,
35:12, 53:7,
69:25, 93:3, 93:9
size 22:2
slow 71:24
slower 31:23
smaller 42:4
solicit 13:25
solicited 37:20,
74:19
soliciting 14:7
somebody 73:23
somehow 71:21,
91:15, 92:1
someone 8:24, 9:22,

11:2, 64:16,
64:21, 67:13,
89:20
sometimes 59:20
somewhat 5:14, 23:13
Sonix 97:19
soon 40:5
Sorry 9:4, 22:8,
27:14, 31:6,
31:11, 44:12,
50:12, 53:14,
85:25
sort 52:4, 58:7,
62:11, 64:13,
66:12
SOSLAND 2:16, 68:24,
69:5, 69:8, 69:9,
69:17, 69:20
sought 35:9, 37:14,
37:24
sounding 13:14
source 4:13, 11:2
sovereign 83:2,
85:20
space 93:7
speaker 61:21, 64:2,
64:3, 64:15, 66:3
speakers 34:1
speaking 67:25
speaks 11:1, 38:3,
65:1
Special 6:25, 7:5,
7:8, 7:11, 8:2,
8:10, 9:1, 9:15
specific 8:2, 30:13,
38:13, 46:1,
47:12, 58:21
specifically 20:7,
38:19, 44:13,
97:10
specifies 37:19
speculate 94:15
speculation 79:18
speed 7:15, 69:2
spell 48:6
spelling 37:22
spend 59:24
spent 60:25, 63:18,
74:20
spin 94:19

split 22:6, 22:8
splitting 68:25
spoken 10:17
sponte 92:13
spring 23:16
STADLER 2:27, 55:10,
55:11, 55:12,
58:8, 58:18,
58:21, 63:20,
64:6, 66:4, 66:16,
68:2, 68:3, 68:12,
68:13
staff 65:21, 99:1
stand 65:2, 93:3,
93:12, 93:17
Standard 52:20,
53:2, 56:23,
59:19, 61:11,
61:19, 61:23,
62:5, 63:10, 64:23
standards 34:20,
38:9, 38:11, 55:8,
55:15, 55:20,
57:2, 57:3, 57:4,
58:5, 59:3, 59:4,
59:15, 59:17,
59:18, 59:22,
62:12, 62:13, 65:5
start 5:17, 8:2,
8:19, 9:3, 17:3,
17:21, 37:6,
69:24, 70:1
started 28:20,
46:10, 87:19
starting 6:2
state 76:1, 76:6,
78:15
statement 6:10,
28:17, 47:24,
81:1, 94:21,
94:23, 97:9
statements 21:10,
32:8, 32:20
States 1:1, 1:34,
76:3, 100:7
status 5:14, 5:16,
12:25, 23:12
statute 8:16, 10:8,
75:2, 75:4, 75:5,
76:20, 78:13,

90:11, 94:10,
95:3, 95:9, 95:17,
95:21
statutes 94:11,
94:18, 94:20
statutory 7:20,
29:22, 33:22
stayed 88:16
steal 97:3
steam 20:1
Steel 83:21
stenography 2:48
steps 8:1, 41:14,
42:15
stipulation 33:11,
33:14, 33:17
Stockton 76:5, 78:8,
78:9, 80:2, 82:5,
84:23
stone 25:1
stop 92:8
Storm 12:21
straight 30:4
Strange 87:10
streamed 7:10
strict 61:14
strike 39:10
structural 13:7,
96:20, 97:21
structure 7:20,
22:20, 74:15,
75:12, 77:6
structured 74:24,
96:14
sua 92:13
Suarez 78:6
subcommittee 17:3
subdivisions 76:2
subject 5:1, 46:12,
46:15, 78:25,
82:22, 88:17,
88:22
submission 60:7,
68:7
submissions 49:6,
60:14
submit 59:16, 59:21,
60:10
submits 82:23
submitted 26:22,

26:24, 56:3, 57:6,
57:10, 73:9
subordinates 71:17
subset 8:3, 23:22,
23:23
substantial 24:10
substantive 14:20
subsumes 53:17
successful 9:11,
13:17, 21:13,
67:16
suddenly 87:14,
87:16, 88:12
sued 78:1
suffer 25:4
Suffice 27:21,
32:18, 42:15,
43:14
sufficient 60:2
sufficiently 38:8
suggest 26:1, 26:4,
52:22, 53:7, 68:15
suggestions 47:13
suing 90:21
sum 14:3
summary 13:12, 28:1,
46:16, 46:18,
47:18, 47:19,
49:5, 53:10
summer 12:20, 78:24
sunshine 11:10
superb 99:3
Support 5:18, 5:23,
6:3, 6:7, 6:8,
6:13, 6:16, 13:2,
13:4, 21:6, 28:10,
32:9, 64:15,
65:11, 82:15, 99:3
supported 35:8
supporting 61:21
supports 41:15
supposed 49:12
Supreme 60:18
surfaced 16:4
surpluses 24:4
surprised 70:4
survival 42:20
survives 46:14
Susheel 2:24
sustainability 29:18

SUT 22:8
Suzzanne 2:8, 34:5
Swain 1:33, 100:7
switch 31:9


< T >
tab 81:17
table 19:2
Tacoronte 50:14
taken. 68:18
talks 82:22
target 24:11, 27:23,
40:8
task 72:15
tasks 13:23
tax 91:24, 91:25,
92:2, 92:8, 92:14
Taylor 1:33, 100:7
technical 89:11,
89:18, 95:13, 98:5
technicalities 88:11
technicality 88:12,
88:15, 89:7
technically 89:8
teed 28:15
telephonic 4:8
template 38:7, 66:12
ten 20:24, 39:10
ten-minute 68:15
Tenth 91:21, 92:5,
92:7, 92:15
term 6:3, 6:7,
11:17, 11:25,
15:7, 23:18, 24:2,
24:7, 38:23, 81:8,
87:24, 88:1, 88:2,
88:13
terms 5:20, 6:8,
38:4, 97:24
territory 39:18,
76:1
texting 4:24
themselves 56:10,
60:13, 62:13, 96:1
theories 89:11
theory 18:16, 73:17,
74:23, 77:23,
89:19
there'd 47:6

thereof 5:15
thereunder 24:4
They've 74:16, 90:9,
90:20, 97:5
thinking 15:25,
47:1, 48:4, 97:8
thinks 54:20
third 60:24, 66:23,
81:22
thoroughly 57:5
though 19:13, 37:4,
84:5, 95:10
thoughts 88:7
three 5:19, 5:24,
14:19, 14:20,
32:24, 51:9, 52:5,
52:23, 62:16,
81:16, 82:16
three. 51:8
threshold 46:24,
91:5
throughout 7:19,
87:9
Thursday 40:13,
40:17
thwarting 79:2
tie 31:20
tighten 63:5
timekeeper 64:3
timekeepers 64:1,
66:15
timing 25:22, 40:4,
44:24
Titles 82:22, 82:25
today 5:5, 15:5,
16:1, 25:12,
25:16, 40:16,
54:25, 62:17,
68:8, 98:22, 99:3
together 31:3,
82:19, 98:20
tone-deaf 26:7
took 42:15
tools 67:21
top 46:20, 71:16
topic 5:16, 43:10
topics 17:24
total 14:11, 50:25
touching 77:8
toward 14:22, 23:25,

31:3
town 83:11
tracing 37:10
trade-offs 41:15
transaction 18:23,
    19:3, 19:16,
    37:23, 38:20,
    41:12, 47:16,
    47:17, 47:22,
    70:7, 71:4, 73:14,
    79:2, 79:10,
    83:19, 84:18,
    86:14, 94:9, 96:5
transactions 37:19,
    71:18, 75:16,
    89:25, 90:13,
    90:16
transcribed 51:22
Transcript 2:48,
    51:20, 51:25,
    64:19, 64:21,
    100:4
transcription 100:5
transform 13:11
transformation
    13:10, 13:18,
    13:23
translate 88:23
transmission 12:13,
    14:2
transparent 11:2
Transportation 2:20
travels 99:5
Treasury 29:14
treat 88:4
treated 72:9
tricky 8:15
tried 56:17, 84:10
triggered 57:25
triggers 98:8
Tropical 12:21
true 75:11, 77:25,
    97:12, 100:5
truly 47:3
Trustee 35:6, 91:2
Trustees 97:1, 97:11
try 21:12
trying 17:20, 39:10,
    56:8, 88:10
Tuesday 7:9, 43:12,

43:22, 53:2
turn 34:2, 44:9,
    46:21
turned 4:16, 4:20,
    36:16
tweaks 51:1
Twenty-nine 14:14
twice 79:5
two 20:12, 28:2,
    43:18, 45:16,
    46:5, 46:6, 49:19,
    50:18, 51:7, 51:9,
    52:5, 57:7, 58:19,
    58:22, 61:15,
    61:17, 61:18,
    62:7, 64:1, 65:7,
    66:2, 75:22,
    76:14, 79:11,
    83:4, 87:20, 91:18
two-thirds 34:21
two-year 7:6
type 34:25, 63:23
types 64:7

< U >
UCC 43:19, 50:24,
    51:1, 69:10, 87:4,
    87:5, 87:23, 90:24
UHLAND 2:8, 34:3,
    34:4, 34:5, 36:9,
    36:14, 36:17,
    38:14, 39:7,
    39:15, 39:19,
    39:22, 40:1, 40:9,
    40:11, 40:14,
    40:18, 40:25,
    41:3, 41:6, 69:13,
    69:22
ultimate 97:17
ultimately 19:16,
    32:25, 57:13,
    63:12
unaffordable 24:7
uncharted 39:17
underbrush 72:20
underlying 69:16
understand 17:2,
    20:22, 25:6, 31:7,
    38:1, 39:22,

47:10, 58:6, 59:7,
    67:24, 97:14
understanding 6:7,
    38:23, 39:2
Understood 49:1,
    55:3, 66:1
undertaking 47:16
underwriters 39:1
unfair 30:5, 93:8
unfortunately 21:2
uninsured 13:2
union 87:6
unions 87:6
unique 90:1
uniquely 61:25, 62:2
United 1:1, 1:34,
    100:6
Unless 4:17, 6:9,
    74:16, 92:21
Unlike 97:13
unnecessary 45:10
unreasonable 65:11
Unsecured 1:43
unseemly 26:7
unthinkable 81:17,
    81:19
until 32:23, 47:17,
    48:17, 56:19
unusual 7:20
up-front 35:18
updated 12:15, 13:13
UPR 26:18
urgent 25:22
urging 15:18
useful 11:2
using 4:17, 63:8,
    63:9, 67:17
usual 98:24
utilizing 66:19

< V >
vacuum 25:9
value 9:8, 9:17,
    9:24, 22:13, 90:19
variations 46:7
variety 86:9, 86:11
various 7:22, 13:7,
    19:21, 25:18,
    26:3, 29:11,

38:22, 83:7,
  83:23, 96:15
vendor 87:8, 87:9,
  95:1
vendors 87:6
venue 47:5, 47:9
verbatim 36:24
verified 35:2
verify 67:2
versions 50:16
versus 62:7, 89:3
via 93:24
vibration 4:19
video 98:24
view 29:12, 37:21,
  38:7, 56:14, 60:9,
  61:10, 61:11,
  64:13, 80:4, 84:5,
  84:9, 89:13
viewed 41:23
viewpoint 9:15
views 60:19, 74:17
violate 84:16
violated 76:21
violating 89:20
violation 26:24,
  72:22, 77:1,
  87:17, 89:9,
  89:12, 89:18,
  90:12, 91:11,
  92:11, 92:20,
  93:5, 93:21, 98:5
violations 87:12,
  87:21
violative 73:22
virtue 19:2
voiced 56:2
vote 34:21, 35:6,
  35:10, 74:18
voted 34:18, 35:13,
  70:5, 70:7
votes 14:7, 33:23,
  34:15, 35:5
voting 19:16, 19:18,
  34:21, 34:25,
  35:1, 35:2, 36:4,
  36:5, 36:8
vying 91:18

< W >
Wait 19:23, 30:16,
  30:20, 78:2,
  79:24, 95:14
waited 17:6
waiting 17:19
waive 45:22
waived 46:13, 47:3
waiver 47:2, 78:20
Walker 100:11,
  100:12
walking 39:17
wanted 15:13, 20:3,
  23:2, 40:23, 44:1,
  49:1, 56:16
wants 90:14, 90:15
warm 5:4
warranted 9:21
waste 63:14, 65:22,
  81:18
wasteful 45:1
water 76:10, 76:11
watershed 32:10
wax 77:23
ways 7:25, 24:10,
  36:20, 38:22,
  65:15, 85:3
Wednesday 40:13
week 35:9, 40:10,
  45:25
weekly 11:22, 12:10
weigh 34:6
weighed 25:18, 26:3
weighty 26:12, 65:10
welcome 4:6, 5:4
well-established
  60:20
Westlaw 67:5
whatever 48:11,
  53:19
whenever 56:8
Whether 7:1, 8:7,
  8:23, 14:21, 19:1,
  19:2, 19:3, 25:24,
  38:25, 39:1, 39:3,
  42:24, 45:4,
  47:25, 60:1, 64:4,
  65:2, 65:3, 67:3,
  83:6, 83:16,
  85:22, 97:15,

97:16, 97:18,
  98:6, 98:8
whoever 44:16
whole 74:15, 77:22,
  98:11
whole-- 76:5
Williamson 2:26,
  61:1, 67:24, 68:1,
  68:3, 68:5
willing 44:16
Willkie 31:14
win 78:9, 78:10
wish 31:7, 68:1
within 7:6, 33:6,
  37:9, 40:10, 71:7,
  77:5, 83:9
without 47:23, 48:1,
  51:12, 51:15,
  56:23, 59:5,
  64:21, 89:24,
  90:11
withstanding 24:17,
  29:14, 59:20
WITNESSES 3:3
word 80:14
words 53:8, 53:9
work 6:12, 13:6,
  21:12, 45:19,
  50:17, 54:6, 59:8,
  60:23, 62:12,
  78:23, 78:25, 99:2
worked 49:3, 49:5
working 59:8, 86:18
works 62:21, 62:22,
  82:19
worth 67:5
wound 70:21
wow 64:20
wrestle 29:23
writing 94:22
written 83:25, 98:17

< Y >
year 18:11, 18:17,
  19:14
years 22:7
yesterday 40:24
yields 63:11
York 4:8, 6:14,

31:8, 32:16, 34:1,
53:1, 53:3, 98:21,
98:23, 99:2


< Z >
zealously 14:25
zero 28:4, 71:19