Hearing Date: October 3, 2018 at 2:00 p.m. (AST)

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

---------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

     Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

---------------------------------------------------------------x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF PUERTO RICO

     Movant,

v.

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

     Respondents.

PROMESA
Title III

**Re: ECF No. 3881**

---------------------------------------------------------------x

## OBJECTION OF
## FINANCIAL OVERSIGHT AND MANAGEMENT
## BOARD TO OFFICIAL COMMITTEE OF UNSECURED
## CREDITORS' MOTION FOR ORDER GRANTING DERIVATIVE
## STANDING TO ACT ON BEHALF OF TITLE III DEBTORS FOR CERTAIN
## LIMITED PURPOSES AND OTHER RELATED RELIEF WITH RESPECT TO
## RESTRUCTURING OF GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number (listed as a bankruptcy case number due to software limitations) and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK- 3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 2

BACKGROUND ................................................................................................................... 7

I.      The GDB Restructuring ............................................................................................ 8

II.     The UCC Attacks on All Fronts the GDB Restructuring in the Title III and Title VI
        Cases ........................................................................................................................ 9

ARGUMENT ...................................................................................................................... 11

III.    PROMESA Does Not Allow for Derivative Standing.............................................. 11

IV.     PROMESA Permits Only Limited Derivative Standing Under Bankruptcy Code
        Section 926 and the UCC Cannot Rely On It ......................................................... 17

V.      Derivative Standing is Not Warranted Even if Permitted........................................ 19

VI.     The Oversight Board is the Only Appropriate Representative of the Title III
        Debtors ................................................................................................................... 23

        A.      Congress Contemplated a Holistic Approach to Puerto Rico's Restructuring ..... 24
        B.      The UCC Cannot Bypass PROMESA's Carefully Constructed Framework ....... 25
        C.      The UCC's Allegations of Conflict Ring Hollow................................................. 26

VII.    The Entire Fairness Doctrine is Being Misused ..................................................... 27

CONCLUSION ................................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ass'n. of Retired Employees. v. City of Stockton (In re City of Stockton)*,
478 B.R. 8 (Bankr. E.D. Cal. 2012) ..................................................................13

*Campana v. Pilavis (In re Pilavis)*,
233 B.R. 1 (Bankr. D. Mass. 1999) ........................................................6, 20, 23

*Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983) ..........................................................................21

*Commodore Int'l, Ltd. v. Gould (In re Commodore Int'l, Ltd.)*,
262 F.3d 96 (2d Cir. 2001) ..............................................................................17

*Fin. Oversight & Mgmt. Bd. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin.
Oversight & Mgmt. Bd.)*,
899 F.3d 13 (1st Cir. 2018) ...........................................................................2, 15

*G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.)*,
313 B.R. 612 (Bankr. D. N.J. 2004) .................................................................23

*Holstein v. Sanitary & Improv. Dist. No. 7 (In re Sanitary & Improv. Dist. No. 7)*,
96 B.R. 967 (Bankr. D. Neb. 1989) .............................................................13, 23

*Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc.*,
419 B.R. 749 (M.D. Tenn. 2009) ......................................................................21

*In re After Six, Inc.*
154 B.R. 876 (Bankr. E.D. Pa. 1993) ...............................................................21

*In re Calvary Temple Evangelistic Ass'n.*,
47 B.R. 520 (Bankr. D. Minn. 1984) ................................................................21

*In re City of Stockton*,
486 B.R. 194 (Bankr. E.D. Cal. 2013) .....................................................13, 14, 23

*In re Dow Corning Corp.*,
199 B.R. 896 (Bankr. E.D. Mich. 1996) ...........................................................21

*In re Dziurgot-Farnsworth*,
2014 Bankr. LEXIS 5046 (Bankr. D.R.I. Dec. 12, 2014) ....................................24

*In re Hardeman Cnty. Hosp. Dist.*,
540 B.R. 229 (Bankr. N.D. Tex. 2015) ..............................................................12

*In re New York City Off-Track Betting Corp.*,
    2011 WL 309594 (Bankr. S.D.N.Y. Jan. 25, 2011)........................................................12, 19

*In re New York City Off-Track Betting Corp.*,
    434 B.R. 131 (Bankr. S.D.N.Y. 2010) .................................................................12, 13, 19

*In re Richmond Unified School Dist.*,
    133 B.R. 221 (Bankr. N.D. Cal. 1991) ...........................................................................13

*In re Sunset Hollow Properties, LLC*,
    359 B.R. 366 (Bankr. D. Mass. 2007) ...........................................................................17

*In re Trados Inc.*,
    73 A.3d 17 (Del. Ch. 2013).............................................................................................29

*In re Waters*,
    2008 Bankr. LEXIS 374 (Bankr. D. Conn. Feb. 8, 2008) .............................................21

*In re Yasin*,
    179 B.R. 43 (Bankr. S.D.N.Y. 1995) .............................................................................19

*Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*,
    316 B.R. 141 (D. Del. 2004) ...........................................................................................23

*Larson v. Foster (In re Foster)*,
    516 B.R. 537 (B.A.P. 8th Cir. 2014)..............................................................................23

*Morley v. Ontos, Inc. (In re Ontos, Inc.)*,
    478 F.3d 427 (1st Cir. 2007)...........................................................................................20

*Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*,
    467 F.3d 73 (2d Cir. 2006)..............................................................................................21

*Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*,
    330 F.3d 548 (3d Cir. 2003)............................................................................................17

*Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.)*,
    429 B.R. 692 (Bankr. C.D. Cal. 2010)...........................................................................13

*Reed v. Cooper (In re Cooper)*,
    405 B.R. 801 (Bankr. N.D. Tex. 2009).....................................................................23, 24

*S.I. Acquisition, Inc. v. Eastway Delivery Serv. (In re S.I. Acquisition), Inc.*,
    817 F.2d 1142 (5th Cir.1987) .........................................................................................15

*Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp.*
    *Health Tr.)*,
    25 F.3d 1281 (5th Cir. 1994) .........................................................................................15

*Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC),*
   423 F.3d 166 (2d Cir. 2000) ..............................................................................................21

*United States v. Johnson,*
   529 U.S. 53 (2000) ............................................................................................................18

## Statutes

7 L.P.R.A. § 562 ......................................................................................................................22

11 U.S.C. § 101(10) ................................................................................................................19

11 U.S.C. § 105 .................................................................................................................13, 16

11 U.S.C. §§ 105(a), 503(b), 1103(c), 1109(b) .......................................................................4

11 U.S.C. § 363 .........................................................................................................6, 13, 14, 20

11 U.S.C. § 405(m)(4) .......................................................................................................24, 25

11 U.S.C. § 541 ......................................................................................................................15

11 U.S.C. §§ 544, 545, 547, 548, 549(a) .....................................................................5, 18, 20

11 U.S.C. § 903 ......................................................................................................................12

11 U.S.C. § 904 .................................................................................................................12, 13

11 U.S.C. § 926 ............................................................................................................... passim

11 U.S.C. § 926(a) ...............................................................................................................2, 5

11 U.S.C. § 930 ......................................................................................................................13

11 U.S.C. § 1104 ...............................................................................................................12, 18

Act 109-2017 ............................................................................................................................8

PROMESA §  101(a) ........................................................................................................22, 24

PROMESA § 101(b) .................................................................................................................7

PROMESA § 101(e) ...............................................................................................................25

PROMESA § 104(b) ...............................................................................................................16

PROMESA § 104(i)(1) ..........................................................................................................8, 9

PROMESA §§ 104(j) ................................................................................................................8

PROMESA § 106(e) ..................................................................................................28

PROMESA § 108(a)(2) ............................................................................................26

PROMESA § 109 ......................................................................................................25

PROMESA § 301(a) ............................................................................................5, 17

PROMESA § 301(c)(5) ............................................................................................15

PROMESA § 301(c)(7) ..................................................................................... passim

PROMESA § 303 ..............................................................................12, 14, 15, 16

PROMESA § 304 ..............................................................................................8, 12, 14

PROMESA § 305 ............................................................................................. passim

PROMESA § 315(b) ......................................................................................... passim

PROMESA § 405(m) ..................................................................................................9

PROMESA § 407 ......................................................................................................16

PROMESA § 601 ..............................................................................................7, 29

PROMESA § 601(g)(2)(A) ........................................................................................8

PROMESA § 601(m)(1)(D) ...............................................................................9, 29

## OTHER AUTHORITIES

6 COLLIER ON BANKRUPTCY ¶ 904.01 .....................................................................12

6 COLLIER ON BANKRUPTCY ¶ 904.01[2] ...........................................................13, 14

Fed. R. Bankr. P. 9004 ..............................................................................................4

Fed. R. Civ. P 10(a) ..................................................................................................4

To the Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Puerto Rico Sales Tax Financing Corporation ("COFINA"), the Puerto Rico Highways and Transportation Authority ("HTA"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Electric Power Authority ("PREPA," and together with the Commonwealth, COFINA, and HTA, the "Debtors"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this objection to the *Official Committee of Unsecured Creditors' Motion for Order Granting Derivative Standing to Act on Behalf of Title III Debtors for Certain Limited Purposes and Other Related Relief With Respect to Restructuring of Government Development Bank for Puerto Rico* [ECF No. 3881] (the "Derivative Standing Motion") in which the Official Committee of Unsecured Creditors (the "UCC") seeks to obtain derivative standing to act on behalf of the Title III debtors (except COFINA) (hereinafter referred to as the "Title III Debtors") for the purpose of objecting to the restructuring of the Government Development Bank for Puerto Rico ("GDB").

## PRELIMINARY STATEMENT

1.    Even though Congress made it crystal clear the Oversight Board is the sole representative of each Title III debtor, and no trustee may be appointed except to prosecute an avoidance action under Bankruptcy Code section 926(a), the UCC assumes without the support of a single chapter 9 decision that the Court has power to grant the UCC the powers a trustee would have to determine whether and how to respond to GDB's Title VI application.   The UCC's

---

[2]  PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

assumption is erroneous, as evidenced by the lack of authority for it and multiple statutory provisions rebutting it.

2.      Moreover, the UCC's factual premises for its Derivative Standing Motion are actually horrible imaginings of non-existent facts.  Paragraph 1 of the UCC's motion alleges "current and former officers, directors, employees, agents, and representatives…which will undoubtedly be argued to include the investment banks, law firms, and others that facilitated and profited from Puerto Rico's ruinous debt offerings – will be released from any potential liability to the Title III Debtors…"  In fact, the releases apply neither to former officers, directors, and employees, nor to investment banks, law firms, and other non-individuals, nor to present officers and directors for periods prior to the instant restructuring.  *See* Case No. 18-1561-LTS, ECF No. 151 ("GDB Restructuring Informative Motion") at ¶¶ 7-9.  Regrettably, the UCC did not withdraw its instant motion after the filing of the foregoing informative motion.

3.      Put differently, the UCC Derivative Standing Motion is based neither on valid law, nor on valid facts.

4.      Because the UCC lacks constitutional and prudential standing to challenge the GDB's Title VI Qualifying Modification directly, it now asks the Court to take the unprecedented step of sweeping the Oversight Board aside so the UCC can exercise the Oversight Board's rights as sole representative of the Title III Debtors to deal with GDB's restructuring.  Congress, however, made the Oversight Board the sole representative (PROMESA section 315(b)) of each Title III Debtor, provided it many trustee powers (PROMESA section 301(c)(7)), and foreclosed the ability of parties in interest to obtain court orders interfering with the Title III Debtors' political powers and property rights absent Oversight Board consent (PROMESA section 305).  (The UCC nowhere explains how it could exercise the Oversight Board's powers in respect of the GDB

3

restructuring while the Oversight Board retains key consent rights under section 305).  As a result, the Court cannot grant the UCC "double derivative standing" to play the role of both Oversight Board and Government to decide for the Title III Debtors the best use of their property—*i.e.* by tampering with the carefully structured GDB restructuring.  Notably, the UCC fails to comply with Bankruptcy Rule 9004 and Fed. R. Civ. P. 10(a) as it does not identify any respondent to its motion.

5.      To carry out Congress's mandate, PROMESA ensures the Oversight Board remains at the helm of the restructuring process for Title III debtors.  Unlike chapter 9, where the municipal debtor is given the powers of a bankruptcy trustee, PROMESA entrusts most trustee powers to an independent, federally-appointed Oversight Board, with the Government retaining powers not granted to the Oversight Board.    Moreover, PROMESA section 305 prohibits the Court from entering an order interfering with the Title III Debtors' property rights (here, the assertion of rights, defenses, and alleged causes of action against GDB) absent Oversight Board consent.

6.      Unable to point to a specific provision in PROMESA permitting it to supplant the Oversight Board as representative and trustee, the UCC moves for derivative standing through a hodgepodge of Bankruptcy Code sections: 105(a), 503(b), 1103(c), and 1109(b).  While it provides a laundry list of 14 decisions from various circuits (not including binding First Circuit jurisprudence) in which a form of nonconsensual derivative standing was granted, the UCC does not supply a single case where it was granted in a chapter 9 case.  The reason for this omission is obvious:  a court, absent consent or the applicability of Bankruptcy Code section 926(a), cannot permit a party to stand in the shoes of a chapter 9 or Title III debtor and substitute its judgments for that of the governmental debtor (or, as here, the Oversight Board).   Significantly, Bankruptcy Code section 926(a) only allows derivative standing in the context of avoidance actions that,

outside bankruptcy, belong to creditors in the first place.  Here, the UCC wants to control the Title III debtors' rights that never belong to creditors.

7.  Having foreclosed the rights of any third party to exercise discretion over a Title III Debtor`s property or restructuring (in addition to conspicuously omitting trustee appointment powers from PROMESA), Congress provided only a limited avenue for a creditor to prosecute certain causes of action belonging to a Title III Debtor.  Bankruptcy Code section 926 (incorporated into PROMESA by section 301(a)), provides, in relevant part "[i]f the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a), or 550 of this title, then on request of a *creditor*, the court may appoint a trustee to pursue such cause of action."  11 U.S.C. section 926 (emphasis added).  Because the UCC is not a creditor, and because the actions it seeks to take (*i.e.* objecting to the Title VI Qualifying Modification and the GDB Restructuring Act) are not claims that fall within the exclusive list of claims permitted under section 926, the UCC cannot obtain derivative standing under this section.[3]  Indeed, Supreme Court jurisprudence is clear that when Congress creates a limited exception to a rule, a court cannot create additional exceptions.  Section 926 is the exception the UCC, with no authority whatsoever, is trying to expand to include derivative standing as if the Title III case were a chapter 11 case.

8.  Even if the derivative standing sought by the UCC were not prohibited by PROMESA, the UCC is unable to show it is warranted. Obtaining derivative standing in chapter 11 cases requires a showing the trustee is aware of colorable claims but unjustifiably fails or refuses to pursue them.[4]  The UCC has not pointed to any colorable claims it seeks to pursue.  Rather, it seeks derivative standing for the purpose of "maintaining the status quo" and "preserving"

---

[3] Not being a creditor because it does not own any claim, the UCC could not avail itself of section 926 even if it applied here, which it does not.

[4] *See Campana v. Pilavis (In re Pilavis)*, 233 B.R. 1, 3–4 (Bankr. D. Mass. 1999).

unidentified and potentially non-existent "rights and claims."[5]  There is no test for derivative standing in chapter 9 and Title III cases for good reason.  There can be no unjustifiable failure or refusal to use property of the debtor where Bankruptcy Code section 363 does not apply.  The Oversight Board is given complete authority to settle any cause of action or enter into any agreement without court approval because section 363 of the Bankruptcy Code is absent from PROMESA.

9.    Faced with no standing to challenge the GDB Title VI restructuring directly nor the ability to pursue derivative standing under Bankruptcy Code section 926, the UCC pounds the table with the accusation the Oversight Board is inherently conflicted simply because (by express operation of PROMESA) it represents all Title III Debtors.  This claim rings hollow.  Congress chose to establish a single independent Oversight Board as the representative of each and every Title III Debtor, thus avoiding the chaos that would ensue if each debtor were pulling in separate directions rather than moving in unison for the benefit of Puerto Rico and its stakeholders.  The UCC loses sight of the fact that all the Title III and non-Title III debtors are integral parts of the same government.   In line with Congressional thinking that there should be one Oversight Board for all the covered entities, the United States Trustee created one general statutory creditors' committee for all the Title III debtors.  The only reason the UCC does not also represent creditors of GDB in Title VI is that Title VI, unlike Title III, does not provide for statutory creditors' committees.

---

[5]  *See* Commonwealth of Puerto Rico, Financial Information and Operating Data Report (Dec. 18, 2016), at 189, *available at* http://bgfpr.com/documents/CommonwealthofPuertoRicoFinancialInfoFY201612-18-16.pdf ("GDB loans were also used to cover operational deficits of the Commonwealth and its instrumentalities."); P.R. Act No. 31-2013, Statement of Motives, at 1-2 ("[HTA] operates with a deficiency of approximately $355 million annually, which has been corrected in the past by means of loans granted by the Government Development Bank for Puerto Rico (BGF) to continue operating and meeting its obligations to its creditors.  This practice began in 2008, when [HTA] resorted to financing to cover its operations.").

10.     Finally, the UCC's argument that a fairness standard be applied to the GDB restructuring is not only entirely out of place in a derivative standing motion, it is no more than erroneous rhetoric.  Congress has prescribed the standards for approving a Title VI restructuring in PROMESA section 601.  Those standards cannot be altered by the UCC's notion of "fairness."  GDB's bond claims have overwhelmingly voted to support the GDB restructuring.  The Oversight Board, as Administrative Supervisor of GDB and representative of the Title III Debtors, ensured that the transaction complied with PROMESA.  And despite outrageous claims that two members of the Oversight Board are conflicted as a result of their past ties to GDB, all seven members of the Oversight Board voted unanimously to approve the transaction—thus providing a majority of independent board members even if two votes were set aside.

11.     Accordingly, the UCC's inappropriate attempt to usurp the Oversight Board's congressionally mandated role and substitute its judgment for that of both Congress and the democratically elected Government of Puerto Rico should be denied.

## **BACKGROUND**

12.     On June 30, 2016, the Oversight Board was established under PROMESA section 101(b).  Pursuant to PROMESA section 315(b), "[t]he Oversight Board in a case under this title is the representative of the debtor" and "may take any action necessary on behalf of the debtor to prosecute the case of the debtor, including filing a petition under section 304 of [PROMESA] . . . or otherwise generally submitting filings in relation to the case with the court."

13.     On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing a case under title III thereof.

14.     Thereafter, Title III cases were commenced for (i) ERS (Case No. 17-BK-3566 (LTS)), (ii) HTA (Case No. 17-BK-3567 (LTS)) and (iii) PREPA (Case No. 17-BK-4780 (LTS)).

15.     On June 15, 2017, the Office of the United States Trustee for the District of Puerto

Rico (the "U.S. Trustee") filed a *Notice of Appointment of Official Committee of Unsecured*

*Creditors in the Commonwealth of Puerto Rico* [Case No. 17-3283, ECF No. 338].  The U.S.

Trustee subsequently appointed the UCC in the Title III cases of the ERS, HTA, and PREPA.  *See*

Case No. 17-3283, ECF No. 1171.

## I.     THE GDB RESTRUCTURING

16.     Concurrently with the commencement of the Title III Cases, on May 15, 2017, the

GDB, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and certain

supporting creditors entered into a Restructuring Support Agreement (the "RSA") concerning

GDB's financial obligations to its creditors.

17.     On July 12, 2017, the Oversight Board certified the RSA as a "Voluntary

Agreement" under PROMESA section 104(i)(1) and as a Qualifying Modification pursuant to

PROMESA section 601(g)(2)(A).

18.     On August 24, 2017, the Governor of Puerto Rico signed Act 109-2017 (the "GDB

Restructuring Act") into law.

19.     On May 8, 2018, the Oversight Board recertified the RSA as amended on October

20, 2017, December 20, 2017, March 20, 2018, and April 6, 2018, pursuant to PROMESA section

104(i)(1).

20.     On August 10, 2018, GDB and AAFAF commenced a case under PROMESA Title

VI by filing an application with the United States District Court for the District of Puerto Rico (the

"Title VI Court") for approval of the Qualifying Modification pursuant to PROMESA section

601(m)(1)(D) [Case No. 18-1561, ECF No. 1] (the "Title VI Case").

21.     The Qualifying Modification the Title VI Court is being asked to approve is critical

to Puerto Rico's recovery.  The GDB case involves a significant number of local, Puerto Rican

8

bondholders and Puerto Rican lending institutions invested in GDB debt. *See* Press Release, AAFAF, *AAFAF, GDB and a Significant Portion of the RSA Parties Have Reached a Deal to Amend the GDB Restructuring Support Agreement* (Mar. 27, 2018). Its restructuring is key to invigorating Puerto Rico's economy and ensuring that essential public services continue on the island. *See* GDB Restructuring Act, Statement of Motives; PROMESA section 405(m).

22.     On September 20, 2018, the *Declaration of Jane Sullivan on Behalf of Epiq Corporate Restructuring Certifying the Tabulation of Votes Cast on the Qualifying Modification for GDB Under Title VI of PROMESA* [Case No. 18-1561, ECF No. 156] was filed, revealing that "Eligible Voters of over 74.8% of the aggregate principal amount of the Participating Bond Claims in the GDB Bond Claims Pool voted, and that, of those that voted in such pool, over 97.4% of the Participating Bond Claims voted to approve the Qualifying Modification, reflecting over 72.9% of the aggregate principal amount." *Id.* at 3. In addition, "100% of the aggregate principal amount of the Participating Bond Claims in the Guaranteed Bond Claims Pool voted to approve the Qualifying Modification." *Id.*

## II.     THE UCC ATTACKS ON ALL FRONTS THE GDB RESTRUCTURING IN THE TITLE III AND TITLE VI CASES

23.     Despite the overwhelming approval of the Qualifying Modification and the beneficial effects of the GDB restructuring to Puerto Rico's recovery, the UCC has initiated a multitude of repetitive litigation within the Title VI and Title III cases to attack the GDB restructuring on all fronts.

24.     On August 22, 2018, the UCC filed the *Official Committee of Unsecured Creditors' Notice of Intention to Object Regarding Purported Qualifying Modification for Government Development Bank* [Case No. 18-1561, ECF No. 59] ("UCC Notice") in the Title VI Case, signaling its desire to object to the Qualifying Modification directly in the Title VI Case.

25.     On the same day the UCC filed the UCC Notice, it filed the *Urgent Motion of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Sections 105(a) and 362, for Entry of Order Enforcing Automatic Stay and Court's June 29, 2017 Order Confirming Application of Automatic Stay With Respect to GDB Restructuring* in the Commonwealth's Title III Case. [Case No. 17-3283, ECF No. 3797] (the "UCC Stay Motion").

26.     On September 1, 2018, the Oversight Board filed the *Objection of Financial Oversight and Management Board for Puerto Rico as the Administrative Supervisor of the Government Development Board for Puerto Rico to the Official Committee of Unsecured Creditors' Notice of Intention to Object to Qualifying Modification for Government Development Bank* [Case No. 18-1561, ECF No. 111] (the "Standing Objection").

27.     On September 6, 2018 the UCC filed the Derivative Standing Motion in the Commonwealth's Title III case.  On the same day, the UCC filed the *Complaint of Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) for Declaratory Judgment with Respect to GDB Restructuring* [Case No. 18-AP-101-LTS, ECF No. 1] (the "UCC Adversary Complaint"), commencing an adversary proceeding seeking declarations that the GDB Restructuring Act is invalid and unenforceable on a variety of grounds.

28.     On September 13, 2018, the UCC filed the *Omnibus Response of Official Committee of Unsecured Creditors to GDB/AAFAF's and Oversight Board's Standing Objections* [Case No. 18-cv-1561, ECF No. 131] (the "UCC Standing Response").

29.     The next day, on September 14, 2018, the UCC filed the *Preliminary Objection of Official Committee of Unsecured Creditors of All Puerto Rico Title III Debtors (Other Than COFINA) to Proposed PROMESA Title VI Modification of Government Development Bank for Puerto Rico* [Case No. 18-1561, ECF No. 136] (the "UCC Title VI Preliminary Objection").

10

30. On September 18, 2018, the Court entered the *Memorandum Order Denying Motion of Official Committee of Unsecured Creditors for Entry of an Order Enforcing the Automatic Stay*, [Case No. 17-3283, ECF No. 3941] (the "Stay Enforcement Order") denying the UCC Stay Motion. The Court ruled the automatic stay did not preclude the debtors or the Oversight Board from carrying out the GDB restructuring as "Congress intended to preserve governmental debtors' ability to initiate transactions affecting their assets." *Id.* at 6.

## ARGUMENT

## I. PROMESA DOES NOT ALLOW FOR DERIVATIVE STANDING

31. In its attempt to transplant the derivative standing doctrine of chapter 11 into PROMESA Title III, the UCC cites a hodgepodge of case law from across various circuits. *See* Derivative Standing Motion at ¶¶ 42-44. Notably absent from its string cites are any binding decisions regarding derivative standing from the First Circuit, and even more telling is the absence of any cases demonstrating the derivative standing doctrine is applicable in chapter 9. The absence of support for derivative standing in chapter 9 illuminates the obvious: Congress made clear a party in interest cannot supplant a municipal debtor (and in this case, the Commonwealth or its instrumentalities) in the exercise of its powers over property (with the limited exception of Bankruptcy Code section 926, discussed below).

32. **The Oversight Board is the Only Representative of the Debtors**. PROMESA made clear that the Oversight Board is the sole representative (PROMESA section 315(b)) with many trustee powers (PROMESA section 301(c)(7)), of each Title III Debtor. Congress foreclosed the ability of any party to obtain derivative standing or advocate for the rights of any of the Title III Debtors. Not only is there no such derivative right, but PROMESA specifically excludes Bankruptcy Code section 1104, which permits a party in interest to move for appointment of a trustee to supersede a debtor`s governance (here, the Oversight Board).

11

33.     **PROMESA Prohibits Nonconsensual Derivative Standing**.     PROMESA

sections 303 and 305 (which have as their chapter 9 analogs Bankruptcy Code sections 903 and

904) insulate the Title III Debtor's decisions—regarding both political and property matters—from

court interference.[6]   This is because, as the chapter 9 court explained in *In re New York City Off-

Track Betting Corp.*, "[u]nlike the Bankruptcy Code generally, chapter 9 is not concerned with

balancing the rights of creditors and debtors.  Rather, the principal purpose of chapter 9 is to allow

municipal debtors the opportunity to continue operations while adjusting or refinancing their

creditor's obligations."  2011 WL 309594 at *5 (Bankr. S.D.N.Y. Jan. 25, 2011).

34.     PROMESA section 305 embodies these considerations.  It provides in relevant part

that "notwithstanding any power of the court, unless the Oversight Board consents . . . the court

may not, by any stay, order, or decree . . . interfere with . . . (2) any of the property or revenues of

the debtor; or (3) the use or enjoyment by the debtor of any income producing property."

PROMESA § 305.  The inclusion of this section, combined with the absence of Bankruptcy Code

section 363, demonstrates a Title III debtor retains control over its property and decision-making—

subject to the Oversight Board's powers under PROMESA Titles I, II, and III—and the Court lacks

jurisdiction to order otherwise.   *In re City of Stockton*, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013)

(holding the Court cannot "prevent a chapter 9 debtor from spending its money for any reason,

even foolishly or in a manner that disadvantages other creditors" without consent.); *Holstein v.

Sanitary & Improv. Dist. No. 7 (In re Sanitary & Improv. Dist. No. 7)*, 96 B.R. 967, 972 (Bankr.

D. Neb. 1989) (holding in chapter 9 "[t]he debtor is free to use its property and the bankruptcy

---

[6]  *See, e.g.,* 6 COLLIER ON BANKRUPTCY ¶ 904.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ("Section
904 compliments section 903 in providing a constitutional shield for chapter 9 by limiting federal intrusion upon
States' rights."); *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229, 233 (Bankr. N.D. Tex. 2015) (noting the Tenth
Amendment requires "that a municipal debtor be left in complete control of its political and governmental affairs").

court cannot approve or disapprove such use."); *Prime Healthcare Mgmt., Inc. v. Valley Health Sys.* (I*n re Valley Health Sys.*), 429 B.R. 692, 714 (Bankr. C.D. Cal. 2010) ("By virtue of § 904, a debtor in chapter 9 retains title to, possession of, and complete control over its property and its operations, and is not restricted in its ability to sell, use, or lease its property.").[7]

35.    Specifically, PROMESA section 305 (combined with the exclusion of Bankruptcy Code section 363) preserves a Title III debtor's authority to settle causes of actions—precisely what the Title III Debtors are seeking to accomplish through the GDB restructuring—without Court approval.  *In re City of Stockton*, 486 B.R. at 199 (holding debtor could freely enter into settlements without court approval, as "[t]he power to approve a compromise implies the power to disapprove a compromise. And the power to disapprove is the power to interfere. And the power to interfere without consent with property or revenues is precisely what Congress has withheld in chapter 9 cases.").[8]  Indeed, in its Stay Enforcement Order, this Court recognized that "Congress intended to preserve governmental debtors' ability to initiate transactions affecting their assets given, for example, the inclusion of Section 303, 304(i) and 305 of PROMESA."   Stay Enforcement Order at 6.   The Court further observed that the sovereign considerations animating the exclusion of Bankruptcy Code section 363 operated to permit a Title III Debtor to enter into

---

[7]  *See also, e.g., In re Richmond Unified School Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991) ("the debtor is free to use, sell or lease property without regard to the restrictions in section 363 . . . Should a debtor do so irresponsibly, the sole remedy provided is dismissal for cause pursuant to section 930."); *Ass'n of Retired Employees. v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012) ("a federal court can use no tool in its toolkit — no inherent authority power, no implied equitable power, no Bankruptcy Code § 105 power, no writ, no stay, no order — to interfere with a municipality regarding political or governmental powers, property or revenues, or use or enjoyment of income-producing property . . . In short, the § 904 limitation on the court's authority is absolute, with only the two exceptions stated in § 904: consent; and provision in a plan of adjustment"); *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 140 (Bankr. S.D.N.Y. 2010) (holding that the command of sections 903 and 904 "is clear:" a court "may not interfere with a chapter 9 debtor's political or governmental powers, or the use of the debtor's property, without the debtor's consent."); *see also* 6 COLLIER ON BANKRUPTCY ¶ 904.01[2] ("a municipal debtor is not restricted in its ability to use, sell or lease its property, and the court is not to involve itself with the day to day operations of the municipality.").

[8]  *See also* 6 COLLIER ON BANKRUPTCY ¶ 904.01[2] ("The chapter 9 debtor is free to enter into (or not enter into) a settlement as it sees fit, without the necessity of court approval").

negotiated resolutions of disputes over property rights or otherwise taking actions to dispose of its property, including the GDB restructuring. *Id*.

36.     The logic of this structure is confirmed by the fact that a contrary conclusion would prevent the Debtors from continuing normal operations.  For example, the Commonwealth, with the approval of the Oversight Board, can appropriate funds to its instrumentalities (as budgets for the Commonwealth have been doing for years) without seeking Court approval.   If the Commonwealth retains appropriation power it (along with the other Debtors) surely retains the ability to settle claims to implement the GDB restructuring.

37.     In this case, the Debtors and the Oversight Board, as representative of the Debtors, have made determinations, in the exercise of their sole judgment, regarding an appropriate disposition of the Title III Debtors' property (*i.e.* any potential claims they may have against GDB).[9]   The UCC now asks the Court to interfere with this carefully considered decision to promote the best interests of the island and its stakeholders and instead bestow the UCC standing to control the Title III Debtors' property in its misguided belief that such action would benefit the unsecured claimholders.   But the Oversight Board has not consented to such interference, and, therefore, PROMESA section 305 prohibits the Court from granting the relief sought by the UCC.

38.     This conclusion is consistent with the First Circuit Court of Appeals' recent decision in *Fin. Oversight & Mgmt. Bd. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd.)*, 899 F.3d 13 (1st Cir. 2018).   There, the First Circuit recognized

---

[9] It is well settled that causes of action are property of a debtor's estate and the trustee has exclusive standing to assert such claims. *See Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994) (citing *S.I. Acquisition, Inc. v. Eastway Delivery Serv. (In re S.I. Acquisition), Inc.*, 817 F.2d 1142, 1153-54 (5th Cir.1987)).  In chapter 11, an estate is created under 541 which holds the claims and causes of action of the debtor.  PROMESA does not incorporate section 541, and PROMESA section 301(c)(5) defines "property of the estate" as "property of the debtor."  Because there is no estate, all claims and causes of action that can be asserted by the Title III Debtors constitute "property of the debtor," which is protected by PROMESA section 305 from Court interference.

PROMESA section 305 did not prohibit the Court from "stand[ing] aside" to "allow another court to decide whether to interfere with the powers or properties of the debtors," but *did* prohibit the Court from issuing "any [] stay, order, or decree that itself interferes with the debtor's powers or assets," *id.* at 19, because "[w]hen a bankruptcy or Title III court acts directly, it impinges on th[e] autonomy" protected by PROMESA section 305.  *Id.* at 21.  Here, if the Court were to grant the UCC's request to stand in the Title III Debtors' shoes to control the use of their property, the Court would be entering an order that directly interferes with the Title III Debtors' autonomy.  Such direct interference, the First Circuit made clear, is proscribed by section 305.

39.     **Derivative Standing Would Deprive the Government, Acting With the Approval of the Oversight Board, of Control Over the Commonwealth and its Instrumentalities**.  Similarly, PROMESA section 303 prohibits the relief sought by the UCC.  PROMESA section 303 provides, in relevant part, that PROMESA Title III "does not limit or impair the power of a covered territory to control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise of the political or governmental powers of the territory."  PROMESA § 303.  Here, the Commonwealth has enacted the GDB Restructuring Act.  In doing so, it has acted to control itself and its instrumentalities "by legislation," a clear "exercise of the political or governmental powers of the territory."[10]

40.     **The UCC's Reliance on the Commonwealth-COFINA Stipulation is Misplaced**.  Moreover, the UCC's reference to the *Stipulation and Order Approving Procedure to*

---

[10] The Court's inability to order derivative standing in PROMESA Title III is further illustrated by the fact that Congress clearly knew how to grant 'derivative standing' style remedies to creditors when it wanted to, but chose not to provide for any similar right during a Title III case.  This can be seen, for example, in PROMESA section 407, which gives secured creditors certain rights to bring suit over inter-debtor transfers of assets by Puerto Rican instrumentalities.  Notably, Congress did not include section 407 remedies in Title III.  *See* PROMESA section 407(b) ("A creditor may enforce rights under this section . . . unless a stay under title III is in effect.").  This further demonstrates Congress wanted to consolidate in the hands of the Oversight Board alone the power to choose to bring—or not—causes of action on behalf of the various debtors during a Title III case.

*Resolve Commonwealth-COFINA Dispute* [ECF No. 996] (the "CW-COFINA Stipulation") does not support its argument that the Court can grant the derivative standing it seeks here.  In the CW-COFINA Stipulation, the Oversight Board appointed the UCC to act as its agent in resolving the CW-COFINA Dispute, pursuant to PROMESA subsections 104(b) (the authority of the Oversight Board's agents) and 104(g) (authority of the Oversight Board to enter into contracts) and subject to limitations drawn up by the Oversight Board itself.  CW-COFINA Stipulation at ¶ 2.  An agent acts for its principal and does not replace it or step into its shoes.[11]  The UCC did not supplant the Oversight Board as representative and trustee of the Commonwealth, as it seeks to do here.  First, the Oversight Board exercised its own power to appoint agents.  Second, the Oversight Board at all times "remain[ed] the only party authorized by PROMESA to propose a title III plan of adjustment" that could effectuate any settlement reached by the Commonwealth and COFINA agents, and retained the right to "negotiate and mediate with creditors to achieve [its own] settlement of the Commonwealth-COFINA Dispute."  *Id.* at ¶ 4.n.  The CW-COFINA Stipulation was designed and advocated by the Oversight Board, which expressly consented under PROMESA section 305 to the appointment of the Commonwealth Agent in its limited capacity.  *See id.* at ¶ 2; *see also* ¶ 11 ("Except as provided in paragraph 2, the Oversight Board does not consent or otherwise release any rights of the Oversight Board under PROMESA or otherwise, including section 305 of PROMESA.").  Here, the Oversight Board has not consensually ceded its authority over the Title III Debtors with respect to the GDB restructuring, and nothing in the CW-COFINA

---

[11] Based on the fact that the agents were retained by the Oversight Board, the Court clarified that the agents are exempt from liability pursuant to PROMESA §105, which only applies to the "Oversight Board, its members and its employees."  Case No. 17-3283, ECF No. 1612 at ¶ 2 (applying immunity protections of PROMESA section 105 to agents); ¶ 6 (providing that nothing in the Order "limits the powers and authority of the Oversight Board . . . with respect to any of its agents and employees").  Notably, the UCC filed a response to the COFINA Agent's motion seeking the PROMESA section 105 protections (*see* Case No. 17-3283, ECF No. 1121) quoting PROMESA section 105 and stating that "the Commonwealth Agent [*i.e.* the UCC] is the approved agent appointed by the Oversight Board . . . and, therefore, should enjoy the benefit of this protection."  Case No. 17-3283, ECF No. 1279 at ¶ 2.

16

Stipulation supports the notion that the UCC can wrest away the Oversight Board's authority or otherwise exercise the Title III Debtors' rights to impede the GDB restructuring.[12]

## II.   PROMESA PERMITS ONLY LIMITED DERIVATIVE STANDING UNDER BANKRUPTCY CODE SECTION 926 AND THE UCC CANNOT RELY ON IT

41.     Congress provided only a limited form of derivative standing in chapter 9 and PROMESA.  Bankruptcy Code section 926, made applicable to Title III pursuant to PROMESA section 301(a), provides, in relevant part, "If the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a), or 550 of this title, then on request of a *creditor*, the court *may* appoint a trustee to pursue such cause of action."  Bankruptcy Code section 926 (emphasis added). The plain language of section 926 illustrates that only a creditor (and not any party in interest) may seek standing from the court to pursue a limited universe of claims, *i.e.* avoidance actions, and only if the debtor refuses.  Notably, the causes of action embodied in section 926 start out as actions owned by creditors outside bankruptcy, or do not exist outside bankruptcy.  Thus, section 926 acts to return to creditors actions they owned.  Here, the UCC is asking to control actions the UCC and the creditors it represents never owned.

42.     Congress's incorporation of section 926 into PROMESA, and its exclusion of other Bankruptcy Code sections such as section 1104 (permitting a party in interest to seek appointment and removal of a trustee), demonstrates Congress' intentional foreclosure of other forms of derivative standing.  *United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides

---

[12] The cases on derivative standing cited in the CW-COFINA Stipulation (at ¶ 2) all relate to the *consensual* grant of derivative standing to a creditors' committee for a limited purpose, and draw a clear distinction between that situation and one where the UCC seeks to seize the debtor-in-possession's authority to pursue claims without the debtor-in-possession's consent, applying a completely different test to such situations.  *See Commodore Int'l, Ltd. v. Gould (In re Commodore Int'l, Ltd.)*, 262 F.3d 96, 99-100 (2d Cir. 2001) (detailing the test for the *consensual* grant of standing to a creditors' committee and distinguishing cases where the "debtor in possession unjustifiably failed to bring suit"); *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 566 (3d Cir. 2003) (citing *Commodore Int'l*'s test on consensual derivative standing approvingly); *In re Sunset Hollow Properties, LLC*, 359 B.R. 366, 383 (Bankr. D. Mass. 2007) (citing *Commodore Int'l* approvingly).

17

exceptions in a statute, it does not follow that courts have authority to create others.  The proper inference, and the one we adopt here, is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."); *Santana v. Holder*, 731 F.3d 50, 56 (1st Cir. 2013) (refusing to imply additional exception to statute as "[t]he absence of such a limitation, despite the explicit enumeration of others, serves as a strong indication that Congress imposed the restrictions that it deemed important and declined to impose others.").   That PROMESA section 301(c)(7) provides that the Oversight Board is the "trustee" for all Bankruptcy Code provisions incorporated into PROMESA *except* section 926 further underscores that this is the only limited circumstance in which derivative standing is authorized.

43. **The UCC's Requested Relief Does Not Comply with Section 926.**  Because section 926 is the only provision in PROMESA that specifically provides for derivative standing, a creditor may only petition the Court to appoint a trustee in conformance with this section.  The UCC does not own a claim and, pursuant to Bankruptcy Code section 101(10), is therefore not a "creditor" for purposes of PROMESA.  Moreover, the UCC is not seeking to pursue the causes of action listed in section 926.  The UCC makes no attempt to move under section 926, and could not if it wanted to.

44. First, only a *creditor,* and not just any party in interest, can move for derivative standing under section 926.  This limitation was intentional and is animated by sovereignty concerns.  For example, in *In re New York City Off-Track Betting Corp.*, the bankruptcy court denied a motion by former employees of a chapter 9 debtor to appoint a trustee, noting "[c]ourts should be loath to appoint a trustee given that the court's limited powers in a chapter 9 case are best understood as operating within the context of constitutional and federalism concerns."  No. 09-17121 MG, 2011 WL 309594, at *4 (Bankr. S.D.N.Y. Jan. 25, 2011).  The court went on to

explain that "the narrow application of section 926 is evidenced by the fact that *only* a creditor, and not any party in interest (or the court *sua sponte*), can seek the appointment of a trustee." *Id.* (emphasis added).  Here, the UCC is not a creditor, it has no assets or liabilities, and it does not own (nor can it assert) any of its constituents' claims, which are not even against GDB but the Title III Debtors.  The UCC is therefore precluded from moving under section 926.

45.     Second, even if it could move under section 926, the UCC seeks far more than the circumscribed relief permitted by section 926.  The UCC does not identify specific claims it seeks to pursue; rather, it seeks to wield the Title III Debtors' rights in order to dismantle the GDB restructuring and object to (indeed, override) the Commonwealth's own legislative prerogatives. But standing under section 926 is a limited right which provides for a <u>closed</u> list of actions, none of which the UCC has implicated in its intended objections.  *See In re Yasin*, 179 B.R. 43, 48 n.6 (Bankr. S.D.N.Y. 1995) ("In chapter 9, the court can appoint a trustee solely for the purpose of bringing certain avoiding actions. The chapter 9 trustee can neither assume nor reject unexpired leases or executory contracts or be compelled to do so; only the debtor can.").  The UCC could only pursue section 926 standing for claims pursuant to sections 544, 545, 547, 548, 549(a), or 550 of the Bankruptcy Code.  None of the UCC's far reaching objections constitute claims that can properly fall within these sections.

## III.     DERIVATIVE STANDING IS NOT WARRANTED EVEN IF PERMITTED.

46.     Even if the Court could grant derivative standing under PROMESA Title III (it cannot), the UCC does not begin to show it would be justified on the facts.  Bankruptcy courts within the First Circuit have permitted derivative standing only where the moving party has demonstrated there is (1) a colorable claim for relief, (2) the trustee had knowledge of the case and unjustifiably failed or refused to pursue the claim, and (3) the litigation presented no burden to the estate.  *Campana v. Pilavis (In re Pilavis)*, 233 B.R. 1, 3–4 (Bankr. D. Mass. 1999); *see also*

*Morley v. Ontos, Inc. (In re Ontos, Inc.)*, 478 F.3d 427, 431-32 (1st Cir. 2007) ("creditors only have standing to pursue [] claims during bankruptcy proceedings when a trustee or debtor in possession unjustifiably fails to pursue the claim.").  The UCC has not made, and cannot make, the required showings.  As a threshold matter, however, as explained above, in the absence of Bankruptcy Code section 363, there can be no judicial determination that the Title III debtors have unjustifiably failed or refused to prosecute a claim or defense.

47.    First, the UCC fails to show the existence of any "colorable claims."  Indeed, the UCC does not allege any claims actually exist, and does not seek authority to pursue them if they did.  Rather, the UCC simply seeks to obtain derivative standing solely for the purpose of "maintaining the status quo" and "preserving" unidentified and potentially non-existent "rights and claims."  Derivative Standing Motion at 1, ¶ 39.  This is not a valid basis for the grant of derivative standing because "the *entire purpose* of seeking derivative standing is to pursue claims that a trustee cannot or will not pursue."  *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc.*, 419 B.R. 749, 757 (M.D. Tenn. 2009) (emphasis added).  Moreover, statutory creditors' committees are not entitled to assert derivative standing simply to interfere with the debtor's use of its property or its decision making.  *See In re Calvary Temple Evangelistic Ass'n.*, 47 B.R. 520, 523 (Bankr. D. Minn. 1984) (holding that derivative standing was never to be granted to allow creditors' committees to move to sell estate assets, the court holding derivative standing powers should not "be extended to motions or proceedings involving the ongoing operations and business judgments of the debtor. It simply creates too many obstacles."); *In re Dow Corning Corp.*, 199 B.R. 896, 900 (Bankr. E.D. Mich. 1996) ("although it might be in the best interests of the estate to sell an asset, an official committee cannot usurp the power of management (trustee or

debtor-in-possession) to make that choice.").[13]  We have not found any court that has ever granted derivative standing for the sole purpose of sabotaging an affiliated, non-Title 11 debtor entity's restructuring efforts (which, in this case, will benefit the overall restructuring of the Commonwealth)—the only thing the UCC wishes to do here.

48.     Second, the UCC cannot demonstrate that the Title III Debtors "unjustifiably refused" to pursue such (unidentified) claims.  Indeed, besides alleging the existence of shadowy and ill-defined conflicts of interest, the UCC makes no attempt to argue this element.  This omission is by design: there is no unjustifiable refusal because the Title III Debtors the UCC is supposedly trying to "protect" are net debtors *vis-à-vis* GDB[14]—which means if the UCC succeeds in dismantling the GDB restructuring, the Title III Debtors would experience more harm than good.

---

[13] *See also In re Waters*, 2008 Bankr. LEXIS 374 *32-33 (Bankr. D. Conn. Feb. 8, 2008) (holding "only a trustee (or debtor in possession) can sell property"); *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,* 467 F.3d 73, 80 (2d Cir. 2006) ("a creditors' committee may not settle an adversary proceeding over the objections of the debtor-in-possession.") (citing *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 184 (2d Cir. 2000)); *In re After Six, Inc.* 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (holding that in relation to sale of debtor's property in chapter 11 case the Creditors' Committee's view "must be subjected to the deference to the Debtor's wishes."); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (bankruptcy court is admonished not to "blindly follow the hue and cry of the most vocal special interest groups;" in that case the official Creditors' Committee).

[14] Specifically, (*i*) HTA owes GDB over $1.933 billion, while having a demand deposit claim of, if anything, under $33 million, (*ii*) the Commonwealth Treasury Department (Hacienda) owes GDB over $884 million, while its demand deposit claim was $568 million, (*iii*) PREPA owes GDB over $324 million because notwithstanding section 562 of the GDB Enabling Act, a minimum of approximately $324 million was withdrawn by PREPA while GDB was insolvent and, in addition, PREPA owes over $43 million for money borrowed, while its demand deposit claim is only $152 million, and (*iv*) ERS has a $33 million demand deposit claim against GDB for funds on deposit at GDB, which funds Act 106 of August 2017 and Joint Resolution 188 mandate to be transferred to the Commonwealth to help pay pension claims. Demand deposit amounts and liabilities for loans from GDB are taken from the GDB fiscal plan certified April 20, 2018 at pp. 37-38. We understand the Commonwealth actually owes GDB substantially more than reflected above. *See* Proof of Claim No. 29485, filed in Case No. 17-03283 (D.P.R. filed May 25, 2018) (asserting claim of not less than $2,231,033,108 by GDB against the Commonwealth); Proof of Claim No. 29533, filed in Case No. 17-03567 (D.P.R. filed May 25, 2018) (asserting claim of $2,355,974,556.98 by GDB against HTA); Proof of Claim No. 29617, filed in Case No. 17-04780 (D.P.R. filed May 25, 2018) (asserting claim of $41,357,139.80 by GDB against PREPA); Proof of Claim No. 151149, filed in Case No. 17-03567 (D.P.R. filed Jun. 29, 2018) (asserting claim of $2,355,974,556.98 by GDB against HTA).

49.     Moreover, the Oversight Board's decision to support the GDB restructuring was made as part of its territory-wide mandate to restore the entirety of Puerto Rico to fiscal responsibility and access to capital markets, *see* PROMESA section 101(a), taking into account the interconnectedness of the island's affairs.  The UCC's desire to interpose itself to undo the Oversight Board's determination of what is best holistically (and to instead focus only on the competing interests of unsecured claimholders across the Title III Debtors) would eviscerate the Oversight Board's ability to prosecute global restructurings for the entire island—its Congressionally ordained role.  The Oversight Board's decision to fulfill its mandate instead of bending to the UCC's comparatively narrow asserted interests is eminently justifiable.  That the UCC (wrongly) believes the GDB transaction is not beneficial to the Title III Debtors is irrelevant.  The UCC cannot insert its judgment in place of that of the Debtors and certainly not that of the Oversight Board.  *In re City of Stockton*, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013); *In re Sanitary & Improv. Dist. No. 7*, 96 B.R. 967, 972 (Bankr. D. Neb. 1989) (making clear the Court cannot "prevent a chapter 9 debtor from spending its money for any reason, even foolishly or in a manner that disadvantages other creditors" without consent).[15]  As mentioned above, the Oversight Board retains complete authority to enter into settlements of causes of action without Court approval, which is for all intents and purposes what the GDB restructuring is *vis-à-vis* the Title III Debtors.  Thus there is no basis to challenge the Oversight Board's approval of the GDB restructuring.

---

[15] Notably, the UCC has the burden of establishing all three prongs required for derivative standing.  *See Larson v. Foster (In re Foster)*, 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014) (holding "[t]he party seeking such derivative standing bears the burden of proof" on showing the necessary requisites are proved); *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004) ("It is the creditor's burden in the first instance to demonstrate that it has satisfied these prerequisites for derivative standing."); *G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 629 (Bankr. D. N.J. 2004) ("it is the committee's burden in the first instance to demonstrate that it has satisfied the test for derivative standing").  The UCC fails to even allege that they satisfy the third standard, that the litigation presents no burden to the estate.  *Campana v. Pilavis (In re Pilavis)*, 233 B.R. 1, 3–4 (Bankr. D. Mass. 1999).  Nor could they as the GDB restructuring is an important element of the overall Commonwealth revitalization.  Accordingly, any litigation challenging the GDB restructuring would impose a great burden on the Debtors' Title III cases.

50.     Finally, no equitable reason to grant derivative standing exists here.  This is because, under PROMESA Title III, Congress put the Oversight Board in charge of prosecuting causes of action and defenses of the Title III Debtors.  *See* PROMESA sections 301(c)(7), 315(b).  This arrangement is unlike chapter 11, where the debtor's prepetition management generally remain in place, and is more like a chapter 7 case with an appointed trustee from the outset of the case.  Notably, certain courts have held that derivative standing is unnecessary in chapter 7 because "there is always a trustee in place.  There is not the potential for a conflicted board of directors pulling its punches.  There is not the risk of the proverbial fox guarding the henhouse."  *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 812 (Bankr. N.D. Tex. 2009).  Therefore, just as in chapter 7, "there would seem to be no equitable rationale" to grant derivative standing.  *Id*; *see also In re Dziurgot-Farnsworth*, 2014 Bankr. LEXIS 5046 *4 (Bankr. D.R.I. Dec. 12, 2014) (citing *Reed v. Cooper* approvingly).

## IV.   THE OVERSIGHT BOARD IS THE ONLY APPROPRIATE REPRESENTATIVE OF THE TITLE III DEBTORS

51.     The Oversight Board is the only entity that was specifically established and designed by Congress to serve as representative of the Debtors, and was given many trustee powers to carry out this responsibility.  It is thus the only appropriate body that can serve in this role.  The UCC is simply unfit to replace it.  The UCC's judgment as to the disposition of the Title III Debtors' property would not be from the vantage point of the island's recovery as a whole (as the Oversight Board is charged with doing), but solely as it purportedly pertains to the recoveries of unsecured claimholders across various Title III Debtors.  This extreme outcome is without precedent, and would fly in the face of Congressional intent and the structure and purposes of PROMESA.  More fundamentally, the creditors of the Title III debtors cannot realistically expect to be better off by focusing solely on the disposition of transactions between themselves and GDB.

23

Those dispositions pale in comparison to the importance of the resurgence of the Commonwealth as a whole.

### A.      Congress Contemplated a Holistic Approach to Puerto Rico's Restructuring

52.      In enacting PROMESA, Congress specifically found that "[a] comprehensive approach to fiscal, management, and structural problems and adjustments that exempts no part of the Government of Puerto Rico is necessary, involving independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process."   PROMESA § 405(m)(4).  Congress established the Oversight Board with the purpose "to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a).  To achieve its mandate, Congress imbued the Oversight Board with myriad powers to oversee and manage the recovery and revitalization of the island.  Such powers are not limited to Title III, but include the certification of fiscal plans and budgets, revitalization projects under Title V, and consensual creditor collective action arrangements under Title VI.

53.      Through Title III, PROMESA establishes a novel framework for dealing with the adjustment of a territory's debts based on chapter 9 of the Bankruptcy Code.  Whereas in chapter 9 the municipal debtor serves as trustee, in Title III the Oversight Board holds many trustee powers (PROMESA section 301(c)(7)) and is the sole representative (PROMESA section 315(b)) of each Title III Debtor from the inception of a case.  The Oversight Board is given critical responsibilities in prosecuting the debtor's case, including settling claims and negotiating and filing plans of adjustment.  Congress took this extraordinary step of installing the Oversight Board because it specifically recognized that a comprehensive and holistic approach to solving Puerto Rico's fiscal and structural problems required independent oversight.  *See* PROMESA section 405(m)(4).  It established an Oversight Board composed of hand-selected, highly qualified members of diverse

24

backgrounds and experience.  Such members underwent a rigorous selection process, were

appointed by the President (*see* PROMESA section 101(e)), are uncompensated, and, to ensure

their independence, are subject to federal conflict of interest and disclosure of financial interests

laws (*see* PROMESA section 109).  Each Title III Debtor had to consent to the filing of a Title III

petition, aware that doing so would make the Oversight Board its sole representative within Title

III and would give the Oversight Board the power to consent to Court interference with the debtors'

property under PROMESA section 305.

### B.    The UCC Cannot Bypass PROMESA's Carefully Constructed Framework

54.    Not only is the UCC asking for derivative standing to step into the shoes of the

debtors, but it is going one step further and is trying to step into the shoes of the Oversight Board.

Even if the Court could grant the UCC derivative standing under PROMESA Title III to step into

the shoes of the Debtors, the Court cannot grant the UCC "double derivative standing" to play the

role of both Oversight Board and Government.  Not surprisingly, the UCC fails to identify the

respondents to its motion. The UCC has deployed an inadequate caption failing to name any

respondent and to comply with Bankruptcy Rule 9004, thus leaving the responding parties

unknown.[16]

55.    The UCC cannot bypass PROMESA's carefully constructed framework by asking

the court to install it as the 'new' representative of the Title III Debtors.  It cannot effectively

change the composition of the members of the Oversight Board by replacing it with its own

members – that is left to the President (as the UCC itself recognized and supported in the

---

[16] Bankruptcy Rule 9004 requires every caption to include the title of the case, and Fed. R. Civ. P 10(a) explains the title of a complaint must "name all the parties," after which other pleadings may refer generally to the parties. Because contested matters such as this are commenced by motion, the original motion needs to specify each party, as the Oversight Board's pleadings always do.  The UCC's instant motion neither has a caption naming only one Title III debtor and no respondents.

Appointments Clause litigation).[17]   Nor can it obtain the power to block the enforcement of a Commonwealth statute, as it seeks to do here, when only one entity was given that power: the Oversight Board.  *See* PROMESA section 108(a)(2).

56.     Significantly, the UCC is unfit to replace the Oversight Board as trustee even in a limited capacity.  Rather than being established by Congress and comprised of members appointed by the President, it is a creature of Title III, it is appointed by the U.S. Trustee, and its members are unsecured claimholders of each Title III Debtor.  Unlike the Oversight Board, it has no mandate nor duty to consider the impact of adjustment of debts on the long-term financial sustainability of the Commonwealth and on its access to capital markets.  Unlike the Government of Puerto Rico, it has no obligation to ensure the provision of governmental services, to be responsive to the concerns of the island's inhabitants, nor to promote the revitalization of Puerto Rico's economy.  Its only objective is to maximize recoveries of unsecured claimholders of Title III debtors.  It would contravene Congressional intent and the sovereignty of Puerto Rico to permit the UCC to helm the ship as representative of the debtor, even in a limited capacity.

### C.    The UCC's Allegations of Conflict Ring Hollow

57.     The UCC's allegations that the Oversight Board is inherently conflicted because it represents all Title III Debtors ring hollow.  Congress specifically chose to make this Oversight Board the representative of *each* and *every* debtor and the Administrative Supervisor of a Title VI modification.  No disqualifying conflict can thus exist based on this statutorily mandated structure, contrary to the UCC's argument.  Indeed, having separate representation for each Title III debtor

---

[17] *See* Case No. 17-3283, ECF No. 1631 at 5-11 (arguing in favor of constitutionality of PROMESA appointment provisions and Congress's nigh unlimited power in that regard).

would create chaos and could lead to an antagonistic result with each part of the ship sailing full steam ahead in opposite directions.

58.    Indeed, the UCC represents creditors of four separate Title III debtors, each with their own competing interests.  For example, the Qualifying Modification might be more favorable from the perspective of one debtor's (*e.g.* HTA's) unsecured claimholders but less favorable to another debtor's (*e.g.* PREPA's) unsecured claimholders.  That the UCC believes it could fulfill the role of trustee without conflict but the Oversight Board cannot underscores the insincerity of its argument that the Oversight Board is conflicted.

59.    The UCC also alleges that the members of the Oversight Board that have connections to GDB are not disinterested.[18]  If the UCC is correct, then former Treasury Secretary Henry Paulson would not have been allowed implement the "bailout" deal because of his prior affiliations with Goldman Sachs—an absurd result.  The wheels of government would grind to a halt, as any individual who had been through the "revolving door" of government would suddenly be unable to pursue any initiative related to their past employment or employer.

## V.    THE ENTIRE FAIRNESS DOCTRINE IS BEING MISUSED

60.    While having no bearing on the merits of its derivative standing request, the UCC uses its Derivative Standing Motion in the Title III Case to suggest that the Title VI Court (where the UCC has no standing) should assess the transaction according to the fairness standard it utilized in the PREPA post-petition financing context.  Derivative Standing Motion at ¶ 4.  The UCC asks the question "Who was representing the interests of the Title III Debtors with respect to their claims against GDB and the GDB Releasees?"  *Id.*  The answer they claim is "no one."   This is wrong.

---

[18] As described below, the only Oversight Board connections to GDB are that two of its members are former officers of GDB.  Notably, no former officer of GDB is being released under the GDB Restructuring Act.  GDB Restructuring Informative Motion at ¶ 7.

The Oversight Board reviewed the transaction from the perspective of all debtors and the goals of PROMESA and could have vetoed the transaction in its capacity as Administrative Supervisor. Having satisfied itself that the transaction was compliant with PROMESA and consistent with the Oversight Board's mandate, the Oversight Board certified the Qualifying Modification—a determination that cannot be second-guessed by other parties nor reviewed by the Court. PROMESA § 106(e).

61.    Moreover, the UCC's outrageous claims that certain Oversight Board members acted out of personal interest are unfounded.  The Oversight Board's members are not being released, as the release is limited to *current* officers in their capacity as such, not former officers now serving on the Oversight Board.  *See* GDB Restructuring Informative Motion at ¶ 7. Obviously, then, to state the Oversight Board acted in self-interest and was conflicted when none of its members are even slightly benefitting by the restructuring makes no sense.

62.    Furthermore, while there is not a shred of merit to the UCC's allegations, even if taken at face value they would not rise to the level of an interested transaction that is scrutinized for entire fairness to determine whether the officers and directors carried out their fiduciary duty of care in accordance with the business judgment rule.  Indeed, there is no law applying business judgment tests to the governmental judgments the Oversight Board and AAFAF are called on to make.

63.    Even if the entire fairness and business judgment tests were somehow reconfigured and imposed on a governmental and political regime, the Oversight Board's vote as Administrative Supervisor to certify the Qualifying Modification was unanimous.   Only two of the seven Oversight Board members have ties to the GDB.  The case law demonstrates that, to assess whether there was "a disinterested and independent board majority, the court conducts a director-by-

director analysis." *In re Trados Inc.*, 73 A.3d 17, 44-45 (Del. Ch. 2013).   A court cannot apply

an entire fairness standard of review unless the *majority* of the voting members are interested.   *Id.*

at 20 ("To obtain review under the entire fairness test, the stockholder plaintiff must prove that

there were not enough independent and disinterested individuals among the directors making the

challenged decision to comprise a board majority.").  Therefore, even if the Court had jurisdiction

to review the Oversight Board's certification determination, such determination should be assessed

based on the board members' 'business judgment' rather than entire fairness.

64.     Finally, entire fairness is also inapplicable because Title VI has its own

confirmation procedures that prescribe a narrow scope of Court review.  Specifically, the Title VI

Court shall not approve the Qualifying Modification if and only if the Court determines that such

Qualifying Modification does not meet certain, specified requirements of section 601.  PROMESA

section 601(m)(1)(D).  The Court is *not* asked to make wide-ranging value judgments as to the

reasonableness of the Qualifying Modification.

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtors respectfully request that the Court deny the

Derivative Standing Motion.

Dated: September 21, 2018
      San Juan, Puerto Rico

Respectfully submitted,

*/s/  Martin J. Bienenstock*

Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Timothy W. Mungovan
Margaret A. Dale
Maja Zerjal
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

*/s/   Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*