# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
-------------------------------------------------------------------- X
                                        :
In re:                                  :
                                        :
THE FINANCIAL OVERSIGHT AND             :  PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,       :  Title III
                                        :
        as representative of            :  Case No. 17-BK-3283 (LTS)
                                        :
THE COMMONWEALTH OF PUERTO RICO et al., :  (Jointly Administered)
                                        :
        Debtors.¹                       :
-------------------------------------------------------------------- X
```

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OMNIBUS REPLY IN SUPPORT OF ITS MOTION FOR ORDER GRANTING DERIVATIVE STANDING TO ACT ON BEHALF OF TITLE III DEBTORS FOR CERTAIN LIMITED PURPOSES AND OTHER RELATED RELIEF WITH RESPECT TO RESTRUCTURING OF <u>GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO</u>

---

[1]    The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...........................................................................................................4

    A.    "Clarification" Of Releases Under GDB Restructuring Act Does Not
Come Close To Resolving Conflicts Of Interest ....................................4

    B.    GDB/AAFAF And Oversight Board Have Done Far More Than Just Fail
To Bring Claims On Title III Debtors' Behalf ........................................8

    C.    There Are Potential "Colorable Claims" That Need To Be Protected ................10

    D.    Committee's Reliance On Commonwealth-COFINA Dispute Procedure Is
Not "Misplaced" ....................................................................................15

    E.    GDB/AAFAF's Reply On Direct Standing In Title VI Case Ignores The
Most Critical Points ...............................................................................17

    F.    Court Can Reach The Right Result Without Any Section 305 Implications .......19

    G.    PROMESA Section 305 Does Not Preclude Derivative Standing ......................20

    H.    PROMESA Section 303 Does Not Preclude Derivative Standing ......................23

    I.    Title III Debtors Are Not "Net Debtors" Vis-à-Vis GDB ...............................26

    J.    Committee Should At Least Be Granted Amicus Status ....................................29

CONCLUSION .......................................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ASARCO LLC v. Americas Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008) ................................................................ 14

*Baker v. Carr*,
  369 U.S. 186 (1962) .............................................................................. 3

*In re City of Cent. Falls, R.I.*,
  2011 WL 9933766 (Bankr. D.R.I. Nov. 2, 2011) ................................... 2

*In re City of Stockton*,
  526 B.R. 35 (Bankr. E.D. 2015) ............................................ 7, 8, 23, 24

*In re City of Stockton, Cal.*,
  486 B.R. 194 (Bankr. E.D. Cal. 2013) ................................................... 2

*Commerce Bank of Kansas City, N.A. v. Achtenberg*,
  1993 WL 476510 (W.D. Mo. 1993) ....................................................... 12

*Dean v. Davis*,
  242 U.S. 438 (1917) ......................................................................... 13, 14

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013) .............................................................................. 3

*In re FBN Food Serv., Inc.*,
  175 B.R. 671 (Bankr. N.D. Ill. 1994), *aff'd sub nom. In re FBN Food Servs.,
  Inc.*, 185 B.R. 265 (N.D. Ill. 1995), *aff'd and remanded sub nom. Matter of
  FBN Food Servs., Inc.*, 82 F.3d 1387 (7th Cir. 1996) ........................... 14

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
  899 F.3d 13 (1st Cir. 2018) ........................................................ 20, 21, 22

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
  136 S. Ct. 1938 (2016) .......................................................................... 14

*In re Martin*,
  817 F.2d 175 (1st Cir. 1987) .................................................................. 8

*Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C*,
  467 F.3d 73 (2d Cir. 2006) .................................................................... 18

*In re Renegade Holdings, Inc.*,
  457 B.R. 441 (Bankr. M.D.N.C. 2011) .................................................. 12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Rodriguez*,
  895 F.2d 725 (11th Cir. 1990) ................................................................................... 12

*In re Sackman Mortg. Corp.*,
  158 B.R. 926 (Bankr. S.D.N.Y. 1993) ....................................................................... 14

*In re Tronox Inc.*,
  503 B.R. 239 (Bankr. S.D.N.Y. 2013) ....................................................................... 12

*VFB LLC v. Campbell Soup Co.*,
  482 F.3d 624 (3d Cir. 2007) ...................................................................................... 12

**Statutes**

7 L.P.R.A. § 563 ............................................................................................................ 9, 15

11 U.S.C.
  § 363 ........................................................................................................................... 21
  § 502(d) ...................................................................................................................... 27
  § 553(a) ...................................................................................................................... 28
  § 553(a)(1) .................................................................................................................. 27

26 U.S.C.
  § 3404(b) .................................................................................................................... 13
  § 6502(a) .................................................................................................................... 11

28 U.S.C.
  § 3001 ......................................................................................................................... 11
  § 3304(b) .................................................................................................................... 13
  § 3306(b) .................................................................................................................... 11

Bankruptcy Code
  § 105(a) ...................................................................................................................... 16
  § 503(b)(3)(B) ............................................................................................................ 16
  § 544(b) ...................................................................................................................... 11
  § 548 ........................................................................................................................... 11
  § 548(a)(1) ............................................................................................................. 11, 14
  § 549 ........................................................................................................................... 22
  § 553 ...................................................................................................................... 27, 29
  § 903 ..................................................................................................................... 7, 8, 24
  § 926 ................................................................................................................. 18, 22, 23
  § 1103(c) .................................................................................................................... 16
  § 1109 ......................................................................................................................... 19
  § 1109(b) .................................................................................................................... 16

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Federal Debt Collection Procedure Act ....................................................................11, 13
   § 3304 ........................................................................................................................11

GDB Enabling Act ..............................................................................................6, 9, 15, 29

1957 P.R. Laws 3 ...........................................................................................................9, 15

2015 P.R. Laws 97 .........................................................................................................9, 15

PROMESA
   § 4 ...............................................................................................................................27
   § 104(b) ................................................................................................................16, 17
   § 104(g) ...............................................................................................................16, 17
   § 301 ....................................................................................................................27, 28
   § 303 ................................................................................................20, 23, 25, 26
   § 304(g) ........................................................................................................................5
   § 304(j) .......................................................................................................................22
   § 305 ..................................................................................19, 20, 21, 22, 23
   § 601(g)(1)(D) .............................................................................................................2
   § 601(M)(1)(D) .........................................................................................................30
   § 601(m)(2) ...............................................................................................................17
   § 903 ..........................................................................................................................23
   § 904 ..........................................................................................................................23

Puerto Rico Corporation Debt Enforcement and Recovery Act.................................14

To the Honorable United States District Court Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA) (the "Committee") hereby files this omnibus reply (the "Reply") to the objection of the Government Development Bank for Puerto Rico ("GDB") and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), dated September 21, 2018 [Docket No. 3961], and the objection of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), dated September 21, 2018 [Docket No. 3959], to the Committee's *Motion For Order Granting Derivative Standing To Act On Behalf Of Title III Debtors For Certain Limited Purposes And Other Related Relief With Respect To Restructuring Of Government Development Bank For Puerto Rico* (the "Derivative Standing Motion"), dated September 6, 2018 [Docket No. 3881]. In support of this Reply, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Fundamentally, the GDB Restructuring is an attempt by hopelessly conflicted actors to liquidate GDB and extinguish rights and claims of the Title III Debtors against GDB in a manner that could never be accomplished pursuant to a Title III plan of adjustment or a lawful application of Title VI, which are the only two means of restructuring permitted by PROMESA. The GDB Restructuring could never be accomplished pursuant to Title III or a lawful application of Title VI because, among other things, all of GDB's most valuable assets are being transferred to certain favored unsecured creditors while leaving the Title III Debtors holding a potentially empty bag. Even the proceeds of GDB's claims against third parties such as the investment banks that facilitated and profited from the debt offerings orchestrated for the Title III Debtors

by GDB are being excluded from what the Title III Debtors are receiving under the GDB

Restructuring.[2]

2.      This absurdly lopsided asset allocation scheme is the antithesis of the "fair and

equitable" treatment of creditors required by Title III and the pooling requirements of Title VI.

While it is true that the Qualifying Modification for which GDB is seeking approval meets

certain of the Title VI's pooling requirements, this is only because the Qualifying Modification

leaves the Title III Debtors' claims against GDB completely out of the Title VI process.  Had the

Title III Debtors' claims against GDB been included as part of the Qualifying Modification, they

would have to have been included in the same pool as GDB's favored unsecured creditors and

their claims treated "fairly and equitably" as part of that same pool.[3]

3.      If the unfairness and inequity of the GDB Restructuring were not enough, the

GDB Restructuring Act purports to deprive the Title III Debtors of any authority or standing to

---

[2]   As the Offering Memorandum attached to the Solicitation Statement makes clear, the PET (the entity that receives
the Title III Debtors' sole distributions from GDB) will not receive any recoveries from GDB's own causes of
action (other than causes of action to enforce loans that are PET assets).  *See Declaration of Suzzanne S. Uhland,
Esq. In Support Of The Application Of The Government Development Bank For Puerto Rico And The Puerto Rico
Fiscal Agency And Financial Authority, Pursuant To Section 601(M)(1)(D) Of The Puerto Rico Oversight,
Management, And Economic Stability Act, For Approval Of The Qualifying Modification For GDB* [18-01561,
Docket No. 1-19] ("Uhland Decl.") (August 10, 2018) Ex. O [18-01561, Docket No. 1-15], Solicitation Statement,
Offering Memorandum at E-101-102.

[3]   Moreover, had the Title III Debtors' claims been included, the proposed modification could not have been
approved unless the Court found that the modification was in the best interests of creditors and was feasible.  *See*
PROMESA § 601(g)(1)(D).  Because a government's sovereignty does not extend to factual findings by a federal
court, there would be no question, had GDB/AAFAF and the Oversight Board not unjustifiably excluded the Title
III Debtors' claims, that GDB/AAFAF and the Oversight Board had consented to the court's interference for the
purposes of section 305 of PROMESA.  *See In re City of Cent. Falls, R.I.*, 2011 WL 9933766, at *4 (Bankr.
D.R.I. Nov. 2, 2011) (subsequent history omitted) (sections 903 and 904 did not apply when debtor sought a
ruling from the bankruptcy court with respect to a lease, as "[d]enial of the relief sought is not control over the
property, revenues, or political or governmental powers of the debtor"); *see also In re City of Stockton*, 486 B.R.
194, 199 (Bankr. E.D. Cal. 2013) (municipal debtor can consent to judicial interference to obtain court approval).

challenge the restructuring or any related transactions (which a Commonwealth law cannot do).[4]

Thus, the Committee is now all that stands in the way of this unlawful liquidation of GDB.

Indeed, if the Committee is denied standing and the GDB Restructuring is approved, it will long

be remembered as a notorious case in which, right under everyone's noses, an insolvent entity

was unlawfully liquidated pursuant to a territory law, all of its most valuable assets were used to

pay a favored subset of unsecured creditors, rights and claims of potentially enormous value

were released without any prior investigation, disfavored creditors were rendered powerless to

do anything about it, and the parties ultimately harmed were not allowed to come forward and be

heard.

      4.      GDB/AAFAF and the Oversight Board purport to justify all of this on the grounds

that the GDB Restructuring is for the overall good of Puerto Rico.  But no such purported

justification (which the facts do not bear out) has any place in a multi-debtor bankruptcy where

the debtors' cases have not been substantively consolidated.  Absent substantive consolidation,

which PROMESA expressly disclaims (absent a specific court order), each debtor must be

treated as a standalone entity.  As a corollary of this fundamental principle, AAFAF and the

Oversight Board cannot represent both sides of inter-debtor claims.  As far as the Committee is

aware, no court has ever sanctioned such conflicted representation in the face of actual adversity,

and the Court should not do so here.  Rather, this Court should exercise its equitable powers to

grant the Committee derivative standing to act on the Title III Debtors' behalf in preventing the

extinguishment of their rights and claims through an illegal liquidation of GDB, or, in the

---

[4]    GDB/AAFAF and the Oversight Board argue that, because the GDB Restructuring Act purports to deprive the
Title III Debtors of standing to challenge the GDB Restructuring, they have no standing from which the
Committee's standing might derive.  This argument is meritless, as "standing in federal court is a question of
federal law, not state law."  *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013); *see also Baker v. Carr*, 369 U.S.
186, 204 (1962) (same).  No Commonwealth law can create or destroy standing in federal court.

alternative, simply refuse to proceed with the Title VI case unless and until the Committee is authorized to appear in that case.

## ARGUMENT

### A.   "Clarification" Of Releases Under GDB Restructuring Act Does Not Come Close To Resolving Conflicts Of Interest

5.       As the Court is aware, GDB/AAFAF filed an informative motion on September 17, 2018 "clarifying" that the release provision in the GDB Restructuring Act applies only to current officers and directors[5] of GDB with respect to their current roles.  Although couched as a "clarification," neither GDB/AAFAF nor the Oversight Board went so far as to claim that this was the intended scope of the release provision all along.

6.       In any event, while the Committee welcomes GDB/AAFAF's recent "clarification," it does not come close to resolving the conflicts of interest at the heart of the GDB Restructuring.  The fact remains that the GDB Restructuring was orchestrated by current and former GDB officers and/or former officers of closely tied investment banks who have nothing to gain from a GDB "autopsy" and, if they are not being released, potentially a great deal to lose.  Indeed, if they are not being released, they have even **more** of an incentive to "bury" GDB before a thorough autopsy can be conducted.[6]

7.       At the September 13, 2018 hearing, the Court asked counsel for the Oversight Board whether, in light of the "issues raised throughout these proceedings, and particularly recently, about the unusual statutory structure and composition of the Oversight Board and its

---

[5]    *See Informative Motion Regarding Releases Under Article 702 of The GDB Restructuring Act*, ¶¶ 7-8, *Government Development Bank for P.R.*, No. 18-cv-1561 (LTS) (D.P.R. Sept. 17, 2018) [Docket No. 151] (the "Informative Motion").

[6]    With regard to the two former GDB presidents who are members of the Oversight Board, it is no answer to say that their votes to certify the Qualifying Modification were unnecessary because the voting was unanimous. While this statement is true as far it goes, it betrays a troubling insensitivity to conflicts of interest when it comes to GDB.  Given their conflicts, these former GDB presidents should never have been part of any discussions or deliberations regarding the GDB Restructuring.

range of responsibilities that cross various debtors," there are "procedures in place to ensure the appropriate evaluation of these issues from the perspective of each debtor."[7]  Counsel for the Oversight Board responded that the "Special Investigations Committee" charged with bringing claims identified in the Kobre & Kim report "does not consist of any persons who were formerly associated with the Government Development Bank or other government instrumentalities."[8]

8.      Counsel's statement did not even address the Court's concern that both AAFAF and the Oversight Board are on both sides of inter-affiliate claims and thus are conflicted.  They are purporting to resolve those claims as if their cases have been substantively consolidated, which, of course, they have not.  As pointed out in the Committee's Derivative Standing Motion, section 304(g) of PROMESA provides that "nothing in this title shall be construed as authorizing substantive consolidation of the case of affiliated debtors."  This means that, absent a specific court order, each debtor must be treated separately and not as part of an overall "enterprise."

9.      AAFAF, which is GDB's successor as fiscal agent and financial advisor to the Puerto Rico government, purports to represent both GDB and the Title III Debtors in the GDB Restructuring, including with respect to their inter-debtor claims.  The same is true of AAFAF's counsel.  Meanwhile, the Oversight Board purports to be both the representative of each Title III Debtor and the overseer of GDB as a covered "territorial instrumentality," not to mention the Administrative Supervisor of the Title VI process and the certifier of the Qualifying Modification.  The Oversight Board also certified the respective Fiscal Plans of GDB and the

---

[7]    Sept. 13, 2018 Hr'g Tr. at 7:18-24.

[8]    *Id.* at 8:2-6.  However, it is evident that **no such "separate committee" was created to evaluate the GDB Restructuring** because, in fact, the entire Oversight Board voted on the certification of the Qualifying Modification.  *See* Financial Oversight and Management Board for Puerto Rico, Unanimous Written Consent (May 8, 2018).

Title III Debtors, which contemplate transactions designed to benefit GDB and its favored unsecured creditors at the Title III Debtors' expense.

10.     To "represent" a debtor is to owe that debtor a duty, fiduciary or otherwise. Absent substantive consolidation, this includes a duty to respect the separateness of each debtor. The notion that "representation" of a debtor can mean subordinating its interests to those of a non-consolidated affiliate offends the most basic conceptions of propriety, no less because GDB and the Title III Debtors are government entities.  This is especially true when an entity is being liquidated, and the challenged conduct deals solely with the resolution of inter-affiliate claims. Among other examples of this bizarre inversion of "representation," the Oversight Board and/or AAFAF have:

- approved the release of all of the Title III Debtors' potential litigation claims against GDB without having conducted a thorough (or any) investigation;

- taken the position that PREPA owes GDB more than $324 million on account of preference claims that GDB supposedly holds against PREPA under the GDB Enabling Act, even though no such claims have ever been asserted and the RSA lists PREPA as having a net deposit claim against GDB of more than $114 million;

- orchestrated and/or approved the GDB Restructuring's two-entity structure, which was created for no apparent reason other than to protect the recoveries of GDB's favored unsecured creditors from dilution on account of potential claims of the Title III Debtors;

- adopted, apparently without any independent investigation, GDB's flawed calculation of the Commonwealth's supposed $890.6 million net loan obligation to GDB, which, as discussed more fully above, prematurely assumes that GDB's loan claims will be allowed in the Title III cases without reduction or subordination, fails to account for non-deposit claims against GDB (including the Title III Debtors' potential litigation claims against GDB), fails to account for claims against GDB relating to federal funds never used for their designed purposes, and assumes that no funds deposited by the Title III Debtors with GDB are held in trust (or pursuant to "specific deposit" agreements) and thus that all such fund are GDB assets. [9]

---

[9]     Despite the Committee's repeated requests, which have now been pending for months, GDB/AAFAF has steadfastly refused to produce documents regarding funds being held in trusts or pursuant to special deposit agreements.  This not unlike when AAFAF objected to the Committee's requests for lists of any bank accounts containing over $2 million in deposits, and questioned the purpose of these requests.  *See Omnibus Reply In Support of Renewed Motion of Creditors' Committee Seeking Entry of Order, Under Bankruptcy Rule 2004,*

6

- approved or condoned the purported deprivation of authority or standing of the Title III Debtors to challenge the GDB Restructuring; and

- adopted GDB's position that the Commonwealth should assume approximately $312 million in liabilities to the federal government on account of GDB's misuse of the above-mentioned federal funds;

11.     The Committee well understands the need of a government debtor to retain control over its territory and instrumentalities in the legitimate exercise of its "political governmental powers" (properly understood, as set forth below).  But it does not follow that claims between nonconsolidated debtors (which have their separate sets of creditors) can be resolved by conflicted government bodies and their conflicted legal and restructuring professionals doing whatever they think is best for Puerto Rico as a whole.

12.     The Committee is not aware of a single chapter 9 case involving inter-debtor claims between affiliated governmental entities, much less a case holding that such claims can be litigated and/or resolved without representation by independent fiduciaries.  The situation confronting this Court is simply unprecedented.  The closest analogue is *In re City of Stockton*, 526 B.R. 35, 52 (Bankr. E.D. 2015), in which the State of California (which obviously was not a debtor itself) passed a law favoring CalPERS over the other creditors of the City of Stockton, just as the Commonwealth passed the GDB Restructuring Act to favor GDB's bondholders over the Title III Debtors with claims against GDB.  The bankruptcy court flatly rejected the state's attempt, holding that, notwithstanding section 903 of the Bankruptcy Code, the state could not favor CalPERS over other creditors, even by passing a law that was deemed by the California legislature to be in the state's best interests.[10]

---

*Authorizing Discovery Program With Respect To Certain Causes Of Puerto Rico Financial Crisis Beginning on August 15, 2018* [Docket No. 3183], ¶ 21 (May 30, 2018).  A short time after the Committee's request, AAFAF announced that it "discovered" billions in hundreds of previously "missing" cash accounts.  *Id.*

[10]   *In re City of Stockton*, 526 B.R. at 54 ("The PERL § 20574 termination lien and the PERL § 20487 prohibition on rejection in chapter 9 of a municipality's CalPERS pension servicing contract do not reflect the exercise of the

13.     Nor is the Committee aware of a single bankruptcy case in which the court has allowed the same fiduciaries or counsel to represent affiliates in the litigation or settlement of adverse claims.  On the contrary, as discussed at length in the Committee's Derivative Standing Motion, there comes a point where such conflicts of interest require the appointment of independent fiduciaries or some other prophylactic mechanism (such as allowing an official committee to represent one of the debtors) for the litigation and/or resolution of inter-debtor disputes.[11]  Moreover, as the First Circuit has held in addressing conflicts in the bankruptcy context, "[s]incerity or protestations of good faith, no matter how genuine, will not be enough."[12] The officers and directors of GDB/AAFAF, the members of Oversight Board, and their respective counsel undoubtedly regard themselves as acting in good faith and in a reasonable manner, but that cannot be the test when material adversity arises.

### B.     GDB/AAFAF And Oversight Board Have Done Far More Than Just Fail To Bring Claims On Title III Debtors' Behalf

14.     GDB/AAFAF and the Oversight Board argue that, even if derivative standing is available in Title III, derivative standing is unwarranted because the Committee has not shown the existence of a "colorable claim" or an unjustified failure to pursue any such claim.[13]  This is quite an audacious argument under the circumstances.  Not only has the Oversight Board failed to assert "colorable claims" on the Title III Debtors' behalf, but, as detailed above, the Oversight Board and AAFAF have been acting directly adverse to the Title III Debtors' interests, essentially "confessing judgment" in favor of GDB and relinquishing valuable rights and claims without so much as a thorough investigation.

---

'political or governmental' powers protected by § 903 . . . In other words, hiding behind the § 903 protection of the exercise of 'political or governmental' powers does not work for CalPERS.").

[11]   Derivative Standing Motion ¶¶ 45-51.

[12]   *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987).

[13]   Oversight Board Objection ¶ 47; GDB/AAFAF Objection ¶¶ 26-28.

15.     The Oversight Board's position that preferential transfers were made to PREPA in 2014 and 2015 while GDB was insolvent shows the perils of "representing" two adverse parties (in that case, PREPA and GDB) at the same time and in the same proceedings.  Receiving deposits while insolvent is a crime in Puerto Rico, [14] and GDB received millions of dollars in deposits (including from Title III Debtors) during the same time period that the Oversight Board alleges GDB was insolvent.  Thus, in its zeal to make PREPA into a "net debtor" of GDB, the Oversight Board took a position implying that the GDB officers who allowed GDB to receive deposits during the 2014-2015 time period are at risk of a felony conviction.  The Oversight Board also misses the fact that more than $750 million of principal and interest paid to GDB bondholders during the same period (and even through the first half of 2016) would also be preferential transfers. [15]  How is it that the GDB bondholders are getting a "free pass" for these preferential payments?  Which fiduciary advocated for that lopsided result?

16.     Indeed, GDB/AAFAF and the Oversight Board make no bones about it.  They decided to sacrifice the rights and claims of the Title III Debtors for what they deemed to be in the best interests of Puerto Rico's residents.  Of course, the unsecured creditors of the Title III Debtors are almost all Puerto Rico residents and businesses, and there is zero evidence that the GDB Restructuring in its current form is critical to Puerto Rico.  Nor is there any evidence that Puerto Rico residents hold more GDB bonds than other types of government bonds issued by the Title III Debtors, and, from the standpoint of Puerto Rico's "revitalization," there is certainly no

---

[14]   *See* GDB Enabling Act, 1948 P.R. Laws 17, § 15, as amended by 1957 P.R. Laws 3 (providing for imprisonment of one to five years); see also 2015 P.R. Laws 97 (amending Enabling Act to remove criminal penalties for accepting deposits while GDB is insolvent).  The current version of this statute is at 7 L.P.R.A. § 563.

[15]   It appears that, commencing on January 1, 2015 and August 1, 2016, a total of approximately $750 million in principal and interest payments were made to GDB bondholders.

basis for preferring their interests to those of the Title III Debtors' unsecured creditors in what is a zero-sum game with respect to the distribution of GDB's assets.

### C.     <u>There Are Potential "Colorable Claims" That Need To Be Protected</u>

17.     It is important to point out, yet again, that the Committee is not seeking at this time to assert claims; it is simply trying to protect such claims against immediate release and/or discharge. As far as "colorable claims" are concerned, it is sufficient to point out that the Kobre & Kim report, which was commissioned by the Oversight Board's own Special Investigations Committee, identifies the factual predicate for any number of potential claims against GDB arising out of its central role in Puerto Rico's disastrous financial mismanagement. This is to say nothing of potential avoidance claims, which the investigators did not even attempt to address.[16] Nor did they opine on the likelihood of success of any claims the report identifies.[17]

18.     The Oversight Board and GDB/AAFAF practically concede that they have conducted **no** investigation into causes of actions the Title III Debtors may have against GDB.[18] Indeed, the Oversight Board's main defense for its refusal to pursue such causes of action is not that they do not exist, but that the Title III Debtors are "net debtors *vis-à-vis* GDB,"[19] i.e., that it is not worth the time and effort to investigate the Title III Debtors' potential causes of action given the significant net obligations by the Title III Debtors to GDB. In its objection to the Committee's direct standing in the GDB's Title VI case, the Oversight Board even went so far to

---

[16]    Kobre & Kim Report at 502, 504, 535.

[17]    *Id.* at 30.

[18]    While the Oversight Board pays lip-service to a purported analysis of the Debtors' causes of actions, it does not identify any specific claims that it investigated or why it determined to release such claims. *See* Oversight Board Objection ¶37 (noting that the Debtors and the Oversight Board "made determinations, in the exercise of their sole judgment, regarding an appropriate disposition of the Title III Debtors' property"). The GDB/AAFAF Objection also offers no analysis whatsoever of any potential claims.

[19]    Oversight Board Objection ¶48. However, as discussed at pages 26-29 below, the Oversight Board's premise is dubious given the numerous flaws in the setoff calculation that supposedly shows the Title III Debtors' net obligations to GDB.

assert that "it is beyond credulity that the Commonwealth, HTA, and PREPA can have meritorious claims against the governmental entity that loaned them money and kept them afloat at the request of the Puerto Rico government."[20]

19.    Of course, the Oversight Board's belief that a thorough investigation of the Title III Debtors' claims against GDB is not a worthwhile effort does not mean that no such claims exist.  As an initial matter, it is important to emphasize that, as the Oversight Board's investigator concluded, the Title III Debtors are not limited by the two-year lookback period under section 548 of the Bankruptcy Code, but that, pursuant to section 544(b) of the Bankruptcy Code, they can utilize non-bankruptcy fraudulent transfer law to avoid transfers **going back as far as ten years**.[21]

20.    Thus, it is by no means difficult (and it certainly does not stretch "credulity") to identify potential fraudulent transfer claims against GDB, particularly if one adopts the Oversight Board's position that GDB was insolvent beginning in 2014.  For example, in 2014, the Commonwealth transferred more than $450 million of net proceeds from its offering of general obligation bonds (the "GO Bonds") to repay the line of credit provided by GDB to the

---

[20]    *Objection Of Financial Oversight And Management Board For Puerto Rico As The Administrative Supervisor Of The Government Development Board For Puerto Rico To The Official Committee Of Unsecured Creditors' Notice Of Intention To Object To Qualifying Modification For Government Development Bank* [18-01561, Docket No. 111] ¶ 48 (September 1, 2018).

[21]    Kobre & Kim Report at 509-11.  One such non-bankruptcy law is the Federal Debt Collections Procedure Act (the "FDCPA"), which allows the IRS to collect a taxpayer's tax liabilities from transferees of the taxpayer's property if the taxpayer made a fraudulent transfer to or for the benefit of the transferee.  28 U.S.C. § 3001, *et seq.*  As the Oversight Board's investigator found, the IRS is a creditor here, having filed proofs of claim against the Commonwealth, HTA, and PREPA.  Kobre & Kim Report at 511.  The FDCPA, which largely tracks the requirements for constructive and fraudulent transfers found in section 548 of the Bankruptcy Code, (provides for a six-year look-back period.  *Id.* § 3306(b).  Similar to section 548(a)(1) of the Bankruptcy Code, section 3304 of FDCPA allows for the avoidance of constructive and actual fraudulent transfers.  In addition, the IRS (and, by extension, the Title III Debtors) can also utilize any applicable state fraudulent transfer laws to avoid fraudulent transfers going back ten years.  26 U.S.C. § 6502(a).

Public Building Authority (the "PBA").[22]  These transfers appear to satisfy all elements of a

constructive fraudulent transfer with respect to GDB.  Specifically:

- These transfers were clearly made for GDB's benefit.

- The Commonwealth did not receive reasonably equivalent value in exchange for such transfers.  As numerous courts have recognized, a parent entity does not receive reasonably equivalent value for transfers made to an insolvent entity that it controls, because such transfers do not increase the parent's equity value in its subsidiary.[23]  Here, GDB and PBA were both undercapitalized, if not insolvent, at the time of the transfers.  In fact, the Oversight Board has already conceded that GDB was insolvent[24] and, therefore, it should be estopped from arguing otherwise.

- The Commonwealth was also, at a minimum, undercapitalized, if not insolvent, at the time of the GO Bond offering in 2014.  In this regard, it is no defense that the Commonwealth was able to access the capital markets for the 2014 GO Bond offering.  Courts have rejected such a "market test" defense where, as here, the true financial condition of the issuer was not disclosed to the investing public.[25]  In fact, the Oversight Board's investigator points out that GDB officials expressed doubt about the truthfulness of certain GDB statements made in 2014 at the time of the GO Bond offering.[26]

---

[22]  Commonwealth of Puerto Rico, Quarterly Report dated July 17, 2014, at 32.  Specifically, the Commonwealth used $459.4 million of the net proceeds from the GO Bonds offering to PBA to reduce PBA's lines of credit with GDB as follows: (i) $187.3 million used to pay interest and principal on outstanding bonds and (ii) $272.2 million used for working capital.  These amounts were presumably deposited with GDB.

[23]  *See In re Rodriguez*, 895 F.2d 725, 728 (11th Cir. 1990) (holding that a parent company's payments on an insolvent subsidiary's loan were not in exchange for reasonably equivalent value when the parent received no economic benefit);  *Commerce Bank of Kansas City, N.A. v. Achtenberg*, 1993 WL 476510, *4 (W.D. Mo. 1993) (finding that the subsidiary's insolvency at the time of the transaction "erased any presumption of reasonably equivalent value"); *In re Renegade Holdings, Inc.*, 457 B.R. 441, 445 (Bankr. M.D.N.C. 2011) (finding that transfers to an insolvent subsidiary are not entitled to a presumption of indirect benefit going to reasonably equivalent value).

[24]  The Oversight Board has alleged that certain payments by GDB to PREPA in 2014 and 2015 were made while GDB was insolvent.  *See* Oversight Board Objection ¶ 48 n. 14.

[25]  *See, e.g.*, *In re Tronox Inc.*, 503 B.R. 239, 300 (Bankr. S.D.N.Y. 2013) (finding that "the assumption of market efficiency" in connection with an IPO was "overcome" by omissions in the IPO disclosures related to significant environmental liabilities); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("**Absent some reason to distrust it**, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.") (emphasis added) (internal quotation omitted).  Here, of course, the market did not know that GDB had hired bankruptcy counsel to draft a bankruptcy statute several months before the 2014 GO Bond offer.  Kobre & Kim Report at 106.

[26]  Kobre & Kim Report at 105 ("then-high ranking official within GDB suggested [in an internal email] that the [GDB] spokeperson's statement was 'false' and should be reframed").

21.     In addition, transfers of approximately $1.6 billion from the 2014 GO Bond

offering to repay Commonwealth and PBA lines of credit with GDB and to provide PBA with

working capital may also be avoided as actual fraudulent transfers.[27]  Importantly, actual

fraudulent intent does not require a showing of criminal intent.  Nor does it even require a

showing of intent to defraud.  An intent to hinder or delay creditors is sufficient.[28]  Moreover, the

requisite intent can be demonstrated (including under the FDCPA) through certain "badges of

fraud."[29]

22.     Here, several badges of fraud are present, including that the transfers in question

were made to or for the benefit of insiders (PBA and GDB), the Commonwealth did not fully

disclose the extent of its financial distress at the time and the retention of bankruptcy counsel, the

Commonwealth was, at a minimum, undercapitalized, if not insolvent, and the transfers occurred

shortly after a substantial debt ($3.5 billion in GO Bonds) was incurred.[30]  In addition, the

repayment of an antecedent debt in contemplation of bankruptcy is also "an element upon which

fraud may be predicated."[31]  Here, the repayment of Commonwealth and PBA lines of credit

---

[27]  As detailed in the Kobre & Kim Report, approximately $1.9 billion dollars of the proceeds from the 2014 GO
Bond issuances were earmarked for the repayment of lines of credit with GDB and deposit to Redemption Fund.
Kobre & Kim Report at 107.  Approximately $234.9 million of that amount were deposited into the Redemption
Fund.  Of the remaining amount, i.e., $1,661.1 million , the Commonwealth used (a) $459.4 million to reduce
PBA's lines of credit and for PBA's working capital (as noted above), (b) $1,107.5 million to reduce its own lines
of credit with GDB, and (c) $94.1 million for working capital.  *See* Commonwealth's Quarterly Report dated July
17, 2014 at 32.

[28]  The relevant fraudulent intent is the "actual intent to hinder, delay, **or** defraud" creditors.  28 U.S.C. § 3304(b)
(emphasis added).

[29]  *See* 26 U.S.C. § 3404(b) (in determining actual intent to hinder, delay, or defraud a creditor, consideration may be
given to a list of factors, including insider relationships and insolvency) (emphasis added).  As the statute
indicates ("among other factors"), the list of badges of fraud is not exhaustive.

[30]  While the repayment of the Commonwealth's own lines of credit with GDB with proceed from the 2014 GO Bond
offering may have constituted "value" to the Commonwealth (as it was the repayment of an antecedent debt), the
actual fraudulent intent analysis does not require a showing that the transferor received less than reasonably
equivalent value.

[31]  *Dean v. Davis*, 242 U.S. 438, 444 (1917) ("[W]here the advance is made to enable the debtor to make a
preferential payment with bankruptcy in contemplation, the transaction presents an element up which fraud may
be predicated.  The fact that the money advanced is actually used to pay a debt does not necessarily establish good

13

(and the provision of working capital to PBA) was made in contemplation of bankruptcy, as bankruptcy counsel to GDB was retained in early 2014 to advise regarding Puerto Rico's restructuring.[32]

23.     Furthermore, given that, as the Oversight Board's investigator found, GDB exercised complete control over every aspect of the Title III Debtors' various bond offerings,[33] it is GDB's fraudulent intent (not the Commonwealth's) that governs.[34]  Among other things, as detailed in the Oversight Board's investigator report, GDB abused its position as a lender to the Title III Debtors by increasing their debt load in a way that benefitted GDB as a creditor of the Commonwealth relative to other Commonwealth creditors.[35]  **Around half** of the entire proceeds from the 2014 GO Bond offering (approximately $1.6 billion) were earmarked to repay

---

faith"; affirming lower court's decisions that debtor mortgaged his property with purpose and intent to hinder, delay, or defraud his creditors).

[32]   Counsel was engaged by GDB starting in January 2014 "to provide specialized legal services with respect to the evaluation of potential liability management transactions as may be requested by the [GDB]."  *See* Agreement for Professional Services Between the Government Development Bank for Puerto Rico and Proskauer Rose LLP, dated February 3, 2014 (2014-BGF090), at 2.  These "liability management transactions" (i.e., restructuring and/or bankruptcy services) included drafting the Puerto Rico Corporation Debt Enforcement and Recovery Act (the "Recovery Act").  *See* Kobre & Kim Report at 538.  The Recovery Act was enacted on June 28, 2018, but was subsequently invalidated by the U.S. Supreme Court.  *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 136 S. Ct. 1938 (2016) (Puerto Rico's Recovery Act invalid on ground that chapter 9 of Bankruptcy Code preempts it).

[33]   Kobre & Kim Report at 71 (characterizing GDB as a "traffic cop" that "intermediated all of the [Title III Debtors'] bond issuances," deciding "which of the Puerto Rico-Related Entities would issue their bonds [] and when" and selecting underwriters and law firms for those issuances).

[34]   *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 369 (S.D. Tex. 2008) ("Most courts recognize that when a transferee is in a position to dominate or control the debtor's disposition of the property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor."); *In re FBN Food Serv., Inc.*, 175 B.R. 671, 686 (Bankr. N.D. Ill. 1994), *aff'd sub nom. In re FBN Food Servs., Inc.*, 185 B.R. 265 (N.D. Ill. 1995), *aff'd and remanded sub nom. Matter of FBN Food Servs., Inc.*, 82 F.3d 1387 (7th Cir. 1996) ("To protect the assets of a Debtor from actions taken by insiders, courts recognize that when a transferee is in a position to dominate or control the debtor's disposition of property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor."); *In re Sackman Mortg. Corp.*, 158 B.R. 926, 938 (Bankr. S.D.N.Y. 1993) ("Moreover, where the transferee is in a position to dominate or control the debtor's disposition of his property, the transferee's intent to hinder, delay, or defraud creditors may be imputed to the debtor to render the transfer fraudulent within section 548(a)(1) without respect to the actual purpose of the debtor transferor.").  Here, the Oversight Board's investigator has concluded that GDB controlled the debt offering process for Puerto Rico governmental entities.

[35]   Kobre & Kim Report at 72 ("GDB's provision of short-term cash injections to certain Puerto Rico-Related Entities while they waited to access the capital markets appears to have increased the debt load of certain Puerto Rico-Related Entities, in a way that arguably had the effect of benefitting GDB as creditor relative to others.").

Commonwealth and PBA lines of credit with GDB (and for PBA working capital).[36]  These
repayments were ostensibly motivated by the GDB board members' concerns over their own
personal and criminal liability if GDB were insolvent.[37]  Indeed, accepting deposits while
insolvent gives rise to criminal liability under Puerto Rico law.[38]  In short, the 2014 GO Bond
offering was designed, in large part, to improve GDB's balance sheet (for the benefit of GDB's
directors and officers) by hindering or delaying (if not defrauding) other Commonwealth
creditors.

24.     The Committee has no doubt that counsel for the Oversight Board will argue that
these and other avoidance claims have no merit.  However, it is evident from the objections filed
by the Oversight Board and GDB/AAFAF that they have spent no time analyzing the
Commonwealth's claims against GDB, as their sole focus has been on getting the Title VI
restructuring approved regardless of the effects on the Title III Debtors.  There is simply no one
other than the Committee advocating for the Title III Debtors.  These potential claims are just
examples of some of the claims that the Title III Debtors may have.  The Committee has not had
the opportunity to meaningfully analyze the transactions between the Title III Debtors and GDB.

**D.     Committee's Reliance On Commonwealth-COFINA Dispute Procedure Is
Not "Misplaced"**

25.     The Oversight Board argues that the procedure implemented to resolve the
Commonwealth-COFINA dispute—the appointment of independent fiduciaries—is not an
appropriate precedent for the resolution of inter-debtor claims between GDB and the Title III

---

[36]   *Id.* at 107.

[37]   *Id.* at 104.

[38]   *See* GDB Enabling Act, 1948 P.R. Laws 17, § 15, as amended by 1957 P.R. Laws 3 (providing for imprisonment
of one to five years); see also 2015 P.R. Laws 97 (amending Enabling Act to remove criminal penalties for
accepting deposits while GDB is insolvent).  The current version of this statute is at 7 L.P.R.A. § 563.

15

Debtors.[39]  According to the Oversight Board, it is not an appropriate precedent because, in that case, the Oversight Board consented whereas here it has not.[40]  But the question immediately arises:  "Why did the Oversight Board consent?"  To ask the question is to answer it.  The Oversight Board consented because there was no legitimate alternative for resolving that inter-debtor dispute.  All parties recognized that the issues in dispute could not be legitimately resolved by the Oversight Board and its counsel simply deciding what was in the overall best interests of Puerto Rico's residents as determined by the Oversight Board.  After all, whether the pledged SUT revenues ended up as property of the Commonwealth and COFINA would have an enormous impact on the recoveries of their respective creditors.  If GDB/AAFAF and the Oversight Board can resolve the inter-debtor claims between GDB and the Title III Debtors by deciding for the Title III Debtors that they should "take one for the team," there is no principled reason why the Oversight Board could not have resolved the Commonwealth-COFINA dispute by simply deciding that all of the pledged SUT revenues should go to the Commonwealth because it needed the money—an obviously absurd proposition that no one in his or her right mind would have accepted.  What is going on with the GDB Restructuring is no less absurd and should not be accepted by this Court.  Rather, this Court should exercise its equitable powers to confer derivative standing on the Committee for the limited purpose of challenging the GDB Restructuring as an independent fiduciary for the Title III Debtors.[41]

---

[39]    Oversight Board Objection ¶ 40.

[40]    *Id.*

[41]    Moreover, while the Oversight Board notes that the Commonwealth-COFINA Stipulation appointed the Committee to act as its agent pursuant to sections 104(b) (the authority of the Oversight Board's agents) and 104(g) (the authority of the Oversight Board to enter into contracts) of PROMESA, the Oversight Board elides over the fact that the same paragraph also states that the Committee was also appointed as the Commonwealth Agent pursuant to a grant of derivative standing.  *See Stipulation And Order Approving Procedure To Resolve Commonwealth-COFINA Dispute* [Docket No. 996], ¶ 2 (Aug. 10, 2017) ("With respect to the appointment of the Commonwealth Agent (as defined below), Bankruptcy Code sections 105(a), 503(b)(3)(B), 1103(c), and 1109(b) permit the Oversight Board to consensually grant standing to the Creditors' Committee (as defined below), when

16

**E.      GDB/AAFAF's Reply On Direct Standing In Title VI Case Ignores The Most Critical Points**

26.      Although their opposition was supposed to be confined to derivative standing, GDB/AAFAF took the opportunity to "summarize" their arguments on direct standing in the Title VI case, which are "explained more fully in [their Title VI] Standing Objection."  Their arguments ignore the main point, which is that the Committee's constituents—the unsecured creditors of the Title III Debtors—will be bound by the GDB Restructuring if the Qualifying Modification is approved.  As set forth in the Committee's omnibus response to GDB/AAFAF's and Oversight Board's Title VI standing objections, the GDB Restructuring Act, which becomes effective upon approval of the Qualifying Modification, expressly provides that the GDB Restructuring "will be full, final, complete, binding, and conclusive as to the territorial government Issuer, other territorial instrumentalities of the territorial government Issuer, and **any creditors of such entities**, and should not be subject to any collateral attack or other challenge by any such entities in any court or other forum."[42]  The proposed approval order filed by GDB on September 10, 2018 makes crystal clear GDB/AAFAF's and the Oversight Board's understanding (which they now disclaim) that "creditors of such entities" includes the Title III Debtors' unsecured creditors.[43]  If the unsecured creditors of the Title III Debtors will be bound, just as the Title III Debtors themselves, they have just as much a right to be heard on the Title VI Application.  *Cf.  Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C*, 467 F.3d

---

necessary and beneficial to do so.").  That same stipulation appointed Bettina Whyte as the COFINA Agent under sections 104(b) and 104(g) but not through a grant of derivative standing, as the Committee is a party in interest in the Title III cases, and thus capable of exercising derivative standing, while Ms. Whyte was not.

[42]      PROMESA § 601(m)(2) (emphasis added).

[43]      The proposed approval order stated that "[t]he Qualifying Modification, including all settlements, compromises, releases, discharges, and injunctions, shall be full, final, complete, binding, and conclusive as to **the Commonwealth, all Commonwealth instrumentalities, and any creditors of such entities**, and shall not be subject to any collateral attack or other challenge by any such entities in any court or other forum."  [Notice of Filing Of Proposed Order Approving The Qualifying Modification For GDB [Docket No. 125] Ex. A, at 11 (emphasis added).

73, 78 (2d Cir. 2006) ("[A] nonparty may appeal a judgment by which it is bound . . . and may appeal if it has an interest affected by the . . . judgment.").

27.    GDB/AAFAF also fail to address the fact that, if the Qualifying Modification is approved and the GDB Restructuring Act becomes effective, any avoidance claims the Title III Debtors have against GDB will be released, thereby depriving their unsecured creditors of the right under section 926 of the Bankruptcy Code to seek appointment of a trustee to bring such claims. Accordingly, GDB/AAFAF are simply wrong in their assertion that "[t]he members of the UCC . . . have no legal rights of their own directly affected by the Qualifying Modification." GDB/AAFAF and the Oversight Board also accuse the Committee of "speculation" in raising the possibility of avoidance claims, and yet, as set forth above, they have done nothing to determine what claims might exist or their potential value, all the while stonewalling the Committee's efforts to perform such an investigation on its own. In fact, it was only on Friday of last week that the Committee finally received, after **more than a year** of resistance and delay, the minutes of the GDB's board meetings, which are the logical starting point of any investigation and should have been produced on day one. This delay persisted, even though GDB's counsel represented at the July 25 Omnibus Hearing that such materials would be promptly made available—and the Court ordered that the "Board minute issue needs to be addressed and produced [before August 15]."[44]

28.    While not addressing the most critical points, GDB/AAFAF replay their argument that the Committee cannot act outside the Title III cases in which it was appointed, even when necessary to protect the interests of the Title III Debtors' unsecured creditors. According to GDB/AAFAF, "the UCC has no authority to appear in a Title VI Action [because] the UCC's

---

[44]    July 25, 2018 Tr., at 78:25 to 79:1.

sole source of authority is Bankruptcy Code section 1109," which PROMESA does not make
applicable to a case under Title VI. As GDB/AAFAF acknowledge, however, the Committee
has "cite[d] a string of cases for the proposition that the Court, under appropriate circumstances,
may allow a committee to appear outside the bankruptcy proceeding."[45] If that proposition is
true (and it is), it necessarily follows that a creditors' committee does not flash out of existence
the instant it crosses the border of the case in which it was appointed. Unable to distinguish the
Committee's cases in any meaningful way, GDB/AAFAF can muster no more than a conclusory
declaration that "[t]hose cases are unpersuasive here."[46]

### F.    Court Can Reach The Right Result Without Any Section 305 Implications

29.    GDB/AAFAF and the Oversight Board argue that derivative standing is also
precluded by section 305 of PROMESA because any order granting the Committee's motion
would "interfere" with the Title III Debtors' "political or governmental powers," their "property
or revenues," and their "use or enjoyment . . . of income-producing property."[47] More
specifically, they argue that any such order would interfere with the Title III Debtors'
"settlement" of claims in connection the GDB Restructuring.[48] According to them, "the
Oversight Board retains complete authority to enter into settlements of causes of action without
Court approval, which is for all intents and purposes what the GDB restructuring is *vis-à-vis* the
Title III Debtors . . . and [t]hus there is no basis to challenge the Oversight Board's approval of
the GDB restructuring."[49]

---

[45]    GDB/AAFAF Objection to Standing Motion, ¶ 38.

[46]    *Id.*

[47]    Oversight Board Objection ¶ 33-34; GDB/AAFAF Objection ¶ 17; *see also*, PROMESA § 305.

[48]    Oversight Board Objection ¶ 35; GDB/AAFAF Objection ¶ 18.

[49]    Oversight Board Objection ¶ 49.

30.     GDB/AAFAF and the Oversight Board's heavy reliance on section 305 is

predictable given that they seem to view it as an all-purpose "trump card."  But this Court has

options available to it that would not implicate section 305, which applies only to bar any

prohibited "stay, order, or decree."  One such option plays out on a daily basis in bankruptcy

courts across the country when courts refuse to sign proposed debtor-in-possession financing

orders that unduly restrict or burden the rights of a creditors' committee to review and challenge

a debtor's waiver of claims.  Bankruptcy courts refuse to sign such orders even though debtors

represent to them that they will be forced to liquidate if the financing is not approved and even

though such bankruptcy courts cannot force a debtor-in-possession lender to provide financing

on particular terms.  Here, the Court has the same prerogative.  It could indicate that it will not

entertain the Title VI Application unless certain prophylactic measures are put in place, such as

allowing the Committee to appear in such Title VI case.  At that point, GDB/AAFAF and the

Oversight Board would have to decide whether to abandon the Title VI Application in light of

the Court's views.

31.     One thing, however, is clear:  GDB's favored unsecured creditors would never

want to relinquish the chance of having the GDB Restructuring approved in a Title VI case.  That

is because millions of dollars of their "fees" are being paid in the Title VI case, and such fees

could never be paid in a Title III case because they are mere unsecured creditors.

### G.     PROMESA Section 305 Does Not Preclude Derivative Standing

32.     Contrary to the objectors' arguments, section 305 does preclude derivative

standing because that section does not itself affect GDB or its Title VI case because, as the First

Circuit has observed, "[s]ection 305 only applies in Title III cases."  *In re Fin. Oversight &*

*Mgmt. Bd. for Puerto Rico*, 899 F.3d 13, 19 (1st Cir. 2018) ("*PREPA*").  While section 305

precludes a Title III court from directly interfering with a debtor's governmental powers or

property (properly understood), it does not preclude the Court from issuing orders that might be construed as doing so "indirectly." *Id.* Here, an order granting the Committee derivative standing to act on the Title III Debtors' behalf in the Title VI case would not directly interfere with any government power or property of the Title III Debtors, particularly because the Committee is not seeking to assert claims at this time; it is simply trying to prevent the release and discharge of such claims. In the *PREPA* case, the First Circuit held that the Title III court was not precluded from lifting the automatic stay to allow bondholders to seek the appointment of a receiver for PREPA in a different Commonwealth court. *Id.* at 17. Likewise, the Committee seeks to act outside of the Title III court (i.e., in the GDB Title VI court). This Court's "concerns [in the *PREPA* case] about the deleterious impact that a robust receivership outside the Title III court's control might have on the efforts of the Title III court to consolidate and adjust the debtor's affairs" (*id.* at 21) are wholly absent here, as Your Honor is the judge in both the Title III and Title VI courts.

33.     In any event, assuming (without conceding) that section 305 and the non-incorporation of Bankruptcy Code 363 generally allow the settlement of claims without court approval, PROMESA cannot possibly be read as allowing GDB/AAFAF or the Oversight Board (not to mention their legal and restructuring professionals) to settle inter-debtor claims while representing both sides. To illustrate the point, if counsel for AAFAF or the Oversight Board were to appear in court on a claim objection purporting to represent both a governmental entity that is a claim holder and the debtor governmental entity objecting to such claim, this Court would not countenance such a conflict for a minute. The fact that claims are being "settled" rather than litigated to the end does not render the conflict any less impermissible.[50]

---

[50]     Moreover, there was no "settlement" involving the Title III Debtors in any meaningful sense of the word. The GDB Restructuring was negotiated by AAFAF, not the Oversight Board, on behalf of all Puerto Rico entities, and

21

34.     GDB/AAFAF and the Oversight Board argue as if the Committee is seeking derivative standing to tell the Title III Debtors how to use their money, thereby "wresting" control from the Oversight Board as their sole statutory representative.  Nothing could be farther from the truth.  The Committee's primary goal in seeking derivative standing is **only to prevent the unlawful extinguishment of the Title III Debtors' rights and claims against GDB** and thus preserve the right of their unsecured creditors to seek appointment of a trustee under section 926 to pursue avoidance claims against GDB as discussed above.[51]

35.     In its objection, the Oversight Board acknowledges that section 926 is an "exception" to and overrides section 305.[52]  Indeed, unlike various sections of the Bankruptcy Code and/or PROMESA (e.g., section 304(j) of PROMESA), which apply "notwithstanding **any provision of this title** to the contrary," section 305 applies "notwithstanding any power of the court" because Congress did not intend section 305 to nullify other provisions of PROMESA such as section 926.  As the First Circuit held in the *PREPA* case, "Section 305 does not tie the Title III court's hands quite so much as that court found it did."[53]  Accordingly, section 305 cannot sensibly be read as precluding the Court from granting the Committee derivative standing

---

the legislature, through the GDB Restructuring Act, deemed the Title III Debtors to have consented to the GDB Restructuring while purportedly depriving them of any authority or standing to challenge their mistreatment.  This is the antithesis of a settlement, and GDB/AAFAF and the Oversight Board cannot change the legal landscape mid-stream to suit their needs.  Furthermore, as late as May 2018, the Oversight Board expressly stated that it had not undertaken "an independent review or valuation of the assets that are being transferred by GDB to each of the Issuer and the Public Entity Trust."  Financial Oversight and Management Board for Puerto Rico, Unanimous Written Consent, at 2 (May 8, 2018).  It is quite remarkable, therefore, that the Oversight Board now proclaims that it is blessing this "settlement."  Oversight Board Objection ¶ 49.

[51]   It is irrelevant that the Committee itself is not a creditor.  Given that the Committee represents unsecured creditors generally, it should be able to seek appointment of a trustee as well.  But, more importantly, the Committee is not seeking the appointment of a trustee at this time.  Rather, it is merely attempting to ensure that such relief will not be rendered moot by the GDB Restructuring.  The Committee has no doubt that when the time comes to seek appointment of a trustee under section 926, individual creditors will join in the request if the Court determines that a creditors' committee cannot seek such relief under section 926 on its own.  The Oversight Board is also wrong that section 926 merely allows individual creditors to assert claims that existed pre-bankruptcy.  In fact, section 926 expressly includes claims under section 549, which applies only to post-petition transfers.

[52]   *See*, Oversight Board Objection ¶¶ 7, 43-45.

[53]   *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d 13, 19 (1st Cir. 2018).

to preserve the availability of relief—the appointment of a trustee under section 926— that the Court indisputably has the power to grant in the first instance.

36.     Finally, it bears noting that the Committee's additional request for an order confirming its ability to appear in the Title VI case to litigate the issue of direct standing does not implicate sections 303 or 305 of PROMESA and therefore should be granted without hesitation.[54]

### H.      PROMESA Section 303 Does Not Preclude Derivative Standing

37.     GDB/AAFAF and the Oversight Board argue that derivative standing is precluded by section 303 of PROMESA because, if the Title III Debtors can do whatever they want with their property, no one can have standing to challenge the GDB Restructuring.  In so arguing, they misconstrue the purpose and meaning of section 303, which does nothing more than preserve the Commonwealth's power to "control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise of the **political or governmental powers** of the territory or territorial instrumentality . . . ."[55]  Section 303 does not give the Commonwealth free reign to effectuate otherwise unlawful financial restructuring transactions, extinguishing debts and effectively disallowing claims in the process.

38.     As the Court is aware, section 303 of PROMESA is derived from section 903 of the Bankruptcy Code.  In the only decision to interpret the phrase "political or governmental powers" in section 903, the bankruptcy court held that "[the] 'political or governmental' powers [reserved to the debtor] relate to basic requirements of government and political polity and

---

[54]   The "political or governmental powers" prong of section 305 is inapplicable because, as explained more fully below with respect to section 303, such powers do not extend to financial relations among government entities. *See In re City of Stockton*, 526 B.R at 54 ("the concept of 'political or governmental' powers is central to both sections 903 and 904" and the analysis of one "inform[s] the analysis of" the other).  The case law is clear that the analysis of "political or governmental powers" is the same for sections 903 and 904 of the Bankruptcy Code, which are the counterparts to sections 303 and 305 of PROMESA.

[55]   PROMESA § 303 (emphasis added).

23

exclude financial and employment relations."[56]  Thus, the "political or governmental powers"

referenced in section 903 of the Bankruptcy Code and section 303 of PROMESA relate to "basic

matters of the organization and operation of government that are incidents of sovereignty" and

do not extend, for example, to "financial relations between the state and its municipalities."[57]

39.     The GDB Restructuring is fundamentally a financial transaction involving the

mandatory setoff of claims against GDB and, in AAFAF's own words, "the resolution of the

interrelated claims among the Commonwealth, its instrumentalities, and GDB."[58]  The

adjustment of such "financial relations between the [Commonwealth] and its [instrumentalities]"

is simply not within the "political or governmental powers" preserved by section 303 of

PROMESA.[59]  The GDB Restructuring Act also extinguishes all of the Title III Debtors' claims

against GDB and the GDB Releasees, including any avoidable claims, which are avoidable even

if the transferee is another instrumentality of the Commonwealth.  As with the setoff and

resolution of claims vis-à-vis GDB, the "political or governmental powers" of the

Commonwealth simply "do not include the financial relations that are implicit in these avoiding

powers."[60]

40.     The GDB Restructuring is therefore not an exercise of the "political or

governmental powers" preserved by section 303 of PROMESA, even if the restructuring

ultimately serves a "public purpose."  Indeed, the same could be said of any governmental

---

[56]   *See In re City of Stockton*, 526 B.R. at 54 (Bankr. E.D. Cal. 2015) (subsequent history omitted).

[57]   *Id.*

[58]   *The Objections are the Objection of the Government Development Bank for Puerto Rico and the Puerto Rico
Fiscal Agency and Financial Advisory Authority to the Urgent Motion of Official Committee of Unsecured
Creditors, Pursuant to Bankruptcy Code Sections 105(a) and 362, for Entry of Order Enforcing Automatic Stay
and Court's June 29, 2017 Order Confirming Application of Automatic Stay with Respect to GDB Restructuring*
[Docket No. 3826] ¶ 36 (August 29, 2018) (the "GDB/AFFAF Objection to Entry for Order Enforcing Automatic
Stay").

[59]   *See In re City Of Stockton*, 526 B.R. at 54.

[60]   *Id.* at 53.

24

action.  Nor is the GDB Restructuring an exercise of "governmental and political powers" merely because it is being effectuated pursuant to a Commonwealth statute (the GDB Restructuring Act).  At the end of the day, the GDB Restructuring is nothing more than the liquidation of an insolvent financial institution that has already "essentially froze[n] its bank functions."[61]  GDB is not providing any "essential services," and its fiscal agent and financial advisor functions have long since been transferred to AAFAF.  Simply put, section 303 of PROMESA is not a license for GDB/AAFAF and the Oversight Board (or, for that matter, Puerto Rico's political branches) to liquidate GDB in a manner that could never have been accomplished under Title III or a lawful application of Title VI, and it certainly cannot be used to deny standing to any party that would challenge the GDB Restructuring on that basis.

41.     In reality, the GDB Restructuring barely serves its stated public purposes, if at all. While the Oversight Board asserts that the GDB Restructuring "is an important element of the overall Commonwealth revitalization,"[62] it provides no explanation for how this is so when the GDB Restructuring does nothing more than liquidate the defunct GDB.  The Committee, which represents thousands of on-island creditors ranging from employees to small businesses, is at a loss to understand how a statute (such as the GDB Restructuring Act) that directly and adversely affects such creditors could somehow be heralded as "an important element of the overall Commonwealth revitalization."

42.     For their part, GDB/AAFAF assert that the GDB Restructuring "provides immediate relief to Puerto Rico's cash-strapped municipalities, which will reduce the likelihood

---

[61]   GDB/AFFAF Objection to Entry for Order Enforcing Automatic Stay ¶ 11.

[62]   *Objection of Financial Oversight and Management Board to Official Committee of Unsecured Creditors' Motion for Order Granting Derivative Standing to Act on Behalf of Title III Debtors for Certain Limited Purposes and Other Related Relief with Respect to Restructuring of Government Development Bank for Puerto Rico* [3959] ¶ 49 n.15 ("Oversight Board Objection").

that the Government would be called upon to provide cash assistance to ensure the continuation of essential services."[63]  This is a classic example of the "tail wagging the dog."  The amount of actual relief for the municipalities is miniscule compared to the GDB bond debt being restructured and is nothing compared to the substantial detriment the Title III Debtors will suffer if the GDB Restructuring is approved.  Specifically, under the GDB Restructuring, the distributions to be received by the municipalities amount to a mere 3% of the $3.76 billion in GDB bond debt being restructured.  Perhaps even more significantly, GDB/AAFAF offer no reason why the distribution of undisbursed Excess CAE funds must be tied to the GDB Restructuring.  The Commonwealth certainly could have passed a law releasing Excess CAE (or a portion thereof) apart from any restructuring of GDB debt.

## I.       Title III Debtors Are Not "Net Debtors" Vis-à-Vis GDB

43.     GDB/AAFAF and the Oversight Board continue their refrain that the Title III Debtors are "net debtors" vis-à-vis GDB and thus will suffer no harm as a result of the GDB Restructuring.[64]  This is entirely untrue.  In fact, when all claims of the Title III Debtors are properly accounted for and setoffs are appropriately calculated, it becomes clear that the Title III Debtors are net **creditors** vis-à-vis GDB.

44.     If the Title III Debtors were truly net debtors, there would be no reason for the GDB Restructuring's two-entity structure in which the Title III Debtors (and the other Non-Municipal Government Entities) receive "claims" against the Public Entity Trust while the favored unsecured creditors receive new secured bonds issued by the Recovery Authority.  Indeed, if the Title III Debtors were net debtors, GDB could simply transfer these net obligations

---

[63]   *Objection of the Government Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority to the Official Committee of Unsecured Creditors' Derivative Standing Motion* [3961] ¶ 33 ("GDB/AAFAF Objection").

[64]   Oversight Board Objection ¶ 48; GDB/AAFAF Objection ¶ 33.

(which would be assets of GDB) to the Recovery Authority to serve as additional collateral for
the new Recovery Authority bonds and allow all GDB creditors to share pro rata in all of GDB's
assets, as should be the case in a proper liquidation. Of course, the deal was not structured this
way precisely because the favored unsecured creditors were justifiably concerned that the Title
III Debtors could have significant net claims against GDB that would dilute their recoveries.
The entire purpose of the two-entity structure is to protect their recoveries by placing GDB's
most valuable assets beyond the reach of the Title III Debtors and the other Non-Municipal
Government Entities.

45.     In any event, the flaws in GDB's purported setoff calculations are numerous. As
an initial matter, setoff is premature. Pursuant to section 553 of the Bankruptcy Code, which
applies in the Title III cases and prevails over any inconsistent territory law,[65] a claim against a
Title III Debtor may not be used for setoff to the extent it is disallowed.[66] The claims that GDB
purports to set off against the Title III Debtors' outstanding deposits are claims for unpaid loans
that have not been allowed. Upon investigation of these inter-government claims by the
Committee and other parties in interest, defenses may be identified that could result in their full
or partial disallowance. To the extent the claims are disallowed, they cannot be used for setoff
under section 553. Neither the Oversight Board nor AAFAF's counsel have conduced any
analysis of potential grounds for disallowing GDB's claims against the Title III Debtors.[67]

---

[65]     PROMESA § 301 (incorporating section 553 of the Bankruptcy Code); § 4 (providing that PROMESA supersedes
contrary territory laws).

[66]     11 U.S.C. § 553(a)(1).

[67]     To the extent GDB was the recipient of avoidable transfers from the Title III Debtors, any claim of GDB against
the Title III Debtors would be mandatorily disallowed. *See* 11 U.S.C. § 502(d) ("[T]he court **shall** disallow any
claim of any entity from which the property is recoverable under . . .") (emphasis added). As discussed more fully
in above, the Title III Debtors have numerous potential avoidance claims against GDB.

46.     In addition, GDB's calculations consider only the Title III Debtors' deposit claims
and not any other claims against GDB, including avoidable transfer claims and other litigation
claims against arising out of GDB's role in the events leading to the Puerto Rico's financial
crisis.  Although further investigation is required, information available to date suggests that
these claims could have significant value.  Regardless, it should be **the burden of the Oversight
Board** (as representative of the Title III Debtors), not the Committee, to demonstrate that it has
determined the value of these claims after a proper investigation.  Once these additional claims
are incorporated into the setoff calculation, some or all of the Title III Debtors may have net
positive claims against GDB.

47.     GDB and AAFAF also fail to account properly for claims that the Title III
Debtors hold against GDB with respect to federal funds that, upon information and belief, GDB
failed to disburse for their intended purposes and used for its own purposes instead.  GDB
appears to **deduct** these funds from the Title III Debtors' account balances, effectively treating
them as liabilities of the Title III Debtors when establishing their net balances with GDB.[68]
Worse yet, under the Commonwealth's Fiscal Plan, the Commonwealth is required to cover any
"loss" associated with the federal funds, in which case it may be subrogated to claims of the
intended recipients against GDB.  These post-petition claims would not be subject to setoff
against prepetition loan balances.[69]

48.     Finally, even assuming the accuracy and appropriateness of GDB's setoff
calculations, at least two Title III Debtors—PREPA and ERS—hold significant net deposit

---

[68]     GDB claims in its Title VI Application that "[f]ederal funds held on deposit at GDB . . . will not be subject to the
setoffs contemplated by the GDB Restructuring Act."  Title VI Appl. ¶ 35 n. 5.  The Committee was told
otherwise previously.  Moreover, the notion that Federal Funds are not subject to setoff is belied by Schedule 6 to
the RSA, which does not reflect such deposits as claims against the PET.

[69]     *See* PROMESA § 301; 11 U.S.C. § 553(a) (permitting setoff only of **prepetition** claims against **prepetition** debts)
(emphasis added).

claims against GDB.  The RSA lists PREPA and ERS as holding net deposit claims of more than

$114 million and $32 million, respectively.[70]  The Oversight Board has recently taken the

position (in yet another example of the Oversight Board acting as plaintiff, judge, jury, and

executioner) that, notwithstanding the RSA, PREPA in fact **owes** GDB more than $324 million

on purported preference claims that GDB holds against PREPA under the GDB Enabling Act.[71]

However, no such preference claims have ever been asserted against PREPA, much less resulted

in a judgment.  Accordingly, for purposes of the Qualifying Modification, PREPA and ERS both

hold net positive claims against GDB that deserve to be paid *pari passu* with the claims of

GDB's favored unsecured creditors.

### J.   Committee Should At Least Be Granted Amicus Status

49.     For GDB/AAFAF, it is not enough that the Committee be deprived of direct or

derivative standing to challenge the GDB Restructuring.  They also urge this Court to deny the

Committee's alternative request for leave to file amicus briefs opposing the GDB Restructuring

in the Title VI and Title III cases.  Although they couch their argument in terms of a concern for

efficiency and judicial economy, their real concern is that the Court's mind not be troubled with

fundamental questions regarding the legality of the GDB Restructuring when it considers GDB's

Title VI Application.  Indeed, GDB/AAFAF want this Court to approve the Title VI Application

as if the Qualifying Modification can be considered apart from the GDB Restructuring Act—a

preposterous notion given that the Qualifying Modification is an inseparable component of the

overall GDB Restructuring.

50.     Casting the Committee as a pesky meddler with nothing relevant to say,

GDB/AAFAF assert that "amicus briefs are not a vehicle to allow the assertion of new claims

---

[70]   Uhland Decl., Ex. C [18-01561, Docket No. 1-3], RSA Sched. 7.

[71]   *See* Oversight Board Objection ¶ 48 n. 14.

and objections by outsiders who lack standing and act as mere outside commentators providing no substantive guidance or insight."[72] Of course, the Committee's objections are "new" only because the Title III Debtors are not being represented by any independent fiduciary and have purportedly been deprived by statute of any authority or standing to challenge the GDB Restructuring. Furthermore, to characterize the Committee as providing "no substantive guidance or insight" is to ignore the substance of the Committee's Preliminary Objection, which lays out a number of serious, well-supported challenges to the GDB Restructuring that cannot be waived away as some kind of lunatic rant. At a minimum, this Court deserves to be fully informed of the issues bearing on the legality of the GDB Restructuring, and only the Committee is positioned to provide that "substantive guidance and insight." As recent events regarding the scope of releases have shown, there are important issues that no one but the Committee cares to address.

## CONCLUSION

51. For all the foregoing reasons, the Committee respectfully requests that the objections of GDB/AAFAF and the Oversight Board be overruled and that the Derivative Standing Motion be granted.

*[Remainder of page intentionally left blank]*

---

[72] GDB/AAFAF Objection ¶ 39.

Dated:  September 28, 2018          _/s/ Luc A. Despins_____

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. (*Pro Hac Vice*)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured
Creditors*

- and -

_/s/ Juan J. Casillas Ayala_____

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured
Creditors*