Hearing Date: December 19, 2018 at 9:30 a.m. (AST)
Proposed Objection Deadline: December 4, 2018 at 4:00 p.m. (AST)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>     Debtors.[1] | PROMESA Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>     Debtor. | PROMESA Title III<br><br>Case No. 17 BK 4780-LTS<br><br>(This court filing relates only to Case No. 17 BK 4780-LTS) |

## MOTION OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND SYNCORA GUARANTEE INC. FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW MOVANTS TO ENFORCE <u>THEIR STATUTORY RIGHT TO HAVE A RECEIVER APPOINTED</u>

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................4

    A.    PREPA's Undisputed History of Mismanagement and Corruption ......................4

    B.    Past Efforts to Reform PREPA..................................................................6

    C.    Political Abuses Blocked These Reform Efforts...................................8

    D.    The Mismanagement of PREPA Has Continued Unabated .................................9

    E.    The Hurricanes Reveal the Depths of PREPA's Chronic Dysfunction ...............14

    F.    Political Abuses Continue to Cripple PREPA Today ...........................................17

    G.    The Transformation and Privatization of PREPA Will Take Years, And Will Require Proper Management to Shepherd PREPA through the Process..................................................................................................20

    H.    Movants Have A Clear Right under Commonwealth Law to A Court-Appointed, Professional, and Independent Receiver ...........................................22

JURISDICTION ........................................................................................24

RELIEF REQUESTED ......................................................................................25

ARGUMENT ....................................................................................................25

THE COURT SHOULD LIFT THE AUTOMATIC STAY FOR "CAUSE" UNDER SECTION 362(D)(1), INCLUDING FOR LACK OF ADEQUATE PROTECTION.................25

    A.    PREPA's Revenue Pledge And Supporting Covenants Provided As Security For Billions From Bondholders Are Interests In Property Entitled To Adequate Protection.......................................................26

        1.    PREPA Bondholders' Property Rights Under Non-Bankruptcy Law ................................................................26

        2.    PROMESA's Special Revenue Provisions Preserve And Protect the Lien On PREPA's Post-Petition Revenues ........................................30

    B.    Cause Exists To Lift the Automatic Stay To Permit Bondholders To Seek A Receiver Under Commonwealth Law ............................................32

- i -

## TABLE OF CONTENTS
### (Continued)

**Page**

    C.      The Balance of Harms and Other *Sonnax* Factors Strongly Favor Lifting the Stay.................................................................................................34

CONCLUSION.................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bank of N.Y. Mellon v. Jefferson County (In re Jefferson County)*,
  482 B.R. 404 (Bankr. N.D. Ala. 2012)................................................................31

*In re Buehne Farms, Inc.*,
  321 B.R. 239 (Bankr. S.D. Ill. 2005)................................................................26

*In re Century Inv. Fund VIII Ltd. P'ship*,
  155 B.R. 1002 (Bankr. E.D. Wis. 1989)................................................................32

*City of Santa Monica v. Grubb*,
  245 Cal. App. 2d 718 (1966) ................................................................27, 28

*In re DeSardi*,
  340 B.R. 790 (Bankr. S.D. Tex. 2006)................................................................33

*Dimino v. Sec'y of Commonwealth*,
  695 N.E.2d 659 (Mass. 1998) ................................................................28, 29, 32

*Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*,
  75 F.2d 870 (5th Cir. 1935) ................................................................27

*In re: Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
  899 F.3d 13 (1st Cir. 2018)................................................................*passim*

*First Agric. Bank v. Jug End in Berkshires, Inc. (In re Jug End in Berkshires, Inc.)*,46 B.R. 892 (Bankr. D. Mass. 1985)................................................................33

*First Nat'l Bank of Bos. v. Maine Turnpike Auth.*,
  136 A.2d 699 (Me. 1957) ................................................................28, 32

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
  85 F. Supp. 3d 577 (D.P.R.), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S.
  Ct. 1938 (2016) ................................................................29

*George v. City of Asheville*,
  80 F.2d 50 (4th Cir. 1935) ................................................................27

*In re Jefferson County*,
  474 B.R. 228 (Bankr. N.D. Ala. 2012)................................................................26, 28

*Le Sannom Bldg. Corp. v. Nathanson*,
  No. 92 CIV. 8716 (LAP), 1993 WL 330442 (S.D.N.Y. Aug. 23, 1993) ................................................................32

*Lend Lease, a Div. of Nat'l Car Rental Sys., Inc. v. Briggs Transp. Co. (In re Briggs Transp. Co.)*,
  780 F.2d 1339 (8th Cir. 1985) ........................................................ 33

*Marder v. Turner (In re Turner)*,
  161 B.R. 1 (Bankr. D. Me. 1993) .................................................... 34

*Minn-Kota Farm Agency, Inc. v. Home Fed. Sav. & Loan Ass'n*,
  978 F.2d 1264 (8th Cir. 1992) (unpublished table decision, text at 1992 WL
  323066) ........................................................................ 26, 29, 32

*N. Tr. Co. v. Leavell (In re Leavell)*,
  56 B.R. 11 (Bankr. S.D. Ill. 1985) .................................................. 26

*In re Offerman Farms, Inc.*,
  67 B.R. 279 (Bankr. N.D. Iowa 1986) .......................................... 29, 32

*Oswald v. City of Blue Springs*,
  635 S.W.2d 332 (Mo. 1982) ........................................................ 28

*Patterson v. Carey*,
  363 N.E.2d 1146 (N.Y. 1977) ...................................................... 29

*Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  899 F.3d 1 (1st Cir. 2018) ........................................................ 30

*PREC v. The Fin. Oversight & Mgmt. Bd. For Puerto Rico (In re: The Financial Oversight & Mgmt. Bd. for Puerto Rico)*,
  Case No. 18-00021-LTS (D.P.R. Mar. 4, 2018) ................................. 10

*In re Ridgemont Apartment Assocs.*,
  105 B.R. 738 (Bankr. N.D. Ga. 1989) ........................................... 32

*Scripps GSB I, LLC v. A Partners, LLC (In re A Partners, LLC)*,
  344 B.R. 114 (Bankr. E.D. Cal. 2006) .......................................... 25

*Sonnax Indus., Inc. v. TRI Component Prods. Corp. (In re Sonnax Indus., Inc.)*,
  907 F.2d 1280 (2d Cir. 1990) .................................................. 34, 35

*State v. City of Lakeland*,
  154 Fla. 137 (Fla. 1943) .......................................................... 27

*In re Tex. State Optical, Inc.*,
  188 B.R. 552 (Bankr. E.D. Tex. 1995) .......................................... 25

*U.S. Tr. Co. of N.Y. v. New Jersey*,
  431 U.S. 1 (1977) ................................................................. 28

STATUTES

11 U.S.C. § 362(d) ..............................................................................................*passim*

11 U.S.C. § 928............................................................................................. 27, 30, 31

48 U.S.C. 2161 ............................................................................................... 1, 24, 30

Puerto Rico Electric Power Authority Act, P.R. Laws Ann. tit. 22, § 194 et seq. ...............*passim*

P.R. Laws Ann. tit. 22, § 1051...............................................................................5

P.R. Laws Ann. tit. 22, § 1071...............................................................................5

P.R. Laws Ann. tit. 22, § 1074...............................................................................7

PROMESA, 48 U.S.C. § 2101 et seq. ...............................................................*passim*

LEGISLATIVE HISTORY

H.R. Rep. No. 95-595 (1977) ...............................................................................33

S. Rep. No. 100-506 (1988)........................................................................... 30, 31

S. Rep. No. 95-989 (1978)....................................................................................33

*Hearing Before H. Subcomm. on Energy and Mineral Res., Comm. on Nat. Res.*
(Jan. 12, 2016) (statement of Lisa J. Donahue, Chief Restructuring Officer,
PREPA) ...............................................................................................................5

*The Status of the Puerto Rico Electric Power Authority (PREPA) Restructuring
Support Agreement: Hearing Before the Subcomm. on Indian, Insular and
Alaska Native Affairs*, 115th Cong. 3 (2017) (statement of Luis Benítez,
Chairman, PREPA Governing Board)....................................................................7

Memorandum from Subcomm. on Energy and Minerals Staff (x5-9297) to
Subcomm. on Energy and Minerals Members, Oversight Hearing on
Exploring Energy Challenges and Opportunities Facing Puerto Rico, 4 (Jan.
11, 2016)............................................................................................................13

*Oversight Hearing on the Need for Transparent Financial Accountability in
Territories' Disaster Recovery Efforts: Hearing Before H. Comm. on Natural
Resources, Comm. on Nat. Res.,* 115th Cong. 1 (2017) (statement of Chairman
Rob Bishop at 2)................................................................................................15

**OTHER AUTHORITIES**

*Order Identifying and Implementing Temporary Oversight Measures*, Case No.
CEPR-MI-2017-0008, Dkt. No. 1 (Nov. 17, 2017) ............................................................15

PREC, *Final Resolution and Order,* Case No. CEPR-AP-2015-0001 (Jan. 10,
2017) (Dkt. No. 373) .....................................................................................................8

*PREPA's Second Motion to Extend Due Date of Response to June 22 Order, Item
A*, Case No. CEPR-AP-2018-0002, Dkt. No. 12 (Aug. 31, 2018) .........................................10

Resolution and Order Establishing Calendar for Submission of Information, Case
No. CEPR-AP-2018-0002 (June 22, 2018) .........................................................................10

National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. (collectively, "**Movants**"), who are holders and/or insurers of bonds issued by the Puerto Rico Electric Power Authority ("**PREPA**") representing approximately 27% of the approximately $8.3 billion in outstanding bond debt, respectfully submit this combined motion and memorandum of law (the "**Motion**") to lift the automatic stay to commence an action in a court of competent jurisdiction against PREPA for the appointment of a receiver.  This Motion is filed pursuant to 11 U.S.C. § 362(d) (made applicable to this proceeding pursuant to 48 U.S.C. § 2161) and consistent with the First Circuit's remand decision issued August 8, 2018.  *See In re: Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d 13, 24 (1st Cir. 2018) ("**Remand Decision**").

## PRELIMINARY STATEMENT[2]

PREPA remains today, as it has been for decades, a dysfunctional entity.  It serves only the political forces that control it, at the expense of everybody else.  And PREPA's perceived invulnerability to reform efforts fuels its worst practices.   Since the denial of the Chief Transformation Officer motion filed by the Financial Oversight and Management Board (the "**FOMB**"), the pace of mismanagement and bad decision-making at PREPA has only increased, and it is rapidly approaching escape velocity.  The wrong turns PREPA is taking today will harm its creditors and the people of Puerto Rico long after this Title III case is finished.  Now, more than ever, PREPA needs a receiver for the benefit of all stakeholders.

The long history of mismanagement at PREPA is well-documented.  PREPA was run not by business people with knowledge of public utilities, but by bands of political loyalists that

---

[2] True and correct copies of the documents cited herein, and not previously filed in Case Nos. 17-3283 or 17-4780, are attached to the Declaration of Robert S. Berezin ("**Berezin Decl.**") filed contemporaneously with this Motion. Capitalized terms not defined herein are defined in the Trust Agreement, dated as of January 1, 1974.  *See* Trust Agreement between Puerto Rico Electric Power Authority and U.S. Bank N.A., as Successor Trustee ("**Trustee**"), as amended and supplement (the "**Trust Agreement**"), dated January 1, 1974.

shifted with each new election.  It began expensive projects and then abandoned them when political winds changed direction.  As of 2014, it had failed to collect receivables adding up to some $1.75 billion.  A movement to reform PREPA briefly held sway from 2014 to 2017—with the creation of an independent regulator, an agreement with bondholders, and laws requiring independence and professionalism.  But reform succumbed once again to improper political interference after only one election cycle.  PREPA's Title III case followed.

Since the Title III petition, PREPA's problems have grown even worse.  PREPA tragically bungled the response to the hurricanes, exacerbating and prolonging a humanitarian crisis.  PREPA's systems have not been properly managed, hardened, or maintained for future hurricanes.  It has churned through *five* different leaders in the past year.  All its independent directors were forced to resign in July 2018 under intense pressure from Governor Rosselló, leaving PREPA's Board of Directors (the "**Board**") without a lawful quorum.  Its collection efforts remain abysmal.  As of June 2018, PREPA reports uncollected accounts receivable of almost *$3.4 billion*.  It obstructs its independent regulator at every turn, foiling efforts to develop reliable and low-cost electricity service.  And its political entanglements have left it rife with conflicts of interest.  Among others: the new chairman of the PREPA Board also serves as Executive President of the Puerto Rico Aqueduct and Sewer Authority ("**PRASA**"), and PREPA's latest executive director was formerly PRASA's Chief Executive Officer.  Meanwhile, PRASA owes PREPA millions of dollars.  Instead of collecting that money, PREPA now has an initiative (presumably at the Governor's behest) to transfer assets to PRASA on secret terms.  Indeed, PREPA's lack of transparency continues in spite of its debtor status.

As history clearly demonstrates, PREPA will not fix these problems of its own accord.  PREPA must be led by a receiver, free from impermissible political influence, with experience

- 2 -

and proven expertise managing public utilities in the best interests of all of its constituents. Commonwealth law, public need and safety, and common sense require nothing less. Sound management is especially important now. Under the best of circumstances, it will take PREPA many years to accomplish the proposed transformation and privatization described in the current fiscal plan certified by the FOMB on August 1, 2018 ("**Fiscal Plan**"). The people of Puerto Rico cannot afford to wait that long—they need a well-run PREPA *today*. Nor can anyone reasonably expect PREPA to attract private investment and produce a feasible plan of adjustment in its current state. Failure at any of the critical tasks facing PREPA today could harm all of its stakeholders, including the citizens of Puerto Rico, and prospects for a meaningful transformation and privatization for years to come. And PREPA is on track to fail at all of them.

As security for promises to repay billions of dollars, PREPA pledged its revenues and entered into integral and non-severable covenants that have long been held to constitute property interests entitled to protection in and outside of bankruptcy. Congress expressly preserved and protected the liens held by PREPA's bondholders ("**Bondholders**") under the special revenue provisions incorporated into the Puerto Rico Oversight, Management and Economic Stability Act of 2016 ("**PROMESA**"). Bondholders therefore have a continuing lien on PREPA's current and future pledged revenues. The dire situation confronting PREPA today puts all these interests at risk. A receiver will materially reduce this continuing threat.

PREPA Bondholders could have sought a receiver to immediately enforce the rate covenant by initiating a rate proceeding with the Puerto Rico Energy Bureau, which is an essential part of this municipal financing. But, this Motion does not seek that relief. Why not? Because the first priority should be to stanch the bleeding at PREPA by making improvements that creditors and ratepayers all have reason to support.

- 3 -

More fundamentally, a receiver would not interfere with any functions of the FOMB, which is and would remain PREPA's representative in the Title III case. FOMB retains its rights to file a plan of adjustment, to certify fiscal plans, and to act in its capacity as representative of PREPA in the Title III case. Under the receiver's stewardship, PREPA would remain subject to this Court's jurisdiction, just as it is now. But PREPA's problems begin in the *boardroom*, not the courtroom, and the FOMB has no reach there. As this Court previously held, under PROMESA, the role of FOMB is separate from PREPA's management and that would remain if a receiver is appointed.[3]

The appointment of the proposed receiver under Commonwealth law will reap benefits not just for creditors, but for all of PREPA's stakeholders. Cause exists to lift the automatic stay, including for lack of adequate protection. Before deciding this Motion, the Court should permit the parties to take discovery and develop a full factual record on these critical points, especially in light of the lack of transparency that has long plagued PREPA.[4] The Court should fully understand how bad the situation at PREPA really is, and why it does not need to be this way. With that understanding, the path forward will be clear: the Court should grant the Motion and lift the automatic stay.

### STATEMENT OF FACTS

### A.   PREPA's Undisputed History of Mismanagement and Corruption

PREPA has a long and undisputed history of mismanagement, corruption, and poor performance.[5] As Puerto Rico's Legislative Assembly found in 2014, "PREPA has become a

---

[3] *Opinion and Order*, Nov. 16, 2017 (Dkt. No. 471) ("**CTO Order**").

[4] In connection with this Motion, Movants will seek tailored discovery relating to the issues presented by this Motion.

[5] *See generally* Declaration of Sandra Ringelstetter, dated October 3, 2018 ("**Ringelstetter Decl.**"), attached hereto as Exhibit 3.

monopoly that regulates itself; sets its own rates without actual oversight; incurs operational, managerial, and administrative deficiencies whose actual cost, at the end of the day, is borne directly by customers; and whose governance lacks transparency and citizen participation."[6] PREPA's ills stem from improper political interference.  As the Puerto Rico legislature has explained, "partisan political influences have led to a lack of trust and credibility in [PREPA]."[7]

Before 2014, Puerto Rico governors controlled the PREPA Board, appointing six of nine board members, and influenced the selection of executive directors and management.[8]  These executives and managers—and, at any given time, hundreds of lower-level operators—became "*empleados de confianza*," or "trust employees."[9]  Their politically motivated hiring resulted in chronic mismanagement and lack of independent expertise.[10]  Turnover at the executive and management level stymied institutional knowledge, drove up expenses, and led to "delay or cancellation of maintenance and capital improvement projects initiated by the management

---

[6] Puerto Rico Energy Transportation and RELIEF Act of May 27, 2014, No. 57 ("**Act 57-2014**"), Statement of Motives (codified at P.R. Laws Ann. Tit. 22 § 1051).

[7] Puerto Rico Electric Power Authority Revitalization Act of February 16, 2016, No. 4 ("**Act 4-2016**"), Statement of Motives (codified at P.R. Laws Ann. Tit. 22 § 1071).  As one of many examples, from December 2011 to January 2013, energy prices dropped "artificially" due to loans "granted by the Government Development Bank for Puerto Rico during the *general elections period*." *Id.* at 4 (emphasis added).

[8] Kobre & Kim LLP, Final Investigative Report: The Financial Oversight & Management Board for Puerto Rico ("**FOMB Investigative Report**") at 116-17 (Aug. 20, 2018) (Berezin Decl. Ex. 5).

[9] *Id.* Trust employees were accountable to political actors and forced to resign if they did not comply with an administration's requests. *Id.* at 118.  Trust employees who survived one administration were generally replaced by an incoming administration with different political aims; some trust employees were able to "switch to career positions, from which they could not be terminated without cause, and where they would remain employed, often with very light or undefined responsibilities, until their political party came back into power." *Id.* at 113.

[10] *See Exploring Energy Challenges and Opportunities Facing Puerto Rico: Hearing Before H. Subcomm. on Energy and Mineral Res., Comm. on Nat. Res.* at 2 (Jan. 12, 2016) (statement of Lisa J. Donahue, Chief Restructuring Officer, PREPA) (Berezin Decl. Ex. 6) (throughout its history, PREPA's "management and other strategic decisions, including staffing and capital investment, were too often based on political or electoral considerations rather than best practices or business imperatives."); *see also id.* at 6 (Hearing Memorandum from Staff) (Jan. 11, 2016) (Berezin Decl. Ex. 7) ("The organizational structure of PREPA has promoted bureaucracy and politics over a meritocracy").

- 5 -

team."[11]  PREPA also missed opportunities for fiscal stabilization because of its dismal billing

practices and collection efforts.  A 2014 report detailed $950 million in outstanding accounts

receivables for general customers, more than half of which were over 120 days old.[12]  Non-

collection extended to cities and governmental instrumentalities, a "de-facto subsidy" to these

PREPA customers.[13]  As of June 2018, PREPA's accounts receivable totaled a staggering $3.4

billion.[14]

　　　　Rather than fix the mismanagement and political interference, PREPA historically relied

on loans from the Government Development Bank for Puerto Rico ("**GDB**") to mask its liquidity

issues.[15]  PREPA set its budget based on the expectation that it would receive sufficient funding

to balance the budget.[16]

### B.　　Past Efforts to Reform PREPA

　　　　In 2014, the legislature attempted to reform PREPA by creating an independent regulator

and limiting the Governor's power to appoint the PREPA Board.[17]  The legislature also delimited

the Board's role and imposed upon it "the highest duties of loyalty, due care, competence, and

---

[11] FOMB Investigative Report at 119; *see also* Ringelstetter Decl. ¶¶ 69-81.

[12] *See* FTI Capital Advisors, LLC, Accounts Receivable and CILT Report ("**FTI Report**") at 9, 16-17, 19, 28-30 (Nov. 15, 2014) (Berezin Decl. Ex. 8).

[13] *Id.* at 17.

[14] *See* PREPA's Monthly Report to the Governing Board at 21 (June 2018) ("**PREPA June 2018 Monthly Board Report**") (Berezin Decl. Ex. 9), *available at*
https://www.aeepr.com/INVESTORS/DOCS/Financial%20Information/Monthly%20Reports/2018/June%202018.pdf.  The $3.4 billion figure includes roughly $787 million in "General clients" accounts receivable and another $2.6 billion in Government accounts receivable.  *Id.*; *see also* Ringelstetter Decl. ¶ 54 & Ex. 5.

[15] FOMB Investigative Report at 90, 94, 127.

[16] *Id.*

[17] Act 57-2014 § 2.3 (amending Section 4(a) of Act No. 83 of May 2, 1941, as amended) (reducing the number of governor-appointed Board members from six to four of nine, requiring Board members to have certain professional experience, requiring the governor to select one of his Board members from a list of ten candidates submitted by a professional associations and non-profit organizations, establishing Board member term limits, and limiting vacancy appointments).

diligence."[18]   PREPA  made  fiscal  and  operational  progress  because  of  these  efforts.

Bondholders agreed to forbear from exercising certain remedies, and PREPA agreed to appoint a

chief restructuring officer ("**CRO**") to renegotiate PREPA's debt, address its operational issues,

and  restore  its  finances.[19]   PREPA  hired  Lisa  Donohue  as  its  CRO  and  AlixPartners  as  a

consultant, who, in their short tenure, identified $212 million in recurring annual operating

expense  savings  and  an  additional  $267  million  in  one-time  savings.[20]   Negotiation  with

creditors,  including  the  Movants,  also  led  to  a  consensual  restructuring  of  PREPA's  debt,

memorialized  in  the  Restructuring  Support  Agreement  ("**RSA**")  in  late  2015.[21]   The  RSA

included  multiple  commitments  by  PREPA  to  ensure  it  was  properly  and  professionally

managed.[22]  This was an auspicious start, but as PREPA's regulator observed:

> The  transformation  of  PREPA  will  require  deep  commitment  not  only  from
> bondholders and customers, but also from PREPA's Board, executives, managers,
> employees  and  unions.   The  quadrennial  turnover  of  managers  with  each  new
> political administration, the political pressures from elected officials to avoid
> necessary rate increases, the failure of government agencies to pay their electricity
> bills on time, the irresponsible initiation and termination of expensive capital
> projects, the high levels of electricity theft, the work rules that prevent efficient
> use of well-paid employees, the poor recordkeeping and antiquated administrative
> procedures, the compensation schemes that prevent PREPA from recruiting and

---

[18] *Id.* § 4(d)(3).

[19] *See* Forbearance Agreement, between PREPA, the Movants, and the Ad Hoc Group of PREPA Bondholders, Aug. 14, 2014 (the "Forbearance Agreement") (Berezin Decl. Ex. 10), *available* at http://www.gdb.pr.gov/ documents/BondholderForbearanceAgreementEXECUTED.pdf.

[20] *The Status of the Puerto Rico Electric Power Authority (PREPA) Restructuring Support Agreement: Hearing Before the Subcomm. on Indian, Insular and Alaska Native Affairs*, 115th Cong. 3 (2017) (statement of Luis Benítez, Chairman, PREPA Board), attached as Exhibit B to the HasBrouck Decl. (ECF No. 74-20).

[21] Amended and Restated Restructuring Support Agreement, Between PREPA and Supporting Creditors, December 23, 2015 (Berezin Decl. Ex. 11), *available at* http://www.gdb.pr.gov/investors_resources/documents/ 12.23.2015AmendedandRestatedRSA.pdf.

[22] The RSA required, among other things, PREPA to appoint a Board with consumer representatives and a majority of professional, independent members, staggered board terms and for-cause termination to insulate board members from political interference.  These provisions were incorporated into Puerto Rican law.  *See* P.R. Laws Ann. tit. 22, § 1074.

retaining qualified and experienced personnel—all this must come to a halt, to be replaced by a universal commitment to the good of the Commonwealth.[23]

## C.    Political Abuses Blocked These Reform Efforts

The reform efforts at PREPA could not outlast even one election cycle.  Upon assuming office in 2017, Governor Ricardo Rosselló Nevares reasserted control over the PREPA Board by signing Act 37 of 2017 into law.[24]  Governor Rosselló promptly fired the previous PREPA Board and nominated political insiders as replacements.[25]  His actions were widely condemned.[26]  Consistent with this political agenda, in February 2017, PREPA terminated the engagement of AlixPartners and Lisa Donahue.[27]  And there is no indication that PREPA has implemented the strategies that AlixPartners recommended at the end of its engagement for a successful operational and financial restructuring.[28]  Not only was this a waste of the AlixPartners

---

[23] PREC, *Final Resolution and Order* at 23-24, Case No. CEPR-AP-2015-0001 (Jan. 10, 2017) (Dkt. No. 373) (Berezin Decl. Ex. 12).

[24] Act No. 37 of June 26, 2017 ("**Act 37-2017**") § 1 (amending Section 4 (a) of Act No. 83 of May 2, 1941) (reducing the Board to seven members and giving the governor the power to appoint three out of seven with advice and consent of the Puerto Rico Senate and three at his sole discretion).  Governor Rosselló also signed Act 3 into law in 2017, which granted him the authority to remove any Board member from any public corporation, including PREPA: "that [the Governor] deems not to be carrying out the public policy established by [the Governor], or whom [the Governor] does not trust in the development and execution of the fiscal plan required by the federal legislation known as PROMESA."  Act No. 3 of January 23, 2017 ("**Act No. 3-2017**"), at § 29 (certified translation attached as Exhibit 2 to Dkt. No. 139).  In describing these changes to the PREPA Board, Governor Rosselló said he wanted political loyalty as the "first criteria" for Board members: "That the members are not partisan political figures, that is not the first criteria of this administration . . . .  The criteria is if they well effectuate the public policy of this administration."  *Rosselló Nevares Says Energy Reform Will Bring Down Costs, Defends PREPA Board Shakeup*, REORG RESEARCH (Feb. 14, 2017) (Berezin Decl. Ex. 13), *available at* https://platform.reorg-research.com/print/article/30713.

[25] FOMB Investigative Report at 120.

[26] *Id.* at 120-21.

[27] *See* Cynthia López Cabán, *The Departure of AlixPartners is Near*, EL NUEVO DÍA (Feb. 2, 2017) (Berezin Decl. Ex. 14), *available at* https://www.elnuevodia.com/english/english/nota/thedepartureofalixpartnersisnear-2287053; *see also Rosselló Pledges to Protect 'Most Vulnerable' in Pension Reform*, REORG RESEARCH (Feb. 15, 2017) (Berezin Decl. Ex. 15), *available at* https://platform.reorg-research.com/print/article/30778.

[28] *See* AlixPartners' Hand-Over Strategy Presentation to the Governing Board Puerto Rico Electric Power Authority (Feb. 1, 2017) (Berezin Decl. Ex. 16), *available at* https://www.aeepr.com/jg/docs/ PREPA_Exit%20Strategy%2002-01-2017%20final.pdf; Ringelstetter Decl. ¶¶ 45, 49, 78.

- 8 -

engagement and the resources dedicated to it, but it kept PREPA at square one with respect to its operational and financial efficacy.

### D.   The Mismanagement of PREPA Has Continued Unabated

After the FOMB decided to reject the RSA and to commence this Title III case, PREPA's managerial and operational deficiencies escalated to crisis levels.[29]   PREPA currently fails to collect enormous sums owed for electricity it provides—particularly by government customers that have come to take free power for granted.[30]   PREPA's failure to collect its bills is an egregious outlier in the industry.   Indeed, even before Hurricane Maria, PREPA's reported accounts receivables equaled *nearly 100% of its revenues* from sales for an entire year—a figure that dwarfed the industry average, in which accounts receivable typically equaled only about 6 to 15% of annual sales.[31]   Moreover, rather than be transparent about its financial condition, PREPA hides behind vague excuses about its massive accounts receivable balances.[32]   Further, instead of taking any meaningful steps recommended by its advisers to improve collections, PREPA has ceased efforts to collect on inactive and severely past due accounts, and it no longer reports the extent to which it cancels service on delinquent accounts.[33]   By forgoing industry-standard collection practices, PREPA is effectively giving its customers interest-free loans of indefinite duration.

---

[29] *See* Letter from FOMB to Mohammad Yassim, Chief Legal & Regulatory Officer, AAFAF (June 28, 2017), at 1 (Berezin Decl. Ex. 17), *available at* https://drive.google.com/file/d/1b2foiw_bBh5RUpgHa1MInyOQGfRe54oO/view.

[30] *See Mgmt. Crisis at the Puerto Rico Electric Power Auth. and Implications for Recovery*: *Hearing Before H. Comm. on Nat. Res., Comm. on Nat. Res.,*115 Cong. (July 25, 2018) (Memorandum from Andrew Vecera, Majority Committee Staff at 8) (July 23, 2018) ("**July 23, 2018 HNRC Memo**") (Berezin Decl. Ex. 18) ("Failure to collect past due accounts . . . has promoted a culture in which electric customers do not necessarily believe they must pay for electrical service.").

[31] Ringelstetter Decl. ¶ 55.

[32] *See, e.g.*, Letter from PREPA Creditors to PREPA re: Joint Request for Additional Information (February 23, 2018), Request No. 4 (Berezin Decl. Ex. 19).

[33] *See* Ringelstetter Decl. ¶¶ 48-51.

Another way PREPA differs from other utilities is that it openly and consistently defies its own regulator, the Puerto Rico Energy Bureau, formerly known as the Puerto Rico Energy Commission ("**PREC**").  Indeed, PREPA identified its regulator as a "key challenge" for the utility.[34]  Just this year, PREC initiated litigation against PREPA based on multiple failures to comply with its mandatory orders.[35]  PREC documented how PREPA had ignored provisions of PREC's approved Integrated Resource Plan; failed to provide contracts and budgets to PREC for review (in contravention of PREC's orders); and failed to provide other critical information to PREC.[36]  PREPA has also hindered PREC proceedings, including a rate-setting proceeding, in which PREPA's responses to information requests were determined to be "inconsistent with the statements made by one of PREPA's representatives" and included groundless objections that defied PREC's authority to gather important information concerning the very entity it regulates.[37]

PREPA's workforce also is overstaffed at the administrative level, yet understaffed and under-skilled in key areas such as transmission and distribution.[38]  At the same time, PREPA's employees are constantly turning over due to PREPA's politicized management, and there appear to be no effective succession or training plans in place to staunch the perpetual loss of

---

[34] PREPA, Fiscal Plan (Apr. 28, 2017) at 58 (Berezin Decl. Ex. 20).

[35] *See* Verified Adversary Compl. of the Puerto Rico Energy Commission for Declaratory J. and Request for Injunctive Relief, *PREC v. The Financial Oversight & Mgmt. Bd. For Puerto Rico (In re: The Financial Oversight & Mgmt. Bd. for Puerto Rico)*, Case No. 18-00021-LTS (D.P.R. Mar. 4, 2018) (Dkt. No. 1) (Berezin Decl. Ex. 21) ("**PREC Compl.**"); *Mot. for Preliminary Injunction*, *Id.* (Dkt No. 3) (Berezin Decl. Ex. 22).

[36] *See* PREC Compl. ¶¶ 36-39, 44-47, 54-55.

[37] *See* Resolution and Order Establishing Calendar for Submission of Information ¶ 1, Case No. CEPR-AP-2018-0002 (June 22, 2018) (Dkt. No. 7) (Berezin Decl. Ex. 23); *see also, e.g.*, *PREPA's Compliance Filing for Items Due July 13, 2018*, Case No. CEPR-AP-2018-0002, Dkt. No. 8 (July 20, 2018), at 3-4 (Berezin Decl. Ex. 24) (refusing to provide various information or claiming such information is "currently not available"); *PREPA's Second Motion to Extend Due Date of Response to June 22 Order, Item A*, Case No. CEPR-AP-2018-0002, Dkt. No. 12 (Aug. 31, 2018) at 3 (Berezin Decl. Ex. 25) (interpreting PREC information request narrowly because "PREPA believes that … a higher level of information is requested . . . ," and asking for further extension of time to submit response).

[38] Ringelstetter Decl. ¶¶ 36-40, 76-77.

- 10 -

experience and skills.[39]  PREPA also has deficient policies and practices in customer service, outage management, bidding, and accounting—all to the severe detriment of the people of Puerto Rico and to PREPA's bottom line.[40]  PREPA's "disorganized and ineffective" customer service costs too much and delivers too little.[41]

Predictably, PREPA's bad management leads to bad outcomes.  PREPA experiences outages with 12 times greater frequency than the mainland U.S. average and takes much longer to fully restore power after an outage begins.[42]  This problem is exacerbated by the fact that PREPA does not attempt to proactively address the potential for failures—for instance by shoring up the system during periods of low demand—but simply reacts to failures as they occur, and is thus constantly "fire-fighting."[43]  Likewise, PREPA's practices with respect to bidding and accounting fall below industry standards.[44]  Taken together, PREPA's many failures managing its business and operations have caused it to incur unnecessary expenses and lost revenue.[45]

PREPA also fails to reliably forecast its own revenues and expenses.[46]  Perhaps the most glaring example of this was PREPA's request for post-petition financing (and the related proceedings).  On January 27, 2018, the FOMB and AAFAF filed an urgent motion on PREPA's behalf seeking a $1.3 **billion** priming, superpriority DIP loan to address a purported impending

---

[39] *See id.* ¶¶ 40, 69-81.

[40] *See id.* ¶¶ 18-35, 43-45, 57-64.

[41] *Id.* ¶¶ 43-44 (quoting PREPA, Fiscal Plan (Apr. 28, 2017)).

[42] *See id.* ¶¶ 19, 24-25 & Ex. 4.

[43] AlixPartners' Hand-Over Strategy Presentation to the Governing Board Puerto Rico Electric Power Authority (Feb. 1, 2017), *available at* https://www.aeepr.com/jg/docs/PREPA_Exit%20Strategy%2002-01-2017%20final.pdf; *see also* Ringelstetter Decl. ¶¶ 18-20, 36 (describing PREPA's failure to maintain its transmission infrastructure).

[44] *See* Ringelstetter Decl. ¶¶ 57-64.

[45] *See, e.g., id.* at ¶¶ 53, 57-61, 76; *see also supra* notes 12-14.

[46] *See* Ringelstetter Decl. ¶¶ 57-61.

cash crisis at PREPA.[47]  They claimed that "[w]ithout an immediate infusion of liquidity," Puerto Rico's only power company "may be forced to cease operations within the coming month."[48] But the FOMB and AAFAF's spotty attempts to support their DIP Motion were "devoid of negotiation history," and ultimately they could not show that "the size of the proposed loan [was] appropriately tailored to PREPA's actual needs. . . ."[49]  As a result, the Court limited the size of PREPA's DIP loan to $300 million—fully $1 billion less than PREPA requested.[50]  But the purportedly imminent crisis never happened: even after the Court approved the smaller $300 million loan on February 19, 2018, PREPA waited nearly another week to close the transaction and then did not begin drawing any of the facility until the week ending March 9, 2018.  Even then, the loan money was only "used" insofar as some was moved to another account, which was already sufficiently funded during that period.[51]  And despite PREPA's representation that the

---

[47] *See* Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing, (B) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, (D) Scheduling A Final Hearing, And (E) Granting Related Relief ¶¶ 20, 41, Case No. 17-04780, Dkt. No. 549 (Jan. 27, 2018) ("**DIP Motion**").

[48] *Id.* ¶ 20; *see also id.* ¶ 72 ("[T]he Debtor's liquidity crisis has become dire; *the Debtor's cash on hand and projected revenues are insufficient to cover the utility's operational expenses beyond February*." (emphasis added)); PREPA's Omnibus Reply in Supp. of Post-Petition Financing, Case No. 17-04780, Dkt. No. 617 (Feb. 3, 2018) ¶ 3 ("The undisputed evidence shows PREPA is *running out of money and that without an injection of liquidity in the near term there will be insufficient cash to continue to provide power to Puerto Rico*." (emphasis added)); Feb. 15, 2018 DIP Hr'g Tr. 8:1-12:6 (Berezin Decl. Ex. 26) (counsel for PREPA explaining that without requested financing, PREPA would have to shut down operations in a "staged fashion," and that within three to four weeks, would not be able to pay for "critical services"); *id.* 11:15-18 ("[A] short period, three to four weeks tops maximum, PREPA will cease operations, 6,000 people will be out of work, and the island will be plunged back into darkness.").  According to Angel Figueroa Jaramillo, president of UTIER, PREPA's main union, PREPA's threat to implement an emergency plan was a "publicity campaign" aimed at "blackmailing" the federal court to approve PREPA's sought-after financing.  *UTIER Chief Calls PREPA Emergency Plan a 'Publicity Campaign' as Labor Leaders Underline Opposition to Privatization Plans,* REORG RESEARCH (Feb. 15, 2017) (Berezin Decl. Ex. 27), *available at* platform.beta.reorg-research.com/v3#/items/intel?item_id=50291.

[49] Feb. 15, 2018 DIP Hr'g Tr. 233:11-12, 234:3.

[50] *See* Order Approving Debtor to Obtain Postpetition Financing at 4, Feb. 19, 2018 (Dkt. No. 2545).

[51] *See* Puerto Rico Electric Power Authority: 13-Week Cash Flow Update at 5 (Mar. 14, 2018) (Berezin Decl. Ex. 28) (showing no transfer to operating accounts or eligible disbursements on loan facility until week ending March 9, at which time $89.3 million was transferred to the operating account, even though that account already had over $200 million at the time, excluding the loan).

$300 million it received was only enough to "continue operation in the ordinary course until late March 2018,"[52] *that* purportedly imminent crisis never materialized either.[53]

Finally, despite the poor condition of its power grid, PREPA *incentivizes* municipalities to consume (and waste) more electricity than they otherwise would.   PREPA subsidizes electricity to cities through a misapplied framework called Contribution or Payment in Lieu of Taxes, or "CILT."   In exchange for certain municipal tax exemptions, PREPA reduces the cities' power costs by what the taxes would have been, "*plus* an even larger amount . . . the more energy the municipalities use."[54]  This encourages more free consumption.  There have also been reports of Puerto Rico officials abusing CILT by applying it to city-owned, for-profit businesses (such as a for-profit ice skating rink in Aguadilla), thereby generating revenues for the city at PREPA's expense.[55]   Further, rather than properly collecting revenues from city power usage, PREPA "'offsets accounts receivables with the amount of the CILT and never collects on invoices sent,' resulting in uncollected revenues that amount to '17-20% of PREPA's total produced electricity.'"[56]   In support of its DIP Motion, PREPA could not offer any evidence

---

[52] Third Suppl. Decl. of Todd Filsinger ¶ 5, Feb. 16, 2018 (Dkt. No. 2523-6).

[53] Even after receiving the $300 million loan on February 23, PREPA announced that it planned to continue the emergency shutdown procedures even though it conceded that "[w]ith this loan, PREPA won't have to cut power to customers; it gives us the liquidity needed to continue the restoration."  *PREPA To Continue the Strategic Emergency Operations Plan*, Autoridad de Energía Eléctrica (Feb. 23, 2018) (Berezin Decl. Ex. 29), *available at* https://www.aeepr.com/Noticias/noticiasread.asp?r=MVTSJUOPCM.  Yet PREPA later indicated that it would not need additional post-petition financing.  *See* July 25, 2018 Omnibus Hr'g Tr. 12:12-15 (Berezin Decl. Ex. 30).

[54] FOMB Investigative Report at 131 (emphasis added).

[55] *Id.* at 131-132 (citing FTI Report at 20 and Mary Williams Walsh, *How Free Electricity Helped Dig $9 Billion Hole in Puerto Rico*, N.Y. TIMES (Feb. 1, 2016)); *see also* Ringelstetter Decl. ¶ 53.

[56] FOMB Investigative Report at 131 (quoting Alvarez & Marsal, *Presentation to the Government Development Bank of Puerto Rico*, 38 (2012) and Memorandum from Subcomm. on Energy and Minerals Staff (x5-9297) to Subcomm. on Energy and Minerals Members, Oversight Hearing on Exploring Energy Challenges and Opportunities Facing Puerto Rico, 4 (Jan. 11, 2016)).

- 13 -

supporting its position that CILT precluded PREPA from collecting revenues from city power usage.[57]

### E.    The Hurricanes Reveal the Depths of PREPA's Chronic Dysfunction

In September 2017, Hurricanes Irma and Maria exposed PREPA's chronic dysfunction, demonstrating the tragic consequences of improper political interference and incompetent management. PREPA's response to the hurricanes was notoriously and catastrophically deficient: its recovery effort was plagued by gross mismanagement and corruption, causing serious harm to the island and its residents.[58]  By January 2018, only approximately 60-70% of customers had access to lines that had been energized and PREPA had only restored capability of billing to approximately 35-40% of its customers.[59]  By March 7, 2018, *nearly six months after the hurricanes*, over 155,000 Puerto Ricans remained without power.[60]

Even before the hurricanes struck Puerto Rico, PREPA failed to follow well-established industry practices in hurricane preparedness when it did not activate mutual aid assistance to

---

[57] Resp. of Nat'l Public Finance Guarantee Corp. to the Oversight Board's and AAFAF's Urgent Appl. and Notice of Revised Proposed $300 Million Loan from Commonwealth to PREPA at 7, Feb. 17, 2018 (citing First Supp. Decl. of Filsinger ¶ 11) (Dkt. No. 735).

[58] *See, e.g.*, Letter from U.S. Congressman Rob Bishop, Chairman, H. Comm. on Natural Resources, et al. to Justo González, Interim Exec. Dir., PREPA (Mar. 12, 2018) ("**Mar. 12, 2018 Letter from Chairman Bishop**") (Berezin Decl. Ex. 31); Daniella Cheslow, *Puerto Rico Releases Data on Hundreds of Deaths Following Hurricane Maria*, NPR (June 13, 2018) (Berezin Decl. Ex. 32), *available at* https://www.npr.org/2018/06/13/619440877/puerto-rico-releases-data-on-hundreds-of-deaths-following-hurricane-maria; Nsikan Akpan, *Puerto Rico Energy Authority Investigates Dozens of Post-Maria Bribery Cases*, PBS NEWS HOUR (Jan. 14, 2018) (Berezin Decl. Ex. 33), *available at* https://www.pbs.org/newshour/nation/puerto-rico-energy-authority-investigates-dozens-of-post-maria-bribery-cases ("The Puerto Rico Electric Power Authority has suspended three employees without pay as it investigates 25 cases of possible bribery that occurred in the wake of Hurricane Maria."); Letter from Minority Leader Rafael Hernánez Montañez, Government of Puerto Rico, to John Kelly, Acting Inspector General, FEMA, et al. (Jan. 14, 2018) (titled "Formal complaint of political discrimination and mismanagement of Hurricane María power restoration resources by PREPA and the Government of Puerto Rico against municipalities controlled by the opposition party") (Berezin Decl. Ex. 34), *available at* https://new.reorgresearch.com/data/documents/20180116/5a5e1ddcf0ecb.pdf.

[59] DIP Motion ¶¶ 17, 19

[60] March 12, 2018 Letter from Chairman Bishop (citing Hurricanes Maria & Irma: March 7, 2018 Event Summary, Report #94, 2, U.S DEP'T OF ENERGY, INFRASTRUCTURE SECURITY & ENERGY RESTORATION (Mar. 7, 2018)).

secure necessary resources, as any responsible electric utility would do.[61]  Moreover, in the wake of the disaster, rather than do the logistical work expected of any utility, PREPA entered into a $300 million contract with a two-person, two-year-old Montana company called Whitefish Energy Holdings, LLC ("**Whitefish**") that had no experience with major utility repairs.[62]  The Whitefish contract, plainly the result of a deficient selection process,[63] created an enormous bottleneck at PREPA, starving the utility of the people needed to repair the system efficiently. Public utilities that wanted to help PREPA were told to go through Whitefish, which created major delay in aid.[64]  As a result, PREPA fell far behind in its repair efforts, widening the "trust deficit" between PREPA's stakeholders, including the citizens of Puerto Rico, and its management.[65]  On top of that, the Whitefish contract charged PREPA exorbitant rates and provided that its profit and compensation provisions could not be audited by any governmental

---

[61] PREPA inexplicably failed to reach agreement with any of the members of the American Public Power Association (the "APPA"), an industry group of public utilities across the United States, or the Edison Electric Institute (the "EEI"), the corollary for privately owned utilities, to secure necessary resources. *See* Alan Gomez & Rick Jervis, *Puerto Rico Power Restoration: Why it Is Taking So Long*, USA TODAY (Oct. 30, 2017) (Berezin Decl. Ex. 35), *available at* https://www.usatoday.com/story/news/world/2017/10/30/puerto-rico-power-restoration-whytaking-solong/806747001.

[62] *See* Letter from U.S. Congressman Rob Bishop, Chairman, H. Comm. on Natural Resources, et al. to Ricardo Ramos, Exec. Dir., PREPA (Oct. 26, 2017) ("**Oct. 26, 2017 Letter from Chairman Bishop**") (Berezin Decl. Ex. 36).

[63] *See id.*; PREC, *Order Identifying and Implementing Temporary Oversight Measures*, Case No. CEPR-MI-2017-0008, Dkt. No. 1 (Nov. 17, 2017) ("**Contract Review Order**") (Berezin Decl. Ex. 37).

[64] *See* Alan Gomez & Rick Jervis, *Puerto Rico Power Restoration: Why it Is Taking So Long*, USA TODAY (Oct. 30, 2017).

[65] *Oversight Hearing on the Need for Transparent Financial Accountability in Territories' Disaster Recovery Efforts*: *Hearing Before H. Comm. on Natural Resources, Comm. on Nat. Res.,* 115th Cong. 1 (2017) (statement of Chairman Rob Bishop at 2) (Berezin Decl. Ex. 38).

entity, including FEMA.[66]   The current Governor and his legal advisors continued to defend the Whitefish contract through October 2017.[67]

As the recovery efforts continued, more scandals came to light.  In January 2018, the United States Army Corps of Engineers, accompanied by an armed security detail, seized a PREPA warehouse where utility supplies had reportedly been hoarded, to the detriment of recovery efforts.[68]   Most egregiously, there were allegations of serious malfeasance, bribery, and corruption in the recovery.   "PREPA officials were reportedly paid $5,000 and provided free entry tickets, valued at $1,000 apiece, to restore power to San Juan area exotic dance clubs ahead of the scheduled restoration timeline."[69]   There were also allegations that PREPA officials restored power out of sequence and to their own homes before restoring power to critical locations.[70]

These botched recovery efforts only "reemphasized the ineptitude of PREPA," with great costs to the grid, the island, and all stakeholders.[71]   Even after repairs, the grid is in a worse state now than before the hurricanes, with power lines tied to trees and continuing island-wide

---

[66] *See* Frances Robles, *The Lineman Got $63 an Hour. The Utility Was Billed $319 an Hour*, N.Y. TIMES (Nov. 12, 2017) (Berezin Decl. Ex. 39), *available at* https://www.nytimes.com/2017/11/12/us/whitefish-energy-holdings-prepa-hurricane-recovery-corruption-hurricane-recovery-in-puerto-rico.html; *Urgent Motion*, Case No. 17-04780-LTS, ECF No. 364, Ex. D, Art. 59.

[67] *See, e.g.*, Tr. of Hearing, Oct. 25, 2017, 32:12-24 (Berezin Decl. Ex. 40); Nick Brown, *Puerto Rico, Whitefish Defend Controversial Power Contract*, Reuters (Oct. 24, 2017) (Berezin Decl. Ex. 41), *available at* https://www.reuters.com/article/us-usa-puertorico-power/puerto-rico-whitefish-defend-controversial-power-contract-idUSKBN1CU020.

[68] *Puerto Rico Governor Asks DOJ To Investigate Island's Public Power Utility*, NPR (Jan. 11, 2018) (Berezin Decl. Ex. 42) (describing discovery of rebuilding materials in warehouse, PREPA's denial that it had withheld those materials, and Governor Rosselló's request that the Justice Department investigate the incident).

[69] Mar. 12, 2018 Letter from Chairman Bishop at 1.

[70] *Id.*

[71] July 23, 2018 HNRC Memo at 4.

- 16 -

blackouts and breakdowns.[72]   Nor has PREPA undertaken any necessary hardening in the wake

of the hurricanes even though, more than a year later, Puerto Rico is in the middle of another

hurricane season.[73]   These practices are inconsistent with industry norms: many other utilities

affected by natural disasters have, with competent management, promptly undertaken hardening

measures, including ensuring that all new equipment in flood zones is submersible, requiring

new customers to have connections above grade, installing stronger poles and wires, creating

redundancies in the system, strengthening overhead components, and coordinating new

distribution assets with storm strategies.[74]

### F.   Political Abuses Continue to Cripple PREPA Today

The improper political interference that has dogged PREPA for years continues unabated.

In February 2017, with newly obtained powers to appoint members to the PREPA Board,[75]

Governor Rosselló fired the entire Board and then hand-picked political insiders as replacements,

including a member of his administration and the treasurer of his campaign.[76]   Meanwhile,

experienced utility executives who were hired to improve PREPA's management and operations

have been forced out due to political backlash over their contracts.   On July 11, 2018, PREPA

---

[72] *See, e.g., Management Crisis at the Puerto Rico Electric Power Authority and Implications for Recovery: Hearing Before H. Comm. on Natural Resources, Comm. on Nat. Res.,* 115 Cong. (July 25, 2018) (testimony of David Svanda, Principal, Svanda Consulting) (Berezin Decl. Ex. 43); Recent Circuit Breaker Fire Overview (internal document produced during DIP discovery, describing island-wide blackout after the hurricanes due to ill-maintained equipment and lack of isolation and redundancy in grid) (Berezin Decl. Ex. 44); *An excavator impacted line 50700 and caused the blackout,* El Nuevo Día (Apr. 18, 2018) (detailing an island-wide blackout due to a single component failure) (Berezin Decl. Ex. 45), *available (in Spanish) at* https://www.elnuevodia.com/ noticias/locales/nota/centralsanjuanypalosecoyaestangenerandocargatraselapagon-2415603/.

[73] *See* Ringelstetter Decl. ¶¶ 29-35.

[74] *Id.* at ¶ 35.

[75] *See* Act 37-2017.

[76] *See* FOMB Investigative Report at 120-21 (finding that the Governor's machinations were "largely opposed by his political opponents and by PREPA's then-Executive Director Javier Quintana Méndez (who resigned soon after the change was implemented).   These critics asserted that the move threatened PREPA's newfound political independence, as well as the then-ongoing negotiations between PREPA and its bond holders under the Restructuring Support Agreement [ ]").

- 17 -

Executive Director Walter Higgins announced his resignation after only four months on the job, citing pressure from Puerto Rico politicians about his compensation.[77] His replacement, Rafael Díaz-Granados, likewise faced extreme pressure over his salary, culminating with an ultimatum from the Governor: Vote to reduce the Executive Director's salary or resign.[78]  On July 12, 2018, *every remaining independent Board member*, including Díaz-Granados, resigned in protest. Their resignation letter to Governor Rosselló decried that "petty political interests . . . are put ahead of the needs of the people . . . ."[79]  On July 18, 2018, Governor Rosselló then appointed Jose Ortiz—a former PREPA Board Chair—to serve as the PREPA CEO, even as critics worried that Ortiz had already been part of "the poor management culture that drove PREPA, and the entire Puerto Rican territory, into bankruptcy in recent years."[80]

In the wake of this mass forced resignation, Governor Rosselló has since selected two more Board members—Elí Díaz Atienza and Ralph Kreil—bringing the Board's current composition to four members, all selected by the Governor. Notably, some of the Governor's picks have significant conflicts of interest.  Mr. Diaz Atienza, the current chairman of the Board, is also the Executive President of PRASA, and José Ortiz—appointed by Governor Rosselló as

---

[77] *See* Andrew Scurria, *Puerto Rico Power Utility CEO Resigns After Less Than Four Months on Job*, WALL ST. J. (July 11, 2018) (Berezin Decl. Ex. 46), *available at* https://www.wsj.com/articles/puerto-rico-power-utility-ceo-resigns-after-less-than-4-months-on-job-1531328679.

[78] *See* Karen Pierog, Jessica Resnick-Ault, *Puerto Rico Power Utility board Quits, Leaving Leadership Void*, REUTERS (July 12, 2018) (Berezin Decl. Ex. 47), *available at* https://www.reuters.com/article/us-usa-puertorico-prepa/puerto-rico-power-utility-board-quits-leaving-leadership-void-idUSKBN1K22QS.

[79] *See* Letter from Ernesto Sgroi, Chair, PREPA Governing Board, et al. to Hon. Ricardo Rosselló Nevares, Governor of Puerto Rico (July 12, 2018) (Berezin Decl. Ex. 48); *see also* Letter from U.S. Congressman Rob Bishop, Chairman, H. Comm. on Natural Resources to Governor Ricardo Rosselló at 1 (July 19, 2018) (Berezin Decl. Ex. 49) ("[T]he recent departure of PREPA's . . . governing board are the most recent signs of the utility's continued dysfunction and a sign that "political forces . . . continue to control PREPA.'").

[80] Gavin Bade, *Puerto Rico Governor Names New PREPA CEO, Board Members*, UTILITY DIVE (July 19, 2018) (Berezin Decl. Ex. 50), *available at* https://www.utilitydive.com/news/puerto-rico-governor-names-new-prepa-ceo-board-members/528152/.  Local sources have also commented on prior contracting and project missteps under Ortiz.

Executive Director of PREPA on July 18, 2018—was CEO of PRASA from 2007 to 2013. Yet PRASA owes millions of dollars to PREPA in outstanding accounts receivable.[81]

In addition to being over-politicized, the PREPA Board, as currently composed, does not satisfy the basic requirements of Puerto Rico law. The Enabling Act requires that the Board be comprised of seven members, four of whom "shall constitute a quorum" to conduct business.[82] The Board currently has only four members, and one of them, Christian Sobrino (Chief Economic Advisor of the Governor) cannot be counted toward a quorum because he is merely an ex-officio member who was neither elected to the Board nor appointed.[83] The Board also lacks the required majority of politically independent members—an explicit requirement of Act 37.[84] Indeed, even the FOMB demanded that PREPA's fiscal plan be amended to include the condition that two-thirds of PREPA's Board members be independent.[85] Currently, only one of PREPA's four Board members, Ralph Kreil, might be politically independent (though he too was selected by Governor Rosselló).

---

[81] *See, e.g.*, Second Supplemental Declaration of Todd Filsinger, Dkt. No. 688, at 8 (outstanding accounts receivable balance of $62.8 million); *see also* Ringelstetter Decl. ¶ 88.

[82] P.R. Laws Ann. tit. 22, § 194(b).

[83] Mr. Sobrino serves on the PREPA Board as AAFAF's executive director, pursuant to Article 16 of AAFAF's Enabling Act. An Act to Create the Puerto Rico Fiscal Agency and Financial Advisory Authority of Jan. 18, 2017, No. 2 ("**Act 2-2017**"). PREPA's Enabling Act, however, makes no mention of an ex-officio member of the Board, and contemplates that a quorum be comprised of members appointed by the Governor and elected according to the selection process articulated in § 4(a) of Act 37-2017.

[84] *See* Act 37-2017, § 4(a). This provision requires the Governor to choose three independent selections from a list of at least ten candidates submitted by a recognized executive search firm. These three independent members then must be confirmed by the Senate. *See id.* To date, however, the Governor has not followed the prescribed process for selecting independent members.

[85] FOMB, *Resolutions Adopted at the Seventh Public Meeting of the Financial Oversight and Management Board for Puerto Rico Held on April 28, 2017 in New York, New York (Resolution #2)* (Apr. 28, 2017) (Berezin Decl. Ex. 51).

- 19 -

### G.  The Transformation and Privatization of PREPA Will Take Years, And Will Require Proper Management to Shepherd PREPA through the Process

This Motion is currently the only viable option for near-term reform at PREPA. The transformation of PREPA contemplated by the Fiscal Plan would, under the best circumstances, take years to achieve.  According to PREPA's most recent Fiscal Plan, certified by the FOMB on August 1, 2018, "the transformation of the electric sector in Puerto Rico is anticipated to involve a sale of existing generation assets, development of new generation and a concession by the public entity of the [transmission and distribution] System."[86]  The goal of this transformation is to create a system that is modern, reliable, resilient, sustainable, and affordable.[87]  Doing so will require numerous steps in multiple phases, will affect essentially every aspect of PREPA, and will cost many billions of dollars.[88]  The Fiscal Plan specifically recognizes that transformation will involve "drastic[]" changes to PREPA as well as "myriad negotiations and processes that must occur."[89]  Governor Rosselló has likewise repeatedly recognized that "[g]reat changes are needed,"[90] and that the transformation will be a time of "profound changes."[91]

Without effective management, the chances of a successful transformation are remote. The latest PREPA Fiscal Plan describes various processes and hurdles that must be confronted to bring about the desired transformation, including: (i) restructuring power generation;

---

[86] PREPA Fiscal Plan at 17 (Berezin Decl. Ex. 52).

[87] *Management Crisis at the Puerto Rico Electric Power Authority and Implications for Recovery: Hearing Before H. Comm. on Natural Resources, Comm. on Nat. Res.,* 115 Cong. (July 25, 2018) (written statement of Governor Rosselló at 2) (Berezin Decl. Ex. 53).

[88] *See, e.g.*, PREPA Fiscal Plan at 3, 15-16, 42-44, 48, 52.

[89] *Id.* at 2.

[90] Jan. 22, 2018 Message of Governor Rosselló (Office of the Puerto Rico Governor) (Berezin Decl. Ex. 54).

[91] Press Release, La Fortaleza, Oficina del Gobernador, Governor Rosselló Announces Appointment of New Executive Director for the Puerto Rico Electric Power Authority (July 19, 2018) (Berezin Decl. Ex. 55), *available at* https://www.fortaleza.pr.gov/content/governor-rossell-announces-appointment-new-executive-director-puerto-rico-electric-power.

- 20 -

(ii) rebuilding and modernizing the grid; (iii) transforming operations; (iv) securing funds for and making billion-dollar capital investments; and (v) moving toward a new industry structure.[92] Governor Rosselló also recently described the "complex process" of transformation in written testimony, noting that it further involves "developing new legislative and regulatory structures, integrated resource planning, updating the public private partnerships framework for the transaction, coordinating and complying with federal disaster funding requirements, addressing legacy obligations and resolving ongoing bankruptcy proceedings at both PREPA and the Government of Puerto Rico."[93]

According to the government's January 2018 announcement, the process would take at least eighteen months.[94]  That estimate was not remotely realistic.  The latest PREPA Fiscal Plan states that: "[t]he ultimate form of the transformation will be informed by many elements **currently unknown and beyond PREPA's control** including market appetite for the transaction and legislative action.  PREPA, therefore, expects to amend and modify this Fiscal Plan to reflect the inputs received from the transformation process."[95]  The Fiscal Plan shows various changes related to the transformation continuing through at least FY2023.[96]  Other officials have admitted that this complex process could take four to seven years.[97]  The

---

[92] *See* PREPA Fiscal Plan at 3; *see also id.* at 15-16 (documenting numerous required steps).

[93] *Management Crisis at the Puerto Rico Electric Power Authority and Implications for Recovery: Hearing Before H. Comm. on Natural Resources, Comm. on Nat. Res.,* 115 Cong. (July 25, 2018) (written statement of Governor Rosselló) at 3.

[94] *See* Jan. 22, 2018 Message of Governor Rosselló (Office of the Puerto Rico Governor); PREPA Fiscal Plan at 13 ("18+ month transformation and privatization process"); Letter from Citigroup Global Markets Inc. and Rothschild & Co. re: The Potential Transformation of the Puerto Rico Electric Sector at 4 (June 4, 2018) (Berezin Decl. Ex. 56).

[95] PREPA Fiscal Plan at 6 (emphasis added).

[96] *See, e.g., id.* at 42, 44.

[97] *See, e.g.,* José A. Delgado Robles, *Jenniffer González Drafts Bill to Depoliticize PREPA*, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ (July 27, 2018)   (Berezin   Decl.   Ex.   57),   *available   at*   https://www.elnuevodia.com/english/english/nota/

transformation process contemplated under the fiscal plan is likely to take several years and as many as ten or more years to accomplish.[98]

Professional and independent management is critical to stabilize PREPA, to ensure that its legacy system can function properly for years until the transition is complete, and to shepherd PREPA through the "drastic changes" that will be required.  As members of the U.S. Congress have recognized, before transformation can happen, "substantive structural and cultural reform within PREPA must occur."[99]   That is exactly what a receiver would accomplish. There are many highly qualified firms or individuals with substantial public utility management experience that could fulfill this role.[100]

### H.   Movants Have A Clear Right under Commonwealth Law to A Court-Appointed, Professional, and Independent Receiver

Movants own and insure revenue bonds issued by PREPA (the "**Bonds**"), which are secured by, among other things, a pledge of all current and future revenues of the System:

> in order to secure the payment of all bonds at any time issued and outstanding hereunder . . . and in order to secure the performance and observance of all the covenants, agreements and conditions . . . **[PREPA] has pledged and does hereby pledge to the Trustee the *revenues of the System*** . . . and other moneys to the extent provided in this Agreement as security for the payment of the bonds and the interest and the redemption premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such bonds[.][101]

---

jenniffergonzalezdraftsbilltodepoliticizeprepa-2437814; José A. Delgado Robles, *José Ortiz: "We have to move fast"*, EL NUEVO DÍA (Aug. 1, 2018), (Berezin Decl. Ex. 58), *available at* https://www.elnuevodia.com/english/english/nota/joseortizwehavetomovefast-2438710.

[98] *See* Ringelstetter Decl. ¶¶ 107-114.

[99] July 23, 2018 HNRC Memo at 8.

[100] Indeed, without proper management, any proposed plan of adjustment likely will fail simply due to lack of feasibility. A receiver will address this critical impediment to reaching a consensual resolution of this Title III case.

[101] Trust Agreement at 11-12 (emphasis added); *see also id.* § 701 (providing that the Bonds are "payable solely from the Revenues and said Revenues are hereby pledged to the payment thereof . . . ."). The "other moneys" referenced in the "whereas" clause captures more than revenues of the System, and includes bond proceeds, which are deposited into certain accounts established under the Trust Agreement.

The Trust Agreement provides for the application of these revenues to pay debt.[102] Revenue pledges, like PREPA's, are regularly used in municipal finance. To make these pledges meaningful, revenue bond documents routinely include a binding commitment to maintain, charge, and collect rates at a level sufficient to cover debt service and operating expenses.[103] These commitments are an integral and non-severable component of the revenue pledge.[104] PREPA made each of these covenants as further security to PREPA Bondholders.[105]

PREPA Bondholders holding at least 25 percent of the principal amount of Bonds outstanding also have both a statutory and contractual right to require the appointment of a receiver following an event of a default. Section 17(a) of the Enabling Act provides:

> [I]n the event that [PREPA] shall default in any agreement made with the holders of the bonds, any holder or holders of the bonds . . . ***shall have the right*** to apply in an appropriate judicial proceeding to any court of competent jurisdiction in Puerto Rico for the appointment of a receiver . . . . Upon such application the court may appoint, and if the application is made by the holders of twenty-five (25%) per centum in principal amount of such bonds then outstanding, or by any Trustee for holders of bonds in such principal amount, ***shall appoint a receiver of such undertakings***.[106]

As the preceding language shows, this relief is mandatory ("shall"), not discretionary. This statutory right held by bondholders was expressly incorporated into the Trust Agreement.[107]

---

[102] Trust Agreement §101 (mandates that revenues be paid to the Trustee for payment of debt service and the funding of reserves, after payment of Current Expenses (as defined in the Trust Agreement and subject to the limitations for such expenses in Article V of the Trust Agreement).

[103] Declaration of Robert A. Lamb, dated October 3, 2018 ("**Lamb Decl.**") ¶ 12, attached hereto as Exhibit 4.

[104] *Id.*

[105] Trust Agreement §§ 501, 502 and 712. While section 507(h) purports to grant a lien on certain accounts held by the Trustee, the Trust Agreement makes clear this lien is *further* security for the bondholders. In other words, it supplements the primary security: the revenue pledge. For the avoidance of doubt, Movants are not currently seeking any type of order that determines what is a Current Expense and whether certain prepetition debt obligations are Current Expenses for purposes of the Trust Agreement.

[106] P.R. Laws Ann. tit. 22, § 207(a) (emphasis added).

[107] *See* Trust Agreement § 804 (requiring Trustee to proceed for the appointment of a receiver upon written request of the holders of 25% or more of the principal amount of Bonds outstanding).

If the automatic stay is lifted, Movants will be able to exercise this mandatory receiver right. Movants hold and/or insure (which, for purposes of directing remedies, qualifies as holding) approximately 27% of the Bonds upon default.[108]  PREPA has defaulted on the Bonds; indeed, it has done so multiple times.[109]  Events of default include, among other things, the failure to make any principal or interest payments on the Bonds as they come due; any instance in which PREPA is "rendered incapable of fulfilling its obligations"; the failure to properly repair, replace, or reconstruct any part of the System necessary for effective operation; and instituting any proceeding with PREPA's consent or acquiescence for the purpose of adjusting the claims of PREPA's creditors.[110]  Undisputed events of default occurred, at a minimum, when PREPA failed to pay its debt service on July 3, 2017, January 2, 2018, and July 2, 2018, and when PREPA filed its Title III case on July 2, 2017.[111]  Further, as described above, PREPA has failed to adequately rebuild its system and harden its grid following Hurricanes Irma and Maria.[112]

## JURISDICTION

The Court has jurisdiction to grant the relief sought in this Motion pursuant to section 362(d) of title 11 of the United States Code, which applies to this proceeding pursuant to section 301 of PROMESA, 48 U.S.C. § 2161.  This Motion is filed pursuant to Rule 4001-1 of the Local

---

[108] *See* Case No. 17-4780-LTS, Proof of Claim No. 18449, filed by the Trustee (Berezin Decl. Ex. 59); *see also* Case No. 17-4780-LTS, Proofs of Claim Nos. 29020 (Berezin Decl. Ex. 60), 32829 (Berezin Decl. Ex. 61), and 31087 (Berezin Decl. Ex. 62), filed by Assured Guaranty Corp. and Assured Guaranty Municipal Corp.; Case No. 17-4780-LTS, Proofs of Claim Nos. 22078 (Berezin Decl. Ex. 63) and 23396 (Berezin Decl. Ex. 64), filed by National Public Finance Guarantee Corp.; Case No. 17-4780-LTS, Proof of Claim No. 49143 (Berezin Decl. Ex. 65), filed by Syncora Guarantee Inc.

[109] *See* Case No. 17-4780-LTS, Proofs of Claim Nos. 18448, 29020, 32829, 31087, 22078, 23396, and 49143.

[110] Trust Agreement § 802.

[111] *See supra* note 109.

[112] *See* Ringelstetter Decl. ¶¶ 29-35.

Bankruptcy Rules of the Bankruptcy Court for the District of Puerto Rico, and consistent with the First Circuit's Remand Decision.[113]

## RELIEF REQUESTED

Movants request an order, in the form of the proposed order attached as **Exhibit 1**, lifting the automatic stay (i) to permit the filing of a complaint substantially in the form attached as **Exhibit 2** to the Motion, as well as any other associated pleadings (the "**Receiver Litigation**"), to be fully briefed, argued and decided by a court of competent jurisdiction, and (ii) if the Receiver Litigation is resolved in the Movants' favor, to allow the court of competent jurisdiction to appoint a receiver, and (iii) if a receiver is appointed, to allow the receiver to exercise its duties and powers under the supervision of the court of competent jurisdiction in the Receiver Litigation.  If a receiver is appointed, the receiver would responsibly manage PREPA to reduce waste and inefficiency and generate revenues; enable the utility to properly function in a manner to provide reliable service and complete the planned privatization; and have such other powers provided for under the Enabling Act and the Trust Agreement and that the court appointing the receiver may deem appropriate.

## ARGUMENT

### THE COURT SHOULD LIFT THE AUTOMATIC STAY FOR "CAUSE" UNDER SECTION 362(D)(1), INCLUDING FOR LACK OF ADEQUATE PROTECTION

"On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . for cause."[114]  "Cause" is a "broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations."[115]

---

[113] Remand Decision, 899 F.3d at 24.

[114] 11 U.S.C. § 362(d)(1); PROMESA at § 301(a) (incorporating Section 362).

[115] *Scripps GSB I, LLC v. A Partners, LLC (In re A Partners, LLC)*, 344 B.R. 114, 127 (Bankr. E.D. Cal. 2006); *accord In re Tex. State Optical, Inc.*, 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995).

Cause should be found for "lack of adequate protection of an interest in property of such party in interest."[116]   Mismanagement of a debtor may also be cause for stay relief.[117]

### A. PREPA's Revenue Pledge And Supporting Covenants Provided As Security For Billions From Bondholders Are Interests In Property Entitled To Adequate Protection

#### 1. PREPA Bondholders' Property Rights Under Non-Bankruptcy Law

Public utilities and other municipal entities depend on financing to provide essential public services.   To access credit markets, public utilities must—and invariably do—grant security to creditors.   Because these borrowers cannot grant liens on physical assets, the collateral package typically includes a lien on revenues.[118]

PREPA is no different.   Its enabling statute expressly authorizes it to pledge its current and future revenues as security for repayment of the Bonds.[119]   And in the Trust Agreement, PREPA does so: it "hereby pledge[s] to the Trustee the revenues of the System" to secure the Bonds.[120]   This pledge creates a lien on all PREPA revenues.   While the Trust Agreement permits PREPA to pay certain current operating expenses before debt service, the granting clause is unambiguous: Bondholders have a lien on "revenues of the System."[121]   As is typical in municipal finance, both current and future revenues are subject to the lien.   *See State v. City of*

---

[116] 11 U.S.C. § 362(d)(1).

[117] *See, e.g.*, *Minn-Kota Farm Agency, Inc. v. Home Fed. Sav. & Loan Ass'n*, 978 F.2d 1264 (8th Cir. 1992) (unpublished table decision, text at 1992 WL 323066).

[118] *See* Lamb Decl. ¶ 10; *see also* P.R. Laws Ann. Tit. 22 § 206; *In re Jefferson County*, 474 B.R. 228, 238-39 (Bankr. N.D. Ala. 2012) ("[M]any states do not allow municipalities to encumber their properties with liens that could be enforced by foreclosure or repossession of the properties.")

[119] Act No. 83 of May 12, 1941, (codified as amended at P.R. Laws Ann. tit. 22, § 206(e)(1)).   Interests in property entitled to adequate protection are for the most part "created and defined by state law."   *N. Tr. Co. v. Leavell (In re Leavell)*, 56 B.R. 11, 13 (Bankr. S.D. Ill. 1985); *In re Buehne Farms, Inc.*, 321 B.R. 239, 242 (Bankr. S.D. Ill. 2005) ("The existence, nature and extent of a security interest in property is decided by reference to state law.").

[120] Trust Agreement at 11-12.

[121] *Id.*   This is one of many pledges in the Trust Agreement.   *See, e.g.*, *id.* at 5 (pledge of moneys in the special fund to payment of principal and interest on Bonds); *id.* § 513 (application and pledge of moneys in the sinking fund).

- 26 -

*Lakeland*, 154 Fla. 137, 139-40 (Fla. 1943) ("[A]n express pledge of revenues to be derived from a particular source . . . creates a lien or charge upon the specific revenues designated, *whether then or thereafter collected*." (emphasis added)).  Further, by law, the revenue pledge precludes application of the revenues for any other purpose prejudicial to bondholders.  *See id.*; *see also See George v. City of Asheville*, 80 F.2d 50, 56-57 (4th Cir. 1935); *Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*, 75 F.2d 870, 872-73 (5th Cir. 1935).  And, as discussed below, the special revenue provisions incorporated by PROMESA ensure that the lien on revenues is not cut off by a Title III petition.[122]

In addition to pledging its revenues, PREPA made binding commitments to Bondholders that are also part of Movants' collateral package.[123]  One of these pledges requires PREPA to set rates at levels sufficient to pay debt service.[124]  Another requires it to render and collect bills for its services.[125]  And, of particular relevance here, if PREPA defaults on payment or other obligations, the Trust Agreement provides Bondholders or the Trustee the right to obtain a court-appointed receiver.[126]

The Rate Covenant, Collection Covenant, and Receiver Right are the essential infrastructure of the revenue pledge.  "Without these covenants the bonds would not be merchantable."[127]  This is because the laws of most U.S. states and territories (including Puerto

---

[122] *See* 11 U.S.C. § 928(a).

[123] *See* Proof of Claim No. 18449 ¶¶ 7-9 (explaining that bondholders' claims are secured by property interests established by the PREPA Enabling Act and the Trust Agreement, including, but not limited to, the pledge of revenues, and the rate and receiver covenants); *see also* Proof of Claim No. 29020 annex at 2; Proof of Claim No. 31087 annex § A; Proofs of Claim Nos. 22078 and 23396 add. ¶¶ 5-6; Proof of Claim No. 49143 add. § A.

[124] Trust Agreement § 502 ("**Rate Covenant**"); *see also* P.R. Laws Ann. tit. 22, § 207(a) (authorizing rate covenant).

[125] Trust Agreement § 501 ("**Collection Covenant**").

[126] Upon an uncured default (including for failure to make principal or interest payments as they become due), the Trustee or holders of at least 25% of the principal amount of outstanding bonds may exercise their right to a receiver.  *See* P.R. Laws Ann. tit. 22, § 207; Trust Agreement § 804 ("**Receiver Right**").

[127] *City of Santa Monica v. Grubb*, 245 Cal. App. 2d 718, 727 (1966).

- 27 -

Rico) restrict public utilities from pledging physical assets as collateral for financial obligations.[128]  As a result, a pledge of revenues in municipal finance is invariably accompanied by covenants to ensure that the stream of revenues is adequate to repay the issuer's bond debt.[129]  Together, the revenue pledge, covenants, and Receiver Right provide equivalent security to a lien on equipment or real property, so that the debt can be adequately secured.[130]  The existence of such covenants also positively impact credit agency ratings for municipal bonds, to which potential investors look to for guidance in determining whether to purchase them.[131]

As the Supreme Court and numerous other courts have held, the covenants supporting and otherwise accompanying a pledge of revenues are property rights held by bondholders.  *Cf. U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").  For example, in *First National Bank of Boston v. Maine Turnpike Authority*, 136 A.2d 699 (Me. 1957), the Maine Supreme Court held that the legislature could not impair a rate covenant by increasing expenses and thus reducing the revenues pledged to debt service.  Doing so, the court explained, would unconstitutionally "transfer a vested property right from one person to another by the pure fiat of the Legislature."[132]  And in *Dimino v. Sec'y of Commonwealth*, 695 N.E.2d 659, 663-64 & n.4 (Mass. 1998), the Supreme Judicial Court of

---

[128] P.R. Laws Ann. tit. 22, § 206; *see, e.g.*, *In re Jefferson County*, 474 B.R. at 238-39  ("[M]any states do not allow municipalities to encumber their properties with liens that could be enforced by foreclosure or repossession of the properties.").

[129] Lamb Decl. ¶ 10.

[130] *See Grubb*, 245 Cal. App. 2d at 727 ("Where a city has the power to enter into a contractual obligation payable solely from revenues, it also has the power to make covenants, including a rate covenant, necessary to insure that the revenues will in the future be sufficient to meet the obligation."); *accord Oswald v. City of Blue Springs*, 635 S.W.2d 332, 334 (Mo. 1982); *see also* Rhonda C. Thomas, *The Hancock Amendment: The Limits Imposed on Local Governments*, 52 UMKC L. REV. 22, 36 (1984) ("revenue bonds are necessarily and statutorily secured by a rate covenant").

[131] Lamb Decl. ¶¶ 11, 16, 20.

[132] *First Nat'l Bank of Bos.*, 136 A.2d at 722.

Massachusetts held that freezing toll rates or eliminating tolls would "unconstitutionally
depriv[e] the bondholders of their security interest" because it would conflict with the rate
covenant securing the bonds.  Likewise, in *Patterson v. Carey*, 363 N.E.2d 1146, 1151-53 (N.Y.
1977), New York's high court struck down a law limiting a public authority's power to increase
tolls pledged to bondholders.  As the court explained, "[s]ince toll revenues are the sole source of
funds for bond-repayment, the provision granting the authority the power to increase tolls was an
important security provision."[133]

The Receiver Right is also a property interest.  *See e.g.*, *Minn-Kota Farm Agency, Inc. v.
Home Fed.  Sav. & Loan Ass'n*, 978 F.2d 1264 (8th Cir. 1992) (unpublished table decision, text
at 1992 WL 323066) (mortgagee's right to compel the mortgagor to insure the property, and pay
taxes, was part of the bundle of rights determining adequate protection); *In re Offerman Farms,
Inc.*, 67 B.R. 279, 282-84 (Bankr. N.D. Iowa 1986) (ruling that property interests are broader
than the collateral value and include a creditor's legal and equitable interests in property,
including the right to a receiver). Indeed, this Court previously ruled that PREPA Bondholders
hold a property right to a receiver.  *See, e.g.*, *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F.
Supp. 3d 577, 611-12 (D.P.R.), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S.  Ct. 1938
(2016).

All of these property rights—including the revenue pledge—existed on the day that
PREPA filed for Title III.  Indeed, all of this collateral existed when PREPA entered into the
Trust Agreement in 1974 to make its Bonds marketable.  The value of this collateral is being
impaired by PREPA's mismanagement. Due to the automatic stay, Bondholders have had to sit
idly by while PREPA tragically mismanaged the aftermath of Hurricane Maria, failed to collect

---

[133] *Patterson*, 363 N.E.2d at 1152.

revenues for services rendered, incurred needless expenses, failed to maintain, repair and harden the System, and failed properly to prepare for its "transformation." This Motion seeks to protect this existing collateral, without which PREPA's Bonds would not have been marketable. The Motion does not seek to create new collateral. *Cf.* Remand Decision, 899 F.3d at 23. And, as discussed below, the collateral at risk during this Title III case includes PREPA's future revenues, as the special revenue provisions of the Bankruptcy Code make clear.

### 2. PROMESA's Special Revenue Provisions Preserve And Protect the Lien On PREPA's Post-Petition Revenues

Unlike in a Chapter 11 bankruptcy case, Movants' lien on revenues continues after the filing of the Title III petition. Congress specifically provided for the continuation of this lien by incorporating the special revenue protections of Chapter 9 of the Bankruptcy Code (11 U.S.C. §§ 902, 922(d), and 928(a)) into Title III of PROMESA.[134] To cure any potential ambiguity as to whether pledged special revenues would fit within section 552(b) of the Bankruptcy Code, Congress chose to preclude the application of section 552(a) in its entirety with respect to revenue bonds. *See Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 1, 7 (1st Cir. 2018). As Congress expressly directed, special revenues acquired by the debtor after the petition date "*shall* remain subject to *any lien* resulting from any security agreement." 11 U.S.C. § 928(a) (emphasis added).

The special revenue provisions were enacted to "insure that revenue bondholders receive the benefit of their bargain with the municipal issuer, *namely they will have unimpaired rights to the project revenue pledged to them.*"[135] The purpose of these provisions is to recognize a

---

[134] *See* 48 U.S.C. § 2161. Section 928(a) of the Bankruptcy Code, incorporated by Section 301 of PROMESA, provides that "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a).

[135] S. Rep. No. 100-506, at 12 (1988) (emphasis added).

"hypothetical mortgage from which revenues are derived where a real mortgage cannot be created either for legal reasons or because of compelling considerations of public policy."[136] Congress made clear that the special revenue provisions apply to a broad panoply of revenue pledges, even where bond documents allow a debtor to net out some of its operating expenses before paying debt service.[137]

The special revenue provisions have important consequences for Movants' collateral package during this Title III case. Unlike most liens in Chapter 11 cases, the value of Movants' collateral is not frozen on the petition date. Rather, the revenue pledge remains in effect, and section 928 makes clear that the revenues acquired by the debtor after the petition date remain subject to the bondholders' prepetition liens. Thus, movants retain a continuing lien on PREPA's current and future revenues during and after the Title III case.[138]

PREPA's pattern of mismanagement has impaired the value of this collateral. Shielded by the automatic stay, PREPA serves political interests instead of its stakeholders. It wastes its resources, fails to safeguard its system, and fails to collect bills (including at the direction of the Governor). It also fails to provide reliable and efficient service to the people of Puerto Rico, further impairing the revenue stream. To preserve the value of Movants' collateral, PREPA must be prudently managed.

---

[136] *Id.* at 13.

[137] *Id.* at 22-23.

[138] Section 928(b) provides that liens on "special revenues . . . derived from a project or system shall be subject to the necessary operating expenses of such project or system[.]" 11 U.S.C. § 928(b). This provision covers a narrow universe of expenses, and does not displace or otherwise supplant the lien protections of section 928(a). S. Rep. 100-506, at 23. Necessary operating expenses do not include, among other things, the costs of capital improvements or enhancements. *See Bank of N.Y. Mellon v. Jefferson County (In re Jefferson County)*, 482 B.R. 404, 437 (Bankr. N.D. Ala. 2012).

- 31 -

**B.    Cause Exists To Lift the Automatic Stay To Permit Bondholders To Seek A Receiver Under Commonwealth Law**

Unfortunately, PREPA is—today more than ever—the poster child for malfeasance and mismanagement.  PREPA's maladministration harms the people of Puerto Rico and jeopardizes creditors' rights.  And since the start of this Title III case, the dysfunction and impermissible political influence at PREPA have only gotten worse.

Courts have repeatedly found cause to lift the automatic stay due to mismanagement on a far lesser scale and under circumstances far less compelling.  *See, e.g.*, *Minn-Kota Farm Agency, Inc. v. Home Fed. Sav. & Loan Ass'n*, 978 F.2d 1264, 1008 (8th Cir. 1992); *In re Century Inv. Fund VIII Ltd. P'ship*, 155 B.R. 1002, 1008 (Bankr. E.D. Wis. 1989) (creditor with mortgage on real estate, which contained a receiver provision, was entitled to the appointment of a receiver to collect rents and pay necessary expenses, where the debtor's income was insufficient to cover mortgage payments); *In re Ridgemont Apartment Assocs.*, 105 B.R. 738, 741 (Bankr. N.D. Ga. 1989) (secured creditor successfully moved to lift stay to obtain appointment of receiver to collect rents); *Le Sannom Bldg. Corp. v. Nathanson*, No. 92 CIV. 8716 (LAP), 1993 WL 330442, at *3-4 (S.D.N.Y. Aug. 23, 1993) (automatic stay lifted to permit receiver to exercise authority under state law); *In re Offerman Farms, Inc.*, 67 B.R. at 282-84 (in mortgage foreclosure cases, creditor's contractual and statutory rights to a receiver were rights subject to adequate protection).

Mismanagement is especially problematic when the debtor is a public utility like PREPA, because it depletes the revenues that are Bondholders' only recourse for payment.  Just as reducing revenues or freezing toll rates unconstitutionally deprives bondholders of security

- 32 -

interests,[139] so does failing to collect billions of dollars in electricity rates that are long overdue.

Or failing to maintain the System, which results in frequent unnecessary outages, and then taking

far too long to bring it back on line.  Or inexplicably failing to invoke mutual aid assistance after

catastrophic hurricanes, and then committing hundreds of millions of dollars in recovery funds to

a two-man outfit in Montana that clearly was not up to the job.  These and all the other missteps

at PREPA drive down its revenues and incur unnecessary expenses, to the detriment of

Bondholders and all of PREPA's other stakeholders, including the citizens of Puerto Rico.  Most

of all, leaving PREPA in the grip of "petty politics"—until every one of its independent directors

is driven from their posts—is bad for creditors and bad for Puerto Rico.  Adequate protection is

ultimately about ensuring that secured creditors receive the benefit of their bargain.[140]  No

Bondholder bargained for the dysfunction that reigns at PREPA today.  And all this conduct has

occurred while PREPA has been sheltered by the automatic stay.

Lasting change at PREPA will not happen overnight.  The transformation contemplated

by the current Fiscal Plan would take years, maybe even a decade, to achieve.  But there will

*never* be real change at PREPA until it is under new management that is insulated from political

control.  Without a receiver, PREPA will keep limping toward a plan of adjustment, trading in its

---

[139] *First Nat'l Bank*, 136 A.2d at 722; *Dimino*, 695 N.E.2d 659, 663-64 & n.4.

[140] *See e.g.*, Remand Decision, 899 F.3d at 20. (section 362(d)(1) of the Bankruptcy Code, incorporated by Section 301 of PROMESA, "guards against the possibility that the automatic stay could deprive a creditor of its property interest by precluding the creditor from exercising any rights it possesses to protect that interest from destruction."); *Lend Lease, a Div. of Nat'l Car Rental Sys., Inc. v. Briggs Transp. Co. (In re Briggs Transp. Co.)*, 780 F.2d 1339, 1342 (8th Cir. 1985) ("By providing a creditor with a means of protecting its interest through section 362(d)'s adequate protection requirement, the competing interests of the debtor's need to reorganize and the secured creditor's entitlement to constitutional protection of its bargained-for property interests are reconciled"); *In re DeSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) ("Adequate protection is also grounded in the belief that secured creditors should not be deprived of the benefit of their bargain"); *First Agric. Bank v. Jug End in Berkshires, Inc. (In re Jug End in Berkshires, Inc.)*, 46 B.R. 892, 899 (Bankr. D. Mass. 1985) ("The intent of adequate protection is not confined to constitutional protection, but also encompasses the policy grounds of not depriving secured creditors of the benefit of their bargain"); H.R. Rep. No. 95-595, at 339 (1977) (The "concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain."); S. Rep. No. 95-989, at 49 (1978) (The concept of adequate protection "is derived from the Fifth Amendment protection of property interests as enunciated by the Supreme Court.").

opportunities for political chits.   It will not attract private investment.   It will deplete the revenues that have been pledged to Bondholders.   And it will be in no state to provide the people of Puerto Rico the reliable and affordable electricity service they need and deserve.

This Motion does not seek to appoint a receiver to petition for an increase in rates to enforce Section 502(B)(b) of the Trust Agreement.   The first order of business at PREPA should be to install sound and prudent management, on par with other public utilities.   Creditors, ratepayers, and other PREPA stakeholders will all reap the benefits thereof, both immediately and in the future.

### C.    The Balance of Harms and Other *Sonnax* Factors Strongly Favor Lifting the Stay

As secured creditors whose collateral is diminishing, Movants are not required to meet the Second Circuit's *Sonnax* test to obtain stay relief.   Regardless, the *Sonnax* factors only confirm that the stay should be lifted.   Of particular importance here is the "impact of the stay on the parties and the balance of harms."[141]   "Cause may exist for lifting the stay whenever the stay harms the creditor and lifting the stay will not unduly harm the debtor."[142]

PREPA, today, is unduly harming *itself*.   The automatic stay now protects only the political forces that have exerted improper control over PREPA, not the debtor or its legitimate interests.   Maintaining the stay would reinforce the conviction that PREPA can never be truly reformed.   PREPA, its creditors, and the people of Puerto Rico would all pay the price.

Movants are mindful of the concerns expressed by the Court in connection with the prior receiver lift-stay motion.   This is a very different Motion: Movants expressly do *not* now seek a

---

[141] *Sonnax Indus., Inc. v. TRI Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990).

[142] *Marder v. Turner (In re Turner)*, 161 B.R. 1, 3 (Bankr. D. Me. 1993).

receiver "to force a rate increase" under the relevant provision of the Rate Covenant.[143]   Nor do
they seek a receiver that could interfere with the FOMB's prerogatives under PROMESA or the
Commonwealth's authority over energy or other public policies.[144]   On the contrary, PREPA,
managed by a receiver, would have the same responsibility to work with the FOMB as exists
today and would remain subject to the jurisdiction of this Court.[145]   The receiver would not be
subject to Movants' control either.[146]   The receiver would merely step into the shoes of PREPA's
current management, with one key difference: unlike PREPA's existing leadership, an
independent and professional receiver with utility experience would manage PREPA prudently,
as Puerto Rico law requires and Puerto Rico's people desperately need.[147]

Every day that PREPA spends without competent management is a day that PREPA and
all its constituents court disaster.  The Court should grant the Motion.

## CONCLUSION

For the foregoing reasons, Movants respectfully request an order, in the form of the
proposed order attached as **Exhibit 1**, lifting the automatic stay to permit the filing of a
complaint substantially in the form attached as **Exhibit 2**, as well as any other associated
pleadings, to be fully briefed, argued and decided by a court of competent jurisdiction.

---

[143] *Opinion & Order*, Dkt. No. 299 (Sept. 14, 2017), at 14; *see also* Trust Agreement § 502(B)(b).

[144] *See id.* at 14-15.  As this Court previously held, under PROMESA, the role of FOMB is separate from PREPA's management and that would remain if a receiver is appointed.  CTO Order at 15.  Therefore, the receiver would not impact or hinder the authority of the FOMB.

[145] *See* P.R. Laws Ann. tit. 22, § 207(d); *see also* Remand Decision, 899 F.3d at 23 (noting that limitations might be imposed on the receiver's power).

[146] For all these reasons, beyond the balance of harms, the second *Sonnax* factor (interference with the bankruptcy case) as well as the seventh (whether other creditors would be prejudiced) and tenth (expeditious and economical resolution of litigation) all favor lifting the stay so that a receiver can be appointed.  *See In re Sonnax*, 907 F.2d at 1286.

[147] *See* P.R. Laws Ann. tit. 22, § 207(b).

**RESPECTFULLY SUBMITTED,** in San Juan, Puerto Rico, this 3rd day of October, 2018.

**WE HEREBY CERTIFY** that on this same date a true and exact copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record. Also, copy of this document will be notified via electronic mail to all case participants.

Dated: <u>October 3, 2018</u>
       San Juan, Puerto Rico

**ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC**

/s/ *Eric Pérez-Ochoa*
ERIC PÉREZ-OCHOA
USDC-PR No. 206,314
E-mail: epo@amgprlaw.com

/s/ *Luis A. Oliver-Fraticelli*
LUIS A. OLIVER-FRATICELLI
USDC-PR NO. 209,204
E-mail: loliver@amgprlaw.com

208 Ponce de Leon Ave., Suite 1600
San Juan, PR 00936
Tel.: (787) 756-9000
Fax: (787) 756-9010

*Counsel for National Public Finance Guarantee Corp.*

**WEIL, GOTSHAL & MANGES LLP**

/s/ *Marcia Goldstein*
MARCIA GOLDSTEIN*
JONATHAN POLKES*
GREGORY SILBERT*
ROBERT BEREZIN*
767 Fifth Avenue
New York, New York 10153
Tel.: (212) 310-8000
Fax: (212) 310-8007
Email: marcia.goldstein@weil.com
       jonathan.polkes@weil.com
       gregory.silbert@weil.com
       robert.berezin@weil.com

*admitted *pro hac vice*

*Counsel for National Public Finance Guarantee Corp.*

**GOLDMAN ANTONETTI & CORDOVA, LLC**

/s/ *Carlos A. Rodríguez-Vidal*
CARLOS A. RODRÍGUEZ-VIDAL
USDC-PR No. 201,213
E-mail: crodriguez-vidal@gaclaw.com

/s/ *Solymar Castillo-Morales*
SOLYMAR CASTILLO-MORALES
USDC-PR NO. 218,310
E-mail: scastillo@gaclaw.com

**DEBEVOISE & PLIMPTON LLP**

/s/ *My Chi To*
MY CHI TO*
CRAIG A. BRUENS*
ELIE J. WORENKLEIN*
919 Third Avenue
New York, New York 10022
Tel.: (212) 909-6000
Fax: (212) 909-6836
Email: mcto@debevoise.com

P.O. Box 70364
San Juan, PR 00936-8364
Tel.: (787) 759-4117
Fax: (787) 767-9177

*Counsel for Syncora Guarantee Inc.*

cabruens@debevoise.com
eworenklein@debevoise.com

*admitted pro hac vice*

*Counsel for Syncora Guarantee Inc.*


**CASELLAS ALCOVER & BURGOS P.S.C.**

/s/ *Heriberto Burgos Pérez*
HERIBERTO BURGOS PÉREZ
USDC-PR No. 204,809
Ricardo F. Casellas-Sánchez
USDC-PR No. 203,114
Diana Pérez-Seda
USDC–PR No. 232,014
E-mail: hburgos@cabprlaw.com
         rcasellas@cabprlaw.com
         dperez@cabprlaw.com

P.O. Box 364924
San Juan, PR 00936-4924
Tel.: (787) 756-1400
Fax: (787) 756-1401

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**CADWALADER, WICKERSHAM & TAFT LLP**

/s/ *Howard R. Hawkins, Jr.*
HOWARD R. HAWKINS, JR.*
MARK C. ELLENBERG*
ELLEN V. HOLLOMAN*
WILLIAM J. NATBONY*
ELLEN M. HALSTEAD*
THOMAS J. CURTIN*
CASEY J. SERVAIS*
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
Fax: (212) 406-6666
Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        ellen.holloman@cwt.com
        bill.natbony@cwt.com
        ellen.halstead@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

*admitted pro hac vice*

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

# EXHIBIT   1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>        Debtor. | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 4780-LTS<br><br>(This court filing relates only to Case No. 17 BK 4780-LTS) |

## [PROPOSED] ORDER GRANTING
## RELIEF FROM THE AUTOMATIC STAY

**WHEREAS**, upon the *Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief From the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed,* dated October 3, 2018 (the "**Motion**"),[2] pursuant to section 362(d) of the

---

[1]    The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2]    Capitalized terms not defined in this Order shall have the meanings ascribed to them in the Motion.

Bankruptcy Code, made applicable to this proceeding by section 301(a) of the Puerto Rico

Oversight, Management, and Economic Stability Act of 2016 ("**PROMESA**"), 48 U.S.C.

§ 2161(a); and the Court having jurisdiction over this matter under 28 U.S.C. § 1331, and under

sections 306(a)-(b) of PROMESA, 48 U.S.C. § 2166(a)-(b); and venue being proper under

section 307(a) of PROMESA, 48 U.S.C. § 2167(a); and due and proper notice of the Motion

having been provided, and it appearing that no other or further notice need be provided; and the

Court having reviewed the Motion and opposition thereto and having considered the evidence

presented and statements of counsel at the evidentiary hearing held before the Court (the

"**Hearing**"); and the Court having determined that the legal and factual bases set forth in the

Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before the Court and after due deliberation and sufficient cause appearing

therefore;

       **IT IS HEREBY ORDERED** as follows:

       1.    The Motion is granted as set forth below.

       2.    The automatic stay arising under sections 362 and 922(a) of the Bankruptcy

Code is lifted and vacated (i) to permit the filing of a complaint substantially in the form attached

as Exhibit 2 to the Motion, as well as any other associated pleadings (the "**Receiver Litigation**"),

to be fully briefed, argued and decided by a court of competent jurisdiction, and (ii) if the Receiver

Litigation is resolved in the Movants' favor, to allow the court of competent jurisdiction to appoint

a receiver, and (iii) if a receiver is appointed, to allow the receiver to exercise its duties and powers

under the supervision of the court of competent jurisdiction in the Receiver Litigation.

       3.    This Order is without prejudice to the Movants' right to seek other or further

relief from the automatic stay in appropriate circumstances.

4.      Notwithstanding anything herein to the contrary, this Order shall not limit any of the Movants' rights and powers under the Trust Agreement and applicable statutes and law.

5.      Notwithstanding anything herein to the contrary, this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, enforcement, or interpretation of this Order.

6.      Notwithstanding anything herein to the contrary, absent an order from the Court or consent from the FOMB, the receiver will not have the power to initiate a rate proceeding with PREC to enforce the requirement of Section 502(B)(b) of the Trust Agreement that—after the 1947 Indenture Bonds have been paid—PREPA shall charge rates sufficient "to provide an amount at least equal to one hundred twenty per centum (120%) of the aggregate Principal and Interest Requirements for the next fiscal year on account of all the bonds then outstanding under this Agreement reduced by any amount deposited to the credit of the Bond Service Account from the proceeds of bonds to pay interest to accrue thereon in such fiscal year."

7.      Notwithstanding anything herein to the contrary, the receiver will not have the power to propose any plan of adjustment or otherwise infringe upon the powers afforded to the FOMB established under PROMESA (which for the avoidance of doubt, does not include the power to operate PREPA or to adjust rates).

SO ORDERED

Dated:      _____, 2018


_____
Honorable Laura Taylor Swain
United States District Judge

3

**EXHIBIT  2**

| | |
|---|---|
| NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND SYNCORA GUARANTEE INC., <br><br> Plaintiffs <br><br> v. <br><br> PUERTO RICO ELECTRIC POWER AUTHORITY, <br><br> Defendant. | Civil Action No. _____ |

## [DRAFT] COMPLAINT FOR APPOINTMENT OF A RECEIVER

Plaintiffs National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc., by and through their undersigned counsel, for their Complaint for Appointment of a Receiver against Defendant Puerto Rico Electric Power Authority ("**PREPA**" or the "**Authority**"), upon knowledge of their own respective actions, allege and pray as follows:

## NATURE OF THIS ACTION

1.      Plaintiffs are insurers and holders of approximately $2.28 billion of principal amount of revenue bonds issued by PREPA (the "**Bonds**") under a trust agreement between PREPA and U.S. Bank National Association, as successor trustee (the "**Trustee**"), dated January 1, 1974, as amended and supplemented (the "**Trust Agreement**"). The Bonds are secured by, among other things, a pledge of all or substantially all of the present and future revenues of PREPA.

2.      Since July 3, 2017, PREPA has been in default on the payment of principal and interest on the Bonds then due and payable.

3.      As a result of these payment defaults and the continuing, serious mismanagement of PREPA, Plaintiffs seek appointment of a receiver for PREPA under Section 804 of the Trust Agreement and under Section 17 of the Puerto Rico Electric Power Authority Act, Act No. 83 of May 12, 1941, P.R. Laws Ann. Tit. 22 §§ 191, *et seq.* (the "**Enabling Act**"), at § 207.

### THE PARTIES, JURISDICTION AND VENUE

4.      Plaintiff Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "**Assured**") are, respectively, Maryland and New York insurance companies that guaranteed payment of principal and interest when due on certain of the Bonds.  Assured insures over $835 million of the Bonds and owns approximately $42 million (exclusive of accrued and accreted interest) of uninsured Bonds.  In addition, since July 3, 2017, Assured paid approximately $66 million on account of the Bonds that it insured, and is therefore subrogated to the rights of PREPA bondholders.

5.      Plaintiff National Public Finance Guarantee Corporation ("**National**") is a New York insurance company that guarantees payment of principal and interest when due on certain of the Bonds.  National insures approximately $1.09 billion of the Bonds and has paid claims to holders of Bonds of approximately $246.9 million.  In addition, National owns approximately $139.2 million (exclusive of accrued and accreted interest) of uninsured Bonds.

6.      Plaintiff Syncora Guarantee Inc. ("**Syncora**") is a New York insurance company that guarantees payment of principal and interest when due on certain of the Bonds.  Syncora insures approximately $86.385 million of the Bonds.  In addition, Syncora owns

2

approximately $88.4 million of the Bonds and rights to receive payment thereunder on account of claims paid to holders of such Bonds under Syncora's insurance policies.

7.    Together, Plaintiffs Assured, National and Syncora are holders and insurers of more than 25% of the outstanding principal amount of the Bonds.

8.    Defendant PREPA is a public corporation organized and existing under the laws of Puerto Rico that provides electrical power to residents and businesses located in the Commonwealth.

## BACKGROUND

### A.    The PREPA Enabling Act and PREPA Bonds

9.    In 1941, the Commonwealth established PREPA through enabling legislation as a public corporation, separate and independent from the Commonwealth of Puerto Rico.  *See* P.R. Laws Ann. Tit. 22 §§ 191-239.

10.    Section 16 of the Enabling Act authorized PREPA to issue bonds (the "**Bonds**") to the public.  *See* P.R. Laws Ann. Tit. 22 § 206.  Pursuant to its statutory authority, PREPA has issued approximately $8.3 billion in Bonds that remain currently outstanding.

11.    The Bonds issued by PREPA are secured by perfected liens on and payable from a stream of PREPA's revenues derived from its System, as well as property interests established by the PREPA Enabling Act and the Trust Agreement, including the covenants described below.[1]

12.    The Trust Agreement defines Revenues as "all moneys received by the Authority in connection with or as a result of its ownership or operation of the System, including

---

[1] Capitalized terms that are used but not defined herein shall have the meanings given to them in the Trust Agreement, attached hereto as Exhibit A.

3

the income derived by the Authority from the sale of electricity generated or distributed by the System . . ." Trust Agreement between § 101.

13.    Unlike financings for privately-owned utilities, holders of revenue bonds in public utility financings generally are secured solely by a pledge of revenues of the utility and have no recourse to or mortgage or other lien on physical assets of the utility.  This is because the laws of most U.S. states and territories (including Puerto Rico) restrict public utilities from pledging their physical assets as collateral for their financial obligations.

14.    As is typical for public utility financings, the PREPA Bonds are limited recourse bonds that are secured solely by the revenues pledged to secure the Bonds.  However, as with other public utilities, PREPA provided its creditors with the equivalent of a mortgage or other lien on physical assets of PREPA by providing a collateral package consisting of: (i) a lien on revenues generated by PREPA, (ii) a covenant that PREPA will maintain and collect reasonable rates at levels sufficient to cover debt service, and (iii) the right to require a court of competent jurisdiction to appoint a receiver if PREPA is in default.  *See* P.R. Laws Ann. Tit. 22 § 207; Trust Agreement §§ 502, 804; *see also* Case No. 17-4780-LTS (D.P.R), Proof of Claim No. 18449 filed by U.S. Bank National in its Capacity as Trustee, Case No. 17-04780, ¶¶ 7-9 (May 21, 2018).

## B.    Right to a Receiver under the Enabling Act and Trust Agreement

15.    Section 17 of the Enabling Act grants holders of the Bonds the right to appointment of a receiver for PREPA upon an event of default under the Trust Agreement. P.R. Laws Ann. Tit. 22 § 207.

16.    Upon an uncured default (including for failure to make principal or interest payments as they become due), the Trustee or holders of at least 25% of the principal amount of

4

outstanding Bonds may exercise the right to a receiver.  P.R. Laws Ann. tit. 22, § 207; Trust Agreement § 804.  Section 802 of the Trust Agreement specifies various events of default.

17.     An event of default includes the failure to pay principal or interest then due and payable.  Trust Agreement §§ 802(a), (b).  From July 3, 2017, and on each payment date thereafter, PREPA has failed to make any timely payment on hundreds of millions of dollars of principal and interest due and payable on the Bonds, including those owned, held or insured by Plaintiffs.  The failure to make these payments qualifies as an event of default under section 802(a) and (b) of the Trust Agreement.

18.     The commencement of a restructuring or adjustment proceeding also qualifies as an event of default.  *Id.* § 802(g).  On July 2, 2017, the Financial Oversight and Management Board ("**FOMB**"), with PREPA's acquiescence, filed a Title III petition under the Puerto Rico Oversight, Management, and Economic Stability Act ("**PROMESA**") in the United States District Court for the District of Puerto Rico ("**Title III Court**").  These proceedings were commenced for the purpose of adjusting PREPA's debts.   The commencement of these proceedings constitutes an event of default under section 802(g) of the Trust Agreement.

19.     PREPA's failure to perform any of its covenants or other agreements under the Trust Agreement qualifies as an event of default.  *Id.* § 802(h) (an event of default occurs if "[PREPA] shall default in the due and punctual performance of any other of the covenants, conditions, agreements and provisions contained in the bonds or in this Agreement on the part of the Authority to be performed").  As described more fully below, PREPA's various failures to enforce covenants, including its willful failure to collect rates from customers, constitute events of default.

5

C.    **Chronic and Gross Mismanagement of PREPA**

20.    Despite being a public corporation with "legal existence and personality separate and apart from" the Commonwealth, *see* P.R. Laws Ann. Tit. 22, § 193, PREPA has and continues to be grossly mismanaged, used by Commonwealth administrations as a political piggy bank for short term political gain, rather than as a mechanism for providing efficient and reliable electric service to the citizens of Puerto Rico. This chronic mismanagement has had devastating consequences for the citizens of Puerto Rico and creditors alike.

1.    **Political Interference with PREPA is Causing it to be Grossly Mismanaged**

21.    PREPA's mismanagement stems largely from the fact that PREPA has been used by the current and prior administrations as a political tool, which provides jobs to political allies and reduce rates to gain popularity. This reduces efficiency at PREPA, and increases its expenses, thereby harming the citizens of Puerto Rico and impairing the PREPA bondholders' collateral.

22.    As outlined in a final report issued by Kobre & Kim, an independent investigator commissioned by the FOMB, PREPA has experienced debilitating turnover in its workforce, with employees being hired on the basis of political affiliation. *See* Kobre & Kim LLP, Final Investigative Report: The Financial Oversight & Management Board for Puerto Rico ("**FOMB Investigative Report**") at 118 (Aug. 20, 2018).

23.    As the FOMB Investigative Report found, since 2001, "it is estimated that every incoming Fortaleza has replaced around 200 of PREPA's top managers upon taking office, meaning that PREPA's top administrative posts have turned over at least five different times in the last 17 years." *Id.*

6

24.     The politically appointed executives and managers—as well as hundreds of lower-level operators at any given time—are called "*empleados de confianza*," or "trust employees." *Id.*[2] Their politically motivated hiring resulted in chronic mismanagement and lack of independent expertise. *See, e.g.*, *Exploring Energy Challenges and Opportunities Facing Puerto Rico*: *Hearing Before H. Subcomm. on Energy and Mineral Res., Comm. on Nat. Res.* (Jan. 12, 2016) (statement of Lisa J. Donahue, Chief Restructuring Officer, PREPA).

25.     Turnover at the executive and management level stymied institutional knowledge, drove up expenses, and led to "delay or cancellation of maintenance and capital improvement projects initiated by a prior management team." FOMB Investigative Report at 119. In many instances projects in progress and otherwise under construction were entirely abandoned when a new administration came into power.

26.     Rather than fix the mismanagement and political interference, PREPA relied on loans from the Government Development Bank for Puerto Rico ("**GDB**") to mask its liquidity issues. *Id.* at 90, 94, 127. PREPA set its budget based on the expectation that it would receive sufficient funding to balance the budget. *Id.*

**2.      Past Efforts to Reform PREPA**

27.     In 2014, the Puerto Rico legislature attempted to reform PREPA by creating an independent regulator and limiting the Governor's power to appoint the PREPA Board of Directors (the "**Board**"). Among other things, the legislature reduced the number of governor-

---

[2] Trust employees were accountable to political actors and forced to resign if they did not comply with an administration's requests. *See* FOMB Investigative Report at 118. Obedient trust employees who survived one administration were generally replaced by an incoming administration with different political aims; while some trust employees were able to "switch to career positions, from which they could not be terminated without cause, and where they would remain employed, often with very light or undefined responsibilities, until their political party came back into power." *Id.* at 113.

appointed Board members from six to four of nine; required Board members to have certain professional experience; required the governor to select one of his Board members from a list of ten candidates submitted by a professional associations and non-profit organizations; established Board member term limits, and limited vacancy appointments. *See* Act 57-2014 § 4(a). The legislature also delimited the Board's role and imposed upon it "the highest duties of loyalty, due care, competence, and diligence." *Id.* § 4(d).

28.     PREPA made fiscal and operational progress because of these legislative efforts. As a result, and relying on this historical reform, bondholders agreed to forbear from exercising certain remedies, and PREPA agreed to appoint a chief restructuring officer ("**CRO**") to renegotiate PREPA's debt, address its operational issues, and restore its finances.[3]

29.     PREPA hired Lisa Donahue as its CRO and AlixPartners as a consultant, who, in their short tenure, achieved $212 million in recurring annual operating expense savings and an additional $267 million in one-time savings. *The Status of the Puerto Rico Electric Power Authority (PREPA) Restructuring Support Agreement: Hearing Before the Subcomm. on Indian, Insular and Alaska Native Affairs*, 115th Cong. 3 (2017) (statement of Luis Benítez, Chairman, PREPA Board), attached as Exhibit B to the HasBrouck Decl. (ECF No. 74-20).

30.     Negotiation with creditors also led to a consensual restructuring of PREPA's debt, memorialized in the Restructuring Support Agreement ("**RSA**") in late 2015. *See* Amended and Restated Restructuring Support Agreement, Between PREPA and Supporting Creditors,         December         23,         2015,         *available         at* http://www.gdb.pr.gov/investors_resources/documents/12.23.2015AmendedandRestatedRSA.pdf

---

[3] The original forbearance agreement executed on August 14, 2014 between PREPA, Plaintiffs and the Ad Hoc Group of PREPA bondholders, is available at http://www.gdb.pr.gov/investors_resources/prepa.html.

. The RSA included multiple commitments by PREPA to ensure it was properly and professionally managed.[4]

### 3.     Political Abuses Blocked These Reform Efforts

31.     The reform efforts at PREPA could not outlast even one election cycle. Upon assuming office in 2017, Governor Ricardo Rosselló Nevares enacted Act 37-2017, which gave him the power to appoint seven members to the PREPA Board.  Once this law was enacted, Governor Rosselló promptly fired the previous PREPA Board and nominated political insiders as replacements.  FOMB Investigative Report at 120.  His actions were widely condemned.  *Id.* at 120-21.

32.     In February 2017, PREPA terminated the engagement of AlixPartners and Lisa Donahue.  *See, e.g.*, Cynthia López Cabán, *The Departure of AlixPartners is Near*, EL NUEVO DÍA     (Feb.     2,     2017),     *available     at* https://www.elnuevodia.com/english/english/nota/thedepartureofalixpartnersisnear-2287053.

33.     PREPA also declined to implement the strategies that AlixPartners recommended for a successful operational and financial restructuring. *See* AlixPartners' Hand-Over Strategy Presentation to the Governing Board Puerto Rico Electric Power Authority (Feb. 1, 2017),     *available     at*     https://www.aeepr.com/jg/docs/PREPA_Exit%20Strategy%2002-01-2017%20final.pdf.  Not only was this a waste of the AlixPartners engagement and the resources dedicated to it, but it kept PREPA at square one with respect to its operational and financial efficacy.  PREPA still has not implemented these important strategies.

---

[4] The RSA required, among other things, PREPA to appoint a board of directors with consumer representatives and a majority of professional, independent members, staggered board terms and for-cause termination to insulate board members from political interference.  These provisions are incorporate into Puerto Rican law.  *See* P.R. Laws Ann. tit. 22, § 1074.

9

### 4.    The Mismanagement of PREPA Continued Unabated

34.    After the FOMB decided to discard the RSA and to commence a Title III case, PREPA's managerial and operational deficiencies escalated to crisis levels. *See* Letter from FOMB to Mohammad Yassin, Chief Legal & Regulatory Officer, AAFAF (June 28, 2017), at 1, *available at* https://drive.google.com/file/d/1b2foiw_bBh5RUpgHa1MInyOQGfRe54oO/view.

35.    PREPA currently fails to collect enormous sums owed for electricity it provides—particularly by government customers that have come to take free power for granted. *See Mgmt. Crisis at the Puerto Rico Electric Power Auth. and Implications for Recovery: Hearing Before H. Comm. on Nat. Res., Comm. on Nat. Res.*, 115 Cong. (July 25, 2018) (Memorandum from Andrew Vecera, Majority Committee Staff at 8) (July 23, 2018) ("**July 23, 2018 HNRC Memo**"), at 8 ("Failure to collect past due accounts … has promoted a culture in which electric customers do not necessarily believe they must pay for electric service.").

36.    PREPA's failure to collect its bills remains an outlier in the industry: its reported accounts receivables, totaling some $3.7 billion as of June 2018, dwarf industry norms.[5] Moreover, rather than be transparent about its financial condition, PREPA hides behind vague excuses about its massive accounts receivable balances. *See, e.g.*, PREPA Creditors' February 23, 2018 Joint Request for Additional Information from PREPA, Request No. 4.

37.    Further, contrary to PREPA's representation that it cannot obtain any meaningful payment from consistently delinquent customers, PREPA elects not to incentivize such payments by deciding: (i) not to charge late fees for overdue payments; (ii) not to charge other

---

[5]*See* PREPA's Monthly Report to the Governing Board at 12 and n.2 (June 2018), *available at* https://www.aeepr.com/INVESTORS/DOCS/Financial%20Information/Monthly%20Reports/2018/June%202018.pdf.  The $3.7 billion figure includes roughly $1.1 billion in "General clients" accounts receivable and another $2.6 billion in Government accounts receivable.  *Id.*

penalties for nonpayment; and (iii) not to cut off power to non-critical government customers that do not pay. By forgoing these standard industry practices, PREPA is effectively giving its customers interest-free loans of indefinite duration.

38.     Another way PREPA differs from other utilities is that it openly defies its own regulator, the Puerto Rico Energy Bureau, formerly known as the Puerto Rico Energy Commission ("**PREC**"). Indeed, PREPA identified its regulator as a "key challenge[]" for the utility. *See* April 28, 2017 PREPA Fiscal Plan at 58. Earlier this year, PREC initiated litigation against PREPA based on multiple failures to comply with its mandatory orders. *Verified Adversary Complaint of the Puerto Rico Energy Commission for Declaratory Judgment and Request for Injunctive Relief*, *PREC v. FOMB*, Case No. 18-00021, Dkt. No. 1 (D.P.R. Mar. 4, 2018) ("**PREC Compl.**"); *see also Motion for Preliminary Injunction*, *PREC v. FOMB*, Case No. 18-00021, Dkt. No. 3 (D.P.R. Mar. 4, 2018).

39.     PREC documented how PREPA had ignored provisions of PREC's approved Integrated Resource Plan; failed to provide contracts and budgets to PREC for review (in contravention of PREC's orders); and failed to provide other critical information to PREC. *See* PREC Compl. at ¶¶ 36-39, 44-47, 54-55.

40.     PREPA has also hindered PREC proceedings, including a rate-setting proceeding, in which PREPA's responses to information requests were determined to be "inconsistent with the statements made by one of PREPA's representatives" and included groundless objections that defied PREC's authority to gather important information concerning the very entity it regulates. *Resolution and Order*, Case No. CEPR-AP-2018-0002 (P.R.E.C. June 22, 2018), Dkt. No. 7, ¶¶ 1, 4; *see also, e.g.*, *PREPA's Compliance Filing for Items Due July 13, 2018*, Case No. CEPR-AP-2018-0002 (P.R.E.C. July 20, 2018), Dkt. No. 8, at 3-4 (refusing to

provide various information or claiming such information is "currently not available"); *PREPA's Second Motion to Extend Due Date of Response to June 22 Order, Item A*, Case No. CEPR-AP-2018-0002 (P.R.E.C. Aug. 31, 2018), Dkt. No. 12, ¶¶ 8, 10 (interpreting PREC information request narrowly because "PREPA believes that … a higher level of information is requested," and asking for further extension of time to submit response).

41.     PREPA's workforce also is overstaffed, yet under-skilled in key areas such as transmission and distribution.  PREPA's employee headcount is multiples of the industry norm: three times normal levels for the generation business unit, and twice-normal levels for the transmission and distribution business unit.

42.     At the same time, PREPA's employees are constantly turning over due to PREPA's politicized management, and there appear to be no effective succession or training plans in place to staunch the perpetual loss of experience and skills.  PREPA also has deficient policies and practices in customer service, outage management, bidding, and accounting—all to the severe detriment of the people of Puerto Rico and to PREPA's bottom line.  PREPA's poor customer service costs too much and delivers too little.

43.     Predictably, PREPA's bad management leads to bad outcomes.  PREPA experiences outages with 12 times greater frequency than the mainland U.S. average and takes much longer to fully restore power after an outage begins.  This problem is aggravated by the fact that PREPA does not attempt to proactively address the potential for failures—for instance by shoring up the system during periods of low demand—but simply reacts to failures as they occur, and is thus constantly "putting out fires."  Likewise, PREPA's practices with respect to bidding and accounting fall below industry standards.  Taken together, PREPA's many failures managing

its business and operations have caused it to incur (and continue to incur) unnecessary expenses and lost revenue.

44.     PREPA's request for post-petition financing in its Title III case in the District of Puerto Rico and the related proceedings provided perhaps the clearest example of PREPA's inability to forecast its own revenues and expenses. They also demonstrated PREPA's preference for deploying scare tactics instead of providing transparent and reliable financial information to authorities.[6]  On January 27, 2018, the FOMB and AAFAF filed an urgent motion on PREPA's behalf seeking a $1.3 *billion* priming, superpriority DIP loan to address a purported impending cash crisis at PREPA. *See Urgent Joint Motion*, Case No. 17-04780, Dkt. No. 549 (D.P.R. Jan. 27, 2018) ("**DIP Motion**").

45.     In the DIP Motion, PREPA claimed that "[w]ithout an immediate infusion of liquidity," Puerto Rico's only power company "may be forced to cease operations within the coming month."  *Id.* at 14; *see also id.* at 43; *Omnibus Reply in Support of Post-Petition Financing*, Case No. 17-04780, Dkt. No. 617 (Feb. 3, 2018), at 1 ("The undisputed evidence shows PREPA is *running out of money and that without an injection of liquidity in the near term there will be insufficient cash to continue to provide power to Puerto Rico*." (emphasis added)).  But the FOMB and AAFAF's spotty attempts to support their DIP Motion were "devoid of negotiation history," and ultimately they could not show that "the size of the proposed loan is appropriately tailored to PREPA's actual needs."  Feb. 15, 2018 DIP Hearing Tr. at 233:8-16, 234:3.

---

[6] According to Angel Figueroa Jaramillo, president of UTIER, PREPA's main union, PREPA's threat to implement an emergency plan was a "publicity campaign" aimed at "blackmailing" the federal court to approve PREPA's sought-after financing. *UTIER Chief Calls PREPA Emergency Plan a 'Publicity Campaign' as Labor Leaders Underline Opposition to Privatization Plans,* REORG RESEARCH (Feb. 15, 2017), *available at* platform.beta.reorg-research.com/v3#/items/intel?item_id=50291.

46.     Thus, the Title III Court limited the size of PREPA's DIP loan to $300 million—a full $1 billion less than PREPA requested.  *See Order Approving Debtor to Obtain Postpetition Financing*, Case No. 17-04780, Dkt. No. 744 (Feb. 19, 2018).  But the purportedly imminent crisis never happened.  Even after the Title III Court approved the $300 million loan, PREPA waited nearly a week to close the transaction and did not begin drawing *any* of the facility until the week ending March 9, 2018.  Even then, the loan money was only "used" insofar as some was moved to another account, which was already sufficiently funded during that period.  *See* Presentation, Puerto Rico Electric Power Authority, 13-Week Cash Flow Update at 5 (Mar. 14, 2018) (showing no transfer to operating accounts or eligible disbursements on loan facility until week ending March 9, 2018, at which time $89.3 million was transferred to the operating account, even though that account already had over $200 million at the time, excluding the loan).

47.     And despite PREPA's representation that the $300 million it received was only enough to "continue operation in the ordinary course until late March 2018,"[7] *that* purportedly imminent crisis never materialized either.[8]

48.     Finally, despite the poor condition of its power grid, PREPA *incentivizes* cities to consume (and waste) more electricity than they otherwise would.  PREPA subsidizes electricity to cities through a misapplied framework called Contribution or Payment in Lieu of Taxes, or "CILT."

---

[7] Third Supplemental Declaration of Todd Filsinger, Case No. 17-04780, Dkt. No. 722-6 (Feb. 16, 2018), at ¶ 5.

[8] Even after receiving the $300 million loan on February 23, PREPA announced that it planned to continue the emergency shutdown procedures even though it conceded that "[w]ith this loan, PREPA won't have to cut power to customers; it gives us the liquidity needed to continue the restoration." *PREPA To Continue the Strategic Emergency Operations Plan*, Autoridad de Energía Eléctrica (Feb. 23, 2018), *available at* https://www.aeepr.com/Noticias/noticiasread.asp?r=MVTSJUOPCM.  Yet PREPA later indicated that it would not need additional post-petition financing.  *See* July 25, 2018 Omnibus Hearing Tr. at 12:12-15.

14

49. In exchange for certain municipal tax exemptions, PREPA reduces the cities' power costs by what the taxes would have been, "*plus* an even larger amount . . . the more energy the municipalities use." FOMB Investigative Report at 131 (emphasis added). There have also been reports of Puerto Rico officials abusing CILT by applying it to city-owned, for-profit businesses (such as a for-profit ice skating rink in Aguadilla), thereby generating revenues for the city at PREPA's expense. *Id.* at 131-132 (citing FTI Capital Advisors, Accounts Receivables and CILT Report at 20 (Nov. 15, 2014), *available at* https://www.aeepr.com/Docs/restructuracion/PREPA%20AR%20and%20CILT%20Report%20F inal.pdf; and Mary Williams Walsh, *How Free Electricity Helped Dig $9 Billion Hole in Puerto Rico*, N.Y. TIMES (Feb. 1, 2016), *available at* https://www.nytimes.com/2016/02/02/business/dealbook/puerto-rico-power-authoritys-debt-is-rooted-in-free-electricity.html.).

50. Further, rather than properly collecting revenues from city power usage, PREPA "'offsets accounts receivables with the amount of the CILT and never collects on invoices sent,' resulting in uncollected revenues that amount to '17-20% of PREPA's total produced electricity.'" *Id.* (quoting Alvarez & Marsal, *Presentation to the Government Development Bank of Puerto Rico*, 38 (2012) and Memorandum from Subcomm. on Energy and Minerals Staff (x5-9297) to Subcomm. on Energy and Minerals Members, Oversight Hearing on Exploring Energy Challenges and Opportunities Facing Puerto Rico, 4 (Jan. 11, 2016), *available at* https://naturalresources.house.gov/uploadedfiles/hearing_memo_--_fc_ov_hrg_07.25.18.pdf.).

51. In support of its DIP Motion, PREPA could not offer any evidence supporting its position that CILT precluded PREPA from collecting revenues from city power usage. *Response of National Public Finance Guarantee Corporation to the Oversight Board's and*

15

*AAFAF's Urgent Application and Notice of Revised Proposed $300 Million Loan from Commonwealth to PREPA*, Case No. 17-04780, Dkt. No. 735, at 6-7 (Feb. 17, 2018) (citing First Supp. Decl. of Filsinger, Case No. 17-04780, Dkt. No. 620-4 at ¶ 11 (Feb. 3, 2018)).

### 5.    The Hurricanes Reveal the Depths of PREPA's Chronic Dysfunction

52.    In September 2017, Hurricanes Irma and Maria exposed PREPA's chronic dysfunction, demonstrating the tragic consequences of improper political interference and incompetent management. PREPA's response to the hurricanes was notoriously and catastrophically deficient: its recovery effort was plagued by gross mismanagement and corruption, causing serious harm to the island and its residents. *See, e.g.*, Letter from U.S. Congressman Rob Bishop, Chairman H. Comm. on Natural Resources, et al. to Justo González, PREPA    Interim    Exec.    Dir.    (Mar.    12,    2018),    *available    at* https://naturalresources.house.gov/uploadedfiles/3.12.18_letter_to_prepa_re_corruption_and_mis management.pdf.

53.    PREPA disclosed in the DIP Motion that, by January 2018, only approximately 60-70% of customers had access to lines that had been energized and PREPA had only restored capability of billing to approximately 35-40% of its customers.  DIP Motion at ¶¶ 17, 19.  By March 7, 2018, *nearly six months after the hurricanes*, over 155,000 Puerto Ricans remained without power.  *See* Letter from Chairman Bishop (Mar. 12, 2018) (citing Hurricanes Maria & Irma: March 7, 2018 Event Summary, Report #94, 2, U.S DEP'T OF ENERGY, INFRASTRUCTURE SECURITY & ENERGY RESTORATION (Mar. 7, 2018), *available at* https://www.energy.gov/sites/prod/files/2018/03/f49/Hurricanes%20Maria%20%20Irma%20Eve nt%20Summary%20March%207%2C%202018.pdf).

54.    First, PREPA failed to follow well-established industry practices in hurricane preparedness.  Approximately three days before Hurricane Maria struck Puerto Rico, the National Hurricane Center warned that Hurricane Maria would strike "Puerto Rico by mid week as a dangerous major hurricane."  National Hurricane Center: National Oceanic and Atmospheric Administration, *Hurricane Maria* (Sept. 17, 2017), *available at* https://www.nhc.noaa.gov/archive/2017/al15/al152017.discus.006.shtml.

55.    Despite this warning, PREPA failed to take necessary steps to prepare for the hurricane and its aftermath.  For example, a responsible electric utility would invoke mutual assistance agreements with mainland utilities, including utilities that are part of the American Public Power Association ("**APPA**").  Under these arrangements, mainland utilities assist in restoration efforts, thereby ensuring that electricity is promptly restored to citizens affected by a natural disaster.  PREPA is a participant in mutual aid arrangements. *See* American Public Power Association, FEMA Mutual Aid Agreement – Region II, *available at* https://www.publicpower.org/fema-mutual-aid-agreement-region-ii.

56.    Yet PREPA opted not to activate mutual aid assistance to secure necessary resources, as any responsible electric utility would do.  *See* Alan Gomez & Rick Jervis, *Puerto Rico power restoration: Why it is taking so long*, USA TODAY (Oct. 30, 2017), *available at* https://www.usatoday.com/story/news/world/2017/10/30/puerto-rico-power-restoration-whytaking-solong/806747001.

57.    Instead of activating mutual aid, PREPA opted to enter into a $300 million contract with a two-year old Montana based firm known as Whitefish Energy ("**Whitefish**" and the "**Whitefish Contract**").

17

58.     At the time that it was retained by PREPA, Whitefish had only two full-time employees and no experience handling a restoration project of the magnitude facing Puerto Rico.  *See* Steven Mufson et al., *Small Montana Firm Lands Puerto Rico's Biggest Contract to Get the Power Back On*, WASH. POST (Oct. 23, 2017), *available at* https://www.washingtonpost.com/national/small-montana-firm-lands-puerto-ricos-biggest-contract-to-get-the-power-back-on/2017/10/23/31cccc3e-b4d6-11e7-9e58-e6288544af98_story.html?utm_term=.a17858383e28. Indeed, as the *Washington Post* found, the "scale of the disaster… is far larger than anything Whitefish ha[d] handled." *Id.* Rather, Whitefish's largest project was a $1.3 million deal to replace and upgrade parts of a 4.8 mile transmission line in Arizona. *Id.*

59.     Following the *Washington Post's* exposé on the Whitefish Contract, politicians and the media began to probe and criticize PREPA's decision to enter into the Whitefish Contract.  For example, the *New York Times* reported that while power linemen earned $63 per hour working in Puerto Rico, Whitefish billed PREPA $319 an hour for the linemen, "a rate that industry experts said was  far above the norm even for emergency work—*and almost 17 times the average salary of their counterparts in Puerto Rico*." Frances Robles, *The Lineman Got $63 an Hour.  The Utility Was Billed $319 an Hour*, N.Y. TIMES (Nov. 12, 2017), *available at* https://www.nytimes.com/2017/11/12/us/whitefish-energy-holdings-prepa-hurricane-recovery-corruption-hurricane-recovery-in-puerto-rico.html.

60.     The Whitefish Contract also provided that no agency or entity would be able to audit these questionable charges.  Indeed, the Whitefish Contract specifically provided: "In no event shall PREPA, the Commonwealth of Puerto Rico, the FEMA Administrator, the Comptroller General of the United States, or any of their authorized representatives have the right to audit or

review the cost and profit elements of the labor rates specified herein." *See Urgent Motion*, Case No. 17-04780-LTS, ECF No. 364, Ex. D, Art. 59.

61. While the Governor and his administration later denied involvement with the Whitefish Contract, as late as October 24, 2017, Governor Rosselló and his administration publicly defended the Whitefish Contract. *See* Nick Brown, *Puerto Rico, Whitefish Defend Controversial Power Contract*, Reuters (Oct. 24, 2017), https://www.reuters.com/article/us-usa-puertorico-power/puerto-rico-whitefish-defend-controversial-power-contract-idUSKBN1CU020.

62. And at an October 25, 2017 hearing in PREPA's Title III case, the Commonwealth's lawyers also defended the Whitefish Contract, stating:

> [T]he government wants to note that Whitefish is actually the only contract provider on the ground right now doing critical infrastructure work of repairing PREPA. *The government believes that contract was conducted in a compliant manner with FEMA regulations.*

Oct. 25, 2017 Hearing Tr. at 32:12-24 (emphasis added).

63. In reality, the Whitefish Contract was not compliant with FEMA regulations, and it never received the approval of FEMA. On October 27, 2018, FEMA disclaimed involvement with the Whitefish Contract and stated that any "language in any contract between PREPA and Whitefish that states FEMA approved the contract is inaccurate." FEMA Statement on Puerto Rico Electric Power Authority's Contract with Whitefish (Oct. 27, 2017), *available at* https://www.fema.gov/news-release/2017/10/27/updated-fema-statement-puerto-rico-electric-power-authoritys-contract. PREC also criticized the deficient selection process that led to the Whitefish Contract. *See id.*; *Order Identifying and Implementing Temporary Oversight Measures*, Case No. CEPR-MI-2017-0008, Dkt. No. 1 (P.R.E.C. Nov. 17, 2017) ("**Contract Review Order**").

19

64.     Despite the Rosselló administration's insistence that it had no involvement in the procurement of the Whitefish Contract, press reports surfaced suggesting that the Whitefish Contract was awarded to curry political favor.  Among other things, Whitefish was a company located in Whitefish, Montana—the town where Interior Secretary, Ryan Zinke, grew up.  *See* Richard Perez-Pena, *FEMA Cites 'Significant Concerns' with Puerto Rico Power Contract*, N.Y. TIMES (Oct. 27, 2017), *available at* https://www.nytimes.com/2017/10/27/us/whitefish-puerto-rico-electricity.html?_r=0.

65.     Moreover, Secretary Zinke's son interned for Whitefish and Zinke was reportedly friends with the chief executive of Whitefish.  *Id.*  Zinke reportedly denied involvement with the Whitefish Contract.  *Id.*

66.     News reports also stated that Elias Sanchez Sifonte, the Governor's representative to the FOMB and reported close confidante to the Governor, personally lobbied for the Whitefish Contract because he "saw it as a business opportunity." RADIOISLA, Acevedo Vilá asegura Elías Sánchez cabildeó por contrato de Whitefish (English: Acevedo Vilá says Elías Sánchez lobbied for Whitefish contract) (Oct. 26, 2017), *available at* https://www.radioisla1320.com/acevedo-vila-asegura-elias-sanchez-cabildeo-contrato-whitefish/.

67.     On the ground, the Whitefish contract created an enormous bottleneck at PREPA, depleting the utility of the people and resources needed to repair the system efficiently. Public utilities that wanted to help PREPA were told to go through Whitefish, which created major delay in aid. *See* Alan Gomez & Rick Jervis, *Puerto Rico power restoration: why it is taking so long*, USA TODAY (Oct. 30, 2017), *available at* https://www.usatoday.com/story/news/world/2017/10/30/puerto-rico-power-restoration-why-taking-so-long/806747001/.

20

68.     On top of that, the Whitefish Contract charged PREPA exorbitant rates and provided that its profit and compensation provisions could not be audited by any governmental entity, including FEMA. Frances Robles, *The Lineman Got $63 an Hour.  The Utility Was Billed $319 an Hour.*, N.Y TIMES (Nov. 12, 2017), *available at* https://www.nytimes.com/2017/11/12/us/whitefish-energy-holdings-prepa-hurricane-recovery-corruption-hurricane-recovery-in-puerto-rico.html.

69.     Confronted with mounting criticism, PREPA withdrew from the Whitefish Contract, which resulted in delays to restoration efforts. *See* Danica Coto, *Puerto Rico Utility Moves to Scrap $300M Whitefish Contract*, ASSOCIATED PRESS (Oct. 30, 2017), *available at* https://www.apnews.com/0de9d002a14a40908bfa24b57981414d ("[Executive Director Ramos] said the cancellation will delay pending work by 10 to 12 weeks if no alternatives are found." *Id.*) Shortly thereafter, Governor Rosselló's handpicked executive director for PREPA resigned. Frances Robles, C.*E.O. of Puerto Rico Power Authority Resigns*, N.Y. TIMES (Nov. 17, 2017), *available at* https://www.nytimes.com/2017/11/17/us/prepa-ceo-resigns-puerto-rico.html.

70.     Because of the Whitefish Contract and PREPA's subpar repair efforts, the "trust deficit" between PREPA's stakeholders and its management widened. *Oversight Hearing on the Need for Transparent Financial Accountability in Territories' Disaster Recovery Efforts*: Hearing Before H. Comm. on Natural Resources, 115th Cong. 1 (2017) (statement of Chairman Rob Bishop), at 2.

71.     As recovery efforts continued, more scandals came to light.  In January 2018, the United States Army Corps of Engineers, accompanied by an armed security detail, seized a PREPA warehouse where utility supplies had reportedly been hoarded, to the detriment of recovery efforts. *Puerto Rico Governor Asks DOJ To Investigate Island's Public Power Utility*,

NPR (Jan. 11, 2018), *available at* https://www.npr.org/2018/01/11/577439244/puerto-rico-governor-asks-doj-to-investigate-island-s-public-power-utility (describing discovery of rebuilding materials in warehouse, PREPA's denial that it had withheld those materials, and Governor Rosselló's request that the Justice Department investigate the incident).

72.     Most egregiously, there were allegations of serious malfeasance, bribery, and corruption in the recovery.  "PREPA officials were reportedly paid $5,000 and provided free entry tickets, valued at $1,000 apiece, to restore power to San Juan area exotic dance clubs ahead of the scheduled restoration timeline." Letter from Chairman Bishop (Mar. 12, 2018).  There were also allegations that PREPA officials restored power out of sequence and to their own homes before restoring power to critical locations.  *Id.*

73.     These botched recovery efforts only "reemphasized the ineptitude of PREPA," with great costs to the grid, the island, and all stakeholders.  July 23, 2018 HNRC Memo at 4. Even after repairs, the grid is in a worse state now than before the hurricanes, with power lines tied to trees and continuing island-wide blackouts and breakdowns. *See, e.g.*, *Management Crisis at the Puerto Rico Electric Power Authority and Implications for Recovery*: Hearing Before H. Comm. on Natural Resources (July 25, 2018) (testimony of David Svanda), at 1-2.

74.     Nor has PREPA undertaken any necessary hardening in the wake of the hurricanes even though, more than a year later, Puerto Rico is in the middle of another hurricane season.  *See, e.g.*, *Management Crisis at the Puerto Rico Electric Power Authority and Implications for Recovery*: *Hearing Before H. Comm. on Natural Resources, Comm. on Nat. Res.*, 115 Cong. (July 25, 2018) (testimony of James E. Spiotto, Managing Director, Chapman Strategic Advisors LLC), at 3.

75.     These practices are inconsistent with industry norms: many other utilities affected by natural disasters have, with competent management, promptly undertaken hardening measures, including raising or relocating vulnerable substations, expanded tree trimming programs, installing stronger poles and wires, creating redundancies in the system, and deploying smart grid technologies.

### 6.     Political Abuses Continue to Cripple PREPA Today

76.     The improper political interference that has plagued PREPA for years continues unabated.  In February 2017, with newly obtained powers to appoint members to the PREPA Board, Governor Rosselló fired the entire Board and then hand-picked political insiders as replacements, including a member of his administration and the treasurer of his campaign. Meanwhile, experienced utility executives who were hired to improve PREPA's management and operations have been forced out due to political backlash over their contracts.

77.     On July 11, 2018, PREPA Executive Director Walter Higgins announced his resignation after only four months on the job, citing pressure from Puerto Rico politicians about his compensation.  *See* Letter of Resignation from Exec. Director Walter Higgins (July 11, 2018). His replacement, Rafael Díaz-Granados, likewise faced extreme pressure over his salary, culminating with an ultimatum from the Governor: Vote to reduce the Executive Director's salary or resign.

78.     On July 12, 2018, every remaining independent Board member, including Díaz-Granados, resigned in protest.  Their letter to Governor Rosselló decried that "petty political interests . . . are put ahead of the needs of the people."  *See* Letter from Ernesto Sgroi, PREPA Board Chair, et al. to Governor Rosselló (July 12, 2018); *see also* Letter from U.S. Congressman Rob Bishop, Chairman H. Comm. on Natural Resources, to Governor Rosselló (July 19, 2018)

23

("[T]he recent departure of PREPA's governing board are the most recent signs of the utility's continued dysfunction and a sign that 'political forces . . . continue to control PREPA.'").

79.     On July 18, 2018, Governor Rosselló then appointed Jose Ortiz—a former PREPA Board Chair—to serve as the PREPA CEO, even as critics worried that Ortiz had already been part of "the poor management culture that drove PREPA, and the entire Puerto Rican territory, into bankruptcy in recent years."  Gavin Bade, *Puerto Rico governor names new PREPA CEO, board member*s, UTILITY DIVE (July 19, 2018), *available at* https://www.utilitydive.com/news/puerto-rico-governor-names-new-prepa-ceo-board-members/528152/.

80.     In the wake of this mass forced resignation, Governor Rosselló has since selected two more Board members—Elí Díaz Atienza and Ralph Kreil—bringing the Board's current composition to four members, all selected by the Governor.  Notably, some of the Governor's picks have significant conflicts of interest.  Mr. Diaz Atienza, the current chairman of the Board, is also the Executive President of PRASA, and José Ortiz—appointed by Governor Rosselló as Executive Director of PREPA on July 18, 2018—was CEO of PRASA from 2011 to 2013.  Yet PRASA owes more than $100 million to PREPA in outstanding accounts receivable.

81.     In addition to being over-politicized, the PREPA Board, as currently composed, does not satisfy the basic requirements of Puerto Rico law.  The Enabling Act requires that the Board be comprised of seven members, four of whom "shall constitute a quorum to conduct business."  P.R. Laws Ann. tit. 22, § 194(b).  The Board currently has only four members, and one of them, Christian Sobrino (Chief Economic Advisor of the Governor) cannot be counted toward a quorum because he is merely an ex-officio member who was neither elected to the Board nor appointed.

24

82.     The Board also lacks the required majority of politically independent members—an explicit requirement of Act 37.   Indeed, even the FOMB demanded that PREPA's fiscal plan be amended to include the condition that two-thirds of PREPA's Board members be independent.[9]   Currently, only one of PREPA's four Board members, Ralph Kreil, might be politically independent (though he too was selected by Governor Rosselló).

### 7.     The Transformation and Privatization of PREPA Will Take Years, And Will Require Proper Management to Shepherd PREPA through the Process

83.     A receiver is currently the only viable option for near-term reform at PREPA.  The transformation of PREPA contemplated by PREPA's fiscal plan, certified by the FOMB on August 1, 2018 (as further amended or supplemented, "**Fiscal Plan**")  would, under the best circumstances, take years to achieve.  According to the Fiscal Plan, "the transformation of the electric sector in Puerto Rico is anticipated to involve a sale of existing generation assets, development of new generation and a concession by the public entity of the [transmission and distribution] System."  Aug. 1, 2018 PREPA Fiscal Plan at 17.

84.     The goal of this transformation is to create a system that is modern, reliable, resilient, sustainable, and affordable. Management Crisis at the Puerto Rico Electric Power Authority and Implications for Recovery: Hearing Before H. Comm. on Natural Resources, Comm. on Nat. Res., 115 Cong. (July 25, 2018) (written statement of Governor Rosselló at 2). Doing so will require numerous steps in multiple phases, will affect essentially every aspect of PREPA, and will cost many billions of dollars. *See, e.g.*, Aug. 1, 2018 PREPA Fiscal Plan at 3,

---

[9] FOMB, *Resolutions Adopted at the Seventh Public Meeting of the Financial Oversight and Management Board for Puerto Rico Held on April 28, 2017 in New York, New York (Resolution #2)* (Apr. 28, 2017).

15-16, 42-44, 48, 52, *available at* https://aeepr.com/Docs/Fiscal%20Plan%20-%20PREPA%20-%20CERTIFIED.pdf.

85.     The Fiscal Plan specifically recognizes that transformation will involve "drastic[]" changes to PREPA as well as "myriad negotiations and processes that must occur." *Id.* at 2.  Governor Rosselló has likewise repeatedly recognized that "[g]reat changes are needed," and that the transformation will be a time of "profound changes."  Message of Governor of Puerto Rico Ricardo Rosselló, Office of the Puerto Rico Governor (Jan. 22, 2018); Message of Governor Rosselló, Office of the Puerto Rico Governor) (July 18, 2018).

86.     And without effective management, the chances of a successful transformation are remote.  The Fiscal Plan describes various processes and hurdles that must be confronted to bring about the desired transformation, including: (i) restructuring power generation; (ii) rebuilding and modernizing the grid; (iii) transforming operations; (iv) securing funds for and making billion-dollar capital investments; and (v) moving toward a new industry structure. *See* Aug. 1, 2018 PREPA Fiscal Plan at 3; *see also id.* at 15-16 (documenting numerous required steps).

87.     Governor Rosselló also recently described the "complex process" of transformation in written testimony, noting that it further involves "developing new legislative and regulatory structures, integrated resource planning, updating the public private partnerships framework for the transaction, coordinating and complying with federal disaster funding requirements, addressing legacy obligations and resolving ongoing bankruptcy proceedings at both PREPA and the Government of Puerto Rico." *Management Crisis at the Puerto Rico Electric Power Authority and Implications for Recovery: Hearing Before H. Comm. on Natural Resources, Comm. on Nat. Res.*, 115 Cong. (July 25, 2018) (Written Statement of Governor Rosselló at 3).

88.     According to the government's January 2018 announcement, the process would take at least eighteen months. *See* Jan. 22, 2018 Message of Governor Rosselló (Office of the Puerto Rico Governor); Aug. 1, 2018 PREPA Fiscal Plan at 13 ("18+ month transformation and privatization process"); Letter from Citigroup Global Markets Inc. and Rothschild & Co. re: The Potential Transformation of the Puerto Rico Electric Sector, at 4 (June 4, 2018), at 4.

89.     That estimate is not realistic.  The Fiscal Plan states that: "[t]he ultimate form of the transformation will be informed by many elements **currently unknown and beyond PREPA's control** including market appetite for the transaction and legislative action.  PREPA, therefore, expects to amend and modify this Fiscal Plan to reflect the inputs received from the transformation process." Aug. 1, 2018 PREPA Fiscal Plan at 6 (emphasis added).  The Fiscal Plan shows various changes related to the transformation continuing through at least FY2023. *See, e.g.*, *id.* at 42, 44.  Other officials have admitted that this complex process could take up to seven years. *See, e.g.*, José A. Delgado Robles, *José Ortiz: "We have to move fast"*, EL NUEVO DÍA (Aug. 1, 2017) *available at* https://www.elnuevodia.com/english/english/nota/joseortizwehavetomovefast-2438710.

90.     Professional and independent management is critical to stabilize PREPA, to ensure that its legacy system can function properly for years until the transition is complete, and to shepherd PREPA through the drastic changes that will be required.  As members of the U.S. Congress have recognized, before transformation can happen, "substantive structural and cultural reform within PREPA must occur." July 23, 2018 HNRC Hearing Memo at 8. That is exactly what a receiver would accomplish. There are many highly qualified candidates with substantial public utility management experience that could fulfill this role

## APPOINTMENT OF A RECEIVER

91.     The Enabling Act expressly provides that, upon a default, bondholders have an absolute right to automatic appointment of a receiver for PREPA.  Section 17(a) of the Enabling Act, P.R. Laws Ann. Tit. 22 § 207(a), provides:

> *[I]n the event that [PREPA] shall default in any agreement made with the holders of the bonds, any holder or holders of the bonds . . . shall have the right to apply in an appropriate judicial proceeding to any court of competent jurisdiction in Puerto Rico for the appointment of a receiver* of the undertakings, or parts thereof, the income or revenues of which are pledged to the payment of the bonds so in default . . . .  Upon such application the court may appoint, and *if the application is made by the holders of twenty-five (25%) per centum in principal amount of such bonds then outstanding, or by any Trustee for holders of bonds in such principal amount,* <u>*shall*</u> *appoint a receiver of such undertakings*.

(emphasis added).

92.     Neither the Enabling Act nor the Trust Agreement requires any other grounds for appointment of a receiver.

93.     The Enabling Act provides for the Court to appoint a receiver at the request of bondholders (or the Trustee) and for the receiver to continue in possession and control of PREPA until the Bonds have been repaid in full.

94.     It is therefore appropriate for Plaintiffs to nominate a qualified person for the Court to consider as a receiver.

95.     Although no additional grounds are necessary for the appointment of a receiver, the continuing, serious mismanagement of PREPA—and specifically its failure to enforce various covenants—also justifies the appointment of a receiver.

96.     The continuing, serious mismanagement described above imminently threatens the well-being of Puerto Rico citizens and threatens PREPA bondholders' property interest in pledged special revenues.  A receiver will materially reduce this continuing threat.

97.     No other remedies at law are available to protect PREPA bondholders' property interests, as the PREPA bondholders do not have recourse to or mortgage or other lien on physical assets of PREPA.  PREPA bondholders' have a property interest in the statutory rights and Trust Agreement covenants, which PREPA has refused to enforce.  Only a receiver will enforce these covenants and protect the property of PREPA bondholders.

98.     As described above, PREPA began to make fiscal and operational progress in 2014, as Plaintiffs and other bondholders agreed to forbear from exercising certain remedies and PREPA agreed to appoint a CRO to renegotiate PREPA's debt, address its operational issues, and restore its finances.  PREPA's CRO and consultant achieved enormous savings and helped move PREPA toward consensual restructuring with its bondholders.  Yet PREPA terminated the engagement of its consultant and CRO, and declined to implement the strategies they recommended for a successful operational and financial restructuring.

99.     In light of its defaults, negligence, misconduct, and the non-recourse nature of PREPA's obligations to bondholders, among other reasons, Plaintiffs have exhausted and do not have any other remedies.  It has become clear that only a receiver can improve operations without political interference, enforce the covenants that comprise the bondholders' collateral package, and protect the bondholders' property.  Today, PREPA's remaining management has been unwilling or unable to avoid the payment and other defaults in the first place and now to cure the defaults.  The PREPA Board lacks the independence necessary to steer PREPA toward an

29

efficient and successful transformation.  All PREPA stakeholders need an independent receiver now.

100.    PREPA's mismanagement has already damaged Puerto Rico severely, as evidenced by PREPA's notoriously and catastrophically deficient response to Hurricane Irma and Maria in 2017.  PREPA's failure to follow well-established industry practices and its botched recovery efforts came with great costs to the grid, the island, and all stakeholders.  The appointment of a receiver will expedite improvements to the grid that have not yet been undertaken, make energy cheaper and more reliable for citizens, and protect the island from future disaster.  The appointment of a receiver will not harm anyone; to the contrary, it will benefit all stakeholders.

101.    The receiver appointed by this Court will adopt measures designed to address PREPA's financial and operational problems—just as the CRO and consultant started doing in 2014.  The receiver will also assist with hurricane restoration efforts, including preparing the system for future hurricanes.  A receiver will take action to reduce costs and other expenditures, improve productivity, and increase revenues without the chronic mismanagement and politicization that PREPA currently faces.

102.    In sum, although appointment of the receiver is mandatory and automatic under Commonwealth law, in the alternative, ample cause under Puerto Rico law exists for an independent receiver to be appointed to oversee PREPA's affairs and to address its operational problems.

103.    The receiver appointed by this Court will be vested with the duties and powers to (i) assume all powers of the PREPA Executive Director and Board of Directors, subject to Act 57-2014 and Act 4-2016; (ii) lead development and implementation of a plan to maintain and operate PREPA's system, including, without limitation, the power to restore PREPA's system

and to assist in prevention of future outages; (iii) implement near term cost-saving and revenue enhancement measures; and (iv) exercise any other rights, powers, and remedies afforded to the receiver under P.R. Laws Ann. Tit. 22 § 207.

104.    Notwithstanding anything to the contrary herein, absent an order from the Title III Court or consent from the FOMB, the receiver will not have the power to initiate a rate proceeding with PREC to enforce the requirement of Section 502(B)(b) of the Trust Agreement that—after the 1947 Indenture Bonds have been paid—PREPA shall charge rates sufficient "to provide an amount at least equal to one hundred twenty per centum (120%) of the aggregate Principal and Interest Requirements for the next fiscal year on account of all the bonds then outstanding under this Agreement reduced by any amount deposited to the credit of the Bond Service Account from the proceeds of bonds to pay interest to accrue thereon in such fiscal year."

105.    Notwithstanding anything to the contrary herein, the receiver will not have the power to propose any plan of adjustment or otherwise infringe upon the powers afforded to the FOMB established under PROMESA (which for the avoidance of doubt, does not include the power to operate PREPA or adjust rates).

## COUNT I
## (APPOINTMENT OF A RECEIVER)

106.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 96 of this complaint.

107.    An event of default under the Trust Agreement has occurred as a result of PREPA's failure to pay principal and interest on the Bonds on July 3, 2017 and on each payment date thereafter.  Events of default have also occurred by virtue of the commencement of Title III proceedings on behalf of PREPA, and by virtue of PREPA's continuing, serious mismanagement that includes the breach of covenants.

31

108.    An event of default having occurred under the Trust Agreement, Plaintiffs as holders and insurers of more than 25% of the outstanding principal amount of Bonds are entitled to the appointment of a receiver pursuant to Section 17(a) of the Enabling Act and the Trust Agreement.

109.    Alternatively, equitable and ample cause exists to justify the appointment of a receiver.

110.    Accordingly, the Court should enter judgment appointing a receiver consistent with the authority described herein.

## RELIEF DEMANDED

(a) The appointment of a receiver, to be nominated by Plaintiffs, to ensure compliance with all of PREPA's obligations under the Trust Agreement, such receiver to have such powers as provided for under the Enabling Act and Trust Agreement;

(b) Notwithstanding anything to the contrary herein, absent an order from the Title III Court or consent from the FOMB, the receiver will not have the power to initiate a rate proceeding with PREC to enforce Section 502(B)(b) of the Trust Agreement. Section 502(B)(b) requires that—after the 1947 Indenture Bonds have been paid—PREPA shall charge rates sufficient "to provide an amount at least equal to one hundred twenty per centum (120%) of the aggregate Principal and Interest Requirements for the next fiscal year on account of all the bonds then outstanding under this Agreement reduced by any amount deposited to the credit of the Bond Service Account from the proceeds of bonds to pay interest to accrue thereon in such fiscal year."

(c) Notwithstanding anything to the contrary herein, the receiver shall not have the power to propose any plan of adjustment or otherwise infringe upon the powers afforded to the

FOMB established under PROMESA (which for the avoidance of doubt, does not include the power to operate PREPA or adjust rates);

(d) The entry of an order appointing such receiver with and empowering such receiver to act under the direction and supervision of the Court;

(e) Granting Plaintiffs such other and further relief as this Court may deem just and proper.

**RESPECTFULLY SUBMITTED,**

In San Juan, Puerto Rico, today _____, 2018.

| | |
|---|---|
| **ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC** | **WEIL, GOTSHAL & MANGES LLP** |

/s/ *DRAFT* _____
ERIC PÉREZ-OCHOA
USDC-PR No. 206,314
E-mail: epo@amgprlaw.com

/s/ *DRAFT* _____
LUIS A. OLIVER-FRATICELLI
USDC-PR NO. 209,204
E-mail: loliver@amgprlaw.com

208 Ponce de Leon Ave., Suite 1600
San Juan, PR 00936
Tel.: (787) 756-9000
Fax: (787) 756-9010

*Counsel for National Public Finance
Guarantee Corp.*

/s/ *DRAFT* _____
MARCIA GOLDSTEIN*
JONATHAN POLKES*
GREGORY SILBERT*
ROBERT BEREZIN*
767 Fifth Avenue
New York, New York 10153
Tel.: (212) 310-8000
Fax: (212) 310-8007
Email: marcia.goldstein@weil.com
jonathan.polkes@weil.com
gregory.silbert@weil.com
robert.berezin@weil.com

*admitted *pro hac vice*

*Counsel for National Public Finance
Guarantee Corp.*

**GOLDMAN ANTONETTI & CORDOVA,
LLC**

/s/ *DRAFT* _____
CARLOS A. RODRÍGUEZ-VIDAL
USDC-PR No. 201,213
E-mail: crodriguez-vidal@gaclaw.com

/s/ *DRAFT* _____
SOLYMAR CASTILLO-MORALES
USDC-PR NO. 218,310
E-mail: scastillo@gaclaw.com

P.O. Box 70364
San Juan, PR 00936-8364
Tel.: (787) 759-4117
Fax: (787) 767-9177

*Counsel for Syncora Guarantee Inc.*

**DEBEVOISE & PLIMPTON LLP**

/s/ *DRAFT* _____
MY CHI TO*
CRAIG A. BRUENS*
ELIE J. WORENKLEIN*
919 Third Avenue
New York, New York 10022
Tel.: (212) 909-6000
Fax: (212) 909-6836
Email: mcto@debevoise.com
cabruens@debevoise.com
eworenklein@debevoise.com

*admitted *pro hac vice*

*Counsel for Syncora Guarantee Inc.*

**CASELLAS ALCOVER & BURGOS P.S.C.**


/s/ *DRAFT*_____
HERIBERTO BURGOS PÉREZ
USDC-PR No. 204,809
Ricardo F. Casellas-Sánchez
USDC-PR No. 203,114
Diana Pérez-Seda
USDC–PR No. 232,014
E-mail: hburgos@cabprlaw.com
          rcasellas@cabprlaw.com
          dperez@cabprlaw.com

P.O. Box 364924
San Juan, PR 00936-4924
Tel.: (787) 756-1400
Fax: (787) 756-1401


*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**CADWALADER, WICKERSHAM & TAFT LLP**


/s/ *DRAFT*_____
HOWARD R. HAWKINS, JR.*
MARK C. ELLENBERG*
ELLEN V. HOLLOMAN*
WILLIAM J. NATBONY*
ELLEN M. HALSTEAD*
THOMAS J. CURTIN*
CASEY J. SERVAIS*
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
Fax: (212) 406-6666
Email:  howard.hawkins@cwt.com
          mark.ellenberg@cwt.com
          ellen.holloman@cwt.com
          bill.natbony@cwt.com
          ellen.halstead@cwt.com
          thomas.curtin@cwt.com
          casey.servais@cwt.com


* admitted *pro hac* vice

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*