# EXHIBIT   11

*Execution version*

## **AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT**

THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT (including the annexes, exhibits and schedules attached hereto and as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***" or "***RSA***"), dated as of December 23, 2015, is entered into by and among Puerto Rico Electric Power Authority ("***PREPA***"), National Public Finance Guarantee Corporation ("***National***"), Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together with Assured Guaranty Corp., "***Assured***"), Syncora Guarantee Inc. ("***Syncora***"), the undersigned members of the Ad Hoc Group of PREPA Bondholders identified on Annex A (the "***Ad Hoc Group***"), Scotiabank de Puerto Rico (in its capacity as administrative agent for the Scotiabank Lenders, "***Scotiabank***"), the lenders (the "***Scotiabank Lenders***") under that certain Scotiabank Credit Agreement (as herein defined), Solus Opportunities Fund 5 LP, SOLA LTD and Ultra Master LTD (collectively, "***Solus***" or the "***Solus Lenders***" and together with Scotiabank, the Scotiabank Lenders and any persons who execute a joinder to this Agreement pursuant to section 18(b) hereof in the form of Annex B-2, the "***Credit Agreements Lenders***"), and Government Development Bank for Puerto Rico ("***GDB***").  National and Assured will be referred to herein collectively as the "***Insurers***," and the Ad Hoc Group, together with persons who beneficially own or control Uninsured Bonds (as defined herein) and are party to this Agreement (including, for the avoidance of doubt, Solus) or execute a joinder to this Agreement pursuant to section 18(a) hereof in the form of Annex B-1, will be referred to herein collectively as the "***Holders***," and the Insurers, the Holders, Scotiabank, the Scotiabank Lenders, Solus and GDB will be referred to herein collectively as the "***Supporting Creditors***."  The Supporting Creditors, together with PREPA, will be referred to herein collectively as the "***Parties***."

## **RECITALS**

**A.**     PREPA is the issuer of power revenue bonds (collectively, the "***Revenue Bonds***") and power revenue refunding bonds (collectively with the Revenue Bonds, the "***Bonds***") issued and outstanding pursuant to that certain Trust Agreement, dated as of January 1, 1974, as amended and supplemented through July 1, 2015, between PREPA and U.S. Bank National Association, as successor trustee (the "***Trustee***" and, with respect to said trust agreement, as amended, the "***Trust Agreement***").  Capitalized terms used but not defined in this Agreement shall have the meanings given to such terms in the Trust Agreement.

**B.**     Each individual series of Bonds issued under the Trust Agreement was authorized pursuant to specific resolutions of PREPA authorizing the issuance of such series of Bonds.

**C.**     In connection with the issuance of certain of the Bonds (such Bonds, the "***Insured Bonds***"), PREPA entered into various insurance agreements with the Trustee corresponding to insurance policies issued by various insurers including National, Assured and Syncora (such insurance policies to which any of National, Assured or Syncora or any other person that insures Bonds is currently a party, and the insurance agreements related thereto, collectively, the "***Bond Insurance Agreements***" and, together with the Trust Agreement, the Bonds, the resolutions approving the Bonds, and any other agreements, supplements, amendments, or other documents executed or delivered in connection with the issuance or maintenance of the Bonds, including the

TA Amendment (as defined herein), the "***Bond Documents***").  Any Bonds that are not Insured Bonds are referred to herein as "***Uninsured Bonds***."

**D.**      PREPA has requested, and the Insurers and Holders have agreed, subject to the terms and conditions of this Agreement, to consent to an amendment of the Trust Agreement in the form and substance reasonably acceptable to the Supermajority Holders, the Supermajority Insurers and the Supermajority Credit Agreement Lenders and consistent with the description attached hereto as <u>Annex C</u> (the "***TA Amendment***").

**E.**      The Bond Insurance Agreements provide the Insurers the sole right in lieu of the beneficial owners of the applicable Insured Bonds to consent to the TA Amendment in accordance with the terms of such Bond Insurance Agreements.

**F.**      PREPA, Scotiabank and the Scotiabank Lenders have entered into that certain Credit Agreement, dated as of May 4, 2012 (as amended, restated, extended, supplemented or otherwise modified and in effect from time to time, the "***Scotiabank Credit Agreement***"), with Scotiabank as agent thereunder.

**G.**      PREPA and the Solus Lenders are parties to that certain Trade Finance Facility Agreement, dated as of July 20, 2012 (as amended, restated, extended, supplemented or otherwise modified and in effect from time to time, the "***Solus Credit Agreement***" and together with the Scotiabank Credit Agreement, the "***Credit Agreements***").

**H.**      PREPA and GDB have entered into that certain Collateral Swap Loan Agreement, dated as of June 21, 2013 (as amended, restated, extended, supplemented or otherwise modified from time to time and currently in effect, together with any related documents, the "***Collateral Swap Loan Agreement***").

**I.**      PREPA and GDB have entered into that certain Isabela Dam Loan Agreement, dated as of March 26, 2004 (as amended, restated, extended, supplemented or otherwise modified from time to time and currently in effect, together with any related documents, the "***Isabela Dam Loan Agreement***" and together with the Collateral Swap Loan Agreement, the "***GDB Loan Agreements***").

**J.**      GDB is the fiscal agent under that certain Loan Agreement, dated as of September 6, 2012, by and between Puerto Rico Infrastructure Financing Authority, acting on behalf of the Commonwealth of Puerto Rico ("***PRIFA***"), and PREPA (as amended, restated, extended, supplemented or otherwise modified from time to time and currently in effect, together with any related documents, the "***Aguirre Loan Agreement***").

**K.**      GDB is the fiscal agent under that certain Financial Agreement, dated as of September 27, 2013, by and between PRIFA and PREPA (as amended, restated, extended, supplemented or otherwise modified from time to time and currently in effect, together with any related documents, the "***San Juan Water Financial Agreement***").

**L.**  As of the date hereof, the total outstanding principal amount of Bonds insured by National under the Bond Insurance Agreements is $1,329,155,000, the total outstanding principal amount of

Insured Bonds that are beneficially owned by National is $0 and the total outstanding amount of Uninsured Bonds that are beneficially owned by National is $0.[1]

**M.**     As of the date hereof, the total outstanding principal amount of Bonds insured by Assured under the Bond Insurance Agreements is $830,550,000, the total outstanding principal amount of Insured Bonds that are beneficially owned by Assured is $0[2] and the total outstanding principal amount of Uninsured Bonds that are beneficially owned by Assured is $0.

**N.**     As of the date hereof, the total outstanding principal amount of Bonds insured by Syncora under the Bond Insurance Agreements is $197,405,000, the total outstanding principal amount of Insured Bonds that are beneficially owned by Syncora and the total outstanding principal amount of Uninsured Bonds that are beneficially owned by Syncora are set forth on its respective signature page hereto .

**O.**     PREPA and GDB have entered into certain depository and custodial agreements (as amended, restated, extended, supplemented or otherwise modified from time to time and currently in effect, together with any related documents, the "***Custodial Agreements***" and, together with the Collateral Swap Loan Agreement, the Isabela Dam Loan Agreement, the Aguirre Loan Agreement, and the San Juan Water Financial Agreement, the "***GDB Agreements***").

**P.**  As of the date hereof, $8,107,995,000.00 in principal amount of Bonds is outstanding.  The total outstanding principal amount of Bonds as of any date shall be known hereunder as the "***Bond Principal Amount***".

**Q.**     As of the date hereof, the total outstanding principal amount of Uninsured Bonds that are beneficially owned by each member of the Ad Hoc Group is set forth on their respective signature pages hereto.

**R.**     As of the date hereof, the total outstanding principal amount of Uninsured Bonds that are beneficially owned by Solus is set forth on its respective signature page hereto.

**S.**     The Insurers and the Holders collectively control more than 60% of the total outstanding principal amount of the Bonds for purposes of consenting to the TA Amendment.

**T.**     As of the date hereof, there is $549,950,000 in aggregate principal amount (the "***Scotiabank Principal Amount***") (plus applicable accrued fees and interest) outstanding under the Scotiabank Credit Agreement (the loans outstanding thereunder, the "***Scotiabank Loans***") and the total outstanding principal amount of Uninsured Bonds that are beneficially owned or controlled by Scotiabank and the Scotiabank Lenders is $35,000.

**U.**     As of the date hereof, there is $146,041,914.24 in aggregate principal amount (the "***Solus Principal Amount***", together with the Scotiabank Principal Amount, the "***Credit Agreements***

---

[1] For the avoidance of doubt, this figure excludes National's ownership of any 2015A Bonds, which have been defeased.

[2] For the avoidance of doubt, this figure excludes Assured's ownership of any 2015A Bonds, which have been defeased.

*Principal Amount*," and the Credit Agreements Principal Amount collectively with the Bond Principal Amount, the "***Outstanding Principal Amount***") (plus applicable accrued fees and interest) outstanding under the Solus Credit Agreement (the loans outstanding thereunder, the "***Solus Loans***").

**V.**     PREPA, the Holders, the Credit Agreement Lenders and GDB entered into a Restructuring Support Agreement on November 5, 2015 (as amended by the Amendment No. 1, Amendment No. 2, Amendment No. 3 and Amendment No. 4 (each as defined below), the "***Initial RSA***").

**W.**     PREPA, the Holders, the Credit Agreement Lenders and GDB entered into an Amendment No. 1 to the Initial RSA, dated as of November 12, 2015 (the "***Amendment No. 1***"), an Amendment No. 2 to the Initial RSA, dated as of November 20, 2015 (the "***Amendment No. 2***"), an Amendment No. 3 to the Initial RSA, dated as of December 7, 2015 (the "***Amendment No. 3***") and an Amendment No. 4 to the Initial RSA, dated as of December 17, 2015 (the "***Amendment No. 4***").

**X.**     After good faith, arm's length negotiations, the Parties have agreed, subject to the terms and conditions of this Agreement, to amend and restate in its entirety the Initial RSA to support the Recovery Plan (as defined herein) as described in the Recovery Plan Term Sheet (as defined herein) attached hereto as Annex D, including, without limitation, the Consent Solicitation, the Exchange Offer and Credit Agreements Amendments (each as defined in the Recovery Plan Term Sheet).

        **NOW, THEREFORE**, in consideration of the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

    1.     Mutual Obligations and Acknowledgments.

    (a)     During the period commencing on the Effective Date (as defined herein) and ending on the termination of this Agreement with respect to, or withdrawal from this Agreement by, such Party in accordance with the terms hereof (such period with respect to such Party, the "***Support Period***"), each Party shall work collaboratively and in good faith with the other Parties to finalize, document and implement a comprehensive recovery plan (including the incorporated terms and conditions below, the "***Recovery Plan***") incorporating (i) the terms and conditions described on the Recovery Plan Term Sheet attached hereto as Annex D (including all schedules thereto, the "***Recovery Plan Term Sheet***") (ii) the terms and conditions described on the January Payment Term Sheet (as defined herein) and (iii) such other terms, conditions and documents necessary to implement and effect the Recovery Plan based on, and consistent with, the Recovery Plan Term Sheet and this Agreement, including without limitation the definitive documentation relating to the transactions set forth in the January Payment Term Sheet (the "***January Payment Transactions***"), the Exchange Offer, Cash Tender, Backstop Facility, Consent Solicitation, TA Amendment and Credit Agreements Amendments, the Securitization Documents and any bills or legislation to enact

4

the Legislative Reform Package (each as defined herein or in the Recovery Plan Term Sheet) (such bills, legislations or documents, in Acceptable Form (as defined herein), collectively, the "***Recovery Plan Documents***"), which Recovery Plan Documents shall (A) contain the same economic terms as, and other terms consistent in all material respects with, the terms set forth in the Recovery Plan Term Sheet, (B) be consistent with this Agreement in all material respects and (C) not contain any material additional terms, elements or transactions that adversely affect any Supporting Creditor in its capacity as a PREPA creditor (any such bill, legislation, document, agreement, pleading or transaction that satisfies the standards described in the foregoing clauses (A)-(C) in this subsection shall be deemed to be in "***Acceptable Form***" as such term is used in this Agreement).  For the avoidance of doubt, for purposes of this Agreement, if an event affects a Supporting Creditor in its capacity as a potential future surety provider or future holder of Securitization Bonds (as defined below), insurer of Securitization Bonds or Bonds defeased with Securitization Bonds, in each case pursuant to the Recovery Plan, then such event shall be deemed to affect such Supporting Creditor in its capacity as a PREPA creditor. "***Securitization Bonds***" refer to the bonds referred to as "Securitization Bonds" and "Restructuring Bonds" in the Recovery Plan Term Sheet, including, for the avoidance of doubt, in Schedules I-A, I-B and II thereto.

(b)     The Parties hereby mutually acknowledge and agree that nothing in this Agreement or in any forbearance agreement entered into between or among any of the Supporting Creditors and PREPA prior to the Effective Date (a "***Prior Forbearance Agreement***") shall prejudice any of the Supporting Creditors' right to contest or defend, formally or informally, the priority of repayments of the Scotiabank Loan Obligations (as such term is defined herein) and the Solus Loan Obligations (as such term is defined herein) relative to the Bonds. Notwithstanding the foregoing or anything herein to the contrary, the Supporting Creditors and PREPA agree not to contest or take any position, whether formally or informally, regarding the priority of repayments of the Scotiabank Loan Obligations or the Solus Loan Obligations relative to the Bonds on the basis of (x) any of the following actions or agreements by Scotiabank, the Scotiabank Lenders, or the Solus Lenders, as applicable, on or prior to the Effective Date and during the Support Period:  (i) forbearing, delaying or failing to exercise remedies, (ii) agreeing to a postponement or delay in payment of interest or principal, (iii) granting an extension of any maturity date, (iv) not requiring the repayment or readvance of any loans under the Scotiabank Credit Agreement or Solus Credit Agreement or not requiring any loans under the Scotiabank Credit Agreement or Solus Credit Agreement to be revolving loans, (y) the inclusion in this Agreement as a Bond Potential Default, in any Prior Forbearance Agreement as a "Potential Default" (as defined therein), and in the Trust Agreement (as amended) as a "Potential Default" (as defined in the Trust Agreement, as amended), of PREPA's use of monies from the General Fund (as defined in the Trust Agreement) to service its debt under the Scotiabank Credit Agreement or Solus Credit Agreement, or (z) PREPA servicing its debt outstanding under the Credit Agreements or the Trust Agreement, including any payment of principal

made on July 1, 2015, and none of the Supporting Creditors or PREPA shall (or shall, in the case of the Bonds, direct the Trustee to) use any such actions as a basis for contesting whether any expense, claim, liability or amount shall be construed as a "Current Expense" under the Trust Agreement by virtue of the foregoing or use any such actions in making any argument, filing any pleading or complaint, or supporting any other person in doing the same.

(c)     "***Securitization Documents***" means (A) all documents relating to the Securitization Bonds, including, without limitation and for the avoidance of doubt, (i) the Restructuring Resolution (as defined in the Recovery Plan Term Sheet), Securitization Trust Agreement (as defined below), and Servicing Agreement (as defined in the Recovery Plan Term Sheet), (ii) the governing documents of the issuer of the Securitization Bonds (the "***Securitization SPV***"), (iii) the form of Securitization Bonds, (iv) any other agreements to be entered into, resolutions adopted or certificates delivered by the Securitization SPV that affect the holders of Securitization Bonds and (v) any documents executed or delivered pursuant to the Securitization Special Legislation (as defined in the Recovery Plan Term Sheet), and the forms of such documents, and, without duplication, (B) all documents implementing the transactions contemplated by Schedule II to the Recovery Plan Term Sheet.  The "***Securitization Trust Agreement***" refers to the Initial Trust Agreement (as defined in the Recovery Plan Term Sheet).

2.     <u>PREPA's Obligations</u>. During the Support Period, PREPA shall:

(a)     support and take any and all commercially reasonable, necessary or appropriate actions to facilitate, implement and consummate the Recovery Plan and the Recovery Plan Documents;

(b)     work cooperatively with the Supporting Creditors and their advisors to prepare and execute any documentation necessary (including the Recovery Plan Documents), as well as to take such steps as are commercially reasonable, necessary or appropriate to implement and consummate the Recovery Plan;

(c)     refrain from (i) taking, recommending, proposing, supporting, soliciting, or participating in any action not required by law that is inconsistent in any material respect with, or that would materially delay or impede approval, execution of documentation for, or implementation or consummation of the Recovery Plan, or that is otherwise inconsistent in any material respect with the express terms of this Agreement, (ii) directly or indirectly, proposing, supporting, soliciting, or participating in the formulation of any plan or proposal to restructure PREPA other than the Recovery Plan, and (iii) initiating any proceeding under any bankruptcy or insolvency law, any suspension period or proceeding under the Recovery Act, or any other action or proceeding that seeks to adjust, extend or challenge the claims of the Supporting Creditors pursuant to any federal, state or Puerto Rico statute, now or hereinafter enacted into law, except for any such proceeding to implement the Recovery Plan; provided that PREPA shall exercise

commercially reasonable efforts to provide the Supporting Creditors' advisors with draft copies of the petition and all motions, applications, pleadings and other material documents that it intends to file with the applicable court or governmental authority in connection therewith, in each case at least five (5) business days before the filing date and in any event shall provide such drafts to the Supporting Creditors' advisors within at least three (3) business days before the filing date, and shall consult with, and consider in good faith any recommendations made by, the Supporting Creditors' advisors with respect to each such document; provided further that any such filed document shall be in Acceptable Form as determined in good faith by each Requisite Supporting Creditor Majority and Supermajority Insurers;

(d)     Refrain from directly or indirectly promoting or supporting any bill or legislation that is materially inconsistent with the Recovery Plan or this Agreement, that would materially and adversely affect the ability of PREPA to comply with its obligations under this Agreement or under the Recovery Plan Documents, or that would materially and adversely affect any Supporting Creditor in its capacity as a PREPA creditor;

(e)     Refrain from filing any documents in or regarding any validation proceeding (a "*Validation Proceeding*") in respect of the Securitization Bonds, their issuance or the relevant authorizing legislation or publicly disclose (or permit to be publicly disclosed) any written legal opinions (from counsel for PREPA or the Securitization SPV, including, without limitation, bond counsel) regarding the validity of the securitization charge for the Securitization Bonds or the validity of the legislation authorizing the Securitization Bonds unless such documents or written legal opinions are reasonably acceptable to the Supermajority Holders and the Supermajority Insurers; *provided* however that, if PREPA or its legal advisors do not receive any written objection to any such document or written legal opinion from Holders of Uninsured Bonds holding at least 20% of principal amount of the Uninsured Bonds held by all Holders or from Insurers insuring at least 30% of principal amount of Insured Bonds within five (5) days after the legal advisors to the Holders and Insurers receive notice of and a copy of the final form of such document or written legal opinion (and, where all or a portion of such document or written legal opinion is not in English, an English translation of such document or written legal opinion), such document or written legal opinion shall be deemed to be reasonably acceptable to the Supermajority Holders and the Supermajority Insurers for purposes of this section 2(e); *provided* further that PREPA shall exercise commercially reasonable efforts to provide the Supporting Creditors' legal advisors with draft copies of the petition and all documents intended to be filed in any such Validation Proceeding and of any written legal opinions (from counsel for PREPA or the Securitization SPV, including, without limitation, bond counsel) intended to be obtained and publicly disclosed, in each case at least five (5) business days before the date such document is filed or opinion is obtained or publicly disclosed, and shall consult with, and consider in good faith any recommendations made by, the Supporting Creditors' legal advisors with respect to each such document and opinion;

(f)     Other than as provided in section 9(c), refrain from entering into a restructuring support agreement or similar agreement related to the Recovery Plan or otherwise relating to a restructuring of all or a portion of the debt constituting the Outstanding Principal Amount with any Insurer, Syncora, any other person that insures Bonds, any Supporting Creditor or any other holder of such debt other than by means of an Amendment to this Agreement pursuant to section 17; and

(g)     Keep the Supporting Creditors' financial and legal advisors reasonably informed regarding the PREC Public Hearing (as defined herein), and consult with such advisors in good faith with respect to any documents that PREPA may file or publish (or which PREPA is assisting the SPV or other parties in filing or publishing) relating to the PREC Public Hearing.

Notwithstanding anything to the contrary herein but subject to section 22, nothing in this Agreement or the Recovery Plan shall limit or restrict PREPA from taking any action that PREPA shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Recovery Plan or the Recovery Plan Documents.

Notwithstanding anything to the contrary contained herein, but subject to section 16, nothing in this Agreement shall limit or restrict PREPA from taking any action that PREPA may take under the Bond Documents, Credit Agreements and/or GDB Agreements, at law or in equity, that PREPA deems is necessary or appropriate to preserve, protect or defend (but not to enforce) any of PREPA's rights thereunder against any challenge, including, without limitation, (i) defending, intervening in or filing any legal proceedings relating to any such rights of PREPA, (ii) sending notices to any persons, governmental authorities or entities concerning the existence of any such rights of PREPA, or (iii) otherwise preserving any of the rights, remedies, positions or defenses of PREPA, all of which are hereby expressly reserved.

3.     <u>Supporting Creditors' Obligations</u>.  During the Support Period, each Supporting Creditor (other than GDB) shall:

(a)     support and take any and all commercially reasonable, necessary or appropriate actions to facilitate, implement and consummate the Recovery Plan, including, without limitation, by working cooperatively with PREPA, the other Supporting Creditors, and their respective advisors to prepare and execute any documentation necessary (including the Recovery Plan Documents) and by giving any notices, orders, instructions or directions that are commercially reasonable, necessary or appropriate to support, facilitate, implement or consummate, or otherwise give effect to the Recovery Plan; *provided*, however, that nothing in this Agreement shall require any Supporting Creditor to indemnify the Trustee;

(b)     refrain from (i) taking, recommending, proposing, supporting, soliciting, or participating in any action not required by law that is inconsistent in any material respect with, or that would materially delay or impede approval, execution of documentation for, or implementation or consummation of the Recovery Plan, or

that is otherwise inconsistent in any material respect with the express terms of this Agreement, and (ii) directly or indirectly, proposing, supporting, soliciting, or participating in the formulation of any plan or proposal to restructure PREPA other than the Recovery Plan; and

(c)     Refrain from directly or indirectly promoting or supporting any bill or legislation that is materially inconsistent with the Recovery Plan or this Agreement, that would materially and adversely affect the ability of PREPA to comply with its obligations under this Agreement or the Recovery Plan Documents including, without limitation, commencing any rate case with the Energy Commission, or that would materially and adversely affect any Supporting Creditor in its capacity as a PREPA creditor.

Notwithstanding anything in this Agreement, but subject to section 7 hereof, each Supporting Creditor is entitled to act to protect its interests as holders of other obligations issued by the Commonwealth of Puerto Rico or any of its instrumentalities (other than PREPA).

Except as expressly provided in this Agreement, including the Recovery Plan and any Recovery Plan Document, each Supporting Creditor shall in no way be required as a result of this Agreement to expend any cash resources or assume any additional risk or liability (including, for the avoidance of doubt, indemnifying the Trustee) in support of the Recovery Plan or this Agreement. Each Supporting Creditor acknowledges that PREPA has made no representations as to what actions, if any, PREPA will take after this Agreement terminates.

4.     <u>Insurers' and Holders' Obligations</u>.

(a)     During the Support Period, the Ad Hoc Group and Solus shall:

(i)     negotiate with PREPA in good faith to provide a backstop for the financing of a Cash Tender (as defined in the Recovery Plan Term Sheet) for the Non-Forbearing Uninsured Holders (as defined in the Recovery Plan Term Sheet) on terms to be determined by mutual agreement between each Holder providing a portion of the backstop and PREPA (the "***Backstop Facility***").

(b)     During the Support Period, each Holder shall:

(i)     tender any and all Uninsured Bonds (other than the January Payment Bonds) owned or controlled by such Holder in the Exchange Offer. Notwithstanding anything to the contrary in this Agreement, no Holder shall be required to tender into the Exchange Offer any of the Bonds sold by PREPA pursuant to the January Bond Purchase Agreement (the "***January Payment Bonds***") and the terms of any exchange of the January Payment Bonds shall be governed by the January Payment Term Sheet and the January Bond Purchase Agreement.

(c)     During the Support Period, National and Assured shall:

9

(i)     participate in purchasing  the January Payment Bonds as set forth in section 8, and provide the DSRF sureties, in each case, subject to the terms and conditions set forth in Schedule II to the Recovery Plan Term Sheet (together, the "***Insurers' Transactions***"); *provided* that it shall be a condition precedent to each applicable Insurer's obligations hereunder and under Schedule II to the Recovery Plan Term Sheet that PREPA shall not have commenced or be subject to (a) any proceeding under bankruptcy or insolvency law, (b) any suspension period or proceeding under the Recovery Act, or (c) any other action or proceeding that seeks to adjust, extend or challenge the claims of the Supporting Creditors, in each case whether pursuant to any federal, state, Puerto Rico or other statute or law, now or hereinafter in effect.

For the avoidance of doubt, each applicable Insurer's obligation to participate in the Insurers' Transactions in accordance with the terms of Schedule II to the Recovery Plan Term Sheet shall be limited to the amounts of the Insurers' Transactions that are set forth in the letter agreement between National and Assured described in footnote three of Schedule II to the Recovery Plan Term Sheet, and no Insurer shall be obligated to participate in or perform the Insurers' Transactions in respect of amounts or obligations set forth in such letter or in Schedule II to the Recovery Plan Term Sheet with respect to any of the other Insurers.

(ii)    National agrees to seek approval of a stay and/or suspend all proceedings related to National's petition for a temporary rate increase filed before the Energy Commission on September 17, 2015, and the subsequent appeal of that action filed with the Puerto Rico Circuit Court of Appeals on October 30, 2015 (the "***Action***") until the earlier of the following occurs (such period, the "***Suspension Period***"):  (x) termination of this Agreement and (y) National's withdrawal from or termination of this Agreement.  PREPA agrees to support National's request for a stay or suspension, including by filing a formal pleading indicating its support.  Such stay or suspension shall be without prejudice to any of the Parties' rights upon resumption of litigation in those proceedings after termination of the Suspension Period.  Notwithstanding the foregoing, this Agreement shall not prohibit National from responding to any pleading, order, court communication, or notice as necessary to preserve National's Action and National's rights in the Action during the Suspension Period, or from unilaterally dismissing its appeal of the Action.

(iii)   During the Suspension Period, except to the extent provided in the last two sentences of this paragraph, refrain from instituting, commencing, prosecuting, joining, supporting or otherwise participating directly or indirectly in any way in any legal or administrative proceedings regarding PREPA's rates other than the Rate Structure contemplated in the Recovery Plan.  Nothing in this Agreement shall prohibit or limit in any way the Insurers' participation in the Integrated Resources Plan

proceedings.  Except with respect to the Action to the extent provided herein, this Agreement does not prohibit the Insurers from intervening in, filing pleadings or other documents with, or otherwise participating in any proceeding before the Energy Commission; *provided* that, during the Suspension Period, such intervention or filings shall in no way interfere with or delay PREPA's rate case related to the Rate Structure filed with the Energy Commission pursuant to the Recovery Plan.

(d)     During the Support Period, each of the Insurers and Holders shall:

    (i)     consent to the execution and delivery by PREPA and the Trustee of the TA Amendment, in compliance with the terms of the Trust Agreement;

    (ii)     in the case of a Holder, deliver consents with respect to any and all Uninsured Bonds owned or controlled by such Holder in the Consent Solicitation, and, in the case of an Insurer, deliver consents with respect to any and all Insured Bonds insured by such Insurer, as described in Schedule II to the Recovery Plan Term Sheet, in each case in accordance with the terms of the Bond Documents;

    (iii)     take all commercially reasonable and necessary actions to effectuate and/or implement the TA Amendment, the Insurers' Transactions, the Consent Solicitation and the Exchange Offer, as applicable, including, without limitation, transmitting its consent direction to its Depository Trust Company participant or participants, and any other person whose action is required to effectuate and/or implement the TA Amendment, the Insurers' Transactions, the Consent Solicitation and the Exchange Offer, as applicable (but without any obligation under this Agreement to indemnify the Trustee); and

    (iv)     forbear from exercising, or consenting to the exercise of, any right to direct the Trustee to enforce or exercise any rights or remedies available to the Trustee under the Trust Agreement or applicable law arising solely by reason of any default or event of default under any Bond Document that may have occurred or may subsequently occur as identified on Annex E attached hereto (the "***Bond Potential Defaults***").

(e)     Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall limit or restrict any Holder or Insurer or the Trustee from taking any action that the Trustee or any such Holder or Insurer may take under its respective Bond Documents, at law or in equity, that the Trustee or any such Holder or Insurer deems necessary or appropriate to preserve, protect or defend (but not to enforce) any trust rights, security interests, collateral, pledges of assets, liens, any other property rights or any other rights under the Bond Documents for the benefit of the Trustee or the Bonds, either held directly by the Holders or Insurers or held through the Trustee (the "***Rights***") against any challenge, infringement or assertion of priority, including, without limitation, (i) defending,

11

intervening in or filing pleadings and other documents in any legal proceedings relating to any such Rights, (ii) sending notices to any persons, governmental authorities or entities concerning the existence of any such Rights, (iii) directing the Trustee to take any action to preserve, protect or defend any such Rights, (iv) appearing and participating as a party in interest in any matter to be adjudicated or decided in any bankruptcy or insolvency proceeding concerning PREPA, or (v) otherwise preserving any of the rights, remedies, positions or defenses of such Insurer or Holder or the Trustee, all of which are hereby expressly reserved.

(f)     Notwithstanding anything to the contrary herein but subject to section 22, nothing in this Agreement or the Recovery Plan shall limit or restrict any Insurer or Holder from taking any action that any such Insurer or Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Recovery Plan or the Recovery Plan Documents.

(g)     During the Support Period, (i) except as provided by the Recovery Plan, PREPA's obligations to pay any and all Principal and Interest Requirements when due in accordance with the terms of the Bond Documents shall continue, and (ii) the Insurers and Holders agree and acknowledge that PREPA shall not be required to make transfers to the Revenue Fund or the Sinking Fund pursuant to Sections 506 or 507 of the Trust Agreement.

(h)     Except as expressly provided herein or in the TA Amendment, none of (A) the existence, execution, delivery or performance of any term or provision of this Agreement or the TA Amendment, (B) any failure by any Holder or Insurer to object to any document or action contemplated by or taken under or in connection with this Agreement or the TA Amendment, or (C) any action taken under or in connection with this Agreement or the TA Amendment, including any approvals or consents to any action or document, shall (i) constitute a modification or relinquishment of any term or aspect of, or any right or remedy under or with respect to, the Bond Documents or any other document (other than this Agreement to the extent expressly provided herein) or under applicable law; (ii) constitute a consent to, waiver of, or admission of any default or event of default (or the absence of a default or event of default) in any of the Bond Documents; (iii) extend the due date of any obligations under the Bond Documents or otherwise affect the enforceability of such obligations; (iv) give rise to any obligation to extend, amend, waive or otherwise modify any term or condition of any of the applicable Bond Documents, or in the case of the Insurers and Holders, to direct the Trustee with respect to any of the foregoing; (v) give rise to any defenses or counterclaims to PREPA, the Insurers or the Holders, or to any right of the Insurers or Holders to direct the Trustee under the Bond Documents, to compel payment of the obligations under any of the applicable Bond Documents or to otherwise enforce rights or remedies thereunder or under applicable law; (vi) prohibit any Insurer or Holder from instituting, commencing, prosecuting, joining, interceding in, supporting or otherwise participating directly or indirectly in any way in any legal proceedings regarding the validity or enforceability of the Puerto Rico Public Corporation Debt Enforcement and

Recovery Act, Act No. 71-2014 (as amended, supplemented, modified, superseded, or replaced with other legislation in respect of a restructuring of PREPA, the "*Recovery Act*") or any provision thereof, or intervening or otherwise participating in any lawsuit filed by any party regarding the validity or enforceability of the Recovery Act (any such legal proceedings, actions or lawsuits, "*Recovery Act Legal Actions*"); or (vii) prejudice the rights of any party to the Recovery Act Legal Actions.  Except as expressly limited herein, each Insurer, each Holder and PREPA hereby expressly reserves all of its rights, remedies, positions and defenses under or with respect to the Bond Documents and under applicable law, and waives none.  From and after the termination of this Agreement as to any Insurer or Holder, (x) each such Insurer or Holder (each, a "*Terminated Insurer*" or "*Terminated Holder*", respectively) shall be entitled to protect, defend, enforce and assert any of its rights, remedies, positions and defenses under or with respect to the Bond Documents, in accordance with their respective terms, or under applicable law, including without limitation, commencing legal proceedings and (y) PREPA shall, subject to its obligations under this Agreement to the remaining Parties, be entitled to protect, defend, enforce and assert any of its rights, remedies, positions and defenses under or with respect to the Bond Documents, in accordance with their respective terms, or under applicable law, including without limitation, commencing legal proceedings, solely against the Terminated Insurer or Terminated Holder, as applicable.  PREPA acknowledges that no Insurer or Holder has made any representations as to what actions, if any, any Holder or Insurer will take after this Agreement terminates as to such Holder or Insurer (including by withdrawal).

5.    <u>Scotiabank and the Scotiabank Lenders' Obligations</u>.

(a)    Scotiabank and the Scotiabank Lenders shall (i) (A) consent to the Scotiabank Credit Agreement Amendments (as defined in the Recovery Plan Term Sheet) with respect to all or part of the Scotiabank Loans and/or (B) exchange all or part of the Scotiabank Loans in the Exchange Offer (as described in the Recovery Plan Term Sheet) and (ii) agree to take any and all reasonably necessary and appropriate action to effectuate the Scotiabank Credit Agreement Amendments and/or the Exchange Offer, as applicable, in each case so that the entirety of the Scotiabank Loans are either subject to the Scotiabank Credit Agreement Amendments or exchanged into the Exchange Offer (or a combination thereof).

(b)    PREPA, Scotiabank and the Scotiabank Lenders agree that the definition of "Maturity Date" under the Scotiabank Credit Agreement shall be amended in its entirety as follows:

"*"Maturity Date*" means the date that certain Restructuring Support Agreement (the "Restructuring Support Agreement") between the Borrower and the Administrative Agent and the Scotiabank Lenders, among other parties, dated as of November 5, 2015, terminates with respect to the Administrative Agent and the Scotiabank Lenders, on the one hand, and the Borrower, on the other hand, or the Administrative

Agent and the Scotiabank Lenders cease to be "Supporting Creditors" thereunder, in each case in accordance with the terms of the Restructuring Support Agreement."

(c)      During the Support Period, subject to the terms and conditions set forth herein, Scotiabank and each of the Scotiabank Lenders agrees as follows:

(i)      With respect to the Scotiabank Credit Agreement, Scotiabank and each Scotiabank Lender will forbear from exercising, or consenting to the exercise of, any right to direct the Agent (as such term is defined in the Scotiabank Credit Agreement) to enforce or exercise any rights or remedies available to the Agent under the Scotiabank Credit Agreement or applicable law arising solely by reason of any Default or Event of Default (as such terms are defined in the Scotiabank Credit Agreement) that may have occurred or may subsequently occur as identified on <u>Annex F</u> attached hereto (the "***Scotiabank Potential Defaults***"); and

(ii)     Scotiabank and each Scotiabank Lender will forbear from enforcing or exercising any rights or remedies available under the Loan Documents (as such term is defined in the Scotiabank Credit Agreement) or applicable law in respect of the Scotiabank Potential Defaults.

(d)      Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall limit or restrict Scotiabank or any Scotiabank Lender from (i) taking any action that Scotiabank or any such Scotiabank Lender may take under the Loan Documents, at law or in equity, that Scotiabank or such Scotiabank Lender deems is necessary or appropriate to preserve, protect or defend (but not to enforce) any of the Scotiabank Priority Rights (as defined below) against any challenge, infringement or assertion of priority, including, without limitation, (A) defending, intervening in or filing any legal proceedings relating to any such Scotiabank Priority Rights, (B) sending notices to any persons, governmental authorities or entities concerning the existence of any such Scotiabank Priority Rights, or (C) otherwise preserving any of the rights, remedies, positions or defenses of Scotiabank or such Scotiabank Lender, all of which are hereby expressly reserved; (ii) defending, intervening in or filing pleadings and other documents in any legal proceedings relating to the validity, amount, priority, or other terms of the Scotiabank Credit Agreement or the Scotiabank Loan Obligations; (iii) intervening in, filing pleadings or other documents with, or otherwise participating in any proceeding before the Energy Commission; or (iv) appearing and participating as a party in interest in any matter to be adjudicated or decided in any bankruptcy or insolvency proceeding concerning PREPA, *provided* that the positions advocated in connection with such appearance are not materially inconsistent with the Recovery Plan and do not delay or hinder in any material respect, or prevent consummation of the Recovery Plan.  For purposes hereof, "***Scotiabank Priority Rights***" shall mean the treatment of the Obligations (as such term is defined in the Scotiabank Credit Agreement, the "***Scotiabank Loan Obligations***") as "Current Expenses" under the Trust Agreement.

(e)     PREPA shall continue to make scheduled payments of interest in cash under the Scotiabank Credit Agreement; *provided* that, notwithstanding anything to the contrary in the Scotiabank Credit Agreement, during the Support Period, interest shall accrue and be paid in cash on the Scotiabank Loan Obligations at a rate of 7.25% per annum on the first business day of each month.  The Agent on behalf of the Scotiabank Lenders acknowledges and agrees that no default interest under the Scotiabank Credit Agreement will accrue or be paid during the Support Period.

(f)     Except as expressly provided herein, none of (A) the existence, execution, delivery or performance of any term or provision of this Agreement, (B) any failure by Scotiabank or any Scotiabank Lender to object to any document or action contemplated by or taken under or in connection with this Agreement, or (C) any action taken under or in connection with this Agreement, including any approvals or consents to any action or document, shall (i) constitute a modification or relinquishment of any term or aspect of, or any right or remedy under or with respect to, the Loan Documents or a direction to Scotiabank with respect to any of the foregoing; (ii) constitute a consent to, waiver of, or admission of any default or event of default (or the absence of a default or event of default) in any of the Loan Documents; (iii) extend the due date of any obligations under the Loan Documents or otherwise affect the enforceability of such obligations; (iv) give rise to any obligation to extend, amend, waive or otherwise modify any term or condition of any of the applicable Loan Documents; (v) give rise to any defenses or counterclaims for PREPA, Scotiabank or the Scotiabank Lenders, or to any right of the Scotiabank Lenders to direct the Agent under the Loan Documents, to compel payment of the obligations under any of the applicable Loan Documents or to otherwise enforce rights or remedies thereunder; (vi) prohibit Scotiabank or the Scotiabank Lenders from instituting, commencing, prosecuting, joining, interceding in, supporting or otherwise participating directly or indirectly in any way in any legal proceedings regarding the validity, enforceability or application of the Recovery Act or any provision thereof, or intervening or otherwise participating in any Recovery Act Legal Action; or (vii) prejudice the rights of any party to the Recovery Act Legal Actions.  Except as expressly limited herein, Scotiabank, each Scotiabank Lender and PREPA each hereby expressly reserve all of their respective rights, remedies, positions and defenses under or with respect to the Loan Documents and under applicable law, and waive none.  From and after the termination of this Agreement as to Scotiabank and the Scotiabank Lenders, (x) Scotiabank and each Scotiabank Lender shall be entitled to protect, defend, enforce and assert any of their respective rights, remedies, positions and defenses under or with respect to the Loan Documents in accordance with their respective terms or under applicable law, including without limitation commencing legal proceedings, and (y) PREPA shall, subject to its obligations under this Agreement to the remaining Parties, be entitled to protect, defend, enforce and assert any of its respective rights, remedies, positions and defenses under or with respect to the Loan Documents in accordance with their respective terms or under applicable law, including without limitation commencing legal proceedings.  PREPA acknowledges that none of

Scotiabank and the Scotiabank Lenders have made any representations as to what actions, if any, Scotiabank and the Scotiabank Lenders will take after this Agreement terminates, and with respect thereto Scotiabank and the Scotiabank Lenders specifically reserve any and all rights, remedies, and claims Scotiabank and the Scotiabank Lenders have (after giving effect hereto) with respect to the Scotiabank Potential Defaults and each other Default (as such term is defined in the Scotiabank Credit Agreement) that may occur.

(g)     Notwithstanding anything to the contrary herein but subject to section 22, nothing in this Agreement or the Recovery Plan shall limit or restrict Scotiabank or any Scotiabank Lender from taking any action that Scotiabank or such Scotiabank Lender shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Recovery Plan or the Recovery Plan Documents.

6.     <u>Solus and the Solus Lenders' Obligations</u>.

(a)     Each Solus Lender (i) shall (A) consent to the Solus Credit Agreement Amendments (as defined in the Recovery Plan Term Sheet, together with the Scotiabank Credit Agreement Amendments, the "***Credit Agreements Amendments***") with respect to all or part of the Solus Loans and/or (B) exchange all or part of the Solus Loans in the Exchange Offer (as described in the Recovery Plan Term Sheet) and (ii) agrees to take any and all reasonably necessary and appropriate action to effectuate the Solus Credit Agreement Amendments and/or the Exchange Offer, as applicable, in each case so that the entirety of the Solus Loans are either subject to the Solus Credit Agreement Amendments or exchanged into the Exchange Offer (or a combination thereof).

(b)     During the Support Period, subject to the terms and conditions set forth herein, the Solus Lenders agree that, with respect to the Solus Credit Agreement, the Solus Lenders will forbear from enforcing or exercising any rights or remedies available to the Solus Lenders under the Solus Credit Agreement or applicable law arising solely by reason of any Default or Event of Default (as such terms are defined in the Solus Credit Agreement) that may have occurred or may subsequently occur as identified on <u>Annex G</u> attached hereto (the "***Solus Potential Defaults***", and collectively with the Scotiabank Potential Defaults and Bond Potential Defaults, the "***Potential Defaults***").

(c)     Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall limit or restrict Solus from (i) taking any action that Solus may take under the Facility Documents (as such term is defined in the Solus Credit Agreement), at law or in equity, that Solus deems is necessary or appropriate to preserve, protect or defend (but not to enforce) any of the Solus Priority Rights (as defined below) against any challenge, infringement or assertion of priority, including, without limitation, (A) defending, intervening in or filing pleadings and other documents in any legal proceedings relating to any such Solus Priority Rights, (B) sending notices to any persons, governmental authorities or entities

16

concerning the existence of any such Solus Priority Rights, or (C) otherwise preserving any of the rights, remedies, positions or defenses of Solus, all of which are hereby expressly reserved; (ii) defending, intervening in or filing pleadings and other documents in any legal proceedings relating to the validity, amount, priority, or other terms of the Solus Credit Agreement or the Solus Loan Obligations; (iii) intervening in, filing pleadings or other documents with, or otherwise participating in any proceeding before the Energy Commission; or (iv) appearing and participating as a party in interest in any matter to be adjudicated or decided in any bankruptcy or insolvency proceeding concerning PREPA, *provided* that the positions advocated in connection with such appearance are not materially inconsistent with the Recovery Plan and do not delay or hinder in any material respect, or prevent consummation of the Recovery Plan.  For purposes hereof, "**Solus Priority Rights**" shall mean the treatment of the Obligations (as such term is defined in the Solus Credit Agreement, the "**Solus Loan Obligations**") as "Current Expenses" under the Trust Agreement.

(d)     PREPA shall continue to make scheduled payments of interest in cash under the Solus Credit Agreement; *provided* that notwithstanding anything to the contrary in the Solus Credit Agreement, during the Support Period, interest shall accrue and be paid in cash on the Solus Loan Obligations at a rate of 7.25% per annum on the first business day of each month.  Each of the Solus Lenders acknowledges and agrees that no default interest under the Solus Credit Agreement will accrue or be paid during the Support Period.

(e)     Except as expressly provided herein, none of (A) the existence, execution, delivery or performance of any term or provision of this Agreement, (B) any failure by any Solus Lender to object to any document or action contemplated by or taken under or in connection with this Agreement, or (C) any action taken under or in connection with this Agreement, including any approvals or consents to any action or document, shall (i) constitute a modification or relinquishment of any term or aspect of, or any right or remedy under or with respect to, the Facility Documents; (ii) constitute a consent to, waiver of, or admission of any default or event of default (or the absence of a default or event of default) in any of the Facility Documents; (iii) extend the due date of any obligations under the Facility Documents or otherwise affect the enforceability of such obligations; (iv) give rise to any obligation to extend, amend, waive or otherwise modify any term or condition of any of the applicable Facility Documents; (v) give rise to any defenses or counterclaims to PREPA or the Solus Lenders, or to any right of the Solus Lenders to compel payment of the obligations under any of the applicable Facility Documents or to otherwise enforce rights or remedies thereunder; (vi) prohibit the Solus Lenders from instituting, commencing, prosecuting, joining, interceding in, supporting or otherwise participating directly or indirectly in any way in any legal proceedings regarding the validity, enforceability or application of the Recovery Act or any provision thereof, or intervening or otherwise participating in any Recovery Act Legal Actions; or (vii) prejudice the rights of any party to the Recovery Act Legal Actions.  Notwithstanding anything to the contrary, nothing in this Agreement shall amend or modify Sections 8.02

17

and 8.04 of the Solus Credit Agreement.  Except as expressly limited herein, each Solus Lender and PREPA hereby expressly reserves all of its rights, remedies, positions and defenses under or with respect to the Facility Documents and under applicable law, and waives none.  From and after the termination of this Agreement as to Solus, the Solus Lenders and PREPA shall, subject to PREPA's obligations under this Agreement to the remaining Parties, be entitled to protect, defend, enforce and assert any of their respective rights, remedies, positions and defenses under or with respect to the Loan Documents in accordance with their respective terms or under applicable law, including without limitation commencing legal proceedings.  PREPA acknowledges that Solus has made no representations as to what actions, if any, Solus will take after this Agreement terminates as to Solus (including by withdrawal), and with respect thereto Solus hereby specifically reserves any and all rights, remedies, and claims it has (after giving effect hereto) with respect to the Solus Potential Defaults and each other Default (as such term is defined in the Solus Credit Agreement) that may occur.

(f)     Notwithstanding anything to the contrary herein but subject to section 22, nothing in this Agreement or the Recovery Plan shall limit or restrict Solus from taking any action that Solus shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Recovery Plan or the Recovery Plan Documents.

7.     <u>GDB's Obligations</u>.

(a)     During the Support Period:

(i)     GDB shall work cooperatively with the Supporting Creditors and their advisors to prepare and execute any documentation necessary (including the Recovery Plan Documents), as well as to take such steps as are commercially reasonable, necessary or appropriate to support, facilitate, implement and consummate the Recovery Plan;

(ii)     GDB (x) shall consent to the GDB Loan Amendments (as defined in the Recovery Plan Term Sheet) with respect to all or part of its indebtedness under the GDB Loan Agreements and/or (y) exchange all or part of its indebtedness under the GDB Loan Agreements in the Exchange Offer (as described in the Recovery Plan Term Sheet) and (z) agrees to take any and all reasonably necessary and appropriate action to effectuate the GDB Loan Amendments and/or the Exchange Offer, as applicable, in each case so that the entirety of its indebtedness under the GDB Loan Agreements is either subject to the GDB Loan Amendments or exchanged into the Exchange Offer (or a combination thereof);

(iii)     upon the request of PREPA or the Supporting Creditors, GDB shall provide reasonable access to its management in connection with the documentation, execution, and implementation of the Recovery Plan in the

18

form of regular meetings between and/or among such management, advisors to PREPA, and the Supporting Creditors and/or their advisors;

(iv) upon the terms and subject to the conditions set forth herein, GDB shall not enforce any rights or remedies (including, without limitation, the commencement of any legal proceedings and the exercise of any right of setoff or recoupment) against PREPA or its assets in respect of GDB's rights or claims under the GDB Loan Agreements or GDB's pecuniary rights or claims to payment under any other contract or agreement between GDB and PREPA;

(v) GDB shall refrain from directly or indirectly promoting or supporting any bill or legislation that is materially inconsistent with the Recovery Plan or this Agreement, that would materially and adversely affect the ability of PREPA to comply with its obligations under this Agreement or under the Recovery Plan Documents, or that would materially and adversely affect any Supporting Creditor in its capacity as a PREPA creditor; and

(vi) GDB shall refrain from (i) taking, recommending, proposing, supporting, soliciting, or participating in any action not required by law that is inconsistent in any material respect with, or that would materially delay or impede approval, execution of documentation for, or implementation or consummation of the Recovery Plan, or that is otherwise inconsistent in any material respect with the express terms of this Agreement, and (ii) directly or indirectly, proposing, supporting, soliciting, or participating in the formulation of any plan or proposal to restructure PREPA other than the Recovery Plan.

(b) Nothing contained in this Agreement is intended, or shall be deemed or construed to (i) constitute a waiver of any term or provision of the GDB Agreements (other than waiver of the exercise of any rights or remedies, including any exercise of a setoff or recoup right, in each case during the Support Period) and any other agreements between GDB and PREPA or applicable law, (ii) establish a custom or course of dealing between PREPA, on the one hand, and GDB, on the other hand, or (iii) limit or restrict GDB's ability or right to exercise its duty to act as the fiscal agent to any other person.

(c) Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall limit or restrict GDB from taking any action that GDB may take under the GDB Agreements, at law or in equity, that is necessary or appropriate to preserve, protect or defend (but not to enforce) any of GDB's rights thereunder against any challenge, including, without limitation, (i) defending, intervening in or filing any legal proceedings relating to any such GDB's rights, (ii) sending notices to any persons, governmental authorities or entities concerning the existence of any such GDB's rights, or (iii) otherwise preserving any of the rights, remedies, positions or defenses of GDB, all of which are hereby expressly reserved; *provided*, however that during the Support Period GDB shall not have

the right to setoff against any of PREPA's moneys, notwithstanding if GDB has such rights under the GDB Loan Agreements or under any other applicable documents or law.

(d)     Upon termination of this Agreement, without the requirement of any notice to PREPA or any other person or Party: (i) all agreements set forth in section 7(a)(iv) of this Agreement shall terminate automatically and be of no further force or effect, and (ii) subject to the terms of the GDB Agreements and applicable law, except as otherwise required by this Agreement, GDB and PREPA shall be free in their sole and absolute discretion without limitation to proceed to enforce any or all of their respective rights and remedies set forth in the GDB Agreements and applicable law including, without limitation, commencing legal proceedings. Notwithstanding anything to the contrary herein but subject to section 22, nothing in this Agreement or the Recovery Plan shall limit or restrict GDB from taking any action that GDB shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Recovery Plan or the Recovery Plan Documents.

(e)     GDB agrees that during the Support Period PREPA shall have no obligation to pay any principal or interest under the GDB Loan Agreements, *provided* that interest shall continue to accrue but shall not be payable unless and until all principal and interest due and payable to the Supporting Creditors shall have been paid; notwithstanding the foregoing, such GDB principal or interest payments may be made on a current basis to the extent paid out of funds disbursed by a federal or local governmental entity (other than PREPA) for the purpose of paying such amounts pursuant to a federal or local program or appropriation.

(f)     Except as expressly provided in this Agreement, including the Recovery Plan and any Recovery Plan Document, GDB shall in no way be required as a result of this Agreement to expend any cash resources or assume any additional risk or liability in support of the Recovery Plan or this Agreement. GDB acknowledges that PREPA and the Supporting Creditors have made no representations as to what actions, if any, PREPA or any of the Supporting Creditors will take after this Agreement terminates.

8.     <u>Additional Covenant by the Participating Holders, PREPA, and the Insurers</u>. Each of the Participating Holders (as defined in the January Payment Term Sheet), PREPA and the applicable Insurers agree to execute a mutually agreeable bond purchase agreement (the "***January Bond Purchase Agreement***"), in accordance with and subject to the terms and conditions set forth in <u>Annex H</u> hereto ("***January Payment Term Sheet***").

9.     <u>Additional Covenants by PREPA</u>.  PREPA hereby covenants as follows:

(a)     During the Support Period, PREPA shall provide the following to each Supporting Creditor or, if so directed by a Supporting Creditor in writing, such

Supporting Creditor's financial and legal advisors, in each case, subject to an Acceptable NDA:

(i) Within two (2) business days after receipt, any default, event of default or termination notice received by PREPA under the Trust Agreement, the Credit Agreements, the GDB Loan Agreements or any other agreement under which PREPA owes or could owe more than $10 million if a counterparty exercises remedies thereunder;

(ii) Within five (5) business days after the end of any month, a cash report showing account balances for the General Fund and the Construction Fund (as each term is defined in the Trust Agreement);

(iii) Within five (5) business days after execution by PREPA, copies of any agreements with vendors for the delivery of fuel oil or for the purchase of power with projected annual spend of greater than $50 million;

(iv) Within five (5) business days after PREPA has proposed or received any proposal that it intends in good faith to consider, any such proposal (whether formal or informal) that concerns any new financing or loan facility or any proposed recovery program or debt enforcement plan;

(v) Within five (5) business days after the Effective Date, a 13-week cash flow statement (the "***Initial 13-Week Cash Flow Statement***") and weekly updates to the Initial 13-Week Cash Flow Statement (the "***Rolling 13-Week Cash Flow Statement***");

(vi) No later than seven (7) business days prior to the end of the period covered by the Initial 13-Week Cash Flow Statement and each subsequent 13-week period, a budget covering the next 13-week period including the same categories as the Initial 13-Week Cash Flow Statement;

(vii) Copies of all documents filed or published by any person relating to the PREC Public Hearing (including any comment period), to the extent not publicly available online and to the extent permissible under any relevant confidentiality obligation; and

(viii) Written notice of any (A) default by any Party under this Agreement, or (B) Termination Event (as defined herein), and, in the case of clause (A), the waiver or cure of any such default, in each case within two (2) business days after the occurrence of such default, Termination Event, waiver, or cure, shall have been notified in writing to PREPA or PREPA shall have otherwise obtained actual knowledge of the occurrence of such default, Termination Event, waiver, or cure.

(b) During the Support Period, PREPA shall (i) consult, in good faith, with the Supporting Creditors' financial and legal advisors with respect to (A) any proposal that concerns any new financing or loan facility, (B) any proposed

recovery program or debt enforcement plan, (C) any rate case (a "***Rate Case***") to be submitted to the Energy Commission (including with respect to the Rate Structure (as defined in the Recovery Plan Term Sheet)), the initial petition and other substantive pleadings (excluding any pleadings responding to information requests) submitted to the Energy Commission, (D) any substantive pleadings (excluding any pleadings responding to information requests) submitted to the Energy Commission in connection with the SPV Petition, (E) the Legislative Reform Package, and, for the avoidance of doubt, to the extent practicable, any amendments thereto, and (F) to the extent permissible under relevant confidentiality agreements with the rating agencies, any presentations provided to, or discussions or correspondence with, any rating agency in connection with PREPA's efforts to obtain a rating on the Securitization Bonds; (ii) consider, in good faith, any recommendations made by such advisors with respect to each of the foregoing; *provided,* that, with respect to item (C), (D) and (F) above (to the extent practicable, and for (F), only with respect to presentations provided to any rating agencies), PREPA shall provide a copy of each of the documents described therein to each of the Supporting Creditors' financial and legal advisors no later than five (5) business days prior to submission to the Energy Commission or a rating agency, as applicable; and (iii) keep the Supporting Creditors' financial and legal advisors reasonably informed regarding any material developments with respect to (X) the matters described in clauses (i)(A)-(F) of this subsection, (Y) any power purchase agreement or public-private partnership with PREPA, and (Z) any other material transaction outside the ordinary course of PREPA's business.

(c)      Except as provided by the Recovery Plan, PREPA shall not agree to any amendments, modifications, or supplements to the Bond Documents, Credit Agreements or GDB Loan Agreements (collectively, the "***Supporting Creditor Agreements***") that (A) prejudice or impair any Supporting Creditors' rights (as applicable) under the applicable Supporting Creditor Agreements or are otherwise adverse to any Supporting Creditors in their capacity as PREPA creditors, (B) enhance the existing rights of the Insurers, Holders, Scotiabank, the Scotiabank Lenders, Solus or GDB (as applicable), or (C) without limiting the preceding clauses (A) or (B), modify any Supporting Creditor Agreement (as applicable) in any way that is adverse to any Supporting Creditor (in its capacity as a PREPA creditor) not party to such agreement or which enhances the rights of any Supporting Creditor under a Supporting Creditor Agreement, in the case of clauses (A), (B) and (C), without the written consent of the Requisite Supporting Creditors and Supermajority Insurers, counting, for purposes of clause (C) only, only those Supporting Creditors within each class of Supporting Creditors that are not parties to such Supporting Creditor Agreement.

Prior to entering into any amendment, modification or supplement to the Supporting Creditor Agreements, PREPA shall provide written notice of any such proposed amendment (each, a "***Proposed Amendment***") to the financial and legal advisors of any Supporting Creditors not party to such Supporting Creditor Agreement no less than ten (10) business days prior to the effectiveness of such Proposed Amendment.  If PREPA does not receive any written objection to a

22

Proposed Amendment from counsel to any such Supporting Creditors within ten (10) business days after providing such notice, no consent of such Supporting Creditors shall be required pursuant to the preceding paragraph prior to PREPA's entry into the applicable Proposed Amendment;

(d)     It shall use reasonable commercial efforts to respond promptly to any reasonable written request for information concerning further diligence requests made by any Supporting Creditor;

(e)     It shall provide to the Supporting Creditors and their advisors reasonable access to its management and advisors that are participating in the development of the Recovery Plan from time to time, including, without limitation, if requested, weekly meetings and/or telephone conference calls with the financial advisors to the Supporting Creditors to discuss, among other things, any of the reports provided pursuant to section 9(a) of this Agreement;

(f)     It shall use commercially reasonable efforts to pursue any overdue accounts in respect of its accounts receivable from all of its customers (including, without limitation, all governmental entities and municipalities) and take all reasonable actions to seek to collect such Revenues;

(g)     It shall attempt, in good faith, to minimize potential setoff risks in conducting its cash management practices;

(h)     It shall satisfy, when due and in accordance with their terms, its payment obligations under (i) the interest rate swap transaction between PREPA and UBS AG, Stamford Branch, evidenced by a confirmation, dated April 18, 2007, as amended and supplemented from time to time; and (ii) the interest rate swap transaction between PREPA and JPMorgan Chase Bank, N.A., evidenced by a confirmation, dated April 27, 2007, as amended and supplemented from time to time (such swaps, the "***Assured Swaps***");

(i)     PREPA shall record (i) revenue from municipalities and associated receivable balances on a gross basis, without reflecting any offset or accounting adjustment for Contributions in Lieu of Taxes ("***CILT***"); and (ii) CILT liabilities on a gross basis;

(j)     PREPA shall post the following to its publicly accessible website within two (2) business days after the date such documents are delivered to the Trustee (and shall make such delivery on a timely basis):  (i) the annual report of the consulting engineers required under Section 706 of the Trust Agreement and (ii) the monthly statements under Section 710 of the Trust Agreement;

(k)     On the Effective Date, PREPA paid to each (x) Holder (or its designee) a support fee (the "***Holder Support Fee***") in cash in an amount equal to its pro rata share (calculated based on the Bond Principal Amount held or controlled by all Holders) of $1,250,000, and (y) Credit Agreements Lender (or its designee) a support fee (the "***Lender Support Fee***") in cash in an amount equal to its pro rata

share (calculated based on the Credit Agreements Principal Amount held or controlled by the Credit Agreements Lenders in their capacities as such) of $400,000; in each case under clauses (x) and (y) above, upon PREPA's receipt of a written certification by such Supporting Creditor (or its designee) that such pro rata share does not exceed, after giving effect to amounts reimbursed to their advisors from payments of prior fees made by PREPA under the Prior Forbearance Agreements, the aggregate amount of fees and expenses incurred by such Supporting Creditor relating to work performed in connection with PREPA's restructuring, including the negotiation and documentation of this Agreement and the Recovery Plan and related diligence (but excluding, for the avoidance of doubt, any work related to litigation by such Supporting Creditor, or in which such Supporting Creditor participates, against PREPA or in respect of the Recovery Act or in respect of any rate case brought by such Supporting Creditor or in which such Supporting Creditor participates), which shall be creditable against any obligation of PREPA to pay any fees and expenses of such Supporting Creditor;

(l)     No later than the first (1st) business day of each month after the Effective Date during the Support Period, counsel to each Supporting Creditor that receives a payment pursuant to Section 9(k) shall, by written notice to PREPA's counsel, subject to section 14, advise PREPA of any changes in the aggregate principal amount of Uninsured Bonds, Insured Bonds (solely in the case of the Insurers), Scotiabank Loans or Solus Loans (as applicable) beneficially owned, controlled or insured by its clients that are Supporting Creditors.  On the fifteenth (15th) day of each calendar month (or the first business day thereafter), starting on the first such day after the Effective Date and through the Closing Date (as defined herein), PREPA shall pay, in arrears, a support fee that is a Party to this Agreement at such time (or its designee) equal to its pro rata share (calculated based on the aggregate principal amount of Uninsured Bonds held or controlled by all Holders Party to this Agreement at such time) of $1,000,000, and (y) each Credit Agreements Lender that is a Party to this Agreement at such time (or its designee) equal to its pro rata share (calculated based on the Credit Agreements Principal Amount held or controlled by the Credit Agreements Lenders in their capacities as such) of $250,000; in each case, upon PREPA's receipt of a written certification by such Supporting Creditor (or its designee) that such pro rata share does not exceed, after giving effect to amounts reimbursed to their advisors from payments of prior fees made by PREPA under the Prior Forbearance Agreements or otherwise, the aggregate amount of fees and expenses incurred by such Supporting Creditor relating to work performed in connection with PREPA's restructuring, including the negotiation and documentation of this Agreement and the Recovery Plan and related diligence (but excluding, for the avoidance of doubt, any work related to litigation by such Supporting Creditor, or in which such Supporting Creditor participates, against PREPA or in respect of the Recovery Act or in respect of any rate case brought by such Supporting Creditor or in which such Supporting Creditor participates), which shall be creditable against any obligation of PREPA to pay any fees and expenses of such Supporting Creditor;

(m)     On the Restatement Effective Date, PREPA shall pay to National and Assured (or any designee), if such Insurer is a Supporting Creditor Party, a support fee (the "*Schedule II Insurer Support Fee*"), which is separate and distinct from quarterly fees and premium described in Schedule II to the Recovery Plan Term Sheet, in cash in an amount equal to such Insurer's share (as set forth in the letter agreement between National and Assured described in footnote three of Schedule II of the Recovery Plan Term Sheet) of $1,000,000.  On the fifteenth (15th) day of each calendar month (or the first business day thereafter), starting on the first such day after the Effective Date and through the Closing Date (as defined herein), PREPA shall pay, in arrears, a support fee to National and Assured (or any designee), if such Insurer is a Party to this Agreement at such time, equal to such Insurer's share (as set forth in the letter agreement between National and Assured described in footnote three of Schedule II of the Recovery Plan Term Sheet) of $1,000,000; upon PREPA's receipt of a written certification by National and Assured (or their designee) that such pro rata share does not exceed, after giving effect to amounts reimbursed to their advisors from payments of prior fees made by PREPA under the Prior Forbearance Agreements or otherwise, the aggregate amount of fees and expenses incurred by such Supporting Creditor relating to work performed in connection with PREPA's restructuring, including the negotiation and documentation of this Agreement and the Recovery Plan and related diligence (but excluding, for the avoidance of doubt, any work related to litigation by such Supporting Creditor, or in which such Supporting Creditor participates, against PREPA or in respect of the Recovery Act or in respect of any rate case brought by such Supporting Creditor or in which such Supporting Creditor participates), which shall be creditable against any obligation of PREPA to pay any fees and expenses of such Supporting Creditor.  In consideration of the fees set forth in this paragraph, notwithstanding any other contractual rights to the contrary, Assured and National shall not be entitled to any fees or expenses (including, for the avoidance of doubt, any fees and expenses of legal and financial advisors) incurred in connection with PREPA's restructuring other than the Schedule II Insurer Support Fee, the monthly fees payable hereunder, and the Quarterly Fee and the DSRF surety premiums described in Schedule II of the Recovery Plan Term Sheet;

(n)     PREPA shall include in the Consent Solicitation documents a description of  the revised "Current Expenses" definition to be incorporated in the Trust Agreement pursuant to the Closing Date Trust Agreement Amendments (as described in the Recovery Plan Term Sheet), which definition in the Closing Date Trust Agreement Amendments shall expressly provide that the Scotiabank Loan Obligations and the Solus Loan Obligations shall constitute "Current Expenses" under the Trust Agreement, as provided in the Recovery Plan Term Sheet;

(o)     PREPA shall retain a recognized search firm with extensive experience in selecting executives and directors for electric utility companies (other than PREPA) of similar size, complexity and risks as PREPA (the "*Search Firm*") to conduct a search for independent directors as contemplated by the Legislative Reform Package on or before February 19, 2016, and shall consult, in good faith,

with the Supporting Creditors (subject to an Acceptable NDA) and the financial and legal advisors of the Supporting Creditors before retaining any search firm;

(p)     During the Support Period PREPA shall not institute, join or support any action or proceeding to challenge, modify, alter or otherwise take any public position regarding the treatment of the Solus Loan Obligations and the Scotiabank Loan Obligations as "Current Expenses" under the Trust Agreement; and

(q)     PREPA and Syncora shall each negotiate in good faith to reach an agreement with the Supporting Creditors with respect to Syncora's participation in the Recovery Plan on or prior to January 22, 2016.

10.     <u>Withdrawal</u>.  Any Supporting Creditor (other than GDB) may withdraw from this Agreement upon the occurrence of any of the following events (each, a "***Withdrawal Event***") upon written notice to PREPA and the advisors to the other Supporting Creditors, in which case this Agreement will terminate as to such notifying Supporting Creditor (each a "***Withdrawing Creditor***") and it will no longer be considered a Supporting Creditor as of the date of delivery of such written notice (or the expiration of any applicable cure period):

(a)     The TA Amendment is not effective on or before forty-five (45) days after the Restatement Effective Date;

(b)     PREPA does not receive from the U.S. Internal Revenue Service (the "***IRS***"), on or before May 30, 2016, a private letter ruling or a closing agreement in an Acceptable Form as determined in good faith by such Withdrawing Creditor; *provided*, that such failure has not been cured within ten (10) days after receipt of a written notice thereof from such Withdrawing Creditor; *provided* further that such notice may be provided no later than ten (10) days after the legal advisors to the Supporting Creditors receive notice of and an executed copy of such IRS private letter ruling or closing agreement (as applicable);

(c)     During the Support Period, any regulatory authority or court of competent jurisdiction appoints a receiver with respect to PREPA; unless such appointment has, prior to the withdrawal of such Withdrawing Creditor, been stayed, reversed or vacated;

(d)     Any of GDB, Scotiabank, the Scotiabank Lenders, the Solus Lenders, Holders of more than 15.0% in principal amount of the aggregate amount of the Uninsured Bonds beneficially owned or controlled by all the Holders at such time, or the individual Insurers (each, a "***Triggering Creditor***"), fail to comply with any of the material terms, covenants, provisions, or conditions of this Agreement or any such material terms, provisions or conditions are otherwise subject to any breach, default or violation on the part of any Triggering Creditor, or any of the material representations or warranties of any Triggering Creditor as set forth in this Agreement is not true or accurate in any material respect at any time during the Support Period (each of the foregoing, a "***Default***"), which Default, if capable of being cured, is not cured within ten (10) days after receipt of a written notice

26

thereof from such Withdrawing Creditor; *provided* that such Default materially and adversely affects the rights or interests of such Withdrawing Creditor under this Agreement;

(e)     Either of PREPA or GDB breaches its obligations under sections 2(d), 2(f) or 7(a)(v), respectively; *provided* that such breach, if capable of being cured, is not cured within ten (10) days after receipt of a written notice thereof from such Withdrawing Creditor;

(f)     The Energy Commission or the Commonwealth orders or approves (i) a reduction in the base rates of PREPA or (ii) an adjustment in any rates of PREPA in a manner that adversely and materially affects the Supporting Creditors in their capacity as PREPA creditors as determined in good faith by such Withdrawing Creditor; *provided*, that, such order or approval has not been stayed, reversed or vacated within ten (10) days after receipt of a written notice thereof from such Withdrawing Creditor;

(g)     PREPA or the Securitization SPV files any document in or regarding any Validation Proceeding in respect of the Securitization Bonds, their issuance or the relevant authorizing legislation or publicly discloses (or permits to be publicly disclosed) any written legal opinions regarding the validity of the securitization charge for the Securitization Bonds or the validity of the legislation authorizing the Securitization Bonds that are not reasonably acceptable as determined in good faith by such Withdrawing Creditor; *provided* however that, if PREPA or its legal advisors do not receive any written objection to any such document or written legal opinion from counsel to the Supporting Creditor within five (5) days after providing such counsel with a copy of the final form of such document or written legal opinion (and where all or a portion of such document or written legal opinion is not in English, an English translation of such document or written legal opinion) accompanied by a notice stating the accompanying document or written legal opinion is in final form, such document or written legal opinion shall be deemed to be reasonably acceptable to such Supporting Creditor for purposes of this section 10(g);

(h)     An Amendment pursuant to section 17(e)(C) becomes effective without the consent of such Withdrawing Creditor; *provided* that a Supporting Creditor may only withdraw from this Agreement pursuant to this section 10(h) within ten (10) days after receipt of a notice pursuant to section 17 that such Amendment has been entered into;

(i)     An Amendment becomes effective without the consent of such Withdrawing Creditor which (x) effects a change in (A) the Exchange Offer exchange ratio, (B) the interest rates of the Securitization Bonds, (C) the Ratings Condition (as defined in the Recovery Plan Term Sheet) or (D) the date prior to which the optional redemption of the Securitization Bonds is not permitted, or (y) reflects an agreement with one or more Insurers (or Syncora or any other person that insures Bonds) with respect to any participation or change in participation for any Insurer

27

(or Syncora or any other person that insures Bonds) in the Recovery Plan, including the terms set forth in Schedule II to the Recovery Plan Term Sheet; *provided* that a Supporting Creditor may only withdraw from this Agreement pursuant to this section 10(i) within ten (10) days after receipt of a notice pursuant to section 17 that such Amendment has been entered into;

(j)   PREPA or any other party acting on its behalf commences any proceeding under any bankruptcy or insolvency law, suspension period or proceeding under the Recovery Act or any other action or proceeding that seeks to adjust, extend or challenge the claims of the Supporting Creditors pursuant to any federal, state or Puerto Rico statute, now or hereinafter enacted into law, except for any such proceeding to implement the Recovery Plan in accordance with section 2(c); *provided* that each Supporting Creditor shall be deemed to have withdrawn automatically (without the requirement to deliver any written notice) upon commencement of any such proceeding, unless such Supporting Creditor shall have elected to expressly waive in writing its withdrawal right;

(k)   PREPA fails to make any required debt service payment on any of the Bonds;

(l)   Legislation containing substantive provisions that implements the Recovery Plan is not enacted into law on or before January 22, 2016;

(m)   An Amendment becomes effective without the consent of such Withdrawing Creditor which effects a change to (A) sections 13(e)(vi) or 13(e)(viii) or (B) notices delivered pursuant thereto, or any consequences of the notices contemplated thereby; *provided* that a Supporting Creditor may only withdraw from this Agreement pursuant to this section 10(m) within ten (10) days after receipt of a notice pursuant to section 17 that such Amendment has been entered into.

Once a Party is no longer a Party to this Agreement (including due to a withdrawal pursuant to section 10), such Party shall be entitled to exercise any rights or remedies it may have under or in respect of the Bond Documents, Loan Documents, Facility Documents or applicable law, at law or in equity, and any applicable statutes of limitation with respect to any such rights or remedies shall be tolled during the Support Period applicable to such Party; *provided* that in such event, PREPA or GDB shall, subject to their respective obligations under this Agreement to the remaining Parties,  be entitled to protect, defend, enforce and assert any of its rights, remedies, positions and defenses or take any other action that PREPA or GDB may take under the Bond Documents, Loan Documents, Facility Documents, GDB Agreements (as applicable) or applicable law, at law or in equity, in connection thereto, in each case, solely against Parties no longer Party to this Agreement, subject in all respects to section 16.  The withdrawal of a Supporting Creditor from this Agreement shall be deemed a withdrawal from this Agreement with respect to all Bonds, Scotiabank Loans and Solus Loans (as applicable) held or insured by such Withdrawing Creditor.

11.   Conditions to Effectiveness.  The Initial RSA was initially executed and became effective on November 5, 2015 (the "***Effective Date***").  The amendment and restatement of this

Agreement embodied herein shall become effective as of the date (the "*Restatement Effective Date*") that each of the following shall have occurred:

(a) Each Party (including, for the avoidance of doubt, members of the Ad Hoc Group beneficially owning or controlling, in the aggregate, not less than 35% of the Bond Principal Amount) shall have duly delivered and executed a counterpart of this Agreement no later than 11:59 p.m. (prevailing Eastern Time) on December 23, 2015;

(b) No proceeding pursuant to the Recovery Act or any other action or proceeding that seeks to adjust the claims of the Supporting Creditors pursuant to any federal, state, or Puerto Rico statute, now or hereinafter enacted into law, shall have been instituted by or on behalf of PREPA;

(c) PREPA shall, no later than 11:59 p.m. (prevailing Eastern Time) on December 28, 2015, have received and provided written confirmation to all Supporting Creditors of all approvals required to enter into and perform this Agreement, including, without limitation, (i) submission to the Supporting Creditors of resolutions duly adopted by the boards of directors of each of PREPA and GDB, in each case authorizing PREPA and GDB, respectively, to enter into and perform this Agreement, and (ii) submission of this Agreement for registration with the Office of the Comptroller of the Commonwealth of Puerto Rico pursuant to the provisions of Act. No. 18 of the Legislative Assembly of the Commonwealth, approved on October 30, 1975, as amended; and

(d) PREPA shall, no later than 11:59 p.m. (prevailing Eastern Time) on December 28, 2015, have paid the Schedule II Insurer Support Fee to National and Assured (or their designees) in accordance with section 9(m).

12. <u>Representations</u>.

(a) <u>Mutual Representations</u>.  Each Party hereby represents and warrants to the other as follows (each of which is a continuing representation and warranty, and shall be true during the Support Period):

 (i) it has the legal right, power and authority to enter into this Agreement and consummate the transactions contemplated hereby;

 (ii) this Agreement is a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding at equity or law));

 (iii) (A) with respect to PREPA, it is a public corporation of the Commonwealth of Puerto Rico, duly existing under the laws of the Commonwealth of Puerto Rico, and (B) with respect to each Party, it is

29

duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization with full power and authority to execute and deliver, and to perform and observe the terms and provisions of, this Agreement; and

(iv)     the execution, delivery, performance and observance of this Agreement by such Party (A) have been duly authorized by all necessary action on the part of such Party, do not and will not conflict with, or result in a violation of, any law applicable to it, and do not require it to obtain any permit, consent, approval, order or authorization of, or provide notice to or make a filing with, any court, governmental or regulator agency or authority or other person or entity that has not been obtained, provided or made, as applicable, (B) (1) with respect to PREPA, do not contravene, or constitute a default under, any provision of applicable law or regulation or of any agreement, judgment, injunction, order, decree or other instrument binding on PREPA and (2) with respect to each Party, do not and will not violate, conflict with or result in the breach of any provision of its organizational or governance documents and (C) do not and will not result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage, indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement (including without limitation the Bond Documents, Loan Documents, Facility Documents and GDB Agreements) to which it is a party, which would materially adversely affect its ability to carry out its obligations under and otherwise observe this Agreement or cause the occurrence of a Termination Event.

(b)     <u>Additional Representations of PREPA</u>.  PREPA hereby represents and warrants as follows (each of which is a continuing representation and warranty, and shall be true during the Support Period):

(i)     except to the extent that a Potential Default has occurred, no default under any Bond Document, Loan Document, Facility Document or GDB Agreement has occurred and is continuing to the best of its knowledge;

(ii)     it is in full compliance with, and no breach or default has occurred or is continuing in respect of, the covenants contained in Section 712 of the Trust Agreement; and

(iii)     each of the representations in the Recitals set forth above as to PREPA is true and accurate as of the date hereof.

(c)     <u>Additional Representations of the Insurers</u>.  Each of the Insurers hereby represents and warrants as follows (each of which is a continuing representation and

warranty, and shall, subject to the provisions herein relating to Transfer (as defined in section 18(a) below) be true throughout the Support Period):

(i) with respect to the Insured Bonds identified on its respective signature page hereto, the applicable Insurer has the sole right in lieu of the beneficial owners of such Insured Bonds to consent to the TA Amendment and to deliver the consents set forth in the Schedule II to the Recovery Plan Term Sheet as part of the Consent Solicitation;

(ii) no default or event of default has occurred with respect to it under any Bond Insurance Agreement to which it is a party;

(iii) it has not transferred any voting, consent or direction rights related to the applicable Insured Bonds; and

(iv) each of the representations in the Recitals set forth above as to such Insurer is true and accurate as of the date hereof.

(d) <u>Additional Representations of the Holders</u>. Each of the Holders hereby represents and warrants as follows (each of which is a continuing representation and warranty, and shall, subject to the provisions relating to Transfer (as defined in section 18(a) below) be true throughout the Support Period):

(i) it owns or has investment management responsibility for accounts that own Uninsured Bonds in the principal amounts set forth on its respective signature page hereto or joinder to this Agreement in the form of <u>Annex B-1</u> (as applicable), and that it has not sold, assigned, transferred, participated or otherwise pledged such Bonds, or any voting, consent or direction rights related to such Bonds, to any other person or entity, in each case, except as permitted by section 18 of this Agreement; and

(ii) each of the representations in the Recitals set forth above as to the Holders is true and accurate as of the date hereof.

(e) <u>Additional Representations of Scotiabank and the Scotiabank Lenders</u>. Each of Scotiabank and the Scotiabank Lenders hereby represents and warrants (which is a continuing representation and warranty, and shall, subject to the provisions herein relating to Transfer (as defined in section 18(a), below) be true throughout the Support Period) that each of the representations in the Recitals set forth above as to Scotiabank and the Scotiabank Lenders is true and accurate as of the date hereof.

(f) <u>Additional Representations of Solus</u>. Solus hereby represents and warrants (which is a continuing representation and warranty, and shall, subject to the provisions herein relating to Transfer (as defined in section 18(a), below) be true throughout the Support Period) that each of the representations in the Recitals set forth above as to Solus is true and accurate as of the date hereof.

13.    Termination.

(a)    This Agreement shall terminate as to all Parties at 11:59 p.m. (prevailing Eastern Time) on June 30, 2016 (the "***Termination Date***"), unless terminated earlier in accordance with the terms of this Agreement.

(b)    In addition, this Agreement shall terminate as to all Parties automatically upon the occurrence of each of the following events (or the expiration of any applicable cure period) (each an "***Automatic Termination Date***"):

(i)    **[RESERVED]**;

(ii)    PREPA does not initiate a rate approval process with respect to the Rate Structure on or before March 22, 2016;

(iii)    The Securitization SPV does not file with the Energy Commission a petition (including the proposed Restructuring Resolution and other supporting documentation, the "***SPV Petition***") for the approval of the calculation methodology for the Transition Charges and the Adjustment Mechanism (each as defined in the Recovery Plan Term Sheet) on or before February 10, 2016;

(iv)    Legislation containing substantive provisions that implements the Recovery Plan is not enacted into law on or before January 22, 2016;

(v)    The Energy Commission does not conduct a public hearing process to approve a revised rate structure (which may include a provisional rate in accordance with Schedule VI to the Recovery Plan Term Sheet) designed to implement the Recovery Plan as contemplated by, and in accordance with each deadline set forth in, the Legislative Reform Package, as enacted into law (the "***Rate Public Hearing***");

(vi)    The Energy Commission does not approve a revised rate, which may be a provisional rate, on or prior to June 10, 2016;

(vii)    The Energy Commission does not conduct a public hearing process to approve the calculation methodology for the Transition Charges and the Adjustment Mechanism as contemplated by, and in accordance with each deadline set forth in, Schedule I-A to the Recovery Plan Term Sheet (the "***SPV Public Hearing***", and together with the Rate Public Hearing, the "***PREC Public Hearing***");

(viii)    On or prior to the sixtieth (60th) day after the SPV Petition is filed with the Energy Commission, the Energy Commission has not issued the Restructuring Order (as defined in the Recovery Plan Term Sheet) or the calculation methodology for the Transition Charges and the Adjustment Mechanism have not otherwise been approved or deemed approved in accordance with Schedule I-A to the Recovery Plan Term Sheet;

(ix)    PREPA does not commence the Exchange Offer, Consent Solicitation and Credit Agreements Amendment Solicitation (each as defined in the Recovery Plan Term Sheet) on or before June 15, 2016;

(x)    PREPA does not consummate the Exchange Offer, Consent Solicitation or Credit Agreements Amendments on or before forty-five (45) days after the commencement thereof, unless with respect to (x) the Exchange Offer and Consent Solicitation, each is extended with the consent of Majority Holders and Supermajority Insurers, or (y) the Credit Agreements Amendments, the Credit Agreements Amendment Solicitation is extended with the consent of Majority Scotiabank Lenders and Majority Solus Lenders;

(xi)    The Securitization SPV is not formed and its board is not appointed within three (3) business days after the Securitization Special Legislation is enacted into law;

(xii)    The Securitization SPV does not adopt the Restructuring Resolution by two (2) business days after the earlier of (A) the date the Energy Commission issues the Restructuring Order or (B) the date the calculation methodology for the Transition Charges and the Adjustment Mechanism have otherwise been approved or deemed approved in accordance with Schedule I-A to the Recovery Plan Term Sheet;

(xiii)    Neither GDB nor the Securitization SPV publishes a notice to interested parties regarding challenges to the Securitization Special Legislation within three (3) business days after the Securitization Special Legislation is enacted into law;

(xiv)    The Securitization SPV does not publish a notice to interested parties regarding challenges to the Restructuring Resolution and the Securitization Bonds within three (3) business day after the Restructuring Resolution is adopted;

(xv)    During the Support Period, except as expressly permitted under this Agreement and the Recovery Plan, PREPA makes any principal repayment of any outstanding indebtedness under the Bond Documents, the Credit Agreements or the GDB Loan Agreements, except with respect to the Series 2015A Bonds issued by PREPA on July 30, 2015; or

(xvi)    On the date on which each of the Exchange Offer, Consent Solicitation, Closing Date Trust Agreement Amendments and Credit Agreements Restructuring (each as defined in the Recovery Plan Term Sheet) closes and becomes effective (the "***Closing Date***").

(c)    In addition, PREPA shall have the right, upon written notice to the Supporting Creditors, to terminate this Agreement upon the occurrence of any of the following events (each, a "***PREPA Termination Event***"):

   (i)   Solely as to the applicable Supporting Creditor (a "***Defaulting Creditor***"), if such Defaulting Creditor fails to comply with any of the material terms, covenants, provisions, or conditions of this Agreement or any Recovery Plan Document or any such material terms, provisions or conditions are otherwise subject to any breach, default or violation on the part of such Defaulting Creditor, or any of the material representations or warranties of such Defaulting Creditor as set forth in this Agreement is not true or accurate in any material respect at any time during the Support Period (each of the foregoing, a "***Supporting Creditor Default***"), which Supporting Creditor Default, if capable of being cured, is not cured within ten (10) days after receipt of a written notice thereof from PREPA;

   (ii)  Either (a) the Ad Hoc Group, together with any direct or indirect Bond Qualified Transferee of any of the members of the Ad Hoc Group, ceases to beneficially own or control, in the aggregate, at least 30% of the Bond Principal Amount or (b) one or more members of the Ad Hoc Group that are signatories to this Agreement as of the date hereof cease to collectively beneficially own or control, in the aggregate, at least 40% in principal amount of the aggregate amount of the Uninsured Bonds collectively beneficially owned or controlled by the Ad Hoc Group as of the date hereof;

  (iii)  PREPA's governing board of directors adopts a resolution determining, after consultation with counsel, that materially changed circumstances exist warranting a termination of this Agreement as a result of the board's fiduciary or statutory duties; *provided* that in such case, PREPA shall provide no less than three (3) business days' prior written notice of such determination to the Supporting Creditors;

  (iv)  In the event that (x) PREPA and the Supporting Creditors that intend to participate in the Backstop Facility have not held discussions regarding a general framework for the Backstop Facility on or prior to May 2, 2016, (y) the Supporting Creditors that intend to participate in the Backstop Facility have not proposed a term sheet setting forth the basic terms of the Backstop Facility (a "***Backstop Term Sheet***") on or prior to May 24, 2016, or (z) PREPA has not reached an agreement with the applicable Supporting Creditors as to such Backstop Term Sheet on or prior to June 6, 2016;

  (v)  In the event that PREPA and the applicable Supporting Creditors do not execute the January Bond Purchase Agreement, on or prior to December 29, 2015, in accordance with the terms and conditions set forth in Annex H hereto;

  (vi)  In the event that the Requisite Supporting Creditors do not provide their written approval of the final version of a definitive document described

in section 13(e)(xiv) within five (5) business days after PREPA has
requested such written approval;

    (vii)   Solely as to the Defaulting Creditor, if such Defaulting Creditor
breaches its obligations under section 3(c); *provided* that such breach, if
capable of being cured, is not cured within ten (10) days after receipt of
a written notice thereof from PREPA; or

    (viii)   In the event that any of the Participating Holders or Insurers do not pay
the purchase price for the January Payment Bonds on or prior to the
earlier of (i) the Funding Date (as defined in Annex H hereto) and (ii)
February 26, 2016, in either case other than as a result of (A) the failure
by PREPA to satisfy conditions (1), (2), (3), (7), (8), (9) or (10) set forth
under paragraph "Conditions Precedent to Purchasers' Obligations"
included in Annex H hereto or (B) a decision by PREPA in its discretion
to not issue the January Payment Bonds as described in the first sentence
under "Conditions Precedent to Purchasers' Obligations" included in
Annex H hereto.

A PREPA Termination Event shall be deemed to have occurred as of the date
and time when PREPA delivers such written notice (or after expiration of the
relevant cure period or notice period) and shall terminate this Agreement with
respect to all applicable Parties thereto.

    (d)    In addition, PREPA or any Supporting Creditor shall have the right, upon written
notice to the other Parties, to terminate this Agreement in the event that (i) at any
time, the Supporting Creditors beneficially own, hold, control or insure in the
aggregate less than 50% of the Outstanding Principal Amount or (ii) a court,
arbitral tribunal, administrative agency or commission or other governmental or
regulatory agency or authority issues, enters, enacts, promulgates or enforces a
statute, law, ordinance, rule or regulation, or judgment, injunction or order (that is
final and non-appealable and that has not been vacated, withdrawn or overturned
within thirty (30) days after notice thereof) enjoining, staying or otherwise
prohibiting the transactions contemplated by this Agreement, including
implementation of the Recovery Plan (each, a "***Mutual Termination Event***").
Such termination shall be deemed to have occurred as of the date and time when
the notifying Party delivers such written notice.

    (e)    In addition, this Agreement may be terminated as between:

    (1)    the Holders, as a class, and the other Parties, by the delivery to PREPA
and the other Supporting Creditors, of a written notice by the Holders that
beneficially own or control at least 50.1% in principal amount of the
aggregate amount of the Uninsured Bonds beneficially owned or
controlled by all the Holders at such time (the "***Majority Holders***"); or

(2)     one or more Insurers that beneficially control or insure at least 30% in principal amount of the aggregate amount of the Bonds beneficially controlled or insured by all the Insurers at such time (the "**Applicable Insurers**"), and the other Parties, by the delivery to PREPA and the other Supporting Creditors, of a written notice by such Applicable Insurers; or

(3)     Scotiabank and the Scotiabank Lenders, as a class, and the other Parties, by the delivery to PREPA and the other Supporting Creditors, of a written notice by Scotiabank on behalf of the Scotiabank Lenders that hold or control at least 50.1% in principal amount of the Scotiabank Principal Amount held by them at such time (the "**Majority Scotiabank Lenders**"); or

(4)     the Solus Lenders, as a class, and the other Parties, by the delivery to PREPA and the other Supporting Creditors, of a written notice by the Solus Lenders that hold or control at least 50.1% in principal amount of the Solus Principal Amount held by them at such time (the "**Majority Solus Lenders**", and the Majority Holders, Applicable Insurers and Majority Scotiabank Lenders, or Majority Solus Lenders, as applicable in the context in which such term is used, each a "**Requisite Supporting Creditor Majority**" and collectively the "**Requisite Supporting Creditors**");

in each case, in the exercise of their discretion upon the occurrence and continuation of any of the following events (each, a "**Creditor Termination Event**", and together with the Mutual Termination Events, the PREPA Termination Events, the Automatic Termination Dates or the Termination Date, each a "**Termination Event**"):

(i)     A default by PREPA or an event of default (except for the Potential Defaults) has occurred and is continuing under any Bond Document, Recovery Plan Document, Loan Document or Facility Document and, if subject to a cure period, has not been cured by PREPA within the applicable cure period;

(ii)    Any federal or Puerto Rico law is enacted into law or a legal action is commenced by a party other than such Supporting Creditors either of which has a material adverse effect on PREPA or the rights or interests of such Supporting Creditors, in their capacity as creditors of PREPA; *provided*, that in no event shall a Recovery Act Legal Action constitute a material adverse effect on PREPA or the Supporting Creditors; *provided*, further, that if capable of being cured, such material adverse effect has not been cured within five (5) business days after receipt of a written notice thereof from such notifying Supporting Creditors;

(iii)   PREPA fails to comply with any of the material terms, covenants, provisions, or conditions of this Agreement or any such material terms,

covenants provisions or conditions are otherwise subject to any breach, default or violation on the part of PREPA, or any of the material representations or warranties of PREPA as set forth in this Agreement is not true or accurate in any material respect at any time during the Support Period (each of the foregoing, a "**PREPA Support Agreement Default**"), which PREPA Support Agreement Default, if capable of being cured, is not cured within ten (10) days after receipt of a written notice thereof from such notifying Supporting Creditors;

(iv)     PREPA seeks, or announces an intent, to effect a restructuring plan other than the plan contemplated by the Recovery Plan;

(v)      [Reserved]

(vi)     (A) The Legislative Reform Package (other than the Securitization Special Legislation) is not enacted into law in an Acceptable Form or (B) any amendment to the Legislative Reform Package (other than the Securitization Special Legislation) is enacted into law and such amendment is not in an Acceptable Form, in each case, as determined in good faith by the notifying Majority Holders or Applicable Insurers; *provided*, that, such failure (whether described in the preceding clause (A) or (B)) has not been cured within ten (10) days after receipt of a written notice thereof from such notifying Majority Holders or Applicable Insurers; *provided* further that such notice may be provided no later than fifteen (15) days after the legal advisors to the Holders and Insurers receive notice of and a copy of the enacted legislation; and *provided* further that if a Holder or Insurer (or the Majority Holders or Applicable Insurers on its behalf) fails to deliver a notice of termination under this section 13(e)(vi) within the aforementioned fifteen (15) day period, the Legislative Reform Package (other than the Securitization Special Legislation) shall be deemed to be in Acceptable Form as to such Holder or Insurer for purposes of this section 13(e)(vi) and condition precedent (6) set forth in January Payment Term Sheet under "Conditions Precedent to Purchasers' Obligations";

(vii)    (A) The Legislative Reform Package (other than the Securitization Special Legislation) is not enacted into law in form and substance reasonably acceptable or (B) any amendment to the Legislative Reform Package (other than the Securitization Special Legislation) is enacted into law and such amendment is not in form and substance reasonably acceptable, in each case, as determined in good faith by the notifying Majority Scotiabank Lenders or Majority Solus Lenders; *provided*, that, such failure (whether described in the preceding clause (A) or (B)) has not been cured within ten (10) days after receipt of a written notice thereof from such notifying Majority Scotiabank Lenders or Majority Solus Lenders; *provided* further that such notice may be provided no later than fifteen

(15) days after the legal advisors to the Scotiabank Lenders and Solus Lenders receive notice of and a copy of the enacted legislation;

(viii)   (A) The Securitization Special Legislation is not enacted into law in form and substance reasonably acceptable or (B) any amendment to the Securitization Special Legislation is enacted into law and such amendment is not in form and substance reasonably acceptable, in each case, as determined in good faith by the notifying Majority Holders or Applicable Insurers; *provided*, that, such failure (whether described in the preceding clause (A) or (B)) has not been cured within ten (10) days after receipt of a written notice thereof from such notifying Majority Holders or Applicable Insurers; *provided* further that such notice may be provided no later than fifteen (15) days after the legal advisors to the Holders and Insurers receive notice of and a copy of the enacted legislation; and *provided* further that if a Holder or Insurer (or the Majority Holders or Applicable Insurers on its behalf) fails to deliver a notice of termination under this section 13(e)(viii) within the aforementioned fifteen (15) day period, the Securitization Special Legislation shall be deemed to be reasonably acceptable as to such Holder or Insurer for purposes of this section 13(e)(viii) and condition precedent (6) set forth in January Payment Term Sheet under "Conditions Precedent to Purchasers' Obligations";

(ix)   (A) The Securitization Special Legislation is not enacted into law in an Acceptable Form or (B) any amendment to the Securitization Special Legislation is enacted into law and such amendment is not in an Acceptable Form, in each case, as determined in good faith by the notifying Majority Scotiabank Lenders or Majority Solus Lenders; *provided*, that, such failure (whether described in the preceding clause (A) or (B)) has not been cured within ten (10) days after receipt of a written notice thereof from such notifying Majority Scotiabank Lenders or Majority Solus Lenders; *provided* further that such notice may be provided no later than fifteen (15) days after the legal advisors to the Scotiabank Lenders and Solus Lenders receive notice of and a copy of the enacted legislation;

(x)   Any petition or substantive pleading (excluding any pleadings responding to information requests) filed by PREPA with the Energy Commission in a Rate Case is not in an Acceptable Form as determined in good faith by the notifying Requisite Supporting Creditor Majority; *provided*, that, such failure has not been cured within ten (10) days after receipt of a written notice thereof from counsel to such Requisite Supporting Creditor Majority; *provided* further that such notice may be provided no later than (x) five (5) business days after the financial and legal advisors to the Supporting Creditors receive notice of and a copy of the filed petition or pleading in English (as applicable), and (y) fifteen (15) days after the financial and legal advisors to the Supporting Creditors receive notice of and a copy of the filed petition or pleading in Spanish (as applicable);

*provided* further that, with respect to each Scotiabank Lender and each Solus Lender, any such petition or pleading that seeks a provisional rate that does not cover all operating costs, capital expenditures and debt costs (assuming a restructuring in accordance with the Recovery Plan) shall be deemed not to be in Acceptable Form;

(xi)     PREPA supports or proposes any bill or legislation relating to the Legislative Reform Package (or, for the avoidance of doubt, any amendment to any such bill or legislation) which is not in an Acceptable Form as determined in good faith by the notifying Requisite Supporting Creditor Majority; *provided*, that, such failure has not been cured within ten (10) days after receipt of a written notice thereof from such Requisite Supporting Creditor Majority; *provided* further that such notice may be provided no later than fifteen (15) days after the legal advisors to the Supporting Creditors receive notice of and a copy of any such bill or legislation;

(xii)    The Energy Commission does not approve the Rate Structure in an Acceptable Form as determined in good faith by the notifying Majority Holders or Applicable Insurers; *provided*, that, such notice may be provided no later than fifteen (15) days after the legal advisors to the Holders and Insurers receive notice of and a copy of such approved Rate Structure as well as, to the extent not publicly available online and to the extent permissible under any relevant confidentiality obligation, copies of all orders and regulations implementing such approved Rate Structure;

(xiii)   The Energy Commission does not approve the Rate Structure in form and substance reasonably acceptable as determined in good faith by the notifying Majority Scotiabank Lenders or Majority Solus Lenders; *provided*, that, such notice may be provided no later than fifteen (15) days after the legal advisors to the Scotiabank Lenders and Solus Lenders receive notice of and a copy of such approved Rate Structure as well as, to the extent not publicly available online and to the extent permissible under any relevant confidentiality obligation, copies of all orders and regulations implementing such approved Rate Structure;

(xiv)    Any of the definitive documentation (other than with respect to the Securitization Documents) relating to the Exchange Offer, Cash Tender, Backstop Facility, the January Payment Transactions, the Consent Solicitation, the TA Amendment, the Closing Date Trust Agreement Amendments, the Credit Agreements Amendments and the Credit Agreements Amendment Solicitation is not entered into or adopted in form and substance reasonably acceptable as determined in good faith by the notifying Requisite Supporting Creditor Majority; it being understood that any determination by a Requisite Supporting Creditor Majority that any such final definitive documentation is reasonably acceptable shall be evidenced by such Requisite Supporting Creditor Majority's written

approval, which, in the case of the Insurers, for the avoidance of doubt, shall require the written approval of both National and Assured;

(xv)   PREPA enters into any new financing or loan facility, recovery program or debt enforcement plan, any power purchase agreement or public-private partnership or any other material transaction outside the ordinary course of PREPA's business which the notifying Requisite Supporting Creditor Majority determines in good faith is not in Acceptable Form; *provided* that such notice may be provided no later than ten (10) days after the financial and legal advisors to the Supporting Creditors receive notice of and a copy of such executed definitive documentation entered into in connection with the foregoing;

(xvi)   Any Securitization Documents are adopted, entered into or enacted into law in form or substance not reasonably acceptable as determined in good faith by the notifying Majority Holders or Applicable Insurers; *provided* however that, if PREPA does not receive any written objection to any such document from Majority Holders or Applicable Insurers within five (5) business days after such document has been adopted, entered into or enacted into law and a copy of such document was provided to the Holders' and the Insurers' legal advisors together with notice that such document has been adopted, entered into or enacted into law, such document shall be deemed to be reasonably acceptable to each Holder and each Insurer for purposes of this section 13(e)(xvi);

(xvii)   Any Securitization Documents are not adopted, entered into or enacted into law in an Acceptable Form as determined in good faith by the notifying Majority Scotiabank Lenders or Majority Solus Lenders; *provided* however that, if PREPA does not receive any written objection to any such document from Majority Scotiabank Lenders or Majority Solus Lenders within five (5) business days after such document has been adopted, entered into or enacted into law and a copy of such document was provided to the Scotiabank Lenders' and Solus Lenders' legal advisors together with notice that such document has been adopted, entered into or enacted into law, such document shall be deemed to be in Acceptable Form to each Scotiabank Lender and Solus Lender for purposes of this section 13(e)(xvii);

(xviii)   PREPA does not launch the RFQ Process (as defined in the Recovery Plan Term Sheet) on or before April 1, 2016 in a manner and on terms consistent in all material respects with the Recovery Plan and this Agreement and which does not include any additional or inconsistent terms that materially and adversely affect such Supporting Creditor in its capacity as a PREPA creditor; *provided*, that, such failure has not been cured within ten (10) days after receipt of a written notice thereof from such notifying Requisite Supporting Creditor Majority;

(xix)  The Securitization SPV shall have not become a Party to this Agreement, on or before twenty-five (25) days after the Legislative Reform Package is enacted into law, on such terms and with such Amendments as shall be reasonably acceptable as determined in good faith by the notifying Requisite Supporting Creditor Majority; *provided*, that, such failure has not been cured within ten (10) days after receipt of a written notice thereof from counsel to such Requisite Supporting Creditor Majority; *provided* further that such notice may be provided no later than five (5) business days after the financial and legal advisors to the Supporting Creditors receive notice of and a copy of such executed Amendment;

(xx)  Prior to its entry into this Agreement, the Securitization SPV takes an action that materially and adversely affects any Supporting Creditor in its capacity as a creditor of PREPA; *provided*, that, such material adverse effect has not been cured within ten (10) days after receipt of a written notice thereof from the notifying Requisite Supporting Creditor Majority;

(xxi)  In the event that PREPA and the applicable Supporting Creditors do not execute the January Bond Purchase Agreement, on or prior to December 29, 2015, in accordance with the terms and conditions set forth in Annex H hereto;

(xxii)  In the event that (x) PREPA and the Supporting Creditors that intend to participate in the Backstop Facility have not held discussions regarding a general framework for the Backstop Facility on or prior to May 2, 2016, (y) the Supporting Creditors that intend to participate in the Backstop Facility have not proposed a Backstop Term Sheet on or prior to May 24, 2016, or (z) PREPA has not reached an agreement with the applicable Supporting Creditors as to such Backstop Term Sheet on or prior to June 6, 2016;

(xxiii)  In the event that (i) the SPV Petition, (ii) any other submissions or filings made by PREPA or the SPV in connection with the SPV Petition or (iii) the Restructuring Order is not reasonably acceptable as determined in good faith by the notifying Requisite Supporting Creditor Majority; *provided* that such notice may be provided no later than fifteen (15) days after the financial and legal advisors to the Supporting Creditors receive notice of and a copy of the document as filed with, submitted to or issued by the Energy Commission; or

(xxiv)  GDB breaches any material obligation under the Custodial Agreements to honor, within a commercially reasonable period of time, a duly authorized withdrawal request made by PREPA in the ordinary course of business.

Whenever a substantive provision of this Agreement requires that one or more Supporting Creditors be excluded in the determination of "Majority Solus Lenders", Majority Scotiabank Lenders", "Applicable Insurers", "Majority Holders", "Requisite Supporting Creditor Majority"

or "Requisite Supporting Creditors", such defined term or terms shall be calculated after giving effect to the exclusion of such Supporting Creditors, and the exclusion of the principal amount of claims held or insured by them from both numerator and denominator in the calculation of any majority, in connection with the use thereof in such substantive provision.

(f)     In addition, this Agreement may be terminated as between Assured or National and the other Parties, by the delivery to PREPA and the other Supporting Creditors, of a written notice by such Insurer following a failure of PREPA to make required payments to holders of the Series 2015A Bonds, in which case such Insurer shall no longer be considered a Supporting Creditor as of the date of delivery of such written notice.

(g)     In addition, this Agreement may be terminated as between Assured and the other Parties, by the delivery to PREPA and the other Supporting Creditors, of a written notice by Assured in the event that PREPA fails to satisfy its payment obligations under the Assured Swaps, in which case Assured shall no longer be considered a Supporting Creditor as of the date of delivery of such written notice.

(h)     In addition, this Agreement shall automatically terminate (without the requirement to deliver any written notice) as between Syncora and the other Parties, in the event that PREPA and Syncora do not reach agreement with the Supporting Creditors with respect to Syncora's participation in the Recovery Plan on or prior to January 22, 2016.

If this Agreement is terminated as to the Solus Lenders as a class, this Agreement shall also terminate as to Solus in its capacity as a Holder (and the Bonds owned by Solus shall no longer be bound by this Agreement), and if this Agreement is terminated as to the Holders as a class, this Agreement shall also terminate as to the Solus Lenders as a class (and the Solus Loans owned by Solus shall no longer be bound by this Agreement), in either case without the need for any further approvals or consents.

14.     Disclosure of Information.

(a)     Subject to section 14(c) below, PREPA shall be required to provide to the Supporting Creditors' advisors any information reasonably necessary to understand the transactions contemplated in this Agreement.

(b)     Subject to section 14(c) below, during the Support Period, to the extent that a Supporting Creditor in good faith seeks any confidential information with respect to (i) a determination whether a basis exists for a Withdrawal Event, or (ii) a determination whether a basis exists for a Termination Event, PREPA will provide such confidential information to the Supporting Creditor's advisors to the extent reasonably necessary to make such determination.

(c)     Notwithstanding anything herein to the contrary:

(i)     PREPA shall not be required to provide any documents or information that is confidential information to any Supporting Creditor or any of its advisors that is not party to (A) if the Supporting Creditor or advisor has

42

signed a non-disclosure agreement with PREPA in the past (including, for the avoidance of doubt, pursuant to Section 6 of any Prior Forbearance Agreement), a non-disclosure agreement on the same or substantially similar terms and with an agreed-upon cleansing date and that has a term until at least December 31, 2016 or an extension to the term of its existing non-disclosure agreement through at least December 31, 2016, or (B) if the Supporting Creditor or advisor has not signed a non-disclosure agreement with PREPA in the past, a non-disclosure agreement on terms reasonably acceptable to PREPA and with an agreed-upon cleansing date and that has a term  until at least December 31, 2016 (each non-disclosure agreement that meets conditions under preceding clauses (A) or (B), an "*Acceptable NDA*"); and

(ii)     PREPA may elect to designate as confidential information, including on an advisors-only basis, any document or information that (A) is not otherwise required to be provided to the Trustee under the Trust Agreement, any Bond Document or applicable law or (B) has not been transmitted to other entities without an Acceptable NDA.

(d)     Notwithstanding anything herein to the contrary, information concerning the Bonds beneficially owned or insured by the Supporting Creditors, including, without limitation, the description of such Bonds reflected on the signature pages hereto, the description of such Bonds on any documentation related to the TA Amendment, and information delivered pursuant to section 14(e), below, shall be confidential, and shall not be disclosed to any person without the prior written consent of the applicable Supporting Creditor, except to PREPA's and the other Supporting Creditors' attorneys or advisors (solely to the extent necessary for them to perform their obligations under this Agreement and the Trust Agreement) (collectively, the "*Authorized Persons*"); *provided, however*, that an Authorized Person that receives such confidential information shall be permitted to disclose such information (i) on an aggregate basis, the principal amount held by all Supporting Creditors collectively (without disclosing individual holdings), (ii) to the extent required by any law, rule or regulation or by any subpoena or similar judicial and/or administrative order, or other regulatory authority (including any self-regulatory organization having jurisdiction or claiming to have jurisdiction over such person), or (iii) to the extent that such information is or becomes generally available to the public other than as a result of disclosure by an Authorized Person; *provided further, however*, that an Authorized Person that receives such confidential information concerning the Bonds beneficially owned or insured by the Supporting Creditors shall be permitted to disclose to its respective clients the aggregate percentage of Bonds beneficially owned or insured by any group of Insurers or Holders, without disclosure of the amount or percentage of Bonds beneficially owned or insured by any individual Insurer or Holder.

(e)     PREPA authorizes the Trustee to disclose to a beneficial holder of Bonds, upon request of such holder, (i) any reports or certificates required to be filed with the

43

Trustee under the following sections of the Trust Agreement: 502 (revisions of rates), 504 (annual and supplemental budgets), 505 (report of expenditure in excess of annual budget), 706 (report of the Consulting Engineers), 710 (monthly reports on income, expense and other matters set forth therein, annual audits and additional reports or audits required by law) and 712 (abandonment, sale or lease of any part of the System); and (ii) the balances in any funds or accounts held by the Trustee for the benefit of holders of Bonds.

15.    Further Acquisition.  This Agreement shall not limit, abridge, or otherwise impair, or be construed to preclude, the right of any Supporting Creditor to acquire additional Bonds or additional rights and obligations under any Credit Agreement; *provided* that any additional Uninsured Bonds or additional rights and obligations under any Credit Agreement acquired by any Party shall be, and shall automatically be deemed to be, subject to the terms and conditions of this Agreement.

16.    Release of Claims and Waiver of Defenses.

(a)    In further consideration of the Supporting Creditors' entry into and performance under this Agreement, PREPA, on behalf of itself and its successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, agents and attorneys hereby forever, fully, unconditionally and irrevocably waives and releases the Supporting Creditors (other than GDB) and their respective successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, attorneys, advisors and agents (collectively, the "***Releasees***") from any and all claims, liabilities, obligations, debts, causes of action (whether at law or in equity or otherwise), defenses, counterclaims and setoffs of any kind, whether known or unknown, liquidated or unliquidated, matured or unmatured, fixed or contingent, or otherwise, directly or indirectly arising out of, connected with, resulting from or related to any act or omission by such Supporting Creditors or any other Releasee with respect to the Bond Documents, Loan Documents and Facility Documents, except to the extent that any such claims, liabilities, obligations, debts, causes of action, defenses, counterclaims and setoffs are found in a final, nonappealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the applicable Releasees.  Nothing in this Agreement shall (x) release any obligations of the Insurers (or Syncora or any other person insuring Bonds) under the Bond Insurance Agreements, or (y) release GDB or any of its affiliates, or any of their respective successors, assigns, officers, directors, employees, attorneys, or agents, from any claim, liability, obligation, debt, cause of action, defense, counterclaim, or setoff, except as provided in subsection 16(b) below.

(b)    In further consideration of GDB's entry into and performance under this Agreement, upon the occurrence of the Closing Date, PREPA, on behalf of itself and its successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, agents and attorneys, shall forever, fully, unconditionally and irrevocably waive and release GDB and its Releasees from any and all claims, liabilities, obligations, debts, causes of action (whether at law or in equity or

44

otherwise), defenses, counterclaims and setoffs of any kind, whether known or unknown, liquidated or unliquidated, matured or unmatured, fixed or contingent, or otherwise, directly or indirectly arising out of, connected with, resulting from or related to any act or omission by GDB or any other Releasee with respect to the Bond Documents and GDB Loan Agreements, except to the extent that any such claims, liabilities, obligations, debts, causes of action, defenses, counterclaims and setoffs are found in a final, nonappealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of GDB or the applicable Releasees.

17.     <u>Amendments and Waivers</u>.

Once effective, this Agreement, including, for the avoidance of doubt, the Recovery Plan Term Sheet attached hereto as <u>Annex D</u>, may not be modified, amended, supplemented or otherwise altered (except as expressly provided herein), and no term or condition may be waived (such modification, amendment, supplement and waiver, referred to collectively as an "***Amendment***"), except in a writing signed by PREPA and Majority Holders, Supermajority Insurers, Majority Scotiabank Lenders and Majority Solus Lenders; *provided, however,* that:

(a)     any Amendment to the terms described in Schedule I to the Recovery Plan Term Sheet (the "***Holders' Terms***"), shall require the written consent of: (i) PREPA, (ii) Holders that beneficially own or control at least 80.0% in principal amount of the aggregate amount of the Uninsured Bonds beneficially owned or controlled by all the Holders that are Supporting Creditors at such time (the "***Supermajority Holders***") and (iii) (A) Supermajority Insurers, Majority Scotiabank Lenders and Majority Solus Lenders, if such Amendment (x) does not enhance or improve the Holders' Terms and (y) does not materially and adversely affect any of the Insurers or the Credit Agreements Lenders, or (B) Insurers that beneficially control or insure at least 75.0% in principal amount of the aggregate amount of the Bonds beneficially controlled or insured by all the Insurers that are Supporting Creditors at such time (the "***Supermajority Insurers***") if the conditions of either clause (x) or (y) above are not satisfied with respect to any Insurer and Supermajority Credit Agreements Lenders (as defined herein) if the conditions of either clause (x) or (y) above are not satisfied with respect to any Credit Agreements Lender;

(b)     any Amendment to the terms described in Schedule II to the Recovery Plan Term Sheet (the "***Insurers' Terms***"), shall require the written consent of: (i) PREPA, (ii) Supermajority Insurers and (iii) (A) Supermajority Holders, Majority Scotiabank Lenders and Majority Solus Lenders, if such Amendment (x) does not enhance or improve the Insurers' Terms and (y) does not materially and adversely affect any of the Holders or the Credit Agreements Lenders, or (B) Supermajority Holders if the conditions of either clause (x) or (y) above are not satisfied with respect to any Holder and Supermajority Credit Agreements Lenders if the conditions of either clause (x) or (y) above are not satisfied with respect to any Credit Agreements Lender;

(c)     any Amendment to the terms described in Schedule III to the Recovery Plan Term Sheet (the "***Fuel Lines Lenders' Terms***"), shall require the written consent of: (i) PREPA, (ii) Solus Lenders holding at least 75.0% in principal amount of the Solus Principal Amount held by all Solus Lenders that are Supporting Creditors at such time and Scotiabank Lenders holding at least 75.0% in principal amount of the Scotiabank Principal Amount held by all Scotiabank Lenders that are Supporting Creditors at such time (the "***Supermajority Credit Agreements Lenders***") and (iii) (A) Majority Holders and Supermajority Insurers, if such Amendment (x) does not enhance or improve the Credit Agreements Lenders' Terms and (y) does not materially and adversely affect any of the Holders or the Insurers, or (B) Supermajority Holders if the conditions of either clause (x) or (y) above are not satisfied with respect to any Holder and Supermajority Insurers if the conditions of either clause (x) or (y) above are not satisfied with respect to any Insurer; or

(d)     any Amendment to the non-economic terms described in Schedules IV, VI, VII, VIII and IX to the Recovery Plan Term Sheet (the "***Non-Economic Terms***"), shall require the written consent of: (i) PREPA, (ii) Supermajority Holders, (iii) Supermajority Insurers and (iv) Supermajority Credit Agreements Lenders.

(e)     Notwithstanding anything in this section 17,

(A) any Amendment that alters the percentage of Bond Principal Amount, Solus Principal Amount or Scotiabank Principal Amount, as applicable, required for (i) determining consents, amendments, terminations, withdrawals, extensions or other actions hereunder (including, without limitation, this section 17), or (ii) determining the termination or withdrawal rights of such Supporting Creditors hereunder (including, without limitation, sections 10 or 13), in each case, shall not be effective unless in writing and signed by PREPA and each Supporting Creditor affected by such Amendment;

(B) any Amendment whose sole effect is to change one or more dates or deadlines set forth in sections 10 or 13 (other than as set forth in sections 13(a) and 10(l)) shall require the consent of PREPA, GDB, Supermajority Insurers and the Requisite Supporting Creditors; and

(C) other than as provided in sections 17(e)(A) and 17(e)(B), any Amendment that materially alters any provision relating to termination or extension of, or withdrawal from, this Agreement (including for the avoidance of doubt, an amendment to the dates set forth in sections 13(a) or 10(l)) shall not be effective unless in writing and signed by PREPA, GDB, the Supermajority Holders, the Supermajority Insurers and the Supermajority Credit Agreements Lenders;

*provided,* that section 13(d) and this section 17 shall not be amended without the written consent of each Supporting Creditor that is a Party to this Agreement as of the date of such Amendment.

Notice of any Amendment pursuant to this Section 17 shall be provided to each Supporting Creditor within two (2) business days of the date of such Amendment.

18.    Assignment; Transfer Restrictions.

(a)    For the period commencing as of the date any Supporting Creditor executes this Agreement until the earliest to occur of (i) the fifteenth (15th) business day following such date if the Restatement Effective Date has not occurred and (ii) termination of this Agreement as to such Supporting Creditor pursuant to the terms hereof (the "***Bond Transfer Limitation Period***"), such Supporting Creditor shall not sell, assign, transfer or otherwise pledge or dispose ("***Transfer***") any Uninsured Bonds beneficially owned by such Supporting Creditor, or any voting, consent or direction rights related to such Uninsured Bonds, except such Transfer may be made (A) if the transferee is a Supporting Creditor at the time of the Transfer or (B) if the transferee is not a Supporting Creditor at the time of the Transfer, such transferee (a transferee pursuant to this clause (B) or the immediately preceding clause (A), a "***Bond Qualified Transferee***") delivers to each of the Supporting Creditors' advisors and PREPA, at or prior to the time of the Transfer, the joinder attached hereto as Annex B-1, pursuant to which such transferee shall assume all obligations of such Supporting Creditor transferor hereunder (such transferee, if any, shall also be a "Supporting Creditor" hereunder).  In addition, and without limiting the foregoing, each of the Insurers agrees that it will not transfer any voting, consent or direction rights related to Insured Bonds during the Bond Transfer Limitation Period unless the transferee agrees to be bound by the terms of this Agreement and delivers notice of such agreement to each of the Supporting Creditors and PREPA; provided that an Insurer may Transfer Insured Bonds beneficially owned by such Insurer if the Transfer is by an Insurer and the Bonds Transferred are Insured Bonds, and the representations and warranties of the applicable Insurer contained in section 12(c) hereof are true after giving effect to the Transfer with respect to such Bonds. To the extent that a Transfer violates the provisions of this section, the Transfer shall be void *ab initio* and the applicable Bonds and the Supporting Creditor attempting the Transfer of the Bonds shall continue to remain subject to the terms of this Agreement.  This Agreement shall in no way be construed to preclude any of the Supporting Creditors from acquiring additional Bonds; *provided* that any such acquired Uninsured Bonds shall automatically and immediately upon acquisition by a Supporting Creditor be deemed subject to all of the terms of this Agreement.

(b)    For the period commencing as of the date any Supporting Creditor executes this Agreement until the earliest to occur of (i) the fifteenth (15th) business day following such date if the Restatement Effective Date has not occurred and (ii) termination of this Agreement pursuant to the terms hereof (the "***Fuel Line Limitation Period***"), such Supporting Creditor shall not Transfer all or a portion

47

of any of its rights and obligations under any Credit Agreement except such Transfer may be made (A) if the transferee is a Supporting Creditor at the time of the Transfer, or (B) if the transferee is not a Supporting Creditor at the time of the Transfer, such transferee (a "*Credit Agreement Qualified Transferee*") delivers to each of the Supporting Creditors' advisors and PREPA, at or prior to the time of the Transfer, the joinder attached hereto as <u>Annex B-2</u>, pursuant to which such transferee shall assume all obligations of such Supporting Creditor transferor hereunder (such transferee, if any, shall also be a "Supporting Creditor" hereunder).  To the extent that a Transfer violates the provisions of this section, the Transfer shall be void *ab initio* and the applicable rights and obligations under the applicable Credit Agreement and the Supporting Creditor attempting the Transfer of such rights and obligations shall continue to remain subject to the terms of this Agreement.  This Agreement shall in no way be construed to preclude any of the Supporting Creditors from acquiring additional rights and obligations under any Credit Agreement; *provided* that any such acquired rights and obligations under a Credit Agreement shall automatically and immediately upon acquisition by a Supporting Creditor be deemed subject to all of the terms of this Agreement.

(c)     Notwithstanding anything contained in this Agreement to the contrary, (i) a Supporting Creditor may Transfer any right, title or interest in the Uninsured Bonds, the Scotiabank Credit Agreement, or the Solus Credit Agreement to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a Supporting Creditor; *provided* that such Qualified Marketmaker subsequently Transfers such right, title or interest in the Uninsured Bonds, the Scotiabank Credit Agreement or the Solus Credit Agreement to a Supporting Creditor, a Bond Qualified Transferee or a Credit Agreement Qualified Transferee within the earlier of (x) the date that is ten (10) days after such Qualified Marketmaker's acquisition of such right, title or interest and (y) in the event the transfer to the Qualified Marketmaker occurs prior to the record date set for the Exchange Offer and Consent Solicitation, the record date set for the Exchange Offer and Consent Solicitation; and (ii) to the extent that a Supporting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in the Uninsured Bonds that the Qualified Marketmaker acquires from a holder of the Uninsured Bonds that is not a Supporting Creditor without the requirement that the transferee be or become a Supporting Creditor.

(d)     "*Qualified Marketmaker*" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the Bonds or debt obligations such as the Scotiabank Loans and the Solus Loans or enter with customers into long and short positions in debt securities such as the Bonds, in its capacity as a dealer or market maker in such Bonds; (y) is in fact regularly in the business of making a market in debt securities or bank debt obligations; and (z) if transacting with respect to Bonds, is registered with the Securities and Exchange Commission and Financial Institutions Regulatory Authority.

No later than the first (1st) business day of each month, and upon PREPA's reasonable request, (i) each Holder shall disclose to PREPA a list of the principal amount of Uninsured Bonds beneficially owned by such Holder, and (ii) the Ad Hoc Group shall disclose to PREPA a list, by CUSIP number, of the aggregate principal amount of Uninsured Bonds collectively held by the Ad Hoc Group, which disclosures pursuant to the preceding clauses (i) and (ii) shall be treated as confidential information by PREPA in accordance with section 14(d).  The foregoing shall not prohibit PREPA from disclosing the aggregate holdings of the Ad Hoc Group or all Supporting Creditors collectively.

19.     No Third Party Beneficiaries.  The terms and conditions of this Agreement are intended solely for the benefit of the Parties and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other person.

20.     No Solicitation.  The Parties acknowledge and agree that neither the negotiation nor the execution and delivery of this Agreement is, nor shall it be deemed to be, a solicitation within the meaning of any applicable state or federal securities laws.

21.     Settlement Discussions.  This Agreement is the product of negotiations among the Parties hereto and reflects various agreements and compromises to implement the Recovery Plan.  Pursuant and subject to Federal Rule of Evidence 408 and any applicable state or Commonwealth rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

22.     Remedies.  The sole and exclusive remedy of any Party for any breach of this Agreement by any other Party shall be termination under section 13 or withdrawal under section 10, and such breach shall not give rise to any claims against any Party at law or in equity; *provided, however*, that notwithstanding the foregoing, the Parties agree that (i) irreparable damage would occur in the event that any Supporting Creditor breaches its obligations under sections 4(b)(i), 4(c)(i)-(iii), 4(d)(i), 4(e)(i)-(ii), 5(a)(i), 6(a)(i), 7(a)(ii)(x) and (y), 15 or 17(e) (the "***Specified Sections***") of this Agreement, and accordingly PREPA shall be entitled to specific performance in the event of any breach of the Specified Sections in the Enforcement Court (as defined below) if such breach has not been cured within ten (10) days after receipt by the applicable Supporting Creditor of a written notice specifying such breach and requesting its cure; (ii) irreparable damage would occur in the event that PREPA or any Supporting Creditor breaches its obligations under sections 1(b) or 14 of this Agreement, and accordingly PREPA and each Supporting Creditor shall be entitled to specific performance in the event of any breach of sections 1(b) or 14 of this Agreement in the Enforcement Court; and (iii) specific performance in accordance with the preceding clauses (i) and (ii) (as applicable), together with termination of this Agreement in accordance with section 13 and withdrawal from this Agreement in accordance with section 10, as applicable, shall be the sole remedies for any breach of the Specified Sections or sections 1(b) or 14 of this Agreement.  For the avoidance of doubt, no Party shall be entitled to monetary damages for any breach of any provision of this Agreement, including the Specified Sections.  As used herein, the "***Enforcement Court***" refers to any federal court sitting in the Puerto Rico district and any appellate court from any thereof or, in the event

such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereof.

For the avoidance of doubt, any consent right, termination right or withdrawal right provided to a Supporting Creditor under this Agreement shall be cumulative to, and not in lieu of, any other consent right, termination right or withdrawal right provided to such Supporting Creditor hereunder.

23.    <u>No Waiver</u>.  The failure or neglect by a Party to enforce any rights under this Agreement will not be deemed to be a waiver of that Party's rights. No waiver of satisfaction or nonperformance of an obligation under this Agreement will be effective unless in writing and signed by the Party granting the waiver.

24.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, legal representatives and assigns. PREPA shall not assign or transfer its rights under this Agreement without the consent of each of the Supporting Creditors.  No Supporting Creditor shall assign or transfer its rights under this Agreement other than in connection with a Transfer pursuant to section 18 of this Agreement. This Agreement is entered into for the exclusive benefit of the Parties hereto, no other person shall derive any rights or benefits herefrom, and all third-party beneficiary rights are hereby expressly disclaimed.

25.    <u>Further Assurances</u>.  The parties hereto agree that upon the reasonable request of any other Party to this Agreement, each such Party will execute and deliver to the requesting Party such other additional instruments and documents or perform or cause to be performed such other and further acts and things, as may be reasonably necessary to more fully consummate the transactions as set forth in this Agreement; *provided, however*, that performance by any Party under this paragraph shall not create any new liability or obligation on the performing Party whatsoever.

26.    <u>Notice</u>.  All notices or demands given or made by one Party to the other relating to this Agreement shall be in writing and either (i) personally served or sent by registered or certified mail, postage paid, return receipt requested, overnight delivery service, in each case, with a copy by electronic mail transmission or (ii) by electronic mail transmission with a copy by first-class mail, and shall be deemed given for purposes of this Agreement on the earlier of the date of actual receipt or three (3) days after the deposit thereof in the mail; *provided*, *however*, that no notice or consent pursuant to any provision of this Agreement, including for the avoidance of doubt Sections 10, 13 and 17, shall be deemed to have been delivered by any Scotiabank Lender unless given by Scotiabank, in which case such notice or consent shall be deemed to have been given by, and be effective as to, all Scotiabank Lenders.  Scotiabank and each Scotiabank Lender hereby agree, for the sole benefit of Scotiabank and each other Scotiabank Lender, as applicable, that Scotiabank shall give such notices and consents in accordance with and subject to the provisions of the Scotiabank Credit Agreement, including Section 9.02 thereof.  Any notice required to be given by any Party hereunder may be delivered by such Party's counsel on such Party's behalf.  Unless a different or additional address for subsequent notices is specified in a notice sent or delivered in accordance with this section, such

notices or demands shall be sent solely to the notice addresses listed below for advisors to the
Supporting Creditors and the other below-listed entities:

If to PREPA:

Richard J. Cooper, Esq. and
Sean A. O'Neal, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
rcooper@cgsh.com
soneal@cgsh.com

and

Puerto Rico Electric Power Authority
Attention: Office of the General Counsel
P.O. Box 364267
San Juan, Puerto Rico 00936-4267

If to Syncora:

Richard F. Hahn, Esq. and
My Chi To, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
rfhahn@debevoise.com
mcto@debevoise.com

and

James W. Lundy, Jr.
Syncora Holdings Ltd.
135 W. 50th Street, 20th Floor
New York, New York 10020
James.lundy@scafg.com

If to the Ad Hoc Group:

Amy Caton, Esq.,
Alice J. Byowitz, Esq. and
Steven Segal, Esq.

If to GDB:

Alejandro Febres
Government Development Bank for Puerto
Rico
P.O. Box 42001
San Juan, PR 00940-2001
Alejandro.Febres@bgfpr.com

If to National:

Marcia Goldstein, Esq.,
Joseph Smolinsky, Esq. and
Sara Coelho, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Marcia.goldstein@weil.com
Joseph.Smolinsky@weil.com
Sara.coelho@weil.com

and

Patricia Ferrari and
Adam Bergonzi
National Public Finance Guarantee Corporation
1 Manhattanville Road, Suite 301
Purchase, NY 10577
Trish.Ferrari@mbia.com
Adam.bergonzi@nationalpfg.com

If to Assured:

Jorge Gana and
Kevin Lyons
Assured Guaranty Corp.

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York  NY 10036
acaton@kramerlevin.com
abyowitz@kramerlevin.com
ssegal@kramerlevin.com

and

Ari Gabinet
Michael Sternhell
Oppenheimer Funds
Two World Financial Center
225 Liberty Street, New York, NY 10281
agabinet@ofiglobal.com
msternhell@ofiglobal.com

31 W. 52nd St
New York, NY 10019
jgana@assuredguaranty.com
klyons@assuredguaranty.com

and

Lary Stromfeld, Esq.
Howard Hawkins, Esq.
Mark Ellenberg, Esq. and
Ivan Loncar, Esq.
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
lary.stromfeld@cwt.com
howard.hawkins@cwt.com
mark.ellenberg@cwt.com
ivan.loncar@cwt.com

If to Solus:

Stephen Blauner
Francis Blair
Solus Alternative Asset Management LP
410 Park Avenue
11th Floor
New York, NY 10022
sblauner@soluslp.com
fblair@soluslp.com

and

Steve Fuhrman
Nicholas Baker
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
sfuhrman@stblaw.com
nbaker@stblaw.com

If to Scotiabank:

Richard G. Mason,
Austin T. Witt and
Brian Bolin
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
rgmason@wlrk.com
awitt@wlrk.com
bbolin@wlrk.com

and

Roy Purcell
Scotiabank de Puerto Rico
Scotiabank Plaza
290 Jesus T. Pinero Avenue
8th Floor
San Juan, PR 00918
Roy.purcell@scotiabank.com

27.   Governing Law.   This Agreement, but for the avoidance of doubt, not the TA Amendment, shall be governed and construed and enforced in accordance with the laws of the State of New York.  Terms used in the TA Amendment that are defined herein shall be construed in accordance with the last paragraph of Section 1301 of the Trust Agreement when interpreting

the TA Amendment, and shall be construed in accordance with the laws of the State of New York when interpreting this Agreement.

28.    <u>Jurisdiction</u>.  Subject to section 22, any dispute arising under or in connection with this Agreement shall be brought in the exclusive jurisdiction and venue of the courts of the Commonwealth of Puerto Rico or the United States District Court for the District of Puerto Rico. For the avoidance of doubt, this section 28 shall not apply to any Recovery Plan Document and each such document shall be governed in accordance with its own terms.

29.    <u>WAIVER OF TRIAL BY JURY</u>. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING SOLELY OUT OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF, WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.  For the avoidance of doubt, this section shall not apply to any definitive documentation relating to any Recovery Plan Document, the Exchange Offer, Consent Solicitation or Credit Agreements Amendments and such documentation shall be governed in accordance with its own terms.

30.    <u>Survival</u>.  Upon the termination of this Agreement as to a Party hereunder, (i) such Party shall cease to be a party to this Agreement and this Agreement shall be null and void and of no further force or effect with respect to such Party, except that, notwithstanding anything to the contrary in this Agreement, sections 1(b), 16, 19, 21, 22, 26 – 30, 32 shall survive and continue to be fully enforceable in accordance with their terms notwithstanding such termination, (ii) the applicable Party shall be free to enforce their respective rights and remedies under (A) the Bond Documents and applicable law, (B) the Loan Documents, the Facility Documents and applicable law, and (C) the GDB Agreements and applicable law, in each case as applicable, and (iii) nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights, subject to the terms of section 16.

31.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and either of the Parties hereto may execute this Agreement by signing any such counterpart.  Delivery of an executed signature page of this Agreement by facsimile or email transmission shall be effective as delivery of a manually executed counterpart hereof.

32.    <u>Business Day</u>.  The term "business day" means any day other than a Saturday, Sunday, or legal holiday on which the banking institutions in the Municipality of San Juan, Puerto Rico are authorized by law to be closed.

33.    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement, and supersedes any prior agreements, including any deemed agreements, among the Parties regarding the subject matter hereof.

34.    <u>Headings</u>.  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

*[Remainder of page intentionally blank; signature pages follow]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

PUERTO RICO ELECTRIC POWER AUTHORITY

By: _____

Name: Javier A. Quintana Méndez

Title: Executive Director

AG MM, L.P.
AG CAPITAL RECOVERY PARTNERS VIII, L.P.
AG ELEVEN PARTNERS, L.P.
AG SUPER FUND INTERNATIONAL
PARTNERS, L.P.
NUTMEG PARTNERS, L.P.
AG CENTRE STREET PARTNERSHIP, L.P.
AG PRINCESS, LP
AG SUPER FUND, L.P.

By: Angelo, Gordon & Co., L.P., its manager or
advisor

By: _____

Name: _____Gavin Baiera_____

Title: _____Authorized Signatory_____

**REDACTED**

*RSA – Signature Page*

BLUEMOUNTAIN GUADALUPE PEAK FUND L.P.
BLUEMOUNTAIN FOINAVEN MASTER FUND L.P.
BLUEMOUNTAIN CREDIT OPPORTUNITIES MASTER FUND I L.P.
BLUEMOUNTAIN KICKING HORSE FUND L.P.
BLUEMOUNTAIN STRATEGIC CREDIT MASTER FUND L.P.
BLUEMOUNTAIN DISTRESSED MASTER FUND L.P.
BLUEMOUNTAIN TIMBERLINE LTD.
BLUEMOUNTAIN CREDIT ALTERNATIVES MASTER FUND L.P.
BLUEMOUNTAIN MONTENVERS MASTER FUND SCA SICAV-SIF
BLUEMOUNTAIN LOGAN OPPORTUNITIES MASTER FUND L.P.

By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, ITS INVESTMENT MANAGER

By: _____

Name:____**DAVID O'MARA**_____
         **Deputy General Counsel**

Title: _____

REDACTED

*RSA – Signature Page*

D.E. SHAW GALVANIC PORTFOLIOS, L.L.C.

By: _____

Name: _____Shi   Wisman_____

Title: _____Authorized  Signatory_____

REDACTED

FRANKLIN ADVISERS, INC. on behalf of the following funds:

CALIFORNIA INTERMEDIATE TERM TAX FREE INCOME FUND

CALIFORNIA HIGH YIELD MUNICIPAL BOND FUND

TENNEESEE MUNICIPAL BOND FUND

CALIFORNIA TAX FREE INCOME FUND

NEW YORK TAX FREE INCOME FUND

FEDERAL TAX FREE INCOME FUND

DOUBLE TAX FREE INCOME FUND

COLORADO TAX FREE INCOME FUND

GEORGIA TAX FREE INCOME FUND

PENNSYLVANIA TAX FREE INCOME FUND

HIGH YIELD TAX FREE INCOME FUND

MISSOURI TAX FREE INCOME FUND

OREGON TAX FREE INCOME FUND

VIRGINIA TAX FREE INCOME FUND

FLORIDA TAX FREE INCOME FUND

LOUISIANA TAX FREE INCOME FUND

MARYLAND TAX FREE INCOME FUND

NORTH CAROLINA TAX FREE INCOME FUND

NEW JERSEY TAX FREE INCOME FUND

FRANKLIN STRATEGIC INCOME FUND – UNITED STATES

FIST-FRANKLIN TOTAL RETURN FUND

*RSA – Signature Page*

FRANKLIN STRATEGIC INCOME FUND – CANADA

FTIF – FRANKLIN US TOTAL RETURN FUND

FTVIP – FRANKLIN STRATEGIC INCOME VIP FUND

FDP SERIES FT TOTAL RETURN FDP FUND

FTIF – FRANKLIN STRATEGIC INCOME FUND

FT OPPORTUNISTIC DISTRESSED FUND, LTD.

By: _____

Name: _____

Title: _____

REDACTED

Goldman Sachs High Yield Municipal Fund, A
Series of the Goldman Sachs Trust; Goldman Sachs
Short Duration Tax-Free Fund, A Series of the
Goldman Sachs Trust; and Goldman Sachs
Dynamic Municipal Income Fund, A Series of the
Goldman Sachs Trust

By: _____

Name: _____ Daniel Burke _____

Title: _____ Sec- _____

REDACTED

KNIGHTHEAD ANNUITY & LIFE
ASSURANCE COMPANY

BY: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____

Name:_____
          Laura Torrado
          Authorized Signatory

Title: _____

REDACTED

*RSA – Signature Page*

KNIGHTHEAD (NY) FUND, L.P.

BY: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____

Name: _____
        Laura Torrado
        Authorized Signatory

Title: _____

REDACTED

KNIGHTHEAD MASTER FUND, L.P.

BY: Knighthead Capital Management, LLC, its
Investment Manager

By: _____

Name:_____
Laura Torrado
Authorized Signatory

Title: _____

REDACTED

LMA SPC FOR AND ON BEHALF OF THE
MAP84 SEGREGATED PORTFOLIO

BY: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____

Name: _____
Laura Torrado
Authorized Signatory
Title: _____

REDACTED

By Marathon Asset Management, LP solely in its
capacity as Investment Advisor to the
Fund(s)/Account(s) named in Schedule A of this
Agreement

By: _____

Name: _Peter Coppa_____

Title: _Authorized Signatory_____

REDACTED

OPPENHEIMERFUNDS, INC.

By: _____

Name: _____

Title: _____

SCOTIABANK DE PUERTO RICO, as Agent and
as Lender

By: _____

Name: *Roy Purcell*

Title: *VICE PRESIDENT*

BANCO POPULAR DE PUERTO RICO, as
Lender

By: _____

Name: _____

Title: _____

ORIENTAL BANK, as Lender

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

FIRSTBANK PUERTO RICO, as Lender

By: _____

Name: _____

Title: _____

[*RSA – Signature Page*]

SCOTIABANK DE PUERTO RICO, as Agent and
as Lender

By: _____

Name: _____

Title: _____


BANCO POPULAR DE PUERTO RICO, as
Lender

By: _Juan Pablo Tmrs_____

Name: _Juan Pablo Torres_____

Title: _AVP_____


ORIENTAL BANK, as Lender

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


FIRSTBANK PUERTO RICO, as Lender

By: _____

Name: _____

Title: _____


*[RSA – Signature Page]*

SCOTIABANK DE PUERTO RICO, as Agent and
as Lender

By: _____

Name: _____

Title: _____

BANCO POPULAR DE PUERTO RICO, as
Lender

By: _____

Name: _____

Title: _____

ORIENTAL BANK, as Lender

By: _Patrick Haggarty_____

Name: _Patrick Haggarty_____

Title: _Executive Vice President_

By: _____

Name: _Tomás Tonnes_____

Title: _SVP· Chief Credit·OFFKeR·_

FIRSTBANK PUERTO RICO, as Lender

By: _____

Name: _____

Title: _____

*[RSA – Signature Page]*

SCOTIABANK DE PUERTO RICO, as Agent and
as Lender

By: _____

Name: _____

Title: _____


BANCO POPULAR DE PUERTO RICO, as
Lender

By: _____

Name: _____

Title: _____


ORIENTAL BANK, as Lender

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


FIRSTBANK PUERTO RICO, as Lender

By: _____

Name: _MICHAEL MCDONALD_

Title: _SVP - BUSINESS GROUP_


*[RSA – Signature Page]*

Ultra Master LTD, as Lender and Holder

By:     Solus Alternative Asset Management LP
Its Investment Advisor

_____

Name: _____Scott  Martin_____

Title: _____Partner_____

REDACTED

SOLA LTD, as Lender and Holder

By:    Solus Alternative Asset Management LP
Its Investment Advisor


Name:   _Scott  Martin_

Title:  _Partner_


REDACTED

Solus Opportunities Fund 5 LP, as Lender and
Holder

By:     Solus Alternative Asset Management LP
Its Investment Advisor

Name: _____ Scott Martin _____

Title: _____ Partner _____

REDACTED

*[RSA – Signature Page]*

GOVERNMENT DEVELOPMENT BANK FOR
PUERTO RICO

By: _____

Name: _Melba Acosta Febo_____

Title: _President_____

NATIONAL PUBLIC FINANCE GUARANTEE
CORPORATION

By: _____

Name: _William C. Fallon_____

Title: _Chief Executive Officer_____

REDACTED

*[RSA – Signature Page]*

EXECUTION VERSION

**ASSURED GUARANTY CORP.,**

**ASSURED GUARANTY MUNICIPAL CORP.**

By: _Francis J. Coughlin, Jr._____

Name:  Francis J. Coughlin, Jr.

Title:  Deputy Chief Surveillance Officer, Public Finance

REDACTED

*[RSA – Signature Page]*

SYNCORA GUARANTEE INC.

By: _____

Name: James W. Lundy, Jr.

Title: General Counsel

REDACTED

**List of Annexes**

**Annex A - Ad Hoc Group Members**

**Annex B-1 – RSA Joinder Form (Bonds)**

**Annex B-2 – RSA Joinder Form (Credit Agreements)**

**Annex C – Trust Agreement Amendment**

**Annex D – Recovery Plan Term Sheet**

**Annex E - Bond Potential Defaults**

**Annex F – Scotiabank Potential Defaults**

**Annex G – Solus Potential Defaults**

**Annex H – January Payment Term Sheet**

## Annex A
## Ad Hoc Group Members

AG MM, L.P.

AG CAPITAL RECOVERY PARTNERS VIII, L.P.

AG ELEVEN PARTNERS, L.P.

AG SUPER FUND INTERNATIONAL PARTNERS, L.P.

NUTMEG PARTNERS, L.P.

AG CENTRE STREET PARTNERSHIP, L.P.

AG PRINCESS, LP

AG SUPER FUND, L.P.

BLUEMOUNTAIN GUADALUPE PEAK FUND L.P.

BLUEMOUNTAIN FOINAVEN MASTER FUND L.P.

BLUEMOUNTAIN CREDIT OPPORTUNITIES MASTER FUND I L.P.

BLUEMOUNTAIN KICKING HORSE FUND L.P.

BLUEMOUNTAIN STRATEGIC CREDIT MASTER FUND L.P.

BLUEMOUNTAIN DISTRESSED MASTER FUND L.P.

BLUEMOUNTAIN TIMBERLINE LTD.

BLUEMOUNTAIN CREDIT ALTERNATIVES MASTER FUND L.P.

BLUEMOUNTAIN MONTENVERS MASTER FUND SCA SICAV-SIF

BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC

BLUEMOUNTAIN LOGAN OPPORTUNITIES MASTER FUND L.P.

D.E. SHAW GALVANIC PORTFOLIOS, L.C.C.

CALIFORNIA INTERMEDIATE TERM TAX FREE INCOME FUND

CALIFORNIA HIGH YIELD MUNICIPAL BOND FUND

TENNEESEE MUNICIPAL BOND FUND

CALIFORNIA TAX FREE INCOME FUND

NEW YORK TAX FREE INCOME FUND

FEDERAL TAX FREE INCOME FUND

DOUBLE TAX FREE INCOME FUND

COLORADO TAX FREE INCOME FUND

GEORGIA TAX FREE INCOME FUND

PENNSYLVANIA TAX FREE INCOME FUND

HIGH YIELD TAX FREE INCOME FUND

MISSOURI TAX FREE INCOME FUND

OREGON TAX FREE INCOME FUND

VIRGINIATAX FREE INCOME FUND

FLORIDA TAX FREE INCOME FUND

LOUISIANA TAX FREE INCOME FUND

MARYLAND TAX FREE INCOME FUND

NORTH CAROLINA TAX FREE INCOME FUND

NEW JERSEY TAX FREE INCOME FUND

FRANKLIN STRATEGIC INCOME FUND UNITED STATES

FIST -FRANKLIN TOTAL RETURN FUND

FRANKLIN STRATEGIC INCOME FUND CANADA

FTIF- FRANKLIN US TOTAL RETURN FUND

FTVIP- FRANKLIN STRATEGIC INCOME VIP FUND

FDP SERIES FT TOTAL RETURN FDP FUND

FTIF- FRANKLIN STRATEGIC INCOME FUND

FT OPPORTUNISTIC DISTRESSED FUND, LTD.

GOLDMAN SACHS HIGH YIELD MUNICIPAL FUND, A SERIES OF THE GOLDMAN
SACHS TRUST

GOLDMAN SACHS DYNAMIC MUNICIPAL INCOME FUND, A SERIES OF THE
GOLDMAN SACHS TRUST

GOLDMAN SACHS SHORT DURATION TAX-FREE FUND, A SERIES OF THE
GOLDMAN SACHS TRUST

KNIGHTHEAD MASTER FUND, L.P.

KNIGHTHEAD ANNUITY & LIFE ASSURANCE COMPANY

LMA SPC FOR AND ON BEHALF OF THE MAP 84 SEGREGATED PORTFOLIO

KNIGHTHEAD (NY) FUND, L.P.

MARATHON CREDIT DISLOCATION FUND, LP

MARATHON STRATEGIC OPPORTUNITIES PROGRAM, LP

MARATHON COURT SQUARE, LP

MARATHON CENTRE STREET PARTNERSHIP, L.P.

KTRS CREDIT FUND, LP

MARATHON CURRITUCK FUND, LP – SERIES C

BALDR MASON FUND INC.

MARATHON CREDIT OPPORTUNITY MASTER FUND, LTD.

MV CREDIT OPPORTUNITY FUND, L.P.

MARATHON SPECIAL OPPORTUNITY MASTER FUND, LTD

MARATHON LES GRANDES JORASSES MASTER FUND

PENTELI MASTER FUND, LTD

MASTER SIF SICAV SIF

MARATHON LIQUID CREDIT LONG SHORT FUND

OPPENHEIMER ROCHESTER AMT –FREE MUNICIPAL FUND

OPPENHEIMER ROCHESTER AMT –FREE NEW YORK MUNICIPAL FUND

OPPENHEIMER ROCHESTER CALIFORNIA MUNICIPAL FUND

OPPENHEIMER ROCHESTER LIMITED TERM CALIFORNIA MUNICIPAL FUND

OPPENHEIMER ROCHESTER LIMITED TERM MUNICIPAL FUND (A SERIES OF OPPENHEIMER MUNICIPAL FUND)

OPPENHEIMER ROCHESTER LIMITED TERM NEW YORK MUNICIPAL FUND (A SERIES OF ROCHESTER PORTFOLIO SERIES)

OPPENHEIMER ROCHESTER NEW JERSEY MUNICIPAL FUND (A SERIES OF OPPENHEIMER MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER PENNSYLVANIA MUNICIPAL FUND (A SERIES OF OPPENHEIMER MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER HIGH YIELD MUNICIPAL FUND (A SERIES OF OPPENHEIMER MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER FUND MUNICIPALS

OPPENHEIMER ROCHESTER OHIO MUNICIPAL FUND

OPPENHEIMER ROCHESTER MICHIGAN MUNICIPAL FUND

OPPENHEIMER ROCHESTER MASSACHUSETTS MUNICIPAL FUND

OPPENHEIMER ROCHESTER VIRGINIA MUNICIPAL FUND

OPPENHEIMER ROCHESTER ARIZONA MUNICIPAL FUND

OPPENHEIMER ROCHESTER MARYLAND MUNICIPAL FUND

OPPENHEIMER ROCHESTER NORTH CAROLINA MUNICIPAL FUND

OPPENHEIMER ROCHESTER MINNESOTA MUNICIPAL FUND

MASSMUTUAL INTERNATIONAL HOLDING MSC

MASSMUTUAL UNIFIED TRADITIONAL SEPARATE ACCOUNT

**<u>Annex B-1</u>**
**<u>RSA Joinder Form (Bonds)</u>**

## FORM OF JOINDER

This Joinder to the Amended and Restated Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time, the "***Restructuring Support Agreement***"), dated as of [●], 2015 by and among: Puerto Rico Electric Power Authority ("***PREPA***"), National Public Finance Guarantee Corporation ("***National***"), Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together with Assured Guaranty Corp., "***Assured***"), Syncora Guarantee Inc. ("***Syncora***"), the members of the Ad Hoc Group of PREPA Bondholders identified on Annex A thereto (the "***Ad Hoc Group***"), Scotiabank de Puerto Rico (in its capacity as administrative agent for the Scotiabank Lenders, "***Scotiabank***"), the lenders (the "***Scotiabank Lenders***") under that certain Scotiabank Credit Agreement, Solus Opportunities Fund 5 LP, Sola LTD and Ultra Master LTD (the "***Solus Lenders***" or "***Solus***"), and Government Development Bank for Puerto Rico ("***GDB***"), is executed and delivered by [_____] (the "***Joining Supporting Creditor***").  Each capitalized term used herein but not defined herein shall have the meaning set forth in the Restructuring Support Agreement.

1.      Agreement to be Bound.  The Joining Supporting Creditor hereby agrees to be bound by all of the terms of the Restructuring Support Agreement.  The Joining Supporting Creditor shall hereafter be deemed to be a "Supporting Creditor" and a Party for all purposes under the Restructuring Support Agreement.

2.      Representations and Warranties. With respect to the aggregate principal amount of Uninsured Bonds held by the Joining Supporting Creditor upon consummation of the Transfer of such Uninsured Bonds to the Joining Supporting Creditor, the Joining Supporting Creditor hereby makes, as of the date hereof, the representations and warranties of the Holders set forth in sections 12(a) and 12(d) of the Restructuring Support Agreement to each of the other Parties to the Restructuring Support Agreement.

3.      Governing Law.  Section 27 of the Restructuring Support Agreement is incorporated by reference as if set forth fully herein, except that any references to "Agreement" shall be replaced with references to "Joinder".

\* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

1

IN WITNESS WHEREOF, the Joining Supporting Creditor has caused this Joinder to be executed as of the date first written above.

_____
Entity Name of Joining Supporting Creditor

Authorized Signatory:

By:  _____

Name:

Title:

Address:


Principal amount of Uninsured Bonds beneficially owned by Joining Supporting Creditor, or beneficially owned by accounts for which Joining Supporting Creditor has investment management responsibility:

**<u>Annex B-2</u>**
**<u>RSA Joinder Form (Credit Agreements)</u>**

## FORM OF JOINDER

This Joinder to the Amended and Restated Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time, the "***Restructuring Support Agreement***"), dated as of [●], 2015 by and among: Puerto Rico Electric Power Authority ("***PREPA***"), National Public Finance Guarantee Corporation ("***National***"), Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together with Assured Guaranty Corp., "***Assured***"), Syncora Guarantee Inc. ("***Syncora***"), the members of the Ad Hoc Group of PREPA Bondholders identified on Annex A thereto (the "***Ad Hoc Group***"), Scotiabank de Puerto Rico (in its capacity as administrative agent for the Scotiabank Lenders, "***Scotiabank***"), the lenders (the "***Scotiabank Lenders***") under that certain Scotiabank Credit Agreement, Solus Opportunities Fund 5 LP, Sola LTD and Ultra Master LTD (the "***Solus Lenders***" or "***Solus***"), and Government Development Bank for Puerto Rico ("***GDB***"), is executed and delivered by [_____] (the "***Joining Supporting Creditor***").  Each capitalized term used herein but not defined herein shall have the meaning set forth in the Restructuring Support Agreement.

1.      <u>Agreement to be Bound</u>.  The Joining Supporting Creditor hereby agrees to be bound by all of the terms of the Restructuring Support Agreement.  The Joining Supporting Creditor shall hereafter be deemed to be a "Supporting Creditor" and a Party for all purposes under the Restructuring Support Agreement.

2.      <u>Representations and Warranties</u>. With respect to any rights and obligations under any Credit Agreement held by the Joining Supporting Creditor upon consummation of the Transfer of such rights and obligations to the Joining Supporting Creditor, the Joining Supporting Creditor hereby makes, as of the date hereof, the representations and warranties of (i) Scotiabank and the Scotiabank Lenders, set forth in sections 12(a) and 12(e) of the Restructuring Support Agreement, or (ii) Solus, set forth in sections 12(a) and 12(f) of the Restructuring Support Agreement, as applicable, to each of the other Parties to the Restructuring Support Agreement.

3.      <u>Governing Law</u>.  Section 27 of the Restructuring Support Agreement is incorporated by reference as if set forth fully herein, except that any references to "Agreement" shall be replaced with references to "Joinder".

\* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

1

IN WITNESS WHEREOF, the Joining Supporting Creditor has caused this Joinder to be executed as of the date first written above.

_____

Entity Name of Joining Supporting Creditor

Authorized Signatory:

By: _____

Name:

Title:

Address:

Principal amount under Scotiabank Credit Agreement and Solus Credit Agreement beneficially owned by Joining Supporting Creditor, or beneficially owned by accounts for which Joining Supporting Creditor has investment management responsibility:

## Annex C
## Trust Agreement Amendment

[*Trust Agreement Amendment to (i) increase thresholds for exercise of remedies so long as the Restructuring Support Agreement is in effect as to Supermajority Insurers and each other class of Supporting Creditors and (ii) provide that fuel line lenders' Current Expense status is not prejudiced by their entering the RSA and previous forbearance agreements, in each case, similarly to the amendments entered into in connection with forbearance agreements. The Trust Agreement Amendment shall be in form and substance reasonably acceptable to the Supermajority Holders, the Supermajority Insurers and the Supermajority Credit Agreement Lenders.  The Trust Agreement Amendment shall only be effective as to matters described in clause (i) on the 16th day following passage of the Legislative Reform Package. The provisions in the Trust Agreement Amendment permitting the issuance of the January Payment Bonds shall be effective before issuance of those bonds.*

**<u>Annex D</u>**
**<u>Recovery Plan Term Sheet</u>**

**ANNEX D**

**RECOVERY PLAN TERM SHEET**

*This Recovery Plan Term Sheet does not address all material terms that would be required in definitive documents and in order to consummate the transactions set forth in this Recovery Plan Term Sheet.  This Recovery Plan Term Sheet does not constitute (nor shall it be construed as) an offer with respect to any securities.*

*Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.*

| | |
|---|---|
| **FORBEARING UNINSURED BONDS** | ▪ Existing holders of uninsured power revenue and revenue refunding bonds ("**Uninsured Bonds**") who are parties to the Restructuring Support Agreement ("**Forbearing Uninsured Holders**") will participate in **(a)** a consent solicitation to amend the Trust Agreement ("**Consent Solicitation**") to reflect agreed upon amendments, including amendments described in <u>Schedule II</u> hereto ("**Closing Date Trust Agreement Amendments**"), which amendments shall, among others, (A) expressly provide that (1) the Scotiabank Loan Obligations and the Solus Loan Obligations constitute "Current Expenses" under the Trust Agreement, (2) any amendments, waivers, modifications or supplements to the Trust Agreement that would amend, modify, or waive such status as "Current Expenses" shall require the prior written consent of the Scotiabank, the Scotiabank Lenders, and the Solus Lenders (or their respective successors and assigns, as applicable) and that Scotiabank, the Scotiabank Lenders, and the Solus Lenders (and their respective successors and assigns) are express third-party beneficiaries of the provisions of the Trust Agreement providing for such "Current Expense" status and consent rights, and (B) include the other amendments described in Schedule II hereto in the section titled "Exit Consents" and **(b)** an exchange offer ("**Exchange Offer**") to exchange 100% of their Uninsured Bonds (other than the January Payment Bonds) for new securitization bonds ("**Securitization Bonds**"), at an exchange ratio of 85%, to be issued by a new bankruptcy-remote public corporation and governmental instrumentality of the Commonwealth, including the terms set forth in <u>Schedule I-B</u> hereto ("**Securitization Term Sheet**"). |
| **NON-FORBEARING UNINSURED BONDS** | ▪ Existing holders of uninsured power revenue and revenue refunding bonds ("**Uninsured Bonds**") who are not parties to the Restructuring Support Agreement ("**Non-Forbearing Uninsured Holders**") shall have the option to either **(a)** participate in the Consent Solicitation and participate in the Exchange Offer on the same terms as the Forbearing Uninsured Holders, or **(b)** participate in the Consent Solicitation and tender their bonds in a cash tender at a price to be determined in consultation with the parties providing the Backstop Facility, their advisors and PREPA's advisors ("**Cash Tender**"). |
| **INSURERS** | ▪ The Insurers (other than Syncora) shall participate in purchasing the January Payment Bonds as set forth in section 8 of the RSA, and provide the DSRF sureties, in each case, subject to the terms and conditions set forth in <u>Schedule II</u> hereto.<br><br>▪ The Insured Bonds (other than the Insured Bonds insured by Syncora) shall |

| | |
|---|---|
| | receive the treatment provided for in <u>Schedule II</u> hereto. |
| **CREDIT AGREEMENTS** | ▪ Each Scotiabank Lender and Solus Lender under its Credit Agreements shall either **(a)** amend and restate the applicable Credit Agreement as set forth in <u>Schedule III</u> hereto (the "**Solus Credit Agreement Amendment**" and the "**Scotiabank Credit Agreement Amendment**", together, the "**Credit Agreements Amendments**", and the solicitation of consents with respect to the Credit Agreements Amendments, the "**Credit Agreements Amendment Solicitation**") and/or **(b)** exchange all or a portion of its indebtedness under its Credit Agreement into Securitization Bonds, so that all of the outstanding indebtedness held by such Scotiabank Lender and Solus Lender shall be restructured or exchanged (together with the Credit Agreements Amendments, the "**Credit Agreements Restructuring**"). |
| **GDB DEBT** | ▪ Existing indebtedness owed to GDB will be subject to substantially the same treatment as the indebtedness under the Credit Agreements. |
| **SWAP OBLIGATIONS** | ▪ Swap obligations will be paid out in full on the current schedule. |
| **NEW GOVERNANCE** | ▪ Recovery Plan will provide for the establishment of a new governance structure for PREPA, with the purposes of promoting long-term planning and sustainability, reducing political interference and encouraging use of industry best practices.  A summary of the governance changes, which will require adoption of legislation, is attached hereto as <u>Schedule IV</u> ("**New Governance**"). |
| **OPERATIONAL IMPROVEMENTS** | ▪ In connection with the Recovery Plan, PREPA will implement operational improvements with respect to, among others, procurement, fuel supply, customer service, collections and safety ("**Operational Improvements**"). A summary of Operational Improvements is attached hereto as <u>Schedule V</u>. |
| **LABOR / PENSIONS** | ▪ PREPA will implement initiatives (the "**Labor Initiatives**") to achieve labor cost savings, including as set forth in <u>Schedule V</u>. |
| **RATE STRUCTURE** | ▪ PREPA will seek Energy Commission approval for a new rate structure (the "**Rate Structure**") incorporating the elements set forth in <u>Schedule VI</u> hereto, including without limitation approval by the Energy Commission of the Rate Structure on an expedited basis. |
| **CAPITAL PLAN** | ▪ Recovery Plan will include a capital improvement plan intended to permit PREPA to achieve compliance with applicable environmental laws and regulations, including MATS and other standards, as well as enhance efficiency, reliability and flexibility of its power generation assets.  A summary of the development plans for the Aguirre Offshore Gas Port ("**AOGP**"), PREPA's generation assets ("**Generation Assets**") and transmission and distribution network ("**T&D Network**") is set forth in <u>Schedule VII</u> hereto ("**Capital Plan**"). |
| | ▪ In addition, in connection with the Recovery Plan, PREPA will conduct a competitive bidding process in accordance with applicable laws, as described in <u>Schedule VIII</u> hereto ("**RFP Process**"), to retain one or more private sector entities to carry out the Capital Plan with respect to certain Generation Assets. In the event that no acceptable bidders are identified and/or bids are submitted, PREPA shall carry out the Capital Plan through its available |

2

| | resources. |
|---|---|
| **CONDITIONS PRECEDENT** | The closing of each of the Consent Solicitation, Closing Date Trust Agreement Amendments, Exchange Offer and Credit Agreements Restructuring (collectively, the "**Restructuring Transactions**") will be conditioned on the prior or simultaneous closing of each of the other Restructuring Transactions. In addition, the closing of the Restructuring Transactions will be conditioned on the following, among other conditions: |

- Negotiation and execution of all documents and agreements necessary to consummate the Restructuring Transactions.

- Enactment of legislative reform to implement the Recovery Plan.  A summary of the legislative reform package is attached hereto as Schedule I-A ("**Securitization Special Legislation**") and Schedule IX (collectively, the "**Legislative Reform Package**").

- Energy Commission approval of the Rate Structure.

- After the participation of the Non-Forbearing Uninsured Holders as described above, no more than $700 million (or such higher other amount determined at PREPA's discretion) of Uninsured Bonds (other than the January Payment Bonds) shall be outstanding, subject to input from PREPA's advisors.

- All substantial documentation, including without limitation required legislation, securitization documentation, new trust agreement documentation (regarding the PREPA Trust Agreement and the Securitization Bonds trust agreement), is subject to the Supporting Creditors' consultation and, as applicable, consent, withdrawal and termination rights with respect thereto as provided in the Restructuring Support Agreement.

- Receipt of unqualified opinion of U.S. recognized bond counsel that interest on the Securitization Bonds and each of the Credit Agreements (after giving effect to the Credit Agreement Amendments), is excludable from gross income for federal income tax purposes and exempt from all state and Puerto Rico taxes.

- Appointment of a number of directors of the Board of PREPA that is sufficient for the Board to take any action in accordance with Section A of the Legislative Reform Package, *provided* that at least 3 independent directors shall have been appointed.

- Implementation of the New Governance.

- Receipt of all necessary consents and internal approvals.

- Other customary conditions precedent to be discussed.

3

**S**CHEDULES

**Schedule I-A**      **Securitization Special Legislation Outline**

**Schedule I-B**      **Securitization Term Sheet**

**Schedule II**        **Monoline Term Sheet**

**Schedule III**       **Credit Agreements Restructuring**

**Schedule IV**       **New Governance**

**Schedule V**         **Operational Improvements**

**Schedule VI**       **Rate Structure**

**Schedule VII**      **Capital Plan**

**Schedule VIII**   **REOI / RFQ / RFP Indicative Plan**

**Schedule IX**       **Legislative Reform Package**

*Execution version*

**Schedule I-A**

**Securitization Special Legislation Outline**

Section 1.　　<u>Definitions</u>.  As used or referred to in this Act, unless a differing meaning clearly appears from the context:

"Adjustment Mechanism" means the formulaic adjustment mechanism contained in a Restructuring Resolution, and approved in a Restructuring Order, to be applied by the Corporation periodically, but not less often than semi-annually, to adjust the Transition Charges to ensure the collection of Transition Charge Revenues sufficient to provide for the timely payment of Ongoing Financing Costs, as further described in Section 4 of this Act.  The Adjustment Mechanism and its implementation shall not be subject to legislative or any other governmental review or approval, except the approval of the Adjustment Mechanism in the Restructuring Order as provided in Section 5(b) of this Act  and as provided in Section 4 of this Act regarding review by the Corporation for and correction of mathematical errors.

"Ancillary Agreement" means any bond insurance policy, letter of credit, reserve account, surety bond, swap arrangement, hedging arrangement, liquidity or credit support arrangement or other arrangement designed to promote the credit quality and marketability of Restructuring Bonds or to mitigate the risk of a change in interest rates.

"Approved Restructuring Costs" means any or all of the following costs approved under a Restructuring Resolution:  (a) the capital costs related to the construction and equipping of the Aguirre Offshore Gasport, subject to satisfaction of any conditions set forth in the applicable Trust Agreement for any outstanding Restructuring Bonds; (b) the costs of retiring [[or defeasing]][1] all or a portion of PREPA's debt obligations or the Restructuring Bonds; (c) rebate, yield reduction payments and any other amounts payable to the United States to preserve or protect the federal tax-exempt status of PREPA's or the Corporation's outstanding debt obligations; (d) deposits from proceeds of Restructuring Bonds to the credit of a capitalized interest fund or account, debt service reserve fund or account or operating expense reserve fund or account established in connection with such Restructuring Bonds and, solely in connection with the first issue of Restructuring Bonds, a deposit to the Self-Insurance Fund, established pursuant to the trust agreement, dated as of January 1, 1974, as amended, by and between PREPA and U.S. Bank National Association, as successor trustee, in an amount not to exceed $100 million; and (e) subject to any limitations contained in this Act, Financing Costs.

 "Board" means the board of directors of the Corporation established pursuant to Section 2 hereof.

"Cause" means with respect to a director of the Corporation, (i) acts or omissions by such director that constitute willful disregard of, or bad faith or gross negligence with respect to, such director duties under this Act and the Corporation's other organizational documents; (ii) that such director has engaged in or has been charged with, or has been convicted of, fraud or other

---

[1 NTD:  Inclusion of double bracketed language dependent on whether agreement with monolines is reached]

acts constituting a crime under any law applicable to such director, (iii) that such director is unable to perform his or her duties as director due to death, disability or incapacity, (iv) that such director no longer meets the requirements of this Act, or (v) any other act or omission set forth in Section __ of this Act.

"Commission" means the Puerto Rico Energy Commission established by Act No. 57 of the Legislative Assembly of Puerto Rico, approved on May 27, 2014, as amended.

"Corporation" means Puerto Rico Electric Power Authority Revitalization Corporation, a special purpose public corporation and a governmental instrumentality of the Commonwealth, established pursuant to Section 2 hereof.

"Court" has the meaning given to it in Section 5(c)(1) of this Act.

"Customer" means any Person that is connected to or takes or receives electric service within the Commonwealth by means of the electric generation, transmission or distribution facilities constituting part of System Assets, whether or not those electric generation, transmission or distribution facilities are owned by PREPA.  PREPA shall not be a Customer. Each municipality in the Commonwealth shall be a Customer to the extent that the dollar value of its usage of electric service (including in determining such value the dollar value of Transition Charges which would otherwise be imposed on such municipality and PREPA charges) in any fiscal year exceeds the dollar value owed by PREPA to such municipality as a contribution in lieu of taxes for such fiscal year.

[["Defeasance" means with respect to any debt, the legal or economic defeasance of such debt.  "Defease" has a meaning correlative thereto.]]

"Financing Costs" means the costs to issue, service, repay or refinance Restructuring Bonds, whether incurred upon issuance of such Restructuring Bonds or over the life of the Restructuring Bonds, and approved for recovery in a Restructuring Resolution.   Without limitation or duplication, "Financing Costs" may include, as applicable, any of the following:

(a)      principal, interest and redemption premiums payable on Restructuring Bonds;

(b)      any payment required under an Ancillary Agreement and any amount required to fund or replenish (or to reimburse a third party for replenishing) a debt service reserve fund or account, operating reserve fund or account or other fund or account established under a Trust Agreement, any Ancillary Agreement, resolution or other financing document relating to the Restructuring Bonds;

(c)      any federal or state taxes and charges, including federal or state payments or contributions in lieu of taxes, franchise fees or license fees imposed on Transition Charge Revenues (but excluding any Commonwealth or local taxes, fees or contributions or payments in lieu of taxes);

(d)      any cost related to obtaining a Restructuring Order, administering the Corporation, the Restructuring Bonds or the Restructuring Property, including the costs of implementing the Adjustment Mechanism, Trustee (and other similar fiduciary), legal, accounting and other consultants', depository, calculation agent, manager, rating agency fees and expenses and Servicing Fees and expenses, in each case subject to the provisions of this Act;

(e)      any cost related to protecting the status of Restructuring Property and collecting Transition Charges, including any cost related to any judicial or similar proceedings that the

2

Corporation or the Trustee or any owner of all or a portion of Restructuring Property deems necessary to enforce or collect Transition Charge Revenues or protect the Restructuring Property or any other costs referred to in Section 8(a) of this Act, in each case subject to the provisions of this Act; and

(f)     any other cost related to issuing Restructuring Bonds, administering and servicing Restructuring Property and Restructuring Bonds, including costs of calculating adjustments of Transition Charges, Servicing Fees and expenses, Trustee (or similar fiduciary) fees and expenses, legal fees and expenses, accounting fees and expenses, administration fees and expenses, placement fees and expenses, underwriting fees and expenses, printing and marketing fees, filing or listing fees, fees and expenses of the Corporation's other consultants, if any, rating agency fees and any other cost approved by the Board as necessary or desirable for the accomplishment of the purposes of this Act.

"Financing Entity" means any Servicer, Trustee (or similar fiduciary), collateral or escrow agent, or other Person acting for the benefit of owners of the Restructuring Bonds or the Corporation that may own Restructuring Property or have rights to receive proceeds of Restructuring Bonds.

"Interested Person" means (a) the trustee representing the owners of PREPA's outstanding bonds, (b) the securities depositary, if any, at which any of such bonds shall be immobilized, (c) any owner of PREPA's outstanding debt obligations or any Person providing credit or liquidity support, including financial guaranty insurance, to any or all of such obligations, (d) any financial institution to which PREPA is indebted (other than through the securities depositary) or otherwise obligated, (e) the Secretary of Justice of Puerto Rico, (f) any Customer, (g) any vendor of PREPA not included in clause (f) of this definition, (h) any Person who has filed with the secretary of the Board and PREPA a request to receive the notice set forth in Section 5(c)(2) or 5(d)(2) of this Act, (i) any Person who would otherwise be entitled to receive notice with respect to the adjustment of PREPA rates and charges and (j) any other Person interested in the matters raised in the proceedings provided for in Section 5(c) or 5(d) of this Act.

"Non-bypassable" means that the Transition Charge shall be paid by all Customers, even if the Customer elects to purchase electricity in whole or in part from an alternative electric supplier.

"Ongoing Financing Costs" means Financing Costs that are not Upfront Financing Costs and any excess of actual Upfront Financing Costs over the Corporation's estimate of Upfront Financing Costs to be paid from the proceeds of the Restructuring Bonds.

"Person" means any natural or juridical person, including any local agency, or any individual, firm, partnership, joint venture, trust, joint stock company, association or public or private corporation, municipality, organized or existing under the laws of the Commonwealth, the United States of America or any state, any agency or instrumentality of the United States, or any combination of the above.

"PREPA" means Puerto Rico Electric Power Authority, a public corporation and governmental instrumentality established and existing by virtue of Act No. 83 of the Legislative Assembly of Puerto Rico, approved May 2, 1941, as amended, and any successor or successors thereto, including successors referred to in Section 5(l) of this Act.

3

"Restructuring Bonds" means bonds, notes, or other evidences of indebtedness that are issued by the Corporation pursuant to this Act, any Restructuring Resolution and the Trust Agreement related thereto (a) the [[payments on or]] proceeds of which are used, directly or indirectly, to finance or refinance Approved Restructuring Costs, (b) that are directly or indirectly secured by, or payable from, Restructuring Property, and (c) that have a term no longer than thirty-five years.

"Restructuring Order" means the irrevocable order of the Commission that is not subject to further Commission review or amendment approving the calculation methodology for the Transition Charges and the Adjustment Mechanism related thereto, as provided in this Act.

"Restructuring Property" means a Restructuring Resolution and the property rights and interests created thereby, including the right, title, and interest in and to: (a) the right to create and receive Transition Charges; (b) the Transition Charges, as adjusted from time to time in accordance with the Adjustment Mechanism, including any rights under a Servicing Agreement assigned pursuant to the related Trust Agreement or other security agreement; (c) all revenues, collections, claims, payments, money, or proceeds of or arising from the Transition Charges or constituting Transition Charges, regardless of whether such revenues, collections, claims, payments, money, or proceeds are billed, received, collected or maintained by PREPA or by the Corporation together with or commingled with other revenues, collections, claims, payments, money or proceeds; (d) all rights to obtain adjustments to the Transition Charges pursuant to the terms of the Restructuring Resolution related thereto; and (e) all reserves established in connection with the Restructuring Bonds or the Restructuring Property.  Upon the issuance of Restructuring Bonds, Restructuring Property shall constitute a vested, presently existing property right in the Corporation, as initial owner, subject to Section 8(c) and any pledge of Restructuring Property pursuant to this Act, notwithstanding the fact that the value of the property right will depend on further acts that have not yet occurred, including Customers remaining or becoming connected to the System Assets and taking or receiving electric service, the imposition and billing of Transition Charges, or PREPA performing services.

"Restructuring Resolution" means a resolution of the Board adopted in accordance with this Act, which resolution creates Restructuring Property, approves the imposition and collection of Transition Charges and the financing of Approved Restructuring Costs through the issuance of Restructuring Bonds and which resolution contains the related Adjustment Mechanism, all as provided in Section 4 of this Act.

"Servicer" means PREPA to the extent permitted by this Act, and if PREPA is replaced as Servicer pursuant to the Servicing Agreement, a Person or Persons authorized and required, by contract or otherwise, to impose, bill or collect Transition Charges, to prepare periodic reports regarding billings and collections of Transition Charges, to remit collections to or for the account of the Corporation or its assigns or pledgees, including a Financing Entity, and to provide other related services for the Corporation, which may include calculation of periodic adjustments to the Transition Charges or providing other services related to the Restructuring Property; and shall be deemed to include any co-Servicer, subservicer, backup servicer (including if it becomes a Servicer under a Servicing Agreement), replacement servicer or the successors of any of the foregoing, authorized to act as such under a Restructuring Resolution.

4

"Servicing Agreement" means the agreement or agreements between the Corporation and the Servicer providing for the administering and servicing of Restructuring Property, as the same may be amended from time to time by the parties thereto in a manner not prohibited by this Act.

"Servicing Fee" means the periodic amount paid to a Servicer for its services required in connection with the issuance of Restructuring Bonds and the administering and servicing of Restructuring Property.

"System Assets" means the electric generation, transmission and distribution facilities (and other general property and equipment used in connection therewith), whether now existing or hereafter acquired, used by PREPA as of the effective date of this Act or thereafter acquired for use by it, including any successor electric utility, in providing electric service to Customers, including any transmission and distribution service.

"Third-party Biller" means any Person authorized to bill or collect transition charges other than the Corporation, PREPA or, if different, a Servicer.

"Transition Charge Revenues" means all money and other property received or to be received, directly or indirectly, on account of the Transition Charges, and all proceeds of the investment thereof.

"Transition Charges" means those rates and charges that are separate from rates of PREPA and that are imposed pursuant to a Restructuring Resolution on Customers to recover the Ongoing Financing Costs, and shall include a pro rata share of any late payment fee imposed in respect of any past-due bill for electric service that includes in such bill an amount for Transition Charges.

"Trust Agreement" means a trust agreement, trust indenture or similar agreement executed by the Corporation and the Trustee establishing the rights and responsibilities of the Corporation and of the owners of Restructuring Bonds issued thereunder and secured thereby.

"Trustee" means the trustee party to a Trust Agreement representing the owners of the Restructuring Bonds issued and secured thereunder.

"Upfront Financing Costs" means the costs associated with obtaining the Restructuring Order, the structuring, marketing, and issuance of Restructuring Bonds, not including scheduled debt service or other Ongoing Financing Costs, to the extent such Ongoing Financing Costs are payable from Transition Charge Revenues.  Upfront Financing Costs include Trustee (or similar fiduciary) fees and expenses, legal fees and expenses, accounting fees and expenses, administration fees and expenses, placement fees and expenses, underwriting fees and expenses, printing and marketing fees, filing or listing fees and compliance fees, fees and expenses of the Corporation's other consultants, if any, rating agency fees and any other cost approved by the Board as necessary or desirable for the accomplishment of the purposes of this Act and shall include reimbursement to any Person of amounts advanced for payment of such costs.

Section 2.    Creation of Corporation.   (a) A special purpose public corporation and governmental instrumentality of the Commonwealth is hereby created to be known as "Puerto Rico Electric Power Authority Revitalization Corporation," which shall exercise essential governmental and public powers for the good of the public.  The Corporation shall not be created or organized, and its operations shall not be conducted, for the purpose of making a profit.  No part of the revenues or assets of the Corporation shall inure to the benefit of or be distributable to

its directors or officers or any other private Persons, except as herein provided for reasonable consideration for actual services rendered or property.

(b)      (1) The Corporation shall be governed by a Board consisting of three directors. Until the Governor appoints the non-interim directors in accordance with paragraph (2) of this subsection (b), the President of Government Development Bank for Puerto Rico, the Executive Director of Puerto Rico Infrastructure Financing Authority and the Secretary of State of the Commonwealth shall serve as directors ex officio whose terms shall expire on the date that the Governor makes the appointments from the list referred to below in paragraph (2) of this subsection (b).

(2)      The non-interim appointment of the directors shall be made in accordance with the procedures set forth in this paragraph (2).  The non-interim appointment of the directors shall be made by the Governor after receiving input from the President of the Senate and the President of the House of Representatives not later than March 1, 2016.  The directors so appointed by the Governor shall be selected from a list of at least ten (10) candidates prepared by a recognized firm in the field of search for executive candidates, according to objective criteria that take into account professional and educational backgrounds and delivered to the Governor. Such list must include at least two (2) Commonwealth residents.  The Governor, in his/her discretion, shall evaluate the list of recommended candidates and choose three (3) individuals from the list.  If the Governor does not appoint three directors from such list within twenty (20) days after such list's submission to the Governor, the above-mentioned search firm shall submit another list within the next thirty (30) days.

(3)      The ex officio interim directors shall occupy their respective director positions as long as they serve in their current offices.  Of the non-interim directors originally appointed by the Governor, one shall serve a term of four years from the date of appointment, one shall serve a term of five years from the date of appointment and one shall serve a term of six years from the date of appointment.  Each director shall continue in office until his or her successor has been appointed and qualified.  Except for the ex officio, interim directors, all Board members shall be obliged to comply with The New York Stock Exchange Corporate Governance Rules (NYSE Independent Director Rules) for director independence.  Nothing in this Act shall preclude a Customer from being a director solely because such Person is a Customer.  The ex officio interim directors shall not receive compensation for services provided as directors.  The non-interim directors shall receive a market-based compensation comparable to that received by board members of local institutions of similar size, complexity and risks.  No member of the Board shall receive more than fifty thousand dollars ($50,000) annually, on such account.

(4)      Any vacancy among the non-interim directors shall be filled by appointment by the Governor for the unexpired term of the original appointment and following the same procedures through which the original, non-interim appointments were made, and the Governor may use the most recent ten (10) candidate list submitted by the search firm described in the following sentence.  Accordingly, the Governor shall elect from a list of at least ten (10) candidates submitted by a recognized firm in the field of search for executive candidates, which will be selected following objective criteria that take into account experience as well as professional and educational qualifications.  Such list shall include at least two (2) residents of the Commonwealth.  Upon expiration of their respective terms, the Governor shall appoint successors for a period of six (6) years following the same procedures by which the original,

non-interim appointments were made.  No non-interim director may be designated for said position for more than two (2) terms.  Directors may be removed by the Governor only for Cause.  The process of selection of candidates performed by a recognized firm in the field of search for executive candidates shall be effective for a period of fifteen (15) years, after which the Legislative Assembly will evaluate the performance of the Corporation and the Board and determine whether or not it is appropriate to continue with said process of election.  If the Legislative Assembly takes no action upon the expiration of the period described in the preceding sentence, the process for selecting directors shall continue in effect until the Legislative Assembly changes such process, subject to any requirements imposed by any Trust Agreement and laws applicable to the preservation of the tax-exempt or otherwise tax favored status of interest on any Restructuring Bonds.

(5)     In addition to the other requirements established in this Section 2(b), no Person may become a non-interim director if he/she: (i) is an employee, retiree, or has any direct or indirect substantial economic interest in any private company with which the Corporation or PREPA has any contracts or with whom it engages in transactions of any kind, other than the purchase of electric service under generally applicable rates and tariffs; (ii) within two (2) years before holding office, has had a business relationship with or any interest in any private company with which the Corporation, PREPA, Government Development Bank for Puerto Rico or the Commonwealth has any contracts or with whom it engages in transactions of any kind, other than the purchase of electric service under generally applicable rates and tariffs; (iii) has been a member of a local or central directing body of a political party registered in the Commonwealth, during the year immediately preceding his/her appointment; (iv) is an employee, member, advisor, or contractor of PREPA's labor unions; or (v) has failed to provide the certification of having filed income tax returns during the five (5) preceding taxable years issued by the Department of the Treasury, the certification of having no debts outstanding with PREPA, the Criminal Record issued by the Puerto Rico Police Department, as well as negative certifications of the Child Support Administration (ASUME, Spanish acronym) and the Municipal Revenues Collection Center (CRIM, Spanish acronym).

(6)     Except for the ex officio directors, no director shall be considered a public employee under the terms of Section 5.1 of Act 1-2012.

(7)     Each director shall have a fiduciary duty to act in the best interests of the Corporation, including the owners of the Restructuring Bonds and its other creditors, and such other duties as may be specified in the organizational documents or other agreements of the Corporation.

(8)     A majority of the directors at the time serving shall constitute a quorum for the transaction of any business or the exercise of any power or function of the Corporation. The Board may delegate to one or more of its directors, or officers, agents and employees, such powers and duties as the Board may deem proper.

(c)     Without impairing the rights pursuant to Section 3 of this Act, the Board and the officers, agents and employees of the Corporation shall not incur civil liability for any actions taken in good faith in the performance of their duties and responsibilities pursuant to the provisions of this Act, provided there has been no conduct that constitutes a crime, breach of duty of loyalty or gross negligence, and they shall be indemnified for any costs incurred in connection with any claim for which they enjoy immunity as provided hereunder.  The Board, its

directors and any officers, agents or employees of the Corporation shall also be fully indemnified for any civil liability adjudicated under the laws of the United States of America.  The governing board and individual directors, officers, agents and employees of any Servicer shall be entitled to the immunities from personal liability as shall be specified by law and if not so specified, to the immunities from personal liability as are specified in this Section 2(c) *mutatis mutandis*.

Section 3.      Powers of the Corporation; No Merger.   (a) The Corporation is hereby authorized to:

(1)      Adopt Restructuring Resolutions;

(2)      In consideration of providing financial assistance to PREPA by payment of Approved Restructuring Costs, impose and collect Transition Charges in connection with the financing of Approved Restructuring Costs through the issuance of Restructuring Bonds for the benefit of PREPA, including (i) making such Transition Charges Non-bypassable to Customers and (ii) approving an Adjustment Mechanism, subject to Commission approval in a Restructuring Order prior to the issuance of the related Restructuring Bonds;

(3)      Issue Restructuring Bonds contemplated by a Restructuring Resolution and pledge the Restructuring Property to the payment thereof;

(4)      Provide for and direct the use of proceeds of Restructuring Bonds on behalf of PREPA in accordance with a Restructuring Resolution and a Trust Agreement executed by the Corporation in connection with such Restructuring Bonds; and

(5)      Contract for administering and servicing of Restructuring Property and Restructuring Bonds and for administrative services, including by hiring a manager or administrator that is not an employee of PREPA.

(b)      The Corporation shall have no authority to engage in other business activities; but shall, in connection with the powers specified in paragraph (a) of this Section 3, have the power to:

(1)      sue and be sued; and settle existing or threatened litigation on such terms as the Board may approve;

(2)      have a seal and alter the same at its pleasure;

(3)      make and alter by-laws for its organization and internal management and make and alter rules and regulations governing its operations and the use of its property, in each case in accordance with the limitations set forth in this Act;

(4)      make and execute contracts and all other instruments necessary or convenient for the exercise of its powers and functions under this Act and to commence any action to protect or enforce any right conferred upon it by any law, contract or other agreement, including make and execute contracts with PREPA, any other Servicers, any Financing Entity or any other Person (public or private) to administer and service Restructuring Property, to service Restructuring Bonds issued by the Corporation and to provide services administering the Corporation, and to pay compensation for such services;

(5)      appoint officers, agents and employees, prescribe their duties and qualifications, fix their compensation and engage the services of consultants, accountants,

counsel and others on a contract basis for rendering professional and technical assistance and advice and pay compensation therefor;

(6)     pay its operating expenses, scheduled debt service on Restructuring Bonds and other Ongoing Financing Costs;

(7)     provide for the rights of the owners of the Restructuring Bonds;

(8)     implement and enforce the implementation of the Adjustment Mechanism in accordance with the related Restructuring Resolution and Servicing Agreement;

(9)     procure insurance against any loss in connection with its activities, properties and assets in such amount and from such insurers as it may deem desirable;

(10)     invest any funds under its custody and control in investment securities or under any Ancillary Agreement;

(11)     establish and maintain such reserves and special funds and accounts, to be held in trust or otherwise, as may be required by agreements made in connection with the Restructuring Bonds, or any agreement between itself and third parties;

(12)     as security for the payment of the principal of and interest on any Restructuring Bonds issued by it pursuant to this Act, and any agreement made in connection therewith, pledge and create liens on all or any part of its revenues or assets, including Restructuring Property, unspent proceeds of its Restructuring Bonds, Transition Charge Revenues, and earnings from the investment and reinvestment of unspent proceeds of its Restructuring Bonds and Transition Charge Revenues; and

(13)     exercise such other corporate powers not inconsistent herewith, as are conferred upon corporations by the laws of the Commonwealth and to exercise all its powers within and without the Commonwealth to the same extent as natural Persons might or could do and (without duplication) do any and all things necessary or convenient to carry out its purposes and exercise the powers expressly given and granted in this Section 3.

(c)     So long as any Restructuring Bonds remain outstanding and any Financing Costs that have or may become due have not been paid in full, the Corporation shall not be authorized to dissolve, liquidate or transfer or sell all or substantially all of the Corporation's assets (except as expressly provided for in the applicable Trust Agreement), or merge or consolidate, directly or indirectly, with any Person.  Additionally, the Corporation shall not have the power or authority to incur, guarantee or otherwise become obligated to pay any debt or other obligations other than Restructuring Bonds and Financing Costs unless otherwise permitted by a Restructuring Resolution.  The Corporation shall not own any assets or property other than the Restructuring Property, incidental personal property necessary for the ownership and operation of the Restructuring Property and any investment-grade securities in accordance with the terms of the Restructuring Bonds.  The Corporation shall keep its assets and liabilities separate and distinct from those of any other Person, including PREPA.

(d)     The Corporation shall not pledge its assets to secure the obligations of any other Person or hold out its credit as being available to satisfy the obligations of any other Person.

(e)     Each of the Corporation and PREPA shall maintain its books, financial records and accounts (including inter-entity transaction accounts) in a manner so as to identify separately the assets and liabilities of each such entity from those of any other Person; each shall observe all

9

applicable corporate procedures and formalities, including, where applicable, the holding of regular periodic and special meetings of governing bodies, the recording and maintenance of minutes of such meetings, and the recording and maintenance of resolutions, if any, adopted at such meetings; and all transactions and agreements between and among the Corporation, PREPA and any Person will reflect the separate legal existence of each entity and shall be formally documented in writing.  The Corporation shall not enter into any transaction with an affiliate of PREPA, the Corporation, Government Development Bank for Puerto Rico or the Commonwealth except on commercially reasonable terms similar to those available to unaffiliated Persons in an arm's length transaction.

(f)      The Corporation and PREPA shall each have separate annual financial statements, prepared in accordance with generally accepted accounting principles, that reflect the separate assets and liabilities of each such entity and all transactions and transfers of funds involving each such entity, and each shall pay or bear the cost of the preparation of its own financial statements regardless of whether such statements (whether audited or unaudited) are prepared internally or by a certified public accounting firm that prepares or audits its financial statements.

(g)      The Corporation and PREPA shall pay their respective liabilities and losses from their own respective separate assets.  In furtherance of the foregoing, the Corporation shall compensate all employees, consultants, independent contractors and agents from its own funds for services provided to it by such employees, consultants, independent contractors and agents. The Corporation shall maintain a sufficient number of employees in light of its contemplated business purpose.

(h)      Each of the Corporation and PREPA shall not commingle any of its assets, funds or liabilities with the assets, funds or liabilities of any other Person.  Each of them shall conduct all business between itself and third parties in its own name separate and distinct from the other and shall correct any known misunderstanding regarding its separate identity.

(i)      Neither the assets nor the creditworthiness of PREPA shall be held out as being available for the payment of any liability of the Corporation, and vice versa.  Assets shall not be transferred by PREPA to or from the Corporation inconsistently with this Act or with the intent to hinder, delay or defraud creditors.

(j)      PREPA in its papers and the statements of its officials shall refer to the Corporation as a separate and distinct legal entity; and shall take no action that is inconsistent with this Act or that would give any of its creditors cause to believe either that any such obligations incurred by PREPA would be not only the obligation of PREPA, but also of the Corporation, or that PREPA were not or would not continue to remain an entity separate and distinct from the Corporation.

Section 4.      Content of Restructuring Resolution.  In connection with any issuance of Restructuring Bonds, the Restructuring Resolution related thereto, in addition to the other matters required to be included in such Restructuring Resolution by this Act, shall contain provisions, among others, (i) specifying the maximum amount of Restructuring Bonds authorized for issuance, including parameters or limitations for such maturities, scheduled maturities, interest rates or interest rate determination methods and other details of the Restructuring Bonds as the Board finds appropriate; (ii) a description of the Approved Restructuring Costs to be paid through the issuance of the Restructuring Bonds and recovered through Transition Charges; (iii) the qualitative or quantitative limitations on Financing Costs to

be recovered (not to impair the ability to pay and service the Restructuring Bonds in accordance with their terms); (iv) the calculation methodology for the Transition Charges; (v) a description of the Adjustment Mechanism to be applied based on the methodology for allocating Transition Charges to reconcile actual collections with forecasted collections on at least a semi-annual basis to ensure that the collections of Transition Charges are adequate to pay principal of and interest on the associated Restructuring Bonds when due pursuant to the expected amortization schedule, to fund all debt service reserve funds or accounts to the required levels and to pay when due all Ongoing Financing Costs; (vi) a description of the benefits to Customers and to PREPA that are expected to result from the issuance of Restructuring Bonds; (vii) a finding that the calculation methodology determined pursuant to clause (iv) and the Adjustment Mechanism described in clause (v) are fair and reasonable; (viii) authorizing the creation of the Restructuring Property and specifying that it will be created and vest in the Corporation upon the issuance of the Restructuring Bonds and addressing such other matters as may be necessary or desirable for the marketing or servicing of the Restructuring Bonds or the servicing of the Restructuring Property; (ix) authorizing the imposition, billing and collection of Transition Charges to pay debt service on the Restructuring Bonds and other Ongoing Financing Costs; (x) a description of the Restructuring Property that will be created pursuant to the Restructuring Resolution and vested upon the issuance of the Restructuring Bonds in the Corporation and that may be used to pay and secure the payment of the Restructuring Bonds; (xi) authorizing the execution and delivery by the Corporation of one or more servicing, billing or collection agreements with one or more Servicers and other agents and providing for the appointment of co-Servicer or subservicer upon the occurrence of such events as the Corporation, being advised by its consultants, determines enhances the marketability of the Restructuring Bonds; (xii) authorizing the execution and delivery by the Corporation of one or more depository, trust or escrow agreements with financial institutions or other Persons providing for the escrowing and allocation of the collections of Customer bills between PREPA and the Corporation, as the Corporation, in consultation with such advisers as it may deem appropriate, determines enhances the marketability of the Restructuring Bonds; (xiii) requiring the filing of such billing and collection reports relating to the Transition Charges as the Corporation may require from the Servicer (not less frequently than monthly); (xiv) authorizing the form of and the execution and delivery of a Trust Agreement; and (xv) such other findings, determinations and authorizations as the Corporation, being advised by its consultants, shall deem appropriate.

Each Restructuring Resolution, the Restructuring Property and the Adjustment Mechanism and all other obligations of the Corporation set forth in such Restructuring Resolution will be direct, explicit, irrevocable and unconditional upon issuance of the Restructuring Bonds, legally enforceable against the Commonwealth, PREPA, the Corporation and the Customers.  Except for the requirements in Section 5(b) of this Act, the Transition Charges and the Adjustment Mechanism will not be subject to any other provision of law, including the provisions of Act No. 21 of the Legislature of Puerto Rico, approved May 31, 1985, Act No. 57 of the Legislature of Puerto Rico, approved May 27, 2014, as amended, and any other provision of law requiring or providing for the review (except by the Corporation as provided below) or approval of rates of any governmental entity, or the holding of public hearings or notification of rate changes of any governmental entity, including the Legislative Assembly or the Commission, and neither the Commission nor any other governmental entity shall adopt any regulations, rules or procedures or take any other action that would delay or adversely affect the implementation of the Adjustment Mechanism or collection of Transition

Charge Revenues.  The Corporation's review of the periodic adjustment of Transition Charges pursuant to the Adjustment Mechanism shall be limited solely to the mathematical accuracy of the calculations of the amount of such adjustments, and in connection with each such review by the Corporation, it shall retain the services of one of more Persons with the necessary experience in reviewing such periodic adjustments for mathematical accuracy.   If the Corporation determines that the calculation of any adjustment in Transition Charges was mathematically inaccurate, such adjustment shall be changed not later than the next succeeding application of the Adjustment Mechanism, and estimated over collections or under collections resulting from such mathematical inaccuracy shall be taken into account in connection therewith, but no Customer shall be entitled to a refund of Transition Charges or the retroactive application of the same by reason of mathematical inaccuracies in such periodic adjustments.  No adjustment of Transition Charges pursuant to the Adjustment Mechanism shall in any way affect the irrevocability of the Restructuring Resolution related thereto.  PREPA is authorized and directed to provide to the Corporation and its agents such information as may be required for the Corporation's calculation and review, and for a third-party calculation agent's review, of all such periodic adjustments.

Section 5.   Restructuring Bonds.   (a) Authorization to Issue Restructuring Bonds; Transition Charges.   The Corporation is authorized, without review or approval by the Commission or any other governmental entity, to issue Restructuring Bonds [[(which may include the issuance of Restructuring Bonds to defease all or any portion of PREPA's debt)]] at one time or (subject to satisfying the conditions, if any, therefor set forth in any then existing Trust Agreement) from time to time for (i) Approved Restructuring Costs or (ii) refinancing Restructuring Bonds to achieve [[(without taking into account for purposes of calculating any such savings any Restructuring Bonds issued to defease all or any portion of PREPA's debt)]] net present value debt service savings.   In connection with the adoption of the initial Restructuring Resolution and the Restructuring Bonds related thereto, the term Approved Restructuring Costs shall not include the purpose set forth in clause (a) of the definition thereof in Section 1 of this Act.  After the date on which the initial series of Restructuring Bonds is issued, other series of Restructuring Bonds may be issued from time to time, provided that with respect to any Restructuring Bonds issued for the purpose described in clause (a) of the definition of Approved Restructuring Costs in Section 1 of this Act, any conditions for maintaining the credit rating on such initial series, as set forth in the related Trust Agreement, are satisfied.

(b)   Approval Process.  (i) Notwithstanding any other provision of law to the contrary, the Corporation shall submit a petition to the Commission accompanied by a proposed Restructuring Resolution and such other information as is required in [Article 17] of this Act. Pursuant to [Article 17] of this Act, the Commission will review the proposed form of Restructuring Resolution and such other information to determine whether the calculation methodology followed by the Corporation for the Transition Charges, and the Adjustment Mechanism to be applied to adjust the Transition Charges is consistent with the cost distribution and other standards set forth in [Article 17] of this Act and is not arbitrary or capricious.  The Commission shall conduct one or more public hearings with respect to the same as provided in [Article 17] of this Act.  The Corporation may not adopt a Restructuring Resolution unless the Commission has either approved a Restructuring Order or the Commission has lost jurisdiction in accordance with [Article 17] of this Act.  The Corporation shall adopt a Restructuring Resolution within 5 business days after (A) approval by the Commission of the related

Restructuring Order or (B) the date on which the Commission has lost jurisdiction in accordance with [Article 17] of this Act.

(ii) Any judicial proceedings challenging a Restructuring Order or the findings and determinations in a Restructuring Resolution shall only be brought in accordance with the procedures set forth in subsection (d) of this Section 5, and the Court shall review such findings and determinations under the standard of whether the Commission or the Corporation acted in a manner that was arbitrary or capricious.

(c)  Validation of Act.  (1) Within seven (7) days after the effective date of this Act, the Corporation or Government Development Bank for Puerto Rico shall publish in the manner provided in paragraph (2) of this subsection (c) a notice inviting any Interested Person to bring an action in the Superior Court, San Juan Part (the "Court"), to determine, among other things:

(A)  the validity of this Act;

(B)  that any provision of this Act, including the imposition of Transition Charges, does not result in the breach or impairment of any contract or covenant made by the Commonwealth or PREPA to the bondholders or other creditors of PREPA, or in any taking of property by the Commonwealth without just compensation;

(C)  that the money to be received by or on behalf of the Corporation or any Servicer from the related Transition Charge is revenue and income of the Corporation and not of PREPA or any other Person and is not available resources of the Commonwealth nor does the Transition Charge constitute a tax and that the right of the Corporation to impose and collect Transition Charges may not be revoked or rescinded;

(D)  that the Transition Charge Revenues are not subject to any lien or charge of bondholders or other creditors of PREPA or any other Person other than the lien or charge of the applicable Trust Agreement to be entered into in connection with the issuance of the applicable Restructuring Bonds; and

(E)  any or all other matters relating to the foregoing including any United States or Commonwealth Constitutional matters.

(2)  The Corporation or Government Development Bank for Puerto Rico acting on behalf of the Corporation shall give notice to all Interested Persons of the passage of this Act and the opportunity to challenge its validity by publication once a week for three successive weeks in a newspaper of general circulation in the Commonwealth and in a newspaper of general circulation or a financial journal published or circulated in The City of New York.  In addition, (i) the Corporation, Government Development Bank for Puerto Rico and PREPA shall post a copy of the notice on their websites, (ii) not more than five (5) days after the first such publication, the Corporation or Government Development Bank for Puerto Rico acting on behalf of the Corporation shall (A) to the extent known by the Corporation or Government Development Bank for Puerto Rico deliver, or cause to be delivered, a copy of the notice to those Interested Persons listed in clauses (a) through (e) of the definition of Interested Person in Section 1 of this Act and (B) file or cause PREPA to file a copy of the notice with the Electronic Municipal Market Access system maintained by the Municipal Securities Rulemaking Board (or equivalent), (iii) PREPA shall deliver a copy of the notice referred to above to all Customers by means of (A) a direct mailing of such notice to such Customers not more than ten (10) days after the first such publication and (B) an insert included in the next billing statement distributed by it

13

after the first such publication and to all Interested Persons listed in clause (g) of the definition of said term, and (iv) not more than fifteen (15) days after the first such publication the Corporation or PREPA shall deliver a copy of the notice to any Interested Person listed in clauses (h) and, to the extent known by PREPA, clause (i) of the definition of such term in Section 1 of this Act.

(3)     Upon the first publication of the notice in a newspaper of general circulation in the Commonwealth and in a newspaper of general circulation or a financial journal published or circulated in The City of New York, all Interested Persons will be deemed to know or have reason to know of the passage of this Act and any alleged injury or claims related to this Act. A 60-day term of repose [*caducidad*] to challenge this Act as set forth in paragraph 1 of this subsection (c) shall begin on the date of the first publication of such notice in a newspaper of general circulation in the Commonwealth and in a newspaper of general circulation or a financial journal published or circulated in The City of New York (and if not first published on the same date, the later date of the two publication dates shall be used for this purpose). The notice shall provide a detailed summary of the matter the Corporation seeks to validate. The notice shall be substantially similar to the form provided below:

Notice of Enactment of PREPA Revitalization Act

[On [insert date], Act No. __ of the Legislative Assembly of Puerto Rico, approved ____ __, 201[5], became effective. Any party interested may, not later than _____ [not more than 60 days after the first publication of notice], appear and contest in the Superior Court, San Juan Part, the legality or validity of said Act or any matter related thereto. No court shall have jurisdiction of any purported action relating to the aforementioned Act if such purported action is filed after the specified date. No contest except by the Corporation of any thing or matter under the aforementioned Act shall be made other than within the time and the manner herein specified.

[Detailed summary; additional information_____]

Puerto Rico Electric Power
Authority Revitalization Corporation

(4)     Only the Court shall have jurisdiction over any purported action relating to the matters addressed in this subsection (c), and only if such challenge or contest is timely filed within the 60-day statute of repose [*caducidad*]. Any Interested Person may, within this 60-day period, appear and contest the legality or validity of any matter sought to be determined. No other court shall have jurisdiction of any purported action relating to any of the matters addressed in this subsection (c). The Court shall lack jurisdiction if such purported action is filed after this 60-day period.

(5)     If more than one action is pending concerning similar contests which may be brought under this subsection, they shall be consolidated, and the Court may make such orders as may be necessary or proper to effect consolidation and as may tend to avoid unnecessary costs or delays. Such orders shall not be appealable to or reviewable by any court, except that they may be questioned on appeal of the final judgment as prescribed in paragraph (7) of subsection (d) of this Section. Actions brought pursuant to this Act shall be entitled to liberal joinder and cross-claim rules and given preference over all other civil actions before the court in the matter of setting the same for motions, pleadings, hearing or trial, and in hearing the same, to the end that such actions shall be speedily heard and determined.

14

(6)     No contest except by the Corporation of any thing or matter under this subsection (c) shall be made other than within the time and the manner specified in this subsection (c), except for any contest permitted to be brought in accordance with subsection (d) of this Section 5.  Nothing in subsections (c) and (d) of this Section 5 shall preclude the use by the Corporation of any other remedy to determine the validity of any thing or matter.

(7)     An appeal from the final judgment of the trial court may only be taken directly to the Supreme Court of the Commonwealth, in the manner described in subsection (f)(2) below.

(d)     Validation of Initial Issuance of Restructuring Bonds.  (1) After the Commission has approved the initial Restructuring Order and the Corporation has approved the initial Restructuring Resolution and prior to the award of the first issue of Restructuring Bonds, the Corporation shall publish in the manner set forth in paragraph (2) of this subsection (d) a notice inviting any Interested Person to bring an action in the Court to determine, among other things:

(A)     the validity of the Restructuring Order, the Corporation's approval of Restructuring Bonds, including provisions for the payment of such Restructuring Bonds, the validity of such Restructuring Bonds, the creation of Restructuring Property, the validity of the formula or formulae used to establish the amount of such Transition Charges for each Customer class, including the distribution of Financing Costs among Customer classes, and all proceedings of the Corporation related thereto;

(B)     the validity and enforceability of the Transition Charges and the Adjustment Mechanism and that the right of the Corporation to impose and collect Transition Charges may not be revoked or rescinded;

(C)     that neither the issuance of the Restructuring Bonds [[(including the use of such Restructuring Bonds by PREPA to defease its outstanding debt)]] nor the amount of the Transition Charge results in the breach of any contract or covenant made by the Commonwealth or PREPA to the bondholders or other creditors of PREPA, any fraudulent conveyance or any taking of property by the Commonwealth without just compensation or is otherwise subject to avoidance or rescission; and

(D)     any or all other matters relating to the foregoing including any United States or Commonwealth Constitutional matters.

(2)     The Corporation shall give notice to all Interested Persons of the adoption of the Restructuring Resolution and the authorization of the Restructuring Bonds and the opportunity to challenge their validity by publication of notice once a week for three successive weeks in a newspaper of general circulation in the Commonwealth and in a newspaper of general circulation or a financial journal published or circulated in The City of New York.  In addition, (i) the Corporation, Government Development Bank for Puerto Rico and PREPA shall post a copy of the notice along with a copy of the Restructuring Resolution on their websites, (ii) not later than five (5) days after the first such publication, the Corporation or Government Development Bank for Puerto Rico acting on behalf of the Corporation shall (A) to the extent known by the Corporation or Government Development Bank for Puerto Rico deliver, or cause to be delivered, a copy of the notice to those Interested Persons listed in clauses (a) through (e) of the definition of Interested Person in Section 1 of this Act, and (B) file or cause PREPA to file a copy of the notice with the Electronic Municipal Market Access system maintained by the

15

Municipal Securities Rulemaking Board (or equivalent), (iii) PREPA shall deliver a copy of the Corporation's notice referred to above to all Customers by means of (A) a direct mailing of such notice to such Customers not more than ten (10) days after the first such publication and (B) an insert included in the next billing statement distributed by it after the first such publication and to all Interested Persons listed in clause (g) of said definition, and (iv) not more than fifteen (15) days after the first such publication the Corporation or PREPA shall deliver a copy of the notice to any Interested Person listed in clauses (h) and, to the extent known by PREPA, clause (i) of the definition of such term in Section 1 of this Act.

(3)     Upon the first publication of the notice in a newspaper of general circulation in the Commonwealth and in a newspaper of general circulation or a financial journal published or circulated in The City of New York, all Interested Persons and any other Person interested in the matter will be deemed to know or have reason to know of the passage of this Act and any injury or claims related to this Act. A 45-day term of repose [*caducidad*] to challenge this Act as set forth in paragraph 1 of this subsection (d) shall begin to run at the time of the first publication of the notice in a newspaper of general circulation in the Commonwealth and in a newspaper of general circulation or a financial journal published or circulated in The City of New York (and if not first published on the same date, the later date of the two publication dates shall be used for this purpose). The notice shall provide a detailed summary of the matter the Corporation seeks to validate. The notice shall be substantially similar to the form provided below:

Notice of Puerto Rico Electric Power Authority Debt Restructuring

[On [insert date], Puerto Rico Electric Power Authority Revitalization Corporation (the "Corporation") approved Resolution No. __ (the "Restructuring Resolution") authorizing the issuance of not to exceed $_____ principal amount of its [insert designation of Restructuring Bonds]. In connection with such issuance, the Corporation will, pursuant to authority granted under Act No. __ of the Legislative Assembly of Puerto Rico, approved _____, as amended, impose a Transition Charge of [insert amount and basis of calculation] on all Customers of Puerto Rico Electric Power Authority commencing [immediately after the issuance of said Restructuring Bonds; if different, add effective date].

Any party interested may, not later than _____ [not more than 45 days after the first publication of notice], appear and contest in the Superior Court, San Juan Part, the legality or validity of any matter sought to be determined. No court shall have jurisdiction of any purported action relating to the aforementioned Act, the Restructuring Resolution or any of the matters addressed in said Act if such purported action is filed after the specified date. No contest except by the Corporation of any thing or matter under the aforementioned Act shall be made other than within the time and the manner herein specified.

[Detailed summary; additional information_____]

Puerto Rico Electric Power
Authority Revitalization Corporation

(4)     Only the Court shall have jurisdiction over any purported action relating to the matters addressed in this subsection (d), and only if such challenge or contest is timely filed within the 45-day statute of repose [*caducidad*]. Any Interested Person may, within this 45-day period, appear and contest the legality or validity of any matter sought to be determined. No

16

other court shall have jurisdiction of any purported action relating to the matters addressed in this subsection (d).  The Court shall lack jurisdiction if such purported action is filed after this 45-day period.

(5)     For purposes of this subsection (d), the Restructuring Bonds and Transition Charges shall be deemed to be in existence upon their authorization and the Restructuring Bonds and Transition Charges shall be deemed authorized as of the date of adoption by the Board of the Restructuring Resolution.

(6)     No contest except by the Corporation of any thing or matter under this subsection (d) shall be made other than within the time and the manner herein specified.  Nothing in subsections (c) and (d) of this Section 5 shall preclude the use by the Corporation of any other remedy to determine the validity of any thing or matter.

(7)     An appeal from the final judgment of the trial court may only be taken directly to the Supreme Court of the Commonwealth, in the manner described in subsection (f)(2) below.

(e)     Actions to be Consolidated; Liberal Joinder and Cross-claim Rules, etc.  If more than one action is pending concerning similar contests which may be brought under this Act, they shall to the extent practicable be consolidated for trial, and the court may make such orders as may be necessary or proper to effect consolidation and as may tend to avoid unnecessary costs or delays.  Such orders shall not be appealable to or reviewable by any court, except that they may be questioned on appeal of the final judgment as prescribed in this Section 5.  Actions brought pursuant to this Act shall be entitled to liberal joinder and cross-claim rules and given preference over all other civil actions before the court in the matter of setting the same for motions, pleadings, hearing or trial, and in hearing the same, to the end that such actions shall be speedily heard and determined.

(f)     Nature of Judgment; Appeals.  (1) Any final judgment of the Court entered pursuant to this Act, if no appeal is taken, or if taken and the final judgment is affirmed, shall, notwithstanding any other provision of law thereupon become and thereafter be forever binding and conclusive, as to all matters therein adjudicated or which at that time could have been adjudicated, against the Corporation and against all other Persons, including the Commonwealth, the Commission,  the Servicer and PREPA, and the final judgment shall permanently enjoin the institution by any Person of any action or proceeding raising any issue as to which the judgment is binding and conclusive.  Furthermore, in the case of any final judgment rendered pursuant to subsection (d) of this Act, it shall be irrefutably presumed that said approval for the issuance of the Restructuring Bonds has been duly and regularly adopted by the Corporation in compliance with this Act and of any other applicable law.  Following any final judgment, the validity of this Act, said issuance approval or any of this Act's provisions, including the provisions for payment of the Restructuring Bonds to which such approval relates wherever contained, and the validity of said Restructuring Bonds authorized thereby, shall not be questioned by any Person, regardless of the provisions in conflict with any provision of this Act or any other act or regulation, and no action, suit or proceeding questioning any issue which was litigated or which could have been litigated, including whether the money received by or on behalf of the Corporation or any Servicer is revenue or income of the Corporation or of PREPA or constitutes available resources of the Commonwealth, or constitute a tax, or whether the imposition or collection of the Transition Charges may be revoked or rescinded or whether the Transition

Charge Revenues are subject to any lien or charge of bondholders or other creditors of PREPA or whether the passage of this Act or the issuance of the Restructuring Bonds results in the breach of any contract or covenant made by the Commonwealth to the bondholders or other creditors of PREPA, or in any taking of property by the Commonwealth without just compensation, or in any fraudulent conveyance or is otherwise subject to avoidance or rescission or any other United States or Commonwealth Constitutional matter whether or not related to the foregoing, shall thereafter be heard by any court.

(2)     Notwithstanding any other provision of law and any rule of court, no appeal shall be allowed from any judgment entered pursuant to this Act unless it is filed with the Supreme Court of the Commonwealth within 30 days after the notice of entry of the judgment, and the failure to file such appeal within such period shall thereafter bar any appeals court from exercising jurisdiction over the matters which could be so appealed.

(g)     Agreement to Issue Restructuring Bonds.   The Corporation may issue Restructuring Bonds, in one or more series, and at one or more times, pursuant to an agreement to issue the Restructuring Bonds [[or to defease PREPA's outstanding debt]].  The Restructuring Bonds may be sold for cash or delivered to any Person for such consideration (provided by that Person or any other Person) as the Board may deem adequate.  No later than the third business day after the pricing of the related Restructuring Bonds in accordance with any such agreement, the Servicer shall calculate and the calculation agent for Corporation employed in accordance with the provisions of the applicable Trust Agreement shall confirm the calculation of the initial Transition Charges, which shall be effective from the date specified in the corresponding Restructuring Resolution without any further action by the Corporation or any other Person.

(h)     Irrevocability.   Upon the issuance of the Restructuring Bonds, the Restructuring Resolution corresponding thereto, the related Transition Charges, including their Non-bypassability and the procedures for the applicable Adjustment Mechanism, as provided in the Restructuring Resolution, Trust Agreement or other security document related thereto, shall be irrevocable, final, non-discretionary and effective without further action by the Corporation or any other Person.

(i)     Transition Charges Non-bypassable; Payment to Depository.   For so long as Restructuring Bonds are outstanding, and the Approved Restructuring Costs (including, without duplication, any payments that have or may become due under Ancillary Agreements) have not been paid in full, the Transition Charges authorized and imposed by this Act shall be Non-bypassable and shall apply to all Customers.

Without limiting authority elsewhere conferred, PREPA is hereby authorized and directed to enter into a Servicing Agreement and perform such duties of the Servicer as may be required or permitted by this Act, to provide further assurances to the Corporation, other Financing Entities or the owner (if different) of all or a portion of the Restructuring Property in respect of the Restructuring Property and receipt of the Transition Charge Revenues, and to do all things necessary or desirable for the accomplishment of the purposes of this Act.  The Servicer shall terminate service to non-paying Customers on the same basis as termination of service is permitted for nonpayment of electric or other rates by PREPA, but none of the Corporation, other owner of the Restructuring Property and the Trustee may directly terminate electric service to any Customer.

18

The Corporation shall impose and adjust, and the Corporation, PREPA and, if different, the Servicer (as their respective duties may be specified pursuant to the applicable Restructuring Resolution) shall impose and adjust, bill and collect any Transition Charges applicable to all Customers, shall include in each such bill the applicable Transition Charge as a separate line item (or footnote), shall allocate partial payments by Customers between the Corporation and PREPA as provided in subsection (k)(1) below and the Servicing Agreement, and shall take all other actions permitted by law to collect unpaid bills including making use of any intercept provisions for non-payment of electric or other rates by public agencies, municipalities, public corporations or other governmental entities that is applicable to nonpayment of electric or other rates charged by PREPA, shall exercise all enforcement rights of the owner or pledgee of the Restructuring Property for the benefit of such owner or pledgee, and shall remit any Transition Charge Revenue to the owner or pledgee of the Restructuring Property.  The corresponding Trust Agreement may provide that the calculation of all Transition Charges and adjustments thereto shall be confirmed by a third-party calculation agent unrelated to the Government of Puerto Rico or PREPA (which may be the Servicer if PREPA is no longer the Servicer) appointed by the Corporation or the Trustee.

The Servicer shall, except to the extent otherwise specified in a Restructuring Resolution, be entitled to reasonable compensation, which in the case of PREPA shall not be less than the estimated incremental cost of imposing and billing the Transition Charges and collecting the Transition Charge Revenues, preparing servicing reports and performing customary servicing services required by any Servicing Agreement in connection with the Restructuring Bonds.  The Corporation (or the Trustee in accordance with the terms of the applicable Trust Agreement) is authorized to replace the Servicer upon the occurrence in respect of such Servicer of an event of default as defined or specified in the Servicing Agreement.

As soon as possible after receipt of same, all Transition Charge Revenues and PREPA charges shall be paid or deposited or directed to be paid or deposited to a special collection account at a bank organized under and subject to regulation by the laws of the United States or any state thereof (and licensed to operate in the Commonwealth) selected by the Corporation and not related to PREPA or the Commonwealth or under the control of PREPA.  Such amounts shall be allocated and remitted to the Corporation or its assigns or pledgees and to PREPA or its assigns or pledgees on a daily basis in accordance with their respective interests.  Any Servicing Agreement and depository agreement shall be required to include the forgoing deposit and allocation requirements.

Under no circumstances shall any Transition Charges imposed or Restructuring Property created by the Corporation to secure any Restructuring Bonds be or be deemed to be raised by taxation, be deemed to be for any purpose PREPA or Commonwealth revenue or be or be deemed to be for any purpose received as a result of PREPA's ownership or operation of its System Assets, nor shall any Restructuring Bonds be or be deemed to be a debt or other obligation of PREPA or the Commonwealth or any of its other political subdivisions.  PREPA shall in servicing and collecting any Transition Charges be deemed to be acting solely as an agent of the Corporation and not as principal, any such Charges to be held in trust for the exclusive benefit of the Corporation, the owners of Restructuring Bonds and Persons entitled to receive payment therefrom for any Financing Costs (such Transition Charges shall not lose their character as Transition Charges by virtue of any possession by PREPA) and PREPA shall

immediately transfer any such Transition Charges received to the special collection account referred to in the first sentence of the preceding paragraph.

(j)        Restructuring Property.  (1) Restructuring Property shall constitute an existing, present and continuing property right for all purposes, including for agreements securing Restructuring Bonds, whether or not the revenues and proceeds arising with respect thereto have accrued, and notwithstanding the fact that the imposition and collection of Transition Charges will depend on further acts that have not yet occurred, including:  (a) PREPA    delivering services, (b) a Servicer performing servicing functions relating to the billing and collection of Transition Charges, and (c) the level of future consumption (or no consumption) of such service. Restructuring Property shall exist whether or not Transition Charges have been imposed, billed, accrued or collected and notwithstanding the fact that the value or amount of the Restructuring Property is dependent on the future provision of service to Customers.  Subject to applicable law and regulations, the timely payment in full of all Transition Charges shall be a condition of receiving service from PREPA.

(2)        All Restructuring Property shall continue to exist until the corresponding Restructuring Bonds and all Ongoing Financing Costs relating to the Restructuring Bonds have been paid in full.

(3)        If the Servicer defaults in any required remittance of Transition Charge Revenues or shall otherwise default in the performance of its obligations under any agreement related thereto, any court in the Commonwealth, including the federal district court for the District of Puerto Rico, upon application by the Corporation, in accordance with the terms of the Servicing Agreement, or the Trustee or the owners of the Restructuring Bonds in accordance with the terms of the corresponding Trust Agreement, and without limiting any other remedies available to the applying party, shall order the sequestration and payment of the Transition Charge Revenues for the benefit of the owners or pledgees of Restructuring Property.  The order shall remain in full force and effect notwithstanding any bankruptcy, reorganization, or other insolvency proceedings with respect to a Servicer, the Corporation, PREPA or any other Person.

(k)        No  Set-off  Regarding  Restructuring  Property,  etc.;  Statutory  Lien. (1) Restructuring Property, Transition Charges, Transition Charge Revenues, and the interests of a bondholder, Financing Entity or any other Person in Restructuring Property or in Transition Charge Revenues are not subject to set-off, counterclaim, surcharge or defense by a Servicer, any Customer, the Corporation, PREPA, holders of any other debt issued by PREPA (or any other creditors of PREPA) or any other Person or in connection with any default, bankruptcy, reorganization or other insolvency proceeding of any of the foregoing Persons.  To the extent that any Customer makes a partial payment of a bill containing both Transition Charges and any other charges, such payment shall be allocated pro rata between the Transition Charges and the other charges.

(2)        Restructuring Bonds and obligations of the Corporation under Ancillary Agreements shall be secured by a statutory lien on the Restructuring Property in favor of the owners or beneficial owners of Restructuring Bonds and parties to such Ancillary Agreements. The lien shall automatically arise upon issuance of the applicable Restructuring Bonds without the need for any action or authorization by the Corporation or the Board.  The lien shall be valid and binding from the time the Restructuring Bonds or Ancillary Agreements, as applicable, are executed and delivered.  The Restructuring Property shall be immediately subject to the lien, and

the lien shall immediately attach to the Restructuring Property and be effective, binding, and enforceable against PREPA, its creditors, their successors, transferees, and creditors, and all others asserting rights therein, irrespective of whether those Persons have notice of the lien and without the need for any physical delivery, recordation, filing, or further act.  The lien is created by this Act and not by any security agreement, but may be enforced by a Trustee or other fiduciary for the owners or beneficial owners of Restructuring Bonds.

This statutory lien is a continuously perfected security interest and has priority over any other lien, created by operation of law or otherwise, that may subsequently attach to that Restructuring Property or any proceeds thereof unless the owners or beneficial owners of Restructuring Bonds have as specified in the applicable Trust Agreement agreed in writing otherwise.  This statutory lien is a lien on Transition Charges and all Transition Charge Revenues or other proceeds that are deposited in any deposit account or other account of the Servicer or other Person in which Transition Charge Revenues or other proceeds have been commingled with other funds.  Without limiting the effectiveness of the statutory lien created by this Act, any other security interest that may apply to Transition Charge Revenues shall be terminated when such revenues or proceeds are transferred to a segregated account for an assignee or a Financing Entity.  No application of the Adjustment Mechanism shall affect the validity, perfection, or priority of the statutory lien created by this Act.  Any Transition Charge Revenues commingled with other funds subject to any lien shall be administered in a manner that allows for the identification of the Transition Charge Revenues and such other funds.

(3)     The statutory lien shall not adversely be affected or impaired by, among other things, the commingling of Transition Charge Revenues or other proceeds from Transition Charges with other amounts regardless of the Person holding such amounts.  Any Transition Charge Revenues commingled with other funds subject to any lien shall be administered in a manner that allows for the identification of the Transition Charge Revenues and such other funds.

(l)     Successors Bound.  PREPA, any successor or assign of PREPA or any other Person with any operational control of any portion of the System Assets, whether as owner, lessee, franchisee or otherwise and any successor Servicer shall be bound by the requirements of this Act and shall perform and satisfy all obligations imposed pursuant hereto in the same manner and to the same extent as did its predecessor, including the obligation to bill, adjust and enforce the payment of Transition Charges.

(m)     Authorization to Pledge Restructuring Property.   All or any portion of Restructuring Property may be pledged to secure the payment of Restructuring Bonds, amounts payable to Financing Entities, and other Ongoing Financing Costs.  So long as the Restructuring Property remains pledged to secure any such payments, revenues from the collection of Transition Charges shall be applied solely to pay Ongoing Financing Costs.

(n)     Legality for Investment.  The Restructuring Bonds are hereby made securities in which all public officers and bodies of the Commonwealth and all public corporations, municipalities and municipal subdivisions, all insurance companies and associations and other Persons carrying on an insurance business, all banks, bankers, trust companies, savings banks and savings associations including savings and loan associations, building and loan associations, investment companies and other Persons carrying on a banking business, all administrators, conservators, guardians, executors, trustees and other fiduciaries, and all other Persons now or

hereafter authorized to invest in bonds or in other obligations of the Commonwealth, may properly and legally invest funds, including capital, in their control or belonging to them; and the Restructuring Bonds may be deposited with and may be received by all public officers and bodies of the Commonwealth and all municipalities and public corporations for any purpose for which the deposit of bonds or other obligations of the Commonwealth is now or may hereafter be authorized.

(o)     Tax Exemption.  (1) It is hereby determined that this Act and the carrying out of its purposes are in all respects for the benefit of the people of the Commonwealth and for a public purpose.  Accordingly, the Corporation shall be regarded as performing an essential governmental function in the exercise of the powers conferred upon it pursuant to this Act and shall not be required to pay, and the Restructuring Property, including the Transition Charges and Transition Charge Revenues, regardless of whether the Corporation is the owner of the Restructuring Property, shall not be subject to any fees, taxes, special ad valorem levies or assessments of any kind, including income taxes, franchise taxes, sales taxes or other taxes or payments or contributions in lieu of taxes.  In addition, Persons that enter into contracts with the Corporation shall not be subject to the tax on contracts imposed by Act No. 1 of the Legislative Assembly of Puerto Rico, approved January 31, 2011, as amended.

(2)     the Commonwealth hereby covenants with the purchasers and with all subsequent owners and transferees of Restructuring Bonds, in consideration of the acceptance of and payment for the Restructuring Bonds, that the Restructuring Bonds and the income therefrom and all revenues, money, and other property pledged to pay or to secure the payment of such Bonds shall at all times be free from taxation; and this covenant may be included in the Restructuring Bonds.

(p)     Restructuring Bonds Negotiable Instruments.  Whether or not the Restructuring Bonds are of such form and character as to be negotiable instruments under the terms of the uniform commercial code, the Restructuring Bonds are hereby made negotiable instruments within the meaning of and for all the purposes of the uniform commercial code and any other applicable laws of the Commonwealth, subject only to the provisions of the Restructuring Bonds for registration.

(q)     No Personal or Corporate Liability on Restructuring Bonds.  Neither the directors of the Corporation nor any Person executing Restructuring Bonds shall be liable personally thereon or be subject to any personal or corporate liability or accountability solely by reason of the issuance thereof.  The Restructuring Bonds shall not be a debt of the Commonwealth, nor shall they be payable out of any funds other than those of the Corporation; and such Bonds shall contain on the face thereof a statement to that effect.

Section 6.     Use of Proceeds[[; Defeasance of PREPA Debt]].  The proceeds of the Restructuring Bonds shall be used only to pay or fund Upfront Financing Costs and all remaining proceeds will be contributed to or for the account of PREPA or otherwise applied to Approved Restructuring Costs, all as provided in the applicable Restructuring Resolution.  [[Restructuring Bonds may also be issued without such issuance generating any proceeds to defease a portion of PREPA's outstanding debt.]]  Upon payment or defeasance of all Restructuring Bonds and all related Financing Costs, all amounts held or receivable by the Corporation or any Financing Entity shall be used to make a refund or credit to Customers on the same basis that Transition Charges are then being imposed, to the extent such a refund or credit is practical.  Any failure by

any Person to apply the proceeds of the Restructuring Bonds in a reasonable, prudent and appropriate manner or otherwise comply with any provisions of this Act (including any Restructuring Resolution or applicable Trust Agreement or any agreement between the Corporation and PREPA) shall not invalidate, impair or affect any Restructuring Property, Transition Charge or Restructuring Bonds.

Section 7.    No Recourse.  Restructuring Bonds shall be without recourse to the credit or any assets of the Corporation, PREPA, the Commonwealth, any Third-party Biller, any Servicer, co-Servicer or subservicer, escrow agent or other Financing Entity, other than the Restructuring Property and other assets and revenues specified in the applicable Restructuring Resolution, Trust Agreement or other security document.

Section 8.    Standing.   (a) Subject to the limitations, if any, in any Restructuring Resolution or related Trust Agreement, the Corporation or any other owner of Restructuring Property, or the applicable Trustee, (1) is authorized to hire consultants, attorneys and other Persons and enter into such agreements as the Corporation, other owner or Trustee deems necessary to enforce and collect the Transition Charge Revenues or protect the Restructuring Property and include the cost thereof as a Financing Cost, and notwithstanding any other provision of law, and (2) shall be expressly permitted hereby to (i) bring actions against any owner of the System Assets, any Servicer, or any other Person authorized to bill or collect Transition Charges, any Customers or any other Person for failure to impose, bill, pay or collect any Transition Charges constituting part of the Restructuring Property then pledged as security for such Restructuring Bonds or for enforcement of any other provision of this Act or action taken by the Corporation in respect thereof or (ii) take any other action as the Corporation, other owner of Restructuring Property or the Trustee may deem necessary to enforce and collect the Transition Charge Revenues or protect the Restructuring Property in accordance with the terms of the Restructuring Resolution related thereto and applicable Restructuring Bonds, regardless of whether an event default has occurred and is continuing in respect of the Restructuring Bonds, but no action may be brought by the Corporation, the Trustee or the party to any Ancillary Agreement or on their behalf (other than through PREPA or any successor Servicer) against any Customer for its failure to pay any Transition Charge so long as PREPA or any successor Servicer is complying with its obligations under the Servicing Agreement with respect to the enforcement of any collection of charges (including Transition Charges) due from such Customer.

(b)    Any court shall have jurisdiction over any actions for failure to impose, bill, pay or collect any Transition Charges or for enforcement of any provision of this Act.

(c)    Subject to the terms of any Trust Agreement, after the occurrence of an event of default and during the continuance thereof with respect to the Restructuring Bonds, all or any portion of Restructuring Property may be transferred, sold, conveyed or assigned (including by an action to foreclose on the Restructuring Property) to any Person.

Section 9.    Corporation Not a Utility.  The Corporation shall not be considered to be an electric power company, electric power service company or electric power generation company (as such terms are defined in Act No. 57 of the Legislative Assembly of Puerto Rico, approved May 27, 2014, as amended), public utility or Person providing utility service solely by virtue of the transactions described in this Act.  None of the transactions authorized by this Act, including the adoption of a Restructuring Resolution, the creation of Restructuring Property, the

23

initial Transition Charge and any adjustment to the Transition Charges authorized by this Act, shall be subject to review or approval by any governmental authority, including the Commission, except the approval in the Restructuring Order of the calculation methodology for the Transition Charges and the Adjustment Mechanism as provided in Section 5(b) of this Act and as provided in Section 4 of this Act regarding review by the Corporation for and correction of mathematical errors.

Section 10.   Termination of Corporation.  The corporate existence of the Corporation shall continue until terminated by law, but no such law shall take effect so long as the Corporation shall have bonds, notes and other obligations outstanding, unless provision has been made for the payment thereof in accordance with the terms thereof.  Upon termination of the existence of the Corporation, all of its rights and properties shall pass to and be vested in the Commonwealth.

Section 11.   Commonwealth Non-impairment and Bankruptcy Covenants. Notwithstanding any provision of this Act or any other law of the Commonwealth to the contrary, prior to the date that is one year and one day after the Corporation no longer has any Restructuring Bonds outstanding or any Ancillary Agreement with payment obligations that have or may become due thereunder, the Corporation shall have no authority to file a petition for relief as a debtor under any chapter of the federal bankruptcy code or any other bankruptcy, insolvency, debt composition, moratorium, receiver or similar federal laws or any Commonwealth bankruptcy, moratorium, debt adjustment, composition or similar laws permitting stay or delay of payment or discharge or reduction in amount owed on any Restructuring Bonds as may, from time to time, be in effect, and no public officer, organization, entity or other Person shall authorize the Corporation to be or become a debtor under chapter 9 or similar federal law or any such Commonwealth law during such period.  The Commonwealth hereby covenants with the owners of the Restructuring Bonds and parties to any Ancillary Agreements that the Commonwealth will not limit or alter the denial of authority under this Section 11 during the period referred to in the preceding sentence. The Corporation is authorized and directed as agent of the Commonwealth to include this covenant as an agreement of the Commonwealth in any contract with the owners of Restructuring Bonds or such Ancillary Agreement parties.

The Commonwealth further covenants, pledges and agrees with the owners of any Restructuring Bonds and with those Persons that enter into contracts with the Corporation, including parties to any Ancillary Agreement, pursuant to the provisions of this Act, that after the issuance of Restructuring Bonds, the Commonwealth will not authorize the issuance of debt by any public corporation and governmental instrumentality of the Commonwealth or any other Person secured by Restructuring Property or any other rights and interests in rates, charges, taxes or assessments that are separate from rates and charges of PREPA and that are imposed upon Customers (in their capacity as Customers) to recover the ongoing financing costs of such debt, if upon the issuance of such debt the security for any Restructuring Bonds or such Ancillary Agreements shall be materially impaired.  It shall be conclusive proof that such security shall not be materially impaired if upon the issuance of such debt, the credit ratings for the then outstanding Restructuring Bonds (without regard to any third-party credit enhancement) shall not have been reduced or withdrawn.  The Corporation is authorized and directed as agent of the Commonwealth to include this covenant as an agreement of the Commonwealth in any contract with the owners of Restructuring Bonds or such Persons.

The Commonwealth further covenants, pledges and agrees with the owners of any Restructuring Bonds issued under this Act and with those Persons that enter into other contracts with the Corporation, including parties to any Ancillary Agreement, pursuant to the provisions of this Act, that it shall not limit, alter, impair, postpone or terminate the rights conferred in this Act, any Restructuring Resolution and related agreements, including the requirements in Sections 2(b)(3) and 5(i) of this Act, until such Restructuring Bonds and the interest thereon are paid or legally defeased in accordance with their terms and such other contracts are fully performed and honored on the part of the Corporation.   The Corporation is authorized and directed as agent of the Commonwealth to include this covenant as an agreement of the Commonwealth in any contract with the owners of Restructuring Bonds.

The Commonwealth further covenants, pledges and agrees with the owners of any Restructuring Bonds issued under this Act and with those Persons that enter into other contracts with the Corporation, pursuant to the provisions of this Act, that after the issuance of Restructuring Bonds, neither the Commonwealth nor any agency, political subdivision or other instrumentality thereof (including the Commission) shall take or permit any action to limit, alter, reduce, impair, postpone or terminate the rights conferred in any Restructuring Resolution, including those relating to Transition Charges and the related Adjustment Mechanism, as the same may be adjusted from time to time pursuant to the applicable Restructuring Resolution in a manner that impairs the rights or remedies of the Corporation or the owners of the Restructuring Bonds, parties to any Ancillary Agreement or any Financing Entity or the security for the Restructuring Bonds or Ancillary Agreements, or that impairs the Restructuring Property or the billing or collection of Transition Charge Revenues; nor shall the amount of revenues arising with respect to Restructuring Property be subject in any way to limitation, alteration, reduction, impairment, postponement or termination by the Commonwealth or any agency, political subdivision or other instrumentality thereof (except by the Corporation as contemplated by the Adjustment Mechanism).   The Corporation is authorized and directed as agent of the Commonwealth to include this covenant as an agreement of the Commonwealth in any contract with the owners of Restructuring Bonds or such Ancillary Agreement parties.

Section 12.   Rules of Interpretation; Effectiveness of Act.   (a) The powers and faculties conferred upon the Corporation by this Act shall be interpreted liberally so as to promote the development and implementation of the public policy enunciated in this Act. Notwithstanding any provisions of law to the contrary, no approvals, notices or authorizations other than those specified in this Act shall be required with respect to the transactions and contracts authorized in or contemplated by this Act.

(b)      In the event of conflict between this Act and any other law, this Act shall govern to the extent of the conflict.

(c)      Effective on the date that Restructuring Bonds are first issued under authority of this Act, if any provision of this Act is held to be invalid or is invalidated, superseded, replaced, repealed or expires for any reason, that occurrence shall not affect any action allowed under this Act that is taken by the Corporation, the Commission, PREPA, a Servicer or other collection agent, a Financing Entity, a holder of Restructuring Bonds or a party to an Ancillary Agreement and any such action shall remain in full force and effect.

(d)      If any section, subdivision, paragraph or subparagraph of this Act or the application thereof to any Person, circumstance or transaction is held by a court of competent

jurisdiction to be unconstitutional or invalid, the unconstitutionality or invalidity shall not affect the constitutionality or validity of any other section, subdivision, paragraph or subparagraph of this Act or its application or validity to any Person, circumstance or transaction, including the irrevocability of any Transition Charge imposed pursuant to this Act, the validity of the Restructuring Bonds or their issuance, the transfer or assignment of Restructuring Property or the collection and recovery of Transition Charge Revenues, but shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part thereof directly involved in the controversy in which such judgment shall have been rendered.  To these ends, the Legislative Assembly of Puerto Rico hereby declares that the provisions of this Act are intended to be severable and that said Legislative Assembly would have enacted this Act even if any section, subdivision, paragraph or subparagraph of this Act held to be unconstitutional or invalid had not been included in this Act.

(e)     The Corporation may provide for the interpretation and construction of any of its agreements to be governed by the law of the State of New York, applied as if all such agreements were executed in New York and to be performed entirely within New York.  The Corporation is authorized to submit in each Restructuring Resolution and the Trust Agreement corresponding thereto and all other agreements related to the issuance of Restructuring Bonds [and PREPA is authorized to submit in the Servicing Agreement] to non-exclusive *in personam* jurisdiction and venue in the state and federal courts located in New York, New York, and the Corporation is authorized to agree to maintain contacts with the State of New York sufficient to give the courts located therein personal jurisdiction over the Corporation, and waive any objection to venue.  All matters of the constitutional and statutory law of the Commonwealth (including this Act) and any Restructuring Resolution, all rights of the Corporation or the Servicer against any Customer by virtue of this Act and of the effect of the judgments and decrees of the Commonwealth courts, shall in all events be governed by the law of the Commonwealth.  Notwithstanding any provision in this Act to the contrary, any proceeding commenced and undertaken pursuant to the provisions of Sections 5(c) or 5(d) of this Act must be filed in the Court and follow the procedures established therein.

EXCERPTS OF ADDITIONAL PROVISIONS OF THE PREPA REVITALIZATION ACT RELATING TO PUBLIC HEARING PROCESS FOR CONSIDERATION OF THE PETITIONS TO BE FILED BY THE CORPORATION AND PREPA:

Article 17.- A new Article 6.25A is added to Act No. 57-2014, as amended, which shall read as follows:

"Article 6.25A –Rate Determination and Review Following the Agreement with Creditors.

(a)  Initial Rate Review.  As a measure for the approval of the new rate structure contemplated by the Agreement with Creditors referenced in Section 6A of Act No. 83 of May 2, 1941, the Commission shall conduct the following expedited and extraordinary procedures to evaluate (i) the petition for approval of PREPA's rate structure to be filed by PREPA and, separately and independently, (ii) the petition for approval of the calculation methodology for the Transition Charges and the Adjustment Mechanism to be presented by the Puerto Rico Electric Power Authority Revitalization Corporation (the "Corporation") as contemplated in Chapter III of the PREPA Revitalization Act.  The Corporation, the Authority and the Commission shall organize and coordinate in good faith an itinerary for review of the petitions of the Corporation and the Authority so that the management of those procedures is adequate, complies with the itineraries prescribed in the Agreement with Creditors and that the evaluation of the Commission of both petitions facilitates fulfillment of said itineraries for implementation of the restructuring.

(b)  Review of Petition by the Corporation. With respect to the review by the Commission of the calculation methodology for the Transition Charges and the Adjustment Mechanism (as such terms are defined in Chapter III of the PREPA Revitalization Act) to be imposed by the Corporation in connection with Restructuring Bonds (as such term is defined in Chapter III of the PREPA Revitalization Act), the Corporation shall file a petition before the Commission, which petition shall include a copy of the initial proposed Restructuring Resolution (as such term is defined in Chapter III of the PREPA Revitalization Act), which Resolution shall comply with the provisions of Article 30 of the PREPA Revitalization Act, and the documents listed in item (b)B. of this Article 6.25A. The date of the filing of the petition by the Corporation shall be known as the "Corporation Petition Date".

A.  The scope of the Commission's review will be limited to, based on the information, assumptions and conditions set forth in the Restructuring Resolution and all other items submitted by the Corporation pursuant to (b)B. of this Article 6.25A, determining whether the calculation methodology for the Transition Charges and the Adjustment Mechanism included in the Restructuring Resolution complies with the following criteria and principles for distributing Financing Costs among Customer classes and for fixing and adjusting the Transition Charges (as such term is defined in Chapter III of the PREPA Revitalization Act):

(1) The share of Financing Costs to be recovered from each customer class shall be calculated based upon the historic energy (kWh) usage of each class of Customers, as such information is provided by PREPA, and as the Corporation shall have determined in a not capricious or arbitrary way, is practicable to administer and ensures the full and timely payment of the Restructuring Bonds in accordance with their terms and other Ongoing Financing Costs (as such term is defined in Chapter III of the PREPA Revitalization Act).

*(2) Once the share of Financing Costs to be recovered from each Customer class shall have been calculated (i) Transition Charges for Customers (other than residential customers) will be based upon historic energy usage (kWh) data, and (ii) Transition Charges for all residential Customers will be a per capita charge based upon average historical energy usage for all residential class Customers, as such information is provided by PREPA, and as the Corporation shall have determined in a not capricious or arbitrary way, is practicable to administer and ensures the full and timely payment of the Restructuring Bonds in accordance with their terms and other Ongoing Financing Costs.*

*(3) Delinquencies of any class of Customers will be added to the revenue requirements of next periods and allocated among all Customer classes as provided in clauses (1) and (2) of this paragraph (b)A.*

*(4) When calculating Customer energy usage in clauses (1) and (2) of this paragraph (b)A, if the Corporation determines that the inclusion of estimated load served by net metering or distributed generation ("behind the meter") is adequate and consistent to make Transition Charges not arbitrary or capricious, is practical to administer, and would ensure the full and timely payment of the Restructuring Bonds in accordance with their terms and other Ongoing Financing Costs, such estimates shall be included in the referred calculation of usage.*

B. *The Corporation's filing of a petition shall be deemed complete and shall be accepted for filing by the Commission and the period for the review process referred in paragraph (b)C.(5) of this Article 6.25A shall not be tolled, if the Corporation submits with or includes in the petition:*

    (1)     *A form of Restructuring Resolution that includes:*

        (i)     *A description of Ongoing Financing Costs;*

        (ii)     *The determination of Customer classes among which Ongoing Financing Costs are distributed and the distribution of Ongoing Financing Costs among Customer classes;*

        (iii)     *The calculation of Transition Charges for Customers (other than residential customers) based upon historical energy usage (kWh) data;*

        (iv)     *The calculation of Transition Charges for residential Customers on a per Customer charge based upon average historical energy usage for the residential class;*

        (v)     *A provision that delinquencies of any class of Customers will be distributed among all Customer classes as provided in (b) B. (1) (ii), (iii) and (iv) of this Article 6.25A and included in the Adjustment Mechanism;*

        (vi)     *Whether the Corporation shall include estimated load served by net metering or estimated distributed generation ("behind the meter") in determining energy usage in (b) B. (1) (ii), (iii) and (iv) of this Article 6.25A and included in the Adjustment Mechanism;*

        (vii)     *A determination by the Corporation that:*

            (1)     *the distributions in (b) B. (1) (ii), (iii) and (iv) of this Article 6.25A are practicable to administer and ensure the full and timely payment of all Ongoing Financing Costs during the term of the Restructuring Bonds; and*

            (2)     *if the Corporation determines to include estimated net metering or estimated distributed generation ("behind the meter") in determining*

28

energy usage in (b) B. (1) (ii), (iii) and (iv) of this Article 6.25A, that this inclusion is adequate and consistent to make Transition Charges not arbitrary or capricious, is practicable to administer and ensures the full and timely payment of all Ongoing Financing Costs during the term of the Restructuring Bonds.

(2)        The historic energy (kWh) usage of each class of Customers as certified by an officer of PREPA that served as the basis of the distributions set forth in (b)B. (1) (ii), (iii) and (iv) of this Article 6.25A; and

(3)        A report prepared by an independent financial consultant with recognized expertise in financing public electric utilities setting forth material assumptions, historical energy (kWh) usage, a projection of Ongoing Financing Costs and Transition Charges during the term of the Restructuring Bonds, and a conclusion that such Transition Charges distributed as provided b.B. (1) (ii), (iii) and (iv) of this Article 6.25A and in accordance with the assumptions included in such report, will ensure the full and timely payment of all Ongoing Financing Costs during the term of the Restructuring Bonds.

C.  The process for review by the Commission of the Corporation's petition shall be the following:

(1)        The Commission, PREPA and the Corporation shall publish on their respective websites the petition presented by the Corporation within 24 hours of its receipt by the Commission. The Commission shall notify the public of the upcoming public hearing or hearings to evaluate the petition by the Corporation at least ten (10) days in advance of holding such hearings, which announcement shall include the matters to be discussed, the location, date and time of the hearing.  The announcement shall also comply with the following:  (i) it shall be published in two newspapers of general circulation in the Commonwealth at least twice during such ten (10) day period, (ii) posting a copy of such announcement during such period of ten (10) days in the main offices of the Commission, the Corporation and PREPA and in each PREPA Customer service office, in each case in a place fully accessible to the public during normal business hours, and (iii) posting a copy of such announcement along with copies of the petition including the form of initial Restructuring Resolution and all supporting documentation required to be filed with the petition, on the websites of the Commission, the Corporation, PREPA and the Government Development Bank for Puerto Rico, safeguarding confidential or privileged information included in such documents, if any. The public hearing shall be held in order to collect the general opinion of the citizens regarding the compliance with the criteria previously established for the Corporation's calculation methodology for the Transition Charges and the Adjustment Mechanism.  The Commission shall appoint an independent official examiner to preside over the hearing or hearings.

(2)        The official examiner shall have fifteen (15) days after the conclusion of the last public hearing to submit a report to the Commission. The report shall be published on the Commission's, the Corporation's, PREPA's and the Government Development Bank's websites. The report shall include a record of all objections, testimonies, opinions, documents, recommendations and any other pertinent information presented during the hearings, as well as the examiner's own conclusions and recommendations. Any person interested in submitting further

*comments with respect to the examiner's report, may do so in writing to the Commission within ten (10) days after the publication of the report.*

*(3)      The Commission shall review the Corporation's petition with the documentation filed by the Corporation pursuant to b(B) of this Article 6.25A, the examiner's report and any comments thereto, and shall issue a resolution and order regarding the Corporation's petition for approval of the calculation methodology for the Transition Charges and the Adjustment Mechanism within the term of sixty (60) days from the Corporation Petition Date, as required below in item (b)C.(5). of this Article 6.25A. The Commission shall approve or disapprove the calculation methodology for the Transition Charges and Adjustment Mechanism. The Commission shall have no authority to limit, qualify, amend or otherwise change the Restructuring Resolution.*

*(4)      The evaluation process to be conducted by the Commission shall be a transparent process, and will consider the urgent need to implement an agile, flexible, informal process, so that the citizens may provide their testimonies and express their opinions in the public hearing or submit them in writing during a specific period of time to be determined by the Commission within the expedited process established herein in order to allow the Commission and its examiner to act in a diligent way within the parameters established in section b.A of this Article 6.25A.*

*(5)      The Commission shall have the power and it shall be its duty, upon receiving the Corporation's petition to either approve or reject the calculation methodology for the Transition Charges and the Adjustment Mechanism in the Restructuring Resolution within sixty (60) days after the Corporation Petition Date. The Commission shall approve the calculation methodology for the Transition Charges and the Adjustment Mechanism included the Restructuring Resolution, in which case it shall issue a Restructuring Order approving such calculation methodology during the given period of sixty (60) days after the Corporation Petition Date, unless the Commission determines in a written order during the given period of sixty (60) days after the Corporation Petition Date that either the determinations to be made by the Corporation in the Restructuring Resolution with respect to the calculation methodology for the Transition Charges and the Adjustment Mechanism are arbitrary and capricious or that any material assumption or conclusion of the report referred to in (b)(B)(3) is clearly erroneous.  If during the given period of sixty (60) days after the Corporation Petition Date, the Commission has not reached a final decision to approve or reject the Corporation's petition, the calculation methodology for the Transition Charges and Adjustment Mechanism proposed by the Corporation shall become final, the Commission shall lose jurisdiction to approve the calculation methodology for the Transition Charges and Adjustment Mechanism and the Corporation may adopt the Restructuring Resolution.  Any party wishing to challenge the Commission's Restructuring Order or the approval deemed granted by the inaction of the Commission shall follow the process contemplated in Article 31(d) of the PREPA Revitalization Act. In that process, the court shall sustain the Commission's Restructuring Order in which the Commission has determined*

*whether the calculation methodology for the Transition Charges and Adjustment Mechanism was or was not arbitrary or capricious, or if the Corporation's petition to the Commission on calculation methodology for the Transition Charges and Adjustment Mechanism has been deemed approved, if there is substantial evidence in the administrative record that supports such Order or petition by the Corporation, as the case may be. The Commission's approval shall become final and irrevocable upon the earlier of (A) approval by the Commission of the related Restructuring Order or (B) the date on which the Commission has lost jurisdiction; subject only to the process contemplated in Article 31(d) of the PREPA Revitalization Act.*

*(c) Review of Petition by PREPA. With respect to the review by the Commission of the petition by PREPA of its proposed rate structure, PREPA shall submit a petition for the Commission including reasonable and relevant information that supports the fulfillment of the following just and reasonable standards. The date of the filing of the petition by PREPA shall be known as the "PREPA Petition Date"*

A.   *The scope of the Commission's review of PREPA's petition shall be to determine whether or not PREPA's proposed rate structure complies with the following criteria and principles:*

*(1) It includes the appropriate mechanism to obtain the necessary revenue levels in order to cover its costs, including (i) the annual debt service, including principal, interest, reserves and other requirements imposed by agreements with creditors (excluding the Transition Charge of the securitization structure that shall be determined separately) as modified by the Agreement with Creditors, as well as (ii) costs of the purchase of fuel and energy, (iii) operational, maintenance and administrative costs, including maintenance of the transmission and distribution network, employees' payroll and fringe benefits in accordance with the capacity of PREPA to pay for such benefits and with the contemplated savings, (iv) costs of necessary capital investments for the applicable period, (v) costs of CILT and other contributions and subsidies that PREPA is obliged to make pursuant to special laws, (vi) other reasonable and necessary costs. The cost analysis shall determine the adequate distribution among the different classes or kinds of customers with similar uses and levels of demand so that such distribution of costs is fair and equitable;*

*(2) It does not violate any of the terms or conditions required by PREPA's Trust Agreement with its bondholders, assuming that the amendments contemplated in the Agreement with Creditors are effective in accordance with their terms;*

*(3) It provides for a periodic reconciliation with revenues in excess or below what is necessary to cover costs of providing services, so that any subsequent necessary adjustments to billings can be made;*

*(4) It remains in effect during cycles of at least three years, except for periodic adjustments that are inherent to the structure, which adjustment shall be presented as part of the proposal filed with the Commission;*

*(5) It considers efficiencies and operational and administrative savings contemplated in the Agreement with Creditors, as determined and reasonably estimated in good faith by PREPA at the date of presentation of the proposal to the Commission; and*

31

(6) Considering the level of debt and operational expenses prior to the restructuring, and the rate that would have been necessary for PREPA to comply with all of its obligations if the Agreement with Creditors had not taken place, the new proposed rate reflects a just and reasonable allocation of PREPA's costs among all of its customer classes.

B.   The Commission and PREPA shall publish on their websites the petition presented by PREPA within 24 hours of its receipt by the Commission. The Commission shall notify the public of the upcoming public hearing or hearings to evaluate PREPA's petition at least ten (10) days in advance of holding such hearings, which announcement shall include the matters to be discussed and the location, date and time of the hearing. The announcement shall also comply with the following:  (1) it shall be published in two newspapers of general circulation in the Commonwealth at least twice during such ten (10) day period, (2)  a copy of such announcement shall be continuously posted during such ten (10) day period in the main office of the Commission and PREPA and in each PREPA Customer service office, in each case in a place fully accessible to the public during normal business hours, and (3) a copy of such announcement along with copies of PREPA's rate proposal and all supporting documents and other information shall be posted on the websites of the Commission, PREPA and the Government Development Bank for Puerto Rico, safeguarding confidential or privileged information included in such documents, if any. The public hearing shall be held in order to collect the general opinion of the citizens regarding the compliance by the PREPA rate proposal with the criteria established in paragraph (c)A. of this Article 6.25A.  The Commission shall appoint an independent official examiner to preside over the hearing or hearings.

C.   The official examiner shall have fifteen (15) days after the conclusion of the last public hearing to submit a report to the Commission. The report shall be published on the Commission's, PREPA's and the Government Development Bank's websites. The report shall include a record of all objections, testimonies, opinions, documents, recommendations and any other pertinent information presented during the hearings, as well as the examiner's own conclusions and recommendations. Any person interested in submitting further comments with respect to the examiner's report, may do so in writing to the Commission within ten (10) days after the publication of the report.

D.   The Commission shall review PREPA's petition, any other supporting materials that PREPA may have filed, the examiner's report and comments thereto and shall issue a resolution and order regarding PREPA's petition for approval of the proposed rate structure within the term of sixty (60) days from the PREPA Petition Date, as required below in paragraph (c)(F) of this Article 6.25A.

E.   The evaluation process to be conducted by the Commission shall be a transparent process, and will consider the urgent need to implement an agile,  flexible, informal process, so that the citizens may provide their testimonies and express their opinions in the public hearing or submit them in writing during a specific period of time to be determined by the Commission within the expedited process established herein in order

32

*to allow the Commission and its examiner to act in a diligent way, in each case subject to the parameters established in this subsection c.*

F.     *If during the given period of sixty (60) days after the PREPA Petition Date the Commission has not reached a final decision to approve or reject PREPA's petition for approval of the proposed rate structure, PREPA's proposed structure shall take effect immediately as an emergency rate while the Commission reaches a final decision within a term that shall not exceed thirty (30) additional days. The emergency rate hereby authorized shall not be considered a temporary rate nor shall it be subject to the applicable dispositions of Section 6B of Act 83 of May 2, 1941, nor to Article 6.25 of this law. If after ninety (90) days following the PREPA Petition Date, the Commission has not reached a final decision to approve or reject the proposed rate structure, PREPA's proposed rate structure shall become final and the Commission shall lose its jurisdiction to approve it. If the Commission determines that the proposed rate does not comply with the criteria previously enumerated, it shall justify its decision with specific reference to said criteria and to the documents and information that support its resolution. Notwithstanding the foregoing, the PREPA proposed rate structure shall not be reflected in bills to the Customers until the Restructuring Bonds are issued.*

*(d)  Subsequent Rate Review. If the Commission determines to reject the Corporation's petition for approval of the calculation methodology for the Transition Charges and Adjustment Mechanism proposed by the Corporation or the rate structure proposed by PREPA, or if PREPA withdraws its request for rate approval, PREPA shall commence an ordinary rate case before the Commission within ninety (90) days of such rejection or withdrawal following the provisions and procedures established in Section 6B and 6C of Act 83 of May 2, 1941.*

*Execution version*

## Schedule I-B

### Securitization Term Sheet
### Indicative Summary of Terms

Capitalized terms used in this Schedule that are not explicitly defined herein shall have the meanings ascribed to them in Section 1 of Schedule I-A or the Restructuring Support Agreement (the "**Agreement**").  All terms and conditions in Schedule I-A ("**Schedule I-A**" and as enacted the "**Securitization Special Legislation**") are deemed to be incorporated herein and are in addition to, and not in lieu of, the terms and conditions herein.  The Supporting Creditors, the Corporation, and as appropriate PREPA, shall be referred to in this term sheet (this "**Term Sheet**") as the "**Parties**".

All blank terms and conditions in this Term Sheet shall be mutually agreed upon between the Parties.

This Term Sheet does not constitute (nor shall it be construed as) an offer with respect to any securities. This Term Sheet does not address all material terms that would be required in definitive documents and in order to consummate the transactions set forth in this Term Sheet, and is subject to definitive documentation in form and substance reasonably acceptable to the Supporting Creditors.

| **Issuer** | Puerto Rico Electric Power Authority Revitalization Corporation ("**Corporation**"), a public corporation and governmental instrumentality of the Commonwealth constituting a special purpose, bankruptcy-ineligible issuer created pursuant to Schedule I-A formed to own the Restructuring Property and authorized to issue the Restructuring Bonds and to perform activities incidental thereto.  Neither PREPA nor any other affiliate thereof will be an obligor under the Restructuring Bonds. |
|---|---|
| | So long as any Restructuring Bonds remain outstanding and any Financing Costs that have or may become due have not been paid in full, the Corporation shall not be authorized to dissolve, liquidate or transfer or sell all or substantially all of the Corporation's assets, or merge or consolidate, directly or indirectly, with any Person, and this restriction shall be included as a covenant in each Trust Agreement, including the Initial Trust Agreement.  Additionally, the Corporation shall not have the power or authority to incur, guarantee or otherwise become obligated to pay any debt or other obligations other than Restructuring Bonds and Financing Costs, and no Restructuring Resolution or Trust Agreement shall authorize the Corporation to do so, and this restriction shall be included as a covenant in all Trust Agreements, including the Initial Trust Agreement. |
| | The Corporation shall not own any assets or property other than the Restructuring Property, incidental personal property necessary for the ownership and operation of the Restructuring Property and any investment-grade securities in accordance with the terms of the Restructuring Bonds. The Corporation shall keep its assets and liabilities separate and distinct from those of any other Person, including PREPA. |
| | Prior to the date that is one year and one day after the Corporation no longer has any Restructuring Bonds outstanding or any Ancillary Agreement with payment obligations that have or may become due thereunder, the Corporation shall have no authority to file a petition for relief as a debtor under any chapter  of the federal bankruptcy code or any other bankruptcy, |

|  | insolvency, debt composition, moratorium, receiver or similar federal laws or any Commonwealth bankruptcy, moratorium, debt adjustment, composition or similar laws permitting stay or delay of payment or discharge or reduction in amount owed on any Restructuring Bonds as may, from time to time, be in effect, and no public officer, organization, entity or other Person shall authorize the Corporation to be or become a debtor under chapter 9 or similar federal law or any such Commonwealth law during such period. |
|---|---|
|  | The corporate existence of the Corporation shall continue until terminated by law, but no such law shall take effect so long as the Corporation shall have bonds, notes and other obligations outstanding, unless adequate provision has been made for the payment thereof. |
|  | The Corporation, and the Restructuring Property, including the Transition Charges and Transition Charge Revenues, regardless of whether the Corporation is the owner of the Restructuring Property, shall not be subject to any fees, taxes, special ad valorem levies or assessments of any kind, including income taxes, franchise taxes, sales taxes or other taxes or payments or contributions in lieu of taxes. |
| **Issuance of Restructuring Bonds** | Restructuring Bonds may be issued at one time or (subject to satisfying the conditions set forth in this Term Sheet, including the Ratings Condition (defined below), and in the Trust Agreement relating to issuance of an additional series of Restructuring Bonds) from time to time for (i) defeasing Restructuring Bonds to achieve net present value debt service savings or (ii) other Approved Restructuring Costs (excluding defeasance of Restructuring Bonds). |
|  | The Trust Agreement pursuant to which the initial series of Restructuring Bonds are issued (the "**Initial Trust Agreement**") shall contain terms and conditions regarding additional issuances of Restructuring Bonds (whether issued under the same or a separate Restructuring Resolution, and whether secured by the initial Transition Charge or a new or additional Transition Charge or other charge on Customers) that are reasonably acceptable to the Parties, which shall include the Ratings Condition. |
|  | Issuance of Restructuring Bonds will not be subject to review or approval by the Commission or any other governmental entity; *provided*, that the Transition Charges and Adjustment Mechanism shall be subject to Commission review as set forth in Schedule I-A.  The Restructuring Bonds may be sold for cash or delivered to any Person for such consideration as the Board may deem adequate; *provided*, that the Initial Trust Agreement may contain terms and conditions that are reasonably acceptable to the Parties excluding the Corporation, PREPA, the Commonwealth, or its instrumentalities, public corporations, or municipalities, or any subsidiary or affiliate of any of them from directly or indirectly holding, voting or controlling Restructuring Bonds. |
| **Initial Issuance** | The initial series of Restructuring Bonds will be issued in connection with the Exchange Offer, to generate proceeds to fund certain reserves and costs of issuance, and to replenish PREPA's Self-insurance Fund in an amount no greater than $100 million; *provided*, that any Restructuring Bonds issued to replenish the Self-insurance Fund shall contain terms that are the same in all material respects as the Restructuring Bonds issued to the Forbearing |

| | |
|---|---|
| | Uninsured Holders and that are reasonably agreed upon between the parties; and *provided* further that, prior to the issuance of such Restructuring Bonds, the parties shall reasonably agree that such Restructuring Bonds will not have a material impact on the pricing of the Restructuring Bonds issued to the Forbearing Uninsured Holders.  The initial issuance of Restructuring Bonds shall be for purposes reasonably acceptable to the Parties and solely for the purposes set forth in clauses (b), (d) and (e) of the definition of Approved Restructuring Costs as defined in Schedule I-A, and to the extent reasonably agreed by the Parties for the purpose set forth in clause (c) of such definition.  Such issuance shall not include the purpose set forth in clause (a) of the definition thereof as defined in Section 1 of Schedule I-A. |
| | The initial issuance of Restructuring Bonds shall be scheduled to pay principal annually or semi-annually and interest semi-annually in accordance with the terms described in this Term Sheet. |
| | The initial issuance of Restructuring Bonds shall be issued in the following forms: |
| | • Restructuring Bonds paying current interest ("**Current Interest Bonds**") |
| | • Convertible capital appreciation Restructuring Bonds accreting interest for the first 5 years (or such other term as may be reasonably acceptable to the Parties) after the issue date and converting into Current Interest Bonds thereafter ("**Convertible CABs**") |
| | The amount of Current Interest Bonds and Convertible CABs issued shall be determined based on the elections of each PREPA creditor participating in the Exchange Offer, subject to any caps reasonably agreed upon between the Parties. |
| **Ratings Condition** | The initial issuance of Restructuring Bonds shall receive an investment grade rating from any rating agency that rates the Restructuring Bonds.  PREPA shall request and diligently pursue ratings from Moody's and Standard and Poor's. |
| | Before any future issuance of Restructuring Bonds or incurrence of any other indebtedness or guarantee of indebtedness by the Corporation (whether issued under the same or a separate Restructuring Resolution, and whether secured by the Transition Charge in effect prior to the time of issuance or a new or additional Transition Charge or other charge on Customers), the Corporation must provide the Trustee confirmation that (i) each rating agency that maintains a rating on the Restructuring Bonds outstanding at that time has confirmed the proposed action will not result in a suspension, reduction or withdrawal of the then current rating by such rating agency or agencies and (ii) at least one rating agency will maintain the same or higher rating as it originally assigned to the initial series of Restructuring Bonds. |
| | The above terms (the "**Ratings Condition**") shall be included as a covenant in the Initial Trust Agreement. |

| **Interest Rate** | For Current Interest Bonds: | For Convertible CABs: |
|---|---|---|
| | • Weighted average interest rate across maturities (based on yield curve) shall be fixed at the | • Weighted average interest / accretion rate across maturities (based on yield curve) shall be |

| | | |
|---|---|---|
| | specified rates (BBB- and above) subject to the final investment grade rating, as follows:<br><br>AAA:                    4.00%<br><br>AA+/AA/AA-:      4.25%<br><br>A+/A/A-:            4.50%<br><br>BBB+/BBB/BBB-:  4.75% | fixed at the specified rates (BBB- and above) subject to the final investment grade rating, as follows:<br><br>AAA:                    4.50%<br><br>AA+/AA/AA-:      4.75%<br><br>A+/A/A-:            5.25%<br><br>BBB+/BBB/BBB-:  5.50% |
| **Exchange Ratio** | 85.0%; *provided* that the exchange ratio shall not apply to the January Payment Bonds, which January Payment Bonds shall be governed by Annex H and the Bond Purchase Agreement (as defined therein). | |
| **Interest Accrual; Interest Payment Dates** | Interest will be due or accrue (as applicable) at a fixed rate on a 30/360 basis and due as follows: | |
| | For Current Interest Bonds:<br><br>• Only cash interest will be payable during 5 years following the issue date (thereafter, cash interest and principal will be payable)<br><br>• Interest will be payable semi-annually, [_____] and [_____] (each, an "**Interest Payment Date**")<br><br>• First scheduled Interest Payment Date is [_____, 2016] | For Convertible CABs:<br><br>• Interest will accrete during 5 years following the issue date (thereafter, cash interest and principal will be payable)<br><br>• Interest will be payable semi-annually on each Interest Payment Date after 5-year conversion date (based on accreted value as of such 5th anniversary) |
| **Principal Payments** | Principal will be repaid sequentially starting in the sixth year after the issue date until each applicable Scheduled Retirement Date with annual or semi-annual payments on each [_____] and on the Scheduled Retirement Date for each Tranche (each, a "**Principal Payment Date**"), with the amortization schedule to be reasonably agreed by the Parties.<br><br>No Tranches will receive principal payments until all Tranches with earlier Scheduled Retirement Dates have been paid in full, unless (i) a failure to fully retire Restructuring Bonds on the Final Maturity Date occurs with respect to two or more Tranches, in which case a principal payment shall be made pro rata with respect to such Tranches, or (ii) there is an acceleration of the Restructuring Bonds following an event of default in which case principal of all Tranches will be paid on a pro-rata basis. | |
| **Expected Average Life** | As is reasonably acceptable to the Parties. | |
| **Expected Scheduled Retirement Date; Bond Structure** | Scheduled maturity in [●] 2043; Restructuring Bonds may be issued as a combination of serial and term bonds with earlier scheduled maturity and/or sinking fund redemption dates as is reasonably acceptable to the Parties. | |
| **Final Maturity Date** | At least two years after Scheduled Retirement Date, or such period of time as required to obtain investment grade rating that is not less than one year. | |

| | | |
|---|---|---|
| **Scheduled Retirement Dates** | Principal of Restructuring Bonds is expected to be paid or redeemed in full on the Scheduled Retirement Dates based on a serial bond and sinking fund (term bond) amortization schedule that is reasonably acceptable to the Parties (each maturity thereunder, a "**Scheduled Retirement Date**" and each series of Restructuring Bonds redeemable on each Scheduled Retirement Date, a "**Tranche**"). | |
| **Optional Redemption** | For Current Interest Bonds:<br><br>• Not optionally callable for 10 years after issue date | For Convertible CABs:<br><br>• Not optionally callable for 10 years after conversion date |
| **At Par Mandatory Redemption** | For Current Interest Bonds:<br><br>• As required to preserve tax-exempt status of Current Interest Bonds (e.g., change in use of refinanced assets) | For Convertible CABs:<br><br>• As required to preserve tax-exempt status of Convertible CABs (e.g., change in use of refinanced assets) |
| **Debt Service Reserve Fund; Surety Reimbursement Obligation** | Securitization shall have a debt service reserve of up to 10% as required to receive an investment grade rating. Size of the reserve shall be determined by PREPA in consultation with the rating agencies and the Ad Hoc Group, and shall be sized such that, together with net interest cost on the Restructuring Bonds, PREPA minimizes its funding costs. Reserve to be funded from Restructuring Bond proceeds, a surety policy, and/or deposits over time.  If a portion of the debt service reserve is secured by a surety, the Corporation's reimbursement obligation thereunder will be subordinate to the payment of debt service on the Restructuring Bonds prior to the principal thereof and accrued and unpaid interest thereon being declared immediately due and payable, and upon and after such declaration, such reimbursement obligation shall be payable pari passu with the payment of such principal and any accrued and unpaid interest thereon. | |
| **Tax Treatment** | Tax-exempt | |
| **Denominations** | Integral multiples of $5,000 or such other multiple that is reasonably acceptable to the Parties. | |
| **Exchange Offer** | In connection with PREPA's restructuring, the Restructuring Bonds shall be issued in exchange for PREPA's existing indebtedness held by the following holders of outstanding PREPA bonds ("**Exchange Offer**"):<br><br>1- Forbearing Uninsured Holders<br><br>2- Non-Forbearing Uninsured Holders<br><br>In addition, Lenders under Credit Agreements shall have the opportunity to exchange their claims under the Credit Agreements in accordance with the terms of the Agreement.<br><br>Restructuring Bonds may also be sold to potential "Backstop Parties" in exchange for cash consideration, on terms to be negotiated between PREPA and the Backstop Parties, that will be used to tender for outstanding PREPA bonds. | |
| **Minimum Participation Rate** | Minimum participation rate in the Exchange Offer, waivable by PREPA in accordance with the Agreement: | |

| | |
|---|---|
| | 1- *Forbearing Uninsured Holders*: 100% of Bonds; *provided*, that any January Payment Bonds held by such Forbearing Uninsured Holders shall be governed by Annex H and the Bond Purchase Agreement (as described therein). |
| | 2- *Non- Forbearing Uninsured Holders*: Principal amount such that principal amount of outstanding PREPA Bonds, but not including any January Payment Bonds, held by non-exchanging Uninsured Non-Forbearing Holders does not exceed $700 million, or such higher other amount determined at PREPA's discretion, after consultation with investment bankers and the Forbearing Uninsured Holders |
| | There will be no minimum participation rate for the Lenders under Credit Agreements. |
| **Restructuring Resolution; Financing Costs** | The Corporation will submit to the Commission along with the form of Restructuring Resolution a petition (and such other materials explicitly required by statute to be submitted along with the petition) for approval of the calculation methodology for the Transition Charges and the Adjustment Mechanism.  The scope and standard of the Commission's review of the Corporation's petition will be as set forth in Schedule I-A.  If the Commission does not approve the Transition Charges and the Adjustment Mechanism within sixty (60) days after submission, the Transition Charges and Adjustment Mechanism shall become final and the Commission shall lose jurisdiction to approve them. |
| | Within two (2) business days of the Commission's approval of the calculation methodology for the Transition Charges and the Adjustment Mechanism, the Corporation shall adopt a Restructuring Resolution creating, and constituting part of, the Restructuring Property and approving the imposition and collection of Transition Charges, and the financing of Approved Restructuring Costs through the issuance of Restructuring Bonds, and which Restructuring Resolution contains the Adjustment Mechanism. The Restructuring Resolution shall address such other matters as may be necessary or desirable for the marketing or servicing of the Restructuring Bonds or servicing the Restructuring Property, with such terms and conditions that are reasonably acceptable to the Parties.  Such Restructuring Resolution shall be irrevocable. |
| | Financing Costs that are reasonably acceptable to the Parties and subject to caps that are reasonably acceptable to the Parties shall be set forth in the Restructuring Resolution and the Initial Trust Agreement. |
| **Trustee** | The Trustee for the initial issuance of Restructuring Bonds shall be a mainland financial institution reasonably acceptable to the Parties. |
| **Servicer** | PREPA as the initial Servicer shall covenant in the Servicing Agreement, as described in Schedule I-A and as reasonably agreed by the Parties, in connection with the initial series of Restructuring Bonds to, among other things: |
| | • Obtain meter reads, calculate or estimate electricity usage, calculate per capita charges and bill the Transition Charges to the Customers pursuant to a Servicing Agreement (defined below) as a separate line item on |

6

|  | PREPA's bills; |
|---|---|
|  | • Direct Customers that do not pay in person (either at PREPA service centers or at designated bank branches) to remit Transition Charges, together with all other PREPA charges (including any CILTs that may be billed to Customers), to a third-party collection agent reasonably acceptable to the Parties that is neither affiliated with, nor located in, the Commonwealth (the "**Depository**").  If PREPA receives any billed amounts from Customers in respect of PREPA charges and/or Transition Charges, then PREPA shall promptly transfer such receipts to the Depository; |
|  | • Calculate the Adjustment Mechanism at least semiannually; |
|  | • Daily allocation of Transition Charges and PREPA charges by the Depository; |
|  | • Include charges for CILT as a line item on all Customer bills separate from the Transition Charge and all other PREPA charges; |
|  | • Use best efforts to collect all Transition Charges; |
|  | • Provide to the Corporation, Trustee (or, if different, any owner of all or any portion of the Restructuring Property), any rating agency rating the Restructuring Bonds, or any calculation agent, as the case may be, any financial information in respect of the Servicer, or any material information regarding the Restructuring Property, as may be necessary for the  Corporation, Trustee (or such other owner), any rating agency rating the Restructuring Bonds, or any calculation agent to monitor the Servicer's performance under the Servicing Agreement, perform their respective duties, determine compliance by the Servicer with the Servicing Agreement or calculate the Transition Charge or perform the Adjustment Mechanism; |
|  | • Terminate service to non-paying Customers on the same basis as termination of service is permitted for nonpayment of electric or other rates by PREPA; and |
|  | • Make use of any intercept provisions for non-payment of electric or other rates by public agencies, municipalities, public corporations or other governmental entities that are applicable to nonpayment of electric or other rates charged by PREPA. |
| **Servicing Agreement** | The Servicing Agreement shall provide for the billing and collection of the Transition Charges, on terms and conditions (including PREPA's obligations thereunder and the Trustee's replacement powers upon a default by PREPA under the Servicing Agreement, among other things) as described in Schedule I-A and as reasonably agreed by the Parties.  PREPA shall provide the Corporation with monthly reports on Transition Charge collections and such other information as may be reasonably agreed by the Parties.<br><br>The Servicing Agreement shall:<br><br>• set forth caps on the Servicer's compensation consistent with Schedule I-A, which caps shall be reasonably agreed by the Parties; |

| | |
|---|---|
| | •  include the deposit and allocation requirements of Schedule I-A; and<br><br>•  contain provisions, reasonably agreed upon by the Parties, for resignation or removal, and replacement, of the Servicer.<br><br>The Servicing Agreement shall include a backup servicer on terms reasonably agreed upon by the Parties.  It may also include co-Servicers or subservicers, as reasonably agreed upon by the Parties.  It shall also provide for the option on the part of the Servicer to make advances to the Corporation with respect to Transition Charge receivables and for the Trustee's replacement of the Servicer, subject to terms and conditions reasonably agreed upon by the Parties but to include failure to take reasonable collection actions against Customers. |
| **Depository** | Amounts held by Depository shall be allocated and transferred daily to Trustee (in respect of Transition Charge collections) and PREPA (in respect of PREPA charges) in accordance with a methodology reasonably agreed upon by the Parties. The Trustee shall receive and hold all such amounts in a segregated deposit account at a branch located in New York City.<br><br>PREPA will be expressly prohibited in the Servicing Agreement from acting as Depository in respect of the Transition Charges. If PREPA receives any Transition Charges, such receipt will be in its capacity as agent of the Corporation only, and PREPA will hold such Transition Charges in trust for the exclusive benefit of the Corporation, holders of Restructuring Bonds and the persons entitled to the Financing Costs to be paid, directly or indirectly, from the Transition Charges in accordance with the terms and conditions of the Restructuring Resolution.  PREPA shall take any action necessary to direct third parties to turn over Transition Charges and PREPA charges to the Depository.  Transition Charges shall not lose their character as revenues of the Corporation by virtue of possession by PREPA or any other party, and such Transition Charges shall be transferred as soon as possible to the Depository.<br><br>The Depository (i) shall be a mainland financial institution reasonably agreed upon by the Parties, (ii) shall not be related to the Commonwealth or its instrumentalities, public corporations, or municipalities, and (iii) shall hold its accounts in New York City.<br><br>The Initial Trust Agreement shall authorize the Trustee to replace the Depository, subject to terms and conditions reasonably agreed upon by the Parties.<br><br>Any funds held by the Depository or the Trustee shall be invested in either cash or in obligations of or backed by the full faith and credit of the United States Government.  Without limiting the foregoing, no funds shall be invested in any certificates of deposit or other obligations of the GDB or deposited in or with the GDB. |
| **Calculation Agent** | A third-party calculation agent (not affiliated with the Commonwealth or its instrumentalities, public corporations, or municipalities) (in such capacity, "**Calculation Agent**") reasonably agreed upon by the Parties will be appointed and retained to confirm Servicer's calculation of Transition Charges and application of the Adjustment Mechanism. |

8

| | The Initial Trust Agreement shall include the qualifications for the Calculation Agent and shall allow the Trustee to remove and replace the Calculation Agent.<br><br>In case of a dispute between the Calculation Agent and the Servicer, an independent expert shall be appointed. |
|---|---|
| **Restructuring Property; Security; Statutory Lien** | The Restructuring Property created by the Corporation pursuant to Schedule I-A and the Restructuring Resolution will be as described in Schedule I-A. Restructuring Bonds and obligations of the Corporation under Ancillary Agreements shall be secured by the same statutory lien on the Restructuring Property in favor of the owners or beneficial owners of Restructuring Bonds and parties to such Ancillary Agreements, subject, in the case of the Ancillary Agreements, to the subordination provisions described herein under "Debt Service Reserve Fund; Surety Reimbursement Obligation".<br><br>Pursuant to the Initial Trust Agreement, the Corporation shall grant the Trustee a security interest in the Restructuring Property, and in all other funds and accounts held by the Trustee thereunder, to secure the initial series of Restructuring Bonds. Such pledge of Restructuring Property or proceeds thereof, including any moneys, revenues or property or of a revenue producing contract or contracts constituting part of the Restructuring Property, made by the Corporation, shall be perfected as described in Schedule I-A.<br><br>The lien of the Trustee shall have priority over any other lien on the Restructuring Property, and the Initial Trust Agreement shall not permit any other lien on the Restructuring Property senior to the lien of the Restructuring Bonds and the Ancillary Agreements.<br><br>Trustee shall have the right to foreclose on all Restructuring Property, including the Servicing Agreement, and sell such property. |
| **Transition Charges** | Provisions relating to the Transition Charges, including irrevocability and non-bypassability, application to all PREPA customers and inclusion in Customers' bills, among other things, as described in Schedule I-A. |
| **True-up Mechanism for Payment of Scheduled Principal and Interest** | Establishment and operation of the Adjustment Mechanism established by the Restructuring Resolution and as described in Schedule I-A and to be included in the Restructuring Resolution.  The Adjustment Mechanism shall be applied not less than semi-annually and will result in adjustments to Transition Charges as shall be necessary to provide for the payment of the Restructuring Bonds by their respective Schedule Retirement Dates. |
| **Priority of Payment** | On each payment date in respect of principal and interest, all amounts on deposit in the collection account will be available to pay the following amounts in the following priority (except as may otherwise be reasonably agreed upon by the Parties):<br><br>1. Fees, costs and expenses owed to the Trustee (up to a cap to be negotiated)<br><br>2. Depository, Servicer (up to a cap to be negotiated) and Calculation Agent fees (up to a cap to be negotiated)<br><br>3. [Administration fees in character and amount to be negotiated] |

9

| | |
|---|---|
| | 4. Other Ongoing Financing Costs |
| | 5. Interest on Restructuring Bonds (if applicable) |
| | 6. Principal of each Tranche of Restructuring Bonds when due, pro rata and sequentially by tranche when due prior to acceleration, and pro rata across all tranches upon acceleration |
| | 7. Indemnity amounts owed to the Trustee |
| | 8. Amounts owed by Corporation in satisfaction of reimbursement obligation under any surety held to the credit of Debt Service Reserve Fund unless the provider of such surety fails to reinstate such surety by any amount that was previously reimbursed to such surety provider |
| | 9. Replenishment of Debt Service Reserve Fund to required reserve level |
| | 10. Amounts owed by Corporation in satisfaction of reimbursement obligation under any surety held to the credit of Debt Service Reserve Fund that are not paid under clause (8) above |
| | 11. Excess amounts to be held for distribution on subsequent Interest Payment Dates and/or Principal Payment Dates, as applicable. |
| **Partial Payments Allocated Pro Rata** | Any partial payments by PREPA's customers shall be allocated pro rata between the Corporation (in respect of the Transition Charges) and PREPA (in respect of the PREPA charges), such pro rata allocation to be based upon the relative amounts of the Transition Charges and the PREPA charges as a part of the total bill. |
| **Events of Default** | The Initial Trust Agreement shall include the following events of default and such other events of default as may be reasonably agreed by the Parties:<br><br>• Payment default on any Restructuring Bond, subject to such notice and cure periods, if any, as may be reasonably agreed upon by the Parties; *provided*, that the failure to pay or redeem principal of any Restructuring Bonds on or after the applicable Scheduled Retirement Date will not constitute an event of default unless such Restructuring Bonds are not paid/redeemed in full on the related Final Maturity Date;<br><br>• Covenant defaults subject to such notice and cure periods, if any, as may be reasonably agreed upon by the Parties;<br><br>• An event of default by any party under the Servicing Agreement;<br><br>• Bankruptcy defaults reasonably agreed upon by the Parties;<br><br>• Any act or failure to act by the Commonwealth or any of its agencies (including the Corporation), officers or employees that violates or is not in accordance with the Restructuring Resolution or the Commonwealth Pledge; and<br><br>• If the Commonwealth (either directly or through any of its public corporations, instrumentalities, or municipalities) (i) issues debt secured by Restructuring Property or any other rights and interests in rates, charges, taxes or assessments that are separate from rates and charges of |

10

| | |
|---|---|
| | PREPA and that are imposed upon Customers (in their capacity as Customers) to recover the ongoing financing costs of such debt, if upon the issuance of such debt the security for any Restructuring Bonds or such Ancillary Agreements shall be materially impaired; (ii) creates or imposes, or permits to be created or imposed, a tax or similar charge upon electric service within the Commonwealth by means of any facilities constituting part of System Assets, if such tax or other charge shall materially impair the security for any Restructuring Bonds or such Ancillary Agreements; and/or (iii) if prior to any issuance of debt described in clause (i) above or the creation or imposition of a tax or charge described in clause (ii) above, the Trustee shall not have been provided with written confirmation upon each such issuance, or creation or imposition, as the case may be, that the credit ratings for the then outstanding Restructuring Bonds (without regard to any third-party credit enhancement) shall not have been withdrawn or reduced below the ratings assigned thereto at the time of original issuance. |
| **Successors or Managers Bound by Securitization Special Legislation** | Any successor owner or manager of the PREPA system assets and any successor Servicer shall be bound by the requirements as described in Schedule I-A. |
| **Governance** | The Initial Trust Agreement shall provide such terms and conditions regarding the Corporation's governance as reasonably agreed by the Parties. |
| **Commonwealth Pledge** | As provided in Schedule I-A, the Commonwealth will make tax-exempt, non-impairment and bankruptcy pledges, and other covenants, as described in Schedule I-A, that will expressly form part of the contract of the holders of the Restructuring Bonds.<br><br>The Initial Trust Agreement shall include all the covenants of the Commonwealth set forth in Schedule I-A, including those in Section 5(o)(2) and Section 11. |
| **Remedies** | The Corporation, the Trustee and any owner of all or a portion of the Restructuring Property shall have the rights set forth in Section 8(a) of Schedule I-A, along with other rights and remedies to be reasonably agreed by the Parties.<br><br>The Initial Trust Agreement shall include no limitation on the exercise of rights under Section 8(a) of Schedule I-A except as specifically set forth in Section 8(a) of Schedule I-A.<br><br>The Initial Trust Agreement shall provide that if an event of default shall have occurred and be continuing thereunder, the Trustee may, in addition to other remedies provided in such Initial Trust Agreement, foreclose on and sell all Restructuring Property and other collateral or any portion thereof or rights or interests therein, at one or more public or private sales called and conducted in any manner permitted by law.  Such remedy shall not be subject to any other limitation in the Initial Trust Agreement. |
| **Governing Law; Venue** | All documents relating to the Restructuring Bonds or the issuance of the Restructuring Bonds, including any Trust Agreement (including the Initial Trust Agreement) or Servicing Agreement (other than the Restructuring Resolution), and all the Corporation's agreements shall be governed by the law of the State of New York, applied as if all such documents and |

11

| | |
|---|---|
| | agreements were executed in New York and were performed entirely within New York.  All rights of the holders of the Restructuring Bonds shall be governed by the law of New York.<br><br>The Corporation shall, in each Restructuring Resolution and all Trust Agreements (including the Initial Trust Agreement) corresponding thereto, and all other agreements related to the issuance of Restructuring Bonds:<br><br>• submit to non-exclusive in personam jurisdiction and venue in the state and federal courts located in New York, New York;<br>• agree to maintain contacts with the State of New York sufficient to give the courts located therein personal jurisdiction over the Corporation; and<br>• waive any objection to venue.<br><br>PREPA shall, in the Servicing Agreement:<br><br>• submit to non-exclusive in personam jurisdiction and venue in the state and federal courts located in New York, New York; and<br>• waive any objection to venue. |
| **Conditions Precedent** | Customary conditions precedent to be mutually agreed upon between the Parties and shall include:<br><br>• Treatment of Lenders on terms substantially consistent with Schedule III to the RSA and acceptable to the Holders;<br><br>• Treatment of Insurers on terms acceptable to the Holders;<br><br>• Satisfaction of the Ratings Condition;<br><br>• Passage of Securitization Special Legislation in accordance with the terms of the Agreement;<br><br>• Tender of minimum percentages required under Exchange Offer (subject to the terms in the Minimum Participation Rate);<br><br>• Receipt by the Trustee, for the benefit of the owners of the Restructuring Bonds, of resolutions and legal opinions, in form and substance satisfactory to counsel for Ad Hoc Group, from the Corporation's counsel and bond counsel, PREPA's counsel and bond counsel, and the Secretary of Justice of the Commonwealth;<br><br>• Completion of the Validation Proceeding and any appeals therefrom; and<br><br>• All Securitization Documents (including the Restructuring Resolution and the Servicing Agreement), and all documents related to the Consent Solicitation, Exchange Offer, and Closing Date Trust Agreement Amendments, have been negotiated between the Parties and are in form and substance reasonably agreeable to the Parties. |

12

*Execution version*

## Schedule II

## MONOLINE TERM SHEET

*This Term Sheet does not purport to list or summarize all of the terms and conditions of the proposed securitization and related transactions. All information contained herein is qualified in its entirety by the information that would be contained in the final documentation for the proposed securitization and related transactions. This Term Sheet contemplates that the Closing Date (as herein defined) will occur on or prior to June 30, 2016.[1]*

| Term | Description |
|------|-------------|
| Legacy Bonds | Revenue bonds issued by the Puerto Rico Electric Power Authority ("PREPA") and outstanding under the Trust Agreement, dated as of January 1, 1974, as amended and supplemented from time to time, between PREPA and U.S. Bank, National Association (the "Trust Agreement"). |
| Securitization Bonds | Bonds that are (a) "Restructuring Bonds" as described in the Securitization Term Sheet[2] attached to the Restructuring Support Agreement (as amended from time-to-time and to include Monolines as Supporting Creditors, the "RSA" and the parties to the RSA, the "RSA Parties"), dated as of November 5, 2015 (the "Securitization Term Sheet") and (b) payable and secured on a *pari passu* basis with all other Restructuring Bonds contemplated by the Securitization Term Sheet. Securitization Bonds may be issued by the Corporation (as defined in the Securitization Term Sheet) from time to time, including on the Closing Date (as defined herein), in accordance with the terms of the Securitization Term Sheet and subject to the limitations herein. For the avoidance of doubt, none of the Securitization Bonds will be insured by National or Assured, unless otherwise agreed. |
| Exchange Offer | Securitization Bonds that are issued on the closing date (the "Closing Date") of PREPA's exchange offer in exchange for uninsured Legacy Bonds as |

---

[1]   For the avoidance of doubt, if this Monoline Term Sheet or any term in the Recovery Plan Term Sheet (as defined in the RSA) provides a consent right or other right to a Supporting Creditor (as such term is defined in the RSA) but does not provide that right to other Supporting Creditors, such provision shall not imply that such other Supporting Creditors do not have or will not have such right.

[2]   Securitization Term Sheet to be revised to provide or clarify (i) that any DSRF surety reimbursement obligation will be subordinated to debt service on Securitization Bonds prior to their acceleration, and that upon acceleration such reimbursement obligation will be payable on a *pari passu* basis with such Securitization Bonds, (ii) that the lag between the Scheduled Retirement Date and Final Maturity Date (each as defined in the Securitization Term Sheet) for any tranche will in no event be less than one year, (iii) that the servicing agreement and other relevant documentation will permit the servicer to provide, at its option, advances to the Corporation with respect to Transition Charge (as defined in the Securitization Term Sheet) receivables, (iv) in the "Restructuring Property; Statutory Lien" section thereof, that Ancillary Agreements will also be secured by such property, subject to subordination as otherwise described herein, and (v) in the "True-up Mechanism for Payment of Scheduled Principal and Interest," that the Transition Charge will be adjusted to ensure that collections are sufficient to pay Securitization Bonds by their Scheduled Retirement Date. Other than as set forth in this footnote, nothing in this Monoline Term Sheet shall limit or amend the terms of the Securitization Term Sheet, including, for the avoidance of doubt, with respect to the purposes for which the initial issuance of Restructuring Bonds may be issued.

| | |
|---|---|
| Securitization Bonds | described in the RSA, dated as of November 5, 2015 (the "Exchange Offer"). |
| Clear Market Period | During the three-year (thirty-six (36) month) period after the Closing Date (the "Clear Market Period"), the Corporation shall not issue any new Securitization Bonds unless they have a yield equal to or lower than the interest rate of the Exchange Offer Securitization Bonds having the same weighted average maturity as such new Securitization Bonds and meet the Ratings Condition (as defined in the Securitization Term Sheet) and any other terms agreed upon by the RSA Parties in the trust agreement for the initial series of Restructuring Bonds. |
| Refinancing of Callable Insured Legacy Bonds | $345mm of callable Legacy Bonds (the "Callable Insured Legacy Bonds") insured by Assured and National (collectively, the "Monolines")[3] will be refinanced with Securitization Bonds or otherwise called or refinanced no later than six (6) months after the expiration of the Clear Market Period (such six (6)-month period, the "Refinancing Period"); *provided* that PREPA (i) shall use good faith efforts to refinance such Callable Insured Legacy Bonds as promptly as possible during the Refinancing Period subject to market conditions, (ii) may prioritize in its own discretion the order in which such Callable Insured Legacy Bonds will be called so long as all Callable Insured Legacy Bonds insured by National are called or refinanced before any Callable Insured Legacy Bonds insured by Assured are called or refinanced, and (iii) shall not be obligated to refinance the Callable Insured Legacy Bonds if it determines not to based on market conditions, provided that the failure to refinance the Callable Insured Legacy Bonds for any reason, including market conditions, will not result in a default or other liability of PREPA or the Corporation other than accelerated replacement of all DSRF sureties, as described below. |
| Refinancing of Non-Callable Insured Legacy Bonds | During the Refinancing Period, PREPA will fund a tender at a price not higher than par for $62mm of non-callable Legacy Bonds (the "Non-Callable Insured Legacy Bonds") insured by National and due within the next five years after the tender with proceeds of Securitization Bonds or other funds; *provided* that PREPA (i) shall use good faith efforts to refinance such Non-Callable Insured Legacy Bonds as promptly as possible during the Refinancing Period subject to market conditions, (ii) may prioritize in its own discretion the order in which such Non-Callable Insured Legacy Bonds will be called, and (iii) shall not be obligated to refinance the Non-Callable Insured Legacy Bonds if it determines not to based on market conditions, provided that failure to refinance the Non-Callable Insured Legacy Bonds for any reason, including market conditions, will not result in a default or other liability of PREPA or the Corporation other than accelerated replacement of all DSRF sureties, as described below; *provided further*, that PREPA may fund such tender or otherwise refinance the Non-Callable Insured Legacy |

---

[3]    Final allocation between Assured and National of the amounts of DSRF sureties will be reflected in a letter agreement between National and Assured and acknowledged by PREPA.  While this Term Sheet addresses only Assured and National's wrapped Legacy Bonds, Syncora is expected to contribute to the overall deal with such contribution being consistent with the contributions of other Monolines and commensurate with Syncora's exposure to PREPA and with the form of such contribution to be agreed to among Syncora, the Monolines, the other Supporting Creditors under the RSA and PREPA.

| | Bonds at any time prior to the Refinancing Period, so long as any Securitization Bonds issued to fund such tender or refinancing during the Clear Market Period comply with the requirements in effect during the Clear Market Period described herein under "Clear Market Period." |
|---|---|
| Refinancing of Other Insured Legacy Bonds | After the Refinancing Period, refinancing of other insured Legacy Bonds with Securitization Bonds (without extending the amortization or increasing debt service), to the extent economically beneficial to PREPA and the Corporation as determined by PREPA and the Corporation from time to time, subject to the documentation for such refinancing being acceptable to the Monolines. Any such Securitization Bonds may only be issued if they meet the Ratings Condition and any other terms agreed upon by the RSA Parties in the trust agreement for the initial series of Restructuring Bonds. |
| Mirror Bonds | All other insured Legacy Bonds that are not retired as provided above will be economically defeased[4] through issuance, no later than the Closing Date, of Securitization Bonds that will have the same economic terms (*i.e.*, amount, interest rate[5], and maturity[6]) as the remaining insured Legacy Bonds and shall not accelerate as a result of acceleration of the Legacy Bonds (such Securitization Bonds, the "Mirror Bonds").[7] [8] |

---

[4]   Mechanics of economic defeasance of insured Legacy Bonds (including, without limitation, secondary market insured Legacy Bonds) to be discussed.

[5]   So long as the related interest rate swap agreement remains in effect, the interest rate for Mirror Bonds that economically defease variable rate insured Legacy Bonds shall bear interest at the fixed rate payable by PREPA under the applicable interest rate swap agreement.  In such case, the Mirror Bonds will secure both debt service on the related insured Legacy Bonds and the applicable interest rate swap.  If the related interest rate swap agreement expires or terminates, the interest rate for Mirror Bonds that economically defease variable rate insured Legacy Bonds shall be identical to the interest rate borne by such variable rate insured Legacy Bonds.

[6]   The Scheduled Retirement Date for a series of Mirror Bonds will be the same as the maturity date for the related insured Legacy Bonds and the Final Maturity Date for such series of Mirror Bonds will be two-years (or any shorter period if the lag applicable to other Securitization Bonds is less than two years) after the maturity date of such related insured Legacy Bonds.

[7]   If an interest amount on a series of Mirror Bonds is not paid when due or if such series of Mirror Bonds is not paid in full by its Scheduled Retirement Date (which is also the maturity date of the related insured Legacy Bonds), then (a) the DSRF securing such series of Mirror Bonds shall be drawn upon to fund any such shortfall (with cash being applied in such DSRF before a claim is made on the related DSRF surety) and (b) if the draw on the DSRF is not sufficient to satisfy such shortfall in its entirety, any remaining shortfall on the related insured Legacy Bonds shall be payable from any net revenues that are available for payment of debt service of Legacy Bonds in accordance with the terms of the Legacy Bonds trust agreement (as amended to the extent agreed in the RSA).  The applicable insurance agreements will be amended to provide that if the related Legacy Bonds are not paid in full on their maturity date after the application of funds pursuant to the immediately preceding sentence, then the respective Monoline will be deemed to have agreed to forbear from exercising remedies as a result of the payment default as long as (a) PREPA has provided evidence satisfactory to the Monolines that an increase in PREPA's rates is the only action available to it for curing such payment default and (b) PREPA increases its rates and obtains the approval of the Commission for such increase within an agreed period of such payment default so that such increased rates are sufficient to ensure that such defaulted Legacy Bonds will be fully paid within an agreed period after such payment default.  Pursuant to such amended insurance agreement, the respective Monoline will assign to PREPA its right, title and interest in any payments received by the escrow agent under Mirror Bonds after the date on which the related insured Legacy Bonds have been paid in full.  Consistent with other Securitization Bonds, if the applicable

| January 1 Payment | *See January Payment Term Sheet (as defined in the RSA).* |
|---|---|
| July 1 Payment | If the Closing Date occurs before July 1, provision for funding of the July 1, 2016 payment shall have been made in a manner satisfactory to each of the Monolines and to the Ad Hoc Group.<br><br>If the Closing Date does not occur by July 1 and each of the parties has agreed (in its sole discretion) to extend the RSA, then it will be a condition precedent to the Monolines further obligations under the RSA that the July 1 payment has been made. |
| Securitization Bonds to Fund Restructuring Transactions | Amount of Securitization Bonds that may be issued:<br><br>-On the Closing Date:<br><br>    o   The Exchange Offer Securitization Bonds.<br><br>    o   $2,086mm in Mirror Bonds.[9]<br><br>    o   Nothing in this Monoline Term Sheet shall prohibit the Corporation from issuing Securitization Bonds on the Closing Date in the aggregate principal amount not exceeding 1% of the total amount of Securitization Bonds issued to fund the Cash-Funded DSRF and up to $50 million of Securitization Bonds on the Closing Date to fund the SIF, provided that any such potential issuance shall be subject in all respects to the terms, conditions and contingencies set forth in the Initial RSA, including the Securitization Term Sheet or as otherwise may be agreed to by the RSA Parties. For the avoidance of doubt, the foregoing shall not enhance or diminish the rights of any of the RSA Parties or the Corporation regarding the potential issuance of such Securitization Bonds.<br><br>    o   An amount of Securitization Bonds that the RSA Parties agree may be necessary to fund a Cash Tender with the goal of achieving the minimum Exchange Offer participation levels as set forth in the Securitization Term Sheet, *provided that such Securitization Bonds shall be issued with a yield* |

---

series of Mirror Bonds is not paid in full by its Final Maturity Date (i.e., two years (or any shorter period if the lag applicable to other Securitization Bonds is less than two years) after the maturity date of the related insured Legacy Bonds), then an event of default will have occurred under the indenture for the Securitization Bonds.

[8]    Assured and National will have all voting and enforcement rights of the holders of Mirror Bonds, as consistent with the Legacy Bonds trust agreement and the insurance agreements.

[9]    Such amount includes all insured Legacy Bonds that are outstanding as of the Closing Date and will be increased by an amount equal to the aggregate principal amount outstanding of Purchased Bonds (as defined in the January Payment Term Sheet)  and shall subsequently be reduced by the aggregate principal amount of Refinanced Insured Bonds that are refinanced with Securitization Bonds and by the aggregate principal amount of Purchased Bonds that are exchanged for Securitization Bonds as provided in the January Payment Term Sheet.  Amount and mechanics to be discussed, but may increase in the event that the Monolines refinance the July 1 payment, which for the avoidance of doubt, will require the consent of the RSA Parties.

equal to or lower than the interest rate of the Exchange Offer Securitization Bonds of the same weighted average maturity as such Securitization Bonds or as otherwise may be agreed by the RSA Parties.

o   Other Securitization Bonds that may be agreed to by the RSA Parties.

- After the Closing Date:

o   Nothing in this Monoline Term Sheet shall prohibit the Corporation from issuing up to $500 of Securitization Bonds after the Closing Date to fund AOGP; provided that any such potential issuance shall be subject in all respects to the terms, conditions and contingencies set forth in the Initial RSA, including the Securitization Term Sheet or as otherwise may be agreed by the RSA Parties. For the avoidance of doubt, the foregoing shall not enhance or diminish the rights of any of the RSA Parties or the Corporation regarding the potential issuance of such Securitization Bonds.

o   Additional Securitization Bonds issued in exchange for Purchased Bonds in accordance with the January Payment Term Sheet.

- After the Clear Market Period:

o   Up to $345mm to refinance the Callable Insured Legacy Bonds (amount subject to reduction based on amount of surety).

o   Up to $62mm to fund tender of Non-Callable Insured Legacy Bonds.

o   Other Securitization Bonds that may be agreed to by the RSA Parties.

•   Securitization Bonds may only be issued after the Closing Date if they meet the Ratings Condition and any other terms agreed upon by the RSA Parties in the trust agreement for the initial series of Restructuring Bonds; provided that Interest rate on Securitization Bonds to be issued as part of the Refinanced Insured Bond Transactions to refinance the Refinanced Insured Bonds during the Refinancing Period may be set based on market conditions at the time of issuance and the Corporation will take any market risk associated with, and the Ratings Condition will not apply to, the issuance of such Securitization Bonds in the Refinanced Insured Bond Transactions after the Clear Market Period.

•   Notwithstanding anything to the contrary in this Term Sheet, the aggregate amount of Refinanced Insured Bonds to be refinanced or

| | |
|---|---|
| | refunded with Securitization Bonds pursuant to this Term Sheet shall be no greater than the aggregate amount of the DSRF sureties securing Securitization Bonds (other than Mirror Bonds) *plus* $24 million. The aggregate principal amount of such Refinanced Insured Bonds to be refinanced to complete the Refinanced Insured Bond Transactions (as defined below) and the sum of the aggregate amount of DSRF sureties provided by the Monolines to secure Securitization Bonds shall be measured *pro forma* for the Refinanced Insured Bond Transactions.<br><br>• Other terms of Securitization Bonds shall conform to the Securitization Term Sheet and the Securitization Special Legislation (as defined in the RSA). |
| Series 2015A Bonds | All remaining principal (approximately $105mm) due at maturity on January 1, 2016 to be funded via the SIF and any balance to be paid by PREPA from operating cash. |
| Securitization DSRF | • Separate Debt Service Reserve Fund (each, a "<u>DSRF</u>") to be established for each series of Mirror Bonds (each, a "<u>Mirror Bond DSRF</u>"), and common DSRF to be established for all of the Securitization Bonds other than the Mirror Bonds (the "<u>Common DSRF</u>").   Aggregate surety capacity provided by National and Assured for both the Mirror Bond DSRF and the Common DSRF shall in no event be in excess of $435.60[10] mm.<br><br>• Common DSRF requirement to be up to 10% of the outstanding aggregate principal amount of Securitization Bonds (other than Mirror Bonds), but in no event shall the Common DSRF surety capacity provided by Assured and National be in excess of $383.44[11]mm (the "<u>Maximum Common DSRF Surety Capacity</u>"). PREPA will provide National and Assured with the same consultation rights as to the rating agency process as is provided to the Ad Hoc Group (as defined in the RSA) in the RSA dated as of November 5, 2015.<br><br>    o Common DSRF will be initially funded by the Corporation in cash at the time of the issuance of the Securitization Bonds (other than the Mirror Bonds) in an amount equal to 1% of the outstanding aggregate principal amount of such Securitization Bonds (the "<u>Cash-Funded Common DSRF</u>") and Assured and National to provide Common DSRF sureties |

[10]   This amount will be increased by an amount equal to (i) 2.5% of the aggregate principal amount of Purchased Bonds (as defined in the January Payment Term Sheet) that are not owned by Syncora and (ii) an additional 6.5% of the aggregate principal amount of Purchased Bonds that are exchanged for Securitization Bonds as provided in the January Payment Term Sheet and that are not owned by Syncora.  Otherwise, such amount cannot be increased without the consent of National and Assured.

[11]   This amount will be increased by an amount equal to 9% of the aggregate principal amount of Purchased Bonds that are exchanged for Securitization Bonds as provided in the January Payment Term Sheet and that are not owned by Syncora.  Otherwise, such amount cannot be increased without the consent of National and Assured.

in an amount up to 9% of such outstanding aggregate principal amount with claims on any such surety arising only after the applicable cash reserve is fully exhausted on a pro-rata basis. If the Common DSRF requirement is lower than 10%, such DSRF shall be funded with 1/10 cash from the Corporation and 9/10 with a surety from National and Assured.

- Mirror Bond DSRF requirement to be up to 3.5% of the outstanding aggregate principal amount of each series of Mirror Bonds, but in no event shall such DSRF surety capacity provided by Assured and National be in excess of $52.16[12]mm (the "Maximum Mirror Bond DSRF Surety Capacity" and, collectively with the Maximum Common DSRF Surety Capacity, the "Maximum DSRF Surety Capacity").

  - Mirror Bond DSRF will be initially funded by the Corporation in cash at the time of the issuance of the Mirror Bonds in an amount equal to 1% of the outstanding aggregate principal amount of such Mirror Bonds (the "Cash-Funded Mirror Bond DSRF"[13] and together with the Cash-Funded Common DSRF, the "Cash-Funded DSRF") and Assured and National to provide Mirror Bond DSRF sureties in an amount equal to 2.5% of such outstanding aggregate principal amount with claims on any such surety arising only after the applicable cash reserve is fully exhausted. The Mirror Bond DSRF requirement shall not be lower than 3.5%. If after an agreed upon time period after the Closing Date the Mirror Bonds are not rated investment grade by S&P and Moody's, then the Monolines will have the option to increase the DSRF requirement for Mirror Bonds to up to 10% of the outstanding aggregate principal amount of such Mirror Bonds and increase the amount of the DSRF sureties for such Mirror Bonds to up to 9% of the outstanding aggregate principal amount of such Mirror Bonds (with the corresponding obligation of the Corporation to pay premiums associated to such increased amount).

---

[12]   This amount will be increased by an amount equal to 2.5% of the aggregate principal amount of Purchased Bonds that are not owned by Syncora, but will subsequently be reduced by 2.5% of the aggregate principal amount of Purchased Bonds that are exchanged for Securitization Bonds as provided in the January Payment Term Sheet that are not owned by Syncora. Otherwise, such amount cannot be increased without the consent of National and Assured.

[13]   On the Closing Date, the Cash-Funded Mirror Bond DSRF will include an amount equal to 1% of the aggregate principal amount of Purchased Bonds outstanding on the Closing Date. In the event holders of Purchased Bonds exchange such Purchased Bonds for Securitization Bonds in the manner contemplated by the January Payment Term Sheet, an amount of cash equal to 1% of the aggregate principal amount of such exchanged Purchased Bonds shall be transferred from the applicable Cash-Funded Mirror Bond DSRF to the Cash-Funded Common DSRF.

○ Monolines will enter into a forward commitment to provide, on the closing date of any refinancing of Refinanced Insured Bonds with Securitization Bonds during the Refinancing Period, a Common DSRF surety in an amount up to 9% of the outstanding aggregate principal amount of such Refinanced Insured Bonds that are refinanced with Securitization Bonds during the Refinancing Period (and the Mirror Bond DSRF surety related to such Refinanced Insured Bonds will be released upon such refinancing) (the "Forward Surety Commitment"), *provided* that the Corporation shall also fund the Common DSRF surety in an amount up to 1% of such Refinanced Insured Bonds.  If the Common DSRF requirement is lower than 10%, such DSRF will be funded with 1/10 cash from the Corporation and the Forward Surety Commitment shall apply to 9/10 of the Common DSRF requirement. The aggregate of the Maximum DSRF Surety Capacity provided with respect to the Closing Date and the additional Common DSRF surety capacity provided pursuant to the commitment described in this paragraph shall not exceed $462mm[14].

- Prior to acceleration, repayment of any amounts drawn on any DSRF surety shall be subordinate to the payment of scheduled interest on and principal of the Securitization Bonds. After acceleration, repayment of any amounts drawn on any DSRF surety shall be *pari passu* with the Securitization Bonds, it being agreed that the occurrence of a payment default under the Mirror Bonds will not constitute an event of default under the trust agreement securing the Securitization Bonds (including the Mirror Bonds) until the aggregate amount of interest on and principal of Mirror Bonds that has not been paid when due and continues to be unpaid is greater than the amount of any excess of 10% of the aggregate principal amount of such Mirror Bonds over the DSRF requirement for such Mirror Bonds.[15]

- All DSRF sureties for each series of Securitization Bonds shall be replaced by the Corporation using cash over 7 years beginning in year 7,

---

[14]   This amount will be increased by an amount equal to (i) 2.5% of the aggregate principal amount of Purchased Bonds that are not owned by Syncora and (ii) an additional 6.5% of the aggregate principal amount of Purchased Bonds that are exchanged for Securitization Bonds as provided in the January Payment Term Sheet and that are not owned by Syncora.  Otherwise, such amount cannot be increased without the consent of National and Assured.

[15]   Criteria to determine events of default under the trust agreement for the Securitization Bonds subject to review and feedback from rating agencies and the consent of the RSA Parties.

to be funded in equal amounts each year.

o   If an Excess Surety Event exists as of the date that is two (2) years after the Closing Date[16], then the percentage of the DSRF sureties equal to the Excess Surety Amount shall be replaced by the Corporation using cash over nine (9) years to be funded in equal amounts each year with the Transition Payment (as such term is defined in the Securitization Term Sheet) to be adjusted beginning on the 25th month after the Closing Date and the first cash replacement shall occur on the 31st month after the Closing Date.  If an Excess Surety Event exists as of the date that is 2 years after the Closing Date, but ceases to exist at any time thereafter, then any remaining amount of the DSRF sureties shall be replaced by the Corporation using cash over 7 years beginning in year 7, to be funded in equal amounts each year.

o   The existence of an Excess Surety Event will not result in a default or any liability of PREPA or the Corporation other than accelerated replacement of all DSRF sureties referenced in this section.

o   RSA Parties to work collaboratively on mutually agreeable terms for rate stabilization and treatment of excess cash received by the Corporation.

o   The true-up mechanism described in the Securitization Term Sheet shall provide for the adjustment of the Transition Charges at least semi-annually to ensure that the collection of revenues is sufficient for, among other things, the timely replacement of the DSRF sureties with cash in accordance with the above schedule.

o   DSRF surety providers will have the direct right to enforce the foregoing true-up adjustment subject to any limitations set forth in the definitive documentation, including the priority of payments described above. If the DSRF surety replacement does not occur in accordance with actual replacement schedule described above, DSRF surety providers will have the right to exercise other rights and remedies provided for under the relevant surety documentation (including the replacement of the servicer and other service providers if such service providers are the cause for such non-compliance).

"Refinanced Insured Bonds" means the Callable and Non-Callable Insured Legacy Bonds that may be refinanced through the Refinanced Insured Bond

---

[16]   If an Excess Surety Event exists on the true-up adjustment date immediately preceding the date that is 2 years after the closing of the Exchange Offer, then it will be assumed for purposes of the true-up adjustment occurring on such date that such Excess Surety Event will continue to exist as of the second year anniversary date.

| | |
|---|---|
| | Transactions; *provided*, *however*, that, the aggregate principal amount of such Callable and Non-Callable Insured Legacy Bonds that may be refinanced shall not exceed the sum of the aggregate amount of DSRF sureties provided by the Monolines to secure Securitization Bonds (other than Mirror Bonds) *plus* $24 million.  The aggregate principal amount of such insured Legacy Bonds that may be refinanced to complete the Refinanced Insured Bond Transactions and the sum of the aggregate amount of DSRF sureties provided by the Monolines to secure Securitization Bonds other than Mirror Bonds shall be measured *pro forma* for the Refinanced Insured Bond Transactions.<br><br>"Refinanced Insured Bond Transactions" means the refinancing of the Callable and Non-Callable Legacy Bonds with Securitization Bonds other than Mirror Bonds in accordance with the terms set forth opposite the headings "Refinancing of Callable Insured Legacy Bonds" and "Refinancing of Non-Callable Insured Legacy Bonds."<br><br>"Excess Surety Amount" means, as of any day, the percentage of the aggregate principal amount of Refinanced Insured Bonds that are not refinanced through Refinanced Insured Bonds Transactions on or prior to such day.<br><br>"Excess Surety Event" means that, as of any day, there is an Excess Surety Amount greater than zero on such day. |
| Legacy Bonds | • No new Legacy Bond covenants.<br><br>• Debt service requirements on the remaining insured Legacy Bonds, if any, shall not be included in the rate covenant calculation under the Legacy Bonds trust agreement (as amended pursuant to exit consents), except upon a payment default on such insured Legacy Bonds as provided in footnote 7.<br><br>• The DSRF requirement under the Trust Agreement with respect to the insured Legacy Bonds that are economically defeased with related Mirror Bonds will be suspended pursuant to exit consents and such insured Legacy Bonds will not be secured by the Legacy Bonds DSRF for as long as no defaults have occurred under the Mirror Bonds.<br><br>• Mirror Bonds to be deposited into an irrevocable escrow to solely support related insured Legacy Bonds. The arrangements with respect to the escrow deposit of the Mirror Bonds will be structured so that the escrow is bankruptcy remote from PREPA, not subject to Federal, Commonwealth or state taxation and preserves the tax-exempt status of the insured Legacy Bonds.   Mirror Bonds shall be (i) issued simultaneously with the Securitization Bonds issued in the Exchange Offer, (ii) held in irrevocable escrow, and (iii) include restrictions against any trading of interests in Mirror Bonds separately from the Legacy Bonds. For the avoidance of doubt, the holders of insured Legacy Bonds that are supported by Mirror Bonds shall not have the right to exchange their Legacy Bonds for such Mirror Bonds and shall only have the right |

|  | to transfer any of their interests in such Mirror Bonds by transferring their Legacy Bonds. |
|  | • The obligation of PREPA to make a debt service payment under the insured Legacy Bonds that are economically defeased will be discharged only upon the application of the corresponding debt service payment under the related Mirror Bonds to the payment of such debt service payment. As a result, such insured Legacy Bonds will continue to be "outstanding" for purposes of the Legacy Bonds trust agreement (other than for purposes agreed by the Parties, including without limitation the rate covenant and sizing the DSRF requirement for the insured Legacy Bonds) and National and Assured shall retain the rights (including voting and enforcement rights) that they currently have with respect to such Legacy Bonds, provided that (i) the holders of the insured Legacy Bonds will not have the right to recover amounts in excess of interest on and principal of such insured Legacy Bonds; (ii) PREPA will not be liable for breaches by the Corporation or other parties (*i.e.*, Agents); (iii) any amounts paid under the related Mirror Bonds after such insured Legacy Bonds have been paid in full will be assigned to PREPA, all as described in footnote 7; and (iv) the DSRF supporting such Mirror Bonds shall be applied towards any payment shortfall on the Mirror Bonds as described in footnote 7, and the forbearance provisions of the amended insurance agreements shall apply as described in footnote 7. Parties to discuss mechanics of implementing these arrangements including whether and to what extent these rights will be embedded in National's and Assured's insurance agreements rather than the underlying Legacy Bonds. |
| Fees | • Payment by the Corporation of annual premiums with respect to the Common DSRF Surety, Mirror Bond DSRF Surety and Forward Surety Commitment of 2% of the face amount of each such DSRF surety for the year for which the premium is paid. |
|  | • In addition, as of the Closing Date, an additional surety fee of $1.25mm per quarter shall begin accruing on such day and be payable by the Corporation in arrears on a quarterly basis (the "<u>Quarterly Fee</u>")[17]; *provided* that the sum of all Quarterly Fees paid shall not exceed $7mm. |
|  | • Payment to the Monolines of (i) a $1mm "<u>Insurer Support Fee</u>" upon entry into the RSA, and (ii) a monthly $1mm fee during the term of the RSA, to be allocated between the Monolines as set forth in the letter agreement referenced in footnote 3. Notwithstanding any other contractual rights to the contrary, Assured and National shall not be entitled to any fees or expenses (including, for the avoidance of doubt, any fees and expenses of legal and financial advisors) incurred in |

---

[17] The allocation of the Quarterly Fee shall be reflected in the letter agreement referenced in footnote 3 between the Monolines.

| | |
|---|---|
| | connection with PREPA's restructuring or the issuance of the Securitization Bonds prior to the Closing Date other than the Insurer Support Fee, the monthly fees payable under the RSA, and the Quarterly Fee and the DSRF surety premiums described herein. |
| Exit Consents | National and Assured to provide exit consents[18] with respect to Legacy Bonds, including to: <br><br> (i) suspend DSRF requirement for insured Legacy Bonds so that such insured Legacy Bonds are no longer required to be supported by a DSRF for as long as no default has occurred under the Mirror Bonds; <br><br> (ii) amend SIF requirements to permit replenishment of a certain agreed (between PREPA, the Monolines and the Ad Hoc Group) amount and over a reasonable period of time to be agreed between PREPA, the Monolines, and the Ad Hoc Group, subject to the terms in the Securitization Term Sheet and the terms set forth herein; <br><br> (iii) amend Current Expense definition to clearly include the restructured fuel line repayment, a refinancing thereof (on economic terms that, in the aggregate, are no less favorable, including in an amount not in excess of the (x) fuel line debt subject to the RSA dated as of November 5, 2015) plus (y) the Solus Unpaid Expense Amount and the Scotiabank Unpaid Expense Amount, as applicable (subject to an aggregate cap of $1mm for both the Solus Unpaid Expense Amount and the Scotiabank Unpaid Expense Amount) and any hedging expenses; <br><br> (iv) amendments to remove or clarify potential restrictions on the issuance of Securitization Bonds and the Mirror Bonds, if any[19]; <br><br> (v) amend to permit potential public-private partnerships and asset sale processes, subject to agreed covenants (e.g., ratings confirmation, coverage tests, use of proceeds, etc.); <br><br> (vi) amend to increase the thresholds for exercise of remedies to simple majority; and <br><br> (vii) other amendments to events of default and remedies to be agreed. |
| Legislation, Documentation and Opinions | The closing of the transactions contemplated herein shall be subject to the conditions precedent set forth in the RSA, as amended, which shall include the conditions set forth in the RSA dated as of November 5, 2015 with respect to the PREPA Revitalization Act and the documentation[20] necessary to effect |

---

[18] Nothing herein shall preclude PREPA from seeking or obtaining additional, valid exit consents from uninsured bondholders to effectuate the amendments contemplated herein.

[19] Parties (including PREPA, the Monolines, and the Ad Hoc Group) to agree on a list of specific amendments that would be necessary to permit the issuance of Securitization Bonds (including Mirror Bonds).

[20] Documentation implementing transactions contemplated by this term sheet shall be included in the defined term "Securitization Documents" in the RSA.

|  | such transactions and related legal opinions (including, without limitation, a final non-appealable judgment validating such transactions) all being in form and substance reasonably acceptable to Assured and National.[21]<br><br>Amendment to RSA to be entered into by the parties no later than December 23, 2015. |
|---|---|
| Servicing | Acceptable servicing agreements and arrangements with PREPA as contemplated by the RSA dated as of November 5, 2015. |

---

[21] This includes, without limitation, conditions regarding PREPA governance and Commonwealth support.

*Execution version*

## Schedule III

## Credit Agreements Restructuring

*Capitalized terms used herein and not otherwise defined shall have the meaning assigned to such terms in the Restructuring Support Agreement (the "**RSA**") or the Recovery Plan Term Sheet, as applicable.*

---

**General:** Lenders under the existing Solus Credit Agreement and Scotiabank Credit Agreement shall have the option to elect, prior to the closing of the Restructuring Transactions, either of the following alternatives (or a combination thereof):

(a) Amend and restate the Solus Credit Agreement or the Scotiabank Credit Agreement, as applicable, as set forth below to provide for an amended and restated term loan facility (the "**Solus Facility**" or the "**Scotiabank Facility**", as applicable); and/or

(b) Exchange all or part of their indebtedness under the Solus Credit Agreement and Scotiabank Credit Agreement, as applicable, into Securitization Bonds (subject to the terms and conditions set forth in the Securitization Term Sheet, including with respect to the 85% exchange ratio and interest-only period).

---

| Solus Credit Agreement Amendment | |
| --- | --- |
| **Amended and Restated Bank Facility** | Revolving facility under the Solus Credit Agreement is converted into a term loan facility. |
| **Amount** | US$146,041,914.24 (the "**Unadjusted Principal Amount**") plus the Solus Unpaid Expense Amount; *provided* that the Solus Unpaid Expense Amount shall be subject to a cap in an amount equal to the pro rata share (calculated based on the Credit Agreements Principal Amount held or controlled by the Credit Agreements Lenders in their capacities as such) of $1,000,000 (the "**Total Unpaid Expenses Amount Cap**"). |
| **Unpaid Expenses** | The principal amount of the Solus Facility or the Securitization Bonds issued to the Solus Lenders in their capacities as such shall be increased by an amount (the "**Solus Unpaid Expense Amount**") equal to all reasonable and documented unreimbursed out-of-pocket costs and expenses incurred by the Solus Lenders as of the Closing Date in connection with the Solus Credit Agreement, PREPA's restructuring negotiations, the RSA, and the transactions contemplated hereby and thereby (including the Recovery Plan), as certified to PREPA by the Solus Lenders; *provided* that with respect to the advisors' costs, these shall be limited to the reasonable and documented out-of pockets costs and expenses of one (1) Puerto Rico counsel and one (1) New York counsel to the Solus Lenders; *provided* further that the aggregate amount of Solus Unpaid Expense Amount shall in no event exceed its pro rata share of the Total Unpaid Expenses Amount Cap.  For the avoidance of doubt, the Lender Support Fee and monthly amounts paid |

| | |
|---|---|
| | to the Solus Lenders pursuant to Sections 9(k) and (l), respectively, of the RSA shall not be credited against the Solus Unpaid Expense Amount. |
| **Interest Rate** | 5.75% per annum, paid in cash quarterly in arrears |
| **Maturity** | 6 years from the date of issuance |
| **Amortization** | Quarterly amortization, based on a fixed payment schedule (see <u>Schedule A</u> below with respect to the Unadjusted Principal Amount). The payments set forth in <u>Schedule A</u> below shall be automatically adjusted so that the Solus Unpaid Expense Amount is amortized on the same percentage basis as the Unadjusted Principal Amount. |
| **Security/Ranking** | Unsecured.<br><br>The Closing Date Trust Agreement Amendments (as defined below) shall provide that the Solus Facility, any refinancing thereof, and all debt service thereof and obligations thereunder, shall constitute, and be included in PREPA's annual budget as, current expenses of PREPA and shall constitute "Current Expenses" (as defined in the Trust Agreement governing the Bonds) relative to PREPA's power revenue bonds that are not exchanged for securitized bonds (the **"Bonds"**) and other obligations that are not presently defined as Current Expenses and shall be paid prior to any payment of the Bonds (i.e., the Bonds shall remain net revenue bonds). The foregoing shall be set forth in an amendment to the Trust Agreement executed by persons holding or controlling at least 60% of the Bonds prior to the closing of the Restructuring Transactions, which amendment shall be in form and substance reasonably satisfactory to the Solus Lenders (the "**Closing Date Trust Agreement Amendments**").<br><br>The Closing Date Trust Agreement Amendments shall provide that any amendments, waivers, modifications or supplements to the Trust Agreement that would amend, modify or waive the current expense status of the Solus Facility as contemplated above shall require the prior written consent of the Solus Lenders (or their successors and assigns, as applicable), and the Solus Lenders (and their successors and assigns, as applicable) shall be included as express third party beneficiaries of the Trust Agreement with respect to such current expense status and consent rights.<br><br>The Closing Date Trust Agreement Amendments shall be conditioned on customary legal opinions and resolutions each in form and substance reasonably satisfactory to the Solus Lenders. |
| **Tax-Exempt Status** | The Solus Facility shall be tax-exempt under U.S. federal, state and Puerto Rico law to the extent permitted by law and on terms mutually acceptable to PREPA and the Solus Lenders. |

| | |
|---|---|
| **Other Loan Terms** | Representations and warranties, covenants (including financial maintenance covenants) and events of default to be based on Solus Credit Agreement, with revisions and additions to be mutually agreed in light of final agreed capital structure and business plan of restructured PREPA.  Events of default will include, without limitation, cross-payment default and cross-acceleration to Material Indebtedness (as defined in the Solus Credit Agreement) of PREPA.  Negative covenants may include, without limitation, restrictions on direct or indirect payments, transfers, and servicing advances by PREPA to or for the account of the Corporation that are acceptable to the RSA Parties.<br><br>PREPA and the Solus Lenders will negotiate mutually agreeable covenants and related events of default to be included in the Solus Credit Agreement Amendment executed prior to the Closing Date, which provisions may include, among other things, lender protections in the event that the permanent rate approved by the Energy Commission negatively affects PREPA's ability to service the debt under the Solus Facility, relative to any provisional rate. |
| **Governing Law** | Commonwealth |
| **Jurisdiction** | Exclusive jurisdiction of SDNY and US District Court of PR (or NY Supreme Court) |
| **Conditions to Consummation** | Same as those set forth in the Securitization Term Sheet, but including in addition:<br><br>• Treatment of Ad Hoc group on terms substantially consistent with Securitization Term Sheet and otherwise acceptable to Solus Lenders;<br><br>• Treatment of Scotiabank credit agreement and monolines on terms acceptable to Solus Lenders; and<br><br>• The RSA shall be in full force and effect as to the Solus Lenders and PREPA.<br><br>• Receipt by the Solus Lenders of customary legal opinions and resolutions in form and substance reasonably satisfactory to the Lenders. |

\*\*\* \*\*\* \*\*\*

### Schedule A – Principal and Interest Schedule[1]

|  | Interest | Principal | Total Debt Service |
|---|---|---|---|
| 3/31/2016 | $ 2,099,353 | $ 5,476,572 | $ 7,575,924 |
| 6/30/2016 | $ 2,020,627 | $ 5,476,572 | $ 7,497,199 |
| 9/30/2016 | $ 1,941,901 | $ 5,476,572 | $ 7,418,473 |
| 12/31/2016 | $ 1,863,175 | $ 5,476,572 | $ 7,339,747 |
| 3/31/2017 | $ 1,784,450 | $ 5,476,572 | $ 7,261,021 |
| 6/30/2017 | $ 1,705,724 | $ 5,476,572 | $ 7,182,296 |
| 9/30/2017 | $ 1,626,998 | $ 5,476,572 | $ 7,103,570 |
| 12/31/2017 | $ 1,548,272 | $ 5,476,572 | $ 7,024,844 |
| 3/31/2018 | $ 1,469,547 | $ 5,476,572 | $ 6,946,119 |
| 6/30/2018 | $ 1,390,821 | $ 5,476,572 | $ 6,867,393 |
| 9/30/2018 | $ 1,312,095 | $ 5,476,572 | $ 6,788,667 |
| 12/31/2018 | $ 1,233,370 | $ 5,476,572 | $ 6,709,941 |
| 3/31/2019 | $ 1,154,644 | $ 7,302,096 | $ 8,456,740 |
| 6/30/2019 | $ 1,049,676 | $ 7,302,096 | $ 8,351,772 |
| 9/30/2019 | $ 944,709 | $ 7,302,096 | $ 8,246,804 |
| 12/31/2019 | $ 839,741 | $ 7,302,096 | $ 8,141,837 |
| 3/30/2020 | $ 734,773 | $ 9,127,620 | $ 9,862,393 |
| 6/29/2020 | $ 603,564 | $ 9,127,620 | $ 9,731,183 |
| 9/29/2020 | $ 472,354 | $ 9,127,620 | $ 9,599,974 |
| 12/30/2020 | $ 341,145 | $ 9,127,620 | $ 9,468,764 |
| 3/30/2021 | $ 209,935 | $ 3,651,048 | $ 3,860,983 |
| 6/29/2021 | $ 157,451 | $ 3,651,048 | $ 3,808,499 |
| 9/29/2021 | $ 104,968 | $ 3,651,048 | $ 3,756,015 |
| 12/30/2021 | $ 52,484 | $ 3,651,048 | $ 3,703,532 |
| **Total** | **$ 26,661,777** | **$ 146,041,914** | **$ 172,703,691** |

---

[1] Assumes an issuance date of January 1, 2016 and does not include the Solus Unpaid Expense Amount.

4

| Scotiabank Credit Agreement Amendment | |
|---|---|
| **Amended and Restated Bank Facility** | Revolving facility under the Scotiabank Credit Agreement is converted into a term loan facility. |
| **Amount** | US$549,950,000.00 (the "**Unadjusted Principal Amount**") plus the Scotiabank Unpaid Expense Amount; *provided* that the Scotiabank Unpaid Expense Amount shall be subject to a cap in an amount equal to the pro rata share (calculated based on the Credit Agreements Principal Amount held or controlled by the Credit Agreements Lenders in their capacities as such) of $1,000,000 (the "**Total Unpaid Expenses Amount Cap**"). |
| **Unpaid Expenses** | The principal amount of the Scotiabank Facility shall be increased by an amount (the "**Scotiabank Unpaid Expense Amount**") equal to all reasonable and documented unreimbursed out-of-pocket costs and expenses incurred by Scotiabank as of the Closing Date in connection with the Scotiabank Credit Agreement, PREPA's restructuring negotiations, the RSA, and the transactions contemplated hereby and thereby (including the Recovery Plan), as certified to PREPA by Scotiabank; *provided* that with respect to the advisors' costs, these shall be limited to the reasonable and documented out-of pockets costs and expenses of one (1) Puerto Rico counsel, one (1) New York counsel and one (1) financial advisor to Scotiabank; *provided* further that the aggregate amount of Scotiabank Unpaid Expense Amount shall in no event exceed its pro rata share of the Total Unpaid Expenses Amount Cap.  For the avoidance of doubt, the Lender Support Fee and monthly amounts paid to Scotiabank and the Scotiabank Lenders pursuant to Sections 9(k) and (l), respectively, of the RSA shall not be credited against the Scotiabank Unpaid Expense Amount. |
| **Interest Rate** | 5.75% per annum, paid in cash quarterly in arrears |
| **Maturity** | 6 years from the date of issuance |
| **Amortization** | Quarterly amortization, based on a fixed payment schedule (see <u>Schedule B</u> below with respect to the Unadjusted Principal Amount). The payments set forth in <u>Schedule B</u> below shall be automatically adjusted so that the Scotiabank Unpaid Expense Amount is amortized on the same percentage basis as the Unadjusted Principal Amount. |
| **Security/Ranking** | Unsecured.<br><br>The Closing Date Trust Agreement Amendments (as defined below) shall provide that the Scotiabank Facility, any refinancing thereof, and all debt service thereof and obligations thereunder, shall constitute, and be included in PREPA's annual budget as, current expenses of PREPA and shall constitute "Current Expenses" (as defined in the Trust Agreement governing the Bonds) relative to PREPA's power revenue |

| | |
|---|---|
| | bonds that are not exchanged for securitized bonds (the "**Bonds**") and other obligations that are not presently defined as Current Expenses and shall be paid prior to any payment of the Bonds (i.e., the Bonds shall remain net revenue bonds). The foregoing shall be set forth in an amendment to the Trust Agreement executed by persons holding or controlling at least 60% of the Bonds prior to the closing of the Restructuring Transactions, which amendment shall be in form and substance reasonably satisfactory to the Scotiabank Lenders (the "**Closing Date Trust Agreement Amendments**"). |
| | The Closing Date Trust Agreement Amendments shall provide that any amendments, waivers, modifications or supplements to the Trust Agreement that would amend, modify or waive the current expense status of the Scotiabank Facility as contemplated above shall require the prior written consent of Scotiabank (or its successor or assign) on behalf of the Scotiabank Lenders (or their respective successors and assigns), and Scotiabank and the Scotiabank Lenders (and their respective successors and assigns) shall be included as express third party beneficiaries of the Trust Agreement with respect to such current expense status and consent rights. |
| | The Closing Date Trust Agreement Amendments shall be conditioned on customary legal opinions and resolutions each in form and substance reasonably satisfactory to Scotiabank, on behalf of the Scotiabank Lenders. |
| **Tax-Exempt Status** | The Scotiabank Facility shall be tax-exempt under U.S. federal, state, and Puerto Rico law to the extent permitted by law and on terms mutually acceptable to PREPA and the Scotiabank Lenders. |
| **Other Loan Terms** | Representations and warranties, covenants (including financial maintenance covenants) and events of default to be based on Scotiabank Credit Agreement, with revisions and additions to be mutually agreed in light of final agreed capital structure and business plan of restructured PREPA.  Events of default will include, without limitation, cross-payment default and cross-acceleration to Material Indebtedness (as defined in the Scotiabank Credit Agreement) of PREPA.  Negative covenants may include, without limitation, restrictions on direct or indirect payments, transfers, and servicing advances by PREPA to or for the account of the Corporation that are acceptable to the RSA Parties. |
| | PREPA and the Scotiabank Lenders will negotiate mutually agreeable covenants and related events of default to be included in the Scotiabank Credit Agreement Amendment executed prior to the Closing Date, which provisions may include, among other things, lender protections in the event that the permanent rate approved by the Energy Commission negatively affects PREPA's ability to service the debt under the Scotiabank Facility, relative to any provisional rate. |

6

| Governing Law | Commonwealth |
|---|---|
| **Jurisdiction** | Exclusive jurisdiction of SDNY and US District Court of PR (or NY Supreme Court) |
| **Conditions to Consummation** | Same as those set forth in the Securitization Term Sheet, but including in addition:<br><br>• Treatment of ad hoc group on terms substantially consistent with Securitization Term Sheet and otherwise acceptable to Scotiabank;<br><br>• The RSA shall be in full force and effect as to Scotiabank, the Scotiabank Lenders, and PREPA;<br><br>• Receipt by Scotiabank and the Scotiabank Lenders of customary legal opinions and resolutions in form and substance reasonably satisfactory to Scotiabank, on behalf of the Scotiabank Lenders; and<br><br>• Treatment of Solus credit agreement and monolines on terms acceptable to Scotiabank. |

*** *** ***

## Schedule B – Principal and Interest Schedule[2]

| Date | Principal | Interest | Total Debt Service |
|---|---|---|---|
| 3/31/16 | $20,623,125 | $7,905,531 | $28,528,656 |
| 6/30/16 | 20,623,125 | 7,609,074 | 28,232,199 |
| 9/30/16 | 20,623,125 | 7,312,616 | 27,935,741 |
| 12/31/16 | 20,623,125 | 7,016,159 | 27,639,284 |
| 3/31/17 | 20,623,125 | 6,719,702 | 27,342,827 |
| 6/30/17 | 20,623,125 | 6,423,244 | 27,046,369 |
| 9/30/17 | 20,623,125 | 6,126,787 | 26,749,912 |
| 12/31/17 | 20,623,125 | 5,830,329 | 26,453,454 |
| 3/31/18 | 20,623,125 | 5,533,872 | 26,156,997 |
| 6/30/18 | 20,623,125 | 5,237,414 | 25,860,539 |
| 9/30/18 | 20,623,125 | 4,940,957 | 25,564,082 |
| 12/31/18 | 20,623,125 | 4,644,500 | 25,267,625 |
| 3/31/19 | 27,497,500 | 4,348,042 | 31,845,542 |
| 6/30/19 | 27,497,500 | 3,952,766 | 31,450,266 |
| 9/30/19 | 27,497,500 | 3,557,489 | 31,054,989 |
| 12/31/19 | 27,497,500 | 3,162,213 | 30,659,713 |
| 3/31/20 | 34,371,875 | 2,766,936 | 37,138,811 |
| 6/30/20 | 34,371,875 | 2,272,840 | 36,644,715 |
| 9/30/20 | 34,371,875 | 1,778,745 | 36,150,620 |
| 12/31/20 | 34,371,875 | 1,284,649 | 35,656,524 |
| 3/31/21 | 13,748,750 | 790,553 | 14,539,303 |
| 6/30/21 | 13,748,750 | 592,915 | 14,341,665 |
| 9/30/21 | 13,748,750 | 395,277 | 14,144,027 |
| 12/31/21 | 13,748,750 | 197,638 | 13,946,388 |
| **Total** | **$549,950,000** | **$100,400,247** | **$650,350,247** |

---

[2] Assumes an issuance date of January 1, 2016 and does not include the Scotiabank Unpaid Expense Amount.

8

*Execution version*

## Schedule IV

## New Governance

[*See Recovery Plan Term Sheet, Schedule IX- Legislative Reform Package, item A –
"Governance"*]

*Execution version*

**Schedule V**

**Operational Improvements**

*Capitalized terms used herein and not otherwise defined shall have the meaning assigned to such terms in the RSA or the Recovery Plan Term Sheet, as applicable.*

**A.   ON-GOING FUEL PROCUREMENT INITIATIVES**

| | Activities | Benefits |
|---|---|---|
| **Optimize Generation Dispatch** | ▪ Continuously monitor fuel unit $/MMbtu costs to leverage cost arbitrage from the different fuel sources to optimize cost per kwh | ▪ Fuel cost savings benefiting end customers |
| **Fuel Inventory Controls** | ▪ Standardize inventory controls across all plants with a standard inventory tool<br><br>▪ Integrate inventory controls into "Asset Suite" | ▪ Provide robust inventory controls that follow industry standards<br><br>▪ Create visibility for inventory variations in an auditable process |
| **Fuel Sourcing** | ▪ Support the tendering/retendering process to identify lower cost suppliers focused on adders reduction<br><br>▪ Get alternative suppliers to drive competitive pricing | ▪ Reduce cost of adders for Fuel Oil # 6 by 15-30% through FY2017 |
| **Fuel Supply Chain Structure** | ▪ Evaluate infrastructure options to allow different supply alternatives while leveraging the AOGP<br><br>▪ Enable fuel diversity for the different plants | ▪ Provide sustainable supply redundancies for NG<br><br>▪ Leverage alternate NG sources to obtain favorable pricing in the midterm for Costa Sur |
| **Fuel Consumption (Generation)** | ▪ Reduce the utilization of the existing fleet by optimizing the spinning reserve levels<br><br>▪ Mitigate the forced outages driving increased higher cost unit usage (i.e., Diesel) | ▪ Reduced fuel consumption by using the most efficient units<br><br>▪ Potential generation spinning reserves reduction |

B.   ON-GOING CUSTOMER SERVICE INITIATIVES

| Activities | Benefits |
|---|---|
| **General customers** | <ul><li>Implement new process for service suspension / new fees for reconnection</li><li>Accelerate process to bring Law 33 cases to arbitration and collect full deposit</li><li>Launch collection of inactive accounts with Collection Agencies</li><li>Endeavor to improve call center response time, outage restoration time, and overall customer service satisfaction</li></ul> | <ul><li>One time cash improvement for reduced A/R</li><li>Increased reconnection fees</li></ul> |
| **Decrease Non Technical Losses** | <ul><li>Continue implementation of programs to improve theft detection and recovery</li><li>Decrease in the amount of accounts estimated each month, improve the estimation algorithm</li><li>Accelerate remediation of meters with no reading</li><li>Reduce the time it takes to complete service suspension for non-payment</li></ul> | <ul><li>PREPA retains the costs saved though the base rate, rest is passed on to customers through reduce fuel and PP charges</li></ul> |
| **Municipalities** | <ul><li>Collection of charges at "for profit sites"</li></ul> | <ul><li>Additional revenue</li></ul> |

2

C.    ON-GOING FLEET & OTHER GENERAL O&M INITIATIVES

| | Activities | Benefits |
|---|---|---|
| **Procurement** | • Execute on security guard phase I & II<br>• Develop and execute sourcing of fleet parts<br>• Develop and execute sounding of MDE/MRO parts<br>• Improve procurement processes and limit decentralization of activities | • Improved cost base<br>• Increased use of standardized, catalogued items will reduce complexity and drive SG&A efficiencies |
| **Inventory** | • Review footprint and optimize warehouse operations (in coordination with fleet consolidation)<br>• Identify and dispose of obsolete and slow moving SKU's<br>• Reset safety stock levels to reduce overall inventory | • Reduced labor and network costs (fewer locations with increased velocity)<br>• Limit write-downs / obsolete SKU's |
| **Shops** | • Review footprint and optimize shop operations (in coordination with fleet optimization)<br>• Develop shop SWAT team to target shops (weekly basis) with high out of service %<br>• Rollout improved metrics to drive higher accountability<br>• Review and execute on opportunities to outsource lower skill maintenance tasks | • Improved vehicle availability<br>• Reduce T&D non-productive labor time ("patio entries") |
| **Fleet** | • Review network and reduce overall fleet, increasing utilization<br>• Expand usage of GPS across fleet to increase visibility to and drive improvement within utilization<br>• Consolidate overall accountability of fleet (availability, utilization, cost) within transportation<br>• Develop fleet renewal program by | • Reduced investment required to renew fleet<br>• Improved tracking and centralized accountability will enable more efficient rebalancing of fleet |

| | |
|---|---|
| | vehicle class |
| **Real Estate** | ■ Engage third party to develop cohesive real estate portfolio strategy and divest excess properties | ■ More efficient use of real estate assets<br><br>■ One-time liquidity gain selling excess properties |

D.   **EMPLOYEE RELATED**

| | Activities | Benefits |
|---|---|---|
| **Safety** | ■ Engage consultant to assess current safety environment and develop framework for achieving a culture focused on safety | ■ Reduce frequency of safety related incidents and serious accidents |
| **Productivity** | ■ Address inflexible work rules and high absenteeism | ■ Improved labor and employee productivity |
| **Employee related** | ■ Rollout and restructured, merit based organization<br><br>■ Develop updated job descriptions including clear KPI's to measure performance | ■ Merit based organization with clear accountability to support key objectives and tasks |

4

*Execution Version*

## Schedule VI

## Rate Structure

*Capitalized terms used herein and not otherwise defined shall have the meaning assigned to such terms in the RSA or the Recovery Plan Term Sheet, as applicable.*

### 1.1 Overview

PREPA rates will be established through a rate structure, as approved by the Energy Commission. PREPA will file a rate case that shall include a request for the approval of a provisional rate, which provisional rate shall be determined by the Energy Commission no earlier than 60 days from the date the petition is deemed complete by the Energy Commission.  In addition, a portion of PREPA's existing debt will be restructured using a securitized debt structure that will require the imposition of a surcharge (the "**Transition Charge**") in accordance with the Recovery Plan.  PREPA rates plus the Transition Charge will constitute the full charge to PREPA customers, but the Energy Commission shall only have jurisdiction to approve the methodology to calculate the Transition Charge and the Adjustment Mechanism.  The securitization structure, including the Transition Charge and the Adjustment Mechanism, is described in Schedule I-B.

### 1.2 Rate Process

Energy Commission's first rate review and approval process to be undertaken in connection with the Recovery Plan will follow the regular revision process of Act 57-2014, which provides for a review process than can take up to one hundred eighty (180) days for the Energy Commission to make a final determination on the petition, with the possibility of a provisional rate implemented sooner.

### 1.3 Rate Structure

#### 1.3.1 Provisional Rate

PREPA shall file a request for the approval of a provisional rate at the same time that the permanent rate petition is presented.  The Energy Commission has the discretion to establish a provisional rate, as requested by PREPA or as the Commission may determine, and it shall become effective not earlier than sixty (60) days from the date the petition is deemed complete by the Energy Commission.  If approved, the provisional rate shall be effective for as long as the Commission is evaluating the permanent rate petition.  PREPA shall request an amendment to the Revitalization Act clarifying that the provisional rate shall be effective until PREPA implements the permanent rate approved by the Energy Commission, which implementation shall not be longer than sixty (60) days, unless the Energy Commission extends such period as requested by PREPA.

The provisional rate requested will be designed to cover all operating costs, capital expenditures and debt costs consistent with the three year permanent rate case cycle (assuming a restructuring in accordance with the Recovery Plan).  The provisional rate will be implemented in the most expedited manner possible.

#### 1.3.2 Permanent Rate---Formula Ratemaking Mechanism

PREPA's rate consultant, Navigant, has recommended a Formula Ratemaking Mechanism ("**FRM**") for

setting PREPA's rates.  FRM uses a predetermined formula to determine the upcoming year's revenue requirements based on the test period expenses (usually a prior year adjusted for known and/or measurable changes).  Revenue requirements are composed of all operating costs including fuel, purchased power, operations and maintenance expenses, revenue funded capital expenditures, CILT, subsidies, taxes paid, debt service and any other costs expected to be incurred (assuming a restructuring in accordance with the Recovery Plan).  Debt service includes principal, interest, debt service reserves and/or debt service coverage ratio ("**DSCR**"), but excludes any debt service recovered through the Transition Charge.  The resulting revenue requirement is compared against revenues calculated using existing rates for the test period to determine if rates are sufficient to cover full costs of providing services and if not make appropriate adjustments.

### 1.3.3 Revenue Requirements Overview

The FRM addresses each component to determine the best approach to estimate the component's costs during the test period.  Fiscal year ("**FY**") 2017 will be used as the first rate case's test period given the first rate case will mainly cover FY2017.  Most components are linked to FY2014 adjusted for known and measurable changes.  Some components, such as debt and cost improvements, will be based on forward estimates given inputs underlying these components have altered or changed dramatically or the component did not exist previously.

Fuel, purchased power, CILT and subsidies will all be pass-through components.  While these components will be estimated to arrive at full revenue requirements for illustrative purposes, rates for these components will be determined by actual costs.  Fuel and purchased power use estimated costs as both components have been very volatile in recent years.

| | RATE COMPONENT | TEST YEAR SOURCE |
|---|---|---|
| **Revenue Requirements** | | |
| **Operating Expense** | | |
| **Pass-Through Charges**[1] | | |
| Fuel[2] | Fuel Pass-Through | IRP FY 17 Estimate |
| Purchased Power | PP Pass-Through | IRP FY 17 Estimate |
| CILT/Subsidies Set Aside | Subsidy Pass-Through | FY 2015 Payments to Municipalities |
| **Non-fuel O&M Expense** | | |
| Generation Expenses | PREPA Base Rate | FY14 adjusted to FY 2015 |
| Transmission Expenses | PREPA Base Rate | FY14 adjusted to FY 2015 |
| Distribution Expenses | PREPA Base Rate | FY14 adjusted to FY 2015 |
| Customer Billing Expenses | PREPA Base Rate | FY14 adjusted to FY 2015 |
| Administrative and General Expenses | PREPA Base Rate | FY14 adjusted to FY 2015 |
| Post Employment Benefits | PREPA Base Rate | FY14 adjusted to FY 2015 |
| **Other Operating Expenses** | | |
| Bad Debt Expense | PREPA Base Rate | FY15 Uncollected Billed Revenue (excluding CILT/Subsidies) |
| Energy Commission Assessment | PREPA Base Rate | New Assessment |
| **Adjustments** | | |
| Less:  Other Income | PREPA Base Rate | Other Income Credited Against Revenue Requirements |
| Less:  Improvements[3] | PREPA Base Rate | TBD |
| Plus: Rate Stabilization/Working Capital | PREPA Base Rate | TBD |
| | | |
| **Other Expenses** | | |
| **Debt and Capital Expenses** | | |
| Legacy Debt Service | PREPA Base Rate | Restructured Debt Agreements |
| Revenue Funded Capital Expenditure[4] | PREPA Base Rate | IRP (payment timing adjusted) |
| | | |
| **Securitization**[5] | | |
| **Transition Charge** | Securitization | Restructured Debt Agreements |

Footnotes:

[1] Pass-through charges are included for full rate illustrative purposes only, rates will be reflective of actual costs incurred

[2] Includes estimated fuel related improvements

[3] Improvements to take into account operational and administrative efficiencies/savings contemplated in the RSA that are reasonably estimated as of the date of the submission of the rate case as determined in good faith by PREPA

[4] Excludes any capital expenditures funded by debt of other external parties

[5] Securitization is a separate charge and is not part of the PREPA Revenue Requirements

## 1.3.4 FRM Allocation to Customer Classes

The FRM process will include a Cost of Service ("**COS**") analysis to assign or allocate each relevant cost component on an appropriate basis to determine the relative costs to serve various customer classes with similar end uses and demand.  The objective of the COS is to apportion the total utility costs among customer classes in a fair and equitable manner.

### *1.4 Approval Process*

To minimize time and expense associated with rate filings and to minimize delays in adjusting rates, Naviant has recommended using FRM for setting rates for a period which is the greater of [nine] years

or until PREPA restores investment grade metrics.  Navigant also proposes a three year rate cycle in which the FRM would be evaluated every three years with the Energy Commission.

### 1.5 Rate Process

Assuming a three year rate cycle, the rate process will have a base year ("**Base Year**") and two non-base years ("**Non-Base Years**") in each rate cycle.  The Base Year rate determination will be based on estimated revenue requirements while the Non-Base Year rate determinations will also include an adjustment for under or over recovery of rates and known and/or measurable changes from the Base Year.  The Base Year will also include the COS analysis in the rate filing.

## 1.5.1 FRM Base Year

The FRM Base Year has the following attributes:
- Operations, maintenance and capital expenditure expenses for all functions of the utility including transmission, distribution, generation and customer service;
- Fuel, purchased power, CILT and subsidies are estimated to arrive at full revenue requirements, however, charges will be a pass-through and based on actual costs;
- Capital expenditure budget  to be funded from revenues for all years in rate cycle;
- Debt service including principal, interest, funding of debt service reserves and/or DSCR; and
- Administrative costs including those costs associated with PREPA's restructuring.

## 1.5.2 FRM Non-Base Years

The FRM Non-Base Years have the following attributes:
- Adjustment for under / over-recovery of costs adjusted for weighted average cost of capital during prior year;
- Debt service adjustments; and
- Known and/or measurable changes from Base Year.

### 1.6 Periodic Informational Filings and Rate Adjustments

PREPA will make periodic informational filings with the Energy Commission.  After the end of each period, PREPA will file with the Energy Commission indicating the under / over-recovery of FRM components during the previous period represented by the difference between revenues collected and total costs incurred plus debt service requirements such as debt service reserve and/or DSCR adjusted for weighted average cost of capital.  The periodic filings will be made within 45 days of the end of the applicable period and will provide year-to-date results.  To the extent practicable, the periodic informational filings will be based off the most recent audited financials.

Periodic rate adjustments are proposed to be undertaken as follows:
- Pass-through components, fuel, purchased power, CILT, would be adjusted periodically but at least every period, except period one of the Base Year, to reflect under / over-recovery of fuel, purchased power, CILT and subsidies costs for the previous period plus reflect any revision in forecasted fuel, purchased power, CILT and subsidy costs for the upcoming period.  All adjustments will be formulaically determined and occur automatically with Energy Commission review limited to application and calculation of the formulas.
- At least every year revenue requirements will be adjusted as shown in section 1.4.  All non-pass-through rate components will be reviewed via the periodic filing and may be adjusted periodically if it is required to meet cash obligations.

- All rate adjustments for all components are made concurrently to the extent possible to make the process less administratively burdensome for both the Energy Commission and PREPA.

In the event of an unusual occurrence, such as a storm or other unforeseen event resulting in higher cash costs, PREPA may seek an emergency rate adjustment. PREPA may temporarily (for no more than 180 days) increase the rate in the event of an emergency, including natural disasters, environmental emergencies and others, as contemplated under Act 21-1985. The emergency rates will be presented to the Energy Commission and will become effective immediately upon such filing. If such emergency rates need to become permanent, PREPA shall present a rate case before the Energy Commission and begin any process for such revision before the expiration of the 180 days.

### *1.7 Billing and Rate Implementation*

PREPA bills will be redesigned to reflect the new rate structure and to provide additional transparency for various cost components as well as the Transition Charge.  The bill redesign will require the PREPA billing system and reporting to be completely modified.  This includes new bill designs and reporting for each of 51 different customer classes.  The ultimate billing design will be determined by the rate structure and rates the Energy Commission approves as well as the securitization structure.

The bill design will be transparent and shall include at a minimum the items listed below.  Other details regarding costs will be published on PREPA's website and by the Energy Commission.

- Transition Charge;
- Base Rate Charge;
- Fuel and Purchased Power Cost Adjustment (true-up); and
- CILT and Subsidies.

The billing system modification will take several months to implement.  Assuming the rate review process commences in March 2016 and is limited to a 180 day approval time period and the securitization Transition Charge and Adjustment Mechanism are established and approved by April 2016, PREPA estimates the provisional rate could be implemented by July 1, 2016.  The new bills reflecting the approved permanent rate structure could be ready by no earlier than September 30, 2016.  Actual timing will be dependent on the restructuring process, legislative change, rate review and approval process, implementation challenges and reporting requirements.

*Execution version*

**Schedule VII**

**Capital Plan**

*The following Capital Plan is subject to revision based on input received from regulatory agencies, if applicable, and through the REOI/RFP Process.[1]*

*Capitalized terms used herein and not otherwise defined shall have the meaning assigned to such terms in the RSA or the Recovery Plan Term Sheet, as applicable.*

**A.    Phase I (2016-2021)**

| | Investment/Action | Effect |
|---|---|---|
| **AOGP and Aguirre Related Projects** | ▪ Construction of AOGP<br>▪ Conversion of Aguirre steam and combined cycle units to burn natural gas | ▪ Improve fuel diversity<br>▪ MATS Compliance |
| **Palo Seco New Units** | ▪ Construction of New Units at Palo Seco | ▪ MATS compliance<br>▪ Improve renewable integration capability<br>▪ Improve energy efficiency<br>▪ Maintain electric system stability |
| **Limited Operation of Existing Units** | ▪ Limited use of oil-fired units at San Juan, Costa Sur, Palo Seco | ▪ MATS compliance<br>▪ Limited use of inefficient/old units<br>▪ Maintain electric system stability under emergency conditions |
| **T&D** | ▪ New equipment (i.e. STATCOMs, capacitors, etc.) and installations in transmission and distribution system | ▪ Modernize aging infrastructure<br>▪ Improve system reliability and increase flexibility<br>▪ Facilitate renewable integration and trends in distributed generation |

---

[1] Subject to modifications as required to reach a consent decree with EPA and the Puerto Rico Energy Commission's approval of the PREPA IRP.

**B.      Phase II (after 2021)[2]**

| | Investment/Action | Effect |
|---|---|---|
| **Fleet Upgrade** | ▪ Repowering existing units and/or installation of new combined cycle units at Aguirre (Steam and CC) and Costa Sur | ▪ Improve energy efficiency<br>▪ Replace aging infrastructure<br>▪ Improve renewable integration capability |

---

[2] Phase II capital plan as well timing could be amended or modified due to circumstances changing.

*Execution version*

## Schedule VIII

## REOI / RFQ / RFP Indicative Plan

*The Request for Expressions of Interest ("REOI"), Request for Qualification ("RFQ") and Request for Proposals ("RFP") plans are indicative and are subject to revisions based on a number of factors, including without limitation enactment of legislative reforms and approval and revisions of PREPA's Integrated Resource Plan.  Each plan's timing is dependent on timing of previous processes completion.*

*Capitalized terms used herein and not otherwise defined shall have the meaning assigned to such terms in the RSA or the Recovery Plan Term Sheet, as applicable.*

| Proposed Timeline | Work Stream |
|---|---|
| *Q3/Q4 2015 – REOI Process* | – Preparation for Request for Expressions of Interest ("REOI")<br>– PREPA designated representatives from various functional areas collect due diligence materials and populate REOI data room<br>– Secure necessary authorizations and launch REOI<br>– Preparation and execution of confidentiality agreements for REOI participants<br>– Receipt and review of REOI responses with proposals for asset modernization projects |
| | – Respond to REOI questions and inquiries<br>– Supplement REOI data room as appropriate |
| | – Identify potential RFP market participants for market soundings (to be supplemented and informed by participants in REOI process) |
| *Q1 2016- RFQ/RFP Process* | – Define scope of RFQ and RFP based on PREPA objectives and REOI responses, if applicable<br>– Identify any roadblocks, authorizations or limitations for RFQ/RFP processes and proposed structure |
| | – Prepare RFQ and associated ancillary documents, to include:<br>  ▪ Overview of RFQ and RFP process, rules, procedures and schedule<br>  ▪ Rules of submission and required submission forms<br>  ▪ Required respondent structure (addresses conflicts of interest; rules for consortia)<br>  ▪ Confidentiality procedures<br>  ▪ Selection objectives (technical and financial criteria)<br>  ▪ Protest procedures<br>  ▪ Reserved PREPA rights<br>– Prepare RFP and associated ancillary documents, to include:<br>  ▪ Detailed outline of scope of generation units being sought<br>  ▪ If relevant, description of existing facility or facilities and historical operating performance<br>  ▪ Required technical and performance criteria for new units<br>  ▪ Description of RFP rules and procedures<br>  ▪ Outline of terms and conditions |

| | |
|---|---|
| | ▪ Selection objectives<br>▪ Prepare term sheet and contract for RFP |
| | − Identify, collect and upload information to RFP data room<br>− Prepare and finalize RFQ materials<br>− Create process for requests for information<br>− Secure necessary authorizations for launching RFQ<br>− **Launch RFQ Process**<br>− Finalize contract to be included in RFP<br>− Draft and finalize confidentiality agreements for RFP participants |
| *Q2 2016* | − Complete RFP data room<br>− Prepare RFP marketing materials including information memorandum and presentations to be given by PREPA<br>− Receive and evaluate RFQ responses, announce RFP participants<br><br>− **Launch RFP**<br>− Execute confidentiality agreements with RFP participants and allow access to RFP data room<br>− Respond to due diligence requests, and supplement due diligence materials as appropriate<br>− Conduct site visits as appropriate<br>− Receive and review first round of comments on contract from RFP participants |
| *Q3 2016* | − Receive initial RFP proposals and contract revisions<br>− Refine scope of RFP based on initial proposals and prepare revised RFP contract based on submissions if applicable<br>− Provide revised RFP contract to RFP participants |
| *Q4 2016* | − RFP participants provide final proposals and comments on RFP contract<br>− Evaluate of RFP submissions and identify preferred bidder(s)<br>− Revise RFP contract<br>− Provide final bid version of RFP contract to preferred bidder(s)<br>− RFP participants submit final bids and contracts<br>− Negotiate and finalize bid and contract<br>− Present preferred bidder(s) and gain any necessary approvals for preferred bidder(s) and contract<br><br>− Announce preferred bidder, if any<br>− Commence closing |

*Execution version*

**Schedule IX**

**Legislative Reform Package**

**"PREPA REVITALIZATION ACT"**

*This outline (in addition to Schedule I-A) summarizes key legislative reform measures intended to implement the Recovery Plan contemplated by the Restructuring Support Agreement and to fulfill the public policy established by the Puerto Rico Energy Transformation and RELIEF Act, Act No. 57-2015.*

### A. Governance

*Proposed Amendments:*

PREPA's Organic Act would be amended to provide as follows:

**1. Board Composition**:[1]

    a. 7 Board members – must include: (i) 1 elected consumer representative; and (ii) 6 independent members appointed by Governor from a 10-person list of candidates prepared according to objective criteria by a Search Firm, which list must include, to the extent available, at least 5 Puerto Rico residents (Governor may request additional candidates who meet such criteria). Board members appointed by Governor with input from the President of the Senate and the President of the House of Representatives. "Search Firm" shall mean a recognized firm with experience in selecting board members in the energy industry and institutions of similar size, complexity and risks as PREPA.

    b. For the Board to take any action, at least four (4) members shall have been appointed.

    c. Authorize the establishment of market based compensation commensurate with that received by board members of institutions in the energy industry of similar size, complexity and risks as PREPA, taking into account PREPA's status as a public corporation and in any event sufficient to attract qualified candidates.

    d. All directors (including elected consumer representative) must meet the Final NYSE Corporate Governance Rules for director independence.

    e. Directors shall not be deemed to be public officers (*funcionarios públicos)* for purposes of reporting income and other financial disclosures, including under Act No. 1-2012.

---

[1] Consumer representative may be increased to two (2) with a commensurate decrease in the number of independent members.

   f.   Require an evaluation of the Board with respect to corporate governance matters PREPA at least once every three (3) years by a recognized corporate governance consultant with extensive experience advising board of directors of companies (other than PREPA) with similar risks, complexities and income as. PREPA shall publish a public version of the consultant's report, including findings and recommendations by the consultant. The Governor will receive a copy of the full report.

   g.   Within the first year of being constituted, the Board shall adopt a formal document establishing the mission, vision, values, and strategic goals of the Authority, in accordance with the public policy enacted by Act No. 57-2014, as amended, and the Restructuring Agreement. The Board shall revise said document annually.

**2.  Replacement Mechanics:**

   a.   Initial Board Members to have staggered terms of 5 and 6 years. Thereafter, members to be appointed for a term of five years, with a limit of three terms per Board member. In the event of death, resignation or incapacity of an independent member, a replacement will need to be appointed within 6 months of the date on which the vacancy occurs and the Governor may use the most recent list of independent board members presented by a Search Firm.

   b.   Governor appointed Board members shall be replaced by Governor, chosen by the Governor from a 10-person list of candidates as provided above, with input from the President of the Senate and the President of the House of Representatives.

**3.  Suspension of Process of Election for Independent Members**:

   a.   The use of a Search Firm to provide a list of candidates for independent members to be presented to the Governor, will remain in effect for fifteen (15) years, after which period of time the Legislative Assembly will assess whether the mechanism of election shall be extended or amended. Absent legislative action, said mechanism shall remain in effect until it is established otherwise by legislative action.

**4.  Quorum:**

   a.   Quorum for meetings requires at least 4 members.

   b.   Decisions will be made by majority of members present at a meeting (but without taking into account abstaining votes).

**5.   Faculties:**

a. Provide authorization to the Board to authorize the   use competitive negotiated processes (RFPs), rather than formal bids, for certain purchases and contracts, beyond professional services or fuel procurement, to foster genuine competition, avoid collusion, and obtain for PREPA the best possible price from as many sources as possible.

b. PREPA Board to implement the savings set forth in the RSA and in the rate case that will be presented by PREPA to the Energy Commission.

**6.   Prohibited Activities; Basis for Removal:**

a. Specify prohibited political activities applicable to Board members similar to Federal Hatch Act or PRASA Enabling Act:

    (i)   Impose limitations on participation in political campaigns, fund-raising activities or contributing to political parties or candidates;

    (ii)   Cannot hold any elected, administrative or directive positions in political parties;

    (iii)   Cannot hold the position if in the past it held any elected, administrative or directive positions in political parties;

    (iv)   Cannot violate any of the remaining provisions in Section 4 of Act No. 83 regarding requirements to be a member.

b. Establish specific basis for removing from their positions, strictly based on violation to the prohibitions stated above, and non-performance, unethical behavior or other improper actions.

**7.   Management:**

a. Incorporate positions for "executive officers" and grant the board the power to establish specific professional criteria that shall be used to select upper and key middle management positions; compensation shall be comparable to professionals in similar positions in electric utility companies in the US of similar size, complexity and risks as PREPA.

b. Specify prohibited activities for upper and key middle management, as stated above for Board members.

c. Establish specific basis for removing upper and key middle management, as stated above for Board members.

**8.   [Reserved]**

**9.   D&O Liability:**

Add the following provisions (to foster the recruitment of the candidates needed under the new governance structure): "Without impairment to the rights pursuant to the provisions of §§ 3077-3092a of Title 32, the Board and its past, current or future individual directors, and the officers, agents or employees of the Authority shall not incur civil liability for any action taken in good faith in the performance of their duties and responsibilities pursuant to the provisions of this chapter, provided there has been no conduct that constitutes a crime or gross negligence, and they shall be indemnified for any costs incurred in connection with any claim for which they enjoy immunity as provided hereunder. The Board and its individual directors, and officers, agents or employees of the Authority shall also be fully indemnified for any civil liability adjudicated under the laws of the United States of America for any action taken in good faith in the performance of their duties and responsibilities pursuant to the provisions of this chapter, provided there has been no conduct that constitutes a crime or gross negligence."

## B. Electricity Rates and Rate Structure

*Proposed Amendments:*

The Energy Relief Act would be amended as follows:

*I. Rate resulting from negotiation with creditors under the Restructuring Agreement:*

1. Clarify that Energy Commission can approve new rate structure proposed by PREPA as agreed in the RSA without having to conduct the initial rate review contemplated by Act 57-2014.

2. Expedited and criteria-specific process mandated to the Energy Commission to approve or reject the rate structure: *See Recovery Plan Term Sheet Schedule I-A*

*II. With respect to prospective "ordinary" rate revision processes:*

1. Clarify that PREPA and the Energy Commission may hold joint hearings to consider prospective rate adjustments proposed by PREPA. No need for each one to hold separate hearings for the same purpose.

2. Clarify that if the Energy Commission, on its own, commences a rate adjustment review process, PREPA is not required to conduct hearings.

3. Clarify that if OIPC Director has not been appointed or no OIPC resources are available (staff/members) the OIPC's functions would instead be performed by the a person designated by the Governor within the same rate revision process.

4. PREPA may temporarily (for no more than 180 days) increase the rate in the event of an emergency, including natural disasters, environmental emergencies and others, as contemplated under Act 21-1985. The emergency rates will be presented to the Energy Commission and will become effective immediately upon such filing. As is contemplated under Act 21, if such emergency rates need to

become permanent, PREPA shall present a rate case before the Commission and begin any process for such revision before the expiration of the 180 days.

### III. Transparent Bill

1. PREPA and Commission to establish a plan for the implementation of the new transparent bill to include, at a minimum, the following line items:

   a. Securitization Charge

   b. Base Rate Charge

   c. Fuel and Purchased Power Cost Adjustment

   d. CILT and Subsidies

2. The current invoice form shall continue to be valid until the first rate review process is finalized and, within 180 days after the rate structure presented to the Commission is approved, PREPA shall implement the new transparent bill.

3. Clarify that the calculation of the Transition Charge and the Adjustment Mechanism will be effective in accordance with the Restructuring Order issued by the Commission, either in the current bill or as part of the new transparent bill.

### IV. Transition Charge

*See Recovery Plan Term Sheet Schedule I-A*

## C. Securitization For Refinancing PREPA Debt

*See Recovery Plan Term Sheet Schedule I-A*

## D. Collection of Receivables

*Proposed Amendments:*

### 1. Government Agencies and Public Corporations[2]

PREPA's Organic Act is amended, or changes are included as part of a current bill under consideration by the House of Representatives to provide that any public corporation and agency of the central government with an outstanding debt to PREPA, shall enter into a payment plan.  If the agency or public corporation does not comply with these payments, PREPA is authorized to curtail or disconnect.

---

[2]   These provisions will be incorporated into another bill currently in the House of Representative and already passed at the Senate.

## 2. Private Consumers

PREPA's Organic Act would be amended to authorize PREPA as follows:

1. PREPA shall have the power to report to the credit bureaus delinquent residential customers who have disputed or undisputed debt outstanding with PREPA of more than sixty (60) days without a payment plan after sending one collection letter. Indications of past due amounts in at least two current invoices and one separate collection letter warning that credit bureaus will be informed if delinquent debt is not paid within the period specified in the letter, shall be considered reasonable and sufficient collection mechanisms.

2. PREPA may not deny service to any new customer (to the extent that such customer or entities incorporated or controlled by such customer do not currently owe payment to PREPA under prior contracts), but shall have the power to conduct credit checks of customers requesting new accounts and to require security deposits from new customers depending on their risk level based on credit scores.

3. Amend Act 57-2014 to simplify the dispute process, establish requirements to deter frivolous claims and correct loopholes currently being used by customers to eternally challenge invoices and avoid disconnection.

   a. Disputes and claims (i) must relate to the actual electric bill as applied to a customer (i.e., matters such as incorrect meter reads, incorrect consumption calculations, incorrect rate applicability, or incorrect accounting of payments made by customer) and (ii) cannot be used to challenge the rate structure in general or the securitization charge.

## E. Issuance of Debt by PREPA

### *Proposed Amendments:*

PREPA's Organic Act would be amended to:

1. Provide that the Energy Commission must submit any recommendation or comment to GDB with respect to PREPA debt no later than ten (10) days following a notification by the GDB about a proposed debt issuance, except that the Energy Commission shall not have any jurisdiction to make a recommendation or comment with respect to any debt issued by PREPA in connection with the Restructuring Transactions.

2. Authorize PREPA to create liens over its assets, except land, solely to comply with federal requirements to obtain financing/guaranty from the U.S. Department of Energy for AOGP and in any event subject to applicable contractual limitations including those set forth in the Trust Agreement and each of the Credit Agreements (in each case, as amended).

6

**F.  Authority to conduct RFP processes for Operation and Maintenance and other Outsourcing Public Private Agreements for Modernization of Infrastructure and Expansion/Replacement Capacity (including with IPPs), with respect to (i) Transmission and Distribution Facilities and (ii) Existing and New Generation Facilities.**

*Proposed Amendments:*

PREPA's Organic Act, the Energy Relief Act and the PPP Act would be amended to:

1.  Specifically authorize PREPA to enter into any kind of Public-Private Partnership ("PPP") agreements permitted by Act No. 29-2009, including PPP agreements for long-term land leases, the development, concession, financing, construction, operation and/or maintenance of all or part of its electrical system or any other related facility/project. Execution of said contracts shall not require prior approval from the Energy Commission or PPP Authority. The authority shall have exclusive jurisdiction to run the RFP process for said PPPs, unless the Authority requires assistance from the PPP Authority or the Commission, as determined by the Authority.

2.  Eliminate Energy Commission jurisdiction to carry out procurement processes related to the modernization of PREPA generation fleet and approval of selection and execution of related power purchase agreements.

3.  The Authority shall be in charge of running the process of publication, evaluation and negotiation of RFPs, as provided by the Board and under surveillance of the Partnership Committee, which will be integrated by two representatives of the Authority, one representative of the Government Development Bank, one representative of the Energy Public Policy Office and one representative of the Authority for the PPP.

4.  Expressly provide PREPA with the PPP procurement process requirements for a fair and transparent bidding and awarding of contracts, similar to the PPP Act but directed by PREPA. The amendment would, among other criteria as may be discussed with stakeholders, include what is provided by Section 8 (Partnership Committee), Section 9 (Procedure for the Selection of Proponents and Award of Partnerships), Section 10 (Partnership Contract, except for the power granted to contractors to fix rates provided in subsection (c)), Section 12 (Tax Liability and Benefits), Section 19 (Inapplicability of Certain Laws), Section 20 (Judicial Review Procedures).

5.  As part of any RFP process, PREPA would evaluate and consider alternative means to achieve the objectives of the RFP, including by not bringing private capital to finance the capital projects being considered, and it will pursue the

alternative that best serves its customers in terms of improving the cost, reliability and quality of its services to its customers.

6. IPPs, would remain subject to Energy Commission regulation and oversight once the power plant comes on-line as an "energy company" under Act 57-2014.

## G. Efficiency and Net Metering

Amend applicable laws to:

1. Revise Section 2.9 of Act 57-2014 regarding achieving "high efficiency" to provide that the Energy Commission shall ensure that the IRP selected plan guarantees efficiency in the generation of power.

2. Revise provisions on renewable RPS: Grant legislative waiver of 5 years and include hydroelectric power and distributed generation generated as counting towards compliance with RPS.

3. Revise Net Metering Act 114-2007 as follows:

   a. Net metering customers will be compensated at a rate that will not trigger any cross subsidies that would economically harm other customers. Credits to net metering customers will be for the entire production for their systems (behind the meter consumption and amount exported to the grid) based on PREPA's marginal cost.. In accordance with a revised mechanism and calculation of amounts charged and credited, Section 4 and Section 5 of Law 114 will be amended.  Any PREPA regulation or existing agreement will be subject to the new established rate design.

## H. CILT and Collections from Municipalities[3]

PREPA's Organic Act would be amended to provide as follows:

1. The legislation will ratify that the provisions regarding CILT reform included in Act 57-2014 shall become effective and be applicable to municipal accounts corresponding to FY 2015 with respect to all aspects of CILT. However, to assist any municipality that may have exceeded its CILT cap in FY 2015 and owes PREPA an amount that cannot be paid in its entirety as part of the FY 2016 budget, an alternative mechanism shall be granted to come current with its debt,

---

[3] Proposed amendments assume that the Energy Commissions pending CILT regulation is approved and that PREPA's suggestions are incorporated therein.

including a separate payment plan or reduction of its Municipal CILT Cap for FY 2016.

2. Eliminate rebates of 40% if the savings are higher than 5%. The alternative is that the costs of such rebates shall be paid by clients as pass-through.

3. Municipalities must pay for amounts consumed in excess of CILT cap in currency, not by way of compensation or set-off.

4. The reference to 11% of gross revenues from fuel and energy purchases to calculate the amount from which to pay CILT and other subsidies and reserves, is replaced by CILT becoming a pass-through cost payable directly by customers. However, municipalities' consumption covered by the CILT continues to be capped as per Act 57-2014. Provision requiring 2% for stabilization fund is eliminated.

5. CILT will be expressly included as a line item in the bill to customers as part of the revised rate structure.

6. Include that if after collection efforts by PREPA in accordance with Energy Commission CILT regulation (which includes disconnection) a municipality still owes amounts to PREPA over the Municipal CILT Cap, PREPA shall notify CRIM and the CRIM shall deduct from any amounts otherwise payable by CRIM for the benefit of such municipality and remit such amounts to PREPA.

7. If a municipality still owes amounts and neither the municipality nor CRIM has remitted such amounts within thirty (30) days from PREPA's notification to the CRIM, PREPA shall notify GDB, and GDB shall include such amounts in the calculation of the delinquent municipality's borrowing margin, so that it is not available for other financing.

### Annex E
### Bond Potential Defaults[1]

1.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 501 of the Trust Agreement or any similar provision of any other Bond Document, insofar as such noncompliance or failure is a result of PREPA's failure to establish and enforce reasonable regulations in relation to the collection of bills for services and facilities provided by PREPA.

2.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 502 of the Trust Agreement or any similar provision of any other Bond Document, insofar as such noncompliance or failure is a result of PREPA's failure to revise the rates and charges for the services and facilities furnished by PREPA, or the result of PREPA's failure to revise its regulations in relation to the collection of bills for such services and facilities.

3.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 503 or section 505 of the Trust Agreement or any similar provision of any other Bond Document, insofar as such noncompliance or failure is a result of PREPA's use of monies from the General Fund to service its debt under its line of credit with Scotiabank and/or its line of credit with Solus in accordance with the Restructuring Support Agreement in effect as of the Effective Date.

4.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 504 of the Trust Agreement or any similar provision of any other Bond Document, insofar as such noncompliance or failure is a result of PREPA's failure to adopt and file a budget that is consistent with the procedural and/or substantive requirements of section 504 of the Trust Agreement or any such similar provision contained in the Bond Documents, as applicable.

5.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 506 of the Trust Agreement or any similar provision of any other Bond Document, insofar as such noncompliance or failure is a result of PREPA's failure to transfer monies from the General Fund to the Revenue Fund in a manner consistent with section 506 of the Trust Agreement or any such similar provision contained in the Bond Documents, as applicable.

6.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 507 of the Trust Agreement or any similar provision of any other Bond Document, insofar as such noncompliance or failure is a result of PREPA's failure to transfer monies from the Revenue

---

[1] Capitalized terms used in this Annex E that are not defined in the Restructuring Support Agreement shall have the meanings ascribed to them in the Trust Agreement.

Fund to the Sinking Fund in a manner consistent with section 507 of the Trust Agreement or any such similar provision contained in the Bond Documents, as applicable.

7.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 702 of the Trust Agreement or any similar provision of any other Bond Document, as applicable, insofar as such noncompliance or failure is a result of PREPA's failure to operate in an efficient and economical manner, maintain the system in good repair and sound operating condition (including by making all necessary repairs, renewals and replacements), or as a result of PREPA's employment of more persons than are necessary and non-compliance with all valid and applicable rules, regulations, and orders.

8.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to keep accurate records or complete and file its audited financial statements within the time periods specified in section 710 of the Trust Agreement or any similar provision of any other Bond Document; provided  that the failure to cause to be filed with the Trustee and the Consulting Engineers the monthly reports required by section 710 of the Trust Agreement shall not be a Bond Potential Default.

9.      Any default or event of default under Section 802(i) of the Trust Agreement.

10.     Any default or event of default under the Bond Insurance Agreements as a result of PREPA's failure to pay or reimburse the Insurers for any and all charges, fees, costs and expenses incurred by the Insurers in connection with the Bond Insurance Agreements.

11.     Any default or event of default under the Bond Insurance Agreements as a result of PREPA's failure to comply with any reporting requirements to the Insurers under the Bond Insurance Agreements.

**Annex F**
**Scotiabank Potential Defaults[1]**

1.      Any Default or Event of Default under clause (d) of Article VII of the Scotiabank Credit Agreement, solely with respect to any failure to comply with Section 5.02(a) of the Scotiabank Credit Agreement in relation to PREPA's obligation to give notice within 10 days of (a) the change in PREPA's Senior Debt rating by Moody's or S&P's (an Adjustment Event), specifically (i) Moody's change of its rating of PREPA's Senior Debt to *"Ba2"* on February 7, 2014, (ii) S&P's change of its rating of PREPA's Senior Debt to *"BBB-"* on June 18, 2014 and (b) a Default due to such change in Senior Debt rating resulting in the counterparties under certain interest rate swap agreements or Solus under the Solus Credit Agreement, each constituting Material Indebtedness under the Scotiabank Credit Agreement, having the right to cause the corresponding Indebtedness to become due prior to their respective scheduled maturities under the Scotiabank Credit Agreement.

2.      Any Default or Event of Default under clause (f) of Article VII of the Scotiabank Credit Agreement in connection with any defaults listed on (i) Annex E to the Restructuring Support Agreement and (ii) Annex G to the Restructuring Support Agreement.

3.      Any Default or Event of Default under clause (g) of Article VII of the Scotiabank Credit Agreement in connection with any defaults listed on (i) Annex E to the Restructuring Support Agreement and (ii) Annex G to the Restructuring Support Agreement.

4.      Any Default or Event of Default under sub-clause (vi) of clause (i) of Article VII of the Scotiabank Credit Agreement (solely with respect to relief under the Recovery Act).

5.      Any Default or Event of Default under clause (j) of Article VII of the Scotiabank Credit Agreement.

6.      Any Default or Event of Default under clause (a) of Article VII of the Scotiabank Credit Agreement as a result of PREPA's failure to pay any principal of or default interest on any Advance during the Support Period.

7.      Any Default or Event of Default under clause (b) of Article VII of the Scotiabank Credit Agreement as a result of PREPA's failure to pay any fees incurred by advisors to the Administrative Agent and the Scotiabank Lenders during the Support Period (other than fees required to be paid pursuant to the Restructuring Support Agreement).

---

[1] Capitalized terms used in this Annex F that are not defined in the Restructuring Support Agreement shall have the meanings ascribed to them in the Scotiabank Credit Agreement.

**Annex G**
**Solus Potential Defaults[1]**

1.      Any Default or Event of Default under clause (d) of Article VII of the Solus Credit Agreement, solely with respect to any failure to comply with Section 5.02(a) of the Solus Credit Agreement in relation to PREPA's obligation to give notice within 10 days of (a) the change in PREPA's Senior Debt rating by Moody's or S&P's (an Adjustment Event) and (b) a Default due to such change in Senior Debt rating resulting in the counterparties under certain interest rate swap agreements or the Scotiabank Lenders under the Scotiabank Credit Agreement, each constituting Material Indebtedness under the Solus Credit Agreement, having the right to cause the corresponding Indebtedness to become due prior to their respective scheduled maturities under the Solus Credit Agreement.

2.      Any Default or Event of Default under clause (f) of Article VII of the Solus Credit Agreement, in connection with any default listed on (i) Annex E to the Restructuring Support Agreement and (ii) Annex F to the Restructuring Support Agreement.

3.      Any Default or Event of Default under clause (g) of Article VII of the Solus Credit Agreement, in connection with any default listed on (i) Annex E to the Restructuring Support Agreement and (ii) Annex F to the Restructuring Support Agreement.

4.      Any Default or Event of Default under sub-clause (vi) of clause (i) of Article VII of the Solus Credit Agreement (solely with respect to relief under the Recovery Act).

5.      Any Default or Event of Default under clause (j) of Article VII of the Solus Credit Agreement.

6.      Any Default or Event of Default under clause (a) of Article VII of the Solus Credit Agreement as a result of PREPA's failure to pay any principal of or default interest on any Advance during the Support Period.

7.      Any Default or Event of Default under clause (q) of Article VII of the Solus Credit Agreement as a result of the downgrading of the long term rating of the Senior Debt, specifically (i) Moody's change of its rating of PREPA's Senior Debt to *"Caa2"* on July 1, 2014, (ii) S&P's change of its rating of PREPA's Senior Debt to *"CCC"* on July 31, 2014.

8.      Any Default or Event of Default under clause (b) of Article VII of the Solus Credit Agreement as a result of PREPA's failure to pay any fees incurred by advisors to Solus during the Support Period (other than fees required to be paid pursuant to the Restructuring Support Agreement).

---

[1] Capitalized terms used in this Annex G that are not defined in the Restructuring Support Agreement shall have the meanings ascribed to them in the Solus Credit Agreement.

*Execution version*

ANNEX H

PUERTO RICO ELECTRIC POWER AUTHORITY
JANUARY PAYMENT TERM SHEET

*The rights of all parties are subject to the agreement and execution of a bond purchase agreement and other definitive documentation in all respects. This January Payment Term Sheet does not address all material terms that would be required in definitive documents, including the bond purchase agreement. This January Payment Term Sheet does not constitute (nor shall it be construed as) an offer with respect to any securities.*

*Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement (including the Recovery Plan Term Sheet (as defined therein)) and that certain Trust Agreement, dated as of January 1, 1974, as amended and supplemented, between PREPA and U.S. Bank National Association, as successor trustee (the "**Trustee**" and, with respect to said trust agreement, as amended, the "**Trust Agreement**").*

| **PREPA:** | Puerto Rico Electric Power Authority ("**PREPA**") |
|---|---|
| **Monolines:** | National Public Finance Guarantee Corporation ("**National**"); and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "**Assured**", and together with National, the "**Monolines**"). |
| **Participating Holders:** | Members of the Ad Hoc Group (each, a "**Participating Holder**", and together with PREPA and the Monolines, the "**Parties**"). |
| **Allocation of January Interest Payment:** | The January 1, 2016 interest payment in the amount of $196 million (the "**January Interest Payment**") shall be paid from the following sources, after giving effect to the transactions described in this January Payment Term Sheet: <br><br> (1)  $25 million to be paid from the BABs interest account & Capitalized Interest Account; <br><br> (2)  From the General Fund in an amount equal to $115 million[1] which is the amount of proceeds of Purchased Bonds purchased by the Monolines and Participating Holders in accordance with the terms set forth below; and <br><br> (3)  An additional no less than $55 million[2] to be paid from the General Fund. |
| **PREPA Obligations:** | <u>Transfers for January Interest Payment</u> <br><br> Subject to the conditions set forth below, on December 31, 2015, PREPA will |

---

[1] Aggregate proceeds of Purchased Bonds to equal the amount necessary to cover the aggregate amount of interest (net of payments from the BABs interest account to the BABs bonds and the Capitalized Interest Account to the Series 2013A bonds) due on January 1, 2016 with respect to (i) Uninsured Bonds held by members of the Ad Hoc Group, and (ii) the Insured Bonds insured by the Monolines.

[2] Amount necessary to cover (i) Syncora's, (ii) Solus's and (iii) Non-Supporting Uninsured Holders' portion of the January Interest Payment, net of payments from the BABs interest account to the BABs bonds and the Capitalized Interest Account to the Series 2013A bonds.

| | |
|---|---|
| | transfer $171 million[3] from the General Fund to the Bond Service Account with monies on deposit therein for debt service due on the Bonds on January 1, 2016.<br><br>Execution of other agreements<br><br>No later than December 23, 2015, PREPA will enter into an Amended and Restated Restructuring Support Agreement with the Monolines and the Holders.  No later than December 29, PREPA will execute the Bond Purchase Agreement (as defined below). |
| **Purchasers' Obligations:** | Bond Purchase Agreement[4]<br><br>(1) No later than December 29, 2015, the Monolines and Participating Holders (in this context, collectively, the "**Purchasers**") will enter into a binding commitment (the "**Bond Purchase Agreement**") to purchase Bonds (the "**Purchased Bonds**") in the aggregate principal amount of $115 million on the Funding Date (as defined below), at a price equal to the face amount of Purchased Bonds (the "**Purchase Price**").   The Purchasers' obligation under the Bond Purchase Agreement to pay the Purchase Price will be conditioned upon the events listed in "Conditions Precedent to Purchasers' Obligations" and "Additional Conditions Precedent to Purchasers' Obligations" below.<br><br>(2) The Participating Holders shall purchase Purchased Bonds for $65 million and the Monolines shall purchase Purchased Bonds for $50 million[5] on the Funding Date (as defined below).<br><br>The Purchased Bonds will be fully negotiable, freely transferable on issuance subject to the RSA, and have the following key terms:<br><br>a) Same priority, remedies and acceleration rights as existing Bonds.<br><br>b) Maturity date of July 1, 2019.<br><br>c) Mandatory early redemption upon the terms and conditions |

---

[3] Amount to be transferred from General Fund to include amount necessary to cover the entire January Interest Payment, other than amounts covered by BABs interest account & Capitalized Interest Account.

[4] Securitization Term Sheet to be amended to clarify that (i) Purchased Bonds are not taken into account for purposes of calculating the $700 million threshold set forth under "Minimum Participation Rate" and (ii) holders of Purchased Bonds shall not be required to tender the Purchased Bonds in the Exchange Offer described therein and shall instead receive the treatment described herein.

[5] Each Participating Holder's and Monoline's purchase rights and obligations shall be based on its pro rata share of the aggregate amount of interest (net of interest on the Series 2015A bonds and payments from the BABs interest account to the BABs bonds and the Capitalized Interest Account to the Series 2013A bonds) due on January 1, 2016 and shall not exceed such pro rata share.  For the avoidance of doubt, no Purchaser shall be liable as a result of the failure of any other Purchaser to perform its obligations, including its obligation to purchase Purchased Bonds.

| | described below. |
|---|---|
| | d) Upon the Closing Date (as defined in the RSA), holders of the Purchased Bonds shall have their bonds (which shall thereafter be referred to as "**Defeased Purchased Bonds**") economically defeased through issuance of January Mirror Bonds (as defined below). No later than the Election Date (as defined below), holders of the Defeased Purchased Bonds may elect to exchange their Defeased Purchased Bonds directly into Securitization Bonds with economic terms as set forth below at 100% of principal amount. Unless any holder of Defeased Purchased Bonds has affirmatively elected to exchange its Defeased Purchased Bonds in the Exchange Offer on or prior to the Election Date, it will be deemed that such holder has elected to keep its Defeased Purchased Bonds. |
| | e) Interest rate: 10% per annum, payable in cash semi-annually on January 1 and July 1. |
| | f) Each Purchaser may elect to have the Bonds beneficially owned by such Purchaser insured, with the premium to be agreed upon by the Purchaser and the insurer (such premium to be paid by the Purchaser from interest on the Bonds or otherwise by the Purchaser). |
| **Conditions Precedent to Purchasers' Obligations** | The Bond Purchase Agreement shall provide that the Purchasers shall be obligated to purchase the Purchased Bonds on the Funding Date. PREPA shall have the right to decide not to issue the Purchased Bonds in its discretion at any time before the Funding Date, upon delivery of written notice to each of the Purchasers; *provided*, however, that such decision by PREPA shall not permit it to terminate the RSA or alter its obligations thereunder on the basis that the Purchasers have not purchased the Purchased Bonds. As used herein, the "**Funding Date**" refers to a date mutually agreeable to PREPA and the Purchasers that is no less than 10 calendar days after satisfaction or waiver (in each Purchaser's sole discretion) of all the conditions precedent, including the Funding Trigger Date; *provided* that the Funding Date shall not be later than February 26, 2015. |
| | The Purchasers' obligation to purchase on the Funding Date shall be subject to all the terms and conditions listed herein (including, for the avoidance of doubt, the transfers for and payment in full of the January Interest Payment), the terms and conditions listed in the Bond Purchase Agreement, and the following additional terms and conditions:[6] |
| | (1) Sidley Austin LLP, Bond Counsel, shall have issued an unqualified opinion in form and substance satisfactory to the Purchasers and to the Authority as to the validity and enforceability of the Purchased Bonds and of the Trust Agreement Amendment (as defined herein) and |

---

[6] The Bond Purchase Agreement shall provide that it shall terminate upon the automatic termination of the RSA or the occurrence or failure to occur (as applicable) of the following conditions: conditions (2), (5), (7), or (9).

consistent with the standards set forth herein.  The approving opinion to be rendered on the Funding Date by said Bond Counsel shall explicitly state that no opinion is expressed regarding the treatment of interest on the Purchased Bonds for Federal income tax purposes.

(2) PREPA shall have made the transfers for and payment in full of the January Interest Payment due on the Bonds.

(3) PREPA shall not have breached the Bond Purchase Agreement.

(4) The applicable Purchaser shall not have withdrawn from the RSA as permitted in accordance with its terms, and the RSA shall remain in full force and effect as to such Purchaser.

(5) The Securitization Special Legislation and the Legislative Reform Package (other than the Securitization Special Legislation) shall have been enacted into law no later than January 22, 2016.

(6) PREPA shall have given written notice of the enactment into law of the Securitization Special Legislation and the Legislative Reform Package (other than the Securitization Special Legislation) no later than one day after such enactment into law (the "**Enactment Notice**"), and (i) PREPA shall not have received within 15 calendar days after the Enactment Notice a notice in response (a "**Deficiency Notice**") from either the Participating Holders committing to purchase a majority of the principal amount of Purchased Bonds (the "**Majority Participating Holders**"), Assured or National, stating either that:

    o   The Securitization Special Legislation as enacted into law is not reasonably acceptable to the noticing parties; or

    o   The Legislative Reform Package (other than the Securitization Special Legislation), as enacted into law, is not in Acceptable Form;

in either case stating the objection to the statute or statutes, or (ii) if PREPA has received a Deficiency Notice, the objection is resolved within 10 days of receipt of the Deficiency Notice to the satisfaction of each of PREPA, National, Assured and the Majority Participating Holders; *provided* further that, if a Purchaser (or Majority Holders on its behalf) has not delivered a notice of termination pursuant to section 13(e)(vi) or (viii) of the RSA within the time periods set forth therein, (A) the Securitization Special Legislation shall be deemed reasonably acceptable as to such Purchaser for purposes of this condition precedent (6) and section 13(e)(viii), and (B) the Legislative Reform Package (other than the Securitization Special Legislation) shall be deemed in Acceptable Form as to such Purchaser for purposes of this condition precedent (6) and section 13(e)(vi).

(7) No proceeding pursuant to the Recovery Act, title 11 of the United States Code, nor any other action or proceeding that seeks to adjust,

| | |
|---|---|
| | extend, or challenge the claims of the Supporting Creditors or institute any suspension period pursuant to any federal, state, or Puerto Rican statute, now or hereinafter enacted into law, shall have been instituted by or on behalf of PREPA.<br><br>(8) The Trust Agreement Amendment (as defined below) shall be in effect.<br><br>(9) No receiver has been appointed with respect to PREPA, unless such appointment has, prior to the applicable Funding Date, been stayed, reversed or vacated.<br><br>(10)     No event of default under the Trust Agreement shall have occurred, unless such event of default is subject to forbearance pursuant to the RSA, or the applicable Purchaser has (in its own discretion) waived the breach or event of default.<br><br>All conditions precedent to the Funding Date shall have been satisfied no later than the earlier of (i) 26 days after enactment of the Securitization Special Legislation and the Legislative Reform Package (other than the Securitization Special Legislation) and (ii) February 17, 2016 (the earlier of such dates, the "**Funding Trigger Date**"). |
| **Mandatory Early Redemption** | PREPA shall be obligated to redeem the full amount of the Purchased Bonds upon the occurrence of the later of the following, subject to the redemption procedures of the Trust Agreement:<br><br>(1) The date upon which the RSA terminates as to any Applicable Insurer or any Purchaser's respective Supporting Creditor class, as applicable; and<br><br>(2) July 1, 2016;<br><br>in either case provided that the Closing Date has not occurred by that date.  For the avoidance of doubt, the RSA shall terminate with respect to each Purchaser on June 30, 2016, unless extended beyond that date in such Purchaser's sole discretion.<br><br>A failure to redeem the full amount of the Purchased Bonds on a mandatory redemption date or upon maturity shall constitute an Event of Default under the Trust Agreement. |
| **Closing Date and Election Date** | On the Closing Date of the RSA, if the Purchased Bonds have not been redeemed early in accordance with the mandatory early redemption requirements, all Purchased Bonds shall be economically defeased through the issuance of January Mirror Bonds.  On the Election Date, Holders of the Defeased Purchased Bonds shall have the right to elect that their Defeased Purchased Bonds be exchanged for Securitization Bonds on terms as set forth below.  Unless any holder of the Defeased Purchased Bonds has affirmatively elected to exchange its Defeased Purchased Bonds, it will be deemed that such |

| | holder has elected to retain its Defeased Purchased Bonds. |
|---|---|
| **Securitization Bonds** | Holders who elect to exchange their Defeased Purchased Bonds for Securitization Bonds shall receive Securitization Bonds with the following key terms: <br><br>    a) Same priority, remedies and acceleration rights as all Securitization Bonds issued on the Closing Date. <br><br>    b) Scheduled Retirement Date of July 1, 2019 and Final Maturity Date of July 1, 2021. <br><br>    c) Interest rate: payable in cash semi-annually on January 1 and July 1 at a rate equal to the weighted average of the interest rates on all Securitization Bonds at issuance; *provided*, that if the weighted average market yield on all Securitization Bonds, based on trading prices during the first 20 days of regular-way trading, is higher than the weighted average of the issuance interest rates, the interest shall be increased to the lesser of the weighted average market yield and 50 b.p. above the weighted average of the issuance interest rates; and *provided further* that the election to exchange into Securitization Bonds shall take place 15 calendar days after the determination of the weighted average market yield (such date, the "**Election Date**"); and *provided further* that, the Parties shall agree on a calculation methodology that will take into account the shorter tenor of the Purchased Bonds. <br><br>    d) Exchange ratio of 100%. |
| **Use of Proceeds** | Applied in a manner consistent with tax-exemption of interest on Purchased Bonds and Securitization Bonds issued in exchange for all or any portion of the Purchased Bonds as described herein. |
| **Tax Issues** | Purchased Bonds will be structured in conformity with the requirements of Section 103 and related provisions of the Internal Revenue Code, including the timely filing of a Form 8038-G, to enable Sidley Austin LLP, in its capacity as Bond Counsel, to deliver its opinion, retroactive to the date of issuance, that the interest on such bonds is excludable from gross income for Federal income tax purposes and exempt from Puerto Rico and state and local income taxes promptly following the issuance by the Internal Revenue Service of letter rulings favorably addressing, among other matters, the changes to the governance of PREPA effected by the Legislative Reform Package and subject to change in law risks and the delivery of customary certificates in support of its opinion. |
| **January Mirror** | The Purchased Bonds shall be economically defeased on the Closing Date by |

| | |
|---|---|
| **Bonds** | the Securitization SPV issuing Mirror Bonds with the same economic terms (*i.e.,* amount, interest rate, and maturity[7]) as the Purchased Bonds (such Mirror Bonds, the "**January Mirror Bonds**"), which January Mirror Bonds will be used to economically defease the Defeased Purchased Bonds on the same terms and conditions as provided for other Mirror Bonds in the Monoline Term Sheet.   The January Mirror Bonds shall not accelerate as a result of acceleration of the Legacy Bonds.[8] <br><br> The January Mirror Bonds shall have the same rights and remedies as all other Mirror Bonds, including benefiting from a Mirror Bond DSRF funded at the same level and on the same terms as all other Mirror Bond DSRFs.   The January Mirror Bonds shall be deposited into an irrevocable escrow subject to the same terms and subject to the same restrictions regarding issuance, trading, and transfer as the other Mirror Bonds. <br><br> The obligation of PREPA to make a debt service payment under the Purchased Bonds once they are economically defeased will be discharged only upon the application of the corresponding debt service payment under the related January Mirror Bonds to the payment of such debt service payment. As a result, such Purchased Bonds will continue to be "outstanding" for purposes of the Trust Agreement (other than for purposes agreed by the Parties), and each respective Purchaser shall retain the rights (including voting and enforcement rights) that they have under the Trust Agreement with respect to the Purchased Bonds, provided that (i) the holders of the Purchased Bonds will not have the right to recover amounts in excess of interest on and principal of the Purchased Bonds; (ii) PREPA will not be liable for breaches by the Securitization SPV or other parties (i.e., Agents); and (iii) any amounts paid under the related January Mirror Bonds after the Purchased Bonds have been paid in full will be assigned to PREPA as described in the Monoline Term Sheet.   Parties to discuss mechanics of implementing these arrangements. |
| **Equal Treatment** | Each Purchaser (whether a Participating Holder or Monoline) will purchase the Purchased Bonds on the exact same terms and under the same Bond Purchase Agreement.  The Bond Purchase Agreement will provide that any future offers made to one Purchaser relating to the Purchased Bonds shall be made to all Purchasers. |
| **Mutual Conditions Precedent** | <u>Amended and Restated Restructuring Support Agreement</u> <br><br> On or prior to December 23, 2015, the Monolines, the Ad Hoc Group, Scotiabank, the Scotiabank Lenders and Solus (collectively, the "**Supporting Creditors**") shall have entered into the Amended and Restated Restructuring Support Agreement. |

---

[7] The Scheduled Retirement Date for the January Mirror Bonds will be the same as the maturity date for Purchased Bonds and the Final Maturity Date for the January Mirror Bonds will be two-years (or any shorter period if the lag applicable to other Securitization Bonds is less than two years) after the maturity date of the Purchased Bonds.

[8] The Purchasers will have all voting and enforcement rights of the holders of Mirror Bonds, consistent with the Monoline Term Sheet.

| | |
|---|---|
| **Additional Conditions Precedent to Purchasers' Obligations** | As a condition to the obligation of the Purchasers to fund under the Bond Purchase Agreement, PREPA, the Holders, the Monolines and the Trustee shall have amended the Trust Agreement as follows (the "**Trust Agreement Amendment**"):<br><br>    a)  Waiver of the requirements under Section 209 of the Trust Agreement ("Issuance of Revenue Bonds for any Proper Corporate Purpose"), solely for the purpose of allowing the issuance of the Purchased Bonds and to the extent necessary permitting the other transactions contemplated hereunder and all other amendments necessary to make Purchased Bonds payable and enforceable by their terms; and<br><br>    b)  During the period the Amended and Restated Restructuring Support Agreement remains in effect as to each Supporting Creditor class, National and Assured, increase thresholds for the exercise of remedies to a majority of bondholders, consistent with the terms of the 17th Supplemental Agreement to the Trust Agreement.<br><br>As a further condition to the obligation of the Purchasers to purchase on the Funding Date, all conditions to purchase set forth in the Bond Purchase Agreement shall have been satisfied or waived and the following conditions to the obligation of the Purchasers to purchase under the Bond Purchase Agreement shall have been met:<br><br>    a)  All conditions herein having been met or waived; and<br><br>    b)  All documents to be executed as described herein shall be in a form reasonably acceptable to PREPA and each of the Purchasers. |
| **Governing Law; Venue** | The Purchased Bonds shall be governed by the laws set forth in section 1301 of the Trust Agreement.<br><br>The Bond Purchase Agreement shall be governed by the laws of the Commonwealth, and PREPA shall submit to jurisdiction in any federal court sitting in the Puerto Rico district and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom.<br><br>The January Mirror Bonds shall be governed by the laws of the state of New York, and the Securitization SPV shall submit to jurisdiction in the state and federal courts located in New York, New York, and waive any objection to jurisdiction and venue. |

| Fees | PREPA shall pay all reasonable and documented[9] fees and expenses arising out of the negotiation and documentation of this January Payment Term Sheet and the Bond Purchase Agreement. |
| --- | --- |

---

[9] Reasonable and documented fees and expenses shall not include time detail but will contain a summary of estimated hours by attorney and total fees and expenses.