# EXHIBIT   21

# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS |
| PUERTO RICO ENERGY COMMISSION<br><br>       Plaintiff,<br><br>       v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>       Defendants. | Adversary No: _____ |

**Verified Adversary Complaint of the Puerto Rico Energy Commission
For Declaratory Judgment and Request for Injunctive Relief**

# TABLE OF CONTENTS

Introduction ......................................................................................................... 1

**COUNT ONE: Declaratory Judgment that FOMB Has No Authority To Mandate or Authorize Substantive Electricity Actions Not Authorized by the Commission** .......... 13

**I. Factual justifications for the declaratory judgment** ........................................ 13

    A.    FOMB's assertion of power, to authorize or mandate substantive electricity actions not approved by the Commission, creates a "case or controversy" supporting the Court's jurisdiction ............................................................... 13

    B.    Investor and customer uncertainty arising from FOMB's imminent action supports the Court's exercise of its discretion ..................................... 19

        1.    Fitness .............................................................................................. 27

        2.    Hardship ........................................................................................... 29

**II. Declarations sought** ....................................................................................... 33

    A.    FOMB has no power to mandate or authorize substantive electricity actions the Commission has not authorized ........................................................... 33

        1.    Legal analysis .................................................................................. 33

        2.    Declarations sought ......................................................................... 37

    B.    FOMB's directives to PREPA, if taken within FOMB's PROMESA authority, preempt the Commission only when it is not possible to design those directives consistently with Commonwealth law ....................................... 39

        1.    Legal analysis .................................................................................. 39

        2.    Declarations sought ......................................................................... 41

**COUNT TWO: Preliminary Injunction (a) Prohibiting FOMB from Mandating or Authorizing Substantive Electricity Actions the Commission Has Not Approved, and (b) Prohibiting PREPA from Taking Such Actions Without Commission Approval** ..... 42

**COUNT THREE: Permanent Injunction (a) Prohibiting the FOMB from Mandating Substantive Electricity Actions by PREPA, and (b) Prohibiting PREPA from Taking Certain Actions** ................................................................................................ 49

**Prayer for Relief** ................................................................................................ 49

## Verified Adversary Complaint of the Puerto Rico Energy Commission
## For Declaratory Judgment and Request for Injunctive Relief

## Introduction

To the Honorable Court:

1.      Plaintiff Puerto Rico Energy Commission ("PREC" or "the Commission")
brings this Verified Adversary Complaint for Declaratory Judgment and Request for
Injunctive Relief against the Financial Oversight and Management Board for Puerto Rico
("FOMB") and the Puerto Rico Electric Power Authority ("PREPA"). Our purpose is to
prevent irreparable harm and eliminate uncertainties arising from imminent *ultra vires*
action by FOMB and continuing and imminent unlawful actions by PREPA.

2.      PREPA has submitted to FOMB a Fiscal Plan. On information and belief, this
Fiscal Plan proposes actions that will affect Puerto Rico's substantive electricity policy—
actions relating to PREPA's power supply mix, capital and operating expenditures, internal
operations, revenue requirements and rate design, among other things. All these subjects
and actions lie within the Commission's jurisdiction under Commonwealth law.

3.      PREPA has submitted this Fiscal Plan to FOMB without presenting its
substance to the Commission for its review—a review necessary to determine whether the
proposed actions are consistent with Commonwealth statutes, as interpreted and applied
by the only agency legally authorized to interpret and apply those statutes. FOMB has
declined to provide the document to the Commission.

4.      FOMB asserts that it has the power, by mandating or authorizing PREPA's
activities, to shape the restoration, operation and transformation of Puerto Rico's electric
industry. FOMB's assertion of that power conflicts with the Puerto Rico Oversight,

Case:18-00021-LTS Doc#:1-7 Filed:03/04/18 Entered:03/04/18 06:51:23 Desc: Main Document Page 5 of 66

Management, and Economic Stability Act of 2016 ("PROMESA"), 48 U.S.C. §§ 2101-2241, and with the Commission's powers, duties and interests under Commonwealth law. Both the assertion and application of that power (as FOMB sees it), and the resulting legal uncertainty, is currently, and will continue to be, harmful to the Commission, PREPA's electricity customers, existing and future bondholders and the public interest.

5.    This Complaint therefore asks the Court to declare that FOMB can neither mandate nor authorize PREPA to take substantive electricity actions that are subject to the Commission's jurisdiction but that the Commission has not authorized. Substantive electricity actions are core regulatory matters that Puerto Rico law assigns to the Commission, and that PROMESA § 303 preserves for the Commonwealth and thus for the Commission. The requested declaration is thus necessary to preserve the Commonwealth's ability, through the Governor, the Legislature, the current Commission and any successor regulatory entity, to determine, free of FOMB's interference, the essential characteristics of Puerto Rico's electric industry, including but not limited to resource mix, market structure, transactional relations, operational standards and capital expenditure priorities.

6.    The Commission also seeks preliminary and permanent injunctions against FOMB and PREPA. FOMB's assertion of power not granted by Congress is currently causing, and will continue to cause, irreparable harm—to the Commission, PREPA, other electric service companies, investors, electricity customers, the economy of Puerto Rico and the public interest. The requested injunctions would prohibit FOMB from mandating or authorizing PREPA to take substantive electricity actions subject to the Commission's jurisdiction but not authorized by the Commission—such as, but not limited to, actions affecting resource mix; asset ownership, operations, maintenance and retirement; market

structure; microgrids; integrated resource planning; and rates.  To support the request for injunction, *i.e.*, to show likelihood of success on the merits, this pleading contains, in Parts II.A.1 and II.B1 of Count One, a detailed legal analysis of PROMESA, Commonwealth law and preemption principles.

7.    A necessary accompaniment to the injunctions against FOMB are preliminary and permanent injunctions against PREPA.  These injunctions would prohibit PREPA from complying with any FOMB mandate or authorization to carry out substantive electricity actions that are subject to this Commission's jurisdiction but which the Commission has not authorized.

8.    We have been here before.  Rejecting FOMB's proposal to take over PREPA's entire business, this Court held that FOMB does not have "broad executive and managerial authority over PREPA's operations," nor the power to "interfere unilaterally with [PREPA's] powers … or with [its] property or revenues," nor the power to "control virtually everything PREPA does."[1]  Despite the Court's clarity, FOMB still acts as if it has powers to direct not only PREPA's current activities but also the substantive transformation of Puerto Rico's electric industry.  This Complaint asks the Court to correct FOMB's misunderstanding by making clear the scope of FOMB's powers.  Then the restoration and transformation of Puerto Rico's electric industry can occur without further litigation and uncertainty.  The Court's clarification, we hope and expect, will also cause FOMB to drop its unexplained, nine-months-long resistance to collaborating with the Commission to create

---

[1]  Opinion and Order Denying Urgent Motion of FOMB to Confirm Appointment of a Chief Transformation Officer (Docket Entry No. 361, Nov. 16, 2017) at 10-16 (hereinafter, "CTO Order").

sensible decision-making protocols that make efficient and effective use of each entity's legal powers, all for the benefit of the Commonwealth's 1.5 million electricity customers. To advance that process, we attach as Appendix A a draft set of protocols for Commission-FOMB cooperation. We do so for two reasons: to prevent FOMB and PREPA from mischaracterizing our Complaint as an effort to "usurp" (to use their overheated language) FOMB's powers, and to take an unfortunately necessary step toward bringing FOMB into a productive joint effort to discipline PREPA's performance.

9.     The Commission does not intend, and wishes not to be misinterpreted or mischaracterized as intending, to erect a blockade to, or create any delay affecting, the reasoned, evidence-based, expedited consideration of ideas articulated by FOMB, PREPA, the Governor, the Legislature or anyone else to restore and transform Puerto Rico's electric industry. We intend, rather, to ensure that decisions on those matters rest with the Commonwealth—not with a federal board whose duties, as detailed in this Complaint (at Part II of Count One), do not include shaping the structure and operations of Puerto Rico's electric industry.

### "Substantive" vs. "fiscal": Separate spheres, overlapping and interacting

10.     This Complaint uses the terms "substantive" and "fiscal" for brevity. To avoid any confusion or mischaracterization, we explain here how we use these terms.

11.     When we say that FOMB's powers are not "substantive," we mean that PROMESA gives FOMB no authority to establish Puerto Rico's policies for the structure and operations of electric industry, just as it gives FOMB no authority to establish Puerto Rico's policies for hazardous waste, law enforcement, or elementary school curricula. Applying

this understanding of "substantive" to the electric industry, FOMB has no power to

establish, for example:

      a.   resource mix (*i.e.*, the mix of conventional generation, renewable generation, demand response or energy efficiency);

      b.   rules for transmission interconnection, distribution interconnection or microgrid interconnection;

      c.   engineering efficiency standards for power plants;

      d.   revenue requirements, rate designs and rates;

      e.   standards for operations;

      f.   market structure (including the mix of monopoly markets and competitive markets for various services);

      g.   priorities for specific capital expenditures, whether for restoration, maintenance or modernization; or

      h.   priorities for the acquisition, retirement or sale of any particular asset.

A comprehensive list of items falling within these substantive categories appears below in

para. 80.  Taking any of these actions—none mentioned by PROMESA—would enmesh this

temporary, federally-created agency, one with no experience or expertise in electricity

regulation, in the exercise of Commonwealth governmental powers.  That was not

Congress's intent.  What this Court held FOMB cannot due directly (by imposing on PREPA

a "chief restructuring officer"), FOMB cannot do indirectly (by compelling PREPA to take

substantive electricity actions).

      12.    When we say that FOMB's powers are "fiscal," we refer to its powers to

address PREPA's financial condition.  Every PROMESA phrase establishing FOMB's

purposes, duties and authorities relates to financial condition.  FOMB must "provide a

method for a covered territory to achieve fiscal responsibility and access to the capital

markets," PROMESA § 101(a); create conditions for a "sustainable level of debt," §
104(i)(1)(B); ensure credible "estimates of revenues and expenditures," § 201(b)(1(A);
ensure "the [sufficient] funding of essential services," § 201(b)(1)(B); eliminate "structural
deficits," § 201(b)(1)(C) and (D); provide a "debt burden that is sustainable," §
201(b)(1)(E); "improve fiscal governance, accountability, and internal controls," §
201(b)(1)(F); and "enable the achievement of fiscal targets," § 201(b)(1)(G).  PROMESA's
grants of power to FOMB make no mention of substantive policy, electricity or otherwise.

13.     We readily acknowledge that while the Commission's and FOMB's statutory
spheres are separate, they do interact.  As just detailed, PROMESA § 201(b) requires FOMB
to make credible estimates of revenues and expenditures, eliminate structural deficits,
make the debt burden sustainable, achieve fiscal targets, and improve fiscal governance.
These FOMB duties under federal law will affect—they may even constrain—the
Commission's decisions under Commonwealth law.  And the Commission's decisions about
resource mix, operational criteria, revenue requirements, revenue allocation, rate design
and market structure all will have fiscal effects.  Thus the interactions move in both
directions, FOMB constraining the Commission and the Commission constraining FOMB.
Those bidirectional constraints are precisely what Congress anticipated when it (a)
instructed FOMB to respect Commonwealth authority (as detailed in paras. 82-89 below);
and (b) required preemption when, notwithstanding that instruction to respect
Commonwealth law, inconsistencies between Commonwealth law and PROMESA are
unavoidable.

14.     Distinct from interactions are overlaps.  While FOMB has no federal law
authority over substantive matters, the Commission does have Commonwealth law

authority over certain fiscal matters.  Each of FOMB's fiscal areas—"revenues and
expenditures," "structural deficits," "debt burdens," "fiscal targets" and "fiscal
governance"—are also areas covered by Act 57-2014 (hereinafter called "Act 57").  This
statute created, after 70 years of an unregulated monopoly, regulatory oversight of PREPA.
Act 57 commands the Commission to "oversee [that] PREPA's debt issues are in the public
interest."  Act 57, § 6.3(n).  The Commission also must "prevent[] its actions from impairing
PREPA to meet its contractual obligations to bondholders."  Act 57, Statement of Motives,
Regulations.  Commission-set rates must produce revenues sufficient "for the payment of
the principal of and interest on [PREPA's] bonds."  Act 83, §§ 6(l) and 6B(b) (as amended
by Act 57 §§ 2.6 and 2.8, respectively); *see also* Act 57 § 6.3(m) (requiring Commission to
exercise its authority in a manner that ensures "that PREPA meets its obligations to
bondholders").  Act 57 grants PREC powers similar to those PROMESA grants FOMB.

15.     In these overlapping situations, the relationship between FOMB and the
Commission is governed by PROMESA sec. 4:  If there is "inconsistency" between an FOMB
directive authorized by PROMESA and a Commission order, FOMB prevails.  This PROMESA
provision signals conflict preemption, not field preemption.  Absent unresolvable
inconsistency, FOMB actions on fiscal issues do not preclude Commission actions on fiscal
issues.

16.     This existence of interactions and overlaps does not vest FOMB with
authority it does not have.  It means, instead, that FOMB and the Commission must make
these interactions and overlaps work toward the two entities' mutual goals.  FOMB's
obligation to do so arises from PROMESA's command that FOMB respect Commonwealth
law (as explained in Part II.B.1 of Count One below).  The Commission's obligation to do so

arises from PROMESA § 4, which preempts the Commission in cases of unresolvable inconsistency. The relationship can work only if FOMB and the Commission collaborate. The relationship cannot work if FOMB refuses to collaborate and claims substantive territory it does not have. But that is what FOMB has done; that is why the Commission has filed this Complaint.

### The legal effect of certification

17. If FOMB has no power to order or authorize substantive electricity actions not approved by the Commission, then what is the purpose of a PREPA fiscal plan—and what is the legal effect of certification? The answer comes straightforwardly from PROMESA. Certification of a fiscal plan creates binding parameters on fiscal matters—such as budgeting, expenditures, repayment of existing debt and issuing of new debt. Those fiscal parameters bind PREPA and constrain the Commission. The basis for those fiscal parameters is the set of substantive electricity actions described in the fiscal plan—actions that PROMESA requires be consistent with Commonwealth law, as enacted by the Legislature and applied by the Commission. FOMB's certification of a fiscal plan thus binds fiscally, not substantively. The certification does not direct, or preemptively authorize, PREPA to carry out substantive electricity actions because under PROMESA § 205(a), FOMB's substantive role is only to "recommend."

18. In short, FOMB's certification is an authorization, or mandate, to carry out fiscal actions whose basis is the substantive electricity plan. That substantive electricity plan must reflect the judgments of the Commonwealth. That is how Congress achieved the melding of Commonwealth substantive law—which PROMESA preserves—and federal fiscal discipline—which Congress directs FOMB to impose.

19.     Given this legal reasoning, the logical, orderly sequence is for PREPA to have

its substantive ideas approved by the Commission first.  Those substantive features become

the basis for the fiscal plan PREPA submits to FOMB.  Otherwise—if PREPA can submit to

FOMB substantive electricity plans not approved by the Commission—there is risk that the

fiscal constraints and fiscal authorizations approved through FOMB certification will be

based on substantive actions that violate Commonwealth law, resulting in repetitive round

trips by PREPA to the Commission and the FOMB until the fiscal parameters approved by

the FOMB and the substantive priorities established by the Commission are in synch.

20.     In no way does the Commission intend to bind, or interfere with, the FOMB

when FOMB carries out its fiscal duties.  If the Commission approves a substantive plan

that the FOMB finds too expensive, FOMB will reject the accompanying proposed

expenditure level.  That rejection will constrain the Commission.  It will force the PREPA,

subject to Commission review, to design a new substantive plan that honors FOMB's limits.

### The Parties

21.     Plaintiff Puerto Rico Energy Commission ("PREC" or "the Commission") is an

independent regulatory agency established by the Commonwealth Legislature in Act 57.

The Commission is "in charge of regulating, overseeing, and ensuring compliance with the

public policy on energy of the Commonwealth of Puerto Rico."  It is "the key component

for the faithful and transparent execution of the Energy Reform."[2]  Act 57 commands the

Commission to:

> "guarantee the orderly and integrated development of our electrical system, thus
> ensuring the reliability, efficiency, and transparency thereof, and the provision of
> electric power services at reasonable prices";

---

[2] Act 57, Statement of Motives.

9

"evaluate [PREPA's plans] regarding its obligation to efficiently generate electric power, various operational issues, and the integration of renewable energy, among other mandates";

"oversee all types of operations, processes, and mandates pertaining to the efficiency of the energy sector of the Island";

"oversee [that] PREPA's debt issues are in the public interest";

"approve the electricity rates proposed by PREPA, [so that those rates are] just and reasonable"; and

"guarantee that PREPA meets its obligations to bondholders."[3]

22.     Defendant FOMB is an entity within the territorial government of Puerto Rico, as provided for in PROMESA § 101, 48 U.S.C. § 2121.  Under PROMESA § 201, 48 U.S.C. § 2141, FOMB is responsible for certifying fiscal plans submitted by territorial instrumentalities.

23.     Defendant PREPA is a public corporation within the territorial entity of Puerto Rico, designated by FOMB as a covered territorial instrumentality and represented in this Title III proceeding by FOMB.

---

[3] *Id.*

## Jurisdiction and Venue

24.     This dispute concerns FOMB's misunderstanding of its powers under PROMESA. It also concerns PREPA's decisions to disobey Commission decisions issued under Commonwealth law unchanged by PROMESA, where PREPA justifies its behavior by citing FOMB's misunderstanding. This Court has federal question jurisdiction under 28 U.S.C. § 1331. This Court also has jurisdiction under PROMESA § 106(a), 48 U.S.C. § 2126(a) (vesting jurisdiction over "any action against the Oversight Board, and any action otherwise arising out of [PROMESA], in whole or in part"); as well as under PROMESA § 306(a) (vesting jurisdiction over "all civil proceedings arising under this title").

25.     This Court has authority to provide declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. As described in Part I of Count One, there exists an actual, justiciable controversy due to FOMB's assertions of authority to mandate and authorize PREPA to take substantive electricity actions that are subject to the Commission's jurisdiction but that have not been authorized by the Commission. Multiple factors, described in Part I of Count One, (a) establish a "case or controversy" necessary to the Court's jurisdiction, and (b) support the Court's discretionary exercise of that jurisdiction.

26.     The Commission has standing to bring this case because FOMB's intentions to direct the substantive shape and performance of the Commonwealth's electric industry interfere with the Commission's exercise of its powers under Commonwealth law. This interference causes PREPA to disregard, or delay compliance with, Commission orders. Together, FOMB's and PREPA's behaviors have caused, and will continue to cause, the Commission to devote its limited resources, in terms of internal staff and Commissioner

time, and consultant expense, to (a) issue and enforce its orders; and (b) clarify for investors and customers, current and prospective, the regulatory conditions under which the restoration and transformation of Puerto Rico's electric industry will occur. FOMB is causing confusion, and confusion is costly. These harms to the Commission will be redressed by a declaratory judgment defining FOMB's powers to mandate or authorize PREPA activities as fiscal, not substantive.

27.     This Court has jurisdiction to grant injunctive relief under Rule 65 of the Federal Rules of Civil Procedure (applicable in Title III under Rule 7065 of the Federal Rules of Bankruptcy Procedure), and PROMESA § 310.

28.     Venue in the District of Puerto Rico is appropriate under PROMESA §§ 106(a) and 307.

29.     PROMESA § 106(e) does not bar this Complaint. Section 106(e) states: "There shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under this Act." The Commission is not here challenging an FOMB certification. The Commission is challenging FOMB's assertion of power to mandate or authorize substantive electricity actions that the Commission has not authorized—a power not contained within FOMB's certification authority. As this Court has held, interpreting PROMESA § 108: "PROMESA does not preclude the government from pushing back and seeking court determinations regarding the FOMB's interpretations of PROMESA."[4]

---

[4] Opinion and Order Denying Urgent Motion of FOMB to Confirm Appointment of a Chief Transformation Officer (Docket Entry No. 361, Nov. 16, 2017) at 20 (hereinafter, "CTO Order").

# COUNT ONE

## Declaratory Judgment that FOMB Has No Authority to Mandate or Authorize Substantive Electricity Actions Not Authorized by the Commission

## (Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)

30.     The Commission incorporates by reference paras. 1 to 29.

31.     Declaratory judgment plaintiffs must satisfy two tests: a constitutional test (Is there a "case or controversy"?); and a prudential test (Should the Court exercise its statutory discretion?). Part I states the facts that satisfy each test. Part II describes the declarations sought and presents the supporting legal analysis.

## I.    Factual justifications for the declaratory judgment

### A.    FOMB's assertion of power, to authorize or mandate substantive electricity actions not approved by the Commission creates a "case or controversy" supporting this Court's jurisdiction

32.     Jurisdiction to grant a declaratory judgment complaint requires "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). This test is met by the following facts.

33.     On December 20, 2017, FOMB, acting under PROMESA § 201, directed PREPA to submit a Fiscal Plan.

34.     On December 20, 2017, the FOMB Chairman sent to Puerto Rico's Governor a letter listing subjects PREPA must address in its to-be-submitted Fiscal Plan.[5]  This list was largely substantive:  "low-cost reliable power," "investments in resiliency ... at an investment level comparable to mainland utilities following major storms," "new technology deployment," "significantly reduced demand forecast," "revised capital investment program," and operational "targets and milestones to enable PREPA to become a world-class utility."  The letter also required the Plan to address fiscal matters:  "financial sustainability," "private investment" and the use of federal funding for reconstruction.

35.     On January 24, 2018, PREPA submitted to FOMB a draft "Amended and Restated Fiscal Plan" (the January 24 Plan).[6]  This document, a revision of the Fiscal Plan certified by FOMB on April 28, 2017, described numerous planned PREPA actions relating to restoration, operations under "normal circumstances," rates and regulatory treatment and "macro resource planning."  The document included an Appendix describing the "transformation" of Puerto Rico's electric industry, including selling off PREPA's generation assets to private owners, retaining government ownership of PREPA's transmission and distribution assets, and awarding a concession to a to-be-selected private provider of transmission and distribution services.  The entire document involves substantive industry matters that, as we will explain in Part II of this Count One, are outside FOMB's statutory

---

[5]  Available at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/5a315ece7eeb2.pdf.  To reduce the complexity of this submission, the Commission has provided as exhibits only those cited items for which there is no web site address.  Should the Honorable Judge wish an electronic copy of any other cited document, we will supply it.

[6]  Available at http://www.aafaf.pr.gov/assets/prepa-revisedfiscalplan-01-24-18.pdf.

domain.  Ironically, PREPA's draft Fiscal Plan had no "fiscal" discussion—no revenues, no expenditures, no debt projections, no debt repayment plans.  The entire document was substantive.

36.     On January 31, 2018, the Commission issued an order (the January 31 Order) directing PREPA to submit its Fiscal Plan to the Commission, along with a list of witnesses able to answer the Commission's questions about the Plan.[7]  PREPA has not complied with this Order.

37.     On February 5, 2018, FOMB sent the Governor a letter critiquing PREPA's January 24 Plan.[8]  FOMB identified multiple deficiencies and instructed PREPA to correct them.  In the fiscal area, FOMB required more detail on financial projections, estimates of federal funding, revenue and expense measures, and cash management controls; as well as a debt sustainability analysis.  In the substantive area, FOMB required a "path to a new integrated resource plan," including "generation portfolio targets, with the goal of decreasing fuel and purchased power costs by at least 5 cents per kWh"; and more details on operational savings.  FOMB also required more detail on PREPA's proposal (set forth in the Appendix to the January 24 draft Fiscal Plan) to "privatize" generation and award a concession for transmission and distribution service.  FOMB required PREPA to submit a revised fiscal plan by February 12, 2018.

---

[7]  In Re: Puerto Rico Electric Power Authority's Fiscal Plan, Case No. CEPR-IN-2018-0001 (available at http://energia.pr.gov/wp-content/uploads/2018/01/Resolution-and-Order-PREPAs-Fiscal-Plan-CEPR-IN-2018-0001.pdf).

[8]  Available at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/5a78d5cd6b7de.pdf.

38.  On February 12, 2018, PREPA submitted to FOMB a revised Fiscal Plan (the February 12 Plan).  PREPA did not submit the February 12 Plan to the Commission, and FOMB has not made it public.  The Commission has not seen the February 12 Plan.

39.   On February 14, 2018, the Commission received a letter from the Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF), acting on behalf of PREPA.[9] That letter states a refusal to comply with the January 31 Order.

40.  On information or belief, FOMB intends to order or authorize PREPA to carry out substantive electricity actions described in PREPA's February 12 Fiscal Plan (or a subsequent revision), without the Commission having authorized, or even reviewed, those actions.

41.  Prior communications to the Commission by PREPA and its agent AAFAF make clear that both entities incorrectly assume that FOMB can mandate or authorize PREPA's substantive electricity actions, and that those mandates or authorizations preempt the Commission's jurisdiction.  Consequently, PREPA will take the substantive electricity actions specified in its Fiscal Plan without Commission approval.  When taking those actions, PREPA will incur costs.  The Commission then will have no choice but to make ratepayers pay for those costs, regardless of their reasonableness.  Because PREPA has no private shareholders, the only possible cost-bearers are its ratepayers.  (A more detailed explanation of this point appears in para. 54 below.)

42.  On information and belief, there are multiple conflicts between the substantive electricity actions described in PREPA's February 12 Plan and prior

_____

[9]  Exhibit A.

Commission orders.  The evidentiary basis for this belief is that such conflicts appeared in the January 24 Plan, but FOMB's February 5 critique of that January 24 Plan nowhere mentioned those conflicts, let alone required their elimination.  Those conflicts create uncertainty for the Commission, investors and customers large and small, over whether PREPA will obey or disobey those prior Commission orders.  Discussed next are two areas of conflict:  integrated resource plan, and revenue allocation and rate design.

### Integrated resource planning

43.     Section 6.23 of Act 57 requires PREPA to have an "integrated resource plan" (IRP).[10]  An IRP guides the procurement of all resources necessary to ensure a cost-effective, reliable electric system.  The Commission's rules and procedures addressing the IRP constitute the central means of disciplining expenditures by this multi-billion-dollar monopoly.

44.     As detailed in the Commission's September 2016 order approving a Modified Integrated Resource Plan, PREPA's efforts to submit an appropriate IRP, during 2015 and 2016, fell far below statutory and industry standards.[11]  Numerous revisions, directed by the Commission, were necessary to correct deficiencies in PREPA's various drafts.

45.     PREPA's January 24 Plan reveals that PREPA learned little from this experience.  Here are two examples.  First, the January 24 Plan (at 40-41) presents an "illustrative" capacity expansion plan.[12]  That illustrative plan is "based on the results of

--------

[10]  An "integrated resource plan" is:

a plan that considers all reasonable resources to satisfy the demand for electric power services during a specific period of time, including those related to the offering of electric power, whether existing, traditional, or new resources, and those related to energy demand, such as energy conservation and efficiency, or demand response and localized energy generation by the customer.

Act 57, Art. 1.3(ee).

[11]  Final Resolution and Order, CEPR-AP-2015-0002 (Sept. 2016) (hereinafter, "September 2016 IRP Order"), available at http://energia.pr.gov/wp-content/uploads/2016/09/23-sept-2016-Final-Resolution-and-Order-IRP-CEPR-AP-2015-0002.pdf.

[12]  A capacity expansion plan is the portion of a capital expenditure plan relating to the addition and retirement of generation capacity.

system and production cost modeling in PROMOD and PSS®E." But the Commission's

September 2016 IRP Order expressly rejected the use of PROMOD and PSS®E, because

neither tool is a "capacity expansion model"[13]—the standard model-type used by IRP

professionals. The Commission ordered PREPA to use capacity expansion modeling in its

next IRP.[14] The January 24 Plan ignores this requirement.

46.     Second, the specific capacity options listed in the January 24 Plan (at 41)

conflict with the Commission's approved Modified IRP (September 2016 IRP Order at 88)

in at least seven ways, as displayed in the following table:

---

[13] As the Commission stated (September 2016 IRP Order at 93):

In developing resource options, PREPA did not use a capacity expansion model. A
capacity expansion model is designed to find optimal (that is, least-cost) resource
combinations objectively. It considers such factors as demand, unit prices and fuel
prices under specific constraints such as reliability, emissions and capital limits....
Instead, PREPA developed resource portfolios by "manually," i.e., subjectively,
selecting units to be added to one of its main three generation sites (Aguirre, Costa
Sur and Palo Seco/North Metro).

The Commission added: "PROMOD is a production cost model....The production cost model
used by PREPA has no capability to determine a long-term, least-cost resource mix by
selecting new resources and retiring existing resources...."

[14] *See* September 2016 IRP Order at p. 91 (requiring a "description of the modeling
framework PREPA will use in the next IRP, including a discussion of how PREPA will use
capacity expansion modeling capabilities"). *See also* the IRP Rule, § 3.04(A)(6).

| Resource | Modified Action Plan in IRP Order | Illustrative Capacity Expansion Plan from PREPA Fiscal Plan | Consistent with IRP Order? |
|---|---|---|---|
| AOGP | Pursue permitting; no order to construct.[15] | Assumes construction | No |
| New Aguirre CC | Pursue permitting | No mention | No |
| Aguirre CC 1 and 2 | Pursue permitting. Start competitive bidding process; no order to construct | Assumes construction | Possibly[16] |
| Palo Seco Three Small CCs | Pursue permitting | No mention | No |
| Palo Seco One Small CC | Start competitive bidding process, but no order to construct | Assumes construction | Possibly |
| Palo Seco 1 and 2 | Retire | No mention | No |
| Costa Sur 3 and 4 | Retire | No mention | No |
| San Juan 7 and 8 | Retire | No mention | No |
| San Juan 9 and 10 | Designate "limited use" | Retire | No |
| Palo Seco 3 and 4 | No mention | "Limited Use" | Possibly[17] |
| Aguirre 1 and 2 Steam Unit Replacement | Outside 5-year Plan period[18] | Assumes construction | Possibly[19] |

---

[15]  The Commission has opened Docket No. CEPR-AP-2017-0001 to investigate the economics of AOGP.  In its Order opening that investigation, the Commission stated: "Although the Commission's Final Resolution [in the IRP proceeding CEPR-AP-2015-0002] provided PREPA with the procedural mechanism for filing a sound economic analysis of AOGP, PREPA has not done so.  Given PREPA's inaction, the Commission has taken the initiative in moving forward with a comprehensive and reliable evaluation of AOGP."

[16]  It is reasonable for PREPA to plan as though generators for which the Commission ordered a competitive bidding process following permitting will be constructed.  However, the IRP Order stopped short of approving construction.

[17]  The need for Palo Seco 3 and 4 would be reduced by the commissioning of new generation at Palo Seco.  It is reasonable, therefore, for PREPA to assume these units could transition to Limited Use status when that new generation is operational.  Consistency between the draft Fiscal Plan and the Commission's September 2016 IRP Order is thus contingent on the fate of other generation at Palo Seco.

[19]  It is consistent with the IRP Order for PREPA to plan for replacement of steam units at Aguirre and Costa Sur if the date of construction is more than five years in the future and subsequent IRP evaluation would intervene.  The lack of dates in the January 24 Plan means that the Commission cannot verify this timeline.

47.     As this table shows, PREPA's illustrative capacity expansion plan omits the retirement of Costa Sur Units 3 and 4, Palo Seco Units 1 and 2, and San Juan Units 7 and 8, even though the Commission specifically ordered these retirements to occur as soon as feasible, subject to maintaining system stability.

48.     The hurricanes surely will cause PREPA and the Commission to revisit the Modified IRP (which the Commission will do, per Act 57, during 2018). But until then, PREPA remains bound by the Commission's September 2016 Order approving the Modified IRP.

49.     In sum, FOMB assertion of power over electricity substance would include authorizing PREPA to disregard the Commission's directives to base resource portfolios on a capacity expansion model and to take specific actions (or not) on specific generation resources. PREPA's actions will lead to PREPA incurring unreasonable costs—costs which, once incurred, ratepayers will have to bear.

### Revenue allocation and rate design

50.     PREPA's January 24 Plan (at 35-38) raised legitimate questions about efficient price signals, inter-class revenue allocation of revenue responsibility, class subsidies, uneconomic bypass, economic development rates and "stranded cost" recovery. Deciding these questions correctly is essential to making rates just and reasonable and not unduly discriminatory, as required by Act 57. But the Jan. 24 Plan nowhere acknowledged,

---

[19] It is consistent with the IRP Order for PREPA to plan for replacement of steam units at Aguirre and Costa Sur if the date of construction is more than five years in the future and subsequent IRP evaluation would intervene. The lack of dates in the January 24 Plan means that the Commission cannot verify this timeline.

let alone corrected, PREPA's deficiencies in those areas, as detailed in the Commission's

Rate Order of January 10, 2017.[20] Specifically:

1. PREPA proposed (January 24 Plan at 37) to move rates for each customer class closer to the cost of serving each customer class. But the document ignores the Commission's finding that PREPA's cost of service study (COSS) had too many deficiencies to be used as a basis for allocating revenue responsibility. (Jan. 2017 Rate Order at paras. 325, 331)

2. PREPA asserted (*id.* at 37) that there is "heavy subsidization of certain PREPA residential classes, which discourages energy conservation and efficiency." But the document ignores the Commission's finding that most of the subsidies are required by statute (Jan. 2017 Rate Order at para. 252). And nowhere in the January 24 Plan is there any mention of plans to invest in "energy conservation and efficiency," although there is plenty mention of restoring and adding generating plants. (January 24 Plan at 40-42)

3. About rate design, PREPA proposes (*id.* at 38) to move more costs from volumetric charges (*i.e.*, per-kWh) to fixed charges (*i.e.*, per-customer). This change, PREPA asserts, will "reduce volatility [in recovery of fixed costs] and discourage inefficient bypass." But based on the Commission's evaluation of PREPA's marginal cost signals and price signals, the January 2017 Rate Order rejected some of PREPA's proposals and accepted others (paras. 347, 356-357; Directives 74, 80). In denying much of PREPA proposed increase to fixed charges, the Commission also found that the Company "provided no evidence about the magnitude of the risk [of not recovering its fixed costs]." (para. 347)

4. PREPA's proposal to "unbundle" delivery and supply rates and costs (January 24 Plan at 38) ignores the Commission's rejection of this rate structure as providing information irrelevant to consumers. (January 2017 Rate Order, Finding 372)

5. Of the targeted "economic development" rate tools PREPA proposes, the Commission has approved a load-retention tariff, but only where necessary to retain load and only subject to Commission advance approval. The purpose of the Commission's advance review is to ensure that the discount "shall...not produce rates below marginal cost, shall be no greater than necessary, shall not encourage wasteful consumption, and shall not pose an obstacle to the development of economical renewable energy." (Directive 85)

---

[20] Final Resolution and Order in Docket CEPR-AP-2015-0001 (January 10, 2017), available at http://energia.pr.gov/wp-content/uploads/2017/01/Final-Resolution-and-Order.pdf.

Case:18-00021-LTS Doc#:1 Filed:03/04/18 Entered:03/04/18 16:06:15 Desc: Main
Exhibit 21 Page 25 of 65

6.      PREPA's proposal to initiate economic development rates ignores the
Commission's rejection of this proposal, due to lack of specificity, in its
January 10, 2017 Rate Order. The Commission found that while it considers
stimulating economic development to be a worthy goal, PREPA had not
"address[ed], among other things, the types of jobs or their longevity…or the
Commission's ability to enforce job creation requirement against a customer
that fails to achieve that requirement." (Directive 84)

51.      PREPA and AAFAF base their disregard for the Commission's orders on
FOMB's assertion of power to declare, and intent to declare, substantive policies for
Puerto Rico's electric industry. This intent is evidenced in at least four distinct ways,
discussed next.

52.      First, on January 24, 2018, the Commission published a Policy Statement—a
detailed legal analysis explaining why the FOMB has no "authority to impose substantive
electricity obligations on PREPA or Puerto Rico."[21] This document, much of which is
restated in the legal analysis contained Part II.A of Count One, explains that the FOMB's
powers do not include controlling the substantive features of Puerto Rico's electric
industry. By letter of February 3, 2018, signed by Mr. Jaime El Koury, FOMB stated that it
"vehemently rejected the Commission's legal position." Although the vehemence was
unsupported by any legal analysis, this letter establishes sufficient disagreement among
the parties to create a "case or controversy."[22]

53.      Second, FOMB's Executive Director, by email of November 2, 2017, chose not
to have executed a simple two-page memorandum of understanding, prepared by the

_____

[21]  Available at http://energia.pr.gov/wp-content/uploads/2018/01/Policy-
Statement-CEPR-MI-2018-0003.pdf.

[22]  Exhibit B.

23

Commission, by which each entity's Chairman would direct his lawyers to conceive and prepare, by a date specified by the Chairmen, a protocol that meshes the two entities' legal duties.[23]  The Executive Director's email said the lawyers from each entity could talk.  But at no point before and after that email, at no point in the past ten months (the Commission first reached out to FOMB's counsel at Proskauer last May), have FOMB's representatives responded substantively, or positively, to Commission efforts to create protocols that mesh our respective duties.  Mr. El Koury's November 3 statement, that FOMB "has engaged [the Commission] for many months in an effort to develop a collaborative relationship," is not consistent with the facts—not if one defines "collaborative relationship" to mean coordinating their legal authorities.  As already stated, the Commission has prepared a draft set of protocols, attached as Appendix A, and remains ready to start and complete this essential task once FOMB realizes the limits on its jurisdiction and the necessity of cooperation.

54.      Third, FOMB intends to preempt, and prevent, the Commission's expert review of PREPA's budgets.  Already FOMB has supported PREPA's resistance to that review.  This situation renders the Commission unable to protect PREPA ratepayers from imprudent PREPA costs.  We mean this statement literally.  Here is the background:  In its January 2017 Rate Order, the Commission required PREPA to receive Commission approval of its budgets before incurring costs under those budgets.[24]  The Commission explained that because PREPA was a non-profit entity, the conventional regulatory

---

[23]  Exhibit C.

[24]  January 2017 Rate Order at paras. 427-444.

treatment of imprudent costs—requiring their absorption by shareholders—is

unavailable because a non-profit company has no private shareholders.  In the non-profit

context, unless all costs are recovered from ratepayers the utility will have insufficient

revenues to operate; so disallowing costs from rates is cutting off one's nose to spite one's

face.  Given this constraint, *the only way to protect ratepayers from imprudent costs is to*

*prevent PREPA from incurring them to begin with.*  The Commission therefore required

PREPA to submit an annual budget before spending its money.  (PREPA had proposed a

"true-up" process that amounted to "We spend it, we tell you about it, you make

ratepayers pay it"—the very absence of accountability that Act 57 was enacted to fix.)[25]

When PREPA challenged this feature of the Commission's rate order in the

Commonwealth court system, FOMB in September 2017 supported AFFAF's Notice of

Removal of the challenge to this Court, the removal notice being based on preemption.[26]

As detailed in our response to the removal notice,[27] the preemption argument is wrong

because (a) PROMESA's preemption provision (§ 4) requires only conflict preemption, not

field preemption; and (b) there is no reason why PREPA cannot comply with both sets of

requirements.  Until this Court (or a Commonwealth Court, if this Court remands the

---

[25]  A comparison of the Commission's 18-paragraph discussion (January 2017 Rate Order at paras. 427-444) with PREPA's 6-bullet-point characterization (January 24 Plan at 36) will leave any objective person dazed by the disfigurement.  Only a company confident of its imminent release from Commission regulation—thanks to FOMB's overreach—would so distort an order's intent.

[26]  The Notice of Removal is Doc#1 in Case No. 17-00256-LTS, filed and entered September 5, 2017.

[27]  The Commission's Response is Doc#29 in Case No. 17-00256-LTS, filed and entered December 19, 2017.

appeal) makes plain that the Commission's budget-review authority is not preempted, PREPA is able to incur expenses, which ratepayers will have to bear, without the Commission reviewing those expenses first. For this situation, the term "unregulated monopoly" is not hyperbole.

55.     Fourth, FOMB is impeding the Commission's efforts to review PREPA's contracts. As just explained in para. 54, once PREPA incurs costs, the Commission has little choice but to set rates that force PREPA's customers to bear those costs. To ensure that rates are "just and reasonable" (as Act 57 requires), the Commission therefore must review PREPA's contracts before PREPA commits to them.[28]  We readily acknowledge that FOMB has authority under PROMESA to review PREPA's contracts, just as the Commission has that duty under Act 57. Because PROMESA signals conflict preemption rather than field preemption, the Commission reached out to FOMB to determine ways to coordinate contract review so that PREPA could comply with both agencies' requirements without conflict. FOMB's Executive Director sent the Commission in mid-January a draft letter effectively declining to share PREPA contracts with the Commission unless the Commission "suspend[ed] review of PREPA's contracts under [the Commission's] regulations."[29]  FOMB's response is, of course, the definition of non-cooperation because it

---

[28]  The Commission issued Order on November 17, 2017, requiring advance Commission approval of contracts exceeding $10 million for energy, grid services and fuel procurement, $1 million for infrastructure development; and $250,000 for professional services. *In re Temporary Oversight Measures Relating to the Procurement and Management of Restoration Services by PREPA*, Docket No. CEPR-MI-2017-0008 (Nov. 17, 2017), available at http://energia.pr.gov/wp-content/uploads/2017/11/Order-Temporary-Oversight-Measures-CEPR-MI-2017-0008-1.pdf Appendix: http://energia.pr.gov/wp-content/uploads/2017/11/Appendix-I-Order-CEPR-MI-2017-0008.pdf.  PREPA has failed to comply, and FOMB has not directed PREPA to comply.

[29]  Exhibit D.

would require the Commission to act unlawfully—to abandon its own statutory duties in order to gain information necessary to carry out its statutory duties.

56.     The sum of FOMB two central positions—that its authority covers substantive electricity matters and that this Commission is preempted from controlling PREPA's costs by preventing imprudent costs before they occur—creates an immediate and continuing risk of irreparable damage, since all costs incurred by PREPA must be recovered in rates charged by PREPA.  The situation leaves the Commission no choice but to seek this Court's assistance in clarifying the law so that PREPA can no longer cite FOMB as the reason for disobeying the Commission.

**B.     Investor and customer uncertainty arising from FOMB's imminent action supports the Court's exercise of its discretion**

57.     Even with a "case or controversy," granting a declaratory judgment is a matter of discretion.  *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491(1942).  In deciding whether to exercise that discretion, courts consider "the fitness of the matter for judicial decision and the hardship to the parties of withholding court consideration."  *In re Combustion Equipment Associates, Inc.*, 835 F.2d 35, 37 (2d Cir. 1988) (*citing Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).

**1.     Fitness**

58.     To determine fitness, courts consider "(1) whether the agency action is 'final' and (2) whether the issue is purely legal or whether 'consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to enforce the regulations.'"  *Combustion Equipment*, *supra* at 37-38 (*quoting Gardner v. Toilet Goods Association*, 387 U.S. 167, 171 (1967)).

59.     The finality requirement does not apply here because the Commission is not, and will not be, a party in any FOMB proceeding whose outcome the Commission would then challenge.  The same reason makes inapplicable any requirement to exhaust administrative remedies.[30]  In any event, FOMB's actions as described in this Complaint  are actions sufficiently "final" to support this Court's discretion.  From these FOMB actions, industry actors will necessarily infer that that the Commission has no authority to reject, modify or condition PREPA's actions under the Plan, thus causing the harm we discuss in Count Two.

60.     There is nothing "tentative" about )(a) FOMB's intention to mandate or authorize substantive electricity actions that are within the Commission's jurisdiction but that the Commission has not approved, and (b) PREPA's intent to follow FOMB's directives without getting Commission permission first.[31]

61.     Nor will this problem will "disappear by [it]self."[32]  Nine months of Commission effort to engage FOMB has not made the problem disappear.

---

[30]  *Cf. Cadillac Publishing Co. v. Summerfield*, 227 F.2d 29, 30 (D.C. Cir. 1955) (upholding district court's dismissal of publisher's complaint for failure to exhaust remedies before the U.S. Postal Service).

[31]  *Compare Combustion Equipment*, *supra*, 835 F.2d at 38 (dismissing complaint for declaratory judgment as "unripe"; among other reasons, "the tentative nature of the EPA's action is still relevant because it indicates why the substantive issues [declaratory judgment plaintiff] Carter Day seeks to raise might never have to be decided"); with *Evers v. Dwyer*, 358 U.S. 202 (1958) (upholding grant of declaratory judgment complaint brought by African American citizen seeking adjudication of his right to ride in a segregated bus; though he had not yet been arrested, it was clear that local authorities would enforce the segregation law.

[32]  *Cf. Combustion Equipment*, *supra*, 838 F.2d at 37 (stating that "accelerated judicial intervention [through declaratory judgment] creates the risk of burdening the courts and the litigants with disputes that were otherwise destined to disappear by themselves).

62. The issues are purely legal. They require only an interpretation of PROMESA (provided in Parts II.A.1 and II.B.1 of this Count 1). There is no factual dispute over either FOMB's intent to mandate or authorize substantive elements of Puerto Rico's electric industry without Commission approval, or PREPA's intent to propose them in a fiscal plan and then on certification of that plan implement them without Commission approval.

63. As mentioned (in para. 54), this Court has pending a separate dispute on whether the Commission's action requiring PREPA to submit budgets for approval is preempted by PROMESA.[33] That preemption question is legally distinct from whether FOMB is exceeding its authority. The Commission acknowledges that budget review is outside FOMB's authority. The question in the removed case is whether the Commission's budget review is preempted. As we have argued there, (a) PROMESA signals conflict preemption, not field preemption; and (b) there is no conflict because PREPA faces no impossibility of complying with requirements of both the Commission and the FOMB.

**2. Hardship**

64. *Without judicial clarification*, there is risk of customers paying for unreasonable costs. Here's why: To prepare for the Commonwealth's electricity needs, PREPA must take actions now. The Commission must guide and discipline those actions, approving those that are prudent and preventing those that are imprudent. Otherwise customers will end up paying for the imprudence (as explained in para. 54). Yet PREPA has resisted Commission orders aimed at curbing its imprudence, on the grounds that FOMB is

---

[33] Adv. Proc. No. 17-256-LTS in Case No. 17 BK-04780-LTS. That matter is before this Court because AFFAF removed to federal court PREPA's Commonwealth court challenge (along with another appellant's challenge) to the Commission's January 2017 Rate Order. AFFAF's pleading states (at n.5) that FOMB authorized the filing.

the primary, preemptive forum. We have already explained PREPA's preemption-related resistance to the Commission's January 2017 Rate Order, requiring advance review of budgets and costs, as discussed at para. 54. PREPA also is resisting the Commission's November 17, 2017 Order requiring advance Commission approval of contracts, as explained in para. 55 above. Since all costs must be recovered in customers' rates, there is immediate and continuing risk of irreparable damage as long as PREPA continues insisting on incurring costs undisciplined by Commission action. That insistence is directly attributable to, and supported by, FOMB's intent, unauthorized by PROMESA, to occupy the field of all substantive electricity matters.

65. A distinct customer risk exists if the Commission, acting as required by Act 57, approves third-party investments in projects that are later blocked by FOMB acting *ultra vires.* High on the list of any utility's cost-effective investments are investments in energy efficiency. The more energy efficiency, the less need for expensive, risky physical projects that could become excess due to declining demand. Suppose the Commission selects a provider of energy efficiency services and approves its costs; but then FOMB certifies a fiscal plan with a physical project that renders the energy efficiency investment uneconomic—and then PREPA views that certification as a preemptive directive or authorization to proceed. The risk of such conflicting decisions will both deter investors and raise their capital costs, to the detriment of Puerto Rico consumers. But worse, if a private investment is made based on a Commission decision that is later superseded by a FOMB action, the already incurred costs will have to be covered by customers, since the policy reversal would not have been the investors' fault.

66. *Without judicial clarification*, there will be a long, continuous series of preemption disputes before this Court—over who has authority to mandate or approve capital expenditures, operational expenditures, power supply mix, transmission and distribution modernization, cost recovery procedures, revenue requirement, rate design and any other matter that lies within the Commission's Commonwealth law jurisdiction. The Commission, acting as required under Act 57, will be making decisions in each of those areas. PREPA, when aggrieved, will challenge these decisions as preempted by FOMB's actions—even though FOMB's powers do not extend to those substantive matters. Each of these disputes, brought to an already busy Court, will cause uncertainty and delay in matters essential to Puerto Rico's recovery: power supply investments, third party contracts, rates, energy efficiency initiatives and others.

67. *Without judicial clarification*, there will remain uncertainty and confusion over which entity has authority over which PREPA actions and inactions. That uncertainty and confusion adversely affects the Commission and consumers. Under Act 57, the Commission must establish standards for PREPA's performance. It must determine the resource mix for Puerto Rico's electricity customers. It must establish the market structures and other policies that attract the suppliers most likely to provide those resources cost-effectively. It must set ratemaking policies that attract investors and conservation policies that educate customers. The Commission cannot accomplish these things in a legal fog—a fog created by FOMB's insistence on mandating or authorizing actions outside its authority.

68. *With* judicial clarification, most of these disputes will disappear—along with their associated hardships. With FOMB properly placed in its fiscal domain, the

Commission can proceed with the complex restorative and transformative work that Act 57 requires. The Commission then will use the professional expertise and procedural discipline demonstrated in its prior proceedings—professional expertise FOMB's part-time members do not have and procedural discipline FOMB does not use. The Commission examines proposals using administrative law principles—transparent processes, witness statements under oath, professional questioning by experienced practitioners and attentive Commissioners, with all interested parties having comparable opportunities to present and test the evidence. FOMB does none of this.

69.    Prior to PROMESA and prior to federal involvement in the hurricane aftermath, the statutory responsibility for the Puerto Rico's electric industry's performance rested with the Commission. Once federal involvement ends, that same legal responsibility will rest with the Commission or its successor. During this interim period of federal involvement, it is both logical and necessary for the Commission to continue playing a central role.

70.    A declaratory judgment will cause no hardship to FOMB. If the Court agrees with the Commission, FOMB's workload will be reduced. If the Court disagrees with the Commission, FOMB will proceed as it intends currently. Clarity benefits both parties. But more importantly, clarity benefits the entire Commonwealth: the state and local governments, electricity customers, electricity entrepreneurs seeing opportunities to bring modern technology to electric infrastructure, existing and prospective bondholders, businesses contemplating a move to or from Puerto Rico, PREPA employees and retirees—everyone.

## II.    Declarations sought

### A.    FOMB has no power to mandate or authorize substantive electricity actions the Commission has not authorized

#### 1.    Legal analysis

71.    Multiple PROMESA provisions make clear that FOMB's powers are largely fiscal, not substantive.

72.    The list begins with § 101(a):  "The purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  The subjects of "fiscal responsibility" and "access to the capital markets" do not include transforming electric industry structure, selecting power supply mix, or determining market structures or asset ownership.

73.    This distinction between fiscal and substantive matters is repeated in PROMESA's provisions on the purposes and elements of on Fiscal Plans.

> **Purposes:**  The purpose of a Fiscal Plan is to create conditions for a "sustainable level of debt";[34] and to "provide a method to achieve fiscal responsibility and access to the capital markets...."[35]  This Court sees purposes similarly:  PROMESA-mandated fiscal plans and budgets "provide blueprints for revenues, expenses, debt, and capital resources, and they are used to substantiate methods for responsible financial management."[36]

---

[34]  Section 104(i)(1)(B).

[35]  Section 201(b)(1).

[36]  CTO Order at 12.

***Elements:*** A Fiscal Plan must provide for credible "estimates of revenues and expenditures";[37] "ensure the [sufficient] funding of essential services";[38] provide "adequate funding for public pension systems" and for the "elimination of structural deficits";[39] provide for a "debt burden that is sustainable";[40] "improve fiscal governance, accountability, and internal controls";[41] "enable the achievement of fiscal targets";[42] include "independent forecasts of revenue";[43] and include a "debt sustainability analysis."[44]

All these purposes and elements are fiscal. They give the FOMB no authority to control, through fiscal plans, substantive decisions about Puerto Rico's electric industry.

74.    More confirmation of the fiscal-substantive distinction appears in § 203. That provision requires the Commonwealth to submit periodic reports comparing actual revenues and expenditures to budgets. It does not require—indeed no PROMESA provision requires—reports on substantive actions (*e.g.*, transmission lines constructed, competitive markets created, power supply plans implemented). And if there is an "inconsistency" between approved and actual budget figures, FOMB can only "make reductions in nondebt expenditures," "institute hiring freezes," or prohibit certain contracts or transactions, § 203(d)(2)(A). Those are the FOMB's only tools; it has no authority to mandate particular

---

[37]  Section 201(b)(1)(A).

[38]  Section 201(b)(1)(B).

[39]  Section 201(b)(1)(C) and (D).

[40]  Section 201(b)(1)(E).

[41]  Section 201(b)(1)(F).

[42]  Section 201(b)(1)(G).

[43]  Section 201(b)(1)(H).

[44]  Section 201(b)(1)(I).

activities, like power supply mix, new ownership arrangements or new market structures.

FOMB can cancel the actions it took under § 203(d)(2)(A) if the instrumentality at issue has

"initiated appropriate measures to reduce expenditures or increase revenues," § 203(e);

but again, FOMB has no power to order the instrumentality to conform its actions to any

FOMB substantive vision. The FOMB's powers are fiscal, not substantive.

75.     It is unsurprising that the Fiscal Plan must "provide for capital expenditures

and investments necessary to promote economic growth," § 201(b)(1)(J). Without

"expenditures and investments," there would be no need to address revenues, debt,

funding, targets and all the other items listed in § 201(b)(1). But the legal source of the

"expenditures and investments" is not FOMB's substantive preferences, because PROMESA

gives FOMB no power over electricity industry substance; the legal source of "expenditures

and investments" is Commonwealth law—specifically, Act 57 as applied by the

Commission, or other statutes the Legislature might enact. This reasoning finds explicit

support in § 201(b)(1)(N), which establishes FOMB's key constraint: A plan certified by

the FOMB must "respect the relative lawful priorities … in … other laws … of a covered

territory … in effect prior to the date of enactment of this Act."

76.     Any remaining doubt is removed by § 205(a). It authorizes FOMB to make

*recommendations* about, among other things, "the modification of existing revenue

structures, or the establishment of additional revenue structures," § 205(a)(3);

"modifications or transfers of the types of services that are the responsibility of, and are

delivered by the territorial government," § 205(a)(5); "modifications of the types of

services that are delivered by entities other than the territorial government under

alternative service delivery mechanisms," § 205(a)(6); and "the privatization and

commercialization of entities within the territorial government," § 205(a)(10). The territorial government must consider these recommendations and explain any rejection, but it has no obligation to accept them, §. 205(b). If these substantive matters were within the FOMB's mandatory authority, the recommendatory provisions of § 205(a) and (b) would be surplusage. The FOMB's mandatory authority is fiscal, not substantive.

77.     There is more. Section 209 requires FOMB to terminate when the territorial government (a) has "adequate access to short-term and long-term credit markets at reasonable interest rates"; (b) has, for four consecutive fiscal years, developed its budgets consistent with "modified accrual accounting standards"; and (c) has lived within those budgets. FOMB's termination has no substantive precondition. FOMB's purpose is fiscal, not substantive.

78.     Real substantive authority for FOMB appears in only two situations. The first is § 204(b)(2), authorizing FOMB to establish policies "to ensure that proposed contracts promote market competition...." In PREPA's context, it is not clear whether this provision refers to competition among prospective contractors to PREPA, or instead refers to competition to provide electric services (*e.g..*, generation, transmission, distribution, storage, microgrids, demand response and energy efficiency). Regardless, neither of those goals conflicts with Commission policies. Furthermore, neither purpose authorizes FOMB to issue mandates about the subjects that fall within the Commission's Act 57 jurisdiction.

79.     The second exception is in Title V, which creates a path by which FOMB can approve a "Critical Project." Title V makes Congress's intent clear: FOMB's authority over Critical Projects must support the Commission, not preempt it. Specifically, § 503(b)(1)(D) requires that any project connecting to PREPA's transmission or distribution facilities

"shall be ineligible for Critical Project designation" if the Commission timely determines the

project will "adversely affect an approved Integrated Resource Plan." Note also that Title V,

which creates the Revitalization Coordinator role, confines that role to *making*

*recommendations* to the FOMB about Critical Projects. The Revitalization Coordinator *has*

*no other role*. It certainly is legitimate for the Coordinator to have a vision for Puerto Rico's

electric industry that guides his recommendations on particular projects. But PROMESA

gives neither him nor the FOMB any substantive authority to mandate that vision. As this

Court held:

> Although the FOMB's fiscal plan and budgeting powers give it a strong and
> substantially determinative voice in overall strategy regarding the
> Commonwealth's revenues, expenses, and general direction for responsible
> financial management, they do not imply that the FOMB's role includes
> detailed operational planning or direct executive authority over the
> implementation of those plans and budgets.[45]

The FOMB's powers are fiscal, not substantive.

### 2. Declarations sought

80. Because PROMESA does not authorize FOMB to mandate or authorize

substantive electricity actions that the Commission has not authorized, FOMB has no power

to address actions in the following areas, among others:

### *Market transformation*

Current and future market structures (monopoly vs. competition) for various
products and services

Whether and to what extent PREPA should continue as a provider of electricity
services

Whether and in what roles there should be new provider(s) of electricity services

---

[45] CTO Order at 12.

Divestitures of PREPA assets or business functions

Acquisitions by PREPA of assets or business functions

The mix of government and non-government ownership of electricity assets

The mix of government and non-government provision of electricity services

Whether there should be "wheeling" service, and on what terms

Whether there should be microgrids, and on what terms

Terms of interconnections between PREPA and power producers

### *Resource mix*

Mix of power supply, energy efficiency and demand resources

Integrated resource plan

Determine future percentage mix of renewable and non-renewable, and types of each

Establish framework for determining need and value of ancillary services

Establish framework for determining need and value of resource flexibility

Approve near-term IRP action plans

Siting of power supply resources

### *Electricity rates*

Caps or floors on PREPA's rates (including any adjustment clauses)

Procedures by which PREPA's rates (including any adjustment clauses) are adjusted

Terms for net-metering

Terms for demand response or energy efficiency

### *Operations*

Reliability parameters for Puerto Rico's electric industry

Performance metrics, reporting procedure and enforcement methods

Restoration plans, priorities and expenditures

Maintenance plans, priorities and expenditures

Generating plant efficiency standards

Criteria and decisions on hiring contractors

Criteria and decisions on hiring, laying off or buying out employees

81.    All these features of Puerto Rico's electric industry are decisions to be made

by the Commonwealth.[46]

**B.    FOMB's directives to PREPA, if taken within FOMB's PROMESA
authority, preempt the Commission only when it is not possible to
design those directives consistently with Commonwealth law**

**1.    Legal analysis**

82.    Repeatedly and explicitly, PROMESA directs FOMB to act consistently with

Commonwealth law.

83.    Section 201(b)(1)(A)(i) provides that a Fiscal Plan shall "provide for

estimates of revenues and expenditures in conformance with agreed accounting standards

and be based on ... *applicable law*..." (emphasis added).  Act 57 is "applicable" here because

it directs the Commission to ensure that rates are "just and reasonable."  Thus, FOMB may

not approve budgets or prescribe actions that lead to rates that are not just and reasonable.

The legal duty to determine what is just and reasonable lies exclusively with the

Commission.

---

[46]    On this point, PREPA appears to agree:  "The Government of Puerto Rico reserves
all rights under Section 303 of PROMESA and otherwise to determine the future of the
electric sector in Puerto Rico as a matter of public policy."  January 24 Fiscal Plan at 4.

84.     Section 201(b)(1)(B) requires the Fiscal Plan to "ensure the funding of
essential services." The legal duty to determine what services are essential, given the prior
reference to "applicable law," lies exclusively with the Commission.

85.     Section 201(b)(1)(J) requires the Fiscal Plan to "provide for capital
expenditures and investments necessary to promote economic growth...." That provision
does not mean that the FOMB determines *what* expenditures and investments are
necessary; it means only that for the expenditures and investments that are necessary, the
Fiscal Plan must show the funding sources. Under Commonwealth law, the legal duty to
determine what capital expenditures and investments are necessary for electric service lies
exclusively with the Commission. That Commission role is confirmed by Section
503(b)(1)(D) which, as explained in para. 79 above, preserves the Commission's power to
prevent Energy Projects that "adversely affect an approved Integrated Resource Plan."

86.     Section 201(b)(1)(N) requires the FOMB-certified Fiscal Plan to "respect the
relative lawful priorities ... in the ... other laws ... of a covered territory ... in effect prior to
the date of enactment of this Act." Those laws include Act 57, as applied by the
Commission created by Act 57.

87.     Separately and together, the above-mentioned PROMESA provisions obligate
FOMB to act consistently with Commission authority, unless doing so would undermine
PROMESA goals. To satisfy PROMESA, FOMB must shape its decisions to avoid
undermining Commonwealth policy. Only when such shaping is impossible, only when
FOMB cannot achieve a PROMESA objective without preempting Commonwealth law, may
preemption occur. FOMB cannot be a bull in the Commonwealth's china closet. As this
Court stated: "The primary mechanism through which fiscal plans and instrumentality

budgets are developed under PROMESA sections 201 and 202 looks first to the territorial government, not the FOMB, for origination and refinement.  While the FOMB can certify its own fiscal plan and budget under certain circumstances, it may only do so after an interactive process with the territorial government does not yield a plan or budget that is acceptable to the FOMB."[47]

88.     Under PROMESA § 4, the Commission's decisions under Commonwealth law cannot conflict with the FOMB's requirements.  But that provision limits Commission actions only where FORM is acting within its authority.

89.     PROMESA thus addresses Commonwealth law in terms of preservation and preemption.  The necessary logical combination of those two principles is this:  If in solving a problem within its statutory scope, FOMB has a choice between an action that undermines Commonwealth law and an action that does not, FOMB must choose the latter.  Where inconsistency is unavoidable, FOMB prevails.  Finding inconsistencies and designing ways to avoid them requires coordination.  As this Court held, PROMESA "requires the FOMB and the territorial government to work together to establish a fiscally responsible path forward that is acceptable to the FOMB."[48]

### 2.     Declarations sought

90.     FOMB's certification of a PREPA-proposed Fiscal Plan may bind PREPA only on matters that lie within FOMB's jurisdiction.  That a Fiscal Plan describes substantive electric actions as bases for fiscal actions does not give FOMB powers it does not have—

---

[47]  CTO Order at 10.

[48]  CTO Order at 19.

such as powers to mandate or authorize PREPA to take substantive electric actions that are subject to Commission jurisdiction but which the Commission has not approved. The fiscal subject areas or actions over which FOMB has power are PREPA's budgets, PREPA's spending, and PREPA debt issuances and debt restructuring.

91.     FOMB's directives to PREPA, if taken within FOMB's PROMESA authority, preempt the Commission only when it is not possible to design those directives consistently with Commonwealth law.

## COUNT TWO

### Preliminary Injunction (a) Prohibiting FOMB From Mandating or Authorizing Substantive Electricity Actions Without Commission Approval, and (b) Prohibiting PREPA From Taking Such Actions Without Commission Approval

### (Rule 65 of the Federal Rules of Civil Procedure; Rule 7065 of the Federal Rules of Bankruptcy Procedure; PROMESA § 310)

92.     The Commission incorporates by reference paragraphs 1 to 91.

93.     This pleading has explained that FOMB has no legal authority to impose substantive electricity obligations on PREPA, and that FOMB intends to do so imminently. Any FOMB action mandating or authorizing PREPA to take substantive actions that the Commission has not approved would be *ultra vires.*

94.     Such an *ultra vires* order would violate PROMESA § 303, which reserves "political or governmental powers," including substantive electricity regulation, to the Commission.

95.     The Commission therefore seeks a preliminary injunction prohibiting FOMB from issuing *ultra vires* orders governing substantive electricity actions that the Commission has not approved.

96.     In considering a request for preliminary injunction, a court weighs four factors:  "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs and (4) the effect, if any, on the public interest."[49]  As discussed next, this request for preliminary injunction complies with all four factors.

### Likelihood of success on the merits

97.     "The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."[50]  The Commission's strong likelihood of success is demonstrated by the legal arguments appearing in paras. 71to 79 and 82 to 89.  As a matter of law, FOMB has no legal authority to impose substantive electricity obligations on PREPA or Puerto Rico.  That authority lies exclusively with the Governor, the Commonwealth Legislature, and the Commission or any successor regulatory agency.

---

[49]  *Sindicato Puertorriqueño de Trabajadores*, 699 F.3d 1, 10 (1st Cir. 2012) (*quoting Jean v. Mass. State Police*, 492 F.3d 24, 26-27 (1st Cir. 2007)); *Rhode Island Dept. of Environmental Management v. U.S.*, 304 F.3d 31 (1st Cir. 2002).

[50]  *Sindicato Puertorriqueño de Trabajadores*, *supra*, 699 F.3d at 10 (*quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).

*Irreparable harm to plaintiff Commission*

98.     Act 57 requires the Commission to establish standards for PREPA's performance, so that customers will receive reliable electric service at reasonable cost. Elements of performance include, without limitation, determining the resource mix for Puerto Rico's electricity customers; establishing the market structures and other policies that attract the suppliers most likely to provide those resources cost-effectively; setting pricing policies that attract investors while protecting customers from abuse; and designing rate structures that allocate costs to those who cause them, so as to induce efficient consumption behavior.

99.     FOMB's insistence on dictating the substantive shape of Puerto Rico's electric industry makes it impossible for the Commission to achieve these ends. By combining its technical expertise with transparent procedures, and by applying principles from the disciplines of engineering, accounting, economics, finance and management, the Commission has issued rules, orders and guides to PREPA on resource planning, rates, capital expenditures, operations, customer billing, distributed generation and contracting, among other things. PREPA has resisted, or delayed complying with, a number of these orders, citing in some instances its incorrect legal view that on matters of electricity substance its master is FOMB, not the Commission.[51] PREPA's persistence reappears in its

---

[51] For example: In May 2017, PREPA sought a stay in three separate Commission proceedings, on grounds (among others) that FOMB had required revisions to PREPA's Fiscal Plan. *See* "Puerto Rico Electric Power Authority's Verified Motion to Stay Proceedings and Budget Filing Requirements" in Docket No. CEPR-AP-2015-0001 (May 19, 2017) (seeking stay of the budget review and reconciliation process required by Commission's rate order of Jan. 10, 2017); "The Puerto Rico Electric Power Authority's Verified Motion to Stay Proceeding" in Docket No. CEPR-IN-2016-0002 (May 19, 2017) (seeking stay of Commission investigation into PREPA's overall performance); and "The Puerto Rico Electric Power Authority's Verified Motion to Stay Proceeding" in Docket No.

proposed Fiscal Plan, which (as discussed in paras. 42 to 50 above) conflicts with
Commission guidance on integrated resource planning and revenue allocation and rate
design. PREPA sees in FOMB's actions an opportunity to avoid accountability to the
Commission. If FOMB mandates or authorizes PREPA to take substantive electricity
actions, indeed if FOMB continues to assert its control over electricity policy, PREPA will
cite FOMB's actions to resist the Commission's current and future orders.

100. Worsening this harm to the Commission's authority is the pressure on its
limited resources. PREPA's resistance to Commission regulation, a direct result of FOMB's
assertions of control over the Commonwealth's electricity policy, causes the Commission to
spend extra resources, in terms of staff time, Commissioner time and consultant time—all
resources that citizens expect, and need, to be spent on Commission efforts to guide and
discipline PREPA's actions to restore and improve Puerto Rico's electricity infrastructure.

### *Irreparable harm to consumers and to the public*

101. Act 57 aims to "improve the quality of life of all Puerto Ricans."[52] By avoiding
the Commission's orders and regulations, PREPA can continue with the operational
inefficiencies, poor performance practices and lack of transparency described in Act 57's
Preamble, then detailed in the Commission's September 2016 order on integrated resource
planning and its January 2017 Rate Order. That PREPA behavior stems directly from

---

CEPR-IN-2017-0001 (seeking stay of Commission proceeding on rate design and cost
allocation issues).

[52] *See* Act 57, Statement of Motives: "The high cost of energy limits our ability to
stimulate the economy, strengthen small- and medium-sized business, as well as to attract
private investors from abroad, develop commercial, industrial and manufacturing
activities, and improve the quality of life of all Puerto Ricans."

FOMB's *ultra vires* actions. If PREPA can disregard the Commission's decisions on future resources, PREPA will incur more unreasonable costs that will necessarily fall on its customers.

102. As noted in para. 65, investments in energy efficiency will avoid excess investment in risky, fossil-burning generating units. Once PREPA invests in new units, or in expensive reworking of existing units, those costs become "sunk"; meaning customers have to bear the costs, thus reducing the potential savings from, and attractiveness of, energy efficiency investments. The Commission must retain its power to require a study of energy efficiency investments before PREPA sinks new dollars into major physical infrastructure. Only the requested injunction will prevent FOMB and PREPA from acting contrary to customers' interests before the Commission does its work.

103. The uncertainties created by FOMB's assertions of substantive power will deter outside investors and raise their capital costs. Capital scarcity and increased capital costs increase electricity rates, thus harming Puerto Rico consumers and the Commonwealth's economy.

104. This legal uncertainty will reduce PREPA's (and any successor's) ability to attract the new capital necessary to restore and modernize its infrastructure. No reasonable investor, eyeing the uncertainty over who has what regulatory powers, will want to lend, at a reasonable interest rate, the billions PREPA needs. Absent new sources of capital, PREPA will have to limp along with its current infrastructure—a deteriorating infrastructure consisting, as detailed in the Commission's orders on rates and on integrated resource planning, of obsolete, inefficient, barely-working and air-polluting units. The harms to the citizens from high rates, pollution (including the risk of penalties from

environmental regulators—which are ultimately paid by customers or taxpayers because PREPA is a non-profit company) and unreliable service, are tangible and immediate. These harms are being caused now.

### Irreparable harm to Puerto Rico's energy sector

105.    Although the central beneficiaries of the Commission's powers are consumers, another category of beneficiaries are the non-PREPA companies that hope to bring their technology, labor and expertise to Puerto Rico's energy sector. Their participation in the Commission's proceedings on rates, integrated resource planning, microgrids and other subjects demonstrates their trust in the Commission's neutrality and expertise. That trust breeds optimism that after 70 years of an unregulated monopoly subject to political interference, opportunities to supply electricity-related services will be based on merit. FOMB's assertions of control over electric policy, by making the Commission's authority uncertain, risks reducing this optimism—a prerequisite to any serious new investment in Puerto Rico's electric industry.

106.    The same concerns apply to non-electric businesses hoping to remain in, expand in, or move to, Puerto Rico. Absent the declarations and injunction sought here, the regulatory uncertainty caused by FOMB's position makes business planning and development infeasible—again to the detriment of Puerto Rico's economy.

### Benefits of the injunction to FOMB and others

107.    An injunction will relieve FOMB of its self-assigned (but not statute-assigned) responsibility to shape Puerto Rico's electric industry. FOMB can cease spending taxpayer money on lawyers who fight the Commission, and on consultants who unnecessarily duplicate the Commission. Instead, FOMB will have the benefit of an unobstructed

Commission performing its Act 57 duties, transparently and with the necessary professional expertise.  Then, when FOMB reviews PREPA's *fiscal* projections and plans, FOMB can more reliably assess whether those projections and plans make sense in light of the substantive vetting by the Commission.  FOMB will save money and gain insights—all things it could have had for the last nine months had it cooperated with the Commission.

108.    For all the reasons stated above, the Commission is entitled to equitable relief in the form of a preliminary injunction.  We ask this Court to enjoin FOMB from mandating that PREPA take substantive electricity actions without Commission approval.

109.    The Commission recognizes that its timely action on PREPA's Fiscal Plan is essential to FOMB's efforts to resolve PREPA's debt.  The Commission therefore commits to working cooperatively with FOMB on a schedule that accommodates both entities' needs.

110.    A necessary accompaniment to the preliminary injunction against FOMB is a preliminary injunction against PREPA, prohibiting PREPA from taking substantive electricity actions mandated or authorized by FOMB, if those actions are jurisdictional to the Commission but not authorized by the Commission.  Absent a preliminary injunction, PREPA could cause irreparable harm by taking actions that cause costs, which costs ratepayers then would have to bear (as explained in para. 54), even if the Court later held the FOMB mandate or authorization *ultra vires*.

## COUNT THREE

## Permanent Injunction (a) Prohibiting FOMB from Mandating Substantive Electricity Actions by PREPA, and (b)Prohibiting PREPA From Taking Certain Actions

## (Rule 65 of the Federal Rules of Civil Procedure; Rule 7065 of the Federal Rules of Bankruptcy Procedure; PROMESA § 310)

111.    Plaintiff incorporates by reference paragraphs 1 to 110.

112.    For all the reasons stated in Count Two, the Commission is entitled to equitable relief in the form of a permanent injunction prohibiting FOMB from mandating substantive electricity actions by PREPA.

113.    A necessary accompaniment to the permanent injunction against FOMB is a permanent injunction against PREPA.  The permanent injunction would prohibit PREPA from taking substantive electricity actions mandated or authorized by the FOMB, if those actions are subject to this Commission's jurisdiction but the Commission has not authorized them.

## Prayer for Relief

WHEREFORE, the Commission requests the following judgments for Plaintiff Commission and against Defendants FOMB and PREPA:

A Declaration that FOMB may not mandate or authorize substantive electricity actions that are within the Commission's jurisdiction but that the Commission has not approved, including but not limited to the following:  actions affecting resource mix; asset ownership, operations, maintenance and retirement; market structure; integrated resource

planning; and rates (including but not limited to revenue requirement, revenue allocation, cost allocation and rate design).

A Declaration that when FOMB exercises its fiscal powers over PREPA, it shall do so consistently with Commission actions, orders and regulations on substantive electricity matters, and on fiscal matters unless inconsistency is unavoidable.

A Declaration that whenever a proposed PREPA Fiscal Plan would impact substantive electric industry matters, the Commission's timely assessment and approval is a prerequisite for FOMB's certification of such Fiscal Plan.

Preliminary and permanent injunctions against FOMB, prohibiting FOMB from mandating or authorizing PREPA to take substantive electricity actions if those actions are jurisdictional to the Commission but not authorized by the Commission.

Preliminary and permanent injunctions against PREPA, prohibiting PREPA from taking substantive electricity actions mandated or authorized by the FOMB, if those actions are jurisdictional to the Commission but not authorized by the Commission.

Such further relief, in law and/or equity, as the Court deems just and proper.

Dated:  March 4, 2018

San Juan, Puerto Rico

Respectfully submitted,

**PUERTO RICO ENERGY COMMISSION**
By its attorneys:

*/s/ Alejandro J. Figueroa-Ramírez*

USDC No. 305603
Alejandro J. Figueroa-Ramírez,
General Counsel
Puerto Rico Energy Commission
268 Muñoz Rivera Ave., Suite 702
San Juan, PR 00918
Tel:  (787) 523-6262

Case:18-00021-LTS Doc#:1-7 Filed:03/04/18 Entered:03/04/18 14:06 Desc: Main Document Page 53 of 65

Email: afigueroa@energia.pr.gov

/s/ Scott Hempling

Admitted pro hac vice
Scott Hempling
Scott Hempling, Attorney at Law, LLC
417 St. Lawrence Dr.
Silver Spring, MD 20901
Tel: (301) 754-3869
Email: shempling@scotthemplinglaw.com


/s/ Mariana I. Hernández Gutiérrez

USDC No. 229102
Mariana I. Hernández Gutiérrez
Hernández-Gutiérrez Law, PSC
1519 Ponce de León Ave.
First Federal Bldg. Suites 713-715
San Juan, PR 00909
Tel: (787) 460-5715
Email: mhernandez@mihglaw.com

## VERIFICATION

I, José Román Morales, hereby state under penalty of perjury that I am fully familiar with the matters set forth in this Complaint and the forgoing statements are true and correct to the best of my knowledge.

José Román Morales
Chairman, Puerto Rico Energy Commission
March 4, 2018

Case:18-00021-LTS Doc#:1 Filed:03/04/18 Entered:03/04/18 06:51:23 Desc: Main Document Page 55 of 65

# Appendix A
# Commission-FOMB Cooperation: Essential Protocols

This document describes procedures by which the Commission and FOMB can coordinate their decisions affecting PREPA. The bold headings identify each subject or action over which the Commission has authority under Commonwealth law. The italicized material has two purposes. First, it describes, where relevant and necessary, the policy reasons for the Commission's obligations, so that FOMB—which is not experienced in utility regulation—understands why Puerto Rico's welfare depends on the Commission carrying out its duties. Second, it presents a proposed procedure by which the two agencies would make decisions.

Underlying each of the draft ideas are the following legal or policy principles:

a. The Commission has been, since 2014, the statutory agency responsible for ensuring that PREPA's performance serves the Commonwealth's public interest, as that public interest is defined by Act 57-2014 and other statutes. The Commission, or any successor, will continue in that role after FOMB exits Puerto Rico.

b. PROMESA does not make FOMB Puerto Rico's utility regulator. FOMB does not have authority to mandate or authorize substantive electricity actions that are within the Commission's jurisdiction but have not been approved by the Commission. For a detailed explanation, see the Commission's Policy Statement issued January 23, 2018 and the Complaint against FOMB and PREPA filed with the federal Court on March 4, 2018.

c. The preemption provision of PROMESA § 4 signals "conflict preemption," not "occupation of the field" preemption. See the Policy Statement. At the same time, PROMESA requires FOMB to act consistently with Commonwealth law. The combination of these two PROMESA features yields this result: FOMB's directives to PREPA, when taken within FOMB's PROMESA authority, preempt the Commission only when it is not possible to design those directives consistently with Commonwealth law, as applied by the Commission.

d. PREPA, supported by AFFAF, routinely disobeys or ignores Commission orders, usually citing as a reason FOMB's presence and its asserted powers. FOMB has not directed PREPA to obey the Commission's orders; nor has FOMB issued any orders that would achieve what the Commission must achieve under Act 57. The result, well-known to FOMB, is that PREPA is acting as an unregulated monopoly, contrary to the letter of Act 57 and the intent of PROMESA.

e. There is no benefit, only harm, from a series of lawsuits in which FOMB challenges Commission actions, the Commission challenges FOMB actions, PREPA resists Commission orders and/or the Commission sues PREPA for failure to heed Commission orders.

f. There is, for each area listed below, some solution that makes the best use of the Commission's and FOMB's powers, so as to end PREPA's practice of noncompliance.

With this document, the Commission intends to display the type of thoughtfulness and advance thinking that are necessary to serve its constituents. With reciprocation by FOMB, the public will be served.

The document addresses the following seven subject areas:

1. ***Spending, cost recovery and rate-setting***
2. ***Contracts***
3. ***Customer relations***
4. ***Supply and demand resources***
5. ***Internal PREPA operations***
6. ***Finance***
7. ***Market structure transformation***

# *1.  Spending, cost recovery and rate-setting*

## **1.1.  Approve budgets**

### *1.1.1.  Purpose*

*1.1.1.1.  In a nonprofit utility, all costs, once incurred, must be reflected in rates.  But for rates to be just and reasonable, they must reflect only prudent costs.  The Commission thus can ensure just and reasonable rates only by preventing imprudent costs before they are incurred.  The only way to do so is by establishing advance caps on spending, through procedures that (a) review and approve (or modify) budgets before they go into effect and (b) audit PREPA to ensure to that its spending does not exceed the approved budgets.*

*1.1.1.2.  Separate from establishing caps on spending is ensuring sufficient spending.  Approving budgets, then setting rates consistent with those budgets, ensures that sufficient funds are available to (a) carry out PREPA's obligation to serve, as that obligation is defined by an approved Integrated Resource Plan (IRP) and other projects ordered or approved by the Commission or mandated by Commonwealth law; and (b) comply with obligations to bondholders.*

### *1.1.2.  Procedure*

*1.1.2.1.  (a) PREPA submits its annual budget simultaneously to the Commission and FOMB, under a schedule that the Commission and FOMB develop jointly in consultation with PREPA.  The proposed budget would conform to advance guidelines prepared jointly by the Commission and FOMB.  There should be separate budgets for (i) capital projects and (ii) operations and maintenance.*

*(b) The Commission would hold an official proceeding under Act 57 to review, modify as necessary, then approve a budget.  FOMB can participate in this proceeding to avoid duplicative or serial processes.  The Commission would play this role because (a) it has that duty under Act 57 and (b) it has the technical expertise and administrative procedures that ensure a rigorous and efficient investigation.  Rigor is especially important given PREPA's history of undisciplined spending and inadequate recordkeeping, as detailed in the Commission's Rate Order of January 10, 2017.*

*1.1.2.2  The total budget approved by the Commission must be consistent with any FOMB-approved Fiscal Plan (assuming such FOMB-approved Plan does not contain details outside the FOMB's authority to mandate—as explained in the Commission's Policy Statement).  "Consistent" means that PREPA can simultaneously operate within the budget and carry out all Fiscal Plan activities.  "Consistent" means the budget does not leave PREPA with insufficient funds to carry out the Plan; nor does the budget include projects not within the Fiscal Plan,*

*unless such projects are required by a Commission-approved IRP (which the Fiscal Plan must accommodate anyway, per PROMESA's requirement that the Fiscal Plan be consistent with Commonwealth law).*

*1.1.2.3 For this joint effort to work, (a) FOMB will need to direct PREPA and AFFAF to drop its appeal of the Commission's Jan. 2017 Rate Order establishing Commission review of PREPA's budgets, which is pending in federal court due to AFFAF's Notice of Removal (which FOMB authorized). The Notice of Removal implicitly misinterprets PROMESA section 4 as establishing "occupation of the field" preemption, whereas section 4 establishes only "conflict" preemption. There is no conflict today; and if the Commission and FOMB work out a coordinated procedure schedule for budget review, there will be no conflict. It is illogical for FOMB to assert conflict when it has not participated in coordination efforts aimed at avoiding conflict.*

*1.1.2.4. The FOMB has authority to modify a Commission-approved budget, to the extent required for consistency with an FOMB-approved Fiscal Plan. The FOMB does not have authority to approve a budget, or a Fiscal Plan, that is inconsistent with a Commission-approved IRP.*

*1.1.2.5. If PREPA refuses or fails to comply with a Commission-approved budget, the FOMB and the Commission shall execute one or more joint strategies to produce compliance, using both Commonwealth law and PROMESA. FOMB and the Commission should design those strategies now, then ensure that PREPA understands them. Such design and notice will, we hope, make these strategies unnecessary.*

## 1.2. Establish revenue requirement

*1.2.1. The Commission will establish PREPA's revenue requirement, as required by Act 57, according to its normal procedures. The revenue requirement in total must be consistent with the approved budgets and thus with any FOMB-approved Fiscal Plan. For example, if the Fiscal Plan calls for a particular level of payments for debt service, the Commission-set revenue requirement must include a line item for that debt service. It is possible, however, that some or all of the debt service associated with existing debt will be addressed outside of the normal revenue requirement through a special charge, similar to that approved by the Commission in its Resolution of June 21, 2016.*

*1.2.2. **Questions** for the Commission and FOMB to address together, to avoid inconsistencies among the revenue requirement, the Fiscal Plan and any approved budgets.*

1.2.2.1. *Given the Judge's CTO Order, does PROMESA allow FOMB's Fiscal Plan to specify individual projects, and costs for those projects? What is the appropriate level of detail for an FOMB-approved PREPA Fiscal Plan?*

1.2.2.2. *If an FOMB Fiscal Plan mandates or approves specific projects, should that FOMB Fiscal Plan have project cost caps? If not, what is the means of ensuring project budget compliance?*

1.2.2.3. *What are the best procedures for ensuring that the Fiscal Plan does not include projects the Commission deems inconsistent with an approved IRP, given that PROMESA sec. 503(b)(1)(D) renders such projects ineligible for Critical Project status?*

1.2.2.4. *Where the FOMB Fiscal Plan identifies a particular project and cost level, the Commission has the legal authority, for rate purposes, and in advance of spending, to reduce the allowable cost of a particular item from the FOMB-approved level if the Commission finds a lower cost is reasonable. By what procedure do we ensure that PREPA understands this point, so that PREPA does not lobby FOMB—which lacks the Commission's expertise and its procedures for truth-seeking—for an excessive project budget and then assert that the Commission is preempted from requiring a lower budget? Under preemption precedent a lower Commission budget for a given project does not cause a conflict with FOMB because PREPA can comply simultaneously with a low budget and a higher budget; by not exceeding the lower ceiling it is not violating the higher ceiling. A difference is not a conflict; a conflict exists only if compliance with both orders is impossible. (We recognize that this reasoning does not work in the other direction; the Commission cannot authorize PREPA to spend more money than a Fiscal Plan has allowed—again assuming the FOMB requirements in the Fiscal Plan do not exceed FOMB's PROMESA authority.)*

### 1.3. Establish revenue allocation and rate design

1.3.1. *The Commission would establish revenue allocation and rate designs in PREPA rate cases.*

1.3.2. *There is no FOMB authority to establish or modify revenue allocation or rate designs.*

1.3.3. **Question:** *Revenue allocation involves allocating costs among customer groups. To protect and promote economic development, the Commission has statutory authority to under-allocate fixed costs to commercial and industrial customers (thus necessarily over-allocating costs to residential customers). How may, or should, or must, the Commission take into account FOMB policies on economic development when the Commission makes revenue allocation decisions?*

1.3.4. **Question:** *PREPA's revenue projections are based on assumed elasticities of demand. Those elasticities vary by customer class. Revenue therefore may vary depending on cost allocation. What procedures are necessary to ensure that revenue projections in an FOMB-approved Fiscal Plan are consistent with revenue allocation and rate designs established by the Commission?*

## 1.4. Establish procedure for updating revenue requirement and rates

*There are no incremental issues here relative to those raised in other sections under spending, cost recovery and rate-setting.*

## 2. Contracts

### 2.1. *Substance*

2.1.1. *Consistent with the Commission's obligation to prevent imprudent costs before they are incurred, the Commission will review and approve contracts. Act 57 imposes that duty. Also, Act 57 as well as the Commission IRP Order impose an obligation that PREPA competitively bid specific generation-related projects as a means of securing the best cost for these projects. The Commission's duties include overseeing that process. Act 4-2016 has some variations on this point for public-private partnership projects but the Commission duty to prevent imprudent costs remains.*

2.1.2. *A conflict could arise if the FOMB and the Commission have different views about any feature of a contract—its purpose, its cost, its allocation of risk, the appropriate counter-party, the process of selecting the counter-party, or the manner of implementation. However, such difference of opinion would create a preemptive conflict only if FOMB **ordered** PREPA **not** to execute a particular contract, while the Commission **ordered PREPA to** execute that contract, assuming FOMB was acting within the limited scope of its authority (e.g., its reason for rejecting a contract was fiscal rather than substantive, as explained in the Commission's Policy Statement).*

*A difference of opinion also would arise if FOMB **ordered** PREPA to enter a particular contract, while the Commission ordered PREPA **not** to enter that contract. But that difference of opinion would not trigger preemption because, as explained in the Commission's Policy Statement, FOMB has no authority to order PREPA to enter particular contracts where the effect is to determine substantive electricity policies.*

2.1.4. *FOMB's policy on contracts says that to the extent FOMB says so, contracts must be the "result of a competitive and transparent procurement and tender process...." If FOMB says a particular contract need not be the result of a competitive bidding process, that statement does not prevent the Commission from requiring a competitive process. The situation would represent a difference of opinion but not a conflict,*

*because PREPA will be able to comply simultaneously with the FOMB and the Commission orders. There would be a conflict only in the unlikely case that the FOMB mandated that there **not** be a competitive procurement. Such a mandate would be beyond the FOMB's statutory authority. The Commission with its continuing expertise is in the better position to determine when conditions justify a waiver of or adjustment to competitive bidding.*

### *2.2. Procedures*

*2.2.1. PREPA would submit each proposed contract to the Commission and the FOMB simultaneously. On receiving the contract, FOMB and the Commission would determine a review schedule.*

*2.2.2. Per that schedule, each agency would act, giving its reasons. Before actions become formally issued, informal collaboration between the two entities would be useful. For example, the Commission would assess the contract and its associated scope of work in terms of prudent practices, consistency with the approved budget and consistency with the IRP (where the IRP is relevant).*

*2.2.3. Commission and FOMB should identify now the scheduling plan, and also the criteria each will apply, so that each entity's scrutiny is supportive of the other's.*

*2.2.5 In addressing contracts, the Commission will consider the resource needs identified in the IRP, as informed by the Commonwealth's situation. The IRP, for example, provides a list of specific transmission projects related to expansion. Any proposal for a transmission project deviating from this list must be accompanied by a justification of its necessity and cost-effectiveness.*

*2.2.6. PREPA needs to notify the Commission of all contracts, even those under the stated cap, so we can keep an eye out for patterns, like contracts just slightly under the approval cap amount.*

## *3. Customer relations*

3.1. Approve bill format.

3.2. Establish customer complaint procedures.

3.3. Design and implement customer education.

*There is no FOMB authority in this area; therefore no potential for conflict and therefore no need for protocol.*

# 4. Supply and demand resources

## 4.1. Establish and enforce reliability parameters

4.1.1. Establish customer- and system-level reliability standards (including whether NERC standards apply).

4.1.2. Establish and enforce planning reserve margin level (target and operational).

4.1.3. Determine equivalent load carrying capability for renewable resources.

*The FOMB has no authority in the reliability space; therefore, there is no potential for Commission-FOMB conflict.*

## 4.2. Create IRP

4.2.1. Establish load forecast and capacity requirements for the forecast period.

4.2.2. Determine composition of optimal future resource portfolio, subject to load and resource balance, renewable portfolio standard requirements, resource costs and availabilities, and other statutory considerations. Resource portfolio includes generation retirement schedule and additions of appropriate types of future resources (generation, T&D, storage, and other) in appropriate sizes and at appropriate locations.

4.2.3. Establish framework for determining need and value of ancillary services.

4.2.4. Establish framework for determining need and value of resource flexibility.

4.2.5. Determine need for additional major transmission projects.

4.2.6. Approve near-term IRP action plans.

*Under Act 57, the Commission will carry out all six of these steps.*

*The Fiscal Plan must carry out, and therefore be consistent with, the IRP; not the other way around. See PROMESA Section 503(b)(1)(D). There is no authority in FOMB to impose an IRP or any particular mix of resources. The FOMB can of course inform the Commission of its views on industry structure and resource mix, and recommend scenarios to be evaluated. But the statutory authority to approve the resulting resources, and the rates necessary to pay for such resources, lies exclusively with the Commission.*

### 4.3. Establish RFPs and competitive bidding procedures for power supply, energy efficiency and demand resources

*There is no statutory FOMB role in establishing RFPs or competitive bidding procedures. Those are internal PREPA operations over which the Commission has statutory authority.*

### 4.4. Approve sites for power supply resources

*FOMB has no authority in this area. While the Commission does not have direct authority over siting, it can approve or deny projects based on cost, which is itself affected by siting.*

## 5. Internal PREPA operations

5.1. Establish performance metrics, reporting procedure and enforcement methods.

5.2. Appoint independent monitors to oversee restoration contracting and work.

5.3. Establish standards for, and approve, restoration plan.

5.4. Establish standards for, and approve, maintenance plan.

5.5. Establish power plant efficiency standards.

5.6. Establish criteria for, and approve, hiring of contractors.

5.7. Approve disaster preparation and restoration plan (for future events).

5.8. Approve plans for workforce recruitment, development and compensation.

*Other than contracting, FOMB has no authority over these areas. Therefore there is no possibility of conflict, provided the Commission's decisions in these areas are consistent with the Fiscal Plan.*

## 6. Finance

6.1. Approve financing plans.

6.2. Approve issuance of debt.

6.3. Approve restructuring of debt.

*Under Section 6.3(n) of Act 57, the Commission has obligation to "oversee PREPA's debt issues." But its approvals must be consistent with FOMB decisions about debt restructuring and with any appropriate FOMB-approved Fiscal Plan.*

*The Commission must reflect the FOMB's debt restructuring decisions in its decisions on revenue requirement.*

***Question***: *For the Commission's review of debt issuances, what is appropriate information-sharing and sequencing between Commission and FOMB?*

## 7. Market structure transformation

7.1. Determine current and future market structures (monopoly vs. competition) for various products and services.

7.2. Appoint provider(s) of monopoly services.

7.3. Implement competition for competitive services.

7.4. Approve any transfer of PREPA assets or business functions.

7.5. Determine appropriateness, and terms and conditions, of "wheeling."

7.6. Distributed generation, community solar and microgrids by third-parties to end-use customers: Determine interconnection terms, compensation, payments for transportation, locational choices and other parameters .

7.7. Determine net-metering terms.

7.8. Establish remaining plans for distribution system.

7.9. Determine energy efficiency policy and providers.

*The FOMB has no authority over these decisions. Decisions by the Commission, or by any successor agency or by the Legislature, decisions must be consistent with an FOMB-approved Fiscal Plan. But that Fiscal Plan does not restructure markets; its focus is debt and solvency, all as explained in the Policy Statement.*

# List of Exhibits

EXHIBIT A: AAFAF letter to Commission (February 14, 2018)

EXHIBIT B: FOMB letter to Commission (February 3, 2018)

EXHIBIT C: Commission Draft MOU and FOMB Executive Director's Response (November 2, 2017)

EXHIBIT D: FOMB Executive Director draft letter to Commission re contract review (mid-January 2018)