# EXHIBIT   30

1                    UNITED STATES BANKRUPTCY COURT

2                       DISTRICT OF PUERTO RICO

3
     In Re:                      )        Docket No. 3:17-BK-3283(LTS)
4                                )
                                 )        Title III
5    The Financial Oversight and )
     Management Board for        )
6    Puerto Rico,                )        (Jointly Administered)
                                 )
7    *as representative of*      )
                                 )
8    The Commonwealth of         )
     Puerto Rico, *et al.*,      )        July 25, 2018
9                                )
                   Debtors.      )
10
     _____
11
     Siemens Transportation       )        Docket No. 3:18-AP-030(LTS)
12   Partnership Puerto Rico,     )
     S.E.                         )        *in 17-BK-3567(LTS)*
13                                )
                   Plaintiff,     )
14   v.                           )
                                  )
15   Puerto Rico Highways and     )
     Transportation Authority,    )
16   *et al.*                     )
                                  )
17                 Defendants.    )
     _____
18

19

20

21

22

23

24

25

```
 1  _____

 2  Hon. Ricardo Antonio        )      Docket No. 3:18-AP-080(LTS)
    Rosselló Nevares, et al.    )
 3                              )      in 17-BK-3283(LTS)
                                )
 4              Plaintiffs,     )
    v.                          )
 5                              )
    The Financial Oversight     )
 6  and Management Board for    )
    Puerto Rico, et al.         )
 7                              )
                Defendants.     )
 8  _____

 9  Hon. Thomas Rivera Schatz,  )      Docket No. 3:18-AP-081(LTS)
    et al.                      )
10                              )      in 17-BK-3283(LTS)
                Plaintiffs,     )
11  v.                          )
                                )
12  The Financial Oversight     )
    and Management Board for    )
13  Puerto Rico, et al.         )
                                )
14              Defendants.     )
    _____

15

16                      OMNIBUS HEARING

17    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

18              UNITED STATES DISTRICT COURT JUDGE

19      AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

20          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

21  _____

22
    APPEARANCES:
23

24  For The Commonwealth
    of Puerto Rico, et al.:  Mr. Martin Bienenstock, PHV
25                           Mr. Paul V. Possinger, PHV
```

```
 1  ║ APPEARANCES CONTINUED:
    ║
 2  ║ For The Commonwealth
    ║ of Puerto Rico, et al.:  Mr. Timothy Mungovan, PHV
 3  ║                          Mr. Brian Rosen, PHV
    ║                          Ms. Margaret Dale, PHV
 4  ║
    ║ For the U.S. Trustee
 5  ║ Region 21:               Ms. Monsita Lecaroz Arribas, AUST
    ║
 6  ║ For Official Committee
    ║ of Unsecured Creditors:  Mr. Luc Despins, PHV
 7  ║
    ║ For Puerto Rico Fiscal
 8  ║ Agency and Financial
    ║ Advisory Authority:      Ms. Carolina Velaz Rivero, Esq.
 9  ║                          Mr. John Rapisardi, PHV
    ║                          Mr. Mauricio Muniz Luciano, Esq.
10  ║                          Mr. Peter Friedman, PHV
    ║                          Mr. William Sushon, PHV
11  ║
    ║ For the Government
12  ║ Development Bank:        Ms. Maria Trelles Hernandez, Esq.
    ║                          Ms. Suzanne Uhland, PHV
13  ║                            Appearing in New York
    ║
14  ║ For Ad Hoc Retiree
    ║ Committee:               Mr. Robert Gordon, PHV
15  ║                          Mr. Landon Raiford, PHV
    ║                          Ms. Melissa Root, PHV
16  ║
    ║ For Siemens
17  ║ Transportation
    ║ Partnership Puerto Rico: Ms. Claudia Springer, PHV
18  ║
    ║ For Banco Popular de
19  ║ Puerto Rico:             Mr. John Dorsey, PHV
    ║
20  ║ For ERS Secured
    ║ Creditors:               Mr. Benjamin Rosenblum, PHV
21  ║                          Mr. Bruce Bennett, PHV
    ║
22  ║ For Hon. Thomas
    ║ Rivera Schatz, et al.:   Mr. Claudio Aliff, Esq.
23  ║
    ║ Independent
24  ║ Investigator:            Mr. David Farrington Yates, PHV
    ║
25  ║
```

```
 1   APPEARANCES CONTINUED:

 2   For the GO Group:          Mr. Donald Burke, PHV
                                Mr. Mark Stancil, PHV
 3
     For the Puerto Rico
 4   House of
     Representatives:           Mr. Israel Roldan Gonzalez, Esq.
 5
     For the Puerto Rico
 6   Funds:                     Mr. Jason N. Zakia, PHV

 7   For the American
     Federation of State,
 8   County and Municipal
     Employees:                 Mr. Manuel Rodriguez Banchs, Esq.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by stenography.  Transcript produced by
25   CAT.
```

```
 1                         I N D E X

 2   WITNESSES:                                    PAGE

 3        None offered.

 4

 5   EXHIBITS:

 6        None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6

```
 1                                    San Juan, Puerto Rico

 2                                    July 25, 2018

 3                                    At or about 9:39 AM

 4                        *      *      *

 5          THE COURT:  Again, good morning.  Welcome, Counsel,

 6   parties in interest, members of the public, the press, those

 7   observing here and in New York and the telephonic

 8   participants.  It is, as always, good to be back in San Juan,

 9   and it's particularly good to be here on Puerto Rico

10   Constitution Day to discuss matters that are of such

11   importance to the future of Puerto Rico.

12          I remind you that consistent with the court and

13   judicial conference policies and the Orders that have been

14   issued, there is to be no use of any electronic devices in the

15   courtroom to communicate with any person, source, or outside

16   repository of information, nor to record any part of the

17   proceeding.

18          Thus, all electronic devices must be turned off

19   unless you're using a particular device to take notes or to

20   refer to notes or documents that are already loaded on the

21   device.  All audible signals, including vibration features,

22   must be turned off.

23          No recording or retransmission of the hearing is

24   permitted by any person, including but not limited to the

25   parties or the press.  Anyone who is observed or otherwise
```

1    found to have been texting, e-mailing or otherwise

2    communicating with a device from the courtroom during the

3    Court proceeding will be subject to sanctions, including but

4    not limited to confiscation of the device and denial of future

5    requests to bring devices into the courtroom.

6            So having finished my usual friendly greeting, I will

7    call on counsel for the Oversight Board to begin with a status

8    report, for which we've allocated 20 minutes.

9            MR. ROSEN:  Good morning, Your Honor.  Brian Rosen of

10   Proskauer Rose on behalf of the Oversight Board.  I'll take

11   the first half of that, Your Honor, and then turn it over to

12   my colleague.

13           Your Honor, with respect to the claims aspect, as you

14   know, the bar date was May 29 of this year.  And even today,

15   while all of the claims, excuse me, have been logged in and

16   time stamped, not all of the claims have been categorized or

17   even scanned.  And that is because the estimate, as of

18   yesterday, was that over 173,000 claims were timely filed.

19   They were date stamped.  Even after that, Your Honor, we've

20   already received 6,000 late filed claims.

21           At this point, approximately 45,000 of those claims

22   have been scanned in and categorized, and the amounts

23   associated with those 45,000 are in excess of 32 trillion

24   dollars.  Those claims obviously are large claims, Your Honor.

25   Many of them are claims filed by bond trustees.  So they are

1   significant because they cover the entire issue of the series

2   that was -- excuse me, that was issued by the Commonwealth or

3   PREPA or one of the other entities, that have been filed.

4          There are other claims that have been filed, such as

5   55 billion dollar claims that were filed by the Retirees'

6   Committee and so on.  Likewise, there are claims for tax

7   refunds that have been filed by multitudes, as well as a lot

8   of pension and retiree claims.

9          You asked what the claims reconciliation process is

10  going to be.  Your Honor, at this time we formalized the

11  retention of two claims agents to assist us in the analysis

12  associated with those claims.

13         Specifically, we've brought on -- the Oversight Board

14  has brought on Deloitte and BDO to assist with respect to the

15  PREPA claims that have been filed.  And Alvarez & Marsal will

16  be assisting with respect to the Commonwealth, HTA, ERS and

17  COFINA.

18         We intend to finalize those retention agreements this

19  week and then file applications for those retentions with the

20  Court hopefully as early as next week.  We've also been

21  working with the Unsecured Creditors' Committee and AAFAF with

22  respect to procedures for the reconciliation of these claims.

23         With respect to many of the claims that I already

24  referred to, Your Honor, like tax refunds and the pension

25  retiree claims, there are already administrative procedures

1    that have been in place and have been followed for years by

2    the government to process those claims.  And like what was

3    done in Detroit, in that case, Your Honor, we will attempt to

4    continue to use that reconciliation process.

5            With respect to other claims, Your Honor, we have

6    been developing with the committee and AAFAF a process that is

7    actually streamlined to have claims submitted to the parties

8    for the purpose of mediation, and if not mediation resolving

9    those claims, a very shortened form of determination by this

10   Court or another court that we all determine is the

11   appropriate way to proceed.

12           We obviously don't want to be burdening this Court

13   with over a hundred thousand claims, and so we're trying to

14   come up with a process that will work best for everyone.  At

15   this point, we intend to include that procedure in a plan of

16   adjustment, but obviously if that takes longer to get to, Your

17   Honor, we will attempt to file those procedures with the Court

18   and have that process move forward, even before we get to the

19   plan of adjustment stage.

20           With that, Your Honor, that is really where we are on

21   the claim status.  I will turn it over to Mr. Possinger to

22   discuss where we are with PREPA.

23           THE COURT:  Thank you, Mr. Rosen.

24           MR. ROSEN:  Thank you.

25           MR. POSSINGER:  Good morning, Your Honor.  Paul

1   Possinger, Proskauer Rose, on behalf of the Oversight Board,

2   and I will be providing the status update that you requested

3   with respect to PREPA.

4          And, Your Honor, I will start with the recent changes

5   to PREPA's management.  As I think the Court knows, during the

6   week of July 9th, PREPA incurred the sudden resignation of two

7   successive CEOs and five of its six board members.

8          The Oversight Board was certainly alarmed by this

9   unfortunate development, and we are concerned about the

10  destabilizing effect that this could have on the operations,

11  on the recovery, and ultimately on the transformation process.

12  We are informed by PREPA's advisors that PREPA's management is

13  functioning and that operations are continuing in the ordinary

14  course of business.

15         On July 23rd, Monday of this week, Jose Ortiz began

16  his tenure as the new executive director and CEO of PREPA.

17  Mr. Ortiz has experience in both the public and private

18  sector, and has previously held leadership positions in the

19  government of Puerto Rico under administrations of both major

20  political parties on the island.

21         Additionally, Mr. Eli Diaz Atienza has been appointed

22  to the PREPA board.  Mr. Diaz Atienza is the executive

23  director of PRASA, which is the water utility.

24         And Ralph Kreil Rivera has also been appointed to the

25  PREPA board by the Governor.  Mr. Rivera is a professional

1    engineer with over 30 years experience, both in Puerto Rico

2    and the Caribbean region, and he's a former president of the

3    college of engineers of Puerto Rico.

4         The Governor is working right now on identifying

5    candidates for additional independent director positions of

6    PREPA.  And in the meantime, Filsinger Energy Partners and

7    Ankura Consulting are continuing to provide day-to-day

8    operation support and support for the privatization and

9    transformation process that's currently under way.

10        With respect to operations, power has now been

11   restored to over 99.5 percent of power customers on the island

12   since the hurricanes.  The current average weekly generation

13   delivered to the power grid is at 95 percent of prehurricane

14   levels, and approximately 84 percent of the large transmission

15   lines on the island are fully operational.

16        With respect to the cash position and PREPA's

17   liquidity, currently PREPA has approximately 299 million

18   dollars in its operating accounts, and that includes 174

19   million dollars of outstanding borrowings under the

20   Commonwealth DIP financing facilities.

21        Your Honor may remember, the DIP financing facility

22   was a revolver that converted to term loan at the end of June,

23   and so any amounts that are now repaid on that loan can no

24   longer be reborrowed.  Last week PREPA repaid approximately

25   126 million dollars on the DIP financing loan.  However, in

1    the last four weeks, the average weekly cash collections have

2    been approximately 62 million dollars per week, which we're

3    advised is enough to service most of the operational expenses

4    of PREPA and is a substantial improvement over where we were

5    last February when we did the hearings on the DIP financing

6    facility.

7         THE COURT:  Would you speak a little louder and more

8    directly into the microphone?  Apparently there's some trouble

9    with the telephonic participants.

10        MR. POSSINGER:  Will do, Your Honor.

11        THE COURT:  Thank you.

12        MR. POSSINGER:  So I think as we indicated last

13   hearing and is still the case, PREPA does not anticipate the

14   need to seek further post-petition financing in the

15   foreseeable future.

16        Finally, Your Honor, with respect to the

17   transformation process, the transformation process is

18   underway.  A brief update on milestones.  There has been a

19   market sounding process that was completed on schedule in mid

20   June.  That process confirmed that there is a significant

21   amount of interest in the marketplace to do a privatization

22   transaction or transactions with PREPA, and PREPA received --

23   PREPA and its advisors received constructive feedback upon how

24   to structure and achieve a successful privatization and

25   transformation of PREPA.

```
 1              Amendments to the public-private partnership law
 2    facilitating the transformation was signed into law in June.
 3    A new integrated resource plan is presently under production
 4    with Siemens, and that's a plan for capital expenditures and
 5    the mix of energy supply going forward in accordance with the
 6    fiscal plan.
 7              A regulatory working group and a blue ribbon panel
 8    with respect to energy regulation has been announced.  The P3
 9    Authority, the Public-Private Partnership Authority, and PREPA
10    have begun the necessary tasks to move forward on
11    privatization transformation transaction, or transactions.
12              And in the meantime, PREPA, through Filsinger Energy
13    Partners and Ankura, are continuing to work with the Oversight
14    Board to develop a fiscal year 2019 budget with the goal of
15    certifying that budget by the end of this month.
16              THE COURT:  Thank you.
17              MR. POSSINGER:  If you have any questions on PREPA --
18              THE COURT:  That was quite comprehensive.
19              MR. POSSINGER:  Thank you, Your Honor.
20              THE COURT:  Thank you.
21              MR. DESPINS:  Your Honor.
22              THE COURT:  Mr. Despins.
23              Mr. DESPINS:  Good morning, Your Honor.  Luc Despins
24    with Paul Hastings on behalf of the committee.  Just on the
25    proof of claim process, ten seconds.
```

1          You'll recall that the committee asked, and I'll

2     admit at the last minute, to extend the bar date by 30 days.

3          THE COURT:  Yes.

4          MR. DESPINS:  And you may have thought at the time,

5     really?  We're really going to extend this for 30 days?  I had

6     the same reaction initially.  But just so you know, more than

7     10,000 claims were filed between the original date and the new

8     date, so I think that was a good thing.  I just wanted to make

9     sure you knew that.

10         THE COURT:  Thank you.  And I'd also just like to

11    take this opportunity to commend the court and Prime Clerk

12    staff who handled the intake of claims by physical filers at

13    the court locations.  Particularly in the last couple of days

14    of the process, there were literally thousands of people lined

15    up here, and very heavy traffic in Ponce.  And the staff of

16    the clerk's office, working together with the people from

17    Prime Clerk, went over and above to make sure that all of the

18    filers were attended to as quickly and as respectfully as

19    possible.

20         People were out in the street in the sun with the

21    filers taking papers to expedite the process.  And so I want

22    to publicly acknowledge and thank all of those who did that

23    work in the process of claims filing.  And it did turn out to

24    be a very good thing that the extra time was afforded.  And

25    there continue to be people filing there.

1          Mr. Rosen referred to the late claims.  And so we are

2    accepting whatever comes to the clerk's office.  And there

3    will be processes for evaluating and any objections or

4    whatever to claims later, but we are making sure that there

5    are facilities to respond to the people who have come.  So

6    thank you.

7          The next agenda item is the status report on *Siemens*

8    *v. HTA*, and the procedures that will be used for the Title VI

9    and the resolution of the Siemens claim.  In that connection,

10   I've asked Judge Dein to lead that part of the discussion.

11         Pardon us for a minute.

12         HONORABLE MAGISTRATE JUDGE DEIN:  We're not switching

13   robes.

14         MS. SPRINGER:  Good morning, Your Honors, and thank

15   you for your time today.  I'm Claudia Springer from Reed

16   Smith, and I represent Siemens Transportation Partnership

17   Puerto Rico, which I will --

18         THE COURT:  Ms. Springer, may I just ask you to

19   project even a little bit more and maybe angle the microphone

20   closer to you?

21         MS. SPRINGER:  Sure.  Please let me know if that

22   works.  Nobody's ever accused me of being soft spoken, Your

23   Honor, so this would be a first.

24         Your Honor, we have attempted to work with the

25   defendants in this matter to come up with a joint resolution

1    on a protocol and deadlines for both discovery and the trial

2    on our matter.  And unfortunately, we have not been able to

3    come up with a meeting of the minds on that.  However, I don't

4    think we are that far apart.

5         I guess the one sticking point here is that the date

6    that the defendants want to start this process is a date that

7    is still unknown, because it is the date that they file a

8    Title VI, which as you may recall, has shifted about five

9    times at this point.

10         It is now supposedly going to occur on August 6th.

11   However, when we were before you a little bit more than a

12   month ago, it was supposed to start on July 6.  We are

13   prepared to start the process tomorrow.  And in fact, the

14   papers that we filed on the status report, the T letter, can

15   be tomorrow if Your Honor thinks that that will speed things

16   up.

17         What we don't want to see happen is that we're

18   railroaded and not able to adequately prepare for and present

19   our case.  If we did start tomorrow, and we were given the

20   amount of time that we have requested, which is roughly 100

21   days, starting on the T date, that would take us till about

22   the end of October, beginning of November.  Not that different

23   from what it will take if the date is actually August 6th and

24   not again delayed by the GDB, in terms of filing the Title VI

25   action.

1      I think all of the dates that we've put in here are

2 reasonable.  It is the summertime, as everyone knows.  It is

3 not a great time to have clients respond to discovery requests

4 and be present for depositions, but we nonetheless are

5 prepared to do that.  And prepared to, if necessary, work over

6 the Labor Day weekend.  However, we want to get started, but

7 we want the amount of time that we think is necessary to

8 adequately prepare our case.

9      HONORABLE MAGISTRATE JUDGE DEIN:  I understand GDB

10 wants to speak from New York; is that correct?

11      MS. TRELLES HERNANDEZ:  Your Honor, if I may?

12      HONORABLE MAGISTRATE JUDGE DEIN:  Yes.

13      MS. TRELLES HERNANDEZ:  Good morning.  Maria Trelles

14 from Pietrantoni Mendez & Alvarez on behalf of GDB on this

15 matter.

16      What we'd like to do is turn this over to Ms. Uhland

17 for an overview of where we are in the Title VI, because

18 obviously that has an impact on the *Siemens* case, and then

19 address any *Siemens* specific issues here.

20      HONORABLE MAGISTRATE JUDGE DEIN:  Let's do it that

21 way.

22      MS. UHLAND:  Thank you, Your Honor.  Suzanne Uhland

23 of O'Melveny & Myers on behalf of AAFAF and GDB.

24      Your Honor, at this point, GDB and AAFAF do

25 anticipate launching the solicitation of the GDB qualifying

1    modification and commencing the Title III over the next few

2    weeks.

3         At this point, the solicitation materials have been

4    submitted to the Oversight Board, and we are awaiting

5    confirmation of the delivery -- information delivery

6    requirement as set forth in 601(f) of PROMESA.  We are

7    awaiting confirmation that that has been satisfied.

8         Siemens has requested that the commencement date

9    occur no later than August 17.  We expect that we will be

10   launching sooner than that, but at this point, since we have a

11   gating item, which is this approval from the Oversight Board,

12   we cannot definitively commit to a launch date.  But again, we

13   do expect to be proceeding within the next few weeks.

14        The other item I wanted to point out to the Court is

15   that we intend, when we commence the Title VI, to file a

16   procedures motion, and in that procedures motion, you know,

17   set forth a schedule.  And parties would have the opportunity

18   to object to our procedures motion.

19        We set out a timetable in the status report, and we

20   actually realized it has a glitch in it, because we have the

21   hearing on the procedures motion occurring after some of the

22   dates by which things, you know, would need to occur.  But I

23   don't know whether at this juncture the Court wants to walk

24   through what the schedule would look like, since it is -- you

25   know, we have not filed the procedures motion or launched the

```
 1    Title VI yet.  It seems like we're maybe getting ahead of
 2    ourselves here.
 3              HONORABLE MAGISTRATE JUDGE DEIN:  So I guess, to both
 4    of you, maybe it makes sense to have the two speakers at the
 5    microphones.  It's the Court's preference to have this all
 6    teed up, ready to go at the November Omni, which is November
 7    7th.
 8              At that point, it would either be an evidentiary
 9    hearing, you know, give or take a day, or argument on a
10    summary judgment type motion.  Briefing for that should be
11    done the week before, which is October 31st.  And that's all
12    the briefing.  All right.  I think that fits in with both of
13    the proposed schedules.  It shortens it.
14              If August 17th was the start date, I think that comes
15    out to T plus 82.  So it's somewhere in between.  I think it
16    makes the most sense now to assume that it's going to be done
17    in the context of a Title VI, as everybody's agreed.  And I'm
18    assuming that you can either reach an agreement regarding what
19    happens to this 13 million dollars in the interim or file a
20    motion on it.
21              And we can make an official ruling, but I think
22    everybody's agreeing, at least for now, that that money isn't
23    going anywhere during this process.  And both sides seem to
24    have agreed to that, so I think that's fine.
25              There was a question on what rules of procedure
```

```
 1    should govern, and it seems there doesn't seem to be a real
 2    objection on that.  We'll have Bankruptcy Rule 9014 applying.
 3    If you can agree on other Federal Rules, fine.  If not, file a
 4    motion and we'll deal with it.
 5          All of this is on the assumption that the outside
 6    date is August 17th.  If the outside date passes, we'll have
 7    to re-evaluate this, because we would really very much like to
 8    have it by November, but we also recognize the need to have
 9    discovery, so --
10          MS. SPRINGER:  Your Honor, thank you very much.  I
11    mean, we definitely would like it to end by that November
12    date, and we are happy to work backwards.  And, you know, if
13    we need to shorten some of our dates and they need to lengthen
14    some of theirs, that's fine.
15          What I fear is further delay.  So if we can have -- I
16    mean, we don't have a problem having this litigated within the
17    Title VI, as long as the Title VI is going to be actually
18    filed, and filed sometime very soon, because as Your Honor
19    knows, we've been hearing the same story for months and
20    months.  And we heard it last month.  Now we're hearing it
21    again about, you know, within a few weeks.
22          So we want assurance that our matter is, in fact,
23    going to be heard within the near future and is going to be
24    litigated through discovery within the next -- certainly
25    within the next few months.
```

1          HONORABLE MAGISTRATE JUDGE DEIN:  So I think what

2    makes the most sense, and tell me if I'm wrong, is that this

3    proposal to have it heard at the November Omni assumes an

4    outside date of August 17th.  If that doesn't appear to be

5    happening, file something and we'll figure out how to either

6    start it or end it at a different time, but that's the

7    timeframe.

8          I think that's sufficient time for all the discovery,

9    and it should fit into the schedule proposed by GDB for the

10   qualified modification process, as well assuming an outside

11   date of August 17th.  And what I'm hearing from GDB is that

12   that should be attainable, at least as of now.

13         And it sounds to me like more steps have been taken.

14   The process is further along today than it was at the last

15   hearing.  So assuming that that's happening.  If not, file

16   something at the beginning of August, you know, when you have

17   a sense, by August 6th, if this isn't happening and we'll

18   reassess the schedule at that point.

19         MS. SPRINGER:  Your Honor, one more thing based upon

20   what you're saying.  I get assurances from GDB that they will

21   advise me at the beginning of August whether it looks like

22   they are going to make that date of August 17th or sometime

23   beforehand so I'm not told on August 17 -- actually, I find

24   out from looking at the docket that, in fact, the Title VI has

25   not been filed.

```
1              HONORABLE MAGISTRATE JUDGE DEIN:  Does GDB want to

2     comment?

3              MS. TRELLES HERNANDEZ:  Your Honor, yes.  Again,

4     Maria Trelles for GDB.

5              We can advise Siemens as to the progress of the Title

6     VI filing on the same day that we advise everyone else on that

7     progress.  So it will be the same deadline for everyone.

8              I do want to take just a moment, if Your Honor would

9     allow me, to address one specific point.  Just that the Title

10    VI is farther along than what it was some time ago.  We do

11    think it's important to note that discovery is farther along

12    than it may be in some other cases, because Siemens already

13    took Rule 2004 discovery here.

14             So GDB has made a substantial production of documents

15    and made one deposition from its chief restructuring officer

16    available.  Even so, we have considered Siemens' position, and

17    in order to move things along, we are willing to continue

18    supplementing that discovery while the Title VI gets teed up

19    just so that discovery -- Siemens has more time for discovery.

20    And then it can use that within the Title VI once it files its

21    objection.  But that way it minimizes the risk of any delays

22    affecting Siemens.

23             HONORABLE MAGISTRATE JUDGE DEIN:  I appreciate that.

24    And I appreciate that you've been working together, but again,

25    all I can do is sort of evaluate the proposals that I have.
```

1   So the proposal that I have assumes a start date of August

2   17th.  Let's -- it sounds like that's reasonable as of now,

3   and --

4           MS. TRELLES HERNANDEZ:  Yes, Your Honor.

5           HONORABLE MAGISTRATE JUDGE DEIN:  -- until proven

6   otherwise, I'm going to assume that happens.

7           MS. SPRINGER:  Thank you, Your Honor.

8           MS. UHLAND:  Thank you, Your Honor.  And we do

9   believe that's reasonable, and we will certainly aim for that

10  date.

11          MS. DALE:  Your Honor, Margaret Dale, Proskauer Rose,

12  for the Oversight Board.

13          Just one point, Your Honor.  Siemens began an

14  adversary proceeding in HTA's Title III.  That -- the Motions

15  to Dismiss were fully briefed in that action.  And at the last

16  Omni, the Court made it clear that the Siemens claim should be

17  handled in the Title VI, and we're supportive of that.  But we

18  did want to remind the Court that the adversary Complaint in

19  HTA's Title III will have to be resolved at some point.

20          HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

21          MS. DALE:  You're welcome.

22          HONORABLE MAGISTRATE JUDGE DEIN:  You've added to my

23  guilt list.

24          THE COURT:  Well, to that, assuming that we are going

25  forward with resolving this claim within the Title VI, within

1    the time frames that we've discussed or roughly those time

2    frames, I have been working on the assumption that there will

3    be a withdrawal of the Complaint and/or the Motion as the

4    mechanism for resolving that adversary proceeding.

5            Is that a reasonable working assumption?

6            MS. SPRINGER:  We had not thought about exactly how

7    we were going to do this, Your Honor.  We understand that

8    there will be -- as soon as the Title VI is filed, we will be

9    filing an objection, which will look very similar to our

10   Complaint.  So everybody has notice of what is happening, you

11   know -- has had notice, frankly, of Siemens' claim.

12           There may actually be more extensive remarks or

13   statements in the objection than even existed in the

14   Complaint.  However, because of the way this is being teed up,

15   which was not known at the time of the filing of the

16   Complaint, of course we will be filing an objection, but

17   again, it will look very similar to the Complaint.

18           And if it's -- certainly if it's appropriate at that

19   time for us to withdraw the Complaint, we can withdraw the

20   Complaint.  But I don't want to make any promises yet.  I want

21   to see how this shakes out with the filing of the Title VI and

22   when.

23           THE COURT:  So would you all consent to our formally

24   entering an Order staying that adversary at this point,

25   without prejudice of course, to lifting of that stay on the

1  adversary if things go sideways in terms of coordinating with

2  the Title VI process or there is other appropriate cause for

3  lifting that stay?

4          MS. SPRINGER:  As long as that language was in there,

5  that it wasn't going to prejudice us and that we could move

6  the Court to reopen or to --

7          HONORABLE MAGISTRATE JUDGE DEIN:  Lift the stay.

8          MS. SPRINGER:  -- lift the stay at that point.  And

9  as I said, I'm hoping that we will be able to have

10 constructive dialogue with the defendants, all of them, but

11 especially GDB regarding when that Title VI is going to be

12 filed.

13         Up until now, we have not found out until, frankly,

14 the actual date it was to have been filed that it was not

15 going -- that it was being delayed again.  So I'm hoping that

16 by the beginning of August, we will have been told whether or

17 not it is going to be filed by August 17.

18         THE COURT:  We will enter something to that effect.

19         MS. DALE:  Thank you.

20         THE COURT:  If there is consent.

21         MS. DALE:  There is consent to the stay from the

22 Board and HTA's perspective.

23         Your Honor, I was just informed that there has been

24 additional progress, I guess, in terms of the Title VI.  The

25 Board has acknowledged the disclosure materials.  That

1    acknowledgment was sent to AAFAF and to GDB earlier this week.

2    So again, that's moving forward as well.

3              THE COURT:  Very good.  Don't all go away.

4              MS. TRELLES HERNANDEZ:  Your Honor, on behalf of GDB,

5    of course there's no objection to staying the adversary, and

6    counsel here for AAFAF --

7              MR. MUNIZ LUCIANO:  Good afternoon, Your Honor.

8    Mauricio Muniz of Marini Pietrantoni Muniz on behalf of AAFAF.

9    We would support that Stay Order.

10             THE COURT:  Thank you.

11             MS. TRELLES HERNANDEZ:  Your Honor.  Your Honor, if

12   that is all on our part, we would appreciate if you could

13   excuse us from the hearing.  This is all we had.

14             HONORABLE MAGISTRATE JUDGE DEIN:  You will be

15   excused, but not yet.

16             MS. TRELLES HERNANDEZ:  Okay.

17             HONORABLE MAGISTRATE JUDGE DEIN:  I guess maybe it

18   makes sense to do something a little more formally on the 13

19   million dollars.  And from the -- I'm not understanding

20   frankly the real distinction between what everybody's seeking

21   here.  It seems as a practical matter, until the qualified

22   modification is ruled on, that the 13 million should not be

23   moved, but I don't really understand whether that's disputed

24   or not.

25             MS. SPRINGER:  Well --

1          HONORABLE MAGISTRATE JUDGE DEIN:  I know from your

2     point of view it's not, so I guess it's more of a GDB --

3          MS. SPRINGER:  Your Honor, I think there is some

4     level of clarification that I need to provide.  It -- when we

5     prepared the status report, and since we were obviously not in

6     agreement on the scheduling of the *Siemens* litigation,

7     vis-a-vis the Title VI, we simply wanted to make sure that

8     until that litigation is concluded, whether it's when the

9     qualifying memorandum has been approved, not approved,

10    whatever, we want to make sure that that money remains intact.

11         So in other words, if it were the case that the

12    qualifying memorandum was approved, but the litigation for

13    whatever reason was not over, we want to make sure that that

14    13 million dollars does not leave the bank, which we think

15    should not be a problem, because this, after all, is a

16    multibillion dollar RSA.

17         It cannot be, I hope, anyway, that that 13 million

18    dollars will make or break the success of that Qualifying

19    Memorandum and that RSA.  So all we ask for is that that money

20    stay intact, at the bank, until this *Siemens* litigation has

21    concluded, whether it's before or after or on the same date as

22    the Qualifying Memorandum is ruled upon.

23         MS. TRELLES HERNANDEZ:  Your Honor, GDB has

24    represented it will hold at least 13 million in cash until the

25    qualified hearing has been held.  At this point, we think

1   that's a sufficient representation.

2            The expectation is that this will end with a

3   qualified modification hearing, but if, as the process moves

4   forward, it is necessary to enter into a different agreement

5   or make a different representation, we can consider that later

6   on.  At this point, again, the expectation is that this will

7   all end with the qualified modification approval hearing.

8            The monies that GDB holds in general -- the 13

9   million are part of all the money that GDB holds.  They're

10  not -- they're subject to severe restrictions for

11  disbursements.  GDB is not generally disbursing monies.  It

12  has to go through a process to disburse, and it has to be for

13  very specific things, essential services.  And it has to go to

14  the Board.

15           So the monies GDB has, we expect that it will have

16  them, roughly the same proportion, the same amount that it has

17  right now, by the time of the qualified modification hearing.

18           THE COURT:  Well, the schedule that GDB had proposed

19  literally says, as you just did, that it will be held until --

20           MS. TRELLES HERNANDEZ:  Yes.

21           THE COURT:  -- the date of the hearing.  This is

22  expected to be a contested hearing.  The ruling may not be

23  instantaneous, although I understand that it is one of some

24  urgency.

25           And so at a minimum, from the Court's perspective, I

```
 1    need a clear commitment that the hold will be through a

 2    determination of the Qualifying Modification Motion, whether

 3    that's the same day, two days later or whenever is consistent

 4    with the overall timetable.

 5          I think that I heard Ms. Springer make a further

 6    request and I'm not precisely sure I understand how she would

 7    identify her end point, but from the Court's perspective, at a

 8    minimum, it would need to be until a determination of the

 9    Qualifying Modification Motion.

10          MS. TRELLES HERNANDEZ:  And I -- we would have no

11    issue withholding the monies until the determination by the

12    Court, Your Honor.

13          HONORABLE MAGISTRATE JUDGE DEIN:  And then without

14    prejudice, I assume --

15          THE COURT:  Yes, without prejudice to a request for

16    extension, if that's deemed necessary.

17          MS. SPRINGER:  Yes.  Your Honor, I think you

18    understood what I was saying.  I should have said it more

19    artfully, but I believe with what we're concerned about -- and

20    the reason this was highlighted in our papers is because we

21    didn't know whether there would be a -- necessarily be a

22    decision on the *Siemens*' matter at the same time as a decision

23    on the qualifying modification.

24          So we didn't want to run into a situation where the

25    qualifying modification would be decided upon first and
```

1    Siemens' situation was not resolved at that point.

2            THE COURT:  Well, it has been my understanding, and

3    please correct me if I'm wrong, that the Qualifying

4    Modification Motion is being cued up in such a way that the 13

5    million -- the GDB is seeking approval of inclusion of the 13

6    million in the amounts to be restructured under the RSA, so

7    that a resolution of Siemens' claim to that 13 million would

8    be necessary in order to resolve the Qualifying Modification

9    Motion.  Is that correct?

10           MS. TRELLES HERNANDEZ:  Yes, Your Honor.  That's

11   correct.

12           HONORABLE MAGISTRATE JUDGE DEIN:  So there's an

13   agreement then that it will stay, at least through a ruling on

14   the qualified modification hearing, and that's without

15   prejudice to Siemens' right to seek to extend that.

16           MS. TRELLES HERNANDEZ:  Yes, Your Honor.  Until the

17   resolution, qualified modification.

18           MS. DALE:  And just one point, Your Honor.  I'm sorry

19   to keep this going, but we just want to make clear that the 13

20   million dollars is not segregated in some account right now at

21   GDB.  It is part of the GDB estate, so to speak, and it will

22   remain, as counsel have just agreed, but there isn't -- it

23   isn't separated and segregated at this point in time.

24           THE COURT:  I think --

25           MS. SPRINGER:  That may be the case, but that's the

1    nub of the problem here, Your Honor, right?  What was told to

2    Siemens and what is happening in actuality --

3         HONORABLE MAGISTRATE JUDGE DEIN:  We understand that

4    that's the issue.  I think the bottom line that's coming down

5    is if Siemens prevails, there will be 13 million dollars to

6    pay them.

7         MS. TRELLES HERNANDEZ:  Yes, Your Honor.  We know.

8    And Ms. Dale is perfectly correct, as I said earlier, GDB

9    holds all of the monies together, and these 13 million are

10   part of all of the money.  So it's part of the liquidity.

11        HONORABLE MAGISTRATE JUDGE DEIN:  The other question

12   that came up in our review of the GDB's proposed Title VI

13   timeline is given the commencement and the very short period

14   by which people need to file their Notice of Intention to

15   Object.  How are you getting notice of the notice period out?

16        THE COURT:  Since there's a seven-day deadline after

17   the filing date, how does that work as a practical matter?

18        MS. TRELLES HERNANDEZ:  I'll tee this up to

19   Ms. Uhland in New York.

20        MS. UHLAND:  Yes, Your Honor.

21        What we propose to do is the day that we file, that

22   we launch the GDB and the solicitation and upon commencement

23   of the Title VI, we intend to file something with the court,

24   the Procedures Motion.  We also intend to host that on EMMA,

25   which is the public securities -- it's like an SEC filing for

1  municipal securities.  So we will, in fact, be doing a very

2  broad notice.

3         We are also intending to do a publication notice of

4  the -- well, actually not for that particular deadline.  We

5  were going to do that for the notices to object.  We intend to

6  do public notice.  But for the standing -- the reason for the

7  intention to object is to try to resolve the standing issues

8  and to try to understand who's going to do objections so that

9  standing objections could be raised.  It's not trying to -- so

10 that's the purpose for that particular deadline.

11        So we're open to, you know, the Court's views on a

12 better way to do that, but we were just trying to figure out

13 how do we handle the standing objections without forcing

14 people to do full-blown objections early in the process.

15        THE COURT:  So let me just first ask again about

16 logistics.  You're filing this Procedures Motion; you're

17 anticipating a hearing after the filing of objections to the

18 Procedures Motion; but at the same time, you're proposing firm

19 deadlines in advance of the hearing.  And indeed, one deadline

20 even in advance of the objection to the Procedures Motion.

21        So are you planning on day one to be asking me to

22 sign an Order that sets that seven-day deadline, and the

23 14-day deadline and the 21-day deadline?  Will you include

24 alternatively in the disclosures on the RSA a notice that this

25 timetable is going to be proposed and that I'll be asked on

1    the first day to sign an Order setting the timetable?  I

2    just --

3           MS. UHLAND:  Your Honor, what I think we should do,

4    given what the Court has stated with the November date, you

5    know, assuming an early August filing is -- yes, we did assume

6    that we would reach out to you when we filed to get a schedule

7    for the procedures hearing.  And we would ask for that, have

8    the Court Order that schedule.

9           Given the timing, you know, moving it out to

10   November, I believe that as part of the Procedures Motion, we

11   will ask you to set a date for this intention to object for

12   the standing hearing, so we don't have to have that date

13   occurring before the procedures hearing.

14          I think we can move that date so that the Court --

15   set by the Court when the Court makes the procedures, enters

16   the procedures Order.

17          THE COURT:  All right.  Well, clearly you're thinking

18   through the mechanics of it, and so we'll await the more fully

19   developed proposal.  But I wanted to put those issues on the

20   table in terms of effective notice, operative Court Orders,

21   and a meaningful ability of the targets of those deadlines to

22   appreciate the deadlines and react in a timely and appropriate

23   way.

24          MS. UHLAND:  Yes.  We will take that into account,

25   Your Honor.  Thank you.

1          THE COURT:  Thank you.

2          HONORABLE MAGISTRATE JUDGE DEIN:  I think we're

3    done.

4          THE COURT:  Oh, Mr. Despins.

5          MR. DESPINS:  I'm sorry.  This is not directed at

6    *Siemens* at all.  Your Honor, Luc Despins for the Creditors'

7    Committee.

8          As I mentioned at the last hearing, we have some

9    concerns about the GDB restructuring.  We are in discussions

10   with Ms. Uhland.  The concern I have is I think you mentioned

11   in the last hearing that you would not be available for a

12   hearing in August.  I think I recall something along those

13   lines.

14         THE COURT:  The end of August, the last ten days or

15   so of August, into the beginning of the Labor Day weekend.

16   Not until after the Labor Day weekend.  I'm not expecting to

17   be asked to have a full-blown hearing on September 4th with

18   briefing that comes in during the last week of August.

19         MR. DESPINS:  Okay.  So I think that's going to -- if

20   we cannot reach an agreement, there's likely to be a lot of

21   legal turbulence with this between the Committee and the

22   debtors.  So I -- so I am concerned about -- so you're saying

23   that you are available for the first 15 -- I don't want to put

24   you -- 15 days or so in August, or is that generally the time

25   frame?

1        THE COURT:  I think it is -- just one moment.  I

2   believe it is that I am relatively scarce starting in mid

3   August --

4        MR. DESPINS:  Okay.

5        THE COURT:  -- and I am not available period from

6   about the 23rd or 24th, but give me just a minute to look at

7   my calendar.

8        Okay.  So really the -- hold on a minute.  So I am --

9   I have diminished ability to deal with major matters starting

10  the week of the 13th of August.

11       MR. DESPINS:  Okay.

12       THE COURT:  And I will just simply not be able to

13  hear anything from the 24th of August until just after Labor

14  Day.

15       MR. DESPINS:  Okay.  Thank you, Your Honor.  We'll

16  have to coordinate with --

17       THE COURT:  You'll have to coordinate.  But why can't

18  your objections to procedures or objections to the Title VI be

19  handled within the proposed structure of objections to

20  proposed procedures, objections to procedures, standing

21  issues, the litigation structure that Ms. Uhland and

22  Ms. Trelles-Hernandez have spoken about here?

23       Are you expecting you want to create something

24  different for your issue?

25       MR. DESPINS:  I mean, we're still formulating our

1    legal strategy, but I'm not sure -- I mean, when would that

2    take -- can that take place?  I mean, we will object if we

3    can't reach an agreement in August.  The question is if

4    there's a need for a hearing.  That's my concern, is that if

5    you're not -- but I understand.

6                THE COURT:  Well, their proposed timetable puts a

7    hearing on the procedures at 27 days out from their T date,

8    which is not going to be the first of August, as I understand

9    it.

10               MR. DESPINS:  Okay.

11               THE COURT:  So that puts that in early September.

12               MR. DESPINS:  Okay.  I'm sorry.  That's fine.

13               THE COURT:  Okay.  Thank you.

14               MR. DESPINS:  Thank you.

15               HONORABLE MAGISTRATE JUDGE DEIN:  That's one way to

16   get rid of the cases.

17               THE COURT:  Yes.  I'm sorry.  I just dropped my

18   device.

19               HONORABLE MAGISTRATE JUDGE DEIN:  Is there anything

20   further on *Siemens*?

21               MS. SPRINGER:  I don't think so.  Thank you, Your

22   Honor.

23               MS. TRELLES-HERNANDEZ:  Thank you, Your Honor.

24               THE COURT:  So that concludes the *Siemens* matter.

25               And the next matter on the agenda as printed is the

1    2004 Motion continuation, but we actually are first going to

2    take up the Exit Plan Motion.  And then we'll segue from that

3    into 2004, because there are some issues that are likely to

4    carry over.

5         So first, have there been any further developments on

6    agreed changes to the Proposed Order in response to the

7    objections since the Reply filing?

8         MR. YATES:  Your Honor, first of all, David

9    Farrington Yates at Kobre Kim for the independent

10   investigator.

11        THE COURT:  Good morning, Mr. Yates.

12        MR. YATES:  Good morning.  How are you?

13        THE COURT:  Very well.

14        MR. YATES:  We have proposed certain changes in

15   response to the Committees' objections, and I will refer to

16   both the Retirees' Committee and the Creditors' Committee as

17   "committees" as I talk about the issues, unless they have

18   different positions which would be important for me to

19   distinguish.

20        So what we had proposed, and it's specifically with

21   respect to access to the independent investigator's materials,

22   and specifically with respect to information that's on top of

23   what we've already provided pursuant to the earlier Orders

24   from Judge Dein, with respect to our access to the GDB

25   database, custodians, search terms, et cetera, have been

```
 1   provided.  And we've also done the same with respect to

 2   Popular and Santander.

 3        Those three entities, if the Court recalls, were

 4   subject of the original motion for 2004 examination, which was

 5   since renewed.  So from our perspective, essentially what the

 6   committees should be receiving, pursuant to agreements reached

 7   with us and agreements reached with GDB specifically, are

 8   productions of non-privileged materials, and also productions

 9   of privilege logs.

10        With respect to the documents that have been provided

11   to us by GDB, the Court may recall that under PROMESA, we have

12   access, by statute, to their materials log.  And so some

13   material has been provided to us that is classified as highly

14   confidential, attorneys' eyes only.

15        We understand that GDB and AAFAF have provided or are

16   in the process of providing a privilege log to the committees

17   to identify what those documents are.  So that's a long way of

18   saying, in addition to the information that we've already

19   provided, we will also provide a date range with respect to

20   any searches.  We'll put that into the depository. We would

21   also put in any other privilege logs that we have received.

22        And then finally, it seems that much of the

23   discussion from the committees was very much focused on our,

24   the independent investigator's, written notes and summaries

25   from its witness examinations and when we spoke with
```

1   disclosing parties.  And so what we proposed was, to reserve

2   all rights, we have taken the position that these are our work

3   product.  They also are subject of attorney-client

4   communication.

5        Among other reasons, they should be withheld as

6   privileged.  However, we will hold on to them through what

7   we've defined in our motion as the cooperation period, which

8   is a period to June 1, 2019, whereby the investigator has

9   agreed to sit and talk on request from the committees, from

10  the debtor, from regulators, from the United States Trustee to

11  discuss the report after it's published, and reserve all

12  rights that if anyone, the committee, says that they would

13  like to gain access to those materials, that they have to come

14  to court and demonstrate need.

15       We think right now that doing more, without the

16  benefit of the report being published, is really putting the

17  cart before the horse.  And so a number of the requests that

18  were made by the committee specifically we thought were

19  misplaced, because they are essentially demands that are

20  better informed after the report is published.  And we're

21  still on track to do so in August, August 15.

22       And so these procedures, I think, are the best

23  manifestation of the planning and structure of a way for us to

24  publish our report, resolve any issues regarding disputes on

25  confidentiality of information that we intend to publish in

1    our report, turn over information that's been provided to the

2    investigator along the way by third parties, and third parties

3    other than Santander, Popular and GDB, by agreement to do it

4    on a voluntary basis as opposed to an involuntary

5    subpoena-like process.

6            And then ultimately, to allow for the investigator to

7    publish the report and exit, agreeing to cooperate for a

8    period of time, and ultimately to serve its function,

9    discharge its obligation on behalf of the special committee of

10   the Board to investigate the issues for the benefit of the

11   people of Puerto Rico.

12           And that report is going to contain the manifestation

13   of our investigation, our choices with respect to strategy,

14   who we talk to, et cetera.  That will all be reflected there.

15           So at this time, as far as changes to the Proposed

16   Order, we stand essentially by the procedures that we

17   proposed.  We think that they are balanced.  We think that

18   they are reasonable, particularly with respect to expectations

19   of third parties that provided information to us in

20   cooperation, and so they are entitled by agreement to keep

21   that information private.

22           We think that trying to gain access to these

23   materials through an Exit Procedures Motion, affirmative

24   relief is misplaced.  I think that the Creditors' Committee

25   has said they want access now.  The Retirees' Committee has

1  said, we want access to everything subject to a negative

2  notice process whereby everyone would receive notice and they

3  would have to file an objection ten days after any sort of

4  Order was entered with respect to the Exit Procedures Motion.

5        And so ultimately, we think that puts on its head the

6  expectations of the party.  And also the parties put on its

7  head what we were trying to accomplish in an efficient and

8  economic way, to get the report done as quickly as possible,

9  cover the issues that we needed to cover, provide for

10  confidential treatment of information, and ultimately put

11  everything in one place, where on demonstration of need, and

12  also as part of that, justification of cost would be made

13  available.

14        THE COURT:  Thank you.  It seems to me, then, that

15  the objections that were essentially rejected by the

16  independent investigator as reflected in the Reply Brief have

17  not been -- there hasn't been any change of positions on

18  those.  So that unless the committees are withdrawing those

19  objections, I will still need to rule on them.

20        MR. YATES:  Yes, Your Honor.

21        THE COURT:  And so before I hear from the committees,

22  I'd like to preview for everyone that I have reviewed very

23  carefully the submissions.  I'm prepared to walk through the

24  rulings on the disputed issues, issue by issue, but I want to

25  give you an overview of the direction.

1          So in general, my intention is to have uniform

2     procedures to which the committees will be subject,

3     substantially in the form of the structure that the

4     independent investigator has proposed.

5          Issues as to discovery of particular information

6     would be dealt with in the 2004 context, and/or requests

7     through the procedures, because there is some overlap there.

8     And that's one reason Judge Dein is going to be taking up 2004

9     issues after we finish this discussion.

10         The procedure timetable will be sped up a little bit,

11    with an explicit provision for application to the Court for

12    expedited litigation timetables as was described in the Reply

13    Brief, but not documented in the Proposed Order that was

14    attached to the Reply Brief.

15         The investigator would be required to preserve all of

16    its material that's not going into the repository during the

17    cooperation period, not just witness interview notes, because

18    frankly, it's not clear to me, and I think it wasn't clear to

19    others what the universe of quote, unquote, privileged

20    materials not going into the repository consists of.

21         So that forbearance agreement or obligation should

22    apply to all of the investigator's files through the end of

23    the cooperation period, which is the earlier of the dates

24    stated, and confirmation.

25         My inclination is to make that date stated a year

1   from the filing of the report as opposed to two years from the

2   commencement of the Commonwealth's Title III, since it did

3   take a while for the independent investigator's process to get

4   started.  So my intention is to make that date August 16th of

5   2019, without prejudice to applications in advance of that

6   date on a showing of good cause to extend that date.  But the

7   stated date would be August 16th of 2019.

8          So would anyone like to make remarks in response to

9   that general description of my approach before I go to

10  particular rulings and textual changes?  I'm just trying to do

11  this in the most efficient way possible.

12         MR. YATES:  Sure.  Your Honor, I just had one

13  question.  So when you described the outside date of August

14  16, 2019, you mentioned adjustment.  And so I wanted to be

15  clear, the way we've structured the deadline for the end of

16  the cooperation period is through a date certain, or unless

17  the investigator's engagement is terminated.

18         THE COURT:  I thought you had said it was the earlier

19  of confirmation and June 1st, unless the investigator's

20  engagement is terminated early.  So I guess there are sort of

21  three conditions built into that, one of which is a date

22  certain.  So I was proposing to change that date certain to

23  August 16 from June 1.

24         MR. YATES:  Sure.  So we had only said date certain

25  for our termination.  The committees introduced the concept of

1    confirmation of a Plan of Adjustment for a particular debtor,

2    and so that's why I was asking the question.  I don't want

3    there to be any confusion about what the end date will be for

4    the cooperation period.

5           And so I would suggest, the way we drafted it was a

6    date certain, which would now be August 16, 2019, unless the

7    investigator's engagement is terminated soon.

8           THE COURT:  So just one -- and so your Proposed

9    Order, document 3666-1 says, and this is on page nine of the

10   ECF filing, page eight of the document itself, it says, "Until

11   at least June 1, 2019, or confirmation of a plan of adjustment

12   for the Title III debtors, whichever is earlier, unless the

13   engagement of the independent investigator by the special

14   investigation committee is terminated sooner," to which I had

15   intended to add, "and subject to extension upon a timely

16   application to the Court and a showing of good cause."

17          MR. YATES:  Your Honor, I stand corrected.  We did

18   modify that in response to input that we had from the

19   committee.  So what you're proposing is fine from the

20   independent investigator's perspective.  And if a plan of

21   adjustment is confirmed earlier, that would be a termination

22   date, too.  So I'm sorry if I was confusing you and confusing

23   the Court.

24          THE COURT:  Thank you.

25          And so do the committee representatives or other

1    counsel want to make general remarks or shall I -- yes, sir.

2             MR. RAIFORD:  Good morning, Your Honor.  Landon

3    Raiford, Jenner & Block, for the Retirees' Committee.

4             THE COURT:  Good morning, Mr. Raiford.

5             MR. RAIFORD:  I think before we go into kind of our

6    point-by-point breakdown, maybe if we could get some

7    clarification, you mentioned that your intention was to

8    expedite the timetable for gaining access to the document

9    depository.

10            I was wondering if you could provide a little more

11   detail, because it may resolve our objection on that,

12   depending on what the Court's thoughts are at the moment.

13            THE COURT:  All right.  The all access -- there would

14   be no pre-report release access, but the ten-day period

15   timetable would be shortened so that those -- hold on one

16   second.  I'll try to do this in a logical way, orderly way.

17            So on the Proposed Order, ECF page seven, printed

18   page six, in subsection 14(D), the first ten business day

19   period from the notice by the neutral vendor to targets of the

20   request as to what the request is remains the same.  But since

21   that's a fairly generous period, the meet and confer period

22   regarding objections is shortened to five days, and the

23   timetable for filing a motion, if necessary, is shortened to

24   five additional days.

25            HONORABLE MAGISTRATE JUDGE DEIN:  Business days.

```
 1              THE COURT:  Business days, yes.

 2              It's all still in terms of business days.  There will

 3    be an express provision that expedited proceedings may be

 4    scheduled with the approval of the Court if an objection is

 5    filed.  And for clarification, you'd say that "to the extent

 6    that no timely objection is asserted," or if no motion is

 7    filed, then the neutral vendor promptly makes the requested

 8    documents available.

 9              So if there's an objection to ten percent of the

10    documents that are requested, the other 90 percent go right

11    away and it's only the ten percent that will be withheld

12    pending potentially expedited resolution of an objection that

13    will be filed earlier than the timetable that was proposed in

14    the Proposed Order.

15              MR. RAIFORD:   Perfect.  Thank you.

16              So for me, that's the only question I had, generally

17    speaking.  I will be back, I'm sure, to address the

18    blow-by-below account in a few minutes, but I'll turn the

19    podium over to anyone else who wants to address their general

20    thoughts.

21              THE COURT:  Thank you.

22              Mr. Despins.

23              MR. DESPINS:  Do we understand from your preliminary

24    thoughts that you are rejecting the -- clearly the automatic

25    production?  We understand --
```

```
 1              THE COURT:  Yes.

 2              MR. DESPINS:  But the automatic notice, deemed notice

 3    that both committees want everything that's in that file --

 4              THE COURT:  Yes.

 5              MR. DESPINS:  -- I trust it was simple to put that in

 6    the Order to say, okay, you're all on notice.  We want

 7    everything that's in there.  That starts the clock running.

 8    We don't see any harm to those parties.

 9              Normally what the examiner gets in a Chapter 11, the

10    committees get at the same time.  The only issue they could

11    have, the parties, is confidentiality, which is a pretty very

12    straightforward issue to resolve.

13              They can't argue burdensome.  They've already

14    produced the documents.

15              THE COURT:  Well, I don't believe it's an undue

16    burden on the committees to require the committees to have the

17    report in their hands for at least 45 seconds before they make

18    an affirmative determination that they need and want to ask

19    for everything.

20              MR. DESPINS:  Okay.

21              THE COURT:  You can make that request at 90 seconds,

22    which will trigger the determination of whether there will be

23    objections.  And I'm sure that since you have given all of us

24    notice many times, that your default position is going to be

25    asking for everything, that the Oversight Board and the major
```

1    third-party producers should be on notice and in the thought

2    process as to what their intended objections would be.

3              MR. DESPINS:  Okay.  Thank you, Your Honor.

4              THE COURT:  And so with that, let's turn to

5    specifics.

6              So there are a number of objections that dealt with

7    document access.  So for clarity, the first objection that

8    I'll address is the request that the committees receive access

9    to the entire depository with the ten-day notice period.  I

10   just spoke to that generally with Mr. Despins.

11             That objection is overruled.  The same request

12   procedures would apply to everyone with the speeding up of the

13   timetable that I went over a few minutes ago.

14             MR. YATES:  Yes, ma'am.

15             THE COURT:  All right.  Then the second issue is --

16   I'm sorry.  Mr. Yates, did you wish to speak to the speeded up

17   timetable?

18             MR. YATES:  No, ma'am.  The timetable is reasonable.

19   Thank you.

20             THE COURT:  Thank you.  And the second was that the

21   depository should include document requests, objections and

22   privilege logs.  The independent investigator has agreed to

23   include the privilege logs.  I am overruling the request for

24   inclusion of objections without prejudice to the use of other

25   discovery tools.

1          Does anybody want to yell at me about that?  All

2    right.  Yes.  Mr. Raiford.

3          MR. RAIFORD:  I don't want to yell.  I don't think

4    that's going to get me very far.  We would ask you to maybe

5    reconsider that position.  And the reason for that is while it

6    is very important for the committees to know what the

7    investigator asked for, and we are grateful that the

8    investigator has agreed to share that with us, it is just as

9    important that we have the flip side of that coin.

10         Because we may know what the maximum universe could

11   have been, but if we don't know what the producing parties

12   actually did in response to that request, we don't truly know

13   what the investigator has or what kind of that middle ground

14   is that the investigator asked for but never received, because

15   clearly that would be the type of information that the

16   committees would rule to come in on their own discovery and

17   seek.

18         And so I think it would be very helpful.  It's going

19   to make the process -- after the investigator is done, it's

20   going to speed that along.  It's going to save costs and time

21   for everyone.  And I don't quite see the distinction between

22   why it's okay for the -- or why the investigator should and is

23   very comfortable with giving us information about what they

24   requested, privilege logs, how they limited the date ranges of

25   their requests, but they have a big problem with the idea of

1   us just seeing what the parties that they subpoenaed or that

2   they were talking to, their responses back to the

3   investigator.

4          To us, that doesn't go to the heart of the

5   investigatory process at all.  It simply gives us a complete

6   picture of what we're dealing with, is going to help both my

7   committee, the Retirees' Committee, and the UCC take advantage

8   as quickly and efficiently as possible once the report is

9   filed on August 15.

10          THE COURT:  Thank you.

11          Mr. Yates.

12          MR. YATES:  Sure, Your Honor.  The difference is, is

13   that the discussion between us and the disclosing party is

14   ultimately going to be manifested in the final report.  And so

15   from our perspective, whether there's a need or not, or no

16   need to understand if, in fact, there was some sort of

17   discussion or what the investigator may or may not have agreed

18   to or rejected, I think should be framed in the context of

19   seeing the report.

20          And so I really don't -- and when you talk about

21   what's a date range, what's a search term, et cetera, we have

22   provided that information.  This does start to drift into our

23   strategic choices, and what it is we decided to incorporate or

24   reflect in the final report.

25          And that's why it should stand and others should not

1    really gain any additional access into our thinking and

2    decision making about what goes in and what stays out.

3             THE COURT:  Well, my impression was that this request

4    went more to understanding the third-party documents aspect of

5    the repository rather than the report exhibit, report

6    inclusion-specific choices of the investigator.

7             Having said that, I read the investigator's

8    submissions as indicating that the process of resolving

9    objections was one that was iterative, and interactive, and

10   didn't involve simply the service of a Rule 34 type request

11   and the receipt of objections to the Rule 34 request with item

12   numbers that there -- at least to a certain extent, and

13   perhaps to a great extent, were discussions that resulted in

14   the production of whatever was produced.  So that if there

15   were such documents, it wouldn't be a complete record.

16            And if the investigator were, you know, asked to kind

17   of recreate some description of what happened, that would

18   invade the area that the investigator considers work product

19   protected.

20            Did I understand your submissions or am I off?

21            MR. YATES:  No.  You understood our submissions.  And

22   that -- I may have said it inartfully and perhaps as a

23   shortcut, but that's exactly what I'm talking about.  We

24   issued relatively few subpoenas, and so this process of

25   receives an objection, et cetera, really didn't happen.

1          And so if, in fact, there were discussions with

2    parties and we were choosing what to pursue or what not to

3    pursue, again, that drifts into, as you say, the iterative

4    process, and we believe that's privileged.

5          And there's really no demonstration of need until we

6    see the report, because I think they're only going to be

7    interested in figuring out if we included something or asked

8    about something, if they have a question about the report.

9    Again, the report starts the process.

10         THE COURT:  So given the -- I'm sorry.  Mr. Despins,

11   did you want to say anything before I finalized my ruling?

12         MR. DESPINS:  Not on this issue, Your Honor.

13         THE COURT:  All right.  So given the nature of the

14   process, the representations as to the nature of the process,

15   and what the documentation would be, if it exists at all, and

16   the work product issues, and -- I overrule the objection.

17         So the next is related, that the investigator should

18   disclose objections and withdrawn document requests.  For

19   substantially the same reasons, that objection is overruled

20   without prejudice to a request for assistance from the

21   investigator in accordance with the exit plan procedures and

22   burdens.

23         Then the next that I have is that the investigator

24   should not be allowed to destroy non-depository documents,

25   including witness notes.  And as I indicated in my general

1    remarks, I will require that the investigator forbear from

2    destroying all documents for the entire cooperation period,

3    which is extended to August 16th of 2019.

4         And for specific text edits on that, I'd ask you to

5    turn to page six first of the ECF document, which is page five

6    of the Proposed Order, in paragraph ten.  I ask you to --

7    let's see, in the second sentence, delete the words from

8    "witness interview notes" through "special investigation

9    committee."  And after the words discard or delete, add "any

10   such documents and information."

11        So that the middle sentence will read, "The

12   independent investigator shall not exercise any right to

13   discard or delete any such documents and information during

14   the cooperation period as defined below."

15        And the extent of any such documents is, all

16   documents and information that have not been transferred to

17   the document depository as described in the preceding

18   sentence.

19        And then I'd ask you to turn to page nine of the ECF,

20   which is paragraph 16(A), and in paragraph 16(A), change June

21   1st to "August 16th of 2019."

22        HONORABLE MAGISTRATE JUDGE DEIN:  I think we need B,

23   also.

24        THE COURT:  Okay.  Great.  So it's an August 16 date,

25   and substituted for June 1st in subparagraphs A and B.  And

1  then at the end of subparagraph A, before the parenthetical

2  reference to the cooperation period, add, comma, "and subject

3  to extension upon a timely application to Court and a showing

4  of good cause."

5          MR. DESPINS:  Your Honor.

6          THE COURT:  Mr. Despins.

7          MR. DESPINS:  I have a specific question on that

8  paragraph.

9          THE COURT:  Hold on until Mr. Yates can make the

10 microphone available, since the others have to hear.

11         MR. DESPINS:  There's a provision in these two

12 paragraphs that says that -- it says, "Unless the engagement

13 of the independent investigator is terminated sooner."  I want

14 to make sure that what you've added is an override over

15 that -- let's state the following scenario.  The Board

16 terminates the engagement of the investigator September 1st.

17 I mean, that's the end of it?  Or do we still have the

18 ability -- or do we still have until a year after that?

19         I need to understand what takes precedence in those

20 various provisions.

21         THE COURT:  My intention is that there be an ability

22 of a requesting party to make a request for an extension of

23 any of these alternative deadlines.  Before the deadline, as

24 to the ones that are objectively obvious, like dates on the

25 calendar coming up, and confirmation, which will be a process,

1    to the extent the Oversight Board pops up one day and says

2    we've terminated the engagement, then it would have to be made

3    promptly in relation to that announcement.

4            MR. DESPINS:  So should we put a provision saying the

5    Oversight Board shall or -- provide 15 days notice of any such

6    termination so that we can do something about it?

7            HONORABLE MAGISTRATE JUDGE DEIN:  How about having

8    them hold the documents for 15 days after termination to allow

9    somebody time to file a motion?

10           MS. DALE:  Your Honor, Margaret Dale again for the

11   Oversight Board.

12           We have no intention of terminating the cooperating

13   again, the independent investigator, at least for one year

14   following the issuance of the report.  So if that helps --

15           THE COURT:  So that would take us to August 16th, for

16   that event anyway?

17           MS. DALE:  Yes, ma'am.

18           THE COURT:  Very good.  Thank you for clarifying

19   that.

20           Mr. Yates.

21           MR. YATES:  Yes, Your Honor.  Just one clarification.

22   Actually, two.  Sorry.  So with the language you're giving us,

23   we'll need to make some conforming changes, if not referred to

24   specifically.

25           THE COURT:  Very good.

1          MR. YATES:  I'd like authority and direction to do

2     that.  And then secondly, we just want to be clear, I know the

3     Court is very focused on August 16, 2019, as -- for the year

4     from when the report is published.  With that, what we would

5     suggest is make it a year from the date the report is

6     published, because that may drift a day or two.

7          So I just wanted to alert the Court to that issue,

8     without raising alarm, that if you are fixed on one year, it

9     may not be on August 16.

10          THE COURT:  All right.  So you'd prefer to use

11     formulaic language as opposed to a particular date?

12          MR. YATES:  One year from publication.

13          THE COURT:  That's fine.  And I appreciate your

14     making conforming changes throughout.

15          MR. YATES:  Thank you.

16          THE COURT:  All right.  So the next -- I'm sorry.

17     Did you wish to speak further, Mr. Yates?

18          MR. YATES:  No, ma'am.

19          THE COURT:  So next on my list is the request that

20     the investigator disclose GDB related information and

21     responses.  Mr. Yates spoke to the general universe of GDB

22     related materials that are being included in the depository,

23     and any remaining GDB issues should be dealt with in the

24     context of the Rule 2004.  So there will be no change in the

25     Proposed Order in that regard.

1          Next was the request by the committees for access to

2     unredacted versions of all of the document depository

3     documents.  That objection is overruled without prejudice to

4     requests under the regular procedures.  That will be

5     established by the Order, so there is no change in the

6     Proposed Order.

7          Next is the request that the investigator disclose

8     whether pre-final report meet and confers led to exclusions

9     from or changes to the report.  That objection is overruled

10    without prejudice to the committees' rights to pursue

11    information requests under the Exit Plan procedures and/or

12    Rule 2004.  There will be no change in the Proposed Order.

13         And then the committees had requested that the

14    assistance period extend until January 2020.  I have made the

15    deadline a year from issuance of the report, and the Order

16    will be changed accordingly.

17         Then I just need the Oversight Board to confirm that

18    the Oversight Board has no objection to the provision that the

19    Order, the Exit Plan Order, will override any contrary

20    provision and a plan of adjustment, which the Oversight Board

21    has the sole power to propose in the first place.

22         MR. BIENENSTOCK:  Your Honor, Martin Bienenstock for

23    the Oversight Board.  We're fine with that.

24         THE COURT:  Thank you.

25         And so as to the request for investigatory documents

1   that were provided by GDB to the regulators, that is overruled

2   with respect to Exit Plan provisions.  And so any requests

3   that are not considered or understood to be covered by the

4   document depository should be directed to GDB and/or to FINRA

5   and the SEC if you want to go in that direction.  And also, we

6   have the Rule 2004 process, and Judge Dein will be discussing

7   that in a few minutes.

8          I think that takes me through my catalog of

9   unresolved objections to the Exit Plan, but give me just one

10  moment.

11         And so the other proposed provisions of the Order to

12  which there were no objections, including the extension of the

13  PROMESA 105 exculpation provision to the special investigator

14  are approved.  And so my request is that the independent

15  investigator's counsel revise the Proposed Order to conform to

16  the changes that we've discussed here on the record and file

17  it on presentment.

18         MR. YATES:  We will, Your Honor.  Thank you.

19         THE COURT:  Thank you.  So the motion is granted as

20  explained on the record.

21         MR. YATES:  Thank you.

22         HONORABLE MAGISTRATE JUDGE DEIN:  Could you wait one

23  minute now?

24         MR. YATES:  Sure.

25         HONORABLE MAGISTRATE JUDGE DEIN:  So I just want to

1   understand the documents that were provided to SEC, FINRA and

2   OCIF.  Are you -- what is your proposal with respect to those

3   documents that were provided by GDB as opposed to SEC's own

4   documents?

5          MR. YATES:  Sure.  So our proposal for documents with

6   respect to GDB is that if they are simply -- we will return

7   anything that's been characterized as highly confidential or

8   for attorneys' eyes only.  And then any other documents that

9   are not confidential will be put into the depository.

10         HONORABLE MAGISTRATE JUDGE DEIN:  So are those going

11  to be included in the privilege log then?

12         MR. YATES:  So what's going to be included in the

13  privilege log are going to be the documents, as I understand

14  it, that are being withheld as privileged.  My understanding

15  is that GDB and the committees have reached a separate

16  agreement where documents that are produced to us, that are

17  considered privileged, will be produced to them -- I'm sorry,

18  that are characterized as confidential, but not highly

19  confidential, nor for attorneys' eyes only, will be produced

20  to them.

21         So this issue, it shouldn't really be an issue as far

22  as the committees are concerned.

23         HONORABLE MAGISTRATE JUDGE DEIN:  All right.  So with

24  respect to the documents that were provided to you from the

25  financial -- from the government agencies --

1          MR. YATES:  Right.

2          HONORABLE MAGISTRATE JUDGE DEIN:  -- they're still

3   going into the depositories if they were GDB documents?

4          MR. YATES:  No, ma'am -- I just want to make sure I

5   heard your question.

6          HONORABLE MAGISTRATE JUDGE DEIN:  So this is my

7   concern:  As I understand it, you got some documents, let's

8   say, from the SEC?

9          MR. YATES:  Right.

10          HONORABLE MAGISTRATE JUDGE DEIN:  Those included GDB

11   documents that you didn't then get from the GDB --

12          MR. YATES:  Uh-huh.

13          HONORABLE MAGISTRATE JUDGE DEIN:  -- because you had

14   them already from the SEC?

15          MR. YATES:  Uh-huh.

16          HONORABLE MAGISTRATE JUDGE DEIN:  But those are the

17   type of documents that would otherwise be in the depository if

18   they had come to you from GDB?  And I want to make sure those

19   documents are in the depository.

20          MR. YATES:  Sure, Your Honor.  My understanding,

21   based on our review, is there really aren't those kinds of

22   documents that would fall within this questionable category.

23   The information that we got from the regulators was pursuant

24   to their exercise of the regulatory authority, and under

25   PROMESA, we are entitled to see that.  Others are not.

1          And so they suggested an approach, much like the

2    Court has already delivered, which is if you want that

3    information, go directly to the SEC, FINRA, OCIF or other

4    parties, but not through the investigator.

5          And so I think it should be clear that if somebody

6    wants documents from GDB, they can look in the depository, see

7    what's there, and if they think they need something else, then

8    the exit procedures would allow for them to make that request

9    directly to GDB.

10         HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

11         THE COURT:  And I actually realized I had one little

12    technical point in the document of the Proposed Order, which

13    is that in paragraph 14(C), I think you need a definition of

14    the term Notice, with a capital N.  And I assume you would

15    want to put that in the second line following the reference to

16    the neutral vendor providing a notice, since you used Notice,

17    with a capital N, later on in the formula.

18         MR. YATES:  Yes, ma'am.  Thank you.

19         HONORABLE MAGISTRATE JUDGE DEIN:  And the other, the

20    next items, I guess group of items, which I don't think are

21    very large, but these are the information that the committees

22    requested now, which would be the Board materials, the D&O

23    policies and the like, some of which, as I understand it, are

24    in the -- are going to be in the depository.

25         How does that work?  And is there a way to put them

1  in there where they're easily located?

2        MR. YATES:  So those documents -- we have received

3  board minutes.  They have been classified and characterized as

4  highly confidential, because they are privileged.  Therefore,

5  they would not be turned over to the depository.  They would

6  be returned to GDB.

7        HONORABLE MAGISTRATE JUDGE DEIN:  And they would be

8  on the privilege log, then?

9        MR. SUSHON:  Your Honor, Bill Sushon of O'Melveny &

10  Myers for AAFAF, as representative of GDB.  The GDB board

11  minutes have been provided as highly confidential and

12  attorneys' eyes only to the investigator in an effort to

13  hasten their access to the materials.

14        We are currently reviewing them document by document

15  for privilege.  Some portion of those documents will be

16  redesignated, so they will be made available directly to the

17  committees under our agreement with them.  Other documents

18  will be withheld as privileged or redacted.  And anything that

19  is withheld or redacted will be logged on a

20  document-by-document basis, so it will be very clear to the

21  committees what they have and what has been withheld.

22        HONORABLE MAGISTRATE JUDGE DEIN:  So while I have

23  you, then, let me go over the items.  And then I'll hear from

24  the committees.  The D&O policies.

25        MR. SUSHON:  The D&O policies have not been produced

1    to the investigator.  We think that it's inappropriate for the

2    committees to have access to those.

3            Do you want to hear argument on that now, Your Honor?

4            HONORABLE MAGISTRATE JUDGE DEIN:  No.

5            MR. SUSHON:  Okay.

6            HONORABLE MAGISTRATE JUDGE DEIN:  I love saying

7    that.

8            MR. SUSHON:  It makes me happy, too.

9            HONORABLE MAGISTRATE JUDGE DEIN:  And then the

10   retention policies.

11           MR. SUSHON:  The retention policies have been

12   produced to the committees.  In fact, they had retention

13   policies before they requested them.

14           HONORABLE MAGISTRATE JUDGE DEIN:  And then the bond

15   bibles, I understand they were produced; is that correct?

16           MR. SUSHON:  That's correct, Your Honor.  They have

17   bond bibles.

18           HONORABLE MAGISTRATE JUDGE DEIN:  Okay.  From the

19   committees, is there any specific documents you want to

20   address?

21           MR. DESPINS:  Luc Despins with Paul Hastings for the

22   committees.  I guess we're into the 2004 motion now?

23           HONORABLE MAGISTRATE JUDGE DEIN:  Yes.

24           MR. DESPINS:  Okay.  Well, there were three types of

25   items.  So the Board minutes, because if I understand

1    correctly -- because they said we should not get the Board

2    minutes, it was burdensome.  Now what we're going to get is a

3    privilege log with all board minutes that are being withheld?

4              HONORABLE MAGISTRATE JUDGE DEIN:  No.  As I

5    understand it, they're being reviewed.  So some of them will

6    be produced that are not privileged.  Some of them will be

7    produced in a redacted form.  And others will be identified as

8    privileged.

9              MR. DESPINS:  But we will have -- so therefore, GDB

10   is withdrawing its objection that this is burdensome.  They

11   are actually going to do one of these three things, which is

12   either produce them, or withhold because they're privileged,

13   or redact them in part.  So I want to make sure that's clear.

14             MR. SUSHON:  That's correct, Your Honor.

15             MR. DESPINS:  Okay.  So now we can move on to the

16   other issue, which is the D&O policy.  The only thing that was

17   said about this is that it's inappropriate.  They cite no case

18   law.

19             Judge, this is like in every 2004 we do, and I've

20   done a lot of these over the years.  We always ask for the D&O

21   policy, because that tells you the value of your asset,

22   meaning your asset is a cause of action.

23             If there's a five million dollar policy as opposed to

24   a 500 million dollar policy, that's a huge difference in the

25   claim, and, therefore, that's why the courts have Ordered the

1   production of D&O policies.  And we've given counsel yesterday

2   cites to this, but to the extent there's any doubt about this,

3   there's the *Roman Catholic Church* case, which is 513 B.R. 761;

4   the *Lincoln North Associate* case, 163 B.R. 403; and there is

5   another one, *Lufkin*, which is 255 B.R. 204.

6            And the point, though, is that they cite no case for

7   this, that it's inappropriate.  They say it's inappropriate

8   because -- there's no because there.  They just said it's

9   inappropriate.  They don't want to produce this.  It can't be

10  burdensome, right?

11           These policies are 20 pages long.  They know where

12  they are.  So there's no burdensome.  It's purely that they

13  don't want -- that someone from GDB doesn't want to produce

14  those.  And it's just standard fare, Your Honor.  And that's

15  why courts have Ordered the production of policies, of D&O

16  policies.

17           The next item was this issue that we talked about,

18  which was the various reports obtained by the investigator

19  from the SEC.  And so we understand, the investigator does not

20  want to give to us what he got from the SEC.  We got that.

21  There's no reason why GDB can't produce that to us.  And it's

22  the same thing for the financial institutions.

23           HONORABLE MAGISTRATE JUDGE DEIN:  Well, I'm not sure

24  whether that is true.  I'm not sure what kind of documents

25  that we're speaking about.  Some of them are going to be, I

1   assume, covered by the Bank Secrecy Act and the like of

2   documents that can't be publicly disseminated.

3        MR. DESPINS:  But that's then subject to

4   confidentiality.

5        HONORABLE MAGISTRATE JUDGE DEIN:  Having litigated

6   that more than I want to admit, I'm not sure -- there are

7   limitations.  But to the extent that there are GDB documents

8   that are just about the financial condition of GDB, that are

9   otherwise regular documents, I would expect them to be in the

10  room, in some form.

11       MR. DESPINS:  So to be clear, Your Honor, what we're

12  saying is that if they produce something to the SEC, that's

13  what we want to see.  Or SEC, as an example.  I mean, it could

14  be other agencies.  That cannot be burdensome, because they've

15  already produced it.

16       And it's the same thing for the financial

17  institution.  What they produce to the SEC or to other

18  regulatory bodies, it's easy for them to produce that because

19  they've already produced it once.  There's plenty of courts

20  that say it in 2004 context, that once an entity has already

21  made a production to a third party, that the burdensome

22  argument goes out the door, because they've already produced

23  it.  They just have to push the button and recreate the same

24  production.

25       The only issue is confidentiality.  We already have

1    confidentiality provisions or agreements in place.  So that

2    issue, I don't see how that can be an issue.

3         So I understand the examiner -- or sorry, the

4    investigator does not want to share with us what he got

5    directly from the SEC.  We respect that.  We understand that.

6    But the targets, which are the financial institutions and GDB,

7    have no such protection in the sense that whatever they

8    produce is not burdensome, produced to those agencies is not

9    burdensome, and there's no basis not to give it to us.

10         And I want to say this, Your Honor.  You notice that

11   we're very targeted, Board minutes, these documents produced

12   to third parties and the D&O policies.  There's a whole other

13   issue which we have not brought to the Court yet, which is

14   that the examiner -- sorry, the investigator saw thousands of

15   documents, but is only giving us what was printed, meaning

16   what they decided to print.

17         We're not burdening the Court with that today, but I

18   want to make sure this issue is not waived.  Right now we're

19   very targeted in what we're seeking.  And the reason why we're

20   targeting it is because we believe that these document, the

21   Board minutes, will help us have an even more targeted follow

22   up.  So I want to make sure that that issue is not lost.

23         Thank you, Your Honor.

24         HONORABLE MAGISTRATE JUDGE DEIN:  Okay.

25         MR. SUSHON:  Your Honor, Bill Sushon from O'Melveny &

1   Myers.

2          Your Honor set forth a process for the committees to

3   get documents that were shared with the investigator, review

4   those documents, and then make a determination as to whether

5   they wanted more.  And they're showing that they're entitled

6   to it, and that it makes financial sense to do that.

7          By way of this informative motion which requests

8   relief, which is something an informative motion should never

9   do, they're trying to short-circuit that process.  And as

10  we've already seen with some of their requests, they were

11  looking for documents they already had.  And if they'd bother

12  to review them instead of trying to create disputes with AAFAF

13  and GDB, they would know they had those documents instead of

14  wasting the Court's time and the parties' time on these

15  issues.

16         So these requests are improper in that respect.

17  They're improper because it's in the form of an informative

18  motion and not a motion to compel.  But the request for the

19  D&O policies is also unjustified here.  There's no question

20  that D&O policies can be subject to discovery, and that

21  they're an appropriate subject for discovery under certain

22  circumstances.  But here they are not.

23         And the reason for that is that the UCC does not

24  represent creditors of GDB.  The UCC represents creditors of

25  the Commonwealth.  So they need to identify some kind of a

1   claim that they would bring on behalf of the Commonwealth

2   against GDB that would tap our GDB's D&O's, that would tap

3   those policies.  They haven't done that, Your Honor.  They

4   haven't even tried to do that.

5           We know from the Oversight Board's submission to the

6   Court that the Oversight Board intends to bring claims that

7   belong to the Commonwealth.  They'll be doing that.  That's

8   not for the UCC to do.  We also know that the Commonwealth

9   owes GDB, on a net basis, nearly 900 million dollars.

10          So there would have to be some kind of massive claim

11  before you would ever get into a situation where the D&O

12  policies could possibly be relevant.  It's just not

13  appropriate in these circumstances, Your Honor.

14          As for document productions to regulators, they

15  should first look and see what they have in -- from the

16  documents we've given them.  And if they think that there are

17  documents missing, we think it would be much more efficient,

18  Your Honor, for them to identify the documents they think we

19  should give them, and then we can discuss those.  But to

20  simply ask for productions to the SEC, productions to other

21  regulators, some of which may be subject to bank examiner or

22  other privileges, it just doesn't seem like the appropriate

23  path to us.

24          HONORABLE MAGISTRATE JUDGE DEIN:  Let me deal with

25  them separately.  So for the board minutes, you're reviewing

1    those and you've discussed and those will be produced, or at

2    least identified?

3           MR. SUSHON:  Correct, Your Honor.

4           HONORABLE MAGISTRATE JUDGE DEIN:  The D&O Policies, I

5    think, is just premature.  Let's see what the report is.  You

6    can renew the request after the report comes.  But I don't

7    want to mess up the procedure that we've set up, which is that

8    you should review the report and then request documents in the

9    context of something.

10          The documents to the regulators, though, what I'm --

11   what I want to be able to address is that there were documents

12   that were normally requested by the investigator, which would

13   have been in the room if they had come directly from GDB.  But

14   if they are not there because they came from the SEC, I think

15   the committees have the right to those documents, because they

16   fit within all the other types of documents that would have

17   been -- that have been in the room and have normally been

18   produced to the committees.

19          I don't know the easiest way to get them into the

20   room.

21          MR. SUSHON:  Your Honor, I don't know what the

22   investigator requested or received from regulators.  I have

23   absolutely no insight into that.  That's something that the

24   investigator undertook on its own, so I can't speak to whether

25   there are any documents that even fall into that category.

1          It really does seem as though the appropriate path

2     here is for them to review what they've got, and then if there

3     are documents that they think they need, then they can go

4     through the process that the Court has already described.  It

5     just doesn't seem like this is an appropriate way to approach

6     this issue.

7          HONORABLE MAGISTRATE JUDGE DEIN:  I'm just trying to

8     make it the easiest way, because I know the committees are

9     going to stand up here and say, how do we know what we can ask

10    for if we don't know what the documents are.

11         So you don't have to stand up and say it.  I know

12    you're going to say it.  Maybe to the investigator, maybe

13    that's -- I'm just trying to make it within the context of

14    what we've already been doing, which is GDB has allowed access

15    to all the documents that it -- non-privileged documents that

16    it turned over to you, it has given to the committees.

17         I feel like maybe there's this group of documents

18    that you can identify that maybe GDB can produce to the

19    committees or put in the room.

20         MR. YATES:  Sure.  So my understanding is that the

21    investigator would not have received any other documents from

22    a third party, not the SEC, that hadn't been produced by that

23    third party to them.  So I don't --

24         HONORABLE MAGISTRATE JUDGE DEIN:  I'm sorry.  Say

25    that again.

1          MR. YATES:  So you're asking if there's -- the

2     document that GDB produced to the SEC as an example that was

3     delivered to us, that GDB or the committees somehow identify

4     whether they should have access to that.

5          And my point is, is that we would not have that

6     document unless it was produced by GDB in the first place, so

7     any third-party documents to the SEC, other than what they've

8     generated and produced on their own as part of their process,

9     came from third parties.

10          So from our perspective, it is easiest, I think, to

11     go to the disclosing party and say, what did you produce.

12     That's going to capture all the documents that would be in the

13     SEC's possession it's my understanding.

14          THE COURT:  So you support the committees' approach,

15     which is to ask for the SEC -- the production to the SEC or

16     FINRA or whoever?

17          MR. YATES:  I think that would be the appropriate

18     request.  I do think, however, that request should be made as

19     suggested within the context of the procedures, because we

20     have seen circumstances where the committees have asked for

21     information that they already have.  And so I do think that

22     the notion that it's inappropriate because they should look at

23     what they've got first, and also take a look at the report to

24     see what exactly is needed, is really the best way to proceed.

25     So --

1          THE COURT:  But you -- but these aren't documents

2     that they would be able to get through the procedures

3     identified as documents produced to the SEC, because you'll

4     have given back to the SEC whatever you've got from the SEC?

5          MR. YATES:  That's correct.  And that's our

6     agreement with all of the regulators.  Again, we are

7     different.  We have access according to PROMESA.  And so we

8     received information.

9          If they're concerned with what was produced by a

10    party to the SEC in response to a request, our view would be

11    go ask the producing party.  And my understanding is that

12    would also be the position of the regulators, because whatever

13    issues regarding confidentiality, et cetera, are best

14    addressed by the producing party as opposed to a request

15    directly to the regulator or a request directly to the

16    investigator.

17         HONORABLE MAGISTRATE JUDGE DEIN:  But is there a way

18    for you to work directly with GDB for you to identify those

19    documents so GDB can then produce the documents into the room?

20    Conceptually what I'm seeing is that there are documents that

21    are sort of in the room that are coming out of the room.  And

22    that normally at the end of this, the whole point was that we

23    don't redo it again and have the same big productions again.

24         So if these are documents that you could have

25    obtained from GDB, normally would have obtained from GDB as

1    part of your investigation, but didn't obtain from GDB because

2    you already had them from the agencies, I think they need to

3    get into this room.

4         MR. YATES:  And so as everyone else is starting to

5    talk about process, we would have just asked for anything and

6    everything from the SEC regarding this particular issue.  We

7    would not have broken it into what's been produced by GDB,

8    what has not been produced by GDB.  It's what do you have

9    about -- in response to this particular inquiry.

10        So I don't think we have an ability to go through and

11   do as you suggest.  And so my kind of -- my reaction is that

12   forcing GDB and the investigator to parse through something

13   that's been produced by the SEC that they say pursuant to our

14   agreement must be returned to them, because we got access to

15   it under a different procedure, number one, you know, requires

16   their consent before it's disclosed.

17        And number two, again, I think it just directs us

18   back to the producing party.  The investigator wouldn't have

19   anything that the producing party wouldn't have produced in

20   the first place.

21        HONORABLE MAGISTRATE JUDGE DEIN:  Let me just ask

22   you:  Did you not obtain doc -- did you consciously not obtain

23   documents from GDB that you already -- because you already had

24   it from the investigators?

25        MR. YATES:  From the regulators?

```
 1              HONORABLE MAGISTRATE JUDGE DEIN:  From the

 2   regulators.

 3              MR. YATES:  No.  That wasn't part of our -- I

 4   explained what our process was.

 5              HONORABLE MAGISTRATE JUDGE DEIN:  All right.  Do you

 6   want to add anything?

 7              MR. SUSHON:  No, Your Honor.  I believe that that

 8   covers it.  If there's no way to reconstruct what was in the

 9   room, then I think the appropriate process is for them to see

10   what they have, and then we can meet and confer about any

11   further requests that the committees may have.

12              Thank you, Your Honor.

13              MR. DESPINS:  Your Honor, that was very helpful.  I

14   think you had a sense of what we've been dealing with for the

15   last year.  Either GDB has produced tons of stuff to the SEC,

16   which would be really troubling, or they haven't.  The point

17   is they know that.  So this thing of whether it's in the room

18   or not -- we don't have any production that has been

19   identified as being produced to the SEC.

20              And by the way, we asked that a year ago exactly, so

21   it's not like this is a new thing that we're springing on

22   through an informative motion.  The 2004 Motion was adjourned

23   to today.  They know what they've produced to the SEC.  We've

24   asked for this a year ago.  We're entitled to the production

25   to any regulator that they've made.  There's no ifs and buts
```

1   about that.

2            HONORABLE MAGISTRATE JUDGE DEIN:  All right.  Let me

3   comment on that.  The whole point of this was for you to work

4   through the investigator if you wanted additional documents,

5   and if you wanted specific documents, so don't quote to me

6   what you had in the initial 2004 request, all right?

7            If these were things that you needed while this

8   process was going on, you should have been working with the

9   investigator, as I understand it, in these weekly telephone

10  conferences or whatever.  So let's just skip over that part of

11  it.

12           MR. DESPINS:  But, Judge, we did that.

13           HONORABLE MAGISTRATE JUDGE DEIN:  But you're not

14  concerned about the -- it's not that the document was produced

15  to the SEC that makes it relevant.  It's that the document

16  exists that makes it relevant.

17           So if I'm hearing that the investigator did not limit

18  its request of documents to GDB because it already had the

19  documents from the investigator, then the same documents may

20  already be in the room.

21           MR. DESPINS:  No.  No, Your Honor.  You know why?

22  Because they had access to all documents through their screen

23  review.  And of course if they had the document already, they

24  could have said, we don't care about that.

25           We're limited to a universe of 5,000 that they

1    printed.  Of course they wouldn't print something that they've

2    already received from the SEC.  That's the whole -- we've had

3    this whole fight with them over, you know, we want to see

4    these documents.  They said, we're not going to share.

5          This is not a new issue.  It's been pending for six

6    months, at least.  They've always said, we have a relationship

7    with the regulators, we cannot breach that.  We said, that's

8    fine, but in the meantime, we are entitled to any e-mail or

9    any letter from the GDB to SEC that says, enclosed is our

10   production at your request.

11         We should have that.  And they're not saying that

12   they produced that to us.  And frankly, there's no reason why

13   the investigator would have put that in its 5,000 printed

14   copies, because they already have those productions.

15         And why is it so relevant?  Because the SEC is not

16   calling for production of documents on innocuous issues.

17   They're usually very targeted, and they know what they're

18   going after.  And that's why I don't understand why -- they

19   know what they produced to the SEC.  They can do that in a

20   nanosecond.  Why can't we get those documents?

21         HONORABLE MAGISTRATE JUDGE DEIN:  Anybody want to add

22   anything?  All right.

23         MS. DALE:  Hi, Your Honor.  Margaret Dale for the

24   Oversight Board.

25         The one thing I want to add is just to bring this

1   back in perspective, now we're talking about the 2004.  The

2   2004 has a limited scope and intentionality behind it.  The

3   claims here, when the independent investigator issues this

4   report, will be controlled and solely are the providence of

5   the Oversight Board.

6          And we have indicated in our statement in support of

7   the investigator's motion that we intend to discuss with the

8   committees the claims to be pursued, as well as AAFAF.  But

9   they belong to the Oversight Board.  It is not clear that

10  claims of a sovereign could be handled or given to a committee

11  to be brought, or that the Oversight Board would consent to

12  that procedure.

13         So in terms of what the committees are seeking, we

14  want to assist and be supportive of that, but we want to make

15  sure that our position is on the record, that the claims will

16  solely be controlled by the Oversight Board.

17         HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

18         All right.  I want to stick to the procedure that I

19  set up last time, which is that the report will be issued -- I

20  hear that it's on track.  All right?  I'll give you until

21  August 16.  Maybe a day or two, but we're on track, correct?

22         MR. YATES:  Yes, ma'am, we're on track.

23         HONORABLE MAGISTRATE JUDGE DEIN:  All right.  And

24  then the committees can renew specific requests targeted to

25  specific issues.  Okay.  But the Board minute issue needs to

1  be addressed and produced before then.

2          MR. SUSHON:  Yes, Your Honor.

3          HONORABLE MAGISTRATE JUDGE DEIN:  All right.  I think

4  that covers my 2004.

5          MR. YATES:  Thank you.

6          HONORABLE MAGISTRATE JUDGE DEIN:  Thank you.

7          MR. SUSHON:  Thank you, Your Honor.

8          MR. YATES:  Your Honor, can we --

9          THE COURT:  Yes.

10          MR. YATES:  -- the investigator be excused?

11          THE COURT:  Yes.  Thank you.

12          MR. YATES:  Thank you, Your Honor.

13          THE COURT:  So our next agenda item is -- one

14  moment.

15          MR. ROSEN:  Yes, Your Honor.  It was in connection

16  with the ERS, the Motion for Lift of Stay.

17          THE COURT:  Yes.

18          MR. ROSEN:  Again, Your Honor, Brian Rosen from

19  Proskauer Rose.

20          Your Honor, the Court entered an Order the other day

21  where it announced that for reasons it would state on the

22  record, this preliminary hearing would be continued to the

23  final hearing to be held on September 12.

24          We trust that that is what we'll be doing now, which

25  is to listen to the Court, as to what your arguments are or

1    your reasons are.  The only point that we would like to raise

2    with respect to that is under 362(e)(1), we would like to make

3    sure that the automatic stay is continued beyond the 30 days

4    from the conclusion of this preliminary hearing to the

5    determination that the Court would make at the final hearing

6    to be held on September 12th.

7              THE COURT:  Yes.

8              MR. ROSEN:   Thank you.

9              THE COURT:  And so my anticipated remarks cover those

10   issues.  And here they are.

11             Section 362(d) of the Bankruptcy Code provides that

12   creditors may seek relief from the automatic stay for cause.

13   Section 362(g) places the ultimate burden of persuasion for

14   stay relief motions on non-movants for all issues except for

15   the issue of a debtor's equity in property.  However, movants

16   still retain the burden of making a showing of cause that is

17   adequate to make out a prima facie case for the relief they

18   seek.

19             In the instant context, where stay relief is sought

20   on the basis of a lack of adequate protection, that showing

21   must include an initial showing of a diminution in the value

22   of movant's collateral resulting from the effect of the

23   automatic stay.  Movants have not made such a showing in their

24   submissions.

25             As a result and in light of the pendency of the

1    summary judgment motion practice concerning the validity and

2    extent of the liens claimed by the ERS bondholders, the Court

3    has determined pursuant to section 362(e)(1) that there is a

4    compelling reason to treat the hearing today on this motion as

5    a preliminary hearing.

6           As noted in the Order that the Court has issued, the

7    final hearing on the motion will be held at the next Omnibus

8    Hearing in the Title III cases in September.

9           Furthermore, the lack of a showing relative to

10   diminution of the value of collateral by reason of the

11   automatic stay leads the Court to conclude at this juncture

12   that there is a reasonable likelihood that the party opposing

13   relief from the stay will prevail at the conclusion of the

14   final hearing within the meaning of Section 362(e)(1).

15          The Court, therefore, Orders that the automatic stay

16   will remain in effect pending the final hearing on the motion,

17   which is now set for September 12, 2018, the date of the next

18   scheduled Omnibus Hearing.

19          So I think that covers the technical points, as well

20   as the substantive reasoning.

21          MR. ROSEN:   Thank you very much, Your Honor.   It

22   does.

23          THE COURT:   Thank you.

24          Mr. Bennett.

25          MR. BENNETT:   Your Honor, we think the record in this

1    case amply demonstrates the problem, which is that all of the

2    collateral has been taken and been spent.  Does Your Honor

3    want declarations in advance of the final hearing?

4            THE COURT:  Well --

5            MR. BENNETT:  I want to make sure we go forward

6    adequately, because I don't think there's a question as to

7    what is going on.  I just want to make sure the record is

8    satisfactory to Your Honor so that the burden does, in fact,

9    shift where it belongs.

10           THE COURT:  Well, if you believe in light of my

11   remarks that points you intended to make as to what the

12   precise equity is that you claim and how it is that the

13   automatic stay, as distinguished from anything else, has

14   resulted in its diminution, we can do a schedule for any

15   further supplemental submissions and a response to the

16   supplemental submission in advance of the final hearing.

17   So --

18           MR. BENNETT:  Your Honor, absent -- well, again, I

19   don't think these matters are disputed.  The money that is our

20   collateral now has been diverted to the Commonwealth, and

21   every nickel of it has been spent.  That's occurring because

22   the automatic stay prevents us from doing something about it.

23           THE COURT:  And it never went into the hands of ERS

24   because of the new structure, correct?

25           MR. BENNETT:  Correct.  And we have an adversary

1  proceeding that there's a Motion to Dismiss pending on,

2  also --

3         THE COURT:  Yes.

4         MR. BENNETT:  -- that seeks to deal with that as

5  well.

6         THE COURT:  Yes.

7         MR. BENNETT:  But the fact is we can't do anything

8  about that in any court, and we're not just dealing with

9  monies from the Commonwealth, but we're dealing with monies

10  from other municipalities and other corporations that are not

11  in bankruptcy.

12         So as I said before, I want to meet every technical

13  requirement that Your Honor believes exists.  And whatever

14  they are, we're going to meet them, because the facts are, I

15  think, extraordinarily well known.  But I want to make sure we

16  get the facts in front of Your Honor in a way Your Honor is

17  comfortable with them.

18         THE COURT:  Well, the argumentation in the -- well,

19  the opposition argumentation posits that the relevant

20  collateral in the hands of ERS affected by the automatic stay

21  is the money from which distributions have been being made.

22  And they're the arguments about employee contributions,

23  employer contributions and interest.

24         So let me put it this way.  Your papers don't

25  identify precisely what relief you would be seeking, were the

1    stay lifted and from whom --

2              MR. BENNETT:  Okay.

3              THE COURT:  Would you like to speak to that?

4              MR. BENNETT:  I'm happy to, Your Honor.  First of

5    all, just to make it clear, we sought relief against both ERS,

6    because we fully understand that they concede some property

7    remains in ERS, we also sought relief of the stay in the

8    *Commonwealth* case, because, I don't think this is disputed,

9    the property that was in ERS is -- some property that was in

10   ERS is now in the *Commonwealth* case.

11             So as to what we would do if we had relief, we would

12   take every step necessary to prevent the continuing

13   expenditure of collateral in violation of our rights.  Some of

14   that is pursuing the litigation that is already pending in

15   this court.

16             There's one other claim that would be brought in this

17   court.  I keep forget -- remembering the statute name, but

18   there's another claim for transferring property from one

19   debtor to another debtor that can't be asserted until relief

20   from stay is obtained.  So that would be another claim that

21   would either be part of the existing adversary proceeding or

22   another adversary proceeding.

23             And, of course, that would be an administrative

24   claim, because all of the acts that resulted in the transfer

25   of the collateral happened after the filing of the petition.

1    And just so people remember, before the hurricane, before

2    either of the hurricanes.

3         But there's another whole area of potential

4    litigation, which again, adequate protection would be better

5    than any of this, but in the absence of adequate protection,

6    we have to do our jobs.

7         There are a large number of non-debtors that are

8    obligated to make employer contributions that we believe our

9    lien attaches to, and to enforce those liens, because they're

10   not debtors, they're not before Your Honor, and we would

11   likely have to go to other courts to enforce the liens.  We

12   fully would intend to do so.  And again, in the absence of

13   adequate protection, we're entitled to do so.

14        So that's the relief that we would seek.  And I don't

15   think that's a mystery to anybody either.  So again, we're

16   going to have time.  I want to make sure that there's -- that

17   whatever format Your Honor wants to see it, if you want to see

18   it in the form of an actual evidentiary showing through

19   declarations, if you want additional allegations -- I think in

20   our Reply, we pointed out that none of this is disputed.  But,

21   yes, the collateral is being diminished very significantly,

22   every month.

23        THE COURT:  Thank you.

24        It looks like Mr. Rosen wishes to speak.

25        MR. ROSEN:  Yes, Your Honor.  Very quickly.

1    Obviously there is a question that needs to be answered in all

2    the things that Mr. Bennett was saying, and that question has

3    to be answered by the Court.  And so until that is done, I'm

4    not sure Mr. Bennett can do any of the things that he is

5    claiming that he is intending to do.

6          But we would be happy to work with him with respect

7    to a schedule for additional submissions, declarations,

8    counter declarations, whatever he thinks is appropriate over

9    the next few weeks.  We're happy to do that.

10         One other technical point I would like to add, Your

11   Honor, is I know that Mr. Friedman may have already spoken

12   with your chambers about the possible movement of September

13   12th as the Omnibus Hearing date, because I believe it follows

14   the Rosh Hashanah holiday the next day --

15         THE COURT:  Yes.

16         MR. ROSEN:   -- and people may have difficulty

17   getting to San Juan.  But if, in fact, you wanted to have the

18   ERS hearing, to adjust the ERS hearing, if you're not going to

19   be moving everything off of that date, we're prepared to go

20   forward with that, and even in New York, if that works better

21   with all parties.

22         THE COURT:  Okay.  I hadn't yet been in the loop

23   about the possible moving of the date.

24         MR. FRIEDMAN:  I hadn't reached out.  I was waiting

25   to confirm with Mr. Bienenstock.  But yes, I would appreciate

1    if the hearing is not in San Juan on the 12th, because I would

2    not be able to get down from Washington the night before.

3         THE COURT:  For anyone who didn't hear through the

4    microphone, Mr. Friedman has confirmed that he was intending

5    to ask and is now asking that the September hearing date be

6    moved in order to mitigate the coincidence with the Rosh

7    Hashanah holiday.  So that's something that we will look into

8    and work out in an appropriate way, and the continued hearing

9    on ERS will, if necessary, be adjusted accordingly.

10        So, Mr. Bennett, what I would ask you to do is, first

11   of all, I have -- my assessment at this point is that the

12   evidentiary record is not one that shows adequately the

13   automatic stay linked diminution of collateral.

14        And I recognize that a lot of this is bound up in

15   theories of what is the security, and those are sub judice.

16   And it is my expectation that we'll -- that we'll all know

17   more about my thinking about those things before we come back

18   for the final hearing.  That is my intention.

19        But in the meantime, you have the ability to clarify

20   and supplement your record.  And so I would urge you to speak

21   with Mr. Rosen, come up with a proposed schedule, and I will

22   expect to get a proposed schedule within the next -- say by

23   the end of next week.  So that gives you ten days to do that.

24        MR. BENNETT:  We actually might even have the entire

25   submission done by then.

```
1              THE COURT:  Would you speak a little louder?

2              MR. BENNETT:  We might even have the entire

3    submission done by then.

4              THE COURT:  That will work, too.

5              MR. BENNETT:  Your Honor, I think what I'm hearing

6    from Mr. Rosen is that we are going to be having an

7    evidentiary hearing as the final hearing, because it sounds

8    like they think there are disputed issues of fact.  He

9    mentioned counter designations.

10             So it turns out that the 12th doesn't work for me

11   either, but could we have a separate date so that we could

12   actually have an evidentiary hearing?  And it could be in New

13   York.  It wouldn't trouble me.  But I think it would be very

14   hard to do a full-blown evidentiary hearing in the context of

15   what ordinarily happens on Omnibus days.

16             THE COURT:  Mr. Rosen.

17             MR. ROSEN:   Your Honor, I'm not saying that we could

18   have --

19             THE COURT:  Come closer to the microphone.

20             MR. ROSEN:  I'm sorry, Your Honor.  I'm not saying we

21   would have a full-blown evidentiary hearing until I know what,

22   in fact, the allegations are.  So we'll work with them.  We'll

23   determine what is appropriate.

24             THE COURT:  So your meet and confer shouldn't only be

25   about scheduling.  You should try to get to a bottom line as
```

1   to whether there are disputed issues of fact that would have

2   to be explored at an evidentiary hearing, as opposed to an

3   agreed set of facts whose legal significance I need to

4   determine.

5           MR. ROSEN:  Exactly, Your Honor.

6           MR. BENNETT:  And actually, I need to make clear for

7   the record that we do not waive our rights to a hearing, to

8   the final hearing being conducted within 30 days of today.  So

9   I understand Your Honor has an issue, but in the absence of a

10  specific date that works, we believe we're entitled to relief

11  in 30 days, if there's not a hearing.

12          THE COURT:  Well, I have made the 362(e)(1) findings,

13  and the specific date, as we stand here right now, is

14  September 12th or as soon thereafter as the parties can be

15  heard.  And you're going to work with telling me what dates

16  will work for you all, and I'll look at my calendar dates, and

17  we will work out the date as soon thereafter as the parties

18  can be heard, since September 12 here appears not to work for

19  a critical mass here.

20          MR. BENNETT:  We don't -- Your Honor, we do not

21  believe that the finding that you made justifies an extension

22  of the 30-day period, but if that's your ruling, we

23  understand.  We just want to make sure it's clear that we're

24  not acquiescing.

25          THE COURT:  Thank you.  I understand.

1          MS. ROOT:  And Your Honor, Melissa Root on behalf of

2    the Retirees' Committee.

3          I just want to make one point for the record, because

4    Mr. Bennett represented that a number of things were not, in

5    his words, in dispute.  The Retirees' Committee certainly

6    disputes that there has been any diminution in the

7    bondholders' purported collateral or that that's been diverted

8    in any way.  I just want to make that clear for the record.

9          THE COURT:  Thank you.

10          MR. ROSEN:  Your Honor, I believe that concludes all

11    the matters other than the two adversary proceedings.

12          THE COURT:  There's the 2019 amendment.

13          MR. ROSEN:  Oh, I'm sorry.  I thought it was --

14          THE COURT:  Yes.  And so who is speaking in support?

15    Is that Mr. Despins?

16          MR. DESPINS:  Yes, that's my motion.

17          THE COURT:  Yes.  So Mr. Despins, please come.  This

18    is agenda item 11.4, the Creditors' Committee Motion to

19    Clarify or Amend the Fourth Amended Case Management Order.

20          And so before you speak, Mr. Despins, let me tell you

21    that as to the scope of triggers for reporting, it does seem

22    appropriate to me to clarify that reporting as to each debtor

23    in whose case a Rule 2019(B) group files a pleading in a group

24    or representative capacity is required -- is a change that we

25    ought to make.

1          So to the extent there was any doubt that the scope

2     of 2019 obligation is as set forth in your proposal A, I will

3     do that.  But that trigger is a filing in a group capacity or

4     in a representative capacity.

5          So I had some concern about your general references

6     to proofs of claim, if a particular creditor files its own

7     proof of claim and it isn't purportedly a Rule 2019(B) group

8     claim, then that wouldn't trigger Rule 2019 obligations.

9          I am not -- and I'll have some language suggestions

10    for you, as I always do.  I am not, at this point, persuaded

11    that retroactive reporting is necessary or appropriate,

12    especially given that we're sort of a year out from when all

13    this started.  And there were earlier, much earlier on filings

14    that would have indicated the existence of this problem,

15    particularly by the GO Group.

16         So if you'd like to focus on that issue, and I'll

17    hear from your opponents and then make my decision.

18         MR. DESPINS:  So I'll put the Proof of Claim aside

19    for now, Your Honor.  There's no doubt that when people sign a

20    stipulation giving them automatic intervention rights, and

21    that was done in August or probably late July of that last

22    year, that at that point they were taking a position in those

23    cases, and those cases were the *COFINA* case and the

24    *Commonwealth* case.  I don't see how we get around that.

25         And, in fact, the GO Group knew that they had an

1   obligation to disclose COFINA holdings, because they did it

2   the first time around.

3        THE COURT:  And that's what I'm saying about the

4   disparate filings in the context that it would have indicated

5   that this problem existed a year ago.

6        MR. DESPINS:  Well, no, because the way we read the

7   second filing is that they no longer held COFINA bonds,

8   meaning that they -- and we were very polite in our motion

9   when we said there was confusion.

10       There was a conscious decision not to disclose the

11  holding of COFINA bonds and the trading of COFINA bonds while

12  they were arguing before with this Court side by side with the

13  committee against COFINA, and that's what prompted this

14  motion.  And we were very troubled by that.

15       That's why we think retroactive disclosure is

16  appropriate, because it's important for certainly the Court,

17  but also for us, when we were basically operating as de facto

18  co-counsel on the COFINA litigation with a group that holds

19  COFINA bonds.  To us it may be naive, but it was shocking.

20  And that's what prompted this motion.

21       And we tried to be polite about it, but that's why

22  the Court needs to know, and we need to know, when were the

23  buying and selling of those bonds?  Before or after the

24  meetings with us where we disclosed the strengths and

25  weaknesses of our cases against COFINA, for example?  Before

1    the oral argument?  After the oral argument?

2         The point is that they admit that they've been

3    trading in those bonds.  So we believe that absolutely, it's

4    important for the process here for everyone to know what

5    really went on there, which --

6         THE COURT:  When you're saying it's important for the

7    process, are you saying that this is by way of sanction, for

8    want of a better quick term, or that there is some potential

9    for retroactive re-evaluation or change in perspective going

10   forward that would be materially informed by the filing of

11   this information?

12        MR. DESPINS:  I don't know.  It's clearly not our

13   intention to seek sanctions, and we're not seeking retroactive

14   changes or anything like that.  But I think that it's

15   important from a process point of view to understand what

16   happened here.

17        I don't know when they were trading, how much they

18   bought, how much they sold.  We will only know that when we

19   see the information.  But there were things that happened here

20   where -- you know this because it was filed with Your Honor.

21   You know, they issued a press release saying, oh, the

22   settlement failed, but it was a great concept and all that.

23   I'm quoting from their own press release.

24        Were they buying bonds at that time, just before that

25   time or after that time?  That's -- to me, I don't see how --

1    I mean, this is the Puerto Rico case.  We need to have

2    complete transparency about everything.  And this is why we

3    brought the motion.  They know that on the law, we're right,

4    that they should have filed this.  They did it right the first

5    time.  And they didn't see the second pleading -- by the way,

6    we're no longer disclosing this.  They just assumed that it

7    was gone.  The filing is otherwise the same.

8            Now they're saying yeah, we're okay with the future,

9    but not retrospective.  But there's no burden here.  These are

10   associated funds.  They have compliance officers.  They can

11   push the button and print out exactly when they bought, how

12   much they bought.  And they can supplemental filings.

13           That's going to take them a half hour to do so.  So

14   there's clearly no burden.  And I think that from a process

15   point of view, it's fundamental for everyone to know what was

16   going on there.

17           Thank you, Your Honor.

18           THE COURT:  Thank you.

19           MR. BURKE:  Good morning, Your Honor.  Donald Burke

20   from Robbins Russell for the GO Group.

21           THE COURT:  Good morning, Mr. Burke.

22           MR. BURKE:  I think, as Mr. Despins' comments make

23   clear, the dispute that's actually before the Court here is

24   very narrow.  We have no objection to the clarification or

25   expansion of disclosure requirements going forward, but we do

1    think that it would be inappropriate to insist that those

2    disclosure requirements also be applied retrospectively.

3         From our perspective, it seems like a rather

4    extraordinary request.  They haven't cited any court decision.

5    We're not aware of one yet.

6         THE COURT:  Well, you were supposed to have done it

7    in the first place.  And as Mr. Despins has noted, you were

8    actively involved in taking positions in the public

9    litigation.  There were press releases, at least one press

10   release that was in the context of your having disclosed only

11   a position on one side of it.

12        Obviously the proposed Commonwealth-COFINA settlement

13   is something that has generated both controversy and

14   excitement of all sorts.  And so why shouldn't -- and these

15   are securities that are actively traded in the market.  And

16   the services will tell us that they're very actively traded in

17   the market right now.

18        So why shouldn't the market have full information

19   about where you were at particular times, that the market

20   could not track to movements, and why shouldn't we have in the

21   context of this proceeding, information that you should have

22   filed on a timely basis?

23        MR. BURKE:  Well, I think to be clear, we dispute the

24   premise that there was, you know, any shortcomings in our

25   filings or the information.

1          THE COURT:  And I frankly don't -- I see that you're

2    seeking to kind of gracefully accept it going forward, but I

3    am not persuaded by your argument that there was no obligation

4    at the time.  And so maybe you'd like to run that one past me

5    one more time?

6          MR. BURKE:  Well, in light of what you just said, I'm

7    not sure that's the best idea for me.  But I think I'll just

8    rest on the position that we set forth in our Response to the

9    UCC's motion, which is that our participation was in adversary

10   proceedings and we now understand that the Order is to be

11   modified to clarify that.

12         THE COURT:  An adversary proceeding can only be filed

13   in a case, and you -- your clients were trading in securities

14   that were securities of debtors in Title III cases.

15         MR. BURKE:  Well, that's correct, Your Honor, but

16   the -- your Case Management Order, as I understood it,

17   required the disclosure of economic interest in -- only as to

18   debtors in which the group has taken a position.  And as we

19   understood it, we had not taken a position -- taken a position

20   in cases other than the Commonwealth's Title III case.

21         Now, Mr. Despins points to our initial Rule 2019

22   filing, which I believe was in May of last year.  I think that

23   was the first Rule 2019 filing that anyone submitted in this

24   case.  It was submitted before even your first Case Management

25   Order was entered.

1          So I think it's the -- and to the extent there's a

2     difference between the scope of what was disclosed there and

3     what was disclosed in our minute forms, it's a consequence of

4     what we understood to be the clarification about the nature of

5     and the scope of disclosure requirements as to, you know, the

6     particular debtor and in whose case you were taking interest.

7          I guess I did want to respond to the committees'

8     insinuation that the group has tried to conceal economic

9     interest in COFINA bonds in order to mislead the Court or the

10    public about the basis for our position in the Commonwealth

11    COFINA litigation.

12         I don't think that's supported by any evidence in --

13    and it's absolutely false.  You don't have to take my word for

14    it.  If you take a look at page four of their Reply Brief,

15    they acknowledge that if the GO Group's position is correct in

16    its COFINA related litigation position, COFINA would

17    essentially own no property.

18         In other words, throughout this litigation, summary

19    judgment, oral argument and our Response to the agents'

20    agreement, in principle, we've taken the maximally anti-COFINA

21    position.  So from our perspective, the notion that there was

22    some sort of elaborate ploy to advance economic interest in

23    COFINA bonds just doesn't -- it doesn't make sense.  It

24    doesn't fit with the evidence.  But -- so that's, I mean,

25    that's our response.  And unless there's anything further from

1   the Court, that's all I had.

2          THE COURT:  Do you want to turn to burden?

3          MR. BURKE:  Well, I do think, from our perspective,

4   the key point is that we don't think that the committee has

5   identified any sort of basis or benefit associated with the

6   retrospective application of the rules.  The -- you know, if

7   you look at page 14 of their motion, it just says they request

8   retrospective clarification or amendment, and there's no sort

9   of -- they don't identify any benefit on that one side of the

10  ledger.  And from our perspective --

11         THE COURT:  Mr. Despins has, in his oral remarks,

12  elaborated on the written submission.

13         MR. BURKE:  I think that's correct, Your Honor.  On

14  the burden point, it is a significant burden to go back and

15  sort of retrospectively create a set of disclosures that were

16  not made at the time because we thought we were operating

17  under a different set of standards.

18         It's true that our clients have access to trading

19  information, but it requires an exercise of judgment to figure

20  out when changes in an economic position have changed

21  substantially enough that it's a material change.  And a Rule

22  2019 filing would have been required.  And so I think

23  Mr. Despins really exaggerates the ease with which this

24  process would be completed.

25         And I guess one other point I'd raise is that from

1   our perspective, it's a little bit difficult or a little bit

2   hard to credit the UCC's position on burden, given that for

3   months in this case the UCC had failed to comply with Rule

4   2019 by failing to even update the membership of their

5   committee after it changed multiple times after these cases

6   were filed.

7          The GO Group noticed that.  We urged the committee to

8   update their disclosure, which they did after some

9   communications and some protracted delay.  But given, you

10  know, their inability to even comply with what seems to be

11  the, you know, most basic aspect of the Rule, we do find their

12  burden position a bit hard to credit.

13         And we would ask that to the extent there is any

14  retrospective application of these standards, it's clear that

15  it applies to everybody, including the committee itself.

16         Thank you, Your Honor.

17         THE COURT:  And do you have a view as to -- that you

18  want me to hear as to how much time should be allowed, if I am

19  allowing and requiring retroactive disclosure, and the date to

20  which that should go back?

21         MR. BURKE:  In terms of -- I'm not sure I understand

22  the question.  In terms of how far back the --

23         THE COURT:  What the deadline should be for filing

24  the retroactive reports, and how far back it should go to

25  capture rewriting of reports.

1          MR. BURKE:  I don't have a position on the deadline

2     for filing the retroactive or retrospective reports.

3          THE COURT:  So you think two weeks from now would

4     work for you?

5          MR. BURKE:  We'd have no objection to that, Your

6     Honor.  And as to the latter point, I think we would defer to

7     Your Honor.  If there are guide points in the case that you

8     would feel more comfortable with retrospective application,

9     then we would defer to your decision then.

10          THE COURT:  Thank you.

11          I'll let --

12          MR. BURKE:  Thank you.

13          THE COURT:  -- Mr. Despins put some information on

14     these points as well.  You have blanks in your Proposed Order.

15          Mr. DESPINS:  Yes.  Basically, we would say from the

16     date that the Commonwealth-COFINA stipulation was signed by

17     the GO holders, they were in that litigation.  They were

18     taking a position.  So that's the date where it should go back

19     to.  That date.

20          And as to how much time, we have no position on that,

21     Your Honor

22          THE COURT:  Well, in light of the types of activities

23     that were going on, and the profile of the activities that

24     were going on, and my firm view that filing in an adversary

25     proceeding is a filing in a case, and the stipulation dealt

1     with both the *Commonwealth* case and the *COFINA* case, there was

2     an obligation stretching back to last year by the GO Group to

3     disclose holdings in both Title III debtors.

4           I will require the retroactive reporting, with the

5     retroactive reports to be filed within 14 days.  What I'm

6     going to request that Mr. Despins do, instead of having this

7     as a stand-alone Order that accompanies the fourth CMO and

8     that could be overlooked, I'm going to ask him to prepare a

9     proposed restated fifth CMO that includes these provisions,

10    with a couple of changes that I will read out in just a

11    moment, and file that on presentment.

12          So for the additional changes in footnote three, in

13    the A version of the Proposed Order, after the word,

14    "pleading," and before the words, "in any Title III case,"

15    insert the words, "by or on behalf of a Rule 2019(B) group."

16          And similarly, in footnote four, change the term,

17    "party," to "Rule 2019(B) group."  And then in paragraph

18    three, which is the retroactive amended filing provision,

19    begin that with, "within 14 days after entry of this Order."

20    And complete the blank with the date of the entry of the

21    Commonwealth-COFINA stipulation.

22          And when you re-submit the Order, spell out "Taylor"

23    in the middle of my name.  I ask that of everybody.  I'm not

24    "Laura T. Swain," ever.  So that would be helpful.

25          MR. DESPINS:  Yes, Your Honor.

```
 1              THE COURT:  All right.  So I think that that

 2     concludes the first part of the agenda.  And when we return,

 3     we'll turn to the arguments on the Motions to Dismiss and the

 4     adversary proceedings.

 5              So we'll reconvene at 1:15.  It is now 12:10.

 6              Thank you all.

 7              (At 12:12 PM, recess taken.)

 8              (At 1:21 PM, proceedings reconvened.)

 9              THE COURT:  Our next and final agenda item is oral

10     argument on the Motions to Dismiss in the case of *Rosselló*

11     *Navarez against the Oversight Board*, and the case of *Rivera*

12     *Schatz, et al., against the Commonwealth*.

13              And I understand that the parties have agreed in

14     these two adversaries, 18-80 and 18-81, to present the oral

15     arguments together.  And so I have an opening of 15 minutes by

16     Oversight Board's counsel; with five minutes allocated for the

17     UCC counsel.  And then opposition at 24 minutes for AAFAF's

18     counsel, or the Governor's counsel; eight for counsel for the

19     Senate; and eight for counsel for the House.  And then

20     rebuttal at 20 minutes.  Is that correct?

21              MR. ALIFF-ORTIZ:  Your Honor, if I may, this is

22     Claudio Aliff.

23              THE COURT:  Yes.

24              MR. ALIFF-ORTIZ:  Good afternoon, Your Honor.

25              THE COURT:  Good afternoon.
```

 1          MR. ALIFF-ORTIZ:  My name is Claudio Aliff, and I

 2   represent the president of the Senate of Puerto Rico.

 3          And the agreement was the Senate would have 12

 4   minutes, and the House of Representatives would have four

 5   minutes for its argumentation.  So that's how the time is

 6   going to be distributed amongst us.

 7          THE COURT:  Your colleague will --

 8          MR. ROLDAN:  Good afternoon, Your Honor.  Israel

 9   Roldan on behalf of the House.

10          What brother counsel said is correct.  We agree as to

11   that timetable.

12          THE COURT:  Thank you --

13          MR. ROLDAN:  All right.

14          THE COURT:  -- for correcting me.

15          So it will be 12 minutes and four minutes.  Thank you

16   both.

17          All right, then.  So would counsel for the Oversight

18   Board like to come to the podium to begin?  Mr. Bienenstock.

19          MR. BIENENSTOCK:  Good afternoon, Your Honor, and

20   thank you for enabling us to -- all of us to bring this to the

21   Court on such a rapid schedule.

22          My name's Martin Bienenstock from Proskauer Rose,

23   LLP.  We represent the Oversight Board for itself and as the

24   Title III representative of the Commonwealth.

25          The relief we request, Your Honor, are Orders

1    dismissing the Governor's Complaint dated July 5, 2018, and

2    the Legislative Assembly and Senate's Complaint dated July 9,

3    2018.

4         Although -- taking the Governor's Complaint first,

5    although the Governor's Complaint essentially turns on five

6    discrete issues that the Governor has raised, plus there's a

7    catchall which has its own significance, if anything, the

8    Governor determines at a later time ought to be considered an

9    unenforceable recommendation.

10        THE COURT:  May I ask you to pause for just a moment?

11        Shouldn't we be setting that for 15 and then five?

12        LAW CLERK:  15 and five, yes.

13        THE COURT:  Okay.  So is it 18?

14        Okay.  And if you'll -- I'm sorry.  We need to wait

15   just one more minute because my computer's kicking me off and

16   I need to log back on.  Sorry about that.  Technology is

17   wonderful except when it works against you.

18        I'm back.  Our machine is reset for 15 minutes.

19        Mr. Bienenstock, thank you for your patience.

20        MR. BIENENSTOCK:   Thank you, Your Honor.  Do I need

21   to start again or is what I said was on the record?

22        THE COURT:  What you said was on the record, so just

23   continue.

24        MR. BIENENSTOCK:   Thank you.  I picked up a few

25   seconds in the bargain then.

1          The Governor's Complaint raises five discrete issues,

2     and then has a catchall for any subsequent portions of the

3     fiscal planning budget that are certified, that the Governor

4     determines at some point should be considered unenforceable

5     recommendations.

6          What makes this matter so specially specific,

7     notwithstanding that it really turns on five discrete,

8     somewhat unique issues is that each of the issues impacts the

9     ability of the Oversight Board to carry out its statutory

10    mission to return the Commonwealth to fiscal responsibility

11    and market access.  This is its ability to ensure that the

12    people of Puerto Rico have a sustainable, competent economy

13    and a meaningful future.

14         I'm going to go back to the five issues with the

15    knowledge that the ruling on each one affects the ultimate

16    outcome, even though it's just a discrete, unique issue.

17         I'll premise the legal part, and we know Your Honor

18    has carefully read all the pleadings, so I'm not going to

19    spend much time, except of course the Court's questions, in

20    rehashing what we said.

21         But I will say that I think an overarching legal

22    principle, so as not to be lost, because it may be obvious, is

23    that the statute commanding the Oversight Board is to certify

24    a fiscal plan, whether developed by the Governor or itself,

25    has four key provisions that are mandatory.  And I'm referring

1  to 201(b)(1)(A), (D), (F), and (G).

2          Now, for sure there are other mandatory provisions,

3  many others, but these are particularly relevant here.  (A)

4  provides that the fiscal plan shall provide estimates of

5  revenue and expenditures and other things.  (D) provides that

6  it shall eliminate structural deficits.  It should provide for

7  the elimination of structural deficits.  (F) provides that it

8  shall improve fiscal governance, accountability and internal

9  controls.  And (G) provides that the fiscal plan shall enable

10  the achievement of fiscal targets.

11          Your Honor, each and every one of the five issues

12  raised by the Governor carry out one or more of those four

13  commands.  Therefore, the notion that they could be considered

14  an unenforceable recommendation, we submit, is wrong at the

15  outset.

16          And as Your Honor knows from our pleadings, we

17  believe, based on the statute, that 205 provides a procedure

18  for the Oversight Board to make recommendations and get

19  feedback from the Governor, but 201(b)(1)(K) tells the

20  Oversight Board that if it's developing the fiscal plan, it

21  must adopt appropriate recommendations.

22          And at that point they're adopted, they're

23  enforceable.  There's no such thing as an unenforceable

24  recommendation in a fiscal plan.

25          THE COURT:  Well, 201(b)(1)(K) refers to adopting

1   appropriate recommendations submitted by the Oversight Board

2   under 205(a), and the only process of submission that is

3   referred to and described in 205(a) is a process in which

4   something is first incarnated as a recommendation and

5   responded to by the Governor.

6          And so why doesn't the use of the term submitted in

7   201(b)(1)(K) suggest that the 205 process in its entirety is a

8   precondition to any mandatory inclusion of a recommendation,

9   even a rejected one, in the fiscal plan?

10          MR. BIENENSTOCK:  Well, in this case, the Governor

11   took the five issues that he's raised in his Complaint as

12   recommendations, and he responded both to the Oversight Board

13   and Congress and the President, as 205 provides that he can

14   and should.

15          THE COURT:  And so you agree generally with the

16   allegation in I think it's paragraph 59 of the Governor's

17   Complaint, that his May 6, 2018, letter constituted the

18   response and notice to the Board, the President and the

19   Congress in accordance with 205(b)(3)?  So that to the extent

20   any of these can be characterized as a recommendation, the 205

21   process has been carried through?

22          MR. BIENENSTOCK:   Exactly, Your Honor.  And I'm

23   grateful that Your Honor put in the last part, because as the

24   Court knows from our pleadings, we don't believe these are

25   recommendations, but if they are, he's responded and the Board

1    has adopted them.

2            There are two of the five in particular -- I'm going

3    to go through all five, but there are two of the five in

4    particular that I believe deserve special mention and

5    consideration, because they're so overarching in terms of the

6    Board's ability to carry out its mission.  And the two are the

7    reprogramming and the criminal penalties.

8            The reprogramming issue that the Governor has raised

9    is based on fiscal plan section 11.2.1 at page 63.  And the

10   relevant portion of the fiscal plan says that the power from

11   the OMV, Fiscal Agency and Financial Advisory Authority, or

12   the Department of Treasury, et cetera, to authorize the

13   reprogramming or extension of appropriations for prior fiscal

14   years is hereby suspended.

15           The reason I went to the trouble of reading that is

16   that I wanted to point out that what the fiscal plan is doing

17   is suspending the authorization or the power of AAFAF, et

18   cetera, to authorize reprogramming.  And I'm emphasizing

19   authorize, because when we read the government brief, and

20   pleadings and Complaint, it's unclear from which section of

21   which pleading one reads whether they're complaining about

22   the power to authorize being taken away or the power to

23   request.

24           Presumably if it were just the power to say may I,

25   they wouldn't have made a Federal case out of it, but they do

1    say that's the issue in various pleadings.  That's not an

2    issue.  We don't care if the government -- the Governor says

3    may I.  What we do care about a lot is if the Governor or

4    other parts of the government independently, without Oversight

5    Board approval, authorize reprogramming.

6           Now, why do we care so much?  We set the fiscal plan

7    and the budget.  For every dollar available, Your Honor, there

8    has to be a careful decision made, should it go to services

9    for the people, investment in their future, or payment to

10   creditors.  And we have to get the balance right so that it

11   results in a sustainable economy and hope for people and

12   creditors in the future.

13          If the Governor has the power to go into some prior

14   budget and say, oh, gee whiz, there was some unused

15   appropriated funds in this budget, I'm going to -- that

16   doesn't mean there's money set aside.  It just means there was

17   a legal appropriation that wasn't used.

18          If the Governor finds that at any given time, day or

19   night, any time in the 12 months, says, oh, I'm going to use

20   some money for a project over here or a project over here,

21   then we've lost control of the fiscal plan and the budget, and

22   the debt restructuring, because that wasn't in our plans.

23          And the notion that this can happen not only destroys

24   the ability to control the budget and the debt negotiations,

25   it destroys the perception that there's a transparent process

1   where we know what money is available and we know what we're

2   spending it on.

3        THE COURT:  I fully understand why the prospect is so

4   distressing from the perspective of the Oversight Board, but

5   what -- how do you reconcile the specific provision in 204,

6   speaking to reprogramming within a particular fiscal year,

7   when there's a fiscal plan and budget in place?  And the

8   provision in 201 (b)(1)(A) that speaks of conformity with

9   applicable laws, with the notion that the Oversight Board can

10  unilaterally disable a pre-PROMESA statutory allocation of

11  authority.

12       MR. BIENENSTOCK:   Okay.  I'm glad Your Honor raised

13  it.  204.  It's a process for the Governor to ask, to ask, to

14  request that money within the certified budget be

15  reprogrammed.  And the legislature cannot, is not authorized

16  to do that unless the Oversight Board certifies to the

17  legislature that that reprogramming will not be contrary,

18  inconsistent with the fiscal plan.

19       We have no problem with asking, and the Oversight

20  Board being allowed to say, okay, it fits or it doesn't.  As a

21  practical matter, Your Honor, the Governor knows at all times

22  we consider requests for changing anything.  If it's a good

23  idea, we want it.  It's the notion of independent authority.

24  And that I think --

25       THE COURT:  Yes, but my question to you is that that

1    statutory authorization of request for reprogramming and

2    control of the Oversight Board over whether the request will

3    be granted or not is enacted in terms of a fiscal year under a

4    certified fiscal plan.

5           MR. BIENENSTOCK:  Right.

6           THE COURT:  It doesn't say whatever, whenever.  It

7    doesn't speak to prior allocations.

8           MR. BIENENSTOCK:  But that's our -- that's our point.

9    That the only thing the statute does is let the judge -- let

10   the Governor ask to reprogram money within the certified

11   fiscal plan for the year.  It doesn't authorize the Governor

12   to do anything else.

13          And let me get to that answer, because I thought this

14   was really the second part of the Court's question.  Under --

15   whether you call it under 204 or under 201 (b)(1)(A), the

16   answer is anything that's inconsistent with PROMESA is

17   preempted by Section Four of PROMESA.  When PROMESA goes

18   through all of 201 and 202, telling the Board how it -- how it

19   should formulate a fiscal plan or assess a fiscal plan

20   formulated by the Governor, and then tells the Board how it

21   should do the same for the budget, a pre-existing

22   authorization from pre-PROMESA law in Puerto Rico saying,

23   well, not withstanding what Congress has said about the budget

24   in the fiscal plan, you just go right ahead and reprogram at

25   will, that's totally inconsistent, because we can't control

1   the cash flow or anything else if the Governor has that power.

2            THE COURT:  Well, it is indeed a conundrum, but we do

3   have 201(b)(1)(A) that says, "and be based on applicable

4   laws," and Section Four, the preemption provision, speaks of

5   inconsistencies with this Act.  It doesn't say inconsistency

6   with steps or measures taken or implemented pursuant to the

7   Act.

8            So is there some legal significance in the specific

9   phrasing of those two provisions for the question of the scope

10  of the Oversight Board's unilateral power?  Obviously I'm

11  seeking to engage and explore that issue.

12           MR. BIENENSTOCK:  Well, I think under 201(b)(1)(A),

13  it's very general that the Oversight Board should provide a

14  method for estimating revenues and expenses.  And it's hard to

15  see how the Congress could have intended that provision to

16  mean the Governor can undermine the same fiscal plan and

17  budget by finding appropriations that he wants to reprogram at

18  will without asking permission.

19           THE COURT:  Or is it a command that if the Oversight

20  Board wants to disable that, it has to, as part of the fiscal

21  plan, specify bills that require enactment in order to

22  reasonably achieve the projections of the fiscal plan?  And so

23  was it -- is it a requirement that in your fiscal plan, you

24  have as one of the action items repeal of this Act 230

25  provision or authorization?

```
 1            MR. BIENENSTOCK:  Well, we didn't think we needed to

 2    dictate repeal, because it's so inconsistent with the notion

 3    that we set the budget.  This is basically imposing a budget

 4    item that we didn't agree to, that we didn't approve.  I think

 5    it's just the opposite.  It's just totally inconsistent.  The

 6    time is running.

 7            On the criminal penalties, what the Governor is

 8    asking is that overspending the appropriations in the

 9    certified budget doesn't have consequences.  What could be

10    more indicative of the fact that this is an effort to

11    basically make the Oversight Board's fiscal plan and budget

12    meaningless?  That's what the Governor is asking for.

13            We didn't change the criminal laws in Puerto Rico.

14    We just said this is an appropriation.  If you -- if you spend

15    more than that, knowingly and willingly, and we agree, the

16    terms of their criminal statute govern.  It has to be

17    knowingly and willingly.  You're subject to the same sanctions

18    as if this had been a prior budget.

19            THE COURT:  So is that your interpretation of the

20    impact of the statute, or are you saying that the Oversight

21    Board under PROMESA has authority to direct the prosecutorial

22    authorities to --

23            MR. BIENENSTOCK:  No.

24            THE COURT:  -- bring criminal charges?

25            MR. BIENENSTOCK:  No, not at all.  This is a
```

1    statement that in our view, this budget, like every other

2    budget they passed -- which has the same language, by the way,

3    Your Honor.  Their own budgets had it.

4           This budget, because it's deemed approved by the

5    legislature and the Governor, this budget has the same

6    significance as a pre-PROMESA budget approved by the Governor

7    and the legislature.  And if somebody knowingly and willingly

8    overspends an appropriation, they're subject to Puerto Rico

9    laws that would have to be brought by the Puerto Rico Attorney

10   General, et cetera, under their standards, et cetera.

11          We pointed that out, but the Governor is saying no,

12   since it's your fiscal plan and budget, people shouldn't be

13   subject to that.  That just tells the Court, it tells

14   everyone, he wants to make this a completely ineffectual

15   budget, because you can overspend with impunity.  That's why

16   this is so important, Your Honor.

17          I see that I'm over time.

18          THE COURT:  I have a couple of questions for you --

19          MR. BIENENSTOCK:  Sure.

20          THE COURT:  -- that are on my clock.

21          MR. BIENENSTOCK:  Thank you, Your Honor.

22          THE COURT:  So first, is there documentation of the

23   certified budget?  We searched high and low and couldn't find

24   something that is a granular, particularized budget.  So could

25   you tell us where it is?

```
 1              MR. BIENENSTOCK:   Yes, Your Honor.  I only have one
 2    copy with me here, but --
 3              THE COURT:  Well, if you can tell us where it's
 4    been -- where it's filed.  We looked on your website.  We
 5    looked as best we could through the pleadings, couldn't find
 6    it.
 7              MR. BIENENSTOCK:   Okay.  It's at the top -- it's
 8    Exhibit 14 -- it's document number 38-14 filed July 21, 2018,
 9    and it's 68 pages, in case number 18-00081.  That's the
10    adversary proceeding.
11              THE COURT:  All right.  So Exhibit 38-14 -- I'm
12    sorry.  Would you read that ECF number again?
13              MR. BIENENSTOCK:   Sure.  It's document number -- my
14    copy says 38-14.  I guess that's because it's Exhibit 14 to
15    document 38.
16              THE COURT:  All right.  38-14 in 18-80?
17              MR. BIENENSTOCK:    In 00081.
18              THE COURT:  In 18-81.  All right.  Thank you.
19              Before you sit down, one other question.  In the
20    Oversight Board's view, is legislative action required to
21    implement a budget that has been certified by the Oversight
22    Board?  So is there some appropriation legislation or
23    something else that's required?
24              MR. BIENENSTOCK:   Absolutely not.  202 clearly says
25    that when the Oversight Board certifies its budget, it is
```

1   deemed approved by the Governor and the legislature.

2          THE COURT:  And the Joint Resolutions that were

3   attached to the Complaint, and I gather were attached to the

4   budget, are those measures that the Board would consider

5   enacted or adopted by virtue of the Board's certification, or

6   were those proposals for adoption by the legislature in order

7   to implement?

8          MR. BIENENSTOCK:   The former, Your Honor.  Most of

9   them, Your Honor, most all of them are the same resolutions

10  that the Puerto Rico legislature attached to budgets in prior

11  years.  It's one -- and the Puerto Rico Constitution provides

12  that the budget has to come with rules for its implementation.

13  That's what the resolutions are, rules for its implementation.

14          It's all one packet.  It all comes under the heading,

15  budget.

16          THE COURT:  And so in this case, your understanding

17  of PROMESA is that it allows -- the deemed approval by the

18  legislature is also a deemed approval by the legislature of

19  the joint resolution aspect of the typical Puerto Rican

20  budgetary package?

21          MR. BIENENSTOCK:  Yes, Your Honor.

22          THE COURT:  Thank you.

23          Mr. Despins.

24          MR. DESPINS:  Good afternoon, Your Honor.  Luc

25  Despins for the official committee.  I probably will not use

1    the full five minutes.

2            As Your Honor knows, we did not file a pleading, even

3    though we had a right to do so, because we're not taking a

4    position on the legal issues here.  We don't believe that we

5    would add very much by rehashing all the points that have been

6    made, nor has the committee taken a position regarding the

7    desirability of some policy questions regarding, among other

8    things, the repeal of Law 80.

9            The committee intervened in this proceeding because

10   it was concerned that absent its intervention, there would be

11   no discussion of the potential impact that fiscal plans or

12   plans -- or plan or changes to such plans have on settlements

13   reached or to be reached in these Title III cases.

14           The Oversight Board's Reply mentions this vaguely in

15   footnote 16, but we wanted to elaborate on that point very

16   quickly, which is that when the committee in its capacity as

17   the Commonwealth agent approved or entered into the agreement

18   in principle on June 5th with respect to the

19   Commonwealth-COFINA dispute, there was a certified fiscal plan

20   in place.

21           That was the May 30th fiscal plan.  And that fiscal

22   plan contains certain assumptions about revenues, expenses,

23   debt capacity.  And obviously this was relevant to the May

24   30th fiscal plan.

25           In light of recent developments involving the fiscal

1    plan, some of these assumptions are no longer valid, thereby

2    affecting these same revenue and expense and debt capacity

3    projections.  This, in turn, could have a very real effect on

4    the feasibility of the settlement contemplated in the

5    Commonwealth-COFINA agreement in principle.

6            To be clear, the committee does not take a position

7    as to which fiscal plan should be certified.  All it seeks is

8    to make sure that any fiscal plan that is put in place

9    provides for the same or higher debt level capacity as

10   provided under the fiscal plan that was in effect on June 5th.

11   Without that, you know, we're going to have some issues with

12   respect -- or we may very well have issues with respect to the

13   Commonwealth-COFINA settlement, where obviously the committee

14   is not abandoning the settlement.

15           I want to make clear that the message is not that,

16   but rather that these internal issues need to play out before

17   we have clarity on where we stand.  And that was the purpose

18   of our statement, Your Honor.

19           THE COURT:  So before you sit down, are you asking me

20   to be mindful that this is an essential externality, if that's

21   not a contradiction in terms?  Are you asking me to do

22   something in particular with respect to any ruling that I

23   issue?  Are you underscoring this issue for the Oversight

24   Board as it takes positions on what its fiscal plan will be?

25   Can you give me context?

1          MR. DESPINS:  There's some of that, but the Oversight

2   Board understands that issue clearly, and I believe the

3   Commonwealth understands it as well.  So it's just that we

4   wanted the Court to be aware of that dimension.

5          I know you're dealing with complex legal issues about

6   who has the power, and of course these are the issues you need

7   to address.  But we believe that the parties in the case need

8   to understand that there's another dimension to this.

9          THE COURT:  Thank you.

10          MR. DESPINS:  Thank you.

11          THE COURT:  And now we turn to Mr. Friedman.

12          MR. FRIEDMAN:  Good afternoon, Your Honor.  Peter

13   Friedman on behalf of Governor Rosselló and AAFAF from

14   O'Melveny & Myers.

15          Actually, one of the things that might highlight the

16   narrowness of the relief that we're seeking is we don't think

17   that the Court can do and certainly haven't asked the Court to

18   do what Mr. Despins just asked.  We don't think we can tell

19   the Oversight Board, go certify a fiscal plan with X surplus.

20   That's well beyond the narrow issues we've raised.

21          We're raising a really narrow set of issues that if

22   the relief we asked for is granted, what it will do is balance

23   the roles and rights and powers of the government with the

24   Oversight Board, and reject the concept that we basically have

25   no functional role.

1          Mr. Bienenstock said the Governor doesn't want things

2    to be -- doesn't want the budget to be meaningful.  Nothing

3    could be further from the truth.  First of all, if the

4    government doesn't comply with the budget, nothing in our

5    Complaint attacks in the slightest bit the Oversight Board's

6    powers under 203 to require a report as to whether revenue,

7    cash flow and expenditures are compliant with the budget.

8          It doesn't change the fact that if the Oversight

9    Board goes through 203(c) and sends the right message, that it

10   can then step into its powers under 203(d) and start making

11   appropriate budget cuts at the Commonwealth or with respect to

12   territorial instrumentality.  It's just not true that their

13   budget has no teeth.

14         Moreover, Your Honor, the question with respect to

15   both suspension of reprogramming and with respect to the

16   implementation of a criminal law is not should the

17   Commonwealth pass a law that says this is a crime.  It's can

18   the Board legislate.  We think the answer to that is no, it

19   can't legislate.  It does not have the power to make something

20   a crime even if the Commonwealth does.

21         Criminalizing something is, I think, at the heart of

22   an independent government's ability to control itself, to

23   control its legislature, to control its people.  To take that

24   power away from the Commonwealth and say that the -- I'm

25   sorry, Your Honor.  You clearly have something to say, so I'll

1    stop pontificating.

2          THE COURT:  Well, just so that I follow, I think what

3    I heard Mr. Bienenstock say as to the last criminalization

4    point is PROMESA, at the appropriate stage, takes the making

5    of a budget out of the -- the certification of the budget out

6    of the hands of the elected government and lets the Oversight

7    Board put it in place.  And Puerto Rico already has a statute

8    that says noncompliance with the budget, that is, the

9    operative budget for the Commonwealth, is a crime.

10          And the Oversight Board is contributing to the mix by

11   way of underscoring the significance of and the solemnity of

12   the certification, its position that noncompliance with that

13   official budget for the Commonwealth would be a crime within

14   the meaning of the pre-existing statute.  So how is that

15   legislating?

16          MR. FRIEDMAN:  So when I look at a joint resolution,

17   a joint resolution is not a budget, right?  They were not

18   given the power, all legislative power, under Article III of

19   the Puerto Rico Constitution, to legislate.  They were given

20   the right to deal with a budget.

21          A budget is not a defined term in PROMESA.  It's a

22   small B, budget.  There's a capital B, territorial budget, but

23   that links back to the definition of budget, which is a small

24   B.

25          I think the right way to define budget is not budget,

1   plus all budget adjacent powers, or budget, plus every power

2   the Puerto Rico legislature ever had with respect to a budget.

3   It's -- I could imagine if, one -- they could say, well, we

4   can put anything we want to in a budget, right?  We can change

5   the name of Puerto Rico to Rich Port in a budget because we

6   think that's what you ought to do; that's the right way to

7   implement a budget.  No.

8          They have the power to submit a bunch of numbers.

9   Those numbers can be fairly detailed and line item oriented,

10   but we think that's all they have the power to do.

11          How do we know what a budget is?  Look at their own

12   budget.  107 says the Oversight Board has to submit a budget

13   to Puerto Rico in the Constitution and to Congress.

14          If you look on their website, what their budget is,

15   it's a bunch of numbers.  It doesn't say, here's how the

16   Oversight Board is going to do everything possible with

17   respect to its budget.  It's just a budget.

18          It says, we're going to spend money on motor oil;

19   we're going to spend money on cars; we're going to spend money

20   on rental -- on renting space; we're going to pay people.

21   That's what a budget is to us.

22          THE COURT:  So two questions.  First, on the

23   ancillary documentation to the budget, it seems to me

24   Mr. Bienenstock's understanding is that Puerto Rico

25   operationally, in order to implement a budget, has these

1   ancillary documents.

2          So are you saying that they can't create and have

3   deemed approved these ancillary documents?  So that simply by

4   refusing to pass the joint resolution, or otherwise not acting

5   on the set of numbers that the Board sends across the

6   legislature, can stymie the certified budget?

7          MR. FRIEDMAN:  Your Honor, if that happens, Puerto

8   Rico can't spend any money.  There's no money to be spent

9   outside the context of their budget.

10          So if the Puerto Rico legislature decides not to pass

11   a statute, that says here's how we're going to enable things,

12   we can't spend a penny outside of compliance with the fiscal

13   plan and the budget.  And I think that's one of the things

14   that's gotten lost here.

15          When we think about what's mandatory and what can be

16   done, either under the budget or the fiscal plans, the way we

17   think something is made mandatory and the way you know it's

18   mandatory is by looking at 104, 203 and 204.  Do they have the

19   right to punish?

20          I think, as you said in a CTO decision, strongly

21   incentivised.  Do they have a right to cut something?  Do they

22   have a right to review a piece of legislation?

23          You know, Mr. Bienenstock made the argument, if I

24   understand it, hey, if it's inconsistent with 201 or any

25   provision of PROMESA or anything we do, it's preempted.

 1          We don't think that's right, because we think that's

 2     allowing them to legislate.  We think the examples where

 3     they're allowed to legislate, or really even repeal laws or

 4     take oversight over laws is super narrow.  It's under 204(a),

 5     and also the section that says they can review any statute

 6     passed in the gap period before the Board was fully, you know,

 7     instituted or constituted.

 8          We think that they have rights under 204 that let

 9     them review Executive Orders, let them review contracts, but

10     for specific purposes -- review regulations, but for specific

11     purposes.  Not suspend them.  Not write them away if there's

12     not some empowerment under 203 or 204 or 104 to do it.

13          And I think that's at the crux of this.  Can the

14     Board legislate, whether through the budget or through a

15     recommendation?  We think the answer is no.  We think what

16     they have the right to do is to make recommendations.

17          I think the proof of that, Your Honor -- and I think

18     you mentioned 201(a).  They can make recommendations to what

19     laws can be passed.  Does that mean if they put it in the

20     fiscal plan it becomes the law?  The answer to that is no.

21          And the reason we know that is because Law 80 is

22     still the law of Puerto Rico.  If that is true, just by

23     putting something in a fiscal plan, that the effect was the

24     legislature and the government had to do it, A, you'd have

25     like a massive, crazy Control Board that was unlike anything

1    in the statutes.  And B, sitting here today, the May fiscal

2    plan that said Law 80 is repealed and all the assumptions

3    about revenue and budget, et cetera, those would be the law of

4    the land.  But they're not, because they don't have that

5    power.

6          So I don't know if that answered your question or

7    that was a little more broad than what you were looking for,

8    but I think those are sort of fundamental principles that

9    animate our position.

10         And, Your Honor, what we're asking the Court to do is

11   say, if something is listed in a recommendation under

12   205(a)(1) through (10), that's all it is.  It's a

13   recommendation.  The Board can tell us it's a recommendation.

14   If the Governor agrees it's a recommendation, then at least

15   with respect to the Governor, it has some force.

16         If the legislature agrees to a recommendation,

17   frankly I think we're getting into a little bit of a gray

18   area, because if the legislature backs out, I'm not exactly

19   sure what happens.

20         Can they be ordered to vote on something?  I don't

21   think so.  But thankfully, that's not the situation we're

22   dealing with.  But again, all it is is a recommendation.

23      THE COURT:  Well, what about something that doesn't

24   require a change in existing law, something that the Oversight

25   Board has put through the recommendation process?  The

 1    Governor interpreted these five items to have been done.  The

 2    Oversight Board's judgment is, nonetheless, that it is

 3    necessary for Puerto Rico's future.  And so the Oversight

 4    Board certifies the budget that funds its desired outcome,

 5    defunds without, for purposes of this hypothetical, violating

 6    any specific statute, the course of action that the

 7    Commonwealth seems to want to pursue.  What prevents the

 8    Oversight Board from doing that?

 9            MR. FRIEDMAN:  Your Honor, if they don't budget for

10    it, then we've got a problem.  We can't spend -- nothing in

11    our Complaint says that we can spend in a manner inconsistent

12    with their budgets.

13            Do I think that means -- let's say they budgeted one

14    dollar for Christmas bonuses next year.  Does that eliminate a

15    person's statutory right to a Christmas bonus?  Probably not.

16            Does it mean we can't pay that Christmas bonus?  I

17    think it does mean that we can't pay the Christmas bonus,

18    because the Christmas bonus is six hundred dollars.

19            THE COURT:  Or it forces hard choices in an

20    application for reallocation or reprogramming.

21            MR. FRIEDMAN:  Which I think they consent, I think

22    they acknowledge that, hey, if we can meet their budget

23    targets, good luck.  Right?  And those are hard decisions that

24    I think they are reserved to the government, their elected

25    government, in part because the way PROMESA is structured is

1    to ensure that the governed still have a stake.

2           It's the Governor who has to make some difficult

3    choices, because he's the one who has to answer to the people.

4    The Oversight Board is just, here's how much money you get.

5    If people have to be let go, if Christmas bonuses don't get

6    paid because of that, that's on us.  That's on the chief

7    executive officer of Puerto Rico to make a determination how

8    to implement that budget guideline.  And if there are

9    violations of that budget guideline, then 203 kicks in.

10          If new legislation is passed inconsistent with that

11   fiscal plan and that budget resolution and tries to say, oh,

12   next year you have to spend 20 million dollars on Christmas

13   bonuses per person, that legislation has to be scored.  If

14   it's scored and it says yeah, this is materially inconsistent

15   with the fiscal plan, then they get to do certain things that

16   are not particularly pleasant for Puerto Rico.

17          But we're not -- nothing we do takes away a single

18   iota of their power to do that.  We don't challenge that.

19          THE COURT:  So you accept that the Board could give

20   you a bucket that's salaries, benefits, bonuses, whatever that

21   is.  To cover Christmas bonuses means something else has to be

22   squeezed, and you have to live within that bucket.

23          MR. FRIEDMAN:  Yes.

24          THE COURT:  Do you also accept that the Board can

25   give you an operating expense item for administrative

1    agencies, that if spread among 134 administrative agencies,

2    would give you 25 cents per agency; but if consolidated down

3    to 22, would give you -- or some other number or consolidated

4    in some other way, would give a workable budget?  Is that

5    something that the Board can do?

6              MR. FRIEDMAN:  I think that's within their power.

7    Your Honor, we can probably spend a lot of time on

8    hypotheticals.

9              THE COURT:  I'm trying to understand.  That's all.

10             MR. FRIEDMAN:  Yes, I accept that one.  If the Board

11   gave the legislature one dollar next year for itself, would

12   that be a problem?  I think it would, because that would

13   vitiate the legislature's ability to play a meaningful role

14   under PROMESA.

15             I don't think this Oversight Board, which is made up

16   of seven extremely smart, extremely competent people who care

17   about Puerto Rico's future, would ever do that; but I think

18   there are some outer limits, perhaps.  Or maybe if they do

19   that, it's a political problem and the President removes them

20   for cause.  Maybe that's the bigger answer.  I don't think

21   that would ever happen.

22             I guess I accept what you've said as being within

23   their lawful power, and I think if you read our Complaint, I

24   don't think we've challenged that.

25             I think this is a good time to say, Your Honor, that,

1    and the Oversight Board acknowledges this in its pleadings,

2    there's been a tremendous amount of working together, of

3    listening.  There's a 113-page fiscal plan.  We're talking

4    about five issues.

5         I think both the Oversight Board and us took exactly

6    what you said in November to heart, which is that we have to

7    act respectfully, candidly and cooperatively.  But I think

8    what we're trying to get at in this Complaint is the other

9    part of what you said in that Opinion, which is that all that

10   has to happen within their roles as defined by Commonwealth

11   law and PROMESA.

12        And I guess our concern, Your Honor, is that the

13   Oversight Board basically seems to give us no role under the

14   Commonwealth law in PROMESA, while our approach to statutory

15   interpretation respects a role for both the elected government

16   and the Board.

17        Your Honor, I want to talk about reprogramming for

18   just a second, because I think a critical issue with

19   reprogramming is again, we get it, we cannot act

20   inconsistently with 204.  I don't think they can go beyond 204

21   and change the law.  But if our reprogramming -- to the extent

22   that the Governor would ever try to use Act 230 to reprogram,

23   if our reprogramming means that we are spending more money in

24   a fiscal year than we're allowed to, that's a program for us

25   under 203.  And the Board has the power to do certain things

1    to us.

2          What we object to is their legislating to try to

3    suspend the law when they don't have the right to suspend a

4    law outside of 204, which talks about when they get to suspend

5    the laws or prevent the enforcement of the laws.  I think

6    they're just going well beyond what their statutory powers

7    are, and that's what we object to.

8          The same thing, Your Honor, comes through in our

9    issue with respect to the hiring freeze example.  They talk

10   about, I think in their -- you know, the fiscal plan appears

11   to make mandatory, on certain events, a hiring freeze.  We

12   don't think they have the right to say mandatory hiring

13   freeze.

14         First, we think it's a recommendation.  All right.

15   And second of all, because it relates to one of the 205

16   topics -- and second of all, the budgetary powers they have

17   specifically mention hiring freezes, when they're allowed to

18   impose hiring freezes.

19         And it's not just sort of by automatic operation if

20   you fail to comply with X.  It's, first of all, only if a

21   territorial instrumentality, not the Commonwealth; and second

22   of all, it's only after 203(a), (b), (c), and (d) have been

23   complied with.

24         We just don't think they can change PROMESA by

25   putting it in their fiscal plan.  That is our concern, not

1   whether the Board has the ability to do things with respect to

2   fiscal responsibility.  It has the tools it needs to do that.

3   We're just saying you can't go beyond your tools by putting

4   something into a fiscal plan in the guise of what we think are

5   recommendations.

6          Let me give you an example of something that's not a

7   recommendation, because you may be worrying or wondering,

8   Mr. Friedman, if I grant you the relief that you want, like

9   does the Oversight Board have any power left?  Sure.

10          So I guess, as an example, I would use section 12.52

11   of the fiscal plan.  That's an example of how the Governor

12   believes the fiscal plan is supposed to work.

13          The section provides that the PRDE, the education

14   department, must achieve 54 million dollars in net personnel

15   savings, and seven million dollars in non-personnel savings in

16   fiscal year 2019.  That's a must.  And you know what?  We

17   think that must can be put into the budget.

18          But section 12.52 then offers recommendations as to

19   how PRDE should accomplish these goals.  PRDE could

20   consolidate its footprint, including schools, classes,

21   teachers and administration, modernize facilities, revise the

22   curriculum, and equip teachers with what they need to succeed.

23          And you know what?  The Government's going to have to

24   choose in between those options or maybe some other options,

25   how to get to the 54 in personnel savings and the seven

1    million in non-personnel savings, but it should be up to us to

2    figure that out.

3          And I would say in some places in their briefs, I

4    read them to be saying, you're right.  You can pick Christmas

5    bonuses, or you don't actually have to consolidate in, you

6    know, all the agencies as long as you hit the money bonus.  We

7    think that's how it's all supposed to work.

8          And I think one of the reasons that it works, Your

9    Honor, that way is the way -- and I know this Court is

10   extremely familiar with it, it's the way Congress set up

11   PROMESA.

12         Congress had the power to do whatever it wanted to.

13   It could have taken all power away from the elected government

14   and said, control -- you know, a mega control board is in

15   place, but it didn't.  And because it didn't, I think we

16   should sort of heed *Gregory versus Ashcroft* which says, when

17   Congress intends to make significant changes in a

18   traditionally sensitive area -- and to my mind, home ruling

19   self-government qualifies as a traditionally sensitive area --

20   it must make its intention to do so unmistakably clear in the

21   language of the statute.

22         So I kind of think of that, Your Honor, as the tie

23   should go to us.  Right.  If the statute is a little bit like,

24   hey, you could read it either way -- and let me be honest, the

25   statute has some areas where maybe that's right -- I think it

 1   goes to us, because it's not unmistakably clear that the power

 2   has been taken away from us.

 3         And again, both sides can quote snippets from the

 4   legislative history.  I get that.  Right.  We have ours.  They

 5   have theirs.

 6         We think the most compelling, finally, significant

 7   portion of the legislative history is what did Congress think

 8   about doing?  It thought about a D.C. Control Board type power

 9   where the Board had the specific power to force

10   recommendations down the elected Government's throat, whether

11   that be the Governor or the legislature, and they chose not to

12   do that.

13         We think that was an act of legislative significance,

14   and how you interpret what 205 means and how you interpret

15   what 201 means.

16         THE COURT:  Then you have 201(b)(1)(K), which brings

17   back an ingredient that is not full-blown D.C. Control Board,

18   and is not absence of D.C. Control Board.  So that's the hard

19   thing, isn't it?

20         MR. FRIEDMAN:  It is a hard thing, right?  But you

21   know, Your Honor, we think too -- we obviously have very

22   different interpretations of what 205 means.  And we do think

23   the reference in 201 to 205 is a very meaningful and

24   significant mechanism.

25         So what I would say about that is, I kind of think

1   that the position they took in their Reply Brief, which is 205

2   just gives the Governor a right to complain, only works if you

3   think something else in PROMESA took away the Governor's right

4   to complain.

5        The Governor can issue press releases.  The Governor

6   can write letters to whoever he wants.  The Senate can pass

7   non-binding census of the Senate and the House and say, this

8   is an outrage.  This is terrible.  Right.  205 isn't where

9   that power comes from.

10       And I think their interpretation effectively is

11  saying, you have a right to complain and say you don't like

12  our recommendations, and the fiscal plan gives you that.  I

13  don't think that's right.  I think we get to complain no

14  matter what.

15       THE COURT:  Doesn't it up the ante on a complaint if

16  it obliges the Governor, if he's going to object formally, to

17  produce a justification of a level and of a degree of

18  significance and some solemnity that warrants a letter to the

19  President and Congress?  And then if the Oversight Board wants

20  to go there, it has to engage and be prepared to meet both

21  politically and in the public eye the concerns that have been

22  raised by the Governor, and potentially the attention of

23  Congress to those issues in saying, this is so important that

24  we are wielding this, you know, very powerful tool that we

25  believe Congress gave us?

```
 1              MR. FRIEDMAN:  Two responses to that.  First of all,
 2   I think the statute would say, you can impose rejected
 3   recommendations, if that's the power they had.  Or it would
 4   say, as the original draft of the statute in the D.C. Control
 5   Board said, Oversight Board, you then have to explain in your
 6   own letter responding to the Governor's letter by, you know,
 7   point by point, why what you're doing is so important, and you
 8   have to do something else.
 9              But the process for recommendations just ends in 205.
10   It doesn't say, and then you get to do X.  And I think what's
11   really important to note about 205, Your Honor, is it's not
12   just recommendations.  It's recommendations that the Governor
13   -- the government may take, and this is what I think the most
14   important step is, to ensure compliance with the fiscal plan.
15              If the fiscal plan was so sacrosanct that we had to
16   do everything in the world to comply with every aspect of it,
17   why would we be allowed to reject measures to ensure
18   compliance with the fiscal plan?  Because we're allowed to,
19   assuming they don't hit any of the targets under 204 that give
20   the government, the Oversight Board the power to take
21   corrective actions.
22              And there's nothing in 204 that says, if you reject a
23   recommendation, we get to take a corrective action.  We think
24   that -- so when you look at 204 and 205 together, that's
25   pretty powerful.
```

```
 1              The other point I'd make about 205 -- I'm sorry,
 2   about the statute and the way it works -- and if you want to
 3   ignore this because I didn't put it in the brief, that's fine.
 4   It didn't occur to me until yesterday afternoon -- is that 202
 5   has some really important language about what happens when a
 6   budget is deemed certified, or was certified.
 7              And under 202, it's (e)(3) maybe, because it's in
 8   full force and effect, the fiscal plan doesn't say a rejected
 9   recommendation is in full force and effect and is the law of
10   Puerto Rico.  Again, I think that's meaningful, and I think it
11   shows the Board doesn't get to legislate.
12              The Board doesn't get to tell us what to do, because
13   the fiscal plan doesn't become the law of Puerto Rico.  It
14   just becomes something they can hold us to if they have a
15   specific power to do that under 204.
16              Unless you have any further questions, Your Honor, we
17   rest on the rest of our papers.
18              THE COURT:  Give me just one moment.
19              That's all.  Thank you.
20              MR. FRIEDMAN:  Thank you, Your Honor.  And I do echo
21   Mr. Bienenstock's comments, that we are grateful to your staff
22   for exercising the power, and to you to exercise us to --
23   having been heard so quickly.
24              THE COURT:  Thank you.  It's very important.
25              MR. ALIFF-ORTIZ:  Good afternoon, Your Honor.
```

1          THE COURT:  Good afternoon.

2          MR. ALIFF-ORTIZ:  This is Claudio Aliff on behalf of

3     the Legislative Assembly, the Senate of Puerto Rico and its

4     President on behalf of the Senate.

5          Your Honor, I will begin by saying that Section Four

6     of PROMESA makes PROMESA the supreme law of the territory on

7     everything consistent with it, but it does not make the Board

8     supreme in Puerto Rico.  PROMESA did not appoint the Board as

9     the king of this island territory.

10          In fact, PROMESA respects the political powers that

11     the -- the political branches of government has under the

12     Puerto Rico Constitution, and allows the legislature to enact

13     laws and to approve budgets.  Something that the Board

14     prevented from doing -- prevented the Legislative Assembly

15     from doing when it engaged in behavior outside of the confines

16     of the Act, such as the decision on June 29 to rush the

17     certification of a fiscal plan in violation of Section 201(c)

18     and (d).

19          The procedures departed -- that departed from Section

20     204(a)(4)(B), when it interfered with the legislative process,

21     sending a letter on June 4 to a president of a committee of

22     the House of Representatives telling him that if PROME -- if

23     Law 80 was not repealed in the way the Board wants it to be

24     repealed, it would have adverse consequences to the government

25     of Puerto Rico and the legislature in particular of depriving

1    it of its budget, and the practices of misrepresenting revenue

2    forecast to throw monkey wrenches at the legislature,

3    preventing it from ever being able to approve a certifiable

4    budget.

5         If you look at the revenue forecast that the

6    legislature -- that the Board assessed in the June 29 fiscal

7    plan, which estimated them downward, to the budget that they

8    approved, the budget that they approved is 200 million dollars

9    over the revenue forecast for the fiscal year 2018-2019.  It's

10   that -- the budget that's approved by the Legislative Assembly

11   of Puerto Rico was 40 billion less than the revenue forecast

12   that the Board certified on May 6, when it referred the budget

13   to the legislature.

14        So those are really monkey wrenches thrown at the

15   legislative process that will never allow the legislature to

16   exercise its authority within PROMESA.  Meanwhile, we have the

17   Board exceeding its authority within the confines of PROMESA

18   just to frustrate the legislative process.

19        Not only that, when we see the reason why, the only

20   reason that the Board has given to rush into a certification

21   of a new plan on June 29 was because Law 80 was not repealed

22   in the fashion that they wanted it.  So that prompted,

23   according to them, the need to revise the new -- the fiscal

24   plan of May 30th and approve unilaterally one on June 29.

25   That will certainly frustrate passing or certification of the

1    legislature budget.

2         And moreover, that reason is purely pretextual,

3    because PROMESA -- I'm sorry, because the Board's own

4    estimates show that repealing of Law 80 would not have any

5    fiscal impact in the Puerto Rico budget until, at the best,

6    the year 2020.  Because the assumptions on which repeal of Law

7    80 rests will not trigger any new income until after it has

8    come into place, which is January 1st of 1919 -- of 2019.  I'm

9    sorry.  And the revenues will not come into the Commonwealth

10   coffers until the year 2020.  Therefore, it's pretextual.

11        The idea that they have to offset any losses created

12   by the legislature on the Puerto Rico revenues for the fiscal

13   year 2018-2019 as a result of not repealing Law 80, it's

14   totally a conscious misrepresentation by the Board to justify

15   illegal acts outside of the purviews of PROMESA, Your Honor.

16   And it was incumbent on the Board to wait until the

17   legislative process ended, until the legislature produced a

18   law that repealed or not Law 80, and then let -- then engage

19   in what Section 204 requires them to do, which is ask the

20   legislature to explain the inconsistencies on that repeal.

21        But no, they did not do that.  They chose to

22   interrupt the legislative process by threatening the

23   legislature in a letter dated June 4, and then just

24   decertifying a validly certified fiscal plan, which is the May

25   30th fiscal plan, and approve the new one without the

1    participation of the Governor in any fashion or way.

2         And then the eventual consequence is what?  They have

3    approved and certified their own budget.  And right now we are

4    operating in Puerto Rico with, according to our perspective,

5    an illegal budget.

6         And that creates a real bad situation here, because

7    if Your Honor agrees with us, then what are we going to do?

8    Are we going to give the Board the option to determine whether

9    the budget is certifiable or not, the budget approved by the

10   legislature and the government of Puerto Rico?  I don't think

11   that that's an adequate remedy at this point.

12        The Court can reinstate then the budget approved by

13   the legislature, but it has a problem.  It has not been

14   certified by the Board.

15        THE COURT:  Yes, but --

16        MR. ALIFF-ORTIZ:  Yes?

17        THE COURT:  Well, I was going to ask you, what in

18   PROMESA or any other body of law would give this Court the

19   power to certify a budget?

20        MR. ALIFF-ORTIZ:  Well, not to certify, but yes, put

21   in place a budget that was validly certified, which is the

22   2017-2018 budget.  Article VI, Section Six of the Puerto Rico

23   Constitution requires that when for a new fiscal year the

24   legislature cannot agree on a budget, the fiscal year of the

25   prior -- I'm sorry, the budget from the prior fiscal year will

1   then continue operating for that fiscal year in which the

2   government could not agree on a budget.

3          Here we have the budget from the year 2017-2018.

4   It's a certified budget.  That budget was certified by the

5   Board.  So we have -- we have a budget that the Court can look

6   at as one that was compliant, according to the Board, and put

7   it in place.

8          THE COURT:  And so now that is a remedy that was not

9   flushed out or pleaded in your Complaint, correct?

10         MR. ALIFF-ORTIZ:  Yes, Your Honor.  It was not

11  clearly developed, but we have a catchall request, which is to

12  provide any remedy that is adequate in law.  And based on the

13  Constitution of Puerto Rico, that is a remedy that is adequate

14  in law.

15         When the Board chose to deprive the legislature of

16  its prerogatives within the constitutional framework in which

17  it operates, it took away their functions as a representative

18  of the people that they voted for, when they decided not to

19  repeal Law 80, and when they decided to approve a particular

20  budget.

21         So the actions of the Board certainly affected the

22  legislative functions of each one of the legislature and the

23  branch itself when it took away the powers to approve a budget

24  without even giving the opportunity of comparing that budget

25  to a validly approved fiscal plan to which it complied.

1            It is very important, Your Honor, that Law -- repeal

2     of Law 80, and I want to stress what brother counselor already

3     expressed, repeal of Law 80 is just a recommendation that the

4     law allows the legislature to reject, which they did.

5     According to the law, they sent the letter to the President,

6     the Congress, the Board, everyone, stating the basis for the

7     rejection.

8            So foreseeing that transformation in the employment

9     area of Puerto Rico, which is outside of the boundaries of the

10    Board, because that affects the private sector -- the Board is

11    here to lead and direct the government of Puerto Rico, the

12    public sector, on matters of fiscal responsibility and being

13    able to return to the markets to gain financing to provide

14    services and operate in the future.

15           THE COURT:  Well, is it illogical to think that the

16    Board is necessarily concerned with the economy of Puerto Rico

17    as a whole, and the ability of the Puerto Rican economy, both

18    public sector and private sector, to operate in a way that is

19    sufficiently credible to attract interest in the credit

20    markets?

21           MR. ALIFF-ORTIZ:  Sure.  And they can -- and they can

22    engage in the exchange of ideas to develop those changes in

23    the market, in the labor market, in the private sector.  And

24    that's what they miss, because instead of waiting for the end

25    of the legislative process, and receiving the input from the

1  legislature as to why it did not agree with the way the Board

2  wanted to repeal Law 80, instead of imposing their public --

3  the policy views on how the market should be, really

4  transcends, went beyond its power in PROMESA, because PROMESA

5  creates the avenue to this exchange of ideas, to create

6  legislation that is satisfactory to the Board, and

7  accomplishes the ends that they intend to accomplish, Your

8  Honor.

9       And I think that by just bypassing that process, they

10  just violated PROMESA and acted beyond the purview of their

11  authority.

12       We submit our position, Your Honor.  Thank you.

13       THE COURT:  Thank you, sir.

14       MR. ROLDAN GONZALEZ:  Buenas tardes, Your Honor.

15  Israel Roldan on behalf of the House of Representatives.

16       THE COURT:  Buenas tardes.

17       MR. ROLDAN GONZALEZ:  Your Honor, we are here mainly

18  for -- because of two reasons.  First, we -- and when I say

19  we, I mean Puerto Rico -- we are subjected to the territorial

20  clause of the United States Constitution.

21       This was addressed by Judge Swain in her recent

22  Opinion and Order.  We are a territory.  We are a colony.  For

23  some of us, Your Honor, that's shameful, but that simply is

24  the truth.

25       The second reason, Your Honor, was stated by the

1  brother counsels in their Reply Memorandum that was filed the

2  day before yesterday.  And I quote, we are here because the

3  legislature demands restoration of its budget without

4  repealing Law 80.

5          Your Honor, the House and the Senate were working on

6  repealing Law 80.  There was all -- differences between the

7  House and the Senate on how to do it, and they were working on

8  it.  They agreed on two things:  The first one was that Law 80

9  had to be repealed.  The second one was that both houses agree

10 that it was to be repealed prospectively.  But the Board

11 wanted the law to be repealed retroactively.

12         So why the cuts to the legislative fiscal year 2018

13 budget?  This is also answered by the Board in the Memoranda

14 of Law, and allow me to quote again.  The Oversight Board

15 agreed to certify a new fiscal plan restarting the legislative

16 budget and making certain other changes the Governor

17 requested, in exchange for the repeal of Law 80.  When the

18 legislature failed to enact the repeal, the Board addressed

19 the economic impact by certifying the June 2018 fiscal plan.

20         So, Your Honor, the question is not if the Board --

21 at least from my point of view, it's that the Board has the

22 power to certify the June 2018 fiscal plan and the 2018-19

23 budget.  The question that we present, Your Honor, is that if

24 it was done in valid reasons, as stated in PROMESA, or it was

25 done in retaliation because Law 80 was not repealed

1    retroactively as -- and in doing so, the Board exceeded its

2    authority.

3         It is clear that due to the Legislative Assembly

4    disapproval of a bill, repeal Law 80, in the way and manner

5    the Board wanted, he refused to certify the legislative

6    assembly budget which complies with PROMESA, and proceeded to

7    impose punitive measures which included reducing the

8    legislative assembly operational budget.

9         The Board's acts exceeding authority on PROMESA

10   constituted a usurpation of the legislative assembly,

11   exclusive legislative power, and furthermore, constituted an

12   act of supplementation, bypass or replacement of the

13   Commonwealth elected leaders.  Therefore, has unlawfully

14   enclosed upon the Legislative Assembly exclusive legislative

15   power under the Puerto Rico Constitution.

16        So we submit, Your Honor, that there is no valid

17   reason for the Board's action.  If the alleged reason for

18   repealing Law 80 is that this will promote the creation of new

19   jobs, why it has to be retroactively?

20        The reason, Your Honor, we respectfully submit, is

21   that there are no reasons.  The Board wants to repeal Law 80

22   retroactively, and this constitutes an abuse of its power.

23   This is the real reason why we're here today.

24        We pray for justice, Your Honor.

25        THE COURT:  Thank you.  May I ask you a question?

1        MR. ROLDAN GONZALEZ:  Sure.

2        THE COURT:  The Board I think will say something to

3   the effect that it has done its economic and policy studies,

4   and believes that the change has to apply retroactively in

5   order to achieve certain targets in the future.  And the Board

6   would say that's its reason is that it genuinely believes

7   that.

8        And the Board also, I think, has been saying that it

9   has -- it has the power to create budget lines and to use that

10  budget authority to give incentives or disincentives to the

11  legislature and the Governor to see things the Board's way.

12       What in PROMESA specifically or other applicable

13  legislation makes it illegal for the Board to use that tool of

14  persuasion?  Why should the Board just have to walk away?

15       MR. ROLDAN GONZALEZ:  Your Honor, as we read PROMESA,

16  if the Legislative Assembly works on a budget, and they

17  discuss that with PROMESA, PROMESA makes its recommendations,

18  and the budget that is approved is in accordance with PROMESA.

19  And the budget that was signed by the government -- the

20  Governor, was approved by PROMESA.  Why the Board certifies

21  their budget other than the fact that Law 80 was not

22  immediately repealed as they requested?

23       Your Honor, as brother counsel Aliff said, Law 80 has

24  a theory as to the fact of repealing Law 80.  But the Board

25  agreed that that will not take effect until 2020.  So why

```
 1    didn't they let the Legislative Assembly finish working under

 2    their procedure to repeal Law 80?  And once that was done,

 3    they still had the power to repeal any law enacted by the

 4    legislature of Puerto Rico.

 5          They have the power, Your Honor.  We're not asking --

 6    we're not arguing that.  What we're saying is that for no

 7    valid reason, at least no valid reason presented to the

 8    Legislative Assembly, they said, we want Law 80 to be

 9    repealed; and we want it now, and we want it retroactively.

10          The assembly says, well, okay.  We agree with

11    repealing Law 80, but we believe it has to be repealed

12    prospectively.

13          So there was some kind of disagreement which was cut

14    off.  There was no space to work out, to reach some kind of

15    agreement, because the Board immediately approved their

16    budget.  That is, Your Honor, the reason why they did that.

17          We respectfully submit that it was against what

18    PROMESA is all of, and we submit that it was an abuse of the

19    powers granted to them by PROMESA.

20          THE COURT:  Thank you.

21          MR. ROLDAN GONZALEZ:  Respectfully submitted, Your

22    Honor.

23          THE COURT:  Thank you, sir.

24          And now rebuttal, please.

25          MR. BIENENSTOCK:  Thank you, Your Honor.  Martin
```

1   Bienenstock of Proskauer Rose for the Oversight Board.

2           Your Honor, I want to briefly revisit the initial

3   discussion we had about the reprogramming, because Your Honor

4   asked a question about the impact on that issue of 201

5   (b)(1)(A), and I was able to read it all and better, I think,

6   better formulate the response while I was listening to

7   everyone else.

8           So there are three key points that I would offer.

9   The first is when 201(b)(1)(A) says that the fiscal plan shall

10  provide for estimates of revenues and expenses and be based on

11  applicable laws, they're talking about the revenues and

12  expenses in the fiscal plan.  They're not talking about other

13  expenses the Governor might interject through reprogramming

14  that he can't know at the time.

15          We don't know, now that the Governor said he wants

16  the right, we don't know what he's going to claim was an

17  unused appropriation and what he wants to do with it.  So the

18  first point is we don't think applicable laws meant the law in

19  the books authorizing reprogramming.

20          Second, 201(b)(1)(F) provides that the fiscal plan

21  shall improve fiscal governance.  There's nothing more

22  important in fiscal governance than saying to the Governor and

23  the legislature, the budget is the budget.  You can't change

24  it willy-nilly based on some reprogramming authorization you

25  have under prior law.

1      But let's say that were wrong, Your Honor, and let's

2  say Your Honor would determine that's what they can do.  Well,

3  that leads to the following consequence.  It would mean before

4  a budget and fiscal plan is certified, we would have to get

5  from the government every possible unused appropriation they

6  could use, add up all the amounts, and say okay, if you're

7  going to exercise that power or reserve the right to exercise

8  it -- let's say they come back and say, we have 50 million of

9  unused appropriations from prior years.  You say, okay, we're

10  subtracting 50 million from our fiscal plan and budget,

11  because you want the right to authorize on your own.  Now,

12  that makes no sense, and it makes no sense that that's what

13  Congress intended.

14      Finally, Your Honor --

15      THE COURT:  I'll ask my question after your third

16  point.  Thank you.

17      MR. BIENENSTOCK:  Okay.  Your Honor, I think -- and

18  this is really the point that I didn't appreciate earlier when

19  Your Honor asked, it's at least possible -- I raised

20  preemption of Section Four as to a reason why a statute on the

21  books authorizing reprogramming would be preempted.  And Your

22  Honor, I think Your Honor's point was, well, that statute

23  might be inconsistent with the Board's certified budget.

24      But Section Four only preempts things inconsistent

25  with the PROMESA Act.  And my point --

1          THE COURT:  It can be read that way, yes.

2          MR. BIENENSTOCK:  Well, that's what it does say.  And

3    I agree with that.  We agree with that, Your Honor.

4          My point is that when the PROMESA Act says to the

5    Board, you certify the fiscal plan, you certify the budget,

6    something on the books in Puerto Rico that says, well, the

7    Governor under this authorization to reprogram can change what

8    you did, that's inconsistent with the Act.  The Act gives the

9    Board the right to prescribe what it shall be, not the

10   Governor.

11         Now, that point, I think, can be driven home even

12   further in connection with this and the Christmas bonus.

13   Let's hypothesize for a moment that pre-PROMESA, the Puerto

14   Rico legislature had said, the following is going to be our

15   budget for the 2018-19 fiscal year.  Well, I don't think

16   there's any question in anyone's mind that that is preempted

17   by PROMESA, because PROMESA says the legislature doesn't say

18   what it is.  It's got to be the Board, and the Board has to

19   certify it.

20         Well, it's no different to say that they couldn't

21   have passed a law setting the entire budget than to say they

22   couldn't have passed a law setting pieces of it like the

23   Christmas bonus.  Anything they legislated that said, you're

24   going to spend 67 million dollars on a Christmas bonus, that's

25   inconsistent with PROMESA that says, no, the budget will be

1   what the Board certifies it will be, not what your prior

2   statutes say you want to spend.

3          So it is inconsistent with the Act, not the budget,

4   or not just the budget.

5          THE COURT:  Thank you.  So two questions.  First, as

6   to budget -- statutory budgetary line items, you have a

7   specific tool for post PROMESA, post constitution of the Board

8   legislation that is inconsistent with the fiscal plan or a

9   budget.

10          Do you also take the position that specific budget

11   line items that may have been created by pre-PROMESA

12   legislation are in effect preempted by PROMESA, or do those

13   fall into the applicable law category because prior law puts

14   them on the books?

15          MR. BIENENSTOCK:  No.  The former, Your Honor.  As I

16   think the Christmas bonus example makes clear, it's Section

17   Four of PROMESA that makes these prior laws that create budget

18   items inconsistent.  And they're inconsistent not only with

19   the budget and fiscal plan, they're inconsistent with Section

20   201 and 202 of PROMESA that says, it's the Board, in its sole

21   discretion no less, that gets to certify the fiscal plan and

22   the budget.

23          It's not the Puerto Rico legislature that can preempt

24   that by saying, well, you have to spend X, Y and Z, because we

25   passed those laws previously and they are immutable.  That's

1    the whole purpose we believe of having Section Four in the

2    fiscal plan -- in PROMESA rather.

3           THE COURT:  Thank you.  My other question, the one I

4    originally intended to interrupt you with, is that I think I

5    heard Mr. Friedman say in his remarks that he accepted that,

6    well, the Governor accepts that any attempt to reprogram, to

7    top up with monies from a prior fiscal year, would be

8    inconsistent with the Board's determination that the --

9    determination of the parameters of the current year's budget.

10   And would be noncompliant, and would trigger the noncompliance

11   procedures and sanctions, so that effectively, the Governor

12   couldn't do it willy-nilly.  And the Board would be able to

13   use powers to attack it on the back end as opposed to consider

14   it unavailable on the front end.

15          Do you have a response to that that you'd like me to

16   hear?

17          MR. BIENENSTOCK:  Yes.  Definitely, Your Honor.  And

18   we think Mr. Friedman proved our point for the following

19   reason:  The way I understood him is he said, if the Governor

20   finds unused appropriations in a prior year, let's say just,

21   for example, he finds ten million, he can't spend ten million

22   on whatever he wants to do with it if the ten million will put

23   him over the budget limit in the Board certified budget.

24          So what I understood him to be saying is, he has to

25   come within the Board certified budget.  The reason I said he

1   proved our point is the whole purpose of 201 and 202 of

2   PROMESA, and PROMESA in general, is it's not just how much

3   revenue will you have and how much expense can you have.  It's

4   what should you be spending money on?

5        Do we want to spend money on different types of

6   services, University of Puerto Rico, things to encourage

7   growth, services for people, pensions for poor people, even if

8   they're unfunded?  It matters what they're spent on, and what

9   Mr. -- and that is what PROMESA gives the Oversight Board its

10  sole discretion to determine.

11       And what Mr. Friedman is saying is, oh, no, the

12  Governor, under this prior Puerto Rico law authorized in

13  reprogramming, he can decide how the money will be spent.  And

14  that makes the point, that makes it not our certified budget

15  anymore.

16       Now the resources of the Commonwealth, which are

17  scarce, everyone agrees are being used for purposes other than

18  what the Oversight Board said they should be used for.  If

19  they were being used for what we said they would be used for,

20  well, then he doesn't have to reprogram, because we are

21  already approving them.

22       So it's only when the Governor wants to deviate from

23  what the Board certified that the reprogramming right has any

24  meaning.  And he is saying they can do it.  And I've now said

25  two or three times why I think that proves our point.

1        THE COURT:  Thank you.

2        MR. BIENENSTOCK:  Now, when it comes to the -- what

3   we call the benefit issue, where they're -- the fiscal plan

4   required certain savings from what we call benefits, all of

5   which except for the hiring freeze and the Christmas bonus are

6   already required by existing Puerto Rico law, you can no

7   longer get cash for unused sick and vacation days, et cetera.

8        And we said in our pleadings that while we don't

9   think there's a good method to accomplish the amount of

10  savings we required, without using cancellation of the

11  Christmas bonus and a hiring freeze, if they find a way, that

12  would not be contrary to this certified fiscal plan and

13  budget.

14       That doesn't mean we couldn't have required a hiring

15  freeze, but that issue is not in front of the Court, because

16  in that situation, we gave them an amount of savings to --

17  that they had to achieve, and how they achieve it is, under

18  this fiscal plan and budget, within their discretion.  As I

19  said, we think certain realities set in, but it is within

20  their discretion.

21       THE COURT:  Now, would you help me understand the

22  difference you see between the repeal of Law 80 and the

23  suspension of Act 230?  Because your submissions assume, and I

24  think affirmatively state, that you went to the June 30th

25  plan; you couldn't do what you were proposing to do on May

 1   30th, because it would have required the repeal of Law 80.

 2   You can't do that by yourself, but you can suspend Act 230.

 3          MR. BIENENSTOCK:   Right.

 4          THE COURT:  Prior budgetary budget lines out of prior

 5   legislation are automatically superseded, preempted by

 6   PROMESA.  What's so special about Law 80 that you can't do

 7   anything about it if your other theories are right?

 8          MR. BIENENSTOCK:  Okay.  And the difference is this:

 9   The reason we can suspend Act 230 that authorizes

10   reprogramming is the reason I gave just previously, that it is

11   directly inconsistent with PROMESA.  Therefore, it's

12   preempted, because it effectively let's the Governor decide

13   what budget items should be, as opposed to the Oversight

14   Board.

15          The reason repeal of Law 80 doesn't fit into that is

16   Law 80 is simply a law different than 49 of the 50 states,

17   that it says, in Puerto Rico, an employee can't be terminated

18   without cause.  So as a practical matter, he can't really

19   terminate without having the expense and aggravation of

20   litigation or whatever.

21          We think that's bad for Puerto Rico.  It's really bad

22   for Puerto Rico.  But it's not inconsistent with PROMESA.

23   There's nothing in PROMESA that says that it's got to be an

24   at-will employment territory.

25          THE COURT:  So you're targeting macroeconomic effects

1    with the repeal of Law 80?  That's not something that's

2    specifically provided for in PROMESA?

3              MR. BIENENSTOCK:   Right.

4              THE COURT:  On the other hand, a specific budget line

5    item would be.  And if that's inconsistent, then that would be

6    preempted because of the power given to the Board?

7              MR. BIENENSTOCK:   Exactly.  Exactly.

8              THE COURT:  Thank you.

9              MR. BIENENSTOCK:  Now I'll respond to the

10   legislature's argument.  They said what's -- I think they

11   don't contest, they don't mention it, but they don't contest

12   that our original budget and fiscal plan -- or actually,

13   fiscal plan in April, 2018, had the same cut to the

14   legislature's budget for 2019 as the current budget does.

15             And the reason it had it is that it's an outsized per

16   capita expense in Puerto Rico compared to the other 50 states.

17   And even after the cut, it's still an outsized expense.  It

18   needs to be reduced.

19             We basically had discussions with the Governor, this

20   is all explained in our pleadings, and they don't contest it,

21   that the Governor said he would procure the repeal of Law 80

22   if we gave back certain things.  The most, I guess, important

23   or newsworthy item was the legislature's budget.  But they're

24   back where they should have been in April of 2018.

25             The word retaliation is not in the Oversight Board's

1    vocabulary.  It's just not.  And I'll leave it there.

2            And the answer to what's so bad about repealing Law

3    80 only for new jobs and not for present employees is simple,

4    and this is in our pleading, too.  You would have people in

5    the same work place, most hired yesterday or before, new

6    people hired tomorrow, subject to two different termination

7    standards.

8            You would still have the problem of going to outside

9    investors saying, please invest in this business in Puerto

10   Rico.  Oh, by the way, it still has people subject to Law 80,

11   so you can't really terminate them.

12           That -- you can't foster business and investment if

13   people have to get into a situation where they don't have

14   employees at will.  It's giant.  We pointed that out in our

15   briefs.  It's the difference between having money for debt

16   restructurings and largely not having it.

17           Something will have to be done about this.

18   Unfortunately it didn't get done by the end of June.  But for

19   the reason I gave, we were not comfortable that we had the

20   right to impose the repeal of Law 80.

21           THE COURT:  Do you disagree with the legislature's

22   proposition that the -- two propositions:  One, that the Board

23   had an obligation under PROMESA to essentially negotiate with

24   the legislature rather than call the question and certify a

25   plan?  And two, that there was no particular urgency to the

1    June 30th certification date?

2         MR. BIENENSTOCK:   Well, let me take the latter

3    first, because it's shorter.  We have to certify a budget

4    before the first day of the fiscal year, so we couldn't wait

5    later than June 29 to do it.  The statute says we have to

6    certify before the new fiscal year.

7         We gave them the maximum amount of time.  People work

8    24/7.  We don't complain or ask for sympathy, but the

9    Oversight Board could not have done any more.

10        Second, I don't -- I think their comments were wrong,

11   because members -- actual members of the Oversight Board

12   participated in all of the discussions the legislature wanted

13   to have.  And no, we don't think it was a legal obligation,

14   but that doesn't mean we didn't want to do it, we didn't

15   actually do it.  And we're willing to keep talking to them and

16   the Governor, as we always plan to do.

17        If I could shift back quickly to the Governor's

18   arguments.  The argument about the D.C. statute, again,

19   supports us.  That statute, which as Mr. Friedman said, it

20   allows the oversight, or the authority as they called it

21   there, I think, but the Control Board there, to impose

22   recommendations that still had a process for the Governor to

23   say no.

24        So the fact that we have the same thing in PROMESA,

25   except we can impose it under the fiscal plan by adopting it,

1    is not a significant difference between the D.C. statute and

2    our statute.  We actually have more power in our statute.  We

3    have sole discretion.  They don't.

4         We can deem the budget approved by the legislature

5    and the Governor.  The D.C. statute didn't give them that.  We

6    have 106(e).  They didn't have it.  So actually, we have a

7    more potent statute in all of those respects.

8         And in respect of the Creditors' Committee's point,

9    we have always said that if we've made mistakes or if facts

10   change, we will be changing the fiscal plans.  And that can

11   lead to changes in the budget obviously.

12        The Oversight Board wants to make clear, however,

13   that it will not change a fiscal plan or budget simply to

14   accommodate a deal, a creditor deal.  The creditor -- it's the

15   reverse.  The creditor restructuring has to fit within what

16   the Commonwealth can afford and still have a sustainable

17   economic future.  The fiscal plan has to come first, not the

18   desired outcome.

19        God willing, we'll be able to get this done somehow,

20   but we're not going to change the fiscal plan on account of

21   that.  If other facts change to the good, then we could change

22   the fiscal plan.

23        And I would just leave with this thought, Your Honor.

24   It's inconceivable, we submit, that Congress created the

25   Oversight Board, with its power over fiscal plans and budgets,

```
 1   only to create fiscal plans and budgets that you don't know

 2   which provisions are enforceable and which are not until the

 3   Governor says which ones he regards as recommendations.

 4          We think for all the reasons we put in our briefs,

 5   that was not what Congress did, and that none of the five

 6   points that the Governor has raised are in any sense

 7   unenforceable.

 8          THE COURT:  One final question.  With respect to the

 9   jurisdictional arguments that were made in the papers with

10   respect to both of the actions, more vigorously with respect

11   to the legislature's action, is the lack of discussion of them

12   today an indication that they are not being pressed, although

13   of course the Court has an independent duty to examine subject

14   matter jurisdiction anyway, or was it just your choice as to

15   what to spend your argument time on?

16          MR. BIENENSTOCK:  It was the latter, Your Honor.

17   First, we think we made the point in the papers.  They weren't

18   really the subject of the remarks of the legislature's

19   attorneys, but we are pressing them.  We just didn't think

20   they were -- more discussion of them here would be helpful to

21   the Court.  But if Your Honor has any questions, I'm obviously

22   more than willing to answer them.

23          THE COURT:  No, thank you.  I think they were covered

24   well in the papers.  I just wanted to make sure there wasn't

25   some sort of signal --
```

1          MR. BIENENSTOCK:  No.

2          THE COURT:  -- or new consensus that I wasn't picking

3     up on.  All right.

4          MR. BIENENSTOCK:  Thank you, Your Honor.

5          THE COURT:  So thank you very much.  I thank you all

6     for these very serious, very powerful arguments on these very

7     important issues.

8          I must reserve decision, because I must reflect

9     further on them.  But I do understand the urgency of the

10    situation and how fundamentally it goes to the ability of the

11    government of Puerto Rico to operate efficiently and

12    effectively, and of the Oversight Board to do whatever job it

13    is that Congress has determined in its particulars the Board

14    is empowered to do.

15         And so I will render a decision as quickly as I

16    possibly can.  And I thank you all for your patience and your

17    understanding.

18         This concludes today's agenda.  Currently the next

19    scheduled hearing date is September 12.  It was scheduled for

20    San Juan.  I understand that the sentiment seems to be turning

21    toward the feasibility of doing it in New York on that date,

22    but not the feasibility of doing it here on that date.  We

23    will explore that further, and I will issue Orders so that

24    everyone will know what is going on.

25         And again, I thank the court staff here and in New

1    York, and I wish safe travels and good health to all.  We are

2    adjourned.

3              (At 3:03 PM, proceedings concluded.)

4                              *     *     *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   U.S. DISTRICT COURT      )

2   DISTRICT OF PUERTO RICO)

3

4        I certify that this transcript consisting of 163 pages is

5   a true and accurate transcription to the best of my ability of

6   the proceedings in this case before the Honorable United

7   States District Court Judge Laura Taylor Swain and Honorable

8   United States District Court Magistrate Judge Judith Dein on

9   July 25, 2018.

10

11

12   S/ Amy Walker

13   Amy Walker, CSR 3799

14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

< Dates >
"August 16th 53:21
11.2.1 108:9
April, 2018 156:13
August 15 50:9
August 16 43:23,
    53:24, 56:9, 78:21
August 16, 2019
    43:13, 44:6, 56:3
August 16th 43:4,
    43:7, 53:3, 55:15
August 17 18:9,
    21:23, 25:17
August 17th 19:14,
    20:6, 21:4, 21:11,
    21:22, 23:1
August 6th 16:10,
    16:23, 21:17
August, august 15
    39:21
January 1st 139:8
January 2020 57:14
July 21, 2018 115:8
July 23rd 10:15
July 25, 2018 1:16,
    6:2, 163:9
July 5, 2018 104:1
July 6 16:12
July 9, 2018 104:2
July 9th 10:6
June 1 43:23
June 1, 2019 39:8,
    44:11
June 1st 43:19,
    53:20, 53:25
June 2018 144:19,
    144:22
June 29 137:16,
    138:6, 138:21,
    138:24, 158:5
June 4 137:21,
    139:23
June 5th 117:18,
    118:10
May 29 7:14
May 6 138:12
May 6, 2018 107:17
November 7th 19:6
October 31st 19:11
September 12 79:23,

89:18, 161:19
September 12, 2018
    81:17
September 1st 54:16
September 4th 34:17
(10) 125:12

< 0 >
00081 115:17

< 1 >
10,000 14:7
100 16:20
104 123:18, 124:12
105 58:13
106(e 159:6
107 122:12
11 47:9
11.4 90:18
113-page 129:3
12 103:3, 103:15,
    109:19
12.52 131:10, 131:18
126 11:25
12:10. 102:5
12:12 102:7
12th 80:6, 86:13,
    87:1, 88:10, 89:14
13 19:19, 26:18,
    26:22, 27:14,
    27:17, 27:24,
    28:8, 30:4, 30:5,
    30:7, 30:19, 31:5,
    31:9
134 128:1
13th 35:10
14 98:7, 101:5,
    101:19, 115:8,
    115:14
14(C 61:13
14(D 45:18
14-day 32:23
15 34:23, 34:24,
    55:5, 55:8,
    102:15, 104:11,
    104:12, 104:18
16 117:15
16(A 53:20

163 65:4, 163:4
17-BK-3283(LTS 1:6,
    2:5, 2:19
17-BK-3567(LTS 1:24
173,000 7:18
174 11:18
18 104:13
18-00081. 115:9
18-80 102:14, 115:16
18-81 102:14
18-81. 115:18
18-AP-030(LTS 1:22
18-AP-080(LTS 2:3
18-AP-081(LTS 2:17
1919 139:8
1:15. 102:5
1:21 102:8

< 2 >
20 7:8, 65:11,
    102:20, 127:12
200 138:8
2004 22:13, 37:1,
    37:3, 38:4, 42:6,
    42:8, 58:6, 63:22,
    64:19, 66:20,
    75:22, 76:6, 78:2,
    79:4
2004. 56:24, 57:12,
    78:1
201 110:8, 111:15,
    111:18, 123:24,
    133:15, 133:23,
    148:4, 151:20,
    153:1
201(a 124:18
201(b)(1)(a 106:1,
    112:3, 112:12,
    148:9
201(b)(1)(f 148:20
201(b)(1)(k 106:19,
    106:25, 107:7,
    133:16
201(c 137:17
2017-2018 140:22
2017-2018. 141:3
2018 144:12
2018-19 144:22,
    150:15

2018-2019 139:13
2018-2019. 138:9
2018. 156:24
2019 13:14, 43:5,
    90:12, 91:2, 91:8,
    96:21, 96:23,
    98:22, 99:4,
    156:14
2019(B 90:23, 91:7,
    101:15, 101:17
2019. 43:7, 53:3,
    53:21, 131:16,
    139:8
202 111:18, 115:24,
    136:4, 136:7,
    151:20, 153:1
2020. 139:6, 139:10,
    146:25
203 120:6, 123:18,
    124:12, 127:9
203(a 130:22
203(c 120:9
203(d 120:10
203. 129:25
204 110:5, 111:15,
    124:8, 124:12,
    129:20, 130:4,
    135:19, 135:22,
    135:24, 139:19
204(a 124:4
204(a)(4)(b 137:20
204. 65:5, 110:13,
    123:18, 129:20,
    136:15
205 106:17, 107:7,
    107:13, 107:20,
    130:15, 133:14,
    133:22, 133:23,
    134:1, 134:8,
    135:11, 135:24,
    136:1
205(a 107:2, 107:3
205(a)(1 125:12
205(b)(3 107:19
205. 135:9
21-day 32:23
21: 3:9
22 128:3
230 112:24, 129:22,
    154:23, 155:2,

155:9
23rd 35:6
24 102:17
24/7. 158:8
24th 35:6, 35:13
25 128:2
255 65:5
27 36:7
299 11:17


< 3 >
30 11:1, 14:2, 14:5,
    80:3, 89:8, 89:11
30-day 89:22
30th 117:21, 117:24,
    138:24, 139:25,
    154:24, 155:1,
    158:1
32 7:23
34 51:10, 51:11
362(d 80:11
362(e)(1 80:2, 81:3,
    81:14, 89:12
362(g 80:13
3666-1 44:9
3799 163:13
38 115:15
38-14 115:8, 115:11,
    115:16
38-14. 115:14
3: 1:6, 1:22, 2:3,
    2:17
3:03 162:3


< 4 >
40 138:11
403 65:4
45 47:17
45,000 7:21, 7:23
49 155:16


< 5 >
5,000 76:25, 77:13
50 149:8, 149:10,
    155:16, 156:16
500 64:24
513 65:3

54 131:14, 131:25
55 8:5
59 107:16


< 6 >
6,000 7:20
601(f 18:6
62 12:2
63. 108:9
67 150:24
68 115:9


< 7 >
761 65:3


< 8 >
80 124:21, 125:2,
    137:23, 138:21,
    139:4, 139:7,
    139:13, 139:18,
    141:19, 142:2,
    142:3, 143:2,
    144:8, 144:25,
    145:4, 145:18,
    145:21, 146:21,
    146:23, 147:2,
    147:8, 147:11,
    154:22, 155:6,
    155:15, 155:16,
    156:1, 156:21,
    157:3, 157:10
80. 117:8, 144:4,
    144:6, 144:17,
    146:24, 155:1,
    157:20
82. 19:15
84 11:14


< 9 >
90 46:10, 47:21
900 69:9
9014 20:2
95 11:13
99.5 11:11
9:39 6:3

< A >
AAFAF 8:21, 9:6,
   17:23, 17:24,
   26:1, 26:6, 26:8,
   38:15, 62:10,
   68:12, 78:8,
   102:17, 108:17,
   119:13
abandoning 118:14
ability 33:21, 35:9,
   54:18, 54:21,
   74:10, 87:19,
   105:9, 105:11,
   108:6, 109:24,
   120:22, 128:13,
   131:1, 142:17,
   161:10, 163:5
able 16:2, 16:18,
   25:9, 35:12,
   70:11, 73:2, 87:2,
   138:3, 142:13,
   148:5, 152:12,
   159:19
above 14:17
absence 85:5, 85:12,
   89:9, 133:18
absent 82:18, 117:10
Absolutely 70:23,
   93:3, 97:13,
   115:24
abuse 145:22, 147:18
accept 96:2, 127:19,
   127:24, 128:10,
   128:22
accepted 152:5
accepting 15:2
accepts 152:6
access 37:21, 37:24,
   38:12, 39:13,
   40:22, 40:25,
   41:1, 45:8, 45:13,
   45:14, 48:7, 48:8,
   51:1, 57:1, 62:13,
   63:2, 71:14, 72:4,
   73:7, 74:14,
   76:22, 98:18,
   105:11
accommodate 159:14
accompanies 101:7

accomplish 41:7,
   131:19, 143:7,
   154:9
accomplishes 143:7
accordance 13:5,
   52:21, 107:19,
   146:18
According 73:7,
   138:23, 140:4,
   141:6, 142:5
accordingly 57:16,
   87:9
account 30:20,
   33:24, 46:18,
   159:20
accountability 106:8
accounts 11:18
accurate 163:5
accused 15:22
achieve 12:24,
   112:22, 131:14,
   146:5, 154:17
achievement 106:10
acknowledge 14:22,
   97:15, 126:22
acknowledged 25:25
acknowledges 129:1
acknowledgment 26:1
acquiescing 89:24
across 123:5
Act 66:1, 112:5,
   112:7, 112:24,
   129:7, 129:19,
   129:22, 133:13,
   137:16, 145:12,
   149:25, 150:4,
   150:8, 151:3,
   154:23, 155:2,
   155:9
acted 143:10
acting 123:4
action 16:25, 23:15,
   64:22, 112:24,
   115:20, 126:6,
   135:23, 145:17,
   160:11
actions 135:21,
   141:21, 160:10
actively 95:8,
   95:15, 95:16

activities 100:22,
   100:23
acts 84:24, 139:15,
   145:9
actual 25:14, 85:18,
   158:11
actuality 31:2
Actually 9:7, 16:23,
   18:20, 20:17,
   21:23, 24:12,
   32:4, 37:1, 49:12,
   55:22, 61:11,
   64:11, 87:24,
   88:12, 89:6,
   94:23, 119:15,
   132:5, 156:12,
   158:15, 159:2,
   159:6
Ad 3:27
add 44:15, 53:9,
   54:2, 75:6, 77:21,
   77:25, 86:10,
   117:5, 149:6
added 23:22, 54:14
addition 38:18
additional 11:5,
   25:24, 45:24,
   51:1, 76:4, 85:19,
   86:7, 101:12
Additionally 10:21
address 17:19, 22:9,
   46:17, 46:19,
   48:8, 63:20,
   70:11, 119:7
addressed 73:14,
   79:1, 143:21,
   144:18
adequate 80:17,
   80:20, 85:4, 85:5,
   85:13, 140:11,
   141:12, 141:13
adequately 16:18,
   17:8, 82:6, 87:12
adjacent 122:1
adjourned 75:22,
   162:2
adjust 86:18
adjusted 87:9
Adjustment 9:16,
   9:19, 43:14, 44:1,

44:11, 44:21,
57:20
Administered 1:11
administration
131:21
administrations
10:19
administrative 8:25,
84:23, 127:25,
128:1
admit 14:2, 66:6,
93:2
adopt 106:21
adopted 106:22,
108:1, 116:5
adopting 106:25,
158:25
adoption 116:6
advance 32:19,
32:20, 43:5, 82:3,
82:16, 97:22
advantage 50:7
adversaries 102:14
adversary 23:14,
23:18, 24:4,
24:24, 25:1, 26:5,
82:25, 84:21,
84:22, 90:11,
96:9, 96:12,
100:24, 102:4,
115:10
adverse 137:24
advise 21:21, 22:5,
22:6
advised 12:3
advisors 10:12,
12:23
Advisory 3:16,
108:11
affected 83:20,
141:21
affecting 22:22,
118:2
affects 105:15,
142:10
affirmative 40:23,
47:18
affirmatively 154:24
afford 159:16
afforded 14:24

afternoon 26:7,
102:24, 102:25,
103:8, 103:19,
116:24, 119:12,
136:4, 136:25,
137:1
agencies 59:25,
66:14, 67:8, 74:2,
128:1, 132:6
Agency 3:15, 108:11,
128:2
agenda 15:7, 36:25,
79:13, 90:18,
102:2, 102:9,
161:18
agent 117:17
agents 8:11, 97:19
aggravation 155:19
ago 16:12, 22:10,
48:13, 75:20,
75:24, 92:5
agree 20:3, 103:10,
107:15, 113:4,
113:15, 140:24,
141:2, 143:1,
144:9, 147:10,
150:3
agreed 19:17, 19:24,
30:22, 37:6, 39:9,
48:22, 49:8,
50:17, 89:3,
102:13, 144:8,
144:15, 146:25
agreeing 19:22, 40:7
agreement 19:18,
27:6, 28:4, 30:13,
34:20, 36:3, 40:3,
40:20, 42:21,
59:16, 62:17,
73:6, 74:14,
97:20, 103:3,
117:17, 118:5,
147:15
agreements 8:18,
38:6, 38:7, 67:1
agrees 125:14,
125:16, 140:7,
153:17
ahead 19:1, 111:24
aim 23:9

al 1:16, 1:31, 2:4,
2:12, 2:18, 2:25,
2:42, 3:4, 3:44,
102:12
alarm 56:8
alarmed 10:8
alert 56:7
Aliff 3:44, 102:22,
103:1, 137:2,
146:23
ALIFF-ORTIZ 102:21,
102:24, 103:1,
136:25, 137:2,
140:16, 140:20,
141:10, 142:21
allegation 107:16
allegations 85:19,
88:22
alleged 145:17
allocated 7:8,
102:16
allocation 110:10
allocations 111:7
allow 22:9, 40:6,
55:8, 61:8,
138:15, 144:14
allowed 52:24,
71:14, 99:18,
110:20, 124:3,
129:24, 130:17,
135:17, 135:18
allowing 99:19,
124:2
allows 116:17,
137:12, 142:4,
158:20
alternative 54:23
alternatively 32:24
Although 28:23,
104:4, 104:5,
160:12
Alvarez 8:15, 17:14
Amend 90:19
Amended 90:19,
101:18
amendment 90:12,
98:8
Amendments 13:1
American 4:13
Among 39:5, 117:7,

128:1
amongst 103:6
amount 12:21, 16:20,
    17:7, 28:16,
    129:2, 154:9,
    154:16, 158:7
amounts 7:22, 11:23,
    30:6, 149:6
amply 82:1
Amy 163:12, 163:13
analysis 8:11
ancillary 122:23,
    123:1, 123:3
and/or 24:3, 42:6,
    57:11, 58:4
angle 15:19
animate 125:9
Ankura 11:7, 13:13
announced 13:8,
    79:21
announcement 55:3
answer 111:13,
    111:16, 120:18,
    124:15, 124:20,
    127:3, 128:20,
    157:2, 160:22
answered 86:1, 86:3,
    125:6, 144:13
ante 134:15
anti-cofina 97:20
anticipate 12:13,
    17:25
anticipated 80:9
anticipating 32:17
Antonio 2:3
Anybody 49:1, 77:21,
    85:15
anyway 27:17, 55:16,
    160:14
apart 16:4
Apparently 12:8
appear 21:4
APPEARANCES 2:38,
    3:1, 4:1
Appearing 3:25
appears 89:18,
    130:10
applicable 110:9,
    112:3, 146:12,
    148:11, 148:18,

151:13
application 42:11,
    44:16, 54:3, 98:6,
    99:14, 100:8,
    126:20
applications 8:19,
    43:5
applied 95:2
applies 99:15
apply 42:22, 48:12,
    146:4
applying 20:2
appoint 137:8
appointed 10:21,
    10:24
appreciate 22:23,
    22:24, 26:12,
    33:22, 56:13,
    86:25, 149:18
approach 43:9, 61:1,
    71:5, 72:14,
    129:14
appropriate 9:11,
    24:18, 25:2,
    33:22, 68:21,
    69:13, 69:22,
    71:1, 71:5, 72:17,
    75:9, 86:8, 87:8,
    88:23, 90:22,
    91:11, 92:16,
    106:21, 107:1,
    120:11, 121:4
appropriated 109:15
appropriation
    109:17, 113:14,
    114:8, 115:22,
    148:17, 149:5
appropriations
    108:13, 112:17,
    113:8, 149:9,
    152:20
approval 18:11,
    28:7, 30:5, 46:4,
    109:5, 116:17,
    116:18
approve 113:4,
    137:13, 138:3,
    138:24, 139:25,
    141:19, 141:23
approved 27:9,

27:12, 58:14,
    114:4, 114:6,
    116:1, 117:17,
    123:3, 138:8,
    138:10, 140:3,
    140:9, 140:12,
    141:25, 146:18,
    146:20, 147:15,
    159:4
approving 153:21
approximately 7:21,
    11:14, 11:17,
    11:24, 12:2
April 156:24
area 51:18, 85:3,
    125:18, 132:18,
    132:19, 142:9
areas 132:25
argue 47:13
arguing 92:12, 147:6
argument 19:9, 63:3,
    66:22, 93:1, 96:3,
    97:19, 102:10,
    123:23, 156:10,
    158:18, 160:15
argumentation 83:18,
    83:19, 103:5
arguments 79:25,
    83:22, 102:3,
    102:15, 158:18,
    160:9, 161:6
around 91:24, 92:2
Arribas 3:9
artfully 29:19
Article 121:18,
    140:22
Ashcroft 132:16
aside 91:18, 109:16
aspect 7:13, 51:4,
    99:11, 116:19,
    135:16
Assembly 104:2,
    137:3, 137:14,
    138:10, 145:3,
    145:6, 145:8,
    145:10, 145:14,
    146:16, 147:1,
    147:8, 147:10
asserted 46:6, 84:19
assess 111:19

assessed 138:6
assessment 87:11
asset 64:21, 64:22
assist 8:11, 8:14,
   78:14
assistance 52:20,
   57:14
assisting 8:16
Associate 65:4
associated 7:23,
   8:12, 94:10, 98:5
assume 19:16, 23:6,
   29:14, 33:5,
   61:14, 66:1,
   154:23
assumed 94:6
assumes 21:3, 23:1
assuming 19:18,
   21:10, 21:15,
   23:24, 33:5,
   135:19
assumption 20:5,
   24:2, 24:5
assumptions 117:22,
   118:1, 125:2,
   139:6
assurance 20:22
assurances 21:20
at-will 155:24
Atienza 10:21, 10:22
attached 42:14,
   116:3, 116:10
attaches 85:9
attack 152:13
attacks 120:5
attainable 21:12
attempt 9:3, 9:17,
   152:6
attempted 15:24
attended 14:18
attention 134:22
Attorney 114:9
attorney-client 39:3
attorneys 38:14,
   59:8, 59:19,
   62:12, 160:19
attract 142:19
audible 6:21
August 21:16, 21:21,
   25:16, 33:5,

34:12, 34:14,
   34:15, 34:18,
   34:24, 35:3,
   35:10, 35:13,
   36:3, 36:8, 91:21
AUST 3:9
authorities 113:22
Authority 1:30,
   3:16, 13:9, 56:1,
   60:24, 108:11,
   110:11, 110:23,
   113:21, 138:16,
   138:17, 143:11,
   145:2, 145:9,
   146:10, 158:20
authorization
   108:17, 111:1,
   111:22, 112:25,
   148:24, 150:7
authorize 108:12,
   108:18, 108:19,
   108:22, 109:5,
   111:11, 149:11
authorized 110:15,
   153:12
authorizes 155:9
authorizing 148:19,
   149:21
automatic 46:24,
   47:2, 80:3, 80:12,
   80:23, 81:11,
   81:15, 82:13,
   82:22, 83:20,
   87:13, 91:20,
   130:19
automatically 155:5
available 22:16,
   34:11, 34:23,
   35:5, 41:13, 46:8,
   54:10, 62:16,
   109:7, 110:1
avenue 143:5
average 11:12, 12:1
await 33:18
awaiting 18:4, 18:7
aware 95:5, 119:4
away 26:3, 46:11,
   108:22, 120:24,
   124:11, 127:17,
   132:13, 133:2,

134:3, 141:17,
   141:23, 146:14


< B >
b)(1)(a 110:8,
   111:15, 148:5
back 6:8, 46:17,
   50:2, 73:4, 74:18,
   78:1, 87:17,
   98:14, 99:20,
   99:22, 99:24,
   100:18, 101:2,
   104:16, 104:18,
   105:14, 121:23,
   133:17, 149:8,
   152:13, 156:22,
   156:24, 158:17
backs 125:18
backwards 20:12
bad 140:6, 155:21,
   157:2
balance 109:10,
   119:22
balanced 40:17
Banchs 4:16
Banco 3:36
Bank 3:23, 27:14,
   27:20, 66:1, 69:21
Bankruptcy 1:1,
   20:2, 80:11, 83:11
bar 7:14, 14:2
bargain 104:25
based 21:19, 60:21,
   106:17, 108:9,
   112:3, 141:12,
   148:10, 148:24
basic 99:11
Basically 92:17,
   100:15, 113:3,
   113:11, 119:24,
   129:13, 156:19
basis 40:4, 62:20,
   67:9, 69:9, 80:20,
   95:22, 97:10,
   98:5, 142:6
BDO 8:14
become 136:13
becomes 124:20,
   136:14

beforehand 21:23
began 10:15, 23:13
begin 7:7, 101:19,
    103:18, 137:5
beginning 16:22,
    21:16, 21:21,
    25:16, 34:15
begun 13:10
behalf 7:10, 10:1,
    13:24, 17:14,
    17:23, 26:4, 26:8,
    40:9, 69:1, 90:1,
    101:15, 103:9,
    119:13, 137:2,
    137:4, 143:15
behavior 137:15
behind 78:2
believe 23:9, 29:19,
    33:10, 35:2,
    47:15, 52:4,
    67:20, 75:7,
    82:10, 85:8,
    86:13, 89:10,
    89:21, 90:10,
    93:3, 96:22,
    106:17, 107:24,
    108:4, 117:4,
    119:2, 119:7,
    134:25, 147:11,
    152:1
believes 83:13,
    131:12, 146:4,
    146:6
belong 69:7, 78:9
belongs 82:9
below. 53:14
benefit 39:16,
    40:10, 98:5, 98:9,
    154:3
benefits 127:20,
    154:4
Benjamin 3:40
Bennett 3:41, 81:24,
    81:25, 82:5,
    82:18, 82:25,
    83:4, 83:7, 84:2,
    84:4, 86:2, 86:4,
    87:10, 87:24,
    88:2, 88:5, 89:6,
    89:20, 90:4

best 9:14, 39:22,
    72:24, 73:13,
    96:7, 115:5,
    139:5, 163:5
better 32:12, 39:20,
    85:4, 86:20, 93:8,
    148:5, 148:6
beyond 80:3, 119:20,
    129:20, 130:6,
    131:3, 143:4,
    143:10
bibles 63:15, 63:17
big 49:25, 73:23
bigger 128:20
Bill 62:9, 67:25,
    145:4
billion 8:5, 138:11
bills 112:21
bit 15:19, 16:11,
    42:10, 99:1,
    99:12, 120:5,
    125:17, 132:23
blank 101:20
blanks 100:14
Block 45:3
blow-by-below 46:18
blue 13:7
bodies 66:18
body 140:18
bond 7:25, 63:14,
    63:17
bondholders 81:2,
    90:7
bonds 92:7, 92:11,
    92:19, 92:23,
    93:3, 93:24, 97:9,
    97:23
bonus 126:15,
    126:16, 126:17,
    126:18, 132:6,
    150:12, 150:23,
    150:24, 151:16,
    154:5, 154:11
bonuses 126:14,
    127:5, 127:13,
    127:20, 127:21,
    132:5
books 148:19,
    149:21, 150:6,
    151:14

borrowings 11:19
bother 68:11
bottom 31:4, 88:25
bought 93:18, 94:11,
    94:12
bound 87:14
boundaries 142:9
branch 141:23
branches 137:11
breach 77:7
break 27:18
breakdown 45:6
Brian 3:5, 7:9,
    79:18
Brief 12:18, 41:16,
    42:13, 42:14,
    97:14, 108:19,
    134:1, 136:3
briefed 23:15
Briefing 19:10,
    19:12, 34:18
briefly 148:2
briefs 123:3,
    157:15, 160:4
bring 7:5, 69:1,
    69:6, 77:25,
    103:20, 113:24
brings 133:16
broad 32:2, 125:7
broken 74:7
brother 103:10,
    142:2, 144:1,
    146:23
brought 8:13, 8:14,
    67:13, 78:11,
    84:16, 94:3, 114:9
Bruce 3:41
bucket 127:20,
    127:22
budgetary 116:20,
    130:16, 151:6,
    155:4
budgeted 126:13
budgets 114:3,
    116:10, 126:12,
    137:13, 159:25,
    160:1
Buenas 143:14,
    143:16
built 43:21

bunch 122:8, 122:15
burden 47:16, 80:13,
 80:16, 82:8, 94:9,
 94:14, 98:2,
 98:14, 99:2, 99:12
burdening 9:12,
 67:17
burdens 52:22
burdensome 47:13,
 64:2, 64:10,
 65:10, 65:12,
 66:14, 66:21,
 67:8, 67:9
BURKE 4:3, 94:19,
 94:21, 94:22,
 95:23, 96:6,
 96:15, 98:3,
 98:13, 99:21,
 100:1, 100:5,
 100:12
Business 10:14,
 45:18, 45:25,
 46:1, 46:2, 157:9,
 157:12
buts 75:25
button 66:23, 94:11
buying 92:23, 93:24
bypass 145:12
bypassing 143:9


< C >
calendar 35:7,
 54:25, 89:16
call 7:7, 111:15,
 154:3, 154:4,
 157:24
called 158:20
calling 77:16
cancellation 154:10
candidates 11:5
candidly 129:7
capacity 90:24,
 91:3, 91:4,
 117:16, 117:23,
 118:2, 118:9
capita 156:16
capital 13:4, 61:14,
 61:17, 121:22
capture 72:12, 99:25

care 76:24, 109:2,
 109:3, 109:6,
 128:16
careful 109:8
carefully 41:23,
 105:18
Caribbean 11:2
Carolina 3:16
carried 107:21
carry 37:4, 105:9,
 106:12, 108:6
cars 122:19
cart 39:17
cases 22:12, 36:16,
 81:8, 91:23,
 92:25, 96:14,
 96:20, 99:5,
 117:13
cash 11:16, 12:1,
 27:24, 112:1,
 120:7, 154:7
CAT 4:49
catalog 58:8
catchall 104:7,
 105:2, 141:11
categorized 7:16,
 7:22
category 60:22,
 70:25, 151:13
Catholic 65:3
cause 25:2, 43:6,
 64:22, 80:12,
 80:16, 128:20,
 155:18
cause. 44:16, 54:4
census 134:7
cents 128:2
CEO 10:16
Ceos 10:7
certain 37:14,
 43:16, 43:22,
 43:24, 44:6,
 51:12, 68:21,
 117:22, 127:15,
 129:25, 130:11,
 144:16, 146:5,
 154:4, 154:19,
 156:22
certainly 10:8,
 20:24, 23:9,

24:18, 90:5,
 92:16, 119:17,
 138:25, 141:21
certifiable 138:3,
 140:9
certification 116:5,
 121:5, 121:12,
 137:17, 138:20,
 138:25, 158:1
certified 105:3,
 110:14, 111:4,
 111:10, 113:9,
 114:23, 115:21,
 117:19, 118:7,
 123:6, 136:6,
 138:12, 139:24,
 140:3, 140:14,
 140:21, 141:4,
 149:4, 149:23,
 152:23, 152:25,
 153:14, 153:23,
 154:12
certifies 110:16,
 115:25, 126:4,
 146:20, 151:1
certify 105:23,
 119:19, 140:19,
 140:20, 144:15,
 144:22, 145:5,
 150:5, 150:19,
 151:21, 157:24,
 158:3, 158:6,
 163:4
certifying 13:15,
 144:19
cetera 37:25, 40:14,
 50:21, 51:25,
 73:13, 108:12,
 108:18, 114:10,
 125:3, 154:7
challenge 127:18
challenged 128:24
chambers 86:12
change 41:17, 43:22,
 53:20, 56:24,
 57:5, 57:12,
 90:24, 93:9,
 98:21, 101:16,
 113:13, 120:8,
 122:4, 125:24,

129:21, 130:24,
146:4, 148:23,
150:7, 159:10,
159:13, 159:20,
159:21
changed 57:16,
98:20, 99:5
changes 10:4, 37:6,
37:14, 40:15,
43:10, 55:23,
56:14, 57:9,
58:16, 93:14,
98:20, 101:10,
101:12, 117:12,
132:17, 142:22,
144:16, 159:11
changing 110:22,
159:10
Chapter 47:9
characterized 59:7,
59:18, 62:3,
107:20
charges 113:24
chief 22:15, 127:6
choice 160:14
choices 40:13,
50:23, 51:6,
126:19, 127:3
choose 131:24
choosing 52:2
chose 133:11,
139:21, 141:15
Christmas 126:14,
126:15, 126:16,
126:17, 126:18,
127:5, 127:12,
127:21, 132:4,
150:12, 150:23,
150:24, 151:16,
154:5, 154:11
Church 65:3
circumstances 68:22,
69:13, 72:20
cite 64:17, 65:6
cited 95:4
cites 65:2
Claim 9:21, 13:25,
15:9, 23:16,
23:25, 24:11,
30:7, 64:25, 69:1,

69:10, 82:12,
84:16, 84:18,
84:20, 84:24,
91:6, 91:7, 91:8,
91:18, 148:16
claimed 81:2
claiming 86:5
clarification 27:4,
45:7, 46:5, 55:21,
94:24, 97:4, 98:8
Clarify 87:19,
90:19, 90:22,
96:11
clarifying 55:18
clarity 48:7, 118:17
classes 131:20
classified 38:13,
62:3
Claudia 3:34, 15:15
Claudio 3:44,
102:22, 103:1,
137:2
clause 143:20
clear 23:16, 29:1,
30:19, 42:18,
43:15, 56:2, 61:5,
62:20, 64:13,
66:11, 78:9, 84:5,
89:6, 89:23, 90:8,
94:23, 95:23,
99:14, 118:6,
118:15, 132:20,
133:1, 145:3,
151:16, 159:12
clearly 33:17,
46:24, 49:15,
93:12, 94:14,
115:24, 119:2,
120:25, 141:11
CLERK 14:11, 14:16,
14:17, 15:2,
104:12
clients 17:3, 96:13,
98:18
clock 47:7, 114:20
closer 15:20, 88:19
CMO 101:7, 101:9
co-counsel 92:18
Code 80:11
coffers 139:10

COFINA 8:17, 91:23,
92:1, 92:7, 92:11,
92:13, 92:18,
92:19, 92:25,
97:9, 97:11,
97:16, 97:23,
101:1
coin 49:9
coincidence 87:6
collateral 80:22,
81:10, 82:2,
82:20, 83:20,
84:13, 84:25,
85:21, 87:13, 90:7
colleague 7:12,
103:7
collections 12:1
college 11:3
colony 143:22
comes 15:2, 19:14,
34:18, 70:6,
116:14, 130:8,
134:9, 154:2
comfortable 49:23,
83:17, 100:8,
157:19
coming 31:4, 54:25,
73:21
comma 54:2
command 112:19
commanding 105:23
commands 106:13
commence 18:15
commencement 18:8,
31:13, 31:22, 43:2
commencing 18:1
commend 14:11
comment 22:2, 76:3
comments 94:22,
136:21, 158:10
commit 18:12
commitment 29:1
committee. 53:9
Commonwealth-cofina
95:12, 100:16,
101:21, 117:19,
118:5, 118:13
communicate 6:15
communicating 7:2
communication 39:4

communications 99:9
compared 156:16
comparing 141:24
compel 68:18
compelling 81:4,
  133:6
competent 105:12,
  128:16
complain 134:2,
  134:4, 134:11,
  134:13, 158:8
complaining 108:21
Complaint 23:18,
  24:3, 24:10,
  24:14, 24:16,
  24:17, 24:19,
  24:20, 104:1,
  104:2, 104:4,
  104:5, 105:1,
  107:11, 107:17,
  108:20, 116:3,
  120:5, 126:11,
  128:23, 129:8,
  134:15, 141:9
complete 50:5,
  51:15, 94:2,
  101:20
completed 12:19,
  98:24
completely 114:14
complex 119:5
compliance 94:10,
  123:12, 135:14,
  135:18
compliant 120:7,
  141:6
complied 130:23,
  141:25
complies 145:6
comply 99:3, 99:10,
  120:4, 130:20,
  135:16
comprehensive 13:18
computer 104:15
conceal 97:8
concede 84:6
concept 43:25,
  93:22, 119:24
Conceptually 73:20
concern 34:10, 36:4,

60:7, 91:5,
  129:12, 130:25
concerned 10:9,
  29:19, 34:22,
  59:22, 73:9,
  76:14, 117:10,
  142:16
concerning 81:1
concerns 34:9,
  134:21
conclude 81:11
concluded 27:8,
  27:21
concluded. 162:3
concludes 36:24,
  90:10, 102:2,
  161:18
conclusion 80:4,
  81:13
condition 66:8
conditions 43:21
conducted 89:8
confer 45:21, 75:10,
  88:24
conference 6:13
conferences 76:10
confers 57:8
confidential 38:14,
  41:10, 59:7, 59:9,
  59:18, 59:19,
  62:4, 62:11
confidentiality
  39:25, 47:11,
  66:4, 66:25, 67:1,
  73:13
confines 137:15,
  138:17
confirm 57:17, 86:25
confirmation 18:5,
  18:7, 42:24,
  43:19, 44:1,
  44:11, 54:25
confirmed 12:20,
  44:21, 87:4
confiscation 7:4
conform 58:15
conforming 55:23,
  56:14
conformity 110:8
confusing 44:22

confusion 44:3, 92:9
Congress 107:13,
  107:19, 111:23,
  112:15, 122:13,
  132:10, 132:12,
  132:17, 133:7,
  134:19, 134:23,
  134:25, 142:6,
  149:13, 159:24,
  160:5, 161:13
connection 15:9,
  79:15, 150:12
conscious 92:10,
  139:14
consciously 74:22
consensus 161:2
consent 24:23,
  25:20, 25:21,
  74:16, 78:11,
  126:21
consequence 97:3,
  140:2, 149:3
consequences 113:9,
  137:24
consider 28:5,
  110:22, 116:4,
  152:13
consideration 108:5
considered 22:16,
  58:3, 59:17,
  104:8, 105:4,
  106:13
considers 51:18
consistent 6:12,
  29:3, 137:7
consisting 163:4
consists 42:20
consolidate 131:20,
  132:5
consolidated 128:2,
  128:3
constituted 107:17,
  124:7, 145:10,
  145:11
constitutes 145:22
Constitution 6:10,
  116:11, 121:19,
  122:13, 137:12,
  140:23, 141:13,
  143:20, 145:15,

151:7
constitutional
    141:16
constructive 12:23,
    25:10
Consulting 11:7
contain 40:12
contains 117:22
contemplated 118:4
contest 156:11,
    156:20
contested 28:22
context 19:17, 42:6,
    50:18, 56:24,
    66:20, 70:9,
    71:13, 72:19,
    80:19, 88:14,
    92:4, 95:10,
    95:21, 118:25,
    123:9
continuation 37:1
continue 9:4, 14:25,
    22:17, 104:23,
    141:1
CONTINUED 3:1, 4:1,
    79:22, 80:3, 87:8
continuing 10:13,
    11:7, 13:13, 84:12
contracts 124:9
contradiction 118:21
contrary 57:19,
    110:17, 154:12
contributing 121:10
contributions 83:22,
    83:23, 85:8
Control 109:21,
    109:24, 111:2,
    111:25, 120:22,
    120:23, 124:25,
    132:14, 133:8,
    133:17, 133:18,
    135:4, 158:21
controlled 78:4,
    78:16
controls 106:9
controversy 95:13
conundrum 112:2
converted 11:22
cooperate 40:7
cooperating 55:12

cooperation 39:7,
    40:20, 42:17,
    42:23, 43:16,
    44:4, 53:2, 53:14,
    54:2
cooperatively 129:7
coordinate 35:16,
    35:17
coordinating 25:1
copies 77:14
copy 115:2, 115:14
corporations 83:10
Correct 17:10, 30:3,
    30:9, 30:11, 31:8,
    63:15, 63:16,
    64:14, 70:3, 73:5,
    78:21, 82:24,
    82:25, 96:15,
    97:15, 98:13,
    102:20, 103:10,
    141:9
corrected 44:17
correcting 103:14
corrective 135:21,
    135:23
correctly 64:1
cost 41:12
costs 49:20
Counsel 6:5, 7:7,
    26:6, 30:22, 45:1,
    58:15, 65:1,
    102:16, 102:17,
    102:18, 102:19,
    103:10, 103:17,
    146:23
counselor 142:2
counsels 144:1
counter 86:8, 88:9
County 4:15
couple 14:13,
    101:10, 114:18
course 10:14, 24:16,
    24:25, 26:5,
    76:23, 77:1,
    84:23, 105:19,
    119:6, 126:6,
    160:13
courtroom 6:15, 7:2,
    7:5
courts 64:25, 65:15,

66:19, 85:11
cover 8:1, 41:9,
    80:9, 127:21
covered 58:3, 66:1,
    160:23
covers 75:8, 79:4,
    81:19
crazy 124:25
create 35:23, 68:12,
    98:15, 123:2,
    143:5, 146:9,
    151:17, 160:1
created 139:11,
    151:11, 159:24
creates 140:6, 143:5
creation 145:18
credible 142:19
credit 99:2, 99:12,
    142:19
creditor 91:6,
    159:14, 159:15
Creditors 3:12,
    3:40, 8:21, 34:6,
    37:16, 40:24,
    68:24, 80:12,
    90:18, 109:10,
    109:12, 159:8
crime 120:17,
    120:20, 121:9,
    121:13
criminal 108:7,
    113:7, 113:13,
    113:16, 113:24,
    120:16
criminalization
    121:3
Criminalizing 120:21
critical 89:19,
    129:18
crux 124:13
CSR 163:13
CTO 123:20
cued 30:4
current 11:12,
    152:9, 156:14
Currently 11:9,
    11:17, 62:14,
    161:18
curriculum 131:22
custodians 37:25

customers 11:11
cut 123:21, 147:13,
   156:13, 156:17
cuts 120:11, 144:12


< D >
D&O 61:22, 62:24,
   62:25, 64:16,
   64:20, 65:1,
   65:15, 67:12,
   68:19, 68:20,
   69:2, 69:11, 70:4
Dale 3:6, 23:11,
   23:21, 25:19,
   25:21, 30:18,
   31:8, 55:10,
   55:17, 77:23
database 37:25
dated 104:1, 104:2,
   139:23
dates 17:1, 18:22,
   20:13, 42:23,
   54:24, 89:15,
   89:16
David 3:47, 37:8
Day 6:10, 17:6,
   19:9, 22:6, 29:3,
   31:21, 32:21,
   33:1, 34:15,
   34:16, 35:14,
   45:18, 55:1, 56:6,
   78:21, 79:20,
   86:14, 109:18,
   144:2, 158:4
day-to-day 11:7
days 14:2, 14:5,
   14:13, 16:21,
   29:3, 34:14,
   34:24, 36:7, 41:3,
   45:22, 45:24,
   45:25, 46:1, 46:2,
   55:5, 55:8, 80:3,
   87:23, 88:15,
   89:8, 89:11,
   101:5, 101:19,
   154:7
de 3:36, 92:17
deadline 22:7,
   31:16, 32:4,

32:10, 32:19,
   32:22, 32:23,
   43:15, 54:23,
   57:15, 99:23,
   100:1
deadlines 16:1,
   32:19, 33:21,
   33:22, 54:23
deal 20:4, 35:9,
   69:24, 83:4,
   121:20, 159:14
dealing 50:6, 75:14,
   83:8, 83:9, 119:5,
   125:22
dealt 42:6, 48:6,
   56:21, 100:25
debt 109:22, 109:24,
   117:23, 118:2,
   118:9, 157:15
debtor 39:10, 44:1,
   80:15, 84:19,
   90:22, 97:6
Debtors 1:18, 34:22,
   44:12, 85:10,
   96:14, 96:18,
   101:3
decertifying 139:24
decide 153:13,
   155:12
decided 29:25,
   50:23, 67:16,
   141:18, 141:19
decides 123:10
decision 29:22,
   51:2, 91:17,
   92:10, 95:4,
   100:9, 109:8,
   123:20, 137:16,
   161:8, 161:15
decisions 126:23
declarations 82:3,
   85:19, 86:7, 86:8
deem 159:4
deemed 29:16, 47:2,
   114:4, 116:1,
   116:17, 116:18,
   123:3, 136:6
default 47:24
Defendants 1:33,
   2:14, 2:27, 15:25,

16:6, 25:10
defer 100:6, 100:9
deficits 106:6,
   106:7
define 121:25
defined 39:7, 53:14,
   121:21, 129:10
Definitely 20:11,
   152:17
definition 61:13,
   121:23
definitively 18:12
defunds 126:5
degree 134:17
delay 20:15, 99:9
delayed 16:24, 25:15
delays 22:21
delete 53:7, 53:9,
   53:13
delivered 11:13,
   61:2, 72:3
delivery 18:5
Deloitte 8:14
demands 39:19, 144:3
demonstrate 39:14
demonstrates 82:1
demonstration 41:11,
   52:5
denial 7:4
departed 137:19
Department 108:12,
   131:14
depending 45:12
deposition 22:15
depositions 17:4
depositories 60:3
depository 38:20,
   45:9, 48:9, 48:21,
   53:17, 56:22,
   57:2, 58:4, 59:9,
   60:17, 60:19,
   61:6, 61:24, 62:5
deprive 141:15
depriving 137:25
described 42:12,
   43:13, 53:17,
   71:4, 107:3
description 43:9,
   51:17
deserve 108:4

designations 88:9
desirability 117:7
desired 126:4,
  159:18
destabilizing 10:10
destroy 52:24
destroying 53:2
destroys 109:23,
  109:25
detail 45:11
detailed 122:9
determination 9:9,
  29:2, 29:8, 29:11,
  47:18, 47:22,
  68:4, 80:5, 127:7,
  152:8, 152:9
determine 9:10,
  88:23, 89:4,
  140:8, 149:2,
  153:10
determined 81:3,
  161:13
determines 104:8,
  105:4
Detroit 9:3
develop 13:14,
  142:22
developed 33:19,
  105:24, 141:11
developing 9:6,
  106:20
Development 3:23,
  10:9
developments 37:5,
  117:25
deviate 153:22
device 6:19, 6:21,
  7:2, 7:4, 36:18
devices 6:14, 6:18,
  7:5
dialogue 25:10
Diaz 10:21, 10:22
dictate 113:2
difference 50:12,
  64:24, 97:2,
  154:22, 155:8,
  157:15, 159:1
differences 144:6
different 16:22,
  21:6, 28:4, 28:5,

35:24, 37:18,
  73:7, 74:15,
  98:17, 133:22,
  150:20, 153:5,
  155:16, 157:6
difficult 99:1,
  127:2
difficulty 86:16
dimension 119:4,
  119:8
diminished 35:9,
  85:21
diminution 80:21,
  81:10, 82:14,
  87:13, 90:6
DIP 11:20, 11:21,
  11:25, 12:5
direct 113:21,
  142:11
directed 34:5, 58:4
direction 41:25,
  56:1, 58:5
directly 12:8, 61:3,
  61:9, 62:16, 67:5,
  70:13, 73:15,
  73:18, 155:11
director 10:16,
  10:23, 11:5
directs 74:17
disable 110:10,
  112:20
disagree 157:21
disagreement 147:13
disapproval 145:4
disburse 28:12
disbursements 28:11
disbursing 28:11
discard 53:9, 53:13
discharge 40:9
disclose 52:18,
  56:20, 57:7, 92:1,
  92:10, 101:3
disclosed 74:16,
  92:24, 95:10,
  97:2, 97:3
disclosing 39:1,
  50:13, 72:11, 94:6
disclosure 25:25,
  92:15, 94:25,
  95:2, 96:17, 97:5,

99:8, 99:19
disclosures 32:24,
  98:15
discovery 16:1,
  17:3, 20:9, 20:24,
  21:8, 22:11,
  22:13, 22:18,
  22:19, 42:5,
  48:25, 49:16,
  68:20, 68:21
discrete 104:6,
  105:1, 105:7,
  105:16
discretion 151:21,
  153:10, 154:18,
  154:20, 159:3
discuss 6:10, 9:22,
  39:11, 69:19,
  78:7, 146:17
discussed 24:1,
  58:16, 70:1
discussing 58:6
discussion 15:10,
  38:23, 42:9,
  50:13, 50:17,
  117:11, 148:3,
  160:11, 160:20
discussions 34:9,
  51:13, 52:1,
  156:19, 158:12
disincentives 146:10
Dismiss 23:15, 83:1,
  102:3, 102:10
dismissing 104:1
disparate 92:4
dispute 90:5, 94:23,
  95:23, 117:19
disputed 26:23,
  41:24, 82:19,
  84:8, 85:20, 88:8,
  89:1
disputes 39:24,
  68:12, 90:6
disseminated 66:2
distinction 26:20,
  49:21
distinguish 37:19
distinguished 82:13
distressing 110:4
distributed 103:6

distributions 83:21
District 1:3, 2:32,
   2:33, 2:35, 163:1,
   163:2, 163:7,
   163:8
diverted 82:20, 90:7
doc 74:22
Docket 1:6, 1:22,
   2:3, 2:17, 21:24
document 44:9,
   44:10, 45:8, 48:7,
   48:21, 52:18,
   53:5, 53:17, 57:2,
   58:4, 61:12,
   62:14, 67:20,
   69:14, 72:2, 72:6,
   76:14, 76:15,
   76:23, 115:8,
   115:13, 115:15
document-by-document
   62:20
documentation 52:15,
   114:22, 122:23
documented 42:13
doing 32:1, 39:15,
   69:7, 71:14,
   79:24, 82:22,
   108:16, 126:8,
   133:8, 135:7,
   137:14, 137:15,
   145:1, 161:21,
   161:22
dollar 8:5, 27:16,
   64:23, 64:24,
   109:7, 126:14,
   128:11
dollars 7:24, 11:18,
   11:19, 11:25,
   12:2, 19:19,
   26:19, 27:14,
   27:18, 30:20,
   31:5, 69:9,
   126:18, 127:12,
   131:14, 131:15,
   138:8, 150:24
Donald 4:3, 94:19
done 9:3, 19:11,
   19:16, 34:3, 38:1,
   41:8, 49:19,
   64:20, 69:3, 86:3,

87:25, 88:3,
   91:21, 95:6,
   123:16, 126:1,
   144:24, 144:25,
   146:3, 147:2,
   157:17, 157:18,
   158:9, 159:19
door 66:22
Dorsey 3:37
doubt 65:2, 91:1,
   91:19
down 31:4, 87:2,
   115:19, 118:19,
   128:2, 133:10
downward 138:7
draft 135:4
drafted 44:5
drift 50:22, 56:6
drifts 52:3
driven 150:11
dropped 36:17
due 145:3
during 7:2, 10:5,
   19:23, 34:18,
   42:16, 53:13
duty 160:13


< E >
e)(3 136:7
e-mail 77:8
e-mailing 7:1
earlier 26:1, 31:8,
   37:23, 42:23,
   43:18, 44:12,
   44:21, 46:13,
   91:13, 149:18
early 8:20, 32:14,
   33:5, 36:11, 43:20
ease 98:23
easiest 70:19, 71:8,
   72:10
easily 62:1
easy 66:18
ECF 44:10, 45:17,
   53:5, 53:19,
   115:12
echo 136:20
economic 41:8,
   96:17, 97:8,

97:22, 98:20,
   144:19, 146:3,
   159:17
economy 105:12,
   109:11, 142:16,
   142:17
edits 53:4
education 131:13
effect 10:10, 25:18,
   80:22, 81:16,
   118:3, 118:10,
   124:23, 136:8,
   136:9, 146:3,
   146:25, 151:12
effective 33:20
effectively 134:10,
   152:11, 155:12,
   161:12
effects 155:25
efficient 41:7,
   43:11, 69:17
efficiently 50:8,
   161:11
effort 62:12, 113:10
eight 44:10, 102:18,
   102:19
Either 19:8, 19:18,
   21:5, 64:12,
   75:15, 84:21,
   85:2, 85:15,
   88:11, 123:16,
   132:24
elaborate 97:22,
   117:15
elaborated 98:12
elected 121:6,
   126:24, 129:15,
   132:13, 133:10,
   145:13
electronic 6:14,
   6:18
Eli 10:21
eliminate 106:6,
   126:14
elimination 106:7
EMMA 31:24
emphasizing 108:18
employee 83:22,
   155:17
Employees 4:16,

157:3, 157:14
employer 83:23, 85:8
employment 142:8,
  155:24
empowered 161:14
empowerment 124:12
enable 106:9, 123:11
enabling 103:20
enact 137:12, 144:18
enacted 111:3,
  116:5, 147:3
enactment 112:21
enclosed 77:9,
  145:14
encourage 153:6
end 11:22, 13:15,
  16:22, 20:11,
  21:6, 28:2, 28:7,
  29:7, 34:14,
  42:22, 43:15,
  44:3, 54:1, 54:17,
  73:22, 87:23,
  142:24, 152:13,
  152:14, 157:18
ended 139:17
ends 135:9, 143:7
Energy 11:6, 13:5,
  13:8, 13:12
enforce 85:9, 85:11
enforceable 106:23,
  160:2
enforcement 130:5
engage 112:11,
  134:20, 139:18,
  142:22
engaged 137:15
engagement 43:17,
  43:20, 44:7,
  44:13, 54:12,
  54:16, 55:2
engineer 11:1
engineers 11:3
enough 12:3, 98:21
ensure 105:11,
  127:1, 135:14,
  135:17
enter 25:18, 28:4
entered 41:4, 79:20,
  96:25, 117:17
entering 24:24

enters 33:15
entire 8:1, 48:9,
  53:2, 87:24, 88:2,
  150:21
entirety 107:7
entities 8:3, 38:3
entitled 40:20,
  60:25, 68:5,
  75:24, 77:8,
  85:13, 89:10
entity 66:20
entry 101:19, 101:20
equip 131:22
equity 80:15, 82:12
ERS 3:39, 8:16,
  79:16, 81:2,
  82:23, 83:20,
  84:5, 84:7, 84:9,
  84:10, 86:18, 87:9
especially 25:11,
  91:12
Esq 3:16, 3:18,
  3:23, 3:44, 4:8,
  4:16
essential 28:13,
  118:20
essentially 38:5,
  39:19, 40:16,
  41:15, 97:17,
  104:5, 157:23
established 57:5
estate 30:21
estimate 7:17
estimated 138:7
estimates 106:4,
  139:4, 148:10
estimating 112:14
et 1:16, 1:31, 2:4,
  2:12, 2:18, 2:25,
  2:42, 3:4, 3:44,
  37:25, 40:14,
  50:21, 51:25,
  73:13, 102:12,
  108:12, 108:17,
  114:10, 125:3,
  154:7
evaluate 22:25
evaluating 15:3
event 55:16
events 130:11

eventual 140:2
everybody 19:17,
  19:22, 24:10,
  26:20, 99:15,
  101:23
everyone 9:14, 17:2,
  22:6, 22:7, 41:2,
  41:22, 48:12,
  49:21, 74:4, 93:4,
  94:15, 114:14,
  142:6, 148:7,
  153:17, 161:24
everything 41:1,
  41:11, 47:3, 47:7,
  47:19, 47:25,
  74:6, 86:19, 94:2,
  122:16, 135:16,
  137:7
evidence 97:12,
  97:24
evidentiary 19:8,
  85:18, 87:12,
  88:7, 88:12,
  88:14, 88:21, 89:2
Exactly 24:6, 51:23,
  72:24, 75:20,
  89:5, 94:11,
  107:22, 125:18,
  129:5, 156:7
exaggerates 98:23
examination 38:4
examinations 38:25
examine 160:13
examiner 47:9, 67:3,
  67:14, 69:21
example 66:13, 72:2,
  92:25, 130:9,
  131:6, 131:10,
  131:11, 151:16,
  152:21
examples 124:2
exceeded 145:1
exceeding 138:17,
  145:9
except 80:14,
  104:17, 105:19,
  154:5, 158:25
excess 7:23
exchange 142:22,
  143:5, 144:17

excitement 95:14
exclusions 57:8
exclusive 145:11,
  145:14
exculpation 58:13
excuse 7:15, 8:2,
  26:13
excused 26:15, 79:10
Executive 10:16,
  10:22, 124:9,
  127:7
exercise 53:12,
  60:24, 98:19,
  136:22, 138:16,
  149:7
exercising 136:22
Exhibit 51:5, 115:8,
  115:11, 115:14
EXHIBITS 5:9
existed 24:13, 92:5
existence 91:14
existing 84:21,
  125:24, 154:6
exists 52:15, 76:16,
  83:13
Exit 37:2, 40:7,
  40:23, 41:4,
  52:21, 57:11,
  57:19, 58:2, 58:9,
  61:8
expansion 94:25
expect 18:9, 18:13,
  28:15, 66:9, 87:22
expectation 28:2,
  28:6, 87:16
expectations 40:18,
  41:6
expected 28:22
expecting 34:16,
  35:23
expedite 14:21, 45:8
expedited 42:12,
  46:3, 46:12
expenditure 84:13
expenditures 13:4,
  106:5, 120:7
expense 118:2,
  127:25, 153:3,
  155:19, 156:16,
  156:17

expenses 12:3,
  112:14, 117:22,
  148:10, 148:12,
  148:13
experience 10:17,
  11:1
explain 135:5,
  139:20
explained 58:20,
  75:4, 156:20
explicit 42:11
explore 112:11,
  161:23
explored 89:2
express 46:3
expressed 142:3
extend 14:2, 14:5,
  30:15, 43:6, 57:14
extended 53:3
extension 29:16,
  44:15, 54:3,
  54:22, 58:12,
  89:21, 108:13
extensive 24:12
extent 46:5, 51:12,
  51:13, 53:15,
  55:1, 65:2, 66:7,
  81:2, 91:1, 97:1,
  99:13, 107:19,
  129:21
externality 118:20
extra 14:24
extraordinarily
  83:15
extraordinary 95:4
extremely 128:16,
  132:10
eye 134:21
eyes 38:14, 59:8,
  59:19, 62:12


< F >
facie 80:17
facilitating 13:2
facilities 11:20,
  15:5, 131:21
facility 11:21, 12:6
fact 16:13, 20:22,
  21:24, 32:1,

  50:16, 52:1,
  63:12, 82:8, 83:7,
  86:17, 88:8,
  88:22, 89:1,
  91:25, 113:10,
  120:8, 137:10,
  146:21, 146:24,
  158:24
facto 92:17
facts 83:14, 83:16,
  89:3, 159:9,
  159:21
fail 130:20
failed 93:22, 99:3,
  144:18
failing 99:4
fairly 45:21, 122:9
fall 60:22, 70:25,
  151:13
false 97:13
familiar 132:10
far 16:4, 40:15,
  49:4, 59:21,
  99:22, 99:24
fare 65:14
Farrington 3:47,
  37:9
farther 22:10, 22:11
fashion 138:22,
  140:1
fear 20:15
feasibility 118:4,
  161:21, 161:22
features 6:21
February 12:5
Federal 20:3, 108:25
Federation 4:14
feedback 12:23,
  106:19
feel 71:17, 100:8
few 18:1, 18:13,
  20:21, 20:25,
  46:18, 48:13,
  51:24, 58:7, 86:9,
  104:24
fifth 101:9
fight 77:3
figure 21:5, 32:12,
  98:19, 132:2
figuring 52:7

file 8:19, 9:17,
   16:7, 18:15,
   19:19, 20:3, 21:5,
   21:15, 31:14,
   31:21, 31:23,
   41:3, 47:3, 55:9,
   58:16, 101:11,
   117:2
filers 14:12, 14:18,
   14:21
files 22:20, 42:22,
   90:23, 91:6
filing 14:23, 14:25,
   16:24, 22:6, 24:9,
   24:15, 24:16,
   24:21, 31:17,
   31:25, 32:16,
   32:17, 33:5, 37:7,
   43:1, 44:10,
   45:23, 84:25,
   91:3, 92:7, 93:10,
   94:7, 96:22,
   96:23, 98:22,
   99:23, 100:2,
   100:24, 100:25,
   101:18
filings 91:13, 92:4,
   94:12, 95:25
Filsinger 11:6,
   13:12
final 50:14, 50:24,
   79:23, 80:5, 81:7,
   81:14, 81:16,
   82:3, 82:16,
   87:18, 88:7, 89:8,
   102:9, 160:8
finalize 8:18
finalized 52:11
Finally 12:16,
   38:22, 133:6,
   149:14
Financial 1:9, 2:10,
   2:23, 3:15, 59:25,
   65:22, 66:8,
   66:16, 67:6, 68:6,
   108:11
financing 11:20,
   11:21, 11:25,
   12:5, 12:14,
   142:13

find 21:23, 99:11,
   114:23, 115:5,
   154:11
finding 89:21,
   112:17
findings 89:12
finds 109:18,
   152:20, 152:21
fine 19:24, 20:3,
   20:14, 36:12,
   44:19, 56:13,
   57:23, 77:8, 136:3
finish 42:9, 147:1
finished 7:6
FINRA 58:4, 59:1,
   61:3, 72:16
firm 32:18, 100:24
fit 21:9, 70:16,
   97:24, 155:15,
   159:15
fits 19:12, 110:20
five 10:7, 16:8,
   45:22, 45:24,
   53:5, 64:23,
   102:16, 104:5,
   104:11, 104:12,
   105:1, 105:7,
   105:14, 106:11,
   107:11, 108:2,
   108:3, 117:1,
   126:1, 129:4,
   160:5
fixed 56:8
flip 49:9
flow 112:1, 120:7
flushed 141:9
focus 91:16
focused 38:23, 56:3
follow 67:21, 121:2
followed 9:1
following 54:15,
   55:14, 61:15,
   149:3, 150:14,
   152:18
follows 86:13
footnote 101:12,
   101:16, 117:15
footprint 131:20
forbear 53:1
forbearance 42:21

force 125:15, 133:9,
   136:8, 136:9
forces 126:19
forcing 32:13, 74:12
forecast 138:2,
   138:5, 138:9,
   138:11
foreseeable 12:15
foreseeing 142:8
forget 84:17
form 9:9, 42:3,
   64:7, 66:10,
   68:17, 85:18
formalized 8:10
formally 24:23,
   26:18, 134:16
format 85:17
former 11:2, 116:8,
   151:15
forms 97:3
formula 61:17
formulaic 56:11
formulate 111:19,
   148:6
formulated 111:20
formulating 35:25
forth 18:6, 18:17,
   68:2, 91:2, 96:8
forward 9:18, 13:5,
   13:10, 23:25,
   26:2, 28:4, 82:5,
   86:20, 93:10,
   94:25, 96:2
foster 157:12
found 7:1, 25:13
Four 12:1, 97:14,
   101:16, 103:4,
   103:15, 105:25,
   106:12, 111:17,
   112:4, 137:5,
   149:20, 149:24,
   151:17, 152:1
Fourth 90:19, 101:7
frame 34:25
framed 50:18
frames 24:1, 24:2
framework 141:16
frankly 24:11,
   25:13, 26:20,
   42:18, 77:12,

96:1, 125:17
freeze 130:9,
   130:11, 130:13,
   154:5, 154:11,
   154:15
freezes 130:17,
   130:18
Friedman 3:19,
   86:11, 86:24,
   87:4, 119:11,
   119:12, 119:13,
   121:16, 123:7,
   126:9, 126:21,
   127:23, 128:6,
   128:10, 131:8,
   133:20, 135:1,
   136:20, 152:5,
   152:18, 153:11,
   158:19
friendly 7:6
front 83:16, 152:14,
   154:15
frustrate 138:18,
   138:25
full 95:18, 117:1,
   136:8, 136:9
full-blown 32:14,
   34:17, 88:14,
   88:21, 133:17
fully 11:15, 23:15,
   33:18, 84:6,
   85:12, 110:3,
   124:6
function 40:8
functional 119:25
functioning 10:13
functions 141:17,
   141:22
fundamental 94:15,
   125:8
fundamentally 161:10
Funds 4:11, 94:10,
   109:15, 126:4
future 6:11, 7:4,
   12:15, 20:23,
   94:8, 105:13,
   109:9, 109:12,
   126:3, 128:17,
   142:14, 146:5,
   159:17

< G >
GAIL 2:34
gain 39:13, 40:22,
   51:1, 142:13
gaining 45:8
gap 124:6
gather 116:3
gating 18:11
gave 128:11, 134:25,
   154:16, 155:10,
   156:22, 157:19,
   158:7
gee 109:14
General 28:8, 42:1,
   43:9, 45:1, 46:19,
   52:25, 56:21,
   91:5, 112:13,
   114:10, 153:2
generally 28:11,
   34:24, 46:16,
   48:10, 107:15
generated 72:8,
   95:13
generation 11:12
generous 45:21
genuinely 146:6
gets 22:18, 47:9,
   151:21
getting 19:1, 31:15,
   86:17, 125:17
giant 157:14
Give 19:9, 35:6,
   41:25, 58:9,
   65:20, 67:9,
   69:19, 78:20,
   118:25, 127:19,
   127:25, 128:2,
   128:3, 128:4,
   129:13, 131:6,
   135:19, 136:18,
   140:8, 140:18,
   146:10, 159:5
Given 16:19, 31:13,
   33:4, 33:9, 47:23,
   52:10, 52:13,
   65:1, 69:16,
   71:16, 73:4,
   78:10, 91:12,

99:2, 99:9,
   109:18, 121:18,
   121:19, 138:20,
   156:6
gives 50:5, 87:23,
   134:2, 134:12,
   150:8, 153:9
giving 49:23, 55:22,
   67:15, 91:20,
   141:24
glad 110:12
glitch 18:20
goal 13:14
goals 131:19
God 159:19
GONZALEZ 4:8,
   143:14, 143:17,
   146:1, 146:15,
   147:21
Gordon 3:28
gotten 123:14
govern 20:1, 113:16
governance 106:8,
   148:21, 148:22
governed 127:1
Government 3:22,
   9:2, 10:19, 59:25,
   108:19, 109:2,
   109:4, 119:23,
   120:4, 120:22,
   121:6, 124:24,
   126:24, 126:25,
   129:15, 131:23,
   132:13, 133:10,
   135:13, 135:20,
   137:11, 137:24,
   140:10, 141:2,
   142:11, 146:19,
   149:5, 161:11
gracefully 96:2
grant 131:8
granted 58:19,
   111:3, 119:22,
   147:19
granular 114:24
grateful 49:7,
   107:23, 136:21
gray 125:17
Great 17:3, 51:13,
   53:24, 93:22

greeting 7:6
Gregory 132:16
grid 11:13
ground 49:13
Group 4:3, 13:7,
    61:20, 71:17,
    90:23, 91:3, 91:7,
    91:15, 91:25,
    92:18, 94:20,
    96:18, 97:8,
    97:15, 99:7, 101:2
group. 101:15,
    101:17
growth 153:7
guess 16:5, 19:3,
    25:24, 26:17,
    27:2, 43:20,
    61:20, 63:22,
    97:7, 98:25,
    115:14, 128:22,
    129:12, 131:10,
    156:22
guide 100:7
guideline 127:8,
    127:9
guilt 23:23
guise 131:4


< H >
half 7:11, 94:13
hand 156:4
handle 32:13
handled 14:12,
    23:17, 35:19,
    78:10
hands 47:17, 82:23,
    83:20, 121:6
happen 16:17, 51:25,
    109:23, 128:21,
    129:10
happened 51:17,
    84:25, 93:16,
    93:19
happening 21:5,
    21:15, 21:17,
    24:10, 31:2
happens 19:19, 23:6,
    88:15, 123:7,
    125:19, 136:5

happy 20:12, 63:8,
    84:4, 86:6, 86:9
hard 88:14, 99:2,
    99:12, 112:14,
    126:19, 126:23,
    133:18, 133:20
harm 47:8
Hashanah 86:14, 87:7
hasten 62:13
Hastings 13:24,
    63:21
head 41:5, 41:7
heading 116:14
health 162:1
hear 35:13, 41:21,
    54:10, 62:23,
    63:3, 78:20, 87:3,
    91:17, 99:18,
    152:16
heard 20:20, 20:23,
    21:3, 29:5, 60:5,
    89:15, 89:18,
    121:3, 136:23,
    152:5
hearings 12:5
heart 50:4, 120:21,
    129:6
heavy 14:15
heed 132:16
held 10:18, 27:25,
    28:19, 79:23,
    80:6, 81:7, 92:7
help 50:6, 67:21,
    154:21
helpful 49:18,
    75:13, 101:24,
    160:20
helps 55:14
hereby 108:14
HERNANDEZ 3:23,
    17:11, 17:13,
    22:3, 23:4, 26:4,
    26:11, 26:16,
    27:23, 28:20,
    29:10, 30:10,
    30:16, 31:7, 31:18
high 114:23
higher 118:9
highlight 119:15
highlighted 29:20

highly 38:13, 59:7,
    59:18, 62:4, 62:11
Highways 1:29
hired 157:5, 157:6
hiring 130:9,
    130:11, 130:12,
    130:17, 130:18,
    154:5, 154:11,
    154:14
history 133:4, 133:7
hit 132:6, 135:19
Hoc 3:27
Hold 27:24, 29:1,
    35:8, 39:6, 45:15,
    54:9, 55:8, 136:14
holders 100:17
holding 92:11
holdings 92:1, 101:3
holds 28:8, 28:9,
    31:9, 92:18
holiday 86:14, 87:7
home 132:18, 150:11
Hon 2:3, 2:17, 3:43
honest 132:24
Honors 15:14
hope 27:17, 109:11
hopefully 8:20
hoping 25:9, 25:15
horse 39:17
host 31:24
hour 94:13
House 4:7, 102:19,
    103:4, 103:9,
    134:7, 137:22,
    143:15, 144:5,
    144:7
houses 144:9
HTA 8:16, 15:8,
    23:14, 23:19,
    25:22
huge 64:24
hundred 9:13, 126:18
hurricane 85:1
hurricanes 11:12,
    85:2
hypothesize 150:13
hypothetical 126:5
hypotheticals 128:8

< I >
idea 49:25, 96:7,
  110:23, 139:11
ideas 142:22, 143:5
identified 64:7,
  70:2, 73:3, 75:19,
  98:5
identify 29:7,
  38:17, 68:25,
  69:18, 71:18,
  72:3, 73:18,
  83:25, 98:9
identifying 11:4
ifs 75:25
ignore 136:3
III 1:8, 18:1,
  23:14, 23:19,
  43:2, 44:12, 81:8,
  96:14, 96:20,
  101:3, 101:14,
  103:24, 117:13,
  121:18
illegal 139:15,
  140:5, 146:13
illogical 142:15
imagine 122:3
immediately 146:22,
  147:15
immutable 151:25
impact 17:18,
  113:20, 117:11,
  139:5, 144:19,
  148:4
impacts 105:8
implement 115:21,
  116:7, 122:7,
  122:25, 127:8
implementation
  116:12, 116:13,
  120:16
implemented 112:6
importance 6:11
important 22:11,
  37:18, 49:6, 49:9,
  92:16, 93:4, 93:6,
  93:15, 114:16,
  134:23, 135:7,
  135:11, 135:14,
  136:5, 136:24,
  142:1, 148:22,

156:22, 161:7
impose 130:18,
  135:2, 145:7,
  157:20, 158:21,
  158:25
imposing 113:3,
  143:2
impression 51:3
improper 68:16,
  68:17
improve 106:8,
  148:21
improvement 12:4
impunity 114:15
inability 99:10
inappropriate 63:1,
  64:17, 65:7, 65:9,
  72:22, 95:1
inartfully 51:22
incarnated 107:4
incentives 146:10
incentivised 123:21
inclination 42:25
include 9:15, 32:23,
  48:21, 48:23,
  80:21
included 52:7,
  56:22, 59:11,
  59:12, 60:10,
  145:7
includes 11:18,
  101:9
including 6:21,
  6:24, 7:3, 52:25,
  58:12, 99:15,
  131:20
inclusion 30:5,
  48:24, 107:8
inclusion-specific
  51:6
income 139:7
inconceivable 159:24
inconsistencies
  112:5, 139:20
inconsistency 112:5
inconsistent 110:18,
  111:16, 111:25,
  113:2, 113:5,
  123:24, 126:11,
  127:10, 127:14,

149:23, 149:24,
  150:8, 150:25,
  151:3, 151:8,
  151:18, 151:19,
  152:8, 155:11,
  155:22, 156:5
inconsistently
  129:20
incorporate 50:23
incumbent 139:16
incurred 10:6
Independent 3:46,
  11:5, 37:9, 37:21,
  38:24, 41:16,
  42:4, 43:3, 44:13,
  44:20, 48:22,
  53:12, 54:13,
  55:13, 58:14,
  78:3, 110:23,
  120:22, 160:13
independently 109:4
indicated 12:12,
  52:25, 78:6,
  91:14, 92:4
indicating 51:8
indication 160:12
indicative 113:10
ineffectual 114:14
information 6:16,
  18:5, 37:22,
  38:18, 39:25,
  40:1, 40:19,
  40:21, 41:10,
  42:5, 49:15,
  49:23, 50:22,
  53:13, 53:16,
  56:20, 57:11,
  60:23, 61:3,
  61:21, 72:21,
  73:8, 93:11,
  93:19, 95:18,
  95:21, 95:25,
  98:19, 100:13
information. 53:10
informative 68:7,
  68:8, 68:17, 75:22
informed 10:12,
  25:23, 39:20,
  93:10
ingredient 133:17

initial 76:6, 80:21,
    96:21, 148:2
initially 14:6
innocuous 77:16
input 44:18, 142:25
inquiry 74:9
insert 101:15
insight 70:23
insinuation 97:8
insist 95:1
instant 80:19
instantaneous 28:23
instead 68:12,
    68:13, 101:6,
    142:24, 143:2
instituted 124:7
institution 66:17
institutions 65:22,
    67:6
instrumentality
    120:12, 130:21
intact 27:10, 27:20
intake 14:12
integrated 13:3
intend 8:18, 9:15,
    18:15, 31:23,
    31:24, 32:5,
    39:25, 78:7,
    85:12, 143:7
intended 44:15,
    48:2, 82:11,
    112:15, 149:13,
    152:4
intending 32:3,
    86:5, 87:4
intends 69:6, 132:17
Intention 31:14,
    32:7, 33:11, 42:1,
    43:4, 45:7, 54:21,
    55:12, 87:18,
    93:13, 132:20
intentionality 78:2
interactive 51:9
interest 6:6, 12:21,
    83:23, 96:17,
    97:6, 97:9, 97:22,
    142:19
interested 52:7
interfered 137:20
interim 19:19

interject 148:13
internal 106:8,
    118:16
interpret 133:14
interpretation
    113:19, 129:15,
    134:10
interpretations
    133:22
interpreted 126:1
interrupt 139:22,
    152:4
intervened 117:9
intervention 91:20,
    117:10
interview 42:17,
    53:8
introduced 43:25
invade 51:18
invest 157:9
investigate 40:10
investigation 40:13,
    44:14, 53:8, 74:1
investigators 74:24
investigatory 50:5,
    57:25
investment 109:9,
    157:12
investors 157:9
involuntary 40:4
involve 51:10
involved 95:8
involving 117:25
iota 127:18
island 10:20, 11:11,
    11:15, 137:9
Israel 4:8, 103:8,
    143:15
issuance 55:14,
    57:15
issued 6:14, 8:2,
    51:24, 78:19,
    81:6, 93:21
item 15:7, 18:11,
    18:14, 51:11,
    65:17, 79:13,
    90:18, 102:9,
    113:4, 122:9,
    127:25, 156:5,
    156:23

items 61:20, 62:23,
    63:25, 112:24,
    126:1, 151:6,
    151:11, 151:18,
    155:13
iterative 51:9, 52:3
itself 44:10, 99:15,
    103:23, 105:24,
    120:22, 128:11,
    141:23


< J >
Jason 4:11
Jenner 45:3
job 161:12
jobs 85:6, 145:19,
    157:3
John 3:17, 3:37
Joint 15:25, 116:2,
    116:19, 121:16,
    121:17, 123:4
Jointly 1:11
Jose 10:15
Juan 6:1, 6:8,
    86:17, 87:1,
    161:20
judgment 19:10,
    81:1, 97:19,
    98:19, 126:2
judice 87:15
judicial 6:13
Judith 2:34, 163:8
July 91:21
juncture 18:23,
    81:11
June 11:22, 12:20,
    13:2, 154:24,
    157:18, 158:1
jurisdiction 160:14
jurisdictional 160:9
justice 145:24
justification 41:12,
    134:17
justifies 89:21
justify 139:14


< K >
keep 30:19, 40:20,

84:17, 158:15
key 98:4, 105:25,
   148:8
kicking 104:15
kicks 127:9
Kim 37:9
kind 45:5, 49:13,
   51:16, 65:24,
   68:25, 69:10,
   74:11, 96:2,
   132:22, 133:25,
   147:13, 147:14
kinds 60:21
king 137:9
knowingly 113:15,
   113:17, 114:7
knowledge 105:15
known 24:15, 83:15
knows 10:5, 17:2,
   20:19, 106:16,
   107:24, 110:21,
   117:2
Kobre 37:9
Kreil 10:24

< L >
Labor 17:6, 34:15,
   34:16, 35:13,
   142:23
lack 80:20, 81:9,
   160:11
land 125:4
Landon 3:29, 45:2
language 25:4,
   55:22, 56:11,
   91:9, 114:2,
   132:21, 136:5
large 7:24, 11:14,
   61:21, 85:7
largely 157:16
Last 11:24, 12:1,
   12:5, 12:12, 14:2,
   14:13, 20:20,
   21:14, 23:15,
   34:8, 34:11,
   34:14, 34:18,
   75:15, 78:19,
   91:21, 96:22,
   101:2, 107:23,

121:3
late 7:20, 15:1,
   91:21
later 15:4, 18:9,
   28:5, 29:3, 61:17,
   104:8, 158:5
latter 100:6, 158:2,
   160:16
launch 18:12, 31:22
launched 18:25
launching 17:25,
   18:10
Laura 2:32, 101:24,
   163:7
lawful 128:23
laws 110:9, 112:4,
   113:13, 114:9,
   124:3, 124:4,
   124:19, 130:5,
   137:13, 148:11,
   148:18, 151:17,
   151:25
lead 15:10, 142:11,
   159:11
leaders 145:13
leadership 10:18
leads 81:11, 149:3
least 19:22, 21:12,
   27:24, 30:13,
   44:11, 47:17,
   51:12, 55:13,
   70:2, 77:6, 95:9,
   125:14, 144:21,
   147:7, 149:19
leave 27:14, 157:1,
   159:23
Lecaroz 3:9
led 57:8
ledger 98:10
left 131:9
legal 34:21, 36:1,
   89:3, 105:17,
   105:21, 109:17,
   112:8, 117:4,
   119:5, 158:13
legislate 120:18,
   120:19, 121:19,
   124:2, 124:3,
   124:14, 136:11
legislated 150:23

legislating 121:15,
   130:2
legislation 115:22,
   123:22, 127:10,
   127:13, 143:6,
   146:13, 151:8,
   151:12, 155:5
Legislative 104:2,
   115:20, 121:18,
   133:4, 133:7,
   133:13, 137:3,
   137:14, 137:20,
   138:10, 138:15,
   138:18, 139:17,
   139:22, 141:22,
   142:25, 144:12,
   144:15, 145:3,
   145:5, 145:8,
   145:10, 145:11,
   145:14, 146:16,
   147:1, 147:8
lengthen 20:13
less 138:11, 151:21
letter 16:14, 77:9,
   107:17, 134:18,
   135:6, 137:21,
   139:23, 142:5
letters 134:6
level 27:4, 118:9,
   134:17
levels 11:14
lien 85:9
liens 81:2, 85:9,
   85:11
Lift 25:7, 25:8,
   79:16
lifted 84:1
lifting 24:25, 25:3
light 80:25, 82:10,
   96:6, 100:22,
   117:25
likelihood 81:12
likely 34:20, 37:3,
   85:11
Likewise 8:6
limit 76:17, 152:23
limitations 66:7
limited 6:24, 7:4,
   49:24, 76:25, 78:2
limits 128:18

Lincoln 65:4
line 31:4, 61:15,
    88:25, 122:9,
    151:6, 151:11,
    156:4
lined 14:14
lines 11:15, 34:13,
    146:9, 155:4
linked 87:13
links 121:23
liquidity 11:17,
    31:10
list 23:23, 56:19
listed 125:11
listen 79:25
listening 129:3,
    148:6
literally 14:14,
    28:19
litigated 20:16,
    20:24, 66:5
litigation 27:6,
    27:8, 27:12,
    27:20, 35:21,
    42:12, 84:14,
    85:4, 92:18, 95:9,
    97:11, 97:16,
    97:18, 100:17,
    155:20
little 12:7, 15:19,
    16:11, 26:18,
    42:10, 45:10,
    61:11, 88:1, 99:1,
    125:7, 125:17,
    132:23
live 127:22
LLP 103:23
loaded 6:20
loan 11:22, 11:23,
    11:25
located 62:1
locations 14:13
log 38:12, 38:16,
    59:11, 59:13,
    62:8, 64:3, 104:16
logged 7:15, 62:19
logical 45:16
logistics 32:16
logs 38:9, 38:21,
    48:22, 48:23,

49:24
long 20:17, 25:4,
    38:17, 65:11,
    132:6
longer 9:16, 11:24,
    92:7, 94:6, 118:1,
    154:7
Look 18:24, 24:9,
    24:17, 35:6, 61:6,
    69:15, 72:22,
    72:23, 87:7,
    89:16, 97:14,
    98:7, 121:16,
    122:11, 122:14,
    135:24, 138:5,
    141:5
looked 115:4, 115:5
looking 21:24,
    68:11, 123:18,
    125:7
looks 21:21, 85:24
loop 86:22
losses 139:11
lost 67:22, 105:22,
    109:21, 123:14
lot 8:7, 34:20,
    64:20, 87:14,
    109:3, 128:7
louder 12:7, 88:1
love 63:6
low 114:23
Luc 3:12, 13:23,
    34:6, 63:21,
    116:24
LUCIANO 3:18, 26:7
luck 126:23
Lufkin 65:5


< M >
ma'am 48:14, 48:18,
    55:17, 56:18,
    60:4, 61:18, 78:22
machine 104:18
macroeconomic 155:25
mainly 143:17
major 10:19, 35:9,
    47:25
Management 1:10,
    2:11, 2:24, 10:5,

10:12, 90:19,
    96:16, 96:24
mandatory 105:25,
    106:2, 107:8,
    123:15, 123:17,
    123:18, 130:11,
    130:12
manifestation 39:23,
    40:12
manifested 50:14
manner 126:11, 145:4
Manuel 4:16
Margaret 3:6, 23:11,
    55:10, 77:23
Maria 3:23, 17:13,
    22:4
Marini 26:8
Mark 4:4
market 12:19, 95:15,
    95:17, 95:18,
    95:19, 105:11,
    142:23, 143:3
marketplace 12:21
markets 142:13,
    142:20
Marsal 8:15
Martin 2:42, 57:22,
    103:22, 147:25
mass 89:19
massive 69:10,
    124:25
material 38:13,
    42:16, 98:21
materially 93:10,
    127:14
materials 18:3,
    25:25, 37:21,
    38:8, 38:12,
    39:13, 40:23,
    42:20, 56:22,
    61:22, 62:13
matter 15:25, 16:2,
    17:15, 20:22,
    26:21, 29:22,
    31:17, 36:24,
    36:25, 105:6,
    110:21, 134:14,
    155:18, 160:14
matters 6:10, 35:9,
    82:19, 90:11,

142:12, 153:8
Mauricio 3:18, 26:8
maximally 97:20
maximum 49:10, 158:7
mean 20:11, 20:16,
    35:25, 36:1, 36:2,
    54:17, 66:13,
    94:1, 97:24,
    109:16, 112:16,
    124:19, 126:16,
    126:17, 143:19,
    149:3, 154:14,
    158:14
meaning 64:22,
    67:15, 81:14,
    92:8, 121:14,
    153:24
meaningful 33:21,
    105:13, 120:2,
    128:13, 133:23,
    136:10
meaningless 113:12
means 109:16,
    126:13, 127:21,
    129:23, 133:14,
    133:15, 133:22
meant 148:18
meantime 11:6,
    13:12, 77:8, 87:19
Meanwhile 138:16
measures 112:6,
    116:4, 135:17,
    145:7
mechanics 33:18
mechanism 24:4,
    133:24
mediation 9:8
meet 45:21, 57:8,
    75:10, 83:12,
    83:14, 88:24,
    126:22, 134:20
meeting 16:3
meetings 92:24
mega 132:14
Melissa 3:30, 90:1
members 6:6, 10:7,
    158:11
membership 99:4
Memoranda 144:13
Memorandum 27:9,

27:12, 27:19,
    27:22, 144:1
Mendez 17:14
mention 108:4,
    130:17, 156:11
mentioned 34:8,
    34:10, 43:14,
    45:7, 88:9, 124:18
mentions 117:14
mess 70:7
message 118:15,
    120:9
method 112:14, 154:9
microphone 12:8,
    15:19, 54:10,
    87:4, 88:19
microphones 19:5
mid 12:19, 35:2
middle 49:13, 53:11,
    101:23
milestones 12:18
million 11:17,
    11:19, 11:25,
    12:2, 19:19,
    26:19, 26:22,
    27:14, 27:17,
    27:24, 28:9, 30:5,
    30:6, 30:7, 30:20,
    31:5, 31:9, 64:23,
    64:24, 69:9,
    127:12, 131:14,
    131:15, 132:1,
    138:8, 149:8,
    149:10, 150:24,
    152:21, 152:22
mind 132:18, 150:16
mindful 118:20
minds 16:3
minimizes 22:21
minimum 28:25, 29:8
minute 14:2, 15:11,
    35:6, 35:8, 58:23,
    78:25, 97:3,
    104:15
minutes 7:8, 46:18,
    48:13, 58:7, 62:3,
    62:11, 63:25,
    64:2, 64:3, 67:11,
    67:21, 69:25,
    102:15, 102:16,

102:17, 102:20,
    103:4, 103:5,
    103:15, 104:18,
    117:1
mislead 97:9
misplaced 39:19,
    40:24
misrepresentation
    139:14
misrepresenting
    138:1
missing 69:17
mission 105:10,
    108:6
mistakes 159:9
mitigate 87:6
mix 13:5, 121:10
modernize 131:21
Modification 18:1,
    21:10, 26:22,
    28:3, 28:7, 28:17,
    29:2, 29:9, 29:23,
    29:25, 30:4, 30:8,
    30:14, 30:17
modified 96:11
modify 44:18
moment 22:8, 35:1,
    45:12, 58:10,
    79:14, 101:11,
    104:10, 136:18,
    150:13
Monday 10:15
money 19:22, 27:10,
    27:19, 28:9,
    31:10, 82:19,
    83:21, 109:16,
    109:20, 110:1,
    110:14, 111:10,
    122:18, 122:19,
    123:8, 127:4,
    129:23, 132:6,
    153:4, 153:5,
    153:13, 157:15
monies 28:8, 28:11,
    28:15, 29:11,
    31:9, 83:9, 152:7
monkey 138:2, 138:14
Monsita 3:9
month 13:15, 16:12,
    20:20, 85:22

months 20:19, 20:20,
  20:25, 77:6, 99:3,
  109:19
morning 6:5, 7:9,
  9:25, 13:23,
  15:14, 17:13,
  37:11, 37:12,
  45:2, 45:4, 94:19,
  94:21
Motions 23:14,
  80:14, 102:3,
  102:10
motor 122:18
movant 80:22
Movants 80:15, 80:23
move 9:18, 13:10,
  22:17, 25:5,
  33:14, 64:15
moved 26:23, 87:6
movement 86:12
movements 95:20
moves 28:3
moving 26:2, 33:9,
  86:19, 86:23
multibillion 27:16
multiple 99:5
multitudes 8:7
Mungovan 3:4
Municipal 4:15, 32:1
municipalities 83:10
Muniz 3:18, 26:7,
  26:8
Myers 17:23, 62:10,
  68:1, 119:14
mystery 85:15


< N >
naive 92:19
name 84:17, 101:23,
  103:1, 103:22,
  122:5
nanosecond 77:20
narrow 94:24,
  119:20, 119:21,
  124:4
narrowness 119:16
nature 52:13, 52:14,
  97:4
Navarez 102:11

near 20:23
nearly 69:9
necessarily 29:21,
  142:16
necessary 13:10,
  17:5, 17:7, 28:4,
  29:16, 30:8,
  45:23, 84:12,
  87:9, 91:11, 126:3
needed 41:9, 72:24,
  76:7, 113:1
needs 78:25, 86:1,
  92:22, 131:2,
  156:18
negative 41:1
negotiate 157:23
negotiations 109:24
net 69:9, 131:14
neutral 45:19, 46:7,
  61:16
Nevares 2:4
New 3:25, 6:7,
  10:16, 13:3, 14:7,
  17:10, 31:19,
  75:21, 77:5,
  82:24, 86:20,
  88:12, 127:10,
  138:21, 138:23,
  139:7, 139:25,
  140:23, 144:15,
  145:18, 157:3,
  157:5, 158:6,
  161:2, 161:21,
  161:25
newsworthy 156:23
Next 8:20, 15:7,
  18:1, 18:13,
  20:24, 20:25,
  36:25, 52:17,
  52:23, 56:16,
  56:19, 57:1, 57:7,
  61:20, 65:17,
  79:13, 81:7,
  81:17, 86:9,
  86:14, 87:22,
  87:23, 102:9,
  126:14, 127:12,
  128:11, 161:18
nickel 82:21
night 87:2, 109:19

nine 44:9, 53:19
Nobody 15:22
non-binding 134:7
non-debtors 85:7
non-depository 52:24
non-movants 80:14
non-personnel
  131:15, 132:1
non-privileged 38:8,
  71:15
noncompliance 121:8,
  121:12, 152:10
noncompliant 152:10
None 5:5, 5:11,
  85:20, 160:5
nonetheless 17:4,
  126:2
nor 6:16, 59:19,
  117:6
Normally 47:9,
  70:12, 70:17,
  73:22, 73:25
North 65:4
note 22:11, 135:11
noted 81:6, 95:7
notes 6:19, 6:20,
  38:24, 42:17,
  52:25, 53:8
Nothing 120:2,
  120:4, 126:10,
  127:17, 135:22,
  148:21, 155:23
Notice 24:10, 24:11,
  31:14, 31:15,
  32:2, 32:3, 32:6,
  32:24, 33:20,
  41:2, 45:19, 47:2,
  47:6, 47:24, 48:1,
  48:9, 55:5, 61:14,
  61:16, 67:10,
  107:18
noticed 99:7
notices 32:5
notion 72:22, 97:21,
  106:13, 109:23,
  110:9, 110:23,
  113:2
notwithstanding
  105:7
November 16:22,

19:6, 20:8, 20:11,
21:3, 33:4, 33:10,
129:6
nub 31:1
number 39:17, 48:6,
74:15, 74:17,
85:7, 90:4, 115:8,
115:9, 115:12,
115:13, 128:3
numbers 51:12,
122:8, 122:9,
122:15, 123:5

< O >
O'melveny 17:23,
62:9, 67:25,
119:14
Object 18:18, 31:15,
32:5, 32:7, 33:11,
36:2, 130:2,
130:7, 134:16
objection 20:2,
22:21, 24:9,
24:13, 24:16,
26:5, 32:20, 41:3,
45:11, 46:4, 46:6,
46:9, 46:12, 48:7,
48:11, 51:25,
52:16, 52:19,
57:3, 57:9, 57:18,
64:10, 94:24,
100:5
objections 15:3,
32:8, 32:9, 32:13,
32:14, 32:17,
35:18, 35:19,
35:20, 37:7,
37:15, 41:15,
41:19, 45:22,
47:23, 48:2, 48:6,
48:21, 48:24,
51:9, 51:11,
52:18, 58:9, 58:12
objectively 54:24
obligated 85:8
obligation 40:9,
42:21, 91:2, 92:1,
96:3, 101:2,
157:23, 158:13

obligations 91:8
obliges 134:16
observed 6:25
observing 6:7
obtain 74:1, 74:22
obtained 65:18,
73:25, 84:20
obvious 54:24,
105:22
Obviously 7:24,
9:12, 9:16, 17:18,
27:5, 86:1, 95:12,
112:10, 117:23,
118:13, 133:21,
159:11, 160:21
occur 16:10, 18:9,
18:22, 136:4
occurring 18:21,
33:13, 82:21
OCIF 59:2, 61:3
October 16:22
offer 148:8
offered 5:5, 5:11
offers 131:18
office 14:16, 15:2
officer 22:15, 127:7
officers 94:10
Official 3:11,
19:21, 116:25,
121:13, 163:14
offset 139:11
oil 122:18
Omni 19:6, 21:3,
23:16
Omnibus 2:31, 81:7,
81:18, 86:13,
88:15
OMV 108:11
once 22:20, 50:8,
66:19, 66:20,
147:2
one. 128:10
ones 54:24, 160:3
open 32:11
opening 102:15
operate 142:14,
142:18, 161:11
operates 141:17
operating 11:18,
92:17, 98:16,

127:25, 140:4,
141:1
operation 11:8,
130:19
operational 11:15,
12:3, 145:8
operationally 122:25
operations 10:10,
10:13, 11:10
operative 33:20,
121:9
Opinion 129:9,
143:22
opponents 91:17
opportunity 14:11,
18:17, 141:24
opposed 40:4, 43:1,
56:11, 59:3,
64:23, 73:14,
89:2, 152:13,
155:13
opposing 81:12
opposite 113:5
opposition 83:19,
102:17
option 140:8
options 131:24
oral 93:1, 97:19,
98:11, 102:9,
102:14
Order. 101:19
Ordered 64:25,
65:15, 125:20
orderly 45:16
Orders 6:13, 33:20,
37:23, 81:15,
103:25, 124:9,
161:23
ordinarily 88:15
ordinary 10:13
oriented 122:9
original 14:7, 38:4,
135:4, 156:12
originally 152:4
Ortiz 10:15, 10:17
Others 42:19, 50:25,
54:10, 60:25,
64:7, 106:3
otherwise 6:25, 7:1,
23:6, 60:17, 66:9,

94:7, 123:4
ought 90:25, 104:8,
   122:6
ourselves 19:2
outcome 105:16,
   126:4, 159:18
outer 128:18
outrage 134:4
outset 106:15
outside 6:15, 20:5,
   20:6, 21:4, 21:10,
   43:13, 123:9,
   123:12, 130:4,
   137:15, 139:15,
   142:9, 157:8
outsized 156:15,
   156:17
outstanding 11:19
overall 29:4
overarching 105:21,
   108:5
overlap 42:7
overlooked 101:8
override 54:14,
   57:19
overrule 52:16
overruled 48:11,
   52:19, 57:3, 57:9,
   58:1
overruling 48:23
overspend 114:15
overspending 113:8
overspends 114:8
overview 17:17,
   41:25
owes 69:9
own 49:16, 59:3,
   70:24, 72:8, 91:6,
   93:23, 97:17,
   104:7, 114:3,
   122:11, 135:6,
   139:3, 140:3,
   149:11


< P >
P3 13:8
package 116:20
packet 116:14
PAGE 5:3, 44:9,

44:10, 45:17,
   45:18, 53:5,
   53:19, 97:14,
   98:7, 108:9
pages 65:11, 115:9,
   163:4
paid 127:6
panel 13:7
papers 14:21, 16:14,
   29:20, 83:24,
   136:17, 160:9,
   160:17, 160:24
paragraph 53:6,
   53:20, 54:8,
   61:13, 101:17,
   107:16
paragraphs 54:12
parameters 152:9
Pardon 15:11
parenthetical 54:1
parse 74:12
part 6:16, 15:10,
   26:12, 28:9,
   30:21, 31:10,
   33:10, 41:12,
   64:13, 72:8, 74:1,
   75:3, 76:10,
   84:21, 102:2,
   105:17, 107:23,
   111:14, 112:20,
   126:25, 129:9
participants 6:8,
   12:9
participated 158:12
participation 96:9,
   140:1
particular 6:19,
   32:4, 32:10, 42:5,
   43:10, 44:1,
   56:11, 74:6, 74:9,
   91:6, 95:19, 97:6,
   108:2, 108:4,
   110:6, 118:22,
   137:25, 141:19,
   157:25
particularized
   114:24
Particularly 6:9,
   14:13, 40:18,
   91:15, 106:3,

127:16
particulars 161:13
parties 6:6, 6:25,
   9:7, 10:20, 18:17,
   39:1, 40:2, 40:19,
   41:6, 47:8, 47:11,
   49:11, 50:1, 52:2,
   61:4, 67:12,
   68:14, 72:9,
   86:21, 89:14,
   89:17, 102:13,
   119:7
Partners 11:6, 13:13
Partnership 1:23,
   3:34, 13:1, 13:9,
   15:16
parts 109:4
party 41:6, 50:13,
   54:22, 66:21,
   71:22, 71:23,
   72:11, 73:10,
   73:11, 73:14,
   74:18, 74:19,
   81:12, 101:17
pass 120:17, 123:4,
   123:10, 134:6
passed 114:2, 124:6,
   124:19, 127:10,
   150:21, 150:22,
   151:25
passes 20:6
passing 138:25
past 96:4
path 69:23, 71:1
patience 104:19,
   161:16
Paul 2:43, 9:25,
   13:24, 63:21
pause 104:10
pay 31:6, 122:20,
   126:16, 126:17
payment 109:9
penalties 108:7,
   113:7
pendency 80:25
pending 46:12, 77:5,
   81:16, 83:1, 84:14
penny 123:12
pension 8:8, 8:24
pensions 153:7

People 14:14, 14:16,
    14:20, 14:25,
    15:5, 31:14,
    32:14, 40:11,
    85:1, 86:16,
    91:19, 105:12,
    109:9, 109:11,
    114:12, 120:23,
    122:20, 127:3,
    127:5, 128:16,
    141:18, 153:7,
    157:4, 157:6,
    157:10, 157:13,
    158:7
per 12:2, 127:13,
    128:2, 156:15
percent 11:11,
    11:13, 11:14,
    46:9, 46:10, 46:11
perception 109:25
Perfect 46:15
perfectly 31:8
perhaps 51:13,
    51:22, 128:18
period 31:13, 31:15,
    35:5, 39:7, 39:8,
    40:8, 42:17,
    42:23, 43:16,
    44:4, 45:14,
    45:19, 45:21,
    48:9, 53:2, 53:14,
    54:2, 57:14,
    89:22, 124:6
permission 112:18
permitted 6:24
person 6:15, 6:24,
    126:15, 127:13
personnel 131:14,
    131:25
perspective 25:22,
    28:25, 29:7, 38:5,
    44:20, 50:15,
    72:10, 78:1, 93:9,
    95:3, 97:21, 98:3,
    98:10, 99:1,
    110:4, 140:4
persuaded 91:10,
    96:3
persuasion 80:13,
    146:14

Peter 3:19, 119:12
petition 84:25
phrasing 112:9
PHV 2:42, 2:43, 3:4,
    3:5, 3:6, 3:12,
    3:17, 3:19, 3:20,
    3:24, 3:28, 3:29,
    3:30, 3:34, 3:37,
    3:40, 3:41, 3:47,
    4:3, 4:4, 4:11
physical 14:12
pick 132:4
picked 104:24
picking 161:2
picture 50:6
piece 123:22
pieces 150:22
Pietrantoni 17:14,
    26:8
place 9:1, 36:2,
    41:11, 57:21,
    67:1, 72:6, 74:20,
    95:7, 110:7,
    117:20, 118:8,
    121:7, 132:15,
    139:8, 140:21,
    141:7, 157:5
places 80:13, 132:3
Plaintiff 1:26
Plaintiffs 2:7, 2:20
planning 32:21,
    39:23, 105:3
plans 109:22,
    117:11, 117:12,
    123:16, 159:10,
    159:25, 160:1
play 118:16, 128:13
pleaded 141:9
pleading 90:23,
    94:5, 101:14,
    108:21, 117:2,
    157:4
pleadings 105:18,
    106:16, 107:24,
    108:20, 109:1,
    115:5, 129:1,
    154:8, 156:20
pleasant 127:16
Please 15:21, 30:3,
    90:17, 147:24,

157:9
plenty 66:19
ploy 97:22
plus 19:15, 104:6,
    122:1
PM 102:7, 102:8,
    162:3
podium 46:19, 103:18
point-by-point 45:6
point. 16:9, 21:18,
    22:9, 23:19, 25:8,
    30:1, 111:8,
    140:11, 153:25
pointed 85:20,
    114:11, 157:14
points 81:19, 82:11,
    96:21, 100:7,
    100:14, 117:5,
    148:8, 160:6
Policies 6:13,
    61:23, 62:24,
    62:25, 63:10,
    63:11, 63:13,
    65:1, 65:11,
    65:15, 65:16,
    67:12, 68:19,
    68:20, 69:3,
    69:12, 70:4
policy 64:16, 64:21,
    64:23, 64:24,
    117:7, 143:3,
    146:3
polite 92:8, 92:21
political 10:20,
    128:19, 137:10,
    137:11
politically 134:21
Ponce 14:15
pontificating 121:1
poor 153:7
pops 55:1
Popular 3:36, 38:2,
    40:3
Port 122:5
portion 62:15,
    108:10, 133:7
portions 105:2
position 11:16,
    22:16, 39:2,
    47:24, 49:5,

73:12, 78:15,
91:22, 95:11,
96:8, 96:18,
96:19, 97:10,
97:15, 97:16,
97:21, 98:20,
99:2, 99:12,
100:1, 100:18,
100:20, 117:4,
117:6, 118:6,
121:12, 125:9,
134:1, 143:12,
151:10
positions 10:18,
11:5, 37:18,
41:17, 95:8,
118:24
posits 83:19
possession 72:13
possible 14:19,
41:8, 43:11, 50:8,
86:12, 86:23,
122:16, 149:5,
149:19
possibly 69:12,
161:16
POSSINGER 2:43,
9:21, 9:25, 10:1,
12:10, 12:12,
13:17, 13:19
post 151:7
post-petition 12:14
potent 159:7
potential 85:3,
93:8, 117:11
potentially 46:12,
134:22
powerful 134:24,
135:25, 161:6
powers 119:23,
120:6, 120:10,
122:1, 130:6,
130:16, 137:10,
141:23, 147:19,
152:13
practical 26:21,
31:17, 110:21,
155:18
practice 81:1
practices 138:1

PRASA 10:23
pray 145:24
PRDE 131:13, 131:19
pre-existing 111:21,
121:14
pre-final 57:8
pre-promesa 110:10,
111:22, 114:6,
150:13, 151:11
pre-report 45:14
precedence 54:19
preceding 53:17
precise 82:12
precisely 29:6,
83:25
precondition 107:8
preempt 151:23
preempted 111:17,
123:25, 149:21,
150:16, 151:12,
155:5, 155:12,
156:6
preemption 112:4,
149:20
preempts 149:24
prefer 56:10
preference 19:5
prehurricane 11:13
prejudice 24:25,
25:5, 29:14,
29:15, 30:15,
43:5, 48:24,
52:20, 57:3, 57:10
preliminary 46:23,
79:22, 80:4, 81:5
premature 70:5
premise 95:24,
105:17
PREPA 8:3, 8:15,
9:22, 10:3, 10:5,
10:6, 10:12,
10:16, 10:22,
10:25, 11:6,
11:16, 11:17,
11:24, 12:4,
12:13, 12:22,
12:23, 12:25,
13:9, 13:12, 13:17
prepare 16:18, 17:8,
101:8

prepared 16:13,
17:5, 27:5, 41:23,
86:19, 134:20
prerogatives 141:16
prescribe 150:9
present 16:18, 17:4,
102:14, 144:23,
157:3
presented 147:7
presently 13:3
presentment 58:17,
101:11
preserve 42:15
President 11:2,
103:2, 107:13,
107:18, 128:19,
134:19, 137:4,
137:21, 142:5
press 6:6, 6:25,
93:21, 93:23,
95:9, 134:5
pressed 160:12
pressing 160:19
Presumably 108:24
pretextual 139:2,
139:10
pretty 47:11, 135:25
prevail 81:13
prevails 31:5
prevent 84:12, 130:5
prevented 137:14
preventing 138:3
prevents 82:22,
126:7
preview 41:22
previously 10:18,
151:25, 155:10
prima 80:17
Prime 14:11, 14:17
principle 97:20,
105:22, 117:18,
118:5
principles 125:8
print 67:16, 77:1,
94:11
printed 36:25,
45:17, 67:15,
77:1, 77:13
Prior 108:13,
109:13, 111:7,

113:18, 116:10,
140:25, 148:25,
149:9, 151:1,
151:13, 151:17,
152:7, 152:20,
153:12, 155:4
private 10:17,
40:21, 142:10,
142:18, 142:23
privatization 11:8,
12:21, 12:24,
13:11
privilege 38:9,
38:16, 38:21,
48:22, 48:23,
49:24, 59:11,
59:13, 62:8,
62:15, 64:3
privileged 39:6,
42:19, 52:4,
59:14, 59:17,
62:4, 62:18, 64:6,
64:8, 64:12
privileges 69:22
Probably 91:21,
116:25, 126:15,
128:7
problem 20:16,
27:15, 31:1,
49:25, 82:1,
91:14, 92:5,
110:19, 126:10,
128:12, 128:19,
140:13, 157:8
procedure 9:15,
19:25, 42:10,
70:7, 74:15,
78:12, 78:18,
106:17, 147:2
proceed 9:11, 72:24
proceeded 145:6
proceeding 6:17,
7:3, 18:13, 23:14,
24:4, 83:1, 84:21,
84:22, 95:21,
96:12, 100:25,
115:10, 117:9
Proceedings 4:48,
46:3, 90:11,
96:10, 102:4,

102:8, 162:3,
163:6
processes 15:3
procure 156:21
produce 64:12, 65:9,
65:13, 65:21,
66:12, 66:17,
66:18, 67:8,
71:18, 72:11,
73:19, 134:17
producers 48:1
producing 49:11,
73:11, 73:14,
74:18, 74:19
product 39:3, 51:18,
52:16
production 13:3,
22:14, 46:25,
51:14, 65:1,
65:15, 66:21,
66:24, 72:15,
75:18, 75:24,
77:10, 77:16
productions 38:8,
69:14, 69:20,
73:23, 77:14
professional 10:25
profile 100:23
program 129:24
progress 22:5, 22:7,
25:24
project 15:19,
109:20
projections 112:22,
118:3
PROME 137:22
promises 24:20
promote 145:18
prompted 92:13,
92:20, 138:22
promptly 46:7, 55:3
Proof 13:25, 91:7,
91:18, 124:17
proofs 91:6
property 80:15,
84:6, 84:9, 84:18,
97:17
proportion 28:16
proposal 21:3, 23:1,
33:19, 59:2, 59:5,

91:2
proposals 22:25,
116:6
propose 31:21, 57:21
proposing 32:18,
43:22, 44:19,
154:25
proposition 157:22
propositions 157:22
prosecutorial 113:21
Proskauer 7:10,
10:1, 23:11,
79:19, 103:22,
148:1
prospect 110:3
prospectively
144:10, 147:12
protected 51:19
protection 67:7,
80:20, 85:4, 85:5,
85:13
protocol 16:1
protracted 99:9
proved 152:18, 153:1
proven 23:5
proves 153:25
provide 11:7, 27:4,
38:19, 41:9,
45:10, 55:5,
106:4, 106:6,
112:13, 141:12,
142:13, 148:10
provided 37:23,
38:1, 38:10,
38:13, 38:15,
38:19, 40:1,
40:19, 50:22,
58:1, 59:1, 59:3,
59:24, 62:11,
118:10, 156:2
providence 78:4
provides 80:11,
106:4, 106:5,
106:7, 106:9,
106:17, 107:13,
116:11, 118:9,
131:13, 148:20
providing 10:2,
38:16, 61:16
provision 42:11,

46:3, 54:11, 55:4,
57:18, 57:20,
58:13, 101:18,
110:5, 110:8,
112:4, 112:15,
112:25, 123:25
provisions 54:20,
58:2, 58:11, 67:1,
101:9, 105:25,
106:2, 112:9,
160:2
public 6:6, 10:17,
31:25, 32:6, 95:8,
97:10, 134:21,
142:12, 142:18,
143:2
Public-private 13:1,
13:9
publication 32:3,
56:12
publicly 14:22, 66:2
publish 39:24,
39:25, 40:7
published 39:11,
39:16, 39:20,
56:4, 56:6
punish 123:19
punitive 145:7
purely 65:12, 139:2
purported 90:7
purportedly 91:7
purpose 9:8, 32:10,
118:17, 152:1,
153:1
purposes 124:10,
124:11, 126:5,
153:17
pursuant 37:23,
38:6, 60:23,
74:13, 81:3, 112:6
pursue 52:2, 52:3,
57:10, 126:7
pursued 78:8
pursuing 84:14
purview 143:10
purviews 139:15
push 66:23, 94:11
put 17:1, 33:19,
34:23, 38:20,
38:21, 41:6,

41:10, 47:5, 55:4,
59:9, 61:15,
61:25, 71:19,
77:13, 83:24,
91:18, 100:13,
107:23, 118:8,
121:7, 122:4,
124:19, 125:25,
131:17, 136:3,
140:20, 141:6,
152:22, 160:4
puts 36:6, 36:11,
41:5, 151:13
putting 39:16,
124:23, 130:25,
131:3

< Q >
qualified 21:10,
26:21, 27:25,
28:3, 28:7, 28:17,
30:14, 30:17
qualifies 132:19
Qualifying 17:25,
27:9, 27:12,
27:18, 27:22,
29:2, 29:9, 29:23,
29:25, 30:3, 30:8
question 19:25,
31:11, 36:3,
43:13, 44:2,
46:16, 52:8, 54:7,
60:5, 68:19, 82:6,
86:1, 86:2, 99:22,
110:25, 111:14,
112:9, 115:19,
120:14, 125:6,
144:20, 144:23,
145:25, 148:4,
149:15, 150:16,
152:3, 157:24,
160:8
questionable 60:22
questions 13:17,
105:19, 114:18,
117:7, 122:22,
136:16, 151:5,
160:21
quick 93:8

quickly 14:18, 41:8,
50:8, 85:25,
117:16, 136:23,
158:17, 161:15
quite 13:18, 49:21
quote 42:19, 76:5,
133:3, 144:2,
144:14
quoting 93:23

< R >
RAIFORD 3:29, 45:2,
45:3, 45:4, 45:5,
46:15, 49:2, 49:3
railroaded 16:18
raise 80:1, 98:25
raised 32:9, 104:6,
106:12, 107:11,
108:8, 110:12,
119:20, 134:22,
149:19, 160:6
raises 105:1
raising 56:8, 119:21
Ralph 10:24
range 38:19, 50:21
ranges 49:24
rapid 103:21
Rapisardi 3:17
rather 51:5, 95:3,
118:16, 152:2,
157:24
Re 1:6
re-evaluate 20:7
re-evaluation 93:9
re-submit 101:22
reach 19:18, 33:6,
34:20, 36:3,
147:14
reached 38:6, 38:7,
59:15, 86:24,
117:13
react 33:22
reaction 14:6, 74:11
read 51:7, 53:11,
92:6, 101:10,
105:18, 108:19,
115:12, 128:23,
132:4, 132:24,
146:15, 148:5,

150:1
reading 108:15
reads 108:21
ready 19:6
real 20:1, 26:20,
   118:3, 140:6,
   145:23
realities 154:19
realized 18:20,
   61:11
reallocation 126:20
really 9:20, 14:5,
   20:7, 26:23, 35:8,
   39:16, 50:20,
   51:1, 51:25, 52:5,
   59:21, 60:21,
   71:1, 72:24,
   75:16, 93:5,
   98:23, 105:7,
   111:14, 119:21,
   124:3, 135:11,
   136:5, 138:14,
   143:3, 149:18,
   155:18, 155:21,
   157:11, 160:18
reasonable 17:2,
   23:2, 23:9, 24:5,
   40:18, 48:18,
   81:12
reasonably 112:22
reasoning 81:20
reasons 39:5, 52:19,
   79:21, 80:1,
   132:8, 143:18,
   144:24, 145:21,
   160:4
reassess 21:18
reborrowed 11:24
rebuttal 102:20,
   147:24
recall 14:1, 16:8,
   34:12, 38:11
recalls 38:3
receipt 51:11
receive 41:2, 48:8
received 7:20,
   12:22, 12:23,
   38:21, 49:14,
   62:2, 70:22,
   71:21, 73:8, 77:2

receives 51:25
receiving 38:6,
   142:25
recent 10:4, 117:25,
   143:21
recess 102:7
recognize 20:8,
   87:14
recommendation
   104:9, 106:14,
   106:24, 107:4,
   107:8, 107:20,
   124:15, 125:11,
   125:13, 125:14,
   125:16, 125:22,
   125:25, 130:14,
   131:7, 135:23,
   136:9, 142:3
recommendations
   105:5, 106:18,
   106:21, 107:1,
   107:12, 107:25,
   124:16, 124:18,
   131:5, 131:18,
   133:10, 134:12,
   135:3, 135:9,
   135:12, 146:17,
   158:22, 160:3
reconcile 110:5
reconciliation 8:9,
   8:22, 9:4
reconsider 49:5
reconstruct 75:8
reconvene 102:5
reconvened. 102:8
record 6:16, 51:15,
   58:16, 58:20,
   78:15, 79:22,
   81:25, 82:7,
   87:12, 87:20,
   89:7, 90:3, 90:8,
   104:21, 104:22
recorded 4:48
recording 6:23
recovery 10:11
recreate 51:17,
   66:23
redact 64:13
redacted 62:18,
   62:19, 64:7

redesignated 62:16
redo 73:23
reduced 156:18
reducing 145:7
Reed 15:15
refer 6:20, 37:15
reference 54:2,
   61:15, 133:23
references 91:5
referred 8:24, 15:1,
   55:23, 107:3,
   138:12
referring 105:25
refers 106:25
reflect 50:24, 161:8
reflected 40:14,
   41:16
refunds 8:7, 8:24
refused 145:5
refusing 123:4
regard 56:25
regarding 19:18,
   25:11, 39:24,
   45:22, 73:13,
   74:6, 117:6, 117:7
regards 160:3
Region 3:9, 11:2
regular 57:4, 66:9
regulation 13:8
regulations 124:10
regulator 73:15,
   75:25
regulators 39:10,
   58:1, 60:23,
   69:14, 69:21,
   70:10, 70:22,
   73:6, 73:12,
   74:25, 75:2, 77:7
regulatory 13:7,
   60:24, 66:18
rehashing 105:20,
   117:5
reinstate 140:12
reject 119:24,
   135:17, 135:22,
   142:4
rejected 41:15,
   50:18, 107:9,
   135:2, 136:8
rejecting 46:24

rejection 142:7
related 52:17,
  56:20, 56:22,
  97:16
relates 130:15
relation 55:3
relationship 77:6
relative 81:9
relatively 35:2,
  51:24
release 45:14,
  93:21, 93:23,
  95:10
releases 95:9, 134:5
relevant 69:12,
  76:15, 76:16,
  77:15, 83:19,
  106:3, 108:10,
  117:23
relief 40:24, 68:8,
  80:12, 80:14,
  80:17, 80:19,
  81:13, 83:25,
  84:5, 84:7, 84:11,
  84:19, 85:14,
  89:10, 103:25,
  119:16, 119:22,
  131:8
remain 30:22, 81:16
remaining 56:23
remains 27:10,
  45:20, 84:7
remarks 24:12, 43:8,
  45:1, 53:1, 80:9,
  82:11, 98:11,
  152:5, 160:18
remedy 140:11,
  141:8, 141:12,
  141:13
remember 11:21, 85:1
remembering 84:17
remind 6:12, 23:18
removes 128:19
render 161:15
renew 70:6, 78:24
renewed 38:5
rental 122:20
renting 122:20
reopen 25:6
repaid 11:23, 11:24

repeal 112:24,
  113:2, 117:8,
  124:3, 139:6,
  139:20, 141:19,
  142:1, 142:3,
  143:2, 144:17,
  144:18, 145:4,
  145:21, 147:2,
  147:3, 154:22,
  155:1, 155:15,
  156:1, 156:21,
  157:20
repealed 125:2,
  137:23, 137:24,
  138:21, 139:18,
  144:9, 144:10,
  144:11, 144:25,
  146:22, 147:9,
  147:11
repealing 139:4,
  139:13, 144:4,
  144:6, 145:18,
  146:24, 147:11,
  157:2
replacement 145:12
Reply 37:7, 41:16,
  42:12, 42:14,
  85:20, 97:14,
  117:14, 134:1,
  144:1
Reporter 163:14
reporting 90:21,
  90:22, 91:11,
  101:4
reports 65:18,
  99:24, 99:25,
  100:2, 101:5
repository 6:16,
  42:16, 42:20, 51:5
represent 15:16,
  68:24, 103:2,
  103:23
representation 28:1,
  28:5
representations
  52:14
representative 1:13,
  62:10, 90:24,
  91:4, 103:24,
  141:17

Representatives 4:8,
  44:25, 103:4,
  137:22, 143:15
represented 27:24,
  90:4
represents 68:24
reprogram 111:10,
  111:24, 112:17,
  129:22, 150:7,
  152:6, 153:20
reprogrammed 110:15
reprogramming 108:7,
  108:8, 108:13,
  108:18, 109:5,
  110:6, 110:17,
  111:1, 120:15,
  126:20, 129:17,
  129:19, 129:21,
  129:23, 148:3,
  148:13, 148:19,
  148:24, 149:21,
  153:13, 153:23,
  155:10
requested 10:2,
  16:20, 18:8, 46:7,
  46:10, 49:24,
  57:13, 61:22,
  63:13, 70:12,
  70:22, 144:17,
  146:22
requesting 54:22
requests 7:5, 17:3,
  39:17, 42:6,
  48:21, 49:25,
  52:18, 57:4,
  57:11, 58:2, 68:7,
  68:10, 68:16,
  75:11, 78:24,
  110:22
require 47:16, 53:1,
  101:4, 112:21,
  120:6, 125:24
required 42:15,
  90:24, 96:17,
  98:22, 115:20,
  115:23, 154:4,
  154:6, 154:10,
  154:14, 155:1
requirement 18:6,
  83:13, 112:23

requirements 94:25,
    95:2, 97:5
requires 74:15,
    98:19, 139:19,
    140:23
requiring 99:19
reserve 39:1, 39:11,
    149:7, 161:8
reserved 126:24
reset 104:18
resignation 10:6
resolution 15:9,
    15:25, 30:7,
    30:17, 46:12,
    116:19, 121:16,
    121:17, 123:4,
    127:11
Resolutions 116:2,
    116:9, 116:13
resolve 30:8, 32:7,
    39:24, 45:11,
    47:12
resolved 23:19, 30:1
resolving 9:8,
    23:25, 24:4, 51:8
resource 13:3
resources 153:16
Respectfully 14:18,
    129:7, 145:20,
    147:17, 147:21
respects 129:15,
    137:10, 159:7
respond 15:5, 17:3,
    97:7, 156:9
responded 107:5,
    107:12, 107:25
responding 135:6
Response 37:6,
    37:15, 43:8,
    44:18, 49:12,
    73:10, 74:9,
    82:15, 96:8,
    97:19, 97:25,
    107:18, 148:6,
    152:15
responses 50:2,
    56:21, 135:1
responsibility
    105:10, 131:2,
    142:12

rest 96:8, 136:17
restarting 144:15
restated 101:9
restoration 144:3
restored 11:11
restrictions 28:10
restructured 30:6
restructuring 22:15,
    34:9, 109:22,
    159:15
restructurings
    157:16
rests 139:7
result 80:25, 139:13
resulted 51:13,
    82:14, 84:24
resulting 80:22
results 109:11
retain 80:16
retaliation 144:25,
    156:25
retention 8:11,
    8:18, 63:10,
    63:11, 63:12
retentions 8:19
Retiree 3:27, 8:8,
    8:25
Retirees 8:5, 37:16,
    40:25, 45:3, 50:7,
    90:2, 90:5
retransmission 6:23
retroactive 91:11,
    92:15, 93:9,
    93:13, 99:19,
    99:24, 100:2,
    101:4, 101:5,
    101:18
retroactively
    144:11, 145:1,
    145:19, 145:22,
    146:4, 147:9
retrospective 94:9,
    98:6, 98:8, 99:14,
    100:2, 100:8
retrospectively
    95:2, 98:15
return 59:6, 102:2,
    105:10, 142:13
returned 62:6, 74:14
revenue 106:5,

118:2, 120:6,
    125:3, 138:1,
    138:5, 138:9,
    138:11, 153:3
revenues 112:14,
    117:22, 139:9,
    139:12, 148:10,
    148:11
reverse 159:15
review 31:12, 60:21,
    68:3, 68:12, 70:8,
    71:2, 76:23,
    123:22, 124:5,
    124:9, 124:10
reviewed 41:22, 64:5
reviewing 62:14,
    69:25
revise 58:15,
    131:21, 138:23
revisit 148:2
revolver 11:22
rewriting 99:25
ribbon 13:7
Rican 116:19, 142:17
Ricardo 2:3
Rich 122:5
rid 36:16
rights 39:2, 39:12,
    57:10, 84:13,
    89:7, 91:20,
    119:23, 124:8
risk 22:21
Rivera 2:17, 3:44,
    10:24, 10:25,
    102:11
Rivero 3:16
Robbins 94:20
Robert 3:28
robes 15:13
Rodriguez 4:16
ROLDAN 4:8, 103:8,
    103:9, 103:13,
    143:14, 143:15,
    143:17, 146:1,
    146:15, 147:21
role 119:25, 128:13,
    129:13, 129:15
roles 119:23, 129:10
Roman 65:3
room 66:10, 70:13,

70:17, 70:20,
71:19, 73:19,
73:21, 74:3, 75:9,
75:17, 76:20
Root 3:30, 90:1
Rose 7:10, 10:1,
23:11, 79:19,
103:22, 148:1
ROSEN 3:5, 7:9,
9:23, 9:24, 15:1,
79:15, 79:18,
80:8, 81:21,
85:24, 85:25,
86:16, 87:21,
88:6, 88:16,
88:17, 88:20,
89:5, 90:10, 90:13
Rosenblum 3:40
Rosh 86:14, 87:6
Rossell 2:4, 102:10,
119:13
roughly 16:20, 24:1,
28:16
RSA 27:16, 27:19,
30:6, 32:24
Rule 20:2, 22:13,
41:19, 49:16,
51:10, 51:11,
56:24, 57:12,
58:6, 90:23, 91:7,
91:8, 96:21,
96:23, 98:21,
99:3, 99:11,
101:15, 101:17
ruled 26:22, 27:22
Rules 19:25, 20:3,
98:6, 116:12,
116:13
ruling 19:21, 28:22,
30:13, 52:11,
89:22, 105:15,
118:22, 132:18
rulings 41:24, 43:10
run 29:24, 96:4
running 47:7, 113:6
rush 137:16, 138:20
Russell 94:20


< S >

S/ 163:12
sacrosanct 135:15
safe 162:1
salaries 127:20
San 6:1, 6:8, 86:17,
87:1, 161:20
sanction 93:7
sanctions 7:3,
93:13, 113:17,
152:11
Santander 38:2, 40:3
satisfactory 82:8,
143:6
satisfied 18:7
save 49:20
savings 131:15,
131:25, 132:1,
154:4, 154:10,
154:16
saw 67:14
scanned 7:17, 7:22
scarce 35:2, 153:17
scenario 54:15
Schatz 2:17, 3:44,
102:12
schedule 12:19,
18:17, 18:24,
21:9, 21:18,
28:18, 33:6, 33:8,
82:14, 86:7,
87:21, 87:22,
103:21
scheduled 46:4,
81:18, 161:19
schedules 19:13
scheduling 27:6,
88:25
schools 131:20
scope 78:2, 90:21,
91:1, 97:2, 97:5,
112:9
scored 127:13,
127:14
screen 76:22
search 37:25, 50:21
searched 114:23
searches 38:20
Second 45:16, 48:15,
48:20, 53:7,
61:15, 92:7, 94:5,

111:14, 129:18,
130:15, 130:16,
130:21, 143:25,
144:9, 148:20,
158:10
secondly 56:2
seconds 13:25,
47:17, 47:21,
104:25
Secrecy 66:1
Section 80:11,
80:13, 81:3,
81:14, 108:9,
108:20, 111:17,
112:4, 124:5,
131:10, 131:13,
131:18, 137:5,
137:17, 137:19,
139:19, 140:22,
149:20, 149:24,
151:16, 151:19,
152:1
sector 10:18,
142:10, 142:12,
142:18, 142:23
Secured 3:39
securities 31:25,
32:1, 95:15,
96:13, 96:14
security 87:15
seeing 50:1, 50:19,
73:20
seek 12:14, 30:15,
49:17, 80:12,
80:18, 85:14,
93:13
seeking 26:20, 30:5,
67:19, 78:13,
83:25, 93:13,
96:2, 112:11,
119:16
seeks 83:4, 118:7
seem 19:23, 20:1,
69:22, 71:1, 71:5,
90:21
seems 19:1, 20:1,
26:21, 38:22,
41:14, 95:3,
99:10, 122:23,
126:7, 129:13,

161:20
seen 68:10, 72:20
segregated 30:20,
  30:23
segue 37:2
self-government
  132:19
selling 92:23
Senate 102:19,
  103:2, 103:3,
  104:2, 134:6,
  134:7, 137:3,
  137:4, 144:5,
  144:7
sending 137:21
sends 120:9, 123:5
sense 19:4, 19:16,
  21:2, 21:17,
  26:18, 67:7, 68:6,
  75:14, 97:23,
  149:12, 160:6
sensitive 132:18,
  132:19
sent 26:1, 142:5
sentence 53:7,
  53:11, 53:18
sentiment 161:20
separate 59:15,
  88:11
separated 30:23
separately 69:25
September 36:11,
  80:6, 81:8, 86:12,
  87:5, 89:14
series 8:1
serious 161:6
serve 40:8
service 12:3, 51:10
services 28:13,
  95:16, 109:8,
  142:14, 153:6,
  153:7
set 18:6, 18:17,
  18:19, 33:11,
  33:15, 68:2, 70:7,
  78:19, 81:17,
  89:3, 91:2, 96:8,
  98:15, 98:17,
  109:6, 109:16,
  113:3, 119:21,

123:5, 132:10,
  154:19
sets 32:22
setting 33:1,
  104:11, 150:21,
  150:22
settlement 93:22,
  95:12, 118:4,
  118:13, 118:14
settlements 117:12
seven 45:17, 128:16,
  131:15, 131:25
seven-day 31:16,
  32:22
severe 28:10
shakes 24:21
shall 45:1, 53:12,
  55:5, 106:4,
  106:6, 106:8,
  106:9, 148:9,
  148:21, 150:9
shameful 143:23
share 49:8, 67:4,
  77:4
shared 68:3
shift 82:9, 158:17
shifted 16:8
shocking 92:19
short 31:13
short-circuit 68:9
shortcomings 95:24
shortcut 51:23
shorten 20:13
shortened 9:9,
  45:15, 45:22,
  45:23
shortens 19:13
shorter 158:3
Shouldn't 59:21,
  88:24, 95:14,
  95:18, 95:20,
  104:11, 114:12
show 139:4
showing 43:6, 44:16,
  54:3, 68:5, 80:16,
  80:20, 80:21,
  80:23, 81:9, 85:18
shows 87:12, 136:11
sick 154:7
side 49:9, 92:12,

95:11, 98:9
sides 19:23, 133:3
sideways 25:1
Siemens 1:22, 3:32,
  13:4, 15:7, 15:9,
  15:16, 17:18,
  17:19, 18:8, 22:5,
  22:12, 22:16,
  22:19, 22:22,
  23:13, 23:16,
  24:11, 27:6,
  27:20, 29:22,
  30:1, 30:7, 30:15,
  31:2, 31:5, 34:6,
  36:20, 36:24
sign 32:22, 33:1,
  91:19
signal 160:25
signals 6:21
signed 13:2, 100:16,
  146:19
significance 89:3,
  104:7, 112:8,
  114:6, 121:11,
  133:13, 134:18
significant 8:1,
  12:20, 98:14,
  132:17, 133:6,
  133:24, 159:1
significantly 85:21
similar 24:9, 24:17
similarly 101:16
simple 47:5, 157:3
simply 27:7, 35:12,
  50:5, 51:10, 59:6,
  69:20, 123:3,
  143:23, 155:16,
  159:13
single 127:17
sir 45:1, 143:13,
  147:23
sit 39:9, 115:19,
  118:19
sitting 125:1
situation 29:24,
  30:1, 69:11,
  125:21, 140:6,
  154:16, 157:13,
  161:10
Six 10:7, 45:18,

53:5, 77:5,
126:18, 140:22
skip 76:10
slightest 120:5
small 121:22, 121:23
smart 128:16
Smith 15:16
snippets 133:3
soft 15:22
sold 93:18
sole 57:21, 151:20,
153:10, 159:3
solely 78:4, 78:16
solemnity 121:11,
134:18
solicitation 17:25,
18:3, 31:22
somebody 55:9, 61:5,
114:7
somehow 72:3, 159:19
someone 65:13
sometime 20:18,
21:22
somewhat 105:8
somewhere 19:15
soon 20:18, 24:8,
44:7, 89:14, 89:17
sooner 18:10, 44:14
sooner. 54:13
Sorry 30:18, 34:5,
36:12, 36:17,
44:22, 48:16,
52:10, 55:22,
56:16, 59:17,
67:3, 67:14,
71:24, 88:20,
90:13, 104:14,
104:16, 115:12,
120:25, 136:1,
139:3, 139:9,
140:25
sort 22:25, 41:3,
43:20, 50:16,
73:21, 91:12,
97:22, 98:5, 98:8,
98:15, 125:8,
130:19, 132:16,
160:25
sorts 95:14
sought 80:19, 84:5,

84:7
sounding 12:19
sounds 21:13, 23:2,
88:7
source 6:15
sovereign 78:10
space 122:20, 147:14
speakers 19:4
speaking 46:17,
65:25, 90:14,
110:6
speaks 110:8, 112:4
special 40:9, 44:13,
53:8, 58:13,
108:4, 155:6
specially 105:6
specific 17:19,
22:9, 28:13, 53:4,
54:7, 63:19, 76:5,
78:24, 78:25,
89:10, 89:13,
105:6, 110:5,
112:8, 124:10,
126:6, 133:9,
136:15, 151:7,
151:10, 156:4
Specifically 8:13,
37:20, 37:22,
38:7, 39:18,
55:24, 130:17,
146:12, 156:2
specifics 48:5
specify 112:21
sped 42:10
speed 16:15, 49:20
speeded 48:16
speeding 48:12
spell 101:22
spend 105:19,
113:14, 122:18,
122:19, 123:8,
123:12, 126:10,
126:11, 127:12,
128:7, 150:24,
151:2, 151:24,
152:21, 153:5,
160:15
spending 110:2,
129:23, 153:4
spent 82:2, 82:21,

123:8, 153:8,
153:13
spoke 38:25, 48:10,
56:21
spoken 15:22, 35:22,
86:11
spread 128:1
SPRINGER 3:34,
15:14, 15:15,
15:18, 15:21,
20:10, 21:19,
23:7, 24:6, 25:4,
25:8, 26:25, 27:3,
29:5, 29:17,
30:25, 36:21
springing 75:21
squeezed 127:22
staff 14:12, 14:15,
136:21, 161:25
stage 9:19, 121:4
stake 127:1
stamped 7:16, 7:19
Stancil 4:4
stand 40:16, 44:17,
50:25, 71:9,
71:11, 89:13,
118:17
stand-alone 101:7
standard 65:14
standards 98:17,
99:14, 114:10,
157:7
standing 32:6, 32:7,
32:9, 32:13,
33:12, 35:20
start 10:4, 16:6,
16:12, 16:13,
16:19, 19:14,
21:6, 23:1, 50:22,
104:21, 120:10
started 17:6, 43:4,
91:13
starting 16:21,
35:2, 35:9, 74:4
starts 47:7, 52:9
State 4:14, 54:15,
79:21, 154:24
stated 33:4, 42:24,
42:25, 43:7,
143:25, 144:24

statement 78:6,
    114:1, 118:18
statements 24:13
States 1:1, 2:33,
    2:35, 39:10,
    143:20, 155:16,
    156:16, 163:7,
    163:8
stating 142:6
status 7:7, 9:21,
    10:2, 15:7, 16:14,
    18:19, 27:5
statute 38:12,
    84:17, 105:23,
    106:17, 111:9,
    113:16, 113:20,
    121:7, 121:14,
    123:11, 124:5,
    126:6, 132:21,
    132:23, 132:25,
    135:2, 135:4,
    136:2, 149:20,
    149:22, 158:5,
    158:18, 158:19,
    159:1, 159:2,
    159:5, 159:7
statutes 125:1,
    151:2
statutory 105:9,
    110:10, 111:1,
    126:15, 129:14,
    130:6, 151:6
Stay 24:25, 25:3,
    25:7, 25:8, 25:21,
    26:9, 27:20,
    30:13, 79:16,
    80:3, 80:12,
    80:14, 80:19,
    80:23, 81:11,
    81:13, 81:15,
    82:13, 82:22,
    83:20, 84:1, 84:7,
    84:20, 87:13
staying 24:24, 26:5
stays 51:2
stenography 4:48
step 84:12, 120:10,
    135:14
steps 21:13, 112:6
stick 78:18

sticking 16:5
stipulation 91:20,
    100:16, 100:25,
    101:21
stop 121:1
story 20:19
straightforward
    47:12
strategic 50:23
strategy 36:1, 40:13
streamlined 9:7
street 14:20
strengths 92:24
stress 142:2
stretching 101:2
strongly 123:20
structural 106:6,
    106:7
structure 12:24,
    35:19, 35:21,
    39:23, 42:3, 82:24
structured 43:15,
    126:25
studies 146:3
stuff 75:15
stymie 123:6
sub 87:15
subject 7:3, 28:10,
    38:4, 39:3, 41:1,
    42:2, 44:15, 54:2,
    66:3, 68:20,
    68:21, 69:21,
    113:17, 114:8,
    114:13, 157:6,
    157:10, 160:13,
    160:18
subjected 143:19
submission 69:5,
    82:16, 87:25,
    88:3, 98:12, 107:2
submissions 41:23,
    51:8, 51:20,
    51:21, 80:24,
    82:15, 86:7,
    154:23
submit 106:14,
    122:8, 122:12,
    143:12, 145:16,
    145:20, 147:17,
    147:18, 159:24

submitted 9:7, 18:4,
    96:23, 96:24,
    107:1, 107:6,
    147:21
subparagraph 54:1
subparagraphs 53:25
subpoena-like 40:5
subpoenaed 50:1
subpoenas 51:24
subsection 45:18
subsequent 105:2
substantial 12:4,
    22:14
substantially 42:3,
    52:19, 98:21
substantive 81:20
substituted 53:25
subtracting 149:10
succeed 131:22
success 27:18
successful 12:24
successive 10:7
sudden 10:6
sufficient 21:8,
    28:1
sufficiently 142:19
suggest 44:5, 56:5,
    74:11, 107:7
suggested 61:1,
    72:19
suggestions 91:9
summaries 38:24
summary 19:10, 81:1,
    97:18
summertime 17:2
sun 14:20
super 124:4
superseded 155:5
supplement 87:20
supplemental 82:15,
    82:16, 94:12
supplementation
    145:12
supplementing 22:18
supply 13:5
support 11:8, 26:9,
    72:14, 78:6, 90:14
supported 97:12
supportive 23:17,
    78:14

supports 158:19
supposed 16:12,
    95:6, 131:12,
    132:7
supposedly 16:10
supreme 137:6, 137:8
surplus 119:19
SUSHON 3:20, 62:9,
    62:25, 63:5, 63:8,
    63:11, 63:16,
    64:14, 67:25,
    70:3, 70:21, 75:7,
    79:2, 79:7
suspend 124:11,
    130:3, 130:4,
    155:2, 155:9
suspended 108:14
suspending 108:17
suspension 120:15,
    154:23
sustainable 105:12,
    109:11, 159:16
Suzzanne 3:24, 17:22
Swain 2:32, 101:24,
    143:21, 163:7
switching 15:12
sympathy 158:8


< T >
table 33:20
taken. 102:7
talked 65:17
talks 130:4
tap 69:2
tardes 143:14,
    143:16
targeted 67:11,
    67:19, 67:21,
    77:17, 78:24
targeting 67:20,
    155:25
targets 33:21,
    45:19, 67:6,
    106:10, 126:23,
    135:19, 146:5
tasks 13:10
tax 8:6, 8:24
Taylor 2:32, 101:22,
    163:7

teachers 131:21,
    131:22
technical 61:12,
    81:19, 83:12,
    86:10
Technology 104:16
tee 31:18
teed 19:6, 22:18,
    24:14
teeth 120:13
telephone 76:9
telephonic 6:7, 12:9
tells 64:21, 106:19,
    111:20, 114:13
ten 13:25, 34:14,
    41:3, 45:18, 46:9,
    46:11, 87:23,
    152:21, 152:22
ten-day 45:14, 48:9
ten. 53:6
tenure 10:16
term 11:22, 50:21,
    61:14, 93:8,
    101:16, 107:6,
    121:21
terminate 155:19,
    157:11
terminated 43:17,
    43:20, 44:7,
    44:14, 54:13,
    55:2, 155:17
terminates 54:16
terminating 55:12
termination 43:25,
    44:21, 55:6, 55:8,
    157:6
terms 16:24, 25:1,
    25:24, 33:20,
    37:25, 46:2,
    78:13, 99:21,
    99:22, 108:5,
    111:3, 113:16,
    118:21
terrible 134:8
territorial 120:12,
    121:22, 130:21,
    143:19
territory 137:6,
    137:9, 143:22,
    155:24

text 53:4
texting 7:1
textual 43:10
thankfully 125:21
theirs 20:14, 133:5
theories 87:15,
    155:7
theory 146:24
thereafter 89:14,
    89:17
thereby 118:1
They'll 69:7
They've 47:13,
    66:14, 66:19,
    66:22, 71:2, 72:7,
    72:23, 75:23,
    75:25, 77:1, 77:6,
    93:2
thinking 33:17,
    51:1, 87:17
thinks 16:15, 86:8
third 40:2, 40:19,
    66:21, 67:12,
    71:22, 71:23,
    72:9, 149:15
third-party 48:1,
    51:4, 72:7
Thomas 2:17, 3:43
though 65:6, 70:10,
    71:1, 105:16,
    117:3
thoughts 45:12,
    46:20, 46:24
thousand 9:13
thousands 14:14,
    67:14
threatening 139:22
three 38:3, 43:21,
    63:24, 64:11,
    101:12, 101:18,
    148:8, 153:25
throat 133:10
throughout 56:14,
    97:18
throw 138:2
thrown 138:14
tie 132:22
till 16:21
timeframe 21:7
timeline 31:13

timely 7:18, 33:22,
    44:15, 46:6, 54:3,
    95:22
timetable 18:19,
    29:4, 32:25, 33:1,
    36:6, 42:10, 45:8,
    45:15, 45:23,
    46:13, 48:13,
    48:17, 48:18,
    103:11
timetables 42:12
timing 33:9
Timothy 3:4
today 7:14, 15:15,
    21:14, 67:17,
    75:23, 81:4, 89:8,
    125:1, 145:23,
    160:12, 161:18
together 14:16,
    22:24, 31:9,
    102:15, 129:2,
    135:24
tomorrow 16:13,
    16:15, 16:19,
    157:6
tons 75:15
took 22:13, 107:11,
    129:5, 134:1,
    134:3, 141:17,
    141:23
tool 134:24, 146:13,
    151:7
tools 48:25, 131:2,
    131:3
top 37:22, 115:7,
    152:7
topics 130:16
totally 111:25,
    113:5, 139:14
toward 161:21
track 39:21, 78:20,
    78:21, 78:22,
    95:20
traded 95:15, 95:16
trading 92:11, 93:3,
    93:17, 96:13,
    98:18
traditionally
    132:18, 132:19
traffic 14:15

transaction 12:22,
    13:11
transactions 12:22,
    13:11
transcends 143:4
Transcript 4:48,
    163:4
transcription 163:5
transfer 84:24
transferred 53:16
transferring 84:18
transformation
    10:11, 11:9,
    12:17, 12:25,
    13:2, 13:11, 142:8
transmission 11:14
transparency 94:2
transparent 109:25
Transportation 1:22,
    1:30, 3:33, 15:16
travels 162:1
Treasury 108:12
treat 81:4
treatment 41:10
TRELLES 3:23, 17:11,
    17:13, 22:3, 22:4,
    23:4, 26:4, 26:11,
    26:16, 27:23,
    28:20, 29:10,
    30:10, 30:16,
    31:7, 31:18
TRELLES-HERNANDEZ
    35:22, 36:23
tremendous 129:2
trial 16:1
tried 69:4, 92:21,
    97:8
tries 127:11
trigger 47:22, 91:3,
    91:8, 139:7,
    152:10
triggers 90:21
trillion 7:23
trouble 12:8, 88:13,
    108:15
troubled 92:14
troubling 75:16
true 65:24, 98:18,
    120:12, 124:22,
    163:5

truly 49:12
trust 47:5, 79:24
Trustee 3:8, 39:10
trustees 7:25
truth 120:3, 143:24
try 32:7, 32:8,
    45:16, 88:25,
    129:22, 130:2
trying 9:13, 32:9,
    32:12, 40:22,
    41:7, 43:10, 68:9,
    68:12, 71:7,
    71:13, 128:9,
    129:8
turbulence 34:21
turn 7:11, 9:21,
    14:23, 17:16,
    40:1, 46:18, 48:4,
    53:5, 53:19, 98:2,
    102:3, 118:3,
    119:11
turned 6:18, 6:22,
    62:5, 71:16
turning 161:20
turns 88:10, 104:5,
    105:7
Two 8:11, 10:6,
    19:4, 29:3, 43:1,
    54:11, 74:17,
    78:21, 90:11,
    100:3, 102:14,
    108:2, 108:3,
    108:6, 112:9,
    122:22, 135:1,
    143:18, 144:8,
    151:5, 153:25,
    157:6, 157:22,
    157:25
two. 55:22, 56:6
type 19:10, 49:15,
    51:10, 60:17,
    133:8
types 63:24, 70:16,
    100:22, 153:5
typical 116:19

< U >
UCC 50:7, 68:23,
    68:24, 69:8, 96:9,

99:2, 99:3, 102:17
Uhland 3:24, 17:16,
    17:22, 23:8,
    31:19, 31:20,
    33:3, 33:24,
    34:10, 35:21
ultimate 80:13,
    105:15
ultimately 10:11,
    40:6, 40:8, 41:5,
    41:10, 50:14
unavailable 152:14
unclear 108:20
undermine 112:16
underscoring 118:23,
    121:11
understanding 26:19,
    30:2, 51:4, 59:14,
    60:20, 71:20,
    72:13, 73:11,
    116:16, 122:24,
    161:17
understands 119:2,
    119:3
understood 29:18,
    51:21, 58:3,
    96:16, 96:19,
    97:4, 152:19,
    152:24
undertook 70:24
underway 12:18
undue 47:15
unenforceable 104:9,
    105:4, 106:14,
    106:23, 160:7
unfortunate 10:9
Unfortunately 16:2,
    157:18
unfunded 153:8
uniform 42:1
unilateral 112:10
unilaterally 110:10,
    138:24
unique 105:8, 105:16
United 1:1, 2:33,
    2:35, 39:10,
    143:20, 163:6,
    163:8
universe 42:19,
    49:10, 56:21,

76:25
University 153:6
unjustified 68:19
unknown 16:7
unlawfully 145:13
Unless 6:19, 37:17,
    41:18, 43:16,
    43:19, 44:6,
    44:12, 54:12,
    72:6, 97:25,
    110:16, 136:16
unlike 124:25
unmistakably 132:20,
    133:1
unquote 42:19
unredacted 57:2
unresolved 58:9
Unsecured 3:12, 8:21
Until 23:5, 25:13,
    26:21, 27:8,
    27:20, 27:24,
    28:19, 29:8,
    29:11, 30:16,
    34:16, 35:13,
    44:10, 52:5, 54:9,
    54:18, 57:14,
    78:20, 84:19,
    86:3, 88:21,
    136:4, 139:5,
    139:7, 139:10,
    139:16, 139:17,
    146:25, 160:2
unused 109:14,
    148:17, 149:5,
    149:9, 152:20,
    154:7
update 10:2, 12:18,
    99:4, 99:8
urge 87:20
urged 99:7
urgency 28:24,
    157:25, 161:9
using 6:19, 154:10
usual 7:6
usurpation 145:10
utility 10:23


< V >
vacation 154:7

vaguely 117:14
valid 118:1, 144:24,
    145:16, 147:7
validity 81:1
validly 139:24,
    140:21, 141:25
value 64:21, 80:21,
    81:10
various 54:20,
    65:18, 109:1
Velaz 3:16
vendor 45:19, 46:7,
    61:16
version 101:13
versions 57:2
versus 132:16
VI 15:8, 16:8,
    16:24, 17:17,
    18:15, 19:1,
    19:17, 20:17,
    21:24, 22:6,
    22:10, 22:18,
    22:20, 23:17,
    23:25, 24:8,
    24:21, 25:2,
    25:11, 25:24,
    27:7, 31:12,
    31:23, 35:18,
    140:22
vibration 6:21
view 27:2, 73:10,
    93:15, 94:15,
    99:17, 100:24,
    114:1, 115:20,
    144:21
views 32:11, 143:3
vigorously 160:10
violated 143:10
violating 126:5
violation 84:13,
    137:17
violations 127:9
virtue 116:5
vis-a-vis 27:7
vitiate 128:13
vocabulary 157:1
voluntary 40:4
vote 125:20
voted 141:18

< W >
wait 58:22, 104:14,
    139:16, 158:4
waiting 86:24,
    142:24
waive 89:7
waived 67:18
walk 18:23, 41:23,
    146:14
Walker 163:12,
    163:13
wanted 14:8, 18:14,
    27:7, 33:19,
    43:14, 56:7, 68:5,
    76:4, 76:5, 86:17,
    108:16, 117:15,
    119:4, 132:12,
    138:22, 143:2,
    144:11, 145:5,
    158:12, 160:24
wants 17:10, 18:23,
    46:19, 61:6,
    85:17, 112:17,
    112:20, 114:14,
    134:6, 134:19,
    137:23, 145:21,
    148:15, 148:17,
    152:22, 153:22,
    159:12
warrants 134:18
Washington 87:2
wasting 68:14
water 10:23
weaknesses 92:25
website 115:4,
    122:14
week 8:19, 8:20,
    10:6, 10:15,
    11:24, 12:2,
    19:11, 26:1,
    34:18, 35:10,
    87:23
weekend 17:6, 34:15,
    34:16
weekly 11:12, 12:1,
    76:9
weeks 12:1, 18:2,
    18:13, 20:21,
    86:9, 100:3

Welcome 6:5, 23:21
whatever 15:2, 15:4,
    27:10, 27:13,
    51:14, 67:7, 73:4,
    73:12, 76:10,
    83:13, 85:17,
    86:8, 111:6,
    127:20, 132:12,
    152:22, 155:20,
    161:12
whenever 29:3, 111:6
whereby 39:8, 41:2
whether 18:23,
    21:21, 25:16,
    26:23, 27:8,
    27:21, 29:2,
    29:21, 47:22,
    50:15, 57:8,
    65:24, 68:4,
    70:24, 72:4,
    75:17, 89:1,
    105:24, 108:21,
    111:2, 111:15,
    120:6, 124:14,
    131:1, 133:10,
    140:8
whichever 44:12
whiz 109:14
whoever 72:16, 134:6
whole 67:12, 73:22,
    76:3, 77:2, 77:3,
    85:3, 142:17,
    152:1, 153:1
whom 84:1
wielding 134:24
William 3:20
willing 22:17,
    158:15, 159:19,
    160:22
willingly 113:15,
    113:17, 114:7
willy-nilly 148:24,
    152:12
wish 48:16, 56:17,
    162:1
wishes 85:24
withdraw 24:19
withdrawal 24:3
withdrawing 41:18,
    64:10

withdrawn 52:18
withheld 39:5,
    46:11, 59:14,
    62:18, 62:19,
    62:21, 64:3
withhold 64:12
withholding 29:11
Without 24:25,
    29:13, 29:15,
    30:14, 32:13,
    39:15, 43:5,
    48:24, 52:20,
    56:8, 57:3, 57:10,
    109:4, 112:18,
    118:11, 126:5,
    139:25, 141:24,
    144:3, 154:10,
    155:18, 155:19
withstanding 111:23
witness 38:25,
    42:17, 52:25, 53:8
WITNESSES 5:3
wonderful 104:17
wondering 45:10,
    131:7
word 97:13, 101:13,
    156:25
words 27:11, 53:7,
    53:9, 90:5, 97:18,
    101:14, 101:15
work 9:14, 13:13,
    14:23, 15:24,
    17:5, 20:12,
    31:17, 39:2,
    51:18, 52:16,
    61:25, 73:18,
    76:3, 86:6, 87:8,
    88:4, 88:10,
    88:22, 89:15,
    89:16, 89:17,
    89:18, 100:4,
    131:12, 132:7,
    147:14, 157:5,
    158:7
workable 128:4
working 8:21, 11:4,
    13:7, 14:16,
    22:24, 24:2, 24:5,
    76:8, 129:2,
    144:5, 144:7,

147:1
works 15:22, 86:20,
  89:10, 104:17,
  132:8, 134:2,
  136:2, 146:16
world 135:16
worrying 131:7
wrenches 138:2,
  138:14
write 124:11, 134:6
written 38:24, 98:12


< Y >
years 9:1, 11:1,
  43:1, 64:20,
  108:14, 116:11,
  149:9
yell 49:1, 49:3
yesterday 7:18,
  65:1, 136:4,
  144:2, 157:5
York 3:25, 6:7,
  17:10, 31:19,
  86:20, 88:13,
  161:21, 162:1
yourself 155:2


< Z >
Zakia 4:11