# EXHIBIT   40

Hapnproa

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------x

3   IN RE THE FINANCIAL OVERSIGHT
    AND MANAGEMENT BOARD FOR
4   PUERTO RICO,

5        as representative of

6                                      New York, N.Y.

7                                      No. 17 BK 3283-LTS

8   THE COMMONWEALTH OF PUERTO RICO,
    *et al.*,
9
                  Debtors.
10
    -------------------------------x
11
                                       October 25, 2017
12                                     10:25 a.m.

13  Before:

14                  HON. LAURA TAYLOR SWAIN,

15                                      District Judge

16                      APPEARANCES

17  PROSKAUER ROSE LLP
         Attorneys for Debtors
18  BY:  MARTIN J. BIENENSTOCK
         PAUL V. POSSINGER
19       TIMOTHY MUNGOVAN

20  PAUL HASTINGS LLP
         Attorneys for Official Committee of Unsecured Creditors
21  BY:  LUC A. DESPINS

22  U.S DEPARTMENT OF JUSTICE
         Attorneys  for FEMA
23  BY:  MATTHEW J. TROY

24

25

Hapnproa

```
 1

 2                   APPEARANCES (Continued)

 3   WILLKIE FARR & GALLAGHER LLP
              Attorneys for COFINA Agent
 4   BY:  MATTHEW A. FELDMAN
          ANTONIO YANEZ, JR.
 5            and
     KLEE TUCHIN BOGDANOFF & STERN LLP
 6            Attorneys  for COFINA Agent
     BY:   KENNETH N. KLEE
 7            and
     GREENBERG TRAURIG
 8            Attorneys for AAFAF
     BY:   NANCY MITCHELL
 9            and
     LAW OFFICE OF ANDRES LOPEZ
10            Attorneys  for AAFAF
     BY:   ANDREW LOPEZ

11

12   O'MELVENY & MYERS LLP
              Attorneys for AAFAF
13   BY:   PETER FRIEDMAN
           SUZANNE UHLAND

14

     REED SMITH LLP
15            Attorneys for Bank of New York Mellon
     BY:   C. NEIL GRAY

16

     ROBBINS RUSSELL ENGLERT ORSECK UNTEREINER & SAUBER
17            Attorneys for GO Bondholders
     BY:   MARK STANCIL
18           DONALD BURKE

19   MILBANK TWEED HADLEY & McCLOY
              Attorneys for AMBAC
20   BY:   DENNIS DUNNE
           ATARA MILLER

21

     WEIL GOTSHAL & MANGES LLP
22            Attorneys for National Public Finance Guarantee Corp.
     BY:   JARED FRIEDMAN
23           MARCIA GOLDSTEIN

24   QUINN EMANUEL URQUHART & SULLIVAN LLP
              Attorneys  for COFINA Senior Bondholders
25   BY:   SUSHEEL KIRPALANI
```

1                    APPEARANCES (Continued)

2    MASLON EDELMAN
             Attorneys  for U.S. Bank Nat. Assoc.
3    BY:  CLARK T. WHITMORE

4    JENNER & BLOCK
             Attorneys for Official Committee of Retirees
5    BY:  ROBERT GORDON

6    KRAMER LEVIN NAFTALIS & FRANKEL LLP
             Attorneys  for Ad Hoc Group of PREPA Bondholders
7    BY:  AMY CANTON

8    WACHTELL LIPTON ROSEN & KATZ
             Attorneys  for Scotiabank
9    BY:  RICHARD MASON
             EMIL KLEINHAUS
10

11   CADWALADER WICKERSHAM & TAFT LLP
             Attorneys  for Assured Guaranty
     BY:  ELLEN HALSTEAD
12            ELLEN HOLLOMAN

13   JONES DAY REAVIS & POGUE
             Attorneys  for ERS Secured Creditors
14   BY:  BENJAMIN ROSENBLUM

15   NAVARRO-CABRER LAW OFFICES
             Attorneys  for COFINA agent
16   BY:  NILDA M. NAVARRO-CABRER

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE COURT:  Again, *buenos dias*, and good morning to |
| 3 | the parties in interest, attorneys, members of the public and |
| 4 | press and our court colleagues gathered here and in San Juan as |
| 5 | well as to those listening on the telephone. |
| 6 | The courts thoughts are with those on the island of |
| 7 | Puerto Rico as they continue to rebuild their lives and work |
| 8 | toward the recovery of Puerto Rico in the aftermath of |
| 9 | Hurricane Maria.  The courage and resilience demonstrated by |
| 10 | the American citizens of Puerto Rico are an important example |
| 11 | for all of us. |
| 12 | I would like to take a minute to introduce Gretchen |
| 13 | Rodriguez -- would you please stand -- who is the assistant |
| 14 | operations manager of the United States District Court for the |
| 15 | District of Puerto Rico.  She is here today as representative |
| 16 | of the District of Puerto Rico, whose judicial officers and |
| 17 | staff are continuing their dedicated work under extraordinarily |
| 18 | challenging conditions. |
| 19 | Thank you for being here. |
| 20 | Thank you for your work, and thank you to all of our |
| 21 | colleagues who are in San Juan. |
| 22 | MS. RODRIGUEZ:  Thank you, your Honor. |
| 23 | THE COURT:  Our first order of business this morning |
| 24 | is the joint urgent motion concerning federal disaster relief |
| 25 | funds. |

Hapnproa

 1          I gather from the requests that have been made for

 2     time to speak that there hasn't been a consensual resolution of

 3     the remaining issues, so we will proceed in a moment in

 4     accordance with the time allocations that have been worked out

 5     with the courtroom deputy.

 6          I would just ask procedurally that counsel make all of

 7     their remarks from the podium and be certain to speak into the

 8     microphone so that everyone on the telephone and in the

 9     San Juan courtroom will be able to hear clearly.

10          We have set up the light system so that the green

11     light will go on at the beginning of the time allocation, the

12     yellow light will go on two minutes before the expiration of

13     the time allocation, and the red light goes on at the end of

14     the time allocation.

15          Just to review the allocations, we have five minutes

16     to start for Ms. Uhland of AAFAF, then five minutes for

17     Mr. Despins for the UCC, then six minutes for Mr. Stancil for

18     the GO bondholders, then five minutes for Mr. Dunne for AMBAC,

19     six minutes for Ms. Goldstein for National; and then, for

20     rebuttal, ten minutes for Mr. Friedman for AAFAF and five

21     minutes for Mr. Possinger for the oversight board.

22          No disagreement?

23          All right.

24          Ms. Uhland, would you please go to the podium.

25          MS. UHLAND:  Thank you, your Honor.

```
 1            I hope that we may be able to address some of the

 2     objections in this, in my initial presentation to narrow the

 3     issues.

 4            Maybe that is some good news there.

 5            THE COURT:  Good.

 6            MS. UHLAND:  As you know, the situation in Puerto Rico

 7     is beyond one of the worst crises it's faced, and right now a

 8     substantial majority continue without power, and a substantial

 9     number of citizens do not have safe drinking water.

10            It was declared a disaster by the President in

11     September after the hurricane, and by virtue of that disaster

12     declaration became entitled to federal disaster relief funds.

13     There are certainly FEMA funds that we have all heard about,

14     but there may also be funds from other federal agencies,

15     including HUD and HHS.

16            What we would like to do today is obtain an order from

17     the Court in order to provide assurance to FEMA and the other

18     federal agencies that the grants received -- we are talking

19     about grants here from the federal agencies -- will not become

20     entangled in the Title III, case and the grants will, in fact,

21     go toward the disaster recovery effort, to the mandated relief

22     work, and to pay the vendors and other service providers who

23     are in fact restoring Puerto Rico.

24            We also desire this to provide comfort to the vendors

25     who are providing the services that they have assurances that
```

1    they will be paid and the federal grants that pass through the

2    debtors will not again be subject to creditor claims.

3          Our view and the view of the U.S. government is that

4    these federal grants are, in fact, property of the federal

5    government and are not necessarily -- are really being held as

6    a bailment by the commonwealth or the other entity that is

7    receiving the fund.

8          Therefore, we do not believe that they would be

9    subject to creditor liens because of the nature of the federal

10   law regarding federal grants.  Nonetheless, we want to seek

11   this comfort order to make it perfectly clear that there are no

12   liens attaching.

13         Another aspect of this order, because we are seeking

14   this on an urgent basis, and we were hoping to get an agreed

15   order frankly, is we included a reservation of rights, because,

16   notwithstanding the position of the oversight board, AAFAF, and

17   the federal government that liens don't attach to these funds,

18   creditors have different positions with respect to that.

19         So there is a reservation of rights for the creditors.

20   That is, with respect to the determination of their nature,

21   extent, and treatment of their claims, they can make arguments

22   at that time that these are subject to their liens.  We reserve

23   the full right, all parties reserve the right to dispute those

24   arguments.

25         But the goal here today is to get the clarity around

1  that these grants themselves are not subject to liens or any

2  encumbrances or any priority from the creditors in the case.

3           During the process of the negotiations of what we hope

4  to be a fully agreed order, a largely agreed order, we began

5  discussing with the creditors the structure of the way the FEMA

6  grants will come in.

7           The way it will work is as follows:  There is a single

8  agreement that's entered into by the commonwealth.  It is the

9  initial recipient of all FEMA grants, including the FEMA grants

10 that would be to PREPA or PRASA or other government entities.

11          The commonwealth is, if you will, a conduit of the

12 FEMA funds.  At the request of some of the creditors at the

13 commonwealth, we included in the order a provision to provide

14 that, to the extent those funds ever became deobligated, which

15 means that there was, later down the road, an audit say by FEMA

16 and some of the funds were found to be, you know, spent not in

17 accordance with their guidelines and therefore had to be

18 returned to the government, because those funds passed through

19 the commonwealth, the commonwealth would in fact be on the hook

20 for those deobligated funds.  Therefore, the creditors of the

21 commonwealth asked us to include, and we did include in the

22 order and the motion a provision to provide that, to the extent

23 of this deobligation, by virtue of funds, for example, that

24 went to PREPA, the commonwealth, who has to return the funds to

25 the government, would have a superpriority claim at PREPA.

Case 17-03283-LTS Doc#1586 Filed 10/27/17 Entered 10/27/17 18:09:51:23 Desc: Main
Exhibit 40 Page 10 of 112

Hapnproa

1          This particular provision of the order, we have been

2      receiving continued comments on it on both sides.  We have an

3      objection from the GO bondholders, who believe it should not

4      just be a superpriority claim but should be supported by a

5      lien.

6          We have received comments from parties, including

7      parties from PREPA, that they have concerns with the extent of

8      the superpriority lien being granted on this urgent basis.

9          What we would propose to do is that provision of the

10     order we would like to continue and have that provision

11     considered at the omnibus hearing in November.

12             THE COURT:  You want to carry that issue over?

13             MS. UHLAND:  Yes.

14             THE COURT:  OK.  So that is just the nature of

15     whatever the claim over or lien might be in the case of

16     deobligated funds.  Today you are looking for the general

17     declaration that the federal disaster funds are passthrough

18     funds and are not property of the estate and not subject to

19     liens, but the consequences with respect to other entities

20     would be put off until November?

21             MS. UHLAND:  Yes.

22             THE COURT:  Thank you.

23          If you think it would be beneficial to give any

24     further general conceptual explanation or anything else you

25     want to carve off for the next session before I hear other

1    counsel, I will permit you to go on and do that in a succinct

2    manner if you think that would help to make this more

3    efficient.

4         MS. UHLAND:  I think there are just really two other

5    points I would like to make to make this more efficient.

6         There were two objections that we believed we have

7    addressed.

8         One is there was a request by AMBAC that there should

9    be reporting with respect to the FEMA funds.  We have reviewed

10   and discussed this with the oversight board, the oversight

11   board and AAFAF.  We believe that the appropriate resolution to

12   that would be for AAFAF to post in the data room, which the

13   parties, most of the parties, certainly all the objecting

14   parties are have access to, the quarterly reports that are

15   required by FEMA as part of the FEMA funds.  So there is a

16   reporting obligation by FEMA, and what we would do is post

17   those complete reports in the data room.

18        We certainly don't think it is appropriate, given the

19   tax on the time and resources of the commonwealth to have

20   additional reporting added to their burden, but we are willing

21   to provide the creditors the reporting that's being done by

22   FEMA, which is, you know, as one would expect, comprehensive

23   reporting with respect to the use of the funds.

24        The other objection that I just wanted to preview our

25   response to is that we did receive an objection from the GO

1  bondholders wanting to limit the relief to FEMA funds only and

2  not other federal agency funds.

3        We had a provision in the draft order that just said

4  funds under other related agreements.  We will make that clear

5  in our order that it's related agreements with the United

6  States.  It is not any agreement that has this priority.  So

7  it's FEMA grants and it's other federal agency grants.  I know

8  the United States counsel is here today.  This is something

9  that the federal government also asked us to include in the

10  order for clarity.

11        With that, unless the Court has any questions --

12        THE COURT:  No, thank you.

13        MS. UHLAND:  -- I cede what is remaining.

14        THE COURT:  Thank you very much.

15        Now, Mr. Despins.

16        MR. DESPINS:  Good morning, your Honor.  For the

17  record, Luc Despins with Paul Hastings for the official

18  creditors committee.

19        Normally I wouldn't have said anything at this

20  hearing, because, as you saw, we filed a statement in support

21  of the motion.  But this morning we were advised by counsel for

22  AAFAF that they were withdrawing the provision that we insisted

23  on, which is the provision that was also described by

24  Ms. Uhland.

25        That is the provision in paragraph 10 that protects an

1  entity like the commonwealth, which is just a conduit, from

2  being left holding the bag to the extent that any activity at

3  one of the other entities takes place and FEMA decides that

4  there needs to be deobligation, which is the term they use for

5  when funds were not used in compliance with FEMA regulations.

6  THE COURT:  Before you go on, I thought that I heard

7  Ms. Uhland say not that she was withdrawing that but seeking to

8  defer that aspect of the controversy while going ahead with a

9  provision now that would permit the money to flow.

10  MR. DESPINS:  She did say that, your Honor.

11  We are not trying to stop the money from flowing, but

12  that is just a question of semantics about tabling that until

13  later.  It is not the equivalent the getting the protection

14  now.

15  Money apparently will start flowing between now and

16  November 15, and that money should be protected, meaning that

17  the entity that is the mere conduit here should have the

18  benefit of this protection.  That is what we bargained for.

19  And, frankly, we believed there was a bait and switch here,

20  where we didn't object because we got what we wanted.  Then we

21  are told, no, that's OK.  We will deal with that later.

22  We don't have any certainty of what is going to happen

23  later.  Therefore, we are in a position of requesting that the

24  Court put in the order that provision which the commonwealth

25  and the oversight board had agreed to, subject to your Honor

1  revisiting that on November 15, if you think it is not

2  appropriate, to take it out at that point.

3         THE COURT:  I am going to ask you a question and also

4  Ms. Uhland.

5         If Mr. Friedman can put the microphone close to

6  Ms. Uhland, I am going ask her a question.

7         It is this:  Is there any dissent from the proposition

8  that this protection should be at least a superpriority claim,

9  leaving aside the question of whether it should also be a lien?

10         So, Ms. Uhland, would we be able to go forward today

11  in your understanding with a provision that says it is a

12  superpriority claim against an instrumentality debtor, and

13  leave aside the question of the propriety of a lien in addition

14  to the superpriority claim for the November omni?

15         MS. UHLAND:  We heard comments from PREPA parties at

16  interest in the PREPA case, who have raised issues with respect

17  to the language regarding a superpriority claim.

18         THE COURT:  The language, the concept, or both?

19         MS. UHLAND:  Specifically the language.  We received

20  comments last night requesting that, you know, qualifying

21  language be added to that paragraph.

22         THE COURT:  All right.  Perhaps when we've gone

23  through this round of arguments, in the break you can speak

24  with the PREPA parties about whether this is something that we

25  can have in the order now, subject to tightening up or

1    whatever.

2              MS. UHLAND:  OK.

3              THE COURT:  Mr. Despins, if we took that approach,

4    would that satisfy your today concern?

5              MR. DESPINS:  I'm sorry, your Honor.  Somebody was

6    passing me a note while that discussion was going on.

7              What is the proposal?

8              THE COURT:  What I asked was whether, if I granted the

9    motion today, the motion could include the language that had

10   been proposed by AAFAF in terms of a superpriority claim.

11   Ms. Uhland said that there had been some issues with respect to

12   PREPA representatives about the language, and so I asked that

13   perhaps that be visited after this argument.  But if we are

14   able to go forward with language that includes the concept of

15   the superpriority claim against instrumentality debtor, would

16   that satisfy you for today?

17             MR. DESPINS:  Absolutely.  That is the only issue we

18   have, your Honor.

19             I just want to make sure -- and I lost some of my time

20   during that discussion there -- that the PREPA secured

21   creditor -- I mean, when you step back and look at what could

22   be their argument, their argument would be, yeah, PREPA did get

23   the money, but it didn't get used properly.  And we want the

24   commonwealth to be on the hook for that?

25             There is no reasoning behind their objection other

1 than we want somebody else to be at risk here. That is really

2 not appropriate. Again, the PREPA bondholder did not file an

3 objection to this motion as far as I recall.

4        I know this was the deal that was struck with the

5 creditors committee, and we think that language should stay in,

6 subject to your Honor revisiting that on November 15.

7        Thank you, your Honor.

8        THE COURT: Thank you.

9        Next the GO bondholders, represented by Mr. Stancil.

10        MR. STANCIL: Good morning, your Honor. Mark Stancil

11 for the GO ad hoc group.

12        Just very briefly at the outset I think it's important

13 to state certainly on behalf of our group, but also I think all

14 of the other creditors, I think we share the same big picture

15 objective in getting the federal money flowing to the right

16 parties in the right projects.

17        I think what we would like to focus on are a few ways

18 that this order could be and we think needs to be improved to

19 make sure we are avoiding additional litigation down the road

20 about this use or that use or this attempt to put this under

21 the order or that under the order.

22        We share the objective. I think we're really close.

23 There are a few points I would like focus on.

24        First, with respect to paragraph 2 of the order, there

25 is a statement at the end of paragraph 2 after saying that the

1  funds will not be subject to any liens, encumbrances, etc., it

2  says that such funds and accounts shall not be considered

3  available funds, revenues, or resources for any purpose in

4  connection with any restructuring proceeding under Title III of

5  PROMESA.

6         We have a couple of concerns with that.

7         First, we think it's entirely unnecessary.  The prior

8  part of that sentence has already covered priorities, liens,

9  etc.  So I don't know why it would need to then say and here's

10 how it will be treated in a Title III.

11        We are concerned frankly that it would be misread in

12 the following scenario, misread to suggest that if there were

13 in a fiscal plan, in a plan of adjustment contemplated disaster

14 recovery expenditures ongoing that we would be prohibited from

15 pointing out that there are FEMA funds set aside for that

16 purpose.

17        So, the language, you know, for any purpose in

18 connection with any restructuring proceeding, I think it would

19 be strange if the bondholders were being told, well, there's

20 only X available for this purpose or that purpose, and we're

21 not able to say, Well, the federal government has already given

22 you money for X purpose or Y purpose.

23        We think the simplest thing is just to take that out.

24 Alternatively, I think the court could simply say these funds

25 are not available for distribution in a restructuring

Case 1:17-03283-LTS Doc #1564-26 Filed 10/04/18 Entered 10/04/18 06:51:23 Desc: Main
Document Page 18 of 112
Exhibit 40 Page 18 of 112

Hapnproa

1    proceeding under Title III.  But we think there is some risk

2    that this could be misread and is overbroad.

3         We raised this objection.  There was no response to it

4    in the oversight board's papers, so I am at a loss to know what

5    the reason is for it.

6         With respect to the definition of federal disaster

7    relief funds, I think there's one piece of good news, and then

8    two things I think need to be fixed.

9         I heard Ms. Uhland clarify on the record and I just

10   want to make sure we are absolutely clear.  We are talking

11   about grants and not loans.  And I think that's where we are.

12   If that is the case, there is a simple fix that needs to be

13   added after the reference to 2 C.F.R. Section 200.40.  If that

14   is 200.40(a), if I have that correct, that will only be grants.

15        THE COURT:  This is in footnote 2?

16        MR. STANCIL:  Yes, your Honor.  Footnote 2, line 2.  I

17   believe there is no objection to that, to adding (a).

18        Now you can ignore everything in our objection about

19   loans with respect to one exception.

20        THE COURT:  Is there a language change or tweak you

21   are specifically asking for in footnote 2?

22        MR. STANCIL:  That one I believe is agreed to.

23        There are two other changes we think need to be made,

24   your Honor, that are separate from this loans concept.

25        THE COURT:  OK.  But this change is one you think is

1   agreed to, but not reflected in the revised footnote 2 that was

2   filed a couple of days ago?

3           MR. STANCIL:  Yes, your Honor.

4           We have exchanges pursuant to the mediation, so I am

5   reluctant to repeat conversations that we have had.

6           THE COURT:  I am not asking you to.

7           MR. STANCIL:  Thank you.

8           THE COURT:  I am just trying to make sure I am looking

9   at the piece of paper I am authorized to have at this juncture.

10          MR. STANCIL:  Yes, your Honor.

11          Thank you.

12          THE COURT:  You have clarified that for me.

13          Thank you.

14          MR. STANCIL:  Two things we think do need to be made

15  to this definition.

16          One Ms. Uhland did address, which I understand the

17  sentiment, but I think is a potential for concern.  This should

18  be limited to FEMA money, precisely because we now have a long

19  and detailed understanding of how the FEMA program works.

20          We know the regulations, we know the contract, we know

21  the oversight, we know what goes into it, which is why the vast

22  majority of this order is agreed to.

23          Throwing in other federal agencies we don't know what

24  that means.  So we think it would be great if HUD would send

25  relief dollars down there, but we don't know today what the HUD

1   regulatory framework is or the HHS regulatory framework is.

2           This order should be limited to the Stafford Act under

3   FEMA. As other funds become available, I am sure we can work

4   out something along the same lines. But there is a concern

5   that the treatment in this order is being given against a

6   backdrop that we just don't know what it is. So we think that

7   the footnote 2 needs to be corrected for that.

8           Relatedly, in the last version the phrase "and related

9   program income" was added. Candidly we have no idea what that

10  means. It was added in the last turn of the order.

11          We are concerned it could be taken to an unreasonable

12  extent, or, frankly, we are just not sure what that

13  contemplates. So we think that should be out as well.

14          If I could just briefly touch on the granting of a

15  superpriority claim to the United States government. This is

16  in paragraph 8 of the order, which proposes to give the

17  government -- well, it says, you know, if the commonwealth

18  misspends -- I'm summarizing of course -- if the commonwealth

19  violates the regulations, the federal government gets a

20  superpriority claim against the commonwealth.

21          Well, first, we don't think there is a basis in the

22  law for that. They have their remedies that the FEMA

23  regulations and laws may provide. But we think it's way too

24  late to be throwing something like that, and just candidly it's

25  exactly the wrong thing to do.

```
 1          If the federal government is reassured that they get a

 2     superpriority claim no matter how the funds are spent, that is

 3     exactly the wrong incentive.  We want the federal government

 4     watching this money like a hawk, as it should be, to make sure

 5     the money gets to the right place.

 6          We think that should come out as well.

 7          Your Honor, I have one final point if I could --

 8          THE COURT:  Yes.

 9          MR. STANCIL:  I will do it in 30 seconds.

10          The idea of postponing, the idea of the superpriority

11     claim, I think as long as it is in the order to start, we don't

12     think it goes far enough.  We do think there should be a

13     security interest against that.

14          There's one particular dimension to this that is

15     concerning.  A superpriority claim makes some sense, a lot of

16     sense in the context of an entity that is already a Title III

17     debtor, but PRASA for example is not a Title III debtor.  We

18     don't know if it will become one.

19          The University of Puerto Rico is not one.  We don't

20     know if it will become one.  Presumably it will have

21     accreditation issues and the like if it did.

22          So that's why we are focused on granting of the

23     security interest against these other entities, because if they

24     are not a debtor the superpriority claim doesn't really fit.

25          THE COURT:  I get your point about the superpriority
```

1   concept not really fitting or applying outside the Title III

2   context. But how can I grant a lien against presumably

3   already, at least arguably encumbered property of a non-Title

4   III debtor without noticing this out to and making this

5   litigation that involves identification of all purportedly

6   secured creditors of the other entity and representation of the

7   other entity and revisiting that lien issue in maybe January,

8   February, March when everybody comes into the room.

9           How as a practical matter could I do that?

10          MR. STANCIL: It may be difficult, your Honor, I grant

11  that. I think that just shows the importance of it. If they

12  were to send $500 million to the University of Puerto Rico,

13  that is a major investment. So it shouldn't be done lightly.

14          I don't think we're proposing something where every

15  $50 that goes out is going to require a separate hearing. But

16  I think that actually illustrates the points that we have,

17  which, is for the same reasons that it might be difficult to

18  do, it's very important to do.

19          There would be other ways that we can work out I

20  think. I think if we had the ability to get like a statutory

21  lien that would attach automatically, I think that could be

22  done as well.

23          We would be happy to sit down and try to work out the

24  mechanics if people are agreeable to the concept. We just

25  don't want to find ourselves in a position where major dollars

1   go out, are misspent, and then, because it's never put into

2   Title III, we have a superpriority claim that doesn't, you

3   know, that exists in the ether, but doesn't make sense.  We

4   would be happy to work out something.

5          THE COURT:  Since you concede it's not something that

6   I could grant today anyway, I take it you don't have an

7   objection to the deferral of the lien concept aspect at least

8   until the November omni, with work in between to try to examine

9   that and see where that can go?

10         MR. STANCIL:  Yes your Honor.

11         We would be happy, and we will spend the time to try

12  to work out something that would be achievable.

13         Thank you, your Honor.

14         THE COURT:  Thank you.

15         Mr. Dunne.

16         MR. DUNNE:  Good morning, your Honor.

17         For the record, Dennis Dunne from Milbank Tweed Hadley

18  & McCloy on behalf of AMBAC.

19         Good news.  I don't think I am going to use up the

20  entire five minutes.  Ms. Uhland and Mr. Stancil kind of

21  eliminated a lot of what I am going to say, and Ms. Uhland's

22  remarks in a positive way.

23         Let me start out by saying -- and I think everybody is

24  going to echo this -- that AMBAC recognizes how critical it is

25  that this order gets entered today.  The island needs these

1   dollars to begin to repair, restore and revitalize Puerto Rico.

2   Our concern was that the order should be narrowly tailored to

3   effectuate that goal.

4        There were a number of instances, and Mr. Stancil just

5   addressed a few of them, where we thought it was too broad and

6   that could have unintended consequences that might ripple

7   through the Title III.

8        One of which that we were concerned about has been

9   resolved.  We wanted it clear that this order does not apply to

10  federal loans.  That seems to have been clarified by

11  Ms. Uhland.

12        If there were to be federal loans, presumably we would

13  see a Section 364 motion and order to that effect.

14        I have one technical wordsmithing point on this, which

15  is again in the definition of federal disaster relief funds.

16        THE COURT:  That is in the footnote?

17        MR. DUNNE:  Footnote 2 in the order, your Honor.

18  There was a phrase that was deleted from the definition in the

19  motion, in the definition in this order.  It comes right before

20  the first proviso in the order.  Right after recovery and

21  restorative assistance in the motion, it said in the form of

22  grants.

23        That was deleted and in this proposed order.  Hence

24  our concern that that deletion was intentional and they

25  intended to cover something in addition to grants.  We would

 1    just suggest putting it back in.

 2              THE COURT:  Ms. Uhland has agreed to that.

 3              MS. UHLAND:  Yes.

 4              MR. DUNNE:  Great.

 5              Moving on, your Honor I am going to touch one other

 6    point, which is transparency and accountability, and I had a

 7    lot to say on this, but I think Ms. Uhland addressed a bunch of

 8    it.

 9              In this case particularly having auditing and

10    reporting is paramount.  We are here today because of decades

11    of financial irresponsibility, sometimes corruption and waste,

12    and I think that it would be incorrect to assume that those

13    days can never recur.

14              You don't have to look farther than the reports on the

15    FBI investigation into the handling of some of the funds, the

16    Whitefish contract at PREPA, to see that those concerns are

17    extant.  So we should err on the side of maximum accountability

18    and auditing.

19              What I heard Ms. Uhland say was that they were going

20    to share in the data room -- and we're fine with that

21    concept -- the information that's going to the oversight board.

22    Subject to working out language with them on that, with respect

23    to those reports, we should be fine with that, recognizing we

24    may come back at periods of time, your Honor, and say we really

25    need more information because the reality of how it's working

```
 1    isn't giving us enough visibility into how the funds are being
 2    spent.
 3           Because one of the risks, and we've talked about it,
 4    is that FEMA, the federal government decides at some point that
 5    the monies were being misused.  You need to know that as soon
 6    as it happens so that we don't have a period of time where
 7    these claims get disobligated or deobligated, I don't know what
 8    the term of art is, but become obligations of various entities,
 9    and they are no longer grants.  They are reimbursement claims.
10           THE COURT:  You are saying if there is a statement by
11    FEMA that they are considering disobligating or going to take
12    steps to disobligation, you want there to be notice to
13    creditors of that indication apart from and in addition to the
14    quarterly posting of the regular reports to FEMA or whatever
15    entity?
16           MR. DUNNE:  Yes.
17           Ideally, your Honor, we would like to see what the
18    federal government sees on that, but it's really your point,
19    that when the federal government is concerned, they are
20    auditing, they think may have been inappropriate use or misuse
21    of these proceeds, we should know that real time.
22           THE COURT:  Thank you.
23           MR. DUNNE:  That is all I have.
24           THE COURT:  Thank you.
25           Ms. Goldstein.  Good morning.
```

1        MS. GOLDSTEIN:  Thank you, your Honor.  Marcia

2   Goldstein on of behalf of National Public Finance.

3        National is a creditor of the commonwealth, of PREPA,

4   and of HTA, so we have a very significant interest in this

5   order.

6        We filed a limited objection because we do support the

7   requested comfort order for FEMA.  We obviously hope to see the

8   FEMA funds made available to Puerto Rico, whether it's the

9   commonwealth or the instrumentalities, as soon as possible so

10  that the island can get back on the path to recovery.

11       At the same time, we believe the order should not

12  abridge or enlarge the rights of either the creditors or the

13  debtors in the Title III cases.  So that prompted our limited

14  objection focused on a few sections of the order.

15       We talked quite a bit before I got up here about the

16  section regarding the commonwealth having a superpriority

17  claim.  For the record, this is the first I have heard today

18  that anybody was considering a superpriority lien.

19       That would, of course, as your Honor has stated,

20  require an additional court hearing, and we, as secured

21  creditors of PREPA and HTA, would obviously oppose that.  But I

22  think that's not before the Court today.

23       We had concerns with respect to the superpriority

24  claim provision, and we appreciate Ms. Uhland's suggestion that

25  we try to work that out.  We think that can be worked out.

Hapnproa

```
 1            We think it's important for the creditors of all the

 2    entities to understand how contracts are being approved.

 3    Mr. Dunne mentioned the Whitefish contract, which has garnered

 4    quite a bit of attention, and the facts relating to something

 5    that could be viewed later by FEMA as a noncompliant contract

 6    or a noncompliant expenditures and a resulting deobligation may

 7    be determinative of the superpriority claim of the

 8    commonwealth.

 9            We don't know at this point in time who is actually

10    approving the contracts, and so there may be some factual

11    determination that needs to be made even with respect to a

12    superpriority claim.

13            There isn't a need today -- and again I appreciate

14    Ms. Uhland's suggestion that we continue to work on this -- to

15    create intercreditor issues where there may not be any, because

16    today we really do not have a factual predicate for the

17    superpriority claim that's currently in the order.

18            The other provision that we --

19            THE COURT:  So, to be clear, as of this point, and

20    subject to further side discussion with Ms. Uhland, even today

21    National's position would be to oppose inclusion of the

22    proposed superpriority claim provision in the order if I am

23    entering an order today?

24            MS. GOLDSTEIN:  Today, yes.  We would not want that in

25    the order today.  We had suggested some qualifying language
```

1  that would preserve rights to come to court and argue that it

2  was inappropriate in the particular factual circumstance.

3      So I'm not here to prejudge whether the commonwealth

4  should have a superpriority claim or not.  It may be very well

5  appropriate in those circumstances.  I think the most important

6  thing, and I think that's that Mr. Dunne alluded to, is for the

7  creditors to have an understanding not only through reporting

8  of how the money is spent, but what is the approval process

9  here?  Is the oversight board going to be approving contracts?

10      We would like to have some transparency into that, and

11 if we're comfortable this issue may go away.  I think we all

12 share an interest in making sure there is minimal, if any, risk

13 of deobligation here.

14      THE COURT:  I appreciate your patience with me in my

15 need for insight in a situation in which you all have much

16 larger information base than I do as to what these issues are.

17      Are you saying that if we were to enter today an order

18 with a superpriority concept in it or provision, you would be

19 comfortable if that also had a caveat that explicitly reserved

20 the right to attack the superpriority or litigate the issue of

21 whether the superpriority is appropriate as to a particular

22 deobligation on a more developed factual record later?

23      MS. GOLDSTEIN:  Your Honor, that would be very

24 helpful.  I think we would want to be sure that the

25 superpriority is compliant with applicable law, and that, as

1   you suggest, have an opportunity to consider the factual

2   predicate and have that considered by the Court if necessary.

3         THE COURT:  So the provision could be there but not

4   preclude such litigation later?

5         MS. GOLDSTEIN:  That's right.

6         THE COURT:  Thank you for helping me understand what

7   you are looking for there.

8         MS. GOLDSTEIN:  The other provision that we raised

9   with respect to items that are not necessary at this time, and

10  let me just step back a second.

11        On the superpriority it isn't necessary today to have

12  that determined in order to give FEMA comfort.  That's why we

13  distinguish, and I think this has been mentioned by the prior

14  speakers, we want an order entered today as to what FEMA needs

15  to give it comfort that the creditors are not asserting liens

16  with respect to their funds.

17        So that takes me to one of the other provisions in the

18  proposed order.  We received many versions of this on adequate

19  protection.

20        Let me say that -- at least I can speak for my

21  client -- there is no intention to assert an adequate

22  protection claim with respect to FEMA funds.

23        However, the FEMA funds -- and let's use PREPA as an

24  example -- will be used to rebuild, to repair the PREPA system.

25  The PREPA creditors, the PREPA bondholders have a lien, a

 1 | revenue lien, a special revenue lien under bankruptcy law with

 2 | respect to those revenues.

 3 |         It was unclear and it remains unclear.  AAFAF's

 4 | counsel has added some language based on language we gave to

 5 | the reservation of rights.  We want to be clear that our lien

 6 | rights are not limited.  The trust agreement provides that

 7 | improvements, repairs, etc., are part of the system.  We will

 8 | have a lien on those revenues.  And we believe this order

 9 | should not be in any way limiting that lien.

10 |         If AAFAF or the oversight board has any argument about

11 | that lien, that's fine.  We suggested language to the original

12 | paragraph 7 which I think in the new order is still paragraph

13 | 7.

14 |         We are OK if our language is moved to paragraph 11.

15 | There is, as I said, some version of our language that has been

16 | placed in paragraph 11, but it does not provide the clarity

17 | that we've requested with respect to this order not limiting

18 | the lien rights of PREPA secured creditors.

19 |         It's one thing to say that we are not limiting a

20 | right.  It's another thing to say, which their language does,

21 | to say we could assert a right or that it may be considered.

22 |         We suggest on this -- this is a language issue.  We

23 | would suggest that the paragraph on adequate protection also be

24 | deferred along with the paragraph on superpriority so that we

25 | can work out this language.

1          We don't think this language is necessary for FEMA.

2     This is a language with respect to creditors' lien rights.  I

3     think that's something that we could also continue to discuss

4     with counsel for AAFAF and the oversight board.

5          THE COURT:  Thank you.

6          I think that brings us back to Mr. Friedman for

7     rebuttal.

8          MR. P. FRIEDMAN:  Your Honor.

9          THE COURT:  Yes.

10         MR. P. FRIEDMAN:  Peter Friedman from O'Melveny &

11    Myers.  I wonder if it may be helpful to take a two-second

12    break so I could talk to other counsel about their issues and

13    see if I could resolve them before coming back for my rebuttal,

14    if that's helpful.

15         THE COURT:  That makes sense.

16         Let's call this a five-minute break.

17         MR. P. FRIEDMAN:  Thank you, your Honor.

18         (Recess).

19         THE COURT:  Good morning again, please be seated.

20         MR. P. FRIEDMAN:  Your Honor, Peter Friedman.

21         THE COURT:  Just one moment.

22         Counsel, I'm told that there's an audibility problem

23    in San Juan, so please be certain always to speak up and speak

24    directly into the microphone.

25         So I understand we are starting with Mr. Friedman with

1   six minutes?

2        MR. P. FRIEDMAN:  Yes, your Honor.  Peter Friedman

3   from O'Melveny & Myers.  I am going to speak hopefully for 90

4   seconds, and Ms. Uhland is going to walk through the issues

5   that have been resolved and some additional language.

6        Matthew Troy from the United States government is

7   going to address provisions that are extremely important to the

8   government and why they are important and why, despite

9   objections, those provisions cannot come out of the order and

10  the objections should be overruled.

11       I wanted to say two things.

12       First, as you have heard about the Whitefish contract,

13  just from the government's perspective, from AAFAF's

14  perspective, first of all, the government wants to note that

15  Whitefish is actually the only contract provider on the ground

16  right now doing critical infrastructure work of repairing

17  PREPA.

18       The government believes that contract was conducted in

19  a compliant manner with FEMA regulations.  Of course,

20  information about that process and the contract will be shared

21  with the oversight board.  That is something the oversight

22  board requests.  In addition, something called a GAR, or

23  governor's audit review, will be conducted with respect to that

24  contract.

25       On the somewhat related issue of reporting, just to

 1   clarify comment that Mr. Dunne made, so that there is no

 2   confusion, AAFAF is willing to place reporting to FEMA, the

 3   quarterly reports made to FEMA in the data room, not all

 4   oversight board reporting, but FEMA reporting, and we think

 5   that should provide creditors with important insight into how

 6   disaster relief funds are being spent.

 7          Mr. Dunne has requested, and I think we are agreeable

 8   to have a discussion with them about some of the other

 9   disclosure issues which he alluded to in his remarks.  To the

10   extent that there are continue to be open issues, I think

11   hopefully, with the Court's permission, we can address those on

12   the 15th.

13          So I will commit to having discussions.  I can't

14   commit to what additional disclosures can be made, but I

15   certainly can commit to discussions about an issue that I know

16   is of interest on creditors.

17          With that I would like to turn it over to Ms. Uhland

18   to address how the order has been changed based on discussions

19   with creditors who have raised objections.

20          THE COURT:  Thank you.

21          MS. UHLAND:  Thank you, your Honor.

22          I have a hand marked copy of the order, if I may

23   approach with it.

24          THE COURT:  Yes, please.

25          MS. UHLAND:  Your Honor, the red line is against the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  version you have the, typed red line is against the version

2  that you have.  So there are red-line changes as well as my

3  hand-marked changes to resolve the issues.

4       The first change is in paragraph 2.

5       The GO bondholders had raised some concerns about the

6  last part of paragraph 2.  We are amenable to changing that to

7  be clear that we are talking about distributions in any Title

8  III case as opposed to for any purpose in connection with.

9       THE COURT:  All right.

10       Does everyone out here already know what the precise

11  language change is?

12       MS. UHLAND:  It was a little bit of a swarm.

13       THE COURT:  Let me just try to do it efficiently from

14  my perspective.  So we have language that said "or resources

15  for any purpose in connection with any restructuring

16  proceeding" and you are striking the words "purpose in

17  connection with" and instead saying "resources for any

18  distribution in any restructuring proceeding."

19       MS. UHLAND:  Yes, your Honor.

20       Our second two changes are to footnote 2.

21       First is the clarification that we are talking about

22  subpart (a) in the second line of C.F.R. 200.40, subpart (a).

23       THE COURT:  Yes.

24       MS. UHLAND:  And the second change -- even though we

25  believe this is redundant, but it is an issue for the

Hapnproa

```
1    creditors -- is we are going to reinsert the language before

2    the first proviso that says "in the form of grants."

3            THE COURT:  So right after the words "restorative

4    assistance" so that the reference is to "restorative assistance

5    in the form of grants"?

6            MS. UHLAND:  Yes.

7            THE COURT:  Thank you.

8            MS. UHLAND:  Well, in the form of grants actually

9    modifies the entire phrase ahead of that, all the disaster

10   relief funds that are enumerated there.

11           THE COURT:  Yes.

12           MS. UHLAND:  That may be used for the purposes of

13   providing emergency assistance disaster relief.

14           THE COURT:  And/or recovery and restorative assistance

15   in the form of grants.

16           MS. UHLAND:  Right.

17           THE COURT:  Is everyone at peace with the inclusion of

18   the reference to related program income?

19           MS. UHLAND:  We included that at the request of the

20   federal government, and I believe they still would like to have

21   that language included.

22           THE COURT:  Thank you.

23           MS. UHLAND:  Next, in paragraphs 3 and 4, we wanted to

24   clarify that we are talking about federal agreements to provide

25   aid.  So we have added at the very end of paragraph 3 the
```

1    phrase, "with the United States or any agency thereof," so that

2    it is clear we are talking about related agreements with the

3    United States or any agency thereof when we are talking about

4    which funds are going to be treated.

5           Similarly, in paragraph 4, there was a reference to

6    "or related agreements," the fourth line from the bottom.  And

7    we inserted the language, after "related agreements," "with the

8    United States or any agency thereof."

9           THE COURT:  Yes.

10          MS. UHLAND:  Similarly, at the very end of paragraph

11   6, we have added the same phrase, after "related agreements,"

12   "with the United States or any agency thereof."

13          With respect to paragraph 7 and the adequate

14   protection, we believe we have reached an agreement in

15   principle with a variety of creditors with respect to paragraph

16   7 and the adequate protection concept, but there is some

17   continuing discussion we were going to have around

18   wordsmithing.

19          So what we would propose to do is submit a revised

20   order later today once we have the opportunity to go back and

21   modify likely paragraphs 7 and 11.

22          THE COURT:  That is fine.

23          That is as to both paragraph 7 and paragraph 11?

24          MS. UHLAND:  Yes.  In paragraph 8, at the request of

25   the United States, we added in the second line from the bottom

1    the word "present or future" before "case under Title III of

2    PROMESA."

3           Going to the next page, at the end of paragraph 9, we

4    had a proviso that was intended to help the creditors be clear

5    that we were only talking about grants and not loans. But the

6    concern was that it actually muddied, maybe muddied the waters

7    by having this clarification in there, so we are striking the

8    proviso at the end of paragraph 9.

9           THE COURT: Yes.

10          MS. UHLAND: Paragraph 10 on the superpriority claim.

11          This is a superpriority claim that the commonwealth

12   would have in a case of another entity in Title III.

13          We propose, after discussion with the parties, that we

14   add to the end the phrase "in the amount, if any, determined by

15   the Court after notice and hearing."

16          THE COURT: So it's not an automatic superpriority

17   claim. There would be an application for a superpriority claim

18   in the event that there were a deobligation and a need to

19   assert a reimbursement claim?

20          MS. UHLAND: The issue is the status -- the level of

21   the claim the parties are agreeing to. The concern that

22   creditors have raised is, one, what is the amount and what

23   debtor actually should be on the hook for it?

24          So there is an argument that if it was the

25   commonwealth's administration of the PREPA contract that caused

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    the funds going to PREPA to become deobligated, that shouldn't

2    necessarily be a PREPA liability.

3         So there needs to be an understanding of how the claim

4    arose and which party should be on the hook and in what amount.

5    So it was raised as a question of allocation and amount.

6         THE COURT:  Thank you.

7         MS. UHLAND:  You see some red line -- actually it is

8    in paragraphs 11 and 12.  We will be coming back to the Court

9    to deal with this issue.

10        The crux of the issue, your Honor, is that we want the

11   clarity that, the moving parties want the clarity that there

12   won't be an adequate protection claim for the use of the

13   federal funds.  In other words, the expenditure of the federal

14   funds, that that won't give rise to an adequate protection

15   claim because that could be a liquidity issue for us.

16        The creditors are concerned.  They want to preserve

17   all of their rights with respect to their existing collateral.

18   To the extent, for example, that federal funds improve their

19   collateral and that generates revenues, they want to make sure

20   they preserve their collateral claims with respect to that.

21        As I said, I think we have a meeting of the minds.  It

22   is just that there was too much language to work through right

23   now.  But we expect we will have something later today for the

24   Court.

25        THE COURT:  So you do expect, then, that the order

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    that I would be asked to sign today would include the further

2    refined adequate protection language as well as the

3    superpriority lien subject to quantification and identification

4    of targets of the -- sorry, superpriority claim, not lien.  I

5    apologize.  I didn't mean to panic anybody.

6          So the language we just discussed

7    and-adequate-protection language will be in the order that I

8    will be requested to sign, but it will be further refined from

9    what is here?

10          MS. UHLAND:  That is correct, your Honor.

11          THE COURT:  So as to issues deferred to November,

12    there would be the question of whether there would be a lien in

13    addition to the superpriority claim.

14          Is there any other issue that you know of right now

15    that would be deferred for November?

16          MS. UHLAND:  No.

17          THE COURT:  Thank you.

18          MS. UHLAND:  I will turn it over to Mr. Troy.

19          THE COURT:  Thank you.

20          Good morning, Mr. Troy.

21          MR. TROY:  Good morning, your Honor.

22          Matthew Troy, Department of Justice, Civil Division,

23    on behalf of the United States.

24          Your Honor, I was going to address two of the

25    objection that is were made to you earlier regarding the terms

1    of the order, one that Ms. Uhland already addressed with you,

2    but for further clarification with respect to the proviso or

3    the additional language of other related agreements with the

4    United States or an agency thereof.

5        The reason for that, your Honor, the reason the

6    government requested it is because there are other federal

7    disaster relief funds at play here for which the commonwealth

8    and its instrumentalities might be eligible that are not

9    administered by FEMA.

10       There is, for example, $7.4 billion appropriated under

11   the Housing and Community Development Act that is administered

12   by HUD.

13       The availability of those funds is tied to a major

14   disaster declaration under the Stafford Act, but it's HUD that

15   administers that program and those funds subject to its

16   regulations in the Housing and Community Development Act.

17       So there is the possibility of having not just a FEMA

18   agreement, but an agreement with other U.S. agencies.

19       THE COURT:  That is something that is in prospect in

20   real time, not something that just might happen down the road?

21       MR. TROY:  To the best of my knowledge, your Honor.

22       I am also learning about this process as well along

23   with everyone else in the room, but to the best of my

24   knowledge, yes.

25       The second issue, your Honor, had to do with what I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    believe is paragraph 8 in what we will call the superpriority

 2    claim for the United States, your Honor.

 3            That is something that the United States is requiring,

 4    your Honor.  They are extending these funds now in real time to

 5    help essentially rebuild Puerto Rico, your Honor.

 6            We feel that that is a necessary protection, and I

 7    would point out that it is a protection that only arises upon

 8    the disallowance of funds used by the commonwealth.

 9            So simply the use of the funds by the commonwealth or

10    one of its instrumentalities is not the triggering point.  It

11    is the use of those funds and then a later determination that

12    they haven't been used in accordance with applicable federal

13    law.  That triggers the disallowance, your Honor.  That's when

14    this paragraph comes into play.

15            Thank you.

16            THE COURT:  Thank you.

17            So, Mr. Friedman or Ms. Uhland, do you wish to say

18    anything further?

19            All right.  Thank you.

20            So, having carefully listened to everything said here

21    today, and with the benefit of your further negotiations,

22    consultations, language changes, and explanations following the

23    break, the Court finds that it is necessary, appropriate, and

24    authorized by law to grant the urgent joint motion, and that

25    the grant of the motion will be in the form of the revised

Hapnproa

```
1    order whose substance was described by Ms. Uhland on the record

2    a few minutes ago, subject to further revisions that are to be

3    submitted to the Court this afternoon.

4          The objections are overruled to the extent they are

5    inconsistent with the revised form of order, and the Court will

6    be prepared to enter that order when it is forwarded to the

7    Court.

8          I suggest that you forward it in the form of a Word

9    document to the Swain DPR e-mail address.

10          I suppose for clarity as to the source of my order you

11   can also just file it on ECF as an informative motion of the

12   proposed order being submitted to the Court today so that the

13   parties have an ECF docket entry source to join it up with.

14          Does that work for you?

15          MS. UHLAND:  Yes.

16          THE COURT:  Very good.  Thank you.

17          So that concludes the proceedings on the joint motion

18   regarding disaster relief funds.  Let's take a five-minute

19   break before proceeding with the motion of the COFINA agent.

20          Thank you.

21          (Recess)

22          THE COURT:  Good afternoon.  Please be seated.

23          So now we turn to the COFINA agent's motion for

24   miscellaneous relief.  I'll refer to it as the clarification

25   motion.  I think we all know what we are talking about.
```

```
 1            So, to review the time allocations as we have them,

 2    the COFINA agent's principal argument of 20 minutes will be

 3    presented by Mr. Yanez.

 4            Then Mr. Despins will have ten minutes,

 5    Mr. Bienenstock will have ten minutes, the representative of

 6    AAFAF will have 12 minutes will to be speaking.

 7            MR. P. FRIEDMAN:  I will.

 8            THE COURT:  Mr. Friedman of AAFAF will have 12

 9    minutes, Mr. Gray will have five minutes for Bank of New York

10    Mellon, and five minutes will be shared by Messrs. Kirpalani

11    and Friedman for the COFINA senior bondholders and National

12    respectively.

13            Then the COFINA agent will have 20 minutes for

14    rebuttal.

15            Is that consistent with everybody's expectations?

16            Good.  So I would invite Mr. Yanez to the podium.

17            THE COURT:  Before you start your argument, I have a

18    question.

19            So one aspect of this application is approval of the

20    retention of the Navarro-Cabrer Law Offices as local counsel.

21    I didn't see any opposition to that application in any of the

22    submissions.  So raise your hand if you represent anyone who is

23    opposed to that portion of the application?

24            Seeing no raised hands, that aspect of the motion is

25    granted as unopposed.
```

 1          So we can focus on the remaining aspects of the

 2   motion.

 3          MR. YANEZ:  Thank you, your Honor.

 4          Good afternoon.  May it please the court, Antonio

 5   Yanez from Willkie Farr & Gallagher on behalf of the COFINA

 6   agent.

 7          Judge, there are two remaining items with respect to

 8   our motion.

 9          One is that we are seeking confirmation that PROMESA

10   Section 105 applies to the COFINA agent.

11          The other is clarification with respect to the payment

12   of fees and expenses.

13          I would like to discuss each of those in turn.

14          With respect to Section 105, your Honor, the issue

15   before the Court is whether the COFINA agent should have

16   protections for good-faith actions taken in discharging her

17   obligations.

18          There are objections which are focused on scope and

19   which I will cover.  But the issue properly before the court

20   today is not scope.  It is immunity.  To be clear, it is

21   immunity for good-faith actions taken by the COFINA agent in

22   connection with her responsibilities.  No one today is alleging

23   bad faith, and there would be no basis for that allegation were

24   it to be made.

25          Judge, we submit that the COFINA agent clearly should

1    be protected by Section 105.  In fact, it seems like the only

2    reason we are here is a gap in the drafting of the stipulation

3    that appointed the COFINA agent.

4           Section 105 exempts the oversight board, its members

5    and employees for liability for official action.  The COFINA

6    agent was appointed in order to carry out the oversight board's

7    responsibilities in litigating and mediating the

8    commonwealth-COFINA dispute.  In other words, she's stepping

9    into the shoes of the oversight board for those purposes.  It

10   should follow that she should have the same immunity, which

11   means, again, immunity for all actions taken in good faith.

12          That's critical --

13          THE COURT:  So the drafting gap is that the

14   stipulation doesn't address the 105 issue at all, or is it that

15   105 of PROMESA itself doesn't explicitly mention agents, or is

16   it both?

17          MR. YANEZ:  It is that the stipulation is not explicit

18   that the Section 105 protections extend to the COFINA agent.

19          Judge, that is critical for the COFINA agent frankly

20   for the same reasons that it's critical for the oversight board

21   and its members and for that matter to trustees and unsecured

22   creditors committees and others that enjoy similar protections

23   in other contexts.

24          The threat of liability should not be a consideration

25   if the COFINA agent is discharging her responsibilities in good

1  faith.

2       I do want to emphasize, Judge, that what we are

3  talking about is personal liability.  The agent is not an

4  institution or a committee.  This is potential personal

5  liability for an individual.

6       Now, as the Court knows, there were two objections,

7  one from the oversight board and the other from AAFAF.  None of

8  the COFINA constituents and none of the commonwealth

9  constituents have objected to immunity.  But the oversight

10 board and AAFAF take the position that the COFINA agent should

11 only receive immunity to the extent that she acts in a manner

12 that is consistent with what they view as being within the

13 scope of her authority.

14       Our papers and papers that have been filed by others

15 provide the Court with a number of reasons that those

16 objections should be overruled.  I would like to focus on

17 three.

18       The first is that immunity is not the proper mechanism

19 to address questions about the scope of the agent's authority.

20 If there are questions about scope, and we know that there are,

21 they can be raised in the context of motions to dismiss.  Those

22 motions can be briefed, they can be argued, and your Honor can

23 render a decision.

24       THE COURT:  Well, that is certainly a way of

25 determining whether or not the issues claimed to be ultra vires

1    are furthered in the litigation.  But since what we are talking

2    about is a delegation of authority from the oversight board,

3    doesn't the oversight board have a legitimate concern with the

4    contours of that delegation?

5             So, to the extent it's delegating authority, to the

6    extent it is opening the door to a sharing of its immunity, the

7    oversight board presumably did not intend to write a blank

8    check.  The oversight board intended to make a specific

9    delegation.

10            So don't I need to have some clarity as to the scope

11   of the delegation now in order to be able to make a meaningful

12   affirmation of the extent of immunity?

13            MR. YANEZ:  Your Honor is correct, that there are

14   scope issues.  I think that the question is what is the proper

15   mechanism for addressing those, putting aside for the moment

16   the timing.

17            One way to go is the way that we seem to be going

18   here, which is to address them under the rubric of immunity,

19   which frankly hangs over the COFINA agent, the threat of

20   liability.

21            In other words, as we stand right now, it's not even

22   clear that the COFINA agent could engage in good faith in

23   argument before Court on the question of scope without further

24   exposing herself to liability.

25            That's not workable, Judge.  The motion to dismiss is

1 one mechanism that can be used to address those issues, which

2 really come down to questions of standing and, as your Honor

3 has pointed out, questions of delegation of authority.

4      That is not the only mechanism.  I guess our main

5 point for today is that what is clearly not the proper

6 mechanism is immunity and the threat of personal liability.

7      THE COURT:  So, again, I am just trying to understand

8 how your proposal works as a practical matter.  This may also

9 help the oversight board and AAFAF in explaining to me the

10 contours of their objection.

11      Are you saying, for instance, that whatever happens,

12 because these claims were asserted, claims and defenses were

13 asserted in good faith by the COFINA agent in the first

14 instance, until and unless those claims are dismissed, then the

15 COFINA agent should have immunity covering litigation

16 concerning those claims and indeed even the argument today

17 about the breadth of the contours of the delegation under the

18 stipulation, so that there should be no scenario in which I

19 decide today that the COFINA agent's assertion ab initio of

20 those counterclaims and defenses was basically on her own meter

21 as opposed to a meter that would be covered by the 105

22 immunity?

23      MR. YANEZ:  That is exactly right, your Honor.  That

24 is exactly right.

25      Admittedly there is a need for clarity on scope.  I

1   think there are lots of questions that different people have

2   raised.

3           Until those issues are clarified by the Court, the

4   COFINA agent should have immunity to litigate what she believes

5   in good faith she should be litigating, which is, of course,

6   her charge under the stipulation that appointed her.

7           THE COURT:  Thank you.

8           MR. YANEZ:  So let me speak to that just a little bit

9   more, in particular, the really untenable situation that the

10  COFINA agent would find herself in if she were called upon to

11  move forward with litigation in any form really without having

12  immunity for good-faith actions.

13          The stipulation that appointed the COFINA agent, your

14  Honor, defines the commonwealth-COFINA dispute as whether,

15  after considering all procedural and substantive defenses and

16  counterclaims, including constitutional issues, the sales and

17  use taxes purportedly pledged by COFINA to secure debt are the

18  property of the commonwealth or COFINA under applicable law.

19  So what's contemplated, at least under the plain terms of the

20  stipulation, is a litigation involving all procedural and

21  substantive defenses and counterclaims.

22          In the context of contemplating a litigation involving

23  all defenses and counterclaims, the stipulation imposes on the

24  COFINA agent a duty of care, and in that same context it

25  provides for intervention by the parties in economic interest

1  and requires the COFINA agent to consult.

2          Where we are right now is that the oversight board and

3  AAFAF are putting the COFINA agent in a position where she

4  faces personal liability to the extent that her view of all

5  defenses and counterclaims is different from theirs, even

6  though every one of her counterclaims I would add relates to

7  COFINA's rights to the pledged sales tax.

8          In addition to that, the COFINA agent's duty of care

9  would seem to encompass bringing counterclaims that might be

10  deemed compulsory under the Federal Rules of Civil Procedure.

11          She can't expose COFINA to the argument that

12  counterclaims have been raised, but again, according to the

13  oversight board and AAFAF, she should face personality

14  liability if they think she's gone too far.

15          And further still, Judge, the COFINA agent needs to

16  consider how her actions might affect complaints in

17  intervention, and that includes whether someone might argue

18  that intervenors are foreclosed from bringing certain claims

19  because they are outside the scope of what the COFINA agent

20  asserted as counterclaims.  But again that leaves her open to

21  personal liability, too.

22          It is not a workable situation, your Honor.

23          THE COURT:  I am not asking you to go through every

24  single line of the counterclaims and defenses, but I would ask,

25  because I think it may help for context in this discussion, for

1    you to draw the synapses between certain of the assertions that

2    have been picked out in the objections and the issue ultimately

3    of the ownership of the SUT funds and/or issues relating to

4    potential negotiations to resolve that.

5           If you can lay out for us as plainly and succinctly as

6    you can, how, for instance, a request to dismiss the Title III

7    relates to litigation or negotiation of ownership of the SUT

8    fund.

9           MR. YANEZ:  I will begin with that one, your Honor.

10          The reason that is in there is that one could argue

11   that a logical consequence of COFINA owning the funds would be

12   questions about the Title III petition.  Having said that, with

13   respect to that aspect of the prayer for relief, we would be

14   prepared to withdraw it without prejudice to its assertion

15   later.

16          More broadly, Judge, every single one of our

17   counterclaims other than the first counterclaim, which is a

18   mirror image to the declaratory judgment claim, every single

19   one of the counterclaims except for the one that mirrors the

20   constitutional questions that were raised by the commonwealth

21   agent has been challenged here.

22          I will speak to that generally, and then I'm happy to

23   go through counterclaim by counterclaim if the Court would like

24   me to.

25          As a general matter --

1    THE COURT:  Just give us some highlights, because I

2  don't want to take up all your time.

3    MR. YANEZ:  OK.

4    As a general matter, start the proposition which is

5  supposed to be here, which is all counterclaims under available

6  law.  That is what the stipulation says, and that is what the

7  COFINA agent's duty of care required her to assert.

8    What we were responding to was a broad complaint.  It

9  was an expansive complaint by the commonwealth agent that

10  asserted 13 causes of action, different theories for the

11  commonwealth to take the pledged sales tax and different

12  avenues for the commonwealth to avoid a breach or reject its

13  obligations.

14    So that is the broader context.  With respect to

15  specific counterclaims that we have asserted, we have asserted

16  counterclaims alleging that, to the extent that a pledged sales

17  tax is taken from COFINA, that constitutes a takings under the

18  federal Constitution, that it constitutes also a violation of

19  the contracts clause.

20    The issue there is, if it COFINA's property, and it is

21  nevertheless taken what does ownership mean and can it be taken

22  without consequence?  It goes to the rights that COFINA has in

23  the property.

24    We seek declaratory judgment with respect to the

25  compliance law, that the compliance law, to the extent it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  purports to authorize the government to take the pledged sales

2  tax from COFINA, that that is a violation of PROMESA.  Again,

3  it goes to ownership, and it goes to applicable law, because

4  PROMESA is the applicable law here, as is the compliance law.

5      We've got a claim for declaratory judgment with

6  respect to Act 84, which changes the percentage of the SUT that

7  COFINA receives and the speed with which it receives it over

8  the course of the year -- again, going to ownership, and Act 84

9  being applicable law that speaks to ownership.

10     There are other claims, but there is one that may

11 receive some focus here, which is that we seek declaratory

12 judgment that certain general obligation debt violates the debt

13 limit in the commonwealth constitution.

14     The connection between that claim, your Honor, and the

15 claim with respect to COFINA's ownership is that if the COFINA

16 structure is constitutional, but there is a ruling that the

17 commonwealth can have access to COFINA funds because they are

18 quote-unquote available resources within the meaning of the

19 Puerto Rico constitution, that does not give the commonwealth

20 carte blanche to take all of it.

21     What that means is they have the ability potentially

22 to access funds necessary to service validly issued general

23 obligation debt.  If there is less validly issued general

24 obligation debt that is out there, then there is less debt to

25 service and there is a smaller amount that the commonwealth can

 1   have access to within the funds that belong to COFINA.

 2              THE COURT:  Thank you.

 3              MR. YANEZ:  Those are the broad strokes in terms of

 4   how the counterclaims that we have asserted are within the

 5   COFINA agent's authority.

 6              I want to make one final point on this subject before

 7   moving on.

 8              An additional reason the objection should be

 9   overruled, Judge, is that the COFINA agent and the commonwealth

10   agent were appointed because the oversight board and AAFAF are

11   conflicted here.  Given those conflicts, they should not be

12   able to dictate the shape of the commonwealth-COFINA dispute.

13              As an aside, Judge, AAFAF doesn't even have standing

14   to object.  Others will go into that, so I won't, but we are

15   not waiving the issue.

16              For present purposes, what I want to focus on is that

17   the whole idea was to appoint agents who would act

18   independently and litigate without being dictated to.  That was

19   explicit, Judge, in the motion papers that sought to appoint

20   the agents.  It was explicit in the stipulation itself, which

21   provides that neither the oversight board nor AAFAF shall have

22   any right to contest any judgment made by the agents in

23   litigation.  That's in paragraph 4K of the stipulation, your

24   Honor.

25              I don't want to belabor this, but it was explicit in

1  the transcript of the June 28 hearing that preceded the agent's

2  appointment.

3        Your Honor, at that hearing here's what the oversight

4  board's counsel had to say in response to questions from the

5  Court on this subject.  I am reading, your Honor, from pages

6  118 and 119:

7        "I think we would want the COFINA agent to litigate to

8  the death what they believe is in the best interest of COFINA.

9  That may take into account what I think your Honor just

10 articulated and I think I just did, but we wouldn't tell it

11 what's in its best interest.  We leave that completely up to

12 them.  Really, as I explained at the outset, our only desire is

13 to have influence on the settlement if someone comes up with

14 something that just doesn't work."

15       Judge the idea here was to have an independent agent.

16 The idea was to have an agent that exercised its discretion.

17 She is obligated to exercise that discretion consistent with

18 her duty of care.

19       It is not fair, Judge, and it's not workable to impose

20 upon her those obligations in that context and at the same time

21 say she can't have immunity for good-faith actions.

22       Unless the Court has additional questions on that

23 subject, I'm prepared to move on.

24       THE COURT:  You can move on to fees.

25       Thank you.

| | |
|---|---|
| 1 | MR. YANEZ: Thank you. Let me turn then to the |
| 2 | question of fees and expenses. |
| 3 | The COFINA agent seeks clarification that the agent |
| 4 | herself and her professionals should be paid by COFINA, and, to |
| 5 | the extent that COFINA can't pay, by the commonwealth. |
| 6 | There are two objections there as well, one from Bank |
| 7 | of New York Mellon and the other from AAFAF. |
| 8 | With respect to Bank of New York Mellon, the principal |
| 9 | objection is that payment can't be made by funds that are held |
| 10 | by Bank of New York Mellon because those funds are held in |
| 11 | trust for the COFINA bonds. They're pledged to bondholders and |
| 12 | they don't belong to COFINA. |
| 13 | So, Bank of New York Mellon isn't arguing that the |
| 14 | COFINA agent and her professionals shouldn't be paid. Only |
| 15 | that payment shouldn't come from them. |
| 16 | That objection, we would submit, your Honor, should be |
| 17 | overruled for two reasons. |
| 18 | First, payment of fees from secured collateral is |
| 19 | consistent with Section 506(c) of the Bankruptcy Code. As your |
| 20 | Honor knows, that section allows fees to be charged against a |
| 21 | secured creditor's collateral if reasonable and necessary to |
| 22 | preserve the collateral. |
| 23 | That is what the COFINA agent is trying to do. |
| 24 | There is also the second reason, is that the services |
| 25 | that the COFINA agent is providing themselves constitute |

1    adequate protection.  The COFINA agent's working to protect

2    COFINA's rights to the pledged sales tax.  Without those

3    efforts COFINA's estate and the collateral, the value of that

4    collateral would be diminished.  So those efforts themselves

5    provide adequate protection.

6          I would also point out, Judge, that none of the

7    bondholders, none of the COFINA bondholders is objecting to

8    payment here.

9          THE COURT:  Would you be looking to be paid ahead of

10   Bank of New York Mellon, and would you be looking to be paid

11   out of those interpleaded funds before the Court makes its

12   final determination as to ownership and disposition of the

13   entire corpus of interpleaded funds?

14         MR. YANEZ:  Yes, your Honor.

15         THE COURT:  Aren't at least fees accrued by Bank of

16   New York Mellon postpetition also administrative expenses that

17   would have to be paid?

18         What would be your theory for priming other

19   administrative expenses if there is a limited corpus in COFINA?

20         MR. YANEZ:  So, I think, your Honor, that our

21   perspective is that we are providing services to preserve the

22   collateral, that we are providing services that themselves

23   constitute adequate protection.

24         Those will need to be paid as administrative expenses

25   prior to the confirmation of the Title III plan of adjustment.

1    But, going along, our view is that the COFINA agent and her

2    professionals should be paid on a continuous basis.

3           THE COURT:  So, to the extent you would be looking for

4    authorization to be paid from funds held by Bank of New York

5    Mellon, you would be asking me to change the terms of the

6    interpleader, which as currently set require Bank of New York

7    Mellon to hold those funds until the Court determines for whom

8    those funds are properly being held.

9           MR. YANEZ:  That's correct, your Honor.  That's

10   correct.  And your Honor obviously has the power to modify her

11   own order to the extent necessary.

12          There is another aspect of this, Judge, and it goes to

13   AAFAF's objection.  Their objection seems to be that payment

14   must come from Bank of New York Mellon and cannot come from the

15   commonwealth.

16          Our view is that we need the commonwealth as a

17   backstop.  Otherwise the COFINA agent and her professionals are

18   essentially on a contingency fee here.

19          It is possible that the Court rules in favor of the

20   commonwealth agent.  We don't think that's the right answer,

21   but it is possible.  It would leave COFINA without any assets

22   from which to make payment.

23          Given that possibility, whatever actions the COFINA

24   agent takes would be subject to attack, that she's motivated

25   not by what is in the best interest of COFINA but by her desire

 1   to get paid, and those types of considerations just don't have

 2   a role in this case.

 3          My last point, Judge, is that the oversight board

 4   itself filed a statement in support of the relief we are

 5   seeking.  Specifically, the oversight board has pointed out

 6   that the COFINA's agent fees must be paid in order to confirm a

 7   Title III plan, that COFINA or Bank of New York Mellon at

 8   COFINA's direction should pay the fees, and that if COFINA does

 9   not or cannot at the end of the day then the commonwealth

10   should.

11          THE COURT:  Thank you, Mr. Yanez.

12          MR. YANEZ:  Thank you, your Honor.

13          THE COURT:  Mr. Despins.

14          MR. DESPINS:  Good afternoon, your Honor.

15          Is it possible for me to take eight minutes and keep

16   two minutes for the reply?

17          Is it too late for that?

18          THE COURT:  I think that makes it a little too

19   complicated.

20          MR. DESPINS:  OK.  Let me just dive right in.  The

21   first thing that we want to point out is that the issue of

22   scope is an important one.

23          We believe, we said that in our reply, that in some

24   instances that COFINA agent we believe exceeded the scope of

25   the stipulation.

1        But we said -- this is in footnote 10 -- that it

2   doesn't follow that the COFINA agent is not entitled to the

3   protection of Section 105 as a result of that.

4        The scope needs to be determined.  I think we will

5   discuss this probably after the hearing is completed on this

6   issue, but the scope needs to be determined, and it needs to be

7   determined after all the intervenors file their interventions,

8   because I can guarantee you that there will be all sorts of

9   claims asserted in that context.

10        But it is not a basis to deny coverage or immunity to

11   the COFINA agent or to the commonwealth agent.  As you know, we

12   are seeking the same relief, basically a me-too type of

13   pleading.  We believe we are entitled to that.

14        If we first focus on Section 105, the language is,

15   "Resulting from actions taken to carry out this act" -- or if

16   we transpose that to the stipulation -- "to carry out the

17   stipulation."

18        I don't think the oversight board would want to be

19   held to the standard that they want to apply here, which is

20   that, if it's ever determined that they were outside of

21   carrying out the act, that they have no immunity.

22        I think that if they are pursuing things in good

23   faith, that they are entitled to immunity, and that's why both

24   agents are entitled to immunity.

25        I am not going to repeat all the arguments made by

1   counsel for the COFINA agent.

2         THE COURT:  Is there anything that you would like to

3   share with the oversight board in a thought about nonobvious

4   connections between your view of the scope of the stipulation

5   and claims that have been identified in opposition papers as

6   perceived as going beyond the scope of your delegation?

7         MR. DESPINS:  In terms of our?

8         THE COURT:  Yes.

9         MR. DESPINS:  Yes.

10        I believe, first of all, the board, as far as I know,

11  was never identified any issues where we're quote-unquote

12  outside of our lane.  AAFAF has raised that issue in two

13  instances.

14        One was the issue of rejecting -- to the extent that

15  the statutory scheme creates an executory contract that the

16  commonwealth agent would reject or exercise its right to reject

17  that statutory scheme as an executory contract.

18        That is one issue.

19        The second issue they raised is that the

20  constitutional challenge they believe is outside of our lane.

21        Let me start with the executory contract rejection

22  issue.

23        The argument there is that if in fact, and courts have

24  held that statutory schemes can constitute an executory

25  contract, if in fact that can be rejected, that essentially

1   entitles us, the commonwealth, to keep all the proceeds after

2   rejection, all the future proceeds from the SUT.  So obviously

3   we believe that is within our lane.

4          The second issue that was raised is the

5   constitutionality of the COFINA structure.  We don't understand

6   how we could be outside of our lane.  The very definition of

7   the commonwealth-COFINA dispute includes constitutional issues.

8          So, obviously, if the COFINA statutory scheme violated

9   the Puerto Rico constitution, that's, one, within the scope of

10  our mandate; and, two, would obviously have an impact on

11  ownership of these SUT, because if the statutory scheme

12  violates the constitution, it is null and void.  Therefore, the

13  SUT is owned by the commonwealth.

14         Now, they'll dispute that for all sorts of reasons,

15  and I'm not going to go into remedies, but we believe that

16  these two are clearly within our lane, if you will, and within

17  our mandate.

18         The last point I would address your Honor is you

19  raised the issue of Bank of New York having an administrative

20  claim.  I want be to clear on this.  We believe that the COFINA

21  agent should be paid from the COFINA pot.  There is no doubt

22  about that.

23         We've conceded that if there is no such pot at the end

24  of the day because we are successful on all of claims they can

25  get paid from the commonwealth, because otherwise who are we

1  going to get to handle this litigation?  We need someone to be

2  compensated.

3       The issue of Bank of New York having an admin claim,

4  the Bank of New York cannot have an admin claim because they

5  are not providing services to the estate.

6       These guys -- these guys, the COFINA agent is

7  providing a service to the estate, the COFINA estate, and they

8  have an admin claim, and also, because they are protecting

9  collateral, they can surcharge that.

10      But Bank of New York cannot have an administrative

11  expense claim for whatever work or service it's doing now.  It

12  may have the right to surcharge or to get paid out of the

13  COFINA collateral.  That is not our issue.  But they don't have

14  an admin claim against any estate.

15      I am not going to belabor the point, your Honor.  I

16  think that scope needs to be resolved.  There is no doubt about

17  that.  But we don't believe that it is appropriate to use

18  immunity as a way to determine scope.

19      I think that the best way to do that is wait for the

20  interventions to be filed.  I guess we will discuss scheduling

21  later.  Then the Court can see all the arguments that are

22  raised by all the parties, and then say, OK, this is in, this

23  is out, and then we can move on from there.

24      But we don't believe that either agent should be held

25  to a standard where they don't benefit from immunity because

 1  the Court ultimately determines that what they pled was outside

 2  the COFINA stipulation.

 3          THE COURT:  So, like Mr. Yanez, you believe that

 4  immunity should cover the litigation even of the claims that

 5  have been challenged until such time as they are resolved,

 6  whether that be early knocking out or full litigation of them?

 7          MR. DESPINS:  Correct, your Honor.

 8          Even I said I believe that some of the claims they are

 9  asserting in their counterclaim are outside the scope of the

10  stipulation.  I still believe that they are entitled to

11  indemnity.

12          Just as a practical point of view, your Honor, Bettina

13  Whyte is a stranger to this case.  In a sense she is not a

14  creditor.  She has no involvement in this case.

15          How are we going to find someone to be an agent if in

16  fact they are personally liable if the Court determines a month

17  later that some claims that are asserted are outside the scope

18  of the stipulation?

19          It is impossible to conduct a case that way.  And, of

20  course, again, as I said, the scope issues need to be

21  determined.

22          Thank you.

23          THE COURT:  Thank you.

24          Mr. Bienenstock.

25          MR. BEINENSTOCK:  Thank you, your Honor.  Martin

1   Bienenstock with Proskauer Rose for the oversight board as the

2   representative in Title III of both COFINA and the

3   commonwealth.

4          THE COURT:  Would you pull the microphone just a

5   little closer to you.  Thank you.

6          MR. BEINENSTOCK:  Yes, your Honor.

7          Several points on fees.

8          I think we agree exactly with Mr. Despins for the

9   reasons he stated.  This has to be done for the good of both

10  estates.  So the COFINA agent should be paid from COFINA, we

11  believe.  If for some reason it's not, then by the

12  commonwealth.

13         The issues that concern us that divide us a lot with

14  the COFINA agent and a little with the commonwealth agent are

15  having to do with the scope of the agency.

16         We originally filed a support of the COFINA's agent's

17  motion on September 11.  Then we saw what they filed in terms

18  of an answer and counterclaims on September 15, and we said,

19  oh, my gosh.  What is going on here?

20         And the reason we said that is that, as they have

21  depicted their powers that they could only get from the

22  oversight board, there is no limit.  That is both not intended,

23  wasn't the deal, and is dangerous.

24         What I mean by that is this:  The issue to be

25  litigated, as the stipulation makes very clear, is whether

1   COFINA or the commonwealth own the sales and use taxes.  Is it

2   property of COFINA, or are they property of the commonwealth?

3   And, yes, the stipulation does authorize both agents to assert

4   affirmative defenses and counterclaims.

5            It is implicit, we think, that the counterclaims have

6   to be within the scope of what they were charged to do.  I want

7   to mention just two of them that we mentioned in our pleading.

8            The eighth counterclaim that the COFINA agent

9   propounds is to deprioritize the claims of GO debt holders,

10  general obligation debt holders against the commonwealth.

11           Now, I would first say to your Honor, as the judge on

12  this adversary proceeding, what will that have to do with your

13  Honor's decision as to who owns the sales and use taxes?

14           Do you really need to know the priority of the GO debt

15  holders against the commonwealth's other creditors to decide

16  who owns the sales and use taxes?

17           Of course not.

18           THE COURT:  Isn't there an issue that is imbued with

19  the structural conflict that brought us here in the first place

20  as to priorities within a commonwealth pot as between the GO

21  bondholders and COFINA's claim against the commonwealth should

22  I determine that the SUT lives in the commonwealth's bank

23  account as opposed to living in a COFINA bank account?  So am I

24  to have you negotiate yet another set of agencies to determine

25  that issue after the gross question of ownership is determined?

1          MR. BEINENSTOCK:  OK.

2          Your Honor, the answer to that is very simple.  If

3     your Honor decides that the sales and use taxes are not

4     property of COFINA, and then the COFINA creditors say, well,

5     either we or COFINA itself has a claim against the

6     commonwealth, fine.  We will deal with that, not the agents.

7          Once the commonwealth knows what property it has, it

8     will have to allocate that property to its creditors, and we

9     will deal with that.  That was not part of the dispute that was

10    assigned to the two agents.

11         The two agents are supposed to decide are the sales

12    and use taxes property of one debtor or the other debtor, not

13    decide all the issues having to do with plans of adjustment

14    that might be propounded for the commonwealth.

15         There is another problem, your Honor.

16         They labeled that eighth counterclaim as a

17    counterclaim.  One would think that if you are going to

18    challenge the priority of a general obligation bondholder that

19    the general obligation bondholder ought to be on the other

20    side.  It is not.

21         Mr. Stancil here I don't think would agree that they

22    delegated to the creditors committee of the commonwealth as

23    agent here the power to represent the GO bondholders.

24         This goes well beyond any possible scope.  When we

25    said they could bring counterclaims, the stip means you can

1    bring counterclaims against the other party that are proper

2    counterclaims.  They've brought a claim that where they would

3    have to name every GO debt holder.  They were never authorized

4    to do that and they haven't done it.

5          Similarly, they have asked to dismiss the COFINA Title

6    III case.  One would think, if you are going to ask for

7    dramatic relief like that, you would need to name the creditors

8    who were affected by that dismissal.  The creditors aren't on

9    the other side.

10         What they've done here, bottom line, your Honor, is

11   this:  They have said we could litigate who owns the sales and

12   use taxes, but in our negotiations we will have more leverage

13   if we make these claims against the GO bondholders that will

14   deprioritize them and other types of claims.

15         Yeah, I get it, that in the big, big picture they have

16   more leverage and negotiating power perhaps if they make these

17   claims against the GO debt holders.  Once they are allowed to

18   do something like that, there is no limit to what they can do,

19   because they can say that any claim they make will help them

20   because it will give them leverage and clout and will help them

21   negotiate a better deal.  There is no limit.

22         Now, I want to move off that point to I think other

23   points that address the concerns of the agents.

24         We are not and do not countenance anyone playing a

25   game of gotcha.  It is not the oversight board's position that

1    anyone should go forward and be told later on, sorry, you were

2    outside your scope, so you don't have immunity and you have

3    personal liability.

4         We immediately told the COFINA agent and the world in

5    our pleading that we thought those two counterclaims that I've

6    mentioned are outside the scope.

7         We haven't said, well, you won't be paid for putting

8    them in your papers, and we are going to sue you for liability

9    for putting them there.  No, of course not.  They did it.

10        We warned them, and now it's got to be decided.  But

11   if it is outside their scope it is not they shouldn't have

12   immunity for propounding it.

13        THE COURT:  So what do you want to leave them exposed

14   to for propounding it?

15        If you agree that they should get paid and they should

16   be able to litigate the scope issue, what do you accomplish by

17   denying them immunity for that process of determining the

18   contours of the delegation?

19        MR. BEINENSTOCK:  They would only have personal

20   liability in the highly unlikely event that after a ruling that

21   it's outside the scope they try to go forward with it one way

22   or another.

23        THE COURT:  How is that different from what Messrs.

24   Yanez and Despins seem to me to be asking me to do today, which

25   is to let the viability and propriety of those claims and

1    counterclaims play out in the litigation of 257, but embrace

2    with the 105 immunity the actions taken in good faith.

3        Then you would have the argument that an action taken

4    after I have said no it is not in good faith.  And they come

5    back and say, ah, the appeal is in good faith, and that's just

6    the way litigation works.

7        MR. BEINENSTOCK:  The problem is the oversight board

8    is not a party in that litigation.  We are not there to move to

9    dismiss on the ground that someone has asserted something they

10   labeled a counterclaim outside of their scope.  So we need to

11   get it determined really outside of that litigation.

12       We would hope that they would have dismissed those

13   counterclaims.  There was sort of a volunteer to dismiss I

14   think one of them, it sounded to me like albeit without

15   prejudice.

16       But we are not in that litigation able to move to

17   dismiss counterclaims.  If your Honor is saying the oversight

18   board needs to intervene, and that will be our role, of course,

19   we would do that.  I need to cover other issue, your Honor.

20   May I have a few extra seconds?

21       THE COURT:  Yes.

22       Let me make clear I am not practicing law for you, so

23   I am not giving you legal advice as to how to keep things up.

24   I am trying to understand what people's positions are today.

25       You may go on.

1          MR. BEINENSTOCK:  Thanks.

2          They made the point that National had made an argument

3    about the stip that we created these agents because the

4    oversight board is conflicted.

5          I want to say yet again that is not the case.

6    Congress assigned the oversight board to be representative of

7    each entity.  We are completely able to go forward.  If the

8    commonwealth or the COFINA agent would look at paragraph 4N of

9    the stipulation, it would see that that very stipulation says

10   the oversight board on its own can negotiate a settlement of

11   the COFINA-commonwealth dispute and can propose a plan

12   embodying a settlement and can do it on its own.

13         So clearly we did not think that we couldn't do those

14   things and be involved, and their argument that you shouldn't

15   listen to us because we announced ourselves conflicted is just

16   wholly wrong.

17         Bottom line, time is of the essence.  This needs to

18   get done.  But when a party, as the COFINA agent has done here,

19   has gone so far beyond the scope of what its agency is, there

20   are no rules that they can take on GO claims against the

21   commonwealth when they are a COFINA agent, we don't think that

22   they can be immunized after it's brought to their attention,

23   the Court rules, and they still go forward.

24         It's a very narrow limitation I'm asking for, but I

25   think it's necessary.

1          THE COURT:  What precisely are you asking me to do in

2     terms of the procedural framework and the specifics of a ruling

3     on contours now?

4          MR. BEINENSTOCK:  That they do not have unlimited

5     blanket immunity under 105.

6          I am saying procedurally they should be told that they

7     have 105 to the extent they act within the scope of their

8     agency.  I am also volunteering that we will not play a gotcha

9     game with them.  If we think they are outside the scope, we

10    will advise them.

11         If they disagree with us, we will have to bring it to

12    the Court and get it resolved.  But if they still want to go

13    forward with what is outside the scope, they don't have

14    immunity after that.

15         That is all we are asking.

16         THE COURT:  After a Court determination?

17         MR. BEINENSTOCK:  Yes.

18         THE COURT:  So you have given them the heads-up on

19    these two things now that you don't think are within the scope.

20         They say for reasons they have explained they believe

21    they are within the scope.

22         What happens procedurally now?

23         What am I supposed to do?

24         MR. BEINENSTOCK:  Well, if they won't, we will have to

25    bring a motion within the COFINA or the commonwealth case or

1  both asking your Honor to rule that they are acting outside

2  their scope.

3          We wouldn't do it within that adversary proceeding.

4  We would just say that we have an agent that's acting ultra

5  vires outside its scope, and ask your Honor to rule on that.

6          THE COURT:  So up until the point where I make a

7  determination, if I do, that it is outside the scope, then you

8  would not contest that the 105 immunity would apply?

9          MR. BEINENSTOCK:  Right.

10          As I said, we're not playing a gotcha game.

11          THE COURT:  Thank you.

12          MR. BEINENSTOCK:  Thank you.

13          MR. P. FRIEDMAN:  Good afternoon, your Honor, Peter

14  Friedman from O'Melveny on behalf of AAFAF.

15          A couple of things.  AAFAF actually is -- on the fee

16  issue we are in agreement.  We also concur that the COFINA

17  agent shouldn't be left holding an empty bag.

18          If COFINA is found to not be a valid structure, as

19  somebody who has rights to object to fee payments, etc., as

20  AAFAF we would not object to the commonwealth paying COFINA

21  fees.

22          I think the way Mr. Bienenstock formulated the

23  ultimate issue is consistent with our view after having met

24  with COFINA counsel prior to this hearing and had consultation

25  with the oversight board, that AAFAF isn't looking to go after

Hapnproa

75

1  anybody on a personal basis.

2          It sounds like the mechanism Mr. Bienenstock has

3  proposed is, if these claims aren't dropped today, after today,

4  is for the oversight board to file a motion to enforce the

5  stipulation.

6          I don't know if you want me to address what we have

7  put in our papers with respect to some of the issues as to why

8  we actually don't think there is a connection between the

9  claims and what's authorized under the stipulation or whether

10 you would prefer me to just focus on sort of what right I have

11 to be up here.

12         THE COURT:  So far it sounds to me on your first

13 question as though everybody acknowledges that there is a scope

14 issue.  Everyone is in agreement that the 105 protection should

15 apply until the scope issue is determined.  If it's determined

16 against the agents, that a separate focused proceeding of an

17 appropriate type would be cued up to make that determination.

18 If I'm correct on that, we don't have to do any more mapping of

19 pleadings.

20         MR. P. FRIEDMAN:  OK.  I will say that I think there

21 is some mapping that relates to why we're entitled to be up

22 here.  There are some issues in the counterclaim.

23         So, for example, there is a counterclaim about the

24 contract clause, which asserts that the government could have

25 taken different measures in order to raise kinds of revenue, or

Hapnproa

1    that the mechanism in the future if there is a violation of the

2    contract clause wasn't the least amount of interference that

3    could be done.

4         In our view that runs squarely into the kinds of

5    activity with respect to 303 that's protected for the

6    government.  That gets into the fiscal decisions the government

7    is making that I think are recognized under PROMESA, under the

8    Court's decision in PREPA, as the kinds of decisions that the

9    government has a right to be heard on and the government has a

10   right to participate in.

11        I think, your Honor, it's a little odd that after --

12   like I said earlier this morning, a motion where AAFAF fully

13   participated in the drafting and the arguing, in the devising

14   of the theory that people still very AAFAF's right to be heard

15   in this case.

16        It doesn't make sense for AAFAF to be muzzled.  And

17   why AAFAF, the voice of the elected government of Puerto Rico,

18   why for them to be heard would be threatening or inappropriate

19   just doesn't make sense to me.

20        It doesn't make sense when you look at the stipulation

21   and order in this case, which expressly provides that AAFAF can

22   intervene as of right to exercise its rights to be heard under

23   applicable law in any litigation about these matters.

24        It doesn't make sense in our view when you read

25   PROMESA as a whole, not just involving 303 and 305.  But when

Hapnproa

 1  you look at the fact that AAFAF as debtor's counsel, the debtor

 2  has the right, for example, to apply for counsel fees separate

 3  and apart from the oversight board.  That wouldn't make sense

 4  if the government didn't have a right to be participate and be

 5  heard.

 6          Under 1109, sort of if all else fails, we are a party

 7  in interest.  The interest we protect is the government as a

 8  whole and as a fiscal matter.

 9          I think beyond that, your Honor, when you at look at

10  the orders of this Court -- so, for example, why are speaking

11  on these fees?  Well, the intercom comp orders in this case

12  give us the right to object to fees.

13          It would be strange if we had the right to object to

14  fees, but didn't have the right to make an argument with

15  respect to who ought to be paying those fees in the first

16  place.

17          So an argument that we can't be heard is inconsistent

18  with I think each of those three matters.

19          Starting with the stipulation, we think under court

20  order we already have a right to be heard on matters with

21  respect to this case.

22          THE COURT:  That court order being the stipulation

23  giving you right to intervene?

24          MR. P. FRIEDMAN:  Yes, your Honor.

25          It's true we haven't intervened yet, and I don't know

 1   whether we will or we won't.  But to me the right to intervene

 2   in general suggests the right to be heard on matters relating

 3   to the litigation.

 4          Your Honor, obviously it would be remiss of me to talk

 5   about the structure of PROMESA without mentioning the fact that

 6   PROMESA makes somebody a debtor's representative.  We get that,

 7   and we've worked very closely with the oversight board.

 8          We have not heard Mr. Bienenstock complain about any

 9   of the pleadings we have filed or any effort to usurp the

10   rights of the oversight board as the debtor's representative or

11   to take positions inconsistent with the oversight board.

12          Maybe we will.  If we do, we can have a fight with the

13   party that's named the debtor's representative as to what the

14   scope of that means and how the debtor's representative power

15   interacts with 303.

16          But that is certainly not a fight for this matter,

17   because the oversight board is not objecting to the role that

18   we are playing here.  I think in many of the positions we have

19   taken and in many -- as you have seen working together in the

20   PEAJI matter and lift-stay matters, it's been an entirely

21   cooperative relationship and one that the oversight board has

22   taken to respect the elected government's right to be heard in

23   these proceedings.

24          As this Court knows well, 303 protects, it makes clear

25   that Title III doesn't limit, impair the power of a covered

1    territory to control the territory and any instrumentality

2    thereof and the exercise of its political and governmental

3    functions.

4         Again, we think some of the claims and counterclaims

5    here directly implicate the issue of governmental control over

6    its entities.

7         There are attacks on statutes, statutes that I would

8    note, you know, for example, specifically, in the interpleader,

9    COFINA alleged prepetition that a statute didn't constitute a

10   violation of the COFINA resolution.

11        It's discordant and -- but for COFINA to take, the

12   COFINA agent to take an opposite position in this litigation,

13   especially because it exceeds the scope of the litigation, but

14   that issue, right, the enforceability of a statute I think is

15   highly important to the government's ability to control the

16   territorial instrumentality.

17        As I mentioned, under 316(a) the Court can award fees

18   to a professional person employed by the debtor.  As I

19   mentioned, 1109(b) is very broad.

20        I think, look, the attacks on standing amount to you

21   are not the debtor's representative.  They amount to -- the

22   resolution of the COFINA-commonwealth dispute is not an

23   exercise of political and governmental powers for the reasons I

24   have explained.

25        I think that many of the asserted counterclaims that

 1  │ were asserted here actually do go to exercise of governmental
 2  │ and political powers and seek to entrench on those in ways that
 3  │ are relevant and do implicate what the government's mandate
 4  │ under PROMESA is.
 5  │        You know, AAFAF is not seeking to control or
 6  │ intimidate the COFINA side in favor of the commonwealth's side.
 7  │ It's just not true.
 8  │        We have been aggressive with a lot of different
 9  │ constituencies.  You have seen that.  We intend to vigorously
10  │ represent what we think falls under the AAFAF statutory mandate
11  │ under Puerto Rico law.
12  │        AAFAF's objection here, which noted issues in both
13  │ claim and counterclaim, is focused on litigating the narrowly
14  │ circumscribed commonwealth-COFINA dispute.
15  │        That is what we are focused on.  We are not trying to
16  │ put our hand on a scale, our thumb on a scale.  We are trying
17  │ to focus on keeping the process moving forward and keeping the
18  │ litigation focused on the precisely the issues court ordered
19  │ that they be focused on.
20  │        I think your Honor with that and the way that other
21  │ people have already framed the issues I'm happy to give back
22  │ the rest of my two and a half minutes.
23  │        Thank you, your Honor.
24  │        THE COURT:  Thank you, Mr. Friedman.
25  │        Mr. Gray.

1            MR. GRAY:  Good afternoon, your Honor.

2            THE COURT:  Good afternoon.

3            MR. GRAY:  For the record, Neil Gray of reed Smith, on

4      behalf of the Bank of New York Mellon as trustee.

5            The Bank of New York Mellon filed a limited objection

6      to the COFINA agent's motion, so in that spirit I will keep my

7      comments short.

8            I would like to address two points.

9            The first is payment of the COFINA agent and her

10     professional fees.

11           The second is AAFAF's surreply, which was filed

12     yesterday.

13           The Bank of New York does not dispute that the COFINA

14     agent and her professionals must be paid.  In fact, there

15     appears to be agreement that should be the case generally as

16     cross the board.

17           Where there is not agreement is what the source of the

18     payment of those fees should be.  The bank has no objection to

19     payment of fees out of unencumbered funds of COFINA.  Those are

20     fair game, and we don't object to that.

21           But to the extent that unencumbered funds are

22     insufficient or that COFINA will not pay out of those

23     unencumbered funds, then payment should come from the

24     commonwealth.

25           Here's why we take that position.

 1    First, the COFINA agent contends that payment should

 2   come out of funds currently held by the Bank of New York

 3   Mellon.

 4    That doesn't work.  The funds held by the Bank of New

 5   York Mellon are not COFINA's funds.  They have no present

 6   interest in any of the funds held by the Bank of New York

 7   pursuant to the resolution.

 8    THE COURT:  That's a position that is being taken in

 9   the interpleader proceeding.  Actually, this is a divided

10   issue, but we certainly have in the -- well, in the

11   commonwealth-COFINA complaint there is the position that, even

12   those funds, none of those funds belong to COFINA or anyone

13   else.  I, in the interpleader, said that I would ultimately

14   decide for whom the funds are properly being held.

15    So I think I need to recognize that there are

16   different perspectives on who has interest and to what degree

17   even in the funds being held by Bank of New York Mellon.

18    MR. GRAY:  Yes.

19    We would argue that under the resolution it's fairly

20   clear that COFINA has no present interest in the funds held by

21   the Bank of New York.

22    And pursuant to the interpleader order, you know, the

23   Bank of New York can't do anything with those.  To the extent

24   that the resolution of the commonwealth-COFINA dispute

25   determines that COFINA had no right to those funds, well, then

1    we are in a different situation.

2             But under the resolution, we, the bank of New York,

3    hold those funds in our accounts in trust for bond owners, and

4    we hold legal title to them.  So we do not think it's

5    appropriate for currently the COFINA agent to draw from those

6    funds.

7             Next the COFINA agent advocates that payment should

8    come from pledged sales tax not yet transferred to the Bank of

9    New York Mellon.  As the Court is aware from the briefing, the

10   Bank of New York has security interest in liens in those funds

11   not currently transferred.  Absent adequate protection,

12   allowing the COFINA agent to draw on those funds essentially

13   subordinates the Bank of New York's rights and interests.

14            THE COURT:  How do you respond to the notion that, to

15   the extent there is an adequate protection issue, the COFINA

16   agent is working to make sure that you have something to make a

17   claim against, and therefore you are adequately protected?

18            MR. GRAY:  I recognize that they are making that

19   claim.  I don't think that has been fully developed.

20            There is not a factual record to appropriately

21   determine the value of the Bank of New York's claim, the risk

22   that it's put to by allowing the COFINA agent to draw on funds,

23   and whether the protection that they are offering is truly

24   adequate.

25            From what I have seen, the only assertion is we are

1   doing this work for you and that's adequate protection.

2           To the extent that they want to pursue that, we, the

3   Bank of New York, think that should be subject to a notice and

4   hearing, where interested parties are able to provide input on

5   that, the bond owners of the COFINA bonds may want to provide

6   input.  They may want to give direction to the Bank of New

7   York.

8           We would need to develop that factual record.  That is

9   not developed, and you don't have that before your Honor right

10  now to determine if the protection is adequate.

11          THE COURT:  Wouldn't you need to develop that factual

12  record to the extent you are asserting that adequate protection

13  is necessary?

14          You've raised it as an objection to this application,

15  which asserts that it's appropriate, that it's authorized by

16  506(c), that there is a right to it.

17          you say that adequate protection is potentially a

18  roadblock, but it is not clear to me that it would be the

19  COFINA agent's responsibility in this motion practice to come

20  back on reply to your opposition with a factual case, if such

21  is actually needed, on adequate protection.

22          So please help me with your procedural picture here.

23          MR. GRAY:  Sure.

24          It would be the Bank of New York's position that there

25  should be an opportunity, separate and apart from the briefing

1    that your Honor has before her, for the bank and others to

2    develop the record that the claim that there is adequate

3    protection here is not correct.

4            if I remember correctly, the adequate protection

5    assertion was only raised in reply, but the Bank of New York

6    would press the ability to develop the factual record.

7            THE COURT:  OK.  Since all these fees would be subject

8    to the interim fee procedures anyway, it's not as though anyone

9    would be asking for a check to be written from this tomorrow

10   even if I authorized the general structure that is being

11   requested by the COFINA agent.

12           So it seems to me there would be time if an adequate

13   protection motion practice were to be cued up for that to be

14   cued up.

15           MR. GRAY:  I would agree, your Honor.  There does

16   appear to be time.

17           So, in light of that, if you look at what's left, the

18   COFINA agent advocates that if COFINA and/or the Bank of New

19   York do not or cannot pay the fees in question, then the

20   commonwealth should.

21           It seems to us, while the Bank of New York agrees with

22   that and it seems to us that the commonwealth has acknowledged

23   that, too, they wrote in their papers, "The commonwealth has an

24   interest in COFINA resolving the commonwealth-COFINA dispute,"

25   and that "if COFINA does not and/or cannot pay the allowed

1    administrative expenses against it, the commonwealth should do

2    so because COFINA is its instrumentality."

3           For those reasons, we think that, from the Bank of New

4    York's position, the funds really should come from two spaces,

5    that is, either the unencumbered funds of COFINA or the

6    commonwealth.  That's set out in the papers.

7           THE COURT:  What are the unencumbered funds of COFINA?

8           MR. GRAY:  To the extent that COFINA has assets that

9    are not subject to security interests or liens.

10          THE COURT:  Do you know of any such?

11          My gross understanding is that whatever COFINA has

12   comes out of the sales and use taxes.

13          It seems to me you are arguing that the minute there

14   is a sales and use tax that falls into the COFINA allocation,

15   it's encumbered one way are the other.

16          So is there some animal that I am not seeing that is

17   in the room?

18          MR. GRAY:  Under normal circumstances, under the

19   operation of the resolution, the funds that come into the Bank

20   of New York Mellon are paid in the following order:  They are

21   paid to COFINA's operating expenses up to an operating cap,

22   they are then paid to fund debt service accounts up to

23   requisite amounts.  And then, to the extent that there is a

24   balance, that can be applied, upon COFINA's written direction,

25   for specific purposes, including the payment of operating

1   expenses that were over and above the cap.

2          THE COURT:  This might be a matter of classifying this

3   as an operating expense going in that part of the pot before

4   the part of the pot that would go to debt service?

5          MR. GRAY:  Correct.

6          THE COURT:  Thank you for helping me with that.

7          MR. GRAY:  In any event, currently that process is for

8   all intents and purposes suspended as a result of the

9   interpleader order, where the bank is simply just holding the

10  funds.

11         THE COURT:  Thank you.

12         MR. GRAY:  Your Honor, if I may, I just wanted to make

13  a couple of comments on the AAFAF surreply that was filed

14  yesterday.

15         I see my time is up.

16         If I could have a couple of minutes.

17         THE COURT:  Briefly, yes.

18         MR. GRAY:  AAFAF in their surreply contended that the

19  Bank of New York questioned its standing.

20         That's not true.  What the Bank of New York raised was

21  AAFAF's capacity to object.  I think that is an important

22  inquiry.

23         Here may AAFAF advocate for one governmental entity

24  over another, and in doing so -- can do so in contravention of

25  the entity's contractual obligations to the Bank of New York

1  and bond owners.

2           Let me explain that a little bit more.

3           If they are acting for COFINA, then they have a duty

4  to defend the right to the Bank of New York and the bond owners

5  under the resolution against all claims and demands.  That's

6  resolution Section 705.

7           If they are acting for the commonwealth, then it has a

8  duty, AAFAF has a duty not to limit or restrict COFINA's right

9  to meet its obligation to the bond owners.

10          So it seems to us that in that sense they are under

11 the same fundamental conflict that the board is and that led to

12 the appointment of the agents.

13          AAFAF cannot advocate for one of its charges to the

14 detriment of the other.

15          THE COURT:  Is it just opening the government up to

16 yet another claim of breach of contract and whatever

17 consequences I ultimately determine might flow from that

18 breach.

19          MR. GRAY:  I'm sorry, your Honor.  Say again.  I am

20 not sure --

21          THE COURT:  You are saying that there are contractual

22 and statutory obligations that you say would be violated by the

23 positions that AAFAF is taking.

24          You say that that is disabling or whatever, which is I

25 guess essentially a position that you are entitled to specific

1   performance of those obligations, and the government has no

2   option of taking another course and suffering whatever

3   consequences may flow from that.

4        So why is the latter road not open to the government

5   if AAFAF determines that's in the best interests of one or both

6   entities?

7        MR. GRAY:  I take your point, your Honor.

8        I think what I am suggesting is something more narrow

9   than that, that in terms of AAFAF's surreply, you know, in

10  terms of -- you know, not being able to serve two masters.

11       On the issues that the Bank of New York raises here,

12  whether funds can be paid out of the funds that it holds or

13  whether the COFINA agent can be paid out of the funds that it

14  holds or out of the Bank of New York's collateral, the pledged

15  sales tax that hasn't yet been transferred, we just don't see

16  that AAFAF can take sides on that under their obligations under

17  the resolution.

18       THE COURT:  Thank you.

19       MR. GRAY:  Thank you, your Honor.

20       THE COURT:  Mr. Kirpalani.

21       MR. KIRPALANI:  Good afternoon, your Honor.  Nice to

22  see you again.

23       On behalf of -- Susheel Kirpalani, Quinn Emanuel

24  Urquhart & Sullivan, on behalf of the COFINA seniors coalition.

25  I do have some points, because the time allotted is very short,

1  so I will try to also cover some concerns that AMBAC had

2  raised.  Then, if there is a little bit of time left I know

3  National wants to use it for sure.

4       First and foremost, I wanted to echo your Honor's

5  comments.  Our thoughts and players also do go out people of

6  Puerto Rico.  We really admire their resolve to rebuild their

7  lives.  Whatever the COFINA's seniors can do, we intend to do

8  try to help that.

9       Since before the Title III cases, AAFAF has tried to

10  put its thumb on the scale, your Honor.  You will see this play

11  itself out in the Bank of New York litigation.

12       It was not even 60 days into their administration when

13  they decided they were going to do everything in their power to

14  undermine COFINA and even put that in writing in an agreement

15  with the GO bondholders.

16       Like I say, it's a matter of public record, but you

17  will see it in connection with that litigation.  What's

18  untenable here is, in the context of finally getting an

19  independent agent for COFINA, for AAFAF to try and divert

20  attention from its own conduct and its own irreconcilable

21  conflicts by saying it represents the voice of the elected

22  government.  So, therefore, it must be heard on issues that

23  come before you in Title III.

24       I just want to reflect on that comment and focus on it

25  for a moment.

```
 1           They are the voice of the elected government.  But,

 2   your Honor, this is not Chapter 9.  I know that your Honor

 3   knows that a lot of people worked on this legislation in order

 4   to get it passed.  Congress spoke with one voice when it said

 5   the representative of the debtor would be the oversight board

 6   and not AAFAF.

 7           The Congress of the United States gave exclusive

 8   standing to an unpolitical entity specifically because it did

 9   not trust the elected government with handling the

10   restructuring of the island's finances.

11           That's what the law says.  I know that the AAFAF folks

12   don't like it, but that's what the law says.

13           THE COURT:  Why is it so dangerous for me to hear

14   them?

15           I am the one who will ultimately make the decisions,

16   and they are in the room like a whole lot of other parties in

17   interest who the First Circuit tells me I have to listen to if

18   they invoke 109 and wink their eye at me.

19           Why do I have to lock them up in the closet?

20           MR. KIRPALANI:  You don't have to lock them up in a

21   closet.  If they wish to be heard the same way another party

22   without standing to advance interests on behalf of an entity

23   simply wished to be heard, of course, your Honor, it is not

24   dangerous for the Court.

25           The Court can decide what is an appropriate argument
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   and what is not an appropriate argument.

2          THE COURT:  I hope so.

3          MR. KIRPALANI:  I know so.

4          But the issue is, when speaking on behalf of my

5   debtor, COFINA, they have no role to speak on behalf of it.

6   The same is true with respect to the commonwealth.

7          When the Court needs to know -- and I have seen it,

8   I've been to every hearing.  Your Honor knows I watch very

9   carefully.  Whenever the Court wants to know what the debtor's

10  position, your Honor asks Mr. Bienenstock or one of his

11  colleagues because the oversight board is the exclusive

12  representative of the debtor.

13         There are no copilots here.  I understand that

14  Mr. Bienenstock and his firm are trying very hard to coordinate

15  and work in a cooperative way with the O'Melveny folks, but I

16  want to make very clear what our position is and what the law

17  is.

18         This is not a copilot bankruptcy.  There is one

19  representative of the debtor.

20         Mr. Friedman is talking about Section 303 in the

21  reserved powers of the government.  What he fails to mention is

22  that the very lead-in to Section 303 says, except otherwise

23  provided in Title I.

24         Section 108(a) of PROMESA makes explicit what Congress

25  had in mind.  What it says there, if I can just turn to it, is

1  that the conduct and decisions that are made by the oversight

2  board cannot be second guessed, not by the governor and not by

3  the legislature.

4          That's what Section 108(a) says.  It's the autonomy of

5  the oversight board.

6          When you read that in connection with Section 315

7  about who is the exclusive party to make decisions for COFINA

8  and for the commonwealth as debtors before you, the conclusion

9  is inescapable as to who actually does make those decisions.

10         What they also said in their papers, AAFAF says, well,

11 the protocol stipulation -- your Honor, I was the scribner for

12 much of that protocol stipulation, so I do recall concerns that

13 were raised by parties like AMBAC in connection with how that

14 protocol was put together.

15         But AAFAF says, well, the protocol stipulation in

16 paragraph 5 specifically gave us the right to intervene.

17         But what they don't tell you is that that same

18 paragraph 5 says "nothing herein waves the right of any party

19 in interest from asserting any intervenor is conflicted."

20         To be perfectly clear, that is exactly what we are

21 saying here.  You heard some of this from the Bank of New

22 York's counsel.  You are going to here more of it from us.

23         Your Honor only sees what the participants in this

24 case have an opportunity to show you.  We have grave concerns

25 about AAFAF's conduct, not just in the courtroom, outside of

1   the courtroom.

2       Every single day our computer screens light up with

3   chaotic activity that is going on and what can we do to try to

4   prevent it from happening.

5       The latest gambit was last week in San Juan where the

6   governor tries to introduce emergency legislation that would

7   render this whole protocol a mockery.  It would give the

8   governor the right to cancel the sales tax.

9       Fortunately the legislative leaders in San Juan

10  understood the constitutional issues with that legislation, and

11  I believe the newspapers, in El Nuevo Dia yesterday called a

12  bill that was unsalvageable.  So we do appreciate the

13  leadership there.

14      THE COURT:  I understand that you have a lot of

15  issues.  This is a thorny ball of issues itself, and so I would

16  like to remain focused today on the COFINA agent's application.

17      MR. KIRPALANI:  Understood, your Honor.

18      The COFINA's agent's request for immunity is essential

19  to insuring the independence of our agent.  Absolutely Bettina

20  Whyte should have full rein to do whatever she feels she needs

21  to do to protect our property from the grabby hands of the

22  commonwealth government and the creditors of the commonwealth.

23      That is absolutely what the protocol was supposed to

24  do, and to give us some sense of order away from the

25  irreconcilable conflicts of the various parties who purported

1    to act for our debtor.

2          That is our position.  We think what's happening here

3    is intimidation.  It is intimidation by threatening personal

4    liability to Bettina Whyte.

5          THE COURT:  What I have heard from the entities that

6    took that position is that the scope issue gets litigated

7    separately in an orderly manner, and there's no threat of

8    personal liability pending the litigation of that scope issue.

9          So, yes, conceptually you have a dramatic issue.

10   Practically I don't think so.

11         MR. KIRPALANI:  Your Honor was able to I think get us

12   to that place only during the hearing today.  But I do think

13   that if that is where we end up that should be OK with the

14   COFINA agent.

15         THE COURT:  Thank you.

16         MR. KIRPALANI:  I appreciate that.

17         I know you said there are lots of thorny issues.

18         One of them was a question that your Honor raised with

19   the Bank of New York's counsel about why couldn't the

20   government just treat the COFINA property right or the COFINA

21   bond resolution as another contract that they wished to breach,

22   and wouldn't that just be one of the options available.

23         I don't want to be silent on the issue.  I am not

24   going to argue it, your Honor.

25         THE COURT:  You are on a red light, so be succinct.

1          MR. KIRPALANI:  Yes.

2          There are U.S. constitutional problems with that type

3    of conduct.  We have filed a lawsuit in the district of Puerto

4    Rico on May 2, three days before this bankruptcy was commenced.

5          We will amend that lawsuit and file an adversary

6    proceeding if the local government attempts to usurp property

7    rights and violate the contracts clause of the U.S.

8    Constitution.

9          It is not going to be as simple as what AAFAF is

10   trying to pretend it is both inside of the courtroom and

11   outside of the courtroom, well, it's just another contract we

12   might want to terminate.  We will not agree with that

13   interpretation.

14         THE COURT:  I think I very clearly referred to risking

15   whatever consequences might flow from the action yet to be

16   determined.  So I don't think that is inconsistent with the

17   notice you have given here.

18         MR. KIRPALANI:  Not inconsistent, but I appreciate the

19   opportunity to be heard.

20         THE COURT:  Thank you.

21         MR. KIRPALANI:  Thank you.

22         THE COURT:  All right.

23         That wasn't the shared five minutes?

24         MR. J. FRIEDMAN:  If I could have one minute, your

25   Honor.  Your Honor, Jared Friedman from Weil Gotshal & Manges

1    on behalf of National Public Finance Guarantee Corporation.

2          As I think your Honor noted, the positions have moved

3    a lot during the course of this hearing, in a good way.

4          I just want to clarify, though, procedurally.  What we

5    understand now is that the COFINA agent and the commonwealth

6    agent likewise would have immunity for all of their efforts to

7    zealously litigate the issues that they are doing so.

8          Therefore, there is no threat for any procedural or

9    substantive defenses or counterclaims any of those issues,

10   including defending those counterclaims or claims at a

11   dismissal.

12         I think we heard a little bit from the oversight

13   board's counsel that maybe they would bring a separate hearing.

14   The proper place to do that would be just a motion to dismiss

15   either brought by AAFAF if they intervene or the agent on the

16   other side could bring that claim to dismiss.

17         But the point is that the agents would be protected

18   with immunity throughout defending that, and only after a

19   finding that was outside of the scope, if that were the

20   finding, at that point obviously any effort to pursue that,

21   which there would be no reason to, would be in bad faith and

22   not covered by immunity, but they would be covered through that

23   finding.

24         And any suggestion that, well, the oversight board

25   warned them earlier on that is of no moment.  Maybe that causes

1      an agent to decide not to pursue it, but they are covered by

2      immunity notwithstanding a warning until the Court determines

3      that is outside of the scope.

4             That is our position.

5             THE COURT:  OK.  Mr. Bienenstock, Mr. Friedman, do you

6      agree that that's a fair statement of where we generally ended

7      up with this immunity question?

8             MR. BEINENSTOCK:  With one major exception.

9             It is the oversight board's power that is being

10     misused.  We are not going to ask Mr. Despins to decide what

11     agency we conferred and to enforce it.

12            We have to enforce it ourselves, and we propose to do

13     it in the process I outlined earlier.  We will bring a motion

14     or complaint in the commonwealth case saying that an agent is

15     going beyond their power.

16            THE COURT:  Thank you.

17            MR. J. FRIEDMAN:  Your Honor, one clarification should

18     be obviously the immunity shouldn't end at your Honor's

19     decision but obviously they would have a right to appeal your

20     Honor's decision as well.  That should still be covered by the

21     immunity.

22            THE COURT:  So we are negotiating language here?

23            MR. J. FRIEDMAN:  Clarification of the issue being

24     finally determined.

25            THE COURT:  I hear your position.

1          Thank you.

2          MR. J. FRIEDMAN:  Thank you, your Honor.

3          THE COURT:  All right.

4          Mr. Yanez.

5          MR. YANEZ:  So, Judge, just a couple of points

6     quickly.

7          We would echo the appeal point that's just been made.

8          In terms of the procedure for resolving scope, that is

9     not something obviously the court needs to do today.  There are

10    different avenues that have been articulated which seem like,

11    you know, the parties can come at this from different

12    directions.

13         One point that I would make is that when the Court

14    decides the issue it should do so with the benefit of the

15    intervention papers having been filed, so we don't have an

16    argument about scope now only to then have a different argument

17    or an additional argument or other considerations that come

18    when the intervenors come in and make whatever arguments they

19    are going to make and whatever claims they are going to make.

20         On the subject of --

21         THE COURT:  I am going to ask you to hold that thought

22    and come back to it after we finish this portion of the

23    argument and you give me the status update on the discussions

24    of commonwealth-COFINA timing because, as I recall, the joint

25    proposed order presumed some resolution of the scope issues in

1    advance of the November date on which certain pleadings were to

2    be filed.

3         Sitting here I am not quite sure how that gets put

4    together in the new context, but you may want to think about

5    that in your copious spare time, even as you speak.

6         MR. YANEZ:  Yes, your Honor.  I will do that.

7         Just one point of clarification, though.  I believe

8    what we said is that the immunity issue has to be resolved

9    before November 21.  It sounds like we are there.  I am not

10   going to retread that ground.

11        THE COURT:  Thank you.

12        MR. YANEZ:  Thank you.

13        Turning to fees, just a couple of quick points.  We

14   are not aware of any unencumbered assets that COFINA has.

15        We also don't believe that the situation is aided by

16   categorizing these fees as operating expenses.  There is a

17   limit there that won't work.  It is a small limit over the

18   course of a year.  The bottom line is that the only assets here

19   are the pledged sales tax.

20        With respect to adequate protection and the need to

21   come back and make a record, our view, Judge, is that will in

22   many ways constitute just a waste of resources to brief and

23   argue that issue again.

24        We noticed all of the parties in economic interest in

25   connection with this motion.  They were aware that the issue

| | |
|---|---|
| 1 | was teed up and no one has objected. |
| 2 | Unless the Court has questions that is all I have. |
| 3 | THE COURT:  I have no further specific questions for |
| 4 | you. |
| 5 | I just want to take a minute before you sit down to |
| 6 | review where we have ended up. |
| 7 | So, as to immunity, it seems to me that granting the |
| 8 | motion and I believe using the language that proposed, I am |
| 9 | turning to your proposed order now, this is document 1121-2. |
| 10 | MR. YANEZ:  Yes. |
| 11 | THE COURT:  The language in paragraph 2 of your |
| 12 | proposed order has the provisions of 48 U.S.C. 2125 applying to |
| 13 | the COFINA agent, paren, employees with respect to the |
| 14 | execution of duties under the stipulation and order. |
| 15 | Today we have come to an understanding that the issue |
| 16 | of the scope of those duties may well be challenged, and at |
| 17 | least there will be an effort to take a different view of them. |
| 18 | But, in any event, at some point I will determine what duties |
| 19 | are within the scope of the stipulation and order, and until |
| 20 | and unless I decide that there's something outside them and |
| 21 | that's finally determined, paragraph 2 as proposed would seem |
| 22 | to cover what we need to cover. |
| 23 | Would you agree with that? |
| 24 | MR. YANEZ:  I would, your Honor.  Yes. |
| 25 | THE COURT:  Mr. Bienenstock, would you agree with |

1  that?

2          MR. BEINENSTOCK:  Your Honor, that is what we have

3  discussed today.

4          The way this is written is actually not ideal for the

5  agents.  But if they're happy with it, that's fine.

6          The way it's written, without the gloss of this

7  hearing and your Honor's comments, they don't only have

8  immunity for what they do within their duties.  So if you prove

9  later it was outside, they don't have the immunity.

10          I'm happy to go with this language with the gloss of

11  your Honor's comments at this hearing.  I think we all know

12  what we understood and discussed today.

13          THE COURT:  What I am going to ask, since you and the

14  commonwealth agent and I think AAFAF also requested to be

15  covered at least by the fee payment aspect and the commonwealth

16  agent was also asking to be covered by the 105 aspect and there

17  were some other nuanced issues that came up today, I am going

18  to ask for a revision and resubmission of the proposed order,

19  but I want it with the benefit of everybody sitting here today

20  to look at the language to see what we would start from.  So I

21  would encourage you to have whatever clarifying discussions you

22  feel are necessary to accomplish this.

23          MR. YANEZ:  For what it is worth, Judge, the point

24  that was just made is a good one.  That language probably

25  should be clarified.

 1          THE COURT:  With respect to the issue of AAFAF's

 2    standing, I find that AAFAF has standing to be heard today

 3    under a number of theories, including 1109 and to the extent

 4    it's acting as an actor on behalf of a government whose assets

 5    and liabilities are implicated by everything that we're doing.

 6          So if there was an implicit request to strike the

 7    submission or the comments, that's denied, and I have listened.

 8          Now, the commonwealth backstop of agency and

 9    professional fees for COFINA is at the end of the day

10    undisputed.  It is appropriate, and that aspect of the motion

11    is granted.

12          As to payment in real time in relation to interim fee

13    applications from funds in the hands of BNY Mellon, that is in

14    essence a request for revision of the interpleader order.  The

15    interpleader order contemplates the money sitting until I

16    finally determine who owns what.

17          So I am --

18          MR. P. FRIEDMAN:  Your Honor?

19          THE COURT:  Yes.

20          MR. P. FRIEDMAN:  Peter Friedman.  I maybe should have

21    pointed this out earlier.  I think it would be helpful.  There

22    is money that goes before --

23          THE COURT:  Actually, would you sit and pull the

24    microphone really close to you so everybody can hear.

25          MR. P. FRIEDMAN:  Yes, your Honor.

```
 1              There is money -- when the discussion was being had, I
 2      think there were two conceptual pots of money.  I think we
 3      agree on it.  There's the money at BNY, and there's money
 4      before it goes to BNY subject to BNY's liens.  That is at Banco
 5      Popular.
 6              THE COURT:  Yes.
 7              MR. P. FRIEDMAN:  I think everybody is in agreement,
 8      at least at this table, if there is going to be money paid from
 9      COFINA, it should come from the Banco Popular account rather
10      than the interpleader account.
11              I think that's right, which would not require a
12      modification of the interpleader order.  It comes from their
13      liens, but it is not the money account that is actually at BNY.
14      It's money that is at Banco Popular.  So I don't think it would
15      require modification of the interpleader order.
16              THE COURT:  Mr. Gray, you are not pressing your
17      objection as an objection to a direction to pay from funds that
18      are at Banco Popular and haven't been transferred to BNY
19      Mellon.
20              MR. GRAY:  My comments earlier were with respect to
21      adequate protection --
22              THE COURT:  Even closer to the microphone please.
23              MR. GRAY:  My comments earlier about adequate
24      protection and the bank's security interest in liens would
25      stand.
```

1    We still don't believe that it is appropriate to pay

2    the COFINA agents out of those.

3        THE COURT:  So that objection is overruled without

4    prejudice to cueing up the adequate protection issue for motion

5    practice if at the end of the day it is determined in good

6    faith that that is a course of action that is worth the expense

7    and calls on the judicial time and effort that that would take.

8        I do urge you to have discussions and ponder carefully

9    that, since there are many, many pressing demands on all of the

10   actors here and needs of the people of Puerto Rico for a lot of

11   attention.  So let's husband our resources and use them all as

12   wisely as we can.

13       Just so that it is clear at this point factually, that

14   BNYM payment route is not on the table here.  We will ask that

15   the revised order cross out the parenthetical that says "or, at

16   COFINA's request, BNYM."

17       This has a five-day payment provision by the

18   commonwealth.

19       I think in the interim fee payment procedures order

20   AAFAF had requested 14 days or something like that.  14 days?

21       MS. UHLAND:  That's correct.

22       THE COURT:  So change the five days to 14 days for

23   consistency, please.

24       MR. YANEZ:  Thank you, your Honor.

25       THE COURT:  Are there any material objections or

 1   issues that I haven't addressed in going through that order

 2   conceptually?

 3           MR. POSSINGER:  Your Honor, Paul Possinger of

 4   Proskauer Rose on behalf of the oversight board.

 5           To the extent that fees are going to be paid from

 6   Banco Popular, subject to motion practice as your Honor

 7   described, I think it should also be clear in the order that

 8   such payment does not constitute a default with respect to the

 9   COFINA bond occupants.

10           THE COURT:  Is there any objection to that proviso?

11           Seeing none, work out the language, please.

12           So the motion of the COFINA agent is granted as

13   outlined here on the record, and I will look for an informative

14   motion presenting the agreed form of order.

15           MR. YANEZ:  Thank you, your Honor.

16           THE COURT:  Thank you.

17           So let's now have the update on the

18   commonwealth-COFINA scheduling issues, please.

19           MR. YANEZ:  I think where we are, your Honor -- and

20   others will have their own perspective -- is that we have

21   submitted a proposal that contemplates over the course of the

22   next month or so the filing of intervention papers.  Discovery

23   will be ongoing simultaneously, and then will continue through

24   December and into January, with February 9 being the date, the

25   deadline to complete expert discovery.

1          Within the next three months or so, it is a little

2     over three months, we contemplate the filing of pleadings by

3     the intervenors, the briefing and resolution of motions, fact

4     discovery from parties and nonparties, including parties that

5     are on the island, where patience is appropriate, resolution of

6     the inevitable discovery disputes, expert reports, expert

7     discovery, and mediation throughout.

8          That's the proposal.

9          I will let the oversight board and AAFAF speak for

10    themselves.  I think they would like things to move more

11    quickly.

12         I will offer from our perspective that we understand

13    the need to move quickly and that we have built a schedule that

14    we believe is aggressive and moves fast.

15         THE COURT:  Your schedule also contemplates summary

16    judgment motion practice beginning on or before February 12,

17    correct?

18         MR. YANEZ:  It contemplates motion practice.

19         I believe that it is motion practice beginning no

20    later than February 12.

21         THE COURT:  Yes.

22         I think I said on or before February 12.

23         MR. YANEZ:  Sorry.  I apologize, your Honor.

24         There is the possibility for summary judgment, partial

25    summary judgment or summary judgment with respect to the whole

1    case, and parties are free to make those motions whenever they

2    like between now and then, and there's a briefing schedule

3    that's contemplated.

4              THE COURT:  Thank you.

5              MR. YANEZ:  Thank you, your Honor.

6              THE COURT:  Mr. Bienenstock or Mr. Possinger.

7              MR. BEINENSTOCK:  Your Honor, the oversight board

8    believes that the schedule is too elongated.

9              It was originally going to be November and then

10   December.  We have no problems, as we've all been doing,

11   accommodating any issues on the island necessitating extra time

12   for a whole variety of reasons.

13             But we think that they are setting something up where

14   this key issue may not be resolved until next summer.  I am

15   factoring in some time for your Honor potentially to have a

16   trial and then to have briefs and noodle over the outcome if

17   it's not all resolved in summary judgment.

18             We are hoping to move the cases a lot faster than that

19   because it's hard to attract investment to PREPA or to anywhere

20   else in Puerto Rico by telling people you come invest, etc.,

21   etc. and don't worry.  At some point we'll get around to

22   dealing with the debt overhang.  We have to do it faster than

23   that.

24             So they know that we were upset with the timetable

25   they came to us with, and we would ask that your Honor give

1  them earlier dates.

2        If they need to go into January, fine, but we think

3  it's just too long and it hurts the commonwealth.

4        THE COURT:  Do you have a specific proposal and a

5  specific realistic information base that would tell me that

6  earlier dates are feasible?

7        Are you asking that I preclude summary judgment

8  motions even if it is a situation in which there is a purely

9  legal issue that would not have to be part of a trial?

10        Where do you see your scope of the litigation

11  challenges coming into a more compressed timetable?

12        Please be as concrete with me as you can.

13        MR. BEINENSTOCK:  OK.

14        Originally, it was supposed to be calculated to be

15  resolved by December 15.  It was earlier, November, but then it

16  was moved to December.

17        We would ask that if there are going to be summary

18  judgment motions that they be filed by January 15 and that a

19  trial date be set by the end of February.

20        I know that they will say that that requires them to

21  take too much discovery too fast.  We frankly think that a lot

22  of the things they are discovering and looking into have

23  nothing to do with the dispute that was assigned to them.

24        There is a lot of push and pull here.  We would ask

25  for the January 15 and end of February trial date.  One for

Case 17-03283-LTS Doc#1064-26 Filed 10/04/18 Entered 10/04/18 06:51:23 Desc: Main
Case 17-03283-LTS Doc#15864 Filed 10/27/17 Entered 10/27/17 14:59:52 Desc: Main
Exhibit40 Page 110 of 112
Document Page 109 of 111

Hapnproa

1     summary judgment, one for trial.

2              THE COURT:  So what I am going to ask is that, in

3     light of the scope and procedural discussions we have had today

4     and these remarks, you all take one more pass at the proposed

5     schedule and submit to me an informative motion with either a

6     revised proposed schedule or the same proposed schedule and

7     tell me that that you have had the discussions.  Then I will

8     make a decision on entering it.

9              The near-term dates as to answers counterclaims and

10    oppositions to motions to intervene certainly make sense under

11    any scenario, but it is the after-the-first-of-the-year dates

12    that I think you ought to revisit.

13             So let's say in principle the dates before the end of

14    the year and the hearing of motions to intervene at the

15    December omnibus are approved in principle.  But I will await

16    one more refinement of the order before entering an order that

17    covers the schedule into early 2018.

18             Is that acceptable?

19             Seeing no dissent.

20             Mr. Despins, dissent?

21             MR. DESPINS:  If I could just be heard for one minute.

22             THE COURT:  Yes.

23             MR. DESPINS:  Your Honor, Luc Despins with Paul

24    Hastings, on behalf of the committee as the commonwealth agent.

25             The issue of the schedule is not only for the

1  litigation.  Yes, it is a litigation schedule.  But, of course,

2  you know that our goal is to settle this.  The point on that is

3  that there will not be any good information about what we are

4  fighting over, meaning the size of the SUT, what the

5  commonwealth will look like until well into late December,

6  January.

7          So the point is we can accelerate the schedule, but

8  the people who need to settle this at the end of the day look

9  at, OK, what is my recovery?  You are proposing to settle this

10  for X percent, what does that translate into.

11          If we can't give them any information about that, it's

12  going to be impossible to settle, which is the goal, because

13  the litigation is incredibly expensive.

14          So the schedule is longer than Mr. Bienenstock would

15  like it to be, and I understand that, but there is another

16  aspect of this that I wanted the Court to be aware of, which is

17  that it benefits I believe the settlement process.

18          THE COURT:  Thank you.

19          Mr. Yanez.

20          MR. YANEZ:  Just for purposes of --

21          THE COURT:  Please go to the podium.

22          MR. YANEZ:  Just very quickly, your Honor.  I think

23  your Honor said this, but I want to be certain.

24          The currently proposed schedule contemplates activity

25  starting today.  Did I hear you correctly that the parties

1   should assume that the dates for the filing of the revised

2   complaint and our revised counterclaim and all these other

3   deadlines for intervention are the deadlines they should be

4   work towards?

5           I want to make sure people know what is expected.

6           THE COURT:  Yes.

7           The dates in 2A through 2J are approved.

8           I am asking you to revisit with each other and give me

9   a revised or reproposed version of the schedule from 2K forward

10  through 3.

11          And I think the other items are -- 4 is sort of

12  informational.

13          5, the terms will be immediately effective.

14          So your new order will be effective nunc pro tunc to

15  the extended covered dates starting from today.

16          And, yes, I'll retain jurisdiction.

17          MR. YANEZ:  Thank you, your Honor.

18          Thank you very much.

19          THE COURT:  I think that takes us through our entire

20  agenda for today.

21          Thank you all for your work, your advocacy, your

22  patience, and your work on behalf of all of those interested

23  and living in Puerto Rico.

24          Take care.  We are adjourned.

25          (Adjourned)