# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| THE OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF THE COMMONWEALTH OF<br>PUERTO RICO,<br><br>    as agent of<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>        Plaintiff,<br><br>v.<br><br>BETTINA WHYTE,<br><br>    as agent of<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO | Adv. Proc. No. 17-00257 (LTS) |

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

as representative of

THE PUERTO RICO SALES TAX FINANCING
CORPORATION,

       Defendant.

**DECLARATION OF JEFFREY W. LEVITAN
IN SUPPORT OF THE COMMONWEALTH OF PUERTO
RICO'S MOTION PURSUANT TO BANKRUPTCY RULE 9019 FOR
ORDER APPROVING SETTLEMENT BETWEEN COMMONWEALTH OF
<u>PUERTO RICO AND PUERTO RICO SALES TAX FINANCING CORPORATION</u>**

I, Jeffrey W. Levitan, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      I am a member of the bar of the State of New York, I am admitted to practice

before this Court *pro hac vice*, and I am a member of the law firm of Proskauer Rose LLP, with

offices at Eleven Times Square, New York, New York 10036.

2.      I submit this declaration in support of the *Commonwealth of Puerto Rico's Motion*

*Pursuant to bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of*

*Puerto Rico and Puerto Rico Sales Tax Financing Corporation* filed concurrently with this

declaration.

3.      Attached hereto as **<u>Exhibit A</u>** is a true and correct copy of the Amended and

Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 10,

2009.

4.      Attached hereto as **<u>Exhibit B</u>** is a true and correct copy of that certain Amended

and Restated Plan Support Agreement, dated September 20, 2018.

I declare under penalty of perjury that the foregoing facts are true and correct.


Dated: October 19, 2018              */s/ Jeffrey W. Levitan*
      New York, New York            Jeffrey W. Levitan

## Exhibit A

**Puerto Rico Sales Tax Financing Corporation**

**Amended and Restated Sales Tax Revenue Bond Resolution**

**PUERTO RICO SALES TAX FINANCING CORPORATION**

---

**AMENDED AND RESTATED
SALES TAX REVENUE BOND RESOLUTION**

---

Adopted on July 13, 2007
As amended on June 10, 2009

511470.30 032563 RES

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS AND STATUTORY AUTHORITY

SECTION 101.   Definitions................................................................................1
SECTION 102.   Authority for this Resolution .......................................................21
SECTION 103.   Resolution to Constitute Contract ...............................................21
SECTION 104.   Special Provisions Concerning Capital Appreciation Bonds.......................21

## ARTICLE II

### AUTHORIZATION AND ISSUANCE OF BONDS

SECTION 201.   Authorization of Bonds...............................................................23
SECTION 202.   General Provisions for Issuance of Bonds. ...................................23
SECTION 203.   Special Provisions for Refunding Bonds. .....................................27
SECTION 204.   Delegation of Officers and Committees. .......................................28
SECTION 205.   Credit and Liquidity Facilities; Rights of Credit Facility Providers............28
SECTION 206.   Qualified Hedges .......................................................................29
SECTION 207.   Parity Obligations and Subordinate Obligations...........................................29

## ARTICLE III

### GENERAL TERMS AND PROVISIONS OF BONDS

SECTION 301.   Medium of Payment; Form and Date; Letters and Numbers.......................30
SECTION 302.   Legends....................................................................................30
SECTION 303.   Execution and Authentication......................................................30
SECTION 304.   Negotiability, Transfer and Registry.............................................31
SECTION 305.   Registration of Transfer of Bonds................................................31
SECTION 306.   Regulations with Respect to Exchanges and Registration of
               Transfers .................................................................................31
SECTION 307.   Bonds Mutilated, Destroyed, Stolen or Lost.................................32
SECTION 308.   Preparation of Definitive Bonds; Temporary Bonds. .....................32
SECTION 309.   Tender of Option Bonds or Fixed Tender Bonds; Original Issue
               Discount ..................................................................................33
SECTION 310.   Book-Entry-Only System..............................................................33

## ARTICLE IV

### REDEMPTION OF BONDS

SECTION 401.   Privilege of Redemption and Redemption Price............................................34

i

# TABLE OF CONTENTS

Page

SECTION 402.   Redemption at the Election of the Corporation ...........................................34
SECTION 403.   Redemption out of Sinking Fund Installments. ...........................................34
SECTION 404.   Selection of Bonds to be Redeemed in Partial Redemption. ......................35
SECTION 405.   Notice of Redemption ..............................................................................35
SECTION 406.   Payment of Redeemed Bonds ..................................................................36
SECTION 407.   Cancellation and Disposition of Bonds.....................................................36

## ARTICLE V

## PLEDGE; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND APPLICATION THEREOF

SECTION 501.   The Pledge. .............................................................................................38
SECTION 502.   Establishment of Fund and Accounts. ......................................................38
SECTION 503.   Costs of Issuance Account and Capitalized Interest Account. ...................39
SECTION 504.   Bond Proceeds Account............................................................................40
SECTION 505.   Revenue Account. .....................................................................................41
SECTION 506.   Debt Service Account. ..............................................................................43
SECTION 507.   Debt Service Reserve Account. ................................................................45
SECTION 508.   Satisfaction of Sinking Fund Installments. ...............................................47
SECTION 509.   Redemption Account; Amounts to be Deposited Therein. ..........................48
SECTION 510.   Rebate Account. ........................................................................................49

## ARTICLE VI

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601.   Security for Deposits................................................................................50
SECTION 602.   Investment of Funds, Accounts and Subaccounts Held by the
               Trustee.....................................................................................................50
SECTION 603.   Valuation and Sale of Investments. ..........................................................51

## ARTICLE VII

## PARTICULAR COVENANTS OF THE CORPORATION

SECTION 701.   Payment of Obligations; Pledged Sales Tax Base Amount..........................53
SECTION 702.   Extension of Payment of Bonds.................................................................53
SECTION 703.   Offices for Servicing Bonds.......................................................................53
SECTION 704.   Further Assurance.....................................................................................53
SECTION 705.   Power to Issue Bonds and Pledge Funds and Accounts .............................54
SECTION 706.   Agreement of the Commonwealth. ............................................................54
SECTION 707.   Creation of Liens.......................................................................................54
SECTION 708.   Accounts and Reports. ..............................................................................55

511470.30 032563 RES

# TABLE OF CONTENTS

Page

SECTION 709.   Tax Matters. ...................................................................................................55
SECTION 710.   Issuance of Additional Bonds; Incurrence of Additional Parity
Obligations and Subordinate Obligations; Payment of  Obligations...........56
SECTION 711.   General...........................................................................................................59

## ARTICLE VIII

## CONCERNING THE TRUSTEE

SECTION 801.   Trustee Appointment and Acceptance of Duties ..........................................60
SECTION 802.   Responsibilities of Trustee...........................................................................60
SECTION 803.   Evidence on Which Trustee May Act............................................................61
SECTION 804.   Compensation and Indemnification ..............................................................61
SECTION 805.   Certain Permitted Acts..................................................................................62
SECTION 806.   Resignation of Trustee ..................................................................................62
SECTION 807.   Removal of Trustee ........................................................................................63
SECTION 808.   Appointment of Successor Trustee. ..............................................................63
SECTION 809.   Transfer of Rights and Property to Successor Trustee...................................64
SECTION 810.   Appointment of Co-Trustee. .........................................................................64
SECTION 811.   Merger or Consolidation ...............................................................................65
SECTION 812.   Adoption of Authentication ..........................................................................65
SECTION 813.   Accounting by Trustee; Nonpetition Covenant ............................................66

## ARTICLE IX

## SUPPLEMENTAL RESOLUTIONS

SECTION 901.   Supplemental Resolutions Effective upon Filing with the Trustee ...............67
SECTION 902.   Supplemental Resolutions Effective upon Consent of Trustee.....................68
SECTION 903.   Supplemental Resolutions Effective with Consent of Bondowners .............68
SECTION 904.   General Provisions. ........................................................................................68

## ARTICLE X

## AMENDMENTS

SECTION 1001.   Mailing and Publication................................................................................70
SECTION 1002.   Powers of Amendment..................................................................................70
SECTION 1003.   Consent of Bondowners ...............................................................................71
SECTION 1004.   Modifications by Unanimous Consent..........................................................71
SECTION 1005.   Modification Before Bonds Outstanding ......................................................71
SECTION 1006.   Exclusion of Bonds ......................................................................................72
SECTION 1007.   Notation on Bonds ........................................................................................72

iii

# TABLE OF CONTENTS

Page

ARTICLE XI

DEFAULTS AND REMEDIES

SECTION 1101. Events of Default. .................................................................73
SECTION 1102. Remedies..................................................................................73
SECTION 1103. Priority of Payments After Event of Default. ...........................75
SECTION 1104. Termination of Proceedings .....................................................76
SECTION 1105. Bondowners' Direction of Proceedings .....................................76
SECTION 1106. Limitation on Rights of Bondowners........................................76
SECTION 1107. Possession of Bonds by Trustee Not Required ..........................77
SECTION 1108. Remedies Not Exclusive ...........................................................77
SECTION 1109. No Waiver of Default.................................................................78
SECTION 1110. Notice of Event of Default.........................................................78

ARTICLE XII

MISCELLANEOUS

SECTION 1201. Defeasance. ..............................................................................79
SECTION 1202. Evidence of Signatures of Bondowners and Owners of Bonds. ...............81
SECTION 1203. Moneys Held for Particular Bonds ...........................................82
SECTION 1204. Preservation and Inspection of Documents................................82
SECTION 1205. Parties Interested Herein .........................................................82
SECTION 1206. No Personal Liability ...............................................................82
SECTION 1207. Successors and Assigns.............................................................82
SECTION 1208. Severability of Invalid Provisions ............................................82
SECTION 1209. Headings ..................................................................................82
SECTION 1210. Conflict ....................................................................................83
SECTION 1211. Governing Law ........................................................................83
SECTION 1212. Effective Date ..........................................................................83

iv

511470.30 032563 RES

## SALES TAX REVENUE BOND RESOLUTION

BE IT RESOLVED by the Puerto Rico Sales Tax Financing Corporation, as follows:

## ARTICLE I

## DEFINITIONS AND STATUTORY AUTHORITY

SECTION 101. Definitions. The following terms shall, for all purposes of this Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior

511470.30 032563 RES

Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of  Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such  Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.  The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the

511470.30 032563 RES

related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the

-3-

Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of this Resolution, and for the purposes of the thirteenth sentence of Section 802 of this Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

**Bond Proceeds Account** shall mean the Account by that name established by Section 502.

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital

-4-

511470.30 032563 RES

Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity, in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to Section 502.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Commonwealth Sales Tax** shall mean the sales and use tax enacted by the Legislative Assembly of Puerto Rico by virtue of Act No. 117 of the Legislature of Puerto Rico, approved July 4, 2006, as amended.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at

-5-

which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of this Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act..

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to Section 502.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which

-6-

shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

(i)     Government Obligations;

511470.30 032563 RES

(ii)    Defeased Municipal Obligations;

(iii)    certificates, depository receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) or (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depository receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)    a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)    which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)    (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

-8-

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

511470.30 032563 RES

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Holding Subaccount** means each Account by that name established in a Debt Service Account pursuant to Section 502.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by Section 502.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

(i)     Defeasance Obligations;

(ii)    Defeased Municipal Obligations;

(iii)   public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)    direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)     direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)    prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)   shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or

-10-

any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii) bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)   repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)   investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)   any other obligations conforming to any Corporation guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

511470.30 032563 RES

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility.   Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding,** when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

511470.30 032563 RES

(i)       any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

(ii)       Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

(iii)      Bonds deemed to have been paid as provided in Section 1201;

(iv)      Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007;

(v)       Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)      as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in this Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

-13-

511470.30 032563 RES

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.    All Revenues.

2.    All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

3.    The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Sections 1201 and 1203.

4.    Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

5.    Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

-14-

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in Section 508) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by Section 502.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be

-15-

based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds.  Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Account** shall mean the Account by that name established by Section 502.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Series Resolution authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by Section 502.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to this Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to Section 203 or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to this Resolution and the applicable Series Resolution.

**Related August 2 Computation Period** shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

-17-

**Resolution** shall mean this Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by Section 502.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.     All Pledged Sales Tax received by the Corporation or the Trustee.

2.     With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of Section 710 or other purposes of the Resolution.

3.     Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

4.     Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution, subject to the provisions of Sections 1201 and 1203.

5.     Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee  in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee  under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

511470.30 032563 RES

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Secretary** means, for purposes of the Resolution and so long as Bonds shall be Outstanding, the Secretary of the Board of Directors of Government Development Bank for Puerto Rico, who shall also act as Secretary of the Board of Directors of the Corporation and as Secretary under this Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee, in the form appended hereto as Appendix A.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to Article III or Section 1007, regardless of variations in maturities, principal amount, interest rate or other provisions.

511470.30 032563 RES

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of this Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with Article IX.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to Section 801 to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa.

The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms as used in this Resolution, refer to this Resolution. All references to Articles and Sections in this Resolution refer to the Articles and Sections hereof unless otherwise expressly stated.

SECTION 102. <u>Authority for this Resolution</u>.    This Resolution is adopted pursuant to the authority conferred on the Corporation by the Act.

SECTION 103. <u>Resolution to Constitute Contract</u>.    In consideration of the purchase and acceptance of any and all of the Bonds authorized to be issued hereunder by those Persons who shall hold the same from time to time, the Resolution shall be deemed to be and shall constitute a contract among the Corporation, the Owners from time to time of the Bonds, and all other Beneficiaries; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and all other Beneficiaries, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and such Beneficiaries over any other thereof, except as expressly otherwise provided in or permitted by the Resolution.

SECTION 104. <u>Special Provisions Concerning Capital Appreciation Bonds</u>.

Except as otherwise may be provided in a Supplemental Resolution:

1.    For purposes of clause (ii) within the definition of "Outstanding" in this Resolution, the principal amount of any Capital Appreciation Bond, in reference to the payment thereof at maturity, shall be deemed to equal its Maturity Amount.

2.    For purposes of the definition of "Redemption Price" in this Resolution, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended redemption.

3.    For purposes of Sections 305, 307 and 308, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended exchange or substitution.

-21-

4. For purposes of Section 406, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount.

5. For purposes of Sections 501, 502, and 1103, and of all other provisions of this Resolution relating to security for the Bonds or application of assets which secure the Bonds, the principal amount of each Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended application of the subject assets.

6. For purposes of Sections 1002, 1003, 1101, 1102, 1105 and 1106 and of all other provisions of this Resolution relating to consents or directions given by, or requests of, Owners of the Bonds, the principal amount of each Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the most recent Compounding Date.

7. For purposes of Section 1201, the principal amount of any Capital Appreciation Bond payable upon the maturity thereof shall be deemed to equal its Maturity Amount.

511470.30 032563 RES

## ARTICLE II

## AUTHORIZATION AND ISSUANCE OF BONDS

SECTION 201.  Authorization of Bonds.  There is hereby created and established an issue of Bonds of the Corporation to be designated as "Sales Tax Revenue Bonds," which Bonds may be issued as hereinafter provided without limitation as to amount except as is or may hereafter be provided in the Resolution or in a Supplemental Resolution or as may be limited by law.  There is hereby further created by the Resolution, in the manner and to the extent provided herein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to this Resolution.  The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation.  The Commonwealth shall not be liable on the Bonds or any Ancillary Bond Facility.  Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the good faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond or any Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property and other funds and assets of or available to the Corporation and pledged therefor, and the Bonds and each Ancillary Bond Facility shall contain a statement to the foregoing effect.

SECTION 202.  General Provisions for Issuance of Bonds.

1.    The Bonds may, if and when authorized by the Corporation pursuant to one or more Series Resolutions, be issued in one or more Series, as Senior Bonds or one or more Classes of Subordinate Bonds, and the designation thereof, in addition to the name "Sales Tax Revenue Bonds," shall include such further appropriate particular designations added to or incorporated in such title for the Bonds of any particular Series as the Corporation may determine, including designations of Classes.  Each Bond shall bear upon its face the designation so determined for the Series to which it belongs.  Except as may be limited by applicable law, Bonds of a Series may be issued in the form of Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender Bonds, Taxable Bonds or Tax Exempt Bonds or any combination of the foregoing, which in each case may be Serial Bonds or Term Bonds, or any combination thereof.  Any Bonds that are to be issued as Subordinate Bonds may be issued with priorities of payment hereunder among all such Subordinate Bonds, as set forth in the related Series Resolutions.

2.    Each Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds shall also specify, except as may be limited by applicable law:

(i)    the authorized principal amount and designation of such Series of Bonds;

(ii)    the purpose or purposes for which such Series of Bonds is being issued, which shall be one or more of the following, to the extent then permitted by applicable law and the provisions of the Resolution:  (a) to provide sufficient

-23-

funds for the Project; (b) to refund or otherwise prepay any Bonds or other bonds, notes or other evidences of indebtedness issued by the Corporation for the Project; (c) to pay or provide for the payment of Financing Costs, including but not limited to Costs of Issuance; and/or (d) for such other purposes or projects as may be authorized by the Act, as the same may be amended and then in effect.

(iii)    the date or dates, maturity date or dates (which for all Bonds issued after the date of issuance of Bonds designated "Series 2008A", shall be on August 1 in the related year) and amounts of each maturity of the Bonds of such Series;

(iv)    the interest rate or rates of the Bonds of such Series (which may include variable, convertible or other rates, original issue discount and zero interest rate bonds), or the manner of determining such interest rate or rates, and the interest payment dates of the Bonds of such Series, and the date or dates on which the rate at which Adjustable Rate Bonds of such Series bear interest shall be adjusted;

(v)    the type of Bonds to be issued, including, but not limited to, Capital Appreciation Bonds (including Convertible Capital Appreciation Bonds), Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender bonds, Taxable Bonds or Tax Exempt Bonds;

(vi)    the designation of Bonds of such Series as Senior Bonds or as one or more Classes of Subordinate Bonds and the designation of Beneficiaries;

(vii)    the Record Date, if any, for such Bonds;

(viii)    the denomination or denominations of, and the manner of dating, numbering and lettering, the Bonds of such Series;

(ix)    if so determined by the Corporation, any Debt Service Reserve Requirement for the Bonds of such Series, and the method of calculating the same and funding thereof (which may be from Bond proceeds);

(x)    the place or places of payment of the principal of and premium, if any, and interest on the Bonds of such Series, or the method of determining the same;

(xi)    the Redemption Price or Prices, if any, and, subject to the provisions of Article IV, the redemption terms, if any, for the Bonds of such Series (including but not limited to any notice of redemption period other than as provided in Section 406), provided that Bonds of any maturity for which Sinking Fund Installments shall be established pursuant to paragraph (xii) of this subsection shall in any event be redeemable, or payable at maturity, by application of the Sinking Fund Installments for such Bonds on the due dates of such Sinking Fund Installments;

(xii)   the amount of each Sinking Fund Installment, or the method for determining such amount, and due date of each Sinking Fund Installment, if any, for Bonds of like maturity of such Series (which date for all Bonds issued after the date of issuance of Bonds designated "Series 2008A" shall be on August 1 in the related year);

(xiii)   the amount, if any, or the method for determining such amount, to be credited to the Capitalized Interest Account, for capitalized interest with respect to such Series of Bonds and provisions for the application thereof to the payment of all or a portion of the interest on such Series of Bonds or any other Series of Bonds;

(xiv)   the amount, if any, or method of determining such amount, to be credited to the Costs of Issuance Account or otherwise to be paid for Costs of Issuance;

(xv)   if so determined by the Corporation, provisions for the application of any moneys available therefor to the purchase or redemption of Bonds of such Series and for the order of purchase or redemption of such Bonds;

(xvi)   if so determined by the Corporation, provisions for the sale of the Bonds of such Series;

(xvii)   provisions for the execution and authentication of the Bonds of such Series;

(xviii) the forms of the Bonds of such Series and of the Trustee 's certificate of authentication;

(xix)   if Bonds of such Series are Adjustable Rate Bonds that are not the subject of a Qualified Hedge, the Contractual Maximum Interest Rate for such Bonds and the provisions, if any, as to the calculation or change of Adjustable Rates;

(xx)   if Bonds of such Series are Option Bonds or Fixed Tender Bonds, provisions regarding tender for purchase or redemption thereof and payment of the purchase or Redemption Price thereof;

(xxi)   if so determined by the Corporation, modifications to the definition of Revenues or Pledged Property applicable to the Bonds of such Series reflecting the addition of resources to Revenues or Pledged Property;

(xxii)  if so determined with respect to the Bonds of such Series, that Section 709 shall not apply to such Bonds;

(xxiii) deposits into Funds, Accounts and Subaccounts as may be required or permitted by the Resolution and not otherwise provided for above;

-25-

(xxiv)  if such Bonds are not payable in Dollars, the Foreign Currency or Currencies or Currency Unit in which the Bonds of such Series shall be denominated or in which payment of the principal of (and/or premium, if any) and/or interest on the Bonds of such Series may be made;

(xxv)  if the amount of principal of (and premium, if any) or interest on the Bonds of such Series may be determined with reference to an index, including, but not limited to, an index based on a Currency or Currencies other than that in which the Bonds of such Series are denominated or payable, or any other type of index, the manner in which such amounts shall be determined; and

(xxvi)  any other provisions deemed advisable by the Corporation, not in conflict with the provisions of the Resolution or the Act as each is then in effect.

3.    Each Series of Bonds shall be executed by the Corporation for issuance under the Resolution and delivered to the Trustee and thereupon shall be authenticated by the Trustee and delivered to the Corporation or upon its order, but only upon satisfaction with the conditions to issuance of additional Bonds contained in Section 710 and only upon the receipt by the Trustee of:

(i)    a copy of the Resolution, certified by an Authorized Officer of the Corporation or the Secretary;

(ii)    an Opinion of Bond Counsel to the effect that (A) the Corporation has the right and power under the Act, as amended to the date of such opinion, to adopt the Resolution and the Resolution has been duly and lawfully adopted by the Corporation, is in full force and effect and is valid and binding upon the Corporation and enforceable in accordance with its terms, and no other authorization for the Resolution is required; (B) the Resolution creates the valid pledge for the benefit of the Owners of the Bonds which it purports to create of the Pledged Property, subject only to the provisions of the Resolution permitting the application thereof to the purposes and on the terms and conditions set forth in the Resolution; and (C) the Bonds of such Series are valid and binding special obligations of the Corporation as provided in the Resolution, enforceable in accordance with their terms and the terms of the Resolution (except insofar as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore or thereafter enacted and may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), or other customary exception), and entitled to the benefit of the Resolution and of the Act, as amended to the date of such opinion, and such Bonds have been duly and validly authorized, executed and issued in accordance with law, including the Act, as amended to the date of such opinion, and in accordance with the Resolution;

(iii)    a written order as to the authentication and delivery of the Bonds of such Series, signed by an Authorized Officer of the Corporation;

-26-

511470.30 032563 RES

(iv)    a copy of the Series Resolution authorizing such Series, certified by an Authorized Officer of the Corporation or the Secretary;

(v)    a certificate of an Authorized Officer of the Corporation as to deposits in Accounts and stating that the Corporation is not in default in any material respect in the performance of any of the terms, provisions or covenants of this Resolution or any Supplemental Resolution to be complied with or performed by the Corporation;

(vi)    such further documents as are required by the provisions of this Section or Article IX or any Supplemental Resolution or Supplemental Resolution adopted pursuant to Article IX.

4.    Each Series of Bonds shall be issued upon compliance with Section 710.

SECTION 203.  Special Provisions for Refunding Bonds.

1.    Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of Section 202 and this Section, as Refunding Bonds, including for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation.  Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

2.    The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee only upon receipt by the Trustee (in addition to the requirements of Section 202) of:

(i)    irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication, irrevocable instructions to the Trustee, to provide notice in the manner provided in Section 1201 with respect to the payment of such Bonds pursuant to such Section 1201;

(iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of subsection 2 of Section 1201, which moneys and Defeasance Securities shall be held in trust and used only as provided in subsection 2 of Section 1201; and

(iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in

-27-

paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

3.      Refunding Bonds may be issued only upon compliance with Section 710.

SECTION 204.  Delegation of Officers and Committees.

A Supplemental Resolution authorizing Bonds may delegate to any Authorized Officer or committee of the Corporation, and any such committee may delegate to an Authorized Officer of the Corporation, the power to issue Bonds from time to time and to fix the details of any such Bonds by an appropriate certificate of such Authorized Officer.  Any such action by an Authorized Officer of the Corporation shall be in writing.  Each such action by an Authorized Officer or committee of the Corporation with respect to any Bonds shall be deemed to be part of the Supplemental Resolution providing for such Bonds.

SECTION 205.  Credit and Liquidity Facilities; Rights of Credit Facility Providers.

1.      In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

2.      Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

511470.30 032563 RES

SECTION 206.  Qualified Hedges.  The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

SECTION 207.  Parity Obligations and Subordinate Obligations.  For purposes of Articles V and XI, all Parity Obligations and Subordinate Obligations shall specify, to the extent applicable, the interest and principal components of such Parity Obligations and Subordinate Obligations; provided, however, that in the case of Qualified Hedges, scheduled payments thereunder shall constitute the interest components thereof and there shall be no principal components.

511470.30 032563 RES

## ARTICLE III

## GENERAL TERMS AND PROVISIONS OF BONDS

SECTION 301. <u>Medium of Payment; Form and Date; Letters and Numbers</u>.

1.     The Bonds shall be payable, with respect to interest, principal and premium, if any, in Dollars or any Currency which at the time of payment is legal tender for the payment of public and private debts, as provided in the applicable Series Resolution.

2.     The Bonds of each Series shall be issued only in the form of fully registered Bonds without coupons unless otherwise authorized by the Supplemental Resolution authorizing the issuance thereof.

3.     Each Bond shall be lettered and numbered as provided in the Supplemental Resolution authorizing the issuance thereof and so as to be distinguished from every other Bond.

4.     Bonds of each Series shall be dated as provided in the Supplemental Resolution authorizing the issuance thereof.

5.     If so provided by the Supplemental Resolution authorizing the issuance thereof, the Bonds of any Series authorized to be issued by such Supplemental Resolution may be evidenced in book entry form without definitive certificates delivered to each beneficial owner thereof.

SECTION 302. <u>Legends</u>.  The Bonds of each Series in the form set forth in any Supplemental Resolution may also contain or have endorsed thereon such provisions, specifications and descriptive words not inconsistent with the provisions of the Resolution as may be necessary or desirable to comply with custom or otherwise, as may be determined by the Corporation prior to the authentication and delivery thereof.

SECTION 303. <u>Execution and Authentication</u>.

1.     The Bonds shall be executed in the name of the Corporation by the manual or facsimile signature of an Authorized Officer of the Corporation and its corporate seal (or a facsimile thereof) shall be thereunto affixed, imprinted, engraved or otherwise reproduced, and attested by the manual or facsimile signature of its Secretary.  In case any one or more of the officers who shall have signed or sealed any of the Bonds shall cease to be such officer before the Bonds so signed and sealed shall have been authenticated and delivered by the Trustee, such Bonds may, nevertheless, be authenticated and delivered as herein provided, and may be issued as if the persons who signed or sealed such Bonds had not ceased to hold such offices.  Any Bond of a Series may be signed and sealed on behalf of the Corporation by such persons as at the time of the execution of such Bond shall be duly authorized or hold the proper office in the Corporation, although at the date borne by the Bonds of such Series such persons may not have been so authorized or have held such office.

-30-

2.    The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Resolution authorizing such Bonds, executed manually by the Trustee.  Only such Bonds as shall bear thereon such certificate of authentication shall be entitled to any right or benefit under the Resolution and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee  upon any Bond executed on behalf of the Corporation shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered under the Resolution and that the Owner thereof is entitled to the benefits of the Resolution.

SECTION 304.  Negotiability, Transfer and Registry.  All Bonds issued under the Resolution shall be negotiable, subject to the provisions for registration and registration of transfer contained in the Resolution and in the Bonds.  So long as any of the Bonds shall remain outstanding, the Corporation shall maintain and keep, at the Corporate Trust Office, books for the registration and registration of transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Corporation shall register or cause to be registered therein, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or registration of transfer.  So long as any of the Bonds remain Outstanding, the Corporation shall make all necessary provision to permit the exchange of Bonds at the Corporate Trust Office.

SECTION 305.  Registration of Transfer of Bonds.

1.    The transfer of each Bond shall be registrable only upon the books of the Corporation, which shall be kept for that purpose at the Corporate Trust Office, by the Owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer duly executed by the Owner or his duly authorized attorney. Upon the registration of transfer of any such Bond the Corporation shall issue in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity, and interest rate, as the surrendered Bond.

2.    The Corporation and the Trustee  may deem and treat the person in whose name any Bond shall be registered upon the books of the Corporation as the absolute owner of such Bond whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal or Redemption Price, if any, of and interest on such Bond and for all other purposes, and all such payments so made to any such Owner or upon his duly authorized written order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid, and neither the Corporation nor the Trustee shall be affected by any notice to the contrary.  The Corporation agrees to indemnify and hold the Trustee harmless against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without gross negligence under the Resolution, in so treating such Owner.

SECTION 306.  Regulations with Respect to Exchanges and Registration of Transfers.  In all cases in which the privilege of exchanging Bonds or registering transfers of Bonds is exercised, the Corporation shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of the Resolution.  All Bonds surrendered in any such exchanges or registration of transfers shall forthwith be canceled by the Trustee.  For every such exchange or registration of transfer of Bonds, whether temporary or definitive, the Corporation

-31-

511470.30 032563 RES

or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or registration of transfer, and, except (i) with respect to the delivery of definitive Bonds in exchange for temporary Bonds, (ii) in the case of a Bond issued upon the first exchange or registration of transfer of a Bond or Bonds surrendered for such purpose within 60 days after the first authentication and delivery of any of the Bonds of the same Series, or (iii) as otherwise provided in the Resolution, may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or registration of transfer, which sum or sums shall be paid by the person requesting such exchange or registration of transfer as a condition precedent to the exercise of the privilege of making such exchange or registration of transfer. Neither the Corporation nor the Trustee shall be required to register the transfer of or exchange any Bonds called for redemption.

SECTION 307. Bonds Mutilated, Destroyed, Stolen or Lost. In case any Bond shall become mutilated or be destroyed, stolen or lost, the Corporation shall execute, and thereupon the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, and principal amount as the Bond so mutilated, destroyed, stolen or lost, in exchange and substitution for such mutilated Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for the Bond destroyed, stolen or lost, upon filing with the Trustee evidence satisfactory to the Corporation and the Trustee that such Bond has been destroyed, stolen or lost and upon furnishing the Corporation and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Corporation and the Trustee may prescribe and paying such expenses as the Corporation and Trustee may incur. All Bonds so surrendered to the Trustee shall be canceled by it. Any such new Bonds issued pursuant to this Section in substitution for Bonds alleged to be destroyed, stolen or lost shall constitute original additional contractual obligations on the part of the Corporation, whether or not the Bonds so alleged to be destroyed, stolen or lost be at any time enforceable by anyone, and shall be equally secured by and entitled to equal and proportionate benefits with all other Bonds issued under the Resolution, in any moneys or securities held by the Corporation or the Trustee for the benefit of the Bondowners.

SECTION 308.  Preparation of Definitive Bonds; Temporary Bonds.

1.       Until the definitive Bonds of any Series are prepared, the Corporation may execute, in the same manner as is provided in Section 303, and, upon the request of the Corporation, the Trustee shall authenticate and deliver, in lieu of definitive Bonds, one or more temporary Bonds substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in denominations or any multiples thereof authorized by the Corporation, and with such omissions, insertions and variations as an Authorized Officer of the Corporation may deem appropriate to temporary Bonds. The Corporation at its own expense shall prepare and execute and, upon the surrender of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds, the Trustee shall authenticate and, without charge to the Owner thereof, deliver in exchange therefor definitive Bonds, of the same aggregate principal amount, Series and maturity if any, as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds authenticated and issued pursuant to the Resolution.

511470.30 032563 RES

2.      All temporary Bonds surrendered in exchange either for another temporary Bond or Bonds or for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

SECTION 309.  <u>Tender of Option Bonds or Fixed Tender Bonds; Original Issue Discount</u>.  Option Bonds or Fixed Tender Bonds which are required to be delivered for redemption or purchase pursuant to the provisions hereof or of the Supplemental Resolution authorizing such Bonds shall be deemed surrendered for transfer even though such Bonds have not been actually delivered by the Owners thereof.  The Corporation shall file with the Trustee promptly at the end of each Bond Year (i) a written notice specifying the amount of original issue discount (including daily rates and accrual periods) accrued on Outstanding Bonds as of the end of such Bond Year, and (ii) such other specific information relating to such original issue discount as, in the judgment of the Trustee, may then be relevant under the Internal Revenue Code of 1986, as amended from time to time.

SECTION 310.  <u>Book-Entry-Only System</u>.  Notwithstanding any other provision of the Resolution, the Corporation may employ a book-entry-only system of registration with respect to any Bonds, and the procedures regarding such registration shall be set forth in a Supplemental Resolution and/or the book-entry-only system depository.  Any provisions of the Resolution inconsistent with book-entry-only Bonds, including but not limited to the manner in which Bonds may be paid, shall not be applicable to such book-entry-only Bonds.

-33-

## ARTICLE IV

## REDEMPTION OF BONDS

SECTION 401.  Privilege of Redemption and Redemption Price.  Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in this Article IV, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in this Article IV as may be specified in the Supplemental Resolution authorizing such Series.

SECTION 402.  Redemption at the Election of the Corporation.  In the case of any redemption of Bonds otherwise than as provided in Section 403, the Corporation shall give written notice to the Trustee  of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price.  Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee.  In the event notice of redemption shall have been given as provided in Section 406, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee  an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

SECTION 403.  Redemption out of Sinking Fund Installments.

1.     In addition to the redemption of Bonds pursuant to Sections 401 and 402 above, Term Bonds issued pursuant to this Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

2.     In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in Section 508) and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment.  Such notice

-34-

shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

3.     The Corporation shall, and hereby covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

SECTION 404.  Selection of Bonds to be Redeemed in Partial Redemption.

1.     In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to Section 401 or 402 hereof, the Corporation shall designate the maturities of the Bonds to be redeemed.

2.     If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed.  For purposes of this Section 404, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

SECTION 405.  Notice of Redemption.  When the Trustee shall receive notice from the Corporation of its election to redeem Bonds pursuant to Section 402, or when Bonds are to be redeemed pursuant to Section 403, the Trustee shall give notice, in the name of the Corporation, of the redemption of such Bonds, which notice shall specify the Series and maturities and interest rate of the Bonds to be redeemed, the redemption date and the place or places where amounts due upon such redemption will be payable and, if less than all of the Bonds of any like Series and maturity and interest rate are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds so to be redeemed, and, in the case of Bonds to be redeemed in part only such notice shall also specify the respective portions of the principal amount thereof to be redeemed, and, if applicable, that such notice is conditional and the conditions that must be satisfied.  Such notice of redemption shall further state that on such redemption date there shall become due and payable upon each Bond or portion thereof to be redeemed the Redemption Price thereof, together with interest accrued to the redemption date, in the Currency in which the Bonds of such Series are payable, and that from and after such date interest thereon shall cease to accrue and be payable on the Bonds or portions thereof to be redeemed, unless, in the case of any conditional notice, such conditions are not satisfied.  The Trustee shall mail a copy of such notice, postage prepaid, no less than sixteen (16) days before the redemption date, or such other period for any particular Bonds as may be provided by the Supplemental Resolution authorizing such Bonds, to the Owners of Bonds or portions of Bonds which are to be redeemed, at their last address, if any, appearing upon the registry books.  Failure

-35-

so to mail any such notice to any particular Owner shall not affect the validity of the proceedings for the redemption of Bonds not owned by such Owner and failure of any Owner to receive such notice shall not affect the validity of the proposed redemption of Bonds.

Any notice of optional redemption of Bonds given pursuant to this Section may be made conditional upon receipt by the Trustee of moneys sufficient to pay the Redemption Price of such Bonds, in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of such Redemption Price if any such condition so specified is not satisfied or if any such other event shall not occur. Notice of such rescission shall be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee shall give notice of such recission to affected Owners of Bonds at least one (1) Business Day prior to such scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

SECTION 406. Payment of Redeemed Bonds. Notice having been given in the manner provided in Section 405, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series are payable, and upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series are payable, except to the extent the same shall not occur on account of a condition stated in the notice to the Trustee pursuant to Section 402 and in the notice of redemption pursuant to Section 405. If there shall be called for redemption less than all of a Bond, the Corporation shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the Owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered, Bonds of like Series and maturity in any authorized denomination. If, on the redemption date, moneys for the redemption of all the Bonds or portions thereof of any like Series and maturity and interest rate to be redeemed, together with interest to the redemption date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been provided as aforesaid, and, with respect to any conditional notice of redemption, the conditions stated in the notice of redemption shall have been met and satisfied, then, from and after the redemption date, interest on the Bonds or portions thereof of such Series and maturity and interest rate so called for redemption shall cease to accrue and become payable. If said moneys shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

SECTION 407. Cancellation and Disposition of Bonds. All Bonds paid or redeemed, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bonds shall thereupon be promptly canceled. Bonds so canceled shall be disposed of by the Trustee, in accordance with the Trustee's standard procedures, and upon request from the Corporation the Trustee shall execute a certificate of disposition in duplicate by the signature of one of its Authorized Officers describing the Bonds so disposed of,

-36-

and one executed certificate shall be delivered to the Corporation and the other executed certificate shall be retained by the Trustee.

511470.30 032563 RES

## ARTICLE V

## PLEDGE; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND APPLICATION THEREOF

SECTION 501.  The Pledge.

1.      The Pledged Property, subject to Section 804, is hereby pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution, and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds.  Nothing contained herein shall prevent (i) a Credit Facility, Liquidity Facility or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to this Article V with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

2.      To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof.  Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

SECTION 502.  Establishment of Fund and Accounts.

1.      The "Project Fund" is hereby created and the following special Accounts and Subaccounts are hereby created and established within the Project Fund, each of which shall be held by the Trustee:

(1)      Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

(2)      Capitalized Interest Account,

(3)      Bond Proceeds Account,

(4)      Revenue Account,

-38-

511470.30 032563 RES

(5)     Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

(6)     Debt Service Reserve Account, established for each Class of Bonds,

(7)     Redemption Account, and

(8)     Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

2.     The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

3.     Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

SECTION 503.  Costs of Issuance Account and Capitalized Interest Account.

1.     If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.  If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Persons as directed in writing to the Trustee by the Corporation.

2.     There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth in paragraph (xiii) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.

3.     If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in

-39-

accordance with the requirements of the Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

4.      Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i)      setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii)      stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

5.      Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in subsection 6 of this Section.

6.      The Trustee  shall deposit any funds described in subsection 5 of this Section in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

7.      In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201.

SECTION 504.  Bond Proceeds Account.

1.      There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to this Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time.  Such amounts may include, but not be limited to, proceeds of Bonds and Build America Tax Credit Receipts.  Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

511470.30 032563 RES

2.    Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to provide for the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

3.    The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i)    setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii)    stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

4.    Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

SECTION 505.  Revenue Account.

1.    All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose.  All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts.  In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited.  Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America

Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH:   to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH:   to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto capitalized interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written

-42-

direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

2. Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

3. Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

SECTION 506. Debt Service Account.

1. There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

2. There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i) Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii) Amounts transferred from the Capitalized Interest Account pursuant to Section 503 for the payment of interest on the Bonds of such Series.

(iii) Amounts transferred from the Debt Service Reserve Account pursuant to Section 507 for the payment of interest on the Bonds and the interest component of Parity Obligations.

3. There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

-43-

(i)     Amounts transferred from a Debt Service Reserve Account pursuant to Section 507 for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)    Amounts transferred from the Redemption Account pursuant to Section 511 for the payment of Principal Installments of any Bonds.

4.      The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of subsection 2 of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

5.      The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee ; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of subsection 3 of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee, according to the amounts due on such date, without any discrimination or preference.

6.      In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201.

7.      There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding Amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to

-44-

be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

SECTION 507.  Debt Service Reserve Account.

1.     At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

2.     Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

3.     Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

4.     Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201, and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

5.     If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized

-45-

Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

6.      Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

7.      Reserve Account Cash Equivalents may be deposited in a Debt Service Reserve Account as provided in this subsection. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to subsection 3 of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by subsection 5 of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by subsection 5 of this Section.

-46-

8.     Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

SECTION 508.  Satisfaction of Sinking Fund Installments.

1.     Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows:

(i)     to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or

(ii)     to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

2.     Upon the purchase or redemption of any Bond pursuant to subsection 1 of this Section, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited  against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption.  Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee  a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

3.     In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment.  All Bonds so delivered to the Trustee  in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds.  Concurrently with such delivery of such Bonds the Corporation shall

511470.30 032563 RES

deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

4.     In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

5.     The Trustee shall, upon receipt of the notice specified by Section 403 and in the manner provided in Article IV, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in Section 403.

SECTION 509.  Redemption Account; Amounts to be Deposited Therein.

1.     The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)     amounts determined pursuant to subsection 6 of Section 503;

(ii)    amounts determined pursuant to subsection 4 of Section 504;

(iii)   amounts determined pursuant to subsection 2 of Section 505; and

(iv)    amounts transferred from the Debt Service Reserve Accounts pursuant to Section 507 for the payment of the Redemption Price of Bonds.

2.     Subject to the limitations contained in subsection 4 of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall

-48-

transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

3.     To the extent not required to make up a deficiency as required in subsection 2 of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to subsection 1 of Section 505.

4.     The transfers required by subsection 2 of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to Section 405, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

SECTION 510.  Rebate Account.

1.     The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

2.     The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

3.     The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

4.     The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

511470.30 032563 RES

## ARTICLE VI

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601. <u>Security for Deposits</u>. All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Corporation and the Owners of the Bonds and Parity Obligations in such manner as may then be required by applicable federal or state laws and regulations regarding security, by Investment Obligations of a market value at least equal at all times to the amount of the deposit so held by the Trustee; provided, however, that it shall not be necessary, unless required by applicable law, for the Trustee to give security for the deposit of any moneys with them held in trust and set aside for the payment of the principal or Redemption Price of, or interest on, any Bonds, or for the Trustee to give security for any moneys which shall be represented by obligations purchased under the provisions of the Resolution as an investment of such moneys. The Trustee shall have no obligation for the payment of interest on moneys properly held by it uninvested hereunder.

SECTION 602. <u>Investment of Funds, Accounts and Subaccounts Held by the Trustee.</u>

1.     Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated hereby except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of this Resolution as of the end of the preceding month.

2.     Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

3.     Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or

511470.30 032563 RES

Subaccount but, unless otherwise expressly provided in this Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account, and if not required to be so deposited in the Rebate Account because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

4. The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to this Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

5. Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

6. In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

SECTION 603. Valuation and Sale of Investments.

1. In computing the amounts in the Revenue Account, Debt Service Accounts, Debt Service Reserve Accounts and Rebate Account obligations purchased as an investment of moneys therein shall be valued at Amortized Value. Accrued interest received upon the sale of any Investment Obligation shall be treated as income from such Investment Obligation for purposes of this Section, except to the extent that such accrued interest represents the repayment of accrued interest paid upon purchase of such Investment Obligations.

-51-

2.      Neither the Trustee nor the Corporation shall be liable or responsible for the making of any investment authorized by the provisions of this Article, in the manner provided in this Article, or for any loss resulting from any such investment so made or disposed of in the manner provided in this Article; provided, however, that nothing in this subsection shall affect the obligation of the Corporation under any of the Bonds.

-52-

## ARTICLE VII

## PARTICULAR COVENANTS OF THE CORPORATION

The Corporation covenants and agrees with the Trustee and the Bondowners as follows:

SECTION 701.  Payment of Obligations; Pledged Sales Tax Base Amount.  The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in this Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201.  If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year.  In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget.  Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 5 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

SECTION 702.  Extension of Payment of Bonds.  The Corporation shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or claims for interest by the purchase or funding of such Bonds or by any other arrangement.  Nothing herein shall be deemed to limit the right of the Corporation (i) to issue Option Bonds or Refunding Bonds as provided in herein and such issuance shall not be deemed to constitute an extension of maturity of Bonds or (ii) to apply any amount in the Debt Service Account or the Redemption Account to the purchase or redemption of Bonds as provided in this Resolution.

SECTION 703.  Offices for Servicing Bonds.  The Trustee shall at all times maintain one or more offices or agencies where Bonds may be presented for payment, registration of transfer or exchange, and where notices, demands and other documents may be served upon the Corporation in respect of the Bonds or of the Resolution.  The Corporation hereby appoints the Trustee as its agent to maintain such offices or agencies.

SECTION 704.  Further Assurance.  At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other

-53-

moneys, securities and funds hereby pledged or assigned, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

SECTION 705. <u>Power to Issue Bonds and Pledge Funds and Accounts</u>.   The Corporation is duly authorized under all applicable laws to create and issue the Bonds and to adopt the Resolution and to pledge the Pledged Property purported to be pledged by the Resolution in the manner and to the extent provided in the Resolution. The Pledged Property is and will be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto except as permitted by the Resolution, and all corporate action on the part of the Corporation to that end has been and will be duly and validly taken. The Bonds are and will be the valid and legally binding special obligations of the Corporation enforceable in accordance with their terms and the terms of the Resolution. The Corporation shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries and the Bondowners under the Resolution against all claims and demands of all persons whomsoever.

SECTION 706. <u>Agreement of the Commonwealth</u>.

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of  "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available resources" of the Commonwealth for purposes of Section 2

-54-

and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

SECTION 707.  Creation of Liens.  Until the pledge created in Section 501 of this Resolution shall be discharged and satisfied as provided in Section 1201, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under this Resolution.  The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds.  The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under this Resolution.

SECTION 708.  Accounts and Reports.

1.    The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee (it being understood that the Trustee shall have no duty so to inspect) and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing.

2.    The Corporation shall file with the Trustee  and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying such Event of Default or other event as described in this subsection, and specifying the nature and status of such Event of Default or other such event.

SECTION 709. Tax Matters.

1.    The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

2.    The Corporation will not make, or give its consent to the Trustee  or any other Person, to make, any use of the proceeds of the Bonds or of any moneys which may be

-55-

deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

        3.      The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Tax Exempt Bonds shall be excluded from gross income for Federal income tax purposes.

        4.      Notwithstanding any other provision of this Resolution, including in particular Section 1201 hereof, the obligation to comply with the requirements of this Section 709 shall survive the defeasance or payment in full of the Bonds.

        SECTION 710.  Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations.

        1.      No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

        (1)  (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and

-56-

Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

### *Additional Requirements—Senior Bonds and Parity Obligations*

A.     (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.     (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C. No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt

511470.30 032563 RES

service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second

-58-

511470.30 032563 RES

Subordinate Bonds and Second Subordinate Obligations and such additional Second Subordinate Bonds or Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2.     In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by Section 505.1 which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act.  Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3.     The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

SECTION 711. General.

1.     The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

2.     Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

511470.30 032563 RES

## ARTICLE VIII

## CONCERNING THE TRUSTEE

SECTION 801. <u>Trustee Appointment and Acceptance of Duties</u>. The Bank of New York Mellon is hereby appointed as Trustee under the Resolution. The Trustee shall signify its acceptance of the duties and obligations imposed upon it by the Resolution by executing the certificate of authentication endorsed upon the Bonds, and by executing such certificate upon any Bond the Trustee shall be deemed to have accepted such duties and obligations not only with respect to the Bond so authenticated, but with respect to all Bonds thereafter to be issued, but only, however, upon the terms and conditions set forth in the Resolution.

SECTION 802. <u>Responsibilities of Trustee</u>. The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Trustee. The recitals of fact herein and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of this Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by this Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by this Resolution, the feasibility of the Project, the compliance by the Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by this Resolution, whether or not impaired by operation of law. No provision of this Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Resolution at the request or direction of any of the Owners pursuant to this Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any

-60-

error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under this Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Resolution. Anything in this Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of this Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VIII.

SECTION 803.  Evidence on Which Trustee May Act.

1.     The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

2.     Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon. The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document.

3.     Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee  shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

SECTION 804.  Compensation and Indemnification.  The Corporation shall pay to the Trustee  from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the

-61-

compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 804, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under this Resolution, when the Trustee incurs expenses or renders services in connection with a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of this Section 804 shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under this Section 804 shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

SECTION 805. Certain Permitted Acts. The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding. The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder. The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

SECTION 806. Resignation of Trustee. The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in

-62-

Section 808, in which event such resignation shall take effect immediately on the appointment of such successor.

SECTION 807. Removal of Trustee. The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

SECTION 808. Appointment of Successor Trustee.

1.     In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

2.     If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in Section 807 or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under Section 808, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

-63-

SECTION 809.  Transfer of Rights and Property to Successor Trustee.

Any successor Trustee appointed under the Resolution shall execute, acknowledge and deliver to its predecessor Trustee, and also to the Corporation, an instrument accepting such appointment, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers, duties and obligations of such predecessor Trustee, with like effect as if originally named as Trustee; but the Trustee   ceasing to act shall nevertheless, on the written request of the Corporation, or of the successor Trustee, upon payment of its charges and all other amounts payable to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the right, title and interest of the predecessor Trustee in and to any property held by it under the Resolution, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth but subject to Section 804.   Should any deed, conveyance or instrument in writing from the Corporation be required by such successor Trustee for more fully and certainly vesting in and confirming to such successor Trustee any such estates, rights, powers and duties, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Corporation.

SECTION 810.  Appointment of Co-Trustee.

(a)     Notwithstanding any other provisions of this Resolution, at any time for the purpose of meeting any legal requirement of any jurisdiction (including any jurisdiction in which any part of the Pledged Property may at the time be located), the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable (including title to the Pledged Property or any part thereof).  Each co-trustee or separate trustee hereunder shall be required to have a combined capital and surplus (computed in accordance with Section 310(a)(2) of the Trust Resolution Act of 1939, as amended) of at least $50,000,000 and the Trustee shall, at the expense of the Corporation, provide prompt notice to holders of the appointment of any co-trustee or separate trustee.

(b)     Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)     all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such

-64-

rights, powers, duties and obligations (including the holding of the Pledged Property or any portion thereof in any such jurisdiction ) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(ii)     no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)    the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)     Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Resolution and the conditions of this Section 810. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Resolution, specifically including every provision of this Resolution relating to the conduct of, affecting the liability of, or affording protection or rights (including the right to compensation, reimbursement and indemnification hereunder) to, the Trustee. Every such instrument shall be filed with the Trustee.

(d)     Any separate trustee or co-trustee may at any time constitute the Trustee its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Resolution on its behalf and in its name. If any separate properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without appointment of a new or successor trustee.

SECTION 811. Merger or Consolidation. Any company into which the Trustee may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank or trust company organized under the laws of any state of the United States or the Commonwealth or a national banking association, and shall be authorized by law to perform all the duties imposed upon it by the Resolution, shall be the successor to the Trustee  without the execution or filing of any paper or the performance of any further act.

SECTION 812. Adoption of Authentication.   In case any of the Bonds contemplated to be issued under the Resolution shall have been authenticated but not delivered, any successor Trustee may adopt the certificate of authentication of any predecessor Trustee so authenticating such Bonds and deliver such Bonds so authenticated; and in case any of the said Bonds shall not have been authenticated, any successor Trustee may authenticate such Bonds in the name of the predecessor Trustee, or in the name of the successor Trustee, and in all such cases such certificate shall have the full force which it is anywhere in said Bonds or in the Resolution provided that the certificate of authentication of the Trustee  shall have.

-65-

SECTION 813. <u>Accounting by Trustee; Nonpetition Covenant</u>.   The Trustee shall, upon receipt of a written request therefor from the Corporation, provide to the Corporation an accounting of the amounts on deposit in all Funds, Accounts and Subaccounts maintained under the Resolution as of the date of such accounting.  Notwithstanding any prior termination of this Resolution, the Trustee  shall not, prior to the date which is one year and one day after the termination of this Resolution, acquiesce, petition or otherwise invoke or cause the Corporation to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Corporation under any Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Corporation or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Corporation.

511470.30 032563 RES

## ARTICLE IX

## SUPPLEMENTAL RESOLUTIONS

SECTION 901.  Supplemental Resolutions Effective upon Filing with the Trustee. For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

1.      to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

2.      to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

3.      to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

4.      to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

5.      to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in Section 202, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

6.      to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

7.      to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to Section 301(5);

8.      to cure any ambiguity, defect or inconsistent provision in the Resolution;

9.      to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under this Resolution of any Bonds then Outstanding;

10.     to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by Section 501(1).

-67-

11.    as permitted by Section 1005;

12.    to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

13.    to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

SECTION 902.  Reserved.

SECTION 903.  Supplemental   Resolutions   Effective   with   Consent   of Bondowners.  At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Article X, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of Article X, shall become fully effective in accordance with its terms as provided in Article X.

SECTION 904.  General Provisions.

1.    The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of this Article IX and Article X. Nothing contained in this Article IX or Article X shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of Section 704 or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

2.    Any Supplemental Resolution referred to and permitted or authorized by Sections 901 and 902 may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively.  The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.  After any Supplemental Resolution becomes effective under this Article, the Corporation shall mail to the Owners a notice briefly describing such Supplemental Resolution; provided, however, the failure to give such notice , or any defect therein, shall not impair or affect the validity of such Supplemental Resolution under this Article.

3.    The Trustee is hereby authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by Sections 901, 902 or 903

511470.30 032563 RES

and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

4.    No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

## ARTICLE X

## AMENDMENTS

SECTION 1001. <u>Mailing and Publication</u>.

1.      Any provision in this Article for the mailing of a notice or other paper to Bondowners shall be fully complied with if it is mailed postage prepaid only (i) to each Owner of Bonds then Outstanding at his address, if any, appearing upon the registry books of the Corporation, and (ii) to the Trustee.

2.      In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail as required by the Resolution, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

SECTION 1002. <u>Powers of Amendment</u>.  Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in Section 1003, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.  No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee  without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without the prior written consent of such Persons.  For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series.  The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

-70-

SECTION 1003.  Consent of Bondowners.   The Corporation may at any time adopt a Supplemental Resolution making a modification or amendment permitted by the provisions of Section 903, to take effect when and as provided in this Section.  A copy of such Supplemental Resolution (or brief summary thereof or reference thereto in form approved by the Trustee ) together with a request to Bondowners for their consent thereto in form satisfactory to the Trustee, shall be mailed by the Corporation to Bondowners.  Such Supplemental Resolution shall not be effective unless and until (i) there shall have been delivered to the Trustee  (a) the written consents of Owners of the percentage of the aggregate principal amount of Outstanding Bonds specified in Section 1002 and (b) an  Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted and filed by the Corporation in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms, and (ii) notice shall have been given as hereinafter in this Section provided.  Ownership of Bonds shall be conclusively presumed by the registration books of the Corporation.  Any such consent shall be binding upon the Owner of the Bonds giving such consent and, anything in Section 1102 to the contrary notwithstanding, upon any subsequent Owner of such Bonds and of any Bonds issued upon registration of transfer thereof or in exchange therefor (whether or not such subsequent Owner thereof has notice thereof), unless such consent is revoked in writing by the Owner of such Bonds giving such consent or a subsequent Owner thereof by filing with the Trustee, prior to the time when the written statement of the Trustee  hereinafter in this Section provided for is filed.  At any time after the Owners of the required percentages of Bonds shall have filed their consents to the Supplemental Resolution, the Trustee shall make and file with the Corporation  a written statement that the Owners of such required percentage of the aggregate principal amount of Bonds have filed such consents.  Such written statement shall be conclusive that such consents have been so filed.  At any time thereafter, notice, stating in substance that the Supplemental Resolution (which may be referred to as a Supplemental Resolution adopted by the Corporation on a stated date, a copy of which is on file with the Trustee) has been consented to by the Owners of the required percentage of the aggregate principal amount of Bonds and will be effective as provided in this Section, shall be given Bondowners by the Corporation by mailing such notice to Bondowners.  The Corporation shall file with the Trustee proof of the mailing of such notice.  A record, consisting of the papers required or permitted by this Section 1003 to be delivered to the Trustee, shall be proof of the matters therein stated.

SECTION 1004.  Modifications by Unanimous Consent.   The terms and provisions of the Resolution and the rights and obligations of the Corporation and of the Owners of the Bonds may be modified or amended in any respect upon the adoption and filing by the Corporation with the Trustee of a Supplemental Resolution and the consent of the Owners of all of the Bonds then Outstanding, such consent to be given as provided in Section 1003 except that no notice to Bondowners shall be required.

SECTION 1005.  Modification Before Bonds Outstanding.  Prior to the issuance and delivery of the first Series of Bonds under the Resolution, the terms and conditions of the Resolution and the rights and obligations of the Corporation and of the Owners of the Bonds may be modified or amended in any respect without the consent of any person, upon the adoption of a Supplemental Resolution and the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation.

511470.30 032563 RES

SECTION 1006. <u>Exclusion of Bonds</u>. Bonds owned or held by or for the account of the Corporation shall not be deemed Outstanding for the purpose of consent or other action or any calculation of Outstanding Bonds provided for in this Article, and the Corporation shall not be entitled with respect to such bonds to give any consent or take any other action provided for in this Article. At the time of any consent or other action taken under this Article, the Corporation shall furnish the Trustee a certificate of an Authorized Officer, upon which the Trustee may rely, describing all Bonds so to be excluded.

SECTION 1007. <u>Notation on Bonds</u>. Bonds authenticated and delivered after the effective date of any action taken as in Article IX or this Article provided may, and, if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Corporation and the Trustee as to such action, and in that case upon demand of the Owner of any Bond Outstanding at such effective date and presentation of his Bond for the purpose at the Corporate Trust Office of the Trustee, suitable notation shall be made on such Bond by the Trustee as to any such action. If the Corporation or the Trustee shall so determine, new Bonds so modified as in the opinion of the Trustee and the Corporation to conform to such action shall be prepared, authenticated and delivered, and, upon demand of the Owner of any Bond then Outstanding, shall be exchanged, without cost to such Bondowners for Bonds of the same Series and maturity and then Outstanding, upon surrender of such Bonds.

511470.30 032563 RES

## ARTICLE XI

## DEFAULTS AND REMEDIES

SECTION 1101. <u>Events of Default</u>.

1.     Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of this Resolution, and all references in this Article XI to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

2.     In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

SECTION 1102. <u>Remedies</u>.

1.     Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, declare

-73-

the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i)     by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)    by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii)   by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv)    by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

2.      In the enforcement of any remedy under the Resolution, but subject to Sections 201, 501 and 1206, the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

-74-

SECTION 1103.  Priority of Payments After Event of Default.

1.       Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee  and its agents and attorneys necessary in the opinion of the Trustee  to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee  shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH of this subsection 1, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST or FOURTH of this paragraph;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an

-75-

511470.30 032563 RES

insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

2.      The provisions of this Section are in all respects subject to the provisions of Section 702.

3.      Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct.   Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal (or Compounded Amount, if any) to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate for the fixing of any such date.  The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

SECTION 1104.  Termination of Proceedings.  In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

SECTION 1105.  Bondowners' Direction of Proceedings.   Anything in this Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee  hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of this Resolution, including Section 804 hereof, and that the Trustee  shall have the right to decline to follow any such direction which in the opinion of the Trustee  would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

SECTION 1106.  Limitation on Rights of Bondowners.

1.      No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law hereunder, or for the protection or enforcement of any right under this Resolution unless such Owner shall have given to the Trustee  written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee  after the

-76-

511470.30 032563 RES

right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers herein granted or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under this Resolution or for any other remedy provided hereunder or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary hereby secured shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Resolution, or to enforce any right hereunder or under law with respect to the Bonds, or the Resolution, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in this Article shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued hereunder to the Owner thereof at the time and place in said Bond expressed.

2.     Anything to the contrary contained in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

SECTION 1107. Possession of Bonds by Trustee Not Required. All rights of action under this Resolution or under any of the Bonds, enforceable by the Trustee, may be enforced by it without the possession of any of the Bonds or the production thereof on the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Owners of such Bonds, subject to the provisions of this Resolution.

SECTION 1108. Remedies Not Exclusive. No remedy herein conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

511470.30 032563 RES

SECTION 1109.  No Waiver of Default.  No delay or omission of the Trustee, the Beneficiaries or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by this Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

SECTION 1110.  Notice of Event of Default.   The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice.  However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries.  Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof:  (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

511470.30 032563 RES

# ARTICLE XII

## MISCELLANEOUS

SECTION 1201. Defeasance.

1.     Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of this Section.   Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions of this Section, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant to this Article or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

2.     If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

3.     Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in subsection 12 of this Section.  Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in subsection 1 of this Section 1201 if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee  either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee  at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit

-79-

required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

4.     Neither Defeasance Securities nor moneys deposited with the Trustee pursuant to this Section, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under this Section 1201.

5.     For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of this Section, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of this Section, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

511470.30 032563 RES

6.     Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of this Section only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of this Section, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes of this subsection 4. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

7.     Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

SECTION 1202.  Evidence of Signatures of Bondowners and Owners of Bonds.

1.     Any request, consent, revocation of consent or other instrument which the Resolution may require or permit to be signed and executed by the Bondowners may be in one or more instruments of similar tenor, and shall be signed or executed by such Bondowners in person or by their attorneys appointed in writing. The fact and date of the execution by any Bondowner or his attorney duly authorized in writing of such instruments may be proved by a guarantee of the signature thereon by a bank or trust company or by the certificate of any notary public or other officer authorized to take acknowledgments of deeds, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. Where such execution is by an officer of a corporation or association or a member of a partnership, or on behalf of such

-81-

a corporation, association or partnership, such signature guarantee, certificate or affidavit shall constitute proof of his authority.

2.      The ownership of Bonds and the amount, numbers and other identification, and date of holding the same shall be proved by the registry books.

3.      Any request or consent by the Owner of any Bond shall bind all future Owners of such Bonds in respect of anything done or suffered to be done by the Corporation or the Trustee in accordance therewith.

SECTION 1203.  Moneys Held for Particular Bonds.  The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

SECTION 1204.  Preservation and Inspection of Documents.  All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

SECTION 1205.  Parties Interested Herein.  Nothing in the Resolution expressed or implied is intended or shall be construed to confer upon, or to give to, any person or corporation, other than the Corporation, the Trustee, the Beneficiaries, and the Owners of the Bonds, any right, remedy or claim under or by reason of the Resolution or any covenant, condition or stipulation thereof; and all the covenants, stipulations, promises and agreements in the Resolution contained by and on behalf of the Corporation shall be for the sole and exclusive benefit of the Corporation, the Trustee, the Beneficiaries and the Owners of the Bonds.

SECTION 1206.  No Personal Liability.  Neither the members of the Corporation nor any other Person executing the Bonds or an Ancillary Bond Facility shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

SECTION 1207.  Successors and Assigns.  Whenever in the Resolution the Corporation is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Resolution contained by or on behalf of the Corporation shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

SECTION 1208.  Severability of Invalid Provisions.  If any one or more of the covenants or agreements provided in the Resolution on the part of the Corporation or the Trustee to be performed should be contrary to law, then such covenant or covenants, agreement or agreements, shall be deemed severable from the remaining covenants and agreements, and shall in no way affect the validity of the other provisions of the Resolution.

SECTION 1209.  Headings.  The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Resolution.

-82-

SECTION 1210. <u>Conflict</u>.    All resolutions or parts of resolutions or other proceedings of the Corporation in conflict herewith be and the same are repealed insofar as such conflict exists.

SECTION 1211. <u>Governing Law</u>.  This Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contained in this Resolution and the provisions of Section 601 (and the "applicable law" referred to in such Section 601 shall not include the laws of the Commonwealth) shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 1212. <u>Notices</u>.    Except as otherwise provided herein, all notices, certificates or other communications hereunder shall be in writing and shall be deemed given upon receipt, by hand delivery, mail, overnight delivery, or telecopy, except in the case of notices or communications given to the Trustee, which shall be effective only upon actual receipt, addressed as follows:

<u>To the Trustee:</u>

The Bank of New York Mellon
101 Barclay Street—7W
New York, New York 10286
Attention: Northern Municipals
Phone: 212-815-6955
Fax: 212-815-5595/5596

<u>To the Corporation:</u>

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940
Attention: Executive Director
Phone: 787-722-2525
Fax: 787-728-0975

SECTION 1213. <u>Effective Date</u>.  This Resolution shall take effect immediately upon its adoption.

-83-

511470.30 032563 RES

**EXHIBIT A**

SECURITY AGREEMENT

   This SECURITY AGREEMENT, dated as of July 31, 2007, is by and between the Puerto Rico Sales Tax Financing Corporation (the "Debtor") and Owners (this and other capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Resolution referenced below) from time to time of the Sales Tax Revenue Bonds of the Debtor (the "Sales Tax Revenue Bonds") issued from time to time pursuant to the provisions of the Debtor's Resolution No. __, adopted on July 13, 2007, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as trustee under the Resolution (the "Secured Party").

   In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Sales Tax Revenue Bonds and payment to Beneficiaries in accordance with their respective terms and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the funds and accounts maintained by the Secretary of the Treasury, as paying agent, as the first repository for all Dedicated Sales Tax received from merchants and retailers and authorized collectors until deposited into the COFINA Project Fund (and all accounts therein) maintained under the Resolution, (ii) all amounts on deposit in the COFINA Project Fund (and all accounts therein) maintained under the Resolution, and all amounts required to be on deposit therein by the terms of the Resolution, and (iii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Sales Tax Revenue Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Sales Tax Revenue Bonds are as set forth in the Resolution.

   The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

PUERTO RICO SALES TAX FINANCING CORPORATION

By _____

   Name and Title:

THE BANK OF NEW YORK, as Trustee under the Resolution

By _____

   Name and Title:

511470.30 032563 RES

## **Exhibit B**

**Amended and Restated Plan Support Agreement, dated September 20, 2018**

## AMENDED AND RESTATED PLAN SUPPORT AGREEMENT

AMENDED AND RESTATED PLAN SUPPORT AGREEMENT, dated as of
September 20, 2018, by and among (a) Financial Oversight and Management Board for
Puerto Rico (the "**Oversight Board**"), (b) Corporación del Fondo de Interés Apremiante de
Puerto Rico, whose name in English is the Puerto Rico Sales Tax Financing Corporation
("**COFINA**"), (c) Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"),
(d) holders of Senior COFINA Bond Claims, as defined below, which may include the
advisors or managers who are advising or managing a holder of Senior COFINA Bond
Claims on behalf of such holders as set forth on Exhibit "A" hereto (together with their
respective successors and assigns with respect to transfers made in accordance with the terms
hereof, the "**Senior Holders**"), (e) Ambac Assurance Corporation ("**Ambac**"), (f) National
Public Finance Guarantee Corporation ("**National**"), (g) holders of Junior COFINA Bond
Claims, as defined below, which may include the advisors or managers who are advising or
managing a holder of the Junior COFINA Bond Claims on behalf of such holders as set forth
on Exhibit "B" hereto, (together with their respective successors and assigns with respect to
transfers made in accordance with the terms hereof, the "**Junior Holders**"), (h) Assured
Guaranty Municipal Corp. ("**Assured**"), formerly known as Financial Security Assurance
Inc., and (i) Bonistas del Patio, Inc. ("**Bonistas**"). The signatories hereto are referred to
hereafter collectively as the "**Parties**" or individually as a "**Party**". Capitalized terms used
but not otherwise defined herein shall have the meanings set forth in Article I below.

RECITALS

A.    Pursuant to that certain Amended and Restated Sales Tax Revenue Bond
Resolution, adopted on July 13, 2007, as amended on June 19, 2009 and pursuant to certain
supplemental resolutions (collectively, the "**Bond Resolutions**"), COFINA issued the
following series of Puerto Rico Sales Tax Revenue Bond to provide funds for the
Commonwealth of Puerto Rico (the "**Commonwealth**") to, among other things, repay certain
debt obligations of the Puerto Rico Government Development Bank and the Puerto Rico
Public Finance Corporation.

| Resolution | Bond Series | Amounts |
|---|---|---|
| First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007 | Senior Series 2007A | $2,667,603,573 |
| Second Supplemental Sales Tax Revenue Bond Resolution, adopted on July 17, 2007 | Senior Series 2007B | $1,333,101,780 |
| Third Supplemental Sales Tax Revenue Bond Resolution, adopted December 18, 2007 | Senior Series 2007C | $499,996,628 |
| Fourth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 25, 2008 | Senior Series 2008A | $737,046,992 |
| Seventh Supplemental Sales Tax Revenue Bond Resolution, adopted on June 10, 2009 | First Subordinate Series 2009A | $4,118,153,700 |

101736284v3

| Resolution | Bond Series | Amounts |
|---|---|---|
| Eighth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 17, 2009 | First Subordinate Series 2009B | $1,217,915,799 |
| Seventh Supplemental Sales Tax Revenue Bond Resolution, adopted on June 10, 2009 | Senior Series 2009C | $237,875,000 |
| Twelfth Supplemental Sales Tax Revenue Bond Resolution, adopted on January 28, 2010 | First Subordinate Series 2010A | $1,823,757,271 |
| Fourteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010C | $1,619,404,577 |
| Fifteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010D | $89,435,000 |
| Sixteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010E | $92,755,000 |
| Eighteenth Supplemental Sales Tax Revenue Bond Resolution, adopted November 16, 2011 | First Subordinate Series 2011A-1<br>First Subordinate Series 2011A-2 | $397,758,386<br><br>$337,037,188 |
| Nineteenth Supplemental Sales Tax Revenue Bond Resolution, adopted November 16, 2011 | First Subordinate Series 2011B | $45,600,000 |
| Twentieth Supplemental Sales Tax Revenue Bond Resolution, adopted December 1, 2011 | Senior Series 2011C | $1,006,474,702 |
| Twenty First Supplemental Sales Tax Revenue Bond Resolution, adopted December 1, 2011 | Senior Series 2011D | $91,155,000 |

B.      In connection with the issuance of certain of the Senior COFINA Bonds, Ambac and National issued certain insurance policies and National entered into insurance agreements with respect thereto.

C.      In connection with the issuance of certain of the Junior COFINA Bonds, COFINA entered into insurance agreements with Assured corresponding to insurance policies issued by Assured.  Assured also insures certain of the Junior COFINA Bonds pursuant to secondary market insurance policies.

D.      On June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187) ("**PROMESA**").

101736284v3

E.      PROMESA created the Oversight Board and provided the Oversight Board with certain powers over the finances and restructuring process with respect to the Commonwealth and its instrumentalities as provided for in PROMESA, and the Oversight Board has designated COFINA as a Covered Territorial Instrumentality (as defined in PROMESA).

F.      Pursuant to Act 2-2017, AAFAF was appointed as the representative of the Government of Puerto Rico, and granted authority with respect to, reaching agreements with creditors on any indebtedness issued by any governmental entity of the Commonwealth.

G.      On May 5, 2017, the Oversight Board filed a Title III petition on behalf of COFINA (the "**Title III Case**") in the United States District Court for the District of Puerto Rico (the "**Title III Court**").

H.      The Oversight Board is the representative of COFINA in the Title III Case pursuant to Section 315(b) of PROMESA.

I.      The Parties have engaged in good faith, arm's length negotiations regarding the principal economic terms of a proposed restructuring of the Senior COFINA Bonds and the Junior COFINA Bonds to be implemented in a manner to be mutually agreed upon as set forth in the term sheet annexed hereto as Exhibit "C" (the "**Term Sheet**").

J.      On August 29, 2018, substantially all of the Parties executed a Plan Support Agreement (the "**Initial Agreement**"), which agreement included substantially all of the terms set forth herein.  In light of necessary modifications, the Parties have agreed to enter into this Agreement, which amends and restates the Initial Agreement.

K.      The Oversight Board and AAFAF consent to COFINA's execution and delivery of this Agreement and to COFINA performing and exercising its rights under this Agreement, including, without limitation, COFINA's rights to terminate this Agreement and its right to consent to any waiver or amendment, in each case, in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, the Parties, in consideration of the promises, covenants and agreements herein described and for other good and valuable consideration, acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1.    Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2.    Definitions.  The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

*"Actions"* shall mean, collectively, the litigation styled (a) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Adv. Pro. No. 17-AP-143-LTS, currently pending in the Title III Court, (b) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Case No. 17-CV-3750-LTS, currently pending in the Title

3

III Court, (c) <u>Ambac Assurance Corp. v. The Bank of New York Mellon</u>, Case No. 17-CV-3804-LTS, currently pending in the United States District Court for the Southern District of New York, (d) <u>The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al.</u>, Adv. Pro. No. 17-133-LTS, currently pending in the Title III Court, and (e) <u>Rodriguez-Perelló et al. v. Rosselló-Nevares et al.</u>, No. 3:17-cv-01566-FAB (D.P.R. 2017), currently pending in the United States District Court for the District of Puerto Rico.

"*Adversary Proceeding*" shall mean that certain adversary proceeding styled <u>The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as agent of The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico v. Bettina Whyte, as agent of The Financial Oversight and Management Board for Puerto Rico, as representative of The Puerto Rico Sales Tax Financing Corporation</u>, Adv. Proc. No. 17-257-LTS, currently pending in the United States District Court for the District of Puerto Rico, regarding ownership of the Pledged Sales Tax Base Amounts.

"*Agents*" shall mean, collectively, the COFINA Agent and the Commonwealth Agent.

"*Agreement*" shall mean, collectively, this Amended and Restated Plan Support Agreement, and each exhibit annexed hereto or thereto, including, without limitation, the Term Sheet, as each may be amended, supplemented or otherwise modified in accordance with the terms hereof or thereof.

"*Agreement in Principle*" shall mean the Terms and Conditions of Agreement in Principle to Resolve Commonwealth-COFINA Dispute, attached as Exhibit "A" to the Joint Informative Motion of Commonwealth Agent and COFINA Agent Disclosing Agreement in Principle [Adv. Proc. No. 17-257 LTS, Dkt. No. 486].

"*Appointments Related Litigation*" shall mean, collectively, the litigation styled (a) <u>In Re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico</u>, No. 18-1108, currently pending in the United States Court of Appeals for the First Circuit, (b) <u>In re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico</u>, No. 18-1746, currently pending in the United States Court of Appeals for the First Circuit, (c) <u>Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Electric Power Authority</u>, et al., Adv. Pro. No. 17-AP-228-LTS, currently pending in the Title III Court, (d) <u>René Pinto Lugo, et al. v. The Government of the United States of America, et al.</u>, Adv. Pro. No. 18-041-LTS, currently pending in the Title III Court, (e) <u>Hermanidad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al.</u> v. <u>Government of the United States of America, et al.</u>, Adv. Pro. No. 18-066-LTS, currently pending in the Title III Court, (f) <u>Hon. Rafael Hernandez-Montanez, et al. v. The Financial Oversight and Management Board of Puerto Rico</u>, Adv. Pro. No. 18-090-LTS, currently pending in the Title III Court, and (g) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the COFINA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

"*Aurelius*" shall mean Aurelius Capital Master, Ltd.

"*Bankruptcy Code*" shall mean Title 11 of the United States Code, as amended, §101, et seq.

"*Bankruptcy Rules*" shall mean The Federal Rules of Bankruptcy Procedure.

"*Business Day*" shall mean a day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

"*COFINA Agent*" shall mean Bettina Whyte, as agent for the Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Sales Tax Financing Corporation.

"*COFINA Effective Date*" shall mean the date on which the transactions contemplated by the Plan and authorized by the Title III Court pursuant to the Confirmation Order have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms.

"*Commonwealth Agent*" shall mean the Official Committee of Unsecured Creditors of The Commonwealth of Puerto Rico, as agent of the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico.

"*Confirmation Order*" shall mean the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code made applicable in the Title III Case in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to each Party.

"*Custodial Trusts*" shall mean, collectively, the trust(s), or custodial arrangement(s), if any, which may be formed on or prior to the COFINA Effective Date in accordance with the provisions of the Term Sheet and the Plan.

"*Definitive Documents*" shall mean, collectively, the documents, including, without limitation, any related agreements, instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Term Sheet, the Plan (including any amendments, modifications and supplements thereto), the Dispute Settlement, the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, the Settlement Agreement, the Settlement Motion, the Settlement Order, the organizational documents of Reorganized COFINA, and the Bond Resolutions, as amended (or as repealed and replaced), each having terms and conditions consistent with this Agreement and PROMESA in all respects and otherwise be in form and substance reasonably satisfactory to each Party; provided, however, that the rights of each Party with respect to the documentation relating to the Custodial Trusts shall be governed exclusively by the terms and provisions of the Term Sheet.

"*Dispute Settlement*" shall mean the compromise and settlement of the Adversary Proceeding and the claims and causes asserted therein, as announced by the Agents in the Agreement in Principle on June 5, 2018, and to be set forth in the Settlement Agreement; provided, however, that, to the extent that any provisions of the Settlement Agreement are

5

inconsistent with the terms and provisions set forth herein, in the Term Sheet or in the Plan, the terms and provisions set forth herein, in the Term Sheet and in the Plan shall govern.

*"Disclosure Statement"* shall mean the disclosure statement filed with respect to the Plan with the Title III Court by the Oversight Board in the Title III Case in accordance with section 1125 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably satisfactory to each Party.

*"Disclosure Statement Order"* shall mean the order of the Title III Court (a) approving the form of Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptance and rejections to the Plan and (ii) elections of distributions thereunder, which order shall be in form and substance reasonably satisfactory to each Party.

*"Final Order"* shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or, (b) if an appeal, writ of certiorari, new trial reargument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the applicable local Bankruptcy Rules.

*"First Puerto Rico Family of Funds"* shall mean, collectively, First Puerto Rico AAA Target Maturity Fund I, Inc., First Puerto Rico AAA Target Maturity Fund II, Inc., First Puerto Rico Tax-Exempt Fund, Inc., First Puerto Rico Tax-Exempt Fund II, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc., First Puerto Rico Target Maturity Income Opportunities Fund I, Inc., First Puerto Rico Target Maturity Income Opportunities Fund II, Inc., First Puerto Tax Advantaged Target Maturity Fund I, Inc. and First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.

*"Government Parties"* shall mean, collectively, the Oversight Board, AAFAF and COFINA.

*"Government Released Claims"* shall mean, collectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which

6

any Party, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with COFINA, the Senior COFINA Bonds, the Senior COFINA Bond Claims, the Junior COFINA Bonds, the Junior COFINA Bond Claims and the Actions, and arising prior to the COFINA Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) COFINA (or its successor, including Reorganized COFINA) arising from or relating to the Plan or the securities to be issued pursuant to the Plan or (ii) a Government Party unrelated to COFINA or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct.

*"Government Releasees"* shall mean the Government Parties and the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Case.

*"GSAM"* shall mean Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it serves as investment manager.

*"Informative Motion"* shall mean that certain Commonwealth Agent's Informative Motion with Respect to Oversight Board's Announcement, Dated August 8, 2018, Regarding Certain Terms for COFINA Plan of Adjustment [Adv. Proc. No. 17-257-LTS, ECF No. 540].

*"Insurers"* shall mean, collectively, Ambac, Assured and National.

*"Insured Claims"* shall mean, collectively, Insured Senior COFINA Bond Claims and Insured Junior COFINA Bond Claims.

*"Insured Junior COFINA Bond Claims"* shall mean, collectively, Junior COFINA Bond Claims, the payment of which has been insured by Assured.

*"Insured Junior Holders"* shall mean, collectively, the Parties that are beneficial holders of Insured Junior COFINA Bond Claims.

*"Insured Senior COFINA Bond Claims"* shall mean, collectively, Senior COFINA Bond Claims, the payment of which has been insured by Ambac or National, including, without limitation, Senior COFINA Bond Claims the payment of which (a) is insured by MBIA Insurance Company and reinsured by National or (b) was originally insured by Finance Guaranty Insurance Company but for which primary insurer responsibility was subsequently novated to National.

*"Insured Senior Holders"* shall mean, collectively, the Parties that are beneficial holders of the Insured Senior COFINA Bond Claims.

*"Junior COFINA Bond Claims"* shall mean, collectively, the claims arising from or relating to the Junior COFINA Bonds, which shall be calculated, for purposes of the Plan, as the outstanding principal amount of the Junior COFINA Bonds plus the accrued and unpaid

interest on the Junior COFINA Bonds (or, in the case of capital appreciation bonds, the accreted value thereon) up to, but not including, May 5, 2017.

*"Junior COFINA Bonds"* shall mean, collectively, those bonds issued by COFINA in accordance with the Bond Resolutions and such other documents and instruments executed and delivered in connection therewith, and that are identified as "First Subordinate" in the respective Bond Resolutions pursuant to which they were issued, the Series of which are set forth in the chart contained in Recital A herein.

*"Junior Holders Group"* shall mean, collectively, GSAM, Oppenheimer and First Puerto Rico Family of Funds.

*"Oppenheimer"* shall mean, collectively, funds and accounts managed or advised by Oppenheimer Funds, Inc. and OFI Global Institutional Inc. and listed on the signature pages hereto.

*"Plan"* shall mean the COFINA plan of adjustment to be filed with the Title III Court by the Oversight Board in the Title III Case in accordance with Section 312 of PROMESA and incorporating the terms and provisions herein and in the Term Sheet, the form and substance of which shall be reasonably satisfactory to each Party.

*"Plan Supplement"* shall mean, the volume(s) of documents, agreements and instruments, including, without limitation, the Definitive Documents, which shall be filed with the Title III Court in connection with the Plan and consummation of the transactions contemplated therein, and each of which shall be in form and substance reasonably satisfactory to each of the Parties; provided, however, that the rights of each Party with respect to the documentation relating to the Custodial Trusts shall be governed exclusively by the terms and provisions of the Term Sheet.

*"Principal Amount"* shall mean, solely for purposes of the signature pages affixed hereto, (a) with respect to current interest bonds, the principal amount of the Senior COFINA Bonds or Junior COFINA Bonds, plus the accrued and unpaid interest thereon, and (b) with respect to the capital appreciation bonds, the accreted value of the Senior COFINA Bonds or Junior COFINA Bonds, as applicable, and, in each case, accrued or accreted up to, but not including, May 5, 2017.

*"PSA Creditors"* shall mean, collectively, the Senior Ad Hoc Holders, the Junior Holders Group, the Puerto Rico Funds, Ambac, Assured, Aurelius, Six PRC and National.

*"Puerto Rico Funds"* shall mean, collectively, Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico Fixed Income Fund VI, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free

101736284v3

Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., Tax-Free Puerto Rico Target
Maturity Fund, Inc., and UBS IRA Select Growth & Income Puerto Rico Fund.

*"Qualified Marketmaker"* shall mean an entity that (x) holds itself out to the market
as standing ready in the ordinary course of its business to purchase from customers and sell
to customers debt securities such as the COFINA Bonds or enter with customers into long
and short positions in debt securities such as the COFINA Bonds, in its capacity as a dealer
or market marker in such COFINA Bonds; (y) is in fact regularly in the business of making a
market in debt securities; and (z) if transacting with respect to COFINA Bonds, is registered
with Securities and Exchange Commission and financial institutions regulatory authority.

*"Reorganized COFINA"* shall mean COFINA from and after the COFINA Effective
Date.

*"Senior Ad Hoc Holders"* shall mean, collectively, Aristeia Capital, L.L.C., Canyon
Capital Advisors L.L.C., Decagon Holdings 1, L.L.C., Decagon Holdings 2, L.L.C., Decagon
Holdings 3, L.L.C., Decagon Holdings 4, L.L.C., Decagon Holdings 5, L.L.C., Decagon
Holdings 6, L.L.C., Decagon Holdings 7, L.L.C., Decagon Holdings 8, L.L.C., Decagon
Holdings 9, L.L.C., Decagon Holdings 10, L.L.C., GoldenTree Asset Management LP, Old
Bellows Partners LP, Scoggin Management LP, Taconic Capital Advisors L.P., Taconic
Master Fund 1.5 L.P., Tilden Park Capital Management LP and Whitebox Advisors L.L.C.,
each on behalf of itself or certain of its respective managed funds and, in each case, their
respective successors and assigns with respect to transfers made in accordance with the terms
hereof.

*"Senior COFINA Bond Claims"* shall mean, collectively, the claims arising from or
relating to the Senior COFINA Bonds, which shall be calculated, for purposes of the Plan, as
the outstanding principal amount of the Senior COFINA Bonds plus the accrued and unpaid
interest on the Senior COFINA Bonds (or in the case of capital appreciation bonds, the
accreted value thereon) up to, but not including, May 5, 2017.

*"Senior COFINA Bonds"* shall mean, collectively, those bonds issued by COFINA
in accordance with the Bond Resolutions and such other documents and instruments executed
and delivered in connection therewith, and that are identified as "Senior" in the respective
Bond Resolutions pursuant to which they were issued, the Series of which are set forth in the
chart contained in Recital A herein.

*"Settlement Agreement"* shall mean that certain Settlement Agreement to be entered
into by the Agents setting forth their agreement compromising and settling the claims and
causes of action asserted, or which could have been asserted, in the Adversary Proceeding;
provided, however, that, in the event that the Agents do not enter into the Settlement
Agreement, "Settlement Agreement" shall mean the material economic terms set forth in the
Agreement in Principle, as further developed by the Oversight Board and the Parties hereto,
compromising and settling the claims and causes of action asserted, or which could have
been asserted in the Adversary Proceeding and set forth in the Settlement Motion.

*"Settlement Motion"* shall mean the motion filed with the Title III Court by the
Oversight Board in the Commonwealth Title III proceeding seeking entry of an order
approving the Dispute Settlement in accordance with Bankruptcy Rule 9019 and applicable
law, which motion shall be in form and substance reasonably satisfactory to each Party.

9

*"Settlement Order"* shall mean the order of the Title III Court in the Commonwealth Title III case granting the relief requested in the Settlement Motion and authorizing the consummation of the Dispute Settlement, which order shall be in form and substance reasonably satisfactory to each Party.

*"Six PRC"* shall mean Six PRC Investments LLC.

Section 1.3.    <u>Other Terms</u>.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.  Capitalized terms used herein, but not otherwise defined, shall have the meanings set forth in the Term Sheet.  As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise.  The words "include", "includes", and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine or neutral genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement", "herein", "hereof", "hereby", "hereunder", and words of similar impact refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

Section 1.4.    <u>Interpretations</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

Section 1.5.    <u>Exhibits</u>.  Each of the exhibits, annexes, signature pages and schedules annexed hereto are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes and schedules.

ARTICLE II
GENERAL PROVISIONS

Section 2.1.    <u>Mediation</u>.  Each of the Parties acknowledges and agrees that this Agreement and the Term Sheet are the product of their participation in mediation ordered by the Title III Court and the mediation team appointed in connection therewith.  In the event that any disputes arise in connection with the preparation of the Plan and the Disclosure Statement, each of the Parties consent to such matters being referred to mediation for the resolution thereof; <u>provided</u>, <u>however</u>, that no Party is limited to having any such dispute finally determined by mediation.

Section 2.2    <u>Financial Information</u>.  Each of the Government Parties acknowledges and agrees that (a) the financial information set forth on signature pages affixed to this Agreement and the CUSIP numbers for each of the Senior COFINA Bonds or Junior COFINA Bonds provided by the Parties pursuant to Section 2.3 hereof are proprietary, privileged and confidential and (b) unless otherwise ordered by the Title III Court, shall use their reasonable best efforts to protect the confidential nature of such financial information and CUSIP numbers, including, without limitation, in filings to be made in the Title III Court or any other public release.

10

Section 2.3    CUSIP Information.  Within five (5) Business Days after the date hereof, each of the Senior Holders, the Junior Holders, Ambac, Assured, and National shall provide the Oversight Board, in writing, the CUSIP numbers for each of the Senior COFINA Bonds and Junior COFINA Bonds, if any, such Party owns or has due investment management responsibility and authority for funds or accounts which own such Senior COFINA Bonds or Junior COFINA Bonds, as the case may be.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.1.    Representations and Warranties of the Oversight Board.  The Oversight Board hereby represents and warrants that: (a) it is duly created in accordance with the terms and provisions of PROMESA with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval, power and authority to execute and deliver and to perform its obligations under this Agreement and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it or any law, rules or regulations applicable to it; and (c) except with respect to the Appointments Related Litigation and the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.2.    Representations and Warranties of AAFAF.  AAFAF hereby represents and warrants that: (a) it is duly created under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval,  power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) except with respect to the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.3.    Representations and Warranties of COFINA.  COFINA hereby represents and warrants that, subject to entry of an order of the Title III Court in connection with the Title III Case: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and

11

validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) except as set forth on Schedule 3.4 hereto and the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

      Section 3.4.   Representations and Warranties of the Senior Holders.   Each of the Senior Holders (other than Ambac and National), severally and not jointly,  hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the Senior COFINA Bonds of no less than the principal amounts set forth on the signature pages affixed to this Agreement (i) as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than with respect to the Insured Senior COFINA Bonds Claims, and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way such Senior Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; provided, however, that each of the Insured Senior Holders acknowledges that the Insured Senior COFINA Bonds Claims shall be voted by the applicable Insurers, so long as this Agreement remains in effect, and (ii) as of 5:00p.m. (EDT) on August 7, 2018.

      Section 3.5.   Representations and Warranties of the Junior Holders.   Each of the Junior Holders (other than Ambac), severally and not jointly hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval,  power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding

101736284v3

before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the Junior COFINA Bonds of no less than the principal amounts set forth on the signature pages affixed to this Agreement (i) as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than with respect to the Insured Junior COFINA Bond Claims, and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Junior COFINA Bonds or any voting, consent or direction rights related to such Junior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way such Junior Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; provided, however, that each of the Insured Junior Holders acknowledges that the Insured Junior COFINA Bond Claims shall be voted by Assured, so long as this Agreement remains in effect, and (ii) as of 5:00p.m. (EDT) on August 7, 2018.

Section 3.6.    Representations and Warranties of Ambac.  Ambac, in its capacity as an Insurer and as a beneficial holder of Senior COFINA Bond Claims and Junior COFINA Bond Claims, hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby, with such exceptions, individually or in the aggregate, as would not have a material adverse effect upon the foregoing; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law, rule or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it insures, owns or has due investment management responsibility and authority for accounts which own the Senior COFINA Bonds and Junior COFINA Bonds of no less than the amounts set forth on the signature pages affixed to this Agreement which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or Junior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds or Junior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way Ambac's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

Section 3.7.    Representations and Warranties of National.  National, in its capacity as an Insurer and as a beneficial holder of Senior COFINA Bond Claims, hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions

13

contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it insures, owns or has due investment management responsibility and authority for accounts which own the Senior COFINA Bonds of no less than the amounts set forth on the signature pages affixed to this Agreement which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way National's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

Section 3.8.   Representations and Warranties of Assured.  Assured hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.9.   Representations and Warranties of Bonistas.  Bonistas hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite power and authority to carry on the business in which it is engaged, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder and (d) Bonistas do not hold any Junior COFINA Bonds or Senior COFINA Bonds, or any Junior COFINA Bond Claims or Senior COFINA Bond Claims.

14

Section 3.10.  <u>Representations of the Parties to this Agreement</u>.  Each Party, severally and not jointly, represents and acknowledges that (a) in executing this Agreement, it does not rely, and has not relied, upon any representation or statement made by any other Party or any of such Party's representatives, agents or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as may be stated specifically in this Agreement; (b) in executing this Agreement, it has relied entirely upon its own judgment, beliefs and interest and the advice of its counsel and that it has had a reasonable period of time to consider the terms of this Agreement before entering into it; (c) it has reviewed this Agreement and that it fully understands and voluntarily accepts all of the provisions contained herein; and (d) no holder of Junior COFINA Bond Claims or holder of Senior COFINA Bond Claims, including any "on island" bondholder, is or can be bound by Bonistas participation as a Party hereunder or any action taken by Bonistas in connection therewith.  Nothing contained herein shall limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more Senior Holders or Junior Holders, on the one hand, and an Insurer, on the other hand.

ARTICLE IV
COVENANTS

Section 4.1.  <u>Covenants of the Oversight Board</u>.  The Oversight Board hereby covenants and agrees as follows:

(a)     The Oversight Board shall take, and cause COFINA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (A) filing, or causing the Commonwealth Agent to file, the Settlement Motion on or prior to October 15, 2018, (B) filing on or prior to October 15, 2018, the Disclosure Statement and the Plan, in form and substance consistent with this Agreement, including the Term Sheet, and reasonably acceptable to the Parties, (C) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (D) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (E) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)     In connection with the solicitation of acceptances and rejections to the Plan with respect to Insured Claims, the Oversight Board shall use its reasonable best efforts to obtain approval of the Disclosure Statement Order by the Title III Court providing that (i)

15

Insured Claims shall be voted by the Insurers, so long as this Agreement remains in effect, and (ii) elections (other than the Assured Election) regarding the form of distributions with respect to the Insured Claims shall be made by the beneficial holders thereof, provided that the form of elections for holder of Insured Claims regarding their distributions for such claims shall be set forth as an exhibit to the Disclosure Statement Order. For the avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Insurers' and their insured bondholders' right to vote to accept or reject any Plan.

(c)     The Oversight Board shall negotiate in good faith with the respective Insurers regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to the respective Insurers and be reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

Section 4.2.     Covenants of AAFAF.  AAFAF hereby covenants and agrees as follows:

(a)     AAFAF shall take, and cause COFINA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (A) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (B) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (C) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)     AAFAF shall use its reasonable best efforts to cause the Legislature to enact legislation required under Section II(M) of the Term Sheet.

(c)     As soon as practicable from and after the date hereof, but in no event later than September 15, 2018, AAFAF, with the assistance of COFINA, and with the prior approval of the Oversight Board, shall release requests for proposals to entities interested in serving as trustee and paying agent in connection with the new COFINA securities to be issued pursuant to the Plan.  Upon receipt of responses to such requests for proposals, AAFAF, together with the other Government Parties, shall discuss the merits of such responses with counsel for the other Parties, with the Government Parties making such selection, in their joint and absolute discretion.  For the avoidance of doubt, the entity

16

selected to serve as trustee or paying agent in connection with the new COFINA securities to be issued pursuant to the Plan shall not be an agency or instrumentality of the Commonwealth.  AAFAF shall select, in its sole and absolute discretion, the entity or entities to serve as dealer manager(s) for the COFINA Bonds, after consulting with the Senior Ad Hoc Holders.

Section 4.3.    Covenants of COFINA.  COFINA hereby covenants and agrees as follows:

(a)    COFINA shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the entry of the Confirmation Order, the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents provided that the Disclosure Statement and the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (A) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (B) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (C) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)    COFINA shall use its reasonable best efforts to cause the Legislature to enact legislation required under Section II(M) of the Term Sheet.

(c)    As soon as practicable from and after the date hereof, but in no event later than September 15, 2018, COFINA, with the assistance of AAFAF, and with the prior approval of the Oversight Board shall release a request for proposals to entities interested in serving as trustee and paying agent in connection with the new COFINA securities to be issued pursuant to the Plan.  Upon receipt of responses to such request for proposals, COFINA, together with the other Government Parties shall, discuss the merits of such responses with counsel for the other Parties, with the Government Parties making such selection, in their joint and absolute discretion.

Section 4.4.    Covenants of the Senior Holders.  Each of the Senior Holders (other than Ambac and National), severally and not jointly, hereby covenants and agrees as follows:

(a)    None of the Senior Holders shall sell, transfer, pledge, hypothecate or assign (a "Transfer") any of the Senior COFINA Bond Claims, related claims or any voting rights or participations or other interests therein (collectively, the "Senior COFINA Interests") during the period from the date hereof up to and including the earlier to occur of (i) the COFINA

101736284v3

Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, each of the Senior Holders may transfer any Senior COFINA Interests to (1) another PSA Creditor or (2) in the event that the transferee is not a PSA Creditor at the time of the Transfer, such transferee executes and delivers, within five (5) calendar days after execution thereof, to counsel for the Oversight Board and AAFAF the Joinder Agreement attached hereto as Exhibit "D" (a "Qualified Transferee"), pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, such Senior Holder shall be deemed to have relinquished its rights (other than the right to Consummation Costs, as defined in the Term Sheet, and be released from its obligations (other than as set forth in Sections 4.4(c) and (e) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.4(a), it shall be void *ab initio* and the applicable Senior COFINA Bond Claims and the Senior Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any of the Senior Holders from acquiring additional Senior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by a Senior Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.4(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities.  Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)      None of the Senior Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such Senior Holders' aggregate holdings of Senior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and each such Senior Holder agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.4(b).

(c)      Each of the Senior Holders, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III

18

Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations sets forth in this Agreement.

(d)      Subject to the terms set forth herein, none of the Senior Holders shall be limited or prohibited from (i) taking any action that any such Senior Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)      Each of the Senior Holders shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.4 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of any Senior Holder from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.5.      Covenants of the Junior Holders.  Each of the Junior Holders (other than Ambac), severally and not jointly, hereby covenants and agrees as follows:

(a)      None of the Junior Holders shall Transfer any of the Junior COFINA Bond Claims, related claims or any voting rights or participations or other interests therein (collectively, the "Junior COFINA Interests") during the period from the date hereof up to and including the earlier to occur of (i) COFINA Effective Date and (ii) the termination of Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, each of the Junior Holders may transfer any Junior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, such Junior Holder shall be deemed to have relinquished its rights (other than the right to Consummation Costs and be released from its obligations (other than as set forth in Sections 4.5(c) and (e) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.5(a), it shall be void ab initio and the applicable Junior COFINA Bond Claims and the Junior Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to

19

preclude any of the Junior Holders from acquiring additional Junior COFINA Bond Claims or related claims; provided, however, that any such Junior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by a Junior Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.5(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)     None of the Junior Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such Junior Holders' aggregate holdings of Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and each such Junior Holder agrees to stay all such pending litigations, proceedings actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.5(b).

(c)     Each of the Junior Holders, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)     Subject to the terms set forth herein, none of the Junior Holders shall be limited or prohibited from (i) taking any action that any such Junior Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

101736284v3

(e)      Each of the Junior Holders shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.5 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of any Junior Holder from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.6.      Covenants of Ambac.  Ambac, in its capacity as an Insurer and as a holder of Senior COFINA Bonds Claims and Junior COFINA Bond Claims, hereby covenants and agrees as follows:

(a)      In its capacity as holder of Senior COFINA Bond Claims and Junior COFINA Bond Claims, Ambac covenants and agrees that it shall not Transfer any Senior COFINA Interests or Junior COFINA Interests during the period from the date hereof up to and including the earlier to occur of (i) the COFINA Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, Ambac may Transfer any Senior COFINA Interests or Junior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of Ambac as the transferor of Senior COFINA Bond Claims or Junior COFINA Bond Claims in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, Ambac as prior holder of the Senior COFINA Bond Claims or Junior COFINA Bond Claims, as the case may be, shall be deemed to have relinquished its rights (other than the right to the Consummation Costs and be released from its obligations (other than as set forth in Sections 4.6(c) and (f) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such Senior COFINA Bond Claims and Junior COFINA Bond Claims transferred; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.6(a), it shall be void *ab initio* and the applicable Senior COFINA Bond Claims or Junior COFINA Bond Claims and Ambac shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude Ambac from acquiring additional Senior COFINA Bond Claims or Junior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or Junior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by Ambac be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.6(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities.  Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.  This Section 4.6(a) does not apply to and shall not affect any rights or obligations of Ambac as an Insurer.

21

(b)      Ambac shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claims as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, Ambac's aggregate holdings of the Senior COFINA Bond Claims and Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and Ambac agrees to stay all such pending litigations proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.6(b).

(c)      Ambac shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment with respect to COFINA not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)      Subject to the terms set forth herein, Ambac shall not be limited or prohibited from (i) taking any action that Ambac shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)      Ambac shall negotiate in good faith with the Oversight Board regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to Ambac and be reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

(f)      Ambac shall support and not otherwise object to the approval of the Settlement Motion by Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.6 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of Ambac from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect

22

to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.7.   Covenants of National.  National, in its capacity as an Insurer and as a holder of Senior COFINA Bond Claims, hereby covenants and agrees as follows:

(a)   In its capacity as a holder of Senior COFINA Bond Claims, National covenants and agrees that it shall not Transfer any Senior COFINA Interests during the period from the date hereof up to and including the earlier to occur of (i) the COFINA Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, National may Transfer any Senior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of National as the transferor of Senior COFINA Bond Claims in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, National as a prior holder of Senior COFINA Bond Claims shall be deemed to have relinquished its rights (other than the right to Consummation Costs and be released from its obligations (other than as set forth in Sections 4.7(c) and (f) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such Senior COFINA Bond Claims so transferred; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.7(a), it shall be void ab initio and the applicable Senior COFINA Bond Claims and National shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude National from acquiring additional Senior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by National be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.7(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities.  Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder or by any other applicable law or regulation.  This Section 4.7(a) does not apply to and shall not affect any rights or obligations of National as Insurer.

(b)   National shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, National's aggregate holdings of Senior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and National agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid

23

any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.7(b).

(c)     National shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment with respect to COFINA not proposed or supported by the Oversight Board, AAFAF and COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)     Subject to the terms set forth herein, National shall not be limited or prohibited from (i) taking such action that National shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)     National shall negotiate in good faith with the Oversight Board and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are Parties regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to National and reasonably acceptable to the Oversight Board and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are Parties and shall be included in the Plan Supplement.  National shall use its reasonable best efforts to maximize tax-exempt treatment of distributions to certificate holders from the National Custodial Trust.

(f)     National shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.7 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of National from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

101736284v3

Section 4.8.    Covenants of Assured.  Assured hereby covenants and agrees as follows:

(a)    Assured shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, Assured's aggregate holdings of Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and Assured agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.8(a).

(b)    Assured shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(c)    Assured shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.8 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of Assured from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or the direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

(d)    Subject to the terms set forth herein, Assured shall not be limited or prohibited from (i) taking such action that Assured shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

25

(e)     Assured shall negotiate in good faith with the Oversight Board regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to Assured and reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

Section 4.9.     Covenants of Bonistas.  Bonistas hereby covenants and agrees as follows:

(a)     Bonistas shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of the Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or encourage any "on island" bondholder to vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not support or encourage any "on island" bondholder to vote for any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(b)     Bonistas shall (i) actively encourage support by "on island" bondholders for the agreement set forth in the Term Sheet, (ii) post a statement of support for the Term Sheet and the Plan on the Bonistas' website, (iii) make Bonistas available to "on island" bondholders to answer questions regarding the Term Sheet, the Plan, Disclosure Statement, Confirmation Order and other Definitive Documents, and (iv) support legislation that may be necessary or appropriate to implement the transactions contemplated by the Term Sheet.

(c)     Notwithstanding the foregoing subsections, Bonistas' covenants herein to support and encourage "on island" bondholders to support the Term Sheet and vote in favor of the Plan is expressly subject to (i) the provisions of Section 5.2 of this Agreement and (ii) individual "on island" bondholders' consultations with their own legal, financial and tax advisors to analyze the terms of the Term Sheet, the Plan and the transactions contemplated thereunder.

Section 4.10.   Qualified Marketmaker Exemption.  Notwithstanding anything contained in this Article IV to the contrary, (a) a PSA Creditor may Transfer any Senior COFINA Interests or Junior COFINA Interests to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a PSA Creditor; provided that such Qualified Marketmaker subsequently Transfers all such Senior COFINA Interests or Junior COFINA Interests to a PSA Creditor or a Qualified Transferee within the date that is ten (10) calendar days after such Qualified Marketmaker's acquisition of such Senior COFINA Interests or Junior COFINA Interests, as the case may be; and (b) to the extent that a PSA Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any Senior COFINA Interests or

26

Junior COFINA Interests that the Qualified Marketmaker acquires from a holder of the Senior COFINA Interests or Junior COFINA Interests that is not a PSA Creditor without the requirement that the transferee be or become a PSA Creditor.

Section 4.11.   Right to Vote.   Each Party acknowledges that, for purposes of this Agreement, and any Plan solicited in accordance with the provisions of this Agreement, and so long as this Agreement remains in effect, (a) each Insurer shall have the exclusive right to vote to accept or reject the Plan on account of any existing COFINA securities that it insures and (b) it shall not object to the Insurers' right to vote or reject the Plan or take any action inconsistent therewith.   For avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Insurers' and their insured bondholders' rights to vote to accept or reject any Plan.

Section 4.12.   Appointments Related Litigation.   Notwithstanding anything contained herein to the contrary, a Party which is a plaintiff in an Appointments Related Litigation may continue such litigation but, under all circumstances, such Party (a) hereby covenants and agrees to perform all other duties and obligations as set forth in this Agreement, including, without limitation, the other duties and obligations set forth in Articles IV and V hereof, and (b) without prejudice to any rights reserved in accordance with Sections 4.4(e), 4.5(e) and 4.8(c) hereof, hereby covenants and agrees that, no matter the determination and the entry of a Final Order in connection with the Appointments Related Litigation, with such determination and Final Order being entered either prior to consideration of approval of the Settlement Motion or confirmation of the Plan by the Title III Court or subsequent to entry of an order approving the Settlement Motion and confirmation of the Plan, such Party (i) shall not urge or argue that such determination and Final Order reverses, affects, or otherwise modifies the transactions contemplated herein, in the Term Sheet, in the Settlement Motion and in the Plan and (ii) in the event that such determination and Final Order (y) occurs prior to approval of the Settlement Motion and confirmation of the Plan and (z) causes or requires the reconstitution or reappointment of the Oversight Board, such Party shall urge and request, in writing, that such reconstituted or reappointed board (1) enforce the terms and conditions of this Agreement and the Term Sheet and (2) promptly seek approval of the Settlement Motion and confirmation of the Plan by the Title III Court.

Section 4.13.   Additional Litigation.   Aurelius and Six PRC shall, and shall cause each of their applicable entities to, request entry of an order dismissing, with prejudice, those claims and causes of action, or portions of claims and causes of action, that Aurelius and Six PRC, or their affiliated entities, have asserted, or were required, by applicable law, to assert, in the litigation styled Lex Claims, LLC v. The Commonwealth of Puerto Rico, No. 16-cv-02374 FAB (D.P.R.), currently pending in the United States District Court for the District of Puerto Rico (appealed at First Circuit Case Nos. 17-1241, 17-1248, 17-1272, 17-1337), which are premised on challenges to COFINA's constitutionality, COFINA's entitlement to proceeds of the sales and use taxes, if any, transferred by the Commonwealth to COFINA, and such other claims and causes of action which may be interpreted reasonably to challenge the transactions contemplated by the Term Sheet, the Plan and the Settlement Motion, with the effectiveness of such order conditioned on the entry of an order approving the Settlement Motion and confirmation of the Plan.

## ARTICLE V
## PLAN AND PLAN SUPPORT

Section 5.1.    Plan Support Commitment.  From and after the date hereof, and provided that (a) this Agreement has not been terminated and (b) none of the Disclosure Statement, the Plan and any of the proposed Definitive Documents have been filed, amended or modified in a manner adverse to the PSA Creditors or, in the case of Bonistas, the "on island" bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims, each of the PSA Creditors and Bonistas (to the extent remaining a Party) shall (i) support (A) approval of the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, (B) confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, (C) approval of the Settlement Motion and the compromise and settlement contemplated therein by the Title III Court, and (D) unless otherwise ordered by the Title III Court, upon a motion on notice to the Government Parties and The Bank of New York Mellon, seeking a stay of all proceedings and determinations in connection with the Adversary Proceeding and the Actions, (ii) subject to receipt of the Disclosure Statement and/or other solicitation materials in respect of the Plan, to the fullest extent permitted by law, timely vote, or cause to be voted, to accept the Plan in its capacity as a Senior Holder, a Junior Holder or an Insurer, as applicable (or, in the case of Bonistas, publicly support the terms herein and in the Term Sheet and publicly encourage the support and timely votes for the Plan from "on island" bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims) with rights of acceptance in accordance with the Disclosure Statement Order, each as the case may be, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote (or, in the case of Bonistas, any such support or encouragement), (iv) not consent to or vote (or, in the case of Bonistas, not encourage "on island" bondholders to vote) for any modification of the Plan unless such modification is (Y) not adverse to the Senior Holders, the Junior Holders, Ambac, Assured, National or "on island" bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims and (Z) not inconsistent with the terms provided herein and the Term Sheet, and (v) not vote for or support any plan of adjustment not proposed to or supported by the Government Parties, so long as none of the Government Parties is in material breach of this Agreement.

Section 5.2.    Solicitation Required in Connection with Plan.  Notwithstanding anything contained in this Article V or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan. Each of the Parties, severally and not jointly, acknowledges and agrees that (a) the votes on the Plan will not be solicited until the Title III Court has approved the Disclosure Statement and related solicitation materials, and such Disclosure Statement and solicitation materials have been transmitted to parties entitled to receive same and (b) this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY PROMESA, THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY ANY ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

101736284v3

## ARTICLE VI
## TERMINATION

Section 6.1.    Termination of Agreement.  This Agreement may be terminated as follows:

(a)    By any PSA Creditor or Bonistas, solely as to itself, at their sole option and discretion and upon written notice to the other Parties, in the event that (i) the Board of Directors of COFINA shall have failed to ratify this Agreement within seven (7) calendar days of the date hereof, (ii) the Settlement Motion, the Plan, the Disclosure Statement and the motion seeking entry of the Disclosure Statement Order are not filed with the Title III Court on or prior to October 15, 2018, or (iii) the Oversight Board withdraws the Settlement Motion, the Plan, the Disclosure Statement or the motion seeking entry of the Disclosure Statement Order or files any motion or pleading with the Title III Court, in each case, that is inconsistent with this Agreement, including the Term Sheet, in any material respect, and such motion or pleading has not been withdrawn before the earlier to occur of (y) five (5) Business Days after the Oversight Board receives written notice from another Party (in accordance with the notice provisions set forth in Section 7.10 hereof) that such motion or pleading is inconsistent with this Agreement in such material respect and (z) entry of an order of the Title III Court approving such motion or pleading and granting the relief requested therein.

(b)    By any Party, solely as to itself, at their sole option and discretion and upon written notice to the other Parties, in the event that (i) a Party materially breaches any of the covenants set forth in Article IV hereof or any of its other undertakings in this Agreement, (ii) the Confirmation Order is not entered by the Title III Court and the COFINA Effective Date does not occur on or prior to March 1, 2019, (iii) the Title III Court or such other court of competent jurisdiction enters a Final Order denying confirmation of the Plan, or (iv) a court of competent jurisdiction issues a ruling, judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Plan, which ruling, judgment or order has not been reversed or vacated within sixty (60) calendar days after such issuance and is not subject to a stay; provided, however, that, upon the joint instruction and notice provided by the Government Parties, the date set forth in subsection (ii) above shall be extended up to and including June 1, 2019;

and, provided, further, that, under no circumstances shall a Party have the right to terminate this Agreement solely on the basis that the Title III Court determines that the Insurers are unable to accept the Plan on behalf of holders of Insured Senior Holders or Insured Junior Holders, as the case may be; and, provided, further, that, in the event that this Agreement is terminated by the Oversight Board, it shall be deemed terminated as to all Parties hereto; and, provided, further, that the automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.  This Agreement shall automatically terminate upon the occurrence of the COFINA Effective Date.

Section 6.2.    Effect of Termination.  Except as otherwise provided herein, in the event of the termination of this Agreement as to any Party, (a) this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of such Party (or of any of its directors, officers, employees, consultants, contractors, agents, legal and

29

financial advisors or other representatives), (b) such Party shall not have any obligations to any other Party arising out of, and shall have no further rights, benefits or privileges under, this Agreement (including, without limitation, any rights to Consummation Costs in accordance with the provisions of the Term Sheet), except for the obligations and or provisions set forth in Sections 2.1, 2.2, 7.2, 7.5 and 7.14 hereof and this clause (b) of Section 6.2 hereof, which provisions are intended to survive the expiration or termination of this Agreement and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement prior to the date of such expiration or termination shall survive such expiration or termination, and (c) such Party shall have all the rights and remedies that it would have had, and be entitled to take all actions that it would have been entitled to take, had it not entered into this Agreement and no such rights shall be deemed waived pursuant to a claim of laches or estoppel; provided, however, that in no event shall any such termination relieve such Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such expiration or termination; and, provided, further, that, unless otherwise ordered by the Title III Court, upon notice to such terminating Party, any and all consents, ballots and votes tendered by such Party prior to such expiration or termination shall be deemed to be, for all purposes, automatically null and void *ab initio,* shall not be considered or otherwise used in any manner by the Parties in connection with the Plan, this Agreement or otherwise; and, provided, further, that, if a terminating Party is also party to commutation agreement with an Insurer, then, any elections tendered by such terminating Party in relation to the treatment of existing COFINA securities insured by such Insurer shall be deemed to be automatically null and void *ab initio* only if permitted pursuant to the terms of such commutation agreement or if such terminating Party is no longer party to such commutation agreement. Except in connection with a dispute concerning a breach of this Agreement or the interpretation of the terms hereof upon termination, (y) neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein where the result of negotiations and compromises of the respective positions of the Parties and (z) no Party shall seek to take discovery concerning this Agreement or admit this Agreement or any part of it into evidence against any other Party hereto.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1.    Amendments.  This Agreement, including, without limitation, the Term Sheet, may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected (or, in the case of Bonistas, if "on island" bondholders are to be affected) by such modification, amendment or supplement.

Section 7.2.    No Admission of Liability.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other Person with respect to any of the matters addressed in this Agreement.

101736284v3

(b)      None of this Agreement (including, without limitation, the Recitals and Exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in the Actions or of any wrongdoing or liability of any Party; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (iii) is or may be deemed to be or used as an admission or evidence against Reorganized COFINA or COFINA with respect to the validity of any of the Senior COFINA Bond Claims or the Junior COFINA Bond Claims.  None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement herein shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement.

Section 7.3.      Good Faith Negotiations.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement; the negotiations related to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; each Party knows all of the relevant facts and his, her or its rights in connection therewith, and that he, she or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement.  The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.  The Parties further acknowledge and agree that, in connection with the Title III Case and the negotiation and consummation of this Agreement, including, without limitation, the Term Sheet, the Parties, at all times, acted (a) in good faith and (b) solely for themselves and not on behalf of or in representation of any other creditors, bondholders or other parties in interest.

Section 7.4.      Third Party Beneficiary.  Other than funds and/or accounts which are holders of the Senior COFINA Bonds or Junior COFINA Bonds and whose advisors or managers are Parties hereto, nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto, Reorganized COFINA and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 7.5.      Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York and applicable federal law, without giving effect to the principles of conflicts of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this

31

Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Title III Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, subject to a Party's rights pursuant to applicable law.  In the event any such action, suit or proceeding is commenced, each of the Parties hereby (a) agrees and consents that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 7.10 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 7.10 hereof and (b) waives to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising from or relating to this Agreement and the representations, covenants and other obligations set forth herein.

Section 7.6.    Headings. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 7.7.    Binding Agreement; Successors and Assigns.  This Agreement shall be effective and binding only upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto.  This Agreement is intended to, and shall be deemed to, bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives.  The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic and legal substance of the transactions contemplated herein or in the Term Sheet are not affected in any manner adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated herein are consummated as originally contemplated to the greatest extent possible.

Section 7.8.    Entire Agreement.  This Agreement, including, without limitation, the Term Sheet, constitutes the full and entire agreement among the Parties with regard to the subject hereof and the Term Sheet, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof.  No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement. Notwithstanding the foregoing, nothing contained herein shall be deemed to limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more Senior Holders or Junior Holders, on the one hand, and an Insurer, on the other hand.

32

Section 7.9.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement.  Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 7.10.    <u>Notices</u>.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (i), when personally delivered by courier service or messenger, (ii) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (iii) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid- return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

(a)    If to the Oversight Board, to:

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
Email: mbienenstock@proskauer.com
          Brian S. Rosen, Esq.
Email: brosen@proskauer.com
Facsimile: 212-969-2900

(b)    If to AAFAF or COFINA, to:

O'MELVENY & MEYERS LLP
Seven Times Square
New York, NY 10036
Attn:   John Rapisardi, Esq.
Email: jrapisardi@omm.com
          Suzzanne Uhland, Esq.
Email: suhland@omm.com
Facsimile: 212-326-2061

(c)    If to Ambac, to:

MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
Attn:   Dennis Dunne, Esq.
Email: ddunne@milbank.com
          Atara Miller, Esq.
Email: amiller@milbank.com
Facsimile: 212-530-5219

33

(d)     If to Assured, to:

CADWALADER, WICKERSHAM & TAFT
200 Liberty Street

New York, NY 10281
Attn: Mark Ellenberg, Esq.
Email: mark.ellenberg@cwt.com
        Lary Stromfeld, Esq.
Email: lary.stromfeld@cwt.com
        Ivan Loncar, Esq.
Email: ivan.loncar@cwt.com
        Casey Servais, Esq.
Email: casey.servais@cwt.com
Facsimile: 212-504-6666

(e)     If to National, to:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Marcia L. Goldstein, Esq.
Email: marcia.goldstein@weil.com
        Gabriel Morgan, Esq.
Email: gabriel.morgan@weil.com
Facsimile: 212-310-8007

(f)     If to the Senior Ad Hoc Holders, to:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue
New York, NY 10010
Attn:   Susheel Kirpalani, Esq.
Email: susheelkirpalani@quinnemanuel.com
        Eric Kay, Esq.
Email: erickay@quinnemanuel.com
Facsimile: 212-849-7100

(g)     If to Oppenheimer or the First Puerto Rico Family of Funds, to:

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Attn:   Thomas Mayer, Esq.
Email: tmayer@kramerlevin.com
        Amy Caton, Esq.
Email: acaton@kramerlevin.com
        Douglas Buckley, Esq.

34

Email: dbuckley@kramerlevin.com
Facsimile: 212-715-8169

(h)    If to GSAM, to:

McDERMOTT, WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60606
Attn:   William P. Smith, Esq.
Email: wsmith@mwe.com
        David L. Taub, Esq.
Email: dtaub@mwe.com
        Alexandra C. Scheibe, Esq.
Email: ascheibe@mwe.com
Facsimile: 312-277-9069

(i)    If to the Puerto Rico Funds, to:

WHITE & CASE LLP
200 South Biscayne Boulevard
Miami, FL 33131
Attn:   John K. Cunningham, Esq.
Email: jcunningham@whitecase.com
        Fernando de la Hoz, Esq.
Email: fdelahoz@whitecase.com
Facsimile: 305-358-5744

(j)    If to Bonistas, to:

DAVIS, POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Attn:   Donald Bernstein, Esq.
Email: donald.bernstein@davispolk.com
        Brian Resnick, Esq.
Email: brian.resnick@davispolk.com
Facsimile: 212-701-5800

(k)    If to certain of the Insured Senior Holders, to:

NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Attn:   Lawrence A. Larose, Esq.
Email: lawrence.larose@nortonrosefulbright.com
        Eric Daucher, Esq.
Email: eric.daucher@nortonrosefulbright.com

(l)    If to GoldenTree Asset Management LP, to:

35

101736284v3

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Attn: Ira S. Dizengoff, Esq.
Email: idizengoff@akingump.com
        Philip C. Dublin, Esq.
Email: pdublin@akingump.com

(m)   If to Tilden Park Capital management LP, to:

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Attn:   Sandy Qusba, Esq.
Email: squsba@stblaw.com
        Nicholas Baker, Esq.
Email: nbaker@stblaw.com
Facsimile: 212-455-2502

(n)   If to Whitebox Advisors LLC, to:

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
Attn:   Daniel A. Fliman, Esq.
Email: dfliman@stroock.com
Facsimile: 212-806-6006

(o)   If to Aurelius or Six PRC, to:

PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:   Andrew N. Rosenberg, Esq.
Email: arosenberg@paulweiss.com
Facsimile: 212-373-3000

Section 7.11.   Non-Waiver of Remedies.   Except as expressly provided in this Agreement, nothing contained herein is intended, nor shall it be construed in any manner, to waive, limit, impair or restrict any right or ability of the Parties to protect and preserve each of their rights, remedies and interests, contractual or otherwise, under the Bond Resolutions, Title III or any other provision of PROMESA or any other law or regulation.

Section 7.12.   Several, Not, Joint Obligations.   The agreements, representations, covenants and other obligations of the Parties set forth in this Agreement are, in all respects, several and not joint.

36

Section 7.13.   <u>Remedies Cumulative</u>.  All rights, powers and remedies provided in accordance with the terms and provisions of this Agreement or otherwise available in respect hereof of law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the contemporaneous or later exercise of any other such right, power or remedy by any such Party.

Section 7.14.   <u>Specific Performance</u>.  Each of the Parties agrees and understands that money damages are an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Title III Court or such other court of competent jurisdiction requiring any Party to comply promptly with any of its obligation hereunder. Notwithstanding anything contained in this Agreement to the contrary, specific performance and injunctive or other relief and the right to terminate this Agreement in accordance with the terms and provisions hereof shall be the sole and exclusive remedies for any breach of this Agreement by any Party (or any other person) and no Party (or any other person) shall be entitled to monetary damages for any breach of any provision of this Agreement.

Section 7.15.   <u>Further Assurances</u>.  Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, such instruments, and to take such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

101736284v3

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
    Name:  Natalie A. Jaresko
    Title:  Executive Director


THE PUERTO RICO SALES TAX
FINANCING CORPORATION

By: _____
    Name:
    Title:


PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
    Name:
    Title:


BONISTAS DEL PATIO, INC.


By: _____
    Name:  Rafael E. Rojo
    Title:  Chairman

38

101736284v3

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be
executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By:  _____
    Name:
    Title:


PUERTO RICO SALES TAX
FINANCING CORPORATION

By:  Puerto Rico Fiscal Agency and Financial
    Advisory Authority

By:  _____
    Name: Christian Sobrino Vega
    Title:  Executive Director of AAFAF, in its
         capacity as Authorized Signatory for
         COFINA


PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By:  _____
    Name: Christian Sobrino Vega
    Title:  Executive Director


BONISTAS DEL PATIO, INC.

By:  _____
    Name:  Rafael E. Rojo
    Title:   Chairman

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
     Name:
     Title:

THE PUERTO RICO SALES TAX
FINANCING CORPORATION

By: _____
     Name:
     Title:

PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
     Name:
     Title:

BONISTAS DEL PATIO, INC.

By: _____
     Name:  Rafael E. Rojo
     Title:  Chairman

**AMBAC ASSURANCE CORPORATION**


By:  s/Claude LeBlanc
      Name: Claude LeBlanc
      Title: President and Chief Executive Officer

Holder of Principal Amount of Senior COFINA Bonds:

Insurer of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Insurer of Principal Amount of Junior COFINA Bonds:

**ARISTEIA CAPITAL, L.L.C.,** solely in its capacity as Investment Manager or Adviser to underlying funds

By: s/Willian R. Techar
    Name: William R. Techar
    Title:  Manager
           Aristeia Capital, LLC.

By: s/Andrew B. David
    Name: Andrew B. David
    Title:  Chief Operating Officer
           Aristeia Capital, LLC.

Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Aristeia Capital, L.L.C.
One Greenwich Plaza, 3rd Floor
Greenwich, CT 06830
Fax:  (203) 622-2701
Attention:  Steven Robinson/William Techar
Email:  robinson@aristeiacapital.com/techar@aristeiacapital.com

**ASSURED GUARANTY MUNICIPAL CORP.**

By:  s/Jorge A. Gana
       Name: Jorge A. Gana
       Title: M.D.

Insurer of Principal Amount of Junior COFINA Bonds:

**AURELIUS CAPITAL MASTER, LTD.**

By:  s/Dan Gropper
      Name: Dan Gropper
      Title: Authorized Person

Principal Amount of Senior COFINA Bonds held as of September 20, 2018:

Principal Amount of Junior COFINA Bonds held as of September 20, 2018:

Notice Address

Aurelius Capital Management, LP
535 Madison Avenue, 22nd Floor
New York, NY 10022
Fax: 212-786-5870
Attention: Dan Gropper
Email: dgropper@aurelius-capital.com

**CANYON CAPITAL ADVISORS LLC,** on behalf of its participating funds and/or accounts

By: s/John P. Plaga
     Name: John P. Plaga
     Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Canyon Capital Advisors LLC
2000 Avenue of the Stars, 11th Floor
Los Angeles, CA 90067
Fax:  1-310-272-1371
Attention:  General Counsel
Email:  legal@canyonpartners.com;
jheller@canyonpartners.com;
akawalsky@canyonpartners.com

**DECAGON HOLDINGS 1, L.L.C.**

By:  s/Jeffrey R. Katz
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 1, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 2, L.L.C.**

By:  s/Jeffrey R. Katz
       Name:  Jeffrey R. Katz
       Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 2, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 3, L.L.C.**

By: s/Jeffrey R. Katz
　　　Name:  Jeffrey R. Katz
　　　Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 3, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 4, L.L.C.**

By: s/Jeffrey R. Katz
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 4, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 5, L.L.C.**

By:  s/Jeffrey R. Katz
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 5, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 6, L.L.C.**

By: s/Jeffrey R. Katz _____
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 6, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 7, L.L.C.**


By:  s/Jeffrey R. Katz_____
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 7, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 8, L.L.C.**

By: s/Jeffrey R. Katz
      Name:  Jeffrey R. Katz
      Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 8, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 9, L.L.C.**

By:  s/Jeffrey R. Katz
      Name:  Jeffrey R. Katz
      Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 9, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 10, L.L.C.**

By:  s/Jeffrey R. Katz _____
   Name:  Jeffrey R. Katz
   Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 10, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**FIRST PUERTO RICO FAMILY OF FUNDS**

First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.

By: *Frank J Serra*
    Name: Frank J Serra
    Title: President

Holder of Principal Amount of Insured Senior COFINA Bonds: ████████

Holder of Principal Amount of Uninsured Senior COFINA Bonds: ████████

Holder of Principal Amount of Junior COFINA Bonds: ████████

**GOLDENTREE ASSET MANAGEMENT LP**, on behalf of certain of its affiliated funds and certain funds and accounts for which it serves as investment manager

By:  s/Peter Alderman_____
      Name:  Peter Alderman
      Title:   General Counsel--Americas


Investment Advisor to Holders of Principal Amount of Senior COFINA Bonds:


Investment Advisor to Holders of Principal Amount of Junior COFINA Bonds:


Notice Address:

GoldenTree Asset Management LP
300 Park Avenue, 20th Floor
New York, NY 10022
Fax:  212-847-3496
Attention:  Legal Department
Email:  legalgroup@goldentree.com

**GOLDMAN SACHS ASSET MANAGEMENT, L.P.,** on behalf of certain funds and accounts for which it serves as investment manager

By: s/David Z. Alter
          Name: David Z. Alter
          Title: Managing Director

Investment Manager to Holder of Principal Amount of Senior COFINA Bonds:

Investment Manager to Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Goldman Sachs Asset Management, L.P.
200 West Street, 3rd Floor
New York, NY 10282
Attention:  David Z. Alter
Email:  david.alter@gs.com

With a copy to:

Goldman Sachs Asset Management, L.P.
200 West Street, 15th Floor
New York, NY 10282
Attn: General Counsel

**NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION**

By: s/Adam Bergonzi
     Name:  Adam Bergonzi
     Title:   Chief Risk Officer

Holder of Principal Amount of Senior COFINA Bonds:

     *by National Public Finance Guarantee Corporation:*

     *by MBIA Insurance Corporation:*

Insurer of Principal Amount of Senior COFINA Bonds:


Notice Address:

National Public Finance Guarantee Corporation
1 Manhattanville Road
Purchase, NY 10577
Fax:  (914) 765-3164
Attention:  Adam Bergonzi
Email:  adam.bergonzi@nationalpfg.com

**OLD BELLOWS PARTNERS LP**

By: <u>s/ A. Dev Chodry</u>
     Name: A. Dev Chodry
     Title: Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



<u>Notice Address:</u>

Scoggin Management LP
660 Madison Ave, #20
New York, NY 10065
Fax: <u>646-607-5686</u>
Attention: <u>Nicole Kramer</u>
Email: <u>nkramer@scogcap.com</u>

**OPPENHEIMER FUNDS. INC., as investment advisor for the following accounts:**

      Oppenheimer Rochester Amt -Free Municipal Fund
      Oppenheimer Rochester Amt -Free New York Municipal Fund
      Oppenheimer Rochester California Municipal Fund
      Oppenheimer Rochester Limited Term California Municipal Fund
      Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
      Oppenheimer Municipal Fund)
      Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of
      Rochester Portfolio Series)
      Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer Multi-
      State Municipal Trust)
      Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
      Multi-State Municipal Trust)
      Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
      State Municipal Trust)
      Oppenheimer Rochester Fund Municipals
      Oppenheimer Rochester Minnesota Municipal Fund

and

**OFI GLOBAL INSTITUTIONAL, Inc., as investment manager for the following
accounts:**

      MASSMUTUAL International Holding MSC, Inc.
      MASSMUTUAL Unified Traditional

By: _____
      Name: RICHARD STEIN
      Title: VICE PRESIDENT

Holder of Principal Amount of Insured Senior COFINA Bonds: $██████████

Holder of Principal Amount of Uninsured Senior COFINA Bonds: $██████████

Holder of Principal Amount of Uninsured Junior COFINA Bonds: $██████████

**TAX-FREE PUERTO RICO FUND, INC.**

**TAX-FREE PUERTO RICO FUND II, INC.**

**TAX-FREE PUERTO RICO TARGET MATURITY FUND, INC.**

**PUERTO RICO AAA PORTFOLIO BOND FUND, INC.**

**PUERTO RICO AAA PORTFOLIO BOND FUND II, INC.**

**PUERTO RICO AAA PORTFOLIO TARGET MATURITY FUND, INC.**

**PUERTO RICO FIXED INCOME FUND, INC.**

**PUERTO RICO FIXED INCOME FUND II, INC.**

**PUERTO RICO FIXED INCOME FUND III, INC.**

**PUERTO RICO FIXED INCOME FUND IV, INC.**

**PUERTO RICO FIXED INCOME FUND V, INC.**

**PUERTO RICO FIXED INCOME FUND VI, INC.**

**PUERTO RICO GNMA & U.S. GOVERNMENT TARGET MATURITY FUND, INC.**

**PUERTO RICO MORTGAGE-BACKED & U.S. GOVERNMENT SECURITIES FUND, INC.**

**UBS IRA SELECT GROWTH & INCOME PUERTO RICO FUND**

By: s/ Carlos V. Ubiñas_____
         Name: Carlos V. Ubiñas
         Title: Chairma

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

**PUERTO RICO INVESTORS TAX-FREE FUND, INC.**
**PUERTO RICO INVESTORS TAX-FREE FUND, INC. II**
**PUERTO RICO INVESTORS TAX-FREE FUND III, INC.**
**PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.**
**PUERTO RICO INVESTORS TAX-FREE FUND V, INC.**
**PUERTO RICO INVESTORS TAX-FREE FUND VI, INC.**
**PUERTO RICO INVESTORS BOND FUND I**


By:  s/Javier Rubio
        Name: Javier Rubio
        Title: Senior Vice President

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

**SCOGGIN MANAGEMENT LP**

By: s/A. Dev. Chodry
     Name:  A. Dev Chodry
     Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:


Notice Address:

Scoggin Management LP
660 Madison Ave, #20
New York, NY 10065
Fax:  646-607-5686
Attention:  Nicole Kramer
Email:  nkramer@scogcap.com

**SIX PRC INVESTMENTS LLC**

By: Monarch Debt Recovery Master Fund Ltd
Monarch Alternative Solutions Master Fund Ltd
Monarch Capital Master Partners III LP
Monarch Capital Master Partners IV LP
MCP Holdings Master LP
Monarch Special Opportunities Master Fund Ltd, as Members

By Monarch Alternative Capital LP, as investment manager


By:  s/Adam Sklar_____
       Name:  Adam Sklar
       Title:   Managing Principal


Principal Amount of Senior COFINA Bonds as of September 20, 2018:


Principal Amount of Junior COFINA Bonds as of September 20, 2018:


Notice Address:

Monarch Alternative Capital LP
535 Madison Avenue
New York, NY 10022
Fax: 866-610-5157
Attention: Adam Sklar
Email: adam.sklar@monarchlp.com

**TACONIC CAPITAL ADVISORS L.P.**
**on behalf of funds under management**


By:  s/Peyton McNutt
     Name:  Peyton McNutt
     Title:   Deputy General Counsel


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Taconic Capital Advisors L.P.
280 Park Avenue, 5th Floor
New York, New York 10017
Fax:  (212) 209-3185
Attention:  Marc Schwartz
Email:  maschwartz@taconiccap.com

**TILDEN PARK CAPITAL MANAGEMENT LP,** on behalf of certain of its managed funds

By: s/Samuel Alcoff
      Name:  Samuel Alcoff
      Title:   Managing Member

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Tilden Park Capital Management LP
452 5th Ave, 28th Floor
New York, NY 10018
Fax:  N/A
Attention:  Rahul Pande
Email: rpande@tildenparkcapital.com
      with a copy to:  legal@tildenparkcapital.com

**WHITEBOX ADVISORS LLC,** on behalf of funds it manages

By: <u>s/Mark Strefling</u>
    Name: Mark Strefling
    Title:   Chief Executive Officer

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

<u>Notice Address:</u>

Whitebox Advisors LLC
3033 Excelsior Boulevard, Suite 300
Minneapolis, MN 55416
Attention:  <u>Sean Russell</u>
Email:  <u>SRussell@whiteboxadvisors.com</u>

## EXHIBIT A

### LIST OF SENIOR HOLDERS PARTY HERETO

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Aurelius Capital Master, Ltd.
Canyon Capital Advisors LLC
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it
    serves as investment manager
National Public Finance Guarantee Corporation
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
    Oppenheimer Municipal Fund)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Fund Municipals
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.

First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Target Maturity Fund, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund II, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund, Inc. II
Puerto Rico Investors Tax-Free Fund III, Inc.
Puerto Rico Investors Tax-Free Fund IV, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

101736284v3

## EXHIBIT B

### LIST OF JUNIOR HOLDERS PARTY HERETO

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Aurelius Capital Master, Ltd.
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it
    serves as investment manager
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Limited Term California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
    Oppenheimer Municipal Fund)
    Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of
    Rochester Portfolio Series)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Fund Municipals
    Oppenheimer Rochester Minnesota Municipal Fund
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
    MASSMUTUAL Unified Traditional
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.

First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund II, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund II, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
Puerto Rico Fixed Income Fund VI, Inc.
Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.
Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

# **EXHIBIT C**

## TERM SHEET

101736284v3

EXECUTION VERSION

**COFINA**
**Restructuring Proposal**
**Summary of Terms and Conditions**

This amended and restated term sheet (the "Term Sheet"), dated as of September 20, 2018, is a summary of indicative terms and conditions for a proposed restructuring (the "Restructuring"), and a plan of adjustment (the "COFINA Plan of Adjustment") consummated in connection with proceedings under Title III of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA"; such proceedings being referred to as the "PROMESA Proceedings"), of the indebtedness of, and claims and causes of action against, the Puerto Rico Sales Tax Financing Corporation ("COFINA"). References herein to (1) the "PSA" are to that certain Amended and Restated Plan Support Agreement, dated as of September 20, 2018, by and among (a) the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), (b) COFINA, (c) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" and, together with the Oversight Board and COFINA, the "Government Parties"), (d) certain holders of Senior COFINA Bond Claims, as defined therein, (e) Ambac Assurance Corporation ("Ambac"), (f) National Public Finance Guarantee Corporation ("National"), (g) certain holders of Junior COFINA Bond Claims, as defined therein, (h) Assured Guaranty Municipal Corp. ("Assured"), formerly known as Financial Security Assurance Inc., and (i) Bonistas del Patio, Inc. ("Bonistas"), and (2) "COFINA PROMESA Proceeding" are to the PROMESA Proceeding of COFINA. The signatories to the PSA as of August 29, 2018, shall be referred to herein as the "PSA Parties".

I.      **Compromise and Settlement of Commonwealth – COFINA Dispute**

      A.     On or prior to October 15, 2018, the Oversight Board, on behalf of the Commonwealth of Puerto Rico (the "Commonwealth"), shall file a motion (the "Settlement Motion") in the Commonwealth PROMESA Proceedings with the United States District Court having jurisdiction over the PROMESA Proceedings (the "Title III Court") in accordance with Bankruptcy Rule 9019 seeking the approval of the compromise and settlement of the dispute (the "Commonwealth–COFINA Dispute") between the Commonwealth and COFINA regarding ownership of the sales and use taxes purportedly transferred by the Commonwealth to COFINA and pledged by COFINA to secure the repayment of certain indebtedness of COFINA, including, without limitation, ownership of collections required to be deposited in the Dedicated Sales Tax Fund (as defined in the Bond Resolutions), which funds accumulate annually up to the Pledged Sales Tax Base Amount ("PSTBA"), i.e., the annual dollar amounts determined for each fiscal year of the Commonwealth ("FY") in accordance with Section 3 of Act No. 91-2006, as amended ("Act 91"), and with respect to each FY during the period from 2019 to 2058, inclusive, set forth in Schedule 1 hereto, currently being litigated in the adversary proceeding styled The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as agent of the Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico v. Bettina Whyte, as agent of The Financial Oversight and Management Board for Puerto Rico as representative of The Puerto Rico Sales Tax Financing Corporation, Adv. Proc. No. 17-257-LTS (the "Adversary Proceeding"). The Commonwealth–COFINA Dispute shall be compromised and settled pursuant to the Settlement Motion in the Commonwealth PROMESA Proceeding, on the one hand, and pursuant to the COFINA Plan of Adjustment, as defined below, on the other hand, with (i) COFINA being granted an ownership interest of the COFINA Portion, as defined below, and (ii) the Commonwealth being granted an ownership interest of the Commonwealth Portion, as defined below; provided, however, that, except as expressly set forth in Sections II(N) and (P) hereof, (a) one hundred percent (100%) of the funds on deposit prior to July 1, 2018 in the debt service, reserve and such other accounts and any earnings thereon held by the Bank of New York Mellon ("BNYM"), as the COFINA bond trustee, for the benefit of the bondholders (collectively, the "Pre-FY2019 BNYM Deposits") in accordance with the Adversary Proceeding and such other orders entered in connection therewith; provided, however, that, (i) of Seventy-Eight Million Three Hundred Fifty-Five Thousand Eight Hundred and Thirty-Seven Dollars and Sixty-Three Cents ($78,355,837.63)

1

of the Pre-FY2019 BNYM Deposits, (x) Thirty-Three Million Three Hundred Fifty-Five Thousand Eight Hundred Thirty-Seven Dollars and Sixty-Three Cents ($33,355,837.63) shall be distributed to the Commonwealth, (y) Five Million Dollars ($5,000,000.00) shall be allocated to fund an operating expense fund for COFINA, and (z) Forty Million Dollars ($40,000,000.00) shall be allocated to the Taxable Election Cash distributable under the COFINA Plan of Adjustment and if the Taxable Election Cash distributable under the COFINA Plan of Adjustment is less than Sixty Million Dollars ($60,000,000.00) (such difference, the "Tax Election Remainder Amount"), then an amount equal to the Tax Election Remainder Amount, up to Forty Million Dollars ($40,000,000.00) allocated as Taxable Election Cash, shall be distributed (I) *first*, to further fund the operating expense fund for COFINA up to an additional Ten Million Dollars ($10,000,000.00), and (II) *second*, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders, and the Commonwealth, on the other hand, (b) one hundred percent (100%) of the funds deposited on or after July 1, 2018 to the debt service, reserve and such other accounts (collectively, the "FY2019 BNYM Deposits"), on a first dollars basis up to the amount of fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA, plus any earnings thereon (the "COFINA FY2019 BNYM Deposits") held by BNYM in accordance with the Adversary Proceeding and such other orders entered in connection therewith, will, on the COFINA Effective Date, as defined below, be the exclusive property of COFINA and will be distributed to COFINA for purposes of distribution in accordance with the COFINA Plan of Adjustment and (c) any FY2019 BNYM Deposits net of the COFINA FY2019 BNYM Deposits, shall be distributed in its entirety to the Commonwealth. Pursuant to the provisions of the PSA regarding support of the Settlement Motion, and except as expressly set forth in Sections II(N) and (P) hereof, the parties hereto reserve their right, if any, to contest in the Commonwealth PROMESA Proceeding the Commonwealth's (a) use, or direction of the use, of monies received by the Commonwealth or to be received by the Commonwealth and (b) deposit or other use, or direction of the use, of such monies. Consideration and confirmation of the COFINA Plan of Adjustment in the COFINA PROMESA Proceeding shall be contemporaneous with consideration and approval of the Settlement Motion in the Commonwealth PROMESA Proceeding; provided, however, that, in all circumstances, the effective date of the order granting the Settlement Motion shall be contemporaneous with, and its contemporaneous occurrence shall be a condition to, the COFINA Effective Date, as defined below.

B.    Unless (i) approval of the Settlement Motion is denied by the Title III Court or (ii) the COFINA Effective Date does not occur, the effective date of the compromise and settlement (the "Compromise Date") shall be retroactive to July 1, 2018 and, in addition to receipt of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, and the COFINA FY2019 BNYM Deposits on the COFINA Effective Date, COFINA will own, and will be entitled to receive, the COFINA Portion commencing as of FY2019. Until the COFINA Effective Date, all revenues attributable to the PSTBA, including, without limitation, the COFINA Portion and the Commonwealth Portion, shall be maintained in accordance with orders of the Title III Court entered in the COFINA PROMESA Proceeding, the Commonwealth PROMESA Proceeding, the Adversary Proceeding and that certain litigation styled The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al., Adv. Proc. No. 17-133-LTS (the "Interpleader Action"). Without in any way limiting the foregoing, but subject to the occurrence of the COFINA Effective Date, the Commonwealth will own and will be entitled to receive the Commonwealth Portion, as defined below.

C.    On the COFINA Effective Date, pursuant to the Settlement Order and the Confirmation Order, as defined below, which orders shall amend and supersede such orders of the Title III Court entered in the COFINA PROMESA Proceeding, the Commonwealth PROMESA

2

Proceeding, the Adversary Proceeding and the Interpleader Action to the extent that such orders are inconsistent therewith, (1) BNYM shall make distributions as set forth in Section I(A) hereof, (2) the Adversary Proceeding shall be dismissed, with prejudice, and all other claims and causes of action asserted therein by the Commonwealth Agent, the COFINA Agent and the Permitted Intervenors, as defined in the Adversary Proceeding, shall be deemed dismissed, with prejudice, and the Commonwealth Agent and the COFINA Agent and their respective professionals shall be deemed to have satisfied any and all of their respective obligations in connection with the Adversary Proceeding and the COFINA Agent shall be deemed to have been released from any and all liabilities associated therewith, (3) the Interpleader Action will be dismissed, with prejudice, and all other claims and causes of action asserted therein shall be dismissed, with prejudice, and the funds deposited in connection therewith shall be distributed in accordance with the terms and provisions of this Term Sheet, and (4) except with respect to claims and causes of actions asserted or that could have been asserted by Ambac, Whitebox Multi-Strategy Partners, L.P. or funds affiliated with Whitebox Advisors LLC against BNYM for gross negligence, willful misconduct or intentional fraud, the Actions shall be dismissed, with prejudice, and claims and causes of action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice.

**D.**    Solely for purposes of confirmation and consummation of the COFINA Plan of Adjustment, (i) the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) shall be deemed allowed in the aggregate amount of $7,760,877,871.98, (ii) the Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and the Junior COFINA Bond Claims (Assured Insured) shall be deemed allowed in the aggregate amount of $9,876,235,996.34, and (iii) the holders of existing COFINA bonds shall be deemed secured to the extent of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, the COFINA FY2019 BNYM Deposits and the COFINA Portion.

## II.    COFINA Plan of Adjustment

**A.**    **Overview:** Contemporaneously with the filing of the Settlement Motion, the Oversight Board, on behalf of COFINA, will file the COFINA Plan of Adjustment and disclosure statement related thereto. The COFINA Plan of Adjustment shall provide, among other things, (i) that, as of the COFINA Effective Date, COFINA will be the sole and exclusive owner of the present and future revenues and collections generated by the five and one-half percent (5.5%) of the sales and use taxes imposed by the Commonwealth (the "COFINA Pledged Taxes") up to the COFINA Portion, (ii) for the issuance of a single tranche of securities that will be issued in five (5) series with the sinking fund schedules, accreted value and final maturities set forth in Exhibit A (the "COFINA Bonds"), which obligations (a) shall be secured by a statutory first lien on the COFINA Pledged Taxes and, with respect to any permitted substitution thereof and all rights related thereto and proceeds thereof, (b) shall not be secured by or have recourse to any property of the Commonwealth and (c) shall be a special, limited obligation of COFINA (payable solely from the COFINA Portion and any other COFINA property pledged by COFINA to secure the repayment of the COFINA Bonds pursuant to the COFINA Plan of Adjustment). The Government Parties shall use their reasonable best efforts to cause all of the COFINA Bonds to be issued as tax exempt in accordance with Section 103 of the Internal Revenue Code and under Puerto Rico law to the extent permitted under applicable law; provided, however, that, in the event applicable U.S. law does not permit all COFINA Bonds to be issued on a federally tax exempt basis, COFINA shall issue Taxable COFINA Bonds as a sub-series of COFINA Bonds, which shall be distributed, first, in accordance with the provisions of Sections II(D)(4) and II(D)(7) hereof and, second, with respect to any remaining Taxable COFINA Bonds ratably to all other recipients of COFINA Bonds under the COFINA Plan of Adjustment. In each FY, the

3

aggregate scheduled debt service due, including accreted amounts, on all COFINA Bonds and COFINA Parity Bonds shall not exceed the COFINA Portion scheduled for such FY.

In connection with the filing of the COFINA Plan of Adjustment and related disclosure statement, the Oversight Board shall cause the certification of a COFINA fiscal plan pursuant to Section 201(a) of PROMESA consistent with the transactions contemplated in the COFINA Plan of Adjustment, including, without limitation, the issuance of the COFINA Bonds.

In furtherance of the efforts to cause all of the COFINA Bonds to be issued as tax exempt in accordance with Section 103 of the Code, including, without limitation, in connection with the use of custodial trusts described herein, the Government Parties agree to consult with the PSA Parties' tax counsel to consider the optimal capital structure of COFINA based on applicable law and guidance from applicable federal agencies.

Except as otherwise provided in this Term Sheet, for all purposes herein, the Oversight Board, in its sole and absolute discretion, but upon consultation with Section 103 tax counsel and the PSA Parties party to the Interpleader Action, shall determine the use and application of all Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, and the COFINA FY2019 BNYM Deposits pursuant to the COFINA Plan of Adjustment in a manner that maximizes the issuance of tax-exempt COFINA Bonds; provided, however, that the parties' expectation as of the date hereof is that the Pre-FY2019 BNYM Deposits shall be applied in accordance with the priorities and approximate amounts set forth on Schedule 2 hereto; and, provided, further, that any such use and application of Pre-FY2019 BNYM Deposits shall be pro rata per each applicable series subject to such adjustments as may be desirable for administrative convenience to account for minimum bond par denominations.

**B.**    **Additional Definitions:** For purposes of this Term Sheet, the following capitalized terms shall have the meanings ascribed below[1]:

Ambac Custodial Certificates:  The certificate(s) or receipt(s) to be issued by the Ambac Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the Ambac Custodial Trust.

Ambac Custodial Trust:  The custodial trust(s) which may be formed by COFINA and/or Ambac on or prior to the COFINA Effective Date for the sole benefit of holders of Senior COFINA Bond Claims (Ambac Insured) that elect not to commute their Ambac Insurance Policies.

Ambac Insurance Policy:  The existing insurance policy issued by Ambac relating to the Ambac Insured Bonds, together with all agreements and other documents related thereto.

Assured Custodial Certificates:  The certificate(s) or receipt(s) that may be issued by the Assured Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the Assured Custodial Trust.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed thereto in the PSA; provided, however, that, in the event of any conflict between the terms defined in the PSA and herein, the meanings set forth in this Term Sheet shall govern.

Assured Custodial Trust:  The custodial trust(s) which may be formed by COFINA and/or Assured on or prior to the COFINA Effective Date for the sole benefit of holders of Junior COFINA Bond Claims (Assured Insured).

Assured Insurance Policies:  The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with all agreements and other documents related thereto.

Bond Claim: A claim on account of an existing COFINA security (as reflected in the chart set forth in Recital A of the PSA) with such claim being calculated as (a) with respect to current interest bonds and convertible capital appreciation bonds that converted into current interest bonds as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding, the outstanding principal amount of such bonds plus the accrued and unpaid interest thereon and (b) with respect to capital appreciation bonds and convertible capital appreciation bonds that have not converted into current interest bonds as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding, the compounded amount for such bonds, in each case, as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding.

COFINA Cash Available for Distribution: The amount of cash available for distribution on the COFINA Effective Date comprised of the Pre-FY2019 BNYM Deposits minus the sum of (a) the Rounding Amount Cash plus (b) Section 103 Cash plus (c) Taxable Election Cash plus (d) Consummation Costs as required pursuant to Section II(O) hereof plus (e) the cash, if any, retained by COFINA for the operating expense account or distributed to the Commonwealth pursuant to Section I(A) hereof.

COFINA Pledged Taxes: The present and future revenues and collections generated by the five and one-half percent (5.5%) sales and use taxes imposed by the Commonwealth.

COFINA Portion: The COFINA Pledged Taxes and all rights thereto (including the right to receive the COFINA Pledged Taxes as set forth under First Dollars Funding in Section II(E)(7) hereof) in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA in any given FY until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

Commonwealth Portion: Collectively, an interest that is second in priority of payment, funding and collections, in all circumstances, subject and pursuant to the First Dollars Funding in Section II(E)(7) hereof, in the COFINA Pledged Taxes and all rights thereto including the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given FY, and (b) all COFINA Pledged Taxes after the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms; provided, however, that, under all circumstances, the Commonwealth Portion shall exclude in its entirety the COFINA Portion, and the Commonwealth shall have no ownership interest in the COFINA Portion.  Subject to Sections II(E)(4) and II(E)(7), the Commonwealth shall have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a FY unless and until COFINA has received the COFINA Portion.  The Commonwealth shall have no right to receive Debt Service Savings in any FY unless and until all debt service payments on the COFINA Bonds and COFINA Parity Bonds required to be made or set aside in such FY, including any overdue debt service payments from all prior FYs, are made as required, as provided in Section II(E)(4) hereof.  The COFINA Portion shall not, now or hereafter, be property of the Commonwealth, and in the event of any subsequent Title III case or similar or other proceedings of the Commonwealth, in any forum, it is the express intent that it shall not be subject to the automatic stay.

5

Debt Service Savings:  For each FY, the difference between principal due on COFINA Bonds and COFINA Parity Bonds prior to the issuance of COFINA Parity Bonds and/or the purchase of COFINA Bonds and COFINA Parity Bonds in the open market and principal due on COFINA Bonds and COFINA Parity Bonds that will remain outstanding after the issuance of such COFINA Parity Bonds and/or the purchase of COFINA Bonds and COFINA Parity Bonds.

Insurance Policies:  Collectively, the Ambac Insurance Policy, the Assured Insurance Policies and the National Insurance Policies.

Junior COFINA Bond Claim:  A Bond Claim, other than a Junior COFINA Bond Claim (Assured Insured) or a Junior COFINA Bond Claim (Taxable Election), on account of an existing First Subordinate COFINA security.

Junior COFINA Bond Claim (Assured Insured):  A Bond Claim on account of an existing First Subordinate COFINA security, with respect to which the repayment of principal and interest or accreted value has been insured by Assured including pursuant to a secondary market insurance policy.

Junior COFINA Bond Claim (Taxable Election): A Bond Claim, other than a Junior COFINA Bond Claim (Assured Insured), on account of an existing First Subordinate COFINA security, the holder of which has affirmatively elected to receive a Taxable Bond Distribution and the holder of which (i) is a Puerto Rico Investor, provided that if Taxable Bond Distributions are elected by Puerto Rico Investors for Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution, provided that if Taxable Bond Distributions are elected by Puerto Rico Institutions for Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claims' ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim.

Junior COFINA Bond Distribution:  A distribution of COFINA Bonds allocable to holders of Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured Insured) and Junior COFINA Bond Claims (Taxable Election) (it being understood that such holders are recipients of distributions in Classes 5-7) equal to fifty-six and three hundred ninety-nine one thousandths percent (56.399%) of such holders' aggregate Bond Claims, plus any incremental value distributable as a result of an increase in COFINA Cash Available for Distribution.

Maximum Taxable Bond Election Amount:  One Billion Dollars ($1,000,000,000.00), provided that if the amount of Taxable COFINA Bonds exceeds the aggregate amount of COFINA Bonds distributable in respect of Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) each as calculated, for purposes of this proviso, assuming a Maximum Taxable Bond Election Amount of One Billion Dollars ($1,000,000,000.00), the Maximum Taxable Bond Election Amount shall increase by the amount necessary to provide for the distribution of all Taxable COFINA Bonds pursuant to Taxable Bond Distributions, provided further that in no event shall the Maximum Taxable Bond Election Amount exceed Three Billion Dollars ($3,000,000,000.00).

National Custodial Certificates:  The certificate(s) or receipt(s) to be issued by the National Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the National Custodial Trust.

6

National Custodial Trust:  The custodial trust(s) which may be formed, on or prior to the COFINA Effective Date, by or on behalf of and for the sole benefit of the holders of Senior COFINA Bond Claims (National Insured) that elect not to commute their National Insurance Policies.

National Insurance Policies:  The existing insurance policies initially issued by Financial Guaranty Insurance Company or MBIA Insurance Corporation and novated to National and relating to the National Insured Bonds, as defined below, together with all agreements and other documents related thereto.

Puerto Rico Institution:  A holder, other than a Puerto Rico Investor, that is domiciled in Puerto Rico.

Puerto Rico Investor:  A holder that is, or that is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth of Puerto Rico for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board, in its sole and absolute discretion).

Remainder Taxable Bond Election Amount:  An amount equal to the Maximum Taxable Bond Election Amount minus the aggregate amount of Bond Claims held by Puerto Rico Investors and for which such holders have affirmatively elected a Taxable Bond Distribution.

Rounding Amount Cash:  The amount of cash necessary, up to a maximum aggregate amount of Twenty Five Million Dollars ($25,000,000.00), for distribution to holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) and Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Assured Insured) in the form of rounding amounts to ensure that all holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) and Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Assured Insured) receive their pro rata share of CIBs, as defined below, in the minimum bond par denomination of One Thousand Dollars ($1,000.00) per COFINA Bond.

Section 103 Cash:  The amount of cash deemed necessary by the Oversight Board, and after consultation with Section 103 tax counsel and the PSA Parties, which amount of cash (i) shall be no less than the interest accrued on the existing COFINA securities as of, and including May 4, 2017 and (b) shall not exceed the amount of Pre-FY2019 BNYM Deposits minus the amount of Rounding Amount Cash, to be applied to reduce the amount and number of Taxable COFINA Bonds solely to the extent that the COFINA Bonds cannot all be issued as tax-exempt bonds under applicable federal law.

Senior COFINA Bond Claim:  A Bond Claim, other than a Senior COFINA Bond Claim (Ambac Insured), a Senior COFINA Bond Claim (National Insured) or a Senior COFINA Bond Claim (Taxable Election), on account of an existing senior COFINA security.

Senior COFINA Bond Claim (Ambac Insured):  A Bond Claim on account of an existing senior COFINA security, the repayment of which has been insured by Ambac.

Senior COFINA Bond Claim (National Insured):  A Bond Claim on account of an existing senior COFINA security, the repayment of which has been insured by National.

7

Senior COFINA Bond Claim (Taxable Election): A Bond Claim, other than a Senior COFINA Bond Claim (Ambac Insured) or a Senior COFINA Bond Claim (National Insured), on account of an existing senior COFINA security, the holder of which has affirmatively elected to receive a Taxable Bond Distribution and the holder of which (i) is a Puerto Rico Investor, provided that if Taxable Bond Distributions are elected by Puerto Rico Investors holding Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution, provided that if Taxable Bond Distributions are elected by Puerto Rico Institutions holding Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claims' ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim.

Senior COFINA Bond Distribution: A distribution of COFINA Bonds and cash, in the aggregate, allocable to holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac Insured), Senior COFINA Bond Claims (National Insured) and Senior COFINA Bond Claims (Taxable Election) (it being understood that such holders are recipients of distributions in Classes 1-4) equal to ninety-three percent (93%) of such holders' aggregate Bond Claims, plus any incremental value distributable as a result of an increase in COFINA Cash Available for Distribution.

Taxable Bond Distribution: A Senior Taxable Bond Distribution (as defined in Section II(D)(4)) or a Junior Taxable Bond Distribution (as defined in Section II(D)(7)), as applicable.

Taxable COFINA Bonds: COFINA Bonds in an aggregate amount deemed necessary by the Oversight Board, after consultation with Section 103 tax counsel and the PSA Parties, to be issued as tax exempt under Puerto Rico law, but taxable in accordance with Section 103 of the Internal Revenue Code (the "Code"), which COFINA Bonds shall be issued as CIBs with an interest rate of four and fifty-five one hundredths percent (4.55%) and a maturity date of 7/1/2038.

Taxable Election Cash: The amount of cash equal to two percent (2.0%) (net of any administrative costs of the election process related to the applicable Bond Claims) of the aggregate amount of all Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election), which amount of cash shall not exceed Sixty Million Dollars ($60,000,000.00).

C.    **Classes of Claims**: The COFINA Plan of Adjustment shall have the following classes:

1.    Class 1: Senior COFINA Bond Claims

2.    Class 2: Senior COFINA Bond Claims (Ambac Insured)

3.    Class 3: Senior COFINA Bond Claims (National Insured)

4.    Class 4: Senior COFINA Bond Claims (Taxable Election)

5.    Class 5: Junior COFINA Bond Claims

6.    Class 6: Junior COFINA Bond Claims (Assured Insured)

8

102136844v2

7.    Class 7:  Junior COFINA Bond Claims (Taxable Election)

8.    Class 8:  GS Derivative Claim

9.    Class 9:  General Unsecured Claims

Notwithstanding the foregoing classification of claims, the Oversight Board reserves the right
to amend or modify such classification, including, without limitation, supplement such
classification with additional classes or modify the treatment afforded holders in Classes 8
and 9 as set forth in Section II(D) hereof, provided that such amendment or modification does
not adversely impact the treatment afforded holders of claims in Classes 1 through 7 above.

D.    **Treatment of Claims**:  Subject to the conditions to effectiveness of the COFINA Plan of
      Adjustment, including, without limitation, those listed under "Conditions to Effective Date of
      COFINA Plan of Adjustment" below, on the effective date of the COFINA Plan of
      Adjustment (the "COFINA Effective Date"), COFINA claims shall be treated as follows:

1.    Class 1:  Each holder of a Senior COFINA Bond Claim shall be entitled to receive its
      pro rata share of the Senior COFINA Bond Distribution, comprised of (a) Section 103
      Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds
      and (d) Rounding Amount Cash, if necessary.

2.    Class 2:  Subject to the provisions of Sections II(F) and (G) hereof, each holder of a
      Senior COFINA Bond Claim (Ambac Insured) shall have the option to elect on the
      ballot/election form distributed in connection with the solicitation of acceptances and
      rejections to the COFINA Plan of Adjustment to receive its pro rata share of (1) (a) the
      Senior COFINA Bond Distribution comprised of (i) Section 103 Cash, if applicable,
      (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds and (iv) Rounding
      Amount Cash, if necessary, plus (b) consideration, distributable by or at the direction
      of Ambac, in accordance with the provisions of Section II(F)(1) hereof, in full and
      complete satisfaction, release and discharge of any further obligation of Ambac with
      respect, to its insurance policy and such holder's agreement to commute Ambac's
      insurance policy relating to such holders' Senior COFINA Bond Claim (Ambac
      Insured), or (2) the Ambac Custodial Certificates referred to in Section II(G)(1) hereof;
      provided, however, that, in the event that a holder of a Senior COFINA Bond Claim
      (Ambac Insured) (a) fails to timely return its ballot /election form, (b) fails to elect a
      form of distribution or (c) elects multiple options on such ballot/election form, then
      such holder shall be deemed to have elected to release, discharge and commute
      Ambac's obligations and the Ambac Insurance Policy and to receive distributions in
      accordance with the provisions of subsection (1) above.  Subject to the approval of the
      Title III Court, (y) the solicitation of acceptances and rejections to the COFINA Plan of
      Adjustment by holders of Class 2 claims shall be made by COFINA to Ambac and (z)
      the elections described in subsections (1) and (2) above regarding the COFINA Bonds
      shall be made by the holders of Senior COFINA Bond Claims (Ambac Insured).
      Ambac reserves the right to formulate alternative election or implementation options
      with respect to the Senior COFINA Bond Claims (Ambac Insured), including deemed
      acceleration of the existing COFINA securities insured by Ambac on the COFINA
      Effective Date, but any such alternative implementation option (i) must be proposed at
      or prior to the hearing to consider the adequacy of the information contained in the
      disclosure statement filed in connection with the COFINA Plan of Adjustment and (ii)
      shall not, and shall not be deemed to, modify, amend, or cancel, or otherwise affect in
      any way, any commutation agreements or arrangements agreed to or entered into prior
      to, on or after the effective date of the PSA between Ambac, on the one hand and any

9

holders of any Senior COFINA Bond Claims (Ambac Insured), on the other hand, in connection with the Ambac Insurance Policy.

3.  Class 3: Subject to the provisions of Sections II(F) and (G) hereof, each holder of a Senior COFINA Bond Claim (National Insured) shall have the option to elect on the ballot/election form distributed in connection with the solicitation of acceptances and rejection to the COFINA Plan of Adjustment to receive its pro rata share of (1) (a) the Senior COFINA Bond Distribution comprised of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds and (iv) Rounding Amount Cash, if necessary, plus (b) consideration, distributable by or at the direction of National, in accordance with the provisions of Section II(F)(2) hereof, in full and complete satisfaction, release and discharge of any further obligation of National with respect to the National Insurance Policies and such holder's agreement to commute National Insurance Policies relating to such holder's Senior COFINA Bond Claim (National Insured), or (2) the National Custodial Certificates referred to in Section II(G)(2) hereof representing an interest in the National Trust Assets, as defined below; provided, however, that, in the event that a holder of a Senior COFINA Bond Claim (National Insured) (a) fails to timely return its ballot/election form, (b) fails to elect a form of distribution or (c) elects multiple options on such ballot/election form, then such holder shall be deemed to have elected to release, discharge and commute National's obligations and the National Insurance Policies and to receive distributions in accordance with subsection (1) above; and, provided, further, that, at any time prior to the hearing to consider the adequacy of the information contained in the disclosure statement filed in connection with the COFINA Plan of Adjustment, National may elect an alternative treatment option for Senior COFINA Bond Claims (National Insured), pursuant to which, in its sole and absolute discretion, and subject to the consent of the Oversight Board, which consent shall not be unreasonably withheld, on the COFINA Effective Date, the existing COFINA securities insured by National shall be paid off, in full, at an acceleration price of one hundred percent (100%) of the Compounded Amount (as defined in the Bond Resolutions) of the National Insured Bonds, as of the COFINA Effective Date, as follows: the COFINA Bonds to be issued to holders of Senior COFINA Bond Claims (National Insured) shall be underwritten and sold into the market, the proceeds of which, together with any cash portion of the Senior COFINA Bond Distribution that would otherwise be allocated for payment of Senior COFINA Bond Claims (National Insured), shall be used to pay, in cash, on the COFINA Effective Date, one hundred percent (100%) of the Compounded Amount (as defined in the Bond Resolutions) of the National Insured Bonds, as of the COFINA Effective Date, with any deficiency in such amounts being paid by National in full, in cash, on the COFINA Effective Date (the "National Election"). Subject to the order approving the disclosure statement filed in connection with the COFINA Plan of Adjustment, (y) the solicitation of acceptances and rejections to the COFINA Plan of Adjustment by holders of Class 3 claims shall be made by COFINA to National and (z) the elections described in subsections (1) and (2) above regarding the COFINA Bonds shall be made by the holders of Senior COFINA Bond Claims (National Insured).

4.  Class 4: Each holder of a Senior COFINA Bond Claim (Taxable Election) shall be entitled to receive (a) its pro rata share of the Senior COFINA Bond Distribution comprised of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary, and (b) its pro rata share of the Taxable Election Cash (collectively, the distributions under this Class 4, a "Senior Taxable Bond Distribution").

10

5.  **Class 5:** Each holder of a Junior COFINA Bond Claim shall be entitled to receive its
pro rata share of the Junior COFINA Bond Distribution comprised of (a) Section 103
Cash, if applicable, (b) COFINA Bonds and (c) Rounding Amount Cash, if necessary.

6.  **Class 6:** Subject to the provisions of Section II(O) hereof, each holder of a Junior
COFINA Bond Claim (Assured Insured) shall be entitled to receive its pro rata share of
the Junior COFINA Bond Distribution comprised of (a) Section 103 Cash, if
applicable, (b) COFINA Bonds and (c) Rounding Amount Cash, if necessary;
provided, however, that, notwithstanding the foregoing, at the election of Assured (the
"Assured Election"), in its sole and absolute discretion, on the COFINA Effective
Date, the existing COFINA securities insured by Assured (including insurance issued
in the secondary market) shall be paid off, in full, at an acceleration price of par plus
accrued interest or compounded amount as of the COFINA Effective Date, (1) from the
Section 103 Cash and Rounding Amount Cash, if any, which in each case is allocable
to holders to Junior COFINA Bond Claims (Assured Insured), and (2) otherwise as
follows: the COFINA Bonds allocable to holders of Junior COFINA Bond Claims
(Assured Insured) shall be (i) wrapped by a new insurance policy issued by Assured,
(ii) underwritten and (iii) sold into the market, the proceeds of which shall be used to
pay, in cash, on the COFINA Effective Date, one hundred percent (100%) of the Junior
COFINA Bond Claims (Assured Insured), with any deficiency in such amounts being
paid by Assured in accordance with the insurance policies wrapping the existing
securities underlying the Junior COFINA Bond Claims (Assured Insured). The
principal amount, maturities and coupons of the bonds to be insured by Assured (the
"Assured New Bonds") will be determined by Assured in consultation with Bank of
America Merrill Lynch, as underwriter for the Assured New Bonds, provided that the
debt service on the Assured New Bonds due in any year shall not be greater than the
debt service that would be due if such Assured New Bonds were issued as COFINA
Bonds not insured by Assured or any other insurer (although the Assured New Bonds
may mature later than the COFINA Bonds, but in no event later than the
Commonwealth's FY2058). All other terms regarding the underwriting of the Assured
New Bonds shall be subject to the approval of Assured.

7.  **Class 7:** Each holder of a Junior COFINA Bond Claim (Taxable Election) shall be
entitled to receive (a) its pro rata share of the Junior COFINA Bond Distribution
comprised of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance
remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds
and (ii) Rounding Amount Cash, if necessary and (b) its pro rata share of the Taxable
Election Cash (collectively, the distributions under this Class 7, a "Junior Taxable
Bond Distribution").

8.  **Class 8:** The holder of the GS Derivative Claim shall to the extent that the termination
value of the GS Derivative Claim is (a) greater than the amount of the collateral in such
holder's possession, be entitled to retain such collateral and with respect to the balance
of the GS Derivative Claim, and (1) to the extent that rejection damages associated
with such GS Derivative Claim is a Parity Obligation (as defined in the Bond
Resolutions), such holder's pro rata share of the Senior COFINA Bond Distribution,
comprised of (i) COFINA Cash Available for Distribution, (ii) COFINA Bonds and
(iii) Rounding Amount Cash, if necessary, and (2) to the extent that rejection damages
associated with such GS Derivative Claim is a not a Parity Obligation (as defined in the
Bond Resolutions), such holder shall not receive a distribution pursuant to the
COFINA Plan of Adjustment, and (b) is less than the amount of collateral in such
holder's possession, the holder of the GS Derivative Claim shall liquidate such
collateral in full and complete satisfaction of the GS Derivative Claim and return the
balance of such collateral value to COFINA.

11

**9.**   Class 9: The claims within Class 9 shall not receive a distribution pursuant to the COFINA Plan of Adjustment; provided, however, that, notwithstanding the foregoing, in the event that Class 9 votes to accept the COFINA Plan of Adjustment, each holder of a COFINA General Unsecured Claim shall be entitled to receive its pro rata share of One Hundred Thousand Dollars ($100,000.00).

## E.   Terms of COFINA Bonds

*Issuance of COFINA Bonds*

Subject to the conditions to effectiveness of the COFINA Plan of Adjustment, including, without limitation, those listed under "Conditions to Effective Date of COFINA Plan of Adjustment" below, on the COFINA Effective Date, COFINA, shall issue the COFINA Bonds comprised of (i) four (4) series of Current Interest Bonds ("CIBs") and (ii) one series of Capital Appreciation Bonds ("CABs"). The maturities, interest rates and amortization schedules for COFINA Bonds are annexed hereto as Exhibit "A". All debt service on COFINA Bonds and COFINA Parity Bonds which is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid, with accrued interest on the unpaid amount, first, in each FY from the balance, if any, of the COFINA Portion remaining after the payment of debt service on the COFINA Bonds and COFINA Parity Bonds then due and payable in such FY; second, in each FY, from the Debt Service Savings, if any; and third, to the extent not paid pursuant to first or second, following the final scheduled maturity of all COFINA Bonds and COFINA Parity Bonds. Interest shall accrue on such overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until the applicable COFINA Bonds or COFINA Parity Bonds are paid or satisfied in full in accordance with their terms. The Government Parties shall use their commercially reasonable best efforts to obtain ratings on the COFINA Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties, following consultation with a designee of the PSA Parties, including based upon the Government Parties' judgment with respect to expected benefits. After the Government Parties determine which rating agencies to apply for ratings from, the Government Parties shall use their commercially reasonable best efforts to obtain the best possible ratings.

### 1.   Terms of the COFINA Bonds

*CIBs*: Subject to any adjustments provided for herein, the CIBs shall have the original principal amount, interest rate and maturity date, except as provided for in Section II(D)(6) hereof, as follows: (a) Seven Hundred Eighty-Two Million Nine Hundred Fifteen Thousand Dollars ($782,915,000.00), four and thirty-five one-hundredths percent (4.35%), and 7/1/2028; (b) One Billion Ninety-One Million Four Hundred Sixty Thousand Dollars ($1,091,460,000.00), four and five-tenths percent (4.5%), and 7/1/2032; (c) Two Billion Nine Hundred Ninety-Seven Million Two Hundred Forty-Five Thousand Dollars ($ 2,997,245,000.00), four and fifty-five one hundredths percent (4.55%), and 7/1/2038; and (d) Four Billion Seven Hundred Forty-Four Million Seven Hundred Forty-Five Thousand Dollars ($4,744,745,000.00), four and six-tenths percent (4.6%), and 7/1/2044.

*CABs:* Subject to any adjustments provided for herein, the CABs shall have the original principal amount, interest rate and maturity date, except as provided for in Section II(D)(6) hereof, as follows: Two Billion Four Hundred Four Million One Hundred Ninety-Two Thousand Five Hundred Ninety-Nine Dollars and Ninety Cents ($2,404,192,599.90), five and one-half percent (5.5%), and 7/1/2058.

Neither CIBs nor CABs shall carry any default rate of interest, provided that interest shall accrue on all overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until paid or satisfied in full in accordance with their terms.

12

## 2.    Collateral for Repayment of COFINA Bonds

Subject to the provisions of Section II(E)(10), entitled <u>Substitution of Collateral</u>, repayment of the
COFINA Bonds and COFINA Parity Bonds from the COFINA Portion shall be secured by a statutory
first lien on the COFINA Pledged Taxes.  Such lien shall (i) remain in effect and (ii) be closed until, in
each case, the COFINA Bonds and the COFINA Parity Bonds have been paid or satisfied in full in
accordance with their terms.  Such statutory lien will be incorporated in the legislation described in
Section II(M) hereof and be judicially confirmed and the COFINA Bonds shall be judicially
determined to be legal, valid, binding and enforceable obligations of COFINA by the Title III Court.

## 3.    Deemed Issuance Date

Notwithstanding the timing of the COFINA Effective Date, interest on the COFINA Bonds shall
commence to accrue or accrete, as the case may be, as of August 1, 2018, which date shall be
designated as the dated date of the COFINA Bonds.  COFINA FY2019 BNYM Deposits shall be
deposited into the debt service fund established for the benefit of holders of COFINA Bonds in the
new COFINA bond resolution.

## 4.    Additional Bonds Test for COFINA Bonds

Except with respect to the issuance of refinancing securities on the terms discussed herein, COFINA
may not issue any securities on a *pari passu* or higher priority basis than the COFINA Bonds issued
on the COFINA Effective Date.  Notwithstanding the foregoing, COFINA may issue additional
refunding or refinancing securities on a *pari passu* basis with the COFINA Bonds issued on the
COFINA Effective Date (collectively, the "<u>COFINA Parity Bonds</u>") for the purpose of refinancing, in
whole or in part, COFINA Bonds or COFINA Parity Bonds provided, that (a) notwithstanding the
terms of such COFINA Parity Bonds, COFINA shall not be entitled to an increase of the COFINA
Portion; (b) the principal and interest payment dates on the COFINA Parity Bonds shall be the same
principal and interest payments dates on the COFINA Bonds; (c) the final maturity date of the
COFINA Parity Bonds shall not be later than the original scheduled final maturity date of the
COFINA Bonds; and (d) upon the issuance of any COFINA Parity Bonds:

> (i)      annual debt service due in the then-current and each future FY on all COFINA Bonds
> and COFINA Parity Bonds outstanding after the issuance of the COFINA Parity Bonds shall
> be equal to or less than the annual debt service due in the then-current and each future fiscal
> year on all COFINA Bonds and COFINA Parity Bonds outstanding prior to such issuance;

> (ii)     as set forth in the new COFINA bond resolution, Debt Service Savings shall only be
> realized in the same FYs in which principal of COFINA Bond and COFINA Parity Bonds
> was refunded and/or purchased;

> (iii)    Debt Service Savings in any FY shall be applied first, to the repayment of principal
> and interest on COFINA Bonds or COFINA Parity Bonds unpaid from any prior FY; and
> second, at the option of COFINA, (x) to purchase COFINA Bonds and COFINA Parity
> Bonds in the open market (subject to the limitation in subsection (ii) above), (y) to pay
> operating expenses of COFINA or (z) transfer such savings to the Commonwealth; and

> (iv)     any Debt Service Savings released to the Commonwealth as set forth in subsection
> (iii) above shall be available for any lawful purpose of the Commonwealth.

Subject to compliance with the provisions of the additional bonds test ("<u>ABT</u>") set forth below,
additional bonds (the "<u>Subordinated Lien Bonds</u>") may be issued by COFINA for the benefit of, and
with the consent of, the Commonwealth and for any lawful purpose of the Commonwealth, provided
that repayment of such additional bonds shall be secured by a second lien that is subordinated in all

13

respects, including, without limitation, in respect of payment, funding and remedies to the COFINA Bonds and COFINA Parity Bonds, with repayment of Subordinated Lien Bonds being secured by a subordinated second or more junior lien on the COFINA Pledged Taxes, provided that, notwithstanding anything contained in this Term Sheet to the contrary, repayment of the Subordinated Lien Bonds shall not be payable from the COFINA Portion.  COFINA may issue such Subordinated Lien Bonds provided that, prior to the issuance thereof, the Commonwealth and COFINA shall deliver a jointly executed certificate to the COFINA bond trustee certifying that the following conditions are each satisfied:  (a) (1) the projected COFINA Pledged Taxes ((i) which, in the event that Subordinated Lien Bonds are being issued prior to FY2024, are calculated assuming the preceding FY's collection of the COFINA Pledged Taxes grow annually at the "sales and use tax" growth rates set forth for those subsequent years in the Commonwealth's certified fiscal plan, dated April 18, 2018, or (ii) in the event that Subordinated Lien Bonds are being issued during FY2024 or thereafter, are calculated assuming that preceding fiscal year's collection of the COFINA Pledged Taxes grow thereafter at a rate equal to the average annual "sales and use tax" growth rate for the preceding five (5) fiscal years)) equals or exceeds (2) one and one-half times (1.5x), in any succeeding fiscal year, of the annual aggregate debt service due on the COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); (b) the preceding fiscal year's collections from the COFINA Pledged Taxes is equal to or greater than one and one-tenth times (1.10x) coverage of the maximum annual aggregate debt service due in any succeeding fiscal year on all COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); and (c) the Subordinated Lien Bonds have a maturity not later than FY2058; provided, however, that, subsequent to June 30, 2028, and subject to compliance with the foregoing ABT, final maturity beyond FY2058 shall be permissible for future Subordinated Lien Bonds.

### 5.   Call Provisions

The COFINA Bonds shall be callable, in whole or in part, in any order of maturity, at par plus accrued interest thereon or accreted value, as applicable, upon thirty (30) days prior written notice as follows:

2028 CIBS: Non-Call
2032 CIBS: Par Call Commencing 2025 (7 year call)
2038 CIBS: Par Call Commencing 2028 (10 year call)
2044 CIBS: Par Call Commencing 2028 (10 year call)
2058 CABS: Call Commencing 2028 at the following call prices:

| Year | Price |
|------|-------|
| 2028-2032 | 107.5% of Accreted Value |
| 2033-2037 | 105% of Accreted Value |
| 2038-2042 | 103% of Accreted Value |
| 2043-2058 | 100% of Accreted Value |

If less than all of the COFINA Bonds of a particular series are called for prior redemption, COFINA will select the maturity or maturities of such series of the COFINA Bonds to be redeemed, and DTC, on behalf of the trustee, will select the COFINA Bonds within the same maturity of such series to be redeemed by means of a random lottery.

### 6.   Debt Service Reserve Fund

The COFINA Bonds shall not have a debt service reserve fund.

### 7.   First Dollars Funding

14

Until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, and subsequent to the funding of reasonable and necessary COFINA operating expenses, including, without limitation, COFINA board member fees and expenses, the COFINA Portion shall be funded annually from "first dollars" collected from the COFINA Pledged Taxes. From and after FY2024, and solely in the event that (a) for any date of determination at which time the Oversight Board or any successor to its budgetary function is in existence, (1) the prior and then-current FY budgets are balanced, as determined by the Oversight Board and (2) the Commonwealth is current on all continuing disclosure requirements relating to the public disclosure of its audited financial statements, (b) quarterly bucketing of twenty-five percent (25%) of the then-current FY's COFINA Portion is shown to be necessary to avoid intra-FY TRANs borrowing and (c) collection of prior fiscal year COFINA Pledged Taxes provided a two <u>times</u> (2x) coverage of the COFINA Portion, then, in each quarter, until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, (x) the "first dollars" collected from the COFINA Pledged Taxes up to twenty-five percent (25%) of the then-current FY's COFINA Portion shall be deposited into the "Debt Service Fund" held by the trustee for the benefit and payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds and (y) thereafter, the remaining quarterly collection from the COFINA Pledged Taxes shall be for the benefit of, and be paid to, the trustee for any Subordinated Lien Bonds issued by COFINA and remaining outstanding up to twenty-five percent (25%) of the yearly scheduled debt service due on such bonds, and (z) the balance thereof, if any, shall be paid to the Commonwealth for the balance of such fiscal quarter; <u>provided, however</u>, that, in any quarter in which there is a shortfall in the amounts required to be deposited by the preceding clause (x), then such shortfall shall be added to the amount required to be paid in accordance with clause (x) in the following quarter until the entire amount of the cumulative shortfall has been deposited into the "<u>Debt Service Fund</u>" held by the trustee for the benefit and payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds; and, <u>provided, further</u>, that, in any quarter in which there is a shortfall in the amount required to be deposited by the preceding clause (y), then such shortfall shall be added to the amount required to be paid in accordance with clause (y) in the following quarter until the entire amount of cumulative shortfall has been paid to the trustee for any Subordinated Lien Bonds issued by COFINA and which remain outstanding.

**8.    Rights of Acceleration**

The COFINA Bonds, the COFINA Parity Bonds and any Subordinated Lien Bonds shall not have rights of acceleration.

**9.    Covenants**

**a.    *Sales and Use Covenant***

Subject to the terms and provisions of Section II(E)(10) hereof, entitled <u>Substitution of Collateral</u>, the Commonwealth shall covenant for the benefit of all initial and subsequent holders of the COFINA Bonds and all COFINA Parity Bonds, that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the rate of the COFINA Pledged Taxes from which the PSTBA is derived shall not be reduced to a rate less than five and one-half percent (5.5%) unless, on each such occasion prior to such reduction, at least two (2) of the following four (4) nationally recognized statistical rating organizations then in existence and rating the COFINA Bonds: S&P Global Ratings ("<u>S&P</u>"), Moody's Investor Service, Inc. ("<u>Moody's</u>"), Fitch Ratings ("<u>Fitch</u>") and Kroll Bond Rating Agency Inc. ("<u>Kroll</u>"), or their respective successors, with one (1) of such organizations being S&P or Moody's, or its respective successor, confirm that ratings will not be downgraded and (without regard to bond insurance or other third party credit enhancement) will be rated at least A2/A category or higher following such reduction; <u>provided, however</u>, that, notwithstanding the foregoing, until all obligations with respect to the COFINA Bonds and any COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, if the rate of

the COFINA Pledged Taxes is reduced below three percent (3%), then such reduction shall constitute a substitution of collateral and shall be subject to the terms and provisions of Section II(E)(10) hereof, entitled Substitution of Collateral.

b.   *Non-Impairment Covenant*

The Commonwealth shall covenant for the benefit of all initial and subsequent holders of COFINA Bonds and all COFINA Parity Bonds, that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will take no action that would (1) impair COFINA's right to receive the COFINA Portion, (2) limit or alter the rights vested in COFINA in accordance with the COFINA Plan of Adjustment and the Confirmation Order, as defined below, to fulfill the terms of any agreements with the holders of COFINA Bonds and all COFINA Parity Bonds, (3) materially adversely impair the collection of COFINA Pledged Taxes in any FY, or (4) impair the rights and remedies of the holders of the COFINA Bonds or any COFINA Parity Bonds or the collateral security thereof.

c.   *Tax-Exemption Covenant*

COFINA shall covenant for the benefit of all initial and subsequent holders of tax-exempt COFINA Bonds and all tax-exempt COFINA Parity Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, COFINA will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any tax-exempt COFINA Bonds or tax-exempt COFINA Parity Bonds shall be and remain excludable from gross income for federal income tax purposes.

d.   *Rating Agency Covenant*

In connection with a Substitution of Collateral pursuant to the provisions of Section II(E)(10) hereof, COFINA shall use its reasonable best efforts and work in good faith to obtain the best rating possible on the outstanding COFINA Bonds, including, but not limited to responding to requests for documents.

**10.   Substitution of Collateral**

Notwithstanding anything contained herein to the contrary, the Commonwealth may enact legislation that permits a Commonwealth revenue stream to replace the COFINA Pledged Taxes (the "New Collateral", which, for the avoidance of doubt, shall include any substitution of already substituted New Collateral) as security for the repayment of the COFINA Bonds only upon, and on each such occasion, satisfaction of the following conditions: (a) such New Collateral is all or a portion of a tax of general applicability throughout Puerto Rico that is being enacted in full substitution of the then-existing island-wide sales and use tax or otherwise constitutes like or comparable security for the COFINA Bonds and COFINA Parity Bonds and such legislation provides (i) for the irrevocable transfer of, including ownership of, such New Collateral to COFINA, (ii) for an automatic mandatory statutory lien on such New Collateral in favor of holders of COFINA Bonds and COFINA Parity Bonds, and (iii) that, following such transfer, such New Collateral is not, and shall not constitute, "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution, and is otherwise owned by COFINA in the same manner and to the same extent as the COFINA Portion, (b) upon substitution of the New Collateral, that rating confirmations are received from at least two (2) of the following four (4) nationally recognized statistical rating organizations then in existence:  S&P, Moody's, Fitch and Kroll, with one (1) of such organizations being either S&P or Moody's, prior to such collateral substitution confirming that ratings for all COFINA Bonds and COFINA Parity Bonds (without regard to bond insurance or other third party credit enhancement) will not be downgraded and will be at least A2/A category or higher following such collateral substitution, (c) the Commonwealth shall continue to provide the Non-Impairment Covenant with

16

respect to such New Collateral and (d) such other documents as may be required pursuant to applicable law and bond resolutions.

## F.    Insurance Contribution

### 1.    Ambac

In consideration for the releases to be given to Ambac, and in accordance with Section II(D)(2) above, on the COFINA Effective Date, a beneficial holder of a Senior COFINA Bond Claim (Ambac Insured) that does not validly elect to receive Ambac Custodial Certificates shall receive (in addition to the Senior COFINA Bond Distribution) consideration from Ambac in an amount, in Ambac's sole and absolute discretion, set forth in the COFINA Plan of Adjustment with respect to a Senior COFINA Bond Claim (Ambac Insured), which amount, together with the Senior COFINA Bond Distribution, may not, on an aggregate basis, provide full accreted value of such bonds, and the beneficial holder thereof shall have no other or further rights with respect to the Ambac Insurance Policies, the Ambac Custodial Trust or the Ambac Custodial Certificates. The provisions set forth in this Section II(F)(1) apply only to Senior COFINA Bond Claims (Ambac Insured) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof or its predecessor in interest otherwise purchased or acquired insurance on the secondary market.  A holder of a Senior COFINA Bond Claim (Ambac Insured) that does not validly elect to receive Ambac Custodial Certificates shall have, on or after the COFINA Effective Date, its existing COFINA securities cancelled, transferred, or otherwise disposed of, in each case, in accordance with the provisions of the COFINA Plan of Adjustment.

### 2.    National

In consideration for the releases to be given to National, and in accordance with Section II(D)(3) above, on the COFINA Effective Date, a beneficial holder of a Senior COFINA Bond Claim (National Insured) that does not validly elect to receive National Custodial Certificates shall receive (in addition to the Senior COFINA Bond Distribution) consideration from National in an amount, in National's sole and absolute discretion, set forth in the COFINA Plan of Adjustment with respect to a Senior COFINA Bond Claim (National Insured), and the beneficial holder thereof shall have no other or further rights with respect to the National Insurance Policies, the National Custodial Trust or the National Custodial Certificates. The provisions set forth in this Section II(F)(2) apply only to Senior COFINA Bond Claims (National Insured) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof or its predecessor in interest otherwise purchased or acquired insurance on the secondary market.  A holder of a Senior COFINA Bond Claim (National Insured) that does not validly elect to receive National Custodial Certificates shall have, on or after the COFINA Effective Date, its existing COFINA securities cancelled, transferred, or otherwise disposed of, in each case, in accordance with the provisions of the COFINA Plan of Adjustment.

For the avoidance of doubt, Ambac and National shall be permitted to structure their respective commutation payments in different amounts and means.

The terms and provisions regarding commutation in accordance with the provisions of this Section II(F) shall be included in the COFINA Plan of Adjustment and the Confirmation Order and shall be in form and substance acceptable to Ambac and National, as the case may be.

## G.    Custodial Trusts

### 1.    Ambac Custodial Trust

17

On or prior to the COFINA Effective Date, COFINA and/or Ambac, together with an entity appointed by COFINA and/or Ambac to serve as trustee, shall form the Ambac Custodial Trust for the sole benefit of beneficial holders of existing securities insured by Ambac (the "Ambac Insured Bonds") that validly elect to receive the Ambac Custodial Certificates in accordance with the approved solicitation procedures.  On the COFINA Effective Date, the following shall be deposited into the Ambac Custodial Trust: (1) the Ambac Insured Bonds allocable to such electing holder of a Senior COFINA Bond Claim (Ambac Insured), (2) the COFINA Bonds allocable to such electing holder of a Senior COFINA Bond Claim (Ambac Insured) and (3) the Ambac Insurance Policy (collectively, with the Ambac Insured Bonds and the COFINA Bonds, the "Ambac Trust Assets").  Notwithstanding the deposit therein, the Ambac Insured Bonds shall not be cancelled, unless otherwise elected by Ambac prior to the COFINA Effective Date, and all rights and remedies under and in accordance with Ambac Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the Ambac Insurance Policy shall be preserved and remain in full force and effect.  Upon deposit of the Ambac Trust Assets, the trustee shall issue one or more series of Ambac Custodial Certificates to the beneficial holders of the COFINA Bonds deposited into the Ambac Custodial Trust on a pro rata basis.

The Ambac Custodial Certificates shall entitle the holder thereof to its pro rata share of value in and any distribution of cash from the Ambac Custodial Trust, which distribution shall reduce the obligation under the Ambac Insurance Policy.  Documentation related to the Ambac Custodial Trust shall, in Ambac's sole discretion, include, among other terms, provisions relating to the corporate governance thereof and permitting Ambac to purchase any Ambac Trust Assets in any sale thereof and use such proceeds to pay down the Ambac Custodial Certificates and reduce Ambac's obligations under the Ambac Insurance Policy.  The Ambac Custodial Trust shall permit Ambac to enter into private commutation arrangements on and after the COFINA Effective Date.  Documentation related to the Ambac Custodial Trust shall (i) be negotiated in good faith with the Oversight Board, (ii) be in form and substance acceptable to Ambac and reasonably acceptable to the Oversight Board, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

To the extent that a holder of a Senior COFINA Bond Claim (Ambac Insured) agrees to commute the Ambac Insurance Policy on or prior to the COFINA Effective Date, such holder shall receive a distribution from Ambac and the holder shall have no rights with respect to the Ambac Insurance Policy, the Ambac Custodial Trust or the Ambac Custodial Certificates.

## 2.      National Custodial Trust

In the event that National does not make the National Election, on or prior to the COFINA Effective Date, the National Custodial Trust shall be formed by or on behalf of, and for the sole benefit of, beneficial holders of, existing COFINA securities insured by the National Insurance Policies (the "National Insured Bonds"), that (i) elect to receive National Custodial Certificates on the ballot/election form distributed in connection with the solicitation of acceptances and rejections of the COFINA Plan of Adjustment and (ii) have not otherwise agreed to commute the National Insurance Policies on or prior to the COFINA Effective Date.  The trustee of the National Custodial Trust shall be an entity that is a nationally recognized U.S. domiciled financial institution and fiduciary regularly acting as trustee in the municipal finance market.  On the COFINA Effective Date, the following shall be deposited into the National Custodial Trust: (1) the National Insured Bonds that have not been commuted, (2) other than the portion distributable to commuting holders, all of the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National Insured) in accordance with the terms of Section II(D)(3) hereof, (3) the National Insurance Policies and (4) the consideration to be distributed to National in accordance with Section II(O) hereof (item numbers 1 through 4, collectively, the "National Trust Assets").  The costs, including fees and expenses and any obligation arising under this Term Sheet or the COFINA Plan of Adjustment, associated with the formation and operation of the National Custodial Trust shall be paid out of the National Trust Assets.

18

Notwithstanding the deposit therein, the National Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with National Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the National Insurance Policies shall be preserved and remain in full force and effect. Upon deposit of the National Trust Assets, on a pro rata basis, the trustee shall issue one or more series of National Custodial Certificates to the beneficial holders of Senior COFINA Bond Claims (National Insured) whose allocable shares of the Senior COFINA Bond Distribution are deposited into the National Custodial Trust.

The National Custodial Certificates shall entitle the holder thereof (the "National Certificate Holder") to its pro rata share of value in and any distribution of cash from the respective National Custodial Trust, which distribution shall (1) in all cases, occur promptly upon receipt thereof by the National Custodial Trust and (2) automatically reduce the obligation outstanding under the National Insurance Policies as of the date of such distribution to National Certificate Holders. For the avoidance of doubt, National's obligation to pay the scheduled Compounded Amount, as defined in the Bond Resolutions, of the underlying National Insured Bonds as and when due shall, in all cases, continue to compound as scheduled to the date that the trustee of the National Custodial Trust actually makes payment to the National Certificate Holders. Each series of National Custodial Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through DTC. So long as National (i) is not in default under the National Insurance Policies and (ii) has not agreed to and has not become subject to regulatory supervision, rehabilitation or liquidation (or similar) proceedings, National (a) shall be deemed the sole holder of the COFINA Bonds in the National Custodial Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (b) may, at any time prior to dissolution of the National Custodial Trust, deliver or direct the trustee to deliver a general notice to all National Certificate Holders, through DTC or any similar means, of the intent to sell for cash all or a portion of the COFINA Bonds held in the National Custodial Trust (the "Sale Notice"). The cash proceeds of such a sale shall be promptly distributed to National Certificate Holders on a pro rata basis (the "Sale Proceeds") and, upon such distribution, shall automatically reduce the obligation outstanding under the National Insurance Policies as of the date and in the amount of such distribution to National Certificate Holders; provided, however, that each National Certificate Holder may elect (within a reasonable specified period of time to be negotiated) after delivery of the Sale Notice to receive its pro rata share of the COFINA Bonds for sale pursuant to the Sale Notice in lieu of its allocable share of the Sale Proceeds and, in accordance with such election, the obligation outstanding under the National Insurance Policies as of the date of such distribution shall be reduced automatically in an amount equal to the portion of the Sale Proceeds that would have been attributable to such COFINA Bonds if sold. Documentation related to the National Custodial Trust shall (i) be negotiated in good faith, (ii) be in form and substance acceptable to National and reasonably acceptable to the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the PSA, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

To the extent that a holder of a Senior COFINA Bond Claim (National Insured) agrees to commute the National Insurance Policies on or prior to the COFINA Effective Date, such holder shall receive a distribution from National and the holder thereof shall have no rights with respect to the National Insurance Policies, the National Custodial Trust or the National Custodial Certificates.

### 3.      Assured Custodial Trust

In the event that Assured does not make the Assured Election, on or prior to the COFINA Effective Date, Assured, together with an entity appointed by Assured to serve as trustee, shall form one or more substantially identical Assured Custodial Trusts, for the sole benefit of beneficial holders of existing securities insured (including insurance issued in the secondary market) by Assured (the "Assured Insured Bonds"). On the COFINA Effective Date, each holder of a Junior COFINA Bond

19

Claim (Assured Insured) shall be deemed to have deposited such claim into the Assured Custodial Trust in exchange for one or more Assured Custodial Certificates evidencing the following: (1) Assured Insured Bonds, (2) the COFINA Bonds allocable to a holder of a Junior COFINA Bond Claim (Assured Insured), (3) Assured Insurance Policies and (4) Section 103 Cash and Rounding Amount Cash, if any, allocable to such holder (collectively, the "Assured Trust Assets"). Notwithstanding the deposit therein, the Assured Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with Assured Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the Assured Insurance Policies shall be preserved and remain in full force and effect.

The Assured Custodial Certificates shall entitle the holder thereof to its pro rata share of value in and any distribution of cash from the Assured Custodial Trust, which distribution shall (1) occur promptly upon receipt thereof by the Assured Custodial Trust and (2) automatically reduce the obligation outstanding under the Assured Insurance Policies as of the date of such payment. Each series of Assured Custodial Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through DTC. So long as Assured has not failed to make a payment when due under the applicable Insurance Policies, it shall (a) have the sole right to control the management of the Assured Trust Assets, (b) be deemed the sole holder of the COFINA Bonds deposited in the Assured Custodial Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (c) be fully subrogated to the rights of the holders of Assured Insured Bonds in respect of the COFINA Bonds deposited in the Assured Custodial Trust. Documentation related to the Assured Custodial Trust shall (i) be negotiated in good faith with the Oversight Board, (ii) be in form and substance acceptable to Assured and reasonably acceptable to the Oversight Board, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

### 4.   Costs

The Government Parties shall be held harmless by Ambac, Assured and National for any costs and all fees and expenses associated with the formation and operation of the Custodial Trusts.

### 5.   Trust Terms

Notwithstanding anything contained herein to the contrary, the terms of the Ambac Custodial Trust, the National Custodial Trust and the Assured Custodial Trust may be different from each other.

## H.   Conditions to the Effective Date of the COFINA Plan of Adjustment

Conditions precedent to the COFINA Effective Date will include, but not be limited to:

- Entry of (a) a court order approving the COFINA Plan of Adjustment (the "Confirmation Order") and (b) a court order approving the Settlement Motion (the "Settlement Order"), in the form reasonably acceptable to the Government Parties and the PSA Parties, pursuant to Title III of PROMESA. Without limiting the foregoing, for the express benefit of, among others, the bond trustee and the holders of COFINA Bonds, the Confirmation Order and the Settlement Order, as applicable, shall be a binding determination that, as of the COFINA Effective Date:

    1.   The COFINA Bonds and the covenants by COFINA and the Commonwealth, as applicable, for the benefit of the holders of the COFINA Bonds and COFINA Parity Bonds (including the sales and use tax, non-impairment, substitution of collateral and tax-exemption covenants) constitute valid, binding, legal and enforceable obligations of COFINA and the Commonwealth, as applicable, under Puerto Rico and federal law, and the COFINA Portion (and any substitution of collateral on the terms and conditions provided for herein) is the

20

property of COFINA, free and clear of all liens, claims, encumbrances, and other interests of creditors of COFINA, the Commonwealth, or any instrumentality of the Commonwealth (other than liens and claims afforded to holders of COFINA Bonds under the COFINA Plan of Adjustment) and shall not be "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution;

2.   Pursuant to the legislation referenced in Section II(M), the COFINA Bonds and COFINA Parity Bonds have been granted and are secured by a statutory first lien on the COFINA Pledged Taxes, which shall remain in full force and effect until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms;

3.   The statutory lien on, and pledges of, COFINA Pledged Taxes, and all other provisions made to pay or secure payment of the COFINA Bonds and COFINA Parity Bonds are valid, binding, legal, and enforceable; including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution as adequate protection for the property rights conferred under the COFINA Plan of Adjustment and the Confirmation Order;

4.   The transfer of the COFINA Portion (and any substitution of collateral on the terms and conditions provided for herein) pursuant to the COFINA Plan of Adjustment is appropriate and binding and specifically enforceable against COFINA and the Commonwealth, their respective creditors and all parties in interest in accordance with the COFINA Plan of Adjustment, including, without limitation, because the transfer of the COFINA Portion created in COFINA an ownership interest in such property (and any substitution of collateral on the terms and conditions provided for herein) and is a valid provision made to pay or secure payment of the COFINA Bonds; and

5.   The Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (i) COFINA, (ii) the Commonwealth, (iii) each person or entity asserting claims or other rights against COFINA, the Commonwealth or any of its other instrumentalities, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by COFINA, the Commonwealth, or any of its other instrumentalities or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the COFINA Plan of Adjustment and, if impaired, whether or not such person or entity accepted the COFINA Plan of Adjustment, (iv) any other person, and (v) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representative, attorneys, beneficiaries or guardians.

- The Settlement Order shall become effective contemporaneously with the COFINA Effective Date;

- Execution and delivery of all Definitive Documents, in form and substance reasonably satisfactory to the Government Parties and the PSA Parties, and such definitive documents being in full force and effect;

- Usual and customary legal opinions for issuances of this type of outside counsel to COFINA covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the PSA Parties, will have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the COFINA Plan of Adjustment;

21

102136844v2

- Unless otherwise permitted or required by PROMESA or similar authority, completion of any required legislative or other governmental action required to consummate the COFINA Plan of Adjustment, including, without limitation, Commonwealth legislation and court orders, if any, required to (i) ensure that the payment obligations of COFINA cannot in the future be modified or altered without the consent of the requisite holders of COFINA Bonds as set forth in a new bond resolution for the COFINA Bonds, (ii) ensure the validity, enforceability, liens and priority of the COFINA obligations contemplated by the COFINA Plan of Adjustment and (iii) except as otherwise permitted in connection with the substitution of collateral, ensure that the COFINA Pledged Taxes not be modified or altered prior to the satisfaction of COFINA's obligations thereunder;

- The Confirmation Order shall contain provisions to support the tax-exempt treatment of distributions to National Certificate Holders from the National Custodial Trust. Such Confirmation Order provisions shall be acceptable to the Oversight Board, National and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the PSA;

- Pursuant to the Confirmation Order, the deemed acceleration of existing insured COFINA securities on the COFINA Effective Date, (i) in connection with the treatment of Junior COFINA Bond Claims (Assured Insured), (ii) if requested by Ambac, in connection with the treatment of Senior COFINA Bond Claims (Ambac Insured) and (iii) if determined to be necessary or appropriate by National, to implement the National Election; provided, however, that such deemed acceleration shall not, nor shall it be construed to, affect issues regarding "default" or acceleration which were pending prior to the COFINA Effective Date; and

- Other customary conditions to be agreed and reasonably acceptable to the Government Parties and the PSA Parties.

**I.    Releases**

Customary releases and exculpations (which releases and exculpations shall not include releases for claims and causes of action arising from or related to any act or omission that constitutes intentional fraud or willful misconduct) of all relevant parties and their respective parents, subsidiaries and affiliates, and each of their respective board members, directors, officers, employees and advisors will be included in the COFINA Plan of Adjustment, including, without limitation, but subject to the foregoing, the release of (1) BNYM (as limited by Section I(C) hereof) in connection with the Adversary Proceeding, the Interpleader Action and any claims and causes of action related to (a) the Senior COFINA Bond Claims, the Senior COFINA Bond Claims (Ambac Insured), the Senior COFINA Bond Claims (National Insured) and the Senior COFINA Bond Claims (Taxable Election) and (b) the Junior COFINA Bond Claims, the Junior COFINA Bond Claims (Assured Insured) and the Junior COFINA Bond Claims (Taxable Election) and (2) each of Ambac, National and Assured with respect to all negotiations regarding and any actions taken consistent with the COFINA Plan of Adjustment, including, without limitation, in connection with a custodial trust structure, commutation, the Assured Election, the National Election, and any release of obligations under applicable Insurance Policies; provided, however, that, notwithstanding the foregoing, the COFINA Plan of Adjustment shall not provide for the release of: (1) with respect to any beneficial holder of the Insured Bonds that receive Ambac Custodial Certificates in accordance herewith, any claim against Ambac with respect to Ambac's payment obligations under the Ambac Insurance Policy, as adjusted to account for any distributions from the Ambac Custodial Trust (and any claims that Ambac may have against a beneficial holder of such Ambac Insured Bonds with respect to Ambac's obligations under the Ambac Insurance Policy); (2) with respect to any beneficial holder of Assured Insured Bonds that receives Assured Custodial Certificates in accordance herewith, any claim against

22

Assured with respect to Assured's payment obligations under the Assured Insurance Policies in accordance with their terms (and any claims that Assured may have against a beneficial holder of such Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policy); (3) with respect to any beneficial holder of National Insured Bonds that received National Custodial Certificates in accordance herewith, any claim against National with respect to National's payment obligations under the National Insurance Policies, as adjusted to account for any distributions from the National Custodial Trust (and any claims that National may have against a beneficial holder of such National Insured Bonds with respect to National's obligations under the National Insurance Policies); or (4) in the case of the Assured Election, with respect to any beneficial holder of Assured Insured Bonds, any payment obligation under the applicable Assured Insurance Policy in accordance with its terms solely to the extent of any failure by Assured to pay the acceleration price in full (or any claims that Assured may have against a beneficial holder of Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policies).  The releases to be incorporated into the COFINA Plan of Adjustment are an integral and necessary component of the agreement  contemplated herein, will be presented as a resolution of disputed claims inextricably bound with the COFINA Plan of Adjustment pursuant to Federal Rule of Bankruptcy Procedure 9019 and, subject to approval of the Title III Court, which approval shall be supported by parties in accordance with the PSA, will bind all parties in interest, including, without limitation, any party purporting to assert any released claim derivatively on the part of COFINA or the Commonwealth.

**J.**     **Governing Law/Jurisdiction**

The COFINA Bonds will be governed by, and construed in accordance with, the laws of the State of New York.  The Title III Court shall retain jurisdiction from and after the COFINA Effective Date of all matters arising from or related to the COFINA Plan of Adjustment, including, without limitation, with respect to the payment, enforcement and remedies of the COFINA Bonds to the fullest extent permitted by law[2].  Any disputes, legal action, suit, or proceeding arising from or related to the COFINA Bonds (a) shall be brought in accordance with the documentation relating to the COFINA Bonds by any party or its successors or assigns in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**K.**     **Structure for Collection and Application of SUT**

The COFINA Bonds shall be issued by COFINA following amendment of Act 91, which entity shall be a "bankruptcy remote," single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the COFINA Plan of Adjustment, and as reflected in this Term Sheet.  The collection and deposit of the COFINA Portion, net of COFINA operating expenses, shall be (a) promptly after collection, kept in segregated bank accounts maintained

---

[2]  The parties hereto acknowledge and agree that, pursuant to section 945(a) of the Bankruptcy Code, applicable in the COFINA PROMESA Proceeding in accordance with Section 301(a) of PROMESA, and in light of the critical importance to assure that post-confirmation disputes regarding matters resolved or addressed by the COFINA Plan of Adjustment do not impede the successful implementation of the COFINA Plan of Adjustment, the Title III Court may retain jurisdiction over each of the matters specified in the COFINA Plan of Adjustment and such retention is reasonable, appropriate, in the best interests of the Commonwealth, COFINA, their respective creditors and other parties interest, and not inconsistent with PROMESA, the Bankruptcy Code or any other applicable law.

102136844v2

in one or more mainland U.S. Banks in the name of the trustee appointed under the new COFINA bond resolution and (b) designed to ensure that COFINA is the unconditional owner of the COFINA Portion, now existing or hereafter collected, under Puerto Rico and other applicable law.

**L.**    **Corporate Governance:**  On the COFINA Effective Date, and pursuant to the COFINA Plan of Adjustment, the COFINA board of directors shall be appointed and shall consist of three (3) members appointed by the Governor of the Commonwealth, all of whom shall meet the independence and qualification standards set forth in definitive documentation, including, without limitation, that the independent director may not be an officer, employee or director of the government of Puerto Rico or instrumentality thereof (other than COFINA), must have executive experience in finance or with respect to securities similar to the COFINA Bonds and shall otherwise be qualified to serve on the board of directors.  Notwithstanding the foregoing, (a) the holders of Senior COFINA Bond Claims, Ambac and National (in consultation with the holders of the Junior COFINA Bond Claims and Assured) may submit up to three (3) recommendations for the Governor's consideration regarding the initial appointment of the independent directors; provided, however, that the Governor shall be under no obligation to appoint any such recommended persons as directors and (b) to the extent permitted by applicable law, COFINA's corporate governance documents shall be amended to be consistent with all of the foregoing and to provide that board approval shall be required for all material actions to be taken.  COFINA's amended corporate governance documents shall provide that all board members will owe a fiduciary duty to COFINA as consistent with Puerto Rico law and its Constitution.  The amended corporate governance documents and identities of board members will be filed as part of the Plan Supplement.

**M.**    **Legislation and Documentation:** On or prior to the COFINA Effective Date, legislation shall be enacted to amend (or repeal and replace) the existing COFINA legislation to, among other things, (i) establish the independent COFINA board of directors referred to in Section II (L) above, (ii) permit the sales and use tax, tax exemption, substitution of collateral and non-impairment provisions referred to herein and (iii) grant such other authorizations, if any, which may be required to implement the transactions contemplated herein, including, without limitation, (a) a determination that COFINA is the owner of the COFINA Portion under applicable law, (b) a grant of a statutory lien on the COFINA Portion to secure the payment obligations with respect to the COFINA Bonds and COFINA Parity Bonds, in whole or in part, or otherwise in accordance with the ABT, (c) enhanced financial reporting, (d) events of default and imposition of certain measures upon an event of default (e) submission to the jurisdiction of the Title III Court, and (f) other customary terms, conditions, and covenants for similarly structured and supported municipal bonds that are acceptable to the PSA Parties.  To the extent applicable, the foregoing terms and such other terms as may be agreed upon shall be included in the new bond resolution authorized by COFINA.

**N.**    **Commonwealth/COFINA Expenses:**  All expenses incurred by the Commonwealth or COFINA, as the case may be, in connection with the development, negotiation, confirmation and consummation of the COFINA Plan of Adjustment and the compromise and settlement of the Commonwealth-COFINA Dispute shall be paid to the extent available from the funds distributable to the Commonwealth in accordance with the provisions of Section I(A) hereof and otherwise by the Commonwealth.

**O.**    **Consummation Costs:**  Notwithstanding anything contained in this Term Sheet or the COFINA Plan of Adjustment to the contrary, in order to compensate parties for the cost of negotiation, confirmation and consummation of this Term Sheet and the COFINA Plan of Adjustment, and in consideration of (1) the execution and delivery of the PSA by each Consummation Cost Party, as defined below, and (2) the obligations and covenants contained in the PSA, Assured, Ambac, National, each holder of a Senior COFINA Bond Claim, and

24

each holder of Junior COFINA Bond Claim, each listed on Exhibit "B" hereto (a "Consummation Cost Party"), which executes the PSA consistent with the terms set forth herein by no later than 11:59p.m. (EDT) on September 20, 2018 (the "Deadline"), shall be entitled to receive on the COFINA Effective Date, based upon their respective positions (insured or otherwise) as of 5:00p.m. (EDT) on August 7, 2018, a pro rata share of cash in an amount equal to two percent (2.0%), truncated to two decimal points, of the (a) aggregate amount of the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac Insured), Senior COFINA Bond Claims (National Insured), Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured Insured), Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) (calculated without duplication), minus (b) One Billion Dollars ($1,000,000,000.00); provided, however, that, with respect to any Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured), unless otherwise agreed to, in writing, by Ambac and National, Ambac or National, as the case may be, and not the beneficial holder of such Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) regardless of whether such beneficial holder is also a Consummation Cost Party, shall receive the amount of cash that would have otherwise been distributed to such other Consummation Cost Party in accordance with the provisions of this Section II(O); and, provided, however, that, notwithstanding the foregoing provisions of this Section II(O), amounts due and payable to Aurelius Capital Master, Ltd. and Six PRC Investments LLC as a result of being a Consummation Cost Party (i) shall not be taken into account in the connection with the above-referenced calculations solely with respect to payments to other Consummation Cost Parties, which payments to other Consummation Cost Parties shall be made by COFINA or its successor in interest, and (ii) with respect to payments to be made to Aurelius Capital Master, Ltd. and Six PRC Investments LLC, shall be taken into account in connection with the above-referenced calculations for all Consummation Cost Parties, which payments to Aurelius Capital Master, Ltd. and Six PRC Investment LLC shall be payable by the Commonwealth in accordance with the provisions of Sections I(A) and II(O) hereof; and, provided, further, that, with respect to the Junior COFINA Bond Claims (Assured Insured), Assured, and not the beneficial holders of the Junior COFINA Bond Claims (Assured Insured), shall receive the amount of cash distributable on account of the Junior COFINA Bond Claims (Assured Insured).

**P.**     **Unsubscribed Taxable Election Cash Amount:** The amount, up to Sixty Million Dollars ($60,000,000.00), allocated for distributions to holders in Classes 4 and 7, but not distributed based upon elections not made, and calculated as the difference between Sixty Million Dollars ($60,000,000.00) minus the Taxable Election Cash shall be reallocated as follows: if such amount is (a) equal to or less than Forty Million Dollars ($40,000,000.00), such amount shall be allocated (i) *first*, if the aggregate amount of Taxable Election Cash distributable under the COFINA Plan of Adjustment is greater than Twenty Million Dollars ($20,000,000.00), to be distributed as cash in accordance with the COFINA Plan of Adjustment, (ii) *second*, to the extent of any remainder, to further fund the operating expense fund for COFINA up to an additional Ten Million Dollars ($10,000,000.00), and (iii) *third*, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders, and the Commonwealth, on the other hand, and (b) greater than Forty Million Dollars ($40,000,000.00), such amount up to Forty Million Dollars ($40,000,000.00) shall be allocated as described in subsection (a) above and such amounts above Forty Million Dollars ($40,000,000.00) shall be allocated in accordance with the COFINA Plan of Adjustment to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders.

**Q.**     **Government Parties' Covenant Regarding Taxable Election:** The Government Parties shall use their reasonable best efforts, including, without limitation, by, directly or indirectly,

25

actively coordinating with, and promptly responding to inquiries from, any and all persons or
entities, including dealers, to ensure the comprehensive outreach to Puerto Rico Investors and
Puerto Rico Institutions holding existing COFINA securities regarding such holders' right to
elect to receive a Taxable Bond Distribution and to ensure the dissemination of complete and
accurate information regarding such election to such holders.

26

**EXHIBIT A**

**Scheduled Amortization and Certain Other Terms of COFINA Bonds**

102136844v2

## Exhibit A: Coupons and Maturity Dates

### Current Interest Bond Terms

| (7/1) Year | Par | Cpn/Yld |
|---|---|---|
| Total/Avg | $9,616,365,000.00 | 4.553% |
| 2028 | 782,915,000.00 | 4.350% |
| 2032 | 1,091,460,000.00 | 4.500% |
| 2038** | 2,997,245,000.00 | 4.550% |
| 2044 | 4,744,745,000.00 | 4.600% |

### Capital Appreciation Bond Terms

| (7/1) Year | Initial Value | Accreted Value | Yield |
|---|---|---|---|
| Total/Avg | $2,404,192,599.90 | $14,232,325,521.50 | 5.500% |
| 2058 | 2,404,192,599.90 | 14,232,325,521.50 | 5.500% |

### Current Interest Bond Sinking Fund Schedule

| (7/1) Year | Yr# | Par | Term Par |
|---|---|---|---|
| Total | | $9,616,365,000.00 | $9,616,365,000.00 |
| 2019 | 1 | 18,855,000.00 | - |
| 2020 | 2 | - | - |
| 2021 | 3 | 17,480,000.00 | - |
| 2022 | 4 | 36,420,000.00 | - |
| 2023 | 5 | 56,910,000.00 | - |
| 2024 | 6 | 79,045,000.00 | - |
| 2025 | 7 | 102,935,000.00 | - |
| 2026 | 8 | 128,680,000.00 | - |
| 2027 | 9 | 156,395,000.00 | - |
| 2028 | 10 | 186,195,000.00 | 782,915,000.00 |
| 2029 | 11 | 218,225,000.00 | - |
| 2030 | 12 | 252,920,000.00 | - |
| 2031 | 13 | 290,175,000.00 | - |
| 2032 | 14 | 330,140,000.00 | 1,091,460,000.00 |
| 2033 | 15 | 372,985,000.00 | - |
| 2034 | 16 | 419,060,000.00 | - |
| 2035 | 17 | 468,400,000.00 | - |
| 2036 | 18 | 521,185,000.00 | - |
| 2037 | 19 | 577,645,000.00 | - |
| 2038 | 20 | 637,970,000.00 | 2,997,245,000.00 |
| 2039 | 21 | 702,415,000.00 | - |
| 2040 | 22 | 771,550,000.00 | - |
| 2041 | 23 | 842,060,000.00 | - |
| 2042 | 24 | 880,800,000.00 | - |
| 2043 | 25 | 921,310,000.00 | - |
| 2044 | 26 | 626,610,000.00 | 4,744,745,000.00 |
| 2045 | 27 | - | - |
| 2046 | 28 | - | - |
| 2047 | 29 | - | - |
| 2048 | 30 | - | - |
| 2049 | 31 | - | - |
| 2050 | 32 | - | - |
| 2051 | 33 | - | - |
| 2052 | 34 | - | - |
| 2053 | 35 | - | - |
| 2054 | 36 | - | - |
| 2055 | 37 | - | - |
| 2056 | 38 | - | - |
| 2057 | 39 | - | - |
| 2058 | 40 | - | - |

### Capital Appreciation Bond Sinking Fund Schedule

| (7/1) Year | Yr# | Accretion Table | Future Value Redemption | Accreted Value Redemption |
|---|---|---|---|---|
| | | | $20,968,015,000.00 | $14,232,325,521.50 |
| 2019 | 1 | $602.50 | - | - |
| 2020 | 2 | 636.10 | - | - |
| 2021 | 3 | 671.60 | - | - |
| 2022 | 4 | 709.05 | - | - |
| 2023 | 5 | 748.55 | - | - |
| 2024 | 6 | 790.30 | - | - |
| 2025 | 7 | 834.35 | - | - |
| 2026 | 8 | 880.90 | - | - |
| 2027 | 9 | 930.00 | - | - |
| 2028 | 10 | 981.85 | - | - |
| 2029 | 11 | 1,036.60 | - | - |
| 2030 | 12 | 1,094.40 | - | - |
| 2031 | 13 | 1,155.40 | - | - |
| 2032 | 14 | 1,219.85 | - | - |
| 2033 | 15 | 1,287.85 | - | - |
| 2034 | 16 | 1,359.65 | - | - |
| 2035 | 17 | 1,435.50 | - | - |
| 2036 | 18 | 1,515.50 | - | - |
| 2037 | 19 | 1,600.00 | - | - |
| 2038 | 20 | 1,689.25 | - | - |
| 2039 | 21 | 1,783.40 | - | - |
| 2040 | 22 | 1,882.85 | - | - |
| 2041 | 23 | 1,987.85 | - | - |
| 2042 | 24 | 2,098.70 | - | - |
| 2043 | 25 | 2,215.70 | - | - |
| 2044 | 26 | 2,339.25 | 720,495,000.00 | 337,083,585.75 |
| 2045 | 27 | 2,469.65 | 2,009,425,000.00 | 992,515,290.25 |
| 2046 | 28 | 2,607.35 | 1,903,310,000.00 | 992,519,065.70 |
| 2047 | 29 | 2,752.75 | 1,802,775,000.00 | 992,517,776.25 |
| 2048 | 30 | 2,906.25 | 1,707,555,000.00 | 992,516,343.75 |
| 2049 | 31 | 3,068.25 | 1,617,400,000.00 | 992,517,510.00 |
| 2050 | 32 | 3,239.35 | 1,531,970,000.00 | 992,517,403.90 |
| 2051 | 33 | 3,419.95 | 1,451,070,000.00 | 992,517,369.30 |
| 2052 | 34 | 3,610.65 | 1,374,430,000.00 | 992,517,135.90 |
| 2053 | 35 | 3,811.95 | 1,301,850,000.00 | 992,517,421.50 |
| 2054 | 36 | 4,024.50 | 1,233,095,000.00 | 992,518,165.50 |
| 2055 | 37 | 4,248.90 | 1,167,970,000.00 | 992,517,546.60 |
| 2056 | 38 | 4,485.80 | 1,106,290,000.00 | 992,519,136.40 |
| 2057 | 39 | 4,735.90 | 1,047,865,000.00 | 992,516,770.70 |
| 2058 | 40 | 5,000.00 | 992,515,000.00 | 992,515,000.00 |

*Due to rounding of bonds into $5,000 denominations, debt service on Bonds will be slightly below the 53.65% PSTBA.
**Current Interest Bonds may include both Tax-Exempt and Taxable Bonds.

28

102136844v2

**EXHIBIT B**

**List of Consummation Cost Parties**

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Assured Guaranty Municipal Corp.
Aurelius Capital Master, Ltd.
Canyon Capital Advisors LLC
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it serves as
   investment manager
National Public Finance Guarantee Corporation
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
   Oppenheimer Rochester Amt-Free Municipal Fund
   Oppenheimer Rochester Amt-Free New York Municipal Fund
   Oppenheimer Rochester California Municipal Fund
   Oppenheimer Rochester Limited Term California Municipal Fund
   Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of Oppenheimer
   Municipal Fund)
   Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of Rochester
   Portfolio Series)
   Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer Multi-
   State Municipal Trust)
   Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer Multi-State
   Municipal Trust)
   Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-State Municipal
   Trust)
   Oppenheimer Rochester Fund Municipals
   Oppenheimer Rochester Minnesota Municipal Fund
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
   MASSMUTUAL International Holding MSC, Inc.
   MASSMUTUAL Unified Traditional
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.

29

First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund II, Inc.
Puerto Rico AAA Portfolio Target Maturity Fund, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund I, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
Puerto Rico Fixed Income Fund VI, Inc.
Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.
Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund II, Inc.
Puerto Rico Investors Tax-Free Fund III, Inc.
Puerto Rico Investors Tax-Free Fund IV, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

102136844v2

## SCHEDULE 1

| Fiscal Year | Pledged Sales Tax Base Amount | COFINA 53.65% Portion Pledged Sales Tax Base Amount | Commonwealth 46.35% Portion Pledged Sales Tax Base Amount |
|---|---|---|---|
| 2019 | 783,197,251 | 420,185,325 | 363,011,926 |
| 2020 | 814,525,141 | 436,992,738 | 377,532,403 |
| 2021 | 847,106,147 | 454,472,448 | 392,633,699 |
| 2022 | 880,990,393 | 472,651,346 | 408,339,047 |
| 2023 | 916,230,008 | 491,557,399 | 424,672,609 |
| 2024 | 952,879,209 | 511,219,696 | 441,659,513 |
| 2025 | 990,994,377 | 531,668,483 | 459,325,894 |
| 2026 | 1,030,634,152 | 552,935,223 | 477,698,929 |
| 2027 | 1,071,859,518 | 575,052,631 | 496,806,887 |
| 2028 | 1,114,733,899 | 598,054,737 | 516,679,162 |
| 2029 | 1,159,323,255 | 621,976,926 | 537,346,329 |
| 2030 | 1,205,696,185 | 646,856,003 | 558,840,182 |
| 2031 | 1,253,924,033 | 672,730,244 | 581,193,789 |
| 2032 | 1,304,080,994 | 699,639,453 | 604,441,541 |
| 2033 | 1,356,244,234 | 727,625,032 | 628,619,202 |
| 2034 | 1,410,494,003 | 756,730,033 | 653,763,970 |
| 2035 | 1,466,913,763 | 786,999,234 | 679,914,529 |
| 2036 | 1,525,590,314 | 818,479,203 | 707,111,111 |
| 2037 | 1,586,613,926 | 851,218,371 | 735,395,555 |
| 2038 | 1,650,078,483 | 885,267,106 | 764,811,377 |
| 2039 | 1,716,081,623 | 920,677,791 | 795,403,832 |
| 2040 | 1,784,724,887 | 957,504,902 | 827,219,985 |
| 2041 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2042 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2043 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2044 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2045 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2046 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2047 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2048 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2049 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2050 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2051 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2052 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2053 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2054 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2055 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2056 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2057 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2058 | 1,850,000,000 | 992,525,000 | 857,475,000 |

31

**SCHEDULE 2**

**Application of BNYM Pre-7/1/2018 Debt Service Fund Monies**

| | |
|---|---:|
| Pre-7/1/2018 BNYM Cash | 1,200,165,636 |
| Rounding Amount Cash Est.* | 25,000,000 |
| Section 103 Cash (Pre-Petition Interest) | 124,540,331 |
| PSA Consummation Costs | 332,742,277 |
| On-Island Min Taxable Election | 20,000,000 |
| On-Island Flex Taxable Election | 40,000,000 |
| Remaining Set Aside of Funds | 38,355,838 |
| Remaining Funds to Seniors | 619,527,190 |
| TE COFINA Sr. Cash** | 377,273,865 |
| TAX COFINA Sr. Cash** | 242,253,325 |

*All rounding shall be made up to the nearest $1,000 current interest bond denominations.
**Split Proportional to current TE/TAX ratio on COFINA Sr. of Accreted Value as of Petition Date.

**<u>EXHIBIT D</u>**

<u>FORM OF JOINDER</u>

## FORM OF JOINDER AGREEMENT

JOINDER AGREEMENT TO THE AMENDED AND RESTATED PLAN SUPPORT AGREEMENT, dated as of September __, 2018 (as amended, supplemented or otherwise modified from time to time, the "**PSA**"), by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), (b) Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), (c) Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), (d) holders of Senior COFINA Bond Claims, as defined below, set forth on Exhibit "A" thereto (together with their respective successors and assignors with respect to transfers made in accordance with the terms thereof, the "**Senior Holders**"), (e) Ambac Assurance Corporation ("**Ambac**"), (f) National Public Finance Guarantee Corporation ("**National**"), (g) holders of Junior COFINA Bond Claims, as defined below, set forth on Exhibit "B" thereto, (together with their respective successors and assignors with respect to transfers made in accordance with the terms hereof, the "**Junior Holders**"), (h) Assured Guaranty Municipal Corp. ("**Assured**"), formerly known as Financial Security Assurance Inc., (i) Bonistas del Patio, Inc. ("**Bonistas**"), and (j) the other PSA Creditors from time to time party thereto, is executed and delivered by (the "**Joining PSA Creditor**") as of _____, 2018.  Capitalized terms used herein, but not defined herein, shall have the meanings ascribed thereto in the PSA.

     1.   <u>Agreement to be Bound</u>.  The Joining PSA Creditor hereby agrees to be bound by all of the terms and provisions of the PSA.  The Joining PSA Creditor shall hereafter be deemed to be a "PSA Creditor," a "Party," a "Senior Holder" (if it holds Senior COFINA Bond Claims) and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) for all purposes under the PSA, including, without limitation, and for the avoidance of doubt, with respect to any Senior COFINA Bond Claims and Junior COFINA Bond claims held by the Joining PSA Creditor as of the date of this Joinder Agreement (other than any Senior COFINA Bond Claims or Junior COFINA Bond Claims held in a Qualified Marketmaker capacity).

     2.   <u>Representations and Warranties and Covenants</u>.  With respect to the aggregate principal amount of Senior COFINA Bond Claims and Junior COFINA Bond Claims held by the Joining PSA Creditor, including, without limitation, upon consummation of any pending Transfer of Senior COFINA Bond Claims or Junior COFINA Bond Claims to the Joining PSA Creditor, the Joining PSA Creditor hereby (a) makes, as of the date hereof, the representations and warranties of the "Senior Holder" (if it holds Senior COFINA Bond Claims) set forth in Section 3.4 of the PSA and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) set forth in Section 3.5 of the PSA and (b) covenants and agrees to perform all of the "Covenants" of the "Senior Holder" (if it holds Senior COFINA Bond Claims) set forth in Section 4.4 of the PSA, and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) set forth in Section 4.5 of the PSA,  to each of the other Parties to the PSA.

     3.   <u>Governing Law</u>. Section 7.5 of the PSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "PSA" shall be replaced with references to Joinder Agreement.

101736284v3

4.     <u>Notice of Joinder</u>.  The Joining PSA Creditor agrees to provide a copy of the Joinder Agreement to counsel to the Oversight Board and AAFAF in accordance with Section 4.4 of the PSA (if it holds Senior COFINA Bond Claims), Section 4.5 of the PSA (if it holds Junior COFINA Bond Claims) and the notice provisions set forth in Section 7.10 of the PSA.

IN WITNESS WHEREOF, the Joining PSA Creditor has caused this Joinder Agreement to be executed as of the date set forth above.

[NAME OF INSTITUTION]

By:_____
Name:
Title:

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

101736284v3

## Schedule 3.4

## Pending Litigation Naming COFINA

### Title III Litigation

The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation (COFINA) et al., Adv. Pro. No. 17-00133-LTS (D.P.R. 2017)

The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as agent of The Commonwealth of Puerto Rico v. Bettina Whyte as agent of The Puerto Rico Sales Tax Financing Corporation, Adv. Pro. No. 17-00257-LTS (D.P.R. 2017)

Cooperativa de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al., Adv. Pro. No. 18-00028-LTS (D.P.R. 2018)

### Pre-Title III Federal Litigation

Lex Claims, LLC v. The Commonwealth of Puerto Rico, No. 3:16-cv-02374-FAB (D.P.R. 2016) (stayed) (appealed at First Circuit Case Nos. 17-1241, 17-1248, 17-1272, 17-1337)

Rodriguez-Perelló et al. v. Rosselló-Nevares et al., No. 3:17-cv-01566-FAB (D.P.R. 2017) (stayed)

### State Court Litigation

Comisión Ciudadana Para La Auditoría Integral del Crédito Público, Inc. v. Autoridad De Asesoría Financiera y Agencia Fiscal, et al. No. SJ 2018CV06428 (Court of First Instance, San Juan 2018)