# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                    Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                    Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## DISCLOSURE STATEMENT FOR THE
## TITLE III PLAN OF ADJUSTMENT OF THE DEBTS
## OF PUERTO RICO SALES TAX FINANCING CORPORATION

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile: (212) 969-2900 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813<br>Telephone: (787) 764-8181<br>Facsimile: (787) 753-8944 |

*Attorneys for the Financial Oversight and Management Board*
*as Representative for the Puerto Rico Sales Tax Financing Corporation in its Title III Case*

Dated:  October 19, 2018

THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN OF ADJUSTMENT. VOTES MAY NOT BE SOLICITED UNTIL THE TITLE III COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE TITLE III COURT.   THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IMPORTANT INFORMATION

THE PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT ("PROMESA") PROVIDES THAT THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO (THE "OVERSIGHT BOARD") MAY TAKE ANY ACTION NECESSARY TO PROSECUTE THE TITLE III CASE OF THE DEBTOR, INCLUDING FILING A TITLE III PETITION, SUBMITTING A PLAN OF ADJUSTMENT FOR THE DEBTOR, AND OTHERWISE GENERALLY SUBMITTING FILINGS IN RELATION TO THE TITLE III CASE.  PROMESA ALSO PROVIDES THAT ONLY THE OVERSIGHT BOARD MAY FILE A PLAN OF ADJUSTMENT OF THE DEBTS OF THE DEBTOR.  PROMESA REQUIRES THAT THE PLAN OF ADJUSTMENT FOR THE TITLE III DEBTOR BE FILED IN ITS TITLE III CASE TOGETHER WITH A DOCUMENT CALLED A DISCLOSURE STATEMENT.  THIS DOCUMENT IS THE DISCLOSURE STATEMENT FOR THE PLAN OF ADJUSTMENT DESCRIBED HEREIN.  THIS PROPOSED DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.  THIS DISCLOSURE STATEMENT HAS BEEN PREPARED AND FILED BY THE OVERSIGHT BOARD ON BEHALF OF THE PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA").  ALL BANKRUPTCY CODE PROVISIONS REFERENCED HEREIN ARE MADE APPLICABLE TO THIS TITLE III CASE BY SECTION 301(a) OF PROMESA.

THE TITLE III COURT HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED THAT IT CONTAINS ADEQUATE INFORMATION PURSUANT TO BANKRUPTCY CODE SECTION 1125(b) AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE ON THE PLAN OF ADJUSTMENT.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN OF ADJUSTMENT OR MAKE AN ELECTION THEREUNDER ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS CITED HEREIN AND THE PLAN OF ADJUSTMENT ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN OF ADJUSTMENT.  SEE SECTION [VII], "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF CERTAIN FEDERAL SECURITIES LAWS. ALL STATEMENTS CONTAINED HEREIN THAT ARE NOT CLEARLY HISTORICAL IN NATURE ARE FORWARD-LOOKING AND THE WORDS "ANTICIPATE," BELIEVE," "COULD," "SHOULD," "EXPECT," "ESTIMATE," "FORECAST," "INTEND," "POTENTIAL," "PROJECT," "TARGET," AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ALL STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, OTHER THAN STATEMENTS OF HISTORICAL FACT, INCLUDING STATEMENTS ABOUT THE PLAN OF ADJUSTMENT, STRATEGIES, PROSPECTS, AND EXPECTATIONS REGARDING FUTURE EVENTS AND COFINA'S FINANCIAL PERFORMANCE, ARE FORWARD-LOOKING STATEMENTS THAT INVOLVE CERTAIN RISKS AND UNCERTAINTIES. WHILE THESE STATEMENTS REPRESENT THE DEBTOR'S CURRENT JUDGMENT ON WHAT THE FUTURE MAY HOLD, AND THE DEBTOR BELIEVES THESE JUDGMENTS ARE BASED UPON REASONABLE ASSUMPTIONS UNDER THE CIRCUMSTANCES, THESE STATEMENTS ARE NOT GUARANTEES OF ANY EVENTS OR FINANCIAL RESULTS, AND COFINA'S ACTUAL RESULTS MAY DIFFER MATERIALLY. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FORWARD-LOOKING STATEMENTS AND PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING CONSUMMATION OF THE PLAN OF ADJUSTMENT, ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, UNLESS OTHERWISE SPECIFIED. THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE PUBLICLY THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FORWARD-LOOKING STATEMENTS, TO REFLECT NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS REQUIRED BY LAW. ALL FORWARD-LOOKING STATEMENTS INVOLVE RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND COFINA'S CONTROL, WHICH MAY CAUSE ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS TO DIFFER MATERIALLY FROM ANTICIPATED RESULTS, PERFORMANCE, OR ACHIEVEMENTS. THE DEBTOR CANNOT GUARANTEE THAT PROJECTED RESULTS OR EVENTS WILL BE ACHIEVED. FACTORS THAT COULD CAUSE COFINA'S ACTUAL RESULTS TO BE MATERIALLY DIFFERENT FROM THE DEBTOR'S EXPECTATIONS INCLUDE THOSE FACTORS DESCRIBED HEREIN UNDER SECTION [VII], "CERTAIN RISK FACTORS TO BE CONSIDERED". THE DEBTOR URGES HOLDERS OF CLAIMS TO CONSIDER THESE FACTORS CAREFULLY IN EVALUATING THE FORWARD-LOOKING STATEMENTS AND NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS.

THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE SET FORTH ON THE COVER PAGE, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN ARE UNCHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN OF ADJUSTMENT MUST RELY ON ITS OWN EVALUATION OF

COFINA AND ITS OWN ANALYSIS OF THE TERMS OF THE PLAN OF ADJUSTMENT IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN OF ADJUSTMENT.

A PLAN SUPPLEMENT CONTAINING DRAFT OR FINAL VERSIONS OF, AMONG OTHER DOCUMENTS, [_____], WILL BE FILED WITH THE CLERK OF THE TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN FIFTEEN (15) DAYS) PRIOR TO THE BALLOT DATE, OR ON SUCH OTHER DATE AS THE TITLE III COURT ESTABLISHES. THE PLAN SUPPLEMENT SHALL BE DEEMED INCORPORATED INTO AND PART OF THE PLAN OF ADJUSTMENT AS IF SET FORTH THEREIN IN FULL.

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN OF ADJUSTMENT. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE. THE DEBTOR URGES EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN OF ADJUSTMENT.

THE OVERSIGHT BOARD, AS COFINA'S TITLE III DEBTOR REPRESENTATIVE IN THIS TITLE III CASE PURSUANT TO PROMESA SECTION 315(b), HAS NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION CONCERNING THE PLAN OF ADJUSTMENT OR COFINA, OR THE VALUE OF COFINA'S PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT ORDER. HOLDERS OF CLAIMS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, WARRANTIES, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF THE PLAN OF ADJUSTMENT.

THIS DISCLOSURE STATEMENT AND THE TITLE III COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DO NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. FURTHER, THE TITLE III COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE TITLE III COURT'S CONFIRMATION OF THE PLAN OF ADJUSTMENT. THE TITLE III COURT HAS SCHEDULED A HEARING ON JANUARY 16, 2019 TO CONSIDER CONFIRMATION OF THE PLAN OF ADJUSTMENT UNDER THOSE SPECIFIC BANKRUPTCY CODE PROVISIONS MADE APPLICABLE TO PROMESA UNDER SECTION 301 AND UNDER SECTION 314 OF PROMESA, AS WELL.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY FOREIGN OR STATE SECURITIES COMMISSION HAS

APPROVED OR DISAPPROVED OF THE SECURITIES DESCRIBED HEREIN OR THIS DISCLOSURE STATEMENT OR OPINED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

NONE OF THE SECURITIES TO BE ISSUED TO HOLDERS OF ALLOWED CLAIMS PURSUANT TO THE PLAN OF ADJUSTMENT WILL HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE LAWS.

THE DEBTOR RECOMMENDS POTENTIAL RECIPIENTS OF COFINA BONDS (AS DEFINED HEREIN), AMBAC CERTIFICATES (AS DEFINED HEREIN), NATIONAL CERTIFICATES (AS DEFINED IN THE PLAN), OR ASSURED CERTIFICATES (AS DEFINED IN THE PLAN OF ADJUSTMENT), AS APPLICABLE, TO BE ISSUED PURSUANT TO THE PLAN OF ADJUSTMENT CONSULT THEIR OWN ADVISORS CONCERNING ANY RESTRICTIONS ON HOLDING OR THE TRANSFERABILITY OF SUCH SECURITIES, OR ANY OTHER POTENTIAL CONSEQUENCE OF HOLDING SUCH SECURITIES.

THE TAX CONSEQUENCES OF THE PLAN OF ADJUSTMENT TO HOLDERS OF CLAIMS ARE COMPLEX, AND DEPEND IN PART ON BOTH THE TYPE OF CLAIM HELD AND THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. THE DEBTOR RECOMMENDS THAT ALL HOLDERS OF CLAIMS CONSULT THEIR OWN RESPECTIVE TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, TERRITORIAL (INCLUDING PUERTO RICO), LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN OF ADJUSTMENT IN THEIR RESPECTIVE INDIVIDUAL CIRCUMSTANCES.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN OF ADJUSTMENT, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION RELATING TO COFINA. THE DEBTOR BELIEVES THESE SUMMARIES ARE FAIR AND ACCURATE. NO OTHER PARTY, INCLUDING OTHER PARTIES TO THE AMENDED PSA, MAKES ANY REPRESENTATION AS TO THE FAIRNESS OR ACCURACY OF THESE SUMMARIES OR THE DESCRIPTIONS OF PARTIES' LEGAL RIGHTS AND REMEDIES CONTAINED HEREIN. IF THERE IS ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OF ADJUSTMENT OR ANY OF THE OTHER DOCUMENTS OR FINANCIAL INFORMATION REFERENCED HEREIN, THE TERMS AND PROVISIONS OF THE PLAN OF ADJUSTMENT, OR SUCH OTHER DOCUMENT OR FINANCIAL INFORMATION, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

THE DEBTOR RESERVES THE RIGHT TO AMEND, MODIFY, OR WITHDRAW THE PLAN OF ADJUSTMENT AT ANY TIME, IN ACCORDANCE WITH THE TERMS OF THE AMENDED PSA, THE PLAN OF ADJUSTMENT AND PROMESA TITLE III.

## Table of Contents

**Page**

I.    Introduction ....................................................................................................... 1
    A.    PROMESA Title III: An Overview ............................................................ 4
    B.    Summary of Key Components of COFINA's Plan of Adjustment ................ 5
    C.    Holders of Claims Entitled to Vote on the Plan of Adjustment ............... 24
    D.    Solicitation and Voting Procedures ......................................................... 25
    E.    Confirmation Hearing and Deadline for Objections to Confirmation ........ 26

II.   Overview of COFINA ....................................................................................... 26
    A.    Historical Information About COFINA ..................................................... 26
    B.    Summary of COFINA's Revenues, Assets, and Liabilities ...................... 40

III.  Significant Events Leading to Commencement of COFINA's Title III Case .......... 41
    A.    The Commonwealth's Steady Operational and Financial Decline ............ 41
    B.    Creation of AAFAF .............................................................................. 45
    C.    Summary of PROMESA ........................................................................ 45
    D.    Adoption of Commonwealth Fiscal Plan and COFINA Fiscal Plan .......... 52
    E.    Summary of Certain Pre-Title III Litigation Relevant to COFINA ........... 54
    F.    Commencement of the Commonwealth's Title III Case .......................... 56

IV.   Overview of COFINA's Title III Case ................................................................ 56
    A.    Commencement of COFINA's Title III Case .......................................... 56
    B.    Lex Claims Motion for Relief from the Automatic Stay ........................... 57
    C.    Other Related Litigation ....................................................................... 57
    D.    Claims Process and Bar Date ................................................................ 62
    E.    The Commonwealth-COFINA Dispute .................................................... 63

V.    Compromises and Settlements .......................................................................... 70

VI.   The Title III Plan of Adjustment ....................................................................... 75
    A.    Overview of the Plan of Adjustment ...................................................... 75
    B.    Compromise and Settlement of Disputes ............................................... 76
    C.    Provisions for Payment of Administrative Expense Claims ...................... 76
    D.    Classification and Treatment of Claims .................................................. 77
    E.    Provisions Regarding Allocation of Unsubscribed Taxable Election Cash ......... 89
    F.    Treatment of Executory Contracts and Unexpired Leases ...................... 89
    G.    Provisions Governing Distributions ........................................................ 92
    H.    Rights and Powers of Disbursing Agent ................................................. 97
    I.    Procedures for Treatment of Disputed Claims ....................................... 97
    J.    Acceptance or Rejection of the Plan of Adjustment, Effect of Rejection by
        One or More Classes of Claims ............................................................ 100
    K.    Identification of Claims Impaired by the Plan and Not Impaired by the

101361236v22

|        |      | Plan ........................................................................................................ | 100 |
|        | L.   | Conditions Precedent to Confirmation of the Plan............................... | 101 |
|        | M.   | Conditions Precedent to the Effective Date........................................ | 103 |
|        | N.   | Prosecution and Extinguishment of Claims Held by COFINA ............. | 106 |
|        | O.   | Modification, Revocation, or Withdrawal of the Plan of Adjustment............... | 107 |
|        | P.   | Retention of Jurisdiction.................................................................... | 108 |
|        | Q.   | Miscellaneous Provisions .................................................................. | 110 |
| VII.   |      | Confirmation of the Plan of Adjustment ................................................... | 122 |
|        | A.   | Confirmation Hearing......................................................................... | 122 |
|        | B.   | Deadlines to Object to Confirmation.................................................. | 122 |
|        | C.   | Requirements for Confirmation of the Plan of Adjustment ................. | 125 |
| VIII.  |      | COFINA Bonds .......................................................................................... | 130 |
|        | A.   | General................................................................................................ | 130 |
|        | B.   | Redemption......................................................................................... | 131 |
|        | C.   | Collateral for Repayment of COFINA Bonds ..................................... | 135 |
|        | D.   | Statutory Lien..................................................................................... | 136 |
|        | E.   | Application of COFINA Revenues ...................................................... | 136 |
|        | F.   | Refunding Bonds ................................................................................ | 137 |
|        | G.   | Certain Covenants of the Government ................................................ | 137 |
|        | H.   | Certain Covenants of COFINA ........................................................... | 139 |
|        | I.   | Bond Indenture ................................................................................... | 140 |
|        | J.   | Defeasance.......................................................................................... | 145 |
|        | K.   | Certain Provisions Relating to Capital Appreciation Bonds .............. | 146 |
|        | L.   | Notices................................................................................................ | 147 |
|        | M.   | Governing Law ................................................................................... | 147 |
|        | N.   | Venue .................................................................................................. | 147 |
|        | O.   | Book-Entry Only ................................................................................ | 147 |
|        | P.   | Continuing Disclosure ....................................................................... | 148 |
| IX.    |      | Custodial Trusts......................................................................................... | 151 |
|        | A.   | Terms of Ambac Trust........................................................................ | 151 |
|        | B.   | Terms of National Trust ..................................................................... | 153 |
|        | C.   | Assured Trusts and Assured Certificates ........................................... | 154 |
| X.     |      | New Bond Legislation ............................................................................... | 158 |
|        | A.   | Purpose and Separate Legal Existence of the Corporation................. | 158 |
|        | B.   | Ownership of the COFINA Revenues ................................................. | 158 |
|        | C.   | Permitted and Prohibited Activities.................................................... | 159 |
|        | D.   | Corporate Governance ........................................................................ | 160 |
|        | E.   | The Corporation and the Plan of Adjustment..................................... | 160 |
|        | F.   | Covenants of the Commonwealth ....................................................... | 161 |

101361236v22

XI.     Corporate Governance and Management of Reorganized COFINA...............................163
        A.     Corporate Action ...........................................................................................163
        B.     Amendment of By-Laws ................................................................................163
        C.     Directors of the Reorganized COFINA ..........................................................163
        D.     Officers of Reorganized COFINA ..................................................................164
        E.     Structure for Collection and Application of COFINA Pledged Taxes ...............164

XII.    Certain Risk Factors to Be Considered ......................................................................164
        A.     Risks Related to the Title III Case................................................................165
        B.     Risks Related to COFINA .............................................................................167
        C.     Risks Related to the COFINA Bonds .............................................................168
        D.     Risks Related to the Collection of the Pledged Sales Tax...................................176
        E.     Risk Factors Related to Future Judicial Actions .............................................181
        F.     Risks Related to Future Legislative Actions ...................................................182
        G.     Risks Related to Tax Treatment of the COFINA Bonds .....................................183

XIII.   Material United States Federal Income Tax Considerations .........................................185
        A.     General..........................................................................................................185
        B.     U.S. Holders .................................................................................................186
        C.     Non-U.S. Holders .........................................................................................202

XIV.    XIII. Certain Material Puerto Rico Income Tax Considerations.....................................204
        A.     P.R. Holders..................................................................................................205
        B.     Consequences to P.R. Holders.........................................................................205
        C.     Non-P.R. Holders ..........................................................................................210

XV.     Applicability of Certain Federal and State Securities Laws...........................................212
        A.     General..........................................................................................................212

XVI.    Financial Information and Projections ........................................................................213
        A.     Financial Statements......................................................................................213
        B.     COFINA Fiscal Plan and Projections..............................................................213

XVII.   Additional Information ..............................................................................................214

XVIII.  Conclusion ................................................................................................................215

101361236v22

**<u>Table of Exhibits</u>**

**<u>Exhibit A</u>** – The Plan of Adjustment, Together with its Exhibits

**<u>Exhibit B</u>** – The Amended and Restated Plan Support Agreement, dated September 20, 2018

**<u>Exhibit C</u>** – The Scheduled Amortization and Certain Other Terms of COFINA Bonds

**<u>Exhibit D</u>** – The Certified COFINA Fiscal Plan

**<u>Exhibit E</u>** – Audited Financial Statements for COFINA for the Year Ended June 30, 2015

**[<u>Exhibit F</u>** – A schedule of Existing Securities Listed by CUSIP and Class, as Determined Prior to Elections made Pursuant to the Plan of Adjustment]

101361236v22

## Index of Defined Terms

AAFAF .................................................................................................................... 5
Abeyance Motion .................................................................................................. 62
Act 21 .................................................................................................................. 50
Act 91 .................................................................................................................. 22
Adversary Proceeding ......................................................................................... 60
AFG ...................................................................................................................... 30
AGE ...................................................................................................................... 34
Agents .................................................................................................................. 59
AGL ...................................................................................................................... 33
Ambac .................................................................................................................... 5
Ambac Certificate Holder ........................................................................... 163, 177
Ambac Insurance Policy ...................................................................................... 28
Ambac Insured Bonds ......................................................................................... 28
Ambac Trust Assets ............................................................................................. 16
Amended PSA ........................................................................................................ 5
Applicable P.R. Tax Law .................................................................................... 183
Assured ................................................................................................................... 5
Assured Information ............................................................................................. 35
Assured Insurance Policies .................................................................................. 32
Assured Insured Bonds ........................................................................................ 32
Assured Insured Bonds Paying Agent ................................................................. 32
Assured Insured Bonds Trustee ........................................................................... 32
Assured Legacy Bond Holder ............................................................................. 178
Ballot ...................................................................................................................... 3
Banco Popular ...................................................................................................... 36
Bankruptcy Code ............................................................................................. 1, 46
Bankruptcy Rules ................................................................................................... 2
Bar Date Orders ................................................................................................... 57
BNYM ................................................................................................................... 36
Bond Counsel ..................................................................................................... 171
Bond Documents .................................................................................................. 57
Bond Representative ............................................................................................ 57
Bonistas .................................................................................................................. 5
CABs .................................................................................................................... 15
Centerview ........................................................................................................... 59
Centerview Application ........................................................................................ 59
Certification Motion ............................................................................................ 52
CIBs ..................................................................................................................... 15
Clarification Motion ............................................................................................ 59
Class 2047 ............................................................................................................ 16
Class 2054 ............................................................................................................ 16
COFINA ................................................................................................................. 1
COFINA Agent .................................................................................................... 59
COFINA Bond Indenture ..................................................................................... 15
COFINA Bonds .................................................................................................... 15

v

COFINA FY2019 BNYM Deposits ................................................................................................66
COFINA Parity Bonds ................................................................................................................16
COFINA Revenues ...................................................................................................................125
COFINA's Title III Case .............................................................................................................52
Committee ..................................................................................................................................58
Commonwealth .............................................................................................................................2
Commonwealth Agent ................................................................................................................59
Commonwealth Title III Case .......................................................................................................2
Commonwealth's Title III Case ..................................................................................................51
Commonwealth-COFINA Dispute ................................................................................................2
Commonwealth-COFINA Dispute Procedures Motion ...............................................................58
Confirmation Hearing ...................................................................................................................1
Debt Service Fund ......................................................................................................................67
Debtor ...........................................................................................................................................1
Disclosure Statement ....................................................................................................................1
Dismissed Claims .......................................................................................................................61
Disputed Funds ...........................................................................................................................53
Disputed Funds Motion ..............................................................................................................62
Disputed Funds Order ................................................................................................................63
DSTF ...........................................................................................................................................36
Election Notice .............................................................................................................................3
Escrow Agent .............................................................................................................................18
Escrow Agreement .....................................................................................................................18
Escrow Parties ............................................................................................................................18
Escrow Property .......................................................................................................................178
Escrow Tax-Exempt Interest ....................................................................................................178
Exchange Act .............................................................................................................................28
Existing Bond Resolution ..........................................................................................................23
Existing Securities ......................................................................................................................23
First Subordinate Existing Securities .........................................................................................24
Fiscal Year ..................................................................................................................................36
FOMB ...........................................................................................................................................1
FY2019 BNYM Deposits ...........................................................................................................66
GDB .............................................................................................................................................23
General Bar Date ........................................................................................................................57
GNP .............................................................................................................................................38
GO Bonds ...................................................................................................................................50
GO Debt ......................................................................................................................................50
Governor .....................................................................................................................................40
Initial Bar Date Order ................................................................................................................57
Initial Distributions ....................................................................................................................66
Insurance Trustee .......................................................................................................................29
Interest Funding Requirement ..................................................................................................126
Interpleader Action ....................................................................................................................53
IRC ...........................................................................................................................................164
IRS ............................................................................................................................................164

101361236v22

JRS.................................................................................................................40
KBRA............................................................................................................33
Legislative Assembly...................................................................................22
Lex Claims Litigation...................................................................................50
Lex Claims Motion.......................................................................................52
MAC..............................................................................................................34
Monoline Certificates.................................................................................152
Moody's........................................................................................................33
Moratorium Act............................................................................................40
Movants........................................................................................................52
National...........................................................................................................5
National Certificate Holder..................................................................17, 175
National Insurance Policies.........................................................................26
National Trust Assets.................................................................................175
National Trust Tax-Exempt Interest..........................................................175
OID..............................................................................................................167
Original PSA...................................................................................................5
Oversight Board..............................................................................................1
P.R. Code....................................................................................................183
P.R. Holder.................................................................................................184
P.R. Treasury..............................................................................................183
PFC................................................................................................................23
Plan of Adjustment.........................................................................................1
Planning Board.............................................................................................38
Pledged Property..........................................................................................36
Pledged Sales Tax........................................................................................23
Pledged Sales Tax Base Amount...........................................................22, 125
Pledged Sales Taxes...................................................................................125
Post-FY2024 Deposits.................................................................................67
Pre-FY2019 BNYM Deposits.....................................................................66
Principal Funding Requirement.................................................................126
Procedures Order..........................................................................................58
Project Accounts...........................................................................................36
PSTBA.....................................................................................................22, 125
Puerto Rico Funds........................................................................................52
Remaining Post-FY2024 Deposits.............................................................67
Retirement Systems......................................................................................40
Revenue Account..........................................................................................36
Revenues.......................................................................................................37
Rule.............................................................................................................191
S&P................................................................................................................33
Sales Tax Account........................................................................................36
SEC................................................................................................................27
Senior Existing Securities............................................................................24
Settlement Motion..........................................................................................2
Settlement Parties...........................................................................................5

101361236v22

STRB Resolution ................................................................................................23
SUT Revenues ..................................................................................................22
Tax Election Remainder Amount ....................................................................66
Taxable Bonds ................................................................................................171
Tax-Exempt Bonds .........................................................................................171
Title III Case ......................................................................................................2
Title III Cases ...................................................................................................52
Title III Court .....................................................................................................2
Title III Stay .....................................................................................................46
Treasury Regulations .....................................................................................164
TRS ...................................................................................................................40
Trustee ..............................................................................................................23
U.S. Holder .....................................................................................................165
UCC ..................................................................................................................58
Whitebox ...........................................................................................................53

101361236v22

## I.   **Introduction**

> THE FOLLOWING STATEMENTS IN THIS SECTION I ARE QUALIFIED IN THEIR ENTIRETY BY THE MORE DETAILED INFORMATION AND FINANCIAL INFORMATION CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT AND IN THE PLAN OF ADJUSTMENT AND THE EXHIBITS TO EACH.

Pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), made applicable to Title III of PROMESA pursuant to section 301(a) of PROMESA, the Financial Oversight and Management Board for Puerto Rico (the "FOMB" or the "Oversight Board"),[1] submits this disclosure statement (the "Disclosure Statement") to all holders of Claims[2] against COFINA in connection with (i) the solicitation of acceptances or rejections of the proposed *Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* [ECF No. ____] (the "Plan of Adjustment"), dated October [12], 2018, and (ii) the hearing on confirmation of the Plan of Adjustment (the "Confirmation Hearing") scheduled for January 16, 2019 at [9:30 a.m.] (prevailing Atlantic Time).

To the extent any inconsistencies exist between this Disclosure Statement, the Amended PSA (defined below), the Term Sheet, and the Plan of Adjustment, the Plan of Adjustment will govern.

This Disclosure Statement includes the following exhibits and supplements (collectively, the "Disclosure Statement"):

- The Plan of Adjustment, together with its exhibits (Exhibit A);

- The Amended and Restated Plan Support Agreement, dated September 20, 2018 (Exhibit B);

- The Scheduled Amortization and Certain Other Terms of COFINA Bonds (Exhibit C);

- The certified COFINA Fiscal Plan (Exhibit D);

- Audited Financial Statements for COFINA for the Year Ended June 30, 2015 (Exhibit E); and

- [A schedule of Existing Securities listed by CUSIP and class, as determined prior to elections made pursuant to the Plan of Adjustment (Exhibit F).]

---

[1] The Oversight Board submits this Disclosure Statement in Case No. 17-BK-3284-LTS, as the Title III debtor representative of the Puerto Rico Sales Tax Financing Corporation ("COFINA") in its Title III Case, in accordance with PROMESA section 315(b) (the Oversight Board, in its capacity as representative of COFINA, is referred to as the "Debtor").

[2] Capitalized terms used but not defined in this Disclosure Statement have the respective meanings given to them in the Plan of Adjustment.

On June 30, 2016, the Oversight Board was established under section 101(b) of PROMESA.  On August 31, 2016, President Barack Obama appointed the seven (7) members of the Oversight Board pursuant to section 101(e) of PROMESA.  On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to sections 104(j) and 206 of PROMESA and, at the request of the Governor, filed a voluntary petition for relief for COFINA pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "Title III Court"), commencing a case under Title III of PROMESA (the "Title III Case"). On [October 19], 2018, the Debtor filed the [*Puerto Rico Sales Tax Financing Corporation's Motion for Order (I) Approving Notice of Disclosure Statement Hearing; (II) Approving Disclosure Statement; (III) Fixing Voting Record Date; (IV) Scheduling Plan Confirmation Hearing and Approving Form and Manner of Related Notice and Objection Procedures; (V) Approving Solicitation Packages and Procedures for the Distribution Thereof; (VI) Approving Forms of Ballots and Voting Procedures; (VII) Fixing Voting Deadline; and (VIII) Approving Vote Tabulation Procedures*] with the Title III Court [ECF No. ___] (the "Disclosure Statement Approval Motion").  On [October 19], 2018, the Debtor filed the Plan of Adjustment [ECF No. ___].

The Oversight Board also filed a voluntary petition for relief for the Commonwealth in the Title III Court (the "Commonwealth Title III Case").  While the Commonwealth Title III Case is distinct from COFINA's Title III Case, both cases are related and raise certain similar issues.  Most notably, there is a dispute between the Commonwealth and COFINA regarding ownership of the sales and use taxes purportedly transferred by the Commonwealth to COFINA to secure payment of certain indebtedness of COFINA (the "Commonwealth-COFINA Dispute").

Concurrently with the Debtor's filing of the Plan of Adjustment, on October [15], 2018], the Oversight Board, in its capacity as the representative of the Commonwealth of Puerto Rico (the "Commonwealth"), filed in the Commonwealth Title III case the [*Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation*] [ECF No. ___, Case No. 17-3283] (the "Settlement Motion"), seeking an order of the Title III Court approving the compromise and settlement of the Commonwealth-COFINA Dispute, described further in Section [III.E.1, "The Commonwealth-COFINA Dispute and the Lex Claims Litigation"] of this Disclosure Statement.  On [___], 2018, the Title III Court issued the [Disclosure Statement Order] approving the Disclosure Statement.  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE TITLE III COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN OF ADJUSTMENT.  THE TITLE III COURT WILL CONSIDER CONFIRMATION OF THE PLAN OF ADJUSTMENT AT THE CONFIRMATION HEARING SCHEDULED FOR JANUARY 16, 2019 AT [9:30 A.M.] (PREVAILING ATLANTIC TIME).**

The Confirmation Hearing may be adjourned or continued from time to time.  Therefore, parties in interest should check the online docket at https://cases.primeclerk.com/puertorico to confirm the latest scheduled date and time of the Confirmation Hearing.

2

101361236v22

The Debtor is furnishing this Disclosure Statement as the proponent of the Plan of Adjustment pursuant to Bankruptcy Code section 1125 and in connection with the solicitation of votes to accept or reject the Plan of Adjustment, as it may be amended or supplemented from time to time in accordance with Title III and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as made applicable to Title III pursuant to section 310 of PROMESA.

This Disclosure Statement provides the information required by Bankruptcy Code section 1125 and summarizes the Plan of Adjustment, COFINA's operations, its financial condition, including the certified fiscal plan, financial projections, as well as other related matters, including the treatment of holders of Claims against COFINA. This Disclosure Statement also describes certain potential federal and Puerto Rico income tax consequences to holders of Claims, voting and distribution election procedures, and the confirmation process.

A ballot for the acceptance or rejection of the Plan of Adjustment (a "Ballot") and/or a notice of election of distributions under the Plan of Adjustment (an "Election Notice") is enclosed with the copy of this Disclosure Statement distributed to the holders of Claims in the Classes that are entitled either to vote to accept or reject the Plan of Adjustment and/or elect the form of distribution it will receive under the Plan of Adjustment. The Ballot includes information regarding the voting deadlines and detailed instructions for voting to accept or reject the Plan of Adjustment. The Election Notice includes information regarding the election deadline and detailed instructions for making an election of the form of distribution to be received under the Plan of Adjustment. Before voting and/or making the applicable election, each holder of a Claim entitled to vote and/or make an election should read this Disclosure Statement (including the exhibits and documents incorporated by reference herein) and the instructions accompanying the Ballot and Election Notice. These documents contain, among other things, important information concerning the classification of Claims for voting and tabulation of votes. No solicitation of votes on the Plan of Adjustment may be made except pursuant to this Disclosure Statement, as it may be amended, and the Disclosure Statement Order and Bankruptcy Code section 1125. In voting on the Plan of Adjustment or making an election, the holder of a Claim should rely solely on the information relating to COFINA contained or incorporated by reference in this Disclosure Statement and the Plan of Adjustment, including the exhibits attached to these documents.

**THE PLAN OF ADJUSTMENT IS THE PRODUCT OF SUBSTANTIAL NEGOTIATIONS AND REFLECTS VARIOUS SETTLEMENTS AND COMPROMISES, AMONG THE DEBTOR, AAFAF, CERTAIN SIGNIFICANT HOLDERS OF SENIOR COFINA BOND CLAIMS, BOND INSURERS (AMBAC, NATIONAL, AND ASSURED), CERTAIN SIGNIFICANT HOLDERS OF JUNIOR COFINA BOND CLAIMS, AND BONISTAS DEL PATIO, INC. (AN ORGANIZATION ADVOCATING FOR THE INTERESTS OF LOCAL BONDHOLDERS). THE DEBTOR, AAFAF, CERTAIN SIGNIFICANT HOLDERS OF SENIOR COFINA BOND CLAIMS, AMBAC, NATIONAL, ASSURED, CERTAIN SIGNIFICANT HOLDERS OF JUNIOR COFINA BOND CLAIMS, AND BONISTAS BELIEVE THE PLAN OF ADJUSTMENT REPRESENTS A FAIR AND REASONABLE OUTCOME FOR ALL CREDITORS OF COFINA AND, THEREFORE, CONFIRMATION OF THE PLAN OF ADJUSTMENT IS IN THE BEST INTERESTS OF COFINA AND ITS**

101361236v22

**CREDITORS. THE DEBTOR, AAFAF, CERTAIN SIGNIFICANT HOLDERS OF SENIOR COFINA BOND CLAIMS, AMBAC, NATIONAL, ASSURED, CERTAIN SIGNIFICANT HOLDERS OF JUNIOR COFINA BOND CLAIMS, AND BONISTAS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN OF ADJUSTMENT.**

**FOR THE AVOIDANCE OF DOUBT, THIS DISCLOSURE STATEMENT IS DISTRIBUTED SOLELY ON BEHALF OF THE DEBTOR, AND SOME OF THE STATEMENTS HEREIN MAY BE DISPUTED BY CERTAIN CREDITORS, INCLUDING, WITHOUT LIMITATION, STATEMENTS REGARDING THE INTERPRETATION OF PROMESA AND RIGHTS AND REMEDIES OF COFINA, HOLDERS OF SENIOR COFINA BOND CLAIMS, HOLDERS OF JUNIOR COFINA BOND CLAIMS, AND MONOLINE INSURERS.   EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE VIEWS EXPRESSED IN THIS DISCLOSURE STATEMENT ARE THE VIEWS OF THE DEBTOR ONLY AND MAY NOT BE ATTRIBUTED TO ANY OF THE SETTLEMENT PARTIES OR ANY OTHER PARTY.[3]**

## A.      PROMESA Title III: An Overview

Confirmation of a Title III plan of adjustment by the Title III Court binds the debtor, any issuer of securities under the plan of adjustment, any person acquiring property under the plan of adjustment, and any creditor of the debtor.  Subject to certain limited exceptions, the order confirming a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the applicable obligations specified under the confirmed plan of adjustment.

The Title III Court will confirm a plan of adjustment if it satisfies both section 314(b) of PROMESA and the incorporated subsections of Bankruptcy Code section 1129, which are further discussed in Section [VI.C, "Requirements for Confirmation of the Plan of Adjustment"] of this Disclosure Statement.  Among other things, section 314(b) requires that (i) the plan of adjustment comply with the provisions of PROMESA and the applicable provisions of the Bankruptcy Code, (ii) all the required legislative, regulatory, or electoral approvals necessary to carry out any provision of the plan of adjustment shall have been obtained, or such provision is conditioned upon such approval, (iii) the plan of adjustment is feasible and in the best interests of creditors, and (iv) the plan of adjustment is consistent with the applicable fiscal plan certified by the Oversight Board under PROMESA Title II.  On [October 18, 2018], pursuant to section 104(j) of PROMESA, the Oversight Board certified the submission of the Plan of Adjustment. Section 314(b) of PROMESA requires that the Title III Court make an independent determination of whether the Plan of Adjustment is consistent with the applicable fiscal plan.

While the Debtor believes all classes of Claims should vote to accept the Plan of Adjustment, the Plan of Adjustment may be "crammed down" on non-accepting creditors.

---

[3] While the PSA Parties support the Plan of Adjustment and the Settlement, except as otherwise expressly provided herein, including with respect to the information provided by applicable bond insurers (Ambac, National, and Assured) in Article [X] of this Disclosure Statement, the view expressed in this Disclosure Statement are not the views of the PSA Parties, including AAFAF.

Bankruptcy Code section 1129(b)(1) provides that if all of the applicable requirements of section 1129(a) (including the requirement that at least one impaired class accepts the plan of adjustment) other than class acceptance (as provided in section 1129(a)(8)) are met with respect to a plan of adjustment, the Title III Court, on request of the proponent, shall confirm the plan of adjustment if it does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under and has not accepted the plan of adjustment.

## B.    Summary of Key Components of COFINA's Plan of Adjustment

The Debtor submits that the Plan of Adjustment maximizes the value of COFINA's assets for the benefit of its creditors, and that any alternative to confirmation of the Plan of Adjustment would result in significant delays, litigation, lost value, and additional costs.

The Debtor also believes the Plan of Adjustment's contemplated restructuring is feasible and in the best interests of COFINA's creditors.  If the Plan of Adjustment were not to be confirmed, COFINA's options would be either for the Debtor to propose an alternate Title III plan of adjustment or for the Title III Case to be dismissed, in which event, multi-party, multifaceted litigation would likely ensue, as holders of claims compete for the limited resources available to pay those claims.

The following overview summarizes certain key components of the Plan of Adjustment. The overview is qualified in its entirety by the full text of the Plan of Adjustment.

### 1.    Implementation of Settlement Agreement

The Oversight Board, COFINA, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), certain holders of Senior COFINA Bond Claims, Ambac Assurance Corporation ("Ambac"), National Public Finance Guarantee Corporation ("National"), certain holders of Junior COFINA Bond Claims, Assured Guaranty Municipal Corp. ("Assured"), and Bonistas del Patio, Inc. ("Bonistas") (collectively, the "Settlement Parties") have engaged in extensive communications regarding the Plan of Adjustment process, and participated in an extensive Title III Court-authorized mediation process in a concerted effort to resolve their existing and potential disputes, including the Commonwealth-COFINA Dispute.  These efforts culminated in the entry into a Plan Support Agreement and Term Sheet, dated August 29, 2018 (the "Original PSA"), among the Settlement Parties, outlined in the terms of the Plan of Adjustment.  Key provisions of the Original PSA incorporated into the Plan of Adjustment include:

- Settlement of the Commonwealth-COFINA Dispute by allocating an amount up to fifty-three and sixty-five one-hundredths percent (53.65%) of the Pledged Sales Tax Base Amount (as defined below) in any given fiscal year to COFINA (with the balance of the annual Pledged Sales Tax Base Amount distributed to the Commonwealth).  If the Plan of Adjustment is approved, all pending claims and causes of action related to the Commonwealth-COFINA Dispute will be dismissed with prejudice;

- Issuance of new bonds by Reorganized COFINA to holders of Existing Securities, which will be governed by a New Bond Resolution containing certain covenants agreed to by

101361236v22

the Settlement Parties.  As discussed in detail in the following section, "Puerto Rico Investors" and "Puerto Rico Institutions" that hold uninsured Existing Securities will be eligible to receive additional consideration if they elect to receive new taxable bonds under the Plan of Adjustment.  Additionally, certain holders of insured Existing Securities have the option of receiving interests in a custodial trust or escrow account established by their applicable bond insurer in lieu of the distribution they would otherwise receive on account of their Existing COFINA Bonds; and

- Allocation of certain existing cash deposits between the Commonwealth and COFINA, as described in Section II.N.[22] of this Disclosure Statement (amounts allocated to COFINA will be used, in part, to fund distributions to holders of Existing Securities).

The Original PSA was amended and restated on September 20, 2018 (the "Amended PSA") to include additional holders of Existing Securities, who also held significant amounts of certain GO Bonds (defined below), and provide for the dismissal of the claims and causes of action asserted by Aurelius Capital Master, Ltd. and Six PRC Investments LLC in the litigation styled *Lex Claims, LLC v. The Commonwealth of Puerto Rico*, No. 16-cv-02374 FAB (D.P.R.), currently pending in the United States District Court for the District of Puerto Rico (appealed at the First Circuit Case Nos. 17-1241, 17-1248, 17-1272, 17-1337), which are premised on, among other things, challenges to COFINA's constitutionality and COFINA's entitlement to proceeds of the sales and use taxes.  The compromises and settlements under the Amended PSA are set forth in the Plan of Adjustment pursuant to which distributions to creditors will be made in accordance with its terms, and the Settlement Agreement filed simultaneously with the Plan of Adjustment in the Commonwealth's Title III Case.

Except if Class 9 – General Unsecured Claims votes to reject the Plan of Adjustment, the Plan of Adjustment provides a recovery to all classes of Claims not subject to subordination.

## 2.  Holders of Allowed Claims Permitted to Vote or Make Elections

Pursuant to the Disclosure Statement Order and the Plan of Adjustment, certain holders of Claims are entitled to make an election regarding the form of distribution they will receive under the Plan of Adjustment.  Some holders of Claims may not be entitled to vote to accept or reject the Plan of Adjustment as the insurers of their bonds were granted voting rights, but such holders are entitled to make the foregoing elections.  Below is a chart summarizing who will receive a Ballot and/or Election Notice as well as an overview of the distribution elections and limitations on voting applicable to certain holders of Claims.

|  | Ballot | Election Notice | Non-Voting Notice |
|---|:---:|:---:|:---:|
| Holders of Claims in Class 1 – Senior COFINA Bond Claims | X | X | |
| Beneficial holders of Claims in Class 2 – Senior COFINA Bond Claims (Ambac) | | X | |

| | Ballot | Election Notice | Non-Voting Notice |
|---|---|---|---|
| Ambac with respect to Claims in Class 2 – Senior COFINA Bond Claims (Ambac) | X | | |
| Beneficial holders of Claims in Class 3 – Senior COFINA Bond Claims (National) | | X | |
| National with respect to Claims in Class 3 – Senior COFINA Bond Claims (National) | X | | |
| Holders of Claims in Class 4 – Senior COFINA Bond Claims (Taxable Election)[4] | | | |
| Holders of Claims in Class 5 – Junior COFINA Bond Claims | X | X | |
| Beneficial holders of Claims in Class 6 – Junior COFINA Bond Claims (Assured) | | X | |
| Assured with respect to Claims in Class 6 – Junior COFINA Bond Claims (Assured) | X | | |
| Holders of Claims in Class 7 – Junior COFINA Bond Claims (Taxable Election)[5] | | | |
| Holder of Claims in Class 8 – GS Derivative Claim | X | | |
| Holders of Claims in Class 9 – General Unsecured Claims | X | | |

---

[4] All holders of Claims in respect of "Senior" Existing Securities that are not Ambac Insured Bonds or National Insured Bonds will receive a Class 1 Ballot. Puerto Rico Investors and Puerto Rico Institutions holding such Claims may opt out of Class 1 and elect to be treated under Class 4 to receive a Taxable Bond Distribution. Holders treated under Class 4 will be deemed to accept the Plan of Adjustment and will not receive a Class 4-specific Ballot, but electing holders may cast a provisional vote to accept or reject the Plan of Adjustment on the Class 1 Ballot, which will be counted if it is later determined that they are not eligible for Class 4 or if Class 4 is oversubscribed, in which case, their Claims will be treated wholly or partially under Class 1 and their votes will be counted with Class 1.

[5] Each holder of a Claim in respect of "First Subordinate" Existing Securities that are not Assured Insured Bonds will receive a Class 5 Ballot. Puerto Rico Investors and Puerto Rico Institutions holding such Claims may opt out of Class 5 and elect to be treated under Class 7 to receive a Taxable Bond Distribution. Holders treated under Class 7 will be deemed to accept the Plan of Adjustment and will not receive a Class 7-specific Ballot, but electing holders may cast a provisional vote to accept or reject the Plan of Adjustment on the Class 5 Ballot, which will be counted if it is later determined that they are not eligible for Class 7 or if Class 7 is oversubscribed, in which case, their claims will be treated wholly or partially under Class 1 and their votes will be counted with Class 5.

7

| | Ballot | Election Notice | Non-Voting Notice |
|---|---|---|---|
| Holders of Claims in Class 10 – Section 510(b) Subordinated Claims | | | **X**[6] |

      ***Senior Taxable Bond Distribution Election.***  If you hold "Senior" Existing Securities that are not Ambac Insured Bonds or National Insured Bonds, you may opt out of treatment under Class 1 and elect to have your Claim treated as a Senior COFINA Bond Claim (Taxable Election) under Class 4 in order to receive your distribution under the Plan of Adjustment in the form of the Senior Taxable Bond Distribution if you certify that you are a Puerto Rico Investor or a Puerto Rico Institution.  A holder of uninsured Existing Securities qualifies as:

- a **Puerto Rico Investor** if such holder is either,

  o  A natural person that is a resident of the Commonwealth (for Puerto Rico personal income tax purposes), or

  o  An entity that is wholly owned by or entirely beneficially owned by one or more natural persons that are residents of the Commonwealth (for Puerto Rico personal income tax purposes).

- a **Puerto Rico Institution** if such holder is not a Puerto Rico Investor and is an entity that is domiciled in Puerto Rico.

      If you make the above-described election and your Claim is treated as a Senior COFINA Bond Claim (Taxable Election) under Class 4, you will be deemed to accept the Plan of Adjustment, but will be entitled to cast a provisional vote to accept or reject the Plan of Adjustment, which will be counted if it is later determined you are ineligible to have your Claim treated under Class 4 or if Class 4 is oversubscribed relative to the maximum size of the class.  If you do not elect to receive your distribution under Class 4 or if you are determined to be ineligible for treatment under Class 4, your Claim will be treated under Class 1 and your vote will be counted with Class 1.

      **IF YOU ELECT TO RECEIVE THE SENIOR TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE, AMONG OTHER THINGS, COFINA BONDS IN THE FACE AMOUNT EQUAL TO ___% OF "SENIOR" EXISTING SECURITIES AND THE TAXABLE ELECTION CASH.  IF YOU DO NOT ELECT TO RECEIVE THE SENIOR TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE, AMONG OTHER THINGS, COFINA BONDS IN THE FACE AMOUNT EQUAL TO ____% OF "SENIOR" EXISTING SECURITIES.**

      Bonistas believe that Taxable COFINA Bonds may trade at prices lower than tax-exempt COFINA Bonds.  The price of Taxable COFINA Bonds, however, may trade at prices equal or higher than tax-exempt COFINA Bonds.  In addition, COFINA Bonds distributed to holders

---

[6] Holders of Claims in Class 10 will receive a special notice indicating they are deemed to reject the Plan of Adjustment and not entitled to vote.

electing treatment under Class 4 will have certain repayment terms that differ from those distributed to holders receiving treatment under Class 1.

You are encouraged to review the entire Disclosure Statement, including the tax consequences of making an election discussed in Sections [VIII., "Material United States Federal Income Tax Considerations" and IX., "Certain Material Puerto Rico Income Tax Considerations"] of this Disclosure Statement, before making an election to receive your distribution under the Plan of Adjustment in the form of the Senior Taxable Bond Distribution.

***Junior Taxable Bond Distribution Election.*** If you hold "First Subordinate" Existing Securities that are not Assured Insured Bonds, you may opt out of treatment under Class 5 and elect to have your Claim treated as a Junior COFINA Bond Claim (Taxable Election) under Class 7 in order to receive your distribution under the Plan of Adjustment in the form of the Junior Taxable Bond Distribution if you certify that you are a Puerto Rico Investor or a Puerto Rico Institution. A holder of uninsured "First Subordinate" Existing Securities qualifies as:

- a **Puerto Rico Investor** if such holder is either,

  - A natural person that is a resident of the Commonwealth (for Puerto Rico personal income tax purposes), or

  - An entity that is wholly owned by or entirely beneficially owned by one or more natural persons that are residents of the Commonwealth (for Puerto Rico personal income tax purposes).

- a **Puerto Rico Institution** if such holder is not a Puerto Rico Investor and is an entity that is domiciled in Puerto Rico.

If you make the above-described election and your Claim is treated as a Junior COFINA Bond Claim (Taxable Election) under Class 7, you will be deemed to accept the Plan of Adjustment, but will be entitled to cast a provisional vote to accept or reject the Plan of Adjustment, which will be counted if it is later determined you are ineligible to have your Claim treated under Class 7 or if Class 7 is oversubscribed relative to the maximum size of the class. If you do not elect to receive your distribution under Class 4 or if you are determined to be ineligible for treatment under Class 7, your Claim will be treated under Class 5 and your vote will be counted with Class 5.

**IF YOU ELECT TO RECEIVE THE JUNIOR TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE, AMONG OTHER THINGS, COFINA BONDS IN THE FACE AMOUNT EQUAL TO ___% OF "FIRST SUBORDINATE" EXISTING SECURITIES AND THE TAXABLE ELECTION CASH. IF YOU DO NOT ELECT TO RECEIVE THE JUNIOR TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE, AMONG OTHER THINGS, COFINA BONDS IN THE FACE AMOUNT EQUAL TO ____% OF "FIRST SUBORDINATE" EXISTING SECURITIES.**

Bonistas believe that Taxable COFINA Bonds may trade at prices lower than tax-exempt COFINA Bonds. The price of Taxable COFINA Bonds, however, may trade at prices equal or higher than tax-exempt COFINA Bonds. In addition, COFINA Bonds distributed to holders

9

electing treatment under Class 7 will have certain repayment terms that differ from those distributed to holders receiving treatment under Class 5.

You are encouraged to review the entire Disclosure Statement, including the tax consequences of making an election discussed in Sections [VIII., "Material United States Federal Income Tax Considerations" and IX., "Certain Material Puerto Rico Income Tax Considerations"] of this Disclosure Statement, before making an election to receive your distribution under the Plan of Adjustment in the form of the Junior Taxable Bond Distribution.

***Senior COFINA Bond Claims (Ambac) – Distribution Election and Voting.*** If you are a beneficial holder of securities giving rise to impaired Claims in Class 2 (Senior COFINA Bond Claims (Ambac)), you may elect on your Election Notice(s) to receive either your Pro Rata Share of (1) the Senior COFINA Bond Distribution, or (2) the Ambac Certificates; however, you will not be able to vote to accept or reject the Plan of Adjustment. However, Ambac will have the right to vote to accept or reject the Plan of Adjustment on behalf of beneficial holders of securities giving rise to impaired Claims in Class 2, as contemplated by the Amended PSA.

***Senior COFINA Bond Claims (National) – Distribution Election and Voting.*** If you are a beneficial holder of securities giving rise to impaired Claims in Class 3 (Senior COFINA Bond Claims (National)), you may elect on your Election Notice(s) to receive either your Pro Rata Share of (1) the Senior COFINA Bond Distribution, or (2) the National Certificates; however, you will not be able to vote to accept or reject the Plan of Adjustment. However, National will have the right to vote to accept or reject the Plan of Adjustment on behalf of beneficial holders of securities giving rise to impaired Claims in Class 3, as contemplated by the Amended PSA.

***Junior COFINA Bond Claims (Assured) – Distribution Election and Voting.*** If you are a beneficial holder of securities giving rise to impaired Claims in Class 6 (Junior COFINA Bond Claims (Assured)), and Assured has not exercised the Assured Election with respect to your Assured Insured Bonds as of the Voting Record Date, you may choose on the form accompanying your Election Notice one of the following Assured Bondholder Elections: (1) Assured Bondholder Election 1, pursuant to which you will receive from Assured the applicable Acceleration Price on the Effective Date in full satisfaction and discharge of (a) your claims against COFINA arising from the Assured Insured Bonds and (b) all of Assured's obligations under the applicable Assured Insurance Policies; or (2) Assured Bondholder Election 2, pursuant to which you will receive the treatment set forth in section 17.3 of the Plan of Adjustment. However, Assured will have the right to vote to accept or reject the Plan of Adjustment on behalf of beneficial holders of securities giving rise to impaired Claims in Class 6, as contemplated by the Amended PSA.

AFTER THE ELECTION DEADLINE, ALL SECURITIES THAT HAVE BEEN TENDERED WITH RESPECT TO AN ELECTION WILL BE RESTRICTED FROM FURTHER TRADING OR TRANSFER UNTIL THE EFFECTIVE DATE OF THE PLAN OF ADJUSTMENT. THIS IS NECESSITATED BY THE DEPOSITORY TRUST COMPANY PROCEDURES TO ASSOCIATE AN ELECTION WITH THE UNDERLYING SECURITY, WHICH CAN ONLY BE ACCOMPLISHED BY TENDERING THE UNDERLYING SECURITY.

101361236v22

3.      **Treatment of Allowed Claims**

Except for Administrative Claims and Professional Claims, which are not required to be classified, all Claims that existed on the Petition Date are divided into classes under the Plan of Adjustment.  The following summarizes the treatment of the classified Claims under the Plan of Adjustment on the Effective Date.  The amount that a creditor may actually recover could vary from the estimates below.

*Class 1 – Senior COFINA Bond Claims*:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim against COFINA shall receive its Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds, and (d) Rounding Amount Cash, if necessary.

Any holder of an Allowed Senior COFINA Bond Claim who is (i) a Puerto Rico Investor or (ii) a Puerto Rico Institution may elect to be treated under Class 4 – Senior COFINA Bond Claims (Taxable Election).

Estimated Percentage Recovery – Taxable Election:  [____]

Estimated Percentage Recovery – No Taxable Election:  [____]

*Class 2 - Senior COFINA Bond Claims (Ambac)*:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (Ambac) against COFINA shall have the option to elect to receive its Pro Rata Share of:

(1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, plus (b) consideration, distributable by or at the direction of Ambac, in accordance with the provisions of section 6.2 of the Plan of Adjustment, in full and complete satisfaction, release, and discharge of any further obligation of Ambac with respect to the Ambac Insurance Policy (and, by making such election, the holder shall agree to commute the Ambac Insurance Policy relating to such holder's Allowed Senior COFINA Bond Claim (Ambac) and such holder shall have no other or further rights with respect to the Ambac Insurance Policy, the Ambac Trust, or the Ambac Certificates); or

(2) the Ambac Certificates representing an interest in the Ambac Trust Assets.

For the avoidance of doubt, with respect to any holder of an Allowed Senior COFINA Bond Claim (Ambac) that elects (or is deemed to elect) to receive distributions in accordance with the provisions of subsection (1) above, (i) such holder shall be deemed to have released Ambac from its obligations and liabilities under or related to the Ambac Insurance Policy in respect of such holder's Ambac Insured Bonds, (ii) such holder shall not be entitled to the benefit of the Ambac Insurance Policy and shall have no right to make a claim under, or receive payment from, the Ambac Insurance Policy, (iii) Ambac shall be released from its obligations under or related to the Ambac Insurance Policy in respect of such holder's Ambac Insured Bonds, and (iv) the Ambac Insurance Policy shall be terminated and commuted in full with respect to such holder's Ambac Insured

11

Bonds, no provision of the Ambac Insurance Policy with respect to such Ambac Insured Bonds shall survive termination, and such Ambac Insured Bonds shall no longer have the benefit of the Ambac Insurance Policy.

***Ambac Insurance Contribution:*** In consideration for the releases to be given to Ambac, and in accordance with Section 6.1(a) of the Plan of Adjustment, on the Effective Date, a beneficial holder of an Allowed Senior COFINA Bond Claim (Ambac) that does not validly elect to receive Ambac Certificates shall receive, in addition to the Senior COFINA Bond Distribution, consideration from Ambac in an amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (Ambac) as of the Petition Date, and the beneficial holder thereof shall have no other or further rights under or with respect to the Ambac Insurance Policy, the Ambac Trust, or the Ambac Certificates.  The provisions set forth in section 6.2 of the Plan of Adjustment apply only to Senior COFINA Bond Claims (Ambac) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof or its predecessor in interest otherwise purchased or acquired insurance on the secondary market.  A holder of an Allowed Senior COFINA Bond Claim (Ambac) that does not validly elect to receive Ambac Certificates shall have, on or after the Effective Date, the Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policy, underlying such holder's Allowed Senior COFINA Bond Claim (Ambac) cancelled.

***Non-Commutation/Ambac Trust:*** In the event that a holder of a Senior COFINA Bond Claim (Ambac) timely returns its Ballot/Election Notice and elects to receive the distributions set forth in section 6.1(b) of the Plan of Adjustment, on the Effective Date, COFINA shall deposit or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Senior COFINA Bond Distribution into the Ambac Trust and such holder shall be deemed to have received its Pro Rata Share of the Senior COFINA Bond Distribution and shall receive its pro rata share of Ambac Certificates in consideration therefor.

***Commutation Disclosure:*** Ambac notes that a beneficial holder of an Allowed Senior COFINA Bond Claim (Ambac) that elects (or is deemed to have elected) to commute its Ambac Insurance Policy is estimated to receive aggregate consideration under the Plan (assuming the COFINA Bonds trade at par) totaling at least 100% of such holder's Allowed Senior COFINA Bond Claim (Ambac) as of the Petition Date, comprised of (i) COFINA Bonds, (ii) interest accrual or accretion on COFINA Bonds, commencing as of August 1, 2018, (iii) Cash, and (iv) the Ambac Commutation Payment.  Ambac makes no representation regarding this Disclosure Statement, including, without limitation, whether the COFINA Bonds will trade at par.

Estimated Percentage Recovery:  [____]

***Class 3 - Senior COFINA Bond Claims (National)***:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (National) against COFINA shall have the option to elect to receive its Pro Rata Share of:

12

(1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, plus (b) Cash, distributable by or at the direction of National, in accordance with the provisions of section 7.2 of the Plan of Adjustment, in full and complete satisfaction, release, and discharge of any further obligation of National with respect to the applicable National Insurance Policies (and, by making such election, the holder shall agree to commute the National Insurance Policies relating to such holder's Allowed Senior COFINA Bond Claim (National) and such holder shall have no other or further rights with respect to the National Insurance Policies, the National Trust, or the National Certificates); or

(2) the National Certificates representing an interest in the National Trust Assets.

For the avoidance of doubt, with respect to any holder of an Allowed Senior COFINA Bond Claim (National) that elects (or is deemed to elect) to receive distributions in accordance with the provisions of subsection (1) above, (i) such holder shall be deemed to have released National from its obligations and liabilities under or related to the National Insurance Policies in respect of such holder's National Insured Bonds, (ii) such holder shall not be entitled to the benefit of the National Insurance Policies and shall have no right to make a claim under, or receive payment from, the National Insurance Policies, (iii) National shall be released from its obligations under or related to the National Insurance Policies in respect of such holder's National Insured Bonds, and (iv) the National Insurance Policies shall be terminated and commuted in full with respect to such holder's National Insured Bonds, no provision of the National Insurance Policies with respect to such National Insured Bonds shall survive termination, and such National Insured Bonds shall no longer have the benefit of the National Insurance Policies.

***National Insurance Contribution:*** In consideration for the releases to be given to National, and in accordance with the provisions of section 7.1 of the Plan of Adjustment, on the Effective Date, a beneficial holder of an Allowed Senior COFINA Bond Claim (National) that fails to validly elect to receive National Certificates shall receive, in addition to its Pro Rata Share of the Senior COFINA Bond Distribution, Cash distributable by or at the direction of National, in an amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (National) as of the Petition Date, and the beneficial holder thereof shall have no other or further rights under or with respect to the National Insurance Policies, the National Trust, or the National Certificates.  The provisions set forth in section 7.2 of the Plan of Adjustment apply only to Senior COFINA Bond Claims (National) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof is or its predecessor in interest otherwise purchased or acquired insurance on the secondary market.  A holder of an Allowed Senior COFINA Bond Claim (National) that fails to validly elect to receive National Certificates shall have, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the related National Insurance Policies, underlying such holder's Allowed Senior COFINA Bond Claim (National) cancelled.

13

***Non-Commutation/National Trust:*** In the event that a holder of a Senior COFINA Bond Claim (National) timely returns its Ballot/Election Notice and elects to receive the distributions set forth in section 7.1(b) of the Plan of Adjustment (in accordance with the instructions set forth in the Election Notice), on the Effective Date, COFINA shall deposit or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Senior COFINA Bond Distribution into the National Trust and such holder shall be deemed to have received its Pro Rata Share of the Senior COFINA Bond Distribution and shall receive its pro rata share of National Certificates in consideration therefor.

***National Election:*** At any time prior to the commencement of the Disclosure Statement Hearing, National may elect, in a written notice provided to the Oversight Board, an alternative treatment option for Senior COFINA Bond Claims (National), pursuant to which, in the sole and absolute discretion of National, and subject to the consent of the Oversight Board, which consent shall not be unreasonably withheld, on the Effective Date, the National Insured Bonds shall be paid off, in full, at an acceleration price equal to one hundred percent (100%) of the Compounded Amount (as defined in the Existing Bond Resolution) of the National Insured Bonds, as of the Effective Date, as follows: the COFINA Bonds to be issued to holders of Senior COFINA Bond Claims (National) shall be underwritten and sold into the market, the proceeds of which, together with any cash portion of the Senior COFINA Bond Distribution that would otherwise be allocated for payment of Senior COFINA Bond Claims (National), shall be used to pay, in Cash, one hundred percent (100%) of the Compounded Amount of the National Insured Bonds, as of the Effective Date, with any deficiency in such amounts being paid by National in full, in Cash, on the Effective Date.

Estimated Percentage Recovery:  [____]

***Class 4 – Senior COFINA Bond Claims (Taxable Election)***:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (Taxable Election) against COFINA shall be entitled to receive, in full satisfaction, release, and exchange of such holder's Allowed Senior COFINA Bond Claim (Taxable Election), its Pro Rata Share of:

(1) the Senior COFINA Bond Distribution, consisting of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds have been distributed, tax-exempt COFINA Bonds, and (ii) Rounding Amount Cash, if necessary; and

(2) the Taxable Election Cash.

If Taxable Bond Distributions are elected by Puerto Rico Investors holding Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Class 4 Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Class 1 Senior COFINA Bond Claim.

101361236v22

If Taxable Bond Distributions are elected by Puerto Rico Institutions holding Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Class 4 Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Class 1 Senior COFINA Bond Claim.

Estimated Percentage Recovery:  [____]

***Class 5 – Junior COFINA Bond Claims***:  On the Effective Date and subject to the right of election set forth in section 9.2 of the Plan of Adjustment, each holder of an Allowed Junior COFINA Bond Claim against COFINA shall be entitled to receive its Pro Rata Share of the Junior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Bonds, and (c) Rounding Amount Cash, if necessary.

Any holder of an Allowed Junior COFINA Bond Claim who is (i) a Puerto Rico Investor or (ii) a Puerto Rico Institution may elect to be treated under Class 7 – Junior COFINA Bond Claims (Taxable Election).

Estimated Percentage Recovery – Taxable Election:  [____]

Estimated Percentage Recovery – No Taxable Election:  [____]

***Class 6 – Junior COFINA Bond Claims (Assured)***:  In the event Assured makes the Assured Election with respect to any Assured Insured Bonds, all or any portion of the Assured Insured Bonds selected by Assured pursuant to the Assured Election shall be paid, in full, at the applicable Acceleration Price as of the Effective Date, (1) from the Section 103 Cash and Rounding Amount Cash, if any, which, in each case, is allocable to Junior COFINA Bond Claims (Assured), and (2) otherwise as follows:  the COFINA Bonds allocable to holders of Junior COFINA Bond Claims (Assured) shall be (i) guaranteed in accordance with a new insurance policy issued by Assured, (ii) underwritten and (iii) sold into the market, the proceeds of which shall be used to pay, in cash, on the Effective Date, the applicable Acceleration Price, with any deficiency in such amounts being paid by Assured in accordance with the Assured Insurance Policies guaranteeing the Assured Insured Bonds underlying the Junior COFINA Bond Claims (Assured). The principal amount, maturities and interest rates of the Assured New Bonds will be determined by Assured in consultation with the underwriter for the Assured New Bonds, provided that the debt service on the Assured New Bonds due in any year shall not be greater than the debt service that would be due if such Assured New Bonds were issued as COFINA Bonds without insurance (although the Assured New Bonds may mature later than the other COFINA Bonds, but in no event later than FY2058).   For the avoidance of doubt, the compensation for the underwriter(s) and any other costs of issuance associated with the issuance of Assured New Bonds will be payable by the Government Parties.  All other terms regarding the underwriting of the Assured New Bonds will be subject to the approval of Assured.  Payment of the applicable Acceleration Price with respect to any Assured Insured Bond in accordance with the Assured Election shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

15

***Bondholder Elections:*** In the event that Assured declines to make the Assured Election with respect to any Assured Insured Bonds, each beneficial holder of an Assured Insured Bond with respect to which Assured has not made the Assured Election may choose one of the following Assured Bondholder Elections: (1) Assured Bondholder Election 1, pursuant to which such holder shall receive from Assured the applicable Acceleration Price on the Effective Date in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured shall receive either (a) the Pro Rata Share of the Junior COFINA Bond Distribution allocable to such holder or (b) at Assured's election, any Section 103 Cash and Rounding Amount Cash allocable to such holder, and the COFINA Bonds otherwise allocable to such holder shall be sold into the market as Assured New Bonds in the same manner and on the same terms as if Assured had exercised the Assured Election with respect to such holder's Assured Insured Bonds; or (2) Assured Bondholder Election 2, pursuant to which such holder shall opt into the treatment set forth in section 17.3 of the Plan of Adjustment (summarized below); *provided, however*, that, in the event that a beneficial holder of a Junior COFINA Bond Claim (Assured) (i) fails to timely return its properly completed Ballot/Election Notice (in accordance with the instructions set forth in the Election Notice), (ii) fails to choose one of the Assured Bondholder Elections, or (iii) elects more than one Assured Bondholder Election on such Ballot/Election Notice, then such holder shall be deemed to have elected Assured Bondholder Election 2.

***Terms of Assured Trusts (Section 17.3 of the Plan of Adjustment):*** Subject to the provisions of section 17.3 of the Plan of Adjustment, On the Effective Date, by electing (or being deemed to have elected) Assured Bondholder Election 2, each beneficial holder of an Assured Legacy Bonds CUSIP shall be deemed to have exchanged and deposited such Assured Legacy Bonds CUSIP into the Assured Trust that is formed for the benefit of beneficial holders of such Assured Legacy Bonds CUSIP in exchange for one or more Assured Certificates issued by such Assured Trust and evidencing a pro rata beneficial ownership interest in the related Assured Trust Assets.  On the Effective Date, COFINA shall concurrently with the exchange described in the immediately preceding sentence, deposit the applicable Assured Trust Assets (other than the Assured Legacy Bonds) into each of the Assured Trusts.  The Assured Trust Assets shall not be property of COFINA, but shall be held by the Assured Trustee solely for the benefit of the Assured Certificate Holders and Assured (to the extent that it is subrogated to the rights of the holders of the Assured Certificate Holders) in accordance with the terms of the Assured Trust Agreement.  The Assured Certificate Holders shall be the "tax owners" of the Assured Trust Assets for Federal income tax purposes.

***Deemed Acceleration:*** The principal amount (or Compounded Amount in the case of capital application bonds) of the Assured Insured Bonds will be deemed accelerated and immediately due and payable, including for purposes of section 1102 of the Bond Resolution, as of the Effective Date; *provided, however*, that such deemed acceleration shall not affect, nor will it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

Estimated Percentage Recovery:  [____]

***Class 7 – Junior COFINA Bond Claims (Taxable Election)***:   On the Effective Date, each holder of an Allowed Junior COFINA Bond Claim (Taxable Election) against COFINA shall be entitled to receive, in full satisfaction, release, and exchange of such holder's Allowed Junior COFINA Bond Claim (Taxable Election), its Pro Rata Share of:

> (a) the Junior COFINA Bond Distribution consisting of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary; and

> (b) the Taxable Election Cash.

> If Taxable Bond Distributions are elected by Puerto Rico Investors for Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Class 7 Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Class 5 Junior COFINA Bond Claim

> If Taxable Bond Distributions are elected by Puerto Rico Institutions for Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Class 7 Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Class 5 Junior COFINA Bond Claim.

> Estimated Percentage Recovery:  [____]

***Class 8 – GS Derivative Claim***:  On the Effective Date, the holder of the Allowed GS Derivative Claim against COFINA shall, to the extent that the termination value of the GS Derivative Claim is

> (1) greater than the amount of the collateral in such holder's possession, be entitled to retain such collateral and, with respect to the balance of the GS Derivative Claim, (a) to the extent that rejection damages, if any, associated with such GS Derivative Claim is a Parity Obligation, as defined in the Existing Bond Resolution, such holder's Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (i) COFINA Cash Available for Distribution, (ii) COFINA Bonds and (iii) Rounding Amount Cash, if necessary, and (b) to the extent that rejection damages, if any, associated with such GS Derivative Claim is a not a Parity Obligation, such holder shall not receive a distribution pursuant to the Plan of Adjustment, or

> (2) less than the amount of collateral in such holder's possession, the holder of the GS Derivative Claim shall liquidate such collateral in full and complete satisfaction of the GS Derivative Claim and return the balance of such collateral value to Reorganized COFINA.

> Estimated Percentage Recovery:  [____]

***Class 9 – General Unsecured Claims***:  On the Effective Date, if Class 9 votes to accept the Plan of Adjustment, each holder of an Allowed General Unsecured Claim against COFINA shall be entitled to receive its pro rata share of One Hundred Thousand Dollars ($100,000.00); provided, however, that if Class 9 votes to reject the Plan of Adjustment, holders of Allowed General Unsecured Claims against COFINA shall not receive a distribution pursuant to the Plan of Adjustment.

> Estimated Percentage Recovery:  If Class 9 votes to accept the Plan of Adjustment, [____]%.  If Class 9 votes to reject the Plan of Adjustment, 0%.

***Class 10 – Section 510(b) Subordinated Claims***:  Allowed Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan of Adjustment, and each holder of an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the Plan of Adjustment.

#### 4.      Overview of COFINA Bonds to be issued on the Effective Date

On the Effective Date, COFINA will issue: (i) four (4) series of Current Interest Bonds ("CIBs"), and (ii) one series of Capital Appreciation Bonds ("CABs") (collectively, and together with any other bonds issued by COFINA or Reorganized COFINA pursuant to the Plan of Adjustment, the "COFINA Bonds").  Subject to certain adjustments permitted under the Plan of Adjustment, including with respect to the Assured New Bonds, the CIBs will have an aggregate original principal amount of $9,616,365,000, interest rates between 4.35% and 4.60%, and stated maturity dates between July 1, 2028 and July 1, 2044.  Subject to certain adjustments permitted under the Plan of Adjustment, including with respect to the Assured New Bonds, CABs will have an aggregate original principal amount of $2,404,192,599.90, an interest rate of 5.50%, and a stated maturity date of July 1, 2058.  The COFINA Bonds will be issued pursuant to a COFINA Bond Indenture, adopted by the Board of Directors of COFINA on or prior to the Effective Date (the "COFINA Bond Indenture"). The COFINA Bonds will be distributed as set forth in the Plan of Adjustment.  Notwithstanding the timing of the Effective Date, interest on the COFINA Bonds shall commence to accrue or accrete, as the case may be, as of August 1, 2018, which date shall be designated as the "dated" date of the COFINA Bonds.

Neither the CIBs nor CABs shall carry any default rate of interest, provided that interest shall accrue on all overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until paid or satisfied in full in accordance with their terms.

Pursuant to the Plan of Adjustment, and subject to certain qualifications provided in the Plan of Adjustment, COFINA may also issue securities after the Effective Date, on a *pari passu* basis with the COFINA Bonds issued on the Effective Date, for the purpose of refinancing, in whole or in part, COFINA Bonds or securities previously issued to refinance COFINA Bonds, (the "COFINA Parity Bonds").  Except with respect to the issuance of COFINA Parity Bonds, COFINA may not issue any securities on a *pari passu* or higher priority basis than the COFINA Bonds issued on the Effective Date.

### 5.     Overview of Ambac Certificates and National Certificates

*Ambac Certificates.*   On or prior to the Effective Date, the Ambac Trust will be established for the benefit of beneficial holders of Senior COFINA Bond Claims (Ambac) that validly elect to receive the Ambac Certificates in accordance with the approved solicitation procedures.  On the Effective Date, the following shall be deposited (or deemed deposited) into the Ambac Trust:  (1) the Ambac Insured Bonds allocable to the electing holders of the Senior COFINA Bond Claims (Ambac), (2) the Senior COFINA Bond Distribution (consisting of Section 103 Cash, if applicable, COFINA Cash Available for distribution, COFINA Bonds, and Rounding Amount Cash, if necessary) allocable to the electing holders of the Senior COFINA Bond Claims (Ambac) and (3) the benefits of the Ambac Insurance Policy (collectively (1)-(3), the "Ambac Trust Assets").  Notwithstanding the deposit therein, the Ambac Insured Bonds shall not be cancelled and all rights and remedies (other than with respect to the payment obligations of COFINA) under and in accordance with the Ambac Insured Bonds, the Existing Bond Resolution, and the Ambac Insurance Policy shall be preserved and remain in full force and effect.

Upon deposit of the Ambac Trust Assets, the trustee shall issue on a pro rata basis two series of Ambac Certificates, (i) a series with a mandatory redemption date of August 1, 2047, and (ii) a series with a mandatory redemption date of August 1, 2054, to the beneficial holders of the Ambac Insured Bonds deposited into the Ambac Trust in accordance with the related maturity date of the Ambac Insured Bonds deposited on behalf of such beneficial holders.  Each holder of the Ambac Certificates will receive a mixture of taxable and tax-exempt income from the Ambac Trust.

Each class of Ambac Certificates will have its own class accretion schedule that sets forth the accreted payment amounts as of any date.  Each distribution on the Ambac Certificates (whether or not taxable to a holder or reduced by withholding or tax payments made by the Ambac Trust) shall reduce the related obligation of Ambac under the Ambac Insurance Policy, shall be deemed to reduce the amount outstanding on the Ambac Insured Bonds, and shall result in the recalibration of the related class accretion schedules.  Upon repayment or redemption of all Ambac Certificates, Ambac will be entitled to receive all remaining assets in the Ambac Trust.

Although the trustee of the Ambac Trust will hold the Ambac Trust Assets for the benefit of the holders of the Ambac Certificates, the trustee will not actively manage the Ambac Trust.  The trust agreement will provide that Ambac will have the right to direct the trustee to dispose of COFINA Bonds or take certain other actions in respect of the Ambac Trust Assets, including any actions permitted of a holder of the COFINA Bonds.  Distributions to holders of Ambac Certificates from payments received on the COFINA Taxable Bonds will not be distributed to holders of the Ambac Certificates if Ambac directs the Trustee to reinvest such distributions.  Accordingly, there can be no guarantee as to when holders of Ambac Certificates will receive distributions on the COFINA Taxable Bonds.

The Ambac Trust Assets are not expected to be liquid.  There will be no market for any class of Ambac Trust Assets prior to the issuance of the Ambac Trust Assets and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide liquidity of investment or that it will continue for the life of such Ambac Trust Assets.

101361236v22

Additional terms and conditions of the Ambac Trust are described in Section [____] of this Disclosure Statement.

Beneficial Holders of Senior COFINA Bond Claims (Ambac) are encouraged to review the entire Disclosure Statement, including the risk factors of electing to receive Ambac Certificates discussed in Section [____] of this Disclosure Statement, before making an election to receive a distribution under the Plan of Adjustment in the form of the Ambac Certificates.

*National Certificates.* On or prior to the Effective Date, the National Trust shall be formed on behalf of, and for the sole benefit of the holders of Senior COFINA Bond Claims (National) that validly elect to receive the National Certificates in accordance with the approved solicitation procedures and so long as any such holder has not otherwise agreed to commute the National Insurance Policies on or prior to the Effective Date pursuant to the Plan of Adjustment or otherwise. On or before the Effective Date, the following shall be deposited (or deemed deposited) into the National Trust: (i) the National insured Existing Securities that have not been commuted; (ii) the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National) that elect to receive National Certificates; (iii) the National Insurance Policies; and (iv) National's entitlement to the Consummation Costs, as defined in the Amended PSA.

Upon deposit of the National Trust Assets into the National Trust, the trustee shall issue on a pro rata basis one or more series of National Certificates to the beneficial holders of Senior COFINA Bond Claims (National) whose allocable shares of the Senior COFINA Bond Distribution are deposited into the National Trust. The National Certificates shall entitle the holder thereof (the "National Certificate Holder") to its pro rata share of value in and any distribution of cash from the respective National Trust. Any such distribution shall (i) in all cases, occur promptly upon receipt thereof by the National Trust and (ii) automatically reduce the obligation outstanding under the National Insurance Policies as of the date of such distribution to National Certificate Holders by the amount of such distribution. Each series of National Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through the Depository Trust Company.

Beneficial holders of Senior COFINA Bond Claims (National) are encouraged to review the entire Disclosure Statement, including the risk factors of electing to receive National Certificates discussed in Section [ ] of this Disclosure Statement, before making an election to receive a distribution under the Plan of Adjustment in the form of the National Certificates.

### 6.   Overview of Assured Trusts and Assured Certificates

#### (a)   *General Terms*

In the event that (i) Assured declines to exercise the Assured Election with respect to all Assured Insured Bonds and (iii) any Assured Legacy Bonds exist as of the Effective Date (*i.e.*, Assured Insured Bonds with respect to which Assured has not exercised the Assured Election and the beneficial holders of which have not elected Assured Bondholder Election 1) a separate Assured Trust shall be formed on behalf of, and for the benefit of, beneficial holders of each Assured Legacy Bonds CUSIP. The Assured Trustee of each Assured Trust shall be in Entity selected by Assured that is a nationally recognized U.S. domiciled financial institution and

fiduciary regularly acting as trustee in the municipal finance market.  On the Effective Date, by electing (or being deemed to have elected) Assured Bondholder Election 2, each beneficial holder of an Assured Legacy Bonds CUSIP shall be deemed to have exchanged and deposited such Assured Legacy Bonds CUSIP into the Assured Trust that is formed for the benefit of beneficial holders of such Assured Legacy Bonds CUSIP in exchange for one or more Assured Certificates issued by such Assured Trust and evidencing a pro rata beneficial ownership interest in the related Assured Trust Assets.  On the Effective Date, COFINA shall concurrently with the exchange described in the immediately preceding sentence, deposit the applicable Assured Trust Assets (other than the Assured Legacy Bonds) into each of the Assured Trusts.  The Assured Trust Assets shall not be property of COFINA, but shall be held by the Assured Trustee solely for the benefit of the Assured Certificate Holders and Assured (to the extent that it is subrogated to the rights of the holders of the Assured Certificate Holders) in accordance with the terms of the Assured Trust Agreement.  The Assured Certificate Holders shall be the "tax owners" of the Assured Trust Assets for Federal income tax purposes.

By electing (or being deemed to have elected) Assured Bondholder Election 2, (a) the beneficial holders of Assured Legacy Bonds shall be deemed to have directed each securities intermediary for such Assured Legacy Bonds (including, without limitation, the Depository Trust Company) to take any action that is necessary to effect the transfer of securities entitlements with respect to such Assured Legacy Bonds and the related Assured Certificates in its books-entry systems and/or on its books and records, as applicable, in order to give effect to the provisions of the immediately preceding paragraph.  Each such securities intermediary shall promptly comply with such deemed direction.  Until the Depository Trust Company effects the transfer of securities entitlements with respect to the Assured Legacy Bonds to a securities account designated by the Assured Trustee and established for the benefit of the respective Assured Trust, the bond trustee for the Assured Legacy Bonds (or custodian in the case of Secondary Market Assured Legacy Bonds) shall disburse any payments received under the respective Assured Insurance Policies directly to the Assured Trustee for the benefit of the respective Assured Trusts (rather than such payments being made through the Depository Trust Company), and Assured shall be authorized (but not required) to make any payments under such Assured Insurance Policies directly to the Assured Trustee for the benefit of the respective Assured Trusts (rather than such payments being made through the bond trustee or custodian, as applicable, and the Depositary Trust Company).

The Assured Legacy Bonds that are deposited into the Assured Trusts as described above shall be extinguished, terminated and cancelled other than with respect to (a) the rights of the holders thereof thereunder in respect of the respective Assured Insurance Policies, (b) the rights and obligations of the bond trustee, paying agent, and Assured thereunder in respect of the respective Assured Insurance Policies, and (c) the performance of others necessary administrative or other functions with respect to the foregoing.  The Assured Insurance Policies for the Assured Legacy Bonds that are deposited into the Assured Trusts as described above shall not be cancelled and all rights and remedies under and in accordance with such Assured Insurance Policies shall be preserved and remain in full force and effect.

Subject to the terms and provisions of section 17.3(e) of the Plan of Adjustment, the Assured Certificates shall entitle an Assured Certificate Holder to its pro rata share of value in any distribution of Cash from the respective Assured Trusts, which distribution shall (a) in all

cases, occur promptly upon receipt thereof by such Assured Trust and (b) automatically reduce the obligation outstanding under the respective Assured Insurance Policies as of the date of such distribution to Assured Certificate Holders in the amount of such distribution, as determined by Assured in its sole discretion.  On each Original Assured Scheduled Date for any Assured Legacy Bonds, Assured shall be obligated to pay and remaining amount of the scheduled payment that is due for payment in accordance with the terms of the respective Assured Insurance Policy after giving effect to any reduction pursuant to the immediately preceding sentence.  Upon repayment, redemption or other retirement of all Assured Certificates issued by an Assured Trust (including, without limitation, as a result of the exercise of the Assured Advancement Option as set forth in section 17.3(b) of the Plan of Adjustment or the satisfaction of all of Assured's payment obligations under the respective Assured Insurance Policy), Assured shall be entitled to receive all remaining Assured Trust Assets of such Assured Trust.  At any time on or after the date of receipt of such Assured Trust Assets, Assured shall have the right to sell all or any of the Tax-Exempt COFINA Bonds and/or Taxable COFINA Bonds comprising such Assured Trust Assets.

Each series of Assured Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through the Depository Trust Company.  So long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall be deemed the sole holder of the COFINA Bonds deposited in the respective Assured Trusts with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings.  In addition, Assured shall be fully subrogated to the rights of the respective Assured Certificate Holders in respect of the COFINA Bonds deposited in the respective Assured Trusts.

(b)     *Assured Advancement Option*

Assured shall have the right to exercise the Assured Acceleration Option at any time.  In addition, on the Effective Date, COFINA shall assign to Assured any rights to redeem the Assured Legacy Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured.  Upon the exercise of any Assured Advancement Option and the payment of the Acceleration Payment with respect to any Assured Legacy Bonds CUSIP, the Assured Trustee shall be required to disburse such Acceleration Payment to the related Assured Certificate Holders as set forth in Section 17.3(a) hereof and Assured shall become fully subrogated to all of the rights of such Assured Certificate Holders.  Upon the disbursement of such Acceleration Payment to the related Assured Certificate Holders, the related Assured Certificates shall be retired, the related Assured Trust shall be terminated, and the Assured Trustee shall deliver the related Assured Trust Assets to or at the direction of Assured.

(c)     *Assured Certificate Holder Exchange Option*

Pursuant to the Assured Trust Agreement, a holder of Assured Certificates with an aggregate unpaid principal amount that is equal to the Minimum Threshold or any integral multiple thereof shall have the right to exercise the Assured Certificate Holder Exchange Option by exchanging such Assured Certificates for such holder's pro rata share of related Assured Trust Assets (other than the related Assured Legacy Bonds CUSIP and related Assured Insurance Policy).  Upon the exercise of such Assured Certificate Holder Exchange Option, (i) the

22

exchanging holder's pro rata share of the Assured Legacy Bonds on deposit in the respective Assured Trust shall be deemed to be no longer outstanding for purposes of the related Assured Insurance Policy and such exchanging holder shall relinquish its rights under such Assured Insurance Policy, and (ii) the Assured Trustee shall effect the cancellation of such Assured Certificates.  The Assured Trust Agreement may provide, at Assured's option, that the Assured Certificate Holder Exchange Option may be exercised only (i) after the expiration of any Assured Certificate Holder Exchange Exercise Period and (ii) upon a written notice of such exercise that must be provided prior to the effective date of such exercise such that the effective date occurs after the lapse of any Assured Certificate Holder Exchange Exercise Period.  For the avoidance of doubt, each beneficial holder of Assured Certificates that has not exercised its Assured Certificate Holder Exchange Option on any day on which such option may be exercised(including the first day on which such option may be exercised at the time the applicable Assured Trust is created) has effectively elected to deposit and hold (or continue to hold) its pro rata share of the COFINA Bonds and any other assets comprising the related Assured Trust Assets in the related Assured Trust until such beneficial holder has validly exercised such option.

(d) *__Secondary Market Assured Legacy Bonds__*

On the Effective Date, each bond certificate that currently evidences both Secondary Market Assured Legacy Bonds and any other Existing Securities bearing the same CUSIP shall be exchanged for two separate bond certificates with different CUSIPs but otherwise identical terms – one evidencing the secondary Market Assured Legacy Bonds and the other evidencing such other Existing Securities.  After giving effect to such exchange, Secondary Market Assured Legacy Bonds shall have a unique CUSIP.  Concurrently with such exchange, by electing (or being deemed to have elected) Assured Bondholder Election 2, each beneficial holder of custody receipts evidencing a beneficial ownership interest in the Secondary Market Assured Legacy Bonds with a unique CUSIP and the respective Assured Insurance Policy shall be deemed to have deposited such custody receipts into the respective Assured Trust in exchange for Assured Certificates evidencing a pro rata beneficial ownership interest in the related Assured Trust Assets, which shall consist of such custody receipts and the assets described in clause (b) and (c) of the definition thereof and otherwise shall be subject to the terms set forth in section 17.3 of the Plan of Adjustment.

(e) *__Costs and Expenses__*

All fees, costs and expenses incurred in connection with transactions contemplated pursuant to section 17.3 of the Plan of Adjustment, including, without limitation, fees and expenses associated with the formation and maintenance of the Assured Trusts and the fees and expenses incurred by the Assured Trustee in accordance with the provisions of the Assured Trust Agreement, shall be the sole obligation and responsibility of Assured and the Assured Trusts, and not COFINA or Reorganized COFINA, as the case may be, and the failure of Assured or the Assured Trusts to satisfy any such obligations shall release and discharge COFINA and Reorganized COFINA, as the case may be, from fulfilling any further obligations in connection with the Assured Trust Agreement.

23

## C.       Holders of Claims Entitled to Vote on the Plan of Adjustment

Pursuant to PROMESA Title III and the Bankruptcy Code, only holders of Allowed Claims in classes of claims or equity interests that are impaired and are not deemed to have accepted or rejected a proposed Title III plan of adjustment are entitled to vote to accept or reject a proposed plan of adjustment.  Classes of claims in which the holders of claims are unimpaired under the plan of adjustment are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan of adjustment.  Classes of claims in which the holders of claims will receive no recovery under the plan of adjustment are deemed to have rejected the plan of adjustment and are also not entitled to vote to accept or reject the plan of adjustment.

Holders of Allowed Claims in the following Classes are entitled to vote to accept or reject the Plan of Adjustment:

Class 1 – Senior COFINA Bond Claims;

Class 5 – Junior COFINA Bond Claims;

Class 8 – GS Derivative Claims; and

Class 9 – General Unsecured Claims.

Any Puerto Rico Investor or Puerto Rico Institution holding an Allowed Claim eligible for treatment under Class 1 may opt out of Class 1 and elect to be treated under Class 4 and in such event, shall be deemed to accept the Plan of Adjustment.  Any Puerto Rico Investor or Puerto Rico Institution holding an Allowed Claim eligible for treatment under Class 5 may opt out of Class 5 and elect to be treated under Class 7 and, in such event, shall be deemed to accept the Plan of Adjustment.  [For more information regarding eligibility to make such elections, please refer to Section [___] of this Disclosure Statement.]  Eligible holders who elect to be treated under Classes 4 and 7, respectively, will be entitled to cast a provisional vote to accept or reject the Plan of Adjustment, which will be counted if it is later determined such holders are ineligible to be treated under Class 4 or 7, or if Classes 4 and 7 are oversubscribed relative to the maximum allowed size of such classes, in which case, such holders' Claims will be treated wholly or partially under Class 1 or 5, as applicable.

Beneficial holders of Existing Securities or Allowed Claims (or their nominees) in the following Classes are not entitled to vote to accept or reject the Plan of Adjustment:

Class 2 – Senior COFINA Bond Claims (Ambac);

Class 3 – Senior COFINA Bond Claims (National); and

Class 6 – Junior COFINA Bond Claims (Assured).

Under the Plan of Adjustment, only the applicable bond insurer (Ambac, National, or Assured) with respect to Claims in these Classes is entitled to vote to accept or reject the Plan of Adjustment, pursuant to the terms of the applicable bond insurance policy.  Beneficial holders of Claims in Classes 2, 3, and 6 are entitled to make an election of the form of distribution they

wish to receive under the Plan of Adjustment.  For more information regarding the voting procedures for Classes 2, 3, and 6, please refer to Section [____] of this Disclosure Statement.

Holders of Allowed Claims in Class 10 – Section 510(b) Subordinated Claims will not receive a distribution pursuant to the Plan of Adjustment and shall be deemed to have rejected the Plan of Adjustment and are not entitled to vote.

Bankruptcy Code section 1126 defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class holding at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that voted for acceptance or rejection of the plan of adjustment.  Thus, acceptance of the Plan of Adjustment by Claims in each Class entitled to vote on the Plan of Adjustment will occur only if at least two-thirds in dollar amount and a majority in number of the holders of Allowed Claims in such Class that have actually voted their Ballots have voted in favor of the Plan of Adjustment.  A vote may be disregarded if the Title III Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of PROMESA or the Bankruptcy Code.

It is important that holders of Claims in Classes 1, 5, 8, and 9, as well as the applicable bond insurer (Ambac, National, or Assured) with respect to Claims in Classes 2, 3, and 6, that are eligible to vote exercise their right to vote to accept or reject the Plan of Adjustment.  **EVEN IF YOU DO NOT VOTE OR DO NOT HAVE THE RIGHT TO VOTE TO ACCEPT THE PLAN OF ADJUSTMENT, YOU MAY BE BOUND BY THE PLAN OF ADJUSTMENT IF IT IS CONFIRMED BY THE TITLE III COURT.**  The amount and number of votes required for acceptance or rejection of the Plan of Adjustment by a Class are computed on the basis of Claims actually voting to accept or reject the Plan of Adjustment.  There are no quorum requirements with respect to the number of Claims in a Class that actually vote.

If at least one impaired class of claims accepts a Title III plan of adjustment (without counting the votes of insiders), Bankruptcy Code section 1129(b), made applicable to Title III of PROMESA pursuant to section 301(a) of PROMESA, permits the confirmation of the plan under certain conditions, notwithstanding the rejection of the plan by one or more other impaired classes of claims.  Under that section, a plan may be confirmed by a court if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  Refer to Section [VI.C.1(d)] for more information.

The Debtor's determination as to whether to request confirmation of the Plan of Adjustment pursuant to Bankruptcy Code section 1129(b) will be announced prior to or at the Confirmation Hearing.

D.      **Solicitation and Voting Procedures**

Concurrently with the filing of this Disclosure Statement, the Debtor has filed the Disclosure Statement Approval Motion, seeking an order from the Title III Court (i) approving the proposed Disclosure Statement, (ii) fixing a Voting Record Date (as defined therein) for voting on the Plan of Adjustment, (iii) approving the Confirmation Hearing Notice (as defined therein), (iv) approving the proposed contents of the Solicitation Package (as defined therein)

and procedures for distribution thereof, (v) approving the forms of ballots and election notices, and establishing solicitation, voting, distribution election, and balloting procedures, (vi) approving the form and manner of Notice of Non-Voting Status – Class 10 (as defined therein), (vii) fixing the Voting Deadline (as defined therein) and Election Deadline (as defined therein), and (viii) approving procedures for tabulating creditor votes.

For more information regarding the solicitation and voting procedures surrounding the Plan of Adjustment, see the Disclosure Statement Approval Motion and the Disclosure Statement Order.

**E.    Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Bankruptcy Code section 1128, the Title III Court has scheduled the Confirmation Hearing on whether the Debtor has fulfilled the confirmation requirements of section 314 of PROMESA on January 16, 2019 at [9:30 a.m.] (prevailing Atlantic Time) before the Honorable Laura Taylor Swain, at Courtroom [COURTROOM LOCATION].   The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Title III Court has ordered that objections, if any, to confirmation of the Plan of Adjustment be filed and served on or before [___], 2018 at [___] (prevailing Atlantic Time).

## II.    Overview of COFINA

**A.    Historical Information About COFINA**

**1.    COFINA Enabling Act**

COFINA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 91 of the Legislative Assembly of the Commonwealth (the "Legislative Assembly"), approved May 13, 2006 (as amended by Act No. 291, approved December 26, 2006; Act No. 56, approved July 5, 2007; Act No. 1, approved January 14, 2009; Act No. 7, approved March 9, 2009, as amended; Act No. 18, approved May 22, 2009; Act 133, approved July 12, 2012; Act 116, approved October 10, 201; Act 101, approved July 1, 2015; and Act 84, approved July 22, 2016) (collectively, "Act 91").

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006, the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% and authorized its municipalities to impose a municipal sales and use tax at a rate of 1.5% (the sales and use tax revenues at the 5.5% rate, the "SUT Revenues").[7]

---

[7]   In 2014, the Commonwealth lowered the municipal sales and use tax by 0.5% and increased the Commonwealth sales and use tax by the same amount (with the revenues from the 0.5% remaining for the benefit of the Municipal Administration Fund). The Commonwealth then increased the aggregate rate of the Commonwealth sales and use tax from 6% to 10.5% by imposing a sales and use tax surcharge of 4.5%. The revenues attributable to such increase are the property of the Commonwealth and are not available to COFINA. More recently, the

Act 91 currently requires that the following amounts of the SUT Revenues be transferred in each Fiscal Year to COFINA, whichever is greater: (i) a minimum fixed amount (the "Pledged Sales Tax Base Amount" or "PSTBA"); and (ii) the product of the amount of the SUT Revenues collected during such Fiscal Year multiplied by a fraction, the numerator of which is 2.75% and the denominator of which is 5.5% (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). The Pledged Sales Tax is the only source of funds available to pay debt service on "Senior" Existing Securities and "First Subordinate" Existing Securities.[8]

As originally established in 2006, COFINA was authorized to use such portion of the SUT Revenues to pay or finance, in whole or in part, or fund: (i) certain appropriation backed debt outstanding as of June 30, 2006 payable to the Government Development Bank for Puerto Rico ("GDB") and the Puerto Rico Public Finance Corporation ("PFC"); and (ii) certain Commonwealth expenses.

During 2009, the Legislative Assembly expanded the purposes of COFINA to authorize COFINA to pay or finance, in whole or in part, or fund: (i) the debt of the Secretary of the Treasury of the Commonwealth (the Secretary of the Treasury) with GDB in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for fiscal year 2009, (ii) certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth GO Bonds (defined below), and any debt of the Commonwealth outstanding as of December 31, 2008, that did not have a source of repayment or was payable from budgetary appropriations, (iii) a portion of the accounts payable to suppliers of the Commonwealth, (iv) operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) operational expenses of the Commonwealth for fiscal year 2012, to the extent included in the annual budget of the Commonwealth, (vi) that certain Puerto Rico Economic Stimulus Fund, (vii) that certain Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) that certain Economic Cooperation and Public Employees Alternatives Fund.

## 2.    Existing COFINA Bond Resolution and Existing Securities

The Existing Securities, as defined below, were issued pursuant to a Sales Tax Revenue Bond Resolution adopted on July 13, 2007 (as amended and restated on June 10, 2009, the "STRB Resolution"). Each series of Existing Securities was issued pursuant to a supplemental resolution providing for its issuance and the terms of such series, in each case adopted by the Board of Directors of COFINA. The STRB Resolution together with the supplemental resolutions issued pursuant thereto is referred to as the "Existing Bond Resolution." Under the Existing Bond Resolution, the Bank of New York Mellon acts as trustee (the "Trustee") for the Existing Securities.

---

Commonwealth reset the portion of the Commonwealth sales and use tax allocated to COFINA to the original 5.5%.

[8]   It has been asserted that, under section 5(d) of Act 91, if the amounts transferred to COFINA are insufficient to cover its obligations, including the Existing Securities, Act 91 provides for the transfer of future SUT Revenues to cover such deficiency

As of the Petition Date, COFINA had outstanding [$17.64] billion aggregate principal amount of its sales tax revenue bonds issued under the Existing Bond Resolution, including [$11.54] billion of current interest bonds, plus [$6.10] billion accreted on existing capital appreciation bonds and convertible capital appreciation bonds (collectively, the "Existing Securities"). The Existing Securities consist of [$7.76] billion senior and [$9.88] billion first subordinate bonds (respectively, the ""Senior" Existing Securities" and ""First Subordinate" Existing Securities"), as described below.

### *"Senior" Existing Securities*

The "Senior" Existing Securities[9] were issued between 2007 and 2011, bearing interest rates between 3.80% and 6.35% and maturing between August 1, 2020 and August 1, 2057. The "Senior" Existing Securities are subject to voluntary redemption at the option of COFINA commencing between August 1, 2017 and August 1, 2021. Certain of the "Senior" Existing Securities are capital appreciation bonds and certain are current interest bonds. Capital appreciation bonds or "CABs" do not pay interest on a current basis, but rather accrete interest until maturity, when the entire compounded amount is due. As of the Petition Date, there was [$7.74] billion aggregate principal amount of "Senior" Existing Securities outstanding, consisting of [$4.02] billion aggregate principal amount of current interest bonds and [$2.25] billion aggregate principal amount of CABs plus [$1.46] billion accreted. Approximately [$1.33] billion of the "Senior" Existing Securities are insured by Ambac and [$1.11] billion are insured by National.

The "Senior" Existing Securities are payable solely from and secured equally and ratably by a security interest granted under the Existing Bond Resolution in the Pledged Property, as defined in the Existing Bond Resolution. It should be noted that there is an existing dispute as to whether the Existing Bond Resolution in fact grants a valid security interest in the Pledged Property. This dispute, referred to as the Commonwealth-COFINA Dispute, is described further in Section [ ] of this Disclosure Statement. The Pledged Property also includes the following, collectively: (1) all COFINA Revenues, as defined in the Existing Bond Resolution; (2) all right, title and interest of COFINA in and to COFINA Revenues, and all rights to receive the same; and (3) funds, deposits, accounts, and subaccounts held by the Trustee.

The "Senior" Existing Securities are senior in payment priority to the "First Subordinate" Existing Securities. Upon an event of default, the Trustee may, or upon the written request of owners of 25% of all outstanding "Senior" Existing Securities, shall, declare the principal of and accrued interest on the "Senior" Existing Securities to be immediately due and payable. Upon such declaration, the principal of and accrued interest on the "Senior" Existing Securities become immediately due and payable. In addition, upon a declaration of an event of default, holders of "First Subordinate" Existing Securities may not declare a default, or cause the Trustee to take any remedial action thereunder in the event that "First Subordinate" Existing Securities are not

---

[9]   COFINA's "Senior" Existing Securities consist of the following: (i) Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds"), (v) Sales Tax Revenue Bonds, Series 2009C (the "Series 2009C Bonds"), (vi) Sales Tax Revenue Bonds, Series 2011C (the "Series 2011C Bonds"), and (vii) Sales Tax Revenue Bonds, Series 2011D (the "Series 2011D Bonds").

timely paid amounts due thereunder until such time that the "Senior" Existing Securities are fully retired or are defeased in accordance with the provision of the Existing Bond Resolution.  Upon an event of default, the Existing Bond Resolution provides for the priority of payments if the funds held by the Trustee are insufficient for the payment of interest and principal or Compounded Amount (as defined in the Existing Bond Resolution) or redemption price then due on the "Senior" Existing Securities. It dictates that regularly scheduled fees shall be paid first, followed by installments of interest, and then unpaid principal or the redemption price of "Senior" Existing Securities prior to payment of "First Subordinate" Existing Securities.[10]

A schedule of the "Senior" Existing Securities is included in Exhibit A to the Plan of Adjustment.

### *"First Subordinate" Existing Securities*

The "First Subordinate" Existing Securities [11] were issued between 2009 and 2011, bearing interest rates between 3.63% and 7.48% and maturing between August 1, 2017 and August 1, 2050. The "First Subordinate" Existing Securities are subject to voluntary redemption at the option of COFINA commencing between August 1, 2014 and August 1, 2029. Certain of the "First Subordinate" Existing Securities are CABs and certain are current interest bonds. As of the Petition Date, there was [$9.78] billion aggregate principal amount of "First Subordinate" Existing Securities outstanding, consisting of [$7.40] billion aggregate principal amount of current interest bonds and [$1.50] billion aggregate principal amount of CABs plus [$0.87] billion accreted. Approximately [$0.25] billion of the "First Subordinate" Existing Securities are insured by Assured.

The "First Subordinate" Existing Securities are payable solely from and secured equally and ratably by a security interest granted under the Existing Bond Resolution in the Pledged Property, as defined in the Existing Bond Resolution.  The "First Subordinate" Existing Securities cannot declare an event of default or control remedies until the "Senior" Existing Securities are satisfied in full.

The relative rights and remedies of the "Senior" Existing Securities and "First Subordinate" Existing Securities, including the nature and scope of any subordination, is a matter of dispute among various parties in interest, and certain parties in interest may dispute the description of such matters (or of other matters) contained in this Disclosure Statement.

---

[10] No event of default had been declared by the Trustee as of the filing of the Title III Case.

[11] The "First Subordinate" Existing Securities consist of the following: (i) Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), (ii) Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), (iii) Sales Tax Revenue Bonds, First Subordinate Series 2010A (the "Series 2010A Bonds"), (iv) Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds"), (v) Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds"), (vi) Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds"), (vii) Sales Tax Revenue Bonds, First Subordinate Series 2011A (the "Series 2011A Bonds"), and (vii) Sales Tax Revenue Bonds, First Subordinate Series 2011B (the "Series 2011B Bonds").

A schedule of the "First Subordinate" Existing Securities is included in Exhibit A to the Plan of Adjustment.

### 3.     Insurance of Existing Securities

#### (a)     *National Public Finance Guarantee Corporation*

The following information has been furnished by National for use in this Disclosure Statement, and the Debtor makes no representation as to its fair presentation, accuracy, or completeness of information, including documents incorporated herein by reference. With respect to certain "Senior" Existing Securities, National issued financial guaranty insurance policies (whether initially issued by (i) Financial Guaranty Insurance Corporation and subsequently novated to National, or (ii) MBIA Insurance Corporation and subsequently reinsured by National, together with all agreements and other documents related thereto, the "National Insurance Policies"), pursuant to which National guaranteed the scheduled payment of principal of and interest on such Senior COFINA Bond Claims (National) when due, as set forth in the National Insurance Policies.

The National Insurance Policies unconditionally and irrevocably guarantee the full and complete payment required to be made by or on behalf of COFINA to the Trustee or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Senior COFINA Bond Claims (National) as such payment shall become due but shall not be so paid (except that if there is any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the National Insurance Policies shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, subject to any of National's right to elect in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment that is subsequently recovered from any owner of the Senior COFINA Bond Claims (National) pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law.

The National Insurance Policies do not insure against loss of any prepayment premium that may at any time be payable with respect to any Senior COFINA Bond Claim (National). The National Insurance Policies do not, under any circumstance, insure against loss relating to, among other things: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; or (iii) payments of the purchase price of the Senior COFINA Bond Claims (National) upon tender by an owner thereof. The National Insurance Policies also do not insure against nonpayment or any other act or omission of the Bond Trustee or any other paying agent, if any, for the Senior COFINA Bond Claims (National).

*General*. National is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company. MBIA Inc. is not obligated to pay the debts of or claims against National. National is domiciled in the State of New York and licensed to do business in and

subject to regulation under the laws of all 50 states, the District of Columbia, the U.S. Virgin Islands and the Territory of Guam.

The principal executive offices of National are located at 1 Manhattanville Road, Suite 301, Purchase, New York 10577 and the main telephone number at that address is (917) 765-3333.

*Regulation*. As a financial guaranty insurance company licensed to do business in the State of New York, National is subject to the New York Insurance Law which, among other things, prescribes minimum capital requirements and contingency reserves against liabilities for National, limits the classes and concentrations of investments that are made by National and required the approval of policy rates and forms that are employed by National. State law also regulates the amount of both the aggregate and individual risks that may be insured by National, the payment of dividends by National, changes in control with respect to National, and transactions among National and its affiliates.

The National Insurance Policies are not covered by the Property/Casualty Insurance Security Funds specified in Article 76 of the New York Insurance Law.

### *Financial Strength Ratings of National*.

On December 1, 2017, at the request of National, S&P Global Ratings withdrew its "A" financial strength rating on National.  On January 17, 2018, Moody's downgraded the financial strength rating of National to Baa2 from A3 with a stable outlook. Moody's Investors Services, at its discretion and in the absence of a contract with National, continues to maintain ratings on National.  On December 5, 2017, at the request of National, Kroll Bond Rating Agency withdrew its rating.  Any further explanation as to the significance of the ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the Existing Securities, COFINA Bonds, Senior COFINA Bond Claims (National) and/or National Certificates, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the Existing Securities, COFINA Bonds, Senior COFINA Bond Claims (National) and/or National Certificates. National does not guaranty the market price of the Existing Securities, COFINA Bonds, Senior COFINA Bond Claims (National) and/or National Certificates nor does it guaranty that the ratings on the Existing Securities, COFINA Bonds, Senior COFINA Bond Claims (National) and/or National Certificates will not be revised or withdrawn.

*National Financial Information.* Based upon statutory financials, as of June 30, 2018, National had total net admitted assets of $3.7 billion (unaudited), total liabilities of $1.6 billion (unaudited), and total surplus of $2.1 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

For further information concerning National, see the financial statements of MBIA Inc. and its subsidiaries as of December 31, 2017, prepared in accordance with generally accepted

accounting principles, included in the Annual Report on Form 10-K of MBIA Inc. for the year ended December 31, 2017.

*Incorporation of Certain Documents by Reference.* The following documents filed by MBIA Inc. with the Securities & Exchange Commission ("SEC") are incorporated by reference into this Disclosure Statement:

(1)     MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2017;

(2)     MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended June 30, 2018.

Any documents, including any financial statement of National and its subsidiaries that are included therein or attached as exhibits thereto, filed by MBIA Inc. pursuant to section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") after the date of MBIA Inc.'s most recent Quarterly Report on Form 10-Q or Annual Report on Form 10-K, and prior to the [Voting Deadline established by the Disclosure Statement Order] shall be deemed to be incorporated by reference in this Disclosure Statement and to be a part hereof from the respective dates of filing such documents. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein or in any other subsequently filed documents that also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Disclosure Statement.

MBIA Inc. files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of MBIA Inc.'s SEC filings (including (1) MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2017 and (2) MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended June 30, 2018) are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington, D.C.; (iii) over the Internet at MBIA, Inc.'s web site at http://www.nationalpfg.com; and (iv) at no cost, upon request to MBIA, Inc. at its principal executive offices.

National makes no representation regarding this Disclosure Statement, including but not limited to the fair presentation, accuracy or completeness of information contained in this Disclosure Statement, nor has it participated in the preparation of this Disclosure Statement, other than in connection with the information supplied by National and presented under the heading "COFINA Bond Insurance – (a) National Public Finance Guarantee Corporation."

### (b)     *Ambac Assurance Corporation*

The following information has been furnished by Ambac for the use in this Disclosure Statement, and the Debtor makes no representation as to its fair presentation, accuracy, or completeness of information, including documents incorporated herein by reference. Ambac issued a financial guaranty insurance policy (the "Ambac Insurance Policy") for some of the "Senior" Existing Securities (the "Ambac Insured Bonds"), pursuant to which Ambac guaranteed

the scheduled payment of principal of and interest on such Ambac Insured Bonds when due, as set forth in the Ambac Insurance Policy.  As described in [___] of this Disclosure Statement, holders of Senior COFINA Bond Claims (Ambac) who elect to receive the Ambac Certificates will deposit their Ambac Insured Bonds in the Ambac Trust, which will be considered the holder of such Ambac Insured Bonds, in exchange for the Ambac Certificates.  The following information is provided as a summary and shall not be deemed to modify the terms of the Ambac Insurance Policy (which terms govern to the extent of any inconsistency with the summary below).

***Payment Pursuant to Ambac Insurance Policy***. Under the terms of the Ambac Insurance Policy, Ambac is obligated to pay to The Bank of New York Mellon, in New York, New York, or any successor thereto (the "Insurance Trustee"), or, at Ambac's discretion, to the registered holders of the Ambac Insured Bonds, that portion of the principal of and interest on the Ambac Insured Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment (as each of such terms is defined in the Ambac Insurance Policy) by COFINA. Under the terms of the Ambac Insurance Policy, Ambac is obligated to make such payments to the Insurance Trustee on the later of the date on which such principal and/or interest becomes Due for Payment or within one business day following the date on which Ambac shall have received notice of Nonpayment from the Bond Trustee.

The Ambac Insurance Policy insures payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. Under the Ambac Insurance Policy, if the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac will remain obligated to pay the principal of and interest on the outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates, including mandatory sinking fund redemption dates. Under the Ambac Insurance Policy, if there is any acceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration, except to the extent that Ambac elects, in its sole discretion, to pay all or a portion of the accelerated principal and interest accrued thereon to the date of acceleration (to the extent unpaid by COFINA). Upon payment of all such accelerated principal and interest accrued to the acceleration date, Ambac's obligations under the Ambac Insurance Policy shall be fully discharged.

The Ambac Insurance Policy does **not** insure any risk other than Nonpayment (as set forth in the Ambac Insurance Policy). Specifically, the Ambac Insurance Policy does **not** cover, among other things:

(1)     payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity;

(2)     payment of any redemption, prepayment or acceleration premium, which at any time may become due in respect of any obligations, other than at the sole option of Ambac; and

(3) nonpayment of principal or interest caused by the insolvency or negligence of the Bond Trustee, paying agent or bond registrar, if any.

Under the Ambac Insurance Policy and the bond documents for the Ambac Insured Bonds, if it becomes necessary to call upon the Ambac Insurance Policy, payment of principal requires surrender of the Ambac Insured Bonds together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac to the extent of the payment under the Ambac Insurance Policy. Payment of interest pursuant to the Ambac Insurance Policy requires proof of holder entitlement to interest payments and an appropriate assignment of the holder's right to payment to Ambac.

Under the Ambac Insurance Policy and the bond documents for the Ambac Insured Bonds, upon payment of the insurance benefits, Ambac will become the owner of the Ambac Insured Bonds, appurtenant coupon, if any, and the right to payment of the principal of and interest on such Ambac Insured Bonds and will be fully subrogated to the surrendering holder's rights to such payment, in each case to the extent of such payment.

*General.* Ambac is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin, and is licensed to do business in 50 states (except Tennessee), the District of Columbia, the Commonwealth and the U.S. Virgin Islands (although certain licenses have been suspended or restricted), with admitted assets of approximately $3,381,759,049 (unaudited) and statutory capital of approximately $1,757,457,800 (unaudited) as of June 30, 2018. Statutory capital consists of Ambac's policyholders' surplus and statutory contingency reserve.

Ambac has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an obligation by Ambac will not affect the treatment for federal income tax purposes of interest on such obligation and that insurance proceeds representing maturing interest paid by Ambac under policy provisions substantially identical to those contained in the Ambac Insurance Policy shall be treated for federal income tax purposes in the same manner as if such payments were made by COFINA.

Ambac makes no representation regarding this Disclosure Statement, including but not limited to the fair presentation, accuracy or completeness of information contained in this Disclosure Statement, nor has it participated in the preparation of this Disclosure Statement, other than in connection with the information supplied by Ambac and presented under the heading "COFINA Bond Insurance – (b) Ambac Assurance Corporation."

*Available Information.* The parent company of Ambac, Ambac Financial Group, Inc. ("AFG"), is subject to the informational and periodic reporting requirements of the Exchange Act, and in accordance therewith files reports, proxy statements and other information with the SEC. These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding issuers that file electronically with the SEC, including AFG. These reports, proxy statements and other information can also be read at AFG's

internet website at www.ambac.com. AFG's common stock and warrants are listed on NASDAQ and trade under the symbols "AMBC" and "AMBCW," respectively.

Copies of Ambac's financial statements prepared on the basis of accounting practices prescribed or permitted by the State of Wisconsin's Office of the Commissioner of Insurance are available from Ambac and can also be read at AFG's internet website at www.ambac.com. The address of Ambac's administrative offices is One State Street Plaza, 16th Floor, New York, New York 10004, and its telephone number is (212) 658-7470.

**Incorporation of Certain Documents by Reference.** The following documents filed by AFG with the SEC (File No. 1-10777) are incorporated by reference in this Disclosure Statement:

(1)     The Company's Current Reports on Form 8-K filed on February 15, 2018;

(2)     The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 and filed on February 28, 2018;

(3)     The Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 filed on May 9, 2018;

(4)     The Company's Current Reports on Form 8-K filed on May 18, 2018;

(5)     The Company's Current Reports on Form 8-K filed on June 25, 2018;

(6)     The Company's Current Reports on Form 8-K filed on July 16, 2018;

(7)     The Company's Current Reports on Form 8-K filed on July 26, 2018; and

(8)     The Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 filed on August 8, 2018.

Ambac's consolidated financial statements and all other information relating to Ambac and subsidiaries included in AFG's periodic reports filed with the SEC subsequent to the date of this Disclosure Statement and prior to the Effective Date shall, to the extent filed (rather than furnished pursuant to Item 9 of Form 8-K), be deemed to be incorporated by reference into this Disclosure Statement and to be a part hereof from the respective dates of filing of such reports.

Any information contained in a document furnished by AFG incorporated in this Disclosure Statement by reference shall be modified or superseded for the purposes of this Disclosure Statement to the extent that any information contained in a subsequently filed document incorporated by reference herein modifies or supersedes such information. Any information so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Disclosure Statement.

Copies of all information regarding Ambac that is incorporated by reference in this Disclosure Statement are available for inspection in the same manner as described above in "*Available Information*."

All documents subsequently filed by AFG pursuant to the requirements of the Exchange Act after the date of this Disclosure Statement will be available for inspection in the same manner as described above in "*Available Information.*"

(c)     ***Assured Guaranty Municipal Corp.***

The following information has been furnished by Assured for use in this Disclosure Statement, and the Debtor makes no representation as to its fair presentation, accuracy, or completeness of information, including documents incorporated herein by reference. With respect to certain "First Subordinate" Existing Securities (the "Assured Insured Bonds"), Assured issued municipal insurance policies (including policies issued in the secondary market, and together with all agreements and other documents related thereto, the "Assured Insurance Policies"), pursuant to which Assured guaranteed the scheduled payment of principal of and interest on such Assured Insured Bonds when due, as set forth in the Assured Insurance Policies.

***Payment Pursuant to Assured Insurance Policy.*** Under the terms of the Assured Insurance Policies, Assured agreed to pay to the trustee (the "Assured Insured Bonds Trustee") or paying agent (the "Assured Insured Bonds Paying Agent") for the Assured Insured Bonds, for the benefit of the Owners of the applicable Assured Insured Bonds or, at the election of Assured, directly to each Owner of an applicable Assured Insured Bond, and subject to the terms of the applicable Assured Insurance Policy, that portion of the principal of and interest on the applicable Assured Insured Bonds that shall become Due for Payment (as defined below) but shall be unpaid by reason of Nonpayment (as defined below) by COFINA.

On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which Assured shall have received Notice of Nonpayment, Assured will disburse to or for the benefit of each Owner of an applicable Assured Insured Bond the face amount of principal of and interest on the Assured Insured Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by COFINA, but only upon receipt, by Assured, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in Assured. Upon disbursement in respect of an Assured Insured Bond, Assured shall become the owner of the Assured Insured Bond, any appurtenant coupon to the Assured Insured Bond or right to receipt of payment of principal of or interest on the Assured Insured Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Assured Insured Bond, to the extent of any payment by Assured under the applicable Assured Insurance Policy. Payment by Assured to the Assured Insured Bonds Trustee or Assured Insured Bonds Paying Agent for the benefit of the Owners shall, to the extent of such payment, discharge the obligation of Assured under the applicable Assured Insurance Policy.

For the purposes of this section of the Disclosure Statement, solely as it pertains to information furnished by Assured for use in this Disclosure Statement, the following terms shall have the following meanings:

36

"Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or Assured's fiscal agent are authorized or required by law or executive order to remain closed.

"Due for Payment" means (a) when referring to the principal of an Assured Insured Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless Assured shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on an Assured Insured Bond, payable on the stated date for payment of interest.

"Nonpayment" means, in respect of an Assured Insured Bond, the failure of COFINA to have provided sufficient funds to the Assured Insured Bonds Trustee or Assured Insured Bonds Paying Agent for payment in full of all principal and interest that is Due for Payment on such Assured Insured Bond.

"Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Assured Insured Bonds Trustee or the Assured Insured Bonds Paying Agent to Assured which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment.

"Owner" means, in respect of an Assured Insured Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Assured Insured Bond to payment thereof, except that "Owner" shall not include COFINA or any person or entity whose direct or indirect obligation constitutes the underlying security for the Assured Insured Bonds.

***General.*** Assured is a New York domiciled financial guaranty insurance company and an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, infrastructure, and structured finance markets. Neither AGL nor any of its shareholders or affiliates, other than Assured, is obligated to pay any debts of Assured or any claims under any insurance policy issued by Assured.

Assured's financial strength is rated "AA" (stable outlook) by S&P Global Ratings, a business unit of Standard & Poor's Financial Services LLC ("S&P"), "AA+" (stable outlook) by Kroll Bond Rating Agency, Inc. ("KBRA") and "A2" (stable outlook) by Moody's Investors Service, Inc. ("Moody's"). Each rating of Assured should be evaluated independently. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies, including withdrawal initiated at the request of Assured in its sole discretion. In addition, the rating agencies may at any time change Assured's long-term rating outlooks or place such ratings on a watch list for possible downgrade in the near term. Any downward revision or withdrawal of

101361236v22

any of the above ratings, the assignment of a negative outlook to such ratings or the placement of such ratings on a negative watch list may have an adverse effect on the market price of any security guaranteed by Assured.  Assured only guarantees scheduled principal and scheduled interest payments payable by the issuer of bonds insured by Assured on the date(s) when such amounts were initially scheduled to become due and payable (subject to and in accordance with the terms of the relevant insurance policy), and does not guarantee the market price or liquidity of the securities it insures, nor does it guarantee that the ratings on such securities will not be revised or withdrawn.

*Current Financial Strength Ratings*.  On June 26, 2018, S&P announced it had affirmed Assured's financial strength rating of "AA" (stable outlook).  Assured can give no assurance as to any further ratings action that S&P may take.

On May 7, 2018, Moody's announced it had affirmed Assured's insurance financial strength rating of "A2" (stable outlook).  Assured can give no assurance as to any further ratings action that Moody's may take.

On January 23, 2018, KBRA announced it had affirmed Assured's insurance financial strength rating of "AA+" (stable outlook).  Assured can give no assurance as to any further ratings action that KBRA may take.

For more information regarding Assured's financial strength ratings and the risks related thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2017.

*Capitalization of Assured.*  At June 30, 2018:

- The policyholders' surplus of Assured was approximately $2,221 million.

- The contingency reserves of Assured and its indirect subsidiary Municipal Assurance Corp. ("MAC") (as described below) were approximately $1,166 million.  Such amount includes 100% of Assured's contingency reserve and 60.7% of MAC's contingency reserve.

- The net unearned premium reserves and net deferred ceding commission income of Assured and its subsidiaries (as described below) were approximately $1,898 million.  Such amount includes (i) 100% of the net unearned premium reserve and deferred ceding commission income of Assured, (ii) the consolidated net unearned premium reserves and net deferred ceding commissions of Assured's wholly owned subsidiary Assured Guaranty (Europe) plc ("AGE"), and (iii) 60.7% of the net unearned premium reserve of MAC.

The policyholders' surplus of Assured and the contingency reserves, net unearned premium reserves and deferred ceding commission income of Assured and MAC were determined in accordance with statutory accounting principles.  The net unearned premium reserves and net deferred ceding commissions of AGE were determined in accordance with accounting principles generally accepted in the United States of America.

38

*Incorporation of Certain Documents by Reference.* Portions of the following documents filed by AGL with the SEC (File No. 001-32141) that relate to Assured are incorporated by reference in this Disclosure Statement and shall be deemed to be a part hereof:

(1)    AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (filed by AGL with the SEC on February 23, 2018);

(2)    AGL's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2018 (filed by AGL with the SEC on May 4, 2018); and

(3)    AGL's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2018 (filed by AGL with the SEC on August 2, 2018).

All consolidated financial statements of Assured and all other information relating to Assured included in, or as exhibits to, documents filed by AGL with the SEC pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, excluding Current Reports or portions thereof "furnished" under Item 2.02 or Item 7.01 of Form 8-K, after the filing of the last document referred to above and before the termination of the solicitation shall be deemed incorporated by reference into this Disclosure Statement and to be a part hereof from the respective dates of filing such documents.  Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request at Assured Guaranty Municipal Corp.: 1633 Broadway, New York, New York 10019, Attention: Communications Department (telephone (212) 974-0100).  Except for the information referred to above, no information available on or through AGL's website shall be deemed to be part of or incorporated in this Disclosure Statement.

Any information regarding Assured included herein under the caption "Assured Guaranty Municipal Corp." or included in a document incorporated by reference herein (collectively, the "Assured Information") shall be modified or superseded to the extent that any subsequently included Assured Information (either directly or through incorporation by reference) modifies or supersedes such previously included Assured Information.  Any Assured Information so modified or superseded shall not constitute a part of this Disclosure Statement, except as so modified or superseded.

Assured makes no representation regarding this Disclosure Statement, including but not limited to the fair presentation, accuracy or completeness of information contained in this Disclosure Statement, nor has it participated in the preparation of this Disclosure Statement, other than in connection with the information supplied by Assured and presented under the heading "COFINA Bond Insurance – (c) Assured Guaranty Municipal Corporation."

*Miscellaneous Matters.*  Assured has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Disclosure Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information supplied by Assured regarding Assured and the Assured Insurance Policies.

101361236v22

B.      **Summary of COFINA's Revenues, Assets, and Liabilities**

1.      **Flow of COFINA Pledged Taxes**

Pursuant to Act 117-2006, as amended, the Commonwealth imposed for the first time a tax on the sale or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% and authorized its municipalities to impose a municipal sales and use tax of up to 1.5%.  In May 2015, the Commonwealth also imposed a 4.5% sales and use tax surcharge, which is the property of the Commonwealth and not available to COFINA.

Each month, on or prior to the 10th day, merchants and retailers are required to file the returns and pay all sales and use tax revenues collected during the prior month (including the SUT Revenues) to Banco Popular de Puerto Rico ("Banco Popular") or any other agent designated by the Secretary of the Treasury of Puerto Rico. Banco Popular is required to transfer all sales and use tax revenues (including the SUT Revenues) to a joint collection account (the "Sales Tax Account").  Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers all SUT Revenues on a daily basis (with a 2 day delay) to a dedicated sales tax fund (the "DSTF"), an account established pursuant to Act 91 and held at Banco Popular's Trust Department in the name of COFINA.  Act 91 provides that all funds deposited in the DSTF and all future funds that must be deposited into the DSTF pursuant to the provisions of Act 91 are "the property of COFINA."

Commencing at the beginning of each fiscal year of the Commonwealth, which begins on July 1 (the "Fiscal Year"), Banco Popular transfers on a daily basis all moneys on deposit in the DSTF to an account (the "Revenue Account") that also is owned by COFINA and held at Bank of New York Mellon ("BNYM") until the Pledged Sales Tax Base Amount established for each Fiscal Year has been deposited therein. Under the Existing Bond Resolution, after an amount equal to the Pledged Sales Tax Base Amount has been deposited in the Revenue Account, all SUT Revenues are distributed to the Puerto Rico Treasury Department for general use by the Commonwealth until the Commonwealth also has received an amount equal to the Pledged Sales Tax Base Amount. Thereafter, the Existing Bond Resolution provides that half of all SUT Revenue collected is transferred to the Revenue Account to serve as collateral for the Existing Securities and the other half is transferred to the Treasury Department for use by the Commonwealth.

On the last business day of each calendar month, amounts deposited in the Revenue Account are transferred to certain debt service accounts and debt service reserve accounts established for the Existing Securities according to the priorities set forth in section 505 of the Existing Bond Resolution until each debt service account holds sufficient funds to make principal and interest payments for the next 12-month period (or 15-month period for bonds that pay debt service quarterly or monthly) and each debt service reserve account holds an amount calculated under the applicable supplemental resolution adopted by COFINA with respect to each series of Existing Securities issued. The funds transferred to the debt service accounts are then allocated to a principal subaccount, an interest subaccount, and a holding subaccount (collectively, with the Revenue Account, the debt service accounts, and the debt service reserve accounts, the "Project Accounts"). Payments on the Existing Securities are made from the

40

principal and interest subaccounts. The Project Accounts are accounts of COFINA that are maintained by BNYM and are subject to the lien of the holders of COFINA Bonds.

### 2.  Security for Existing Securities

Pursuant to the Existing Bond Resolution, the Existing Securities are limited obligations of COFINA payable solely from, and secured by a grant of a security interest in, the Pledged Property.  It should be noted that there is an existing dispute as to whether the Existing Bond Resolution in fact grants a valid security interest in the Pledged Property.  This dispute, referred to as the Commonwealth-COFINA Dispute, is described further in Section [ ] of this Disclosure Statement.  In general, the Existing Bond Resolution defines "Pledged Property" to consist of (i) all "Revenues" (as discussed below), and all right, title and interest of COFINA in and to the Revenues and all rights to receive the same, (ii) the funds, accounts and subaccounts held by the Trustee (subject in each case to certain limited exceptions), and certain other moneys, securities and cash equivalents from time to time held by the Trustee under the terms of the Existing Bond Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by COFINA to the Trustee under the Existing Bond Resolution as and for additional security for the Existing Securities, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property described in clauses (i) through (iii) above, including those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The Existing Bond Resolution defines the term "Revenues" to consist of all Pledged Sales Tax collections received by COFINA or the Trustee and other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of COFINA or by the Trustee, lawfully available for the purposes of the Existing Bond Resolution and deposited by or on behalf of COFINA or by the Trustee in any fund, account or subaccount held by the Trustee (subject in each case to certain limited exceptions).  It should be noted that it is disputed whether the security interest in the Pledged Property received by COFINA continues after commencement of the Title III Case.

### III.  Significant Events Leading to Commencement of COFINA's Title III Case

### A.  The Commonwealth's Steady Operational and Financial Decline

### 1.  The Commonwealth

*General.* The Commonwealth is an island located in the Caribbean approximately 1,600 miles southeast of New York City. It has an area of approximately 3,500 square miles and a population estimated by the United States Census Bureau of approximately 3.34 million as of July 1, 2017.

The Commonwealth came under United States sovereignty pursuant to the Treaty of Paris of 1898. Puerto Ricans have been citizens of the United States since 1917. In 1950, the United States Congress authorized the Commonwealth to draft and approve its own Constitution, which was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of the Commonwealth, amended and ratified by the United States Congress, and subsequently approved by the President of the United States in 1952. The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative and judicial

branches of government. The current Governor, Ricardo Rosselló Nevares, was sworn into office for a four-year term on January 2, 2017. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms.

Residents of the Commonwealth do not vote in Presidential elections and are represented in Congress by a non-voting Resident Commissioner. Most federal taxes, except those such as Social Security and Medicare taxes, are not levied on Puerto Rico source income earned by Puerto Rico residents.

The United States and the Commonwealth share a common defense, market and currency. In general terms, the Commonwealth exercises virtually the same control over its internal affairs as do each of the 50 states. Recently, as a result of the current fiscal crisis that affects the Commonwealth, the United States Congress enacted PROMESA, which established the Oversight Board with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs while the Oversight Board remains in existence under PROMESA. Congress created the Oversight Board for the purpose of providing a method for the Commonwealth and its instrumentalities to achieve fiscal responsibility and access to capital markets.

*Description of the Commonwealth's Public Corporations and Instrumentalities.* In the Commonwealth, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the Commonwealth. Public corporations may obtain revenues from rates charged for services or products, but, as described further below, many receive sizable subsidies from the Commonwealth. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are ascribed to departments of the Commonwealth.

Public corporations, such as COFINA and the PFC, have been created as financing vehicles for the Commonwealth and have issued debt backed by taxes (in the case of COFINA) or appropriations (in the case of PFC) as their sole source of repayment.

## 2.    Description of the Commonwealth's Economy and Fiscal Challenges

*General.* The Commonwealth and most of its public corporations are in the midst of a profound fiscal crisis. Despite various measures undertaken in recent years to stimulate economic growth, reduce government expenses and increase revenues, the Commonwealth has been unable to spur economic growth and eliminate the recurrent excess of expenditures over revenues. During the past 12 years, the Commonwealth's balance sheet has significantly deteriorated due to years of economic contraction, recurring budget deficits, the financing of recurrent expenses with long-term debt and the failure to adequately fund legacy obligations, such as pensions.

The Commonwealth's balance sheet deterioration, combined with continued structural imbalances between revenues and expenditures and the Commonwealth's inability to access the capital markets, resulted in the Commonwealth and certain of its instrumentalities becoming

unable to make scheduled debt payments while continuing to provide government services and ultimately being placed into debt restructuring proceedings under Title III of PROMESA.

***The Commonwealth's Economy.*** The Commonwealth's economy entered a recession in the fourth quarter of fiscal year 2006, and the Commonwealth's gross national product ("GNP") has contracted (in real terms) every fiscal year between 2007 and 2017, with the exception of fiscal year 2012. The slight GNP growth in fiscal year 2012 was due mainly to the large number of stimuli and deficit spending injected into the Commonwealth's economy during the period and not as a result of economic recovery.

The Puerto Rico Planning Board (the "Planning Board") has the legal responsibility of creating an annual Economic Report to the Governor and the Legislative Assembly, presenting the Commonwealth's economic outlook and an analysis of its economic behavior. According to the Planning Board's report released in January 2018, the Commonwealth's real GNP for fiscal years 2016 and 2017 decreased by 1.3% and 2.4%, respectively. The Planning Board's GNP forecast for fiscal year 2018, which was released in April 2017 and has not been revised, projects a contraction of 1.5%. These numbers do not account for the impact of Hurricanes Irma or María.

In Fiscal Year 2017, preliminary aggregate personal income in the Commonwealth was $64.5 billion and personal income per capita was $19,140.

The economy of the Commonwealth is closely linked to the United States economy, as most of the external factors that affect the Commonwealth's economy are determined by the policies and performance of the United States economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation and tourist expenditures. During Fiscal Year 2017, approximately 78% of the Commonwealth's exports went to the United States mainland, while the United States mainland was the source of approximately 53% of the Commonwealth's imports.

***Recurrent Deficits.*** One of the principal causes of the Commonwealth's current fiscal crisis has been its inability to increase its revenues and reduce its expenditures in order to avoid recurrent structural deficits. These deficits have historically been funded with borrowings from either the public bond market or governmental institutions, such as GDB, or by deferring the costs of certain legacy liabilities. The practice of issuing long-term debt to pay for current operational expenses, together with the failure to properly fund legacy liabilities (such as employee retirement benefits), the ballooning cost of healthcare and the contraction of the revenue base due to prevailing economic conditions, have led to a material deterioration in the Commonwealth's consolidated net position, as calculated pursuant to generally accepted accounting principles in the United States.

***Employment.*** Total average annual employment, as measured by the Commonwealth's Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey," has decreased in recent years. The reduction in total employment began in the fourth quarter of Fiscal Year 2007, when total employment was 1,244,425, and continued to decline consistently until the first half of fiscal year 2015, after which time employment levels largely stabilized. According to the Household Survey, during fiscal year 2017, total

43

employment remained relatively unchanged from the prior Fiscal Year, with a 0.4% decrease compared to the same period for the prior Fiscal Year, while the unemployment rate averaged 11.5%, compared to 11.7% for the prior Fiscal Year.

According to the Department of Labor and Human Resources' Current Employment Statistics Survey (Establishment Survey – NAICS Codes), total payroll for non-farm employment decreased by 1% during Fiscal Year 2017 as compared to Fiscal Year 2016. Total private employment also fell during Fiscal Year 2017 by 0.6%, which translates to a reduction of almost 4,000 employees, as compared to the same period for the prior Fiscal Year.

*Aggregate Debt Burden of the Commonwealth and Its Instrumentalities.* As of March 31, 2017, the aggregate outstanding principal amount of debt of the Commonwealth and its instrumentalities was approximately $72.1 billion (including accreted interest on capital appreciation bonds). For Fiscal Year 2019, the aggregate scheduled annual debt service on all bonds and notes issued by the Commonwealth and its instrumentalities is approximately $4.6 billion. The Commonwealth's ratio of tax-supported debt to revenue is more than double that of Connecticut, the state with the highest debt-to-revenue ratio, and almost seven times the U.S. state median. The Commonwealth's tax-supported debt per capita, as a share of GDP and as a share of personal income, is also disproportionally high when compared to mainland jurisdictions.

*Pension Liabilities.* In addition to debt service on outstanding bonds, notes and other financial debt obligations, one of the most significant expenditures faced by the Commonwealth and its public corporations are pension benefits payable to retired employees. Prior to fiscal year 2018, Commonwealth employees, together with employees of certain public corporations (excluding PREPA and UPR, which have separate retirement plans) and municipalities, participated in the following three principal retirement systems: ERS, the Puerto Rico System of Annuities and Pensions for Teachers ("TRS") and the Retirement System for the Judiciary of the Commonwealth of Puerto Rico ("JRS" and, together with ERS and TRS, the "Retirement Systems"). ERS is the largest of the three Retirement Systems. The combined Retirement Systems' net pension liability was approximately $49 billion as of June 30, 2015.

*Hurricanes Irma and Maria.* In September 2017, Hurricanes Irma and Maria struck Puerto Rico causing widespread damage throughout the island and exacerbating the economic challenges described above. Hurricane Maria made landfall in Puerto Rico on September 20, 2017, bringing sustained winds of 155 miles per hour and significant rainfall over a 30-hour period of time. Hurricane Maria crossed Puerto Rico diagonally, entering through the southeast and exiting through the northwest region of the island. The hurricane caused catastrophic destruction in Puerto Rico, leaving the island completely without power and flooding many streets and roads. Only two weeks prior to Hurricane Maria, Hurricane Irma—one of the strongest hurricanes ever recorded in the Atlantic—passed by Puerto Rico's northern coast. As a result of the massive impact of the hurricanes, the government of Puerto Rico undertook a series of actions to address the crisis. As it relates to COFINA, on November 8, 2017, the Governor issued executive order OE-2017-068, which established a 10% reimbursement for certain small and mid-sized business on their SUT filings from August 2017 through November 2017. Further, due to the extended power outages in the wake of Hurricane Maria that left many people without access to refrigeration or ovens, the Governor temporarily waived SUT collections on

44

prepared foods through December 2017 to enable relief organizations and families to maximize their resources.

## B.     Creation of AAFAF

On April 6, 2016, the Government enacted the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (the "Moratorium Act"), which granted the governor of the Commonwealth (the "Governor") the authority to, among other things, (i) implement a moratorium on debt service payments, (ii) redirect certain revenues assigned to public entities for the payment of their obligations to the payment of essential services, and (iii) temporarily stay related creditor remedies. In connection with the Moratorium Act, the former Governor, Alejandro García Padilla, issued a number of executive orders, including orders to declare a moratorium on the payment of debt service by various government entities, including the Commonwealth.

Also on April 6, 2016, AAFAF was created under the Moratorium Act for the purpose of assuming GDB's role as fiscal agent, financial advisor and reporting agent to the Commonwealth and its instrumentalities and municipalities. In January 2017, AAFAF's role was expanded to include additional responsibilities related to the restructuring of the indebtedness of the Commonwealth and its instrumentalities and to oversee compliance with the fiscal plans and budgets of said entities approved by the Oversight Board pursuant to PROMESA.

## C.     Summary of PROMESA[12]

### 1.     Enactment of PROMESA

On June 30, 2016, Congress enacted PROMESA, which provides a framework for the Commonwealth and its covered instrumentalities to restructure their indebtedness by establishing, among other things:

- the Oversight Board, which provides oversight of the Commonwealth's and COFINA's restructuring efforts by, among other things, (i) reviewing and approving fiscal plans and budgets for the Commonwealth and its covered instrumentalities, and (ii) representing the Commonwealth and its covered instrumentalities in any cases commenced under Title III of PROMESA;

- a court-supervised, quasi-bankruptcy process under Title III similar to chapter 9 of the Bankruptcy Code to allow the Commonwealth and its covered instrumentalities to restructure their indebtedness pursuant to a plan of adjustment;

- a Congressional Task Force on Economic Growth in Puerto Rico that reports to Congress on the conditions leading to the Commonwealth's fiscal crisis and the status of the Commonwealth's public debt; and

---

[12] This section summarizes certain provisions of PROMESA.  Although the Debtor believes that this description covers the materially relevant provisions of PROMESA, this summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, PROMESA.

- a framework for the designation, oversight and implementation of critical infrastructure projects aimed at growing the Commonwealth's economy.

## 2. Creation of the Oversight Board

Pursuant to PROMESA section 101(a), the Oversight Board was established immediately upon the enactment of PROMESA for the purpose of providing "a method for a covered territory to achieve fiscal responsibility and access to the capital markets." The Oversight Board currently consists of seven voting members appointed by the President of the United States from a bipartisan list of nominees and a non-voting *ex officio* member appointed by the Governor. On August 31, 2016, President Obama appointed the Oversight Board's seven voting members, who are (1) José B. Carrión III, (2) Carlos M. García, (3) David A. Skeel, Jr., (4) Andrew G. Biggs, (5) Arthur J. González, (6) José R. González, and (7) Ana J. Matosantos. Christian Sobrino Vega currently serves as the Commonwealth's non-voting *ex officio* member of the Oversight Board.

Each member of the Oversight Board serves a three-year term without any compensation and may be appointed to an unlimited number of consecutive terms, but the President of the United States may remove any member for cause.

In addition to its seven voting members and non-voting *ex officio* member, the Oversight Board also has an executive team, which includes (i) Natalie A. Jaresko, as Executive Director, (ii) Jaime El Koury, as General Counsel, (iii) Kyle A. Rifkind, as Deputy General Counsel, and (iv) Noel Zamot, as Revitalization Coordinator. Pursuant to the Oversight Board's bylaws, the Executive Director acts as the chief executive officer of the Oversight Board with general supervision and direction of its business affairs (including the power to enter into contracts on behalf of the Oversight Board), subject to the supervision and control of the Oversight Board. The General Counsel acts as the chief legal officer of the Oversight Board. The Revitalization Coordinator is responsible for executing the duties prescribed under section 503 of PROMESA relating to the identification, prioritization and implementation of critical infrastructure projects for the Commonwealth.

In accordance with section 108(a) of PROMESA, the Oversight Board acts as an autonomous entity, such that neither the Governor nor the Legislative Assembly may exercise any control over the Oversight Board and its activities and cannot take any actions that would impair or defeat the purposes of PROMESA. Although created by federal statute, the Oversight Board is not a "department, agency, establishment, or instrumentality of the Federal Government." Instead, as set forth in section 101(c)(1) of PROMESA, the Oversight Board is deemed "an entity within the territorial government" of the Commonwealth. The Oversight Board operates from offices located in San Juan, Puerto Rico and New York, New York.

In accordance with section 209 of PROMESA, the Oversight Board will continue in existence until the Oversight Board certifies that: (i) the Commonwealth has adequate access to short-term and long-term capital markets at reasonable interest rates to meet its borrowing needs; and (ii) for at least four consecutive Fiscal Years (a) the Commonwealth has developed its budgets in accordance with modified accrual accounting standards, and (b) the expenditures made by the Commonwealth during each such Fiscal Year did not exceed its revenues during that year, as determined in accordance with modified accrual accounting standards.

101361236v22

### 3.      Oversight Board Powers and Responsibilities

***Certification of Fiscal Plans and Budgets***

One of the cornerstones of PROMESA is the development, approval and enforcement of fiscal plans and budgets for the Commonwealth and its covered instrumentalities. Such fiscal plans and budgets provide a framework for achieving fiscal responsibility and access to the capital markets. Fiscal plans are long-term planning tools, covering a period of at least five Fiscal Years, while budgets cover at least one Fiscal Year. Budgets must be consistent with the fiscal plan then in effect.

PROMESA contemplates that the Oversight Board and the elected government of the Commonwealth will work together to adopt a fiscal plan. The process begins with the Oversight Board providing the Governor with a schedule for the development, submission, and approval of fiscal plans for the Commonwealth and any covered instrumentality. The Governor is required to submit the proposed fiscal plan in accordance with such schedule. Following submission, the Oversight Board may certify the proposed fiscal plan if it determines that such fiscal plan meets 14 statutory requirements set forth in PROMESA, which are designed to "provide a method to achieve fiscal responsibility and access to the capital markets." The fiscal plan must:

- provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on (i) applicable laws, or (ii) specific bills that require enactment in order to reasonably achieve the projections of the fiscal plan;

- ensure the funding of essential public services;

- provide adequate funding for public pension systems;

- provide for the elimination of structural deficits;

- for Fiscal Years covered by a fiscal plan in which a stay under Title III or Title IV of PROMESA is not effective, provide for a debt burden that is sustainable;

- improve fiscal governance, accountability and internal controls;

- enable the achievement of fiscal targets;

- create independent forecasts of revenue for the period covered by the fiscal plan;

- include a debt sustainability analysis;

- provide for capital expenditures and investments necessary to promote economic growth;

- adopt appropriate recommendations submitted by the Oversight Board;

- include such additional information as the Oversight Board deems necessary;

47

- ensure that assets, funds or resources of a territorial instrumentality are not loaned to, transferred to or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under Title III or a Qualifying Modification approved under Title VI of PROMESA; and

- respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA.

The Oversight Board reviews the proposed fiscal plan and determines whether it satisfies these 14 requirements. If the Oversight Board determines that the fiscal plan satisfies these requirements, it will approve and certify the fiscal plan.  If the Oversight Board determines that the fiscal plan does not satisfy these requirements, it will issue a notice of violation to the Governor that includes recommendations for revisions to the fiscal plan and an opportunity to correct the violations. The exchange of proposed fiscal plans and Oversight Board recommendations can continue, as long as there is time, until the Oversight Board is satisfied with the fiscal plan submitted by the Governor. However, if the Governor fails to submit a fiscal plan or a revised fiscal plan that, in the Oversight Board's sole discretion, satisfies the requirements set forth above within the time frame set by the Oversight Board, the Oversight Board is required to develop and certify a fiscal plan that satisfies such requirements. Alternatively, at the Oversight Board's option, instead of exchanging proposed fiscal plans and recommendations, the Governor and the Oversight Board may jointly develop and certify a fiscal plan that reflects a consensus between them.

After certification of the fiscal plan, the Oversight Board will provide to the Governor and the Legislative Assembly a schedule for the development, approval and certification of budgets for the Commonwealth and its covered instrumentalities. The Oversight Board also must provide to the Governor and the Legislative Assembly a revenue forecast for use in developing the budget. If the Oversight Board determines that the proposed Commonwealth budget submitted by the Governor is compliant with the certified fiscal plan, the Oversight Board will approve it and submit it to the Legislative Assembly. If the Oversight Board determines in its sole discretion that the proposed budget is not compliant with the fiscal plan, it will provide a notice of violation to the Governor that includes a description of the necessary corrective action and an opportunity to correct such violation by submitting a revised budget that complies with the fiscal plan. The Governor may submit as many revised budgets as the schedule established by the Oversight Board permits. However, if the Governor fails to submit a Commonwealth budget that complies with the fiscal plan within the time frame set by the Oversight Board, the Oversight Board must develop and submit to the Governor and the Legislative Assembly a budget that complies with the certified fiscal plan. The Legislative Assembly will then submit to the Oversight Board the budget it adopts in order that the Oversight Board can determine whether such budget complies with the certified fiscal plan. If the Oversight Board determines that the budget adopted by the Legislative Assembly complies with the certified fiscal plan, the Oversight Board will issue a compliance certification for such budget. If the Oversight Board determines that the budget adopted by the Legislative Assembly does not comply with the certified fiscal plan, the Oversight Board will provide to the Legislative Assembly a notice of violation that includes a description of the necessary corrective action and an opportunity to

48

correct such violation. The Legislative Assembly may submit as many revised budgets as the schedule established by the Oversight Board permits. If the Governor and the Legislative Assembly fail to develop and approve a budget that complies with the fiscal plan within the time frame set by the Oversight Board, the Oversight Board must develop and submit a budget that complies with the certified fiscal plan before the first day of the Fiscal Year for which the Commonwealth budget is being developed. Such budget shall be deemed approved by the Governor and Legislative Assembly, the subject of a compliance certification issued by the Oversight Board, and in full force and effect beginning on the first day of the applicable Fiscal Year. Budgets of instrumentalities are developed by the Governor and follow a similar process between the Governor and the Oversight Board, whereby the Governor develops an instrumentality budget and the Oversight Board reviews it to determine whether it complies with the instrumentality's certified fiscal plan. If the Governor fails to develop an instrumentality budget that complies with the certified fiscal plan for that instrumentality before the first day of the Fiscal Year, the Oversight shall submit to the Governor a revised budget which shall be deemed approved by the Governor, the subject of a compliance certificate issued by the Oversight Board and in full force and effect for the applicable Fiscal Year.

Not later than 15 days after the last day of each quarter of a Fiscal Year, the Governor must submit to the Oversight Board a financial report for the Commonwealth and each covered instrumentality describing actual revenues, expenditures and cash flows for such quarter. If the Oversight Board determines that actual revenues, expenditures and cash flows are not consistent with the projected revenues, expenditures or cash flows set forth in the certified budget for such quarter, the Oversight Board will establish a deadline by which the Commonwealth must provide an explanation for the inconsistency that the Oversight Board finds reasonable or the Commonwealth must implement corrective actions to address such inconsistency. If the Commonwealth fails to provide a reasonable explanation or to correct the inconsistency, the Oversight Board must certify to the President, the United States Congress, the Governor, and the Legislative Assembly that the Commonwealth is inconsistent with the certified budget and describe the amount of the inconsistency. After providing such certification and determining that the Commonwealth has failed to correct the inconsistency, the Oversight Board must make appropriate reductions in non-debt expenditures to ensure that revenues and expenses are in compliance with the Commonwealth's certified budget. In the case of an instrumentality, the Oversight Board can also institute automatic hiring freezes and prohibit such instrumentality from entering into any contract.

Since the enactment of PROMESA on June 30, 2016, the Oversight Board has certified budgets for the Commonwealth for fiscal years 2018 and 2019. The Commonwealth's general fund budget for Fiscal Year 2019 as certified by the Oversight Board authorizes approximately $8.8 billion in expenditures. The three largest categories of general fund expenditures in Fiscal Year 2019 are: (1) K-12 and higher education (25%); (2) pension paygo obligations (22%); and (3) public safety (10%). Healthcare expenditures funded by the general fund are substantially lower than in prior years due to a temporary increase in Medicaid funds, which covers the majority of total local healthcare costs through September 2019. Relative to Fiscal Year 2018, the Commonwealth's general fund budget also included material reductions in payroll expenditures ($271 million) and subsidies to the University of Puerto Rico ($71 million) and municipalities ($44 million), and the elimination of the Christmas bonus ($67 million). The current budget also included new expenditures such as police salary increases ($19 million) and

49

overtime back pay ($122 million) and salary increases for teachers ($24 million). The budget also included strict controls on spending and reapportionment authority to enforce fiscal discipline. In addition, for Fiscal Year 2019, the Oversight Board certified separate budgets for each instrumentality in order to provide greater transparency and improve budget monitoring.

In furtherance of the foregoing duties, the Oversight Board has the authority to enforce the fiscal plans and budgets by reviewing certain activities of the government of the Commonwealth and its instrumentalities. Accordingly, the Commonwealth's proposed legislative acts must be submitted to the Oversight Board and must be accompanied by an estimate of the new law's impact on expenditures and revenues. The Oversight Board also has the authority to review any of the contracts, rules, regulations and orders of the Commonwealth and its covered instrumentalities for their economic impact on the fiscal plans and budgets. If the Oversight Board determines that any of the foregoing activities are inconsistent with a fiscal plan or budget, the Oversight Board may (subject to certain limitations set forth in PROMESA) take any actions necessary to ensure that the enactment of a new law or execution of a new contract will not adversely affect compliance with the fiscal plan or budget. In addition, the Oversight Board at any time may submit to the Governor or the Legislative Assembly recommendations for actions that would ensure compliance with the fiscal plans or otherwise promote financial stability and management responsibility in the Commonwealth's public corporations. The Commonwealth may adopt or reject such recommendations, subject to providing a report to the President of the United States and Congress on its justifications for rejecting any recommendations.

The Commonwealth and its covered instrumentalities may not issue any debt without the approval of the Oversight Board pursuant to section 207 of PROMESA.

### Title III of PROMESA

PROMESA provides the Commonwealth and its instrumentalities with two alternative methods to adjust unsustainable debt: (i) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modification to financial debt can be accepted by a supermajority of creditors; and (ii) a quasi-bankruptcy proceeding under Title III of PROMESA, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of title 11 of the United States Code (the "Bankruptcy Code").

PROMESA Title III establishes an in-court process for restructuring the debts of Puerto Rico and other United States territories that is modeled after the process under chapter 9 of the Bankruptcy Code. Under section 302 of PROMESA, in order to be a debtor under Title III, the territory and/or its instrumentalities must (i) have an Oversight Board established for it or be designated a "covered entity"; (ii) have the Oversight Board issue a restructuring certification under section 206(b) of PROMESA; and (iii) "desire to effect a plan to adjust its debt." The Oversight Board has sole authority to file a voluntary petition seeking protection under PROMESA Title III.

In a Title III case, the Oversight Board acts as the debtor's representative and is authorized to take any actions necessary to prosecute the Title III case. Immediately upon filing

the Title III petition, Bankruptcy Code sections 362 and 922 (which are incorporated into Title III cases under PROMESA) apply to automatically stay substantially all litigation against the debtor (the "Title III Stay").  After the Title III case is commenced, the Chief Justice of the United States Supreme Court must designate a district court judge to sit by designation and preside over the Title III case.  Section 303 of PROMESA also provides that the commencement of a Title III case "does not limit or impair the powers of a covered territory to control by legislation or otherwise the exercise of the political or governmental powers of the territory or territorial instrumentality," subject, however, to the limitations contained in PROMESA Titles II and III.

The core component of the Title III case is the confirmation of a plan of adjustment of the debts of the debtor.  The Oversight Board has the exclusive authority to file a plan of adjustment and to modify a plan of adjustment prior to confirmation.  In order to be confirmed, a proposed plan of adjustment must meet the requirements set forth under section 314 of PROMESA.

### Other Powers and Responsibilities

Pursuant to section 208 of PROMESA, within 30 days after the end of each Commonwealth Fiscal Year, the Oversight Board is required to submit an annual report to the President of the United States, Congress, the Governor and the Legislative Assembly. The annual report must describe the Commonwealth's progress in achieving PROMESA's objectives and how the Oversight Board has assisted such progress. In addition, the Oversight Board must describe the precise manner in which it used its allocated funds during the Fiscal Year. The annual report may also include the Oversight Board's recommendations for further federal action, including amending PROMESA or enacting other legislation, to support compliance with certified fiscal plans.

In addition to the foregoing core responsibilities, the Oversight Board has also been granted other significant powers to assist in achieving its objectives. These additional powers include, among other things:

1. holding hearings and sessions;

2. obtaining official data from the Commonwealth, the federal government and creditor information;

3. accepting, using and disposing of gifts;

4. issuing subpoenas;

5. entering into contracts;

6. enforcing the laws of the Commonwealth prohibiting public sector employees from participating in a strike or lockout;

7. certifying voluntary restructuring agreements and protecting pre-existing restructuring agreements between the Commonwealth and its creditors;

8.  certifying debt modifications under Title VI of PROMESA;

9.  initiating civil actions to enforce its authority under PROMESA;

10. imposing appropriate penalties against officers or employees of the Commonwealth for violations of valid orders of the Oversight Board;

11. investigating the Commonwealth's disclosure and selling practices related to its bonds;

12. ensuring the prompt payment and administration of Commonwealth taxes;

13. analyzing any materially underfunded pensions in the Commonwealth's pension system; and

14. intervening in any litigation filed against the Commonwealth or its covered instrumentalities.

## D.    Adoption of Commonwealth Fiscal Plan and COFINA Fiscal Plan

To fulfill its mission of achieving for the Commonwealth fiscal responsibility and market access, the Oversight Board evaluates the macroeconomic framework underlying the fiscal plans (including for COFINA) proposed by the Governor.  Thus, starting as early as September 2016, the Oversight Board, alongside its economists, municipal consultants, and financial advisors, spent hundreds of hours in research and working sessions in order to understand the dire situation in Puerto Rico.  The Oversight Board also held numerous internal meetings and external meetings with government officials and the various creditor groups.  The Oversight Board got up to speed on the many fiscal challenges that Puerto Rico faces and within only a few months was in a position to formulate its own fiscal plan or evaluate the Government's proposed fiscal plan.

The Oversight Board was also tasked with providing recommendations to ensure that the proposed plans comport with the requirements and goals of PROMESA.  Among these requirements is that the fiscal plan provide Puerto Rico with a method to achieve fiscal responsibility and access to the capital markets.  In addition, Congress in PROMESA expressed the view that any durable solution for Puerto Rico's fiscal crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States.[13]

On March 11, 2017, Governor Rosselló Nevares submitted a joint fiscal plan of the Commonwealth, which included COFINA, to the Oversight Board, and the advisors of the Governor and of the Oversight Board engaged in extensive discussions on March 11 and 12, 2017.  After the Governor submitted a final revised version of the fiscal plan on March 13, 2017, the Oversight Board voted unanimously to certify the joint fiscal plan, as amended, on March 13,

---

[13] PROMESA section 701 ("It is the sense of the Congress that any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States.").

2017.  The joint fiscal plan has evolved over the past nineteen (19) months based upon a multitude of factors, including the devastation caused by Hurricanes Irma and Maria that hit Puerto Rico approximately six months after the March 2017 certification of the fiscal plan, and the resulting effect upon Puerto Rico and its inhabitants.

Following the devastation caused by Hurricanes Irma and María, the Oversight Board certified a revised fiscal plan for the Commonwealth on April 19, 2018 after extensive discussions between the Oversight Board and the Government of Puerto Rico to address issues regarding labor reform in the fiscal plan.  The Oversight Board and Governor Rosselló continued to engage in good-faith negotiations over labor reform in the Commonwealth fiscal plan, and on May 30, 2018, the Oversight Board certified a revised Commonwealth fiscal plan that incorporated the Oversight Board and Governor's compromise regarding labor reform, including the repeal of certain legislation.  The Legislative Assembly, however, ultimately failed to pass any repeal of such legislation, and on June 29, 2018, the Oversight Board re-certified its revised version of the Commonwealth fiscal plan that reverted back to the April 19, 2018 fiscal plan requirements.

A revised Commonwealth fiscal plan that certified on June 29, 2018 was subject to an adversary complaint filed on July 5, 2018 by Governor Rosselló and AAFAF in *Rosselló Nevares v. The Financial Oversight and Management Board for Puerto Rico*, Adv. Proc. No. 18-00080.  In their adversary complaint, Governor Rosselló and AAFAF sought declaratory and injunctive relief against (a) the Oversight Board, (b) each of its members, and (c) its Executive Director, solely in their official capacities, seeking (i) a declaration that the Oversight Board lacks the authority to impose policy initiatives on the Government through a fiscal plan and/or budget, including the fiscal plan and budget, as certified by the Oversight Board; (ii) a declaration that the substantive policy mandates contained in the certified fiscal plan and rejected by the Governor pursuant to section 205 of PROMESA are null and void; (iii) a declaration that the substantive policy mandates contained in the certified budget exceeds the Board's powers and are null and void; and (iv) an injunction against the defendants that would prohibit them from implementing and enforcing the Oversight Board's rejected policy recommendations contained in the certified fiscal plan and budget.

After a hearing on July 25, 2018, the Title III Court issued a ruling partially dismissing certain claims of the complaint. On September 10, 2018, the Governor and AAFAF moved the Title III Court to certify its decision for immediate interlocutory appeal to the U.S. Court of Appeals for the First Circuit. On September 21, 2018, the Oversight Board filed its opposition to the motion, arguing that the Governor and AAFAF have failed to show any of the statutory predicates for certification of an interlocutory appeal. On September 27, 2018, the Governor and AAFAF filed a reply in support of their motion, arguing that all three grounds set out in the legal standard for certification have been met, although only one is needed to be sufficient.    On October 9, 2018, the Title III court denied plaintiffs' certification motion, but, on its own motion, certified for immediate interlocutory appeal certain aspects of its order dismissing certain claims of the complaint.  Specifically, the aspects of the dismissal order which address claims concerning the following two issues are certified for appeal: (i) whether plaintiffs were entitled to declarations concerning the ability of the Oversight Board to treat as mandatory fiscal plan and budgetary provisions that the Governor had specifically rejected; and (ii) the issue of whether the certification of a budget under PROMESA precludes reprogramming of previously-

authorized expenditures from prior years.  The Title III Court noted that for both issues there is no controlling Supreme Court or First Circuit authority, and that a definitive appellate resolution of these issues can clarify the legal context for the resolution of certain policy-based conflicts between the Government and the Oversight Board, mapping important contours of the "awkward power-sharing arrangement" between the Oversight Board and the Government that has been created by PROMESA.

On August 21, 2018, the Commonwealth submitted a revised fiscal plan to the Oversight Board, which incorporated substantial updates to the Commonwealth fiscal plan certified on June 29, 2018.  On August 30, 2018, the Oversight Board delivered to the Commonwealth a notice of violation pursuant to section 201(c)(3)(B) of PROMESA requiring certain revisions before the Oversight Board could certify the fiscal plan as compliant with the requirements of PROMESA.  On September 7, 2018, the Commonwealth submitted a revised fiscal plan to the Oversight Board.  On [___], 2018, the Oversight Board voted to certify the Commonwealth fiscal plan, as amended.

In connection with negotiations surrounding the Original PSA (as further described below in Section [IV.E.4, "Entry into the Plan Support Agreement"] of this Disclosure Statement) and in anticipation of the transactions contemplated by the Original PSA, on August 22, 2018, the Oversight Board requested a standalone fiscal plan for COFINA for Fiscal Years 2019 to 2023.  On August 27, 2018, COFINA submitted its fiscal plan to the Oversight Board.  On August 30, 2018, the Oversight Board delivered to COFINA a notice of violation pursuant to section 201(c)(3)(B) of PROMESA requiring certain changes and/or explanations in a revised COFINA fiscal plan.  On September 7, 2018, COFINA submitted a revised fiscal plan to the Oversight Board.  On [___], 2018, the Oversight Board voted to certify the COFINA fiscal plan, as amended.

## E.     Summary of Certain Pre-Title III Litigation Relevant to COFINA

### 1.     The Commonwealth-COFINA Dispute and the Lex Claims Litigation

The Commonwealth has issued or guaranteed approximately $17.8 billion in general obligation bond debt (the "GO Debt").  The GO Debt falls into two categories: (i) the general obligation bonds issued by the Commonwealth (the "GO Bonds") that are backed by a pledge of the Commonwealth's full faith, credit, and taxing power; and (ii) bonds issued by certain of the Commonwealth's public corporations, which are guaranteed by the same pledge of the Commonwealth's full faith, credit, and taxing power.

On July 20, 2016, certain holders of the GO Bonds commenced an action in the U.S. District Court for the District of Puerto Rico against the Commonwealth and several of its officials, including the Governor, seeking (a) declaratory relief that the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*, Act 21-2016 ("Act 21"), which authorized the Governor to, among other things, declare a temporary moratorium on debt service and stay creditor remedies, and an executive order issued pursuant to Act 21 announcing a moratorium on payment of the Commonwealth's GO Bonds, are preempted by section 204(c)(3) of PROMESA, and (b) an injunction to prevent certain measures taken by the Commonwealth permitting transfers outside of the ordinary course.  *Lex Claims, LLC v. García-Padilla*; District Court,

District of Puerto Rico, July 20, 2016, Case No. 16-2374-FAB (the "Lex Claims Litigation"). On November 6, 2016, the plaintiffs filed a second amended complaint adding new causes of action, including three causes of action relating to COFINA, and adding COFINA and other parties as defendants. On December 16, 2016, COFINA filed an answer to the second amended complaint generally denying the allegations and asserting various affirmative defenses.

Plaintiffs in the Lex Claims Litigation argued, among other things, that the Puerto Rico Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure. They point to article VI, section 8 of the Puerto Rico Constitution, which provides that if Puerto Rico's "available resources" are insufficient to meet all its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, section 8. In their view, the Pledged Sales Tax is an "available resource" and COFINA was created and has issued bonds in an attempt to evade the claim of holders of GO Debt on available resources and related constitutional limitation on the quantity of public debt the Commonwealth was permitted to issue.

Holders and insurers of the Existing Securities, permitted to intervene in the Lex Claims Litigation, argue that the Pledged Sales Tax was legislatively rendered property of COFINA from its inception, thereby eliminating any possibility that such tax may be property or "available resources" of the Commonwealth. They point to Act 91 providing the Pledged Sales Tax "shall [not] constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the Secretary." Act 91, section 2. They further assert that COFINA was essential in permitting the Commonwealth to access the capital markets on favorable terms.

Following the commencement of COFINA's Title III Case, the Title III Court entered an order on May 17, 2017 staying the Lex Claims Litigation. There has been no further activity in this action since the commencement of COFINA's Title III Case.

## 2.    Rodriguez-Perello, et al. v. Rosselló-Nevares, et al., Case No. 17-cv-1566-FAB

On May 2, 2017, certain COFINA bondholders commenced an action for declaratory and injunctive relief against COFINA, AAFAF, GDB, Governor Rosselló and certain other governmental officials. Plaintiffs asserted that their interest in the Existing Securities provided them with contract and property rights protected by the Constitutions of the United States and the Commonwealth, as well as federal and Puerto Rico statutes. Plaintiffs further asserted that the defendants had unlawfully and unconstitutionally impaired these contractual rights and taken plaintiffs' property. In the action, plaintiffs sought protection and vindication of their rights through a declaratory judgment that defendants had breached plaintiffs' constitutional, statutory, and contractual obligations to COFINA bondholders, and injunctive relief against defendants' continuation of those breaches.

Following the commencement of COFINA's Title III Case, the Title III Court entered an order on May 17, 2017 staying the litigation. There has been no further activity in this action since the commencement of COFINA's Title III Case.

### 3.      Other Creditor Litigation

Pursuant to section 405 of PROMESA, the establishment of the Oversight Board operated as a temporary stay of all actions, claims, and proceedings in any court or tribunal with respect to any Liability, as defined in section 405(a) of PROMESA, of the Commonwealth and its territorial instrumentalities.  As soon as the section 405 of PROMESA stay expired, dozens of creditors threatened to file or pursue lawsuits against the Commonwealth and its territorial instrumentalities.  In response, the Oversight Board had little choice but to file petitions under Title III of PROMESA for the Commonwealth and certain of its instrumentalities, which gave rise to a further stay and continue to protect the Commonwealth and its territorial instrumentalities.

## F.      Commencement of the Commonwealth's Title III Case

After negotiations with its creditor constituencies, the Commonwealth was unable to negotiate—and saw no prospect of negotiating—an out-of-court resolution that would address its financial situation and lay a foundation for economic recovery and prosperity going forward without a renegotiation of outstanding debts.  Accordingly, on May 3, 2017, the Oversight Board, at the request of the Governor, issued a restructuring certification pursuant to sections 104(j) and 206 of PROMESA and filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA, commencing a case under Title III thereof (the "Commonwealth's Title III Case").

On June 23, 2017, the Title III Court entered the *Order Appointing Mediation Team* [ECF No. 430] "to further the goal of the successful, consensual resolution of the issues raised in these debt adjustment proceedings." The members of the Mediation Team currently include: (1) Judge Barbara Houser (Bankr. N.D. Tex.); (2) Judge Thomas Ambro (3d. Cir.); (3) Judge Nancy Atlas (S.D. Tex.); (4) Judge Victor Marrero (S.D.N.Y.); and (5) Judge Roberta Colton (Bankr. M.D. Fla.).

## IV.      Overview of COFINA's Title III Case

## A.      Commencement of COFINA's Title III Case

On May 5, 2017, the Oversight Board, at the request of the Governor, issued a restructuring certification pursuant to sections 104(j) and 206 of PROMESA and filed a voluntary petition for relief for COFINA, pursuant to section 304(a) of PROMESA, commencing a case under Title III thereof ("COFINA's Title III Case" and together with the Commonwealth's Title III Case, the "Title III Cases").

On June 1, 2017, the Title III Court entered an order granting the joint administration of the Commonwealth's Title III Case and COFINA's Title III Case, for procedural purposes only [ECF No. 242].

Since the Petition Date, the Title III Stay has provided COFINA with an important "breathing spell" to address its financial circumstances and craft a plan of adjustment without interference from adverse creditor actions.

101361236v22

## B. Lex Claims Motion for Relief from the Automatic Stay

On June 7, 2017, the UBS Family of Funds and the Puerto Rico Family of Funds (together, the "Puerto Rico Funds"), and mutual funds managed by Oppenheimer Funds, Inc., Franklin Advisers, Inc., and the First Puerto Rico Family of Funds (collectively, the "Movants") filed the *Puerto Rico Funds and Mutual Funds Group's Motion for Relief from the Automatic Stay* [ECF No. 270] (the "Lex Claims Motion") seeking an order lifting that automatic stay to allow the Lex Claims Litigation, before the U.S. District Court for the District of Puerto Rico, to proceed in order for the District Court to decide the Puerto Rico Funds' motion to certify the question of the constitutionality of COFINA to the Puerto Rico Supreme Court (the "Certification Motion"), and if the Certification Motion is granted, to allow the Puerto Rico Supreme Court to consider and decide the certified questions. In the alternative, Movants requested that the Lex Claims Litigation be transferred pursuant to section 306(d)(3) of PROMESA to the Title III Cases as an adversary proceeding.

The Title III Court denied the Lex Claims Motion without prejudice, holding that (1) the Movants did not show that lifting the stay would result in a partial or complete resolution of the issues where it was uncertain that the District Court would grant the certification if the stay was lifted or, if the Certification Motion was granted, that the Puerto Rico Supreme Court would accept certification; (2) judicial economy would not be achieved by lifting the automatic stay because the Title III Court had before it various adversary proceedings pending to address the very issues raised in the certified questions; (3) the certification had not been fully briefed in the Lex Claims Litigation, and the parties in the Lex Claims Litigation were not better positioned to litigate the issues in the certified questions than the parties to the Title III proceedings; and (4) the Movants have not demonstrated a particular harm that they are likely to suffer in the absence of relief from the automatic stay.

## C. Other Related Litigation

### 1. *Bank of New York Mellon v. COFINA, et al.,* Adv. Proc. No. 17-00133

On May 16, 2017, shortly after the commencement of the COFINA Title III Case, BNYM, as the trustee for the Existing Securities, filed an interpleader action in the Title III Court (the "Interpleader Action") to determine certain parties' respective rights to the funds generated from the Pledged Sales Taxes held in BNYM's possession (the "Disputed Funds").[14] Through the Interpleader Action, parties in interest asserted claims to the Disputed Funds based on, among other things, the existence or non-existence of an uncured default arising from certain actions of the Commonwealth and COFINA, including the passage of a fiscal plan compliance law enabling the Governor to use Pledged Sales Tax to cover deficiencies in the Commonwealth's cash flow under certain circumstances.

On May 30, 2017, the Title III Court granted the interpleader request and ordered the Disputed Funds remain in trust and no distributions made until the Title III Court issues a final

---

[14] The Disputed Funds include the funds on deposit prior to July 1, 2018 in the debt service reserve and such other accounts and including earnings thereon held by BNYM, as the COFINA bond trustee, for the benefit of the bondholders. As summarized below, the Commonwealth-COFINA Settlement provides for the distribution of the Disputed Funds.

ruling in the Interpleader Action.  From June to September 2017, several parties and parties in interest, including BNYM and certain creditors, served document requests and deposition subpoenas on various Puerto Rico Government entities, affiliates, and officials, including COFINA, the Government Development Bank for Puerto Rico, the Commonwealth, AAFAF, and the Oversight Board. The subpoenaed entities and individuals produced documents, but AAFAF and the Oversight Board each submitted binding statements of facts in lieu of depositions.  On November 6, 2017, several parties in interest, including BNYM and certain creditors, filed motions for summary judgment. Briefing on the summary judgment motions was completed on January 5, 2018, and summary judgment is pending.  On September 27, 2018, in light of the agreements and compromises under the Commonwealth-COFINA Settlement and the Plan of Adjustment, the Title III Court, *sua sponte*, entered an order terminating the pending summary judgment motions without prejudice to restoration of the motions on or after October 1, 2018. [Adv. Proc. No. 17-00133, ECF. No. 518].

2.   ***Whitebox Multi-Strategy Partners, L.P., et al. v Bank of New York Mellon***, **Adv. Proc. No. 17-00143**

Plaintiffs Whitebox Multi-Strategy Partners, L.P., *et al.* ("Whitebox") initiated an action in the Supreme Court of New York claiming BNYM, as the trustee for sales tax revenue bonds issued by COFINA, failed to investigate and enforce alleged events of default relating to these bonds.  After the parties consented to removal of the action to the Title III Court, the Title III Court entered an order granting the same relief in *Bank of New York Mellon v. COFINA, et al.,* Adv. Proc. No. 17-00133, *i.e.*, the Disputed Funds shall remain in trust and no distributions shall be made until the Title III Court issues a final ruling.

3.   ***UTIER v. Puerto Rico Elec. Power Auth., et. al.,*** **Adv. Proc. No. 17-00228**

Plaintiff challenges the constitutionality of PROMESA on the grounds that the appointment of the members of the Oversight Board violates the Appointments Clause and the separation-of-powers principles of the United States Constitution because the members were not appointed by the President with the advice and consent of the Senate.  Plaintiff seeks declaratory judgments that PROMESA violates the Appointments Clause and that all of the Oversight Board's acts to date are invalid.  Plaintiff also seeks to enjoin the Oversight Board from exercising any authority granted to it by PROMESA.

Defendants moved to dismiss the amended complaint on November 3, 2017, arguing (i) Plaintiff lacks standing, and the Title III Court therefore lacks subject-matter jurisdiction, because it has not alleged harm from the Oversight Board's appointment and acts; and (ii) Plaintiff failed to state a claim under the Appointments Clause because (a) the Oversight Board does not implicate the Appointments Clause since it is part of the territorial, rather than federal, government, and (b) the Appointments Clause does not apply to Puerto Rico.  Defendants further argued that UTIER seeks relief far broader than required by the claims it asserts. A hearing on the motion to dismiss was held on January 10, 2018.

On August 15, 2018, the Title III Court entered an opinion and order granting Defendants' motion to dismiss the amended complaint.  The Title III Court held that Plaintiff had standing, but that, as it determined in another Appointments Clause challenge, *In re Fin.*

58

*Oversight and Mgmt. Bd. for P.R.*, __ F. Supp. 3d __, 2018 WL 3425294, at *6 (D.P.R. July 13, 2018), there is no constitutional defect in the method of appointment. The Title III Court reasoned that the Oversight Board is an instrumentality of the Commonwealth established pursuant to Congress's plenary powers under the Territories Clause, and its members are not officers of the United States. On August 16, 2018, Plaintiffs filed a notice of appeal to the First Circuit, and on August 27, filed a motion to expedite the appeal. On September 9, 2018, the First Circuit granted Plaintiffs' motion to expedite and also consolidated Plaintiffs' appeals (First Circuit ECF No. 18-187) with two related Appointments Clause challenges brought by Aurelius Investment, LLC et al. (First Circuit ECF No. 18-1671) and Assured Guaranty Corp. et al. (First Circuit ECF No. 18-1746). Briefing in the consolidated appeals is ongoing, and oral argument before the First Circuit is scheduled for December 3, 2018.

### 4. *Pinto-Lugo, et. al. v. United States of America, et. al.*, Adv. Proc. No. 18-00041

Plaintiffs allege that PROMESA is unconstitutional because it violates the First, Fifth, and Fourteenth Amendments to the United States Constitution, international treaties, and the Declaration of Independence. Plaintiffs primarily base their arguments on the *Insular Cases* and the United States' alleged treatment of Puerto Rico as a colony. Plaintiffs request (i) a declaration that PROMESA violates the aforementioned constitutional provisions, the Declaration of Independence, the United Nations Charter, the United Nations Declaration of Human Rights, and the International Covenant of Civil and Political Rights; (ii) the removal of two Oversight Board members; (iii) a stay of the Title III proceedings and the adoption of fiscal plans until an audit of the Commonwealth's debt can occur and any persons engaging in illegal conduct surrounding the sale of bonds is held liable; (iv) the United States assume the Commonwealth's public debt; and (v) an order prohibiting any sale of PREPA.

The United States, the Oversight Board, and Governor Rosselló all moved to dismiss the case, alleging that (i) Plaintiffs lacked standing, (ii) certain claims are barred by sections 4, 105, and 210(a) of PROMESA, (iii) the treaties do not create binding domestic legal obligation, (iv) the Declaration of Independence is not a legally operative document, (v) Congress is not constrained by separation-of-powers principles when it legislates pursuant to the Territories Clause, (vi) the court does not have the authority to remove Oversight Board members, and (vii) the Oversight Board is not obligated to conduct an audit.

The action is currently pending.

### 5. *Unión de Empleados de la Corporación del Fondo del Seguro del Estado v. Government of the United States of America, et. al.*, Adv. Proc. No. 18-00066

Plaintiffs—three Commonwealth unions and four individual union members—allege that PROMESA violates the Thirteenth and Fifteenth Amendments to the United States Constitution and various international treaties and charters. Plaintiffs' claims are based primarily on their views on the *Insular Cases* and the United States' alleged treatment of Puerto Rico as a colony. Plaintiffs seek declaratory judgments that (i) PROMESA violates the Thirteenth and Fifteenth Amendments; (ii) the Oversight Board's acts to date are unconstitutional and null; and (iii) PROMESA violates various international treaties and charters. Plaintiffs further request that the

court (i) overturn the *Insular Cases*; (ii) enjoin Defendants from acting pursuant to the authority granted by PROMESA; and (iii) direct Congress to decolonize Puerto Rico.

Plaintiffs' second amended complaint was filed on October 5, 2018.  Defendants have twenty-eight (28) days to file an answer or otherwise respond to the second amended complaint.

6.      ***In re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico*, No. 18-1108**

Plaintiffs—beneficial owners of general obligation bonds issued by the Commonwealth and of bonds issued by certain Commonwealth instrumentalities—filed an adversary complaint on June 29, 2017.  *ACP Master, Ltd., et al. v. The Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-ap-189.  Plaintiffs asserted that their bonds are secured by an absolute and enforceable first claim and lien on all of the Commonwealth's available resources and that their debt is senior to all other debt issued by the Commonwealth.  Plaintiffs also claim their bonds are "Constitutional Debt" entitled to unique protections under the Puerto Rico Constitution because they are backed by a pledge of the Commonwealth's good faith, credit, and taxing power.  Plaintiffs further allege that the Constitutional Debt is entitled to full and timely payment.  Plaintiffs seek declarations that (i) certain property tax and claw back revenues (collectively, the "Revenues") can only be applied to pay Constitutional Debt; (ii) the Commonwealth lacks an equitable or beneficial property interest in the Revenues and that Plaintiffs have statutory liens on the Revenues; (iii) Plaintiffs' liens on the claw back revenues are liens on special revenues; (iv) the Commonwealth's diversion of the Revenues is an unconstitutional taking; and (v) the Revenues must be segregated and cannot be used for any purpose other than paying Constitutional Debt.  Plaintiffs also seek an injunction requiring Defendants to segregate and preserve the Revenues.

Defendants filed a motion to dismiss on August 21, 2017, principally arguing that the claims are precluded by PROMESA section 305 or seek advisory opinions.  Defendants also argue that certain claims are precluded by PROMESA sections 4 and 106(e) and that Plaintiffs have no property interests in or liens on the Revenues.  Defendants further argue that the Puerto Rico Constitution does not create a property right recoverable under its debt-repayment priority scheme and that certain counts fail because there is an adequate remedy at law (money damages).

The Title III Court granted the motion to dismiss in part for failure to state a claim and in part for lack of subject-matter jurisdiction.  The Title III Court held that certain claims sought (1) impermissible advisory opinions because they were vague or would not resolve any current concrete dispute or (2) were barred by PROMESA section 305 because they would interfere with the Commonwealth's use of its property or revenues or its governmental powers without the consent of the Oversight Board.

Plaintiffs appealed the decision to the First Circuit Court of Appeals.  The appeal has been fully briefed by the parties, and Altair Global Credit Opportunities Fund (A), LLC, *et al.* submitted an amicus brief.  Plaintiffs also filed a letter of supplemental authority regarding the First Circuit's decision in *In re Puerto Rico Electric Power Authority* (PREPA), No. 17-2079,

101361236v22

and Defendants filed a letter in response.  Oral argument is currently scheduled for November 5, 2018.

### 7. *In re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico*, No. 18-1746

On July 23, 2018, Assured filed an adversary complaint challenging the constitutionality of PROMESA on the grounds that the appointment of the members of the Oversight Board violated the Appointments Clause and separation-of-powers doctrine, inasmuch as the members were not appointed by the President with the advice and consent of the Senate. *Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico, et al.*, Adv. Proc. No. 18-ap-087.

On August 3, 2018, the Title III Court entered a stipulated judgment dismissing the case. Assured filed a notice of appeal to the First Circuit on the same day.  This appeal has been consolidated with related Appointments Clause challenges brought by Aurelius Investment, LLC, *et al.* (No. 18-1671) and UTIER (No. 18-1787).  The parties in the consolidated appeal have filed their initial briefs.  Appellants' reply briefs are due on October 24, 2018, and oral argument is scheduled for December 3, 2018.

### 8. *Hon. Rafael Hernandez-Montanez, et al. v. The Financial Oversight and Management Board of Puerto Rico*, Adv. Pro. No. 18-090-LTS

On July 25, 2018, Plaintiffs—members of the Popular Democratic Party—filed an adversary complaint seeking an order declaring that the Oversight Board's members were appointed in violation of the Appointments Clause; or, in the alternative, an order declaring that Congress's delegation of executive and legislative authority to the Oversight Board violates the separation-of-powers doctrine; or, in the alternative, an order declaring that the Oversight Board's exercise of authority over budgeting impermissibly interferes with the common-law right of legislative autonomy.  If Plaintiffs prevail on their constitutional claims, they request that the Title III Court enjoin the Oversight Board from exercising authority under PROMESA, and if Plaintiffs prevail on their common-law claim, they request that the Title III Court permanently enjoin the Oversight Board from engaging in such interference.  On July 30, 2018, the Title III Court certified the constitutional challenge to the Attorney General.

On August 24, 2018, the parties filed a joint status report in which Plaintiffs agreed to stay their claim that the Oversight Board's members were appointed in violation of the Appointments Clause pending a decision in Aurelius' appeal of the denial of its motion to dismiss the Commonwealth Title III petition (the "*Aurelius* appeal") (No. 18-1671/1746/1787).  Plaintiffs also agreed to dismiss their common-law claim.  The parties disagreed as to whether Plaintiffs' remaining claim regarding the separation-of-powers doctrine should be stayed pending the resolution of the *Aurelius* appeal.  On September 6, 2018, the Title III Court dismissed the common-law claim.  On October 4, 2018, the Oversight Board filed a motion to stay litigation related to Plaintiffs' adversary complaint.  Five days later, Plaintiffs filed an opposition to the Oversight Board's motion.  The Oversight Board's reply brief is due on October 25, 2018.

### D.      Claims Process and Bar Date

#### 1.      Section 924/925 Lists

Section 924 of the Bankruptcy Code requires debtors to file a list of creditors. Section 925 of the Bankruptcy Code provides that "[a] proof of claim is deemed filed" for claims set forth on the list of creditors required by section 924 of the Bankruptcy Code except as to claims that are "listed as disputed, contingent, or unliquidated." 11 U.S.C. § 925. As discussed in greater detail in [Section ___] of this Disclosure Statement, the Debtor has filed a List of Creditors which satisfies the requirements of sections 924 and 925 of the Bankruptcy Code.

#### 2.      Bar Date Orders

Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2521] (the "Initial Bar Date Order") and *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160] (together with the Initial Bar Date Order, the "Bar Date Orders"), the Title III Court established the following bar dates for filing proofs of claim in the Title III Cases:

- June 29, 2018 at 4:00 p.m., prevailing Atlantic Time, as the general bar date for the filing of all proofs of claim (the "General Bar Date"), except as noted below;

- the later of (a) the General Bar Date or (b) 4:00 p.m., prevailing Atlantic Time, on the date that is the first business day that is 35 days after the date of entry of the applicable order rejecting an executory contract or unexpired lease as the bar date for any Claims arising from the rejection of such executory contract or unexpired lease;

- the later of (a) the General Bar Date or (b) 4:00 p.m., prevailing Atlantic Time, on the date that is 35 days after the date that a notice of an amendment to the List of Creditors is served on a claimant as the bar date for any Claims relating to such amendment to the List of Creditors.

The Bar Date Orders authorized the following parties to file master proofs of claim on behalf of the constituencies described below:

- The indenture trustees, fiscal agents, or any similar agent or nominee (each a "Bond Representative") for each respective series of bonds issued by a debtor or non-debtor (to the extent such Bond Representative exists) may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond document (the "Bond Documents"); and

- Each agent under any credit agreement may file a separate master proof of claim against the applicable debtor on behalf of itself and all lenders under such credit agreement.

62

Approximately [3,472] proofs of claim have been filed in the Title III Case asserting Claims against COFINA and/or its property.  BNYM, as trustee for Existing Securities, has filed various claims against COFINA on behalf of COFINA bondholders.  In addition, many holders of COFINA Bonds also filed proofs of claim against COFINA.  The Debtor believes that many of the proofs of claim filed by COFINA bondholders are duplicative of the claims filed by BNYM or otherwise resolved under the Plan of Adjustment.

**E.      The Commonwealth-COFINA Dispute**

**1.      General Background**

The dominant issue in the COFINA Title III Case is the Commonwealth-COFINA Dispute (*i.e.*, the dispute regarding ownership of the sales and use taxes purportedly transferred by the Commonwealth to COFINA to secure repayment of certain indebtedness of COFINA).  If such revenues are property of the Commonwealth, it is the Commonwealth's position that there may be no funds available to pay COFINA's debts.   If such revenues are property of COFINA, then there will be approximately $750 million less available per year (which annual amount will increase over time) to pay the Commonwealth's liabilities and expenses.

**2.      Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute**

On June 10, 2017, the Oversight Board filed the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Commonwealth-COFINA Dispute Procedures Motion") [ECF No. 303] to authorize a procedure to resolve the Commonwealth-COFINA Dispute in furtherance of fulfilling its responsibilities under PROMESA.

At the omnibus hearing held in San Juan, Puerto Rico on June 28, 2017, the Title III Court denied the Commonwealth-COFINA Dispute Procedures Motion without prejudice.  The Title III Court (a) directed the Oversight Board to seek the agreement of all interested parties to a procedure for resolving the Commonwealth-COFINA Dispute through confidential mediation under the supervision of Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas, and (b) authorized the Oversight Board to file a revised motion with or without unanimous support of interested parties.  Following the hearing, the Oversight Board worked with Chief Bankruptcy Judge Houser and various creditors to formulate procedures agreeable to the interested parties.

On July 21, 2017, the Oversight Board filed the *Revised Motion of Debtors for Order Approving Stipulation Providing Procedure to Resolve Commonwealth-COFINA Dispute* [ECF No. 718] seeking approval of a stipulation establishing a protocol to address the Commonwealth-COFINA Dispute, including appointing a Commonwealth agent and COFINA agent to litigate, mediate, and/or settle the Commonwealth-COFINA Dispute, and providing a procedure and timeline for the agents to consult with creditors and their respective debtors.

On August 10, 2017, the Title III Court entered the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [ECF No. 996] (the "Procedures Order"), which, among other things, provided that (a) the Oversight Board authorized the statutory committee of unsecured creditors of the Commonwealth (the "UCC" or "Committee")

to serve as the agent for the Oversight Board, as representative of the Commonwealth in its Title III case, to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth (the "Commonwealth Agent"); and (b) the Oversight Board authorized Bettina Whyte to serve as the agent for the Oversight Board, as representative of COFINA in its Title III case, to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA (the "COFINA Agent" and together with the Commonwealth Agent, the "Agents").[15] The Procedures Order defines the Commonwealth-COFINA Dispute as "whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA under applicable law . . . ." Procedures Order ¶ 4.

The Procedures Order also expressly acknowledges that the Oversight Board retains its authority to separately develop a settlement to the Commonwealth-COFINA Dispute and propose plans of adjustment for the Commonwealth and COFINA. Specifically, the Procedures Order provides that "the Oversight Board shall remain the only party authorized by PROMESA to propose a title III plan of adjustment, and to carry out that power and duty, the Oversight Board may, at any time, propose title III plans of adjustment for the Commonwealth and COFINA that incorporate a settlement of the Commonwealth-COFINA Dispute developed by the Agents or developed by the Oversight Board, and the Oversight Board may negotiate and mediate with creditors to achieve such settlement of the Commonwealth-COFINA Dispute . . . ." Procedures Order ¶ 4(n).

On August 21, 2017, the COFINA Agent filed a motion seeking an order: (i) confirming the applicability of 48 U.S.C. § 2125 to the COFINA Agent and her employees with respect to her work resolving the Commonwealth-COFINA Dispute, (ii) confirming that the COFINA Agent's local Puerto Rico counsel may be employed by the COFINA Agent without further application or order of the Title III Court, and (iii) clarifying that the COFINA Agent and her professionals retained pursuant to the Procedures Order will have their allowed fees and expenses paid pursuant to the Title III Court's order on interim compensation for professionals in COFINA's Title III Case [ECF No. 1121] (the "Clarification Motion").

On November 3, 2017, the Title III Court entered an order granting the Clarification Motion, but preserving the Oversight Board's and any other part in interest's arguments as to the scope of authority delegated by the Oversight Board to the Agents or otherwise set forth in the Procedures Order.

On September 11, 2017, the COFINA Agent filed an *Application of COFINA Agent for Entry of Order Authorizing Retention of Centerview Partners LLC as Financial Advisor and Expert* [ECF No. 1273] (the "Centerview Application"), seeking authorization for the COFINA Agent to retain Centerview Partners LLC ("Centerview") to provide financial advisory and expert services that include familiarizing itself with the fiscal condition of the Commonwealth and COFINA, reviewing and evaluating COFINA's capital structure and advising on possible restructuring strategies, providing expert testimony at any hearings in connection with the Commonwealth-COFINA Dispute, and assisting and advising with negotiation and mediation

---

[15] Following the entry of the Procedures Order, the Agents, along with certain creditor parties, engaged in confidential mediation with Chief Bankruptcy Judge Barbara Houser.

strategy.  On September 19, 2017, the Oversight Board, as representative of COFINA, filed its objection to the Centerview Application [ECF Nos. 1347, 1352].  On October 18, 2017, the Title III Court entered an order denying the Centerview Application, holding that (1) the proper scope and terms of Centerview's retention cannot be decided without first clarifying the scope of the COFINA Agent's authority and duties under the Procedures Order, including whether formulation of hypothetical restructuring scenarios is an appropriate exercise of the COFINA Agent's negotiation responsibilities under the Procedures Order, given PROMESA reserves to the Oversight Board the exclusive power to propose any plan of adjustment for confirmation, and (2) the Centerview Application was insufficiently fleshed out as to the reasons for certain of the proposed services, and did not provide the Title III Court with sufficient bases for approving Centerview's flat fee compensation terms.

### 3.  *Official Committee of Unsecured Creditors v. Whyte*, Adv. Proc. No. 17-00257

On September 9, 2017, the Committee, as Commonwealth Agent, commenced an adversary proceeding to prosecute the Commonwealth-COFINA Dispute (the "Adversary Proceeding").  The Commonwealth Agent's adversary proceeding complaint, Adversary Proceeding, ECF No. 1 (the "Complaint"), sought declaratory judgments that, among other things, (a) Act 91 did not transfer present ownership of future SUT revenues to COFINA; (b) Act 91 did not assign to COFINA any "right to receive" future SUT revenues; (c) the transfer language in Act 91 was, at most, an unsecured promise of a future transfer that can be breached or otherwise rejected in Title III; (d) COFINA has no enforceable security interest in future SUT revenues; (e) any unperfected security interest in SUT revenues is avoidable under sections 544(a)(1) and 547(b) of the Bankruptcy Code; (f) in the event that any security interest is not avoidable under section 544(a)(1) or section 547(b) any transfer made within two years of the petition date is still avoidable as a fraudulent transfer pursuant to section 548(a)(1)(B); (g) any post-petition transfer is avoidable under section 549(a); (h) any security interest held by COFINA is subordinate to rights of the Oversight Board acting as trustee/lien creditor; (i) any security interest was "cut off" by the commencement of the Commonwealth Title III case pursuant to section 552(a), as post-petition SUT revenues are after-acquired property; (j) any non-UCC post-petition transfers are avoidable because they were incomplete at the time the Commonwealth Title III petition was filed; (k) any post-petition transfer of SUT revenues to non-Commonwealth entities violates the automatic stay; (l) Act 91 is unconstitutional because it evades the debt provisions of Puerto Rico's Constitution; and (m) the COFINA structure is unconstitutional because Act 91 was enacted and/or amended in violation of the balanced budget clause of the Puerto Rico Constitution.

The Commonwealth Agent asserted in its Complaint that the Pledged Sales Tax is property of the Commonwealth because (a) the COFINA enabling legislation (including Act 91, as amended) did not grant COFINA a right to future revenues, merely an unsecured promise that such revenues would be transferred to COFINA in the future and, even if there were a security interest, it is unperfected and therefore avoidable under Title III and the Bankruptcy Code, and (b) the COFINA structure is unconstitutional because the result of the enabling legislation was to violate the debt limit, priority of payment to public debtholders, and balanced budget provisions of the Commonwealth Constitution.

On September 15, 2017, the COFINA Agent filed her answer to the Complaint, Adversary Proceeding, ECF No. 27 (the "Answer and Counterclaims"), vigorously disputing the Commonwealth Agent's claims, asserting various counterclaims, and seeking declaratory judgments that: (a) the COFINA enabling legislation is constitutional and thereby made the Pledged Sales Tax transferred to COFINA property of COFINA and not an "available resource" of the Commonwealth; (b) COFINA has a perfected and unavoidable lien in the Pledged Sales Tax, and/or there is an enforceable subordination agreement whereby the Commonwealth has agreed to subordinate any interest it may have in the Pledged Sales Tax to the interest of COFINA, and/or the Pledged Sales Tax is held in constructive trust for the benefit of COFINA; (c) the Commonwealth's misappropriation of the Pledged Sales Tax violates the United States and Puerto Rico Constitutions; (d) the fiscal plan compliance law violates PROMESA; (e) Act No. 84-2016, which amended the COFINA enabling legislation to decrease the amount of SUT proceeds COFINA receives from 6% to 5.5%, violates PROMESA, and COFINA is entitled to 6% of the SUT proceeds until the Pledged Sales Tax Base Amount is reached each year; and (f) any non-COFINA debt, including GO Bonds issued in violation of the debt limit provisions in the Puerto Rico Constitution, are not entitled to priority under the Puerto Rico Constitution's debt priority provisions.   The COFINA Agent's Answer and Counterclaims also sought injunctive relief, including that: (y) the Court impose a constructive trust in COFINA's favor over the Pledged Sales Tax in order to prevent the Commonwealth's alleged tortious interference and fraud with respect such revenues; and (z) the Court enter an order permanently enjoining the Commonwealth from diverting or transferring the Pledged Sales Tax proceeds away from COFINA, designating such revenues as "available resources," and taking any action to breach, revoke or reject the transfer of such revenues to COFINA or to otherwise interfere with COFINA's rights to such revenues.

In addition to the claims asserted by the Commonwealth Agent and the COFINA Agent, multiple groups of COFINA and GO Debt bondholders, as well as other parties that had been permitted to intervene in the Adversary Proceeding, filed counterclaims and cross-claims regarding ownership of the applicable portion of the SUT.

On December 21, 2017, the Title III Court entered an order dismissing, without prejudice, several of the Commonwealth Agent's and the COFINA Agent's claims as outside the scope of the Commonwealth-COFINA Dispute, as well as several claims asserted by the intervening parties (the "Dismissed Claims").   The Title III Court found that the scope of the Dispute, as defined in the Procedures Order, is confined to whether the Commonwealth or COFINA owns the Pledged Sales Tax.   The Dismissed Claims, the Title III Court found, were outside the scope of the Commonwealth-COFINA Dispute because they presumed either the Commonwealth's or COFINA's ownership of the Pledged Sales Tax or addressed other issues that were not related to the ownership question.   Following the Title III Court's order and subsequent order permitting the Commonwealth Agent to amend its complaint, which it did on January 16, 2018, the Commonwealth Agent's only remaining claims asserted that (a) Act 91 did not transfer present ownership of future SUT Revenues to COFINA;  (b) Act 91 did not assign to COFINA any "right to receive" future SUT Revenues; and (c) Act 91 was designed to, and did, violate the debt and balanced budget provisions of the Puerto Rico Constitution.   The COFINA Agent's only remaining claims asserted that Act 91 is constitutional and the Pledged Sales Tax and DSTF are COFINA's property.

On February 1, 2018, the Oversight Board and the Agents filed a joint motion seeking to expand the authority, and the coverage of orders relating to immunity protection and compensation, of the Agents and their professionals, in connection with the mediation of the Dismissed Claims, which the Court granted pursuant to an order entered on February 10, 2018.

On February 21, 2018, the Commonwealth Agent, the COFINA Agent, and several of the intervening parties, filed cross-motions for summary judgment. In its motion, the Commonwealth Agent asserted that (a) Act 91 did not transfer to COFINA a present property interest in potential future tax revenues because no such property exists to be transferred; (b) there was no "true sale" of future tax revenues to COFINA because the Commonwealth retained the power to substitute, reduce, or even eliminate those revenues, and the Commonwealth and COFINA both accounted for the transaction in question as a "collateralized borrowing" by the Commonwealth rather than a "sale" of revenues to COFINA; (c) Act 91 did not transfer to COFINA the Commonwealth's "right to receive" future tax revenues because the Act says nothing to that effect, and the Commonwealth has no "right to receive" tax revenues until a taxable transaction occurs; and (d) Act 91 and the purported SUT revenue transfer are unconstitutional because the Legislative Assembly cannot create financing structures that operate as an evasion of the debt and balanced budget provisions of the Puerto Rico Constitution. Adversary Proceeding, ECF Nos. 321, 322, 323, 324. The intervening parties who filed cross-motions in favor of the Commonwealth asserted, among other things, that (a) the scope of the Adversary Proceeding is limited to ownership of post-petition and future SUT revenues which cannot have been transferred to COFINA due to the automatic stay; (b) under the Puerto Rico Civil Code, the Commonwealth did not transfer ownership of future SUT revenues to COFINA; (c) under the Bankruptcy Code, a "right to receive" future SUT revenues is not an asset that can be transferred; (d) the Pledged Sales Tax remains property of the Commonwealth because it is an "available resource" under the Puerto Rico Constitution; and (e) Act 56 did not transfer ownership of the Pledged Sales Tax to COFINA. Adversary Proceeding, ECF Nos. 300, 314. Conversely, the COFINA Agent asserted that the Legislative Assembly has the power to, and did, transfer the Pledged Sales Tax to COFINA through Act 91. Adversary Proceeding, ECF Nos. 310, 312, 316, 317. The intervening parties who filed cross-motions in favor of COFINA asserted, among other things, that (a) the Commonwealth's transfer of the Pledged Sales Tax to COFINA was valid under the Puerto Rico Constitution; (b) the Pledged Sales Tax is not an "available resource" under the Puerto Rico Constitution; (c) it is not "legally impossible" to transfer future SUT revenues; and (d) the plain terms of COFINA's enabling legislation clearly transferred ownership of the Pledged Sales Tax to COFINA. Adversary Proceeding, ECF No. 307. A hearing on the cross-motions was held on April 10, 2018.

Concurrently with the litigation in the Adversary Proceeding, the Agents participated in court-sanctioned mediation to settle the Commonwealth-COFINA Dispute. Through the auspices of the mediation team, the Agents reached an understanding set forth in that certain Agreement in Principle (the "Agreement in Principle") on a settlement of the Commonwealth-COFINA Dispute. On June 5, 2018, the Agents jointly moved to hold the Title III Court's decision on the pending motions for summary judgment in abeyance for sixty (60) days due to their agreement in principle to settle the Commonwealth-COFINA Dispute. Adversary Proceeding, ECF No. 484 (the "Abeyance Motion"). On June 7, 2018, the Agents announced the terms of their agreement in principle, which contemplates, among other things, that, starting in

67

Fiscal Year 2019, the Commonwealth and COFINA will share the Pledged Sales Tax Base Amount, on a 46.35% and 53.65% basis, respectively. Adversary Proceeding, ECF No. 486.

The Title III Court entered an order granting the Abeyance Motion on June 11, 2018, agreeing to hold the summary judgment motions in abeyance until August 4, 2018. On August 3, 2018, upon a joint motion of the Agents, the Title III Court extended its order holding its decision on the motions for summary judgment in abeyance until September 13, 2018. On September 12, 2018, upon another joint motion of the Agents, the Title III Court further extended this date to October 3, 2018. On September 27, 2018, in light of the agreements and compromises set forth in the Settlement Agreement and the Plan of Adjustment, the Title III Court, *sua sponte*, entered an order terminating the pending summary judgment motions without prejudice to restoration of the motions on or after October 3, 2018. Adversary Proceeding, ECF No. 544.

On June 14, 2018, consistent with the Agreement in Principle, the Commonwealth Agent filed the *Commonwealth Agent's Urgent Motion, Pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 9019, for Order Establishing Procedures Governing 5.5% SUT Revenues Collected on or After July 1, 2018*, Adversary Proceeding, ECF No. 495 (the "Disputed Funds Motion"), seeking an order establishing procedures governing the 5.5% portion of the SUT collected by Banco Popular or other authorized collector of the SUT on or after July 1, 2018, pending implementation of the settlement of the Commonwealth-COFINA Dispute. Following discussions with a number of parties, the Commonwealth Agent resolved virtually all issues raised with respect to the Disputed Funds Motion and filed a revised proposed order.

On June 29, 2018, the Court entered an order, Adversary Proceeding, ECF No. 525 (the "Disputed Funds Order") establishing procedures governing revenues received from the Pledged Sales Tax on deposit and to be deposited with BNYM, as trustee for the Existing Securities. The Disputed Funds Order provides, among other things, that BNYM will separately account for (i) Pledged Sales Tax revenues currently in BNYM accounts or received on or before June 30, 2018, (ii) Pledged Sales Tax revenues received by BNYM on or after July 1, 2018 and prior to the earlier of the end of the Abeyance Period plus 30 calendar days or the date of a ruling by the Court on the pending motions for summary judgment in the Adversary Proceeding, and (iii) Pledged Sales Tax revenues received by BNYM following the end of the Abeyance Period.

Following entry of the Disputed Funds Order, the Commonwealth Agent and BNYM reached an agreement resolving BNYM's concern with respect to the Disputed Funds Motion regarding sufficient notice to beneficial holders of Existing Securities, and the Court entered an order modifying and replacing the Disputed Funds Order incorporating the agreement between the Commonwealth and BNYM.

### 4.  Entry into the Amended PSA

The Settlement Parties engaged in extensive discussions regarding the Plan of Adjustment process to resolve, among other things, the Commonwealth-COFINA Dispute and the intra-COFINA creditor disputes, with the invaluable participation of the mediation team. On August 29, 2018, the Settlement Parties entered into the Original PSA that contemplates, among other things, the following: (i) the compromise and settlement of the Commonwealth-COFINA

Dispute that provides COFINA ownership of an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the Pledged Sales Tax Base Amount; (ii) approval by the Title III Court of the terms of the compromise and settlement of the Commonwealth-COFINA Dispute concurrently through the Plan of Adjustment in COFINA's Title III Case and the Settlement Motion in the Commonwealth's Title III Case; (iii) acknowledgement by the parties thereto that, so long as the agreement is in effect, each Insurer (as defined in the Original PSA) shall have the exclusive right to vote to accept or reject the Plan of Adjustment on account of any Existing Securities it insures; and (iv) filing of the Disclosure Statement and Plan of Adjustment with the Title III Court for COFINA in the COFINA Title III Cases on or before October 15, 2018, concurrently with a Settlement Motion to be filed in the Commonwealth's Title III Case, seeking the approval of the compromise and settlement of the Commonwealth-COFINA Dispute. The Settlement Parties also agreed to support the filing of, and vote to accept, a plan of adjustment consistent with the Term Sheet attached to the Original PSA.  The Plan of Adjustment attached as Exhibit A hereto is consistent with the Term Sheet and supported by the Settlement Parties.

On September 20, 2018, the Original PSA was amended and restated to include certain additional holders of Existing Securities, who also held significant amount of certain GO Bonds and were among the plaintiffs in the Lex Claims Action.  Among other things, the Amended PSA provides that (i) Aurelius Capital Master, Ltd. and Six PRC Investments LLC, and each of their applicable entities, will request dismissal, with prejudice, of their claims and causes of action in the Lex Claims Litigation, effective upon the entry of an order approving the Settlement Motion and confirmation of the Plan of Adjustment, and (ii) parties to the Amended PSA generally will not oppose approval of the Settlement Motion in the Commonwealth Title III Case.

In order to compensate the parties for the cost of negotiation, confirmation and consummation of the Term Sheet and the Plan of Adjustment, and in consideration of (a) the execution and delivery of the Amended PSA by certain of the parties thereto and (b) the obligations and covenants contained in the Amended PSA provides that each Consummation Cost Party (as defined in the Plan of Adjustment) is entitled to receive, in accordance with the terms set forth in the Term Sheet and the Plan of Adjustment, based upon such entity's respective positions (insured or otherwise) as of 5:00 p.m. (EDT) on August 7, 2018, a pro rata a share of cash in an amount equal to two percent, truncated to two decimal points, of (i) the aggregate amount of the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National), Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured), Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) (calculated without duplication), minus (ii) One Billion Dollars ($1,000,000,000.00).

Any of the PSA Creditor Parties (as defined in the Amended PSA) may terminate the Amended PSA, solely as to itself, upon written notice to the parties thereto if, among other things, the Settlement Motion, the Plan of Adjustment, the Disclosure Statement, and the motion seeking entry of the Disclosure Statement Order are not filed on or prior to October 15, 2018. Any party to the Amended PSA may terminate the Amended PSA, solely as to itself, upon written notice to the parties thereto if, among other things, another party materially breaches any of the covenants thereunder or if the Confirmation Order is not entered by the Title III Court and the Effective Date does not occur on or prior to March 1, 2019; provided, however, that such

101361236v22

date may be extended up to and including June 1, 2019 upon joint instruction and notice provided by the Government Parties (as defined in the Amended PSA).

## V.    Compromises and Settlements

The Settlement Agreement is incorporated into the Plan of Adjustment. The Settlement Agreement shall be approved as part of the Plan of Adjustment pursuant to Bankruptcy Code sections 105(a), 1123(a)(5) and 1123(b)(3) and Bankruptcy Rule 9019. The Settlement represents a compromise and settlement between the Oversight Board, on behalf of the Commonwealth, and the COFINA Agent, on behalf of COFINA, as set forth in the Settlement Agreement. The Settlement Agreement represents a full, final, and complete compromise, settlement, and release of, among other matters, the claims and issues arising from and relating to the Commonwealth-COFINA Dispute, including without limitation, the claims asserted in the Adversary Proceeding.

Concurrently with the Debtor's filing of the Plan of Adjustment, the Commonwealth filed the Settlement Motion on [October 19, 2018] in the Commonwealth Title III Case. The Settlement Agreement will be contemporaneously considered for approval by the Title III Court: (i) in the Commonwealth Title III Case through submission of the Settlement Motion and Settlement Order pursuant to Bankruptcy Rule 9019 and (ii) in the COFINA Title III Case through submission of the Plan of Adjustment, which fully incorporates the Settlement Agreement.

In the Settlement Motion, the Commonwealth seeks an order of the Title III Court approving, pursuant to Bankruptcy Rule 9019, the terms of the compromise and settlement between the Commonwealth and COFINA resolving the Commonwealth-COFINA Dispute as reflected in the Settlement Agreement. For the Settlement Motion to be approved, the Title III Court must find that the Settlement Agreement satisfies the requirements of Bankruptcy Rule 9019, meaning that the Settlement terms are found to not fall below the lowest point in the range of reasonableness in view of, among other things, the legal issues being resolved by the settlement.

In determining the reasonableness of the Settlement, the Title III Court will consider: (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of litigation involved, and the expense, inconvenience and delay attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

The terms of the compromise and settlement in the Settlement Agreement are reasonable and meet the requirements for approval under Bankruptcy Rule 9019 because, among other things, (i) the issues resolved pursuant to the Settlement Agreement are complex, many of which present questions of first impression, (ii) regardless of the Title III Court's ruling in the Adversary Proceeding to determine the Commonwealth-COFINA Dispute, it is likely that multiple appeals would follow, (iii) protracted litigation would come at a substantial cost to the Commonwealth and COFINA, and (iv) if the Commonwealth were determined to be the owner of the Pledged Sales Taxes, including future SUT Revenues, none of the $750 million Pledged

Sales Tax Base Amount (which increases annually) would be available for COFINA's use towards distribution to its creditors.

In the absence of approval of the Settlement Agreement, COFINA and its stakeholders would be faced with a return to the complex, protracted and novel litigation of the Commonwealth-COFINA Dispute, which threatened the very foundation of COFINA. In addition, the Holders face substantial risks in event the Commonwealth-COFINA Dispute is decided in favor of the Commonwealth. If the Commonwealth were to prevail, the Holders recoveries could be materially adversely affected. On the other hand, if COFINA were determined to be the owner, none of the Pledged Sales Tax Base Amount would be available to the Commonwealth for payment of essential services or distribution to its creditors.

If there is any inconsistency between the Settlement Agreement, the Plan of Adjustment or the Confirmation Order, the documents shall control in the following order of priority: (i) the Confirmation Order, (ii) the Plan of Adjustment, and (iii) the Settlement Agreement.

Pursuant to the Settlement Motion and [Section ___ of the Plan of Adjustment], the Commonwealth-COFINA Dispute shall be compromised and settled as follows:

1.      **COFINA Interests**

COFINA will be granted an ownership interest in the COFINA Pledged Taxes and all rights thereto in an amount equal to the COFINA Portion until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

2.      **Commonwealth Interests**

The Commonwealth will be granted an ownership interest in an interest that is second in priority of payment, funding and collections, in the COFINA Pledged Taxes and all rights thereto subject to the First Dollars Funding described in Section IV.G.4. of this Disclosure Statement. This ownership interest includes the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given fiscal year of the Commonwealth, and (b) all COFINA Pledged Taxes after the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms. The Commonwealth shall have no ownership interest in the COFINA Portion, and the Commonwealth Portion shall exclude the COFINA Portion.

3.      **Distribution of Amounts Held in BNYM Debt Service, Reserve, and Other Accounts**

(a)      **Pre-FY2019 BNYM Deposits**

One hundred percent (100%) of the Pre-FY2019 BNYM Deposits held by BNYM in accordance with the Adversary Proceeding (defined below) and such other orders entered in connection therewith shall be distributed as COFINA Cash Available for Distribution under the Plan of Adjustment; provided, however, Seventy-Eight Million Three Hundred Fifty-Five Thousand Eight Hundred and Thirty-Seven Dollars and Sixty-Three Cents ($78,355,837.63) of the funds on deposit prior to July 1, 2018 in the debt service, reserve and such other accounts and

any earnings thereon held by BNYM, as the Existing COFINA Bond trustee, for the benefit of the bondholders (collectively, the "Pre-FY2019 BNYM Deposits") in accordance with the Adversary Proceeding shall be distributed as follows (the "Initial Distributions"):

> (i)      Thirty-Three Million Three Hundred Fifty-Five Thousand Eight Hundred Thirty-Seven Dollars and Sixty-Three Cents ($33,355,837.63) will be distributed to the Commonwealth,

> (ii)     Five Million Dollars ($5,000,000.00) will be allocated to fund an operating expense fund for COFINA, and

> (iii)    Forty Million Dollars ($40,000,000.00) will be allocated to the Taxable Election Cash distributable under the Plan of Adjustment.  If the Taxable Election Cash distributable under the Plan of Adjustment is less than Sixty Million Dollars ($60,000,000.00) (such difference, the "Tax Election Remainder Amount"), then an amount equal to the Tax Election Remainder Amount, up to Forty Million Dollars ($40,000,000.00) allocated as Taxable Election Cash.

After the Initial Distributions, one hundred percent (100%) of the Pre-FY2019 BNYM Deposits will be distributed (a) first, to further fund the operating expense fund for COFINA up to an additional Ten Million Dollars ($10,000,000.00), and (b) second, to the extent of any further remainder, to be distributed evenly to (x) COFINA, on the one hand, to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders, and (y) the Commonwealth, on the other hand.

### (b)      FY2019 BNYM Deposits

On the Effective Date, COFINA will receive, for purposes of distribution in accordance with the Plan of Adjustment, one hundred percent (100%) of the funds deposited on or after July 1, 2018 to the debt service, reserve and such other accounts (collectively, the "FY2019 BNYM Deposits"), on a first dollars basis up to the amount of fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA, plus any earnings thereon (collectively, the "COFINA FY2019 BNYM Deposits") held by BNYM in accordance with the Adversary Proceeding.

### (c)      Residual FY2019 BNYM Deposits

Any remaining FY2019 BNYM Deposits after distribution of the COFINA FY2019 BNYM Deposits will be distributed to the Commonwealth.

### 4.      First Dollars Funding

The COFINA Portion will be funded annually from "first dollars" collected from the COFINA Pledged Taxes, after initially funding reasonable and necessary COFINA operating expenses (such as board member fees and expenses), until the [COFINA Bonds] and [COFINA Parity Bonds] have been paid or satisfied in full in accordance with their terms.

Beginning in fiscal year 2024 of the Commonwealth, if (i) for any date of determination at which time the Oversight Board or any successor is in existence, (1) the prior and then-current

fiscal year budgets are balanced, as determined by the Oversight Board (or its successor in interest), and (2) the Commonwealth is current on its continuing disclosure requirements relating to its audited financial statements; (ii) quarterly bucketing of twenty-five percent (25%) of the COFINA Portion associated with the then-current fiscal year of the Commonwealth is shown to be necessary to avoid intra-FY tax revenue anticipation notes borrowing, and (iii) collection of prior fiscal year COFINA Pledged Taxes provided a two times (2x) coverage of the COFINA Portion, then, in each quarter, until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms:

> (a) the "first dollars" collected from the COFINA Pledged Taxes up to twenty-five percent (25%) of the COFINA Portion associated with the then-current fiscal year of the Commonwealth will be deposited into the "Debt Service Fund" held by the New Bond Indenture trustee for the benefit of, and payment of debt service with respect to, the COFINA Bonds and the COFINA Parity Bonds (the "Post-FY2024 Deposits"); and

> (b) thereafter, the remaining quarterly collection from the COFINA Pledged Taxes shall be deposited in accordance with the "Flow of Funds" established in the New Bond Indenture.

However, in any quarter in which there is a shortfall in the amounts required to be deposited under the Post-FY2024 Deposits, then such shortfall will be added to the amount required to be paid in accordance with the Post-FY2024 Deposits in the following quarter until the entire amount of the cumulative shortfall has been deposited into the "Debt Service Fund" held by the trustee for the benefit of, and payment of debt service with respect to, the COFINA Bonds and the COFINA Parity Bonds.

Furthermore, in any quarter in which there is a shortfall in the amount required to be deposited under the Remaining Post-FY2024 Deposits, then such shortfall will be added to the amount required to be paid under the Remaining Post-FY2024 Deposits in the following quarter until the entire amount of cumulative shortfall has been paid to the trustee for any Subordinated Lien Bonds issued by COFINA and which remain outstanding.

### 5.   Additional Terms of Compromise and Settlement

The Commonwealth will have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a fiscal year of the Commonwealth unless and until COFINA has received the COFINA Portion.   The Commonwealth will have no right to receive Debt Service Savings in any fiscal year of the Commonwealth unless and until all debt service payments on the COFINA Bonds and COFINA Parity Bonds required to be made or set aside in such fiscal year of the Commonwealth, including any overdue debt service payments from all prior fiscal years of the Commonwealth, are made as required.   The COFINA Portion will not be property of the Commonwealth, and if there is any subsequent Title III case or similar or other proceeding of the Commonwealth, in any forum, it shall not be subject to the automatic stay.

The subsections (1) through (5) below describe certain of the principal provisions of the Settlement Agreement.

### 6.   Compromise Date

Unless (i) approval of the Settlement Motion is denied by the Title III Court, or (ii) the Effective Date does not occur, the effective date of the compromise and settlement shall be retroactive to July 1, 2018 and, in addition to receipt of the net Pre-FY2019 BNYM Deposits and the COFINA FY2019 BNYM Deposits on the Effective Date, COFINA will own, and will be entitled to receive, the COFINA Portion commencing as of FY2019.

### 7. Litigation Dismissal

On the Effective Date, pursuant to the Settlement Order and the Confirmation Order, (1) BNYM shall make distributions as set forth in the Plan of Adjustment, (2) the Adversary Proceeding shall be dismissed, with prejudice, and all other Claims and Causes of Action asserted, or that could have been asserted, therein by the Commonwealth Agent, the COFINA Agent and the Permitted Intervenors, as defined in the Adversary Proceeding, shall be deemed dismissed, with prejudice, and the Oversight Board, the Commonwealth Agent and the COFINA Agent and their respective professionals shall be deemed to have no further obligations in connection with the Adversary Proceeding and the COFINA Agent and her professionals shall be deemed to have been released from any and all liabilities associated therewith or that otherwise arise from or relate to the Title III Case, the Actions, the Adversary Proceeding, the Interpleader Action, the Plan of Adjustment, the Plan Support Agreement and the compromises set forth in the Commonwealth-COFINA Dispute Settlement, including, without limitation, in connection with or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities, operations or property, (3) the Interpleader Action shall be dismissed, with prejudice, and all other Claims and Causes of Action asserted, or that could have been asserted, therein shall be dismissed, with prejudice, and the funds deposited in connection therewith shall be distributed in accordance with the terms and provisions of the Plan of Adjustment, and (4) except with respect to Claims and Causes of Action asserted, or that could have been asserted, by Ambac or Whitebox, whether sounding in contract or tort, against BNYM in the Ambac Action or the Whitebox Actions, respectively, for gross negligence, willful misconduct or intentional fraud, the Actions shall be dismissed, with prejudice, and Claims and Causes of Action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice.

Litigation identified in "Other Related Litigation" under OVERVIEW OF COFINA's TITLE III CASE, and not subject to dismissal pursuant to the Plan of Adjustment, may be permitted to proceed. There can be no assurance that litigation that is permitted to proceed will not have a material adverse effect on COFINA after its emergence from Title III or the effectiveness of the Plan of Adjustment or the Confirmation Order. For additional information regarding significant risks associated with the Plan of Adjustment, *see* "CERTAIN RISK FACTORS TO BE CONSIDERED."

### 8. Allowance of Bond Claims

Solely for purposes of confirmation and consummation of the Plan of Adjustment, on the Effective Date, (i) the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National) shall be deemed allowed in the aggregate amount of $7,760,871,398.36, (ii) the Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and the Junior COFINA Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $9,876,235,996.34;

101361236v22

*provided*, *however*, that, in accordance with the solicitation procedures attendant to the Plan of Adjustment, the foregoing amounts shall be deemed allowed for voting purposes, and (iii) the holders of Existing Securities shall be deemed secured to the extent of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Article II of the Plan of Adjustment, the COFINA FY2019 BNYM Deposits and the COFINA Portion.

### 9.      Releases, Injunctions, and Exculpation

The releases, injunctions, and exculpation provided in Article XXX of the Plan of Adjustment (and, with respect to the COFINA Agent, Article II of the Plan of Adjustment) are integral to obtaining the value provided under the Commonwealth-COFINA Dispute Settlement and the releases, injunctions, and exculpation under the Plan of Adjustment and Plan Support Agreement constitute an essential component of the compromises reached and are not severable from the other provisions of the Plan of Adjustment.

## VI.     The Title III Plan of Adjustment

### A.     Overview of the Plan of Adjustment

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN OF ADJUSTMENT, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN OF ADJUSTMENT.  THE DEBTOR URGES ALL HOLDERS OF CLAIMS TO CAREFULLY READ AND STUDY THE PLAN OF ADJUSTMENT, A COPY OF WHICH IS ATTACHED HERETO AS **EXHIBIT A**.

Section 1123 of the Bankruptcy Code, made applicable to the Title III Case by PROMESA, provides that except for administrative claims, a plan of adjustment must categorize claims against a debtor into individual classes. Although PROMESA and the Bankruptcy Code give COFINA significant flexibility in classifying claims, section 1122 of the Bankruptcy Code dictates that a plan of adjustment may only place a claim into a class containing claims that are substantially similar.

The Plan of Adjustment identifies ten (10) Classes of Claims (certain of which encompass numerous individual series of the relevant debt, as set forth on the Exhibits to the Plan of Adjustment).  These Classes take into account the differing nature and priority of Claims against COFINA. Administrative Claims are not classified for purposes of voting or receiving distributions under the Plan of Adjustment (as is required by section 1123(a)(1) of the Bankruptcy Code) but are treated separately as unclassified Claims.

The Plan of Adjustment provides specific treatment for each Class of Claims.  Only certain holders of Claims that are impaired under the Plan of Adjustment are entitled to vote and receive Distributions under the Plan of Adjustment.

Unless otherwise provided in the Plan of Adjustment or the Confirmation Order, the treatment of any Claim under the Plan of Adjustment will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim.  Upon Confirmation, the Plan of

Adjustment will be binding on all holders of a Claim regardless of whether such holders voted on the Plan of Adjustment or voted to accept the Plan of Adjustment.

The following discussion sets forth the classification and treatment of all Claims against COFINA. It is qualified in its entirety by the terms of the Plan of Adjustment, which is attached hereto as Exhibit A, and which should be read carefully by you in considering whether to vote to accept or reject the Plan of Adjustment.

## B.   Compromise and Settlement of Disputes

### 1.   Commonwealth-COFINA Dispute

The Settlement Agreement is incorporated into the Plan of Adjustment.  The Settlement Agreement shall be approved as part of the Plan of Adjustment pursuant to Bankruptcy Code sections 105(a), 1123(a)(5) and 1123(b)(3) and Bankruptcy Rule 9019.  If there is any inconsistency between the Settlement Agreement, the Plan of Adjustment or the Confirmation Order, the documents shall control in the following order of priority: (i) the Confirmation Order, (ii) the Plan of Adjustment, and (iii) the Settlement Agreement; *provided*, *however*, that under no circumstances shall the Confirmation Order modify the economic terms of the Plan of Adjustment.  For additional information, *see* Section V "Compromises and Settlements" above.

## C.   Provisions for Payment of Administrative Expense Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, made applicable to the Title III Case pursuant to section 301(a) of PROMESA, Administrative Expense Claims and Professional Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article IV of the Plan of Adjustment.

### 1.   Administrative Expense Claims

An Administrative Claim is a claim against COFINA arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to COFINA's Title III Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b), or 507(a)(2) of the Bankruptcy Code, as made applicable by section 301 of PROMESA.

On the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim, Reorganized COFINA shall (a) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (b) satisfy and discharge such Allowed Administrative Expense Clam in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and Reorganized COFINA; *provided*, *however*, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course by COFINA shall be paid in full and performed by Reorganized COFINA in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, *provided*, *further*, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within ninety (90) days after the Effective Date, such ordinary course expense shall be barred and the

holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan of Adjustment.

### 2. Professional Compensation and Reimbursement Claims

All Entities awarded compensation or reimbursement of expenses by the Title III Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court (a) as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order or (b) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Government Parties; *provided*, *however*, that, except as provided in the Plan of Adjustment, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the Administrative Claim Bar Date. Reorganized COFINA is authorized to pay compensation for professional services extended and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

### 3. Consummation Costs

In order to compensate Consummation Cost Parties for the cost of negotiation, confirmation and consummation of the Term Sheet and the Plan of Adjustment, and in consideration of (a) the negotiation, execution and delivery of the Amended PSA by each Consummation Cost Party and (b) the obligations and covenants contained in the Amended PSA, each Consummation Cost Party, on the Effective Date, shall receive, based upon such Entity's respective positions (insured or otherwise) as of 5:00p.m. (EDT) on August 7, 2018, it's pro rata share of Cash in an amount equal to two percent (2.0%), truncated to two decimal points, of (i) the aggregate amount of the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National), Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured), Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) (calculated without duplication), minus (ii) One Billion Dollars ($1,000,000,000.00), subject to the exceptions provided in section 3.3 of the Plan of Adjustment.

### D. Classification and Treatment of Claims

If the Plan of Adjustment is confirmed by the Title III Court, each Allowed Claim in a particular Class will receive the same treatment as the other Allowed Claims in such Class, whether or not the holder of such Claim voted to accept the Plan of Adjustment.

### 1. General Notes on Classification and Treatment of Classified Claims

Pursuant to Bankruptcy Code sections 1122 and 1123, Claims (other than Claims arising under Bankruptcy Code section 507(a)(2), which Claims do not require classification pursuant to Bankruptcy Code section 1123(a)) are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan of Adjustment, as set forth in the Plan of Adjustment. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class. A Claim is Allowed in that Class if it has not been paid or

otherwise settled prior to the Effective Date, and satisfies the definition of a Claim that is Allowed or is otherwise Allowed pursuant to the terms of the Plan of Adjustment.

### 2. Treatment of Classified Claims

**THE PROJECTED RECOVERIES SET FORTH BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.   FOR A COMPLETE DESCRIPTION OF THE DEBTOR'S CLASSIFICATION AND TREATMENT OF CLAIMS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN OF ADJUSTMENT.[16]**

Class 1 – Senior COFINA Bond Claims

**(a)**     Classification:  Class 1 consists of all Bond Claims, other than Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National), or Senior COFINA Bond Claims (Taxable Election), on account of a "Senior" Existing Security.

**(b)**     Treatment:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim against COFINA shall receive its Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds, and (d) Rounding Amount Cash, if necessary.

**(c)**     Voting:  Class 1 is Impaired by the Plan of Adjustment.  Class 1 and each holder of an Allowed Senior COFINA Bond Claim against COFINA are entitled to vote to accept or reject the Plan of Adjustment.

**(d)**     Taxable Election:  Any Puerto Rico Investor or Puerto Rico Institution holding a Bond Claim that is eligible to receive treatment under Class 1 may opt out of Class 1 and elect to be treated under Class 4 – Senior COFINA Bond Claims (Taxable Election).

**(e)**     Allowed Amount of Claims:  [____]

**(f)**     Projected Recovery under the Plan of Adjustment – Taxable Election:  [____]

**(g)**     Projected Recovery under the Plan of Adjustment – No Taxable Election:  [____]

Class 2 – Senior COFINA Bond Claims (Ambac)

**(a)**     Classification:  Class 2 consists of all Bond Claims on account of a "Senior" Existing Security, the repayment of which has been insured by Ambac.

---

[16] Where applicable, the projected recoveries below are based upon the face amount of the applicable security distributed under the Plan of Adjustment, and does not include interest on such security or payment of the Consummation Costs.

**(b)**   Treatment:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (Ambac) against COFINA shall have the option to elect to receive its Pro Rata Share of:

(1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, plus (b) consideration, distributable by or at the direction of Ambac, in accordance with the provisions of section 6.2 of the Plan of Adjustment, in full and complete satisfaction, release, and discharge of any further obligation of Ambac with respect to the Ambac Insurance Policy (and, by making such election, the holder shall agree to commute the Ambac Insurance Policy relating to such holder's Allowed Senior COFINA Bond Claim (Ambac) and such holder shall have no other or further rights with respect to the Ambac Insurance Policy, the Ambac Trust, or the Ambac Certificates); or

(2) the Ambac Certificates representing an interest in the Ambac Trust Assets.

For the avoidance of doubt, with respect to any holder of an Allowed Senior COFINA Bond Claim (Ambac) that elects (or is deemed to elect) to receive distributions in accordance with the provisions of subsection (1) above, (i) such holder shall be deemed to have released Ambac from its obligations and liabilities under or related to the Ambac Insurance Policy in respect of such holder's Ambac Insured Bonds, (ii) such holder shall not be entitled to the benefit of the Ambac Insurance Policy and shall have no right to make a claim under, or receive payment from, the Ambac Insurance Policy, (iii) Ambac shall be released from its obligations under or related to the Ambac Insurance Policy in respect of such holder's Ambac Insured Bonds, and (iv) the Ambac Insurance Policy shall be terminated and commuted in full with respect to such holder's Ambac Insured Bonds, no provision of the Ambac Insurance Policy with respect to such Ambac Insured Bonds shall survive termination, and such Ambac Insured Bonds shall no longer have the benefit of the Ambac Insurance Policy.

***Ambac Insurance Contribution:*** In consideration for the releases to be given to Ambac, and in accordance with Section 6.1(a) of the Plan of Adjustment, on the Effective Date, a beneficial holder of an Allowed Senior COFINA Bond Claim (Ambac) that does not validly elect to receive Ambac Certificates shall receive, in addition to the Senior COFINA Bond Distribution, consideration from Ambac in an amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (Ambac) as of the Petition Date, and the beneficial holder thereof shall have no other or further rights under or with respect to the Ambac Insurance Policy, the Ambac Trust, or the Ambac Certificates.  The provisions set forth in section 6.2 of the Plan of Adjustment apply only to Senior COFINA Bond Claims (Ambac) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof or its predecessor in interest otherwise purchased or acquired insurance on the secondary market.  A holder of an Allowed Senior COFINA

Bond Claim (Ambac) that does not validly elect to receive Ambac Certificates shall have, on or after the Effective Date, the Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policy, underlying such holder's Allowed Senior COFINA Bond Claim (Ambac) cancelled.

***Non-Commutation/Ambac Trust:*** In the event that a holder of a Senior COFINA Bond Claim (Ambac) timely returns its Ballot/Election Notice and elects to receive the distributions set forth in section 6.1(b) of the Plan of Adjustment, on the Effective Date, COFINA shall deposit or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Senior COFINA Bond Distribution into the Ambac Trust and such holder shall be deemed to have received its Pro Rata Share of the Senior COFINA Bond Distribution and shall receive its pro rata share of Ambac Certificates in consideration therefor.

***Commutation Disclosure:*** Ambac notes that a beneficial holder of an Allowed Senior COFINA Bond Claim (Ambac) that elects (or is deemed to have elected) to commute its Ambac Insurance Policy is estimated to receive aggregate consideration under the Plan (assuming the COFINA Bonds trade at par) totaling at least 100% of such holder's Allowed Senior COFINA Bond Claim (Ambac) as of the Petition Date, comprised of (i) COFINA Bonds, (ii) interest accrual or accretion on COFINA Bonds, commencing as of August 1, 2018, (iii) Cash, and (iv) the Ambac Commutation Payment.  Ambac makes no representation regarding this Disclosure Statement, including, without limitation, whether the COFINA Bonds will trade at par.

***Alternative Treatment:*** The Oversight Board and Ambac reserve the right to formulate an alternative election or implementation option with respect to the Senior COFINA Bond Claims (Ambac), including, without limitation, the deemed acceleration of the Ambac Insured Bonds on the Effective Date; *provided*, *however*, that any such alternative implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing; *and*, *provided*, *further*, that any such alternative election or implementation option shall not, and shall not be deemed to, modify, amend, or cancel, or otherwise affect in any way, any commutation agreements or arrangements agreed to or entered into prior to, on or after the effective date of any agreement between Ambac, on the one hand, and any holder of any Senior COFINA Bond Claims (Ambac), on the other hand, in connection with the Ambac Insurance Policy.

(c)     Voting:  Class 2 is Impaired by the Plan of Adjustment.  Beneficial holders of Allowed Senior COFINA Bond Claims (Ambac) are not entitled to vote to accept or reject the Plan of Adjustment, but are entitled to make an election of distributions to be received pursuant to the Plan of Adjustment.  Ambac, as contemplated by the Amended PSA, is entitled to vote to accept or reject the Plan of Adjustment.

(d)     Allowed Amount of Claims:  [____]

    **(e)**    Projected Recovery under the Plan of Adjustment:  [____]

**Class 3 – Senior COFINA Bond Claims (National)**

    **(a)**    Classification:  Class 3 consists of all Bond Claims on account of a "Senior" Existing Security, the repayment of which has been insured by National.

    **(b)**    Treatment:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (National) against COFINA shall have the option to elect to receive its Pro Rata Share of:

(1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, plus (b) Cash, distributable by or at the direction of National, in accordance with the provisions of section 7.2 of the Plan of Adjustment, in full and complete satisfaction, release, and discharge of any further obligation of National with respect to the applicable National Insurance Policies (and, by making such election, the holder shall agree to commute the National Insurance Policies relating to such holder's Allowed Senior COFINA Bond Claim (National) and such holder shall have no other or further rights with respect to the National Insurance Policies, the National Trust, or the National Certificates); or

(2) the National Certificates representing an interest in the National Trust Assets.

For the avoidance of doubt, with respect to any holder of an Allowed Senior COFINA Bond Claim (National) that elects (or is deemed to elect) to receive distributions in accordance with the provisions of subsection (1) above, (i) such holder shall be deemed to have released National from its obligations and liabilities under or related to the National Insurance Policies in respect of such holder's National Insured Bonds, (ii) such holder shall not be entitled to the benefit of the National Insurance Policies and shall have no right to make a claim under, or receive payment from, the National Insurance Policies, (iii) National shall be released from its obligations under or related to the National Insurance Policies in respect of such holder's National Insured Bonds, and (iv) the National Insurance Policies shall be terminated and commuted in full with respect to such holder's National Insured Bonds, no provision of the National Insurance Policies with respect to such National Insured Bonds shall survive termination, and such National Insured Bonds shall no longer have the benefit of the National Insurance Policies.

***National Insurance Contribution:*** In consideration for the releases to be given to National, and in accordance with the provisions of section 7.1 of the Plan of Adjustment, on the Effective Date, a beneficial holder of an Allowed Senior COFINA Bond Claim (National) that fails to validly elect to receive National Certificates shall receive, in addition to its Pro Rata Share of the Senior COFINA Bond Distribution, Cash distributable by or at the direction of National, in an

amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (National) as of the Petition Date, and the beneficial holder thereof shall have no other or further rights under or with respect to the National Insurance Policies, the National Trust, or the National Certificates.  The provisions set forth in section 7.2 of the Plan of Adjustment apply only to Senior COFINA Bond Claims (National) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof is or its predecessor in interest otherwise purchased or acquired insurance on the secondary market.  A holder of an Allowed Senior COFINA Bond Claim (National) that fails to validly elect to receive National Certificates shall have, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the related National Insurance Policies, underlying such holder's Allowed Senior COFINA Bond Claim (National) cancelled.

*Non-Commutation/National Trust:*  In the event that a holder of a Senior COFINA Bond Claim (National) timely returns its Ballot/Election Notice and elects to receive the distributions set forth in section 7.1(b) of the Plan of Adjustment (in accordance with the instructions set forth in the Election Notice), on the Effective Date, COFINA shall deposit or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Senior COFINA Bond Distribution into the National Trust and such holder shall be deemed to have received its Pro Rata Share of the Senior COFINA Bond Distribution and shall receive its pro rata share of National Certificates in consideration therefor.

*National Election:*  At any time prior to the commencement of the Disclosure Statement Hearing, National may elect, in a written notice provided to the Oversight Board, an alternative treatment option for Senior COFINA Bond Claims (National), pursuant to which, in the sole and absolute discretion of National, and subject to the consent of the Oversight Board, which consent shall not be unreasonably withheld, on the Effective Date, the National Insured Bonds shall be paid off, in full, at an acceleration price equal to one hundred percent (100%) of the Compounded Amount (as defined in the COFINA Bond Indenture) of the National Insured Bonds, as of the Effective Date, as follows: the COFINA Bonds to be issued to holders of Senior COFINA Bond Claims (National) shall be underwritten and sold into the market, the proceeds of which, together with any cash portion of the Senior COFINA Bond Distribution that would otherwise be allocated for payment of Senior COFINA Bond Claims (National), shall be used to pay, in Cash, one hundred percent (100%) of the Compounded Amount of the National Insured Bonds, as of the Effective Date, with any deficiency in such amounts being paid by National in full, in Cash, on the Effective Date.

(c)   Voting:  Class 3 is Impaired by the Plan of Adjustment.  Beneficial holders of Allowed Senior COFINA Bond Claims (National) are not entitled to vote to accept or reject the Plan of Adjustment, but are entitled to make an election of distributions to be received pursuant to the Plan of Adjustment.  National, as

contemplated by the Amended PSA, is entitled to vote to accept or reject the Plan of Adjustment.

**(d)**    Allowed Amount of Claims:  [____]

**(e)**    Projected Recovery under the Plan of Adjustment:  [____]

Class 4 – Senior COFINA Bond Claims (Taxable Election)

**(a)**    Classification:  Class 4 consists of all Bond Claims, other than Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National), on account of a "Senior" Existing Security, the holder of which (a) has affirmatively elected to receive a Senior Taxable Bond Distribution and (b) is (i) a Puerto Rico Investor; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Investors holding Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Institutions holding Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim.

**(b)**    Treatment:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (Taxable Election) against COFINA shall be entitled to receive, in full satisfaction, release, and exchange of such holder's Allowed Senior COFINA Bond Claim (Taxable Election), its Pro Rata Share of:

(1) the Senior COFINA Bond Distribution, consisting of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds have been distributed, tax-exempt COFINA Bonds, and (ii) Rounding Amount Cash, if necessary; and

(2) the Taxable Election Cash.

**(c)**    Voting:  Class 4 is Impaired by the Plan of Adjustment; however, holders of Claims in Class 4 elected to be treated in such Class and, therefore, are deemed to accept the Plan of Adjustment.

**(d)**    Allowed Amount of Claims:  [____]

**(e)**    Projected Recovery under the Plan of Adjustment:  [____]

Class 5 – Junior COFINA Bond Claims

(a)     Classification:  Class 5 consists of all Bond Claims, other than Junior COFINA Bond Claims (Assured) and Junior COFINA Bond Claims (Taxable Election), on account of a "First Subordinate" Existing Security.

(b)     Treatment:  On the Effective Date and subject to the right of election set forth in section 9.2 of the Plan of Adjustment, each holder of an Allowed Junior COFINA Bond Claim against COFINA shall be entitled to receive its Pro Rata Share of the Junior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Bonds, and (c) Rounding Amount Cash, if necessary.

(c)     Voting:  Class 5 is Impaired by the Plan of Adjustment.  Class 5 and each holder of an Allowed Junior COFINA Bond Claim against COFINA are entitled to vote to accept or reject the Plan of Adjustment.

(d)     Taxable Election:  Any Puerto Rico Investor or Puerto Rico Institution eligible to receive treatment under Class 5 may opt out of Class 5 and elect to be treated under Class 7 – Junior COFINA Bond Claims (Taxable Election).

(e)     Allowed Amount of Claims:  [____]

(f)     Projected Recovery under the Plan of Adjustment – Taxable Election:  [____]

(g)     Projected Recovery under the Plan of Adjustment – No Taxable Election:  [____]

Class 6 – Junior COFINA Bond Claims (Assured)

(a)     Classification:  Class 6 consists of all Bond Claims on account of a "First Subordinate" Existing Security, with respect to which the repayment of principal and interest or accreted value has been insured by Assured, including pursuant to a secondary market insurance policy.

(b)     Treatment:  In the event Assured makes the Assured Election with respect to any Assured Insured Bonds, all or any portion of the Assured Insured Bonds selected by Assured pursuant to the Assured Election shall be paid, in full, at the applicable Acceleration Price as of the Effective Date, (1) from the Section 103 Cash and Rounding Amount Cash, if any, which, in each case, is allocable to Junior COFINA Bond Claims (Assured), and (2) otherwise as follows:  the COFINA Bonds allocable to holders of Junior COFINA Bond Claims (Assured) shall be (i) guaranteed in accordance with a new insurance policy issued by Assured, (ii) underwritten and (iii) sold into the market, the proceeds of which shall be used to pay, in cash, on the Effective Date, the applicable Acceleration Price, with any deficiency in such amounts being paid by Assured in accordance with the Assured Insurance Policies guaranteeing the Assured Insured Bonds underlying the Junior COFINA Bond Claims (Assured). The principal amount, maturities and interest rates of the Assured New Bonds will be determined by Assured in consultation with the underwriter for the Assured New Bonds, provided that the debt service on the Assured New Bonds due in any year shall not be greater than the debt service that would be due if such Assured New Bonds

84

were issued as COFINA Bonds without insurance (although the Assured New Bonds may mature later than the other COFINA Bonds, but in no event later than FY2058). For the avoidance of doubt, the compensation for the underwriter(s) and any other costs of issuance associated with the issuance of Assured New Bonds will be payable by the Government Parties. All other terms regarding the underwriting of the Assured New Bonds will be subject to the approval of Assured. Payment of the applicable Acceleration Price with respect to any Assured Insured Bond in accordance with the Assured Election shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

***Bondholder Elections:*** In the event that Assured declines to make the Assured Election with respect to any Assured Insured Bonds, each beneficial holder of an Assured Insured Bond with respect to which Assured has not made the Assured Election may choose one of the following Assured Bondholder Elections: (1) Assured Bondholder Election 1, pursuant to which such holder shall receive from Assured the applicable Acceleration Price on the Effective Date in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured shall receive either (a) the Pro Rata Share of the Junior COFINA Bond Distribution allocable to such holder or (b) at Assured's election, any Section 103 Cash and Rounding Amount Cash allocable to such holder, and the COFINA Bonds otherwise allocable to such holder shall be sold into the market as Assured New Bonds in the same manner and on the same terms as if Assured had exercised the Assured Election with respect to such holder's Assured Insured Bonds; or (2) Assured Bondholder Election 2, pursuant to which such holder shall opt into the treatment set forth in section 17.3 of the Plan of Adjustment (summarized below); *provided, however,* that, in the event that a beneficial holder of a Junior COFINA Bond Claim (Assured) (i) fails to timely return its properly completed Ballot/Election Notice (in accordance with the instructions set forth in the Election Notice), (ii) fails to choose one of the Assured Bondholder Elections, or (iii) elects more than one Assured Bondholder Election on such Ballot/Election Notice, then such holder shall be deemed to have elected Assured Bondholder Election 2.

***Terms of Assured Trusts (Section 17.3 of the Plan of Adjustment):*** Subject to the provisions of section 17.3 of the Plan of Adjustment, On the Effective Date, by electing (or being deemed to have elected) Assured Bondholder Election 2, each beneficial holder of an Assured Legacy Bonds CUSIP shall be deemed to have exchanged and deposited such Assured Legacy Bonds CUSIP into the Assured Trust that is formed for the benefit of beneficial holders of such Assured Legacy Bonds CUSIP in exchange for one or more Assured Certificates issued by such Assured Trust and evidencing a pro rata beneficial ownership interest in the related Assured Trust Assets. On the Effective Date, COFINA shall concurrently with the exchange described in the immediately preceding sentence, deposit the applicable Assured Trust Assets (other than the Assured Legacy Bonds) into each of the Assured Trusts. The Assured Trust Assets shall not be property of COFINA, but shall be held by the Assured Trustee solely for the benefit of the

85

Assured Certificate Holders and Assured (to the extent that it is subrogated to the rights of the holders of the Assured Certificate Holders) in accordance with the terms of the Assured Trust Agreement.  The Assured Certificate Holders shall be the "tax owners" of the Assured Trust Assets for Federal income tax purposes.

***Deemed Acceleration:*** The principal amount (or Compounded Amount in the case of capital application bonds) of the Assured Insured Bonds will be deemed accelerated and immediately due and payable, including for purposes of section 1102 of the Bond Resolution, as of the Effective Date; *provided*, *however*, that such deemed acceleration shall not affect, nor will it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

***Alternative Treatment:*** The Oversight Board and Assured reserve the right to formulate an alternative election or implementation option with respect to the Junior COFINA Bond Claims (Assured); *provided*, *however*, that any such alternative implementation option must be proposed, in writing prior to the commencement of the Disclosure Statement Hearing.

(c)   Voting:  Class 6 is Impaired by the Plan of Adjustment.  Beneficial holders of Allowed Junior COFINA Bond Claims (Assured) are not entitled to vote to accept or reject the Plan of Adjustment, and are not entitled to make an election of distributions to be received pursuant to the Plan of Adjustment.  Assured, as contemplated by the Amended PSA, is entitled to vote to accept or reject the Plan of Adjustment.

(d)   Allowed Amount of Claims:  [____]

(e)   Projected Recovery under the Plan of Adjustment:  [____]

Class 7 – Junior COFINA Bond Claims (Taxable Election)

(a)   Classification:  Class 7 consists of all Bond Claims, other than Junior COFINA Bond Claims (Assured), on account of a "First Subordinate" Existing Security, the holder of which (a) has affirmatively elected to receive a Junior Taxable Bond Distribution and (b) is (i) either (i) a Puerto Rico Investor; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Investors in respect of Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Institutions in respect of Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to

such Bond Claim's ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim.

**(b)**     Treatment:  On the Effective Date, each holder of an Allowed Junior COFINA Bond Claim (Taxable Election) against COFINA shall be entitled to receive, in full satisfaction, release, and exchange of such holder's Allowed Junior COFINA Bond Claim (Taxable Election), its Pro Rata Share of:

(a) the Junior COFINA Bond Distribution consisting of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary; and

(b) the Taxable Election Cash.

**(c)**     Voting:  Class 7 is Impaired by the Plan of Adjustment; however, holders of Claims in Class 7 elected to be treated in such Class and, therefore, are deemed to accept the Plan of Adjustment.

**(d)**     Allowed Amount of Claims:  [_____]

**(e)**     Projected Recovery under the Plan of Adjustment:  [_____]

## Class 8 – GS Derivative Claim

**(a)**     Classification:  Class 8 consists of the GS Derivative Claim against COFINA.

**(b)**     Treatment:  On the Effective Date, the holder of the Allowed GS Derivative Claim against COFINA shall, to the extent that the termination value of the GS Derivative Claim is

(1) greater than the amount of the collateral in such holder's possession, be entitled to retain such collateral and, with respect to the balance of the GS Derivative Claim, (a) to the extent that rejection damages, if any, associated with such GS Derivative Claim is a Parity Obligation, as defined in the COFINA Bond Indenture, such holder's Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (i) COFINA Cash Available for Distribution, (ii) COFINA Bonds and (iii) Rounding Amount Cash, if necessary, and (b) to the extent that rejection damages, if any, associated with such GS Derivative Claim is a not a Parity Obligation, such holder shall not receive a distribution pursuant to the Plan of Adjustment, or

(2) less than the amount of collateral in such holder's possession, the holder of the GS Derivative Claim shall liquidate such collateral in full and complete satisfaction of the GS Derivative Claim and return the balance of such collateral value to Reorganized COFINA.

87

**(c)**     Voting:  Class 8 is Impaired by the Plan of Adjustment.  Class 8 and the holder of an Allowed GS Derivative Claim against COFINA is entitled to vote to accept or reject the Plan of Adjustment.

**(d)**     Estimated Amount of Claims:  [____]

**(e)**     Projected Recovery under the Plan of Adjustment:  [____]

Class 9 – General Unsecured Claims

**(a)**     Classification:   Class 9 consists of all General Unsecured Claims against COFINA.

**(b)**     Treatment:   On the Effective Date, if Class 9 votes to accept the Plan of Adjustment, each holder of an Allowed General Unsecured Claim against COFINA shall be entitled to receive its pro rata share of One Hundred Thousand Dollars ($100,000.00); provided, however, that if Class 9 votes to reject the Plan of Adjustment, holders of Allowed General Unsecured Claims against COFINA shall not receive a distribution pursuant to the Plan of Adjustment.

**(c)**     Voting:  Class 9 is Impaired by the Plan of Adjustment.  Class 9 and each holder of an Allowed General Unsecured Claim against COFINA are entitled to vote to accept or reject the Plan of Adjustment.

**(d)**     Estimated Amount of Claims:  [____]

**(e)**     Projected Recovery under the Plan of Adjustment:  [____]

Class 10 – Section 510(b) Subordinated Claims

**(a)**     Classification:   Class 10 consists of all Section 510(b) Subordinated Claims against COFINA.

**(b)**     Treatment:   Allowed Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan of Adjustment.

**(c)**     Voting:  Class 10 is Impaired by the Plan of Adjustment.  Class 10 and each holder of a Section 510(b) Subordinated Claim are deemed to have rejected the Plan of Adjustment.

**(d)**     Estimated Amount of Claims:  [____]

**(e)**     Projected Recovery under the Plan of Adjustment:  [____]

101361236v22

E.     **Provisions Regarding Allocation of Unsubscribed Taxable Election Cash**

1.     **Unsubscribed Taxable Election Cash Amount**

On the Effective Date, the amount, up to Sixty Million Dollars ($60,000,000.00), allocated for distributions to holders of Allowed Senior COFINA Bond Claims (Taxable Election) and Allowed Junior COFINA Bond Claim (Taxable Election) in Classes 4 and 7, respectively, but not distributed based upon elections made or not made, as the case may be, then the Taxable Election Remainder Amount shall be reallocated and distributed as follows: if such amount is (a) equal to or less than Forty Million Dollars ($40,000,000.00), such amount shall be allocated (i) first, if the aggregate amount of Taxable Election Cash distributable under the Plan of Adjustment is greater than Twenty Million Dollars ($20,000,000.00), to be distributed as Taxable Election Cash in accordance with the Plan of Adjustment, (ii) second, to the extent of any remainder, to further fund the COFINA Operating Expense Account up to an additional Ten Million Dollars ($10,000,000.00), and (iii) third, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash Available for Distribution, and the Commonwealth, on the other hand, and (b) greater than Forty Million Dollars ($40,000,000.00), such amount up to Forty Million Dollars ($40,000,000.00) shall be added to the COFINA Cash Available for Distribution and allocated to holders of Allowed Bond Claims in accordance with the terms and provisions of the Plan of Adjustment.

2.     **Commonwealth/COFINA Expenses**

Notwithstanding anything contained in the Plan of Adjustment to the contrary, all expenses, including Allowed Administrative Expense Claims and Allowed Professional Claims, incurred by the Commonwealth or COFINA, as the case may be, in connection with the development, negotiation, confirmation and consummation of the Plan of Adjustment and the compromise and settlement of the Commonwealth-COFINA Dispute shall be paid to the extent available from the funds distributable to the Commonwealth in accordance with the provisions of sections 2.1 and 15.1 of the Plan of Adjustment and otherwise by the Commonwealth.

F.     **Treatment of Executory Contracts and Unexpired Leases**

1.     **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases**

Pursuant to section 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and subject to the provisions of sections 18.5 and 18.7 of the Plan of Adjustment, all Executory Contracts and Unexpired Leases that exist between COFINA and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by COFINA as of the Effective Date, except for any Executory Contract and Unexpired Lease that (a) has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date or (b) is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement; *provided*, *however*, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event

such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date. The Debtor shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of section 18.1 of the Plan of Adjustment, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of the section 18.1 of the Plan of Adjustment, by serving a separate notice to the relevant counterparties to such agreements. To the extent there are any amendments to such schedules, the Debtor shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby. The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtor that such document is an Executory Contract and Unexpired Lease or that COFINA has any liability thereunder.

## 2. Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order by the Title III Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to section 18.1 of the Plan of Adjustment.

## 3. Inclusiveness

Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

## 4. Cure of Defaults

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to section 18.1 of the Plan of Adjustment, the Debtor shall, pursuant to the provisions of section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the Confirmation Hearing, file with the Title III Court and serve by first class mail on each non-COFINA party to such Executory Contracts and Unexpired Leases to be assumed pursuant to section 18.1 of the Plan of Adjustment, a notice, which shall list the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned. The parties to such Executory Contracts and Unexpired Leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtor. If there are any objections filed, the Title III Court shall hold a hearing on a date to be set by the Title III Court. Notwithstanding section 18.1 of the Plan of Adjustment, the Debtor shall retain its rights to reject any of its Executory Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

101361236v22

5.     **Insurance Policies**

Subject to the terms and provisions of section 18.7 of the Plan of Adjustment, each of COFINA's Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan of Adjustment.  Unless otherwise provided in the Plan of Adjustment and to the extent executory in nature, on the Effective Date, COFINA shall, first, deposit all Insurance Policies and any agreements, documents and instruments relating to coverage of all insured Bond Claims into the applicable Custodial Trusts and, second, be deemed to have rejected all such Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims; *provided, however*, that, such rejection shall not, and shall not be construed to, discharge or relieve any of Ambac, Assured or National with respect to their respective obligations to holders of Allowed Senior COFINA Bond Claims (Ambac), Allowed Junior COFINA Bond Claims (Assured) and Allowed Senior COFINA Bond Claims (National),  respectively, pursuant to the applicable Insurance Policies of each such Entity.  For the avoidance of doubt, nothing contained in the Plan of Adjustment shall prejudice any subrogation, reimbursement, or similar rights of an insured against the applicable Custodial Trust or the assets thereof.

6.     **Rejection Damage Claims**

If the rejection of an Executory Contract and Unexpired Lease by the Debtor hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against COFINA, or its properties or agents, successors, or assigns, including, without limitation, Reorganized COFINA, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized COFINA, as the case may be, on or before thirty (30) days after the late to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

7.     **Indemnification and Reimbursement Obligations**

For purposes of the Plan of Adjustment, (i) to the extent executory in nature, the obligations of COFINA, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Petition Date shall be deemed assumed as of the Effective Date and (ii) indemnification obligations of COFINA arising from conduct of officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.

8.     **Nonoccurrence of Effective Date**

If the Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

9.      **Reservation of Rights**

Nothing contained in the Plan of Adjustment or the Plan Supplement shall constitute an admission by the Debtor, Reorganized COFINA, or any other party that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that COFINA has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized COFINA shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

G.      **Provisions Governing Distributions**

1.      **Time and Manner of Distribution**

Except as otherwise provided in the Plan of Adjustment, including, without limitation, in Articles X and XVIII thereof, distributions under the Plan of Adjustment shall be made to each holder of an Allowed Claim as follows:

(a)      *Distributions to Holders of Bond Claims*

Within ten (10) Business Days following the Effective Date, and subject to the terms and provisions of section 19.5 of the Plan of Adjustment regarding distributions to Ambac and Whitebox on account of the pendency of the Ambac Action and the Whitebox Actions, respectively, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Senior COFINA Bond Claim, an Allowed Senior COFINA Bond Claim (Ambac), an Allowed Senior COFINA Bond Claim (National), an Allowed Senior COFINA Bond Claim (Taxable Election), an Allowed Junior COFINA Bond Claim, an Allowed Junior COFINA Bond Claim (Assured) and an Allowed Junior COFINA Bond Claim (Taxable Election), in each case consistent with the terms of the Plan of Adjustment, such Creditor's Pro Rata Share, if any, of Section 103 Cash, COFINA Cash Available for Distribution, Rounding Amount Cash, Taxable Election Cash, Consummation Costs, if applicable, and COFINA Bonds, together with, where applicable, the consideration described in sections 6.1 and 7.1 of the Plan of Adjustment, or, in lieu of all of the foregoing, certificates in the applicable Custodial Trust.

(b)      *Distributions with Respect to GS Derivative Claim*

Within (10) Business Days following the Effective Date, and solely to the extent that the holder of the Allowed GS Derivative Claim is entitled to a distribution in excess of the value of the collateral retained by such holder, the Disbursing Agent shall distribute, or cause to be distributed, to the holder of the Allowed GS Derivative Claim, such Creditor's share, if any, of Section 103 Cash, COFINA Cash Available for Distribution, Rounding Amount Cash and COFINA Bonds.

(c)      *Distributions with Respect to General Unsecured Claims*

Within ten (10) Business Days following the Effective Date, and solely to the extent that Class 9 votes to accept the Plan of Adjustment, the Disbursing Agent shall distribute or cause to

be distributed to each holder of an Allowed General Unsecured Claim such Creditor's Pro Rata Share, if any, of One Hundred Thousand Dollars ($100,000.00).

(d)   <strong><em><u>Distribution of Cash to Holders of Certain Other Claims</u></em></strong>

Except as otherwise provided in the Plan of Adjustment, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Administrative Expense Claim, Cash in the amount of such Allowed Claim.

### 2.    Timeliness of Payments

Any payment or distribution to be made pursuant to the Plan of Adjustment shall be deemed to be timely made if made within ten (10) days after the date specified in the Plan of Adjustment.  Whenever any distribution to be made under the Plan of Adjustment shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due, including, without limitation, deeming distributions made pursuant to section 19.1(a) of the Plan of Adjustment to have been made on the Effective Date.

### 3.    Distributions by the Disbursing Agent

Except as otherwise provided in the Plan of Adjustment, all distributions under the Plan of Adjustment shall be made by the Disbursing Agent.  The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property.

### 4.    Manner of Payment under the Plan of Adjustment

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made, at the election of the payor, by check drawn on a domestic bank or by wire transfer from a domestic bank; *provided*, *however*, that no Cash payment shall be made to a holder of an Allowed Claim until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

### 5.    Delivery of Distributions

Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the Plan of Adjustment, distributions and deliveries to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Title III Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if COFINA has been notified in writing of a change of address, subject to the qualifications provided in section 19.5 of the Plan of Adjustment.

6.      **Cancellation of Notes, Instruments, Certificates, and Other Documents**

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan of Adjustment, (b) for purposes of evidencing a right to distribution under the Plan of Adjustment, or (c) as specifically provided otherwise in the Plan of Adjustment (including any rejection of Executory Contracts or Unexpired Leases pursuant to section 18.1 thereof), on the Effective Date, the "Senior" and "First Subordinate" Existing Securities and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against COFINA without any further act or action under any applicable agreement, law, regulation, order or rule, with COFINA and BNYM having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to COFINA, as applicable, under the Existing Securities and all instruments and documents related thereto shall be discharged, subject to the qualifications provided in section 19.6 of the Plan of Adjustment.

7.      **Undeliverable/Reserved Distributions**

(a)      **<u>*Holding of Undeliverable Distributions by the Disbursing Agent*</u>**

If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address.  Subject to the terms and provisions of section 19.7(b) of the Plan of Adjustment, undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable.  All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals of any kind.  Nothing contained in the Plan of Adjustment shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

(b)      **<u>*Failure to Claim Undeliverable Distributions*</u>**

If (i) a check is sent, by the Disbursing Agent to a holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof.  Any holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the Plan of Adjustment to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan of Adjustment, against Reorganized COFINA, the trustees, or their respective professionals, agents, or property, and any (1) Cash in the possession of the Disbursing Agent or the trustee with respect to Existing Securities, as the case may be, shall be released to Reorganized COFINA for use to discharge operating expenses of Reorganized COFINA and (2) COFINA Bonds in the possession of the

Disbursing Agent or trustee with respect to Existing Securities, as the case may be, shall be released to Reorganized COFINA for cancellation or deposit into the treasury of Reorganized COFINA, as determined by Reorganized COFINA in its sole and absolute discretion.

8. **Withholding and Reporting Requirements**

Any party issuing any instrument or making any distribution under the Plan of Adjustment shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or Tax Authority, and all distributions under the Plan of Adjustment shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan of Adjustment shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan of Adjustment has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan of Adjustment fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

9. **Time Bar to Cash Payments**

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

10. **Distributions After Effective Date**

Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XIX of the Plan of Adjustment.

11. **Setoffs**

Except as otherwise provided in the Plan of Adjustment or in the Confirmation Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against

any Allowed Claim and the distributions to be made pursuant to the Plan of Adjustment on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and causes of action of any nature that COFINA or Reorganized COFINA may hold against the holder of such Allowed Claim; *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by COFINA or Reorganized COFINA of any such claims, rights, and causes of action that COFINA or the Reorganized COFINA may possess against such holder; and, *provided*, *further*, that nothing contained in the Plan of Adjustment is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment; *and*, *provided*, *further*, that nothing in section 19.11 of the Plan of Adjustment shall affect the releases and injunctions provided in Article XXX of the Plan of Adjustment.

### 12. Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan of Adjustment consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts; *provided*, *however*, that COFINA or Reorganized COFINA's treatment of any distributions for its tax purposes will not be binding on any Creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

### 13. Payment of Trustee Fees and Expenses

Upon the entry of an order of the Title III Court authorizing payment thereof, upon notice and a hearing, the Disbursing Agent, unless otherwise stayed, shall pay the Trustee Claims; *provided*, *however*, that, with respect to the allowance of Trustee Claims for which an order of the Title III Court had been entered prior to the Effective Date, the Disbursing Agent shall pay such Trustee Claims as soon as practicable after the Effective Date.  To the extent that the Disbursing Agent fails to pay any Trustee Claim approved by the Title III Court, such trustee shall have the right to assert its Lien and priority rights pursuant to the applicable indenture or governing documents for payment of any payment or other distribution to be made in accordance with the provisions contained in the Plan of Adjustment.  Notwithstanding the foregoing, the Disbursing Agent shall be responsible and, upon presentation of supporting documentation in form and substance satisfactory to the Disbursing Agent, shall satisfy the trustee distribution expenses; *provided*, *however*, that, under no circumstance shall the Disbursing Agent be responsible for any indemnification obligation, cost, or expense of any of the trustees associated with the gross negligence, intentional fraud or willful misconduct of a trustee in making any such distribution.

### 14. Distribution Record Date

For purposes of distributions on account of Allowed Bond Claims, on the Distribution Record Date, registers of BNYM as trustee for the Existing Securities shall be closed and BNYM shall have no obligation to recognize, and shall not recognize, any transfers of Bond Claims

arising under or related to the indentures or the governing documents occurring from and after the Distribution Record Date.

## H.    Rights and Powers of Disbursing Agent

### 1.    Exculpation

From and after the Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan of Adjustment or any order of the Title III Court entered pursuant to or in furtherance of the Plan of Adjustment, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent.  No holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan of Adjustment or for implementing the provisions of the Plan of Adjustment.

### 2.    Powers of the Disbursing Agent

Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan of Adjustment, (b) make distributions contemplated by the Plan of Adjustment, (c) comply with the Plan of Adjustment and the obligations thereunder, and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Title III Court, pursuant to the Plan of Adjustment, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan of Adjustment.

### 3.    Fees and Expenses Incurred From and After the Effective Date

Except as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Title III Court.

## I.    Procedures for Treatment of Disputed Claims

### 1.    Objections to Claims; Prosecution of Disputed Claims

Except with respect to Allowed Claims, Reorganized COFINA shall object to, and shall assume any pending objection filed by the Debtor to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.   All objections, affirmative defenses and counterclaims shall be litigated to Final Order; *provided*, *however*, that Reorganized COFINA shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court.  Unless otherwise ordered by the Title III Court, to the extent not

already objected to by the Debtor, Reorganized COFINA shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than one hundred twenty (120) days following the Effective Date or such later date as may be approved by the Title III Court. Notwithstanding anything contained in the Plan of Adjustment to the contrary, on the Effective Date, any Bond Claim filed by any Entity, other than the Bond Claims filed by BNYM, as trustee with respect to the Existing Securities, for amounts due under Existing Securities, shall be deemed disallowed and expunged and the Oversight Board shall instruct Prime Clerk LLC, its court-appointed representative, to remove such Bond Claims from the claims registry maintained for the benefit of the Title III Court.

## 2.    Estimation of Claims

Except with respect to Allowed Claims, on and after the Effective Date, and unless otherwise limited by an order of the Title III Court, Reorganized COFINA may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to or sought to estimate such Claim, and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Unless otherwise provided in an order of the Title III Court, if the Title III Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title III Court; *provided*, *however*, that, if the estimate constitutes the maximum limitation on such Claim, Reorganized COFINA may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, *provided*, *further*, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

## 3.    Payments and Distributions on Disputed Claims

### (a)    *Disputed Claims Holdback*

From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or allowed or disallowed by Final Order of the Title III Court, Reorganized COFINA shall retain, for the benefit of each holder of a Disputed Claim, COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds, and, to the extent elected by such holder, Custodial Trust Certificates, and any dividends, gains or income attributable in respect of any of the foregoing, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims shall be estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized COFINA; *provided*, *however*, that the recovery by any holder

of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above.  Any COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds retained and held for the benefit of a holder of a Disputed Claim shall be treated as payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash distributed in COFINA Bonds if the Disputed Claim ultimately becomes an Allowed Claim.  Such Cash and any dividends, gains or income paid on account of the COFINA Bonds (if any) retained for the benefit of holders of Disputed Claims shall be retained by Reorganized COFINA for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan of Adjustment.  To the extent that Reorganized COFINA retains COFINA Bonds on behalf of Disputed Claims holders, until such time as such COFINA Bonds are distributed, Reorganized COFINA shall exercise voting or consent rights with respect to such bonds.

**(b)**     ***Allowance of Disputed Claims***

At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, Reorganized COFINA shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan of Adjustment, together with any earnings that have accrued on the amount of COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds so retained (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as practicable after the date that the order or judgement of the Title III Court allowing such Disputed Claim becomes a Final Order, but in no event more than ninety (90) days thereafter.  The balance of any COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds previously retained but not distributed to a Disputed Claim holder shall be included in future distributions with respect to COFINA Bonds.

**4.      Authority to Amend List of Creditors**

Except with respect to Bond Claims, the Debtor shall have the authority to amend the List of Creditors with respect to any Claim and to make distributions based on such amended List of Creditors without approval of the Title III Court.  If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor will provide the holder of such Claim with notice of such amendment and such holder will have twenty (20) days to file an objection to such amendment with the Title III Court.  If no such objection is filed, the Disbursing Agent may proceed with distributions based on such amended List of Creditors without approval of the Title III Court.

**5.      Non-Accrual of Interest**

Unless otherwise specifically provided for in the Plan of Adjustment or by order of the Title III Court, post-petition interest shall not accrue or be paid on Claims, Allowed or otherwise, and no holder of a Claim, Allowed or otherwise, shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the

Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### 6. Disallowance of Claims

All Claims of any Entity from which property is sought by the Debtor under sections 550, or 553 of the Bankruptcy Code or that the Debtor alleges is a transferee of a transfer that is avoidable under sections 544, 545, 547, 548, or 549 of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtor, on the other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### J. Acceptance or Rejection of the Plan of Adjustment, Effect of Rejection by One or More Classes of Claims

#### 1. Impaired Classes to Vote

Except as otherwise provided pursuant to the Disclosure Statement Order, each holder, as of the voting record date established in the Disclosure Statement Order, of a Claim in an impaired Class not otherwise deemed to have rejected or accepted the Plan of Adjustment shall be entitled to vote separately to accept or reject the Plan of Adjustment.

#### 2. Acceptance by Class of Creditors

An impaired Class of holders of Claims shall have accepted the Plan of Adjustment if the Plan of Adjustment is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have affirmatively voted to accept or reject the Plan of Adjustment.

#### 3. Cramdown

If any impaired Class of Claims shall fail to accept, or be deemed to reject, the Plan of Adjustment in accordance with section 1129(a) of the Bankruptcy Code, the Debtor reserves the right to request that the Title III Court confirm the Plan of Adjustment in accordance with section 1129(b) of the Bankruptcy Code.

### K. Identification of Claims Impaired by the Plan and Not Impaired by the Plan

#### 1. Impaired Classes

Claims in Classes 1 through 10 are impaired under the Plan of Adjustment.

#### 2. Impaired Classes to Vote

The Claims in Classes 1 through 9 are impaired and receiving distributions pursuant to the Plan of Adjustment, and are therefore entitled to vote to accept or reject the Plan of

Adjustment; *provided*, *however*, that, based upon the elections made on the Election Notice, Classes 4 and 7 are deemed to have accepted the Plan of Adjustment. The Claims in Class 10 are impaired and not receiving a distribution pursuant to the Plan of Adjustment and, therefore, Class 10 is deemed to have rejected the Plan of Adjustment.

**L.     Conditions Precedent to Confirmation of the Plan**

Confirmation of the Plan of Adjustment is subject to satisfaction of the following conditions precedent:

**1.     Conditions Precedent to Confirmation of the Plan**

**(a)     *Fiscal Plan Certification***

The Oversight Board shall have determined that the Plan of Adjustment is consistent with the COFINA Fiscal Plan and shall have certified the submission of the Plan of Adjustment, and any modifications to the Plan of Adjustment through the Confirmation Date, in accordance with sections 104(j) and 313 of PROMESA.

**(b)     *Required Orders***

The Clerk of the Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order, the Confirmation Order, and the Settlement Order) providing for the following:

(i)     Approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)     Authorizing the solicitation of votes and elections with respect to the Plan of Adjustment;

(iii)     Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

(iv)     Confirming and giving effect to the terms and provision of the Plan of Adjustment, including the releases set forth in Article XXX of the Plan of Adjustment;

(v)     Approving the Settlement Agreement in accordance with its terms, including, but not limited to, the releases of the Agents and their respective representatives, professionals and advisors;

(vi)     Determining that all applicable tests, standards and burdens in connection with the Plan of Adjustment have been duly satisfied and met by the Oversight Board, COFINA and the Plan of Adjustment;

(vii)     Approving the documents in the Plan Supplement, other than the New Bond Legislation (to the extent included in the Plan Supplement) and the Reorganized COFINA By-Laws;

(viii)   Authorizing Reorganized COFINA to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan of Adjustment, the documents in the Plan Supplement, and the Settlement Agreement;

(ix)   Determining that the compromises and settlements set forth in the Settlement Agreement and the Plan of Adjustment are appropriate, reasonable and approved; and

(x)   The deemed acceleration of the Existing Securities on the Effective Date (i) in connection with  the treatment of Junior COFINA Bond Claims (Assured) and (ii) if requested by Ambac and/or National prior to the commencement of the Disclosure Statement Hearing, in connection with the Senior COFINA Bond Claims (Ambac) and the National Election, respectively; *provided*, *however*, that, such deemed acceleration shall not affect, nor shall it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

### (c)   *Form of Orders*

The Confirmation Order, the Settlement Order and the Plan of Adjustment are each in form and substance reasonably acceptable to the Oversight Board, AAFAF, COFINA, the PSA Creditors and Bonistas.

### (d)   *Confirmation Order*

The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan of Adjustment and the Settlement Agreement satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations, and injunctions set forth in Article XXX of the Plan of Adjustment, and (iii) the provisions set forth in section 25.1(c) of the Plan of Adjustment.

### 2.   Waiver of Conditions Precedent to Confirmation

To the extent practicable and legally permissible, each of the conditions precedent in section 24.1 of the Plan of Adjustment may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of AAFAF, COFINA, the PSA Creditors and Bonistas, which consent shall not be unreasonably withheld.  Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

101361236v22

**M.**      **Conditions Precedent to the Effective Date**

**1.**      **Conditions Precedent to the Effective Date**

The occurrence of the Effective Date and the substantial consummation of the Plan of Adjustment are subject to satisfaction of the following conditions precedent:

(a)      *Satisfaction of Certain Settlement Agreement Conditions*

The satisfaction of the "Conditions to Effective Date" set forth in Section 4 of the Settlement Agreement.

(b)      *Fiscal Plan Certification*

The Oversight Board shall have determined that the Plan of Adjustment is consistent with COFINA Fiscal Plan and shall have certified the submission of the Plan of Adjustment, and any modifications to the Plan of Adjustment through the Confirmation Date, in accordance with sections 104(j) and 313 of PROMESA.

(c)      *Entry of the Confirmation Order*

The Clerk of the Title III Court shall have entered the Confirmation Order in accordance with section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable to the Title III Case pursuant to section 301 of PROMESA, which shall be in form and substance reasonably acceptable to the Oversight Board, AAFAF, COFINA, the PSA Creditors and Bonistas, and the Confirmation Order shall provide for the following:

(i)      Authorize COFINA and Reorganized COFINA, as the case may be, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)      Decree that the provisions of the Confirmation Order and the Plan of Adjustment are non-severable and mutually dependent;

(iii)      Authorize COFINA and Reorganized COFINA, as the case may be, to (1) make all distributions and issuances as required under the Plan of Adjustment and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

(iv)      Authorize the implementation of the Plan of Adjustment in accordance with its terms.

(v)      The COFINA Bonds and the covenants by COFINA, Reorganized COFINA, and the Commonwealth, as applicable, for the benefit of the holders of the COFINA Bonds and COFINA Parity Bonds (including the Sales Tax, non-impairment, substitution of collateral and tax-exemption covenants set forth in Article XVI of the Plan of Adjustment), as provided in the New Bond Legislation and the New Bond Indenture, constitute valid, binding, legal and enforceable obligations of COFINA, Reorganized

COFINA, and the Commonwealth, as applicable, under Puerto Rico and federal law, and the COFINA Portion (and any substitution of New Collateral on the terms and conditions provided for in the Plan of Adjustment) is the property of Reorganized COFINA, free and clear of all liens, claims, encumbrances, and other interests of creditors of COFINA, Reorganized COFINA, the Commonwealth, or any instrumentality of the Commonwealth, other than liens and claims afforded to holders of COFINA Bonds under the Plan of Adjustment and the Confirmation Order, and shall not be "available resources" or "available revenues" of the Government of Puerto Rico, as used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution);

(vi)     Pursuant to the New Bond Legislation, the COFINA Bonds and COFINA Parity Bonds have been granted and are secured by a statutory first lien as described in section 16.2 of the Plan of Adjustment, which Lien shall remain in full force and effect until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms;

(vii)     The statutory lien on, and pledges of, COFINA Pledged Taxes as provided in the New Bond Legislation and the New Bond Indenture, as applicable, and all other provisions made to pay or secure payment of the COFINA Bonds and COFINA Parity Bonds are valid, binding, legal, and enforceable; including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of New Collateral as adequate protection for the property rights conferred under the Plan of Adjustment and the Confirmation Order;

(viii)     New Bond Legislation has been enacted to amend (or repeal and replace) the existing COFINA legislation to, among other things, (i) establish the independent COFINA board of directors referred to in section 28.3 of the Plan of Adjustment, (ii) permit the Sales Tax, tax exemption, substitution of New Collateral and non-impairment provisions referred to therein and (iii) grant such other authorizations, if any, which may be required to implement the transactions contemplated therein, including, without limitation, (a) a determination that COFINA is the owner of the COFINA Portion under applicable law, (b) a grant of a statutory Lien on the COFINA Portion to secure the payment obligations with respect to the COFINA Bonds and COFINA Parity Bonds, in whole or in part, or otherwise in accordance with the Additional Bonds Test, (c) enhanced financial reporting, (d) events of default and imposition of certain measures upon an event of default (e) submission of any disputes under the New Bond Indenture to the jurisdiction of the Title III Court, and (f) other customary terms, conditions, and covenants for similarly structured and supported municipal bonds that are acceptable to the PSA Creditor Parties.  To the extent applicable, the foregoing terms and such other terms as may be agreed upon shall be included in the New Bond Indenture;

(ix)     The transfer of the COFINA Portion (and any substitution of New Collateral on the terms and conditions provided for in the Plan of Adjustment) pursuant to the Plan of Adjustment is appropriate and binding and specifically enforceable against Reorganized COFINA and the Commonwealth, their respective creditors and all parties

104

in interest in accordance with the Plan of Adjustment, including, without limitation, because the transfer of the COFINA Portion created in Reorganized COFINA an ownership interest in such property (and any substitution of New Collateral on the terms and conditions provided for in the Plan of Adjustment) and is a valid provision made to pay or secure payment of the COFINA Bonds;

(x)     The deemed acceleration of the Existing Securities on the Effective Date (i) in connection with  the treatment of Junior COFINA Bond Claims (Assured) and (ii) if requested by Ambac and/or National prior to the commencement of the Disclosure Statement Hearing, in connection with the Senior COFINA Bond Claims (Ambac) and the National Election, respectively; *provided*, *however*, that, such deemed acceleration shall not affect, nor shall it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date;

(xi)     The Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) COFINA, (2) Reorganized COFINA, (3) the Commonwealth, (4) each Person or Entity asserting claims or other rights against COFINA, the Commonwealth or any of its other instrumentalities, including each holder of a Bond Claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by COFINA, the Commonwealth, or any of its other instrumentalities or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the Plan of Adjustment and, if impaired, whether or not such person or entity accepted the Plan of Adjustment, (5) any other Person or Entity, and (6) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representative, attorneys, beneficiaries or guardians; and

(xii)     The Plan of Adjustment is consistent with the COFINA Fiscal Plan and satisfied section 314(b)(7) of PROMESA.

**(d)     *No Injunction***

The Confirmation Order shall be effective and not be stayed in any respect.

**(e)     *Authorizations***

All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan of Adjustment, including, without limitation, the New Bond Legislation, have been obtained or enacted and not revoked, and (2) except to the extent expressly provided in the Plan of Adjustment and not inconsistent with any other provision of the Plan of Adjustment, unless otherwise permitted or required by PROMESA or similar authority, completion of any other required legislative or other governmental action required to consummate the Plan of Adjustment, including, without limitation, Commonwealth legislation and court orders, if any, required to (i) ensure that the payment obligations of

COFINA cannot in the future be modified or altered without the consent of the requisite holders of COFINA Bonds as set forth in a New Bond Indenture, (ii) ensure the validity, enforceability, liens and priority of the COFINA obligations contemplated by the Plan of Adjustment and (iii) except as otherwise permitted in connection with the substitution of collateral, ensure that the COFINA Pledged Taxes not be modified or altered prior to the satisfaction of COFINA's obligations thereunder.

### (f) *Execution of Documents; Other Actions*

All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents, necessary to implement the terms and provisions of the Plan of Adjustment, including the Definitive Documents, are effected or executed and delivered, as applicable, in form and substance reasonably satisfactory to the Government Parties, the PSA Creditors and Bonistas, and are in full force and effect.

### (g) *Opinions*

Usual and customary legal opinions for issuances of the type similar to the COFINA Bonds by outside counsel to COFINA covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the PSA Creditors, have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the Plan of Adjustment.

### 2. Waiver of Conditions Precedent

Subject to the provisions of the Plan of Adjustment, the Debtor may waive any of the conditions to the Effective Date set forth in section 25.1 of the Plan of Adjustment at any time without any notice to any other parties in interest, other than the PSA Creditors and Bonistas, and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the Plan of Adjustment.

### 3. Effect of Non-Occurrence of Conditions to Effective Date

If prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in any order of the Title III Court vacating the Confirmation Order, the Plan of Adjustment will be null and void in all respects, and nothing contained in the Plan of Adjustment or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, or Causes of Action; (b) prejudice in any manner the rights of COFINA, the Oversight Board, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by COFINA, the Oversight Board, or any other Entity.

## N. Prosecution and Extinguishment of Claims Held by COFINA

### 1. Prosecution of Claims

Except as settled and released in the Plan of Adjustment, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA, including, without limitation, any

Avoidance Action, any other Cause of Action, right to payment, or Claim that may be pending on the Effective Date or instituted by COFINA or Reorganized COFINA thereafter, to a Final Order, and may compromise and settle such claims, without approval of the Title III Court.

**O.   Modification, Revocation, or Withdrawal of the Plan of Adjustment**

**1.   Modification of Plan of Adjustment**

Subject to (a) sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and (b) the terms and provisions of the Plan Support Agreement, the Debtor may alter, amend or modify the Plan of Adjustment or the Exhibits at any time prior to or after the Confirmation Date but prior to the Effective Date.  A holder of a Claim that has accepted the Plan of Adjustment shall be deemed to have accepted the Plan of Adjustment as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

**2.   Revocation or Withdrawal**

**(a)**   Subject to the terms and provisions of the Plan Support Agreement, the Plan of Adjustment may be revoked or withdrawn prior to the Confirmation Date by the Debtor.

**(b)**   If the Plan of Adjustment is revoked or withdrawn prior to the Confirmation Date, or if the Plan of Adjustment does not become effective for any reason whatsoever, then the Plan of Adjustment shall be deemed null and void. In such event, nothing contained in the Plan of Adjustment shall be deemed to constitute a waiver or release of any claim by COFINA or any other Entity, or to prejudice in any manner the rights of COFINA or any other Entity in any further proceeding involving COFINA.

**3.   Amendment of Plan of Adjustment Documents**

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan of Adjustment, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the Plan of the Adjustment and their respective attachments, as the case may be.

**4.   No Admission of Liability**

**(a)**   The submission of the Plan of Adjustment is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in the Plan of Adjustment.

**(b)**   None of the Plan of Adjustment (including, without limitation, the Exhibits hereto), or any settlement entered, act performed or document executed in connection with the Plan of Adjustment: (i) is or may be deemed to be or may be used as an admission or

evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized COFINA, COFINA, or any other Person or Entity with respect to the validity of any Claim.   None of the Plan of Adjustment or any settlement entered, act performed or document executed in connection with the Plan of Adjustment shall be admissible in any proceeding for any purposes, except to carry out the terms of the Plan of Adjustment, and except that, once confirmed, any Entity may file the Plan of Adjustment in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

**P.      Retention of Jurisdiction**

**1.       Retention of Jurisdiction**

The Title III Court shall retain and have exclusive jurisdiction over any matter arising under PROMESA, arising in or related to, the Title III Case and the Plan of Adjustment, or that relates to the following:

(a)      to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim, including, without the limitation, the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

(b)      to resolve any matters related to Executory Contracts or Unexpired Leases, including, without limitation, (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which COFINA is party or with respect to which COFINA may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(c)      to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan of Adjustment and adjudicate any and all disputes arising from or relating to distributions under the Plan of Adjustment;

(d)      to adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving COFINA or Reorganized COFINA that may be pending on the Effective Date or brought thereafter;

(e)      to decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses

to Professionals authorized pursuant to PROMESA, the Plan of Adjustment or orders entered by the Title III Court;

(f)     to enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Case and (b) the Plan of Adjustment, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan of Adjustment, including, without limitation, orders pertaining to the substitution of New Collateral for COFINA Pledged Taxes to secure repayment of the COFINA Bonds and COFINA Parity Bonds;

(g)     to resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the Plan of Adjustment, the Confirmation Order, or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan of Adjustment or any Entity's rights arising from or obligations incurred in connection with the Plan of Adjustment or such documents;

(h)     to approve any modification of the Plan of Adjustment or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan of Adjustment or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan of Adjustment, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan of Adjustment or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan of Adjustment;

(i)     to adjudicate, decide or resolve any matters relating to COFINA's compliance with the Plan of Adjustment and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

(j)     to determine any other matters that may arise in connection with or relate to the Plan of Adjustment, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan of Adjustment, the Disclosure Statement or the Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(k)     to enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan of Adjustment or the Confirmation Order;

(l)     to adjudicate any and all controversies, suits or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the Plan of Adjustment or Confirmation Order, including, without limitation, issuance of the COFINA Bonds or COFINA Parity Bonds, and enter any necessary or appropriate orders or relief in

connection with such adjudication; to determine any other matters that may arise in connection with or relate to the Plan of Adjustment, the Disclosure Statement, the Confirmation Order, the Settlement Agreement, or any contract, instrument, release, or other agreement or document created in connection with the Plan of Adjustment, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(m)     to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)     to enter an order or final decree concluding or closing the Title III Case pursuant to section 945(b) of the Bankruptcy Code;

(o)     to enforce and clarify any orders previously entered by the Title III Court in the Title III Case; and

(p)     to hear any other matter over which the Title III Court has jurisdiction under sections 305 and 306 of PROMESA.

## Q.     Miscellaneous Provisions

### 1.     Title to Assets

Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of COFINA encompassed by the Plan of Adjustment shall vest in Reorganized COFINA, free and clear of all Liens (except the Liens securing repayment of the COFINA Bonds and the COFINA Parity Bonds), and the Confirmation Order shall be a judicial determination of discharge of the liabilities of COFINA except as provided in the Plan of Adjustment.

### 2.     Discharge and Release of Claims

(a)     Except as expressly provided in section 30.6 of the Plan of Adjustment or the Confirmation Order, all distributions and rights afforded under the Plan of Adjustment shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against COFINA that arose, in whole or in part, prior to the Effective Date, relating to COFINA or Reorganized COFINA or any of its Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan of Adjustment on account of such Claims or Causes of Action.   Upon the Effective Date, COFINA and Reorganized COFINA shall be deemed discharged and released from any and all Claims, Causes of Action, and any other debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan of Adjustment.

**(b)**      Except as provided in sections 30.6 and 30.12 of the Plan of Adjustment or the Confirmation Order, all Entities shall be precluded from asserting any and all Claims against COFINA and Reorganized COFINA, and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to COFINA or Reorganized COFINA or any of their respective assets and property, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan of Adjustment on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities.  In accordance with the foregoing, except as expressly provided in the Plan of Adjustment or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action, or debt of or against COFINA pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against COFINA or Reorganized COFINA and their respective Assets and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability.  As of the Effective Date, and in consideration for the value provided under the Plan of Adjustment and the Settlement Agreement, each holder of a Claim in any Class under the Plan of Adjustment shall be and hereby is deemed to release and forever waive and discharge as against COFINA and Reorganized COFINA, and their respective Assets and property, all such Claims.

### 3.      Injunction on Claims

Except as otherwise expressly provided in sections 30.6 and 30.13 of the Plan of Adjustment, the Confirmation Order or such other Final Order of the Title III Court that may be applicable, all Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to section 30.2 of the Plan of Adjustment or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to section 30.2 of the Plan of Adjustment are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the Plan of Adjustment against any of the Released Parties or any of their respective assets or property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan of Adjustment, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan of Adjustment, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the Plan of Adjustment.  Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

101361236v22

4.      **Integral to Plan of Adjustment**

Each of the discharge, injunction, exculpation and release provisions provided in Article XXX of the Plan of Adjustment is an integral part of the Plan of Adjustment and is essential to its implementation.  Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in Article XXX of the Plan of Adjustment.

5.      **Releases by COFINA and Reorganized COFINA**

Except as otherwise expressly provided in the Plan of Adjustment, the Confirmation Order, or the Settlement Agreement, on the Effective Date, and for good and valuable consideration each of COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that COFINA, Reorganized COFINA, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims or otherwise are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event or other circumstance relating to COFINA taking place or existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged in the Actions, the Related Actions, including, without limitation, any such Claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees; *provided*, *however*, that the foregoing release shall not extend to acts of gross negligence, intentional fraud, or willful misconduct of BNYM.

6.      **Releases by Holders of Claims**

On the Effective Date, and for good and valuable consideration, and to the fullest extent permissible under applicable law, each Releasing Party that (i) has held, currently holds or may hold a Released Claim, (ii) is entitled to receive, directly or indirectly, a distribution or satisfaction of its Claim pursuant to the Plan of Adjustment, and (iii) elects, by not checking the appropriate box on its Election Notice, as the case may be, to grant the releases set forth in section 30.6 of the Plan of Adjustment on their own behalf and on behalf of anyone claiming through them, shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge each and all of the Released Parties, from any and all Released Claims (solely in their capacity as Creditors) and/or any claim, act fact, transaction, occurrence, statement, or omission in connection with or alleged in the Actions or the Related Actions, or that could have been alleged in respect of the foregoing or other similar proceeding (solely in their capacity as Creditors), including, without limitation, any such claim demand, right, liability or cause of action for indemnification, contribution or any other basis in law or equity for damages, costs or fees incurred by the releasers in the Plan of Adjustment arising directly or indirectly from or otherwise relating thereto from any and all released third party causes of action; ***provided***, ***however***, **that each Entity that has elected not to grant the releases set forth in section 30.6 of the Plan of Adjustment including, without limitation,**

**any Entity that fails to execute and deliver a release following notice in accordance with the provisions of section 30.6 thereof, shall not be entitled to, and shall not receive, any payment, distribution or other satisfaction of its claim pursuant to the Plan of Adjustment**; and, *provided*, *further*, that notwithstanding anything contained in section 30.6 of the Plan of Adjustment to the contrary, the release set forth in section 30.6(a) of the Plan of Adjustment shall not extend to acts of gross negligence, intentional fraud or willful misconduct of any Released Parties, whether claims asserted thereon sound in contract or tort.

**IMPORTANT INFORMATION REGARDING THE THIRD PARTY RELEASE**: IF YOU ARE ENTITLED TO RECEIVE A DISTRIBUTION OR SATISFACTION OF YOUR CLAIM PURSUANT TO THE PLAN OF ADJUSTMENT, YOU MAY OPT OUT OF THE THIRD PARTY RELEASE PROVIDED IN SECTION 30.6 OF THE PLAN OF ADJUSTMENT BY FOLLOWING THE APPROPRIATE INSTRUCTIONS ON YOUR BALLOT OR ELECTION NOTICE AND YOU WILL NOT BE BOUND BY SUCH RELEASE. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. **HOWEVER, IF YOU ELECT NOT TO GRANT THE RELEASES SET FORTH IN SECTION 30.6 OF THE PLAN OF ADJUSTMENT, YOU WILL NOT BE ENTITLED TO, AND SHALL NOT RECEIVE, ANY PAYMENT, DISTRIBUTION OR OTHER SATISFACTION OF YOUR CLAIM PURSUANT TO THE PLAN OF ADJUSTMENT.**

7.      **Waiver of Section 1542**

**All persons providing releases pursuant to the provision of section 30.6 of the Plan of Adjustment expressly and voluntarily waive section 1542 of the California Civil Code, or any similar, comparable or equivalent provision of the statutory or non-statutory law of California or any other jurisdiction.  Section 1542 provides:**

> **A general release does not extend to claims under which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

8.      **Injunction Related to Releases**

As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim that is released pursuant to sections 30.5 and 30.6 of the Plan of Adjustment, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims: (i) commencing, conducing or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount

101361236v22

against any liability or obligation owed to any Entity released under sections 30.5 and 30.6 of the Plan of Adjustment; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or its inconsistent with the provisions of the Plan of Adjustment or the Confirmation Order.

9.    **Exculpation**

(a)    *__Government Parties__*

The Oversight Board, the Commonwealth, AAFAF, COFINA, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan of Adjustment or any compromises or settlements contained therein, the Disclosure Statement, the Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan of Adjustment and the Settlement Agreement; *provided*, *however*, that the foregoing provisions of section 30.8 of the Plan of Adjustment shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct. Nothing in provisions of section 30.8(a) of the Plan of Adjustment shall prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan of Adjustment.

(b)    *__Monoline Insurers__*

Each of Ambac, Assured and National, and their respective Related Persons, shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan of Adjustment in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan of Adjustment, including, without limitation, in connection with the structure of the Custodial Trusts, commutation, the Assured Election, the National Election, the voting procedures, the election procedures, and any release of obligations under the applicable Insurance Policies; *provided*, *however*, that, notwithstanding anything contained in the Plan of Adjustment to the contrary, the terms and provisions of the Plan of Adjustment shall not, and shall not be construed to, release or exculpate: (1) with respect to any beneficial holder of the Ambac Insured Bonds that receive Ambac Certificates in accordance with the Plan of Adjustment, any claim against Ambac with respect to Ambac's payment obligations under the Ambac Insurance Policy (which claim shall only be asserted by the trustee of the Ambac Trust), as adjusted to account for any distributions from the Ambac Trust (and any claims that Ambac may have against a beneficial holder of such Ambac Insured Bonds with respect to Ambac's obligations under the Ambac Insurance Policy); (2) with respect to any beneficial holder of Assured Insured Bonds that receives Assured Certificates in accordance with the treatment and distributions in accordance with section 17.3 the Plan of Adjustment, any claim against Assured with respect to Assured's payment

114

obligations under the Assured Insurance Policies in accordance with their terms (and any claims that Assured may have against a beneficial holder of such Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policy); (3) with respect to any beneficial holder of National Insured Bonds that received National Certificates in accordance with the Plan of Adjustment, any claim against National with respect to National's obligations under the National Insurance Policies (which claim shall be asserted in accordance with the terms of the National Insurance Policies), as adjusted to account for any distributions from the National Trust (and any claims that National may have against a beneficial holder of such National Insured Bonds with respect to National's obligations to such beneficial holder under the National Insurance Policies); or (4) in the case of the Assured Election, with respect to any beneficial holder of Assured Insured Bonds, any payment obligation under the applicable Assured Insurance Policy in accordance with its terms solely to the extent of any failure by Assured to pay the applicable Acceleration Price in full (or any claims that Assured may have against a beneficial holder of Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policies).

(c)      ***PSA Creditors***

Each of the PSA Creditors solely in their capacity as a Creditor, from the Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan of Adjustment or any compromises or settlements contained therein, the Disclosure Statement, the Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan of Adjustment and the Settlement Agreement; *provided*, *however*, that the provisions of section 30.8(c) of the Plan of Adjustment shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

**10.      Appointments Related Litigation**

Notwithstanding anything contained in the Plan of Adjustment to the contrary, in the event that a Final Order is entered in connection with the Appointments Related Litigation subsequent to entry of the Settlement Order and the Confirmation Order, in consideration of the distributions made, to be made, or deemed to be made in accordance with the terms and provisions of the Plan of Adjustment and documents and instruments related hereto, all Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result of the Plan of Adjustment, consent and agree that such Final Order shall not in any way or manner reverse, affect or otherwise modify the transactions contemplated in the Plan of Adjustment, the Settlement Agreement, the Confirmation Order and the Settlement Order, including, without limitation, the compromise and settlement of the Commonwealth-COFINA Dispute and the releases, exculpations and injunctions provided pursuant to Article XXX of the Plan of Adjustment.

### 11. Bar Order

To the limited extent provided in section 30.6 of the Plan of Adjustment, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the Plan of Adjustment, the negotiation and consummation of the Settlement Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Related Actions, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related Actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

### 12. Deemed Consent

By submitting a Ballot/Election Notice and receiving a distribution under or any benefit pursuant to the Plan of Adjustment and not electing to withhold consent to the releases of the applicable Released Parties and the Entities set forth in section 30.6 of the Plan of Adjustment, or by order of the Title III Court, each holder of a Claim shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in section 30.6 of the Plan of Adjustment.

### 13. No Waiver

Notwithstanding anything to the contrary contained in sections 30.5, 30.6, and 30.7 of the Plan of Adjustment, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized COFINA, or the PSA Creditors to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

### 14. Supplemental Injunction

Notwithstanding anything contained in the Plan of Adjustment to the contrary, except to the limited extent provided in section 30.6 of the Plan of Adjustment, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against COFINA, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the

Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

> **(a)** Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

> **(b)** Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

> **(c)** Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

> **(d)** Except as otherwise expressly provided in the Plan of Adjustment, the Confirmation Order, or the Settlement Agreement, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

> **(e)** Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan of Adjustment, the Confirmation Order, or the Settlement Agreement relating to such Released Claim; provided, however, that COFINA's compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan of Adjustment provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

## 15.   Post-Effective Date Fees and Expenses

From and after the Effective Date, Reorganized COFINA shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by Reorganized COFINA related to implementation and consummation of the Plan of Adjustment without further approval from Title III Court.

## 16.   Securities Act Exemption

Pursuant to section 1145 of the Bankruptcy Code (other than an underwriter as defined in section 1145(b) of the Bankruptcy Code) and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the COFINA Bonds, Ambac Certificates, Assured Certificates and National Certificates pursuant to the terms hereof shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

### 17.     Severability

Subject to the terms and provisions of the Plan Support Agreement, if, prior to the Confirmation Date, any term or provision of the Plan of Adjustment shall be held by the Title III Court to be invalid, void or unenforceable, the Title III Court shall, with the consent of the Government Parties, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

### 18.     Governing Law

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection with the Plan of Adjustment provides otherwise, the rights, duties, and obligations arising under the Plan of Adjustment shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

### 19.     Closing Case

The Debtor shall, promptly upon the full administration of the Title III Case, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court.  Notwithstanding the closing of the Title III Case, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XXIX of the Plan of Adjustment.

### 20.     Section Headings

The section headings contained in the Plan of Adjustment are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan of Adjustment.

### 21.     Inconsistencies

To the extent of any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the Plan of Adjustment, the terms and provisions contained in the Plan of Adjustment shall govern and (b) the terms and provisions of the Plan of Adjustment and the terms and provisions of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and be deemed a modification of the Plan of Adjustment; *provided*, *however*, that under no circumstances shall the Confirmation Order modify the economic terms set forth in the Plan of Adjustment.

22. **Document Retention**

From and after the Effective Date, COFINA may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by COFINA.

23. **Immediate Binding Effect**

Pursuant to section 944(a) of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan of Adjustment and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all holders of Claims and their respective successors and assigns, whether or not the Claim of any such holder is impaired under the Plan of Adjustment and whether or not such holder has accepted the Plan of Adjustment. The releases, exculpations, and settlements effected under the Plan of Adjustment will be operative, and subject to enforcement by the Title III Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan of Adjustment. Once approved, the compromises and settlements embodied in the Plan of Adjustment, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan of Adjustment must (a) challenge such compromise and settlement prior to confirmation of the Plan of Adjustment and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

24. **Additional Documents**

On or before the Effective Date, the Debtor may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan of Adjustment. COFINA and all holders of Claims receiving distributions pursuant to the Plan of Adjustment and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan of Adjustment.

25. **Reservation of Rights**

Except as expressly set forth in the Plan of Adjustment, the Plan of Adjustment shall have no force or effect unless the Title III Court shall enter the Confirmation Order. None of the filing of the Plan of Adjustment, any statement or provision contained in the Plan of Adjustment, or the taking of any action by COFINA with respect to the Plan of Adjustment, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of COFINA with respect to the holders of Claims or with respect to the Commonwealth prior to the Effective Date. Except as expressly set forth in the Plan of Adjustment, the rights and powers of the government of Puerto Rico under the Puerto Rico Constitution and PROMESA, including, without limitation, under sections 303 and 305 of

101361236v22

PROMESA, are expressly reserved (subject to any limitation thereon imposed by the Puerto Rico Constitution, the U.S. Constitution or PROMESA), and nothing in the Plan of Adjustment shall be deemed a waiver of any such rights and powers.

### 26.    Termination of the Oversight Board

Upon the termination or dissolution of the Oversight Board pursuant to section 209 of PROMESA or otherwise, all rights, powers and authorities of the Oversight Board to implement and perform under the Plan of Adjustment shall vest in COFINA or Reorganized COFINA, as applicable, without the need for any notice to, or action by, the Title III Court, the Oversight Board, COFINA, Reorganized COFINA or any other Entity.  Neither COFINA nor Reorganized COFINA shall be, or be deemed to be, a successor to the Oversight Board by reason of any theory of law or equity, and neither COFINA nor Reorganized COFINA shall assume or be responsible for any liability or obligation of the Oversight Board of any kind or nature whatsoever.

### 27.    Successors and Assigns

Except as expressly provided otherwise in the Plan of Adjustment, the rights, benefits, and obligations of any Entity named or referred to in the Plan of Adjustment or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 28.    Notices

All notices, requests to, demands or other document(s) required by the Plan of Adjustment or the Confirmation Order to be served on or delivered to the Oversight Board, COFINA or AAFAF: to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided in the Plan of Adjustment, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Oversight Board, to:    Financial Oversight and Management Board for Puerto Rico
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn:   Natalie A. Jaresko, Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel:    (212) 969-3000
Fax:    (212) 969-2900

If to COFINA, to:           Puerto Rico Sales Tax Financing Corporation
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn:    Christian Sobrino Vega, Executive Director

                – with a copy to –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn:    John Rapisardi, Esq.
          Suzzanne Uhland, Esq.
Tel:     (212) 326-2000
Fax:    (212) 326-2061


If to AAFAF, to:           Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn:    Christian Sobrino Vega, Executive Director

                – with a copy to –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn:    John Rapisardi, Esq.
          Suzzanne Uhland, Esq.
Tel:     (212) 326-2000
Fax:    (212) 326-2061

## 29.     Term of Injunctions or Stays

Unless otherwise provided in the Plan of Adjustment or in the Confirmation Order, all injunctions or stays in effect in the Title III Case (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan of Adjustment or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan of Adjustment or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 30.    Entire Agreement

Except as otherwise indicated, the Plan of Adjustment supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan of Adjustment.

### 31.    Plan Supplement

All documents included in the Plan Supplement are incorporated into and are a part of the Plan of Adjustment as if set forth in full in the Plan of Adjustment.  Upon the filing of the Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel at the address above or by downloading such documents from [https://cases.primeclerk.com/puertorico/] or the Title III Court's website, available via PACER.  Unless otherwise ordered by the Title III Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the Plan of Adjustment that does not constitute the Plan Supplement, such part of the Plan of Adjustment that does not constitute the Plan Supplement shall control; *provided*, *however*, that, with respect to matters governed by the New Bond Indenture, to the extent that any provisions of the Plan of Adjustment are inconsistent with the New Bond Indenture, the New Bond Indenture shall control.

## VII.    <u>Confirmation of the Plan of Adjustment</u>

### A.    Confirmation Hearing

PROMESA and the Bankruptcy Code require the Title III Court, after notice, to conduct a Confirmation Hearing at which it will hear arguments in support of the Plan of Adjustment, any objections to the Plan of Adjustment, and consider evidence with respect to whether the Plan of Adjustment should be confirmed.  At the Confirmation Hearing, the Title III Court will confirm the Plan of Adjustment only if all of the requirements of section 314 of PROMESA described below are met.

On [__], the Title III Court entered the Scheduling Order. By the Scheduling Order, the Title III Court scheduled various deadlines and events relating to the confirmation of the Plan of Adjustment.  In particular, the Scheduling Order provides that the Confirmation Hearing will begin on [__] (prevailing Atlantic Time) before the Honorable Laura Taylor Swain, United States District Judge, [__COURTROOM LOCATION__]. The Confirmation Hearing may be adjourned from time to time by the Title III Court or the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B.    Deadlines to Object to Confirmation

The Scheduling Order establishes the following deadlines with respect to objections to the Plan of Adjustment:

- [__] is the deadline for parties other than individual bondholders (but including any bond insurers that may hold bonds) and individual retirees to file objections to the Plan of Adjustment;

- [__] is the deadline for individual bondholders (not including any bond insurers that may hold bonds) and individual retirees to file objections to the Plan of Adjustment; and

- [__] is the deadline for any party that filed a timely objection to the Plan of Adjustment to file a supplemental objection, but only to the extent that discovery, or the results of plan voting, give rise to additional or modified objections to the Plan of Adjustment.

Objections to the confirmation of the Plan of Adjustment must: (1) be in writing; (2) state the name and address of the objecting party and the nature of the Claim of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Title III Court, and served on the following parties so that they are received no later than the applicable deadline set forth above:

(a) the Office of the United States Trustee for the District of Puerto Rico, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, PR 00901 (re: In re: Commonwealth of Puerto Rico);

(b) attorneys for the Oversight Board as representative of COFINA, Proskauer Rose LLP, 11 Times Square, New York, New York 10036, Attn: Martin J. Bienenstock, Esq., and Brian Rosen, Esq.;

(c) co-attorneys for the Oversight Board as representative of COFINA, O'Neill & Borges LLC, 250 Muñoz Rivera Ave., Suite 800, San Juan, PR 00918- 1813, Attn: Hermann D. Bauer, Esq.;

(d) the attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, Attn: John J. Rapisardi, Esq., Suzzanne Uhland, Esq., and Diana M. Perez, Esq.;

(e) the attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, Marini Pietrantoni Muniz, LLC, Luis C. Marini-Biaggi, Esq., MCS Plaza, Suite 500, 255 Ponce de León Ave., San Juan P.R. 00917;

(f) the attorneys for the Official Committee of Unsecured Creditors, Paul Hastings LLP, 200 Park Ave., New York, NY 10166, Attn: Luc A. Despins, Esq., Andrew V. Tenzer, Esq., Michael E. Comerford, Esq., and G. Alexander Bongartz, Esq.;

(g) those creditors holding the 20 largest unsecured claims against COFINA (on a consolidated basis);

101361236v22

(h) the attorneys for the Official Committee of Unsecured Creditors, Casillas, Santiago & Torres LLC, El Caribe Office Building, 53 Palmeras Street, Ste. 1601, San Juan, PR 00901, Attn: Juan J. Casillas Ayala, Esq. and Alberto J.E. Añeses Negrón, Esq.;

(i) the attorneys for the Official Committee of Retired Employees, Jenner & Block LLP, 919 Third Ave., New York, NY 10022, Attn: Robert Gordon, Esq. and Richard Levin, Esq., and Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60654, Attn: Catherine Steege, Esq. and Melissa Root, Esq.;

(j) the attorneys for the Official Committee of Retired Employees, Bennazar, García & Milián, C.S.P., Edificio Union Plaza, PH-A, 416 Ave. Ponce de León, Hato Rey, PR 00918, Attn: A.J. Bennazar- Zequeira, Esq.;

(k) all parties that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure;

(l) the attorneys for Ambac, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005, Attn: Dennis Dunne, Esq. and Atara Miller, Esq.;

(m) the attorneys for Assured, Cadwalader, Wickersham & Taft, 200 Liberty Street, New York, NY 10281, Attn: Mark Ellenberg, Esq., Lary Stromfeld, Esq., Ivan Loncar, Esq., and Casey Servais, Esq.;

(n) the attorneys for National, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Marcia L. Goldstein, Esq. and Gabriel Morgan, Esq.;

(o) the attorneys for the COFINA Senior Bondholders' Coalition, Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, New York, NY 10010, Attn: Susheel Kirpalani, Esq. and Eric Kay, Esq.;

(p) the attorneys for Oppenheimer and the First Puerto Rico Family of Funds, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Thomas Moers Mayer, Esq., Amy Caton, Esq., and Douglas Buckley, Esq.;

(q) the attorneys for GSAM, McDermott, Will & Emery LLP, 444 West Lake Street, Chicago, IL 60606, Attn: William P. Smith, Esq., David L. Taub, Esq., and Alexandra C. Scheibe, Esq.;

(r) the attorneys for the Puerto Rico Funds, White & Case LLP, 200 South Biscayne Boulevard, Miami, FL 33131, Attn: John K. Cunningham, Esq. and Fernando de la Hoz, Esq.;

(s) the attorneys for Bonistas del Patio, Inc., Davis, Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Donald Bernstein, Esq. and Brian Resnick, Esq.;

(t) the attorneys to certain of the Insured Senior Holders, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Lawrence A. Larose, Esq. and Eric Daucher, Esq.;

(u) the attorneys to GoldenTree Asset Management LP, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.;

(v) the attorneys to Tilden Park Capital Management LP, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandy Qusba, Esq. and Nicholas Baker, Esq.;

(w) the attorneys to Whitebox Advisors LLC, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038, Attn: Daniel A. Fliman, Esq.; and

(x) the attorneys for Aurelius and Six PRC, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn: Andrew N. Rosenberg, Esq.

For purposes of filing objections in these cases, the address of the Title III Court is: United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl St., Suite No. 3212, New York, New York 10007-1312

## C.  Requirements for Confirmation of the Plan of Adjustment

Pursuant to PROMESA section 312(a), only the Oversight Board may file a plan of adjustment on behalf of the debtor upon the issuance of a certificate under PROMESA section 104(j).[17]   The Plan of Adjustment must comply with other provisions of PROMESA section 314(b), including the applicable provisions of Bankruptcy Code section 1129(b), as follows:

- The Plan of Adjustment must comply with the provisions of the Bankruptcy Code made applicable by PROMESA section 301 (PROMESA section 314(b)(1));

- The Plan of Adjustment must comply with the provisions of PROMESA Title III (PROMESA section 314(b)(2));

- COFINA must not be prohibited by law from taking any action necessary to carry out the Plan of Adjustment (PROMESA section 314(b)(3));

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan of Adjustment must provide that on the Effective Date each holder of a claim of a kind specified in 507(a)(2) of the Bankruptcy Code will receive on account of such claim cash equal to the allowed amount of such claim (PROMESA section 314(b)(4));

- Any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the Plan of Adjustment must be obtained, or such provision must be expressly conditioned on such approval (PROMESA section 314(b)(5));

---

[17] PROMESA section 104(j) provides that before filing a plan of adjustment on behalf of the debtor, the Oversight Board must certify the plan of adjustment.  To certify the plan of adjustment, the Oversight Board must determine, in its sole discretion, that the plan of adjustment is consistent with the applicable certified fiscal plan.

- The Plan of Adjustment must be consistent with the fiscal plan certified by the Oversight Board for COFINA under title II (PROMESA section 314(b)(7));

- COFINA, as the proponent of the Plan of Adjustment by and through the Oversight Board, must have complied with all provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)); PROMESA section 301(a); and

- The Plan of Adjustment must have been proposed in good faith and not by any means forbidden by law (11 U.S.C. § 1129(a)(3); PROMESA section 301(a)).

Moreover, with respect to classification of claims, PROMESA section 301(e) provides that in determining whether claims are substantially similar for the purpose of Bankruptcy Code section 1122, the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims.

At the Confirmation Hearing, the Title III Court will determine whether the Plan of Adjustment satisfies the requirements of Title III of PROMESA. The Debtor believes that the Plan of Adjustment will satisfy all of the applicable statutory requirements of PROMESA and the Bankruptcy Code. Among the requirements for confirmation are that the Plan of Adjustment (1) is accepted by the requisite holders of all impaired Classes of Claims or, if not so accepted, is accepted by at least one impaired Class of Claims, is "fair and equitable", and does not discriminate unfairly as to the non-accepting class, (2) is in the "best interests" of creditors, which requires the Title III Court to consider whether available remedies under the non-bankruptcy laws and Puerto Rico Constitution would result in a greater recovery for the creditors than is provided by the Plan of Adjustment (3) is feasible, and (4) complies with the applicable provisions of PROMESA and the Bankruptcy Code.

## 1.    General Requirements for Confirmation

A plan is accepted by an impaired class of claims if holders of two-thirds in dollar amount and a majority in number of allowed claims of that class vote to accept the plan of adjustment. Only those holders of claims who actually vote to accept or reject the plan count in the tabulation. All impaired classes must accept the plan in order for the plan to be confirmed without application of the "cramdown" test contained in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code. For additional information on "cramdown," *see* "Cramdown" below.

### (a)    *The Plan of Adjustment Complies with Applicable Provisions of the Bankruptcy Code*

The Plan of Adjustment must comply with the provisions of the Bankruptcy Code made applicable by PROMESA section 301. These requirements include:

- COFINA, as the proponent of the Plan of Adjustment by and through the Oversight Board, must have complied with all provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)); PROMESA section 301(a); and

- The Plan of Adjustment must have been proposed in good faith and not by any means forbidden by law (11 U.S.C. § 1129(a)(3); PROMESA section 301(a)).

The Debtor believes that the Plan of Adjustment satisfies these requirements.

### (b)     *The Plan of Adjustment is Consistent with the Fiscal Plan*

PROMESA section 314(b)(7) requires that the Plan of Adjustment be consistent with the Fiscal Plan certified by the Oversight Board.  The Debtor believes that the Plan of Adjustment is consistent with the Fiscal Plan, and the Oversight Board has certified that the Plan of Adjustment is indeed consistent with the Fiscal Plan pursuant to PROMESA section 104(j).

### (c)     *The "Best Interests of Creditors" Test*

Notwithstanding acceptance of the Plan of Adjustment by each impaired Class of Claims, the Title III Court also must determine that the Plan of Adjustment is in the best interests of creditors pursuant to section 314(b)(6) of PROMESA. To satisfy this "best interests of creditors" test under PROMESA, a debtor must establish that confirmation of its proposed plan of adjustment, more likely than not, would leave the debtor's creditors as a whole in a better position than would dismissal of the debtor's title III case. Because the failure of plan confirmation and dismissal of a debtor's Title III case, in most instances, would result in a race to the courthouse that could leave many creditors with no recovery at all, the best interests of creditors test is a flexible standard that is less stringent than a test requiring that a plan be "fair and equitable."

The Debtor believes that the Plan of Adjustment satisfies the best interest of creditors test set forth in section 314(b)(6) of PROMESA.  Confirmation of the Plan of Adjustment relieves COFINA of a substantial portion of its debt burden (in excess of $5 billion in face amount of debt and more than $32 billion in nominal debt service over the next 40 years) and resolves the risk of non-payment to holders of Existing Securities posed by the Commonwealth-COFINA Dispute.  It also ensures that COFINA will be able to service the COFINA Bonds through its ownership of the COFINA Portion, an ownership that will be authorized under the Confirmation Order and the New Legislation. In the absence of confirmation of the Plan of Adjustment, and the various interrelated settlements and compromises reflected in the Plan of Adjustment, COFINA and its stakeholders would be faced with a return to the complex, protracted, and novel litigation of the Commonwealth-COFINA Dispute, which threatened the very foundation of COFINA to service its Existing Securities.

The foregoing demonstrates the simple proposition that prompted COFINA's Title III filing in the first instance: *there is no non-restructuring solution to the problems facing COFINA and its stakeholders*.  The Plan of Adjustment embodies COFINA's attempt to provide claimants with the highest possible recovery (consistent with their relative rights against COFINA) while resolving the litigation that threatens COFINA's ability to pay its debts.  Accordingly, the Debtor believes that the Plan of Adjustment provides a better outcome than creditors could have achieved, as a whole, outside of the Title III Case and, thus, satisfies the "best interest of creditors" test set forth at section 314(b)(6) of PROMESA.

### (d)    *Feasibility*

Section 314(b)(6) also requires that a plan of adjustment be feasible. While the best interests of creditors test establishes a "floor" with respect to how much a debtor can be expected to pay creditors under a plan of adjustment, the feasibility standard of section 314(b)(6) of PROMESA imposes a "ceiling" on creditor recoveries under such a plan of adjustment. To satisfy the feasibility requirement, a municipal debtor must generally demonstrate, by a preponderance of the evidence, that it has the ability to make the payments set forth in the proposed plan of adjustment while also maintaining sufficient assets to (i) provide adequate levels of governmental services, (ii) fund normal operations, and (iii) remain financially viable after the conclusion of the Title III case and during the contemplated payment period.

To determine whether a proposed plan of adjustment satisfies the feasibility standard of section 314(b)(6) of PROMESA, a court must analyze the debtor's income and expense projections. A plan of adjustment is feasible if the debtor's income and expense projections (i) are realistic, reliable and not unreasonably optimistic and (ii) the plan is workable and appears to have a reasonable prospect of success; *i.e.*, it appears reasonably probable that the debtor will be able to make the payments to creditors contemplated in the plan of adjustment while maintaining adequate levels of services.  Because COFINA is a securitization vehicle that never provided services to Commonwealth residents beyond its financing function, the Title III Court need only (i) determine whether COFINA's projected revenues and expenses are reasonable, and (ii) if so, decide whether COFINA will be able to make the contemplated payments under the Plan of Adjustment while avoiding a recurrence of the type of financial distress that caused it to commence its Title III case.

For purposes of determining whether the Plan of Adjustment meets this requirement, COFINA has prepared financial projections (as set forth in greater detail in Section [XI.B, "COFINA Fiscal Plan and Projections"] and Exhibit E) that demonstrate, as a result of COFINA's ownership of the COFINA Portion, COFINA's ability to fulfill its obligations under the Plan of Adjustment during that period.  The Debtor believes that its financial projections (and its underlying assumptions) are reasonable and demonstrate a probability that COFINA will be able to satisfy its obligations under the Plan of Adjustment.  Accordingly, the Debtor believes that the Plan of Adjustment meets the feasibility requirement of section 314(b)(6) of PROMESA.

### (e)    *Cramdown*

PROMESA and the Bankruptcy Code provide that the Title III Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired class of claims accepts the plan and the so-called "cramdown" provisions set forth in sections 1129(b)(l), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied.  The plan of adjustment may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 314(b) of PROMESA, it (i) is "fair and equitable" and (ii) does not discriminate unfairly with respect to each class of claims that is impaired under and has not accepted the plan of adjustment.  To the extent that any impaired Classes of Claims do not accept the Plan of Adjustment under section 1126(c) of the Bankruptcy Code, the Debtor believes that the Plan of Adjustment and the treatment of all Classes of Claims under the Plan of Adjustment satisfy the following requirements for nonconsensual confirmation of the Plan of Adjustment.

i.     "Fair and Equitable"

Uncertainty exists as to the contours of the "fair and equitable" requirement in Title III. Outside of the context of Title III, the "fair and equitable" requirement generally requires, among other things, that, unless a dissenting unsecured class of claims receives payment in full for its allowed claims, no holder of allowed claims in any class junior to that class may receive or retain any property on account of such claims. This is known as the "absolute priority rule." Few published opinions have addressed the meaning of the "fair and equitable" requirement in chapter 9 cases.  Courts have held that the "fair and equitable" requirement in chapter 9 cases is understood as requiring that, where a debtor seeks nonconsensual confirmation of a plan of adjustment, the impaired creditors of such debtor, under the proposed plan of adjustment, will receive all that they can reasonably expect under the circumstances.

With respect to holders of secured claims, the "fair and equitable" requirement generally requires that secured claimholders (1)(a) retain the liens securing their claims to the extent of the allowed amount of such claim and (b) receive deferred cash payments totaling at least the allowed amount of their claims, of a value, as of the effective date of the plan of adjustment, of at least the value of such creditors' interest in the debtor's interest in the collateral securing the creditors' claim, or (ii) for the realization by such holders of the indubitable equivalent of such creditors' claims.  Under the Plan of Adjustment and the Confirmation Order, COFINA will be the owner of the COFINA Portion and holders of COFINA Bonds will receive a statutory lien against the COFINA Portion and deferred cash payments on account of the COFINA Bonds of substantially all the value of the COFINA Assets.

Accordingly, the Debtor believes that the Plan is "fair and equitable" with respect to holders of Claims against COFINA as it provides such holders of Claims with all they reasonably can expect under the circumstances of COFINA's Title III Case.  In the absence of confirmation, COFINA and its stakeholders would be faced with a return to litigation of the Commonwealth-COFINA Dispute.  Under the circumstances, the Debtor does not believe that it could provide holders of Claims with greater recoveries while also settling the Commonwealth-COFINA Dispute and addressing the risk that litigation posed to COFINA and its stakeholders.

ii.     Unfair Discrimination

A plan of adjustment does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims. The Plan of Adjustment provides relative recoveries to holders of Allowed Claims in a manner consistent with the legal rights and entitlements of creditors under applicable law, including whether such claims are secured and whether such claims have priority over other claims.  The Debtor believes that the Plan of Adjustment does not unfairly discriminate against any impaired Class of Claims.

**IN THE EVENT OF REJECTION OF THE PLAN OF ADJUSTMENT BY ONE OR MORE IMPAIRED CLASSES, THE DEBTOR RESERVES THE RIGHT TO REQUEST THE TITLE III COURT TO CONFIRM THE PLAN OF ADJUSTMENT IN ACCORDANCE WITH PROMESA AND SECTION 1129(b)(1), (b)(2)(A) AND (b)(2)(B) OF THE BANKRUPTCY CODE.  THE**

**DEBTOR, SUBJECT TO THE PRIOR WRITTEN CONSENT OF THE PSA CREDITOR PARTIES, HAS RESERVED THE RIGHT TO MODIFY THE PLAN OF ADJUSTMENT TO THE EXTENT, IF ANY, THAT CONFIRMATION OF THE PLAN OF ADJUSTMENT UNDER SECTION 314 OF PROMESA AND SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES MODIFICATION.**

### 2.      Alternatives to Confirmation and Consummation of the Plan

The Debtor has evaluated numerous alternatives to the Plan of Adjustment, which is premised and conditioned upon approval and effectiveness of the Settlement Agreement, including alternative structures and terms of the Plan of Adjustment and delaying the adoption thereof.  While the Debtor has concluded that the Plan of Adjustment is the best alternative and will maximize recoveries by holders of Allowed Claims against COFINA, if the Plan of Adjustment is not confirmed, the Debtor could attempt to formulate and propose a different plan of adjustment. The Plan of Adjustment was formulated after months of difficult negotiations among numerous creditor constituencies, including in connection with numerous mediation sessions ordered by the Title III Court (*see* Section [____]).  Under the circumstances, the Debtor believes that the Plan of Adjustment provides the greatest and earliest possible recoveries to Creditors and that acceptance and confirmation of the Plan of Adjustment and approval of the Settlement Agreement are in the best interests of the Debtor and all Creditors. The Debtor further believes that any alternative to the Plan of Adjustment would result in unnecessary delay, uncertainty, litigation, and expense, the net effect of which would result in recoveries to Creditors less than the distributions to be made to Creditors under the Plan of Adjustment.  The Debtor, therefore, believes that confirmation and consummation of the Plan of Adjustment is preferable to potential alternatives.

### VIII.   COFINA BondsGeneral

The COFINA Bonds and the COFINA Parity Bonds will be issued pursuant to the terms and provisions of the New Bond Indenture and will be distributed as set forth in the Plan of Adjustment.  As described below under the caption "COFINA Parity Bonds", COFINA may issue additional bonds for refunding or refinancing purposes only to the extent permitted by the New Bond Indenture, secured and payable on a *pari passu* basis with the COFINA Bonds (the "COFINA Parity Bonds").  The definitive documentation governing the COFINA Bonds and the COFINA Parity Bonds shall generally provide for the terms set forth in this summary, subject to the results of any election permitted by the Plan of Adjustment, such as the Junior COFINA Bond Claim (Taxable Election) and the Senior COFINA Bond Claim (Taxable Election) and other adjustments permitted or required by the Plan of Adjustment. This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the COFINA Bonds, the New Bond Indenture and the Plan of Adjustment.

On the Effective Date, COFINA shall issue the COFINA Bonds as (i) four (4) series of CIBs and (ii) four series of CABs.  The COFINA Bonds will be dated as of August 1, 2018 and will accrue or accrete interest, as applicable, from such date.

101361236v22

*CIBs.*  The CIBs will mature on July 1 of the years, in the principal amounts and bear interest at the rates set forth below:

| Maturity | Principal Amount | Interest Rate |
|---|---|---|
| 2034 | $   375,090,000 | 4.50% |
| 2040 | 2,996,115,000 | 4.55 |
| 2053 | 1,451,135,000 | 4.75 |
| 2058 | 4,297,080,000 | 5.00 |

Interest on the CIBs will be paid on the Effective Date and on each July 1 and January 1 thereafter (each such date an "Interest Payment Date").  Interest on the CIBs will be computed on the basis of a 360-day year consisting of twelve 30-day months.  The CIBs will be issued as fully registered bonds in denominations of $1,000 or any integral multiples thereof.

*CABs.*  The CABs will mature on July 1 of the years, in the principal amounts and accrete at the rates set forth below:

| Maturity | Initial Issuance Amount | Accretion Rate |
|---|---|---|
| 2027 | $   422,356,575.15 | 4.00% |
| 2033 | 723,876,898.70 | 4.65 |
| 2049 | 1,510,823,428.75 | 5.46 |
| 2051 | 244,235,233.70 | 5.50 |

If any such Interest Payment Date or maturity date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of the delay.

**B.  Redemption**

        **(a)  *Optional Redemption***

The COFINA Bonds maturing on July 1, 2027 are not subject to redemption at the election or direction of COFINA prior to maturity.

The COFINA Bonds, other than the COFINA Bonds maturing on July 1, 2027, are subject to redemption prior to maturity, at the election or direction of COFINA, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, during the periods and at the redemption prices set forth below:

| Maturity | Redemption Period | Redemption Price |
|---|---|---|
| July 1, 2034 | On or after July 1, 2025 | 100% |
| July 1, 2040, | | |

131

| July 1, 2053 and July 1, 2058 | On or after July 1, 2028 | 100% |
|---|---|---|
| July 1, 2033 | July 1, 2028 through June 30, 2030 | 107.5% of Accreted Value |
| | July 1, 2031 through June 30, 2032 | 105% of Accreted Value |
| | July 1, 2032 through June 30, 2033 | 103% of Accreted Value |
| July 1, 2049 and July 1,2051 | July 1, 2028 through June 30, 2032 | 107.5% of Accreted Value |
| | July 1, 2032 through June 30, 2037 | 105% of Accreted Value |
| | July 1, 2037 through June 30, 2042 | 103% of Accreted Value |
| | On or after July 1, 2042 | 100% of Accreted Value |

**(b)**   ***Mandatory Redemption***

The COFINA Bonds maturing on July 1, 2034, July 1, 2040, July 1, 2053 and July 1, 2058 are subject to mandatory redemption prior to maturity, by lot, in such manner as the Trustee may reasonably determine, at a redemption price of 100% of the principal amount thereof, plus accrued or accreted interest:

**COFINA Bonds**
**maturing July 1, 2034**

| Year | Amount |
|---|---|
| 2033 | $ 52,970,000 |
| 2034[†] | 322,120,000 |

[†] Final maturity.

**COFINA Bonds**
**maturing July 1, 2040**

| Year | Amount |
|---|---|
| 2035 | $366,885,000 |
| 2036 | 415,060,000 |
| 2037 | 466,685,000 |
| 2038 | 521,965,000 |
| 2039 | 581,125,000 |
| 2040[†] | 644,395,000 |

[†] Final maturity.

**COFINA Bonds**
**maturing July 1, 2053**

| Year | Amount |
|---|---|
| 2052 | $708,735,000 |
| 2053[†] | 742,400,000 |

[†] Final maturity.

**COFINA Bonds**
**maturing July 1, 2058**

| Year | Amount |
|---|---|
| 2054 | $777,665,000 |
| 2055 | 816,545,000 |
| 2056 | 857,375,000 |
| 2057 | 900,240,000 |

2058[†]                    945,255,000

[†] Final maturity.

### COFINA Bonds
### maturing July 1, 2027

| Year | Accreted Value |
| --- | --- |
| 2019 | $ 19,609,604.80 |
| 2021 | 17,476,880.85 |
| 2022 | 35,660,179.80 |
| 2023 | 54,563,615.70 |
| 2024 | 74,225,412.30 |
| 2025 | 94,679,742.40 |
| 2026 | 115,939,925.00 |
| 2027[†] | 138,060,000.00 |

[†] Final maturity.

### COFINA Bonds
### maturing July 1, 2027

| Year | Accreted Value |
| --- | --- |
| 2019 | $ 19,609,604.80 |
| 2021 | 17,476,880.85 |
| 2022 | 35,660,179.80 |
| 2023 | 54,563,615.70 |
| 2024 | 74,225,412.30 |
| 2025 | 94,679,742.40 |
| 2026 | 115,939,925.00 |
| 2027[†] | 138,060,000.00 |

[†] Final maturity.

### COFINA Bonds
### maturing July 1, 2033

| Year | Accreted Value |
| --- | --- |
| 2028 | $161,061,688.80 |
| 2029 | 184,983,293.00 |
| 2030 | 209,867,262.00 |
| 2031 | 235,734,069.60 |
| 2032 | 262,649,025.35 |
| 2033[†] | 237,660,000.00 |

[†] Final maturity.

### COFINA Bonds
### maturing July 1, 2049

| Year | Accreted Value |
| --- | --- |
| 2041 | $708,734,290.05 |
| 2042 | 708,736,860.30 |
| 2043 | 708,731,972.10 |
| 2044 | 708,735,502.80 |
| 2045 | 708,735,564.00 |
| 2046 | 708,733,948.50 |
| 2047 | 708,734,769.60 |
| 2048 | 708,734,235.75 |
| 2049[†] | 708,735,000.00 |

[†] Final maturity.

**COFINA Bonds**
**maturing July 1, 2051**

| Year | Accreted Value |
|------|----------------|
| 2050 | $708,732,170.90 |
| 2051[†] | 708,735,000.00 |

[†] Final maturity.

**(c)**     *__Selection of COFINA Bonds to be Redeemed from Sinking Fund Installments__*

If less than all of the COFINA Bonds of a single maturity and tenor are to be redeemed, the particular COFINA Bonds of such maturity to be redeemed shall be selected by lot by Depository Trust Company, on behalf of the Trustee.

**(d)**     *__Purchase of COFINA Bonds__*

COFINA may, at any time subsequent to the first day of any Fiscal Year but in no event less than thirty-five (35) days prior to the succeeding date on which a Sinking Fund Installment is scheduled to be due, direct the Trustee to purchase, with money on deposit in the Debt Service Fund, at a price not in excess of par plus interest accrued and unpaid to the date of such purchase, COFINA Bonds to be redeemed from such Sinking Fund Installment. The principal amount of each COFINA Bond so canceled will be credited against the Sinking Fund Installment due on such date.

**(e)**     *__Notice of Redemption__*

When COFINA Bonds are to be redeemed, the Trustee will give notice of the redemption of the COFINA Bonds in the name of COFINA which notice will specify the COFINA Bonds to be redeemed, the maturity dates and interest rates of the COFINA Bonds to be redeemed and the date such COFINA Bonds were issued; the numbers and other distinguishing marks of the Bonds to be redeemed, including CUSIP numbers; the redemption date; the Redemption Price, if then known; and the principal amount of each Bond to be redeemed. If COFINA's obligation to redeem the COFINA Bonds is subject to conditions, the notice will include a statement to that effect and of the conditions to such redemption. Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each COFINA Bond to be redeemed the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, and that, from and after such date, payment having been made or provided for, interest thereon shall cease to accrue.

The Trustee will give notice by mailing a copy of such notice not less than thirty (30) days (or such shorter period if then permitted by DTC) nor more than 60 days prior to the redemption date by mail, to the registered owners of the COFINA Bonds which are to be redeemed, at their last known addresses appearing on the registration books not more than ten Business Days prior to the date such notice is given. The failure of any Holder of a COFINA Bond to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the COFINA Bonds.

134

(f)   *__Payment of Redeemed Bonds__*

Notice having been given by mail in the manner described above, the COFINA Bonds or portions thereof so called for redemption will become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, and, upon presentation and surrender of such COFINA Bonds, at the office or offices specified in such notice, such COFINA Bonds, or portions thereof, shall be paid at the Redemption Price, plus interest accrued and unpaid to the redemption date.  If there is called for redemption less than all of the principal amount of a COFINA Bond, COFINA will execute and the Trustee will authenticate and deliver, upon the surrender of such COFINA Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the registered COFINA Bond so surrendered, COFINA Bonds of like maturity and tenor in any of the authorized denominations. If, on the redemption date, money for the redemption of all COFINA Bonds or portions thereof of any like maturity and tenor to be redeemed, together with interest accrued and unpaid thereon to the redemption date, shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as described above, then, from and after the redemption date, interest on the COFINA Bonds or portions thereof so called for redemption shall cease to accrue and such COFINA Bonds shall no longer be considered to be Outstanding under the Indenture.  If such money is not available on the redemption date, such COFINA Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

## C.   Collateral for Repayment of COFINA Bonds

 Repayment of the COFINA Bonds from the COFINA Revenues, as defined below, shall be secured by a statutory first lien on the COFINA Pledged Taxes, as defined below, to the extent of the COFINA Revenues`, subject to the "Substitution of Collateral" provisions described below.  Such lien shall (i) remain in effect and (ii) be closed until, in each case, the COFINA Bonds have been paid or satisfied in full in accordance with their terms.

"COFINA Pledged Taxes" shall mean the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).

"COFINA Revenues" shall mean the COFINA Pledged Taxes and all rights thereto including, without limitation, the right to receive the COFINA Pledged Taxes pursuant to the First Dollars Funding in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the Pledged Sales Tax Base Amount, as defined below, in any given Fiscal Year.

"PSTBA" or "Pledged Sales Tax Base Amount" shall mean the annual dollar amounts determined for each Fiscal Year of the Commonwealth in accordance with Section 3 of Act No. 91-2006 of the Commonwealth, as amended.

Until the COFINA Bonds have been paid or satisfied in full in accordance with their terms, the COFINA Revenues shall be funded annually from "first dollars" collected from the COFINA Pledged Taxes, subject to the qualifications provided in section 16.5 of the Plan of Adjustment.

135

For more information, please refer to Section [IV.F.4] of this Disclosure Statement.

**D.      Statutory Lien**

The New Bond Legislation provides that the COFINA Bonds shall be secured by a statutory first lien on all of COFINA's right, title and interest in and to the COFINA Pledged Taxes.  The statutory first lien shall automatically attach from the time such obligations are issued without further action or authorization by COFINA or any other entity, person, governmental authority or officer.  The statutory lien shall be valid and binding from the time such obligations are executed and delivered and the statutory lien shall automatically be effective, binding and enforceable against all Persons having claims of any kind in tort, contract or otherwise against COFINA or its assets irrespective of whether such Persons have notice of such lien.

**E.      Application of COFINA Revenues**

Promptly (and in no event later than two Business Days) following the deposit of the COFINA Pledged Taxes into the COFINA Revenue Fund, the Trustee shall withdraw from the COFINA Revenue Fund and transfer and apply such amounts as follows and in the following order of priority:

*First*:  To the Interest Account of the Debt Service Fund in each Fiscal Year, an amount equal to the Interest Funding Requirement for such Fiscal Year (net of investment earnings that are on deposit therein);

*Second*:  To the Principal Account of the Debt Service Fund in each Fiscal Year, an amount equal to the Principal Funding Requirement for such Fiscal Year (net of investment earnings that are on deposit therein);

*Third*:  Upon the direction of an Authorized Officer of COFINA, to the Arbitrage Rebate Fund the amount set forth in such direction;

*Fourth*:  To the Operating Fund in each Fiscal Year the amount necessary such that, taking into account funds on deposit therein, the total amount deposited in the Operating Fund in such Fiscal Year, equals the Operating Cap;

*Fifth*: Upon the direction of COFINA, to the Debt Retirement Fund, the amount set forth in such direction; and

*Sixth*:  To the Remainder Fund, any remaining balance.

"Interest Funding Requirement" means, for each Fiscal Year, 100% of the interest due and payable on all Outstanding Bonds in such Fiscal Year and on the next succeeding July 1, including any interest unpaid from prior Fiscal Year calculated based on a 360-day year consisting of twelve (12) 30-day months.

"Principal Funding Requirement" means, for each Fiscal Year, an amount equal to the sum of the principal and Sinking Fund Installments due on all Outstanding Bonds in such Fiscal

136

Year and on the next succeeding July 1, including any principal and Sinking Fund Installments unpaid from prior Fiscal Years.

## F.    Refunding Bonds

### (a)    *COFINA Parity Bonds*

COFINA may issue COFINA Parity Bonds to refund or refinance the COFINA Bonds or other COFINA Parity Bonds provided, that (i) notwithstanding the terms of such COFINA Parity Bonds, COFINA shall not be entitled to an increase of the COFINA Revenues; (ii) the principal and interest payment dates on the COFINA Parity Bonds shall be the same principal and interest payments dates on the 2018 COFINA Bonds; (iii) the final maturity date of the COFINA Parity Bonds shall not be later than July 1, 2058; and (iv) upon the issuance of any COFINA Parity Bonds:

> (a)    principal and interest due in the then-current and each future Fiscal Year on all COFINA Bonds outstanding immediately after the issuance of such COFINA Parity Bonds shall be equal to or less than the annual debt service due in the then-current and each future Fiscal Year on all COFINA Bonds outstanding immediately prior to such issuance; and

> (b)    as set forth in the New Bond Indenture, Debt Service Savings shall only be realized in the same Fiscal Years in which principal of the COFINA Bonds were refunded and/or purchased.

### *Additional Indebtedness*

COFINA reserves the right to incur additional indebtedness pursuant to a separate bond resolution or bond indenture provided that such additional indebtedness is incurred in compliance with Section __ of the Plan of Adjustment and is authorized by the Commonwealth Legislature, which legislation establishes the terms of such additional indebtedness and the purposes for which the proceeds of such additional indebtedness will be used. Such additional indebtedness shall not be secured by nor shall such indebtedness be payable from the trust estate securing the COFINA Bonds.

## G.    Certain Covenants of the Government

### (a)    *Sales and Use Taxes*

The COFINA Act provides that until all obligations with respect to the COFINA Bonds and the COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, the rate of the COFINA Pledged Taxes from which the PSTBA is derived shall not be reduced to a rate less than five and one-half percent (5.5%) unless, on each such occasion prior to such reduction, at least two (2) of the following four (4) nationally recognized statistical rating organizations then in existence and rating the COFINA Bonds: S&P Global Ratings, Moody's Investor Service, Inc., Fitch Ratings and Kroll Bond Rating Agency Inc., or their respective successors, with one (1) of such organizations being S&P Global Ratings or Moody's Investor Service, Inc., or its respective successor, confirm that ratings will not be downgraded and

137

(without regard to bond insurance or other third party credit enhancement) will be rated at least A2/A category or higher following such reduction, subject to the qualifications provided in section 16.6(a) of the Plan of Adjustment.

(b) <strong><em>Non-Impairment Covenant</em></strong>

The COFINA Act authorizes the inclusion in the New Bond Indenture of the covenant of the Government that, until all obligations with respect to the COFINA Bonds and the COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, the Government will take no action that would (a) impair COFINA's right to receive the COFINA Revenues, (b) limit or alter the rights vested in COFINA in accordance with the Plan of Adjustment and the Confirmation Order, to fulfill the terms of any agreements with the holders of COFINA Bonds and the COFINA Parity Bonds, (c) materially adversely impair the collection of the COFINA Pledged Taxes in any Fiscal Year, or (d) impair the rights and remedies of the holders of the COFINA Bonds and the COFINA Parity Bonds or the collateral security thereof.

(c) <strong><em>Substitution of Collateral</em></strong>

The Government may enact legislation that permits a Commonwealth revenue stream to replace the COFINA Pledged Taxes as security for the repayment of the COFINA Bonds and the COFINA Parity Bonds only upon, and on each such occasion, satisfaction of the following conditions:

(a) such Substituted Collateral is all or a portion of a tax of general applicability throughout Puerto Rico that is being enacted in full substitution of the then-existing island-wide sales and use tax or otherwise constitutes like or comparable security for the COFINA Bonds and the COFINA Parity Bonds and such legislation provides:

(i) for the irrevocable transfer of, including ownership of, such Substituted Collateral to COFINA;

(ii) for an automatic mandatory statutory lien on such Substituted Collateral in favor of holders of COFINA Bonds and the COFINA Parity Bonds; and

(iii) that, following such transfer, such Substituted Collateral is not, and shall not constitute, "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution, and is otherwise owned by the Restructured COFINA in the same manner and to the same extent as the COFINA Revenues;

(b) upon substitution of the Substituted Collateral, that rating confirmations are received from at least two (2) of the following four (4) nationally recognized statistical rating organizations then in existence:  S&P Global Ratings, Moody's Investor Service, Inc., Fitch Ratings and Kroll Bond Rating Agency Inc., with one (1) of such organizations being either S&P Global Ratings or Moody's Investor Service, Inc., prior to such collateral substitution confirming that ratings for all COFINA Bonds (without regard to bond insurance or other third party credit enhancement) will not be downgraded and will be at least A2/A category or higher following such collateral substitution;

138

(c) the Government shall continue to provide the Non-Impairment Covenant with respect to such New Substituted Collateral; and

(d) such other documents as may be required pursuant to applicable law and bond resolutions.

    **(d)**    ***First Funding***

Section 401 of the COFINA Act provides that for each Fiscal Year, the first funds comprising the COFINA Pledged Taxes shall be transferred to, and deposited with, COFINA, or any account or fund (including the COFINA Revenue Fund or an account or fund controlled by the Trustee designated in the New Bond Indenture pursuant to which obligations were incurred in accordance with the COFINA Act and the Definitive Documents) designated by COFINA, until such time as the COFINA has received an amount equal to the COFINA Revenues for such Fiscal Year. The requirement that the first funds comprising the COFINA Pledged Taxes up to the COFINA Revenues be deposited with COFINA or in any account or fund (including the COFINA Revenue Fund or an account or fund controlled by the Trustee designated in the New Bond Indenture pursuant to which obligations were incurred in accordance with this Act and the Definitive Documents) designated by Reorganized COFINA may not be modified; provided, that the New Bond Indenture contains provisions allowing for the quarterly distribution of the COFINA Pledged Taxes between Reorganized COFINA and the Government of Puerto Rico upon satisfaction of the requirements set forth in the New Bond Indenture and consistent with the Plan of Adjustment. Reorganized COFINA shall have the rights set forth in Section 401 of the COFINA Act until such time as the COFINA Bonds and COFINA Parity Bonds, together with any interest thereon, and all obligations under all the Definitive Documents, have been completely paid in cash in full or have otherwise been discharged in accordance with their terms.

**H.**    **Certain Covenants of COFINA**

The New Bond Indenture will provide that COFINA will, among other things:

(a)     pay principal and interest on the COFINA Bonds in accordance with the terms thereof;

(b)     maintain the trust estate free and clear of any pledge, lien, charge or other encumbrance;

(c)     to the extent permitted by law, defend, preserve and protect the pledge of the trust estate and all of the rights of the Holders under the New Bond Indenture;

(d)     as far as authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all of the rights and pledges made under the New Bond Indenture;

(e)     keep proper books and records;

(f)     maintain in the Borough of Manhattan, in the City of New York, an office or agency where COFINA Bonds or the COFINA Parity Bonds may be presented or surrendered for payment, where COFINA Bonds or COFINA Parity Bonds may surrendered for registration of transfer or exchange and where notices and demands to or upon COFINA in respect of the COFINA Bonds, COFINA Parity Bonds and the New Bond Indenture may be serves and give prompt written notice to the Trustee of the location and of any change in the location of such office or agency;

(g)     prior to the start of each Fiscal Year, prepare a budget of operating expenses for COFINA for such Fiscal Year;

(h)     pay all taxes and assessments or other municipal or governmental charges, if lawfully levied or assessed upon the trust estate; and

(i)     do and perform or cause to be done and performed all things required to be done and performed by or on behalf of COFINA under the provisions of the New Bond Indenture.

Unless expressly permitted by the New Bond Indenture, COFINA will not, among other things:

(a)     indirectly extend or assent to the extension of the maturity of any of the COFINA Bonds and the COFINA Parity Bonds;

(b)     except as permitted in the Plan of Adjustment and in the New Bond Indenture, create or cause to be created any lien or charge that is prior or equal to that of the COFINA Bonds and the COFINA Parity Bonds on the trust estate;

(c)     make any payments or distributions of the COFINA Pledged Taxes or moneys in the funds and accounts established under the New Bond Indenture except in accordance with the provisions of the New Bond Indenture; or

**(a)**     take any action or fail to take any action that would cause interest on tax-exempt COFINA Bonds or COFINA Parity Bonds to be includable in gross income for federal income tax purposes.

## I.     Bond Indenture

### (a)     *Modification and Amendment of the COFINA Bond Indenture*

The New Bond Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of the New Bond Indenture described below. Subject to the limitations set forth in the New Bond Indenture and consistent with the Plan of Adjustment, Reorganized COFINA may execute and deliver at any time or from time to time Supplemental Indentures for any one or more of the following purposes, and any such Supplemental Indentures shall become effective in accordance with its terms:

(a)      To provide for the issuance of a Series of COFINA Bonds pursuant to the provisions of the New Bond Indenture and to prescribe the terms and conditions pursuant to which such COFINA Parity Bonds may be issued, paid or redeemed;

(b)      To add additional covenants and agreements of Reorganized COFINA for the purpose of further securing the payment of the COFINA Bonds and COFINA Parity Bonds, provided such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of Reorganized COFINA contained in the New Bond Indenture;

(c)      To prescribe further limitations and restrictions upon the issuance of COFINA Bonds and COFINA Parity Bonds and the incurring of indebtedness by Reorganized COFINA which are not contrary to or inconsistent with the limitations and restrictions thereon theretofore in effect;

(d)      To surrender any right, power or privilege reserved to or conferred upon Reorganized COFINA by the terms of the New Bond Indenture, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of Reorganized COFINA contained therein;

(e)      To confirm, as further assurance, any pledge under the New Bond Indenture, and the subjection to any lien, claim or pledge created or to be created by the provisions thereof, of the COFINA Pledged Taxes, or any pledge of any other money, investments thereof or funds;

(f)      To modify any of the provisions of the New Bond Indenture or of any previously adopted Supplemental Indenture in any other respects, provided that such modifications shall not be effective until after all COFINA Bonds and COFINA Parity Bonds Outstanding as of the effective date of such Supplemental Indenture shall cease to be Outstanding, and all COFINA Bonds and the COFINA Parity Bonds issued under such Supplemental Indentures shall contain a specific reference to the modifications contained in such subsequent Supplemental Indenture;

(g)      With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision in the New Bond Indenture or to insert such provisions clarifying matters or questions arising thereunder as are necessary or desirable, provided that any such modifications are not contrary to or inconsistent therewith as theretofore in effect, or to modify any of the provisions thereof or of any previous Supplemental Indenture in any other respect, provided that such modification shall not adversely affect the interests of the Bondholders in any material respect; or

(h)      To modify any of the provisions of the New Bond Indenture or of any previously adopted Supplemental Indenture in any other respects, provided that such modifications shall not be effective unless there has been delivered to the Trustee (i) a rating confirmation and (ii) an opinion of Transaction Counsel to the effect that the same is not inconsistent therewith and will not adversely affect the exclusion of interest on any Tax Exempt Bond from gross income for purposes of federal income taxation.

Except as described in clauses (a) through (h) above, any modification or amendment of the New Bond Indenture and of the rights and obligations of Reorganized COFINA and of the Holders of the COFINA Bonds and the COFINA Parity Bonds thereunder, in any particular, may be made by a Supplemental Indenture, with the written consent (i) of the Holders of at least a Majority in Interest (as defined below) of the COFINA Bonds and the COFINA Parity Bonds Outstanding at the time such consent is given, or (ii) in case less than all of the several Series of COFINA Bonds and the COFINA Parity Bonds then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the COFINA Bonds and the COFINA Parity Bonds of each Series so affected and Outstanding at the time such consent is given; ***provided, however,*** that any such amendment or modification is consistent with the provisions of the Plan of Adjustment; ***provided, further,*** if such modification or amendment will, by its terms, not take effect so long as any COFINA Bonds and the COFINA Parity Bonds of any specified like Series, maturity and tenor remain Outstanding, the consent of the Holders of such COFINA Bonds and the COFINA Parity Bonds shall not be required and such COFINA Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding COFINA Bonds and the COFINA Parity Bonds under this paragraph.  No such modification or amendment shall permit a change in the amount or date of any Sinking Fund Installment, the terms of redemption or maturity of the principal of any Outstanding COFINA Bond and the COFINA Parity Bond or of any installment of interest thereon or a reduction in the principal amount or the Redemption Price thereof or in the rate of interest thereon without the consent of the Holder of such COFINA Bond and the COFINA Parity Bond, or shall reduce the percentages or otherwise affect the classes of COFINA Bonds and the COFINA Parity Bonds the consent of the Holders of which is required to effect any such modification or amendment.  For the purposes of this paragraph, a Series shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of COFINA Bonds and the COFINA Parity Bonds of such Series in any material respect.  The Trustee may in its discretion determine whether or not, in accordance with the foregoing provisions, the COFINA Bonds and the COFINA Parity Bonds of any particular Series or maturity would be affected by any modification or amendment hereof and any such determination shall be binding and conclusive on Reorganized COFINA and all Holders of COFINA Bonds and the COFINA Parity Bonds.  The Trustee may receive an opinion of counsel, including an opinion of Transaction Counsel, as conclusive evidence as to whether the COFINA Bonds and the COFINA Parity Bonds of any particular Series or maturity would be so affected by any such modification or amendment hereof.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding COFINA Bonds and COFINA Parity Bonds eligible to act on a matter, measured by (i) with respect to COFINA Bonds and COFINA Parity Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (ii) with respect to Capital Appreciation Bonds, the Accreted Value of such COFINA Bonds or COFINA Parity Bonds as of such date.

**(b)      *Events of Default***

An "**Event of Default**" under the New Bond Indenture means any one of the following events:

(a) payment of the principal or Redemption Price of any COFINA Bond or COFINA Parity Bond is not made by Reorganized COFINA when due and payable, either at maturity or by proceedings for redemption or otherwise;

(b) payment of an installment of interest on any COFINA Bond or COFINA Parity Bond is not made by Reorganized COFINA when due and payable;

(c) Reorganized COFINA defaults in the due and punctual performance of any other of the covenants, conditions, agreements and provisions contained in the New Bond Indenture or in the COFINA Bonds or COFINA Parity Bond or in any Supplemental Indenture on the part of Reorganized COFINA to be performed and such default shall continue for 90 days after written notice specifying such default and requiring same to be remedied shall have been given to Reorganized COFINA by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than 25 percent in principal amount and Accreted Value of the Outstanding COFINA Bonds, and COFINA Parity Bonds unless, if such default is capable of being cured but is not capable of being cured within 90 days, Reorganized COFINA has commenced to cure such default within said 90 days and diligently prosecutes the cure thereof;

(d) Reorganized COFINA, pursuant to or within the meaning of any U.S. federal or Commonwealth insolvency, bankruptcy, reorganization, restructuring receivership or any other form of debtor relief law, including without limitation PROMESA (collectively, "Bankruptcy Laws"):

    (i)       commences proceedings to be adjudicated bankrupt or insolvent;

    (ii)      consents to the institution of bankruptcy or insolvency proceedings against it;

    (iii)    files, or consents to the filing of, a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law;

    (iv)    consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or any substantial part of its property;

    (v)     makes a general assignment for the benefit of its creditors;

    (vi)    is deemed to be a covered territorial instrumentality under PROMESA or is otherwise determined to be subject to oversight under applicable Bankruptcy Law; or

    (vii)   takes any corporate or similar action in furtherance of any of the foregoing;

(e)  a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)  is for relief against Reorganized COFINA in a proceeding in which Reorganized COFINA is to be adjudicated bankrupt or insolvent;

(ii)  approves as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of Reorganized COFINA under any Bankruptcy Law;

(iii)  appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of Reorganized COFINA for all or any substantial part of the property of Reorganized COFINA; or

(iv)  orders the liquidation, dissolution or winding up of Reorganized COFINA and the order or decree remains unstayed and in effect for 60 consecutive days;

(f)  the Commonwealth defaults in the due and punctual performance of any of the covenants of the Commonwealth contained in the COFINA Act or the New Bond Indenture; and

(g)  Reorganized COFINA permits the validity or effectiveness of the New Bond Indenture, the COFINA Bonds or the COFINA Parity Bonds to be impaired, and such impairment affects the enforceability of or payments on the COFINA Bonds or COFINA Parity Bonds, or any person to be released from any covenants or obligations with respect to the COFINA Bonds or COFINA Parity Bonds.

### (c)  _Remedies_

If an Event of Default occurs:

(a) The Trustee shall, upon the written request of the Holders of not less than a Majority in Interest of the Outstanding COFINA Bonds and COFINA Parity Bonds, protect and enforce its rights and the rights of the Bondholders under the New Bond Indenture or under any Supplemental Indenture or under the laws of the Commonwealth by such suits, actions or special proceedings in equity or at law: (i) for specific performance of any covenant in the New Bond Indenture or any Supplemental Indenture or in aid or execution of any power granted in the New Bond Indenture or any Supplemental Indenture, or (ii) for an accounting against Reorganized COFINA as if Reorganized COFINA were the trustee of an express trust, or (iii) for the enforcement of any proper legal or equitable remedy as the Trustee deems most effectual to protect and enforce such rights, including the enforcement of its rights and remedies granted to it under the New Bond Indenture and of its rights and obligations under the COFINA Act.

(b) The Trustee shall give notice of each Event of Default known to it to Reorganized COFINA within ten days after knowledge of the occurrence thereof and to the Holders of COFINA Bonds and COFINA Parity Bonds within 30 days after knowledge of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of

144

such notice. In the case of an Event of Default other than an Event of Default described in clause (a) or (b) of the definition of "Event of Default" above, the Trustee may withhold notice thereof to the Holders of COFINA Bonds and COFINA Parity Bonds if and so long as the Trustee in good faith determines that the withholding of such notice is in the best interests of the Holders of the COFINA Bonds and COFINA Parity Bonds. The Holders of a majority in principal amount of the Outstanding COFINA Bonds and COFINA Parity Bonds shall have the right to direct the method and place of conducting all remedial proceedings to be taken by the Trustee under the New Bond Indenture and each Supplemental Indenture.

Neither the Trustee nor the Holders of COFINA Bonds or COFINA Parity Bonds have the right to sell or foreclose on the COFINA Revenues.  An Event of Default will <u>not</u> result in acceleration of any of the COFINA Bonds or COFINA Parity Bonds.

### (d)    *Priority of Payments after Default*

If at any time the money held by the Trustee under the New Bond Indenture and under each Supplemental Indenture is not sufficient to pay the principal of and interest on the COFINA Bonds and COFINA Parity Bonds as they become due and payable, such money together with any money then available or thereafter becoming available for such purpose, whether through exercise of the remedies provided for in the New Bond Indenture or otherwise, shall be applied (after payment of all amounts owing to the Trustee under the New Bond Indenture) as follows:

(a) First, to the payment to the persons entitled thereto of all installments of interest then due in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference; and

(b) Second, to the payment to the persons entitled thereto of the unpaid principal or Redemption Price of any COFINA Bonds and COFINA Parity Bonds which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any date, then to the payment thereof ratably, according to the amount of principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

## J.    Defeasance

If Reorganized COFINA shall pay or cause to be paid to the Holders of COFINA Bonds or COFINA Parity Bonds of a Series the principal or Redemption Price of and interest thereon, at the times and in the manner stipulated therein, in the New Bond Indenture, and in the applicable Supplemental Indenture, then the pledge of the trust estate and all other rights granted by the New Bond Indenture to such COFINA Bonds and COFINA Parity Bonds shall be discharged and satisfied.

COFINA Bonds or COFINA Parity Bonds for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee (through deposit of money for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in the

preceding paragraph. All Outstanding COFINA Bonds or COFINA Parity Bonds of any Series or any maturity within a Series or a portion of a maturity within a Series shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in the previous paragraph if (i) in case any of said COFINA Bonds or COFINA Parity Bonds are to be redeemed on any date prior to their maturity, Reorganized COFINA shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in the New Bond Indenture notice of redemption on said date of such COFINA Bonds and COFINA Parity Bonds, (ii) there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or defeasance securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay when due the principal, Sinking Fund Installments, if any, or Redemption Price, if applicable, and interest due and to become due on said COFINA Bonds or COFINA Parity Bonds on and prior to the redemption date or maturity date thereof, as the case may be, (iii) in the event said COFINA Bonds and COFINA Parity Bonds are not by their terms subject to redemption within the next succeeding sixty (60) days, Reorganized COFINA shall have given the Trustee, in form satisfactory to it, irrevocable instructions to give, as soon as practicable, by first class mail, postage prepaid, to the Holders of said COFINA Bonds and COFINA Parity Bonds at their last known addresses appearing on the registration books, a notice to the Holders of such COFINA Bonds and COFINA Parity Bonds that the deposit required by (ii) above has been made with the Trustee and that said COFINA Bonds and COFINA Parity Bonds are deemed to have been paid in accordance with the New Bond Indenture and stating such maturity or redemption date upon which money is to be available for the payment of the principal, Sinking Fund Installments, if any, or Redemption Price, if applicable, of and interest on said COFINA Bonds or COFINA Parity Bonds and shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that said COFINA Bond or COFINA Parity Bonds having been deemed to have been paid as provided in the Indenture would not (A) cause said COFINA Bond or COFINA Parity Bonds to be considered to have been "reissued" for purposes of Section 1001 of the Code and (B) adversely affect the exclusion of interest on such tax-exempt bond from gross income for purposes of federal income taxation.

Any income or interest certified by the Trustee to be in excess of the amounts required to pay the principal, Sinking Fund Installments, if any, or Redemption Price, if applicable, of and interest on such COFINA Bonds and COFINA Parity Bonds, as realized, shall be paid by the Trustee as follows:  first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of Reorganized COFINA; and, then, the balance thereof to the Remainder Fund. The money so paid by the Trustee shall be released of any trust, pledge, lien, encumbrance or security interest created by the New Bond Indenture.

## K.     Certain Provisions Relating to Capital Appreciation Bonds

For the purposes of receiving payment of the Redemption Price if a Capital Appreciation Bond is redeemed prior to maturity, the then current Accreted Value of such COFINA Bond shall be deemed to be its principal amount. In computing the principal amount of COFINA Bonds held by the registered owner of a Capital Appreciation Bond in giving to the Reorganized COFINA or the Trustee any notice, consent, request, or demand pursuant hereto for any purpose

146

whatsoever, the Accreted Value of such Capital Appreciation Bond as at the immediately preceding Valuation Date shall be deemed to be its principal amount. Notwithstanding any other provision of the New Bond Indenture, the amount payable at any time with respect to the principal and Sinking Fund Installments, if any, of and interest on any Capital Appreciation Bond shall not exceed the Accreted Value thereof at such time. For purposes of receiving payment of the Redemption Price or principal or Sinking Fund Installments, if any, of a Capital Appreciation Bond called for redemption prior to maturity, the difference between the Accreted Value of such Capital Appreciation Bond when the Redemption Price or principal thereof is due upon such redemption or declaration and the principal of such Capital Appreciation Bond on the date the bonds of the Series of which it is a part were first issued shall be deemed not to be accrued and unpaid interest thereon.

## L.    Notices

The Trustee shall give notice of each Event of Default under the New Bond Indenture known to it to Reorganized COFINA within 10 days after knowledge of the occurrence thereof and to the Holders of COFINA Bonds and COFINA Parity Bonds within thirty (30) days after knowledge of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. While COFINA Bonds and COFINA Parity Bonds are held in book-entry form, notices will be delivered by the Trustee to DTC. If the COFINA Bonds and COFINA Parity Bonds are issued in definitive form, these notices will be mailed to the addresses provided to the Indenture Trustee by the Holders of record as of the relevant record date. Such notices will be deemed to have been given as of the date of delivery to DTC or mailing.

## M.    Governing Law

The New Bond Indenture, the COFINA Bonds and COFINA Parity Bonds are governed by and will be construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction.

## N.    Venue

The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan of Adjustment including, without limitation with respect to the payment, enforcement and remedies of the COFINA Bonds and COFINA Parity Bonds to the extent permitted by law. Any legal action, suit, or proceeding arising from or related to the COFINA Bonds and COFINA Parity Bonds (a) shall be brought by any party or its successors or assigns in any wealth and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

## O.    Book-Entry Only

The COFINA Bonds will initially be registered through a book-entry only system operated by The Depository Trust Company, New York, New York ("DTC"). Beneficial interests in the COFINA Bonds may be held through DTC, directly as a participant or indirectly

through organizations that are participants in DTC.  Beneficial ownership interest in the COFINA Bonds will be available in the book-entry form only, in authorized denominations and any whole multiple thereof.  Purchasers of beneficial ownership interest in the COFINA Bonds (the "Beneficial Owners") will not receive certificates representing their interest in the COFINA Bonds received in the exchange.  While held in book-entry only form, all payments of principal of and interest on the COFINA Bonds will be made by wire transfer to DTC or its nominee as the sole registered owner of the COFINA Bonds.  Payments to Beneficial Owners are the sole responsibility of DTC and its participants.

### P.      Continuing Disclosure

The delivery of the COFINA Bonds pursuant to the Plan of Adjustment is not covered by SEC Rule 15c2-12 (the "Rule") because the COFINA Bonds are proposed to be issued in exchange for the Existing COFINA Bonds without involvement of an underwriter, as defined in such Rule.  However, Reorganized COFINA intends to voluntarily execute and deliver, for the benefit of the holders of the COFINA Bonds, a new continuing disclosure undertaking (the "CDA") containing certain disclosure obligations.  The CDA will be delivered on the Effective Date.  Pursuant to the CDA, Reorganized COFINA will provide the following information:

(a)      Within 305 days after the end of each Fiscal Year, beginning 305 days after the Fiscal Year ending June 30, 2019, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"):

(1)      Reorganized COFINA's audited financial statements; provided, however, if the audited financial statements of Reorganized COFINA are not available on the date required above, Reorganized COFINA shall post on EMMA, or shall cause to be posted on EMMA, unaudited financial statements and the audited financial statements shall be filed promptly upon becoming available to Reorganized COFINA;

(2)      the Operating Cap, the Interest Funding Requirement and the Principal Funding Requirement for the current and succeeding Fiscal Year;

(3)      information regarding actual receipts of the COFINA Pledged Taxes received by Reorganized COFINA in the preceding year and estimates regarding projected receipts of the COFINA Pledged Taxes in the current Fiscal Year; and

(4)      such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

(b)      In a timely manner, not in excess of ten business days after the occurrence of the event, to the MSRB through EMMA, notice of any of the following events with respect to the COFINA Bonds:

(1)      principal and interest payment delinquencies;

101361236v22

(2)     non-payment related defaults, if material;

(3)     unscheduled draws on debt service reserves reflecting financial difficulties;

(4)     unscheduled draws on credit enhancements reflecting financial difficulties;

(5)     substitution of credit or liquidity providers, or their failure to perform;

(6)     adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices of determinations with respect to the tax status of the COFINA Bonds, or other material events affecting the tax status of the COFINA Bonds;

(7)     modifications to rights of COFINA Bondholders, if material;

(8)     COFINA Bond calls, if material, and tender offers;

(9)     defeasances;

(10)    release, substitution, or sale of property securing repayment of COFINA Bonds, if material;

(11)    rating changes;

(12)    bankruptcy, insolvency, receivership or similar proceedings of Reorganized COFINA;

(13)    the consummation of a merger, consolidation, or acquisition involving Reorganized COFINA or the sale of all or substantially all of the assets of Reorganized COFINA, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

(14)    the appointment of a successor or additional trustee or the change of name of a trustee, if material.

With respect to the following events:

Event (3).  Event (3) is included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers dated September 19, 1995. However, Event (3) may not be applicable since no "debt service reserves" will be established for the COFINA Bonds.

Events (4) and (5).  Reorganized COFINA does not undertake to provide any notice with respect to credit enhancement (including credit facilities and liquidity facilities) added after the delivery of the COFINA Bonds, unless Reorganized COFINA applies for or participates in obtaining the enhancement.

149

Event (6).  Event (6) is relevant only to the extent interest on the COFINA Bonds is tax-exempt.

Events (8).  Reorganized COFINA does not undertake to provide notice of a mandatory scheduled redemption through Sinking Fund Installments not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in connection with the delivery of such COFINA Bonds subject to Sinking Fund Installments, (ii) the only open issue is which COFINA Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the owners of the COFINA Bonds as required under the terms of the COFINA Bonds, (iv) public notice of the redemption is given pursuant to the Exchange Act Release Number 23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or COFINA Bond purchases.

Event (13).  According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

Reorganized COFINA may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of Reorganized COFINA, such other event is material with respect to the COFINA Bonds, but Reorganized COFINA does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

(c)     In a timely manner, to the MSRB, notice of any failure by Reorganized COFINA to comply with paragraph (a) above.

No Bondholder may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Bondholder shall have filed with Reorganized COFINA evidence of ownership and a written notice of and request to cure such breach, Reorganized COFINA shall have refused to comply within a reasonable time and such Bondholder stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all Bondholders of the outstanding COFINA Bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

150

## IX.   Custodial TrustsTerms of Ambac Trust

**(a)**   *General Terms*

On or prior to the Effective Date, COFINA shall establish the Ambac Trust, solely on behalf of, and for the sole benefit of beneficial holders of Allowed Senior COFINA Bond Claims (Ambac) that validly elect to receive the Ambac Certificates in accordance with the approved solicitation procedures pursuant to the Disclosure Statement Order and set forth on the Ballot/Election Notice.   On the Effective Date, the following Ambac Trust Assets shall be deposited (or deemed deposited) into the Ambac Trust: (1) the Ambac Insured Bonds allocable to such electing holders of Allowed Senior COFINA Bond Claims (Ambac), (2) the Senior COFINA Bond Distribution (consisting of Section 103 Cash, if applicable, COFINA Cash Available for Distribution, COFINA Bonds and Rounding Amount Cash, if necessary) allocable to such electing holders of Allowed Senior COFINA Bond Claims (Ambac) and (3) the benefit of the Ambac Insurance Policy.   The COFINA Bonds shall consist of Taxable COFINA Bonds and Tax-Exempt COFINA Bonds.   Notwithstanding the deposit of the Ambac Insured Bonds in the Ambac Trust, the Ambac Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with Ambac Insured Bonds, the Bond Resolution (other than with respect to the payment and other obligations of COFINA and the Commonwealth thereunder) and the Ambac Insurance Policy shall be preserved and remain in full force and effect.   The Ambac Trust shall be the owner of any Ambac Insured Bonds deposited therein, provided that all rights with respect to such Ambac Insured Bonds shall be subject to the terms of the trust agreement.

Upon deposit of the Ambac Trust Assets, the trustee shall issue two series of Ambac Certificates, (i) a series with a mandatory redemption date of August 1, 2047, and (ii) a series with a mandatory redemption date of August 1, 2054, to the holders of Allowed Senior COFINA Bond Claims (Ambac) that validly elected to receive the Ambac Certificates in accordance with the scheduled sinking fund payments, if any, and the maturity date of such holder's Ambac Insured Bonds.   Each series of Ambac Certificates shall bear unique CUSIPs and be freely tradeable and transferrable through the Depository Trust Company.   Each class of Ambac Certificates will have its own class accretion schedule that sets forth the accreted payment amounts as of any date.   Ambac shall not insure any payments on the Ambac Certificates, shall not be required to pay any default or other interest amounts with respect to the Ambac Insured Bonds, and is only required to pay its obligations under the Ambac Insurance Policy as provided therein and in the trust agreement.   In addition, Ambac shall have the right, but not any obligation, to make payments in whole or in part under the Ambac Insurance Policy prior to the applicable mandatory redemption date for a class of Ambac Certificates.   To the extent Ambac determines, in its sole discretion, to make any earlier payment under the Ambac Insurance Policy, upon such payment, the remaining obligations of Ambac with respect to such Ambac Insurance Policy shall result in the recalibration of the related class accretion schedules.   Upon repayment or redemption of all Ambac Certificates, Ambac shall be entitled to receive all remaining assets in the Ambac Trust.

Other than with respect to their differing mandatory redemption dates and accretion schedules, each class of the Ambac Certificates shall have substantially the same terms and entitle the holder thereof to its pro rata share of distributions made by the Ambac Trust.   Each

distribution on the Ambac Certificates (whether or not taxable to a holder or reduced by withholding or tax payments made by the Ambac Trust) shall reduce the related obligation of Ambac under the Ambac Insurance Policy, shall be deemed to reduce the amount outstanding on the Ambac Insured Bonds, and shall result in the recalibration of the related class accretion schedules.  The Ambac Trust will distribute all payments received on the Tax-Exempt COFINA Bonds to holders of the Ambac Certificates promptly following receipt thereof in accordance with the trust agreement.  Ambac may elect, in its sole discretion, to distribute from time to time payments received on account of the Taxable COFINA Bonds to holders of the Ambac Certificates or to reinvest such payments in investments permitted by the terms of the trust agreement; provided, however, that the Ambac Trust shall have no obligation to distribute such payments prior to the applicable mandatory redemption date for a series.  In addition, Ambac may, in its sole and absolute discretion, direct the Ambac Trust to sell all or any portion of the COFINA Bonds held by the Ambac Trust in accordance with the terms of the trust agreement and thereafter, if such COFINA Bonds are Tax-Exempt COFINA Bonds, direct the Ambac Trust to distribute the proceeds of such sale to the holders of the Ambac Certificates and, if such COFINA Bonds are Taxable COFINA Bonds, direct the Ambac Trust to distribute the proceeds of such sale to the holders of Ambac Certificates or retain the proceeds of such sale in the Ambac Trust.  Ambac shall be deemed the sole holder of the COFINA Bonds in the Ambac Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings.  Taxes on any investment earnings, shall be paid out of the Ambac Trust Assets.

The Ambac Trust agreement will provide that (a) all rights of a holder of COFINA Bonds (whether as to amendments and consents, direction of remedies or otherwise) shall be exercisable solely by Ambac and no holder of the Ambac Certificates shall be entitled to any right with respect to the COFINA Bonds and (b) Ambac may, at its option, elect to direct a distribution of a proportional percentage of the underlying COFINA Bonds to individual holders of Ambac Certificates upon the release of such holder's claims on the related Ambac Insurance Policy and against the Ambac Trust.  Such distribution and release shall not give rise to any other holder of Ambac Certificates asserting a right to reserve the same treatment.

On the Effective Date, unless otherwise agreed to by Ambac, the position at the Depository Trust Company with respect to each Ambac Insured Bond deposited, or deemed deposited, into the Ambac Trust pursuant to the terms and provisions of the Plan shall become zero and the Ambac Trust shall be deemed the sole holder of such Ambac Insured Bonds.

### (b)     *Costs and Expenses*

All fees, costs and expenses incurred in connection with transactions contemplated pursuant to Section 17.1 hereof, including, without limitation, fees and expenses associated with the formation and maintenance of the Ambac Trust and the fees and expenses incurred by the trustee of the Ambac Trust, shall be the sole obligation and responsibility of Ambac and the Ambac Trust, and not COFINA or Reorganized COFINA, as the case may be, and the failure of Ambac or the Ambac Trust to satisfy any such obligations shall release and discharge COFINA and Reorganized COFINA, as the case may be, from fulfilling any further obligations in connection with the Ambac Trust.

B.      **Terms of National Trust**

In the event that National declines to exercise the National Election, on or prior to the Effective Date, the National Trust shall be formed on behalf of, and for the sole benefit of beneficial holders of, National Insured Bonds that (a) elect to receive National Certificates on the Ballot/Election Notice distributed in connection with the solicitation of acceptances and rejections of the Plan of Adjustment and (b) have not otherwise agreed to commute the National Insurance Policies on or prior to the Effective Date.  The trustee of the National Trust shall be an entity that is a nationally recognized U.S. domiciled financial institution and fiduciary regularly acting as trustee in the municipal finance market.  On the Effective Date, the National Trust Assets, consisting of (1) the National Insured Bonds that have not been commuted, (2) other than the portion distributable to commuting holders, all of the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National) in accordance with the terms of section 7.1(b) of the Plan of Adjustment, (3) the National Insurance Policies and (4) the consideration to be distributed to National in accordance with section 3.3 of the Plan of Adjustment, shall be deposited into the National Trust.  The costs, including fees and expenses and any obligation arising under the Term Sheet or the Plan of Adjustment, associated with the formation and operation of the National Trust shall be paid out of the National Trust Assets. Notwithstanding the deposit therein, the National Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with National Insured Bonds, the Bond Resolution (other than with respect to the payment obligations of COFINA) and the National Insurance Policies shall be preserved and remain in full force and effect.  Upon deposit of the National Trust Assets, on a pro rata basis, the trust shall issue one or more series of National Certificates to the beneficial holders of Senior COFINA Bond Claims (National) whose allocable shares of the Senior COFINA Bond Distribution are deposited into the National Trust.

The National Certificates shall entitle a National Certificate Holder to its pro rata share of value in and any distribution of Cash from the respective National Trust, which distribution shall (1) in all cases, occur promptly upon receipt thereof by the National Trust and (2) automatically reduce the obligation outstanding under the National Insurance Policies as of the date of such distribution to National Certificate Holders in the amount of such distribution.  For the avoidance of doubt, National's obligation to pay the scheduled Compounded Amount of the underlying National Insured Bonds as and when due shall, in all cases, continue to compound as scheduled to the date that the trustee of the National Trust actually makes payment to the National Certificate Holders.  Each series of National Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through the Depository Trust Company.

(a)      *__Sale of COFINA Bonds__*

So long as National (i) is not in default under the National Insurance Policies and (ii) has not agreed to and has not become subject to regulatory supervision, rehabilitation or liquidation (or similar) proceedings, National (a) shall be deemed the sole holder of the COFINA Bonds in the National Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (b) may, at any time prior to dissolution of the National Trust, deliver or direct the trustee to deliver a Sale Notice to all National Certificate Holders, through Depository Trust Company or any similar means, setting forth its intention to sell, for Cash, all or a portion of the

COFINA Bonds held in the National Trust.  The Sale Proceeds of such a sale shall be promptly distributed to National Certificate Holders on a pro rata basis and, upon such distribution, shall automatically reduce the obligation outstanding under the National Insurance Policies as of the date and in the amount of such distribution to National Certificate Holders; *provided*, *however*, that each National Certificate Holder may elect (within a reasonable specified period of time to be negotiated) after delivery of the Sale Notice to receive its pro rata share of the COFINA Bonds for sale pursuant to the Sale Notice in lieu of its allocable share of the Sale Proceeds and, in accordance with such election, the obligation outstanding under the National Insurance Policies as of the date of such distribution shall be reduced automatically in an amount equal to the portion of the Sale Proceeds that would have been attributable to such COFINA Bonds if sold.  Documentation related to the National Trust shall (i) be negotiated in good faith, (ii) be in form and substance acceptable to National and reasonably acceptable to the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the Plan Support Agreement, and (iii) be included in a Plan Supplement.

To the extent that a holder of a Senior COFINA Bond Claim (National) agrees to commute the National Insurance Policies on or prior to the Effective Date, such holder shall receive a distribution from National and the holder thereof shall have no rights with respect to the National Insurance Policies, the National Trust or the National Certificates.

### (b) *Costs and Expenses*

All fees, costs and expenses incurred in connection with transactions contemplated pursuant to section 17.2 of the Plan of Adjustment, including, without limitation, fees and expenses associated with the formation and maintenance of the National Trust and the fees and expenses incurred by the trustee of the National Trust, shall be the sole obligation and responsibility of National and the National Trust, and not COFINA or Reorganized COFINA, as the case may be, and failure of National or the National Trust to satisfy any such obligations shall release and discharge COFINA and Reorganized COFINA, as the case may be, from fulfilling any further obligations in connection with the National Trust.

## C. Assured Trusts and Assured Certificates

### (a) *General Terms*

In the event that (i) Assured declines to exercise the Assured Election with respect to all Assured Insured Bonds and (iii) any Assured Legacy Bonds exist as of the Effective Date (*i.e.*, Assured Insured Bonds with respect to which Assured has not exercised the Assured Election and the beneficial holders of which have not elected Assured Bondholder Election 1) a separate Assured Trust shall be formed on behalf of, and for the benefit of, beneficial holders of each Assured Legacy Bonds CUSIP.  The Assured Trustee of each Assured Trust shall be an Entity selected by Assured that is a nationally recognized U.S. domiciled financial institution and fiduciary regularly acting as trustee in the municipal finance market.  On the Effective Date, by electing (or being deemed to have elected) Assured Bondholder Election 2, each beneficial holder of an Assured Legacy Bonds CUSIP shall be deemed to have exchanged and deposited such Assured Legacy Bonds CUSIP into the Assured Trust that is formed for the benefit of

beneficial holders of such Assured Legacy Bonds CUSIP in exchange for one or more Assured Certificates issued by such Assured Trust and evidencing a pro rata beneficial ownership interest in the related Assured Trust Assets.  On the Effective Date, COFINA shall concurrently with the exchange described in the immediately preceding sentence, deposit the applicable Assured Trust Assets (other than the Assured Legacy Bonds) into each of the Assured Trusts.  The Assured Trust Assets shall not be property of COFINA, but shall be held by the Assured Trustee solely for the benefit of the Assured Certificate Holders and Assured (to the extent that it is subrogated to the rights of the holders of the Assured Certificate Holders) in accordance with the terms of the Assured Trust Agreement.  The Assured Certificate Holders shall be the "tax owners" of the Assured Trust Assets for Federal income tax purposes.

By electing (or being deemed to have elected) Assured Bondholder Election 2, (a) the beneficial holders of Assured Legacy Bonds shall be deemed to have directed each securities intermediary for such Assured Legacy Bonds (including, without limitation, the Depository Trust Company) to take any action that is necessary to effect the transfer of securities entitlements with respect to such Assured Legacy Bonds and the related Assured Certificates in its books-entry systems and/or on its books and records, as applicable, in order to give effect to the provisions of the immediately preceding paragraph.  Each such securities intermediary shall promptly comply with such deemed direction.  Until the Depository Trust Company effects the transfer of securities entitlements with respect to the Assured Legacy Bonds to a securities account designated by the Assured Trustee and established for the benefit of the respective Assured Trust, the bond trustee for the Assured Legacy Bonds (or custodian in the case of Secondary Market Assured Legacy Bonds) shall disburse any payments received under the respective Assured Insurance Policies directly to the Assured Trustee for the benefit of the respective Assured Trusts (rather than such payments being made through the Depository Trust Company), and Assured shall be authorized (but not required) to make any payments under such Assured Insurance Policies directly to the Assured Trustee for the benefit of the respective Assured Trusts (rather than such payments being made through the bond trustee or custodian, as applicable, and the Depositary Trust Company).

The Assured Legacy Bonds that are deposited into the Assured Trusts as described above shall be extinguished, terminated and cancelled other than with respect to (a) the rights of the holders thereof thereunder in respect of the respective Assured Insurance Policies, (b) the rights and obligations of the bond trustee, paying agent, and Assured thereunder in respect of the respective Assured Insurance Policies, and (c) the performance of others necessary administrative or other functions with respect to the foregoing.  The Assured Insurance Policies for the Assured Legacy Bonds that are deposited into the Assured Trusts as described above shall not be cancelled and all rights and remedies under and in accordance with such Assured Insurance Policies shall be preserved and remain in full force and effect.

Subject to the terms and provisions of section 17.3(e) of the Plan of Adjustment, the Assured Certificates shall entitle an Assured Certificate Holder to its pro rata share of value in any distribution of Cash from the respective Assured Trusts, which distribution shall (a) in all cases, occur promptly upon receipt thereof by such Assured Trust and (b) automatically reduce the obligation outstanding under the respective Assured Insurance Policies as of the date of such distribution to Assured Certificate Holders in the amount of such distribution, as determined by Assured in its sole discretion.  On each Original Assured Scheduled Date for any Assured

Legacy Bonds, Assured shall be obligated to pay and remaining amount of the scheduled payment that is due for payment in accordance with the terms of the respective Assured Insurance Policy after giving effect to any reduction pursuant to the immediately preceding sentence.  Upon repayment, redemption or other retirement of all Assured Certificates issued by an Assured Trust (including, without limitation, as a result of the exercise of the Assured Advancement Option as set forth in section 17.3(b) of the Plan of Adjustment or the satisfaction of all of Assured's payment obligations under the respective Assured Insurance Policy), Assured shall be entitled to receive all remaining Assured Trust Assets of such Assured Trust.  At any time on or after the date of receipt of such Assured Trust Assets, Assured shall have the right to sell all or any of the Tax-Exempt COFINA Bonds and/or Taxable COFINA Bonds comprising such Assured Trust Assets.

Each series of Assured Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through the Depository Trust Company.  So long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall be deemed the sole holder of the COFINA Bonds deposited in the respective Assured Trusts with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings.  In addition, Assured shall be fully subrogated to the rights of the respective Assured Certificate Holders in respect of the COFINA Bonds deposited in the respective Assured Trusts.

### (b)    *Assured Advancement Option*

Assured shall have the right to exercise the Assured Acceleration Option at any time.  In addition, on the Effective Date, COFINA shall assign to Assured any rights to redeem the Assured Legacy Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured.  Upon the exercise of any Assured Advancement Option and the payment of the Acceleration Payment with respect to any Assured Legacy Bonds CUSIP, the Assured Trustee shall be required to disburse such Acceleration Payment to the related Assured Certificate Holders as set forth in Section 17.3(a) hereof and Assured shall become fully subrogated to all of the rights of such Assured Certificate Holders.  Upon the disbursement of such Acceleration Payment to the related Assured Certificate Holders, the related Assured Certificates shall be retired, the related Assured Trust shall be terminated, and the Assured Trustee shall deliver the related Assured Trust Assets to or at the direction of Assured.

### (c)    *Assured Certificate Holder Exchange Option*

Pursuant to the Assured Trust Agreement, a holder of Assured Certificates with an aggregate unpaid principal amount that is equal to the Minimum Threshold or any integral multiple thereof shall have the right to exercise the Assured Certificate Holder Exchange Option by exchanging such Assured Certificates for such holder's pro rata share of related Assured Trust Assets (other than the related Assured Legacy Bonds CUSIP and related Assured Insurance Policy).  Upon the exercise of such Assured Certificate Holder Exchange Option, (i) the exchanging holder's pro rata share of the Assured Legacy Bonds on deposit in the respective Assured Trust shall be deemed to be no longer outstanding for purposes of the related Assured Insurance Policy and such exchanging holder shall relinquish its rights under such Assured Insurance Policy, and (ii) the Assured Trustee shall effect the cancellation of such Assured

156

101361236v22

Certificates.  The Assured Trust Agreement may provide, at Assured's option, that the Assured Certificate Holder Exchange Option may be exercised only (i) after the expiration of any Assured Certificate Holder Exchange Exercise Period and (ii) upon a written notice of such exercise that must be provided prior to the effective date of such exercise such that the effective date occurs after the lapse of any Assured Certificate Holder Exchange Exercise Period.  For the avoidance of doubt, each beneficial holder of Assured Certificates that has not exercised its Assured Certificate Holder Exchange Option on any day on which such option may be exercised (including the first day on which such option may be exercised at the time the applicable Assured Trust is created) has effectively elected to deposit and hold (or continue to hold) its pro rata share of the COFINA Bonds and any other assets comprising the related Assured Trust Assets in the related Assured Trust until such beneficial holder has validly exercised such option.

(d) <strong><em>Secondary Market Assured Legacy Bonds</em></strong>

On the Effective Date, each bond certificate that currently evidences both Secondary Market Assured Legacy Bonds and any other Existing Securities bearing the same CUSIP shall be exchanged for two separate bond certificates with different CUSIPs but otherwise identical terms – one evidencing the secondary Market Assured Legacy Bonds and the other evidencing such other Existing Securities.  After giving effect to such exchange, Secondary Market Assured Legacy Bonds shall have a unique CUSIP.  Concurrently with such exchange, by electing (or being deemed to have elected) Assured Bondholder Election 2, each beneficial holder of custody receipts evidencing a beneficial ownership interest in the Secondary Market Assured Legacy Bonds with a unique CUSIP and the respective Assured Insurance Policy shall be deemed to have deposited such custody receipts into the respective Assured Trust in exchange for Assured Certificates evidencing a pro rata beneficial ownership interest in the related Assured Trust Assets, which shall consist of such custody receipts and the assets described in clause (b) and (c) of the definition thereof and otherwise shall be subject to the terms set forth in section 17.3 of the Plan of Adjustment.

(e) <strong><em>Costs and Expenses</em></strong>

All fees, costs and expenses incurred in connection with transactions contemplated pursuant to section 17.3 of the Plan of Adjustment, including, without limitation, fees and expenses associated with the formation and maintenance of the Assured Trusts and the fees and expenses incurred by the Assured Trustee in accordance with the provisions of the Assured Trust Agreement, shall be the sole obligation and responsibility of Assured and the Assured Trusts, and not COFINA or Reorganized COFINA, as the case may be, and the failure of Assured or the Assured Trusts to satisfy any such obligations shall release and discharge COFINA and Reorganized COFINA, as the case may be, from fulfilling any further obligations in connection with the Assured Trust Agreement.

101361236v22

**X.** **New Bond Legislation**New legislation is to be enacted on or prior to the Effective Date authorizing the transactions contemplated by the Plan of Adjustment, providing for the collateralization of the COFINA Pledged Taxes and the granting of the New Collateral and incorporating such other terms as set forth in section 25.1(b)(viii) of the Plan of Adjustment.

On [●], 2018, the Governor of Puerto Rico signed into law Act No. [●]-2018 (the "COFINA Restructuring Act"), which amends and restates Act No. 91-2006, as amended, to establish the legal framework for the restructuring of the Corporation's issued and outstanding bonds. To this end, the COFINA Restructuring Act provides for (i) the modification of the Corporation's corporate governance structure, (ii) the authorization for the Corporation to issue Plan of Adjustment Bonds and provide for the terms of such bonds, (iii) confirmation of the Corporation's ownership of the COFINA Revenues, (iv) the creation of the statutory lien to secure the Plan of Adjustment Bonds, and (v) covenants to secure further the repayment of the Plan of Adjustment Bonds, such as the COFINA Revenues being funded from first funds, a non-impairment covenant and covenants that allow the Commonwealth to modify the Pledged Sales Tax upon satisfaction of certain requirements.

Below is a summary description of certain provisions of the COFINA Restructuring Act, which does not purport to be complete and is qualified in its entirety by reference to the full text of the COFINA Restructuring Act.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in the COFINA Restructuring Act.

**A.** **Purpose and Separate Legal Existence of the Corporation**

The COFINA Restructuring Act provides that the Corporation's purpose is to (i) issue the Plan of Adjustment Bonds, (ii) own and administer the COFINA Revenues, and (iii) issue any other bonds, notes or evidence of indebtedness of the Corporation as may be permitted by the Corporation Plan of Adjustment and the Ancillary Agreements and which will be payable from such sources as may be provided for by the Legislative Assembly.

The COFINA Restructuring Act also provides that the Corporation is and shall be recognized for all purposes as an independent and separate legal entity from the Government of Puerto Rico.  It shall be operated independently, and its business and affairs shall be governed by or under the direction of its Board of Directors.

**B.** **Ownership of the COFINA Revenues**

The COFINA Restructuring Act provides that any and all ownership interests and rights to the COFINA Revenues were, have been or are hereby transferred to the Corporation and that such transfer is an absolute transfer of all legal and equitable right, title and interest, and not a pledge or other financing.  It also provides that (i) the Corporation is and will be the sole and exclusive owner of the COFINA Revenues until such time as the Plan of Adjustment Bonds, together with any interest thereon, and all amounts and obligations under all Ancillary Agreements, have been completely paid in cash in full or have otherwise been discharged in accordance with their terms and (ii) the COFINA Revenues do not constitute "available resources" or "available revenues" of the Government of Puerto Rico as used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution.

The COFINA Revenues are defined as the Corporation's right to receive the first funds comprising the portion of the sales and use tax imposed by the Commonwealth that corresponds to a tax rate of five and one-half percent (5.5%) in any fiscal year (July 1 to June 30) up to an amount equal to fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed Income for each such fiscal year.  For fiscal year 2018-2019, the Fixed Income is seven hundred eighty-three million, one hundred ninety-seven thousand, two hundred and fifty-one dollars ($783,197,251) and, for each subsequent fiscal year, the Fixed Income for the prior fiscal year plus four percent (4%) of such Fixed Income, up to one billion eight hundred fifty million dollars ($1,850,000,000).

## C.    Permitted and Prohibited Activities

The COFINA Restructuring Act provides that the Corporation will not engage in any activity other than: (i) receiving and owning the COFINA Revenues and such other revenues or property as may be provided or transferred to the Corporation; (ii) adopting the Restructuring Resolution; (iii) issuing, from time to time, Plan of Adjustment Bonds and any bonds, notes or evidences of indebtedness the issuance of which is authorized by section 203 of the Act; (iv) entering into and performing the Ancillary Agreements, including payment of its portion of the Financing Costs; (v) to pay any bonds, notes or evidences of indebtedness the issuance of which is authorized by section 203 of this Act by pledging, on a basis subordinate in all respects to the lien established in section 302 of this Act, (a) any amounts remaining of the COFINA Revenues after the payment of principal and interest on the Plan of Adjustment Bonds or (b) any other funds or property that may be allocated to the Corporation after the Effective Date; and (vi) taking any and all other actions as may be necessary or appropriate to effectuate this transaction. Additionally, the COFINA Restructuring Act grants the Corporation certain ancillary powers described in Article 205 of the COFINA Restructuring Act, in order to carry out its authorized activities.

Pursuant Article 206 of the COFINA Restructuring Act, the Corporation will be prohibited from taking any of the following actions: (i) merging or consolidating, directly or indirectly, with any person, (ii) incurring, guaranteeing or otherwise becoming obligated to pay any debt or other obligations other than the Plan of Adjustment Bonds, bonds or other evidences of indebtedness authorized pursuant to section 203 of the COFINA Restructuring Act and certain other costs, (iii) pledging, creating or recording liens on any of its properties (including the COFINA Revenues), other than (a) the pledge to secure the payment of Plan of Adjustment Bonds created pursuant to section 302 of this Act or (b) any pledge or lien to secure any bond, note or evidence of indebtedness permitted under section 203 hereof but only to the extent such pledge or lien is subordinate in all respects to the lien established in section 302 of this Act, (iv) engaging in any business activities other than as expressly authorized by the COFINA Restructuring Act, (v) dissolving, liquidating, selling, or, except as permitted by section 204(e), otherwise transferring any or all of the COFINA Revenues, and (vi) taking any other action that is inconsistent with the Corporation's purpose as set forth in the COFINA Restructuring Act or ancillary thereto.

## D. Corporate Governance

The powers of the Corporation shall be exercised by the Board of Directors, which shall be composed of three (3) members appointed by the Governor of Puerto Rico; provided, that, pursuant to the provisions of the Ancillary Agreements, certain holders of Plan of Adjustment Bonds may submit up to three (3) recommendations for the Governor's consideration of the initial appointment of the Corporation's directors but the Governor shall be under no obligation to appoint any such recommended persons. Each member of the Board of Directors must satisfy the independence and qualification standards (including that no member of the Board of Directors may be an officer, employee or director of any entity of the Government of Puerto Rico other than the Corporation) set forth in the Ancillary Agreements.

Each member of the Board of Directors shall (a) be entitled to one (1) vote and (b) be appointed for a term of three (3) years and may serve consecutive terms as an appointed member; provided, that the Governor may remove any member prior to the expiration of their term if such member fails to uphold the responsibilities set forth in this Act or for gross negligence, willful misconduct or fraud. Each member of the Board of Directors. All decisions and actions of the Board of Directors shall require the affirmative vote of the majority of the members of the Board of Directors at the time serving; provided, that, the Corporation's bylaws may require a higher approval threshold for particular matters described therein.

## E. The Corporation and the Plan of Adjustment

*Authorization of the Plan of Adjustment Bonds.* In order to authorize the issuance of the Plan of Adjustment Bonds, the Corporation must adopt one or more resolutions providing for the (i) issuance of the Plan of Adjustment Bonds and the terms thereof, and (ii) payment of certain costs and expenses, each in accordance with the terms of the Corporation Plan of Adjustment.

*Source of Repayment of the Plan of Adjustment Bonds.* The Plan of Adjustment Bonds will be payable solely from the COFINA Revenues, in accordance with the terms of the Corporation Plan of Adjustment and the Ancillary Agreements. Moreover, the Plano of Adjustment Bonds will not constitute a debt of the Commonwealth or of any public corporation or instrumentality of the Commonwealth other than as a special limited obligation of the Corporation as described herein.

*Creation of Statutory Lien on the COFINA Revenues.* Upon the issuance of such Plan of Adjustment Bonds, they will be automatically secured by a statutory first lien on the all of the Corporation's right, title and interest in and to the Pledged Taxes, including any moneys, income, revenues, accounts, contract rights or general intangibles derived therefrom, in favor of the Indenture Trustee for the benefit of the holders of Plan of Adjustment Bonds. Such statutory first lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person. No instrument needs to be executed or delivered or recorded in any official record or in any government registry or office in order to perfect or continue such statutory first lien or to establish or maintain the priority thereof. No commingling of the Pledged Taxes with any property of the Government of Puerto Rico, any other government entity or any other Person shall limit, defeat, impair or interfere with such statutory lien. Such lien shall be valid, binding,

perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Corporation or its assets irrespective of whether such Persons have notice of such lien.

*First Funds Funding of the COFINA Revenues.* Each fiscal year, the first funds comprising the Pledged Taxes shall be transferred to, and deposited with, the Corporation, or any account or fund designated by the Corporation, until such time as the Corporation has received an amount equal to the COFINA Revenues for such fiscal year. The requirement that the first funds comprising the Pledged Taxes up to the COFINA Revenues be deposited with the Corporation or in any account or fund designated by the Corporation may not be modified; provided, that the Bond Indenture may contain provisions allowing for the quarterly distribution of the Pledged Taxes between the Corporation and the Government of Puerto Rico upon satisfaction of the requirements set forth in the Bond Indenture and consistent with the Corporation Plan of Adjustment. The Corporation shall have the rights set forth in this section 401 until such time as the Plan of Adjustment Bonds, together with any interest thereon, and all obligations under all Ancillary Agreements, have been completely paid in cash in full or have otherwise been discharged in accordance with their terms.

During each fiscal year, the Indenture Trustee or such other Person as may be designated in the Bond Indenture shall determine, on a monthly basis, if the Corporation has received the COFINA Revenues. Once the Indenture Trustee or such other Person determines that the COFINA Revenues have been deposited with the Indenture Trustee (or that portion of the COFINA Revenues as the Corporation may be entitled to the extent the quarterly distribution referenced in section 401(a) above is in effect), all revenues of the Pledged Taxes received after such determination shall be transferred to the Government of Puerto Rico.

*Excess Funding of the Corporation.* Once the Indenture Trustee determines that the COFINA Revenues has been deposited with the Indenture Trustee (or that portion of the COFINA Revenues as the Corporation may be entitled to the extent the quarterly distribution referenced above is in effect), all revenues of the Pledged Taxes received after such determination shall be transferred to the Government of Puerto Rico. Also, the amounts deposited with the Corporation each fiscal year in excess of the amounts required to pay principal and interest on the Plan of Adjustment Bonds then due and payable (including the principal and interest due and payable on any past due Plan of Adjustment Bonds), satisfy obligations assumed pursuant to the Ancillary Agreements then due and payable, pay its transaction costs or operating expenses as provided in the Ancillary Agreements, or make any other payment related to other obligations incurred by the Corporation, will be transferred to the Corporation, free and clear of the statutory lien established by the COFINA Restructuring Act and any other lien established by the Ancillary Agreements.

## F.    Covenants of the Commonwealth

The Government of Puerto Rico, with the intent of being contractually bound, hereby agrees and covenants with the Corporation and each Person that holds Plan of Adjustment Bonds, and authorizes the Corporation to include such covenant in the Bond Indenture for the benefit of the holders of Plan of Adjustment Bonds, that it will not, and no Government Entity shall be authorized to, until the Plan of Adjustment Bonds, together with the interest thereon, and

all amounts and obligations under all Ancillary Agreements, have been completely paid in cash in full or otherwise discharged in accordance with their terms:

(a)  take any action that would (A) impair the Corporation's right to receive the COFINA Revenues, (B) limit or alter the rights vested in the Corporation in accordance with the Corporation Plan of Adjustment to fulfill the terms of any agreements with the holders of Plan of Adjustment Bonds, (C) materially and adversely impair the collection of the Pledged Taxes in any Fiscal Year, or (D) impair the rights and remedies of the holders of the Plan of Adjustment Bonds or the collateral security established under section 302 of this Act;

(b)  reduce the Pledged Taxes to a rate less than five and one-half percent (5.5%) unless, in connection with such reduction, the credit rating and other requirements set forth in the Ancillary Agreements are satisfied; provided, however, that, notwithstanding the foregoing, until all obligations with respect to the Plan of Adjustment Bonds have been paid or satisfied in full in accordance with their terms, if the rate of the Pledged Taxes is reduced below three percent (3%), then, in connection with such reduction, the Government of Puerto Rico must comply with the Substitution Requirements;

(c)  impair, limit, restrict, rescind, delay or modify the rights or powers of the Corporation, the Indenture Trustee or the holders of Plan of Adjustment Bonds under this Act or relating to the COFINA Revenues, or the Corporation's ability to meet its obligations to its bondholders;

(d)  amend this Act to impair, limit, restrict, rescind, delay or modify any obligation or commitment of the Corporation to the holders of Plan of Adjustment Bonds; and

(e)  limit or restrict the rights or powers of the appropriate officers of the Government of Puerto Rico to impose, maintain, charge or collect the Pledged Taxes, provided that the foregoing shall not preclude the Government of Puerto Rico from exercising its power, through a change in law, replace the portion of the Sales Tax that corresponds to a tax rate of five and one half percent (5.5%) with Substituted Collateral in accordance with the Substitution Requirements.

For purposes of (e) above, the term (i) "Substituted Collateral" means all or a portion of a tax of general applicability throughout Puerto Rico that is enacted in full substitution of the Pledged Taxes or otherwise constitutes like or comparable security for the Plan of Adjustment Bonds and (ii) "Substitution Requirements" means (1) the enactment of legislation providing for Substituted Collateral that also provides (A) that the Substituted Collateral in an amount equal to the COFINA Revenues has been irrevocably transferred to and is owned solely and exclusively by the Corporation to the full extent provided under section 202 of this Act, (B) that, following such transfer, such Substituted Collateral in an amount equal to the COFINA Revenues is not, and shall not constitute, "available resources" or "available revenues" of the Government of Puerto Rico as that term is used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution, (C) for a lien on such Substituted Collateral in

162

favor of the Indenture Trustee for the benefit of the holders of Plan of Adjustment Bonds to the full extent provided for under section 302 of this Act, and (D) that the Government of Puerto Rico and the government entities shall continue to provide the covenants set forth in section 303 of this Act with respect to such Substituted Collateral, and (2) prior to the substitution of the Substituted Collateral, the ratings requirements set forth in the Ancillary Agreements are satisfied with respect to the Substituted Collateral.

## XI.   Corporate Governance and Management of Reorganized COFINA

### A.   Corporate Action

On the Effective Date, all matters provided for under the Plan of Adjustment that would otherwise require approval of the directors of COFINA or Reorganized COFINA, including, without limitation, the authorization to issue or cause to be issued the COFINA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized COFINA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized COFINA pursuant to the Plan of Adjustment, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, and without further action by any Person or Entity under any other applicable law, regulation, order, or rule.  Other matters provided under the Plan of Adjustment involving the corporate structure of the Reorganized COFINA or corporate action by Reorganized COFINA, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, and without requiring further action by any Person or Entity under any other applicable law, regulation, order, or rule.  Without limiting the foregoing, from and after the Confirmation Date, COFINA and Reorganized COFINA shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein in accordance with the New Bond Legislation and the new corporate governance documents, as applicable.

### B.   Amendment of By-Laws

The by-laws of Reorganized COFINA shall be amended as of the Effective Date to provide substantially as set forth in the Reorganized COFINA Certificates of Incorporation and the Reorganized COFINA By-Laws.

### C.   Directors of the Reorganized COFINA

On the Effective Date, and pursuant to the terms and provisions of section 25.1(c) of the Plan of Adjustment, the Reorganized COFINA By-Laws shall provide that the board of directors of Reorganized COFINA shall consist of three (3) persons appointed by the Governor of the Commonwealth all of whom shall meet the independence and qualification standards set forth in the Definitive Documents, including, without limitation, that the independent director may not be an officer, employee, or director of the government of Puerto Rico or instrumentality thereof (other than COFINA), must have executive experience in finance or with respect to securities similar to the COFINA Bonds and shall otherwise be qualified to serve on the board of directors. The initial directors shall be disclosed prior to the Confirmation Hearing.  If, during the period

163

from the Confirmation Hearing up to and including the Effective Date, circumstances require the substitution of one (1) or more persons selected to serve on the boards of directors of Reorganized COFINA, the Governor of the Commonwealth shall choose a substitute and COFINA shall file a notice thereof with the Title III Court and, for purposes of section 1129 of the Bankruptcy Code, any such replacement person, designated in accordance with the requirements of the immediately preceding sentence, shall be deemed to have been selected and disclosed prior to the Confirmation Hearing.  Notwithstanding the foregoing, (a) the holders of Senior COFINA Bond Claims, Ambac and National (in consultation with the holders of Junior COFINA Bond Claims and Assured) may collectively submit up to the three (3) recommendations for the Governor's consideration regarding the initial appointment of independent directors; *provided*, *however*, that the Governor shall be under no obligation to appoint any such recommended persons as directors and (b) to the extent permitted by applicable law, COFINA's corporate governance documents shall be amended to be consistent with all of the foregoing.

## D.   Officers of Reorganized COFINA

To the extent applicable, the board of directors of Reorganized COFINA shall elect officers of Reorganized COFINA as of or after the Effective Date.

## E.   Structure for Collection and Application of COFINA Pledged Taxes

The COFINA Bonds shall be issued by Reorganized COFINA pursuant to the New Bond Legislation and the New Bond Indenture, which entity shall be a "bankruptcy remote," single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the Plan of Adjustment and as reflected in the Term Sheet.  Reorganized COFINA shall be authorized, but not required, to enter into one or more agreements, including, without limitation, the New Banking Services Agreement, providing for the collection and deposit of the COFINA Pledged Taxes, which agreement or agreements may provide, among other things, that the COFINA Portion, net of COFINA operating expenses, shall be (a) promptly after collection, kept in segregated bank accounts maintained in one or more mainland U.S. banks and in the name of the trustee appointed under the New Bond Indenture and (b) designed to ensure that COFINA is the unconditional owner of the COFINA Portion, now existing or hereafter collected, under Puerto Rico and other applicable law.

## XII.   Certain Risk Factors to Be Considered

**AS WITH ANY INVESTMENT, RECOVERIES ON THE COFINA BONDS INVOLVES RISKS. YOU SHOULD CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW REGARDING THE PLAN OF ADJUSTMENT AND COFINA BONDS, AS WELL AS ALL OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT. THE FOLLOWING RISK FACTORS ARE NOT THE ONLY RISKS COFINA FACES, ARE NOT MEANT TO BE A COMPLETE LIST OF RISKS ASSOCIATED WITH THE PLAN OF ADJUSTMENT OR THE COFINA BONDS AND DO NOT NECESSARILY REFLECT THE RELATIVE IMPORTANCE OF VARIOUS RISKS. ADDITIONAL**

**RISKS AND UNCERTAINTIES NOT CURRENTLY KNOWN TO THE DEBTOR OR THAT THE DEBTOR DOES NOT CURRENTLY CONSIDER TO BE MATERIAL, OR THAT ARE GENERALLY APPLICABLE TO ALL GOVERNMENTAL INSTRUMENTALITIES, ALSO MAY MATERIALLY AND ADVERSELY AFFECT COFINA AND COFINA'S ABILITY TO CONSUMMATE THE PLAN OF ADJUSTMENT AND MAKE PAYMENTS ON THE COFINA BONDS. YOU ARE ADVISED TO CONSIDER THE FOLLOWING RISK FACTORS, AMONG OTHERS, AND TO REVIEW THE OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT BEFORE MAKING ANY DECISIONS WITH RESPECT TO THE PLAN OF ADJUSTMENT OR COFINA BONDS. ANY ONE OR MORE OF THE FACTORS DISCUSSED HEREIN, AND OTHER FACTORS NOT DESCRIBED HEREIN, COULD AFFECT RECOVERIES UNDER THE PLAN OF ADJUSTMENT OR LEAD TO A DECREASE IN THE MARKET VALUE AND THE LIQUIDITY OF THE COFINA BONDS. THERE CAN BE NO ASSURANCE THAT OTHER RISK FACTORS NOT DISCUSSED BELOW WILL NOT BECOME MATERIAL IN THE FUTURE.**

**NEITHER THE DEBTOR NOR ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THE COFINA BONDS OR PASSED ON THE ADEQUACY OR ACCURACY OF THIS DISCLOSURE STATEMENT.**

**A.      Risks Related to the Title III Case**

*The Title III Court may not confirm the Plan of Adjustment.*

PROMESA section 314(b) and Bankruptcy Code section 1129 (in its incorporated parts) set forth the requirements for confirmation of a Title III plan of adjustment, and require the Title III Court to make a series of specified, independent findings.  There can be no assurance that the Title III Court will find that the Plan of Adjustment meets all of these requirements and confirm the Plan of Adjustment.  If the Plan of Adjustment is not confirmed, it is uncertain what recoveries, if any, holders would receive with respect to their Claims under an alternative plan of adjustment or under other applicable law if the Title III Court dismissed the Title III Case.  [For additional information, *see* Requirements for Confirmation of the Plan of Adjustment under CONFIRMATION OF THE PLAN OF ADJUSTMENT.]

*The Title III Court has not approved or disapproved the Fiscal Plan.*

Under section 314(b)(7) of PROMESA, the Plan of Adjustment must be consistent with the COFINA Fiscal Plan certified by the Oversight Board.  Although the Oversight Board has certified under section 104(j)(3) of PROMESA that the Plan of Adjustment is consistent with the COFINA Fiscal Plan, PROMESA section 314(b) requires that the Title III Court make an independent determination as to whether the Plan of Adjustment is consistent with the COFINA Fiscal Plan. Therefore, there can be no assurance that the Title III Court will find that the Plan of Adjustment is consistent with the COFINA Fiscal Plan.

*The Title III Court may not approve the settlements and compromises in the Plan of*

*Adjustment or the Settlement Motion contemporaneously filed in the Commonwealth Title III Case.*

The Plan of Adjustment is contingent on the approval of the Settlement Motion in the Commonwealth Title III Case. Concurrently with the Debtor's filing of the Plan of Adjustment in the Title III Case, the Oversight Board, in its capacity as representative of the Commonwealth in the Commonwealth Title III Case pursuant to section 315(b) of PROMESA, filed the Settlement Motion in the Commonwealth Title III Case, which Settlement Motion seeks, among other things, court approval of the compromise and settlement of the Commonwealth-COFINA Dispute in accordance with the terms and provisions of the Settlement Agreement. For the Settlement Motion to be approved, the Title III Court must find that the Commonwealth-COFINA Dispute settlement satisfies the requirements of Bankruptcy Rule 9019, meaning that the settlement would have to be found to not fall below the lowest point in the range of reasonableness in view of, among other things, the legal issues being resolved by the settlement.

The Debtor believes that the significant compromises and settlements reflected in the Plan of Adjustment and Settlement Agreement are fair, equitable, and reasonable. Such compromises and settlements are an integral part of the Plan of Adjustment, and they provide value and certainty for COFINA and all Creditors by eliminating significant litigation risk and expenses, and providing a framework for COFINA to emerge from Title III expeditiously.

While parties to the Plan Support Agreement include holders of billions of dollars in Claims against the Commonwealth, other parties in interest in the Commonwealth Title III Case may object to the Settlement Motion. For example, the Committee has threatened to object to the Settlement Motion. There can be no assurance that the Settlement Motion will be approved. If the Settlement Motion is not approved in the Commonwealth Title III Case, the Debtor may not be able to confirm the Plan of Adjustment.

The Plan of Adjustment may also be contingent on the approval of other settlements and compromises resolved under the Plan of Adjustment. If the settlements and compromises contained in the Plan of Adjustment require approval, but are not approved, the Debtor may not be able to confirm the Plan of Adjustment.

*The Effective Date may not occur.*

Article [XXV] of the Plan of Adjustment provides for certain conditions that must be satisfied (or waived) prior to the occurrence of the Effective Date. Many of the conditions are outside of the control of COFINA. [One such condition outside the control of COFINA is the enactment of New Bond Legislation to amend (or repeal and replace) the existing COFINA legislation to, among other things, (i) establish an independent board of directors for COFINA, (ii) grant COFINA an ownership interest in the COFINA Portion, (iii) provide that the COFINA Portion does not constitute "available resources" of the Commonwealth as used in section 8 of Article VI of the Puerto Rico Constitution, (iv) grant a statutory first lien on COFINA's right, title, and interest in and to the COFINA Pledged Taxes to secure repayment of the COFINA Bonds, and (v) authorize the Commonwealth and COFINA, as applicable, to covenant against impairing COFINA's right to receive the COFINA Portion, materially and adversely impairing the collection of the COFINA Pledged Taxes in any fiscal year, and impairing the rights and

remedies of the holders of COFINA Bonds. While AAFAF and COFINA have agreed to use their reasonable best efforts to cause the Legislative Assembly to enact the New Bond Legislation, as of the date of this Disclosure Statement, the New Bond Legislation has not yet been proposed and there can be no guarantee that the New Bond Legislation will be enacted or, if enacted, that the New Bond Legislation will conform to the terms of the Amended PSA.]

As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to effectiveness of the Plan of Adjustment will be satisfied (or waived), including, without limitation, [the enactment of the New Bond Legislation or the inclusion of any of the specified provisions listed above.] Accordingly, even if the Plan of Adjustment is confirmed by the Title III Court, there can be no assurance that the Plan of Adjustment will be consummated and the adjustment of COFINA's debts completed. *See* Section [V.P, "Conditions Precedent to the Effective Date"] of this Disclosure Statement (description of the conditions to the effectiveness of the Plan of Adjustment). In addition, certain agreements contemplated in the Plan of Adjustment impose conditions that must be satisfied as of the Effective Date. There can be no assurance that such conditions will be timely satisfied or waived.

***If the Amended PSA is terminated, the ability of the Debtor to consummate the Plan of Adjustment may be materially and adversely affected.***

The Amended PSA contains a number of termination events, upon the occurrence of which certain parties to the Amended PSA may terminate or withdraw from such agreement. For example, if certain milestones are not met (including with respect to consummation of the Plan of Adjustment), certain parties may have the right to terminate or withdraw from the Amended PSA. If the Amended PSA is terminated, each of the parties thereto will be released from their obligations in accordance with the terms of the Amended PSA. In addition, upon the occurrence of certain events, individual parties to the Amended PSA may withdraw from such agreement and be released from their obligations under such agreement. For instance, each creditor party to the Amended PSA may terminate the Amended PSA, solely as to itself, if the Debtor withdraws the Settlement Motion, the Plan of Adjustment, the Disclosure Statement, or the motion seeking entry of an order approving the Disclosure Statement, or files any motion or pleading with the Title III Court, in each case, that is inconsistent with the Amended PSA in any material respect and such motion or pleading has not been withdrawn within a specified period of time. The withdrawal of support by creditors from, or the termination of, the Amended PSA may have a material adverse effect on the Debtor's ability to consummate the Plan of Adjustment.

## B.    Risks Related to COFINA

***The financial information contained herein is based upon COFINA's books and records and publicly available information as of the date hereof or the date to which such information relates, as applicable; no audit or independent examination of such information was performed.***

The financial information contained herein has not been, and will not be, audited or reviewed by any independent accounting firm or third party and is limited in scope. Although the Debtor believes that it has used its reasonable efforts to assure the accuracy of the financial information provided herein, there can be no assurance that the financial information contained

167

herein is without material inaccuracies or inconsistencies. [In addition, the historical data provided in this Disclosure Statement relating to SUT Revenue may differ substantially from future SUT Revenue.] The Debtor has not independently verified the financial information contained herein, including any information contained herein regarding the projected future SUT Revenue. Furthermore, certain events that are not within the control of COFINA may materially impact future SUT Revenue. As a result, you are cautioned not to place undue reliance on any of the financial information contained herein.

***The Debtor has no duty to update the statements contained in this Disclosure Statement.***

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Title III Court or as required under the Bankruptcy Code or Bankruptcy Rules.

***No representations outside this Disclosure Statement are authorized.***

No representations concerning or related to COFINA, the Title III Case, or the Plan of Adjustment are authorized by the Title III Court, PROMESA, or the Bankruptcy Code, other than as set forth in this Disclosure Statement and any other Solicitation Materials that accompany this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan of Adjustment that are other than as contained in, or included with, this Disclosure Statement should be relied upon by you at your own risk in arriving at your decision.

***Financial reporting going forward may not be completed on a timely basis.***

COFINA's most recent audited financial statements was released as of and for the year ended June 30, 2015. No guaranty can be made as to the availability of current audited financial statements or COFINA's ability to provide financial reporting on a timely basis.

## C.     Risks Related to the COFINA Bonds

***The COFINA Bonds are special limited obligations of COFINA payable solely from, secured solely by, and having recourse solely to, the COFINA Pledged Taxes. The COFINA Bonds are not indebtedness or liabilities of the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than COFINA. The COFINA Bonds are not backed by the good faith, credit and taxing power of the Commonwealth, nor are they payable or secured by any of the Commonwealth's public instrumentalities or political subdivisions, other than COFINA. The COFINA Bonds represent indebtedness solely of COFINA and will not be insured or guaranteed by the Commonwealth, the Trustee or any of their respective affiliates, or any other Commonwealth government entity.***

As a result of concerns with the Commonwealth's current financial circumstances, holders of the COFINA Bonds may encounter limited market acceptance upon any attempt to sell COFINA Bonds, making sales at or near par potentially difficult. Holders of COFINA Bonds after the Effective Date may not be able to sell such debt for any price for some time. Alternatively, potential purchasers may demand discounts to the par amount of obligations

before a potential purchaser would be willing to purchase COFINA Bonds. There can be no assurance that a secondary market will exist for any COFINA Bonds. The absence of a secondary market for the COFINA Bonds or a lack of liquidity in the secondary markets could limit bondholders' ability to resell any COFINA Bonds or adversely affect the market value of the COFINA Bonds.

The COFINA Bonds and transactions described herein will be made on the basis of exemptions from registration provided in the Securities Act of 1933, as amended. The COFINA Bonds have not been approved or disapproved by the United States Securities and Exchange Commission, any state or Commonwealth securities commission or any other regulatory authority, nor have any of the forgoing passed upon the accuracy or adequacy of this Disclosure Statement. Any representation to the contrary is a criminal offense. Therefore, the secondary market for the COFINA Bonds may be limited, and bondholders may not be able to sell the COFINA Bonds when they want to do so or obtain the price that they wish to receive for the COFINA Bonds, and, as a result, could suffer significant losses.

Major disruptions in the global financial markets in recent years have caused a significant reduction in liquidity in the secondary market for securities. While conditions in the financial markets and the secondary markets have improved, periods of illiquidity could occur again and affect the secondary market, thereby materially adversely affecting the value of the COFINA Bonds and limiting bondholders' ability to sell the COFINA Bonds. Concerns with the Commonwealth's fiscal crisis may also adversely affect the market value and liquidity of the COFINA Bonds.

### *Limited Nature of Remedies*

Upon any declaration of default under the COFINA Bond Indenture, COFINA's payment of the COFINA Bonds cannot be accelerated.

Given the unique nature of the Plan of Adjustment, certain closing conditions and closing deliverables, including legal opinions, with respect to the Plan of Adjustment will differ in type and scope from those typically required in municipal debt offering transactions that occur outside of a court-supervised restructuring process. In making their investment decision, investors should consider that certain actions, procedures or requirements of legal advisors and other third parties in connection with the Plan of Adjustment will differ materially from and be more limited than those typical requirements.

### *Limited Nature of Ratings; Reductions, Suspension, or Withdrawal of a Rating*

Any rating assigned to the COFINA Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the COFINA Bonds on their respective maturity or mandatory redemption dates. Any rating of the COFINA Bonds is not a recommendation to purchase, hold or sell such COFINA Bonds and such rating will not address the marketability of such COFINA Bonds, their market price, or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended, or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors

prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for COFINA or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the COFINA Bonds. While COFINA has agreed to use commercially reasonable best efforts to obtain ratings on the COFINA Bonds as soon as reasonably practicable as determined solely by COFINA, the COFINA Bond Indenture will not include a covenant by COFINA to maintain a specific rating with respect to outstanding COFINA Bonds.

*An adverse rating of the COFINA Bonds could adversely affect the market price of the COFINA Bonds.*

A rating agency may issue an unsolicited rating on the COFINA Bonds, employing quantitative and qualitative factors, including COFINA's actual or perceived financial strength, the prospects for payment of principal and interest on the COFINA Bonds, the impact of the Commonwealth's fiscal crisis, and other macroeconomic conditions in the Commonwealth related to the collection of sales tax revenues or otherwise. Ratings also reflect various methodologies and assumptions used by the rating agencies, which are subject to change without notice. Actions taken by the rating agencies can include initiating, maintaining, upgrading, downgrading or withdrawing a current rating of COFINA's indebtedness or placing COFINA on negative outlook for possible future downgrading. Such action may be taken at any time and is beyond COFINA's control. The downgrade or withdrawal of any credit rating of COFINA's indebtedness, including the COFINA Bonds, or placing COFINA on negative outlook for possible future downgrading may have a negative effect on the value of the COFINA Bonds.

*The investment of holders electing to receive either an Ambac Certificate, a National Certificate, or an Assured Certificate will be dependent on the business and financial prospects of Ambac, National, and Assured, respectively.*

If you are eligible and properly elect to receive either an Ambac Certificate, a National Certificate, or an Assured Certificate, then your investment will also be dependent on the business and financial prospects of Ambac, National, and Assured, respectively. Holders that elect to receive custodial certificates should, in addition to evaluating the ability of COFINA to fulfill its obligations under the COFINA Bonds, also evaluate the ability of the applicable insurer to make payments on the applicable insurance policies deposited as trust assets for the benefit of the trusts. In recent years, many bond insurers have become significantly weaker from a financial perspective. If an insurer experiences financial difficulties of its own in the future, it may not be able to make payments on the applicable insurance policies deposited as trust assets for the benefit of the trusts.

*Risks Relating to Making or Declining to Make the Commutation Election - Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National)*

The Plan of Adjustment provides holders of Class 2 Senior COFINA Bond Claims (Ambac) and Class 3 Senior COFINA Bond Claims (National) with an option to choose whether to commute their insurance policies or to receive a distribution of Ambac Certificates or National Certificates, as applicable. A holder of an Allowed Senior COFINA Bond Claim (Ambac) that

does not validly elect to receive Ambac Certificates will have, on or after the Effective Date, the Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policy, underlying such holder's Allowed Senior COFINA Bond Claim (Ambac) canceled and such holder shall receive distributions in accordance with section 6.1(a) of the Plan of Adjustment.  Similarly, a holder of an Allowed Senior COFINA Bond Claim (National) that does not validly elect to receive National Certificates will have, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the related National Insurance Policies, underlying such holder's Allowed Senior COFINA Bond Claim (National) canceled and such holder shall receive distributions in accordance with section 7.1(a) of the Plan of Adjustment.

The ability of a non-commuting holder of Class 2 or Class 3 Claims recover on account of its Claims is subject to the collection risk associated with its applicable insurer (*i.e.*, Ambac or National). The holders of Class 2 and Class 3 Claims should investigate the financial condition of Ambac and National, as applicable, prior to determining whether to make the commutation election under the Plan of Adjustment and in its Election Notice.

Future events could occur that could give rise to payment or other counterparty risks with respect to each of Ambac and National. Such risks would attach to the Ambac Certificates and National Certificates, and the Debtor can make no guarantee that any holder would be able to realize any particular level of recovery from any insurer.

### *Risks Relating to Making or Being Deemed to Make Assured Bondholder Election 2 – Junior COFINA Bond Claims (Assured)*

In the event Assured does not make the Assured Election, the Plan of Adjustment provides holders of Class 6 Junior COFINA Bond Claims (Assured) with an option to choose whether to receive the applicable Acceleration Price on the Effective Date (Assured Bondholder Election 1) or to continue to receive payments on their Assured Legacy Bonds (i) from the applicable Assured Trust and (ii) from Assured pursuant to the applicable Assured Insurance Policies in accordance with the terms of such Assured Insurance Policies (Assured Bondholder Election 2).  A holder of an Allowed Junior COFINA Bond Claim (Assured) that (i) fails to timely return its Election Notice, (ii) fails to make an Assured Bondholder Election on its Election Notice, or (iii) elects more than one Assured Bondholder Election on its Election Notice, will be deemed to have elected Election 2.

If a holder of Class 6 Claims elects or is deemed to have elected Assured Bondholder Election 2, such holder will be exposed to the ongoing credit risk of Assured with respect to its payment obligations under the applicable Assured Insurance Policy.  The holders of Class 6 Claims should investigate the financial condition of Assured prior to determining whether to elect Assured Bondholder Election 2.

Future events could occur that could give rise to payment or other counterparty risks with respect to Assured.  The Debtor can make no guarantee that any holder electing or deemed to have elected Assured Bondholder Election 2 would be able to realize any particular level of recovery from Assured.

### Risks Relating to the Ambac Certificates

Holders that elect to receive Ambac Certificates will be subject to additional risks including, but not limited to, the following:

- The Ambac Certificates are not expected to be liquid. There will be no market for the Ambac Certificates before the issuance of the Ambac Certificates and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide liquidity of investment or that it will continue for the life of the Ambac Certificates;

- Distributions to holders of Ambac Certificates from payments received on the COFINA Taxable Bonds will not be distributed to holders of the Ambac Certificates if Ambac directs the Trustee to reinvest such distributions. Accordingly, there can be no guarantee as to when holders of Ambac Certificates will receive distributions on the COFINA Taxable Bonds;

- Holders of Ambac Certificates will likely receive both taxable and tax-exempt income on account of their Ambac Certificates. It is anticipated that distributions on the tax-exempt COFINA Bonds will be passed-through to holders of Ambac Certificates as tax-exempt distributions, but neither the Trust nor Ambac makes any assurance that such distributions will be tax exempt. Certain distributions on the Ambac Certificates will not be tax exempt and holders of Senior COFINA Bond Claims (Ambac) that intend to elect to receive the Ambac Certificates should consider the impact of this characterization on their individual tax position. Holders of Ambac Certificates may also be deemed to receive taxable income in excess of distributions made to them ("phantom income"), which could result in the holders having obligations to pay taxes in amounts that exceed distributions from the Ambac Trust. To the extent that distributions on the Ambac Certificates represent proceeds of sales or other dispositions of the COFINA Bonds, any gains on such sales will be treated as taxable to the holders of Ambac Certificates unless offset by losses. See "Material United States Federal Income Tax Considerations – Taxation on Sale or Other Disposition of Tax-Exempt COFINA Bonds." Holders are urged to discuss the potential acquisition of the Ambac Certificates with their tax and accounting advisors before making any election relating thereto;

- Each distribution on the Ambac Certificates will reduce the related obligation of Ambac under the Ambac Insurance Policy. Notwithstanding any tax that is payable by or on behalf of a holder of Ambac Certificates on account of distributions from the Ambac Trust, or payable by the Ambac Trust itself, the gross amount of the distribution allocable to such holder (without any reduction for taxes payable by such holder or the Ambac Trust) will reduce Ambac's obligations under the Ambac Insurance Policy;

- The Ambac Trust is expected to be treated as a partnership for U.S. federal income tax purposes and, accordingly, holders of Ambac Certificates will receive

172

partnership reporting statements for tax purposes. It will be the obligation of holders of the Ambac Certificates to provide the Ambac Trust with sufficient information for the Trust to prepare such reporting. See "Material United States Federal Income Tax Considerations – Taxation on Sale or Other Disposition of Tax-Exempt COFINA Bonds." Holders are urged to discuss the potential acquisition of the Ambac Certificates with their tax and accounting advisors before making any election relating thereto;

- No holder of Ambac Certificates will have the right to direct the trustee to take any action with respect to the Ambac Trust Assets. The Trust Agreement will provide that Ambac will have the right to direct the trustee to dispose of COFINA Bonds or take certain other actions in respect of the Ambac Trust Assets, including any actions permitted of a holder of the COFINA Bonds. Accordingly, the Ambac Trust may not take actions with respect to the COFINA Bonds (such as selling the COFINA Bonds or enforcing remedies under the COFINA Bonds) that an investor would take if it held the COFINA Bonds directly; and

- Except as provided under the Ambac Insurance Policy, holders of the Ambac Certificates will have no recourse to the trustee of the Ambac Certificates, Ambac, or any their Related Persons. Moreover, holders will have no recourse against such persons or their assets for payments on the Ambac Certificates, except as set forth in the Ambac Insurance Policy and the trust agreement. Additionally, only the Ambac Trust itself (and not the holders of Ambac Certificates) will have recourse to the Ambac Insurance Policy insuring the existing COFINA Bonds. The Ambac Certificates will be obligations of the Ambac Trust and distributions thereon will only be made out of the Ambac Trust Assets.

### *Risks Relating to the National Certificates*

Holders that elect to receive National Certificates will be subject to additional risks including, but not limited to, the following:

- The National Certificates may not be liquid. There will be no market for the National Certificates before the issuance of the National Certificates and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide liquidity of investment or that it will continue for the life of the National Certificates;

- Holders of National Certificates will likely receive both taxable and tax-exempt income on account of their National Certificates. It is anticipated that distributions on the tax-exempt COFINA Bonds will be passed-through to holders of National Certificates as tax-exempt distributions, but neither COFINA, the National Trust, nor National makes any assurance that such distributions will be tax exempt. Certain distributions on the National Certificates may not be tax exempt and holders of Senior COFINA Bond Claims (National) that intend to elect to receive the National Certificates should consider the impact of this

characterization on their individual tax position.  Holders of National Certificates may also be deemed to receive taxable income in excess of distributions made to them ("phantom income"), which could result in the holders having obligations to pay taxes in amounts that exceed distributions from the National Trust.  To the extent that distributions on the National Certificates represent proceeds of sales or other dispositions of the COFINA Bonds, any gains on such sales will be treated as taxable to the holders of National Certificates unless offset by losses.  See "Material United States Federal Income Tax Considerations – Taxation on Sale or Other Disposition of Tax-Exempt COFINA Bonds."  Holders are urged to discuss the potential acquisition of the National Certificates with their tax and accounting advisors before making any election relating thereto;

- Pursuant to the terms of the trust agreement, each holder of National Certificates shall be entitled to its pro rata share of value in and any distribution of cash from the National Trust.  In addition, National may, at any time prior to the dissolution of the National Trust, subject to the terms of the trust agreement, deliver or direct the trustee to deliver a general notice to all holders of National Certificates of the intent to sell for cash all or a portion of the COFINA Bonds held in the National Trust.  Each distribution on the National Certificates, including sale proceeds, will automatically reduce the related obligation of National under the National Insurance Policies as of the date of such distribution.  Notwithstanding any tax that is payable by or on behalf of a holder of National Certificates on account of distributions from the National Trust, or payable by the National Trust itself, the gross amount of the distribution allocable to such holder (without any reduction for taxes payable by such holder or the National Trust) will reduce National's obligations under the National Insurance Policies;

- Early payments may leave a holder of National Certificates unable to reinvest in comparable investments;

- The National Trust is expected to be treated as a partnership for U.S. federal income tax purposes and, accordingly, holders of National Certificates will receive partnership reporting statements for tax purposes.  It will be the obligation of holders of the National Certificates to provide the National Trust with sufficient information for the National Trust to prepare such reporting.  See "Material United States Federal Income Tax Considerations – Taxation on Sale or Other Disposition of Tax-Exempt COFINA Bonds."  Holders are urged to discuss the potential acquisition of the National Certificates with their tax and accounting advisors before making any election relating thereto;

- Subject to the terms of the trust agreement, National will (1) have the right to direct the trustee to sell COFINA Bonds form the National Trust and (2) so long as National is not in default under the National Insurance Policies and has not agreed to and has not become subject to regulatory supervision, rehabilitation or liquidation (or similar proceedings) will be deemed the sole holder of COFINA Bonds in the National Trust with respect to voting, amendment, acceleration, events of default, and election and direction of rights and remedies.  Accordingly,

174

the National Trust may not take actions with respect to the COFINA Bonds (such as selling the COFINA Bonds or enforcing remedies under the COFINA Bonds) that an investor would take if it held the COFINA Bonds directly;

- Except as provided under the National Insurance Policies, holders of the National Certificates will have no recourse to the trustee of the National Certificates, National, or any their Related Persons. Moreover, holders will have no recourse against such persons or their assets for payments on the National Certificates, except as set forth in the National Insurance Policies and the trust agreement. The National Certificates will be obligations of the National Trust and distributions thereon will only be made out of the National Trust Assets;

- There will be no obligation to obtain ratings on the National Certificates. However, a rating agency may issue an unsolicited rating on the National Certificates. Such action may be taken at any time and is beyond the control of COFINA, National, and the holders of National Certificates. Such rating may have a negative effect on the value of the National Certificates; and

- Any investment in the National Trust will be dependent on the business and financial prospects of National. Holders of National Certificates should, in addition to evaluating the ability of COFINA to fulfill its obligations under the COFINA Bonds, also evaluate the ability of National to fulfill its obligations under the National Certificates. If National experiences financial difficulties of its own in the future, it may not be able to make payments on the National Certificates.

### *Risks Relating to the Assured Certificates*

Holders hat elect (or are deemed to elect) to receive Assured Certificates pursuant to Assured Bondholder Election 2 will be subject to additional risks including, but not limited to, the following:

- The Assured Certificates may not be liquid and there may be limited potential for resale thereof. There can be no assurance that a secondary market in Assured Certificates will exist or, if it does exist, that it will provide liquidity of investment or that it will continue for the life of such Assured Certificates. Limited liquidity may adversely affect the timing of a holder's resale of Assured Certificates or the price obtainable upon resale;

- Pursuant to the terms of the Assured Certificates, cash proceeds of the Assured Trust Assets will be disbursed to the holders of the Assured Certificates on a pro-rata basis as such cash proceeds are received by the Assured Trustee and will reduce Assured's obligations on the respective Original Assured Scheduled Dates under the respective Assured Insurance Policies, as described above. As a result, certain cash proceeds of the Assured Trust Assets (including the COFINA Bonds) may be disbursed to the holders of Assured Certificates prior to the Original Assured Scheduled Dates of the related Assured Legacy Bonds. Any such early

175

disbursement from cash proceeds of Assured Trust Assets may leave a holder of Assured Certificates unable to reinvest such cash proceeds in comparable investments that would provide such holder with an after-tax yield that is equivalent to the after-tax yield that it would have realized absent such early disbursement;

- It is expected that certain cash proceeds of the Assured Trust Assets (including the COFINA Bonds) required to be disbursed to holders of Assured Certificates will not be tax exempt and there is a risk that any short-fall payments made by Assured under the respective Assured Insurance Policies may not be tax-exempt. As a result, holders of Assured Insured Bonds that intend to elect (or that will be deemed to elect) to receive the treatment described in Section 17.3 of the Plan of Adjustment should consider the impact of this characterization on their individual tax position. Such holders are urged to discuss the consequences of such potential election with their tax and accounting advisors prior to making (or being deemed to be make) any election relating thereto;

- Although the trustee of the applicable Assured Certificates will hold the related Assured Trust Assets for the benefit of the relevant holders of the Assured Certificates, the applicable trustee will not actively manage the related trust. The restrictions on the trustee's powers and obligations may mean that the applicable trust will not take actions with respect to the COFINA Bonds – in particular, selling such COFINA Bonds or enforcing remedies under such COFINA Bonds – that an investor would take if it held the COFINA Bonds directly; and

- There is no recourse to the applicable trustee of the Assured Certificates, Assured, or any related person of the foregoing persons, and no recourse may be had against such persons or their respective assets, for payments on the Assured Certificates, except as set forth in the applicable Assured Insurance Policy and the Assured Trust Agreement. Additionally, only the applicable Assured Trust itself (and not the holders of Assured Certificates) will have recourse to the applicable Assured Insurance Policy. The Assured Certificates will be obligations of the applicable Assured Trust and distributions thereon will only be made out of the applicable Assured Trust Assets.

## D. Risks Related to the Collection of the Pledged Sales Tax

***The Commonwealth's ongoing fiscal and economic crisis and global economic developments could adversely affect the performance and market value of the COFINA Bonds.***

Under the Plan of Adjustment, COFINA will be the sole owner of the COFINA Portion. The COFINA Portion consists of the COFINA Pledged Taxes and all rights thereto (including the right to receive the COFINA Pledged Taxes as set forth under First Dollar Funding in Section 16.5 of the Plan of Adjustment) in an amount up to fifty-three and sixty-five one-hundredths percent (53.65%) of the Pledged Sales Tax Base Amount in any given fiscal year until the COFINA Bonds have been paid or satisfied in full in accordance with their terms. Accordingly, COFINA's ability to pay debt service on the COFINA Bonds is dependent upon the

176

Commonwealth generating an amount of sales and use tax on an annual basis of at least the amount of the COFINA Portion.

The Commonwealth is in the midst of a profound fiscal and economic crisis, which has affected many of the Commonwealth's public instrumentalities and municipalities. The Commonwealth's gross national product contracted in real terms in every year except one between fiscal year 2007 and fiscal year 2017 (inclusive). According to the Puerto Rico Planning Board's latest economic forecast (published in April 2017), gross national product is also projected to further contract by 1.5% during fiscal year 2018. In addition, these forecasts were compiled prior to the devastation caused by Hurricanes Irma and María (as described below), which are expected to further negatively affect economic growth. The Revised Commonwealth Fiscal Plan, which accounts for the impact of Hurricanes Irma and María, estimates a 13.3% contraction in real gross national product in fiscal year 2018.

Factors that may continue to adversely affect the Commonwealth's ability to increase the level of economic activity, some of which are not within the control of the Commonwealth, include the high cost of energy, changes in federal policy, the cost of repairs and rebuilding from severe weather events, United States and global economic and trade conditions, population decline, epidemics or pandemics of communicable diseases, the Commonwealth's high level of debt and the ongoing debt restructuring proceedings. Thus far, efforts by the Commonwealth to alleviate the recession have been unsuccessful, and it is not expected that the recession will end in the near to medium term.

Population decline has had, and may continue to have, an adverse impact on the Commonwealth's economic growth. According to the United States Census Bureau, the population of the Commonwealth decreased by 2.2% from 2000 to 2010, and by an estimated 6.8% from 2010 to 2015, driven primarily by a falling birth rate, a rising death rate, and migration to the United States mainland. The U.S. Census Bureau estimates suggest that the Commonwealth continued to lose population during fiscal year 2017 as well. Although it is too soon to accurately forecast the full effect and impact of the recent disruption caused by Hurricanes Irma and María, it is anticipated that population decline will accelerate. Reductions in population, particularly of working-age individuals, are likely to have an adverse effect on tax and other government revenues that will not be entirely offset by reductions in government expenses in the short or medium term. In addition, the average age of the population of the Commonwealth is increasing, due mainly to a reduction in the birth rate and the migration of younger people to the United States mainland. This phenomenon is likely to affect every sector of the economy to the extent that the local consumer base is diminished and the local labor force fails to meet the demand for workers. Moreover, this trend increases the demand for health and other services provided by the Commonwealth and its municipalities, and the relative cost to the Commonwealth and its municipalities of providing such services. There can be no assurance that historical trends related to economic conditions in the Commonwealth are predictive of future trends.

Events in the global financial markets, including downgrades of sovereign debt, devaluation of currencies by foreign governments and slowing economic growth, have caused or may cause a significant reduction in liquidity in the secondary market for asset-backed securities, which could adversely affect the market value of the COFINA Bonds and limit the ability of an

177

investor to sell its COFINA Bonds. On June 23, 2016, the United Kingdom voted in a referendum to discontinue its membership in the European Union. On March 29, 2017, the United Kingdom provided formal notice to the European Council stating its intention to leave the European Union. The exit of the United Kingdom or any other country out of the European Union or the abandonment by any country of the euro may have a destabilizing effect on all Eurozone countries and their economies and a negative effect on the global economy as a whole. No prediction or assurance can be made as to the effect that these developments may have on the Commonwealth's economy and, consequently, on the rate of delinquencies and/or losses on the Restructuring Property or the market value of the COFINA Bonds.

If the recession in the Commonwealth continues or is exacerbated by other regional or global economic downturns, as the case may be, the collection of SUT may be impaired, which will directly affect COFINA's ability to make timely payments on the COFINA Bonds.

***The full effect of the damage caused by Hurricanes Irma and María, which struck the Commonwealth in September 2017, is currently unknown, but was significant and may have a material adverse effect on the Commonwealth and its economy, the collections of SUT and COFINA's ability to make payments on the COFINA Bonds.***

In September 2017, Hurricanes Irma and María struck the Commonwealth. The physical damage from such storms was significant and widespread and there was substantial damage to the Commonwealth's power grid, infrastructure, buildings, residences and other structures. The U.S. federal government has approved a major disaster declaration for the Commonwealth, and the Federal Emergency Management Agency has made federal disaster assistance available to the Commonwealth. Recovery efforts continue throughout the Commonwealth.

It is not possible at present to quantify with any certainty the short-term or long-term impacts of Hurricanes Irma and María on the Commonwealth and its economy, collections of SUT or COFINA's ability to make payments on the COFINA Bonds, any offsetting economic benefit that may result from recovery and rebuilding activities or the amount of additional resources from federal, Commonwealth and other local sources that will be required. No assurances can be given as to the impact of Hurricanes Irma and María or other future severe weather events on the Commonwealth and its economy, the collections of taxes and COFINA's ability to make payments on the COFINA Bonds.

***The Commonwealth's macroeconomic data may not accurately reflect the performance of its economy and that of its municipalities.***

The Puerto Rico Planning Board has acknowledged the existence of certain significant deficiencies in the calculation of its macroeconomic data. The deficiencies relate mostly to the deflators of the components of trade-related services and, in some cases, monetary accounts of certain components of gross national product. As a result, the historical rate of change in gross national product at constant prices (real gross national product change) and at current prices (nominal gross national product change) could have been either overstated or understated for several years. It is still too early to determine how these deficiencies have affected, or will affect, the Commonwealth's macroeconomic data. Until such time as these revisions are finalized and fully applied to the Commonwealth's macroeconomic data, there is no assurance that previously

reported macroeconomic data accurately reflects the performance of the economy of the Commonwealth.

### Factors Affecting SUT Revenues: Competition

Increases in SUT rates in the Commonwealth may create incentives for certain purchases to be made in jurisdictions with lower overall sales tax rates. As a result, increasing SUT rates may not result in a corresponding percentage increase in revenues, and may prompt certain commercial and industrial activities to relocate to jurisdictions with lower sales tax rates.

### Factors Affecting SUT Revenues: Internet Sales

In future years, it is expected that increasing numbers of sales transactions will take place over the Internet. If these Internet sales are not treated, for SUT purposes, comparably to, or if they displace, the types of transactions where the SUT currently is collected, tax collections may be adversely affected.

### Legislative Assembly Authority over the Commonwealth Sales Tax

Section 2 of Article VI of the Puerto Rico Constitution states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended.  In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances.  There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax.  See [*Commonwealth Sales Tax Revenues"*] and [*"Commonwealth Sales Tax Collections and Projections"*] under PLEDGED SALES TAX.

Under the New Bond Legislation and COFINA Bond Indenture, the Commonwealth will covenant for the benefit of all initial and subsequent holders of COFINA Bonds and COFINA Parity Bonds, that, until all obligations *with* respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will take no action that would (1) impair COFINA's right to receive the COFINA Portion, (2) limit or alter the rights vested in COFINA in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of COFINA Bonds and COFINA Parity Bonds, (3) materially adversely impair the collection of COFINA Pledged Taxes in any Fiscal Year, or (4) impair the rights and remedies of the holders of the COFINA Bonds or COFINA Parity Bonds or the collateral security thereof.  The New Bond Legislation will also contain a covenant that if the Commonwealth seeks to enact legislation that would permit a Commonwealth revenue stream to replace the COFINA Pledged Taxes as security for the repayment of the COFINA Bonds, it can do so only upon, and on each such occasion, the Commonwealth having to satisfy certain specified conditions, including (i) for the irrevocable transfer of, including ownership of, such New Collateral to COFINA, (ii) for an automatic mandatory statutory lien on such New Collateral in favor of holders of COFINA Bonds and COFINA Parity Bonds, and (iii) that,

following such transfer, such New Collateral is not, and shall not constitute, "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution, and is otherwise owned by Recognized COFINA in the same manner and to the same extent as the COFINA Portion.

### Certain Constitutional Considerations Related to Act 91

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

As described above, it is a condition to effectiveness of the Plan of Adjustment that New Bond Legislation shall be enacted to amend (or repeal and replace) the existing COFINA legislation to, among other things, provide that the COFINA Portion does not constitute "available resources" of the Commonwealth as used in section 8 of Article VI of the Puerto Rico Constitution. As of the date of this Disclosure Statement, the Legislative Assembly has not passed New Bond Legislation and New Bond Legislation has not been enacted.

It is also a condition to effectiveness of the Plan of Adjustment that the Confirmation Order provides that the COFINA Bonds and the covenants by COFINA and the Commonwealth, as applicable, for the benefit of the holders of the COFINA Bonds and COFINA Parity Bonds (including the sales and use tax, non-impairment, substitution of collateral and tax-exemption covenants set forth in Article XVI of the Plan of Adjustment) constitute valid, binding, legal and enforceable obligations of COFINA and the Commonwealth, as applicable, under Puerto Rico and federal law, and the COFINA Portion (and any substitution of collateral on the terms and conditions provided for in the Plan of Adjustment) is the property of COFINA, free and clear of all liens, claims, encumbrances, and other interests of creditors of COFINA, the Commonwealth, or any instrumentality of the Commonwealth (other than liens and claims afforded to holders of COFINA Bonds under the Plan of Adjustment) and shall not be "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution. The Confirmation Order will also provide for the Title III Court to retain jurisdiction over any disputes that may arise in respect of the COFINA Bonds. While the settlement of the Commonwealth-COFINA Dispute on the terms set forth in the Plan of Adjustment and Settlement Agreement significantly mitigates the risk of potential challenges to the COFINA Bonds in relation to COFINA's Existing Securities, there can be no assurance the effectiveness of the Confirmation Order will be binding on persons who are not existing creditors of COFINA or the Commonwealth in any future litigation challenging (i) the New Bond Legislation, (ii) that

180

the COFINA Portion does not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) that the COFINA Portion is not available for use by the Secretary of the Treasury.

## E.    Risk Factors Related to Future Judicial Actions

*The COFINA Bonds are being issued in connection with a plan of adjustment subject to confirmation pursuant to PROMESA Title III, which is newly enacted legislation that has not been previously used for financial restructuring, and substantial uncertainties related to its construction exists, including uncertainties due to the lack of judicial decisions interpreting PROMESA Title III.*

The Plan of Adjustment is effected pursuant to PROMESA Title III.  PROMESA is a new federal statute signed into law in 2016, and a plan of adjustment pursuant to Title III thereof has not yet been confirmed by any court or consummated by any party.  As a result, there are uncertainties relating to the successful confirmation and consummation of a plan of adjustment pursuant to PROMESA Title III.  For example, it is uncertain to what extent an order of the Title III Court confirming the Plan of Adjustment can be appealed or its effectiveness delayed.  While courts likely will borrow from existing precedents from chapters 9 and 11 of the Bankruptcy Code, there can be no assurances that courts would do so or consider other factors when interpreting the provisions of PROMESA.  Such uncertainties may affect, among other things, market perception and, therefore, the trading value of the COFINA Bonds.

In addition, there is uncertainty associated with the consummation of a plan of adjustment pursuant to PROMESA Title III because there is no judicial experience interpreting the provisions of a plan of adjustment confirmed pursuant to PROMESA Title III.  Judicial interpretations of a plan of adjustment confirmed pursuant to PROMESA Title III, including those related to the successful consummation of a plan of adjustment, could affect the value of the COFINA Bonds.

*PROMESA is subject to challenges regarding its constitutionality.*

For example, certain parties have challenged the constitutionality of PROMESA on the grounds that appointment of the members of the Oversight Board violates the Appointments Clause and the separation-of-powers principles of the United States Constitution because the members were not appointed by the President with the advice and consent of the Senate.  These parties seek to dismiss the Commonwealth Title III Case and seek declaratory judgments that PROMESA violates the Appointments Clause and that all of the Oversight Board's acts to date are invalid.  These parties also seek to enjoin the Oversight Board from exercising any authority granted to it by PROMESA.  The Title III Court entered an opinion and order holding that there is no constitutional defect in the method of appointment. The parties challenging PROMESA's constitutionality have filed a notice of appeal to the First Circuit.  There can be no assurance as to the outcome of the constitutional challenge to PROMESA. For additional information, *see [*"Other Related Litigation"*] under OVERVIEW OF COFINA'S TITLE III CASE.

*COFINA may be subject to future claims and legal actions.*

COFINA may be subject to various claims and legal actions arising in the ordinary course

of its activities that arise after the Effective Date.  The Debtor is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on COFINA after its emergence from Title III.

***COFINA Bonds may not trade at par.***

Holders of the COFINA Bonds may encounter limited market acceptance of COFINA's credit upon any attempt to sell COFINA debt obligations, making sales at or near par potentially difficult. Holders of COFINA debt after the Effective Date may not be able to sell such debt for any price for some time. Alternatively, potential purchasers may demand discounts to the par amount of obligations before a potential purchaser would be willing to purchase COFINA debt of any kind. There can be no assurance that a secondary market will exist for any COFINA debt.

***The enforcement of rights under the COFINA Bonds, COFINA Bond Indenture, and New COFINA Legislation may be unavailable to the extent COFINA is subject to a subsequent case under Title III of PROMESA.***

The holders of COFINA Bonds may be unable to enforce rights under the COFINA Bonds, COFINA Bond Indenture, and New COFINA Legislation to the extent COFINA is subject to a subsequent case under Title III of PROMESA as a result of the application of the automatic stay on enforcement of remedies that would become effective upon the filing of the Title III petition.

Pursuant to the New Bond Legislation, Reorganized COFINA will be a "bankruptcy remote," single purpose municipal agency, public corporation or entity to the fullest extent permitted under applicable law.  As a bankruptcy remote entity, COFINA should not be permitted to restructure its debts pursuant to any federal or local insolvency or bankruptcy regime, whether in existence now or enacted in the future.  Furthermore, the Confirmation Order shall provide that in the event of any subsequent Title III case or similar or other proceedings of the Commonwealth, in any forum, it is the express intent that the COFINA Portion owned by Reorganized COFINA shall not be subject to the automatic stay.   Nonetheless, there can be no assurance that a court would not allow Reorganized COFINA to be the subject of an insolvency or bankruptcy proceeding, or that a court would not determine the COFINA Portion to be subject to the automatic stay in the event of a future insolvency or bankruptcy proceeding by the Commonwealth.

## F.     Risks Related to Future Legislative Actions

***Notwithstanding the New Bond Legislation's non-impairment provisions, future legislative action could reduce the value of the COFINA Bonds.***

Notwithstanding the New Bond Legislation's non-impairment provisions, future action by the Legislative Assembly could change the New Bond Legislation in ways that affect the security and sources of payment on the COFINA Bonds. Any such action would be subject to the Commonwealth's statutory covenant to the bondholders that it will not impair, limit, restrict, rescind, delay or modify the rights and powers of COFINA, the Trustee or the Holders under the New Bond Legislation, or COFINA's ability to meet its obligations to bondholders, until the

COFINA Bonds have been paid in full or are otherwise discharged. While the covenant is designed to act as adequate protection of COFINA and its bondholders' interest in property, any such action, as well as the litigation that likely would ensue, might adversely affect the value of the COFINA Bonds and the recoveries on the COFINA Bonds. Furthermore, the enforcement of any rights against the Commonwealth under the Commonwealth's statutory non-impairment covenant may be subject to the exercise of judicial discretion and limitations on legal remedies against the Commonwealth or the enforcement of the non-impairment covenant. See [*"Commonwealth Non-Impairment Covenant"*] under SECURITY AND SOURCE OF PAYMENT OF THE COFINA BONDS.

In addition, other future actions by the Legislative Assembly that do not violate the Commonwealth's statutory non-impairment covenant could also materially adversely affect the value of the COFINA Bonds and the recoveries on the COFINA Bonds.

## G.    Risks Related to Tax Treatment of the COFINA Bonds

### *The treatment of the exchange of the Existing Securities for COFINA Bonds is uncertain.*

The Debtor expects that the exchange of Existing Securities for COFINA Bonds will constitute a taxable exchange for U.S. federal income tax purposes. A U.S. Holder (as defined in "Material United States Federal Income Tax Considerations") will recognize gain or loss equal to the difference between the amount realized on the exchange (except to the extent attributable to accrued and unpaid interest) and the U.S. Holder's adjusted tax basis in the Existing Securities on the date of the exchange. If, the IRS were to determine that the exchange of the Existing Securities for the COFINA Bonds is treated as a recapitalization contrary to our expectation, gain or loss generally would not be recognized for U.S. federal income tax purposes in connection with the exchange of the Existing Securities for COFINA Bonds, and other tax consequences described below under "Material United States Federal Income Tax Considerations" may differ materially. See "*Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims"—Holders of Senior Bond COFINA Claims (Class 1), Senior Bond COFINA Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior Bond COFINA Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Tax Treatment of Exchange.*"

### *The proportion of COFINA Bonds that will be issued as tax-exempt debt is uncertain.*

The COFINA Bonds will be issued either as Tax-Exempt Bonds (as defined in "Material United States Federal Income Tax Considerations") or Taxable Bonds (as defined in "Material United States Federal Income Tax Considerations"). While the Commonwealth expects that, under existing law as of the date of this Disclosure Statement, interest on at least a portion of the COFINA Bonds will be Tax-Exempt Bonds, the proportion of COFINA Bonds that will be Tax-Exempt Bonds is uncertain and cannot be determined as of the date of this Disclosure Statement. The Commonwealth expects to cause an opinion of nationally recognized bond counsel addressing the tax status of the COFINA Bonds to be delivered with the COFINA Bonds on the Effective Date.  Recipients of the COFINA Bonds should refer to such opinion for more information on the tax status of the COFINA Bonds. However, such opinion is not binding on the IRS or the courts, and it is possible that the IRS or the courts may disagree with any

conclusions contained therein. See "*Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims"—Holders of Senior Bond COFINA Claims (Class 1), Senior Bond COFINA Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior Bond COFINA Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Taxation of COFINA Bonds—Interest Including OID*."

**The manner in which interest accruals should be calculated with respect to the COFINA Bonds for U.S. tax purposes is uncertain.**

The Commonwealth does not intend to treat the COFINA Bonds as "contingent payment debt instruments" under the applicable Treasury Regulations (as defined in "Material United States Federal Income Tax Considerations"), and U.S. Holders will be bound by this determination in the absence of contrary determination by the IRS or the courts. However, if the IRS or a court determines that the COFINA Bonds are deemed to be contingent payment debt instruments, interest accruals on the COFINA Bonds will be determined under original issue discount principles, and each U.S. Holder, regardless of its method of accounting for U.S. federal income tax purposes, will be required to accrue income on the New Bonds on a constant yield basis at a comparable yield to the return on a fixed rate instrument with similar terms, subject to adjustments to reflect the occurrence or non-occurrence of the underlying contingency. Portions of the accrued income, or the adjustments to reflect the occurrence or non-occurrence of underlying contingencies, could be taxable to U.S. Holders even with respect to Tax-Exempt Bonds. In addition, any gain recognized by a U.S. Holder on the sale or other disposition of a COFINA Bond would be treated as ordinary interest income, and any loss would be an ordinary loss to the extent of the interest previously included in gross income and, thereafter, capital loss. See "*Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims"—Holders of Senior Bond COFINA Claims (Class 1), Senior Bond COFINA Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior Bond COFINA Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Taxation of COFINA Bonds—Interest Including OID*."

**The treatment of the National, Ambac and Assured Trusts is uncertain.**

The Commonwealth expects to take the position that the National Trust and the Assured Trust will be treated as a grantor trust for U.S. federal income tax purposes. To the extent each of these trusts is treated as a grantor trust, each National Certificate Holder (as defined in "Material United States Federal Income Tax Considerations") and Assured Certificate Holder (as defined in "Material United States Federal Income Tax Considerations") will be treated as receiving their respective National Certificate or Assured Certificate in exchange of their Allowed Claims, and as owning its pro rata undivided interest in the assets held in such trust, each to the extent of its pro rata interest in the custodial certificates of such trust. Furthermore, the Commonwealth expects to take the position that the Ambac Trust will be treated as a partnership for U.S. federal income tax purposes. To the extent the Ambac Trust is treated as a partnership, it should not be subject to any entity level U.S. federal income tax. Each holder of an Ambac Certificate (an "<u>Ambac Certificate Holder</u>") will be treated as receiving their respective certificate in exchange of their Allowed Claims, and as owning an interest in the Ambac Trust. However, contrary to our expectation, the IRS may determine that the National,

Ambac and Assured Trusts are properly characterized in a manner other than as provided herein. See "*Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims"—Holders of Senior Bond COFINA Claims (Ambac) that elect to receive the Ambac Certificates (Class 2), Senior Bond COFINA Claims (National) that elect to receive the National Certificates (Class 3) and Junior Bond COFINA Claims (Assured) (Class 6) —Tax Characterization of the Trusts.*"

**U.S. Holders may be required to report income in certain years in excess of the amount of cash received by such holders in those years, resulting in "phantom income" for U.S. federal income tax purposes.**

If, for U.S. federal income tax purposes, the COFINA Bonds that are Taxable Bonds (as defined in "Material United States Federal Income Tax Considerations") are issued with more than a de minimis amount of original issue discount, generally, 0.25% of the stated redemption price at maturity multiplied by the number of remaining complete years to maturity, then a holder of Taxable Bonds subject to U.S. federal income tax must include original issue discount in income as it accrues (regardless of the holder's regular method of tax accounting) using a constant yield method under the accrual rules for original issue discount. If interest accruals exceed the cash payments on the Taxable Bonds in any year, a U.S. Holder will have "phantom income" in that year, which may be substantial.

In the event of a sale or other taxable disposition of a COFINA Bond with accrued market discount, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued in the event of a sale or other taxable disposition of a COFINA Bond. Recent legislation and IRS guidance may affect the timing of interest inclusion and market discount inclusions for accrual basis taxpayers that maintain financial statements in accordance with GAAP or any other financial reporting standard. See "*Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims"— Holders of Senior Bond COFINA Claims (Class 1), Senior Bond COFINA Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior Bond COFINA Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Taxation of COFINA Bond.*"

ALL HOLDERS SHOULD READ THE DISCUSSION OF THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP, AND THE DISPOSITION OF THE NEW BONDS THAT IS CONTAINED IN THIS DISCLOSURE STATEMENT UNDER THE HEADING "MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS."

### XIII.   Material United States Federal Income Tax Considerations

**A.    General**

A general description of certain material U.S. federal income tax consequences of the Plan of Adjustment to Holders of certain Claims is provided below. This description is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), regulations promulgated under

the IRC (the "<u>Treasury Regulations</u>"), judicial decisions and administrative determinations, all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect. Changes in any of these authorities or in their interpretation could cause some or all of the U.S. federal income tax consequences of the Plan of Adjustment to differ materially from the consequences described below.

The U.S. federal income tax consequences of the Plan of Adjustment are complex. As of the date of this Disclosure Statement, no ruling has been requested from the Internal Revenue Service (the "<u>IRS</u>"); no opinion has been requested from the Debtor's counsel concerning any tax consequence of the Plan of Adjustment except as specifically set forth therein; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of U.S. federal income taxation that may be relevant to Holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers (*e.g.*, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency for tax purposes is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax, individuals receiving Social Security or Railroad Retirement benefits, and persons whose claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, the description does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires COFINA Bonds in the secondary market. Furthermore, the description does not discuss state, territorial (including Puerto Rico), local or non-U.S. income or other tax consequences (including estate or gift tax consequences).

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of a Claim. Holders of Claims are urged to consult with their own tax advisors regarding the federal, state, territorial (including Puerto Rico), local and non-U.S. tax consequences of the Plan of Adjustment.

**The Puerto Rico tax consequences of the Plan of Adjustment to Holders that are bona fide residents of the Commonwealth, and others who may be subject to tax on a gross or net basis by the Commonwealth are not discussed in this section. Such Holders should review the section "Certain Material Puerto Rico Income Tax Considerations" below.**

**B.      U.S. Holders**

**1.      Definition of U.S. Holder**

Unless otherwise noted, the discussion below applies only to U.S. Holders. As used herein, the term "<u>U.S. Holder</u>" means a beneficial owner of Existing Securities on the Effective Date of the Plan of Adjustment that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Existing Securities, the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership holding Existing Securities are urged to consult their tax advisors.

If you are a "U.S. Holder" that is an individual bona fide resident of Puerto Rico for all or part of the taxable year that includes the Effective Date, the application of this discussion to you may depend on your individual circumstances, except where specifically noted below for Holders of Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election). Such Holders should consult their own tax advisors regarding the U.S. income tax consequences of the Plan of Adjustment in their individual circumstances and should also review the section "Certain Material Puerto Rico Income Tax Considerations" below.

A U.S. Holder who holds Allowed Claims on more than one Class may have different U.S. federal income tax consequences for each Class of Allowed Claims. Holders should carefully review the sections of this discussion applicable to each Class of Allowed Claims such U.S. Holder holds, and U.S. Holders of more than one Class of Allowed Claims should consult their own tax advisors as to the potential interaction of the U.S. federal income tax consequences of each Class of Allowed Claims such U.S. Holder holds.

Certain U.S. Holders that use the accrual method of accounting for U.S. federal income tax purposes generally will be required to include certain amounts in income with respect to the Allowed Claims no later than the time that such amounts are reflected on certain financial statements of such U.S. Holders. Such U.S. Holders should consult their own tax advisors for regarding the U.S. federal income tax consequences of the Plan of Adjustment in their individual circumstances.

2.  **Tax Treatment of Allowed Claims**

   (a)  ***Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to***

*receive the National Certificates (Class 3) and Junior COFINA Bond*
*Claims (Class 5)*

The Debtor expects that pursuant to the Plan of Adjustment, each U.S. Holder of any of the following: Senior COFINA Bond Claims; Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates; Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates; and Junior COFINA Bond Claims will be treated as exchanging a portion of such U.S. Holder's Existing Securities that are the subject of these Classes of Allowed Claims for COFINA Bonds and exchanging the remaining portion of such U.S. Holder's Existing Securities that are the subject of these Classes of Allowed Claims for cash, in separate transactions for U.S. federal income tax purposes. The remainder of this discussion assumes this will be the case.

This discussion does not apply to U.S. Holders of Senior COFINA Bond Claims (Ambac) that elect to receive the Ambac Certificates or to U.S. Holders of Senior COFINA Bond Claims (National) that elect to receive the National Certificates. See below under "—Holders of Senior COFINA Bond Claims (Ambac) that elect to receive the Ambac Certificates (Class 2), and Senior COFINA Bond Claims (National) that elect to receive the National Certificates (Class 3)" regarding the U.S. federal income tax consequences of the Plan of Adjustment for such U.S. Holders.

i.      **Tax Treatment of Exchange**

The tender of the allocable portion of the Existing Securities in exchange for the COFINA Bonds will be treated as an exchange of such allocable portion of the Existing Securities for the COFINA Bonds for U.S. federal income tax purposes.

Whether or not such exchange will be taxable for a U.S. Holder will depend in part on whether or not the exchange of a portion of the Existing Securities for the COFINA Bonds qualifies as a recapitalization for U.S. federal income tax purposes. The exchange of such portion of the Existing Securities for COFINA Bonds will constitute a recapitalization for U.S. federal income tax purposes only if (i) COFINA is classified as a corporation for U.S. federal income tax purposes and (ii) both the Existing Securities and the COFINA Bonds are treated as "securities" for purposes of the applicable IRC provisions. It is not clear whether COFINA would be classified as a corporation for U.S. federal income tax purposes. We believe that the Existing Securities and the COFINA Bonds are securities for U.S. federal income tax purposes. While the matter is not free from doubt, the Debtor intends to take the position that the exchange does not qualify as a recapitalization because COFINA should not be classified as a corporation for U.S. federal income tax purposes. However, no direct authority exists on this issue, and U.S. Holders should consult their own tax advisors regarding whether the exchange qualifies as a recapitalization for U.S. federal income tax purposes.

a.      **Tax Treatment if the Exchange is not Treated as a**
        **Recapitalization**

If, consistent with our expectation, the exchange of a portion of the Existing Securities for the COFINA Bonds pursuant to the Plan of Adjustment does not qualify as a recapitalization,

then the exchange will be considered a taxable exchange under section 1001 of the IRC. In this case, a U.S. Holder will recognize gain or loss in an amount equal to (i) the "issue price" of the COFINA Bonds for U.S. federal income tax purposes (determined in the manner described below under "—Issue Price"), (ii) less the allocable portion of the U.S. Holder's adjusted tax basis in the Existing Securities that were tendered therefor (such adjusted tax basis calculated as described below). Subject to the discussion under "—Market Discount," any gain or loss that a U.S. Holder recognizes upon the exchange of the allocable portion of the Existing Securities for the COFINA Bonds pursuant to the exchange will generally be capital gain or loss and, if the U.S. Holder's holding period of the Existing Securities surrendered is more than one year, long-term capital gain or loss.

If the exchange of the allocable portion of Existing Securities for COFINA Bonds is a taxable exchange, the holding period for the COFINA Bonds will begin the day after the exchange. A U.S. Holder's tax basis in the COFINA Bonds received in the exchange will generally be equal to the "issue price" of the COFINA Bonds (determined in the manner described below under "—Issue Price").

### b.    Tax Treatment if the Exchange is Treated as a Recapitalization

If contrary to our expectation, the IRS determines that the exchange of the allocable portion of the Existing Securities for the COFINA Bonds is treated as a recapitalization, then gain or loss generally would not be recognized for U.S. federal income tax purposes in connection with the U.S. Holder's receipt of the COFINA Bonds.

A U.S. Holder will generally have an adjusted tax basis in an Existing Security (equal to the amount it paid for such Existing Security), plus any original issue discount ("OID," described below) and market discount previously included in income in respect of such Existing Security and minus any payments on the Existing Securities other than a payment of qualified stated interest and any previously amortized bond premium on such Existing Security.

Further, if the exchange is treated as a recapitalization, a U.S. Holder's aggregate tax basis in the COFINA Bonds received in the exchange will be equal to the allocable portion of such U.S. Holder's tax basis in the Existing Securities exchanged therefor, plus the amount of any gain recognized by such U.S. Holder on the exchange, minus cash (other than cash received attributable to accrued but unpaid interest) and fair market value of other property received for the Existing Securities. The U.S. Holder's holding period in the COFINA Bonds will include the holding period for the Existing Securities exchanged therefor.

### c.    Tax Treatment of Receipt of Cash

### (1)    Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash

Each of Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash is expected to be treated as a payment on the Existing Securities, other than cash received attributable to accrued but unpaid interest. The Plan of Adjustment provides that, to the extent applicable, all distributions to a Holder of a Claim will apply first to the principal amount

of such Claim until such principal amount is paid in full and then to any applicable accrued interest included in such Claim to the extent that interest is payable under the Plan of Adjustment. Legislative history of the Bankruptcy Tax Act of 1980 indicates that an allocation of consideration as between principal and interest provided in certain reorganizations under the United States Bankruptcy Code is binding for U.S. federal income tax purposes. The Treasury Regulations generally treat payments on indebtedness as allocated first to accrued but unpaid interest. However, the IRS has provided that in the case of an insolvent issuer, payments in liquidation of the debt (including tax-exempt bonds) are allocated first, to principal and then to accrued but unpaid interest. While the Debtor intends to report distributions to a U.S. Holder in accordance with the Plan of Adjustment, there can be no assurance that the IRS will respect those allocations with respect to Existing Securities. U.S. Holders should consult their tax advisors to determine the appropriate characterization of payment received.

A U.S. Holder will recognize gain or loss in an amount equal to (i) the cash received (other than cash received attributable to accrued but unpaid interest), (ii) less the allocable portion of the U.S. Holder's adjusted tax basis in the Existing Securities that were tendered therefor (such adjusted tax basis calculated as described above). Subject to the discussion under "—Market Discount," any gain or loss that a U.S. Holder recognizes upon the exchange of the allocable portion of Existing Securities for cash will generally be capital gain or loss and, if the U.S. Holder's holding period of the Existing Securities surrendered is more than one year, long-term capital gain or loss. Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders. The deductibility of capital losses is subject to limitations.

If any of the cash received is attributable to accrued but unpaid interest, the treatment of such cash paid to a U.S. Holder will depend on whether the accrued but unpaid interest on such U.S. Holder's Claim is, or is not, tax-exempt for U.S. federal income tax purposes. In general, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be required to include such amount of cash received as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest. A U.S. Holder that was previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan of Adjustment. However, a U.S. Holder that receives a distribution of accrued but unpaid interest on a Claim that is tax-exempt will not be required to include such amount as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest. Although U.S. Holders generally will not be required to include the foregoing amounts in computing U.S. taxable income, U.S. Holders will likely have to report such amounts to the IRS.

For tax-exempt Existing Securities that are capital appreciation bonds, the accrual of the original issue discount is treated as tax exempt interest and, as such original interest discount accrued, the amount thereof would have increased the tax basis of a bondholder, thereby increasing a bondholder's investment in the capital appreciation bond. Such increase in tax basis is generally considered an increase in the principal amount of the capital appreciation bond such that the principal amount is equal to the accreted value thereof from time to time. While there is no direct authority that concludes such accruals are treated as principal for purposes of applying the allocation rules between principal and interest described above for insolvent issuers, the treatment of such accruals as principal for general federal income tax purposes should also apply

in this case.

U.S. Holders of Claims on which interest has accrued are urged to consult their own tax advisors regarding the tax treatment of distributions under the Plan of Adjustment and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

### (2)     Consummation Costs

The U.S. federal income tax treatment of the Consummation Costs is unclear. The Debtor intends to treat the receipt of the Consummation Costs in the same manner as the Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash as discussed above under "—Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash". It is possible, however, that the Consummation Costs could instead be treated as a separate fee that would be reported as ordinary income, rather than an amount paid under the Existing Securities. U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax treatment of the Consummation Costs.

### (3)     National Payment and Ambac Payment

The Holders of Senior COFINA Bond Claims (National) and Senior COFINA Bond Claims (Ambac) that do not validly elect to receive the National Certificates of Ambac Certificates, respectively, will each receive their pro rata portion of Senior COFINA Bond Distribution plus consideration from National or Ambac, as applicable. Generally, for U.S. federal income tax purposes, the IRS treats a bond insurance policy as both incidental and not a separate debt instrument or similar investment if, at the time it is purchased: (i) the amount paid to obtain it is reasonable; (ii) the purchase is customary; and (iii) it is consistent with the expectation that the issuer of the bonds, rather than the insurer, will pay debt service on the bonds. Additionally, the result is the same regardless of whether the holder acquired the bonds at original issuance or on the secondary market. Although the matter is not free from doubt, we believe that the Senior COFINA Bond Distribution received by U.S. Holders of Senior COFINA Bond Claims (National) and U.S. Holders of Senior COFINA Bond Claims (Ambac) pursuant to the Plan of Adjustment will be treated in the same manner as described above under "—Tax Treatment of Exchange; —Tax Treatment of Receipt of Cash—Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash and—Consummation Costs."

The consideration from National and Ambac will be treated as additional payment of principal or interest, as applicable, under the Existing Securities. Furthermore, to the extent that the payments relate to a tax-exempt bond, any amounts received that relate to accrued but unpaid interest will not be subject to tax. The IRS has ruled in situations where the debtor is not in bankruptcy proceedings that interest paid by an insurance company on behalf of an issuer of tax-exempt obligations is excludable from gross income of the holders of such obligations. The Debtor intends to report the consideration from National and Ambac in a manner consistent with such rulings.

U.S. Holders of Senior COFINA Bond Claims (National) and U.S. Holders of Senior COFINA Bond Claims (Ambac) should consult their own tax advisors regarding the tax treatment of payments received under the Plan of Adjustment.

191

### d.  Market Discount

If a U.S. Holder acquired the Existing Securities for less than the "adjusted issue price" of the Existing Securities and the difference between the U.S. Holder's cost and the "adjusted issue price" exceeded a *de minimis* threshold (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining complete years to maturity), such difference will generally be treated as "market discount."

If the exchange of the Existing Securities for the COFINA Bonds does not qualify as a recapitalization, any gain recognized on the exchange should be treated as ordinary income to the extent of any accrued market discount not previously included in ordinary income with respect to the Existing Securities.

If the exchange of the Existing Securities for the COFINA Bonds qualifies as a recapitalization, any accrued market discount not previously included in ordinary income with respect to the Existing Securities should generally carry over to the COFINA Bonds and not be recognized on the exchange.

However, to the extent gain is recognized pursuant to the exchange of Existing Securities for COFINA Bonds, including in the case of a recapitalization (as a result of the receipt of cash), a U.S. Holder must include as ordinary income any gain that would have otherwise been treated as capital gain to the extent of the accrued market discount on the Existing Securities, unless the U.S. Holder previously elected to include the market discount in income as it accrued. See below "—Taxation of COFINA Bonds—Sale, Retirement or Other Disposition of COFINA Bonds" for a further discussion regarding the election to include market discount in income as it accrues.

Holders should consult their own tax advisors regarding the tax treatment of market discount pursuant to the exchange including the interaction of the market discount, OID and acquisition premium rules.

### ii.  Taxation of COFINA Bonds

The COFINA Bonds will be issued as either bonds the interest on which is excluded from gross income for U.S. federal income tax purposes (the "Tax-Exempt Bonds") or bonds the interest on which is not excluded from gross income for U.S. federal income tax purposes (the "Taxable Bonds"). While the Commonwealth expects that, under existing law as of the date of this Disclosure Statement, interest on at least a portion of the COFINA Bonds will be excluded from gross income for U.S. federal income tax purposes, the tax status of the COFINA Bonds cannot be determined as of the date of this Disclosure Statement. The Commonwealth expects to cause an opinion of nationally recognized bond counsel ("Bond Counsel") addressing the tax status of the COFINA Bonds to be delivered with the COFINA Bonds on the Effective Date. Recipients of the COFINA Bonds should refer to such opinion for more information on the tax status of the COFINA Bonds.

### a.  Issue Price

The Debtor expects that the issue price of the COFINA Bonds should equal the fair

192

market value of the COFINA Bonds on the date of the exchange. This determination is based on our conclusion that both the Existing Securities and the COFINA Bonds should be treated as "publicly traded" within the meaning of the applicable Treasury Regulations. The fair market value of the COFINA Bonds will be determined by the "trading price" on the date of the exchange. There is no specific guidance on how to determine the trading price as of a specific time; however, related regulations suggest that a taxpayer may use any consistently applied, reasonable method to determine fair market value when there is more than one sales price or quoted price. Our determination that the Existing Securities and the COFINA Bonds are "publicly traded" will be binding on all Holders, unless a Holder discloses its contrary position in the manner required by applicable Treasury Regulations. The rules regarding the determination of "issue price" are complex and highly detailed, and U.S. Holders should consult their own tax advisors regarding the determination of the "issue price" of the COFINA Bonds for U.S. federal income tax purposes.

### b.      Interest Including OID

#### (1)      Tax-Exempt Bonds

The IRC imposes certain requirements that must be met subsequent to the issuance and delivery of the Tax-Exempt Bonds for interest thereon to be and remain excluded from gross income for federal income tax purposes pursuant to Section 103 of the IRC. Noncompliance with such requirements could cause the interest on the Tax-Exempt Bonds to be included in gross income for federal income tax purposes retroactive to the date of issue of the Tax-Exempt Bonds. When the Tax-Exempt Bonds are issued on the Effective Date, the Commonwealth and COFINA will covenant to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Tax-Exempt Bonds from gross income for federal income tax purposes pursuant to Section 103 of the Code. In addition, the Commonwealth and COFINA will have made certain representations and certifications relating to the Tax-Exempt Bonds. Bond Counsel will not independently verify the accuracy of those representations and certifications.

On the Effective Date, Bond Counsel is expected to deliver an opinion that, under then-existing law and assuming compliance with the aforementioned covenants, and the accuracy of the representations and certifications made by the Commonwealth and COFINA, interest on the Tax-Exempt Bonds will be excluded from gross income for federal income tax purposes under Section 103 of the Code. Bond Counsel is also expected to opine that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the IRC.

#### (2)      Taxable Bonds

If interest on the COFINA Bonds (or a portion of them) is not treated as exempt from gross income for U.S. federal income tax purposes, then payments or accruals of "qualified stated interest" (as defined below) on the COFINA Bonds (or the relevant portion of them) will be taxable to such U.S. Holder as ordinary interest income at the time received or accrued, in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the debt instrument at a single fixed rate of interest, or, subject

193

to certain conditions, based on one or more interest indices. Stated interest payments on the COFINA Bonds is expected to be qualified stated interest.

### (3)    OID

The amount of OID on the COFINA Bonds, if any, will be equal to the excess of the sum of all principal and stated interest payments (other than qualified stated interest) provided by the COFINA Bonds (initially taking into account the payment schedule as described below) over the "issue price" (determined in the manner described above under "—Issue Price") of the COFINA Bonds. Furthermore, the taxable COFINA Bonds would bear OID only if the issue price of a COFINA Bond is less than its principal amount by more than a de minimis amount. OID will be considered de minimis if it is less than 0.25% of the stated redemption price at maturity multiplied by the number of remaining complete years to maturity of the COFINA Bonds. U.S. Holders, whether on the cash or accrual method of accounting for U.S. federal income tax purposes, must include the OID in gross income (as ordinary income) as it accrues (on a constant yield to maturity basis), regardless of whether cash attributable to such OID is received at such time. However, the COFINA Bonds may be subject to the acquisition premium rules (described below under "—Acquisition Premium"), which could reduce the amount of OID includible in gross income.

For taxable COFINA Bonds, the amount of OID includible in gross income by a U.S. Holder in any taxable year generally is the sum of the "daily portions" of OID with respect to a COFINA Bond for each day during such taxable year or portion of such taxable year on which the U.S. Holder holds the COFINA Bond. The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a COFINA Bond may be of any length and may vary in length over the term of the COFINA Bond, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period, subject to the possible adjustments described below, will be an amount equal to the product of the COFINA Bond's "adjusted issue price" at the beginning of the accrual period and its yield to maturity (less payments of qualified stated interest allocable to that period). The "yield to maturity" of the COFINA Bonds is the discount rate that, when used in computing the present value (as of the issue date) of all principal and interest payments to be made on the COFINA Bonds, produces an amount equal to the "issue price" of the COFINA Bonds. The amount of OID allocable to the final accrual period is the difference between the amount payable at maturity (other than a payment of qualified stated interest) and the "adjusted issue price" at the beginning of the final accrual period. The "adjusted issue price" of a COFINA Bond at the beginning of any accrual period is equal to its "issue price," increased by the accrued OID for each prior accrual period and reduced by any payments made on the COFINA Bond during the prior accrual periods (other than payments of qualified stated interest).

For Tax-Exempt Bonds, the amount of OID is excluded from gross income for federal income tax purposes to the same extent as interest on the Tax-Exempt Bonds. The OID accruals are computed in the same manner as described above for Taxable Bonds, but such accruals will be added to the Holder's tax basis for the Tax-Exempt Bonds. The accrual of OID may be taken into account as an increase in the amount of tax-exempt income for purposes of determining

various other tax consequences of owning the Tax-Exempt Bonds, even though there will not be a corresponding cash payment. Owners of the Tax-Exempt Bonds with OID are advised that they should consult with their own advisors with respect to the tax consequences of owning such Tax-Exempt Bonds.

This disclosure assumes that the COFINA Bonds will not be considered contingent payment debt instruments.

The rules regarding OID are complex and the rules described above may not apply in all cases. If other rules apply instead, U.S. Holders receiving the COFINA Bonds could be treated differently than described above. U.S. Holders receiving the COFINA Bonds should consult their own tax advisors regarding the potential application of the OID and related U.S. federal income tax rules to the COFINA Bonds.

### c.     Acquisition Premium

A COFINA Bond would be treated as acquired at an acquisition premium if the U.S. Holder's initial basis in a COFINA Bond is (a) less than or equal to the sum of all amounts payable on the COFINA Bond (other than payments of qualified stated interest) and (b) greater than the COFINA Bond's "adjusted issue price."

If a taxable COFINA Bond was acquired with acquisition premium, generally a U.S. Holder would reduce the amount of OID that otherwise would be included in income for each accrual period by an amount equal to (i) the amount of OID otherwise includible in income multiplied by (ii) a fraction, the numerator of which is the excess of the adjusted tax basis of the COFINA Bond immediately after its acquisition by the U.S. Holder over the "adjusted issue price" of the COFINA Bond and the denominator of which is the excess of the sum of all amounts payable on the COFINA Bond after the purchase date, other than payments of qualified stated interest, over the COFINA Bond's "adjusted issue price." If a Tax-Exempt Bond were acquired with acquisition premium, a U.S. Holder will reduce the COFINA Bond's tax basis during each accrual period using the same method described above for a taxable COFINA Bond.

As an alternative to reducing the amount of OID that otherwise would be included in income during an accrual period or reducing the tax basis of the COFINA Bond in the case of a Tax-Exempt Bond, the U.S. Holder may elect to compute OID accruals by applying the constant yield method described above. U.S. Holders who acquire COFINA Bonds with acquisition premium should consult their own tax advisors as to the consequences of such an election in their individual circumstances.

### d.     Sale, Retirement or Other Disposition of COFINA Bonds

A U.S. Holder will generally recognize taxable gain or loss on the sale, exchange, retirement (including redemption) or other taxable disposition of a COFINA Bond equal to the difference, if any, between (i) the amount realized upon such disposition (other than cash received attributable to accrued but unpaid interest) and (ii) the adjusted tax basis of the COFINA Bond. A U.S. Holder's adjusted tax basis in a COFINA Bond will generally equal such U.S. Holder's tax basis on such COFINA Bond on the date the U.S. Holder acquired such

COFINA Bond, increased by any OID previously accrued by the U.S. Holder, and decreased by the amount of any cash payments (other than payments of qualified stated interest) previously received on the COFINA Bond by the U.S. Holder. U.S. Holders should consult with their own tax advisors as to the tax basis of their COFINA Bonds on the date of acquisition.

Subject to the discussion of market discount below, any gain or loss that a U.S. Holder recognizes upon the sale or other taxable disposition of a COFINA Bond should generally constitute capital gain or loss and will be long-term capital gain or loss if such Holder's holding period in the COFINA Bond is greater than one year. A U.S. Holder's holding period in COFINA Bonds received pursuant to the exchange will begin the day after the exchange, if the exchange is not treated as a recapitalization. If the exchange is treated a recapitalization, a U.S. Holder's holding period in COFINA Bonds received pursuant to the exchange will include the holding period of the Existing Securities exchanged therefor. Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders. The deductibility of capital losses is subject to limitations. U.S. Holders should consult their own tax advisors as to the possibility of market discount carrying over to the COFINA Bonds in case, contrary to our expectation, the IRS rules that the exchange of the Existing Securities for the COFINA Bonds is a recapitalization. Upon a taxable disposition of the COFINA Bonds, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued. A U.S. Holder can elect to include market discount in income as it accrues, in which case such income would be treated as ordinary interest income at the time it is recognized and the U.S. Holder would increase its basis in the COFINA Bond by the amount of the market discount recognized. Such election is made by including market discount in income on a timely filed U.S. federal income tax return and attaching a statement to the return providing that such election has been made.

If such election is made, the election applies to all market discount bonds acquired by the U.S. Holder during the year for which the election is made and all subsequent years.

(b) ***Holders of Senior COFINA Bond Claims (Ambac) that elect to receive the Ambac Certificates (Class 2), and Senior COFINA Bond Claims (National) that elect to receive the National Certificates (Class 3)***

This section only addresses U.S. Holders that elect to receive the Ambac Certificates or the National Certificates, as applicable. See below under "—Tax Treatment of Exchange if National Exercises the National Election" for the U.S. federal income tax consequences to U.S. Holders if National exercises the National Election.

i.   **National Trust[18]**

a.   **Tax Characterization of the Trust**

The National Trust is expected to be treated as a grantor trust for U.S. federal income tax purposes. To the extent the National Trust is treated as a grantor trust, each holder of a National

---

[18] NTD: Subject to further review of the trust documents.

Certificate (a "National Certificate Holder") will be treated as receiving their respective certificate in exchange of their Allowed Claims, and as owning its pro rata undivided interest in the assets held in the National Trust (the "National Trust Assets"), each to the extent of its pro rata interest in the National Certificates.  U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax treatment of the National Trust.

To the extent National Certificate Holders are treated as owning their pro rata share of the National Trust Assets under a grantor trust, they will be treated as if they had received distributions under the Plan of Adjustment directly and as owners of their pro-rated portion of the COFINA Bonds.  Interest on a portion of such COFINA Bonds is expected to be excluded from gross income for U.S. federal income tax purposes (such interest, the "National Trust Tax-Exempt Interest").  Orrick Herrington & Sutcliffe, LLP expects to deliver an opinion, on the Effective Date, that, under then current law, the National Trust Tax-Exempt Interest received by the National Trust, and passed through and paid to the National Certificate Holders will be excluded from gross income for federal incomes tax purposes to the same extent as if the COFINA Bonds were directly held by the National Certificate Holders.  Such opinion is subject to the final documentation governing the National Trust.  The opinion of Orrick Herrington & Sutcliffe, LLP is not binding on the IRS or the courts.  No opinion is expected to be delivered by Orrick Herrington & Sutcliffe, LLP or any other counsel on payments made to the National Trust, and passed through to the National Certificate Holders, that do not derive from the COFINA Bonds.

It is possible that the IRS may assert that the National Trust is properly characterized in a manner other than as a grantor trust for U.S. federal income tax purposes. Such alternative characterization could result in different (and possibly adverse) tax consequences to the National Trust and the National Certificate Holders. All National Certificate Holders are urged to consult their own tax advisors regarding the tax consequences in case the National Trust is not classified as a grantor trust for U.S. federal income tax purposes.

### b.      Taxation of Ownership and Sale or Disposition of the National Certificates

To the extent that each National Certificate Holder is treated as owning its pro rata share of the applicable outstanding COFINA Bonds and related insurance policy, it will be entitled to payments from the underlying insurance policy.  See "Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Tax Treatment of Exchange—Receipt of Cash—National Payment and Ambac Payment" for a discussion of U.S. federal income tax treatment of the insurance payment.  To the extent that each National Certificate Holder is treated as owning its pro rata share of the COFINA Bonds, see "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Taxation of COFINA Bonds" above for a discussion of the U.S. federal income tax consequences of owning the COFINA Bonds.

To the extent that each National Certificate Holder is treated as receiving its pro rata share of the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National) including the Consummation Cost, see above "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Treatment of Exchange" for the U.S. federal income tax consequences of receiving such distribution.

Certain aspects of the U.S. federal income tax treatment of owning and disposing of a National Certificate are uncertain. U.S. Holders should consult their tax advisors regarding the ownership, sale and disposition of the National Certificates in their individual circumstances.

### c.      Tax Treatment of Exchange if National Exercises the National Election

If National exercises the National Election, U.S. Holders of Senior COFINA Bond Claims (National) will receive cash consideration in an amount equal to one hundred percent (100%) of the Compounded Amount (as defined in the Bond Resolutions) of the National Insured Bonds. As discussed above in "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Treatment of Exchange—Tax Treatment of Receipt of Cash," generally, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on a Bond Claim that is not tax-exempt may be required to include such amount as interest income for U.S. federal income tax purposes. Otherwise, the remainder portion of such cash consideration is expected to be treated as a payment under the Existing Securities. A U.S. Holder would recognize gain or loss in an amount equal to the difference between (i) the cash received, and (ii) the U.S. Holder's adjusted tax basis in the Senior COFINA Bond Claims (National).

### ii.      Ambac Trust

### a.      Tax Characterization of the Trust

Although it is not free from doubt, the Ambac Trust is expected to be treated as a partnership for U.S. federal income tax purposes. To the extent the Ambac Trust is treated as a partnership, it should not be subject to any entity level U.S. federal income tax. Each holder of an Ambac Certificate (an "Ambac Certificate Holder") will be treated as receiving their respective certificate in exchange of their Allowed Claims, and as owning an interest in the Ambac Trust. Certain restrictions and limitations may be placed on the ownership or transferability of the Ambac Certificates if a determination is made that such provisions are necessary or desirable to prevent the Ambac Trust from being treated as a publicly traded partnership taxable as a corporation.

U.S. Holders should consult with their own tax advisors regarding the U.S. federal income tax treatment of the Ambac Trust.

### b.    Taxation of Sale or Other Disposition of Tax-Exempt Bonds

To the extent that Tax-Exempt Bonds are sold at a gain, such gain shall be distributed to each Ambac Certificate Holder but will be subject to U.S. federal income taxation to the extent not offset by any consequent losses.

### (c)    *Junior COFINA Bond Claims (Assured) (Class 6)*

#### i.    Tax Treatment of Exchange if Assured Exercises the Assured Election

If Assured exercises the Assured Election, U.S. Holders of Junior COFINA Bond Claims (Assured) will receive one hundred percent (100%) of the Junior COFINA Bond Claims (Assured) at an acceleration price of par plus accrued interest or Compounded Amount. Generally, the U.S. federal income tax consequences to the U.S. Holders in the case of the Assured Election generally would be as described above. See above under "—Treatment of Exchange if National Exercises the National Election."

#### ii.    Tax Characterization of the Assured Trusts

Each Assured Trust is expected to be treated as a grantor trust for U.S. federal income tax purposes. To the extent each Assured Trust is treated as a grantor trust, each holder of a related Assured Certificate (an "Assured Certificate Holder") will be treated as receiving its respective Assured Certificate in exchange for its Allowed Claims, and as owning its pro rata beneficial ownership interest in the assets held in such Assured Trust (the "Assured Trust Assets"), each to the extent of its pro rata interest in the Assured Certificates. U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax treatment of the Assured Trusts.

To the extent Assured Certificate Holders are treated as owning their pro rata share of the Assured Trust Assets, as if under a grantor trust, they will be treated as if they had received distributions under the Plan of Adjustment directly and as owners of their pro rated portion of the COFINA Bonds.  Interest on a portion of such COFINA Bonds is expected to be excluded from gross income for U.S. federal income tax purposes (such interest, the "Assured Trust Tax-Exempt Interest").

It is possible that the IRS may assert that the Assured Trusts are properly characterized in a manner other than as a grantor trust for U.S. federal income tax purposes. Such alternative characterization could result in different (and possibly adverse) tax consequences to the Assured Trusts and the Assured Certificate Holders.  No opinion is expected to be delivered to the Assured Trustee or any Assured Certificate Holders on the treatment of any Assured Trust as a grantor trust or the treatment of any payments made to any Assured Trust, and passed through to the Assured Certificate Holders, for Federal income tax purposes.  All Assured Certificate Holders are urged to consult their own tax advisors regarding the tax consequences in case any Assured Trust is not treated as a grantor trust for U.S. federal income tax purposes.

#### iii.    Taxation of Ownership and Sale or Disposition of the Certificates

To the extent that each Assured Certificate Holder is treated as owning its pro rata share of the applicable outstanding COFINA Bonds and related insurance policy, it will be entitled to payments from the underlying insurance policies.  See "Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Tax Treatment of Exchange—Receipt of Cash—National Payment and Ambac Payment" for a discussion of U.S. federal income tax treatment of the insurance payment.  To the extent that each Assured Certificate Holder is treated as owning its pro rata share of the COFINA Bonds, see "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Taxation of COFINA Bonds" above for a discussion of the U.S. federal income tax consequences of owning the COFINA Bonds. To the extent that each Assured Certificate Holder is treated as receiving its pro rata share of Section 103 Cash and/or Rounding Amount Cash, see above "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Treatment of Exchange—Tax Treatment of Receipt of Cash" for the U.S. federal income tax consequences of receiving such consideration.

Certain aspects of the U.S. federal income tax treatment of owning and disposing of an Assured Certificate are uncertain. U.S. Holders should consult their tax advisors regarding the ownership, sale and disposition of the Assured Certificates in their individual circumstances.

### (d) *Holders of Senior COFINA Bond Claims (Taxable Election) (Class 4) and Junior COFINA Bond Claims (Taxable Election) (Class 7)*

The exchange of the Existing Securities for the COFINA Bonds and the distribution of Rounding Amount Cash by U.S. Holders of Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) generally will be treated as described above under "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Tax Treatment of Exchange; —Tax Treatment of Receipt of Cash—Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash and—Consummation Costs." Although, not free from doubt, the Debtor expects that the Taxable Bond Election Amount generally shall be treated similarly to our description above of Consummation Costs under "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Tax Treatment of Receipt of Cash— Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash and— Consummation Costs."

U.S. Holders of Senior COFINA Bond Claims and Junior COFINA Bond Claims that are eligible to make the election described above should consult their own tax advisors regarding the

U.S. federal income tax consequences of making such election.

### (e)  *Holders of GS Derivative Claims (Class 8)*

The tax treatment of derivatives is complex. U.S. Holders of GS Derivative Claims should refer to the underlying offering document and agreement and consult their tax advisors regarding the tax treatment of their derivatives including the consequences of the termination of their contracts.

### (f)  *Holders of General Unsecured Claims (Class 9)*

In the event that a U.S. Holder of General Unsecured Claims votes to accept the Plan of Adjustment and receives its pro rata share of One Hundred Thousand Dollars ($100,000.00), it would recognize gain or loss in an amount equal to the difference between (a) the amount of such cash, and (b) the U.S. Holder's adjusted tax basis in such General Unsecured Claims.

### 3.    Bad Debt and/or Worthless Securities Deduction

A U.S. Holder who, under the Plan of Adjustment, receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction or a worthless securities deduction. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims should consult their tax advisors with respect to their ability to take such a deduction.

### 4.    Medicare Surtax

A U.S. Holder of Taxable Bonds that is an individual, estate or trust that does not fall into a special class of trusts that is exempt from such tax, is subject to a 3.8% Medicare surtax on the lesser of (1) the U.S. Holder's "net investment income" (or "undistributed net investment income" in the case of an estate or trust) for the relevant taxable year, which includes, among other items, interest (including original issue discount) on debt, and capital gains from the sale or other taxable disposition of debt, and (2) the excess of the U.S. Holder's modified adjusted gross income (or adjusted gross income in the case of an estate or trust) for the taxable year over a certain threshold (which in the case of individuals is between $125,000 and $250,000, depending on the individual's circumstances). A U.S. Holder that is an individual, estate or trust should consult its own tax advisors regarding the applicability of the Medicare surtax to its income and gains in respect of its exchanges and their ownership of the COFINA Bonds.

### 5.    Information Reporting and Backup Withholding

Information reporting will generally apply to (i) payments in respect of the exchange, (ii) payments of principal and interest and OID, if any, on the COFINA Bonds, and (iii) payments of proceeds of the sale or other disposition of the COFINA Bonds.

Additionally, backup withholding may apply to any payments if such U.S. Holder (a)

fails to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has failed to report all interest and dividends required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding. The application for exemption is available by providing a properly completed IRS Form W-9 (or suitable substitute).

Backup withholding is not an additional tax. A U.S. Holder generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain U.S. Holders are not subject to information reporting and backup withholding, in some cases provided they properly identify themselves as exempt. U.S. Holders should consult their own tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

## C.    Non-U.S. Holders

### 1.    Definition of Non-U.S. Holders

Unless otherwise noted, the discussion below applies only to Non-U.S. Holders. As used herein, the term "Non-U.S. Holder" means a beneficial owner of Existing Securities that is not (i) a U.S. Holder, (ii) a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes or (iii) an individual that is a bona fide resident of Puerto Rico for all or part of the taxable year that includes the Effective Date.

The following discussion includes only certain U.S. federal income tax consequences of the Plan of Adjustment to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders should consult their own tax advisors regarding the U.S. federal, state and local and the foreign tax consequences of the consummation of the Plan of Adjustment in their individual circumstances.

### 2.    Tax Treatment of Exchange

A Non-U.S. Holder generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan of Adjustment, unless (i) such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States), in which case the gain will be subject to tax in the same manner as effectively connected income as described below under "—Sale, Retirement or Other Disposition of COFINA Bonds"; or (ii) such Non-U.S. Holder is a nonresident alien individual who holds the COFINA Bonds as a capital asset and is present in the United States for 183 days or more in the taxable year of the exchange and such gain is derived from sources within the United States.

3.      **Taxation of COFINA Bonds**

(a)      _**Treatment of Interest**_

Payments of interest on a COFINA Bond (including OID) to a Non-U.S. Holder, which will be foreign source income for U.S. federal income tax purposes, generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such income is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and interest (including OID) on the Taxable Bonds is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

(b)      _**Sale, Retirement or Other Disposition of COFINA Bonds**_

Gain realized upon a sale, retirement or other disposition of a COFINA Bond by a Non-U.S. Holder generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such gain is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a COFINA Bond by the Non-U.S. Holder is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

The tax consequences of the Plan of Adjustment to the Non-U.S. Holders are uncertain. Non-U.S. Holders should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan of Adjustment.

4.      **FATCA**

Pursuant to FATCA, foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities generally must comply with certain new information reporting rules with respect to their U.S. account holders and investors or confront a new withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party). A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements generally would be subject to withholding tax with respect to any "withholdable payments." For this purpose, "withholdable

101361236v22

payments" are any U.S.-source payments of fixed or determinable, annual or periodic income and, beginning January 1, 2019, also include the entire gross proceeds from the sale or other disposition of any property of a type which can produce U.S.-source interest or dividends even if the payment would otherwise not be subject to U.S. nonresident withholding tax. For taxable years beginning no earlier than January 1, 2019, withholding under FATCA generally may apply to certain "foreign passthru payments." Withholding under FATCA generally should not apply to payments of interest (including OID) under a COFINA Bond because such payment generally should be foreign source income. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Holders should consult with their tax advisors as to the application of FATCA in their individual circumstances.

### XIV. <u>XIII. Certain Material Puerto Rico Income Tax Considerations</u>

A general description of certain material Puerto Rico income tax consequences of the Plan of Adjustment to Holders of Allowed Claims is provided below. This summary is based on current provisions of Act No. 91 of May 13, 2016, as amended, known as the Urgent Interest Fund Act, the Puerto Rico Internal Revenue Code of 2011, as amended (the "<u>P.R. Code</u>") and the regulations promulgated or applicable thereunder issued by the Department of Treasury of Puerto Rico (the "<u>P.R. Treasury</u>"), the Puerto Rico Municipal Property Tax Act of 1991, as amended, and the regulations promulgated thereunder, the Municipal License Tax Act, as amended, and the regulations promulgated thereunder, and administrative pronouncements and judicial decisions in connection with the foregoing laws and regulations (collectively, "<u>Applicable P.R. Tax Law</u>"). Changes in or new interpretations of Applicable P.R. Tax Law may have retroactive effect and could significantly affect the Puerto Rico tax consequences described below.

The Puerto Rico tax consequences of the Plan of Adjustment are complex. No ruling has been requested from the P.R. Treasury with respect to the tax consequences discussed herein, and the discussion below is not binding upon P.R. Treasury or the courts. No tax opinion is given by this disclosure statement and no assurance can be given that P.R. Treasury would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically noted otherwise, this summary does not address U.S. federal, state, local or foreign tax consequences of the exchange, nor does it purport to address all aspects of Puerto Rico taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as registered investment companies, broker-dealers, banks, insurance companies, financial institutions, tax-exempt organizations, corporations of individuals, partnership or other pass-through entities, beneficial owners of pass-through entities, Holders who hold Claims or who will hold the COFINA Bonds as part of a straddle, hedge, conversion transaction, or other integrated investment, or subsequent purchasers of COFINA Bonds).

Furthermore, this summary assumes that a Holder holds Existing Securities and COFINA Bonds only as a "capital asset" (within the meaning of section 1034.01(a)(1) of the P.R. Code) and that the COFINA Bonds qualify as debt under the P.R. Code.

**THIS SUMMARY IS FOR GENERAL INFORMATION PURPOSES ONLY, AND**

101361236v22

**IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR WITH REGARD TO THE APPLICATION OF THE APPLICABLE P.R. TAX LAWS , AS WELL AS THE APPLICATION OF NON-INCOME TAX LAWS AND THE LAWS OF NON-PUERTO RICO TAXING JURISDICTIONS, TO YOUR PARTICULAR SITUATION.**

**A.    P.R. Holders**

**1.    Definition of P.R. Holder**

Unless otherwise noted, the discussion below applies only to P.R. Holders. As used herein, the term "P.R. Holder" means a beneficial owner of Existing Securities or COFINA Bonds, that is:

- An individual who for the entire taxable year is a bona fide resident of Puerto Rico for purposes of section 933 of the IRC (as determined under section 937(a) of such code) and resident of Puerto Rico for purposes of the P.R. Code;

- a corporation or other entity organized under the laws of Puerto Rico that is treated as a corporation for Puerto Rico income tax purposes, excluding a corporation or any other type of entity subject to pass through tax treatment or any other special tax regime under the P.R. Code;

- an estate, the income of which is subject to Puerto Rico income taxation regardless of its source;

- a trust (other than a business trust), all of the beneficiaries of which are individual residents of Puerto Rico, as described above.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds Existing Securities or COFINA Bonds, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership are urged to consult their tax advisors.

**B.    Consequences to P.R. Holders**

**1.    Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2); Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3); and Junior COFINA Bond Claims (Class 5) (These Holders are collectively referred to in this discussion as the "SENIOR AND JUNIOR HOLDERS")**

**(a)    _Tax Treatment of Exchange_**

205

The exchange of Existing Securities for COFINA Bonds will constitute a taxable exchange of the Existing Securities, unless such exchange qualifies as a recapitalization under the P.R. Code. An exchange of Existing Securities for COFINA Bonds will constitute a tax-free recapitalization, in part, for Puerto Rico income tax purposes if (i) COFINA is classified as a corporation under the P.R. Code and (ii) both the Existing Securities and the COFINA Bonds are treated as "securities" for purposes of the applicable P.R. Code provisions. It is not clear whether COFINA would be classified as a corporation under the P.R. Code. While the matter is not free from doubt, the Debtor intends to take the position that the exchange does not qualify as a recapitalization because under the P.R. Code since COFINA does not seem to be the type of entity classified as a corporation. However, no direct Puerto Rico authority exists on this issue, and P.R. Holders should consult their own tax advisors regarding whether the exchange qualifies as a recapitalization for Puerto Rico income tax purposes and the Puerto Rico income tax consequences in that event. The discussion below assumes that the exchange of Existing Securities for the COFINA Bonds does not qualify as a recapitalization.

### (b)   *Exchange of Existing Securities for COFINA Bonds*

If, consistent with our position, the exchange of the Existing Securities for the COFINA Bonds pursuant to the Plan of Adjustment does not qualify as a recapitalization, the exchange of Existing Securities for the COFINA Bonds will constitute a taxable exchange for Puerto Rico income tax purposes. Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the P.R. Holder's adjusted tax basis in the Existing Securities on the date of the exchange. The amount realized on the exchange of Existing Securities will equal the fair market value of each COFINA Bond plus any cash received (except for any portion attributable to accrued and unpaid interest). Please refer to the discussion below related to cash payments for consummation costs and insurance payments.

Gain or loss on the exchange of Existing Securities for COFINA Bonds will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the COFINA Bonds is longer than one year. Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the alternate basic tax is applicable). The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the exchange of the Existing Securities for COFINA Bonds against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term losses for seven taxable years and may be used to offset up to 80% of the capital gains realized during any such taxable years.

*Accrued Interest.* To the extent that any consideration (*i.e.*, COFINA Bonds or portion thereof, plus any cash payment) received by a P.R. Holder in exchange for Existing Securities is attributable to accrued and unpaid interest on the Existing Securities, that amount of consideration will be considered exempt interest income for Puerto Rico income tax purposes. In that event, the portion allocated to accrued and unpaid interest will reduce the amount realized by the P.R. Holder to compute gain or loss on the exchange.

The Plan of Adjustment provides that, to the extent applicable, all distributions to a Holder of an Allowed Claim will be applied first to the principal amount of such Allowed Claim until such principal amount is paid in full and then to any applicable accrued interest included in such Allowed Claim to the extent that interest is payable under the Plan of Adjustment. There is no specific Applicable P.R. Tax Law that considers how payments must be applied in our situation. Therefore, for Puerto Rico income tax purposes, the Debtor intends to treat the distributions to a P.R. Holder in accordance with the Plan of Adjustment. In that event, any distributions received under the Plan of Adjustment would be applied first to reduce your adjusted basis in the Existing Securities (and if it is not sufficient to cover the adjusted basis in the Existing Securities, any amount not covered will be used to compute your loss), next to reduce your accrued and unpaid interest and lastly to determine your gain.

***Cash payments of Consummation Costs and Insurance Payments.*** The Puerto Rico income tax treatment of cash payments of consummation costs and the insurance payments is not specifically addressed by Applicable P.R. Tax Law and there is no clear guidance on the matter. However, the Debtor intends to treat the National and Ambac payments similar to the treatment adopted for U.S. federal income tax purposes, thus, they will be part of your amount realized on the exchange of Existing Securities for COFINA Bonds and subject to Puerto Rico income taxes as described above. Please refer to the U.S. federal income tax discussion of "Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2); Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3); and Junior COFINA Bond Claims (Class 5) — Tax Treatment of Receipt of Cash". However, P.R. Treasury may not agree and consider such payments (or some of them) as amounts not paid under the Existing Securities and tax them separately as ordinary income.

P.R. Holders should consult their own tax advisors regarding the tax treatment of distributions received under the Plan of Adjustment.

### (c)     ***Ownership of COFINA Bonds***

*Interest*. Interest paid or accrued to P.R. Holders on the COFINA Bonds will not be subject to Puerto Rico income tax, including the alternate basic tax, and the municipal license tax.

The excess of the principal amount of the COFINA Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

Ownership of the COFINA Bonds may result in a portion of the interest paid or accrued by a P.R. Holder and other expenses incurred by the P.R. Holder attributable to interest on the COFINA Bonds being disallowed as deductions for Puerto Rico income tax purposes.

***Sale, Exchange or Retirement of the COFINA Bonds.*** Gain or loss on the sale or exchange of COFINA Bonds will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the COFINA Bonds is longer than one year. Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be

subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the alternate basic tax is applicable). The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the sale or exchange of the COFINA Bonds against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term losses for seven taxable years and may be used to offset up to 80% of the capital gains realized during any such taxable years.

*Property Taxes*. The COFINA Bonds will be exempt from Puerto Rico property taxes.

*Estate and Gift Taxes.* The transfer of the COFINA Bonds by gift or upon the death of a P.R. Holder that is an individual will not be subject to Puerto Rico estate or gift taxes.

2.    **Holders of Senior COFINA Bond Claims (Ambac) that elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Assured) (Class 6)**

For purposes of the following discussion, each of the Ambac Trust, the National Trust and the Assured Trust will be referred to as a "Trust," as applicable, and the assets that shall be deposited into each such Trust as "Trust Assets," as applicable. Each of the Ambac Certificates, the National Certificates and the Assured Certificates will be referred to as a "Custodial Certificate," and each P.R. Holder who holds such Custodial Certificates will be referred to as a "Certificate Holder."

(a)    *Tax Characterization of the Trusts*

Under the P.R. Code, the Trusts will be classified as grantor trusts if classified as such for U.S. federal income tax purposes. Therefore, please refer to the U.S. federal income tax discussion under "Holders of Senior COFINA Bond Claims (Ambac) that elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that elect to receive the National Certificates (Class 3) — National Trust — Tax Characterization of the Trust — Ambac Trust — Tax Characterization of the Trust" and "Junior COFINA Bond Claims (Assured) (Class 6) — Tax Characterization of the Assured Trust".

The rest of this discussion assumes that the Trusts will be classified as grantor trusts for U.S. federal and Puerto Rico income tax purposes. However, if the Trusts are not classified as grantor trusts for U.S. federal income tax purposes, P.R. Treasury may assert that the Trusts are properly characterized in a manner other than as grantor trusts for Puerto Rico income tax purposes. Such alternative characterization could result in different (and possibly adverse) tax consequences to the Trusts and the Certificate Holders than the ones discussed below. Each Certificate Holder is urged to consult its own tax advisor regarding the tax consequences in case the Trusts are not classified as grantor trusts.

(b)    *Taxation of Ownership and Sale or Disposition of the Custodial Certificates*

208

If a Trust is treated as a grantor trust, each Certificate Holder will be treated as receiving applicable Custodial Certificates in exchange of its Allowed Claims and as owning its pro rata undivided interest in the applicable Trust Assets, each to the extent of its pro rata interest in the applicable Custodial Certificates.

To the extent Certificate Holders are treated as owning their pro rata share of the applicable Trust Assets under a grantor trust, they will be treated as if they had received distributions under the Plan of Adjustment directly and as owners of their prorate portion of the COFINA Bonds. Therefore, they will be subject to Puerto Rico income taxes similar to the manner discussed in this discussion for "SENIOR and JUNIOR Holders — Tax Treatment of Exchange — Exchange of Existing Securities for COFINA Bonds — Ownership of COFINA Bonds."

P.R. Holders are urged to consult their tax advisors regarding the ownership, sale and disposition of the Custodial Certificates under their individual circumstances.

### (c) *Tax Treatment if National Exercises the National Election*

If National exercises the National Election, P.R. Holders of Senior COFINA Bond Claims (National) will receive cash consideration in an amount equal to one hundred percent (100%) of the Compounded Amount (as defined in the Existing Bond Resolution) of the National Insured Bonds. The Debtor intends to treat such cash consideration as payments under the exiting COFINA Bonds. Therefore, a P.R. Holder would recognize gain or loss in an amount equal to the difference between the cash received and the P.R. Holder's adjusted tax basis in the Senior COFINA Bond Claims (National), except for any amount allocated to accrued and unpaid interest. Please refer to the discussions for "SENIOR and JUNIOR Holders — Tax Treatment of the Exchange — Exchange of Existing Securities for COFINA Bonds — Ownership of COFINA Bonds" for more detail. In particular, please refer to "SENIOR and JUNIOR Holders — Cash payments of Consummation Costs and Insurance Payments" for discussion of payments made by National.

### (d) *Tax Treatment if Assured Exercises the Assured Election*

If Assured exercises the Assured Election, U.S. Holders of Junior COFINA Bond Claims (Assured) will receive one hundred percent (100%) of the Junior COFINA Bond Claims (Assured) at an acceleration price of par plus accrued interest or compounded amount. Generally, the Puerto Rico income tax consequences to the P.R. Holders in the case of the Assured Election would generally be as described above under "Treatment of Exchange if National Exercises the National Election."

### 3. Holders of Senior COFINA Bond Claims (Taxable Election) (Class 4) and Junior COFINA Bond Claims (Taxable Election) (Class 7)

The exchange of the Existing Securities for the COFINA Bonds and cash by P.R. Holders of Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) will be treated as described above under "SENIOR and JUNIOR Holders — Tax Treatment of Exchange — Exchange of Existing Securities for COFINA Bonds — Ownership of COFINA Bonds". Although Applicable P.R. Tax Law does not specifically address treatment of

209

Taxable Election Cash, the Debtor expects that the Taxable Election Cash will be treated similarly to our description above for cash payments of Consummation Costs and Insurance Payments under "SENIOR and JUNIOR Holders — Exchange of Existing Securities for COFINA Bonds."

P.R. Holders of Senior COFINA Bond Claims and Junior COFINA Bond Claims that are eligible to make the election described above should consult their own tax advisors regarding the Puerto Rico income tax consequences of making such election.

### 4.  Holders of GS Derivative Claims (Class 8)

The tax treatment of derivatives is complex and there is limited guidance under the Applicable P.R. Law. P.R. Holders of GS Derivative Claims should refer to the underlying offering document and agreement and consult their tax advisors regarding the tax treatment of their derivatives including the consequences of the termination of their contracts.

### 5.  Holders of General Unsecured Claims (Class 9)

In the event that a P.R. Holder of General Unsecured Claims votes to accept the Plan of Adjustment and receives its pro rata share of One Hundred Thousand Dollars ($100,000.00), it would recognize gain or loss in an amount equal to the difference between the amount of such cash, and the P.R. Holder's adjusted tax basis in such General Unsecured Claims.

## C.  Non-P.R. Holders

### 1.  Definition of Non-P.R. Holders

Unless otherwise noted, the discussion below applies only to Non-P.R Holders. As used herein, the term "Non-P.R. Holder" means a beneficial owner of Existing Securities or COFINA Bonds that is not (i) a P.R. Holder or (ii) a partnership or other entity treated as a partnership or other pass-through entity for Puerto Rico income tax purposes.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds Existing Securities or COFINA Bonds, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership are urged to consult their tax advisors.

The following discussion includes only certain Puerto Rico income tax consequences of the Plan of Adjustment to Non-P.R. Holders. The discussion does not include any non-Puerto Rico tax considerations. Non-P.R. Holders should consult their own tax advisors regarding the Puerto Rico and foreign tax consequences of the consummation of the Plan of Adjustment under their individual circumstances.

### 2.  Tax Treatment of Exchange

A Non-P.R. Holder that is not engaged in trade or business in Puerto Rico would not be subject to Puerto Rico income tax with respect to any gain realized on the exchange of an

210

Allowed Claim pursuant to the Plan of Adjustment, including any amount allocated to accrued and unpaid interest. On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for Puerto Rico income tax purposes will be subject to Puerto Rico income tax on any such gain if it is effectively connected with their Puerto Rico trade or business.

The Debtor intends to treat cash payments of consummation costs and any insurance payments by National, Ambac and Assured as amounts paid under Existing Securities and, therefore, as part of the amount realized to determine gain or loss on the exchange of Allowed Claims. However, P.R. Treasury may not agree and consider such payments (or some of them) as amounts not paid under the Existing Securities and tax them separately as ordinary income. In that event, such cash payments may be subject to Puerto Rico income taxes if deemed to be derived from sources within Puerto Rico.

3.      **Taxation of COFINA Bonds**

*Payments of Interest.* Interest paid or accrued on the COFINA Bonds to a Non-P.R. Holder will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

The excess of the principal amount of the COFINA Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

The deductions for Puerto Rico income tax purposes of a Non-P.R. Holder engaged in a trade or business in Puerto Rico that are related to interest paid or accrued and other expenses incurred that are attributable to interest on the COFINA Bonds may be disallowed.

*Sale, Exchange or Retirement of COFINA Bonds.* Gain recognized on the sale or exchange of the COFINA Bonds by a Non-P.R. Holder that is not engaged in a trade or business in Puerto Rico will not be subject to Puerto Rico income tax, by way of withholding or otherwise, or municipal license tax. On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for Puerto Rico income tax purposes will be subject to Puerto Rico income tax on any such gain if it is effectively connected with their Puerto Rico trade or business

*Property Taxes.* The COFINA Bonds will be exempt from Puerto Rico property taxes.

*Estate and Gift Taxes.* The transfer of the COFINA Bonds by gift or upon the death of a Non-P.R. Holder will not be subject to Puerto Rico gift or estate taxes, as the case may be.

## XV.   Applicability of Certain Federal and State Securities Laws

**A.    General**

**1.    Registration of Securities**

In general, securities issued by Reorganized COFINA, such as the COFINA Bonds are exempt from the registration requirements of the Securities Act under section 3(a)(2) of the Securities Act.

In addition to exemptions provided to government agencies and instrumentalities such as COFINA under the Securities Act, section 1145(a)(1) of the Bankruptcy Code, made applicable to the Title III Case pursuant to section 301 of PROMESA, provides an exemption to all kinds of debtors from the registration requirements of the Securities Act and from any requirements arising under state securities laws in conjunction with the offer or sale of securities of the debtor under a plan of adjustment where such securities are issued to a creditor of the debtor.  The Bankruptcy Code provides that certain creditors, which are deemed "underwriters" within the meaning of the Bankruptcy Code, may not resell securities of a debtor that they receive pursuant to a plan of adjustment without registration under the Securities Act or pursuant to an exemption therefrom. Since obligations of COFINA are exempt from registration under generally applicable securities law, this exception is not relevant to securities of Reorganized COFINA, although the provisions of section 1145 of the Bankruptcy Code which suspend the operation of securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code. Creditors of COFINA who believe they meet the definition of "underwriter" within the meaning of the Bankruptcy Code should consult qualified counsel with respect to their obligations under relevant federal and state securities laws.

Like the exemption from registration provided by COFINA under section 3(a)(2) of the Securities Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by governmental entities. Therefore, each trust indenture, ordinance and resolution relating to the COFINA Bonds will be exempt from qualification under section 304(a)(4) of the Trust Indenture Act.

To the extent the Ambac Certificates or the National Certificates are deemed to be "securities," the issuance of the Ambac Securities and the National Certificates under the Plan of Adjustment is expected to be exempt from registration under the Securities Act of 1933, as amended, and any other applicable federal, state and local laws requiring registration of securities.   The Ambac Trust and the National Trust are also expected to be exempt from registration under the Investment Company Act of 1940, as amended.

**2.    Market Disclosure**

**(a)    _Initial Offer and Sale_**

Although exempt from registration, securities issued by COFINA are subject to the anti-fraud provisions of federal securities laws. Section 10(b) of the Securities Act and Rule 10b-5 promulgated by the SEC under the Securities Act generally prohibit fraud in the purchase and sale of securities. Therefore, each publicly offered sale of COFINA obligations typically is

accompanied by an offering document that is referred to as an "Official Statement" and contains disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decision as to whether to purchase the securities being offered. Section 1125(d) of the Bankruptcy Code, which has been adopted by PROMESA, provides that the adequacy of any disclosure to creditors and hypothetical investors typical of holders of Claims in this case is not subject to principals of any otherwise applicable non-bankruptcy law, rule or regulation, which includes federal securities laws.  Instead, section 1125(b) of the Bankruptcy Code, which has been adopted by PROMESA, provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of COFINA and to hypothetical investors in obligations of COFINA through a disclosure statement such as this Disclosure Statement.

(b)     <b><i>Continuing Disclosure</i></b>

Publicly offered securities of COFINA generally are subject to the requirements of Rule 15c2-12 under the Exchange Act (the "Rule"), promulgated by the SEC under the Securities Act, unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issue of municipal securities, such as COFINA.

The delivery of the COFINA Bonds pursuant to the Plan is not covered by the Rule because the COFINA Bonds are proposed to be issued in exchange for a claimholder's Claim without the involvement of an underwriter as defined in the Rule. [However, the Debtor intends to voluntarily execute and deliver for the benefit of holders of the COFINA Bonds, a new continuing [Disclosure Undertaking] containing certain disclosure obligations to be delivered on the Plan of Adjustment Effective Date.]

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the COFINA Bonds.

<b>XVI.   <u>Financial Information and Projections</u></b>

**A.   Financial Statements**

A copy of COFINA's audited financial statements for the year ended June 30, 2015 is attached to this Disclosure Statement as Exhibit E.

**B.   COFINA Fiscal Plan and Projections**

Attached to this Disclosure Statement as <u>Exhibit D</u> is a copy of the COFINA Fiscal Plan, certified by the Oversight Board on [____], 2018, which provides details regarding COFINA's projected operations under the Plan of Adjustment, subject to the assumptions and qualifications set forth in the certified COFINA Fiscal Plan.

213

It is important to note the projections described in the COFINA Fiscal Plan may differ from actual performance and are highly dependent on significant assumptions concerning the future economic and financial condition of the Commonwealth and its instrumentalities, which are affected by various legal, financial, social, economic, environmental, governmental and political factors.  These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the government of Puerto Rico, the Oversight Board, and other third-party entities such as the government of the United States.

The financial projections included in the COFINA Fiscal Plan assume the successful implementation of the Plan of Adjustment and consist of the following [unaudited projected financial information]: [___].  The financial projections included in the COFINA Fiscal Plan should be reviewed in conjunction with the assumptions, notes, and qualifications included in the COFINA Fiscal Plan, and the assumptions, qualifications, and explanations set forth in this Disclosure Statement, including in the Sections titled "Overview of COFINA," "The Title III Plan of Adjustment," "Certain Risk Factors to Be Considered," "Federal Income Tax Consequence of Consummation of the Plan of Adjustment," and "Applicability of Certain Federal and State Securities Laws."

The COFINA Fiscal Plan does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Oversight Board cannot express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the government of Puerto Rico or COFINA and the information contained herein.

In deciding whether to vote to accept or reject the Plan of Adjustment, holders of Claims must make their own determinations as to the reasonableness of the assumptions and the reliability of the financial projections and should consult with their own advisors.

## XVII.  Additional Information

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as Exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. All Exhibits to the Plan of Adjustment will be filed with the Title III Court and available for review, free of charge, on the Document Website at https://cases.primeclerk.com/puertorico prior to the Voting Deadline. Copies of all Exhibits to the Plan of Adjustment also may be obtained, free of charge, by contacting the Solicitation and Tabulation Agent (A) by telephone (1) for U.S. and Canadian callers toll-free at [] and (2) for international callers at +1 [___]; or (B) in writing at [___]. All parties entitled to vote on the Plan of Adjustment are encouraged to obtain and review all Exhibits to the Plan of Adjustment prior to casting their vote.

101361236v22

## XVIII. <u>Conclusion</u>

The Debtor and the Settlement Parties, which include Bonistas, advocates for the interests of on-island retail bondholders, believe the Plan of Adjustment is in the best interests of all creditors and urge the holders of impaired Claims entitled to vote on the Plan of Adjustment to vote to accept the Plan of Adjustment and to evidence the acceptance by timely returning their Ballots marked to accept the Plan of Adjustment by the Voting Deadline.

101361236v22