**<u>Exhibit D</u>**

**Certified COFINA Fiscal Plan**

# COFINA FISCAL PLAN

AS CERTIFIED BY THE FINANCIAL OVERSIGHT
AND MANAGEMENT BOARD FOR PUERTO RICO
OCTOBER 18, 2018





DISCLAIMER

The Financial Oversight and Management Board for Puerto Rico (the "FOMB," or "Oversight Board") has formulated this Fiscal Plan based on, among other things, information obtained from the Commonwealth of Puerto Rico (the "Commonwealth," or the "Government").

This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Oversight Board cannot express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

This Fiscal Plan is directed to the Governor and Legislature of Puerto Rico based on underlying data obtained from the Government.  No representations or warranties, express or implied, are made by the Oversight Board with respect to such information.

Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various legal, financial, social, economic, environmental, governmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government, the Oversight Board, and other third-party entities such as the government of the United States. Examples of these factors include, but are not limited to:

–   *Any future actions taken or not taken by the United States government related to Medicaid or the Affordable Care Act;*

–   *The amount and timing of receipt of any distributions from the Federal Emergency Management Agency and private insurance companies to repair damage caused by Hurricanes María and Irma;*

–   *The amount and timing of receipt of any amounts allocated to Puerto Rico and provided under the Community Disaster Loans Program;*

–   *The amount and timing of receipt of any additional amounts appropriated by the United States government to address the funding gap described herein;*

–   *The timeline for completion of the work being done by the Puerto Rico Electric Power Authority ("PREPA") to repair PREPA's electric system and infrastructure and the impact of any future developments or issues related to PREPA's electric system and infrastructure on Puerto Rico's economic growth;*

–   *The impact of the measures described herein on outmigration;*

–   *The impact of the resolution of any pending litigation in the Title III cases; and*

–   *The occurrence or nonoccurrence of agreement on definitive documentation required to implement the transactions contemplated by the PSA (as defined herein) and approval of such transactions by the Title III Court.*

Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by the Oversight Board, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

By receiving this document, the recipient is deemed to have acknowledged the terms of these limitations. This document may contain capitalized terms that are not defined herein or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should refer questions to the Oversight Board at comments@oversightboard.pr.gov should clarification be required.

This Fiscal Plan is based on what the Oversight Board believes is the best information currently available to it.  To the extent the Oversight Board becomes aware of additional information after it certifies this Fiscal Plan that the Oversight Board determines warrants a revision of this Fiscal Plan, the Oversight Board will so revise it.

ii

Fiscal Plan for COFINA

**List of Acronyms and Key Terms**

| | |
|---|---|
| AAFAF | Puerto Rico Fiscal Agency and Financial Advisory Authority (Spanish acronym) |
| ABT | Additional Bonds Test |
| BNYM | Bank of New York Mellon |
| CAB | Capital Appreciation Bonds |
| CBO | Congressional Budget Office |
| CDBG-DR | Community Development Block Grant- Disaster Recovery |
| CIB | Current Interest Bonds |
| CINE | Puerto Rico Motion Picture Arts, Sciences and Industry Development Corporation (Spanish acronym) |
| COFINA | Puerto Rico Sales Tax Financing Corporation (Spanish acronym) |
| COR3 | Central Office of Recovery, Reconstruction and Resiliency |
| CW | Commonwealth of Puerto Rico |
| DHS | Department of Homeland Security |
| DRF | Disaster Relief Fund |
| DSA | Debt Sustainability Analysis |
| EAI | Puerto Rican Economic Activity Index |
| FAM | Municipal Administration Fund (Spanish Acronym) |
| FEMA | Federal Emergency Management Agency |
| FY | Fiscal-Year |
| GDB | Government Development Bank for Puerto Rico |
| GDP | Gross Domestic Product |
| GNP | Gross National Product |
| HSOAC | Homeland Security Operational Analysis Center |
| HUD | United States Department of Housing and Urban Development |
| IMF | International Monetary Fund |
| MADS | Maximum Annual Debt Service |
| PAN | Nutritional Assistance Program |
| PFC | Puerto Rico Public Finance Corporation |
| POA | Plan of Adjustment |
| PRASA | Puerto Rico Aqueduct and Sewer Authority |
| PREPA | Puerto Rico Electric and Power Authority |
| PRHTA (or HTA) | Puerto Rico Highway and Transportation Authority |
| PROMESA | Puerto Rico Oversight, Management and Economic Stability Act |
| PSTBA | Pledged Sales Tax Base Amount |
| RSA | Restructuring Support Agreement |
| SUT | Sales and Use Tax |
| TRAN | Tax and Revenue Anticipation Notes |
| UPR | University of Puerto Rico |
| WEO | World Economic Outlook |

iii

Fiscal Plan for COFINA

# Table of Contents

*Executive Summary* ...................................................................................................................5

**PART I: The Sales and Use Tax and COFINA** ................................................................. 7

*Chapter 1. Sales and Use Tax Description* ...............................................................................7

*Chapter 2. The COFINA Settlement* ...................................................................................... 9

*Chapter 3. Material Terms of August Agreement* .................................................................10

**PART II: Context for Puerto Rico's Current Economic and Fiscal Challenges** ...............14

*Chapter 4. Long-term Economic Trends* ...............................................................................14

**PART III: Puerto Rico's Path to Fiscal and Economic Sustainability** ............................16

*Chapter 5. Macroeconomic and Demographic Trajectory Post-Maria* ................................16

*Chapter 6. Financial Projections* ......................................................................................... 25

*Chapter 7. Long-term Projections and Debt Sustainability Analysis (DSA)* ........................ 28

*Appendix A. The Plan Support Agreement ("PSA")* ............................................................. 32

*Appendix B. Debt Outstanding as of May 4, 2017* ............................................................... 33

*Appendix C. U.S. Real GNP Growth Rate Comparison* ........................................................ 34

# EXECUTIVE SUMMARY

Questions regarding the Commonwealth and COFINA's respective ownership interests in the sales-and-use tax revenue pledged as collateral for the existing COFINA bonds have been at the center of Puerto Rico's Title III cases since their commencement in May 2017. Resolution of this issue (the "Commonwealth-COFINA Dispute") is essential in order for Puerto Rico's debt restructuring to move forward.

To expedite resolution of the Commonwealth-COFINA Dispute, the Oversight Board proposed the appointment of representatives for the Commonwealth and COFINA. Under the Stipulation and Order entered by the Title III Court on August 10, 2017, the Official Committee of Unsecured Creditors was appointed as the agent to the Commonwealth (the "Commonwealth Agent") and Bettina Whyte was appointed as the agent to COFINA (the "COFINA Agent.")

On June 5, 2018, the Commonwealth Agent and COFINA Agent announced an agreement in principle (the "Understanding") to resolve the Commonwealth-COFINA Dispute. The Understanding is premised on splitting the "Pledged Sales Tax Base Amount" ("PSTBA") between the Commonwealth and COFINA. The PSTBA is an amount established under Act 91-2006, as amended, and the Sales Tax Revenue Bond Resolution, as amended and restated on June 10, 2009 (the "Bond Resolution"), that, under current law, must be received by COFINA from 5.5% of the SUT before the Commonwealth can receive any of the other 5.5% SUT. Under the Understanding, COFINA will receive (a) 53.65% of the yearly scheduled PSTBA beginning with payments made on July 1, 2018 and (b) all of the cash held in trust at Bank of New York Mellon, as trustee under the Bond Resolution, as of June 30, 2018 (approximately $1.2 billion). The Commonwealth will receive the remaining 46.35% of the PSTBA.

After the announcement of the Understanding, the Oversight Board and AAFAF began negotiating the economic treatment of COFINA bondholders and the terms of new COFINA securities with certain key COFINA creditor constituencies, including monoline insurers, all under the auspices of the judicially-appointed mediation team. On August 8, 2018, the Oversight Board and the Government announced that an agreement in principle had been reached on the terms of a restructuring of COFINA's outstanding bond debt (the "August Agreement"). The August Agreement incorporates the proposed PSTBA split as reflected in the Understanding.

In connection with efforts to consummate the transactions contemplated by the August Agreement, on August 22, 2018, the Oversight Board requested a standalone fiscal plan for COFINA for FY19-23. In response, on August 29, 2018, prior to execution of the PSA summarized in Chapter 3 below, a proposed COFINA fiscal plan was submitted to the Oversight Board, which fiscal plan did not take into account the finalized terms of the PSA.

On August 30, 2018, the Oversight Board and the Government announced that COFINA had entered into that certain Plan Support Agreement dated as of August 29, 2018 (together with all schedules and exhibits thereto, including the "Term Sheet" as defined therein and appended as Exhibit C thereto, the "PSA"), by and among (a) the Oversight Board, (b) COFINA, (c) AAFAF, (d) the "Senior Holders," as defined therein, (e) Ambac Assurance Corporation, (f) National Public Finance Guarantee Corporation, (g) the "Junior Holders," as defined therein, (h) Assured

5

Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc., and (i) Bonistas del Patio, Inc.  The PSA incorporated the PSTBA split, consistent with the Understanding and the August Agreement. The PSA, as subsequently amended on September 20, 2018, is attached hereto as Appendix A.

Consummation of the transactions contemplated by the PSA, however, remains subject to, *inter alia*, the passage of certain legislation by the Puerto Rico Legislature, agreement on definitive documentation, and approval of the Title III Court.  There can be no assurance that any of the events required to consummate the transactions contemplated by the PSA will occur, or that the facts and circumstances regarding such transactions will not materially change.  Many of the provisions and assumptions herein are premised on approval of the transactions described herein, and they may change if circumstances warrant; such provisions and assumptions may be context-dependent.  Accordingly, without limiting any of the disclaimers set forth herein, nothing herein shall be construed as, or be deemed to be, an admission or concession on the part of any Party in any respect, and nothing herein is intended to, or shall be construed or deemed to, in any manner waive, limit, impair or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, the right to amend this Fiscal Plan.

Fiscal Plan for COFINA

# PART I: The Sales and Use Tax and COFINA

## Chapter 1. SALES & USE TAX DESCRIPTION

The Commonwealth's sales and use tax ("Commonwealth SUT" or "SUT") was originally imposed in 2006 pursuant to Act No. 117-2006. The SUT in turn replaced the prior 5.0% (effective 6.6%) general excise tax on imported goods and the 3.6% general excise tax on goods manufactured in Puerto Rico.

The SUT is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. Certain items, such as fuel, crude oil and petroleum products and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the SUT.

The Commonwealth SUT had an original tax rate of 5.5%. Act 117-2006 also authorized each municipal government to impose a sales and use tax of 1.5% (the "Municipal SUT"), which generally has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth SUT. Act 18-2014 lowered the portion of the Municipal SUT allocated to the municipalities to 1.0% and allocated the other 0.5% to the Municipal Administration Fund ("FAM"), a fund created to provide a financial mechanism to finance the debt of the municipalities.  The Municipal SUT is not part of the Government's revenues nor is it pledged to COFINA.

In 2013, Act No. 40-2013 eliminated various exemptions to the SUT, which broadened its base, and Act No. 46-2013 required the declaration and payment of the SUT on imported goods at the time of their entry into Puerto Rico.

On May 29, 2015, the Commonwealth enacted Act No. 72-2015 that, among other things, (i) increased the total Commonwealth SUT rate to 10.5% effective on July 1, 2015, with the net 0.5% increase being for the benefit of the General Fund, and (ii) eliminated several exemptions.

Although Act 72-2015 has experienced various amendments since its original enactment, the Commonwealth SUT remains at 10.5%. There is also a special 4.0% SUT that is generally applicable to business-to-business services and designated professional services.  Exhibit 1 shows the SUT collections since inception of the tax. Exhibit 2 shows the allocation of the sales and use tax between FAM, COFINA, and the Government.

The amount of SUT collected depends on various factors, including economic conditions.  For more information on Puerto Rico's economic conditions and forecast, see Part III.

7

EXHIBIT 1: SALES AND USE TAX HISTORICAL COLLECTIONS[1] (10.5%)



EXHIBIT 2: ALLOCATION OF SALES AND USE TAX



1 $3.2 million of SUT revenues flow to CINE every year.
2 Up to annual cap of $420 million in 2019, which grows by 4.0% each year to a maximum of $993 million.

---

[1] SUT historical collections source: http://www.hacienda.gobierno.pr/inversionistas/estadisticas-y-recaudos-statistics-and-revenues/ingresos-del-impuesto-sobre-ventas-y-uso-ivu-sales-and-use-tax-sut-revenues

Fiscal Plan for COFINA

# Chapter 2. THE COFINA SETTLEMENT

COFINA is party to the PSA in an effort to settle the Commonwealth-COFINA Dispute and to restructure its debts to terms that are aligned with the fiscal reality of Puerto Rico. The summary of the PSA in this Fiscal Plan is provided for the convenience of the reader and is qualified in its entirety by reference to the provisions of the PSA itself. To the extent there is any discrepancy between the summary contained herein and the terms set forth in the PSA, the terms set forth in the PSA control. Consummation of the transactions contemplated by the PSA remain subject to, *inter alia*, the passage of certain legislation by the Puerto Rico Legislature, agreement on definitive documentation, and approval of the Title III Court. There can be no assurance that any of the events required to consummate the transactions contemplated by the PSA will occur, or that the facts and circumstances regarding such transactions will not materially change. Many of the provisions and assumptions herein are premised on approval of the transactions described herein, and they may change if circumstances warrant; such provisions and assumptions may be context-dependent. Accordingly, without limiting any of the disclaimers set forth herein, nothing herein shall be construed as, or be deemed to be, an admission or concession on the part of any Party in any respect, and nothing herein is intended to, or shall be construed or deemed to, in any manner waive, limit, impair or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, the right to amend this Fiscal Plan.

However, if implemented, the transactions contemplated by the PSA would grant COFINA an ownership interest in 53.65% of the PSTBA, which will be used to fund debt service payments on new COFINA bonds that will be distributed to existing COFINA senior and subordinated bondholders under a COFINA plan of adjustment (the "COFINA Plan"). COFINA would also receive "first dollars" collected from the pledged SUT until it has received an amount equal to 53.65% of the PSTBA (unless certain conditions are satisfied on a quarterly basis after 2024). The annual 53.65% PSTBA is illustrated in the table below.

EXHIBIT 3: THE COFINA SETTLEMENT DEBT SERVICE ($M)



The total COFINA debt outstanding is detailed in Appendix B.

# Chapter 3. MATERIAL TERMS OF AUGUST AGREEMENT

As stated before, the following summary of the PSA in this Fiscal Plan is provided for the convenience of the reader and is qualified in its entirety by reference to the provisions of the PSA itself.  To the extent there is any discrepancy between the summary contained herein and the terms set forth in the PSA, the terms set forth in the PSA control.

***Issuance of COFINA Bonds***.

The PSA contemplates that under the COFINA Plan existing senior and subordinate COFINA bondholders will receive new senior lien bonds (the "New COFINA Bonds") worth approximately $12.0 billion on account of their approximately $17.6 billion in claims.  The New COFINA Bonds will among other things, be secured by a statutory lien on the "COFINA Pledged Taxes" (as defined therein), subject to the Commonwealth's right to substitute "New Collateral" (as defined therein) in accordance with the terms of the PSA.

The New COFINA Bonds will bear fixed interest rates on a pro-rata basis, which will include: (i) current interest bonds ("CIBs") entitled to cash interest and (ii) capital appreciation bonds ("CABs"), under which interest is added to principal and paid at maturity.  The CIBs will mature in years 16, 22, 35, and 40 (i.e., 2034, 2040, 2053, and 2058), while the CABs will mature in years 9, 15, 31 and 33 (i.e., 2027, 2033, 2049 and 2051).  The New COFINA Bonds will also be redeemable prior to maturity according to the schedule below.

EXHIBIT 4: COFINA CALL SCHEDULE TABLE

| Current Interest Bonds | |
|---|---|
| Maturity | Call Provision |
| 2034 | Par Call Commencing 2025 (7 year call) |
| 2040 | Par Call Commencing 2028 (10 year call) |
| 2053 | Par Call Commencing 2028 (10 year call) |
| 2058 | Par Call Commencing 2028 (10 year call) |
| **Current Interest Bonds** | |
| Maturity | Call Provision |
| 2027 | Non-Call |
| 2033 | Callable at 107.5% Accreted Value ("AV") 2028-30; 105% AV 2031; 103% AV 2032, 100% AV 2033 |
| 2049 | Callable at 107.5% AV 2028-32, 105% AV 2033-37, 103% AV 2038-42, 100% AV 2043-Final Maturity |
| 2051 | Callable at 107.5% AV 2028-32, 105% AV 2033-37, 103% AV 2038-42, 100% AV 2043-Final Maturity |

*All Capital Appreciation Bonds: Sinking Fund Redemptions would be 100% of AV

The Parties of the PSA have agreed, among other things, to support the claims of the COFINA Plan as provided for in the term sheet. Moreover, subject to receipt of the COFINA disclosure

10

statement and other solicitation materials concerning the COFINA Plan, the parties as described in the PSA shall vote to accept the COFINA Plan.

***Filing of Plan of Adjustment***. The Oversight Board is obligated to file the COFINA Plan (based upon the terms and conditions described in the PSA and Term Sheet, as subsequently amended) on or before October 19, 2018.

***Fees***. On the effective date of the COFINA Plan, creditors who are party to the PSA prior to a specified date will receive, subject to certain exceptions, a pro rata share of additional cash in an amount equal to 2.0% of (i) the aggregate amount of existing COFINA bond claims *less* (ii) $1 billion.  Certain other holders—generally, residents of Puerto Rico that elect to receive taxable New COFINA Bonds under the COFINA Plan will also be eligible to receive their pro rata share of cash equal to 2.0% (net of certain administrative costs) of the aggregate amount of such holders' existing COFINA bond claims, which amount of cash shall not exceed $60 million.

***Debt Service Reserve Fund***. The New COFINA Bonds will not have a debt service reserve fund.

***Acceleration***. The New COFINA Bonds will not have any rights of acceleration.

***Covenants***. Under new legislation that will be passed to amend the COFINA statute (the "New Bond Legislation"), the Commonwealth and COFINA, as applicable, agree to the following covenants for the New COFINA Bonds:

- *Sales and Use Covenant*:  The Commonwealth will covenant that the rate of the sales and use tax from which the PSTBA is derived will not be reduced below 5.5% unless two nationally recognized rating agencies confirm that the rating of the New COFINA Bonds will not be downgraded and will be at least A2/A following the rate reduction. Additionally, if the tax rate is lowered below 3.0%, then such reduction constitutes a substitution of collateral and is subject to the Substitution of Collateral provision described below.

- *Non-Impairment*:  The Commonwealth will covenant that it will take no action that would (i) impair COFINA's right to recover the COFINA Portion of the PSTBA, (ii) limit or alter the rights vested in COFINA in accordance with the COFINA Plan and the order confirming the COFINA Plan to fulfill the terms of any agreements with the holders of New COFINA Bonds, (iii) materially adversely impair the collection of the COFINA Pledged Taxes in any fiscal year or (iv) impair the rights and remedies of the holders of the New COFINA Bonds or the collateral security thereof.

- *Tax-Exempt*:  COFINA will covenant for the benefit of holders of tax-exempt New COFINA Bonds that it will do and perform all acts and things permitted by law and "reasonably necessary or desirable" to assure that interest paid to the holders of any tax-exempt New COFINA Bonds will remain excludable from gross income for federal income tax purposes.

- *Rating Agency Covenant*:  In connection with the Substitution of Collateral provision described below, COFINA will use its reasonable best efforts and work in good faith to obtain the best rating possible on the outstanding New COFINA Bonds, including, but not limited to, responding to requests for documents.

11

Fiscal Plan for COFINA

***Substitution of Collateral***:  The New Bond Legislation will permit a Commonwealth revenue stream to replace the COFINA Pledged Taxes (the "New Collateral") as security for the repayment of the New COFINA Bonds only if, among other things, (i) the New Collateral is all or a portion of a tax of general applicability throughout Puerto Rico or otherwise constitutes like or comparable security for the New COFINA Bonds, and (ii) two nationally recognized rating agencies confirm that the rating of the New COFINA Bonds will not be downgraded and will be at least A2/A following the collateral substitution.

***New COFINA Board***:  The New Bond Legislation will provide that COFINA's board of directors will consist of three members appointed by the Governor, provided that (i) each member will be required to meet certain independence and qualification standards that will be agreed upon by the parties to the PSA, and (ii) holders of the existing senior COFINA bonds may submit up to three board member recommendations to the Governor (who will be under no obligation to appoint any such recommended person).

***Confirmation Order***:  The order confirming the COFINA Plan will provide, among other things, that (i) the New COFINA Bonds and the covenants provided by COFINA and the Commonwealth summarized above are valid, binding, legal and enforceable obligations under Puerto Rico and federal law, and (ii) the COFINA Portion of the PSTBA (and any permitted substitute thereof) is property of COFINA, transferred free and clear of all liens, claims, and encumbrances, and shall not be "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution.

***Additional Conditions Precedent to Effectiveness***:  The effective date of the COFINA Plan will be conditioned on, among other things, (i) execution of related definitive documents (including the existing COFINA Bond Resolutions as amended or repealed and replaced) reasonably satisfactory to the parties to the PSA, (ii) receipt of usual and customary legal opinions reasonably acceptable to the parties to the PSA, and (iii) unless otherwise permitted or required by PROMESA or similar authority, completion of any required legislative or other governmental action required to consummate the COFINA Plan, including, without limitation, Commonwealth legislation or court orders, if any required to (A) ensure that the payment obligations of COFINA cannot in the future be modified or altered without the consent of the requisite holders of New COFINA Bonds, (B) ensure the validity, enforceability, liens and priority of the COFINA obligations contemplated by the COFINA Plan and (C) except as otherwise permitted in connection with the substitution of collateral, ensure that the COFINA Pledged Taxes not be modified or altered prior to the satisfaction of COFINA's obligations.

***Legislation***:  On or before the effective date of the COFINA Plan, the PSA provides that the New Bond Legislation shall be enacted to, among other things, (i) establish the new COFINA board summarized above, (ii) permit the sales and use tax, tax exemption, substitution of collateral and non-impairment covenants summarized above, and (iii) grant such other authorizations, if any, which may be required to implement the transactions contemplated by the PSA, including (a) a determination that COFINA is the owner of the COFINA Portion under applicable law, (b) a grant of a statutory lien on the COFINA Portion of the PSTBA, (c) enhanced financial reporting, (d) events of default and imposition of certain measures upon an event of default, (e) submission to the jurisdiction of the Title III Court, and (f) other customary terms, conditions, and covenants for similarly structured and supported municipal bonds.

# PART II: Context for Puerto Rico's current economic and fiscal challenges

## Chapter 4. LONG-TERM ECONOMIC TRENDS

Before being battered by the most powerful hurricane to strike the Island in almost a century, Puerto Rico's economy had been in an acute structural decline for over a decade, the Government had defaulted on debt exceeding the size of Puerto Rico's annual GNP, and nearly half of Puerto Ricans lived below the national poverty line. The reasons for these problems are multiple, but the root causes stretch back decades.

On June 25, 1938, Congress legislated to authorize the Puerto Rico Legislature "to create public corporate authorities to undertake slum clearance and projects, to provide dwelling accommodations for families of low income, and to issue bonds therefor."[2] Bonds issued by public corporations did not constitute debt of the Puerto Rican insular government. This federal legislation permitted Puerto Rico to dramatically increase its debt capacity. By 1947, the Puerto Rico Water Resources Authority (today PREPA) placed the largest debt issuance of any agency or public corporation in the U.S while Puerto Rico was dramatically poorer than mainland jurisdictions.

In the 1940s and 1950s, led by Operation Bootstrap, Puerto Rico's economy grew rapidly, and productivity increased by 5% per annum as it transitioned from an agricultural-led to a manufacturing-led economy. This transition was anchored to the institutionalist economic policy adopted in Puerto Rico during the governorship of Rexford G. Tugwell. However, as economic performance began to decline in the 1970s, the Federal Government adopted two significant policies to help Puerto Rico shore up its economy.

First, transfer programs increased dramatically, particularly as Puerto Rico started receiving Nutritional Assistance Program (PAN) funding, eventually providing, in aggregate, a portion of residents' personal income that was twice the U.S. mainland average.

Second, in 1976, Section 936 of the Federal tax code was introduced to promote investments by companies that could transfer their "intangible assets" to Puerto Rico, and thereby shift profits to the Island. These Section 936 companies, which were mostly in pharmaceuticals and life sciences, became a pillar of Puerto Rico's economy, creating valuable local supply chains, local banking deposits, and contributing substantial tax revenue.

In 1996, Congress decided to end Section 936, gradually phasing it out by 2006. In the face of an anemic local private sector, the Government also expanded its employment to the point that by 2000, 30% of Puerto Rico's jobs were in Government. Large sectors like water, electricity and ports are still run by public corporations, and have consistently crowded out private investment. This crowding out is partly the result of the institutionalist policies instituted long ago. There is also pervasive cross-subsidization between the Government and public corporations and other parts of the public sector that obfuscates financial management and accountability. As a result,

---

[2] U.S. Statute at Large, 75th Cong. 3rd Session, Ch. 703, June 25, 1938, 52 Stat., p. 1203.

today Puerto Rico underperforms on all important measures of a modern economy, including educational attainment, cost of electricity, quality of water, tax compliance, and labor market participation.

To promote the private sector, the Government undertook a broad tax incentives policy that led to a highly complex web of subsidies and special tax arrangements.

Government revenues suffered and became increasingly hard to forecast. To make up for this recurring and growing budgetary shortfall, the Commonwealth turned to debt markets. As investor appetite began to wane, the Government turned to securing new debt by pledging various revenue streams. The result was a highly complex financial structure that limited transparency and financial accountability and management.

When the Great Recession hit in 2008, Puerto Rico's economy was already in a fragile fiscal and financial position.  Since then, the economy has continued to worsen – Puerto Rico has seen its GNP shrink by 20%, and the Island's population has fallen by 10%. Today, Puerto Rico is much poorer relative to the U.S. than it was in 1970.

14

# PART III. Puerto Rico's path to fiscal and economic sustainability

## Chapter 5. MACROECONOMIC AND DEMOGRAPHIC TRAJECTORY POST-MARIA[3]

Hurricanes Irma and Maria have created a new economic reality for Puerto Rico, drastically impacting the years to come. Given this context, the Fiscal Plan projects there will be macroeconomic volatility in the wake of the storms. In FY2018, there is a significant decline in GNP, followed by a partial bounce-back in FY2019 due to disaster relief funding, then a return to slightly above trendline by FY2023 due to the impact of structural reforms.

EXHIBIT 5: REAL GNP GROWTH RATE, BEFORE AND AFTER MEASURES AND STRUCTURAL REFORMS, INCLUSIVE OF DISASTER RELIEF SPENDING



This trendline has similarities to the growth trendline faced by other jurisdictions that have suffered from major natural disasters (**Exhibit 6**).

---

[3] This section does not purport to discuss all of the variables that may impact the level of sales and use tax.

Fiscal Plan for COFINA

EXHIBIT 6: PUERTO RICO'S PROJECTED GROWTH TRAJECTORY COMPARED TO OTHER
JURISDICTIONS AFTER NATURAL DISASTERS



1 Katrina figures not adjusted for inflation

SOURCE: World Bank, Bureau of Economic Analysis, and ECCB

Every fiscal plan has utilized the inflation and gross domestic product for the United States
included in the International Monetary Fund's World Economic Outlook (WEO)[4]. Considering
the importance of the U.S. mainland growth projections on projections for Puerto Rico and the
need for the Proposed Plan to be anchored in forecasts consistent with those that U.S. policy
makers use, the macroeconomic projections now incorporate the Congressional Budget Office
(CBO) 10-year economic projections for both U.S. GDP growth and U.S. inflation. There has been
no methodological change to the macroeconomic model. We will only reference in this document
figures derived utilizing the CBO forecast.

The economic outlook model, which forecasts GNP growth, primarily relies on a comprehensive
data set on the Puerto Rican economy from 1965 to 2017. It includes dozens of variables that
collectively describe the Puerto Rican economy (e.g., growth, population, capital stock, etc.),[5] and
is largely impacted by four major factors: a) the pre-hurricane trendline of Puerto Rico, b) short-

---

[4] The June 2018 Certified Fiscal Plan for the Commonwealth included forecasts from the October 2017 vintage of the WEO.  After
the fiscal plan was first certified on April 19,2018, the IMF published an updated WEO in late April 2018.  This edition of the WEO
included a marked downward revision in medium term economic growth for the United States, from 1.7% to 1.4%, citing lower
potential growth in the outer years of the forecast following a temporary strong expansion caused by recent fiscal policy changes
in the United States. U.S. Treasury has rejected the IMF's view that tax cuts will provide the U.S. economy only a temporary boost
and is projecting a stronger economic outlook since it believes that U.S. policies, including the productivity-boosting blend of tax
reform and regulatory relief, will result in more sustainable economic growth. This revision has a material negative impact on the
macroeconomic forecast for Puerto Rico.

[5]   The forecast relies on a 60-year comprehensive dataset and applying statistical regressions to show the effects of multiple yet
distinct inter-related components of past hurricanes, exogenous developments, and economic policies on growth and inflation.

and long-term impacts from the storm on economic activity and capital stock, c) the stimulating impact of disaster relief assistance *(discussed in Section 5.1)*, and d) proposed fiscal consolidation measures and structural reforms *(discussed in Section 5.3)*.

These factors result in a -8.0% decline in real GNP for FY2018, which is directionally in line with the fiscal year activity of the Puerto Rican Economic Activity Index (EAI)–a metric that historically tracks closely with GNP. For FY2018, EAI was down 6.8% from the previous year. Projected inflation rates (**Exhibit 7**) serve as a proxy for the GNP deflator yielding real GNP growth rates ranging from -8% in FY2018 to 7.7% in FY2019.

EXHIBIT 7: ANNUAL INFLATION RATE



Annual inflation rate, %

| FY18 | FY19 | FY20 | FY21 | FY22 | FY23 |
|------|------|------|------|------|------|
| 1.63 | 1.30 | 1.49 | 1.60 | 1.57 | 1.52 |

## 5.1  Impact and Description of Disaster Spend

- **Stimulating impact over the life of the plan caused by spending on the Island that is expected to be nearly 100% of the projected 2018 GNP.** This stimulus can come in multiple forms such as construction companies hiring local, unemployed workers or workers from the mainland U.S. paying local withholding taxes and spending money on food and lodging.

- **Expected refurbishment of the capital stock on the Island.** The Fiscal Plan factors in the estimated damage to capital stock which is repaired, largely due to the infusion of federal and private monies. This infusion contributes to the bounce-back anticipated in FY2019 and for the increase in growth above pre-Maria trend thereafter.

**The Fiscal Plan projects that approximately ~$82[6] billion of disaster relief funding in total, from Federal and private sources, will be disbursed in the reconstruction effort.** It will be used for a mix of **individual assistance** (e.g., reconstruction of houses, personal expenses related to the hurricane such as clothing and supplies), **public assistance** (e.g., reconstruction of major infrastructure, roads, and schools), and to cover part of **the** Commonwealth's **share of the cost of disaster relief funding** (states often must match some portion of Federal public assistance spend[7]). **Exhibit 8** shows the different sources of disaster relief funding and expected rollout.

EXHIBIT 8: PROJECTED PRIVATE AND PUBLIC DISASTER RELIEF FUNDING AND ROLL OUT

---

[6]   $3.6 billion of disaster relief funding is used for payment of cost share.

[7]   The Fiscal Plan only contemplates cost share paid for by the Commonwealth (and UPR), not PREPA / PRASA or HTA.

Fiscal Plan for COFINA

| | FY18, $M, % | FY19, $M, % | FY20, $M, % | FY21, $M, % | FY22, $M, % | FY23, $M, % | FY24, $M, % | FY25, $M, % | FY26, $M, % | FY27, $M, % | FY28-FY33 $M, % | Total, $M | Total, % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FEMA Public Assistance** | $5,397 / 11.8% | $7,394 / 16.1% | $7,394 / 16.1% | $6,709 / 14.6% | $6,709 / 14.6% | $2,173 / 4.7% | $2,173 / 4.7% | $1,279 / 2.8% | $1,279 / 2.8% | $905 / 2.0% | $4,430 / 9.7% | **$45,843** | **55.8%** |
| **CDBG-DR** | $54 / 0.3% | $976 / 4.9% | $4,201 / 21.0% | $4,693 / 23.5% | $4,608 / 23.0% | $3,321 / 16.6% | $1,815 / 9.1% | $331 / 1.7% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | **$20,000** | **24.4%** |
| **FEMA Individual Assistance[1]** | $1,437 / 44.8% | $1,437 / 44.8% | $331 / 10.3% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | **$3,204** | **3.9%** |
| **Private Insurance[2]** | $4,299 / 53.7% | $1,851 / 23.1% | $1,851 / 23.1% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | **$8,000** | **9.7%** |
| **Other federal funding** | $1,789 / 35.5% | $1,198 / 23.8% | $534 / 10.6% | $421 / 8.4% | $379 / 7.5% | $128 / 2.5% | $128 / 2.5% | $79 / 1.6% | $79 / 1.6% | $58 / 1.2% | $245 / 4.9% | **$5,039** | **6.1%** |
| **Total** | **$12,976** | **$12,855** | **$14,311** | **$11,823** | **$11,696** | **$5,623** | **$4,117** | **$1,689** | **$1,358** | **$963** | **$4,675** | **$82,086** | **100%** |
| Spending as a % of GNP | 19.7% | 17.8% | 18.5% | 14.6% | 13.9% | 6.6% | 4.8% | 2.0% | 1.6% | 1.2% | N/A | | |
| CDBG cost share | $0 | $736 | $736 | $668 | $668 | $216 | $216 | $127 | $0 | $0 | $0 | | |

**Disaster aid by source of funding,** $M



Legend: FEMA PA · Private Insurance · FEMA IA · CDBG · Other Fed funding

1 $3B is current FEMA projected funding for Maria-related disasters
2 Based on early analysis of data from the Office of the Insurance Commissioner of Puerto Rico on already processed payments

The major sources of disaster relief funding are detailed below:

- **FEMA Disaster Relief Fund (DRF):** FEMA provides Individual Assistance to individuals and families who have sustained uncovered losses due to disasters. FEMA also provides Public Assistance for infrastructure projects and other permanent improvements.[8]

- **HUD Community Development Block Grant- Disaster Recovery (CDBG-DR):** Based on a housing recovery plan, HUD provides CDBG-DR funding that can be used for assistance to individuals (e.g., housing repair) and public assistance (e.g., infrastructure development), or by the Government for certain operational costs (e.g., to cover their disaster relief funding match.) The supplemental appropriation included in the Bipartisan Budget Act of 2018 stipulated that about ~$2 billion be used to repair the Island's electric infrastructure (Public Assistance).

- **Private insurance funding:** Large personal property and casualty losses have been incurred in the aftermath of Hurricane Maria. Early analysis of data from the Office of the Insurance Commissioner of Puerto Rico, adjusted for self-insured and other types of coverage, was used to determine the amount that will be paid out to individuals and businesses for major damages.

- **Other supplemental federal funding:** Significant additional federal funding has been allocated to various agencies and projects in Puerto Rico following the hurricane. This money

---

8   The New Fiscal Plan does not account for Operations and Administration funding, which only flows to federal agencies. Rather, it looks at funds that are spent for reconstruction on-Island, though those funds could flow to firms that are local or external

18

is directed at a wide range of recovery efforts, from reconstruction of damaged buildings (for example, funding to repair damage to Job Corps centers in Puerto Rico) to funding for health programs and environmental management (for example, NOAA coastal habitat restoration funding).

Disaster roll out for FEMA funds, CDBG funds, and private spending have been projected in line with historical spending on other major disaster events, particularly Hurricane Katrina in Louisiana. Rollout was then adjusted to reflect specific Puerto Rican conditions, gauged through conversations with FEMA about the pace of spending to date.

The New Fiscal Plan posits that based on how disaster relief funds are spent, these funds will impact the economy in four different ways: to build the capital stock of the Island through constructing and repairing buildings or utilities, to directly impact the economy through spurring consumption of goods and services on the Island, or to fund programs and services on the Island. The Plan estimates a different rate of pass-through to the economy for each of these different types of funding as follows: [9]

- 15.5% pass-through is assumed for funding that is used to construct and repair utilities, given the reliance on specialized labor and materials for such projects. The rest of this funding flows to the Puerto Rican capital stock.

  – Ex. FEMA Category F Public Assistance funding towards constructing public utilities

- 23.5% pass-through is used for funding that is used to construct and repair buildings (i.e. residential, commercial, schools, etc.), given the ability to rely more on local labor and materials. The rest of this funding flows to the Puerto Rican capital stock.

  – Ex. Repair to WIC facilities damaged by the storm

- 23.5% pass-through is assumed for funding that is directed towards programs and services as this funding does not impact the capital stock, and hits the Puerto Rican economy at a lower level through the labor associated with importing and transporting.

  – Ex. Private insurance payments to reimburse personal auto expenses

- 100% pass-through is assumed for funding that is used directly and in full to replace income or stimulate spending on goods and services originating on the Island; this kind of spending does not contribute to the capital stock on the Island

  – Ex. Disaster nutrition assistance, used to stimulate immediate consumption

- GNP is projected to rebound quickly in FY2019 in large part due to disaster relief funding, and this has a direct positive influence across most revenue categories.

## 5.2   Impact of fiscal measures and structural reforms

By optimizing revenue collection and reducing government-wide expenses, **fiscal measures** seek to streamline and transform the Government of Puerto Rico to a size appropriate for its

---

[9]   Estimated using local contracts (e.g., PREPA contract representing utilities construction and a multi-unit residential construction project along with a school construction contract estimating building construction. These contracts were estimated to have a 10% and 18% pass-through on the economy, respectively, which was then augmented by 5.5% average spend on transportation and logistics on construction projects. Historical FEMA spending and the percentage of DHS contracts awarded to local Puerto Rican firms supported this figure

population. Such policy actions, inescapably, will generate a contractionary impact on the economy in the short term, but are necessary to drive fiscal sustainability in the long term. In fact, they drive significantly more in savings than revenues lost due to economic contraction. In addition, the economic contraction from cost-saving measures is limited in the long-term, while such measures are critical for providing long-term financial stability. The macroeconomic impact of the measures is summarized in **Exhibit 9** below.

EXHIBIT 9: MACROECONOMIC IMPACT OF FISCAL MEASURES



Fiscal Measures Effect on Real GNP, %

1.05[1]  FY18
-1.92  FY19
-1.40  FY20
-0.93  FY21
-0.58  FY22
-0.20  FY23

1 Reflects one-time effects of PAN funding and tax refunds

The timing and impact of **structural reforms** are based on work done by the IMF on similar reforms implemented in Europe (e.g., Spain, Estonia), South America (e.g., Peru, Colombia), among other jurisdictions, utilities reform in Latin America, and broadly accepted metrics for measuring improvement in the World Bank's Ease of Doing Business Rankings. Structural reform benchmarks broadly come from nations or jurisdictions without monetary policy options and high informal labor markets, like Puerto Rico. **Labor, energy, and doing business, reforms** are projected to increase GNP by **0.95% by FY2023 (Exhibit 10)**. **K-12 education reforms** add an additional 0.01% annual impact beginning in FY2033, resulting in total GNP increase from structural reforms of **1.21% by FY2048.**[10]

---

10   The impact of educational / human capital structural reforms is 0.26% by FY2058

Fiscal Plan for COFINA

EXHIBIT 10: MACROECONOMIC IMPACT OF STRUCTURAL REFORMS



By FY2048, K-12 Education reforms add an additional 0.26% cumulative impact, resulting in 1.21% annual impact on GNP

## 5.3   Population projections

In the past five years, Puerto Rico's population has trended downward by 1-2% every year as residents have left to seek opportunities elsewhere and birth rates have declined.[11] This trend accelerated after the storm. While some are projected to return as the Island rebuilds, population is still projected to decline over the period of the Fiscal Plan by 5.9% over six years (**Exhibit 11**).[12] Much of this is based on estimated net departures in FY2018, while in the long term, population is projected to continue to decline, but at a rate closer to pre-hurricane trends. One key element of the population projection is the assumption that the low historical rate of immigration into Puerto Rico will continue.

---

[11]   Federal Reserve Bank of St. Louis Economic Research (FRED)

[12]   The Fiscal Plan adopts demographic projections calculated by the Oversight Board's demographer. The projections were initially presented in an Oversight Board listening session held on November 16, 2017 and have since been updated to incorporate the latest available migration data and economic growth projections, as well as real-time estimates of population loss since the hurricane (e.g. net airplane departures). This revision includes a correction due to a forecasting error included in the June 2018 Certified Fiscal Plan for the Commonwealth.

Fiscal Plan for COFINA

EXHIBIT 11: PROJECTED POPULATION CHANGE



# Chapter 6. FINANCIAL PROJECTIONS[13]

## 6.1  Sales & Use Tax forecast.

**Sales and use taxes (SUT):**[14] SUT revenue was expected to maintain a post-hurricane downward trend of approximately ~14%; however, reconstruction efforts had an amplified impact on Q4 FY18 resulting in revenues that were lower by only 3.1% relative to FY17. FY19 revenues are projected from a normalized FY18 base that accounts for ~$114 million of emergency measures taken immediately post-hurricane that were partially offset by $58 million on non-recurring benefit related to reconstruction in FY18. The normalized base is grown by Puerto Rico nominal GNP through FY23.

## 6.2  Sales & Use Tax Measures

In addition to the baseline, there is a measure that impacts the SUT forecast. The increased compliance efforts are expected to yield a 5% uplift on total SUT collections by FY22. It is phased in with impacts of 1% uplift in FY19, 3% in FY20 and 4% in FY21.

---

[13]  Financial projections referenced in this plan utilize the CBO 10-year economic projections for US GDP growth and inflation.

[14]  The Fiscal Plan incorporates the proposed COFINA settlement which if implemented would result in 53.65% of the PSTBA being utilized to settle the COFINA debt.

Fiscal Plan for COFINA

EXHIBIT 12: TOTAL SUT PROJECTION BUILD



The General Fund SUT revenue in the Fiscal Plan for the Commonwealth of Puerto Rico equals the full amount less the COFINA Portion PSTBA, FAM and CINE.

## 6.3   COFINA Recurring Operating Expenses

COFINA's ongoing operating expenses are necessary to ensure an independent operation. Operating expenses are composed of the following categories:

1. Board of Director Fees
2. Payroll and Fringe Benefits
3. D&O Insurance
4. Facilities
5. External Counsel Fees
6. External Auditor
7. Other miscellaneous operating expenses

The PSA provides that certain funds will be immediately available to COFINA for its operating expenses as of the Effective Date of the COFINA Plan. Of the pre-Fiscal Year 2019 funds on deposit with the Bank of New York Mellon (in its capacity as the COFINA bond trustee, the "Bond Trustee"), (i) $5 million shall be allocated to fund COFINA's operating expenses and (ii) subject to cash distributions to holders of "Taxable Election" COFINA bonds under the COFINA Plan (e.g., natural persons residing in Puerto Rico), an additional amount not to exceed $10 million

23

Fiscal Plan for COFINA

shall be allocated to fund COFINA's operating expenses. Accordingly, of the pre-Fiscal Year 2019 funds on deposit with the Bond Trustee, a minimum of $5 million and a maximum of $15 million shall be immediately available to fund COFINA's operating expenses as of the Effective Date of the COFINA Plan.

In addition to the funds described above, operating expenses will be covered by investment earnings derived from interest income generated by funds deposited in the COFINA bond trustee accounts held for the benefit of COFINA at BNYM prior to distribution.

EXHIBIT 13: COFINA PROJECTED DEFICIT/SURPLUS



Projected deficit/surplus, $M

| | FY19 | FY20 | FY21 | FY22 | FY23 |
|---|---|---|---|---|---|
| COFINA Portion PSTBA | 420.2 | 437.0 | 454.5 | 472.7 | 491.6 |
| Investment Earnings | 1.2 | 1.1 | 1.2 | 1.3 | 1.3 |
| Total Revenue | 421.4 | 438.1 | 455.7 | 473.9 | 492.9 |
| Operating Expenses | -1.1 | -1.1 | -1.1 | -1.1 | -1.1 |
| Debt Service | -420.2 | -437.0 | -454.5 | -472.7 | -491.6 |
| Total Expenses | -421.3 | -438.1 | -455.6 | -473.8 | -492.7 |
| Surplus/Deficit | 0.1 | 0 | 0.1 | 0.2 | 0.3 |

# Chapter 7. LONG-TERM PROJECTIONS AND DEBT SUSTAINABILITY ANALYSIS (DSA)

The DSA provides a framework to assess COFINA's long-term debt capacity, minimizing the risk of future default, and provides a framework for future market access.

Sales tax bonds are evaluated on the basis of taxable base and pledge, the legal structure of the proposed financing and financial metrics of the revenue pledge.

Fiscal Plan for COFINA

EXHIBIT 14: CREDIT STRENGTH OF SUT

| Credit Strengths of SUT | |
|---|---|
| 1 | Puerto Rico's economy is reasonably diverse. |
| 2 | SUT is very broad with minimal exceptions. |
| 3 | Senior bonds benefit from a closed lien. |
| 4 | First (annual/quarterly) dollar flow of funds is stronger than usual monthly equal collection for various tax backed credits. |
| 5 | Strong revenue trend and minimal revenue volatility. |

EXHIBIT 15: CHALLENGES OF THE SUT CREDIT

| Challenges of the SUT Credit | |
|---|---|
| 1 | Puerto Rico's per capita income and median household income are significantly below national medians. |
| 2 | Impact of long-term demographic and economic projections on discretionary expenses and personal consumption. |

The COFINA settlement implies total debt service of $32.3 billion over the 40-year period, vs. $75.5 billion of total 5.5% SUT. The excess SUT (46.35% portion) flows to the Commonwealth and provides coverage for the contractual debt service related to the 53.65% portion. The 5.5% SUT is projected to average 2.4x the annual debt service over the 40-year period.

Exhibit 16 shows the projected 5.5% SUT and the PSTBA split in the proposed settlement between the Commonwealth and COFINA bondholders. The COFINA settlement involves the creation of Senior Lien New COFINA bonds ("New COFINA bonds"). Per the terms of the COFINA Settlement and PSA, the New COFINA Bonds would have a senior pledge of the 5.50% SUT up to the 53.65% PSTBA COFINA portion. The "first dollars" of funding in the proposed settlement will come from the pledged 5.5% SUT.

25

Fiscal Plan for COFINA

EXHIBIT 16: ILLUSTRATION OF AGENT "SETTLEMENT IN PRINCIPLE" ALLOCATIONS



Exhibit 17 illustrates the COFINA Settlement debt service in conjunction with the 53.65% of the PSTBA that COFINA bondholders will be entitled to per the terms of the PSA. The chart illustrates that the COFINA debt service fits within the 53.65% of the PSTBA throughout the 40-year forecast period.

26

Fiscal Plan for COFINA



EXHIBIT 17: DEBT SERVICE ($M)



Exhibit 18 demonstrates the coverage ratio remains above 2.4x on a 10-year annual average, 20-year annual average, 30-year annual average and 40-year annual average basis.

EXHIBIT 18: DEBT SERVICE COVERAGE ($M)

|  | 10 year average | 20 year average | 30 year average | 40 year average |
|---|---|---|---|---|
| 5.50% SUT | $1,591 | $1,626 | $1,735 | $1,906 |
| Debt Service | $504 | $626 | $744 | $806 |
| Coverage Ratio | 3.18x | 2.71x | 2.47x | 2.46x |

27

Fiscal Plan for COFINA

EXHIBIT 19: THE COFINA DEBT SUSTAINABILITY ANALYSIS ($M)



Using FY18 SUT collections as the base, we look at the constant annual rate of reduction in sales tax collections such that debt service is still fully covered by the 5.5% SUT pledge. Based on the debt service schedule provided, sales tax would need to decrease by more than 0.71% a year for SUT collections to be insufficient to cover debt service obligations. A comprehensive breakeven analysis is provided below.

EXHIBIT 20: THE COFINA DEBT BREAKEVEN ANALYSIS



28

Fiscal Plan for COFINA

Appendix A: Plan Support Agreement ("PSA")

## AMENDED AND RESTATED PLAN SUPPORT AGREEMENT

AMENDED AND RESTATED PLAN SUPPORT AGREEMENT, dated as of September 20, 2018, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), (b) Corporación del Fondo de Interés Apremiante de Puerto Rico, whose name in English is the Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), (c) Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), (d) holders of Senior COFINA Bond Claims, as defined below, which may include the advisors or managers who are advising or managing a holder of Senior COFINA Bond Claims on behalf of such holders as set forth on Exhibit "A" hereto (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**Senior Holders**"), (e) Ambac Assurance Corporation ("**Ambac**"), (f) National Public Finance Guarantee Corporation ("**National**"), (g) holders of Junior COFINA Bond Claims, as defined below, which may include the advisors or managers who are advising or managing a holder of the Junior COFINA Bond Claims on behalf of such holders as set forth on Exhibit "B" hereto, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**Junior Holders**"), (h) Assured Guaranty Municipal Corp. ("**Assured**"), formerly known as Financial Security Assurance Inc., and (i) Bonistas del Patio, Inc. ("**Bonistas**"). The signatories hereto are referred to hereafter collectively as the "**Parties**" or individually as a "**Party**". Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article I below.

RECITALS

A.     Pursuant to that certain Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 19, 2009 and pursuant to certain supplemental resolutions (collectively, the "**Bond Resolutions**"), COFINA issued the following series of Puerto Rico Sales Tax Revenue Bond to provide funds for the Commonwealth of Puerto Rico (the "**Commonwealth**") to, among other things, repay certain debt obligations of the Puerto Rico Government Development Bank and the Puerto Rico Public Finance Corporation.

| Resolution | Bond Series | Amounts |
|---|---|---|
| First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007 | Senior Series 2007A | $2,667,603,573 |
| Second Supplemental Sales Tax Revenue Bond Resolution, adopted on July 17, 2007 | Senior Series 2007B | $1,333,101,780 |
| Third Supplemental Sales Tax Revenue Bond Resolution, adopted December 18, 2007 | Senior Series 2007C | $499,996,628 |
| Fourth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 25, 2008 | Senior Series 2008A | $737,046,992 |
| Seventh Supplemental Sales Tax Revenue Bond Resolution, adopted on June 10, 2009 | First Subordinate Series 2009A | $4,118,153,700 |

| Resolution | Bond Series | Amounts |
|---|---|---|
| Eighth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 17, 2009 | First Subordinate Series 2009B | $1,217,915,799 |
| Seventh Supplemental Sales Tax Revenue Bond Resolution, adopted on June 10, 2009 | Senior Series 2009C | $237,875,000 |
| Twelfth Supplemental Sales Tax Revenue Bond Resolution, adopted on January 28, 2010 | First Subordinate Series 2010A | $1,823,757,271 |
| Fourteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010C | $1,619,404,577 |
| Fifteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010D | $89,435,000 |
| Sixteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010E | $92,755,000 |
| Eighteenth Supplemental Sales Tax Revenue Bond Resolution, adopted November 16, 2011 | First Subordinate Series 2011A-1 First Subordinate Series 2011A-2 | $397,758,386 $337,037,188 |
| Nineteenth Supplemental Sales Tax Revenue Bond Resolution, adopted November 16, 2011 | First Subordinate Series 2011B | $45,600,000 |
| Twentieth Supplemental Sales Tax Revenue Bond Resolution, adopted December 1, 2011 | Senior Series 2011C | $1,006,474,702 |
| Twenty First Supplemental Sales Tax Revenue Bond Resolution, adopted December 1, 2011 | Senior Series 2011D | $91,155,000 |

B.     In connection with the issuance of certain of the Senior COFINA Bonds, Ambac and National issued certain insurance policies and National entered into insurance agreements with respect thereto.

C.     In connection with the issuance of certain of the Junior COFINA Bonds, COFINA entered into insurance agreements with Assured corresponding to insurance policies issued by Assured.  Assured also insures certain of the Junior COFINA Bonds pursuant to secondary market insurance policies.

D.     On June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187) ("**PROMESA**").

101736284v3

E.       PROMESA created the Oversight Board and provided the Oversight Board with certain powers over the finances and restructuring process with respect to the Commonwealth and its instrumentalities as provided for in PROMESA, and the Oversight Board has designated COFINA as a Covered Territorial Instrumentality (as defined in PROMESA).

F.       Pursuant to Act 2-2017, AAFAF was appointed as the representative of the Government of Puerto Rico, and granted authority with respect to, reaching agreements with creditors on any indebtedness issued by any governmental entity of the Commonwealth.

G.       On May 5, 2017, the Oversight Board filed a Title III petition on behalf of COFINA (the "**Title III Case**") in the United States District Court for the District of Puerto Rico (the "**Title III Court**").

H.       The Oversight Board is the representative of COFINA in the Title III Case pursuant to Section 315(b) of PROMESA.

I.       The Parties have engaged in good faith, arm's length negotiations regarding the principal economic terms of a proposed restructuring of the Senior COFINA Bonds and the Junior COFINA Bonds to be implemented in a manner to be mutually agreed upon as set forth in the term sheet annexed hereto as Exhibit "C" (the "**Term Sheet**").

J.       On August 29, 2018, substantially all of the Parties executed a Plan Support Agreement (the "**Initial Agreement**"), which agreement included substantially all of the terms set forth herein.  In light of necessary modifications, the Parties have agreed to enter into this Agreement, which amends and restates the Initial Agreement.

K.       The Oversight Board and AAFAF consent to COFINA's execution and delivery of this Agreement and to COFINA performing and exercising its rights under this Agreement, including, without limitation, COFINA's rights to terminate this Agreement and its right to consent to any waiver or amendment, in each case, in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, the Parties, in consideration of the promises, covenants and agreements herein described and for other good and valuable consideration, acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1.    Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2.    Definitions.  The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"*Actions*" shall mean, collectively, the litigation styled (a) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Adv. Pro. No. 17-AP-143-LTS, currently pending in the Title III Court, (b) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Case No. 17-CV-3750-LTS, currently pending in the Title

3

III Court, (c) <u>Ambac Assurance Corp. v. The Bank of New York Mellon</u>, Case No. 17-CV-3804-LTS, currently pending in the United States District Court for the Southern District of New York, (d) <u>The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al.</u>, Adv. Pro. No. 17-133-LTS, currently pending in the Title III Court, and (e) <u>Rodriguez-Perelló et al. v. Rosselló-Nevares et al.</u>, No. 3:17-cv-01566-FAB (D.P.R. 2017), currently pending in the United States District Court for the District of Puerto Rico.

  *"Adversary Proceeding"* shall mean that certain adversary proceeding styled <u>The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as agent of The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico v. Bettina Whyte, as agent of The Financial Oversight and Management Board for Puerto Rico, as representative of The Puerto Rico Sales Tax Financing Corporation</u>, Adv. Proc. No. 17-257-LTS, currently pending in the United States District Court for the District of Puerto Rico, regarding ownership of the Pledged Sales Tax Base Amounts.

  *"Agents"* shall mean, collectively, the COFINA Agent and the Commonwealth Agent.

  *"Agreement"* shall mean, collectively, this Amended and Restated Plan Support Agreement, and each exhibit annexed hereto or thereto, including, without limitation, the Term Sheet, as each may be amended, supplemented or otherwise modified in accordance with the terms hereof or thereof.

  *"Agreement in Principle"* shall mean the Terms and Conditions of Agreement in Principle to Resolve Commonwealth-COFINA Dispute, attached as Exhibit "A" to the Joint Informative Motion of Commonwealth Agent and COFINA Agent Disclosing Agreement in Principle [Adv. Proc. No. 17-257 LTS, Dkt. No. 486].

  *"Appointments Related Litigation"* shall mean, collectively, the litigation styled (a) <u>In Re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico</u>, No. 18-1108, currently pending in the United States Court of Appeals for the First Circuit, (b) <u>In re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico</u>, No. 18-1746, currently pending in the United States Court of Appeals for the First Circuit, (c) <u>Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Electric Power Authority</u>, et al., Adv. Pro. No. 17-AP-228-LTS, currently pending in the Title III Court, (d) <u>René Pinto Lugo, et al. v. The Government of the United States of America, et al.</u>, Adv. Pro. No. 18-041-LTS, currently pending in the Title III Court, (e) <u>Hermanidad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al.</u> v. <u>Government of the United States of America, et al.</u>, Adv. Pro. No. 18-066-LTS, currently pending in the Title III Court, (f) <u>Hon. Rafael Hernandez-Montanez, et al. v. The Financial Oversight and Management Board of Puerto Rico</u>, Adv. Pro. No. 18-090-LTS, currently pending in the Title III Court, and (g) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the COFINA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

  *"Aurelius"* shall mean Aurelius Capital Master, Ltd.

4

*"Bankruptcy Code"* shall mean Title 11 of the United States Code, as amended, §101, et seq.

*"Bankruptcy Rules"* shall mean The Federal Rules of Bankruptcy Procedure.

*"Business Day"* shall mean a day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

*"COFINA Agent"* shall mean Bettina Whyte, as agent for the Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Sales Tax Financing Corporation.

*"COFINA Effective Date"* shall mean the date on which the transactions contemplated by the Plan and authorized by the Title III Court pursuant to the Confirmation Order have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms.

*"Commonwealth Agent"* shall mean the Official Committee of Unsecured Creditors of The Commonwealth of Puerto Rico, as agent of the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico.

*"Confirmation Order"* shall mean the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code made applicable in the Title III Case in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to each Party.

*"Custodial Trusts"* shall mean, collectively, the trust(s), or custodial arrangement(s), if any, which may be formed on or prior to the COFINA Effective Date in accordance with the provisions of the Term Sheet and the Plan.

*"Definitive Documents"* shall mean, collectively, the documents, including, without limitation, any related agreements, instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Term Sheet, the Plan (including any amendments, modifications and supplements thereto), the Dispute Settlement, the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, the Settlement Agreement, the Settlement Motion, the Settlement Order, the organizational documents of Reorganized COFINA, and the Bond Resolutions, as amended (or as repealed and replaced), each having terms and conditions consistent with this Agreement and PROMESA in all respects and otherwise be in form and substance reasonably satisfactory to each Party; provided, however, that the rights of each Party with respect to the documentation relating to the Custodial Trusts shall be governed exclusively by the terms and provisions of the Term Sheet.

*"Dispute Settlement"* shall mean the compromise and settlement of the Adversary Proceeding and the claims and causes asserted therein, as announced by the Agents in the Agreement in Principle on June 5, 2018, and to be set forth in the Settlement Agreement; provided, however, that, to the extent that any provisions of the Settlement Agreement are

inconsistent with the terms and provisions set forth herein, in the Term Sheet or in the Plan, the terms and provisions set forth herein, in the Term Sheet and in the Plan shall govern.

**"Disclosure Statement"** shall mean the disclosure statement filed with respect to the Plan with the Title III Court by the Oversight Board in the Title III Case in accordance with section 1125 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably satisfactory to each Party.

**"Disclosure Statement Order"** shall mean the order of the Title III Court (a) approving the form of Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptance and rejections to the Plan and (ii) elections of distributions thereunder, which order shall be in form and substance reasonably satisfactory to each Party.

**"Final Order"** shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or, (b) if an appeal, writ of certiorari, new trial reargument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the applicable local Bankruptcy Rules.

**"First Puerto Rico Family of Funds"** shall mean, collectively, First Puerto Rico AAA Target Maturity Fund I, Inc., First Puerto Rico AAA Target Maturity Fund II, Inc., First Puerto Rico Tax-Exempt Fund, Inc., First Puerto Rico Tax-Exempt Fund II, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc., First Puerto Rico Target Maturity Income Opportunities Fund I, Inc., First Puerto Rico Target Maturity Income Opportunities Fund II, Inc., First Puerto Tax Advantaged Target Maturity Fund I, Inc. and First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.

**"Government Parties"** shall mean, collectively, the Oversight Board, AAFAF and COFINA.

**"Government Released Claims"** shall mean, collectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which

any Party, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with COFINA, the Senior COFINA Bonds, the Senior COFINA Bond Claims, the Junior COFINA Bonds, the Junior COFINA Bond Claims and the Actions, and arising prior to the COFINA Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) COFINA (or its successor, including Reorganized COFINA) arising from or relating to the Plan or the securities to be issued pursuant to the Plan or (ii) a Government Party unrelated to COFINA or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct.

*"Government Releasees"* shall mean the Government Parties and the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Case.

*"GSAM"* shall mean Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it serves as investment manager.

*"Informative Motion"* shall mean that certain Commonwealth Agent's Informative Motion with Respect to Oversight Board's Announcement, Dated August 8, 2018, Regarding Certain Terms for COFINA Plan of Adjustment [Adv. Proc. No. 17-257-LTS, ECF No. 540].

*"Insurers"* shall mean, collectively, Ambac, Assured and National.

*"Insured Claims"* shall mean, collectively, Insured Senior COFINA Bond Claims and Insured Junior COFINA Bond Claims.

*"Insured Junior COFINA Bond Claims"* shall mean, collectively, Junior COFINA Bond Claims, the payment of which has been insured by Assured.

*"Insured Junior Holders"* shall mean, collectively, the Parties that are beneficial holders of Insured Junior COFINA Bond Claims.

*"Insured Senior COFINA Bond Claims"* shall mean, collectively, Senior COFINA Bond Claims, the payment of which has been insured by Ambac or National, including, without limitation, Senior COFINA Bond Claims the payment of which (a) is insured by MBIA Insurance Company and reinsured by National or (b) was originally insured by Finance Guaranty Insurance Company but for which primary insurer responsibility was subsequently novated to National.

*"Insured Senior Holders"* shall mean, collectively, the Parties that are beneficial holders of the Insured Senior COFINA Bond Claims.

*"Junior COFINA Bond Claims"* shall mean, collectively, the claims arising from or relating to the Junior COFINA Bonds, which shall be calculated, for purposes of the Plan, as the outstanding principal amount of the Junior COFINA Bonds plus the accrued and unpaid

interest on the Junior COFINA Bonds (or, in the case of capital appreciation bonds, the accreted value thereon) up to, but not including, May 5, 2017.

*"Junior COFINA Bonds"* shall mean, collectively, those bonds issued by COFINA in accordance with the Bond Resolutions and such other documents and instruments executed and delivered in connection therewith, and that are identified as "First Subordinate" in the respective Bond Resolutions pursuant to which they were issued, the Series of which are set forth in the chart contained in Recital A herein.

*"Junior Holders Group"* shall mean, collectively, GSAM, Oppenheimer and First Puerto Rico Family of Funds.

*"Oppenheimer"* shall mean, collectively, funds and accounts managed or advised by Oppenheimer Funds, Inc. and OFI Global Institutional Inc. and listed on the signature pages hereto.

*"Plan"* shall mean the COFINA plan of adjustment to be filed with the Title III Court by the Oversight Board in the Title III Case in accordance with Section 312 of PROMESA and incorporating the terms and provisions herein and in the Term Sheet, the form and substance of which shall be reasonably satisfactory to each Party.

*"Plan Supplement"* shall mean, the volume(s) of documents, agreements and instruments, including, without limitation, the Definitive Documents, which shall be filed with the Title III Court in connection with the Plan and consummation of the transactions contemplated therein, and each of which shall be in form and substance reasonably satisfactory to each of the Parties; provided, however, that the rights of each Party with respect to the documentation relating to the Custodial Trusts shall be governed exclusively by the terms and provisions of the Term Sheet.

*"Principal Amount"* shall mean, solely for purposes of the signature pages affixed hereto, (a) with respect to current interest bonds, the principal amount of the Senior COFINA Bonds or Junior COFINA Bonds, plus the accrued and unpaid interest thereon, and (b) with respect to the capital appreciation bonds, the accreted value of the Senior COFINA Bonds or Junior COFINA Bonds, as applicable, and, in each case, accrued or accreted up to, but not including, May 5, 2017.

*"PSA Creditors"* shall mean, collectively, the Senior Ad Hoc Holders, the Junior Holders Group, the Puerto Rico Funds, Ambac, Assured, Aurelius, Six PRC and National.

*"Puerto Rico Funds"* shall mean, collectively, Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico Fixed Income Fund VI, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free

Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., Tax-Free Puerto Rico Target Maturity Fund, Inc., and UBS IRA Select Growth & Income Puerto Rico Fund.

*"Qualified Marketmaker"* shall mean an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the COFINA Bonds or enter with customers into long and short positions in debt securities such as the COFINA Bonds, in its capacity as a dealer or market marker in such COFINA Bonds; (y) is in fact regularly in the business of making a market in debt securities; and (z) if transacting with respect to COFINA Bonds, is registered with Securities and Exchange Commission and financial institutions regulatory authority.

*"Reorganized COFINA"* shall mean COFINA from and after the COFINA Effective Date.

*"Senior Ad Hoc Holders"* shall mean, collectively, Aristeia Capital, L.L.C., Canyon Capital Advisors L.L.C., Decagon Holdings 1, L.L.C., Decagon Holdings 2, L.L.C., Decagon Holdings 3, L.L.C., Decagon Holdings 4, L.L.C., Decagon Holdings 5, L.L.C., Decagon Holdings 6, L.L.C., Decagon Holdings 7, L.L.C., Decagon Holdings 8, L.L.C., Decagon Holdings 9, L.L.C., Decagon Holdings 10, L.L.C., GoldenTree Asset Management LP, Old Bellows Partners LP, Scoggin Management LP, Taconic Capital Advisors L.P., Taconic Master Fund 1.5 L.P., Tilden Park Capital Management LP and Whitebox Advisors L.L.C., each on behalf of itself or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms hereof.

*"Senior COFINA Bond Claims"* shall mean, collectively, the claims arising from or relating to the Senior COFINA Bonds, which shall be calculated, for purposes of the Plan, as the outstanding principal amount of the Senior COFINA Bonds plus the accrued and unpaid interest on the Senior COFINA Bonds (or in the case of capital appreciation bonds, the accreted value thereon) up to, but not including, May 5, 2017.

*"Senior COFINA Bonds"* shall mean, collectively, those bonds issued by COFINA in accordance with the Bond Resolutions and such other documents and instruments executed and delivered in connection therewith, and that are identified as "Senior" in the respective Bond Resolutions pursuant to which they were issued, the Series of which are set forth in the chart contained in Recital A herein.

*"Settlement Agreement"* shall mean that certain Settlement Agreement to be entered into by the Agents setting forth their agreement compromising and settling the claims and causes of action asserted, or which could have been asserted, in the Adversary Proceeding; provided, however, that, in the event that the Agents do not enter into the Settlement Agreement, "Settlement Agreement" shall mean the material economic terms set forth in the Agreement in Principle, as further developed by the Oversight Board and the Parties hereto, compromising and settling the claims and causes of action asserted, or which could have been asserted in the Adversary Proceeding and set forth in the Settlement Motion.

*"Settlement Motion"* shall mean the motion filed with the Title III Court by the Oversight Board in the Commonwealth Title III proceeding seeking entry of an order approving the Dispute Settlement in accordance with Bankruptcy Rule 9019 and applicable law, which motion shall be in form and substance reasonably satisfactory to each Party.

9

101736284v3

"*Settlement Order*" shall mean the order of the Title III Court in the Commonwealth Title III case granting the relief requested in the Settlement Motion and authorizing the consummation of the Dispute Settlement, which order shall be in form and substance reasonably satisfactory to each Party.

"*Six PRC*" shall mean Six PRC Investments LLC.

Section 1.3.   <u>Other Terms</u>.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.  Capitalized terms used herein, but not otherwise defined, shall have the meanings set forth in the Term Sheet.  As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise.  The words "include", "includes", and "including" will be deemed to be followed by "without limitation."  Pronouns in masculine, feminine or neutral genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement", "herein", "hereof", "hereby", "hereunder", and words of similar impact refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

Section 1.4.   <u>Interpretations</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

Section 1.5.   <u>Exhibits</u>.  Each of the exhibits, annexes, signature pages and schedules annexed hereto are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes and schedules.

ARTICLE II
GENERAL PROVISIONS

Section 2.1.   <u>Mediation</u>.  Each of the Parties acknowledges and agrees that this Agreement and the Term Sheet are the product of their participation in mediation ordered by the Title III Court and the mediation team appointed in connection therewith.  In the event that any disputes arise in connection with the preparation of the Plan and the Disclosure Statement, each of the Parties consent to such matters being referred to mediation for the resolution thereof; <u>provided</u>, <u>however</u>, that no Party is limited to having any such dispute finally determined by mediation.

Section 2.2   <u>Financial Information</u>.  Each of the Government Parties acknowledges and agrees that (a) the financial information set forth on signature pages affixed to this Agreement and the CUSIP numbers for each of the Senior COFINA Bonds or Junior COFINA Bonds provided by the Parties pursuant to Section 2.3 hereof are proprietary, privileged and confidential and (b) unless otherwise ordered by the Title III Court, shall use their reasonable best efforts to protect the confidential nature of such financial information and CUSIP numbers, including, without limitation, in filings to be made in the Title III Court or any other public release.

101736284v3

Section 2.3     CUSIP Information.  Within five (5) Business Days after the date hereof, each of the Senior Holders, the Junior Holders, Ambac, Assured, and National shall provide the Oversight Board, in writing, the CUSIP numbers for each of the Senior COFINA Bonds and Junior COFINA Bonds, if any, such Party owns or has due investment management responsibility and authority for funds or accounts which own such Senior COFINA Bonds or Junior COFINA Bonds, as the case may be.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.1.     Representations and Warranties of the Oversight Board.  The Oversight Board hereby represents and warrants that: (a) it is duly created in accordance with the terms and provisions of PROMESA with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval, power and authority to execute and deliver and to perform its obligations under this Agreement and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it or any law, rules or regulations applicable to it; and (c) except with respect to the Appointments Related Litigation and the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.2.     Representations and Warranties of AAFAF.  AAFAF hereby represents and warrants that: (a) it is duly created under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval,  power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) except with respect to the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.3.     Representations and Warranties of COFINA.  COFINA hereby represents and warrants that, subject to entry of an order of the Title III Court in connection with the Title III Case: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and

11

101736284v3

validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) except as set forth on Schedule 3.4 hereto and the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.4.    Representations and Warranties of the Senior Holders.  Each of the Senior Holders (other than Ambac and National), severally and not jointly,  hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the Senior COFINA Bonds of no less than the principal amounts set forth on the signature pages affixed to this Agreement (i) as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than with respect to the Insured Senior COFINA Bonds Claims, and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way such Senior Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; provided, however, that each of the Insured Senior Holders acknowledges that the Insured Senior COFINA Bonds Claims shall be voted by the applicable Insurers, so long as this Agreement remains in effect, and (ii) as of 5:00p.m. (EDT) on August 7, 2018.

Section 3.5.    Representations and Warranties of the Junior Holders.  Each of the Junior Holders (other than Ambac), severally and not jointly hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval,  power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding

12

101736284v3

before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the Junior COFINA Bonds of no less than the principal amounts set forth on the signature pages affixed to this Agreement (i) as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than with respect to the Insured Junior COFINA Bond Claims, and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Junior COFINA Bonds or any voting, consent or direction rights related to such Junior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way such Junior Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; provided, however, that each of the Insured Junior Holders acknowledges that the Insured Junior COFINA Bond Claims shall be voted by Assured, so long as this Agreement remains in effect, and (ii) as of 5:00p.m. (EDT) on August 7, 2018.

    Section 3.6.    Representations and Warranties of Ambac.  Ambac, in its capacity as an Insurer and as a beneficial holder of Senior COFINA Bond Claims and Junior COFINA Bond Claims, hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby, with such exceptions, individually or in the aggregate, as would not have a material adverse effect upon the foregoing; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law, rule or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it insures, owns or has due investment management responsibility and authority for accounts which own the Senior COFINA Bonds and Junior COFINA Bonds of no less than the amounts set forth on the signature pages affixed to this Agreement which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or Junior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds or Junior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way Ambac's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

    Section 3.7.    Representations and Warranties of National.  National, in its capacity as an Insurer and as a beneficial holder of Senior COFINA Bond Claims, hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions

13

contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it insures, owns or has due investment management responsibility and authority for accounts which own the Senior COFINA Bonds of no less than the amounts set forth on the signature pages affixed to this Agreement which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way National's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

Section 3.8.   <u>Representations and Warranties of Assured</u>.  Assured hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.9.   <u>Representations and Warranties of Bonistas</u>.  Bonistas hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite power and authority to carry on the business in which it is engaged, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder and (d) Bonistas do not hold any Junior COFINA Bonds or Senior COFINA Bonds, or any Junior COFINA Bond Claims or Senior COFINA Bond Claims.

Section 3.10.   <u>Representations of the Parties to this Agreement</u>.  Each Party, severally and not jointly, represents and acknowledges that (a) in executing this Agreement, it does not rely, and has not relied, upon any representation or statement made by any other Party or any of such Party's representatives, agents or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as may be stated specifically in this Agreement; (b) in executing this Agreement, it has relied entirely upon its own judgment, beliefs and interest and the advice of its counsel and that it has had a reasonable period of time to consider the terms of this Agreement before entering into it; (c) it has reviewed this Agreement and that it fully understands and voluntarily accepts all of the provisions contained herein; and (d) no holder of Junior COFINA Bond Claims or holder of Senior COFINA Bond Claims, including any "on island" bondholder, is or can be bound by Bonistas participation as a Party hereunder or any action taken by Bonistas in connection therewith. Nothing contained herein shall limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more Senior Holders or Junior Holders, on the one hand, and an Insurer, on the other hand.

ARTICLE IV<br>COVENANTS

Section 4.1.   <u>Covenants of the Oversight Board</u>.  The Oversight Board hereby covenants and agrees as follows:

(a)      The Oversight Board shall take, and cause COFINA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (A) filing, or causing the Commonwealth Agent to file, the Settlement Motion on or prior to October 15, 2018, (B) filing on or prior to October 15, 2018, the Disclosure Statement and the Plan, in form and substance consistent with this Agreement, including the Term Sheet, and reasonably acceptable to the Parties, (C) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (D) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (E) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)      In connection with the solicitation of acceptances and rejections to the Plan with respect to Insured Claims, the Oversight Board shall use its reasonable best efforts to obtain approval of the Disclosure Statement Order by the Title III Court providing that (i)

Insured Claims shall be voted by the Insurers, so long as this Agreement remains in effect, and (ii) elections (other than the Assured Election) regarding the form of distributions with respect to the Insured Claims shall be made by the beneficial holders thereof, provided that the form of elections for holder of Insured Claims regarding their distributions for such claims shall be set forth as an exhibit to the Disclosure Statement Order.  For the avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Insurers' and their insured bondholders' right to vote to accept or reject any Plan.

(c)     The Oversight Board shall negotiate in good faith with the respective Insurers regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to the respective Insurers and be reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

Section 4.2.     Covenants of AAFAF.  AAFAF hereby covenants and agrees as follows:

(a)     AAFAF shall take, and cause COFINA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (A) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (B) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (C) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)     AAFAF shall use its reasonable best efforts to cause the Legislature to enact legislation required under Section II(M) of the Term Sheet.

(c)     As soon as practicable from and after the date hereof, but in no event later than September 15, 2018, AAFAF, with the assistance of COFINA, and with the prior approval of the Oversight Board, shall release requests for proposals to entities interested in serving as trustee and paying agent in connection with the new COFINA securities to be issued pursuant to the Plan.  Upon receipt of responses to such requests for proposals, AAFAF, together with the other Government Parties, shall discuss the merits of such responses with counsel for the other Parties, with the Government Parties making such selection, in their joint and absolute discretion.  For the avoidance of doubt, the entity

16

selected to serve as trustee or paying agent in connection with the new COFINA securities to be issued pursuant to the Plan shall not be an agency or instrumentality of the Commonwealth. AAFAF shall select, in its sole and absolute discretion, the entity or entities to serve as dealer manager(s) for the COFINA Bonds, after consulting with the Senior Ad Hoc Holders.

Section 4.3.    Covenants of COFINA.  COFINA hereby covenants and agrees as follows:

(a)    COFINA shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the entry of the Confirmation Order, the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents provided that the Disclosure Statement and the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (A) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (B) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (C) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)    COFINA shall use its reasonable best efforts to cause the Legislature to enact legislation required under Section II(M) of the Term Sheet.

(c)    As soon as practicable from and after the date hereof, but in no event later than September 15, 2018, COFINA, with the assistance of AAFAF, and with the prior approval of the Oversight Board shall release a request for proposals to entities interested in serving as trustee and paying agent in connection with the new COFINA securities to be issued pursuant to the Plan.  Upon receipt of responses to such request for proposals, COFINA, together with the other Government Parties shall, discuss the merits of such responses with counsel for the other Parties, with the Government Parties making such selection, in their joint and absolute discretion.

Section 4.4.    Covenants of the Senior Holders.  Each of the Senior Holders (other than Ambac and National), severally and not jointly, hereby covenants and agrees as follows:

(a)    None of the Senior Holders shall sell, transfer, pledge, hypothecate or assign (a "Transfer") any of the Senior COFINA Bond Claims, related claims or any voting rights or participations or other interests therein (collectively, the "Senior COFINA Interests") during the period from the date hereof up to and including the earlier to occur of (i) the COFINA

17

Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, each of the Senior Holders may transfer any Senior COFINA Interests to (1) another PSA Creditor or (2) in the event that the transferee is not a PSA Creditor at the time of the Transfer, such transferee executes and delivers, within five (5) calendar days after execution thereof, to counsel for the Oversight Board and AAFAF the Joinder Agreement attached hereto as Exhibit "D" (a "Qualified Transferee"), pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, such Senior Holder shall be deemed to have relinquished its rights (other than the right to Consummation Costs, as defined in the Term Sheet, and be released from its obligations (other than as set forth in Sections 4.4(c) and (e) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.4(a), it shall be void *ab initio* and the applicable Senior COFINA Bond Claims and the Senior Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any of the Senior Holders from acquiring additional Senior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by a Senior Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.4(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)      None of the Senior Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such Senior Holders' aggregate holdings of Senior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and each such Senior Holder agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.4(b).

(c)      Each of the Senior Holders, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III

18

Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations sets forth in this Agreement.

(d)     Subject to the terms set forth herein, none of the Senior Holders shall be limited or prohibited from (i) taking any action that any such Senior Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)     Each of the Senior Holders shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.4 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of any Senior Holder from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.5.     Covenants of the Junior Holders. Each of the Junior Holders (other than Ambac), severally and not jointly, hereby covenants and agrees as follows:

(a)     None of the Junior Holders shall Transfer any of the Junior COFINA Bond Claims, related claims or any voting rights or participations or other interests therein (collectively, the "Junior COFINA Interests") during the period from the date hereof up to and including the earlier to occur of (i) COFINA Effective Date and (ii) the termination of Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, each of the Junior Holders may transfer any Junior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, such Junior Holder shall be deemed to have relinquished its rights (other than the right to Consummation Costs and be released from its obligations (other than as set forth in Sections 4.5(c) and (e) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.5(a), it shall be void ab initio and the applicable Junior COFINA Bond Claims and the Junior Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to

19

preclude any of the Junior Holders from acquiring additional Junior COFINA Bond Claims or related claims; provided, however, that any such Junior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by a Junior Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.5(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)     None of the Junior Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such Junior Holders' aggregate holdings of Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and each such Junior Holder agrees to stay all such pending litigations, proceedings actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.5(b).

(c)     Each of the Junior Holders, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)     Subject to the terms set forth herein, none of the Junior Holders shall be limited or prohibited from (i) taking any action that any such Junior Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)     Each of the Junior Holders shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.5 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of any Junior Holder from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.6.     Covenants of Ambac.  Ambac, in its capacity as an Insurer and as a holder of Senior COFINA Bonds Claims and Junior COFINA Bond Claims, hereby covenants and agrees as follows:

(a)     In its capacity as holder of Senior COFINA Bond Claims and Junior COFINA Bond Claims, Ambac covenants and agrees that it shall not Transfer any Senior COFINA Interests or Junior COFINA Interests during the period from the date hereof up to and including the earlier to occur of (i) the COFINA Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, Ambac may Transfer any Senior COFINA Interests or Junior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of Ambac as the transferor of Senior COFINA Bond Claims or Junior COFINA Bond Claims in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, Ambac as prior holder of the Senior COFINA Bond Claims or Junior COFINA Bond Claims, as the case may be, shall be deemed to have relinquished its rights (other than the right to the Consummation Costs and be released from its obligations (other than as set forth in Sections 4.6(c) and (f) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such Senior COFINA Bond Claims and Junior COFINA Bond Claims transferred; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.6(a), it shall be void *ab initio* and the applicable Senior COFINA Bond Claims or Junior COFINA Bond Claims and Ambac shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude Ambac from acquiring additional Senior COFINA Bond Claims or Junior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or Junior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by Ambac be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.6(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities.  Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.  This Section 4.6(a) does not apply to and shall not affect any rights or obligations of Ambac as an Insurer.

21

(b)     Ambac shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claims as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, Ambac's aggregate holdings of the Senior COFINA Bond Claims and Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and Ambac agrees to stay all such pending litigations proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.6(b).

(c)     Ambac shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment with respect to COFINA not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)     Subject to the terms set forth herein, Ambac shall not be limited or prohibited from (i) taking any action that Ambac shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)     Ambac shall negotiate in good faith with the Oversight Board regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to Ambac and be reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

(f)     Ambac shall support and not otherwise object to the approval of the Settlement Motion by Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.6 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of Ambac from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect

22

to the use, or direction of the use, of monies received, or to be received, by the
Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.7.   Covenants of National.  National, in its capacity as an Insurer and as a
holder of Senior COFINA Bond Claims, hereby covenants and agrees as follows:

(a)      In its capacity as a holder of Senior COFINA Bond Claims, National
covenants and agrees that it shall not Transfer any Senior COFINA Interests during the
period from the date hereof up to and including the earlier to occur of (i) the COFINA
Effective Date and (ii) the termination of this Agreement in accordance with the provisions
of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, National may
Transfer any Senior COFINA Interests to (1) another PSA Creditor or (2) a Qualified
Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and
obligations of National as the transferor of Senior COFINA Bond Claims in accordance with
the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be
deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such
Transfer, National as a prior holder of Senior COFINA Bond Claims shall be deemed to have
relinquished its rights (other than the right to Consummation Costs and be released from its
obligations (other than as set forth in Sections 4.7(c) and (f) hereof)) on or after the effective
date of such Transfer under this Agreement solely to the extent of such Senior COFINA
Bond Claims so transferred; and, provided, further, that, to the extent that a Transfer violates
the provisions of this Section 4.7(a), it shall be void ab initio and the applicable Senior
COFINA Bond Claims and National shall continue to remain subject to the terms of this
Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be
construed, to preclude National from acquiring additional Senior COFINA Bond Claims or
related claims; provided, however, that any such Senior COFINA Bond Claims or related
claims acquired from and after the date hereof shall automatically and immediately upon
acquisition by National be deemed subject to all of the terms and provisions of this
Agreement; and, provided, further, that the provisions of this Section 4.7(a) shall not apply to
the grant of any liens or encumbrances in favor of a bank or broker dealer holding custody of
securities in the ordinary course of business and which lien or encumbrance is released upon
the Transfer of such securities.  Notwithstanding the foregoing, nothing contained herein
shall restrict or prohibit any party from taking any action required by the Securities Act of
1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations
promulgated thereunder or by any other applicable law or regulation.  This Section 4.7(a)
does not apply to and shall not affect any rights or obligations of National as Insurer.

(b)      National shall not, except as expressly provided herein, (i) file any additional
claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including
secured, unsecured, administrative or substantial contribution claims), provided that the
failure to file any additional proofs of claim as a result of its obligations under this clause (i)
shall not prejudice, nor shall it be deemed to be a limitation of, National's aggregate holdings
of Senior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any
pending or additional litigation, proceeding, action or matter (and National agrees to stay all
such pending litigations, proceedings, actions or matters) or seek to recover damages or to
seek any other type of relief against any of the Government Releasees based upon, arising
from or relating to the Government Released Claims or any of the claims or causes of action
asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid

23

any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.7(b).

(c)     National shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment with respect to COFINA not proposed or supported by the Oversight Board, AAFAF and COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)     Subject to the terms set forth herein, National shall not be limited or prohibited from (i) taking such action that National shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)     National shall negotiate in good faith with the Oversight Board and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are Parties regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to National and reasonably acceptable to the Oversight Board and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are Parties and shall be included in the Plan Supplement.  National shall use its reasonable best efforts to maximize tax-exempt treatment of distributions to certificate holders from the National Custodial Trust.

(f)     National shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.7 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of National from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

101736284v3

Section 4.8.    Covenants of Assured.  Assured hereby covenants and agrees as follows:

(a)    Assured shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, Assured's aggregate holdings of Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and Assured agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.8(a).

(b)    Assured shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(c)    Assured shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.8 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of Assured from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or the direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

(d)    Subject to the terms set forth herein, Assured shall not be limited or prohibited from (i) taking such action that Assured shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)    Assured shall negotiate in good faith with the Oversight Board regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to Assured and reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

Section 4.9.    Covenants of Bonistas.  Bonistas hereby covenants and agrees as follows:

(a)    Bonistas shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of the Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or encourage any "on island" bondholder to vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not support or encourage any "on island" bondholder to vote for any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(b)    Bonistas shall (i) actively encourage support by "on island" bondholders for the agreement set forth in the Term Sheet, (ii) post a statement of support for the Term Sheet and the Plan on the Bonistas' website, (iii) make Bonistas available to "on island" bondholders to answer questions regarding the Term Sheet, the Plan, Disclosure Statement, Confirmation Order and other Definitive Documents, and (iv) support legislation that may be necessary or appropriate to implement the transactions contemplated by the Term Sheet.

(c)    Notwithstanding the foregoing subsections, Bonistas' covenants herein to support and encourage "on island" bondholders to support the Term Sheet and vote in favor of the Plan is expressly subject to (i) the provisions of Section 5.2 of this Agreement and (ii) individual "on island" bondholders' consultations with their own legal, financial and tax advisors to analyze the terms of the Term Sheet, the Plan and the transactions contemplated thereunder.

Section 4.10.    Qualified Marketmaker Exemption.  Notwithstanding anything contained in this Article IV to the contrary, (a) a PSA Creditor may Transfer any Senior COFINA Interests or Junior COFINA Interests to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a PSA Creditor; provided that such Qualified Marketmaker subsequently Transfers all such Senior COFINA Interests or Junior COFINA Interests to a PSA Creditor or a Qualified Transferee within the date that is ten (10) calendar days after such Qualified Marketmaker's acquisition of such Senior COFINA Interests or Junior COFINA Interests, as the case may be; and (b) to the extent that a PSA Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any Senior COFINA Interests or

26

Junior COFINA Interests that the Qualified Marketmaker acquires from a holder of the Senior COFINA Interests or Junior COFINA Interests that is not a PSA Creditor without the requirement that the transferee be or become a PSA Creditor.

Section 4.11.   Right to Vote.  Each Party acknowledges that, for purposes of this Agreement, and any Plan solicited in accordance with the provisions of this Agreement, and so long as this Agreement remains in effect, (a) each Insurer shall have the exclusive right to vote to accept or reject the Plan on account of any existing COFINA securities that it insures and (b) it shall not object to the Insurers' right to vote or reject the Plan or take any action inconsistent therewith.  For avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Insurers' and their insured bondholders' rights to vote to accept or reject any Plan.

Section 4.12.   Appointments Related Litigation.  Notwithstanding anything contained herein to the contrary, a Party which is a plaintiff in an Appointments Related Litigation may continue such litigation but, under all circumstances, such Party (a) hereby covenants and agrees to perform all other duties and obligations as set forth in this Agreement, including, without limitation, the other duties and obligations set forth in Articles IV and V hereof, and (b) without prejudice to any rights reserved in accordance with Sections 4.4(e), 4.5(e) and 4.8(c) hereof, hereby covenants and agrees that, no matter the determination and the entry of a Final Order in connection with the Appointments Related Litigation, with such determination and Final Order being entered either prior to consideration of approval of the Settlement Motion or confirmation of the Plan by the Title III Court or subsequent to entry of an order approving the Settlement Motion and confirmation of the Plan, such Party (i) shall not urge or argue that such determination and Final Order reverses, affects, or otherwise modifies the transactions contemplated herein, in the Term Sheet, in the Settlement Motion and in the Plan and (ii) in the event that such determination and Final Order (y) occurs prior to approval of the Settlement Motion and confirmation of the Plan and (z) causes or requires the reconstitution or reappointment of the Oversight Board, such Party shall urge and request, in writing, that such reconstituted or reappointed board (1) enforce the terms and conditions of this Agreement and the Term Sheet and (2) promptly seek approval of the Settlement Motion and confirmation of the Plan by the Title III Court.

Section 4.13.   Additional Litigation.  Aurelius and Six PRC shall, and shall cause each of their applicable entities to, request entry of an order dismissing, with prejudice, those claims and causes of action, or portions of claims and causes of action, that Aurelius and Six PRC, or their affiliated entities, have asserted, or were required, by applicable law, to assert, in the litigation styled Lex Claims, LLC v. The Commonwealth of Puerto Rico, No. 16-cv-02374 FAB (D.P.R.), currently pending in the United States District Court for the District of Puerto Rico (appealed at First Circuit Case Nos. 17-1241, 17-1248, 17-1272, 17-1337), which are premised on challenges to COFINA's constitutionality, COFINA's entitlement to proceeds of the sales and use taxes, if any, transferred by the Commonwealth to COFINA, and such other claims and causes of action which may be interpreted reasonably to challenge the transactions contemplated by the Term Sheet, the Plan and the Settlement Motion, with the effectiveness of such order conditioned on the entry of an order approving the Settlement Motion and confirmation of the Plan.

ARTICLE V
PLAN AND PLAN SUPPORT

Section 5.1.    Plan Support Commitment.  From and after the date hereof, and
provided that (a) this Agreement has not been terminated and (b) none of the Disclosure
Statement, the Plan and any of the proposed Definitive Documents have been filed, amended
or modified in a manner adverse to the PSA Creditors or, in the case of Bonistas, the "on
island" bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims,
each of the PSA Creditors and Bonistas (to the extent remaining a Party) shall (i) support (A)
approval of the Disclosure Statement in accordance with section 1125 of the Bankruptcy
Code, (B) confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code,
(C) approval of the Settlement Motion and the compromise and settlement contemplated
therein by the Title III Court, and (D) unless otherwise ordered by the Title III Court, upon a
motion on notice to the Government Parties and The Bank of New York Mellon, seeking a
stay of all proceedings and determinations in connection with the Adversary Proceeding and
the Actions, (ii) subject to receipt of the Disclosure Statement and/or other solicitation
materials in respect of the Plan, to the fullest extent permitted by law, timely vote, or cause to
be voted, to accept the Plan in its capacity as a Senior Holder, a Junior Holder or an Insurer,
as applicable (or, in the case of Bonistas, publicly support the terms herein and in the Term
Sheet and publicly encourage the support and timely votes for the Plan from "on island"
bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims) with
rights of acceptance in accordance with the Disclosure Statement Order, each as the case may
be, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote (or, in
the case of Bonistas, any such support or encouragement), (iv) not consent to or vote (or, in
the case of Bonistas, not encourage "on island" bondholders to vote) for any modification of
the Plan unless such modification is (Y) not adverse to the Senior Holders, the Junior Holders,
Ambac, Assured, National or "on island" bondholders that hold Senior COFINA Bond Claims
or Junior COFINA Bond Claims and (Z) not inconsistent with the terms provided herein and
the Term Sheet, and (v) not vote for or support any plan of adjustment not proposed to or
supported by the Government Parties, so long as none of the Government Parties is in material
breach of this Agreement.

Section 5.2.    Solicitation Required in Connection with Plan.  Notwithstanding
anything contained in this Article V or elsewhere in this Agreement to the contrary, this
Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan.
Each of the Parties, severally and not jointly, acknowledges and agrees that (a) the votes on
the Plan will not be solicited until the Title III Court has approved the Disclosure Statement
and related solicitation materials, and such Disclosure Statement and solicitation materials
have been transmitted to parties entitled to receive same and (b) this Agreement does not
constitute an offer to issue or sell securities to any person or entity, or the solicitation of an
offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be
unlawful.  NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN
SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY PROMESA,
THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT
OF 1934, AS AMENDED, ANY RULE OR REGULATIONS PROMULGATED
THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY
ANY ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL
GOVERNMENTAL AUTHORITY.

101736284v3

ARTICLE VI
TERMINATION

Section 6.1.   Termination of Agreement.  This Agreement may be terminated as follows:

(a)      By any PSA Creditor or Bonistas, solely as to itself, at their sole option and discretion and upon written notice to the other Parties, in the event that (i) the Board of Directors of COFINA shall have failed to ratify this Agreement within seven (7) calendar days of the date hereof, (ii) the Settlement Motion, the Plan, the Disclosure Statement and the motion seeking entry of the Disclosure Statement Order are not filed with the Title III Court on or prior to October 15, 2018, or (iii) the Oversight Board withdraws the Settlement Motion, the Plan, the Disclosure Statement or the motion seeking entry of the Disclosure Statement Order or files any motion or pleading with the Title III Court, in each case, that is inconsistent with this Agreement, including the Term Sheet, in any material respect, and such motion or pleading has not been withdrawn before the earlier to occur of (y) five (5) Business Days after the Oversight Board receives written notice from another Party (in accordance with the notice provisions set forth in Section 7.10 hereof) that such motion or pleading is inconsistent with this Agreement in such material respect and (z) entry of an order of the Title III Court approving such motion or pleading and granting the relief requested therein.

(b)      By any Party, solely as to itself, at their sole option and discretion and upon written notice to the other Parties, in the event that (i) a Party materially breaches any of the covenants set forth in Article IV hereof or any of its other undertakings in this Agreement, (ii) the Confirmation Order is not entered by the Title III Court and the COFINA Effective Date does not occur on or prior to March 1, 2019, (iii) the Title III Court or such other court of competent jurisdiction enters a Final Order denying confirmation of the Plan, or (iv) a court of competent jurisdiction issues a ruling, judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Plan, which ruling, judgment or order has not been reversed or vacated within sixty (60) calendar days after such issuance and is not subject to a stay; provided, however, that, upon the joint instruction and notice provided by the Government Parties, the date set forth in subsection (ii) above shall be extended up to and including June 1, 2019;

and, provided, further, that, under no circumstances shall a Party have the right to terminate this Agreement solely on the basis that the Title III Court determines that the Insurers are unable to accept the Plan on behalf of holders of Insured Senior Holders or Insured Junior Holders, as the case may be; and, provided, further, that, in the event that this Agreement is terminated by the Oversight Board, it shall be deemed terminated as to all Parties hereto; and, provided, further, that the automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.  This Agreement shall automatically terminate upon the occurrence of the COFINA Effective Date.

Section 6.2.   Effect of Termination.  Except as otherwise provided herein, in the event of the termination of this Agreement as to any Party, (a) this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of such Party (or of any of its directors, officers, employees, consultants, contractors, agents, legal and

29

101736284v3

financial advisors or other representatives), (b) such Party shall not have any obligations to any other Party arising out of, and shall have no further rights, benefits or privileges under, this Agreement (including, without limitation, any rights to Consummation Costs in accordance with the provisions of the Term Sheet), except for the obligations and or provisions set forth in Sections 2.1, 2.2, 7.2, 7.5 and 7.14 hereof and this clause (b) of Section 6.2 hereof, which provisions are intended to survive the expiration or termination of this Agreement and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement prior to the date of such expiration or termination shall survive such expiration or termination, and (c) such Party shall have all the rights and remedies that it would have had, and be entitled to take all actions that it would have been entitled to take, had it not entered into this Agreement and no such rights shall be deemed waived pursuant to a claim of laches or estoppel; provided, however, that in no event shall any such termination relieve such Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such expiration or termination; and, provided, further, that, unless otherwise ordered by the Title III Court, upon notice to such terminating Party, any and all consents, ballots and votes tendered by such Party prior to such expiration or termination shall be deemed to be, for all purposes, automatically null and void _ab initio_, shall not be considered or otherwise used in any manner by the Parties in connection with the Plan, this Agreement or otherwise; and, provided, further, that, if a terminating Party is also party to commutation agreement with an Insurer, then, any elections tendered by such terminating Party in relation to the treatment of existing COFINA securities insured by such Insurer shall be deemed to be automatically null and void _ab initio_ only if permitted pursuant to the terms of such commutation agreement or if such terminating Party is no longer party to such commutation agreement.  Except in connection with a dispute concerning a breach of this Agreement or the interpretation of the terms hereof upon termination, (y) neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein where the result of negotiations and compromises of the respective positions of the Parties and (z) no Party shall seek to take discovery concerning this Agreement or admit this Agreement or any part of it into evidence against any other Party hereto.

ARTICLE VII
MISCELLANEOUS

Section 7.1.   Amendments.  This Agreement, including, without limitation, the Term Sheet, may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected (or, in the case of Bonistas, if "on island" bondholders are to be affected) by such modification, amendment or supplement.

Section 7.2.   No Admission of Liability.

(a)   The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other Person with respect to any of the matters addressed in this Agreement.

30

(b)      None of this Agreement (including, without limitation, the Recitals and Exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in the Actions or of any wrongdoing or liability of any Party; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (iii) is or may be deemed to be or used as an admission or evidence against Reorganized COFINA or COFINA with respect to the validity of any of the Senior COFINA Bond Claims or the Junior COFINA Bond Claims.  None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement herein shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement.

Section 7.3.      Good Faith Negotiations.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement; the negotiations related to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; each Party knows all of the relevant facts and his, her or its rights in connection therewith, and that he, she or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement.  The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.  The Parties further acknowledge and agree that, in connection with the Title III Case and the negotiation and consummation of this Agreement, including, without limitation, the Term Sheet, the Parties, at all times, acted (a) in good faith and (b) solely for themselves and not on behalf of or in representation of any other creditors, bondholders or other parties in interest.

Section 7.4.      Third Party Beneficiary.  Other than funds and/or accounts which are holders of the Senior COFINA Bonds or Junior COFINA Bonds and whose advisors or managers are Parties hereto, nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto, Reorganized COFINA and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 7.5.      Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York and applicable federal law, without giving effect to the principles of conflicts of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this

31

101736284v3

Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Title III Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, subject to a Party's rights pursuant to applicable law. In the event any such action, suit or proceeding is commenced, each of the Parties hereby (a) agrees and consents that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 7.10 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 7.10 hereof and (b) waives to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising from or relating to this Agreement and the representations, covenants and other obligations set forth herein.

Section 7.6.    Headings. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 7.7.    Binding Agreement; Successors and Assigns. This Agreement shall be effective and binding only upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto. This Agreement is intended to, and shall be deemed to, bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic and legal substance of the transactions contemplated herein or in the Term Sheet are not affected in any manner adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated herein are consummated as originally contemplated to the greatest extent possible.

Section 7.8.    Entire Agreement. This Agreement, including, without limitation, the Term Sheet, constitutes the full and entire agreement among the Parties with regard to the subject hereof and the Term Sheet, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof. No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement. Notwithstanding the foregoing, nothing contained herein shall be deemed to limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more Senior Holders or Junior Holders, on the one hand, and an Insurer, on the other hand.

32

Section 7.9.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement.  Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 7.10.    Notices.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (i), when personally delivered by courier service or messenger, (ii) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (iii) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid- return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

    (a)    If to the Oversight Board, to:

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
Email: mbienenstock@proskauer.com
       Brian S. Rosen, Esq.
Email: brosen@proskauer.com
Facsimile: 212-969-2900

    (b)    If to AAFAF or COFINA, to:

O'MELVENY & MEYERS LLP
Seven Times Square
New York, NY 10036
Attn:   John Rapisardi, Esq.
Email: jrapisardi@omm.com
       Suzzanne Uhland, Esq.
Email: suhland@omm.com
Facsimile: 212-326-2061

    (c)    If to Ambac, to:

MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
Attn:   Dennis Dunne, Esq.
Email: ddunne@milbank.com
       Atara Miller, Esq.
Email: amiller@milbank.com
Facsimile: 212-530-5219

(d)     If to Assured, to:

CADWALADER, WICKERSHAM & TAFT
200 Liberty Street

New York, NY 10281
Attn: Mark Ellenberg, Esq.
Email: mark.ellenberg@cwt.com
        Lary Stromfeld, Esq.
Email: lary.stromfeld@cwt.com
        Ivan Loncar, Esq.
Email: ivan.loncar@cwt.com
        Casey Servais, Esq.
Email: casey.servais@cwt.com
Facsimile: 212-504-6666

(e)     If to National, to:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Marcia L. Goldstein, Esq.
Email: marcia.goldstein@weil.com
        Gabriel Morgan, Esq.
Email: gabriel.morgan@weil.com
Facsimile: 212-310-8007

(f)     If to the Senior Ad Hoc Holders, to:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue
New York, NY 10010
Attn:   Susheel Kirpalani, Esq.
Email: susheelkirpalani@quinnemanuel.com
        Eric Kay, Esq.
Email: erickay@quinnemanuel.com
Facsimile: 212-849-7100

(g)     If to Oppenheimer or the First Puerto Rico Family of Funds, to:

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Attn:   Thomas Mayer, Esq.
Email: tmayer@kramerlevin.com
        Amy Caton, Esq.
Email: acaton@kramerlevin.com
        Douglas Buckley, Esq.

34

Email: dbuckley@kramerlevin.com
Facsimile: 212-715-8169

(h)      If to GSAM, to:

McDERMOTT, WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60606
Attn:   William P. Smith, Esq.
Email:  wsmith@mwe.com
        David L. Taub, Esq.
Email:  dtaub@mwe.com
        Alexandra C. Scheibe, Esq.
Email:  ascheibe@mwe.com
Facsimile: 312-277-9069

(i)      If to the Puerto Rico Funds, to:

WHITE & CASE LLP
200 South Biscayne Boulevard
Miami, FL 33131
Attn:   John K. Cunningham, Esq.
Email:  jcunningham@whitecase.com
        Fernando de la Hoz, Esq.
Email:  fdelahoz@whitecase.com
Facsimile: 305-358-5744

(j)      If to Bonistas, to:

DAVIS, POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Attn:   Donald Bernstein, Esq.
Email:  donald.bernstein@davispolk.com
        Brian Resnick, Esq.
Email:  brian.resnick@davispolk.com
Facsimile: 212-701-5800

(k)      If to certain of the Insured Senior Holders, to:

NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Attn:   Lawrence A. Larose, Esq.
Email:  lawrence.larose@nortonrosefulbright.com
        Eric Daucher, Esq.
Email:  eric.daucher@nortonrosefulbright.com

(l)      If to GoldenTree Asset Management LP, to:

35

101736284v3

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Attn: Ira S. Dizengoff, Esq.
Email: idizengoff@akingump.com
            Philip C. Dublin, Esq.
Email: pdublin@akingump.com

(m)     If to Tilden Park Capital management LP, to:

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Attn:   Sandy Qusba, Esq.
Email: squsba@stblaw.com
            Nicholas Baker, Esq.
Email: nbaker@stblaw.com
Facsimile: 212-455-2502

(n)     If to Whitebox Advisors LLC, to:

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
Attn:   Daniel A. Fliman, Esq.
Email: dfliman@stroock.com
Facsimile: 212-806-6006

(o)     If to Aurelius or Six PRC, to:

PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:   Andrew N. Rosenberg, Esq.
Email: arosenberg@paulweiss.com
Facsimile: 212-373-3000

Section 7.11.     Non-Waiver of Remedies.  Except as expressly provided in this Agreement, nothing contained herein is intended, nor shall it be construed in any manner, to waive, limit, impair or restrict any right or ability of the Parties to protect and preserve each of their rights, remedies and interests, contractual or otherwise, under the Bond Resolutions, Title III or any other provision of PROMESA or any other law or regulation.

Section 7.12.     Several, Not, Joint Obligations.  The agreements, representations, covenants and other obligations of the Parties set forth in this Agreement are, in all respects, several and not joint.

36

Section 7.13.    <u>Remedies Cumulative</u>.  All rights, powers and remedies provided in accordance with the terms and provisions of this Agreement or otherwise available in respect hereof of law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the contemporaneous or later exercise of any other such right, power or remedy by any such Party.

Section 7.14.    <u>Specific Performance</u>.  Each of the Parties agrees and understands that money damages are an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Title III Court or such other court of competent jurisdiction requiring any Party to comply promptly with any of its obligation hereunder. Notwithstanding anything contained in this Agreement to the contrary, specific performance and injunctive or other relief and the right to terminate this Agreement in accordance with the terms and provisions hereof shall be the sole and exclusive remedies for any breach of this Agreement by any Party (or any other person) and no Party (or any other person) shall be entitled to monetary damages for any breach of any provision of this Agreement.

Section 7.15.    <u>Further Assurances</u>.  Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, such instruments, and to take such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be
executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
    Name:  Natalie A. Jaresko
    Title:  Executive Director


THE PUERTO RICO SALES TAX
FINANCING CORPORATION

By: _____
    Name:
    Title:


PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
    Name:
    Title:


BONISTAS DEL PATIO, INC.


By: _____
    Name:  Rafael E. Rojo
    Title:  Chairman

101736284v3

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
    Name:
    Title:


PUERTO RICO SALES TAX
FINANCING CORPORATION

By:  Puerto Rico Fiscal Agency and Financial
     Advisory Authority

By: _____
    Name: Christian Sobrino Vega
    Title:  Executive Director of AAFAF, in its
        capacity as Authorized Signatory for
        COFINA


PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
    Name: Christian Sobrino Vega
    Title:  Executive Director


BONISTAS DEL PATIO, INC.

By: _____
    Name:  Rafael E. Rojo
    Title:   Chairman

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
     Name:
     Title:

THE PUERTO RICO SALES TAX
FINANCING CORPORATION

By: _____
     Name:
     Title:

PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
     Name:
     Title:

BONISTAS DEL PATIO, INC.

By: _____
     Name:   Rafael E. Rojo
     Title:   Chairman

**AMBAC ASSURANCE CORPORATION**


By:  s/Claude LeBlanc                          
        Name: Claude LeBlanc
        Title: President and Chief Executive Officer

Holder of Principal Amount of Senior COFINA Bonds:

Insurer of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Insurer of Principal Amount of Junior COFINA Bonds:

**ARISTEIA CAPITAL, L.L.C.,** solely in its capacity as Investment Manager or Adviser to underlying funds

By: s/Willian R. Techar
      Name:  William R. Techar
      Title:  Manager
            Aristeia Capital, LLC.

By: s/Andrew B. David
      Name:  Andrew B. David
      Title:  Chief Operating Officer
            Aristeia Capital, LLC.

Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Aristeia Capital, L.L.C.
One Greenwich Plaza, 3rd Floor
Greenwich, CT 06830
Fax:  (203) 622-2701
Attention:  Steven Robinson/William Techar
Email:  robinson@aristeiacapital.com/techar@aristeiacapital.com

**ASSURED GUARANTY MUNICIPAL CORP.**

By: s/Jorge A. Gana
      Name: Jorge A. Gana
      Title: M.D.

Insurer of Principal Amount of Junior COFINA Bonds:

**AURELIUS CAPITAL MASTER, LTD.**

By:  s/Dan Gropper
        Name: Dan Gropper
        Title: Authorized Person

Principal Amount of Senior COFINA Bonds held as of September 20, 2018:

Principal Amount of Junior COFINA Bonds held as of September 20, 2018:

Notice Address

Aurelius Capital Management, LP
535 Madison Avenue, 22nd Floor
New York, NY 10022
Fax: 212-786-5870
Attention: Dan Gropper
Email: dgropper@aurelius-capital.com

**CANYON CAPITAL ADVISORS LLC,** on behalf of its participating funds and/or accounts

By:  s/John P. Plaga
      Name:  John P. Plaga
      Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Canyon Capital Advisors LLC
2000 Avenue of the Stars, 11th Floor
Los Angeles, CA 90067
Fax:  1-310-272-1371
Attention:  General Counsel
Email:  legal@canyonpartners.com;
jheller@canyonpartners.com;
akawalsky@canyonpartners.com

**DECAGON HOLDINGS 1, L.L.C.**

By: s/Jeffrey R. Katz_____
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 1, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 2, L.L.C.**

By:  s/Jeffrey R. Katz
      Name:  Jeffrey R. Katz
      Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 2, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 3, L.L.C.**

By:  s/Jeffrey R. Katz
      Name:  Jeffrey R. Katz
      Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 3, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 4, L.L.C.**

By: s/Jeffrey R. Katz_____
       Name: Jeffrey R. Katz
       Title:  Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 4, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 5, L.L.C.**

By: <u>s/Jeffrey R. Katz</u>
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



<u>Notice Address:</u>

Decagon Holdings 5, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 6, L.L.C.**

By:  s/Jeffrey R. Katz
      Name:  Jeffrey R. Katz
      Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 6, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 7, L.L.C.**

By:  s/Jeffrey R. Katz
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 7, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 8, L.L.C.**

By: s/Jeffrey R. Katz
    Name: Jeffrey R. Katz
    Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 8, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 9, L.L.C.**

By: s/Jeffrey R. Katz
      Name:  Jeffrey R. Katz
      Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 9, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 10, L.L.C.**

By: <u>s/Jeffrey R. Katz</u>
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



<u>Notice Address:</u>

Decagon Holdings 10, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

## FIRST PUERTO RICO FAMILY OF FUNDS

First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.

By: _Frank J Serra_
Name: Frank J Serra
Title: President

Holder of Principal Amount of Insured Senior COFINA Bonds: ██████████

Holder of Principal Amount of Uninsured Senior COFINA Bonds: ██████████

Holder of Principal Amount of Junior COFINA Bonds: ██████████

**GOLDENTREE ASSET MANAGEMENT LP**, on behalf of certain of its affiliated funds and certain funds and accounts for which it serves as investment manager

By:  s/Peter Alderman
     Name:  Peter Alderman
     Title:   General Counsel--Americas

Investment Advisor to Holders of Principal Amount of Senior COFINA Bonds:

Investment Advisor to Holders of Principal Amount of Junior COFINA Bonds:

Notice Address:

GoldenTree Asset Management LP
300 Park Avenue, 20th Floor
New York, NY 10022
Fax:  212-847-3496
Attention:  Legal Department
Email:  legalgroup@goldentree.com

**GOLDMAN SACHS ASSET MANAGEMENT, L.P.,** on behalf of certain funds and accounts
for which it serves as investment manager


By: s/David Z. Alter _____
      Name: David Z. Alter
      Title: Managing Director


Investment Manager to Holder of Principal Amount of Senior COFINA Bonds:


Investment Manager to Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Goldman Sachs Asset Management, L.P.
200 West Street, 3rd Floor
New York, NY 10282
Attention:  David Z. Alter
Email:  david.alter@gs.com


With a copy to:

Goldman Sachs Asset Management, L.P.
200 West Street, 15th Floor
New York, NY 10282
Attn: General Counsel

**NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION**

By:  s/Adam Bergonzi
          Name:  Adam Bergonzi
          Title:   Chief Risk Officer

Holder of Principal Amount of Senior COFINA Bonds:

          *by National Public Finance Guarantee Corporation:*

          *by MBIA Insurance Corporation:*

Insurer of Principal Amount of Senior COFINA Bonds:


Notice Address:

National Public Finance Guarantee Corporation
1 Manhattanville Road
Purchase, NY 10577
Fax:  (914) 765-3164
Attention:  Adam Bergonzi
Email:  adam.bergonzi@nationalpfg.com

**OLD BELLOWS PARTNERS LP**

By:  s/ A. Dev Chodry
       Name:  A. Dev Chodry
       Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Scoggin Management LP
660 Madison Ave, #20
New York, NY 10065
Fax:  646-607-5686
Attention:  Nicole Kramer
Email:  nkramer@scogcap.com

**OPPENHEIMER FUNDS. INC.,** as investment advisor for the following accounts:

Oppenheimer Rochester Amt -Free Municipal Fund
Oppenheimer Rochester Amt -Free New York Municipal Fund
Oppenheimer Rochester California Municipal Fund
Oppenheimer Rochester Limited Term California Municipal Fund
Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
Oppenheimer Municipal Fund)
Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of
Rochester Portfolio Series)
Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer Multi-
State Municipal Trust)
Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
Multi-State Municipal Trust)
Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
State Municipal Trust)
Oppenheimer Rochester Fund Municipals
Oppenheimer Rochester Minnesota Municipal Fund

and

**OFI GLOBAL INSTITUTIONAL, Inc.,** as investment manager for the following
accounts:

MASSMUTUAL International Holding MSC, Inc.
MASSMUTUAL Unified Traditional

By: _(signature)_
 Name: RICHARD STEIN
 Title: VICE PRESIDENT

Holder of Principal Amount of Insured Senior COFINA Bonds: $ ██████████

Holder of Principal Amount of Uninsured Senior COFINA Bonds: $ ██████████

Holder of Principal Amount of Uninsured Junior COFINA Bonds: $ ██████████

**TAX-FREE PUERTO RICO FUND, INC.**
**TAX-FREE PUERTO RICO FUND II, INC.**
**TAX-FREE PUERTO RICO TARGET MATURITY FUND, INC.**
**PUERTO RICO AAA PORTFOLIO BOND FUND, INC.**
**PUERTO RICO AAA PORTFOLIO BOND FUND II, INC.**
**PUERTO RICO AAA PORTFOLIO TARGET MATURITY FUND, INC.**
**PUERTO RICO FIXED INCOME FUND, INC.**
**PUERTO RICO FIXED INCOME FUND II, INC.**
**PUERTO RICO FIXED INCOME FUND III, INC.**
**PUERTO RICO FIXED INCOME FUND IV, INC.**
**PUERTO RICO FIXED INCOME FUND V, INC.**
**PUERTO RICO FIXED INCOME FUND VI, INC.**
**PUERTO RICO GNMA & U.S. GOVERNMENT TARGET MATURITY FUND, INC.**
**PUERTO RICO MORTGAGE-BACKED & U.S. GOVERNMENT  SECURITIES FUND, INC.**
**UBS IRA SELECT GROWTH & INCOME PUERTO RICO FUND**


By: s/ Carlos V. Ubiñas
        Name: Carlos V. Ubiñas
        Title: Chairma

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

**PUERTO RICO INVESTORS TAX-FREE FUND, INC.**
**PUERTO RICO INVESTORS TAX-FREE FUND, INC. II**
**PUERTO RICO INVESTORS TAX-FREE FUND III, INC.**
**PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.**
**PUERTO RICO INVESTORS TAX-FREE FUND V, INC.**
**PUERTO RICO INVESTORS TAX-FREE FUND VI, INC.**
**PUERTO RICO INVESTORS BOND FUND I**


By:  s/Javier Rubio
      Name: Javier Rubio
      Title: Senior Vice President

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

**SCOGGIN MANAGEMENT LP**

By: s/A. Dev. Chodry
     Name:  A. Dev Chodry
     Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Scoggin Management LP
660 Madison Ave, #20
New York, NY 10065
Fax: 646-607-5686
Attention:  Nicole Kramer
Email:  nkramer@scogcap.com

**SIX PRC INVESTMENTS LLC**

By: Monarch Debt Recovery Master Fund Ltd
Monarch Alternative Solutions Master Fund Ltd
Monarch Capital Master Partners III LP
Monarch Capital Master Partners IV LP
MCP Holdings Master LP
Monarch Special Opportunities Master Fund Ltd, as Members

By Monarch Alternative Capital LP, as investment manager


By: s/Adam Sklar_____
        Name:  Adam Sklar
        Title:   Managing Principal


Principal Amount of Senior COFINA Bonds as of September 20, 2018:


Principal Amount of Junior COFINA Bonds as of September 20, 2018:


Notice Address:

Monarch Alternative Capital LP
535 Madison Avenue
New York, NY 10022
Fax: 866-610-5157
Attention: Adam Sklar
Email: adam.sklar@monarchlp.com

**TACONIC CAPITAL ADVISORS L.P.**
**on behalf of funds under management**


By:  s/Peyton McNutt
        Name:  Peyton McNutt
        Title:   Deputy General Counsel


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Taconic Capital Advisors L.P.
280 Park Avenue, 5th Floor
New York, New York 10017
Fax:  (212) 209-3185
Attention:  Marc Schwartz
Email:  maschwartz@taconiccap.com

**TILDEN PARK CAPITAL MANAGEMENT LP,** on behalf of certain of its managed funds

By: s/Samuel Alcoff
     Name: Samuel Alcoff
     Title:  Managing Member


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Tilden Park Capital Management LP
452 5th Ave, 28th Floor
New York, NY 10018
Fax:  N/A
Attention:  Rahul Pande
Email: rpande@tildenparkcapital.com
     with a copy to:  legal@tildenparkcapital.com

**WHITEBOX ADVISORS LLC,** on behalf of funds it manages

By:  s/Mark Strefling
      Name:  Mark Strefling
      Title:   Chief Executive Officer


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:


Notice Address:

Whitebox Advisors LLC
3033 Excelsior Boulevard, Suite 300
Minneapolis, MN 55416
Attention:  Sean Russell
Email:  SRussell@whiteboxadvisors.com

# EXHIBIT A

## LIST OF SENIOR HOLDERS PARTY HERETO

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Aurelius Capital Master, Ltd.
Canyon Capital Advisors LLC
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it
    serves as investment manager
National Public Finance Guarantee Corporation
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
    Oppenheimer Municipal Fund)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Fund Municipals
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.

First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Target Maturity Fund, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund II, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund, Inc. II
Puerto Rico Investors Tax-Free Fund III, Inc.
Puerto Rico Investors Tax-Free Fund IV, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

## EXHIBIT B

### LIST OF JUNIOR HOLDERS PARTY HERETO

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Aurelius Capital Master, Ltd.
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it
    serves as investment manager
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Limited Term California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
    Oppenheimer Municipal Fund)
    Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of
    Rochester Portfolio Series)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Fund Municipals
    Oppenheimer Rochester Minnesota Municipal Fund
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
    MASSMUTUAL Unified Traditional
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.

First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund II, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund II, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
Puerto Rico Fixed Income Fund VI, Inc.
Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.
Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

## **EXHIBIT C**

## TERM SHEET

EXECUTION VERSION

**COFINA**
**Restructuring Proposal**
**Summary of Terms and Conditions**

This amended and restated term sheet (the "Term Sheet"), dated as of September 20, 2018, is a summary of indicative terms and conditions for a proposed restructuring (the "Restructuring"), and a plan of adjustment (the "COFINA Plan of Adjustment") consummated in connection with proceedings under Title III of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA"; such proceedings being referred to as the "PROMESA Proceedings"), of the indebtedness of, and claims and causes of action against, the Puerto Rico Sales Tax Financing Corporation ("COFINA"). References herein to (1) the "PSA" are to that certain Amended and Restated Plan Support Agreement, dated as of September 20, 2018, by and among (a) the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), (b) COFINA, (c) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" and, together with the Oversight Board and COFINA, the "Government Parties"), (d) certain holders of Senior COFINA Bond Claims, as defined therein, (e) Ambac Assurance Corporation ("Ambac"), (f) National Public Finance Guarantee Corporation ("National"), (g) certain holders of Junior COFINA Bond Claims, as defined therein, (h) Assured Guaranty Municipal Corp. ("Assured"), formerly known as Financial Security Assurance Inc., and (i) Bonistas del Patio, Inc. ("Bonistas"), and (2) "COFINA PROMESA Proceeding" are to the PROMESA Proceeding of COFINA. The signatories to the PSA as of August 29, 2018, shall be referred to herein as the "PSA Parties".

**I.     Compromise and Settlement of Commonwealth – COFINA Dispute**

    **A.**     On or prior to October 15, 2018, the Oversight Board, on behalf of the Commonwealth of Puerto Rico (the "Commonwealth"), shall file a motion (the "Settlement Motion") in the Commonwealth PROMESA Proceedings with the United States District Court having jurisdiction over the PROMESA Proceedings (the "Title III Court") in accordance with Bankruptcy Rule 9019 seeking the approval of the compromise and settlement of the dispute (the "Commonwealth–COFINA Dispute") between the Commonwealth and COFINA regarding ownership of the sales and use taxes purportedly transferred by the Commonwealth to COFINA and pledged by COFINA to secure the repayment of certain indebtedness of COFINA, including, without limitation, ownership of collections required to be deposited in the Dedicated Sales Tax Fund (as defined in the Bond Resolutions), which funds accumulate annually up to the Pledged Sales Tax Base Amount ("PSTBA"), i.e., the annual dollar amounts determined for each fiscal year of the Commonwealth ("FY") in accordance with Section 3 of Act No. 91-2006, as amended ("Act 91"), and with respect to each FY during the period from 2019 to 2058, inclusive, set forth in Schedule 1 hereto, currently being litigated in the adversary proceeding styled The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as agent of the Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico v. Bettina Whyte, as agent of The Financial Oversight and Management Board for Puerto Rico as representative of The Puerto Rico Sales Tax Financing Corporation, Adv. Proc. No. 17-257-LTS (the "Adversary Proceeding"). The Commonwealth–COFINA Dispute shall be compromised and settled pursuant to the Settlement Motion in the Commonwealth PROMESA Proceeding, on the one hand, and pursuant to the COFINA Plan of Adjustment, as defined below, on the other hand, with (i) COFINA being granted an ownership interest of the COFINA Portion, as defined below, and (ii) the Commonwealth being granted an ownership interest of the Commonwealth Portion, as defined below; provided, however, that, except as expressly set forth in Sections II(N) and (P) hereof, (a) one hundred percent (100%) of the funds on deposit prior to July 1, 2018 in the debt service, reserve and such other accounts and any earnings thereon held by the Bank of New York Mellon ("BNYM"), as the COFINA bond trustee, for the benefit of the bondholders (collectively, the "Pre-FY2019 BNYM Deposits") in accordance with the Adversary Proceeding and such other orders entered in connection therewith; provided, however, that, (i) of Seventy-Eight Million Three Hundred Fifty-Five Thousand Eight Hundred and Thirty-Seven Dollars and Sixty-Three Cents ($78,355,837.63)

1

of the Pre-FY2019 BNYM Deposits, (x) Thirty-Three Million Three Hundred Fifty-Five Thousand Eight Hundred Thirty-Seven Dollars and Sixty-Three Cents ($33,355,837.63) shall be distributed to the Commonwealth, (y) Five Million Dollars ($5,000,000.00) shall be allocated to fund an operating expense fund for COFINA, and (z) Forty Million Dollars ($40,000,000.00) shall be allocated to the Taxable Election Cash distributable under the COFINA Plan of Adjustment and if the Taxable Election Cash distributable under the COFINA Plan of Adjustment is less than Sixty Million Dollars ($60,000,000.00) (such difference, the "Tax Election Remainder Amount"), then an amount equal to the Tax Election Remainder Amount, up to Forty Million Dollars ($40,000,000.00) allocated as Taxable Election Cash, shall be distributed (I) *first*, to further fund the operating expense fund for COFINA up to an additional Ten Million Dollars ($10,000,000.00), and (II) *second*, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders, and the Commonwealth, on the other hand, (b) one hundred percent (100%) of the funds deposited on or after July 1, 2018 to the debt service, reserve and such other accounts (collectively, the "FY2019 BNYM Deposits"), on a first dollars basis up to the amount of fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA, plus any earnings thereon (the "COFINA FY2019 BNYM Deposits") held by BNYM in accordance with the Adversary Proceeding and such other orders entered in connection therewith, will, on the COFINA Effective Date, as defined below, be the exclusive property of COFINA and will be distributed to COFINA for purposes of distribution in accordance with the COFINA Plan of Adjustment and (c) any FY2019 BNYM Deposits net of the COFINA FY2019 BNYM Deposits, shall be distributed in its entirety to the Commonwealth. Pursuant to the provisions of the PSA regarding support of the Settlement Motion, and except as expressly set forth in Sections II(N) and (P) hereof, the parties hereto reserve their right, if any, to contest in the Commonwealth PROMESA Proceeding the Commonwealth's (a) use, or direction of the use, of monies received by the Commonwealth or to be received by the Commonwealth and (b) deposit or other use, or direction of the use, of such monies. Consideration and confirmation of the COFINA Plan of Adjustment in the COFINA PROMESA Proceeding shall be contemporaneous with consideration and approval of the Settlement Motion in the Commonwealth PROMESA Proceeding; provided, however, that, in all circumstances, the effective date of the order granting the Settlement Motion shall be contemporaneous with, and its contemporaneous occurrence shall be a condition to, the COFINA Effective Date, as defined below.

B.      Unless (i) approval of the Settlement Motion is denied by the Title III Court or (ii) the COFINA Effective Date does not occur, the effective date of the compromise and settlement (the "Compromise Date") shall be retroactive to July 1, 2018 and, in addition to receipt of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, and the COFINA FY2019 BNYM Deposits on the COFINA Effective Date, COFINA will own, and will be entitled to receive, the COFINA Portion commencing as of FY2019. Until the COFINA Effective Date, all revenues attributable to the PSTBA, including, without limitation, the COFINA Portion and the Commonwealth Portion, shall be maintained in accordance with orders of the Title III Court entered in the COFINA PROMESA Proceeding, the Commonwealth PROMESA Proceeding, the Adversary Proceeding and that certain litigation styled The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al., Adv. Proc. No. 17-133-LTS (the "Interpleader Action"). Without in any way limiting the foregoing, but subject to the occurrence of the COFINA Effective Date, the Commonwealth will own and will be entitled to receive the Commonwealth Portion, as defined below.

C.      On the COFINA Effective Date, pursuant to the Settlement Order and the Confirmation Order, as defined below, which orders shall amend and supersede such orders of the Title III Court entered in the COFINA PROMESA Proceeding, the Commonwealth PROMESA

2

Proceeding, the Adversary Proceeding and the Interpleader Action to the extent that such orders are inconsistent therewith, (1) BNYM shall make distributions as set forth in Section I(A) hereof, (2) the Adversary Proceeding shall be dismissed, with prejudice, and all other claims and causes of action asserted therein by the Commonwealth Agent, the COFINA Agent and the Permitted Intervenors, as defined in the Adversary Proceeding, shall be deemed dismissed, with prejudice, and the Commonwealth Agent and the COFINA Agent and their respective professionals shall be deemed to have satisfied any and all of their respective obligations in connection with the Adversary Proceeding and the COFINA Agent shall be deemed to have been released from any and all liabilities associated therewith, (3) the Interpleader Action will be dismissed, with prejudice, and all other claims and causes of action asserted therein shall be dismissed, with prejudice, and the funds deposited in connection therewith shall be distributed in accordance with the terms and provisions of this Term Sheet, and (4) except with respect to claims and causes of actions asserted or that could have been asserted by Ambac, Whitebox Multi-Strategy Partners, L.P. or funds affiliated with Whitebox Advisors LLC against BNYM for gross negligence, willful misconduct or intentional fraud, the Actions shall be dismissed, with prejudice, and claims and causes of action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice.

**D.**  Solely for purposes of confirmation and consummation of the COFINA Plan of Adjustment, (i) the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) shall be deemed allowed in the aggregate amount of $7,760,877,871.98, (ii) the Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and the Junior COFINA Bond Claims (Assured Insured) shall be deemed allowed in the aggregate amount of $9,876,235,996.34, and (iii) the holders of existing COFINA bonds shall be deemed secured to the extent of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, the COFINA FY2019 BNYM Deposits and the COFINA Portion.

## II.   COFINA Plan of Adjustment

**A.**  **Overview:** Contemporaneously with the filing of the Settlement Motion, the Oversight Board, on behalf of COFINA, will file the COFINA Plan of Adjustment and disclosure statement related thereto.  The COFINA Plan of Adjustment shall provide, among other things, (i) that, as of the COFINA Effective Date, COFINA will be the sole and exclusive owner of the present and future revenues and collections generated by the five and one-half percent (5.5%) of the sales and use taxes imposed by the Commonwealth (the "COFINA Pledged Taxes") up to the COFINA Portion, (ii) for the issuance of a single tranche of securities that will be issued in five (5) series with the sinking fund schedules, accreted value and final maturities set forth in Exhibit A (the "COFINA Bonds"), which obligations (a) shall be secured by a statutory first lien on the COFINA Pledged Taxes and, with respect to any permitted substitution thereof and all rights related thereto and proceeds thereof, (b) shall not be secured by or have recourse to any property of the Commonwealth and (c) shall be a special, limited obligation of COFINA (payable solely from the COFINA Portion and any other COFINA property pledged by COFINA to secure the repayment of the COFINA Bonds pursuant to the COFINA Plan of Adjustment).  The Government Parties shall use their reasonable best efforts to cause all of the COFINA Bonds to be issued as tax exempt in accordance with Section 103 of the Internal Revenue Code and under Puerto Rico law to the extent permitted under applicable law; provided, however, that, in the event applicable U.S. law does not permit all COFINA Bonds to be issued on a federally tax exempt basis, COFINA shall issue Taxable COFINA Bonds as a sub-series of COFINA Bonds, which shall be distributed, first, in accordance with the provisions of Sections II(D)(4) and II(D)(7) hereof and, second, with respect to any remaining Taxable COFINA Bonds ratably to all other recipients of COFINA Bonds under the COFINA Plan of Adjustment.  In each FY, the

3

aggregate scheduled debt service due, including accreted amounts, on all COFINA Bonds and COFINA Parity Bonds shall not exceed the COFINA Portion scheduled for such FY.

In connection with the filing of the COFINA Plan of Adjustment and related disclosure statement, the Oversight Board shall cause the certification of a COFINA fiscal plan pursuant to Section 201(a) of PROMESA consistent with the transactions contemplated in the COFINA Plan of Adjustment, including, without limitation, the issuance of the COFINA Bonds.

In furtherance of the efforts to cause all of the COFINA Bonds to be issued as tax exempt in accordance with Section 103 of the Code, including, without limitation, in connection with the use of custodial trusts described herein, the Government Parties agree to consult with the PSA Parties' tax counsel to consider the optimal capital structure of COFINA based on applicable law and guidance from applicable federal agencies.

Except as otherwise provided in this Term Sheet, for all purposes herein, the Oversight Board, in its sole and absolute discretion, but upon consultation with Section 103 tax counsel and the PSA Parties party to the Interpleader Action, shall determine the use and application of all Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, and the COFINA FY2019 BNYM Deposits pursuant to the COFINA Plan of Adjustment in a manner that maximizes the issuance of tax-exempt COFINA Bonds; provided, however, that the parties' expectation as of the date hereof is that the Pre-FY2019 BNYM Deposits shall be applied in accordance with the priorities and approximate amounts set forth on Schedule 2 hereto; and, provided, further, that any such use and application of Pre-FY2019 BNYM Deposits shall be pro rata per each applicable series subject to such adjustments as may be desirable for administrative convenience to account for minimum bond par denominations.

**B.**     **Additional Definitions:** For purposes of this Term Sheet, the following capitalized terms shall have the meanings ascribed below[1]:

Ambac Custodial Certificates:  The certificate(s) or receipt(s) to be issued by the Ambac Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the Ambac Custodial Trust.

Ambac Custodial Trust:  The custodial trust(s) which may be formed by COFINA and/or Ambac on or prior to the COFINA Effective Date for the sole benefit of holders of Senior COFINA Bond Claims (Ambac Insured) that elect not to commute their Ambac Insurance Policies.

Ambac Insurance Policy:  The existing insurance policy issued by Ambac relating to the Ambac Insured Bonds, together with all agreements and other documents related thereto.

Assured Custodial Certificates:  The certificate(s) or receipt(s) that may be issued by the Assured Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the Assured Custodial Trust.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed thereto in the PSA; provided, however, that, in the event of any conflict between the terms defined in the PSA and herein, the meanings set forth in this Term Sheet shall govern.

<u>Assured Custodial Trust</u>:  The custodial trust(s) which may be formed by COFINA and/or Assured on or prior to the COFINA Effective Date for the sole benefit of holders of Junior COFINA Bond Claims (Assured Insured).

<u>Assured Insurance Policies</u>:  The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with all agreements and other documents related thereto.

<u>Bond Claim</u>: A claim on account of an existing COFINA security (as reflected in the chart set forth in Recital A of the PSA) with such claim being calculated as (a) with respect to current interest bonds and convertible capital appreciation bonds that converted into current interest bonds as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding, the outstanding principal amount of such bonds <u>plus</u> the accrued and unpaid interest thereon and (b) with respect to capital appreciation bonds and convertible capital appreciation bonds that have not converted into current interest bonds as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding, the compounded amount for such bonds, in each case, as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding.

<u>COFINA Cash Available for Distribution</u>: The amount of cash available for distribution on the COFINA Effective Date comprised of the Pre-FY2019 BNYM Deposits <u>minus</u> the sum of (a) the Rounding Amount Cash <u>plus</u> (b) Section 103 Cash <u>plus</u> (c) Taxable Election Cash <u>plus</u> (d) Consummation Costs as required pursuant to Section II(O) hereof <u>plus</u> (e) the cash, if any, retained by COFINA for the operating expense account or distributed to the Commonwealth pursuant to Section I(A) hereof.

<u>COFINA Pledged Taxes</u>: The present and future revenues and collections generated by the five and one-half percent (5.5%) sales and use taxes imposed by the Commonwealth.

<u>COFINA Portion</u>: The COFINA Pledged Taxes and all rights thereto (including the right to receive the COFINA Pledged Taxes as set forth under First Dollars Funding in Section II(E)(7) hereof) in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA in any given FY until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

<u>Commonwealth Portion</u>: Collectively, an interest that is second in priority of payment, funding and collections, in all circumstances, subject and pursuant to the First Dollars Funding in Section II(E)(7) hereof, in the COFINA Pledged Taxes and all rights thereto including the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given FY, and (b) all COFINA Pledged Taxes after the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms; <u>provided</u>, <u>however</u>, that, under all circumstances, the Commonwealth Portion shall exclude in its entirety the COFINA Portion, and the Commonwealth shall have no ownership interest in the COFINA Portion.  Subject to Sections II(E)(4) and II(E)(7), the Commonwealth shall have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a FY unless and until COFINA has received the COFINA Portion.  The Commonwealth shall have no right to receive Debt Service Savings in any FY unless and until all debt service payments on the COFINA Bonds and COFINA Parity Bonds required to be made or set aside in such FY, including any overdue debt service payments from all prior FYs, are made as required, as provided in Section II(E)(4) hereof.  The COFINA Portion shall not, now or hereafter, be property of the Commonwealth, and in the event of any subsequent Title III case or similar or other proceedings of the Commonwealth, in any forum, it is the express intent that it shall not be subject to the automatic stay.

5

<u>Debt Service Savings</u>: For each FY, the difference between principal due on COFINA Bonds and COFINA Parity Bonds prior to the issuance of COFINA Parity Bonds and/or the purchase of COFINA Bonds and COFINA Parity Bonds in the open market and principal due on COFINA Bonds and COFINA Parity Bonds that will remain outstanding after the issuance of such COFINA Parity Bonds and/or the purchase of COFINA Bonds and COFINA Parity Bonds.

<u>Insurance Policies</u>: Collectively, the Ambac Insurance Policy, the Assured Insurance Policies and the National Insurance Policies.

<u>Junior COFINA Bond Claim</u>: A Bond Claim, other than a Junior COFINA Bond Claim (Assured Insured) or a Junior COFINA Bond Claim (Taxable Election), on account of an existing First Subordinate COFINA security.

<u>Junior COFINA Bond Claim (Assured Insured)</u>: A Bond Claim on account of an existing First Subordinate COFINA security, with respect to which the repayment of principal and interest or accreted value has been insured by Assured including pursuant to a secondary market insurance policy.

<u>Junior COFINA Bond Claim (Taxable Election)</u>: A Bond Claim, other than a Junior COFINA Bond Claim (Assured Insured), on account of an existing First Subordinate COFINA security, the holder of which has affirmatively elected to receive a Taxable Bond Distribution and the holder of which (i) is a Puerto Rico Investor, <u>provided</u> that if Taxable Bond Distributions are elected by Puerto Rico Investors for Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution, <u>provided</u> that if Taxable Bond Distributions are elected by Puerto Rico Institutions for Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claims' ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim.

<u>Junior COFINA Bond Distribution</u>: A distribution of COFINA Bonds allocable to holders of Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured Insured) and Junior COFINA Bond Claims (Taxable Election) (it being understood that such holders are recipients of distributions in Classes 5-7) equal to fifty-six and three hundred ninety-nine one thousandths percent (56.399%) of such holders' aggregate Bond Claims, plus any incremental value distributable as a result of an increase in COFINA Cash Available for Distribution.

<u>Maximum Taxable Bond Election Amount</u>: One Billion Dollars ($1,000,000,000.00), <u>provided</u> that if the amount of Taxable COFINA Bonds exceeds the aggregate amount of COFINA Bonds distributable in respect of Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) each as calculated, for purposes of this proviso, assuming a Maximum Taxable Bond Election Amount of One Billion Dollars ($1,000,000,000.00), the Maximum Taxable Bond Election Amount shall increase by the amount necessary to provide for the distribution of all Taxable COFINA Bonds pursuant to Taxable Bond Distributions, <u>provided</u> <u>further</u> that in no event shall the Maximum Taxable Bond Election Amount exceed Three Billion Dollars ($3,000,000,000.00).

<u>National Custodial Certificates</u>: The certificate(s) or receipt(s) to be issued by the National Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the National Custodial Trust.

National Custodial Trust:  The custodial trust(s) which may be formed, on or prior to the
COFINA Effective Date, by or on behalf of and for the sole benefit of the holders of Senior
COFINA Bond Claims (National Insured) that elect not to commute their National Insurance
Policies.

National Insurance Policies:  The existing insurance policies initially issued by Financial
Guaranty Insurance Company or MBIA Insurance Corporation and novated to National and
relating to the National Insured Bonds, as defined below, together with all agreements and
other documents related thereto.

Puerto Rico Institution:  A holder, other than a Puerto Rico Investor, that is domiciled in
Puerto Rico.

Puerto Rico Investor:  A holder that is, or that is wholly owned by or the sole beneficial
owner of which is, a natural person(s) and resident(s) of the Commonwealth of Puerto Rico
for purposes of payment of Puerto Rico personal income taxes (as determined by the
Oversight Board, in its sole and absolute discretion).

Remainder Taxable Bond Election Amount:  An amount equal to the Maximum Taxable
Bond Election Amount minus the aggregate amount of Bond Claims held by Puerto Rico
Investors and for which such holders have affirmatively elected a Taxable Bond Distribution.

Rounding Amount Cash:  The amount of cash necessary, up to a maximum aggregate amount
of Twenty Five Million Dollars ($25,000,000.00), for distribution to holders of Senior
COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA
Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) and
Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and Junior
COFINA Bond Claims (Assured Insured) in the form of rounding amounts to ensure that all
holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election),
Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National
Insured) and Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election)
and Junior COFINA Bond Claims (Assured Insured) receive their pro rata share of CIBs, as
defined below, in the minimum bond par denomination of One Thousand Dollars ($1,000.00)
per COFINA Bond.

Section 103 Cash:  The amount of cash deemed necessary by the Oversight Board, and after
consultation with Section 103 tax counsel and the PSA Parties, which amount of cash (i) shall
be no less than the interest accrued on the existing COFINA securities as of, and including
May 4, 2017 and (b) shall not exceed the amount of Pre-FY2019 BNYM Deposits minus the
amount of Rounding Amount Cash, to be applied to reduce the amount and number of
Taxable COFINA Bonds solely to the extent that the COFINA Bonds cannot all be issued as
tax-exempt bonds under applicable federal law.

Senior COFINA Bond Claim:  A Bond Claim, other than a Senior COFINA Bond Claim
(Ambac Insured), a Senior COFINA Bond Claim (National Insured) or a Senior COFINA
Bond Claim (Taxable Election), on account of an existing senior COFINA security.

Senior COFINA Bond Claim (Ambac Insured):  A Bond Claim on account of an existing
senior COFINA security, the repayment of which has been insured by Ambac.

Senior COFINA Bond Claim (National Insured):  A Bond Claim on account of an existing
senior COFINA security, the repayment of which has been insured by National.

Senior COFINA Bond Claim (Taxable Election): A Bond Claim, other than a Senior COFINA Bond Claim (Ambac Insured) or a Senior COFINA Bond Claim (National Insured), on account of an existing senior COFINA security, the holder of which has affirmatively elected to receive a Taxable Bond Distribution and the holder of which (i) is a Puerto Rico Investor, provided that if Taxable Bond Distributions are elected by Puerto Rico Investors holding Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution, provided that if Taxable Bond Distributions are elected by Puerto Rico Institutions holding Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claims' ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim.

Senior COFINA Bond Distribution: A distribution of COFINA Bonds and cash, in the aggregate, allocable to holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac Insured), Senior COFINA Bond Claims (National Insured) and Senior COFINA Bond Claims (Taxable Election) (it being understood that such holders are recipients of distributions in Classes 1-4) equal to ninety-three percent (93%) of such holders' aggregate Bond Claims, plus any incremental value distributable as a result of an increase in COFINA Cash Available for Distribution.

Taxable Bond Distribution: A Senior Taxable Bond Distribution (as defined in Section II(D)(4)) or a Junior Taxable Bond Distribution (as defined in Section II(D)(7)), as applicable.

Taxable COFINA Bonds: COFINA Bonds in an aggregate amount deemed necessary by the Oversight Board, after consultation with Section 103 tax counsel and the PSA Parties, to be issued as tax exempt under Puerto Rico law, but taxable in accordance with Section 103 of the Internal Revenue Code (the "Code"), which COFINA Bonds shall be issued as CIBs with an interest rate of four and fifty-five one hundredths percent (4.55%) and a maturity date of 7/1/2038.

Taxable Election Cash:  The amount of cash equal to two percent (2.0%) (net of any administrative costs of the election process related to the applicable Bond Claims) of the aggregate amount of all Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election), which amount of cash shall not exceed Sixty Million Dollars ($60,000,000.00).

C.   **Classes of Claims**: The COFINA Plan of Adjustment shall have the following classes:

1.   Class 1:  Senior COFINA Bond Claims

2.   Class 2:  Senior COFINA Bond Claims (Ambac Insured)

3.   Class 3:  Senior COFINA Bond Claims (National Insured)

4.   Class 4:  Senior COFINA Bond Claims (Taxable Election)

5.   Class 5:  Junior COFINA Bond Claims

6.   Class 6:  Junior COFINA Bond Claims (Assured Insured)

8

7.  Class 7: Junior COFINA Bond Claims (Taxable Election)

8.  Class 8: GS Derivative Claim

9.  Class 9: General Unsecured Claims

Notwithstanding the foregoing classification of claims, the Oversight Board reserves the right to amend or modify such classification, including, without limitation, supplement such classification with additional classes or modify the treatment afforded holders in Classes 8 and 9 as set forth in Section II(D) hereof, provided that such amendment or modification does not adversely impact the treatment afforded holders of claims in Classes 1 through 7 above.

**D.   Treatment of Claims**: Subject to the conditions to effectiveness of the COFINA Plan of Adjustment, including, without limitation, those listed under "Conditions to Effective Date of COFINA Plan of Adjustment" below, on the effective date of the COFINA Plan of Adjustment (the "COFINA Effective Date"), COFINA claims shall be treated as follows:

1.  Class 1: Each holder of a Senior COFINA Bond Claim shall be entitled to receive its pro rata share of the Senior COFINA Bond Distribution, comprised of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds and (d) Rounding Amount Cash, if necessary.

2.  Class 2: Subject to the provisions of Sections II(F) and (G) hereof, each holder of a Senior COFINA Bond Claim (Ambac Insured) shall have the option to elect on the ballot/election form distributed in connection with the solicitation of acceptances and rejections to the COFINA Plan of Adjustment to receive its pro rata share of (1) (a) the Senior COFINA Bond Distribution comprised of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds and (iv) Rounding Amount Cash, if necessary, plus (b) consideration, distributable by or at the direction of Ambac, in accordance with the provisions of Section II(F)(1) hereof, in full and complete satisfaction, release and discharge of any further obligation of Ambac with respect, to its insurance policy and such holder's agreement to commute Ambac's insurance policy relating to such holders' Senior COFINA Bond Claim (Ambac Insured), or (2) the Ambac Custodial Certificates referred to in Section II(G)(1) hereof; provided, however, that, in the event that a holder of a Senior COFINA Bond Claim (Ambac Insured) (a) fails to timely return its ballot /election form, (b) fails to elect a form of distribution or (c) elects multiple options on such ballot/election form, then such holder shall be deemed to have elected to release, discharge and commute Ambac's obligations and the Ambac Insurance Policy and to receive distributions in accordance with the provisions of subsection (1) above. Subject to the approval of the Title III Court, (y) the solicitation of acceptances and rejections to the COFINA Plan of Adjustment by holders of Class 2 claims shall be made by COFINA to Ambac and (z) the elections described in subsections (1) and (2) above regarding the COFINA Bonds shall be made by the holders of Senior COFINA Bond Claims (Ambac Insured). Ambac reserves the right to formulate alternative election or implementation options with respect to the Senior COFINA Bond Claims (Ambac Insured), including deemed acceleration of the existing COFINA securities insured by Ambac on the COFINA Effective Date, but any such alternative implementation option (i) must be proposed at or prior to the hearing to consider the adequacy of the information contained in the disclosure statement filed in connection with the COFINA Plan of Adjustment and (ii) shall not, and shall not be deemed to, modify, amend, or cancel, or otherwise affect in any way, any commutation agreements or arrangements agreed to or entered into prior to, on or after the effective date of the PSA between Ambac, on the one hand and any

9

holders of any Senior COFINA Bond Claims (Ambac Insured), on the other hand, in connection with the Ambac Insurance Policy.

3.  **Class 3:** Subject to the provisions of Sections II(F) and (G) hereof, each holder of a Senior COFINA Bond Claim (National Insured) shall have the option to elect on the ballot/election form distributed in connection with the solicitation of acceptances and rejection to the COFINA Plan of Adjustment to receive its pro rata share of (1) (a) the Senior COFINA Bond Distribution comprised of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds and (iv) Rounding Amount Cash, if necessary, plus (b) consideration, distributable by or at the direction of National, in accordance with the provisions of Section II(F)(2) hereof, in full and complete satisfaction, release and discharge of any further obligation of National with respect to the National Insurance Policies and such holder's agreement to commute National Insurance Policies relating to such holder's Senior COFINA Bond Claim (National Insured), or (2) the National Custodial Certificates referred to in Section II(G)(2) hereof representing an interest in the National Trust Assets, as defined below; provided, however, that, in the event that a holder of a Senior COFINA Bond Claim (National Insured) (a) fails to timely return its ballot/election form, (b) fails to elect a form of distribution or (c) elects multiple options on such ballot/election form, then such holder shall be deemed to have elected to release, discharge and commute National's obligations and the National Insurance Policies and to receive distributions in accordance with subsection (1) above; and, provided, further, that, at any time prior to the hearing to consider the adequacy of the information contained in the disclosure statement filed in connection with the COFINA Plan of Adjustment, National may elect an alternative treatment option for Senior COFINA Bond Claims (National Insured), pursuant to which, in its sole and absolute discretion, and subject to the consent of the Oversight Board, which consent shall not be unreasonably withheld, on the COFINA Effective Date, the existing COFINA securities insured by National shall be paid off, in full, at an acceleration price of one hundred percent (100%) of the Compounded Amount (as defined in the Bond Resolutions) of the National Insured Bonds, as of the COFINA Effective Date, as follows: the COFINA Bonds to be issued to holders of Senior COFINA Bond Claims (National Insured) shall be underwritten and sold into the market, the proceeds of which, together with any cash portion of the Senior COFINA Bond Distribution that would otherwise be allocated for payment of Senior COFINA Bond Claims (National Insured), shall be used to pay, in cash, on the COFINA Effective Date, one hundred percent (100%) of the Compounded Amount (as defined in the Bond Resolutions) of the National Insured Bonds, as of the COFINA Effective Date, with any deficiency in such amounts being paid by National in full, in cash, on the COFINA Effective Date (the "National Election"). Subject to the order approving the disclosure statement filed in connection with the COFINA Plan of Adjustment, (y) the solicitation of acceptances and rejections to the COFINA Plan of Adjustment by holders of Class 3 claims shall be made by COFINA to National and (z) the elections described in subsections (1) and (2) above regarding the COFINA Bonds shall be made by the holders of Senior COFINA Bond Claims (National Insured).

4.  **Class 4:** Each holder of a Senior COFINA Bond Claim (Taxable Election) shall be entitled to receive (a) its pro rata share of the Senior COFINA Bond Distribution comprised of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary, and (b) its pro rata share of the Taxable Election Cash (collectively, the distributions under this Class 4, a "Senior Taxable Bond Distribution").

10

5.  Class 5:  Each holder of a Junior COFINA Bond Claim shall be entitled to receive its pro rata share of the Junior COFINA Bond Distribution comprised of (a) Section 103 Cash, if applicable, (b) COFINA Bonds and (c) Rounding Amount Cash, if necessary.

6.  Class 6:  Subject to the provisions of Section II(O) hereof, each holder of a Junior COFINA Bond Claim (Assured Insured) shall be entitled to receive its pro rata share of the Junior COFINA Bond Distribution comprised of (a) Section 103 Cash, if applicable, (b) COFINA Bonds and (c) Rounding Amount Cash, if necessary; provided, however, that, notwithstanding the foregoing, at the election of Assured (the "Assured Election"), in its sole and absolute discretion, on the COFINA Effective Date, the existing COFINA securities insured by Assured (including insurance issued in the secondary market) shall be paid off, in full, at an acceleration price of par plus accrued interest or compounded amount as of the COFINA Effective Date, (1) from the Section 103 Cash and Rounding Amount Cash, if any, which in each case is allocable to holders to Junior COFINA Bond Claims (Assured Insured), and (2) otherwise as follows: the COFINA Bonds allocable to holders of Junior COFINA Bond Claims (Assured Insured) shall be (i) wrapped by a new insurance policy issued by Assured, (ii) underwritten and (iii) sold into the market, the proceeds of which shall be used to pay, in cash, on the COFINA Effective Date, one hundred percent (100%) of the Junior COFINA Bond Claims (Assured Insured), with any deficiency in such amounts being paid by Assured in accordance with the insurance policies wrapping the existing securities underlying the Junior COFINA Bond Claims (Assured Insured). The principal amount, maturities and coupons of the bonds to be insured by Assured (the "Assured New Bonds") will be determined by Assured in consultation with Bank of America Merrill Lynch, as underwriter for the Assured New Bonds, provided that the debt service on the Assured New Bonds due in any year shall not be greater than the debt service that would be due if such Assured New Bonds were issued as COFINA Bonds not insured by Assured or any other insurer (although the Assured New Bonds may mature later than the COFINA Bonds, but in no event later than the Commonwealth's FY2058).  All other terms regarding the underwriting of the Assured New Bonds shall be subject to the approval of Assured.

7.  Class 7:  Each holder of a Junior COFINA Bond Claim (Taxable Election) shall be entitled to receive (a) its pro rata share of the Junior COFINA Bond Distribution comprised of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary and (b) its pro rata share of the Taxable Election Cash (collectively, the distributions under this Class 7, a "Junior Taxable Bond Distribution").

8.  Class 8:  The holder of the GS Derivative Claim shall to the extent that the termination value of the GS Derivative Claim is (a) greater than the amount of the collateral in such holder's possession, be entitled to retain such collateral and with respect to the balance of the GS Derivative Claim, and (1) to the extent that rejection damages associated with such GS Derivative Claim is a Parity Obligation (as defined in the Bond Resolutions), such holder's pro rata share of the Senior COFINA Bond Distribution, comprised of (i) COFINA Cash Available for Distribution, (ii) COFINA Bonds and (iii) Rounding Amount Cash, if necessary, and (2) to the extent that rejection damages associated with such GS Derivative Claim is a not a Parity Obligation (as defined in the Bond Resolutions), such holder shall not receive a distribution pursuant to the COFINA Plan of Adjustment, and (b) is less than the amount of collateral in such holder's possession, the holder of the GS Derivative Claim shall liquidate such collateral in full and complete satisfaction of the GS Derivative Claim and return the balance of such collateral value to COFINA.

11

9.    Class 9: The claims within Class 9 shall not receive a distribution pursuant to the COFINA Plan of Adjustment; provided, however, that, notwithstanding the foregoing, in the event that Class 9 votes to accept the COFINA Plan of Adjustment, each holder of a COFINA General Unsecured Claim shall be entitled to receive its pro rata share of One Hundred Thousand Dollars ($100,000.00).

## E.    Terms of COFINA Bonds

*Issuance of COFINA Bonds*

Subject to the conditions to effectiveness of the COFINA Plan of Adjustment, including, without limitation, those listed under "Conditions to Effective Date of COFINA Plan of Adjustment" below, on the COFINA Effective Date, COFINA, shall issue the COFINA Bonds comprised of (i) four (4) series of Current Interest Bonds ("CIBs") and (ii) one series of Capital Appreciation Bonds ("CABs"). The maturities, interest rates and amortization schedules for COFINA Bonds are annexed hereto as Exhibit "A". All debt service on COFINA Bonds and COFINA Parity Bonds which is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid, with accrued interest on the unpaid amount, first, in each FY from the balance, if any, of the COFINA Portion remaining after the payment of debt service on the COFINA Bonds and COFINA Parity Bonds then due and payable in such FY; second, in each FY, from the Debt Service Savings, if any; and third, to the extent not paid pursuant to first or second, following the final scheduled maturity of all COFINA Bonds and COFINA Parity Bonds. Interest shall accrue on such overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until the applicable COFINA Bonds or COFINA Parity Bonds are paid or satisfied in full in accordance with their terms. The Government Parties shall use their commercially reasonable best efforts to obtain ratings on the COFINA Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties, following consultation with a designee of the PSA Parties, including based upon the Government Parties' judgment with respect to expected benefits. After the Government Parties determine which rating agencies to apply for ratings from, the Government Parties shall use their commercially reasonable best efforts to obtain the best possible ratings.

### 1.    Terms of the COFINA Bonds

*CIBs:* Subject to any adjustments provided for herein, the CIBs shall have the original principal amount, interest rate and maturity date, except as provided for in Section II(D)(6) hereof, as follows: (a) Seven Hundred Eighty-Two Million Nine Hundred Fifteen Thousand Dollars ($782,915,000.00), four and thirty-five one-hundredths percent (4.35%), and 7/1/2028; (b) One Billion Ninety-One Million Four Hundred Sixty Thousand Dollars ($1,091,460,000.00), four and five-tenths percent (4.5%), and 7/1/2032; (c) Two Billion Nine Hundred Ninety-Seven Million Two Hundred Forty-Five Thousand Dollars ($ 2,997,245,000.00), four and fifty-five one hundredths percent (4.55%), and 7/1/2038; and (d) Four Billion Seven Hundred Forty-Four Million Seven Hundred Forty-Five Thousand Dollars ($4,744,745,000.00), four and six-tenths percent (4.6%), and 7/1/2044.

*CABs:* Subject to any adjustments provided for herein, the CABs shall have the original principal amount, interest rate and maturity date, except as provided for in Section II(D)(6) hereof, as follows: Two Billion Four Hundred Four Million One Hundred Ninety-Two Thousand Five Hundred Ninety-Nine Dollars and Ninety Cents ($2,404,192,599.90), five and one-half percent (5.5%), and 7/1/2058.

Neither CIBs nor CABs shall carry any default rate of interest, provided that interest shall accrue on all overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until paid or satisfied in full in accordance with their terms.

2.      **Collateral for Repayment of COFINA Bonds**

Subject to the provisions of Section II(E)(10), entitled Substitution of Collateral, repayment of the COFINA Bonds and COFINA Parity Bonds from the COFINA Portion shall be secured by a statutory first lien on the COFINA Pledged Taxes.  Such lien shall (i) remain in effect and (ii) be closed until, in each case, the COFINA Bonds and the COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.  Such statutory lien will be incorporated in the legislation described in Section II(M) hereof and be judicially confirmed and the COFINA Bonds shall be judicially determined to be legal, valid, binding and enforceable obligations of COFINA by the Title III Court.

3.      **Deemed Issuance Date**

Notwithstanding the timing of the COFINA Effective Date, interest on the COFINA Bonds shall commence to accrue or accrete, as the case may be, as of August 1, 2018, which date shall be designated as the dated date of the COFINA Bonds.  COFINA FY2019 BNYM Deposits shall be deposited into the debt service fund established for the benefit of holders of COFINA Bonds in the new COFINA bond resolution.

4.      **Additional Bonds Test for COFINA Bonds**

Except with respect to the issuance of refinancing securities on the terms discussed herein, COFINA may not issue any securities on a *pari passu* or higher priority basis than the COFINA Bonds issued on the COFINA Effective Date.  Notwithstanding the foregoing, COFINA may issue additional refunding or refinancing securities on a *pari passu* basis with the COFINA Bonds issued on the COFINA Effective Date (collectively, the "COFINA Parity Bonds") for the purpose of refinancing, in whole or in part, COFINA Bonds or COFINA Parity Bonds provided, that (a) notwithstanding the terms of such COFINA Parity Bonds, COFINA shall not be entitled to an increase of the COFINA Portion; (b) the principal and interest payment dates on the COFINA Parity Bonds shall be the same principal and interest payments dates on the COFINA Bonds; (c) the final maturity date of the COFINA Parity Bonds shall not be later than the original scheduled final maturity date of the COFINA Bonds; and (d) upon the issuance of any COFINA Parity Bonds:

(i)      annual debt service due in the then-current and each future FY on all COFINA Bonds and COFINA Parity Bonds outstanding after the issuance of the COFINA Parity Bonds shall be equal to or less than the annual debt service due in the then-current and each future fiscal year on all COFINA Bonds and COFINA Parity Bonds outstanding prior to such issuance;

(ii)      as set forth in the new COFINA bond resolution, Debt Service Savings shall only be realized in the same FYs in which principal of COFINA Bond and COFINA Parity Bonds was refunded and/or purchased;

(iii)      Debt Service Savings in any FY shall be applied first, to the repayment of principal and interest on COFINA Bonds or COFINA Parity Bonds unpaid from any prior FY; and second, at the option of COFINA, (x) to purchase COFINA Bonds and COFINA Parity Bonds in the open market (subject to the limitation in subsection (ii) above), (y) to pay operating expenses of COFINA or (z) transfer such savings to the Commonwealth; and

(iv)      any Debt Service Savings released to the Commonwealth as set forth in subsection (iii) above shall be available for any lawful purpose of the Commonwealth.

Subject to compliance with the provisions of the additional bonds test ("ABT") set forth below, additional bonds (the "Subordinated Lien Bonds") may be issued by COFINA for the benefit of, and with the consent of, the Commonwealth and for any lawful purpose of the Commonwealth, provided that repayment of such additional bonds shall be secured by a second lien that is subordinated in all

13

respects, including, without limitation, in respect of payment, funding and remedies to the COFINA Bonds and COFINA Parity Bonds, with repayment of Subordinated Lien Bonds being secured by a subordinated second or more junior lien on the COFINA Pledged Taxes, provided that, notwithstanding anything contained in this Term Sheet to the contrary, repayment of the Subordinated Lien Bonds shall not be payable from the COFINA Portion.  COFINA may issue such Subordinated Lien Bonds provided that, prior to the issuance thereof, the Commonwealth and COFINA shall deliver a jointly executed certificate to the COFINA bond trustee certifying that the following conditions are each satisfied: (a) (1) the projected COFINA Pledged Taxes ((i) which, in the event that Subordinated Lien Bonds are being issued prior to FY2024, are calculated assuming the preceding FY's collection of the COFINA Pledged Taxes grow annually at the "sales and use tax" growth rates set forth for those subsequent years in the Commonwealth's certified fiscal plan, dated April 18, 2018, or (ii) in the event that Subordinated Lien Bonds are being issued during FY2024 or thereafter, are calculated assuming that preceding fiscal year's collection of the COFINA Pledged Taxes grow thereafter at a rate equal to the average annual "sales and use tax" growth rate for the preceding five (5) fiscal years)) equals or exceeds (2) one and one-half times (1.5x), in any succeeding fiscal year, of the annual aggregate debt service due on the COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); (b) the preceding fiscal year's collections from the COFINA Pledged Taxes is equal to or greater than one and one-tenth times (1.10x) coverage of the maximum annual aggregate debt service due in any succeeding fiscal year on all COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); and (c) the Subordinated Lien Bonds have a maturity not later than FY2058; provided, however, that, subsequent to June 30, 2028, and subject to compliance with the foregoing ABT, final maturity beyond FY2058 shall be permissible for future Subordinated Lien Bonds.

### 5.   Call Provisions

The COFINA Bonds shall be callable, in whole or in part, in any order of maturity, at par plus accrued interest thereon or accreted value, as applicable, upon thirty (30) days prior written notice as follows:

2028 CIBS: Non-Call
2032 CIBS: Par Call Commencing 2025 (7 year call)
2038 CIBS: Par Call Commencing 2028 (10 year call)
2044 CIBS: Par Call Commencing 2028 (10 year call)
2058 CABS: Call Commencing 2028 at the following call prices:

| Year | Price |
|------|-------|
| 2028-2032 | 107.5% of Accreted Value |
| 2033-2037 | 105% of Accreted Value |
| 2038-2042 | 103% of Accreted Value |
| 2043-2058 | 100% of Accreted Value |

If less than all of the COFINA Bonds of a particular series are called for prior redemption, COFINA will select the maturity or maturities of such series of the COFINA Bonds to be redeemed, and DTC, on behalf of the trustee, will select the COFINA Bonds within the same maturity of such series to be redeemed by means of a random lottery.

### 6.   Debt Service Reserve Fund

The COFINA Bonds shall not have a debt service reserve fund.

### 7.   First Dollars Funding

Until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, and subsequent to the funding of reasonable and necessary COFINA operating expenses, including, without limitation, COFINA board member fees and expenses, the COFINA Portion shall be funded annually from "first dollars" collected from the COFINA Pledged Taxes. From and after FY2024, and solely in the event that (a) for any date of determination at which time the Oversight Board or any successor to its budgetary function is in existence, (1) the prior and then-current FY budgets are balanced, as determined by the Oversight Board and (2) the Commonwealth is current on all continuing disclosure requirements relating to the public disclosure of its audited financial statements, (b) quarterly bucketing of twenty-five percent (25%) of the then-current FY's COFINA Portion is shown to be necessary to avoid intra-FY TRANs borrowing and (c) collection of prior fiscal year COFINA Pledged Taxes provided a two <u>times</u> (2x) coverage of the COFINA Portion, then, in each quarter, until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, (x) the "first dollars" collected from the COFINA Pledged Taxes up to twenty-five percent (25%) of the then-current FY's COFINA Portion shall be deposited into the "Debt Service Fund" held by the trustee for the benefit and payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds and (y) thereafter, the remaining quarterly collection from the COFINA Pledged Taxes shall be for the benefit of, and be paid to, the trustee for any Subordinated Lien Bonds issued by COFINA and remaining outstanding up to twenty-five percent (25%) of the yearly scheduled debt service due on such bonds, and (z) the balance thereof, if any, shall be paid to the Commonwealth for the balance of such fiscal quarter; <u>provided</u>, <u>however</u>, that, in any quarter in which there is a shortfall in the amounts required to be deposited by the preceding clause (x), then such shortfall shall be added to the amount required to be paid in accordance with clause (x) in the following quarter until the entire amount of the cumulative shortfall has been deposited into the "<u>Debt Service Fund</u>" held by the trustee for the benefit and payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds; and, <u>provided</u>, <u>further</u>, that, in any quarter in which there is a shortfall in the amount required to be deposited by the preceding clause (y), then such shortfall shall be added to the amount required to be paid in accordance with clause (y) in the following quarter until the entire amount of cumulative shortfall has been paid to the trustee for any Subordinated Lien Bonds issued by COFINA and which remain outstanding.

**8.    Rights of Acceleration**

The COFINA Bonds, the COFINA Parity Bonds and any Subordinated Lien Bonds shall not have rights of acceleration.

**9.    Covenants**

a.    *Sales and Use Covenant*

Subject to the terms and provisions of Section II(E)(10) hereof, entitled <u>Substitution of Collateral</u>, the Commonwealth shall covenant for the benefit of all initial and subsequent holders of the COFINA Bonds and all COFINA Parity Bonds, that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the rate of the COFINA Pledged Taxes from which the PSTBA is derived shall not be reduced to a rate less than five and one-half percent (5.5%) unless, on each such occasion prior to such reduction, at least two (2) of the following four (4) nationally recognized statistical rating organizations then in existence and rating the COFINA Bonds: S&P Global Ratings ("<u>S&P</u>"), Moody's Investor Service, Inc. ("<u>Moody's</u>"), Fitch Ratings ("<u>Fitch</u>") and Kroll Bond Rating Agency Inc. ("<u>Kroll</u>"), or their respective successors, with one (1) of such organizations being S&P or Moody's, or its respective successor, confirm that ratings will not be downgraded and (without regard to bond insurance or other third party credit enhancement) will be rated at least A2/A category or higher following such reduction; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, until all obligations with respect to the COFINA Bonds and any COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, if the rate of

the COFINA Pledged Taxes is reduced below three percent (3%), then such reduction shall constitute a substitution of collateral and shall be subject to the terms and provisions of Section II(E)(10) hereof, entitled Substitution of Collateral.

b.     ***Non-Impairment Covenant***

The Commonwealth shall covenant for the benefit of all initial and subsequent holders of COFINA Bonds and all COFINA Parity Bonds, that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will take no action that would (1) impair COFINA's right to receive the COFINA Portion, (2) limit or alter the rights vested in COFINA in accordance with the COFINA Plan of Adjustment and the Confirmation Order, as defined below, to fulfill the terms of any agreements with the holders of COFINA Bonds and all COFINA Parity Bonds, (3) materially adversely impair the collection of COFINA Pledged Taxes in any FY, or (4) impair the rights and remedies of the holders of the COFINA Bonds or any COFINA Parity Bonds or the collateral security thereof.

c.     ***Tax-Exemption Covenant***

COFINA shall covenant for the benefit of all initial and subsequent holders of tax-exempt COFINA Bonds and all tax-exempt COFINA Parity Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, COFINA will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any tax-exempt COFINA Bonds or tax-exempt COFINA Parity Bonds shall be and remain excludable from gross income for federal income tax purposes.

d.     ***Rating Agency Covenant***

In connection with a Substitution of Collateral pursuant to the provisions of Section II(E)(10) hereof, COFINA shall use its reasonable best efforts and work in good faith to obtain the best rating possible on the outstanding COFINA Bonds, including, but not limited to responding to requests for documents.

**10.    Substitution of Collateral**

Notwithstanding anything contained herein to the contrary, the Commonwealth may enact legislation that permits a Commonwealth revenue stream to replace the COFINA Pledged Taxes (the "New Collateral", which, for the avoidance of doubt, shall include any substitution of already substituted New Collateral) as security for the repayment of the COFINA Bonds only upon, and on each such occasion, satisfaction of the following conditions: (a) such New Collateral is all or a portion of a tax of general applicability throughout Puerto Rico that is being enacted in full substitution of the then-existing island-wide sales and use tax or otherwise constitutes like or comparable security for the COFINA Bonds and COFINA Parity Bonds and such legislation provides (i) for the irrevocable transfer of, including ownership of, such New Collateral to COFINA, (ii) for an automatic mandatory statutory lien on such New Collateral in favor of holders of COFINA Bonds and COFINA Parity Bonds, and (iii) that, following such transfer, such New Collateral is not, and shall not constitute, "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution, and is otherwise owned by COFINA in the same manner and to the same extent as the COFINA Portion, (b) upon substitution of the New Collateral, that rating confirmations are received from at least two (2) of the following four (4) nationally recognized statistical rating organizations then in existence:  S&P, Moody's, Fitch and Kroll, with one (1) of such organizations being either S&P or Moody's, prior to such collateral substitution confirming that ratings for all COFINA Bonds and COFINA Parity Bonds (without regard to bond insurance or other third party credit enhancement) will not be downgraded and will be at least A2/A category or higher following such collateral substitution, (c) the Commonwealth shall continue to provide the Non-Impairment Covenant with

respect to such New Collateral and (d) such other documents as may be required pursuant to applicable law and bond resolutions.

## F.     Insurance Contribution

### 1.     Ambac

In consideration for the releases to be given to Ambac, and in accordance with Section II(D)(2) above, on the COFINA Effective Date, a beneficial holder of a Senior COFINA Bond Claim (Ambac Insured) that does not validly elect to receive Ambac Custodial Certificates shall receive (in addition to the Senior COFINA Bond Distribution) consideration from Ambac in an amount, in Ambac's sole and absolute discretion, set forth in the COFINA Plan of Adjustment with respect to a Senior COFINA Bond Claim (Ambac Insured), which amount, together with the Senior COFINA Bond Distribution, may not, on an aggregate basis, provide full accreted value of such bonds, and the beneficial holder thereof shall have no other or further rights with respect to the Ambac Insurance Policies, the Ambac Custodial Trust or the Ambac Custodial Certificates. The provisions set forth in this Section II(F)(1) apply only to Senior COFINA Bond Claims (Ambac Insured) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof or its predecessor in interest otherwise purchased or acquired insurance on the secondary market. A holder of a Senior COFINA Bond Claim (Ambac Insured) that does not validly elect to receive Ambac Custodial Certificates shall have, on or after the COFINA Effective Date, its existing COFINA securities cancelled, transferred, or otherwise disposed of, in each case, in accordance with the provisions of the COFINA Plan of Adjustment.

### 2.     National

In consideration for the releases to be given to National, and in accordance with Section II(D)(3) above, on the COFINA Effective Date, a beneficial holder of a Senior COFINA Bond Claim (National Insured) that does not validly elect to receive National Custodial Certificates shall receive (in addition to the Senior COFINA Bond Distribution) consideration from National in an amount, in National's sole and absolute discretion, set forth in the COFINA Plan of Adjustment with respect to a Senior COFINA Bond Claim (National Insured), and the beneficial holder thereof shall have no other or further rights with respect to the National Insurance Policies, the National Custodial Trust or the National Custodial Certificates. The provisions set forth in this Section II(F)(2) apply only to Senior COFINA Bond Claims (National Insured) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof or its predecessor in interest otherwise purchased or acquired insurance on the secondary market. A holder of a Senior COFINA Bond Claim (National Insured) that does not validly elect to receive National Custodial Certificates shall have, on or after the COFINA Effective Date, its existing COFINA securities cancelled, transferred, or otherwise disposed of, in each case, in accordance with the provisions of the COFINA Plan of Adjustment.

For the avoidance of doubt, Ambac and National shall be permitted to structure their respective commutation payments in different amounts and means.

The terms and provisions regarding commutation in accordance with the provisions of this Section II(F) shall be included in the COFINA Plan of Adjustment and the Confirmation Order and shall be in form and substance acceptable to Ambac and National, as the case may be.

## G.     Custodial Trusts

### 1.     Ambac Custodial Trust

17

On or prior to the COFINA Effective Date, COFINA and/or Ambac, together with an entity appointed by COFINA and/or Ambac to serve as trustee, shall form the Ambac Custodial Trust for the sole benefit of beneficial holders of existing securities insured by Ambac (the "Ambac Insured Bonds") that validly elect to receive the Ambac Custodial Certificates in accordance with the approved solicitation procedures.  On the COFINA Effective Date, the following shall be deposited into the Ambac Custodial Trust: (1) the Ambac Insured Bonds allocable to such electing holder of a Senior COFINA Bond Claim (Ambac Insured), (2) the COFINA Bonds allocable to such electing holder of a Senior COFINA Bond Claim (Ambac Insured) and (3) the Ambac Insurance Policy (collectively, with the Ambac Insured Bonds and the COFINA Bonds, the "Ambac Trust Assets").  Notwithstanding the deposit therein, the Ambac Insured Bonds shall not be cancelled, unless otherwise elected by Ambac prior to the COFINA Effective Date, and all rights and remedies under and in accordance with Ambac Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the Ambac Insurance Policy shall be preserved and remain in full force and effect.  Upon deposit of the Ambac Trust Assets, the trustee shall issue one or more series of Ambac Custodial Certificates to the beneficial holders of the COFINA Bonds deposited into the Ambac Custodial Trust on a pro rata basis.

The Ambac Custodial Certificates shall entitle the holder thereof to its pro rata share of value in and any distribution of cash from the Ambac Custodial Trust, which distribution shall reduce the obligation under the Ambac Insurance Policy.  Documentation related to the Ambac Custodial Trust shall, in Ambac's sole discretion, include, among other terms, provisions relating to the corporate governance thereof and permitting Ambac to purchase any Ambac Trust Assets in any sale thereof and use such proceeds to pay down the Ambac Custodial Certificates and reduce Ambac's obligations under the Ambac Insurance Policy.  The Ambac Custodial Trust shall permit Ambac to enter into private commutation arrangements on and after the COFINA Effective Date.  Documentation related to the Ambac Custodial Trust shall (i) be negotiated in good faith with the Oversight Board, (ii) be in form and substance acceptable to Ambac and reasonably acceptable to the Oversight Board, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

To the extent that a holder of a Senior COFINA Bond Claim (Ambac Insured) agrees to commute the Ambac Insurance Policy on or prior to the COFINA Effective Date, such holder shall receive a distribution from Ambac and the holder shall have no rights with respect to the Ambac Insurance Policy, the Ambac Custodial Trust or the Ambac Custodial Certificates.

## 2.    National Custodial Trust

In the event that National does not make the National Election, on or prior to the COFINA Effective Date, the National Custodial Trust shall be formed by or on behalf of, and for the sole benefit of, beneficial holders of, existing COFINA securities insured by the National Insurance Policies (the "National Insured Bonds"), that (i) elect to receive National Custodial Certificates on the ballot/election form distributed in connection with the solicitation of acceptances and rejections of the COFINA Plan of Adjustment and (ii) have not otherwise agreed to commute the National Insurance Policies on or prior to the COFINA Effective Date.  The trustee of the National Custodial Trust shall be an entity that is a nationally recognized U.S. domiciled financial institution and fiduciary regularly acting as trustee in the municipal finance market.  On the COFINA Effective Date, the following shall be deposited into the National Custodial Trust: (1) the National Insured Bonds that have not been commuted, (2) other than the portion distributable to commuting holders, all of the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National Insured) in accordance with the terms of Section II(D)(3) hereof, (3) the National Insurance Policies and (4) the consideration to be distributed to National in accordance with Section II(O) hereof (item numbers 1 through 4, collectively, the "National Trust Assets").  The costs, including fees and expenses and any obligation arising under this Term Sheet or the COFINA Plan of Adjustment, associated with the formation and operation of the National Custodial Trust shall be paid out of the National Trust Assets.

Notwithstanding the deposit therein, the National Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with National Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the National Insurance Policies shall be preserved and remain in full force and effect. Upon deposit of the National Trust Assets, on a pro rata basis, the trustee shall issue one or more series of National Custodial Certificates to the beneficial holders of Senior COFINA Bond Claims (National Insured) whose allocable shares of the Senior COFINA Bond Distribution are deposited into the National Custodial Trust.

The National Custodial Certificates shall entitle the holder thereof (the "National Certificate Holder") to its pro rata share of value in and any distribution of cash from the respective National Custodial Trust, which distribution shall (1) in all cases, occur promptly upon receipt thereof by the National Custodial Trust and (2) automatically reduce the obligation outstanding under the National Insurance Policies as of the date of such distribution to National Certificate Holders. For the avoidance of doubt, National's obligation to pay the scheduled Compounded Amount, as defined in the Bond Resolutions, of the underlying National Insured Bonds as and when due shall, in all cases, continue to compound as scheduled to the date that the trustee of the National Custodial Trust actually makes payment to the National Certificate Holders. Each series of National Custodial Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through DTC. So long as National (i) is not in default under the National Insurance Policies and (ii) has not agreed to and has not become subject to regulatory supervision, rehabilitation or liquidation (or similar) proceedings, National (a) shall be deemed the sole holder of the COFINA Bonds in the National Custodial Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (b) may, at any time prior to dissolution of the National Custodial Trust, deliver or direct the trustee to deliver a general notice to all National Certificate Holders, through DTC or any similar means, of the intent to sell for cash all or a portion of the COFINA Bonds held in the National Custodial Trust (the "Sale Notice"). The cash proceeds of such a sale shall be promptly distributed to National Certificate Holders on a pro rata basis (the "Sale Proceeds") and, upon such distribution, shall automatically reduce the obligation outstanding under the National Insurance Policies as of the date and in the amount of such distribution to National Certificate Holders; provided, however, that each National Certificate Holder may elect (within a reasonable specified period of time to be negotiated) after delivery of the Sale Notice to receive its pro rata share of the COFINA Bonds for sale pursuant to the Sale Notice in lieu of its allocable share of the Sale Proceeds and, in accordance with such election, the obligation outstanding under the National Insurance Policies as of the date of such distribution shall be reduced automatically in an amount equal to the portion of the Sale Proceeds that would have been attributable to such COFINA Bonds if sold. Documentation related to the National Custodial Trust shall (i) be negotiated in good faith, (ii) be in form and substance acceptable to National and reasonably acceptable to the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the PSA, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

To the extent that a holder of a Senior COFINA Bond Claim (National Insured) agrees to commute the National Insurance Policies on or prior to the COFINA Effective Date, such holder shall receive a distribution from National and the holder thereof shall have no rights with respect to the National Insurance Policies, the National Custodial Trust or the National Custodial Certificates.

3.    **Assured Custodial Trust**

In the event that Assured does not make the Assured Election, on or prior to the COFINA Effective Date, Assured, together with an entity appointed by Assured to serve as trustee, shall form one or more substantially identical Assured Custodial Trusts, for the sole benefit of beneficial holders of existing securities insured (including insurance issued in the secondary market) by Assured (the "Assured Insured Bonds"). On the COFINA Effective Date, each holder of a Junior COFINA Bond

19

Claim (Assured Insured) shall be deemed to have deposited such claim into the Assured Custodial Trust in exchange for one or more Assured Custodial Certificates evidencing the following: (1) Assured Insured Bonds, (2) the COFINA Bonds allocable to a holder of a Junior COFINA Bond Claim (Assured Insured), (3) Assured Insurance Policies and (4) Section 103 Cash and Rounding Amount Cash, if any, allocable to such holder (collectively, the "Assured Trust Assets"). Notwithstanding the deposit therein, the Assured Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with Assured Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the Assured Insurance Policies shall be preserved and remain in full force and effect.

The Assured Custodial Certificates shall entitle the holder thereof to its pro rata share of value in and any distribution of cash from the Assured Custodial Trust, which distribution shall (1) occur promptly upon receipt thereof by the Assured Custodial Trust and (2) automatically reduce the obligation outstanding under the Assured Insurance Policies as of the date of such payment. Each series of Assured Custodial Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through DTC. So long as Assured has not failed to make a payment when due under the applicable Insurance Policies, it shall (a) have the sole right to control the management of the Assured Trust Assets, (b) be deemed the sole holder of the COFINA Bonds deposited in the Assured Custodial Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (c) be fully subrogated to the rights of the holders of Assured Insured Bonds in respect of the COFINA Bonds deposited in the Assured Custodial Trust. Documentation related to the Assured Custodial Trust shall (i) be negotiated in good faith with the Oversight Board, (ii) be in form and substance acceptable to Assured and reasonably acceptable to the Oversight Board, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

4.      **Costs**

The Government Parties shall be held harmless by Ambac, Assured and National for any costs and all fees and expenses associated with the formation and operation of the Custodial Trusts.

5.      **Trust Terms**

Notwithstanding anything contained herein to the contrary, the terms of the Ambac Custodial Trust, the National Custodial Trust and the Assured Custodial Trust may be different from each other.

**H.      Conditions to the Effective Date of the COFINA Plan of Adjustment**

Conditions precedent to the COFINA Effective Date will include, but not be limited to:

- Entry of (a) a court order approving the COFINA Plan of Adjustment (the "Confirmation Order") and (b) a court order approving the Settlement Motion (the "Settlement Order"), in the form reasonably acceptable to the Government Parties and the PSA Parties, pursuant to Title III of PROMESA. Without limiting the foregoing, for the express benefit of, among others, the bond trustee and the holders of COFINA Bonds, the Confirmation Order and the Settlement Order, as applicable, shall be a binding determination that, as of the COFINA Effective Date:

    1.   The COFINA Bonds and the covenants by COFINA and the Commonwealth, as applicable, for the benefit of the holders of the COFINA Bonds and COFINA Parity Bonds (including the sales and use tax, non-impairment, substitution of collateral and tax-exemption covenants) constitute valid, binding, legal and enforceable obligations of COFINA and the Commonwealth, as applicable, under Puerto Rico and federal law, and the COFINA Portion (and any substitution of collateral on the terms and conditions provided for herein) is the

property of COFINA, free and clear of all liens, claims, encumbrances, and other interests of
creditors of COFINA, the Commonwealth, or any instrumentality of the Commonwealth
(other than liens and claims afforded to holders of COFINA Bonds under the COFINA Plan
of Adjustment) and shall not be "available resources" of the Commonwealth within the
meaning of such term under the Puerto Rico Constitution;

2.   Pursuant to the legislation referenced in Section II(M), the COFINA Bonds and COFINA
Parity Bonds have been granted and are secured by a statutory first lien on the COFINA
Pledged Taxes, which shall remain in full force and effect until the COFINA Bonds and
COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms;

3.   The statutory lien on, and pledges of, COFINA Pledged Taxes, and all other provisions
made to pay or secure payment of the COFINA Bonds and COFINA Parity Bonds are valid,
binding, legal, and enforceable; including, without limitation, covenants not to impair such
property, maintain available tax exemption and provide for the conditions regarding
substitution as adequate protection for the property rights conferred under the COFINA Plan
of Adjustment and the Confirmation Order;

4.   The transfer of the COFINA Portion (and any substitution of collateral on the terms and
conditions provided for herein) pursuant to the COFINA Plan of Adjustment is appropriate
and binding and specifically enforceable against COFINA and the Commonwealth, their
respective creditors and all parties in interest in accordance with the COFINA Plan of
Adjustment, including, without limitation, because the transfer of the COFINA Portion
created in COFINA an ownership interest in such property (and any substitution of collateral
on the terms and conditions provided for herein) and is a valid provision made to pay or
secure payment of the COFINA Bonds; and

5.   The Confirmation Order is full, final, complete, conclusive and binding upon and shall
not be subject to collateral attack or other challenge in any court or other forum by (i)
COFINA, (ii) the Commonwealth, (iii) each person or entity asserting claims or other rights
against COFINA, the Commonwealth or any of its other instrumentalities, including a
beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or
otherwise) in respect of bonds issued by COFINA, the Commonwealth, or any of its other
instrumentalities or with respect to any trustee, any collateral agent, any indenture trustee, any
fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not
such claim or other rights of such person or entity are impaired pursuant to the COFINA Plan
of Adjustment and, if impaired, whether or not such person or entity accepted the COFINA
Plan of Adjustment, (iv) any other person, and (v) each of the foregoing's respective heirs,
successors, assigns, trustees, executors, administrators, officers, directors, agents,
representative, attorneys, beneficiaries or guardians.

- The Settlement Order shall become effective contemporaneously with the COFINA Effective
  Date;

- Execution and delivery of all Definitive Documents, in form and substance reasonably
  satisfactory to the Government Parties and the PSA Parties, and such definitive documents being
  in full force and effect;

- Usual and customary legal opinions for issuances of this type of outside counsel to COFINA
  covering matters not expressly addressed in the Confirmation Order, in form and substance
  reasonably acceptable to the PSA Parties, will have been delivered to the applicable trustee or
  other parties regarding the Definitive Documents and the COFINA Plan of Adjustment;

21

- Unless otherwise permitted or required by PROMESA or similar authority, completion of any required legislative or other governmental action required to consummate the COFINA Plan of Adjustment, including, without limitation, Commonwealth legislation and court orders, if any, required to (i) ensure that the payment obligations of COFINA cannot in the future be modified or altered without the consent of the requisite holders of COFINA Bonds as set forth in a new bond resolution for the COFINA Bonds, (ii) ensure the validity, enforceability, liens and priority of the COFINA obligations contemplated by the COFINA Plan of Adjustment and (iii) except as otherwise permitted in connection with the substitution of collateral, ensure that the COFINA Pledged Taxes not be modified or altered prior to the satisfaction of COFINA's obligations thereunder;

- The Confirmation Order shall contain provisions to support the tax-exempt treatment of distributions to National Certificate Holders from the National Custodial Trust. Such Confirmation Order provisions shall be acceptable to the Oversight Board, National and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the PSA;

- Pursuant to the Confirmation Order, the deemed acceleration of existing insured COFINA securities on the COFINA Effective Date, (i) in connection with the treatment of Junior COFINA Bond Claims (Assured Insured), (ii) if requested by Ambac, in connection with the treatment of Senior COFINA Bond Claims (Ambac Insured) and (iii) if determined to be necessary or appropriate by National, to implement the National Election; _provided_, _however_, that such deemed acceleration shall not, nor shall it be construed to, affect issues regarding "default" or acceleration which were pending prior to the COFINA Effective Date; and

- Other customary conditions to be agreed and reasonably acceptable to the Government Parties and the PSA Parties.

## I.      Releases

Customary releases and exculpations (which releases and exculpations shall not include releases for claims and causes of action arising from or related to any act or omission that constitutes intentional fraud or willful misconduct) of all relevant parties and their respective parents, subsidiaries and affiliates, and each of their respective board members, directors, officers, employees and advisors will be included in the COFINA Plan of Adjustment, including, without limitation, but subject to the foregoing, the release of (1) BNYM (as limited by Section I(C) hereof) in connection with the Adversary Proceeding, the Interpleader Action and any claims and causes of action related to (a) the Senior COFINA Bond Claims, the Senior COFINA Bond Claims (Ambac Insured), the Senior COFINA Bond Claims (National Insured) and the Senior COFINA Bond Claims (Taxable Election) and (b) the Junior COFINA Bond Claims, the Junior COFINA Bond Claims (Assured Insured) and the Junior COFINA Bond Claims (Taxable Election) and (2) each of Ambac, National and Assured with respect to all negotiations regarding and any actions taken consistent with the COFINA Plan of Adjustment, including, without limitation, in connection with a custodial trust structure, commutation, the Assured Election, the National Election, and any release of obligations under applicable Insurance Policies; _provided_, _however_, that, notwithstanding the foregoing, the COFINA Plan of Adjustment shall not provide for the release of: (1) with respect to any beneficial holder of the Insured Bonds that receive Ambac Custodial Certificates in accordance herewith, any claim against Ambac with respect to Ambac's payment obligations under the Ambac Insurance Policy, as adjusted to account for any distributions from the Ambac Custodial Trust (and any claims that Ambac may have against a beneficial holder of such Ambac Insured Bonds with respect to Ambac's obligations under the Ambac Insurance Policy); (2) with respect to any beneficial holder of Assured Insured Bonds that receives Assured Custodial Certificates in accordance herewith, any claim against

22

Assured with respect to Assured's payment obligations under the Assured Insurance Policies in accordance with their terms (and any claims that Assured may have against a beneficial holder of such Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policy); (3) with respect to any beneficial holder of National Insured Bonds that received National Custodial Certificates in accordance herewith, any claim against National with respect to National's payment obligations under the National Insurance Policies, as adjusted to account for any distributions from the National Custodial Trust (and any claims that National may have against a beneficial holder of such National Insured Bonds with respect to National's obligations under the National Insurance Policies); or (4) in the case of the Assured Election, with respect to any beneficial holder of Assured Insured Bonds, any payment obligation under the applicable Assured Insurance Policy in accordance with its terms solely to the extent of any failure by Assured to pay the acceleration price in full (or any claims that Assured may have against a beneficial holder of Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policies).  The releases to be incorporated into the COFINA Plan of Adjustment are an integral and necessary component of the agreement  contemplated herein, will be presented as a resolution of disputed claims inextricably bound with the COFINA Plan of Adjustment pursuant to Federal Rule of Bankruptcy Procedure 9019 and, subject to approval of the Title III Court, which approval shall be supported by parties in accordance with the PSA, will bind all parties in interest, including, without limitation, any party purporting to assert any released claim derivatively on the part of COFINA or the Commonwealth.

**J.**     **Governing Law/Jurisdiction**

The COFINA Bonds will be governed by, and construed in accordance with, the laws of the State of New York.  The Title III Court shall retain jurisdiction from and after the COFINA Effective Date of all matters arising from or related to the COFINA Plan of Adjustment, including, without limitation, with respect to the payment, enforcement and remedies of the COFINA Bonds to the fullest extent permitted by law[2].  Any disputes, legal action, suit, or proceeding arising from or related to the COFINA Bonds (a) shall be brought in accordance with the documentation relating to the COFINA Bonds by any party or its successors or assigns in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**K.**     **Structure for Collection and Application of SUT**

The COFINA Bonds shall be issued by COFINA following amendment of Act 91, which entity shall be a "bankruptcy remote," single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the COFINA Plan of Adjustment, and as reflected in this Term Sheet.  The collection and deposit of the COFINA Portion, net of COFINA operating expenses, shall be (a) promptly after collection, kept in segregated bank accounts maintained

---

[2]  The parties hereto acknowledge and agree that, pursuant to section 945(a) of the Bankruptcy Code, applicable in the COFINA PROMESA Proceeding in accordance with Section 301(a) of PROMESA, and in light of the critical importance to assure that post-confirmation disputes regarding matters resolved or addressed by the COFINA Plan of Adjustment do not impede the successful implementation of the COFINA Plan of Adjustment, the Title III Court may retain jurisdiction over each of the matters specified in the COFINA Plan of Adjustment and such retention is reasonable, appropriate, in the best interests of the Commonwealth, COFINA, their respective creditors and other parties interest, and not inconsistent with PROMESA, the Bankruptcy Code or any other applicable law.

in one or more mainland U.S. Banks in the name of the trustee appointed under the new COFINA bond resolution and (b) designed to ensure that COFINA is the unconditional owner of the COFINA Portion, now existing or hereafter collected, under Puerto Rico and other applicable law.

**L.**     **Corporate Governance:** On the COFINA Effective Date, and pursuant to the COFINA Plan of Adjustment, the COFINA board of directors shall be appointed and shall consist of three (3) members appointed by the Governor of the Commonwealth, all of whom shall meet the independence and qualification standards set forth in definitive documentation, including, without limitation, that the independent director may not be an officer, employee or director of the government of Puerto Rico or instrumentality thereof (other than COFINA), must have executive experience in finance or with respect to securities similar to the COFINA Bonds and shall otherwise be qualified to serve on the board of directors. Notwithstanding the foregoing, (a) the holders of Senior COFINA Bond Claims, Ambac and National (in consultation with the holders of the Junior COFINA Bond Claims and Assured) may submit up to three (3) recommendations for the Governor's consideration regarding the initial appointment of the independent directors; provided, however, that the Governor shall be under no obligation to appoint any such recommended persons as directors and (b) to the extent permitted by applicable law, COFINA's corporate governance documents shall be amended to be consistent with all of the foregoing and to provide that board approval shall be required for all material actions to be taken. COFINA's amended corporate governance documents shall provide that all board members will owe a fiduciary duty to COFINA as consistent with Puerto Rico law and its Constitution. The amended corporate governance documents and identities of board members will be filed as part of the Plan Supplement.

**M.**     **Legislation and Documentation:** On or prior to the COFINA Effective Date, legislation shall be enacted to amend (or repeal and replace) the existing COFINA legislation to, among other things, (i) establish the independent COFINA board of directors referred to in Section II (L) above, (ii) permit the sales and use tax, tax exemption, substitution of collateral and non-impairment provisions referred to herein and (iii) grant such other authorizations, if any, which may be required to implement the transactions contemplated herein, including, without limitation, (a) a determination that COFINA is the owner of the COFINA Portion under applicable law, (b) a grant of a statutory lien on the COFINA Portion to secure the payment obligations with respect to the COFINA Bonds and COFINA Parity Bonds, in whole or in part, or otherwise in accordance with the ABT, (c) enhanced financial reporting, (d) events of default and imposition of certain measures upon an event of default (e) submission to the jurisdiction of the Title III Court, and (f) other customary terms, conditions, and covenants for similarly structured and supported municipal bonds that are acceptable to the PSA Parties. To the extent applicable, the foregoing terms and such other terms as may be agreed upon shall be included in the new bond resolution authorized by COFINA.

**N.**     **Commonwealth/COFINA Expenses:** All expenses incurred by the Commonwealth or COFINA, as the case may be, in connection with the development, negotiation, confirmation and consummation of the COFINA Plan of Adjustment and the compromise and settlement of the Commonwealth-COFINA Dispute shall be paid to the extent available from the funds distributable to the Commonwealth in accordance with the provisions of Section I(A) hereof and otherwise by the Commonwealth.

**O.**     **Consummation Costs:** Notwithstanding anything contained in this Term Sheet or the COFINA Plan of Adjustment to the contrary, in order to compensate parties for the cost of negotiation, confirmation and consummation of this Term Sheet and the COFINA Plan of Adjustment, and in consideration of (1) the execution and delivery of the PSA by each Consummation Cost Party, as defined below, and (2) the obligations and covenants contained in the PSA, Assured, Ambac, National, each holder of a Senior COFINA Bond Claim, and

each holder of Junior COFINA Bond Claim, each listed on Exhibit "B" hereto (a "Consummation Cost Party"), which executes the PSA consistent with the terms set forth herein by no later than 11:59p.m. (EDT) on September 20, 2018 (the "Deadline"), shall be entitled to receive on the COFINA Effective Date, based upon their respective positions (insured or otherwise) as of 5:00p.m. (EDT) on August 7, 2018, a pro rata share of cash in an amount equal to two percent (2.0%), truncated to two decimal points, of the (a) aggregate amount of the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac Insured), Senior COFINA Bond Claims (National Insured), Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured Insured), Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) (calculated without duplication), minus (b) One Billion Dollars ($1,000,000,000.00); provided, however, that, with respect to any Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured), unless otherwise agreed to, in writing, by Ambac and National, Ambac or National, as the case may be, and not the beneficial holder of such Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) regardless of whether such beneficial holder is also a Consummation Cost Party, shall receive the amount of cash that would have otherwise been distributed to such other Consummation Cost Party in accordance with the provisions of this Section II(O); and, provided, however, that, notwithstanding the foregoing provisions of this Section II(O), amounts due and payable to Aurelius Capital Master, Ltd. and Six PRC Investments LLC as a result of being a Consummation Cost Party (i) shall not be taken into account in the connection with the above-referenced calculations solely with respect to payments to other Consummation Cost Parties, which payments to other Consummation Cost Parties shall be made by COFINA or its successor in interest, and (ii) with respect to payments to be made to Aurelius Capital Master, Ltd. and Six PRC Investments LLC, shall be taken into account in connection with the above-referenced calculations for all Consummation Cost Parties, which payments to Aurelius Capital Master, Ltd. and Six PRC Investment LLC shall be payable by the Commonwealth in accordance with the provisions of Sections I(A) and II(O) hereof;  and, provided, further, that, with respect to the Junior COFINA Bond Claims (Assured Insured), Assured, and not the beneficial holders of the Junior COFINA Bond Claims (Assured Insured), shall receive the amount of cash distributable on account of the Junior COFINA Bond Claims (Assured Insured).

**P.**     **Unsubscribed Taxable Election Cash Amount:**  The amount, up to Sixty Million Dollars ($60,000,000.00), allocated for distributions to holders in Classes 4 and 7, but not distributed based upon elections not made, and calculated as the difference between Sixty Million Dollars ($60,000,000.00) minus the Taxable Election Cash shall be reallocated as follows: if such amount is (a) equal to or less than Forty Million Dollars ($40,000,000.00), such amount shall be allocated (i) *first*, if the aggregate amount of Taxable Election Cash distributable under the COFINA Plan of Adjustment is greater than Twenty Million Dollars ($20,000,000.00), to be distributed as cash in accordance with the COFINA Plan of Adjustment, (ii) *second*, to the extent of any remainder, to further fund the operating expense fund for COFINA up to an additional Ten Million Dollars ($10,000,000.00), and (iii) *third*, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders, and the Commonwealth, on the other hand, and (b) greater than Forty Million Dollars ($40,000,000.00), such amount up to Forty Million Dollars ($40,000,000.00) shall be allocated as described in subsection (a) above and such amounts above Forty Million Dollars ($40,000,000.00) shall be allocated in accordance with the COFINA Plan of Adjustment to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders.

**Q.**     **Government Parties' Covenant Regarding Taxable Election:**  The Government Parties shall use their reasonable best efforts, including, without limitation, by, directly or indirectly,

25

actively coordinating with, and promptly responding to inquiries from, any and all persons or entities, including dealers, to ensure the comprehensive outreach to Puerto Rico Investors and Puerto Rico Institutions holding existing COFINA securities regarding such holders' right to elect to receive a Taxable Bond Distribution and to ensure the dissemination of complete and accurate information regarding such election to such holders.

102136844v2

**EXHIBIT A**

**Scheduled Amortization and Certain Other Terms of COFINA Bonds**

27

## Exhibit A: Coupons and Maturity Dates

### Current Interest Bond Terms

| (7/1) Year | Par | Cpn/Yld |
|---|---|---|
| Total/Avg | $9,616,365,000.00 | 4.553% |
| 2028 | 782,915,000.00 | 4.350% |
| 2032 | 1,091,460,000.00 | 4.500% |
| 2038** | 2,997,245,000.00 | 4.550% |
| 2044 | 4,744,745,000.00 | 4.600% |

### Capital Appreciation Bond Terms

| (7/1) Year | Initial Value | Accreted Value | Yield |
|---|---|---|---|
| Total/Avg | $2,404,192,599.90 | $14,232,325,521.50 | 5.500% |
| 2058 | 2,404,192,599.90 | 14,232,325,521.50 | 5.500% |

### Current Interest Bond Sinking Fund Schedule

| (7/1) Year | Yr# | Par | Term Par |
|---|---|---|---|
| Total | | $9,616,365,000.00 | $9,616,365,000.00 |
| 2019 | 1 | 18,855,000.00 | - |
| 2020 | 2 | - | - |
| 2021 | 3 | 17,480,000.00 | - |
| 2022 | 4 | 36,420,000.00 | - |
| 2023 | 5 | 56,910,000.00 | - |
| 2024 | 6 | 79,045,000.00 | - |
| 2025 | 7 | 102,935,000.00 | - |
| 2026 | 8 | 128,680,000.00 | - |
| 2027 | 9 | 156,395,000.00 | - |
| 2028 | 10 | 186,195,000.00 | 782,915,000.00 |
| 2029 | 11 | 218,225,000.00 | - |
| 2030 | 12 | 252,920,000.00 | - |
| 2031 | 13 | 290,175,000.00 | - |
| 2032 | 14 | 330,140,000.00 | 1,091,460,000.00 |
| 2033 | 15 | 372,985,000.00 | - |
| 2034 | 16 | 419,060,000.00 | - |
| 2035 | 17 | 468,400,000.00 | - |
| 2036 | 18 | 521,185,000.00 | - |
| 2037 | 19 | 577,645,000.00 | - |
| 2038 | 20 | 637,970,000.00 | 2,997,245,000.00 |
| 2039 | 21 | 702,415,000.00 | - |
| 2040 | 22 | 771,550,000.00 | - |
| 2041 | 23 | 842,060,000.00 | - |
| 2042 | 24 | 880,800,000.00 | - |
| 2043 | 25 | 921,310,000.00 | - |
| 2044 | 26 | 626,610,000.00 | 4,744,745,000.00 |
| 2045 | 27 | - | - |
| 2046 | 28 | - | - |
| 2047 | 29 | - | - |
| 2048 | 30 | - | - |
| 2049 | 31 | - | - |
| 2050 | 32 | - | - |
| 2051 | 33 | - | - |
| 2052 | 34 | - | - |
| 2053 | 35 | - | - |
| 2054 | 36 | - | - |
| 2055 | 37 | - | - |
| 2056 | 38 | - | - |
| 2057 | 39 | - | - |
| 2058 | 40 | - | - |

### Capital Appreciation Bond Sinking Fund Schedule

| (7/1) Year | Yr# | Accretion Table | Future Value Redemption | Accreted Value Redemption |
|---|---|---|---|---|
| | | | $20,968,015,000.00 | $14,232,325,521.50 |
| 2019 | 1 | $602.50 | - | - |
| 2020 | 2 | 636.10 | - | - |
| 2021 | 3 | 671.60 | - | - |
| 2022 | 4 | 709.05 | - | - |
| 2023 | 5 | 748.55 | - | - |
| 2024 | 6 | 790.30 | - | - |
| 2025 | 7 | 834.35 | - | - |
| 2026 | 8 | 880.90 | - | - |
| 2027 | 9 | 930.00 | - | - |
| 2028 | 10 | 981.85 | - | - |
| 2029 | 11 | 1,036.60 | - | - |
| 2030 | 12 | 1,094.40 | - | - |
| 2031 | 13 | 1,155.40 | - | - |
| 2032 | 14 | 1,219.85 | - | - |
| 2033 | 15 | 1,287.85 | - | - |
| 2034 | 16 | 1,359.65 | - | - |
| 2035 | 17 | 1,435.50 | - | - |
| 2036 | 18 | 1,515.50 | - | - |
| 2037 | 19 | 1,600.00 | - | - |
| 2038 | 20 | 1,689.25 | - | - |
| 2039 | 21 | 1,783.40 | - | - |
| 2040 | 22 | 1,882.85 | - | - |
| 2041 | 23 | 1,987.85 | - | - |
| 2042 | 24 | 2,098.70 | - | - |
| 2043 | 25 | 2,215.70 | - | - |
| 2044 | 26 | 2,339.25 | 720,495,000.00 | 337,083,585.75 |
| 2045 | 27 | 2,469.65 | 2,009,425,000.00 | 992,515,290.25 |
| 2046 | 28 | 2,607.35 | 1,903,310,000.00 | 992,519,065.70 |
| 2047 | 29 | 2,752.75 | 1,802,775,000.00 | 992,517,776.25 |
| 2048 | 30 | 2,906.25 | 1,707,555,000.00 | 992,516,343.75 |
| 2049 | 31 | 3,068.25 | 1,617,400,000.00 | 992,517,510.00 |
| 2050 | 32 | 3,239.35 | 1,531,970,000.00 | 992,517,403.90 |
| 2051 | 33 | 3,419.95 | 1,451,070,000.00 | 992,517,369.30 |
| 2052 | 34 | 3,610.65 | 1,374,430,000.00 | 992,517,135.90 |
| 2053 | 35 | 3,811.95 | 1,301,850,000.00 | 992,517,421.50 |
| 2054 | 36 | 4,024.50 | 1,233,095,000.00 | 992,518,165.50 |
| 2055 | 37 | 4,248.90 | 1,167,970,000.00 | 992,517,546.60 |
| 2056 | 38 | 4,485.80 | 1,106,290,000.00 | 992,519,136.40 |
| 2057 | 39 | 4,735.90 | 1,047,865,000.00 | 992,516,770.70 |
| 2058 | 40 | 5,000.00 | 992,515,000.00 | 992,515,000.00 |

*Due to rounding of bonds into $5,000 denominations, debt service on Bonds will be slightly below the 53.65% PSTBA.
**Current Interest Bonds may include both Tax-Exempt and Taxable Bonds.

28

102136844v2

## EXHIBIT B

### List of Consummation Cost Parties

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Assured Guaranty Municipal Corp.
Aurelius Capital Master, Ltd.
Canyon Capital Advisors LLC
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it serves as
    investment manager
National Public Finance Guarantee Corporation
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Limited Term California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of Oppenheimer
    Municipal Fund)
    Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of Rochester
    Portfolio Series)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer Multi-State
    Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-State Municipal
    Trust)
    Oppenheimer Rochester Fund Municipals
    Oppenheimer Rochester Minnesota Municipal Fund
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
    MASSMUTUAL Unified Traditional
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.

First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund II, Inc.
Puerto Rico AAA Portfolio Target Maturity Fund, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund I, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
Puerto Rico Fixed Income Fund VI, Inc.
Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.
Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund II, Inc.
Puerto Rico Investors Tax-Free Fund III, Inc.
Puerto Rico Investors Tax-Free Fund IV, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

## SCHEDULE 1

| Fiscal Year | Pledged Sales Tax Base Amount | COFINA 53.65% Portion Pledged Sales Tax Base Amount | Commonwealth 46.35% Portion Pledged Sales Tax Base Amount |
|---|---|---|---|
| 2019 | 783,197,251 | 420,185,325 | 363,011,926 |
| 2020 | 814,525,141 | 436,992,738 | 377,532,403 |
| 2021 | 847,106,147 | 454,472,448 | 392,633,699 |
| 2022 | 880,990,393 | 472,651,346 | 408,339,047 |
| 2023 | 916,230,008 | 491,557,399 | 424,672,609 |
| 2024 | 952,879,209 | 511,219,696 | 441,659,513 |
| 2025 | 990,994,377 | 531,668,483 | 459,325,894 |
| 2026 | 1,030,634,152 | 552,935,223 | 477,698,929 |
| 2027 | 1,071,859,518 | 575,052,631 | 496,806,887 |
| 2028 | 1,114,733,899 | 598,054,737 | 516,679,162 |
| 2029 | 1,159,323,255 | 621,976,926 | 537,346,329 |
| 2030 | 1,205,696,185 | 646,856,003 | 558,840,182 |
| 2031 | 1,253,924,033 | 672,730,244 | 581,193,789 |
| 2032 | 1,304,080,994 | 699,639,453 | 604,441,541 |
| 2033 | 1,356,244,234 | 727,625,032 | 628,619,202 |
| 2034 | 1,410,494,003 | 756,730,033 | 653,763,970 |
| 2035 | 1,466,913,763 | 786,999,234 | 679,914,529 |
| 2036 | 1,525,590,314 | 818,479,203 | 707,111,111 |
| 2037 | 1,586,613,926 | 851,218,371 | 735,395,555 |
| 2038 | 1,650,078,483 | 885,267,106 | 764,811,377 |
| 2039 | 1,716,081,623 | 920,677,791 | 795,403,832 |
| 2040 | 1,784,724,887 | 957,504,902 | 827,219,985 |
| 2041 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2042 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2043 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2044 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2045 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2046 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2047 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2048 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2049 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2050 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2051 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2052 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2053 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2054 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2055 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2056 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2057 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2058 | 1,850,000,000 | 992,525,000 | 857,475,000 |

31

## SCHEDULE 2

### Application of BNYM Pre-7/1/2018 Debt Service Fund Monies

| | |
|---|---:|
| Pre-7/1/2018 BNYM Cash | 1,200,165,636 |
| Rounding Amount Cash Est.* | 25,000,000 |
| Section 103 Cash (Pre-Petition Interest) | 124,540,331 |
| PSA Consummation Costs | 332,742,277 |
| On-Island Min Taxable Election | 20,000,000 |
| On-Island Flex Taxable Election | 40,000,000 |
| Remaining Set Aside of Funds | 38,355,838 |
| Remaining Funds to Seniors | 619,527,190 |
| TE COFINA Sr. Cash** | 377,273,865 |
| TAX COFINA Sr. Cash** | 242,253,325 |

*All rounding shall be made up to the nearest $1,000 current interest bond denominations.
**Split Proportional to current TE/TAX ratio on COFINA Sr. of Accreted Value as of Petition Date.

# **EXHIBIT D**

## FORM OF JOINDER

# **FORM OF JOINDER AGREEMENT**

JOINDER AGREEMENT TO THE AMENDED AND RESTATED PLAN SUPPORT AGREEMENT, dated as of September __, 2018 (as amended, supplemented or otherwise modified from time to time, the "**PSA**"), by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), (b) Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), (c) Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), (d) holders of Senior COFINA Bond Claims, as defined below, set forth on Exhibit "A" thereto (together with their respective successors and assignors with respect to transfers made in accordance with the terms thereof, the "**Senior Holders**"), (e) Ambac Assurance Corporation ("**Ambac**"), (f) National Public Finance Guarantee Corporation ("**National**"), (g) holders of Junior COFINA Bond Claims, as defined below, set forth on Exhibit "B" thereto, (together with their respective successors and assignors with respect to transfers made in accordance with the terms hereof, the "**Junior Holders**"), (h) Assured Guaranty Municipal Corp. ("**Assured**"), formerly known as Financial Security Assurance Inc., (i) Bonistas del Patio, Inc. ("**Bonistas**"), and (j) the other PSA Creditors from time to time party thereto, is executed and delivered by (the "**Joining PSA Creditor**") as of _____, 2018.  Capitalized terms used herein, but not defined herein, shall have the meanings ascribed thereto in the PSA.

      1.    <u>Agreement to be Bound</u>.  The Joining PSA Creditor hereby agrees to be bound by all of the terms and provisions of the PSA.  The Joining PSA Creditor shall hereafter be deemed to be a "PSA Creditor," a "Party," a "Senior Holder" (if it holds Senior COFINA Bond Claims) and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) for all purposes under the PSA, including, without limitation, and for the avoidance of doubt, with respect to any Senior COFINA Bond Claims and Junior COFINA Bond claims held by the Joining PSA Creditor as of the date of this Joinder Agreement (other than any Senior COFINA Bond Claims or Junior COFINA Bond Claims held in a Qualified Marketmaker capacity).

      2.    <u>Representations and Warranties and Covenants</u>.  With respect to the aggregate principal amount of Senior COFINA Bond Claims and Junior COFINA Bond Claims held by the Joining PSA Creditor, including, without limitation, upon consummation of any pending Transfer of Senior COFINA Bond Claims or Junior COFINA Bond Claims to the Joining PSA Creditor, the Joining PSA Creditor hereby (a) makes, as of the date hereof, the representations and warranties of the "Senior Holder" (if it holds Senior COFINA Bond Claims) set forth in Section 3.4 of the PSA and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) set forth in Section 3.5 of the PSA and (b) covenants and agrees to perform all of the "Covenants" of the "Senior Holder" (if it holds Senior COFINA Bond Claims) set forth in Section 4.4 of the PSA, and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) set forth in Section 4.5 of the PSA,  to each of the other Parties to the PSA.

      3.    <u>Governing Law</u>. Section 7.5 of the PSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "PSA" shall be replaced with references to Joinder Agreement.

4.     <u>Notice of Joinder</u>.  The Joining PSA Creditor agrees to provide a copy of the Joinder Agreement to counsel to the Oversight Board and AAFAF in accordance with Section 4.4 of the PSA (if it holds Senior COFINA Bond Claims), Section 4.5 of the PSA (if it holds Junior COFINA Bond Claims) and the notice provisions set forth in Section 7.10 of the PSA.


 IN WITNESS WHEREOF, the Joining PSA Creditor has caused this Joinder Agreement to be executed as of the date set forth above.


[NAME OF INSTITUTION]


By:_____
        Name:
        Title:

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

**Schedule 3.4**

**Pending Litigation Naming COFINA**

### Title III Litigation

The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation (COFINA) et al., Adv. Pro. No. 17-00133-LTS (D.P.R. 2017)

The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as agent of The Commonwealth of Puerto Rico v. Bettina Whyte as agent of The Puerto Rico Sales Tax Financing Corporation, Adv. Pro. No. 17-00257-LTS (D.P.R. 2017)

Cooperativa de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al., Adv. Pro. No. 18-00028-LTS (D.P.R. 2018)

### Pre-Title III Federal Litigation

Lex Claims, LLC v. The Commonwealth of Puerto Rico, No. 3:16-cv-02374-FAB (D.P.R. 2016) (stayed) (appealed at First Circuit Case Nos. 17-1241, 17-1248, 17-1272, 17-1337)

Rodriguez-Perelló et al. v. Rosselló-Nevares et al., No. 3:17-cv-01566-FAB (D.P.R. 2017) (stayed)

### State Court Litigation

Comisión Ciudadana Para La Auditoría Integral del Crédito Público, Inc. v. Autoridad De Asesoría Financiera y Agencia Fiscal, et al. No. SJ 2018CV06428 (Court of First Instance, San Juan 2018)

## Appendix B Debt Outstanding as of May 4, 2017 ($ in Millions)

| i.d. | Issuance date | Senior Bonds Series | CIB Balance 4-May-17 | CAB Balance 4-May-17 | Total 4-May-17 |
|---|---|---|---|---|---|
| 1 | 31-Jul-07 | Sales Tax Revenue Bonds, Series 2007A | $ 708 | $ 2,727 | $ 3,435 |
| 2 | 31-Jul-07 | Sales Tax Revenue Bonds, Series 2007B | $ 1,187 | $ 268 | $ 1,454 |
| 3 | 20-Dec-07 | Sales Tax Revenue Bonds, Series 2007C | $ 416 | $ 149 | $ 564 |
| 4 | 26-Jun-08 | Sales Tax Revenue Bonds, Series 2008A | $ 489 | $ 427 | $ 916 |
| 5 | 5-Jan-09 | Sales Tax Revenue Bonds, Senior Series 2009A | $ 241 | - | $ 241 |
| 6 | 13-Dec-11 | Sales Tax Revenue Bonds, Senior Series 2011C | $ 916 | $ 142 | $ 1,058 |
| 7 | 13-Dec-11 | Sales Tax Revenue Bonds, Senior Series 2011D | $ 91 | - | $ 91 |
| | | **Total Senior Cofina Bonds** | **$ 4,048** | **$ 3,713** | **$ 7,761** |

| i.d. | Issuance date | Subordinated Bonds Series | CIB Balance 4-May-17 | CAB Balance 4-May-17 | Total 4-May-17 |
|---|---|---|---|---|---|
| 1 | 18-Jun-09 | Sales Tax Revenue Bonds, First Subordinate, Series 2009A | $ 2,892 | $ 800 | $ 3,692 |
| 2 | 25-Jun-09 | Sales Tax Revenue Bonds, First Subordinate, Series 2009B | $ 919 | $ 441 | $ 1,360 |
| 3 | 9-Feb-10 | Sales Tax Revenue Bonds, First Subordinate, Series 2010A | $ 1,550 | $ 443 | $ 1,993 |
| 4 | 30-Jun-10 | Sales Tax Revenue Bonds, First Subordinate, Series 2010C | $ 1,543 | $ 153 | $ 1,696 |
| 5 | 30-Jun-10 | Sales Tax Revenue Bonds, First Subordinate, Series 2010D | $ 89 | - | $ 89 |
| 6 | 30-Jun-10 | Sales Tax Revenue Bonds, First Subordinate, Series 2010E | $ 93 | - | $ 93 |
| 7 | 23-Nov-11 | Sales Tax Revenue Bonds, First Subordinate, Series 2011A | $ 360 | $ 548 | $ 908 |
| | 23-Nov-11 | Sales Tax Revenue Bonds, First Subordinate, Series 2011B | $ 46 | - | $ 46 |
| | | **Total Subordinated Cofina Bonds** | **$ 7,492** | **$ 2,384** | **$ 9,876** |

| | | **Total Cofina Bonds outstanding** | **$ 11,540** | **$ 6,097** | **$ 17,637** |
|---|---|---|---|---|---|

30

Fiscal Plan for COFINA

## Appendix C: U.S. Real GNP Growth Rate Comparison

### REAL GNP GROWTH RATE COMPARISON (IMF World Economic Outlook)



*The IMF forecasts are 5 year forecasts and years 2024-2028 are a continuation of 2023.

### REAL GNP GROWTH RATE COMPARISON (CBO)



31

Fiscal Plan for COFINA

32

Fiscal Plan for COFINA