Hearing Date:  January 16, 2019 at 9:30 a.m. (AST)
Objection Deadline:  November 16, 2018 at 5:00 p.m. (AST)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,
  as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.,*

    Debtors.[1]

| | |
|---|---|
| | PROMESA |
| | Title III |
| | Case No. 17-BK-03283-LTS |
| | (Jointly Administered) |

_____

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF THE COMMONWEALTH OF
PUERTO RICO, as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

  as representative of

THE COMMONWEALTH OF PUERTO RICO,

    Plaintiff,

v.

BETTINA WHYTE, as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

  as representative of

THE PUERTO RICO SALES TAX FINANCING
CORPORATION,

    Defendant.

-------------------------------------------------------------------x

Adv. Proc. No. 17-00257 (LTS)

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

01002569.17

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 3

    SEIU and UAW ........................................................................................................ 3

    Puerto Rico's Need to Build its Economy ................................................................ 3

    Puerto Rico's Staggering Debt Burden .................................................................... 5

    The Most Recent Certified Fiscal Plan ................................................................... 6

    COFINA .................................................................................................................... 8

    Commonwealth-COFINA Dispute ........................................................................... 9

    The Initial Settlement of the Commonwealth-COFINA Dispute ...................................... 11

    The Oversight Board's Settlement ......................................................................... 12

    The Instant Motion ................................................................................................. 14

ARGUMENT:  THE OVERSIGHT BOARD HAS FAILED TO MEET ITS  BURDEN
OF DEMONSTRATING THAT THE SETTLEMENT IS IN THE BEST
INTEREST OF THE COMMONWEALTH ................................................................... 15

I.     THE PROPOSED SETTLEMENT IS SUBJECT TO COURT REVIEW ...................... 15

II.    THE PROPONENT OF A SETTLEMENT MUST SHOW THAT IT IS IN THE
BEST INTEREST OF THE ESTATE ........................................................................ 15

III.   THE OVERSIGHT BOARD SETTLEMENT WOULD BURDEN THE
COMMONWEALTH FOR DECADES TO COME WITH UNSUSTAINABLE
BOND DEBT .......................................................................................................... 16

CONCLUSION .............................................................................................................. 24

CERTIFICATE OF SERVICE ....................................................................................... 25

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*In re 110 Beaver Street Partnership*,
   244 B.R. 185 (Bankr. D. Mass. 2000) ...............................................................15, 16

*In re Boston & Providence R.R. Corp.*,
   673 F.2d 11 (1st Cir. 1982) ............................................................................ 15, 16

*In re C.R. Stone Concrete Contractors, Inc.*,
   346 B.R. 32 (Bankr. D. Mass. 2006) .............................................................15, 16

*In re Hydronic Enter., Inc.*,
   58 B.R. 363 (Bankr. D.R.I. 1986) ..................................................................15, 16

**Other Authorities**

Brad Setser, *Will the Proposed Restructuring of COFINA Bonds Assure Puerto
   Rico's Return to Debt Sustainability?* COUNCIL ON FOREIGN RELATIONS
   (Sept. 27, 2018) ......................................................................................................19

David A. Skeel Jr., *Reflections on Two Years of P.R.O.M.E.S.A.,* UNIV. PA. L.
   SCHOOL, PENN LAW; LEGAL SCHOLARSHIP REPOSITORY 862 (2018) .......................6

Gregory Makoff, *An Update on PROMESA and a Proposal for Restructuring
   Puerto Rico's Debt,* CENTRE FOR INTERNATIONAL GOVERNANCE INNOVATION,
   Policy Brief No. 129 (April 12, 2018) ..................................................................17

Pablo Gluzmann, Martin Guzman, and Joseph Stiglitz, *An Analysis of Puerto
   Rico's Debt Relief Needs to Restore Debt Sustainability,*
   ESPACIOS ABIERTOS (Jan. 2018), .................................................................... 16-17

*Rep. Nydia Velazquez Challenges Continuing Austerity Measures Included in
   Puerto Rico Fiscal Plan*, NEW YORK DAILY NEWS (Oct. 30, 2018)..........................7

United States Government Accountability Office, *Puerto Rico: Factors
   Contributing to the Debt Crisis and Potential Federal Actions to Address
   Them* (May 2018).................................................................................................. 8-9

Satyajit Chatterjee, *Chapter 11 for Counties?*, ECONOMIC INSIGHTS: FEDERAL
   RESERVE BANK OF PHILADELPHIA RESEARCH DEPARTMENT 7 (2d  Quarter
   2016) ........................................................................…………….……………….2

**OBJECTION OF SERVICE EMPLOYEES INTERNATIONAL UNION AND
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW)
TO COMMONWEALTH OF PUERTO RICO'S MOTION PURSUANT TO
BANKRUPTCY RULE 9019 FOR ORDER APPROVING SETTLEMENT
BETWEEN COMMONWEALTH OF PUERTO RICO AND PUERTO RICO
SALES TAX FINANCING CORPORATION [DOCKET ENTRY 4067]**

Service Employees International Union ("SEIU") and International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America (UAW) ("UAW")

submit this objection to the October 19, 2018 *Commonwealth of Puerto Rico's Motion Pursuant*

*to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto*

*Rico and Puerto Rico's Sales Tax Financing Corporation* [Docket Entry No. 4067].

## PRELIMINARY STATEMENT

1.      SEIU and UAW oppose the settlement of the Commonwealth-COFINA

dispute proposed by the Financial Oversight and Management Board for Puerto Rico ("Oversight

Board") because the settlement is not in the best interest of the Commonwealth or the people of

Puerto Rico.  Puerto Rico has a staggering amount of bond debt that needs to be

comprehensively reduced if the Island is ever to regain a secure financial footing.  Given its deep

and widespread poverty, its unreliable and fragile infrastructure, and its feeble rate of growth,

Puerto Rico has far more pressing social and economic needs than most U.S. states, and so

should emerge from these reorganization proceedings with -- at most -- no heavier a debt load

than the average U.S. state.  The proposed settlement, however, would make that outcome

virtually impossible.

2.      Under the settlement, payments to the new COFINA bondholders would,

in 2019, consume virtually the entire debt service that Puerto Rico could pay if it were to achieve

a debt-to-revenue ratio no higher than the average U.S. state.  That would leave Puerto Rico little

or nothing to pay its other bond debt and would undermine its ability to provide essential services to its people.

3.      In years after 2019, the situation would only worsen.  Under the settlement, the COFINA payments would escalate by 4% a year, far outstripping the projected long-term growth rate of Puerto Rico's economy and its tax revenues.  The swelling payments to the new COFINA bondholders would divert funds that Puerto Rico desperately needs for rebuilding its economy and meeting the needs of its people.  Moreover, the settlement would effectively lock in these unaffordable COFINA payments for decades to come.  And, by giving COFINA a "first dollars" claim on the sales and use tax, it would put the risk of any substantial decline in tax revenues squarely on the Commonwealth.

4.      The Oversight Board's most recent certified fiscal plan calls for extensive austerity "measures" and "reforms" that will inevitably cause pain across wide swathes of Puerto Rico's population, especially for its most vulnerable residents.  Yet, the Oversight Board projects that, even if all these measures were implemented, Puerto Rico would still fall into structural deficits in coming years.  Locking the Island into decades of unaffordable COFINA payments will only heighten the risk of a future insolvency.  Indeed, Puerto Rico could well face the same fate as Greece, which, facing a toxic combination of austerity and anemic growth, defaulted on its new debt only a few years after its restructuring.[2]

5.      Congress enacted PROMESA to give Puerto Rico a fresh start, after many years in which the Island's leaders repeatedly entered debt obligations that the Island could not

---

[2] For an analysis of Greece's default, *see* Satyajit Chatterjee, *Chapter 11 for Counties?*, ECONOMIC INSIGHTS: FEDERAL RESERVE BANK OF PHILADELPHIA RESEARCH DEPARTMENT 7 (2d Quarter 2016), available at https://www.philadelphiafed.org/-/media/research-and-data/publications/economic-insights/2016/q2/eiq216_chapter_11.pdf?la=en.

afford.  The Court should not allow the same mistake to be replayed here.  It should reject the proposed settlement.

## BACKGROUND

SEIU and UAW

6.      SEIU represents approximately 1.5 million public service workers throughout North America.  The Commonwealth and its instrumentalities employ approximately 16,000 SEIU members, who belong to either SEIU Local 1996/Sindicato Puertoriqueno de Trabajadores y Trabajadores or SEIU Local 1199/Union General de Trabajadores.  These SEIU members provide a wide array of services to the Commonwealth, including, for example, custodial services in schools and patient care in public hospitals.

7.      UAW has more than 400,000 active members in North America, with approximately 6,800 employed by the Commonwealth or its instrumentalities.  The two largest of UAW's eight chapters in Puerto Rico are UAW Local 2396, which represents school cafeteria workers, and UAW Local 2373, which represents employees of the Commonwealth's Treasury Department.

Puerto Rico's Need to Build its Economy

8.      Puerto Rico needs to build its economy.  Currently, over 40% of the population lives below the poverty line.  *See* October 23, 2018 *New Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity* ("Fiscal Plan"), at 7.  With a 2017 per capita income of just $11,688, Puerto Rico is poorer by far than any U.S. state and approximately 77% below the average U.S. state per capita income.  *See id*. at 36.  Indeed, Puerto Rico is poorer today relative to the mainland than it was in 1970.  *See id*. at 13.  Puerto Ricans suffer not only from extensive poverty but also poor health.  The Island's rates of chronic illnesses like diabetes, asthma and

3

hypertension, as well as premature births and infant mortality, exceed those of the mainland. *See id.* at 102.

9.      Although markedly poorer on average than residents on the U.S. mainland, Puerto Ricans bear a heavy tax burden. They pay income taxes to the Commonwealth at rates comparable to federal tax rates paid by those on the mainland. *See id.* at 36. They also pay a heavy and regressive 11.5% sales and use tax. *See id.* at 109.

10.      Despite paying heavy taxes, Puerto Ricans live on an Island handicapped by a fragile and dilapidated infrastructure. The quality of roads in Puerto Rico ranks second to the bottom among the 50 states, Puerto Rico and the District of Columbia. *See id.* at 60. The electrical grid provides unreliable energy at twice the price of what similar amounts of electricity cost on the mainland. *See id.* at 7, 51. And Puerto Rico's underinvestment in infrastructure grew worse from 2000 to 2014, falling from 3.3% of GDP to 1.4%. *See id.* at 60.

11.      In addition, Puerto Rico's pension funds for its public sector workers are nearly insolvent. *See id.* at 119. Accordingly, the Commonwealth pays benefits under a "pay-as-you-go" system. *See id.* at 29, 119. The Oversight Board projects that such "paygo" pension payments will consume a substantial portion of the Commonwealth's general fund. *See id.* at 119-20.

12.      Not surprisingly, given conditions on the Island, many Puerto Ricans have left and more are expected to leave. The Oversight Board predicts that more than 10% of the population will emigrate in the next five years. *See id.* at 7. Inevitably, the demographics of the outmigration will skew heavily towards the enterprising, the educated and the young, leaving behind a poorer, greyer, more vulnerable population. *See id.* A declining birth rate will further reduce the Island's population. *See id.* at 21 (Exhibit 11).

13.     With a diminished workforce, Puerto Rico's economy will struggle to grow.  Since the Great Recession of 2008, the mainland's economy has bounced back but Puerto Rico's has continued to deteriorate.  Over the past decade, its GNP has shrunk by 20%.  *See id.* at 13.  The Oversight Board projects that in the long term, the Island's economy will grow, but at an anemic rate.  After the stimulus of federal disaster money ends, the annual growth of nominal GNP is projected to settle down to a meager 1.6%.  *See id.* at 32 (Exhibit 19).  The Commonwealth's tax-backed revenues are not expected to rise any faster than that low GNP growth rate.  *See id.* at 31.

Puerto Rico's Staggering Debt Burden

14.     The framers of Puerto Rico's constitution intended that the Commonwealth's debt would remain strictly limited.  First, Article VI, Section 2 of the constitution requires that Puerto Rico's government maintain a balanced budget.  Indeed, the Commonwealth, in advertising its bond offerings, claimed that Puerto Rico would never go broke because its constitution guaranteed a balanced budget.

15.     Second, the Puerto Rico constitution prohibits the Commonwealth from issuing additional bonds pledged against its taxing power if the Commonwealth's existing debt obligations exceed 15% of average annual revenues.

16.     Unfortunately, despite these constitutional limits, the Commonwealth's leaders have over the years managed to amass what the Oversight Board describes as a "staggering debt burden." Fiscal Plan 13.  Puerto Rico now has about $70 billion in financial debt, including approximately $45 billion in net tax-supported debt.  *See id.* at 7, 35.

17.     According to the Oversight Board, U.S. states are the most appropriate comparators to use to assess the magnitude of Puerto Rico's debt load.  *See id.* at 35-36.  The average state in the United States has net tax-supported debt equal to 2.6% of the state's gross

domestic product.  *See id.* at 36 (Exhibit 22).  The debt-to-GDP ratio of the top 10 most indebted

states is less than 6%.  *See id.*  By contrast, Puerto Rico's debt-to-GDP ratio exceeds 55%.  *See
id.*

18.     Another key measure of debt is the ratio of a government's debt service to

its revenues (excluding federal transfers).  For the average U.S. state, that ratio is 4.5%.  *See id.*

The debt-to-revenue ratio of the top ten most indebted states is 9.2%.  Puerto Rico's debt-to-

revenue ratio is 28.1%.  *See id.*

19.     This mountain of debt -- multiple times the average of even the most

indebted U.S states -- is clearly unsustainable.  Puerto Rico could not possibly pay it and have

revenue left over for the essential services that its public-sector workers provide each day.  The

debt overhang also restricts the Commonwealth's ability to tap capital markets for future

projects.  *See* David A. Skeel Jr., *Reflections on Two Years of P.R.O.M.E.S.A.*, UNIV. PA. L.

SCHOOL, PENN LAW; LEGAL SCHOLARSHIP REPOSITORY 862, 883 (2018) (hereafter, "Skeel") ("If

Puerto Rico does not restructure its debt sufficiently—and as a result is not fully on its way to

fiscal balance—future investors will be reluctant to lend to Puerto Rico.").[3]

20.     As the Oversight Board acknowledges, "Puerto Rico needs a

comprehensive restructuring of its debt[.]"  Fiscal Plan at 11.

The Most Recent Certified Fiscal Plan

21.     The Oversight Board's latest fiscal plan, certified October 23, 2018, calls

for extensive and painful austerity measures, measures that have triggered cries of opposition

---

[3] Available at https://scholarship.law.upenn.edu/faculty_scholarship/1990.

from members of Congress, the Governor and Island residents.[4]  Schools will be shuttered,
government agencies merged or closed, subsidies to cities and to the University of Puerto Rico
slashed, payroll for public-sector workers frozen, benefits rolled back, and pensions cut.  *See*
Fiscal Plan at 72, 74, 76 122.  What is utterly remarkable about the Oversight Board's certified
fiscal plan is that it predicts that even with these drastic "measures" and "reforms," the
Commonwealth will eventually fall back into the red, as federal disaster relief funds recede and
healthcare costs mount.  *See id*. at 11 (Exhibit 4), at 33 (Exhibit 21).  And it predicts that the
Commonwealth will be running these deficits even *before* payment of debt service.  *See id*. at 22
("even after fiscal measures and structural reforms *and before contractual debt service*, there is
an annual deficit reflected in the projection starting in FY2034") (emphasis added).

      22.     Of course, even this prediction of Puerto Rico's future may prove overly
optimistic.  The Puerto Rican economy may experience more sluggish growth than projected,
outmigration may exceeded expectations, or medical costs could escalate faster than anticipated.
*See id.* at 34.  There is also what the Oversight Board calls "implementation risk," *id*. at 34,  the
very real likelihood that the Commonwealth will not enact all the "measures" and "reforms" on
which the Oversight Board rests its projections, or will implement them inadequately or
grudgingly.  All of this makes the Fiscal Plan projections highly uncertain.  As Oversight Board
member and bankruptcy law scholar David Skeel has written, the fiscal plan projections "are

---

[4] *See, e.g., Rep. Nydia Velazquez Challenges Continuing Austerity Measures Included in Puerto Rico Fiscal Plan*, NEW YORK DAILY NEWS (Oct. 30, 2018), available at
http://www.nydailynews.com/news/national/ny-news-puerto-rico-fiscal-plan-nydia-velazquez-20181030-story.html.

complex, and some of the key variables are highly uncertain," and "[w]e cannot rule out the possibility that they will prove to be wrong." *See* Skeel, at 881, 883.[5]

23.     It is against this backdrop -- that the Oversight Board is projecting future structural deficits even before debt service -- that the Court should consider, and reject, the COFINA settlement.  This settlement cannot serve as the bedrock upon which this Title III case hinges because it is doomed to fail, even under the Oversight Board's own fiscal plan.

COFINA

24.     Puerto Rico's legislature created COFINA in 2006 as an instrumentality of the Commonwealth.  *See* Docket Entry No. 4067, at 14.[6]  The legislature imposed a sales and use tax ("SUT") of 5.5% on a broad range of goods and services, *see id.* at 18, and authorized COFINA to issue bonds payable from a dedicated portion of that tax, known as the Pledged Sales Tax Base Amount ("PSTBA").  A 2007 resolution by COFINA, amended in 2009, fixes the amount of the PSTBA.  *See id.* at 15-17.  In FY2019, the PSTBA will be $783.2 million, and it will grow by 4% a year after that, until reaching a cap of $1.85 billion in FY2041.  *See id.* at 9.

25.     The SUT revenues are held in an account at Bank of New York-Mellon ("BNYM").  *See id.* at 15-16.

26.     COFINA issued bonds each year from 2007 through 2011.  *See id.* at 81.  Although intended as a means to repay debt, the COFINA bond proceeds were also used to finance ongoing government operations.  *See* United States Government Accountability Office,

---

[5] Indeed, the enormous swing in projections between the Oversight Board's current October 23, 2018 fiscal plan and the May 2018 fiscal plan that proceeded it by just a few months demonstrates the malleability, and profound uncertainty, of the projections.  *Compare* Fiscal Plan, at 140 (Exhibit 82) *with* May 30, 2018 plan, at 123 (Exhibit 77)

[6] Page references to docket entries are to the page numbers stamped at the top of the page by the court's electronic filing system, not to the document's own pagination.

*Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them* (May 2018) (hereafter, "GAO Report"), at 38.[7]

27.  Currently, COFINA owes approximately $17.6 billion to its bondholders. *See* Docket Entry  No. 4067, at 15-16.  That is less than 40% of Puerto Rico's approximately $45 billion in net tax-supported debt, *see* Fiscal Plan at 35, and less than a quarter of Puerto Rico's $70 billion in overall financial debt, *see id*. at 7.

Commonwealth-COFINA Dispute

28.  In its August 10, 2017 *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute*, Docket Entry No. 996, the Court set forth a procedure to resolve the dispute over whether the sales and use tax purportedly pledged to COFINA was the property of COFINA or the Commonwealth.  *See id*. at 4 (¶4).  The order approved the Oversight Board's appointment of the Official Committee of Unsecured Creditors ("UCC") as the Commonwealth's agent in the dispute and its appointment of Bettina Whyte as the COFINA agent.  *See id*. (¶4(a)).  The stipulation and order authorized the two agents to litigate the COFINA dispute or to negotiate a settlement of it.  *See id*. ((¶4(f)).

29.  The stipulation and order provided that, unless agreed to by all signatories, any proposed settlement that was not included in a Commonwealth plan of adjustment would be subject to Court review.  *See id*. at 7-8 (¶4(j)); *see also id*. at 8 (¶4(k)) (permitting all parties in interest to be heard "with respect to any proposed settlement").

30.  On September 8, 2017, the UCC initiated the instant litigation over the Commonwealth-COFINA dispute by filing its complaint in *Official Committee of Unsecured Creditors v. Whyte*, Adversary Proceeding No. 17-00257-LTS.  *See* Docket Entry No. 1 in Adv.

---

[7] Available at https://www.gao.gov/products/GAO-18-387.

Proc. 17-00257-LTS.  The UCC claimed that the Puerto Rico legislature's purported transfer of

future SUT revenues to COFINA amounted to nothing more than an unsecured promise.  *See id*.

2-3.  At most, the UCC claimed, the purported transfer to COFINA constituted a grant of a

security interest in after-acquired property that never became enforceable against the

Commonwealth and, in any event, was not perfected under Article 9 of the Uniform Commercial

Code and was thus avoidable.  *See id*.  Moreover, the UCC asserted, the commencement of the

Commonwealth's Title III case cut off any security interest that COFINA may have had in the

SUT revenues.  *See id*.

31.     The UCC's complaint claimed further that COFINA was an

unconstitutional scheme to evade the constitutional debt limit of the Puerto Rico constitution and

its balanced budget clause.  *See id*. at 30-37.  The UCC explained that the constitution's debt

limit in Article VI, Section 2 applied to COFINA because COFINA's only purpose was to pay

the Commonwealth's debt and expenses and its only source of revenue was the pledged portion

of the Commonwealth's sales and use tax.  *See id*. at 31.  The complaint showed that Puerto Rico

exceeded its debt limit by 2009 at the latest, while COFINA continued issuing bonds through

2011.  *See id*. at 32; Docket Entry No. 1-2, at 2 (Exhibit B).

32.     According to the UCC, COFINA bonds also ran afoul of the provision in

Article VI, Section 2 of the Puerto Rico constitution that "no such bonds or notes issued by the

Commonwealth for any purpose other than housing facilities shall mature more than 30 years

from their date."  *See* Adv. Proc. Case No 17-00257-LTS, Docket Entry No. 1, at 31-32.  The

complaint noted that some of the COFINA bonds were issued with maturities of 48 and 50 years.

*See id*. at 32.

33.     As a result, the UCC asserted, all the SUT revenues were Commonwealth property. *See id*. at 37.

The Initial Settlement of the Commonwealth-COFINA Dispute

34.     On June 5, 2018, after having filed cross-motions for summary judgment, the UCC and the COFINA agent announced that they had reached an agreement in principle on the settlement of the dispute. *See* Adv. Proc. No. 17-00257-LTS, Docket Entry No. 484. The agreement (hereafter, "Original Settlement") provided that COFINA would issue new bonds with a fixed maturity of not more than 40 years. *See* Docket Entry No. 4067, at 93. It further provided that 53.65% of the PSTBA each year would go to COFINA to pay these new bonds, as would all of the accumulated cash in the BNYM account. *See id.* at 91.

35.     While the Original Settlement provided that COFINA's portion of the PSTBA would come from the "first dollars" of the 5.5% SUT, and that the Commonwealth's portion would come from what remained, *see id*., it did not make the Commonwealth liable for the COFINA payments in the event that, in a given year, the 5.5% SUT was insufficient to pay COFINA's portion in full.

36.     The Original Settlement also allowed the Oversight Board to make the new COFINA bonds callable. *See id.* at 95. Refinancing the COFINA bonds could have generated substantial savings for the Commonwealth, savings it could have used to pay for Commonwealth expenses.

37.     The Original Settlement permitted COFINA to issue additional bonds in the future provided, among other things, that such new bonds were within the debt limits of Article VI, Section 2 of Puerto Rico's constitution. *See id.*

38.     The Original Settlement did not require the Commonwealth to pay any of the expenses of the parties on the COFINA side of the deal. *See id*. at 93-94.

The Oversight Board's Settlement

39.     Although the Court's August 10, 2017 stipulation and order authorized

only the UCC and the COFINA agent to resolve the Commonwealth-COFINA dispute, on

August 8, 2018, the Oversight Board announced that it, COFINA, AAFAF and certain

bondholders had reached their own settlement of the dispute (the "Oversight Board Settlement"),

an agreement that was later amended and revised on September 20.  *See* Docket Entry No. 4067,

at 37-38.

40.     Like the Original Settlement, the Oversight Board Settlement -- which is

set forth in the parties' Amended and Restated Plan Support Agreement ("ARPSA") -- provides

that COFINA will receive 53.65% of the PSTBA in any given fiscal year and that COFINA's

portion will come from "first dollars" of the 5.5% SUT.  *See* Docket Entry No. 4067, at 40;

Docket Entry No. 4068, at 171, 181.  The Commonwealth would receive the residual amount of

the PSTBA, if any, after COFINA received its portion.  *See id*. at 171, 181.  For example, in

FY2019, COFINA would receive $420 million of the $783 million PSTBA, leaving, at most,

$363 million for the Commonwealth.  *See id*. at 197.  In 2041, when the PSTBA peaks at $1.85

billion, COFINA would receive $992 million.  *See id.*  COFINA would continue to receive that

amount through 2058.  *See id.* [8]

41.     In addition, the Oversight Board Settlement gives COFINA nearly all of

the approximately $1.2 billion in SUT revenues deposited before 2019 in the BNYM account.

*See* Docket Entry No. 4067, at 41.[9]

---

[8] A carefully defined and narrow exception to this "first dollars" rule could allow a small portion of the 5.5% SUT to go first to the Commonwealth, if the Commonwealth's budgets are balanced and other exacting circumstances are met.  *See id*. at 181.

[9] Approximately $78 million of the BNYM cash would go to other purposes.  *See* Docket Entry No. 4067, at 41-42.

42.      Like the Original Settlement, the Oversight Board Settlement provides for
the issuance of new COFINA bonds, certain of which do not mature until 2058.  *See* Docket
Entry No. 4068, at 178.  Under the settlement, the holders of these new bonds would have a
statutory first lien on COFINA's share of the PSTBA.  *See id.* at 179.

43.      While similar in some key respects to the Original Settlement, the
Oversight Board Settlement is in certain ways materially worse for the Commonwealth.  For
example, the Oversight Board Settlement expressly provides that COFINA shall continue to
receive its portion of the PSTBA until the new COFINA bonds "have been paid or satisfied in
full."  Docket Entry No. 4068, at 181.  Thus, if a future economic trauma to the Island causes the
5.5% SUT to fall below the amount owed COFINA, the shortfall nonetheless "shall remain due
and owing until paid in full" and, until paid, shall accrue interest compounded annually.  *See id.*
at 178.  As a result, if in one or more years the 5.5% SUT falls short, the Commonwealth could
have to continue paying the new COFINA bonds well beyond 2058, until all the bondholders are
fully paid.

44.      In addition, while the Original Settlement set no time restriction on when
the new COFINA bonds could become callable, the Oversight Board Settlement provides that the
new COFINA bonds are callable no earlier than 2028 (with the exception of the 2032 bonds,
which would be callable in 2025).  *See id.* at 180.  Moreover, under the Oversight Board
Settlement, savings from any refinancing would have to be applied to any unpaid amounts owed
to the new COFINA bondholders before they could be used by the Commonwealth.  *See id.* at
179.

45.      The Oversight Board Settlement also provides for "consummation costs,"
payable by the Commonwealth to various bondholder parties, purportedly "to compensate" them

13

for, among other things, "the cost of negotiation, confirmation and consummation" of the settlement. *See id*. at 190.

      46.    Significantly, unlike the Original Settlement, the Oversight Board Settlement nowhere states that additional COFINA bonds would be subject to the debt limits of the Puerto Rico constitution.

      47.    In the Oversight Board Settlement, the Commonwealth covenants that it will not reduce the SUT below 5.5% until all the new COFINA bondholders have been fully paid (unless before any such reduction, certain specified rating agencies determine that the reduction would not downgrade or reduce below A2/A the credit ratings of the COFINA bonds.) *See id.* at 181. The Commonwealth also covenants that, until all the new COFINA bondholders are fully paid, it will not take any action that would impair either COFINA's receipt of its portion of the PSTBA or the collection of COFINA's share of the 5.5% SUT taxes. *See id*. at 182. Finally, under the settlement, if the Commonwealth enacts legislation providing a revenue stream for the COFINA bondholders other than the SUT, such revenue stream would have to come from a tax of general applicability or otherwise provide comparable security for the COFINA bondholders and, in addition, certain ratings agencies would have to determine that the ratings of the COFINA bonds were not downgraded or reduced below the credit rating A2/A. *See id*.

The Instant Motion

      48.    In the instant motion seeking approval of the Oversight Board Settlement, the Oversight Board asserts that the settlement is "fair and reasonable." Docket Entry No. 4067, at 10. However, the motion contains no analysis showing that the Commonwealth can afford the contemplated new COFINA debt.

49.     As explained below, the Court should reject the proposed settlement because it gives too much to COFINA and leaves too little tax revenue to meet both other debt obligations and the critical needs of Puerto Rico's people.

### ARGUMENT:  THE OVERSIGHT BOARD HAS FAILED TO MEET ITS BURDEN OF DEMONSTRATING THAT THE SETTLEMENT IS IN THE BEST INTEREST OF THE COMMONWEALTH

### I.     THE PROPOSED SETTLEMENT IS SUBJECT TO COURT REVIEW

50.     First, there can be no dispute that the proposed settlement is subject to Court review.  The August 10, 2017 stipulation and order made any proposed settlement of the Commonwealth-COFINA dispute subject to such review, so long as it was not approved by all signatories or part of a Commonwealth plan of adjustment.  *See* Docket Entry No. 996, at 7-8 (§§4(j), 4(k)).  Moreover, the ARPSA provides that the Oversight Board shall file a motion seeking approval of any settlement of the dispute.  *See* Docket Entry No. 4068, at 167.

### II.     THE PROPONENT OF A SETTLEMENT MUST SHOW THAT IT IS IN THE BEST INTEREST OF THE ESTATE

51.     The proponent of a settlement in a reorganization proceeding bears the burden of demonstrating that it is in the best interest of the estate.  *See In re C.R. Stone Concrete Contractors, Inc.*, 346 B.R. 32, 49 (Bankr. D. Mass. 2006); *In re 110 Beaver Street Partnership*, 244 B.R. 185, 187 (Bankr. D. Mass. 2000); *In re Hydronic Enter., Inc.*, 58 B.R. 363, 365 (Bankr. D.R.I. 1986) ("even if it is concluded that the settlement is above the lowest level of reasonableness, in our discretion we may still deny approval, if not in the best interest of the estate").

52.     In deciding whether the movant has met its burden, the court must exercise independent judgment.  *See In re Boston & Providence R.R. Corp.*, 673 F.2d 11, 12-13 (1st Cir. 1982).  "The court may not act as a mere rubber stamp or rely on the trustee's word that

15

the compromise is reasonable." *110 Beaver Street*, 244 B.R. at 187 (striking down proposed

settlement as outside the range of reasonable compromises because of its adverse effect on the

debtor); *see also Boston & Providence R.R. Corp.*, 673 F.3d at 12-13 (concluding that record did

not support proposed compromise); *C.R. Stone*, 346 B.R. at 50 (court holding that trustee failed

to meet its burden of demonstrating the benefit of the proposed settlement); *Hydronic Enter.*, 58

B.R. at 368 (denying petition for approval of settlement).  In exercising its independent

judgment, the court is free to consider any factors relevant to "a full and fair assessment of the

wisdom of the compromise." *110 Beaver Street*, 244 B.R. at 187.

       53.     Here, as explained below, the Oversight Board falls well short of

establishing the wisdom of the proposed settlement or that it is in the best interest of the

Commonwealth.

## III.    THE OVERSIGHT BOARD SETTLEMENT WOULD BURDEN THE COMMONWEALTH FOR DECADES TO COME WITH UNSUSTAINABLE BOND DEBT

       54.     As the Oversight Board acknowledges, Puerto Rico has a "staggering

debt burden" that demands "comprehensive restructuring."  Fiscal Plan 11, 13.  If Puerto Rico

and its people are going to have any realistic prospect of rebuilding the Island's economy,

accessing capital markets in the future, and achieving some modicum of prosperity, the

Commonwealth's existing bond debt needs to be cut deeply.

       55.     In a recent study of Puerto Rico's debt, Columbia University economist

and Noble prizewinner Joseph Stiglitz and his co-authors concluded that "the most conservative

estimate of the territory's relief needs" would include full cancellation of interest payments on

bonds "plus 50 to 80 percent of face value reduction."  Pablo Gluzmann, Martin Guzman, and

Joseph Stiglitz, *An Analysis of Puerto Rico's Debt Relief Needs to Restore Debt Sustainability*
ESPACIOS ABIERTOS (Jan. 2018), at 4.[10]

56.     The proposed settlement simply does not cut the debt enough even under
this "most conservative estimate."  The settlement reduces COFINA's claimed portion of the
PSTBA by less than 47%.  That reduction becomes even smaller when one factors into the
Commonwealth-COFINA percentage split COFINA's capture of nearly all of the $1.2 billion in
pre-2019 deposits in the BNYM account.  Such a modest reduction of such a significant portion
of the Commonwealth's bond debt is simply inconsistent with what Puerto Rico and its people
need to achieve a meaningful fresh start in these reorganization proceedings.

57.     The inadequacy of the settlement becomes clear when one compares
Puerto Rico's staggering debt to that of the U.S. states, a comparison that the Oversight Board
deems appropriate.  *See* Fiscal Plan at 35-36.  Because of its extensive and severe poverty, its
dilapidated and vulnerable infrastructure, and its weak growth prospects, Puerto Rico needs to
spend less on debt service -- and more on meeting the pressing needs of its people and on
rebuilding its economy -- than the average U.S. state.  *See* Gregory Makoff, *An Update on
PROMESA and a Proposal for Restructuring Puerto Rico's Debt*, CENTRE FOR INTERNATIONAL
GOVERNANCE INNOVATION, Policy Brief No. 129 (April 12, 2018), at 5.[11]  That the Oversight
Board's latest certified fiscal plan predicts future deficits even *before* debt payment shows how
little Puerto Rico has to spare on debt service.  But even assuming, *arguendo*, that Puerto Rico's

---

[10] Available at http://www.shankerinstitute.org/sites/shanker/files/PR_DSA-
2018.01%20Guzman%20Stiglitz.pdf.

[11] Available at https://www.cigionline.org/publications/update-promesa-and-proposal-restructuring-
puerto-ricos-debt.

debt load only needed to be reduced to the U.S. state average, the settlement's reduction of the COFINA debt would still be far too small.

58.      To reduce Puerto Rico's debt-to-GDP level of 55.1% to the U.S. state average of 2.6%, would require a reduction of Puerto Rico's debt to 4.7% of its current level (2.6 is 4.7% of 55.1)  To reduce Puerto Rico's debt-to-revenue ratio of 28.1% to the U.S. state average of 4.5%, would require shrinking the Commonwealth's debt to 16% of what it is now (4.5 is 16% of 28.1).  A settlement that cuts a major portion of Puerto Rico's bond debt by less than 47% falls far short of the comprehensive reduction needed.

59.      In its May 30, 2018 certified fiscal plan, issued before the COFINA settlement, the Oversight Board found Puerto Rico's FY2018 tax revenue (excluding federal funds) to be approximately $10 billion, and it projected the revenue to stay in that range through FY2023.  *See* May 30, 2018 *New Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity*, at 123 (Exhibit 77).  To achieve the 4.5% debt-to-revenue ratio of the average U.S. state, Puerto Rico would need an annual debt burden -- across the entirety of its bond debt -- of less than $450 million (.045 x $10 billion).  The proposed settlement would require the Commonwealth in FY2019 to pay COFINA $420 million.  *See* Docket Entry No. 4068, at 197.  Thus, the proposed deal -- right from the start -- would by itself consume nearly all of Puerto Rico's debt capacity, if Puerto Rico's debt burden were to be on par with that of the average U.S. state.

60.      Perhaps one could argue in favor of the settlement if Puerto Rico had no bond debt other than COFINA's and if the COFINA debt service remained constant in real terms over time.  But neither of these things is true.

61.      COFINA constitutes a significant portion, but only a portion, of the Island's existing $45 billion in tax-backed bond debt and $70 billion in overall financial debt.

These reorganization proceedings will undoubtedly result in Puerto Rico having to pay

substantial amounts to bondholders other than COFINA's.  The Ad Hoc Group of General

Obligation ("GO") Bondholders, who hold a significant portion of Puerto Rico's bond debt,

claim that their bonds have a priority secured by Puerto Rico's constitution.  *See, e.g.,* Docket

Entry No. 16 in *Bank of New York Mellon v. COFINA et.al*, Adv. Proc. No. 17-00133-LTS; *see*

*also* Docket Entry No. 4079.  Despite signaling early on that they might oppose the COFINA

settlement, the GO bondholders have now agreed not to oppose it, *see* Docket Entry No. 4067, at

38, 52 -- perhaps because they now have reason to believe that the Oversight Board intends to

treat their bond claims generously too.  If the GO bondholders received a payout comparable to

the COFINA bondholders, where would the money come from to pay both groups, as well as

other bondholders?  *See* Brad Setser, *Will the Proposed Restructuring of COFINA Bonds Assure*

*Puerto Rico's Return to Debt Sustainability?* COUNCIL ON FOREIGN RELATIONS (Sept. 27, 2018)

(hereinafter "Setser") (the GO bondholders "will no doubt argue for a mirror image deal that

would raise Puerto Rico's debt service to $2 billion").[12]  The settlement urged here recklessly

forges a commitment to COFINA's new bondholders that would leave Puerto Rico with little or

nothing to service its other bond debt, if it were to limit its debt-to-revenue ratio to the U.S. state

average.

    62.    The commitment to COFINA is reckless even when one considers only

FY2019.  But the proposed settlement will become even more unaffordable with time.  As the

PSTBA escalates by 4% per year, the burden of payments to COFINA will rise inexorably, until

---

[12] Available at https://www.cfr.org/blog/will-proposed-restructuring-cofina-bonds-assure-puerto-
ricos-return-debt-
sustainability?sp_mid=57542461&sp_rid=bWFyay5sZXZpbnNvbkBzZWl1Lm9yZwS2.  Setser, an
economist who is a fellow for international economics at the Council on Foreign Relations, served as
deputy assistant secretary for international economic analysis in the U.S. Treasury.  *See*
*https://www.cfr.org/expert/brad-w-setser*.

reaching a peak of nearly $1 billion in FY2041, and then continuing at that level through

FY2058 (and possibly beyond). *See* Docket Entry No. 4068, at 197. This steady swelling of the

required COFINA payments by 4% per year would far outpace the feeble growth of the Puerto

Rican economy, whose nominal long-term GNP growth the Oversight Board projects at 1.6%.

*See* Fiscal Plan, at 32 (Exhibit 19). Even that projected meager growth assumes the Oversight

Board's "measures" and "reforms" are fully implemented, and that its projections are accurate.

Because the Island's tax-revenues are expected to grow no faster than nominal GNP, *see id*. at

31, the growing payments to COFINA will inevitably siphon off a greater and greater share of

the Commonwealth's scarce revenues, money that could otherwise be used to repair roads, build

infrastructure, pay pensions, fund healthcare, and meet the countless other pressing needs of the

Puerto Rican people.

63.     At least under the Original Settlement, which put no time restriction on

when the new COFINA bonds would be callable, the Commonwealth could save some money by

refinancing under more favorable rates. *See* Docket Entry No 4067, at 95. The Oversight Board

Settlement, however, precludes the Commonwealth from refinancing until years in the future,

and stipulates that any savings it produces goes first to repay any unpaid amounts owed to

COFINA. *See* Docket Entry No. 4068, at 179-180.

64.     The Oversight Board Settlement would bind the Commonwealth to

unaffordable payments for decades, until all the new COFINA bondholders are paid. That would

not be until 2058, at the earliest. Those payments could stretch beyond 2058 if an economic

calamity resulted in the 5.5% SUT providing less than the required COFINA payment in one or

more years, forcing the Commonwealth to make additional payments plus compounded interest.

Like a biblical curse, the decades' long burden of the COFINA settlement would rest not just

20

upon the current generation of Puerto Ricans, but upon their children, and perhaps their children's children.

65.     The tax burdens needed to sustain these debt payments, coupled with weak long-term economic growth, would likely fuel more outmigration.  *See* Setser ("[S]o long as workers can earn more—and get more federal benefits—in Orlando than San Juan, a certain fraction of the rising cohort of new Puerto Ricans will move off-island.").  Such increased outmigration would slow Puerto Rico's economic output further, reduce tax revenues, and -- in a spiral of decline -- make the debt burden that much more unsustainable.

66.     As explained above, even if Puerto Rico's tax revenues continue as projected, the proposed settlement imposes an unsustainable burden.  But, of course, the long-term future performance of Puerto Rico's economy, and the tax revenues it generates, are highly uncertain.  Puerto Rico has a history of overestimating tax revenues.  *See* GAO Report, at 16.  The odds are that in the decades between now and 2058, one or more macroeconomic calamities or natural disasters will devastate Puerto Rico, flattening both its economy and its tax revenues.  But because the Oversight Board Settlement provides that COFINA be paid "first dollars" from the 5.5% SUT, *see* Docket Entry No. 4067, at 91, it shields the COFINA bondholders from the risks of the Island's future economic underperformance, placing that risk squarely on the Commonwealth.  Moreover, rather than offering the Commonwealth any relief in the event of an unforeseen catastrophe, the Oversight Board Settlement would make the Commonwealth responsible for making up any missed payments, plus compounded interest.  *See* Docket Entry No. 4068, at 178.

67.     Adding insult to injury, the Oversight Board Settlement would have the Commonwealth pay various bondholders for their costs incurred in negotiating this exceptionally bad deal.  *See id*. at 190.

68.     The Oversight Board's latest fiscal plan predicts that Puerto Rico will fall back into structural deficits by 2034, even after implementation of all the "measures" and "reforms" in the plan and before any debt payment.  *See* Fiscal Plan at 11 (Exhibit 4), at 22, at 33 (Exhibit 21).  That means, even under the Oversight Board's analysis, the risk of future insolvency looms, which could entail another round of reorganization.  Handcuffing Puerto Rico to a decades' long obligation to make increasingly unaffordable payments to the COFINA bondholders will only heighten the risk of a future default.  It makes a mockery of the Oversight Board's frequent refrain that it is pursuing a "once and done" approach to this Title III proceeding.

69.     COFINA's original sin was that it served to end run the debt limit in Article VI, Section 2 of the Puerto Rico constitution.  The Original Settlement sought to address that, by providing that any additional new COFINA bond issuances would count against the constitution's debt limit.  *See* Docket Entry No. 4067, at 95.  The Oversight Board Settlement, however, offers no such protection, creating the risk of Puerto Rico again falling into the dangerous trap of issuing debt beyond the limit.

70.     The Oversight Board argues that the settlement is "eminently reasonable" because the Commonwealth might have lost the Commonwealth-COFINA litigation.  *See* Docket Entry No. 4067, at 38.  It cites the First Circuit for the proposition that "'[i]n bankruptcy, as in life, half a loaf is sometimes better than none.'"  *Id*. at 52 (*quoting City Sanitation, LLC v. Allied Waste Servs.*, 656 F.3d 82, 93 (1st Cir. 2011)).  That is sometimes true -- but not when you need

more than half the loaf to survive.  As explained, the Commonwealth simply cannot afford to give away well over half of the PBSTA revenues and have enough left to rebuild Puerto Rico's economy and infrastructure, meet the pressing needs of Puerto Rico's people, and service other debt obligations.

71.    To justify the settlement, the Oversight Board also points to "the complexity of the issues, and the expense and delay caused by protracted litigation of the Commonwealth-COFINA Dispute."  Docket Entry No. 4067, at 50.  The litigation has been expensive and complex.  But if the Commonwealth becomes insolvent again in coming years, and has to undergo another entire round of restructuring, the cost and complexity of that "Title VI" case (Title III x 2) would be far more expensive and would generate far more uncertainty.  Also, while resolving the Commonwealth-COFINA litigation could take some time, that time would be nothing compared to the decades during which the Puerto Rico people will have to live under this onerous settlement.  Rushing to reach this deal, just to get it done, makes no sense.

72.    Finally, the Oversight Board argues that the settlement will give the Commonwealth future access to capital markets.  *See* Docket Entry No. 4067, at 53.  In fact, it will impair Puerto Rico's ability to tap into such markets for future financing.  Future investors will be hesitant to buy new bonds issued by the Commonwealth if they lack confidence in the Commonwealth's ability to repay the unaffordable new COFINA bonds and its other reorganized debt.  *See* Skeel, at 883.

73.    One might ask why the Commonwealth agreed to the settlement if it is not in the best interest of the Commonwealth and the Puerto Rican people.  The fact is that Puerto Rico's elected leaders have had a notorious track record of undertaking obligations to bondholders that the Island cannot afford -- closing their eyes and crossing their fingers, and

hoping that it will all somehow work out in the end.  *See* GAO Report at 22-23 ("Puerto Rico's

government made decisions that contributed to the accumulation of unsustainable debt despite

constitutional controls meant to prevent that occurrence").  It is exactly that reckless approach

that landed Puerto Rico in the debt crisis in the first place.  This Court should not allow it to

happen again here.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should deny the motion.

Dated:  November 15, 2018

Respectfully submitted,

/s/ *Peter D. DeChiara*

Richard M. Seltzer
Peter D. DeChiara
Hiram M. Arnaud
COHEN, WEISS AND SIMON LLP
900 Third Avenue
New York, New York 10022-4869
Tel.:  (212) 563-4100
Fax:  (646) 473-8216
rseltzer@cwsny.com
pdechiara@cwsny.com
harnaud@cwsny.com

/s/ *Miguel Simonet Sierra*

Miguel Simonet Sierra
USDC # 210101
MONSERRATE SIMONET & GIERBOLINI
101 San Patricio Ave.
Suite 1120
Guaynabo, PR 00968
Tel.: (787) 620-5300
Fax: (787) 620-5305
msimonet@msglawpr.com

Attorneys for Service Employees International
Union and International Union, United Automobile,
Aerospace and Agricultural Implement Workers of
America (UAW)

24

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 15th day of November 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will notify all counsel of record and caused to be mailed or emailed a copy, as provided in the Court-approved Case Management Procedures in this case.

Dated: November 15, 2018          /s/ *Peter D. DeChiara*

Peter D. DeChiara