**EXHIBIT B**

**COMMONWEALTH OF PUERTO RICO**
**Financial Information and Operating Data Report**
**November 6, 2015**

# TABLE OF CONTENTS

Page

**INTRODUCTION** ..................................................................................................................1

Report Does Not Cover Public Corporations ..................................................................1
Forward-Looking Statements ........................................................................................1

**BASIC FACTS ABOUT THE COMMONWEALTH** .........................................................3

Location and Population ................................................................................................3
Relationship with the United States ...............................................................................3
Official Languages .......................................................................................................3
Government .................................................................................................................4
Fiscal Year ..................................................................................................................4
General Fund................................................................................................................4
Principal Officers Responsible for Fiscal Matters ...........................................................4

**RECENT EVENTS**.................................................................................................................7

**RISK FACTORS** .................................................................................................................34

**FISCAL CONDITION** ........................................................................................................51

Overview; Creation of Working Group for the Economic Recovery of Puerto Rico; Release of Fiscal
and Economic Growth Plan; Filing of  Legislation .....................................................51
Prior Actions Taken by Current Administration to Achieve Fiscal Stabilization and Economic Growth ........51
Other Fiscal Measures Taken by Commonwealth ..........................................................53
Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2015; Projected
Budget Deficit for Fiscal Year 2015 .........................................................................53
Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2014 ...............................55
Fiscal Year 2016 Budget ..............................................................................................57
GDB Funding and Liquidity .........................................................................................58
Historical General Fund Budget Deficits .......................................................................62
Financial Condition of Selected Component Units ..........................................................66
Condition of the Retirement Systems ............................................................................73
Liquidity Analysis of the Commonwealth by Conway MacKenzie .................................77
Enactment of Fiscal Sustainability Act .........................................................................78
Enactment of Puerto Rico Public Corporations Debt Enforcement and Recovery Act ....................................79
United States Bankruptcy Code Amendment Initiative ...................................................82

**THE ECONOMY** .................................................................................................................83

Overview.....................................................................................................................83
Economic Forecast for Fiscal Years 2015 and 2016 .......................................................87
Fiscal Year 2014 .........................................................................................................87
Fiscal Year 2013 .........................................................................................................88
Employment and Unemployment ..................................................................................88
Economic Performance by Sector ..................................................................................90
Higher Education .........................................................................................................103
Tax and Other Economic Development Initiatives ..........................................................104

**DEBT** ...................................................................................................................................117

Public Sector Debt ......................................................................................................117
Variable Rate Bonds and Mandatory Tender Bonds .......................................................122
Interest Rate Exchange Agreements ..............................................................................122
Commonwealth Guaranteed Debt ..................................................................................124

Trends of Public Sector Debt ...................................................................................................125
Debt of the Public Corporations ..............................................................................................126

**RATINGS** .........................................................................................................................................**128**

**COMMONWEALTH TAXES, OTHER REVENUES, AND EXPENDITURES** ...............................**129**

Overview ....................................................................................................................................129
Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2015 Compared to
    Fiscal Year 2014 ..................................................................................................................132
Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2014 Compared to
    Fiscal Year 2013 ..................................................................................................................133
General Fund Budgetary Revenues and Expenditures for Fiscal Year 2013 Compared to Fiscal Year
    2012 .....................................................................................................................................134
General Fund Budgetary Revenues and Expenditures for Fiscal Year 2012 Compared to Fiscal Year
    2011 .....................................................................................................................................134
Income Taxes .............................................................................................................................135
Pass-Through Entities ...............................................................................................................140
Special Excise Tax (Act 154) ....................................................................................................140
Sales and Use Taxes ..................................................................................................................142
Excise Taxes ..............................................................................................................................144
Property Taxes ...........................................................................................................................145
Other Taxes and Revenues ........................................................................................................146
Revenues from Non-Commonwealth Sources ..........................................................................146
Administrative Measures to Increase Collections of Income, Sales, and Excise Taxes and Property
    Taxes ...................................................................................................................................148
Federal Grants ...........................................................................................................................150

**BUDGET OF THE COMMONWEALTH OF PUERTO RICO** ...............................................**151**

Office of Management and Budget .............................................................................................151
Budgetary Process .....................................................................................................................151
Financial Control and Adjustment Procedures ..........................................................................152
Appropriations ...........................................................................................................................153
Budget for Fiscal Year 2016 .....................................................................................................154
Differences between Budget and Basic Financial Statements ...................................................157

**RETIREMENT SYSTEMS AND OTHER POST-EMPLOYMENT BENEFITS** .....................**158**

Overview ....................................................................................................................................158
Governance ................................................................................................................................159
Covered Employees ...................................................................................................................160
Funding Requirements ...............................................................................................................161
Benefits and Special Benefits ...................................................................................................162
Composition and Market Value of Investment Portfolios .........................................................163
Actuarial Valuations of the Retirement Systems ......................................................................164
Funding Shortfalls and Issuance of Pension Obligation Bonds ................................................174
Factors That Contributed to Deterioration in Financial Solvency of the Employees Retirement System ......177
Impact of Funding Shortfall on the Commonwealth .................................................................178
Efforts to Address Cash Flow Shortfall and Improve Funding Ratio ........................................179
Statements of Fiduciary Net Position  and Statements of Changes in Fiduciary Net Position ......183
Post-employment benefits other than pensions .........................................................................190

**PUBLIC CORPORATIONS** ...............................................................................................................**193**

Government Development Bank for Puerto Rico and its Affiliates ............................................193
Electric Power Authority ...........................................................................................................196
Aqueduct and Sewer Authority .................................................................................................196
Highways and Transportation Authority ...................................................................................201
Health Insurance Administration ..............................................................................................203

Children's Trust ...........................................................................................................203
Convention Center District Authority ......................................................................204
Industrial Development Company ............................................................................204
Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ..........204
Infrastructure Financing Authority .........................................................................204
Municipal Finance Agency .......................................................................................206
Port of the Americas Authority ................................................................................206
Ponce Port Authority................................................................................................206
Puerto Rico Ports Authority .....................................................................................207
Public Buildings Authority .......................................................................................207
Sales Tax Financing Corporation.............................................................................207
Special Communities Perpetual Trust......................................................................208
University of Puerto Rico .........................................................................................208

**LITIGATION** ...............................................................................................................**210**
Puerto Rico Debt Enforcement and Recovery Act...................................................210
Recovery of Medicaid Funds ...................................................................................211
Special Education Students.......................................................................................213
Police Institutional Reform ......................................................................................214
Wage Claims.............................................................................................................214
Doral Financial Corporation Litigation....................................................................215
Employees Retirement System Bond Issuance .........................................................215
Police Association Wage Claims ..............................................................................215
Federal Clean Water Act Complaint from the Environmental Protection Agency ........216

**FINANCIAL STATEMENTS** ....................................................................................**217**

**CONTINUING DISCLOSURE** ...................................................................................**217**

**INSURANCE MATTERS** ............................................................................................**219**

**COMMONWEALTH OF PUERTO RICO**
**Financial Information and Operating Data Report**
**November 6, 2015**

## INTRODUCTION

This Financial Information and Operating Data Report (the "Report") contains information about the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"). The information set forth herein is provided as of June 30, 2015, the end of the Commonwealth's 2015 fiscal year, except as otherwise provided herein.

**Report Does Not Cover Public Corporations**

Although this Report contains information about certain of the Commonwealth's public corporations, it is not intended to provide full disclosure about the financial condition or operations of such public corporations, whether individually or in the aggregate. The Commonwealth makes no representation about the accuracy or completeness of the information relating to the Commonwealth's public corporations contained in this Report. Readers of this Report should not rely on it for purposes of making investment decisions with respect to the Commonwealth's public corporations.

**Forward-Looking Statements**

The information included in this Report contains certain "forward-looking" statements. These forward-looking statements may relate to the Commonwealth's fiscal and economic condition, economic performance, plans, and objectives. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth that are difficult to predict. The economic and financial condition of the Commonwealth is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the government of the United States of America or other nations that are not under the control of the Commonwealth. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's projections.

The projections set forth in this Report were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's officers responsible for the preparation of such information, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers'

knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Report are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Report, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.

## BASIC FACTS ABOUT THE COMMONWEALTH

**Location and Population**

Puerto Rico is an island located in the Caribbean approximately 1,600 miles southeast of New York City.  It has an area of approximately 3,500 square miles and a population of approximately 3.6 million people.

**Relationship with the United States**

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris of 1898, which ended the Spanish-American War.  Puerto Ricans have been citizens of the United States since 1917.  In 1950, the United States Congress authorized Puerto Rico to draft and approve its own Constitution, guaranteeing a republican form of government.  The Constitution was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the United States Congress, and subsequently approved by the President of the United States in 1952.

The United States and the Commonwealth share a common defense, market and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states.  It differs from the states, however, in some aspects of its political relationship with the United States federal government with respect to the application of certain federal laws such as the Internal Revenue Code.  The people of Puerto Rico are citizens of the United States but do not vote in Presidential elections.  They are represented in Congress by a non-voting Resident Commissioner.  Most federal taxes, except those such as Social Security and Medicare taxes, are not levied in Puerto Rico.  Puerto Rico residents (other than certain federal employees) do not pay federal income tax on Puerto Rico-source income (but they do pay federal income tax on non-Puerto Rico-source income).

For many years, there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, which controls the Office of the Governor and the Legislative Assembly since the 2012 general elections, and the other favoring statehood, represented by the New Progressive Party.  These two parties have obtained over 90% of the vote for Governor in all elections since 1972. (Or since 1960, if we include a previous pro-statehood party that existed before the New Progressive Party was established.)

The next general election (gubernatorial, municipal and legislative) in Puerto Rico will be held in November 2016.

**Official Languages**

The official languages of Puerto Rico are Spanish and English.

3

**Government**

The Constitution of Puerto Rico provides for the separation of powers of the executive, legislative, and judicial branches of government.  The Governor is elected every four years.  The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms.  The highest Puerto Rico court is the Supreme Court of Puerto Rico.  Decisions of the Supreme Court of Puerto Rico may be appealed to the United States Supreme Court in the same manner as decisions from state courts.  Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court.  Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the United States Supreme Court.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments.  In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Fiscal Year**

The Commonwealth's fiscal year runs from July 1 through June 30 of the following year. References in this Report to a fiscal year are to the period ending on June 30 of such year.

**General Fund**

The General Fund is the primary operating fund of the Commonwealth.  References in this Commonwealth Report to General Fund revenues and expenditures (and to any resulting General Fund deficit), unless otherwise specified, are references to such revenues and expenditures as reflected in the Commonwealth General Fund budget, and are sometimes (but not always) referred to for clarity as General Fund budgetary revenues and budgetary expenditures.  These budgetary revenues and expenditures do not include many sources of revenues and non-budgetary funds and many classes of expenditures that are part of the General Fund for financial reporting purposes in accordance with United States generally accepted accounting principles. Expenditures incurred through non-budgetary funds are material and their exclusion from Central Government budgetary deficit calculations may materially understate the size of Central Government fiscal imbalances.

**Principal Officers Responsible for Fiscal Matters**

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and the Government Development Bank for Puerto Rico ("Government Development Bank" or "GDB").  The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget.  OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures.  The Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

4

*Alejandro J. García Padilla* was sworn in as Governor of Puerto Rico on January 2, 2013.  From 2009 until becoming Governor, Mr. García Padilla served as an elected senator in the Senate of the Commonwealth of Puerto Rico. Prior to that, Mr. García Padilla was an attorney in the private sector.  From 2005 to 2007, Mr. García Padilla was Secretary of the Commonwealth's Department of Consumer Affairs.  Mr. García Padilla was a professor at the School of Law of the Inter American University of Puerto Rico from 2000 to 2002.  Mr. García Padilla clerked for the Commonwealth's Court of Appeals from 1997 to 1999.  He holds a bachelor's degree in Political Science and Economy from the University of Puerto Rico and a Juris Doctor from the Inter American University School of Law.

*Melba Acosta Febo* was appointed President of GDB, effective October 27, 2014. Prior to this appointment, she was the Commonwealth's Secretary of Treasury.  Since March 1, 2013, Ms. Acosta has also been the Chief Public Financial Officer of the Commonwealth of Puerto Rico.  Before these appointments, Ms. Acosta was Director of OMB and Chief Information Officer from 2001 to 2004, and Chief of Staff of the Municipality of San Juan from 1997 to December 2000.  In the private sector, Ms. Acosta worked as an attorney with McConnell Valdés from 1995 to 1997 and from 2010 to 2012.  She served as Executive Vice President, Chief Operating Officer, and Chief Financial Officer of RG Financial Corporation and its bank subsidiary, RG Premier Bank, from 2004 to 2010. In addition, she served as Tax Consultant with Price Waterhouse from 1988 to 1990.  Ms. Acosta is a certified public accountant and an attorney-at-law.  She holds a bachelor's degree in Accounting from the School of Business Administration of the University of Puerto Rico, an MBA from the Harvard Graduate School of Business Administration and a Juris Doctor from the School of Law of the University of Puerto Rico. She is a member of the Boards of Directors of the Puerto Rico Art Museum, the Luis Muñoz Marín Foundation and is the Chairman of the Board of GDB. Previously, she was a member of the Board of Directors of United Way of Puerto Rico.

*Juan C. Zaragoza* was designated Secretary of the Treasury Department of the Commonwealth of Puerto Rico on October 15, 2014, and sworn into his position on November 17, 2014.  He has over 30 years of experience providing tax consulting services, specializing in tax exemption, tax credits, restructuring, and sales and use taxes. Before this appointment, he co-founded in 2002 Zaragoza & Alvarado, a firm engaged in providing tax and business consulting services. Prior to establishing Zaragoza & Alvarado, he was the partner in charge of Arthur Andersen LLP's Tax and Business Advisory Services Practice in San Juan, Puerto Rico. He joined Arthur Andersen in 1993 and became a partner in 1995. From 1989 to 1992, he served as Assistant Secretary for Internal Revenue at the Treasury Department where he oversaw seven major bureaus and was responsible for implementing the Internal Revenue Division's policy-setting and related legislation. From 1983 to 1989, he worked at Price Waterhouse in Puerto Rico, in the Audit and Tax Divisions. Throughout his professional career, Zaragoza has always been very active in the development of tax legislation and the analysis of the tax system in Puerto Rico, both at state and municipal level.  He is Past President of the Puerto Rico Certified Public Accountants Association (1997-1998).  He holds an MBA in Management from Indiana University at Bloomington and a BBA in Accounting from the University of Puerto Rico.

***Luis F. Cruz*** was appointed Director of OMB on October 22, 2014. Prior to this appointment, he served as Director of the Treasury and Budget Commission of the Puerto Rico House of Representatives and as Advisor to the Speaker of the House on Tax, Finance and Budget issues from January 2013 to October 2014. Previously, he had a successful career in public accounting spanning more than 25 years. In 1994, he established his own firm, Luis F. Cruz & Co.—later incorporated as Cruz, Izaguirre & Co., CPA, PSC—to offer accounting, tax, audit, and financial consulting services. In 1999, he established Global Consulting Group, Inc., to offer consulting services in the fraud prevention and detection area, and the evaluation of internal controls. He has offered consulting services to a variety of clients in the private sector, such as Banco Popular de Puerto Rico, Banco Santander, and Ricoh Lanier Puerto Rico. In the public sector, he has provided services to the OMB, Treasury Department, Puerto Rico Office of Courts Administration, among others. Before founding his own firms, he worked with Caribe Detroit Diesel Allison (1990-1992), and with First Federal Savings Bank (now FirstBank) (1987-1990). Mr. Cruz was a member of the Puerto Rico State Board of Accounting (2002-2006) and a member of the Board of Directors and Treasurer of the Puerto Rico Chamber of Commerce, where he served in various committees (2007-2009). He is a member of the American Institute of Certified Public Accountants, of the Puerto Rico Society of Certified Public Accountants, and of the Association of Certified Fraud Examiners. He obtained an MBA in Finance from the InterAmerican University of Puerto Rico and a BBA in Accounting from the University of Puerto Rico. He is a Certified Public Accountant, a Certified Fraud Examiner, and a Chartered Global Management Accountant.

## RECENT EVENTS

**Governor Announces that Puerto Rico's Debt is "Unpayable" in Light of Economic Conditions and Must Be Restructured; Creates Working Group for the Economic Recovery of Puerto Rico**

On June 29, 2015, Governor García Padilla announced that the Commonwealth's debt load was "unpayable" in light of the Commonwealth's economic trajectory and called for a renegotiation of the Commonwealth's debt load with the goal of achieving sustainable payment terms. The Governor warned that if such negotiations were unsuccessful, the Commonwealth would be unable to timely honor all its obligations to bondholders.

On the same date, Governor García Padilla issued an Executive Order to create the Puerto Rico Fiscal and Economic Recovery Working Group (the "Working Group"). The Working Group was created to consider the measures necessary, including the measures recommended in the Krueger Report, discussed below, to address the economic and fiscal crisis of the Commonwealth of Puerto Rico.

The Working Group's members are the Governor's Chief of Staff, the President of GDB, the Secretary of Justice, the President of the Senate and the President of the House of Representatives. It was tasked with the responsibility for developing and recommending to the Governor of Puerto Rico the Puerto Rico Fiscal and Economic Growth Plan (the "FEGP"). The FEGP had to contain the plans and the administrative and legislative measures necessary to address the short, medium and long-term fiscal and economic challenges facing Puerto Rico, including measures to: (i) address the financing gaps and the debt load on the public sector, (ii) achieve the execution of its budgets, (iii) achieve greater transparency with respect to statistics and the government's financial information, and (iv) carry out the structural reforms necessary to promote the economic growth and competitiveness of the Commonwealth.

In preparing the FEGP, the Working Group was directed to:

- require that the budgets for each governmental entity be prepared with the goal of achieving balanced budgets, in accordance with generally accepted accounting principles;

- require that each governmental entity annually reduce its budget deficit in a manner that by the end of the fiscal adjustment period the consolidated budget deficits of the Commonwealth have been completely eliminated, in accordance with the proposed FEGP;

- ensure a material reduction in expenditures through the offering of efficient services by the Commonwealth and its instrumentalities;

- identify such automatic budget stabilizers that ensure compliance with the proposed plan;

- include specific proposals with the goal of improving and diversifying the Commonwealth's economy, reduce the cost of living and the cost of doing business, and achieve economic stability and development of the Commonwealth in the long term;

- promote structural economic reforms designed to enhance the economic development of the Commonwealth, which could include changes to labor and welfare laws.

- require the adjustment of the aggregate debt load of the Commonwealth and its instrumentalities so that such debt can be repaid under sustainable terms;

- ensure that pension obligations may be met in the long term;

- require that financial controls and accounting systems be reformed to ensure compliance with the FEGP and the transparency of governmental data; and

- ensure the long term financial stability of the Commonwealth, as evidenced by access to short and long term capital markets.

**Puerto Rico Fiscal and Economic Growth Plan**

On September 9, 2015, the Working Group presented a draft of the FEGP to the Governor and it was made public on that same day. The FEGP is available in the Government Development Bank's website at www.gdbpr.com under "Investor Resources−Publications and Reports−Investor Presentations."

The FEGP projects that, absent further corrective action, the Commonwealth's cumulative financing gap from 2016 to 2020 will be approximately $27.8 billion. The FEGP contemplates that this financing gap could be reduced to approximately $14 billion through a combination of revenue increases (including the increase in the sales and use tax, which has already gone into effect), expense reductions and economic growth, but that the remaining financing gap will need to be addressed by debt restructuring.  The FEGP also projects that, absent emergency measures, Puerto Rico Treasury's single cash account and GDB will each exhaust their liquidity before the end of this calendar year.

The FEGP includes proposals for (a) economic growth and structural reform, (b) fiscal stability, and (c) institutional reform and transparency. The implementation of the FEGP, as proposed by the Working Group, would require executive action by the Commonwealth and United States governments and, as to certain matters, the approval of legislation by the Commonwealth's Legislative Assembly. For instance, it proposes the implementation of a fiscal control board and new budgetary and accounting standards and procedures. Legislation to that effect was filed in the Commonwealth's House of Representatives on October 15, 2015. See "Puerto Rico Fiscal Responsibility and Economic Revitalization Act."

The FEGP concludes that meaningful changes to federal policies are critical to the ability of the Commonwealth to meet its debt service costs while providing funding for essential services to its residents, most particularly changes in the areas of health care funding and tax

8

policies for economic development. Moreover, the FEGP highlights the need for an orderly process to restructure the Commonwealth's liabilities.

Even after the implementation of the measures included in the FEGP, which the Working Group recognizes are subject to significant political and execution risks, the Working Group's projections suggest that the Commonwealth will not be able to meet all of its debt service requirements as currently scheduled. Moreover, the FEGP concludes that, unless the persistent stagnation of the Commonwealth's economy can be reversed, the Commonwealth's debt is not sustainable. In order to make the greatest amount of the debt sustainable in the long term, the FEGP recommends that priority be given to: (a) reigniting the Commonwealth's economic growth in the short and medium-term; (b) providing essential services, including health, education and safety, to the people of the Commonwealth, the continued deterioration of which the Working Group believes would exacerbate the Commonwealth's negative demographic trends, adversely affect its economic prospects and erode its tax base; and (c) ensuring government can sustain its pension obligations.

As stated above, after accounting for the estimated impact of all of the measures set forth in the FEGP (including the increase in the sales and use tax, which has already gone into effect) and the benefit of the potential economic growth spurred by structural reforms, the FEGP projects the Commonwealth to have a cumulative financing gap from fiscal year 2016 to fiscal year 2020 of approximately $14 billion. It recommends that the Commonwealth's advisors begin working on a voluntary exchange offer to be made to creditors that would take into account the priority accorded to various debt instruments across the Commonwealth's debt complex. The FEGP recognizes that, even assuming the clawback of revenues supporting certain Commonwealth tax supported debt, available resources may be insufficient to service all principal and interest on debt that has a constitutional priority. Finally, the FEGP concludes that a consensual compromise of the creditors' competing claims to the Commonwealth's revenues to support debt service will be required in order to avoid a disorderly default on the Commonwealth's debt and the further destabilization of the Commonwealth's economy and finances.

Pursuant to the proposed Puerto Rico Fiscal Responsibility and Economic Revitalization Act discussed below, the Working Group shall present the final FEGP to the Puerto Rico Fiscal Oversight and Economic Recovery Board and to the Governor before the end of the second quarter of this fiscal year.

**Restructuring Process and Principles**

On September 24, 2015, the Working Group released a document titled "*Restructuring Process and Principles*", which can be viewed at the Government Development Bank's website at   www.gdbpr.com   under   "Investor   Resources−Publications   and   Reports−Investor Presentations." The document outlines the Working Group's plan of engagement with creditors to seek financial relief in the near term.

The restructuring principles that will guide the Working Group's efforts include the following:

- avoid a default on the Commonwealth's debt;

- ensure that the Commonwealth can continue to make payments on its restructured debt while providing essential services to residents;

- reflect, and seek to respect, the Constitutional priorities for payment of the Commonwealth's public debt;

- create a long-term financing solution to the patchwork complex of issuers and indebtedness;

- design a structure that is attractive to existing creditors; and

- restore market access on sustainable terms.

Millstein & Co., a financial advisory firm, has been hired to advise the Commonwealth on financial restructuring matters. Citigroup Global Markets has been mandated to act as underwriter and broker dealer in the proposed voluntary exchange offer. Conway Mackenzie has also been hired to improve the analysis and monitoring of government-wide liquidity and the management and projection of governmental cash flows. GDB or the Commonwealth may engage the services of other professionals to assist the government in its restructuring efforts.

**Liquidity Analysis of the Commonwealth Prepared by Conway MacKenzie**

GDB, in its role as fiscal agent to the Commonwealth and its instrumentalities, hired Conway MacKenzie to: (i) perform a liquidity analysis of the Treasury Department's Single Account held at GDB ("TSA"), in which the Treasury Department deposits and from which it disburses amounts managed by the Treasury Department (e.g. General Fund, enterprise funds and fiduciary funds), (ii) assist with the implementation of measures to improve cash management, forecasting and budgeting procedures, and (iii) provide assistance to the Treasury Department and OMB in the development of short and medium-term cash flow projections. Additionally, Conway assisted in developing cash flow projections for several component units which are supported by the General Fund and the TSA.

As part of the engagement, Conway provided GDB with a preliminary draft report dated April 1, 2015 ("Preliminary Report"), detailing its preliminary findings and observations including TSA liquidity projections through June 2016. The Preliminary Report was updated with available preliminary full fiscal year 2015 data and other information. On August 25, 2015 Conway provided an updated report ("Liquidity Update") which provides revised liquidity projections for fiscal year 2016 for the TSA, certain federal funds, government agencies, general obligation debt issuances and payments, net pension benefits and other items. Conway's analysis was limited to funds available to the Treasury Department in the TSA and did not factor other potential sources of liquidity available to the Commonwealth, such as cash in the Commonwealth's depositary accounts other than the TSA (including accounts holding funds for capital projects of the Commonwealth), and agency deposits at third party financial institutions. The Liquidity Update report also contains information on the analysis performed by Conway on the selected non-General Fund component units.

10

*Conway has not participated in the preparation of this Commonwealth Report and has no responsibility for its contents, including any cash flow and liquidity projections included herein. Conway is not soliciting or recommending the purchase or sale of securities, or any indications for the purchase or sale of securities, or any other investment decisions.*

For a discussion of Conway's work, see "FISCAL CONDITION - Liquidity Analysis of the Commonwealth Prepared by Conway MacKenzie."

**Release of Krueger Report on the Commonwealth's Economic and Financial Stability and Growth Prospects**

On June 29, 2015, Governor García Padilla made public a report on the Commonwealth's economic and financial stability and growth prospects prepared by Dr. Anne O. Krueger, Dr. Ranjit S. Teja and Dr. Andrew Wolfe (the "Former IMF economists"), each of whom has previously occupied senior executive positions at the International Monetary Fund ("IMF"). The Former IMF economists were engaged to prepare this report on February 5, 2015. The report was subsequently updated as of July 13, 2015 and was accompanied by a note indicating that such update did not include the final fiscal numbers for fiscal year 2015, which could materially change the estimated financing gaps mentioned in the report. The July 13, 2015 updated report with its note is hereinafter referred to as the "Krueger Report." The Krueger Report is available at the website of Government Development Bank at www.gdbpr.com under "Investor Resources−Publications and Reports−Investor Presentations" but is not being incorporated by reference and is not part of this Report.

The Krueger Report states that Puerto Rico faces an acute crisis in the face of faltering economic activity, fiscal solvency and debt sustainability, and institutional credibility. Some of the report's principal conclusions are as follows:

● The economic problems of Puerto Rico are structural, not cyclical, and are not going away without structural reforms. The report reviews the various shocks to Puerto Rico's economy in the last decade (including the decline in manufacturing activity and the housing market, the banking crisis and the 2007-2009 U.S. economic recession), and concludes that, even more significantly than those factors, other forces on the supply side have affected economic growth. These supply-side forces include low labor participation (40% versus 63% in the United States) and high labor costs, outmigration and population loss (according to the Puerto Rico Planning Board, population may continue to fall through 2020), high energy costs, high transportation costs and barriers to competition and business activity. The report states that the economy is in a cycle where unsustainable public finances are feeding into uncertainty and low growth, which in turn is raising the fiscal deficit and the debt ratio. The Former IMF economists' believe that the economy will continue to contract at a rate of at least 1% per annum, likely more in fiscal year 2015.

● Fiscal deficits are much larger than assumed and are set to deteriorate. The report points to a number of factors that contribute to the persistent deficits: overly optimistic revenue projections and budget formulation; lack of expenditure control and buildup of payables; negotiated discounts on anticipated tax obligations; extensive tax expenditures in the form of credits and exemptions; and lack of timely and reliable monitoring of fiscal trends. The report

11

concludes that the standard measure of the fiscal balance that has been used historically in Puerto Rico - the General Fund - greatly understates the true deficit and the challenge ahead. The report discusses the conceptual problems with viewing the deficit from the standpoint of the General Fund account in isolation, including that the General Fund (i) being mostly on a cash basis, does not reflect previously incurred expenses until the fiscal year in which they are recorded for payment, (ii) excludes numerous agencies and public corporations that operate like arms of the government and also run deficits, and (iii) excludes capital expenditures. As a result, the report states that an analysis of fiscal and debt sustainability cannot be conducted on the basis of the General Fund measure alone.

Using standard IMF metrics to view the deficit from a broader standpoint than the General Fund, the report indicates that the overall deficit is larger than recognized. The Former IMF economists construct a measure of the overall deficit that incorporates cash and non-cash spending and uses a wider definition of the central government that includes, for example, governmental units receiving formula-based budgetary transfers. Under this methodology, the report identifies a deficit of approximately $2.0 billion for fiscal year 2015 that has been funded through a decline in cash balances and a further buildup of payables at the central government and at various others entities that receive funding from the General Fund. A similar narrative of large deficits is seen at the three largest public enterprises (PREPA, PRASA and HTA) and the principal retirement systems. These deficits have worsened the prospect for debt sustainability.

The report concludes that the actions taken by the Government to date to address the fiscal deficits are insufficient, and, thus, the fiscal deficits too are not going away and have to be closed through wide-ranging policy action.

● The central government deficits (as measured in the report) over the coming years imply an unsustainable trajectory of large financing gaps. The report constructs a projection model using the above-described metrics and certain assumptions, including negative 1% real growth (the report states that this assumption is probably too optimistic in light of the looming crisis) and 2% inflation. The projection assumes the following: (i) budgetary support for the Employee Retirement Fund starting in fiscal year 2017, for the judiciary retirement system starting in fiscal year 2019 and for teachers retirement system starting in fiscal year 2020; (ii) principal payments of debt; (iii) the gradual pay down of arrears to suppliers and taxpayers ($450 million per year); and (iv) additional downside risks from a potential loss of federal funding for the Affordable Care Act and from a decline in Act 154-2010 excise tax receipts (due to modified source income accounting rules for firms operating in multiple tax jurisdictions). Based on current policies, the model reflects overall deficits of between $3 billion and $5 billion per year over the next five years, and continuing to grow thereafter. After factoring the additional downside risks described in clause (iv) above, the report identifies that annual deficits could range from $3.7 billion in fiscal year 2016 to $8.2 billion in fiscal year 2025.

● Puerto Rico's public debt cannot be made sustainable without growth, nor can growth occur in the face of structural obstacles and doubts about debt sustainability. To restore growth and confidence, Puerto Rico needs to implement ambitious measures as an integrated package in three principal areas: (1) structural reforms directed at restoring competitiveness, (2) fiscal reform and restructuring of public debt, and (3) institutional credibility.

First, with respect to structural reforms, the report discusses needed supply-side measures, some of which can be implemented by the Commonwealth by amending local laws (such as labor laws that result in a disincentive for employment) but others that would require federal legislative action. The impact on growth of supply-side reforms, however, takes time. Implementing structural reforms alone would leave large fiscal deficits.

Second, with respect to fiscal adjustment and public debt, the report states that fiscal reforms should focus more on broadening the tax base than on raising tax rates, and on targeted expenditure reductions. The report concludes that there is scope to increase savings to over $2 billion per year by fiscal year 2020 and $2.5 billion per year by fiscal year 2025, although total expenditures would still rise in dollar terms and relative to GNP as it is assumed that the government makes up for any cash shortfalls of the retirement systems. The report states that, while a reduction of fiscal imbalances should improve long-term economic prospects, the adjustment should be designed to be as growth oriented as possible. Too much fiscal tightening could depress demand and would do nothing to address the supply-side problems at the root of the Commonwealth's growth problems. The report also states that there is scope to raise receipts around $3 billion annually by fiscal year 2020 and $4 billion annually by fiscal year 2025. The report acknowledges that their quantitative estimates are subject to great uncertainty and do not reflect the full menu of policy options.

The report concludes that, even after factoring in a substantial fiscal effort, a large residual financing gap persists into the next decade, implying a need for debt relief. Based on the assumptions used in the projection model and incorporating the effects of proposed fiscal reforms, the residual financing gap disappears by fiscal year 2025, but to close the gap in prior years significant debt service relief is required. To close the financing gap, the government would need to seek relief from a significant but progressively declining proportion of principal and interest falling due during fiscal years 2016-2024. The report acknowledges that any debt restructuring would be challenging as there is no precedent of this scale and scope, but concludes that, from an economic perspective, the fact remains that the central government faces large financing gaps even with substantial adjustment efforts (as there are limits to how much expenditures can be cut or taxes raised). The report notes: "difficult or not, the projections are clear that the issue can no longer be avoided".

Finally, with respect to institutional credibility, the report states that the legacy of budgetary laxity, non-transparency and unreliable and dated statistics must be overcome for the reform program to work and command credibility. The recommendations in this area include, among others, legislative approval of a long-term fiscal plan, rules to limit changes to the plan, the establishment of an independent fiscal oversight board to advise on the budget and control its implementation, and the strengthening of statistics on the wider economy.

The report acknowledges that the recommendations contained therein consist of a daunting agenda from a political, legal and organizational standpoint, but the Former IMF economists believe that addressing these issues is urgent and that delays can intensify the crisis.

In preparing their analysis, the Former IMF economists have relied on information provided by the Commonwealth and its instrumentalities and, therefore, these economists do not assume any responsibility for the accuracy or completeness of such information. Furthermore,

13

the analysis prepared by the Former IMF economists includes estimates and projections based on assumptions about economic growth and other variables that are inherently subject to significant political, economic and other uncertainties. Actual results may vary materially from such estimates and projections.

*The Former IMF economists have not participated in the preparation of this Commonwealth Report and have no responsibility for its contents. The Former IMF economists are not soliciting or recommending the purchase or sale of any securities, or any indications for the purchase or sale of any securities, or any investment decisions.*

**Fiscal Responsibility and Economic Revitalization Act**

On October 15, 2015, the administration introduced the Puerto Rico Fiscal Responsibility and Economic Revitalization Act in the Commonwealth's House of Representatives. The proposed legislation seeks to create a five-member fiscal and economic oversight board, to be known as the "Puerto Rico Fiscal Oversight and Economic Recovery Board" (the "Board"). The members of the Board would be appointed by the Governor with the advice and consent of the Senate and would serve four-year staggered terms. The proposed legislation requires that members (a) have knowledge, expertise and at least ten (10) years of experience in finance, management, or the organization or operation of business or government entities; (b) not be direct holders of Commonwealth government debt obligations or have participations in funds that have more than 10% of their funds invested in such obligations; and (c) not be, and have not been for five (5) years, officers or employees of any Commonwealth government entity. The Governor's power to remove Board members would be limited to certain specified circumstances, such as gross neglect of duty, malfeasance, intentional misconduct or knowing violation of law.

The Board would have fiscal oversight authority over the Commonwealth and each agency, department, instrumentality and public corporation of the Commonwealth, other than: the Judicial Branch, the Legislative Assembly and its dependencies, the Office of the Comptroller, the Office of Government Ethics, the Office of the Special Independent Prosecutor's Panel, the Puerto Rico Electric Power Authority and the Puerto Rico Aqueduct and Sewer Authority. Entities subject to the Board's fiscal oversight authority are referred to as "Covered Entities." Further, the proposed legislation provides that the Commonwealth and any other Covered Entity designated by the Board –such entities being referred to as "Reporting Entities"– shall be subject to certain periodic budget reporting and compliance requirements.

The proposed legislation requires the submission by the Working Group to the Board of a Commonwealth-wide consolidated five-year FEGP and requires the Board to review and approve the proposed FEGP if it complies with the following objectives: (a) implementing structural reforms with the goal of restoring economic growth and competitiveness in the Commonwealth; (b) eliminating over time the financing gaps and reducing the debt burden of the Covered Entities to sustainable levels; and (c) regenerating institutional credibility across all government entities by optimizing budget formulation and execution and data transparency.

The Board is charged with reviewing the Reporting Entities' annual budgets and determining whether they comply with the FEGP. The proposed legislation also requires that the

Commonwealth's budget identify certain appropriations, to be known as "Sequestered Appropriations," representing 2.5% of the total appropriations for operating expenses and special appropriations, which would be released throughout the fiscal year in accordance with the act.

The proposed legislation requires Reporting Entities to submit quarterly reports to the Board indicating both actual and accrued revenues and expenditures for such quarter and comparing these with the approved budget. If the Board determines that a Reporting Entity has adhered to its approved budget, it would not take any further action. In the case of the Commonwealth, this would result in the automatic release of certain specified percentages of the Sequestered Appropriations throughout the fiscal year. If, in turn, the Board determines that the Reporting Entity has varied from the approved budget, the Board would issue a non-compliance warning to such Reporting Entity and make recommendations for immediate measures deemed appropriate to ensure compliance with the FEGP. In the case of the Commonwealth, the issuance of a non-compliance warning would result in the non-release of an amount of Sequestered Appropriations equal to the amount by which the Commonwealth's cash or accrued expenditures (whichever is higher) exceeded its actual (cash) revenues. If a non-compliance warning issued to a Reporting Entity is not cured within the specified timeframes, the Board shall issue a preliminary non-compliance finding to such Reporting Entity. In the case of the Commonwealth, this would result in automatic across-the-board expense reductions in the amount necessary to eliminate the projected deficit.

The issuance of a non-compliance finding to a public corporation for failure to approve a budget that complies with the plan or the issuance of a preliminary non-compliance finding to an agency, department or public corporation for failure to comply with an approved budget would result in automatic hiring freezes at the Reporting Entity and the inability of the Reporting Entity to enter into certain transactions without the prior approval of Board. If, notwithstanding these expenditure controls, a preliminary non-compliance finding is not cured by the end of the fiscal year, the Board would issue a non-compliance finding to such Reporting Entity.

Finally, the proposed legislation includes other measures aimed at ensuring sound fiscal and budgetary practices. For instance, the proposed legislation (a) requires that the revenue projection used to prepare the Commonwealth's budget be certified by an independent third-party consultant selected by the Board, (b) creates a special fund for the payment of the government's past due accounts payable, (c) provides for the cancellation of unused appropriations, (d) prohibits the creation of budgetary funds without and identified source of revenue and eliminates funds that have been inactive for the past three (3) years or that have not received funds or appropriations for the past twelve (12) months, and (e) requires that purchase and service orders be certified by the director of finance of the government entity (or his/her designee) or, if the order is in excess of $20,000, by the Office of Management and Budget.

There is no assurance that the proposed legislation will be enacted as currently presented.

## Obama Administration Calls for Congressional Action to Help Puerto Rico Solve its Economic and Fiscal Crisis

On October 21, 2015, the Obama Administration released a legislative proposal to address Puerto Rico's urgent fiscal crisis titled "*Addressing Puerto Rico's Economic and Fiscal*

*Crisis and Creating a Path to Recovery: Roadmap for Congressional Action"* (the "Administration Proposal"). The Administration Proposal states that Puerto Rico is in the midst of an economic and fiscal crisis that without Congressional action could become a humanitarian crisis. On October 22, 215, a senior adviser to the United States Secretary of Treasury testified before Congress in support of the Administration Proposal.

The Administration Proposal provides the following background to the need for Congressional action.

- 3.5 million Americans living in Puerto Rico have endured a decade of economic stagnation;

- Puerto Rico's Government is out of cash and is running out of options;

- Puerto Rico must further strengthen its fiscal discipline;

- Puerto Rico cannot solve its crisis alone;

- the Obama Administration is committed to continuing to work with Puerto Rico, but Congress must act to resolve this crisis; and

- without action by Congress and further fiscal discipline by Puerto Rico, the crisis will escalate.

The Administration Proposal makes the following recommendations for Congressional action:

- Provide Puerto Rico the tools to comprehensively address its financial liabilities. Puerto Rico's liabilities are unsustainable and need to be restructured. Congress should extend the protections of Chapter 9 of the United States Bankruptcy Code to the Commonwealth's municipalities and authorize a broader legal framework to allow a comprehensive restructuring of all of Puerto Rico's liabilities. The Administration Proposal states that bankruptcy protection is not a federal bailout and provides a tested and fair process to all parties.

- Provide independent fiscal oversight to Puerto Rico's efforts to reform its fiscal governance and implement the fiscal reforms necessary to achieve financial stability. This would be enacted as part of comprehensive legislative package and access to the proposed bankruptcy restructuring regime would be conditioned on this oversight. The recommendation also calls for Congress to provide funding and authorization for technical assistance to help Puerto Rico make the necessary investments to modernize its accounting and disclosure practices.

- Provide a long-term solution to Puerto Rico's Medicaid treatment and funding. Remove the cap on Puerto Rico's Medicaid program and increase the federal support Puerto Rico receives through the federal Medicaid match, after a sufficient transition

period, to prevent Medicaid's unstable and insufficient funding from worsening Puerto Rico's fiscal crisis. The Administration Proposal also encourages Congress to improve the quality of Medicaid coverage in the Commonwealth by offering access to additional core services Medicaid beneficiaries would receive if they were living on the mainland.

- Reward work and support growth. Extend the earned income tax credit ("EITC") to individuals in Puerto Rico, a tool proven to stimulate labor participation and employment. This would reward work and support economic growth by increasing participation in Puerto Rico's formal economy.

It is difficult to predict at this time the likelihood that all or part of the Administration Proposal will be enacted by Congress. The Commonwealth supports the Administration Proposal.

**GDB Ends Discussions with Certain GDB Bondholders**

On October 21, 2015, GDB announced that informal discussions with certain bondholders and their advisors regarding a potential financing and liability management transaction related to some of GDB's bonds had ended as they did not result in a mutually acceptable arrangement.

**Preliminary General Fund Budgetary Revenues and Budget Deficit for Fiscal Year 2015**

On July 24, 2015, the Secretary of Treasury announced that the total revenues of the Commonwealth General Fund for fiscal year 2015 were $8.96 billion, which were $76 million less than the revenues for fiscal year 2014 and approximately $604 million below the original revenue estimate. In addition, it was announced that the Commonwealth's General Fund budget deficit for fiscal year 2015 was approximately $703 million. See "FISCAL CONDITION – Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2015; Projected Budget Deficit for Fiscal Year 2015."

The above preliminary budget deficit for fiscal year 2015 is calculated in accordance with statutory (budgetary) basis of accounting, which is the basis of accounting that has historically been used by the Commonwealth, but which is not in accordance with U.S. generally accepted accounting principles (U.S. GAAP). There are material expenditure transactions recorded through the Commonwealth's non-budgetary funds, which consolidate with the General Fund for purposes of U.S. GAAP, that may have a material effect on the consolidated deficit and liquidity of the Commonwealth. The presentation of the General Fund revenues and expenditures in accordance with U.S. GAAP would result in revenues, expenditures and a deficiency of revenues over expenditures significantly higher than those calculated on a budgetary basis.

**Fiscal Year 2016 Budget**

The fiscal year 2016 General Fund budget provides for revenues and expenditures of $9.800 billion, which is $235 million higher than the originally approved budget for fiscal year 2015. The principal reasons for the increase in expenditures are an increase in debt service payments, from $1.138 billion in fiscal year 2015 to $1.475 billion in fiscal year 2016, and an

17

increase in special pension contributions from $560 million in fiscal year 2015 to $652 million in fiscal year 2016. These increases were partially offset by reductions in payroll expenses and other operating expenses of $74 million and $57 million, respectively, and a reduction of $40 million in budgetary appropriations to the Puerto Rico Integrated Transport Authority ("PRITA"). The principal changes in the fiscal year 2016 budgeted General Fund revenues compared to preliminary fiscal year 2015 General Fund revenues are (i) an increase of $1.005 billion in revenue from sales and use taxes resulting from the increase in the SUT tax rate (through the enactment of a sales and use surtax) which became effective on July 1, 2015, which is partially offset by (ii) a decrease in individual income taxes of $160 million, and a decrease in Act 154 excise tax revenues of $37 million. See "BUDGET OF THE COMMONWEALTH OF PUERTO RICO – Budget for Fiscal Year 2016."

On July 1, 2015, Joint Resolution 63-2015 was enacted creating the Economic Development and Obligations Payment Fund (the "EDOP Fund"), to be funded with $275 million from available resources. As of the date of this report, no available resources have been assigned to the EDOP Fund. Under the legislation, the utilization and distribution of the EDOP Fund requires a Joint Resolution of the Legislative Assembly. The EDOP Fund may only be used for economic development initiatives and for the payment of Commonwealth obligations. On August 10, 2015, a resolution was filed in the Senate authorizing the transfer of $93.7 million from the EDOP Fund to the GDB in order to pay the unpaid interest and principal which was due on the PFC Bonds on August 3, 2015. This resolution has not been approved by the Legislature.

Act No. 102-2015, enacted on July 2, 2015, provides for the creation of the Emergency Liquidity Fund, to be funded with the proceeds of any Commonwealth issuance of tax and revenue anticipation notes and the monthly revenue collections, reimbursements and other funds deposited in the Treasury Department's concentration bank account in excess of expenses, payments and other transfers allocated to such month in the Treasury Department's cash flow and expense projection for the fiscal year.  The Emergency Liquidity Fund will be held by GDB, as escrow agent, and the funds deposited therein shall not (i) be deemed part of GDB's assets and (ii) to the fullest extent permitted by law, constitute "available resources" for purposes of Section 2 of Article VI of the Puerto Rico Constitution until such funds are released to the Treasury Department.  Subject to the provision of Section 8 of Article VI of the Puerto Rico Constitution, the funds on deposit in the Emergency Liquidity Fund are also pledged to the payment of tax and revenue anticipation notes issued by the Commonwealth.  GDB, as escrow agent, would disburse funds on deposit in the Emergency Liquidity Fund to the Treasury Department based on a cash flow and expense projection, and upon the satisfaction of certain conditions. The Commonwealth did not deposit the proceeds of the tax and revenue anticipation notes sold to various government agencies in the Emergency Liquidity Fund and no other deposits have been made to such Fund.

**Preliminary General Fund Budgetary Revenues and Expenditures for the First Three Months of Fiscal Year 2016; Early Estimate of General Fund Revenues for October**

Preliminary General Fund revenues (budgetary basis) for the first three months of fiscal year 2016 were $1.936 billion, an increase of $162 million when compared to the same period in the prior fiscal year and $19 million more than the originally estimated revenues for the period. These revenues include approximately $37 million in non-cash revenues mostly from the

18

traditional lottery and $30 million in non-recurring revenues related to tax amnesty collections under Act 44-2015 during the month of July 2015.

Non-cash revenues from the traditional lottery consist mostly of unclaimed lottery prizes that by law are recorded in the General Fund (budgetary basis) after the term for claiming lottery prizes has expired (180 days). Although the General Fund recognizes revenue on a budgetary basis after the expiration of the term to claim such prizes, such recognition does not result in actual cash revenue because all transactions related to the traditional lottery, including the sale of lottery tickets and the payment of cash prizes, are made to and from the Treasury Department's Single Account ("TSA") held at GDB, in which all funds managed by the Treasury Department (budgetary and non-budgetary funds) are commingled. The Secretary of Treasury determines when accumulated traditional lottery non-cash revenues are recognized in the General Fund on a budgetary basis. Certain non-cash revenues from the traditional lottery, although recorded on a budgetary basis during a particular year, may have been accrued for U.S. GAAP purposes during the prior fiscal year. The Commonwealth is currently projecting an additional $18 million of non-cash revenues from unclaimed traditional lottery prizes during the remainder of fiscal year 2016. Other non-cash revenues are related to transfers from non-budgetary funds to the General Fund (budgetary basis).

Preliminary General Fund (budgetary basis) expenditures for the first three months of fiscal year 2016 were $1,682 million or 17% of the total approved budget for such fiscal year of $9,800 million. For the first quarter of fiscal year 2015, the preliminary General Fund expenditures were $2,091 million or 21% of the total fiscal year 2015 approved budget of $9,565 million.

Early accounting of actual General Fund (budgetary basis) revenues for the month of October indicate a decrease of approximately $50 million when compared to the same month in the prior fiscal year and $28 million less than the original estimate for the month. These revenue numbers would result in revenues $9 million lower than the original revenue estimate for the four month period. The preliminary actual revenue total for the month of October includes approximately $18 million in non-cash revenues. The October revenues are not totally comparable with the October revenues for the prior fiscal year because October during the prior fiscal year included approximately $102 million in non-recurring revenues related to the temporary tax preferential rate enacted by Act 77-2014.

In October of 2015, the Treasury Department revised its original estimate of revenues for fiscal year 2016 based on the actual revenues received during the last quarter of fiscal year 2015 and the first quarter of fiscal year 2016, as well as legislation enacted after the start of fiscal year 2016.  As revised, total estimated revenues for fiscal year 2016 are $9.446 billion, which is approximately $355 million lower than originally projected.  The Treasury Department's revised estimates considered the reduction in revenues for the month of October and the remaining months of the fiscal year. Early estimates of October revenues are consistent with the revised monthly estimates. Treasury expects to revise again its fiscal year 2016 revenue estimates during the third quarter of fiscal year 2016. The major changes in the estimated revenues consist of $84 million less in individual income taxes, $110 million less in corporate income taxes, $31 million less in Act 154-2011 excise taxes, $34 million less in motor vehicle excise taxes, $25 million less

in cover over rum excise taxes, $17 million less in cigarette excise taxes, $50 million less in sales and use taxes and $5 million less in withholding income taxes to non-residents.   The Commonwealth attributes such lower revenues in part to slower economic activity, continuing decline in population and the effect of preparing revenue estimates without taking into consideration the effect of actual revenues received during the last two months of fiscal year 2015.   To close the estimated General Fund revenue gap, the Government is in the process of implementing the following measures that are expected to raise approximately $185 million in revenues:

- $60 million to be required as an upfront payment in the renewal of the Electronic Lottery contract.   Legislation will be needed in order to transfer such upfront payment from the Electronic Lottery to the General Fund;

- $25 million in additional revenues  through a temporary reduced tax on corporate dividends provided under Act 159-2015; and

- $100 million in additional revenues through the enactment of administrative measures to increase the collection of tax revenues.

To reduce the remaining gap of approximately $170 million, OMB has already implemented $150 million in aggregate reductions to budgetary appropriations through the elimination of certain contingency accounts, reductions in non-priority program appropriations, and a decrease in the operating budgets of various agencies funded by the General Fund. OMB is in the process of implementing an additional $50 million in reductions to budgetary appropriations.

**Commonwealth Liquidity**

The Commonwealth's liquidity was severely affected during fiscal year 2015 and remains extremely limited, primarily as a result of the Commonwealth's inability to access external sources of financing. As a result, the Commonwealth has not been able to meet all its obligations on a timely manner, and has been prioritizing payments relating to essential government services and payroll.

The TSA bank cash balance and the preliminary book overdraft for the last six months is as follows (in millions):

| Description | April 30 | May 31 | June 30 | July 31 | August 31 | September 30 |
|---|---|---|---|---|---|---|
| Bank cash balance | $146.3 | $20.0 | $13.8 | $21.0 | $71.9 | $136.3 |
| Deposits in Transit | 51.1 | 34.4 | 64.1 | 53.7 | 71.5 | 37.0 |
| Outstanding checks and restricted cash | (280.7) | (325.7) | (506.7) | (504.8) | (434.0) | (543.6) |
| Preliminary book overdraft | ($73.3) | ($271.3) | ($428.8) | ($451.1) | ($290.6) | ($370.3) |

The above preliminary book overdraft computation does not include: (a) outstanding amounts payable for which a check has not been issued and (b) income tax refunds owed to taxpayers.  Actual income tax refunds claimed, processed and unpaid as of September 30, 2015 were approximately $306 million, excluding approximately $30 million in tax credits to senior citizens as provided by law.  The cash balances for August and September include $26 million and $111 million, respectively, in short-term time deposits. Commonwealth third party accounts payable and accrued liabilities as of June 30, 2015 were approximately $2 billion. Such amount excludes (i) income tax refunds owed and amounts due to Commonwealth agencies and public corporations and (ii) accounts payable and accrued liabilities of the Commonwealth's instrumentalities.

On June 5, 2015 and on June 18, 2015, the Puerto Rico State Insurance Fund Corporation and the Automobile Accidents Compensation Administration provided long-term credit facilities of $100 million and $2 million, respectively, to the Treasury Department pursuant to Act 80-2015. The Treasury Department used the full amount of these facilities, which provided deficit financing to the Commonwealth for fiscal year 2015, during the month of June.  Also in the month of June the Commonwealth paid $250 million due under its tax and revenue anticipation notes ("TRANs") plus accrued interest, $72 million related to the monthly set aside payments to the Redemption Fund for the Commonwealth's general obligations bonds, $100 million payment to GDB in principal plus accrued interest on an outstanding emergency credit facility extended by GDB pursuant to Act 164-2001, as amended, and approximately $161 million to GDB related to budgeted appropriations for repayment of outstanding GDB lines of credit.

In July of 2015, the Commonwealth repaid to GDB $300 million outstanding from its fiscal year 2015 TRANs. That month the GDB also extended a new $300 million revolving

TRANs facility to the Secretary of Treasury, which was subsequently reduced to $125 million. In August of 2015, the Commonwealth funded working capital needs through the placement of emergency "intra-governmental" TRANs in the aggregate principal amount of $400 million with the Puerto Rico State Insurance Fund ($335 million), the Automobile Accidents Compensation Administration ($50 million) and the Labor Department's disability fund (SINOT) ($15 million). The Secretary of Treasury has already utilized all proceeds of these TRANs, which are payable in May and June of 2016, to fund government operations.

In the first quarter of fiscal year 2016, the Commonwealth has implemented the following measures to deal with its liquidity challenges: (a) requiring advance payment to the Treasury Department from the two largest government retirement systems of funds required for the payment of retirement benefits to participants (instead of the usual reimbursements made by the retirement systems to the Treasury Department for pension benefits payments made by the Treasury Department on behalf of the retirement systems), (b) suspending during fiscal year 2016 Commonwealth set-asides required by Act No. 39 of May 13, 1976, as amended, for the payment of its general obligation debt, (c) delaying the payment of third-party payables or amounts due to public corporations, (d) deferring the disbursement of certain budgetary assignments, and (e) delaying the payment of income tax refunds. The Commonwealth also did not pay debt service on Public Finance Corporation bonds, since these amounts were not appropriated in the fiscal year 2016 budget as a result of continuing liquidity constraints.

The additional 4.5% sales and use tax recently enacted has generated additional revenues of approximately $170 million in the first quarter of fiscal year, which has improved year-over-year cash flows.

The current TSA cash flow forecast, before any liquidity measures, reflects a negative cash flow starting on November and continuing through the rest of the fiscal year. TSA actual cash flows for the first three months of fiscal year 2016 and forecasted cash flow for the remainder of fiscal year 2016 are as follows:

| | Actual | | | Forecast | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| ($ in millions) | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Jan-16 | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 |
| Beginning Bank Cash | $ 14 | 21 | 72 | 136 | 188 | (72) | (277) | (111) | 75 | 140 | 704 | $ 511 |
| Cash Inflows | 1,680 | 1,357 | 1,298 | 1,463 | 1,097 | 1,622 | 1,525 | 1,515 | 1,413 | 1,871 | 1,342 | 1,459 |
| Cash Outflows | (1,673) | (1,306) | (1,234) | (1,411) | (1,357) | (1,827) | (1,359) | (1,329) | (1,348) | (1,307) | (1,535) | (2,745) |
| Ending Bank Cash Balance | $ 21 | 72 | 136 | 188 | (72) | (277) | (111) | 75 | 140 | 704 | 511 | $ (775) |

Actual and projected cash flows do not include outstanding checks as of the end of each month

In the second quarter of fiscal year 2016, the Commonwealth has to pay $330 million in debt service of its General Obligation Bonds for which set-asides have not yet been made. The Government is evaluating additional liquidity measures, some of which may require legislative action, in order to bridge the gap of the projected TSA cash balance deficit. See "Possible Additional Extraordinary Expense Reduction and Cash Management Measures" below.

## Update on GDB's Liquidity

GDB has historically served as a principal source of short-term liquidity for the Commonwealth and its instrumentalities. During fiscal years 2014 and 2015, GDB's liquidity position was materially and adversely affected by, among other factors, the limited capital

market access of the Commonwealth and its instrumentalities during such fiscal years. As of September 30, 2015, GDB's liquidity resources, net of pledged securities, was approximately $875 million. The cash resources at GDB may be fully depleted before the end of calendar year 2015 in the absence of market access, other financing alternatives (including agreements with GDB's creditors) or emergency liquidity measures, including actions to preserve cash. Due to its strained liquidity situation, GDB is not expected to be a source of short-term liquidity for the Commonwealth or its instrumentalities.

**Possible Additional Extraordinary Expense Reduction and Cash Management Measures**

The Commonwealth has implemented several expense reduction and cash management measures to address its liquidity challenges, as discussed above under "Preliminary General Fund Revenues for the First Three Months of Fiscal Year 2016" and "Commonwealth Liquidity." Even after taking into account such measures, however, as discussed above, there is a high probability that the Commonwealth will not only run a General Fund budget deficit in fiscal year 2016, but that it will also have insufficient liquidity before the end of this calendar year to meet all of its debt service obligations while continuing to provide essential services to the residents of Puerto Rico. Accordingly, while the Commonwealth pursues a voluntary debt exchange offer in order to obtain financial relief, as recommended by the FEGP, the Commonwealth may have to take additional extraordinary expense reduction and cash management measures in order to maintain sufficient liquidity to provide essential government services. These measures could include, among others, if there is an insufficiency of available resources to meet debt service on general obligation debt, the utilization of certain taxes and other revenues previously assigned by law to Puerto Rico Highways and Transportation Authority, Puerto Rico Infrastructure Financing Authority and Puerto Rico Convention Center District Authority to secure their indebtedness that are subject to being applied to the payment of the Commonwealth's general obligation debt service in accordance with Article VI, Section 8 of the Commonwealth's Constitution. Even assuming the use of these revenues, the Commonwealth may not have sufficient funds to service all principal and interest on its general obligation debt without significantly curtailing government operations. Accordingly, the Commonwealth may be forced to implement additional extraordinary expense reduction and cash management measures that could include reducing public services and further delaying (beyond currently implemented delays) the payment of third-party payables, tax refunds and benefits payable to public employees. Some of the services provided by the Commonwealth, however, are essential to maintain the public health, safety and welfare of its residents, which may lead the Commonwealth to prioritize the funding of such services over financial or other obligations, including payment of debt service on its general obligation debt.

**Increase in the Sales and Use Tax Rate and Transition to a Value Added Tax**

On May 29, 2015, the Commonwealth enacted Act No. 72 ("Act 72-2015"), which, among other things, increased the sales and use tax ("SUT") rate by imposing a 4.5% SUT surcharge in addition to the existing 7% SUT, and which provided for a transition to a value added tax ("VAT") to substitute the central government's portion of the SUT, subject to certain conditions.

Since July 1, 2015, transactions subject to the 7% SUT are now subject to an aggregate 11.5% SUT (10.5% collected on behalf of Cofina and the Commonwealth, of which 0.5% goes to a special fund for the benefit of the municipalities, and 1% separately collected by the municipalities). The SUT will be in effect until March 31, 2016, unless the Secretary of Treasury extends the effectiveness of the SUT for an additional 60-day period.

In addition, since October 1, 2015 and until March 31, 2016:

- Business to business transactions that are currently taxable will be subject to an aggregate 11.5% SUT.
- Certain business to business services and designated professional services that were previously exempt from SUT will be subject to a Commonwealth SUT of 4% (with no municipal SUT applying to these services).
- Act No. 72 exempted the following services, among other exemptions, from the business to business SUT: (i) services offered by the Commonwealth government and instrumentalities, (ii) education, (iii) interest and other financing charges, (iv) insurance, (v) health and hospital services, and (vi) services offered by merchants with a volume of business not exceeding $50,000.
- On September 30, 2015, the Governor signed into law Act 159-2015, which expanded the services exempt from the 4% SUT to include certain legal services, advertising services, services rendered to a person engaged exclusively in the storage or handling of fuel in a foreign trade zone, services rendered to bona fide farmers, designated professional services rendered to labor unions, and ocean, air and ground transportation of goods, among other services.

After March 31, 2016 (or the extended sunset date provided for the SUT at the discretion of the Secretary of Treasury), all transactions subject to the SUT will be subject to a new aggregate VAT of 10.5% plus a 1% municipal SUT. The new VAT will also apply on the introduction into Puerto Rico of taxable articles and on taxable transactions which relate to the sale in Puerto Rico of goods and services by a merchant, the rendering of a service by a non-resident to a person in Puerto Rico, and combined transactions. Certain articles and transactions will not be subject to the VAT.

Act 72-2015 created a Commission to Consider Alternatives to Transform Consumption Taxes. This commission was authorized to review and recommend alternatives to the approved VAT, although any recommendation to implement a consumption tax different from the already approved VAT would have required additional legislation. In August of 2015, the commission concluded that the Commonwealth should continue with the implementation of the VAT. The Treasury Department has already commenced to work on the transition from a SUT to a VAT.

The sales tax legislation was subsequently amended in order to clarify that collections attributable to the additional 4.5% sales and use tax surcharge imposed by Act No. 72-2015 will be deposited directly in the General Fund for the benefit of the Commonwealth and not in the COFINA Dedicated Sales Tax Fund. Similarly, upon the effectiveness of the value added tax pursuant to the provisions of Act No. 72-2015, the collections attributable to the additional 4.5% value added tax surcharge imposed by Act No. 72-2015 will be deposited directly in the General Fund for the benefit of the Commonwealth's General Fund.

**New Internal Revenue Bureau**

On September 18, 2015, the Commonwealth enacted Act 156-2015 ("Act 156") to create the Bureau of Internal Revenue, an autonomous entity ascribed to the Treasury Department, with the mission of reducing tax evasion and avoidance, increasing collections, enhancing the professional development of its staff, improving systems technology, and improving the quality of services to taxpayers. Act 156 requires the Secretary of Treasury to provide to the Legislative Assembly within ninety (90) days a structural and organizational plan for the implementation of the Bureau of Internal Revenue. The Secretary of Treasury is currently working on developing such a plan and cannot provide at this time an estimate of when the Bureau of Internal Revenue will be in full operation.

**Enactment of New Petroleum Products Tax**

Act 1-2015, which amends the enabling act of the Puerto Rico Infrastructure Financing Authority ("PRIFA"), imposes a new petroleum products tax and assigns the revenues therefrom to PRIFA to secure the payment of bonds and notes issued by PRIFA. The PRIFA bonds and notes may be guaranteed by the Commonwealth provided the aggregate principal amount of such guaranteed bonds does not exceed $2.95 billion, the nominal annual interest rate does not exceed 8.50% and the maturity does not exceed 30 years.

PRIFA originally planned to issue bonds secured by collections of the new petroleum products tax and use the proceeds therefrom to, among other uses, repay loans made by GDB to PRHTA and PRHTA's outstanding variable rate debt obligations owned by GDB. PRIFA and GDB recently suspended such plans. In anticipation of the then-planned PRIFA bond issuance, on March 17, 2015, PRIFA issued $245,955,000 of bond anticipation notes, the proceeds of which were used to refinance certain outstanding PRHTA bond anticipation notes and pay related expenses.

**Non-Appropriation of Funds for the Payment of Debt Service on PFC Bonds**

On July 15, 2015 Puerto Rico Public Finance Corporation ("PFC") filed a notice with EMMA indicating that the Puerto Rico Legislative Assembly had not included in the approved budget for fiscal year 2016 the funds necessary to pay principal and interest on all outstanding PFC bonds. Such appropriation is the sole source of payment of principal and interest on such bonds. The Office of Management and Budget had included the necessary appropriation for the payment of such debt service but, as a result of the continuing liquidity constraints faced by the Commonwealth, such appropriation was not included in the budget that the Legislative Assembly ultimately approved and sent to the Governor. As a result, except as indicated below, the Trustee for such PFC bonds did not receive the funds from fiscal year 2016 legislative appropriations to pay debt service due during fiscal year 2016. The first payment of debt service for fiscal year 2016 came due on August 3, 2015. On August 3, 2015 PFC made a partial payment of interest in the amount of $628,000 from funds held by PFC representing funds remaining from prior legislative appropriations. On August 10, 2015, a resolution was introduced in the Commonwealth Senate authorizing the payment of past due amounts to PFC bondholders. However, as of the date of this report, this resolution has not been approved, and no legislative

appropriation has been made to pay principal and interest on outstanding PFC bonds during fiscal year 2016.

**Reform and Restructuring of the Puerto Rico Electric Power Authority**

On August 14, 2014, PREPA entered into forbearance agreements (the "Forbearance Agreements") with certain insurers of bonds outstanding under PREPA's Power Revenue Bonds Trust Agreement (the "Trust Agreement") and beneficial owners of the Bonds controlling, collectively, more than 60% of the principal amount of the Bonds then outstanding (collectively, the Forbearing Bondholders"), banks that provide revolving lines of credit used to pay for purchased power, fuel and other expenses (together, with their transferees, as applicable, the "Forbearing Lenders") and the GDB (together with the Forbearing Bondholders and the Forbearing Lenders, the "Forbearing Creditors").

Under the Forbearance Agreements, the Forbearing Creditors agreed to forbear from the exercise of certain rights and remedies under their applicable debt instruments.  The Forbearance Agreements were originally scheduled to terminate on March 31, 2015, but were extended on numerous occasions, most recently through November 5, 2015.  PREPA's monoline bond insurers did not agree to the extensions executed by an ad hoc group of PREPA's bondholders (the "Ad Hoc Group") since September 18, 2015 and one of such insurers did not agree to the extension signed by the Ad Hoc Group and the other two insurers on September 1, 2015.  The agreements are available on GDB's website.

The Forbearance Agreements required PREPA to continue to pay principal and interest on its bonds, and to pay interest on its bank lines of credit, during the forbearance period. PREPA has made all such payments through July 1, 2015.  In connection with its agreement to $415,000,000 in principal and interest payments due on the bonds on July 1, 2015, PREPA issued $130,714,000 of bonds which were purchased by certain of the insurance companies that insure PREPA's outstanding bonds.  Such new bonds mature on January 1, 2016.

In accordance with the Forbearance Agreements, PREPA delivered a recovery plan proposal to the Forbearing Creditors on June 1, 2015 that included a proposal for PREPA's financial and operational transformation.  Since that date, PREPA has engaged in discussions with the Forbearing Creditors regarding the terms of a consensual agreement on a recovery plan.

On September 2, 2015, PREPA announced an agreement in principle regarding the economic terms of a restructuring with the Ad Hoc Group that holds approximately 35% of PREPA's outstanding power revenue bonds.

Under that agreement, bondholders will have the option to receive securitization bonds that will pay cash interest at a rate of 4.0% - 4.75% (depending on the rating obtained) ("Option A Bonds") or convertible capital appreciation securitization bonds that will accrue interest at a rate of 4.5% - 5.5% for the first five years and pay current interest in cash thereafter ("Option B Bonds").  Option A Bonds will pay interest only for the first five years, and Option B Bonds will accrue interest but not receive any cash interest during the first five years.  All of PREPA's uninsured bondholders will have an opportunity to participate in the exchange.

Under the extension to Forbearance Agreement with the Ad Hoc Group executed on September 1, 2015, PREPA agreed to work collaboratively and in good faith with the Ad Hoc Group to reach agreement on a recovery plan incorporating these terms (the "Ad Hoc Group Agreement").

On September 22, 2015, PREPA announced an agreement in principle regarding economic terms with its Forbearing Lenders.

Under that Agreement, the Forbearing Lenders, which hold approximately $700 million of matured debt,  will have the option to either (1) convert their existing credit agreements into term loans, with a fixed interest rate of 5.75% per annum, to be repaid over six years in accordance with an agreed amortization schedule or (2) exchange all or part of principal due under existing credit agreements for new securitization bonds to be issued on the same terms as the Ad Hoc Group.

Under the extensions to the Forbearance Agreements with the Forbearing Lenders executed on September 22, 2015, PREPA agreed to work collaboratively and in good faith with the Forbearing Lenders to reach agreement on a recovery plan incorporating these terms (the "Fuel Line Agreement").

On November 4, 2015, the Governor submitted the PREPA Revitalization Act to the Legislative Assembly to facilitate PREPA's ongoing transformation and recovery plan.  The PREPA Revitaliztion Act sets forth a framework for PREPA to execute on the agreements with creditors reached to date.  Among other things, the PREPA Revitalization Act would (1) enhance PREPA's governance processes; (2) adjust PREPA's practices for hiring and managing management personnel; (3) change PREPA's processes for collecting outstanding bills from public and private entities; (4) improve the transparency of PREPA's billing practices; (5) implement a competitive bidding process for soliciting third party investment in PREPA's infrastructure; (6) allow for the refinancing of existing PREPA bonds through a securitization that would reduce PREPA's indebtedness and cost of borrowing; and (7) set forth an expedited process for the Energy Commission to approve or reject PREPA's proposal for a new rate structure that is consistent with its recovery plan.

On November 5, 2015, PREPA announced its entry into a restructuring support agreement (the "RSA") with the Ad Hoc Group and the Forbearing Lenders setting forth the agreed-upon terms of PREPA's recovery plan.  The economic terms set forth in the RSA are consistent with the Ad Hoc Group Agreement and the Fuel Line Agreement.  In addition, pursuant to the RSA, GDB will receive substantially the same treatment on debt owed by PREPA to it as the Forbearing Lenders will receive.

PREPA's monoline bond insurers are not party to the RSA, and PREPA has not reached an agreement in principle with its monoline bond insurers regarding their treatment under the terms of its recovery plan.

Execution of the transactions set forth in the RSA remain subject to a number of material conditions and risks, including without limitation, (1) obtaining legislative authority for issuance of the securitization bonds and other organizational reforms at PREPA; (2) receipt of an

investment grade rating from any major rating agency that rates the securitization bonds; (3) obtaining an agreed upon level of participation from uninsured bondholders in the exchange offer described above; and (4) reaching agreement with creditors regarding the definitive documentation of the various restructuring transactions.

Ms. Donahue and a team comprised of fourteen full time equivalents from AlixPartners are working, alongside PREPA management, on seeking to reach a consensual agreement with PREPA's creditors, and are working to transform PREPA's operations and implement savings initiatives. AlixPartners' efforts, along with those of PREPA, have already yielded approximately $80 million in one-time cash savings and approximately $105 million in recurring annual savings. Further savings initiatives will be phased in over time with projected one-time savings totaling as high as $260 million and recurring annual savings totaling as high as $390 million upon completion of operational initiatives.

For additional information on PREPA, see "PUBLIC CORPORATIONS- Electric Power Authority."

## Puerto Rico Aqueduct and Sewer Authority

On August 10, 2015, PRASA published a Preliminary Official Statement for the issuance of $750 million of its revenue bonds to, among other things, finance a portion of PRASA's capital improvement program, reimburse PRASA for certain capital improvement program costs incurred during fiscal years 2013, 2014 and 2015 and repay or refinance certain outstanding credit facilities provided by a syndicate of local commercial banking institutions and by Government Development Bank for Puerto Rico. The issuance was not completed during the month of August due to unfavorable market conditions. PRASA may attempt to re-access the market in the near term to finance its capital expenses, subject to market conditions.

The $90 million term loan granted by a syndicate of commercial banking institutions, pursuant to that a credit agreement executed on May 29, 2015, was scheduled to mature on September 15, 2015, and was secured by a $90 million escrow deposit of PRASA's funds, then on deposit in the Rate Stabilization Account of the Surplus Fund created under the Master Trust Agreement, dated March 1, 2008, as amended and restated on February 15, 2012.

On September 15, 2015, PRASA issued $75 million of its 2015A Senior Bonds under the Master Trust Agreement, as supplemented by a Fifth Supplemental Agreement of Trust, dated as of September 15, 2015 (the "Fifth Supplemental Agreement") setting the details of such bonds, including a maturity date of November 30, 2015. The proceeds of the purchase of the 2015A Senior Bonds were used to repay a portion of the outstanding balance of the term loan granted pursuant to the credit agreement referred above. PRASA expects to use a portion of the proceeds of an additional issuance of its revenue bonds to repay the remaining $15 million under the credit agreement and refund the 2015A Senior Bonds, thereby releasing the $90 million presently securing such facilities and permitting their deposit to the Rate Stabilization Account of the Surplus Fund used to fund the escrow accounts relating thereto. There is no assurance, however, that PRASA will be able to successfully consummate a transaction. If PRASA is unable to successfully achieve the issuance of the above referenced revenue bonds, PRASA will be forced to re-evaluate the financing structure for its capital improvement program.

**Health Insurance Administration**

On October 14, 2014, the Board of Directors of the PR Health Insurance Administration ("PRHIA") awarded new contracts for the Government Public Health Insurance Plan (the "GHP"), which replaced the former "Mi Salud" plan, to five private insurance providers pursuant to a bidding process.  The new contracts became effective on April 1, 2015.  Under the new contracts, the Commonwealth public health insurance model changed from a "third-party administrator" (TPA) model, in which the Commonwealth was ultimately responsible for the cost of the health services provided, to a "managed care organization" (MCO) model, in which PRHIA will pay the insurers a fixed premium for each insured beneficiary and the insurers will be responsible for the cost of such services.  The premiums payable by the Commonwealth under the new contracts in fiscal year 2015 exceed by approximately $62 million the amounts included in the fiscal year 2015 budget for such purpose.

PRHIA's transition from a TPA to an MCO model has exacerbated PRHIA's liquidity need.  This heightened liquidity need is due to the TPA's phase-out period, which requires the PRHIA to pay-off the TPA and maintain current MCO premiums.  The MCO insurance model demands premium payments at the beginning of each month, payable during the first five days, subject to a final adjustment by end-of-month. In order to ensure continuity of services, PRHIA recently reached a preliminary agreement with the five private insurance providers to pay-off the premiums throughout the month instead of during the first five days of the month. According to preliminary results for fiscal year 2015, the legacy of the TPA was $156 million approximately in unpaid claims, including the actuarially determined incurred but not reported liability for claims not yet received of approximately $76 million.   In addition, the unpaid premiums of the current insurance model were approximately $220 million.

The Governor recently signed legislation that authorizes PRHIA to borrow, including through the issuance of bonds, up to $400 million in order to repay the amounts mentioned above. There is no assurance that PRHIA will be able to obtain such financing. If PRHIA is unable to secure this financing and if the Commonwealth's financial situation precludes it from continuing to support the Commonwealth health insurance plan, PRHIA might be unable to fulfill its financial and contractual obligations.

On June 8, 2015, the Centers for Medicaid and Medicare services confirmed that the Medicare Advantage funding for Puerto Rico in 2016 will be reduced by approximately 11%. Such reductions to the Medicare Advantage rates would impact the ability of the Medicare Advantage plans to assume the costs of covering the higher-need dual eligible population (approximately 250,000 beneficiaries) covered through PRHIA's "Platino" program.  Medicare Advantage subsidizes the costs of the "Platino" program from the rates paid through Medicare. If the Medicare Advantage plans cannot subsidize the costs of covering the "Platino" program, PRHIA's costs for calendar year 2016 for this population would increase from the current $20 to $30 million per year to $120 to $150 million per year unless benefit reductions are made.

PRHIA is facing other challenges, including a substantial reduction in federal funding (absent Congressional action) in the next few years.

See "FISCAL CONDITION – Financial Condition of Selected Component Units – PRHIA" and "RISK FACTORS – The Commonwealth's healthcare costs represent a very high percentage of its budgetary expenditures, and the Commonwealth may be unable to continue to fund such healthcare costs."

**Puerto Rico Metropolitan Bus Authority**

On September 25, 2015, the Puerto Rico Metropolitan Bus Authority ("PRMBA") executed an amendment to its loan facility with a commercial bank whereby the local commercial bank agreed to extend the maturity date on a $29 million loan to PRMBA until March 31, 2016. The line of credit is secured by approximately $10 million in cigarette tax revenues pledged to PRMBA.

**Counterparty Claims with Respect to Terminated Swaps and Debt Service Deposit Agreements**

The Commonwealth and COFINA face claims from a swap counterparty with respect to swaps that were terminated in 2008. In 2010, the counterparty, which is in bankruptcy, claimed that the termination payment amounts had been calculated using incorrect termination dates (due to arguments concerning the method of notice of termination) and that it was owed substantial additional termination payments, default interest on such payments, and an adjustment for supposedly excessive fees. The Commonwealth believes that if any additional amounts are owed with respect to these swaps, such amounts would be significantly lower than the amounts claimed. The parties were ordered by the bankruptcy court to conduct a mediation process with respect to these disputes, which process is continuing.

In addition, the Commonwealth and COFINA are parties to debt service deposit agreements with affiliates of the counterparty that has asserted the swap termination claims. Under the debt service deposit agreements, the Commonwealth and COFINA (or their predecessors in interest) received upfront payments and in exchange granted the counterparty the right to sell securities to the Commonwealth and COFINA in advance of specified bond payments at their maturity amount rather than market price at the time of sale. The agreements provide the counterparty the right to terminate upon the occurrence of various events. The counterparty has asserted that it currently has the right to terminate both agreements, in which case it would be owed termination payments equal to the cost of replacement agreements that would provide the counterparty with the economic benefits of the agreements, as determined through market quotations or otherwise in accordance with the agreements. Although the termination payments have not been calculated in accordance with the agreements, the Commonwealth estimates that if the agreements were terminated in accordance with their terms, the termination amounts could be material. GDB is also jointly and severally liable with the Commonwealth with respect to the Commonwealth debt service deposit agreement.

**CRIM Litigation**

As of June 30, 2015, Puerto Rico municipalities in the aggregate maintained $515 million on deposit at GDB in special debt service deposit accounts which are funded primarily from the proceeds of a special property tax ("Special Additional Tax"). As of July 31, 2015, after the July

debt service payment, the aggregate balance of debt service deposits related to the Special Additional Tax was $266 million. These funds are collected by the CRIM and used for debt service payments of general obligations bonds issued by the municipalities and, by law, have to be deposited in trust at the GDB. On June 29, 2015, the CRIM filed suit requesting that GDB execute a deed of trust pursuant to Puerto Rico law. The CRIM also stopped transferring collected revenues to GDB until the deed of trust was executed. GDB opposed the CRIM's suit asserting that the law already provided a statutory trust and, hence, there was no need for a deed of trust as requested by the CRIM. On October 23, 2015, the parties announced that a settlement had been reached, that a deed of trust would be executed and that new investment guidelines for the municipalities funds would be approved and applied thereon.  On November 2, 2015, the parties executed the deed of trust and on November 4, 2015 judgment was entered by the Court ending the litigation. The execution of the deed of trust and the new investment guidelines are not expected to have a material adverse effect on GDB's current liquidity or financial position.

**GDB's Economic Activity Index**

In its announcement of the economic activity index for March 2015, GDB indicated that it was changing the seasonal adjustment method to estimate the economic activity index from the multiplicative moving average method to the tramo/seats method.  This methodology estimates seasonal factors that can vary across different years, thus diminishing the volatility of the composite index.

For fiscal year 2015, the GDB-EAI reflected a decrease of 1.6%, and for the first three months of fiscal year 2016 remained flat compared with respect to the same period of the previous fiscal year.

**Downgrade of Bond Ratings**

Since February of 2014, the credit ratings of the Commonwealth's general obligation bonds and Commonwealth guaranteed bonds, as well as the ratings of most of the Commonwealth's public corporations, have been lowered (more than once in most cases) to non-investment grade by Moody's, S&P, and Fitch.  The most recent rating downgrades occurred in September of 2015. See "RATINGS."

**Failure to File Commonwealth Consolidated Annual Financial Statements by May 1 Deadline**

On October 30, 2015 the Commonwealth filed with EMMA a notice that the Commonwealth would not file its audited financial statements for fiscal year 2014 by October 31, 2015, as had been previously announced by the Commonwealth.  The Commonwealth cannot provide an estimate at this time of when it will be able to complete and file its audited financial statements.

The Commonwealth has been unable to finalize its 2014 Financial Statements principally due to delay of certain component units and fiduciary funds in completing their financial statements and the independent auditor's decision to conduct additional audit procedures given the liquidity risk and uncertainties affecting the Commonwealth and such units and funds. The

component units and fiduciary funds that have not issued their audited financial statements as of the date of the above notice filed with EMMA are the three retirement systems of the Commonwealth, the Puerto Rico Electric Power Authority, the Puerto Rico Highways and Transportation Authority and the Government Development Bank for Puerto Rico. The audited financial statements of such component units and fiduciary funds are required to be incorporated into the Commonwealth's financial statements.   For additional information related to noncompliance with the continuing disclosure obligations, see "CONTINUING DISCLOSURE"

**Recovery Act and United States Bankruptcy Code Initiative**

On February 6, 2015, the United States District Court for the District of Puerto Rico issued an opinion and order declaring the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (the "Recovery Act") (which provides a mechanism for certain Commonwealth public corporations, but not the Commonwealth itself, to restructure their obligations) unconstitutional and stating that it was preempted by the United States Bankruptcy Code.  The Commonwealth filed an expedited appeal before the United States Court of Appeals for the First Circuit. On July 6, 2015, a three-judge panel of the Court of Appeals upheld the judgment of the District Court holding that the Recovery Act is unconstitutional. On August 21, 2015, the Department of Justice filed a petition for writ of certiorari before the United States Supreme Court. For a discussion of the Recovery Act, see "FISCAL CONDITION – Enactment of Puerto Rico Public Corporation Debt Enforcement and Recovery Act."

On February 11, 2015, Resident Commissioner Pedro R. Pierluisi filed Bill H.R. 870 seeking to amend the United States Bankruptcy Code to treat the Commonwealth as a state under Chapter 9. On July 15, 2015, Senator Richard Blumenthal filed Bill S. 1774, a companion bill to Bill H.R. 870, in the United States Senate. In the event the United States Congress were to amend the Bankruptcy Code to include the Commonwealth's instrumentalities, as eligible debtor municipalities under Chapter 9, as proposed under Bill H.R. 870 and Bill S. 1774, then public corporations of the Commonwealth could potentially file a petition seeking relief under its provisions.

On July 28, 2015, in a letter addressed to the Chairman of the Senate Committee on Finance, the United States Secretary of the Treasury endorsed the enactment of federal legislation granting the Commonwealth access to an orderly bankruptcy regime to resolve its financial obligations under the supervision of a United States bankruptcy court. On October 21, 2015, as discussed in greater detail above, White House and Treasury Department officials again endorsed the proposed legislation granting Puerto Rico public corporations access to Chapter 9, and in addition proposed the enactment of legislation that would allow the Commonwealth itself to restructure its debt obligations.

To the extent the Commonwealth or any of its public corporations is allowed to and seeks relief under Chapter 9 of the United States Bankruptcy Code or any similar law, bondholder rights and remedies may be adversely affected.  Moreover, the Commonwealth or such public corporation, as applicable, may not be required to honor its outstanding obligations in full to the extent certain creditors agree to the plan presented by the Commonwealth or such public corporation.

**Statements Regarding Possible Incurrence of Commonwealth Debt in Violation of the Puerto Rico Constitution**

On October 22, 2015, the United States Senate Committee on Energy and Natural Resources held a hearing on Puerto Rico's economy, debt and options for Congress. In the hearing, Senator Bernie Sanders (I-VT) asked whether it was possible that some of the Commonwealth's debt was incurred in violation of the Puerto Rico Constitution and, if that were the case, whether such debt would have to be repaid. Both the Governor and the Resident Commissioner testified before the Committee and responded that it was a possibility that should be further studied. Act 97-2015, which amended GDB's organic act, establishes a Public Debt Auditing Commission, charged with providing transparency and citizen participation in the review of the Commonwealth and public corporations' aggregate debt, including legal aspects. Although Act 97-2015 stated that the Commission would commence its functions no later than July 1, 2015, not all members of the Commission have been named.

At this time, and unless a different opinion were to be reached in the event of an audit by the Public Debt Auditing Commission or by a similar investigative process, the Administration has no reason to believe that any of the Commonwealth's debt was incurred in violation of the Puerto Rico Constitution and believes the focus must remain on working towards achieving a comprehensive fiscal adjustment and economic growth plan that includes a consensual restructuring of the Commonwealth's debt. In the absence of such a solution, however, legal disputes of this type could intensify, including among the Commonwealth's different creditors.

# RISK FACTORS

*The following discussion of risk factors does not necessarily reflect the relative importance of various factors and is not meant to be a complete list of risks that could materially adversely affect the Commonwealth's financial and economic condition, liquidity, and operations. Additional risks and uncertainties not currently known by the Commonwealth, or that the Commonwealth does not currently consider to be material, or that are generally applicable to all states and governmental instrumentalities, also may materially and adversely affect the financial condition of the Commonwealth and its ability to repay its bonds and honor its other obligations. Moreover, while some of the risks described below may also affect the Commonwealth's instrumentalities, this Commonwealth Report does not, and is not intended to, identify all the risks associated with each instrumentality. Any one or more of the factors discussed herein, and other factors not described herein, could lead to a decrease in the market value and the liquidity of the Commonwealth's bonds. There can be no assurance that other risk factors not discussed below will not become material in the future.*

*References to "bonds" in this section means the Commonwealth's general obligation bonds and bonds guaranteed by the Commonwealth, and does not include bonds issued by any of the Commonwealth's instrumentalities. Some of the risks discussed below, however, also affect bonds issued by Commonwealth instrumentalities, including bonds payable from Commonwealth appropriations or tax revenues assigned by the Commonwealth.*

## Overview

The Commonwealth is currently facing a fiscal and economic crisis due, among other factors, to a prolonged economic recession, high levels of debt and pension obligations, lack of access to the capital markets, and population decline, which have led to significant budget deficits. The causes of this crisis have been analyzed in the Fiscal and Economic Growth Plan (the "FEGP") released on September 9, 2015, by the Working Group for the Fiscal and Economic Recovery of Puerto Rico and in the Krueger Report, both of which are discussed above under "Recent Events." The conclusions drawn by both the FEGP and the Krueger Report represent significant risks for holders of Commonwealth bonds. The following discussion describes these and other risks. Some of these risks are related.

**The Commonwealth faces an immediate liquidity crisis; it does not have sufficient cash to honor its debt obligations as they come due and it may therefore need to take emergency actions to conserve cash, including a debt moratorium.**

The Commonwealth's liquidity position is extremely weak with very limited or no access to bank credit or the capital markets on terms that the Commonwealth considers reasonable. Since a substantial portion of the Commonwealth's tax revenues are received during the second half of the fiscal year (January through June) while operational expenditures are spent evenly throughout the fiscal year, the Commonwealth normally needs short-term financing during the first half of the fiscal year (July through December), which is usually obtained by the issuance of tax and revenue anticipation notes (TRANs). The Commonwealth has been unable to obtain TRANs financing this fiscal year from commercial banks or capital market sources, and has

34

relied on financing from other government instrumentalities, which is unsustainable. The Commonwealth was unable to pay scheduled debt service on certain appropriation debt in August and has a $330 million payment on general obligation bonds due on January 1, 2016 for which set-asides have not been made. In addition, the Treasury Department recently reduced its revenue estimate for fiscal year 2016 by $355 million, from $9.800 billion to $9.446 billion. The Commonwealth is currently identifying measures to bridge its General Fund budget deficit, but there are no assurances that any measures so identified will be successful in addressing such General Fund budget deficit. Furthermore, the General Fund (budgetary basis) revenues may include non-cash revenues such as unclaimed prizes from the traditional lottery that do not provide the Commonwealth with incremental liquidity. Such non-cash revenues are deposited in the TSA (and thus are commingled with General Fund, other central government revenues and collections made on behalf of certain component units). A significant portion of these non-cash revenues relate to transactions with the traditional lottery that are deposited in the TSA at least six months prior to such revenues being recognized as revenue on a budgetary basis by the General Fund.

In addition to the budgetary deficit in the General Fund, according to the FEGP, the Commonwealth is also projected to incur additional deficits in non-budgetary funds that consolidate with the General Fund for purposes of U.S. GAAP, in non-General Fund governmental funds, in Commonwealth enterprises (proprietary funds), and in certain component units which provide essential services and depend financially on the General Fund.

The Government Development Bank, which has traditionally served as a source of emergency liquidity to bridge General Fund and non-General Fund deficits, is experiencing its own liquidity constraints and is thus unable to continue serving in such role. Although the Commonwealth has been taking extraordinary measures to conserve cash, such as delaying payments to suppliers and delaying tax refunds to taxpayers, these measures are also unsustainable and have significant negative economic effects. Furthermore, the buildup of payables to suppliers and taxpayers creates further strains on the Commonwealth's liquidity and represent additional demands on the Commonwealth's cash resources that are not contemplated in the General Fund budget to the extent such accounts payable relate to prior fiscal years.

Unless the Commonwealth is able to obtain financing in the very near term or to reach restructuring or forbearance agreements with its creditors, it may not be able to honor all of its obligations as they come due while at the same time providing essential government services. The Commonwealth may therefore be forced to take emergency measures that affect the rights of bondholders and other creditors. These measures could include a moratorium on the payment of debt service.

**The Commonwealth does not have sufficient resources to pay its debt obligations in accordance with their terms and it will therefore need to restructure such obligations in order to avoid defaulting on such obligations.**

The FEGP projects that the cumulative financing gap (i.e. the difference between projected revenues and expenses) for the Commonwealth and certain of its instrumentalities that rely primarily on tax revenues for their operations for the five fiscal years between 2016 and 2020 will be $27.8 billion absent corrective actions. The FEGP contemplates that this financing

gap could be reduced to $14 billion through a combination of revenue increases (including the increase in the sales and use tax, which has already gone into effect), expense reductions and economic growth, but that the remaining financing gap will need to be addressed by debt restructuring. The Governor and the Working Group have stated that this restructuring should be carried out through voluntary debt exchanges affecting the bonds and notes of the Commonwealth and its public corporations. The goal of such exchanges would be to provide liquidity relief in the short term and to cap long-term debt service on the Commonwealth's financial obligations to a sustainable percentage of revenues. However, there is no certainty that these voluntary debt exchanges can be successfully consummated, that the expected liquidity and debt relief will be achieved, or that the revenue increase and expense reduction measures will be implemented and produce the expected results. Bondholders may refuse to participate or may challenge the legality of the proposed transactions. In the absence of such voluntary exchanges, the Commonwealth is likely to default on all or a portion of its debt obligations.

The Commonwealth (like each of the states) is not currently eligible to seek relief under Chapter 9 of the United States Bankruptcy Code. The Commonwealth's public corporations are also not eligible to seek relief under the Bankruptcy Code. Although the Commonwealth enacted the Recovery Act discussed under "Fiscal Condition – Enactment of the Puerto Rico Public Corporation Debt Enforcement and Recovery Act," this law was held by a federal court to be preempted by the Bankruptcy Code and therefore unconstitutional. In the future, however, the United States Congress or the Legislative Assembly of the Commonwealth could enact legislation (subject to applicable constitutional limitations), including an amendment to the United States Bankruptcy Code or a debt adjustment statute applicable to Puerto Rico in particular, that entitles the Commonwealth and its public corporations to seek a debt adjustment, moratorium or other remedy that affects the rights of its creditors. The United States Treasury Department has endorsed federal legislation for such purposes.

**The Commonwealth has too much debt in relation to the current size and trajectory of its economy.**

As of September 30, 2015, the Commonwealth had outstanding a total of $22.764 billion aggregate principal amount of bonds and notes issued or guaranteed by the Commonwealth or payable directly from General Fund appropriations, equivalent to approximately 33% of the Commonwealth's gross national product for fiscal year 2014 ($69.202 billion - preliminary). Debt service for fiscal year 2016 on these bonds and notes payable from the General Fund ($1.963 billion) represents approximately 20% of the General Fund budget for fiscal year 2016 ($9.800 billion).

However, when debt from governmental issuers supported by tax revenues or General Fund appropriations is included in the calculation, as suggested by the FEGP, debt service for fiscal year 2016 represents 38% of total central government revenues (excluding federal transfers and after reflecting the projected impact of the legislated 4.5% increase in the sales and use tax rate; when excluding the impact of the sales and use tax rate increase the FEGP estimates the percentage at 42% of total revenues). Other tax supported debt includes bonds issued by the Puerto Rico Sales Tax Financing Authority ("COFINA"), which as of September 30, 2015, had $15.213 billion principal amount of obligations payable from sales and use tax revenues, the Puerto Rico Highways and Transportation Authority and the Puerto Rico Infrastructure Finance

Authority, which had $6.423 billion (inclusive of bank and bond debt) and $2.095 billion, respectively, principal amount of bonds and notes payable in part from petroleum taxes, rum taxes and other taxes, the Employees Retirement System, which had $2.948 billion principal amount of bonds mostly payable from contributions to the System made by the Commonwealth (which are in turn funded by taxes collected by the Commonwealth), the Puerto Rico Convention Center District Authority, which had $543 million principal amount of bonds and notes payable from hotel room taxes, as well as the University of Puerto Rico and PRIDCO. Total debt service on these bonds and notes for fiscal year 2016 equals $1.435 billion. In addition, total debt service for fiscal year 2016 on GDB bonds and notes, which are payable in part from Commonwealth appropriations and revenues from the public corporations, which are themselves tax supported, equals $1.070 billion.

The Commonwealth's high level of debt and the resulting allocation of revenues to service this debt have contributed to significant budget deficits during the past several years, which deficits the Commonwealth has been required to finance, further increasing the amount of its debt.  More recently, the Commonwealth's high level of debt, among other factors, has adversely affected its credit ratings and its ability to obtain financing on sustainable terms.  The Commonwealth expects that its ability to finance future budget deficits will be severely limited, and, therefore, that it will be required to choose between reducing the amount of resources that fund essential governmental programs and services and honoring its debt obligations.

*The budget deficit of the Commonwealth's central government during recent years may be larger than the historical deficits of the General Fund because they do not include the deficits of various governmental funds, enterprise funds, and Commonwealth instrumentalities that ultimately rely on tax revenues.*

As described in the Krueger Report and the FEGP, the standard measure of the fiscal balance that has historically been used in Puerto Rico for several decades - the General Fund – materially understates the financing gaps faced by the Commonwealth.  The General Fund, presented based on a budgetary basis of accounting, excludes numerous governmental funds, enterprise funds and government instrumentalities that have historically run deficits and that ultimately rely on tax revenues or General Fund (budgetary basis) appropriations to operate. According to the Krueger Report and the FEGP, the Commonwealth is projected to incur additional deficits in these funds and component units. In addition, the General Fund excludes hundreds of millions in necessary capital expenditures that are traditionally funded with general obligation bonds and GDB lines of credit, which funding is not expected to be available in the near future.

The total deficit of the central government calculated on a U.S. GAAP basis is thus significantly higher than the deficit of the General Fund calculated on a budgetary basis.

**The Puerto Rico economy has been on a prolonged recession and is likely to continue to contract absent structural reform measures, affecting the Commonwealth's ability to pay its obligations.**

***The Commonwealth's economy has been contracting and, absent future real growth, may be unable to sustain the Commonwealth's outstanding debt.***

The Commonwealth's gross national product contracted in real terms in every year except one between fiscal year 2007 and fiscal year 2014 (inclusive). According to the Puerto Rico Planning Board, for fiscal years 2015 and 2016, gross national product is projected to further contract, by 0.9% and 1.2%, respectively. This persistent contraction has had an adverse effect on employment and tax revenues, and has significantly contributed to General Fund budget deficits in those fiscal years. Factors that can adversely affect the Commonwealth's ability to increase the level of economic activity, some of which are not within the control of the Commonwealth, include the high cost of energy, the loss of patent protection of several products manufactured in Puerto Rico, global economic and trade conditions, population decline, and the Commonwealth's high level of debt.

The FEGP contains a number of proposals designed to promote economic growth. However, many of these proposals require the enactment of legislation by the Puerto Rico Legislative Assembly or the Congress of the United States. Some of these measures face opposition by legislators, labor unions, or other affected parties. There is no certainty that these proposals will be adopted, or that if adopted, they will produce the intended results.

***Population decline, particularly of working age individuals, will adversely affect the economy.***

Changes in population have had, and may continue to have, an impact on economic growth and on tax revenues. According to the United States Census Bureau, the population of Puerto Rico decreased by 2.2% from 2000 to 2010, and by an estimated 4.7% from 2010 to 2014, driven primarily by migration to the United States mainland. Reductions in population, particularly of working age individuals, are likely to have an adverse effect on tax and other government revenues that will not be entirely offset by reductions in government expenses in the short and medium term. In addition, the average age of the population of Puerto Rico is increasing, partly due to a reduction in birth rate, but primarily as a result of the migration of younger persons to the United States mainland. This phenomenon is likely to increase the demand for health and other services on the Commonwealth, and the cost to the Commonwealth of providing such services.

***The Commonwealth's macroeconomic data may not accurately reflect the performance of the economy of Puerto Rico.***

The Puerto Rico Planning Board (the "Planning Board") recently acknowledged the existence of certain significant deficiencies in the calculation of its macroeconomic data. The deficiencies relate mostly to the deflators of the components of trade-related services and, in some cases, monetary accounts of certain components of gross national product. As a result, the historical rate of change in gross national product at constant prices (real gross national product change) and at current prices (nominal gross national product change) could have been either overstated or understated for several years. These deficiencies have also led to the delay in the publication of periodic economic data in order to provide the Planning Board with sufficient time

to determine the particular deficiencies included in the calculation of the "deflators" and the procedures to fix such deficiencies.

The Planning Board has established a corrective action plan that is currently at the technical discussion phase. The Planning Board expects to complete this technical discussion phase by the end of calendar year 2015 and complete its corrective phase and publication of revised macroeconomic data during the first half of calendar year 2016.

It is still too early to determine how the above deficiencies have affected, or will affect, Puerto Rico's macroeconomic data. Until such time as these revisions are finalized and fully applied to Puerto Rico's macroeconomic data, there is no assurance that previously reported macroeconomic data accurately reflect the performance of the economy of Puerto Rico.

**A significant portion of the Commonwealth's expenses relate to essential services and pension benefits; the Commonwealth's ability to reduce such expenses without significantly affecting the residents of Puerto Rico is limited and the Commonwealth may therefore need to prioritize such expenses over payment of debt service.**

### *The cost of the Commonwealth's health insurance program is very significant.*

The Commonwealth, through its Health Insurance Administration, provides health insurance coverage to approximately 1.6 million qualifying (generally low-income) residents of Puerto Rico. The cost of this health insurance program is very significant, totaling $2.5 billion for the fiscal year ended June 30, 2014 and $2.7 billion for the fiscal year ended June 30, 2015. A substantial portion of this cost is currently paid by the federal government and funded principally by non-recurring funding provided pursuant to the federal Patient Protection and Affordable Care Act (the "Affordable Care Act" or "ACA"), as well as recurring Medicaid and Children's Health Insurance Program ("CHIP") funds, which in the case of the Commonwealth are capped at a level lower than that applicable to the states (which are not capped).

Upon exhaustion of the non-recurring ACA funds, currently estimated to occur in March of 2018, and absent Congressional action to renew this non-recurring funding, the amount of federal funds available for this health insurance program will revert to the recurring capped Commonwealth Medicaid and CHIP allocations of approximately $400 million per year, which would result in significantly higher requirements of Commonwealth funding, unless benefits or eligibility or both are reduced significantly. Although the Commonwealth can take various measures to address the imbalance, including reducing coverage and limiting eligible beneficiaries, federal regulations may prohibit or limit the application of these measures.

If the availability of ACA funds is not renewed through Congressional action and if no changes to benefits, co-pays or eligibility are made, the annual deficit of the health insurance program (which the General Fund may be required to fund) could rise to as much as $2.0 billion by fiscal year 2020.

The fiscal stability of the Commonwealth's health insurance program is one of the most significant budgetary challenges facing the Commonwealth, especially if the availability of ACA funds is not renewed or Medicaid funds are not significantly increased. In light of the current

39

disparity in the treatment that the Commonwealth receives compared with the states with respect to the cap imposed on Medicaid matching funds, the Commonwealth is intensifying its efforts to have ACA funding renewed by Congress. The Resident Commissioner is also involved in these efforts and recently members of the private and public sector formed the Puerto Rico Healthcare Crisis Coalition. However, it is not possible to predict the likelihood that such efforts will succeed. To the extent these efforts are unsuccessful, the Commonwealth would have to assume a significantly higher portion of the cost of the health insurance program.

***The assets of the Commonwealth's retirement systems will be completely depleted within the next few years unless the Commonwealth makes significant additional contributions to the retirement systems.***

A significant component of the Commonwealth's budget is the cost of its retirement systems (the "Retirement Systems"). The three principal pension systems of the Commonwealth (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) have a significant unfunded actuarial accrued liability and a very low funding ratio. Although the Commonwealth enacted legislation in 2013 that attempts to reform the Retirement Systems by, among other measures, reducing benefits, increasing employer and employee contributions, and replacing most of the defined benefit elements of the system with a defined contribution system, these reforms were primarily designed to address the Retirement Systems' cash flow needs in a manner that would permit them to make benefit payments when due. As a result, even after giving effect to these reforms, the Retirement Systems will continue to have a large unfunded actuarial accrued liability and a low funding ratio for several decades.

As described under "RETIREMENT SYSTEMS AND OTHER POST-EMPLOYMENT BENEFITS," the Puerto Rico Supreme Court declared invalid certain aspects of the legislation relating to the reform of the Teachers Retirement System and limited the effect of the reform of the Judiciary Retirement System. Failure to amend the legislation in order to compensate for the effect of the provisions declared invalid will lead to the depletion of the assets of these Retirement Systems. Furthermore, in the case of the Employees Retirement System, the Commonwealth has been unable to make all the additional annual employer contributions required by the reform legislation, which could also lead to the depletion of the assets of the Employees Retirement System. If this happens, the Retirement Systems would be operating solely on a "pay-as-you-go" basis, which means that they would be unable to pay benefits that exceed the actual employer and employee contributions received by the Retirement Systems (net of debt service on its obligations and administrative and other expenses), unless the Commonwealth and the other participating employers provide the additional funding required to pay retirement benefits.

In addition, to the extent the assumptions used to estimate the effect of these reforms on the General Fund are not realized, the Commonwealth may be adversely affected as it may have to use additional resources to meet these pension obligations. In particular, the FEGP contemplates an annual reduction of 2% of headcount through attrition, which will result in an increase in the number of retirees and will require an increase in the annual additional uniform contribution. Given the importance of pension benefits to retirees and the economy in general, the Commonwealth is likely to prioritize the payment of pension benefits over its debt service obligations.

*The Commonwealth's education costs represent a very high percentage of its budgetary expenditures, and the Commonwealth has had difficulty controlling such costs.*

The budget appropriation for the Commonwealth's Department of Education has historically represented a significant portion of the total General Fund budget. Therefore, the ability of the Commonwealth to control General Fund expenses depends on its ability to monitor and control the Department of Education's expenditures. However, the Commonwealth has historically had difficulty controlling such expenses.  In addition, certain expenditures, such as those required to fund the Department's special education program, can increase unexpectedly as a result of court orders issued in pending lawsuits by special education students.

*Certain government instrumentalities that provide essential services are experiencing financial difficulties and the Commonwealth may need to support them financially.*

Several public corporations and instrumentalities have traditionally relied on the assignment of specific tax revenues or subsidies or other transfers from the General Fund to fund a portion of their operations. Although the current administration has announced a policy of requiring its instrumentalities to achieve self-sufficiency in the near future, certain of these instrumentalities offer basic and essential services to the population of Puerto Rico. To the extent that any of these instrumentalities is unable to continue to provide such essential services as a result of financial difficulties, the Commonwealth may be required to divert available Commonwealth resources that would otherwise be used to service its debt to ensure that such essential services continue to be provided.  Due to the fact that these governmental entities provide essential services while relying on tax revenues, subsidies or other governmental transfers to sustain their operations, the FEGP consolidates such entities with the Central Government to provide a comprehensive view of the Commonwealth's financing gap.

In particular, the Puerto Rico Health Insurance Administration ("PRHIA"), the Puerto Rico Medical Services Administration ("PRMSA"), the Puerto Rico Municipal Islands Maritime Transport Authority ("MIMTA"), the Puerto Rico Metropolitan Bus Authority ("PRMBA") and the University of Puerto Rico ("UPR") provide essential services to the residents of Puerto Rico and rely heavily on General Fund appropriations to fund their operations. Others, like the Public Buildings Authority ("PBA"), provide essential services to the Commonwealth's government. Notwithstanding the Commonwealth's support, certain of these public corporations suffer from significant annual operating losses and carry material amounts of accounts payable.  Some of the services provided by these public corporations are essential to maintain health, public safety and welfare, which may lead the Commonwealth to prioritize the funding of such services over the payment of debt service.

*A reduction of federal grants may significantly affect the Commonwealth's ability to provide many important services and may force the Commonwealth to allocate resources that would otherwise be used to pay debt service to the provision of such essential services.*

Each fiscal year, the Commonwealth receives a significant amount of grant funding from the U.S. government. A significant portion of these funds is utilized to cover operating costs of those Commonwealth's educational, social services and healthcare programs that are subsidized by the U.S. government. If the aggregate amount of federal grant funds transferred to the

Commonwealth were to be reduced, the Commonwealth would have to make reductions to these federally-supported programs or fund these programs from the General Fund. Reductions in federal funding would also have an adverse impact on the Commonwealth's economy and on efforts to reduce its General Fund budget deficit. In addition, since the per capita income of the residents of Puerto Rico is substantially lower than those of the 50 states, a high percentage of the population of the Commonwealth benefits from these government programs. As a result, the impact on the Puerto Rico economy of any reduction in federal grant funds for such governmental programs would be greater than on the 50 states. Moreover, to the extent the Commonwealth is required to divert resources to continue providing essential services primarily funded through federal funds, the Commonwealth may be unable to honor its other obligations as they come due.

Another important factor is that certain federally funded programs are funded on a per-capita basis and a reduction in the number of beneficiaries due to demographic trends or changes in program parameters could result in a lower amount of federal funds. For instance, the Department of Education has experienced a substantial reduction in student enrollment in recent years that is expected to continue for the foreseeable future. Such reduction has been and will continue to be accompanied by a corresponding reduction in federal funding for some educational grants. To the extent that the cost saving opportunities presented by the reduction in the number of students are not fully realized, the net budgetary effect on the Department of Education of the reduction in student enrollment could be negative.

*The Commonwealth's accounting, payroll and fiscal oversight systems have deficiencies due to obsolescence and compatibility issues and this has affected the Commonwealth's ability to control and forecast expenses.*

The Commonwealth's accounting, payroll and fiscal oversight information systems have deficiencies due to obsolescence and lack of compatibility that have adversely affected the Commonwealth's ability to supervise and control expenditures. Agencies often incur expense overruns that are not detected in time to permit the implementation of corrective measures during the same fiscal year. At the present time, three of the Commonwealth's agencies which are responsible for over 50% of the General Fund expenses have separate accounting systems that are unable to interact on a timely basis with the Commonwealth's central accounting system. In addition, the Commonwealth's central accounting system still relies on various manual processes for recordkeeping that are only reviewed and updated at the end of the fiscal year in connection with the issuance of the audited financial statements. These deficiencies also affect the Commonwealth's ability to timely and accurately report financial information to the market, and to complete its audited financial statements in a timely manner.

A committee named by the Secretary of Treasury to evaluate and submit recommendations with respect to the Commonwealth's accounting systems has concluded its work and presented its findings and recommendations to the Secretary of Treasury. Such findings and recommendations are being evaluated to determine next steps. Some of the proposed changes are expected to improve the Commonwealth's ability to monitor, control and forecast expenses.

**The Commonwealth's ability to increase revenues is limited and depends in part on factors beyond its control.**

> **The Commonwealth's ability to raise additional revenue through taxation may be limited by economic factors.**

The capacity of a state to raise tax revenue is typically measured by the levels and rates of change in economic activity and the income of its citizens and businesses.  The amount of tax paid by individuals and companies relative to total income ("tax burden") is one approximation of capacity to raise additional revenue through taxation.  The composition of taxes is also relevant.  For example, certain types of activity may be highly sensitive to taxation or incremental costs generally.  Imposing or increasing taxes on such activity could significantly curb it, which would undermine both potential tax revenue and economic growth.

In evaluating the capacity of the Commonwealth to raise additional revenue through taxation, one should be mindful of its available base, in the aggregate and in specific categories of activity.  On an aggregate basis, economic output and income can be approximated by gross domestic product ("GDP") and gross national product ("GNP").  GDP measures expenditures and income earned within a state, while GNP includes income from foreign sources but excludes income paid to foreign entities.  For states with significant net direct investment held by foreigners, GNP can be materially lower than GDP.  Taxing the difference between the two aggregate measures can be challenging given the desire to retain that direct investment, which generates employment and both direct and indirect economic activity.

The difference between these two measures of economic expenditures and income is acute in Puerto Rico.  According to preliminary estimates from the Puerto Rico Planning Board, in fiscal year 2013 nominal GNP was 31 percent lower than nominal GDP.  This arises from U.S. mainland corporations' accounting for a substantial share of production taking place in Puerto Rico through activities of their subsidiaries, in particular in the manufacturing sector.

The Commonwealth has been taxing a portion of the income earned by these corporations from activity in Puerto Rico, but proceeds from such taxes may not persist.  Act 154-2010, as amended ("Act 154"), imposes a temporary excise tax to capture the repatriation of profits and dividends to parent firms on the U.S. mainland.  The negative impact of that tax on those firms has, to date, been neutralized in part by creditability provided by U.S. Federal authorities.  Future Federal credibility is not guaranteed.  The continuation and rate of excise tax imposed pursuant to Act 154 without the availability of the federal tax credit will likely affect the decisions of the firms' subsidiaries to continue operations in Puerto Rico.

As a result, using GDP to calculate the current tax burden in Puerto Rico may overstate the capacity of the Commonwealth to raise additional revenue through taxation.  And international comparisons with the tax burden in Puerto Rico based on GDP may be misleading or require adjustments.

At the same time, although to a lesser extent, GNP may overstate the available tax base.  Residents of Puerto Rico benefit from large transfers from the US Federal government.  According to the Puerto Rico Planning Board, in fiscal year 2013 Federal transfer

payments accounted for 24 percent of personal income.  Under current federal law, some of these transfer payments earmarked for social welfare programs may not be taxed by the Commonwealth.

One should also account for differences in behavioral responses among categories that are taxable.  The impact of changes in the rates of taxation on consumption and employment from taxes on goods and services, on the one hand, and income, on the other hand, could vary materially, with respect to both incremental tax receipts and broad economic activity.

***The Commonwealth is dependent on a small number of corporate taxpayers to generate a significant amount of the Commonwealth's tax revenues.***

The economic recession that has affected the Commonwealth since fiscal year 2007 and the income tax reduction program adopted in fiscal year 2011 have negatively affected Commonwealth income tax revenues. The special temporary excise tax imposed by Act 154 has become one of the Commonwealth's principal sources of tax revenues.  For fiscal years 2012, 2013 and 2014, the revenues produced by Act 154 represented approximately 21.6%, 19.7%, and 20.3%, respectively, of the Commonwealth's General Fund revenues.  During fiscal year 2014, the special temporary excise tax was paid by 35 companies of which eight companies accounted for approximately 85% of collections.  To the extent that any of these taxpayers reduces its operations in Puerto Rico or moves its operations to a different jurisdiction, the Commonwealth's tax base would be reduced and its revenues would be adversely affected. Factors that can cause a reduction in the level of Act 154 revenues include a reduction in the level of local economic activity of the corporations that pay the Act 154 taxes, which might occur as a result of general economic conditions or factors affecting individual companies, any difficulties in the transition, after December 31, 2017, from the Act 154 temporary excise tax to the modified source of income rule under Act 154, and any action by the U.S. Treasury Department to reduce or eliminate the federal income tax credit available with respect to the Act 154 temporary excise tax.  For a discussion of Act 154, see *"COMMONWEATH TAXES, OTHER REVENUES AND EXPENDITURES – Special Excise Tax (Act 154)."*

The excise tax of Act 154 is currently scheduled to expire on December 31, 2017 and to be replaced by the "modified source of income rule" provided under Act 154.  However, since it is unlikely that the level of tax collection under the "modified source of income rule" would be sufficient to replace the tax revenues currently received by the Commonwealth pursuant to the special temporary excise tax under Act 154, the FEGP proposes that the 4% excise tax be extended for a five-year period while the Commonwealth implements a new corporate tax regime that would substitute the revenues derived from the excise tax without increasing the current overall tax liability of existing companies. To the extent the Commonwealth is unable to extend the 4% excise tax while maintaining its creditability for United States tax purposes, its revenues would be adversely affected.

***The Commonwealth has frequently failed to meet its revenue projections.***

The Commonwealth's ability to implement measures to increase revenues depends on a number of factors, some of which are not wholly within its control, including its ability to project

44

accurately its revenues in light of changing circumstances, and the performance of the Commonwealth's economy.

The Treasury Department's projections for tax revenues involve many premises and assumptions, the effects of which are beyond its control, such as the impact of external factors and events on the economy that may, in turn, affect tax revenues. The projections also may require the forecasting of new revenue measures with no historical collections experience. In the past, the Commonwealth's projections of tax revenues have differed materially from what the Commonwealth has been able to achieve. As a result, there is no assurance that the Commonwealth will be able to achieve its tax revenue projections.

*The ability of the Commonwealth to use revenues assigned to certain public corporations may be limited.*

Certain revenues assigned to Puerto Rico Highways and Transportation Authority, Puerto Rico Infrastructure Financing Authority and Puerto Rico Convention Center District Authority are stated by existing law to be available Commonwealth resources for purposes of the payment of public debt. However, their availability for such purpose is subject to there being no other available Commonwealth resources. It is not certain what steps the Commonwealth would be required to take or what proof the Commonwealth would be required to produce to compel the diversion of such funds from any such instrumentality to the payment of public debt.

**GDB's financial condition has materially deteriorated and it could become unable to honor all its obligations as they become due.  Since GDB has historically served as the principal source of short-term liquidity for the Commonwealth and its instrumentalities and as the principal depositary of public funds, GDB's deteriorated financial condition and potential inability to comply with all of its legal and financial obligations could further adversely affect the Commonwealth and its instrumentalities.**

GDB's financial condition and liquidity has significantly deteriorated during fiscal years 2015 and 2016 as a result of some of the same factors that have affected the Commonwealth, including lack of market access and the inability of the Commonwealth and its instrumentalities to repay their loans to GDB.  During this period, GDB has continued to fund, in a limited manner, certain financial needs of the Commonwealth and its instrumentalities while paying its debt service obligations.  During the remaining part of fiscal year 2016, GDB faces large debt service obligations, including approximately $736 million of principal payments with respect to maturing debt ($267 million of which is guaranteed by the Commonwealth).

In order to continue honoring its obligations with third-party creditors and depositors while continuing its operations, GDB has taken certain liquidity enhancing and conservation measures and explored new financing opportunities and liability management transactions with respect to its outstanding notes.  GDB, however, has so far been unsuccessful in consummating any such transaction. On October 21, 2015, GDB announced that informal discussions with certain of its bondholders regarding a potential financing and liability management transaction ended as they did not result in a mutually acceptable arrangement.  Other transactions are being considered.  To the extent that GDB is not able to complete any such transaction or otherwise access other sources of funding, GDB may not be able to comply with its legal reserve

requirement and would have to request a waiver from the Secretary of Treasury pursuant to Act 97-2015.  GDB currently projects, based on various assumptions and if no financial transaction can be completed, that it will be unable to comply with its legal reserve requirement by late in the second quarter of fiscal year 2016 and that liquidity levels during such period may be insufficient to operate in the ordinary course as a depositary institution as well as to honor its depositary and financial obligations in full.  Under GDB's enabling act, Act No. 17 of September 23, 1948, as amended (the "GDB Act"), if GDB is not in sound financial condition or becomes insolvent, the Secretary of Treasury may file a petition to a Puerto Rico court for the appointment of a receiver to suspend GDB's operations and settle its obligations.  For a more detailed discussion of GDB's liquidity and potential insolvency, see "GDB Funding and Liquidity" under FISCAL CONDITION.

GDB has historically served as the principal source of short-term liquidity for the Commonwealth and its instrumentalities.  Although GDB has previously assisted the Commonwealth in satisfying its obligations, GDB will not be able to continue to provide such assistance in the near future.  To the extent that GDB financing is unavailable, the Commonwealth will be required to seek other sources of funding in order to meet its obligations.  There is no assurance that the Commonwealth will be able to access other sources of financing or funding sufficient at any one time to meet its obligations as they come due.

GDB also serves as the principal depositary of the funds of the Commonwealth and its instrumentalities. If GDB were to be placed in receivership or if its liquidity falls below a level necessary to operate in the ordinary course, the Commonwealth and its instrumentalities may have limited access to their funds deposited at GDB, which could in turn affect the provision of essential government services.

**The Commonwealth may have limited access to the capital markets for several years.**

*Concerns about the trajectory of the Commonwealth's economy and the sustainability of the Commonwealth's debt load are likely to limit the Commonwealth's access to the capital markets until such concerns are addressed.*

As discussed under "RECENT EVENTS- Release of Krueger Report on the Commonwealth's Economic and Financial Stability and Growth Prospects", the Krueger Report states that the Commonwealth's economy is in a cycle where unsustainable public finances are feeding into uncertainty and low growth, which in turn is raising the fiscal deficit and the debt ratio.  The Central Government deficits over the coming years, as projected in the Krueger Report and the FEGP, imply an unsustainable trajectory of large financing gaps.  Both the Krueger Report and the FEGP conclude that a compromise of the creditors' competing claims to the Commonwealth's revenues to support debt service will be required in order to avoid a disorderly default on the Commonwealth's debt and the further destabilization of the Commonwealth's economy and finances.  Market access on sustainable terms is unlikely to be available to the Commonwealth until doubts regarding its economic trajectory and debt sustainability are addressed.

*The downgrade of the Commonwealth's credit ratings to non-investment grade by the rating agencies has significantly limited the ability of the Commonwealth to borrow.*

Beginning in February of 2014, the credit ratings of the Commonwealth's general obligation bonds and Commonwealth guaranteed bonds have been lowered to non-investment grade by Moody's Investors Service ("Moody's"), Standard & Poor's Rating Services ("S&P"), and Fitch Ratings ("Fitch"). These downgrades reflect the fiscal and financial difficulties that the Commonwealth is experiencing and have in turn contributed to such difficulties. One consequence of such downgrades has been severely limited access to the capital markets. The market for non-investment grade securities is smaller and less liquid than the market for investment grade securities. As a result, it is possible that there may not be sufficient demand in the bond market, or with private commercial banks or other financial institutions, to enable the Commonwealth to issue any future bonds or notes or enter into borrowings in the amounts required by the Commonwealth or that the cost to the Commonwealth of any such borrowing could be substantially higher than if it were able to issue more highly-rated securities. In addition, changes in the Commonwealth's credit ratings are likely to affect its relationships with creditors and other business counterparties.

***The Commonwealth has not complied with its continuing disclosure obligations on a timely basis, and such failure to comply may limit the Commonwealth's access to the capital markets.***

On several occasions the Commonwealth has failed to comply with its continuing disclosure obligations on a timely basis.  For example, the Commonwealth has failed to file its financial statements before its 305-day deadline in ten of the past thirteen years, including the three most recent fiscal years (2012, 2013 and 2014). Furthermore, due to the delay in completing its financial statements for fiscal year 2014, the Commonwealth also currently expects to be delayed with the filing of its financial statements for fiscal year 2015. The Commonwealth's failure to comply with its continuing disclosure obligations on a timely basis could limit its access to the capital markets, because underwriters for Commonwealth bonds must be able to reasonably determine that the Commonwealth will comply with its continuing disclosure obligations on a timely basis before underwriting any future offerings of Commonwealth debt.

**The Commonwealth may not have sufficient capacity under constitutional debt limitations to continue funding its operations and financing gaps with general obligation debt.**

The Constitution of the Commonwealth provides that the Commonwealth may not issue general obligation debt if the principal and interest on all such debt payable in any fiscal year, together with any amount paid by the Commonwealth in the prior fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual internal revenues of the Commonwealth in the two preceding fiscal years. Based on the Commonwealth's current debt service requirements for these obligations and its average revenues for fiscal years 2014 and 2015, this percentage is currently 13.6% Therefore, the Commonwealth expects that its capacity to incur additional general obligation debt will be significantly limited for the next several years as a result of this Constitutional limit, among other factors. As a result, the Commonwealth may be limited in its capacity to issue general obligation debt in the future to cover projected financing gaps, including to finance capital improvement projects, provide working capital, and meet short-term obligations.  Although the Commonwealth could seek to issue debt for which the good faith, credit and taxing power of the Commonwealth is not pledged, there may not be

sufficient demand for such debt.  An inability to issue general obligation debt may affect the Commonwealth's ability to finance essential services, honor its financial obligations and make required investment in infrastructure.

**Bondholders have limited remedies and protection.**

*There is no collateral securing the Commonwealth bonds.*

The Commonwealth's general obligation bonds are not secured by any lien on any physical asset of the Commonwealth. Accordingly, no physical assets of the Commonwealth may be foreclosed on to produce amounts to pay such bonds.  In the event the Commonwealth fails to make a payment of interest or principal on the bonds, the bondholders are only entitled to require the Secretary of the Treasury to apply available resources according to the constitutional priority provisions and do not have the right to compel the exercise of any taxing power of the Commonwealth.

*Holders of the Commonwealth's bonds may not attach the Commonwealth's property.*

The Constitution of Puerto Rico provides that public property and funds of the Commonwealth shall only be disposed of for public purposes, for the support and operation of state institutions, and pursuant to law. Further, the Puerto Rico Supreme Court has determined that Commonwealth property cannot be attached or garnished in an attempt to enforce a judicial order, as it could undermine the Commonwealth's ability to operate and use its property for a public purpose.

*Commonwealth bondholders may face delays enforcing their remedies, and the availability of some remedies is not certain.*

The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first claim over available Commonwealth resources, and that the Secretary of the Treasury can be judicially required by bondholders to allocate funds to the payment of the public debt if available Commonwealth resources are insufficient to cover all budgeted appropriations. However, public policy considerations relating to the safety and well-being of the residents of the Commonwealth, as well as procedural matters, could result in delays in, or limitations on, the judicial enforcement of such remedies, and in limitations on the effectiveness of such remedies. The remedies available to bondholders are dependent on judicial actions, which are often subject to substantial discretion and delay.

The Constitution of Puerto Rico provides that the good faith, credit and taxing power of the Commonwealth are pledged to the payment of the Commonwealth's bonds. Since the Commonwealth has never failed to make a debt service payment on any of its general obligation bonds when due, the Puerto Rico Supreme Court has never had the opportunity to rule on whether bondholders have the right to compel the Legislative Assembly of the Commonwealth to increase taxes in the event that available Commonwealth resources are insufficient to pay the bonds, or to rule on how such right, if determined to exist, could be enforced.

Certain other statutory provisions affecting the rights of bondholders have never been tested. For example, although certain revenues assigned to Puerto Rico Highways and Transportation Authority, Puerto Rico Infrastructure Financing Authority and Puerto Rico Convention Center District Authority are stated by existing law to be available Commonwealth resources for purposes of the payment of public debt, their availability for such purpose is subject to there being no other available Commonwealth resources. It is not certain what steps a Commonwealth bondholder would be required to take or what proof such bondholder would be required to produce to compel the diversion of such funds from any such instrumentality to the payment of public debt, or how the necessary available Commonwealth resources would be thereafter allocated to each such instrumentality.

### The Commonwealth may continue to pledge its good faith, credit and taxing power to guarantee bonds and notes issued by certain of its instrumentalities.

The Constitution of Puerto Rico provides that the Commonwealth shall not guarantee any obligation evidenced by bonds or notes if the principal and interest on all its direct obligations to which the good faith, credit and taxing power of the Commonwealth has been pledged payable in any fiscal year, together with any amount paid by the Commonwealth in the prior fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual internal revenues of the Commonwealth in the two preceding fiscal years. (Such percentage is currently 13.6 %.) Therefore, although according to opinions from several Secretaries of Justice of the Commonwealth, bonds and notes guaranteed by the Commonwealth are considered public debt and enjoy the same priority of payment protection that is afforded by the Constitution of Puerto Rico to bonds and notes issued by the Commonwealth for which its good faith, credit and taxing power has been pledged, debt service payable on such guaranteed obligations is not taken into consideration for purposes of the Constitutional debt limit unless the Commonwealth is actually paying such debt service pursuant to its guarantee. Accordingly, the Commonwealth may continue to guarantee bonds and notes issued by its instrumentalities as long as the 15% limitation is not exceeded. As of July 31, 2015, $5.8 billion of such guaranteed obligations were outstanding (excluding $267 million of GDB Bonds maturing in December of 2015, and $110 million of GDB Senior Guaranteed Notes, Series 2013B, maturing between December of 2017 and December of 2019).  The Commonwealth currently has statutory authority to guarantee (subject to the 15% limitation), over $5 billion of additional debt, including approximately $2.8 billion of PRIFA bonds secured by petroleum taxes, over $600 million of PBA bonds, and over $1.7 billion of GDB debt.

### The Constitution of Puerto Rico may be amended to increase the debt limit and allow the Commonwealth to incur additional general obligation debt

Although the Constitution of Puerto Rico provides holders of general obligation debt certain protections, the Constitution of Puerto Rico may be amended to modify the provisions regarding public debt, such as raising the debt limit.  Although amending the Constitution of Puerto Rico may be difficult (it requires the approval of at least two-thirds of the members of the House of Representatives and the Senate, and the approval of a majority of voters in a referendum of qualified voters), and although there are no current plans to propose such an amendment, an amendment of this nature could be proposed and, if proposed, could be approved.

49

As a result of an amendment of this nature, the Commonwealth could be authorized to incur general obligation debt, or guarantee bonds and notes of instrumentalities, in excess of the current debt limit.  No assurance can be given, as a result, that the Constitutional debt limit will remain at its current level.

### *The Constitution of Puerto Rico and other laws of the Commonwealth could be amended in a manner adverse to bondholders*

Some of the protection provided by the Constitution and laws of the Commonwealth could be eliminated through legislation. For example, on March 15, 2015, a bill was filed in the Puerto Rico House of Representatives that seeks to amend the Puerto Rico Constitution to limit the constitutional protections afforded to the holders of Commonwealth general obligation debt. (This bill is not supported by the legislative leadership and has been publicly opposed by the Governor and GDB.) Similarly, on March 20, 2015, a Commonwealth legislator filed a bill in the Commonwealth House of Representatives proposing to impose a 50% withholding tax on interest paid on bonds issued by the Commonwealth's public corporations. (This bill is not supported by the Commonwealth's Governor or GDB and, if approved, may be preempted by current federal law.)

### *The Commonwealth's general obligation bonds cannot be accelerated upon a default and there are no cross-default provisions.*

The maturity of the Commonwealth's general obligation bonds cannot be accelerated in the event that the Commonwealth defaults in the payment of any installment of interest or principal due on such bonds. There are no cross-default provisions among general obligation bonds, so any default with respect to any particular issue of bonds would not provide any remedy to holders of other bonds which are not affected.

### The liquidity of the Commonwealth's bonds is limited.

There is no assurance that the secondary market for the Commonwealth's bonds will provide holders thereof with sufficient liquidity for their investment or that such secondary market will continue. The risk of illiquidity may increase in the event the Commonwealth defaults on its debt obligations or as a result of market or other factors.

# FISCAL CONDITION

## Overview; Creation of Working Group for the Economic Recovery of Puerto Rico; Release of Fiscal and Economic Growth Plan; Filing of Legislation

The Commonwealth is in the midst of a profound fiscal crisis. Despite various measures that have been undertaken by the current and previous administrations to grow the economy, reduce government expenses, and increase revenues, some of which are described below, the Commonwealth's economy continues to shrink and the Commonwealth has been unable to achieve a balanced budget. On June 29, 2015, Governor García Padilla announced that the Commonwealth had no choice but to seek to renegotiate its debt with the goal of achieving a more sustainable debt service, and that if it was unable to do so the Commonwealth could default on its debt.

Governor García Padilla created, by Executive Order 2015-022, the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "Working Group"), which is led by the Governor's Chief of Staff, and includes the President of the GDB, the Secretary of Justice, and the Presidents of the Puerto Rico Senate and House of Representatives, and which is tasked with the negotiated restructuring of the Commonwealth's public debt. The Working Group's goal is to reach a negotiated, voluntary agreement with bondholders to restructure the Commonwealth's debt in a manner that eliminates projected financing gaps and achieve a sustainable debt repayment schedule for the Commonwealth.

On September 9, 2015, the Working Group released its Fiscal and Economic Growth Plan (the "FEGP"), a comprehensive set of economic growth and reform measures aimed at achieving long-term fiscal stability and growth for the Commonwealth. The FEGP confirms the findings of the Krueger Report and concludes that reforms in conjunction with a restructuring of the Commonwealth's liabilities are essential to restoring Puerto Rico's economic growth. The FEGP also advised the creation of a control board to ensure compliance with the recommended measures. On October 15, 2015, the administration introduced the Puerto Rico Fiscal Responsibility and Economic Revitalization Act in the Commonwealth's House of Representatives.

For a more detailed discussion of the FEGP and the Puerto Rico Fiscal Responsibility and Economic Revitalization Act see "RECENT EVENTS - Puerto Rico Fiscal and Economic Growth Plan; Fiscal Responsibility and Economic Revitalization Act."

## Prior Actions Taken by Current Administration to Achieve Fiscal Stabilization and Economic Growth

When the current Commonwealth administration came into office in January of 2013, the Commonwealth already faced a number of serious fiscal challenges.  The projected General Fund budget deficit of the Commonwealth for fiscal year 2013 was approximately $2.213 billion; several of the Commonwealth's most important public corporations were under severe financial strain; and the assets of the Commonwealth's retirement systems were expected to be completely depleted in the near future. In response to this situation, the Commonwealth

implemented various fiscal stabilization and economic measures. The measures had five primary objectives: (i) progress towards a balanced General Fund budget; (ii) make the Commonwealth's public corporations self-sufficient; (iii) reform the tax code; (iv) grow the economy; and (v) enhance liquidity to provide sufficient time for these measures to have their intended effect.

*Progress towards a balanced General Fund budget*. The Commonwealth adopted various revenue increase and expense reduction measures, including the enactment of the Fiscal Sustainability Act and an increase in the rate of the sales and use tax, each discussed below, which allowed the Commonwealth to reduce the General Fund budget deficit. However, notwithstanding these measures the Commonwealth has been unable to maintain a balanced General Fund budget.

*Make the Commonwealth's public corporations self-sufficient*. The Commonwealth has adopted various measures to turn the Commonwealth's public corporations into self-sufficient enterprises, including (i) the initiation by PREPA of negotiations with its creditors and other stakeholders with the goal of restructuring the debt of the public corporation and transform its governance and operations, (ii) the implementation by PRASA of a 60% water rate increase (on average) in July of 2013 to strengthen the corporation's ability to cover its expenses; (iii) in June of 2013, the Commonwealth increased the petroleum products tax assigned to PRHTA and assigned certain additional vehicle registration fees and cigarette taxes to PRHTA; and (iv) in January of 2015, the Commonwealth enacted the petroleum products tax assigned to PRIFA with the original intention of issuing PRIFA bonds backed by such tax, and using the proceeds to repay all or a substantial portion of PRHTA's loans with GDB. (Such PRIFA bond issuance initiative has been discontinued.)

*Reform the Tax Code*. In December of 2014 the gross profits tax (*patente nacional*) was repealed. Then, in February of 2015, the administration introduced legislation that would have enacted a comprehensive tax reform. Although the legislation was not approved as submitted, the Legislative Assembly approved alternate legislation that increased the existing sales and use tax effective on July 1, 2015, and that is scheduled to replace such sales and use tax with a value added tax in April of 2016.

*Grow the economy.* The Commonwealth has pursued an aggressive economic development program that is discussed under "THE ECONOMY – Tax and Other Economic Incentives Initiatives."

*Enhance the Commonwealth's liquidity*. The Commonwealth has taken various actions to enhance the Commonwealth's liquidity in order to provide enough runway to allow the administration's measures to have their intended effect. For example, in March of 2014 the Commonwealth issued $3.5 billion of general obligation bonds, which allowed the Commonwealth to repay a significant amount of loans to GDB. Recently, the Commonwealth has taken a number of emergency liquidity measures which are unsustainable over the long-run. See "RECENT EVENTS- Commonwealth Liquidity."

**Other Fiscal Measures Taken by Commonwealth**

*Extension of Special Excise Tax - Act 154*.  In February of 2013, the Commonwealth amended Act 154 to extend the duration of the special excise tax (which has become one of the major sources of government revenues) until December 31, 2017 and reset the excise tax rate at a fixed 4% commencing on July 1, 2013.   See "COMMONWEALTH TAXES, OTHER REVENUES AND EXPENDITURES – Special Excise Tax (Act 154)."

*Other Revenue Raising Measures*. During fiscal year 2015, the Commonwealth enacted various measures designed to increase revenues, including (i) adjustment to individual alternative minimum tax brackets; (ii) changes to taxation of passive income; (iii) a 10% deemed dividend tax to foreign owners of non-exempt corporations; (iv) delay and reduction of bonus to senior citizens; (v) a special tax rate for prepayments of IRAs, retirement plans and annuities; and (vi) changes to the sales and use tax collection system at the point of entry.

*Airport lease*.  In February of 2013, the Puerto Rico Ports Authority ("PRPA") executed a forty-year lease agreement with Aerostar Airport Holdings, LLC (Aerostar), pursuant to which Aerostar will finance, operate, maintain and improve PRPA's Luis Muñoz Marín International Airport.  As a result of this transaction, PRPA received from Aerostar a lump-sum payment of $615 million, $491 million of which were used to retire 43% of the outstanding debt of the PRPA.  The PRPA will also receive an estimated $552 million in revenue sharing over the life of the lease.

*Reform of Government Retirement Systems*.  The Commonwealth adopted, in April of 2013, a comprehensive reform of the Employees Retirement System which, among other changes, prospectively replaced the defined benefit system applicable to certain employees with a defined contribution system. In December 2013, the Commonwealth adopted a comprehensive reform of the Teachers Retirement System. Certain reforms to the Teachers Retirement System were overturned by the Puerto Rico Supreme Court. See "RETIREMENT SYSTEMS AND OTHER POST-EMPLOYMENT BENEFITS."

**Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2015; Projected Budget Deficit for Fiscal Year 2015**

*Revenues.* Preliminary General Fund revenues (on a budgetary basis) for fiscal year 2015 were approximately $8.961 billion, a decrease of approximately $76  million, or 0.8%, when compared to the prior fiscal year, and $604 million less than estimated revenues for the fiscal year.  Preliminary collections for the special temporary excise tax under Act 154 were $1.943 billion, an increase of $ 40.7 million from the prior fiscal year, and $52.9 million higher than the projected revenues for the fiscal year.  Preliminary collections of individual income taxes were $2.295 billion, an increase of $315.9 million over the prior fiscal year, but $60.7 million below projections.  Preliminary collections of corporate income taxes were $1.736 billion, $178.5 million lower than the prior fiscal year, and $349.2 million below estimates, mainly as a result of the repeal of the gross receipts tax in December 2014.  Non-recurring revenue for the fiscal year was estimated at approximately $732 million.

*Expenditures.* The General Fund budget for fiscal year 2015 was $9.565 billion. Preliminary General Fund expenditures for fiscal year 2015 were $9.440 billion, a reduction of $125 million when compared to the budget for such fiscal year. In preparing such estimates, OMB takes into consideration transactions that have been recorded and accounted for in the central government accounting system. These estimates are preliminary and are subject to further adjustments.

The expenditures for fiscal year 2015 included $1.138 billion for debt service payments, of which $743 million are General Obligations debt service. Other expenditures included: (i) payroll expenses of $3.392 billion; (ii) special appropriation for the University of Puerto Rico, the Municipalities and the Judicial Branch of $834 million, $360 million and $323 million, respectively; and (iii) special appropriation for the Central Government and the Teachers Retirement Systems of $560 million. The above amounts represent 70% of the total preliminary expenditures of $9,440.

The Central Government's employee workforce chargeable to the General Fund, which is accounted for in the Treasury Department's payroll system, amounts to 89,750[**] employees (headcount), of which 70% consists primarily of teachers (37,000), police officers (15,000), correction officers (7,800), firefighters (1,700) and nurses (1,330). This represents a 34% reduction since the workforce peaked at 139,640 during 2008, and 12% reduction since January of 2013.

The preliminary deficit for fiscal year 2015 is $703 million consisting of $479 million of excess expenditures over revenues, $24 million in additional interest and expenses related to the fiscal year 2015 TRANs and GDB line of credit not contemplated in the budget, $26 million in payments made by the Treasury Department for the reimbursement of energy tax credits taken by exempt companies under Act 73-2008 not contemplated in the budget, and $174 million in income tax refunds payments over the budgeted reserve.

The main drivers for the reduction in fiscal year 2015 estimated revenues are the following:

- A reduction on corporate income taxes of approximately $349 million, of which $200 million are related to the mid-fiscal year repeal of the gross receipts tax ("Patente Nacional") for taxable year 2015, which was originally supposed to become effective at the same time as the enactment of the proposed Value Added Tax (VAT) of 16% in order to offset the loss of revenues from the repeal of the "Patente Nacional" with the new revenues arising from the proposed VAT. This reduction is net of the revenues collected through the enactment of Act 44-2015, which provided for a reduced tax on prepayments of individual retirement accounts, a special temporary tax for corporate dividends and a tax amnesty.

- A reduction in sales and use taxes in the point of entry of approximately $109 million, mainly attributable to lower than expected economic activity and delays in the implementation of the sales and use tax at the point of entry.

---

[**] As of July 31, 2015

- A reduction of approximately $82 million in motor vehicle excise taxes as a result of the decrease in the sale of motor vehicles in Puerto Rico due to lower than expected economic activity, and the rate of such taxes pursuant to Act 186-2014. As of October 31, 2014, prior to the enactment of Act 186-2014, revenues for motor vehicle excise taxes had decreased by approximately $30 million.

- A reduction of approximately $61 million on individual income taxes, mainly as a result of lower than expected economic activity. This amount is net of non-recurring measures, such as the enactment of a prepayment window for individual retirement accounts (IRAs), retirement plans and annuities at a special rate, and a tax amnesty.

- A reduction of approximately $36 million in rum-cover over tax revenues resulting in part from the non-extension by the U.S. Congress for calendar year 2015 of the increase from $10.50 to $13.25 per proof gallon, in the federal excise tax rate on rum produced in Puerto Rico and exported into the U.S., which the federal government transfers (or "covers over") annually to the Commonwealth. The original estimates assumed that the cover over excise tax rate of $13.25 per proof gallon would have been extended for calendar year 2015.

The above reductions were partially offset by an aggregate increase of approximately $33 million in other miscellaneous taxes, primarily due to increase in collections and prepayments made by entities under Act 154.

**Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2014**

*Revenues.* Preliminary General Fund revenues (on a budgetary basis) for fiscal year 2014 (which are still subject to audit and other year-end adjustments) were $9.037 billion, and include: (i) total budgetary operating revenues of the General Fund of $8.803 billion, (ii) revenues from the electronic and traditional lotteries of $154 million that are available to the General Fund, and (iii) $80 million in excess funds transferred from COFINA to the General Fund after payment of COFINA debt service. This represented an increase of $475 million over budgetary revenues for fiscal year 2013 ($8.562 billion), but was $488 million lower than the revised projected revenues for this period ($9.525 billion). The increase in budgetary revenues during this period when compared to fiscal year 2013 is primarily due to legislative measures adopted since January 2013.

Corporate income tax collections for fiscal year 2014 were $1.914 billion, an increase of $628 million, or 48.8%, from the same period of the prior fiscal year. These revenues are $599 million, or 23.8%, less than the revised projected revenues for this period. Individual income tax collections for fiscal year 2014 were $1.979 billion, a decrease of $75 million, or 3.7%, from the same period of the prior fiscal year, and $24.6 million, or 1.22%, less than the revised projected revenues of this category for this period. Collections were withholdings from non-residents were $900 million, a decrease of $83 million, or 8.4%, from prior fiscal year, but $80 million, or 9.8%, more than the revised projected revenues of this category for this period.

55

Sales and use tax collection received by the General Fund on a budgetary basis for fiscal year 2014 were $595 million, an increase of $55 million, or 10.2%, from the prior fiscal year, but $19 million, or 3.0%, less than the revised projected revenues for this period.

Collections for the special temporary excise tax under Act 154 for fiscal year 2014 were $1.902 billion, an increase of $270 million, or 16.5%, from the prior fiscal but $19 million, or 3.0%, less than the revised projected revenues for this period.

The primary reasons for lower corporate income tax collections for fiscal year 2014 when compared to the budget include: (i) higher than estimated tax credits and other residual tax items which were carried over from previous fiscal years, (ii) purchase of tax credits above projections, (iii) postponed payments of corporate taxes due to corporations that filed tax return extensions, (iv) waivers granted on national "volume of business" tax on gross sales/revenues to businesses, (v) corporate reorganizations that reduced corporate tax liabilities, and (vi) lower than expected corporate taxable income, resulting in part from reduced economic activity.

***Expenditures***.   The original fiscal year 2014 budgeted expenditures totaled $9.770 billion, excluding $575 million in general obligation debt service, a portion of which was refunded with the proceeds of the Commonwealth's General Obligation Bonds of 2014, Series A and the remainder funded with interim lines of credit by GDB.  The budget contemplated $245 million in new deficit financing to be funded initially by GDB which, when added to the $575 million general obligation debt refunding, resulted in a total projected budget deficit of $820 million. The budget was subsequently amended to total $9.245 billion in expenditures (excluding the $575 million in general obligations debt service refunding).

Preliminary expenditures for fiscal year 2014 were $9.985 billion (including debt services), a reduction of $360 million when compared with the original budget for fiscal year 2014 of $9.770 billion and the debt service of $575 million. There is an increase of $165 million when compared to the adjusted budget for fiscal year 2014 of $9.245 billion plus the $575 million of debt services.

The following table shows the difference between the preliminary expenditures for fiscal year 2014 and the original and adjusted budget for such fiscal year:

|  | Original Budget | Adjusted Budget |
|---|---|---|
| 2014 Budget | $ 9.770 | $9.245 |
| Debt service | 575 | 575 |
| Sub-total | 10.345 | 9.820 |
| Preliminary Expenditures | 9.985 | 9.985 |
| Reduction (increase) | $360 | ($165) |

After taking into consideration the adjustment for tax refunds described above, the preliminary General Fund Budget deficit for fiscal year 2014 is $1.2 billion, calculated by subtracting preliminary General Fund budgetary revenues for fiscal year 2014 of $9.037 billion from preliminary General Fund budgetary expenditures for fiscal year 2014 of $9.985 billion ($9.245 billion base expenditures plus $575 million in refunded or refinanced general obligation

56

debt service), and adjusted by $243 million in income tax refunds payments over the budgeted reserve.

**Fiscal Year 2016 Budget**

Fiscal year 2016 General Fund budget provides for revenues and expenditures of $9.800 billion, which is $235 million higher than the budget for fiscal year 2015. The principal reasons for the increase in expenditures are (i) a 30% increase in debt service payments, from $1.138 billion in fiscal year 2015 to $1.475[†] billion in fiscal year 2016; and (ii) a 16% increase in special pension contributions, from $560 million in fiscal year 2015 to $652 million in fiscal year 2016. These increases were partially offset by reductions in payroll expenses of $72 million, in other operating expenses of $63 million and $43 million in the Puerto Rico Integrated Transport Authority ("PRITA").

The principal changes in the fiscal year 2016 budgeted General Fund revenues compared to preliminary fiscal year 2015 revenues are (i) an increase of $1.1 billion in sales and use tax, resulting from the increase in the SUT tax rate and an increase of $55 million in corporate income taxes, which are partially offset by (ii) a decrease in individual income taxes of $160 million, and a decrease in Act 154 excise tax revenues of $37 million.

In October 2015, the Puerto Rico Treasury Department revised its revenue estimate for fiscal year 2016 from $9.8 billion to $9.446 billion. This revision was made after taking into consideration (i) the actual revenues for the fourth quarter of fiscal year 2015, (ii) the preliminary revenues for the first quarter of fiscal year 2016, (iii) the projected effect on revenues of legislation enacted since the beginning of the current fiscal year, and (iv) other general economic factors.

The main drivers for the reduction in estimated revenues for fiscal year 2016 are the following:

- actual revenue shortfall against budget of approximately $211 million for the months of May and June 2015 which affected the revenue base used for the fiscal year 2016 budget. The Commonwealth original revenue estimates for the fiscal year 2016 budget were made with actual data up to April 2015;

- enactment of Act 159-2015, which (i) excludes the sale of certain items and the rendering of certain professional services from the SUT and VAT, and (ii) reduces the base on which the SUT or VAT is computed for certain transactions. The Puerto Rico Treasury Department estimates that such changes will reduce revenues by approximately $50 million in fiscal year 2016;

- Act 108-2014 authorized the transfer of $10 million annually of the federal rum excise tax collected by the US Government allocated to the General Fund to

---

[†] A Special Fund of $275 million for Economic Development and Debt Service Payment was created by the Legislative Assembly. The funds should be used for debt service payment but require legislative approval.

PRIDCO. Therefore net General Fund revenues from federal rum excise tax was reduced by such amount; and

- other factors such as the prepayment of foreign taxes under Act 154 and general economic factors which may reduce revenues by an additional $50 million in the aggregate.

To close the currently estimated revenue gap of approximately $355 million, the Government is in the process of implementing the following measures that are expected to raise approximately $185 million in revenues:

- $60 million to be obtained through an upfront payment in the renewal of the Electronic Lottery contract. Legislation will be needed in order to transfer such upfront payment to the General Fund;

- $25 million in additional revenues through a temporary reduced tax on corporate dividends provided under Act 159-2015; and

- $100 million in additional revenues through the enactment of administrative measures to increase the fiscalization of tax revenues.

To reduce the remaining gap of $170 million, OMB has already implemented $150 million in aggregate reductions to budgetary appropriations through the elimination of certain contingency accounts, reductions in non-priority program appropriations, and a decrease in the operating budgets of various agencies funded by the General Fund. OMB is in the process of implementing an additional $50 million in reductions to budgetary appropriations.

The above revenue and expenditure measures do not take into account other factors that have yet to be determined such as any possible spending over budget by government agencies, additional reductions in the labor workforce, actual income tax refunds paid over amount reserved, or possible delays in the implementation of the VAT (currently estimated at $25 million for each month the VAT is delayed). There can be no assurance, however, that the Commonwealth will not incur expenses in excess of appropriated amounts, as reduced by OMB.

**GDB Funding and Liquidity**

One of GDB's objectives is to maintain sufficient liquidity to fund its existing asset base and to meet its financial obligations and provide public sector financing in accordance with its mission. GDB's cash and liquid assets are referred to herein as its "liquidity resources."

GDB's primary sources of funding consist of: (i) public sector deposits, which are GDB's lowest cost source of funding, (ii) senior notes issued by GDB in the bond market with maturities ranging from calendar year 2015 through 2026 and (iii) repurchase agreements.

The following table sets forth a breakdown of GDB's (excluding its subsidiaries) total funding by source as of the dates set forth below (in thousands of dollars). These numbers are preliminary and unaudited.

| Funding Sources | 12/31/14 | % | 3/31/15 | % | 6/30/15 | % | 9/30/15 | % |
|---|---|---|---|---|---|---|---|---|
| Public Deposits | $4,139,215 | 39.0% | $4,576,260 | 43.6% | $4,116,913 | 47.6% | $3,919,811 | 48.2% |
| Private Deposits | 37,865 | 0.4% | 32,865 | 0.3% | 32,335 | 0.4% | 27,452 | 0.3% |
| Bonds and Notes | 5,464,707 | 51.5% | 5,137,257 | 49.0% | 4,237,576 | 49.0% | 4,097,924 | 50.4% |
| Repurchase Agreements | 961,348 | 9.1% | 747,951 | 7.1% | 267,207 | 3.1% | 93,138 | 1.1% |
| **Total** | $10,603,135 | 100.0% | $10,494,333 | 100.0% | $8,654,031 | 100.0% | $8,138,325 | 100.0% |

As of September 30, 2015, GDB's average cost of funding was 3.02% and the average life of its liabilities was 2.4 years.  The decrease in notes outstanding between June 30, 2015 and September 30, 2015 is due to the repayment of $140 million in GDB senior notes which was paid in August, 2015. Also, approximately $736 million in additional outstanding bonds and notes mature in the remainder of fiscal year 2016 (with staggered maturities in December 2015 and May 2016).

As of September 30, 2015, GDB's liquidity resources included: (i) approximately $252 million of deposits made by PREPA for its Reserve Account, Construction Fund and Operating Account, and (ii) $124 million of deposits made by the Puerto Rico Public Housing Administration ("PRPHA"), which are invested in GDB time deposits.

During the remainder of fiscal year 2016, GDB expects PREPA to use approximately $100 million on deposit from the three funds currently held at GDB.  Separately, the PRPHA is expected to substantially withdraw its deposits at GDB by December 31, 2015.

Since July 2015, the Puerto Rico Treasury Department has not been making the monthly sinking fund payments for the Commonwealth General Obligation bonds. On January 1, 2016, a debt service payment of approximately $330 million in principal and interest on the Commonwealth General Obligation bonds is due. Funds to make such debt service payment are expected to come from the Puerto Rico Treasury Department's TSA.

As of September 30, 2015, Puerto Rico municipalities in aggregate maintained $291 million on deposit at GDB in special debt service deposit accounts which are funded primarily from the proceeds of a special property tax ("Special Additional Tax"). These funds are collected by the CRIM and used for debt service payments of general obligations bonds issued by the municipalities and, by law, have to be deposited in trust at GDB.  On June 29, 2015, the CRIM filed suit requesting that GDB execute a deed of trust pursuant to Puerto Rico law. The CRIM also stopped transferring collected revenues to GDB until the deed of trust was executed. GDB opposed the CRIM's suit asserting that the law already provided a statutory trust and, hence, there was no need for a deed of trust as requested by the CRIM. On October 23, 2015, the parties announced that a settlement had been reached, that a deed of trust would be executed and that new investment guidelines for the municipalities funds would be approved and applied thereon. On November 2, 2015, the parties executed the deed of trust. The execution of the deed of trust and the new investment guidelines are not expected to have a material adverse effect on GDB's current liquidity and financial position.

GDB is legally required to maintain reserves equal to 20% of its demand deposits. This requirement is met by investing in securities with maturities of up to 90 days and currently amounts to approximately $300 million.

*Liquidity Resources*. As of September 30, 2015, GDB's cash, bank deposits and investment portfolio at fair market value was $1.0 billion, or 10%, of GDB's assets (excluding its subsidiaries). The following table shows GDB's liquidity resources by source, including the investment securities portfolio, which constitutes an important source of liquidity for GDB because it may be realized through either sales of securities or repurchase agreements:

| Liquidity Resources (in millions) | 9/30/14 | 12/31/14 | 3/31/15 | 6/30/15 | 9/30/15 |
|---|---|---|---|---|---|
| Cash and Bank Deposits | $232 | $333 | $348 | $31 | $52 |
| Federal Funds Sold and Money Market Instruments (excluding $32.2 million reverse repurchase agreement with GDB subsidiary) | 340 | 191 | 210 | 352 | 479 |
| Investment Securities | | | | | |
| U.S. Treasury and Agencies | 1,356 | 1,363 | 1,296 | 592 | 416 |
| Government-Sponsored MBS and CMOs | 2 | 0 | 0 | 0 | 0 |
| Other Securities | 1 | 226 | 60 | 59 | 58 |
| Sub-Total | 1,359 | 1,589 | 1,356 | 651 | 474 |
| Total | $1,931 | $2,113 | $1,914 | $1,034 | $1,004 |
| Securities pledged | (533) | (1023) | (796) | (300) | (130) |
| Net Liquidity | $1,398[1] | $1,090 | $1,118 | $734 | $875 |

_____

(1)   Reflects the disbursement of $400 million in Commonwealth Tax and Revenue Anticipation Notes, Series A that were refinanced by the GDB Notes on October 10, 2014.

GDB's investment portfolio consists mostly of investment securities classified among the three highest rating categories. As of September 30, 2015, the expected average life of the investment securities portfolio was 1 year and approximately $551 million, or 58%, matures in less than one year.

The primary factors driving the rise in net liquidity at GDB as of September 30, 2015 as compared to June 30, 2015 was a decline in net loans amounting to approximately $440 million which was partially offset by deposit outflow of approximately $175 million and the payment of principal on notes and bonds amounting to approximately $140 million. The decline in net loans was due primarily to the repayment of $300 million in 2015 TRANs obligations by the Puerto Rico Treasury Department and a repayment of approximately $106 million in municipal government loans repaid from the special additional tax. However, the decline in net loans also reflects GDB's delays in disbursing advance requests from borrowers under existing lines of credit as a liquidity preservation measure.

The decline in deposits was due primarily to a $223 million decline in demand deposit accounts held by municipalities for the servicing of their general obligation debt, which was offset by a $59 million rise in time deposits. Notes and bonds payable declined $140 million due to the repayment of a GDB note on August 1, 2015.

As of September 30, 2015, of the approximately $1 billion investment securities portfolio, approximately $101 million was pledged to secure or repay borrowings of GDB, consisting of securities sold under agreements to repurchase and $29 million was pledged for other uses. Therefore, as of September 30, 2015, GDB liquidity resources, net of pledged securities, amounted to approximately $875 million, approximately $141 million higher than as of June 30, 2015 and approximately $243 million lower than March 31, 2015.

In its "Special Liquidity Update", dated October 17, 2014, GDB provided a liquidity projection for the remainder of fiscal year 2015 and the first quarter of fiscal year 2016 that projected that, in the absence of a capital markets transaction, it would not have sufficient liquidity to meet its legal reserve requirement by the first quarter of fiscal 2016.  Since the publication of such Special Liquidity Update, various critical assumptions underlying GDB's liquidity projections have been revised, including future deposit net flows, loan origination volumes and loan portfolio repayments. In addition, several administrative cash preservation measures were identified and implemented, commencing in the first quarter of fiscal 2016.  More recent internal GDB liquidity projections suggest that, assuming no capital market transaction, or agreement with its creditors, is completed and that the Commonwealth repays its appropriation lines of credit as budgeted, GDB would still be unable to comply with its legal reserve requirement by late in the second quarter of fiscal year 2016.  This liquidity projection does not take into consideration the implementation of other potential liquidity enhancing or conservation measures, requiring the transfer to GDB of public deposits at private financial institutions, implementing liability management transactions with respect to GDB's outstanding notes and bonds and/or imposing other restrictions on liquidity outflows.

The GDB Act provides that GDB shall be subject to examination and supervision by the Commissioner of Financial Institutions of Puerto Rico (the "Commissioner") in accordance with the provisions of the Puerto Rico Banking Act (the "Banking Act"). The Commissioner is currently examining the financial condition of GDB. The GDB Act imposes restrictions on GDB when it is insolvent and provides that if, as a result of an examination or report made by an examiner, the Secretary of the Treasury of Puerto Rico (the "Secretary of the Treasury") shall have reason to believe that GDB is not in sound financial condition or that its affairs are conducted in a manner as to endanger its funds or other assets, or, if GDB shall refuse to submit its books and records to the inspection of any duly authorized examiner or ceases to establish reserves as required by the GDB Act, or if in the judgment of the Secretary of Treasury of the Commonwealth, GDB becomes insolvent, he may report such facts to the Governor. The Governor may then direct the Secretary of the Treasury to apply to the Puerto Rico court of First Instance where the main office of GDB is located and if, after having heard GDB, the court deems that the facts alleged by the Secretary of the Treasury are well founded then the court shall proceed to appoint a receiver to suspend operations and settle the obligations of GDB.

Under the GDB Act, the receiver shall, under the direction of the court, take possession of the assets and liabilities of GDB, shall collect all loans, fees and claims of GDB, and shall see to

the payment of its obligations and debts and of the necessary expenditures of receivership. The GDB Act further provides that the receiver shall proceed to settle the affairs of GDB as soon as possible, and to this end the receiver may sell the personal and real property and other assets of GDB, subject to the order of the court.

Because of the importance of GDB's functions to the operation of the Commonwealth, its public corporations and municipalities, as described below, if GDB's financial condition deteriorates further, the Commonwealth may amend the GDB Act or enact new emergency legislation (subject to applicable constitutional limitations), which could include a moratorium on the payment of debt service with respect to outstanding GDB indebtedness or other remedy that affects the rights of creditors. Such new legislation could also grant more powers to a conservator or receiver of GDB and further define the receivership process (including the powers to determine claims and provide for their priority of payment).

**Historical Budget Deficits**

One of the most significant challenges that the Commonwealth has faced for many years is an imbalance between its General Fund budgetary revenues and expenditures, which the Commonwealth has been required to finance with debt. This imbalance reached its highest historical level of $2.864 billion in fiscal year 2009, when revenues were $7.825 billion and expenditures were $10.689 billion. Since then, the Commonwealth has been able to reduce its budget deficit every year, except fiscal year 2012, through various measures designed to increase revenues and reduce expenditures.

The table below shows total General Fund budgetary revenues from taxes, licenses and other internal or external sources, total General Fund expenditures (including debt service payments) and the resulting General Fund budget deficit for the last seven fiscal years. Total revenues and expenditures include certain non-recurring items. Accordingly, the amount of the Commonwealth's General Fund budget "structural deficit," or the difference between recurring revenues and expenditures, is higher than the amount shown below. Depending on what revenues and expenditures are considered "recurring," such difference may be significant.

Revenues include General Fund revenues and revenues from the electronic and traditional lotteries that are available to fund General Fund budgetary expenditures. Other revenues may also be included as indicated in the footnotes to the table. Expenditures include General Fund budgetary expenditures, rental payments made by the Commonwealth to the Public Buildings Authority for properties leased by the Government and debt service payments for the Commonwealth's general obligation bonds. The table below may contain certain items that are not included in the statements or in the schedule of revenues and expenditures - budget and actual - budgetary basis - General Fund included in the Commonwealth's financial statements for the fiscal years 2009 to 2013, or otherwise in such financial statements. Some of these items are discussed in the footnotes to the table below.

Revenues and expenditures from the following sources or entities are not part of the General Fund budget, and consequently were excluded from the table below: federal grants and contracts, the portion of rum excise taxes assigned to certain component units and private institutions, motor vehicle licenses fees and fines, excise tax on gasoline, gas, oil, diesel oil,

petroleum, a portion of cigarette taxes assigned to certain component units and private institutions, compulsory vehicle insurance premiums assigned to a private institution, a portion of the non- resident withholding income tax, a portion of the horse racing excise tax, a portion of sales and use tax allocated to COFINA, other charges for services which are assigned by law for specific purposes, other revenues assigned by law for specific purposes, and revenues and expenditures of agencies with independent treasuries. The table below was prepared in accordance with a statutory (budgetary) basis of accounting, which is not in accordance with U.S. generally accepted accounting principles (U.S. GAAP). Under the budgetary basis of accounting, revenue is generally recognized when cash is received, net of estimated income tax refunds, and expenditures are generally recorded when the related expenditure is incurred. Amounts required for settling claims and judgments are not recognized until they are processed for payment. The presentation of the General Fund revenues and expenditures in accordance with U.S. GAAP would result in revenues, expenditures and a deficiency of revenues over expenditures significantly higher than the amounts presented in the table below.

In addition to the fact that the General Fund is on a budgetary basis and not on an accrual basis, the Krueger Report also states that the methodology used to compute the General Fund budget deficit greatly understates such deficits because it excludes numerous government agencies that are not part of the General Fund but depend on General Fund financial support and also excludes $300 million to $400 million in annual capital expenditures. As an example, the Krueger Report's measure of deficit would show a negative balance of $2.580 billion for fiscal year 2013 and $2.065 billion for fiscal year 2014. Those figures are considerably higher than the General Fund budget deficit figures show in the table below. As a result of all of these factors, the Treasury Department and GDB are evaluating changes to the methodology and presentation of the historical General Fund budget deficits of the Commonwealth. As a preliminary step, the Commonwealth is including a calculation of the deficit that uses the modified accrual basis of accounting in the table that follows the following table.

General Fund Budget Deficit
(Budgetary Basis)
Fiscal Years ended June 30,
(in millions)

| Fiscal Year | Total Revenues[1][2] | Total Expenditures[7][8][9] | Deficit |
|---|---|---|---|
| 2009 | $7,825 | $10,689 | $(2,864) |
| 2010 | $8,032[3] | $10,756 | $(2,724) |
| 2011 | $8,343[4] | $10,144 | $(1,801) |
| 2012 | $8,783 | $11,158 | $(2,375) |
| 2013 | $8,664[5] | $9,974 | $(1,310) |
| 2014* | $8,913[6] | 10,104 | (1,191) |
| 2015* | $8,893 | 9,596 | (703) |

---

*Preliminary and unaudited; subject to change.

[1]   Includes General Fund budgetary revenues of $7.583 billion, $7.593 billion, $7.994 billion, $8.573 billion, $8.131 billion, $8.803 billion and $8.961 for fiscal years 2009 through 2015, respectively.  General Fund budgetary revenues were adjusted down by $243 million and $174 million in fiscal years 2014 and 2015, respectively,  to reflect the difference between actual income tax refunds paid over the budgeted reserve

[2]   Includes (i) revenues attributable to the electronic and traditional lotteries of $127 million, $123 million, $102 million, $94 million, $63 million, $154 million and $114 million for fiscal years 2009 through 2015, respectively, and (ii) revenues from the 1.03% property tax of $115 million, $115 million, $122 million, $116 million, $102 million, $119 million and $105 million for fiscal years 2009 through 2015, respectively.

[3]   Includes $201 million from the sale of securities in the PRIFA corpus account.

[4]   Includes approximately $125 million of moneys transferred to the General Fund during fiscal year 2011 from COFINA, consisting principally of Sales and Use Tax Collections remaining after providing debt service on its bonds for that fiscal year.

[5]   Includes (i) $242 million in excess funds transferred from the Redemption Fund to the General Fund and (ii) $126 million of excess funds transferred from COFINA to the General Fund.

[6]   Includes $80 million of excess funds transferred from COFINA to the General Fund.

[7]   Includes General Fund total budgetary expenditures of $9.927 billion, $9.640 billion, $9.075 billion, $9.911 billion, $8.938 billion, $9.366 billion, and $8.548 billion for fiscal years 2009 through 2015, respectively.

[8]   Includes the transfer of rental payments made by the Commonwealth to PBA for properties leased by the Government of $330 million, $251 million, $267 million, $331 million, and $205 million for fiscal years 2009 through 2013, respectively.

[9] Includes (i) debt service for general obligation bonds and other payment of debt of $414 million, $865 million, $802 million, $849 million, $831 million, $738 million, and $1.048 billion for fiscal years 2009 through 2015 , respectively, and (ii) debt service for appropriations bonds of $18 million and $67 million for fiscal years 2009 and 2012, respectively.

*Source:  The "Statement of Revenues and Expenditures- Budget and Actual- Budget Basis- General Fund" as presented in the Commonwealth's financial statements for fiscal years 2009 to 2012; the "Required Supplementary Information- Unaudited- Schedule of Revenues and Expenditures- Budget and Actual- Budgetary Basis- General Fund" as presented in the Commonwealth's financial statements for fiscal year 2013; the Department of Treasury's financial records for fiscal year 2014; and Government Development Bank. Table presentation is different to the statements or schedule of revenues and expenditures- budget and actual –budgetary basis – General Fund included in Commonwealth's financial statements for the fiscal years 2009 to 2013.*

The following table has been prepared using the modified accrual basis of accounting, which provides the near-term inflows and outflows of expendables resources.   The table below includes all governmental funds, which include blended component units that are legally separate public corporations and instrumentalities of the Commonwealth that are legally separate public corporations and instrumentalities of the Commonwealth, such as the Puerto Rico Public Buildings Authority, the Puerto Rico Infrastructure Financing Authority, COFINA, the Special Communities Perpetual Trust, the Children's Trust and the Puerto Rico Maritime Shipping Authority, that are legally separate public corporations and instrumentalities of the Commonwealth. Under the modified accrual basis of accounting, revenue is recognized as it is both measurable and available. Revenue is considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period. Expenditures are generally recorded when a liability is incurred, as under accrual accounting. Modifications to the accrual basis of accounting include the following: (a) employee's vested annual vacation and sick leave are recorded when vested, (b) interest and principal on general long-term obligations and interest on interest rate swap agreements are recorded when due, (c) debt service expenditures, federal funds' cost disallowances, and other long-term obligations, and amounts subject to judgments under litigation are recorded when payment is due.  The table below includes all governmental funds and not just the General Fund. As a result, it shows higher deficits than the preceding table which only included the General Fund and was prepared on a budgetary basis for fiscal years 2009 through 2014. Furthermore, the table below does not include other financing sources (uses),  such as long term debt proceeds, sales of capital assets, and contributions from/to the General Fund to enterprise funds (such as the lottery systems). Results on a modified accrual basis for fiscal year 2014 are preliminary and unaudited, and for fiscal year 2015 are not yet available. For a description of the basis of presentation of the Commonwealth's fund financial statements, see note 1, "Summary of Significant Accounting Policies," to the Commonwealth's Basic Financial Statements and Required Supplementary Information for the fiscal year ended June 30, 2013, which were filed with the Municipal Securities Rulemaking Board through its Electronic Municipal Markets Access System on June 30, 2014.   The Basic Financial Statements are also available in GDB's website at www.gdbpr.com under  "Investor Resources−Publications and Reports−Commonwealth Comprehensive Annual Financial Report."

**Commonwealth Governmental Funds Deficiencies of Revenues over Expenditures
(Modified Accrual Basis)**
Fiscal Years ended June 30,
*(in thousands)*

| Fiscal Year | Description | General [(1)] | Pledged Sales and Use Tax [(2)] | Debt Service | COFINA Special Revenue | COFINA Debt Service | Other Governmental | Total Governmental |
|---|---|---|---|---|---|---|---|---|
| 2009 | | | | | | | | |
| | *Total Revenues* | 14,115,229 | 284,724 | 188,929 | 1,931 | 1,565 | 83,931 | 14,676,309 |
| | *Total Expenditures* | 16,350,490 | - | 487,012 | 136,806 | 258,866 | 962,637 | 18,195,811 |
| | *Excess (Deficiency) of Revenues over Expenditures* | (2,235,261) | 284,724 | (298,083) | (134,875) | (257,301) | (878,706) | (3,519,502) |
| 2010 | | | | | | | | |
| | *Total Revenues* | 14,553,587 | 553,860 | 140,627 | 1,979 | 48 | 16,335 | 15,266,436 |
| | *Total Expenditures* | 16,343,885 | 7,737 | 942,886 | 196,932 | 1,227,552 | 895,820 | 19,614,812 |
| | *Excess (Deficiency) of Revenues over Expenditures* | (1,790,298) | 546,123 | (802,259) | (194,953) | (1,227,504) | (879,485) | (4,348,376) |
| 2011 | | | | | | | | |
| | *Total Revenues* | 14,750,853 | 573,016 | 123,620 | 554 | 8,534 | 7,310 | 15,463,887 |
| | *Total Expenditures* | 16,392,667 | - | 1,624,534 | 6,474 | 540,613 | 685,082 | 19,249,370 |
| | *Excess (Deficiency) of Revenues over Expenditures* | (1,641,814) | 573,016 | (1,500,914) | (5,920) | (532,079) | (677,772) | (3,785,483) |
| 2012 | | | | | | | | |
| | *Total Revenues* | 15,044,657 | 601,393 | 119,298 | 93 | 565 | 46,080 | 15,812,086 |
| | *Total Expenditures* | 17,570,511 | - | 901,008 | 458,254 | 602,217 | 1,503,597 | 21,035,587 |
| | *Excess (Deficiency) of Revenues over Expenditures* | (2,525,854) | 601,393 | (781,710) | (458,161) | (601,652) | (1,457,517) | (5,223,501) |
| 2013 | | | | | | | | |
| | *Total Revenues* | 15,226,172 | - | 102,842 | 33 | 627,902 | 28,981 | 15,985,930 |
| | *Total Expenditures* | 16,572,978 | - | 989,383 | 19 | 644,429 | 1,388,651 | 19,595,460 |
| | *Excess (Deficiency) of Revenues over Expenditures* | (1,346,806) | - | (886,541) | 14 | (16,527) | (1,359,670) | (3,609,530) |
| 2014* | | | | | | | | |
| | *Total Revenues* | 16,489,844 | - | 130,433 | 9 | 646,194 | 43,774 | 17,310,254 |
| | *Total Expenditures* | 18,442,220 | - | 1,051,204 | 333,481 | 652,795 | (1,140,433) | 19,339,267 |
| | *Excess (Deficiency) of Revenues over Expenditures* | (1,952,376) | - | (920,771) | (333,472) | (6,601) | (1,096,659) | (4,309,879) |

* Preliminary, unaudited and subject to change.

(1)  Includes principal payments of $284.9 million, $505.4 million, $658.8 million, $1,088 million, $154.4 million and $1,963 million from fiscal year 2009 to 2015, respectively

(2)  For fiscal years 2013 and 2014 the Pledged Sales and Use Tax Column was included in the General Fund Column.

*Source: Statement of Revenues, Expenditures, and Changes in Fund Balance (Deficit) - Governmental Funds as presented in the Commonwealth's
financial statements for fiscal years 2009 to 2013.*

## Financial Condition of Selected Component Units

Several public corporations and instrumentalities have traditionally relied on subsidies or
other transfers from the General Fund to fund a portion of their operations.  The current
Administration has announced a policy of requiring its instrumentalities to achieve self-
sufficiency in the near future.  Certain of these instrumentalities, including the Puerto Rico
Health Insurance Administration ("PRHIA"), the Puerto Rico Medical Services Administration
("PRMSA"), the Puerto Rico Integrated Transport Authority ("PRITA"), a new public
corporation intended to combine the operations of the Municipal Islands Maritime Transport
Authority ("MIMTA"), the Puerto Rico Metropolitan Bus Authority ("PRMBA") and the Urban

Train ("UT") which has been financially supported by PRHTA, and the University of Puerto Rico ("UPR"), provide essential services to the residents of the Commonwealth and rely heavily on General Fund appropriations to fund their day to day operations. Others, like the Public Buildings Authority ("PBA"), provide essential services to the Commonwealth's government, which are in turn necessary to provide essential services to residents.

The General Fund budget for fiscal year 2016 included approximately $887 million in appropriations to PRHIA, $27 million to PRMSA, $873 million to UPR, $34 million to PRITA (of which $5 million are under the custody of the Office of Management and Budget of Puerto Rico). In addition, the General Fund budget for fiscal year 2016 includes rent payments of $364 million payable to PBA. Notwithstanding the Commonwealth's support, certain of these public corporations suffer from significant annual operating losses and carry material amounts of accounts payable (particularly to other governmental entities such as the State Insurance Fund, the Employees Retirement Systems, PREPA and PRASA). If the Commonwealth's financial condition does not improve, it may be unable to continue to support these operations at the same level without taking action to reduce other expenses or increase revenues. This may result in reduced services to the Commonwealth population. However, some of the services provided by these public corporations are essential to maintain health, public safety and welfare, which may result the Commonwealth prioritizing the funding of such services over financial or other obligations.

*PRHIA*

The Commonwealth, through PRHIA, provides health insurance coverage to approximately 1.686 million qualifying (generally low-income) residents of Puerto Rico. The cost of this health insurance program is very significant, totaling $2.8 billion for the year ended June 30, 2015. The following figure presents selected financial data for PRHIA for fiscal years 2015 and 2014:

|  | June 30, 2015<br>(Selected financial data)<br>(Unaudited) | June 30, 2014<br>(Selected financial data)<br>(Audited) |
|---|---|---|
| Average insured lives | 1,686,000 | 1,600,000 |
| Federal reimbursements | $1,611,553,014 | $1,283,747,024 |
| Cost of medical premiums and claims | $ 2,805,503,136 | $2,494,805,333 |
| Federal funds effective share | 57.44% | 51.46% |
| Change in net position for the year | $ 2,315,176 | ($59,092,691) |

The following table presents selected data from PRHIA's financial statements for fiscal years 2015 and 2014:

|  | (Unaudited) | |
|  | 6/30/2015 | 6/30/2014 |
| General fund appropriations | $892,259,000 | $894,657,000 |
| Federal reimbursements | $1,611,553,014 | 1,283,747,024 |
| Other contributions | 356,270,885 | 291,958,347 |
| Interest and other | 13,192,419 | 40,726,979 |
| Total revenues | $2,873,275,318 | $2,511,089,350 |
| Total expenses | $2,870,960,142 | $2,570,182,041 |
| Increase (decrease) in net position | $2,315,176 | ($59,092,691) |
| Amounts due to suppliers and others | $390,599,275 | $450,941,483[1] |
| Amounts due to other governmental agencies | $188,309,749 | $201,595,435[2] |

(1) As of June 30, 2014, PRHIA had a $100 million line of credit with a syndicate of commercial banks with an outstanding balance of $83 million.  That line of credit was replaced with a $100 million line of credit from GDB that had an outstanding balance of $83 million as of June 30, 2014 and was fully paid by March 31, 2015.
(2) On March 14, 2011, PRHIA entered into a Credit Agreement with GDB in order to pay its obligations to insurers prior to fiscal year 2010.  The principal and interest under the Credit Agreement will be paid with General Fund appropriations.

General Fund appropriations for fiscal year 2016 are $887 million.

A substantial portion of the cost of the Commonwealth's health insurance program is currently paid by the federal government and funded principally by non-recurring funding provided pursuant to the federal Patient Protection and Affordable Care Act (the "Affordable Care Act" or "ACA"), as well as recurring Medicaid and Children's Health Insurance Program ("CHIP") funds, which in the case of the Commonwealth are capped at a level lower than that applicable to the states (which are not capped).

Upon exhaustion of the non-recurring ACA funds, currently estimated to occur in March 2018, and absent Congressional action to renew this non-recurring funding, the amount of federal funds available for this health insurance program will revert to the recurring capped Commonwealth Medicaid and CHIP allocations of approximately $400 million, which would result in significantly higher requirements of Commonwealth funding, unless benefits or eligibility or both are reduced significantly.  Although the Commonwealth can take various measures to address the imbalance, including reducing coverage and limiting eligible beneficiaries, federal regulations may prohibit or limit the application of these measures.

If the availability of ACA funds is not renewed through Congressional action and if no changes to benefits, co-pays or eligibility are made, the annual deficit of the health insurance program (which the General Fund may be required to fund) could rise to as much as $2.0 billion by fiscal year 2020, from a surplus of $2 million in fiscal year 2015.

In addition to the exhaustion of ACA funding, as of September  30, 2015, PRHIA owes approximately $156 million in recorded and unpaid claims under the previous Third Party

Administrator ("TPA") model.  Furthermore, the actuarially determined incurred but not reported ("IBNR") liability for claims not yet received is approximately $57 million.

PRHIA had a $100 million line of credit with GDB that expired on March 31, 2015, and was not renewed.  (This line of credit replaced a similar line of credit with a syndicate of commercial banks.)  The GDB line of credit was used to advance to PRHIA funds that were used to pay for medical claims which are subject to federal reimbursement, and was paid with such federal reimbursement as well as with PRHIA's local funds. PRHIA's lack of a credit facility and its transition from a Third Party Administrator to a Managed Care Organization ("MCO") model has exacerbated PRHIA's liquidity needs because, in the latter model, the contractual agreement requires PRHIA to pay related premiums during the first days of each month.  The Center for Medicaid and Medicare Services ("CMS") agreed with PRHIA to provide its share of federal funds upon availability of local funds on a weekly basis in order to complete the required payments to the MCO's.  The requirement to pay premiums the first days of the month, coupled with the need to fund legacy claims under the Third Party Administrator model, results in a financing need of more than $150 million.  The GDB recently reviewed a proposal from a private investor and determined that PRHIA might not have repayment capacity unless it collects old receivables and applies them to the loan principal.  GDB identified a $28 million receivable related to amounts withheld by the Municipal Revenue Collection Center ("CRIM" in spanish) for disputed municipalities contributions   Some discussions to free such funds have been held with the 11 municipalities involved in the dispute, but no concrete agreement has been reached yet.  If PRHIA is unable to secure funding or financing for this financing gap and/or if the Commonwealth's financial situation precludes it from continuing supporting the Commonwealth health insurance plan, PRHIA might be unable to fulfill its financial and contractual obligations.  In order to ensure continuity of services, PRHIA reached a preliminary agreement with the five private insurance providers, whereby PRHIA will be paying throughout the month the premiums owed to the insurers (as opposed to paying the entire amount during the first days of the month).

The following table summarizes the revised five-year deficit forecast of the PRHIA, absent Congressional renewal of ACA funds or other waiver of the Commonwealth's Medicaid cap.  Although the table incorporates the effect the new health insurance contracts in the calculation of the projected deficit for fiscal year 2015, no adjustment has been made for subsequent fiscal years, as PRHIA is still reviewing the projected costs for these years based on the new capitated managed care organization model.  Therefore, the projected deficits could be materially higher than those presented herein.

| | Fiscal Year | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | **2020** |
| PRHIA surplus (deficit) | ($112,000,000) | ($166,000,000) | ($678,000,000) | ($1,792,000,000) | ($2,001,000,000) |

Other challenges facing the PRHIA are as follows:

- CMS announced that there will be a reduction of approximately 11% in Medicare Advantage funding for Puerto Rico in 2016. Such reductions to the Medicare Advantage rates would impact the ability of the Medicare Advantage plans to assume the costs of covering the higher-need dual eligible population (approximately 250,000 beneficiaries) covered through PRHIA's "Platino" program. Medicare Advantage subsidizes the costs of the "Platino" program from the rates paid through Medicare. If the Medicare Advantage plans cannot subsidize the costs of covering the "Platino" program, PRHIA's costs for calendar year 2016 for this population would increase from the current $20 to $30 million per year to $120 to $150 million per year unless benefit reductions are made.

- Under newly established "Modified Adjusted Gross Income" or "MAGI," standards, the number of Commonwealth residents who are Medicaid-qualified would likely be reduced and their healthcare costs would therefore need to be covered by the Commonwealth without federal reimbursement. The Puerto Rico Health Department and its Medicaid office are responsible for establishing eligibility standards for the Government health plan and therefore are responsible for implementing MAGI. If the Commonwealth decides to continue covering this population under the Government health plan, it is estimated that this may represent an additional cost to the General Fund of $138 million.

There are approximately 180,000 insured lives for which the Commonwealth covers the full amount of their insurance costs as they do not qualify for reimbursement from federal funds. The estimated annual costs for this population are approximately $340 million, which are paid solely by the Commonwealth. In light of all the financial challenges facing the government health plan, the Commonwealth will need to decide if it can afford to continue funding these costs.

The fiscal stability of the Commonwealth's health insurance program is one of the most significant budgetary challenges facing the Commonwealth, especially if neither the availability of ACA funds is renewed nor the cap imposed on Medicaid matching funds is removed. In view of the current funding disparity between the Commonwealth with respect to the states, the Commonwealth is intensifying its efforts to convince Congress to renew ACA funding. Recently members of the private and public sector formed the Puerto Rico Healthcare Crisis Coalition to increase lobbying efforts. However, it is not possible to predict the likelihood that such efforts will succeed. Thus, the Commonwealth will continue evaluating the fiscal structure of the program taking into consideration the current federal funding depletion estimates. To the extent these efforts are unsuccessful; it is unlikely that the Commonwealth would be able to assume a significantly higher portion of the cost of the health insurance program. If the Commonwealth is unable to reduce these costs, it may be required to adopt some of the emergency measures described above in "RISK FACTORS – A significant portion of the Commonwealth's expenses relate to essential services and pension benefits; the Commonwealth's ability to reduce such expenses without significantly affecting the residents is limited and the Commonwealth may therefore need to prioritize such expenses over payment of debt services-*The cost of the Commonwealth's health insurance program is very significant.*"

*PRMSA*

PRMSA is a public corporation adhered to the Puerto Rico Department of Health that operates and administers the centralized health services offered by the member institutions and consumers of the complex known as the Puerto Rico Medical Center. Historically, PRMSA has incurred significant operating losses. The Commonwealth includes in its budget a legislative appropriation to partially offset PRMSA's operating losses. PRMSA received approximately $27 million, $51 million, $47 million and $24 million during fiscal years 2015, 2014, 2013 and 2012, respectively, as financial support from the Commonwealth's General Fund. Its operating revenues, including Commonwealth appropriations, for fiscal years 2014, 2013 and 2012 were $174 million, $158 million and $146 million, respectively. PRMSA suffered operating losses (without considering depreciation and interest expense) during fiscal years 2014, 2013 and 2012 of $61 million, $72 million and $48 million, respectively. Although PRMSA's management has taken measures to reduce its operating deficit, additional measures will be required in order to keep providing continuous services at the medical center. In addition, if the Commonwealth's financial situation precludes it from continuing supporting PRMSA, it could affect continuity of services at the Puerto Rico Medical Center.

PRMSA has experienced significant increases in amounts due to suppliers and other governmental agencies from 2012 to 2014. Amounts due to suppliers and others increased from $69 million as of June 30, 2012 to $97 million as of June 30, 2014; and the balances payable to other governmental entities increased from $282 million as of June 30, 2012 to $283 million as of June 30, 2014.

*MIMTA*

MIMTA is a public corporation that operates the maritime transportation services between the municipalities of San Juan, Cataño, Fajardo, Vieques, and Culebra. MIMTA is funded principally through General Fund legislative appropriations and federal funds. MIMTA received approximately $28 million, $26 million, $24 million and $28 million during fiscal years 2015, 2014, 2013 and 2012, respectively, as financial support from the Commonwealth's General Fund. The fiscal year 2016 General Fund budget includes $34 million in appropriations for mass transit services, including $5 million under the custody of the Office of Management and Budget of Puerto Rico, to be used in part to subsidize MIMTA. Its operating revenues (principally passenger and cargo fares) for fiscal years 2014, 2013 and 2012 were $5.2 million, $5.9 million and $4.7 million, respectively. In the past, the PRHTA and the Puerto Rico Ports Authority have also been sources of funds to MIMTA. For fiscal years 2014, 2013 and 2012, the MIMTA had operating losses (without considering depreciation and interest expense) of $41.9 million, $45.3 million and $36.3 million, respectively.

MIMTA has experienced significant increases in amounts due to suppliers and other governmental agencies from 2012 to 2014. The amounts due to suppliers and others increased from $11.8 million as of June 30, 2012 to $16.2 million as of June 30, 2014; and the balances payable to other governmental entities increased from $4.1 million as of June 30, 2012 to $7.7 million as of June 30, 2014.

71

*PRMBA*

The PRMBA provides public transportation to passengers within the San Juan Metropolitan Area. The principal sources of funds for the operations of PRMBA are Commonwealth General Fund appropriations, certain assigned taxes (cigarette taxes) and federal funds. PRMBA received approximately $42.2 million, $43.4 million and $61.6 million during fiscal years 2014, 2013 and 2012, respectively, from Commonwealth General Fund appropriations. The fiscal year 2016 General Fund budget includes $34 million in appropriations for mass transit services, including $5 million under the custody of the Office of Management and Budget of Puerto Rico, to be used in part to subsidize PRMBA during the fiscal year. Its operating revenues (principally passenger fares, advertising and rental income) for fiscal years 2014, 2013 and 2012 were $4.9 million, $5.8 million and $5.4 million, respectively. For fiscal years 2014, 2013 and 2012, the PRMBA had operating losses (without considering depreciation and interest expense) of $61.4 million, $71.7 million and $86.0 million, respectively.

PRMBA's amounts due to suppliers and other governmental agencies have increased materially from 2012 to 2014. Accounts payable to suppliers increased from $2.9 million as of June 30, 2012 to $5.6 million as of June 30, 2014; and the balances payable to other governmental entities increased from $26.8 million as of June 30, 2012 to $47.1 million as of June 30, 2014. Governmental entities to which PRMBA owes money include the Treasury Department, the State Insurance Fund Corporation, the Retirement Systems Administration, PREPA and PRASA.

PRITA's management has been working on the required federal approvals in order to transfer the above-mentioned operations to PRITA. These operations have a history of significant losses. Although the enabling legislation of PRITA assigns dedicated revenues to PRITA, there is no assurance that the combined operations would be financially self-sufficient.

*UPR*

The University of Puerto Rico ("UPR") has an essential role as the Commonwealth's sole public undergraduate and postgraduate higher education provider and a key contributor to the local economy through its academic, medical and research programs.

Approximately 80.5% of the UPR's funding is derived from non-operating revenues, including Commonwealth General Fund appropriations and Federal grants (in particular, the Federal Pell Grant Program). Under current law, UPR's General Fund appropriations for any year equal 9.6% of the average of the General Fund revenues for the two prior years. However, under the Fiscal Sustainability Act froze UPR's appropriations at their fiscal year 2014 level for three years. UPR's budgeted General Fund appropriations for fiscal years 2016, 2015, 2014 and 2013 were $873 million, $881 million, $888 million and $825 million respectively.

Its operating revenues (principally tuition) for fiscal years 2014, 2013 and 2012 were $264 million, $299 million and $370 million, respectively. UPR had operating losses (without considering depreciation, interest expense and Commonwealth grants and contracts) during fiscal years 2014, 2013 and 2012 of $1.041 billion, $995 million and $953 million, respectively.

UPR's amounts due to third parties increased from $328 million at June 30, 2012 to $410 million at June 30, 2014.

Balances payable to governmental entities increased from $112 million at June 30, 2012 to $124 million at June 30, 2014.  The UPR has limited ability to raise operating revenues due to the economic and political related challenges of maintaining enrollment and increasing tuition.

*PBA*

PBA constructs, purchases or leases office, school, health, correctional and other facilities to departments, public corporations and instrumentalities of the Commonwealth. Ninety five percent of PBA's revenues are derived from rents paid by governmental agencies through the General Fund budget.  These General Fund rent allocations amounted to $364 million, $354 million, $207 million and $214 million for fiscal years 2015, 2014, 2013 and 2012, respectively.  Rent allocations payable from the General Fund were materially lower for fiscal years 2013 and 2012 because a portion of such rental payments were refinanced with GDB lines of credit or long-term debt.  Its operating revenues (principally rent payments) for fiscal years 2014, 2013 and 2012 were $413 million, $186 million and $235 million, respectively. Accounts payable to PBA's suppliers decreased from $112 million at June 30, 2012 to $90 million at June 30, 2014. Balances payable to other governmental entities decreased from $336 million at June 30, 2012 to $213 million at June 30, 2014. As of June 30, 2015, PBA had a cash balance of approximately $4.9 million.  If the Commonwealth's financial situation precludes it from fully complying with its rent obligations to PBA, PBA may be unable to meet its financial and contractual obligations, which include approximately $4.1 billion in bonds guaranteed by the Commonwealth.

**Condition of the Retirement Systems**

A significant component of the Commonwealth's budget is the cost of its three principal retirement systems, the Employees Retirement System of the Commonwealth of Puerto Rico and its Instrumentalities (the "Employees Retirement System"), the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System") and the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System").  These pension systems are severely underfunded.  See "RETIREMENT SYSTEMS AND OTHER POST EMPLOYMENT BENEFITS."

*Employees Retirement System*.  The actuarial valuation report of the Employees Retirement System as of June 30, 2014, under GASB 67, reflects a Total Pension Liability of $30.2 billion, a Fiduciary Net Position of $127 million (total assets of $3.4 billion net of liabilities of $3.3 billion, consisting principally of $3.1 billion in pension obligation bonds), and a Net Pension Liability of $30.1 billion.  The Fiduciary Net Position as a percentage of Total Pension Liability (the "funded ratio") is 0.42%. The net assets of the System were exhausted during fiscal year 2015.

In 2013, the Commonwealth enacted legislation that reformed the Employees Retirement System by, among other measures, reducing benefits, increasing employee contributions, and, in the case of active employees who were entitled to the defined benefits program, replacing most of the defined benefit elements of the system with a defined contribution system for most

prospective accruals. Based on the statutory funding requirements prior to this reform, the annual benefit payments and administrative expenses of the System were significantly larger than the member and employer contributions made to the System. As a result, investment income and the System's assets were being used to cover the negative cash flow, and the System's total (gross) assets were projected to be exhausted by fiscal year 2019. The reform was primarily intended to address the Commonwealth's future cash flow needs and "pay-as-you-go" requirements, while recognizing that the System would continue to have a large unfunded actuarial accrued liability and a low funded ratio. As such, the reform was intended to provide enough cash for the System to be able to pay benefits (as amended through the reform) and debt service on the pension obligation bonds, while maintaining projected System gross assets at no less than $1 billion at all times.

In order to achieve this goal, the reform contemplated that the Commonwealth and other participating employers would have to provide additional annual funding above the statutorily prescribed contributions (the "Additional Uniform Contribution"). Initially, it was projected that the Additional Uniform Contribution required to be made by the employers through fiscal year 2033 was approximately $140 million. The fiscal year 2014 Additional Uniform Contribution was subsequently revised by Act 244-2014 to $120 million, of which approximately $78 million was allocable to the Central Government, to be funded from the General Fund, and the balance of which was allocable to the municipalities and participating public corporations. As a long-term plan, it was recognized that constant monitoring would be required to ensure that the System remained on track to meet the reform's goals.

Timely payment of the Additional Uniform Contribution is a critical component of the reform in order for the System to be able to make payments as they come due without depleting all of its assets first. However, as a result of continued budget deficits in fiscal years 2014 and 2015, the Commonwealth and other participating employers have been unable to make the Additional Uniform Contribution required for these fiscal years (other than $33 million and $5.8 million paid for fiscal years 2014 and 2015, respectively, by public corporations and municipalities). In February 2015, the System's actuaries recalculated the Additional Uniform Contribution for fiscal year 2016 and subsequent years. Based on certain assumptions (which do not account for any fiscal adjustment that the Commonwealth may undertake to address its fiscal challenges), the projected Additional Uniform Contribution for fiscal year 2016 and subsequent years has increased to approximately $352 million (of which approximately $216 million corresponds to the Commonwealth's central government, to be funded from the General Fund and the remaining portion corresponds to the participating public corporations and municipalities). The increase in the Additional Uniform Contribution from the initially projected levels is the result of multiple factors, but the most important ones are the decline in the number of active members and the associated payroll since June 30, 2012, and the three-year salary freeze implemented through Act 66-2014. While these factors result in payroll and related cost savings for the Commonwealth and other participating employers, from the perspective of the System, its projected long-term funding decreases since statutory contributions are based on a percentage of payroll and, thus, a lower level of payroll generates fewer contributions, causing the Additional Uniform Contribution to increase to compensate for the reduction.

The actuarial valuation as of June 30, 2014, again emphasizes that if the Additional Uniform Contribution and the other statutorily prescribed employer contributions are not paid in

full on an annual basis, the Employees Retirement System will continue to rapidly exhaust its gross assets. The actuarial valuation as of June 30, 2014 shows that the Employees Retirement System is being rapidly defunded and projects that its gross assets will be exhausted by fiscal year 2021 if only partial Additional Uniform Contributions are received.   These funding requirements result in additional fiscal challenges for the Commonwealth.

*Teachers Retirement System*.   The Teachers Retirement System's latest actuarial valuation, as of June 30, 2014, under GASB 67, reflects a total pension liability of $14.8 billion, a fiduciary net position of $1.7 billion, a net pension liability (including basic and system administered benefits) of $13.1 billion and a fiduciary net position as a percentage of total pension liability of 11.5%.   This valuation reflects an increase in pension liabilities and a decrease in the funded level for financial reporting purposes.   The decrease in the funded level is the result of a decrease in the actuarial value of assets from $1.9 billion as of June 30, 2013 to $1.7 billion as of June 30, 2014, due to the continued net funding and cash flow shortfall that is exhausting plan assets, among other factors, such as the discount rate. The GASB 67 discount rate used in the valuation report as of June 30, 2014 is 4.33% per year. This single equivalent interest rate yields the same present value of all future benefits as using the expected return on plan assets until fiscal year 2018 of 6.65% and the tax-free municipal bond index return of 4.29% as of June 30, 2014 beginning with fiscal year 2019 for the discount rate.

The Teachers Retirement System is a mature system with a significant retiree population. Based on statutory funding requirements prior to the reform described below, the annual benefit payments and administrative expenses paid by the System are significantly larger than the member and employer contributions made to the System.   As a result, investment income and the System's assets are being used to cover the negative cash flow, and the System's assets are expected to continually decline until exhaustion.

As with the Employees Retirement System, the Commonwealth enacted legislation in 2013 to carry out a comprehensive reform of the Teachers Retirement System that, together with certain additional contributions, was projected, based on actuarial assumptions, to allow the System to make benefit payments when due without depleting all of its assets first.   While most of this legislation was struck down by the Puerto Rico Supreme Court on constitutional grounds, the Commonwealth is still responsible for making certain additional annual contributions to the System.   The legislation provides for two classes of additional contributions by the Commonwealth to the System: (i) a Teacher's Justice Uniform Contribution (the "Uniform Contribution") from the General Fund to the System of $30 million in each of fiscal years 2017 and 2018 and $60 million thereafter until fiscal year 2042, and (ii) an Annual Additional Contribution commencing on fiscal year 2019 and continuing until fiscal year 2042 (the "Annual Additional Contribution") equal to the amount determined by the actuaries as necessary to prevent the projected value of the gross assets of the System from falling below $300 million during any subsequent fiscal year.  In April 2015, the System's actuaries prepared an actuarial study to determine an estimate of the Annual Additional Contribution and, based on various assumptions, projected that the Annual Additional Contribution for fiscal year 2019 and each fiscal year thereafter would be approximately $450 million.  The actuarial study notes that if the Annual Additional Contribution is not paid in full during the intended fiscal years, the amount would increase in the following years.  The actuaries also noted that if the System were unable to sell certain illiquid assets (consisting primarily of loans to members), currently amounting to

approximately $450 million, the System may face liquidity issues since its assets are projected to fall below the $450 million level during fiscal year 2018, one year before the first payment of the Annual Additional Contribution.  These funding requirements result in additional fiscal challenges for the Commonwealth.

The actuaries have also projected the date of depletion for the Teachers Retirement System under the methodology specified in GASB 67 as of June 30, 2014, assuming, given current budgetary constraints, that the Uniform Contribution and the Annual Additional Contribution is not paid in future fiscal years.  Based on this and various other assumptions, the projected date of depletion of the Teachers Retirement System measured on the GASB 67 basis is expected to occur during fiscal year 2019.  The date of depletion projection under the GASB 67 basis is not the same as the date that the System would be expected to exhaust assets as it differs from a cash flow projection.

*Judiciary Retirement System.*  The Judiciary Retirement System's latest actuarial valuation, as of June 30, 2013, under GASB 25, reflected an unfunded actuarial accrued liability (including basic and system administered benefits) of $357.7 million and a funded ratio of 14.2%.  The Judiciary Retirement System's actuaries have completed an actuarial valuation report as of June 30, 2014, that complies with GASB 67.  The valuation reflects an increase in pension liabilities and a decrease in the funded level for financial reporting purposes.  As of June 30, 2014, the valuation reflects a Total Pension Liability of $504.4 million, a Fiduciary Net Position of $62.1 million, and a Net Pension Liability of $442.3 million.  The Fiduciary Net Position as a percentage of Total Pension Liability (the "funded ratio") is 12.3%.  The prior valuation used an investment return assumption of 6.30% per year and, under GASB 25, this assumed return was also used to discount the projected pension benefits to determine the actuarial accrued liability.  The new actuarial valuation reflects a decrease in the investment return assumption to 5.35% per year.  Under GASB 67, the investment return assumption is an input in the calculation of the single equivalent rate that is used to discount pension benefits to determine the Total Pension Liability.  The GASB 67 discount rate used in the valuation report as of June 30, 2014 is 4.30% per year.

In 2013, the Commonwealth enacted a comprehensive reform of the Judiciary Retirement System that was intended, based on actuarial assumptions, to allow the System to make benefit payments when due without depleting all of its assets first.  While most of this legislation was struck down by the Puerto Rico Supreme Court on constitutional grounds, the Commonwealth is still responsible for making certain annual additional contributions to the System.  The legislation provides that the Commonwealth will request an actuarial report to determine the amount of the annual additional contribution the Commonwealth would have to make, commencing in fiscal year 2015, in order to avoid the projected gross assets of the System during any subsequent fiscal year from falling below $20 million.  The first annual additional contribution for fiscal year 2015 has been determined at $11.6 million, and is due by June 30, 2015.  For fiscal year 2016, the annual additional contribution will be $12.1 million, due by June 30, 2016.

The actuaries have also projected the date of depletion for the Judiciary Retirement System.  This projection does not include the annual additional contributions described above.  Based on various assumptions, the projected date of depletion of the Judiciary Retirement

System is expected to occur during fiscal year 2018.  The date of depletion projection is not the same as the date that the System would be expected to exhaust assets as it differs from a cash flow projection.  If the annual additional contributions are not made, the System will continue to be rapidly defunded and its gross assets will be exhausted before the end of the decade.

**Liquidity Analysis of the Commonwealth by Conway MacKenzie**

GDB, in its role as fiscal agent to the Commonwealth and its instrumentalities, hired Conway MacKenzie ("Conway") to: (i) perform a liquidity analysis of the Treasury Department's Single Account held at GDB ("TSA"), in which the Treasury Department deposits and from which it disburses amounts related to the General Fund, (ii) assist with the implementation of measures to improve cash management, forecasting and budgeting procedures, and (iii) provide assistance to the Treasury Department and OMB in the development of short and medium-term cash flow projections. Additionally, Conway assisted in developing cash flow projections for several component units which are supported by the General Fund and the TSA.

As part of the engagement, Conway provided GDB with a preliminary draft report dated April 1, 2015 ("Preliminary Report"), detailing its preliminary findings and observations including General Fund liquidity projections through June 2016. The Preliminary Report was updated with available preliminary full fiscal year 2015 data and other information. On August 25, 2015 Conway provided an updated report ("Liquidity Update") which provides revised liquidity projections for fiscal year 2016 for the TSA, certain federal funds, government agencies, general obligation debt issuances and payments, net pension benefits and other items. Conway's analysis was limited to funds available to the Treasury Department in its TSA and did not factor other potential sources of liquidity available to the Commonwealth, such as cash in the Commonwealth's depositary accounts other than the TSA (including accounts holding funds for capital projects of the Commonwealth), agency deposits at third party financial institutions and cash and other liquid assets held by GDB. The Liquidity Update report also contains information on the analysis performed by Conway on the selected non-General Fund component units. Conway's Liquidity Update report has been available on GDB's website since September 9, 2015.

Conway's base projections discussed herein are based on various assumptions and estimates and do not take into consideration the potential impact of (i) certain cash management, revenue raising and expense reduction initiatives the Commonwealth has identified to reduce the fiscal year 2016 TSA cash flow deficiency , (ii) any new cash management, revenue raising and expense reduction measures that could potentially be identified later in fiscal year 2016 to provide additional liquidity to the TSA, (iii) liquidity from new financing sources, including the issuance of additional TRANs.

*Conway's Fiscal Year 2016 Projections.*  For fiscal year 2016, Conway's Baseline projections reflected a Bank Cash deficit in the TSA, before any risk adjustments and the implementation of any additional cash management, revenue or expense initiatives, of approximately $263.9 million in August 2015 and a peak Bank Cash deficit of $795.5 million in December 2015. Given the timing of tax collections and other inflows to the TSA, Conway projects a gradual improvement in the liquidity projection through the end of fiscal year 2016 to

reach a Bank Cash surplus of $50.7 million in June 2016. As of the end of October, actual tax collections and other non-General Fund revenue inflows to the TSA have been approximately $115 million lower than projected by Conway's Baseline projections, which were based on Treasury's forecast at the time of the report.

Conway's Adjusted TSA Cash Flow identified additional liquidity risks of $562.3 million for fiscal year 2016 due to $306.4 million of revenue risk shortfall, net spending and debt expenditure risks of $132.1 million and cash disbursements related to deferred fiscal year 2015 appropriations of $123.8 million. Conway's Adjusted TSA Cash Flow reflected a Bank Cash deficit in the TSA of approximately $29.8 million in November 2015 and a peak Bank Cash deficit of $511.6 million in June 2016. Further details on Conway's scope of work, methodology, assumptions, results and other information are available on GDB's website. Such additional information is not being incorporated by reference and is not part of this Commonwealth Report.

In preparing its analysis, Conway relied on information provided by the Commonwealth and its instrumentalities and, therefore, Conway assumes no responsibility for the accuracy or completeness of such information.  Conway's analysis does not constitute an audit in accordance with generally accepted auditing standards or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants. Furthermore, Conway's analysis includes estimates and projections that are inherently subject to significant economic and other uncertainties.  Actual results may vary materially from such estimates and projections.

*Conway has not participated in the preparation of this Commonwealth Report and has no responsibility for its contents, including any cash flow and liquidity projections included herein. Conway is not soliciting or recommending the purchase or sale of securities, or any indications for the purchase or sale of securities, or any other investment decisions*.

**Enactment of Fiscal Sustainability Act**

On June 17, 2014, the Legislature of the Commonwealth enacted Act No. 66-2014 (the "Fiscal Sustainability Act"). The Fiscal Sustainability Act is a fiscal emergency law enacted to address the fiscal pressures on the Commonwealth imposed by excessive leverage, persistent budgetary deficits, sluggish economic growth, and fiscally challenged public corporations, among others, as exacerbated by the credit rating downgrades that occurred in February of 2014. The Fiscal Sustainability Act will remain in effect for the three fiscal years ending on June 30, 2017, or earlier if certain parameters are met, including (i) that the preceding fiscal year ends without a budget deficit; (ii) that the economic growth rate forecast for the following fiscal year be 1.5% or higher; and (iii) that a nationally recognized rating agency upgrade the credit rating of the Commonwealth's general obligations to investment grade level.

The principal corrective measures adopted by the Fiscal Sustainability Act include the following: (i) the freezing of benefits under collective bargaining agreements and the reduction of certain non-salary compensation; (ii) the contribution of the savings generated by certain public corporations to support certain General Fund expenditures; (iii) the freezing of formula appropriation increases to the University of Puerto Rico and the municipalities; (iv) the freezing and reduction of formula appropriations to the Judicial Branch, the Legislative Assembly and

78

certain other entities; (v) the reduction in school transportation costs; (vi) the reduction of rates for professional and purchased services; (vii) the freezing of water rates for governmental entities; and (viii) the implementation of a payment plan system for legal judgments, among others. In addition, the Fiscal Sustainability Act imposes substantial additional managerial and administrative controls on the operations of the Executive Branch, including hiring and contracting requirements and procedures, savings targets for rent and utilities, fines to public employees for unauthorized transactions, and overall strengthening of oversight by the Commonwealth's Office of Management and Budget ("OMB").

**Enactment of Puerto Rico Public Corporations Debt Enforcement and Recovery Act**

On June 28, 2014, the Commonwealth enacted Act 71-2014, known as the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (the "Recovery Act"). Prior to the enactment of the Recovery Act, there was no Commonwealth statute providing an orderly recovery regime for public corporations experiencing financial difficulties. At the same time, Chapters 9 and 11 of the United States Bankruptcy Code are generally inapplicable to public corporations that are governmental instrumentalities of the Commonwealth. Thus, the Recovery Act was intended to fill this statutory gap and provide for an orderly legal process governing the enforcement and restructuring of the debts and other obligations of certain public corporations of the Commonwealth.

As discussed in greater detail below, a federal court recently held that the Recovery Act is unconstitutional and is preempted by the United States Bankruptcy Code. The Court of Appeals for the First Circuit upheld the decision of the district court, holding that the Recovery Act violates the United States Constitution.

The purpose of the Recovery Act is to create a legal framework that: (1) allows certain public corporations to adjust their debts in a manner that protects the interests of all affected creditors; (2) provides procedures for the orderly enforcement and restructuring of the debts and obligations of eligible public corporations in a manner that is consistent with the United States and Commonwealth Constitution; and (3) maximizes the return to such public corporation's stakeholders.

The Recovery Act does not apply to the Commonwealth. It applies solely to public corporations, other than the following: the Children's Trust; the Employees Retirement System of the Government of the Commonwealth of Puerto Rico and its Instrumentalities; Government Development Bank for Puerto Rico and its subsidiaries, affiliates, and any entities ascribed to GDB; the Judiciary Retirement System; the Municipal Finance Agency; the Municipal Finance Corporation; the Puerto Rico Public Finance Corporation; the Puerto Rico Industrial Development Company, the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority; the Puerto Rico Infrastructure Financing Authority; the Puerto Rico Sales Tax Financing Corporation (COFINA); the Puerto Rico System of Annuities and Pensions for Teachers; and the University of Puerto Rico.

The Recovery Act establishes two types of processes to adjust a public corporation's obligations. These two processes are designed to work together either concurrently or sequentially. The Recovery Act also provides for the creation of a specialized courtroom and for

the designation of a judge (the "Recovery Act Judge") to handle all court proceedings involving the interpretation and application of the provisions of the Recovery Act. The specialized courtroom is part of the Court of First Instance, San Juan Part. The Chief Justice of the Puerto Rico Supreme Court has designated a judge from the Court of Appeals of the Commonwealth to preside over all proceedings filed in this specialized courtroom.

The first type of process established in the Recovery Act (Chapter 2 process) is a consensual debt modification process with limited judicial intervention that affects only financial debt and culminates in a recovery program whose objective is to enable the public corporation to become financially self-sufficient, allocate equitably among all stakeholders the burdens of the recovery program and provide the same treatment to all creditors within a class of debt. A Chapter 2 process can be initiated by the public corporation (or by GDB with the consent of the Governor) by posting a notice on its website. The debt relief available under this consensual process may include a combination of amendments (such as rate adjustments and maturity extensions), waivers, or exchanges affecting those debt instruments identified by the public corporation (the "affected debt instruments"). The debt enforcement remedies available to holders of affected debt instruments are suspended during the pendency of the process, up to 270 days (subject to 90 day extension with the approval of holders of 20% of the affected debt instruments in a particular class). Any amendments to a class of affected debt instruments must be approved by holders representing at least 75% of the amount of debt in such class that participate in the voting; provided, that holders of at least 50% of the amount of debt in such class participate in the voting. Once approved by such debt holders, the public corporation must obtain court approval in order for the amendments to be binding on all debt holders of the affected class. Compliance with the recovery program adopted by the public corporation (which need not be approved by the creditors) is monitored by an oversight commission appointed by the Governor of Puerto Rico, which provides periodic compliance reports.

The second type of process established in the Recovery Act (Chapter 3 process) is more akin to the type of procedures found in Chapters 9 and 11 of the United States Bankruptcy Code. The Recovery Act Judge oversees this process. The process begins with the filing of a petition for relief in the specialized courtroom described above. Upon the filing of the petition, any action for the enforcement of any claims against such petitioner is automatically stayed. A petitioner is eligible to file if it is: (1) currently unable or at serious risk of being unable to pay its valid debts as they mature, while continuing to provide public services, without additional legislative or financial assistance; (2) ineligible for relief under Chapter 11 of the United States Bankruptcy Code; and (3) authorized to file the petition by its governing body and GDB, or on its behalf by GDB at the request of the Governor of Puerto Rico. This process will allow a public corporation to defer its debt repayment and to decrease interest on and principal of its debt to the extent necessary to enable it to continue to fulfill its public functions. Collective bargaining agreements may be modified or rejected under certain circumstances. Other types of contracts can be rejected (giving rise to claims for breach of contract) and trade debt can be reduced when necessary.

The Chapter 3 process is designed to permit the eligible public corporations to satisfy their contractual obligations to the maximum extent possible, and to maximize distributions to creditors consistent with and subject to the execution of its vital public functions. Only the public corporation (or GDB in its stead) is authorized to file a petition for debt enforcement

under this process — a creditor may not file a petition.  The Chapter 3 process terminates when the debt enforcement plan presented by the public corporation, which must meet certain requirements specified in the Recovery Act (including approval by at least one affected class of claims, with the favorable vote of a majority of all votes cast in such class and of two thirds of the affected claims in such class), is approved by the Recovery Act Judge.  The debt enforcement plan must provide creditors with (i) at least the value attainable had there been simultaneous enforcement of all creditor claims, plus (ii) a note entitling creditors to 50% of the public corporation's free cash flow for the next ten years.  A Chapter 3 plan may involve the transfer of all or substantially all of a public corporation's assets, subject to certain limitations.  Only the public corporation may propose a debt enforcement plan.

During the pendency of a Chapter 2 or Chapter 3 process, the public corporation remains in possession and control of its assets and operations.  The Recovery Act, however, authorizes the Governor to appoint an emergency manager to carry out the functions of the public corporation's board of directors and of its executive director.

As of the date of this report, no public corporation has sought relief under the Recovery Act.

On June 28, 2014, certain holders of bonds issued by PREPA filed a lawsuit in the United States District Court for the District of Puerto Rico seeking a declaratory judgment that the Recovery Act violates multiple provisions of the United States Constitution.  The complaint alleges that the Recovery Act is a law dealing with "bankruptcy matters" and that the Commonwealth is precluded by the United States Constitution from enacting this law since only the United States Congress can do so under the "bankruptcy clause" of the United States Constitution.  The complaint further alleges that certain provisions of the Recovery Act, if enforced, would violate several provisions of the United States Constitution because they would constitute an unconstitutional impairment of the contract between PREPA and its bondholders or a "taking" of the bondholders' property without just compensation.  On July 22, 2014, an investment manager, on behalf of investment funds which purportedly hold bonds issued by PREPA, filed another lawsuit in the United States District Court for the District of Puerto Rico seeking a declaratory judgment that the Recovery Act violates the bankruptcy clause of the United States Constitution and other provisions of the United States and Commonwealth Constitutions, asserting similar arguments as the first complaint.  On August 20, 2014, the District Court issued an order consolidating both actions.

On February 6, 2015, the United States District Court for the District of Puerto Rico issued an opinion and order declaring the Recovery Act unconstitutional and stating that it was preempted by the United States Bankruptcy Code. The Commonwealth filed an expedited appeal before the United States Court of Appeals for the First Circuit. On July 6, 2016, a three-judge panel of the Court of Appeals upheld the judgment of the District Court holding that the Recovery Act is unconstitutional.  On August 21, 2015 the Commonwealth filed a petition for writ of certiorari before the United States Supreme Court.

**United States Bankruptcy Code Amendment Initiative**

On February 11, 2015, Puerto Rico Resident Commissioner Pedro Pierluisi introduced a bill in the U.S. Congress (H.R. 870) that would empower the government of Puerto Rico to authorize Puerto Rico municipalities and public corporations to restructure their debt obligations under Chapter 9 of the United States Bankruptcy Code, which currently applies to municipalities and public corporations of the 50 states, but excludes those of Puerto Rico. The Commonwealth and GDB support this amendment to the United States Bankruptcy Code and are lobbying in favor of H.R. 870.

On February 26, 2015, the Subcommittee on Regulatory Reform, Commercial and Antitrust Law of the U.S. House Committee on the Judiciary, chaired by Congressman Tom Marino, held a public hearing to consider H.R. 870.  While several members of Congress present at the hearing expressed support for the bill, other members of Congress expressed reservations about making the effects of the bill retroactive (i.e., allowing for the modification of existing indebtedness).  Since the date of the hearing, certain holders of debt obligations of the Commonwealth and its instrumentalities have publicly expressed their opposition to the bill and have conducted a media and lobbying effort to prevent its passage.  At this time it is unclear if and when the bill will be approved and, if it is approved, whether its effects will be retroactive or not.

# THE ECONOMY

**Overview**

Puerto Rico's economy entered a recession in the fourth quarter of fiscal year 2006. The Commonwealth's gross national product (GNP) contracted (in real terms) every fiscal year between 2007 and 2014, with the exception of fiscal year 2012. The lower rate of GNP decline after fiscal year 2011 is due in large part to the large amount of stimuli and deficit spending injected into the Puerto Rico economy during the period (e.g. $7.1 billion in federal funds through the American Recovery and Reinvestment Act, $500 million in local stimulus funded by COFINA bond proceeds in 2009 and 2010, and $706 million in corporate and individual income tax cuts (later modified due to resulting revenue shortfalls)). The atypical growth in fiscal year 2012 (0.5%) was partially due to the effects of the different fiscal stimuli mentioned above.

According to the Puerto Rico Planning Board's most recent figures, released in May of 2015, Puerto Rico's real gross national product for fiscal years 2013 and 2014 decreased by 0.2% and 0.9%, respectively. Although the figures for fiscal year 2015 have not been made public, the cumulative values for the monthly economic indicators for fiscal year 2015 indicate that the real gross national product for fiscal year 2015 could also show a contraction. The Planning Board is expected to publish its figures for fiscal year 2015 in March of 2016.

In fiscal year 2014, aggregate personal income was $63.8 billion ($59.5 billion in 2009 prices) and personal income per capita was $17,855 ($16,650 in 2009 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total United States federal transfer payments to individuals amounted to $17.1 billion in fiscal year 2014 and $15.6 billion in fiscal year 2013. Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and United States Civil Service retirement pensions were $13.1 billion, or 77.0% of the transfer payments to individuals in fiscal year 2014 ($11.8 billion, or 75.5%, in fiscal year 2013). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of the phase out of Section 936 of the United States Internal Revenue Code and an increased concentration on higher-wage, high-technology industries, such as pharmaceuticals, computer products, biotechnology, professional and scientific instruments, and certain high technology machinery and equipment. At the present time, almost 90% of manufacturing is generated by chemical and electronic products. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the Puerto Rico GNP for fiscal years 2010 through 2014, compared to the annual percentage increase in real GNP in the United States. There are some

differences between the previously reported figures of Puerto Rico's GNP and the current figures set forth below due to the recent revision of several components of GNP, which included changes since fiscal year 2001. Therefore, growth rates and figures before fiscal year 2001 are not wholly comparable with the amounts reported afterwards.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30,**
**(dollar amounts in $ millions)**

|  | **2010** | **2011** | **2012** | **2013** | **2014**[1] |
|---|---|---|---|---|---|
| GNP (PR) (current prices) | $64,295 | $65,721 | $68,086 | $68,768 | $69,202 |
| Real GNP (PR) (2009 prices) | $61,345 | $60,312 | $60,636 | $60,496 | $59,940 |
| Annual percentage increase (decrease) in real GNP (PR) (2009 prices) | (3.6)% | (1.7)% | 0.5% | (0.2)% | (0.9)% |
| Annual percentage increase (decrease) in real GNP (United States) (2009 prices) | 0.4% | 2.6% | 2.5% | 1.9% | 2.5% |

[1]   Preliminary.

*Sources:* Puerto Rico Planning Board and IHS-Global Insight.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy.  These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.  During fiscal year 2014, approximately 71.8% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 47.2% of Puerto Rico's imports.   In fiscal year 2014, Puerto Rico experienced a positive merchandise trade balance of approximately $20 billion.

The following graph compares the growth rate of real GNP for the Puerto Rico and United States economies since fiscal year 2001, and the forecast of the growth rate for fiscal years 2015 and 2016.



**Real GNP Growth Rate (Percent)**

* Estimate for Puerto Rico from the Puerto Rico Planning Board (May 2015).
** Estimate for U.S. from IHS-Global Insight (Sep 2015).
*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA").  In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis.  The Planning Board revises its statistics on an annual basis.  The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year.  Thus, all macroeconomic accounts for fiscal year 2014 shown in this Report are preliminary until the revised figures for fiscal year 2014 and the preliminary figures for fiscal year 2015 are released, and the forecast for fiscal year 2016 is revised.  The Planning Board could also revise back more than two years to the extent it obtains more complete information.

Certain information regarding current economic activity is available in the form of the GDB Economic Activity Index (GDB-EAI), a coincident indicator of ongoing economic activity. This index, shown in the following graph and published by GDB since December 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power generation, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product. However, the GDB-EAI does not measure the real GNP annual growth rates. Since the GDB-EAI is generated with only four variables, it is more volatile than the real GNP figures. This means that both increments and declines reflected in the GDB-EAI amplify the corresponding movements of the real GNP.  In April, 2015 the GDB published an update about the way it was computing the seasonal adjustments for the components of the GDB-EAI.  That update was performed to reduce the volatility of the Index in order to make the month-to-month comparisons more reliable.  The new method implied changes on the level of the Index (making it slightly higher), and on the growth rates (both, year-over-year and month-over-month, making them less volatile).  The EAI for September 2015 was 127.7, increase by 0.8 compared to September 2014. The average cumulative value for the first three months of fiscal year 2016 remained flat when compared to the same period of fiscal year 2015. Furthermore, for fiscal year 2015, the EAI showed a reduction of 1.6%, compared to the corresponding figure for fiscal year 2014. For more information about the GDB-EAI methodology and recent modifications to reduce volatility see the GDB's website at www.gdbpr.com under "Economy-Economic Activity Index."





## Economic Forecast for Fiscal Years 2015 and 2016

In May 2015, the Planning Board released its GNP forecasts for fiscal years 2015 and 2016. The Planning Board's forecasts for fiscal year 2015 and 2016 project a decrease in gross national product of 0.9% and 1.2%, in constant dollars.  The Planning Board's forecast took into account the estimated effect of the projected growth of the United States gross domestic product, tourism activity, personal consumption expenditures, and federal transfers to individuals.

## Fiscal Year 2014

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2014 indicate that real gross national product decreased 0.9% (an increase of 0.6% in current dollars) over fiscal year 2013.  Nominal gross national product was $69.2 billion in fiscal year 2014 ($59.9 billion in 2009 prices), compared to $68.8 billion in fiscal year 2013 ($60.5 billion in 2009 prices).  Aggregate personal income decreased from $64.3 billion in fiscal year 2013 ($61.5 billion in 2009 prices) to $63.8 billion in fiscal year 2014 ($59.5 billion in 2009 prices).  Personal income per capita increased when measured in current prices, but decreased when measured in constant prices, from $17,755 in fiscal year 2013 ($16,992 in 2009 prices) to $17,885 in fiscal year 2014 ($16,650 in 2009 prices).

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2014 averaged 995,540, a decrease of 2.0% compared to the previous fiscal year; and the unemployment rate averaged 14.3%, an increase from 14.0% for fiscal year 2013.

Among the variables that contributed to the gross national product results were an increase in consumption expenditures and a slight increase in sales to the rest of the world.  There was also  an increase in the average price of West Texas Intermediate (WTI) oil, from $92.1 per barrel in fiscal year 2013 to $101.3 per barrel in fiscal year 2014, an increase of 10.0%.

**Fiscal Year 2013**

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2013 indicate that real gross national product decreased 0.2% (an increase of 1.0% in current dollars) over fiscal year 2012. Nominal gross national product was $68.8 billion in fiscal year 2013 ($60.5 billion in 2009 prices), compared to $68.1 billion in fiscal year 2012 ($60.5 billion in 2009 prices). Aggregate personal income increased from $62.2 billion in fiscal year 2012 ($59.4 billion in 2009 prices) to $64.3 billion in fiscal year 2013 ($61.5 billion in 2009 prices), and personal income per capita increased from $16,981 in fiscal year 2012 ($16,212 in 2009 prices) to $17,755 in fiscal year 2013 ($16,992 in 2009 prices).

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2013 averaged 1,016,134, a decrease of 1.1% compared to the previous fiscal year; and the unemployment rate averaged 14.0%, 1.2% point below the reported rate for fiscal year 2012.

Among the variables that contributed to the small growth in gross national product were an increase in consumption expenditures, government expenditures, and domestic fixed investment expenditures, and an increase in sales to the rest of the world. There was also a small reduction in the average price of West Texas Intermediate (WTI) oil, which went down from $95.0 per barrel in fiscal year 2012 to $92.1 per barrel in fiscal year 2013, a decrease of 3.0%. However, oil prices remained at a relatively high level, which constitutes a drag to the economy. After the financial crisis in the United States, which had significant direct consequences in the local economy, the historically low interest rates have not been enough incentive to jumpstart private investment or to counteract other external factors.

**Employment and Unemployment**

Total average annual employment, as measured by the Puerto Rico Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey" (which is generally used for the computation of the unemployment and participation rates), has decreased in recent years. The reduction in total employment began in the fourth quarter of fiscal year 2007, when total employment was 1,244,425, and has continued consistently through fiscal year 2015, when it was 990,113.

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2015 averaged 990,113, a decrease of 0.5% when compared to the previous fiscal year; and the unemployment rate averaged 13.0%, as compared to the 14.3% it reached during fiscal year 2014. As such, during the first quarter of fiscal year 2016, total employment increased by 2.7% as compared to the same period for the prior fiscal year, and the unemployment rate averaged 11.9%, compared to 14.7% for the same period of the prior fiscal year. According to the Establishment Survey (also known as the Payroll Survey), which is a different survey generally used to measure employment across the various sectors of the economy, total payroll non-farm employment decreased by 1.2% during fiscal year 2015, though it increased by 0.8% during the first quarter of fiscal year 2016. The above mentioned 2015's reduction in employment is partially attributable to attrition and to the changes to the Employees Retirement System made pursuant to the 2013 pension reform, which may have induced some

government employees to accelerate their retirement. Total private employment also fell by 0.6% or 4,100 employees during fiscal year 2015.  Nevertheless, during the first quarter of fiscal year 2016, private employment has increased by 0.9%, which translates to an addition of almost 6,100 employees, as compared to the same period for the prior fiscal year.

The following table presents annual statistics of employment and unemployment for fiscal year 2011 through fiscal year 2015.  These employment figures are based on the Household Survey, which includes self-employed individuals and agricultural employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not.  The number of self-employed individuals represents around 16% of civilian employment in Puerto Rico, more than double the level in the United States.  On the other hand, agricultural employment in Puerto Rico represented 1.7% of total employment in fiscal year 2015.

### Commonwealth of Puerto Rico
### Employment and Unemployment
### (Persons age 16 and over, in thousands)

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[1] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2011 | 1,246 | 1,044 | 202 | 16.2% |
| 2012 | 1,211 | 1,027 | 184 | 15.2% |
| 2013 | 1,182 | 1,016 | 165 | 14.0% |
| 2014 | 1,162 | 996 | 167 | 14.3% |
| 2015 | 1,138 | 990 | 148 | 13.0% |

_____

Totals may not add due to rounding.

[1]  Unemployed as percentage of labor force.

*Source:*  Department of Labor and Human Resources – Household Survey

Employment data coming from the payroll survey is corrected every year (specifically, every March) with a benchmark revision. From calendar year 2006 to calendar year 2011 the revisions implied additions or subtractions of around 4,400 jobs (the highest addition was in 2008 with 5,300 jobs, and the highest subtraction corresponded to 2009 with 6,500 less jobs). However, the benchmark revision of 2013 added 18,433 jobs, the revision of March 2014 (which affected mainly calendar year 2013) increased the number of jobs by 21,275, and the revision of March 2015 (which corresponded mainly to calendar year 2014), decreased the number of jobs by 17,300.  In other words, payroll employment revisions after 2012 have been much more volatile than the previous revisions.

**Economic Performance by Sector**

From fiscal year 2010 to fiscal year 2014, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2010 to 2014.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Sector and Gross National Product
### (in millions at current prices)

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2010** | **2011** | **2012** | **2013** | **2014**[1] |
| Manufacturing | $46,577 | $46,760 | $46,971 | $47,736 | $49,332 |
| Service[2] | 41,408 | 42,690 | 43,553 | 43,869 | 44,301 |
| Government[3] | 8,350 | 8,216 | 8,278 | 8,238 | 7,830 |
| Agriculture | 822 | 795 | 816 | 836 | 858 |
| Construction[4] | 1,518 | 1,332 | 1,369 | 1,317 | 1,188 |
| Statistical discrepancy | (294) | 559 | 577 | 531 | 167 |
| Total gross domestic product[5] | $98,381 | $100,352 | $101,565 | $102,526 | $103,676 |
| Less:  net payment abroad | (34,087) | (34,631) | (33,479) | (33,758) | (34,474) |
| Total gross national product[5] | $64,295 | $65,721 | $68,086 | $68768 | $69,202 |

_____

[1] Preliminary.

[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.

[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government.  Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.

[4] Includes mining.

[5] Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industry presented here, as in the United States, are based on the Establishment (or Payroll) Survey, which is designed to measure number of payrolls by sector.  The Payroll Survey excludes agricultural employment and self-employed persons.  During fiscal year 2015, total non-farm payroll employment averaged 906,233, a 1.2% reduction with respect to the prior fiscal year. Furthermore, for the first quarter of fiscal year 2016, total non-farm payroll employment increased by 0.8%, when compared to the same period of fiscal year 2016.

The following table presents annual statistics of average employment based on the North American Industry Classification System ("NAICS") for fiscal years 2011 to 2015.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Economic Sector [1]**
**(number of employees)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2011** | **2012** | **2013** | **2014** | **2015[2]** |
| Natural resources and construction | 32,050 | 35,100 | 33,717 | 28,200 | 26,042 |
| Manufacturing | | | | | |
|    Durable goods | 33,900 | 33,308 | 32,800 | 32,375 | 31,908 |
|    Non-durable goods | 51,767 | 50,192 | 45,925 | 43,125 | 42,583 |
| Sub-total | 85,667 | 83,500 | 78,725 | 75,500 | 74,492 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|    Wholesale trade | 32,008 | 31,517 | 31,575 | 30,975 | 29,983 |
|    Retail trade | 128,017 | 128,192 | 130,600 | 130,958 | 130,300 |
|    Transportation, warehouse, and utilities | 14,392 | 14,625 | 14,650 | 14,817 | 15,358 |
|      Sub-total | 174,417 | 174,333 | 176,825 | 176,750 | 175,642 |
| | | | | | |
| Information | 18,733 | 18,650 | 19,158 | 19,683 | 20,075 |
| Finance | 43,733 | 44,400 | 44,375 | 43,525 | 42,433 |
| Professional and business | 105,667 | 108,875 | 112,700 | 114,642 | 112,708 |
| Educational and health | 114,158 | 117,617 | 122,158 | 123,100 | 125,342 |
| Leisure and hospitality | 71,208 | 72,775 | 77,017 | 79,500 | 80,508 |
| Other services | 17,925 | 17,625 | 17,908 | 17,892 | 17,442 |
| Government[3] | 260,033 | 258,425 | 254,575 | 238,017 | 231,550 |
|    Total non-farm | 923,592 | 931,300 | 937,158 | 916,808 | 906,233 |

---

[1]  The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources.  There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey.  The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households.  The Payroll Survey excludes the self-employed and agricultural employment.  Totals may not add due to rounding.

[2]  Preliminary.

[3]  Includes state, local, and federal government employees.

*Source:*  Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product.  The Planning Board figures show that in fiscal year 2014 manufacturing generated $49.3 billion, or 47.6%, of gross domestic product.  During fiscal year 2015, payroll employment for the manufacturing sector was 74,492, a decrease of 1.3% compared with fiscal year 2014. For the first quarter of fiscal year 2016, manufacturing employment averaged 73,500, a reduction of 1.4% (or 1,100 employees) from the same time period of the previous fiscal year. Most of Puerto Rico's manufacturing output is exported to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2015, however, the average hourly manufacturing wage rate in Puerto Rico was approximately 69.0% of the average mainland United States rate.

In the last three decades, industrial development in Puerto Rico has been relatively capital intensive and dependent on skilled labor.  This gradual shift in emphasis from labor intensive to capital intensive industrial development is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Commonwealth governments. Federal legislation enacted in 1996, however, which amended Section 936 of the United States Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the scope of the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has contributed to the long-term decline that the activity of this sector has suffered during the past two decades.  In addition, the uncertainty created by the long-term creditability of the Act 154 excise tax has also affected the potential growth for this sector.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2010 to 2014.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Manufacturing Sector
(at current prices, in millions)

| | 2010 | 2011 | 2012 | 2013 | 2014 [1] |
|---|---|---|---|---|---|
| Food | $ 868 | $ 834 | $ 976 | $ 968 | $ 1,033 |
| Beverage and Tobacco Products | 1,358 | 1,228 | 1,314 | 1,407 | 1,522 |
| Textile Mills & Product Mills | 12 | 10 | 13 | 13 | 13 |
| Apparel | 283 | 276 | 258 | 162 | 125 |
| Leather and Allied Products | 22 | 25 | 18 | 17 | 18 |
| Wood Products | 19 | 17 | 18 | 19 | 21 |
| Paper | 45 | 52 | 50 | 66 | 70 |
| Printing and Related Support Activities | 115 | 119 | 102 | 96 | 97 |
| Petroleum and Coal Products | 353 | 352 | 349 | 317 | 322 |
| Chemical | 32,527 | 32,039 | 31,609 | 31,425 | 31,816 |
| Plastics and Rubber Products | 111 | 97 | 95 | 101 | 107 |
| Nonmetallic Mineral Products | 123 | 96 | 126 | 119 | 115 |
| Primary Metals | 200 | 169 | 101 | 100 | 103 |
| Fabricated Metal Products | 175 | 155 | 156 | 248 | 159 |
| Machinery | 233 | 232 | 207 | 222 | 238 |
| Computer and Electronic Products | 7,479 | 8,123 | 8,663 | 9,548 | 10,493 |
| Electrical Equipment, Appliances and Components | 677 | 681 | 754 | 760 | 797 |
| Transportation Equipment | 75 | 79 | 79 | 84 | 91 |
| Furniture and Related Products | 37 | 35 | 37 | 35 | 34 |
| Miscellaneous | 1,865 | 2,140 | 2,047 | 2,037 | 2,166 |
| Total gross domestic product of manufacturing sector[2] | $ 46,577 | $ 46,760 | $ 46,971 | $ 47,736 | $ 49,332 |

(1)   2012-2013 revised figures and 2014 preliminary.

(2)   Totals may not add due to rounding.

*Source:  Planning Board*

The following table presents annual statistics of average manufacturing employment by industry based on the NAICS for fiscal years 2011 to 2015.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Manufacturing Employment by Industry Group
### (number of employees)

| Industry group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2011** | **2012** | **2013** | **2014** | **2015**[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 2,133 | 2,042 | 1,983 | 1,817 | 1,733 |
| Fabricated metal products | 3,625 | 3,608 | 3,583 | 3,350 | 3,292 |
| Computer and electronic | 5,967 | 5,175 | 4,667 | 4,433 | 4,417 |
| Electrical equipment | 5,042 | 5,117 | 5,225 | 5,108 | 4,933 |
| Miscellaneous manufacturing | 11,633 | 11,775 | 11,825 | 12,350 | 12,383 |
| Other durable goods manufacturing | 5,500 | 5,592 | 5,517 | 5,317 | 5,150 |
| Total – durable goods | 33,900 | 33,308 | 32,800 | 32,375 | 31,908 |
| **Non-durable goods** | | | | | |
| Food manufacturing | 11,908 | 11,467 | 11,292 | 11,608 | 11,433 |
| Beverage and tobacco products manufacturing | 3,150 | 2,792 | 2,633 | 2,433 | 2,433 |
| Apparel manufacturing | 8,775 | 9,692 | 6,492 | 4,908 | 5,525 |
| Chemical manufacturing | 21,033 | 19,967 | 19,108 | 18,208 | 17,533 |
| Other non-durable goods manufacturing | 6,900 | 6,275 | 6,400 | 5,967 | 5,658 |
| Total – non-durable goods | 51,767 | 50,192 | 45,925 | 43,125 | 42,583 |
| Total manufacturing employment | 85,667 | 83,500 | 78,725 | 75,500 | 74,492 |

_____
Totals may not add due to rounding.
[1]   Preliminary.

*Source*:  Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 84,066 from fiscal year 1996 to fiscal year 2015, and by 42,825 from fiscal year 2005 to fiscal year 2015. During the period from 2010 through 2015, manufacturing employment decreased by a total of 15.7%.  For fiscal year 2015, average employment in the sector declined by 1,000 jobs, or 1.3%, compared to the previous year.  Given that this sector pays, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that could explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly electricity), the increased use of job outsourcing, and the increase of global competition. Puerto Rico's manufacturing sector continues to face increased international competition.  As patents on pharmaceutical products manufactured in Puerto Rico expire and the production of such patented products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2014, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.1%, while payroll employment in this sector increased slightly at an average annual rate of 0.2%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 16.5% of total employment according to the Household Survey. Most of this employment supports the operation of the service sector.

The service sector ranks second to manufacturing in its contribution to gross domestic product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2014, the service sector generated $44.3 billion, or 42.7%, of gross domestic product. Trade, transportation, finance, professional and business support, education and health and other services experienced growth, while information, and Real Estate & Rental experienced reductions in fiscal year 2014, as measured by gross domestic product at current prices. Service-sector employment increased from 565,450 in fiscal year 2007 to 574,150 in fiscal year 2015, an average annual rate increase of 0.2% (representing 63.4% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2015 represents a small decrease of 0.2% when compared to the prior fiscal year.

Puerto Rico has a developed banking and financial system. According to the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"), as of June 30, 2015, there were nine commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System, and by the OCFI. The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of June 30, 2015 amount to $59.0 billion, remaining virtually at the same level as March 31, 2015.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA"), the United States Securities and Exchange Commission and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $1.1 billion as of June 30, 2015, as compared to $1.0 billion on March 31, 2015. Another relevant component of the financial sector in Puerto Rico is the investment company industry. According to the OCFI, local investment companies had recorded assets under management of $7.2 billion as of June 30, 2015. Assets under management by local investment companies have decreased significantly as a result of the recent downgrades of bonds of the Commonwealth and its instrumentalities and the resulting reduction in the market prices of these bonds.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as "cooperativas").  IBEs are licensed financial businesses that conduct offshore banking transactions.  As of June 30, 2015, there were 33 IBEs (including units of commercial banks) operating in Puerto Rico, with total assets of $57.6 billion, an increase from $50.3 billion in total assets as of March 31, 2015.  Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $8.6 billion in assets as of June 30, 2015 remaining essentially at the same level as March 31, 2015.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following table sets forth gross domestic product for the service sector for fiscal years 2010 to2014.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Service Sector
### (in millions at current prices)

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2010** | **2011** | **2012** | **2013** | **2014**[1] |
| Wholesale trade | $ 2,993 | $ 2,909 | $ 2,819 | $ 2,823 | $ 2,873 |
| Retail trade | 4,473 | 4,787 | 4,809 | 4,923 | 5,067 |
| Transportation and warehousing | 941 | 898 | 946 | 928 | 898 |
| Utilities | 1,982 | 1,868 | 2,074 | 1,744 | 2,087 |
| Information | 2,646 | 2,610 | 2,465 | 2,395 | 2,387 |
| Finance and insurance | 5,241 | 5,611 | 5,176 | 5,577 | 4,631 |
| Real Estate and rental | 13,785 | 14,369 | 15,383 | 15,217 | 15,773 |
| Professional and business | 3,083 | 3,311 | 3,460 | 3,586 | 3,739 |
| Education and health | 4,015 | 4,078 | 4,084 | 4,222 | 4,315 |
| Leisure and hospitality | 1,860 | 1,866 | 1,940 | 2,038 | 2,106 |
| Other services | 390 | 383 | 395 | 416 | 424 |
| Total[2] | $41,408 | $42,690 | $43,553 | $43,869 | $44,301 |

[1]     2012-2013 revised figures and 2014 preliminary.
[2]     Totals may not add due to rounding.
*Source*: Puerto Rico Planning Board

96

The following table sets forth employment for the service sector for fiscal years 2011 to 2015.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector**
**(Persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2011** | **2012** | **2013** | **2014** | **2015**[1] |
| Wholesale trade | 32,008 | 31,517 | 31,575 | 30,975 | 29,983 |
| Retail trade | 128,017 | 128,192 | 130,600 | 130,958 | 130,300 |
| Transportation, warehouse and utilities | 14,392 | 14,625 | 14,650 | 14,817 | 15,358 |
| Information | 18,733 | 18,650 | 19,158 | 19,683 | 20,075 |
| Finance | 43,733 | 44,400 | 44,375 | 43,525 | 42,433 |
| Professional and business | 105,667 | 108,875 | 112,700 | 114,642 | 112,708 |
| Educational and health | 114,158 | 117,617 | 122,158 | 123,100 | 125,342 |
| Leisure and hospitality | 71,208 | 72,775 | 77,017 | 79,500 | 80,508 |
| Other services | 17,925 | 17,625 | 17,908 | 17,892 | 17,442 |
| Total[2] | 545,842 | 554,275 | 570,142 | 575,092 | 574,150 |

[1]   Preliminary.
[2]   Totals may not add due to rounding.
*Source:*  Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

### Hotels and Related Services—Tourism

For fiscal year 2014, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 2,247,100, an increase of 2.3% over the number of persons registered during fiscal year 2013. The average occupancy rate in tourist hotels during fiscal year 2014 was 72.3%, a slight decrease of 0.4% from the prior fiscal year. Also, during fiscal year 2014, the average number of rooms available in tourist hotels increased by 0.7% to 12,042 rooms compared to fiscal year 2013.

During the first ten months of fiscal year 2015, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,914,900, an increase of 4.6% over the number of persons registered during the same period of fiscal year 2014. The average occupancy rate in tourist hotels during the first ten months of fiscal year 2015 was 72.2%, an increase of 0.3% from the prior fiscal year.  Also, during the first ten months of fiscal year 2015, the average number of rooms available in tourist hotels increased by 2.6% to 12,272 rooms compared to the same period of fiscal year 2014.

In terms of employment, according to the Payroll Survey, employment in the leisure and hospitality sector was 77,017 for fiscal year 2013, an increase of 5.8% over employment for fiscal year 2012, which is a larger increment than the average growth rate observed for the tourist hotel registrations (4.8%) during that same year.  For fiscal year 2014, employment in this sector

increased by 3.2% to 79,500 compared to the prior fiscal year, a growth rate higher than the 2.3% increase observed in tourist hotel registrations during that same period. However, for fiscal year 2015, the leisure and hospitality sector employment averaged 80,508 employees, an increase of 1.3% compared to the prior year, a growth rate considerably lower than the average increase of 4.6% observed during the first ten months of registrations in tourist hotels for fiscal year 2015. During the first quarter of fiscal year 2016, the leisure and hospitality sector employment increased by 1.8% 81,100 employees compared to the same period of the prior fiscal year.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.  During fiscal year 2015, the number of cruise passenger movement and trips increased by 24.8% and 24.3%, respectively. However, during the first quarter of fiscal year 2016, the number of cruise passenger movement and trips decreased by 9.9% and 19.2%, respectively.

**Commonwealth of Puerto Rico**
**Tourism Data[1]**

**Number of Visitors**
**(in thousands)**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2009 ........................................... | 1,277.7 | 1,232.0 | 1,905.5 | 4,415.3 |
| 2010 ........................................... | 1,349.4 | 1,193.5 | 1,836.2 | 4,379.2 |
| 2011 ......................................... | 1,408.5 | 1,165.8 | 1,639.4 | 4,213.7 |
| 2012 ......................................... | 1,508.0 | 1,127.8 | 1,561.1 | 4,196.9 |
| 2013 ......................................... | 1,586.1 | 1,038.0 | 1,613.6 | 4,237.7 |
| 2014[5].......................................... | 1,633.2 | 1,209.2 | 1,612.8 | 4,455.2 |

**Total Visitors' Expenditures**
**(in millions)**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2009 ........................................ | $1,464.4 | $173.7 | $1,537.7 | $3,175.8 |
| 2010 ........................................ | $1,541.8 | $171.4 | $1,497.5 | $3,210.7 |
| 2011 ........................................ | $1,618.9 | $169.3 | $1,354.5 | $3,142.8 |
| 2012 ........................................ | $1,706.9 | $167.7 | $1,318.3 | $3,192.9 |
| 2013 ........................................ | $1,811.8 | $156.0 | $1,365.8 | $3,333.5 |
| 2014[5] ...................................... | $1,872.3 | $182.2 | $1,383.6 | $3,438.1 |

---

[1]   Only includes information about non-resident tourists registering in tourist hotels.  They are counted once even if registered in more than one hotel.
[2]   Includes visitors in guesthouses.
[3]   Includes cruise ship visitors and transient military personnel.
[4]   Includes visitors in homes of relatives, friends, and in hotel apartments.
[5]   Preliminary.
*Sources:*  Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCCDA"), has developed the largest convention center in the Caribbean, which is the centerpiece of a 100-acre private development that includes hotels, restaurants, office space, and housing.  The Convention Center District is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments.  The Convention Center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1 million attendees.  A 503 room hotel located next to the Convention Center commenced operations in November of 2009. A  126 key hotel operated under the insignia of Hyatt House opened on October 1, 2014 and another Hyatt hotel with 149 keys is scheduled to open on January 12, 2016 under the flag of Hyatt Place.

The PRCCDA also owns a 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum located in San Juan, Puerto Rico. The Coliseum was inaugurated in 2004 and has hosted more than 400 world-caliber events with an aggregate attendance of over 2.5 million people. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar Magazine in 2005.

### *Government*

The government sector of Puerto Rico has played an important role in the economy.  It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the 20th century, providing the basic infrastructure and services necessary for the modernization of Puerto Rico.

In fiscal year 2014 the government (federal, state and local) industrial sector accounted for $7.8 billion, or 7.6%, of Puerto Rico's gross domestic product.  The government is also a significant employer, employing 231,600 workers (federal, state and local), or 25.6% of total,

non-farm, payroll employment in fiscal year 2015. Government employment has decreased significantly, however, in recent years. In fiscal year 2009, federal, state and local government employment averaged 300,700. From fiscal year 2009 to fiscal year 2015, employment reductions have been of 1,000 jobs (-6.6%) in the federal government, 56,000 jobs (-25.6%) in the state government (including public corporations) and 12,100 jobs (-18.0%) in municipal government. The reductions have occurred, for the most part, in the state and municipal government employment sectors and are related to the recent changes to the Employees Retirement System which prompted the voluntary departure of employees which qualified for retirement but were still employed. Nevertheless, for the first quarter of fiscal year 2016, total government employment grew by 600 jobs (0.3%) to 231,600 jobs. Federal and municipal government increased by 500 jobs (3.9%) and 3,300 jobs (6.0%) respectively, which was partially offset by a decrease of 3,200 jobs (-1.9%) in the state government.

### Transportation

Forty shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including, Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa. Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayagüez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, Patillas and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by more than 20 domestic and international airlines. The Airport receives over 8 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the United States mainland. San Juan has also become a hub for intra-Caribbean service. While the main hubs in the United States mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America. On February 27, 2013, the Puerto Rico Ports Authority entered into a long term lease of the Luis Munoz Marin International Airport with Aerostar Holdings, LLC ("Aerostar") pursuant to a public-private partnership transaction. It is estimated that Aerostar will invest $1.4 billion in the Airport during the life of the lease, including a commitment to invest approximately $267 million in immediate improvements and comply with world-class operating standards.

Rafael Hernández Airport in Aguadilla is served by JetBlue and Spirit and has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport is served by JetBlue and has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

On April 10, 2014, the Ports Authority and PRIDCO signed a long-term lease agreement with Lufthansa Technik Puerto Rico, LLC ("LTPR") under which LTPR will lease from the Ports Authority certain areas of the Rafael Hernández Airport in Aguadilla, where LTPR will

establish an aircraft maintenance, repair and overhaul operation.  In addition to establishing Puerto Rico as a hub for this type of operations, the facility is expected to become a key driver of economic development and increased tax revenues for the Commonwealth.

Puerto Rico's major cities are connected by a modern highway system, which, as of December 31, 2014, totaled approximately 4,630 miles and 12,802 miles of local streets and adjacent roads.  The highway system comprises 392 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 233 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional and inter-municipal traffic and 3,044 miles of tertiary highways and roads serving local, intra-municipal traffic.  The PR-22 and PR-5 toll highways are currently operated by a private company pursuant to a Concession Agreement between the Puerto Rico Highways and Transportation Authority, the P3 Authority and Autopistas Metropolitanas de Puerto Rico, an affiliate of Abertis and Goldman Sachs.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Ponce Port Authority, the terminal can handle containerized import/export and transshipment cargo.  The first phase of the port development was completed in 2004 while the second phase, which included the construction of a container yard with capacity for up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009.  A third development phase is still pending, which would result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units and include the installation of the basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port.  In December of 2013, legislation was enacted to authorize the selection of an international level ports operator and an administrator for the adjacent value added zone.  These measures are aimed at completing the remaining infrastructure required for the project to become operational in the near future.

### *Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it can make significant contributions to the growth of economic activity due to its multiplier effect on the whole economy.  From its peak in fiscal year 2000 to fiscal year 2014, real construction investment declined at an average annual rate of 6.8%.  Construction investment started to decrease significantly in fiscal year 2005, as part of the general economic contraction experienced during the past years in Puerto Rico.  During the last seven fiscal years (from fiscal year 2007 to 2014) real construction investment decreased at an average annual rate of 8.7%.     The Planning Board forecasts a decrease in construction investment of 10.1 and 7.2% in real terms for fiscal year 2015, and 2016.

Public investment has been an important component of construction investment.  During fiscal year 2014, approximately 51.7% of the total investment in construction was related to public projects, which represents an increase in its share of total construction investment compared to 37.9% in fiscal year 2000.  Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is

still suffering from the credit conditions that prevailed during the last decade.  Public investment was primarily in housing, schools, water projects, and other public infrastructure projects. The end of federal ARRA funds also negatively affected public investment in construction during fiscal year 2014.

During fiscal year 2014, the number of construction permits decreased by 9.6%, while the total value of construction permits decreased by 6.6% when compared to fiscal year 2013. During the first eleven months of fiscal year 2015, the number of construction permits decreased by 0.1%, while the total value of construction permits increased by 39.4% compared to the same period of fiscal year 2014. Cement sales, on the other hand, have decreased every year since 2009, except 2012. In fiscal year 2015, cement sales decreased by 9.6% when compared to 2014. During the first quarter of fiscal year 2016, cement sales have decreased by 5.6% when compared to the same period in fiscal year 2015.

Average payroll employment in the construction sector during fiscal year 2015 was 26,042, a reduction of 7.7% from fiscal year 2014.  On the other hand, payroll employment in construction has declined significantly during the past decade, as in fiscal year 2004 this sector averaged 69,300 employees, and for fiscal year 2015 it averaged 26,042.  During the first quarter of fiscal year 2016, payroll employment in the construction sector averaged 24,000, a decrease of 10.5% when compared to the same period in fiscal year 2015.

### Agriculture

Agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2014, gross income from agriculture was $929.7 million at current prices, an increase by 11.6% as compared with fiscal year 2013.  In terms of gross domestic product, agriculture generated a level of production of $858.3 million at current prices in fiscal year 2014, an increase of 2.7% compared to fiscal year 2013.  According to the Household Survey, the number of people employed in this sector has remained stable during the past five years, at close to 17,000 employees.

The Commonwealth government supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers.  Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments.  It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector.  The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects. The Department of Agriculture and related

agencies have directed their efforts at increasing and improving local agricultural production, and stimulating the consumption of locally produced agricultural products.

## Higher Education

During the six decades from 1950 to 2010, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level.  The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels.  During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico.  More recently, employment in the service sector has increased significantly.  This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields.  During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population.  During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

### Commonwealth of Puerto Rico
### Trend in College Enrollment

| Academic Year | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,818,637 | 51.3% |
| 2000 | 428,894[2] | 176,015 | 41.0% | 27,141,150[2] | 15,312,289 | 56.4% |
| 2010 | 375,145[2] | 249,372 | 66.5% | 30,672,088[2] | 20,427,711 | 66.6% |
| 2011 | 375,892[3] | 250,192 | 66.6% | 31,094,473[3] | 21,016,126 | 67.6% |
| 2012 | 373,493[3] | 250,011 | 66.9% | 31,397,205[3] | 20,994,113 | 66.9% |
| 2013 | 369,165[3] | 245,495 | 66.5% | 31,534,166[3] | 20,642,819 | 65.5% |
| 2014 | 361,611[3] | 241,168 | 66.7% | 31,464,158[3] | 20,375,789 | 64.8% |

[1]   Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2]   Based on census population as of April 1 of the stated year.
[3]   Estimated population (reference date July 1 of the stated year).

*Sources*:  U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island.  The University's total enrollment for academic year 2013-2014 was approximately 57,368 students.  Commonwealth appropriations are the principal source of University revenues. The amount of the annual appropriation is based on a statutory formula, and equals 9.60% of the Commonwealth's average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year. Additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources.  The University's capital improvements have been financed mainly by revenue bonds.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico.  Such institutions had an enrollment during academic year 2013-2014 of approximately 183,800 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law.  Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate.  Also, the vast majority of educational institutions are accredited by United States Department of Education-recognized accrediting entities.

## Tax and Other Economic Development Initiatives

Since 2013, the Commonwealth's economic development team has embarked on a comprehensive outreach strategy in order to diversify Puerto Rico's economic base, pursue niche strategies such as Aerospace and Aeronautics, and leverage its human capital and fiscal autonomy to attract new investment opportunities.  The Commonwealth's goal is to protect its manufacturing core while it transitions its economic ecosystem into a regional service and high tech industrial activities hub.

Summarized below are certain tax and other incentive programs designed to promote the development of the manufacturing, service and tourism sectors in Puerto Rico.

### *Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation.  Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes.  The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008 (the "Economic Incentives Act").

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business.  The activities eligible for tax exemption under the Economic Incentives Act include manufacturing and laboratories for research and development, and originally included certain designated services performed for markets outside Puerto Rico

104

(including the United States), the production of energy from local renewable sources for consumption in Puerto Rico. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

### *Individual Investors Act*

In January of 2012, the Legislative Assembly of Puerto Rico approved Act No. 2012-22, also known as the Act to Promote the Relocation of Individual Investors to Puerto Rico (the "Individual Investors Act). The Individual Investors Act seeks to attract new residents to Puerto Rico by providing total exemption from Puerto Rico income taxes on passive income realized or accrued after such individuals become bona fide residents of Puerto Rico. The Individual Investors Act applies to any individual investor that becomes a Puerto Rico resident on or before the taxable year ending on December 31, 2035, provided that such individual was not a resident of Puerto Rico at any time during the 6-year period preceding the effective date of the Individual

105

Investors Act. This relocation is expected to result in new local investments in real estate, services, and other consumption products, and in capital injections to the Puerto Rico banking sector, all of which would stimulate the economy of Puerto Rico.

Over 700 individual investors have applied for the benefits under the Individual Investors Act since 2012. Many of these investors have also established service operations in Puerto Rico under the Export Services Act, discussed below.

### Export Services Act

In January of 2012 the Commonwealth enacted Act No. 2012-20, also known as the Act to Promote the Exportation of Services (the "Export Services Act"), which supersedes the provisions of the Economic Incentives Act that provide benefits to designated services performed for markets outside of Puerto Rico. The Export Services Act seeks to establish and develop in Puerto Rico an international export services center. This act seeks to encourage local service providers to expand their services to persons outside of Puerto Rico, promote the development of new businesses in Puerto Rico and stimulate the inbound transfer of foreign service providers to Puerto Rico. The Export Services Act also creates a special fund for the continuous development of new tax incentives that will promote export services and the establishment of new businesses in Puerto Rico. The Export Services Act applies with respect to any entity with a bona fide office or establishment located in Puerto Rico that is or may be engaged in an eligible service.  Service providers operating under a tax exemption decree issued under the Export Services Act will enjoy various Puerto Rico tax incentives during the term of such decree, such as a 4% flat income tax rate on export services income and 100% tax-exempt dividend distributions.

Over 500 Export Services Act applications have been received for the establishment of new export services operations in Puerto Rico within the following industries: centralized management services and shared services; information technology; financial services; advertising and public relations; and professional services.

### International Finance Center

Act No. 273 of 2012 ("Act 273-2012"), also known as the "International Financial Center Regulatory Act", provides tax exemption to businesses engaged in eligible activities in Puerto Rico.  To qualify for such benefits, a business needs to become an International Financial Entity ("IFE") by applying for a permit and license and obtaining a tax exemption decree.  The International Financial Center has experienced strong growth since 2013 with six operating licenses approved in 2013, nine in 2014, and 4 in 2015.  As of June 30, 2015, International Financial Entities had total assets exceeding $402 million with total capital of $147,939,000 and net income of $27,563,000.

### International Insurance Center

Act No. 399 of 2004 ("Act 399-2004"), provides Puerto Rico with a competitive environment, within which insurers and reinsurers can cover risks outside of Puerto Rico under a secure and flexible regulatory framework with attractive tax benefits.  International insurance

entities have various alternative ways to organize and operate within the Puerto Rico International Insurance Center. These options include operating as an international insurance holding company, an international insurer or a branch of an international insurer, as well as managing protected cell arrangements under a tax efficient framework. Most recently, Act 39-2014 was enacted to set the guidelines for the assumption of domestic risks, regulate third party risks assumptions by captives, and facilitates the organization of insurance linked securities programs (ILS/CAT Bonds).

Promotional efforts and direct approaches to insurance carriers and underwriters, captive managers and related advisors have resulted in: (i) 15 authorized insurance companies; (ii) over 250 approved protected cell arrangements and segregated asset plans; and (iii) total premium income of $220 million for 2014, representing a 43% increase in premium activity as compared to 2013.

### Tourism Incentives Program

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Puerto Rico Tourism Development Act of 2010 (the "Tourism Development Act") provides partial exemptions from income, property, and municipal license taxes for a period of ten years. The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Puerto Rico Tourism Development Fund ("TDF") as a subsidiary of GDB with the authority to make investments in or provide financing (guarantees or loans) to corporate entities that develop hotel and related hospitality projects. As of June 30, 2015, TDF has provided direct loans and guaranteed loans and bonds in the aggregate amount of approximately $1.6 billion for 30 tourism projects representing 5,616 new hotel rooms, with a total investment of approximately $2.6 billion.

More recently, the Commonwealth has focused its efforts on expanding Puerto Rico's air and maritime access given its importance for both tourism and trade growth and in the launching of its new destination advertising campaign. Recent developments include:

- Southwest Airlines entered the Puerto Rico market, substituting its subsidiary AirTran. The airline currently operates nonstop service to Baltimore, Fort Lauderdale, Houston, Tampa and Orlando. The entry of Southwest resulted in an upgrade of aircraft, generating 33% more passengers during 2013-2014.

- Avianca Airlines, a Colombian flag-carrier began flying from Bogotá to San Juan three times a week in July 2013. Based on the success of this route and the recent opening of the Commonwealth's Office in Colombia, 2more weekly flights have been added to this

route since it was initially established.   The airline also opened a VIP lounge in Concourse C at the San Juan International Airport.

- Air Europa, a Spanish carrier with presence in many important cities in Europe and the Middle East, began flying from Madrid to San Juan two times a week in May 2014.  Air Europa also launched a codeshare with Seaborne Airlines to offer daily service from Madrid to San Juan via Punta Cana, Dominican Republic.

- Aruba-based Insel Air began nonstop Aruba-San Juan service in July 2015, with twice-weekly service.

- Norwegian Airlines will begin nonstop service from its gateways in Copenhagen, Denmark; London, United Kingdom; Oslo, Norway; and Stockholm, Sweden in November 2015.  Five weekly flights will be flown, one each per Scandinavian gateway and two from London Gatwick.

- JetBlue launched a direct nonstop service between Chicago O'Hare International Airport to San Juan's Luis Muñoz Marín International Airport, adding 150seats daily.

- Seaborne Airlines moved its headquarters to Puerto Rico, creating 250 jobs.  Seaborne currently serves 15 routes out of its San Juan hub, starting Anguilla service in spring 2014.  The airline has announced it will add a 16th destination, Antigua in December 2015.

- Sun Country Airlines began thrice-weekly nonstop service from San Juan to Fort Myers, Florida in May 2015.

- Volaris launched Mexico City-Cancun-San Juan service in July 2015, with twice-weekly service.

- Cruise ship traffic increased 24.8% in fiscal year 2015 setting a new passenger record of 1,509,283.Transit passengers grew 31.7% and homeport passengers increased 12.1%.  This increase is partly attributable to increased deployments from Royal Caribbean and Carnival Cruise Line.  During Fiscal Year 2016, the Port of San Juan will welcome at least six ships visiting for the first time.   Furthermore, Disney Cruise Line will use San Juan as homeport for the second season and MSC Cruises will increase its deployment in Puerto Rico with summer visits from the MSC Divina.  Fiscal year 2015 saw record arrivals of cruise ship passengers with an impact on the local economy of approximately $1.6 million.  Projections indicate that 2016 will be the busiest summer season in history for the Port of San Juan.

- In December 2014 an expanded Pier 3 was inaugurated to welcome Royal Caribbean's Quantum of the Seas to Puerto Rico. These improvements will also make it possible to accommodate the even larger Oasis-class vessels, such as Oasis of the Seas expected in April 2016 and the Allure of the Seas arriving in June 2016.

- Over 3850 new rooms in financial, permits or construction phases. The construction of these new rooms is expected to create approximately 7837 jobs.

- Four new hotels opened during fiscal year 2014, increasing the amount of available rooms to 14,844. The new hotels include the return of Hyatt Hotels to Puerto Rico with two new "Hyatt Place" hotels that opened in December of 2013 and March of 2014, and a "Hyatt House" that opened in October of 2014 located within the Convention Center District. The inauguration of the Blok Hotel in Vieques, the Vanderbilt in Condado, and Hyatt House at the Convention Center, among others, added nearly 500 new rooms during fiscal year 2015. Occupancy during fiscal year 2015was approximately 70.50%.

- Establishment of the Bed & Breakfast (B&B) Program in order to promote the creation of small businesses. The first official B&B, Casa Sol in Old San Juan, was inaugurated in 2014. Many more are being evaluated to be integrated in the program.

- Two existing hotels, Da'House in Old San Juan and Hotel Colonial in Mayaguez were included in the new promotional program known as Posada. Two other hotels located in Orocovis and Coamo are being evaluated to be part of this program.

- The newly created Medical Tourism Corporation recently began promotional and marketing efforts in certain target markets (the United States East Coast, Latin America and the Caribbean). Also, training courses and visits to providers have been conducted monthly since January 2015. The training courses are provided by the Medical Tourism Association in collaboration with the Medical Tourism Company.

### *Manufacturing and Knowledge Services*

The Commonwealth's recent outreach initiatives have resulted in the following developments:

- Lufthansa Technik – The new facility in Aguadilla, Puerto Rico has started operations with its first overhaul line on time. Initial customers are Airbus A320 family aircraft operators, Spirit Airlines and JetBlue Airways, from the Americas. A second overhaul line is planned to be operational in November, followed by three more lines until early 2017 to include Boeing 737 by then.  Currently, about 140 highly qualified employees have been trained and are working for LTPR. It is planned to grow up to a workforce of 400 in the next 2 years.

- Honeywell Aerospace – The Puerto Rico Industrial Development Company (PRIDCO) has delivered the substantial completion phase of construction of the building that will house Honeywell's new high-tech laboratory in Moca, Puerto Rico.  The facilities should begin operations by October 2015 with a 300 people job potential.

- General Electric - The Puerto Rico Industrial Development Company (PRIDCO) has initiated the construction of GE's new molded case circuit breaker facility in the municipality of Arecibo with an estimated $20M investment.

- Actavis - Commitment of 300 new jobs from the expansion of a generic and specialty pharmaceutical manufacturer.

- Eli Lilly - $240 million investment to expand production in Puerto Rico.

- Neolpharma - $12 million investment in a research and development lab within one year of their acquisition of a Pfizer facility in 2013.

- Merck - Invested $100 million in the last few years to transform its Las Piedras facility into  a strategic high-technology location for the development and launch of new products.

- Medical Devices Manufacturing - Since January 2013, the medical devices subsector has accounted for over 2,000 new jobs committed. These include: (i) Coopervision investing $250 million for the creation of 15 new production lines and 350 jobs; (ii) Medtronic bringing to Puerto Rico new manufacturing technologies with 150 new jobs, after an approximately $6 million investment; and (iii) Hill Room making a multimillion investment to improve and expand its medical device manufacturing operations committing to create new jobs while retaining another 200 jobs.

- Fresenius Kabi – The medical devices manufacturer announced an investment of approximately $10 million over the next years to improve technology and process automation at its facility located in San German, Puerto Rico.

- Dow Agro Sciences has made a multimillion investment to establish a new station for the research of corn and other crops (soy and sunflower) in Puerto Rico.  The total estimated capital investment in this project was approximately $60 million, including the land acquisition, construction, and equipment.  The new research and development station created approximately 16 new regular and highly skilled full time jobs with an estimated payroll of $1.6 million.  Another 300 seasonal farm workers jobs are expected to be generated.

- Infosys BPO, the business process outsourcing subsidiary of Infosys, recently opened its new center on the island.  The center will host approximately 250 employees serving worldwide clients.

- AbbVie announced the expansion of one of its existing sites on the island with an estimated investment of $30 million.  This expansion will add to Puerto Rico's capabilities as a manufacturing destination for biotechnology and is expected to create up to 100 new jobs over the next two years.

- AIAC - American Industrial Acquisition Corporation ("AIAC") completed the acquisition of a Merck's manufacturing facility in Arecibo, Puerto Rico. As part of the agreement, AIAC retained the approximately 200 Merck employees at the site.

- Silgan Containers opened in Puerto Rico its first manufacturing site in the Caribbean. The company is the largest provider of metal food packaging in the United States.

- Rock Solid, a fast-growing technology company that develops and exports IT products and services to over 20 countries, committed to the creation of 100 new jobs to serve new clients located in the Caribbean and other international destinations.

- Over 23,500 jobs committed since January 2013 in the aggregate, related to different manufacturing sectors, including biopharma, medical devices, knowledge services, aerospace electronics and information technology.  Out of those jobs committed, more than 8,300 have been created already.

***Commerce and Trade***

Small and medium sized enterprises (SMEs) were one of the sectors that outperformed in the economy during fiscal year 2013-14 and fiscal year 2014-15. During the last two fiscal years, the Puerto Rico Trade and Export Company through all the initiatives and programs have created a total of 9,151 jobs.  The SME ecosystem has been strengthened by several incentives programs which target job creation.

Building upon the initial success of the Jobs Now Act which created 7,818 jobs, The Puerto Rico Trade and Export Company ("PR Trade") has implemented several initiatives to foster the growth of the SME sector such as:

- Incentives Act for the Generation and Retention of Jobs in the SMEs sector
- Incentives and Financing Act for Young Entrepreneurs
- Business Incubators Act
- Export Accelerators Act
- Community Economic Development Act
- EDCU – Salary Incentives for SMEs in Urban Centers Act
- Creative Industries Act
- Export Franchises Program

The PR Trade Company has been awarded three important federal grants as of August 2015: 1) FAST 2014-2015 for $90,909 to help fund, in part, its new PRO-TECH program which is intended to promote the creation and commercialization of technology based start-ups. 2) FAST 2015-2016 for $100,000.00 to help fund, in part, the PRO-TECH program that PR Trade started in 2014 for the promotion, creation and commercialization of technology based start-ups. 3) The EDA granted PR Trade with $800,000 to help fund, in part, four main initiatives of the PR Trade Company: (i) a federal and state procurement B2B event bringing buyers from the U.S. federal and state governments to meet with local suppliers of goods and services; (ii) the Lufthansa MRO supplier project, which will help identify potential suppliers for goods and services to build the business ecosystem to fulfill the expected needs of the Lufthansa Technik's MRO project in Aguadilla, Puerto Rico; (iii) the Expo Partner project, intended to increase the number of SMEs that export their services and products; and (iv) the Expo PR 2015, a multi-

sector trade show where international buyers are brought to learn and buy Puerto Rico goods and services.

### *Energy Policy*

The current administration is committed to providing reliable electric service and to diversify Puerto Rico's energy sources with the aim of lowering energy costs.

On May 27, 2014, the Governor signed into law Act No. 57 of 2014 ("Act 57-2014"), known as "The Energy Transformation and Relief of Puerto Rico Act". Act 57-2014 provides that two entities will oversee the new law's implementation. The Puerto Rico State Office of Energy Policy ("SOEP") (formerly the Energy Affairs Administration), will be responsible for developing and promoting the Commonwealth's energy policy, and the Puerto Rico Energy Commission ("PREC"), will be responsible for overseeing and regulating the implementation of the Commonwealth's energy policy. Among its duties, PREC will be responsible for approving the electricity rates proposed by PREPA.

Act 57-2014 also amended PREPA's organic law in order to impose on PREPA a duty to provide reliable electric service, contributing to the general welfare and sustainable future of the Commonwealth, and while reducing the social, environmental and economic impacts of such efforts. Act 57-2014 establishes thresholds for energy consumption in the Commonwealth's public agencies and corporations and the legislative and judicial branches of the Government, as well as penalties for non-compliance with such requirements. The municipalities of the Commonwealth are now also subject to energy consumption limitations, as well as to a reduction in the Contribution in Lieu of Taxes (CILT) that they receive from PREPA.

The other principal component of the Commonwealth's fuel diversification strategy is the development of renewable energy generation.  Act No. 82 of June 19, 2010 creates a Renewable Portfolio Standard, recognizing many sources of renewable energy that utilize various technologies, and setting a  target of 12% renewable energy production by 2015 and 15% by 2020, and a requirement for retail energy providers to establish a plan to reach 20% renewable energy production by 2035.  Act No. 83 of June 19, 2010 (Act 83-2010) provides incentives for energy diversification through the Green Energy Fund ("GEF") Program and provides different types of tax credits and subsidies for certain renewable energy technologies.  Through the GEF, the Commonwealth will invest $185 million in renewable energy projects during the period between fiscal year 2012 and fiscal year 2020. The FEV provides reimbursements for the installation of renewable energy systems of 40% with a maximum capacity of 100 kilowatts (kW) (applies for residential and small business) and up to 50% for systems larger than 100 kW and up to 1 megawatt (MW) (applies for medium business and industries). Current GEF regulations allow for solar and wind renewable energy technology to be incentivized.

As of June 2014, 42.9 MW (from 890 GEF incentives applications) have been incentivized by the GEF, 10 MW of which are currently interconnected to the Puerto Rico electrical grid.  From the beginning of the GEF in 2011 through June 2014, of a total of $61.5 million dollars assigned to the Program, SOEP has reserved a total of $59.4 million for renewable energy projects. Of those incentives that have been reserved, SOEP has disbursed

$23.4 million (corresponding to almost 40% of the projects constructed). Currently, there are over 100 MW of large scale projects (over 1 MW) installed (almost all of which are wind technology systems) and approximately 50 MW of distributed generation installed in the Commonwealth (almost all of which is solar technology).

### *Public-Private Partnerships*

The Puerto Rico Public Private Partnerships Authority (the "P3 Authority") has been at the forefront of the U.S. public private partnerships ("P3s") market since its establishment on June 8, 2009, through Act No. 29 (the "P3 Act"). The P3 Authority is the entity responsible for implementing the public policy in the Commonwealth of Puerto Rico regarding P3s in order to promote the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs.

Since the enactment of the P3 Act, the P3 Authority has completed three important transactions, namely: the concession of the operations and maintenance of toll roads PR-22 and PR-5, the School Modernization Program and the concession of the operations and maintenance of the Luis Muñoz Marín International Airport.

The P3 Authority continues with its responsibility of promoting the use of P3s as a viable and effective mechanism of economic development. The P3 Authority is working on various projects, among which there are greenfield and brownfield. With respect to brownfield projects, the P3 Authority is evaluating projects related to the concession of existing public services in order to reduce government operating costs and expenses and to improve the provision of said services to the citizens. Regarding greenfield projects, the P3 Authority is currently working on two new infrastructure projects: the Caguas-San Juan Commuter System, and the Conversion to Natural Gas of PREPA's Northern Power Plants.

The Caguas-San Juan Commuter System involves the development of a mass transit system to connect the Central Eastern Region to the Metropolitan Area. The estimated total investment of the project is $600 million and it is expected to generate more than 12,000 jobs during the construction phase. This project is currently in its planning phase.

The Conversion to Natural Gas of PREPA's Northern Power Plants entails the development of the necessary infrastructure for the receiving, storing and regasification of liquid natural gas for the power plants of San Juan and Palo Seco. PREPA estimates the development costs to be approximately $180 million to $300 million. This project is expected to create between 3,600 to 6,000 jobs. The P3 Authority is currently conducting an evaluation to determine the technical feasibility of the project.

The P3 Authority is collaborating with the analysis of various projects that are expected to advance new infrastructure and/or improve the existing provision of public services to maximize revenues and reduce operational costs. For instance, PRIFA, acting as an agent or project manager of PRHTA has been diligently working to complete the planning and design of the Northwest Corridor Project ("NW Corridor").  After completion of its environmental compliance analysis, the NW Corridor will pass to the P3 Authority for its procurement phase.

The NW Corridor consists of transportation system road improvements on state roads PR-22 and PR-2 within and through the boundaries of the municipalities of Hatillo, Camuy, Quebradillas, Isabela, Moca, and Aguadilla. These improvements will substantially enhance surface transportation connectivity between the San Juan Metropolitan Area and the Aguadilla Urban Area. The estimated total investment for the project is projected to be from $934 million to $1.2 billion and it is expected to create between 14,334 to 17,825 direct/indirect/induced new jobs during the construction phase. Further, the NW Corridor is expected to have long term benefits such as the creation of well-paid jobs.

In related matters, the P3 Authority amended its enabling act last December 2014, through which it incorporated a new and expedited mechanism to procure small scale P3 projects. The P3 Authority is currently evaluating two transportation projects under this new legal framework.

### *Strategic Projects*

The Commonwealth is also targeting strategic/regional projects that are expected to generate investments in various regions of Puerto Rico in order to foster a balanced economic development.

In the northern region, Science City represents a critical effort to move Puerto Rico to the forefront of science, technology and research and development. It seeks to leverage Puerto Rico's competitive advantages in the knowledge-based sectors. Legislation enacted in 2011 expanded the benefits of investing in, and performing, science and technology research and development activities in the newly denominated "Science District", through the inclusion of such activities as eligible for tax exemption under the Economic Incentives Act (as defined below).

The Science District will include the existing University of Puerto Rico (UPR) Medical Sciences Campus, the UPR Rio Piedras Campus, the new Biomedical Sciences Laboratory, and the soon-to-be-constructed Comprehensive Cancer Center. At the center of the Science District will be new laboratory and commercial space on the site of the former Rio Piedras State Penitentiary ("Oso Blanco").

Over the next several years, the Puerto Rico Science Trust will oversee two major initiatives to realize the full potential of the Science District. Specifically, the Trust will:

- complete preparation of the Oso Blanco site and secure a private "anchor tenant" to begin development of laboratory and commercial space.

- actively market and expand programs to fund Puerto Rican investors and entrepreneurs, such as funding for companies applying for Small Business Innovation Research (SBIR) awards, research grants and in-kind support for individual researchers and inventors, and tax exemptions for companies that pursue research at local universities.

In the eastern region of Puerto Rico, the Roosevelt Roads project entails the redevelopment of the old Roosevelt Roads navy base facilities in Ceiba and is a key element in the administration's strategy to create jobs and reignite the economy of Puerto Rico's eastern region, including Ceiba, Naguabo, Vieques, and Culebra. The site of the former Roosevelt Roads Naval Station represents an unparalleled opportunity for the development of a mixed-use development that incorporates tourist, residential, recreational, institutional, light industrial and commercial uses. With 3,400 acres of prime waterfront property available for redevelopment, close proximity to attractions such as Vieques, Culebra, El Yunque, and San Juan, and improvements including a major airfield and deep-water ports, Roosevelt Roads represents a unique large-scale development opportunity. Development on the site would also contribute greatly to the economic growth of eastern Puerto Rico by providing construction jobs and attracting more tourists to the wider area.

The Government, through the Roosevelt Roads Local Redevelopment Authority ("LRA"), intends to develop the site by searching for and entering into an agreement with a master developer and other private parties. The Master Developer will be responsible for coordinating and implementing redevelopment efforts with other developers/investors in accordance with the approved Master Plan. The LRA already signed a short-term lease for operating the on-site marina, and signed other 8 short-term leases with small businesses that are already open for business providing eco-tourism and nature tourism related services. In August 2015, the new Residential Center for Educational Opportunities in Ceiba (CROEC school) was inaugurated with an investment of $6.5 million in the old elementary school facilities of Roosevelt Roads with a capacity to house 250 students. The LRA is also involved in exclusive negotiations with a shipyard company to establish a shipyard operation to fabricate, repair and maintain boats, and the LRA is expecting to sign a long term lease by October 31st 2015.

The Port of Ponce Authority has recently concentrated all efforts on obtaining a world-class operator that can operate the Port. To achieve this, the Port of Ponce Authority published a Request for Proposals during October 2014. On February 2015, the Port of Ponce Authority selected *Portek International Pte Ltd* as the company who would operate the entire port facilities. On August 26, 2015 the Port of Ponce Authority signed a contract with Portek that enables the operation, revitalization, and promotion of the Port of Ponce for the next three years. Portek will evaluate the human resources needed for the operation, sign agreements with different transport and logistics companies and provide logistical support for operations, maintenance and business plans.

In the western region of Puerto Rico, the Commonwealth is focused on the redevelopment of the Aguadilla airport to serve as the second international airport of Puerto Rico and as a regional logistics hub. The PRPA is well on their way to finalize a redevelopment master plan in order to convert the international airport facilities into a regional maintenance, repair and overhaul ("MRO") and cargo hub. To this end, the PRPA completed the process and the Aguadilla airport has been designated as a Free Trade Zone providing huge competitive advantages for companies operating under this structure. The plan will include the creation of a comprehensive aeronautics/aerospace cluster leveraging the University of Puerto Rico's Mayagüez Campus and major aeronautics firms operating in the west/northwest corridor. This

initiative is spearheaded by the agreement reached with Lufthansa Technik with the first phase of construction nearing completion.

### Infrastructure investments

On February 5, 2014, the Governor announced that his administration will accelerate the infrastructure investment plan by pursuing $800 million in infrastructure investments, including public-private partnerships, that have been identified and by accelerating agency reviews of infrastructure investment plans.

### Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. Most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico have converted part or all of their operations to CFCs.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their United States affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Incentives Act, in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the United States Treasury Department announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. The Ways and Means Committee of the House of Representatives has also held recent hearings and released a tax policy white paper that puts forth certain proposed changes to the U.S. Code to combat base erosion and profit shifting by U.S. and foreign multinational corporations. While these initiatives are not directed at Puerto Rico, several of them could affect CFCs operating in Puerto Rico. As of this date, no legislation has been approved by either House of Congress of the United States. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The Commonwealth is developing policy responses to the United States government to seek to safeguard Puerto Rico's economic growth and development plans.

# DEBT

**Public Sector Debt**

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below.

Section 8 of Article VI of the Commonwealth Constitution provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. For purposes of the Constitution, public debt includes only general obligation bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Attorney General of the Commonwealth, also any payments required to be made by the Commonwealth on account of bonds and notes issued by its public instrumentalities and guaranteed by the Commonwealth. Public debt does not include other obligations of the Commonwealth or obligations of public instrumentalities that are not guaranteed by the Commonwealth.

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of, and interest on, such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the treasury (hereinafter, "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance.  Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes.

Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation unless the issuers of such guaranteed bonds are unable to make such payments and the Commonwealth is required to make such payments under its guarantee. During fiscal year 2015, the Commonwealth made debt service payments of $16.6 million on account of debt guaranteed by the Commonwealth (which were the bonds issued by the Port of the Americas Authority held by GDB).

Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury Department, motor vehicle fuel taxes, license fees, and cigarette taxes, which are allocated to the Highways and Transportation Authority, and petroleum products excise taxes, which are allocated to the Highways and Transportation Authority and to the Infrastructure Financing Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.  In addition, the portion of the Sales and Use Tax (and of the value added tax that will

117

replace it in 2016) allocated to COFINA is not included as internal revenues since the legislation that created COFINA transferred ownership of such portion of the Sales and Use Tax to COFINA and provided that such portion was not "available resources" under the Constitutional provisions relating to full faith and credit bonds.

As of July 31, 2015, future maximum annual debt service for the Commonwealth's outstanding general obligation debt in the fiscal year ending on June 30, 2017 (based on the assumption that $126.7 million principal amount of CPI-based variable rate bonds issued bear interest at the maximum rate of 12% per annum), *plus* the amount paid by the Commonwealth in fiscal year 2015 on account of bonds or notes guaranteed by the Commonwealth totals $1.195 billion, which is equal to 13.6% of $8.779 billion, which is the average of the adjusted internal revenues for the fiscal years ended June 30, 2014 and 2015.

Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth (other than refunding bonds) is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures. Debt of public corporations is issued in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The table on the following page presents a summary of the debt of the Commonwealth and its instrumentalities outstanding as of September 30, 2015. This table includes debt primarily payable from Commonwealth or municipal taxes, Commonwealth appropriations, and rates charged by Commonwealth public instrumentalities for services or products, as well as debt payable from other sources, some of which is set forth in footnote 6 below. Excluded from the table is debt that, if included, would result in double counting, including but not limited to bonds issued by Puerto Rico Municipal Finance Agency to finance its purchase of bonds issued by Puerto Rico municipalities (which is included as part of the debt issued by the municipalities), as well as $4.5 billion of GDB bonds and notes.

No deductions have been made in the table on the following page for deposits on hand in debt service funds and debt service reserve funds. This table and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

**Commonwealth of Puerto Rico**
**Public Sector Debt**
**(in millions)**

|  | September 30, 2015 |
|---|---|
| Good faith and credit bonds and notes issued by the Commonwealth | $12,655[1] |
| Bonds and notes guaranteed by the Commonwealth's good faith and credit [2] | 5,648 |
| SUBTOTAL - GOOD FAITH AND CREDIT BONDS AND NOTES | 18,303 |
| Debt supported by Commonwealth appropriations or taxes | 4,061[3] |
| Tax and Revenue Anticipation Notes [4] | 400 |
| SUBTOTAL - DEBT PAYABLE FROM GENERAL FUND | $22,764 |
| Bonds and notes payable from sales and use tax revenues (COFINA) | $15,213 |
| Debt issued by the Commonwealth and its instrumentalities | 23,099[5] |
| Debt issued by municipalities | 3,907 |
| Pension Funding Bonds (payable from employer contributions to ERS) [6] | 2,948 |
| Other limited obligation debt and non-recourse debt [7] | 1,978 |
| SUBTOTAL - OTHER PUBLIC SECTOR DEBT | 47,145 |
| TOTAL PUBLIC SECTOR DEBT | $69,909 |

Totals may not add due to rounding.

[1] Includes approximately $160.8 million of debt issued by the Treasury Department to GDB which is secured by a pledge of the Commonwealth's good faith and credit and is expected to be repaid with revenues of the Commonwealth or proceeds of a future bond issuance. This debt had been previously included under "Debt issued by the Commonwealth and its instrumentalities." Includes also $23.8 million debt from General Services Administration line of credit.

[2] Consists of $677 million of bonds issued by PRASA, $493.3 million of Puerto Rico State Revolving Fund loans made to PRASA under various federal water laws, $225.5 million of bonds issued by the POA (which are held by GDB), $195.3 million of bond anticipation notes issued by PRIFA, and $4.056 billion of PBA bonds. Excludes (in order to avoid double counting) $267 million of GDB bonds payable from available moneys of GDB, and $110 million of GDB senior guaranteed notes Series 2013B.

[3] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes $1.090 billion of bonds issued by the Public Finance Corporation, $2.220 billion of appropriation debt notes issued by the instrumentalities and agencies (including $64.7 million of notes issued by PBA), $715.1 million of notes issued by the Treasury Department (such debt is excluded from the Public Corporations Debt Table) and $36.4 million of bonds issued by the Mental Health and Anti-Addiction Services Administration.

[4] Consists of $400 million in non-revolving notes purchased by GDB.

[5] Excludes (in order to avoid double counting) $4.2 billion of notes issued by GDB, the proceeds of which have been principally used to fund loans to the Commonwealth, instrumentalities, agencies and municipalities, which loans are included in the table in the corresponding line, and excludes a note for $64.7 million of PBA. Includes $116.0 million in notes issued by PBA.

[6] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds. The Commonwealth does not guarantee such bonds. Employer contributions made to the Employees Retirement System by the central government and its agencies and therefore payable from the General Fund currently represent approximately 42% of such total employer contributions. The balance of these contributions is made by the instrumentalities and the municipalities.

[7] Includes the following: (i) $1.2 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; (ii) $140.5 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development ("HUD"); (iii) $295.2 million of Capital Fund Modernization Program Subordinate Bonds, Series 2008 issued by the Puerto Rico Housing Finance Authority and payable primarily from federal housing assistance payments made available by HUD; (iv) $129.8 million of Special Facilities Revenue Bonds issued by the Highways Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; (v) $155 million of Special Facilities Bonds issued by the Puerto Rico Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; (vi) $66.5 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and (vii) approximately $15 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

Source: Government Development Bank

The following table sets forth: (i) the current debt service requirements on the Commonwealth's general obligation bonds; (ii) the debt service requirements on all PBA bonds guaranteed by the Commonwealth; (iii) the debt service requirements on all other debt guaranteed by the Commonwealth; (iv) the total debt service requirements of debt described in items (i), (ii) and (iii); (v) the debt service requirement on all Commonwealth appropriation bonds, which are not guaranteed by the Commonwealth; and (vi) the total debt service requirements on all debt included in the table.

In addition to this debt, various Commonwealth instrumentalities have outstanding debt that is supported in whole or in part, directly or indirectly, from tax revenues or budgetary appropriations, but which is not included in the following table. These include COFINA (sales taxes), PRIFA (petroleum taxes and rum taxes), PRHTA (petroleum taxes and gasoline taxes) the Convention Center District Authority (hotel room taxes), the Employees Retirement System (appropriations from the Commonwealth and various public corporations), PRIDCO (rum taxes and corporate income taxes), and the University of Puerto Rico (Commonwealth appropriations). Total debt service for this debt is equal to $1.435 billion in fiscal year 2016, $1.455 billion in fiscal year 2017, $1.484 billion in fiscal year 2018, $1.512 billion in fiscal year 2019, and $1.547 billion in fiscal year 2020. In addition, GDB has a substantial amount of debt that is payable in whole or in part from Commonwealth appropriations and revenues of the public corporations, which are themselves tax supported. Total debt service for GDB debt is equal to $1.070 billion in fiscal year 2016, $434 million in fiscal year 2017, $423 million in fiscal year 2018, $977 million in fiscal year 2019, and $518 million in fiscal year 2020.

## Debt Service Requirements for Bonds Issued or Guaranteed by the Commonwealth and Publicly-Issued Commonwealth Appropriation Bonds
### (in thousands)

| Fiscal Year Ending June 30 | General Obligation (G.O.) Bonds[1] | PBA Guaranteed Debt | Other Guaranteed Debt[2] | Total G.O. and Guaranteed Debt | Publicly Issued Appropriation Bonds[3] | Total G.O., Guaranteed and Publicly Issued Appropriation Debt |
|---|---|---|---|---|---|---|
| 2016 | 1,175,497 | 312,666 | 381,352 | 1,869,515 | 93,656 | 1,963,171 |
| 2017 | 1,178,086 | 312,705 | 107,727 | 1,598,518 | 85,782 | 1,684,300 |
| 2018 | 1,114,808 | 280,763 | 143,798 | 1,539,369 | 85,665 | 1,625,034 |
| 2019 | 1,135,841 | 280,557 | 129,460 | 1,545,858 | 85,552 | 1,631,410 |
| 2020 | 1,159,873 | 281,226 | 135,319 | 1,576,418 | 85,462 | 1,661,879 |
| 2021 | 1,023,787 | 302,468 | 101,181 | 1,427,435 | 85,344 | 1,512,779 |
| 2022 | 1,027,693 | 298,174 | 101,088 | 1,426,954 | 85,220 | 1,512,174 |
| 2023 | 1,026,861 | 286,730 | 101,047 | 1,414,639 | 85,085 | 1,499,724 |
| 2024 | 1,026,032 | 288,448 | 104,152 | 1,418,633 | 84,884 | 1,503,517 |
| 2025 | 1,025,196 | 285,892 | 103,809 | 1,414,897 | 85,205 | 1,500,102 |
| 2026 | 1,024,238 | 272,673 | 102,586 | 1,399,498 | 85,101 | 1,484,598 |
| 2027 | 1,023,413 | 273,518 | 100,636 | 1,397,567 | 84,982 | 1,482,549 |
| 2028 | 1,022,496 | 1,000,141 | 98,776 | 2,121,414 | 223,979 | 2,345,392 |
| 2029 | 1,021,725 | 206,612 | 92,024 | 1,320,362 | 212,727 | 1,533,088 |
| 2030 | 1,020,839 | 362,782 | 89,315 | 1,472,935 | 103,243 | 1,576,178 |
| 2031 | 1,020,015 | 233,648 | 82,746 | 1,336,409 | 103,246 | 1,439,655 |
| 2032 | 1,019,104 | 215,143 | 82,233 | 1,316,480 | 83,409 | 1,399,889 |
| 2033 | 1,018,205 | 215,036 | 79,644 | 1,312,885 | - | 1,312,885 |
| 2034 | 1,017,274 | 214,925 | 78,386 | 1,310,584 | - | 1,310,584 |
| 2035 | 1,016,419 | 228,469 | 39,886 | 1,284,774 | - | 1,284,774 |
| 2036 | 474,156 | 214,808 | 39,163 | 728,127 | - | 728,127 |
| 2037 | 473,294 | 200,521 | 38,803 | 712,618 | - | 712,618 |
| 2038 | 515,597 | 186,389 | 38,638 | 740,625 | - | 740,625 |
| 2039 | 514,734 | 188,509 | 38,598 | 741,841 | - | 741,841 |
| 2040 | 573,869 | 190,220 | 37,100 | 801,189 | - | 801,189 |
| 2041 | 573,004 | 190,218 | 35,273 | 798,496 | - | 798,496 |
| 2042 | 8,969 | 133,552 | 35,326 | 177,846 | - | 177,846 |
| 2043 | 5,851 | - | 34,441 | 40,292 | - | 40,292 |
| 2044 | - | - | 33,143 | 33,143 | - | 33,143 |
| 2045 | - | - | 31,980 | 31,980 | - | 31,980 |
| 2046 | - | - | 12,038 | 12,038 | - | 12,038 |
| 2047 | - | - | 11,133 | 11,133 | - | 11,133 |
| 2048 | - | - | 7,908 | 7,908 | - | 7,908 |
| 2049 | - | - | 6,263 | 6,263 | - | 6,263 |
| 2050 | - | - | 5,671 | 5,671 | - | 5,671 |
| 2051 | - | - | 3,979 | 3,979 | - | 3,979 |
| 2052 | - | - | 2,191 | 2,191 | - | 2,191 |
| 2053 | - | - | 1,104 | 1,104 | - | 1,104 |
| | $24,236,875 | $7,456,794 | $2,667,919 | $34,361,588 | $1,758,540' | $36,120,128 |

[1] General Obligation Bonds debt service is calculated assuming any outstanding Variable Rate GOs (approximately $126.7 million aggregate principal amount outstanding) bear interest at the maximum allowable rate per annum under Puerto Rico law (12%) and includes a $23.8 million General Services Administration line of credit, $113.6 million of unpaid principal only line of credit for fiscal years 2013 and 2014, and $47.2 million balance of $290 million and $100 million lines of credit. Amounts shown do not include capitalized interest of $160 million for fiscal year 2015 and $75 million for fiscal year 2016.

[2] Includes $677 million of bonds issued by PRASA, $493 million of Puerto Rico State Revolving Fund loans made to PRASA under various federal water laws, $226 million of POA Guaranteed Bonds, $267 million of GDB guaranteed by the Commonwealth and $110 million of GDB senior guaranteed notes Series 2013B. Assumes that the POA Guaranteed Bonds, which are held by GDB and are due on January 1, 2045, are restructured as anticipated to provide for level debt service. Does not include $246 million PRIFA Series 2015A bond anticipation notes maturing in May 2017 that have an outstanding balance of $195.3 million.

[3] Reflects debt issued by the Public Finance Corporation.

**Variable Rate Bonds and Mandatory Tender Bonds**

The Commonwealth and certain public corporations have outstanding variable rate bonds consisting of bonds and notes which provide for periodic interest rate changes based on a LIBOR rate or a particular index, but which are not subject to tender prior to their maturity. Certain public corporations have hedged portions of their variable rate debt exposure by entering into interest rate exchange agreements with certain swap providers.

The only outstanding variable rate debt issued by the Commonwealth is approximately $126.7 million principal amount of variable rate general obligation bonds (the interest rate on which is tied to the consumer price index). As of August 31, 2015, the Commonwealth has no outstanding interest rate exchange agreements.

The following table shows the breakdown of variable rate debt of the Commonwealth and the public corporations as of August 31, 2015. This table does not include approximately $696 million and $35.8 million in PREPA lines of credit with commercial banks and GDB, respectively, all of which bear interest at variable rates.

**Variable Rate Debt Breakdown**
(as of August 31, 2015)

| | |
|---|---:|
| Commonwealth (General Obligation) | $126,725,000 |
| PREPA | 411,825,000 |
| PRHTA | 447,025,000 |
| COFINA | 136,000,000 |
| Total | $1,121,575,000 |

As of June 30, 2015, PBA had $129,225,000 of fixed rate bonds guaranteed by the Commonwealth that are subject to mandatory tender for purchase on July 1, 2017, prior to their maturity date (the "Mandatory Tender Bonds"). There is no liquidity facility in place for the payment of the purchase price payable upon the mandatory tender, which purchase price is expected to be obtained from the remarketing of the bonds. If PBA cannot remarket the Mandatory Tender Bonds, it would have to obtain other funds in order to provide for the purchase price of these bonds or the bonds would become subject to higher interest rates and an accelerated amortization schedule.

**Interest Rate Exchange Agreements**

Certain public corporations are parties to various interest rate exchange agreements or swaps executed in order to hedge the issuer's variable rate debt exposure and the interest rate risks associated therewith.

Over the past several years, the Commonwealth has reduced its exposure to variable rate debt and interest rate exchange agreements, due to the risks of expiring liquidity and credit facilities associated with the majority of this debt and the potential early acceleration or termination rights that could be exercised by lenders, credit facility providers or swap

counterparties as a result of downgrades of the Commonwealth's credit rating with respect to its general obligation debt.  The Commonwealth has refunded this variable rate debt, and terminated the associated interest rate exchange agreements, with the proceeds of long-term fixed rate debt.

The aggregate notional amount of the swaps for the public corporations as of August 31, 2015 was $388.9 million.  The table below shows the aggregate notional amount, as of that date, of synthetic fixed rate swaps of the public corporations.

### Swap Portfolio Breakdown
### Notional Amount
(as of August 31, 2015)

|  | Synthetic Fixed |
|---|---|
| PREPA | $252,875,000 |
| COFINA | 136,000,000 |
| Total | $388,875,000 |

The following table shows, as of August 31, 2015, the net mark-to-market value of all outstanding interest rate exchange agreements.  The mark-to-market value of all such agreements of the public corporations was negative as of such date.  Thus, the public corporations would owe money to the counterparties if any of the agreements with a negative mark-to-market had been terminated as of that date.

### Swap Portfolio Mark-to-Market Valuation
(as of August 31, 2015)

|  | Synthetic Fixed |
|---|---|
| PREPA | ($53,067,291) |
| COFINA | ($74,679,637) |
| Total | ($127,746,928) |

*Collateral Requirements and Additional Termination Events*.  Under its interest rate exchange agreements, PREPA may be required to deliver collateral to the counterparties to guarantee its performance under the agreements, depending on its credit ratings and the credit ratings of insurers, as well as the mark-to-market values.  As of August 31, 2015, PREPA was not required to post any collateral.  However, if the credit ratings of its swap insurers were to be lowered, PREPA could be required to post collateral on all swaps and certain trades may be subject to termination solely at the option of the applicable counterparty.  If any such agreements were to be terminated, they would likely be terminated at their then current mark-to-market valuations, plus cost, which could differ substantially from the mark-to-market valuations set forth in the table above due to market conditions at the time of termination.  Any collateral posted at the time of the terminations could be used to effectively offset a like-amount of liquidity needed to fund the termination payments.  If any such agreements related to underlying

variable rate debt were to be terminated, PREPA would then be subject to variable interest rate risk on the corresponding bonds.

Under its interest rate exchange agreement, COFINA or its swap counterparty may be required to post collateral during each fiscal year depending on the transaction's mark-to-market value. In accordance with these requirements, COFINA had posted collateral of $27 million to its counterparty as of August 31, 2015. The maximum amount COFINA is required to transfer in a given fiscal year is $15 million, with the total posting capped at $60 million. Each year, until the collateral requirement is met, the trustee will deposit up to $15 million from surplus revenues into an account which will be used to satisfy any posting requirements for a given fiscal year.

**Commonwealth Guaranteed Debt**

As of September 30, 2015, $4.056 billion of Commonwealth guaranteed bonds of PBA were outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). Maximum annual debt service on these bonds is $961 million in fiscal year 2028, assuming the receipt of the issuer subsidy from the federal government on the $756,449,000 Government Facilities Revenue Bonds, Series R (Qualified School Construction Bonds – Issuer Subsidy) and the $121,528,000 Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds – Direct Payment), and $1.0 billion in fiscal year 2028 without taking into consideration said subsidy, with their final maturity being July 1, 2042. No payments under the Commonwealth guaranty have been required to date for these bonds.

As of June 30, 2015, $267 million of Commonwealth guaranteed bonds of GDB were outstanding. No payments under the Commonwealth guaranty have been required for these bonds.

As of September 30, 2015, GDB held approximately $226 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth. The proceeds from these bonds have been used to refinance and repay the outstanding bonds that were due and payable on January 1, 2015. The aggregate outstanding principal amount of these bonds is payable in full on January 1, 2045. The Commonwealth has been paying debt service on these bonds under its guaranty pursuant to Act No. 409 of September 22, 2004. While the responsibility for the development and operation of the Port of the Americas was transferred from the Port of the Americas Authority to the Ponce Ports Authority in December 2011, the Port of the Americas Authority retained the liability for the outstanding bonds, which are expected to be paid by the Commonwealth under the guarantee to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient to pay the bonds.

As of September 30, 2015, the aggregate outstanding principal amount of obligations of PRASA guaranteed by the Commonwealth was approximately $1.170 billion. This amount consists of $284.8 million of revenue refunding bonds sold to the public, $392.6 million of bonds issued to the United States Department of Agriculture, Rural Development, and loans made by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA with an outstanding principal amount of $493.3 million. See "PUBLIC CORPORATIONS - Puerto Rico Aqueduct and Sewer Authority."

On March 17, 2015, PRIFA issued approximately $246 million of bond anticipation notes guaranteed by the Commonwealth, and payable from a new petroleum products tax assigned to PRIFA pursuant to Act 1-2015.  The proceeds of these notes were used to refinance certain bond anticipation notes issued by the PRHTA.

During fiscal years 2011 and 2012, the Commonwealth made subsidy payments to PRASA for its operational expenses in the amounts of $105 million and $70.2 million, respectively.

**Trends of Public Sector Debt**

The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of gross national product (in current dollars) for the five fiscal years ended June 30, 2015 and the first three months of fiscal year 2016.  The table reflects the revisions to gross national product made in April of 2015 by the Puerto Rico Planning Board.  As of September 30, 2015, outstanding short-term debt represented 6.6% of total public sector debt.

### Commonwealth of Puerto Rico
### Public Sector Debt and Gross National Product
### (dollars in millions)

| | Public Sector Debt | | | | | Gross National Product[1] | | |
|---|---|---|---|---|---|---|---|---|
| **June 30,** | **Long Term**[2] | **Short Term**[3] | **Total** | **Short Term as % of Total** | **Rate of Increase or Decrease** | **Amount** | **Rate of Increase** | **Total Debt's share of GNP %** |
| 2011 | 54,562 | 4,380 | 58,942 | 7.4% | 3.7% | 65,721 | 2.2% | 89.7% |
| 2012 | 60,780 | 3,981 | 64,760 | 6.1% | 9.9% | 68,086 | 3.6% | 95.1% |
| 2013 | 60,115 | 4,843 | 64,957 | 7.5% | 0.3% | 68,768 | 1.0% | 94.5% |
| 2014 | 62,432 | 4,841 | 67,273 | 7.2% | 3.6% | 69,202 | 0.6% | 97.2% |
| 2015 | 61,801 | 4,382 | 66,183 | 6.6% | -1.6% | 70,075[4] | 1.3% | 94.4% |
| Sept. 30, 2015 | 60,720 | 4,263 | 64,983 | 6.6% | -1.8% | 70,075[4] | 1.3% | 94.4% |

Totals may not add due to rounding.

[1]   In current dollars.
[2]   Does not include debt identified in footnotes 6 and 7 of the table entitled "Commonwealth of Puerto Rico—Public Sector Debt," which would have been issued and outstanding at the time, all of which would be considered long-term debt.
[3]   Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
[4]   Forecast for fiscal year 2015 as of April 2015 from PR Planning Board.

*Source:* Government Development Bank

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2015 and the first three months of fiscal year 2016.

### Commonwealth of Puerto Rico
### Public Sector Debt by Major Category
### (dollars in millions)

| June 30 | Commonwealth[1] | | | Municipalities | | | Public Corporation[2] | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total |
| 2011 | 10,199 | 164 | 10,363 | 3,204 | 333 | 3,537 | 41,401 | 3,883 | 45,284 | 54,804 | 4,380 | 59,184 |
| 2012 | 11,578 | 266 | 11,844 | 3,515 | 357 | 3,872 | 45,687 | 3,358 | 49,045 | 60,780 | 3,981 | 64,760 |
| 2013 | 11,838 | 491 | 12,329 | 3,501 | 381 | 3,882 | 44,776 | 3,970 | 48,746 | 60,115 | 4,843 | 64,957 |
| 2014 | 13,932 | 404 | 14,336 | 3,589 | 604 | 4,193 | 44,910 | 3,834 | 48,744 | 62,432 | 4,841 | 67,273 |
| 2015 | 13,581 | 496 | 14,077 | 3,510 | 616 | 4,126 | 44,709 | 3,270 | 47,980 | 61,801 | 4,382 | 66,183 |
| Sept. 30, 2015 | 13,175 | 596 | 13,771 | 3,331 | 576 | 3,907 | 44,214 | 3,091 | 47,305 | 60,720 | 4,263 | 64,983 |

Totals may not add due to rounding.

(1)     Does not include the Senior Pension Funding Bonds identified in footnote 6 of the table above entitled "Commonwealth of Puerto Rico – Public Sector Debt." Includes certain lines of credit not evidenced by good faith and credit bonds and notes.

(2)     Includes Commonwealth guaranteed debt; does not include the bonds identified in footnote 7 of the table above entitled "Commonwealth of Puerto Rico – Public Sector Debt."

(3)     Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt. Includes Tax and Revenue Anticipation Notes.

*Source*:  Government Development Bank

## Debt of the Public Corporations

The following table presents the outstanding bonds and notes of certain of the public corporations as of September 30, 2015 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Bonds and notes listed under the columns labeled "With Guaranty" are guaranteed by the Commonwealth. Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government, sources other than Commonwealth appropriations or taxes or revenues of public corporations, or from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations, such as GDB, the inclusion of which would reflect double counting. No deductions have been made in the table for amounts on deposit in debt service funds and debt service reserve funds.

**Commonwealth of Puerto Rico**
**Outstanding Debt of Public Corporations**
**September 30, 2015**
**(in thousands)**

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $677,360 | $3,393,260 | $4,070,620 | $493,325 | $95,256 | $588,581 | $1,170,685 | $3,488,516 | $4,659,201 |
| Convention Center District Authority | - | 397,740 | 397,740 | - | 145,285 | 145,285 | - | 543,025 | 543,025 |
| Electric Power Authority | - | 8,238,709 | 8,238,709 | - | 731,838 | 731,838 | - | 8,970,547 | 8,970,547 |
| Highways and Transportation Authority | - | 4,618,177[1] | 4,618,177 | - | 1,805,144 | 1,805,144 | - | 6,423,321 | 6,423,321 |
| Housing Finance Authority | - | 88,442[2] | 88,442 | - | 167,172 | 167,172 | - | 255,614 | 255,614 |
| Industrial Development Company | - | 171,080 | 171,080 | - | 86,325 | 86,325 | - | 257,405 | 257,405 |
| Infrastructure Financing Authority[3] | - | 1,850,273 | 1,850,273 | 195,295 | 49,267 | 244,562 | 195,295 | 1,899,540 | 2,094,835 |
| Port of the Americas Authority | 225,482 | - | 225,482 | - | 1,700 | 1,700 | 225,482 | 1,700 | 227,182 |
| Ports Authority[4] | - | - | - | - | 285,635 | 285,635 | - | 285,635 | 285,635 |
| Public Buildings Authority | 4,056,264 | - | 4,056,264 | - | 180,706 | 180,706 | 4,056,264 | 180,706 | 4,236,970 |
| Public Finance Corporation | - | 1,090,740[5] | 1,090,740 | - | - | - | - | 1,090,740 | 1,090,740 |
| Sales Taxes Financing Corp. (COFINA) | - | 15,212,521 | 15,212,521 | - | | | - | 15,212,521 | 15,212,521 |
| University of Puerto Rico | - | 451,760[6] | 451,760 | - | 81,578 | 81,578 | - | 533,338 | 533,338 |
| Others[7] | - | - | - | - | 2,515,074 | 2,515,074 | - | 2,515,074 | 2,515,074 |
| Total[8] | $4,959,106 | $35,512,702 | $40,471,808 | $688,620 | $6,144,980 | $6,833,600 | $5,647,726 | $41,657,682 | $47,305,408 |

[1]   Excludes $129.8 million of Special Facilities Revenue Bonds issued by PRHTA, which are payable by a private party from net toll revenues collected from the Teodoro Moscoso Bridge.

[2]   Excludes the $140.5 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from HUD; and $295.2 million of Housing Finance Authority Capital Fund Modernization Program Subordinate Bonds, Series 2008 issued by the Housing Finance Authority and payable primarily from federal housing assistance payments made available by HUD.

[3]   Includes, among other debt, (i) $36.4 million of Mental Health Infrastructure Revenue Bonds, 2007 Series A (MEPSI Campus Project), which bonds are limited obligations of the Infrastructure Financing Authority payable solely from the pledge of certain payments made by a governmental entity under a lease agreement, (ii) $192.3 million of Revenue Bonds (Ports Authority Project), Series 2011, which are limited obligations of the Infrastructure Financing Authority payable solely from loan payments made by the Puerto Rico Ports Authority, and (iii) $195.3 million of bond anticipation notes payable from petroleum taxes and guaranteed by the Commonwealth.

[4]   Excludes $155.4 million of Special Facilities Revenues Bonds issued by the Puerto Rico Ports Authority, which bonds are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement.

[5]   Payable primarily from Commonwealth appropriations.

[6]   Excludes $66.5 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by AFICA, which bonds are payable from rent payments made by the University of Puerto Rico.

[7]   Includes lines of credit from GDB and private banks.

[8]   Excludes accretion of interest from the respective issuance dates on capital appreciation bonds.  Also excludes the debt listed in footnote 6 of the Public Sector Debt table above.

*Source:*  Government Development Bank

# RATINGS

Since February of 2014, the credit ratings of the Commonwealth's general obligation bonds and Commonwealth guaranteed bonds, as well as the ratings of most of the Commonwealth's public corporations, have been lowered (more than once in most cases) to non-investment grade by Moody's, S&P, and Fitch.  According to the ratings agencies, further downgrades are possible.  These ratings and outlooks reflect only the opinions of such rating agencies and an explanation of the significance of such ratings may be obtained only from the relevant rating agency.

The following table sets forth the ratings of the Commonwealth and certain of its public corporations after giving effect to the most recent downgrades:

| Public Corporation | S&P | Moody's | Fitch |
|---|---|---|---|
| Commonwealth of Puerto Rico (General Obligations) | CC | Caa3 | CC |
| Government Development Bank | CC | Ca | |
| COFINA | | | |
|     Senior Lien | CC | Caa3 | CC |
|     First Subordinate Lien | CC | Ca | CC |
| PR Electric Power Authority | CC | Caa3 | CC |
| PR Highways and Transportation Authority | | | |
|     Highway Revenue Bonds | CC | Ca | |
|     Senior Transportation Revenue Bonds | CC | Ca | |
|     Subordinate Transportation Revenue Bonds | CC | Ca | |
| PR Aqueduct and Sewer Authority | | | |
|     Revenue Bonds | CCC- | Caa3 | CC |
|     Guaranteed Bonds | CCC- | Caa3 | CC |
| PR Public Buildings Authority | CC | Caa3 | CC |
| PR Employees Retirement System | CC | Ca | CC |
| PR Public Finance Corporation (Commonwealth Appropriation Bonds) | | | |
|     Series 2011A, 2011B and 2012A | D | Ca | |
|     Other Series | CC | Ca | |
| PR Municipal Finance Agency | CC | Ca | |
| PR Convention Center District Authority | CC | Ca | |
| PR Industrial Development Company | CC | Caa3 | |
| PR Infrastructure Financing Authority | | | |
|     Special Tax Revenue Bonds | CC | Ca | |
|     PR Ports Authority Project | B- | Ca | |
| University of Puerto Rico | | | |
|     Revenue Bonds | CC | Ca | |
|     AFICA – Plaza Universitaria Project | CC | Ca | |

128

**COMMONWEALTH TAXES, OTHER REVENUES, AND EXPENDITURES**

**Overview**

The Commonwealth reports its financial position and results of operations in funds, which are considered separate accounting entities, including those component units which are required to be blended. The operations of each fund are accounted for within a set of self-balancing accounts. Fund accounting segregates funds according to their intended purpose and is used to aid management in demonstrating compliance with legal, financial, and contractual provisions. The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows:  (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds.  These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries.

The General Fund is the primary operating fund of the Commonwealth.  References in this Commonwealth Report to General Fund revenues and expenditures (and to the resulting General Fund deficit), unless otherwise specified, are references to such revenues and expenditures as reflected in the Commonwealth General Fund budget, and are sometimes (but not always) referred to for clarity as General Fund budgetary revenues and budgetary expenditures.  These budgetary revenues and expenditures do not include many sources of revenues and funds and many classes of expenditures that are part of the General Fund for financial reporting purposes in accordance with US GAAP. The Special Revenue Fund, for example, is incorporated into the General Fund for financial reporting purposes but not for budgetary purposes.

General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources.  Internal revenues consist principally of income, excise and sales and use taxes.  Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth.  In addition, for financial reporting purposes (but not for budgetary purposes), General Fund revenues include Federal grants and contracts under numerous Federal programs and charges for services. The principal sources of General Fund revenues are described in greater detail further below in this section.

General Fund budgetary revenues exclude the following revenues: federal grants and contracts, the portion of rum excise taxes assigned to certain component units and private institutions, motor vehicle licenses fees and fines, excise tax on gasoline, gas, oil, diesel oil, petroleum, a portion of cigarette taxes assigned to certain component units and private institutions, compulsory vehicle insurance premiums assigned to a private institution, a portion of the non- resident withholding income tax, a portion of the horse racing excise tax, a portion of sales and use tax allocated to COFINA, other charges for services which are assigned by law for specific purposes, other revenues assigned by law for specific purposes, and revenues and expenditures of agencies with independent treasuries.

129

The following table presents the General Fund budgetary revenues and expenditures, as well as other financing sources (uses) under a statutory (also referred to as budgetary) basis of accounting for fiscal years 2010 through 2014.  Fiscal year 2014 results are preliminary and unaudited, and therefore subject to change.

The budgetary basis of accounting is not in accordance with US generally accepted accounting principles (US GAAP). Revenue is generally recognized when cash is received, net of tax refunds claimed by taxpayers as of year-end.  Short-term and long-term borrowings may be used to finance budgetary excess of expenditures over revenue.  Under the statutory basis of accounting, the Commonwealth uses "encumbrance accounting" to record the full amount of purchase orders, contracts, and other commitments of appropriated resources as deductions from the appropriation prior to actual expenditure. In the governmental funds, encumbrance accounting is a significant aspect of budgetary control.  Expenditures are generally recorded when the related expenditure is incurred or encumbered. Encumbrances generally lapse the year following the end of the fiscal year when the encumbrance was established, as established by Act No. 123 of August 17, 2001. Unencumbered appropriations lapse at year-end. Amounts required for settling claims and judgments against the Commonwealth and certain other liabilities are not recognized until they are encumbered or otherwise processed for payment.  If General Fund revenues and expenditures were presented in accordance with US GAAP, revenues, expenditures and the deficiency of revenues over expenditures would be significantly higher than the amounts presented in the table below.

The amounts shown in the following table as expenditures may be different than those reflected in the budget. As described above, the General Fund budgetary revenues and expenditures, and the transfers presented in the table, also differ from the General Fund revenues, expenditures and transfers presented in the financial statements of the Commonwealth, as the financial statements reflect an expanded General Fund entity in accordance with US GAAP.

130

| | 2011 | 2012 | 2013 | 2014[5] | 2015[5][6] |
|---|---|---|---|---|---|
| **Revenues**: | | | | | |
| **Income Taxes:** | | | | | |
| Individuals | $2,178,741 | $2,099,564 | $2,054,654 | $1,979,448 | $2,295,334 |
| Corporations | 1,677,345 | 1,460,354 | 1,286,506 | 1,914,333 | 1,735,836 |
| Partnerships | 3,249 | 1,333 | 756 | 745 | 2,203 |
| Withholdings from non-residents | 1,000,428 | 890,761 | 982,896 | 899,965 | 784,071 |
| Tollgate taxes | 12,607 | 27,678 | 8,903 | 7,140 | 3,679 |
| Interest | 6,985 | 6,807 | 5,425 | 4,900 | 4,414 |
| Dividends | 26,756 | 35,087 | 34,064 | 39,713 | 152,691 |
| Inheritance and gift taxes | 3,101 | 5,465 | 1,833 | 1,395 | 6,593 |
| Total income taxes | **4,909,212** | **4,527,049** | **4,375,037** | **4,847,639** | **4,984,821** |
| **Sales and Use Tax** | **553,020** | **540,026** | **539,929** | **595,256** | **626,253** |
| **Excise Taxes:** | | | | | |
| Alcoholic beverages | 280,963 | 292,614 | 282,316 | 266,542 | 258,152 |
| Foreign (Act 154) | 677,565 | 1,875,823 | 1,632,549 | 1,902,193 | 1,942,867 |
| Tobacco products | 201,965 | 172,155 | 186,909 | 171,108 | 170,880 |
| Motor vehicles | 364,170 | 386,468 | 419,178 | 392,043 | 298,494 |
| Revenues from component units- slot machines | 23,738 | 19,957 | 24,594 | 21,910 | 20,943 |
| Horses races | 20,983 | 19,302 | 13,403 | 16,354 | 11,353 |
| Insurance premiums | 23,785 | 23,382 | 24,569 | 42,642 | 59,834 |
| Other excise taxes | 7,509 | 22,702 | 9,240 | 8,247 | 10,444 |
| Total excise taxes | **1,600,678** | **2,812,403** | **2,592,758** | **2,821,039** | **2,772,967** |
| **Property Taxes** | **241,719** | **65,497** | **52,614** | **19,766** | **21,404** |
| **Licenses and Other Taxes** | **83,327** | **82,578** | **81,127** | **19,845** | **19,570** |
| **Charges for Services** | **228,003** | **179,962** | **105,644** | **108,428** | **96,012** |
| **Miscellaneous Non-tax Revenues** | **44,829** | **100,072** | **136,424** | **143,510** | **134,574** |
| Total revenues from internal sources | **7,660,788** | **8,307,587** | **7,883,533** | **8,555,483** | **8,655,601** |
| **Revenues from Non-Commonwealth Sources:** | | | | | |
| Federal excise taxes[1] | 333,031 | 258,171 | 247,848 | 248,017 | 189,227 |
| Customs | - | 7,739 | - | - | 2,265 |
| Total revenues from non-Commonwealth sources | **333,031** | **265,910** | **247,848** | **248,017** | **191,492** |
| **Total Budgetary Revenues** | **7,993,819** | **8,573,497** | **8,131,381** | **8,803,500** | **8,847,093** |
| **Other Revenues:** | | | | | |
| Cash distributions from Traditional Lottery[2] | 46,165 | 38,225 | - | - | - |
| Non-cash distributions from Traditional Lottery[2] | - | - | 24,322 | 81,769 | 20,207 |
| Cash distributions from Electronic Lottery (Lotto)[2] | **55,690** | 56,163 | 38,876 | 72,287 | 93,603 |
| Excess of collateral received on derivative transactions | - | - | 241,777 | - | - |
| Receipts of COFINA bond proceeds from prior years issuances[3] | 62,642 | - | 125,848 | 79,385 | - |
| **Total Revenues** | **8,158,316** | **8,667,885** | **8,562,204** | **9,037,941** | **8,960,903** |
| **Other Financing Sources (Uses):** | | | | | |
| Transfers in from Debt Service Fund, Lotteries Fund and others | 759,660 | 769,158 | 197,936 | 63,482 | - |
| Receipts of COFINA bond proceeds from current year issuances[3] | 1,489,323 | 952,615 | 333,300 | - | - |
| Proceeds from notes payable issued for debt service payments[4] | 559,626 | 877,034 | 600,433 | 667,902 | - |
| Proceeds from notes payable issued to cover operating expenditures | - | - | - | 89,059 | 202,000 |
| Proceeds from issuance of tax revenue anticipation notes (TRANS) | 1,850,000 | 1,100,000 | 900,000 | 1,200,000 | 1,200,000 |
| Repayments of TRANS | (1,850,000) | (1,100,000) | (900,000) | (1,200,000) | (1,200,000) |
| Excess of income tax refunds payments over budgeted reserve | - | - | - | (243,000) | (174,000) |
| Payments to refunded debts escrow agent and others | (558,003) | (978,403) | (12,478) | - | - |
| Total other financing sources, net | **2,250,606** | **1,620,404** | **1,119,191** | **577,443** | **28,000** |
| **Total Resources** | **10,408,922** | **10,288,289** | **9,681,395** | **9,614,484** | **8,988,903** |
| **Expenditures:** | | | | | |
| General government | 1,410,070 | 1,957,580 | 1,382,066 | 1,284,955 | 1,255,647 |
| Public safety | 1,947,739 | 2,011,965 | 1,966,079 | 1,982,336 | 1,858,819 |
| Health | 1,654,661 | 1,686,402 | 1,378,397 | 1,387,641 | 1,326,667 |
| Public housing and welfare | 466,226 | 474,074 | 460,269 | 457,494 | 411,374 |
| Education | 2,800,677 | 2,926,658 | 2,916,347 | 2,994,997 | 2,767,841 |
| Economic development | 417,853 | 458,102 | 413,948 | 417,186 | 401,218 |
| Intergovernmental | 378,243 | 396,447 | 421,359 | 444,620 | 370,616 |
| **Total Budgetary Expenditures** | **9,075,469** | **9,911,208** | **8,938,465** | **8,969,229** | **8,392,182** |
| **Other Expenditures:** | | | | | |
| **Rent payments to Public Buildings Authority (PBA)[2]** | **267,105** | **331,491** | **205,063** | **358,536** | **355,003** |
| **Transfers out for debt service payments on general obligation bonds[2]** | **722,456** | **745,201** | **728,869** | **737,639** | **944,718** |
| **Total Expenditures** | **10,065,030** | **10,987,900** | **9,872,397** | **10,065,404** | **9,691,903** |
| **Excess (Deficiency) of Resources over (under) Expenditures** | $  343,892 | $  (699,611) | $  (191,002) | ($450,920) | ($703,000) |

[1] Excludes transfers to the Conservation Trust Fund and amounts deposited into a separate account for the promotion of Puerto Rico rums in foreign markets.

[2] For purposes of the General Fund Budget, cash distributions received from lotteries are presented as transfers in and rental payments to PBA and debt service payments on general obligation bonds are presented as transfers out.

[3] Consists of amounts to pay principal of, and interest on, general obligation bonds and notes of the Commonwealth.  Does not include amounts deposited directly into the Redemption Fund from non-General Fund revenues.

[4] Represents the COFINA bond proceeds deposited in the Stabilization Fund.

[5] Preliminary, unaudited and subject to change. Expenditures information based on approved budget, adjusted by a reserve of $125 million.

[6] Expenditures information based on approved budget, adjusted by a  reserve of $125 million.

*Sources*: The "Statement of Revenues and Expenditures- Budget and Actual- Budget Basis- General Fund" as presented in the Commonwealth's financial statements for fiscal years 2010 to 2012; the "Required Supplementary Information- Unaudited- Schedule of Revenues and Expenditures- Budget and Actual- Budgetary Basis- General Fund" as presented in the Commonwealth's financial statements for fiscal year 2013; the Department of Treasury's financial records for fiscal years 2014 and 2015; and Government Development Bank.Totals may not add up due to rounding.

**Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2015 Compared to Fiscal Year 2014**

*Revenues.* Preliminary General Fund revenues for fiscal year 2015 were approximately $8.961 billion, a decrease of approximately 76 million, or 0.8%, when compared to the prior fiscal year, and $604 million less than estimated revenues for the fiscal year. Preliminary collections for the special temporary excise tax under Act 154 were $1.943 billion, an increase of $ 40.7 million from the prior fiscal year, and $52.9 million higher than the projected revenues for the fiscal year. Preliminary collections of individual income taxes were $2.295 billion, an increase of $315.9 million over the prior fiscal year, but $60.7 million below projections. Preliminary collections of corporate income taxes were $1.736 billion, $178.5 million lower than the prior fiscal year, and $349.2 million below estimates, mainly as a result of the repeal of the gross receipts tax in December 2014.  Non-recurring revenue for the fiscal year was estimated at approximately $732 million, consisting mostly of the national gross sales tax (the "patente nacional") which was repealed in December 2014, taxes on increased lottery prizes and a motor vehicle fine amnesty.

*Expenditures*. Preliminary General Fund expenditures for fiscal year 2015 were $9.440 billion, a reduction of $545 million when compared to the prior fiscal year. Payroll expenses for fiscal year 2015 were $3.392 billion a reduction of $227 million when compared to fiscal year 2014. The expenditures for the University of Puerto Rico, Municipalities and Judicial Branch were $1.518 billion, a reduction of $26 million when compared to fiscal year 2014. Other operating expenses were $2.832 billion, a reduction of $544 million or 16% when compared to the prior year.

Debt services and retirement systems expenditures for fiscal year 2015 were $1.138 billion and $560 million, respectively. This represents an increase of $192 million in debt service and $60 million in retirement system expenditures.

The following table shows the fiscal years 2014 and 2015 expenditures

|  | FY 2014 | % | FY 2015 | % | Increase (Decrease) |
|---|---|---|---|---|---|
| Payroll | $3.619 | 36% | $3.392 | 36% | ($227) |
| Debt Service | .946 | 9% | 1.138 | 12% | 192 |
| University of Puerto Rico, Municipalities and Judicial Branch | 1.544 | 15% | 1.518 | 16% | (26) |
| Retirement Systems | .500 | 5% | .560 | 6% | 60 |
| Other | 3,376 | 34% | 2.832 | 30% | (544) |
|  | $9.985 | 100% | $9.440 | 100% | ($545) |

*Department of Education Expenditures.*  The Department of Education preliminary expenditures for fiscal year 2015 were $2.102 billion, a reduction of $179 million or 8% when compared to fiscal year 2014. Payroll expenditures for such fiscal year were $1.397 billion, a reduction of $63 million when compared to fiscal year 2014.

132

**Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2014
Compared to Fiscal Year 2013**

*Revenues.* Preliminary General Fund budgetary revenues for fiscal year 2014 (which are
still subject to audit and other year-end adjustments) were $9.037 billion, an increase of $475
million or 5.5% over fiscal year 2013. These revenues include: (i) General Fund budgetary
operating revenues of $8.803 billion, (ii) revenues from the electronic and traditional lotteries of
$154 million that are available to the General Fund, and (iii) $80 million in excess funds
transferred from COFINA to the General Fund after payment of COFINA debt service. The
increase in revenues during this period when compared to fiscal year 2013 is primarily due to
legislative measures adopted since January 2013.

Corporate income tax collections for fiscal year 2014 were $1.914 billion, an increase of
$628 million, or 48.8%, from the same period of the prior fiscal year. Individual income tax
collections for fiscal year 2014 were $1.979 billion, a decrease of $75 million, or 3.7%, from the
same period of the prior fiscal year. Collections from withholdings from non-residents were
$900 million, a decrease of $83 million, or 8.4%, from prior fiscal year.

Sales and use tax collection received by the General Fund for fiscal year 2014 were $595
million, an increase of $55 million, or 10.2%, from the prior fiscal year.

Collections for the special temporary excise tax under Act 154 for fiscal year 2014 were
$1.902 billion, an increase of $270 million, or 16.5%, from the prior fiscal year.

*Expenditures*. The fiscal year 2014 original budget totaled $9.770 billion in authorized
appropriations, excluding $575 million in general obligation debt service to be refunded with the
proceeds of the Series 2014 Bonds. The budget contemplated $245 million in new deficit
financing from GDB which, when added to the $575 million debt refunding, resulted in a total
projected budget deficit of $820 million. The budget was subsequently amended to total $9.245
billion (excluding the $575 million in refunded debt service). Preliminary expenditures for fiscal
year 2014 were $9.410 billion (excluding the $575 million in refunded debt service).

This estimate does not consider the estimated deficits of public corporations that receive
material operating or program subsidies from the General Fund, such as the Maritime Transit
Authority, PRHIA, the Public Buildings Authority, the Metropolitan Bus Authority, and the
Medical Services Administration. PRHIA, the largest of these entities, had a $59 million deficit
for fiscal year 2014.

This projection also considers special appropriations for fiscal year 2014, which have a
three-year life per Puerto Rico government accounting statutes, as fully spent, even if they are
projected to have unobligated balances at the end of the year. However, the projection does not
consider expenditures or obligations charged against special appropriations from prior fiscal
years, especially fiscal years 2012 and 2013. Both the government agencies and OMB continue,
in the ordinary course of business, to charge expenses from the current fiscal year against
appropriations from prior fiscal years, until those are depleted. However, OMB has broad
legislative authority to transfer unspent balances between special appropriations from prior years,
essentially repurposing the original intended use of the funds. Sometimes, these transfers are
executed to fund new programs, priorities, or contingencies arising in the course of the fiscal

year, or to cover expenses that could otherwise be considered recurring in nature. During fiscal year 2014, OMB executed $33 million in fund transfers in appropriations from prior fiscal years that implied a change in the original intended use of the funds.

**General Fund Budgetary Revenues and Expenditures for Fiscal Year 2013 Compared to Fiscal Year 2012**

General Fund budgetary revenues for fiscal year 2013 were $8.562 billion, a decrease of $106 million, or 1.2%, from fiscal year 2012. This total includes (i) $8.131 billion of budgetary operating revenues, (ii) $63 million of revenues from the electronic and traditional lotteries that are available to the General Fund, (iii) $242 million of excess collateral received on derivative transactions transferred from the Debt Service Fund and, (vi) $126 million of excess funds transferred from COFINA after payment of COFINA debt service.

The major changes from fiscal year 2012 were: (i) a decrease in income taxes from corporations of $174 million, or 12%, (ii) an increase of $92 million in taxes withheld from non-residents, and (iii) a decrease of $243 million from the excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154.

General Fund total expenditures for fiscal year 2013 amounted to $9.872 billion, consisting of $8.938 billion of operational expenditures, $205 million in rent payments to PBA and $729 million of transfers out for debt service payments on general obligation bonds. These expenditures were $1.115 billion or 10.1% lower than the total expenditures for fiscal year 2012.

**General Fund Budgetary Revenues and Expenditures for Fiscal Year 2012 Compared to Fiscal Year 2011**

General Fund budgetary revenues for fiscal year 2012 were $8.668 billion, an increase of $510 million, or 6.2%, from fiscal year 2011. This total includes $8.573 billion of operating budgetary revenues and $94 million of revenues from the electronic and traditional lotteries that are available to the General Fund.

The major changes from fiscal year 2011 were: (i) a decrease in income taxes from corporations of $217 million, or 12.9%, (ii) a decrease of $110 million in taxes withheld from non-residents, (iii) a decrease of $176 million in the temporary special property tax, and (iv) an additional $1.198 billion from the excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154.

General Fund total budgetary expenditures for fiscal year 2012 were $10.988 billion, consisting of $9.911 billion of budgetary operating expenditures, $331 million in rent payments to the PBA, and $745 million of transfers out for debt service payments on general obligation bonds. These expenditures were $923 million or 9.2% higher than the total budgetary expenditures for fiscal year 2011.

**Income Taxes**

The historical revenue data presented in this Report is based on collections realized under the provisions of the Puerto Rico Internal Revenue Code of 1994, as amended (the "1994 Code"), which applied for income tax purposes to taxable years beginning after June 30, 1995 and ending before January 1, 2011. The 1994 Code was replaced by the Puerto Rico Internal Revenue Code of 2011, enacted as Act 1 of 2011 (as amended, the "2011 Code"), which applies for income tax purposes to taxable years commencing after December 31, 2010. The 2011 Code was recently amended by various laws intended to increase revenues. Many of the provisions of the 2011 Code are identical to the equivalent provisions of the 1994 Code. Thus, unless otherwise noted, the discussion below refers to the provisions of both the 1994 Code and the 2011 Code.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The 1994 Code had four tax brackets for individuals, with tax rates of 7%, 14%, 25%, and 33%. The highest income tax bracket applicable to individuals under the 1994 Code was, generally, $50,000. Under the 2011 Code, a 0% tax rate was introduced and the income tax brackets gradually increased every year from taxable year 2011 through taxable year 2013. Originally, the 2011 Code provided for increases in the highest income tax bracket and certain modifications in the applicable tax rate subject to various fiscal requirements for taxable years 2014 through 2016. However, since the fiscal requirements for the application of the modified tax brackets were not met, the applicable income tax brackets for the year 2014 remained the same as enacted for 2013. Act 72-2015 amended the 2011 Code in order to eliminate the modifications of the tax brackets. For the years 2014 and 2015, the 0% tax rate is applicable if the net taxable income is $9,000 or less, and the highest income tax bracket starts with a taxable income of $61,500.

Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at an income tax rate of 15%, in the case of distributions effected after June 30, 2014 (dividends prior to that date were taxed at 10%). Gains realized from the sale or exchange of a capital asset by resident individuals, if held for more than one year, is taxed at a rate of 15% in the case of sales or exchanges effected after June 30, 2014 (transactions prior to that date were taxed at 10% if held for more than six months).

Interest income in excess of $2,000 on deposit with Puerto Rico financial institutions is taxed at a rate of 10%, unless a lower regular tax rate applies; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, estates, corporations and partnerships qualifies for a tax rate of 10%. If said income and other income subject to preferential tax rates exceed certain levels a higher alternate basic tax rate may apply.

With respect to income taxes for individuals, the following summarizes recent amendments to the 2011 Code:

(i)      self-employed individuals with gross income in excess of $200,000 were subject to a 2% surtax on their gross income from self-employment; however, this surtax was repealed for taxable years commenced after December 31, 2014;

(ii)     for taxable years commenced after December 31, 2013, individuals with income subject to alternate basic tax from $150,000 to $200,000 will be subject to an alternate basic tax rate of 10%; individuals with income subject to alternate basic tax from $200,001 to $300,000 will be subject to an alternate basic tax rate of 15%; and individuals with income subject to alternate basic tax in excess of $300,000 will be subject to an alternate basic tax rate of 24%; the tax brackets were reduced from the ones applicable to previous taxable years so that more individuals be subject to the alternate basic tax;

(iii)    the total deduction for mortgage interest on residential property was limited by Act 40-2013 to the lower of the amount of interest paid, 30% of the individual's adjusted gross income, or $35,000;

(iv)     the holding period for long term capital gains was modified in 2013 for transactions taking place after June 30, 2014, to include assets held for more than one year; previously the holding period for long term capital gains was applicable to assets held for more than 6 months;

(v)      capital losses may only be deducted up to the lower of 80% of capital gains or $1,000 (this limitation was reduced by Acts 72-2015 and 159-2015 from 90%);

(vi)     the alternate basic tax credit with respect to the alternate basic tax paid in prior years is limited to 25% of the current net regular tax over the alternate basic tax for such taxable year.  No alternate basic tax credit can be created for taxable years commenced after December 31, 2014;

(vii)    the earned income credit was repealed for taxable years commencing after December 31, 2013; and

(viii)   the low income credit for the elderly was reduced from $400 to $200 for taxable years commenced after December 31, 2013.  The credit may be increased back to $400 if certain budgetary projections of the General Fund are met.

*Corporations.*  Puerto Rico corporations are subject to tax on income from all sources; foreign corporations that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico.  Unless a corporation qualifies for partial exemption from corporate income and other taxes under the tax incentives programs (see "THE ECONOMY - Tax and Other Economic Development Initiatives" above), it is subject to tax at graduated rates.

In general, the 2011 Code originally provided that for taxable years commencing after December 31, 2010, the highest corporate income tax rate would be lowered to 30% for net

136

taxable income in excess of $2,500,000 (which could be lowered to 25% for taxable years starting after December 31, 2013, subject to certain conditions), considering a surtax deduction of $750,000, instead of the 39% top rate for net taxable income in excess of $300,000, considering a surtax deduction of $25,000, provided under the 1994 Code. However, pursuant to Act 40-2013, the maximum corporate income tax rate was reset at 39% for net taxable income in excess of $300,000, considering a surtax deduction of $25,000. Also, the alternative minimum tax is set to the greater of (i) the amount produced by applying a minimum rate of 30% to the alternative minimum net income, or (ii) subject to certain exceptions, the amount produced by applying an excise tax, which rate may range from 2.5% to 6.5%, depending on the taxpayer's gross sales, on the purchases from related parties of tangible personal property to be used in a Puerto Rico trade or business applicable to persons with gross sales of $10 million or more during any of three preceding taxable years, plus 20% of expenses paid to related parties that are not subject to Puerto Rico income tax. The highest excise tax rate is applicable if the taxpayer has gross sales of $2,750 million or more.

Puerto Rico enacted for taxable years commenced between January 1, 2013, and December 31, 2014, a gross receipts tax. However, this gross receipt tax was repealed for taxable years commenced after December 31, 2014.

Gains realized from the sale or exchange of a capital asset, if held for more than six months, are taxed at a maximum regular income tax rate of 15% in the case of sales or exchanges effected before July 1, 2014. This rate was increased to 20% for transactions effected after June 30, 2014, if the capital asset is held for more than one year. Dividends received by Puerto Rico corporations and partnerships from foreign corporations engaged in trade or business in Puerto Rico are subject to general income tax rates. A dividends received deduction may be available when the corporation or partnership making the distribution is organized in Puerto Rico. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations, and paid to corporations and partnerships, qualifies for a special tax rate of 10%.

Resident foreign corporations whose gross income qualifies as income effectively connected with a Puerto Rico trade or business are generally subject to a branch profits tax. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules. Act 77-2014 amends the branch profits tax provision to exclude loans and credit transactions between affiliates, except when such transactions arise from the sale of property or in the case of banking entities, from Puerto Rico Assets and Puerto Rico Liabilities in determining the dividend equivalent amount.

In general, corporations, and the partners of partnerships operating under a new grant of tax exemption issued under the Economic Incentives Act, are subject to a maximum income tax rate of 4% during their basic exemption period. Corporations, and the partners of partnerships operating under a new grant of tax exemption issued under the Tourism Development Act of 2010, are subject to a maximum tax rate of 39% on their taxable income, after applying the 90% exemption granted under the Tourism Development Act of 2010, which results in a maximum effective tax rate of 3.9% on their net tourism development income.

Interest from Puerto Rico sources paid by Puerto Rico resident borrowers to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid by Puerto Rico resident borrowers to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations operating under new grants of tax exemption issued under the Economic Incentives Act and the Green Energy Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by corporations covered under the Economic Incentives Act to non-resident recipients are subject to an income tax withholding of 2% or 12%, depending on certain elections made by the grantee, and in the case of corporations covered by the Green Energy Incentives Act, royalty payments to non-residents are subject to an income tax withholding of 12%.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year, made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% income tax withholding. In addition, Act 48 of June 30, 2013 ("Act 48") provides for a special contribution of 1.5% on payments received from the Commonwealth, its municipalities, instrumentalities and agencies pursuant to contracts for professional services commencing on July 1, 2013.

With respect to income taxes for corporations, the following summarizes recent amendments to the 2011 Code:

(i)     effective for taxable years commenced after December 31, 2012, corporations had their surtax exemption reduced from $750,000 to $25,000; the surtax exemption must be allocated among members of a controlled group of corporations;

(ii)    effective for taxable years commenced after December 31, 2012, corporations had their surtax rates reinstated to pre-2011 levels ranging from 5% to 19% for a maximum corporate income tax rate of 39% on net income in excess of $300,000, considering the surtax exemption of $25,000;

(iii)   the carryover for net operating losses was extended from 10 years to 12 years for losses incurred in taxable years commencing after December 31, 2004, and before January 1, 2013; and the carryover for net operating losses incurred in taxable years commenced after December 31, 2012, will remain at 10 years but the deduction for such losses is limited to 80% of the net income of the year in which the deduction is claimed regardless of the year in which the loss is incurred (this limitation was reduced by Act 72-2015 and 159-2015 from 90%);

(iv)    51% of the payments or transfers to related parties not engaged in trade or business in Puerto Rico or to the payor's home office that are not subject to tax in Puerto Rico, such as payments for services rendered outside of Puerto Rico, will be disallowed as deductions unless the payments are subject to tax in Puerto Rico, by withholding or otherwise; however, this disallowance does not apply to entities with tax exemption grants under the various Commonwealth tax incentives laws, and the Secretary of Treasury has authority to waive this disallowance, subject to certain restrictions that were imposed by Act 72-2015 and 159-2015;

(v)     capital losses may only offset 80% of capital gains (this limitation was reduced by Act 72-2015 and 159-2015 from 90%);

(vi)    carryover of capital losses is limited to 10 years, in the case of losses incurred for taxable years commenced after December 31, 2005, but before January 1, 2013; and 7 years in the case of losses incurred for taxable years commenced after December 31, 2012;

(i)     the alternative minimum tax credit with respect to AMT paid in prior years is limited to 25% of the current net regular tax over the AMT for such taxable year;

(ii)    a new 10% tax on deemed dividends to a 50% or more foreign owner of certain corporations is applicable for taxable years commenced after December 31, 2013;

(iii)   several prepayments of income tax at special rates including: appreciation of certain assets, individual retirement accounts, pension plans and variable annuity contracts were applicable for 2014 and 2015;

(iv)   special tax rates of 5% or 8% on actual or deemed corporate distributions are applicable for 2015, depending on the date of the distribution;

(v)     for taxable years commencing after December 31, 2013 the AMT in the case of corporations is the highest of (i) 30% of the alternative minimum taxable income or (ii) the amount produced by multiplying the purchases from related parties by an excise tax rate as more fully described above, plus 20% of expenses paid to related parties that are not subject to Puerto Rico income tax;

(vi)    the AMT book income adjustment is increased from 50% to 60% effective for taxable years commenced after December 31, 2012;

(vii)   the net operating loss deduction for AMT purposes is 80% of the alternative minimum tax income (this limitation was reduced by Act 72-2015 and 159-2015 from 90%);

(viii)  payments to nonresident partners, shareholders or members owning 50% or more of interest in such pass-through entities will be disallowed as deductions if payments are not subject to tax in Puerto Rico, by withholding or otherwise. These disallowances will not apply to entities with tax exemption grants under the various Commonwealth tax incentives laws. Also, the Secretary of Treasury has the authority to waive the disallowances for other taxpayers, subject to certain restrictions imposed by Acts 72-2015 and 159-2015; and

(ix)    Act 77-2014 imposed a cap of $300 million to R&D credits the Government is authorized to grant per year.

**Pass-Through Entities**

Currently, Puerto Rico has three types of entities that qualify for pass-through treatment: special partnerships, partnerships, and corporations of individuals. Pass-through entities are not subject to tax in Puerto Rico, but their net taxable income flows through to their owners. Each type of pass-through entity has its own set of rules with regards to their creation, operations, distributable income, capital contributions, distributions and dissolutions.

The election to be taxed as a special partnership was introduced by the 1994 Code. Entities engaged in certain activities in Puerto Rico, namely rental and land development, were able to make the election to be taxed as a special partnership and its income would flow through to their owners. However, with the enactment of the 2011 Code, the election to be taxed as a special partnership was eliminated, though the special partnerships in existence as of the effective date of the 2011 Code were grandfathered.

Corporations owned by certain individuals may elect to be treated as a corporation of individuals if their income comes mostly from Puerto Rico sources. The election to be taxed as a corporation of individuals is similar to the election to be taxed as an "S Corporation" under the United States Internal Revenue Code. As in the case of special partnerships, the income of a corporation that elects to be treated as a corporation of individuals will flow through to their owners.

The 2011 Code introduced a new pass-through entity: partnerships. Before the 2011 Code, partnerships were taxed as corporations. However, under the 2011 Code partnerships are taxed as pass-through entities, similar to partnerships under the United States Internal Revenue Code. Partnerships in existence as of the effective date of the Code were able to elect to continue to be treated as a corporation for income tax purposes.

Limited liability companies are, by default, taxed as corporations, but may elect to be taxed as a partnership. The concept of "disregarded entities" under the United States Internal Revenue Code was not adopted under the 2011 Code. Therefore, all legally separate entities are classified as corporation or partnerships for Puerto Rico income tax purposes.

**Special Excise Tax (Act 154)**

Act 154 was enacted, among other things, to balance the tax burden among the taxpayers and increase the tax revenues of the Commonwealth. Act 154 modified the income taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation, and imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. Act 154 applies to income realized and acquisitions occurring after December 31, 2010. The Commonwealth estimates that this excise tax affects mostly foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics.

Act 154 provides that, in certain circumstances, taxpayers will be deemed to be engaged in trade or business in Puerto Rico, and taxable in Puerto Rico with respect to a portion of the taxpayer's income, where the taxpayers engage in significant transactions with other persons that are members of the same controlled group.  Where a person engages in significant transactions with a member of the same controlled group that has gross receipts of $75 million or more in any of the preceding three taxable years, and that manufactures or produces goods in Puerto Rico, or provides services in connection with the manufacture or production of goods in Puerto Rico, the person will not be subject to income tax, and will instead be subject to the excise tax in lieu of any income tax. The excise tax is based on the value of the personal property or services acquired. The excise tax was originally scheduled to apply for a period of six years and was set at 4% for calendar year 2011, declining every year until reaching 1% in 2016. For the reasons explained below, on February 28, 2013, the Commonwealth amended Act 154 to set the excise tax at a fixed 4% and extend its application until 2017.

On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax.  These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions.

At the time of adoption of Act 154, the Commonwealth expected to raise approximately $1.4 billion from the excise tax during the first year of implementation and $5.6 billion for the six year period that the excise tax was originally intended to be in place. Although the amounts collected under Act 154 have met the initial projections, such revenue has not been sufficient to fully offset the reduction in tax revenues from other sources. As a result, on February 28, 2013 the Commonwealth amended Act 154 to extend the period of the excise tax until December 31, 2017 and reset the excise tax rate to a fixed 4% commencing on July 1, 2013.

While the Commonwealth expects that certain taxpayers subject to the excise tax will be able to credit all or a portion of the excise tax paid against their United States federal income tax liabilities, it is uncertain how this tax will affect each individual taxpayer. The long-term effects of the excise tax on the manufacturing sector of the Puerto Rico economy are also uncertain.

In connection with the expansion of the taxation of foreign persons by Act 154, the Commonwealth obtained a legal opinion regarding the creditability of the excise tax for United States federal income tax purposes.  The opinion concludes that the aforementioned excise tax should be creditable against United States federal income tax.  That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax will more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein.

On March 30, 2011, the United States Internal Revenue Service ("IRS") issued Notice 2011-29 addressing the creditability of the excise tax imposed by Act 154.  Notice 2011-29 provides that the provisions of the excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues.  Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an

income tax under Section 903 of the United States Internal Revenue Code of 1986, as amended. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act 154 has not been challenged in court; consequently, no court has passed on the constitutionality of Act 154.  There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Commonwealth's revenues may be materially adversely affected.

**Sales and Use Taxes**

Act No. 117 of July 4, 2006 amended the 1994 Code to provide, among other things, for a general sales and use tax ("SUT") of 5.5% to be imposed by the central government (the "Commonwealth SUT"). One half of the Commonwealth SUT is transferred to COFINA's Dedicated SUT Fund and the balance goes to the General Fund. Act 117 also authorized each municipal government to impose a municipal SUT of 1.5% (the "Municipal SUT"). In general, the Municipal SUT has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth SUT.  Act 117 also provided certain income tax reductions to address the regressive effect of the SUT on taxpayers in lower income tax brackets. The SUT is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations.

Act 117 was amended in May of 2015. The tax rate on the Commonwealth SUT was increased, effective on July 1, 2015, to 10.5%, and various exemptions were eliminated. In addition, the SUT will be replaced, effective on March 1, 2016, with a value added tax ("VAT"), as described in greater detail below.

Prior to the 2015 amendments, the SUT did not apply to, among other things:  (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription drugs, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as raw material in a manufactured good, whether or not bound for export. Act 117 also contained various exemptions from the SUT for certain specific items and for certain kinds of transactions such as business to business services and sales to resellers. As described below, some of these exemptions were eliminated by the 2015 amendments.

Act 117 repealed the 5% (effective 6.6%) general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico.  Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the SUT.

Act 40 of 2013 eliminated various exemptions to the SUT, which broadened its base. Act 40 also reduced the Municipal SUT to 1% and increased the Commonwealth SUT to 6%, maintaining the aggregate tax rate at 7%. In addition, Act 42 of 2013 amended the 2011 Code to broaden the nexus rules used to determine when a merchant will be considered to be engaged in the sale of taxable items in Puerto Rico for purposes of the SUT; and Act 46 of 2013 requires the declaration and payment of the SUT on imported goods at the time of their entry into Puerto Rico.

Act 80 of July 1, 2014 made substantial changes to the SUT provisions of the 2011 Code, including the following:

(i)     property destined to a foreign trade zone is deemed to have been introduced into Puerto Rico upon arrival to the foreign trade zone.

(ii)    inventory imported into Puerto Rico on or after August 1, 2014 is subject to SUT upon importation.

(iii)   manufacturer and eligible wholesaler waivers from collection of SUT are eliminated.

(iv)    electronic filing of Declaration of Imports, SUT on Imports Return and Monthly SUT Return is required.  Payment of SUT is generally due upon entry of goods unless the merchant is bonded

(v)     credit for SUT paid by resellers is increased to 75% of the SUT liability.

(vi)    establishes a Reseller Credit Control Account.

(vii)   Act 80 created a new Monthly SUT on Imports Return due on the 10th of the month following importation.

(viii)  the due date for filing the Monthly SUT Return was changed from the 10th day to the 20th day of the month following the taxable event.

An integrated electronic system (PICO) was established by Treasury for all SUT related filings.  All merchants must register in PICO.

On May 29, 2015, the Commonwealth enacted Act No. 72 ("Act 72-2015"), which, among other things, increased the SUT tax rate and provided for a transition to a value added tax ("VAT") to substitute the Commonwealth SUT, subject to certain conditions.

Commencing on July 1, 2015, transactions currently subject to the 7% SUT will be subject to a 11.5% SUT (10.5% collected by the Treasury Department, of which 0.5% goes to a special fund for the municipalities, and 1% collected by the municipalities). The SUT will be in effect until March 31, 2016, unless the Secretary of Treasury extends the effectiveness of the SUT for an additional 60 day period.

Commencing on October 1, 2015 and until March 31, 2016:

- Business to business transactions that are currently taxable will be subject to a 11.5% SUT.
- Business to business services and designated professional services that were previously exempt from SUT will be subject to a Commonwealth SUT of 4% but no Municipal SUT will apply to these services.
- The following services will be exempt from SUT:  (i) services offered by the Commonwealth government and instrumentalities; (ii) education, (ii) interest and other financing charges, (iii) insurance, (iv) health and hospital services, and (v) services offered by persons with a volume of business not exceeding $50,000.

After March 31, 2016 (or the extended sunset date provided for the SUT at the discretion of the Secretary of Treasury), all transactions subject to the SUT will be subject to a new VAT of 10.5% plus a 1% municipal SUT. The new VAT will also apply on the introduction into Puerto Rico of taxable articles and on taxable transactions, which are: (i) the sale in Puerto Rico of goods and services by a merchant, the rendering of a service by a non-resident to a person in Puerto Rico, and combined transactions. Certain articles and transactions will not be subject to the VAT.

Act 72-2015 also created a Committee to Consider Alternatives to Transform Consumption Taxes. This commission was authorized to review and recommend alternatives to the approved VAT but any alternative other than the VAT would have required additional legislation. In August 2015, the Committee recommended the implementation of the VAT.

On September 30, 2015, the Governor signed into law Act 159-2015 which expanded the services exempt from the 4% sales and use tax to include, among others,  certain legal services,  services rendered to a person engaged exclusively in the storage or handling of fuel in a foreign trade zone, and services rendered to bona fide farmers, designated professional services rendered to labor unions, and ocean, air and ground transportation of goods.

Act 159-2015 also provides a special 8% tax rate on dividend distributions or deemed dividend distributions made from October 1, 2015 through December 15, 2015.  In addition, Act 159-2015 states that cigarette excise taxes up to $36,000,000 in fiscal year 2016 will be transferred  to the Puerto Rico Integrated Transportation Authority.

**Excise Taxes**

The 1994 Code imposes an excise tax on certain articles and commodities, such as cigarettes, alcohol, sugar, cement, motor vehicles, heavy equipment, boats and certain petroleum products, which are taxed at different rates.

Under Act 7, the excise tax was increased on certain articles (cigarettes and certain alcoholic beverages) and was expanded with respect to others (motor vehicles).  With respect to cigarettes, the increase was approximately 81% per taxable unit.  For certain alcoholic beverages, the increase ranged between $0.30 and $0.70 per standard gallon.  The 2011 Code incorporated most of the increases made by Act 7, but provided an increase in the tax applicable to

144

concentrated wine must (from $4.48 to $7.00 per gallon), while reducing the tax payable with respect to champagne from concentrated wine must (from $4.48 to $2.25 per gallon). Motorcycles, all-terrain vehicles and "scooters," which used to be subject to the SUT, are now subject to an excise tax of 10% under the 2011 Code.

Act 41 of 2013 increased the excise tax applicable to cigarettes from $11.15 to $16.15 per hundred cigarettes effective July 1, 2013, and to $17.00 per hundred cigarettes effective July 1, 2015.  Act 41-2013 also imposes a new tax on smokeless tobacco of $1.00 per pound for chewing tobacco and $3.02 per pound for powdered tobacco ("snuff") or other products derived from tobacco.

Act 40 of 2013 imposes a special 1% tax for taxable years commencing after December 31, 2012, on premiums earned after June 30, 2013 by insurance companies authorized to do business in Puerto Rico. Annuities and premiums for Medicare Advantage, Medicaid and Mi Salud programs are excluded.

Act 48 of 2013 imposed a special tax of 1.5% of the value of contracts for professional and consulting services, including advertising, legal, public relations, communications and lobbying services executed by the Government or any of its agencies, instrumentalities, public corporations and the legislative and judicial branches. This tax is not creditable or deductible for income tax purposes.  Act 117-2013 amended Act 48 to clarify the special 1.5% is not creditable against the income tax but it is deductible as an ordinary and necessary business expense.

Act 31 of 2013 reduced the tax on gas oil or diesel oil from $.08 to $.04 per gallon and increased the tax on crude oil products and hydrocarbons from $3.00 per barrel dependent on the price of crude oil to a fixed $9.25 per barrel subject to adjustment for inflation every four years.

**Property Taxes**

Personal property, which accounts for approximately 46% of total collections of taxable property, is self-assessed.  Real property taxes are assessed based on 1958 property values.  No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value.  Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, 1.03% of the property tax based on the assessed value of all property (other than exempted property) is used for purposes of paying the Commonwealth's general obligation debt and is deposited in the Commonwealth's Redemption Fund.

Act 7 did impose, however, an additional real property tax on residential and commercial real properties with appraised values in excess of approximately $210,000.  This tax applied during fiscal years 2010, 2011 and 2012.  The additional real property tax, which was collected by the Treasury Department, amounted to 0.591% of such properties' appraised value as

145

determined by the CRIM.  The 2011 Code eliminated this additional real property tax for fiscal year 2012.

Act 40 of 2013 provides that the SUT paid by a reseller is excluded from the valuation of inventory for personal property tax purposes.

The following table presents the assessed valuations and real and personal property taxes collected for fiscal years 2009 to 2013.

**Commonwealth of Puerto Rico**
**Assessed Valuations and Real and Personal Property Taxes**
**(Commonwealth and Municipalities Combined)**
**(in thousands)**

| Fiscal Years Ended June 30, | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections |
|---|---|---|---|---|---|
| 2009 | $28,903,996 | $1,032,570 | $634,040 | $244,411 | $878,451 |
| 2010 | 175,025,782 | 1,093,769 | 666,429 | 269,857 | 936,286 |
| 2011 | 187,293,462 | 1,152,718 | 712,706 | 225,280 | 937,986 |
| 2012 | 197,624,523 | 1,164,156 | 677,709 | 288,484 | 966,193 |
| 2013* | 191,139,478 | 1,141,443 | 677,988 | 277,855 | 955,844 |

_____
[1]   Valuation set as of July 1 of each fiscal year.
*   Preliminary, unaudited numbers.

*Source:*  Municipal Revenues Collection Center.

Recently enacted Act 136 of November 26, 2013 amended the Municipal Property Tax Act to require all taxpayers to make quarterly estimated tax payments of personal property tax on the 15th day of August, November, February and May.

**Other Taxes and Revenues**

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.  Pursuant to Act 30 of 2013, which is effective for fiscal year 2014 and thereafter, a portion of such registration fees were assigned to PRHTA.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

**Revenues from Non-Commonwealth Sources**

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from Puerto Rico to the United States mainland.  The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth.  The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently $13.50 per gallon.  Of this amount, the lesser of $10.50 per proof gallon and the actual excise tax imposed is currently returned ("covered over") to the Commonwealth.  Since 1999, however, the United States Congress has enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth

to $13.25 per proof gallon.  For fiscal year 2012, the total excise taxes on rum shipments returned to the Commonwealth was $400.5 million, of which $302.3 million went to the General Fund.

In June 2008, the Government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI, Inc. ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012.  Previously, all rum used in Captain Morgan products sold in the United States was procured through a supply contract with Serrallés Distillery ("Serrallés") in Puerto Rico which expired on December 31, 2011.  The Commonwealth estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serrallés during calendar year 2009 were 9,403,224 proof gallons.  These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009.  As a result of the termination of the contract between Serrallés and Diageo, after 2011 the income received by the Commonwealth from the federal excise tax on rum shipments  decreased as Serrallés did not have other clients bulk rum clients for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products. However,  in 20014 Serrallés landed some new bulk rum clients that are expected to help grow Commonwealth revenues from this source.

In an effort to maintain the local rum industry, as a result of the threat posed by the USVI's agreement with Diageo, and to preserve or increase the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, Act No. 178 of December 1, 2010 ("Act 178") was enacted, which increased from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to, and promote, the Puerto Rican rum industry.  The law also authorized the Governor to increase this percentage up to 46% after December 31, 2011, through an Executive Order. Such Executive Order was issued and the percentage limit was increased to 46% effective July 1, 2012.  In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives.  Effective January 1, 2011, Act 1 of 2011 replaced Act 178 and contains identical provisions.

As permitted under Act 1 of 2011, the Commonwealth entered into a definitive agreement with three rum producers and is currently in negotiations with other producers to provide them a series of subsidies and incentives, by allowing such companies to benefit from the cover-over program rebate.  These agreements are expected to promote and encourage the export of rum produced in Puerto Rico.  As a result of these agreements, during fiscal year 2014 the Treasury Department allocated $99.8 million of total revenues from the federal excise tax on rum shipments for these incentives.

In May 2015, the Government agreed to deposit the moneys received from the federal rum excise taxes on a segregated account with a private commercial bank from which such funds would be distributed by the bank to the Government and to the rum producers in accordance with their respective incentives contracts. Such arrangement remains subject to the constitutional priority for payment of the Commonwealth's public debt.  Prior to this arrangement, federal rum

excise taxes were deposited in the TSA and Treasury forwarded to Pridco the amounts necessary to pay the incentives due to the rum producers.

**Administrative Measures to Increase Collections of Income, Sales, and Excise Taxes and Property Taxes**

The Treasury Department has elaborated a strategic plan designed to improve tax collections. The plan includes initiatives to increase tax compliance, implement effective enforcement measures, and attack tax evasion. To promote taxpayers' compliance, the Treasury Department has liberalized the procedures to enter into payment plans, offers-in-compromise agreements, and encouraged voluntary disclosure agreements.

In addition, the Treasury Department has developed initiatives focused on effective enforcement methods, such as improving the efficiency of its audit selection process, and the use of technological solutions to improve collections. The Treasury Department has also integrated its databases and established a tax intelligence project to identify tax evasion and improve its audit selection process.

On September 28, 2010, the Treasury Department signed an agreement for the implementation of a new point of sale system that is intended to strengthen its SUT enforcement efforts. The system is designed to: (i) transmit daily to the Treasury Department information on all SUT transactions; (ii) reconcile transmitted transactional information with information reported by merchants; (iii) provide wireless transmission devices for use by street vendors; and (iv) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets (the "IVU Loto").

The Treasury Department has developed various initiatives directed towards increasing collections of income taxes and the SUT through the implementation of various enforcement and compliance programs. Other programs are geared towards the use of technology to detect noncompliance. For example, the Treasury Department completed the integration of its general computer systems with the SUT database in order to better detect non-compliance. Such integration has allowed the Treasury Department to compare the electronic information provided by the transactional database and the data contained in the tax returns repository. Such comparison offers the Treasury Department with detailed information about which merchants reflect taxable transactions but are either (i) not duly submitting the corresponding sales and use tax return; (ii) submitting erroneously prepared tax returns – returns with less sales volume transactions than the information provided by the transactional database; (iii) merely submitting with no payment as the law requires; (iv) or merchants not reporting cash sales. In order to address these possible instances of non-compliance, the Treasury Department created a task force consisting of fiscal auditors and agents from the Consumer Tax Bureau and the Tax Evasion Bureau. The fiscal auditors are responsible for investigating inconsistencies reported by the point of sale system, determine tax deficiencies and issue preliminary deficiency notices. The agents of the Consumer Tax Bureau provide assistance to the fiscal auditors in connection with any additional information requirements and visit merchants and retailers to investigate the status of their permits and point of sale systems. Finally, the agents from the Tax Enforcement Bureau are responsible for investigating any tax crimes discovered by the fiscal auditors and/or agents from the SUT Bureau.

In addition to the above, the Treasury Department designed and developed a standardized selection process focused on merchants that have been affected by the enactment of Act 40-2013 to verify compliance with SUT, licenses, and IVU loto program.  The design and development process was divided in two groups: (1) merchants that are affected by the business to business provisions and (2) any other merchants.  On July 2, 2013, Treasury issued Circular Letter 13-04 to clarify application of the elimination of the business to business exemption for certain services.  The Treasury Department implemented the initiative at the beginning of August 2013 by visiting the selected merchants to provide guidance  on Circular Letter 13-04.  By the end of fiscal year 2014, the Consumption Tax Bureau's Audit Division had completed 183 audits and collected an aggregate of $2.0 million from 94 such audits.

Treasury identified that taxpayers were incorrectly using the resellers exemption certificates negatively affecting the SUT collection. Act 40 eliminated the resellers exemption certificates, which have been cancelled as of August 16, 2013.  As such, new processes are being implemented to issue new Reseller Certificates and to allow a credit for tax payment in resale businesses as provided on Act 40 on the SUT monthly tax return.

Effective August 16, 2013 the new Reseller Certificates only exempt the reseller from the 1% Municipal SUT.  The Reseller Certificate is required to entitle the reseller to a credit for the SUT paid on its purchases of inventory items, subject to a limitation of 75% of the SUT liability.

On August 1, 2014, the Treasury Department implemented the Integrated Merchant Portal ("PICO") as a tool that would enable merchants and individuals to file Declarations of Imports, Tax on Imports Monthly Returns and SUT Monthly Returns and applicable payments electronically.  Since the SUT is now collected at the point of entry revenues are received at the beginning of the chain of supply instead of the point of sale.

On July, 2015, Treasury implemented an automatic system to automatically deduct from suppliers paid through the TSA, the amount owed to Treasury on past due taxes. Such initiative has provided revenues to the General Fund for the four-months of fiscal year 2016 of approximately $3 million.

On September 18, 2015, the Commonwealth enacted Act 156-2015, to create the Bureau of Internal Revenue, an autonomous entity ascribed to the Treasury Department, with the mission of reducing tax evasion and avoidance, increasing collections, enhancing the professional development of its staff, improving systems technology, and improving the quality of services to taxpayers.

On September 30, 2015, the Governor signed Act 159-2015, which limits the Secretary of Treasury's authority to enter on certain closing agreements granting taxpayers benefits greater than those permitted by existing tax laws.

**Federal Grants**

The Commonwealth receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth are estimated to be $4.646 billion for fiscal year 2012, a decrease of $378 million, or 8%, from fiscal year 2011. Federal grants for fiscal year 2013 are projected at $4.499 billion, which is consistent with the level for fiscal year 2012. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Treasury Department. The figures for fiscal years 2009 through 2012 are actual figures. The figures for fiscal year 2013 are the amounts included in the adopted budget.

Federal grants are not included in General Fund budgetary revenues.

**The Commonwealth of Puerto Rico**
**Federal Grants***
**(in thousands)**

|  | 2012 | 2013 | 2014 | 2015 | 2016[1] |
|---|---|---|---|---|---|
| Welfare | $2,547,357 | $2,518,707 | $2,413,629 | $2,408,897 | $2,409,916 |
| Education | 1,562,508 | 1,575,491 | 1,283,281 | 1,386,770 | 1,427,169 |
| Health | 1,662,258 | 1,541,180 | 1,809,454 | 1,655,814 | 2,123,854 |
| Housing | 612,615 | 537,545 | 518,216 | 582,928 | 595,137 |
| Transportation and Communications | 210,076 | 251,663 | 203,918 | 201,716 | 180,414 |
| Public Safety and Protection | 60,453 | 54,867 | 65,644 | 62,844 | 61,214 |
| Other | 72,655 | 63,707 | 344,943 | 34,356 | 33,547 |
| Contributions to Municipalities | 47,633 | 28,348 | 27,793 | 26,111 | 26,111 |
| Economic Development | 92,361 | 14,108 | 12,570 | 16,082 | 15,402 |
| TOTAL | $6,867,916 | $6,585,616 | $6,679,448 | $6,375,518 | $6,872,764 |

[1]Budget.
*Source:  Office of Management and Budget*

**BUDGET OF THE COMMONWEALTH OF PUERTO RICO**

**Office of Management and Budget**

OMB's primary role is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

**Budgetary Process**

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislative Assembly an annual balanced budget of total resources, capital improvements, and operating expenditures of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Treasury Department, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total resources estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislative Assembly may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes or identifying additional resources to cover such deficit. Upon passage by the Legislative Assembly, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislative Assembly with the Governor's objections. The Legislative Assembly, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the commencement of a fiscal year, the budget for such fiscal year shall be the annual budget for the preceding fiscal year as originally approved by the Legislative Assembly and the Governor until a new budget is approved. This permits the Commonwealth to continue making payments of its operating and other expenditures until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Treasury Department, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislative Assembly a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislative Assembly for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. An amount equal to one percent of the General Fund net revenues of the preceding fiscal year is required to be deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. During the last several fiscal years, the Legislative Assembly approved joint resolutions to halt temporarily the deposit of funds into the Budgetary Fund, and such funds were used instead to cover the budgetary deficit. As of September 30, 2015, the balance in the Budgetary Fund was $8.8 million.

An Emergency Fund was created by Act No. 91 of June 21, 1966 ("Act 91"), as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. Act 91 originally contemplated that the Emergency Fund would be capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act 91 was amended in 2003 to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. Act 91 was further amended in 2005 to authorize the disbursement of funds from the Emergency Fund to cover

certain General Fund expenditures and operational costs of the State Emergency Management Agency and authorized GDB to lend to the Commonwealth up to $150 million to replenish the Emergency Fund to provide funding for emergency and disaster needs. As of September 30, 2015, the Emergency Fund had a balance of  $.343 million.

**Appropriations**

Appropriations in the central government budget of Puerto Rico consist of the following:

(i)      *General Fund appropriations for recurring ordinary operating expenditures of the central government and of the Legislative Assembly.*  These are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)     *General Fund appropriations for special operating expenditures, for contributions to municipalities, the University of Puerto Rico and the Judicial Branch, and for capital expenditures*. These are authorized by separate law.

(iii)    *Disbursements of Special Funds for operating purposes and for capital improvements.* For the most part, these do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress.  Federal grants constitute the major part of the resources of the Special Funds.

(iv)    *Bond Fund appropriations for capital expenditures financed by bonds*. Expenditures of these funds occur in one or more years.

(v)     *Other Funds.* Appropriations may be made from time to time from non-recurring surplus funds extractions or dividends from control government agency special funds, public corporations or other sources.

In Puerto Rico, the central government performs many functions, which in the fifty states are the responsibility of local governments, such as providing public education, police and fire protection.  The central government also provides significant annual appropriations set by formula to the University of Puerto Rico and to the municipalities.  In addition, the Commonwealth appropriates annually to the Judicial Branch an amount equal to 4% of the average annual revenue from internal sources for each of the two preceding fiscal years.  This percentage may be increased upon review, with scheduled reviews every five years.

The following table shows a breakdown between discretionary and non-discretionary General Fund expenditures for fiscal years 2014, 2015 and 2016.  The following expenditures are categorized as discretionary in the table: utility payments to public corporations and all contributions to the government retirement systems, including, among others, regular payroll contributions, Act 70 annuities, incremental Act 114 and Act 116 payroll contributions, voluntary additional appropriations and special laws.

153

**Expenditures Breakdown for the General Fund**
**(in millions)**

|  | 2014* | 2015* | 2016* |
|---|---|---|---|
| **Non-Discretionary Expenditures** | | | |
| Mandated Expenditures (Formula) | | | |
| Contributions to Municipalities | $ 361 | $ 361 | $361 |
| University of Puerto Rico | 834 | 834 | 834 |
| Judicial Branch | 349 | 323 | 315 |
| Debt Payments to Public Buildings Authority | 273 | 274 | 277 |
| General Obligation Debt Service | 162 | 743 | 1,011 |
| Other Debt Service | 441 | 395 | 464 |
| Total of Non-Discretionary Expenditures | $2,420 | $2,929 | $ 3,262 |
| Percent of Total General Fund Expenditures | 25% | 30% | 33% |
| | | | |
| **Discretionary Expenditures** | $7,351 | $6,636 | $6,538 |
| Payroll and Related Costs[1] | $3,619 | $3,392 | $3,320 |
| Payroll as a Percentage of Discretionary Expenditures | 49% | 51% | 51% |
| | | | |
| **Total General Fund Expenditures** | $9,770 | $9,565 | $9,800 |

\* Approved Budget
(1)  Excludes University of Puerto Rico and the Judicial Branch.
*Source: Office of Management and Budget*

## Budget for Fiscal Year 2016

The table below presents a summary of the approved budget for fiscal year 2016.

**Commonwealth of Puerto Rico**
**Summary of General Fund Approved Annual Budget**
**(in thousands)**

| | Fiscal Year 2015 | Fiscal Year 2016 |
|---|---|---|
| Revenues from internal sources: | | |
| Personal income taxes | $2,356,000 | $2,135,000 |
| Retained non-resident income tax | 807,000 | 822,000 |
| Corporate income taxes | 2,085,000 | 1,791,000 |
| Partnership income taxes | 2,000 | 0 |
| Tollgate taxes | 5,000 | 0 |
| 17% withholding tax on interest | 7,000 | 4,000 |
| 10% withholding tax on dividends | 116,000 | 37,000 |
| Inheritance and gift taxes | 3,000 | 5,000 |
| Sales and use taxes | 735,000 | 1,740,000 |
| Excise taxes: | | |
| Alcoholic beverages | 281,000 | 270,000 |
| Foreign (Act 154) | 1,889,000 | 1,905,000 |
| Motor vehicles and accessories | 380,000 | 305,000 |
| Cigarettes | 170,000 | 133,000 |
| Other (excise taxes) | 121,000 | 104,000 |
| Licenses | 25,000 | 19,000 |
| Miscellaneous non-tax revenues: | | |
| Contributions from lottery fund | 42,000 | 48,000 |
| Electronic lottery | 93,000 | 90,000 |
| Registration and document certification fees | 104,000 | 104,000 |
| Other | 118,000 | 102,000 |
| Total revenues from internal sources | 9,340,000 | 9,614,000 |
| Revenues from non-Commonwealth sources: | | |
| Federal excise taxes on off-shore shipments | 225,000 | 186,000 |
| Total  revenues from non-Commonwealth sources | 225,000 | 186,000 |
| Total  revenues and resources | 9,565,000 | 9,800,000 |
| Appropriations: | | |
| Current expenses: | | |
| General government | $935,134 | $841,944 |
| Education | 2,767,841 | 2,626,687 |
| Health | 1,326,667 | 1,340,379 |
| Welfare | 391,993 | 390,354 |
| Economic development | 135,087 | 143,589 |
| Public safety and protection | 1,298,819 | 1,308,401 |
| Transportation and communication | 65,237 | 61,873 |
| Housing | 19,381 | 23,901 |
| Contributions to municipalities | 370,616 | 374,769 |
| Special pension contributions | 560,000 | 652,000 |
| Debt service | 742,718 | 1,011,210 |
| Other debt service (appropriations) | 395,610 | 464,073 |
| PBA | 355,003 | 363,974 |
| Utilities (PREPA, PRASA, Insurance Premiums) | 200,894 | 196,846 |
| Total appropriations – current expenses | 9,565,000 | 9,800,000 |
| Capital improvements | 0 | 0 |
| Total appropriations | 9,565,000 | 9,800,000 |
| Year-end balance | 0 | 0 |
| Total appropriations and year-end balance | $9,565,000 | 9,800,000 |

Totals may not add due to rounding.
*Sources: Treasury Department and Office of Management and Budget*

The fiscal year 2016 General Fund budget provides for revenues and expenditures of $9.800 billion, which is $235 million higher than the budget for fiscal year 2015. The principal reasons for the increase in expenditures are (i) a 30% increase in debt service payments, from $1.138 billion in fiscal year 2015 to $1.475 billion in fiscal year 2016, and (ii) a 16% increase in special pension contributions, from $560 million in fiscal year 2015 to $652 million in fiscal year 2016. These increases were partially offset by reductions in payroll expenses of $72 million, in other operating expenses of $63 million, and in PRITA expenses of $43 million.

The principal changes in the fiscal year 2016 budgeted General Fund revenues compared to preliminary fiscal year 2015 revenues are (i) an increase of $1.005 billion in sales and use tax, resulting from the increase in the SUT tax rate, which is partially offset by (ii) a decrease in other General Fund revenues of $166 million.

In preparing the fiscal year 2016 budget, the Commonwealth started with a revenue base below the one used for the fiscal year 2015 budget due to the fiscal year 2015 revenue shortfall of $211 million and the exclusion of various non-recurring items from fiscal year 2015, estimated at $732 million. These reductions have been offset with the additional revenues expected to be generated from the increase in the sales and use tax which became effective on July 1, 2015.

The Commonwealth was also required to address certain cost escalators in fiscal year 2016, estimated by OMB to total approximately $1.044 billion. These cost escalators include: (i) $685 million in additional debt service requirements, consisting of $269 million in increased debt service for General Obligation bonds, $53 million in increased debt service for new TRANs (based on actual TRANs costs for fiscal year 2015), $55 million in increased debt service for Commonwealth appropriation bonds issued by PFC, $290 million in increased debt service for GDB loans payable from legislative appropriations and $18 million in legislative appropriation with respect to the Tourism Development Fund, (ii) $257 million in Additional Uniform Contributions to the pension system, as determined by the actuaries, corresponding to the Commonwealth's central government; (iii) an increase of $59 million in Commonwealth contributions due to the 1% increase in the statutory employer contribution rates as per Act 114 and 116 of 2011 and special laws; and (iv) $28 million for the Comprehensive Cancer Center.

Expense reduction measures of approximately $258 million were taken into consideration for purposes of the fiscal year 2016 budget. These measures include school consolidations, a reorganization of the collective transportation system, a reduction in special appropriations and other measures.

The following table shows the budget cost escalators and reductions for fiscal year 2016:

|  | Escalator | Appropriation | Difference | Reduction |
|---|---|---|---|---|
| Increase in General Obligation debt services | $269 | $269 | - | |
| Increase in other debt services | 416 | 70 | 346 | |
| Additional Uniform Contribution to Central Government pension system | 257 | 61 | 196 | |
| Increase in employer's incremental contribution as per Act 114 and 116 and special laws | 59 | 59 | - | |
| Increase in rent payment | 15 | 15 | - | |
| Comprehensive Cancer Center | 28 | 19 | 9 | |
| Reduction in payroll expenses | | | | 72 |
| Reduction in other operating expenses | | | | 63 |
| Reduction in PRITA appropriation | | | | 43 |
| Reduction in other special appropriations | | | | 80 |
| Total | $1,044 | $493 | $551 | $258 |

## Differences between Budget and Basic Financial Statements

Revenues and expenditures, as reported by the Treasury Department in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i)     The budgetary accounts are on a cash basis, while financial statements prepared by the Treasury Department include accruals and other adjustments as required by government accounting standards.

(ii)     Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended or amounts not budgeted for a particular fiscal year, but expended during that year, and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(iii)     Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program.  Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

157

## RETIREMENT SYSTEMS
## AND OTHER POST-EMPLOYMENT BENEFITS

**Overview**

A significant component of the Commonwealth's budget is the cost of its three principal retirement systems, the Employees Retirement System of the Commonwealth of Puerto Rico and its Instrumentalities (the "Employees Retirement System"), the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System") and the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"). These pension systems are severely underfunded and are projected to completely deplete their assets in the near future. Although the current administration enacted significant reforms of the retirement systems, some of these reforms were struck down by the Puerto Rico Supreme Court. In addition, due to the current fiscal situation, the Commonwealth has not been able to make the additional contributions to the retirement systems that are required under the reform legislation.

Substantially all of the public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the three retirement systems mentioned above, the Retirement System of the University of Puerto Rico and the Employees Retirement System of Puerto Rico Electric Power Authority. The Employees Retirement System and the Teachers Retirement System are the largest plans, both in number of active members and retirees and in the amount of their actuarial accrued liabilities.

The Retirement System of the University of Puerto Rico and the Employees Retirement System of the Electric Power Authority cover employees of the University of Puerto Rico and PREPA, respectively, and are funded by those public corporations from their revenues. Although the Commonwealth is not required to contribute directly to those two systems, a large portion of the University's revenues is derived from legally mandated legislative appropriations. The discussion that follows only covers the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System (each a "Retirement System" and, collectively, the "Retirement Systems").

The Employees Retirement System is a statutory trust created by Act No. 447 of May 15, 1951, as amended ("Act 447"). Prior to the recent amendments made in 2013 by Act 3-2013 (discussed below), the Employees Retirement System consisted of different benefit structures. Members who had entered the Employees Retirement System before January 1, 2000 participated in a defined benefit program. Members who began to participate prior to April 1, 1990 ("Act 447 Participants") were entitled to the highest benefits structure, while those who began to participate on or after April 1, 1990 ("Act 1 Participants") were subject to a longer vesting period and a reduced level of benefits, as provided by Act No. 1 of February 16, 1990 ("Act 1 of 1990").

In 1999, Act 447 was amended to close the defined benefit program for new participants and, prospectively, establish a new benefit structure similar to a cash balance plan (this new benefit structure is referred to as "System 2000"). Members who entered the Employees Retirement System on or after January 1, 2000 ("System 2000 Participants") participate solely in System 2000. Prior to the amendment made by Act 3-2013, under the System 2000 benefit

structure, a participant was entitled to receive a lump-sum payment, which could be received in full or used to purchase an annuity from a third party, based solely on the amounts contributed in cash by such participant and credited earnings on such cash.  Act 3-2013 amended the law to eliminate the lump sum distribution and substitute it for a life annuity payable to the System 2000 Participant. This amendment was primarily intended to alleviate the cash flow needs of the Employees Retirement System.  System 2000 Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances.  System 2000 Participants do not benefit from any employer contributions. Instead, employer contributions made on account of System 2000 Participants are used to reduce the accumulated unfunded pension benefit obligation of the Employees Retirement System.

System 2000 is not a separate plan as there are no separate accounts for System 2000 Participants.  Contributions received from System 2000 Participants are pooled and invested by the Employees Retirement System together with the assets corresponding to the defined benefit structure.  Thus, future benefit payments under the defined benefit structure of Act 447 and Act 1 of 1990 and the defined contribution structure of System 2000, as amended by Act 3-2013, will be paid from the same pool of assets of the Employees Retirement System.

The Teachers Retirement System is a statutory trust created in 1951. Due to Act 160-2013, it administers two benefit structures: (i) a defined benefit pension program for active participants hired on or before July 31, 2014 and (ii) a contributory hybrid program for participants hired on or after August 1, 2014.

The Judiciary Retirement System is a statutory trust created in 1954.  Due to Act 162-2013, it administers two benefit structures: (i) a defined benefit pension program for active participants hired on or before June 30, 2014 and (ii) a contributory hybrid program for participants hired on or after July 1, 2014.

The Retirement Systems are funded principally by contributions made by employers (the Commonwealth, public corporations and municipalities) and employees, as well as investment income.

Act 3-2013, constitutes a comprehensive reform of the Employees Retirement System. This reform was necessary to address the growing funding shortfalls which threatened the long term solvency of the Employees Retirement System. See "Efforts to Address Cash Flow Shortfall and Improve Funding Ratio" below.  The provisions of Act 3-2013 and its projected impact on the funding shortfalls are discussed below.

In addition, Act 160-2013 and Act 162-2013 were also enacted by the current Administration to carry out comprehensive reforms of the Teachers Retirement System and the Judiciary Retirement System, respectively.  However, both laws were largely struck down by the Puerto Rico Supreme Court.

**Governance**

Governance of the Employees Retirement System and the Judiciary Retirement System is vested in a Board of Trustees, which sets policy and oversees the operations consistent with

applicable laws. There are eleven members of the Board, as follows: the Puerto Rico Secretary of the Treasury (or her appointee), the President of GDB (or his appointee), the Commissioner of Municipal Affairs (or his appointee) and the Director of the Office of Human Resources of the Commonwealth (or his appointee), as *ex officio* members; three members appointed to three-year terms by the Governor of the Commonwealth, two of whom must be members of the Employees Retirement System or the Judiciary Retirement System, with at least ten years of credited service; and a member who is a pensioner of the Employees Retirement System or the Judiciary Retirement System. The other two members will be the President of the Federation of Mayors and the President of the Association of Mayors. The Board is also responsible for appointing the Administrator of the Employees Retirement System and the Judiciary Retirement System.

Governance of the Teachers Retirement System is also vested in a Board of Trustees. There are nine members of the Board, as follows: the Secretary of the Treasury (or her appointee), the President of GDB (or his appointee) and the Secretary of Education (or his appointee), as ex officio members; one representative of a teacher's organization (or his appointee) designated by the Governor for a term of four years; three teachers of the Teachers Retirement System, one of which shall represent active teachers and two of which shall represent retired teachers, each appointed by the Governor for a term of four years; one representative of the collective bargaining unit for teachers pursuant to Puerto Rico law (or his appointee), and if the Teachers of the Department of Education do not have a representative of the collective bargaining unit under Act 45-1998, as amended, the Governor may appoint a teacher in active service as a member of the Board; and a member who represents the public interest, appointed by the Governor for a term of four years. The Board is also responsible for appointing an Executive Director.

**Covered Employees**

The Employees Retirement System covers substantially all employees of the central government (consisting of the departments and agencies of the Commonwealth), all members and regular employees of the Legislative Branch, and all employees of the public corporations (other than the University and PREPA) and the Commonwealth's municipalities, except for those employees that are covered by the other two Retirement Systems. The Judiciary Retirement System only covers judges.

The Teachers Retirement System covers all active teachers of the Department of Education and the employees of the System who become plan members of the System at their date of employment. Licensed teachers working in private schools or other educational organizations have the option to become members of the System so long as the required employer and employee contributions are satisfied.

The following table shows the number of active members, retired members, disabled members, beneficiaries and terminated vested members for each of the Retirement Systems as of June 30, 2014.

**Participant Data**
**(as of June 30, 2014)**

| | Active Members | Retired Members | Disabled Members | Beneficiaries | Terminated Vested Members[1] | Total |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| Act 447 Participants | 19,281 | 86,925 | 14,933 | 13,362 | 7,219 | 141,720 |
| Act 1 Participants | 42,882 | 7,470 | 1,680 | 91 | 3,439 | 55,562 |
| System 2000 Participants | 63,508 | - | 36 | - | - | 63,544 |
| **Total** | 125,671 | 94,395 | 16,649 | 13,453 | 10,658 | 260,826 |
| **Teachers Retirement System** | 39,343 | 35,278 | 2,235 | 3,088 | 689 | 80,633 |
| **Judiciary Retirement System** | 364 | 372 | 0 | 58 | 59 | 853 |

[1]   Represents generally members who ceased employment without the right to a retirement annuity and are due a refund of member contributions and, if applicable, employer contributions, plus interest thereon.

The assets contributed by the Commonwealth central government and all other participating employers to the Employees Retirement System are invested together and not segregated. As of June 30, 2013, the central government was responsible for making contributions with respect to approximately 73,523 active members of the Employees Retirement System, or 58.5% of total active members (consisting of approximately 12,217 Act 447 Participants, 27,747 Act 1 Participants and 33,559 System 2000 Participants).  Municipalities were responsible for approximately 30,572, or 24.33%, active members (consisting of approximately 3,323 Act 447 Participants, 8,958 Act 1 Participants and 18,291 System 2000 Participants). Public corporations were responsible for approximately 21,576, or 17.17%, active members (consisting of approximately 3,741 Act 447 Participants, 6,177 Act 1 Participants and 11,658 System 2000 Participants). Effective July 1, 2013, all active employees were transferred into Act 3.

**Funding Requirements**

The Commonwealth central government is responsible for approximately 59% of total employer contributions to the Employees Retirement System, and the other 41% is the responsibility of public corporations and municipalities. The Commonwealth central government is also responsible for 100% of total employer contributions to the Judiciary and Teachers Retirement Systems.  Retirement and related benefits provided by the Retirement Systems, and required contributions to the Retirement Systems by employers and employees, are determined by law rather than by actuarial requirements.  The Commonwealth is ultimately responsible for any funding deficiency with respect to central government employees in the three Retirement Systems, and may ultimately be responsible for all funding deficiencies.

As of July 1, 2011, after the adoption of Act 116 of July 6, 2011 ("Act 116"), the statutory employer contribution for the Employees Retirement System increased from a minimum of 9.275% to a minimum of 10.275% of covered payroll, and will continue to increase annually until fiscal year 2021. The employer contribution rate for fiscal year 2015 is 13.275%. See "Efforts to Address Cash Flow Shortfall and Improve Funding Ratio" below.  Covered payroll is the compensation regularly paid to active employees on which contributions to the Retirement Systems are computed and is generally equivalent to their annual salary. Act 447

requires that employer contributions cover the difference between (i) the benefits provided by the Retirement System, plus administrative costs, and (ii) the contributions that employees are required to make to the Retirement System.  This requirement, however, has not been adhered to and the level of employer contributions has been limited to the minimum statutory rate.

Required employee contributions for the Employees Retirement System vary according to how the individual employee's retirement benefits are coordinated with social security benefits.  Act 3-2013 increased the employee contribution from 8.275% to 10% of covered payroll.

As a result of the adoption of Act 114 of July 5, 2011 ("Act 114"), the statutory employer contribution for the Teachers Retirement System is scheduled to increase annually from 8.5% of covered payroll in fiscal year 2011 to 19.75% in  fiscal year 2021. Then, pursuant to Act 160-2013, the statutory employer contribution will increase to 20.525% of covered payroll commencing in fiscal year 2022.  The employer contribution for fiscal year 2016 is 13.5% of covered payroll. The statutory employee contribution for the Teachers Retirement System is 9.0% of covered payroll for participants whose entry date is prior to August 1, 2014.  Pursuant to Act 160-2013, in the case of new participants whose entry date is on or after August 1, 2014, the statutory employee contribution is (i) 10% from August 1, 2014 to June 30, 2017, (ii) 13.12% from July 1, 2017 to June 30, 2020, and (iii) 14.02% from July 1, 2020 thereafter.

 For the Judiciary Retirement System, the employer contribution is 30.34% of covered payroll and the employee contribution is 8% of covered payroll if hired before July 1, 2014 and 12% if hired on or after July 1, 2014..

Pursuant to the Constitutional and statutory priority norms for the disbursement of public funds that apply during any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, employer contributions by the Commonwealth to the Retirement Systems fall within the third priority category, after payment of the public debt, the fulfillment of contractual obligations, eminent domain payments and certain commitments to protect the credit and good faith of the Commonwealth government. These priority norms do not apply to employer contributions made by public corporations and municipalities, because the funds of public corporations and municipalities are not available resources of the Commonwealth.

**Benefits and Special Benefits**

Each Retirement System provides basic benefits principally consisting of a retirement annuity and death and disability benefits (collectively referred to herein as "Basic System Pension Benefits").  Each Retirement System also administers benefits granted under various special laws that have provided additional benefits for the retirees and beneficiaries (collectively referred to herein as "System Administered Pension Benefits").  The System Administered Pension Benefits include, among others, additional minimum pension, death and disability benefits, ad-hoc cost-of-living adjustments and summer and Christmas bonuses. Act 3-2013 and Act 160-2013 amended the various laws providing some of these System Administered Pension Benefits to reduce some of the amounts payable to existing retirees while eliminating the benefits for all future retirees (those retiring after June 30, 2013 and July 31, 2014 for ERS and TRS

respectively). Act 162-2013 eliminated the System Administered Pension Benefits for all future retirees of the Judicial Retirement System hired on or after December 24, 2013.

The System Administered Pension Benefits are funded on a pay-as-you-go basis by the Commonwealth from the General Fund or by the participating public corporations and municipalities. These benefits are not an obligation of the respective Retirement Systems. Except for the System Administered Pension Benefits corresponding to former employees of municipalities and public corporations, which are obligations of the municipalities and public corporations, most of the funds used to cover these benefits are required to be paid by the Commonwealth through annual appropriations from the General Fund. Historically, however, the Retirement Systems have made current payments of System Administered Pension Benefits to participants but the costs of these pension benefits have not been recovered by the Retirement Systems in full nor on a timely basis from the Commonwealth and the participating public corporations and municipalities.

**Composition and Market Value of Investment Portfolios**

As of June 30, 2014, the market value of the Employees Retirement System's investment portfolio was $3.156 billion, compared to $3.790 billion as of June 30, 2013. As of June 30, 2014 the investment portfolio was comprised of approximately 22% of equity investments, 40% of fixed income securities, 20% of internally managed mortgage and personal loans portfolio, 12% of short-term cash equivalents (excluding receivables), and 6% of other investments. The decrease in value of the investment portfolio since June 30, 2013 principally reflects the continued use of investment portfolio assets and the sale of a portion of the personal loan portfolio to pay current benefits as discussed below. Total assets as of June 30, 2014 and June 30, 2013 were $3.440 billion and $3.996 billion, respectively, and the total net assets for such periods were $127 million and $731 million, respectively.

As of June 30, 2014 the market value of the Teachers Retirement System's investment portfolio was $1.696 billion, compared to $1.877 billion as of June 30, 2013. As of June 30, 2014, the investment portfolio was comprised of approximately 26% of equity investments, 48% of fixed income securities, 25% of internally managed mortgage and personal loans portfolio, and 1% of other investments. The decrease in value of the investment portfolio principally reflects the continued use of investment portfolio assets to pay current benefits as discussed below. Total assets as of June 30, 2014 and June 30, 2013 were $1.754 billion and $1.980 billion, respectively, and total net assets for such periods were $1.704 billion and $1.907 billion, respectively.

As of June 30, 2014, the market value of the Judiciary Retirement System's investment portfolio was $66.1 million, compared to $63.4 million as of June 30, 2013. As of June 30, 2014, the investment portfolio was comprised of approximately 55% of equity investments, 34% of fixed income securities, 1% of internally managed mortgage and personal loans portfolio, and 10% of short-term cash equivalents (excluding receivables). The increase in value of the investment portfolio reflects the increased proportion invested in equity assets, which have had a superior performance in the stated period. Total assets as of June 30, 2014 and June 30, 2013 were $66.7 million and $63.6 million, respectively, and total net assets for such periods were $62.1 million and $59.0 million, respectively.

163

All the figures provided above for fiscal year 2014 are preliminary and unaudited.

**Actuarial Valuations of the Retirement Systems**

Historically, each of the Retirement Systems has conducted an actuarial valuation as of the end of every two fiscal years. However, due to the deterioration of the funding status of the Retirement Systems, as discussed below, each of the Retirement Systems began conducting annual actuarial valuations effective June 30, 2009. The latest actuarial valuations were conducted by Milliman Inc., a firm of independent consulting actuaries, as of June 30, 2014.

The purpose of an actuarial valuation is to calculate the net pension liability of each of the Retirement Systems, which estimates on the basis of demographic and economic assumptions the present value of the benefits that each of the Retirement Systems will pay to its retired members and active members upon retirement. The actuarial valuations are performed in accordance with generally recognized and accepted actuarial principles and practices. The actuarial valuation compares the total pension liability with the fiduciary net position and any excess of that liability over the assets represents the net pension liability of the applicable Retirement System. In the case of the actuarial valuations of the Retirement Systems, the fiduciary net position is equal to the market value of assets (net of liabilities). An actuarial valuation will also express the percentage that a Retirement System is funded through a fiduciary net position as a percentage of total pension liability which represents the quotient obtained by dividing the fiduciary net position of the Retirement System by the total pension liability of the Retirement System. An actuarial valuation will also state the annual required contribution under GASB 25 as defined below (the "GASB 25 Annual Required Contribution") that consists of two components: (1) normal cost, which generally represents the portion of the present value of retirement benefits that are allocable to active members' current year service, and (2) an amortized portion of the UAAL. The amount that the Commonwealth and other participating entities actually contribute to the Retirement Systems is determined by statute. If additional employer contributions were to be made, they would have to be included in the Governor's budget request and approved by the Legislative Assembly.

The June 30, 2013 actuarial valuations for the Retirement Systems calculated accounting results for pension benefits under Governmental Accounting Standards Board No. 25, "Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans" ("GASB 25"). The Retirement System's actuarial valuation as of June 30, 2014 differs from the actuarial valuation as of June 30, 2013, since, among other reasons, it is the first valuations under GASB Statement No. 67, "*Financial Reporting for Pension Plans*" ("GASB 67"), which replaced GASB 25. GASB 67 specifies certain significant changes for financial reporting purposes, including but not limited to (a) calculation of plan liabilities based on the "entry age normal" method (compared to the "projected unit credit" method used in the prior valuation), (b) calculation of a "depletion date" based on a projection as to the length of time assets will cover projected benefit payments under certain assumptions, and (c) for purposes of valuing the plan's liabilities after the depletion date, use of a discount rate tied to a municipal bond index. GASB 67 also introduces certain new terminology, including: (i) Total Pension Liability, which is the actuarial accrued liability calculated in accordance with the new GASB 67 requirements, (ii) Fiduciary Net Position, which is the market value of plan assets, net of

liabilities (in the case of the Employees Retirement System, Fiduciary Net Position is also equivalent to the previously reported actuarial value of assets), and (iii) Net Pension Liability, which is calculated as Total Pension Liability less Fiduciary Net Position, and is equivalent to the unfunded actuarial accrued liability.

To calculate the net pension liability of each of the Retirement Systems, the actuarial valuations use several actuarial assumptions.  Some examples of these assumptions include an expected rate of return of assets, age of retirement of active members, future pay increases for current employees, assumed rates of disability and post-employment life expectancies of retirees and beneficiaries.  If the experience of the Retirement Systems is different from these assumptions, the net pension liability of the Retirement Systems may increase or decrease to the extent of any variances.  As discussed below, as determined pursuant to the then applicable GASB 25 up to fiscal year 2013,  the actual return of assets of each of the Retirement Systems during fiscal years 2009 and 2012 was lower than the assumed investment return utilized to prepare the actuarial accrued liability. The actual return of assets of the Retirement Systems for fiscal years 2010, 2011, 2013 and 2014, however, was higher than the assumed investment return used to prepare the actuarial valuations.

The actual rate of return on assets of the Retirement Systems depends on the performance of their respective investment portfolios, which can vary materially from the expected rates of return assumed in the actuarial valuations.  The investment portfolios of the respective Retirement Systems can be volatile.  The value of the securities in the investment portfolios can dramatically change from one fiscal year to the next, which could, in turn, cause substantial increases or decreases in the net assets of the Retirement Systems, which directly impacts the net pension liability.  The following table shows the historical annual rates of return for each of the Retirement Systems.

### Historical Annual Rates of Return

| Fiscal Year | Employees Retirement System | Teachers Retirement System | Judiciary Retirement System |
|---|---|---|---|
| 2008-2009 | - 9.80% | -15.90% | -18.02% |
| 2009-2010 | 8.58 | 12.50 | 12.65 |
| 2010-2011 | 16.22 | 21.50 | 20.50 |
| 2011-2012 | 5.14 | 2.00 | 2.48 |
| 2012-2013 | 7.79 | 7.80 | 10.95 |
| 2013-2014 | 11.20 | 10.80 | 16.40 |

The June 30, 2014 actuarial valuation of the Employees Retirement System was completed in accordance with the "entry age normal" method (level percentage of payroll).  The System's fiduciary net position is not expected to be available to make all projected future benefit payments for current active and inactive members.  System's assets were exhausted during fiscal year 2014-2015.  Therefore, the net pension liability as of June 30, 2014 was determined using a discount rate equal to the tax-free municipal bond index (Bond Buyer

165

General Obligation 20-Bond) as of June 30, 2014 of 4.29%, as required by GASB 67.  Salaries were assumed to remain level through June 30, 2017 due to Act 66-2014 and current economic conditions and then to increase 3.0% per year thereafter.  As of June 30, 2014, the assumed investment return on assets was 6.75%.  The actuarial valuation of the Employees Retirement System as of June 30, 2013 had assumed investment returns of 6.40% per year and yearly salary increases of 3.0% and reflected the "projected unit credit" cost method.  Under the "entry age normal" method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases.  The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits. The plan's accrued liability is the sum of (a) the accumulation of each active participant's normal costs attributable to all prior years of service plus (b) the present value of each inactive participant's future benefits.

The June 30, 2014 actuarial valuation of the Judiciary Retirement System was completed in accordance with the "entry age normal" method (level percentage of payroll).  The System's fiduciary net position is not expected to be available to make all projected future benefit payments for current active and inactive members.  System's assets are expected to be exhausted during fiscal year 2017-2018 under the GASB 67 projection basis.  This projection assumes that any illiquid assets will be converted to cash when needed.  Therefore, a single equivalent interest rate that yields the same present value of all future benefits using the expected investment return on plan assets until the 2016-2017 fiscal year and the tax-free municipal bond index (Bond Buyer General Obligation 20-Bond) beginning with the 2017-2018 fiscal year for the discount rate was calculated.  Accordingly, based on the projected 2017-2018 year of depletion, the investment return of 5.35% per year as of June 30, 2014, and the municipal bond index of 4.29% as of June 30, 2014, the single equivalent interest rate as of June 30, 2014 was determined to be 4.30%.  Salaries were assumed to remain level through June 30, 2017 due to Act 66-2014 and then to increase 3.0% per year thereafter.   The actuarial valuation of the Judiciary Retirement System as of June 30, 2013 had assumed investment returns of 6.30% per year and yearly salary increases of 3.0% and reflected the "projected unit credit" cost method.  Under the "entry age normal" method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases.  The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits. The plan's accrued liability is the sum of (a) the accumulation of each active participant's normal costs attributable to all prior years of service plus (b) the present value of each inactive participant's future benefits.

The June 30, 2014 actuarial valuation of the Teachers Retirement System was completed in accordance with the "entry age normal" method (level percentage of payroll).  The System's fiduciary net position is not expected to be available to make all projected future benefit payments for current active and inactive members.  System's assets are expected to be exhausted during fiscal year 2019 under the GASB 67 projection basis.  This projection assumes that

certain illiquid assets (consisting primarily of loans to members), amounting to approximately $450 million as of June 30, 2014, will be converted to cash when needed.  Therefore, a single equivalent interest rate that yields the same present value of all future benefits using the expected return on plan assets until the 2017-2018 fiscal year and the tax-free municipal bond index (Bond Buyer General Obligation 20-Bond) beginning with the fiscal year 2019 for the discount rate was calculated. Accordingly, based on the projected 2019 year of depletion, the investment return of 6.65% per year as of June 30, 2014, and the municipal bond index of 4.29% as of June 30, 2014, the single equivalent interest rate as of June 30, 2014 was determined to be 4.33%.  Salaries for future new entrants were assumed to remain level through June 30, 2017 due to Act 66-2014 and then to increase 2.5% per year thereafter.   The actuarial valuation of the Teachers Retirement System as of June 30, 2013 had assumed investment returns of 6.25% per year and yearly salary increases of 3.5%.  Under the "entry age normal" method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases.  The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits. The plan's accrued liability is the sum of (a) the accumulation of each active participant's normal costs attributable to all prior years of service plus (b) the present value of each inactive participant's future benefits.

Any amounts receivable from the Commonwealth with respect to benefits under System Administered Pension Benefits laws (discussed above) are considered in the actuarial valuation process to determine the unfunded pension benefit obligation of the Retirement Systems to the extent receivables are recognized as such by the Retirement Systems.

The tables in this section set forth, according to the actuarial valuations of the Retirement Systems, the fiduciary net position, total pension liability, net pension liability, fiduciary net position as a percentage of total pension liability, covered payroll and net pension liability as a percentage of covered payroll.  The ratio of the net pension liability to covered payroll is a measure of the significance of the net pension liability relative to the capacity to pay it.  The trend in the ratio provides information as to whether the financial strength of a pension plan is improving or deteriorating over time.  As shown in the "Historical Funding Status" table, the steady increase in the net pension liability to covered payroll for each of the Retirement Systems shows a significant deterioration in their financial strength.

The actuarial cost method used for the special bonus benefits administered by the Teachers Retirement System and paid by the General Fund was revised from the level dollar variation of the entry age normal method in 2013 to the level percentage of payroll variation of the entry age normal method in 2014 to comply with the requirements of GASB 67.  The actuarial cost method for the medical insurance plan contribution (GASB 45) was also changed from the level dollar variation of the entry age normal method in 2013 to the level percentage of payroll variation of the entry age normal method.  Effective with the June 30, 2014 valuation, due to the change in the census collection date to the beginning of the fiscal year, rather than the end of the fiscal year, the year-end liabilities are now determined using roll-forward methods, assuming no liability gains or losses.

The following table summarizes the results of the actuarial valuations, other than with respect to non-pension post-employment benefits (which are discussed below).

### Funding Status
### Actuarial Valuations as of June 30, 2014
### ($ in millions)

| | Fiduciary Net Position (1) | Total Pension Liability[2] | Net Pension Liability[3] | Fiduciary Net Position as a Percentage of Total Pension Liability (4) | Covered Payroll[5] | Net Pension Liability as a Percentage of Covered Payroll[6] |
|---|---|---|---|---|---|---|
| Employees Retirement System............... | $  127 | $30,219 | $30,092 | 0.42% | $3,489 | 862.46% |
| Teachers Retirement System ................. | 1,704 | 14,808 | 13,104 | 11.51 | 1,171 | 1118.89 |
| Judiciary Retirement System  ................ | 62 | 504 | 442 | 12.31 | 32 | 1,394.97 |
| Total .................................................... | $1,893 | $45,531 | $43,638 | 4.16% | $4,692 | 930.05% |

(1)   The fiduciary net position of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is equal to the full market value of the assets held by the Retirement Systems, including expected receivable contributions from the Commonwealth, municipalities and participating public corporations, less bonds payable and other liabilities.

(2)   The total pension liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is an estimate based on demographic and economic assumptions of the present value of benefits that the Retirement System will pay during the assumed life expectancies of the applicable retired members and active members after they retire.

(3)   The net pension liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and reflects the amount of the excess of the total pension liability of a Retirement System over its fiduciary net position. The indicated amounts reflect the net pension liability as calculated pursuant to the requirements of the Government Accounting Standards Board ("GASB") for purposes of presentation in the CAFR.

(4)   The Fiduciary Net Position as a Percentage of Total Pension Liability of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing Fiduciary Net Position of the Retirement System by the total pension liability of the Retirement System. The indicated percentages reflect the Fiduciary Net Position as a Percentage of Total Pension as calculated pursuant to the requirements of GASB for purposes of presentation in the CAFR.

(5)   The covered payroll of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and is equal to the annual salaries paid to active employees on which contributions to the Retirement System are made. Please note that covered payroll is as of July 1, 2013.

(6)   The Net Pension Liability as a percentage of covered payroll is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the Net Pension Liability of the Retirement System by the covered payroll of the Retirement System. Totals may not add due to rounding.

Source: Actuarial valuation reports as of June 30, 2014 for each of the Retirement Systems.

In performing the actuarial valuations, the actuaries rely on data provided by the Retirement Systems.  Although the actuaries review the data for reasonableness and consistency, they do not audit or verify the data.  If the data were inaccurate or incomplete, the results of the actuarial valuations may also be inaccurate or incomplete, and such defects may be material.

***Employees Retirement System.***  The actuarial valuation of the Basic System Benefits and System Administered Benefits as of June 30, 2014 reflects a total pension liability  of $30.2 billion, compared to $28.9 billion as of June 30, 2013. The fiduciary net position  as of June 30, 2014 decreased to .42%, from 2.42% as of June 30, 2013, as a result of a decrease in the plan fiduciary net position. The decrease in the actuarial value of assets reflects a system that is being defunded as a result of the continued net funding and cash flow shortfall that is exhausting plan assets.

For fiscal year 2014, Act 3-2013 provided an annual required contribution of  $1.8 billion, while actual employer contributions to the Employees Retirement System were $742.9 million, or 40.76% of the annual required contribution under Act 3-2013. The actuarial valuation as of June 30, 2014 for Basic System Benefits and System Administered Benefits also reflects an

interest rate assumption of 6.75% per year, compared to 6.40% per year for the June 30, 2013 actuarial valuation.

Act 3-2013, together with Act 32-2013 ("Act 32"), is a dynamic 50-year plan designed to provide enough cash to the Employees Retirement System to be able to make full payment of Basic System Benefits and System Administered Benefits as they come due, as well as to pay debt service on the Employees Retirement System's debt. Hence, Act 3-2013 is not designed to improve the funding ratio in the near term, but rather to ensure that the System remains solvent. Because of the long-term nature of the Act 3-2013 reform, constant monitoring and future adjustments will be needed as a result of actual experience to make sure that the System remains solvent.

The latest actuarial valuation assumed for fiscal year 2014 an additional contribution of $120 million (of which approximately $78.9 million corresponded to the Commonwealth central government and $41.1 million corresponded to the public corporations and municipalities) as provided under Act 32. The actual amount of the additional contribution received by the Employees Retirement System to date for fiscal year 2014, however, is $21.3 million, or $98.6 million less than the required amount and the Employees Retirement System took a reserve against the $83 million balance. As a result of the General Fund revenue shortfall, compared to budget, the Commonwealth made certain adjustments to the fiscal year 2014 budgetary appropriations following the "priority norms" for the disbursement of public funds that apply during any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year. These adjustments included the reduction in full of the portion of the Act 32 additional contribution corresponding to the Commonwealth central government ($78.9 million), as well as the reduction of $5.4 million that had been included in the General Fund budget to assist public corporations that did not have the financial capacity to make their corresponding portion of the additional contribution. For fiscal year 2015, the approved budget included a reduced appropriation of $27.2 million for the Act 32 additional contribution, of which approximately $22.7 million corresponds to the Commonwealth central government (from an estimated contribution of $70.4 million) and $4.5 million is included to assist public corporations and municipalities.

Timely payment of the Additional Uniform Contribution is a critical component of the reform in order for the System to be able to make payments as they come due without depleting all of its assets first. However, as a result of continued budget deficits in fiscal years 2014 and 2015, the Commonwealth and other participating employers have been unable to make the Additional Uniform Contribution required for these fiscal years (other than $33 million and $5.8 million paid for fiscal years 2014 and 2015, respectively, by public corporations and municipalities). In February 2015, the System's actuaries recalculated the Additional Uniform Contribution for fiscal year 2016 and subsequent years. Based on certain assumptions (which do not account for any fiscal adjustment that the Commonwealth may undertake to address its fiscal challenges), the projected Additional Uniform Contribution for fiscal year 2016 and subsequent years has increased to approximately $352 million (of which approximately $216 million corresponds to the Commonwealth's central government, to be funded from the General Fund, and the remaining portion corresponds to the participating public corporations and municipalities). The increase in the Additional Uniform Contribution from the initially projected levels is the result of multiple factors, but the most important ones are the decline in the number

169

of active members and the associated payroll since June 30, 2012, and the three-year salary freeze implemented through Act 66-2014.  While these factors result in payroll and related cost savings for the Commonwealth and other participating employers, from the perspective of the System, its projected long-term funding decreases since statutory contributions are based on a percentage of payroll and, thus, a lower level of payroll generates fewer contributions, causing the Additional Uniform Contribution to increase to compensate for the reduction.

The actuarial valuation as of June 30, 2014, again emphasizes that if the Additional Uniform Contribution and the other statutorily prescribed employer contributions are not paid in full on an annual basis, the Employees Retirement System will continue to rapidly exhaust its gross assets. The actuarial valuation as of June 30, 2014 shows that the Employees Retirement System is being rapidly defunded and projects that its gross assets will be exhausted by fiscal year 2021 if only partial Additional Uniform Contributions are received.  These funding requirements result in additional fiscal challenges for the Commonwealth.

***Teachers Retirement System***.  The actuarial valuation of the Basic System Benefits and System Administered Benefits of the Teachers Retirement System as of June 30, 2014 as per GASB 67 reflects a total pension  liability of $14.8 billion, compared to an actuarial accrued liability of $12.3 billion as of June 30, 2013 (as determined under GASB 25), and a fiduciary net position as a percentage of total pension liability  of 11.5% as of June 30, 2014 (as determined under GASB 67), compared to a funded ratio of 15.6% as of June 30, 2013 (as determined under GASB 25).  The decrease in this  ratio is the result of a decrease in the actuarial value of assets from $1.9 billion to $1.7 billion, due to the continued net funding and cash flow shortfall that is exhausting plan assets and that the discount rate used to measure the liability decreased from 6.25% to 4.33% primarily due to the new GASB 67 requirements, which increases the System's liabilities, among other factors.  Based on the Teachers Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2014 shows that the Teachers Retirement System is being gradually defunded and projects that its fiduciary net position is expected to be exhausted during fiscal year 2019.  This projection assumes that certain illiquid assets (consisting primarily of loans to members), amounting to approximately $450 million as of June 30, 2014, will be converted to cash when needed.

For fiscal year 2014, the GASB 25 Annual Required Contribution was $748.6 million, while actual employer contributions to the Teachers Retirement System were $189.4 million, or 25.3% of the GASB 25 Annual Required Contribution.

The discount rate used in the actuarial valuation as of June 30, 2014 for Basic System Benefits and System Administered Benefits, was determined to be 4.33% based on the projected 2018-2019 year of depletion, the investment return of 6.65% per year as of June 30, 2014, and the municipal bond index of 4.29% as of June 30, 2014.  An interest rate assumption of 6.25% per year was utilized in the June 30, 2013 actuarial valuation.  The June 30, 2014, actuarial valuation reflects increases in the total pension liability as follows: approximately $83.6 million loss as a result of the changes  in assumptions including the change in the discount rate as required by GASB 67 and of $170 million loss as a result of the update of the census data to reflect outsized retirement activity during the fiscal year 2014, plus the difference between actual

and expected benefit payments, which arise from the differences in retirement activity and also actual mortality versus expectations.

*Judiciary Retirement System* The actuarial valuation of the Basic System Benefits and System Administered Benefits of the Judiciary Retirement System as of June 30, 2014 as per GASB 67 reflects a total pension  liability of $504 million, compared to an actuarial accrued liability of $417 million as of June 30, 2013 (as determined under GASB 25), and a fiduciary net position as a percentage of total pension liability of 12.3% as of June 30, 2014 (as determined under GASB 67), compared to a funded ratio of 14.2% as of June 30, 2013 (as determined under GASB 25).  The decrease in this ratio is the result of the decrease in the discount rate used to measure the System's liability from 6.30% as of June 30, 2013 to 4.30% as of June 30, 2014 due to the new GASB 67 requirements, along with the continued net funding and cash flow shortfall that is exhausting plan assets and other factors.  Based on the Judiciary Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2014 shows that the Judiciary Retirement System is being gradually defunded and projects that its fiduciary net position is expected to be exhausted during  fiscal year 2018. The actuarial valuation reflected the parts of Act 162 that were upheld  by the Puerto Rico Supreme Court. Essentially, the reforms instituted by Act 162 will only be applicable to judges appointed on or after December 24, 2013 (the date Act 162 was enacted).

For fiscal year 2014, the GASB 25 Annual Required Contribution was $40.8 million, while actual employer contributions to the Judiciary Retirement System were $12.0 million, or 29.4% of the GASB 25 Annual Required Contribution.

The discount rate used in the actuarial valuation as of June 30, 2014 for Basic System Benefits and System Administered Benefits was determined to be 4.30%, based on the projected 2017-2018 year of depletion, the investment return of 5.35% per year as of June 30, 2014, and the municipal bond index of 4.29% as of June 30, 2014.  An interest rate assumption of 6.30% per year was utilized in the June 30, 2013 actuarial valuation.  The June 30, 2014, actuarial valuation reflects increases in the total pension liability as follows: approximately $8.2 million loss as a result of the changes in assumptions including the change in the discount rate as required by GASB 67 and $3 million loss as a result of the difference between actual and expected benefit payments, which arise from the differences in retirement activity and also actual mortality versus expectations.  .

The table below provides a historical funding status for each of the Retirement Systems. The information for fiscal year 2014 is presented separately to reflect that the valuation was performed using GASB 67 methodology. The information for the prior fiscal years reflect valuations performed under GASB 25/27 therefore the nomenclature and methodology are different than that used for fiscal year 2014.

171

## Historical Funding Status[1]
## Actuarial Valuations as of the Indicated Fiscal Years
### (in millions)

| Fiscal Year Ending June 30, | Fiduciary Net Position | Total Pension Liability | Net Pension Liability | Fiduciary Net Position as a Percentage of Total Pension Liability | Covered Payroll | Net Pension Liability as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2014 | $127 | $30,219 | $30,092 | 0.42% | $3,489 | 862.46% |
| **Teachers Retirement System** | | | | | | |
| 2014 | 1,704 | 14,808 | 13,104 | 11.51 | 1,171 | 1118.89 |
| **Judiciary Retirement System** | | | | | | |
| 2014 | 62 | 504 | 442 | 12.31 | 32 | 1381.25 |
| Total | $1,893 | $45,531 | $43,555 | 4.16% | $4,692 | 930.05% |

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2007 | $2,892 | $16,770 | $13,878 | 17.2% | $4,246 | 326.8% |
| 2009 | 1,851 | 18,944 | 17,092 | 9.8 | 4,293 | 398.2 |
| 2010 | 1,667 | 21,370 | 19,703 | 7.8 | 3,818 | 516.1 |
| 2011 | 1,724 | 25,457 | 23,734 | 6.8 | 3,666 | 647.3 |
| 2012 | 1,237 | 27,646 | 26,409 | 4.5 | 3,570 | 739.7 |
| 2013 | 731 | 23,712 | 22,981 | 3.1 | 3,489 | 658.6 |
| **Teachers Retirement System** | | | | | | |
| 2007 | $3,163 | $7,756 | $4,593 | 40.8% | $1,370 | 335.3% |
| 2009 | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.8 |
| 2010 | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| 2011 | 2,386 | 11,449 | 9,063 | 20.8 | 1,320 | 686.4 |
| 2012 | 2,100 | 12,351 | 10,251 | 17.0 | 1,293 | 792.8 |
| 2013 | 1,907 | 12,252 | 10,345 | 15.6 | 1,249 | 828.5 |
| **Judiciary Retirement System** | | | | | | |
| 2007 | $81 | $259 | $177 | 31.5% | $31 | 566.6% |
| 2009 | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| 2010 | 55 | 338 | 283 | 16.4 | 32 | 882.0 |
| 2011 | 64 | 383 | 319 | 16.7 | 32 | 1002.2 |
| 2012 | 59 | 416 | 358 | 14.1 | 33 | 1081.9 |
| 2013 | 59 | 417 | 358 | 14.2 | 32 | 1113.1 |

---

[1]   Please refer to the footnotes of the immediately preceding table for an explanation of the categories set forth in the columns of this table for fiscal year 2014 due to the use GASB 67 methodology. Prior fiscal years reflect valuations performed under GASB 25/27 methodology.
Source: Actuarial valuation reports as of June 30 of the fiscal years indicated above for each of the Retirement Systems.

The following table shows the GASB 25 Annual Required Contribution, actual employer contributions and resulting amount unfunded and percent contributed for each of the Retirement Systems' last four fiscal years.

### Schedule of Employer Contributions
### to Retirement Systems
### (in millions)

| Fiscal Year Ending June 30, | Annual Required Contributions | Actual Employer Contributions | Amount Unfunded[1] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2010 | $1,460 | $531 | $929 | 36.4% |
| 2011 | 1,735 | 701 | 1,033 | 40.5 |
| 2012 | 2,019 | 590 | 1,429 | 29.2 |
| 2013 | 2,193 | 638 | 1,555 | 29.2 |
| 2014 | 1,823 | 660 | 1,163 | 32.9 |
| **Teachers Retirement System** | | | | |
| 2010 | 477 | 165 | 312 | 34.5 |
| 2011 | 528 | 160 | 368 | 30.3 |
| 2012 | 659 | 177 | 482 | 26.9 |
| 2013 | 737 | 187 | 550 | 25.8 |
| 2014 | 749 | 189 | 560 | 25.3 |
| **Judiciary Retirement System** | | | | |
| 2010 | 28 | 11 | 17 | 39.1 |
| 2011 | 30 | 11 | 19 | 36.9 |
| 2012 | 34 | 11 | 23 | 34.1 |
| 2013 | 39 | 11 | 28 | 29.5 |
| 2014 | 41 | 11 | 30 | 27.2 |
| **Total** | | | | |
| 2010 | 1,965 | 707 | 1,258 | 36.0 |
| 2011 | 2,293 | 874 | 1,419 | 38.1 |
| 2012 | 2,712 | 776 | 1,936 | 28.6 |
| 2013 | 2,969 | 838 | 2,131 | 28.2 |
| 2014 | 2,613 | 943 | 1,670 | 30.1 |

[1]Represents the difference between the Annual Required Contributions and the Actual Employer Contributions from the participating employers.

Source: Information regarding the GASB 25 Annual Required Contribution was derived from the June 30, 2014 actuarial valuation reports for the Retirement Systems. Information regarding the actual contributions for the Retirement Systems was provided by the Retirement Systems.

The Commonwealth recognized that, based on the then current funding requirements of the Retirement Systems, the unfunded liability of the Retirement Systems was expected to continue to increase indefinitely into the future instead of being amortized, and that future scheduled contributions at the then current funding rates would not be sufficient to make future benefit payments when due. It recognized that additional funding from the Commonwealth would ultimately be necessary to cover such unfunded obligation. It was estimated that the Commonwealth would be responsible for approximately 62% of any such funding deficiency of the Employees Retirement System and approximately 74% of the combined funding deficiency of the three Retirement Systems, with the balance being the responsibility of the municipalities and participating public corporations.

**Funding Shortfalls and Issuance of Pension Obligation Bonds**

For several fiscal years, actual employer and employee contributions to each of the Retirement Systems have been lower than annual Basic System Pension Benefits payments and administrative expenses.  These shortfalls in contributions over the amounts required to pay Basic System Pension Benefits and expenses are referred to herein as "funding shortfalls."  The funding shortfalls, however, do not reflect the actual cash flow position of the Retirement Systems, which is affected, among other things, by their investment and financing activities. One type of investment that has particularly contributed to the deterioration of the Retirement Systems' actual cash position has been the increase in personal loans to their members, as discussed below under "*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System*."

The Retirement Systems have been forced to cover the funding shortfalls with investment income, loans from financial institutions and various non-recurring sources of funds.  In some fiscal years, the funding shortfall has also exceeded the investment income of the Retirement Systems, causing the Systems' assets to decline and adversely affecting the funded status.

Besides using investment income to cover benefit payments, the Employees Retirement System has covered some of its historical funding shortfalls with the sale of investment portfolio assets and proceeds of loans from the Treasury Department or other financial institutions, some of which have been collateralized with the Retirement System's assets.

During 2008, the Employees Retirement System issued approximately $2.9 billion of Senior Pension Funding Bonds (the "Pension Bonds"), with interest rates ranging from 5.85% to 6.55%, for which repayment the Employees Retirement System pledged all employer contributions made after the issuance of the bonds.  The Pension Bonds are limited, non-recourse obligations of the Employees Retirement System payable solely from, and secured solely by, the employer contributions.  The maturity of the Pension Bonds is not subject to acceleration for any reason including non-payment of debt service on the bonds.  As of June 30, 2013, approximately $2.9 billion of the Pension Bonds remain outstanding. The purpose of this offering was to increase the assets of the System available to invest and pay benefits.

The table below shows the funding shortfalls for each of the last four fiscal years and the projected funding shortfall for the following five fiscal years for each of the Retirement Systems. The funding shortfalls for fiscal years 2010 through 2013 are based on the audited financial statements for the Retirement Systems for those years and the funding shortfalls for fiscal years 2014 through 2018 are based on the actuarial valuation report as of June 30, 2014. The projected funding shortfalls for the Employees Retirement System for fiscal year 2014 thru 2018 reflect the impact of the amendments made by Act 3-2013.

174

## Funding Shortfalls
## (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions[1] | Basic System Benefit Payments and Administrative Expenses[3] | Net Funding Shortfall[5] |
|---|---|---|---|
| **Employees Retirement System** | | | |
| 2010 | $727 | $(1,102) | $(375) |
| 2011 | 671[2] | (1,183) | (512) |
| 2012 | 689 | (1,528) | (839) |
| 2013 | 747 | (1,522) | (775) |
| 2014 | 1,027[4] | (1,644) | (617) |
| 2015 | 925[4] | (1,655) | (730) |
| 2016 | 957[4] | (1,663) | (698) |
| 2017 | 999[4] | (1,668) | (669) |
| 2018 | 1,064[4] | (1,673) | (609) |
| **Teachers Retirement System** | | | |
| 2010 | 248 | (498) | (250) |
| 2011 | 245 | (593) | (348) |
| 2012 | 247 | (593) | (346) |
| 2013 | 253 | (603) | (350) |
| 2014 | 256 | (630) | (374) |
| 2015 | 265[6] | (672) | (407 |
| 2016 | 269[6] | (681) | (412) |
| 2017 | 280[6] | (694) | (414) |
| 2018 | 300[6] | (711) | (411) |
| **Judiciary Retirement System** | | | |
| 2010 | 13 | (19) | (6) |
| 2011 | 13 | (19) | (6) |
| 2012 | 12 | (21) | (9) |
| 2013 | 13 | (19) | (6) |
| 2014 | 13 | (24) | (12) |
| 2015 | 13 | (25) | (12) |
| 2016 | 13 | (26) | (13) |
| 2017 | 14 | (27) | (13) |
| 2018 | 14 | (28) | (14) |

[1]  Represents the statutory employer and member contributions and does not include amounts received from employers on account of System Administered Pension Benefits, except as described under footnote 4 below. Act 66 provides a salary freeze for fiscal years 2015 through 2017. Projection assumes salary increases of 3% and employer contributions include the rate increases provided for by Act 114 and Act 116.

[2]  Excludes $162.5 million contributed to the Employees Retirement System on June 23, 2011 and invested in COFINA bonds pursuant to Act 96.

[3]  Includes, in the case of the Employees Retirement System, principal and interest paid on the Pension Bonds for fiscal years 2012 and 2013 in the amounts of $191 million and $192 million, respectively, and for fiscal years 2015 through 2019, debt service of $167 million per year.

[4]  Does not include (i) the statutory additional annual contribution except for fiscal year 2014 that reflects $120 million of which only $33.7 million were received, and (ii) savings generated by the System for the difference between receiving the $2,000 per retiree contribution as required under Act 3-2013 and paying $1,500 per retirees to cover certain System Administered Pension Benefits.

[5]  Does not include interest income from asset investment. Totals may not add due to rounding.

[6]  Employer Contributions include the estimated amount of the Employer Supplemental Contribution that remains with the System after the special law benefits are paid to members. Fiscal years 2017 and 2018 do not include the Teachers Justice Uniform Contribution of $30 million.

Source: Information obtained from each of the Retirement Systems, Employees Retirement System projections made by Milliman, and the June 30, 2014 actuarial valuation reports.

The Employees Retirement System anticipates that its future cash flow needs for disbursement of benefits to participants, administrative expenses and debt service are likely to continue to exceed the sum of the employer and employee contributions received and its investment and other recurring income for a period of time, even after taking into account the increases in employer contributions provided for by Act 116, as described below and the amendments made by Act 3-2013.   After the enactment of Act 3-2013, the Employees Retirement System expects to have a decreasing annual funding shortfall (after payment of debt service on the Pension Bonds) and this positive trend is expected to continue, as shown in the table above.   Based on the Employees Retirement System's funding and disbursement projections made prior to the enactment of Act 3-2013 (which reflected continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2012 stated that the Employees Retirement System was being rapidly defunded and projected that its net assets (total assets minus the Pension Bonds and other liabilities) would be depleted by fiscal year 2014 and its gross assets would be depleted by fiscal year 2019.   This meant that during the period from fiscal year 2014 through fiscal year 2019, benefits were expected to be paid from the proceeds of the Pension Bonds, and that after depletion of the gross assets, there would be no funds remaining to pay pension benefits or debt service on the pension obligation bonds. With the enactment of Act 3-2013 and the incremental annual contributions from the General Fund required by Act 32 beginning in fiscal year 2014 and up to fiscal year 2033, it is projected that the gross assets will no longer be depleted. This incremental contribution will be determined on an annual basis based on actuarial studies to be performed by the System's actuaries.

The Teachers Retirement System has also covered funding shortfalls during the last decade through the sale of investment portfolio assets.   For fiscal year 2016, the Teachers Retirement System expects to have a funding shortfall of approximately $412 million, even after taking into account the increases in employer contributions provided for by Act 114, as described below.   Based on the Teachers Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2014 states that the Teachers Retirement System is being gradually defunded and projects that its net and gross assets will be depleted by fiscal year 2019.

The Judiciary Retirement System has also experienced funding shortfalls during the last five fiscal years and has used investment income to cover some of these shortfalls.   For fiscal year 2014, the Judiciary Retirement System expects to have a funding shortfall of approximately $12 million.   Based on the Judiciary Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2014 states that the Judiciary Retirement System is being defunded and projects that its net and gross assets will be depleted by fiscal year 2019.   The actuarial valuation as of June 30, 2014 reflects those changes enacted by Act 162-2013 that were upheld by the Supreme Court.

In the case of the Teachers Retirement Systems and the Judiciary Retirement Systems, if the level of contributions to those systems and the level of benefits were to remain unchanged, the funding deficiencies are expected to continue to be covered with the investment income from, and the sale of, assets of such systems, thus continuing to deplete such assets.  Based on a

cash flow projection prepared by the System's Actuary, for the period from fiscal year 2015 to fiscal year 2018, the average annual funding deficiency is projected to be approximately $411 million for the Teachers Retirement System and approximately $12 million for the Judiciary Retirement System. Once the assets of those systems are depleted, the funding deficiency would have to be covered by the employers. As indicated above, it is estimated that the Commonwealth would have to cover substantially all of the funding deficiency of the Teachers Retirement System and the Judiciary Retirement System.

The estimated years for depletion of the assets stated above could vary depending on how actual results differ from the assumptions used in the actuarial valuations (including the assumed investment rate of return), as well as based on any future changes to the contribution and benefits structures of the Retirement Systems.

The consulting actuaries have recommended that the funding requirements of the Retirement Systems be significantly increased in light of (i) the expected negative net cash flows and exhaustion of plan assets, (ii) the forecasted decrease in funded status, and (iii) the GASB 25 Annual Required Contributions which significantly exceed actual employer contributions. Act 3-2013 was enacted in response to these recommendations with respect to the Employees Retirement System.

**Factors That Contributed to Deterioration in Financial Solvency of the Employees Retirement System**.

Among the factors that have contributed most significantly to the deterioration of the Employees Retirement System are the following: (i) the inadequacy of the historical funding levels for the Retirement Systems; (ii) the enactment of special laws increasing pension benefits without providing the required funding source; (iii) the adoption of early retirement programs that were not adequately funded and that reduced the amount of contributions to the Retirement Systems; (iv) the increase in life expectancy in Puerto Rico; (v) the increase in the maximum amount of permitted personal loans to members; and (vi) the issuances of Pension Obligation Bonds by the Employee Retirement System.

Since their inception, the Retirement Systems have been inadequately funded by the government and the participating employees. On several occasions during the past decades, the Government has increased benefits without raising employer and employee contributions and failing to provide alternate methods to fund these increased benefits.

The Government has also approved several "Special Laws" granting additional benefits on top of those provided under Act 447 and Act 1. These benefits include: (i) a summer bonus; (ii) a medication bonus; (iii) a Christmas bonus; (iv) contributions to medical plans; (v) merit pensions; and (vi) cost of living adjustments (COLAs), among others. Although most of the benefits granted under the Special Laws are supposed to be funded by the General Fund or the other participating government employers, in fact these benefits are often not adequately funded.

The Government has also adopted various early retirement programs since 1994 to reduce the Government workforce. Although these measures reduced payroll expenses, which are a substantial portion of General Fund expenses, early retirement programs also reduced the

177

Retirement Systems' revenues because they caused a decrease in employer and employee contributions. These programs were generally not accompanied by up-front funding of the associated retirement costs and had a negative cash flow impact on the Employees Retirement System as the same funded early retirement benefits without timely reimbursement from the Commonwealth or sponsoring public corporation or municipality.

Another factor that contributed to the deterioration of the Retirement Systems was the increase in the average life expectancy in Puerto Rico and the United States from 59.5 years for men and 62.4 years for women in 1950 to 78 in 2008. This has caused retired employees to receive benefits for more years than originally expected.

Another cause for the current situation of the Employees Retirement Systems is its personal loan program. The Employees Retirement System offers and manages a program that offers personal loans, mortgage loans and loans for cultural travels for retirement plan participants. Participants may obtain up to $5,000 in personal loans for any use. In 2007, the System increased this amount to $15,000, which reduced the cash in the System by approximately $600 million between 2007 and 2010. This deficit has been covered by funds from the System itself and has required the liquidation of assets that would have otherwise been available to make pension payments.  Due to the amount of personal loans originated during recent years, the System's loan portfolio now has a significant amount of illiquid assets. In an effort to improve the situation, in 2011, the Board of Trustees of the Employees Retirement System lowered the maximum loan amount back to $5,000 and, in 2012, it approved the sale of approximately $315 million in loans.  With a balance of $539 million as of June 30, 2013, personal loans are equivalent to approximately 76% of the Employees Retirement System's net assets.

Finally, in 2008, the Employees Retirement System issued $2.9 billion in pension obligation bonds ("POBs"). The purpose of this offering was to increase the assets of the System available to invest and pay benefits. Unlike some other U.S. jurisdictions that have used this strategy, POBs are obligations of the Employees Retirement System itself and government employer contributions constitute the repayment source for the bonds.

**Impact of Funding Shortfall on the Commonwealth**.

The Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the Retirement Systems.  The depletion of the assets available to cover retirement benefits would require the Commonwealth and other participating employers to cover such funding deficiency.  Due to its multi-year fiscal imbalances previously mentioned, however, the Commonwealth has been unable to make the GASB 25 Annual Required Contributions to the Retirement Systems.   If the measures taken or expected to be taken by the current Commonwealth administration fail to address the Retirement Systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the Retirement Systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the Retirement Systems' assets and a significant increase in the net pension liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth could have difficulty funding the annual required

contributions if the measures taken or expected to be taken to reform the retirement systems do not have the expected effect. There may also be limitations on the Commonwealth's ability to change certain pension rights afforded to participants in the Retirement Systems.

**Efforts to Address Cash Flow Shortfall and Improve Funding Ratio**.

In recent years the Retirement Systems have been evaluating measures to improve their financial solvency.  In order to maintain their long-term fiscal integrity and their ability to pay required benefits to their members, the Retirement Systems recognized that a combination of some or all of the following were necessary: (i) a substantial increase in contributions by the Commonwealth and the participating employers, and (ii) actions resulting in changes to liabilities of the Retirement Systems.  Because of the multi-year fiscal imbalances mentioned above, the Commonwealth was unable to make the GASB 25 Annual Required Contributions to the Retirement Systems.

As a result of the work of various commissions and task forces established by the Commonwealth, in recent years several bills were submitted to, and evaluated by, the Legislative Assembly to address in part the Retirement Systems' financial condition.  One of such bills was enacted as Act 96-2011.  On June 23, 2011, in accordance with Act 96-2011, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Development Fund were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%.  The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

Additionally,  on June 9, 2015, the Board of Trustees of the Teachers Retirement System, in an effort to improve the cash flow situation, lowered the maximum loan amount to $5,000 from $20,000 for personal loans and $125,000 for mortgage loans for both individuals and tenants in common from $160,000 and $190,000 respectively.  As of June 30, 2014 the Teachers Retirement System loan portfolio amounted to $420.5 million.

The Commonwealth also enacted Act 114 and Act 116 of 2011.  These Acts provide an increase in employer contributions to the Employees Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years.  As a result of these increases, the Employees Retirement System and the Teachers Retirement System would receive approximately $143 million and $45 million, respectively, in additional employer contributions during fiscal year 2015, and per the Actuary's assumption, the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $189 million per fiscal year) to approximately $467 million and $126 million, respectively, by fiscal year 2021.  The additional employer contributions for fiscal year 2014 were included in the approved budget for such fiscal year.  With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provided that the increases for fiscal years 2012, 2013 and 2014 would be paid for by the Commonwealth from the General Fund budget, representing approximately $20.3 million, $45 million and $72.5 million in fiscal years 2012, 2013 and 2014, respectively.

The tables below show the projected additional contributions to the Employees Retirement System and the Teachers Retirement System as a result of Act 114 and Act 116, based on the expected payroll assumptions used in the actuarial reports as of June 30, 2014.

### Projected Additional Employer Contributions
### Employees Retirement System
### ($ in millions)

| Fiscal Year | Original Employer Contribution Rate | Additional Employer Contribution Rate | Total Employer Contribution Rate | Expected Payroll | Original Employer Contribution | Additional Employer Contribution | Total Employer Contribution |
|---|---|---|---|---|---|---|---|
| 2015 | 9.275% | 4.000% | 13.275% | 3,386 | 314 | 135 | 450 |
| 2016 | 9.275% | 5.000% | 14.275% | 3,365 | 312 | 168 | 480 |
| 2017 | 9.275% | 6.250% | 15.525% | 3,341 | 310 | 209 | 519 |
| 2018 | 9.275% | 7.500% | 16.775% | 3,419 | 317 | 256 | 573 |
| 2019 | 9.275% | 8.750% | 18.025% | 3,498 | 324 | 306 | 630 |
| 2020 | 9.275% | 10.000% | 19.275% | 3,574 | 332 | 357 | 689 |
| 2021 | 9.275% | 11.250% | 20.525% | 3,654 | 339 | 411 | 750 |

### Projected Additional Employer Contributions
### Teachers Retirement System
### ($ in millions)

| Fiscal Year | Original Employer Contribution Rate | Additional Employer Contribution Rate | Total Employer Contribution Rate | Expected Payroll | Original Employer Contribution | Additional Employer Contribution | Total Employer Contribution |
|---|---|---|---|---|---|---|---|
| 2015 | 8.50% | 4.00% | 12.50% | 1,125 | 96 | 45 | 141 |
| 2016 | 8.50% | 5.00% | 13.50% | 1,091 | 93 | 54 | 147 |
| 2017 | 8.50% | 6.25% | 14.75% | 1,071 | 91 | 67 | 158 |
| 2018 | 8.50% | 7.50% | 16.00% | 1,087 | 92 | 82 | 174 |
| 2019 | 8.50% | 8.75% | 17.25% | 1,101 | 94 | 96 | 190 |
| 2020 | 8.50% | 10.00% | 18.50% | 1,113 | 95 | 111 | 206 |
| 2021 | 8.50% | 11.25% | 19.75% | 1,124 | 96 | 126 | 222 |
| 2022[1] | 8.50% | 12.025% | 20.525% | 1,135 | 97 | 136 | 233 |

[1] Contribution increase per Act 160-2013

A fourth bill with respect to the Employees Retirement System was enacted as Act No. 196 of September 18, 2011, which authorized the Employees Retirement System to sell or pledge personal and mortgage loans in its portfolio.  This bill also set up a loan program for members of the Employees Retirement System through certain financial institutions, while also limiting the amount of employee contributions that a member can pledge as collateral for a loan.

In addition to these measures, on August 8, 2011, the Board of Trustees of the Employees Retirement System adopted a new regulation regarding the rules relating to the concession of

180

personal loans to its members, which, among other changes, lowered the maximum amount of those loans from $15,000 to $5,000. This change is expected to improve gradually the Employees Retirement System's liquidity.

On July 2, 2010, the Commonwealth enacted Act 70 ("Act 70"), which is designed to reduce government expenditures by providing a voluntary early retirement window for central government employees. At the same time, Act 70 is expected to have a positive actuarial impact on the net pension liability of the Employees Retirement System and the Teachers Retirement System. Under Act 70, central government employees meeting certain years of service criteria who opted for early retirement by December 31, 2012 receive a higher pension benefit rate than they would otherwise be entitled to receive based on their current years of service, but such pension rate is lower than what they would have been entitled to if they had waited to meet the full vesting requirements. Pursuant to Act 70, the Commonwealth, as employer, will continue making the applicable employer contributions to the Employees Retirement System and the Teachers Retirement System, as well as make payments to cover the annuity payments to the employees opting for the early retirement window, until both the years of service and age requirements for full vesting would have occurred, at which time the applicable Retirement System will continue making the annuity payments. As of June 30, 2014, approximately 8,300 employees participated of the benefits provided by these provisions of Act 70.

*Act 3-2013*. Notwithstanding all of the above legislative and administrative measures directed at addressing the funding shortfall of the Retirement Systems, the funding situation of the Employees Retirement System presented a serious long term challenge that required more urgent and sweeping changes to improve the financial health and long term solvency of the Employees Retirement System. With that objective in mind, on April 4, 2013, the new administration of Governor Alejandro Garcia Padilla succeeded in enacting Act 3-2013.

The most important aspects of the changes effected to the Employees Retirement System by Act 3-2013 are the following:

1. In the case of active employees who are Act 447 Participants and Act 1 Participants, all retirement benefits accrued through June 30, 2013 are frozen, and thereafter all future benefits will accrue under a defined contribution formula which will be paid at retirement through a lifetime annuity.

2. The retirement age for Act 447 Participants will be gradually increased from age 58 to age 61.

3. The retirement age for current System 2000 Participants is gradually increased from age 60 to age 65.

4. The retirement age for new employees is increased to age 67, except for new state and municipal police officers, firefighters, and custody officers, which will be age 58.

5. The employee contribution will be increased from 8.275% to 10%.

6.      In the case of System 2000 Participants, the retirement benefits will no longer be paid as a lump sum payment and instead will be paid in the form of a lifetime annuity.

7.      With respect to post-employment benefits, the Christmas bonus payable to current retirees is reduced from $600 to $200 (and is eliminated for future retirees) and the summer bonus is eliminated.  Future retirees will not receive any post-employment benefits.

8.      Disability benefits will be eliminated and substituted by a mandatory disability insurance policy.

9.      Survivor benefits will be  modified.

*Act 160-2013*.  The most important aspects of the changes effected to the Teachers Retirement System by Act 160-2013 are the following:

1.      Active participants as of July 31, 2014 will continue to participate in the defined benefit program.

2.      Starting on August 1, 2014, new participants will contribute to a contributory hybrid program, and will not participate in the defined benefit plan.

3.      The retirement age for new employees is increased to age 62.

4.      The employee contribution for new employees is increased to 10% from August 1, 2014 to June 30, 2017, 13.12% from July 1, 2017 to June 30, 2020, and 14.02% from July 1, 2020 and thereafter.

5.      The statutory employer contribution is increased to 20.525% starting FY 2022.

6.      With respect to post-employment benefits, the Christmas bonus payable to current retirees is reduced from $600 to $200 and the summer bonus is eliminated.  Future retirees will not receive any post-employment benefits.

*Act 162-2013*.  The most important aspects of the changes effected to the Judiciary Retirement System by Act 162-2013 are the following:

1.      For all existing participants who joined the Judiciary Retirement System between December 24, 2013 and June 30, 2014, the defined benefit plan continued to exist, but with a maximum pension of 60% of salary.  Their employee contribution was increased from 8% to 10%. All other existing benefits remained unchanged.

2.      For all new participants who joined the Judiciary Retirement System after July 1, 2014, a new hybrid plan was enacted, which includes the following:

(i)      No transfer of service from other branches of government will be credited for purposes of benefit accruals.

(ii)   At least 12 years of service and attainment of age 65 will be required in order to accrue an annual pension equal to 1.5% of the employee's average salary for the last five years multiplied by years of service plus an annuity from the employee's contributions.

(iii)   Disability benefits were reduced from 50% to 33% of salary. Participant must have at least five years of service to receive a pension that will not exceed the 33% of the average compensation for the last five years.

(iv)   Death benefits payable for the surviving spouse were changed from 50% of salary to a reimbursement of the judge's pension contributions to the extent not already distributed.

(v)   The employee contribution was increased from 8% to 12% of salary.

(vi)   Christmas, summer and prescription bonuses were eliminated.

All other benefits remained unchanged.

**Statements of Fiduciary Net Position  and Statements of Changes in Fiduciary Net Position**.

The following tables present the Statement of Fiduciary Net Position  and Statement of Changes in Fiduciary Net Position of each of the Retirement Systems for fiscal years 2011, 2012 2013 and 2014.

**The Commonwealth of Puerto Rico**
**Employees Retirement System**
**Statements of Fiduciary Net Position**
**As of June 30, 2011, 2012, 2013 and 2014**
**(in thousands)**

| | 2014* | 2013 | 2012 | 2011 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash, Investments and Loans to Plan Members: | | | | |
| Cash and Cash Equivalents: | $40,444 | $80,683 | $143,364 | $220,852 |
| Cash with Fiscal Agent | 3,470 | 80,433 | 59,250 | - |
| Collateral for Security Lending | 126,648 | 124,411 | 54,870 | 134,319 |
| Deposits with GDB: | | | | |
| Unrestricted | 53,510 | 50,094 | 113,313 | 51,396 |
| Restricted | 25,093 | 30,836 | 233,931 | 411,946 |
| Restricted Cash Bonds | 146,975 | 173,020 | 166,436 | 170,653 |
| Total Cash and Short Term Investment | 396,140 | 539,477 | 771,164 | 989,166 |
| | | | | |
| Investments: | | | | |
| Notes and Bonds | 1,199,169 | 1,351,177 | 1,374,752 | 814,408 |
| Stocks | 750,584 | 75 | 247,772 | 212,040 |
| Private Equity Investments | 54,146 | 55,067 | 57,370 | 65,457 |
| COFINA investment | 138,123 | 1,053,555 | 786,839 | 1,370,202 |
| Total Investments | 2,142,022 | 2,459,874 | 2,466,733 | 2,462,107 |
| | | | | |
| Loans to Plan Members: | | | | |
| Mortgage | 164,416 | 160,109 | 152,666 | 148,156 |
| Personal | 393,918 | 556,019 | 724,122 | 1,048,984 |
| Cultural Trips | 48,569 | 71,782 | 75,308 | 75,197 |
| PEC & Special Loans | 12,476 | 3,251 | 2,961 | 3,044 |
| Total Loans to Plan Members | 619,379 | 791,161 | 955,057 | 1,275,381 |
| Total Cash, Investments and Loans to Plan Members | 3,157,541 | 3,790,512 | 4,192,954 | 4,726,654 |
| | | | | |
| Receivables: | | | | |
| Employers | 195,803 | 131,033 | 111,975 | 184,152 |
| General Fund | 25,752 | 2,940 | 12,697 | 6,147 |
| Judiciary Retirement System | 3,110 | 2,174 | 1,345.0 | 881 |
| Investment Sales | 10,976 | 729 | 78,941 | 9,546 |
| Accrued Interest | 9,500 | 11,494 | 13,044 | 7,594 |
| Other | 20,819 | 13,185 | 20,707 | 4,595 |
| Total Receivables | 265,960 | 161,555 | 238,709 | 212,915 |
| | | | | |
| Capital Assets -net | 11,211 | 8,072 | 11,196 | 8,951 |
| Other Assets | 5,695 | 5,261 | 5,375 | 6,375 |
| Bond issue costs-net | 0 | 29,981 | 31,076 | 32,172 |
| Construction in Progress | - | 522 | 472 | - |
| Total Assets | $3,440,407 | $3,995,903 | $4,479,782 | $4,987,067 |
| | | | | |
| **LIABILITIES** | | | | |
| Book overdraft | - | - | - | 62,843 |
| Payables for securities lending | 126,648 | 124,411 | 54,870 | 134,319 |
| Funds of Mortgage Loans and Guarantee | 7,895 | 7,483 | 8,351 | 9,596 |
| Investment Purchases | 19,009 | - | 82,384 | 1,854 |
| Accounts Payable and Accrued Liabilities | 12,236 | 13,905 | 27,718 | 12,923 |
| Bonds Payable | 3,091,463 | 3,051,189 | 3,026,593 | 3,003,482 |
| Other Liabilities | 41,056 | 37,542 | 28,457 | 24,363 |
| Bonds Interest Payable | - | 13,876 | 13,877 | 13,876 |
| Accounts Payable Law 70 | 14,330 | 16,155 | - | - |
| Special Contributions Due to JRS | 282 | - | - | - |
| Total Liabilities | 3,312,919 | 3,264,561 | 3,242,250 | 3,263,256 |
| | | | | |
| Net Position Restricted for Pensions | $127,488 | $731,342 | $1,237,532 | $1,723,811 |

*Preliminary, unaudited numbers

184

**The Commonwealth of Puerto Rico**
**Employees Retirement System**
**Statements of Changes in Plan Net Position**
**As of June 30, 2011, 2012, 2013 and 2014**
**(in thousands)**

| ADDITIONS: | 2014* | 2013 | 2012 | 2011 |
|---|---|---|---|---|
| Contributions: | | | | |
| Employer | $485,114 | $424,704 | $388,103 | $349,207 |
| Participating employees | 359,862 | 322,528 | 316,178 | 322,008 |
| Other Special Laws | 276,995 | 203,943 | 192,539 | 187,369 |
| Early Retirement | | - | 812 | 305 |
| COFINA Investment | - | - | - | 162,500 |
| Total Contributions | 1,121,971 | 951,175 | 897,632 | 1,021,389 |
| Investment (Loss) Income: | | | | |
| Realized Gain or Loss | 121,160 | 54,311 | 252,183 | 472,076 |
| Unrealized Gain or Loss | 3,747 | 66,645 | (153,171) | - |
| Dividend Income | 75 | 242 | 2,095 | 7,344 |
| Interest Income | 103,005 | 127,377 | 176,892 | 172,783 |
| Total Investment Income | 227,987 | 248,575 | 277,999 | 652,203 |
| Less Investment Expense: | (3,280) | (3,553) | (5,617) | (6,483) |
| Net Investment Income | 224,707 | 245,022 | 272,382 | 645,720 |
| Other Income | 29,711 | 22,035 | 24,727 | 49,257 |
| Total Additions | 1,376,389 | 1,218,232 | 1,194,741 | 1,716,366 |
| **DEDUCTIONS:** | | | | |
| Annuities | 1,273,582 | 1,218,958 | 1,170,749 | 1,133,926 |
| Benefits under Special Laws | 237,555 | 201,742 | 192,539 | 187,369 |
| Death Benefits | 24,438 | 10,012 | 13,604 | 7,932 |
| Refunds of Contributions: | | | | |
| Employers | 4,315 | 971 | 1,228 | 992 |
| Participating Employees | 162,020 | 51,336 | 51,000 | 90,203 |
| Law 70 | 17 | 3,773 | 14,623 | - |
| Other Expenses | 25,858 | 16,095 | 15,770 | 13,199 |
| Administrative Expenses | 29,530 | 29,305 | 30,770 | 34,583 |
| Interest on Bonds | 193,822 | 192,230 | 190,737 | 189,342 |
| Total Deductions | 1,951,137 | 1,724,422 | 1,681,020 | 1,657,546 |
| Net (Decrease) Increase | (574,748) | (506,190) | (486,279) | 58,820 |
| Net Position Restricted for Pensions | | | | |
| Beginning of the Year | 731,342 | 1,237,532 | 1,723,811 | 1,664,991 |
| Beginning of the Year (adjusted POB's -GASB 67) | (29,106) | | | |
| End of Year | $127,488 | $731,342 | $1,237,532 | $1,723,811 |

*Preliminary, unaudited numbers.

185

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Fiduciary Net Position**
**As of June 30, 2011, 2012, 2013 and 2014**
**(in thousands)**

| | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash: | | | | |
| Cash and cash equivalents | $14,205 | $59,183 | $321,635 | $97,269 |
| Cash with fiscal agent | - | 5,196 | 12,925 | 110 |
| Collateral for Security Lending | 15,152 | 48,420 | 20,528 | 70,938 |
| Cash deposited with GDB | 3,301 | 3,298 | 3,295 | 3,291 |
| Total Cash | 32,658 | 116,097 | 358,383 | 171,608 |
| Investments at fair value: | | | | |
| Bonds and notes | 649,774 | 742,146 | 682,728 | 366,995 |
| Stocks | 92,900 | 97,299 | 213,053 | 284,785 |
| Non-exchange traded mutual funds | 503,619 | 546,775 | 516,914 | 1,151,073 |
| Total investment at fair value | 1,246,293 | 1,386,220 | 1,412,695 | 1,802,853 |
| Other investments- private equity investments | 11,170 | 14,823 | 19,221 | 25,630 |
| Total investments | 1,257,463 | 1,401,043 | 1,431,916 | 1,828,483 |
| Loans to plan members: | | | | |
| Mortgage | 158,892 | 146,917 | 135,698 | 128,312 |
| Personal | 259,765 | 262,238 | 266,303 | 276,692 |
| Cultural trips | 1,887 | 1,877 | 1,811 | 1,660 |
| Total loans to plan members | 420,544 | 411,032 | 403,812 | 406,664 |
| Total investments and loans | 1,678,007 | 1,812,075 | 1,835,728 | 2,235,147 |
| Accounts receivable: | | | | |
| Receivables for investments sold | 4,311 | 57 | 38,743 | 2,320 |
| Accrued interest and dividends receivable | 6,146 | 7,847 | 7,603 | 3,982 |
| Other | 14,704 | 23,414 | 34,404 | 44,883 |
| Total accounts receivable | 25,161 | 31,318 | 80,750 | 51,185 |
| Property and equipment, net | 17,325 | 19,312 | 20,885 | 22,204 |
| Other assets | 846 | 781 | 832 | 472 |
| Total Assets | 1,753,997 | 1,979,583 | 2,296,578 | 2,480,616 |
| | | | | |
| **LIABILITIES** | | | | |
| Investments purchased | 4,442 | 65 | 153,714 | 1,701 |
| Payable for securities lending | 15,152 | 48,420 | 20,528 | 70,938 |
| Cash overdraft in cash with fiscal agent | 4,942 | - | - | - |
| Accounts payable | 2,074 | 1,906 | 2,150 | 1,530 |
| Accrued expenses | 14,114 | 14,954 | 14,087 | 13,321 |
| Escrow fund of mortgage loans and guarantee insurance reserve for loans to plan members | 8,475 | 6,308 | 5,773 | 6,322 |
| Other liabilities | 1,019 | 1,048 | 1,110 | 941 |
| Total liabilities | 50,218 | 72,701 | 197,362 | 94,753 |
| **Net position restricted for Pensions** | $1,703,779 | $1,906,882 | $2,099,216 | $2,385,863 |

Totals may not add due to rounding.
*Preliminary, unaudited numbers.

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Changes in Fiduciary Net Position**
**As of June 30, 2011, 2012, 2013 and 2014**
**(in thousands)**

| | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Participating Employees | $115,461 | $119,162 | $121,773 | $123,297 |
| Employer | 139,453 | 133,369 | 123,614 | 112,071 |
| Contributions transferred from other systems | 4,131 | 1,680 | 1,476 | 828 |
| Special | 49,914 | 54,075 | 53,405 | 47,753 |
| Total contributions | 308,959 | 308,286 | 300,268 | 283,949 |
| Investment income: | | | | |
| Interest income | 64,272 | 71,457 | 56,306 | 57,008 |
| Dividend income | 2,148 | 2,693 | 4,342 | 6,915 |
| Net appreciation (depreciation) in fair value of | | | | |
| investments | 126,796 | 86,573 | (20,134) | 421,923 |
| Total investment income | 193,216 | 160,723 | 40,514 | 485,846 |
| Less investment expense | (3,193) | (3,229) | (3,361) | (4,682) |
| Net investment income | 190,023 | 157,494 | 37,153 | 481,164 |
| Other income | 1,416 | 1,432 | 1,374 | 968 |
| **Total additions** | $500,398 | $467,212 | $338,795 | $766,081 |
| | | | | |
| **DEDUCTIONS:** | | | | |
| Benefit paid to participants: | | | | |
| Annuities and death benefits | 626,027 | 579,144 | 547,955 | 513,874 |
| Special benefits | 46,964 | 49,130 | 48,492 | 48,286 |
| Refunds of contributions | 10,707 | 7,666 | 5,220 | 8,465 |
| Administrative expenses | 19,803 | 23,606 | 23,775 | 31,570 |
| **Total deductions** | 703,501 | 659,546 | 625,442 | 602,195 |
| Net increase (decrease) in net assets held in trust | | | | |
| pension benefits | (203,103) | (192,334) | (286,647) | 163,886 |
| **Net position restricted for pensions** | | | | |
| Beginning of year | 1,906,882 | 2,099,216 | 2,385,863 | 2,221,977 |
| **End of year** | $1,703,779 | $1,906,882 | $2,099,216 | $2,385,863 |

Totals may not add due to rounding.
*Preliminary, unaudited numbers.

187

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Fiduciary Net Position**
**As of June 30, 2011, 2012, 2013 and 2014**
**(in thousands)**

| ASSETS | 2014* | 2013 | 2012 | 2011 |
|---|---|---|---|---|
| Cash and Investments: | | | | |
|   Cash and Cash Equivalents | $2,545 | $1,663 | $11,543 | $6,409 |
|   Cash Deposited with GDB or Treasury Department: | | | | |
|   Unrestricted | 3142 | 916 | 745 | 1,010 |
|   Restricted | | | | 1 |
|   Collateral from Securities Lending | 827 | 2,002 | 1,088 | 3,218 |
| Total Cash | 6,514 | 4,581 | 13,376 | 10,638 |
| Receivables: | | | | |
|   Accrued Interest | 174 | 191 | 255 | 263 |
|   Special Laws | 282 | | | |
|   Other | 27 | 27 | 27 | 27 |
| Total receivables | 483 | 218 | 282 | 290 |
| Marketable Securities: | | | | |
|   Notes and Bonds | 22,729 | 22,016 | 30,524 | 39,954 |
|   Stocks | 36,399 | 36,338 | 18,206 | 22,136 |
| Total Investments | 59,128 | 58,354 | 48,730 | 62,090 |
| Loans and Interest Receivable from Members: | | | | |
|   Mortgage | 100 | 0 | 4 | 17 |
|   Personal & PEG | 381 | 378 | 386 | 750 |
|   Cultural Trips | 62 | 58 | 81 | 78 |
| Total Loans to Plan Members | 543 | 436 | 471 | 845 |
| Total cash, investments and loans to plan members | 66,668 | 63,589 | 62,859 | 73,863 |
| **LIABILITIES** | | | | |
| Due to Treasury Department | | | 1,603 | 5,560 |
| Due to the Employees Retirement System | 3,110 | 2,174 | 1,345 | 881 |
| Collateral from Securities lending | 827 | 2,002 | 1,088 | 3,218 |
| Escrow Funds to plan Members and Guarantee Insurance | 29 | 65 | 65 | 66 |
| Investment Purchases | 190 | | | 2 |
| Other Liabilities | 433 | 336 | 170 | 161 |
| Total Liabilities | 4,589 | 4,577 | 4,271 | 9,888 |
| **Net Position Restricted for Pensions** | **$62,079** | **$59,012** | **$58,588** | **$63,975** |

*Preliminary, unaudited numbers.

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Changes in Plan Net Position**
**As of June 30, 2011, 2012, 2013 and 2014**
**(in thousands)**

| | 2014* | 2013 | 2012 | 2011 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer | $10,762 | $10,034 | $10,088 | $9,965 |
| Participating employees | 3,804 | 2,825 | 2,942 | 2,789 |
| Special Laws | 1,532 | 1,944 | 537 | 629 |
| Total Contributions | 16,098 | 14,803 | 13,567 | 13,384 |
| Investment Income: | | | | |
| Realized Gain or Loss | 3,153 | 1,926 | 7,354 | 9,726 |
| Unrealized Gain | 5,715 | 3,870 | -6,837 | 3201 |
| Dividend Income | | | 7 | 176 |
| Interest Income | 845 | 948 | 1,361 | 1,352 |
| Total | 9,713 | 6,744 | 1,885 | 14,455 |
| Less Investment Expense | 0 | -72 | -166 | -162 |
| Other Income | 210 | 27 | 18 | 10 |
| Net Investment Income | 9,923 | 6,699 | 1,737 | 14,303 |
| Total Additions | 26,021 | 21,502 | 15,304 | 27,687 |
| **DEDUCTIONS:** | | | | |
| Annuities | 20,659 | 18,509 | 19,395 | 18,617 |
| Benefits Under Special Laws | 1,250 | 1,944 | 537 | |
| Death Benefits | | | 179 | |
| Refunds to Participating Employees | 110 | | 64 | 5 |
| Refunds to Employers | 120 | | | 5 |
| Administrative Expenses | 815 | 625 | 516 | 495 |
| Other Expenses | 0 | | | |
| Total Deductions | 22,954 | 21,078 | 20,691 | 19,122 |
| Net Increase | 3,067 | 424 | -5,387 | 8,565 |
| Net Position Restricted for Pensions | | | | |
| Beginning of the Year | 59,012 | 58,588 | 63,975 | 55,410 |
| **End of Year** | **$62,079** | **$59,012** | **$58,588** | **$63,975** |

*Preliminary, unaudited numbers.

189

**Post-employment benefits other than pensions**

The Commonwealth also provides other post-employment benefits consisting of a medical insurance plan contribution.  These benefits are funded by each employer on a pay-as-you-go basis from the General Fund, which means that the Commonwealth does not pre-fund or otherwise establish a reserve or other pool of assets against these post-employment expenses.

Act 3-2013 eliminated all other post-employment system benefits to future retirees of the Employees Retirement System.  Act 3-2013 did not change the medical insurance plan contribution for current retirees, which amounts to up to $100 per month to the eligible medical insurance plan selected by the retiree or disabled member.  As a result of the changes in Act 3-2013, the actuarial accrued liability of the Employees Retirement System for these benefits, as of June 30, 2013, decreased by $0.66 billion, from $2.14 billion to $1.48 billion, or by 30.8%, compared to June 30, 2012.

Post-employment benefits other than pensions are valued using actuarial principles similar to the way that pension benefits are calculated.  The following table summarizes the results of the actuarial valuations for these benefits.  Since these benefits are not pre-funded, as discussed above, the unfunded actuarial accrued liability is equal to the actuarial accrued liability.

**Post-Employment Benefits Other Than Pensions**
**Actuarial Valuations as of June 30, 2014**
**($ in millions)**

|  | Actuarial Value of Assets | Actuarial Accrued Liability[1] | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| Employees Retirement System............... | - | $1,439 | $1,439 | 0% | $3,489 | 41.2% |
| Teachers Retirement System ................. | - | 543 | 543 | 0 | 1,171 | 46.4 |
| Judiciary Retirement System ................. | - | 7 | 7 | 0 | 32 | 20.6 |
| Total ...................................................... | - | $1,989 | $1,989 | 0% | $4,692 | 42.4% |

[1]   The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

Source: Actuarial valuation reports as of June 30, 2014 for each of the Retirement Systems.

Post-employment benefits other than pensions paid by the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System amounted to $102.1 million, $35.9 million and $0.3 million, respectively, for fiscal year 2014, and are estimated at $109.2 million, $38.1 million and $0.3 million, respectively, for fiscal year 2015.

In accordance with the provisions of GASB Statement No. 45, the Commonwealth is required to quantify and disclose its obligations to pay non-pension post-employment benefits to current and future retirees.  The following table sets forth, according to the actuarial valuations, the actuarial accrued liability, UAAL, covered payroll and UAAL as a percentage of covered payroll for the non-pension post-employment benefits of the active and retired members of each of the Retirement Systems.  Since these benefits are not pre-funded, as discussed above, the UAAL is equal to the actuarial accrued liability.

**Post-Employment Benefits Other Than Pensions**
**Actuarial Valuations as of the Indicated Fiscal Years**
**(in millions)**

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability[1] | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2009 | - | $1,633 | $1,633 | 0% | $4,293 | 38.0% |
| 2010 | - | 1,699 | 1,699 | 0 | 3,818 | 44.5 |
| 2011 | - | 1,758 | 1,758 | 0 | 3,666 | 48.0 |
| 2012 | - | 2,121 | 2,121 | 0 | 3,570 | 59.4 |
| 2013 | - | 1,482 | 1,482 | 0 | 3,489 | 42.5 |
| 2014 | | 1,439 | 1,439 | 0 | 3,489 | 41.2 |
| **Teachers Retirement System** | | | | | | |
| 2009 | - | 750 | 750 | 0 | 1,418 | 52.9 |
| 2010 | - | 694 | 694 | 0 | 1,370 | 50.7 |
| 2011 | | 706 | 706 | 0 | 1,320 | 53.5 |
| 2012 | - | 797 | 797 | 0 | 1,293 | 61.7 |
| 2013 | - | 793 | 793 | 0 | 1,249 | 63.5 |
| 2014 | - | 543 | 543 | 0 | 1,171 | 46.4 |
| **Judiciary Retirement System** | | | | | | |
| 2009 | - | 6 | 6 | 0 | 31 | 18.5 |
| 2010 | - | 6 | 6 | 0 | 32 | 18.1 |
| 2011 | - | 6 | 6 | 0 | 32 | 18.3 |
| 2012 | - | 7 | 7 | 0 | 33 | 19.9 |
| 2013 | - | 7 | 7 | 0 | 32 | 20.9 |
| 2014 | | 7 | 7 | 0 | 32 | 20.6 |

(1)  The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

191

The following table shows the annual required contributions under GASB 45, actual employer contributions and resulting amount unfunded and percent contributed for the post-employment benefits, other than pensions administered by each of the Retirement Systems, for the last five fiscal years.

### Schedule of Employer Contributions to Retirement Systems on Account of Post-Employment Benefits Other Than Pensions (in millions)

| Fiscal Year Ending June 30, | Annual Required Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2009 | $112 | 85 | 27 | 76.45% |
| 2010 | 128 | 89 | 39 | 69.06 |
| 2011 | 129 | 94 | 35 | 72.53 |
| 2012 | 134 | 95 | 39 | 70.8 |
| 2013 | 155 | 92 | 63 | 59.24 |
| 2014 | 89 | 102 | (13) | 115.34 |
| 2015 | 104 | 109 | (5) | 105.10 |
| **Teachers Retirement System** | | | | |
| 2009 | 38 | 29 | 9 | 77.2 |
| 2010 | 42 | 30 | 12 | 71.0 |
| 2011 | 40 | 33 | 7 | 83.7 |
| 2012 | 41 | 34 | 7 | 83.9 |
| 2013 | 46 | 34 | 12 | 75.0 |
| 2014 | 46 | 36 | 10 | 77.3 |
| 2015 | 36 | 38 | 0 | 105.0 |
| **Judiciary Retirement System** | | | | |
| 2009 | 0.4 | 0.2 | 0.2 | 50.0 |
| 2010 | 0.5 | 0.3 | 0.2 | 60.0 |
| 2011 | 0.5 | 0.3 | 0.2 | 60.0 |
| 2012 | 0.6 | 0.3 | 0.3 | 50.0 |
| 2013 | 0.6 | 0.3 | 0.3 | 50.0 |
| 2014 | 0.7 | 0.3 | 0.4 | 43.0 |
| 2015 | 0.8 | 0.4 | 0.4 | 50.0 |
| **Total** | | | | |
| 2009 | 150.4 | 114.20 | 36.2 | 76.0 |
| 2010 | 170.5 | 119.30 | 51.2 | 70.0 |
| 2011 | 169.5 | 127.3 | 42.2 | 75.1 |
| 2012 | 175.6 | 129.3 | 46.3 | 73.6 |
| 2013 | 201.6 | 126.3 | 75.3 | 62.6 |
| 2014 | 135.7 | 138.3 | (2.6) | 102 |
| 2015 | 140.8 | 147.4 | (6.6) | 105 |

---

[1] The annual required contributions under GASB 45 are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2014.

[2] The actual employer contributions for fiscal year 2015 are based on the expected pay-as-you-go amounts for the post-employment benefits, other than pensions, as set forth in the actuarial valuations as of June 30, 2014.

[3] Represents the difference between the  annual required contribution under GASB 45 and the actual contribution from the participating employers.

192

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government to perform generally a single function or a limited number of related functions.  Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government.  Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are attached to departments of the central government.  Capital improvements of most of the larger public corporations are financed by revenue bonds issued under trust agreements or bond resolutions, or by notes issued under loan agreements.

### Government Development Bank for Puerto Rico and its Affiliates

The principal functions of GDB are to act as financial advisor to, and fiscal agent for, the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to promote the economic development of Puerto Rico.  As part of its role as fiscal agent, during fiscal years 2009, 2010 and 2011, GDB entered into fiscal oversight agreements with  PRASA, PREPA, PRHTA, PRPA, PRHIA, the Medical Services Administration, the Metropolitan Bus Authority and the Maritime Transportation Authority.  As part of these agreements, GDB imposed certain conditions on the extension of credit to these entities and continually monitors their finances, among other things.

As of June 30, 2015, GDB (excluding its blended component units) had total assets of $10.7 billion and total liabilities of $8.8 billion**.**

As of June 30, 2015, $4.2 billion of bonds and notes of GDB (excluding its subsidiaries) were outstanding, consisting of $267 million in Commonwealth guaranteed bonds and $3.9 billion of medium term senior notes.  In addition, on October 10, 2014, GDB issued $900 million of notes guaranteed by the Commonwealth, all of which expired on June 30, 2015, the proceeds of which were used to purchase Tax and Revenue Anticipation Notes of the Commonwealth.

Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of, and interest on, specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of June 30, 2015.

Under Act No. 271 of November 21, 2002, GDB made a required special capital contribution to the Special Communities Perpetual Trust of $500 million and provided the Trust with a $500 million, non-revolving line of credit.  The amounts transferred to the Special Communities Perpetual Trust were deposited in two investment accounts held by GDB for the benefit of the Trust.  As of June 30, 2015, the Special Communities Perpetual Trust had repaid $154.2 million of its line of credit and had an outstanding balance of $345.8 million.  The line of credit is payable from legislative appropriations.

As part of its role as lender and promoter of the economic development of Puerto Rico, GDB provides financing to the Commonwealth, its public corporations and municipalities. This financing includes interim loans to finance the capital expenditures of the Commonwealth in anticipation of the issuance of bonds and notes, and loans to cover operational deficits of those government entities. GDB generally does not provide financing to any governmental entity of the Commonwealth unless GDB reasonably believes that the borrower governmental entity will have sufficient resources, including the ability to issue bonds or notes or otherwise borrow funds, to repay such loan. GDB, however, has provided financing in the past and may continue to provide financing to governmental entities that do not have sufficient independent resources to cover their operating expenses, to the extent permitted by law. A material increase in the amount of loans to the public sector, coupled with continued deterioration of the public sector's fiscal situation and financial condition may have an adverse effect on GDB's financial condition and liquidity. A material reduction on the GDB's ability to act as lender and promoter of economic growth would have a material effect on the Commonwealth, its public corporations and municipalities.

As of June 30, 2015, GDB had outstanding loans to the Commonwealth in the aggregate principal amount of $2.3 billion, outstanding loans to, and bonds of, the public corporations in the aggregate principal amount of $4.5 billion (of which loans to PRHTA represented $2.0 billion), and outstanding loans to the municipalities in the aggregate principal amount of $2.5 billion.

As of June 30, 2015, the approximate market value of GDB's investment portfolio was approximately $1.0 billion.

GDB has several subsidiaries that perform various functions. The principal subsidiaries and their functions are listed below:

***Puerto Rico Housing Finance Authority***. Puerto Rico Housing Finance Authority (the Authority) was created in 1977 to provide public and private housing developers with interim and permanent financing through mortgage loans for the construction, improvement, operation, and maintenance of rental housing for low and moderate-income families. The Authority also issues bonds and notes, the proceeds of which are deposited in separate trusts and generally invested in mortgage-backed securities collateralized by mortgage loans on properties located in Puerto Rico purchased by low and moderate-income families or used to provide subsidies to such families for the acquisition of their primary residence. The Authority is authorized by the U.S. Department of Housing and Urban Development (HUD) to administer the U.S. Housing Act Section 8 program in Puerto Rico, to administer the HOME Investment Partnerships (HOME) Program, and to act as an approved mortgagor, both for multifamily rental units and for single-family homes. In addition, it is an authorized issuer of Government National Mortgage Association (GNMA) mortgage-backed securities and is Puerto Rico's State Credit Agency for the Low-Income Housing Tax Credit Program under Section 42 of the U.S. Internal Revenue Code. Finally, the Authority operates a mortgage loan insurance program which insures a portfolio of approximately $560 million mortgage loans mainly to low and moderate-income families.

As of August 31, 2015 the Authority's total outstanding principal balance of loans to the private sector for development and permanent financing of housing projects targeted to low and moderate income families was $168.4 million.  The Housing Finance Authority's mortgage loans to low and moderate income homeowners represented an additional outstanding principal balance of $158.2 million as of the same date.

The Authority has outstanding tax-exempt revenue bonds the proceeds of which were loaned to the Puerto Rico Public Housing Administration to finance improvements to various housing projects in the Commonwealth. Such bonds are limited obligations of the Authority payable solely from revenues collected from such housing units, with certain exceptions.  As of August 31, 2015, $399.0 million of these bonds were outstanding.  See "DEBT – Debt of Public Corporations" above for additional information on the outstanding debt of the Housing Finance Authority.

As of August 31, 2015, the Housing Finance Authority had a net position of $419.2 million.

*Puerto Rico Tourism Development Fund*.  Puerto Rico Tourism Development Fund ("TDF") was created in September 1993 to facilitate the development of Puerto Rico's hotel industry by working with private-sector financial institutions in structuring financings for new hotel projects and hospitality related projects.   TDF provides guarantees to interim and permanent financings, interim and permanent loans, and preferred equity capital.   As of June 30, 2015, TDF had $324.6 million in guarantees and $151.6 million in loans (net of $169.1 million in allowances for losses on guarantees and loans).  It also had $160.9 million in cash and in marketable securities, and a net deficit of $198.0 million.

*Puerto Rico Development Fund*.  Puerto Rico Development Fund was established in April 1977 to provide an alternate source of financing to private enterprises.  The Development Fund is also authorized to guarantee obligations of those enterprises and invest in their equity securities.  As of June 30, 2015, the Development Fund had assets of $11.6 million, including $2.6 million in loans to private entities, net of allowances for loan losses of approximately $24.2 million, $3.7 million in cash and bank deposits, and $242,000 in preferred shares of various private entities.

*Puerto Rico Public Finance Corporation*.  Puerto Rico Public Finance Corporation ("PFC") was established in November 1984 to provide agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements.  The bond trustees of certain limited obligation bonds issued by the PFC currently hold notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools and the Department of Health and PRASA, among others.  All such PFC bonds are limited, non-recourse obligations of PFC payable solely from Commonwealth appropriations made to pay debt service on the notes held by the bond trustees. On August 1, 2015, PFC failed to make most of the payment due on such date on its bonds as a result of a failure by the Legislative Assembly to appropriate funds for such payment.

**Electric Power Authority**

The Puerto Rico Electric Power Authority ("PREPA") supplies substantially all of the electricity consumed in the Commonwealth. PREPA owns all transmission and distribution facilities and most of the generating facilities that constitute Puerto Rico's electric power system.

PREPA had preliminary net losses of $267 million during fiscal year 2014, compared with net losses of $283 million during fiscal year 2013 and net losses of $346 million during fiscal year 2012.

PREPA's operating results have been adversely affected in recent years by a decrease in electric energy demand caused in part by a declining population and a prolonged recession, high fuel costs which result from reliance on oil for energy generation, high capital expenditure requirements associated with ageing generating facilities, and a high level of debt. As of September 30, 2015, PREPA's debt included $8.229 billion of outstanding revenue bonds and $696 million under bank working capital lines of credit. PREPA also owed GDB approximately $35 million under a line of credit.

*Forbearance Agreements*

On August 14, 2014, PREPA entered into forbearance agreements (the "Forbearance Agreements") with certain insurers of bonds outstanding under PREPA's Power Revenue Bonds Trust Agreement (the "Trust Agreement") and beneficial owners of the Bonds controlling, collectively, more than 60% of the principal amount of the Bonds then outstanding (collectively, the Forbearing Bondholders"), banks that provide revolving lines of credit used to pay for purchased power, fuel and other expenses (together, with their transferees, as applicable, the "Forbearing Lenders") and the GDB (together with the Forbearing Bondholders and the Forbearing Lenders, the "Forbearing Creditors").

Under the Forbearance Agreements, the Forbearing Creditors agreed to forbear from the exercise of certain rights and remedies under their applicable debt instruments. The Forbearance Agreements were originally scheduled to terminate on March 31, 2015, but were extended on numerous occasions, most recently through November 5, 2015. PREPA's monoline bond insurers did not agree to the extensions executed by an ad hoc group of PREPA's bondholders (the "Ad Hoc Group") since September 18, 2015 and one of such insurers did not agree to the extension signed by the Ad Hoc Group and the other two insurers on September 1, 2015. The agreements are available on GDB's website.

The Forbearance Agreements required PREPA to continue to pay principal and interest on its bonds, and to pay interest on its bank lines of credit, during the forbearance period. PREPA has made all such payments through July 1, 2015. In connection with its agreement to $415,000,000 in principal and interest payments due on the bonds on July 1, 2015, PREPA issued $130,714,000 of bonds which were purchased by certain of the insurance companies that insure PREPA's outstanding bonds. Such new bonds mature on January 1, 2016.

In accordance with the Forbearance Agreements, PREPA delivered a recovery plan proposal to the Forbearing Creditors on June 1, 2015 that included a proposal for PREPA's

financial and operational transformation.  Since that date, PREPA has engaged in discussions with the Forbearing Creditors regarding the terms of a consensual agreement on a recovery plan.

*Agreements in Principle with Certain Creditors*

On September 2, 2015, PREPA announced an agreement in principle regarding the economic terms of a restructuring with the Ad Hoc Group that holds approximately 35% of PREPA's outstanding power revenue bonds.

Under that agreement, bondholders will have the option to receive securitization bonds that will pay cash interest at a rate of 4.0% - 4.75% (depending on the rating obtained) ("Option A Bonds") or convertible capital appreciation securitization bonds that will accrue interest at a rate of 4.5% - 5.5% for the first five years and pay current interest in cash thereafter ("Option B Bonds").  Option A Bonds will pay interest only for the first five years, and Option B Bonds will accrue interest but not receive any cash interest during the first five years.  All of PREPA's uninsured bondholders will have an opportunity to participate in the exchange.

Under the extension to Forbearance Agreement with the Ad Hoc Group executed on September 1, 2015, PREPA agreed to work collaboratively and in good faith with the Ad Hoc Group to reach agreement on a recovery plan incorporating these terms (the "Ad Hoc Group Agreement").

On September 22, 2015, PREPA announced an agreement in principle regarding economic terms with its Forbearing Lenders.

Under that Agreement, the Forbearing Lenders, which hold approximately $700 million of matured debt,  will have the option to either (1) convert their existing credit agreements into term loans, with a fixed interest rate of 5.75% per annum, to be repaid over six years in accordance with an agreed amortization schedule or (2) exchange all or part of principal due under existing credit agreements for new securitization bonds to be issued on the same terms as the Ad Hoc Group.

Under the extensions to the Forbearance Agreements with the Forbearing Lenders executed on September 22, 2015, PREPA agreed to work collaboratively and in good faith with the Forbearing Lenders to reach agreement on a recovery plan incorporating these terms (the "Fuel Line Agreement").

*PREPA Revitalization Act*

On November 4, 2015, the Governor submitted the PREPA Revitalization Act to the Legislative Assembly to facilitate PREPA's ongoing transformation and recovery plan.  The PREPA Revitaliztion Act sets forth a framework for PREPA to execute on the agreements with creditors reached to date.  Among other things, the PREPA Revitalization Act would (1) enhance PREPA's governance processes; (2) adjust PREPA's practices for hiring and managing management personnel; (3) change PREPA's processes for collecting outstanding bills from public and private entities; (4) improve the transparency of PREPA's billing practices; (5) implement a competitive bidding process for soliciting third party investment in PREPA's infrastructure; (6) allow for the refinancing of existing PREPA bonds through a securitization

that would reduce PREPA's indebtedness and cost of borrowing; and (7) set forth an expedited process for the Energy Commission to approve or reject PREPA's proposal for a new rate structure that is consistent with its recovery plan.

*Restructuring Support Agreement*

On November 5, 2015, PREPA announced its entry into a restructuring support agreement (the "RSA") with the Ad Hoc Group and the Forbearing Lenders setting forth the agreed-upon terms of PREPA's recovery plan. The economic terms set forth in the RSA are consistent with the Ad Hoc Group Agreement and the Fuel Line Agreement. In addition, pursuant to the RSA, GDB will receive substantially the same treatment on debt owed by PREPA to it as the Forbearing Lenders will receive. PREPA's monoline bond insurers are not party to the RSA, and PREPA has not reached an agreement in principle with its monoline bond insurers regarding their treatment under the terms of its recovery plan.

Execution of the transactions set forth in the RSA remain subject to a number of material conditions, including without limitation, (1) obtaining legislative authority for issuance of the securitization bonds and other organizational reforms at PREPA; (2) receipt of an investment grade rating from any major rating agency that rates the securitization bonds; (3) obtaining an agreed upon level of participation from uninsured bondholders in the exchange offer described above; and (4) reaching agreement with creditors regarding the definitive documentation of the various restructuring transactions.

*Operational Transformation*

Ms. Donahue and a team comprised of fourteen full time equivalents from AlixPartners are working, alongside PREPA management, on seeking to reach a consensual agreement with PREPA's creditors, and are working to transform PREPA's operations and implement savings initiatives. AlixPartners' efforts, along with those of PREPA, have already yielded approximately $80 million in one-time cash savings and approximately $105 million in recurring annual savings. Further savings initiatives will be phased in over time with projected one-time savings totaling as high as $260 million and recurring annual savings totaling as high as $390 million upon completion of operational initiatives.

**Aqueduct and Sewer Authority**

The Puerto Rico Aqueduct and Sewer Authority ("PRASA") owns and operates Puerto Rico's public water supply and wastewater systems. Such systems provide water and wastewater services to 97% and 59% of the Commonwealth's population, respectively.

PRASA reported an operating loss of $291.9 million for fiscal year 2013, compared to operating losses of $136.8 million and $39.6 million for fiscal years 2012 and 2011, respectively. In order to improve its financial condition, PRASA adopted a comprehensive plan to increase its revenues and reduce its expenses. On July 3, 2013, PRASA's Board of Directors approved a rate adjustment, which became effective on July 15, 2013. PRASA management currently expects that the rate adjustment will be sufficient to allow PRASA to cover all of its operating expenses and debt service of the corporation with its own revenues until at least fiscal

year 2017, although significant financing and refinancing risks remain.  Nevertheless, PRASA's capital improvement program is mainly funded through external interim financings and bond issuances, and a limited amount of federal funds and other funding sources.

On May 29, 2015, PRASA entered into a Credit Agreement pursuant to which the lender made a $90 million term loan to PRASA. These funds were used, together with other funds from PRASA's operations, to repay in full other loans due on that date.  To secure the new loan, PRASA used $90 million  from the Rate Stabilization Account under its Master Trust Agreement and pledged such funds to the lender under an Escrow Deposit Agreement. The new loan was issued as "Senior Indebtedness" under the Master Trust Agreement, on parity with the senior bonds issued thereunder.

On September 15, 2015, PRASA issued $75 million of its 2015A Senior Bonds under the Master Trust Agreement, as supplemented by the Fifth Supplemental Agreement of Trust.  The proceeds of the purchase of the 2015A Senior Bonds pursuant to the Bond Purchase Agreement were used to repay a portion of the outstanding balance of the $90 million term loan extended under the Credit Agreement referred to above.  Also on September 15, 2015, the Credit Agreement was amended to reflect the reduction of  its outstanding balance and extend the maturity date of the remaining $15 million term loan through November 30, 2015.  In August 2015, commenced an offering of $750 million of revenue bonds, the proceeds of which would be used in part to repay the amounts due under the Credit Agreement and refund the 2015A Senior Bonds, thereby releasing the $90 million presently securing such facilities and permitting their deposit to the Rate Stabilization Account of the Surplus Fund used to fund the escrow accounts relating thereto. PRASA was unable to complete the transaction and may attempt to reaccess the market in the near term. There is no assurance, however, that PRASA will be able to successfully consummate this transaction. See "DEBT – Debt of Public Corporations" above for additional information on PRASA's outstanding debt.

On July 1, 2003, PRASA entered into an agreement (Civil Action No. 01-1709) with Environmental Protection Agency ("EPA") to attain compliance with the Clean Water Act in relation to PRASA's wastewater pump stations ("WWPSs") in response to a significant number of sanitary sewer bypasses from these locations ("PRASA IV").  The Clean Water Act prohibits discharges of sewage from any point in the collection and treatment system other than the authorized point at the treatment facility.  PRASA completed all improvement projects required by EPA for these WWPSs on or before the established completion dates in the Agreement.
On June 22, 2006, PRASA entered into a consent decree (Civil Action No. 06-1624) with EPA that requires PRASA to implement system-wide remedial measures at all of the wastewater treatment plants operated by PRASA (the "2006 EPA Consent Decree"). The decree establishes deadlines for the compliance with the conditions set forth in the agreement and stipulates penalties for violation of any of those deadlines.

On December 15, 2006, an agreement (Civil Case No. KPE 2006-0858) was signed between PRASA and the Department of Health of the Commonwealth related to violations of the Safe Drinking Water Act (the "DWSA"), as amended. The agreement was preliminarily approved by the supervising court on March 15, 2007 and it was amended and finally approved by that court on June 20, 2008. PRASA agreed to implement a work plan to remediate the violations, establish preventive and mitigation measures, and execute a preventive maintenance

program for the purpose of meeting the requirements of the DWSA.  This Act requires the
compliance with parameters of water quality and treatment techniques

In November of 2007, PRASA entered into negotiation of a consent decree (Civil Action
No. 10-1365) with EPA that requires PRASA to implement system wide remedial measures at all
of the sludge treatment systems at the water treatment plants owned and operated by PRASA.
The consent decree was lodged on May 3, 2010 and its entry date was August 24, 2010 (the
"2010 EPA Consent Decree", and together with PRASA IV, the 2006 EPA Consent Decree, and
the DWSA, the "Existing Consent Decrees").  This consent order supersedes previous Consent
Orders known as PRASA II (Civil Action No. 92-1511) and PRASA III (Civil Action No. 00-
2554).  This consent order establishes deadlines for the compliance with the conditions set forth
in the proposed agreement and stipulates penalties for violation of any of those deadlines.

PRASA manages a capital improvement program designed to not only improve the
condition and operation of the water and wastewater systems, but to meet the regulatory
requirements of the Existing Consent Decrees.  Such program is mainly funded through external
financings and in to lesser degree with federal funds and other available sources.

On September 15, 2015 the United States Department of Justice ("DOJ"), acting at the request of
the Administrator of EPA, filed a complaint (the "Complaint") against PRASA and the
Commonwealth, as a required party under the Clean Water Act (defined below), in the United
States District Court for the District of Puerto Rico (the "District Court"). The Complaint seeks
injunctive relief and the assessment of civil penalties against PRASA for alleged violations of the
Federal Water Pollution Control Act enacted in 1956, as amended by the federal Water Pollution
Control Act Amendments of 1972, the Clean Water Act of 1977, and the Water Quality Act of
1987, as amended (the "Clean Water Act").

Concurrently with the filing of the Complaint, DOJ also filed a consent decree (the "2015 EPA
Consent Decree") executed among EPA, PRASA and the Commonwealth settling the matters
addressed in the Complaint, under the terms agreed upon by PRASA and EPA.  The 2015 EPA
Consent Decree is the result of an extensive negotiation process aimed, among other things, at
resolving the claims addressed in the Complaint and the requirements of PRASA IV, the 2006
EPA Consent Decree and the 2010 EPA Consent Decree (collectively the "EPA Consent
Decrees") related to the allegations included in the Complaint.  EPA and PRASA acknowledged
in the 2015 EPA Consent Decree the work to be undertaken thereunder will enable PRASA to
better understand its sewer systems, but will not resolve all of PRASA's Clean Water Act
obligations with respect to such systems.  The Commonwealth will incur liability under the 2015
EPA Consent Decree only to the extent that the laws of the Commonwealth prevent PRASA
from raising revenues needed to comply with the 2015 EPA Consent Decree.  In this connection,
the Commonwealth has represented under the 2015 EPA Consent Decree that its present laws do
not prevent PRASA from raising the revenues needed to comply with the obligations it has
incurred thereunder.

Negotiations leading to the execution of the 2015 EPA Consent Decree were commenced by
PRASA in order to mitigate the high CIP costs mandated by the Existing Consent Decrees,
representing 60% of CIP and an approximate cost of $1.4 billion during fiscal years 2006-2014.
Another $1.7 billion of mandatory compliance projects would be required under the Existing

Consent Decrees, in their current form, through fiscal year 2025.  Despite being in material compliance with the capital improvement project requirements of the Existing Consent Decrees, PRASA began discussions with the DOJ, on behalf of EPA, EPA and DOH seeking to amend the Existing Consent Decrees, in order to, among other things: (i) reduce required annual project expenditures and extend compliance deadlines, (ii) incorporate other regulatory projects included in PRASA's CIP not currently covered by the Existing Consent Decrees, and (iii) include the operation, maintenance and capital improvement program requirements related to the Puerto Nuevo wastewater collection system, including alleged combined sewer overflows.  The resulting 2015 EPA Consent Decree is expected to realign the cost of these projects and activities with PRASA's current financial condition and economic prospects.  The 2015 EPA Consent Decree will be subject to the approval of the Federal District Court after the thirty (30) day public comment period commenced on October 8, 2015 with the publication of the corresponding notice in the Federal Register. Once final approval is granted, the 2015 EPA Consent Decree will consolidate and supersede the EPA Consent Decrees.

PRASA also expects that after final approval of the 2015 EPA Consent Decree, it will be able to finalize the and amendment to the DWSA (the "Proposed DWSA Amendment") under terms substantially similar to those currently being negotiated with DOH. Although the Proposed DWSA Amendment remains to be finalized, on May 22, 2015 the Superior Court of Puerto Rico approved a joint motion submitted by PRASA and DOH on May 12, 2015 to amend the 2006 Drinking Water Settlement Agreement to incorporate certain regulatory projects that were not originally included under its provisions.  The final approval by the District Court of the 2015 EPA Consent Decree and the culmination of the negotiations of the  Proposed  DWSA Amendment will permit PRASA to significantly reduce annual capital expenditure levels for mandated projects under the Existing Consent Decrees, based on a new comprehensive and holistic prioritization system (the "Prioritization System") for the scheduling and management of CIP projects, which would be applied to capital improvement project requirements under the 2015 EPA Consent Decree and the Proposed DWSA Amendment, as well as other CIP projects that may arise in the future under the Clean Water Act and the Safe Drinking Water Act.

The 2015 EPA Consent Decree and the Proposed DWSA Amendment are expected to extend the compliance date of certain capital improvement projects through 2034 at a cost of approximately $1.7 billion.  No assurance, however, can be given that the 2015 EPA Consent Decree will be approved by the District Court in the form filed on September 15, 2015 and that the Proposed DWSA Amendment will be concluded under terms substantially similar to those currently being negotiated with DOH.  If the 2015 EPA Consent Decree is not approved under terms substantially similar to those filed on September 15, 2015 or the Proposed DWSA Amendment is not approved as anticipated, PRASA would have to significantly increase its Five-Year CIP expenditures from currently projected levels or, if 2015 EPA Consent Decree and the Proposed DWSA Amendment are approved but PRASA fails to comply with such decrees, PRASA's financial and operating condition may be significantly adversely affected.

**Highways and Transportation Authority**

The Puerto Rico Highways and Transportation Authority ("PRHTA") is responsible for highway construction in Puerto Rico.  Such construction is financed by debt (interim notes and revenue bonds), revenues of PRHTA and federal and Commonwealth grants.

PRHTA reported a net operating loss of $567.7 million for fiscal year 2013, compared to a net operating loss of $511.8 million for fiscal year 2012 and $530.8 million for fiscal year 2010. As of June 30, 2013, PRHTA's total debt was $6.8 billion, consisting of $4.8 billion of bonds and $2.0 billion of GDB financings.

Debt service on PRHTA's revenue bonds constitutes a first lien on its gross revenues, which consist currently of (i) all the proceeds of the tax on gasoline, (ii) one-half of the proceeds of the tax on gas oil and diesel oil, (iii) all the proceeds of the excise taxes on petroleum products, up to $120 million per fiscal year, (iv) highway toll revenues, (v) the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees, (vi) certain motor vehicle license fees, and (vii) the first $20 million in annual cigarette excise tax revenues collected by the Commonwealth Treasury Department. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general obligation bonds and notes of the Commonwealth and to payments required to be made by the Commonwealth under its guarantees of bonds and notes, to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues to such payments.

On June 25, 2013, the Commonwealth enacted Acts 30 and 31 to provide additional revenues to PRHTA. Pursuant to these laws, (i) the motor vehicle license fees described above, which for fiscal year 2014 were approximately $57.9 million, were assigned to PRHTA (they were previously received by the Commonwealth Treasury Department), (ii) the tax on petroleum products was increased from $3.00 per barrel to $9.25 per barrel, which for fiscal year 2014 generated approximately $162.7 million in additional annual revenues, and (iii) the cigarette excise taxes described above, which for fiscal year 2014 were approximately $18 million, were assigned to PRHTA (they were previously received by the Commonwealth Treasury Department). In January of 2015, the tax on petroleum products was amended and divided into two separate taxes: the current $9.25 per barrel tax assigned to PRHTA and a new $6.25 per barrel tax which was assigned to PRIFA. Effective on the date that certain conditions are met, including the assumption by PRIFA of all of PRHTA's debt due to GDB, the petroleum products tax assigned to PRHTA will be reduced to $6.00 per barrel and the PRIFA petroleum products tax will be increased to $9.50 per barrel.

PRHTA has a mass transit system, known as Tren Urbano, serving a portion of metropolitan San Juan. It was constructed under several design/build contracts and is being privately operated. The cost of the project was $2.4 billion, which cost was financed by federal Transit Administration grants, other federal funding sources and PRHTA's own resources, including revenue bonds. Tren Urbano commenced operations in June of 2005. The current gross annual operation and maintenance cost of the Tren Urbano is approximately $80 million. In August of 2014, legislation was adopted which creates the Puerto Rico Integrated Transit Authority. Under this legislation, the operations of the Tren Urbano, the Puerto Rico Maritime Authority and the Metropolitan Bus Authority will be consolidated under the newly created Authority.

PRHTA is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll

bridge was financed with special facility revenue bonds of PRHTA, payable by the private operator of the bridge principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In certain circumstances described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require PRHTA, among other things, to assume the operator's obligations with respect to the special facility revenue bonds. Some of those circumstances, including lower than projected toll revenues, exist at this time, but PRHTA does not currently anticipate that the operator will exercise its remedy against PRHTA.

On September 22, 2011, PRHTA and the P3 Authority awarded to Metropistas a concession for the operation of toll roads PR-22 and PR-5. In connection with the establishment of the concession, PRHTA defeased, redeemed or purchased approximately $873.1 million aggregate principal amount of its bonds.

**Health Insurance Administration**

The Puerto Rico Health Insurance Administration ("PRHIA") was created in 1993 to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents under the Commonwealth's "Health Reform" program. Under this system, the Commonwealth selected, through a bidding process, a private health insurance company for each designated region of the island and paid such insurance company the insurance premium for each eligible beneficiary within such region. The health insurance system covered the entire island. On October 1, 2010, the Commonwealth implemented "Mi Salud," which replaced the "Health Reform" program. Effective April 1, 2015 "Mi Salud" was replaced by the "Government Health Plan." Although there are some differences, Mi Salud and the Government Health Plan continue to provide comprehensive health insurance coverage to qualifying Puerto Rico residents.

See "FISCAL CONDITION – Health Insurance" for a description of Mi Salud and the Government Health Plan, and the serious financial challenges facing the Government Health Plan, and see "DEBT – Debt of Public Corporations" for information on the outstanding debt of PRHIA.

**Children's Trust**

The Children's Trust is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to the Children's Trust all of its rights, title and interests under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under such Master Settlement Agreement.

As of June 30, 2015, the Children's Trust had outstanding senior and subordinate Tobacco Settlement Asset Backed Bonds in the principal amount of $1.2 billion, which were issued in 2002, 2005 and 2008 to pay certain capital expenditures, to make grants to third parties, and to pay certain expenses of the Commonwealth. These bonds and any other additional senior

bonds issued by the Children's Trust are payable solely from, and secured by a statutory pledge of, the payments made and to be made by the participating cigarette manufacturers under the Master Settlement Agreement.  To date, all principal and interest payments required to be made by the Children's Trust on its outstanding bonds have been made on a timely basis from such payments.

## Convention Center District Authority

The Puerto Rico Convention Center District Authority ("CCDA") was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Dr. Pedro Rosselló González Convention Center, and designated private parcels located within the Convention Center District in San Juan.  The convention center commenced operating on November 17, 2005.  The CCDA also owns a multipurpose coliseum in San Juan, known as the José Miguel Agrelot Coliseum.  On May 15, 2013, the CCDA acquired the Bahía Urbana project to administer and supervise its operations. Bonds issued by the CCDA in 2006 to finance the construction of the convention center are payable from a portion of a hotel room tax. See "DEBT – Debt of Public Corporations" above for additional information on the outstanding debt of the CCDA.

## Industrial Development Company

The Puerto Rico Industrial Development Company ("PRIDCO") participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers.  PRIDCO reported a consolidated increase in net position of $23.5  million for fiscal year 2014, compared to a consolidated decrease  in net position of $1.9 million  for fiscal year 2013.  Rentals derived from the leasing of certain PRIDCO facilities are pledged to the payment of PRIDCO's revenue bonds.  See "DEBT – Debt of Public Corporations" above for information on the outstanding debt of PRIDCO.

## Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority

Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") was created to finance (through the issuance of its revenue bonds) industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies.  The bonds are payable solely from payments to be made to AFICA by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities.

## Infrastructure Financing Authority

The Puerto Rico Infrastructure Financing Authority ("PRIFA") was created to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities authorized to develop infrastructure facilities and to establish alternate means for financing those

facilities.  PRIFA is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by such entities.

As of September 30, 2015, PRIFA's total debt was approximately $2.1 billion.  This debt includes bonds outstanding of $2.0 billion and interim financing for capital improvements of $53.0 million.

PRIFA oversees the Puerto Rico Infrastructure Fund, which is being funded annually through fiscal year 2052 with the first $117 million of proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to Puerto Rico pursuant to the U.S. Code.  See "COMMONWEALTH TAXES, OTHER REVENUES AND EXPENDITURES - Revenues from Non-Commonwealth Sources."  Rum is the only article currently produced in Puerto Rico  subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury Department (except for negligible collections for other alcoholic beverages).  PRIFA is using these funds to pay debt service of bonds issued to finance various infrastructure projects.

PRIFA also has custody and control of the Infrastructure Development Fund and its Corpus Account, a perpetual account established under Act No. 92 of June 24, 1998 that was funded with $1.2 billion of the proceeds of the sale of the Puerto Rico Telephone Company.  In January of 2009, PRIFA sold the securities held in the Corpus Account and used the proceeds to (i) retire certain PRIFA bonds, (ii) make a deposit to the General Fund which was applied to cover a portion of the Commonwealth's budget deficit, (iii) make a transfer to GDB as a capital contribution, and (iv) make a deposit to the Corpus Account to be invested in a long-term investment agreement with GDB.

As part of the Commonwealth's actions to address the financial condition of the Employees Retirement System, $162.5 million of funds on deposit in the Corpus Account were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%.  PRIFA also invested $165.0 million of funds on deposit in the Corpus Account in capital appreciation bonds of COFINA maturing annually on August 1, 2045 through 2050 and accreting interest at 7%.

PRIFA is responsible for implementing in the Commonwealth the applicable provisions of ARRA. One of its main responsibilities regarding ARRA is to maximize the flow of funds from the Federal Government for the appropriate investment in qualified projects and activities. PRIFA also is responsible for the receipt, administration and disbursement of such funds and monitoring those governmental agencies and entities that receive ARRA funds.

In January of 2015, the Commonwealth enacted a new tax of $6.25 per barrel on petroleum products (other than diesel) and assigned the proceeds of such tax to PRIFA. The legislation also provided that such tax would increase by $3.25 per barrel, to $9.50 per barrel, and that the petroleum tax assigned to PRHTA would decrease by the same amount, to $6.00 per barrel, on the date that certain conditions were met, including the transfer by PRHTA to PRIFA

of all outstanding GDB loans to PRHTA and the release by GDB of its lien on certain revenues of PRHTA.

## Municipal Finance Agency

The Puerto Rico Municipal Finance Agency ("MFA") is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve.  Debt service on MFA's bonds is payable from debt service payments on municipal bonds and notes held by MFA and from the debt service reserve, including investment income thereon.  The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislative Assembly, which appropriation is authorized but not legally required to be made.  To date, no such payments have been required.  See "DEBT – Debt of Public Corporations" above for information on the outstanding debt of MFA.

## Port of the Americas Authority

The Port of the Americas Authority was originally responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico.  In 2011, the Ponce Ports Authority was created and given the exclusive jurisdiction of the Port of the Americas.

The Port of the Americas Authority had been authorized to issue bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million for the development of the Port of the Americas. As of  September 30, 2015, GDB held approximately $233.6 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth.  The proceeds from these bonds have been used to refinance and repay the outstanding bonds that were due and payable on January 1, 2015.  The aggregate outstanding principal amount shall be payable in full on January 1, 2045. The Commonwealth has been paying debt service on these bonds under its guaranty pursuant to Act No. 409 of the Legislature of Puerto Rico, approved September 22, 2004. While the responsibility for the development and operation of the Port of the Americas was transferred from the Port of the Americas Authority to the Ponce Ports Authority by Act No. 240 of 2011, the Port of the Americas Authority retained the liability for the outstanding bonds, which are expected to be paid by the Commonwealth under its guarantee to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient for that purpose.
.

## Ponce Port Authority

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Ponce Ports Authority since 2011, the terminal can handle containerized import/export and transshipment cargo.  The first phase of the port development was completed in 2004 while the second phase, which included the construction of a container yard with capacity for up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009.  A third development phase is still pending, which would result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent

Units and include the installation of the basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port. In December of 2013, legislation was enacted to authorize the selection of an international level ports operator and an administrator for the adjacent value added zone. These measures were aimed at completing the remaining infrastructure required for the project to become operational in the near future.

In October of 2014, the Port of Ponce Authority published a Request for Proposals seeking a world-class operator for the Port. In February of 2015, the Port of Ponce Authority selected *Portek International Pte Ltd* as the company who would operate the entire port facilities. On August 26, 2015 the Port of Ponce Authority signed a contract with Portek that enables the operation, revitalization, and promotion of the Port of Ponce for the next three years. Portek will evaluate the human resources needed for the operation, sign agreements with different transport and logistics companies and provide logistical support for operations, maintenance and business plans.

**Puerto Rico Ports Authority**

PRPA owns the major airport and seaport facilities in Puerto Rico. Until February 27, 2013, PRPA also operated all these facilities. On that date, PRPA transferred the operation of the Commonwealth's principal airport to a private consortium consisting of Grupo Aeroportuario del Sureste and Highstar Capital pursuant to a 40-year lease agreement. As a result of the transaction, PRPA received a $615 million upfront payment, of which it used $176.7 million to repay certain PRIFA limited obligation bonds. PRPA derives revenues from a variety of sources, including charges on airplane fuel sales, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. PRPA reported a decrease in its net position of $61.5 million and $73.4 million during fiscal years 2014 and 2013, respectively. See "DEBT – Debt of Public Corporations" above for additional information on the outstanding debt of PRPA.

**Public Buildings Authority**

PBA is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth. Bonds that have been issued by PBA to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are secured by the Commonwealth's guaranty. PBA is authorized by law to have outstanding at any one time up to $4.7 billion of bonds guaranteed by the Commonwealth. See "DEBT – Debt of Public Corporations" above for additional information on the outstanding debt of PBA.

**Sales Tax Financing Corporation**

COFINA was originally created in 2006 for the purpose of financing the payment of certain appropriation-backed debt outstanding as of June 30, 2006, payable to GDB and PFC. In 2009, the Legislative Assembly of the Commonwealth expanded the purposes for which COFINA was created and increased from 1% to 2.75% (one-half of the sales and use tax rate of 5.5%) the portion of the Commonwealth sales and use tax that is transferred to COFINA. COFINA was then authorized to issue bonds for the following additional purposes: (i) to pay, in

whole or in part, the debt of the Secretary of the Treasury with GDB in the amount of $1 billion, the proceeds of which were used to cover the budgetary deficit for fiscal year 2009, (ii) to pay, in whole or in part, certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iii) to pay, in whole or in part, the accounts payable to suppliers of the Commonwealth, (iv) to pay or finance operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) to pay or finance operational expenses of the Commonwealth for fiscal year 2012, which would have to be included in the annual budget of the Commonwealth, (vi) to fund the Puerto Rico Economic Stimulus Fund, (vii) to fund the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) to generate moneys to fund the Economic Cooperation and Public Employees Alternatives Fund.

On October 9, 2013, an amendment to the COFINA legislation was enacted which increases from 2.75% to 3.50% the portion of the Commonwealth sales and use tax transferred to COFINA and expands the permitted uses of COFINA bond proceeds to include, among others, the refinancing of bond anticipation notes and the financing of the Commonwealth's deficit for fiscal years 2013, 2014 and 2015. Since the planned COFINA bond issue was postponed, Act 72-2014 delays the transfer of these funds to COFINA until the fiscal year following the year in which the COFINA bond issue is consummated.

See "DEBT – Debt of Public Corporations" above for additional information on the outstanding debt of COFINA.

## Special Communities Perpetual Trust

The Perpetual Trust is a public corporation created by law to be an irrevocable and permanent trust. The Perpetual Trust's principal purpose is to fund development projects that address the infrastructure and housing needs of underprivileged communities. GDB made a special capital contribution to the Perpetual Trust of $500 million and provided the Perpetual Trust with a $500 million, non-revolving, line of credit. As of June 30, 2015, the Perpetual Trust had disbursed most of its funds and its line of credit with GDB had an outstanding balance of $345.8 million. The line of credit is payable from legislative appropriations.

## University of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2014-2015 was approximately 58,104 students. Commonwealth appropriations are the principal source of University revenues. The amount of the annual appropriation is based on a statutory formula, and equals 9.60% of the Commonwealth's average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year. Additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. The University's capital improvements have been financed mainly by revenue bonds. See "DEBT – Debt of Public Corporations" above for information on the outstanding debt of the University.

The Fiscal Sustainability Act froze for the three fiscal year period ending on June 30, 2017 the formula appropriations to the University at the same subsidized level granted in the fiscal year 2013 budget. The University has adjusted its operational budget making the necessary modifications to contain increases in costs.

## LITIGATION

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of its governmental operations.  Under Act 104 of June 25, 1955, as amended, persons are authorized to sue the Commonwealth only for causes of actions specified in said Act.  The Commonwealth may be liable under Act 104 for damages up to a maximum amount of $75,000, or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action.

Under certain circumstances, as provided in Act 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them.  There is no limitation on the amount of the judgment that may be paid under Act 9 in cases before federal court, but in all other cases the Puerto Rico Secretary of Justice may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.

With respect to pending and threatened litigation (4,141 cases), excluding the cases mentioned under LITIGATION, as of June 30, 2015 the Commonwealth has included in its financial statements reported liabilities of approximately $1.5 billion for awarded and anticipated unfavorable judgments.  Such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts claimed as of June 30, 2015 exceed $9.5 billion; however, the ultimate specific liability cannot be presently determined, especially because of the nature of labor claims, where the awards for unpaid salaries are calculated by the agencies.  The Commonwealth believes that most of the claims are excessive, frivolous, or both, and that its ultimate liability should not significantly exceed the amounts set forth in the Commonwealth's financial statements.

**Puerto Rico Debt Enforcement and Recovery Act**

On June 28, 2014, certain holders of bonds issued by PREPA filed a lawsuit in the United States District Court for the District of Puerto Rico *Franklin California Tax Free Fund v. Commonwealth of Puerto Rico, Civil No. 14-1518 (FAB),* seeking a declaratory judgment that the Recovery Act violates several provisions of the United States Constitution.  The complaint alleges that the Recovery Act is a law dealing with "bankruptcy matters" and that the Commonwealth is precluded by the United States Constitution from enacting this law since only the United States Congress can do so under the "bankruptcy clause" of the United States Constitution.  The complaint further alleges that certain provisions of the Recovery Act, if enforced, would violate several provisions of the United States Constitution because they would constitute an unconstitutional impairment of the contract between PREPA and its bondholders or a "taking" of the bondholders' property without just compensation.

On July 22, 2014, an investment manager, on behalf of investment funds which purportedly hold bonds issued by PREPA, filed another lawsuit in the United States District Court for the District of Puerto Rico (*Bluemountain Capital Management, LLC v. Alejandro*

*Garcia Padilla, et. al.*) seeking a declaratory judgment that the Recovery Act violates the bankruptcy clause of the United States Constitution and other provisions of the United States and Commonwealth  Constitutions, asserting similar arguments as the *Franklin California Tax Free Fund* complaint.  On August 20, 2014, the District Court issued an order consolidating both actions.

The Commonwealth, PREPA and GDB filed motions to dismiss both lawsuits for failure to state a claim. The motions to dismiss asserted, among other things, that since the Recovery Act has never been invoked, the lawsuits are not ripe, and that there is no preemption by federal law, because there is no federal law applicable to the enforcement of the debts of Puerto Rico public corporations. The Commonwealth, PREPA and GDB believe that the provisions of the Recovery Act can be enforced in a manner that complies with the requirements of both the United States Constitution and the Commonwealth Constitution.

On February 6, 2015, the United States District Court issued a declaratory judgment and permanent injunction holding that the Recovery Act is unconstitutional because it is preempted by the United States Bankruptcy Code.  The Commonwealth filed an expedited appeal before the United States Court of Appeals for the First Circuit. On July 6, 2016, a three-judge panel of the Court of Appeals upheld the judgment of the District Court holding that the Recovery Act is unconstitutional. On August 21, 2015 the Department of Justice filed a petition for writ of certiorari before the United States Supreme Court. In essence, the Government argues that the First Circuit erred in holding that section 903(1) of the Bankruptcy Codes preempts the Recovery Act because the history, text, and structure of section 903(1) do not allow a conclusion of preemption.  The Government also argues that the Court should grant certiorari to address an important question of federal law that has enormous repercussions on Puerto Rico in times of a major financial crisis.

**Recovery of Medicaid Funds**

The Commonwealth is a defendant in two lawsuits, one in Commonwealth court and one in the U.S. District Court for the District of Puerto Rico, filed by certain "Federally Qualified Health Centers" (the "FQHCs") seeking to recover from the Commonwealth approximately $800 million in Medicaid "wraparound payments", also known as "330 Funds", which the Commonwealth Department of Health has failed to make since 1997, when the Commonwealth first became a participant in the Medicaid Program.  The Commonwealth has admitted its noncompliance with the wraparound requirement and the only controversy is the total amount owed.

To date, five partial judgments have been entered in the Commonwealth court case.  Four of the partial judgments are final. Under the four partial judgments that are final, the Commonwealth is required to pay approximately $28 million. In accordance with the court's order, the Commonwealth included $22.5 million of the total in its budget for fiscal year 2015. The court requested for the manner in which the payments would be satisfied. The Commonwealth claimed the applicability of a payment plan under Act No. 66-2014.   In accordance, the Secretary of Justice approved a $3 million payment per fiscal year until the total payment, subject to the budgetary provisions allowed in Act No. 66, supra.  The Centers opposed the payment plan and the application of Act No. 66-2014 to the cases. On November 18, 2014,

the State Court concluded that Act No. 66-2014 did apply to the Partial Judgments, but ordered the State to consign a $5 million per year, divided in two payments, starting on fiscal year 2015-2016.   Both parties presented writs of certiorari in the Court of Appeals, which were consolidated.  The FQHCs disagreed with the application of Act No. 66, supra, to the judgments and the Commonwealth argued that  the imposition of  any payment in excess of the maximum $3 million per year, is unlawful and barred by Act No. 66, supra.   The CA sustained the application of Act No. 66-2014, but remanded the case to the State Court for determination of the appropriate payment plan.  On August 19, 2015 some of the Plaintiffs filed a writ of *certiorari* before the Puerto Rico Supreme Court, challenging the applicability of Act No. 66-2014 to the judgments that are final and binding.  This writ is actually pending.

Another partial judgment of $109,021,559 was entered in favor of 17 centers and $1,334,007.00 in favor of the Commonwealth.  This partial judgment went onto the  appeal process.  The Commonwealth Court of Appeals remanded the case to the State Superior Court to incorporate the changes made to the Special Commissioner's Report, changes which came about as a result of the Judgment of the First Circuit Court of Appeals of the U.S. District Court, in the parallel Federal case of <u>Consejo de Salud de la Playa de Ponce, supra, v. González Feliciano</u>, 695 F.3d. 831 (1st. Cir.2012).  In this federal case the FQHCs claimed the prospective payments of the Medicaid wraparound payments after July 1, 2006, and the First Circuit revoked the District Court for the District of Puerto Rico, and canceled the formula that the Special Master used to calculate the reimbursements of the Supplemental Wraparound Payments (WAP).  The case was remanded for revision of the formula.

It is important to emphasize that, even when the Commonwealth could not affect the partial Judgments which had become final and binding, the State Court of Appeals clarified that the Special Commissioner could grant credits to the Commonwealth, for payments ordered based on those partial Judgments, which would result in excess of the real liabilities of the Government.  The Court of Appeals denied the Commonwealth's argument as to the source of the discount on credits, pertaining to the 330 Funds, based on the argument that, even when it was previously established that said funds where prone to discounts, this was subject to whether the funds had really been used to benefit Medicaid patients, and the probative weight as to this, relies on the Commonwealth and PRHIA. Therefore, the Appellate Court concluded that the Commonwealth and PRHIA failed to present the evidence required to establish that a discount on credits should be granted in their favor.

With regards to the remedy requested by the FQHCs, the Commonwealth Court of Appeals rejected almost the totality of the FQHC appellants' arguments.

A motion for Reconsideration was presented by the FQHC, but denied by the State Court of Appeals on April 29, 2014, order notified to the parties on May 6, 2014.  On July 7, 2014, the Commonwealth of P.R. filed a Writ of Certiorari at the P.R. Supreme Court challenging in part the judgment of the P.R. Court of Appeals in a matter related to the decision that denied the discount on credits pertaining to the 330 Funds.  On August 18, 2014, the codefendant PRHIA filed a motion to join the Writ of Certiorari.  On November 13, 2014, the Puerto Rico Supreme Court issued an order declining to issue the Writ of Certiorari.  The Commonwealth filed a motion for reconsideration on November 26, 2014.  On February 19, 2015, the Puerto Rico

Supreme Court issued an order denying the motion of reconsideration. On May 8, 2105, the Court denied the Commonwealth's second motion for reconsideration. The judgment is final and binding.

In the federal court case, the court has issued various orders requiring the Commonwealth to make the Medicaid "wraparound" payments (WAP) to the health centers, as required under the Medicaid portion of the Social Security Act. The Commonwealth has already made approximately $40 million in uncontested payments pursuant to these orders, and has a $27 million remaining payments due for reconciliation of which $9 million has being disbursed. The next installment of quarterly WAP is due October 17, 2015. Failure to comply with the payment orders will result in garnishment of Commonwealth funds, as happened during payment for the second quarter of 2015. The parties continue litigating various issues relating to the calculation of the balance of the payments.

It should be mentioned that the Federal District Court recently ordered the deconsolidation of the cases ***Consejo de Salud Playa de Ponce v. Francisco Joglar Pesquera, etc.*** 06-1260 (PG), and Ŕio Grande Community Health, et al v. Commonwealth of Puerto Rico, Civil No. 03-1640 (GAG). The first case, Consejo, is operating under a Settlement Agreement that has a formula for the computation of the quarterly payments. The second case continues the litigation not only of the payments, but Plaintiffs are questioning the adequacy of the administrative procedures of the Commonwealth to evaluate the FQHCs requests for payments, requests for review of their rates based on changes in scope of services and procedures to resolve disputes if they arise. These are issues yet to be resolved by the Court.

As of September 30, 2015, this legal contingency has an estimated exposure of $500 million.

**Special Education Students**

The Commonwealth is a defendant in a class action initiated in 1980 by parents of special-education students before Commonwealth courts alleging that the Puerto Rico Department of Education had failed to provide legally required special education and related services. In February of 2002, the court issued a judgment approving the stipulations reached by the parties regarding the manner special education services should be provided. Since December of 2002, the Department of Education has paid fines for not complying with the stipulations reached. The fines were originally set in the amount of $1,000 daily, and were raised to $2,000 daily in January of 2006. On November 13, 2014 the court increased the fines for failure to comply with the court's order to $10,000 per day. Also, the court established a special fine of $300,000 to be used for the benefit of the members of the class. The Department of Education has appealed this decision.

As of December 31, 2013, there were over 121,000 students registered in the Special Education Program, but this number changes frequently since new claims are filed constantly. Said resolution also creates a new scheme of monitoring compliance with the stipulations, including the added participation of 12 experts (each party has the right to designate two experts) in six areas of expertise. Said monitoring scheme began on July 1, 2010.

The February 2002 judgment only disposed of the injunctive relief sought by plaintiffs. Still pending before the court are individual claims for damages regarding the failure to provide adequate services. In 2005, the Court denied class certification for the damages stage of the lawsuit, holding that every member of the class must prove their individual damages. In April of 2014, the court also denied plaintiffs' petition for consolidation of the damage claims, holding that each plaintiff must submit evidence of the causal link between the Department of Education's negligence and plaintiff's alleged damages. On May 16, 2014 plaintiffs filed a petition for *certiorari* before the Court of Appeals. The Court of Appeals upheld the judgment. On February 26, 2015 plaintiffs filed a writ of Certiorari before the Supreme Court of Puerto Rico. On July 20, 2015, the Office of the Solicitor General opposed the issuance of the writ. The case is pending before the Supreme Court.

As of September 30, 2015, this legal contingency has an estimated exposure of $650 million.

**Police Institutional Reform**

The Commonwealth is a defendant in a lawsuit filed by the United States Department of Justice alleging a pattern of civil rights violation and excessive use of force by the officers of the Police Department of Puerto Rico. On July 17, 2013, the parties entered into a settlement agreement that requires significant institutional reforms of the Police Department, to be implemented within the next 10 years. Although the Department of Justice's claim does not include damages, the Commonwealth estimates, based on recent expert opinion, that the institutional reform will require an investment of at least $600 million. The Commonwealth allocated $20 million for fiscal year 2015-2016, the same allocation made the previous fiscal year. In addition, PRPD receives funds from the Equitable Sharing Program ("ESP") with DOJ. These funds are received as a result of PRPD's joint work with federal task forces. The amount to be received under the ESP cannot be ascertained as it varies depending on the fund or goods that are subject to government forfeiture.

Under the settlement agreement, the court dismissed the claim, but retained jurisdiction to assure compliance through the Technical Compliance Advisor ("TCA"). The TCA is the person that was agreed to by the parties to oversee the compliance of the eleven (11) areas of the Police Reform. Mr. Arnaldo Claudio was approved by the Federal Court as the new TCA on June 4, 2014. The TCA Office is composed of the TCA, and a group of five experts and three attorneys. The parties agreed that the TCA would receive a maximum of $1,500,000.00 during the next four (4) years. This fiscal year, the TCA prepared a reduced budget of $1,266,270.00. This budget comes out of the $20 Million assigned to the reform.

**Wage Claims**

The Commonwealth is a defendant in two lawsuits instituted in 2007 and 2009 by a large group of employees from the Department of Family, the Administration of Vocational Rehabilitation and the Administration of Juvenile Institutions claiming that wages in an aggregate amount of $215 million are owed to them. The plaintiffs claim for loss of earnings due to the failure of compliance by the agency of the equal payment for equal work under different laws. The plaintiffs claim that they have been adversely affected by reason of the agencies failure

214

to revise the scales of remuneration each time the federal minimum wage changed. Both cases were dismissed by the Superior Court. Plaintiffs appealed, but the decisions were upheld by the Court of Appeals on March 31, 2015.  On August 3, 2015, Plaintiffs filed a petition of certiorari before the Puerto Rico Supreme Court. As of today, the Supreme Court of PR has not ruled upon it.

As of September 30, 2015, this legal contingency has an estimated exposure of $215 million plus an undetermined amount for interest.

**Doral Financial Corporation Litigation**

On June 5, 2014, Doral Financial Corporation and certain of its subsidiaries filed a lawsuit against the Commonwealth of Puerto Rico and the Puerto Rico Department of the Treasury seeking a declaratory judgment regarding the validity of a 2012 closing agreement between Doral and the Commonwealth Treasury, which provided for a refund of approximately $230 million payable over a five-year period, which closing agreement had been declared null by the Treasury Department. On October 10, 2014, the trial court ruled in favor of Doral, holding that the closing agreement was valid. However, on February 25, 2015, the Court of Appeals reversed the trial court's judgment, and ruled that the closing agreement between the Treasury Department and Doral was null and void. The Puerto Rico Supreme Court declined to review the decision, which is now final and favorable to the Commonwealth.

On March 11, 2015, Doral filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code in New York. The Commonwealth of Puerto Rico (Department of Treasury) filed the correspondent proof of claim, which as of this date has not been replied or contested by Doral. At this time, it is not clear if Doral will attempt to make any other tax reimbursement claims against the Commonwealth.

**Employees Retirement System Bond Issuance**

Plaintiffs are pensioners of the Employees Retirement System.  They filed the claim on behalf of the ERS against the underwriters of certain ERS pension bonds and some of the former members of the Board of Trustees of the ERS.  The complaint requested $800 million in damages resulting from the $3 billion bond issuance in 2008 that according to the plaintiffs compromised the solvency of the ERS.  The case was dismissed by the Superior Court, plaintiffs appealed, and the sentence was revoked by the Court of Appeals.  As of this date, the case is pending at the Court of First Instance with several motions to dismiss and petitions to amend the complaint filed by plaintiffs.  Discovery has not commenced.

**Police Association Wage Claims**

Four police organizations and their members and forty-one agents in a separate lawsuit claim back pay wages under laws that mandated salary increases for the Puerto Rico Police Department ("PRPD") members, among other governmental employees. All cases are in discovery process and pending status and pre-trial conference. The potential exposure of the PRPD is approximately $270 million.

**Federal Clean Water Act Complaint from the Environmental Protection Agency**

The United States Department of Justice ("USDOJ"), acting on behalf of the United States Environmental Protection Agency ("EPA"), has filed a complaint alleging unauthorized discharges of pollutants from the storm sewer systems owned and/or operated by the Municipality of San Juan ("MSJ"), the Department of Transportation and Public Works ("DTPW") and the Puerto Rico Highways and Transportation Authority ("PRHTA") through certain flood control pump stations owned and operated by the Department of Natural and Environmental Resources ("DNER"), into the waters of the United States, in violation of the Federal Clean Water Act. The Complaint seeks the assessment of civil penalties against MSJ, DTPW/PRHTA, DNER and the Commonwealth of Puerto Rico for past and present violations of up to $32,500.00 per day per violation, for those violations that occurred between February 5, 2007 and January 12, 2009; and $37,500.00 per day per violation, for those violations that occurred from January 13, 2009 to the present. The complaint further seeks injunctive relief to bring the defendants into compliance with the Municipal Separate Storm Sewer Systems Permit. DNER and DTPW/PRHTA are currently individually engaged in settlement negotiations with USDOJ/EPA to resolve the matter by entering into separate Consent Decrees to be filed with the U.S. District Court for the District of Puerto Rico. Ongoing settlement negotiations entail discussing the terms and conditions to be incorporated into such Consent Decrees. Pursuant to the settlement negotiations, and taking into consideration the economic impact of a civil penalty and the Puerto Rico Defendants' documented inability to pay a penalty, USDOJ/USEPA have agreed to waive the monetary civil penalty associated with the violations alleged in the Complaint. Thus, the Consent Decrees will focus on injunctive relief (i.e., compliance measures) to enable the Puerto Rico Defendants to attain compliance with applicable statutory and regulatory provisions. At this time DNER and DTPW/HTA are involved in finalizing the terms and conditions of the respective Consent Decrees, so that they can be executed by the appropriate representatives of each party and filed with the court. MSJ has finalized its Consent Decree, which was signed by the Deputy Attorney General on September 30, 2015 and by the Mayor of San Juan on October 6, 2015. The MSJ Consent Decree is pending execution by USDOJ and USEPA so that it can be filed in court.

## FINANCIAL STATEMENTS

The Commonwealth's financial statements for fiscal year 2014 have not been finalized.

For fiscal year 2013, the basic financial statements of the Commonwealth were audited by KPMG LLP.  KPMG LLP did not audit the financial statements of certain activities, funds, and component units identified separately in its report dated June 30, 2014 (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding liquidity risks and uncertainties relating to the Commonwealth, the Retirement Systems (as defined herein) and Government Development Bank, the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, the Puerto Rico Electric Power Authority and the Commonwealth's adoption of new accounting pronouncement GASB Statement No. 61, *The Financial Reporting Entity: Omnibus*).  Those financial statements were audited by other independent auditors whose reports were furnished to KPMG LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

The basic financial statements of the Commonwealth for fiscal year 2013 were filed by the Commonwealth with the Municipal Securities Rulemaking Board through its Electronic Municipal Markets Access System ("EMMA") on June 30, 2014.

## CONTINUING DISCLOSURE

The Commonwealth has entered into several continuing disclosure undertakings in accordance with Rule 15c2-12 of the Securities and Exchange Commission in connection with its bond issuances.  Although the Commonwealth has filed all the reports and financial statements required to be filed (other than the fiscal year 2014 financial statements, which have not been finalized), some of these filings have been made after the Commonwealth's filing deadline, which is normally May 1.

*Fiscal year 2014.* On October 30, 2015 the Commonwealth filed with EMMA a notice that the Commonwealth would not file its audited financial statements for fiscal year 2014 by October 31, 2015, as had been previously announced by the Commonwealth.  The Commonwealth cannot provide an estimate at this time of when it will be able to complete and file its audited financial statements.

The Commonwealth has been unable to finalize its 2014 Financial Statements principally due to delay of certain component units and fiduciary funds in completing their financial statements and the independent auditor's decision to conduct additional audit procedures given the liquidity risk and uncertainties affecting the Commonwealth and such units and funds. The component units and fiduciary funds that have not issued their audited financial statements as of the date of this notice are the three retirement systems of the Commonwealth, the Puerto Rico Electric Power Authority, the Puerto Rico Highways and Transportation Authority and the Government Development Bank for Puerto Rico. The audited financial statements of such

component units and fiduciary funds are required to be incorporated into the Commonwealth's financial statements.

*Fiscal year 2013.* The basic financial statements of the Commonwealth for fiscal year 2013 were filed after the Commonwealth's filing deadline.  Initially, the delay was primarily caused by (i) a delay in the commencement of the financial close and audit process for fiscal year 2013, which did not commence until the completion of the financial statement for fiscal year 2012 on September 16, 2013 (delays in the audit of the 2012 financial statements were principally caused by the government transition process after the November 2012 elections), (ii) delays related to the change of the Commonwealth's external auditors, and (iii) the implementation of GASB Statement No. 61, *The Financial Reporting Entity*, which changed the Commonwealth's financial reporting entity. Although the Commonwealth addressed these issues by dedicating additional resources to the financial close and audit process for fiscal year 2013, the Commonwealth was unable to finalize the 2013 financial statements due to certain additional unanticipated delays attributable to (i) additional procedures required as part of the audit, (ii) delays in the issuance of the audited financial statements of the three Commonwealth retirement systems resulting from the pension reform legislation and the subsequent judicial modification of such reforms, and (iii) delays in the issuance of the audited financial statements of certain other blended and discretely presented component units.

*Fiscal Year 2012.*  The Commonwealth's audited financial statements for the fiscal year ended June 30, 2012 were filed after the Commonwealth's filing deadline due to delays in the audit of such financial statements as a result of the government transition process, as a new administration entered office in January of 2013, and the failure of certain discretely presented component units to finalize their audited financial statements. The Commonwealth Report for fiscal year 2012 was also filed after the Commonwealth's filing deadline.

*Fiscal year 2009.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 were filed after the Commonwealth's filing deadline due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units of the Commonwealth.

*Fiscal year 2008.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2008 (and certain prior years) were filed after the Commonwealth's filing deadline, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth Report for fiscal year 2008 was also filed after the Commonwealth's filing deadline.

The Commonwealth previously established certain policies and procedures that it believed would permit timely compliance with its continuing disclosure obligations. Such policies and procedures included the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; and the assignment of dedicated external and internal resources to assist the Central Accounting Division at the Treasury Department in the

preparation of complex financial information that has historically delayed the audit and to provide periodic and consistent follow up on component unit financial statement deliverables and deadlines.  Notwithstanding the establishment of these policies and procedures, the current fiscal condition and  the existing deficiencies in the Commonwealth's accounting systems due to obsolescence and compatibility have affected the Commonwealth's ability to prepare and file its financial statements by the required date. In light of the Commonwealth's continuing  difficulties in the timely filing of its financial statements, the Commonwealth is reviewing how to improve such policies and procedures, and is considering additional measures, to ensure timely compliance in the future with  its continuing disclosure obligations.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by PREPA and PRASA, whose properties are insured through arrangements and policies obtained by the respective entities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.