**EXHIBIT C**

**COMMONWEALTH OF PUERTO RICO**
**Financial Information and Operating Data Report**
**December 18, 2016**

# TABLE OF CONTENTS

INTRODUCTION .............................................................................................................................1

BASIC FACTS ABOUT THE COMMONWEALTH ....................................................................8

OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION ......................................12

RISK FACTORS ...........................................................................................................................43

PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT .........73

COMMONWEALTH REVENUES AND EXPENDITURES .......................................................83

PUBLIC CORPORATIONS........................................................................................................117

COMMONWEALTH FINANCIAL REPORTING AND FINANCIAL RESULTS FOR FISCAL YEARS 2010 THROUGH 2016 ................................................................................................148

DEBT OF THE COMMONWEALTH,  ITS PUBLIC CORPORATIONS AND MUNICIPALITIES ...........172

RETIREMENT SYSTEMS AND OTHER POST-EMPLOYMENT BENEFITS.......................209

THE ECONOMY .........................................................................................................................247

LITIGATION AND RELATED MATTERS ...............................................................................283

FINANCIAL STATEMENTS ......................................................................................................298

CONTINUING DISCLOSURE ...................................................................................................298

INSURANCE MATTERS............................................................................................................300

**COMMONWEALTH OF PUERTO RICO**
**Financial Information and Operating Data Report**
**December 18, 2016**

**INTRODUCTION**

This Financial Information and Operating Data Report contains information about the Commonwealth of Puerto Rico. The information set forth herein is provided as of June 30, 2016, the end of the Commonwealth's 2016 fiscal year, except as otherwise provided herein.

**Report Does Not Cover Public Corporations**

Although this Report contains information about certain of the Commonwealth's public corporations, it is not intended to provide full disclosure about the financial condition or operations of such public corporations, whether individually or in the aggregate. The Commonwealth makes no representation about the accuracy or completeness of the information relating to the Commonwealth's public corporations contained in this Report. Readers of this Report should not rely on it for purposes of making investment decisions with respect to the Commonwealth's public corporations.

**Forward-Looking Statements**

The information included in this Report contains certain "forward-looking" statements. These forward-looking statements may relate to the Commonwealth's fiscal and economic condition, economic performance, plans, and objectives. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth that are difficult to predict. The economic and financial condition of the Commonwealth is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the government of the United States of America or other nations that are not under the control of the Commonwealth. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's projections.

The projections set forth in this Report were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's officers responsible for the preparation of such information, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be

1

relied upon as being necessarily indicative of future results, and readers of this Report are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Report, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.

**Certain Defined Terms**

The following terms used in this Commonwealth Report have the following meanings:

***Component Units or Instrumentalities of the Commonwealth of Puerto Rico***

**ADEA** means the Agricultural Enterprises Development Administration, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**AFICA** means the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**AMSCA** means the Mental Health and Anti-Addiction Services Administration, an agency of the Commonwealth of Puerto Rico.

**APLA** means the Port of the Americas Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**COFINA** means the Puerto Rico Sales Tax Financing Corporation, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**Commonwealth** or **Puerto Rico** means the Commonwealth of Puerto Rico.

**CRIM** means the Municipal Revenues Collection Center, a municipal corporation. Since the CRIM is not a component unit of the Commonwealth, it is excluded from the Commonwealth Basic Financial Statements.

**Children's Trust or CT** means The Children's Trust, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**Desarrollos Universitarios** means Desarrollos Universitarios, Inc., a non-profit entity and a component unit of the University of Puerto Rico.

**ERS** or **Employees Retirement System** means the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, a statutory trust created by Act No. 447 of May 15, 1951, as amended, to provide pension and other benefits to retired employees of the

Commonwealth, its public corporations and municipalities. ERS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements.

**FAFAA** or **Fiscal Agency and Financial Advisory Authority** means the Puerto Rico Fiscal Agency and Financial Advisory Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**GDB** or **Government Development Bank** means the Government Development Bank for Puerto Rico, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**GSA** or **General Services Administration** means the Puerto Rico General Services Administration, an agency of the Commonwealth of Puerto Rico.

**HFA** or **Housing Finance Authority** means the Puerto Rico Housing Finance Authority, a public corporation and a component unit of the Governmental Development Bank.

**HTA** or **Highways Authority** means the Puerto Rico Highways and Transportation Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**JRS** or **Judiciary Retirement System** means the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, a statutory trust created to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth. JRS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements.

**MBA** or **Metropolitan Bus Authority** means the Puerto Rico Metropolitan Bus Authority, a public corporation and component unit of the Commonwealth of Puerto Rico.

**MFA** or **Municipal Finance Authority** means the Puerto Rico Municipal Finance Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**MTA** or **Maritime Transportation Authority** means the Puerto Rico and Municipal Island Maritime Transportation Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**OMB** or **Office of Management and Budget** means the Office of Management and Budget, an agency of the Commonwealth of Puerto Rico.

**Oversight Board** means the Financial Oversight and Management Board established for Puerto Rico under PROMESA.

**PBA** or **Public Buildings Authority** means the Puerto Rico Public Buildings Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PFC** or **Public Finance Corporation** means the Puerto Rico Public Finance Corporation, a public corporation and a component unit of the Government Development Bank.

**Planning Board** means the Puerto Rico Planning Board, an agency of the Commonwealth of Puerto Rico.

3

**PRASA** or **Aqueduct and Sewer Authority** means the Puerto Rico Aqueduct and Sewer Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRCCDA** or **Convention Center District Authority** means the Puerto Rico Convention Center District Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PREPA** or **Electric Power Authority** means the Puerto Rico Electric Power Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRHIA** or **Health Insurance Administration** means the Puerto Rico Health Insurance Administration, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRIDCO** or **Industrial Development Company** means the Puerto Rico Industrial Development Company, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRIFA** or **Infrastructure Financing Authority** means the Puerto Rico Infrastructure Financing Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRIICO** means the Puerto Rico Industrial Investment Corporation, a subsidiary and component unit of PRIDCO.

**PRITA** means the Puerto Rico Integrated Transit Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRMSA** or **Medical Services Administration** means the Puerto Rico Medical Services Administration, a public corporation and an enterprise fund of the Commonwealth of Puerto Rico.

**Retirement Systems** means the fiduciary funds of the Commonwealth of Puerto Rico, comprised of: the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System.

**SIF** or **State Insurance Fund** means the Puerto Rico State Insurance Fund, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**Treasury Department** means the Department of the Treasury of Puerto Rico, an agency of the Commonwealth of Puerto Rico.

**TRS** or **Teachers Retirement System** means the Puerto Rico System of Annuities and Pensions for Teachers, a statutory trust created to provide pension and other benefits to retired teachers of the Puerto Rico Department of Education and to the employees of the Teachers Retirement System. TRS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements.

**UPR** or **University of Puerto Rico** means the University of Puerto Rico, a public corporation and a component unit of the Commonwealth of Puerto Rico.

### *Other defined terms*

**ACA** or **Affordable Care Act** means the Patient Protection and Affordable Care Act enacted by the Congress of the United States. A significant portion of the funds necessary to fund the Commonwealth's health insurance program are provided by ACA. Without a change in federal policy, the Commonwealth is expected to exhaust its allocation of ACA funds by fiscal year 2018.

**Act**. References to an Act means a law enacted by the Legislative Assembly of the Commonwealth and signed by the Governor of the Commonwealth (except in cases in which a Gubernatorial veto is validly overridden), as amended from time to time.

**Act 154** means Act No. 154-2010, which, *inter alia*, imposes a temporary excise tax on the acquisition by multinationals of certain property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. The Act 154 temporary excise tax expires on December 31, 2017.

**CAE Tax** means the Additional Special Tax collected by CRIM for the benefit of Puerto Rico's municipalities, which serves as the primary source of repayment of municipal general obligation bonds.

**Commonwealth Guaranteed Obligations** means debt obligations guaranteed by the Commonwealth, which guaranty is supported by the good faith, credit and taxing power of the Commonwealth.

**Executive Order**. References to an Executive Order means an Executive Order issued by the Governor of the Commonwealth. Unless other indicated, the Executive Orders mentioned herein were issued in 2016.

**FEGP** or **Fiscal and Economic Growth Plan** means the Fiscal and Economic Growth Plan, originally published in September 2015 and subsequently revised in January 2016, prepared by the Working Group for the Fiscal and Economic Recovery of Puerto Rico.

**Fiscal Sustainability Act** means Act No. 66-2014 of June 17, 2014, enacted by the Legislative Assembly of the Commonwealth, which imposes certain spending and budgetary controls on the Commonwealth.

**U.S. GAAP** means United States Generally Accepted Accounting Principles.

**GASB** means the United States Govermental Accounting Standards Board.

**GDB Notes** means the senior unsecured notes issued by GDB in several series under an Indenture dated February 17, 2006, as amended, with Wilmington Trust, N.A., as successor trustee.

**General Fund** means (i) when used in the context of the Commonwealth's annual budget, the General Fund (Operating Fund), which does not include the Special Revenue Funds (or agencies with independent treasuries), and (ii) when used in the context of the Commonwealth's financial statements prepared in accordance with GAAP, collectively, the General Fund (Operating Fund), the Special Revenue Funds and agencies with independent treasuries.

**General Fund (Operating Fund)** means the Commonwealth principal operating fund; disbursements from such fund are generally approved through the Commonwealth's annual budgeting process.

**GOs** or **General Obligations** means bonds and notes issued by the Commonwealth and supported by the good faith, credit and taxing power of the Commonwealth.

**Governor** means the Governor of the Commonwealth of Puerto Rico.

**Moratorium Act** means the Emergency Moratorium and Financial Rehabilitation Act of 2016, Act 21-2016, enacted by the Legislative Assembly of the Commonwealth of Puerto Rico.

**Pension Bonds** means the Senior Pension Funding Bonds, Series A, Series B and Series C, issued by the Employees Retirement System and payable from employer contributions to the ERS.

**PRIFA BANs** means the Dedicated Tax Fund Revenue Bond Anticipation Notes, Series 2015, issued by PRIFA, payable from a portion of the excise tax on petroleum products.

**PRIFA Ports Bonds** means the Revenue Bonds (Ports Authority Project), Series 2011, issued by PRIFA on behalf of the Port Authority and backed by a GDB letter of credit.

**PRIFA Rum Bonds** means the Special Tax Revenue Bonds and Refunding Bonds, Series 2005A, 2005B, 2005C and 2006 issued by PRIFA and payable from rum federal excise taxes reimbursed to the Commonwealth.

**PROMESA** means the Puerto Rico Oversight, Management and Economic Stability Act, Public Law 114-187, enacted by Congress and signed by the President on June 30, 2016.

**Proposed PROMESA Fiscal Plan** means the plan presented by the Commonwealth in October 2016 to the PROMESA Oversight Board.

**Report** means this Commonwealth Financial Information and Operating Data Report, including the documents incorporated by reference herein.

**Special Revenue Funds** are Commonwealth governmental funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation. Special Revenue Funds are funded from,

6

among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds.

**SUT** or **Commonwealth SUT** means the sales and use tax imposed by the Commonwealth.

**Task Force** means the Congressional Task Force on Economic Growth in Puerto Rico established under PROMESA.

**TRANs** means Tax and Revenue Anticipation Notes issued by the Commonwealth to fund intra-year cash flow deficiencies. TRANs are payable from certain tax collections specified by law.

**TSA** or **Treasury Single Account** means the Commonwealth's main operational account in which substantially all Commonwealth public funds are deposited and from which most expenses are disbursed. TSA receipts include tax collections, charges for services, intergovernmental collections, the proceeds of short and long-term debt issuances and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval.

**Working Group** means the Working Group for the Fiscal and Economic Recovery of Puerto Rico created by the Governor in June 2015.

## BASIC FACTS ABOUT THE COMMONWEALTH

### Location and Population

Puerto Rico is an island located in the Caribbean approximately 1,600 miles southeast of New York City. It has an area of approximately 3,500 square miles and a population estimated at approximately 3.47 million by the United States Census Bureau as of July 1, 2015.

### Relationship with the United States

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris of 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, the United States Congress authorized Puerto Rico to draft and approve its own Constitution, guaranteeing a republican form of government. The Constitution was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the United States Congress, and subsequently approved by the President of the United States in 1952.

The United States and the Commonwealth share a common defense, market and currency. In general terms, the Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. Recently, however, as a result of the current fiscal crisis that affects the Commonwealth (as further discussed below), the United States Congress enacted a law establishing a Financial Oversight and Management Board with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs. The law, known as the "Puerto Rico Oversight, Management and Economic Stability Act" or "**PROMESA**," is discussed below in OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION and PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT.

The people of Puerto Rico are citizens of the United States but do not vote in Presidential elections. They are represented in Congress by a non-voting Resident Commissioner. Most federal taxes, except those such as Social Security and Medicare taxes, are not levied in Puerto Rico. Puerto Rico residents (other than certain federal employees) do not pay federal income tax on Puerto Rico-source income (but they do pay federal income tax on non-Puerto Rico-source income).

For many years, there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, which controls the Executive Branch and the Legislative Assembly since the 2012 general elections, and the other favoring statehood, represented by the New Progressive Party. These two parties had obtained over 90% of the vote for Governor in all elections since 1972. (Or since 1960, if we include a previous pro-statehood party that existed before the New Progressive Party was established.)

On November 8, 2016, general elections took place which resulted in the New Progressive Party obtaining control of the Executive Branch and the Legislative Assembly. Ricardo Rosselló Nevares was elected Governor with approximately 41.76% of the vote.  The candidate for the Popular Democratic Party finished in second place with approximately 38.92% of the vote. Two independent gubernatorial candidates were able to obtain a combined 16.85% of

the vote; and the candidates from the two remaining minority parties obtained a combined 2.47% of the vote. It is the first time since 1968 that the two major political parties have failed to obtain at least 90% of the vote for Governor.

**Official Languages**

The official languages of Puerto Rico are Spanish and English.

**Government**

The Constitution of Puerto Rico provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest Puerto Rico court is the Supreme Court of Puerto Rico. Decisions of the Supreme Court of Puerto Rico may be appealed to the United States Supreme Court in the same manner as decisions from the highest court in each state. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the United States Supreme Court.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.  Certain governmental responsibilities, however, are now subject to the review and approval of the Oversight Board established under PROMESA, discussed later in this Report.

**Fiscal Year**

The Commonwealth's fiscal year runs from July 1 through June 30 of the following year. References in this Report to a fiscal year are to the period ending on June 30 of such year.

**Principal Officers Responsible for Fiscal Matters**

Fiscal responsibility for the Commonwealth is shared among the Treasury Department, the Office of Management and Budget ("**OMB**"), and the Fiscal Agency and Financial Advisory Authority ("**FAFAA**"), which assumed, pursuant to Act No. 21-2016, as amended, known as the Emergency Moratorium and Financial Rehabilitation Act, the fiscal agency and financial advisory responsibilities previously exercised by Government Development Bank for Puerto Rico. The Treasury Department is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and providing revenue projections (as well as monitoring during the fiscal year deviations from revenue projections) in connection to the preparation of each fiscal year's budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. FAFAA now acts as fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and disclosure agent for the Commonwealth.

*Alejandro J. García Padilla* was sworn in as Governor of Puerto Rico on January 2, 2013. From 2009 until becoming Governor, Mr. García Padilla served as an elected senator in the Senate of the Commonwealth of Puerto Rico. Prior to that, Mr. García Padilla was an attorney in the private sector. From 2005 to 2007, Mr. García Padilla was Secretary of the Commonwealth's Department of Consumer Affairs. Mr. García Padilla was a professor at the School of Law of the Inter American University of Puerto Rico from 2000 to 2002. Mr. García Padilla clerked for the Commonwealth's Court of Appeals from 1997 to 1999. He holds a bachelor's degree in Political Science and Economy from the University of Puerto Rico and a Juris Doctor from the Inter American University School of Law.

*Victor Suárez* was appointed as Executive Director of FAFAA on April 18, 2016. He is also the Commonwealth's Secretary of State and the Executive Director of the Puerto Rico Convention Center District Authority. During the past ten years, Mr. Suarez has held various positions with the government of the Commonwealth, including Chief of Staff to the Governor, Executive Director of the Puerto Rico Ports Authority and Secretary of Consumer Affairs. He was also Deputy Mayor and Operations Director for the City of Carolina. Mr. Suarez is an attorney. He received his J.D. degree from the Pontifical Catholic University in Ponce, Puerto Rico, and a Bachelor's Degree in chemical engineering from the University of Puerto Rico. He also has a Master's Degree in engineering management from the Polytechnic University in San Juan, Puerto Rico.

*Juan C. Zaragoza* was designated Secretary of the Treasury of Puerto Rico on October 15, 2014, and sworn into his position on November 17, 2014. He has over 30 years of experience providing tax consulting services, specializing in tax exemption, tax credits, restructuring, and sales and use taxes. Before this appointment, he co-founded in 2002 Zaragoza & Alvarado, a firm engaged in providing tax and business consulting services. Prior to establishing Zaragoza & Alvarado, he was the partner in charge of Arthur Andersen LLP's Tax and Business Advisory Services Practice in San Juan, Puerto Rico. He joined Arthur Andersen in 1993 and became a partner in 1995. From 1989 to 1992, he served as Assistant Secretary for Internal Revenue at the Treasury Department where he oversaw seven major bureaus and was responsible for implementing the Internal Revenue Division's policy-setting and related legislation. From 1983 to 1989, he worked at Price Waterhouse in Puerto Rico, in the Audit and Tax Divisions. Throughout his professional career, Zaragoza has always been very active in the development of tax legislation and the analysis of the tax system in Puerto Rico, both at state and municipal level. He is Past President of the Puerto Rico Certified Public Accountants Association (1997-1998). He holds an MBA in Management from Indiana University at Bloomington and a BBA in Accounting from the University of Puerto Rico.

*Luis F. Cruz* was appointed Director of OMB on October 22, 2014. Prior to this appointment, he served as Director of the Treasury and Budget Commission of the Puerto Rico House of Representatives and as Advisor to the Speaker of the House on Tax, Finance and Budget issues from January 2013 to October 2014. Previously, he had a successful career in public accounting spanning more than 25 years. In 1994, he established his own firm, Luis F. Cruz & Co.—later incorporated as Cruz, Izaguirre & Co., CPA, PSC—to offer accounting, tax, audit, and financial consulting services. In 1999, he established Global Consulting Group, Inc., to offer consulting services in the fraud prevention and detection area, and the evaluation of internal controls. He has offered consulting services to a variety of clients in the private sector, such as Banco Popular de Puerto Rico, Banco Santander, and Ricoh Lanier Puerto Rico. In the

10

public sector, he has provided services to the OMB, Treasury Department, and Puerto Rico Office of Courts Administration, among others. Before founding his own firms, he worked with Caribe Detroit Diesel Allison (1990-1992), and with First Federal Savings Bank (now FirstBank) (1987-1990). Mr. Cruz was a member of the Puerto Rico State Board of Accounting (2002-2006) and a member of the Board of Directors and Treasurer of the Puerto Rico Chamber of Commerce, where he served in various committees (2007-2009). He is a member of the American Institute of Certified Public Accountants, of the Puerto Rico Society of Certified Public Accountants, and of the Association of Certified Fraud Examiners. He obtained an MBA in Finance from the InterAmerican University of Puerto Rico and a BBA in Accounting from the University of Puerto Rico. He is a Certified Public Accountant, a Certified Fraud Examiner, and a Chartered Global Management Accountant.

## OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION

This section presents an overview of the Commonwealth's current fiscal condition.  More detailed discussions of the topics discussed in this section appear in other sections of this Report.

The Commonwealth and most of its public corporations are in the midst of a profound fiscal crisis.  Despite various measures undertaken in recent years to stimulate economic growth, reduce government expenses and increase revenues, the Commonwealth has been unable to spur economic growth and eliminate the recurrent excess of expenditures over revenues.  During the past decade, the Commonwealth's balance sheet has significantly deteriorated due to years of economic recession, the financing of recurrent expenses with long-term debt and the failure to adequately fund legacy obligations, such as pensions. The Commonwealth's most recent ten-year projections suggest that the Commonwealth's fiscal condition is likely to deteriorate further in the absence of a significant debt restructuring and material changes in local and federal policy.

The Commonwealth's balance sheet deterioration, coupled with continued structural imbalances between revenues and expenditures and the Commonwealth's recent inability to access the capital markets, have resulted in the Commonwealth becoming unable to pay scheduled debt payments while continuing to provide government services.

A framework for understanding the fiscal challenges faced by the Commonwealth during the next decade was first proposed in the Krueger Report and it was further developed and refined in the Fiscal and Economic Growth Plan presented to the Governor in September 2015, which was prepared by the Working Group for the Fiscal and Economic Recovery of Puerto Rico, created by the Governor in June 2015.  This framework sought to compare the resources and expenditures that the Commonwealth (and most of its public corporations) expected to collect and incur, respectively, on a consolidated basis, during the next ten years assuming no changes to current laws and policies.  The analysis made by the Krueger Report highlighted the need to measure the Commonwealth's financial health, not on the basis of the Commonwealth's General Fund exclusively, but rather on a more comprehensive and consolidated manner that captures the cost of legacy liabilities, including debt and pensions, the results of operations of those Commonwealth public corporations that provide essential government services or that are directly supported by Commonwealth taxes or appropriations, and the cost of necessary capital expenditures.

The fiscal projections prepared by the Working Group in October 2016 utilizing the aforementioned framework indicate that, based on certain assumptions, including lack of access to third party financing, and without including the impact of changes to current federal or state laws and policies, consolidated expenditures (including required pension payments and debt service on tax-supported debt) would, in the aggregate, exceed consolidated resources by approximately $58.7 billion from fiscal year 2017 to fiscal year 2026.

These projections form the basis of the Fiscal Plan prepared by the Commonwealth pursuant to the requirements of PROMESA and presented to the Oversight Board on October 14, 2016 (the "**Proposed PROMESA Fiscal Plan**"). The Proposed PROMESA Fiscal Plan, described in detail below, identifies the Commonwealth's projected financing gaps under several scenarios and the measures that the Commonwealth may take to reduce such financing gaps. Even assuming that the Commonwealth takes the measures identified in the plan and that such

12

measures produce the projected economic and financial results, the Proposed PROMESA Fiscal Plan projects that, in the absence of federal Affordable Care Act funding for the Government's health programs, there would still be a material cumulative financing gap during the ten-year period *before* any debt payments are made during such period. As further discussed below, the Oversight Board rejected the initial version of the Proposed PROMESA Fiscal Plan and requested that the Governor prepare and submit a revised fiscal plan.

**Recurrent Deficits**

One of the principal causes of the Commonwealth's current fiscal crisis has been the Commonwealth's inability to increase its revenues and reduce its expenditures in order to avoid recurrent structural deficits.  These deficits have historically been funded with borrowings from either the public bond market or governmental institutions, such as GDB, or by deferring the cost of certain legacy liabilities. The practice of issuing long-term debt to pay for current operational expenses, together with the failure to properly fund legacy liabilities such as employee retirement benefits, the ballooning cost of healthcare, and the contraction of the revenue base due to prevailing economic conditions, have led to a material deterioration in the Commonwealth's consolidated net position, as calculated pursuant to Generally Accepted Accounting Principles in the United States ("**U.S. GAAP**").

**Changes in Net Position According to U.S. GAAP.** According to the Commonwealth's Basic Financial Statements prepared in accordance with U.S. GAAP, the net deficit position of the Commonwealth's "Primary Government" and "Discretely Presented Component Units" increased by approximately $28.569 billion from fiscal years 2009 to 2014, from $15.021 billion in fiscal year 2009 to $43.590 billion in fiscal year 2014. During such period, the long-term debt obligations, including capital leases of the Commonwealth's Primary Government and its Discretely Presented Component Units increased by approximately $14.584 billion from $50.998 billion in fiscal year 2009 to $65.582 billion in fiscal year 2014.

The net pension obligation of the Primary Government also increased from approximately $6.754 billion in fiscal year 2009 to approximately $14.591 billion in fiscal year 2014. The unfunded actuarial accrued liability of the Commonwealth's three main Retirement Systems further grew by approximately $10 billion from June 30, 2009 (approximately $24 billion) to June 30, 2013 (approximately $34 billion).

Since reaching a peak in fiscal year 2009, cash and investments of the Primary Government have declined materially, in particular if one excludes cash held at governmental banks such as GDB (which is now restricted pursuant to the Moratorium Act due to GDB's financial difficulties).

**Annual Deficiencies of Revenues under Expenditures.** For several years the Commonwealth has also incurred consecutive annual deficiencies of revenues under expenditures under U.S. GAAP in its "Governmental Funds," which include (i) the General Fund, comprised of results of the Commonwealth's primary operating fund, its Special Revenue Funds and agencies with independent treasuries, (ii) the Debt Service Fund, where the Commonwealth accumulates the resources for the payment of long-term general obligation debt, (iii) the Capital Projects Fund, which accounts for the Commonwealth's capital expenditures, and (iv) the funds related to the Commonwealth's Blended Component Units, including the

Puerto Rico Sales Tax Financing Corporation (**"COFINA"**). Such results <u>do not</u> include the results of operation of the Commonwealth's "Discretely Presented Component Units" (consisting of 44 component units in the fiscal year 2014 audited financial statements, including entities such as HTA, GDB, UPR, and PRHIA) or its various "Proprietary Funds" (such as the Lotteries and PRMSA).

The table below provides results under U.S. GAAP for the Commonwealth's Governmental Funds for fiscal years 2009 through 2016. The information for fiscal years 2015 and 2016 is preliminary, unaudited, based on multiple assumptions and projections, and subject to change. In particular, actual figures for fiscal year 2016 may vary significantly from the preliminary figures set forth below given that the review of the information for fiscal year 2016 is in its initial stages.

**Commonwealth of Puerto Rico**

**Deficiency of revenues under expenditures (Deficit)[1]**

($ in thousands)

| Fiscal Year | Operational General Fund [2] | Special Revenue Funds | Total General Fund [3] | Debt Service Fund | COFINA Funds | Other Governmental Funds | Total Governmental Funds |
|---|---|---|---|---|---|---|---|
| 2009 | (2,343,976) | 108,715 | (2,235,261) | (298,083) | (107,452) | (878,706) | (3,519,502) |
| 2010 | (2,047,053) | 256,755 | (1,790,298) | (802,259) | (876,334) | (879,485) | (4,348,376) |
| 2011 | (1,081,650) | (560,164) | (1,641,814) | (1,500,914) | 35,017 | (677,772) | (3,785,483) |
| 2012 | (1,337,711) | (1,188,143) | (2,525,854) | (781,710) | (458,420) | (1,457,517) | (5,223,501) |
| 2013 | (807,084) | (539,722) | (1,346,806) | (886,541) | (16,513) | (1,359,670) | (3,609,530) |
| 2014 | (439,556) | (1,095,156) | (1,534,712) | (920,771) | (340,073) | (1,008,764) | (3,804,320) |
| 2015 [4] | (810,476) | (237,476) | (1,047,952) | (996,611) | 55,086 | (1,158,108) | (3,147,585) |
| 2016 [5] | (905,753) | (83,427) | (989,180) | (1,085,546) | 42,385 | (1,055,085) | (3,087,426) |

(1) The figures are presented, in accordance with U.S. GAAP, pursuant to the "economic resources" method and the "modified accrual" basis of accounting.

(2) Amounts reported in "Operational General Fund" differ from amounts reported for the "General Fund" on a "budgetary" basis due to, among other things, the former incorporating accounting adjustments required to report such results pursuant to the "modified accrual" basis of accounting under U.S. GAAP.

(3) In accordance with U.S. GAAP, the Commonwealth merges the Operational General Fund and the Special Revenue Funds listed in the first two columns above in a single column in its Basic Financial Statements. These Special Revenue Funds do not meet the required criteria for separate presentation under U.S. GAAP and are thus blended with the General Fund.

(4) The fiscal year 2015 results are preliminary, unaudited and subject to change. Results for fiscal year 2015 do not account for the results of operations of various component units, such as ASES and GDB, which have historically been presented as "Discretely Presented Component Units" in the Basic Financial Statements but that may, as part of the fiscal year 2015 audit, be recharacterized as "Blended Component Units" and thus incorporated into the Governmental Fund financial statements. The fiscal year 2015 deficit also includes approximately an impairment charge on the Commonwealth of approximately $100 million, reflected in the "Operational General Fund," and another $100 million charge on the Special Communities Trust, reflected in the "Other Governmental Funds", in each case to account for the impairment of amounts on deposit in GDB.

(5) The fiscal year 2016 results are preliminary, unaudited and subject to change. Results for fiscal year 2016 do not account for the results of operations of various component units, such as ASES and GDB, which have historically been presented as "Discretely Presented Component Units" in the Basic Financial Statements but that may, as part of the fiscal year 2016 audit, be recharacterized as "Blended Component Units" and thus incorporated into the Governmental Fund financial statements. The fiscal year 2016 deficit also includes an impairment charge on the Commonwealth of approximately $490 million, reflected in the "Operational General Fund," to account for the impairment of amounts on deposit in GDB, and $163 million of clawback revenues retained by the Commonwealth and used for the payment of its General Obligations Bonds. The Special Revenue Funds include a charge of approximately $120 million in unpaid Additional Uniform Contributions to the ERS. As required by U.S. GAAP, the deficit includes, among other things, paid and unpaid debt service

on General Obligations bonds and certain Commonwealth Guaranteed debt, as well as paid and unpaid debt service from governmental funds that was due during fiscal year 2016.

*Source: Schedule of Revenues and Expenditures- Budget vs Actual- Budgetary Basis- General Fund*

*Statement of Revenues, Expenditures and Changes in Fund Balance - Governmental Funds*

The average Governmental Funds deficit for fiscal years 2009 through 2014 was approximately $4.048 billion. The preliminary and unaudited Governmental Fund deficit estimates for fiscal years 2015 and 2016 are $3.148 billion and $3.087 billion, respectively.

The deficit of the Commonwealth's Governmental Funds, excluding principal and interest payments on outstanding debts and debt issuance costs, for fiscal years 2010 through 2013 was approximately $772.2 million, $331.3 million, $1.210 billion, and $1.023 billion, respectively.  For fiscal years 2014 to 2016, the excess of revenues over expenditures of the Commonwealth's Governmental Funds, excluding principal and interest payments on outstanding debts and debt issuance costs, amounted to approximately $1.166 billion, $1.087 billion, and $894 million, respectively.

**Preliminary General Fund Revenues for the First Five Months of Fiscal Year 2017**

Preliminary General Fund (Operating Fund) revenues for the first five months of fiscal year 2017 (July - October) were approximately $3.172 billion, an increase of approximately $121 million when compared to the same period in the prior fiscal year and approximately $104 million higher than the originally estimated revenues for the period. The higher revenues vis-à-vis the original estimate are mostly attributable to higher Act 154 excise tax revenues (approximately $110 million higher than the original estimate due to a non-recurring increase in such revenues) and sales tax revenues (approximately $29 million higher than the original estimate), offset by lower revenues from withholding taxes from non-residents (approximately $31 million lower than the original estimate) and income taxes from individuals (approximately $14 million lower than the original estimate). Based on actual revenues received during the first five months of fiscal year 2017, the Treasury Department continues to estimate that fiscal year 2017 revenues will be approximately $9.1 billion, in line with the original Treasury Department estimate.

**Preliminary General Fund Expenses for the First Four Months of Fiscal Year 2017**

Preliminary General Fund expenses and encumbrances (operating expenses and special appropriations) for the first four months of fiscal year 2017 (July - October) were approximately $2.827 billion. Operating expenses, which constitute 46% of the $8.987 billion approved General Fund budget (which includes $8.787 billion in expenses and a $200 million budgetary reserve), amounted to approximately $1.198 billion for the first four months of the fiscal year.  During such period, OMB has used $12 million of the $200 million budgetary reserve included in the approved General Fund budget to fund Oversight Board expenses and expects to use at least an additional $14 million from such reserve during the rest of the fiscal year to cover other PROMESA-related expenditures, for a total of $26 million throughout the fiscal year (which are not included in the General Fund budget).

Based on projected expenses and encumbrances for the remaining eight months of the fiscal year, OMB expects total budgetary expenditures to total approximately $8.813 billion ($26

15

million over budgeted expenditures, corresponding to the PROMESA-related expenses referenced above). To the extent, however, that budgetary expenditures exceed such projection, OMB expects any such excess to be covered from the $174 million projected to be remaining in the budgetary reserve after the payment of the PROMESA-related expenses referenced above.

**Aggregate Debt Burden of the Commonwealth and its Instrumentalities**

As of July 31, 2016, the aggregate outstanding principal amount of debt of the Commonwealth and its instrumentalities was approximately $71.5 billion (including accreted interest on capital appreciation bonds ("**CABs**") but excluding outstanding GDB notes to avoid double-counting).  Of this amount, approximately $55.8 billion represents General Obligation bonds, debt payable from Commonwealth taxes or appropriations and debt of tax-supported public corporations.  The annual debt service on such tax-supported debt is shown below in DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

For fiscal year 2017, aggregate annual debt service on all bonds and notes issued by the Commonwealth and its instrumentalities (excluding debt service on TRANs, all loans from private or public financial institutions (i.e. GDB) other than the loan to the GSA that is general obligation debt, and all HFA indebtedness other than the Capital Fund Program Bonds) is approximately $4.7 billion.

The debt burden of the Commonwealth and its instrumentalities significantly increased during the past decade. As of June 30, 2006, the Commonwealth's outstanding principal amount of general obligation and guaranteed bonds and notes was approximately $11.1 billion compared to approximately $18.4 billion as of June 30, 2016 (in each case, excluding accreted interest on CABs). The aggregate debt of the Commonwealth's instrumentalities (which includes principal amounts guaranteed by the Commonwealth and thus counted above, but excluding accreted interest on CABs) has also grown significantly from approximately $36.2 billion  as of June 30, 2006 to approximately $56.3 billion as of June 30, 2016, led primarily by an increase in debt issued by the Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), which from 2007-2011 issued the entirety of the approximately $17.3 billion in bonds and notes outstanding as of June 30, 2016. A significant portion of the debt issued during this period was used to cover operational expenses at the Commonwealth and its public corporations.

The Commonwealth's ratio of tax-supported debt to revenue is more than double that of Hawaii, the state with the highest debt-to-revenue ratio, and almost seven times the U.S. State median.  The Commonwealth's tax-supported debt per capita, as a share of Gross Domestic Product and as a share of personal income is also disproportionally high when compared to mainland jurisdictions. Both the Krueger Report and the FEGP concluded that the Commonwealth's debt burden is currently unsustainable and must be restructured.

PROMESA requires fiscal plans that provide for a debt burden that is sustainable.  As further described in this Report, PROMESA contains two methods to adjust Puerto Rico's debts.

16

**Pension Liabilities**

In addition to debt service on outstanding bonds, notes and other financial debt obligations, one of most significant expenditures faced by the Commonwealth and its public corporations are pension benefits payable to retired employees. Commonwealth employees, together with employees of certain public corporations and municipalities, participate in the following three principal retirement systems: the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("**ERS**"), the Commonwealth of Puerto Rico Teacher's Retirement System ("**TRS**") and the Puerto Rico Judiciary Retirement System ("**JRS**"; the ERS, TRS and JRS are collectively referred to as the "**Retirement Systems**").

The Retirement Systems are severely underfunded. In the case of the ERS, which is the largest of the three Retirement Systems, its funded ratio (fiduciary net position as a % of total pension liability) as of June 30, 2015 was <u>negative</u> 1.77%, since its fiduciary net position is negative as of such date, and its net pension liability was $33.2 billion. The ERS projects that it will deplete its liquid assets (which amounted to $655.3 million as of November 14, 2016) by the end of the fourth quarter of the current fiscal year or during the first half of fiscal year 2018 (July to December 2017), depending on whether the Commonwealth is able to pay to the ERS during this fiscal year the additional contributions included in the fiscal year 2017 budget (amounting to $150 million) and whether the ERS is required to pay debt service on its outstanding bonds upon the expiration of the moratorium period imposed under the Moratorium Act. At that point (assuming no liquidation of illiquid assets, which totaled $616.0 million as of November 14, 2016, and no additional annual contributions), the ERS would be operating on a "pay-as-you-go" basis, which means that the ERS would be unable to pay retirement benefits that exceed the actual employer and employee contributions (net of administrative and other expenses), unless the Commonwealth and other participating employers provide additional funding on a timely basis to meet such retirement benefits in full. The ERS may also be unable to make in full all required debt service payments with respect to its pension obligation bonds.

In the case of the TRS and the JRS, their funded ratio was 8.05% and 7.30%, respectively, and their net pension liability was $15.0 billion and $542.6 million, respectively, in each case as of June 30, 2015. The TRS and the JRS are also very close to depleting their liquid assets (which amounted to $514 million as of June 30, 2016 for the TRS and $46.2 million as of November 14, 2016 for the JRS), which is projected to occur during fiscal year 2018, at which time (assuming no liquidation of illiquid assets, which totaled $372 million as of June 30, 2016 for the TRS and $0.5 million as of November 14, 2016 for the JRS, and no additional annual contributions) they would also be operating on a "pay-as-you-go" basis.

In 2013, the Commonwealth enacted legislation to reform each of the Retirement Systems by, among other measures, reducing benefits, increasing employer and employee contributions, and prospectively replacing most of the defined benefit elements of the system with a defined contribution system. The reform laws were subject to judicial challenges and, while the Puerto Rico Supreme Court upheld the constitutionality of the reform of the ERS, it declared invalid certain aspects of the legislation relating to the reform of the TRS and limited the effect of the reform of the JRS. One of the principal goals of these reforms was to address the Retirement Systems' cash flow needs in a manner that would permit them to make benefit payments when due. As such, the Commonwealth recognized that even after the structural reforms that would reduce future benefits, the Commonwealth and other participating employers

17

would still have to make additional annual contribution at levels to be determined by the actuaries in order to maintain sufficient system assets to be able to meet benefit payments when due.

As a result of the worsening fiscal crisis since the enactment of the reforms mentioned above, the Commonwealth and several other employers have been unable to pay most of the required additional annual contributions, which, assuming the collection of all past due contributions, are currently established at $596 million from fiscal year 2017 through fiscal year 2033, in the case of the ERS, and $603.9 million from fiscal year 2019 through fiscal year 2042 (plus $30 million for each of fiscal years 2017 and 2018), in the case of the TRS. In the case of the ERS, the Commonwealth is directly responsible for approximately 60% of the additional annual contribution, and the balance is allocable to the Commonwealth's 78 municipalities and participating public corporations. Some of the participating public corporations, however, are dependent to a significant extent on Commonwealth revenues either in the form of directly assigned resources or payment for goods or services provided to the Commonwealth, while municipalities also receive significant subsidies from the Commonwealth.   In fact, the Commonwealth and related entities incorporated into the Proposed PROMESA Fiscal Plan currently account for approximately 79% of the ERS's additional annual contribution.   The Commonwealth is also directly responsible for all of the additional annual contributions to the TRS.

The additional annual contributions are determined actuarially based on several assumptions, and changes to such assumptions could cause the amount of such contributions to vary materially.  One of the primary determinants of the additional annual contributions is the assumed future level of active membership headcount (employment level) and the related payroll, since employer and employee contributions are paid as a percentage of payroll.  If the projected active membership headcount decreases, the statutory employer and employee contributions also decrease and the additional annual contribution increases.  In determining the $596 million in additional annual contributions for the ERS, the system's actuaries assumed that 50% of the over 11,000 employees eligible to retire under the early retirement incentive program established under Act No. 211-2015 in fact retire and that an additional decrease in active membership through attrition of 3% occurs over a five-year period (with the resulting vacancies in each case not filled with new hires).  In contrast, the latest official calculation of the additional annual contribution for the TRS did not assume material changes in active membership, notwithstanding demographic and fiscal trends that could alter future teacher headcount levels.

Pension benefit payments to public retirees in Puerto Rico are significantly lower than the average in the U.S.  According to their latest actuarial reports, the average monthly pension benefit payment to retirees from the ERS, TRS and JRS was approximately $1,160, $1,525 and $4,642, respectively.   The dire financial condition of the Retirement Systems, and the related economic and social implications of the risk of not being able to satisfy pension benefit payments, has been an important consideration in the development of the Proposed PROMESA Fiscal Plan presented to the Oversight Board.  As such, the Proposed PROMESA Fiscal Plan seeks to protect the vulnerable public retiree population and does not contemplate cuts to core pension benefits of retirees.   The Proposed PROMESA Fiscal Plan budgets additional contributions necessary to fund pension payments when due.  See "Commonwealth's Fiscal Plan" under OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION.

In connection with the development of the Proposed PROMESA Fiscal Plan, the Commonwealth has studied varying scenarios of future levels of active membership and payroll and the resulting effect on the levels at which additional annual contributions would have to be made to the Retirement Systems in order to pay pension benefits when due.  To the extent any scenario reflects a projected lower level of payroll than that projected in the additional annual contributions previously mentioned (either because of an assumed further reduction in headcount over a five-year period or a slower rate of salary increases), the additional annual contributions increase significantly. The Proposed PROMESA Fiscal Plan incorporates additional annual contributions for the ERS and TRS based on such scenario analysis.  In particular, the Proposed PROMESA Fiscal Plan currently assumes that the Commonwealth and related entities included in the Proposed PROMESA Fiscal Plan would need to make additional annual contributions to the Retirement Systems during the 10-year period of the fiscal plan of $642 million for fiscal year 2017 (plus $405 million in payments to catch-up with past due amounts), $572 million for fiscal year 2018 and $1.172 billion for fiscal years 2019 through 2026.  The Commonwealth, together with the Retirement Systems, is currently performing additional diligence with respect to these scenarios, which could result in material revisions to the additional annual contributions contemplated in the Proposed PROMESA Fiscal Plan.

In addition, the Proposed PROMESA Fiscal Plan includes as a measure the prospective segregation of the ERS assets attributable to contributions of active members from the assets attributable to the legacy defined benefit component of the plan.  The plan includes this measure in order to protect future proprietary member contributions from the potential insolvency of the ERS.  Since this measure eliminates the practice of using active member contributions to fund the legacy defined benefit pension payments, the measure results in a material increase in the additional annual contribution to the ERS during the 10-year period of the Proposed PROMESA Fiscal Plan.

The Commonwealth also provides post-employment benefits other than pensions in the form of a medical insurance plan contribution, which benefits are administered by the Retirement Systems and funded on a pay-as-you-go basis by the Commonwealth and other participating employers.

For a description of the Retirement Systems, including a summary of their financial condition, a discussion of factors that may cause the actuarial calculation of the net pension liabilities of the ERS and the TRS to increase from the amounts set forth above, and a discussion of the projected additional annual contributions that may be required to be made to the Retirement Systems in order to fund pension benefits when due, see RETIREMENT SYSTEMS AND OTHER POST-EMPLOYMENT BENEFITS.

**Commonwealth Liquidity**

 **Treasury Single Account.** Act No. 230 of July 23, 1974, as amended, provides that the Secretary of the Treasury is the officer in charge of the custody of all public funds of the Commonwealth. The Commonwealth follows the practice of pooling its cash. The Commonwealth's main operational account is known as the Treasury Single Account or "**TSA**," which is currently held at a private financial institution.

Receipts in the TSA include tax collections (including revenues assigned to certain public corporations and pledged for the payment of their debt service), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), the proceeds of short and long-term debt issuances, and other receipts. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval.  Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA. Furthermore, from time to time, the TSA also includes amounts held in custody by the Secretary of the Treasury for the payment of current pension benefits, including amounts deposited by the ERS, TRS and JRS.

Disbursements from the TSA include payroll and related costs, payments to suppliers and operational disbursements (including those reimbursed by Federal assistance grants and funded from Special Revenue Funds), welfare expenditures, capital outlays, debt service payments, required budgetary formulas and appropriation payments, pass-through payments of pledged revenues to certain public corporations, tax refunds, payments of current pension benefits and other disbursements.

For decades, the TSA receipts had been deposited primarily at GDB. In April 2016, as a result of GDB's deteriorated liquidity situation, the Commonwealth started to deposit TSA receipts in a commercial bank. Remaining cash balances in the TSA held at GDB are subject to the limitations on withdrawals of funds imposed by the Moratorium Act.  For a discussion of the Moratorium Act, see "Emergency Moratorium and Financial Rehabilitation Act" below.

The following chart illustrates the flows of receipts and disbursements to and from the TSA:



1)  Federal funds net of disbursement of the Puerto Rico Nutritional Assistance Program.
2)  Includes disbursements of benefits reimbursed by federal grants.
3)  Inflows and outflows are recorded in the General Fund or the Special Revenue Funds.
4)  Inflows and outflows are recorded in the Special Revenue Funds or the Fiduciary Funds.
5)  Outflows are recorded only in the General Fund.

Historically, TSA annual cash shortfalls have been addressed in the short-term through GDB financings and the stretching of accounts payable.  These shortfalls were ultimately financed through long-term borrowings by the Commonwealth and its tax-backed special purpose vehicles, including COFINA. TSA cash shortfalls are further aggravated by the historical seasonal variability of tax revenues deposited at the TSA. These intra-year cash flow

variances were traditionally covered through the issuance of Tax and Revenue Anticipation Notes ("**TRANs**") in the municipal bond market or with U.S.-based and local banking institutions.

**Liquidity Constraints.** The Commonwealth currently suffers a severe liquidity crisis, which is reflected in current and projected TSA cash balances, primarily as a result of the cumulative effect of the following factors: (i) recurring and accumulated deficiencies of revenues under expenditures in its General Fund and its Special Revenue Funds (each of which flows through the TSA); (ii) increases in fixed liabilities such as debt service and pension payments as a result of historic reliance on debt issuances to cover structural deficits and deferral of contributions to pension systems; (iii) inability to continue accessing the municipal bond market for long-term borrowing to finance current and prior years' budgetary and cash overruns or to refinance maturing debt; (iv) the inability of GDB to continue acting as a lender of last resort (exacerbated by the Commonwealth's loss of access to bank deposits trapped at GDB as a result of GDB's liquidity and solvency crisis and the need for the TSA to provide funds to governmental entities in order to compensate them for the lack of access to their GDB deposits); (v) lack of access to financial markets for short-term, seasonal TRANs borrowings; and (vi) other economic factors such as a prolonged economic recession, high unemployment levels, population decline and increasing health care costs.

During fiscal year 2016, the Commonwealth sought to deal with its liquidity constraints by imposing a series of unsustainable liquidity measures designed to continue providing governmental services to the residents of Puerto Rico, while pursuing negotiations with various creditor groups to effectuate a comprehensive debt restructuring.  These included (i) requiring the two largest government retirement systems to pre-fund the payment of current retirement benefits to participants (in prior fiscal years such amounts were first paid in full by the TSA and only later reimbursed to the TSA by the retirement systems), (ii) suspending Commonwealth set-asides required by Act No. 39 of May 13, 1976, as amended, for the payment of its general obligation debt, (iii) delaying the payment of third-party payables or amounts due to public corporations, (iv) deferring the disbursement of certain budgetary assignments, (v) delaying the payment of income tax refunds, (vi) failing to appropriate debt service for bonds issued by the Public Finance Corporation ("**PFC**") and (vii) triggering, pursuant to Article VI, Section 8 of the Commonwealth Constitution, the "clawback" of certain available resources of the Commonwealth for the payment of debt service on General Obligation bonds.  Cash flow for the Commonwealth was bolstered by the 4.5% surcharge imposed on the sales and use tax rate enacted during 2015 and by placing an emergency "intra-governmental" TRANs in the aggregate principal amount of $400 million with the State Insurance Fund, the Automobile Accidents Compensation Administration ("**AACA**") and the Labor Department's disability fund ("**SINOT**"). During fiscal year 2016, the Commonwealth also received extraordinary distributions from the State Insurance Fund and AACA totaling approximately $105 million.

In April of 2016, the Commonwealth enacted the Moratorium Act.  Based on the provisions of the Moratorium Act, the Commonwealth and certain of its instrumentalities (other than COFINA, which currently continues to make debt service payments when due) suspended the payment of debt service on their respective debts.  In particular, the Commonwealth suspended the payment of $779 million in debt service on General Obligation bonds due July 1, 2016 (net of $352 million of capitalized interest fund and escrow accounts) because it did not have sufficient available funds in its TSA to make such payment.  For a detailed description of

21

the Executive Order issued pursuant to the Moratorium Act, see "Executive Action taken under the Moratorium Act" below.  Relying on such suspension and an expected restructuring of debt service, the fiscal year 2017 General Fund budget did not appropriate funds for debt service (including debt service on Commonwealth General Obligation bonds and Commonwealth Guaranteed Obligations).

**TSA Projection.**  The Treasury Department's fiscal year 2017 cash flow projection for the TSA is based in part on revenue projections for the fiscal year 2017 General Fund budget and approved budgetary appropriations. Inflows and outflows from the TSA also include transactions from the Commonwealth's Special Revenue Funds, certain other governmental funds, certain component units and fiduciary funds.  As such, the TSA's projections will vary significantly from the fiscal year 2017 General Fund budget. Special Revenue Fund inflows and outflows are estimated by the Treasury Department based on historical data, recent events and anticipated changes for the current fiscal year.  The monthly timing of inflows and outflows is based on historical data but certain outflows are adjusted to preserve positive cash balances during the projection period (to the extent this is possible). Such adjustments may vary the timing of disbursement of payables and other encumbrances. Pension inflows are based on input from the Commonwealth's Retirement Systems, reduced by the appropriated additional uniform contributions. The pension inflow projections assume that the Retirement Systems have enough liquid assets to cover the shortfalls between the employer and employee contributions and benefit payments. If ERS depletes its liquid assets during fiscal year 2017, however, it may not be able to transfer to the TSA sufficient funds to cover current pension benefits.  Pension outflows are based on historical data and estimated changes for fiscal year 2017.  For more information regarding the Retirement Systems, see "Pension Liabilities."

The Commonwealth's TSA cash flow projection also assumes: (i) the continued suspension, during the applicable moratorium period (July 2016 to January 2017), of all debt service obligations payable from the General Fund and other funds managed by the Commonwealth (including general obligation debt of the Commonwealth and debt service on PBA, PRIFA and PFC bonds) and (ii) during the moratorium period, the retention, pursuant to Executive Orders issued under the Moratorium Act, of (a) certain revenues assigned by law to certain public corporations (which are in turn used by those public corporations to pay debt service on their outstanding bonds) and (b) certain General Fund appropriations, in each case in order to increase amounts on deposit in the TSA in order to cover government services and provide working capital to the Commonwealth.

Revenues subject to Executive Orders issued under the Moratorium Act retained in the TSA include (i) revenues from the gasoline, diesel and petroleum products excise tax (up to the first $10 million per month) and the first $15 of motor vehicle license fees allocated to the Highways and Transportation Authority ("**HTA**"), (iii) the petroleum products excise tax assigned to PRIFA and (iv) the cigarette excise tax assigned to MBA.

The Commonwealth's fiscal year 2017 TSA cash flow forecast also relies, among other things, on (i) periodic transfers to the TSA of funds by the two largest government retirement systems, (ii) deferral of claimed and processed tax refunds for the 2015 tax year and amounts due to public corporations, (iii) the payment of current and past due payables based on available projected cash, (iv) $26 million for funding the PROMESA Oversight Board and (v) $400

million in "intra-governmental" TRANs funded by the State Insurance Fund, ACAA and SINOT, which occurred in September 2016.

The extraordinary liquidity measures to address the Commonwealth's liquidity needs during fiscal year 2017, described above, are unsustainable over the long-term and their implementation has had a detrimental impact on certain stakeholders of the Commonwealth (such as taxpayers, suppliers and creditors), as well as on the economy of Puerto Rico as a whole, which in turn imposes further downward pressure on governmental revenues. Furthermore, the buildup of payables to suppliers and taxpayers increases the Commonwealth's future liquidity demands on its cash resources that are not contemplated in the General Fund budget to the extent such accounts payable relate to prior fiscal years.

As of November 30, 2016, the TSA "bank" balance was approximately $283.8 million. As of such date, the TSA also had physical checks in vault of approximately $169 million, resulting in a "book" balance of approximately $114.8 million. The preliminary book reconciliation does not include: (i) restricted funds, (ii) income tax refunds owed to taxpayers, (iii) deposits in transit, (iv) outstanding but uncashed checks, and (v) third-party accounts payable.

Actual income tax refunds claimed, processed and unpaid as of November 30, 2016 were approximately $143.9 million. Outstanding third-party accounts payable of funds managed by the Commonwealth (excluding income tax refunds, cash book overdraft, liabilities related to salary-related benefits owed to eligible police officers for annual salary increases, awards and other monetary benefit granted to such officers through several laws, and unpaid legal settlements) are estimated at approximately $1.6 billion as of June 30, 2016. Such amount excludes accounts payable and accrued liabilities of the Commonwealth's instrumentalities.

The TSA cash balance mentioned above excludes: (i) approximately $251 million in operational deposits in GDB (which funds are subject to the limitations imposed on deposit withdrawals by Executive Order 10) and (ii) approximately $290.3 million in clawback revenues retained by the Commonwealth pursuant to Executive Order 46, approximately $144.2 million of which are deposited in GDB (also subject to the limitations on withdrawals referred to above) and approximately $146.1 million of which are deposited in a private financial institution as of November 30, 2016.

Even after implementing all the extraordinary measures described in the preceding paragraphs, the Treasury Department expects to only have sufficient liquidity to operate the government only up to the expiration of the moratorium. The moratorium period expires on January 31, 2017, subject to a two-month extension upon approval from the Governor.  On or before January 31, 2017 (or March 31, 2017, if the expiration date is extended), the Commonwealth will need to take additional emergency liquidity measures to avoid running out of cash on such expiration date and throughout the remainder of fiscal year 2017. Absent such additional emergency liquidity measures, the TSA would experience significant bank cash shortfalls as early as the end of January 2017.

The chart below shows the Treasury Department's current cash flow projection for the last five months of fiscal year 2017. The projection is based on current law and, therefore, assumes the expiration of the moratorium period on January 31, 2017 (i.e. that the Governor does

not extend the moratorium period until March 31, 2017 and the Legislative Assembly does not amend the Moratorium Act to allow for the extension of the moratorium beyond March 31, 2017 and, therefore, that debt service not paid during the moratorium period becomes due and payable on February 1, 2017).

**FY 2017 TSA Shortfall Projections, Considering Debt Service Payments**
**($ in millions)**



The projected negative cash balance as of June 30, 2017 based on current law is approximately $2.075 billion. Such projection assumes the payment of approximately (i) $633 million and $1.127 billion in debt service on General Obligation Bonds corresponding to fiscal years 2016 and 2017, respectively (net of $146 million of "clawback" funds deposited in a private financial institution), (ii) $5 million in debt service on other General Obligation debt (General Services Administration loan) corresponding to fiscal year 2017; (iii) $23 million and $277 million in debt service on PBA bonds guaranteed by the Commonwealth corresponding to fiscal years 2016 and 2017, respectively, and (iv) $13 million and approximately $88 million in debt service on PRIFA BANs guaranteed by the Commonwealth corresponding to fiscal years 2016 and 2017, respectively.

Further, the projected negative cash balance as of June 30, 2017 would be approximately $2.992 billion if, in addition to the payments listed in the foregoing paragraph, the Commonwealth was required to (i) pay $92 million and $78 million in debt service on PFC bonds corresponding to fiscal years 2016 and 2017, respectively, (ii) repay to the applicable public corporations and other governmental entities approximately $440 million in revenues retained by the Commonwealth during fiscal year 2016 pursuant to the exercise of the "clawback" in accordance with Executive Order 2015-46 (including $113 million corresponding to rum excise taxes assigned to PRIFA but net of $13 million in petroleum product excise taxes also assigned to PRIFA but that are reflected above in the payment of the PRIFA BANs guaranteed by the Commonwealth), (iii) repay to the applicable public corporations and other governmental entities approximately $194 million in revenues retained by the Commonwealth

during fiscal year 2017 pursuant to various Executive Orders issued under the Moratorium Act (net of approximately $88 million in petroleum product excise taxes assigned to PRIFA, which are reflected above in the payment of the PRIFA BANs guaranteed by the Commonwealth), and (iv) transfer to PRIFA approximately $113 million corresponding to rum excise taxes assigned to PRIFA but for which an appropriation was not made in the General Fund Budget for fiscal year 2017.

The Treasury Department estimates that, assuming (i) the non-payment from the TSA of any debt service during the fiscal year notwithstanding the expiration of the Moratorium Act, (ii) revenues subject to the "clawback" during fiscal year 2016 are not repaid to the relevant public corporations during fiscal year 2017, and (iii) revenues assigned to public corporations and other governmental entities that are retained during the moratorium period are not forwarded to such entities during fiscal year 2017, the TSA June 30, 2017 cash balance would be approximately $91 million. Such scenario is likely to require the extension of the moratorium period for the entirety of fiscal year 2017 and/or the extension of the PROMESA stay during such period (which, in the absence of a Title III filing under PROMESA may require U.S Congressional action).

**Overview of GDB's Financial Condition**

GDB, which traditionally served as interim and last-resort lender to the Commonwealth, its instrumentalities and municipalities and as the principal depositary of public funds, is currently unable to meet its financial obligations as they become due and its audited financial statements for fiscal year 2014 reflect that it is insolvent on a balance sheet basis. Due to its deteriorated financial condition and the prohibition on the approval and disbursement of loans implemented pursuant to Executive Order 10, GDB is currently unable to serve as a source of liquidity for the Commonwealth and its instrumentalities and its ability do so in the future is uncertain. In addition, the Commonwealth and most of its agencies and instrumentalities had, as of June 30, 2017, approximately $3.7 billion on deposit at GDB. Such entities' ability to withdraw these funds is currently significantly limited as a result of the restrictions on the withdrawal of deposits implemented pursuant to Executive Order 10, which only permits the disbursement of funds certified as necessary to fund essential public services, and subject to a weekly limit established by GDB. Moreover, GDB's depositors, which consist primarily of the Commonwealth and its public corporations, may also suffer significant losses as a result of GDB's inability to pay its creditors in full, including its depositors. As a result, the Commonwealth and its public corporations may also need to record a significant loss in their respective financial statements in connection with the impairment of such deposits. For more information on Executive Order 10 and Executive Order 14 (which declared a moratorium with respect to certain obligations of GDB), see "Executive Action Taken under the Moratorium Act" below and on GDB's current situation see "Government Development Bank for Puerto Rico" under PUBLIC CORPORATIONS.

**Krueger Report on the Commonwealth's Economic and Financial Stability and Growth Prospects**

On June 29, 2015, Governor García Padilla made public a report (the "**Krueger Report**") on the Commonwealth's economic and financial stability and growth prospects prepared by Dr. Anne O. Krueger, Dr. Ranjit S. Teja and Dr. Andrew Wolfe (the "**Former IMF economists**"), each of whom had previously occupied senior executive positions at the International Monetary Fund ("**IMF**"). The report, which was subsequently updated, is available at the website of Government Development Bank at www.gdbpr.com under "Investor Resources−Publications and Reports−Investor Presentations," but it is not being incorporated by reference and is not part of this Commonwealth Report.

The Krueger Report states that Puerto Rico faces an acute crisis in the face of faltering economic activity, fiscal solvency and debt sustainability, and institutional credibility. Some of the report's principal conclusions are summarized below.

● *The economic problems of Puerto Rico are structural, not cyclical, and are not going away without structural reforms*. The report states that the economy is in a cycle where unsustainable public finances are feeding into uncertainty and low growth, which in turn is raising the fiscal deficit and the debt ratio. The Former IMF economists believe that the economy will continue to contract at a rate of at least 1% per annum.

● *Fiscal deficits are much larger than assumed and are set to deteriorate*. The report discusses the conceptual problems with viewing the deficit from the standpoint of the General Fund account in isolation, including that the General Fund (i) being mostly on a cash basis, does not reflect previously incurred expenses until the fiscal year in which they are recorded for payment, (ii) excludes numerous agencies and public corporations that operate like arms of the government and also run deficits, and (iii) excludes capital expenditures. As a result, the report states that an analysis of fiscal and debt sustainability cannot be conducted on the basis of the General Fund measure alone.

● *The central government deficits (as measured in the report) over the coming years imply an unsustainable trajectory of large financing gaps*. Based on current policies, the model reflects overall deficits of between $3 billion and $5 billion per year over the next five years, and continuing to grow thereafter. After factoring certain additional downside risks, the report identifies that annual deficits could range from $3.7 billion in fiscal year 2016 to $8.2 billion in fiscal year 2025.

● *Puerto Rico's public debt cannot be made sustainable without growth, nor can growth occur in the face of structural obstacles and doubts about debt sustainability*. To restore growth and confidence, Puerto Rico needs to implement ambitious measures as an integrated package in three principal areas: (1) structural reforms directed at restoring competitiveness, (2) fiscal reform and restructuring of public debt and (3) institutional credibility.

*The Former IMF economists have not participated in the preparation of this Commonwealth Report and have no responsibility for its contents. The Former IMF economists are not soliciting or recommending the purchase or sale of any securities, or any indications for*

*the purchase or sale of any securities, or any investment decisions.*

**Significant Future Revenue Shortfall and Expenditure Increases**

During the next four fiscal years, the Commonwealth expects to confront various events that may significantly reduce its revenues or increase its expenditures. To the extent the Commonwealth is unable to address these events, its ability to continue operating and providing essential services to its population may be severely compromised.

The Commonwealth will need to replace the revenue produced by the special temporary excise tax imposed by Act 154 if its effective period is not extended (it expires on December 31, 2017) or if the Internal Revenue Service eliminates its creditability against an entity's federal income tax liability. Act 154 currently accounts for approximately 20% of General Fund revenues and, during fiscal year 2016, approximately 10 companies accounted for approximately 90% of Act 154 revenues. Although Act 154 imposes a modified source of income rule upon the expiration of the temporary excise tax, the Commonwealth currently estimates that revenues from the modified source of income rule would be materially lower than revenues collected from the temporary excise tax. To the extent the Commonwealth is unable to replace the revenue generated by the temporary excise tax, the Commonwealth's funding gap will materially increase and the Commonwealth's ability to continue funding its current operations and provide essential services will be compromised. See "***The Commonwealth's ability to raise additional revenue through taxation may be limited by economic factors***" and "***The Commonwealth is dependent on a small number of corporate taxpayers to generate a significant amount of its tax revenues***" under RISK FACTORS.

The Commonwealth is also facing a significant shortfall in revenues available to fund its health insurance program. More than half of the funds necessary to fund the health insurance program at current levels are provided by the federal government under various programs, including Medicare, Medicaid, the Affordable Care Act and the Children's Health Insurance Program. Currently, the Commonwealth is due to exhaust its allocation of funds under the Affordable Care Act by fiscal year 2018. Moreover, the Commonwealth's allocation of Medicaid funds is significantly less than other jurisdictions in the United States. To the extent the federal government reduces current levels of federal health care funding, the Commonwealth may have to materially increase the local resources it assigns to its health insurance program or otherwise curtail the services offered thereunder to its citizens. The former will further strain the Commonwealth's dire fiscal position; the latter would not only affect the wellbeing of many residents, but would also have an adverse effect on the economy. See "***If federal funding for the Commonwealth's health insurance program is not increased from, or at least maintained at, current levels, the Commonwealth may be unable to continue fully funding such program or may be required to deploy resources currently used for other spending priorities to fund the resulting shortfall***" under RISK FACTORS.

Finally, as discussed below, the Retirement Systems are projected to deplete their liquid assets during fiscal year 2018 (although under certain scenarios ERS could deplete its liquid assets during the current fiscal year). Upon depletion of their liquid assets, they will be required to operate on a "pay-as-you-go" basis, which means that they will be unable to pay benefits that exceed the actual employer and employee contributions received (net of debt service on their debts and administrative and other expenses), unless the employers that contribute to the systems

27

provide additional funding. Considering that the Commonwealth is the largest employer that contributes to the ERS and the only employer that contributes to the TRS and JRS, the Commonwealth will have to dedicate a substantial amount of resources currently used to fund other essential services and programmatic priorities to cover this funding deficiency. To the extent the Commonwealth is unable to cover these amounts, the retirement systems will be unable to pay the full amount of benefits due. This would also affect the well-being of many residents and have an adverse effect on the economy. See *"Unless the Commonwealth makes significant additional contributions to the Retirement Systems, current levels of liquid assets could be completely depleted during the current or next fiscal year and the Commonwealth will have to fund pensions on a "pay-as-you-go" basis. In such a scenario, the Commonwealth is likely to seek to prioritize payments to pensioners over other stakeholders, including bondholders."* under RISK FACTORS.

**Commonwealth's Fiscal Plan**

*Creation of the Working Group*

On June 29, 2015, after considering the conclusions of the Krueger Report, the Governor of Puerto Rico announced that the Commonwealth had no choice but to seek to renegotiate its debt with the goal of achieving a more sustainable debt load and, failing to do so, the Commonwealth might have to default on its debt. Following this announcement, the Governor created the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "**Working Group**") to consider the measures necessary, including the measures recommended in the Krueger Report, to address the economic and fiscal crisis of the Commonwealth. It was tasked with the responsibility of developing and recommending to the Governor a fiscal and economic growth plan (the "**FEGP**") containing the plans and administrative and legislative measures necessary to address the short, medium and long-term fiscal and economic challenges facing Puerto Rico.

*Original FEGP*

On September 9, 2015, the Working Group presented a draft of the FEGP to the Governor, which was subsequently revised in January 2016. The FEGP projected that the cumulative difference between projected revenues and expenses of the Commonwealth (the "**Financing Gap**") from fiscal year 2016 to fiscal year 2025 would be approximately $63.4 billion, absent corrective action. The FEGP contemplated that this financing gap could be reduced to approximately $23.9 billion through a combination of revenue increases (including the surcharge imposed on the sales and use tax, which had already gone into effect), expense reductions and economic growth, but that the remaining gap would need to be addressed by a debt restructuring.

*Proposed PROMESA Fiscal Plan*

Pursuant to PROMESA and the requirements imposed by the Oversight Board, on October 14, 2016, the Commonwealth presented the Proposed PROMESA Fiscal Plan to the Oversight Board. The Proposed PROMESA Fiscal Plan is based on seven principles the Commonwealth believes are necessary in order to achieve economic recovery. These are: (i) minimize the impact of austerity on economic growth, (ii) improve budgetary controls and financial transparency, (iii) rationalize expenditures and tax policy to promote efficiency, (iv)

enact structural economic measures and invest in growth, (v) protect vulnerable stakeholders, (vi) create a sustainable debt level that allows for growth and (vii) partner with the federal government to generate growth.

<u>Overview of the Projections Underlying the Proposed PROMESA Fiscal Plan</u>.

*Baseline Projection.* The Proposed PROMESA Fiscal Plan projects that, under current policies, the Commonwealth's Financing Gap during the next ten years will be approximately $58.7 billion (the "**Baseline Projection**"). The Baseline Projection assumes that, among other things, (i) revenues and expenses continue based on existing legal requirements and policy constraints, (ii) no additional austerity or revenue raising measures are taken to close the projected Financing Gap, (iii) the island experiences continued economic contraction at an average rate of approximately 1.7% per year from fiscal year 2018 to fiscal year 2026 (which is calculated to contribute approximately $5.5 billion to the Financing Gap), (iv) an average rate of inflation of approximately 1.8% per year from fiscal year 2018 to fiscal year 2026, (v) the Commonwealth makes payments of incremental cash contributions to the Retirement Systems as required by current law, (vi) the government loses of a portion of current Act 154 revenues resulting from the conversion of the Act 154 excise tax to a modified source income rule in fiscal year 2018 and (vii) Affordable Care Act funding for the Commonwealth's health programs is depleted in fiscal year 2018.

Note that the growth and inflation projections included in the Baseline Projection use only factors that are *exogenous* to Puerto Rico's fiscal position.  As such, the presumed rate of economic contraction in this scenario *does not* assume any measures are taken to fill the resulting Financing Gap.  If the Commonwealth were in fact forced to pursue only austerity-type measures to address such shortfall, the rate of such contraction (and the resulting effect on the Financing Gap) could increase materially.

*Measures Projection.* The Proposed PROMESA Fiscal Plan identifies certain revenue raising and expense reduction measures (summarized below) that are within the Commonwealth's control and that the government proposes to implement in order to reduce the Financing Gap. The Proposed PROMESA Fiscal Plan projects that, even assuming the Commonwealth is able to successfully implement such measures (which are projected to reduce the 10-year Financing Gap by approximately $19 billion), the Commonwealth would still face a ten-year Financing Gap of approximately $5.7 billion *before* the payment of scheduled debt service and approximately $39.9 billion *after* accounting for such debt service payments (the "**Measures Projection**"). The Measures Projection also assumes, among other things, (i) economic growth at an average rate of approximately 0.1% per year from fiscal year 2018 to fiscal year 2026, which is assumed to be driven by meaningful structural reforms and new spending to promote economic stability and growth, (ii) an average rate of inflation of approximately 2% per year from fiscal year 2018 to fiscal year 2026 and (iii) approximately $10 billion in additional spending to promote stability and growth.  The Measures Projection concludes that without federal government assistance, even assuming that the Commonwealth does not pay debt service during the ten-year period, the Commonwealth would still face a significant Financing Gap during such period.

The change in economic trajectory resulting from the Proposed PROMESA Fiscal Plan is calculated to reduce the Financing Gap by approximately $8.7 billion in this scenario.  Of the approximately $10 billion in spending to promote stability and growth contemplated by the

Proposed PROMESA Fiscal Plan, the Measures Projection assumes that, for purposes of calculating the resulting growth rate, the Commonwealth actually spends only the amount of the Commonwealth's internally generated surplus before debt service during such period, which is materially lower than $10 billion.  Therefore, although the Measures Projection results in a significant Financing Gap before debt service, such Financing Gap could potentially be eliminated by reducing the amount proposed to be spent in the Proposed PROMESA Fiscal Plan on stability and growth measures, though only up to the amount of spending that exceeds the available surplus, as any further cuts would reduce the projected growth rate.

Importantly, the Measures Projection assumes the loss of ACA funding.  In contrast, the projection assumes *no loss* of Act 154 revenues based on a temporary extension of the excise tax (during which period it is also assumed such tax is not ruled to be uncreditable under U.S. tax law) and a gradual substitution of such tax revenues by corporate tax reform that increases the local tax liability (but not the aggregate tax liability) of multinational companies subject to Act 154.

*Federal Action Projection*. Finally, the Proposed PROMESA Fiscal Plan states that, if in addition to the measures assumed to be taken by the Commonwealth in the Measures Projection, federal healthcare funding is kept at the current level (so that the Commonwealth is not forced to dedicate other revenues to replace the loss of ACA funding), the Commonwealth could achieve a cumulative surplus before debt service by approximately $16.1 billion, which would in turn permit the Commonwealth to dedicate part of such surplus to additional investments that could drive a higher growth rate.  After factoring the effect of the change in economic trajectory resulting from such additional investments and the impact of structural economic reforms, the Commonwealth estimates a surplus before debt service of approximately $18.9 billion during the next ten years. Reducing such surplus by the debt service owed over the period (including previously missed payments and net of existing debt service reserves) results in a 10-year Financing Gap of approximately $15.4 billion (the "**Federal Action Projection**"). The Federal Action Projection assumes, among other things, (i) economic growth at an average rate of 1.4% per year over the period from fiscal year 2018 through fiscal year 2026, and (ii) an average rate of inflation of approximately 2.5% per year from fiscal year 2018 through fiscal year 2026.  Note that although the projected growth rates are driven primarily by the impact of structural reforms on the Puerto Rico economy, such rates of growth are indicative of the Commonwealth's economic <u>potential</u> and <u>do not</u> necessarily correspond to the structural measures included in the Proposed PROMESA Fiscal Plan, as such measures, in contrast with the FEGP, were not all detailed in the Proposed PROMESA Fiscal Plan and instead the Proposed PROMESA Fiscal Plan emphasized that such measures must be evaluated in light of the Commonwealth's economic contraction and continued citizen outmigration.

<u>Summary of Certain Proposed Measures</u>. The Proposed PROMESA Fiscal Plan begins by underscoring the austerity and revenue enhancing measures already adopted by the Commonwealth, such as reductions in public employee headcount and payroll, public employee salary freezes, increases in excise taxes and the sales and use tax rate, delays in the payment of government suppliers and decreases in public capital spending, and asserts that rather than abating the Commonwealth's economic decline, such measures appear to have exacerbated it.  In order to reverse this trend, the Proposed PROMESA Fiscal Plan asserts that necessary fiscal discipline cannot come at the expense of long-term economic growth.

*Budgetary Controls and Financial Transparency*

Recognizing that Puerto Rico has experienced persistent deficits and has routinely overestimated revenue and failed to control spending, the Proposed PROMESA Fiscal Plan proposes new rules and regulations to enforce budgetary discipline, including budgeting in compliance with GAAP, improving recently instituted third-party revenue validation processes, mandating all spending to be approved through the annual budgetary process and enhancing regular budgetary reporting and tracking.

In addition, the Proposed PROMESA Fiscal Plan underscores that the Commonwealth's ability to properly monitor its fiscal position has been and continues to be hindered by obsolete financial, accounting and payroll systems which, in turn, impede informed decision-making and the ability to publish timely financial statements. To correct this, the Proposed PROMESA Fiscal Plan proposes to invest in new IT infrastructure, reform financial reporting processes and centralize treasury functions. Finally, the Proposed PROMESA Fiscal Plan seeks to improve the Commonwealth's regular economic and statistical reporting to enhance long-term economic forecasting and tracking and proposes to implement a multi-year budgeting requirement that reflects long-term economic forecasts.

*Expenditures and Tax Policy*

The Proposed PROMESA Fiscal Plan calls for the Commonwealth to stabilize its revenue base, improve its revenue collections and rationalize expenditures but emphasizes that the selection and structure of any fiscal measures, and the timing of their implementation, must be designed to foster long-term growth and minimize negative economic effects

According to the Proposed PROMESA Fiscal Plan, the Commonwealth's focus should be on efficiency gains. As such, the Proposed PROMESA Fiscal Plan calls for consolidating 48 agencies and public corporations, merging state hospitals, closing hundreds of underutilized schools, restructuring the Department of Education, implementing functional public-private partnerships and further centralizing procurement to create economies of scale. With respect to the government workforce, the Proposed PROMESA Fiscal Plan proposes to implement a 2% per year employee attrition target and to benchmark public sector benefits to those of the private sector. The Proposed PROMESA Fiscal Plan further calls for eliminating automatic expenditure increases by extending Act No. 66's freeze of service costs and formula appropriations until fiscal year 2021. After fiscal year 2021, the Proposed PROMESA Fiscal Plan proposes to permanently fix formula appropriations at their fiscal year 2014 levels and only allow them to grow after 2021 at the rate of the previous fiscal year's inflation. With respect to municipal and other subsidies, the Proposed PROMESA Fiscal Plan calls for the gradual elimination of subsidies to municipalities and reductions in special appropriations to retirees receiving pension benefits.

The Proposed PROMESA Fiscal Plan also seeks to increase revenue collections by boosting the Commonwealth's capture rate and reducing tax evasion. In particular, the Proposed PROMESA Fiscal Plan seeks to tackle the widespread use of illegal video lottery machines in Puerto Rico by implementing and enforcing a tax on video lottery games. As stated above, with respect to Act 154, the Proposed PROMESA Fiscal Plan recommends extending the Act 154 excise tax temporarily (2-3 years) to provide the government with sufficient time to renegotiate individual tax grants and reform its tax code such that it replaces Act 154 revenues in full during the projection period.

*Structural Economic Measures and Investments in Growth*

The Proposed PROMESA Fiscal Plan recognizes that although Puerto Rico does not control U.S. federal policies that have a significant impact on its economy, the Commonwealth must implement structural reforms within Puerto Rico's control and create a business-friendly environment and attract private investment.

The Proposed PROMESA Fiscal Plan emphasizes the need to adopt pro-growth labor market policies (note that in contrast with the FEGP, it does not detail the character of such changes and underscores that such reform must be evaluated in light of the Commonwealth's economic contraction and increasing outmigration), implement an earned income tax credit and reform welfare programs, with the goal of increasing labor demand and participation. The Proposed PROMESA Fiscal Plan also seeks to reform the permit granting system, implement a pro-growth corporate tax regime and reform PREPA to stabilize energy rates in an effort to reverse recent declines in private sector investment.

The Proposed PROMESA Fiscal Plan proposes to utilize a portion of the savings generated by its expenditure measures to repay past-due tax refunds and over-stretched suppliers, fund public investments (including certain strategic growth projects and deferred maintenance on infrastructure assets) and build a liquidity cushion to stabilize the Commonwealth's liquidity position. The Proposed PROMESA Fiscal Plan calls for public-private partnerships to be leveraged in order to improve operations, boost private sector participation and help fund capital expenditures.

*Protection of Certain Vulnerable Stakeholders*

The Proposed PROMESA Fiscal Plan asserts that shocks to Puerto Rico's most vulnerable constituencies, including elderly, young, disabled and low-income residents, are likely to have a higher negative multiplier effect on the island's already weak economy.

In particular, the Proposed PROMESA Fiscal Plan highlights that nearly half the island's population lives in poverty and relies on a public healthcare system overburdened by inequitable treatment under U.S. healthcare laws. The Proposed PROMESA Fiscal Plan thus opposes cuts to the public health care system, even in the face of reductions in transfers from the U.S. federal government. In light of the underperformance of local schools, and crime rates that remain higher than in the U.S. states, the plan affirmatively seeks to protect education and public safety expenditures.

The Proposed PROMESA Fiscal Plan also does not contemplate cuts to core pension benefits of retirees and instead budgets required additional contributions to the Retirement Systems, in order to ensure adequate funding of pension payments when due. Furthermore, the Proposed PROMESA Fiscal Plan includes a measure that prospectively separates portions of the Employee Retirement System's defined benefit and defined contribution plans to protect certain future proprietary member contributions from potential insolvency and ensure that the defined contribution plan's unfunded liability does not grow as rapidly in the future.

The Proposed PROMESA Fiscal Plan also seeks to protect credit union depositors, who are generally low-income, as well as the cooperative banking system in general, subject to recapitalization plans and effective governance reforms. It is estimated that the cost of such

protection could be approximately $1.2 billion (which could vary depending on the terms of any debt restructuring), a cost that is *not* included in the Proposed PROMESA Fiscal Plan's long-term projections.

*Debt Restructuring*

The Proposed PROMESA Fiscal Plan underscores that without a substantial debt restructuring resulting in a sustainable debt burden, Puerto Rico's growth potential will continue to be hindered by the fear of future defaults, lower public and private investment and further outmigration. While the Proposed PROMESA Fiscal Plan does not include a specific debt restructuring proposal, it does establish that the sustainability of the debt burden must rely on objective and realistic growth and fiscal assumptions. Furthermore, the Proposed PROMESA Fiscal Plan states that the debt restructuring must provide the Commonwealth with sufficient breathing space to guarantee the provision of essential services, to implement smart, pro-growth fiscal and economic policies and to invest in its economy.

The Proposed PROMESA Fiscal Plan also affirms that the restructuring plan must offer a holistic solution for the Commonwealth's tax-supported debt burden, as such debt is all ultimately reliant on the same Commonwealth economy. As such, the Proposed PROMESA Fiscal Plan warns that individual restructurings would be extremely challenging given the interrelatedness of holders, insurers and sources of credit support. Accordingly, the Proposed PROMESA Fiscal Plan includes the tax-supported central government agencies and component units, including those identified by the Oversight Board for inclusion in the Proposed PROMESA Fiscal Plan.

Finally, Proposed PROMESA Fiscal Plan states that the debt proposal must include restrictions on the issuance of new indebtedness, including limitations on the aggregate amount of tax-supported debt, and must account for the impact on local holders.

For more information regarding the Commonwealth's Proposed PROMESA Fiscal Plan, please refer to the Commonwealth of Puerto Rico Fiscal Plan for the Fiscal Oversight and Management Board, dated October 14, 2016, which is available on GDB's website at www.gdbpr.com.

## Oversight Board's Request for a Revised Fiscal Plan

In a meeting held on November 18, 2016, the Oversight Board discussed the Proposed PROMESA Fiscal Plan, rejected the initial version of such plan, established a set of guiding principles for evaluating the Commonwealth's fiscal plan and requested that the Commonwealth submit a revised fiscal plan that complies with such principles. The principles are outlined in a letter sent to the Governor by the Chairman of the Oversight Board dated November 23, 2016. The guiding principles established by the Oversight Board include that the fiscal plan must (i) assume no additional federal support beyond that which is already established by law (including no Affordable Care Act support extension) (ii) assume no replacement of the revenue produced by the special temporary excise tax imposed by Act 154 and (iii) include an appropriate mix of structural reforms, fiscal adjustment and debt restructuring. The Oversight Board also requested that the revised plan include a debt restructuring proposal and a debt sustainability analysis, and that the plan's revised baseline forecast reflect pay-as-you-go funding for pension benefits and account for the segregation of current employee contributions beginning no later than 2018. The

Oversight Board also demanded that the plan meet PROMESA's statutory criteria and lead to the termination of the Oversight Board's mandate within 10 years. The Oversight Board stressed that any plan must be accompanied by operational plans that detail how the initiatives set forth in the plan will be implemented.   Finally, the Oversight Board established a timeline for the certification of a fiscal plan that includes several meetings and working sessions, requested the submission of a revised fiscal plan by December 15, 2016 and established January 31, 2017 as the target date for the certification of a fiscal plan.

The Governor formally responded to the Oversight Board's request for a revised fiscal plan in a letter dated November 29, 2016. In said letter, the Governor stressed that, without federal action related to the creditability of the Act 154 excise tax and without federal healthcare funding, the Commonwealth will not have enough resources to service any debt and will continue to suffer economic contraction. The Governor stated that he is willing to collaborate with the Oversight Board and the Governor elect, that his team is ready to assist the Oversight Board in modeling several scenarios consistent with the principles established by the Oversight Board, and recognized the importance of the certification of a fiscal plan.

As of the date of this Report, the Commonwealth continues to work closely with the Oversight Board in modeling revised projections to form the basis of a revised fiscal plan but the Governor has not yet submitted a revised fiscal plan to the Oversight Board. The Commonwealth expects such revised projections to reflect a significant increase in the Commonwealth's projected Financing Gap during the next ten years (from the $58.7 billion Financing Gap estimated in the Baseline Projection of the Proposed PROMESA Fiscal Plan), due primarily to changes in the economic assumptions of the revised projections.

**Recent Defaults on Required Debt Service Payments or Deposits**

As a result of the Commonwealth's fiscal crisis, the Commonwealth and certain of its public corporations have failed to make certain debt service payments or required deposits to bond debt service and/or reserve accounts.  The following entities have not made payment of principal and/or interest in full on their respective outstanding bonds or notes as of the date hereof: the Commonwealth (since July 1, 2016, with respect to scheduled debt service payments on its General Obligation bonds); Public Buildings Authority (since July 1, 2016, with respect to scheduled debt service payments on bonds payable from lease payments and guaranteed by the Commonwealth's full faith and credit (other than PBA's Series L bonds)); PRIFA (since January 1, 2016, with respect to scheduled debt service payments on bonds payable from the federal rum excise tax; since August 1, 2016, with respect to scheduled debt service payments on bonds payable from a petroleum products excise tax and guaranteed by the Commonwealth's full faith and credit); GDB (since May 1, 2016, with respect to principal payments on its unsecured senior notes; since August 1, 2016, with respect to related interest payments); HTA (since July 1, 2016, with respect to scheduled debt service payments on certain subordinated revenue bonds issued under its 1998 Resolution); and Public Finance Corporation (since August 1, 2015 with respect to scheduled debt service payments on bonds payable from budgetary appropriations). MBA has also failed to make payments since December 2015 on a private bank loan payable from the cigarette excise tax.

The following table lists debt service payments missed during fiscal years 2016 and 2017 (up to September 30, 2016).

<u>Total Bonded Debt Service Payments Missed Through September 30, 2016[1]</u>

| | |
|---|---|
| GO | $782 |
| GDB[2] | 398 |
| PBA | 25 |
| PFC | 145 |
| PRIFA[3] | 134 |
| HTA[4] | 4 |
| Total | $1,489 |

(1) Excludes PRASA Rural Development Bonds (which reached a forbearance agreement ahead of the debt service payment due July 1, 2016), GSA, and GO Notes (line of credit from GDB to Treasury whose debt service on July 1, 2016 was not paid). Amounts missed represent amounts not paid by the Commonwealth and have not been reduced by amounts paid by insurers, where applicable. Amounts shown net of subsidies and sequestration, where applicable.
(2) Includes GDB bonds that are Commonwealth guaranteed. Does not include the $40 million principal payment due on May 1, 2016 that was deferred to May 1, 2017.
(3) Includes PRIFA Rum bonds and PRIFA BANs.
(4) Includes subordinated Series 1998 bonds issued under the 1998 Resolution.

Although certain other governmental entities have not made scheduled deposits of funds required under the governing bond documentation, debt service payments on their bonds have so far been made in full by the respective trustee from funds on deposit in debt service set aside or reserve accounts. These entities include: ERS (making payments from its debt service reserves since October 1, 2016); HTA (making payments from debt service reserves on its 1968 and 1998 Resolution revenue bonds (except certain subordinated revenue bonds issued under its 1998 Resolution) since July 1, 2016); PRCCDA (making payments from its debt service reserves since July 1, 2016); PRIDCO (making payments from its debt service reserves since August 1, 2016); PRIFA (making payments on its ASSMCA bonds from its debt service reserves since October 1, 2016); and UPR (making payments from its debt service reserves since December 1, 2016). Each of these entities is subject to Executive Orders issued under the Moratorium Act, which are described below. For additional information on remaining balances on debt service funds and debt service reserve funds by issuer, see DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

In addition, PREPA and PRASA have entered into forbearance agreements with certain of their respective creditors. The Commonwealth and most of its public corporations are currently in default with respect to scheduled debt service on their loans from GDB.

For more information regarding these matters, see DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES below.

**Restructuring Negotiations and Proposals**

During fiscal year 2016, Commonwealth representatives and its advisors presented various proposals to bondholders and bond insurers seeking to reach an agreement for a voluntary restructuring of the debt of the Commonwealth and that of its public corporations

included in the FEGP.

The Commonwealth's initial proposal, made public on February 1, 2016, sought to exchange $49.2 billion of tax-supported debt into $26.5 billion of mandatorily payable bonds and $22.7 billion in variable payment bonds (payable only in the event the Commonwealth outperformed certain revenue projections). The proposal contemplated no interest payments until fiscal year 2018, no principal payments until fiscal year 2021, maximum annual debt service of $1.7 billion starting fiscal year 2021 and a final maturity in fiscal year 2051.

The most recent proposal from the Commonwealth, made public on June 21, 2016, provided an incremental $52.7 billion of mandatorily payable debt service to creditors as compared to the Commonwealth's February 1, 2016 offer. The proposal continued to contemplate cash flow relief during the first four years but increased cash interest payments during such period and added a non-cash interest portion (payable-in-kind). Maximum annual debt service was set at $2.05 billion starting in fiscal year 2031, with a final maturity in fiscal year 2071.

The Commonwealth's proposals sought to ensure that debt service would never exceed 15% of projected consolidated revenues (as defined in the public presentation explaining the proposal) for the Commonwealth and its tax supported instrumentalities. However, all such proposals were predicated upon a number of key assumptions (many of which are not under the control of the Commonwealth), including (i) a 100% participation rate, (ii) Congress continuing the current level of health care funding provided to Puerto Rico under the Affordable Care Act, (iii) the Commonwealth extending the Act 154 excise tax and the IRS continuing to allow such tax to be creditable against U.S. federal income taxes (along with no further erosion of the Act 154 tax base), (iv) the implementation of all the measures contemplated by the FEGP and (v) the Commonwealth achieving a 2% nominal growth rate.

A summary of the proposals presented by the Commonwealth and counter proposals presented by groups of bondholders may be accessed on GDB's website at www.gdbpr.com.

**Emergency Moratorium and Financial Rehabilitation Act**

In light of the Commonwealth's lack of success in negotiating consensual debt restructuring with its creditors, prior to material debt service payment coming due toward the end of fiscal year 2016, on April 6, 2016, the Governor signed the Moratorium Act into law. The Moratorium Act authorizes the Governor to declare a moratorium and stay creditor remedies with respect to obligations of the government entities covered by the moratorium. The provisions of the Moratorium Act expire on January 31, 2017, subject to a two-month extension that may be implemented by the Governor.

Pursuant to the Moratorium Act, the Governor has the power to declare, by executive order, an emergency period with respect to the Commonwealth or any other government entity. If so provided in the executive order, payments on covered obligations are suspended during the emergency period, and covered obligations will be due on the last day of the covered period to the extent they are otherwise due before or during the covered period. As discussed below, the Governor has issued several executive orders under the Moratorium Act.

During the emergency period for the Commonwealth or any other government entity, legal actions in respect of covered obligations are stayed, and the Governor may take any and all actions that are reasonable and necessary to preserve the Commonwealth's ability to continue providing essential public services, or necessary to provide for the health, safety and welfare of the residents of the Commonwealth. These actions include the ability to expropriate property in a constitutionally permitted manner through eminent domain. During an emergency period for GDB, the Governor may take any and all actions reasonable and necessary to allow GDB to continue performing its operations, including easing restrictions on deposit reserves, suspending payments on letters of credit and extending credit, prohibiting disbursements of loans, and limiting the withdrawal of funds to those necessary to provide for essential services.

The Moratorium Act contemplates that covered obligations subject to a moratorium may, to the extent provided by the Governor in the relevant executive order, be paid interest or accrue interest during the covered period at a rate determined in accordance with the Act. Under certain circumstances, the Moratorium Act provides additional limited protection to creditors that have a legitimate security or property interest with respect to any delayed debt service payment.

The Moratorium Act also created FAFAA to assume GDB's role as fiscal agent, financial advisor and reporting agent for the Commonwealth, its instrumentalities, and municipalities.

**Executive Action Taken Under the Moratorium Act**

Since the enactment of the Moratorium Act, the Governor has adopted several executive orders pursuant thereto declaring an emergency period and moratorium with respect to certain debt obligations of the Commonwealth, PBA, GDB, HTA, PRIFA and PRCCDA. As a result, such entities have failed to make certain debt service payments or have done so with moneys on deposit with the trustees of their bonds. As further discussed below, the Governor has also suspended the obligation of certain government entities to transfer the funds that are used to pay certain debt obligations. Specifically, the Governor has issued the following executive orders under the Moratorium Act:

1. *Executive Order 2016-10, issued on April 8, 2016.*

Pursuant to Executive Order 10, the Governor declared GDB to be in a state of emergency. In accordance with the emergency powers provided in the Moratorium Act, Executive Order 10 implemented a regulatory framework governing GDB's operations and liquidity, including prohibiting loan disbursements and establishing a procedure with respect to governmental withdrawals, payments, and transfer requests in respect of funds held on deposit at GDB. To that effect, Executive Order 10 restricted the withdrawal, payment and transfer of funds held on deposit at GDB to those reasonable and necessary to ensure the provision of essential services and authorized GDB to establish weekly limits on the aggregate amount of such disbursements. Executive Order 10 also suspended GDB's legal reserve requirement.

The procedures implemented by Executive Order 10 have significantly restricted the ability of the Commonwealth and its instrumentalities to withdraw funds held on deposit at GDB. On April 1, 2016, the Commonwealth began depositing its revenues in accounts outside of GDB. However, as of September 30, 2016, the Treasury Department still had approximately $590 million (consisting of $251 million in operating accounts, $143 million of "clawback" funds retained pursuant Article VI, Section 8 of the Constitution of the Commonwealth, and

$196 million in restricted deposits) in funds deposited at GDB, subject to the limitations on withdrawals of funds. Such amounts do not include the funds held on deposit at GDB by the Commonwealth's public corporations and instrumentalities.

     *2.  Executive Order 2016-14, issued on April 30, 2016*

Executive Order 14 declared a payment moratorium with respect to certain obligations of GDB, including notes, bonds and letters of credit issued or guaranteed by GDB. Executive Order 14 also declared an emergency period with respect PRIFA's Revenue Bonds (Ports Authority Project), Series 2011 B, which are secured by a letter of credit issued by GDB.

     *3.  Executive Order 2016-18, issued on May 17, 2016*

Executive Order 18 declared an emergency period with respect to HTA and suspended HTA's obligation to transfer toll revenues to the trustee of its bonds until June 30, 2016 (this extension was later extended pursuant to Executive Order 31, discussed below).

     *4.  Executive Order 2016-27, issued on June 24, 2016*

Executive Order 27 declared the PRIFA Dedicated Tax Fund Revenue Bond Anticipation Notes, Series 2015 (the "**PRIFA BANs**"), which are guaranteed by the Commonwealth, covered obligations of PRIFA and suspended all obligations to transfer money to and from PRIFA in respect of the PRIFA BANs.

     *5.  Executive Order 2016-30, issued on June 30, 2016*

Executive Order 30 declared the Commonwealth to be in a state of emergency and declared a moratorium on the Commonwealth's obligation to make payments on bonds and notes issued or guaranteed by the Commonwealth. Executive Order 30 also declared an emergency period with respect to MBA and PBA, and suspended certain obligations of the Commonwealth to transfer moneys to such entities. The executive order also suspended any obligation of OMB to include an appropriation in the proposed budget submitted to the Legislative Assembly for the payment of bonds issued by PFC. Finally, Executive Order 30 suspended the payment of certain bonds and notes issued by PRIFA, HTA, and PBA.

     *6.  Executive Order 2016-31, issued on June 30, 2016*

Executive Order 31 declared an emergency period with respect to PRCCDA, ERS, PRIDCO, UPR, and PFC.  It also suspended certain obligations to transfer money to and from such entities and from the Puerto Rico Tourism Company to GDB.

Finally, Executive Order 31 also suspended certain transfers of funds to and from HTA, including the transfer of toll revenues from HTA to the trustee of its bonds.

Pursuant to the Executive Orders discussed above and in order to continue providing essential government services, from July 1, 2016 to November 30, 2016, the Commonwealth had retained and deposited in the TSA the following revenues that would have otherwise been

transferred to the public corporations set forth below for the payment of their respective debt obligations:

| Related Debt | Revenues Subject to Retention | Retained Revenues (in thousands) |
|---|---|---|
| **HTA Bonds (Resolution 68 and 98)** | Petroleum products (up to the first $10 million per month), gas and diesel oil excise taxes, and the first $15 of motor vehicle licenses fees | $132,757 |
| **PRIFA Bans** | $6.25 of the petroleum products excise tax | 63,545 |
| **MBA Line of Credit** | Cigarette excise tax (up to $800 thousands per month) | 4,000 |
| **Total** | | $200,302 |

From July 1, 2016 to November 30, 2016, the Commonwealth also retained approximately $103 million corresponding to rum excise tax revenues that would have otherwise been transferred to PRIFA for the payment of its Special Tax Revenue Bonds, pursuant to Executive Order 30 and consistent with the Commonwealth's budget for fiscal year 2017, which does not include an appropriation for the payment of such bonds. Such funds have been used by the Commonwealth to fund its intra-year cash flow needs.

In addition, pursuant to the Executive Orders discussed above, the government entities set forth below have retained the following types of revenues that would have otherwise been transferred to the trustees of their respective bonds and have either segregated such funds or used them in connection with their operations, depending on their respective financial situations:

| Government Entity | Revenues subject to retention |
|---|---|
| **ERS** | Employer contributions |
| **PRPA (PRIFA Ports Authority Bonds)** | Airport and port fees |
| **UPR** | Tuition fees |
| **Tourism Company (PRCCDA Bonds)** | Hotel room tax |
| **PRIDCO** | Rental revenue |
| **HTA** | Toll revenues |

The validity of the Moratorium Act and the actions taken by the Governor thereunder are being challenged in a number of lawsuits filed by bondholders. These legal challenges are described in "Litigation Related to the Commonwealth Debt" under LITIGATION.

**Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA)**

On June 30, 2016, President Obama signed PROMESA into law. In general terms, PROMESA seeks to provide the Commonwealth with fiscal and economic discipline through the creation of an oversight board (the "**Oversight Board**"), relief from creditor lawsuits through the enactment of a temporary stay on litigation, and two alternative methods to adjust unsustainable debt. PROMESA also includes other miscellaneous provisions, including relief from certain wage and hour laws and regulations and provisions for identification and expedited permitting of critical infrastructure projects.

The Oversight Board has plenary authority over Puerto Rico's finances. The board's primary function is to provide fiscal oversight through the development and approval of fiscal plans and budgets, and to enforce compliance with those plans and budgets through broad-based powers such as reducing non-debt expenditures and instituting hiring freezes.

The provisions of PROMESA are described in more detail in PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT.

**Fiscal Sustainability Act**

One important measure that the Commonwealth had taken in its attempt to address Puerto Rico's fiscal condition was the enactment on June 17, 2014 of the Fiscal Sustainability Act, which will remain in effect until June 30, 2017.

The principal corrective measures adopted by the Fiscal Sustainability Act were: (i) the freezing of benefits under collective bargaining agreements and the reduction of certain non-salary compensation; (ii) the contribution of the savings generated by certain public corporations to support certain General Fund expenditures; (iii) the freezing of formula appropriation increases to the UPR and the municipalities; (iv) the freezing and reduction of formula appropriations to the Judicial Branch, the Legislative Assembly and certain other entities; (v) the reduction in school transportation costs; (vi) the reduction of rates for professional and purchased services; (vii) the freezing of water rates applicable to governmental entities imposed by the Aqueduct and Sewer Authority; and (viii) the implementation of a payment plan system for legal judgments, among others. In addition, the Fiscal Sustainability Act imposes substantial additional managerial and administrative controls on the operations of the Executive Branch, including hiring and contracting requirements and procedures, savings targets for rent and utilities, fines to public employees for unauthorized transactions, and overall strengthening of oversight by the OMB.

The Proposed PROMESA Fiscal Plan proposes to extend certain portions of the Fiscal Sustainability Act until June 30, 2021. If such extension is not enacted, the Commonwealth will experience significant expenditure increases.

**Bondholder and Insurer Litigation**

As a result of the extraordinary liquidity measures taken by the Commonwealth over the course of fiscal year 2016, principally the implementation of the clawback in December 2015

and the enactment of the Moratorium Act in April 2016, several groups of bondholders and individual bondholders have separately brought legal actions against the Commonwealth, individual government entities, and/or certain of the Commonwealth officers challenging these actions. These actions are discussed below in "Litigation Related to the Commonwealth Debt" under LITIGATION.

In addition, bondholders have challenged the applicability of the stay under PROMESA to their lawsuits against the Commonwealth entities.

## Highlights of the Commonwealth Economy and Demographics

The Commonwealth faces a number of economic and demographic challenges that adversely impact its ability to successfully address its fiscal condition.  These challenges are highlighted below.  For a more detailed discussion of the Commonwealth's economy, see THE ECONOMY.

**Decline in GNP.**  The Commonwealth's gross national product (GNP) contracted (in real terms) every fiscal year between 2007 and 2015, with the exception of a slight increase for fiscal year 2012.  According to the Puerto Rico Planning Board, GNP is projected to decrease 1.8% and 2.3% in fiscal years 2016 and 2017.

**Decline in Economic Activity Index**.  The Economic Activity Index is an indicator of general economic activity, not a direct measurement of real GNP.  The September 2016 figure for the EAI was 124.5, a 0.5% reduction compared to September 2015, and an increase of 0.2% compared to August 2016. On a year-to-date basis (July to September 2016), the decline was of 1.0% with respect to the same period of the previous fiscal year.

**Decline in Population.**  According to U.S. Census Bureau population estimates, released in June 2016, the population of Puerto Rico, on a midyear basis, has decreased from 3,721,526 in 2010 to 3,474,182 in 2015, as residents migrate to the continental United States in search for employment opportunities and better living conditions.  On the other hand, the population growth rate for Puerto Rico derived from the International Database of the U.S. Census Bureau, showed a decline of 0.5%, or a level of 3,456,811 residents, at midyear 2016.

**Other Demographic Data.** For 2014, there were 9.76 births per 1,000 inhabitants compared to 12.5 births per 1,000 inhabitants for the same year in the mainland United States.  Moreover, median age in Puerto Rico has been increasing consistently, from 37 years in 2010 to 40 years in 2015.  For the U.S., median age was 37.2 years in 2010, and 37.8 in 2015.

**Employment.** As of June 30, 2016, the labor participation rate was 40.3% and the unemployment rate was 11.7%.

**Public School Students.**  The total population of students attending elementary, middle school and high school has decreased from 473,735 during the 2010-11 school year to 365,181 during the 2016-17 school year.  The total population of students attending public high school has decreased from 97,202 during the 2010-11 school year to 84,491 during the 2016-2017 school year.

**Poverty Level.** During 2015, 46% of the residents of Puerto Rico were below the federal poverty level.

**Participation in Public Health Insurance.** Approximately 1.6 million residents of Puerto Rico, or 46% of the population, participate in the government health insurance program. For fiscal year 2017, the cost of this program is expected to be $2.7 billion, of which $1.6 billion or 59.78% of total insurance cost comes from federal government ACA funds. The balance of the cost, is paid by a mix of local funds as follows: legislative appropriation of $885 million, or approximately 10% of the general fund budget for fiscal year 2017, $184 million from rebates and $200 million from Municipal contributions. The federal funds related to ACA funds, unless reenacted, would be depleted between December 2017 and February 2018.

## Extraordinary Legislative Session

On November 16, 2016, the Governor called an extraordinary legislative session for the consideration of 103 bills and 88 appointments. The extraordinary legislative session began on November 17, 2016 and ended on December 7, 2016. The Legislative Assembly approved 33 bills in the extraordinary legislative session, which are in the process of being sent to the Governor for his signature.  As of the date of this Report, the Governor has not confirmed whether he will call a second extraordinary session for the consideration of the measures that were not approved during the first extraordinary session. Several of the measures that were not approved during the first extraordinary session and that could be considered in a second extraordinary session are discussed in the following paragraphs.

One of such measures, House Bill 3003, would require that, beginning in fiscal year 2018, appropriations to the Special Revenue Funds, transfers for specific purposes, and other appropriations previously included in other laws be included in the Commonwealth's General Fund budget. Such measure would also require the closing of all bank accounts of entities with independent treasuries and would mandate that such accounts be administered by the Treasury Department. The Judicial Branch, the Legislative Branch, the Registry of the Property, the Government Ethics Office, the Puerto Rico Federal Affairs Administration, PRHIA, PRMSA, PBA, and all public corporations that do not depend on the General Fund for their operations would be excluded from such requirement. A related measure, House Bill 3004, would establish a mechanism for the Office of Management and Budget to oversee the use of funds appropriated to not-for-profit organizations.

Proposed House Bill 2857 would also amend ERS's enabling act to authorize the creation of a new entity to originate personal loans to ERS participants, buy loans originated by ERS to its participants and issue debt secured by such loans.

Another measure, House Bill 2924, seeks to amend TRS's enabling act, as amended pursuant to Act No. 160-2013, to make certain modifications to reflect the Puerto Rico Supreme Court's decision in AMPR v. Sistema de Retiro para Maestros et als, 190 D.R.E. 854 (2014), which declared certain provisions of Act No. 160-2013 unconstitutional. Consistent with the Puerto Rico Supreme Court's decision in such case, the bill provides that teachers who were participants of the system prior to the enactment of Act No. 160-2013 will not be subject to the changes to core pension benefits imposed by such act.

Pursuant to Section 204(a) of PROMESA, the Governor is required to submit to the Oversight Board all laws enacted by the Commonwealth within seven days of their enactment, along with an estimate of the impact, if any, that the law will have on expenditures and revenues and a determination as to whether the law is consistent with the Commonwealth's fiscal plan. The Commonwealth has stated that it intends to comply with Section 204(a) of PROMESA.

The counsel to the Oversight Board sent a letter to the Governor dated December 9, 2016 indicating that the Oversight Board understands that various proposed laws are under consideration, confirming that the Oversight Board will not pursue any legislation that is inconsistent with PROMESA, and reserving all its rights under Section 108(a)(2) of PROMESA to review any statute that would impair or defeat the purposes of PROMESA.

## RISK FACTORS

*The following discussion of risk factors does not necessarily reflect the relative importance of various factors and is not meant to be a complete list of risks that could materially adversely affect the Commonwealth's financial and economic condition, liquidity, and operations. Additional risks and uncertainties not currently known by the Commonwealth, or that the Commonwealth does not currently consider to be material, or that are generally applicable to all states and governmental instrumentalities, also may materially and adversely affect the financial and economic condition of the Commonwealth, its liquidity and its ability to repay its bonds and honor its other obligations. Moreover, while some of the risks described below may also affect the Commonwealth's instrumentalities, this Report does not, and is not intended to, identify all the risks associated with each instrumentality. Any one or more of the factors discussed herein, and other factors not described herein, could lead to a decrease in the market value and the liquidity of the Commonwealth's bonds. There can be no assurance that other risk factors not discussed below will not become material in the future.*

*References to "bonds" in this section mean the Commonwealth's general obligation bonds and bonds guaranteed by the good faith, credit and taxing power of the Commonwealth, and do not include bonds issued by any of the Commonwealth's instrumentalities (except Commonwealth guaranteed bonds). Some of the risks discussed below, however, also affect bonds issued by Commonwealth instrumentalities, including bonds payable from Commonwealth appropriations or tax revenues assigned by the Commonwealth to such instrumentalities for the repayment of their bonds.*

## Risks Related to the Enactment of PROMESA

***The Commonwealth may be unable to address its fiscal and economic challenges expeditiously because certain requirements and provisions of PROMESA have not been previously judicially interpreted or tested.***

PROMESA is an unprecedented and complicated statute that was the result of bi-partisan efforts to address the challenging financial and fiscal situation of the Commonwealth and its instrumentalities within the context of its unique relationship with the United States. PROMESA contains many provisions that, although similar to the provisions of Chapter 9 or other chapters of the United States Bankruptcy Code, are not identical and may not be interpreted in the same manner. Even in the case of the provisions of Chapter 9 that are expressly incorporated into PROMESA, there is no guaranty that a court will apply such provisions in the same manner

under PROMESA.  PROMESA also includes many provisions that are not contained in the United States Bankruptcy Code and have not been previously interpreted by the courts. Accordingly, the implementation of various provisions of PROMESA, including the debt adjustment provisions included in Titles III and VI, may be delayed as these novel issues are initially resolved and then appealed.

In addition to such delay, the resolution of such issues may adversely affect the Commonwealth to the extent (i) these issues are resolved in a manner that is burdensome to the Commonwealth's efforts to address its fiscal and financial challenges or that makes the provisions of PROMESA less effective to address the Commonwealth's challenges, and (ii) human and financial resources are diverted to address these legal challenges.

Finally, PROMESA's validity may be challenged as a result of its unprecedented nature. The statute has the potential to significantly affect the rights of numerous stakeholders. As a result, stakeholders may challenge PROMESA on federal constitutional grounds. There is no assurance that such a challenge would be resolved expeditiously or in a manner advantageous for the Commonwealth.

The uncertainty of these matters and resulting challenges may delay the Oversight Board's ability to effectively deal with the Commonwealth's financial and fiscal challenges and, thus, temporarily lead to a further deterioration of the Commonwealth's economy.  For more detailed information about PROMESA, see PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT.

***Creditors may be unable to exercise remedies in the near future because PROMESA imposes an automatic stay on the exercise of remedies against the Commonwealth and its instrumentalities for failure to pay a debt obligation or for a breach of any covenant in such debt obligation.***

Section 405 of PROMESA imposes a stay on creditor remedies for the failure by the Commonwealth or its instrumentalities to make payments on their debt or for the breach by the Commonwealth or any of its instrumentalities of any obligation under such debt.  The stay is effective from July 1, 2016 to February 15, 2017, subject to being extended for a limited period of time under certain conditions.  During this period, bondholders and other creditors of the Commonwealth and its instrumentalities will be unable to seek payment or exercise their remedies against them, unless otherwise authorized to do so by the U.S. District Court for the District of Puerto Rico.  Moreover, Title III provides for a stay similar in scope and duration to the stay provided for by Chapter 9 of the United States Bankruptcy Code.  This means that the stay provided for by Title III applies to any and all actions against a debtor thereunder, not just actions related to a debt liability as in the case of Section 405, and its duration is not limited because it applies while the debtor is subject to the provisions of Title III.  As a result, bondholders and other creditors may be adversely affected to the extent they will be unable to seek payment or exercise remedies against a government entity subject to Title III of PROMESA for an indefinite period of time.  Moreover, to the extent a Title III proceeding is not resolved quickly, creditor recoveries may decrease as a result of the performance of the Puerto Rico economy in light of the uncertainty created by the Title III proceeding.

***Certain creditors may be able to enforce remedies against the Commonwealth or its instrumentalities notwithstanding the existence of the stay imposed by PROMESA and such***

*enforcement may adversely affect the Commonwealth and its creditors, including by disrupting the Commonwealth's ability to continue providing essential services to its residents.*

The Commonwealth and certain of its instrumentalities are currently defendants in various cases that challenge the constitutionality of the Moratorium Act and the executive orders adopted thereunder and seek to lift the stay imposed by PROMESA or to prohibit the use of funds previously assigned to certain public corporations to cover essential services. Similar to bankruptcy proceedings under Chapter 9 of the United States Bankruptcy Code, under particular circumstances, certain creditors may be able to obtain a judicial ruling lifting the application of the stay imposed by PROMESA. Furthermore, creditor groups may be successful in arguing that certain types of claims, including claims for violations of restrictions imposed by PROMESA, are not covered by the stay imposed by the federal legislation.

To date, the provisions of the Moratorium Act and the executive orders adopted thereunder have allowed the Commonwealth to continue providing essential services by allowing the Commonwealth to retain funds assigned to certain public corporations and temporarily suspending its obligation to pay debt service. The Commonwealth has also been able to continue operating through the protection from legal actions provided by the PROMESA imposed stay.

To the extent creditors prevail in their actions, the Commonwealth could have to redirect its limited resources to the continued defense of these actions, to redress creditor damage claims, or to pay debt service, and may be prohibited from using available resources for the payment of essential services, to the extent such use is deemed to violate the PROMESA transfer prohibitions. As a result, the Commonwealth may face a shortage of liquidity that would disrupt its ability to continue providing essential services until such time as the stay or the moratorium are reinstated or it is permitted to use available resources to cover expenses for essential services.

Other creditors and stakeholders of the Commonwealth may also be adversely affected to the extent the Commonwealth is unable to equitably allocate its resources among them. The Commonwealth's inability to continue providing essential services to its citizens may also adversely affect creditors, as the further deepening of the current economic recession will curtail the Commonwealth's ability to collect the revenues required to meet its contractual obligations and provide essential services.

***The stay imposed by PROMESA may not provide the Oversight Board, the Commonwealth or its instrumentalities sufficient time to effectively manage the financial and fiscal challenges faced by the Commonwealth and its instrumentalities.***

The stay imposed by PROMESA is effective from July 1, 2016 to February 15, 2017, subject to being extended for a limited period of time under certain conditions.  The period ending February 15, 2017 may not be sufficient for the Commonwealth to finalize negotiations with creditors pursuant to Title VI of PROMESA or for the Oversight Board to make an informed determination as to whether the Commonwealth or any of its instrumentalities should be subject to a restructuring pursuant to the provisions of Title III of PROMESA.  In order to be able to commence a proceeding under Title III certain prerequisites need to be satisfied, including the issuance of a restructuring certification by the Oversight Board after it has determined, among other things, that the entity has made good faith efforts to reach a consensual restructuring with its creditors, has adopted procedures to deliver timely audited financial statements and has adopted a fiscal plan certified by the Oversight Board.  The provisions of

Title III of PROMESA also impose a stay once the Oversight Board has made the determination that a governmental entity will be subject to a proceeding under Title III. As a result, the Commonwealth and its instrumentalities may be subject to creditor claims and challenges to the extent there is any gap between the termination of the stay imposed by Section 405 of PROMESA and the commencement of a stay pursuant to Title III of PROMESA. To the extent that any such gap exists, the Commonwealth and its instrumentalities may be required to allocate their resources in a manner that disproportionately favors one creditor class over another or undermines the Commonwealth's ability to continue providing essential services to its population.

*The application of PROMESA may result in a reduction of interest or principal due on bonds issued by the Commonwealth and its instrumentalities.*

Holders of bonds issued by the Commonwealth and its instrumentalities may be subject to voluntary or involuntary haircuts of interest or principal or both on their bonds as a result of one of the two methods to restructure Puerto Rico's debts contained in PROMESA. The first method is a streamlined process to achieve modifications of financial indebtedness with the consent of a supermajority of affected financial creditors. This method has benefits such as potential speed relative to a traditional restructuring through a formal in-court process. Assuming this method fails to achieve the necessary results, PROMESA provides for a court-supervised debt-adjustment process modeled on Chapter 9 of the U.S. Bankruptcy Code. Both processes include provisions through which dissenting creditors can be forced to accept the decision of a supermajority, in the case of Title VI of PROMESA, or possibly the decision of a minority or separate class of creditors through the inclusion of the so-called "cram-down" power, in the case of Title III of PROMESA. If a successful Title VI or Title III proceeding were achieved, it could result in significant reductions in principal and interest on debt of the Commonwealth and its instrumentalities, which would also be binding on dissenting creditors, in accordance with the terms of PROMESA.

*Delays in the designation of the Oversight Board's staff and the time it may take the Oversight Board to become fully operational and delays in the certification of a fiscal plan may delay the commencement of actions necessary to restore the Commonwealth to fiscal health and may lead to a further deterioration of the Commonwealth's fiscal condition.*

PROMESA creates an Oversight Board charged with providing the Commonwealth with fiscal and economic discipline and provides it with various tools to achieve its purposes, such as approval rights over the Commonwealth's establishment of a fiscal plan, its budget and new debt issuances, and the right to review and rescind certain laws or regulations, among other rights. Notwithstanding the designation of the Oversight Board's members, which took place on August 31, 2016, and the election of a chair of the Oversight Board, which took place on September 30, 2016, the time it may take the Oversight Board to hire an Executive Director and its staff, and the time it will take the members of the Oversight Board and its staff to become sufficiently acquainted with the Commonwealth's current fiscal, financial and economic situation may delay the Oversight Board's ability to begin making decisions necessary to address the Commonwealth's fiscal and economic crisis.

Delays in the designation of the Oversight Board's staff may also affect the Commonwealth's ability to finance its operations to the extent it cannot receive any required approvals for liability management transactions or the issuance of new debt.

As further discussed above, the Oversight Board rejected the initial version of the Proposed PROMESA Fiscal Plan and requested that the Governor present a revised fiscal plan by December 15, 2016 that complies with certain principles established by the Oversight Board. There is no assurance that the Oversight Board and the Governor will agree as to the required revisions or that the Governor will present a revised plan by the established deadline.

The uncertainty created by the lack of a fiscal plan approved by the Oversight Board and by the Oversight Board's right to review and rescind legislation may adversely affect the level of economic activity on the island during the initial months following the Oversight Board's establishment. Further, delays in the approval of a fiscal plan may delay the commencement of debt restructuring proceedings or other actions necessary to restore the Commonwealth to fiscal health and may lead to a further deterioration of the Commonwealth's fiscal condition and subject the Commonwealth to multiple creditor litigations once the stay imposed by PROMESA ends. See the Risk Factor titled *"The stay imposed by PROMESA may not provide the Oversight Board, the Commonwealth or its instrumentalities sufficient time to effectively manage the financial and fiscal challenges faced by the Commonwealth and its instrumentalities."*

**The Oversight Board may face delays in receiving information from the Commonwealth necessary to discharge its responsibilities.**

Although the Oversight Board has certain powers to compel the production of information by Commonwealth officials, it is uncertain whether the Commonwealth will be in a position to comply with all Oversight Board requests in a timely manner. The Oversight Board may also request information that may be unavailable at the level of detail or review requested or that may have to be manually generated or compiled because current Commonwealth systems do not provide for the automatic production of such information. To the extent the information is available, the complex nature of the Commonwealth's organizational and debt structure may delay any decisions by the Oversight Board until it fully understands the governmental structure and its interrelationships and is able to achieve consensus on a path forward to achieve fiscal stability and debt sustainability. Moreover, the change of administration resulting from the November 8 election may cause additional delays in the production of information as the new administration transitions into power, is able to hire sufficient personnel to operate effectively and assimilates the information required to make informed decisions.

**The mechanisms made available to the Commonwealth and its instrumentalities under PROMESA may not be sufficient to address the fiscal and financial challenges they face.**

PROMESA may not achieve its intended goals. The challenges faced by the Commonwealth and its instrumentalities are complicated and are a result of a myriad of economic, political, financial and fiscal problems that have persisted through many years. In order to address these challenges, major and fundamental changes will need to be implemented across many areas of the Commonwealth's governmental structure. In the end, these changes will have to be implemented by local government officials with the supervision of the Oversight Board established by PROMESA. As a result, whether or not PROMESA is successful will depend in part on the coordination and communication developed by the Oversight Board and local, elected officials ultimately responsible for implementing those changes. There is no assurance that the Oversight Board and local officials will agree on the priorities and changes that need to be implemented in order to restore Puerto Rico's fiscal and economic health. The change in administration resulting from the November 8 election may also cause delays in the

implementation of such changes. Moreover, to the extent there is any disagreement between the Oversight Board and local officials, PROMESA may not contain effective enforcement provisions in order to effectively ensure the implementation of the Oversight Board's decisions. Finally, any divergence of opinions between the Oversight Board and local officials may further exacerbate local instability and uncertainty, thereby affecting the ability of the Commonwealth and its instrumentalities to effectively address its financial and fiscal challenges.

PROMESA does not provide mechanisms for addressing those fiscal, financial and economic problems that are outside the purview of the Oversight Board. For example, federal funding levels for certain health and welfare programs that are critical for Puerto Rico, including the health reform, depend exclusively on actions taken by the United States Congress. The continued creditability by the Internal Revenue Service of the excise tax imposed by Act 154 also depends exclusively on actions taken by the Executive Branch of the United States government. Actions by Congress and the federal Executive Branch, which are outside the Commonwealth's or the Oversight Board's control, will thus significantly affect the Commonwealth's ability to address its fiscal and economic challenges.

***Puerto Rico's economy may be adversely affected by PROMESA to the extent that its economic and financial effects disproportionately fall on the Commonwealth government and its residents.***

Puerto Rico's economy may be adversely affected by expenditures cuts or revenue raising measures implemented as a result of PROMESA. An increase in the tax burden of Puerto Rico residents may exacerbate the population decline and economic recession currently experienced by the island. At the same time, additional austerity measures that further reduce governmental expenditures or services, including reductions in the government's workforce, may also increase the rate at which residents leave for the mainland and reduce the disposable income of residents of Puerto Rico. This decline may, in turn, lead to a decrease in economic activity that will affect the government's ability to collect revenues as projected.

Moreover, the restructuring provisions of PROMESA may lead to significant haircuts in principal and interest payments and payments due to beneficiaries of the Commonwealth's various pension systems. As a result of the Commonwealth's past tax and other incentive policies, Puerto Rico residents and entities may own a disproportionate amount of Puerto Rico debt either directly or indirectly through retirement accounts, mutual funds or retirement plans. In particular, numerous savings and loan cooperatives have high concentrations of debt issued by the Commonwealth and GDB. Thus, significant reductions in principal and interest payments or pension benefits under PROMESA may lead to an additional decrease in economic activity as a result of reductions in disposable income and the wealth and income levels of Puerto Rico residents. Any such reduction in principal and interest payments may also adversely affect the financial wherewithal and solvency of Puerto Rico entities and corporations, which may become unable to honor their obligations as a result of critical capital levels.

***Compliance with PROMESA and Oversight Board requirements may cause a significant increase in the expenditures of the Commonwealth and its instrumentalities.***

The activities of the Oversight Board established by PROMESA are likely to result in significant expenditure increases by the Commonwealth and its instrumentalities due to the cost

of its ongoing operations as well as additional costs that may be incurred by the Commonwealth and its instrumentalities to comply with PROMESA's requirements.

Section 107(b) of PROMESA provides that the Oversight Board shall use its powers with respect to the Commonwealth budget to ensure that sufficient funds are available to cover all the expenses of the board.   The Oversight Board's responsibilities over the Commonwealth's finances, including its authority to review and approve fiscal plans and annual budgets, are likely to require significant expenditures in the form of permanent staff, overhead and specialized professional legal, accounting and financial services.   The Congressional Budget Office estimates that the Oversight Board's administrative costs would amount to approximately $370 million from fiscal year 2017 to fiscal year 2022.    In order to arrive at this estimate, the Congressional Budget Office examined the administrative costs — particularly for legal and financial expertise required to oversee procedures related to bankruptcy and debt restructuring — incurred by institutions involved in resolving financial crises faced by U.S. municipalities, including Detroit, Philadelphia, New York City and the District of Columbia.

The Oversight Board's power over the budget and finances of the Commonwealth and its instrumentalities (to the extent designated by the board as a "covered territorial instrumentality") may further increase the expenditures of such entities.  For example, an entity that is required to prepare a five-year fiscal plan, submit its budget to the Oversight Board and restructure its debts through a Title III or VI proceeding may have to hire additional specialized staff and/or consultants or experts to comply with such requirements.   Moreover, the Oversight Board recently required the Governor to provide weekly cash flow reports, monthly reports of bank account data, payroll, federal funds and debt obligations due during the fiscal year, monthly and year-to-date compliance reports and revenue and collection reports and quarterly reports on agency performance metrics and key economic statistics.  Most, if not all, of these reports are not currently produced by the Commonwealth and will require the investment of additional resources in order to comply with the Oversight Board's requirements.  As a result, compliance with the requirements of the Oversight Board and PROMESA may cause a significant increase in expenditures that may compete with the finite resources otherwise available to satisfy the claims of other Commonwealth stakeholders.

Finally, the Oversight Board's power to rescind or prevent the implementation of certain laws and overturn transfers may lead to revenue reductions or expenditure increases. The rescission or prevention of the implementation by the Oversight Board of any revenue raising measure may leave critical programs without sufficient resources to operate. Moreover, if the Oversight Board were to overturn transfers of funds, the affected entity may not have sufficient funds to honor its obligation to return the funds to the extent they have been spent. This could result in increasing expenditures that would affect the government's ability to provide essential services.

**Risks Related to the Commonwealth's Lack of Liquidity and High Level of Debt**

***The Commonwealth continues to face an immediate liquidity crisis notwithstanding emergency liquidity measures implemented to date, including the suspension of the payment of debt service on its general obligation and guaranteed debt on June 30, 2016. The Commonwealth's ability to meets its operating expenses during the current fiscal year may depend on the uniform and continued application of the stays imposed by the Moratorium Act and PROMESA until their expiration, its ability to execute additional emergency cash***

*management measures, and the extension of the stay period, either through the enactment of*
*local or federal legislation or access to a PROMESA Title III proceeding.*

Notwithstanding the fiscal adjustment measures taken by the Commonwealth during the past years, the Commonwealth has faced, and continues to face, severe cash shortages due to, among other things, recurring deficiencies of revenues under expenditures, lack of market access, outdated accounting systems and the inability of GDB to continue serving as an emergency liquidity provider. See "Commonwealth Liquidity" under OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION.

As described in OVERVIEW OF THE COMMONWEALTH'S FINANCIAL CONDITION, during the past decade, the Commonwealth has experienced material deficits under both a U.S. GAAP and budgetary basis. The Commonwealth also expects to run a material deficit on a cash and accrual basis during fiscal year 2017. The continued buildup of payables to suppliers and taxpayers as a cash management measure to address deficits in prior fiscal years further strains the Commonwealth's liquidity and represents additional demands on the Commonwealth's cash resources that are not contemplated in the General Fund budget to the extent such accounts payable relate to prior fiscal years. Furthermore, General Fund revenues and expenditures may not accurately reflect the cash demands on the Commonwealth during the fiscal year due to the existence of deficits in Special Revenue Funds (that do not impact the General Fund) and the need to fund certain public corporations that provide essential services. At the same time, the Commonwealth's actual liquidity during the fiscal year may be less than what its General Fund budgetary revenues may suggest because such revenues may include non-cash items that are not available revenues to meet operational expenditures.

Beyond these recurring deficiencies of revenues under expenditures, the Commonwealth's own cash deficiencies at its TSA are typically exacerbated during the first half of the fiscal year because a substantial portion of the Commonwealth's tax revenues are received during the second half of the fiscal year (January through June), while operational expenditures occur evenly throughout the fiscal year. Working capital financings to address this cash flow deficiency is usually obtained by the issuance of TRANs, which has been unavailable from non-government sources since fiscal year 2016.

GDB, which has traditionally served as a source of emergency liquidity to bridge cash flow deficits, is currently insolvent on a balance sheet basis and is thus unable to continue to provide liquidity. See the risk factor titled "***GDB is insolvent on a balance sheet basis and is unable to honor its obligations as they become due, continue to serve as the principal source of short-term liquidity for the Commonwealth and its instrumentalities and as the principal depositary of public funds, which further adversely affects the Commonwealth and its instrumentalities.***"

The Commonwealth dealt with its severe liquidity crisis during fiscal year 2016 by imposing a series of measures that are unsustainable over the long term. For a description of such measures, see "Liquidity Constraints" under OVERVIEW OF THE COMMONWEALTH'S FINANCIAL CONDITION. Furthermore, in April 2016, the Commonwealth enacted the Moratorium Act. Based on its provisions, the Governor of Puerto Rico suspended the payment of debt service on the Commonwealth's general obligation and guaranteed debt, as well as the payment of debt obligations of certain of its instrumentalities (excluding COFINA, which as of the date of this report continues to make debt service payments

when due); in addition, the Governor suspended the obligations of the Commonwealth to transfer to certain government entities certain taxes and other revenues that would have otherwise been used for the payment of debt service.  For more information regarding the debt service payments that were not made, see "Recent Defaults on Required Debt Service Deposits or Payments" under OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION.

The fiscal year 2017 General Fund budget did not appropriate funds for debt service (including Commonwealth general obligation debt service) in reliance on the suspension of such obligations imposed by the Moratorium Act.

Notwithstanding the unsustainable nature of the measures described above, the Commonwealth's cash flow forecast for its TSA for fiscal year 2017 relies on, among other things, the continued suspension, pursuant to the Moratorium Act, of both the payment on all of the Commonwealth's General Obligations debt and other debt-service obligations and the obligation to transfer certain pledged revenues to certain public corporations provided for in the General Fund budget. Even after implementing all these measures, however, the Treasury Department expects to have sufficient liquidity to operate the government only up to the expiration of the moratorium period, which expires on January 31, 2017, subject to a two-month extension upon approval from the Governor. On or before January 31, 2017 (or March 31, 2017, if the expiration date is extended), the Commonwealth will need to take additional emergency liquidity measures, have access to financing or have the Oversight Board file a PROMESA Title III proceeding to avoid running out of cash on such expiration date and throughout the remainder of fiscal year 2017.

Creditors are challenging the legality of certain measures taken by the Commonwealth to bolster its liquidity position, including those actions taken pursuant to the Moratorium Act.  See LITIGATION. To the extent that such creditors are successful in their challenges notwithstanding the stay provisions of the Moratorium Act and PROMESA, the financial, fiscal and liquidity position of the Commonwealth and its instrumentalities will suffer a significant adverse effect and, as a result, the Commonwealth may not have the liquidity necessary to be able to continue providing essential government services.

Furthermore, although the Commonwealth has already implemented most of the emergency measures at its disposal, it may be forced to take any additional emergency measures available to it, which may affect the rights of its stakeholders, including bondholders and other creditors.

***The Commonwealth does not currently project to have sufficient resources to fund its operational expenses, pay its debt obligations in accordance with their terms, and fund other legacy obligations.  The Commonwealth will therefore need to implement a fiscal adjustment plan and restructure its debt obligations, which is subject to material implementation risk.***

The Proposed PROMESA Fiscal Plan projects that the baseline cumulative financing gap (i.e. the difference between projected revenues and expenses under current policies) for the Commonwealth and certain of its instrumentalities that rely primarily on tax revenues for their operations for the ten fiscal years between 2017 and 2026 would be approximately $59 billion, absent corrective actions. The Proposed PROMESA Fiscal Plan contemplates that this financing gap could be reduced through a combination of revenue increases, expense reductions and

economic growth, but that the remaining financing gap would need to be addressed by debt restructuring.

There is no assurance that the projections and assumptions used to prepare the Proposed PROMESA Fiscal Plan will be realized or that measures contemplated by such plan will be approved, enacted or implemented successfully.  To the extent that any such projection, assumption or measure is not realized, the financing gap faced by the Commonwealth and its instrumentalities may be significantly higher than currently projected and the amount needed to close that gap may increase significantly, thus requiring additional increases in government revenues or reductions of expenditures, which may have an adverse economic impact or necessitate additional adjustments to the debt of the Commonwealth and its instrumentalities. Finally, the Proposed PROMESA Fiscal Plan may be revised to the extent that any incoming administration may have different public policy views and goals than those of the current administration.  For a detailed explanation of the Proposed PROMESA Fiscal Plan and the assumptions contained therein, see "Proposed PROMESA Fiscal Plan".

*The Commonwealth has too much debt in relation to its revenue base and the current size and trajectory of its economy and will have to restructure its debt obligation in order to continue providing essential services to the residents of Puerto Rico.*

As of July 31, 2016, Puerto Rico had outstanding a total of $71.499 billion aggregate principal amount of debt issued by the Commonwealth, its public corporations and instrumentalities, representing approximately 104% of Puerto Rico's gross national product for fiscal year 2015 ($68.521 billion - preliminary).

For fiscal year 2016, aggregate contractual debt service on debt obligations (including GO, PBA, PRIFA, PFC and other appropriation debt (in the case of GDB loans, limited to amounts included in the $275 million budget reserve for such fiscal year) but excluding ERS and TRANs debt service) payable from the General Fund (approximately $1.902 billion) represented approximately 21% of General Fund revenues in fiscal year 2016 ($9.171 billion).

However, when debt from governmental issuers supported by tax revenues or General Fund appropriations is included in the calculation, debt service for fiscal year 2016 represented approximately 36% of such fiscal year's consolidated revenues (as defined in the FEGP, and excluding federal transfers and after reflecting the impact of the legislated 4.5% surcharge on the sales and use tax rate). Other tax-supported debt as of July 31, 2016 included bonds, notes and other obligations issued or incurred by (i) COFINA, which as of such date had approximately $17.3 billion principal amount of obligations payable from sales and use tax revenues, (ii) HTA which had approximately $5.9 billion, principal amount of obligations payable in part from petroleum products excise taxes, gas taxes and other taxes and fees; (iii) PRIFA, which had approximately $1.9 billion principal amount of obligations payable in part from petroleum products excise taxes, federal rum excise taxes and other taxes or appropriations, (iv) ERS, which had approximately $3.1 billion principal amount of bonds mostly payable from contributions to the System made by the Commonwealth (which are in turn funded by taxes collected by the Commonwealth), (v) the PRCCDA, which had approximately $532 million principal amount of bonds and notes payable from hotel room taxes, (vi) the University of Puerto Rico, whose source of repayment are internal revenues of such entities but which receive substantial subsidies from the Commonwealth in the form of assigned tax revenues or General Fund appropriations, and (vii) PRIDCO, whose source of repayment are internal revenues but

which receives certain subsidies to fund its operations and PRIDCO-administered incentive programs. In addition, as of July 31, 2016, GDB also had approximately $3.8 billion principal amount of bonds and notes outstanding, whose source of repayment are principal and interest paid by the Commonwealth and its instrumentalities under loans made by GDB to the Commonwealth and its instrumentalities, which in turn are payable in whole or in part from taxes and Commonwealth appropriations. Total debt service due on tax-supported bonds and notes for fiscal year 2016 (excluding debt service on TRANs, on loans from private or public financial institutions (i.e. GDB) other than the GSA GO guaranteed loan and on indebtedness of municipalities, PREPA, PRASA, HFA or Children's Trust) was approximately $4.1 billon.

The Commonwealth's high level of debt and the resulting allocation of revenues to service this debt have contributed to significant budget deficits during the past several years, which deficits the Commonwealth has been required to finance, further increasing the amount of its debt. More recently, the Commonwealth's high level of debt, among other factors, has adversely affected its credit ratings and its ability to obtain financing on sustainable terms. The Commonwealth expects that it will not be able to finance future budget deficits and, with respect to its funding needs in fiscal year 2017, it has decided to fund essential governmental programs and services rather than honoring its debt obligations. As a result, the Commonwealth expects to continue to rely on the provisions of the Moratorium Act and PROMESA (until such provisions expire) to prioritize the payment of essential governmental services over the making of debt services payments on its debts.

For more information regarding the Commonwealth's debt, see DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

*The Commonwealth recently commenced the audit for its fiscal year 2015 financial statements and has not commenced the audit for its fiscal year 2016 financial statements and the Commonwealth may be unable to complete such audits within a reasonable time period. As a result, the Commonwealth may be unable to comply with certain requirements of PROMESA, access the markets and may be forced to make decisions without audited financial data.*

On October 19, 2016, the Commonwealth contracted with its current nationally recognized independent audit firm for the performance of the audit of its fiscal year 2015 financial statements. As part of the negotiation and in light of the Commonwealth's fiscal and financial condition, the Commonwealth agreed to an increase in audit costs, the addition of significant new procedures and analysis and certain other requirements, such as the assignment by the Treasury Department of suitable key personnel with appropriate skills, knowledge and/or experience to oversee the financial statement preparation process and to evaluate the adequacy and results of the services, among others. To the extent the Commonwealth is unable to comply with these requirements, the audit firm may withdraw from the engagement and the Commonwealth will have to engage a new audit firm. There is no assurance that the incoming administration will comply with all the requirements of the new engagement, specifically those requirements relating to the retention of certain personnel. Moreover, the incoming administration may decide to terminate the current engagement and engage a new audit firm.

Moreover, any additional delays in the audit of the fiscal year 2015 financial statements will further delay the audit of the Commonwealth's fiscal year 2016 financial statements. The Commonwealth has not engaged a firm to audit its fiscal year 2016 financial statements.

To the extent the current audit firm withdraws from its engagement or such firm is terminated by the incoming administration, the Commonwealth may be unable to produce its fiscal year 2015 financial statements within a reasonable time period. Furthermore, if the Commonwealth is unable to engage an audit firm on a timely basis for the fiscal year 2016 audit, the publication of such financial statements may be further delayed. Due to the delay in conducting the fiscal year 2015 and fiscal year 2016 audits, the Commonwealth may be unable to comply with certain requirements of PROMESA or access the debt markets. The Commonwealth may also be forced to make decisions without audited financial data.

## Risks Related to Puerto Rico's Extended Economic Recession

*The Commonwealth's economy has been contracting and, absent future real growth, will be unable to sustain the Commonwealth's current operations and its financial and other legacy obligations.*

The Commonwealth's gross national product contracted in real terms in every year except one between fiscal year 2007 and fiscal year 2016 (inclusive). According to the Puerto Rico Planning Board latest economic forecast (published at the end of October 2016), gross national product is also projected to further contract by 2.3% during fiscal year 2017. This persistent contraction has had an adverse effect on employment and tax revenues, and has significantly contributed to Commonwealth deficits in those fiscal years. Factors that can adversely affect the Commonwealth's ability to increase the level of economic activity, some of which are not within the control of the Commonwealth, include the high cost of energy, changes in federal tax policy, the loss of patent protection of several products manufactured in Puerto Rico and the consolidation of local operations due to excess manufacturing capacity at local factories (which leads to a reduction of manufacturing activity in Puerto Rico), global economic and trade conditions, population decline, and the Commonwealth's high level of debt.

The Commonwealth's economy may also be adversely affected by epidemics or pandemics of communicable diseases. In particular, the Commonwealth is currently experiencing an epidemic level outbreak of the mosquito borne Zika virus, which has been linked to birth defects. As a result, segments of the economy that have shown signs of strength, such as tourism, may be adversely affected. Furthermore, the outbreak of this virus will further strain the Commonwealth's resources if additional, unexpected expenditures are required to address the epidemic and federal government funding is not available to supplement Commonwealth resources.

Federal policy has a significant effect on Puerto Rico's economy and Puerto Rico has no control over such policy. In particular, federal decisions as to funding levels of various programs significantly affect Puerto Rico. For example, as a result of Puerto Rico's low per capita income compared to the fifty states, many Puerto Rico residents receive federal aid through social welfare or health-related programs. Due to the dependency of a significant portion of the population on these programs, any change in the level of available federal funding for Puerto Rico may have an adverse effect on government finances and the economy. For example, many

low-income residents of Puerto Rico may be left without a viable health plan to the extent that funds allocated to Puerto Rico under the Affordable Care Act run out by fiscal year 2018 and Puerto Rico does not receive parity under other health-related programs.  Moreover, Puerto Rico's lack of effective representation at the federal level limits its ability to influence federal policy towards the island.  As a result, there is no assurance that federal funding of critical programs will continue at current levels and, to the extent that federal funding is curtailed, Puerto Rico's ability to effectively address its fiscal and financial challenges may be significantly limited as it may be required to allocate limited resources to address critical programs.  See "*If federal funding for the Commonwealth's health insurance program is not increased from, or at least maintained at, current levels, the Commonwealth may be unable to continue fully funding such program*" for more information regarding available funding for the health insurance program.

The Commonwealth's Proposed PROMESA Fiscal Plan contains a number of proposals designed to promote economic growth. However, many of these proposals require the enactment of legislation by the Puerto Rico Legislative Assembly or the Congress of the United States. Some of these measures face opposition by legislators, labor unions, or other affected parties and may be subject to approval by the Oversight Board created by PROMESA. There is no certainty that these proposals will be adopted, or that if adopted, they will produce the intended results. Moreover, there is no assurance that economic growth will result from the implementation of these proposals. To the extent the Commonwealth does not experience a significant level of economic growth, its ability to cover debt service payments, even if restructured, may be significantly compromised.

### *Population decline, particularly of working-age individuals, will adversely affect the economy.*

Changes in population have had, and may continue to have, an impact on economic growth and on tax revenues.  According to the United States Census Bureau, the population of Puerto Rico decreased by 2.2% from 2000 to 2010, and by an estimated 6.8% from 2010 to 2015, driven primarily by a falling birth rate, a rising death rate and migration to the United States mainland.  Preliminary estimates prepared by the Puerto Rico Institute of Statistics suggest that the island continued to lose population during fiscal year 2016 as well.  Reductions in population, particularly of working-age individuals, are likely to have an adverse effect on tax and other government revenues that will not be entirely offset by reductions in government expenses in the short and medium term. In addition, the average age of the population of Puerto Rico is increasing, due mainly to a reduction in the birth rate and the migration of younger persons to the United States mainland. This phenomenon is likely to affect every sector of the economy to the extent that the local consumer base is diminished and the local labor force fails to meet the demand for workers in certain sectors of the economy.  Moreover, this trend increases the impact of the demand for health and other services on the Commonwealth, and the relative cost to the Commonwealth of providing such services.  Additionally, the loss of doctors, including physicians and trained specialists, and other professionals may lead to an increase in the rate of migration as the population fails to find the specialized services it needs in Puerto Rico.

### *The Commonwealth's macroeconomic data may not accurately reflect the performance of the economy of Puerto Rico.*

The Puerto Rico Planning Board has acknowledged the existence of certain significant deficiencies in the calculation of its macroeconomic data. The deficiencies relate mostly to the deflators of the components of trade-related services and in some cases, monetary accounts of certain components of gross national product. As a result, the historical rate of change in gross national product at constant prices (real gross national product change) and at current prices (nominal gross national product change) could have been either overstated or understated for several years. These deficiencies have also led to the delay in the publication of periodic economic data in order to provide the Planning Board with sufficient time to determine the particular deficiencies included in the calculation of the "deflators" and the procedures to fix such deficiencies.

The Planning Board has established a corrective action plan to modernize Puerto Rico's National Accounts. The plan sets out the roadmap for incorporating methodologies recommended by the Bureau of Economic Analysis of the Federal Department of Commerce. This modernization process is expected to last five years and require an investment of approximately $8.3 million. The Planning Board is currently in the process of signing an agreement with the Bureau of Economic Analysis in order to receive expert advice and human resources to collaborate in the implementation of these new methodologies.

It is still too early to determine how these deficiencies have affected, or will affect, Puerto Rico's macroeconomic data. Until such time as these revisions are finalized and fully applied to Puerto Rico's macroeconomic data, there is no assurance that previously reported macroeconomic data accurately reflect the performance of the economy of Puerto Rico.

**Risks Related to Commonwealth Expenses**

*The Commonwealth's consolidated deficit based on U.S. GAAP is larger than the deficit of the General Fund, particularly when determined based on a budgetary basis of accounting, because the General Fund on a budgetary basis does not include the deficits of various other funds and entities, many of which also provide essential services.*

As described in the Krueger Report and the FEGP, the most common measure of fiscal budgetary balance used historically in Puerto Rico – the General Fund, particularly when presented pursuant to the budgetary basis of accounting – materially understates the financing gaps faced by the Commonwealth. The General Fund on a budgetary basis excludes numerous governmental funds, proprietary funds, agencies with independent treasuries and government instrumentalities that have historically run deficits and that ultimately rely on tax revenues or central government appropriations to operate. When, as required by U.S. GAAP, the General Fund is consolidated with numerous Special Revenue Funds, agencies with independent treasuries and is further adjusted based on the accrual basis of accounting, the total deficit of the central government is significantly higher than the deficit of the General Fund calculated on a budgetary basis. In addition, the General Fund expenses typically do not (i) include the cost of necessary capital expenditures that were traditionally funded with debt, such as general obligation bonds and GDB lines of credit, which funding is not expected to be available in the near future, or (ii) account for the state of disrepair of the physical assets and infrastructure of the Commonwealth and its instrumentalities as a result of years of underfunding or underinvesting in necessary preventive maintenance and capital investment programs.

Furthermore, certain public corporations that provide essential services but are legally distinct from the central government (and are therefore not reflected in the General Fund), such as the University of Puerto Rico, the Health Insurance Administration, the Medical Services Administration, the Metropolitan Bus Authority, and the Maritime Transportation Authority, have also historically incurred material deficits.  Both the Krueger Report and the Proposed PROMESA Fiscal Plan include the deficits of these entities into their analysis of the Commonwealth's consolidated historical and future funding gaps.  For more information regarding the Commonwealth's historical deficits, see "COMMONWEALTH FINANCIAL REPORTING AND FINANCIAL RESULTS FOR FISCAL YEARS 2012 THROUGH 2015".

According to the Krueger Report and the Proposed PROMESA Fiscal Plan, the Commonwealth is projected to incur additional deficits in these funds, agencies and public corporations during the next decade.

***Certain government instrumentalities that provide essential services are experiencing financial difficulties and the Commonwealth may need to continue or increase its current level of financial support.***

Several public corporations and instrumentalities have traditionally relied on the assignment of specific tax revenues or subsidies or other transfers from the General Fund to fund a portion of their operations. Certain of these instrumentalities offer basic and essential services to the population of Puerto Rico. To the extent that any of these instrumentalities is unable to continue to provide such essential services as a result of financial difficulties, the Commonwealth may be required to divert available Commonwealth resources that would otherwise be used to service its debt to ensure that such essential services continue to be provided.  Due to the fact that these governmental instrumentalities provide essential services while relying on tax revenues, subsidies or other governmental transfers to sustain their operations, the Proposed PROMESA Fiscal Plan consolidates such entities with the Central Government to provide a comprehensive view of the Commonwealth's financing gap.

For example, the Health Insurance Administration, the Medical Services Administration, the Highways and Transportation Authority, the Maritime Transportation Authority, the Metropolitan Bus Authority and the University of Puerto Rico provide essential services to the residents of Puerto Rico and rely heavily on General Fund appropriations or transfers of dedicated tax revenues to fund their operations. Others, like the Public Buildings Authority, provide essential services to the Commonwealth's government. Notwithstanding the Commonwealth's support, certain of these public corporations have historically suffered from significant annual operating losses and carry material amounts of accounts payable.  Some of the services provided by these public corporations are essential to maintain health, public safety and welfare, which may lead the Commonwealth to prioritize the funding of such services over the payment of debt service.

In addition, certain agencies and public corporations manage, administer or operate infrastructure assets financed with federal funds.  Federal funding for these assets is usually accompanied by requirements that the agency or public corporation maintain the assets at a certain level of repair or meet a certain level of operation.  To the extent these requirements are not met, the particular agency or public corporation may expose itself to the imposition of fines

57

or even forfeiture of the federal funds granted for the project. As a result, the Commonwealth and its instrumentalities may be required to continue allocating resources to the operation of assets that may not be considered essential in order to prevent the imposition of penalties or fines that the United States Treasury may recover through the sequestration of any funds allocated to the Commonwealth and its instrumentalities.

PREPA and PRASA also provide essential public services and are facing financial difficulties, including liquidity and solvency problems. The financial condition of PREPA and PRASA is affected by the need to heavily invest in their infrastructure, which in many cases is obsolete and in an advanced state of disrepair due to years of underinvestment in capital improvement and maintenance programs. Furthermore, both PREPA and PRASA are subject to substantial environmental regulatory burdens, operate subject to various consent decrees entered into with federal agencies and have to incur material capital expenditures to comply with such federal regulations and consent decrees. Another factor that contributes to the financial difficulties of PREPA and PRASA is that the Commonwealth and other government entities, due to their own financial difficulties, are often unable to pay PREPA and PRASA in a timely manner. PREPA and PRASA have also been affected by a decrease in demand due to the current economic crisis and population decline. To the extent that these utilities continue to face financial difficulties, the Commonwealth may have to fund them directly (like it has done historically with PRASA through its General Fund and GDB) or prioritize the payment of outstanding payables to these utilities in order to provide liquidity to them and allow them to continue to provide essential services to the people of Puerto Rico.

***A reduction of federal grants may significantly affect the Commonwealth's ability to provide many important services and may force the Commonwealth to allocate resources that would otherwise be used to pay debt service to the provision of such essential services.***

Each fiscal year, the Commonwealth receives a significant amount of grant funding from the U.S. government. A significant portion of these funds is utilized to cover operating costs of those Commonwealth educational, social services and healthcare programs that are subsidized by the U.S. government. If the aggregate amount of federal grant funds transferred to the Commonwealth were to be reduced, the Commonwealth would have to make reductions to these federally-supported programs or fund these programs from the General Fund. Reductions in federal funding would also have an adverse impact on the Commonwealth's economy and on efforts to reduce its General Fund budget deficit. In addition, since the per capita income of the residents of Puerto Rico is substantially lower than those of the 50 states, a high percentage of the population of the Commonwealth benefits from these government programs. As a result, the impact on the Puerto Rico economy of any reduction in federal grant funds for such governmental programs would be greater than on the 50 states. Moreover, to the extent the Commonwealth is required to divert resources to continue providing essential services primarily funded through federal funds, the Commonwealth may be unable to honor its other obligations, including debt service, as they come due.

Another important factor is that certain federally funded programs are funded on a per-capita basis and a reduction in the number of beneficiaries due to demographic trends or changes in program parameters could result in a lower amount of federal funds. For instance, the Department of Education has experienced a substantial reduction in student enrollment in recent years that is expected to continue for the foreseeable future. Such reduction has been and will continue to be accompanied by a corresponding reduction in federal funding for some

educational grants. To the extent that the cost saving opportunities presented by the reduction in the number of students are not fully realized, the Department of Education's budget could be negatively affected.

*If federal funding for the Commonwealth's health insurance program is not increased from, or at least maintained at, current levels, the Commonwealth may be unable to continue fully funding such program or may be required to deploy resources currently used for other spending priorities to fund the resulting shortfall.*

The Commonwealth, through the Health Insurance Administration, provides health insurance coverage to approximately 1.6 million qualifying (generally low-income) residents of Puerto Rico. The cost of this health insurance program is very significant, totaling approximately $2.5 billion, $2.8 billion and $2.8 billion for the fiscal years ended June 30, 2014, 2015 and 2016, respectively. In such fiscal years, the cost of the program was funded in substantial part from appropriations from the General Fund to PRHIA of $885 million per year (representing approximately 9% of the General Fund budget for those fiscal years) and the balance was mainly funded with federal funds. For fiscal year 2017, the approved budget similarly includes an appropriation of $885 million for the Health Insurance Administration. The cost of the program currently paid by the federal government is funded principally by non-recurring funding provided pursuant to the Affordable Care Act, as well as recurring Medicaid and Children's Health Insurance Program funds, which in the case of the Commonwealth are capped at a level lower than that applicable to the states (which are not capped).

Upon exhaustion of the non-recurring Affordable Care Act funds, currently estimated to occur between December 2017 and February 2018, and absent Congressional action to renew this non-recurring funding, the amount of federal funds available for this health insurance program will revert to the recurring capped Commonwealth Medicaid and Children's Health Insurance Program allocations of approximately $400 million per year, which would result in significantly higher requirements of Commonwealth funding, unless benefits or eligibility or both are reduced significantly. Although the Commonwealth could take various measures to address the imbalance, including reducing coverage and limiting eligible beneficiaries, federal regulations may prohibit or limit the application of these measures. Furthermore, reducing coverage or limiting beneficiaries could result in additional costs at the Commonwealth's public hospitals, reducing potential savings and increasing expenditures in order to meet demand at the Commonwealth's already over utilized public hospitals.

If the availability of Affordable Care Act funds is not renewed through Congressional action and if no changes to benefits, co-pays or eligibility are made, the annual deficit of the health insurance program (which the General Fund may be required to fund) could rise to as much as $1.804 billion per year by fiscal year 2021.

The fiscal stability of the Commonwealth's health insurance program is one of the most significant budgetary challenges facing the Commonwealth, especially if the availability of Affordable Care Act funds is not renewed or Medicaid funds are not significantly increased. In light of the current disparity in the treatment that the Commonwealth receives compared with the states with respect to the cap imposed on Medicaid matching funds, the Commonwealth is intensifying its efforts to have Affordable Care Act funding renewed by Congress. Both the Governor and the Resident Commissioner have been involved in this effort and recently

members of the private and public sector formed the Puerto Rico Healthcare Crisis Coalition. The Task Force created by PROMESA is further slated to issue a report in December of 2016 describing the impediments in current federal law and programs to economic growth in Puerto Rico, including equitable access to federal health care programs.  However, it is not possible to predict the likelihood that efforts to renew Affordable Care Act funds or increase Medicaid funds will succeed. To the extent these efforts are unsuccessful, the Commonwealth would have to assume a significantly higher portion of the cost of the health insurance program.

The Commonwealth's health related expenditures may also increase due to unexpected outbreaks of communicable diseases.  In particular, the Commonwealth is currently experiencing an epidemic-level outbreak of the mosquito-borne Zika virus, which has been linked to birth defects.  As a result, the Government's health related expenses will increase due to increased emergency room visits and admissions, spending on prevention and mosquito population control programs and increased utilization of the government-sponsored health insurance plan. Although the effect of the Zika virus may not be reflected in the current premiums paid by the Health Insurance Administration, the current experience may result in higher premiums when the current contracts with health insurers expire.

***Unless the Commonwealth makes significant additional contributions to the Retirement Systems, current levels of liquid assets could be completely depleted during the current or next fiscal year and the Commonwealth will have to fund pensions on a "pay-as-you-go" basis. In such a scenario, the Commonwealth is likely to seek to prioritize payments to pensioners over other stakeholders, including bondholders.***

A significant component of the Commonwealth's budget is the cost of its three Retirement Systems.  The three principal pension systems of the Commonwealth (the ERS, TRS and JRS) have significant net pension liabilities (amounting to approximately $48.8 billion based on the latest actuarial reports) and very low funded ratios.  In 2013, the Commonwealth enacted legislation that reformed the Retirement Systems by, among other measures, reducing benefits, increasing employer and employee contributions, and prospectively replacing most of the defined benefit elements of the system with a defined contribution system.  Although the Puerto Rico Supreme Court upheld the constitutionality of the ERS reform, it declared invalid certain important portions of the TRS and JRS reforms.  Given the size of the net pension liabilities of the system, the legislation recognized that even after the structural reforms, the Commonwealth and other participating employers would still have to make additional annual contributions in order to maintain the solvency of the Retirement Systems and allow them to pay pension benefits when due.  The most recent official calculations of the required additional annual contributions to the Retirement Systems amount to $596 million from fiscal year 2017 through fiscal year 2033, in the case of the ERS, and $603.9 million from fiscal year 2019 through fiscal year 2042 (plus $30 million for each of fiscal years 2017 and 2018), in the case of the TRS.  These amounts were calculated based on a number of assumptions and could materially increase in future years under various scenarios, including as a result of policy decisions.

The Commonwealth and other participating employers have been unable to make most of the additional annual employer contributions required by the reform legislation as a result of the worsening fiscal crisis since the enactment of the reforms.  As a result, the Retirement Systems are rapidly depleting their remaining liquid assets, which is projected to occur, in the case of the ERS, during the fourth quarter of the current fiscal year or the first half of fiscal year 2018 (July

to December 2017), and by fiscal year 2018, in the case of the TRS and JRS. If this happens, the Retirement Systems will be operating solely on a "pay-as-you-go" basis, which means that they would be unable to pay benefits that exceed the actual employer and employee contributions received by the Retirement Systems (net of administrative and other expenses), unless the Commonwealth and other participating employers provide the additional funding required to pay retirement benefits. If the Retirement Systems begin operating solely on a "pay-as-you-go" basis, the Commonwealth and other participating employers may not have sufficient resources to cover the amount by which benefits exceed employee and employer contributions. In this scenario, because of the economic and social implications of not being able to satisfy pension payments, the Commonwealth is likely to seek to prioritize payments to pensioners over other stakeholders, including bondholders, by pursuing all options available to it under applicable law, including through the mechanisms afforded by PROMESA. In addition, because various employers participating in the ERS are experiencing financial difficulties of their own and are significantly dependent on the Commonwealth, it is likely that the Commonwealth will need to cover amounts allocated to these participating employers if all pension benefit payments are to be made when due.

Moreover, since the commencement of the defined contribution program, the ERS has been pooling employee contributions to such defined contribution program with other system assets and has used moneys deposited by employees under the defined contribution program to fund benefits under the defined benefits program. As a result, the ERS may not have sufficient funds on deposit to honor the amounts deposited by government employees under the defined contribution program. Furthermore, to the extent that, because of a legal or policy change, employee contributions to the defined contribution program are, like in the TRS, no longer made available to cover the funding deficiency of the legacy defined pension program, the Commonwealth's additional annual contribution to the ERS or the amount the Commonwealth and other participating employers would have to provide in order to pay benefits or both would materially increase. The Proposed PROMESA Fiscal Plan provides for the segregation of the defined contribution program from the legacy defined benefits program.

Reductions in the number of active plan participants that contribute to the Retirement Systems as well as reductions in salaries of plan participants have a material effect in the projected cash flow shortfall of the Retirement Systems since the systems are primarily funded from contributions calculated as a percentage of active payroll. The additional annual contributions to the Retirement Systems included in the Proposed PROMESA Fiscal Plan – amounting to $642 million for fiscal year 2017 (plus $405 million in payments to catch-up with past due amounts), $572 million for fiscal year 2018 and $1.172 billion for fiscal years 2019 through 2026 – were calculated assuming a constant level of employment other than for projected attrition of approximately 5,500 employees retiring under an early incentive program, and salary increases consistent with projected inflation during the 10-year period. The Proposed PROMESA Fiscal Plan projects a further increase in the additional contributions as a result of additional attrition measures and salary freezes contemplated as part of such plan. To the extent the Commonwealth implements such reductions in headcount and rate of salary growth as expenditure measures to address the fiscal crisis, this would result in an increase in the number of retirees, a decrease in the number of active plan participants, and a consequent increase in the required additional annual contributions to the Retirement Systems.

Section 211 of PROMESA authorizes the Oversight Board to conduct an analysis of the pension systems to the extent it determines they are materially underfunded. The analysis would be conducted by an independent actuary and would assist the Oversight Board in evaluating the fiscal and economic impact of pension system cash flows. The analysis would include an actuarial study of pension liability and funding strategy, sources of funding, review of existing benefits and sustainability of such benefits, and a review of the system's legal and operational structure. There is no assurance that this analysis would result in recommendations that would allow the Retirement Systems to cover their pension liabilities or the payments on their outstanding obligations, including the pension obligation bonds issued and outstanding, in their entirety.

Furthermore, Section 201(b)(1)(C) of PROMESA requires that a fiscal plan must "provide adequate funding for public pensions systems." To the extent that an approved fiscal plan requires that sufficient funding for current pension benefits is appropriated, such funding may come at the expense of other Commonwealth stakeholders, including active public employees, creditors and/or citizens that rely on essential government services. If, on the other hand, an approved plan does not provide for the full funding of pension benefits because it prioritizes other expenses, it could result in further economic deterioration.

> ### *The Commonwealth's education costs represent a very high percentage of its budgetary expenditures, and the Commonwealth has had difficulty controlling such costs.*

The budget appropriation for the Commonwealth's Department of Education has historically represented a significant portion of the total General Fund budget. Therefore, the ability of the Commonwealth to control General Fund expenses depends on its ability to monitor and control the Department of Education's expenditures. However, the Commonwealth has historically had difficulty controlling such expenses. In addition, certain expenditures, such as those required to fund the Department's special education program, can increase unexpectedly as a result of court orders issued in pending lawsuits by special education students. For more information regarding this case, in which the Commonwealth has been ordered to implement changes expected to cost in excess of $700 million, see LITIGATION.

> ### *The Commonwealth's accounting, payroll and financial information systems have deficiencies due to obsolescence and compatibility issues and this has affected the Commonwealth's ability to control and forecast expenses and to implement GASB pronouncements and to issue financial statements in a timely manner.*

The Commonwealth's accounting, payroll and financial information systems have deficiencies due to obsolescence and lack of compatibility that have adversely affected the Commonwealth's ability to supervise and control expenditures. Agencies often incur expense overruns that are not detected in time to permit the implementation of corrective measures during the same fiscal year. At the present time, the three Commonwealth agencies that together are responsible for over 50% of General Fund expenses have separate accounting systems that are unable to interact on a timely basis with the Commonwealth's central accounting system. In addition, according to OMB, it has limited visibility and control over expenses generated outside the Commonwealth's General Fund approved budget, which only account for approximately half of General Fund expenditures on a U.S. GAAP basis, and those generated by public corporations, over which OMB has no control notwithstanding their receipt of moneys from the General Fund. Moreover, the Commonwealth's central accounting system still relies on

numerous manual processes for recordkeeping that are only reviewed and updated at the end of the fiscal year in connection with the issuance of the audited financial statements. In addition, the current accounting system does not provide for an accounts payable ledger, capital assets ledger, accounts receivable ledger, and balance sheet information. The balance sheets are prepared manually and such information is updated and prepared on an annual basis. These deficiencies also affect the Commonwealth's ability to timely and accurately report financial information to the market, and to complete its audited financial statements in a timely manner.

Moreover, these deficiencies in the Commonwealth's systems and the ERS census data systems lead to extensive delays in the implementation of GASB pronouncements and changes. As a result, the Commonwealth may be unable to comply with all GASB pronouncements in its audited financial statements for fiscal years 2015, 2016 and 2017, including GASB 68 "Accounting and Financial Reporting on Pensions – an amendment to GASB 27." To the extent the Commonwealth is unable to comply with GASB pronouncements, the auditor's opinion regarding such financial statements would be qualified due to the failure to implement such pronouncement.

A committee named by the Secretary of Treasury to evaluate and submit recommendations with respect to the Commonwealth's accounting, payroll, budget forecasting and control, and financial and fiscal oversight information systems has concluded its work and presented its findings and recommendations to the Secretary of Treasury. As a result, the Treasury Department and OMB entered into an agreement with a third-party supplier to establish and design the requirements for a new accounting, payroll, budget forecasting and control, and financial and fiscal oversight information system for the Commonwealth. The process to establish and design the requirements of such system (Phase 1) is expected to conclude during fiscal year 2017. There is no assurance that, once Phase 1 is completed, the Commonwealth will continue following the steps required to implement the new system. Notwithstanding the foregoing, based on current estimates, even if the Commonwealth continues to follow such steps, the new system will not be fully operational until fiscal year 2019 at the earliest. While the Commonwealth anticipates that the implementation of this new system will assist the Commonwealth's ability to control and forecast expenses, there can be no assurance that the anticipated benefits will materialize.

*The financial information published by the Commonwealth or used to make fiscal and economic decisions may be unreliable.*

The Commonwealth does not maintain a formal risk assessment process to identify areas subject to risk of material misstatements as part of its financial operations, general accounting process and debt compliance operations. As a result, the Commonwealth is unable to perform reconciliations on a timely basis and maintains accounting processes that have been recurrently associated with internal control deficiencies and that are considered by the Commonwealth's independent auditors to be material weaknesses. As a consequence of the lack of timely reconciliations of balance sheet accounts due to the disaggregation of data pertaining to the Commonwealth and its agencies, the inability of the Commonwealth to obtain financial data on timely basis from its different accounting systems, and the recurring control deficiencies underlying the Commonwealth's financial reporting process, the Commonwealth may be publishing incomplete financial information and relying on such information to make fiscal and economic decisions. Although the Commonwealth believe that it has made improvements in the collection and reporting of financial and economic data as part of its efforts to develop the

Proposed PROMESA Fiscal Plan, there is no assurance that such improvements will ameliorate the deficiencies that currently exist.

**Risks Related to Commonwealth Revenues**

*The Commonwealth's ability to raise additional revenue through taxation may be limited by economic factors.*

The capacity of a state to raise tax revenue is typically measured by the levels and rates of change in economic activity and the income of its citizens and businesses. The amount of tax paid by individuals and companies relative to total income ("tax burden") is one approximation of capacity to raise additional revenue through taxation. The composition of taxes is also relevant. For example, certain types of activity may be highly sensitive to taxation or incremental costs generally. Imposing or increasing taxes on such activity could significantly curb it, which would undermine both potential tax revenue and economic growth.

In evaluating the capacity of the Commonwealth to raise additional revenue through taxation, one should be mindful of its available base, in the aggregate and in specific categories of activity. On an aggregate basis, economic output and income can be approximated by gross domestic product ("**GDP**") and gross national product ("**GNP**"). GDP measures expenditures and income earned by residents and nonresidents within a state, while GNP includes income earned by residents from local and foreign sources. For states with significant net direct investment held by foreigners, GNP can be materially lower than GDP. Taxing the difference between the two aggregate measures can be challenging given the desire to retain that direct investment, which generates employment and both direct and indirect economic activity.

The difference between these two measures of economic expenditures and income is acute in Puerto Rico. According to preliminary estimates from the Puerto Rico Planning Board, in fiscal year 2015 nominal GNP was about 67% of nominal GDP. This arises from U.S. mainland corporations' accounting for a substantial share of production taking place in Puerto Rico through activities of their subsidiaries, in particular in the manufacturing sector. The Commonwealth, however, other than through the temporary excise tax described below, imposes very low taxes to these manufacturing activities because it grants tax exemption decrees to many of these companies in order to incentivize their establishment in Puerto Rico.

The Commonwealth has been taxing a portion of the income earned by these corporations from activity in Puerto Rico since January of 2011, but proceeds from such taxes may not persist. Act 154 imposes a temporary excise tax to capture the repatriation of profits and dividends to parent firms on the U.S. mainland. The negative impact of that tax on certain of those firms has, to date, been neutralized in part by its creditability against U.S. federal income taxes under rulings issued by U.S. federal tax authorities. Future federal creditability of this excise tax is unlikely to continue indefinitely. The continuation and rate of excise tax imposed pursuant to Act 154 without the availability of the federal tax credit will likely affect the decisions of the firms' subsidiaries to continue operations in Puerto Rico. Furthermore, the uncertainty generated by this law may discourage the attraction of new products to be manufactured in Puerto Rico. This, in addition to patent expiration of current products, may have a direct negative impact on the revenues generated by this and other related taxes, as well as an indirect negative impact on other revenues.

As a result, using GDP to calculate the current tax burden in Puerto Rico may overstate the capacity of the Commonwealth to raise additional revenue through taxation. Also, comparisons with international jurisdictions with the tax burden in Puerto Rico based on GDP may be misleading or require adjustments.

At the same time, although to a lesser extent, GNP may overstate the available tax base. Residents of Puerto Rico benefit from large transfers from the federal government. According to the Puerto Rico Planning Board, in fiscal year 2015 federal transfer payments accounted for 25.4% of personal income. Under current federal law, some of these transfer payments earmarked for social welfare programs may not be taxed by the Commonwealth.

One should also account for differences in behavioral responses among categories that are taxable. The impact of changes in the rates of taxation on consumption and employment from taxes on goods and services, on the one hand, and income, on the other hand, could vary materially, with respect to both incremental tax receipts and broad economic activity.

### The Commonwealth is dependent on a small number of corporate taxpayers to generate a significant amount of its tax revenues.

The economic recession that has affected the Commonwealth since fiscal year 2007 and the income tax reduction program adopted in fiscal year 2011 have negatively affected Commonwealth income tax revenues. Consequently, the special temporary excise tax imposed by Act 154 has become one of the Commonwealth's principal sources of tax revenues.  For fiscal years 2014, 2015 and 2016, the revenues produced by Act 154 represented approximately 21%, 21.7% and 20.3%, respectively, of the Commonwealth's General Fund revenues.  For fiscal year 2016, approximately 90% of such revenues were collected from ten companies.  To the extent that any of these taxpayers reduce their operations in Puerto Rico or move their operations to a different jurisdiction, the Commonwealth's tax base would be reduced and its revenues would be adversely affected.  Factors that can cause a reduction in the level of Act 154 revenues include a reduction in the level of local economic activity or production of the corporations that pay the Act 154 taxes, which might occur as a result of general economic conditions or factors affecting individual companies (including the expiration of such companies' patents), any difficulties in the transition, after December 31, 2017, from the Act 154 temporary excise tax to the modified source of income rule under Act 154, and any action by the U.S. Treasury Department to reduce or eliminate the federal income tax credit available with respect to the Act 154 temporary excise tax.   For a discussion of Act 154, see "COMMONWEATH REVENUES AND EXPENDITURES – Act 154 Special Tax."

The Act 154 excise tax is currently scheduled to expire on December 31, 2017 and to be replaced by the "modified source of income rule" provided under Act 154.  However, since it is unlikely that the level of tax collection under the "modified source of income rule" would be sufficient to replace the tax revenues currently received by the Commonwealth pursuant to the special temporary excise tax under Act 154, the Proposed PROMESA Fiscal Plan proposes that the 4% excise tax be extended temporarily (2-3 years) to give the government sufficient time to renegotiate individual tax grants and reform its tax code such that it replaces Act 154 revenues in full during the plan's projection period. To the extent the Commonwealth is unable to extend the

Act 154 4% excise tax while maintaining its creditability for United States tax purposes or otherwise find a timely replacement for such revenues, its revenues would be adversely affected.

### *The Commonwealth has frequently failed to meet its revenue projections.*

The Commonwealth's ability to implement measures to increase revenues depends on a number of factors, some of which are not wholly within its control, including its ability to project accurately its revenues in light of changing circumstances, and the performance of the Commonwealth's economy.

The Treasury Department's projections for tax revenues involve many premises and assumptions, the effects of which are beyond its control, such as the impact of external factors and events on the economy that may, in turn, affect tax revenues. The projections also may require the forecasting of new revenue measures with no historical collections experience. In the past, the Commonwealth's projections of tax revenues have often differed materially from what the Commonwealth has ultimately been able to collect.   This has been caused, in part, by the Treasury Department's practice of entering into closing agreements with taxpayers towards the end of the fiscal year in order to meet revenue projections.   This practice, which in essence advanced revenues attributable to future fiscal years, is now prohibited by law. While Puerto Rico law now requires FAFAA to validate the revenue projections prepared by the Treasury Department and used to construct the General Fund budget, and PROMESA further requires the Oversight Board to submit to the Governor and the Legislative Assembly a forecast of revenues for use by the Governor in developing budgets, there is no assurance that this new process will enhance the Commonwealth's ability to achieve its tax revenue projections.

### *The Commonwealth may be deprived of certain revenues, such as sales and use taxes, to the extent underlying assumptions about its growth are not realized.*

The Commonwealth is entitled to receive the portion of the sales and use tax not transferred to COFINA for the payment of its bonds. The amount transferred to COFINA is equal to the greater of a fixed amount that grows annually at 4% or a percentage of the sales and use tax. Since the implementation of the sales and use tax in 2006, sales and use tax collections have not consistently grown at an annual rate at or above 4%, COFINA's assumed statutory growth rate. A portion of the growth during such period has also been driven by expansions in the base of goods and services to which the tax applies, rather than growth occurring due to increased economic activity or tax enforcement. This means that as the fixed amount transferred to COFINA increases, the concurrent increase in the sales and use tax revenues will not be sufficient to match the increase in the amount of taxes transferred, thereby reducing the remaining amount allocated to the Commonwealth. Although the Proposed PROMESA Fiscal Plan assumes a certain level of growth, it is not sufficient to offset the statutorily provided 4% growth rate for the COFINA fixed amount. If the sales and use tax revenues fail to grow at a rate greater than or equal to the rate at which the amount transferred to COFINA grows, the amount allocated to COFINA would increase each year while the amount allocated to the Commonwealth, which is transferred after all amounts allocated to COFINA have been satisfied, would gradually decrease. As a result, to the extent economic activity does not increase at the same rate as the amounts transferred to COFINA, the Commonwealth would receive less sales and use tax collections and its ability to continue providing essential services to the residents of Puerto Rico may be adversely affected. Furthermore, if a material divergence between the

COFINA fixed amount (which grows at 4% annually) and sales and use tax revenues assigned to COFINA were to continue indefinitely, COFINA could, at some point during the next decades, receive the entirety of the portion of the sales and use tax subject to COFINA that is currently received by the General Fund.

*The ability of the Commonwealth to use revenues assigned to certain public corporations may be challenged and, if such revenues are unavailable, the Commonwealth may not be able to cover its operational expenses.*

The Moratorium Act and the executive orders issued thereunder suspend the obligation of the Commonwealth and certain of its public corporations to transfer certain revenues from the central government to HTA, PRIFA, the Convention Center District Authority, ERS, and the MBA, which revenues would otherwise be applied to the payment of such entities debt service and operational expenses. The provisions of the Moratorium Act and the executive orders issued thereunder are currently being challenged in court. Although the Commonwealth believes that the retention of such revenues has been properly authorized, there is no assurance that the Commonwealth will prevail in the defense of the provisions of the Moratorium Act and the executive orders issued thereunder or that the revenues being withheld will be sufficient to allow the government to continue to provide essential services to the people of Puerto Rico. For a more detailed description of these judicial actions, please see "LITIGATION."

**Risks Related to the Commonwealth's Lack of Market Access**

*Concerns about the trajectory of the Commonwealth's economy and the sustainability of the Commonwealth's debt load are likely to limit the Commonwealth's access to the capital markets until such concerns are addressed.*

The Krueger Report stated that the Commonwealth's economy is in a cycle where unsustainable public finances are feeding into uncertainty and low growth, which in turn is raising the fiscal deficit and the debt ratio. The Central Government deficits over the coming years, as projected in the Krueger Report and the Proposed PROMESA Fiscal Plan, imply an unsustainable trajectory of large projected deficiencies of revenues under expenditure and funding gaps. Both the Krueger Report and the Proposed PROMESA Fiscal Plan concluded that a compromise of the creditors' competing claims to the Commonwealth's revenues to support debt service will be required in order to avoid the further destabilization of the Commonwealth's economy and finances. Section 201(b)(1)(E) of PROMESA further requires that a fiscal plan "provide for a debt burden that is sustainable." Market access on sustainable terms is unlikely to be available to the Commonwealth until doubts regarding its economic trajectory and debt sustainability are addressed. The absence of market access in the near-term would exacerbate the funding gaps faced by the Commonwealth and worsen its near-term liquidity crisis.

*The downgrade of the Commonwealth's credit ratings to non-investment grade by the rating agencies, which has recently been reduced to "D", the lowest credit rating given to issuers that have defaulted on their obligations, has significantly limited the ability of the Commonwealth to borrow.*

Beginning in February of 2014, the credit ratings of the Commonwealth's general obligation bonds and Commonwealth guaranteed bonds have been lowered to non-investment grade by Moody's Investors Service, Standard & Poor's Rating Services, and Fitch Ratings.

After the Commonwealth failed to pay debt service on its general obligation bonds and guaranteed bonds due July 1, 2016, each of S&P and Fitch lowered the Commonwealth's credit rating to "D", the lowest credit rating given to issuers that have defaulted on their obligations. These downgrades reflect the fiscal and financial difficulties that the Commonwealth is experiencing and have in turn contributed to such difficulties. One consequence of such downgrades has been severely limited access to the capital markets. The market for non-investment grade securities is smaller and less liquid than the market for investment grade securities. As a result, it is possible that there may not be sufficient demand in the bond market, or with private commercial banks or other financial institutions, to enable the Commonwealth to issue any future bonds or notes or enter into borrowings in the amounts required by the Commonwealth or that the cost to the Commonwealth of any such borrowing could be substantially higher than if it were able to issue more highly rated securities. In addition, changes in the Commonwealth's credit ratings are likely to affect its relationships with creditors and other business counterparties. Finally, considering the current credit ratings of the Commonwealth and its instrumentalities, it may be difficult to achieve in the short and medium term the credit rating levels required to access short and long term financing sources at reasonable rates. Such reasonable market access is a condition for the termination of the Oversight Board established under PROMESA.

*The Commonwealth has not complied with certain of its continuing disclosure obligations on a timely basis, and such failure to comply may limit the Commonwealth's access to the capital markets.*

On several occasions the Commonwealth has failed to comply with its continuing disclosure obligations on a timely basis. For example, the Commonwealth has failed to file its financial statements before its 305-day deadline in ten of the past thirteen years, including the four most recent fiscal years (2012, 2013, 2014 and 2015). Furthermore, due to the delay in completing its financial statements for fiscal year 2014, the Commonwealth has been delayed with the filing of its financial statements for fiscal year 2015 and expects its fiscal year 2016 financial statements and subsequent fiscal years to also be delayed. The Commonwealth's failure to comply with certain of its continuing disclosure obligations on a timely basis could limit its access to the capital markets, because underwriters for Commonwealth bonds must be able to reasonably determine that the Commonwealth will comply with its continuing disclosure obligations on a timely basis before underwriting any future offerings of Commonwealth debt.

**Risks Related to the Commonwealth's Debt Limit**

*The Commonwealth does not have sufficient capacity under constitutional debt limitations to continue funding its operations and financing gaps with direct general obligation debt.*

The Constitution of the Commonwealth provides that the Commonwealth may not issue general obligation debt if the principal and interest on all such debt payable in any fiscal year, together with any amount paid by the Commonwealth in the prior fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual internal revenues of the Commonwealth in the two preceding fiscal years. Depending on the legal interpretation of how the recent defaults in payment of debt service affect the determination of the Constitutional debt limit, it is possible that the 15% debt limit may be exceeded if certain issuers with debt guaranteed by the Commonwealth are unable to meet their debt service payments in January.

Therefore, the Commonwealth expects that its capacity to incur additional general obligation debt will be significantly limited or non-existent for the next several years as a result of this Constitutional limit, among other factors, unless it is able to reduce or restructure its debt service requirements. As a result, to the extent the Commonwealth has any market access, it will be limited in its capacity to issue general obligation debt in the future to cover projected funding gaps, including to finance capital improvement projects, provide working capital, and meet short-term obligations.  Although the Commonwealth could seek to issue debt for which the good faith, credit and taxing power of the Commonwealth is not pledged, the demand for such debt, if any, may be constrained. An inability to issue general obligation debt will affect the Commonwealth's ability to finance essential services, honor its financial obligations and make required investments in infrastructure.

## Risks Related to Certain Features of Commonwealth Bonds

*A preliminary report issued by the Puerto Rico Commission for the Comprehensive Audit of the Public Debt questions whether certain debt issued by the Commonwealth was validly issued.*

Act No. 97 of July 1, 2015 established the Puerto Rico Commission for the Comprehensive Audit of the Public Credit (the "**Audit Commission**") to provide transparency and citizen participation in the review of the Commonwealth's and its public corporations' aggregate debt. In June of 2016, the Audit Commission rendered a pre-audit survey report. Due to timing and funding constraints, the report was limited to a review of documentation produced by GDB associated with the two most recent debt issuances by the Commonwealth (the 2014 $3.5 billion general obligation bond offering and the 2015 tax and revenue anticipations notes). The preliminary report raised concerns about whether the Commonwealth complied with the following requirements set forth in the Commonwealth Constitution: (i) the balanced budget requirement due to the use of bond proceeds to finance deficits; (ii) the debt limit calculation; and (iii) the prohibition against issuing bonds or notes with a maturity in excess of 30 years; among other requirements.  The preliminary report also raised concerns about whether the Commonwealth and its advisors and underwriters complied with applicable U.S. Securities and Exchange laws and regulations, in particular those related to continuing disclosure undertakings. The report states that it does not purport to render a legal opinion of any sort but, rather, provide an overview of some of the laws against which the Commission should determine compliance.

Although Commonwealth officials have stated that they have no reason to believe that any of the Commonwealth's debt was issued in violation of the Commonwealth Constitution or any other applicable laws, it is possible that the Commission's final findings or report will generate challenges regarding the validity of certain of the Commonwealth's debt.

*There is no collateral securing the Commonwealth general obligation bonds and there are no statutory provisions for a lien on any asset or revenue of the Commonwealth.*

The Commonwealth's general obligation bonds are not secured by any lien (statutory or otherwise) on any physical asset or revenue of the Commonwealth. Accordingly, no assets or revenues of the Commonwealth may be foreclosed on to produce funds to pay such bonds.  In the event the Commonwealth fails to make a payment of interest or principal on the bonds, the bondholders are only entitled to require the Secretary of the Treasury to apply available resources to the payment of general obligation bonds and guaranteed bonds according to the

constitutional priority provisions and may not have the right to compel the exercise of any taxing power of the Commonwealth.  As a result, holders of the Commonwealth's general obligation debt could be treated as general, unsecured creditors under a proceeding instituted pursuant to the provisions of Chapter 9 of the United States Bankruptcy Code, if such a proceeding were available to the Commonwealth.  Although PROMESA incorporates certain provisions of Chapter 9 of the United States Bankruptcy Court, there is no assurance that this treatment would be consistent with the treatment provided to such holders pursuant to PROMESA.

Holders of the Commonwealth's general obligation bonds and guaranteed bonds are also stayed from enforcing any remedies against the Commonwealth pursuant to the provisions of PROMESA until February 15, 2017, subject to certain limited extensions under certain conditions.  For additional information regarding the stay imposed by PROMESA, see "PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT".

### *Holders of the Commonwealth's bonds may not attach the Commonwealth's property.*

The Constitution of Puerto Rico provides that public property and funds of the Commonwealth shall only be disposed of for public purposes, for the support and operation of state institutions, and pursuant to law. The Puerto Rico Supreme Court has determined that Commonwealth property cannot be attached or garnished in an attempt to enforce a judicial order, as it could undermine the Commonwealth's ability to operate and use its property for a public purpose.

### *Commonwealth bondholders may face delays in enforcing their remedies, and the availability of some remedies is not certain.*

The stay currently in place due to the enactment of PROMESA prohibits Commonwealth bondholders from enforcing their remedies against the Commonwealth.  Moreover, the Moratorium Act and the executive orders issued thereunder have temporarily suspended the Commonwealth's obligation, and that of certain instrumentalities, to pay debt service on certain obligations (including general obligation bonds and guaranteed bonds) as they become due. Finally, to the extent the Commonwealth or any instrumentality is subject to the provisions of Title III of PROMESA, a stay similar to that applicable in a bankruptcy proceeding would be in place until the end of such proceeding.  As a result, creditors of the Commonwealth and its instrumentalities may face significant delays in enforcing any of their remedies as they await the result of any legal challenge that may be leveled against PROMESA or the Moratorium Act or, to the extent that such laws are deemed valid by a court of competent jurisdiction, until such time as the requirements of such laws have been satisfied.

The Commonwealth Constitution provides that public debt of the Commonwealth (consisting of general obligation bonds and guaranteed bonds backed by a pledge of the Commonwealth's good faith, credit and taxing power) has a first claim over available resources, and that the Secretary of the Treasury can be judicially required by bondholders to allocate funds to the payment of the public debt if available Commonwealth resources are insufficient to cover all budgeted appropriations.  Through the enactment of the Moratorium Act, however, the Commonwealth has exercised its police power and determined that essential services must be prioritized over payments of debt service.  Moreover, public policy considerations relating to the safety and well-being of the residents of the Commonwealth, as well as procedural matters, could result in delays in, or limitations on, the judicial enforcement of such remedies, and in limitations

on the effectiveness of such remedies. The remedies available to bondholders are dependent on judicial actions, which are often subject to substantial discretion and delay.  As a result, there is no assurance that bondholders will be able to enforce their remedies pursuant to the Commonwealth Constitution and, to the extent that bondholders are able to enforce their remedies notwithstanding the provisions of the Moratorium Act or PROMESA, there is no assurance that such remedies will be enforced or granted in a timely manner.

The Commonwealth Constitution provides that the good faith, credit and taxing power of the Commonwealth are pledged to the payment of the Commonwealth's general obligation bonds. Prior to July 1, 2016, the Commonwealth had never failed to make a debt service payment on any of its general obligation bonds when due and, therefore, the Puerto Rico Supreme Court has never had the opportunity to rule on whether bondholders have the right to compel the Legislative Assembly of the Commonwealth to increase taxes in the event that available Commonwealth resources are insufficient to pay the bonds, or to rule on how such right, if determined to exist, could be enforced.

Certain other statutory provisions affecting the rights of bondholders, such as the "clawback" provisions, had never been tested until recently.  As a result, it is not certain what steps a Commonwealth bondholder would be required to take or what proof such bondholder would be required to produce to compel the diversion of funds from any Commonwealth instrumentality to the payment of public debt, or how the necessary available resources would be allocated to each such instrumentality.  See "LITIGATION" for a description of current creditor actions in connection with statutes affecting creditor rights.

***The Commonwealth may continue to pledge its good faith, credit and taxing power to guarantee bonds and notes issued by its instrumentalities.***

The Constitution of Puerto Rico provides that the Commonwealth shall not guarantee any obligation evidenced by bonds or notes if the principal and interest on all its direct obligations to which the good faith, credit and taxing power of the Commonwealth has been pledged payable in any fiscal year, together with any amount paid by the Commonwealth in the prior fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual internal revenues of the Commonwealth in the two preceding fiscal years. Therefore, although according to opinions from several Secretaries of Justice of the Commonwealth, bonds and notes guaranteed by the Commonwealth are considered public debt and enjoy the same priority of payment protection that is afforded by the Constitution of Puerto Rico to bonds and notes issued by the Commonwealth for which its good faith, credit and taxing power has been pledged, debt service payable on such guaranteed obligations is not taken into consideration for purposes of the Constitutional debt limit unless the Commonwealth is actually paying such debt service pursuant to its guarantee. Depending on how recent defaults by the Commonwealth are treated for purposes of measuring the Constitutional debt limit, the Commonwealth is either near this 15% threshold or already above it. In order to be able to guarantee any additional public corporation debt, the Commonwealth would have to be below this level.

***The Commonwealth Constitution may be amended to increase the debt limit and allow the Commonwealth to incur additional general obligation debt.***

Although the Commonwealth Constitution provides holders of general obligation debt certain protections, the Commonwealth Constitution may be amended to modify the provisions

regarding public debt, such as raising the debt limit.  Although amending the Commonwealth Constitution may be difficult (it requires the approval of at least two-thirds of the members of the Puerto Rico House of Representatives and the Puerto Rico Senate, and the approval of a majority of voters in a referendum of qualified voters), and although there are no current plans to propose such an amendment, an amendment of this nature could be proposed and, if proposed, could be approved.  An amendment to the Commonwealth Constitution of this nature, however, would have to be approved by the Oversight Board established by PROMESA while it remains in existence.  As a result of an amendment of this nature and assuming the Legislative Assembly passes legislation authorizing the bond issue, the Commonwealth could be authorized to incur general obligation debt, or guarantee bonds and notes of instrumentalities, in excess of the current debt limit.  No assurance can be given, as a result, that the Constitutional debt limit will remain at its current level.

*The Commonwealth Constitution and other laws of the Commonwealth could be amended in a manner adverse to bondholders or could be overridden by federal law.*

Some of the protection provided by the Commonwealth Constitution and laws of the Commonwealth could be suspended or eliminated through federal or Commonwealth legislation. For example, on April 6, 2016, the Governor signed into law the Moratorium Act, which allows the Governor to declare a moratorium on debt service payments and to stay related creditor remedies for a temporary period for the Commonwealth and certain government instrumentalities. Thereafter, the Governor issued several Executive Orders declaring such a moratorium.  The temporary period set forth in the Moratorium Act lasts until January 31, 2017, with a possible two-month extension at the Governor's discretion.

Moreover, the stay imposed by PROMESA could be seen as overriding the remedies and protections granted by the Commonwealth Constitution to bondholders, such as the right to sue the Secretary of the Treasury to collect on their debts and require that all available revenues be first applied to the payment of the debt service on general obligation bonds and notes.

*The Commonwealth's general obligation bonds cannot be accelerated upon a default and there are no cross-default provisions.*

The maturity of the Commonwealth's general obligation bonds cannot be accelerated in the event that the Commonwealth defaults in the payment of any installment of interest or principal due on such bonds. There are no cross-default provisions among general obligation bonds, so any default with respect to any particular issue of bonds would not provide any remedy to holders of other bonds which are not affected.

**Risks Related to Secondary Market Trading**

*The liquidity of the Commonwealth's bonds is limited.*

There is no assurance that the secondary market for the Commonwealth's bonds will provide holders thereof with sufficient liquidity for their investment or that such secondary market will continue. The risk of illiquidity may increase as a result of the recent non-payment of the Commonwealth's bonds or as a result of market or other factors.

**Risks Related to GDB's Financial Condition**

*The financial condition of the Commonwealth and its instrumentalities could be further adversely affected as a result of GDB's inability to serve as the principal source of short-term liquidity for such entities and to pay all of its liabilities in full, including its deposit liabilities to the Commonwealth and its public corporations*

GDB is currently unable to meet its financial obligations as they become due and its audited financial statements for fiscal year 2014 present a total net deficit of approximately $316 million, which means that GDB is also insolvent on a balance sheet basis. Moreover, such financial statements were issued with a qualification regarding its ability to continue as a going concern.

GDB's ability to operate has been limited by its financial condition and the restrictions placed on it by Executive Order 10 and Executive Order 14. See "Emergency Moratorium and Financial Rehabilitation Act" under OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION for a description of these restrictions. As a result, GDB can no longer serve as the principal source of short-term liquidity for the Commonwealth and its instrumentalities. Thus, the Commonwealth has been required to seek funding from other instrumentalities. There is no assurance that the Commonwealth will be able to access other sources of funding in order to have sufficient liquidity to continue financing current operations.

The Commonwealth and its public corporations have a significant amount of deposits at GDB. Such entities' ability to withdraw their funds deposited at GDB is currently limited as a result of the restrictions on the withdrawal of deposits implemented pursuant to Executive Order 10 and due to GDB's severe liquidity constraints. Restrictions on the withdrawal of GDB deposits may cause certain government entities to be in noncompliance with federal assistance programs and may thus affect future funding under such programs. Moreover, GDB's depositors, which consist primarily of the Commonwealth and its public corporations, may also suffer significant losses as a result of GDB's inability to pay its creditors in full, including its depositors, which, in turn, could further affect such entities' ability to continue providing essential government services and meet their financial obligations.

**PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT**

On June 30, 2016, President Obama signed PROMESA into law. PROMESA is an extraordinarily complex law and creates a framework through which the Commonwealth can effectuate fiscal reforms and adjust its debt so as to allow it to adequately provide for its residents on a long-term basis. PROMESA established the Oversight Board, whose role is to provide fiscal oversight through the development and approval of fiscal plans and budgets for the Commonwealth and any instrumentalities that become "covered territorial instrumentalities" by virtue of designation by the Oversight Board. Subject to Oversight Board approval, PROMESA also provides for access to two different federal debt adjustment schemes: (a) Title VI, which provides for a largely out-of-court process through which modifications to financial debt can be accepted by a supermajority of creditors that bind holdouts; and (b) Title III, which provides an in-court process that incorporates many of the powers and provisions of the Bankruptcy Code and permits adjustment of a broad range of obligations.

**Oversight Board**

*Creation and Composition*. PROMESA established the Oversight Board over Puerto Rico on June 30, 2016. The Oversight Board exists as an entity within Puerto Rico's government, and it is not considered to be a part of the government of the United States. PROMESA established a process for selection of seven members to be appointed by the President, each of whom is to have knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government. The members of the board will serve concurrent three-year terms.

On August 31, 2016, President Obama appointed each of Andrew G. Biggs, Arthur J. González, Ana J. Matosantos, David A. Skeel, Jr., Carlos M. García, José Ramón González, and José B. Carrión III as members of the Oversight Board. On August 31, 2016, the Governor appointed Richard Ravitch as his representative on the Oversight Board, who serves as a non-voting *ex officio* member. On September 30, 2016, the Oversight Board elected José B. Carrión III as chair.

The Board has not yet appointed an executive director. With the approval of the chair, the executive director may appoint such additional personnel as he considers appropriate. PROMESA contemplates that the Oversight Board will adopt bylaws, rules and procedures, including procedures for hiring experts and consultants. On September 30, 2016, the Oversight Board adopted its bylaws. PROMESA also permits the Oversight Board, by majority vote, to conduct business in executive session, consisting only of the voting members and invited professionals, for those business items set forth as part of the vote to convene such executive session. The Governor and the Legislative Assembly exercise no control or supervision over the Oversight Board or its activities.

*Functionality and Funding*. While the Oversight Board has numerous roles, powers and responsibilities, PROMESA vests it with two primary functions. First, the Oversight Board provides fiscal oversight through the development and approval of fiscal plans and budgets for the Commonwealth and any covered territorial instrumentalities. Second, the Oversight Board plays a key supervisory and gatekeeper role in restructuring proceedings under either Title III or Title VI.

On September 30, 2016, the Oversight Board designated the Commonwealth, the Employees Retirement System, the Judiciary Retirement System, the Teachers Retirement System, the University of Puerto Rico, and all of the Commonwealth's public corporations, including entities affiliated with or subsidiaries of the aforementioned entities, as initial covered territorial instrumentalities subject to PROMESA. **The Board also requested that the Commonwealth and the covered instrumentalities deliver the following:**

- Weekly cash flow reports, disclosing all revenues received and expenses
- Monthly breakdowns of bank accounts
- Monthly and year-to-date compliance with budget
- Monthly and year-to-date revenues
- Monthly detailed payroll reports by agency
- Monthly reports on federal funds disbursed
- Monthly reports on debt and what has been paid
- Agency performance and productivity reports with appropriate metrics

- Quarterly reports on key economic financial and labor statistics

While the development of fiscal plans and budgets are iterative processes with the Governor (and in the case of the Commonwealth, the Legislative Assembly), the Oversight Board ultimately has the last word. No fiscal plan or budget for the Commonwealth or any covered territorial instrumentality will become effective without the Oversight Board's approval.

Puerto Rico is financially responsible for the cost associated with the management and operations of the Oversight Board, through designation of a permanent funding source, not subject to subsequent legislative appropriations, in an amount "sufficient to support" the annual expenses of the Oversight Board. Pending designation of such a funding source, the Commonwealth must transfer $2 million or such other amount as determined by the Oversight Board to an account in the exclusive control of the Oversight Board. (As of November 30, 2016, $12 million had been transferred to the account of the Oversight Board.) The Oversight Board is charged with using its powers over the Commonwealth's budget to ensure adequate funding for its expenses, and must submit a budget for each fiscal year to the President, certain Congressional committees, the Governor and the Legislative Assembly. The Congressional Budget Office has estimated that the Oversight Board will cost $350 million in the first two years.

The Oversight Board is vested with subpoena power to compel attendance and testimony, as well as the production of any books or records relating to any matter under investigation. The Oversight Board also has rights of access to both federal and Commonwealth government data. PROMESA authorizes the Oversight Board to investigate disclosure and selling practices with respect to sale of bonds for and on behalf of retail investors, and to make public the findings resulting from such an investigation. In addition, if the Oversight Board determines that a pension system is materially underfunded, it is to conduct an analysis prepared by an independent actuary of such pension system.

PROMESA provides that federal district courts lack jurisdiction to review any challenges to certification determinations made by the Oversight Board. However, the Oversight Board may intervene in any litigation filed against the Commonwealth or covered territorial instrumentalities.

***Fiscal Plan And Budget Approval Process***. Developing a fiscal plan for the Commonwealth and any covered territorial instrumentality designated by the Oversight Board involves an iterative process that begins when the Oversight Board delivers a notice to the Governor providing a schedule for the process of development, submission, approval and certification. After the Governor submits the fiscal plan to the Oversight Board, within the time specified, the Oversight Board will evaluate the fiscal plan for compliance with Section 201(b), which sets forth the requirements for approval. Section 201(b) provides that a fiscal plan shall "provide a method to achieve fiscal responsibility and access to the capital markets," and specifically provides that such fiscal plan shall:

- Provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on (i) applicable laws or (ii) specific bills that require enactment in order to reasonably achieve the projections of the fiscal plan;

- Ensure the funding of essential public services;

75

- Provide adequate funding for public pension systems;

- Provide for the elimination of structural deficits;

- For fiscal years covered by a fiscal plan in which a stay under Titles III or IV is not effective, provide for a debt burden that is sustainable;

- Improve fiscal governance, accountability, and internal controls;

- Enable the achievement of fiscal targets;

- Create independent forecasts of revenue for the period covered by the fiscal plan;

- Include a debt sustainability analysis;

- Provide for capital expenditures and investments necessary to promote economic growth;

- Adopt appropriate recommendations submitted by the Oversight Board (as discussed further elsewhere herein);

- Include such additional information as the Oversight Board deems necessary;

- Ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under Title III, or a Qualifying Modification approved under Title VI; and

- Respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA.

If the Oversight Board finds the fiscal plan to be compliant, it will approve it by issuing a certification; if not, it will issue a notice of violation and provide an opportunity to correct non-compliant portions. This iterative process will continue for as long as allowed by the schedule established by the Oversight Board, and the Governor and the Oversight Board may also jointly develop a compliant fiscal plan. However, if the Governor fails to submit a compliant fiscal plan in the timeframe set forth by the Oversight Board, the Oversight Board can develop and submit to the Governor and the Legislative Assembly a compliant fiscal plan, which shall be deemed approved by the Governor and be effective.

The budgeting process is similarly iterative, except that in the case of a Commonwealth budget (as opposed to an covered territorial instrumentality budget), the process involves the Legislative Assembly as well as the Governor. The Oversight Board and the Governor (along with the Legislative Assembly, in the case of a Commonwealth budget) may also jointly develop a compliant budget. The consequence of failing to provide a compliant budget is the same as failing to provide a compliant fiscal plan: if the Governor and the Legislative Assembly (or in the case of a covered territorial instrumentality budget, the Governor alone) fail to develop and approve a budget that complies with the fiscal plan by the day before the first day of the fiscal

year for which the budget is being developed, the Oversight Board shall submit a compliant budget to the Governor and the Legislative Assembly, which shall be deemed approved and shall be in effect. For budgets that have been certified by the Oversight Board, the Governor may submit a request for reprogramming of any amounts, but neither the Legislative Assembly nor any employee of the government may take any action to carry it out until the Oversight Board certifies the reprogramming as not inconsistent with the Fiscal Plan.

_**Ongoing Oversight**_. Once the fiscal plan and budget are approved, the Oversight Board has the responsibility for ongoing oversight of the financial affairs of the Commonwealth and its covered territorial instrumentalities. The Oversight Board will review quarterly reports submitted by the Governor to determine compliance of revenues, expenditures and cash flows with the relevant budgets. Based on the information provided, the Oversight Board may ask for further explanation and/or require corrections. If the Oversight Board determines that an inconsistency with the approved budget has not been corrected through this process, it may make unilateral reductions in non-debt expenditures to ensure compliance with approved budgets. In the event of noncompliance with a covered instrumentality budget, the Oversight Board may alternatively institute automatic hiring freezes in such covered territorial instrumentality and prohibit the covered territorial instrumentality from entering into any contract or transaction without the prior approval of the Oversight Board. These Oversight Board remedies are terminated only when the Oversight Board determines that the Commonwealth or covered territorial instrumentality has initiated appropriate measures to ensure compliance with the relevant budget.

_**Power Over Legislative Process**_. The Oversight Board also has significant power over the legislative process in the Commonwealth.

For laws enacted _prior to the full appointment of the Oversight Board_, the Oversight Board can retroactively rescind portions of any law that alters creditor priorities if (1) the law was enacted between May 4, 2016 and the date all members of the Oversight Board are appointed, and (2) the law alters the pre-existing priorities of creditors (i) in a manner outside the ordinary course of business or (ii) in a way inconsistent with Puerto Rico's constitution or laws. PROMESA also prohibits the enactment of new laws from the passage of PROMESA until the appointment of the Oversight Board that permit the transfer of funds outside of the ordinary course or that are inconsistent with the Commonwealth's laws or constitution. Such laws are subject to review and rescission.

For laws enacted _after the full appointment of the Oversight Board_, the Governor must submit each newly enacted law to the Oversight Board with a report that analyzes its impact on expenditures and revenues and certify whether the new law is "significantly inconsistent" with the fiscal plan. If the Oversight Board finds the law to be "significantly inconsistent" with an approved fiscal plan, and no remedy or satisfactory explanation is made, the Oversight Board may take such actions as it considers necessary to ensure that the enactment or enforcement of the law will not adversely affect the government's compliance with the fiscal plan (including preventing its enforcement).

The Oversight Board also has broad authority to (1) establish policies to require prior approval by the Oversight Board of a contract, rule, executive order or regulation to ensure they promote market competition and are consistent with the fiscal plan; and (2) prevent the execution or enforcement of a contract, rule, executive order or regulation to the extent that it is

inconsistent with the approved fiscal plan.  The Oversight Board is foreclosed, however, from "exercis[ing] applicable authorities" to impede actions taken to comply with consent decrees of settlements with federal agencies, or implement federal programs.

Moreover, at any time, the Oversight Board may submit recommendations to the Governor to ensure compliance with the fiscal plan or to otherwise support financial stability, economic growth, management responsibility, and service delivery efficiency of the Commonwealth and its covered territorial instrumentalities.  The Commonwealth and its covered territorial instrumentalities can refuse to implement such recommendations, but a refusal must be accompanied by a detailed explanation that will be delivered to Congress. However, "appropriate" Oversight Board recommendations must be incorporated in the fiscal plan.

PROMESA also precludes the Commonwealth and any covered territorial instrumentality from issuing debt or guaranteeing, modifying, exchanging, repurchasing redeeming or entering into any similar transactions with respect to its debt for so long as the Oversight Board remains in operation.

*__Termination__*.  The Oversight Board will terminate only when its members certify that certain conditions have been met, namely that:

(1) The Commonwealth and its covered territorial instrumentalities have adequate access to short-term and long-term credit markets at reasonable interest rates to meet their borrowing needs; and

(2) For at least <u>four</u> consecutive fiscal years, (i) the Commonwealth and its covered territorial instrumentalities have developed budgets in accordance with modified accrual accounting standards, and (ii) revenues equal or exceed expenditures as determined according to modified accrual accounting standards.

## Other Key Provisions

*__Automatic Stay Upon Enactment__*.  The enactment of PROMESA operates as a broad-based stay, applicable to all entities, with respect to claims related to bonds, loans, letters of credit, obligations of insurance, or other financial indebtedness for borrowed money (collectively, "**Bonds**") except for actions that were commenced prior to December 18, 2015 or actions by governmental units to enforce their police and regulatory powers.  The automatic stay also provides broad protections against provisions in contracts that allow for termination and the exercise of remedies based on the financial condition of the government entity, or in the face of financial debt, non-payment or breach of other covenants or conditions.  The stay remains in effect until February 15, 2017, which date may be extended up to 60 days by a Title VI court (discussed below) or 75 days by the Oversight Board if either finds that additional time is needed to complete a voluntary restructuring process under Title VI.

The automatic stay imposed by the enactment of PROMESA applies to covered actions against *all* government instrumentalities in Puerto Rico, which includes political subdivisions like towns and cities, even those that may not be immediately within the jurisdiction and purview of the Oversight Board.  PROMESA also permits the payment of principal and interest on its financial debt, and the Oversight Board can require such payments if it determines in its discretion that they are feasible.

Finally, PROMESA provides a procedure to lift the stay and permits relief "for cause shown" and permits interim relief for creditors with an interest in property to prevent "irreparable damage." In analyzing requests to lift the stay, a court would likely look to look to established principles of bankruptcy law. In any case, the stay terminates if an entity proceeds with a Title III restructuring, which itself imposes a different stay on creditor remedies.

*Restrictions on Transfer*. In addition to the Oversight Board's powers, described above, PROMESA creates a direct right of action in favor of creditors concerning certain post-PROMESA transfers. Specifically, Section 407 provides that while the Oversight Board is in existence, if any property "is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors, then the transferee shall be liable for the value of such property." Creditors may enforce these rights by bringing a district court action after the expiration or lifting of the stay.

*Minimum Wage Change*. Section 403 of PROMESA authorizes the Governor of Puerto Rico, subject to the approval of the Oversight Board, to designate a period not exceeding 4 years during which employers in Puerto Rico may hire new employees that have not attained the age of 25 and pay them at a rate less than the federal minimum wage.

*Purchases from the General Services Administration*. Section 406 of PROMESA authorizes Puerto Rico to make purchases through the General Services Administration, along with all other territories.

*Congressional Task Force*. Section 409 of PROMESA creates a new entity within the legislative branch, known as the Congressional Task Force on Economic Growth in Puerto Rico (the "**Task Force**"), that is required to report to Congress in September 2016 regarding matters the Task Force deems urgent for consideration by Congress. The Task Force must also report to Congress by the end of 2016 regarding impediments under federal law to economic growth, and to recommend changes that would, among other benefits, spur sustainable long-term economic growth and attract investment in Puerto Rico.

*Puerto Rico Infrastructure Revitalization*. Title V of PROMESA establishes the position of "Revitalization Coordinator," which will operate under the Oversight Board, to identify and evaluate infrastructure projects that will provide direct and substantive benefits to Puerto Rico. On November 9, 2016, the Governor selected Aaron Bielenberg as the Revitalization Coordinator from a list of three candidates submitted to him by the Oversight Board. Infrastructure project sponsors may submit any existing, ongoing, or proposed projects to the Revitalization Coordinator accompanied by an analysis of the project on Puerto Rico's infrastructure, the project's estimated cost, and available funding for the project. After receiving a proposal, the Revitalization Coordinator shall identify all Puerto Rico agencies that will have a role in permitting, approving, or authorizing the proposed project, and those agencies will be required to submit to the Revitalization Coordinator an expedited permitting process, with the goal of ensuring that selected projects—known as "critical projects"—can be given priority to the maximum extent possible. The Revitalization Coordinator will then develop a critical project report that assesses the strength and viability of the relevant proposal. The critical project report will include recommendations by both the Governor and the Revitalization Coordinator as to whether the project should be considered a critical project (*i.e.*, a project whose approval and

implementation should be expedited).  After a period of public comments, the Revitalization Coordinator must submit the report to the Oversight Board.  The Oversight Board, in turn, shall approve or disapprove the project as a critical project, and subsequent to such approval, expedited work on critical projects will begin.

Title V also creates an interagency subcommittee to evaluate environmental documents required under Puerto Rico law to facilitate the expedited permitting process, and the Oversight Board has the power to review Puerto Rico laws that may impede the expedited permitting process.  Finally, Title V requires federal agencies to provide a point of contact and to expedite review of projects to the extent possible.

## Debt Restructuring Under Titles VI and III

***Title VI: Creditor Collective Action***.  Title VI creates a streamlined process for achieving modifications of financial indebtedness with the consent of a super-majority of those voting in any affected class—or "Pool"—of creditors, provided that such super-majority of those voting also constitutes a majority of the Bonds outstanding in such Pool.  Importantly, if the voting thresholds and other requirements are met, the terms of such a modification will be binding on all holders of the relevant debt, including those who did not vote or who voted against the proposed modification.  Although it applies to a limited class of obligations, Title VI offers the benefits of potential speed relative to a plenary Title III proceeding.

Title VI also sets forth extensive requirements for the composition of any "Pool" and the treatment of any pooled financial obligation.  Title VI directs the Oversight Board to establish separate Pools for Bonds distinguished by specific provisions governing priority or security arrangements, including for general obligation Bonds; for senior and subordinated Bonds according to the relative priority or security arrangements; for guaranteed and non-guaranteed Bonds; and for Bonds for which revenue streams have been pledged, with separate Pools for Bonds of differing priority in such pledges.  Title VI requires that all Bonds in the Pools subject to a proposed Modification receive the same amount of consideration per amount of principal, the same amount of consideration per amount of interest accrued but unpaid and the same amount of consideration per amount of past due interest (but would permit holders to select from a menu of options).  Title VI has no provision for cram-down of non-consenting Pools, and non-consenting secured holders within a consenting Pool must either retain their liens or receive the lesser of the value of their Bond claims or the collateral securing such claims.  There are no fixed deadlines or timeframes within Title VI, and there is no requirement that an Issuer attempt a Title VI process prior to undertaking a Title III process.  While there are no fixed deadlines for completion of a Title VI proceeding, Title VI does not impose a stay beyond the limited extensions of the PROMESA stay described above.

The threshold for achieving a binding modification, amendment, supplement, or waiver affecting a Pool of Bonds (known as a "**Modification**") is consent of two-thirds of the outstanding principal amount of Bonds that voted on such Modification, provided that such two-thirds also represents a majority of the outstanding principal amount of Bonds in the Pool.  Insurers may vote insured Bonds for the purposes of a Title VI adjustment (to the extent such insurers are granted the right to vote such Bonds for purposes of directing remedies or consenting to proposed amendments or modifications as provided in the applicable contracts).

Access to, and completion of, a Title VI process is subject to approval by the Oversight Board. No entity may consummate a Modification without the Oversight Board's first certifying that the proposed agreement is in conformance with the fiscal plan (also controlled by the Oversight Board) or, if no fiscal plan has been adopted, that the agreement provides for a sustainable level of debt. The Oversight Board also has the power to, among other things, grant (or deny) any instrumentality access to Title VI altogether; establish pools for voting, and issue successive certifications that the proposed modification meets the relevant requirements to (i) become a "Qualifying Modification" and (ii) to have a binding effect. Importantly, creditors may themselves propose a Qualifying Modification, which the Oversight Board may accept on the issuer's behalf.

While there can be some variation, the general Title VI process is set forth below:

(1) A modification is proposed for the Commonwealth or any covered territorial instrumentality of the Commonwealth that is specifically authorized by the Oversight Board to proceed under Title VI. Such modification may be proposed by the issuer, or by creditors and accepted by the Oversight Board on the issuer's behalf.

(2) The Issuer provides certain financial and economic information, and its fiscal plan, if any.

(3) The Oversight Board certifies that the Modification is a "Qualifying Modification," which requires that

- The Issuer has consulted with creditors or the Modification is consistent with a restructuring support or similar agreement with a majority in amount of affected claims that predates passage of PROMESA ("Voluntary Agreement Process");

- The Modification offers equal treatment within each creditor Pool; and

- The Modification (i) is consistent with the Issuer's fiscal plan, (ii), if no fiscal plan then exists, provides for a sustainable level of debt, or (iii) is limited to extending maturities and interest payment dates for a period of up to one year (collectively, the "**Modification Options**").

(4) The Oversight Board approves Pools for voting purposes.

(5) The Issuer solicits each Pool affected by the Qualifying Modification.

(6) Holders of two-thirds in amount of qualifying Bonds voting in each Pool vote to approve the Qualifying Modification, provided that that two-thirds represents a majority of the outstanding amount of such qualifying Bonds.

(7) The Oversight Board Certifies that:

- The voting standard has been satisfied;

- The Qualifying Modification achieves one of the Modification Options; and

- All conditions precedent have been satisfied or waived.

81

(8) The district court, upon review of an application by the Issuer, enters an order that the requirements of Title VI have been satisfied.  For non-consenting secured creditors, the district court must find that either (a) they retained the lien securing their claim, or (b) they will receive the lesser of the value of their claim or the value of the collateral. This order will be valid and binding on all persons asserting claims under the bonds or instruments that are the subject of the Qualifying Modification and enjoin collateral attacks.

Pursuant to Section 104 of PROMESA, Issuers that entered into "Preexisting Voluntary Agreements" with their creditors, which are defined to include only those agreements consummated prior to May 18, 2016, are exempted from the requirement of receiving certification that the agreement achieves one of the Modification Options. Additionally, Section 601 of PROMESA provides that Issuers that entered into Preexisting Voluntary Agreements with their creditors may also classify insured and uninsured Bonds differently for pooling purposes.

_**Title III: Adjustment of Debts**_.    Title III creates a court-supervised debt-adjustment mechanism for the Commonwealth and its covered territorial instrumentalities.  Title III imports heavily from the U.S. Bankruptcy Code, including its classification and cram-down provisions, which potentially will provide Puerto Rico and its covered territorial instrumentalities with significantly greater flexibility in restructuring debts than under Title VI.  Unlike the Bankruptcy Code, Title III gives the Oversight Board significant control in the proceeding.

Title III begins by incorporating various provisions of the U.S. Bankruptcy Code that are to be applicable in a Title III proceeding.  These provisions are largely the same provisions made applicable to cases under Chapter 9 of the U.S. Bankruptcy Code in addition to many of the provisions of Chapter 9 itself.  Relevant provisions include, among others, the automatic stay; standards for adequate protection, for obtaining post-petition credit, and for filing, allowance, and priority of claims; fraudulent transfer, preference, and avoidance and recovery statutes; and most of the plan formulation and confirmation requirements that exist in Chapter 9.

Title III also provides for jurisdiction in federal district courts, with venue in the district of the territory or covered territorial instrumentality or, if determined by the Oversight Board based on considerations of resources and impact on witnesses, in a district where the Oversight Board is located outside of the territory.  The district judge to preside over a Title III proceeding is chosen by designation of the Chief Justice of the United States (for a proceeding of a territory), or of the Chief Judge of the Court of Appeals for the First Circuit (for a proceeding of a territorial instrumentality).  The Federal Rules of Bankruptcy Procedure apply in their entirety to Title III proceedings.

Unlike Chapter 9 of the U.S. Bankruptcy Code, PROMESA grants the Oversight Board (as opposed to the debtor) power over key milestones in the Title III restructuring process.  The Oversight Board controls access to Title III, as the Oversight Board must issue a "restructuring certification," approved by at least five members of the Oversight Board, as a prerequisite to filing under Title III.  The restructuring certification requires that the Oversight Board determine that the prospective debtor has (a) made good-faith efforts to reach a consensual restructuring, (b) adopted procedures necessary to deliver timely audited financial statements, and (c) made public draft financial statements and other information necessary to make an informed decision with respect to possible restructuring.  The Oversight Board then serves as the "representative" of any and all debtors, in the proceeding, and has the power to file and modify plans of

adjustment.  The Oversight Board is also empowered to file any other pleadings it deems appropriate.

Although Title III largely imports plan confirmation standards from Chapter 9, there are two noteworthy departures.  *First*, Title III includes a modified "best interests of creditors" test, which states that a plan will only be confirmed if it is "feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by" the plan to which the court is applying the confirmation analysis. Chapter 9 confirmation standards include a textually shorter formulation such that a plan will be confirmed only if the plan is in the best interests of creditors and is feasible.  However, case law applying the Chapter 9 standard employed a similar analysis.  *Second*, Title III adds a requirement that both the court and the Oversight Board must determine that the plan is consistent with the applicable fiscal plan certified by the Oversight Board.  A fiscal plan must, in turn, respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA.

## COMMONWEALTH REVENUES AND EXPENDITURES

This section describes the major sources of revenue from which the Commonwealth funds its operations.  It also gives a broad overview of central government's expenditures as well as the budgetary process through which such expenses are authorized.

**Revenues**

The Commonwealth funds its operations from internal revenues (primarily revenues from local taxes, fees and charges) as well as revenue from inter-governmental sources, primarily federal funds. The Commonwealth's tax revenues consist principally of income, excise and sales and use taxes.  Such taxes are collected pursuant to the provisions of Act No. 1-2011, the Puerto Rico Internal Revenue Code of 2011, as amended (the "**2011 Code**").

The Commonwealth accounts for most of the tax revenue it collects in its General Fund, sometimes referred to herein as the General Fund (Operating Fund), which is its primary operating fund.  However, for budgetary purposes, certain Commonwealth revenues from designated sources that are assigned on a continuing basis to designated agencies or instrumentalities for specified purposes are not accounted for in the General Fund (Operating Fund) but rather are accounted for in "Special Revenue Funds." (All such revenues, including those accounted for in the Special Revenue Funds, are accounted for in the "General Fund" for purpose of the annual financial statements of the Commonwealth prepared in accordance with U.S. GAAP.) Revenues not accounted for in the General Fund (Operating Fund) but accounted for in Special Revenue Funds include (i) certain tax revenues assigned by law to public corporations or other third parties, (ii) charges and fees for services collected by Commonwealth agencies, (iii) federal funds, (iv) dividends or other distributions received by the Commonwealth from its public corporations and (v) certain other revenues. Furthermore, certain other tax revenues, including the sales and use tax revenues assigned to COFINA, are not accounted for in the General Fund (whether in the Operating Fund or its Special Revenue Funds) but are rather accounted for in other Governmental Funds administered and managed by the relevant

government instrumentality.  Municipal property taxes assigned by law to the Commonwealth's Debt Service Fund, for example, are also not included in the General Fund.

Because the Commonwealth follows the practice of pooling all its cash, most revenues accounted for in the General Fund (Operating Fund) and in the Special Revenue Funds (subject to certain limited exceptions) are deposited in the TSA. See "Commonwealth Liquidity - Treasury Single Account" under OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION.

The following tables shows revenues for the Commonwealth's General Fund and its other Governmental Funds for fiscal years 2016, 2015 and 2014. Revenues for fiscal year 2016 do not include certain accruals and other adjustments required by U.S. GAAP. Revenues for fiscal years 2015 and 2014 are presented pursuant to "current financial resources measurement" focus and the "modified accrual" basis of accounting, in accordance with U.S. GAAP, segregated between the General Fund (Operating Fund) and the Special Revenue Funds, plus a reconciliation column for other adjustments made pursuant to U.S. GAAP for financial statements presentation purposes. The Other Governmental Funds included in the tables are comprised of the following: (a) the Commonwealth's Capital Project Fund, (b) the Commonwealth's Debt Service Fund and (c) the funds related to the Commonwealth's "Blended Component Units", including COFINA, PRIFA, PBA and the Special Communities Trust. The following sections describe in greater detail the principal revenues shown on the following table.

**COMMONWEALTH OF PUERTO RICO**
Governmental Funds Revenues [1][2]
Year Ended June 30, 2016
(in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Total General Fund [1] | Other Governmental Funds [4] | Total Governmental Funds [4] |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| **Income Taxes:** | | | | | |
| Individuals | $2,021,256 | - | $2,021,256 | - | $2,021,256 |
| Corporations | 1,647,422 | - | 1,647,422 | - | 1,647,422 |
| Partnerships | 1,023 | - | 1,023 | - | 1,023 |
| Withholdings from non-residents | 809,750 | 40,254 | 850,004 | - | 850,004 |
| Tollgate taxes | - | - | - | - | - |
| Interest | 4,212 | - | 4,212 | - | 4,212 |
| Dividends | 30,739 | - | 30,739 | - | 30,739 |
| Inheritance and gift taxes | 2,019 | - | 2,019 | - | 2,019 |
| Total income taxes | 4,516,421 | 40,254 | 4,556,675 | - | 4,556,675 |
| **Sales and Use Tax** [3] | **1,559,627** | **3,240** | **1,562,867** | **696,259** | **2,259,126** |
| **Excise Taxes:** | | | | | |
| Alcoholic beverages | 264,704 | - | 264,704 | - | 264,704 |
| Foreign (Act 154) | 1,876,009 | - | 1,876,009 | - | 1,876,009 |
| Tobacco products | 100,295 | 64,765 | 165,060 | - | 165,060 |
| Motor vehicles | 265,606 | 20,000 | 285,606 | - | 285,606 |
| Horses races | 7,199 | - | 7,199 | - | 7,199 |
| Insurance premiums | 58,422 | - | 58,422 | - | 58,422 |
| Petroleum Tax | - | 398,143 | 398,143 | - | 398,143 |
| Gasoline & Diesel Oil Tax | - | 168,033 | 168,033 | - | 168,033 |
| Other excise taxes | 14,882 | 21,007 | 35,889 | - | 35,889 |
| Total excise taxes | **2,587,117** | **671,948** | **3,259,065** | - | **3,259,065** |
| **Property Taxes** | **11,315** | **-** | **11,315** | - | **11,315** |
| **Other Taxes:** | | | | | |
| Motor vehicles Licenses | 2,043 | 92,987 | 95,030 | - | 95,030 |
| Alcoholic Beverages licenses & Other Taxes | 16,980 | 46,027 | 63,007 | - | 63,007 |
| Total other taxes | **19,023** | **139,014** | **158,037** | - | **158,037** |
| **Charges for Services:** | | | | | |
| Public Health/Patient Fees | - | 155,561 | 155,561 | - | 155,561 |
| Charges for Service | 10,140 | 68,621 | 78,761 | - | 78,761 |
| Rental Fees | - | 12,979 | 12,979 | - | 12,979 |
| Documents Rights Fees | 50,545 | 38,327 | 88,872 | - | 88,872 |
| Judicial Services Fees | - | 21,487 | 21,487 | - | 21,487 |
| Public Housing Fees | - | - | - | - | - |
| Motor Vehicle Fines | - | 5,982 | 5,982 | - | 5,982 |
| Motor Vehicle Permits Fees | - | 37,083 | 37,083 | - | 37,083 |
| Professional Licenses Fees | - | 24,361 | 24,361 | - | 24,361 |
| Permits Fees | - | 17,158 | 17,158 | - | 17,158 |
| Registration Fees | - | 11,983 | 11,983 | - | 11,983 |
| Trademark Fees | 25,978 | - | 25,978 | - | 25,978 |
| Other Fines | - | 54,760 | 54,760 | - | 54,760 |
| Other Permits and Fees | - | 10,526 | 10,526 | - | 10,526 |
| Other | 449 | 133,056 | 133,505 | - | 133,505 |
| Total Charges for services | **87,112** | **591,884** | **678,996** | - | **678,996** |
| **Revenue from Global Tabaco Settlement** | **-** | **71,108** | **71,108** | - | **71,108** |
| **Revenue from Component Units** | **17,214** | **203,656** | **220,870** | - | **220,870** |
| **Intergovernmental Revenues:** | | | | | |
| Federal Grants & Subsidies | - | 5,998,512 | 5,998,512 | - | 5,998,512 |
| Offshore Rum Excise Tax | 199,633 | 130,079 | 329,712 | - | 329,712 |
| Municipal Property Tax | - | - | - | 103,314 | 103,314 |
| Other | - | - | - | 36,000 | 36,000 |
| Total Intergovernmental revenues | **199,633** | **6,128,591** | **6,328,224** | **139,314** | **6,467,538** |
| **Interest and Investment earnings** | **-** | **4,616** | **4,616** | **10,590** | **15,206** |
| **Other** | 49,877 | 20,558 | 70,435 | 14,203 | 84,638 |
| **Total Revenues** | $ 9,047,339 | $ 7,874,869 | $ 16,922,208 | 860,366 | $ 17,782,574 |

*Sources:* The Statement of Revenues and Expenditures and Changes in Fund Balance - Governmental Funds - General Fund.
Totals may not add up due to rounding. Fiscal year 2016 figures are preliminary, unaudited and subject to change. 2016 figures did not include related accruals and reclassifications adjustments as required by U.S. GAAP.

[1] As required for presentation pursuant to U.S. Generally Accepted Accounting Principles.
[2] Excludes transfers in or from other funds, receipts of debt or notes issued (including transfers from lotteries funds, among others).
[3] Sales and Use Tax revenues excludes revenues allocated to the Municipal Assistance Fund and COFIM.
[4] Figures do not include all component units that will become "blended component units" in the other governmental funds in fiscal year 2016, as part of a significant change in reporting entity of the Commonwealth, as required by GASB 61.

COMMONWEALTH OF PUERTO RICO
Governmental Funds Revenues
Year Ended June 30, 2015
(in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Accruals & Other Adjustments [4] | Total General Fund [1] | Other Governmental Funds [5] | Total Governmental Funds [5] |
|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | |
| **Income Taxes:** | | | | | | |
| Individuals | $2,156,826 | - | $383,247 | $2,540,073 | - | $2,540,073 |
| Corporations | 1,852,168 | - | - | 1,852,168 | - | 1,852,168 |
| Partnerships | 2,203 | - | - | 2,203 | - | 2,203 |
| Withholdings from non-residents | 810,718 | 82,859 | - | 893,576 | - | 893,576 |
| Tollgate taxes | 3,651 | - | - | 3,651 | - | 3,651 |
| Interest | 4,414 | - | - | 4,414 | - | 4,414 |
| Dividends | 152,691 | - | - | 152,691 | - | 152,691 |
| Inheritance and gift taxes | 2,149 | - | - | 2,149 | - | 2,149 |
| Total income taxes | **4,984,820** | **82,859** | **383,247** | **5,450,926** | **-** | **5,450,926** |
| **Sales and Use Tax [3]** | 619,199 | 3,240 | - | 622,439 | 698,468 | 1,320,907 |
| **Excise Taxes:** | | | | | | |
| Alcoholic beverages | 236,633 | - | - | 236,633 | - | 236,633 |
| Foreign (Act 154) | 1,920,110 | - | - | 1,920,110 | - | 1,920,110 |
| Tobacco products | 153,213 | 31,402 | - | 184,615 | - | 184,615 |
| Motor vehicles | 252,121 | 20,000 | - | 272,121 | - | 272,121 |
| Horses races | 10,151 | - | - | 10,151 | - | 10,151 |
| Insurance premiums | 59,325 | - | - | 59,325 | - | 59,325 |
| Petroleum Tax | 3,158 | 272,183 | - | 275,341 | - | 275,341 |
| Gasoline & Diesel Oil Tax | - | 154,887 | - | 154,887 | - | 154,887 |
| Other excise taxes | 18,764 | 32,398 | - | 51,162 | - | 51,162 |
| Total excise taxes | **2,653,475** | **510,870** | **-** | **3,164,345** | **-** | **3,164,345** |
| **Property Taxes** | 21,586 | **-** | - | 21,586 | **-** | 21,586 |
| **Other Taxes:** | | | | | | |
| Motor vehicles Licenses | 2,156 | 89,629 | - | 91,785 | - | 91,785 |
| Entertainment machine licenses | 29 | 161 | - | 190 | - | 190 |
| Alcoholic Beverages licenses & Other Taxes | 20,846 | 740 | - | 21,586 | - | 21,586 |
| Total other taxes | **23,031** | **90,530** | **-** | **113,561** | **-** | **113,561** |
| **Charges for Services:** | | | | | | |
| Public Health/Patient Fees | - | 145,197 | - | 145,197 | - | 145,197 |
| Charges for Service | - | 92,505 | - | 92,505 | - | 92,505 |
| Rental Fees | - | 12,227 | - | 12,227 | - | 12,227 |
| Documents Rights Fees | 55,337 | 31,317 | - | 86,654 | - | 86,654 |
| Judicial Services Fees | - | 16,555 | - | 16,555 | - | 16,555 |
| Public Housing Fees | - | 37,525 | - | 37,525 | - | 37,525 |
| Motor Vehicle Fines | - | 55,193 | - | 55,193 | - | 55,193 |
| Motor Vehicle Permits Fees | - | 36,765 | - | 36,765 | - | 36,765 |
| Professional Licenses Fees | - | 22,990 | - | 22,990 | - | 22,990 |
| Permits Fees | 3,025 | 16,838 | - | 19,863 | - | 19,863 |
| Registration Fees | 7,146 | 4,764 | - | 11,910 | - | 11,910 |
| Trademark Fees | 34,725 | 9 | - | 34,734 | - | 34,734 |
| Other Fines | 19,543 | 8,552 | - | 28,095 | - | 28,095 |
| Other Permits and Fees | - | 85,006 | - | 85,006 | - | 85,006 |
| Total Charges for services | **119,776** | **565,443** | **-** | **685,219** | **-** | **685,219** |
| **Revenue from Global Tabaco Settlement** | **-** | **71,514** | - | **71,514** | **-** | **71,514** |
| **Revenue from Component Units** | **19,366** | **173,445** | | **192,811** | **6,033** | **198,844** |
| **Intergovernmental Revenues** | | | | | | |
| Federal Grants & Subsidies | - | 6,060,647 | - | 6,060,647 | - | 6,060,647 |
| Offshore Rum Excise Tax | 189,227 | 139,773 | - | 329,000 | - | 329,000 |
| Municipal Property Tax | - | - | - | - | 72,249 | 72,249 |
| Other | 2,265 | 15,792 | - | 18,057 | 36,000 | 54,057 |
| Total Intergovernmental revenues | **191,492** | **6,216,212** | **-** | **6,407,704** | **108,249** | **6,515,953** |
| **Interest and Investment earnings** | **-** | **4,131** | **-** | **4,131** | **12,362** | **16,493** |
| **Other** | 94,020 | 76,478 | | 170,498 | 5,194 | 175,692 |
| **Total Revenues [2]** | **$8,726,765** | **$7,794,722** | **$383,247** | **$16,904,734** | **$830,306** | **$ 17,735,040** |

*Sources*: The Statement of Revenues and Expenditures and Changes in Fund Balance - Governmental Funds.
Totals may not add up due to rounding. Fiscal year 2015 figures are preliminary, unaudited and subject to change.

[1] As required for presentation pursuant to U.S. Generally Accepted Accounting Principles.
[2] Excludes transfers in from other funds, receipts of debt or notes issued (including transfers from lotteries funds, among others).
[3] Sales and Use Tax revenues excludes revenues allocated to the Municipal Assistance Fund and COFIM.
[4] Includes adjustments made only for financial statement presentation purposes, that are not allocated directly to Special Revenue or General Funds.
[5] Figures do not include all component units that will become "blended component units" in the other governmental funds in fiscal year 2015, as part of a significant change in reporting entity of the Commonwealth, as required by GASB 61.

**COMMONWEALTH OF PUERTO RICO**
Governmental Funds detailed revenues [1]
Year Ended June 30, 2014
(in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Accruals & Other Adjustments [3] | Total General Fund [1] | Other Governmental Funds | Total Governmental Funds |
|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | |
| **Income Taxes:** | | | | | | |
| Individuals | $1,832,487 | - | 240,745 | $2,073,232 | - | $2,073,232 |
| Corporations | 1,914,333 | - | - | 1,914,333 | - | 1,914,333 |
| Partnerships | 745 | - | - | 745 | - | 745 |
| Withholdings from non-residents | 899,965 | 67,443 | - | 967,408 | - | 967,408 |
| Tollgate taxes | 7,140 | - | - | 7,140 | - | 7,140 |
| Interest | 4,900 | - | - | 4,900 | - | 4,900 |
| Dividends | 39,713 | 100,000 | - | 139,713 | - | 139,713 |
| Inheritance and gift taxes | 1,395 | - | - | 1,395 | - | 1,395 |
| Total income taxes | **4,700,678** | **167,443** | **240,745** | **5,108,866** | **-** | **5,108,866** |
| **Sales and Use Tax** | **645,254** | **3,240** | | **648,494** | **645,951** | **1,294,445** |
| **Excise Taxes:** | | | | | | |
| Alcoholic beverages | 266,542 | - | - | 266,542 | - | 266,542 |
| Foreign (Act 154) | 1,902,193 | - | 47,995 | 1,950,188 | - | 1,950,188 |
| Tobacco products | 171,108 | 30,744 | - | 201,852 | - | 201,852 |
| Motor vehicles | 407,943 | 20,000 | - | 427,943 | - | 427,943 |
| Horses races | 16,354 | - | - | 16,354 | - | 16,354 |
| Insurance premiums | 42,642 | - | - | 42,642 | - | 42,642 |
| Petroleum Tax | - | 265,240 | - | 265,240 | - | 265,240 |
| Gasoline & Diesel Oil Tax | - | 166,736 | - | 166,736 | - | 166,736 |
| Other excise taxes | 8,247 | 17,867 | - | 26,114 | - | 26,114 |
| Total excise taxes | **2,815,029** | **500,587** | **47,995** | **3,363,611** | **-** | **3,363,611** |
| **Property Taxes** | **58,535** | **-** | **(2,697)** | **55,838** | **-** | **55,838** |
| **Other Taxes:** | | | | | | - |
| Motor vehicles Licenses | 2,209 | 91,009 | - | 93,218 | - | 93,218 |
| Entertainment machine licenses | 22 | 193 | - | 215 | - | 215 |
| Alcoholic Beverages licenses & Other Taxes | 18,275 | 532 | - | 18,807 | - | 18,807 |
| Total other taxes | **20,506** | **91,734** | **-** | **112,240** | **-** | **112,240** |
| **Charges for Services:** | | | | | | |
| Public Health/Patient Fees | - | 135,991 | - | 135,991 | - | 135,991 |
| Charges for Service | - | 63,570 | - | 63,570 | - | 63,570 |
| Rental Fees | - | 34,449 | - | 34,449 | - | 34,449 |
| Documents Rights Fees | 35,603 | 56,874 | - | 92,477 | - | 92,477 |
| Judicial Services Fees | - | 15,936 | - | 15,936 | - | 15,936 |
| Public Housing Fees | - | 37,525 | - | 37,525 | - | 37,525 |
| Motor Vehicle Fines | - | 45,509 | - | 45,509 | - | 45,509 |
| Motor Vehicle Permits Fees | - | 36,923 | - | 36,923 | - | 36,923 |
| Professional Licenses Fees | - | 23,464 | - | 23,464 | - | 23,464 |
| Permits Fees | 9,316 | 14,882 | - | 24,198 | - | 24,198 |
| Registration Fees | 4,829 | 3,218 | - | 8,047 | - | 8,047 |
| Trademark Fees | 43,905 | 15 | - | 43,920 | - | 43,920 |
| Other Fines | 5,392 | 26,107 | - | 31,499 | - | 31,499 |
| Other Permits and Fees | 9,534 | 41,204 | - | 50,738 | - | 50,738 |
| Other | - | 50,261 | - | 50,261 | - | 50,261 |
| Total Charges for services | **108,579** | **585,928** | **-** | **694,507** | **-** | **694,507** |
| **Revenue from Global Tabaco Settlement** | **-** | **72,130** | **-** | **72,130** | | **72,130** |
| **Revenue from Component Units** | **23,673** | **107,460** | | **131,133** | **-** | **131,133** |
| **Intergovernmental Revenues** | | | | | | |
| Federal Grants & Subsidies | - | 6,067,948 | - | 6,067,948 | - | 6,067,948 |
| Offshore Rum Excise Tax | 237,159 | 82,978 | - | 320,137 | - | 320,137 |
| Municipal Property Tax | - | - | - | - | 119,289 | 119,289 |
| Other | - | 25,015 | - | 25,015 | 35,883 | 60,898 |
| Total Intergovernmental revenues | **237,159** | **6,175,941** | **-** | **6,413,100** | **155,172** | **6,568,272** |
| **Interest and Investment earnings** | **-** | **4,158** | **-** | **4,158** | **17,168** | **21,326** |
| **Other** | 116,581 | 16,804 | | 133,385 | 7,891 | 141,276 |
| **Total Revenues** | **$ 8,725,994** | **$7,725,425** | **$286,043** | **$16,737,462** | **$826,182** | **$17,563,644** |

*Sources:* The Statement of Revenues and Expenditures and Changes in Fund Balance - Governmental Funds as presented in the Commonwealth's financial statements for fiscal year 2014. Totals may not add up due to rounding.

[1] As required for presentation pursuant to U.S. Generally Accepted Accounting Principles.

[2] Excludes transfers in or from other funds, receipts of debt or notes issued (including transfers from lotteries funds, among others).

[3] Includes adjustments made only for financial statement presentation purposes, that are not allocated directly to Special Revenue Funds or the General Fund (Operating Fund).

**Income Taxes**

*Individuals*. Resident individuals are subject to tax on their taxable income from all sources. There are five tax brackets for individuals, with tax rates of 0%, 7%, 14%, 25% and 33%. The 0% tax rate is applicable if the net taxable income is $9,000 or less, and the highest income tax bracket is applicable to taxable income above $61,500.

Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at an income tax rate of 15%, in the case of distributions effected after June 30, 2014 (dividends prior to that date were taxed at 10%). Gains realized from the sale or exchange of a capital asset by resident individuals, if held for more than one year, are taxed at a rate of 15% in the case of sales or exchanges effected after June 30, 2014 (transactions prior to that date were taxed at 10% if held for more than six months).  Capital losses may only be deducted up to the lower of 80% of capital gains or $1,000.

Interest income in excess of $2,000 on deposit with Puerto Rico financial institutions is taxed at a rate of 10%, unless a lower regular tax rate applies; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, estates, corporations and partnerships qualifies for a tax rate of 10%. If said income and other income subject to preferential tax rates exceed certain levels, a higher alternate basic tax rate may apply. For taxable years commenced after December 31, 2013, individuals with income subject to alternate basic tax from $150,000 to $200,000 are subject to an alternate basic tax rate of 10%; individuals with income subject to alternate basic tax from $200,001 to $300,000 are subject to an alternate basic tax rate of 15%; and individuals with income subject to alternate basic tax in excess of $300,000 are subject to an alternate basic tax rate of 24%.

Total deduction for mortgage interest on residential property is limited to the lower of the amount of interest paid, 30% of the individual's adjusted gross income, or $35,000.

For fiscal years 2014 and 2015, the Commonwealth's individual income tax revenues (preliminary and unaudited in the case of 2015) amounted to approximately $2.073 billion and $2.540 billion, respectively.  For fiscal year 2016, without the required adjustments to present properly the data pursuant to U.S. GAAP, preliminary and unaudited figures for individual income tax revenues were $2.021 billion.

*Corporations*. Puerto Rico corporations and limited liability companies (other than those electing pass-through treatment) are subject to tax on income from all sources; foreign corporations that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation qualifies for partial exemption from corporate income and other taxes under the tax incentives programs (see "THE ECONOMY - Tax and Other Economic Development Initiatives"), it is subject to tax at graduated rates.

The maximum corporate income tax rate is 39% for net taxable income in excess of $300,000, but taking into account a surtax deduction of $25,000. The alternative minimum tax rate for corporations is 30% applied to the alternative minimum net income.

Gains realized from the sale or exchange of a capital asset, held for more than twelve months, are taxed at a maximum regular income tax rate of 20%. Capital losses may only offset 80% of capital gains. Dividends received by Puerto Rico corporations from foreign corporations are subject to the regular corporate income tax rates. A dividends received deduction of up to 100% may be available when the corporation making the distribution is organized in Puerto Rico. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations, and paid to corporations, qualifies for a special tax rate of 10%.

Resident foreign corporations are generally subject to a branch profits tax on their income effectively connected with their Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules. Act 77-2014 amended the branch profits tax provision to exclude loans and credit transactions between affiliates, except when such transactions arise from the sale of property or in the case of banking entities, from Puerto Rico assets and Puerto Rico liabilities in determining the dividend equivalent amount.

In general, corporations, and the partners of partnerships operating under a new grant of tax exemption issued under Act No. 73-2018, also known as the Economic Incentives Act, are subject to either (i) an income tax rate of 4% with a 12% withholding tax rate on royalty payments or (ii) an income tax rate of 8% with a 2% withholding tax rate on royalty payments, during their basic exemption period. Certain products that are qualified as "pioneer products" enjoy a more favorable tax treatment.

Corporations, and the partners of partnerships operating under a new grant of tax exemption issued under Act No. 74-2010, also known as the Tourism Development Act, are subject to a maximum tax rate of 39% on their taxable income that, after applying the 90% exemption granted under the Tourism Development Act, results in a maximum effective tax rate of 3.9% on their net tourism development income.

Interest from Puerto Rico sources paid by Puerto Rico resident borrowers to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid by Puerto Rico resident borrowers to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations operating under new grants of tax exemption issued under the Economic Incentives Act and Act No. 83-2010, also known as the Green Energy Incentives Act, out of income derived from their tax exempt operations are not subject to Puerto Rico income tax. However, royalty payments made by corporations that hold tax exemption grants under the Economic Incentives Act to non-resident recipients are subject to an income tax withholding of 2% or 12%, depending on certain elections made by the grantee, and in the case of corporations covered by the Green Energy Incentives Act, royalty payments to non-residents are subject to an income tax withholding of 12%.

For fiscal years 2014 and 2015, Commonwealth corporate income tax revenues (preliminary and unaudited in the case of 2015) amounted to approximately $1.914 billion and $1.852 billion, respectively. Preliminary and unaudited corporate income taxes, for fiscal year

2016, without the required adjustments to properly present pursuant to U.S. GAAP were approximately $1.647 billion.

***Non-Resident Withholding Tax***. In general, non-residents are subject to a withholding tax on royalty payments received from Puerto Rico sources. The regular withholding rate on these payments to nonresidents is 29%. However, as explained above, corporations, and the partners of partnerships operating under a grant of tax exemption issued under Act No. 74-2010, are subject during their exemption period to either (i) an income tax rate of 4% with a 12% withholding tax rate on royalty payments or (ii) an income tax rate of 8% with a 2% withholding tax rate on royalty payments. Certain products that are qualified as "pioneer products" enjoy a more favorable tax treatment.  Approximately 10% of the revenues derived from the withholding tax on royalties paid by companies operating under Act No. 74-2010 are assigned to the Economic Development Fund (the "**FEDE**"), an incentive fund administered by PRIDCO.  The revenues assigned to FEDE are recorded in a Special Revenue Fund and are used to provide economic incentive grants to private companies and to fund PRIDCO operations.

In addition to the tax on royalties, dividends paid to non-resident corporations and individuals are subject to a withholding tax of 10% and 15%, respectively, and interest paid to non-resident affiliates is subject to a withholding tax of 29%.

For fiscal year 2014, Commonwealth nonresident withholding tax revenues amounted to approximately $967 million, of which approximately $67 million were assigned to the FEDE. Preliminary and unaudited non-resident withholding tax revenue, for fiscal years 2015 and 2016, without the required adjustments to properly present pursuant to U.S. GAAP, amounted to approximately $894 million and $850 million, respectively. Amounts assigned to the FEDE for such years were $83 million and $40 million, respectively.

***Other Income Taxes***.  Revenues from other income taxes include revenues from tollgate taxes, taxes on interests and dividends and inheritance and gift taxes.  For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $154 million, $165 million and $38 million, respectively, in revenue from other income taxes.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.  Fiscal year 2014 dividend tax revenue results include $100 million from a special dividend declared by the Compulsory Insurance Joint Association (*Asociación Conjunta de Seguro Obligatorio*) that was recorded in a Special Revenue Fund of the Commonwealth.

## Sales and Use Tax

The Commonwealth's sales and use tax ("**Commonwealth SUT**" or "**SUT**") was originally imposed in 2006 pursuant to Act No. 117-2006.  The SUT in turn replaced the prior 5% (effective 6.6%) general excise tax on imported goods and the 3.6% general excise tax on goods manufactured in Puerto Rico.

The SUT is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. Certain items, such as fuel, crude oil and petroleum products and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the SUT.

The Commonwealth SUT had an original tax rate of 5.5%. Act 117-2006 also authorized each municipal government to impose a sales and use tax of 1.5% (the "**Municipal SUT**"), which generally has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth SUT. Act 18-2014 lowered the portion of the Municipal SUT allocated to the municipalities to 1.0% and allocated the other 0.5% to the Municipal Administration Fund, a fund created to provide a financial mechanism to finance the debt of the municipalities.

Pursuant to Act 91-2006, as amended ("**Act 91**"), 1% of the original Commonwealth SUT was assigned to the Puerto Rico Sales Tax Financing Corporation ("**COFINA**"). In 2009, Act 91 was amended to increase the portion of the SUT allocated to COFINA to 2.75% (one-half of the then applicable sales and use tax rate of 5.5%). The actual amount of sales taxes to be transferred to COFINA is, however, the greater of (i) a minimum fixed amount, referred to as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth SUT collected during such Fiscal Year multiplied by a fraction, the numerator of which is 2.75% and the denominator of which is 5.5%. The "Pledged Sales Tax Base Amount", which increases at a rate of 4% per year, has grown since the creation of COFINA at a rate greater than SUT collections as a whole. As a result, the percentage of SUT revenues allocated to the General Fund has decreased during past years and is likely to continue to do so, imposing substantial burdens on the General Fund until SUT collections begin to grow at a rate of more than 4% per year.

In 2013, Act No. 40-2013 eliminated various exemptions to the SUT, which broadened its base, and Act No. 46-2013 required the declaration and payment of the SUT on imported goods at the time of their entry into Puerto Rico.

On May 29, 2015, the Commonwealth enacted Act No. 72-2015 that, among other things, (i) increased the total Commonwealth SUT rate to 10.5% effective on July 1, 2015, with the net 4.5% increase being for the benefit of the General Fund, and (ii) eliminated several exemptions. Although Act 72-2015 has experienced various amendments since its original enactment, the Commonwealth SUT remains at 10.5%. There is also a special 4% SUT that is generally applicable to business-to-business services and designated professional services.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $1.294 billion, $1.439 billion and $2.377 billion, respectively, in revenue from sales and use taxes. Such collections were allocated as follows:

|  | 2014 | 2015 [2] | 2016 [2] |
|---|---|---|---|
| ($ in millions) | | | |
| General Fund | $645.3 | 619.2 | $1,559.6 |
| COFINA | 645.9 | 698.5 | 696.3 |
| Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico | 3.2 | 3.2 | 3.2 |
| Total Sales and Use tax recorded in Governmental Funds | 1,294.4 | 1,320.9 | 2,259.1 |
| Municipal Administration Fund [1] | - | 118.0 | 117.7 |
| Total Sales and Use Tax [3] | 1,294.40 | 1,438.90 | $2,376.8 |

(1) Amounts attributed to the 0.5% increase in the Commonwealth's sales and use
tax as a result of the reduction of the municipal sales and use tax from 1.5% to
1% pursuant to the provisions of Act No. 18-2014. Such amount is not included
in the governmental funds.
(2) Fiscal years 2015 and 2016 are preliminary, unaudited and subject to change.
(3) For fiscal year 2016, includes amounts collected as a result of the 4.5% surcharge
imposed on the Commonwealth's sales and use tax.

## Excise Taxes

*Act 154 Special Tax*. Act 154 was enacted to address the Commonwealth's fiscal crisis by increasing tax revenues derived and collected from the activities of foreign corporations and partnerships operating in Puerto Rico. In particular, Act 154 modified the income taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation, and imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. This excise tax, which is imposed "in lieu" of an income tax based on the "modified source income rule", affects mostly foreign corporations and partnerships that are principally engaged in the manufacturing of pharmaceuticals and other high-tech products.

Act 154 provides that, in certain circumstances, taxpayers will be deemed to be engaged in trade or business in Puerto Rico, and taxable in Puerto Rico with respect to a portion of the taxpayer's income, if the taxpayers engage in significant transactions with other persons that are members of the same controlled group. Where a person engages in significant transactions with a member of the same controlled group that has gross receipts of $75 million or more in any of the preceding three taxable years, and that manufactures or produces goods in Puerto Rico, or provides services in connection with the manufacture or production of goods in Puerto Rico, the person will not be subject to income tax, and will instead be subject to the excise tax in lieu of any income tax. The excise tax is based on the value of the personal property or services acquired.

The excise tax was originally scheduled to apply for a period of six years and was set at 4% for calendar year 2011, declining every year until reaching 1% in 2016.  Due to the continuance of the fiscal crisis Act 154 was meant to palliate, on February 28, 2013, the Commonwealth amended Act 154 to again set the excise tax at a fixed 4% and extend its application until 2017.

On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. While the Commonwealth expects that certain taxpayers subject to the excise tax will be able to credit all or a portion of the excise tax paid against their United States federal income tax liabilities, it is uncertain how this tax affects each individual taxpayer. The long-term effects of the excise tax on the manufacturing sector of the Puerto Rico economy are also uncertain.

In connection with the expansion of the taxation of foreign persons by Act 154, the Commonwealth obtained a legal opinion regarding the creditability of the excise tax for United States federal income tax purposes. The opinion concludes that the aforementioned excise tax should be creditable against United States federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax will more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein.

On March 30, 2011, the United States Internal Revenue Service ("**IRS**") issued Notice 2011-29 addressing the creditability of the excise tax imposed by Act 154. Notice 2011-29 provides that the provisions of the excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903 of the United States Internal Revenue Code of 1986, as amended. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Commonwealth's revenues may be materially adversely affected.

Upon the scheduled expiration of the Act 154 excise tax on December 31, 2017, Act 154 provides that such tax shall be replaced by the "modified source of income rule".  However, since it is unlikely that the level of tax collection under the "modified source of income rule" would be sufficient to replace the tax revenues currently received by the Commonwealth pursuant to the special temporary excise tax under Act 154, the Proposed PROMESA Fiscal Plan includes a proposal to extend the Act 154 excise tax temporarily (2-3 years) to provide the

government with sufficient time to renegotiate individual tax grants and reform its tax code such that it replaces Act 154 revenues in full during the plan's projection period.

The special temporary excise tax imposed by Act 154 has become one of the Commonwealth's principal sources of tax revenues. For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $1.950 billion, $1.920 billion and $1.876 billion, respectively, in revenue from Act 154. For fiscal years 2014, 2015 and 2016, the revenues produced by Act 154 represented approximately 21.8%, 21.8% and 20.7%, respectively, of the revenues of the Commonwealth's General Fund, in which all Act 154 revenues are deposited. In fiscal year 2016, ten companies accounted for approximately 90% of the special temporary excise tax revenues. Results for fiscal years 2015 and 2016 are preliminary and unaudited.

*Alcoholic Beverages Excise Tax*. The excise tax on alcoholic beverages fluctuates between $0.97 to $31.29 per gallon. All revenues from such excise tax are recorded in the General Fund of the Commonwealth. For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $267 million, $237 million and $265 million, respectively, in revenue from such excise tax. Results for fiscal years 2015 and 2016 are preliminary and unaudited.

*Tobacco Products Excise Tax*. The excise tax applicable to cigarettes, which has been increased multiple times in the past decade, is currently $17.00 per hundred cigarettes. The 2011 Code also imposes a tax of $1.00 per pound or fraction thereof of chewing tobacco and $3.02 per pound or fraction thereof of powdered tobacco ("snuff") or other products derived from tobacco.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $202 million, $185 million and $165 million, respectively, in revenue from the tobacco products excise tax. Results for fiscal years 2015 and 2016 are preliminary and unaudited.

A portion of the proceeds of the cigarette excise tax (approximately $30 million annually) has been assigned to HTA and MBA and pledged for the payment of HTA and MBA debt obligations. The assigned portion is recorded in a Special Revenue Fund of the Commonwealth. These revenues are being currently retained by the Commonwealth and redirected to the payment of Commonwealth essential services pursuant to the Moratorium Act and the executive orders issued thereunder.

Another portion of the proceeds of the cigarette excise tax (approximately $2.8 million annually) has been assigned to the following entities (i) the Puerto Rico School of Plastic Arts, (ii) the Puerto Rico Conservatory of Music Corporation, (iii) the Musical Arts Corporation and (iv) the repository of archives and relics of former governors, to cover their operational expenses. Such amounts are recorded in a Special Revenue Fund.

Since fiscal year 2016, a portion of the proceeds of the cigarette excise tax (approximately $36 million annually) has been assigned to the Integrated Transit Authority ("**PRITA**") to cover its operational expenses. The assigned portion is recorded in a Special Revenue Fund.

*Motor Vehicles Excise Tax*. The excise tax applicable to motor vehicles ranges from $637.50 to $9,253 plus 34% of the taxable price in Puerto Rico in excess of $44,890.

Motorcycles and all-terrain vehicles are also subject to an excise tax of 8% and 11.5%, respectively.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $428 million, $272 million and $286 million, respectively, in revenue from the motor vehicles excise tax.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.

A portion of the proceeds of the motor vehicle excise tax ($20 million annually) has been assigned to the Green Energy Fund to provide subsidies to Puerto Rico residents to cover the cost of purchasing energy-efficient materials and equipment. The assigned portion is recorded in a Special Revenue Fund.

*Excise Tax on Petroleum Products and its Derivatives*. The gross excise tax on petroleum products and its derivatives is $15.50 per barrel ($6.25 of which does not apply to diesel products).  Currently, $9.25 of such tax is assigned to HTA ($120 million of which is pledged to HTA bondholders and the rest of which serves as source of repayment for HTA's outstanding loans with GDB) and $6.25 of the tax is currently assigned to PRIFA. (If certain conditions are satisfied, $3.25 of the excise tax assigned to HTA would be transferred to PRIFA, but the Commonwealth does not currently expect these conditions to be satisfied in the near future.) This tax is subject to adjustment based on consumption and inflation every four years.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $265 million, $275 million and $398 million, respectively, in revenue from this excise tax.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.  This tax is recorded in Special Revenue Funds and transferred to HTA and PRIFA.  These revenues are being currently retained by the Commonwealth and redirected to the payment of the Commonwealth essential services pursuant to the Moratorium Act and the Executive Orders thereunder.

*Gasoline, Gas Oil and Diesel Oil Excise Tax*. The gasoline excise tax, set at $0.16 per gallon, and the tax on gas oil and diesel oil, which is now $0.04 per gallon, are recorded in Special Revenue Funds, and are currently assigned to HTA and pledged as collateral to HTA obligations.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $167 million, $155 million and $168 million, respectively, in revenue from this excise tax.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.

These revenues are being currently retained by the Commonwealth and redirected to the payment of Commonwealth essential services pursuant to the Moratorium Act and the Executive Orders thereunder. The assigned portion is recorded in a Special Revenue Fund.

*Horse Races, Insurance Premiums and Other Excise Tax Revenues*. For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $85 million, $121 million and $102 million, respectively, in revenue from these other excise taxes (including those applicable to sugar and coffee). Results for fiscal years 2015 and 2016 are preliminary and unaudited.

The excise tax applicable to sugar and coffee is assigned by law to the Integral Fund for the Development of Agriculture ("**FIDA**") administered by the Puerto Rico Land Authority. Such revenues are pledged to FIDA obligations with GDB.

## Property Taxes

Most real property taxes are either collected for the benefit of the municipalities or deposited in the Redemption Fund (which is not part of the General Fund) and used to pay debt service on Commonwealth General Obligations, and are therefore not accounted for in the General Fund under this category. This category includes only an additional real property tax on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax applied during fiscal years 2010, 2011 and 2012 and generated significant revenues for the General Fund (Operating Fund) for such years. The additional real property tax, which was collected by the Treasury Department, amounted to 0.591% of such properties' appraised value as determined by the CRIM.  The 2011 Code eliminated this additional real property tax for fiscal year 2012. However, some residual collections relating to the 2010-2012 fiscal years continue to be received.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $56 million, $22 million and $11 million, respectively, in revenue from this additional real property tax.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.

## Other Taxes

Other taxes primarily consist of annual motor vehicle license fees imposed under the Vehicle and Traffic Law, and alcoholic beverage and entertainment machine license fees.

Revenues from motor vehicle license fees are recorded in a Special Revenue Fund, assigned to HTA and pledged to secure HTA bonds and other obligations. A significant portion of the alcoholic beverage and entertainment machine license fees and other license fees are also recorded in Special Revenue Funds.

For fiscal year 2014, 2015 and 2016, revenues from other taxes amounted to approximately $112 million, $114 million and $158 million, respectively, of which approximately $93 million, $92 million and $95 million, respectively, were motor vehicle license fees assigned to HTA.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.

## Charges for Services

Charges for services include the fee and other revenue described below, which amounted to approximately $695 million, $685 million and $679 million for fiscal years 2014, 2015 and 2016, respectively (fiscal year 2015 and 2016 results are preliminary and unaudited). Approximately $586 million, $565 million and $592 million of such revenues were accounted for in Special Revenue Funds during such years, with the balance accounted for in the General Fund (Operating Fund).  Collections from charges for services are deposited in the TSA.

The most important of these charges for services are described below.

*Public Health / Patient Fees*. The Department of Health owns three hospitals in Puerto Rico located in San Juan and Bayamon, Puerto Rico. The Department of Health is authorized to bill for medical services rendered in these medical facilities. While the revenues earned are used exclusively for the operation of the medical facilities, appropriations from the General Fund are nevertheless still required to cover a significant amount of operating expenses. All the revenues earned from these fees are recorded in a Special Revenue Fund.

*Judicial Service Fees*. The Judicial Branch of the Commonwealth is authorized by law to charge fees related to the Puerto Rico court system.  Such revenues are to be used exclusively by the Judicial Branch of the Government.  All collections are recorded in a Special Revenue Fund.

*Charges for Services*. Commonwealth agencies are authorized by law to charge for certain services provided by them.  Such revenues are allocated to cover expenditures of the agencies that provided such services.  A portion of such revenues is accounted in a Special Revenue Fund.

*Document Rights Fees*. Commonwealth agencies are authorized by law to charge a fee for certified documents or other official government documents, such as birth certificates and certificates of good outstanding.  Most of the collections from these documents fees are recorded in a Special Revenue Fund and are available for use by such agencies.

*Motor Vehicle Fines*. Motor vehicle fines are currently assigned to HTA for the funding of the Urban Train and are pledged for the payment of HTA obligations due to GDB. Act No. 1-2015 provides that in the event the operation of the Urban Train is transferred to PRITA, such revenues will be assigned to PRITA.  Such revenues of the Commonwealth are recorded in a Special Revenue Fund.

*Motor Vehicles Permits Fees*. The Vehicle and Traffic Law requires that the motor vehicles registration fees collected be used only for the operation of the centers for driving services (known as "CESCOS" for their acronym in Spanish), which are administered by the Department of Transportation and Public Works.  All revenues earned from motor vehicle registration fees are recorded in a Special Revenue Fund.

*Other*.  Other charges include professional license fees, trademark fees, rental fees, public housing fees and other permit, fine and registration fees.  Most collections from such fees are recorded in a Special Revenue Fund of the Commonwealth.

## Revenue from Global Tobacco Settlement

The Commonwealth assigned and transferred to the Children's Trust, a public corporation treated as a "blended component unit" of the Commonwealth for purposes of the Commonwealth's financial statements, all of its rights and interest in a settlement agreement entered into by and among the Commonwealth, forty-six states and several cigarette manufacturers (usually referred to as the Global Tobacco Settlement Agreement), including the Commonwealth's right to receive certain annual payments from such cigarette manufacturers. All such revenues are assigned to the Children's Trust Fund and pledged to the repayment of bonds issued by the Children Trust and are recorded in a Special Revenue Fund.

**Revenue from Component Units**

This category includes primarily transfers from the State Insurance Fund, the Tourism Company and the Puerto Rico Automobile Accidents Compensation Administration. Such revenue amounted to approximately to $131 million, $199 million (of which $193 million were recorded in the General Fund) and $221 million for fiscal years 2014, 2015 and 2016, respectively. Results for fiscal years 2015 and 2016 are preliminary and unaudited.

The transfers from the Tourism Company are related to the allocation to the General Fund (Operating Fund) of the casino slot machine revenues. The transfers from other component units recorded in the Special Revenue Funds are related to dividends declared by such component units and amounts required by special laws to be contributed to finance certain programs of the Commonwealth.

**Intergovernmental Revenues**

***Custom Duties and Offshore Rum Excise Tax***. Intergovernmental revenues include customs duties collected in Puerto Rico and excise taxes on shipments of rum from Puerto Rico to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently $13.50 per gallon. Of this amount, the lesser of $10.50 per proof gallon and the actual excise tax imposed is currently returned or "covered over" to the Commonwealth. Since 1999, however, the United States Congress has enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth to $13.25 per proof gallon.

Puerto Rico distributes revenues from the excise tax on shipments of rum among various governmental entities and private rum producers. In addition, revenues from the excise are distributed among (i) the Puerto Rico Conservation Trust Fund (the "**Conservation Trust**"), a Puerto Rico charitable trust charged with protecting Puerto Rico's natural resources, which receives each fiscal year an amount equal to approximately 45 cents per proof gallon of rum; (ii) the Puerto Rico Science, Research and Technology Trust Fund (the "**Science Trust**"), a government-sponsored trust created by Act No. 214-2004 to set and implement the public policy of the Commonwealth for technological and scientific research and development, which receives $5 million in excise tax revenues each fiscal year; and (iii) PRIDCO, for the benefit of the "Rums of Puerto Rico" incentive program, which receives up to $10 million each fiscal year.

Finally, up to 46% of the revenues from the excise tax corresponding to the rum sales of certain rum producers is transferred to such rum producers pursuant to certain incentive agreements signed with the Commonwealth. This incentive program was created in direct response to the fact that in 2008, the Government of the U.S. Virgin Islands signed an agreement with Diageo USVI, Inc. ("**Diageo**") for the construction and operation of a new rum distillery in St Croix, U.S. Virgin Islands, that would manufacture Captain Morgan branded products, which prior to 2012 were procured through a supply contract with the Serrallés distillery in Puerto Rico. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serrallés and Diageo, after 2011 the income received

98

by the Commonwealth from the federal excise tax on rum shipments has materially decreased as Serrallés has not landed other bulk rum clients sufficient to make up the entirety of the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to support the local rum industry as a result of the threat posed by the U.S. Virgin Islands' agreement with Diageo, and to protect the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, Act No. 178-2010 increased from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to, and promote, the Puerto Rican rum industry. The law also authorized the Governor to increase this percentage up to 46% through Executive Order. Such Executive Order was issued and the percentage limit was increased to 46% effective July 1, 2012. As contemplated by Act 178-2010 (now incorporated into Act No. 1-2011), the Commonwealth has entered into definitive agreements with the three main Puerto Rico rum producers.  These agreements give the rum producers the right to receive 46% of the monies from the excise tax corresponding to the rum sales of each such rum producer. Furthermore, in May 2015, the Government agreed to deposit the moneys received from the federal rum excise taxes on a segregated lockbox account of the Secretary of the Treasury with a private commercial bank from which such funds would be distributed by the bank to the Government and to the rum producers in accordance with their respective incentives contracts. Such arrangement remains subject to the constitutional priority for payment of the Commonwealth's public debt. Prior to this arrangement, federal rum excise taxes were deposited in the TSA and Treasury forwarded to PRIDCO the amounts necessary to pay the incentives due to the rum producers.

For fiscal year 2014, the Commonwealth received approximately $320 million from the federal excise tax on rum shipments from Puerto Rico. As a result of Act 178-2010 and the previous assignments of the excise tax on rum shipments assigned to public corporations and/or private rum producers, the amount recorded in the General Fund was $237 million.  Such amount includes the first $117 million assigned to PRIFA, of which $113 million are assigned to the payment of PRIFA bonds and $4 million are assigned for PRIFA's operations.  The remaining amounts were recorded in a Special Revenue Fund.

For fiscal years 2015 and 2016, the preliminary and unaudited results of revenues from the federal excise tax on rum shipments were approximately $329 million and $330 million, respectively.  The amount allocated to the General Fund, including the first $117 million assigned to PRIFA, amounted to approximately $189 million and $200 million, respectively. The remaining amounts were recorded in a Special Revenue Fund.

***Federal Grants and Subsidies***.  The Commonwealth is the beneficiary of numerous federal programs, which provide funding for essential government services provided by the Puerto Rican government.  For example, federal funds from Medicaid and the Affordable Care Act comprise the majority of the funding for the Commonwealth's health insurance program. Furthermore, a material portion of the expenditures of Puerto Rico's Department of Education is financed through Federal funds, primarily funding from Title I of the Federal Elementary and Secondary Education Act.  The Commonwealth also receives approximately $2 billion annually in federal funds to finance its Nutritional Assistance Program, which provides a monthly benefit for food to low-income households.

The following table presents revenues from federal grants by program areas for fiscal years 2011 to 2015:

## Federal Grants and Subsidies
### (in thousands)

|  | 2011[1] | 2012[1] | 2013[1] | 2014[1] | 2015[1][2] |
|---|---|---|---|---|---|
| Welfare | $ 2,733,526 | $ 2,693,445 | $ 2,613,142 | $ 2,517,066 | $ 2,441,709 |
| Education | 1,367,398 | 1,266,315 | 1,340,892 | 1,390,365 | 1,067,859 |
| Health | 894,738 | 1,572,620 | 1,506,896 | 1,598,343 | 2,036,079 |
| Housing | 478,120 | 475,494 | 435,806 | 386,386 | 408,175 |
| Public Safety and Protection | 46,128 | 82,848 | 73,241 | 73,158 | 57,866 |
| Other | 10,331 | 126,413 | 152,370 | 60,952 | 5,417 |
| Contributions to Municipalities | 78,504 | 58,084 | 68,821 | 40,619 | 41,981 |
| Economic Development | 10,070 | 83,814 | 8,122 | 1,059 | 1,561 |
| TOTAL | $5,618,815 | $6,359,033 | $6,199,290 | $6,067,948 | $6,060,647 |

(1) Amounts do not include rum taxes of $384 million, $275 million, $303 million, $345 million, and $329 million for fiscal years 2011, 2012, 2013, 2014, and 2015 respectively. They are reported as intergovernmental revenue in the fund financial statements.
(2) FY 2015 figures are preliminary, unaudited and subject to change.

Federal grants and subsidies are all accounted for in Special Revenue Funds of the Commonwealth and deposited and disbursed from the Commonwealth TSA.

***Municipal Real Property Tax***. Real property taxes are assessed based on fiscal year 1957-1958 property values. No real property reassessment has been made since fiscal year 1957-1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in fiscal year 1957-1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available. Personal property taxes, which accounts for approximately 46% of total collections of taxable property, are self-assessed.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("**CRIM**"). However, 1.03% of the property tax based on the assessed value of all property (other than exempted property) is assigned by law for the payment of the Commonwealth's general obligations and directed to be deposited in the Commonwealth's Debt Service Fund (which is not part of the General Fund). This 1.03% of property tax recorded in the Other Governmental Funds amounted to approximately $119 million, $72 million and $103 million for fiscal years 2014, 2015 and 2016, respectively (fiscal year 2015 and 2016 results are preliminary and unaudited).

*Other Intergovernmental Revenues*.   Other intergovernmental revenues consist of certain funds collected by the Commonwealth and its Blended Component Units (primarily PRIFA).

### Interest and Investment Earnings

This item consists primarily of interest, dividends and other distributions on investments held by the Commonwealth and its Blended Component Units.

### Other

For fiscal year 2014, other revenues amounted to $141 million (including $133 million recorded in the General Fund, of which approximately $17 million were recorded in Special Revenue Funds.  For fiscal years 2015 and 2016, preliminary and unaudited other revenues, prior to adjustments required by U.S. GAAP, amounted to $176 million (including $170 million from the General Fund, of which approximately $76 million were recorded in Special Revenues Funds) and $84 million (including $70 million from the General Fund, of which approximately $21 million were recorded in Special Revenue Funds), respectively.

### Certain Taxes Collected by Other Commonwealth Instrumentalities

The following tax revenues are collected directly by certain Commonwealth instrumentalities and are recorded as revenue by them.  Such amounts are not included as revenues in the Governmental Funds unless such instrumentalities transfer such funds to the Commonwealth, in which case such amounts would be recorded as "Intergovernmental Revenues."

### Hotel Occupancy Tax

Article 24 of Act No. 272-2003, as amended, imposes a hotel occupancy tax, collected directly by the Puerto Rico Tourism Company, on all hotels and motel accommodations on the Commonwealth. A portion of the proceeds of this tax has been assigned to the Convention Center District Authority and pledged for payment of the Convention Center District Authority's bonds. The Convention Center District Authority's allocated revenues have been retained by the Tourism Company in accordance with the Moratorium Act and the related Executive Orders.

### Property Tax

As discussed above, except for the 1.03% real property tax collected by CRIM and assigned by law to the Commonwealth for the payment of Commonwealth General Obligations, real property taxes are collected for the benefit of the municipalities and serve as source of repayment for municipal debt obligations.

### Municipal Sales and Use Tax

The Municipal Sales and Use Tax, like the Commonwealth SUT, is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Municipal Sales and Use Tax is imposed at a rate of 1% of the amount of the covered transaction.

**Aviation Fuel Tax**

Act 82-1959, as amended, empowers the Puerto Rico Ports Authority to levy and collect a fee from importers of aviation fuel. This fee is currently two cents per gallon of aviation fuel supplied to airlines and other suppliers.

## Expenditures

Puerto Rico's central government has primary responsibility for governmental functions and services on the island, including health, education, safety, public housing, welfare and economic development. Certain functions and services that, in the United States are typically the responsibility of regional or local governments, such as providing primary and secondary public education, police and fire protection, are provided in Puerto Rico primarily at the level of the central government.

The following table shows the Commonwealth Expenditures as reported in its Governmental Funds under U.S. GAAP for fiscal year 2014:

COMMONWEALTH OF PUERTO RICO
Governmental Funds Expenditures
Year Ended June 30, 2014
($ in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Total General Fund [1] | Other Governmental Funds [2] | Total Governmental Funds [3] |
|---|---|---|---|---|---|
| General government | $ 1,281,494 | $ (114,822) | $ 1,166,672 | $ 154,422 | $ 1,321,094 |
| Public Safety | 1,979,809 | 179,200 | 2,159,009 | 723 | 2,159,732 |
| Health | 1,319,724 | 1,718,203 | 3,037,927 | 3,948 | 3,041,875 |
| Public Housing and Welfare | 430,407 | 2,983,122 | 3,413,529 | 17,124 | 3,430,653 |
| Education | 3,382,133 | 1,213,181 | 4,595,314 | 1,856 | 4,597,170 |
| Economic Development | 407,220 | 829,397 | 1,236,617 | 40,132 | 1,276,749 |
| Intergovernmental | 364,763 | 2,137 | 366,900 | 4,658 | 371,558 |
| Capital Outlays | - | 95,736 | 95,736 | 102,615 | 198,351 |
| Debt Service | 737,639 | 1,462,831 | 2,200,470 | 2,770,312 | 4,970,782 |
| Total Expenditures | $ 9,903,189 | $ 8,368,985 | $ 18,272,174 | $ 3,095,790 | $ 21,367,964 |

Source: The "Statement of Revenues and Expenditures, and changes in Fund Balance - Governmental Funds as presented in the Commonwealth's Basic Financial Statements for fiscal year 2014. Totals may not add up due to rounding.

[1]   As required under U.S. GAAP. Total General Funds expenditures are the sum of the General Fund (Operating Fund) expenditures that are presented on a budgetary accounting basis, and the Special Revenue Funds expenditures that are presented on a modified accrual basis of accounting and include adjustments to the expenditures presented in the General Fund (Operating Fund) such as reclassifications between expenditures and other financing sources and uses in order to comply with the modified accrual basis of accounting.

[2]   Other Governmental Funds includes the Commonwealth Debt Service Fund, COFINA, the Commonwealth Capital Project Fund and all other blended component units (such as PBA and PRIFA, among others).

[3]   Includes approximately $83 million in unpaid Additional Uniform Contribution.

The following table shows the Commonwealth preliminary and unaudited expenditures as reported in its Governmental Funds under U.S. GAAP for fiscal year 2015 (unaudited, preliminary and subject to change):

**COMMONWEALTH OF PUERTO RICO**
Governmental Funds Expenditures
Year Ended June 30, 2015 [4]
($ in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Total General Fund [1] | Other Governmental Funds [2] | Total Governmental Funds [3] [5] [6] |
|---|---|---|---|---|---|
| General government | $ 1,198,416 | $ 57,159 | $ 1,255,575 | $ 196,019 | $ 1,451,594 |
| Public Safety | 1,832,188 | 415,977 | 2,248,165 | - | 2,248,165 |
| Health | 1,277,785 | 1,792,499 | 3,070,284 | 109 | 3,070,393 |
| Public Housing and Welfare | 409,490 | 2,976,862 | 3,386,352 | 112,370 | 3,498,722 |
| Education | 3,297,440 | 1,388,688 | 4,686,128 | 1,386 | 4,687,514 |
| Economic Development | 355,164 | 491,094 | 846,258 | 230,900 | 1,077,158 |
| Intergovernmental | 365,850 | 34,804 | 400,654 | 62 | 400,716 |
| Capital Outlays | - | 99,963 | 99,963 | 113,503 | 213,466 |
| Debt Service | 742,718 | 1,216,589 | 1,959,307 | 2,275,590 | 4,234,897 |
| Total Expenditures | $ 9,479,051 | $ 8,473,635 | $ 17,952,686 | $ 2,929,939 | $ 20,882,625 |

Totals may not add up due to rounding.

[1]   As required under U.S. GAAP. Total General Funds expenditures are the sum of the General Fund (Operating Fund) expenditures that are presented on a budgetary accounting basis, and the Special Revenue Funds expenditures that are presented on a modified accrual basis of accounting and include adjustments to the expenditures presented in the General Fund (Operating Fund) such as reclassifications between expenditures and other financing sources and uses in order to comply with the modified accrual basis of accounting.

[2]   Other Governmental Funds includes the Commonwealth Debt Service Fund, COFINA, the Commonwealth Capital Project Fund and all others blended component units (such as PBA, PRIFA, among others).

[3]   The fiscal year 2015 figures do not include a significant change in reporting of the Commonwealth as required by GASB 61.

[4]   The fiscal year 2015 figures are preliminary, unaudited and subject to change.

[5]   Includes approximately $200 million in impairment charge for deposits in GDB.

[6]   Includes approximately $83 million in unpaid Additional Uniform Contribution.

The following table shows the Commonwealth preliminary and unaudited expenditures as reported in its Governmental Funds under U.S. GAAP for fiscal year 2016 (unaudited, preliminary and subject to change):

103

**COMMONWEALTH OF PUERTO RICO**
Governmental Funds Expenditures
Year Ended June 30, 2016 [4] [5]
($ in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Total General Fund [1] | Other Governmental Funds [2] | Total Governmental Funds [3] [4] [5] |
|---|---|---|---|---|---|
| General government | $  1,399,305 | $   161,257 | $ 1,560,562 | $  167,431 | $   1,727,993 |
| Public Safety | 1,741,456 | 467,434 | 2,208,890 | - | 2,208,890 |
| Health | 1,254,463 | 1,731,498 | 2,985,961 | | 2,985,961 |
| Public Housing and Welfare | 397,555 | 3,119,215 | 3,516,770 | 4,415 | 3,521,185 |
| Education | 2,963,738 | 1,634,655 | 4,598,393 | 21,894 | 4,620,287 |
| Economic Development | 163,522 | 812,609 | 976,131 | 306,803 | 1,282,934 |
| Intergovernmental | 360,600 | 69,896 | 430,496 | - | 430,496 |
| Capital Outlays | - | 67,015 | 67,015 | 43,865 | 110,880 |
| Debt Service | 1,011,506 | 533,769 | 1,545,275 | 2,436,099 | 3,981,374 |
| Total Expenditures | $ 9,292,145 | $ 8,597,348 | $ 17,889,493 | $ 2,980,507 | $ 20,870,000 |

Totals may not add up due to rounding.

[1]   As required under U.S. GAAP. Total General Funds expenditures are the sum of the General Fund (Operating Fund) expenditures that are presented on a budgetary accounting basis, and the Special Revenue Funds expenditures that are presented on a modified accrual basis of accounting and include adjustments to the expenditures presented in the General Fund (Operating Fund) such as reclassifications between expenditures and other financing sources and uses in order to comply with the modified accrual basis of accounting.

[2]   Other Governmental Funds includes the Commonwealth Debt Service Fund, COFINA, the Commonwealth Capital Project Fund and all others blended component units (such as PBA, PRIFA, among others)

[3]   The fiscal year 2016 figures do not include a significant change in reporting of the Commonwealth as required by GASB 61.

[4]   The fiscal year 2016 2016 figures are preliminary, unaudited and subject to change. Results for fiscal year 2016 do not account for the results of operations of various component units, such as ASES and GDB, which have historically been presented as "Discretely Presented Component Units" in the Basic Financial Statements but that may, as part of the fiscal year 2016 audit, be recharacterized as "Blended Component Units" and thus incorporated into the Governmental Fund financial statements. The fiscal year 2016 deficit also includes an impairment charge on the Commonwealth of approximately $490 million, reflected in the "Operational General Fund," to account for the impairment of amounts on deposit in GDB, and $163 million of clawback revenues retained by the Commonwealth and used for the payment of its General Obligations Bonds. The Special Revenue Funds include a charge of approximately $120 million in unpaid Additional Uniform Contributions to the ERS. As required by U.S. GAAP, the deficit includes, among other things, paid and unpaid debt service on General Obligations bonds and certain Commonwealth Guaranteed debt, as well as paid and unpaid debt service from governmental funds that was due during fiscal year 2016.

[5]   The fiscal year 2016 figures include certain assumptions and projections, based on historical trends and preliminary information, therefore preliminary figures may significantly differ from actual results.

The preliminary expenditures for fiscal year 2016 are preliminary, unaudited and subject to change.  The results for fiscal year 2016 includes certain assumptions such as projections of accounts payable, income tax refunds, amounts due to component units, recognition of unpaid debt service, and projection of debt service payable to GDB. They also include assumptions related to expenditures of blended component units based on preliminary information provided by such component units. Hence, these preliminary results may significantly differ from actual results.

The Commonwealth government also provides substantial financial support to certain public corporations that, although legally separate from the Commonwealth, provide essential government services.  Such support is provided through annual legislative appropriations or through the assignment of revenues by law to such public corporations of dedicated tax or other revenue streams (recorded in Special Revenue Funds). For example, the central government

provides significant annual appropriations, set by formula, to the University of Puerto Rico, the Commonwealth's primary institution of higher learning. Other public corporations for which the Commonwealth government provides the majority of the funding (excluding federal funds) include (i) the Health Insurance Administration (which provides comprehensive health insurance coverage to qualifying Puerto Rico residents), (ii) the Puerto Rico Medical Services Administration (which operates and administers the Puerto Rico Medical Center), (iii) HTA (which is responsible for highway construction, operation and maintenance in Puerto Rico), (iv) MBA (which provides public transportation to passengers within the San Juan Metropolitan Area) and (v) the Maritime Transportation Authority (which operates the maritime transportation services between the municipalities of San Juan, Cataño, Fajardo, Vieques and Culebra).

Commonwealth appropriations, in the form of lease payments, are also the principal source of funding for entities such as PBA, which constructs, purchases or leases office, school, health, correctional and other facilities for lease to departments, agencies, public corporations and other instrumentalities of the Commonwealth. Commonwealth tax revenues are also the principal source of funding for certain public corporations dedicated to infrastructure development (such as PRIFA) as well as economic and tourism promotion (such as the PRTC and the PRCCDA). For a more detailed description of the Commonwealth's public corporations and the subsidies they receive, see "PUBLIC CORPORATIONS."

Moreover, the central government provides significant annual appropriations set by formula to the municipalities. Such subsidies are a material portion of municipal resources and in fact constitute a majority of the revenues of a substantial amount of Puerto Rico's 78 municipalities.

Most of the Commonwealth's operating expenditures are authorized in the General Fund budget through appropriations approved annually by the Puerto Rico Legislature. Certain appropriations, such as those of the University of Puerto Rico, the municipalities and the Judicial Branch, are set by formula (although such formulas are currently frozen pursuant to Act No. 66-2014). In the case of the Judicial Branch, such formula is equal to 4% of the average annual revenue from internal sources for each of the two preceding fiscal years, provided that the appropriation for any fiscal year cannot be lower than the previous fiscal year. The Commonwealth also accounts for expenditures through its myriad Special Revenue Funds, which operate outside the General Fund budgetary approval process.

**General Fund Budget (Commonwealth Operating Fund)**

The Commonwealth's budget is adopted in accordance with a statutory basis of accounting, which is not in accordance with U.S. GAAP. Revenue is generally recognized when cash is received. Income tax revenues are reduced for an estimated amount of income tax refunds. Short-term and long-term borrowings may be used to finance budgetary excess of expenditures over revenue.

Expenditures are generally recorded when the related expenditure is incurred or encumbered. Encumbrances generally lapse the year the end of the fiscal year when the encumbrance was established, as established by Act No. 123-2001. Amounts required for settling claims and judgments against the Commonwealth and certain other liabilities are not recognized until they are encumbered or otherwise processed for payment. Under statutory basis

105

of accounting, the Commonwealth uses encumbrance accounting to record the full amount of purchase orders, contracts and other commitments of appropriated resources as deductions from the appropriation prior to actual expenditure.

The General Fund Budget excludes all revenues and expenditures recorded in the Special Revenue Funds of the Commonwealth.  If the Commonwealth decided to include all revenues and expenditures in the General Fund Budget, legislation would be required to amend a considerable amount of legislation that currently governs the assignment of revenues of the Commonwealth, redirecting them for special purposes or pledging them to support public corporations.

**Office of Management and Budget**

OMB's primary role is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies and procedures, assesses competing funding demands among agencies and sets funding priorities.

In addition, OMB oversees and coordinates the administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

**Budgetary Process**

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislative Assembly an annual balanced budget of total resources, capital improvements, and operating expenditures of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Treasury Department, and other government offices and agencies including FAFAA, which, pursuant to Commonwealth law, has to validate the Commonwealth's revenue projections prior to such revenue projections being submitted to the Legislative Assembly as part of the Commonwealth's budget. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total resources estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

There are material differences in basis of accounting, entity, and perspective between "budgetary" reporting and U.S. GAAP.  For an overview of such differences, see "COMMONWEALTH FINANCIAL REPORTING AND FINANCIAL RESULTS FOR FISCAL YEARS 2010 THROUGH 2016."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted and (ii) legislative measures proposed by the Governor and

submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board. As required by Commonwealth law, FAFAA, or an independent consultant selected by FAFAA, has to validate the revenue projections of the Commonwealth prior to such revenue projections being submitted to the Legislative Assembly as part of the budget.

The General Fund Budget generally consists of (i) General Fund appropriations for recurring ordinary operating expenditures of the central government and of the Legislative Assembly ("**Ordinary Expenditures**") and (ii) General Fund appropriations for special operating expenditures, for contributions to municipalities, the University of Puerto Rico and the Judicial Branch and for capital expenditures ("**Special Appropriations**"). Each of these types of expenditures is approved annually in separate Joint Resolutions of the Legislative Assembly. As a general matter, appropriations for Ordinary Appropriations have a one-year life. Appropriations for Special Appropriations have a three-year life. Appropriations from Special Revenue Funds and appropriations for capital expenditures financed by bonds generally do not require annual legislative action and are authorized by separate legislation.

The Legislative Assembly may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes or identifying additional resources to cover such deficit. Upon passage by the Legislative Assembly, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislative Assembly with the Governor's objections. The Legislative Assembly, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the commencement of a fiscal year, the budget for such fiscal year shall be the annual budget for the preceding fiscal year as originally approved by the Legislative Assembly and the Governor until a new budget is approved. This permits the Commonwealth to continue making payments of its operating and other expenditures until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes have historically been prepared by the Treasury Department, except for estimates of federal grants, which have been prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised during the fiscal year. Prior to PROMESA, fiscal control over expenditures was exercised exclusively by the Governor, through the Director of OMB, and the Secretary of the Treasury. For the impact of PROMESA on such fiscal controls, see "Impact of PROMESA" below and "PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT."

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislative Assembly a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislative Assembly for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established

by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes. Notwithstanding the foregoing, under section 201(e) of the Moratorium Act, the Governor may reprioritize services and expenses described in the "third" category of the prior sentence to a higher payment priority.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "**Budgetary Fund**"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. An amount equal to one percent of the General Fund revenues of the preceding fiscal year is required to be deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. During the last several fiscal years, the Legislative Assembly has approved joint resolutions to suspend temporarily the deposit of funds into the Budgetary Fund. As of June 30, 2016, the balance in the Budgetary Fund was $14 million.

Act No. 91-1966 ("**Act 91**"), as amended, created the Emergency Fund (the "**Emergency Fund**") to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. Act 91 originally contemplated that the Emergency Fund would be capitalized annually with an amount totaling no less than one percent of General Fund revenues of the preceding fiscal year. Act 91 was amended in 2003 to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. Act 91 was further amended in 2005 to authorize the disbursement of funds from the Emergency Fund to cover certain General Fund expenditures and operational costs of the State Emergency Management Agency and authorized GDB to lend to the Commonwealth up to $150 million to replenish the Emergency Fund to provide funding for emergency and disaster needs. In 2016, Act 91 was further amended to assign, provisionally, $20 million to the Emergency Fund during fiscal year 2017 and to provide that starting with fiscal year 2018 the fund will be funded by 0.5% of the net revenue estimate for the General Fund, as provided by the Treasury Department. As of June 30, 2016, the Emergency Fund had a balance of $308,000.

**Impact of PROMESA**

The enactment of PROMESA has significantly altered the budgetary approval process for the Commonwealth and any Commonwealth instrumentality designated as a covered territorial instrumentality by the Oversight Board. Upon the appointment of all members of the Oversight Board on August 31, 2016, the development and approval of the Commonwealth budget and any covered instrumentality budget is subject to the framework outlined in PROMESA. All Commonwealth budgets and covered territorial instrumentality budgets must be developed in

accordance with the applicable fiscal plan developed pursuant to PROMESA, and no such budget will be effective until it is certified by the Oversight Board as compliant with such fiscal plan. On September 30, 2016, the Oversight Board designated all of the public corporations of the Commonwealth as covered territorial instrumentalities. PROMESA has also imposed additional fiscal controls on the Commonwealth and grants the Oversight Board broad powers to monitor and control expenses and make subsequent adjustments to budgets that were previously certified as compliant by the Oversight Board.

PROMESA requires the Oversight Board to submit to the Governor and the Legislative Assembly a notice delineating a schedule for the development, submission, approval and certification of proposed budgets. Such budget schedule will be applicable for a period of fiscal years as determined by the Oversight Board in its sole discretion but in any case for a period of not less than one fiscal year following the fiscal year in which the notice is delivered. The Oversight Board is required to consult with the Governor and the Legislative Assembly in establishing a budget schedule. However, the Oversight Board retains sole discretion to set or, by delivery of a subsequent notice to the Governor and the Legislative Assembly, change the dates of the budget schedule as it deems appropriate and reasonably feasible. PROMESA further requires the Oversight Board to submit to the Governor and the Legislative Assembly a revenue forecast for the periods covered by the proposed budgets for use by the Governor in developing such budgets.

PROMESA provides the following process for the development and approval of the Commonwealth budget. A similar process applies to the budgets of covered instrumentalities, except that the Legislative Assembly is not involved in the process unless under Puerto Rico law such instrumentality's budget is subject to legislative approval.

- **Commonwealth Budgets Developed by the Governor**. If the Oversight Board determines in its sole discretion that a proposed Commonwealth budget developed by the Governor is compliant with the applicable fiscal plan, then the Oversight Board may submit such budget to the Legislative Assembly for approval. If the proposed Commonwealth budget is found to be non-compliant, Section 202(c)(1) of PROMESA requires the Oversight Board to provide to the Governor (i) a "notice of violation" that includes recommendations to correct any deficiencies and (ii) an opportunity to correct any deficiencies, provided such opportunity is allowed pursuant to the budget schedule approved by the Oversight Board. Should the Governor fail to submit a compliant Commonwealth budget within the time specified by the budget schedule, PROMESA authorizes the Oversight Board to develop and submit to the Governor and the Legislative Assembly a compliant budget.

- **Commonwealth Budgets Adopted by Legislative Assembly.** PROMESA directs the Legislative Assembly to submit to the Oversight Board the Commonwealth budget it approves. If the Legislative Assembly's approved budget is found to be non-compliant, Section 202(d)(1) of PROMESA requires the Oversight Board to provide to the Legislative Assembly (i) a "notice of violation" that includes recommendations to correct any deficiencies and (ii) an opportunity to correct any deficiencies, provided such opportunity is allowed pursuant to the budget schedule approved by the Oversight Board. The Legislative Assembly may submit as many revised budgets as the budget schedule allows. Should the Legislative Assembly fail to submit a compliant budget, PROMESA

authorizes the Oversight Board to develop and submit to the Governor and the Legislative Assembly a revised compliant budget.

- **Certification of Budgets as Compliant.** Pursuant to Section 202(e) of PROMESA, if the Governor and the Legislative Assembly approve a Commonwealth budget that is compliant with the applicable fiscal plan, then the Oversight Board shall issue a compliance certification.  If the Governor and the Legislative Assembly fail to develop and approve a compliant budget, Section 202(e) of PROMESA authorizes the Oversight Board to develop and submit a compliant budget and such budget would be deemed approved by the Governor and the Legislative Assembly and will be in full force and effect on the first day of the applicable fiscal year.

- **Joint Development of Budgets**.  Section 202(f) of PROMESA authorizes the Oversight Board, the Governor and the Legislative Assembly to work collaboratively to develop a Commonwealth budget that meets the requirements of PROMESA.

Section 203 of PROMESA describes the Oversight Board's ongoing oversight responsibilities with respect to, and the consequences of a finding of non-compliance with, the certified Commonwealth budget:

- **Quarterly Reports.**  Pursuant to Section 203(a) of PROMESA, the Governor must submit a report to the Oversight Board no later than 15 days after the last day of each fiscal quarter (beginning in the fiscal year determined by the Oversight Board), in such form as the Oversight Board may require, (i) describing the actual cash revenues, cash expenditures and cash flows of the Commonwealth and covered territorial instrumentalities for the preceding fiscal quarter as compared to the projected revenues, expenditures and cash flows as contained in the certified budget for such preceding fiscal quarter, and (ii) any other information requested by the Oversight Board.

- **Inconsistencies Between Actual and Projected Revenues, Expenditures and Cash Flows.**  Pursuant to Section 203(b) of PROMESA, the Oversight Board may require the Commonwealth and any covered territorial instrumentality to provide additional information to explain inconsistencies between actual and projected revenues, expenses and cash flows based on the Governor's quarterly reports. If such explanations are deemed inadequate by the Oversight Board, the Oversight Board will advise the Commonwealth to correct such inconsistency by implementing remedial corrective actions.

- **Budget Reductions.** If the Oversight Board finds that the Governor and the Legislative Assembly failed to provide an explanation for an inconsistency between actual and projected revenues and expenses, or to correct such inconsistency by the deadline established by the Oversight Board, the Oversight Board is authorized to make appropriate reductions in non-debt expenditures and, in the case of the covered territorial instrumentalities, institute hiring freezes and prohibit entry into new contracts or financial transactions not previously approved by the Oversight Board.  The Oversight Board shall cancel these reductions upon a finding that the Commonwealth or covered territorial instrumentality has initiated the appropriate measures to ensure compliance with the certified budget.

For further information on PROMESA and the approval process for the Commonwealth budget, see "PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT".

**General Fund Budget for Fiscal Year 2017**

The table below presents a summary of the approved General Fund budget for fiscal year 2017 compared to the General Fund budget for fiscal year 2016, as originally approved and subsequently adjusted.

**Commonwealth of Puerto Rico**
**Summary of General Fund Approved Annual Budget**
**(in thousands)**

| | Fiscal Year 2016 Original | Fiscal Year 2016 Adjusted | Fiscal Year 2017 Original |
|---|---|---|---|
| **Revenues from internal sources:** | | | |
| Personal income taxes | $ 2,135,000 | $ 2,044,000 | $ 1,955,000 |
| Retained non-resident income tax | 822,000 | 825,000 | 763,000 |
| Corporate income taxes | 1,791,000 | 1,710,000 | 1,525,000 |
| Property taxes | - | 10,000 | |
| Tollgate taxes | - | - | |
| 17% withholding tax on interest | 4,000 | 4,000 | 3,000 |
| 10% withholding tax on dividends | 37,000 | 34,000 | 31,000 |
| Inheritance and gift taxes | 5,000 | 5,000 | 5,000 |
| Sales and use taxes | 1,740,000 | 1,566,000 | 1,608,000 |
| Excise taxes: | | | |
| Alcoholic beverages | 270,000 | 252,000 | 272,000 |
| Foreign (Act 154) | 1,905,000 | 1,850,000 | 1,924,000 |
| Motor vehicles and accessories | 305,000 | 281,000 | 293,000 |
| Cigarettes | 133,000 | 98,000 | 117,000 |
| Other (excise taxes) | 104,000 | 89,000 | 91,000 |
| Licenses | 19,000 | 18,000 | 19,000 |
| Miscellaneous non-tax revenues: | | | |
| Contributions from lottery fund | 48,000 | 51,000 | 40,000 |
| Electronic lottery | 90,000 | 93,000 | 80,000 |
| Registration and document certification fees | 104,000 | 93,000 | |
| Other | 102,000 | 71,000 | 55,000 |
| Total revenues from internal sources | 9,614,000 | 9,094,000 | 8,781,000 |
| Revenues from non-Commonwealth sources: | | | |
| Federal excise taxes on off-shore shipments | 186,000 | 198,000 | 206,000 |
| Total revenues from non-Commonwealth | 186,000 | 198,000 | 206,000 |
| Total revenues and resources | 9,800,000 | 9,292,000 | 8,987,000 |
| Appropriations: | | | |
| Current expenses: | | | |
| General government | $ 472,664 | $ 473,786 | $ 667,295 |
| Education | 2,551,747 | 2,535,510 | 2,552,248 |
| Health | 1,382,333 | 1,363,199 | 1,410,771 |
| Public housing and welfare | 435,919 | 420,851 | 437,117 |
| Economic development | 247,074 | 226,749 | 271,011 |
| Public safety and protection | 1,651,085 | 1,626,553 | 1,656,010 |
| Contribution to governmental entities | - | - | 258,027 |
| Budgetary and Emergency Fund | - | - | 220,000 |
| Contributions to municipalities | 381,540 | 380,656 | 443,570 |
| Special pension contributions | 643,405 | 624,463 | 786,590 |
| Debt service | 1,011,210 | 1,011,210 | - |
| Other debt service (appropriations) | 464,073 | 70,073 | 24,000 |
| PBA | 363,964 | 363,964 | 90,000 |
| Utilities (PREPA, PRASA, Insurance | 194,986 | 194,986 | 170,361 |
| Total appropriations – current expenses | 9,800,000 | 9,292,000 | 8,987,000 |
| Capital improvements | - | - | - |
| Total appropriations | 9,800,000 | 9,292,000 | 8,987,000 |
| Year-end balance | - | - | - |
| Total appropriations and year-end balance | $ 9,800,000 | $ 9,292,000 | $ 8,987,000 |

Totals may not add due to rounding.
*Sources: Treasury Department and Office of Management and Budget*

Total revenues and resources for the fiscal year 2017 approved General Fund budget exclude approximately $113 million in projected budgetary revenues which are allocated to the PRIFA Rum Dedicated Tax Bonds. General Fund budgetary revenues for fiscal year 2017 are projected to total approximately $9.100 billion. The $113 million in excess revenues are being retained by the Commonwealth as part of the Moratorium Act.

The General Fund budget for fiscal year 2017 provides for expenditures of $8.987 billion, which are divided in $4.178 billion (46%) for Ordinary Expenditures and $4.809 billion (54%) for Special Appropriations. Total expenditures are $813 million lower than the originally approved budget for fiscal year 2016 and $305 million lower than the adjusted budget for fiscal year 2016.

The principal reasons for the decrease in expenditures are a decrease in budgeted debt service payments from $1.475 billion and $1.081 billion in the original and adjusted budget, respectively, for fiscal year 2016, to $24 million for fiscal year 2017, a decrease in payments to PBA from $364 million in the original and adjusted budget for fiscal year 2016 to $90 million for fiscal year 2017, and a decrease in the cost of utilities from $195 million in the original and adjusted budget for fiscal year 2016 to $170 million for fiscal year 2017. These decreases were partially offset by an increase in other operating expenses for fiscal year 2017 of $740 million as compared with the original budget for fiscal year 2016 and $854 million as compared with the adjusted budget for fiscal year 2016, (including certain expenses covered in fiscal year 2016 with financing sources outside the General Fund), and an allocation of $200 million to the Budgetary Fund for fiscal year 2017. The reduction of budgeted debt payments in the fiscal year 2017 General Fund budget is intended to ensure the uninterrupted operation of the government and the continued provision of essential services to Puerto Rico residents.

The following table shows the major increases in General Fund operating expenses, by type, for fiscal year 2017 when compared with the fiscal year 2016 original General Fund budget:

| General Fund Operating Expenses | 2015 | 2016 | 2016(A) | 2017 | 2017 vs. 2016 |
|---|---|---|---|---|---|
| Contribution to Govermental Entitites | - | - | - | 258 | 258 |
| Municipal Subsidies | 10 | 21 | 20 | 83 | 62 |
| Medical Services Operation and Funcional Contributions | 28 | 27 | 27 | 52 | 25 |
| Special Education | - | - | - | 15 | 15 |
| Legal and Responsibility Fund | - | - | - | 117 | 117 |
| Non Govermental Organizations | - | - | - | 21 | 21 |
| Pension Plan Contributions | 560 | 643 | 624 | 787 | 144 |
| Elections and Transitions Cost | - | - | - | 52 | 52 |
| Social Security Contribution-Police | - | - | - | 25 | 25 |
| Accounting and Financial System | - | - | - | 12 | 12 |
| Caño Martin Peña y AFV | | | | 11 | 11 |
| Budgetary and Emergency Fund | - | - | - | 220 | 220 |
| Payroll and Related Costs | 3,392 | 3,320 | 3,320 | 3,272 | (48) |
| Other Operational Expenses | 1,210 | 1,112 | 1,036 | 1,122 | 10 |
| Contribution to Municipalities | 361 | 361 | 361 | 361 | - |
| University of Puerto Rico | 834 | 834 | 834 | 834 | - |
| Judicial Branch | 323 | 315 | 315 | 315 | - |
| Health Insurance | 885 | 885 | 885 | 885 | - |
| General Obligations Debt Service | 743 | 1,011 | 1,011 | - | (1,011) |
| PBA Debt Payment | 274 | 277 | 277 | - | (277) |
| Trans and Other Debt | 395 | 464 | 70 | 24 | (440) |
| Utilities | 201 | 195 | 195 | 170 | (25) |
| Legislature | 142 | 129 | 125 | 138 | 9 |
| PBA Operating Subsidies | 81 | 87 | 87 | 90 | 3 |
| Agriculture Incentive and Subsidies | 78 | 79 | 69 | 84 | 5 |
| University of Puerto Rico Operating Expense | 48 | 40 | 36 | 39 | (1) |
| **Total General Fund** | **$ 9,565** | **$ 9,800** | **$ 9,292** | **$ 8,987** | **$ (813)** |

The increase in General Fund operating expenses was due primarily to the fiscal crisis faced by the Commonwealth and the inability to continue financing current expenditures with non-recurring resources, including bond proceeds, lines of credit from GDB, Special Revenue Fund balances and special dividends from public corporations.

The budget for fiscal year 2017 contains approximately $498 million of expenses that were funded during fiscal year 2016 with financing sources outside the General Fund (Operating Fund) or by the internal revenues of certain public corporations (primarily GDB). The contribution to governmental entities correspond to  (i) $70.5 million of expenses previously funded by GDB lines of credit (including $40 million to cover remaining construction costs of the Puerto Rico Comprehensive Cancer Center), (ii) $40 million to cover the operational expenses of FAFAA (formerly a part of GDB and covered from internal GDB funds), (iii) $22.5 million to cover operational expenses of GBB and (iv) approximately $125 million to replace deposits of various governmental entities deposited in GDB (or make direct payments to such entities in lieu of making payments to GDB), including amounts necessary for the matching of federal funds.   The fiscal year 2017 budget also includes (i) $25 million in additional

114

contributions to PRMSA to fund such entity's operating losses and catch up on payment of payables to suppliers, (ii) $194 million in expenses (comprised of $62 million in annual legislated distributions to municipalities, $15 million in special education expenses, and $117 million to fund the Legal Responsibility Fund) funded in fiscal year 2016 pursuant to Act No. 105-2015 by a special dividend from the State Insurance Fund and other non-recurring financing sources, and (iii) $21 million in recurrent expenses regarding contributions to non-profits funded during fiscal year 2016 with a special dividend from the *Asociación de Subscripción Conjunta* pursuant to Act No. 201 of 2015.

Other incremental expenses for fiscal year 2017 (when compared to the approved fiscal year 2016 General Fund budget) also include (a) $144 million to cover increases in required pension payments, including pursuant to Act No. 114-2011 (increased employer contributions to TRS), Act No. 116-2011 (increased employer contributions to ERS) and Act No. 3-2013 (Additional Uniform Contribution to ERS), (b) $52 million to fund the 2016 election process and related governmental transition, (c) $25 million to fund Social Security contributions for uniformed police officers (which currently do not participate in the Social Security Program), (d) $12 million to fund programmed accounting and financial system upgrades and (e) other net variances.

These incremental operating expenses were offset in part by approximately $27 million in lower Joint Resolution assignments.

The fiscal year 2017 General Fund budget also includes an appropriation of $200 million to the Budgetary Fund to offset the Commonwealth's cash flow shortage and to address unexpected service needs, including the need to catch-up over-stretched suppliers of essential services.  Another $20 million were allocated to the Emergency Fund to cover unexpected public needs, including hurricanes and other natural disasters.

**Special Revenue Funds**

Special Revenue Funds are funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation. As such, in contrast to expenditures from the General Fund, Special Revenue Fund expenditures do not require annual legislative action because their disbursement is pre-authorized by the applicable fund's enabling legislation, which governs until revised by new legislative action.

As described above, Special Revenue Funds are funded from, among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds. Federal transfers constitute the majority of Special Revenue Fund resources. Generally, Special Revenue Fund appropriations have a life of more than one year, subject to extension by OMB.

The Commonwealth's Special Revenue Funds can be divided into several categories, including (i) Federal Fund Funds (funds where the receipt and expenditure of federal funds is recorded), (ii) Pledged Fund Funds (funds whether the receipt and transfers of funds assigned by law to third parties, including public corporations, is recorded), (iii) Special Revenue Funds (funds that record other revenues and expenses or accruals incurred but not included or

appropriated in the annual General Fund budget, including agency expenditures financed from charges for services provided by such agencies and appropriations made by the Commonwealth's Legislature without a specific revenue source) and (iv) Internal Revenue Funds (which account for transactions between and among the Commonwealth's agencies (principally with the General Services Administration (GSA)).

Many of the funds within the Commonwealth accounting system are Special Revenue Funds. As reflected in the Commonwealth's Basic Financial Statements, the Commonwealth has recorded a historic deficiency of revenues under expenditures in its Special Revenue Funds, which has had a material effect on the measurement of the Commonwealth's consolidated deficit, as calculated pursuant to U.S. GAAP. Furthermore, since the revenues and expenditures of many of these funds flow into, and out of, the TSA, the historic deficiency of revenue under expenditures in such funds has had and, in the absence of corrective action, will likely continue to have, a material effect on the overall liquidity position of the Commonwealth.

The Commonwealth's Special Revenue Funds are an important driver of the historical deficit due in part to the non-recurring nature of certain of their revenues. While the Special Revenue Funds receive certain recurring revenue in the form of taxes and charges for services by agencies, the Special Revenue Funds have historically been funded by non-recurring revenues such as bond proceeds, lines of credit from GDB, one-time dividends from public corporations, revenues from tax amnesties, among others. Special Revenue Fund expenditures have included, however, recurrent operating expenditures at the agency level, primarily payroll and professional and other services. The Commonwealth's recent lack of market access, coupled with the inability of GDB and other public corporations to continue as a recurrent source of financing, has forced the Commonwealth to progressively account in its General Fund for ordinary expenditures previously accounted for through its Special Revenue Funds, which in turn explains the recent increase in certain General Fund expenditure line items.  For example, OMB had to include in the fiscal year 2017 General Fund Budget certain recurrent subsidies to municipalities, appropriations to pay legal judgments, and agency and public corporation expenditures that in prior fiscal years had been financed through GDB lines of credit or one-time dividends from the State Insurance Fund.

Neither OMB nor the Treasury Department currently has the ability to effectively control how funds in the Special Revenue Funds are spent.  OMB and the Treasury Department worked on legislation that seeks to eliminate many of these funds and to establish more robust visibility and controls over any remaining ones. This legislation is still pending approval by the Legislature.

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government. Public corporations may obtain revenues from rates charged for services or products but, as described further below, many receive sizable subsidies from the central government. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are ascribed to departments of the central government. Capital improvements of most of the larger public corporations have been financed historically by revenue bonds issued under trust agreements or bond resolutions or by notes or other obligations issued under loan agreements.

As described above, many public corporations and other instrumentalities have traditionally relied on subsidies, in the form of appropriations from the General Fund and/or assignments of Commonwealth tax or other revenues, to fund a material portion of their operations. Certain of these instrumentalities, including PRHIA, PRMSA, PRITA, MTA, MBA, HTA and UPR, provide essential services to the residents of the Commonwealth and rely heavily on such subsidies to fund their day to day operations. Other subsidized public corporations, like PBA, provide essential services to the Commonwealth's government, which are in turn necessary to provide essential services to Commonwealth citizens.

Commonwealth appropriations and tax revenues are also a principal source of funding for certain public corporations dedicated to fiscal and financial advisory (FAFAA), infrastructure development (PRIFA and the Puerto Rico Public Private Partnerships Authority ("**P3 Authority**")); air and maritime transportation and logistics (the Ports of the Americas Authority ("**PAA**")); and economic, tourism and cultural promotion (PRTC, PRCCDA, the Agricultural Enterprises Development Administration ("**ADEA**"), PRIDCO (primarily with respect to the FEDE and the Rums of Puerto Rico Program); and the Institute of Puerto Rican Culture ("**ICP**")).

The General Fund budget for fiscal year 2017 included approximately $891.9 million in appropriations to PRHIA, $41.7 million to PRMSA, $872.4 million to UPR, $132.5 million for GDB and $33 million to PRITA. It also included $109.2 million for ADEA (of which $25 million were appropriated to indemnify ADEA for its lack of access to its deposit account at GDB), $40 million for FAFAA, $2.4 million for the P3 Authority, $3.6 million for PAA and $16.7 million for the ICP. The General Fund budget for fiscal year 2017 includes $90.2 million in lease payments to PBA to cover its operational expenses ($277 million in fiscal year 2017 PBA debt payments, historically covered primarily by General Fund appropriations, are currently subject to the Moratorium Act).

In addition, the Commonwealth's Legislature has assigned tax and fee revenues, by law, to certain of these public corporations.  For example, the Legislature has assigned to HTA the gas excise tax, the diesel excise tax, a portion of the petroleum products excise tax, a portion of the cigarette excise tax and vehicle license fees collected by the Department of Transportation and Public Works.  Each of PRITA and MBA has also been assigned portions of the cigarette excise tax.  PRIFA and PRIDCO receive a portion of the federal excise tax on rum shipments

117

from Puerto Rico that is "covered over" from the General Fund and the latter also administers an economic incentives program funded from the Commonwealth's corporate income tax revenues. PRIFA further receives the remaining portion of the petroleum products excise tax. PRTC collects and funds its operations from revenues from casino slot machines and the hotel room tax.  The latter is also the principal source of funding for PRCCDA. UPR receives by law a portion of the casino slot tax revenue collected by PRTC.

Other public corporations, such as COFINA and PFC have been created as financing vehicles for the Commonwealth and have issued debt backed by taxes (COFINA) or appropriations (PFC) as their sole source of repayment.  For a detailed description of these financing vehicles, see DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

The solvency and ability to continue as going concern of GDB, historically the primary source of interim financing and emergency liquidity for the Commonwealth and its instrumentalities, is further dependent on the financial health of the Commonwealth, including its ability to repay its loans with GDB through General Fund appropriations or to continue subsidizing public corporations such as HTA (which is one of GDB's principal debtors).

Notwithstanding the Commonwealth's substantial level of support, certain of these public corporations have recently suffered from significant annual operating losses and carry material amounts of accounts payable (particularly to other governmental entities such as the SIF, the Employees Retirement System, PREPA and PRASA). If the Commonwealth's financial condition does not improve, it may be unable to continue to support these operations at the same level without taking action to reduce other expenses or increase revenues. This may result in reduced services to the Commonwealth population. However, since some of the services provided by these public corporations are essential to maintain health, public safety and welfare, the Commonwealth may prioritize the funding of such services over financial or other obligations.

Set forth below are brief descriptions of some of the Commonwealth's principal public corporations. Brief descriptions of certain public corporations that issue publicly traded bonds and notes but do not have material operations, such as COFINA and PFC, have been included under "DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES" and are not included herein. For a comprehensive listing of the Commonwealth's public corporations as of June 30, 2014, consult Note 1 to the Commonwealth's Basic Financial Statements for fiscal year 2014.  All financial results herein for fiscal years 2015 and 2016 are preliminary, unaudited and subject to change (unless otherwise noted).

### *Healthcare*

### Puerto Rico Health Insurance Administration

PRHIA was created in 1993 to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents under the Commonwealth's "Health Reform" program. Under this system, the Commonwealth selected, through a bidding process, a private health insurance company for each designated region of the

island and paid such insurance company a fixed premium for each insured beneficiary within such region. The health insurance program covered the entire island. On October 1, 2010, the Commonwealth implemented "Mi Salud," which replaced the "Health Reform" program. Effective April 1, 2015 "Mi Salud" was replaced by the "Government Health Insurance Plan" ("**GHP**").

The Commonwealth, through the GHP, provides health insurance coverage to approximately 1.583 million insured residents of Puerto Rico. The cost of this health insurance program is very significant, totaling $2.8 billion for the year ended June 30, 2016. A substantial portion of the cost of the Commonwealth's health insurance program is currently paid by the federal government and funded principally by non-recurring funding provided pursuant to the federal Patient Protection and Affordable Care Act (the "**Affordable Care Act**" or "**ACA**"), as well as recurring Medicaid and Children's Health Insurance Program ("**CHIP**") funds, which in the case of the Commonwealth are capped at a level lower than that applicable to the states (which are not capped).

Upon exhaustion of the non-recurring ACA funds, currently estimated to occur in December 2017, and absent Congressional action to renew this non-recurring funding, the amount of federal funds available for this health insurance program will revert to the recurring capped Commonwealth Medicaid and CHIP allocations of approximately $400 million, which would result in significantly higher requirements of Commonwealth funding, unless benefits or eligibility, or both, are reduced significantly. Although the Commonwealth can take various measures to address the imbalance, including reducing coverage and limiting eligible beneficiaries, federal regulations may prohibit or limit the application of these measures. Furthermore, reducing coverage or limiting beneficiaries could result in additional costs at the Commonwealth's public hospitals, reducing potential savings and increasing expenditures in order to meet demand at the Commonwealth's already over-utilized public hospitals.

The fiscal stability of the Commonwealth's health insurance program is one of the most significant budgetary challenges facing the Commonwealth, especially if neither the availability of ACA funds is renewed nor the cap imposed on Medicaid matching funds is removed. In light of the current funding disparity between the Commonwealth and the states, the Commonwealth is intensifying its efforts to convince Congress to renew ACA funding or to provide Puerto Rico with parity with respect to Medicaid funds. Recently, members of the private and public sector formed the Puerto Rico Healthcare Crisis Coalition to increase lobbying efforts. However, it is not possible to predict the likelihood that such efforts will succeed. Thus, the Commonwealth will continue evaluating the fiscal structure of the program taking into consideration the current federal funding depletion date estimates. To the extent these efforts are unsuccessful, it is unlikely that the Commonwealth would be able to assume a significantly higher portion of the cost of the health insurance program without materially affecting the resources available to other stakeholders, including bondholders.

In the absence of Congressional action renewing ACA funding, PRHIA will experience material operating deficits.  The following table provides a five-year operating cash flow forecast (amounts in thousands) of PRHIA excluding capital expenditures and debt service payments, assuming no extension of ACA funding, no alternative revenue source nor changes to benefits, co-pays and/or eligibility rules, as presented in the Commonwealth's Fiscal Plan published on October 14, 2016. Although the table incorporates the effect of the new health insurance

contracts in the calculation of the projected results for fiscal years 2017 through 2021, PRHIA has projected costs for these years based on the new capitated managed care organization model and assumptions consistent with historical increases in the program. Therefore, the actual results could be materially different than those presented herein. *

| | Proj. FY2017 | Proj. FY2018 | Proj. FY2019 | Proj. FY2020 | Proj. FY2021 |
|---|---|---|---|---|---|
| Change in Net Position for the Period | $ 141,687 | $ 100,239 | $ 36,059 | $ (51,920) | $ (115,215) |
| Depreciation | 193 | 174 | 156 | 141 | 127 |
| (Increase) decrease in Accounts Receivable and other current assets | 2,161 | (714) | 20,590 | (714) | (714) |
| Increase (decrease) in Accounts Payable and other liabilities | (175,587) | (14,948) | 51 | 50 | (20) |
| Net cash generated (used) in operating activities | ($31,546) | $84,750 | $56,856 | ($52,443) | ($115,822) |
| | | | | | |
| Less:ACA shortfall | – | (865,434) | (1,516,983) | (1,582,761) | (1,680,829) |
| Commonwealth Appropriations for debt service | (6,988) | (6,988) | (6,988) | (6,988) | (6,988) |
| Net cash generated in operating activities after ACA and appropriations adjustment | ($38,535) | ($787,672) | ($1,467,116) | ($1,642,193) | ($1,803,639) |

*Totals may not add due to rounding.*

On October 14, 2014, the Board of Directors of the PRHIA awarded contracts for the GHP to five private insurance providers pursuant to a bidding process. Under the terms of these contracts, insurers began providing services to enrollees on April 1, 2015 until the contracts' termination date of June 30, 2017. The PRHIA may opt to renew these contracts for an additional term of one year until June 30, 2018; however, given that ACA funds will be depleted before the end of fiscal year 2018 it is possible that none of the private insurance providers may execute a contract with PRHIA for such fiscal year. Under the new contracts, the Commonwealth public health insurance model changed, in order to comply with regulations of the Center for Medicaid and Medicare Services ("**CMS**"), from a "third-party administrator" (TPA) model, in which the Commonwealth was ultimately responsible for the cost of the health services provided, to a "managed care organization" ("**MCO**") model, in which PRHIA will pay the insurers a fixed premium for each insured beneficiary and the insurers will be responsible for the cost of such services.  Premiums are negotiated for every fiscal year covered by the contracts (namely from April 1, 2015 to June 30, 2016, and from July 1, 2016 to June 30, 2017).  Any increase in the premiums is subject to PRHIA's determination that the proposed new amount is actuarially sound.

PRHIA's transition from a TPA to an MCO model exacerbated PRHIA's liquidity needs. This heightened liquidity need was due to the TPA's phase-out period, which required the PRHIA to pay-off the TPA and maintain current MCO premiums. The MCO insurance model demands premium payments at the beginning of each month, payable during the first five days.

However, due to the present credit and fiscal condition of the Commonwealth, PRHIA was unable to obtain a renewal of a short-term credit facility from GDB or other prospective lenders. Furthermore, although recent legislation authorized PRHIA to borrow, including through the issuance of bonds, up to $400 million in order to repay payables owed to suppliers, PRHIA was unable to obtain such financing. In order to ensure continuity of services, PRHIA reached a preliminary agreement with the five private insurance providers to pay-off the premiums throughout the month, in weekly installments, instead of during the first five days of the month.

In addition, CMS agreed with PRHIA to provide its share of federal funds upon availability of local funds on a weekly basis in order to complete the required payments to the

MCO's. These agreements resulted in cash management arrangements that allowed PRHIA to pay amounts under its former TPA model along with the current MCO premiums. PRHIA had a positive cash flow from operations for fiscal year 2016 and is expected to continue to have a positive cash flow through fiscal year 2017.

The following figure presents selected financial data for PRHIA for fiscal years 2015 and 2016, in thousands (but audited results for fiscal year 2015 reflect impact of a prior period adjustment:

|  | Audited June 30, 2015 | Audited June 30, 2016 |
|---|---|---|
| Average insured lives | 1,686 | 1,583 |
| Federal reimbursements | $1,592,484 | $1,706,686 |
| Cost of medical premiums and claims | $2,765,772 | $2,829,172 |
| Federal funds effective share | 57.58% | 60.32% |
| Period's Net Change (Deficit)[1] | $13,682 | $84,706 |

There are approximately 170,000 insured lives for which the Commonwealth covers the full amount of their insurance costs as they do not qualify for reimbursement from federal funds (the "Commonwealth Population"). The estimated annual costs for the Commonwealth Population are approximately $340 million, which are paid solely by the Commonwealth. In light of the financial challenges facing the GHP, the Commonwealth will need to decide if it can afford to continue funding these costs.

The following table presents selected financial data from PRHIA's financial statements for fiscal years 2015 and 2016:

| ($ in thousands) | Audited June 30, 2015 | | Audited June 30, 2016 | |
|---|---|---|---|---|
| General fund appropriations | $ | 892,259 | $ | 892,070 |
| Federal reimbursements | | 1,592,484 | | 1,706,686 |
| Other contributions | | 330,251 | | 348,769 |
| Interest and other | | 4,584 | | 5,120 |
| Total revenues | $ | 2,819,578 | $ | 2,952,645 |
| Total expenses | $ | 2,805,896 | $ | 2,867,939 |
| Increase (decrease) in net position | $ | 13,682 | $ | 84,706 |
| Amounts due to suppliers and others | $ | 390,599 | $ | 214,631 |
| Amounts due to other governmental entities | $ | 196,145 | $ | 207,144 |

121

General Fund appropriations to PRHIA for fiscal year 2017 is also approximately $892 million.

On June 8, 2015, CMS confirmed that the Medicare Advantage funding for Puerto Rico in 2016 would be reduced by approximately 11%. Such reduction to the Medicare Advantage rates would impact the ability of the Medicare Advantage plans to assume the costs of covering the higher-need dual eligible population (approximately 260,000 beneficiaries) covered through PRHIA's "Platino" program. Medicare Advantage subsidizes the costs of the Platino program from the rates paid through Medicare. If the Medicare Advantage plans could not continue to subsidize the costs of covering the Platino program, PRHIA's costs for calendar year 2018 for this population would increase from the current $30 million per year to approximately $150 million per year unless benefit reductions are made.

Under newly established "Modified Adjusted Gross Income," or "MAGI," standards, the number of Commonwealth residents who are Medicaid-qualified could be reduced and, if the Commonwealth were to continue providing these residents with coverage, their healthcare costs would therefore need to be covered by the Commonwealth without federal reimbursement. The Puerto Rico Health Department and its Medicaid office are responsible for establishing eligibility standards for the Government health plan and for implementing MAGI.

**Puerto Rico Medical Services Administration**

PRMSA is a public corporation and an enterprise fund of the Commonwealth, ascribed to the Puerto Rico Health Department, that operates and administers the centralized health services offered by the member institutions and consumers of the complex known as the Puerto Rico Medical Center.

PRMSA's two main sources of revenue are (i) centralized health infrastructure services charged to participating institutions within the Puerto Rico Medical Center Complex, which constituted approximately $92 million, or 70%, of its net service revenue in fiscal year 2016 (unaudited) and (ii) reimbursements collected from contracted insurers and non-insured patients for services provided through the emergency room, trauma hospital or outpatient clinic facilities, which constituted approximately $40 million, or 30%, of net service revenue in fiscal year 2016 (unaudited). PRMSA also provides its medical facility infrastructure as teaching and research resources for the UPR Medical Science Campus attending doctors and residents.

Almost the entirety of PRMSA's revenues derive, directly or indirectly, from the Commonwealth or its instrumentalities. As such, PRMSA's financial position and liquidity is highly vulnerable to the economic and financial position of the Commonwealth. One hundred percent of participating institutions charged for centralized health infrastructure services by PRMSA are government agencies or public corporations. Approximately 90% of revenues from such services derive from entities ascribed to the Puerto Rico Health Department. The payment of such services is therefore funded primarily from the Commonwealth's General Fund. As a result of the financial constraints on the Commonwealth, the risk of non-payment or delayed payment by the Commonwealth to PRMSA for acquired centralized services is increasing.

Reimbursements collected from contracted insurers are also highly dependent on government finances. Approximately 53% of PRMSA patients are insured by the government (PRHIA (40%) and ACAA (13%)). PRMSA projects that cash receipts from the insurer

reimbursement line of business during fiscal year 2017 will average approximately $30 million, for which $22 million, or 73%, would be collected from PRHIA and ACAA.

PRMSA has historically been unable to bill insurers, whether public or private, for the actual costs incurred by PRMSA to service insured patients. Insurance companies, which typically operate based on a Third Party Payer System model for insured patients, require PRMSA to bill based on pre-established contractual rates. PRMSA estimates that the difference between PRMSA's costs of providing patient services and the revenues it actually receives from insurers based on contracted rates is approximately $60 million per year.

PRMSA's financial position is also impacted by the need to provide emergency care to uninsured, unidentified and undocumented immigrant patients. Such services cost PRMSA an average of approximately $10 million per year. Furthermore, a significant portion of private hospitals no longer accept government insurance programs (PRHIA and ACCA). There is also a lack of tertiary and above tertiary health structures among private hospitals in Puerto Rico. As a result of these factors, 41% of patients received through PRMSA's emergency room are transfers from private hospitals.

Historically, PRMSA has incurred significant operating losses, which have been financed with General Fund appropriations and GDB lines of credit, payable in turn from General Fund budgetary appropriations. PRMSA's General Fund appropriations for fiscal years 2014, 2015, 2016 and 2017 were $51 million, $47 million, $45 million, and $52 million, respectively. Operating revenues (not including revenues from Commonwealth appropriations or federal grants), for fiscal years 2014, 2015, and 2016 were $123 million, $136 million, and $132 million, respectively.

PRMSA suffered operating losses before depreciation, amortization and interest expense, during fiscal years 2014, 2015 and 2016 of $60.5 million, $37.8 million, and $43.1 million, respectively. If the Commonwealth's financial situation precludes it from continuing to support PRMSA, it could affect continuity of services at the Puerto Rico Medical Center.  Given the essential nature of the services provided by PRMSA, the Commonwealth is likely to prioritize the funding of PRMSA over other obligations, including debt service.

As of June 30, 2016, PRMSA had outstanding indebtedness of approximately $492 million, composed of a $282 million line of credit with GDB, $152.9 million in amounts payable to other governmental entities (primarily PREPA, PRASA, and UPR) and $57.1 of accounts payable to non-governmental entities.

### *Education*

### University of Puerto Rico

UPR, the only public university in Puerto Rico, has eleven campuses located throughout the island. UPR's total enrollment for academic year 2015-2016 was 59,924, an increase of 4.09% when compared to 57,571 students in academic year 2014-2015.

Commonwealth appropriations are the principal source of University revenues. The amount of the annual appropriation is based on a statutory formula and equals 9.60% of the Commonwealth's average annual revenues from internal sources (subject to certain exceptions)

for each of the two fiscal years immediately preceding the current fiscal year. However, the Fiscal Sustainability Act froze for the three fiscal year period ending on June 30, 2017 the formula appropriations to the UPR at the same subsidized level granted in the fiscal year 2013 budget.

UPR further receives supplemental Commonwealth appropriations from the General Fund as well as a portion of the slot machine revenue tax collected by PRTC. Additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants and other sources. UPR's capital improvements have been financed in part by revenue bonds. See "Debt Payable by Tax-Supported Public Corporations and Instrumentalities-University of Puerto Rico" under DEBT OF THE COMMONWEALTH ITS PUBLIC CORPORATIONS AND MUNICIPALITIES. UPR has also historically relied on GDB for liquidity and financial management support.

UPR, including its component units, has had significant recurring operating losses and is highly dependent on Commonwealth appropriations and tax revenues to finance its operations. UPR's audited financial statements for the years ended June 30, 2014 and 2015, reported an operating loss before depreciation, amortization and interest expense of $1.02 billion and $952.7 million, respectively. Total operating revenues amounted to $307.5 million and $312.4 million for the years ended June 30, 2014 and 2015, respectively, an increase of $4.9 million or 2% in 2015. Operating revenues for fiscal year 2016 are not yet available. Non-operating revenues amounted to $1.09 billion and $1.07 billion for the years ended June 30, 2014 and 2015, respectively. Non-operating revenues include Commonwealth's appropriations that represent roughly 60% of the University's total revenues, which amounted to approximately $873.6 million, $873.8 million, and $869.5 million for the years ended June 30, 2014, 2015 and 2016, respectively. Also, reported as other non-operating revenues are the distributions of slot machine revenue from PRTC to UPR. For the years ended June 30, 2014, 2015 and 2016, such slot machine revenue distributions represent roughly 5% of the University's total revenues, which amounted to $64.4 million, $63.5 million and $62.6 million, respectively. Non-operating revenues also include the Federal Pell Grants which represent roughly 10% of the University's total revenues and amounted to $162.0 million, $167.2 million and $178.7 million for the years ended June 30, 2014, 2015 and 2016, respectively. The change in net position amounted to $27.9 million and $71.6 million for the years ended June 30, 2014 and 2015, respectively.

In light of UPR's historical dependency on Commonwealth appropriations and tax revenues, as Commonwealth's liquidity and financial position continues to be strained, UPR's financial condition and liquidity could be adversely affected.

*Public Transportation and Other Infrastructure*

**Puerto Rico Highways and Transportation Authority**

HTA is a public corporation and governmental instrumentality of the Commonwealth that was created in 1965 to assume responsibility for the construction of roads and highways and related transportation facilities in Puerto Rico. Its operating revenues consist primarily of toll and train fares. HTA operating revenues totaled approximately $213.7 million, $235.0 million and $210.9 million in fiscal years 2014, 2015 and 2016, respectively. Toll revenues totaled

$128.72 million, $131.7 million and $134.1 million in fiscal years 2014, 2015 and 2016, respectively.

HTA's most important sources of revenues are revenues from motor vehicle license fees and Commonwealth excise taxes on gasoline, oil, diesel, petroleum products and cigarettes, which have been allocated by law to HTA. Said non-operating revenues amounted to approximately $531.8 million, $432.5 million and $478.2 million in fiscal years 2014, 2015 and 2016, respectively. The following is a breakdown of such non-operating revenues:

- Vehicle license fees (including additional amounts assigned to HTA by Act No. 31-2013, as described below) produced approximately $90.9 million, $89.6 million, and $92.8 million in revenues during fiscal years 2014, 2015 and 2016, respectively.
- Gasoline excise tax revenues totaled approximately $156.02 million, $157.1 million, and $156.0 million in fiscal years 2014, 2015 and 2016, respectively.
- Petroleum products excise tax revenues amounted to approximately $255.59 million, $152.5 million and $198.2 million in fiscal years 2014, 2015 and 2016, respectively.
- Diesel oil tax revenues amounted to approximately $9.12 million, $13.4 million, and $12.9 million in fiscal years 2014, 2015 and 2016, respectively.
- Cigarette excise tax revenue actually transferred to the Authority in fiscal years 2014, 2015 and 2016 amounted to approximately $17.96 million, $19.9 million and $18.3 million, respectively.

On June 25, 2013, the Commonwealth enacted Acts Nos. 30 and 31 of 2013 to provide additional revenues to HTA for the purpose of repaying its loans to GDB. Pursuant to these laws, (i) the excise tax on petroleum products assigned to HTA was increased from $3.00 per barrel (which was the tax rate applicable at the time under a sliding scale) to a fixed $9.25 per barrel, (ii) the portion of the motor vehicle license fees previously received by the Commonwealth's General Fund was assigned to HTA and (iii) $20 million of the cigarette excise tax, previously received by the Commonwealth's General Fund, was assigned to HTA.  In January of 2015, Act 1-2015 further increased taxes on petroleum products (other than diesel) by creating a new $6.25 per barrel excise tax assigned to PRIFA. Effective on the date that certain conditions are met, including the assumption by PRIFA of HTA's debt due to GDB, the petroleum products tax assigned to HTA would be reduced to $6.00 per barrel and the PRIFA petroleum products tax would be increased to $9.50 per barrel. The Commonwealth does not currently contemplate that the conditions for the completion of such transfer will be satisfied in the foreseeable future.

Notwithstanding actions by the Commonwealth to shore up HTA's finances, HTA has experienced significant recurring losses from operations and faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession and the fact that HTA's toll rates are not indexed to inflation.  PRTHA audited financial statements reported a net operating loss before depreciation, amortization and interest expense for fiscal years 2013 and 2014 of approximately $129.5 million and $177.8, respectively.  Preliminary, unaudited information for fiscal year 2015, and 2016 present an operating income (loss) before depreciation and amortization of approximately $9.0 million and ($6.0) million), respectively. After considering non-operating revenues and expenses and capital contributions, HTA net position decreased by approximately $190.2 million in 2014, increased by approximately $109.3 million in 2015, and decreased by approximately $147.3 million in 2016. Accounts payable as of June 30, 2016 amounted to approximately $126.2 million.

HTA's deteriorating financial position has been exacerbated by the fact that in fiscal year 2005 it started operating the mass, heavy-rail transportation system for the San Juan metropolitan area known as the Urban Train. The Urban Train in San Juan consists of approximately 17 kilometers of track running from Bayamón to Santurce. PRTHA incurred approximately $2.42 billion in costs [to construct the Urban Train], of which $685.7 million was paid with federal funds. Maintenance services are partially funded with capital contributions from the Federal Transit Administration. The total annual operation and maintenance costs, including cost of insurance and electricity, for fiscal years ended on June 2014, 2015 and 2016 were approximately $57.348 million, $56.5 million, and $56.323 million, respectively. Operating revenues of the Urban Train were approximately $8.020 million, $9.7 million, and $9.118 million for fiscal years 2014, 2015 and 2016, respectively. HTA is also currently assigned a dedicated fund created from the collection of traffic fines to fund the Urban Train. PRITA was created during fiscal year 2015 to integrate certain mass transit services, including the Urban Train. The transfer of the Urban Train is subject to certain condition precedent which are unlikely to be met in the short run. See next section for additional details. The operating and maintenance expenses of HTA, net of revenues, could be reduced by approximately $58 million annually after the transfer of the Urban Train to PRITA.

Executive Order 18 declared an emergency period with respect to HTA and suspended HTA's obligation to transfer toll revenues to the trustee of its bonds until June 30, 2016 (this extension was later extended pursuant to Executive Order 31.

## Puerto Rico Integrated Transit Authority

PRITA is a public corporation created in 2014 to integrate the mass transit services currently provided by HTA, the Puerto Rico and Municipal Island Maritime Transport Authority ("**MTA**") and the Metropolitan Bus Authority ("**MBA**"). As noted above, HTA operates the Urban Train and related feeder bus services; MTA operates ferry services between the Municipalities of San Juan and Cataño, and Fajardo, Vieques and Culebra; and the MBA operates bus and paratransit services within the metropolitan area.

PRITA commenced operation in February 2015. PRITA's management has been working on the required federal approvals in order to transfer the above-mentioned operations to PRITA, but such approvals are not currently expected to be received in the short-run. Thirty days after obtaining such federal approvals, the MBA and the MTA would merge into PRITA, and their legal entities would cease to exist, and the HTA's Urban Train program would be transferred to PRITA. These operations have a history of significant losses. Although the enabling legislation of PRITA assigns dedicated revenues to PRITA, there is no assurance that the combined operations would be financially self-sufficient.

During fiscal year 2015, PRITA received approximately $6.57 million from General Fund appropriations. During fiscal year 2016, PRITA received approximately $5.38 million in cigarette excise tax revenues and approximately $789,000 from General Fund appropriations. For fiscal year 2017, General Fund appropriations for PRITA amount to approximately $33 million, but of this amount only $4.78 million is expected to be used for PRITA's current operations, with the balance expected to be allocated to operations currently conducted by MBA and MTA. Operating losses before depreciation, amortization and interest expense for PRITA

were approximately $736,584 and $3.6 million for fiscal years 2015 and 2016, respectively. As of June 30, 2016, PRITA had no accumulated outstanding long-term debt.

If and when the Urban Train operations are transferred to PRITA, the dedicated fund funded from traffic fines, currently assigned to HTA for the benefit of the Urban Train, would be available as an additional source of revenue to PRITA.

## Puerto Rico and Municipal Island Maritime Transport Authority

MTA received approximately $26.2 million, $28.6 million and $16.5 million in General Fund appropriations during fiscal years 2014, 2015 and 2016, respectively. For fiscal years 2016 and 2017, General Fund appropriations previously directly assigned to MTA were channeled through PRITA. MTA is expected to receive during fiscal year 2017 approximately $16.3 million from such General Fund appropriations. MTA also received $13.38 million from the cigarette excise tax, via PRITA, during fiscal year 2016. Its operating revenues (principally passenger and cargo fares) for fiscal years 2014, 2015 and 2016 were $5.2 million, $5.4 million and $4.9 million, respectively. In the past, the HTA and the Puerto Rico Ports Authority have also been sources of funds to MTA. Operating losses for fiscal year 2016 were approximately $34.1 million.  Operating losses before depreciation, amortization and interest expense for the fiscal years ending on June 30, 2014 and 2015 amounted to approximately $41.9 million and $30.8 million, respectively.

After considering Commonwealth appropriations and federal grants, the MTA had change in net assets (deficit) of ($14.96 million), $.805 million and $.918 million for fiscal years 2014, 2015 and 2016, respectively. MTA's currently estimates accounts payable to suppliers and other entities as of June 30, 2016 to be approximately $88 million.

Certain transit-related expenses from MTA are eligible for reimbursement from federal funds.

## Metropolitan Bus Authority

MBA's principal sources of operating funds are General Fund's appropriations, revenues from the cigarette excise tax and federal funds. MBA received approximately $42.15 million, $31.3 million and $16.4 million, during fiscal years 2014, 2015 and 2016, respectively, from Commonwealth General Fund appropriations. For fiscal years 2016 and 2017, General Fund appropriations previously assigned to MBA were channeled through PRITA. MBA is expected to receive during fiscal year 2017 approximately $11.9 million from such General Fund appropriations. Directly or via PRITA, MBA received from the cigarette excise tax $9.60 million in fiscal year 2015 and $19.34 million in fiscal year 2016. In fiscal year 2014, MBA received $9.75 million from the diesel excise tax (which was subsequently replaced by the cigarette excise tax). MBA's operating revenues (principally passenger fares, advertising and rental income) for fiscal years 2014, 2015 and 2016 were $4.86 million, $4.24 million and $3.43 million, respectively. Operating losses before depreciation, amortization and interest expense amounted to $61.4 million, $51.1 million and $45.8 million, for fiscal years 2014, 2015 and 2016, respectively.

For fiscal years 2014, 2015 and 2016, MBA had a decrease in net position of $4.1 million, $16.2 million and $8.6 million, respectively.

127

MBA's amounts due to non-governmental suppliers increased materially, from $2.9 million as of June 30, 2012 to $9.2 million as of June 30, 2015; and balances payable to other governmental entities increased from $26.8 million as of June 30, 2012 to $51.9 million (including accumulated penalties and interests) as of June 30, 2015. Governmental entities to which MBA owes money include the Treasury Department, the State Insurance Fund Corporation, the Retirement Systems Administration, PREPA and PRASA.

Certain transit-related expenses from MBA are eligible for reimbursement from federal funds.

MBA pledged part of the revenues derived from the cigarette excise tax as the sole source of repayment of that certain Refinancing of Loan Facilities Agreement, dated as of March 30, 2012, as amended from time to time (the "Loan Agreement"), by and between MBA and a commercial bank. On September 25, 2015, MBA executed an amendment to its Loan Agreement whereby the maturity date was extended until March 31, 2016.  The line of credit is secured by approximately $10 million in cigarette tax revenues pledged to MBA. However, MBA has not made payments under the Loan Agreement since November 30, 2015.

Pursuant to Executive Orders issued under the clawback provisions of the Commonwealth Constitution and the Moratorium Act, the Commonwealth's obligation to transfer cigarette excise taxes to MBA and MBA's obligation to make any payments on its outstanding debt were suspended and MBA is currently in default under the Loan Agreement, as it has not received any amounts from the Commonwealth in order to make the payments due thereunder.

In September 2016, the lender sued MBA seeking declaratory and injunctive relief arguing that sections of the Moratorium Act and certain Executive Orders issued under its authority are unconstitutional and violate PROMESA. On November 11, 2016, the Commonwealth defendants filed a Notice of Automatic Stay under PROMESA.  It is the Government's position that this creditor is currently prohibited from exercising remedies due to the stay provided in the Moratorium Act and PROMESA. See discussion in LITIGATION.

 In the meantime, revenues assigned to MBA and pledged for the repayment of its loans may be applied first to the payment of debt service on Direct GO Obligations and Guaranteed GO Obligations to the extent that no other revenues are available for such purpose.

Due to the above mentioned Executive Orders, since November 2015 MBA has not received its dedicated cigarette excise tax (that is, the one that is not received via PRITA) or a substitute source of funding; thus also causing its other debts to dramatically increase.

**Puerto Rico Public Buildings Authority**

The Puerto Rico Public Buildings Authority ("**PBA**") is a public corporation created in 1958 to design, construct, administer and provide maintenance to office buildings, courts, warehouses, schools, health care facilities, welfare facilities, shops and related facilities leased to the Commonwealth or any of its departments, agencies, instrumentalities or municipalities. The annual rent for each leased building is based on the amounts needed by PBA to cover the payment of:

- principal, interest and other amortization requirements of the notes and bonds issued to finance the buildings;
- operating and maintenance expenses of the buildings, including a reasonable proportional share of administrative expenses, excluding depreciation; and
- cost of equipment replacement and extraordinary repairs.

PBA's enabling act provides that the full faith and credit of the Commonwealth is pledged for the payment of rent under any lease agreement executed pursuant to such enabling act with any agency, public corporation or other instrumentality of the Commonwealth. The enabling act also provides that the Treasury Department will make advances to PBA for any unpaid portion of rent payable to PBA by any agency or instrumentality of the Commonwealth that has entered into lease agreements with PBA. Such advances are recorded as a reduction of accounts receivable since the responsibility of reimbursement belongs to the agency in accordance to the enabling act.

Operating revenues consists principally of lease payments from rent charges to agencies, public corporations and municipalities of the Commonwealth. Operating revenue from lease payments amounted to approximately $412.8 million, $408.0 million and $425 million for fiscal years 2014, 2015 and 2016, respectively.  For the fiscal year ended June 30, 2015, such revenue is net of an estimated reserve for bad debts in the amount of approximately $1.8 million.

Audited financial statements for fiscal years 2014 and 2015 present an operating income before depreciation and amortization of $265.6 million and 277.8 million, respectively.  Most significant non-operating revenues consist of subsidies from the Federal Government for the payment of bonds in the amount of $35.9 million and $36.0 million for the years ended June 30, 2014 and 2015, respectively, and operating grants from the Commonwealth in the amounts of $214.3 million, $5.3 million and $1.1 million for fiscal years 2014, 2015 and 2016, respectively. The significant reduction in Commonwealth grants from fiscal year 2014 to 2015 are due primarily to the receipt during fiscal year 2014 of $192.9 million in operating grants to repay lines of credit incurred as a result of reductions in rental revenue in prior fiscal years.

PBA total revenues are offset by an interest on bonds and notes expense of $250.3 million for fiscal year 2014 and $241.2 million for fiscal year 2015.  Net position increased $181.2 million for the year ended June 30, 2014 and decreased by $12.3 million for the year ended June 30, 2015.  Preliminary results for the year ended June 30, 2016 result in a net position increase of $97 million.  As of June 30, 2016 PBA accounts payable amounted to approximately $24.4 million.

**Puerto Rico Ports Authority ("PRPA")**

PRPA owns the major airport and seaport facilities in Puerto Rico. In February 27, 2013, it transferred the operation of the Commonwealth's principal airport, the Luis Muñoz Marín International Airport, to a private consortium consisting of Grupo Aeroportuario del Sureste and Highstar Capital pursuant to a 40-year lease agreement. As a result of the transaction, PRPA received a $615 million upfront payment, of which $502 million was used to repay certain outstanding bonds and other debts.

129

PRPA derives revenues from a variety of sources, including taxes on aviation fuel sales, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. Net maritime operating revenues totaled $74.5 million in 2014, $75.4 million in 2015 and $81.7 million in 2016 (unaudited), increases that have resulted principally from increased cruise ship traffic to Puerto Rico. Net airport operating revenues totaled $26.0 million in 2014, $28.4 million in 2015, and $13.5 million in 2016 (unaudited).  Revenues from the aviation fuel tax totaled approximately $628,000 , $590,000 and $736,000 during such three fiscal years, respectively.

PRPA's non-operating revenues consist principally of passenger facility charges, Federal Aviation Administration (FAA) approved programs, contributions from the Commonwealth and other governmental entities, fuel flowage fees, penalties and other fees. In 2014, PRPA received approximately $17 million in federal financial assistance, $2.7 million in Commonwealth contributions, approximately $852,000 in passenger facility charges, approximately $109,000 in fuel flowage fees, and $815 in other fees and penalties. In 2015, PRPA received approximately $11.3 million in federal financial assistance, $2.7 million in central government contributions, approximately $705,000 in passenger facility charges, approximately $3.2 million from sales of assets, approximately $10.5 million in litigation settlements and approximately $126,000 in other fees and penalties.

PRPA audited financial information reported an operating income before provisions, depreciation, amortization and interest expense for fiscal years 2014 and 2015 of approximately $17.5 million and $21.5 million, respectively. PRPA reported a decrease in its net position of approximately $61.5 million and $62.8 million during fiscal years 2014 and 2015, respectively. The 2015 decrease responds principally to an approximately $53.4 million provision for uncollectible balances made during fiscal year 2015 regarding receivables from the Commonwealth (approximately $14.7 million) and MTA (approximately $38.6 million).

Other improvements in operations during fiscal year 2015 also resulted from a net effect of: an increase in operating revenues of almost $3 million; reduction in interest expense of approximately $5.9 million; a one-time gain of approximately $10.5 million as a result of a litigation settlement in favor of PRPA; and the non-occurrence that year of an early termination event for employees, which represented approximately $30 million in the prior year.

*Economic Development*

**Puerto Rico Industrial Development Company ("PRIDCO")**

PRIDCO is a public corporation created to promote economic development by stimulating the formation of new local firms and encouraging firms in the United States and foreign countries to establish and expand their operations in Puerto Rico. PRIDCO maintains a continuing real estate development program, which includes leasing or sale of facilities to qualified private industrial investors and the construction of industrial facilities for lease. In fiscal years 2014 and 2015, PRIDCO reported $61.7 million and $61.8 million in rental income from industrial properties, respectively. Additionally, PRIDCO administers legislative appropriations in accordance with various special incentives programs to assist manufacturers in offsetting allowable start-up costs and special legislative appropriations to third parties as approved by the Legislature from time to time.

PRIDCO reported a consolidated decrease in net position of $3.9 million for fiscal year 2015, compared to a consolidated increase in net position of $23.5 million for fiscal year 2014. Rentals derived from the leasing of certain PRIDCO facilities are pledged to the payment of PRIDCO's revenue bonds. See "DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES" for information on the outstanding debt of PRIDCO.

PRIDCO administers three separate incentive funds: the Special Fund for Economic Development ("**FEDE**"), the Special Incentives Fund and the Rums of Puerto Rico Fund. The FEDE was created to strengthen and enhance economic development through economic incentive grants to private enterprises. Funding for said incentives is derived from contributions from the Commonwealth. Total revenue of the FEDE for fiscal year 2014 amounted to $62 million compared to $33 million for fiscal year 2015. These intergovernmental revenues decreased due to the fact that monies received by the FEDE during fiscal year 2015 were not received until May 2015 and the amount due for such fiscal year was not received in full.

The Special Incentives Fund was also created to promote economic development through economic incentives awarded to private enterprises. The Special Incentives Fund was historically funded by General Fund appropriations but it is currently funded annually by contributions from the FEDE. Intergovernmental contributions from the FEDE for the benefit of the Special Incentives Fund for fiscal years 2014 and 2015 were approximately $11.5 million and $34 million, respectively. The Special Incentives Fund has not received any appropriations from the General Fund since fiscal year 2009. Its total deficit for fiscal year 2015 increased by approximately $2 million, or 7%, in comparison with fiscal year 2014 because incentives granted during the year exceeded contributions received by a similar amount.

The Rums of Puerto Rico Fund was created to encourage production and promotion of Puerto Rican rum. The fund is administered by PRIDCO and funded by the lesser of $10 million and 2.5% of the total amount collected of the federal excise tax on rum imported to the United States and produced in Puerto Rico that is "covered-over" or transferred to the Commonwealth pursuant to the U.S. Internal Revenue Code. The Rums of Puerto Rico Fund also receives "cover-over" revenues assigned to private rum producers pursuant to certain incentive agreements signed with the Commonwealth. Total revenue of the Rums of Puerto Rico Fund totaled approximately $76.5 million in fiscal year 2014 and $142 million in fiscal year 2015, out of which $75.9 million and $141.8 million were derived from Commonwealth contributions, and $581 thousand and $393 thousand were derived from federal excise taxes collected, respectively.

**Puerto Rico Tourism Company ("PRTC")**

PRTC is a public corporation and instrumentality of the Commonwealth responsible for stimulating, promoting and regulating the development of Puerto Rico's tourism industry. Among other things, PRTC incentivizes the development of tourism facilities, establishes standards of quality and regulates and oversees gaming operations within Puerto Rico, and provides visitor orientation and technical assistance to investors. The PRTC has facilities and representatives within Puerto Rico and in the U.S. mainland, Canada, Europe and Latin America.

PRTC's income is derived primarily from collections of the hotel room tax and from revenues received from two proprietary funds, the Hotel Development Corporation Fund and

Slot Machines Operations Fund.  Hotel room tax revenues for fiscal years 2014, 2015, and 2016 amounted to $70 million, $75 million and $75.5 million, respectively.  Total slot machine revenues for fiscal year 2014, 2015, and 2016 amounted to $156.0 million, $154.5 million, and $152.5 million. Slot machine revenues, net of expenses, are distributed among the Commonwealth of Puerto Rico, the University of Puerto Rico and PRTC. The following table summarizes the distribution of Slot Machine Net Revenues for fiscal years 2014, 2015 and 2016, respectively:

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Commonwealth General Fund | $21,516 | $21,175 | $20,790 |
| University of Puerto Rico | $64,547 | $63,524 | $62,371 |
| PRTC General Fund | $55,955 | $55,069 | $54,068 |
| Total Distributions | $142,018 | $139,768 | $137,229 |

In addition, PRTC received approximately $5.5 million and $25,000 during fiscal years 2014, and 2015, respectively, as financial support from the Commonwealth's General Fund. PRTC had total revenues, including Commonwealth appropriations but excluding proprietary funds, for fiscal years 2014, 2015, and 2016 of $77.2 million, $77.6 million and $80.3 million, respectively.  PRTC has had a positive fund balance in its general fund for the past 10 years.

The proprietary funds' change in net deficit for fiscal years 2014, 2015 and 2016 were $1.90 million, $0.840 million and $0.971 million, respectively.  The negative change in net position is mainly driven by the deficit of the HDC fund, given the proprietary fund has suffered losses from investments made in tourism projects.  As of June 30, 2016, PRTC owes $33.5 million to suppliers and other governmental agencies.

**Puerto Rico Infrastructure Financing Authority**

PRIFA was created to provide financial, administrative, consulting, technical, advisory and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities authorized to develop infrastructure facilities and to establish alternate means for financing those facilities. As such, PRIFA may issue bonds and provide loans, grants and other financial facilities for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects developed by such entities.

Pursuant to PRIFA's enabling act, PRIFA was authorized to establish the Puerto Rico Water Pollution Control Revolving Fund and the Drinking Water Revolving Fund under the Federal Clean Water Act. In accordance with said mandate, PRIFA subscribed memoranda of understanding with the Puerto Rico Environmental Quality Board and the GDB, and with the Puerto Rico Department of Health and GDB, respectively, for the administration of these funds.

Commonwealth tax revenues are the principal source of funding for PRIFA. Other sources of funds include legislative appropriations, as well as funds provided by entities assisted by PRIFA with respect to their budgeted capital projects.

The PRIFA enabling act also creates the Puerto Rico Infrastructure Fund, funded annually through fiscal year 2052 with the first $117 million of proceeds of federal excise taxes

imposed on rum and other articles produced in Puerto Rico and sold in the United States, which are transferred to the Department of the Treasury of Puerto Rico each fiscal year pursuant to the United States Internal Revenue Code of 1986. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned (or "covered over") from the U.S. Government to the Puerto Rico Treasury Department (except for negligible collections for other alcoholic beverages). PRIFA has periodically issued bonds payable from these funds to finance various capital projects for the benefit of the Commonwealth. For the year ended June 30, 2015, principal and interest paid on Special Tax Revenue Bonds amounted to approximately $112 million.

PRIFA receives $6.50 of the excise tax on petroleum products, which constitutes the source of repayment for certain bond anticipation notes issued by PRIFA pursuant to Act No. 1-2015. Act No. 1-2015 also provides that an additional $3.25 of the excise tax currently assigned to HTA would be transferred to PRIFA if certain conditions are met. However, the Commonwealth does not foresee such conditions to be met in the near future.

PRIFA has also issued bonds for the benefit of PRPA and AMSCA.  For a description of such debt, see DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

For fiscal years 2014 and 2015, PRIFA received $117 million in appropriations from the General Fund, consisting of $113 million for its Dedicated Rum Tax Debt Service and $4 million for its operations. For fiscal year 2016, PRIFA received $4 million for its operations and the $113 million normally allocated to the PRIFA Dedicated Rum Tax Debt Service were retained by the Commonwealth pursuant to the clawback provisions of the Commonwealth Constitution. These amounts do not include other appropriations made to the capital projects fund for the acquisition or construction of capital assets and capital improvements. For fiscal year 2017, the Commonwealth again only appropriated $4 million to PRIFA. The reduction of $113 million in appropriations otherwise destined to repay PRIFA's debt service obligations, is the result of the Moratorium Act and the Executive Orders issued thereunder.

In addition, PRIFA received $38 million for fiscal year 2015 and $132 million for fiscal year 2016 in contributions from HTA to pay certain obligation debt issued by PRIFA in 2015. For a description of such debt, see DEBT OF THE COMMONWEALTH ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

For fiscal year 2017, $4 million was appropriated from the General Fund budget for PRIFA's operations.

**Agricultural Enterprises Development Administration ("ADEA")**

ADEA is a public corporation ascribed to the Department of Agriculture of the Commonwealth created to provide a wide array of services and incentives to the agricultural sector. ADEA receives administrative support from the Department of Agriculture. For fiscal year 2015, 46% of ADEA's revenues came from state grants and contributions, and the remaining 54% came mostly from charges for services related to the coffee program and sales to the Department of Education. Appropriations from the General Fund amounted to approximately

133

$84.5 million for fiscal year 2014, $90.5 million for fiscal year 2015, $79.9 million for fiscal year 2016, and $109.2 million for fiscal year 2017.

ADEA's change in net position amounted to $6.3 million during fiscal year 2015, compared to $9.6 million the previous year.  As of June 30, 2016 ADEA's account payables amounted to $30.6 million.

## GDB and its Subsidiaries

GDB is a component unit of the Commonwealth created pursuant to Act No. 17 of September 23, 1948, as amended. Historically, GDB served as (i) fiscal agent, financial advisor and reporting agent for the Commonwealth, its instrumentalities and municipalities (collectively, "**Commonwealth Entities**"), (ii) an important source of financing for various Commonwealth Entities, and (iii) the principal depositary of the funds of the Commonwealth Entities. However, as discussed below, GDB no longer performs such functions or does so in a more limited capacity.

*GDB's Role as Fiscal Agent for the Commonwealth Entities*.  GDB no longer acts as fiscal agent, financial advisor and reporting agent for the Commonwealth Entities. Such functions are now performed by the Puerto Rico Fiscal Agency and Financial Advisory Authority, a new public instrumentality created pursuant to the Moratorium Act.

*GDB's Role as Lender to the Commonwealth Entities*.  GDB traditionally served as interim lender to Commonwealth Entities in anticipation of the issuance of bonds and notes and provided financing to the Commonwealth Entities to finance budget deficits, collateral requirements under swap agreements, and to meet mandatory payment obligations. As of June 30, 2016, GDB had (i) outstanding loans to the Commonwealth and its agencies in the aggregate principal amount of $2.1 billion, (ii) outstanding loans to, and bonds of, the public corporations in the aggregate principal amount of $4.4 billion (of which loans to HTA represented $1.9 billion), and (iii) outstanding loans to the municipalities in the aggregate principal amount of $2.6 billion. GDB's ability to provide financing to Commonwealth Entities, however, was significantly affected in recent years as a result of GDB's deteriorated liquidity position, which led GDB to implement several extraordinary liquidity preservation and enhancement measures, including imposing restrictions on the approval of new loans and the disbursement of existing loans. Subsequently, the Governor prohibited GDB from making disbursements under existing loans pursuant to Executive Order 10. For more information on the restrictions imposed under Executive Order 10, see "Executive Action Taken under the Moratorium Act" under "OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION."

*GDB's Role as Depositary of Public Funds*.  As of June 30, 2016, GDB held approximately $3.7 billion in deposits from Commonwealth Entities. However, as a result of GDB's deteriorated financial condition, critical liquidity position and the restrictions on the withdrawal of deposits implemented pursuant to Executive Order 10, Commonwealth Entities have started depositing their funds in private depositary institutions. Therefore, inflows to GDB have been drastically reduced in recent months. In addition to having limited access to their deposits, GDB's depositors, which consist primarily of Commonwealth Entities, may also suffer significant losses as a result of GDB's inability to pay its creditors in full, including its

depositors. As a result, Commonwealth Entities may also need to record a significant loss in their respective financial statements in connection with the impairment of such deposits.

*GDB's Audited Financial Statements for Fiscal Year 2014*.  GDB's most recent audited financial statements, dated as of June 30, 2014, note that GDB's management understands that it is highly probable that GDB will be unable to collect all amounts due on its loans to the Commonwealth and its public corporations according to their contractual terms. As a result, the financial statements reflect that such loans have been classified as impaired and that GDB has established an allowance for losses on such loans of approximately $2,504 million in the aggregate, representing approximately 40% of the outstanding principal value of such loans. As a result of the Commonwealth's fiscal and financial condition, it is likely that GDB will have to increase such allowance for loan losses in the future.

Further, GDB's 2014 financial statements reflect a reduction in GDB's net position from $2,372 million on June 30, 2013, to a deficit of approximately $316 million as of June 30, 2014. As noted in the financial statements, GDB's management has concluded that GDB faces significant risks and uncertainties and that it does not have sufficient resources to meet its obligations as they become due. As a result, such financial statements state that there is substantial doubt as to GDB's ability to continue as a going concern.

*GDB's Current Financial Condition*.  As of June 30, 2016, GDB (excluding its blended component units) had total assets of $6.9 billion and total liabilities of $7.7 billion; accordingly, GDB is insolvent on a balance sheet basis. As of June 30, 2016, GDB (excluding its blended component units) had $3.8 billion of medium term senior notes outstanding. As of June 30, 2016, the approximate market value of GDB's investment portfolio was approximately $181.7 million. Although GDB was legally required under its enabling act to maintain liquid reserves of at least 20% of its demand deposits, such legal reserve requirement is temporarily suspended pursuant to Executive Order 10.

Pursuant to Executive Order 14, the Governor suspended the payment of GDB's financial obligations (other than deposits and interest obligations that may be paid "in kind"). For more information on the suspension of the payment of GDB's financial obligations pursuant to Executive Order 14, see "Executive Action Taken under the Moratorium Act" under "OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION."

On July 20, 2016, the Legislative Assembly of the Commonwealth enacted Act No. 74-2016, which authorizes GDB to consolidate and restructure a significant portion of its loans to the Commonwealth and certain of its instrumentalities. Pursuant to such legislation, the loans would be consolidated into a single loan with a 35-year maturity, bearing interest at a rate equal to 5%, and the principal amount of which shall be equal to the book value of the loans being consolidated. The law does not require GDB to accept such restructuring and merely authorizes such transactions.  No action pursuant to Act No. 74-2016 has been taken at this time and any and any such restructuring would ultimately be subject to approval by the Oversight Board pursuant to Section 207 of PROMESA.

*GDB Subsidiaries*.  GDB has several subsidiaries that perform various functions. The principal subsidiaries and their functions are listed below:

***Puerto Rico Housing Finance Authority***. Puerto Rico Housing Finance Authority (the Authority) was created in 1977 to provide public and private housing developers with interim and permanent financing through mortgage loans for the construction, improvement, operation, and maintenance of rental housing for low and moderate-income families. The Authority also issues bonds and notes, the proceeds of which are deposited in separate trusts and generally invested in mortgage-backed securities collateralized by mortgage loans on properties located in Puerto Rico purchased by low and moderate-income families or used to provide subsidies to such families for the acquisition of their primary residence. The Authority is authorized by the U.S. Department of Housing and Urban Development (HUD) to administer the U.S. Housing Act Section 8 program in Puerto Rico, to administer the HOME Investment Partnerships (HOME) Program, and to act as an approved mortgagor, both for multifamily rental units and for single-family homes. In addition, it is an authorized issuer of Government National Mortgage Association (GNMA) mortgage-backed securities and is Puerto Rico's State Credit Agency for the Low-Income Housing Tax Credit Program under Section 42 of the U.S. Internal Revenue Code. Finally, the Authority operates a mortgage loan insurance program which insures a portfolio of approximately $575.6 million mortgage loans mainly to low and moderate-income families.

As of June 30, 2016, the Authority's total outstanding principal balance of loans to the private sector for development and permanent financing of housing projects targeted to low and moderate income families was $52.8 million. The Housing Finance Authority's mortgage loans to low and moderate income homeowners represented an additional outstanding principal balance of $152.4 million as of the same date. The Authority has outstanding tax-exempt revenue bonds the proceeds of which were loaned to the Puerto Rico Public Housing Administration to finance improvements to various housing projects in the Commonwealth. Such bonds are limited obligations of the Authority payable solely from revenues collected from such housing units, with certain exceptions.

As of June 30, 2016, $206.8 million of these bonds were outstanding. See "DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES" for additional information on the outstanding debt of the Housing Finance Authority.

As of June 30, 2016, the Housing Finance Authority had a net position of $434.7 million.

***Puerto Rico Tourism Development Fund***. Puerto Rico Tourism Development Fund ("**TDF**") was created in September 1993 to facilitate the development of Puerto Rico's hotel industry by working with private-sector financial institutions in structuring financings for new hotel projects and hospitality related projects. TDF provides guarantees to interim and permanent financings, interim and permanent loans, and preferred equity capital. As of June 30, 2016, TDF had $226 million in guarantees and $63.9 million in loans (net of 44.1 million in allowances for losses on guarantees and loans). It also had $154 million in cash and in marketable securities, and a net position of $24.1 million. TDF has most of its funds in deposit accounts at GDB. Since April 8, 2016, TDF has been unable to make payments under its guarantees because of the restrictions imposed on the withdrawal of deposits pursuant to Executive Order 2016-10. For more information on the restrictions imposed under Executive Order 10, see "Executive Action Taken under the Moratorium Act" under "OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION."

***Puerto Rico Development Fund***. Puerto Rico Development Fund was established in April 1977 to provide an alternate source of financing to private enterprises. The Development Fund is also authorized to guarantee obligations of those enterprises and invest in their equity securities. As of June 30, 2016, the Development Fund had assets of $12.2 million, including $2.6 million in loans to private entities, net of allowances for loan losses of approximately $24.1 million, $9.3 million in cash and bank deposits, and $242,000 in preferred shares of various private entities.

***Puerto Rico Public Finance Corporation***. Puerto Rico Public Finance Corporation ("**PFC**") was established in November 1984 to provide agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. The bond trustees of certain limited obligation bonds issued by the PFC currently hold notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools and the Department of Health and PRASA, among others. All such PFC bonds are limited, non-recourse obligations of PFC payable solely from Commonwealth appropriations made to pay debt service on the notes held by the bond trustees. The Legislative Assembly of the Commonwealth did not include appropriations for the payment of debt service on such notes in the budgets for fiscal years 2016 and 2017. As a result, as of the date of this Report, PFC has failed to make payments of approximately $146.1 million in respect of its bonds.   For details of GDB debt obligations see "DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES."

## Puerto Rico Fiscal Agency and Financial Advisory Authority

On April 6, 2016, the Moratorium Act created the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**FAFAA**") as an independent public corporation for the purpose of acting as fiscal agent, financial advisor and reporting agent of the Commonwealth and its public corporations, instrumentalities, commissions, authorities, municipalities and political subdivisions and to assist such entities in confronting the grave fiscal and economic emergency that the Commonwealth is currently experiencing. In doing so, FAFAA assumed the fiscal agency and financial advisor responsibilities previously exercised by GDB.

FAFAA also oversees matters related to the restructuring or adjustment of the Commonwealth's financial liabilities, and otherwise coordinates liability management or other transactions with respect to such obligations.  For fiscal year 2017, the new entity was assigned a $40 million appropriation from the General Fund to cover operating expenses.

## Non - Tax Supported Public Corporations

## Puerto Rico Electric Power Authority

The Puerto Rico Electric Power Authority ("**PREPA**") supplies substantially all of the electricity consumed in the Commonwealth. PREPA owns all transmission and distribution facilities and most of the generating facilities that constitute Puerto Rico's electric power system.

PREPA had deficit on net position of $420 million during fiscal year 2014, compared with deficit on net position of $272 million and $345 million, during fiscal years 2013 and 2012, respectively.

137

PREPA's operating results have been adversely affected in recent years by a decrease in electric energy demand caused in part by a declining population, reduced business activity, a prolonged recession, high fuel costs which resulted from reliance on oil for energy generation, high capital expenditure requirements associated with ageing generating facilities, and a high level of debt. As of July 31, 2016, PREPA's debt included approximately $8.259 billion of outstanding revenue bonds issued under PREPA's Trust Agreement, and approximately $696 million of loans under bank working capital lines of credit (the "**Fuel Lines**"). As of July 31, 2016, PREPA also owed GDB approximately $35 million under a line of credit.

### *Agreements in Principle with Certain Creditors*

On September 2, 2015, PREPA announced an agreement in principle (the "**Ad Hoc Group Agreement**") regarding the economic terms of a restructuring with an ad hoc group of PREPA's bondholders (the "**Ad Hoc Group**") that held, at that time, approximately 35% of PREPA's outstanding bonds.

Under the Ad Hoc Group Agreement, bondholders will have the option to exchange their existing uninsured bonds at an 85% exchange ratio for new securitization bonds to be issued by the Puerto Rico Electric Power Authority Revitalization Corporation (the "**PREPARC**"). The securitization bonds will pay cash interest at a rate of 4.0% - 4.75% (depending on the rating obtained) ("**Option A Bonds**") or convertible capital appreciation securitization bonds that will accrue interest at a rate of 4.5% - 5.5% for the first five years and pay current interest in cash thereafter ("**Option B Bonds**"). Option A Bonds will pay cash interest only (no principal payments) for the first five years, and Option B Bonds will accrue interest but not receive any cash interest and will not pay principal during the first five years. All of PREPA's uninsured bondholders will have an opportunity to participate in the exchange.

On September 22, 2015, PREPA announced an agreement in principle (the "**Fuel Line Agreement**") regarding economic terms with its banks that provided revolving lines of credit used to pay for purchased power, fuel and other expenses (together, with their transferees, as applicable, the "**Fuel Line Lenders**"). Under the Fuel Line Agreement, the Fuel Line Lenders, which held 100% of the Fuel Lines, will have the option to either (1) convert their existing credit agreements into term loans, with a fixed interest rate of 5.75% per annum, to be repaid over six years in accordance with an agreed amortization schedule or (2) exchange all or part of the principal amount due under their existing credit agreements for new securitization bonds to be issued on the same terms as the Ad Hoc Group.

### *Restructuring Support Agreement*

On November 5, 2015, PREPA announced its entry into a restructuring support agreement (the "**Initial RSA**") with the Ad Hoc Group (representing at the time 40% in principal amount of outstanding bonds) and the Fuel Line Lenders setting forth the agreed-upon terms of PREPA's recovery plan. The economic terms set forth in the Initial RSA are consistent with the Ad Hoc Group Agreement and the Fuel Line Agreement. In addition, pursuant to the Initial RSA, GDB was entitled to receive substantially the same treatment on the debt owed by PREPA to it as the Fuel Line Lenders. PREPA's monoline bond insurers were not parties to the Initial RSA.

On December 23, 2015, certain of the monoline bond insurers along with the Ad Hoc Group (representing together at that time approximately 66% in principal amount of the

outstanding Bonds), the Fuel Line Lenders and GDB (collectively, the "**Supporting Creditors**"), entered into an amended and restated restructuring support agreement (the "**A&R RSA**," and together with the Initial RSA, the January RSA (as defined below) and the Revised RSA (as defined below), are referred to as the "**RSA**"), containing terms and conditions substantially similar to those in the Initial RSA outlined above.

Under the A&R RSA, the monoline bond insurers have agreed to consent to certain amendments to PREPA's insured bonds, provide up to $462 million of reserve surety bonds at the closing of the transaction and commit to providing additional surety capacity at a later time during the term of the securitization bonds, as credit support for said securitization bonds, which would be available to be drawn upon in the event certain cash reserves and transition payments from PREPA's customers are insufficient to pay current debt service on the securitization bonds. In return for this, (1) PREPARC would issue $2.1 billion additional securitization bonds, which amount is subject to adjustment in accordance with the RSA, as credit support for the outstanding PREPA insured Bonds to be held in escrow for the benefit of holders of PREPA's insured Bonds and (2) PREPA and PREPARC would attempt to refinance certain outstanding Bonds insured by such monoline insurers with securitization bonds during a 6-month period starting 3 years after the date the above exchange closes. The surety bonds to be provided by the monoline bond insurers would be replaced by PREPARC with cash (derived from transition payments) beginning in fiscal year 2019 over a period of nine years, subject to earlier replacement in accordance with certain conditions set forth in the RSA. Among the primary purposes for this transaction are to refinance at a lower cost a portion of PREPA's outstanding Bonds and to improve PREPA's liquidity position during the first five years after the initial securitization bonds issuance in order to facilitate PREPA's recovery and allow it to reinvest in its assets.

Under the A&R RSA, certain of the Supporting Creditors agreed to purchase approximately $115 million in bonds to refund a portion of the interest payable on the Bonds on January 4, 2016, subject to certain conditions including the enactment of the PREPA Revitalization Act in acceptable form pursuant to the standards set forth in the A&R RSA. This agreement was formalized in a Bond Purchase Agreement (the "**Initial 2016AB Bond Purchase Agreement**") executed on December 29, 2015.

On January 23, 2016, the A&R RSA terminated when the PREPA Revitalization Act (discussed below) was not enacted into law and the Ad Hoc Group did not agree to PREPA's request to extend the related RSA milestone. PREPA continued to engage in discussions with the Ad Hoc Group and the other Supporting Creditors regarding a potential extension of the RSA and the transactions contemplated therein. The Initial 2016AB Bond Purchase Agreement also terminated on January 23, 2016 when the A&R RSA terminated. PREPA continued to engage in discussions with the Supporting Creditors regarding the transactions contemplated by the Initial 2016AB Bond Purchase Agreement.

On January 23, 2016, certain of the Fuel Line Lenders agreed to enter into a short form forbearance agreement to forbear from exercising enforcement rights against PREPA under the applicable fuel line agreements through February 12, 2016.

On January 27, 2016, PREPA and the Supporting Creditors entered into a revised RSA (the "**January RSA**") and a revised Bond Purchase Agreement (the "**Revised 2016AB Bond Purchase Agreement**"). The January RSA incorporated the terms and conditions of the A&R

139

RSA, with minor adjustments to address delays in the legislative consideration of the PREPA Revitalization Act.  The milestone date for legislative approval of the PREPA Revitalization Act was extended to February 16, 2016, and other related milestones were also adjusted accordingly. The Revised 2016AB Bond Purchase Agreement contained substantially the same terms and conditions as the Initial 2016AB Bond Purchase Agreement, except that it reduced the amount of total Bonds to be sold from $115 million to $111 million and made certain changes to the timing and conditions of the contemplated Bond purchase.  Under the Revised 2016AB Bond Purchase Agreement, 50% of the total purchased Bonds (the "**Series 2016A Bonds**") were required to be purchased upon a determination by the applicable Supporting Creditors that the PREPA Revitalization Act satisfied the standards set forth in the RSA and the remaining 50% of the total purchased Bonds (the "**Series 2016B Bonds**") were required to be purchased upon the filing of a petition with the Puerto Rico Energy Commission (the "**Energy Commission**") seeking approval of the calculation methodology for the transition charge through the securitization mechanism that satisfies the standards under the RSA. Following several amendments to the Revised 2016AB Bond Purchase Agreement in light of various delays and subsequent developments including the enactment of the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, the closing of the Series 2016A Bonds occurred on May 19, 2016 and the closing of the Series 2016B Bonds occurred on June 22, 2016.

On March 14, 2016, PREPARC became a party to the RSA (the "**Revised RSA**").

On June 29, 2016, PREPARC, PREPA and the Supporting Creditors entered into the First Supplement to the RSA extending the termination date of the RSA from June 30, 2016 to December 15, 2016 and revising certain other terms and milestones of the RSA.  Additionally, as part of the First RSA Supplement, PREPA reached an agreement with Syncora Guarantee Inc., one of its monoline bond insurers, with respect to the restructuring of debt insured by Syncora. Under the terms of the agreement with Syncora, PREPA will refinance certain Syncora-insured debt, PREPARC will conduct a tender offer for certain Syncora-insured debt, and Syncora will exchange certain of the Syncora-insured debt owned by Syncora on the same terms as the Ad Hoc Group.

In connection with the First RSA Supplement and PREPA's payment of approximately $415 million in principal and interest due under the Bonds on July 1, 2016, PREPA, the monoline bond insurers and certain members of the Ad Hoc Group executed a new Bond Purchase Agreement under which they agreed to purchase approximately $264 million of bonds with varying maturity dates ranging from four to six years.  The sale of these bonds closed on June 30, 2016.

There can be no assurance that the transactions contemplated by the RSA will be consummated. Significant uncertainty remains as to the potential consummation of the transactions set forth in the RSA, which is subject to a number of material conditions and contingencies, including without limitation, (1) receipt of an investment grade rating on the new securitization bonds from any major credit rating agency that rates the securitization bonds; (2) receipt of an opinion by U.S. bond counsel that interest on the securitization bonds is excludable from gross income for federal income tax purposes and exempt from all state and Puerto Rico taxes; (3) successful completion of litigation relating to the validation of the PREPA Revitalization Act and the issuance of the new securitization bonds, (4) obtaining approval and reaching agreement with all Supporting Creditors, including the Fuel Line Lenders, regarding the definitive documentation of the various restructuring transactions; (5); and (6) actions to be taken or not taken by third parties, including customers, suppliers, business partners and competitors, and legislative, judicial and governmental authorities and officials, including but not limited to the Oversight Board established pursuant to PROMESA.

The RSA contains a number of termination or withdrawal events in favor of the Supporting Creditors, including if there is a material amendment to certain terms of the recovery plan, if PREPA commences any proceeding under any bankruptcy or insolvency law (except to implement the recovery plan in accordance with the RSA), as well as the failure to achieve certain milestones by specific dates, among other events, which could result in termination of the RSA or withdrawal from the RSA by individual Supporting Creditors. In addition, the RSA contains a number of PREPA termination rights, including if there is a material breach or default by a Supporting Creditor (solely as to the applicable defaulting Supporting Creditor), if the Ad Hoc Group ceases to beneficially own or control, in the aggregate, at least 30% of the outstanding principal amount of Bonds, as well as a fiduciary out if PREPA's Governing Board determines that existing circumstances warrant a termination of the RSA as a result of the board's fiduciary or statutory duties.

### New Securitization Bonds

The PREPA Revitalization Act authorizes the PREPARC, a bankruptcy remote entity (as defined in the PREPA Revitalization Act), to issue securitization bonds and impose a transition charge on PREPA's customers, with an automatic adjustment mechanism, for the purpose of allowing PREPA to restructure certain of its financial indebtedness as contemplated by the RSA. On April 7, 2016, PREPARC filed a petition before the Energy Commission seeking approval of the calculation methodology for the transition charge and the related adjustment mechanism. On June 21, 2016, the Energy Commission approved PREPARC's petition, and on June 28, 2016, PREPARC approved a resolution authorizing the issuance of the new securitization bonds, subject to certain terms and conditions. As approved, the initial transition charge will be approximately 3.1 cents per kWh for residential and commercial customers. The issuance of such securitization bonds remains subject to numerous material risks and contingencies, including without limitation, the successful completion of litigation relating to the validation of the PREPA Revitalization Act and the issuance of the new securitization bonds.

### Provisional Rate

On May 27, 2016, PREPA filed a petition before the Energy Commission seeking approval of a new rate structure, including a request for approval of a provisional rate on an

expedited basis.  On June 24, 2016, the Energy Commission issued an order approving a provisional rate, on a temporary basis, increasing the rate by approximately 1.299 cents per kWh, effective as of thirty days after issuance of the order, subject to certain conditions.  The rate adjustment is estimated to generate additional revenues in the amount of approximately $225 million annually.

### PREPA Revitalization Act

On November 4, 2015, the Governor submitted the PREPA Revitalization Act to the Legislative Assembly to facilitate PREPA's ongoing transformation and recovery plan.

The PREPA Revitalization Act was approved by the Senate of Puerto Rico on February 10, 2016 and by the House of Representatives, with amendments, on February 15, 2016.  The Senate concurred with these amendments, and the Governor signed the bill, Act No. 4-2016 into law on February 16, 2016.

The PREPA Revitalization Act sets forth a framework for PREPA to execute on the agreements with creditors reached to date.  Among other things, the PREPA Revitalization Act (1) enhances PREPA's governance processes; (2) adjusts PREPA's practices for hiring and managing management personnel; (3) changes PREPA's processes for collecting outstanding bills from public and private entities; (4) improves the transparency of PREPA's billing practices; (5) implements a competitive bidding process for soliciting third party investment in PREPA's infrastructure; (6) allows for the refinancing of existing PREPA bonds through a securitization that would reduce PREPA's indebtedness and cost of borrowing; and (7) sets forth an expedited process for the Energy Commission to approve or reject PREPA's proposal for a new rate structure that is consistent with its recovery plan. The PREPA Revitalization Act established a July 1, 2016 deadline for PREPA to appoint new independent directors to its Governing Board. However, the new directors were appointed on October 26 and October 27, 2016, and were confirmed by the Senate of Puerto Rico on December 1, 2016.

### Validation Proceedings

On April 19, 2016, various plaintiffs, including the Irrigation and Electrical Workers Union ("**UTIER**"), a coalition of retirees and a consumer, filed complaints in the Court of First Instance, San Juan Part (the "**Validation Court**"), against various defendants, including PREPA, PREPARC, the Commonwealth of Puerto Rico and the Energy Commission, challenging the constitutionality of the PRA and raising other legal arguments against the PRA. One of those complaints was dismissed, but three others remain. In addition, on August 19, 2016 several plaintiffs, including UTIER, the retiree coalition and certain renewable energy interests, filed legal challenges to the Restructuring Resolution, alleging among other things that the Restructuring Resolution should be invalidated.  The applicable statutes of repose as set forth in the PREPA Revitalization Act with respect to such challenges have now expired.

Currently, there are three (3) lawsuits challenging the constitutionality of the PRA, three (3) lawsuits challenging the Restructuring Order and Resolution  based on administrative law arguments, and one (1) lawsuit that challenges both the PRA and the Restructuring Order and Resolution.  All seven (7) lawsuits are pending before *different* judges.  The parties vary slightly in each of the lawsuits, but PREPA is a defendant in all of them, the SPV is a defendant in most, and the Commonwealth is included or is in the process of being included in all of the

142

constitutional challenges.  The Energy Commission is also a party in the cases challenging the Restructuring Resolution and Order, as well as in one of the constitutional cases.

Consolidation was attempted of the constitutional claims, on the one hand, and the administrative claims, on the other.  However, and despite strong language in the statute, the consolidation requests were denied.  All seven lawsuits are being handled independently by seven Courts.  As of December 2016, the status of the seven cases varied, and could be summarized as follows: (1) one of the constitutional cases, the UTIER case, has been fully briefed on summary judgment and oral argument before the Court of First Instance held, with the parties now awaiting a resolution on the merits; (2) another of the constitutional cases, the first Asociación de Jubilados case, has had motion practice and several hearings on procedural issues, but no dispositive motions have been filed; a schedule should be set in a December 20 hearing; (3) the third constitutional case, the Cuadrado case, is delayed as the Commonwealth has yet to be included, but should be included shortly; (4) the mixed administrative and constitutional case, the Asociación de Jubilados II case, is also in a very early procedural stage, as process has not been served; (5) in the three administrative cases no dispositive briefs by PREPA or SPV have been filed, but the Energy Commission has sought dismissal and PREPA and SPV are affirmatively seeking an order stating that the correct standard of review for those challenges is the arbitrary and capricious standard applicable to administrative cases in general and adopted in the PRA.  Both the Energy Commissions'motion and PREPA's and SPV's motion regarding standard of review are pending.

### PROMESA

PREPA is evaluating its potential options under PROMESA, which may involve, among other things, the commencement of a restructuring process under Title III or Title VI of PROMESA.

### Operational Transformation

Ms. Donahue, chief restructuring officer, and a team of full time consultants from AlixPartners are working, alongside PREPA management, under a contract for services with PREPA that expires on December 15, 2016. AlixPartners' efforts, along with those of PREPA, have yielded approximately $245 million in one-time cash savings and approximately $205 million in recurring annual savings. Additional savings initiatives with projected annual savings of approximately $30 million are in the process of being executed. The team is furthermore working on documenting and transitioning new procedures to PREPA in order to provide for the sustainability of savings achieved over the long term.

### Integrated Resources Plan

In July 2015, PREPA submitted to the Puerto Rico Energy Commission a proposed integrated resources plan (as amended, the "**IRP**") as required under the Puerto Rico Energy Transformation and Relief Act.  Following multiple hearings, on September 23, 2016, the Energy Commission approved a modified IRP including key elements of PREPA's proposed IRP to upgrade PREPA's transmission, distribution and generation systems.  At that time, the Energy Commission did not approve the construction of the Aguirre Offshore Gas Port ("**AOGP**") and related conversion projects as proposed by PREPA and directed PREPA to submit additional

information. However, the Energy Commission allowed PREPA to continue with the relevant permitting process for  the AOGP and to spend up to $15 million for the project.  PREPA has sought reconsideration and clarification of certain aspects of the Energy Commission's IRP order and a final decision from the Energy Commission regarding its approval of the IRP is pending.

**Puerto Rico Aqueduct and Sewer Authority**

The Puerto Rico Aqueduct and Sewer Authority ("**PRASA**") owns and operates Puerto Rico's public water supply and wastewater systems. Such systems provide water and wastewater services to 97% and 59% of the Commonwealth's population, respectively.

### *Financial Results and Inability to Fund CIP Requirements*

PRASA reported an operating income of $115.1 million for fiscal year 2015, compared to operating income of $142.8 million for fiscal year 2014 and an operating loss of $304.4 million for fiscal year 2013. The change in net position for the years ended June 30, 2015 and 2014 amounted to $86.1 million and $41 million, respectively. The operating income in 2015 resulted from PRASA's adoption of a comprehensive plan to increase its revenues and reduce its expenses after reporting operating losses in fiscal years 2011 through 2013, which included the implementation of a new rate structure which became effective on July 15, 2013. At the time of adoption of the rate structure, PRASA's management expected that the revenue increase would be sufficient to allow PRASA to cover its operating expenses and debt service until 2017, assuming that external financing would be available to cover PRASA's capital improvement program ("CIP"), which has historically been funded through external interim financings, bond issues and a limited amount of federal funds and other funding sources.

PRASA has not been able to access the credit markets since August 2015. Therefore, PRASA is currently experiencing cash flow and financing difficulties.  As a result, PRASA has been unable to pay certain outstanding contractor obligations and has had to suspend or cancel substantially all of its CIP projects. As of June 30, 2016, unpaid CIP contractor obligations were approximately $150 million, excluding interest and penalties.

As set forth in Note 15 to PRASA's fiscal year 2015 audited financial statements, PRASA's significant recurring losses, working capital deficiencies, credit downgrades, large non-discretionary capital expenditure requirement, and lack of market access raise substantial doubt about its ability to continue as a going concern. PRASA management's plans in regard to these matters are also described in Note 15 to the financial statements.

### *Qualified Opinion for Fiscal 2015 Financial Statements*

As described in Note 1 to PRASA's 2015 financial statements, PRASA has not implemented the requirements of Statement No. 68 of the Governmental Accounting Standard Board, *Accounting and Financial Reporting for Pensions, an amendment of GASB No. 27* and Statement No. 71, *Pension Transition for contributions Made subsequent to the Measurement Date, an amendment of GASB Statement No. 68*, because the final audited pension information from ERS was not readily available. Therefore, PRASA has not recorded its proportionate share of net pension obligation, deferred inflow of resources and deferred outflow of resources related to pension costs, and PRASA has not recognized the effect of current period changes in net

144

pension obligation, deferred outflow of resources and deferred inflow of resources as these relate to pension costs for the year ended June 30, 2015.

### 2015A Senior Bonds

On September 15, 2015, PRASA issued $75 million of its 2015A Senior Bonds (the "**2015A Senior Bonds**"), due February 29, 2016, under its Master Agreement of Trust. The proceeds of the 2015A Senior Bonds were used to repay a portion of the outstanding balance of a term loan. The 2015A Senior Bonds were secured by an escrow deposit of PRASA's funds, then on deposit in the Rate Stabilization Account of the Surplus Fund created under the Master Agreement of Trust. On February 29, 2016 PRASA paid the 2015A Senior Bonds in full, together with the $15 million balance of the term loan, with the escrowed funds securing such facilities.  See "DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES" for additional information on PRASA's outstanding debt.

### Forbearance Agreements

Historically, PRASA has received federal funds for its CIP through various loans (the "**State Revolving Fund Loans**") made by PRIFA from funds in the Clean Water State Revolving Fund Programs and the Drinking Water State Revolving Fund Programs, created under the federal Clean Water Act of 1972 and Safe Drinking Water Act of 1974, as amended, administered by the Commonwealth's Environmental Quality Board ("**EQB**") and the Puerto Rico Department of Health ("**PRDOH**"), respectively and from bond proceeds from the United States Department of Agriculture ("**USDA**") Rural Development Program by issuing revenue bonds as authorized under PRASA's Resolution No. 1224, adopted by on August 12, 1986, as amended (the "Rural Development Bonds").  The State Revolving Fund Loans and the Rural Development Bonds are secured by a guaranty from the Commonwealth of Puerto Rico under Act No. 45 of the Legislative Assembly of Puerto Rico, approved on July 28, 1994, as amended.

PRASA had to discontinue the making of certain deposits to the Commonwealth Payments Fund under the Master Trust Agreement.  Amounts on deposit in the Commonwealth Payments Fund are used to pay the State Revolving Fund Loans, the Rural Development Bonds and Commonwealth Supported Obligations (consisting of limited obligations of PRASA, payable solely from Commonwealth appropriations, related to the construction of the North Coast Superaqueduct).  PRASA's inability to make such deposits to the Commonwealth Payments Fund or to make payment on the indebtedness payable thereunder does not constitute an Event of Default under the Master Trust Agreement.

On June 30, 2016, PRASA executed a Forbearance Agreement (the "Forbearance Agreement") with the PRDOH, administrator of the Drinking Water State Revolving Fund Programs, EQB, administrator of the Clean Water State Revolving Fund Programs, and PRIFA, a public corporation and instrumentality of the Commonwealth, as operating agent for the for the State Revolving Funds, authorized to assist the PRDOH and the EQB in the administration, financial and accounting activities of the State Revolving Funds. Under the Forbearance Agreement, the payments due on July 1, 2016 under the State Revolving Fund Loans are deferred and the parties thereto agreed to forbear from exercising, or consenting to the exercise of, any enforcement of rights or remedies available to each under the State Revolving Fund Loans.

PRIFA, PRDOH and EQB, with the acknowledgment and support of the United States Environmental Protection Agency ("**EPA**"), granted such forbearance, subject to the terms and conditions set forth in the Forbearance Agreement, for a period of six (6) months, which may be extended for an additional six (6) months if conditions are met. During such forbearance period, the Commonwealth Guaranty will not be enforced either. PRIFA, EQB and PRDOH, with the support of EPA, contemplate that during the forbearance period the parties may negotiate new terms and conditions to the State Revolving Fund Loans under a restructuring of such loans and a revision of underlying agreements between PRASA, PRIFA, EQB, PRDOH and, where applicable, EPA, and understand that given current circumstances, such forbearance and possible restructuring protects the perpetuity of the State Revolving Loan programs beyond the financially stressed scenario faced by both PRASA and the Commonwealth at this time.

Regarding the Rural Development Bonds, PRASA also requested that USDA Rural Development Program provide a short term forbearance period, during which it would refrain from exercising its rights and remedies, including the enforcement of the Commonwealth Guaranty, under the Rural Development Bond documents or grants or loan agreements. To this effect, PRASA and USDA Rural Development Program executed a forbearance document, effective as of June 30, 2016 (the "**USDA Forbearance Agreement**"). The USDA Rural Development Program granted PRASA a three month forbearance period, through September 30, 2016, which has been extended through December 30, 2016, subject to the terms and conditions set forth in the USDA Forbearance Agreement in order to provide for additional time to examine all options available to correct PRASA's deficiencies and restore loan repayment. Pursuant to the USDA Forbearance Agreement the payments due on July 1, 2016 under the Rural Development Bond documents were also deferred for the duration of the forbearance period and USDA Rural Development Program agreed to forbear from exercising, or consenting to the exercise of, any enforcement of rights or remedies available to it under the Rural Development Bond documents or any grant or loan document in relation thereto.

### GDB Term Note

PRASA has not made the quarterly interest and principal payments of the term note payable to GDB, since December 2015.

### PRASA Revitalization Act

On July 12, 2016, the Governor of Puerto Rico signed into law Act 68 of 2016, providing for the creation of a new public corporation, to be known as the Puerto Rico Aqueduct and Sewer Authority Revitalization Corporation (the "PRASA Revitalization Corporation"), as a single purpose, bankruptcy remote entity. The PRASA Revitalization Corporation is authorized to fix and collect securitization charges for the purpose of issuing bonds the proceeds of which may be used by PRASA for its CIP, refinancing of bond anticipation notes and the cancelation, defeasance and refinancing of its Bonds, among other approved financing costs. Act 68 limits the securitization charge which may be imposed by the PRASA Revitalization Corporation to an amount equivalent to 20% of PRASA's revenues and provides that the PRASA Revitalization Corporation may issue up to a maximum of $900 million in bonds for the purpose of financing the development of PRASA's CIP.  In addition, the PRASA Revitalization Corporation may issue one or more series of Bonds in an aggregate principal amount not to exceed the difference between $900,000,000 and the maximum amount of bonds that can be financed with the

securitization charge approved under Act 68, to cover the costs of retiring, defeasing or refinancing PRASA's debt obligations.

PRASA and the PRASA Revitalization Corporation are currently working towards the approval of the Securitization Charge.

### *Environmental Matters*

On September 15, 2015 the United States Department of Justice, acting at the request of the Administrator of EPA, filed a complaint against PRASA and the Commonwealth, as a required party under the Clean Water Act, in the United States District Court for the District of Puerto Rico. The complaint seeked injunctive relief and the assessment of civil penalties against PRASA for alleged violations of the Federal Water Pollution Control Act enacted in 1956, as amended by the federal Water Pollution Control Act Amendments of 1972, the Clean Water Act of 1977, and the Water Quality Act of 1987.

Concurrently with the filing of the complaint, the Department of Justice also filed a consent decree (the "**2015 EPA Consent Decree**") executed among EPA, PRASA and the Commonwealth settling the matters addressed in the complaint, under the terms agreed upon by PRASA and EPA. The 2015 EPA Consent Decree is the result of an extensive negotiation process aimed, among other things, at resolving the claims addressed in the Complaint and the requirements of PRASA IV, and two EPA Consent Decrees executed in 2006 and 2010 (collectively the "**EPA Consent Decrees**") related to the allegations included in the complaint. EPA and PRASA acknowledge in the 2015 EPA Consent Decree that the work to be undertaken thereunder will enable PRASA to better understand its sewer systems, but does not resolve all of PRASA's Clean Water Act obligations with respect to such systems. The Commonwealth will incur liability under the 2015 EPA Consent Decree only to the extent that the laws of the Commonwealth prevent PRASA from raising such revenues needed to comply with the 2015 EPA Consent Decree. In this connection, the Commonwealth represented under the 2015 EPA Consent Decree that its present laws do not prevent PRASA from raising the revenues needed to comply with the obligations it has incurred thereunder.

Negotiations leading to the execution of the 2015 EPA Consent Decree were commenced by PRASA in order to mitigate the high CIP costs mandated by the Existing Consent Decrees, representing 60% of CIP and an approximate cost of $1.4 billion during fiscal years 2006-2014. Another $1.7 billion of mandatory compliance projects would be required under the previously Existing Consent Decrees through fiscal year 2025. Despite being in material compliance with the CIP requirements of the existing consent decrees, PRASA began discussions with the Department of Justice, on behalf of EPA, EPA and PRDOH seeking to amend the existing consent decrees, in order to, among other things: (i) reduce required annual project expenditures and extend compliance deadlines, (ii) incorporate other regulatory projects included in PRASA's CIP not currently covered by the Existing Consent Decrees, and (iii) include the operation, maintenance and CIP requirements related to the Puerto Nuevo wastewater collection system, including alleged combined sewer overflows. The resulting 2015 EPA Consent Decree seeks to realign the cost of CIP projects and activities with PRASA's financial condition and economic prospects.

Pursuant to the terms of the 2015 EPA Consent Decree entered on May 10, 2016, on May 23, 2016, Judgement was entered dismissing the complaint with prejudice and civil case number 15-2283 was closed.

PRASA also expects that with the final approval of the 2015 EPA Consent Decree, it will be able to finalize the amendment to a certain settlement agreement related to violations of the Safe Drinking Water Act, which was originally signed on December 15, 2006 under substantially similar terms (the "**Proposed DWSA Amendment**"). Although the Proposed DWSA Amendment remains to be finalized, on May 22, 2015 the Superior Court of Puerto Rico approved a joint motion submitted by PRASA and PRDOH on May 12, 2015 to amend the 2006 Drinking Water Settlement Agreement to incorporate certain regulatory projects that were not originally included under its provisions. The 2015 EPA Consent Decree and the culmination of the negotiations of the Proposed DWSA Amendment will permit PRASA to significantly reduce annual capital expenditure levels for mandated projects under the Existing Consent Decrees, based on a new comprehensive and holistic prioritization system (the "Prioritization System") for the scheduling and management of CIP projects, applied to CIP requirements under the 2015 EPA Consent Decree and the Proposed DWSA Amendment, as well as other CIP projects that may arise in the future under the Clean Water Act and the Safe Drinking Water Act and taking into account the PRASA's financial situation and available resources.

## State Insurance Fund

SIF is a public corporation and instrumentality of the Commonwealth in charge of managing and regulating the Commonwealth workers' insurance system that covers occupational injuries, diseases and deaths, to which all employers must be subscribed under law. The SIF has nine regional offices throughout the Commonwealth and one Industrial Hospital located in San Juan, which offer workers medical, physical and vocational rehabilitation services. The services offered are mostly defrayed by funds paid by the employers. The SIF did not receive appropriations from the Commonwealth's General Fund in fiscal years 2015, 2014 or 2013.  Its operating revenues, for fiscal years 2015, 2014, and 2013 were $589 million, $615 million and $651 million, respectively.  As of July 31, 2016, SIF estimates it owes approximately $104 million to suppliers and other governmental agencies.

## COMMONWEALTH FINANCIAL REPORTING AND FINANCIAL RESULTS FOR FISCAL YEARS 2010 THROUGH 2016

## Overview

The Commonwealth presents its financial results using different bases of accounting, each of which provides different perspectives of the Commonwealth's financial position.  For example, the Commonwealth presents its results of operation for its General Fund, its primary operating fund, both pursuant to the "modified accrual" basis of accounting and pursuant to the "budgetary" (or "statutory") basis of accounting.  The Commonwealth's financial results may also vary depending on the reporting entities included in the presentation.  For example, the presentation may be limited to certain agencies, public corporations or funds (such as the General Fund), or may be prepared on a "government-wide" basis (i.e., covering all the non-fiduciary activities of the Commonwealth and its public corporations). This section explains how

the financial results of the Commonwealth's operations and the measurements of its financial health compare depending on the reporting entity and the basis of accounting utilized.

Historically, the most common measurement of the Commonwealth's financial health has been the result of its General Fund presented in accordance with the budgetary (or statutory) basis of accounting. While monitoring the financial health of the General Fund is important because this fund receives most of the Commonwealth's tax revenues and books a substantial portion of the government's expenditures on essential services, including health, education and public safety, the measure of financial health provided by the General Fund, particularly on a budgetary basis, is limited given the current complexity of the government. The Commonwealth's government grew in size and complexity as it sought to meet (and finance) new demands for services. The Commonwealth created a myriad of "independent" public corporations to perform essential governmental functions, such as health, education and transportation, while remaining financially responsible for them. At the same time, the Legislature repeatedly diverted tax revenues to fund such public corporations (and the services they offer) as well as to provide collateral and source of repayment for financial indebtedness issued by such legally separate entities.

As described in this section, the financial results of the General Fund pursuant to the budgetary basis of accounting also exclude the financial results of numerous governmental funds of the Commonwealth, results that are nevertheless consolidated with the General Fund under U.S. GAAP for purposes of preparing the Commonwealth's basic financial statements (the "**Basic Financial Statements**"). As a result, the reports that are limited to the General Fund provide a limited view of the government's fiscal condition. Accordingly, a broader, more encompassing view of the Commonwealth's financial position is useful to better understand the total resources of the Commonwealth available to fund essential public services and honor contractual and other legacy commitments, including obligations with bondholders and pensioners.

The economic and financial distress experienced by the Commonwealth during the past decade has underscored the need to monitor and report financial information on a basis broader than the General Fund. In that regard, the Krueger Report concluded that using the General Fund as the standard measure of fiscal balance greatly understated the true deficit of the Commonwealth. After constructing a measure of the Commonwealth's overall deficit based on standard IMF metrics, the report found that central government deficits over the coming years implied an unsustainable trajectory of large financing gaps.

The financial information typically presented in the Commonwealth Basic Financial Statements pursuant to U.S. GAAP provides a much broader view of the Commonwealth's finances than that provided by the General Fund on a budgetary basis. The enactment of PROMESA has underscored the importance of presenting financial information pursuant to U.S. GAAP and ensuring that it is prepared and disseminated in a timely manner. For example, PROMESA requires the Commonwealth to prepare and deliver budgets and fiscal plans pursuant to generally accepted accounting principles, as defined by the Governmental Accounting Standards Board. Furthermore, in order to commence proceedings under Chapter 3 of PROMESA, which provides for a court-supervised debt-adjustment process modeled on Chapter 9 of the U.S. Bankruptcy Code, the Commonwealth must have adopted procedures necessary to deliver timely audited financial statements pursuant to U.S. GAAP and made public draft financial statements and other information sufficient for any interested person to make an informed decision with respect to a possible restructuring.

This section provides a summary of historical financial results for the Commonwealth pursuant to U.S. GAAP and for the General Fund on a budgetary basis, in each case for those periods in which such information is available. In order for the reader to understand and properly interpret this information, it is important to provide a chart of the Commonwealth's structure for financial reporting purposes, a description of the financial information presented by the Commonwealth in its Basic Financial Statements, and an overview of the principal variations resulting from the use of different reporting entities, different basis of accounting, and different accounting methodologies.

## Historical Financial Results – U.S. GAAP

For financial reporting purposes under U.S. GAAP, the Commonwealth as a whole consists of all departments, agencies, funds, functions and public corporations that have been determined to meet the requirements for inclusion in the Commonwealth's financial reporting entity. The following chart, which illustrates the structure of the Commonwealth for financial reporting purposes, identifies the various reporting entities included in the financial information presented by the Commonwealth pursuant to U.S. GAAP.



(1) The Government-Wide financial statements report information of all of the non-fiduciary activities of the Commonwealth and its component units.

(2) Primary operating fund of the Commonwealth. The financial resources received and used in the General Fund (Operating Fund) mostly includes the General Fund budget, as approved by the Commonwealth's Legislature and as adjusted for timing and basis of accounting differences.

(3) OASA: Office for Administration, Sales and Acquisition Fund of the Puerto Rico Department of Housing (also known as *CRUV*, for its Spanish acronym). PRPHA: Puerto Rico Public Housing Administration. PRLDA: Puerto Rico Labor Development Administration. OIPS: Office for Improvement of Public Schools (also known as *OMEP*, for its Spanish acronym).

(4) Special Revenue Funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects.

(5) The Debt Service Fund accounts for and reports financial resources that are restricted, committed or assigned to expenditure for general long-term bonds' principal, interest, and related costs other than bonds payable from the operations of proprietary fund types, pension trust funds, and component units, either blended or discretely presented. Long-term debt and interest due on July 1st of the following fiscal year are accounted for as a fund liability if resources are available as of June 30th for its payment.

(6) The capital projects funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditures for capital outlays, including the acquisition or construction of capital facilities and other capital assets. These capital expenditures may be for the primary government directly or for discrete component units and outside organizations and governments such as the municipalities of the Commonwealth and other applicable entities.

(7) The Governmental Funds of each of the Non-Major Blended Component Units (PBA, PRIFA, Maritime Shipping Authority, The Children's Trust Fund and Special Communities Trust) are classified as Non-Major Governmental Funds in the Fund Financial Statements.

(8) The Water Pollution Control Revolving Fund, administered by the Puerto Rico Environmental Quality Board (EQB), is authorized to enter into operating agreements and capitalization grant agreements with the U.S. Environmental Protection Agency (EPA), mostly for water infrastructure projects, under a joint cooperation agreement between the Environmental Quality Board, the Puerto Rico Infrastructure Financing Authority, the Puerto Rico Aqueduct and Sewer Authority and the Government Development Bank for Puerto Rico, where each entity has agreed to assume their corresponding responsibilities.

(9) The Unemployment Insurance Fund accounts for amounts requisitioned for the Puerto Rico Unemployment Insurance Trust Fund, held by the U.S. Treasury, for payment of unemployment benefits and charges made to individual employers.

(10) Also known as ASEM, for its Spanish Acronym. This fund accounts for the operations of the centralized health services, provided in support of hospitals and other functions offered by the member institutions and consumers of the complex known as Puerto Rico Medical Center.

(11) This fund is administered by the Puerto Rico Department of Health, which is authorized to enter into operating and capitalization grant agreements with the EPA for lending activities

(12) This fund is used to account for contributions made by drivers and their employers to provide a social security plan for the benefit of such drivers. The plan also includes payment of benefits for health and life insurance.

(13) This fund is used to account for disability benefits to remedy temporarily the loss of income as a result of disability caused by sickness or accident unrelated to the employment.

(14) For a description of the Non-Major Discretely Presented Component Units refer to Note 1(b) in the Basic Financial Statements.

The Commonwealth's Basic Financial Statements, prepared pursuant to U.S. GAAP, are comprised of: (i) the "government-wide" financial statements and (ii) the "fund" financial statements. For a detailed description of the structure and basis of presentation of each of these statements, see Note 1, "Summary of Significant Accounting Policies," in the Basic Financial Statements, which are filed with the Municipal Securities Rulemaking Board through its Electronic Municipal Markets Access System. The Basic Financial Statements are also available in GDB's website at www.gdbpr.com under "Investor Resources−Publications and Reports−Commonwealth Comprehensive Annual Financial Report." Below is a high-level description of the government-wide and fund financial statements:

*Government-Wide Financial Statements* – The Commonwealth's government-wide financial statements provide a broad view of the Commonwealth's operations in a manner similar to a private-sector business. The statements provide both short and long-term information about the Commonwealth's financial position, which assist in assessing the Commonwealth's economic condition. These financial statements, which include a Statement of Net Position (balance sheet) and a Statement of Activities (income statement) are prepared using the economic resources measurement focus and the full accrual basis of accounting. As such, expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. The government-wide financial statements present results for the Commonwealth and all of its

agencies, public corporations and instrumentalities (subject to certain limited exceptions, such as fiduciary funds and municipalities and related entities), breaking down the Commonwealth's consolidated operations between its "Primary Government" (divided in turn between "governmental" and "business-type" activities) and its "Discretely Presented Component Units."

Increases or decreases over time in the Commonwealth's Net Position, as reported in its government-wide financial statements, may serve to indicate whether the financial position of the Commonwealth is improving or deteriorating. The following table presents a Summary or Condensed Statement of Net Position for the Commonwealth's Primary Government for fiscal years 2010 through 2014. Results for fiscal years 2015 and 2016 are not yet available.

|  | **Primary Government**<br>**Years Ended June 30**<br>**(in thousands)** | | | | |
|  | **2010** | **2011** | **2012** | **2013** | **2014** |
|  | **(As restated)** [1] | **(As restated)** [1] | **(As restated)** | **(As restated)** | **(As restated)** |
| Revenue: | | | | | |
| Program revenue: | | | | | |
| Charges for services | $1,819,086 | 1,824,729 | 1,926,639 | 2,058,805 | 1,996,051 |
| Operating grants and contributions | 7,080,518 | 6,456,999 | 6,894,892 | 6,963,573 | 6,503,492 |
| Capital grants and contributions | 129,947 | 457,725 | 152,591 | 110,249 | 83,172 |
|  | $ 9,029,551 | $8,739,453 | $8,974,122 | $9,132,627 | $8,582,715 |
| General revenue: | | | | | |
| Taxes | 7,751,387 | 8,602,443 | 8,028,704 | 8,244,567 | 10,226,557 |
| Revenue from global tobacco settlement agreement | — | — | 72,491 | 109,414 | 72,012 |
| Revenue from component units | 76,758 | 84,610 | 74,973 | 90,413 | 131,133 |
| Other, including loss on investments | — | — | 68,065 | 197,804 | 293,275 |
|  | 7,828,145 | 8,687,053 | 8,244,233 | 8,642,198 | 10,722,977 |
| **Total revenue** | **$16,857,696** | **$17,426,506** | **$17,218,355** | **$17,774,825** | **$19,305,692** |
| Expenses: | | | | | |
| General government | 3,156,646 | 2,881,548 | 3,602,639 | 3,342,663 | 2.894.304 |
| Public safety | 2,228,000 | 2,205,782 | 2,240,138 | 2,664,974 | 2,236,392 |
| Health | 2,843,744 | 3,022,000 | 2,903,009 | 3,245,973 | 3,139,595 |
| Public housing and welfare | 3,726,041 | 3,937,901 | 3,674,116 | 3,731,627 | 3,735,594 |
| Education | 4,543,362 | 4,469,337 | 5,145,390 | 4,891,928 | 4,570,665 |
| Economic development | 292,037 | 517,921 | 809,961 | 1,145,653 | 1,417,068 |
| Intergovernmental | 533,939 | 430,941 | 374,127 | 483,970 | 371,719 |
| Interest and other | 1,865,953 | 1,853,685 | 2,429,403 | 2,077,180 | 2,429,405 |
| Unemployment insurance | 720,992 | 635,145 | 685,130 | 387,336 | 271,749 |
| Lotteries | 820,261 | 697,746 | 387,336 | 685,130 | 714,199 |
| Medical Services Administration | — | — | 200,888 | 200,888 | 204,688 |
| Water Pollution Control Revolving Fund | — | — | 1,527 | 1,527 | 1,183 |
| Nonmajor proprietary funds | — | — | 32,386 | 32,614 | 28,920 |
| **Total expenses** | **$20,730,975** | **$20,652,006** | **$22,486,050** | **$22,891,463** | **$22,015,481** |
| **Increase (decrease) in net position before transfers** | **(3,873,279)** | **(3,225,500)** | **(5,267,695)** | **(5,116,638)** | **(2,709,789)** |
| **Transfers** | — | — | — | — | — |
| **Change in net position** | **(3,873,279)** | **(3,225,500)** | **5,267,695** | **(5,116,638)** | **(2,709,789)** |
| **Net position (deficit), beginning of year, as adjusted** | **(29,460,253)** | **(33,333,532)** | **(36,559,032)** | **(41,826,727)** | **(46,943,365)** |
| **Net position (deficit), end of year** | **$(33,333,532)** | **$(36,559,032)** | **$(41,826,727)** | **$(46,943,365)** | **$(49,653,154)** |

[1] The incorporation into the Commonwealth's Basic Financial Statements of, among other things, certain accounting pronouncements issued by GASB during the periods covered below (in particular, GASB Statements Nos. 61, 65 and 70), makes results for such period not completely comparable. The Commonwealth does not prepare a restatement for any period beyond the period immediately preceding the adoption of the applicable accounting pronouncement.

As shown above, the net deficit for fiscal year 2014 was $2.710 billion, a decrease in the deficit of $2.407 billion when compared to the net deficit of $5.117 billion in fiscal year 2013. The decrease in the deficit was a result of higher revenues through the imposition of new taxes and a reduction of expenses.

Note that although the Commonwealth's net position can provide a measure of whether the Commonwealth's financial health is improving or deteriorating, one may also need to consider other non-financial factors, such as changes in the Commonwealth tax structure, demographics, employment levels, debt levels, fiscal condition, economic factors, external markets dynamics and the condition of the Commonwealth's roads, bridges, buildings and other infrastructure, in order to assess the overall economic, financial and operational health of the Commonwealth.

***Discretely Presented Component Units*** – Although legally separate from the Commonwealth, discretely presented component units are important to the Commonwealth because the Commonwealth is financially accountable for them.  As of the date of the last audited financial statements, the Commonwealth classified 48 separate legal entities as discretely presented component units.

The following table presents a Summary or Condensed Statement of Activities and Changes in Net Position for the Commonwealth's Discreetly Presented Component Units for fiscal years 2010 through 2014.  Results for fiscal years 2015 and 2016 are not yet available.

|  | **Discretely Presented Component Units** | | | | |
|  | **Years ended June 30** | | | | |
|  | **(in thousands)** | | | | |
|  | **2010** | **2011** | **2012** | **2013** | **2014** |
|  | **(As restated)**[1] | **(As restated)**[1] | **(As restated)** | **(As restated)** | |
| Revenue: | | | | | |
| Program revenue: | | | | | |
| Charges for services | $8,212,782 | $8,699,462 | $10,082,381 | $9,509,562 | $9,462,985 |
| Operating grants and contributions | 487,044 | 483,202 | 416,931 | 378,626 | 335,884 |
| Capital grants and contributions | 280,108 | 252,625 | 411,165 | 506,665 | 369,369 |
| Other | 26,664 | 19,347 | 92,175 | — | — |
|  | 9,006,598 | 9,454,636 | 11,002,652 | 10,394,853 | 10,168,238 |
| General revenue: | | | | | |
| Excise taxes | 40,862 | 64,519 | 58,468 | 65,642 | 69,999 |
| Grants and contributions not restricted to specific programs | 304,348 | 210,080 | 179,408 | 167,204 | 168,070 |
| Revenue from primary government | 2,998,234 | 2,974,359 | 2,998,055 | 2,262,734 | 2,444,808 |
| Other, including loss on investments | 343,700 | 415,974 | 422,671 | 412,590 | 351,488 |
|  | 3,687,144 | 3,664,932 | 3,658,602 | 2,908,170 | 3,034,365 |
| **Total revenue** | **$12,693,742** | **$13,119,568** | **$14,661,254** | **$13,303,023** | **$13,202,603** |
| Expenses | 13,302,650 | 14,463,231 | 15,244,592 | 14,366,676 | 16,673,901 |
| **Total expenses** | **$13,302,650** | **$14,463,231** | **$15,244,592** | **$14,366,676** | **$16,673,901** |
| **Change in net position** | **(608,908)** | **(1,343,663)** | **(583,338)** | **(1,063,643)** | **(3,471,298)** |
| **Net position (deficit), beginning of year, as adjusted** | **12,863,784** | **12,254,876** | **10,911,213** | **10,597,875** | **9,534,222** |
| **Net position (deficit), end of year** | **$12,254,876** | **$10,911,213** | **$10,597,875** | **$9,534,222** | **$6,062,924** |

[1] The incorporation into the Commonwealth's Basic Financial Statements of, among other things, certain accounting pronouncements issued by GASB during the periods covered below (in particular, GASB Statements Nos. 61, 65 and 70), makes results for such period not completely comparable. The Commonwealth does not prepare a restatement for any period beyond the period immediately preceding the adoption of the applicable accounting pronouncement.

As shown above, the change in net position (deficit) for fiscal year 2014 was $3.471 billion, an increase in the deficit $2.407 billion when compared to the deficit of $1.064 billion in fiscal year 2013. The increase in the deficit was a result of the recognition of approximately $2 billion of loan loss reserves in GDB. GDB had not recorded loan loss reserves prior to fiscal year 2014.

*Fund Financial Statements* – The Commonwealth's fund financial statements for its "governmental funds" and "proprietary funds" (which are the names given to the funds included in "governmental activities" and "business-type activities," respectively, of the primary government under the government-wide financial statements) provide a detailed short-term view of the Commonwealth's finances that assists in evaluating the government's near-term financing

requirements and determining whether there will be adequate financial resources available to meet the current needs of the Commonwealth. As such, the focus and scope of the fund financial statements is narrower than that of the government-wide financial statements. The fund financial statements thus focus on near-term inflows and outflows of expendable resources and, in the case of the governmental fund financial statements (but not in the case of the proprietary fund financial statements), are prepared based on the "current financial resources" measurement focus (instead of the "economic resources" measurement focus used in the government-wide financial statements) and the "modified accrual" basis of accounting (instead of the "full accrual" basis of accounting used in the government-wide financial statements). Furthermore, the governmental fund financial statements include the results of all the Commonwealth funds (including the General Fund and the Debt Service Fund) but record the activities only of those public corporations, such as COFINA, PBA and PRIFA, that meet the standards for inclusion as "blended" component units under U.S. GAAP. In other words, the fund financial statements do not incorporate the results for the 48 discretely presented component units.  As such, the fund financial statements may understate the expenditures for which the Commonwealth may be ultimately financially accountable.

Under the "current financial resources" measurement focus that applies to the fund financial statements, revenue is recognized as soon as it is measurable and available, net of estimated overpayments and amounts considered not collectible. Revenue is considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period. Under the modified accrual basis of accounting, expenditures are generally recorded when a liability is incurred, as under "full accrual" accounting.  However, the accrual of such expenses is "modified" as follows:

- Employees' vested annual vacation and sick leave are recorded as expenditures when matured. The unmatured amount of accumulated annual vacation and sick leave unpaid is reported only in the government wide financial statements.
- Interest and principal on general long-term obligations and interest on interest rate swap agreements are recorded when due, except for interest and principal due on July 1, which are recorded on the immediately preceding June 30.
- Pension liabilities are recorded when contributions are required to be made by law to the pension funds, and therefore include the "additional uniform contributions" (in the case of the ERS) or the "annual additional contributions" (in the case of the TRS) required under Puerto Rico law, but do not include the "actuarially required contribution" (or "ARC") required to be recorded under the full accrual basis of accounting.
- Federal funds' cost disallowances, other long-term obligations and claims subject to litigation are recorded in the governmental funds only when payment is due. Claims subject to litigation would be recorded only after a judgment is rendered or a settlement is agreed to, not when an assessment of the likelihood of success of a claim is made and a contingency recorded, as would be the case under the full accrual basis of accounting.

Because the focus of the governmental funds financial statements (and the "modified accrual" basis of accounting) is narrower than that of the government-wide financial statements (prepared based on the "full accrual" basis of accounting), it is useful to compare the information presented for governmental funds with similar information presented in the government-wide

156

financial statements. By doing so, readers may better understand the long-term impact of the government's near-term financing decisions, including the incurrence of long-term debt service obligations. The Basic Financial Statements provide a reconciliation between the "governmental funds" financial statements and the results of operation of "governmental activities" within the government-wide financial statements.

**Governmental Funds Revenues and Expenditures under U.S. GAAP**

The following table presents a Summary Statement of Revenues and Expenditures for the governmental funds for fiscal years 2011 through 2016 under U.S. GAAP. Results for fiscal years 2015 and 2016 are preliminary, unaudited and subject to adjustment. The table presents the aggregate for all of the Commonwealth's governmental funds, which includes the General Fund, Debt Service Fund, and Capital Projects Fund, and the Commonwealth's blended component units (COFINA, PBA, PRIFA, Maritime Shipping Authority, Children's Trust Fund and the Special Communities Trust).

COMMONWEALTH OF PUERTO RICO
Statement of Revenues, Expenditures, and Changes in Fund Balances – Governmental Funds
Years ended June 30,
(In thousands)

| | 2011 | 2012 | 2013 | 2014 | 2015 [(1)] | 2016 [(2)] |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Taxes: | | | | | | |
| Income taxes | $4,749,942 | $4,068,802 | $4,229,193 | $5,108,866 | $5,450,926 | $4,556,675 |
| Sales and use tax | 1,129,006 | 1,144,659 | 1,170,748 | 1,294,445 | 1,320,907 | 2,259,126 |
| Excise taxes | 2,106,784 | 2,695,543 | 2,870,741 | 3,363,611 | 3,164,345 | 3,259,065 |
| Property taxes | 241,719 | 66,375 | 57,673 | 55,838 | 21,586 | 11,315 |
| Other taxes | 83,589 | 90,514 | 81,449 | 112,240 | 113,561 | 158,037 |
| Charges for services | 632,005 | 624,069 | 698,373 | 694,507 | 685,219 | 678,996 |
| Revenue from global tobacco settlement agreement | 71,097 | 72,491 | 107,688 | 72,130 | 71,514 | 71,108 |
| Revenue from component units | 84,610 | 85,573 | 90,413 | 131,133 | 198,844 | 220,870 |
| Intergovernmental | 6,126,212 | 6,778,445 | 6,643,091 | 6,568,272 | 6,515,953 | 6,467,538 |
| Interest and investment earnings (losses) | 28,529 | 28,659 | (6,230) | 21,326 | 16,493 | 15,206 |
| Other | 210,394 | 156,956 | 42,791 | 141,276 | 175,692 | 84,638 |
| Total revenue | $15,463,887 | $15,812,086 | $15,985,930 | $17,563,644 | $17,735,040 | $17,782,574 |
| **Expenditures:** | | | | | | |
| Current: | | | | | | |
| General government | 1,284,878 | 2,027,460 | 1,109,642 | 1,321,094 | 1,451,594 | 1,727,993 |
| Public safety | 2,044,398 | 2,319,640 | 2,187,022 | 2,159,732 | 2,248,165 | 2,208,890 |
| Health | 2,932,836 | 2,950,367 | 3,225,142 | 3,041,875 | 3,070,393 | 2,985,961 |
| Public housing and welfare | 3,736,104 | 3,406,021 | 3,653,466 | 3,430,653 | 3,498,722 | 3,521,185 |
| Education | 4,453,332 | 4,599,069 | 4,836,900 | 4,597,170 | 4,687,514 | 4,620,287 |
| Economic development | 460,986 | 783,490 | 993,453 | 1,276,749 | 1,077,158 | 1,282,934 |
| Intergovernmental | 430,171 | 377,427 | 484,035 | 371,558 | 400,716 | 430,496 |
| Capital outlays | 452,482 | 558,377 | 518,952 | 198,351 | 213,466 | 110,880 |
| Debt service: | | | | | | |
| Principal | 1,845,785 | 1,871,727 | 724,993 | 3,024,177 | 1,829,738 | 1,660,384 |
| Interest and other | 1,588,601 | 2,064,564 | 1,861,255 | 1,909,784 | 2,405,159 | 2,320,990 |
| Other – debt issuance costs | 19,797 | 77,445 | 600 | 36,821 | — | — |
| Total expenditures | $19,249,370 | $21,035,587 | $19,595,460 | $21,367,964 | $20,882,625 | $20,870,000 |
| Deficiency of revenue under expenditures | (3,785,483) | (5,223,501) | (3,609,530) | (3,804,320) | (3,147,585) | (3,087,426) |
| **Other financing sources (uses):** | | | | | | |
| Transfers in | 5,704,579 | 4,886,177 | 2,412,770 | 4,048,879 | 3,295,525 | 3,230,825 |
| Transfers out | (5,474,028) | (4,666,383) | (2,165,862) | (3,781,923) | (1,237,277) | (2,973,893) |
| Proceeds from long term debt issued | 1,684,135 | 3,703,223 | 1,268,566 | 1,056,504 | 364,743 | — |
| Issuance of refunding bond | 1,364,475 | 4,482,178 | — | 3,500,000 | — | — |
| Payments to refunded bond escrow agent | (483,515) | (2,822,288) | — | (466,574) | — | — |
| Sale of capital assets | 4,279 | 1,434 | 4,713 | 1,016 | 1,150 | — |
| Discount on bonds issued | (20,253) | 18,414 | — | (245,000) | (17,216) | — |
| Termination payments on swap agreements | (23,854) | (550,855) | — | (90,417) | — | — |
| Total other financing sources (uses) | 2,755,818 | 5,051,900 | 1,520,187 | 4,022,485 | 2,406,925 | 256,932 |
| Net change in fund balances | (1,029,665) | (171,601) | (2,089,343) | 218,165 | (740,660) | (2,830,494) |
| Fund balances (deficit) – beginning of year, as restated | $2,901,466 | $1,871,801 | $1,700,200 | $(389,143) | $(170,978) | $(911,638) |
| Fund balances (deficit) – end of year | $1,871,801 | $1,700,200 | $(389,143) | $(170,978) | $(911,638) | $(3,742,132) |

(1) The fiscal year 2015 results are preliminary, unaudited and subject to change. Results for fiscal year 2015 do not account for the results of operations of various component units, such as ASES and GDB, which have historically been presented as "Discretely Presented Component Units" in the Basic Financial Statements but that may, as part of the fiscal year 2015 audit, be recharacterized as "Blended Component Units" and thus incorporated into the Governmental Fund financial statements. The fiscal year 2015 deficit also includes a $200 million impairment charge to account for the impairment of amounts on deposit in GDB.

(2) The fiscal year 2016 results are preliminary, unaudited and subject to change. Results for fiscal year 2016 do not account for the results of operations of various component units, such as ASES and GDB, which have historically been presented as "Discretely Presented Component Units" in the Basic Financial Statements but that may, as part of the fiscal year 2016 audit, be recharacterized as "Blended Component Units" and thus incorporated into the Governmental Fund financial statements. The fiscal year 2016 deficit also includes an impairment charge on the Commonwealth of approximately $490 million, reflected in the "Operational General Fund," to account for the impairment of amounts on deposit in GDB, and $163 million of clawback revenues retained by the Commonwealth and used for the payment of its General Obligations Bonds. The Special Revenue Funds includes a charge of approximately $120 million in unpaid Additional Uniform Contributions to the ERS. As required by U.S. GAAP, the deficit includes, among other things, paid and unpaid debt service on General Obligations bonds and certain Commonwealth Guaranteed debt, as well as paid and unpaid debt service from governmental funds that was due during fiscal year 2016. In addition, the results for fiscal year 2016 include certain assumptions and projections of expenditures related to accrued liabilities, income tax refunds, amounts due to component units, recognition of unpaid debt service, and a projection of debt service payable to

GDB.These projections are based on historical trends and preliminary information available. Hence, these preliminary results may differ significantly from actual results.

The fiscal year 2015 and 2016 results included in the table above are included therein for comparison purposes assuming that the component units required to be "blended" into the Primary Government in fiscal year 2015 and 2016 pursuant to GASB 61 do not change from those required to be blended into the Primary Government in fiscal year 2014.  It is very likely, however, that actual results for the Commonwealth's Governmental Funds for fiscal year 2015 and 2016 will significantly differ from those reported above due to the need to "blend" into the Primary Government certain component units that in prior years have been "discretely presented".  Such entities may include the Puerto Rico Health Insurance Administration, the National Parks Company of Puerto Rico, the Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico, the Puerto Rico Ports of Americas, the University of Puerto Rico Comprehensive Cancer Center, among others.   Also, the Commonwealth is evaluating the need to blend the Governmental Development Bank for Puerto Rico into the Primary Government (and thus reports its funds in the Governmental Funds financial statements). The effect of "blending" such entities in the Primary Government and including their results of operations in the Governmental Funds will significantly increase the deficit reported in the Governmental Funds financial statements.  Furthermore, the Puerto Rico Treasury Department further expects that additional Discretely Presented Component Units may need to be blended pursuant to GASB 61 for fiscal year 2016 due to the current financial situation of the Commonwealth and its component unit, which may require additional changes to the Commonwealth's reporting entity.

**Historical Financial Results – General Fund (Budgetary Basis)**

As discussed above, in addition to the government-wide and the fund financial statements, each of which are prepared in accordance with U.S. GAAP, the Commonwealth has historically reported results for its General Fund, its primary operating fund, pursuant to the budgetary (or statutory) basis of accounting. Information regarding the General Fund on a budgetary basis is historically the most up-to-date. Since most tax revenue is recorded in the General Fund, this statement provides current information regarding the Commonwealth's ability to meet its revenue forecasts.   Furthermore, information regarding the General Fund on a budgetary basis is useful to determine the Commonwealth's compliance with its statutory budgetary requirements in its principal operating fund.

As discussed above, the General Fund statements exclude the results of operation of the Commonwealth public corporations, many of which provide essential services and receive financial support from the Commonwealth in the form of assigned revenues or direct budgetary appropriations.  This limitation makes the calculation of the General Fund deficit an imperfect measurement of the financial health of the Commonwealth as a whole.  The budgetary basis of accounting places additional limitations on the breath and usefulness of this information.  Due to differences in the basis of accounting, the reporting entity, and perspective differences between budgetary reporting and those established by U.S. GAAP, results for revenues and expenditures for the General Fund on a modified accrual basis may differ substantially from results for the General Fund on a budgetary basis.  Presentation of General Fund revenues and expenditures in accordance with U.S. GAAP may result in a deficiency of revenues over expenditures significantly higher than that calculated on a budgetary basis.

Principal differences between U.S. GAAP and the budgetary basis of accounting consist of:

- Under U.S. GAAP, revenues are recognized as soon as they are both "measurable" and "available" whereas under the budgetary basis of accounting revenue recognition is typically deferred until amounts are actually received in cash, net of tax refunds claimed by taxpayers as of year-end.
- Encumbered amounts are treated as expenditures under the budgetary basis of accounting while under U.S. GAAP expenditures are recorded when accrued (as opposed to encumbered).  Expenditures under U.S. GAAP for a particular period can also include amounts accrued during a fiscal year but appropriated, but not expended, during previous fiscal years and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.
- Under U.S. GAAP, the General Fund includes the revenues and expenditures of (a) certain agencies with independent treasuries and (b) the Special Revenue Funds, which are legally separate from the General Fund (Operating Fund), and which are not included in the General Fund budget and are thus not recognized under the budgetary basis of accounting.
- Budgetary revenues and expenditures may include items classified as "other financing sources" and "other financing uses" under U.S. GAAP (such as proceeds of long-term debt).
- U.S. GAAP recognizes as revenue Federal grants and reimbursements of expenses under numerous federal programs that are not included as revenues under the budgetary basis of accounting.

The Commonwealth's Basic Financial Statements include a reconciliation between the General Fund on a modified accrual basis and the General Fund on a budgetary basis in the Notes to the Required Supplementary Information section of the Basic Financial Statements. Entity differences between U.S. GAAP and the budgetary basis of accounting underscore the need for such a reconciliation. The Commonwealth records billions of dollars in expenditures through its various Special Revenue Funds, which are recognized in the General Fund for purposes of Commonwealth financial reporting under U.S. GAAP. These Special Revenue Funds include funds where the receipt and expenditure (or transfer) of federal funds and funds pledged to third parties is recorded, and include funds used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects.

The historic deficiency of revenues over expenditures in such Special Revenue Funds has had a material effect on the measurement of the Commonwealth's consolidated deficit, as calculated pursuant to U.S. GAAP. Furthermore, since the revenues and expenditures of many of such Special Revenue Funds flow into, and out of, the TSA, the historic deficiency of revenues over expenditures in such funds has had and, in the absence of corrective action, will likely continue to have, a material effect on the overall liquidity position of the Commonwealth.

Furthermore, focusing on the General Fund on a budgetary basis provides only a partial view regarding the amount and type of revenues received by the Commonwealth each fiscal year.  For example, General Fund budgetary revenues include revenues raised internally as well

as those from non-Puerto Rico sources. Internal revenues consist principally of income, excise and sales and use taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. However, the General Fund on a budgetary basis excludes revenues from federal grants and contracts, most revenues from charges for services by agencies and certain tax and other miscellaneous revenues collected by the Commonwealth that are reported in the General Fund under U.S. GAAP but are assigned by law to component units or private institutions.  Such assigned taxes and other revenues include all revenues from excise taxes on gasoline, gas, oil, diesel oil and petroleum products and their derivatives, and sugar and coffee, a portion of the revenue from each of the cigarette excise tax and the federal excise tax on rum shipments, revenues from motor vehicle licenses fees and fines and compulsory vehicle insurance premiums. The majority of the assigned tax revenues have been assigned to public corporations such as HTA, MBA and PRIFA and serve as the source of repayment of such entities' financial indebtedness.

In addition, the General Fund on a U.S. GAAP basis includes the results of operation of certain agencies with independent treasuries, namely the Office for Improvement of Public Schools (also known as *OMEP*, for its Spanish acronym), the Puerto Rico Public Housing Administration, the Puerto Rico Labor Development Administration and the Office for Administration, Sales and Acquisition Fund of the Puerto Rico Department of Housing (also known as *CRUV*, for its Spanish acronym).  Certain of these agencies with independent treasuries also record deficiencies of revenues over expenditures (as reported in their stand-alone financial statements).

Finally, as the Krueger Report highlighted, the General Fund (whether on a budgetary or U.S. GAAP basis) also excludes hundreds of millions of dollars in historical annual capital expenditures that are recorded in the Commonwealth's Capital Fund.

**General Fund Revenues and Expenditures Under Budgetary Basis Accounting**

The following table presents the General Fund budgetary revenues and expenditures, as well as other financing sources (uses), under the budgetary basis of accounting for fiscal years 2012 through 2016. The results for fiscal years 2015 and 2016 are preliminary and unaudited, and therefore subject to change. As emphasized above, if General Fund revenues and expenditures were presented in accordance with U.S. GAAP, revenues, expenditures and the deficiency of revenues over expenditures (before financing sources) would be significantly higher than the amounts presented in the table below.

| | 2012 | 2013 | 2014 | 2015 (7) | 2016 (7) |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| **Income Taxes:** | | | | | |
| Individuals | $2,099,564 | $2,054,654 | $1,832,487 | $2,156,826 | $2,021,256 |
| Corporations | 1,460,354 | 1,286,506 | 1,914,333 | 1,852,168 | 1,647,422 |
| Partnerships | 1,333 | 756 | 745 | 2,203 | 1,023 |
| Withholdings from non-residents | 890,761 | 982,896 | 899,965 | 810,718 | 809,750 |
| Tollgate taxes | 27,678 | 8,903 | 7,140 | 3,651 | - |
| Interest | 6,807 | 5,425 | 4,900 | 4,414 | 4,212 |
| Dividends | 35,087 | 34,064 | 39,713 | 152,691 | 30,739 |
| Inheritance and gift taxes | 5,465 | 1,833 | 1,395 | 2,149 | 2,019 |
| Total income taxes | **4,527,004** | **4,375,037** | **4,700,678** | **4,984,820** | **4,516,421** |
| **Sales and Use Tax** | 540,026 | 539,929 | 645,254 | 619,199 | 1,559,627 |
| **Excise Taxes:** | | | | | |
| Alcoholic beverages | 292,614 | 282,316 | 266,542 | 236,633 | 264,704 |
| Foreign (Act 154) | 1,875,823 | 1,632,549 | 1,902,193 | 1,920,110 | 1,876,009 |
| Tobacco products | 172,155 | 186,909 | 171,108 | 153,213 | 100,295 |
| Motor vehicles | 386,468 | 419,178 | 407,943 | 252,121 | 265,606 |
| Revenues from component units- slot machines | 19,957 | 24,594 | 23,673 | 19,366 | 17,214 |
| Horses races | 19,302 | 13,403 | 16,354 | 10,151 | 7,199 |
| Insurance premiums | 23,382 | 24,569 | 42,642 | 59,325 | 58,422 |
| Other excise taxes | 22,702 | 9,240 | 8,247 | 21,922 | 14,882 |
| Total excise taxes | **2,812,403** | **2,592,758** | **2,838,702** | **2,672,841** | **2,604,331** |
| **Property Taxes** | 65,497 | 52,614 | 58,535 | 21,586 | 11,315 |
| **Licenses and Other Taxes** | 82,578 | 81,127 | 20,506 | 23,031 | 19,023 |
| **Charges for Services** | 179,962 | 105,644 | 108,579 | 119,776 | 87,112 |
| **Miscellaneous Non-tax Revenues** | 100,072 | 136,424 | 116,581 | 94,020 | 49,877 |
| Total revenues from internal sources | **8,307,587** | **7,883,533** | **8,488,835** | **8,535,273** | **8,847,706** |
| **Revenues from Non-Commonwealth Sources:** | | | | | |
| Federal excise taxes [1] | 258,171 | 247,848 | 237,159 | 189,227 | 199,633 |
| Customs | 7,739 | - | - | 2,265 | - |
| Total revenues from non-Commonwealth sources | **265,910** | **247,848** | **237,159** | **191,492** | **199,633** |
| **Total Budgetary Revenues** | **8,573,497** | **8,131,381** | **8,725,994** | **8,726,765** | **9,047,339** |
| **Other Revenues:** | | | | | |
| Non-cash distributions from Traditional Lottery | 38,225 | 24,322 | 81,769 | 20,207 | 50,795 |
| Cash distributions from Electronic Lottery (Lotto) | 56,163 | 38,876 | 72,287 | 93,603 | 77,158 |
| Excess of collateral received on derivative transactions | - | 241,777 | - | - | - |
| Receipts of COFINA bond proceeds from prior years issuances [2] | - | 125,848 | - | - | - |
| **Total Revenues** | **8,667,885** | **8,562,204** | **8,880,050** | **8,840,575** | **9,175,292** |
| **Other Financing Sources (Uses):** | | | | | |
| Transfers in from Debt Service Fund, Lotteries Fund and others | 769,158 | 197,936 | 66,518 | | |
| Receipts of COFINA bond proceeds from current year issuances [2] | 952,615 | 333,300 | | - | - |
| Proceeds from notes payable issued for debt service payments [3] | 877,034 | 600,433 | 667,902 | | - |
| Net Proceeds from notes payable issued to cover operating expenditures [4] | | | | 102,000 | - |
| Proceeds from issuance of tax revenue anticipation notes (TRANS) | 1,100,000 | 900,000 | 1,200,000 | 1,200,000 | 400,000 |
| Repayments of TRANS | (1,100,000) | (900,000) | (1,200,000) | (1,200,000) | (400,000) |
| Excess of income tax refunds payments over budgeted reserve | - | - | - | (174,000) | (135,000) |
| Use of funds retained under Clawback Provisions | | | | | (163,900) |
| Impairment of cash balance in GDB | | - | | (100,000) | (490,000) |
| Total other financing sources, net | **2,598,807** | **1,131,669** | **734,420** | **(172,000)** | **(788,900)** |
| **Total Resources** | **11,266,692** | **9,693,873** | **9,614,470** | **8,668,575** | **8,386,392** |
| **Expenditures:** | | | | | |
| General government | 1,957,580 | 1,382,066 | 1,281,494 | 1,198,416 | 1,399,305 |
| Public safety | 2,011,965 | 1,966,079 | 1,979,809 | 1,832,188 | 1,741,456 |
| Health | 1,686,402 | 1,378,397 | 1,319,724 | 1,277,785 | 1,254,463 |
| Public housing and welfare | 474,074 | 460,269 | 430,407 | 409,490 | 397,555 |
| Education | 2,926,638 | 2,916,347 | 3,382,133 | 3,297,440 | 2,963,738 |
| Economic development | 458,102 | 413,948 | 407,220 | 355,164 | 163,522 |
| Intergovernmental | 396,447 | 421,359 | 364,763 | 365,850 | 360,600 |
| **Total Budgetary Expenditures** [5] | **9,911,208** | **8,938,465** | **9,165,550** | **8,736,333** | **8,280,639** |
| **Other Expenditures:** | | | | | |
| Transfers out for debt service payments [6] | **2,055,095** | **946,410** | **737,639** | **742,718** | **1,011,506** |
| **Total Expenditures** | **11,966,303** | **9,884,875** | **9,903,189** | **9,479,051** | **9,292,145** |
| **Excess (Deficiency) of Resources over (under) Expenditures** | **($699,611)** | **($191,002)** | **($288,719)** | **($810,476)** | **($905,753)** |

[1] Net of amount assigned to Rum Producers and the PR Conservation Trust Fund, which are recorded in the Special Revenue Funds.
[2] Represents COFINA bond proceeds deposited in the Stabilization Fund.
[3] Represents GDB notes issued to cover the payment of the Commonwealth general obligations bonds  and other Commonwealth obligations.
[4]  Represents notes issued to the State Insurance Fund and the Automobile Accidents Compensation Administration to cover cash deficiencies of the

Commonwealth.

[5] Includes rent payment to PBA for approximately $331.5 million, $205.1 million, $358.5 million , $366.6 million and $363.9 million for fiscal years 2012 through 2016, respectively.

[6] Consists of amounts to pay principal of, and interest on, general obligation bonds and notes of the Commonwealth. Does not include amounts deposited directly into the Redemption Fund from the Municipal Property Tax (1.03%) pledged revenues. Figures for fiscal year 2012 and 2013, includes approximately $978 and $12 million in payments to refunded debt escrow agents.

[7] Preliminary, unaudited and subject to change. FY 2016 expenditures information is based on available information from OMB and the Commonwealth Financial Systems, expenses do not include adjustments for encumbrances, accounts payables, and other required adjustments to properly present expenses on a GAAP basis.   FY 2015 and FY 2016 do not include adjustments related to the unpaid additional contribution to the Retirement Systems. Actual figures could materially differ from those reported.

Sources: The "Statement of Revenues and Expenditures- Budget and Actual- Budget Basis- General Fund" as presented in the Commonwealth's financial statements for fiscal year 2012; the "Required Supplementary Information- Unaudited- Schedule of Revenues and Expenditures- Budget and Actual- Budgetary Basis- General Fund" as presented in the Commonwealth's financial statements for fiscal years 2013 and 2014 ; the Department of Treasury's financial records for revenue information for fiscal years 2015 and 2016 ; the OMB records for expenditures information for fiscal years 2015 and 2016. Totals may not add up due to rounding.

## Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2016

*Revenues.* Preliminary General Fund revenues on a budgetary basis for fiscal year 2016 (which are still subject to audit and other year-end adjustments) were approximately $9.175 billion, an increase of approximately $334 million when compared to the prior fiscal year. These revenues are approximately $625 million less than the originally estimated revenues for the fiscal year, approximately $271 million less than the revised estimated revenues made in October 2015 and approximately $117 million less than the final revised estimated revenues made in December of 2015. Revenues from the special temporary excise tax under Act 154 were approximately $1.876 billion, a decrease of approximately $44 million from the prior fiscal year. Revenues from individual income taxes were approximately $2.021 billion, a decrease of approximately $136 million from the prior fiscal year. Revenues from corporate income taxes were $1.647 billion, approximately $205 million lower than the prior fiscal year. Revenues from dividends were approximately $153 million, a decrease of approximately $122 million from the prior fiscal year, due to the temporary reduced tax on corporate dividends provided under Act 159-2015.

Preliminary General Fund revenues include approximately $77 million in cash distributions from the electronic lottery, approximately $51 million in non-cash revenues mostly from the traditional lottery, approximately $116 million in non-recurring revenues related to tax amnesty collections under Act 44-2015 and other royalty and corporate income tax revenue. Revenues also include collections from the transfer pricing taxes that were declared unconstitutional during fiscal year 2016. The Treasury Department is unable at this time to make a reasonable estimate of the amounts collected from such transfer pricing taxes.

Non-cash revenues from the traditional lottery consist mostly of unclaimed lottery prizes that by law are recorded in the General Fund on a budgetary basis after the term for claiming lottery prizes has expired (180 days). Although the General Fund recognizes revenue on a budgetary basis after the expiration of the term to claim such prizes, such recognition does not result in actual cash revenue because all transactions related to the traditional lottery, including the sale of lottery tickets and the payment of cash prizes, are made to and from the TSA, in which all funds managed by the Treasury Department (including budgetary funds and Special Revenue Funds) are commingled. The Secretary of Treasury determines when accumulated traditional lottery non-cash revenues are recognized in the General Fund on a budgetary basis. Certain non-cash revenues from the traditional lottery, although recorded on a budgetary basis during a particular year, may have been accrued for U.S. GAAP purposes during the prior fiscal year. Other non-cash revenues are related to transfers from Special Revenue Funds to the General Fund.

In October 2015, the Puerto Rico Treasury Department revised its revenue estimate for fiscal year 2016 from $9.800 billion to $9.446 billion. As further explained below, this revision was made after taking into consideration (i) the actual revenues for the fourth quarter of fiscal year 2015, (ii) the preliminary revenues for the first quarter of fiscal year 2016, (iii) the projected effect on revenues of legislation enacted since the beginning of the 2016 fiscal year, and (iv) other general economic factors. The major changes in the estimated revenues consisted of $84 million less in individual income taxes, $110 million less in corporate income taxes, $31 million less in Act 154 excise taxes, $34 million less in motor vehicle excise taxes, $25 million less in cover over rum excise taxes, $17 million less in cigarette excise taxes, $50 million less in sales and use taxes and $5 million less in withholding income taxes to non-residents. The Commonwealth attributed such lower revenue estimates in part to slower economic activity, continuing decline in population and the effect of preparing revenue estimates without taking into consideration the effect of actual revenues received during the last two months of fiscal year 2015.

The main drivers for the October 2015 revision in estimated revenues for fiscal year 2016 were the following:

- actual revenue shortfall against budget of approximately $211 million for the months of May and June 2015 which affected the revenue base used for the fiscal year 2016 budget. The Commonwealth original revenue estimates for the fiscal year 2016 budget were made with actual data up to April 2015;
- enactment of Act 159-2015, which (i) excluded from the sale of certain items and the rendering of certain professional services from the SUT and VAT and (ii) reduced the base on which the SUT or VAT is computed for certain transactions;
- the reduction by $10 million of the annual allocation to the General Fund of federal rum excise tax returned by the Government to the Commonwealth. Act 108-2014 allocated such amount to PRIDCO; and
- other factors such as the prepayment of foreign taxes under Act 154 and general economic factors which reduced revenues by an additional $50 million in the aggregate.

To close the revenue gap for fiscal year 2016, estimated in October 2015 to be approximately $355 million, (i) OMB implemented $150 million in aggregate reductions to budgetary appropriations through the elimination of certain contingency accounts, reductions in non-priority program appropriations and a decrease in the operating budgets of various agencies funded by the General Fund, and (ii) Treasury tried to implement the following measures that were expected to raise approximately $185 million in revenues:

- $60 million to be obtained through an upfront payment in the renewal of the Electronic Lottery contract, which required legislation;
- $25 million in additional revenues through a temporary reduced tax on corporate dividends provided under Act 159-2015; and
- $100 million in additional revenues through the enactment of administrative measures to increase tax enforcement.

The measures identified by Treasury did not achieve the intended results. In December of 2015, The Puerto Rico Treasury Department revised again its revenue estimates for fiscal year

2016 from approximately $9.446 billion to approximately $9.292 billion. This revision was made after taking into consideration additional decreases in economic growth and population.

As a result of the new reduction in the revenue estimate for fiscal year 2016, on January 13, 2016 OMB issued Circular Letter 128-16 in order to comply with Executive Order 2015-049, implement measurements for the control of expenditures and make budgetary adjustments. Pursuant to this Circular Letter, the previously implemented reductions to budgetary appropriations of $150 million mentioned above were increased to $254 million. In addition, no appropriations were made to fund the Economic Development and Obligations Payment Fund, which was originally to be funded with $275 million from available resources.

*Expenditures.* Preliminary General Fund expenditures for fiscal year 2016 were approximately $9.292 billion, a reduction of approximately $187 million when compared to the prior fiscal year and approximately $508 million less than the original budget for such fiscal year.

Budgeted expenditures for fiscal year 2016 included approximately $1.012 billion for general obligation debt service payments. The aggregate amount of debt service payable on general obligation bonds during fiscal year 2016 was approximately $1.48 billion. The difference between the budgeted debt service and the actual debt service payable during fiscal year 2016 is due to: (i) approximately $351.9 million being payable from funds set aside in an escrow account at a private financial institution in connection with the redemption of certain bonds, and (ii) the remainder expected to be covered from the proceeds of the annual special tax of 1.03% of the assessed value of all real and personal property credited to the Redemption Fund. As a result of the Commonwealth's liquidity crisis, however, the Commonwealth was only able to pay approximately $697.7 million in general obligation debt service during fiscal year 2016 (of which approximately $351.9 million were paid from the escrowed funds referenced above).

Other expenditures included: (i) payroll expenses of $3.074 billion; (ii) special appropriation for the University of Puerto Rico, the municipalities and the Judicial branch of $834 million, $364 million and $315 million, respectively; and (iii) special appropriations for the ERS and TRS of $487 million in the aggregate. Other operating expenses were $3.165 billion, an increase of $102 million or 3% when compared to the prior year.

The Central Government's employee workforce chargeable to the General Fund, which is accounted for in the Treasury Department's payroll system, amounted to 81,675 employees (headcount) as of January 2016, of which 72% consisted of teachers (34,256), police officers (14,058), correction officers (7,454), firefighters (1,733) and nurses (1,330). This represents a 41% reduction since such workforce peaked at 139,640 during 2008 and a 9% reduction since July 2015.

The following table shows preliminary "budgetary" basis expenditures for fiscal years 2015 and 2016 (in millions of dollars).

|  | **FY 2015** | **%** | **FY 2016** | **%** | **Increase (Decrease)** |
|---|---|---|---|---|---|
| Payroll | $3,232 | 35% | $3,074 | 33% | ($158) |
| Debt Service | 1,173 | 12% | 1,053 | 12% | (120) |
| University of Puerto Rico, Municipalities and Judicial Branch | 1,523 | 16% | 1,513 | 16% | (10) |
| Retirement Systems | 488 | 5% | 487 | 5% | (1) |
| Other | 3,063 | 32% | 3,165 | 34% | 102 |
|  | $9,479 | 100% | $9,292 | 100% | ($187) |

***Department of Education Expenditures.*** The Department of Education preliminary expenditures for fiscal year 2016 were $1.635 billion, a reduction of $467 million, or 22%, when compared to fiscal year 2015. Payroll expenditures for such fiscal year were $1.285 billion, a reduction of $112 million when compared to fiscal year 2015.

***Other Financing Sources (Uses).*** For fiscal year 2016, financing sources included $400 million in TRANs financing. Other financing uses included (i) $400 million in repayment of the fiscal year 2016 TRANs, (ii) approximately $135 million in income tax refund payments over the budgeted refund reserve, (iii) approximately $164 million from the use of revenues retained by the Commonwealth pursuant to Article VI, Section 8 of the P.R. Constitution in order to make general obligation debt service and (iv) a $490 million impairment charge on the Commonwealth to account for the impairment of amounts on deposit in GDB.

***Deficit.*** The fiscal year 2016 preliminary "budgetary" basis deficiency of revenues under expenditures was approximately $906 million. Excluding "Other Revenues" and "Other Financing Sources (Uses)" (which compares only "Budgetary Revenues" to "Total Expenditures"), the deficit was approximately $245 million.

**Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2015**

***Revenues.*** Preliminary General Fund revenues on a budgetary basis for fiscal year 2015 (which are still subject to audit and other year-end adjustments) were approximately $8.841 billion, a decrease of approximately $39 million, or 0.4%, when compared to the prior fiscal year. Preliminary collections of the special temporary excise tax under Act 154 were approximately $1.920 billion, an increase of approximately $18 million from the prior fiscal year. Preliminary collections of individual income taxes were approximately $2.157 billion, an increase of approximately $324 million over the prior fiscal year. Preliminary collections of corporate income taxes were $1.852 billion, $62 million lower than the prior fiscal year. Non-recurring revenue for the fiscal year was estimated at approximately $732 million, consisting mostly of revenue from the national gross receipt tax or "**patente nacional**", which was subsequently repealed, revenue from a temporary special tax rate in IRA's accounts and corporate dividends, revenue from taxes on extraordinary lottery prizes and revenue from an income, excise and sales and use tax amnesty.

***Expenditures.*** Preliminary General Fund expenditures for fiscal year 2015 were approximately $9.479 billion, a reduction of approximately $424 million when compared to the prior fiscal year.

Expenditures for fiscal year 2015 included approximately $1.173 billion for debt service payments, of which approximately $743 million were for general obligation debt service. Other expenditures included: (i) payroll expenses of approximately $3.232 billion, a reduction of approximately $316 million when compared to fiscal year 2014; (ii) special appropriations for the University of Puerto Rico, the Municipalities and the Judicial Branch of $834 million, $366 million and $323 million, respectively, for an aggregate of approximately $1.523 billion, an increase of approximately $82 million when compared to fiscal year 2014; and (iii) special appropriations to the ERS and TRS of approximately $488 million. The above amounts represent 68% of the total preliminary expenditures of approximately $9.479 billion.  Other operating expenses were approximately $3,063 billion, a reduction of approximately $477 million, or 13%, when compared to the prior year.

The Central Government's employee workforce chargeable to the General Fund, which is accounted for in the Treasury Department's payroll system, amounted to 89,750 employees (headcount) as of July 31, 2015, of which 70% consisted of teachers (36,085), police officers (15,000), correction officers (7,800), firefighters (1,700) and nurses (1,330). This represents a 34% reduction since such workforce peaked at 139,640 during 2008 and a 12% reduction since January of 2013.

The following table shows the fiscal years 2014 and 2015 expenditures (in millions of dollars):

|  | FY 2014 | % | FY 2015 | % | Increase (Decrease) |
|---|---|---|---|---|---|
| Payroll | $3,548 | 36% | $3,232 | 35% | ($316) |
| Debt Service | 935 | 9% | 1,173 | 12% | 238 |
| University of Puerto Rico, Municipalities and Judicial Branch | 1,441 | 15% | 1,523 | 16% | 82 |
| Retirement Systems | 440 | 4% | 488 | 5% | 48 |
| Other | 3,540 | 36% | 3,063 | 32% | (477) |
|  | $9,904 | 100% | $9,479 | 100% | ($425) |

*Department of Education Expenditures.* The Department of Education preliminary expenditures for fiscal year 2015 were $2.102 billion, a reduction of $179 million, or 8%, when compared to fiscal year 2014. Payroll expenditures for such fiscal year were $1.397 billion, a reduction of $63 million when compared to fiscal year 2014.

*Other Financing Sources (Uses).* For fiscal year 2015, financing sources included (i) $1,200 million in TRANs financing and (ii) $102 million long-term credit facilities made to the P.R. Treasury Department by the State Insurance Fund ($100 million) and the Automobile Accidents Compensation Administration ($2 million). Other financing uses included (a) $1,200 million in repayment of the fiscal year 2015 TRANs, (b) approximately $135 million in income tax refund payments over the budgeted refund reserve and (c) a $100 million impairment charge on the Commonwealth to account for the impairment of amounts on deposit in GDB.

*Deficit.* The fiscal year 2015 preliminary "budgetary" basis deficiency of resources under expenditures was approximately $810 million. Excluding "Other Revenues" and "Other

167

Financing Sources (Uses)" (which compares only "Budgetary Revenues" to "Total Expenditures"), the deficit was approximately $752 million.

## General Fund Budgetary Revenues and Expenditures for Fiscal Year 2014

*Revenues.* General Fund revenues on a budgetary basis for fiscal year 2014 were approximately $8.880 billion, an increase of approximately $318 million or 3.7% over fiscal year 2013. These revenues include: (i) General Fund budgetary operating revenues of approximately $8.726 billion (net of actual income tax refunds paid in excess of reserve) and (ii) revenues from the electronic and traditional lotteries of approximately $154 million (approximately $82 million which were non-cash) transferred to the General Fund.

Corporate income tax revenues for fiscal year 2014 were approximately $1.914 billion, an increase of approximately $628 million, or 48.8%, from the prior fiscal year. Individual income tax revenues for fiscal year 2014 were approximately $1.833 billion, a decrease of approximately $222 million, or 12.1%, from the prior fiscal year. Revenues from withholdings from non-residents were approximately $900 million, a decrease of approximately $83 million, or 8.4%, from the prior fiscal year.

Sales and use tax revenues received by the General Fund (excluding funds assigned to COFINA and others) for fiscal year 2014 were approximately $645 million, an increase of approximately $105 million, or 16.3%, from the prior fiscal year. Revenues for the special temporary excise tax under Act 154 for fiscal year 2014 were approximately $1.902 billion, an increase of approximately $270 million, or 14.2%, from the prior fiscal year.

*Expenditures*. The original fiscal year 2014 budgeted expenditures totaled approximately $9.770 billion, excluding $575 million in general obligation debt service, a portion of which was refunded with the proceeds of the Commonwealth's General Obligation Bonds of 2014, Series A and the remainder funded with interim lines of credit by GDB. The budget contemplated $245 million in new deficit financing to be funded initially by GDB which, when added to the $575 million general obligation debt refunding, resulted in a total projected budget deficit of approximately $820 million. Budget appropriations were subsequently amended to total $9.245 billion in expenditures (excluding the $575 million in general obligations debt service refunding). 9829

Expenditures for fiscal year 2014 were approximately $9.904 billion (including refunded debt service), a reduction of approximately $441 million when compared to total budgeted expenses of $10.345 billion for fiscal year 2014 ($9.770 billion General Fund budget plus non-budgeted general obligation debt service of $575 million). This represents an increase of approximately $84 million when compared to the revised budget for fiscal year 2014 of $9.245 billion plus $575 million of debt service.

The following table shows the difference between the original and adjusted budget for fiscal year 2014 (in millions of dollars):

|                        | Original Budget | Revised budget |
|------------------------|-----------------|----------------|
| Budgeted expenditures  | $9,770          | $9,245         |
| Refunded debt service  | 575             | 575            |
| Sub-total              | $10,345         | $9,820         |
| Actual expenditures    | 9,904           | 9,904          |
| Reduction (increase)   | $441            | ($84)          |

*Other Financing Sources (Uses)*. For fiscal year 2014, financing sources included $1,200 million in TRANs financing. Other financing uses included (i) $1,200 million in repayment of the fiscal year 2014 TRANs, (ii) approximately $668 million from notes payable issued to pay general obligation debt service and (iii) approximately $66 million in transfers from other funds.

*Deficit.* The fiscal year 2014 "budgetary" basis deficiency of revenues under expenditures was approximately $289 million. Excluding "Other Revenues" and "Other Financing Sources (Uses)" (which compares only "Budgetary Revenues" to "Total Expenditures"), the deficit was approximately $1.177 billion.

## General Fund Budgetary Revenues and Expenditures for Fiscal Years 2013 and 2012

General Fund revenues on a budgetary basis for fiscal year 2013 were approximately $8.562 billion, a decrease of approximately $106 million, or 1.2%, from fiscal year 2012, which had revenues of approximately $8.668 billion. Fiscal year 2013 revenues included (i) approximately $8.131 billion of operating revenues, (ii) approximately $63 million of revenues from the electronic and traditional lotteries (approximately $24 million which were non-cash) transferred to the General Fund, (iii) approximately $242 million of excess collateral received on derivative transactions transferred from the Debt Service Fund and (vi) approximately $126 million of excess funds transferred from COFINA after payment of COFINA debt service.

General Fund total expenditures for fiscal year 2013 amounted to $9.885 billion, consisting of $8.938 billion of operational expenditures and approximately $946 million in transfers out for debt service payments, including payments on general obligation and PBA bonds. These expenditures were approximately $2.081 billion or 17% lower than the total expenditures for fiscal year 2012, which were approximately $11.966 billion.

The fiscal years 2013 and 2012 "budgetary" basis deficiencies of resources under expenditures were approximately $191 million and $700 million, respectively. Excluding "Other Revenues" and "Other Financing Sources (Uses)" (which compares only "Budgetary Revenues" to "Total Expenditures"), such deficits were approximately $1.753 billion and $3.393 billion, respectively.

**Expenditure Breakdown for the General Fund**

     The following table shows a breakdown of General Fund expenditures by concept for fiscal years 2015, 2016 (budgeted and actual) and 2017 (budgeted). Other operational expenses include costs such as contributions to not-for-profit organizations, materials and supplies, purchase of equipment, rent payment to third parties, transportation costs, computer software, and other necessary expenditures to carry out the essential services to the citizens of Puerto Rico.

## Expenditures Breakdown for the General Fund
### (In millions)

| | 2015* | 2016* | 2016(A) | 2017* |
|---|---|---|---|---|
| **Expenditures** | | | | |
| Payroll and Related Costs[1] | $ 3,392 | $ 3,320 | $ 3,320 | $ 3,272 |
| Other Operational Expenses | 1,210 | 1,112 | 1,036 | 1,195 |
| Mandated Expenditures (Formula) | | | | |
| Contributions to Municipalities | 361 | 361 | 361 | 361 |
| University of Puerto Rico | 834 | 834 | 834 | 834 |
| Judicial Branch | 323 | 315 | 315 | 315 |
| Pension Plan Contributions | 560 | 643 | 624 | 787 |
| Health Insurance | 885 | 885 | 885 | 885 |
| General Obligation Debt Service | 743 | 1,011 | 1,011 | - |
| PBA Debt Payments | 274 | 277 | 277 | - |
| Trans and Other Debt | 395 | 464 | 70 | 24 |
| Utilities (PREPA, PRASA and Insurance Premiums) | 201 | 195 | 195 | 170 |
| Legislature | 142 | 129 | 125 | 159 |
| PBA Operating Subsidies | 81 | 87 | 87 | 90 |
| Agriculture Incentives and Subsidies | 78 | 79 | 69 | 84 |
| University of Puerto Rico Operating Subsidies | 48 | 40 | 36 | 39 |
| Medical Services Operating and Functional Contributions | 28 | 27 | 27 | 42 |
| Municipal Subsidies | 10 | 21 | 20 | 83 |
| Budgetary and Emergency Fund | - | - | - | 220 |
| Legal and Responsibility fund | - | - | - | 117 |
| Elections and Transition Costs | - | - | - | 52 |
| Contributions to Governmental Entities | - | - | - | 258 |
| **Total General Fund Expenditures** | $ 9,565 | $ 9,800 | $ 9,292 | $ 8,987 |

---

\* Approved Budget

(1) Excludes University of Puerto Rico and the Judicial Branch.

(A) Adjusted Budget.

*Source : Office of Management and Budget*

## DEBT OF THE COMMONWEALTH,
## ITS PUBLIC CORPORATIONS AND MUNICIPALITIES

The following tables and the accompanying discussion present and describe the financial indebtedness of the Commonwealth, its public corporations and municipalities. This includes bonds and notes issued to third parties in public offerings and negotiated transactions, loans from third parties, and notes and loans from GDB and other Commonwealth entities. The tables include a reconciliation to avoid double counting debt issued to fund loans made to other Commonwealth entities. In the case of capital appreciation bonds ("**CABs**") (bonds that do not pay interest on a current basis, but which capitalize interest), the total includes the amount of capitalized interest through the date of the table unless otherwise noted. No deductions have been made in the tables for deposits on hand in debt service funds or debt service reserve funds. Totals may not add due to rounding.

The tables present, among others, total public sector indebtedness organized by repayment source (in the case of the public corporations), a summary of loans from GDB, private banks and intra-government financings to the various Commonwealth entities, the accreted balance of CABs by issuer, and Commonwealth indebtedness that by its terms is payable from a source of payment that can be applied first to the payment of General Obligations of the Commonwealth. Also included are tables setting forth the debt service requirements for the debt of the Commonwealth, its public corporations and municipalities (also organized by ultimate source of repayment in the case of the public corporations).

Table 1 – *Debt Summary by Type of Debt,* shows the total debt of the Commonwealth and each of its instrumentalities (by issuer, except in the case of the municipalities, which are shown in the aggregate), with separate columns for (i) bonds and notes, (ii) loans from banks and other private parties, (iii) loans provided by GDB and (iv) loans and notes from other Commonwealth entities. The table is divided into the following nine categories based on the source of repayment from which the debt is payable and, in the case of certain debt not issued directly by the Commonwealth or directly payable from Commonwealth taxes or appropriations, the level of financial support received by the issuer from the Commonwealth:

(i)     Direct obligations of the Commonwealth supported by the good faith, credit and taxing power of the Commonwealth, which includes general obligation bonds, notes and loans (sometimes referred to as "**General Obligations**" or "**GOs**");

(ii)    Tax and Revenue Anticipation Notes ("**TRANs**"), which are short-term working capital financings issued directly by the Commonwealth to address, among other things, the seasonality of tax revenues;

(iii)   Indebtedness payable primarily from Commonwealth taxes and other revenues, which includes bonds, notes and loans issued by Commonwealth entities that are directly supported by and payable, in whole or in part, from (a) special taxes imposed by the Commonwealth, such as the sales and use tax, gasoline, diesel, gas oil and petroleum product excise taxes, hotel occupancy taxes and cigarette taxes or (b) other Commonwealth revenues such as motor vehicle license fees and federal excise taxes on shipments of rum from Puerto Rico that are "covered over" to the Commonwealth's General Fund;

172

(iv)   Indebtedness payable from Commonwealth appropriations, which includes bonds, notes and loans issued by the Commonwealth or its public corporations that are payable, in whole or in part, from Commonwealth General Fund appropriations (and which are, by their terms, not supported by the good faith, credit and taxing power of the Commonwealth);

(v)   Indebtedness payable by tax-supported public corporations, which includes bonds, notes and loans issued by public corporations that *receive* significant financial support from the Commonwealth but that are payable from such public corporations' internal revenues;

(vi)   Indebtedness payable by non tax-supported public corporations, which includes bonds, notes and loans issued by public corporations that *do not receive* significant financial support from the Commonwealth and that are primarily payable from such public corporations' internal revenues;

(vii)   Indebtedness issued by municipalities, which includes (a) notes and loans provided by GDB and private banks payable from municipal property taxes, (b) Municipal Financing Authority ("**MFA**") bonds, also payable from municipal property taxes, (c) notes and loans provided by GDB and private banks payable from the municipal sales and use tax and (d) operational and other notes and loans; and

(viii)   Non-recourse debt obligations, which includes non-recourse bonds and loans issued by public corporations payable from certain non-Commonwealth resources.

The debt of the Commonwealth and its instrumentalities is categorized in the manner set forth above only for ease of reference and to provide the reader with a framework to analyze the ultimate source of funding or repayment of such obligations.  It is not an analysis of the legal or contractual rights of such debt obligations and does not seek to suggest or describe their relative priority.

**Table 1 – Debt Summary by Type of Debt**

*(Figures shown in millions of dollars as of July 31, 2016)*

| | Bonds and Notes [1] | Private Loans and Others | Total Bonds and Private Loans | Loans From GDB [14] | Loans from Other PR Entities | Total Indebtedness |
|---|---|---|---|---|---|---|
| **Direct Good Faith and Credit Indebtedness** | | | | | | |
| General Obligations | $12,519 | $24 | $12,543 | $169 | - | $12,713 |
| **Tax and Revenue Anticipation Notes** | | | | | | |
| Commonwealth TRANs | - | - | - | - | - | - |
| **Indebtedness Payable Primarily from Commonwealth Taxes** | | | | | | |
| COFINA | 17,322 | - | 17,322 | - | - | 17,322 |
| HTA | 4,176 | - | 4,176 | 1,734 | - | 5,910 |
| PRIFA [2] – *Portion Guaranteed by Commonwealth* | 1,861 | - | 1,861 | - | - | 1,861 |
| PRCCDA [3] | 386 | - | 386 | 4 | - | 391 |
| MBA | - | 28 | 28 | - | - | 28 |
| Subtotal | 23,746 | 28 | 23,774 | 1,738 | - | 25,512 |
| **Indebtedness Payable Primarily from Commonwealth Appropriations** | | | | | | |
| PBA [4] – *Guaranteed by the Commonwealth* | 4,005 | - | 4,005 | 182 | - | 4,187 |
| ERS | 3,144 | - | 3,144 | - | - | 3,144 |
| PFC [5] | 1,091 | - | 1,091 | - | - | 1,091 |
| Other Agencies and Public Corporations [6] | - | - | - | 2,999 | 102 | 3,101 |
| Subtotal | 8,239 | - | 8,239 | 3,181 | 102 | 11,523 |
| **Indebtedness Payable by Tax-Supported Public Corporations** | | | | | | |
| GDB [7] – *Portion Guaranteed by the Commonwealth* | 3,811 | 203 | 4,014 | - | - | 4,014 |
| UPR [8] | 496 | 0 | 496 | 76 | - | 573 |
| PRIDCO | 159 | - | 159 | 78 | - | 237 |
| APLA – *Guaranteed by the Commonwealth* | 226 | - | 226 | 2 | - | 227 |
| HTA – Teodoro Moscoso Bonds | 140 | - | 140 | - | - | 140 |
| PRIFA – Ports and AMSCA Bonds | 226 | - | 226 | - | - | 226 |
| Other Agencies and Public Corporation | - | 0 | 0 | 609 | - | 609 |
| Subtotal | 5,058 | 204 | 5,262 | 765 | - | 6,027 |
| **Indebtedness Payable by Non-Tax-Supported Public Corporations** | | | | | | |
| PREPA [9] | 8,259 | 696 | 8,955 | 35 | 1 | 8,991 |
| PRASA [10] – *Portion Guaranteed by the Commonwealth* | 3,976 | 4 | 3,980 | 66 | 581 | 4,627 |
| Subtotal | 12,235 | 700 | 12,935 | 101 | 582 | 13,618 |
| **Municipal Indebtedness** | | | | | | |
| General Obligations (Property Tax) | - | 881 | 881 | 1,316 | - | 2,197 |
| MFA (Property Tax) [11] | 620 | - | 620 | - | - | 620 |
| SUT | - | 5 | 5 | 533 | - | 538 |
| Special Obligations and Other [12] | 13 | 207 | 221 | 236 | - | 457 |
| Subtotal | 633 | 1,093 | 1,726 | 2,085 | - | 3,811 |
| **Non-Recourse Indebtedness** | | | | | | |
| Children's Trust | 1,442 | - | 1,442 | - | - | 1,442 |
| HFA | 487 | - | 487 | 85 | - | 572 |
| PRIICO | - | 103 | 103 | - | - | 103 |
| Other Agencies and Public Corporations | - | 14 | 14 | 0 | - | 14 |
| Subtotal | 1,929 | 117 | 2,046 | 85 | - | 2,132 |
| **Total** | $64,360 | $2,166 | $66,526 | $8,124 | $684 | $75,334 |
| **Exclusions to Eliminate Double Counting** | | | | | | |
| Total Indebtedness | | | | | | $75,334 |
| Less: GDB Bonds [13] | | | | | | (3,766) |
| **Total "Public Sector Debt" Including CAB Accretion** | | | | | | $71,568 |
| Less: CAB Accretion [1] | | | | | | (2,914) |
| **Total "Public Sector Debt"** | | | | | | $68,654 |

**Footnotes to Table 1**

(1) Amounts shown represent unpaid principal balances plus, in the case of Capital Appreciation Bonds, accreted interest, in each case as of July 31, 2016. Amounts do not include unpaid interest, if any, and do not include principal payments on any debt made by "monoline" bond insurers, where applicable. The Commonwealth or the applicable issuer of such debt may be subject to reimbursement claims for all amounts paid by such insurers pursuant to the terms of the relevant insurance policies.

(2) Includes PRIFA Rum Bonds (payable from revenues from the federal excise tax on rum "covered over" to the P.R. Treasury Department) and PRIFA BANs (payable from a portion of the excise tax on petroleum products).

(3) Of the total $145 million loans from GDB to PRCCDA, approximately $141 million are payable directly from Commonwealth appropriations, while the remaining $4 million are payable by Commonwealth tax revenues. As a result, the $141 million of GDB loans are instead included in "Indebtedness Payable Primarily by Commonwealth Appropriations" under "Other Agencies and Public Corporations."

(4) Almost the entirety of PBA's debt is payable from rental payments paid to PBA for the use of PBA's buildings. A majority of annual rental payments received by PBA have historically been funded by General Fund appropriations. Of the approximately $182 million of loans from GDB, approximately $65 million are not payable from rents, but are expressly payable from General Fund appropriations.

(5) Table 1 excludes loans initially extended by GDB to various agencies and public corporations (including PRASA) that were transferred to PFC pursuant to Act No. 164 of 2001 and serve as the underlying source of repayment of the PFC bonds.

(6) Composed primarily of operational loans from GDB to the P.R. Treasury Department and other agencies and public corporations. Amounts loaned by GDB include approximately $141 million of loans from GBD to PRCCDA, approximately $713,000 of loans from GDB to PREPA, and approximately $49 million of loans from GDB to PRIFA that are in each case payable primarily from General Fund appropriations. Loans from Other PR Entities includes $102 million of long-term credit facilities made available to the P.R. Treasury Department by the State Insurance Fund ($100 million) and the Automobile Accidents Compensation Administration ($2 million).

(7) GDB Bonds and Notes include (i) $110 million of bonds guaranteed by the good faith and credit of the Commonwealth and purchased by the State Insurance Fund and (ii) approximately $44.8 million in bonds issued by third parties but directly guaranteed by the Tourism Development Fund ("**TDF**"), a component unit of GDB. The $203 million of Private Loans and Others represent the amount of private loans directly guaranteed by TDF; a portion of such loans are guaranteed by both GDB and TDF.

(8) UPR Bonds and Notes include approximately $64 million in bonds issued by AFICA on behalf of Desarrollos Universitarios, a blended component unit of UPR, for the purpose of financing the University Plaza Project.

(9) PREPA Bonds and Notes include bonds issued as part of restructuring negotiations with creditors. Loans from GDB exclude approximately $713,000 in loans from GDB which are instead included in "Indebtedness Payable Primarily by Commonwealth Appropriations" under "Other Agencies and Public Corporations," as such debt is payable primarily from General Fund appropriations.

(10) PRASA Bonds and Notes include (i) approximately $2.0 billion in 2012 Senior Revenue Bonds, (ii) approximately $1.3 billion of 2008 Senior Revenue Bonds, (iii) approximately $285 million in 2008 Subordinated Refunding Bonds (guaranteed by the good faith and credit of the Commonwealth) and (iii) approximately $389 million Rural Development Bonds (guaranteed by the good faith and credit of the Commonwealth and held by the U.S. Department of Agriculture). The $581 million in Loans from Other PR Entities represents loans from PRIFA (State Revolving Funds), which are also guaranteed by the good faith and credit of the Commonwealth.

(11) Table 1 excludes approximately $495 million of loans payable from property taxes held by MFA that serve as collateral for the approximately $620 million of MFA bonds outstanding. Such loans have not been shown separately in order to avoid double counting. Since the MFA bonds are obligations of MFA and not of the municipalities, total indebtedness owed directly by municipalities (as opposed to debt payable from municipal resources) is approximately $3.673 billion, which is approximately $138 million less than the $3.7811 billion in Total Municipal Indebtedness shown in the table above (while the variance between the loans payable from property taxes and the MFA bonds is approximately $125 million, the Total Municipal Indebtedness shown in the table includes approximately $13 million of AFICA bonds payable by the Municipality of Guaynabo, which increases the variance to approximately $138 million).

(12) The $13 million in municipal "Bonds and Notes" listed under "Operational and Other" represents bonds issued by AFICA for the benefit of the municipality of Guaynabo, namely the AFICA Guaynabo Government Center Bonds (approximately $7.3 million) and the AFICA Guaynabo Warehouse Bonds (approximately $6.1 million).

(13) Exclusion of GDB Bonds to eliminate double counting does not deduct third party bonds guaranteed by TDF, a component unit of GDB.

(14) The Commonwealth of Puerto Rico, through legislative acts, including Act No. 164-2001 and Act No. 24-2014, has agreed from time to time to assume, through annual legislative appropriations, the payment of certain loans extended by GDB to certain public corporations that currently lack the ability to repay such loans. Such loans, in accordance with their terms and as a result of subsequent legislative action, in certain cases thus have, as sources of repayment, both the internal revenues of such public corporation and legislative appropriations. For purposes of this table, such loans have been classified based on GDB's internal classification for their primary source of repayment.

175

**Commonwealth General Obligations**

Commonwealth General Obligations are bonds, notes and loans issued by the Commonwealth to which the good faith, credit and taxing power of the Commonwealth has been pledged. These bonds, notes and loans are normally issued pursuant to legislation enacted in connection with one or more specific series of bonds, notes or loans or, in the case of refunding bonds and notes, pursuant to legislation that generally authorizes refunding bonds and notes. Commonwealth General Obligations consist primarily of publicly issued bonds. They also included, as of July 31, 2016, a promissory note in the outstanding principal amount of $24 million issued by the General Services Administration and notes with an aggregate outstanding principal amount of $169 million issued by the Commonwealth to GDB in anticipation of one or more public bond offerings that have not been completed.

Section 8 of Article VI of the Commonwealth Constitution provides that "public debt" of the Commonwealth will constitute a first claim on available Commonwealth resources. For purposes of the Constitution, "public debt" includes only general obligation bonds and notes issued by the Commonwealth to which the good faith, credit and taxing power of the Commonwealth have been pledged (i.e. Commonwealth General Obligations) and, according to opinions rendered by the Attorney General of the Commonwealth, includes also any payments required to be made by the Commonwealth on account of bonds and notes issued by its public instrumentalities and guaranteed by the Commonwealth's good faith, credit and taxing power ("**Commonwealth Guaranteed Obligations**"). "Public debt" does not include other obligations of the Commonwealth to which the good faith, credit and taxing power of the Commonwealth are not pledged, or obligations of public corporations or municipalities that are not guaranteed by the Commonwealth.

In the event the Commonwealth has insufficient funds to pay all approved appropriations for a given fiscal year, the Constitution of Puerto Rico requires that available resources of the Commonwealth be used to pay "public debt" before being used for other purposes. Furthermore, the Constitution of Puerto Rico empowers a holder of bonds or notes evidencing "public debt" to bring suit against the Secretary of the Treasury to require application of available Commonwealth resources to the payment of principal of and interest on such public debt when due.

Pursuant to Executive Order 2016-30 issued under the Moratorium Act, the Governor declared the Commonwealth to be in a state of emergency, suspended payment of interest and principal on all Commonwealth General Obligations, suspended payments by the Commonwealth of Commonwealth Guaranteed Obligations and stayed all actions, including suits against the Secretary of the Treasury, to collect on such bonds and notes. On July 1, 2016, the Commonwealth did not pay interest or principal on its General Obligations or Commonwealth Guaranteed Obligations due on that date (other than certain interest on its General Obligations for which funds were held in escrow by the bonds' paying agents).

### *Debt Limit – General Obligations*

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes to which the good faith, credit and taxing power of the Commonwealth have been pledged shall ***not*** be issued ***if*** the amount of

the principal of, and interest on, such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the treasury (hereinafter, "**internal revenues**") in the two fiscal years preceding the fiscal year of such proposed issuance. Internal revenues consist principally of income taxes, sales and use taxes (other than those assigned to COFINA) and excise taxes. The Commonwealth has historically included payments due on July 1 as having been made on June 30.

As of September 30, 2016, future maximum annual debt service for the Commonwealth's outstanding General Obligations is $1.178 billion in the fiscal year ending on June 30, 2017, assuming that (i) $126.7 million principal amount of outstanding CPI-based variable rate bonds bear interest at the maximum rate of 12% per annum and (ii) $779 million of Commonwealth General Obligation debt service due on July 1, 2016 (which would be normally included in fiscal year 2016 debt service) but not paid as a result of the Moratorium Act is *not* included in fiscal year 2017 debt service (after the expiration of the moratorium period under the Moratorium Act). The amount paid by the Commonwealth in fiscal year 2016 on account of bonds or notes guaranteed by the Commonwealth was $18.8 million (paid on bonds issued by the Port of the Americas Authority and held by GDB). The sum of these debt service amounts equals $1.197 billion. The average of the Commonwealth's adjusted internal revenues for the fiscal years ended June 30, 2016 and 2015, as calculated by FAFAA, was $8.873 billion. The percentage obtained by dividing this debt service amount by the revenue amount is 13.49%.

If debt service payments of $25.3 million on PBA guaranteed debt due on July 1, 2016, but not paid as a result of the Moratorium Act were included in the calculation, the resulting percentage obtained by dividing the debt service amount by the revenue amount would increase to 13.77%.

During fiscal year 2017, it is likely that certain issuers that have issued debt guaranteed by the Commonwealth, including PBA, will be unable to meet their debt service payments. If the Commonwealth guarantee is triggered as a result, fiscal year 2017 debt service on Commonwealth guaranteed debt for purposes of the Constitutional debt limit could be significantly higher and could result in a debt service percentage of more than 15% when calculated in fiscal year 2018. Under these circumstances, the Commonwealth would be unable to issue additional General Obligations or guarantee additional debt during fiscal year 2018.

The calculations set forth above give effect to certain forbearance agreements relating to Commonwealth Guaranteed Obligations issued by PRASA and therefore do not include the payments on PRASA Bonds due on July 1, 2016 (which would be covered by the Commonwealth guaranty). However, as mentioned above, they do not give effect to the postponement of the General Obligation or Commonwealth Guaranteed Obligation debt service payments that were not made on July 1, 2016 as a result of the Moratorium Act. If such debt service payments (which under the terms of the Moratorium Act are currently due during fiscal year 2017) were to be included as part of scheduled debt service for fiscal year 2017, the debt service amount for fiscal year 2017 would be significantly higher and would result in a debt service percentage of more than 15%. Under these circumstances, the Commonwealth would be

177

unable to issue additional General Obligations or guarantee additional debt during fiscal year 2017.

### Debt Limit – Commonwealth Guaranteed Obligations

Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% debt limitation has not been exceeded. Annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation unless the Commonwealth is required to make payments under its guarantee.

### Outstanding Commonwealth Guaranteed Obligations

Table 2 below lists all outstanding Commonwealth Guaranteed Obligations as of July 31, 2016. A more detailed description regarding these bonds is provided below in the description of debt by type of underlying issuer.

### Table 2 – Outstanding Commonwealth Guaranteed Obligations [1]
*(Figures shown in millions of dollars as of July 31, 2016)*

| | |
|---|---|
| PBA Bonds | $4,005 |
| PRASA Subordinated Bonds | 1,260 |
| APLA Bonds | 226 |
| GDB Bonds | 110 |
| PRIFA BANs | <u>78</u> |
| Total Commonwealth Guaranteed Obligations | $5,678 |

(1) Includes accreted interest on CABs.

### Debt Subject to the Commonwealth "Clawback"

Certain tax revenues of the Commonwealth have been pledged to bondholders of various public corporations subject to such revenues being re-directed to the payment of Commonwealth General Obligations and Commonwealth Guaranteed Obligations to the extent other funds are not available for such purpose. Such re-direction is sometimes referred to as a "clawback." Pledged tax revenues that, by the terms of the applicable governing bond documents and statutes, are subject to the Commonwealth's "clawback" include (i) a portion of the federal excise tax on offshore shipments of rum, which is collected by the United States Government, returned (or "covered over") to the Puerto Rico Treasury Department and assigned by law to PRIFA; (ii) vehicle license fees, excise taxes on gasoline, gas oil and diesel oil, a portion of the excise tax on petroleum products and a portion of the excise tax on cigarettes, which are assigned by law to HTA; (iii) a portion of the excise tax on petroleum products, which is assigned by law to PRIFA; (iv) a portion of the excise tax on cigarettes, which is assigned by law to MBA; and (v) a portion of the hotel room tax, which is assigned by law to PRCCDA. In the event any such "clawback" is implemented, the bonds issued by these entities that are payable from such revenues would be adversely affected.

Revenues subject to the Commonwealth "clawback" have traditionally not been included as internal revenues for the purpose of calculating the Commonwealth debt limit, although they

may be available for the payment of debt service on the public debt to the extent no other resources are available for such purpose.

On January 4, 2016, the Commonwealth made a portion of the approximately $330 million payment of Commonwealth General Obligations due on that date with approximately $164 million of revenues "clawed-back" from PRIFA, HTA, PRCCDA and MBA pursuant to Executive Order No. 2015-46. The following table sets forth the revenues that were retained by the Commonwealth pursuant to Executive Order No. 2015-46 as of December 31, 2015 and used to make the required payment on General Obligations due on January 4, 2016, as well as the revenues that were retained by the Commonwealth pursuant to Executive Order No. 2015-46 from January 1, 2016 to June 30, 2016 (expressed in thousands of dollars):

### Table 3 – "Clawed-back" Revenues
*(Figures shown in millions of dollars as of June 30, 2016)*

| Entity | Concept | Through Dec '15 | Jan. '16 – Jun. '16 | Total |
|--------|---------|-----------------|---------------------|-------|
| PRIFA | Rum Tax | $113,000 | – | $113,000 |
| PRIFA | Petroleum Products Tax | – | 12,826 | 12,826 |
| MBA | Cigarette Tax | 323 | 4,674 | 4,997 |
| PRCCDA | Hotel Room Tax | 3,033 | 9,100 | 12,134 |
| HTA | Petroleum Products Tax | 20,000 | 60,000 | 80,000 |
| HTA | Gasoline/Diesel/Licenses | 27,561 | 86,369 | 113,930 |
| HTA | Petroleum Products Tax | – | 53,638 | 53,638 |
| HTA | Motor Vehicle Fines | – | 29,117 | 29,117 |
| HTA | Motor Vehicle Licenses | – | 21,814 | 21,814 |
| HTA | Cigarette Tax | – | 11,662 | 11,662 |
| Total Amount Transferred | | $163,917 | $289,201 | $453,118 |

Of the total revenues that were retained by the Commonwealth pursuant to Executive Order No. 2015-46 from January to June 2016, (i) approximately $143.2 million are deposited in GDB and therefore subject to the limitations imposed on withdrawals of funds from GDB by Executive Order No. 2016-014 and (ii) approximately $146.0 million are deposited in a commercial bank.

179

The following table sets forth a list of debt payable from revenues expressly subject to "clawback" (expressed in thousands):

### Table 4 – Debt Payable from Revenues Expressly Subject to "Clawback"[1]
*(Figures shown in millions of dollars as of July 31, 2016)*

| Issuer | Outstanding Amount[2] | Source of Repayment Subject to "Clawback" |
|---|---|---|
| HTA Bonds (1968 and 1998 Resolutions) | $4,176 | Excise taxes on petrolum products, gas and diesel; motor vehicle license fees |
| PRIFA Rum Bonds | 1,783 | Federal excise tax on offshore shipments of rum |
| PRIFA BANs | 78 | Excise tax on petroleum products |
| PRCCDA Bonds | 386 | Hotel room taxes |
| MBA Line of Credit | 28 | Excise tax on cigarrettes |
| Total | $6,452 | |

(1) Includes only debt payable from revenues expressly subject to clawback pursuant to their governing documents.
(2) Includes accreted interest on CABs.

## Tax and Revenue Anticipation Notes *("TRANs")*

Since a substantial portion of the Commonwealth's tax revenues are received during the second half of the fiscal year (January through June) while operational expenditures are made evenly throughout the fiscal year, the Commonwealth normally needs short-term financing during the first half of the fiscal year (July through December). Act No. 1-1987, as amended, authorizes the Secretary of the Treasury of Puerto Rico to issue TRANs from time to time in order to bridge the working capital deficiency created by the timing of the receipt of revenues. The TRANs thus finance, throughout the year, General Fund appropriations for the current fiscal year in anticipation of the receipt of taxes and revenues to be collected in cash during that fiscal year, according to the budget estimates of the General Fund.

The TRANs statute requires taxes and revenues specified in the TRANs authorizing resolution, and received after the issuance of such notes and before the close of the fiscal year, to be deposited in a Special Tax and Revenue Anticipation Notes Redemption Fund and empowers the Secretary of the Treasury to establish a lien on all revenues deposited in such fund in favor of the holders of the TRANs.

On September 6, 2016, the Commonwealth renewed the emergency "intra-governmental" TRANs for fiscal year 2017, in the aggregate principal amount of $400 million, with the Puerto Rico State Insurance Fund, the Automobile Accidents Compensation Administration and the Labor Department's disability fund. The Commonwealth has not been able to obtain this type of financing from non-governmental third parties during the last two fiscal years.

**Other Indebtedness Payable Primarily from Commonwealth Taxes**

*Puerto Rico Sales Tax Financing Corporation ("COFINA")*

COFINA was originally created in 2006 pursuant to the provisions of Act No. 91-2006, as amended ("**Act 91**"), for the purpose of financing the payment of certain appropriation-backed debt outstanding as of June 30, 2006 payable to GDB and PFC. In 2009, the Legislative Assembly of the Commonwealth expanded the purposes for which COFINA was created to include, among other things, the payment or financing of Commonwealth operational expenses for certain subsequent fiscal years, and increased from 1% to 2.75% (one-half of the then-applicable sales and use tax rate of 5.5%) the portion of the Commonwealth sales and use tax ("**Commonwealth SUT**") that is transferred to COFINA. In 2014, the Commonwealth lowered the municipal sales and use tax by 0.5% and increased the Commonwealth SUT by the same amount (with the revenues from the 0.5% remaining for the benefit of the Municipal Administration Fund).   The Commonwealth then increased the aggregate rate of the Commonwealth SUT from 6% to 10.5% by imposing a sales and use tax surcharge of 4.5%.  The revenues attributable to such increase are the property of the Commonwealth and are not available to COFINA. More recently, the Commonwealth reset the portion of the SUT allocated to COFINA to the original 5.5%.

Act 91 currently requires that the following amounts of the Commonwealth SUT be transferred to COFINA, whichever is greater: (i) a minimum fixed amount, referred to as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth SUT collected during such Fiscal Year multiplied by a fraction, the numerator of which is 2.75% and the denominator of which is 5.5% (the greater of (i) and (ii) being referred to as the "**Pledged Sales Tax**"). The Pledged Sales Tax is the only source of funds available to pay debt service on COFINA's senior and first subordinate bonds. The principal difference between senior and first subordinate bonds is that, during the existence of an event of default, holders of first subordinate bonds do not have the right to declare an event of default or exercise remedies until the holders of senior bonds have exercised their remedies, including acceleration, and have been fully paid.

The Statement of Motives of Act No. 56-2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the Pledged Sales Taxes not be made subject to the Commonwealth "clawback." Act 91 provides that such funds (i) shall be the property of COFINA, (ii) shall not be deposited in the General Fund and (iii) shall not constitute "available resources" of the Commonwealth for any purpose, including for purposes of the priority afforded to holders of General Obligations as set forth in Section 8 of Article VI of the Constitution. However, holders of General Obligations have alleged in a recent lawsuit that such funds are "available resources" for purposes of the Commonwealth Constitution. See LITIGATION.

In order to comply with these provisions, all sales and use tax revenues, including the Pledged Sales Tax, are collected, transferred and deposited through independent third parties.  Specifically, merchants remit sales and use tax collections and returns to a third-party financial institution responsible for verifying amounts received and transferring them to the COFINA trustee.  Once the amounts required to be deposited with the COFINA trustee have been transferred, the third-party financial institution will then allocate and transfer incoming sales and use tax revenues to the Commonwealth and, in the event certain thresholds are

exceeded, between COFINA and the Commonwealth. As a result, the Pledged Sales Tax is never on deposit in the General Fund or the Secretary of the Treasury's Treasury Single Account.

The following table sets forth the principal amount outstanding of publicly issued senior and subordinated COFINA bonds, the amount of CAB accretion on such bonds since their issuance, which is significant, and the resulting total outstanding principal amount (including accretion) of each class of COFINA bonds. Totals may not add due to rounding.

### Table 5 – COFINA Indebtedness
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | Principal | CAB Accretion | Total Outstanding |
|---|---|---|---|
| COFINA Senior Bonds | $6,273 | $1,317 | $7,590 |
| COFINA Subordinated Bonds | 8,939 | 793 | 9,732 |
| Total COFINA | $15,213 | $2,110 | $17,322 |

A significant amount of COFINA bonds have been issued as CABs. The nominal amount of accretion to maturity on all COFINA CABs currently outstanding is approximately $20 billion (including the approximately $2.1 billion in accretion as of July 31, 2016).

The Executive Orders issued under the Moratorium Act have not included COFINA or affected its pledged revenues and COFINA has continued to pay debt service on its bonds as scheduled.

### *Puerto Rico Highways and Transportation Authority ("HTA")*

The table below details outstanding (i) HTA bonds issued under its two primary bond resolutions (known as the "1968" and the "1998" bond resolutions), (ii) bonds issued under HTA's Teodoro Moscoso Bridge bond indenture and (iii) loans outstanding (all with GDB), in each case as of July 31, 2016:

### Table 6 – HTA Indebtedness
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | Principal | CAB Accretion | Total Outstanding |
|---|---|---|---|
| 1968 Resolution Bonds | $806 | $9 | $815 |
| 1998 Resolution Bonds | 3,324 | 37 | 3,361 |
| Teodoro Moscoso Bonds | 123 | 18 | 140 |
| Total HTA Bonds | $4,253 | $64 | $4,316 |
| GDB Loans | 1,734 | - | 1,734 |
| Total HTA Debt | $5,986 | $64 | $6,050 |

### *1968 Resolution*

Bonds issued under the 1968 Resolution (the "**1968 Resolution Bonds**") are secured by, and payable from, pledged tax and fee revenue including (i) gasoline excise taxes, (ii) gas oil and diesel excise taxes, and (iii) motor vehicle license fees. The bonds are also secured by the tolls or other charges imposed by HTA for the use of PR-20, PR-52 and PR-53.

*1998 Resolution*

Bonds issued under the 1998 Resolution (the "**1998 Resolution Bonds**") are secured by, and payable from, excess unencumbered revenues from the 1968 Resolution Bonds and other pledged revenues including pledged petroleum products taxes and tolls or other charges imposed by the authority for the use of PR-66.  The 1998 Resolution provide for both senior and subordinate 1998 Resolution Bonds.

As described above, the tax revenues and license fees pledged to the 1968 and 1998 Resolution Bonds are subject to the "clawback".  Toll revenues pledged to the 1968 and 1998 Resolution Bonds, however, are not subject to the clawback.

Separately, HTA also receives additional pledged taxes from vehicle license fees, cigarette excise taxes and excess petroleum products excise taxes that are not pledged assigned to any bonds but are pledged to the repayment of GDB lines of credit. These are also subject to the "clawback".

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended HTA's obligation to transfer pledged funds to the trustee of the 1968 and 1998 Resolution Bonds, and directed HTA to use any such funds remitted to HTA for the provision of essential services. The fiscal agent of the 1968 and 1998 Resolution Bonds paid interest and principal on such bonds (except subordinate bonds issued under the 1998 resolution) on July 1, 2016 using available funds, including debt service reserves. In the case of the subordinated bonds issued under the 1998 resolution, the debt service reserves are held at GDB and have not been available to pay such bonds as a result of the limitations on withdrawal of deposits imposed by the Executive Orders issued under the Moratorium Act.

***HTA's Teodoro Moscoso Bridge Special Facility Revenue Refunding Bonds.*** HTA and Autopistas de Puerto Rico y Compañía, S.E. ("**Autopistas**") are parties to a Concession Agreement dated as of December 20, 1991, pursuant to which Autopistas constructed and is entitled to operate the "Teodoro Moscoso Bridge," a toll bridge spanning the San José Lagoon, which opened for traffic in February of 1994. In order to pay for a portion of the costs related to the construction of the bridge, HTA issued its revenue bonds and loaned the proceeds thereof to Autopistas. Under the loan agreement with Autopistas, Autopistas agreed to repay the loan solely from the revenues generated by the bridge (net of the bridge's operating and maintenance expenses). Under the HTA trust agreement pursuant to which the bonds were issued, such net revenues are pledged to secure the payment of the bonds. The Concession Agreement is scheduled to terminate on February 24, 2044. However, Autopistas has the option to terminate the Concession Agreement if bridge traffic is below certain levels specified in the Concession Agreement. Bridge traffic has in fact been below these levels and is expected to continue to be below these levels for the foreseeable future. As a result, Autopistas has and is expected to continue to have the option to terminate the Concession Agreement. In the event that Autopistas exercises its right to terminate the Concession Agreement, HTA would be obligated to assume the obligation to pay the bonds. Upon such assumption, if permitted under its 1998 bond resolution, HTA would be required to issue bonds thereunder in exchange for the bridge bonds. If the Authority cannot issue bonds under its 1998 bond resolution because it does not meet the additional bonds test, the bridge bonds would continue to be payable from available bridge net toll revenues and from any other revenues available to HTA after payment of debt service on its

senior and subordinated bonds. Based on the fiscal year 2015 audited results and most recent interim results, unless traffic or rate levels improve, expenses are further reduced, or an external capital infusion is made, HTA has identified a significant risk that Autopistas will exercise its termination right in the medium term as net revenues and reserve account deposits may not be sufficient to cover scheduled debt service obligations.

*HTA Loans with GDB*. As of July 31, 2016, HTA had approximately $1.73 billion in loans with GDB outstanding.  As described above, these loans are backed by a portion of the motor vehicle license fees, cigarette excise taxes and excess petroleum products excise taxes that are not pledged or assigned to the 1968 and 1998 Resolution Bonds.  HTA loans with GDB constitute a material portion of GDB's balance sheet. However, HTA's obligation to transfer the revenues pledged for the payment of HTA's outstanding loans with GDB was modified by Executive Order 2016-31, issued pursuant to the Moratorium Act, which modifies HTA's obligation to transfer these pledged revenues to the extent necessary to provide HTA with the revenues it requires to fund operating expenses or essential services.

For a discussion of HTA's funding sources and current financial condition, see "PUBLIC CORPORATIONS – Puerto Rico Highways and Transportation Authority"

### Puerto Rico Infrastructure Financing Authority

PRIFA is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by such entities. Bonds issued by PRIFA are primarily payable from specific taxes or funding sources, such as federal rum excise tax revenue or petroleum products taxes.

The table below lists PRIFA bonds and loans outstanding as of July 31, 2016.  Since the PRIFA Port Authority Bonds and the PRIFA AMSCA Bonds are not payable primarily from Commonwealth taxes or other revenues, these bonds are described elsewhere herein based on their source of repayment.

### Table 7 – PRIFA Indebtedness
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | Principal | CAB Accretion | Total Outstanding |
|---|---|---|---|
| PRIFA Rum Bonds | $1,622 | $160 | $1,783 |
| PRIFA Port Authority Bonds[1] | 191 | - | 191 |
| PRIFA AMSCA Bonds | 36 | - | 36 |
| PRIFA BANs[2] | 78 | - | 78 |
| Total PRIFA Bonds | $1,926 | $160 | $2,087 |
| GDB Loans | 49 | - | 49 |
| Total PRIFA Debt | $1,975 | $160 | $2,137 |

(1)  Covered by a GDB letter of credit.
(2)  Guaranteed by the good faith, credit and taxing power of the Commonwealth.

184

**PRIFA Rum Bonds**

PRIFA oversees the Puerto Rico Infrastructure Fund, which under PRIFA's enabling statute is funded annually through fiscal year 2052 with the first $117 million of proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to Puerto Rico pursuant to the U.S. Code. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes (except for negligible collections for other alcoholic beverages), the proceeds of which are required to be returned (or "covered over") from the U.S. Government to the Puerto Rico Treasury Department. PRIFA has periodically issued bonds backed by such federal excise taxes (the "**PRIFA Rum Bonds**"), the proceeds of which have been used to finance various infrastructure projects. As of July 31, 2016, approximately $1.783 billion in PRIFA Rum Bonds were outstanding (including CAB accretion).

As noted above, revenues assigned by law to PRIFA and pledged for the repayment of the PRIFA Rum Bonds are subject to the Commonwealth "clawback," and may therefore have to be applied first to the payment of debt service on Commonwealth General Obligations and Commonwealth Guaranteed Obligations to the extent that no other revenues are available for such purpose.

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended the obligation to transfer pledged funds to the trustee of the PRIFA Rum Bonds. On January 1, 2016, and July 1, 2016, PRIFA did not pay interest or principal on the PRIFA Rum Bonds, and the trustee does not currently hold any reserves for the payment of such bonds.

**PRIFA Bond Anticipation Notes**

In January of 2015, the Commonwealth enacted a new excise tax of $6.25 per barrel on petroleum products (other than diesel) and assigned by law the revenues of such tax to PRIFA. On March 17, 2015, PRIFA issued approximately $246 million of bond anticipation notes payable from such petroleum products excise tax (the "**PRIFA BANs**"). The proceeds of the PRIFA BANs, which are guaranteed by the good faith, credit and taxing power of the Commonwealth, were used to refinance certain bond anticipation notes previously issued by HTA. As of July 31, 2016, approximately $78 million in PRIFA BANs were outstanding.

Revenues assigned to PRIFA and pledged for the repayment of the PRIFA BANs may be applied first to the payment of debt service on Commonwealth General Obligations and Commonwealth Guaranteed Obligations to the extent that no other revenues are available for such purpose.

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended PRIFA's obligation to transfer pledged funds to the trustee of the PRIFA BANs. The Executive Orders also declared the Commonwealth to be in a state of emergency and suspended the Commonwealth's payment obligations under Commonwealth Guaranteed Obligations. Although payments of principal and interest on these notes through July 1, 2016 were made from funds on deposit with the trustee, including reserves, these funds have how now been exhausted and no additional debt service payment can be made unless pledged funds are transferred to the trustee

185

once again.  On August 1, 2016 and September 1, 2016, PRIFA did not pay interest or principal on these bonds.

### *Puerto Rico Convention Center District Authority ("PRCCDA")*

PRCCDA's bonds are secured by a pledge of a portion of the hotel room tax, which is collected by the Puerto Rico Tourism Company and transferred, through GDB, to the trustee of the bonds. Such funds are not collected by the Treasury Department or deposited in the TSA. However, such funds are subject to the Commonwealth "clawback" and may therefore have to be applied first to the payment of debt service on Commonwealth General Obligations and Commonwealth Guaranteed Obligations to the extent that no other revenues are available for such purpose.  As of July 31, 2016, approximately $386 million in bonds issued by PRCCA were outstanding.

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended the Tourism Company and PRCCDA's obligation to transfer pledged funds to GDB and also suspended PRCCDA and GDB's obligations to transfer pledged funds to the trustee of the PRCCDA bonds. Although payments of principal and interest on these notes were made during fiscal year 2016 partly out of funds available in existing debt service and reserve accounts, PRCCDA is currently projected to miss the contractual debt service payment due July 1, 2017 unless the transfer of pledged funds is restarted.

### *Puerto Rico Metropolitan Bus Authority ("MBA")*

In order to assist MBA in its corporate purpose mission, the Legislative Assembly assigned $10 million of the cigarette excise tax to MBA. This assignment is subordinate to the assignment under Act 30-2013 of $20 million of the cigarette excise tax to HTA.

MBA pledged the revenues derived from its portion of the cigarette excise tax as the sole source of repayment of a loan provided by a commercial bank.  Such loan, as of July 31, 2016, had an outstanding principal amount of approximately $28 million. Pursuant to Executive Orders issued under the Moratorium Act, MBA was declared to be in a state of emergency and the Commonwealth's obligation to transfer cigarette excise taxes to MBA and MBA's obligation to make any payments on its outstanding debt were suspended. As a result, the MBA is currently in default under the loan, as it has not received any amounts from the Commonwealth in order to make the payments due thereunder. Recently, the commercial bank's parent company, which recently acquired the loan from its subsidiary, has declared a default under the loan agreement and has commenced litigation against MBA, but is currently prohibited from exercising remedies due to the stay under the Moratorium Act and PROMESA.

Revenues assigned to MBA and pledged for the repayment of its loans are subject to the Commonwealth "clawback" and may therefore have to be applied first to the payment of debt service on Commonwealth General Obligations and Commonwealth Guaranteed Obligations to the extent that no other revenues are available for such purpose.

**Indebtedness Payable from Commonwealth Appropriations**

### *Puerto Rico Public Buildings Authority ("PBA")*

As of July 31, 2016, PBA had approximately $4.005 billion in bonds outstanding, issued primarily to finance the construction of governmental facilities that are thereafter leased to the Commonwealth and its instrumentalities.

Lease payments made to PBA by the Commonwealth, its public corporations or municipalities in consideration for the use of such facilities constitute the sole source of repayment for PBA's bonds. Most of such lease payments are subject to legislative appropriations from the Commonwealth's General Fund budget.

PBA's lease payments and its bonds are, however, guaranteed by the good faith, credit and taxing power of the Commonwealth. PBA bonds therefore constitute Commonwealth Guaranteed Obligations. PBA is currently authorized by law to have outstanding at any one time up to $4.7 billion of bonds guaranteed by the Commonwealth.

Pursuant to Executive Order 2016-30 issued under the Moratorium Act, the Governor suspended the obligation of the Commonwealth and its departments and agencies to make lease payments to PBA, suspended PBA's obligation to transfer pledged funds to the fiscal agent under its bond resolutions, and suspended payment of interest and principal on all bonds and notes guaranteed by the Commonwealth. On July 1, 2016, PBA paid interest and a portion of the principal due on its bonds from funds on deposit with the bonds' trustee and certain federal subsidy payments, but did not pay the full amount of principal due on such bonds. No further debt service payments are expected to be made while the moratorium remains in effects except from funds on reserve for the PBA Series L bonds (which are expected to continue making debt service payments from available reserves) and from federal subsidy payments.

### *Employees Retirement System ("ERS")*

During 2008, ERS issued its Senior Pension Funding Bonds (the "**Pension Bonds**") as limited, non-recourse obligations of ERS payable solely from, and secured solely by, the employer contributions made to ERS by participating employers in the ERS pension plans. As of July 31, 2016, approximately $3.144 billion in Pension Bonds were still outstanding. The purpose of this offering was to increase the assets of ERS available to invest and pay benefits.

ERS had, as of June 30, 2016, approximately 118,664 active employees in the plan, of which 71,006, or 60%, were Commonwealth employees. Therefore, a majority of the employer contributions to the ERS, which are set as a percentage of employee payroll, are funded by legislative appropriations from the General Fund. Furthermore, a significant number of participating employers, such as HTA, MBA, PRMSA, PRTC, PRIDCO, PRCCDA, are themselves tax-supported public corporations. Entities included in the Proposed PROMESA Fiscal Plan account for approximately 79% of employer contributions to the ERS. Municipalities, which also receive significant Commonwealth subsidies each year, are all participating employers in the ERS.

Pursuant to Executive Order 2016-31 issued under the Moratorium Act, the Governor suspended the Commonwealth's obligation to transfer employer contributions to ERS (up to an amount equal to the debt service payable by ERS during fiscal year 2016-2017) and suspended ERS's obligation to transfer pledged funds to the trustee under its bond resolution. ERS has so far been able to pay debt service on its bonds in full from funds held by the trustee under its bond resolution. However, assuming no additional employer contributions or other funds are transferred to the ERS bond trustee, it is expected that these reserves will be completely depleted, and that ERS will be able to make additional debt service payments from its reserves only up to May 2017.

### Puerto Rico Public Finance Corporation ("PFC")

PFC was established in November 1984 to provide agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. The bond trustees of certain limited obligation bonds issued by PFC currently hold notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools, the Department of Health and PRASA, among others. All such PFC bonds are limited, non-recourse obligations of PFC payable solely from Commonwealth appropriations made to pay debt service on the notes held by the bond trustees. As of July 31, 2016, approximately $1.091 billion in PFC bonds were outstanding.

On August 1, 2015, PFC failed to make most of the payment due on such date on its bonds as a result of a failure by the Legislative Assembly to appropriate funds for such payment. Pursuant to Executive Order 2016-31 issued under the Moratorium Act, the Governor suspended any obligation of the Legislative Assembly to appropriate funds for the payment of PFC bonds. PFC was unable to pay in full a debt service payment due on August 1, 2015, and has not paid any debt service since that date. PFC is not expected to make any additional debt service payments during fiscal year 2017.

### Port of the Americas Authority

As of July 31, 2016, APLA had approximately $226 million in bonds outstanding. The bonds, which are guaranteed by the Commonwealth pursuant to Act No. 409-2004, are all held by GDB. The Commonwealth had recently been paying debt service on these Commonwealth Guaranteed Bonds by including appropriations in its General Fund budget to this effect, discharging its obligation under its guaranty.

While the responsibility for the development and operation of the Port of the Americas was transferred from APLA to the Ponce Ports Authority in December 2011, APLA retains the liability for the outstanding bonds. Since the revenues and other moneys of APLA pledged to the payment of such principal and interest are not sufficient (and are unlikely to be sufficient in the future) to pay the bonds, the Commonwealth, subject to the Moratorium Act, expects to continue to be required to make debt service payments under the Commonwealth guarantee.

Pursuant to Executive Order 2016-30 issued under the Moratorium Act, the Governor suspended the Commonwealth's obligations to pay interest and principal on all bonds and notes guaranteed by the Commonwealth, including the APLA bonds.

### PRIFA – AMSCA and Other GDB Loans

PRIFA issued bonds to fund the acquisition of certain facilities leased to the Mental Health and Anti-Addiction Services Administration ("**AMSCA**"). These bonds are payable from lease payments made by AMSCA, whose revenues are primarily General Fund appropriations. Except in the case of fiscal year 2017, annual payments on the AMSCA bonds have historically been included as appropriations in the Commonwealth's General Fund budget. As of July 31, 2016, approximately $36 million in AMSCA bonds were outstanding.

In addition, PRIFA had, as of July 31, 2016, approximately $49 million of loans payable to GDB. The primary source on repayment on these PRIFA loans has traditionally been General Fund appropriations.

### Other Central Government Indebtedness Payable by Commonwealth Appropriations

The Commonwealth, including the Treasury Department, has also borrowed from GDB and from private banks under lines of credit and through the issuance of notes purchased by GDB to finance ongoing operating and capital expenditures.

As of July 31, 2016, the Commonwealth had approximately $3.531 billion in principal amount of loans and notes outstanding that are payable from Commonwealth appropriations. Approximately $3.429 billion of such borrowings are payable to GDB, $100 million are payable to the State Insurance Fund, and $2 million are payable to the Automobile Accident Compensation Administration.

## Indebtedness Payable by Tax-Supported Public Corporations

### Government Development Bank for Puerto Rico ("GDB")

GDB historically provided financing to the Commonwealth, its public corporations and its municipalities. While certain of these loans were used to finance capital expenditures, in many cases in anticipation of the issuance of bonds and notes, GDB loans were also used to cover operational deficits of the Commonwealth and its instrumentalities.

As funding during the past decade for such financings, GDB relied primarily on issuances of senior unsecured notes ("**GDB Notes**") and public sector deposits. As of July 31, 2016, GDB had approximately $3.766 billion principal amount of GDB Notes outstanding, $110 million of which are guaranteed by the good faith, credit and taxing power of the Commonwealth and held by the State Insurance Fund. Outstanding principal on GDB Notes reached its highest point during fiscal year 2012, when approximately $6.107 billion in GDB Notes were outstanding.

GDB's primary source of income is loan repayments from its public sector loan portfolio. GDB's loan portfolio is primarily comprised of loans to the Commonwealth and its instrumentalities payable from Commonwealth appropriations or from tax revenues assigned to certain instrumentalities, such as HTA, who have pledged such tax revenues to GDB as source of repayment for its loans. As a result of the current financial condition of the Commonwealth and many of its instrumentalities, including HTA, the Commonwealth and these instrumentalities have been unable to repay their loans to GDB in accordance with their terms, which has resulted

in GDB lacking sufficient liquidity (or market access) to honor its debt service obligations. In light of GDB's financial situation, an appropriation to cover GDB's operating costs have been included in the Commonwealth's fiscal year 2017 General Fund budget.

Pursuant to Executive Orders issued under the Moratorium Act, the Governor declared GDB to be in a state of emergency and limited withdrawals, payments and transfer requests to those that are reasonable and necessary to fund the provision of essential services by the Commonwealth. The Executive Orders also suspended payment of GDB debt obligations (other than certain interest obligations that are payment-in-kind), including its obligation to honor certain letters of credit issued by GDB for the benefit of holders of PRIFA Ports Bonds indebtedness, although GDB may request the Governor's authorization to pay interest on its bonds to the extent its liquidity permits. GDB has been unable to fully meet its debt service obligations in full since May 1, 2016, and does not currently expect to make additional debt service payments while the moratorium is in effect.

### University of Puerto Rico ("UPR")

UPR's primary source of revenue is budgetary appropriations from the Commonwealth's General Fund, which amount to approximately 70% of the UPR's annual revenues.

The bonds issued by UPR under its trust indenture are general obligations of UPR and are secured by (i) tuition fees, (ii) student fees, (iii) rental and other charges for the right of use or occupancy of the University's facilities, (iv) net bookstore receipts and (v) certain other revenue sources. Appropriations from the Commonwealth and grants from the U.S. Government are excluded; however, in the event that the pledged revenues are insufficient to pay the bonds, UPR may opt to provide monies from other funds available, including funds appropriated by the Commonwealth. UPR also covenants to set university fees so that the pledged revenues, together with any other funds, will be sufficient to pay principal and interest payments on the bonds.  As of July 31, 2016, approximately $432 million in UPR revenue bonds were outstanding.

In addition to the bonds issued by UPR under its trust indenture, as of July 31, 2016, AFICA had $64 million outstanding principal of bonds issued to fund the construction of certain buildings and parking facilities commonly known as University Plaza that are leased to UPR. The proceeds of the bonds were loaned to Desarrollos Universitarios, a not-for-profit corporation that is a component unit of UPR, which built the facilities and leased them to UPR. The bonds are limited obligations of AFICA payable from loan repayments by Desarrollos Universitarios, which are in turn payable from lease payments under the UPR lease agreement. The lease payments are in turn secured by a subordinated lien on UPR revenues.

As of July 31, 2016, the UPR also had approximately $76 million in loans from GDB.

The table below provides additional detail with respect to UPR's outstanding bonds.

**Table 8 – UPR Indebtedness**
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | Outstanding Principal |
|---|---|
| UPR Revenue Bonds | $432 |
| AFICA – Desarrollos Universitarios Bonds | 64 |
| Total UPR Bonds | $496 |
| GDB Loans | 76 |
| Total UPR Debt | $572 |

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended UPR's obligation to transfer pledged revenues to the trustee of the UPR bonds.

### Puerto Rico Industrial Development Company ("PRIDCO")

PRIDCO bonds are secured by rentals derived from the leasing of certain industrial buildings built by PRIDCO and leased to private firms and, if required, from any other available funds at PRIDCO.  As of July 31, 2016, PRIDCO had approximately $159 million in bonds outstanding (including CAB accretion) and $78 million in GDB loans.

PRIDCO receives support from the central government in the form of (i) transfers of corporate tax revenues deposited in the special fund for economic development (also known as "**FEDE**," for its acronym in Spanish), which PRIDCO utilizes to fund several of its industrial incentives programs, and (ii) an amount equivalent to 2.5% of the total revenues from the federal excise tax on shipments on rum that are "covered over" to the Commonwealth, in an amount not to exceed $10 million each fiscal year, for the benefit of the "Rums of Puerto Rico" incentive program. Furthermore, PRIDCO, pursuant to agreements signed pursuant to Act No. 178-2010 ("**Act 178**"), distributes to certain local rum producers up to their 46% share of the revenues from the federal rum excise tax corresponding to the rum sales of such rum producers. Finally, the income from rental payments on PRIDCO buildings is partially dependent on tax incentives (i.e. tax expenditures) granted by PRIDCO to foreign and local corporations that establish operations in Puerto Rico pursuant to Act No. 73-2008, also known as the Economic Incentives Act.

Pursuant to Executive Order 2016-31 issued under the Moratorium Act, the Governor suspended PRIDCO's obligation to transfer pledged funds to the trustee under its bond indenture.

### PRIFA - Port Authority Bonds

As of July 31, 2016, PRIFA had $191 million principal amount outstanding of its Revenue Bonds (Ports Authority Project), Series 2011A, 2011B and 2011C (the "**PRIFA Ports Bonds**"). The PRIFA Ports Bonds are limited obligations of PRIFA that are secured by the Ports Authority's obligation to make payments under a Loan and Trust Agreement entered into by and between PRIFA and the Ports Authority, which was assigned to the trustee as security for such bonds. The PRIFA Ports Bonds are further secured by two direct pay letters of credit issued by

GDB on behalf of the Ports Authority that may be drawn upon by the trustee. The bonds were marketed based on GDB's credit enhancement and the trustee of the PRIFA Ports Bonds has relied on draws on GDB's letters of credit to pay interest on the bonds and to repurchase bonds at maturity, as the Ports Authority has lacked internal funds or market access to honor such obligations without GDB support.  As of July 31, 2016, GDB had paid approximately $479 million in PRIFA Ports Bonds under its letters of credit. The Ports Authority has reimbursed approximately $266 million of this amount to GDB from the proceeds of the concession of the Luis Muñoz Marín International Airport. The current balance of approximately $211 million has been converted into a five-year term loan intended to be repaid from legislative appropriations.

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended GDB's obligation to honor its letters of credit and suspended the Ports Authority's obligation to make monthly transfers to the trustee of the PRIFA Ports Bonds. Although the June 15, 2016 interest payment was made in full from funds held by the bond trustee, such funds have now been exhausted. PRIFA Port bonds do not have a debt service reserve or debt service account established.

### Other Central Government Entities

As of July 31, 2016, ADEA had a $338,000 loan payable to a private bank.

## Indebtedness Payable by Non-Tax Supported Public Corporations

### Puerto Rico Electric Power Authority ("PREPA")

PREPA's bonds and notes are payable from the revenues derived by it from the sale of electricity, after payment of operating expenses. As of July 31, 2016, PREPA had approximately $8.259 in Power Revenue Bonds outstanding. As of such date, PREPA also had approximately $696 million in loans with private banks, approximately $36 million in loans with GDB and approximately $1 million in loans with other Commonwealth entities.

PREPA does not receive any direct support in the form of taxes or appropriations from the Commonwealth or its instrumentalities. The Commonwealth and its instrumentalities are, however, comprise approximately 12% of PREPA's electricity sales. In the past, the Commonwealth and its instrumentalities have financed working capital deficits by delaying payments to PREPA.

For a discussion of PREPA's recent efforts to restructure its debt through agreements with its creditors, see "PUBLIC CORPORATIONS - Puerto Rico Electric Power Authority."

### Puerto Rico Aqueduct and Sewer Authority ("PRASA")

PRASA's bonds and notes are payable from the revenues derived by it from the sale of water and wastewater services. PRASA's bonds and notes include bonds with a claim on PRASA's gross revenues that is senior to its operating expenses.  As of July 31, 2016, approximately $3.298 billion in senior revenue bonds were outstanding.

In addition, PRASA has bonds and loans payable from revenues remaining after the

payment of debt service on the senior bonds and operating expenses. Such subordinate debt obligations include approximately $285 in subordinate bonds issued in 2008 and guaranteed by the good faith and credit of the Commonwealth. They also include approximately $394 million in "Rural Development" bonds purchased by the U.S. Department of Agriculture and approximately $581 million in loans from the Commonwealth's State Revolving Funds. Both the Rural Development bonds and the State Revolving Funds loans are Commonwealth Guaranteed Obligations.

PRASA also has approximately $66 million in loans from GDB and $4 million in loans from private parties.

The following table sets forth PRASA's outstanding indebtedness.

### Table 9 – PRASA Indebtedness
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | Outstanding Principal | Amount Guaranteed by the Commonwealth |
|---|---|---|
| 2008 Senior Revenue Bonds[1] | $1,299 | - |
| 2012 Senior Revenue Bonds | 1,999 | - |
| 2008 Subordinated Revenue Bonds | 285 | $285 |
| Subordinated Rural Development Bonds | 394 | 394 |
| Total PRASA Bonds | $3,976 | $679 |
| GDB Loans | 66 | - |
| PRIFA Loans (State Revolving Funds) | 581 | 581 |
| Loans from Private Lenders | 4 | - |
| Total PRASA Debt | $4,627 | $1,260 |

(1) Includes $28 million of CAB accretion.

PRASA does not currently receive any direct support in the form of taxes or appropriations from the Commonwealth or its instrumentalities (except for ordinary course charges for water and wastewater services). However, PRASA has in the recent past been subsidized with Commonwealth General Fund appropriations and sizable interim loans from the GDB. As discussed above, the Commonwealth also guarantees a significant portion of PRASA's indebtedness. Furthermore, the Commonwealth and its instrumentalities comprise approximately 13% of PRASA's sales of water and wastewater services. In the past, the Commonwealth and its instrumentalities have financed working capital deficits by delaying payments to PRASA.

For a discussion of PRASA's recent operational and financial challenges, see "PUBLIC CORPORATIONS – Puerto Rico Aqueduct and Sewer Authority."

## Municipal Indebtedness

Municipal debt, other than bond anticipation notes, is supported by real and personal property taxes, municipal license taxes, and municipal sales taxes. Municipal debt is issued pursuant to ordinances adopted by the respective municipal legislatures.

Pursuant to Act No. 64 of July 3, 1996, as amended (the "**Municipal Financing Act**"), municipalities are authorized to borrow money through obligations evidenced by bonds, notes or other instruments. These include (i) general obligations bonds and notes, secured by the full faith, credit and taxing power of the municipality, (ii) obligations payable from municipal sales and use taxes ("**SUT obligations**"), and (iii) special obligations payable from various sources.

### *Municipal General Obligations*

The principal source of repayment of municipal general obligations is an "additional special property tax" that may be imposed by a municipality without limitation as to rate or amount on all taxable property in such municipality (the "**CAE Tax**"). The Municipal Financing Act requires that each municipality levy a CAE Tax that is sufficient to cover the debt service on all outstanding general obligations. If, however, a municipality's CAE Tax revenues are insufficient to make the debt service payments on its outstanding general obligations, said municipality's operating revenues are required to be used to cover such debt service payments. A municipality's operating revenues are all the revenues received by such municipality for the payment of its operating expenses, including, but not limited to: (i) the revenues from a basic property tax of up to 6% on the appraised value of all non-exempt real property and 4% on the appraised value of all non-exempt personal property, which the municipalities are authorized to levy (collectively, the "**Basic Tax**"); (ii) the revenues from the sales and use tax deposited by the Treasury Secretary in the Municipal SUT Development Fund; (iii) the remittances of operating funds sent by CRIM to the municipality; (iv) allocations or contributions received by the municipality from any government agency or instrumentality; and (vi) municipal business licenses, revenues, and any other recurring or non-recurring municipal revenues.  As of July 31, 2016, approximately $2.197 billion in municipal general obligations were outstanding (excluding approximately $495 million of municipal general obligations held by MFA).

CRIM, is responsible for the assessment, collection and distribution of all property taxes, including the CAE Tax, the Basic Tax, and a special tax of 1.03% on the appraised value of all non-exempt real and personal property dedicated to the payment of Commonwealth General Obligations (the "**Special Tax**").

The collections from the Basic Tax, the Special Tax and the CAE Tax are initially deposited in a trust fund known as the Municipal Matching Fund, where GDB serves as Trustee, and Banco Popular de Puerto Rico ("BPPR") serves as Custody Bank. Revenues from the Additional Lottery System and the net internal revenues from the Commonwealth's General Fund corresponding to the municipalities, and any other funds provided by law for the municipalities are also deposited in the Municipal Matching Fund.

From the Municipal Matching Fund, the collections that correspond to the Special Tax are transferred to the Commonwealth General Obligation Redemption Fund and those that correspond to the CAE Tax and any other revenues that are needed to service the municipalities' general obligations are transferred to the Municipal Public Debt Redemption Fund. The remaining monies in the Municipal Matching Fund are eventually distributed among the municipalities following specific rules and formulas set forth by law.

As required by law, CRIM established the Municipal Public Debt Redemption Fund, a trust in which GDB acts as Trustee and BPPR as Custody Bank, for the deposit of any CAE Tax

it collects on behalf of the municipalities. Pursuant to the Trust Deed, the Municipal Public Debt Redemption Fund is composed of two Sub Funds: (i) GDB Sub Fund and (ii) MFA/Private Sector Sub Fund. In the GDB Sub Fund, CRIM is required to deposit on a monthly basis CAE Tax revenues necessary to meet annual debt service on bonds, notes and loans issued by GDB, as determined by FAFAA as fiscal agent. In the MFA/Private Sector Sub Fund, CRIM is required to deposit on a monthly basis CAE Tax revenues necessary to meet annual debt service on bonds issued by MFA and notes, bonds and loans issued by private banks, as determined by FAFAA as fiscal agent. The GDB Sub Fund remains at GDB and the MFA/Private Sector Sub Fund is held at BPPR's Trust division. Since approximately April of 2016, CRIM has not been depositing CAE Tax revenues in the GDB Sub Fund, arguing that they are offsetting "excess" CAE Tax revenues that remain deposited at GDB.

GDB, as trustee and paying agent of the Municipal Public Debt Redemption Fund, is required to pay the principal and interest on municipal general obligations from the funds deposited in the account of each municipality in said fund. If FAFAA, as fiscal agent, determines that the deposits in a municipality's account in the Municipal Public Debt Redemption Fund are not sufficient to cover the payment of principal or interest on any outstanding general obligation, CRIM is required to transfer to said account other revenues from that individual municipality deposited in the Municipal Matching Fund. Once a reserve equivalent to twelve months of debt service on all outstanding general obligations is funded, any surplus in the Municipal Public Debt Redemption Fund is placed at the disposal of the municipality.

### Municipal Finance Agency ("MFA")

MFA is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on MFA's bonds is payable from debt service payments on municipal bonds and notes held by MFA and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislative Assembly, which appropriation is authorized but not legally required to be made. To date, no such payments have been required and all principal and interest payments required to be made on outstanding bonds of MFA have been made on a timely basis.

As of July 31, 2016, MFA had approximately $620 million in bonds outstanding.

### Municipal Sales and Use Tax Obligations

Municipal sales and use tax obligations are municipal obligations payable from the municipal sales and use tax (the "**Municipal SUT**") and for the payment of which the municipality has committed the monies deposited in the "SUT Redemption Fund" or the "SUT Development Fund," which are accounts established with the GDB in which the Secretary of the Treasury deposits some of the revenues from the Municipal SUT collected by the Secretary for the benefit of the municipalities.

As of July 31, 2016, approximately $538 million in municipal obligations payable from the Municipal SUT were outstanding.

*Municipal Special Obligations*

Municipal special obligations are payable only from the revenues derived from one or more specific sources of income pledged by the issuer. They are not secured by the issuer's full faith, credit and taxing power and are subordinated to general obligations. The sources of payment for special obligations include Basic Taxes, other funds in the Municipal Matching Fund, and moneys in the Municipal Public Debt Redemption Fund to the extent not used to pay general obligations.

As of July 31, 2016, approximately $443 million in municipal special obligations were outstanding.

*Other Municipal Obligations - AFICA Guaynabo Government Center Bonds and AFICA Guaynabo Warehouse Bonds*

AFICA issued one series of bonds in 1995 (the "**AFICA Guaynabo Government Center Bonds**") to fund the construction of various industrial buildings, referred to collectively as the Guaynabo Municipal Government Center, that are leased to the Municipality of Guaynabo. The proceeds of these bonds were loaned to G. RB Guaynabo, Inc., a not-for-profit Puerto Rico corporation, which oversaw the construction and outfitting of the facilities. AFICA and G. RB Guaynabo entered into a loan agreement with respect to the loan of the bond proceeds. G. RB Guaynabo separately entered into a deed of lease with option to purchase with the Municipality of Guaynabo governing the lease of the facilities.

The AFICA Guaynabo Government Center Bonds are limited obligations of AFICA that are payable solely from payments under the loan agreement and the lease agreement. The bonds are secured by AFICA's rights under the loan agreement, including the loan payments from G. RB Guaynabo, as well as a first mortgage on the facilities. In addition, G. RB Guaynabo assigned its scheduled lease payments from the Municipality of Guaynabo, which are designed to cover principal and interest due on the bonds, to the bond trustee. As a result, the bond trustee receives payments directly from the Municipality of Guaynabo for payment on the bonds. The Municipality of Guaynabo's payment obligations under the lease agreement are unsecured. The bond trustee may enforce AFICA's rights under the loan agreement and G. RB Guaynabo's rights under the lease agreement with Guaynabo, but the bond trustee has no general recourse against the Municipality of Guaynabo, including its taxing power, to seek payment on the bonds. As of July 31, 2016, approximately $7 million in AFICA Guaynabo Government Center Bonds were outstanding.

AFICA also issued one series of bonds in 1998 (the "**AFICA Guaynabo Warehouse Bonds**") to fund the construction of various buildings and parking facilities, referred to as the Guaynabo Warehouse for Emergencies, that are also leased to the Municipality of Guaynabo. The proceeds of the bonds were loaned to G. RB Guaynabo 2000, Inc., a not-for-profit Puerto Rican corporation, which oversaw the construction and outfitting of the facilities. The contractual arrangements relating to the AFICA Guaynabo Warehouse Bonds are similar to those described above relating to the AFICA Guaynabo Government Center Bonds. The bond trustee may enforce AFICA's rights under the loan agreement and G. RB Guaynabo 2000 rights under the lease agreement with the Municipality of Guaynabo, but the bond trustee has no general recourse against the Municipality, including its taxing power, to seek

196

payment on the bonds.  As of July 31, 2016, approximately $6 million in AFICA Guaynabo Warehouse Bonds were outstanding.

**Non-Recourse Indebtedness**

Certain Commonwealth instrumentalities have outstanding non-recourse debt that is payable from certain non-Commonwealth sources.

### *Children's Trust*

The Children's Trust is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to the Children's Trust all of its rights, title and interests under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under such Master Settlement Agreement.

As of July 31, 2016, the Children's Trust had outstanding senior and subordinate Tobacco Settlement Asset Backed Bonds in the principal amount of $1.442 billion (including CAB accretion), which were issued in 2002, 2005 and 2008 to pay certain capital expenditures, to make grants to third parties and to pay certain expenses of the Commonwealth. The bonds issued in 2008 are subordinated to the bonds issued in 2002 and 2005, and the bonds issued in 2005 are subordinated to the bonds issued in 2002. These bonds and any other additional senior bonds issued by the Children's Trust are payable solely from, and secured by a statutory pledge of, the payments made and to be made by the participating cigarette manufacturers under the Master Settlement Agreement. To date, all principal and interest payments required to be made by the Children's Trust on its outstanding bonds have been made on a timely basis from such payments.

### *Puerto Rico Housing Finance Authority ("HFA")*

HFA was created in 1977 as a subsidiary of GDB to provide public and private housing developers with interim and permanent financing through mortgage loans for the construction, improvement, operation, and maintenance of rental housing for low and moderate-income families. HFA also issues bonds and notes, the proceeds of which are deposited in separate trusts and generally invested in mortgage-backed securities collateralized by mortgage loans on properties located in Puerto Rico purchased by low and moderate-income families or used to provide subsidies to such families for the acquisition of their primary residence. HFA is authorized by the U.S. Department of Housing and Urban Development (HUD) to administer the U.S. Housing Act Section 8 program in Puerto Rico, to administer the HOME Investment Partnerships (HOME) Program, and to act as an approved mortgagor, both for multifamily rental units and for single-family homes.

In addition, HFA is an authorized issuer of Government National Mortgage Association (GNMA) mortgage-backed securities and is Puerto Rico's State Credit Agency for the Low-Income Housing Tax Credit Program under Section 42 of the U.S. Internal Revenue Code.

Finally, the Authority operates a mortgage loan insurance program that insures a portfolio of approximately $676 million mortgage loans mainly to low- and moderate-income families.

As of July 31, 2016, HFA's total outstanding principal balance of loans to the private sector for development and permanent financing of housing projects targeted to low and moderate income families was $85 million. HFA's mortgage loans to low- and moderate-income homeowners represented an additional outstanding principal balance of $45 million as of the same date.

As of July 31, 2016, HFA also has $404 million in outstanding tax-exempt revenue bonds (the "**HFA Capital Fund Bonds**") the proceeds of which were loaned to the Puerto Rico Public Housing Administration ("**PHA**") and a related entity to finance improvements to various housing projects in the Commonwealth. Such bonds are limited obligations of the Authority payable solely from PHA's annual Public Housing Capital Funds allocation from the U.S. Department of Housing and Development ("**HUD**"), as well as, in the case of the 2008 HFA Capital Fund Bonds only, the related entity's promissory notes.

### *Puerto Rico Industrial Investment Corporation ("PRIICO")*

PRIICO is a financing subsidiary of PRIDCO. In certain cases in which PRIDCO's prospective tenants have required a special facility involving a significant capital investment, PRIICO has borrowed the funds required to construct the special facility from a commercial bank and lent the funds to PRIDCO, which then uses the funds to construct the facility. The facility is leased by PRIDCO to the tenant and the rent therefrom is assigned to the lender as security for the loan to PRIICO, together with a mortgage over the facility. In certain transactions, PRIDCO also guaranteed certain loans of PRIICO, although such guarantee is subordinated to PRIDCO's obligation to provide additional funds for the payment of PRIDCO's Bonds. To date, the total principal amount of PRIICO loans guaranteed by PRIDCO in connection with these special financial arrangements is approximately $57.1 million. PRIDCO has entered into these financial arrangements only with tenants that PRIDCO has considered strong credits. These special facilities are neither "Trusteed Properties" nor "Eligible Properties" under PRIDCO's bond indenture and therefore they do not secure PRIDCO's bonds.

**Reserve Balances Held by Bond Trustees**

The following table lists, per issuer, amounts held in debt service funds or debt service reserve funds, in each as of late October 2016.  The amounts reported below have been provided by the relevant trustee and cannot be independently verified by the Commonwealth.

**Table 10 – Debt Service Fund and Debt Service Reserve Fund Balances**
*(Figures shown in millions of dollars)*

| | Total DSF/DSRF Balance* |
|---|---|
| PBA (excl. Series L)[1] | $0 |
| PBA - Series L[2] | 6 |
| COFINA[3] | 455 |
| PRIFA - AMSCA (Mental Health)[4] | 2 |
| PRIFA BANs[5] | 0 |
| UPR[6] | 55 |
| AFICA - University Plaza Project[7] | 7 |
| AFICA - Guaynabo[8] | 4 |
| PRCCDA[9] | 18 |
| PRIDCO[10] | 20 |
| HTA - 1968 Resolution[11] | 64 |
| HTA - 1998 Resolution, Senior[12][13] | 105 |
| HTA - 1998 Resolution, Sub Series 2003[14] | 8 |
| HTA - 1998 Resolution, Sub Series 1998[15][16] | 15 |
| ERS[17] | 86 |
| MFA[18] | 111 |
| HFA[19] | 36 |
| CT[20] | 109 |
| PRASA 2008 A&B, Senior[21] | 123 |
| PRASA 2012 A&B, Senior[21] | 43 |
| PRASA 2008 A&B, Sub[21] | 0 |
| PREPA[22] | 6 |

*Note: all balances shown are strictly funds deposited in the DSF or DSRF, except where noted. Balances include cash amounts where applicable and where reported. Amounts shown on the Current Fund Balances page may not be exhaustive of all accounts held by trustees for various purposes. Debt service reserves as provided by the trustees as of October, unless otherwise stated.

Footnotes to Table 10:
(1) PBA exc. Series L balances shown include amounts in the accounts labeled by the trustee as "PBA 1995 SNK Bd Svc," "PBA 2007M BD Svs Ac," "PBA Govt Fac Rev BD 11R," "PBA Series 2011 T AC," and "PBA 2004K Bond Svc Ac."
(2) PBA Series L balances shown include amounts in the account labeled by the trustee as "PBA SF Reserve."
(3) COFINA balances shown include amounts in the accounts numbered by the trustee as: 313604, 313607, 880518, 880523, 880215, 880217, 880248, 880299, 880318, 880319, 880497, 880498, and 880499.
(4) PRIFA AMSCA (Mental Health) balances shown include amounts in the accounts labeled by the trustee as "2007 Debt Service Reserve Fund," "2007 Sinking Fund Account," and "2007 Interest Account."
(5) PRIFA BANs balances shown include amounts in the account labeled by the trustee as "2015 Redemption Fund."
(6) UPR balances shown include amounts in the account labeled by the trustee as "UPR 6-1-71 Rev Bds Rsv Ac."
(7) AFICA University Plaza Project balances shown include amounts in the account labeled by the trustee as "Debt Service Reserve Fund," and "Master Debt Service."

(8)  AFICA Guaynabo balances shown include amounts in the account labeled by the trustee as "1995 A – Bond Fund," "1995A – Debt Serv.Reserv.Fund," "1998A Interest Acct," "1998A Debt Serv.Resv.," and "1998A Bond Fund."

(9)  PRCCDA balances shown include amounts in the account labeled by the trustee as "Hotel Occ Bds Ser A D S R FD."

(10)  PRIDCO balances shown include amounts in the account labeled by the trustee as "1964 Bond Service Interest," and "1964 Bond Reserve."

(11)  HTA balances shown include amounts in the accounts numbered by the trustee as: 115484, 115526, 115532, 115538, 115482, 115524, 115537, 231806, and 764919.

(12)  HTA 1998 Resolution Senior balances include those available to the HTA 1998 Resolution Variable Rate Debt Obligation ("VRDO") bonds.

(13)  HTA balances shown include amounts in the accounts numbered by the trustee as: 115471, 115479, 115522, 115566, 115653, 231811, 764911, 115469, 115478, 115488, 115515, 115520, 115564, 231793, 231805, 404035, 764914, and 764924.

(14)  HTA balances shown include amounts in the accounts numbered by the trustee as: 115475 and 115473.

(15)  HTA balances shown include amounts in the accounts numbered by the trustee as 115541.

(16)  HTA 1998 Resolution Subordinated Series 1998 bond DSRF amounts are held separately at GDB and are currently not available to make debt service payments on these bonds.

(17)  ERS balances shown include amounts in the account labeled by the trustee as "DS Interest Sub Ac Senior," "Debt Service Reserve Ac," and "General Reserve Ac."

(18)  MFA balances shown include amounts in the account labeled by the trustee as "2002 Bond Serv.," "2002 Reserve Ac.," "1997 SR A/B Reserve," "1997 Bond Service Account," "1999 Bond Service," "1999 Reserve Ac.," "05 Ser Bds Bond Ser Fund," and "05 Ser Bds Reserve Fund." Balances for Series 1999 accounts reported as of November, 2016. Diligence with the trustee on these amounts and additional reserve accounts that may exist remains ongoing.

(19)  HFA balances shown include amounts in the accounts laveled by the trustee as "2008 Debt Service Rsv FD," "2008 Debt Svc Fund," "Puerto Rico HSG Fin Debt Svc Fd Ac," "ST 2008 Debt Svc Rsv Fd," and "Puerto Rico HSG Fin Debt Svc Rsv Fd Ac." Diligence with the trustee remains ongoing on the available reserve balances.

(20)  CT balances shown include amounts in the account labeled by the trustee as "FD 2002 Bd Fd Ds Ac," and "2002 Bd Fd Lq Rsv."

(21)  PRASA balances shown include amounts in the account labeled by the trustee as "2008 Series A&B Senior Interest," "2008 Senior Principal Acct," "2008 Senior Debt Service Res," "2008 Senior B Debt Service Res," "2012 A Senior Interest," "2012-B Senior Principal Acct," and "2008 Subordinated Bond Fund." Note that additional diligence regarding the amounts available for debt service remains ongoing with the trustee.

(22)  PREPA balances shown include amounts in the account labeled by the trustee as "1974 Sinking Fd BS Ac Int," "1974 Sinking Fd Reserve Ac," "Sinking Fd Reserve SubAc A," "Sinking Fd Reserve SubAc B," "Sinking Fd Reserve SubAc C," and "Sinking Fd Reserve SubAc D."

## Variable Rate Bonds and Mandatory Tender Bonds

The Commonwealth and certain public corporations have outstanding variable rate bonds consisting of bonds and notes which provide for periodic interest rate changes based on a LIBOR rate or a particular index, but which are not subject to tender prior to their maturity. Certain public corporations have hedged portions of their variable rate debt exposure by entering into interest rate exchange agreements with certain swap providers.

The only outstanding variable rate debt issued by the Commonwealth is approximately $126.7 million principal amount of variable rate general obligation bonds (the interest rate on which is tied to the consumer price index). As of August 31, 2016, the Commonwealth has no outstanding interest rate exchange agreements.

The following table shows the breakdown of variable rate debt of the Commonwealth and the public corporations as of August 31, 2016. This table does not include approximately $696 million and $35 million in PREPA lines of credit with commercial banks and GDB, respectively, all of which bear interest at variable rates.

**Table 11 - Variable Rate Debt Breakdown**
(as of August 31, 2016)

| | |
|---|---|
| Commonwealth | |
| General Obligations | $126,725,000 |
| PREPA | 411,825,000 |
| HTA | 258,665,000 |
| COFINA | 136,000,000 |
| Total | $933,215,000 |

As of August 31, 2016, PBA had $129,225,000 of fixed rate bonds guaranteed by the Commonwealth that are subject to mandatory tender for purchase on July 1, 2017, prior to their maturity date. There is no liquidity facility in place for the payment of the purchase price payable upon the mandatory tender, which purchase price is expected to be obtained from the remarketing of the bonds. If PBA cannot remarket the mandatory tender bonds, it would have to obtain other funds in order to provide for the purchase price of these bonds or the bonds would become subject to higher interest rates and an accelerated amortization schedule.

**Interest Rate Exchange Agreements**

Certain public corporations are parties to various interest rate exchange agreements or swaps executed in order to hedge the issuer's variable rate debt exposure and the interest rate risks associated therewith.

Over the past several years, the Commonwealth has materially reduced its exposure to variable rate debt and interest rate exchange agreements, due to the risks of expiring liquidity and credit facilities associated with the majority of this debt and the potential early acceleration or termination rights that could be exercised by lenders, credit facility providers or swap counterparties as a result of downgrades of the Commonwealth's credit rating with respect to its general obligation debt. The Commonwealth has refunded this variable rate debt, and terminated the associated interest rate exchange agreements, with the proceeds of long-term fixed rate debt.

The aggregate notional amount of the swaps for the public corporations as of August 31, 2016, was $388.9 million. The table below shows the aggregate notional amount, as of that date, of synthetic fixed rate swaps of the public corporations.

**Table 12 - Swap Portfolio Breakdown**
**Notional Amount**
(as of August 31, 2016)

| | Synthetic Fixed |
|---|---|
| PREPA | $252,875,000 |
| COFINA | 136,000,000 |
| Total | $388,875,000 |

The following table shows, as of August 31, 2016, the net mark-to-market value of all outstanding interest rate exchange agreements. The mark-to-market value of all such agreements of the public corporations was negative as of such date. Thus, the public corporations would owe

money to the counterparties if any of the agreements with a negative mark-to-market had been terminated as of that date.

### Table 13 - Swap Portfolio Mark-to-Market Valuation
(as of August 31, 2016)

|        | Synthetic Fixed |
|--------|-----------------|
| PREPA  | ($65,472,035)   |
| COFINA | ($115,740,443)  |
| Total  | ($181,212,478)  |

*Collateral Requirements and Additional Termination Events*. Under its interest rate exchange agreements, PREPA may be required to deliver collateral to the counterparties to guarantee its performance under the agreements, depending on its credit ratings and the credit ratings of insurers, as well as the mark-to-market values. As of August 31, 2016, PREPA was not required to post any collateral. However, if the credit ratings of its swap insurers were to be lowered, PREPA could be required to post collateral on all swaps and certain trades may be subject to termination solely at the option of the applicable counterparty. If any such agreements were to be terminated, they would likely be terminated at their then-current mark-to-market valuations, plus cost, which could differ substantially from the mark-to-market valuations set forth in the table above due to market conditions at the time of termination. Any collateral posted at the time of the terminations could be used to effectively offset a like-amount of liquidity needed to fund the termination payments. If any such agreements related to underlying variable rate debt were to be terminated, PREPA would then be subject to variable interest rate risk on the corresponding bonds.

Under its interest rate exchange agreement, COFINA or its swap counterparty may be required to post collateral during each fiscal year depending on the transaction's mark-to-market value. In accordance with these requirements, COFINA had posted collateral of $33.3 million to its counterparty as of August 31, 2016. The maximum amount COFINA is required to transfer in a given fiscal year is $15 million, with the total posting capped at $60 million. Each year, until the collateral requirement is met, the trustee will deposit surplus revenues into an account that will be used to satisfy posting requirements for a given fiscal year. Interest earned by COFINA on posted amounts will be held by the counterparty and constitute additional collateral.

### Counterparty Claims with Respect to Terminated Swaps and Debt Service Deposit Agreements

The Commonwealth and COFINA face claims from a swap counterparty with respect to swaps that were terminated in 2008. In 2010, the counterparty, which is in bankruptcy, claimed that the termination payment amounts had been calculated using incorrect termination dates (due to arguments concerning the method of notice of termination) and that it was owed substantial additional termination payments, default interest on such payments, and an adjustment for supposedly excessive fees. The Commonwealth believes that if any additional amounts are owed with respect to these swaps, such amounts would be significantly lower than the amounts claimed. The parties were ordered by the bankruptcy court to conduct a mediation process with respect to these disputes, which process is continuing.

In addition, the Commonwealth and COFINA are parties to debt service deposit agreements with affiliates of the counterparty that has asserted the swap termination claims. Under the debt service deposit agreements, the Commonwealth and COFINA (or their predecessors in interest) received upfront payments and in exchange granted the counterparty the right to sell securities to the Commonwealth and COFINA in advance of specified bond payments at their maturity amount rather than market price at the time of sale. The agreements provide the counterparty the right to terminate upon the occurrence of various events. The counterparty has asserted that it currently has the right to terminate both agreements, in which case it would be owed termination payments equal to the cost of replacement agreements that would provide the counterparty with the economic benefits of the agreements, as determined through market quotations or otherwise in accordance with the agreements. Although the termination payments have not been calculated in accordance with the agreements, the Commonwealth estimates that if the agreements were terminated in accordance with their terms, the termination amounts could be material. GDB is also jointly and severally liable with the Commonwealth with respect to the Commonwealth debt service deposit agreement.

## Debt Service Requirements of Bonds Issued by the Commonwealth and its Instrumentalities

The following tables set forth the debt service requirements of bonds and certain other indebtedness of the Commonwealth and its public corporations and municipalities.

The following table sets forth the debt service requirements for debt that is supported by Commonwealth taxes, which consists of Commonwealth General Obligation bonds, bonds issued by COFINA, HTA, and PRCCDA and certain bonds issued by PRIFA.

**Table 14**

**Debt Service Requirements for the Commonwealth's Bonded Direct Full Faith and Credit Indebtedness and Indebtedness Payable Primarily by Commonwealth Taxes[1]**

*(Figures shown in millions of dollars as of July 31, 2016)*

| | GO Bonds | GO Gtd. Notes | COFINA[2] | HTA[3] | PRIFA[4,5] | PRCCDA | Sum |
|---|---|---|---|---|---|---|---|
| 2017 | $1,128 | $16 | $709 | $347 | $189 | $30 | $2,419 |
| 2018 | 1,066 | 16 | 737 | 347 | 113 | 30 | 2,309 |
| 2019 | 1,091 | 16 | 767 | 345 | 113 | 30 | 2,361 |
| 2020 | 1,119 | 15 | 799 | 346 | 113 | 30 | 2,422 |
| 2021 | 991 | 15 | 831 | 344 | 113 | 30 | 2,325 |
| 2022 | 999 | 15 | 864 | 343 | 113 | 30 | 2,364 |
| 2023 | 999 | 14 | 899 | 330 | 113 | 30 | 2,385 |
| 2024 | 999 | 14 | 934 | 328 | 113 | 30 | 2,419 |
| 2025 | 999 | 13 | 972 | 326 | 113 | 30 | 2,453 |
| FY 2026+ | 13,030 | 172 | 43,001 | 4,145 | 2,373 | 334 | 63,054 |
| **Total** | **$22,420** | **$306** | **$50,512** | **$7,200** | **$3,466** | **$607** | **$84,510** |

(1) Principal and interest schedules assume payments made on July 1 are included as part of the preceding fiscal year, except where noted. Debt service schedules shown are based on contractual debt service and have not been adjusted for missed interest or principal payments or otherwise, if any. All payments are reported net of any bond subsidies. Assumes no interest on missed payments.

(2) Annual COFINA debt service shown herein corresponds on a September to August schedule to align debt service with the revenues collected to pay such debt service in the Commonwealth's fiscal year.

(3) Includes debt service on HTA Rural Development bonds and Variable Rate Debt Obligation bonds . Excludes Teodoro Moscoso bonds.

(4) PRIFA schedule includes principal and interest payments on PRIFA Rum Bonds and PRIFA BANs. Figures exclude debt service on PRIFA Ports Bonds and PRIFA AMSCA bonds.

(5) Principal payments shown for PRIFA BANs inclusive of the redemption price.

204

The following table sets forth the debt service requirements for debt that is payable from Commonwealth legislative appropriations, which includes bonds issued by PBA, ERS, and PFC.

**Table 15**
**Debt Service Requirements for the Commonwealth's Bonded Indebtedness
Payable by Commonwealth Appropriations[1]**
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | PBA | ERS | PFC | Sum |
|---|---|---|---|---|
| 2017 | $277 | $167 | $86 | $530 |
| 2018 | 253 | 167 | 86 | 505 |
| 2019 | 252 | 167 | 86 | 504 |
| 2020 | 253 | 167 | 85 | 505 |
| 2021 | 274 | 217 | 85 | 576 |
| 2022 | 270 | 234 | 85 | 589 |
| 2023 | 259 | 239 | 85 | 583 |
| 2024 | 260 | 174 | 85 | 519 |
| 2025 | 258 | 176 | 85 | 519 |
| FY 2026+ | 4,480 | 6,365 | 897 | 11,741 |
| **Total** | **$6,836** | **$8,069** | **$1,665** | **$16,570** |

(1) Principal and interest schedules assume payments made on July 1 are included as part of the preceding fiscal year, except where noted. Debt service schedules shown are based on contractual debt service and have not been adjusted for missed interest or principal payments or otherwise, if any. All payments are reported net of any bond subsidies. Assumes no interest on missed payments.

205

The following table sets forth the debt service requirements for debt that is indirectly supported by Commonwealth taxes and appropriations. This includes bonds and notes issued by GDB, UPR, PRIDCO, APLA, the HTA - Teodoro Moscoso bonds, and certain PRIFA bonds. The HTA – Teodoro Moscoso bonds are currently payable by a private concessionaire, but would be payable by HTA if the concessionaire exercises its right to terminate the concession (which it currently is entitled to do).

**Table 16**
**Debt Service Requirements for the Commonwealth's Bonded Indebtedness Payable by Tax-Supported Public Corporations and Agencies[1]**
*(Figures shown in millions of dollars as of July 31, 2016)*

| | GDB[2] | UPR | AFICA - UPP[3] | PRIDCO | APLA[4] | HTA Teodoro Moscoso | PRIFA - Ports & ASSMCA | Sum |
|---|---|---|---|---|---|---|---|---|
| 2017 | $472 | $43 | $6 | $18 | $24 | $14 | $15 | $591 |
| 2018 | 417 | 43 | 6 | 18 | 23 | 14 | 14 | 535 |
| 2019 | 971 | 43 | 6 | 18 | 23 | 16 | 14 | 1,090 |
| 2020 | 512 | 43 | 6 | 18 | 22 | 17 | 13 | 630 |
| 2021 | 488 | 43 | 6 | 18 | 21 | 18 | 13 | 607 |
| 2022 | 189 | 43 | 6 | 18 | 21 | 18 | 17 | 312 |
| 2023 | 91 | 43 | 6 | 18 | 20 | 19 | 38 | 235 |
| 2024 | 559 | 43 | 6 | 18 | 20 | 21 | 12 | 679 |
| 2025 | 16 | 43 | 6 | 18 | 19 | 23 | 18 | 143 |
| FY 2026+ | 384 | 256 | 46 | 54 | 270 | 37 | 201 | 1,248 |
| **Total** | **$4,099** | **$639** | **$97** | **$218** | **$463** | **$198** | **$357** | **$6,070** |

(1) Principal and interest schedules assume payments made on July 1 are included as part of the preceding fiscal year, except where noted. Debt service schedules shown are based on contractual debt service and have not been adjusted for missed interest or principal payments or otherwise, if any. All payments are reported net of bond subsidies. Assumes no interest on missed payments.

(2) GDB debt service figures herein do not include any indebtedness incurred by GDB subsidiaries such as the Tourism Development Fund that were incurred either as a result of called guarantees or letters of credit. Includes debt service on $110 million on Commonwealth guaranteed bonds.

(3) Represents debt service on bonds issued by AFICA – Desarrollos Universitarios, a component unit of the University of Puerto Rico.

(4) APLA bonds bear a floating interest rate between 7% and 12%, revised on a quarterly basis. The APLA debt service schedule shown herein assumes a constant interest rate of 7% for illustrative purposes. The principal payments shown may not tie to the amount outstanding, as the amount outstanding includes excludes non invested amounts and any gains therein.

The following table sets forth the debt service requirements for the debt of non-tax supported public corporations. This consists of bonds and notes issued by PREPA and PRASA.

**Table 17**
**Debt Service Requirements for the Commonwealth's Bonded Indebtedness**
**Payable by Non Tax-Supported Public Corporations and Agencies[1]**
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | PREPA[2] | PRASA[3] | Sum |
|---|---|---|---|
| 2017 | $668 | $273 | $942 |
| 2018 | 763 | 273 | 1,036 |
| 2019 | 776 | 273 | 1,049 |
| 2020 | 727 | 272 | 999 |
| 2021 | 719 | 280 | 999 |
| 2022 | 666 | 281 | 947 |
| 2023 | 640 | 281 | 922 |
| 2024 | 640 | 285 | 926 |
| 2025 | 641 | 285 | 926 |
| FY 2026+ | 7,629 | 5,351 | 12,980 |
| **Total** | **$13,868** | **$7,857** | **$21,725** |

(1) Principal and interest schedules assume payments made on July 1 are included as part of the preceding fiscal year, except where noted. Debt service schedules shown are based on contractual debt service and have not been adjusted for missed interest or principal payments or otherwise, if any. All payments are reported net of bond subsidies. Assumes no interest on missed payments.

(2) Debt service schedule differs from that published in Fiscal Plan due to updated assumptions for interest on Series UU variable rate bonds, BAB subsidy sequestration and updates for actual FY 2017 payments.

(3)  Includes debt service on PRASA's Senior Revenue Bonds, Guaranteed Refunding Bonds, and Rural Development Bonds. Diligence on the status of Rural Development Bonds remains ongoing.

The following table sets forth the debt service requirements for municipal debt, which includes bonds issued by MFA and bonds and loans issued by the municipalities.

### Table 18
### Debt Service Requirements for the Commonwealth's Bonded Municipal and Non-Recourse Indebtedness[1]
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | MFA Bonds | Guaynabo Gov. Center | Guaynabo Warehouse | Children's Trust | HFA[2] | Sum |
|---|---|---|---|---|---|---|
| 2017 | $114 | $1 | $1 | $47 | $46 | $209 |
| 2018 | 97 | 1 | 1 | 47 | 46 | 192 |
| 2019 | 90 | 1 | 1 | 47 | 46 | 185 |
| 2020 | 83 | 1 | 1 | 47 | 46 | 178 |
| 2021 | 63 | 1 | 1 | 47 | 46 | 158 |
| 2022 | 56 | 1 | 1 | 47 | 46 | 151 |
| 2023 | 56 | – | 1 | 47 | 46 | 150 |
| 2024 | 49 | – | 1 | 47 | 46 | 143 |
| 2025 | 45 | – | – | 47 | 46 | 138 |
| FY 2026+ | 130 | – | – | 12,513 | 137 | 12,779 |
| **Total** | **$784** | **$9** | **$8** | **$12,933** | **$549** | **$14,282** |

(1) Principal and interest schedules assume payments made on July 1 are included as part of the preceding fiscal year, except where noted. Debt service schedules shown are based on contractual debt service and have not been adjusted for missed interest or principal payments or otherwise, if any. All payments are reported net of any bond subsidies. Assumes no interest on missed payments.

(2) Only inclusive of debt service on Capital Fund Program Bonds (Mortgage Revenue Bonds and Mortgage-Backed Certificates are excluded). HFA interest includes Ongoing Fees.

## RETIREMENT SYSTEMS
## AND OTHER POST-EMPLOYMENT BENEFITS

**Overview**

A significant component of the Commonwealth's expenses is the cost of its three principal retirement systems, the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("**ERS**"), the Commonwealth of Puerto Rico Teacher's Retirement System ("**TRS**") and the Puerto Rico Judiciary Retirement System ("**JRS**"; the ERS, TRS and JRS are collectively referred to as the "**Retirement Systems**").  These pension systems are severely underfunded and are projected to deplete their assets in the near future.  Although the current administration enacted significant reforms of the Retirement Systems in 2013, certain of those reforms have been ruled unconstitutional by Commonwealth courts. The Commonwealth, due to the current fiscal crisis, has also been unable to make the substantial additional contributions to the Retirement Systems that are required under the reform legislation in order to maintain their solvency. The additional funding required to ensure the payment of retirement benefits when due is one of the principal fiscal challenges faced by the Commonwealth that will have to be addressed pursuant to PROMESA through the fiscal plans presented to the Oversight Board.

Substantially all of the public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Retirement Systems mentioned above, the Retirement System of the University of Puerto Rico and the Employees Retirement System of Puerto Rico Electric Power Authority. The ERS and the TRS are the largest plans, both in number of current participating employees (active members) and retirees, and in the amount of their total pension liabilities.

The Retirement System of the University of Puerto Rico and the Employees Retirement System of the Puerto Rico Electric Power Authority cover employees of the University of Puerto Rico and PREPA, respectively, and are funded by those public corporations from their revenues. Although the Commonwealth is not required to contribute directly to those two systems, a large portion of the University's revenues is derived from legally-mandated legislative appropriations and assignments by law of certain tax revenues. The discussion that follows only covers the Retirement Systems.

The Retirement Systems are funded principally by contributions made by employers (the Commonwealth, public corporations and municipalities) and employees, as well as investment income.

The discussion below about the Retirement Systems is organized as follows: (1) Summary Description of the Retirement Systems (providing a summary description of the types of pension plans and the reform legislation enacted in 2013); (2) Depletion of Assets of the Retirement Systems; Insolvency (discussing the depletion of assets of the Retirement Systems that is projected to occur in the near term and the insolvency of the Retirement Systems); (3) Determination of Additional Contributions to the Retirement Systems (discussing the funding needs of the Retirement Systems to allow them to pay retirement benefits when due); (4) Financial Condition of the Retirement Systems – Actuarial Valuations (discussing the most

recent actuarial valuations of the Retirement Systems); (5) Other Information Related to the Retirement Systems (discussing the governance, membership, funding and composition of investment portfolios, as well as the historic funding shortfalls and other factors leading to the deterioration of the financial solvency of the Retirement Systems and the past efforts to address them); (6) Statements of Fiduciary Net Position and Statements of Changes in Fiduciary Net Position (providing basic five-year tables of the financial position of the Retirement Systems); and (7) Post-employment Benefits Other Than Pensions (discussing the other post-employment benefit plans administered by the Retirement Systems and their actuarial position).

**Summary Description of the Retirement Systems**

*ERS*.  The ERS is a statutory trust created by Act No. 447 of May 15, 1951, as amended ("**Act 447**"), to provide pension and other benefits to retired employees of the Commonwealth, most of the public corporations and the municipalities of Puerto Rico.  The ERS administers a cost-sharing, multiple-employer, hybrid defined benefit plan.  The benefits provided to members of the ERS are established by law.  As a cost-sharing plan, plan assets are not legally segregated and may therefore be used to pay benefits to the retirees of any participating employer.  Prior to the amendments made in 2013 by Act No. 3-2013 ("**Act 3-2013**"), the ERS consisted of different benefit structures.  Members who had entered the ERS before January 1, 2000 participated in a defined benefit program.  Members who began to participate prior to April 1, 1990 ("**Act 447 Participants**") were entitled to the highest benefits structure, while those who began to participate on or after April 1, 1990 ("**Act 1 Participants**") were subject to a longer vesting period and a reduced level of benefits, as provided by Act No. 1 of February 16, 1990 ("**Act 1 of 1990**").

In 1999, Act 447 was amended to close the defined benefit program for new participants and, prospectively, establish a new benefit structure similar to a cash balance plan (this new benefit structure is referred to as "**System 2000**").  Members who entered the ERS on or after January 1, 2000 ("**System 2000 Participants**") participate solely in System 2000. Prior to the amendment made by Act 3-2013, under the System 2000 benefit structure, a participant was entitled to receive a lump-sum payment, which could be received in full or used to purchase an annuity from a third party, based solely on the amounts contributed in cash by such participant and credited earnings on such cash.  System 2000 Participants do not benefit from any employer contributions. Instead, employer contributions made on account of System 2000 Participants are used to reduce the accumulated unfunded pension benefit obligation of the ERS.

System 2000 Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances.  System 2000 was not established as a separate plan, however, and there are no segregated accounts for System 2000 Participants. Contributions received from System 2000 Participants were pooled and invested by the ERS together with the assets corresponding to the defined benefit structure. Thus, future benefit payments under the defined benefit structure of Act 447 and Act 1 of 1990 and the defined contribution structure of System 2000, as amended by Act 3-2013, are payable from the same pool of assets of the ERS.

In April 2013, the Commonwealth enacted Act 3-2013 as a comprehensive reform of the ERS in order to address the growing funding shortfalls that threatened the solvency of the ERS. The most important aspects of the changes effected to the ERS by Act 3-2013 are the following:

(i) in the case of active employees who were Act 447 Participants and Act 1 Participants, all retirement benefits accrued through June 30, 2013 were frozen, and thereafter all future benefits accrue under a defined contribution formula which will be paid at retirement through a lifetime annuity; (ii) the retirement age for Act 447 Participants gradually increases from age 58 to age 61; (iii) the retirement age for System 2000 Participants gradually increases from age 60 to age 65; (iv) the retirement age for new employees increased to age 67, except for new state and municipal police officers, firefighters, and custody officers, which will be age 58; (v) the employee contribution increased from 8.275% to 10%; (vi) in the case of System 2000 Participants, the retirement benefits will no longer be paid as a lump sum payment and instead will be paid in the form of a lifetime annuity; (vii) with respect to post-employment benefits, the Christmas bonus payable to current retirees is reduced from $600 to $200 (and is eliminated for future retirees) and the summer bonus ($200) is eliminated;  (viii) future retirees will not receive any other post-employment benefits; and (ix) disability and survivor benefits are modified.

As an integral part of the Act 3-2013 reform, the Commonwealth recognized that an additional annual employer contribution was necessary in order to maintain sufficient system assets to be able to meet benefit payments when due.  As such, Act No. 32-2013 established an Additional Uniform Contribution ("**ERS-AUC**") for the ERS that the Commonwealth and other participating employers would be required to make annually.  The ERS-AUC was established at $120 million for fiscal year 2014, and for fiscal years 2015 through 2033 was to be the amount certified by the ERS's external actuary at least 120 days prior to the start of each fiscal year as the amount necessary to avoid having the projected gross assets of the ERS during any subsequent fiscal year fall below $1 billion.  Due to the worsening fiscal crisis since the enactment of Act 3-2013, however, the Commonwealth and other participating employers have been unable to pay most of the ERS-AUC and, as a result, the ERS projects that it will deplete its liquid assets during the current fiscal year or the first half of fiscal year 2018.  At that point (assuming no liquidation of illiquid assets and no payments of the ERS-AUC payable for the current and prior fiscal years), the ERS would be operating on a "pay-as-you-go" basis, which means that the ERS would be unable to pay retirement benefits that exceed the actual employer and employee contributions received (net of administrative and other expenses), unless the Commonwealth and other participating employers provide additional funding on a timely basis to meet such retirement benefits in full.

*TRS*.  The TRS is a statutory trust created in 1951 to provide pension and other benefits mainly to retired teachers of the Puerto Rico Department of Education, an agency of the Commonwealth, and the employees of the TRS.  The benefits provided to members of the TRS are established by law.  Prior to December 2013, the TRS consisted of a defined benefit pension plan.  In December 2013, the Commonwealth enacted Act 160-2013 ("**Act 160-2013**") as a comprehensive reform of the TRS modeled along the same principles followed in the Act 3-2013 ERS reform.  As such, Act 160-2013 sought to freeze the retirement benefits that TRS participants would have accrued under the defined benefit system as of July 31, 2014 and thereafter replace this defined benefit system with a defined contribution plan.  On April 11, 2014, however, the Puerto Rico Supreme Court struck down the sections of Act 160-2013 that amended the pension benefits of active teachers who were participants in the TRS at the time on the grounds that the Commonwealth had not proven that the amendments would maintain the solvency of the TRS.  As a result, the TRS now administers two benefit structures: (i) a contributory, defined benefit plan for active participants hired on or before July 31, 2014 and (ii) a contributory, hybrid plan for participants hired on or after August 1, 2014.

The Puerto Rico Supreme Court upheld those sections of Act 160-2013 that eliminated certain additional non-pension benefits of all participants.  Other changes effected by Act 160-2013 include: (i) the retirement age for new employees was increased to age 62; (ii) the employee contribution for new employees was increased to 10% from August 1, 2014 to June 30, 2017, 13.12% from July 1, 2017 to June 30, 2020, and 14.02% from July 1, 2020 and thereafter; (iii) the statutory employer contribution was increased to 20.525% starting in fiscal year 2022; (iv) with respect to post-employment benefits, the Christmas bonus payable to retirees at that time was reduced from $600 to $200 and the summer bonus was eliminated; and (v) future retirees will not receive any post-employment benefits.

As an integral part of the Act 160-2013 reform, the Commonwealth also recognized that an additional annual employer contribution was necessary in order to maintain sufficient system assets to be able to meet benefit payments when due.  As such, Act 160-2013 established two classes of additional contributions by the Commonwealth to the TRS: (i) a Teacher's Justice Uniform Contribution (the "**TJUC**") and an Annual Additional Contribution (the "**TRS-AAC**"). The TJUC was established as a fixed annual amount, to be paid from the Commonwealth's General Fund to the TRS, of $30 million payable in each of fiscal years 2017 and 2018, and $60 million thereafter until fiscal year 2042.  The TRS-AAC, which is payable from fiscal year 2019 through fiscal year 2042, is equal to the amount determined by the actuaries as necessary to prevent the projected value of the gross assets of the TRS from falling below $300 million during any subsequent fiscal year.  Based on its latest projections, however, the TRS expects to deplete its liquid assets during fiscal year 2018, prior to the commencement of the TRS-AAC payment period (even after assuming the payment of the TJUC for fiscal years 2017 and 2018).  If that occurs, the TRS would also be operating on a "pay-as-you-go" basis.

*JRS*.  The JRS is a statutory trust created in 1954 to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth.  Prior to December 2013, the JRS consisted of a single-employer defined-benefit pension plan.   In December 2013, the Commonwealth enacted Act No. 162-2013 ("**Act 162-2013**") as a comprehensive reform of the JRS.  Act 162-2013 sought to establish a new hybrid retirement system for judges appointed after July 1, 2014, which included both a defined benefit and a defined contribution component.  On February 21, 2014, the Puerto Rico Supreme Court upheld the constitutionality of Act 162-2013, but only with respect to judges appointed on or after December 24, 2013, the date Act 162-2013 was enacted.  As a result, judges appointed before the approval of Act 162-2013 continue to enjoy their prior retirement benefits. For judges appointed on or after the approval of Act 162-2013, the Puerto Rico Supreme Court interpreted Act 162-2013 as creating two benefits regimes, one for judges appointed between December 24, 2013 and June 30, 2014, as to whom a modified benefits regime applies, and one for judges appointed on or after July 1, 2014, as to whom all provisions of Act 162-2013 apply.  For all existing participants who joined the JRS between December 24, 2013 and June 30, 2014, the defined benefit plan continued to exist, but with a maximum pension of 60% of salary.  Their employee contribution was increased from 8% to 10%.  All other existing benefits remained unchanged.  For all new participants who joined the JRS after July 1, 2014, a new hybrid plan was enacted, which includes the following: (i) no transfer of service from other branches of government will be credited for purposes of benefit accruals; (ii) at least 12 years of service and attainment of age 65 will be required in order to accrue an annual pension equal to 1.5% of the employee's average salary for the last five years multiplied by years of service plus an annuity from the employee's contributions; (iii) disability

212

benefits were reduced from 50% to 33% of salary; (iv) participant must have at least five years of service to receive a pension that will not exceed the 33% of the average compensation for the last five years; (v) death benefits payable for the surviving spouse were changed from 50% of salary to a reimbursement of the judge's pension contributions to the extent not already distributed; (vi) the employee contribution was increased from 8% to 12% of salary; and (vii) Christmas, summer and prescription medicine bonuses were eliminated.  As a result, the JRS now administers two benefit structures: (i) a contributory, defined benefit plan for active participants hired on or before June 30, 2014, and (ii) a contributory, hybrid defined benefit plan for participants hired on or after July 1, 2014.

As an integral part of the Act 162-2013 reform, the Commonwealth also recognized that an additional annual employer contribution was necessary in order to maintain sufficient system assets to be able to meet benefit payments when due.  As such, Act 162-2013 established an additional contribution by the Commonwealth to the JRS (the "**JRS-AAC**"), commencing in fiscal year 2015, equal to the amount determined by the actuaries as necessary to prevent the projected value of the gross assets of the JRS from falling below $20 million during any subsequent fiscal year.  The Commonwealth, however, did not pay the JRS-AAC for fiscal years 2015 and 2016.  As a result, the JRS currently projects that it will deplete its assets during fiscal year 2018.  If that occurs, the JRS would also be operating on a "pay-as-you-go" basis.

**Depletion of Assets of the Retirement Systems; Insolvency**

The Retirement Systems are mature systems with a significant retiree population. The combined Retirement Systems' net pension liability (under the newly adopted GASB Statement No. 67, *Financial Reporting for Pension Plans – an Amendment of GASB Statement No. 25* ("**GASB 67**")) and the combined funded ratio are approximately $48.8 billion and 1.6%, respectively, based on the latest actuarial valuation reports.  Based on the statutory employer contributions based on payroll, the annual benefit payments and administrative expenses paid by the Retirement Systems are significantly larger than the employer and employee contributions received by the Retirement Systems.  As a result, investment income and assets have been used to cover the funding deficiencies and the Retirement Systems' assets are expected to decline until exhaustion.

In the opinion of management of the Retirement Systems, and based on information prepared by consulting actuaries, if measures are not taken to significantly increase funding to the Retirement Systems in the near term, these will exhaust their liquidity and become "pay-as-you-go" in the near term.  In the case of the ERS, where its remaining liquid assets amounted to $655.3 million as of November 14, 2016 and its remaining illiquid investment assets (consisting mainly of loans to members) amounted to $616.0 million as of that date, liquid asset depletion is projected to occur during the fourth quarter of the current fiscal year or the first half of fiscal year 2018 (July to December 2017), depending on whether the Commonwealth is able to pay to the ERS during this fiscal year the additional contributions included in the fiscal year 2017 budget (amounting to $150 million) and whether the ERS is required to pay debt service on its outstanding senior pension funding bonds ("**Pension Bonds**") upon the expiration of the moratorium period imposed under the Moratorium Act.  In the case of the TRS and JRS, liquid asset depletion is projected to occur during fiscal year 2018.  The TRS's liquid assets amounted to $514 million as of June 30, 2016, and its remaining illiquid investment assets (consisting mainly of loans to members) amounted to $372 million.  The JRS' liquid assets amounted to $46.2 million as of November 14, 2016, and its remaining illiquid investment assets (consisting

mainly of loans to members), amounted to $0.5 million as of that date. Asset depletion could occur earlier than projected, however, depending on various factors, including changes in the market value of the Retirement System's investment portfolio, timing of receipt of employer contributions and the Retirement Systems' ability to dispose of illiquid assets.

The estimate of when each of the Retirement Systems will become insolvent and when their assets will be exhausted is based on significant assumptions, including the market value of the Retirement System's investment portfolio, the rate of return on investments, the amount and timing of collections of employer contributions, as well as the estimated participant benefits and the Retirement Systems' administrative expenses to be paid each year.

The ERS has been in a negative net asset position, and hence insolvent from a Statement of Fiduciary Net Position perspective, since fiscal year 2015, mainly due to its $3.1 billion liability on account of its outstanding Pension Bonds. Future employer contributions of the ERS are pledged for the payment of debt service on the Pension Bonds. On April 6, 2016, the Governor signed into law the Moratorium Act. The Moratorium Act authorizes the Governor to declare a moratorium and stay creditor remedies with respect to obligations of the government entities covered by the moratorium. Pursuant to Executive Order 2016-31 issued under the Moratorium Act, the Governor suspended ERS's obligation to transfer the employer contributions to the fiscal agent for the Pension Bonds, and permitted the Commonwealth to offset the amount of debt service due on the Pension Bonds during fiscal year 2017 from the Commonwealth's employer contribution to ERS. Executive Order 2016-31 did not suspend payment on the Pension Bonds and the ERS has continued to pay debt service on these bonds from funds held by the fiscal agent in debt service reserve accounts under the ERS's pension funding bonds resolution. Assuming no additional employer contributions are transferred to the fiscal agent, however, the funds in the debt service reserve accounts will be depleted by April 2017. Further depletion of the ERS's assets could result in the inability to pay retirement benefits and its Pension Bonds.

**Determination of Additional Contributions to the Retirement Systems**

The Retirement Systems are severely underfunded, since actual employer and employee contributions to each of the Retirement Systems have been historically much lower than annual benefit payments and administrative expenses. These funding deficiencies have been covered with the investment income from, and the sale of, assets of the Retirement Systems, thus continuing to deplete such assets. In connection with the reforms of the Retirement Systems adopted in 2013, the Retirement Systems projected that, even after the reduction or elimination of various benefits, their future cash flow needs for disbursement of retirement benefits to participants, administrative expenses and debt service would continue to exceed the sum of the statutory employer and employee contributions and investment and other recurring income for a prolonged period of time after the depletion of the assets of the Retirement Systems. In order to address the long-term solvency of the Retirement Systems and safeguard their ability to pay retirement benefits when due, the 2013 reforms also provided for the ERS-AUC, TRS-AAC and JRS-AAC, which were to be incremental employer contributions determined actuarially (rather than on a percentage of payroll) on an annual basis in order to avoid the depletion of the assets of the Retirement Systems.

Timely payment of the ERS-AUC, TRS-AAC and JRS-AAC were critical components of the reforms in order for the Retirement Systems to be able to make payments as they come due

214

without depleting all of their assets first.  However, as a result of the worsening fiscal crisis since the enactment of the reforms, the Commonwealth and other participating employers have been unable to make the ERS-AUC for fiscal years 2014, 2015 and 2016 and the JRS-AAC for fiscal years 2015 and 2016 (as discussed above, the TRS-AAC is scheduled to commence in fiscal year 2019).

Below is a discussion of the current actuarial determinations of the ERS-AUC, TRS-AAC and JRS-AAC, as well as how the Proposed PROMESA Fiscal Plan treats these additional contributions.

*ERS*.  As discussed above, the Commonwealth enacted Act 3-2013 as a comprehensive reform of the ERS that included, among other measures, reducing benefits, increasing employee contributions and, in the case of active employees who were entitled to the defined benefits program, replacing most of the defined benefit elements of the system with a defined contribution system for most prospective accruals.  Based on the statutory funding requirements prior to this reform, the annual benefit payments and administrative expenses of the ERS were significantly larger than the employer and member contributions.  As a result, investment income and the sale of assets were being used to cover the funding deficiency.  The 2013 reform was primarily intended to address the ERS's future cash flow needs and "pay-as-you-go" requirements, while recognizing that the ERS would continue to have a large net pension liability and a low funded ratio.  As such, the reform was intended to provide enough cash for the ERS to be able to pay retirement benefits (as amended through the reform), administrative expenses and debt service on the Pension Bonds, while maintaining projected gross assets at no less than $1 billion at all times.

In order to achieve this goal, the reform contemplated that the Commonwealth and other participating employers would have to provide additional annual funding above the statutorily prescribed contributions that are based on payroll, in the form of the ERS-AUC.  The initial ERS-AUC for fiscal year 2014 was established by Act 244-2014 at $120 million, of which approximately $83.3 million was allocable to the Central Government and its subsidized public corporations and to be funded from the General Fund, and the balance of which was allocable to the municipalities and other participating public corporations.  For fiscal year 2015 and until fiscal year 2033, the ERS-AUC was required to be determined actuarially prior to the start of each fiscal year as the amount necessary to avoid having the projected gross assets of the ERS during any subsequent fiscal year fall below $1 billion.  As a long-term plan, it was recognized that constant monitoring would be required to ensure that the ERS remained on track to meet the reform's goals.

Timely payment of the ERS-AUC was and remains a critical component of the reform in order for the ERS to be able to make payments as they come due without depleting all of its assets first. However, as a result of continued budget deficits in fiscal years 2014, 2015 and 2016, the Commonwealth and other participating employers have been unable to make the ERS-AUC required for these fiscal years, except for $35.4 million paid by public corporations and municipalities for fiscal year 2014 and $22.7 million paid by the Commonwealth and $37.1 million paid by public corporations and municipalities for fiscal year 2015.  In February 2016, the ERS's actuaries recalculated the ERS-AUC for fiscal year 2017 and subsequent years. Based on certain assumptions (which do not account for any fiscal adjustment that the Commonwealth may undertake to address its fiscal challenges), including the assumption that all past due

amounts of the ERS-AUC are paid to the ERS, the ERS-AUC for fiscal year 2017 and subsequent years until fiscal year 2033 has increased to approximately $596 million (of which approximately $370 million corresponds to the Commonwealth's central government, to be funded from the General Fund, and the remaining portion corresponds to the participating public corporations and municipalities). The increase in the ERS-AUC from the initially projected levels is the result of multiple factors, but the most important ones are the decline in the number of active members and the associated payroll decrease since June 30, 2012 (which was the data used initially as part of the reform to project the ERS-AUC), and the three-year salary freeze implemented through Act 66-2014 as an expense-reduction fiscal measure. While these factors result in payroll and related cost savings for the Commonwealth and other participating employers, from the perspective of the ERS, its projected long-term funding decreases since statutory contributions are based on a percentage of payroll and, thus, a lower level of payroll generates fewer contributions, causing the ERS-AUC to increase to compensate for the reduction.

The most recent calculation of the ERS-AUC is based on a number of assumptions. One of the critical components of the calculation is the demographic projection, which encompasses the assumed future active membership headcount and the related payroll. For the most recent calculation, the ERS's actuaries used an approximate membership level of 119,000 as of July 1, 2015 and assumed that 50% of the over 11,000 employees eligible to participate in the early retirement incentive program established under Act No. 211-2015 in fact retire (and that in accordance with the program the employers continue to make the employer and employee contributions that would correspond to these participants until they reach the retirement age of 61) and that an additional decrease in active membership through attrition of 3% occurs over a five-year period (with the resulting vacancies in each case not filled with new hires). As stated above, if the projected active membership headcount decreases, the statutory employer and member contribution based on payroll decreases and the ERS-AUC increases.

The ERS-AUC is recalculated annually, and future calculations are subject to material changes depending on various factors, including demographic gains or losses, benefit provision changes, investment gains or losses, and other statutory or assumption changes. Thus, the policy decisions to be made as part of the development of a fiscal plan under PROMESA could affect materially the ERS-AUC calculation.

*TRS*. As with the ERS, the Commonwealth enacted Act 160-2013 to carry out a comprehensive reform of the TRS. Act 160-2013 also implemented the TJUC and the TRS-AAC in order to allow the TRS to make benefit payments when due without depleting all of its assets first. While the Puerto Rico Supreme Court struck down most of Act 160-2013 on constitutional grounds, the Commonwealth is still responsible for making the TJUC and TRS-AAC. The TJUC was established as a pre-set contribution of $30 million in each of fiscal years 2017 and 2018 and $60 million thereafter until fiscal year 2042, while the TRS-AAC is payable commencing on fiscal year 2019 and continuing until fiscal year 2042 in the amount determined by the actuaries as necessary to prevent the projected value of the gross assets of the TRS from falling below $300 million during any subsequent fiscal year. In July 2016, the System's actuaries prepared an actuarial study to determine an estimate of the TRS-AAC and, based on various assumptions, projected that the TRS-AAC for fiscal year 2019 and each fiscal year thereafter would be approximately $543.9 million. The calculation of the TRS-AAC does not assume material changes in active membership, notwithstanding demographic and fiscal trends

216

that could alter future teacher headcount level. The TRS-AAC also reflects the impact of the prospective segregation of employee contributions made by participants in the Act 160-2013 defined contribution plan, which has the effect of materially increasing the TRS-AAC due to lower than originally projected inflows to the system.  Furthermore, if the TRS-AAC is not paid in full during the intended fiscal years, the amount would increase in the following years to compensate for the shortfalls.

The actuaries have also noted that if the TRS were unable to sell certain illiquid assets (consisting primarily of loans to members), amounting to approximately $372 million as of June 30, 2016, the TRS may face liquidity issues and become insolvent in fiscal year 2018 since its liquid assets are projected to be exhausted during fiscal year 2018, one year before the first payment of the TRS-AAC is required.

*JRS*.   As discussed above, the Commonwealth enacted Act 162-2013 to carry out a comprehensive reform of the JRS that was intended, based on actuarial assumptions, to allow the JRS to make benefit payments when due without depleting all of its assets first.  While the Puerto Rico Supreme Court struck down most of this legislation on constitutional grounds, the Commonwealth is still responsible for making the JRS-AAC as an annual additional contribution to the JRS.  The JRS-AAC is the annual additional contribution determined actuarially the Commonwealth would have to make, commencing in fiscal year 2015, in order to avoid the projected gross assets of the JRS during any subsequent fiscal year from falling below $20 million.  The JRS-AAC for fiscal years 2015 and 2016 was determined at $11.6 million and $12.1 million, respectively, and due at the end of the fiscal year.  The Commonwealth's General Fund budget for fiscal years 2015 and 2016 did not include an appropriation for the JRS-AAC, which remains unpaid.  The General Fund budget for fiscal year 2017 also does not include an appropriation for the JRS-AAC.  Timely payment of the JRS-AAC is a critical component of the reform in order for the JRS to be able to make payments as they come due without first depleting all of its assets.

*Treatment of Additional Contributions under Proposed PROMESA Fiscal Plan*.  The dire financial condition of the Retirement Systems, and the related economic and social implications of the risk of not being able to satisfy pension benefit payments, has been an important consideration in the development of the Proposed PROMESA Fiscal Plan presented to the Oversight Board.  As such, the Proposed PROMESA Fiscal Plan seeks to protect the vulnerable public retiree population and does not contemplate cuts to core pension benefits of retirees.  The Proposed PROMESA Fiscal Plan contemplates additional annual contributions necessary to fund pension payments when due and maintain a minimum level of plan assets.  See *Commonwealth's Fiscal Plan* under OVERVIEW.

In connection with the development of the Proposed PROMESA Fiscal Plan, the Commonwealth has further studied varying scenarios of future levels of active membership and payroll and the resulting effect on the levels at which additional annual contributions would have to be made to the Retirement Systems in order to pay pension benefits when due.  To the extent any scenario reflects a projected lower level of payroll than that projected in the additional annual contributions discussed above (either because of an assumed further reduction in headcount over a five-year period or a slower rate of salary increases), the additional annual contributions increase significantly.  The Proposed PROMESA Fiscal Plan incorporates additional annual contributions for the ERS and TRS based on such scenario analysis.  In

217

particular, the base scenario of the Proposed PROMESA Fiscal Plan currently assumes that the Commonwealth and related entities included in the Proposed PROMESA Fiscal Plan would need to make additional annual contributions to the Retirement Systems during the 10-year period of the fiscal plan of $642 million for fiscal year 2017 (plus $405 million in payments to catch-up with past due amounts), $572 million for fiscal year 2018 and $1.172 billion for fiscal years 2019 through 2026. This is in addition to the statutorily mandated employer contributions based on a percentage of payroll. The Commonwealth, together with the Retirement Systems, is currently performing additional diligence with respect to these scenarios, which could result in material revisions to the additional annual contributions contemplated in the Proposed PROMESA Fiscal Plan.

As discussed above, the ERS-AUC applies until fiscal year 2033. As such, the calculation the ERS-AUC needs to contemplate a gradual buildup in system assets (projected to be $4.9 billion at the end of the contribution period, under current assumptions), that decrease each year after the end of the contribution period (until reaching the $1 billion limit in fiscal year 2045) as the ERS keeps making benefit payments that exceed contributions during this period. A similar gradual buildup in assets and subsequent decline occurs in the TRS with respect to the TRS-AAC. The Proposed PROMESA Fiscal Plan includes as a measure the extension of the ERS-AUC and TRS-AAC payment periods for an additional ten years (from fiscal year 2033 to fiscal year 2043 in the case of the ERS and from fiscal year 2042 to fiscal year 2052 in the case of the TRS). This ten-year extension results in a decrease in the current estimated amounts of the ERS-AUC and TRS-AAC, but increases the risk that future benefits will not be paid in full.

In addition, the Proposed PROMESA Fiscal Plan includes as a measure the prospective segregation of the ERS assets attributable to certain active member contributions from the assets attributable to the legacy defined benefit component of the plan. The plan includes this measure in order to protect future proprietary member contributions from the potential asset depletion at the ERS. Since this measure eliminates the practice of using active member contributions to fund the legacy defined benefit pension payments, the measure results in a material increase in the additional annual contribution to the ERS during the 10-year period of the Proposed PROMESA Fiscal Plan.

*Projected "Pay-As-You-Go" Benefit Payments*. If, as a result of the current fiscal crisis, the Commonwealth and participating employers are not able to pay on a timely basis the ERS-AUC, TRS-AAC and JRS-AAC in future years, they would still be required to make "pay-as-you-go" benefit payments (consisting of the amount, after depletion of system assets, by which disbursement of benefits and the payment of administrative and other obligations of the Retirement Systems exceed employer and employee contributions) if the Retirement Systems were to continue to pay retirement benefits at the current levels in full. The Commonwealth is currently studying what the projected "pay-as-you-go" benefit payments would be, but believes that, over the long-term the "pay-as-you-go" funding needs may not be significantly lower (and in certain cases, may be higher) than the amounts currently determined for the ERS-AUC, TRS-AAC and JRS-AAC, especially since given the size of the Retirement Systems and the variability of actual future funding needs, in a "pay-as-you-go" scenario the Retirement Systems are unlikely to be able to use ERS assets attributable to active member contributions to fund the legacy defined benefit component of the plan. Furthermore, the Retirement Systems will likely need to maintain an asset cushion in order to be able to operate in the ordinary course and honor retirement benefits when due.

**Financial Condition of the Retirement Systems – Actuarial Valuations**

Each of the Retirement Systems conducts an actuarial valuation as of the end of every fiscal year.  The most recent actuarial valuations were conducted by Milliman Inc., a firm of independent consulting actuaries.  The most recent actuarial valuation reports are as of June 30, 2015, although the actuarial valuations could suffer material changes as a result of the review of the actuarial valuation reports in connection with the preparation and audit of the Commonwealth's audited financial statements for fiscal year 2015.

*Background of Actuarial Valuations*.  The purpose of an actuarial valuation is to calculate the net pension liability of each of the Retirement Systems, which estimates on the basis of demographic and economic assumptions the present value of the benefits that each of the Retirement Systems will pay to its retired members and active members upon retirement.  The actuarial valuations are performed in accordance with generally recognized and accepted actuarial principles and practices.  The actuarial valuation compares the total pension liability with the fiduciary net position and any excess of that liability over the fiduciary net position represents the net pension liability of the applicable Retirement System.  In the case of the actuarial valuations of the Retirement Systems, the fiduciary net position is equal to the market value of assets, net of liabilities.  An actuarial valuation will also express the percentage that a retirement system is funded through the fiduciary net position as a percentage of total pension liability, which represents the quotient obtained by dividing the fiduciary net position of the retirement system by the total pension liability of the retirement system.

Copies of the actuarial valuation reports of the ERS and JRS are available on the website of the Administration of the Retirement Systems at www.retiro.pr.gov.  Copies of the actuarial valuation reports of the TRS are available on the website of the TRS at www.srm.pr.gov.  No information contained on these websites is deemed incorporated herein by reference.

The June 30, 2013 actuarial valuations for the Retirement Systems calculated accounting results for pension benefits under GASB Statement No. 25, "*Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans*" ("**GASB 25**"). The Retirement Systems' actuarial valuations as of June 30, 2014 and 2015 differ from the actuarial valuation as of June 30, 2013, since, among other reasons, the Retirement Systems' actuarial valuations as of June 30, 2014 and thereafter were performed under GASB 67, which replaced GASB 25.  GASB 67 establishes standards of financial reporting for separately issued financial reports and specifies the required approach to measuring the net pension liability of employers for benefits provided through the pension plan about which information is required to be presented.  GASB 67 requires the disclosures of the components of the net pension liability and the assumptions and other methods used to measure the total pension liability.

GASB 67 specifies certain significant changes for financial reporting purposes, including but not limited to (a) calculation of plan liabilities based only on the "entry age normal" method, (b) calculation of a "depletion date" based on a projection as to the length of time assets will cover projected benefit payments under certain assumptions, and (c) for purposes of valuing the plan's liabilities after the depletion date, use of a discount rate tied to a municipal bond index.  GASB 67 also introduces certain new terminology, including: (i) Total Pension Liability, which is the actuarial accrued liability calculated in accordance with the new GASB 67 requirements, (ii) Fiduciary Net Position, which is the total assets and deferred outflows of resources, net of its

liabilities and deferred inflows of resources, and (iii) Net Pension Liability, which is calculated as Total Pension Liability less Fiduciary Net Position, and is equivalent to the unfunded actuarial accrued liability.

Adoption of GASB 67 did not impact the Statements of Fiduciary Net Position of the Retirement Systems; however certain changes to note disclosures and required supplementary information have been incorporated to comply with the new standard.

To calculate the net pension liability of each of the Retirement Systems, the actuarial valuations use several actuarial assumptions. Some examples of these assumptions include an expected rate of return of assets, age of retirement of active members, future pay increases for current employees, assumed rates of disability and post-employment life expectancies of retirees and beneficiaries. If the experience of the Retirement Systems is different from these assumptions, the net pension liability of the Retirement Systems may increase or decrease to the extent of any variances.

The actual rate of return on assets of the Retirement Systems depends on the performance of their respective investment portfolios, which can vary materially from the expected rates of return assumed in the actuarial valuations. The investment portfolios of the respective Retirement Systems can be volatile. The value of the securities in the investment portfolios can dramatically change from one fiscal year to the next, which could, in turn, cause substantial increases or decreases in the net assets of the Retirement Systems, which directly impacts the net pension liability. The following table shows the historical annual rates of return for each of the Retirement Systems.

### Historical Annual Rates of Return

| Fiscal Year | ERS | TRS | JRS |
|---|---|---|---|
| 2008-2009 | - 9.80% | -15.98% | -18.02% |
| 2009-2010 | 8.58 | 12.50 | 12.65 |
| 2010-2011 | 16.22 | 21.50 | 20.50 |
| 2011-2012 | 5.14 | 1.60 | 2.48 |
| 2012-2013 | 7.79 | 7.80 | 10.95 |
| 2013-2014 | 11.20 | 10.80 | 16.40 |
| 2014-2015 | 3.90 | 4.00 | 1.60 |

The most recent actuarial valuations of the Retirement Systems were completed in accordance with the "entry age normal" method (level percentage of payroll). Under the "entry age normal" method (level percentage of payroll), a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases. The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits. The plan's accrued liability is the sum of (a) the accumulation of each active participant's normal costs attributable to all prior years of service plus (b) the present value of each inactive participant's future benefits.

Any amounts receivable from the Commonwealth with respect to benefits under System Administered Pension Benefits laws (discussed above) are considered in the actuarial valuation process to determine the unfunded pension benefit obligation of the Retirement Systems to the extent receivables are recognized as such by the Retirement Systems.

The tables in this section set forth, according to the actuarial valuations of the Retirement Systems, the fiduciary net position, total pension liability, net pension liability, fiduciary net position as a percentage of total pension liability, covered payroll and net pension liability as a percentage of covered payroll. The ratio of the net pension liability to covered payroll is a measure of the significance of the net pension liability relative to the capacity to pay it. The trend in the ratio provides information as to whether the financial strength of a pension plan is improving or deteriorating over time. As shown in the "Historical Funding Status" table, the steady increase in the net pension liability to covered payroll for each of the Retirement Systems reflects the significant deterioration in their financial strength.

In performing the actuarial valuations, the actuaries rely on data provided by the Retirement Systems. Although the actuaries review the data for reasonableness and consistency, they do not audit or verify the data. If the data were inaccurate or incomplete, the results of the actuarial valuations may also be inaccurate or incomplete, and such defects may be material.

*Summary of Actuarial Valuation Results*.  The following table summarizes the results of the most recent actuarial valuations of the Retirement Systems as of June 30, 2015, other than with respect to non-pension post-employment benefits (which are discussed below).

221

## Summary of Actuarial Valuations
### ($ in millions)

| | Fiduciary Net Position[1] | Total Pension Liability[2] | Net Pension Liability[3] | Fiduciary Net Position as a Percentage of Total Pension Liability[4] | Covered Payroll[5] | Net Pension Liability as a Percentage of Covered Payroll[6] |
|---|---|---|---|---|---|---|
| ERS.............................. | $ (579) | $32,669 | $33,248 | (1.77)% | $3,319 | 1,001.66% |
| TRS.............................. | 1,313 | 16,308 | 14,995 | 8.05 | 1,127 | 1,329.90 |
| JRS .............................. | 43 | 585 | 543 | 7.30 | 32 | 1,699.96 |
| Total .............................. | $ 777 | $49,562 | $48,786 | 1.57% | $4,478 | 1,089.45% |

[1] The fiduciary net position of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is equal to the full market value of the assets held by the Retirement Systems, including expected receivable contributions from the Commonwealth, municipalities and participating public corporations, less bonds payable and other liabilities.

[2] The total pension liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is an estimate based on demographic and economic assumptions of the present value of benefits that the Retirement System will pay during the assumed life expectancies of the applicable retired members and active members after they retire.

[3] The net pension liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and reflects the amount of the excess of the total pension liability of a Retirement System over its fiduciary net position. The indicated amounts reflect the net pension liability as calculated pursuant to the requirements of the Government Accounting Standards Board or purposes of presentation in the Basic Financial Statements.

[4] The Fiduciary Net Position as a Percentage of Total Pension Liability of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing Fiduciary Net Position of the Retirement System by the total pension liability of the Retirement System. The indicated percentages reflect the Fiduciary Net Position as a Percentage of Total Pension as calculated pursuant to the requirements of GASB for purposes of presentation in the Basic Financial Statements.

[5] The covered payroll of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and is equal to the annual salaries paid to active employees on which contributions to the Retirement System are made.  Covered payroll is as of July 1, 2014.

[6] The Net Pension Liability as a percentage of covered payroll is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the Net Pension Liability of the Retirement System by the covered payroll of the Retirement System. Totals may not add due to rounding.

Source: Actuarial valuation reports as of June 30, 2015.

The table below provides a historical funding status for each of the Retirement Systems. The information for fiscal years 2014 and 2015 (as well as a valuation as of July 1, 2013) is presented separately since those were performed using GASB 67 methodology.  The information for fiscal years 2013 and before is presented separately to reflect that the valuation was performed using GASB 25 methodology.

### Historical Funding Status under GASB 67
### Actuarial Valuations as of the Indicated Fiscal Years
### ($ in millions)

| | Fiduciary Net Position | Total Pension Liability | Net Pension Liability | Fiduciary Net Position as a Percentage of Total Pension Liability | Covered Payroll | Net Pension Liability as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **ERS** | | | | | | |
| July 1, 2013 ....................................... | $715 | $28,941 | $28,226 | 2.47% | $3,489 | 808.99% |
| June 30, 2014................................... | 81 | 30,220 | 30,139 | 0.27 | 3,489 | 863.80 |
| June 30, 2015................................... | (579) | 32,669 | 33,248 | (1.77) | 3,319 | 1,001.66 |
| | | | | | | |
| **TRS** | | | | | | |
| July 1, 2013 ....................................... | 1,907 | 14,793 | 12,886 | 12.89 | 1,249 | 1,031.96 |
| June 30, 2014................................... | 1,704 | 14,808 | 13,104 | 11.51 | 1,171 | 1,118.89 |
| June 30, 2015................................... | 1,313 | 16,308 | 14,995 | 8.05 | 1,127 | 1,329.90 |
| | | | | | | |
| **JRS** | | | | | | |
| July 1, 2013 ..................................... | 45 | 479 | 434 | 9.45 | 32 | 1,350.74 |
| June 30, 2014................................... | 46 | 504 | 458 | 9.13 | 32 | 1445.44 |
| June 30, 2015................................... | 43 | 585 | 543 | 7.30 | 32 | 1,699.96 |

_____

Source: Actuarial valuation reports for each of the Retirement Systems.

223

## Historical Funding Status Under GASB 25
### Actuarial Valuations as of the Indicated Fiscal Years
### ($ in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **ERS** | | | | | | |
| 2007 | $2,892 | $16,770 | $13,878 | 17.2% | $4,246 | 326.8% |
| 2009 | 1,851 | 18,944 | 17,092 | 9.8 | 4,293 | 398.2 |
| 2010 | 1,667 | 21,370 | 19,703 | 7.8 | 3,818 | 516.1 |
| 2011 | 1,724 | 25,457 | 23,734 | 6.8 | 3,666 | 647.3 |
| 2012 | 1,219 | 27,646 | 26,427 | 4.4 | 3,570 | 740.2 |
| 2013 | 715 | 23,712 | 22,997 | 3.0 | 3,489 | 659.1 |
| **TRS** | | | | | | |
| 2007 | $3,163 | $7,756 | $4,593 | 40.8% | $1,370 | 335.3% |
| 2009 | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.8 |
| 2010 | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| 2011 | 2,386 | 11,449 | 9,063 | 20.8 | 1,320 | 686.4 |
| 2012 | 2,100 | 12,351 | 10,251 | 17.0 | 1,293 | 792.8 |
| 2013 | 1,907 | 12,252 | 10,345 | 15.6 | 1,249 | 828.5 |
| **JRS** | | | | | | |
| 2007 | $81 | $259 | $177 | 31.5% | $31 | 566.6% |
| 2009 | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| 2010 | 55 | 338 | 283 | 16.4 | 32 | 882.0 |
| 2011 | 64 | 383 | 319 | 16.7 | 32 | 1002.2 |
| 2012 | 46 | 416 | 370 | 11.1 | 33 | 1118.8 |
| 2013 | 45 | 417 | 372 | 10.8 | 32 | 1155.7 |

Source: Actuarial valuation reports for each of the Retirement Systems.

*ERS Actuarial Valuation.* The actuarial valuation report of the ERS as of June 30, 2015, under GASB 67, reflected a total pension liability of $32.7 billion, a fiduciary net position deficit of $578.6 million (total assets of $2.8 billion net of liabilities of $3.4 billion, consisting principally of $3.1 billion in Pension Bonds), and a net pension liability of $33.2 billion. The fiduciary net position as a percentage of total pension liability (the "**funded ratio**") was <u>negative</u> 1.77%, since its fiduciary net position was negative as of such date. This valuation reflects an increase in net pension liability and a decrease in the funded level for financial reporting purposes, when compared to the valuation as of June 30, 2014.

The ERS actuarial valuation as of June 30, 2015 reflects that its fiduciary net position is not expected to be available to make all projected future benefit payments for current active and inactive members (the ERS's fiduciary net position was negative as of June 30, 2015). Therefore, as required by GASB 67, the net pension liability as of June 30, 2015 was determined using a discount rate equal to the tax-free municipal bond index (Bond Buyer General Obligation 20-Bond index) as of June 30, 2015 of 3.80%. Salaries were assumed to remain level through

June 30, 2017 due to Act 66-2014 and current economic conditions and then to increase 3.0% per year thereafter. The actuarial valuation of the ERS as of June 30, 2014 had used a discount rate of 4.29% to determine the total pension liability, and the same salary increase assumptions.

The actuarial valuation as of June 30, 2015 emphasizes that the ERS's net assets were exhausted in fiscal year 2015 and that if the ERS-AUC and the other statutorily prescribed employer contributions are not paid in full on an annual basis, the ERS will continue being rapidly defunded and gross assets will be exhausted. If measures are not taken to significantly increase the contributions, the ERS will deplete its liquid assets during the fourth quarter of the current fiscal year or the first half of fiscal year 2018.

*TRS Actuarial Valuation*. The actuarial valuation report of the TRS as of June 30, 2015, under GASB 67, reflected a total pension liability of $16.3 billion, a fiduciary net position of $1.3 billion, a net pension liability of $15.0 billion and a fiduciary net position as a percentage of total pension liability of 8.05%. This valuation reflects an increase in net pension liability and a decrease in the funded level for financial reporting purposes, when compared to the valuation as of June 30, 2014. The decrease in the funded level is the result of a decrease in the actuarial value of assets from $1.7 billion as of June 30, 2014 to $1.3 billion as of June 30, 2015, due to the continued net funding and cash flow shortfall that is exhausting plan assets, among other factors.

The TRS actuarial valuation as of June 30, 2015 reflects that its fiduciary net position is not expected to be available to make all projected future benefit payments for current active and inactive members after fiscal year 2018 (the TRS's assets are exhausted during fiscal year 2019 under the GASB 67 projection basis, which assumes that certain illiquid assets of the TRS, consisting primarily of loans to members, will be converted to cash when needed). Therefore, as required by GASB 67, the net pension liability as of June 30, 2015 was determined using a discount rate of 3.82% (calculated using the single equivalent rate that results in the same actuarial present value as the long-term expected rate of return applied to benefit payments until fiscal year 2018 and the tax-free municipal bond index (Bond Buyer General Obligation 20-Bond index) beginning with fiscal year 2019). Salaries for future new entrants were assumed to remain level through June 30, 2017 due to Act 66-2014 and then to increase 2.5% per year thereafter. The actuarial valuation of the TRS as of June 30, 2014 had assumed a discount rate of 4.33% to determine the total pension liability, and the same salary increase assumptions.

The actuaries have also projected the date of depletion of the TRS's assets under a GASB 67 projection basis. This projection does not include the annual additional contributions on account of the TJUC and the TRS-AAC. Based on various assumptions, the projected date of depletion of the TRS is expected to occur during fiscal year 2019. The date of depletion projection under GASB 67 is not the same as the date that the TRS would be expected to exhaust assets as it differs from a cash flow projection. As stated above, the TRS currently expects that its liquid assets will be exhausted during fiscal year 2018. The actuarial valuation states that, after reflecting the benefit changes under Act 160-2013 that were upheld by the Puerto Rico Supreme Court, if the TJUC and the TRS-AAC are not paid, the TRS will continue to be rapidly defunded and its gross assets will be exhausted by fiscal year 2019.

*JRS Actuarial Valuation*. The JRS's latest actuarial valuation, as of June 30, 2015, under GASB 67, reflected a total pension liability of $585.3 million, a fiduciary net position of

$42.7 million, a net pension liability of $542.6 million, and a fiduciary net position as a percentage of total pension liability of 7.30%.

The JRS actuarial valuation as of June 30, 2015 also reflects that its fiduciary net position is not expected to be available to make all projected future benefit payments for current active and inactive members after fiscal year 2017 (the JRS's assets are exhausted during fiscal year 2018 under the GASB 67 projection basis, which assumes that certain illiquid assets of the JRS, consisting primarily of loans to members, will be converted to cash when needed). Therefore, as required by GASB 67, the net pension liability as of June 30, 2015 was determined using a discount rate of 3.82% (calculated using the single equivalent rate that results in the same actuarial present value as the long-term expected rate of return applied to benefit payments until fiscal year 2017 and the tax-free municipal bond index (Bond Buyer General Obligation 20-Bond index) beginning with fiscal year 2018). Salaries were assumed to remain level through June 30, 2017 due to Act 66-2014 and then to increase 3.0% per year thereafter. The actuarial valuation of the JRS as of June 30, 2014 had assumed a discount rate of 4.30% to determine the total pension liability, and the same salary increase assumptions.

The actuaries have also projected the date of depletion of the JRS's assets under a GASB 67 projection basis. This projection does not include the payment of any amounts on account of the JRS-AAC. Based on various assumptions, the projected date of depletion of the JRS is expected to occur during fiscal year 2019. The date of depletion projection under GASB 67 is not the same as the date that the JRS would be expected to exhaust assets as it differs from a cash flow projection. The actuarial valuation states that, after reflecting the benefit changes under Act 162-2013 that were upheld by the Puerto Rico Supreme Court, if the JRS-AAC is not paid, the JRS will continue to be rapidly defunded and its assets are expected to be exhausted in fiscal year 2019 under a GASB 67 projection basis (as discussed above, liquid assets are projected to be depleted in fiscal year 2018).

## Other Information Related to the Retirement Systems

*Governance.* Governance of the ERS and the JRS is vested in a Board of Trustees, which sets policy and oversees the operations consistent with applicable laws. There are eleven members of the Board, as follows: the Puerto Rico Secretary of the Treasury (or his appointee), the President of GDB (or his appointee), the Commissioner of Municipal Affairs (or his appointee) and the Director of the Office of Human Resources of the Commonwealth (or his appointee), as *ex officio* members; three members appointed to three-year terms by the Governor of Puerto Rico, two of whom must be members of the ERS and one must be a member of the JRS, each with at least ten years of credited service; and two members who are pensioners of the ERS and JRS. The other two members will be the President of the Federation of Mayors and the President of the Association of Mayors. The Board is also responsible for appointing the Administrator of the ERS and the JRS.

Governance of the TRS is also vested in a Board of Trustees. There are nine members of the Board, as follows: the Secretary of the Treasury (or his appointee), the President of GDB (or his appointee) and the Secretary of Education (or his appointee), as ex officio members; one representative of a teacher's organization (or his appointee) designated by the Governor for a term of four years; three teachers who are members of the TRS, one of which shall represent active teachers and two of which shall represent retired teachers, each appointed by the Governor

226

for a term of four years; one representative of the collective bargaining unit for teachers pursuant to Puerto Rico law (or his appointee), and if the teachers of the Department of Education do not have a representative of the collective bargaining unit under Act 45-1998, as amended, the Governor may appoint a teacher in active service as a member of the Board; and a member who represents the public interest, appointed by the Governor for a term of four years. The Board is also responsible for appointing an Executive Director.

*Covered employees*.   The ERS covers substantially all employees of the central government (consisting of the departments and agencies of the Commonwealth), all members and regular employees of the Legislative Branch, and all employees of the public corporations (other than the University of Puerto Rico and PREPA) and the Commonwealth's municipalities, except for those employees that are covered by the TRS and the JRS.   The JRS only covers judges.

The TRS covers all active teachers of the Department of Education and the employees of the TRS who become plan members at their date of employment.   Licensed teachers working in private schools or other educational organizations have the option to become members of the TRS so long as the required employer and employee contributions are satisfied.

The following table shows the number of active members, retired members, disabled members, beneficiaries and terminated vested members for each of the Retirement Systems as of the July 1, 2014 census data collection (July 1, 2013 in the case of the JRS).   Since the actuarial valuation for fiscal year 2014, the Retirement Systems use the census collection data as of the beginning of the fiscal year, rather than the end of the fiscal year, to calculate their actuarial pension liability (using roll-forward methods).   Therefore, the 2015 actuarial valuation reports of the ERS and TRS have been prepared with July 1, 2014 participant data.

### Participant Data

| | Active Members | Retired Members | Disabled Members | Beneficiaries | Terminated Vested Members[1] | Total |
|---|---|---|---|---|---|---|
| **ERS** | | | | | | |
| Act 447 Participants | 15,778 | 88,765 | 13,902 | 13,723 | 7,219 | 139,387 |
| Act 1 Participants | 39,957 | 8,180 | 1,834 | 100 | 3,439 | 53,510 |
| System 2000/Act 3 Participants | 64,055 | 111 | 84 | 43 | - | 64,293 |
| **Total** | 119,790 | 97,056 | 15,820 | 13,866 | 10,658 | 257,190 |
| **TRS** | 37,700 | 36,210 | 2,301 | 3,150 | 527 | 79,888 |
| **JRS** | 364 | 372 | - | 58 | 59 | 853 |

(1)   Represents generally members who ceased employment without the right to a retirement annuity and are due a refund of member contributions and, if applicable, employer contributions, plus interest thereon.

The census data as of July 1, 2014 for the ERS and TRS, when compared to the July 1, 2013 census data, reflects a decrease in the number of active members (from 125,671 to 119,790, in the case of the ERS, and from 39,343 to 37,700, in the case of the TRS) and an increase in the

number of retired members (from 94,395 to 97,056, in the case of the ERS, and from 35,278 to 36,210, in the case of the TRS).

The employer contributions made by the Commonwealth and all other participating employers and employee contributions made by active members to the ERS are invested together and not segregated by benefit structure. As of July 1, 2014, the central government was responsible for making contributions with respect to approximately 71,290 active members of the ERS, or 59.5% of total active members (consisting of approximately 10,123 Act 447 Participants, 26,238 Act 1 Participants and 34,929 System 2000 Participants/Act 3 Participants). Municipalities were responsible for approximately 27,523 active members of the ERS, or 23.0%, of total active members (consisting of approximately 2,566 Act 447 Participants, 7,911 Act 1 Participants and 17,046 System 2000/Act 3 Participants). Public corporations were responsible for approximately 20,976 active members of the ERS, or 17.5%, of total active members (consisting of approximately 3,089 Act 447 Participants, 5,808 Act 1 Participants and 12,079 System 2000/Act 3 Participants). Effective July 1, 2013, all active employees were transferred into Act 3-2013.

*Statutory employer contributions based on payroll*. Historically, the amount that the Commonwealth and other participating employers were required to contribute to the Retirement Systems was determined by statute and established as a percentage of payroll, rather than an annual required contribution determined on an actuarial basis. This resulted in a historical underfunding of the Retirement Systems, with actual employer contributions averaging approximately 32.7% of what were the annual required contributions determined actuarially for the Retirement Systems. Following the pension reform legislation enacted in fiscal year 2013, as discussed above, the Commonwealth and other participating employers are required to contribute, in addition to the statutory employer contributions based on a percentage of payroll, the AUC, AAC and JRS-AAC, which are determined actuarially on an annual basis. The Commonwealth's employer contributions have to be included in the annual budget approved by the Legislative Assembly in order to be paid.

The Commonwealth central government is responsible for approximately 59.5% of total employer contributions to the ERS, and the other 40.5% is the responsibility of public corporations and municipalities. The Commonwealth central government is also responsible for 100% of total employer contributions to the TRS and JRS. The Commonwealth is ultimately responsible for any funding deficiency with respect to central government employees in the three Retirement Systems, and, given the financial dependency of the Commonwealth's instrumentalities on the Central Government, the Commonwealth may ultimately have to cover a greater portion than its pro-rata funding deficiency if retirement benefits to all public sector employees are to be honored.

As a result of the adoption of Act No. 116-2011 ("**Act 116-2011**"), the statutory employer contribution for the ERS increases annually from 9.275% of covered payroll for fiscal year 2011 to 20.525% for fiscal year 2021 and thereafter. The employer contribution rate for fiscal year 2017 is 15.525% of covered payroll. Covered payroll is the compensation regularly paid to active employees on which contributions to the Retirement Systems are computed and is generally equivalent to their annual salary. The table below shows the projected additional employer contributions to the ERS as a result of Act 116-2011, based on the following payroll assumptions used in the actuarial report as of June 30, 2015: 50% of the over 11,000 employees

eligible to retire under the early retirement incentive program established under Act No. 211-2015 in fact retire and an additional decrease in active membership through attrition of 3% occurs over a five year period (with the resulting vacancies in each case not filled with new hires), resulting in an assumed active membership headcount of 110,000 by July 1, 2024, and 3% annual salary increases beginning on July 1, 2017.

### ERS - Projected Act 116-2011 Additional Employer Contributions
### ($ in millions)

| Fiscal Year | Original Employer Contribution Rate | Additional Employer Contribution Rate | Total Employer Contribution Rate | Expected Payroll | Original Employer Contribution | Additional Employer Contribution | Total Employer Contribution |
|---|---|---|---|---|---|---|---|
| 2016 | 9.275% | 5.000% | 14.275% | $3,320 | $308 | $166 | $474 |
| 2017 | 9.275% | 6.250% | 15.525% | 3,320 | 308 | 208 | 516 |
| 2018 | 9.275% | 7.500% | 16.775% | 3,498 | 324 | 262 | 586 |
| 2019 | 9.275% | 8.750% | 18.025% | 3,568 | 331 | 312 | 643 |
| 2020 | 9.275% | 10.000% | 19.275% | 3,640 | 338 | 364 | 702 |
| 2021 | 9.275% | 11.250% | 20.525% | 3,712 | 344 | 418 | 762 |

Required employee contributions for the ERS vary according to how the individual employee's retirement benefits are coordinated with social security benefits. Act 3-2013 increased the employee contribution for members of the ERS from 8.275% to 10% of covered payroll.

As a result of the adoption of Act No. 114-2011 ("**Act 114-2011**"), the statutory employer contribution for the TRS increases annually from 8.5% of covered payroll in fiscal year 2011 to 19.75% in fiscal year 2021. Then, pursuant to the Act 160-2013 reform, the statutory employer contribution will increase to 20.525% of covered payroll commencing in fiscal year 2022. The employer contribution for fiscal year 2017 is 14.75% of covered payroll. The table below shows the projected additional employer contributions to the TRS as a result of Act 114-2011, based on the following payroll assumptions used in the actuarial report as of June 30, 2015: an assumed constant active membership headcount of 36,375, which is lower than the active membership headcount as of July 1, 2014 stated above, and 2.5% annual salary increases beginning on July 1, 2017.

229

**TRS - Projected Acts 114-2011/160-2013 Additional Employer Contributions**
**($ in millions)**

| Fiscal Year | Original Employer Contribution Rate | Additional Employer Contribution Rate | Total Employer Contribution Rate | Expected Payroll | Original Employer Contribution | Additional Employer Contribution | Total Employer Contribution |
|---|---|---|---|---|---|---|---|
| 2016 | 8.50% | 5.00% | 13.50% | $1,082 | $92 | $54 | $146 |
| 2017 | 8.50% | 6.25% | 14.75% | 1,063 | 90 | 66 | 156 |
| 2018 | 8.50% | 7.50% | 16.00% | 1,081 | 92 | 81 | 173 |
| 2019 | 8.50% | 8.75% | 17.25% | 1,098 | 93 | 96 | 189 |
| 2020 | 8.50% | 10.00% | 18.50% | 1,112 | 95 | 111 | 206 |
| 2021 | 8.50% | 11.25% | 19.75% | 1,124 | 96 | 126 | 222 |
| 2022[1] | 8.50% | 12.025% | 20.525% | 1,136 | 97 | 137 | 234 |

[1]  Contribution increase per Act 160-2013

The statutory employee contribution for the TRS is 9.0% of covered payroll for participants whose entry date is prior to August 1, 2014. Pursuant to Act 160-2013, in the case of new participants whose entry date is on or after August 1, 2014, the statutory employee contribution is (i) 10% from August 1, 2014 to June 30, 2017, (ii) 13.12% from July 1, 2017 to June 30, 2020, and (iii) 14.02% from July 1, 2020 thereafter.

For the JRS, the employer contribution is 30.34% of covered payroll and the employee contribution is 8% of covered payroll if hired before July 1, 2014 and, pursuant to the Act 162-2013 reform, 12% if hired on or after July 1, 2014.

Pursuant to the Constitutional and statutory priority norms for the disbursement of public funds that apply during any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, employer contributions by the Commonwealth to the Retirement Systems fall within the third priority category, after payment of the public debt, the fulfillment of contractual obligations, eminent domain payments and certain commitments to protect the credit and good faith of the Commonwealth government. The Commonwealth, however, has continued to partially make its employer contribution to the ERS, subject to the offset of the amount of debt service payable on the Pension Bonds discussed above, and has not paid principal or interest on its public debt since July 1, 2016, given that such debt is subject to a moratorium pursuant to Executive Order 2016-30.

The priority norms stated above do not apply to employer contributions made by public corporations and municipalities, because the funds of public corporations and municipalities are not available resources of the Commonwealth.

*Benefits and Special Benefits*.   Each Retirement System provides basic benefits principally consisting of a retirement annuity and death and disability benefits (collectively referred to herein as "**Basic System Pension Benefits**").   Each Retirement System also administers benefits granted under various special laws that have provided additional benefits for retirees and other beneficiaries (collectively referred to herein as "**System Administered**

**Pension Benefits**"). The System Administered Pension Benefits include, among others, additional minimum pension, death and disability benefits, ad-hoc cost-of-living adjustments and Christmas and other bonuses. Act 3-2013 and Act 160-2013 amended the various laws providing some of these System Administered Pension Benefits to reduce some of the amounts payable to existing retirees while eliminating the benefits for all future retirees (those retiring after June 30, 2013 for the ERS and July 31, 2014 for the TRS). Act 162-2013 eliminated the System Administered Pension Benefits for all future retirees of the JRS hired on or after December 24, 2013.

The System Administered Pension Benefits are funded on a pay-as-you-go basis by the Commonwealth from the General Fund or by the participating public corporations and municipalities. These benefits are not an obligation of the respective Retirement Systems. Except for the System Administered Pension Benefits corresponding to former employees of municipalities and public corporations, which are obligations of the municipalities and public corporations, most of the funds used to cover these benefits are required to be paid by the Commonwealth through annual appropriations from the General Fund. Historically, however, the Retirement Systems have made current payments of System Administered Pension Benefits to participants but the costs of these pension benefits have not been recovered by the Retirement Systems in full or on a timely basis from the Commonwealth and the participating public corporations and municipalities.

*Composition and Market Value of Investment Portfolios*. As of June 30, 2015, the ERS's investment portfolio amounted to $2.371 billion, compared to $3.158 billion and $3.790 billion as of June 30, 2014 and 2013, respectively. The decrease in value of the investment portfolio principally reflects the continued use of investment portfolio assets to pay current benefits as a result of the underfunding of the ERS, as discussed above. The investment portfolio as of June 30, 2015 was comprised of approximately 17% of equity investments, 36% of fixed income securities, 26% of internally managed mortgage and personal loans portfolio, 19% of short-term cash equivalents (excluding receivables), and 2% of other investments.

As of June 30, 2015, the TRS's investment portfolio amounted to $1.286 billion, compared to $1.711 billion and $1.928 billion as of June 30, 2014 and 2013, respectively. As in the ERS, the decrease in value of the investment portfolio of the TRS principally reflects the continued use of investment portfolio assets to pay current benefits as a result of the underfunding of the TRS, as discussed above. The investment portfolio as of June 30, 2015 was comprised of approximately 31% of equity investments, 29% of fixed income securities, 32% of internally managed mortgage and personal loans portfolio, 7% of short-term cash equivalents (excluding receivables), and 1% of other investments.

As of June 30, 2015, the JRS's investment portfolio amounted to $63.1 million, compared to $66.7 million and $63.4 million as of June 30, 2014 and 2013, respectively. As in the other Retirement Systems, the decrease in value of the investment portfolio principally reflects the continued use of investment portfolio assets to pay current benefits. The investment portfolio as of June 30, 2015 was comprised of approximately 23% of equity investments, 64% of fixed income securities, 1% of internally managed mortgage and personal loans portfolio, and 12% of short-term cash equivalents (excluding receivables).

All the figures provided above for fiscal year 2015 are preliminary, unaudited and subject to change.

*Historic Funding Shortfalls*.   For several fiscal years, actual employer and employee contributions to each of the Retirement Systems have been lower than annual Basic System Pension Benefits payments and administrative expenses. These shortfalls in contributions over the amounts required to pay Basic System Pension Benefits and expenses are referred to herein as "funding shortfalls."   The funding shortfalls, however, may not reflect the actual cash flow position of the Retirement Systems, which is affected, among other things, by their investment and financing activities.

The Retirement Systems have been forced to cover the funding shortfalls with investment income, loans from financial institutions and various non-recurring sources of funds. The funding shortfall has also exceeded the investment income of the Retirement Systems, causing the Systems' assets to decline and adversely affecting their funded status.

During 2008, the ERS issued approximately $2.9 billion of Pension Bonds ($2.66 billion as term bonds and $290 million as capital appreciation bonds), with interest rates ranging from 5.85% to 6.55%, for which repayment the ERS pledged all employer contributions made after the issuance of the bonds. The Pension Bonds are limited, non-recourse obligations of the ERS payable solely from, and secured solely by, the employer contributions. The maturity of the Pension Bonds is not subject to acceleration for any reason including non-payment of debt service on the bonds. As of June 30, 2016, approximately $2.9 billion of the Pension Bonds remain outstanding. The purpose of this offering was to increase the assets of the ERS available to invest and pay benefits.

The table below shows the funding shortfalls for each of the last five fiscal years for each of the Retirement Systems.

## Funding Shortfalls
### (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions[1] | Basic System Benefit Payments and Administrative Expenses[2] | Net Funding Shortfall[4] |
|---|---|---|---|
| **ERS** | | | |
| 2012 | $689 | $(1,528) | $(839) |
| 2013 | 747 | (1,522) | (775) |
| 2014 | 1,027[3] | (1,644) | (617) |
| 2015 | 925[3] | (1,655) | (730) |
| 2016 | 957[3] | (1,663) | (706) |
| **TRS** | | | |
| 2012 | 247 | (593) | (346) |
| 2013 | 253 | (603) | (350) |
| 2014 | 255 | (646) | (391) |
| 2015 | 249 | (703) | (454) |
| 2016 | 244 | (699) | (455) |
| **JRS** | | | |
| 2012 | 12 | (21) | (9) |
| 2013 | 13 | (19) | (6) |
| 2014 | 13 | (24) | (11) |
| 2015 | 13 | (25) | (12) |
| 2016 | 13 | (26) | (13) |

---

[1] Represents the statutory employer and member contributions and does not include amounts received from employers on account of System Administered Pension Benefits, except as described under footnote 3 below. Act 66 provides a salary freeze for fiscal years 2015 through 2017. Projection assumes salary increases of 3% and employer contributions include the rate increases provided for by Act 114-2011 and Act 116-2011.

[2] Includes, in the case of the Employees Retirement System, principal and interest paid on the Pension Bonds for fiscal years 2012 and 2013 in the amounts of $191 million and $192 million, respectively, and for fiscal years 2014 through 2016, debt service of $167 million per year.

[3] Does not include (i) the statutory additional annual contribution except for fiscal year 2014 that reflects $120 million of which only $33.7 million were received, and (ii) savings generated by the System for the difference between receiving the $2,000 per retiree contribution as required under Act 3-2013 and paying $1,500 per retirees to cover certain System Administered Pension Benefits.

[4] Does not include interest income from asset investment. Totals may not add due to rounding.

Source: Information obtained from each of the Retirement Systems and the most recent actuarial valuation reports.

*Other Factors That Contributed to Deterioration in Financial Solvency of the Retirement Systems.* Among the factors that have contributed most significantly to the deterioration of the Retirement Systems are the following: (i) the inadequacy of the historical funding levels for the Retirement Systems; (ii) the enactment of special laws increasing pension benefits without providing the required funding source; (iii) the adoption of early retirement programs that were not adequately funded and that reduced the amount of contributions to the Retirement Systems; (iv) the increase in life expectancy in Puerto Rico; (v) the increase in the maximum amount of permitted personal loans to members; and (vi) in the case of the ERS, the issuance of Pension Bonds.

Since their inception, the Retirement Systems have been inadequately funded by the Commonwealth and the other participating employers. On several occasions during the past decades, the Commonwealth increased benefits without raising employer and employee

contributions and failing to provide alternate methods to adequately fund these increased benefits.  The Commonwealth also approved several "special laws" granting additional benefits on top of those provided under Act 447 and Act 1, including a summer bonus, a medication bonus, a Christmas bonus, contributions to medical plans, merit pensions, and cost of living adjustments (COLAs), among others.

The Government also adopted various early retirement programs since 1994 to reduce the government workforce.  Although these measures reduced payroll expenses, which are a substantial portion of governmental, including General Fund, expenses, early retirement programs also reduced the Retirement Systems' revenues because they caused a decrease in employer and employee contributions.  These programs were generally not accompanied by up-front funding of the associated retirement costs and had a negative cash flow impact on the Retirement Systems as the same funded early retirement benefits without timely reimbursement from the Commonwealth or sponsoring public corporation or municipality.

Another factor that contributed to the deterioration of the Retirement Systems was the increase in the average life expectancy in Puerto Rico and the United States, from 59.5 years for men and 62.4 years for women in 1950 to 78 years in 2008.  This has caused retired employees to receive benefits for more years than originally expected.

Finally, in 2008, the ERS issued the Pension Bonds to increase the assets of the ERS available to invest and pay benefits.  Unlike some other U.S. jurisdictions that have used this strategy, the Pension Bonds are obligations of the ERS itself and government employer contributions constitute the repayment source for the bonds.

***Recent Efforts to Address the Financial Condition of the Retirement Systems.***  For the past several years, the Retirement Systems have been evaluating measures to improve their financial solvency. In order to maintain their long-term fiscal integrity and their ability to pay required benefits to their members, the Retirement Systems recognized that a combination of some or all of the following were necessary: (i) a substantial increase in contributions by the Commonwealth and the participating employers, and (ii) actions resulting in changes to liabilities of the Retirement Systems.

Since 2011, the Commonwealth has enacted laws that substantially increase employer contributions to the Retirement Systems, from the increases in the statutory employer contributions based on payroll provided for by Act 114-2011 and Act 116-2011 to the implementation of the additional annual contributions to be actuarially determined (ERS-AUC, TRS-AAC and JRS-AAC) as part of the comprehensive reform legislation of the Retirement Systems in 2013.  As discussed above, however, because of the ongoing fiscal crisis, the Commonwealth has been unable to make these actuarially determined additional annual contributions to the Retirement Systems.

In 2013, the Commonwealth also acted to address the liabilities of the Retirement Systems through the comprehensive pension reforms of Act 3-2013 for the ERS, Act 160-2013 for the TRS and Act 162-2013 for the JRS, which sought to freeze retirement benefits of participants in defined contribution programs and provide for the accrual of future benefits under a defined contribution formula, increase the retirement age for various categories of employees, increase the employee contribution rates and reduce various other retirement benefits.  As

discussed above, however, some of the important provisions of Act 160-2013 and Act 162-2013 were declared unconstitutional by the Puerto Rico Supreme Court, thus lessening their intended effect on the liabilities of the TRS and JRS.

In addition to the principal measures discussed above, the Retirement Systems have at times implemented other administrative measures to improve their cash flow position, such as imposing limits on or suspending certain loan programs available to members.

Notwithstanding all of these legislative and administrative measures directed at improving the financial health and long-term solvency of the Retirement Systems, the financial condition of the Retirement Systems continues to present one of the principal long-term challenges faced by the Commonwealth, its public corporations and municipalities. This challenge will have to be addressed by the Commonwealth and the Oversight Board pursuant to PROMESA. Even under PROMESA, there may also be constitutional or other legal limitations on the Commonwealth's ability to change certain pension rights afforded to participants in the Retirement Systems.

**Statements of Fiduciary Net Position and Statements of Changes in Fiduciary Net Position**

The financial statements of the Retirement Systems reflect the deterioration in their financial position during the last several years as a result of the significant historical underfunding discussed above. Amounts shown in the Statements of Fiduciary Net Position as the "Net Position Restricted for Pensions" for fiscal year 2015 may differ slightly from the "Fiduciary Net Position" set forth in the actuarial reports due to certain adjustments following the completion of the actuarial reports.

*ERS*. As of June 30, 2015 (preliminary, unaudited), the ERS's total assets amounted to $2.771 billion, reflecting a decrease of $660 million from June 30, 2014, and a decrease of $1.209 billion when compared to total assets as of June 30, 2013. Total liabilities as of June 30, 2015 amounted to $3.359 billion, compared to $3.350 billion and $3.265 billion as of June 30, 2014 and 2013, respectively. The ERS's total net deficit position restricted for pensions amounted to $587.7 million as of June 30, 2015, reflecting a decrease in net position of $668.4 million from June 30, 2014 and $1.303 billion when compared to the net position as of June 30, 2013. The ERS has been in a net deficit position since fiscal year 2015.

*TRS*. As of June 30, 2015, the TRS's total assets amounted to $1.364 billion, total liabilities amounted to $52.8 million, and total net position restricted for pensions amounted to $1.311 billion. The TRS's total assets as of June 30, 2015 reflect a decrease of $393 million from June 30, 2014 and a decrease of $616 million when compared to total assets as of June 30, 2013. The total net position restricted for pensions as of June 30, 2015 also reflects a similar decrease of $393 million from June 30, 2014 and $596 million when compared to the net position as of June 30, 2103.

*JRS*. As of June 30, 2015, the JRS's total assets amounted $63.1 million, total liabilities amounted to $20.4 million, and total net position restricted for pensions amounted to $42.8 million. The JRS's total net position restricted for pensions decreased by $5.9 million from June 30, 2014, and by $5.1 million when compared to the net position as of June 30, 2013.

The following tables present the Condensed Statements of Fiduciary Net Position and Statements of Changes in Fiduciary Net Position of each of the Retirement Systems for five years in the period ended June 30, 2015.

**ERS - Pension Plan**
**Condensed Statements of Fiduciary Net Position**
**As of June 30, 2011, 2012, 2013, 2014 and 2015**
(in thousands)

| | 2015* | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and Cash Equivalents: | | | | | |
| Deposits with GDB | $ 180,926 | $ 74,978 | $ 166,338 | $ 406,494 | $ 463,342 |
| Deposits at Commercial Banks | 68,886 | 12,529 | 80,683 | 143,364 | 220,852 |
| Money Market Funds and Others | 116,577 | 181,985 | 168,045 | 166,436 | 170,653 |
| Total Cash and Cash Equivalents | 366,389 | 269,492 | 415,066 | 716,294 | 854,847 |
| | | | | | |
| Receivables- Net: | | | | | |
| Employers, Net | 251,340 | 195,803 | 131,033 | 111,975 | 184,152 |
| Due from Judiciary Retirement System | 7,089 | 19,122 | 15,870 | 1,345 | 881 |
| Accrued Investment Income | 5,314 | 9,500 | 11,494 | 13,044 | 7,594 |
| Investments Sold | 108,607 | 10,976 | 729 | 78,941 | 9,546 |
| Others | 16,688 | 20,819 | 16,125 | 33,404 | 10,742 |
| Total Receivables- Net | 389,038 | 256,220 | 175,251 | 238,709 | 212,915 |
| | | | | | |
| Collateral from Security Lending Transactions | 80,071 | 126,648 | 124,411 | 54,870 | 134,319 |
| | | | | | |
| Investments: | | | | | |
| Bonds and Notes | 764,445 | 1,199,169 | 1,121,358 | 1,129,413 | 651,908 |
| Nonexchange Commingled Trust Funds | 409,001 | 750,482 | 1,053,555 | 786,839 | 1,370,202 |
| Stocks | — | 102 | 75 | 247,772 | 212,040 |
| Investment in Limited Partnerships | 54,026 | 54,146 | 55,067 | 57,370 | 65,457 |
| COFINA bonds | 89,139 | 138,123 | 229,819 | 245,339 | 162,500 |
| Total Investments | 1,316,611 | 2,142,022 | 2,459,874 | 2,466,733 | 2,462,107 |
| | | | | | |
| Members Loans and Interest Receivable-Net | 607,617 | 619,379 | 791,161 | 955,057 | 1,275,381 |
| | | | | | |
| Capital Assets -Net | 10,522 | 11,211 | 8,594 | 11,668 | 8,951 |
| Other Assets | 785 | 5,695 | 5,261 | 5,375 | 6,375 |
| **Total Assets** | 2,771,033 | 3,430,667 | 3,979,618 | 4,448,706 | 4,954,895 |
| | | | | | |
| **LIABILITIES** | | | | | |
| Overdraft in Cash with Fiscal Agent | | - | - | - | 62,843 |
| Accounts Payable and Accrued Liabilities | 9,329 | 12,236 | 13,905 | 27,718 | 12,923 |
| Bonds Interest Payable | 13,876 | 13,876 | 13,876 | 13,877 | 13,876 |
| Payable for Investment Securities Purchased | 7,754 | 19,009 | - | 82,384 | 1,854 |
| Securities Lending Obligations | 80,071 | 126,648 | 124,411 | 54,870 | 134,319 |
| Due to Commonwealth | | 37,082 | | — | — |
| Bonds Payable | 3,105,449 | 3,077,587 | 3,051,189 | 3,026,593 | 3,003,482 |
| Other Liabilities | 142,231 | 63,563 | 61,180 | 36,808 | 33,959 |
| **Total Liabilities** | 3,358,710 | 3,350,001 | 3,264,561 | 3,242,250 | 3,263,256 |
| | | | | | |
| **Net Position Restricted for Pensions** | $ (587,677) | $ 80,666 | $ 715,057 | $ 1,206,456 | $ 1,691,639 |

*Amounts are preliminary, unaudited and subject to change.

237

**ERS - Pension Plan**

**Condensed Statements of Changes in Fiduciary Net Position**

**For the Years Ended June 30, 2011, 2012, 2013, 2014 and 2015**

**(in thousands)**

| | 2015* | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ADDITIONS:** | | | | | |
| Contributions: | | | | | |
| Employer Contributions: | | | | | |
| Basic Benefits, Net | $ 550,809 | $ 485,114 | $ 424,704 | $ 388,103 | $ 349,207 |
| Special Benefits | 186,160 | 228,699 | 203,943 | 193,351 | 187,674 |
| COFINA Investment Contribution | - | - | - | - | 162,500 |
| Member Contributions | 339,650 | 359,862 | 322,528 | 316,178 | 322,008 |
| Total Contributions | 1,076,619 | 1,073,675 | 951,175 | 897,632 | 1,021,389 |
| | | | | | |
| Net Investment and   Security | | | | | |
| Lending Transaction Income | 32,601 | 225,005 | 245,022 | 272,382 | 645,720 |
| Other Income | 28,931 | 30,748 | 22,994 | 24,727 | 49,257 |
| **Total Additions** | 1,138,151 | 1,329,428 | 1,219,191 | 1,194,741 | 1,716,366 |
| | | | | | |
| **DEDUCTIONS:** | | | | | |
| Benefits Paid to Participants: | | | | | |
| Annuities and Death Benefits | 1,355,188 | 1,413,541 | 1,228,271 | 1,184,353 | 1,141,858 |
| Special Benefits | 186,137 | 134,882 | 201,742 | 192,539 | 187,369 |
| Refunds of Contributions | 31,350 | 166,335 | 52,307 | 52,228 | 91,195 |
| Interest on Bonds Payable | 194,400 | 192,947 | 191,135 | 189,641 | 188,247 |
| General, Administrative and Others | 39,419 | 56,114 | 49,324 | 61,163 | 47,782 |
| **Total Deductions** | 1,806,494 | 1,963,819 | 1,722,779 | 1,679,924 | 1,656,451 |
| | | | | | |
| **Net Change in Net Position** | (668,343) | (634,391) | (503,588) | (485,183) | 59,915 |
| | | | | | |
| **Net Position Restricted for Pensions:** | | | | | |
| Beginning of Year, as restated | 80,666 | 715,057 | 1,206,456 | 1,691,639 | 1,664,991 |
| Adjustments of Beginning of Year Net Position: | | | | | |
| Effect of Adoption GASB 65 | | — | — | — | (33,267) |
| Correction of Immaterial Errors | | — | 12,189 | — | — |
| Beginning of Year, as Restated and Adjusted | 80,666 | 715,057 | 1,218,645 | 1,691,639 | 1,631,724 |
| End of Year | $ (587,677) | $    80,666 | $ 715,057 | $1,206,456 | $1,691,639 |

*Amounts are preliminary, unaudited and subject to change.

In fiscal year 2014, the ERS adopted GASB Statement No. 65, *Items Previously Reported as Assets and Liabilities* (GASB 65). This Statement establishes accounting and financial reporting standards that reclassify, as deferred outflows of resources or deferred inflows of resources, certain items that were previously reported as assets and liabilities and recognizes, as outflows of resources or inflows of resources, certain items that were previously reported as assets and liabilities. Concepts Statement No. 4, *Elements of Financial Statements*, introduced and defined the elements included in financial statements, including deferred outflows of resources and deferred inflows of resources. In addition, Concepts Statement No. 4 provides that reporting a deferred outflow of resources or a deferred inflow of resources should be limited to those instances identified by the GASB in authoritative pronouncements that are established after applicable due process. This Statement amends the financial statement element classification of certain items previously reported as assets and liabilities to be consistent with the definitions in Concepts Statement No. 4. This Statement also provides other financial reporting guidance related to the impact of the financial statement elements deferred outflows of resources and deferred inflows of resources and limiting the use of the term deferred in financial statement presentations. GASB 65 requires that debt issuance costs be recognized as deduction in the period incurred in the statement of changes in fiduciary net position. At transition, the impact of GASB 65 was to decrease the fiduciary net position as of July 1, 2010 by approximately $33,267,000 reflecting the cumulative retrospective effect of derecognizing the debt issuance costs which had previously been deferred in the statement of fiduciary net position. In addition, the issuance costs amortization of approximately $1,095,000 in each of the fiscal years ended June 30, 2013, 2012, and 2011 included as deduction of interest on bond payable in the statement of changes in fiduciary net position, were derecognized.

Subsequent to the issuance of the ERS's 2013 financial statements, management identified various errors in such previously issued financial statements. The ERS found unrecorded amounts due from the JRS resulting from net benefits paid by the ERS to the JRS's retirees and beneficiaries and from unallocated ERS's general and administrative expenses and other expenses. As a result, the ERS's net position restricted for pension as of July 1, 2012 was increased by approximately $12,189,000, including an estimate of approximately $4,249,000 for the lost income to be restored to the ERS. Additionally, the other income, the benefits paid to participants and the other expenses for the year ended June 30, 2013 were increased (decreased) by approximately $959,000, ($699,000) and $151,000, respectively, to correct these immaterial errors. Information to restate the financial statements prior to June 30, 2013 was not included because it was impracticable to determine them.

**TRS - Pension Plan**

**Condensed Statements of Fiduciary Net Position**

**As of June 30, 2011, 2012, 2013, 2014 and 2015**

**(in thousands)**

|  | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and Cash Equivalents: | | | | | |
| Deposits with GDB | $ 4,545 | $ 3,301 | $ 8,494 | $ 16,220 | $ 3,401 |
| Deposits at Commercial Banks | 1,951 | 2,722 | 2,880 | 2,715 | 2,371 |
| Money Market Funds and Others | 57,242 | 11,483 | 56,303 | 318,920 | 94,898 |
| Total Cash and Cash Equivalents | 63,738 | 17,506 | 67,677 | 337,855 | 100,670 |
| | | | | | |
| Receivables: | | | | | |
| Accrued Investment Income | 3,399 | 6,146 | 7,847 | 7,603 | 3,982 |
| Investments Sold | 46,862 | 4,311 | 57 | 38,743 | 2,320 |
| Others | 9,983 | 14,704 | 23,414 | 34,404 | 44,883 |
| Total Receivables, Net | 60,244 | 25,161 | 31,318 | 80,750 | 51,185 |
| | | | | | |
| Collateral from Security Lending Transactions | 25,960 | 15,152 | 48,420 | 20,528 | 70,938 |
| | | | | | |
| Investments: | | | | | |
| Bonds and Notes | 371,022 | 649,774 | 742,146 | 682,728 | 366,995 |
| Nonexchange Commingled Trust Funds | 335,528 | 503,619 | 546,775 | 516,914 | 1,151,073 |
| Stocks | 66,357 | 92,900 | 97,299 | 213,053 | 284,785 |
| Investment in Limited Partnerships | 7,500 | 11,170 | 14,823 | 19,221 | 25,630 |
| Total Investments | 780,407 | 1,257,463 | 1,401,043 | 1,431,916 | 1,828,483 |
| | | | | | |
| Members Loans and Interest Receivable- Net | 415,946 | 420,544 | 411,032 | 403,812 | 406,664 |
| | | | | | |
| Capital Assets -Net | 16,570 | 17,325 | 19,312 | 20,885 | 22,204 |
| Other Assets | 1,065 | 846 | 781 | 832 | 472 |
| **Total Assets** | 1,363,930 | 1,753,997 | 1,979,583 | 2,296,578 | 2,480,616 |
| | | | | | |
| **LIABILITIES** | | | | | |
| Overdraft in Cash with Fiscal Agent | — | 4,942 | — | — | — |
| Accounts Payable and Accrued Liabilities | 17,218 | 16,188 | 16,860 | 16,237 | 14,851 |
| Payable for Investment Securities Purchased | 2,518 | 4,442 | 65 | 153,714 | 1,701 |
| Securities Lending Obligations | 25,960 | 15,152 | 48,420 | 20,528 | 70,938 |
| Other Liabilities | 7,153 | 9,494 | 7,356 | 6,883 | 7,263 |
| **Total Liabilities** | 52,849 | 50,218 | 72,701 | 197,362 | 94,753 |
| | | | | | |
| **Net Position Restricted for Pensions** | $1,311,081 | $1,703,779 | $1,906,882 | $2,099,216 | $2,385,863 |

**TRS - Pension Plan**

**Condensed Statements of Changes in Fiduciary Net Position**

**For the Years Ended June 30, 2011, 2012, 2013, 2014 and 2015**

**(in thousands)**

| | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ADDITIONS:** | | | | | |
| Contributions: | | | | | |
| Employer Contributions: | | | | | |
| Basic Benefits | $ 145,773 | $ 139,453 | $ 133,369 | $ 123,614 | $ 112,071 |
| Special Benfits | 48,768 | 49,914 | 54,075 | 53,405 | 47,753 |
| Member Contributions | 107,465 | 119,592 | 120,842 | 123,249 | 124,125 |
| Total Contributions | 302,006 | 308,959 | 308,286 | 300,268 | 283,949 |
| | | | | | |
| Net Investment and  Security | | | | | |
| Lending Transaction Income | 59,921 | 190,023 | 157,494 | 37,153 | 481,164 |
| Other Income | 1,057 | 1,416 | 1,432 | 1,374 | 968 |
| **Total Additions** | 362,984 | 500,398 | 467,212 | 338,795 | 766,081 |
| | | | | | |
| **DEDUCTIONS:** | | | | | |
| Benefits Paid to Participants: | | | | | |
| Annuities and death benefits | 684,074 | 626,027 | 579,144 | 547,955 | 513,874 |
| Special Benefits | 32,819 | 46,964 | 49,130 | 48,492 | 48,286 |
| Refunds of Contributions | 19,407 | 10,707 | 7,666 | 5,220 | 8,465 |
| General, Administrative and Others | 19,382 | 19,803 | 23,606 | 23,775 | 31,570 |
| **Total Deductions** | 755,682 | 703,501 | 659,546 | 625,442 | 602,195 |
| | | | | | |
| **Net Change in Net Position** | (392,698) | (203,103) | (192,334) | (286,647) | 163,886 |
| | | | | | |
| **Net Position Restricted for Pensions:** | | | | | |
| Beginning of Year | 1,703,779 | 1,906,882 | 2,099,216 | 2,385,863 | 2,221,977 |
| End of Year | $1,311,081 | $1,703,779 | $1,906,882 | $2,099,216 | $2,385,863 |

**JRS - Pension Plan**

**Condensed Statements of Fiduciary Net Position**

**As of June 30, 2011, 2012, 2013, 2014 and 2015**

**(in thousands)**

| | 2015* | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and Cash Equivalents: | | | | | |
| Deposits with GDB | $ 3,173 | $ 3,143 | $ 2,579 | $ 745 | $ 1,011 |
| Deposits at Commercial Banks | — | — | — | 11,543 | 6,409 |
| Money Market Funds and Others | 1,624 | 2,545 | — | — | — |
| Total Cash and Cash Equivalents | 4,797 | 5,688 | 2,579 | 12,288 | 7,420 |
| | | | | | |
| Receivables: | | | | | |
| Employer | — | 283 | — | — | — |
| Accrued Investment Income | 162 | 175 | 191 | 255 | 263 |
| Investments Sold | 1,000 | — | — | — | — |
| Others | 62 | 26 | 27 | 27 | 27 |
| Total Receivables- Net | 1,224 | 484 | 218 | 282 | 290 |
| | | | | | |
| Collateral from Security Lending Transactions | 1,393 | 827 | 2,002 | 1,088 | 3,218 |
| | | | | | |
| Investments: | | | | | |
| Bonds and Notes | 32,225 | 19,232 | 18,693 | 27,268 | 28,097 |
| Nonexchange Commingled Trust Funds | 11,368 | 39,896 | 39,661 | 21,462 | 29,135 |
| Stocks | — | — | — | — | 4,858 |
| Total Investments | 43,593 | 59,128 | 58,354 | 48,730 | 62,090 |
| | | | | | |
| Members Loans and Interest Receivable- Net | 477 | 542 | 436 | 471 | 845 |
| **Total Assets** | 51,484 | 66,669 | 63,589 | 62,859 | 73,863 |
| | | | | | |
| **LIABILITIES** | | | | | |
| Overdraft in Cash with Fiscal Agent | 2,381 | — | — | 1,603 | 5,560 |
| Payable for Investment Securities Purchased | — | 190 | — | — | 2 |
| Securities Lending Obligations | 1,393 | 827 | 2,002 | 1,088 | 3,218 |
| Due to Employees Retirement System | 7,089 | 19,122 | 15,870 | 1,345 | 881 |
| Other Liabilities | 449 | 463 | 401 | 235 | 227 |
| **Total Liabilities** | 11,312 | 20,602 | 18,273 | 4,271 | 9,888 |
| | | | | | |
| **Net Position Restricted for Pensions** | $ 40,172 | $ 46,067 | $ 45,316 | $ 58,588 | $ 63,975 |

*Amounts are preliminary, unaudited and subject to change.

**JRS - Pension Plan**

**Condensed Statements of Changes in Fiduciary Net Position**

**For the Years Ended June 30, 2011, 2012, 2013, 2014 and 2015**

**(in thousands)**

| | 2015* | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ADDITIONS:** | | | | | |
| Contributions: | | | | | |
| Employer Contributions: | | | | | |
| Basic Benefits | $ 10,578 | $ 10,762 | $ 10,034 | $ 10,088 | $ 9,966 |
| Special Benfits | 1,759 | 1,230 | 1,368 | 537 | 629 |
| Member Contributions | 3,676 | 3,804 | 2,825 | 2,943 | 2,789 |
| Total Contributions | 16,013 | 15,796 | 14,227 | 13,568 | 13,384 |
| | | | | | |
| Net Investment Income | | | | | |
| Lending Transaction Income | 899 | 9,713 | 6,694 | 1,718 | 14,294 |
| Other Income | 873 | 59 | 603 | 18 | 10 |
| **Total Additions** | 17,785 | 25,568 | 21,524 | 15,304 | 27,688 |
| | | | | | |
| **DEDUCTIONS:** | | | | | |
| Benefits Paid to Participants: | | | | | |
| Annuities and death benefits | 21,371 | 21,489 | 19,208 | 20,111 | 18,617 |
| Special Benefits | 1,759 | 948 | 1,944 | — | — |
| Refunds of Contributions | 4 | 230 | — | 64 | 10 |
| General, Administrative and Others | 546 | 2,150 | 1,455 | 516 | 496 |
| **Total Deductions** | 23,680 | 24,817 | 22,607 | 20,691 | 19,123 |
| | | | | | |
| **Net Change in Net Position** | (5,895) | 751 | (1,083) | (5,387) | 8,565 |
| | | | | | |
| **Net Position Restricted for Pensions:** | | | | | |
| Beginning of Year, as restated | 46,067 | 45,316 | 58,588 | 63,975 | 55,410 |
| Adjustments of Beginning of Year Net Position: | | | | | |
| Correction of Immaterial Errors | — | — | (12,189) | — | — |
| Beginning of Year, as Restated and Adjusted | 46,067 | 45,316 | 46,399 | 63,975 | 55,410 |
| End of Year | $ 40,172 | $ 46,067 | $ 45,316 | $ 58,588 | $ 63,975 |

*Amounts are preliminary, unaudited and subject to change.

Subsequent to the issuance of the JRS's 2013 financial statements, management identified various errors in such previously issued financial statements. The JRS found unrecorded amounts due to the ERS resulting from net benefits paid by the ERS to the JRS's retirees and beneficiaries and from unallocated ERS's general and administrative expenses and other expenses. As a result, the JRS's net position restricted for pension as of July 1, 2012 was decreased by approximately $12,189,000, including an estimate of approximately $4,249,000 for the lost income to be restored to the ERS. Additionally, the net investment and security lending transactions income, the benefits paid to participants, the general and administrative expenses and the other deductions for the year ended June 30, 2013 were increased (decreased) by approximately $22,000, $699,000, ($129,000) and $959,000, respectively, to correct these errors. Information to restate the financial statements prior to June 30, 2013 was not included because it was impracticable to determine them.

**Post-Employment Benefits Other Than Pensions**

The Commonwealth provides post-employment benefits other than pensions, consisting of a medical insurance plan contribution, through defined-benefit plans that are administered by each of the Retirement Systems: the ERS Medical Insurance Plan Contribution ("**ERS MIPC**"), the TRS Medical Insurance Plan Contribution ("**TRS MIPC**"), and the JRS Medical Insurance Plan Contribution ("**JRS MIPC**").

The ERS MIPC is an unfunded cost-sharing, multiple-employer defined-benefit other post-employment benefit ("**OPEB**") plan sponsored by the Commonwealth. The TRS MIPC and JRS MIPC are unfunded, single-employer defined-benefit OPEB plans sponsored by the Commonwealth. These OPEB plans were created under Act No. 95, approved on June 29, 1963. Healthcare benefits are provided through insurance companies whose premiums are paid by the retiree or disabled member, with the Commonwealth providing a matching share of up to $100 per month to the eligible medical insurance plan selected by the retiree or disabled member. Retirees or disabled members contribute the amount of the healthcare insurance premium not covered by the Commonwealth contribution

All of these OPEB plans are funded by the Commonwealth and its public corporations and municipalities on a pay-as-you-go basis. The funding of the OPEB benefits are provided to the ERS MIPC, the JRS MIPC and TRS MIPC through legislative appropriations each July 1 by the Commonwealth's General Fund for former government employees and for former employees of certain public corporations and municipalities. The legislative appropriations are estimates of the benefit payments to be made by the ERS MIPC, the JRS MIPC and TRS MIPC throughout the year. There are no contribution requirements for plan members during active employment.

For the ERS-MIPC, plan members were eligible for this benefit upon meeting the eligibility requirement for pension or disability benefits. Act 3-2013 eliminated this healthcare benefit to ERS MIPC members retired after June 30, 2013. Act 3-2013 did not change the medical insurance plan contribution for members that retired prior to July 1, 2013. As a result of the changes in Act 3-2013, the actuarial accrued liability of ERS MIPC for these benefits, as of June 30, 2013, decreased by $638.1 million, from $2.12 billion to $1.48 billion, or by 30.0%, compared to June 30, 2012.

For the TRS-MIPC, plan members were eligible for this benefit upon meeting the eligibility requirement for pension or disability benefits. Act No. 160-2013 eliminated this

healthcare benefit to TRS MIPC members retired after July 31, 2014.  As a result of the changes in Act No. 160-2013, the actuarial accrued liability of the TRS MIPC for these benefits, as of June 30, 2014, decreased by $249.7 million, from $792.9 million to $543.2 million, or by 31.5%, compared to June 30, 2013.

For the JRS-MIPC, plan members are eligible for this benefit upon meeting the eligibility requirement for pension or disability benefits.  In the case of the JRS-MIPC, Act 162-2013 did not change these benefits.

Post-employment benefits other than pensions are valued using actuarial principles similar to the way that pension benefits are calculated.  The following table summarizes the results of the actuarial valuations for these benefits as of June 30, 2015.  Since these benefits are not pre-funded, as discussed above, the unfunded actuarial accrued liability is equal to the actuarial accrued liability.

### Post-Employment Benefits Other Than Pensions
### ($ in millions)

| | Actuarial Value of Assets | Actuarial Accrued Liability[1] | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| ERS MIPC......................................... | - | $1,429 | $1,429 | 0% | $3,319 | 43.0% |
| TRS MIPC......................................... | - | 549 | 549 | 0 | 1,127 | 48.6 |
| JRS MIPC......................................... | - | 7 | 7 | 0 | 32 | 21.7 |
| Total ............................................... | - | $1,985 | $1,985 | 0% | $4,478 | 44.3% |

[1]   The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.
Source: Actuarial valuation reports for each of the Retirement Systems.

Post-employment benefits other than pensions paid by the Retirement Systems for fiscal years 2014 and 2015 amounted to $138.3 million and 144.1 million, respectively.  These amounts were allocated as follows: for fiscal year 2014, $102.1 million for ERS MIPC, $35.9 million for the TRS MIPC and $0.3 million for the JRS MIPC; and for fiscal year 2015, $106.0 million for the ERS MIPC, $37.8 million for the TRS MIPC and $0.3 million for the JRS MIPC.  The Proposed PROMESA Fiscal Plan measures incorporate certain modifications to these benefits.

In accordance with the provisions of GASB Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*, the Commonwealth is required to quantify and disclose its obligations to pay non-pension post-employment benefits to current and future retirees. The following table sets forth, according to the actuarial valuations, the actuarial accrued liability, unfunded actuarial accrued liability (UAAL), covered payroll and UAAL as a percentage of covered payroll for the non-pension post-employment benefits of the active and retired members of each of the Retirement Systems, for the last five fiscal years of reported actuarial valuations. Since these benefits are not pre-funded, as discussed above, the UAAL is equal to the actuarial accrued liability.

**Post-Employment Healthcare Benefits Plans**
**Actuarial Valuations as of the Indicated Fiscal Years**
**($ in millions)**

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability[1] | UAAL | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **ERS MIPC** | | | | | | |
| 2011 ............................... | - | $1,758 | $1,758 | 0% | $3,666 | 48.0% |
| 2012 ............................... | - | 2,121 | 2,121 | 0 | 3,570 | 59.4 |
| 2013 ............................... | - | 1,483 | 1,483 | 0 | 3,489 | 42.5 |
| 2014……. ..................... | - | 1,438 | 1,438 | 0 | 3,489 | 41.2 |
| 2015……. ..................... | - | 1,429 | 1,429 | 0 | 3,319 | 43.0 |
| **TRS MIPC** | | | | | | |
| 2011 ............................... | | 706 | 706 | 0 | 1,320 | 53.5 |
| 2012 ............................... | - | 797 | 797 | 0 | 1,293 | 61.7 |
| 2013 ............................... | - | 793 | 793 | 0 | 1,249 | 63.5 |
| 2014 ............................... | - | 543 | 543 | 0 | 1,171 | 46.4 |
| 2015……. ..................... | - | 549 | 549 | 0 | 1,127 | 48.6 |
| **JRS MIPC** | | | | | | |
| 2011 ............................... | - | 6 | 6 | 0 | 32 | 18.3 |
| 2012 ............................... | - | 7 | 7 | 0 | 33 | 19.9 |
| 2013 ............................... | - | 7 | 7 | 0 | 32 | 20.9 |
| 2014 ............................... | - | 7 | 7 | 0 | 32 | 20.6 |
| 2015 ............................... | - | 7 | 7 | 0 | 32 | 21.7 |

The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

246

## THE ECONOMY

**Overview**

Puerto Rico's economy entered a recession in the fourth quarter of fiscal year 2006. The Commonwealth's gross national product (GNP) contracted (in real terms) every fiscal year between 2007 and 2015, with the exception of fiscal year 2012. The lower rate of GNP decline after fiscal year 2011 and the slight growth observed in fiscal year 2012 were due mainly to the large amount of stimuli and deficit spending injected into the Puerto Rico economy during the period (e.g. $7.1 billion in federal funds through the American Recovery and Reinvestment Act, $500 million in local stimulus funded by COFINA bond proceeds in 2009 and 2010, and $706 million in corporate and individual income tax cuts (later modified due to resulting revenue shortfalls)).

According to the Puerto Rico Planning Board's numbers released in May of 2016, Puerto Rico's real gross national product for fiscal years 2014 and 2015 decreased by 1.7% and 0.6%, respectively. In October of 2016 the Planning Board revised its real GNP forecast for fiscal years 2016 and 2017, projecting a contraction of 1.8% and 2.3% respectively.

In fiscal year 2015, aggregate personal income was $64.3 billion ($59.6 billion in 2009 prices) and personal income per capita was $18,347 ($17,006 in 2009 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total United States federal transfer payments to individuals amounted to $16.8 billion in fiscal year 2015 and $16.7 billion in fiscal year 2014. Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and United States Civil Service retirement pensions were $13.6 billion, or 81.4% of the transfer payments to individuals in fiscal year 2015 ($12.8 billion, or 76.7%, in fiscal year 2014). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of the phase out of Section 936 of the United States Internal Revenue Code and an increased concentration on higher-wage, high-technology industries, such as pharmaceuticals, computer products, biotechnology, professional and scientific instruments, and certain high technology machinery and equipment. At the present time, almost 90% of manufacturing is generated by chemical and electronic products. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the Puerto Rico GNP for fiscal years 2011 through 2015, compared to the annual percentage increase in real GNP in the United States. There are some differences between the previously reported figures of Puerto Rico's GNP and the current figures set forth below due to the recent revision of several components of GNP, which included

changes since fiscal year 2001. Therefore, growth rates and figures before fiscal year 2001 are not wholly comparable with the amounts reported afterwards.

### Commonwealth of Puerto Rico
### Gross National Product
### Fiscal Years Ended June 30,
### (dollar amounts in $ millions)

|  | **2011** | **2012** | **2013** | **2014** | **2015**[1] |
|---|---|---|---|---|---|
| GNP (PR) (current prices) | $65,721 | $68,086 | $68,945 | $68,461 | $68,521 |
| Real GNP (PR) (2009 prices) | $60,312 | $60,636 | $60,555 | $59,523 | $59,194 |
| Annual percentage increase (decrease) in real GNP (PR) (2009 prices) | (1.7) % | 0.5% | (0.1) % | (1.7) % | (0.6) % |
| Annual percentage increase (decrease) in real GNP (United States) (2009 prices) | 2.4% | 2.2% | 1.3% | 2.2% | 2.8% |

[1]   Preliminary.

*Sources:* Puerto Rico Planning Board and IHS-Global Insight.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures. During fiscal year 2015, approximately 74.1% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 51.7% of Puerto Rico's imports. In fiscal year 2015, Puerto Rico experienced a positive merchandise trade balance of approximately $26.2 billion. On the other hand, the share of total investment to GNP decreased to 13.1% in fiscal year 2015, from 13.5% in fiscal year 2014, and from 27.6% in fiscal year 2001. Total investment reached the level of $8,956.0 million in fiscal year 2015, compared to the level of $12,159.3 in fiscal year 2001. This general trend on the level of investment has been partially compensated by the increase in the net balance of the federal transfer payments which increased from $5,683.4 million in fiscal year 2001 to $13,339.5 million in fiscal year 2015. Moreover, interest rates remained at very low levels during the past years, as well as the core inflation (which exclude energy and food prices), and the U.S. economy has kept growing at a moderated pace since fiscal year 2010.

The following graph compares the growth rate of real GNP for the Puerto Rico and United States economies since fiscal year 2001, and the forecast of the growth rate for fiscal years 2016 and 2017.





\* Estimate for Puerto Rico from the Puerto Rico Planning Board (Oct. 2016).
\*\* Estimate for U.S. from IHS-Global Insight (Oct. 2016).
*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. The Planning Board revises its statistics on an annual basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2015 shown in this Report are preliminary until the revised figures for fiscal year 2015 and the preliminary figures for fiscal year 2016 are released, and the forecast for fiscal year 2017 is revised. The Planning Board could also revise back more than two years to the extent it obtains more complete information.

Certain information regarding current economic activity is available in the form of the FAFAA Economic Activity Index (FAFAA-EAI), a coincident indicator of ongoing economic activity. This index, shown in the following graph (published by GDB from December 2009 to March 2016, and by FAFAA since April 2016), is composed of several variables (total payroll employment based on the Establishment Survey, total electric power generation, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product. However, the FAFAA-EAI does not measure the real GNP annual growth rates. Since the FAFAA-EAI is generated with only four variables, it is more volatile than the real GNP figures. This means that both increments and declines reflected in the FAFAA -EAI amplify the corresponding movements of the real GNP. In April, 2015 the GDB published an update about

the way it was computing the seasonal adjustments for the components of the GDB-EAI. That update was performed to reduce the volatility of the Index in order to make the month-to-month comparisons more reliable. The new method implied changes on the level of the Index (making it slightly higher), and on the growth rates (both, year-over-year and month-over-month, making them less volatile). The FAFAA-EAI for September 2016 was 124.5, a decrease of 0.5% compared to September 2015. The average cumulative value for fiscal year 2016 decreased by 1.4% when compared to fiscal year 2015. Furthermore, for fiscal year 2015, the FAFAA-EAI showed a reduction of 1.8%, compared to the corresponding figure for fiscal year 2014. For more information about the FAFAA-EAI methodology and recent modifications to reduce volatility see the GDB's website at www.gdbpr.com under "Economy-Economic Activity Index.

### FAFAA Economic Activity Index



**Economic Forecast for Fiscal Years 2016 and 2017**

In October of 2016, the Planning Board released its revised GNP forecast for fiscal years 2016 and 2017. The Planning Board's forecasts for fiscal year 2016 and 2017 project a decrease in gross national product of 1.8% and 2.3%, in constant dollars. The Planning Board's forecast took into account global and United States economies, product exports, visitors 'expenditures, investment in construction, personal consumption expenditures, and federal transfers to individuals, among other parameters.

**Fiscal Year 2015**

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2015 indicate that real gross national product decreased 0.6% (an increase of 0.1% in current dollars) over fiscal year 2014. Nominal gross national product was $68.5 billion in fiscal year 2015 ($59.2 billion in 2009 prices), compared to $68.5 billion in fiscal year 2014 ($59.5 billion in 2009 prices). Aggregate personal income increased from $63.3 billion in fiscal year 2014 ($58.9 billion in 2009 prices) to $64.3 billion in fiscal year 2015 ($59.6 billion in 2009 prices). Personal income per capita increased when measured in current and

constant prices, from $17,749 in fiscal year 2014 ($16,538 in 2009 prices) to $18,347 in fiscal year 2015 ($17,006 in 2009 prices).

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2015 averaged 983,530, a decrease of 0.9% compared to the previous fiscal year; and the unemployment rate averaged 13.0%, a decrease from 14.3% for fiscal year 2014.

Among the variables that contributed to the small gross national product results were a slight increase in consumption expenditures and an increase in sales to the rest of the world. There was also a decrease in the average price of West Texas Intermediate (WTI) oil, from $101.3 per barrel in fiscal year 2014 to $69.3 per barrel in fiscal year 2015, a decrease of 31.6%.

**Fiscal Year 2014**

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2014 indicate that real gross national product decreased 1.7% (a decrease of 0.7% in current dollars) over fiscal year 2013. Nominal gross national product was $68.5 billion in fiscal year 2014 ($59.5 billion in 2009 prices), compared to $68.9 billion in fiscal year 2013 ($60.6 billion in 2009 prices). Aggregate personal income decreased from $64.2 billion in fiscal year 2013 ($60.7 billion in 2009 prices) to $63.3 billion in fiscal year 2014 ($59.9 billion in 2009 prices). Personal income per capita increased when measured in current prices, but decreased when measured in constant prices, from $17,753 in fiscal year 2013 ($16,799 in 2009 prices) to $17,749 in fiscal year 2014 ($16,538 in 2009 prices).

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2014 averaged 992,627, a decrease of 2.2% compared to the previous fiscal year; and the unemployment rate averaged 14.3%, an increase from 14.0% for fiscal year 2013.

Among the variables that contributed to the gross national product results were a decrease in consumption expenditures and a slight increase in sales to the rest of the world. There was also an increase in the average price of West Texas Intermediate (WTI) oil, from $92.1 per barrel in fiscal year 2013 to $101.3 per barrel in fiscal year 2014, an increase of 10.0%.

**Employment and Unemployment**

Total average annual employment, as measured by the Puerto Rico Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey" (which is generally used for the computation of the unemployment and participation rates), has decreased in recent years. The reduction in total employment began in the fourth quarter of fiscal year 2007, when total employment was 1,244,425, and continued consistently until the first half of fiscal year 2015, after which it mostly stabilized. Still, at the end of the year the total employment averaged 983,530, a decrease of 0.9% when compared to fiscal year 2014.

Nevertheless, according to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2016 averaged 1,001,525, an increase of 1.8% when compared to the previous fiscal year; and the unemployment rate averaged 11.7%, as compared to the 13.0% it reached during fiscal year 2015. Additionally, during the first five months of fiscal year 2017, total employment decreased by 0.4% when compared to the same period for the prior fiscal year,

251

and the unemployment rate averaged 12.3%, unchanged to what it averaged for the same period of the prior fiscal year. According to the Establishment Survey (also known as the Payroll Survey), which is a different survey generally used to measure employment across the various sectors of the economy, total payroll non-farm employment decreased by 1.2% during fiscal year 2016. Similarly, it decreased by 0.7% during the first five months of fiscal year 2017. Total private employment fell by 1.1%, a reduction of 7,300 employees during fiscal year 2016. Furthermore, during the first five months of fiscal year 2017, private employment also decreased by 0.7%, which translates to a reduction of almost 4,800 employees, as compared to the same period for the prior fiscal year.

The following table presents annual statistics of employment and unemployment for fiscal year 2012 through fiscal year 2016. These employment figures are based on the Household Survey, which includes self-employed individuals and agricultural employment, instead of the non-farm payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 16.4% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agricultural employment in Puerto Rico represented 1.5% of total employment in fiscal year 2016.

### Commonwealth of Puerto Rico
### Employment and Unemployment
### (Persons age 16 and over, in thousands)

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[1] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2012 | 1,208 | 1,025 | 183 | 15.2% |
| 2013 | 1,180 | 1,015 | 165 | 14.0% |
| 2014 | 1,159 | 993 | 166 | 14.3% |
| 2015 | 1,130 | 984 | 147 | 13.0% |
| 2016 | 1,134 | 1,002 | 133 | 11.7% |

Totals may not add due to rounding.
[1] Unemployed as percentage of labor force.

*Source:* Department of Labor and Human Resources – Household Survey

Employment data coming from the Payroll Survey is corrected every year (specifically, every March) with a benchmark revision. From calendar year 2006 to calendar year 2011 the revisions implied additions or subtractions of around 4,400 jobs (the highest addition was in 2008 with 5,300 jobs, and the highest subtraction corresponded to 2009 with 6,500 less jobs). However, the benchmark revision of 2013 added 18,433 jobs, the revision of March 2014 (which affected mainly calendar year 2013) increased the number of jobs by 21,275. The revision of March 2015 (which corresponded mainly to calendar year 2014), decreased the number of jobs by 17,300, and the benchmark revision of March 2016 (the most recent one, that mainly affected calendar year 2015), decreased the number of jobs by 9,017. In other words, payroll employment revisions after 2012 have been much more volatile than the previous revisions.

**Economic Performance by Sector**

From fiscal year 2011 to fiscal year 2015, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2011 to 2015.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2011** | **2012** | **2013** | **2014** | **2015[1]** |
| Manufacturing | $46,760 | $46,971 | $47,581 | $47,715 | $48,310 |
| Service [2] | 42,690 | 43,553 | 44,128 | 44,385 | 45,406 |
| Government [3] | 8,216 | 8,278 | 8,238 | 7,825 | 7,267 |
| Agriculture | 795 | 816 | 847 | 867 | 855 |
| Construction [4] | 1,332 | 1,369 | 1,252 | 1,112 | 1,089 |
| Statistical discrepancy | 559 | 577 | 405 | 184 | (20) |
| Total gross domestic product [5] | $100,352 | $101,565 | $102,450 | $102,089 | $102,906 |
| Less: net payment abroad | (34,631) | (33,479) | (33,505) | (33,627) | (34,385) |
| Total gross national product [5] | $65,721 | $68,086 | $68,945 | $68,461 | $68,521 |

[1] Preliminary.
[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4] Includes mining.
[5] Totals may not add due to rounding.
*Source:* Planning Board

The data for employment by sector or industry presented here, as in the United States, is based on the Establishment (or Payroll) Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons. During fiscal year 2016, total non-farm payroll employment averaged 894,942, a 1.2% reduction with respect to the prior fiscal year. Furthermore, for the first five months of fiscal year 2017, total non-farm payroll employment decreased by 0.7%, when compared to the same period of fiscal year 2016.

The following table presents annual statistics of average employment based on the North American Industry Classification System ("**NAICS**") for fiscal years 2012 to 2016.

253

### Commonwealth of Puerto Rico
### Non-Farm Payroll Employment by Economic Sector [1]
### (number of employees)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015[2] | 2016[2] |
| Natural resources and construction | 35,058 | 33,717 | 28,317 | 26,842 | 23,308 |
| Manufacturing | | | | | |
|     Durable goods | 33,308 | 32,800 | 32,358 | 32,050 | 30,967 |
|     Non-durable goods | 50,192 | 45,925 | 43,108 | 42,900 | 42,092 |
| Sub-total | 83,500 | 78,725 | 75,467 | 74,950 | 73,058 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|     Wholesale trade | 31,517 | 31,575 | 31,025 | 30,383 | 29,458 |
|     Retail trade | 128,192 | 130,600 | 130,975 | 129,267 | 130,000 |
|     Transportation, warehouse, and utilities | 14,625 | 14,650 | 14,808 | 14,742 | 14,975 |
|       Sub-total | 174,333 | 176,825 | 176,808 | 174,392 | 174,433 |
| | | | | | |
| Information | 18,650 | 19,158 | 19,683 | 20,167 | 20,542 |
| Finance | 44,400 | 44,375 | 43,442 | 42,500 | 41,733 |
| Professional and business | 108,875 | 112,700 | 114,792 | 112,475 | 111,100 |
| Educational and health | 117,617 | 122,158 | 123,150 | 123,242 | 121,983 |
| Leisure and hospitality | 72,775 | 77,017 | 79,458 | 80,433 | 81,908 |
| Other services | 17,625 | 17,908 | 17,967 | 17,950 | 17,608 |
| Government [3] | 258,425 | 254,575 | 238,158 | 232,683 | 229,267 |
|     Total non-farm | 931,258 | 937,158 | 917,242 | 905,633 | 894,942 |

---

[1]  The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2]  Preliminary.

[3]  Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

### *Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2015 manufacturing generated $48.3 billion, or 46.9%, of gross domestic product. During fiscal year 2016, payroll employment for the manufacturing sector was 73,058, a decrease of 2.5% compared with fiscal year 2015. For the first five months of fiscal year 2017, manufacturing employment averaged 71,900, a reduction of 2.7% (or 2,000 employees) from the same time period of the previous fiscal year. Most of Puerto Rico's manufacturing output is exported to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2016, however, the average hourly manufacturing wage rate in Puerto Rico was approximately 62.4% of the average mainland United States rate.

In the last three decades, industrial development in Puerto Rico has been relatively capital intensive and dependent on skilled labor. This gradual shift in emphasis from labor intensive to capital intensive industrial development is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Commonwealth governments. Federal legislation enacted in 1996, however, which amended Section 936 of the United States Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the scope of the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has contributed to the long-term decline that the activity of this sector has suffered during the past two decades. In addition, the uncertainty created by the long-term creditability of the Act 154 excise tax has also affected the potential growth for this sector.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2011 to 2015.

255

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
(at current prices, in millions)

| | 2011 | 2012 | 2013 | 2014 | 2015 [1] |
|---|---|---|---|---|---|
| Food | $ 834 | $ 976 | $ 1,214 | $ 1,229 | $ 1,205 |
| Beverage and Tobacco Products | 1,228 | 1,314 | 1,329 | 1,405 | 1,333 |
| Textile Mills & Product Mills | 10 | 13 | 13 | 13 | 14 |
| Apparel | 276 | 258 | 163 | 116 | 136 |
| Leather and Allied Products | 25 | 18 | 14 | 13 | 12 |
| Wood Products | 17 | 18 | 15 | 15 | 15 |
| Paper | 52 | 50 | 48 | 59 | 59 |
| Printing and Related Support Activities | 119 | 102 | 77 | 76 | 77 |
| Petroleum and Coal Products | 352 | 349 | 357 | 386 | 397 |
| Chemical | 32,039 | 31,609 | 31,729 | 30,892 | 31,141 |
| Plastics and Rubber Products | 97 | 95 | 97 | 101 | 106 |
| Nonmetallic Mineral Products | 96 | 126 | 99 | 94 | 93 |
| Primary Metals | 169 | 100 | 166 | 171 | 165 |
| Fabricated Metal Products | 155 | 156 | 154 | 176 | 180 |
| Machinery | 233 | 207 | 326 | 335 | 305 |
| Computer and Electronic Products | 8,123 | 8,663 | 8,938 | 9,806 | 9,856 |
| Electrical Equipment, Appliances and Components | 681 | 754 | 759 | 790 | 782 |
| Transportation Equipment | 79 | 79 | 86 | 86 | 94 |
| Furniture and Related Products | 35 | 37 | 32 | 30 | 30 |
| Miscellaneous | 2,140 | 2,047 | 1,965 | 1,921 | 2,310 |
| Total gross domestic product of manufacturing sector[2] | $ 46,760 | $ 46,971 | $ 47,581 | $ 47,715 | $ 48,310 |

[1]  2013-2014 revised figures and 2015 preliminary.
  Totals may not add due to rounding.
*Source: Planning Board*

The following table presents annual statistics of average manufacturing employment by industry based on the NAICS for fiscal years 2012 to 2016.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Manufacturing Employment by Industry Group
### (number of employees)

| Industry group | 2012 | 2013 | 2014 | 2015[1] | 2016[1] |
|---|---|---|---|---|---|
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 2,042 | 1,983 | 1,817 | 1,700 | 1,575 |
| Fabricated metal products | 3,608 | 3,583 | 3,350 | 3,342 | 3,142 |
| Computer and electronic | 5,175 | 4,667 | 4,483 | 5,217 | 5,467 |
| Electrical equipment | 5,117 | 5,225 | 5,108 | 4,850 | 4,583 |
| Miscellaneous manufacturing | 11,775 | 11,825 | 12,308 | 11,758 | 11,450 |
| Other durable goods  manufacturing | 5,592 | 5,517 | 5,292 | 5,183 | 4,750 |
| Total – durable goods | 33,308 | 32,800 | 32,358 | 32,050 | 30,967 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 11,467 | 11,292 | 11,617 | 11,458 | 11,267 |
| Beverage and tobacco products manufacturing | 2,792 | 2,633 | 2,433 | 2,400 | 2,325 |
| Apparel manufacturing | 9,692 | 6,492 | 4,917 | 5,700 | 5,833 |
| Chemical manufacturing | 19,967 | 19,108 | 18,167 | 17,617 | 17,292 |
| Other non-durable goods manufacturing | 6,275 | 6,400 | 5,975 | 5,725 | 5,375 |
| Total – non-durable goods | 50,192 | 45,925 | 43,108 | 42,900 | 42,092 |
| Total manufacturing employment | 83,500 | 78,725 | 75,467 | 74,950 | 73,058 |

Total employment in the manufacturing sector decreased by 85,500 from fiscal year 1996 to fiscal year 2016, and by 44,259 from fiscal year 2005 to fiscal year 2016. During the period from 2010 through 2016, manufacturing employment decreased by a total of 17.3%. For fiscal year 2016, average employment in the sector declined by 1,892 jobs, or 2.5%, compared to the previous year. Given that this sector pays, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that could explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly electricity), the increased use of job outsourcing, and the increase of global competition. Puerto Rico's manufacturing sector continues to face increased international competition. As patents on pharmaceutical products manufactured in Puerto Rico expire and the production of such patented products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2015, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.2%, while payroll employment in this sector increased slightly at an average annual rate of 0.1%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 16.4% of total employment according to the Household Survey. Most of this employment supports the operation of the service sector.

The service sector ranks second to manufacturing in its contribution to gross domestic product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2015, the service sector generated $45.4 billion, or 44.1%, of gross domestic product. Trade, information, finance, real estate & rental, professional & business support, education & health, and leisure & hospitality experienced growth, while utilities experienced reductions in fiscal year 2015, as measured by gross domestic product at current prices. Service-sector employment increased from 565,450 in fiscal year 2007 to 569,308 in fiscal year 2016, an average annual rate increase of 0.1% (representing 63.6% of total, non-farm, payroll employment). Note that, in terms of growth, the annual rate remained unchanged when compared to the 2007-2015 figure (0.1%). But, nonetheless, the average service-sector employment for fiscal year 2016 does show a small decrease of 0.3% when compared to the prior fiscal year.

Puerto Rico has a developed banking and financial system. According to the Office of the Commissioner of Financial Institutions of Puerto Rico (the "**OCFI**"), as of September 30, 2016, there were nine commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System, and by the OCFI. The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of September 30, 2016 amount to $57.8 billion, as compared to 56.5 billion as of December 31, 2015.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("**FINRA**"), the United States Securities and Exchange Commission and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $1.0 billion as of June 30, 2016, as compared to $1.1 billion on December 31, 2015. Another relevant component of the financial sector in Puerto Rico is the investment company industry. According to the OCFI, local investment companies had recorded assets under management of $6.7 billion as of September 30, 2016. Assets under management by local investment companies have decreased significantly as a result of the recent downgrades of bonds of the Commonwealth and its instrumentalities and the resulting reduction in the market prices of these bonds.

Other components of the financial sector in Puerto Rico include international banking entities ("**IBEs**") and credit unions (locally known as "cooperativas"). IBEs are licensed financial businesses that conduct offshore banking transactions. As of September 30, 2016, there were 30 IBEs (including units of commercial banks) operating in Puerto Rico, with total assets of $56.7 billion, an increase from $53.6 billion in total assets as of December 31, 2015. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $8.5 billion in assets as of June 30, 2016.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following table sets forth gross domestic product for the service sector for fiscal years 2011 to 2015.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Service Sector
### (in millions at current prices)

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2011** | **2012** | **2013** | **2014** | **2015**[1] |
| Wholesale trade | $ 2,909 | $ 2,819 | $ 2,662 | $ 2,710 | $ 2,720 |
| Retail trade | 4,787 | 4,809 | 4,963 | 5,019 | 4,953 |
| Transportation and warehousing | 898 | 946 | 937 | 919 | 919 |
| Utilities | 1,868 | 2,074 | 1,638 | 2,127 | 2,109 |
| Information | 2,610 | 2,465 | 2,331 | 2,334 | 2,408 |
| Finance and insurance | 5,611 | 5,176 | 5,758 | 4,755 | 5,439 |
| Real Estate and rental | 14,369 | 15,383 | 15,426 | 15,832 | 16,042 |
| Professional and business | 3,311 | 3,460 | 3,646 | 3,744 | 3,754 |
| Education and health | 4,078 | 4,084 | 4,264 | 4,364 | 4,460 |
| Leisure and hospitality | 1,866 | 1,940 | 2,078 | 2,149 | 2,170 |
| Other services | 383 | 395 | 424 | 432 | 432 |
| Total[2] | $42,690 | $43,553 | $44,128 | $44,385 | $45,406 |

[1]   2013-2014 revised figures and 2015 preliminary.
[2]   Totals may not add due to rounding.
*Source*: Puerto Rico Planning Board

The following table sets forth employment for the service sector for fiscal years 2012 to 2016.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Employment by Service Sector
### (Persons age 16 and over)

|  | **2012** | **2013** | **2014** | **2015**[1] | **2016**[1] |
|---|---|---|---|---|---|
| Wholesale trade | 31,517 | 31,575 | 31,025 | 30,383 | 29,458 |
| Retail trade | 128,192 | 130,600 | 130,975 | 129,267 | 130,000 |
| Transportation, warehouse and utilities | 14,625 | 14,650 | 14,808 | 14,742 | 14,975 |
| Information | 18,650 | 19,158 | 19,683 | 20,167 | 20,542 |
| Finance | 44,400 | 44,375 | 43,442 | 42,500 | 41,733 |
| Professional and business | 108,875 | 112,700 | 114,792 | 112,475 | 111,100 |
| Educational and health | 117,617 | 122,158 | 123,150 | 123,242 | 121,983 |
| Leisure and hospitality | 72,775 | 77,017 | 79,458 | 80,433 | 81,908 |
| Other services | 17,625 | 17,908 | 17,967 | 17,950 | 17,609 |
| Total[2] | 554,275 | 570,142 | 575,300 | 571,158 | 569,308 |

[1]  Preliminary.
[2]  Totals may not add due to rounding.
*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

### *Hotels and Related Services—Tourism*

For fiscal year 2016, the total number of registrations (Hotels & Paradores), including residents of Puerto Rico and tourists, was 2,644,808, an increase of 1.9% when compared to fiscal year 2015. The average occupancy rate during fiscal year 2016 was 70.4%, a decrease of 0.6% from the prior fiscal year. Also, during fiscal year 2016, the average number of rooms available increased by 1.1% to 15,006 rooms compared to fiscal year 2015.

In terms of employment, according to the Payroll Survey, employment in the leisure and hospitality sector was 79,458 for fiscal year 2014, an increase of 3.2% over employment for fiscal year 2013, which is a larger increment than the average growth rate observed for the tourist hotel registrations (2.4%) during that same year. However, for fiscal year 2015, employment in this sector increased by 1.2% to 80,433 compared to the prior fiscal year, a growth rate considerably lower than the 5.0% increase observed in tourist hotel registrations during that same period. For fiscal year 2016, the leisure and hospitality sector employment averaged 81,908 employees, an increase of 1.8% compared to the prior year, a growth rate equal to the average increase of 1.8% observed in tourist hotel registrations for that fiscal year. During the first five months of fiscal year 2017, the leisure and hospitality sector employment increased by 0.8% to 81,900 employees compared to the same period of the prior fiscal year, a growth rate considerably lower than the 7.4% increase observed in tourist hotel registrations during the first month of fiscal year 2017.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world. During fiscal year 2016, the number of cruise passenger movement and trips decreased by -12.6% and -11.8%, respectively.

**Commonwealth of Puerto Rico**
**Tourism Data[1]**

**Number of Visitors**
**(in thousands)**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2010............................................ | 1,349.4 | 1,193.5 | 1,836.2 | 4,379.2 |
| 2011............................................ | 1,408.5 | 1,165.8 | 1,639.4 | 4,213.7 |
| 2012............................................ | 1,508.0 | 1,127.8 | 1,561.1 | 4,196.9 |
| 2013 ........................................... | 1,586.1 | 1,038.0 | 1,585.9 | 4,210.0 |
| 2014............................................ | 1,634.8 | 1,209.7 | 1,611.2 | 4,455.7 |
| 2015[5]......................................... | 1,737.2 | 1,509.3 | 1,804.5 | 5,051.1 |

**Total Visitors' Expenditures**
**(in millions)**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2010............................................ | $1,541.8 | $171.4 | $1,497.6 | $3,210.7 |
| 2011............................................ | $1,618.9 | $169.3 | $1,354.5 | $3,142.8 |
| 2012............................................ | $1,706.9 | $167.7 | $1,318.3 | $3,192.9 |
| 2013............................................ | $1,811.8 | $156.0 | $1,342.9 | $3,310.6 |
| 2014............................................ | $1,874.1 | $182.3 | $1,382.3 | $3,438.6 |
| 2015[5]......................................... | $2,047.8 | $227.8 | $1,549.5 | $3,825.0 |

---

[1]   Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
[2]   Includes visitors in guesthouses.
[3]   Includes cruise ship visitors and transient military personnel.
[4]   Includes visitors in homes of relatives, friends, and in hotel apartments.
[5]   Preliminary.
*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through PRCCDA, has developed the largest convention center in the Caribbean, which is the centerpiece of a 100-acre private development that includes hotels, restaurants, office space, and housing. The Convention Center District is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The Convention Center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1 million attendees. A 503 room hotel located next to the Convention Center commenced operations in November of 2009. A 126 key hotel operated under the insignia of Hyatt House opened on October 1, 2014 and another Hyatt hotel with 149 keys opened on January 12, 2016 under the flag of Hyatt Place.

The PRCCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum located in San Juan, Puerto Rico. The Coliseum was inaugurated in 2004 and has hosted more than 400 world-caliber events with an aggregate attendance of over

2.5 million people. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar Magazine in 2005.

### Government

The government sector of Puerto Rico has played an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the 20th century, providing the basic infrastructure and services necessary for the modernization of Puerto Rico.

In fiscal year 2015 the government (federal, state and local) industrial sector accounted for $7.3 billion, or 7.1%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing an average of 229,300 workers (federal, state and local), or 25.6% of total, non-farm, payroll employment in fiscal year 2016. Government employment has decreased significantly, however, in recent years. In fiscal year 2009, federal, state and local government employment averaged 300,700. From fiscal year 2009 to fiscal year 2016, employment reductions have been of 900 jobs (-6.0%) in the federal government, 58,500 jobs (-26.8%) in the state government (including public corporations) and 12,000 jobs (-17.9%) in municipal government. The reductions have occurred, for the most part, in the state and municipal government employment sectors and are related to the recent changes to the Employees Retirement System which prompted the voluntary departure of employees which qualified for retirement but were still employed. Likewise, for the first five months of fiscal year 2017, total government employment decreased by 1,400 jobs (-1.4%), when compared to the previous fiscal year. Federal and municipal government increased by 300 jobs (2.4%) and 2,900 jobs (5.3%) respectively, which was offset by a decrease of 4,600 jobs (2.9%) in the state government.

### Transportation

Fifty-five shipping lines offer regular ocean freight service to ninety-eight United States and foreign ports. Ninety-nine percent of container shipments are handled through the Port of San Juan, the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including, Arecibo, Ceiba, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques and Yabucoa. The Old San Juan and Isla Grande tourism piers provided the infrastructure necessary to serve the cruise ship industry.

The Port of San Juan has the highest cruise ship activity in the eastern Caribbean. In fiscal year 2015, backed by an incentive program developed to increase the number of cruises in Puerto Rico, the Port of San Juan received a record of approximately 1.5 million of passengers and 552 cruises. On average, approximately 1.3 million of passengers and over 480 cruises visit San Juan every year. Homeport cruises and in transit operations represent 36% and 64% of all operations, respectively. Of approximately 20 cruise lines received by the Port of San Juan every year, the largest in term of passenger and ship movement are Carnival Cruise Line (40%) and Royal Caribbean Cruise Line (27%). Other mayor cruise lines visiting the port are Celebrity Cruise Line, Holland America Cruise, Norwegian Cruise and Disney Cruises. During fiscal 2017, PRPA is aiming to receive approximately 1.4 million passengers and 530 cruises.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayagüez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, Patillas and Humacao. The Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by more than 25 domestic and international airlines. The airport receives over 8.5 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Bogotá, Boston, Chicago, Cancún, Copenhagen, Dallas, Ft. Lauderdale, Frankfurt, London, Madrid, Miami, Minneapolis/St. Paul, Montreal, New York, Orlando, Oslo, Panama City, Philadelphia and Toronto, and numerous other destinations within the United States mainland. San Juan has also become a hub for intra-Caribbean service. While the main hubs in the United States mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, and Bogotá, Colombia, with connections to Central and South America.

On February 27, 2013, the Puerto Rico Ports Authority entered into a long term lease of the Luis Munoz Marin International Airport with Aerostar Holdings, LLC ("Aerostar") pursuant to a public-private partnership transaction. It is estimated that Aerostar will invest $1.4 billion in the Airport during the life of the lease, including a commitment to invest approximately $267 million in immediate improvements and comply with world-class operating standards.

The Rafael Hernández Airport (BQN) in Aguadilla provides the longest runway in the Caribbean. BQN is the west side home for cargo and commercial passenger flights and for federal agencies such as USCBP, USCG, and USDA. It features a free trade zone which has led to the development of Pegasus, an equine quarantine establishment. The airport is served by JetBlue, United and Spirit. The airport has twenty-three (23) weekly flights to and from Fort Lauderdale, New York, Newark and Orlando. Ponce's Mercedita Airport is served by JetBlue and has fourteen (14) weekly scheduled flights to and from New York and Orlando. Both of these airports also have seasonal charter service to other Caribbean islands. Smaller regional airports serve intra-island traffic. BQN has also been heavily used for technical overlays on cargo and general aviation flights primarily from South America to Europe and the United States.

On April 10, 2014, the Ports Authority and PRIDCO signed a long-term lease agreement with Lufthansa Technik Puerto Rico, LLC ("**LTPR**") under which LTPR will lease from the Ports Authority certain areas of the Rafael Hernández Airport in Aguadilla, where LTPR will establish an aircraft maintenance, repair and overhaul operation. In addition to establishing Puerto Rico as a hub for this type of operations, the facility is expected to become a key driver of economic development and increased tax revenues for the Commonwealth. With the startup of the LTPR operation, the University of Puerto Rico Aguadilla Campus, in a joint venture with the P.R. Department of Education, has established in this airport the Aeronautical and Aerospace Institute of Puerto Rico to train the manpower required to support industry needs.

PRPA has completed a study for the construction of an alternate runway that will allow the deep reconstruction of the BQN's main runway. This alternate runway would eventually be transformed into a taxiway once the main runway reconstruction project is completed, enabling the development of the southern portion of the airport.

Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

263

Puerto Rico's major cities are connected by a modern highway system, which, as of December 31, 2015, totaled approximately 4,817 miles and 12,597 miles of local streets and adjacent roads. The highway system comprises 408 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 242 miles of primary urban system highways, 1,000 miles of secondary system highways serving the needs of intra-regional and inter-municipal traffic and 3,167 miles of tertiary highways and roads serving local, intra-municipal traffic. The PR-22 and PR-5 toll highways are currently operated by a private company pursuant to a Concession Agreement between the Puerto Rico Highways and Transportation Authority, the P3 Authority and Autopistas Metropolitanas de Puerto Rico, an affiliate of Abertis and Goldman Sachs.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Ponce Port Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which included the construction of a container yard with capacity for up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009. A third development phase is still pending, which would result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units and include the installation of the basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port. In December of 2013, legislation was enacted to authorize the selection of an international level ports operator and an administrator for the adjacent value added zone. These measures are aimed at completing the remaining infrastructure required for the project to become operational in the near future.

### *Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it can make significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. From its peak in fiscal year 2000 to fiscal year 2015, real construction investment declined at an average annual rate of 7.3%. Construction investment started to decrease significantly in fiscal year 2005, as part of the general economic contraction experienced during the past years in Puerto Rico. During the last eight fiscal years (from fiscal year 2007 to 2015), real construction investment decreased at an average annual rate of 9.2%. The Planning Board forecasts a decrease in construction investment of 6.8 and 6.6% in real terms for fiscal year 2016, and 2017.

Public investment has been an important component of construction investment. During fiscal year 2015, approximately 40.2% of the total investment in construction was related to public projects, which represents an increase in its share of total construction investment compared to 37.9% in fiscal year 2000. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. Public investment was primarily in housing, schools, water projects, and other public infrastructure projects. The end of federal ARRA funds also negatively affected public investment in construction during fiscal year 2014.

264

During fiscal year 2015, the number of construction permits decreased by 0.8%, while the total value of construction permits increased considerably, by 36.1% when compared to fiscal year 2014. Cement sales, on the other hand, have decreased every year since 2009, except 2012. In fiscal year 2016, cement sales decreased by 11.5% when compared to 2015. During the first five months of fiscal year 2017, cement sales have decreased by 10.9% when compared to the same period in fiscal year 2016.

Average payroll employment in the construction sector during fiscal year 2016 was 23,308, a reduction of 13.2% from fiscal year 2015. Furthermore, payroll employment in construction has declined significantly for more than a decade. In fiscal year 2004, this sector averaged 69,300 employees but by the end of fiscal year 2016 there were 45,992 less workers in this sector, a notable reduction of 66.4%. During the first five months of fiscal year 2017, payroll employment in the construction sector averaged 22,200, a decrease of 7.1% when compared to the same period in fiscal year 2016.

### *Agriculture*

Agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2014, gross income from agriculture was $929.7 million at current prices, an increase by 11.6% as compared with fiscal year 2013. In terms of gross domestic product, agriculture generated a level of production of $854.5 million at current prices in fiscal year 2015, a decrease of 1.4% compared to fiscal year 2014. According to the Household Survey, the number of people employed in this sector has remained stable during the past five years, at close to 17,000 employees.

The Commonwealth government supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects. The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, and stimulating the consumption of locally produced agricultural products.

## Higher Education

During the six decades from 1950 to 2010, Puerto Rico made significant advances in education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s,

265

certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. From the 1970s to 2011, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000. In spite of the current population decline, which implies a reduction in higher education enrollment since 2012, its proportion with respect population between 18 to 24 years of age has remained relatively stable.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

### Commonwealth of Puerto Rico
### Trend in College Enrollment

| Academic Year | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,818,637 | 51.3% |
| 2000 | 428,894[2] | 176,015 | 41.0% | 27,141,150[2] | 14,849,691 | 54.7% |
| 2010 | 375,145[2] | 249,372 | 66.5% | 30,672,088[2] | 20,313,594 | 66.2% |
| 2011 | 374,649[3] | 250,192 | 66.8% | 31,094,454[3] | 21,019,438 | 67.6% |
| 2012 | 372,011[3] | 250,011 | 67.2% | 31,393,663[3] | 21,010,590 | 66.9% |
| 2013 | 368,337[3] | 245,495 | 66.6% | 31,527,716[3] | 20,644,478 | 65.5% |
| 2014 | 359,520[3] | 241,168 | 67.1% | 31,483,957[3] | 20,375,789 | 64.7% |
| 2015 | 347,003[3] | 240,878 | 69.4% | 31,219,892[3] | 20,207,369 | 64.7% |

[1]   Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2]   Based on census population as of April 1 of the stated year.
[3]   Estimated population (reference date July 1 of the stated year).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico.

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2014-2015 was approximately 57,474 students. Commonwealth appropriations are the principal source of University revenues. The amount of the annual appropriation is based on a statutory formula, and equals 9.60% of the Commonwealth's average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year. Additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. The University's capital improvements have been financed mainly by revenue bonds.

In addition to the University of Puerto Rico, there are 54 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2014-2015 of approximately 183,404 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by United States Department of Education-recognized accrediting entities.

## Tax and Other Economic Development Initiatives

Since 2013, the Commonwealth's economic development team has embarked on a comprehensive outreach strategy in order to diversify Puerto Rico's economic base, pursue niche strategies such as Aerospace and Aeronautics, and leverage its human capital and fiscal autonomy to attract new investment opportunities. The Commonwealth's goal is to protect its manufacturing core while it transitions its economic ecosystem into a regional service and high tech industrial activities hub.

The Department of Economic Development and Commerce ("**DDEC**") seeks to build upon Puerto Rico's historic strengths to achieve a more diversified, knowledge-driven economy that addresses the challenges of globalization and seizes upon emerging opportunities. The DDEC's policy priorities are: 1) to defend anchor industries while diversifying job sources in Puerto Rico, 2) to stimulate local entrepreneurship to drive small and medium sized enterprises ("**SMEs**"), 3) to restore Puerto Rico's credibility as a stable, business-friendly jurisdiction, and 4) to take full advantage of opportunities tied to Puerto Rico's relative fiscal autonomy.

The economic development strategy is primarily focused on five priority sectors: life sciences, tourism, agriculture, knowledge services and small & medium sized businesses.

To promote the life sciences sector, the Commonwealth is working to preserve Puerto Rico's status as key BioPharma manufacturing location and increase the share of growing sub-segments (generics) & advanced technologies (biologics). In addition to this, the DDEC are working on consolidating Puerto Rico´s position as a global manufacturing hub for the medical technology sector. Finally, the agriculture biotechnology program involves bolstering Puerto Rico´s position as a center for scientific crop research and development in the Americas.

Tourism industry efforts are focused on capitalizing on Puerto Rico´s diverse tourism offerings to develop niche markets in order to become a premier US and global travel destination. In addition, Puerto Rico seeks to bolster medical tourism by establishing Puerto Rico as a provider of both value and specialized high quality medical services.

Within the agriculture sector, the Commonwealth aims to reduce reliance on food imports by building on Puerto Rico´s traditional strengths and increasing capacity for high productivity industrial agricultural production.

Puerto Rico's knowledge services sector includes 'outsourced knowledge' and involves developing Puerto Rico as a global center for the outsourced knowledge services, particularly focused on near shoring. Export services legislation, Act 20, plays a key part in developing this sector. In addition to Act 20, Act 273 (International Financial Entities) and Act 399 (International Insurance Center) aim to develop Puerto Rico as a global center for insurance and financial services for the Americas.

Finally, the Commonwealth's small and medium enterprise sector is fundamental to Puerto Rico's economy. The Commonwealth is providing significant integrated and multidisciplinary support for entrepreneurs, helping them mature into their next business level. The implementation of an SME Strategy and Action Plan through the one stop shop program has supported this sector significantly.

Summarized below are certain tax and other incentive programs designed to promote the development of the manufacturing, service and tourism sectors in Puerto Rico.

### *Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008 (the "**Economic Incentives Act**" or "**Act 73**").

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing on a commercial scale, recycling activities and laboratories for research and development. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "**1998 Tax Incentives Act**"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

### Individual Investors Act

In January of 2012, the Legislative Assembly of Puerto Rico approved Act No. 2012-22, also known as the Act to Promote the Relocation of Individual Investors to Puerto Rico (the "**Individual Investors Act**" or "**Act 22**"). The Individual Investors Act seeks to attract new residents to Puerto Rico by providing total exemption from Puerto Rico income taxes on passive income realized or accrued after such individuals become bona fide residents of Puerto Rico. The Individual Investors Act applies to any individual investor that becomes a Puerto Rico resident on or before the taxable year ending on December 31, 2035, provided that such individual was not a resident of Puerto Rico at any time during the 6-year period preceding the effective date of the Individual Investors Act. This relocation is resulting in new local investments in real estate, services, consumption products, capital injections to the Puerto Rico banking sector and the creation of new businesses, all of which is stimulating the economy of Puerto Rico.

The Individual Investors Act has had a strong economic impact in local real estate investments. At the time of the enactment of the law, Puerto Rico had an excess inventory of high-value properties which had a very limited market within Puerto Rico. Information from property values shows that close to $266 million have been invested in the local real estate market. The average property value purchased ranged between $1.1 and $1.8 million. In addition, in terms of one-year value of rent, Act 22 has had an impact of $7.1 million. In addition to the impact in real estate, the Act 22 program has indirect and direct impact of new businesses created to provide services to Act 22 beneficiaries, and other investments in the Island. The total potential spending for all decree holders amount to more than $73 million.

Business activities associated with Act 22 (and excludes any potential overlapping with Export Services Act jobs from individuals that hold decrees from both acts) are estimated to have generated close to 2,483 new jobs within the Island. These direct jobs in turn, helped generate 1,604 indirect jobs and 1,127 induced jobs. The direct, indirect and induced employment accounts for a total of 5,214 jobs.

269

Over 1,100 individual investors have applied for the benefits under the Individual Investors Act since 2012 and over 860 grants had been approved by August 2016. Many of these investors have also established service operations in Puerto Rico under the Export Services Act, discussed below.

### Export Services Act

In January of 2012 the Commonwealth enacted Act No. 2012-20, also known as the Act to Promote the Exportation of Services (the "**Export Services Act**" or "**Act 20**"), which supersedes the provisions of the Economic Incentives Act that provide benefits to designated services performed for markets outside of Puerto Rico. The Export Services Act seeks to establish and develop in Puerto Rico an international export services center. This Act seeks to encourage local service providers to expand their services to persons outside of Puerto Rico, promote the development of new businesses in Puerto Rico and stimulate the inbound transfer of foreign service providers to Puerto Rico. The Export Services Act also creates a special fund for the continuous development of new tax incentives that will promote export services and the establishment of new businesses in Puerto Rico.

Act 20 provides new dynamism to Puerto Rico's economy as the activities covered have large positive externalities in the local economy. The service industry shows a growing tendency vis-à-vis manufacturing activity, and other sectors in the local economy. In general, the service economy has a high degree of mobility –less machinery/facilities and more human resources- and thus, allows for faster tangible effects in the economy.

The Export Services Act applies with respect to any entity with a bona fide office or establishment located in Puerto Rico that is or may be engaged in an eligible service. Service providers operating under a tax exemption decree issued under the Export Services Act will enjoy various Puerto Rico tax incentives during the term of such decree, such as a 4% flat income tax rate on export services income and 100% tax-exempt dividend distributions.

Export service companies have directly created/retained over 3,000 jobs since their enactment. These jobs are predominantly high-skill and provide a direct link with foreign businesses and international markets. In terms of the effects in the Gross National Product (GNP), economic impact of this Act could represent close to 1% of Puerto Rico's GNP for 2014. Taking into account the limited time the incentive program has been in place, the total effect of the GNP is relatively high when compared to other incentive programs.

Over 750 Export Services Act applications have been received for the establishment of new export services operations in Puerto Rico within the following industries: centralized management services and shared services; information technology; financial services; advertising and public relations; and professional services. As of August 2016, more than 480 companies operating in Puerto Rico had received approved decrees under Act 20.

### International Finance Center

Act No. 273 of 2012 ("**Act 273-2012**"), also known as the "International Financial Center Regulatory Act", provides tax exemption to businesses engaged in eligible activities in Puerto

Rico. To qualify for such benefits, a business needs to become an International Financial Entity ("**IFE**") by applying for a permit and license and obtaining a tax exemption decree.

The International Financial Center has experienced strong growth since 2013 with six operating licenses approved in 2013, nine in 2014, eight in 2015, and six as of June 30, 2016. As of March 31, 2016, International Financial Entities had total assets exceeding $395 million with total capital of $158 million and net income of $2,266,000.

### International Insurance Center

Act No. 399 of 2004, as amended ("**Act 399-2004**"), provides Puerto Rico with a competitive environment, within which insurers and reinsurers can cover risks outside of Puerto Rico under a secure and flexible regulatory framework with attractive tax benefits. International insurance entities have various alternative ways to organize and operate within the Puerto Rico International Insurance Center. These options include operating as an international insurance holding company, an international insurer or a branch of an international insurer, as well as managing protected cell arrangements under a tax efficient framework. Most recently, Act 39-2014 was enacted to set the guidelines for the assumption of domestic risks, regulate third party risks assumptions by captives, and facilitates the organization of insurance linked securities programs (ILS/CAT Bonds).

Promotional efforts and direct approaches to insurance carriers and underwriters, captive managers and related advisors have resulted in: (i) 18 authorized insurance companies; (ii) over 400 approved protected cell arrangements and segregated asset plans; and (iii) total premium income of $322 million for 2015, representing a 51% increase in premium activity as compared to 2014.

### Tourism Incentives Program

For many years, Puerto Rico has enacted incentive laws designed to stimulate investment in hotel operations on the island. The Puerto Rico Tourism Development Act of 2010 (the "**Tourism Development Act**") provides partial exemptions from income, property, and municipal license taxes for a period of ten years. The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

As part of the incentives to promote the tourism industry, the Commonwealth established in 1993 the Puerto Rico Tourism Development Fund ("**TDF**"). As a subsidiary of GDB with the authority to make investments in or provide financing (guarantees or loans) to corporate entities that develop hotel and related hospitality projects. As of June 30, 2016, TDF has provided direct loans and guaranteed loans and bonds in the aggregate amount of approximately $1.6 billion for 30 tourism projects representing 5,616 new hotel rooms, with a total investment of approximately $2.6 billion.

More recently, the Commonwealth has focused its efforts on expanding Puerto Rico's air and maritime access given its importance for both tourism and trade growth and in the launching of its new destination advertising campaign. Recent developments include:

- Southwest Airlines entered the Puerto Rico market, substituting its subsidiary AirTran. The airline currently operates nonstop service to Baltimore, Fort Lauderdale, Houston, Tampa and Orlando. The entry of Southwest resulted in an upgrade of aircraft, generating 33% more passengers during 2013-2014.

- Avianca Airlines, a Colombian flag-carrier began flying from Bogotá to San Juan three times a week in July 2013. Based on the success of this route and the recent opening of the Commonwealth's Office in Colombia, 2more weekly flights have been added to this route since it was initially established. The airline also opened a VIP lounge in Concourse C at the San Juan International Airport.

- Air Europa, a Spanish carrier with presence in many important cities in Europe and the Middle East, began flying from Madrid to San Juan two times a week in May 2014. Air Europa also launched a codeshare with Seaborne Airlines to offer daily service from Madrid to San Juan via Punta Cana, Dominican Republic. Due to the success of the first two years, Air Europa added a third flight for the summer high season, starting in May 2016.

- Aruba-based Insel Air began nonstop Aruba-San Juan service in July 2015, with twice-weekly service.

- Norwegian Airlines began nonstop service to Puerto Rico from its gateways in Copenhagen, Denmark; London, United Kingdom; Oslo, Norway; and Stockholm, Sweden in November 2015, with five weekly flights (one each per Scandinavian gateway and two from London Gatwick). Due to its initial success, Norwegian Airlines has secured operations for a second year and increased capacity from London.

- JetBlue launched a direct nonstop service between Chicago O'Hare International Airport to San Juan's Luis Muñoz Marín International Airport, adding 150 seats daily.

- Seaborne Airlines moved its headquarters to Puerto Rico, creating 250 jobs by 2015, and estimated to add an additional 400 by the end of 2016. Seaborne currently serves 17 routes out of its San Juan hub.

- Sun Country Airlines began thrice-weekly nonstop service from San Juan to Fort Myers, Florida in May 2015.

- Volaris launched Mexico City-Cancun-San Juan service in July 2015, with twice-weekly service.

- Air Canada announced new nonstop service to Montreal and additional second flight from Toronto starting November 2016.

- Iberia reestablished a direct flight from San Juan, Puerto Rico to Madrid, Spain in May 2016, with three weekly flights (Monday, Wednesday and Sunday) for summer and fall season up until October.  This flight connects Puerto Rico with more than 90 cities in Europe greatly benefitting tourism and commerce.

- Cruise ship traffic increased 24.8% in fiscal year 2015 setting a new passenger record of 1,509,283. Transit passengers grew 31.7% and homeport passengers increased 12.1%. This increase is partly attributable to increased deployments from Royal Caribbean and Carnival Cruise Line. During Fiscal Year 2016, the Port of San Juan welcomed at least six ships visiting for the first time.  Furthermore, Disney Cruise Line will use San Juan as homeport for the second season and MSC Cruises increased its deployment in Puerto Rico with summer visits from the MSC Divina. Fiscal year 2015 saw record arrivals of cruise ship passengers with an impact on the local economy of approximately $1.6 million. Projections indicate that 2016 will be the busiest summer season in history for the Port of San Juan.

- In December 2014 an expanded Pier 3 was inaugurated to welcome Royal Caribbean's Quantum of the Seas to Puerto Rico. These improvements will also make it possible to accommodate the even larger Oasis-class vessels. The Oasis of the Seas made its first voyage in April 2016, the Allure of the Seas in June 2016 and the Harmony of the Seas is expected in November 2016.

- Over 3850 new rooms in financial, permits or construction phases. The construction of these new rooms is expected to create approximately 7837 jobs.

- Four new hotels opened during fiscal year 2014, increasing the amount of available rooms to 14,844. The new hotels include the return of Hyatt Hotels to Puerto Rico with two new "Hyatt Place" hotels that opened in December of 2013 and March of 2014, and a "Hyatt House" that opened in October of 2014 located within the Convention Center District. The inauguration of the Blok Hotel in Vieques, the Vanderbilt in Condado, and Hyatt House at the Convention Center, among others, added nearly 500 new rooms during fiscal year 2015. Occupancy during fiscal year 2015 was approximately 70.50%.

- Establishment of the Bed & Breakfast (B&B) Program in order to promote the creation of small businesses. The first official B&B, Casa Sol in Old San Juan, was inaugurated in 2014. It was joined by Casa Castellana, Villas Las Palmas, Casa Dos Angeles, Rainforest Inn, San Sebastian Bed & Breakfast and Casa Isabel in 2015 and 2016. Additional properties are being evaluated to be integrated in the program.

- Two existing hotels, Da'House in Old San Juan and Hotel Colonial in Mayaguez were included in the new promotional program known as Posada. Two other hotels located in Orocovis and Coamo are being evaluated to be part of this program.

- The newly created Medical Tourism Corporation recently began promotional and marketing efforts in certain target markets (the United States East Coast, Latin America and the Caribbean). Also, training courses and visits to providers have been conducted monthly since January 2015. The training courses are provided by the Medical Tourism Association in collaboration with the Medical Tourism Company.

*Manufacturing and Knowledge Services*

The Commonwealth's recent outreach initiatives have resulted in the following developments:

- Eli Lilly - The global company announced the expansion of its manufacturing footprint in Carolina, Puerto Rico with an investment of $240 million. The $85 million investment will deliver new production technologies.

- Abbvie – PRIDCO promoted an expansion of $30 million, expected to create 100 new jobs within the next three years in their manufacturing facilities in Barceloneta, Puerto Rico.

- Mentor Technical Group – PRIDCO is promoting the expansion and growth plans of the company. Mentor is a local company that has created over 110 new jobs in the life sciences sector during the last year (2015-2016). The company provides technical support and solutions to the regulated industries of biotechnology, pharmaceutical and medical devices. Mentor has been executing its growth plans to expand its services to other regions of the Caribbean and Latin America, with an investment of approximately $750,000. The company expects to create approximately 50 additional jobs, for a total of 160 new jobs committed with PRIDCO.

- Honeywell Aerospace – The new Research and Technology Center in Moca, Puerto Rico is now operational.  The world-class facility provides state-of-the-art testing capabilities to perform commercial, military & space testing of electromagnetic interference for aerospace products. The new facilities, developed by PRIDCO, cover 69,000 square feet of office and test capabilities, employing approximately 330 people.

- Bristol-Myers Squibb – The global biopharmaceutical company announced the expansion of its manufacturing footprint in Puerto Rico. The $85 million investment will deliver new production technologies and enable subsequent product transfers to the manufacturing site located in Manatí. The expansion, which is already undergoing construction, will create approximately 126 new jobs over a three-year period.

- Sartorius Stedim Biotech - The leading international supplier for the biopharma industry, announced the expansion of its production site in Yauco, Puerto Rico. From Yauco, the company provides the American market with its broad range of products covering nearly all steps of biopharmaceutical manufacture. Over the next five years, the company will invest around $50 million in this site and plans to create around 200 new jobs.

274

- Marine Environmental Remediation Group (MER) – The Company will establish a new ship recycling and facility in the marine port of the former US Naval Base of Roosevelt Roads located in Ceiba, Puerto Rico. The new facility will boost economic activity in the eastern region of Puerto Rico, initially employing approximately 500 people over the next two years. MER will focus on the reclamation of steel and other metals recovered using state-of-the-art "green" technology, and the re-selling of vessel machinery and equipment recycled from sea-going vessels and platforms, which have been retired from use.

- Roche - The global leader in research-focused healthcare announced a capital-intensive expansion of its manufacturing process in the manufacturing facility located in the municipality of Ponce, Puerto Rico. The project represents an estimated investment of over $60 M USD for the incorporation of new technologies and the renovation of its current manufacturing facility. The expansion will also add over 40 new positions at launch in 2018.

- Infotech Aerospace Services (IAS) – The Company announced an expansion of operations that will foster the growth of the aerospace industry in the Western region of Puerto Rico. With an estimated investment of $11M, IAS will relocate its operations to the municipality of Aguadilla, creating an additional 250 jobs to support its operations in Puerto Rico.

- SolarTech Universal - The solar energy company announced the development of a state-of-the-art automated manufacturing facility for solar panels in the municipality of San German, Puerto Rico. The project will generate approximately 180 new jobs. SolarTech Universal will invest approximately $11MM in machinery, equipment, working capital and leasehold improvements.

- Lufthansa Technik Puerto Rico - The company started operating its third bay at the beginning of July 2016.  The new bay is a heavy maintenance line performing C-Checks and cabin modifications similar to the existing two operating bays in the hangar. It will be the second line for Spirit Airlines.  Lufthansa Technik Puerto Rico started its operation in July 2015 and has currently a workforce of 270 employees. It is planned to grow up to a workforce of 400 by 2017. The facility in Aguadilla extends over a total area of 215,000 square feet. In its final configuration, Lufthansa Technik Puerto Rico will offer five lines for base and heavy maintenance checks (C-, IL- and D-checks), along with other maintenance work on narrow body aircraft.

- Beckton Dickinson – Expended both of their installations at Cayey and Humacao with a $30 million investment, expected to create 100 new jobs.

- UTC Aerospace Systems – The company announced with PRIDCO an expansion of 100 new jobs in their facilities at Santa Isabel.

- Infosys – Established a new operation for outsourcing services in the aerospace and defense cluster, expected to create 300 new jobs.

275

- In the knowledge services and software development segment the following companies established or expended operations in Puerto Rico: Truenorth Technologies (400 new jobs), Rock Solid (100 new jobs) and Wovenware (40 new jobs).

- In addition, the following companies announced their intention of closing facilities to which PRIDCO mediated and promoted other companies to acquire the following facilities: Merck in Barceloneta to Merial/Sanofi (France), Warner Chillcott in Fajardo and Manati to Actavis (Ireland), Merck in Arecibo to Avara (USA), Eli Lilly in Guayama to Biogen (Colombia) and Blu Caribe in Dorado to PuraCap (China).

- Over 24,300 jobs committed since January 2013 in the aggregate, related to different manufacturing sectors, including biopharma, medical devices, knowledge services, aerospace electronics and information technology. Out of those jobs committed, more than 12,400 have been created already.

### *Commerce and Trade*

SMEs were one of the sectors that outperformed in the economy during fiscal years 2013-14, 2014-15, 2015-16. During the last three fiscal years, the Puerto Rico Trade and Export Company ("**PR Trade**") through all its initiatives and programs have created a total of 13,041 jobs. The SME ecosystem has been strengthened by several incentives programs which target job creation.

PR Trade has implemented several initiatives to foster the growth of the SME sector such as:

- Incentives Act for the Generation and Retention of Jobs in the SME sector
- Incentives and Financing Act for Young Entrepreneurs
- Business Incubators Act
- Export Accelerators Act
- Community Economic Development Act
- EDCU – Salary Incentives for SMEs in Urban Centers Act
- Creative Industries Act
- Export Franchises Program

PR Trade has been awarded four important federal grants as of September 2015: 1) U.S. Small Business Administration ("**SBA**"), Federal and State Technology Partnership (FAST) 2014-2015 grant for $90,909 to help fund, in part, its new PRO-TECH program which is intended to promote the creation and commercialization of technology based start-ups and provide technical capacity to assist small businesses to apply to the Small Business Innovation Research ("**SBIR**") program, a highly competitive program that encourages domestic small businesses to engage in Federal Research/Research and Development (R/R&D) that has the potential for commercialization, 2) U.S. Small Business Administration (SBA) FAST 2015-2016 grant for $100,000.00 to help fund, in part, the PRO-TECH program that PR Trade started in 2014 for the promotion, creation and commercialization of technology based start-ups and

276

provide technical capacity to small businesses to apply to the SBIR program, 3) The Economic Development Administration ("**EDA**") grant of $800,000 to help fund, in part, four main initiatives of the PR Trade Company: (i) a federal and state procurement B2B event bringing buyers from the U.S. federal and state governments to meet with local suppliers of goods and services, in coordination with SBA's American Supplier Initiative; (ii) the Lufthansa MRO supplier project, which will help identify potential suppliers for goods and services to build the business ecosystem to fulfill the expected needs of the Lufthansa Technik's MRO project in Aguadilla, Puerto Rico, as well as additional events to bring together local suppliers and buyers for the benefit of the entire Aerospace industry in Puerto Rico; (iii) the Expo Partner project, a six month program to create an individual Export Plan for the participants in order to  increase the number of SMEs that export their services and products; and (iv) the Expo PR 2015, a multi-sector trade show where international buyers were brought to Puerto Rico to engage in a match-making event to meet local suppliers and their goods and services, 4) The State Trade and Export Promotion ("**STEP**") program, which awarded PR Trade with $288,650.00 to partially fund international trade missions and shows organized by PR Trade's export division, Promoexport, to benefit exporters from the island and promote their goods and services abroad.

### *Energy Policy*

The current administration is committed to providing reliable electric service and to diversify Puerto Rico's energy sources with the aim of lowering energy costs.

On May 27, 2014, the Governor signed into law Act No. 57-2014, known as "The Energy Transformation and Relief of Puerto Rico Act". Act 57-2014 provides that two entities will oversee the new law's implementation. The Puerto Rico State Office of Energy Policy ("**SOEP**") (formerly the Energy Affairs Administration), will be responsible for developing and promoting the Commonwealth's energy policy, and the Puerto Rico Energy Commission, will be responsible for overseeing and regulating the implementation of the Commonwealth's energy policy. Among its duties, the Energy Commission will be responsible for approving the electricity rates and the IRP to upgrade PREPA's infrastructure  proposed by PREPA.

Act 57-2014 also amended PREPA's organic law in order to impose on PREPA a duty to provide reliable electric service, contributing to the general welfare and sustainable future of the Commonwealth, while reducing the social, environmental and economic impacts of such efforts. Act 57-2014 establishes thresholds for energy consumption in the Commonwealth's public agencies and corporations and the legislative and judicial branches of the Government, as well as penalties for non-compliance with such requirements. The municipalities of the Commonwealth are now also subject to energy consumption limitations, as well as to a reduction in the Contribution in Lieu of Taxes ("**CILT**") that they receive from PREPA.

The other principal component of the Commonwealth's fuel diversification strategy is the development of renewable energy generation. Act No. 82 of June 19, 2010 creates a Renewable Portfolio Standard, recognizing many sources of renewable energy that utilize various technologies, and setting a target of 12% renewable energy production by 2015 and 15% by 2020, and a requirement for retail energy providers to establish a plan to reach 20% renewable energy production by 2035. Act No. 83 of June 19, 2010 (Act 83-2010) provides incentives for energy diversification through the Green Energy Fund ("**GEF**") Program and provides different types of tax credits and subsidies for certain renewable energy technologies. Through the GEF,

the Commonwealth will invest $185 million in renewable energy projects during the period between fiscal year 2012 and fiscal year 2020. The GEF provides reimbursements for the installation of renewable energy systems of 40% with a maximum capacity of 100 kilowatts (kW) (applies for residential and small business) and up to 50% for systems larger than 100 kW and up to 1 megawatt (MW) (applies for medium business and industries). Current GEF regulations allow for solar and wind renewable energy technology to be incentivized.

As of June 2014, 42.9 MW (from 890 GEF incentives applications) have been incentivized by the GEF, 10 MW of which are currently interconnected to the Puerto Rico electrical grid. From the beginning of the GEF in 2011 through June 2014, of a total of $61.5 million dollars assigned to the Program, SOEP has reserved a total of $59.4 million for renewable energy projects. Of those incentives that have been reserved, SOEP has disbursed $23.4 million (corresponding to almost 40% of the projects constructed). Currently, there are over 100 MW of large scale projects (over 1 MW) installed (almost all of which are wind technology systems) and approximately 50 MW of distributed generation installed in the Commonwealth (almost all of which is solar technology).

*Public-Private Partnerships*

The Puerto Rico Public Private Partnerships Authority (the "**P3 Authority**") has been at the forefront of the U.S. public private partnerships ("**P3s**") market since its establishment on June 8, 2009, through Act No. 29 (the "**P3 Act**"). The P3 Authority is the entity responsible for implementing the public policy in the Commonwealth of Puerto Rico regarding P3s in order to promote the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs.

Since the enactment of the P3 Act, the P3 Authority has completed three important transactions, namely: the concession of the operations and maintenance of toll roads PR-22 and PR-5, the School Modernization Program and the concession of the operations and maintenance of the Luis Muñoz Marín International Airport.

The P3 Authority continues with its responsibility of promoting the use of P3s as a viable and effective mechanism of economic development. The P3 Authority is working on various projects, among which there are greenfields and brownfields. With respect to brownfield projects, the P3 Authority is evaluating projects related to the concession of existing public services in order to reduce government operating costs and expenses and to improve the provision of said services to the citizens. Regarding greenfield projects, the P3 Authority has been working on two new infrastructure projects: the Caguas-San Juan Commuter System, and the Conversion to Natural Gas of PREPA's Northern Power Plants.

The Caguas-San Juan Commuter System involves the development of a mass transit system to connect the Central Eastern Region to the Metropolitan Area. The estimated total investment of the project is $600 million and it is expected to generate more than 12,000 jobs during the construction phase. This project in its planning phase. However, due to fiscal constraints and the inability of the project stakeholders to identify a source of re-payment, the project was put on hold.

The Conversion to Natural Gas of PREPA's Northern Power Plants entails the development of the necessary infrastructure for the receiving, storing and regasification of liquid natural gas for the power plants of San Juan and Palo Seco. PREPA estimates the development costs to be approximately $180 million to $300 million. This project is expected to create between 3,600 to 6,000 jobs. The P3 Authority completed a technical evaluation for the project in which it identifies a technically suitable location for its development. The location identified is owned by the Ports Authority, and they have claimed that the Project may affect their operations.

The P3 Authority is also involved with the Northwest Corridor Project ("**NW Corridor**"). This project consists of transportation system road improvements on state roads PR-22 and PR-2 within and through the boundaries of the municipalities of Hatillo, Camuy, Quebradillas, Isabela, Moca, and Aguadilla. These improvements will substantially enhance surface transportation connectivity between the San Juan Metropolitan Area and the Aguadilla Urban Area. The estimated total investment for the project is projected to be from $934 million to $1.2 billion and it is expected to create between 14,334 to 17,825 direct/indirect/induced new jobs during the construction phase. Further, the NW Corridor is expected to have long term benefits such as the creation of well-paid jobs. The P3 Authority engaged PRIFA, under an interagency collaborative agreement, for them to provide technical assistance in the development of the Project. PRIFA is currently working to complete the environmental compliance process. After completion of the environmental compliance process, the P3 Authority will initiate the procurement phase.

The P3 Authority amended its enabling act last December 2014, through which it incorporated a new and expedited mechanism to procure small scale P3 projects. Under this new expedited process, the P3 Authority initiated the analysis and is undergoing the procurement process for the concession of the operation and maintenance of the passenger and cargo maritime transportation service in Puerto Rico. This project entails the establishment of a P3 for the concession of the operation and maintenance of the public maritime transportation services provided within the San Juan Bay (Metro Service), the Municipal Islands of Puerto Rico, to wit, Vieques and Culebra (Island Service), and the operation of the Maintenance Base located in Isla Grande, San Juan. The Project would entail a no less than five year concession agreement with the selected private entity.  The objective of the project is to improve the services, identify and introduce efficiencies in the operation of the service by leveraging from the private sector's expertise, and to initially cap and subsequently reduce the government's subsidy for the service.

Under this expedited process the P3 Authority has received and analyzed various unsolicited proposals. For instance, the P3 Authority initiated the analysis of an unsolicited proposal presented for the establishment of a system to improve the registration, processing and issuance of identification cards and driver's licenses that are issued by the Department of Transportation and Public Works. The objective is to improve the quality of the service, reduce costs and to ensure Puerto Rico's compliance with the Real ID Act.

### Strategic Projects

The Commonwealth is also targeting strategic/regional projects that are expected to generate investments in various regions of Puerto Rico in order to foster a balanced economic development.

The Puerto Rico Science Research and Technology Trust (the "**Trust**") is one of the strategic projects within the DDEC's economic development plan. The Trust's main infrastructure-related initiative is the Science District. It is located in Puerto Rico's capital city of San Juan, hosting state-of-the-art facilities for research, academic, and business initiatives, as well as other lifestyle amenities. The 70-acre site will contain a vibrant, culturally rich, planned science campus in an urban setting with many important science, technology, research, health, and academic resources nearby.

The Trust aims to fortify Puerto Rico's research infrastructure and enable its use as a tool to develop, attract, and retain a vibrant research ecosystem. To do so, it is identifying and incorporating additional resources that contribute to the Trust's overarching mission of facilitating economic development and citizens' well-being through science, technology, research, and Puerto Rico's industrial base.

The Trust is executing a plan of action with the ultimate goal of facilitating such an innovation ecosystem. To do so, the Trust is pursuing two action steps: First, it is seeking a development partner to lease, finance, develop, and manage the mixed-use 70-acre Science City project (Master Development - RFQ). Secondly, it is identifying and approaching potential anchor tenants to be a part of Science City.

The Trust has already invested more than $50 million in Puerto Rico's research infrastructure, including Science City. Other research infrastructure in Puerto Rico includes the Molecular Science Research Complex, the Bioprocess Development and Training Complex (BDTC), the Botanical Garden, and others.

In the eastern region of Puerto Rico, the Roosevelt Roads project (the "**RR Project**") entails the redevelopment of the old Roosevelt Roads navy base facilities in Ceiba and Naguabo and is a key element in the administration's strategy to create jobs and reignite the economy of Puerto Rico's eastern region, including Ceiba, Naguabo, Vieques, and Culebra. The site of the former Roosevelt Roads Naval Station represents an unparalleled opportunity for the development of a mixed-use development that incorporates tourist, residential, recreational, institutional, light industrial and commercial uses. With 3,400 acres of prime waterfront property available for redevelopment, close proximity to attractions such as Vieques, Culebra, El Yunque, and San Juan, and improvements including a major airfield and deep-water ports, the RR Project represents a unique large-scale development opportunity. Development on the site will also contribute greatly to the economic growth of eastern Puerto Rico by providing construction jobs and attracting more tourists to the wider area.

While continuing the search for a Master Developer, which will be responsible for coordinating and implementing redevelopment efforts with other developers/investors in accordance with the approved Master Plan and Land Use Plan, the Local Redevelopment Authority for Naval Station Roosevelt Roads ("**LRA**") will promote and develop specific projects to advance the business objectives of the redevelopment of Roosevelt Roads. The RR Project began in 2015 with the opening of eight small businesses providing eco-tourism, nature tourism and other related services, as well as the commencement of other government related operations in the site, and the inauguration in August 2015 of the new STEM high school called Center for Residential Educational Opportunities in Ceiba (CROEC) with the capacity to house 250 students ($6.4 million investment). In 2016, other important projects initiated operations in

Roosevelt Roads or are in the planning, design and permitting stage scheduled for start-up during the latter part of 2016, and overlapping well into 2017 and beyond. MER Group inaugurated a ship dismantling and materials recovery operation in May 2015 (investment of $4 million in facilities), which will create 500 jobs by the end of 2017. Also, Mid-Atlantic Shipyards (MAS) is in the process of developing a multi-tenant shipyard in the dry-dock area of Roosevelt Roads ($25million investment and 250+ jobs) to become fully operational by 2018, and completion of the new Visitor Center by the PR Conservation Trust is expected by end of 2016.

As of July 2016, the LRA has signed short-term and long-term lease contracts that will generate total net income of approximately $19.5 million over the life of the contracts. These contracts represent approximately 400,000 square feet of leased facilities, 12 businesses established in RR, and the creation of 350 jobs. The LRA is looking to concentrate on development efforts in Phase 1 of the redevelopment by attracting commercial, touristic and related uses for the Waterfront District.

Additionally, the LRA also expects to attract new businesses to Roosevelt Roads through its designation as a Promise Zone in June 2016 and a Historically Underutilized Business Zone (HUBZone) area. Through the Promise Zone Initiative, the federal government, through the USDA, will work strategically with the LRA and local leaders to boost economic activity and job growth, improve educational opportunities, and leverage private investment to improve the quality of life in Ceiba, Naguabo, Fajardo and the Roosevelt Roads area. The LRA is the lead entity in charge of promoting private and public sector projects under this program in conjunction with the municipal governments of Ceiba, Naguabo and Fajardo for a ten year period. The LRA achieved the designation of RR as a HUBZone under the Small Business Administration (SBA) on May 7, 2015 and it is currently valid through May 17, 2020. This designation will assist the LRA in making RR more attractive to qualified companies wanting to establish operations at RR and create jobs. The HUBZone Program is designed to assist communities in alleviating poverty and unemployment and has been a critical resource in creating jobs, reducing poverty, reducing unemployment and promoting economic prosperity. The program helps small businesses in urban and rural communities to gain access to federal procurement opportunities and receive competitive advantages in winning federal contracts.

Also, the LRA wants to obtain approval from the USDA for the LRA's application presented for the Water and Wastewater Loan and Grant Program. The LRA will endeavor to create additional jobs and build an infrastructure platform to attract new businesses if awarded the USDA Loan and Grant during 2016.

The Port of Ponce Authority has focused all efforts on commercializing the infrastructure that has been developed up to now for the Port of The Americas. With that objective the Authority has engaged Portek *International Pte Ltd*, to handle the operations of the Port in order to promote business development and cargo growth during an initial period of three years to establish and stabilize the entire operation of the Port. Portek is a world-class operator based in Singapore that has more than 26 years of experience in engineering projects related to port services and 16 years of experience in port operations and manage 9 other ports around the world with their parent company Mitsui & Co., LTD, which is one of the most important Japanese trading houses. After a period of mobilization and due diligence process, since January 2016, Portek has established a development strategy for the Port and has started implementing initiatives as part of the first phase of business development.  Through the current first phase,

efforts are concentrated on attracting new local customers and to strengthen the services provided to existing costumers of the Port in order to build a potential cargo volume to enable calls form shipping lines at Ponce. The cargo volume generated during this initial period will enable the Port to establish its operational capacity to handle greater volumes at subsequent phases, as well as to mitigate cargo handling costs in order to make us more competitive for international and transshipment cargo. Through this strategy, the Port will commercially grow during the next few years to become a hub for international cargo to the US and the Caribbean. During the first phase being implemented at this moment, the Port will improve Puerto Rico's distribution and logistics chain, and enable growth of domestic companies whose operations were limited due to imports and exports capacity constraints. After stabilization of operations, Portek will enter into a longer term concession agreement to continue operating the port. At the same time, by having a strong operational port offer, the Authority expects to be more successful now in promoting development of the value added zone adjacent to the Port. The Authority has recently completed construction Phase III A.2 of the Port of The Americas, which included infrastructure and environmental mitigation improvements that enables the development of land reserved for value added and logistics projects. With the land ready for development and an operational Port, the Authority can promote establishment of new businesses that will support port growth and economic development for the region of Ponce and Puerto Rico.

In the western region of Puerto Rico, the Commonwealth is focused on the redevelopment of the Aguadilla airport to serve as the second international airport of Puerto Rico and as a regional logistics hub. The PRPA is well on their way to finalize a redevelopment master plan in order to convert the international airport facilities into a regional maintenance, repair and overhaul ("**MRO**") and cargo hub. To this end, the PRPA completed the process and the Aguadilla airport has been designated as a Free Trade Zone providing huge competitive advantages for companies operating under this structure. The plan will include the creation of a comprehensive aeronautics/aerospace cluster leveraging the University of Puerto Rico's Mayagüez Campus and major aeronautics firms operating in the west/northwest corridor. This initiative is spearheaded by the agreement reached with Lufthansa Technik with the first phase of construction nearing completion.

### Infrastructure investments

On February 5, 2014, the Governor announced that his administration would accelerate the infrastructure investment plan by pursuing $800 million in infrastructure investments, including public-private partnerships, that have been identified and by accelerating agency reviews of infrastructure investment plans.

### Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("**CFCs**"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties.

Most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico have converted part or all of their operations to CFCs.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("**Section 936 Corporations**"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their United States affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Incentives Act (Act 73), in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the United States Treasury Department announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas.  The Ways and Means Committee of the House of Representatives has also held recent hearings and released a tax policy white paper that puts forth certain proposed changes to the U.S. Code to combat base erosion and profit shifting by U.S. and foreign multinational corporations. While these initiatives are not directed at Puerto Rico, several of them could affect CFCs operating in Puerto Rico. As of this date, no legislation has been approved by either House of Congress of the United States. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The Commonwealth is developing policy responses to the United States government to seek to safeguard Puerto Rico's economic growth and development plans.

## LITIGATION AND RELATED MATTERS

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of its governmental operations. Under Act 104 of June 25, 1955, as amended, persons are authorized to sue the Commonwealth only for causes of actions specified in said Act. The Commonwealth may be liable under Act 104 for damages up to a maximum amount of $75,000, or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action.

Under certain circumstances, as provided in Act 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under Act 9 in cases before federal court, but in all other cases the Puerto Rico Secretary of Justice may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.

With respect to pending and threatened litigation (5,192 cases), excluding the cases mentioned in this section, as of June 30, 2016 the Commonwealth has included in its financial statements reported liabilities of approximately $2.2 billion for awarded and anticipated unfavorable judgments. Such amount represents the amount estimated at the time as a probable

liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts claimed as of June 30, 2016 exceed $10.9 billion; however, the ultimate specific liability cannot be presently determined, especially because of the nature of labor claims, where the awards for unpaid salaries are calculated by the agencies. The Commonwealth believes that most of the claims are excessive, frivolous, or both, and that its ultimate liability should not significantly exceed the amounts set forth in the Commonwealth's financial statements.

The United States Securities and Exchange Commission ("**SEC**") requested information about certain bond issuances of the Commonwealth and its component units. The Commonwealth is cooperating with the inquiry, including by providing the SEC with documents and information. The SEC has advised that the information requests should not be construed as an indication that any violation of the federal securities laws has occurred. This matter is ongoing and the Commonwealth cannot predict when it will be concluded or its outcome

**Substantial pending or threatened litigation (Claims of over $50 million):**

**Debt Litigation**

The following is a list of pending cases concerning Puerto Rico's debt. Joint attorneys for defendants in all of these cases are AMRC, LLC d/b/a Antonetti Montalvo & Ramírez-Coll and Kirkland and Ellis, LLP. Most of the cases, except where noted, do not include claims for monetary relief. Instead, the majority seek a declaration that the Moratorium Act and various Executive Orders issued under its authority are unconstitutional An adverse result, however, could have an economic effect because the plaintiffs could then accelerate maturities and file actions for collection of principal and interest, as well as attorney's fees.

**Assured Guaranty Corp., et al. v. Alejandro García Padilla, et al.**, USDC-PR Civil No. 16-1037; and
**Financial Guaranty Insurance Company v. Alejandro García Padilla, et al.**, USDC-PR Civil No. 16-1095.

Plaintiffs in these cases are monoline insurers of bonds issued by several Puerto Rico public corporations including HTA, PRCCDA and PRIFA. Both cases seek declaratory and injunctive relief arguing that two Executive Orders issued on November 30 (EO2015-46) and December 8, 2015 (EO2015-49) ("the clawback orders") by the Governor of Puerto Rico – concerning the use of certain funds pledged as collateral to bondholders of certain public corporations – are unconstitutional because they violate several clauses of the Constitution of the United States and the Constitution of the Commonwealth of Puerto Rico. The defendants filed motions to dismiss arguing that the federal court lacks jurisdiction because the actions are barred by the doctrine of sovereign immunity and the 11th Amendment of the federal constitution and because the Executive Orders are not preempted methods of composition. After full briefing by both parties, the motions were deemed submitted.  On October 4, 2016, the district court determined that plaintiffs' claims are not barred by the doctrine of sovereign immunity and that the claims were not preempted but granted defendants' motion to dismiss regarding plaintiff's preemption-based claims because no composition of debt has occurred, only the postponement of payment. Subsequently, the Commonwealth defendants argued that the cases, as pled, were

currently stayed by PROMESA. Plaintiffs did not deny the applicability of PROMESA and have not requested lifting of the stay. These cases are not consolidated.

Plaintiffs in the Assured Guaranty case claim to have paid $10.5 million on their PRIFA policies and plaintiff on the Financial Guaranty case claims to have paid $6.39 million, but none have asserted claims for these amounts.

On September 26, Angel Ruiz Rivera filed a notice of interlocutory appeal to contest the denial of his request to intervene. The First Circuit instructed the District Court to decide on a request to allow appellant to proceed in forma pauperis.  On December 2, 2016, the District Court denied said request. On December 6, 2016, the First Circuit instructed appellant to pay the filing fee.  Thus, the First Circuit has not yet acquired jurisdiction over the merits of the appeal.

## Brigade Leveraged Capital Structures Fund, LTD, et al., v. Alejandro García Padilla, et al., USDC-PR Civil No. 16-1610.

This is an action for injunctive and declaratory relief by holders of debt issued by the Government Development Bank arguing that sections of Act 21 of 2016, (the Moratorium Act) are unconstitutional. Defendants filed a motion to dismiss and a notice of stay due to the enactment of PROMESA. After an opposition filed by Plaintiffs, the Court stayed the action pursuant to PROMESA and scheduled a hearing for September 22, 2016 to determine whether the PROMESA stay should be lifted.  For the purpose of the stay hearing, which concluded on September 23, 2016, this case was consolidated with three others, Civil Nos. 16-2101, 16-2257 and 16-2510. In addition, the Oversight Board filed a motion requesting an extension of time to file a response to Plaintiff's motions for relief from the automatic stay and for leave to intervene in this action. The Court granted the Oversight Board's request and determined their motion should be filed no later than October 21, 2016 and any response would have to be filed no later than October 28, 2016. On November 15, 2016, the Court denied without prejudice the Oversight Board's motion to intervene in these consolidated cases and denied "[p]laintiffs' respective requests to vacate the PROMESA automatic stay pursuant to section 405(e)."

Plaintiffs allege that they hold $750 million of GDB bonds, but have not made a claim for any amount.

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on December 1, 2016.  The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay.  Appellant is set to file an opening brief on December 19, 2016. Appellees will do the same on December 27, 2016.  Replies are due on December 30, 2016 and oral argument is set for January 4, 2017.

## National Public Finance Guarantee Corporation v. Alejandro Garcia Padilla et al., USDC-PR Civil No. 16-2101.

Plaintiff, an insurer of debt issued by the Commonwealth of Puerto Rico and some of its public corporations, seeks declaratory and injunctive relief arguing that sections of the Moratorium Act are preempted by Section 903(1) of the Bankruptcy Code and are otherwise unconstitutional. After various motions filed by the parties, the Court stayed the case pursuant to

PROMESA and scheduled a consolidated hearing for Civil Nos. 16-1610, 16-2101, 16-2257 and 16-2510 held on September 22 and 23, 2016 to determine whether the PROMESA stay should be lifted. In addition, the Oversight Board filed a motion requesting an extension of time to file a response to Plaintiff's motions for relief from the automatic stay and for leave to intervene in this action. The Court granted the Oversight Board's request and determined their motion shall be filed no later than October 21, 2016 and any response shall be filed no later than October 28, 2016. On November 15, 2016, the Court denied without prejudice the Oversight Board's motion to intervene in these consolidated cases and denied "[p]laintiffs' respective requests to vacate the PROMESA automatic stay pursuant to section 405(e)."

Plaintiff alleges that it insures $2.4 billion of Puerto Rico debt, but does not claim to have paid any amount and does not include any monetary claim in its complaint.

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on December 1, 2016, The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay.  Appellant is set to file an opening brief on December 19, 2016. Appellees will do the same on December 27, 2016.  Replies are due on December 30, 2016 and oral argument is set for January 4, 2017.

**Municipalities of San Juan and Carolina v Government Development Bank and the Commonwealth of Puerto Rico. Superior Court of San Juan**, Consolidated cases Nos. SJ2016CV00091 and SJ2016CV00102.

The Municipalities of San Juan and Carolina seek withdrawal of funds deposited with the Government Development Bank as well as declaratory and injunctive relief against the application and enforcement of sections of the Moratorium Act that regulate the disbursement of funds deposited with the bank. Both GDB and the Commonwealth moved to dismiss and, after the enactment of PROMESA, for a stay.  On July 13, 2016, the Court of First Instance issued Judgment and stayed proceedings due to the enactment of PROMESA. Plaintiffs have sought review of this Judgment before the Court of Appeals and have requested certification to the Supreme Court.

On November 15, 2016, the Supreme Court denied the motion for reconsideration of the Municipalities of Carolina and San Juan regarding the petition for certification that seeks the Supreme Court to review the determination of the First Instance Court. On December 5, 2016, the Commonwealth and the GDB filed a motion to dismiss the appeal as well as their opening brief before the Commonwealth Court of Appeals.  The Court of Appeals directed the Municipalities to show cause as to why the appeal should not be dismissed as untimely filed. The Municipalities complied on December 12, 2016.  Hence, the motion to dismiss and the appeal on the merits are pending adjudication.

The Municipality of Carolina is seeking to withdraw a deposit $7,676,000 and the municipality of San Juan is demanding $24, 811,000 of property tax funds held by GDB.

**Angel L Acevedo Llamas v Commonwealth of  Puerto Rico et al. Court of First Instance**, San Juan Part, Civil No. K CD2016-0559.

Plaintiff, a holder of bonds issued by the Public Finance Corporation ("PFC"), sued PFC and several government officials, including the Governor, seeking payment of interest due on the bonds and damages equal to the loss of market value of the bonds. The defendants moved for summary judgment due to plaintiff's lack of standing to sue. Plaintiff opposed motion for summary judgment and filed a cross motion for summary judgment. On July 8, 2016, defendants filed a notice of stay pursuant to PROMESA. The court stayed some, but not all of the claims. A motion for reconsideration in this regard is pending resolution.

Plaintiff claims $54,000 for interest due on March 1, 2016, plus daily interest thereafter at the rate of $222. He also seeks $1,761,750 for loss of capital.

On December 5, 2016 the Court entered Judgment staying proceedings pursuant to section 405(b)(1) of PROMESA.

**Dionisio Trigo González et al v Alejandro García Padilla et al**., USDC-PR Civil No. 16-2257.

Plaintiffs, holders of debt issued by GDB and PFC, seek declaratory and injunctive relief arguing that sections of the Moratorium Act violate the US and Puerto Rico Constitutions. Defendants filed a motion to dismiss and a notice of stay pursuant to PROMESA. Plaintiffs opposed said notice and requested relief from the PROMESA stay. The Court stayed the case pursuant to PROMESA and a consolidated hearing for Civil Nos. 16-1610, 16-2101, 16-2257 and 16-2510 was held on September 22 and 23, 2016 to determine whether the PROMESA stay should be lifted. In addition, the Oversight Board filed a motion requesting an extension of time to file a response to Plaintiff's motions for relief from the automatic stay and for leave to intervene in this action. The Court granted the Oversight Board's request and determined their motion shall be filed no later than October 21, 2016 and any response shall be filed no later than October 28, 2016.

On November 15, 2016, the Court denied without prejudice the Oversight Board's motion to intervene in these consolidated cases and denied "[p]laintiffs' respective requests to vacate the PROMESA automatic stay pursuant to section 405(e)."

Plaintiffs allege that they hold $100 million in GDB and PFC bonds, but include no monetary claim in their complaints.

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on December 1, 2016, The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay.  Appellant is set to file an opening brief on December 19, 2016. Appellees will do the same on December 27, 2016.  Replies are due on December 30, 2016 and oral argument is set for January 4, 2017.

**Jacana Holdings I, LLC et al v Commonwealth of Puerto Rico et al**., USDC-SDNY Civil No. 164702.

Plaintiffs, holders of debt issued by the Commonwealth of Puerto Rico, seek declaratory and injunctive relief arguing that the Moratorium Act and executive orders implementing the Moratorium Act violate the United States Constitution, the Puerto Rico Constitution, and New

York state law.  Defendants filed a notice of stay pursuant to PROMESA and plaintiffs filed a brief motion agreeing to the applicability of PROMESA to their claims as pled.

**Lex Claims, LLC et al v Alejandro García Padilla et al**., USDC-PR Civil No. 16-2374.

Plaintiffs are owners of General Obligation bonds. They seek declaratory and injunctive relief arguing that certain laws and actions of the Commonwealth of Puerto Rico with regard to the GOs violate PROMESA and that their lawsuit is not stayed by section 405 of that statute. In the alternative, they seek relief from the stay, should it apply. On September 7, 2016, the Commonwealth filed a notice of stay which was denied. A motion for reconsideration was filed. On October 7, 2016, Plaintiffs filed a motion for leave to amend their complaint to add claims against COFINA alleging that funds from the Sales and Use Tax should not go to COFINA, but rather to the Puerto Rico Treasury for payment of principal and interest on the Commonwealth's general obligation bonds, arguing that such bonds  have a constitutional priority over COFINA bonds.

On November 4, 2016, the Court entered an Order granting plaintiffs' request for leave to file a second amended complaint. However, this Order was granted "to the extent of allowing the second amended complaint to be filed." The Court specifically held that "whether the First, Second, Third and Twelfth causes of action may be prosecuted will be decided in due course." On November 4, 2016, plaintiffs filed their second amended complaint. On November 7, 2016, the defendants filed a Notice of Automatic Stay pursuant to PROMESA, arguing that this case is stayed in its entirety pursuant to sections 405(b)(1) and 405(b)(3-6) of PROMESA. In the alternative, defendants requested that the Court stay the piecemeal litigation and disposition of Counts 1-3 and 12 of the second amended complaint in the exercise of its discretion and its inherent power to manage its docket.

The Commonwealth defendants answered the amended complaint on December 5, 2016. Co-defendants COFINA, Vaquer and BoNY, who have never appeared in this action, have until December 16, 2016 to answer the amended complaint. A number of COFINA bondholders and other interested parties have filed motions requesting intervention, which are pending resolution.

**US Bank Trust, NA v Alejandro García Padilla et al**., USDC-PR Civil No. 16-2510.

Plaintiff alleges to be the successor trustee under a trust agreement entered into by the University of Puerto Rico, pursuant to which plaintiff is to receive and eventually distribute to bondholders revenues from tuition and other sources. Plaintiff seeks declaratory judgment and injunctive relief against certain actions of the Commonwealth that affect those revenues, including a declaration that section 201 of the Moratorium Act and Executive Order 31-2016 are unconstitutional. Plaintiff also seeks relief from the automatic stay imposed by PROMESA. Defendants opposed plaintiff's motion for relief from stay. The case is currently stayed and a consolidated hearing for Civil Nos. 16-1610, 16-2101, 16-2257 and 16-2510 was held on September 22 and 23, 2016. In addition, the Oversight Board filed a motion requesting an extension of time to file a response to Plaintiff's motions for relief from the automatic stay and for leave to intervene in this action. The Court granted the Oversight Board's request and determined their motion shall be filed no later than October 21, 2016 and any response shall be filed no later than October 28, 2016.

On November 15, 2016, the Court denied without prejudice the Oversight Board's motion to intervene in these consolidated cases and denied "[p]laintiffs' respective requests to vacate the PROMESA automatic stay pursuant to section 405(e).  U.S. Bank may, however, proceed to disburse funds held in its reserve account to UPR bondholders pursuant to the terms of its trust agreement."

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on November 28, 2016. The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay.  Appellant is set to file an opening brief on December 19, 2016. Appellees will do the same on December 27, 2016.  Replies are due on December 30, 2016 and oral argument is set for January 4, 2017

**VOYA International Trust Company v. UPR et al.**, USDC-PR Civil No. 16-2519.

Plaintiff is the trustee of a deferred compensation plan established for the benefit of certain employees of the Medical Sciences Campus of the University of Puerto Rico. Plaintiff filed an action against UPR, its President and the Governor seeking a declaration that its actions to date, and its failure to comply with certain instructions from UPR and/or its plan beneficiaries, are in compliance with PROMESA. UPR and the Governor have moved to dismiss the complaint and argue that it is not stayed by PROMESA. No monetary claim against UPR or the Commonwealth has been stated. Resolution of the dispositive motions filed is pending.

**Peaje Investments LLC v. Alejandro García Padilla et al.**, USDC-PR Civil No.16-2365.

Peaje Investments owns bonds issued by HTA.  It seeks a declaration that certain sections of the Moratorium Act and certain executive orders are preempted by the Bankruptcy Act and PROMESA, and violate the Constitution of the United States, because they divert funds from highway tolls and other sources to uses other than the payment of debt, for which those funds were pledged.  A hearing on whether the PROMESA automatic stay should be lifted was scheduled for November 3, 2016.  For purposes of the stay hearing the case is consolidated with Assured Guaranty, Civil No. 16-2384.  Plaintiff also seeks damages against HTA and any transferees of any pledged funds in an amount equal to the funds transferred as well as an injunction to prevent further transfers.

On November 2, 2016, however, the Court issued a Memorandum and Order concluding that the movant in Case 16-2384 (ASSURED GUARANTY CORP) lacks standing to "seek relief from the PROMESA stay". With regard to Cases 16-2365 (Peaje) and 16-2696 (Altair), the Court ruled that the movants "do not lack adequate protection and therefore cannot carry their initial burden of showing cause to vacate the Stay." Faced with this, the request for a lift of stay in all three cases was denied and the hearing scheduled was vacated. From this determination, Peaje presented a NOTICE OF APPEAL on November 9 and the Appeal was docketed on November 15, 2016.

On November 22, 2016, the First Cricuit granted Apppellant's request for expedited briefing.  Subsequently, the First Circuit consolidated this appeal with other appeals dealing with the District Court's denial of the motion to lift the PROMESA automatic stay.  Peaje filed its

opening brief on November 29, 2016.  Appellee's brief is due on December 23, 2016.  Replies are due on December 28, 2016 and oral argument is set for January 4, 2017.

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on November 28, 2016, The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay.  The Board filed its opening brief on December 12, 2016. Appellees will do the same on December 28, 2016.  Replies are due on December 30, 2016 and oral argument is set for January 4, 2017

**Assured Guaranty Corp. et al. v. Commonwealth of Puerto Rico et al.**, USDC-PR Civil No. 16-2384.

Plaintiffs issued insurance policies that guarantee payments on bonds issued by HTA. They seek to lift the automatic stay imposed by PROMESA in order to file a complaint similar to Peaje Investments, Civil No. 16-2365. A consolidated hearing with Civil No. 16-2365 on whether the stay should be lifted was scheduled for November 3, 2016.

On November 2, 2016, however, the Court issued a Memorandum and Order concluding that the movant in Case 16-2384 (ASSURED GUARANTY CORP) lacks standing to "seek relief from the PROMESA stay". With regard to Cases 16-2365 (Peaje) and 16-2696 (Altair), the Court ruled that the movants "do not lack adequate protection and therefore cannot carry their initial burden of showing cause to vacate the Stay." Faced with this, the request for a lift of stay in all three cases was denied and the hearing scheduled was vacated.

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on November 28, 2016, The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay.  Appellant filed its opening brief on December 12, 2016. Appellees will do the same on December 27, 2016.  Replies are due on December 28, 2016 and oral argument is set for January 4, 2017

**Altair Global Credit, et al v. Alejandro García Padilla, et al.**, USDC-PR Civil No. 16-2696.

Plaintiffs hold bonds issued by the Employees Retirement System. The action was filed on September 21, 2016. They seek relief from the PROMESA automatic stay unless the Commonwealth provides "adequate protection" in the form of employer contribution to replenish the funds held by a Fiscal Agent for the benefit of bondholders. On October 14, 2016, the Court consolidated this case with Civil Nos. 16-2365 and 16-2384 for the purpose of deciding whether cause exists to vacate the stay imposed by PROMESA.  The consolidated hearing was set for November 3, 2016.

On November 2, 2016, however, the Court issued a Memorandum and Order concluding that the movant in Case 16-2384 (ASSURED GUARANTY CORP) lacks standing to "seek relief from the PROMISA stay". With regard to Cases 16-2365 (Peaje) and 16-2696 (Altair), the Court ruled that the movants "do not lack adequate protection and therefore cannot carry their initial

290

burden of showing cause to vacate the Stay." Faced with this, the request for a lift of stay in all three cases was denied and the hearing scheduled was vacated.

Altair filed an interlocutory appeal, Appeal No. 16-2433. The Financial Oversight and Management Board also filed a Notice of Interlocutory appeal, Altair and the Board filed their opening briefs on December 13, 2016.  Appellees will file their briefs on December 23, 2016. Replies are due on December 28, 2016 and oral argument is set for January 4, 2017.

### Scotiabank de Puerto Rico v. Alejandro García Padilla, et al., USDC-PR Civil No. 16-2736.

Scotiabank extended credit to the Metropolitan Bus Authority of Puerto Rico.  It seeks declaratory and injunctive relief arguing that sections of the Moratorium Act and certain Executive Orders issued under its authority are unconstitutional and violate PROMESA. The original complaint was filed on September 28, 2016 and an amended complaint was filed on October 17, 2016.

On November 11, 2016, the Commonwealth defendants filed a Notice of Automatic Stay under PROMESA. On November 17, 2016 the Commonwealth defendants filed a Motion regarding the PROMESA stay and for Extension of Time to Answer. The notice filed, which the Court took as a motion, is pending disposition. The Commonwealth defendants have until December 16, 2106 to answer the amended complaint or otherwise plead.

### Oriental Bank v. Alejandro García Padilla, et al., USDC-PR Civil No. 16-2877.

Oriental Bank is party to a Participation Agreement with the Government development Bank (GDB) in connection with a loan extended by the GDB to the Puerto Rico Housing and Finance Authority (PRHFA). Oriental seeks certain declaratory and injunctive relief in order to secure payment of the PRHFA loan. It claims that neither PROMESA nor the Moratorium Act apply to its claims under the Participation Agreement. In the alternative, it requests relief from the PROMESA stay and a declaration that sections of the Moratorium Act and certain Executive Orders issued under its authority are unconstitutional and violate PROMESA. The complaint was filed on October 26, 2016.

On November 22, 2016 the Commonwealth defendants filed a Motion to Stay and for Extension of Time to Answer Complaint or Otherwise Plead. The Court granted defendants until December 22, 2016 to answer the complaint. Oriental opposed the motion for stay on December 9, 2016. Defendants have until December 22, 2016 to reply to Oriental's opposition.

### Recovery of Medicaid Funds

The Commonwealth is a defendant in three lawsuits, one in Commonwealth court and two in the U.S. District Court for the District of Puerto Rico, filed by certain "Federally Qualified Health Centers" (the "FQHCs") seeking to recover from the Commonwealth approximately $800 million in Medicaid "wraparound payments", which the Commonwealth Department of Health has failed to make since 1997, when the Commonwealth first became a participant in the Medicaid Program. The Commonwealth has admitted its noncompliance with the wraparound requirement and the only controversy is the total amount owed.

To date, five partial judgments have been entered in the Commonwealth court case. Four of the partial judgments are final. Under the four partial judgments that are final, the Commonwealth is required to pay approximately $28 million. The court requested for the manner in which the payments would be satisfied. The Commonwealth claimed the applicability of a payment plan under Act No. 66-2014. In accordance, the Secretary of Justice approved a $3 million payment per fiscal year until the total payment, subject to the budgetary provisions allowed in Act No. 66, supra, and deposited on October 2014 the payment corresponding to FY14-15. The Centers opposed the payment plan and the application of Act No. 66-2014 to the cases. In summary, the Court of Appeals sustained the application of Act No. 66-2014, but remanded the case to the State Court for determination of the appropriate payment plan. The Commonwealth has stated its position in writing, which argues there is no payment plan to discuss because Act No. 66 already states the payment plan that applies. The fifth partial judgment of $109,021,559 was entered in favor of 17 centers and $1,334,007.00 in favor of the Commonwealth. This partial judgment went onto the appeal process. The Commonwealth Court of Appeals remanded the case to the State Superior Court to incorporate the changes made to the Special Commissioner's Report, changes which came about as a result of the Judgment of the First Circuit Court of Appeals of the U.S. District Court, in the parallel Federal case of Consejo de Salud de la Playa de Ponce, supra, v. González Feliciano, F.3d. 831 (1st. Cir.2012). In this federal case the FQHCs claimed the prospective payments of the Medicaid wraparound payments after July 1, 2006, and the First Circuit revoked the District Court for the District of Puerto Rico, and canceled the formula that the Special Master used to calculate the reimbursements of the Supplemental Wraparound Payments (WAP). The case was remanded for revision of the formula.

It is important to emphasize that, even when the Commonwealth could not affect the partial Judgments which had become final and binding, the State Court of Appeals clarified that the Special Commissioner could grant credits to the Commonwealth, for payments ordered based on those partial Judgments, which would result in excess of the real liabilities of the Government. The Court of Appeals denied the Commonwealth's argument as to the source of the discount on credits, pertaining to the 330 Funds, based on the argument that, even when it was previously established that said funds where prone to discounts, this was subject to whether the funds had really been used to benefit Medicaid patients, and the probative weight as to this, relies on the Commonwealth and PRHIA. Therefore, the Appellate Court concluded that the Commonwealth and PRHIA failed to present the evidence required to establish that a discount on credits should be granted in their favor.

In the federal court case, the court has issued various orders requiring the Commonwealth to make the Medicaid "wraparound" payments (WAP) to the health centers, as required under the Medicaid portion of the Social Security Act. The Commonwealth has paid WAP up until the second quarter of 2016. Currently, controversies between the parties are being decided by the Special Master and the only matter that awaits resolution is the one pertaining to the reconciliation process ordered by the Court starting from October 2014. For the most part, the Special Master's Resolutions have favored the Commonwealth. Furthermore, the parties have asked the Court permit that objections to the Special Master's resolutions be made after the totality of the controversies have been addressed by the Special Master. It should be mentioned that the Federal District Court ordered the deconsolidation of *Consejo de Salud Playa de Ponce v. Francisco Joglar Pesquera, etc.* 06-1260 (PG), from *Río Grande Community Health, et al v.*

*Commonwealth of Puerto Rico,* Civil No. 03-1640 (GAG). The first case, Consejo, is operating under a Settlement Agreement that has a formula for the computation of the quarterly payments.

This legal contingency has an estimated exposure of $300 million for the amounts owed and a yearly exposure of approximately $45 million while the Government continues to participate in the Medicaid program.

## Special Education Students

The Commonwealth is a defendant in a class action initiated in 1980 by parents of special-education students before Commonwealth courts alleging that the Puerto Rico Department of Education had failed to provide legally required special education and related services. In February of 2002, the court issued a judgment approving the stipulations reached by the parties regarding the manner special education services should be provided. Since December of 2002, the Department of Education has paid fines for not complying with the stipulations reached. The fines were originally set in the amount of $1,000 daily, and were raised to $2,000 daily in January of 2006. On November 13, 2014, the court increased the fines for failure to comply with the court's order to $10,000 per day. Also, the court established a special fine of $300,000 to be used for the benefit of the members of the class. The Department of Education has appealed this decision.

As of December 31, 2015, there were over 146,985 students registered in the Special Education Program and 123,376 served, but this number changes frequently since new claims are filed constantly. Said resolution also creates a new scheme of monitoring compliance with the stipulations, including the added participation of 12 experts (each party has the right to designate two experts) in six areas of expertise. Said monitoring scheme began on July 1, 2010.

The February 2002 judgment only disposed of the injunctive relief sought by plaintiffs. Still pending before the court are individual claims for damages regarding the failure to provide adequate services. In 2005, the Court denied class certification for the damages stage of the lawsuit, holding that every member of the class must prove their individual damages. In April of 2014, the court also denied plaintiffs' petition for consolidation of the damage claims, holding that each plaintiff must submit evidence of the causal link between the Department of Education's negligence and plaintiff's alleged damages. On May 16, 2014, plaintiffs filed a petition for *certiorari* before the Court of Appeals. The Court of Appeals upheld the judgment.

On February 26, 2015, plaintiffs filed a writ of Certiorari before the Supreme Court of Puerto Rico. On July 20, 2015, the Office of the Solicitor General opposed the issuance of the writ. On January 7, 2016, the Supreme Court modified the judgment in order to authorize the accumulation of the damages claims pertaining to the parents and tutors of all the members of the class.  On January 26, 2016, the Office of the Solicitor General filed a Motion for Partial Reconsideration. The Puerto Rico Supreme Court denied the request for reconsideration on February 26, 2016, The mandate was issued on March 8, 2-016.  The decision is final and binding.

Considering that in the original lawsuit the class claimed $5,000 in damages for each member, with an enrollment of approximately 130,000 students in the class, a conservative

estimated exposure is $650 million.  The Commonwealth's strategy is to defend vigorously each case.

## Police Institutional Reform

The Commonwealth is a defendant in a lawsuit filed by the United States Department of Justice alleging a pattern of civil rights violation and excessive use of force by the officers of the Police Department of Puerto Rico (the "**PRPD**"). On July 17, 2013, the parties entered into a settlement agreement that requires significant institutional reforms of the Police Department, to be implemented within the next 10 years. Although the Department of Justice's claim does not include damages, the Commonwealth estimates, based on recent expert opinion, that the institutional reform will require an investment of at least $600 million. The Commonwealth allocates $20 million for each fiscal year, since FY2014-2015. In addition, PRPD receives funds from the Equitable Sharing Program ("ESP") with the Department of Justice. These funds are received as a result of PRPD's joint work with federal task forces. The amount to be received under the ESP cannot be ascertained as it varies depending on the fund or goods that are subject to government forfeiture.

Under the settlement agreement, the court dismissed the claim, but retained jurisdiction to assure compliance through the Technical Compliance Advisor ("TCA"), Mr. Arnaldo Claudio. The TCA is the person that was agreed to by the parties to oversee the compliance of the eleven (11) areas of the Police Reform. The TCA Office is composed of the TCA, and a group of five experts and three attorneys. The parties agreed that the TCA would receive a maximum of $1,500,000.00 during the next four (4) years. This fiscal year, the TCA prepared a budget of $1,499,058.80, which comes out of the $20 Million assigned to the reform each fiscal year.

## Wage Claims

The Commonwealth is a defendant in two lawsuits instituted in 2007 and 2009 by a large group of employees from the Department of Family, the Administration of Vocational Rehabilitation and the Administration of Juvenile Institutions claiming that wages in an aggregate amount of $130 million are owed to them. The plaintiffs claim loss of earnings due to failure of the agency's compliance of equal payment for equal work under different laws. The plaintiffs claim that they have been adversely affected by reason of the agencies failure to revise the scales of remuneration each time the federal minimum wage changed. Both cases were dismissed by the Superior Court. Plaintiffs appealed, but the decisions were upheld by the Court of Appeals on March 31, 2015. On August 3, 2015, Plaintiffs filed a petition of certiorari before the Puerto Rico Supreme Court but the same was finally denied.

Afterwards, an approximate of 4,000 employees filed a complaint before the administrative forum (Comisión Apelativa del Servicio Público). Claimants allege a violation by defendant agencies (Department of Family, the Administration of Vocational Rehabilitation and the Administration of Juvenile Institutions) of the US Constitution and the Constitution of the Commonwealth of PR, Act. No. 5 of 1975; the Merit Principle in the Public Service; Act No. 89 f 1979 and its regulations; Act No. 184 of 2004 and its regulations, the Fair Labor Standard Act (FLSA); the federal minimum wages act, and the Civil Code of Puerto Rico.

This legal contingency has an estimated exposure of $130 million plus an undetermined amount for interest.

## Doral Financial Corporation Litigation

On June 5, 2014, Doral Financial Corporation and certain of its subsidiaries filed a lawsuit against the Commonwealth of Puerto Rico and the Treasury Department seeking a declaratory judgment regarding the validity of a 2012 closing agreement between Doral and the Commonwealth Treasury, which provided for a refund of approximately $230 million payable over a five-year period, which closing agreement had been declared null by the Treasury Department. On October 10, 2014, the trial court ruled in favor of Doral, holding that the closing agreement was valid. However, on February 25, 2015, the Court of Appeals reversed the trial court's judgment, and ruled that the closing agreement between the Treasury Department and Doral was null and void. The Puerto Rico Supreme Court declined to review the decision, which is now final and favorable to the Commonwealth.

On March 11, 2015, Doral filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code in New York. The Commonwealth of Puerto Rico (Department of Treasury) filed the correspondent proof of claim. The committee of creditors filed an adversary proceeding, seeking the validation of the agreement between Doral and the Treasury Department for taxes of years 2006, 2007 & 2009 (Final Agreement). The Treasury Department asked for dismissal of the claim, based on the state court decision, and on March 1, 2016, the adversary complaint filed by creditor of Doral was dismissed. On May 2016, Doral filed the "Disclosure Statement" and the Chapter 11 Plan, both documents under consideration by the Trustee.

## Employees Retirement System Bond Issuance

Plaintiffs are pensioners of the Employees Retirement System, and claim $800 million in damages against the underwriters of certain ERS pension bonds and some of the former members of the Board of Trustees of the ERS. The case is ***Pedro Jose Nazario Serrano, et. al. v. UBS, Jesús Méndez Rodríguez, etc.***, Civil No. K AC2011-1067 (T.A. Núm. KLAN2013-00738, T.S. Núm. CC2014-0834). It is claimed for the $3 billion bond issuance in 2008 that according to the plaintiffs compromised the solvency of the ERS. The case was dismissed by the Superior Court, plaintiffs appealed, and the sentence was revoked by the Court of Appeals. As of this date, the case is pending at the Court of First Instance with several motions to dismiss and petitions to amend the complaint filed by plaintiffs. Discovery has not commenced.

## Police Association Wage Claims

Four police organizations and their members and forty-one agents in a separate lawsuit claim back pay wages under laws that mandated salary increases for the Puerto Rico Police Department members, among other governmental employees. All cases are in discovery process and pending status and pre-trial conference. The potential exposure of the PRPD is approximately $270 million.

**Wal-Mart PR, Inc. v. Juan C. Zaragoza Gomez**

Wal-Mart PR filed on December 4, 2015 a civil action challenging the legality of certain new Puerto Rico tax laws, which allegedly violate the Commerce Clause, Equal Protection Clause, and Bill of Attainder Clause of the U.S. Constitution, and the Federal Relations Act, 48 U.S.C. § 741a.

On May 29, 2015, L a w  n o. 72 was enacted by the Puerto Rico Legislature to increase from 2% to 6.5%, the Tangible Property Component of the corporate Alternative Minimum Tax ("**AMT**") —i.e., the component that taxes the value of property transferred to an entity doing business in Puerto Rico from a related party outside of Puerto Rico—for entities that have gross revenues of more than $2.75 billion from a trade or business in the Commonwealth.  Plaintiff alleges that there is an important exemption to this tax, in favor of local business:  Property transferred from a related party located in Puerto Rico is exempt from the Tangible Property Component of the AMT. Wal-Mart alleges that Act 72's dramatic increase in the Tangible Property Component of the AMT— which by definition affects only commerce flowing into Puerto Rico from outside Puerto Rico— has raised Wal-Mart PR's estimated income tax to an astonishing and unsustainable 91.5% of its net income.  It was also alleged that Act 72's increase in the Tangible Property Component of the AMT, discriminates against interstate commerce in general, and targeted Wal-Mart PR specifically thus in violation of the Commerce Clause, Federal Relations Act and the Equal Protection clause under the Fifth and Fourteenth Amendment. Also, this discriminatory and targeted discrimination violates the Bill of Attainder Clauses.

The case was put in docket and the Court set hearings to entertain both jurisdictional issues and the merits. On March 28, 2016, Judge Fuste entered a 109 pages Opinion and Order that could be summarized as follows: OPINION AND ORDER: On the basis of the Findings of Fact and Conclusions of Law contained in our expanded Opinion and Order, the court hereby permanently enjoins and declares invalid, under both federal constitutional and statutory law, section 1022.03(b)(2) and (d) of the Puerto Rico Internal Revenue Code of 2011, which is codified at 13 L.P.R.A. § 30073(b)(2) and (d). Those subsections of the AMT statute comprise the second measure of tentative minimum tax, which consists of the tangible-property tax and the expenses tax, and the list of exemptions to the tangible-property tax. The injunction shall go into effect immediately. The Puerto Rico Secretary of the Treasury and all of his or her subordinates must stop all levying, collection, and enforcement of the AMT under the enjoined subsections, including as an estimated payment under 13 L.P.R.A. § 30263 and any other applicable section."

On the same date, a judgment was entered accordingly.  The Secretary of Treasury filed on March 31, 2016 a notice of appeal. The case is actually pending for adjudication by the Boston Court of Appeals.  On July 5, 2016, Boston entered an order, requesting the parties to file, on or before July 20, 2016, a supplemental brief, addressing the effect of Congress's passage of the PROMESA Act on the question of Butler Act jurisdiction in this case. The First Circuit issued and opinion an order on August 24, 2016, affirming the District Court's decision holding that the amended AMT is unconstitutional.  The Commonwealth decided that it would not request reconsideration and would not request review by the United States Supreme Court.

296

**CRIM vs. Estado Libre Asociado de Puerto Rico**

On June 24, 2015 CRIM filed a writ of mandamus against the Secretary of the Treasury and the Director of the Office of Management and Budget asking the Court to order central government to comply with the provisions of the Act 83-1991, as amended by Law 162-2012, to pay an additional contribution of $25,000,000.00 yearly, for the fiscal year 2013-2014, 2014-2015 and 2015-2016, for a total of $75 million.

The complaint seeks the Court to order the Governor of Puerto Rico, the OGP and the Secretary of the Treasury to carry out the necessary measures to fulfill its alleged ministerial duties to include $75 million in the budgets corresponding fiscal years 2013-14, 2014-15 and 2015-2016, with any other remedy provided by law.

The Commonwealth of Puerto Rico argued the inappropriateness of the amounts claimed, because as a matter of law this amount was not approved in the budget for said fiscal years.  The budget specifically establishes that total or partial omission of assignments not included in the Joint Resolution of Special Assignments will not generate debt, obligation or commitment by the government.

A petition for summary judgment was filed on July 10, 2015 by the Commonwealth. The plaintiff opposed, and an argumentative hearing was held on August 19, 2015.  On November 10, 2015, the complaint was dismissed by the Court of Instance with prejudice, due to lack of jurisdiction. CRIM appealed, TA Case No. KLAN2016-00031.

On June 30, 2016 the Court of Appeals, San Juan Panel, entered a judgment modifying the judgment of the Court of First Instance, sustaining that the Writ of Mandamus was not the proper via, but a collection action before the Instance Court, which has the primary jurisdiction, not the Commission for Adjudication of Payments and Debts Among Governmental Agencies, as resolved by the Court of First Instance.  The decision is final and binding.

**Federal Clean Water Act Complaint from the Environmental Protection Agency**

**United States v. Municipality of San Juan, et al., Civil No. 2014- 1476 (CCC)**
**U. S. District Court for the District of Puerto Rico**

The United States Department of Justice, acting on behalf of the United States Environmental Protection Agency, has filed a complaint alleging unauthorized discharges of pollutants from the storm sewer systems owned and/or operated by the Municipality of San Juan, the Department of Transportation and Public Works  and HTA through certain flood control pump stations owned and operated by the Department of Natural and Environmental Resources, into the waters of the United States, in violation of the Federal Clean Water Act. The Municipality, the Department of Transportation, HTA and the Department of Natural Resources entered Consent Decrees with the Department of Justice, which were filed in Court independently between October and December 2015. Currently, we are still awaiting the Court's approval of the three Consent Decrees. The Consent Decrees require compliance measures which means a disbursement of millions of dollars.

297

## FINANCIAL STATEMENTS

The Commonwealth's financial statements for fiscal year 2015 and 2016 have not been prepared yet, and may not be available during calendar year 2016.  The Commonwealth expects that the 2016 financial statements will not be filed by the Commonwealth filing deadline.

For fiscal year 2014, the basic financial statements of the Commonwealth were audited by KPMG LLP, which did not audit the financial statements of certain activities, funds, and component units identified separately in its report dated June 30, 2016 (which report expresses unmodified and modified opinions and includes emphasis of matter paragraphs regarding going concern consideration relating to the Commonwealth, GDB, UPR, PRASA, PREPA and an emphasis of matter paragraph regarding the insolvency of the Retirement Systems. Except for the Retirement Systems and GDB, those financial statements were audited by other independent auditors whose reports were furnished to KPMG LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

The basic financial statements of the Commonwealth for fiscal year 2014 were filed by the Commonwealth with the Municipal Securities Rulemaking Board through its Electronic Municipal Markets Access System on July 1, 2016.

## CONTINUING DISCLOSURE

The Commonwealth has entered into several continuing disclosure undertakings in accordance with Rule 15c2-12 of the Securities and Exchange Commission in connection with its bond issuances. Although the Commonwealth has filed all the reports and financial statements required to be filed (other than the fiscal year 2015 financial statements, which have not been finalized), some of these filings have been made after the Commonwealth's filing deadline, which is normally May 1.

*Fiscal year 2015*. The basic financial statements of the Commonwealth for fiscal year 2015 were not filed by the Commonwealth's filing deadline because they have not yet been completed. The delay has been primarily caused by: (a) significant delay on engagement of the Commonwealth audit firm due to significant increase in audit risk and liabilities to the audit firm, (b) implementation of GASB 68, GASB 69 and GASB 72, (c) issues of liquidity and going concern considerations of the Commonwealth and its component units, (d) enhanced analysis over the insolvency of the Retirement Systems, (e) impairment analyses of deposits held at GDB and accounts receivable balances of the Primary Government and component units, (f) significant component units have not yet issued their audited financial statements for fiscal year 2015, such as GDB, PREPA, HTA, ACCA, Special Communities Trust, the PR National Guard Trust, the Puerto Rico Agricultural Insurance Authority  and the Retirement Systems, among others, and (g) significant changes in the composition of the Commonwealth reporting unit, through the inclusion of approximately 10 entities as blended component units instead of discretely presented component units. The Commonwealth external auditors started their field work for the 2015 fiscal year in November of 2016.  The

completion of the audit is expected to occur in the second semester of calendar year 2017. The Commonwealth may not be able to adopt the provisions of GASB 68 on its discretely presented component units, and as a result the opinion of the independent auditors may be qualified.

*Fiscal year 2014.* The basic financial statements of the Commonwealth for fiscal year 2014 were filed after the Commonwealth's filing deadline. The delay was primarily caused by: (a) liquidity and going concern considerations of the Commonwealth and its component units, (b) required enhanced and complex analysis over the GDB loan reserve, (c) implementation of GASB 67 in the Retirement Systems, (d) enhanced analysis over the depletion date of the Retirement Systems, (d) delays in the issuance of certain component units, (e) enhanced and extended audit procedures performed by the Commonwealth auditors and (f) significant adjustments and modifications required to the financial statements relating to going concern considerations of the Commonwealth and its instrumentalities.

*Fiscal year 2013.* The basic financial statements of the Commonwealth for fiscal year 2013 were filed after the Commonwealth's filing deadline. Initially, the delay was primarily caused by (i) a delay in the commencement of the financial close and audit process for fiscal year 2013, which did not commence until the completion of the financial statement for fiscal year 2012 on September 16, 2013 (delays in the audit of the 2012 financial statements were principally caused by the government transition process after the November 2012 elections), (ii) delays related to the change of the Commonwealth's external auditors, and (iii) the implementation of GASB Statement No. 61, *The Financial Reporting Entity*, which changed the Commonwealth's financial reporting entity. Although the Commonwealth addressed these issues by dedicating additional resources to the financial close and audit process for fiscal year 2013, the Commonwealth was unable to finalize the 2013 financial statements due to certain additional unanticipated delays attributable to (i) additional procedures required as part of the audit, (ii) delays in the issuance of the audited financial statements of the three Commonwealth retirement systems resulting from the pension reform legislation and the subsequent judicial modification of such reforms, and (iii) delays in the issuance of the audited financial statements of certain other blended and discretely presented component units.

*Fiscal Year 2012.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2012 were filed after the Commonwealth's filing deadline due to delays in the audit of such financial statements as a result of the government transition process, as a new administration entered office in January of 2013, and the failure of certain discretely presented component units to finalize their audited financial statements. The Commonwealth Report for fiscal year 2012 was also filed after the Commonwealth's filing deadline.

*Fiscal year 2009.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 were filed after the Commonwealth's filing deadline due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units of the Commonwealth.

*Fiscal year 2008.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2008 (and certain prior years) were filed after the Commonwealth's filing deadline, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the

Commonwealth's audited financial statements. The Commonwealth Report for fiscal year 2008 was also filed after the Commonwealth's filing deadline.

The Commonwealth is reviewing how to improve and establish procedures and policies to ensure timely compliance in the future with its continuing disclosure obligations. One of the required items to ensure timely compliance is to change the Commonwealth accounting system, which the Commonwealth has begun to carry out with the Puerto Rico Treasury Department and Microsoft.  Implementation of a new accounting system may take two or three years.  In addition, the Commonwealth may need to reduce significantly its Component Units to facilitate the preparation of the Commonwealth Financial Statements.

PROMESA requires that the Commonwealth establish procedures to ensure timely compliance with its continuing disclosure obligations.  The Commonwealth may need to evaluate the following points to properly address a timely completion:

- Implementation of a consolidated accounting system for all Commonwealth agencies.
- The creation of a shared service center for procurement process, suppliers payment processing, finance and management of federal grants for the Commonwealth.
- Elimination or consolidation of Commonwealth Component units.
- Implementation of a centralized payroll system for all Commonwealth agencies.
- Officers in charge of the preparation of financial statements may not be changed every time there is a change in administration.
- A comprehensive restructuring reform of operational processes and regulations regarding daily financial transactions and proper technical training for government employees.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by PREPA and PRASA, whose properties are insured through arrangements and policies obtained by the respective entities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.