**EXHIBIT F**

# Congressional Task Force
# on Economic Growth in Puerto Rico

## Report to the House and Senate



**114th Congress**

*December 20, 2016*

## **Table of Contents**

Introduction ................................................................................................................ 4

1.  Sources of Information ........................................................................................ 5

2.  Organization of Report ........................................................................................ 7

3.  Statement of Purpose ......................................................................................... 7

Background ................................................................................................................ 8

1.  Overview of Economic, Fiscal and Demographic Situation in Puerto Rico ...................... 8

2.  Puerto Rico's Treatment Under Federal Programs ....................................................... 14

Discussion and Recommendations .............................................................................. 16

1.  Health Care ........................................................................................................ 16

    A.    Medicaid ..................................................................................................... 17

    B.    Medicare ..................................................................................................... 22

    C.    Family-to-Family Health Information Center Grant Program ..................................... 28

    D.    Maternal, Infant, and Early Childhood Home Visiting Program ............................... 29

2.  Federal Tax Policy .............................................................................................. 30

    A.    Federal Tax Policy Toward Individuals and Families ............................................. 30

    B.    Other Federal Tax Provisions ........................................................................... 32

    C.    Federal Tax Policy Toward Businesses ............................................................... 35

3.  Energy ................................................................................................................ 37

4.  Federal Statistical Programs ................................................................................. 40

5.  Support for Small Businesses ............................................................................... 45

    A.    SBA Capital Access Programs .......................................................................... 46

    B.    SBA Procurement Programs ............................................................................. 48

    C.    Small Business Innovation Research and Technology Transfer Programs ................. 50

    D.    SBA Disaster Assistance ................................................................................. 51

6.  Supplemental Security Income ............................................................................. 52

7.  U.S. Department of Commerce .............................................................................. 55

    A.    Bureau of Economic Analysis ........................................................................... 56

    B.    International Trade Administration ...................................................................... 57

    C.    Economic Development Administration ............................................................... 61

    D.    Electronic Export Information ........................................................................... 63

8.   U.S. Department of the Treasury ............................................................... 65

    A.   CDFI Fund ......................................................................................... 65

    B.   Technical Assistance to the Government of Puerto Rico .......................... 68

9.   Investor Protection ................................................................................... 69

10.   Public Safety ......................................................................................... 70

11.   Municipal Solid Waste Landfills ............................................................... 73

12.   Arecibo Observatory ............................................................................... 74

13.   Former Naval Station Roosevelt Roads ...................................................... 76

14.   Caño Martín Peña (Martín Peña Channel) .................................................. 78

15.   Federal Interagency Advisory Council on Child Poverty ............................... 79

16.   Unemployment Compensation Demonstration Project .................................. 80

17.   Administrative Order 346 ......................................................................... 81

18.   Puerto Rico's Political Status .................................................................... 82

Appendix 1:  Submissions to Puerto Rico Task Force Email Portal ........................ 85

Appendix 2:  Federal Programs Under Which Puerto Rico Receives Differential Treatment . 95

Appendix 3:  Treatment of Puerto Rico Under Major U.S. Census Bureau Statistical Programs
..................................................................................................................... 112

**Congressional Task Force on Economic Growth in Puerto Rico**
**Report to the House and Senate**

## Introduction

On June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act, or "PROMESA," was enacted into law as Public Law 114-187. Section 409 of PROMESA established an eight-member "Congressional Task Force on Economic Growth in Puerto Rico" ("Task Force"). In July 2016, in accordance with Section 409(b), two members of the Task Force were appointed by House Speaker Paul Ryan, two members were appointed by House Minority Leader Nancy Pelosi, two members were appointed by Senate Majority Leader Mitch McConnell, and two members were appointed by Senate Minority Leader Harry Reid.

The members appointed are as follows:

- Representative Sean Duffy (R-Wisconsin), appointed by House Speaker Paul Ryan;
- Representative Tom MacArthur (R-New Jersey), appointed by House Speaker Paul Ryan;
- Resident Commissioner Pedro Pierluisi (D-Puerto Rico), appointed by House Minority Leader Nancy Pelosi;
- Representative Nydia Velázquez (D-New York), appointed by House Minority Leader Nancy Pelosi;
- Senator Orrin Hatch (R-Utah), appointed by Senate Majority Leader Mitch McConnell;
- Senator Marco Rubio (R-Florida), appointed by Senate Majority Leader Mitch McConnell;
- Senator Robert Menendez (D-New Jersey), appointed by Senate Minority Leader Harry Reid; and
- Senator Bill Nelson (D-Florida), appointed by Senate Minority Leader Harry Reid.

Pursuant to Section 409(d), Speaker Ryan designated Senator Hatch to serve as chairman of the Task Force.

Section 409(f) required the Task Force to provide a "status update" to the House and Senate between September 1, 2016 and September 15, 2016, containing "information the Task Force has collected" and "a discussion on matters the chairman of the Task Force deems urgent for consideration by Congress." On September 15th, the Task Force published this status update in both English and Spanish.

Section 409(g) requires the Task Force to produce a report, by December 31, 2016, regarding:

"(1) impediments in current Federal law and programs to economic growth in Puerto Rico including equitable access to Federal health care programs;

4

(2) recommended changes to Federal law and programs that, if adopted, would serve to spur sustainable long-term economic growth, job creation, reduce child poverty, and attract investment in Puerto Rico;

(3) the economic effect of Administrative Order No. 346 of the Department of Health of the Commonwealth of Puerto Rico (relating to natural products, natural supplements, and dietary supplements) or any successor or substantially similar order, rule, or guidance of the Commonwealth of Puerto Rico; and

(4) additional information the Task Force deems appropriate."

This document is the report mandated by Section 409(g).  Having issued this report, the Task Force now terminates, consistent with Section 409(l).

## 1.  Sources of Information

To prepare this report, the Task Force obtained information from various sources.

First, on August 4, 2016, the Task Force issued a press release announcing the creation of an email portal and encouraged stakeholders to submit their recommendations to this portal.  The Task Force initially announced a deadline of September 2nd for submissions to the portal. However, on September 6th, the Task Force issued a press release extending the deadline until October 14th in order to ensure that stakeholders had sufficient opportunity to provide input.

The Task Force received approximately 450 submissions via the email portal.  **Appendix 1** of this report contains an alphabetized table that lists the individuals and organizations that made written submissions, including hyperlinks to each submission and any attachments.  Submissions made after the October 14th deadline are included in the table, but marked as late.

The Task Force is grateful to the individuals and organizations who took time to provide submissions to the email portal, as well as to those who visited Capitol Hill—many of them traveling from Puerto Rico—to expand upon their submission.  It is clear that there are many people who care deeply about Puerto Rico, who want the island to prosper, and who have thoughtful suggestions for how it can overcome its challenges and reach its potential.  In preparing this report, and crafting its recommendations, the Task Force was guided by its own appreciation for Puerto Rico and desire to see it succeed.

The Task Force does note that many submissions to the email portal offer recommendations that are local rather than federal in nature, and would therefore be more properly addressed to—and

by—the government of Puerto Rico than to—and by—Congress or federal executive branch agencies. Accordingly, the Task Force recommends that Puerto Rico's elected and appointed leaders, as well as the members and staff of the Financial Oversight and Management Board ("Oversight Board") established by Section 101 of PROMESA, carefully review the submissions in Appendix 1.

Second, the Task Force organized a series of formal staff-level briefings with federal agencies. Here is a list of those briefings:

- August 12:  Federal Reserve Bank of New York
- September 20:  U.S. Small Business Administration
- September 30:  U.S. Department of Energy
- October 4:  Community Development Financial Institutions Fund (U.S. Department of the Treasury)
- October 7:  U.S. Department of Health and Human Services
- October 11:  U.S. Department of the Treasury
- October 14:  U.S. Environmental Protection Agency
- October 21:  U.S. Census Bureau (U.S. Department of Commerce), Bureau of Labor Statistics (U.S. Department of Labor), and National Agricultural Statistics Service (U.S. Department of Agriculture)
- October 28:  Bureau of Economic Analysis (U.S. Department of Commerce), Economic Development Administration (U.S. Department of Commerce), International Trade Administration (U.S. Department of Commerce), and Minority Business Development Agency (U.S. Department of Commerce)

Third, the Task Force consulted with non-partisan congressional support organizations. Specifically, it consulted with analysts at the Congressional Research Service (CRS) about a wide range of federal policy matters pertaining to Puerto Rico, and with analysts at the Congressional Budget Office (CBO) and the Joint Committee on Taxation (JCT) about the budgetary impact of spending and revenue proposals related to Puerto Rico. The Task Force also reviewed reports written by CRS, JCT, and the U.S. Government Accountability Office (GAO) regarding Puerto Rico. Since CRS does not release its reports to the public, the Task Force exercised its right to make the relevant CRS products public, and has linked to these products in this report.

Fourth, Section 409(j) of PROMESA required the Task Force to consult with the Puerto Rico Legislative Assembly, the Puerto Rico Department of Economic Development and Commerce (DDEC, in its Spanish-language acronym), and the private sector of Puerto Rico—and the Task Force has fulfilled that mandate.

Finally, the Task Force staff held a conference call with the Secretary of the Puerto Rico Department of Health, Dr. Ana Rius Armendariz, to discuss Administrative Order 346, issued by the Department on February 9, 2016.

## 2.  Organization of Report

This report is organized as follows.   Following this "Introduction" section, there is a "Background" section that includes two subsections.  Subsection 1 presents a brief overview of the economic, fiscal and demographic situation in Puerto Rico.   Subsection 2 provides information on Puerto Rico's treatment under federal programs.  As explained in Subsection 2, in an effort to inform policymakers and the public, the Task Force has prepared a table of approximately 40 federal programs that allocate resources to states and territories according to a formula, where that formula treats Puerto Rico differently than the states.  That table appears in **Appendix 2**.  The "Background" section is followed by the "Discussion and Recommendations" section, which contains the Task Force's recommendations to Congress, federal agencies, and the government of Puerto Rico.  Recommendations are organized by subject matter area or by federal agency.  Since Section 409(g) of PROMESA makes clear that the Task Force should focus on federal laws and programs, recommendations to the government of Puerto Rico are purposefully limited in scope, confined to areas where there is a strong federal nexus.

Section 409(h) of PROMESA instructs the Task Force that, "[t]o the greatest extent practicable," the Task Force report "shall reflect the shared views of all eight Members."  Consistent with that directive, where the Task Force does make a specific recommendation, that recommendation reflects a consensus among the members.  Section 409(h) authorizes a member, or multiple members, to publish dissenting views, but no member has elected to do so.

The Task Force notes that a number of its recommendations also apply to the four other U.S. territories—American Samoa, Guam, the Northern Mariana Islands, and the United States Virgin Islands, which (to varying degrees) face considerable challenges of their own.

## 3.  Statement of Purpose

The 3.4 million U.S. citizens in Puerto Rico confront significant economic, financial, and social challenges.  A review of Puerto Rico's history demonstrates that these challenges are enduring, not transitory.  In recent years, the challenges have grown more severe, and have attracted more attention from policymakers and the public.

The Task Force is of the view that Puerto Rico's best days lie before it, not behind it.  It is a fact that residents of Puerto Rico, who have greatly contributed to this nation in times of both war and peace, are as talented and as hard-working as their fellow citizens living anywhere else in the

country.[1]  It is also a fact that they have not always been well served by their leaders in San Juan or in Washington, DC.  The Task Force believes that the people of Puerto Rico deserve a strong, stable and diversified economy.  Judging from the written submissions that the Task Force received through the email portal, there is no shortage of important economic development work being performed or planned in Puerto Rico.[2]

The Task Force hopes this report will contribute to a brighter future in Puerto Rico.  At the same time, the Task Force offers a word of caution to those expecting a "federal solution" to each of Puerto Rico's problems.  There are certain challenges in Puerto Rico—such as an outdated energy system, a troubled K-12 public education system, and inefficiencies in various other sectors—that must be tackled first and foremost by the government of Puerto Rico and the private sector.

The members of the Task Force have worked across party lines to identify steps that can be taken to help Puerto Rico's economy stabilize and grow.  The Task Force hopes that its work will serve as a platform for continued bipartisan efforts to support the American citizens in Puerto Rico.

## Background

### 1.  Overview of Economic, Fiscal and Demographic Situation in Puerto Rico

Individual members of the Task Force have a range of views on PROMESA itself, which authorizes public entities in Puerto Rico to restructure their debts pursuant to a process prescribed by law, and establishes a seven-member Oversight Board to temporarily supervise or otherwise be involved in decision-making by the government of Puerto Rico on budgetary, fiscal, and debt restructuring matters.[3]   However, the members of the Task Force concur that

---

[1] For example, the director of the Minority Business Development Agency within the U.S. Department of Commerce informed the Task Force that an executive from the world's largest aerospace company told her that many of the company's best engineers are recruited from Puerto Rico, which is home to one of the leading engineering schools in the nation (the University of Puerto Rico at Mayagüez).  Similarly, representatives of biotechnology firms operating in Puerto Rico regularly cite the productivity and technical proficiency of the locally-educated, locally-trained workforce.

[2] For a sampling of many possible examples, see Appendix 2 for submissions from Parallel18; the Puerto Rico Science, Technology, and Research Trust; the Aeronautical and Aerospace Institute of Puerto Rico; the Puerto Rico Chapter of the Association of Information Technology Professionals; the Foundation for Puerto Rico; Non-Profit Community Service Organizations in Puerto Rico (*Red de Fundaciones de Puerto Rico* and *Una Sola Voz*); the Puerto Rico Community Foundation; the Puerto Rico Information Technology Cluster; and the Youth Development Institute.

[3] For an overview of PROMESA, see D. Andrew Austin et al, The Puerto Rico Oversight, Management, and Economic Stability Act, Congressional Research Service, July 1, 2016.

PROMESA is a product of the grave economic, fiscal and demographic situation in Puerto Rico. The crisis has multiple root causes, and a discussion of those causes is beyond the scope of this report. Nevertheless, it is clear that Puerto Rico faces formidable challenges.

The Task Force will summarize current conditions on the island with a series of bullet points. Because Puerto Rico is a U.S. jurisdiction, the 50 states and the District of Columbia serve as an appropriate point of comparison. As discussed later in the report, many federal statistical programs that collect and publish state-by-state economic data do not collect and publish data for Puerto Rico. Likewise, economic data produced by the government of Puerto Rico are often unreliable or untimely, although efforts are underway to make improvements in this area. Accordingly, the Task Force was not able to obtain as much information about Puerto Rico's economy and government finances as it would have liked. Nevertheless, sufficient information exists to form a reasonably accurate picture of the territory's economy.

- Puerto Rico's economy is typically measured using gross national product (GNP), rather than gross domestic product (GDP). Puerto Rico's GNP is calculated by the Puerto Rico Planning Board (*Junta de Planificación de Puerto Rico*). According to the <u>Statistical Appendix</u> to the Puerto Rico Planning Board's Fiscal Year 2015 Economic Report to the Governor and Legislative Assembly, Puerto Rico's real GNP—measured in constant *1954* dollars—contracted every year between Fiscal Year 2006 ($7.4 billion) and Fiscal Year 2015 ($6.3 billion), except for one year of slight growth between Fiscal Year 2011 ($6.43 billion) and Fiscal Year 2012 ($6.47 billion).[4] In nominal terms, Puerto Rico's GNP increased from $57.9 billion in Fiscal Year 2006 to $68.5 billion in Fiscal Year 2015, and its GDP increased from $87.3 billion in Fiscal Year 2006 to $102.9 billion in Fiscal Year 2015.[5]



---

[4] See <u>Statistical Appendix</u>, page A-6.

[5] See <u>Statistical Appendix</u>, page A-1.



- The Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA), formerly the Puerto Rico Government Development Bank (GDB), maintains an Economic Activity Index (EAI) that consists of four factors:  (1) payroll employment, (2) electric power generation, (3) cement sales, and (4) gasoline consumption.  Between August 2005 and August 2016, the EAI fell by approximately 20 percent, from nearly 160.0 to 124.1.

- According to the U.S. Census Bureau's 2015 Puerto Rico Community Survey and the 2015 American Community Survey, 46.1 percent of Puerto Rico residents live below the federal poverty level, compared to a national average of 14.7 percent.[6]  Of Puerto Rico residents under age 18, 58.3 percent live below the federal poverty level, compared to a national average of 20.7 percent.  Of children in Puerto Rico under age 5, 63.7 percent live below the federal poverty level, compared to a national average of 22.8 percent.  Of Puerto Rico seniors age 65 and older, 41 percent live below the federal poverty level, compared to about 9 percent nationally.



---

[6] To corroborate the Census Bureau data referenced in this report, readers can use the "Advanced Search" function on American FactFinder, available here.

- According to the 2015 Puerto Rico Community Survey, median household income in Puerto Rico is $18,626, with 83.3 percent of island households earning less than $50,000 per year. In the states and the District of Columbia, median household income is $56,515. The state with the lowest median household income is Mississippi, at $40,593. According to May 2015 data from the Bureau of Labor Statistics (BLS) within the U.S. Department of Labor, the median hourly wage for workers in Puerto Rico is $9.61, while the median hourly wage in the states and the District of Columbia is $17.40.

- According to BLS, Puerto Rico's unemployment rate in October 2016 was 12.1 percent, while the national unemployment rate was 4.9 percent and the state with the highest unemployment rate was Alaska at 6.8 percent. According to historical state-by-state BLS unemployment data, which have been published since January 1976, Puerto Rico's unemployment rate has always been several percentage points or more higher than the state with the highest unemployment rate. From January 1976 to December 1989, Puerto Rico's average unemployment rate was about 19 percent. From January 1990 to December 1999, it was about 14 percent. From January 2000 to December 2009, it was about 12 percent. And from January 2010 to October 2016, it was about 14 percent.

- According to BLS, the number of persons employed in Puerto Rico peaked in December 2006 at 1,277,559. In October 2016, that figure was 987,606—a 23 percent reduction.[7] According to the Puerto Rico Planning Board, even when employment was at its peak in Puerto Rico in 2006, the labor force participation rate was 48.6 percent.[8] In 2015, the labor force participation rate was 39.9 percent.[9] According to BLS, the national labor force participation rate is approximately 63 percent.

- Puerto Rico has a large informal or "underground" economy, which refers to activities and income that are partially or fully outside of government regulation (e.g., minimum wage laws and workplace safety laws) and taxation (e.g., income tax and employment tax). Although the size of Puerto Rico's informal economy is, by definition, difficult to measure with precision, estimates about its size generally range from about 15 percent of GNP to about 20 percent of GNP. The existence of a large informal economy has a number of negative effects, chief among them the erosion of Puerto Rico's individual and corporate tax base,

---

[7] The employment decline in this period—23 percent—was significantly larger than the population decline—about 8 percent—during the same period.

[8] The labor force participation rate measures the labor force—the sum of employed individuals and unemployed individuals who do not have a job and are looking for work—as a percentage of the non-institutionalized population age 16 and older.

[9] See Statistical Appendix, page A-62.

which deprives the government of revenue needed to finance operations, provide services, and meet debt obligations.

- According to the proposed Fiscal Plan and Appendix presented to the Oversight Board by the government of Puerto Rico on October 14, 2016, Puerto Rico's aggregate public sector debt stock is $68.7 billion, which is roughly equal to Puerto Rico's nominal GNP. Puerto Rico's public sector debt as a percentage of GNP grew steadily starting in Fiscal Year 2001, when it was about 60 percent of GNP. In 2005, it was about 70 percent of GNP. In 2009, it was about 90 percent of GNP. By 2013, it was about 102 percent of GNP.[10] According to a 2014 report published by the Federal Reserve Bank of New York (FRBNY)—which oversees the Second District of the Federal Reserve System, which encompasses Puerto Rico—Puerto Rico's public debt to GNP ratio is "far higher" than the public debt to GDP ratio of any state.[11]

- According to the Independent Auditors Report accompanying the government of Puerto Rico's audited financial statements for Fiscal Year 2013-Fiscal Year 2014, which were not released until July 1, 2016, the main public pension systems in Puerto Rico—the Puerto Rico Teachers Retirement System (TRS), the Puerto Rico Government Employees Retirement System (ERS), and the Puerto Rico Judiciary Retirement System (JRS)—"are at risk of becoming insolvent."

  o As of June 30, 2015, the TRS reported a net pension liability of $15.0 billion with a "funded ratio"—the value of assets as a percentage of total pension liability—of 8.1 percent.

  o As of June 30, 2015, the ERS—which provides retirement benefits to former central government employees, municipal government employees, and employees of all but one public corporation—is in a *negative* funded position, when assets are considered net of pension obligation bond proceeds. ERS reported a net pension liability of $33.2 billion with a funded ratio of -1.8 percent.

---

[10] See Testimony of Sergio M. Marxuach, Center for a New Economy, Hearing on "Financial and Economic Challenges in Puerto Rico," Senate Committee on Finance, September 29, 2015, at page 25; Carlos A. Colón De Armas, Submission to Congressional Task Force on Economic Growth in Puerto Rico, at page 12; D. Andrew Austin, Puerto Rico's Current Fiscal Challenges: In Brief, Congressional Research Service, June 3, 2016, at page 10.

[11] See Federal Reserve Bank of New York, An Update on the Competitiveness of Puerto Rico's Economy, July 31, 2014, at page 16.

    o  As of June 30, 2015, the JRS net pension liability was $542.6 million, with a funded ratio of 7.3 percent.

| ($ thousands) | ERS 2015 | TRS 2015 | JRS 2015 |
|---|---|---|---|
| **Total Pension Liability (TPL)** | 32,669,162 | 16,307,731 | 585,312 |
| **Actuarial Value of Assets (net)** | (578,633) | 1,313,148 | 42,729 |
| **Net Pension Liability** | 33,247,795 | 14,994,583 | 542,583 |
| **Net Position as % of TPL** | -1.8% | 8.1% | 7.3% |

- According to the U.S. Census Bureau, Puerto Rico's population was 3,808,610 in 2000. The island's population peaked in 2004, at 3,826,878 and has decreased every year since then. Puerto Rico's population in 2015 stood at 3,474,182. From the 2004 peak, that is a loss of 352,696 persons, or 9.2 percent. Researchers at the FRBNY have called the population loss in the territory "staggering" and published multiple reports examining its nature and implications.[12] According to the 2015 American Community Survey, there are now 5.4 million individuals of Puerto Rican birth or descent living in the 50 states and the District of Columbia, up from 3.8 million in 2005. Of those 5.4 million, 1.7 million were born in Puerto Rico, up from 1.3 million in 2005.

- According to the FRBNY, the mortgage delinquency rate (the percentage of mortgage balances that are more than 90 days due) in both Puerto Rico and the United States as a whole rose sharply between 2005 and 2009. While the delinquency rate in the United States has since fallen to about 2 percent, the delinquency rate in Puerto Rico—which peaked in 2010 at 8 percent—"has remained stubbornly high, at 7 percent." The FRBNY notes that "[s]erious delinquency rates on other forms of debt in Puerto Rico also remain well above those on the mainland."

- FRBNY researchers have identified a number of challenges facing Puerto Rico—such as the need to improve labor market opportunities, develop human capital, lower the costs of doing business, mobilize financing for business development and growth, and reduce dependence on the "shrinking" pharmaceutical industry—and presented a series of corresponding policy recommendations.[13] While the Task Force does not necessarily endorse all of the policy

---

[12] See, e.g., Migration in Puerto Rico:  Is There a Brain Drain?, Liberty Street Economics, August 9, 2016; Population Lost:  Puerto Rico's Troubling Out-Migration, Liberty Street Economics, April 13, 2015; The Causes and Consequences of Puerto Rico's Declining Population, Current Issues in Economics and Finance (Volume 20, Number 4; 2014).

[13] See, e.g., Federal Reserve Bank of New York, A Report on the Competitiveness of Puerto Rico's Economy, June 29, 2012; Federal Reserve Bank of New York, An Update on the Competitiveness of Puerto Rico's Economy, July 31, 2014; William C. Dudley, President and Chief Executive Officer,

recommendations of the FRBNY researchers, it does believe they are worthy of study and debate.

- A decade ago, researchers from across the political spectrum, organized by the Brookings Institution and the Puerto Rico-based Center for the New Economy (CNE), authored a series of academic papers on obstacles to economic growth in Puerto Rico, and policies that could help overcome those obstacles, and these papers were compiled in a 2006 book.[14]  Many of the challenges identified at the time remain challenges today, and some have become more severe.  Corrective actions that could have been taken at the time were not, in part because of Puerto Rico's excessive reliance on debt financing.  While the Task Force does not necessarily endorse all of the policy recommendations contained in the Brookings-CNE book, it does believe that the book remains a useful tool for policymakers thinking about Puerto Rico.

## 2.  Puerto Rico's Treatment Under Federal Programs

The U.S. Supreme Court has held that the Territory Clause of the U.S. Constitution (Article IV, Section 3, Clause 2) authorizes Congress to treat territories differently than states under federal laws and programs as long as there is a "rational basis" for the differential treatment.  Congress generally determines whether Puerto Rico and the four other territories are eligible for federal programs on a case-by-case basis, and defines any differential treatment in law.  Puerto Rico is treated the same as the states under certain federal programs, and differently than the states under other federal programs.

Federal law provides that a bona fide resident of Puerto Rico is generally not required to pay federal tax on income he or she earns in Puerto Rico (except for income earned by the roughly 9,400 federal government employees on the island), and that a corporation organized in Puerto Rico is generally treated as a foreign corporation for U.S. tax purposes, and therefore is generally not required to pay federal tax on its Puerto Rico-source income.[15]

---

Federal Reserve Bank of New York, "Opportunities for Economic Growth in Puerto Rico," November 29, 2016.

[14] See The Economy of Puerto Rico:  Restoring Growth, edited by Susan M. Collins, Barry P. Bosworth, and Miguel A. Soto-Class (CNE/Brookings 2006).

[15] For information on Puerto Rico's treatment under federal tax law, see Federal Tax Law And Issues Related To The Commonwealth Of Puerto Rico, Joint Committee on Taxation, September 28, 2015 (JCX-132-15); Puerto Rico, Information on How Statehood Would Potentially Affect Selected Federal Programs and Revenue Sources, Government Accountability Office, March 2014 (GAO-14-31); and Sean Lowry, Tax Policy and U.S. Territories: Overview and Issues for Congress, Congressional Research Service, October 7, 2016.

In those instances when Congress does choose to treat Puerto Rico differently than the states under a particular federal assistance program that is funded by appropriations made from the general fund of the United States, Congress often relies, either explicitly or implicitly, on the argument that such differential treatment is warranted because individuals and businesses in Puerto Rico do not contribute federal income taxes into the general fund to the same degree and extent as their counterparts in the states.

The tax treatment of U.S. corporations operating in Puerto Rico is more complex.  U.S. corporations are subject to federal income tax on their worldwide earnings.  Generally, income earned by the active business operations of U.S. corporations in Puerto Rico is considered foreign-source income.  Federal tax on active corporate income earned in Puerto Rico by foreign *subsidiaries* of U.S. corporations—known as controlled foreign corporations (CFCs)—can be deferred until these earnings are "repatriated" to the United States in the form of dividend distributions to the U.S. parent corporation.  However, federal tax on the income earned by foreign *branches* of U.S. corporations is not deferrable.  A foreign subsidiary is a legal entity separate from its parent company, while a foreign branch is an extension of a domestic company.  Most, but not all, U.S. corporations with active business operations in Puerto Rico are organized as CFCs.

Federal law generally requires individuals and businesses in Puerto Rico to pay federal tax on income they earn outside of Puerto Rico, whether in the United States or in a foreign country.  Federal law also requires employers and employees in Puerto Rico to pay all federal payroll taxes, which fund the Old Age, Survivors, and Disability Insurance program (Social Security), the Medicare hospital insurance program, and the federal unemployment compensation program.  According to the 2015 Internal Revenue Service Data Book, the IRS collected $3.52 billion in federal taxes on individuals and businesses in Puerto Rico in Fiscal Year 2015.[16]

With the assistance of CRS, the Task Force has created a table of approximately 40 federal programs that allocate resources according to a formula, as distinct from programs that allocate resources on a competitive basis, under which Puerto Rico is treated differently than the states and, in certain cases, differently than other territories.  The table, which appears in **Appendix 3**, is intended to be thorough but not exhaustive.  It provides:  (1) the name of the program; (2) the federal executive branch agency that administers the program; (3) the congressional committees in the Senate and the House with jurisdiction over the program; and (4) a description of Puerto Rico's differential treatment under the program.  The table also includes certain programs that allocate resources but do not fall within the commonly-understood definition of a formula-based program.

---

[16] See Internal Revenue Service Data Book, at page 12, Table 5.

This table is intended solely to provide factual information to policymakers and the public. Reference to a program should not be interpreted to signify either support for or opposition to Puerto Rico's differential treatment under the program on the part of the Task Force. Later in the report, the Task Force will make recommendations pertaining to several of these programs.

With respect to federal programs that allocate resources on a competitive basis, rather than pursuant to a formula prescribed in law, the Task Force's informed judgment is that entities in Puerto Rico—whether it be the central government, municipal governments, for-profit firms, or non-profit organizations—tend to fare poorly relative to entities in other jurisdictions, and often do not apply for available funding or apply unsuccessfully. While there is no simple way to reverse this trend, the Task Force believes that steps should be taken by Puerto Rico-based entities to better familiarize themselves with competitive funding opportunities across the federal government, and that the government of Puerto Rico and federal agencies should enhance their respective efforts to provide these entities with information and technical assistance.

In addition, the Task Force is aware of numerous instances in which the government of Puerto Rico has received a formula-based or competitive grant from the federal government, but has not utilized all of that funding within the applicable time frame, thereby requiring the return of unused funding to the federal treasury. Although this problem is not unique to Puerto Rico, it does appear to be more pronounced on the island compared to other jurisdictions, based on information provided to the Task Force. The Task Force urges the government of Puerto Rico as a whole, and each Puerto Rico agency individually, to scrutinize its grant management system so as to reduce such funding reversions to the greatest extent possible. The Task Force further urges the government of Puerto Rico to make appropriate use of available federal support services in this area. Every federal grant dollar returned by the local government is a missed opportunity to assist the people of Puerto Rico.

### Discussion and Recommendations

#### 1. Health Care

Section 409(g)(1) of PROMESA requires the Task Force to make recommendations regarding impediments in current federal law and programs to economic growth in Puerto Rico, "including equitable access to federal health care programs."

On October 7th, the Task Force held a staff-level briefing with officials from the U.S. Department of Health and Human Services (HHS). The Task Force also spoke to a wide range of stakeholders in Puerto Rico's health care community. In addition, numerous individuals and

organizations made submissions via the Task Force's email portal that discuss this topic. Finally, the Task Force consulted an analysis of the subject prepared by CRS.[17]

### A. Medicaid

The Task Force believes that the future financing of the Medicaid program in Puerto Rico is a serious and urgent issue facing federal policymakers attempting to address the territory's economic and social challenges.

Members of the Task Force have differing views regarding the proper role of the federal government in financing federal health programs in general and the Medicaid program in particular, as well as regarding the relative merits of the 2010 Patient Protection and Affordable Care Act (ACA; P.L. 111-148, as amended).   However, Task Force members agree that, irrespective of these larger policy disagreements and the congressional debates they will continue to generate in the coming years, an equitable and sustainable legislative solution to the financing of Puerto Rico's Medicaid program should be enacted early in 2017.

Medicaid is a joint federal-state program that finances the delivery of medical services for low-income individuals.   In Fiscal Year 2015, Medicaid (including the State Children's Health Insurance Program, or CHIP) is estimated to have provided health care services to 73 million individuals at a total cost of $509 billion in federal and state expenditures.

Puerto Rico's Medicaid program, known locally as Mi Salud, has about 1.4 million enrollees, which is over 40 percent of the island's population, a higher proportion than the 50 states and the District of Columbia.   Like numerous states, Puerto Rico uses a managed care system to deliver Medicaid services.   The territory's Medicaid agency contracts with managed care organizations that accept a set per-member, per-month payment, known as a capitation payment.

Federal Medicaid funding to the states and the District of Columbia is open-ended—that is, not subject to any cap.   The federal government reimburses each state for a portion of the state's Medicaid expenditures.   The federal share is known as the federal medical assistance percentage (FMAP).   The FMAP is determined by a formula set in statute and varies by state, with a higher reimbursement rate provided to states with lower per capita incomes, and vice versa.[18]   There is a statutory minimum FMAP rate of 50 percent and a statutory maximum FMAP rate of 83

---

[17] See Annie L. Mach et al, Puerto Rico and Health Care Finance:  Frequently Asked Questions, Congressional Research Service, June 27, 2016.

[18] As of Fiscal Year 1998, the District of Columbia's FMAP rate is set by statute at 70 percent.  Without this exception, it would be at the statutory minimum of 50 percent.

percent.[19]   In Fiscal Year 2016, nine states, including the District of Columbia, had an FMAP rate of 70 percent or above, with Mississippi having the highest at 74.17 percent.[20]

By contrast, in Puerto Rico and the other territories, federal Medicaid funding is subject to an annual cap pursuant to Section 1108 of the Social Security Act (42 U.S.C. 1308).  The cap increases annually according to the change in the Consumer Price Index for All Urban Consumers (CPI-U).  Once the annual federal funding cap is reached, the territory government is responsible for the remaining cost of all Medicaid services.  Puerto Rico's annual cap in Fiscal Year 2016 was $335.3 million.[21]

Also in contrast to the states, the FMAP rates for the territories are not based on per capita income, but rather are fixed in federal statute.  Prior to July 1, 2011, the statutory FMAP rate for the territories was 50 percent.  If the FMAP rates for the territories were calculated based on per capita income, each territory would have an FMAP rate in the 70 to 80 percent range.[22]

Members of the Task Force recognize that the ACA contained both positive and negative elements for the territories' Medicaid programs, insofar as the law provided additional funding but made that funding temporary.  Specifically, the ACA provided for a one-time increase in Medicaid funding for the territories of $7.3 billion, of which Puerto Rico received $6.4 billion. The ACA also permanently increased the territories' statutory FMAP rate from 50 percent to 55 percent—still below the FMAP rate each territory would receive if its rate were based on per capita income.

---

[19]  This discussion involves the "regular" FMAP rate.  Current federal law provides for higher—"enhanced"—FMAP rates for certain services or population groups, which is not pertinent for present purposes.

[20]  This information is drawn from Alison Mitchell, "Medicaid's Federal Medical Assistance Percentage (FMAP)," Congressional Research Service, February 9, 2016.

[21]  According to the Centers for Medicare and Medicaid Services, Puerto Rico's annual cap was $45 million in Fiscal Year 1983, $79 million in Fiscal Year 1993, $207.3 million in Fiscal Year 2003, and $280 million in Fiscal Year 2010.  The Fiscal Year 2016 cap was $11.1 million for American Samoa, $5.9 million for the Northern Mariana Islands, $16.3 million for Guam, and $16.8 million for the U.S. Virgin Islands.

[22]  According to CRS, Puerto Rico's FMAP rate would likely be 83 percent, the maximum rate allowable under current Medicaid law.  See Annie L. Mach et al, Puerto Rico and Health Care Finance:  Frequently Asked Questions, Congressional Research Service, June 27, 2016, at page 25, footnote 88.

To date, according to CMS, Puerto Rico has drawn down all but approximately $1 billion of this $6.4 billion in supplemental funding.[23]   Based on CMS's projections, Puerto Rico's supplemental funding will be depleted before the end of calendar year 2017, a date that has come to be known as the "Medicaid cliff."  Once Puerto Rico depletes this supplemental funding, it will revert to receiving only its annual capped federal Medicaid allotment, which is expected to be $357.8 million in Fiscal Year 2018.[24]

Members of the Task Force understand the often-heard argument that Puerto Rico does not receive state-like treatment under Medicaid because the program is financed from the general fund of the United States, and individuals and businesses in Puerto Rico are not required under federal law to contribute to the general fund to the same degree and extent as their counterparts in the states.  Some members of the Task Force believe that different treatment on the tax-contribution side of the ledger may warrant different treatment on the federal outlay side of the ledger.  Other members of the Task Force do not subscribe to this view.  However, all members of the Task Force believe that, even if differential tax treatment may potentially serve as an argument against *equal* treatment for Puerto Rico under Medicaid, more *equitable* treatment should still be considered.

While it would be wrong to attribute Puerto Rico's annual deficits and accumulated debt solely, or even mainly, to the disproportionate burden it bears in financing its Medicaid program, it would also be wrong to deny that this funding disparity has been a meaningful factor contributing to Puerto Rico's fiscal condition.

Inadequate federal financing for Puerto Rico's Medicaid program long pre-dates the 2010 ACA. It will remain an urgent problem whether the ACA is retained or not.

Inadequate federal financing for Puerto Rico's Medicaid program may "save" federal taxpayer dollars in the short term.  However, over time, these savings are likely to be at least partially offset by the additional costs borne by the federal government and state governments as a result of conditions-based migration from Puerto Rico to the U.S. mainland.  The costs will be

---

[23] Puerto Rico drew down an average of $917 million in supplemental funding annually between Fiscal Year 2012 and Fiscal Year 2016.  In Fiscal Year 2012, the first full year in which this funding was available, Puerto Rico drew down $564 million.  In Fiscal Year 2016, the most recent completed fiscal year, Puerto Rico drew down $1.3 billion.

[24] In addition to its annual capped federal allotment under Section 1108 of the Social Security Act, Puerto Rico receives CHIP funding ($180 million in Fiscal Year 2016); so-called enhanced allotment program (EAP) funding under Section 1935 of the Social Security Act ($49 million in Fiscal Year 2016, less than half of which it was able to utilize, as detailed in the "Medicare Part D" section below); electronic health records (EHR) funding ($35 million in Fiscal Year 2014); and administrative funding for its Medicaid Management Information System (MMIS; $900,000 in Fiscal Year 2014).

particularly significant for states, like Florida, that are popular destinations for individuals from Puerto Rico.

If Congress does not enact legislation to avoid the impending Medicaid cliff, the consequences for the health care system in Puerto Rico are likely to be severe.  The government of Puerto Rico, which currently lacks the ability to borrow money in the capital markets to fill the large hole that will be left by the loss of federal funding, would presumably be compelled either to drop hundreds of thousands of current enrollees from the Medicaid program (harming quality of life and spurring outmigration) or to reallocate funds from other areas, such as payments to creditors and the provision of public services.

The approaching Medicaid cliff, a foreseeable consequence of the funding structure established in the ACA's provisions regarding the territories, presents policymakers with the need to address this issue in the near term.  Given its magnitude, the cliff is certain to disrupt any existing stability in the provision of health care services in Puerto Rico for a large number of beneficiaries.

The Task Force makes the following recommendations:

- The Task Force believes that Puerto Rico and the other territories should be treated in a more equitable and sustainable manner under the Medicaid program, in order to improve patient outcomes in the territories, to strengthen the health care systems in the territories, to enhance federal oversight of those systems, to reduce the incentive for migration from the territories to the states and the associated financial costs to state governments and the federal government, and to stabilize and strengthen the fiscal condition of the territory governments. To that end, the Task Force recommends that **Congress** enact fiscally-responsible legislation to address the impending Medicaid cliff established by the ACA.  The Task Force recommends that Congress begin to address the funding issue early in calendar year 2017 to enable the Puerto Rico Medicaid agency to engage with more certainty when formulating capitation payment contracts with its managed care organizations for Puerto Rico Fiscal Year 2017-2018, which begins on July 1, 2017.  In addition, the Task Force recommends that, going forward, federal financing of the Medicaid programs in Puerto Rico and the other territories should be more closely tied to the size and needs of the territory's low-income population.  Finally, the Task Force recommends that any additional federal Medicaid funding provided to Puerto Rico must be paired with appropriate oversight of and safeguards on Puerto Rico's Medicaid program through use of the MFCU and MMIS mechanisms.

- Federal law requires every state, the District of Columbia, and each U.S. territory to operate a Medicaid Fraud Control Unit (MFCU) to investigate and prosecute Medicaid provider fraud and patient abuse or neglect under state law, unless the state or territory receives a waiver by

demonstrating to the satisfaction of the Secretary of HHS that the operation of a MFCU would not be cost-effective.[25]   MFCUs are typically part of the state Attorney General's office; employ teams of investigators, attorneys, and auditors; and must be separate and distinct from the state Medicaid agency.   Currently, 49 states (North Dakota being the exception) and the District of Columbia have MFCUs.   Federal law provides for an enhanced FMAP rate to support MFCUs.   None of the five territories operate a MFCU, presumably inhibited from doing so because of the annual federal Medicaid funding cap that applies to the territories.[26]   The Task Force recommends that **Congress** enact legislation to remove the current disincentive to establish MFCUs that exists in the territories as a consequence of the annual funding cap.[27]   Once that occurs, the Task Force recommends that the government of Puerto Rico establish a MFCU.

- States and territories are required to operate an automated claims processing and information retrieval system, or Medicaid Management Information System (MMIS), to administer their state Medicaid plans.   The overarching purpose of an MMIS is to enhance the efficiency and improve the internal controls over a jurisdiction's Medicaid program and to minimize the potential for waste, fraud and abuse.   Puerto Rico is already working with CMS to develop an MMIS, with $55 million—$46 million in federal funding and $9 million in local funding— having been committed to this effort to date.   In the written agreements between CMS and the government of Puerto Rico, there are several clearly-delineated targets and milestones to be achieved.   The Task Force recommends that **Congress** ensure that Puerto Rico's ongoing efforts to construct its MMIS continue to completion in compliance with the funding agreements with CMS, and believes that it is appropriate to require continued progress on the MMIS and achievement of targets and milestones set forth in the agreements with CMS as a condition for additional federal Medicaid funding.

---

[25] See Social Security Act 1902(a)(61), 1903(q).

[26] See Testimony of John Hagg, Director of Medicaid Audits, Office of Inspector General, U.S. Department of Health and Human Services, Hearing on "Strengthening Medicaid Program Integrity and Closing Loopholes," House Committee on Energy and Commerce, September 11, 2015, at page 5 (noting that "[t]he major barrier to establishing a MFCU in Puerto Rico and the other territories is the nature of Medicaid funding for the territories," since "the territories receive a capped appropriation to provide both Medicaid services and most administrative costs, which would include operation of a MFCU").

[27] See H.R. 3444, Medicaid and CHIP Territory Fraud Prevention Act (114th Congress; Rep. Pitts), bipartisan legislation that would accomplish this objective.

### B.  Medicare

### I.   Medicare Part A

Medicare is a federal program that pays for covered health care services to individuals over age 65 and certain individuals with disabilities.  Medicare Part A provides coverage for inpatient hospital services, as well as services like skilled nursing, home health, and hospice care.  Unlike hospitals in the other territories, which are paid on a cost basis, subject to certain limitations, hospitals in Puerto Rico are paid using a prospective payment system that is comparable to the Medicare inpatient prospective payment system (IPPS) created to pay hospitals in the 50 states. Hospitals in Puerto Rico are not included in Medicare's current definition of a "subsection (d) hospital"—which denotes hospitals located in the states.   Congress enacted a separate prospective payment system for "subsection (d) Puerto Rico hospitals" in the Omnibus Budget Reconciliation Act of 1986, effective for payments starting in Fiscal Year 1986.

Eligible hospitals in the states and Puerto Rico that treat a certain share of low-income patients can receive additional payments—called Medicare Disproportionate Share Hospital (DSH) payments—to offset the financial effects of treating such patients.  Prior to Fiscal Year 2014, DSH payments were provided by a single statutory formula that increased the inpatient prospective payment system (IPPS) reimbursement amount based on the disproportionate patient percentage (DPP).  The DPP was based on a hospital's share of low-income patients, defined as the share of Medicare inpatient days for individuals entitled to federal Supplemental Security Income (SSI) benefits out of a hospital's total Medicare inpatient days (Medicare/SSI), plus the share of Medicaid inpatient days out of the hospital's total inpatient days.

In Fiscal Year 2014 and subsequent years, DSH funding has been split into two payments with separate methodologies:  (1) "empirically justified" DSH payments, which continue to be based on the traditional DPP, but are limited to 25 percent of the DSH payments that they would have received under prior law; and (2) "uncompensated care pool" fixed DSH payments, which are defined as 75 percent of aggregated operating DSH payments as calculated under the prior DSH formula, multiplied by 1 minus the annual percentage decline in the national uninsured rate.  In Fiscal Year 2017, as a proxy for hospital uncompensated care data, the uncompensated care pool will be allocated to hospitals based on their share of Medicaid and Medicare SSI days relative to all other hospitals that receive DSH payments.  CMS currently projects a 44 percent decline in the national uninsurance rate between 2013 and 2017, estimating that approximately $6 billion will be allocated through the DSH uncompensated care pool in 2017.

Currently, Medicare/SSI is a factor in calculating each of the two different DSH payments. However, Congress has not extended the SSI program to Puerto Rico.  Instead, Puerto Rico continues to use its own prior income-related disability payment program, called AABD.  While

Puerto Rico hospitals may provide care to certain individuals living on the mainland who are eligible for SSI, the vast majority of Puerto Rico residents are ineligible for SSI. Therefore, using Medicare SSI days as a portion of total Medicare days to calculate the DSH uncompensated care pool payment formula—along with the failure to design a payment methodology that appropriately accounts for days provided to patients in both the Puerto Rico disability program and the SSI program—do place Puerto Rico hospitals at a disadvantage.

The Secretary of HHS, using administrative authority in the Fiscal Year 2017 Medicare IPPS final rule, modified the uncompensated care pool payment formula to use 14 percent of a Puerto Rico hospital's Medicaid days as a proxy for Medicare/SSI days. The Secretary did not use a proxy for Medicare/SSI in the empirically justified DSH payment formula, noting that the DPP is prescribed in statute for empirically justified DSH.

The Task Force makes the following recommendation:

- Because the SSI program does not apply in Puerto Rico, the Task Force recommends that **Congress** consider providing increased flexibility to the Secretary of HHS to identify data collection and analysis gaps that could be used to improve the accuracy and efficiency of Medicare DSH payments to Puerto Rico hospitals. For example, one possibility would be to develop a policy that uses a proxy that updates the empirically justified DSH payment formula calculation for subsection (d) Puerto Rico hospitals.

## II.   Medicare Part B

Medicare Part B provides coverage for physicians' services, outpatient hospital services, durable medical equipment, outpatient dialysis, and other medical services. Residents of every state and territory *other than Puerto Rico* who are receiving Social Security benefits are automatically enrolled in both Part A and Part B, with coverage beginning the first day of the month they turn 65. In addition, disabled individuals who have received cash payments for 24 months under the Social Security disability programs are automatically enrolled in Part B unless they decline such coverage. Because beneficiaries must pay a premium for Part B coverage, they have the option of opting out of Part B coverage.

Those individuals who are not automatically enrolled in Medicare—for example, because they have not filed for Social Security benefits—must file an application for Part A and Part B with the Social Security Administration during their seven-month initial enrollment period, which begins three months before the month in which they turn 65. Beneficiaries who do not sign up for Part B during this initial enrollment period may have to pay a late-enrollment penalty for as long as they are enrolled in Part B. The late-enrollment penalty increases Part B monthly premiums by 10 percent for each full 12-month period that one could have had Part B but did not

sign up for it.  Certain low-income beneficiaries may qualify for Part B premium assistance from Medicaid through a Medicare Savings Program (MSP).  Beneficiaries in an MSP are not subject to late-enrollment penalties regardless of when they signed up for Medicare.

Under federal law, when residents of Puerto Rico turn 65 and start receiving Social Security benefits, they are automatically enrolled in Part A, but not automatically enrolled in Part B. Instead, beneficiaries in Puerto Rico are required to take the affirmative step of enrolling in Part B during their seven-month initial enrollment period.  If they fail to enroll, they are subject to a lifetime late-enrollment penalty.[28]

The lack of an automatic Part B enrollment process in Puerto Rico has resulted in a disproportionate number of Medicare beneficiaries in Puerto Rico paying the lifetime late-enrollment penalty.  Puerto Rico does not have an MSP program, so low-income beneficiaries subject to this penalty may be responsible for paying the full penalty amount in addition to their premiums.  According to CMS, there are currently 5,739 Medicare beneficiaries in Puerto Rico who are paying a lifetime penalty for enrolling late in Part B.  In addition, according to CMS, there are 108,678 individuals in Puerto Rico who are currently enrolled in Part A only, not Part B.  Many of those individuals, if they do elect to enroll in Part B, will be subject to a lifetime late enrollment penalty.

The Task Force makes the following recommendations:

- The Task Force recommends that **Congress** amend federal law so that, going forward, Medicare beneficiaries in Puerto Rico are automatically enrolled in Medicare Part B with the option to opt out of coverage, the same way their counterparts in every state and other territory are treated.

- As long as Puerto Rico remains the only U.S. jurisdiction where Medicare beneficiaries are required to opt in to Part B coverage, the Task Force recommends that the **Centers for Medicare and Medicaid Services** and the **Social Security Administration** take timely and targeted steps to educate island residents about the existence of the opt-in requirement and the financial consequences of late enrollment.

### III.    Medicare Part C

The Medicare Advantage program, or Medicare Part C, gives Medicare beneficiaries the option to receive covered benefits from private health plans that are paid a per-member, per-month amount to provide services covered by the traditional Medicare fee-for-service program for Part A and B benefits.  Many Medicare Advantage plans provide additional supplemental benefits,

---

[28] See Social Security Act 1837(f)(3).

such as dental and vision.  According to CRS, in May 2015, 75 percent of Medicare beneficiaries in Puerto Rico were enrolled in an MA plan, compared with 32 percent of beneficiaries in the 50 states and the District of Columbia.  More than half of MA enrollees in Puerto Rico are in a special type of MA plan called a Special Needs Plan (SNP).  While there are three different types of SNPs, nearly half of Puerto Rico beneficiaries are enrolled in a Dual-Eligible SNP (D-SNP), which is a plan that enrolls individuals who are eligible for both Medicare and Medicaid.[29]  Dual eligible beneficiaries tend to experience high rates of chronic illness and multiple chronic conditions.

To address the needs of this particular population, the 2017 Medicare Advantage Final Call Letter included a number of policies to improve stability in the Medicare Advantage program in Puerto Rico.  These policies include a change in payment that CMS estimates will result in increased revenue for MA plans in Puerto Rico.  More specifically, the following policies have been adopted through the 2017 Medicare Advantage Final Call Letter:

- A change in the risk adjustment model that will increase payments to plans with high proportions of full benefit dual eligible beneficiaries, which CMS estimates will benefit Puerto Rico more than any other state or territory;

- An adjustment to the fee-for-service payment basis for plans in 2017 to reflect the higher payments made to hospitals in Puerto Rico in 2016;

- An adjustment to the weighting of the enrollment and risk scores for Medicare beneficiaries based on the nationwide proportion (rather than Puerto Rico alone) of Medicare beneficiaries enrolled in both Parts A and B in fee-for-service that have no Medicare claim reimbursements for a year.  CMS applied a 4.4 percent adjustment to the pre-standardized Puerto Rico fee-for-service rates to help develop the benchmarks for 2017; and

- Changes to the Star Ratings System to reflect socioeconomic status specifically related to low income subsidy/dual eligible and/or disability status.[30]

The Task Force makes the following recommendation:

- The Task Force notes that the Medicare Advantage penetration rate continues to grow in the United States more generally as well as in Puerto Rico specifically, where the penetration

---

[29] See Annie L. Mach et al, Puerto Rico and Health Care Finance: Frequently Asked Questions, Congressional Research Service, June 27, 2016, at page 15.

[30] See generally Centers for Medicare and Medicaid Services, Supporting Medicare in Puerto Rico, April 4, 2016.

rate is higher than in any other U.S. jurisdiction.  As more Medicare beneficiaries choose to enroll in the Medicare Advantage program, the Task Force recommends that **Congress** and **the Centers for Medicare and Medicaid Services** consider whether additional legislative or administrative steps may be warranted to ensure that MA plans, including those in Puerto Rico, are being fairly and properly compensated for the services they provide to beneficiaries.

## IV.    Medicare Part D

Medicare Part D provides an outpatient prescription drug benefit, either through private prescription drug plans that offer only drug coverage or through Medicare Advantage prescription drug plans that offer coverage as part of broader, managed-care plans.  In the states and the District of Columbia, Medicare beneficiaries with incomes up to 150 percent of the federal poverty level are eligible to receive a low-income subsidy (LIS) from the federal government, which reduces or eliminates their monthly premium and other out-of-pocket costs associated with Part D.

Pursuant to federal law, residents of the territories are not eligible for the LIS.[31]  In lieu of the LIS, federal law provides a fixed amount of funding to each territory to provide *Medicaid* coverage of prescription drugs for low-income Medicare beneficiaries.  This funding is provided pursuant to Section 1935(e) of the Social Security Act, and is referred to as the enhanced allotment program (EAP).  Currently, annual EAP funding to Puerto Rico is between $40 million and $50 million.  This is substantially less than the aggregate amount of financial support that low-income Medicare beneficiaries in Puerto Rico would receive if residents of the territories were eligible for the LIS.

Each territory government is required to match its EAP funding at its regular Medicaid FMAP rate of 55 percent.  This means for every dollar a territory spends on providing Medicaid coverage for prescription drugs to low-income Medicare beneficiaries, the territory draws down 55 cents from its allotted Section 1935(e) funding, up to the annual limit, and is responsible for the remaining 45 cents.

Because of the local match requirement, the territories (to varying degrees) have struggled to draw down EAP funding, often leaving much of the funding unused despite a significant need for the funding.  For example, between Fiscal Year 2010 and Fiscal Year 2016, Puerto Rico has

---

[31] See Social Security Act 1860D-14(a)(3)(F).

been able to draw down only about 51 percent of its EAP funding, as reflected in the following chart.[32]

|  | EAP Allotment | PR Draw Down | Percentage |
|---|---|---|---|
| FY 2010 | $49,339,617 | $49,339,618 | 100.0% |
| FY 2011 | $51,701,315 | $23,716,209 | 45.87% |
| FY 2012 | $43,580,880 | $17,357,642 | 39.83% |
| FY 2013 | $44,156,704 | $21,818,368 | 49.41% |
| FY 2014 | $42,361,118 | $16,936,666 | 39.98% |
| FY 2015 | $44,040,604 | $9,240,022 | 20.98% |
| FY 2016 | $49,171,794 | $28,332,152 | 57.61% |
| **FY 2010 – FY 2016** | **$324,352,032** | **$166,740,677** | **51.41%** |

The Task Force makes the following recommendations:

- The Task Force recommends that **Congress** eliminate the requirement that each territory government meet a local Medicaid matching requirement in order to draw down its annual EAP funding. The Task Force notes that the matching requirement has prevented the government of Puerto Rico and other territory governments from effectively utilizing EAP funding to help low-income Medicare beneficiaries purchase prescription drugs. The Task Force further recommends that Congress consider increasing the annual EAP allotment for each territory by a reasonable amount and in a fiscally responsible manner, so that the allotment is more closely tethered to actual need in each territory. Finally, the Task Force recommends that Congress explore the feasibility and cost of extending the LIS to residents of the territories and eliminating the EAP program.[33]

## V.    CMS Administrative Flexibility

Because Puerto Rico and the other territories are treated differently than the states under federal health statutes, it is not uncommon for a literal interpretation by the Centers for Medicare and

---

[32] The data underlying this computation were provided by CMS. In addition, according to CMS data, the percentage of EAP funding utilized by the U.S. Virgin Islands between Fiscal Year 2010 and Fiscal Year 2016 was only 27 percent. The percentage utilized by American Samoa, Guam and the Northern Mariana Islands between Fiscal Year 2010 and Fiscal Year 2014 (more recent data have not been provided to the Task Force) was 94 percent, 81 percent, and 93 percent, respectively. However, there have been recent fiscal years in which both Guam and the Northern Mariana Islands drew down less than 55 percent of their EAP funding.

[33] See S. 2342, Territories Medicare Prescription Drug Assistance Equity Act of 2015 (114th Congress; Sen. Nelson); H.R. 4163, Territories Medicare Prescription Drug Assistance Equity Act of 2015 (114th Congress; Rep. Pierluisi); and Section 215 of S. 2675, Puerto Rico Recovery Act of 2016 (114th Congress; Sen. Menendez).

Medicaid Services of a statutory formula that provides for payments to physicians, hospitals or health plans to lead to anomalous results for Puerto Rico that may not have been intended by Congress, as evidenced by the Medicare Part A example discussed above.

The Task Force makes the following recommendation:

- The Task Force recommends that **Congress** consider providing the Centers for Medicare and Medicaid Services with flexibility to make reasoned and justifiable adjustments to a formula providing for payments to physicians, hospitals or health plans in Puerto Rico and the other territories.  Use of this flexibility should be limited to any formula that is dependent in whole or in part on data that are not available or not reliable as it pertains to the territories, or dependent on factors that are inapplicable to the territories.

### C.  Family-to-Family Health Information Center Grant Program

The Family-to-Family Health Information Center Grant program, called the F2F program, is administered by the Health Resources and Services Administration (HRSA) within HHS.[34]

The F2F program was established as part of the Family Opportunity Act, which was included in the Deficit Reduction Act of 2005 (P.L. 109-171).  Pursuant to the program, HRSA makes competitive grants on an annual basis to support Family-to-Family Health Information Centers. These centers are primarily non-profit organizations operated by families with children and youth with special health care needs, and they provide education, training, peer support, and expertise in navigating health care systems for other families of children and youth with special health care needs.  The law establishing the program makes grants available to support a single center in each of the 50 states and in the District of Columbia, but not in Puerto Rico or the other U.S. territories.[35]  The F2F program is currently funded at $5 million per year.  Funding is distributed equally among centers in every state and the District of Columbia, with each center receiving about $95,000 per year, regardless of the state's population.[36]

The Task Force makes the following recommendation:

---

[34] See Family Voices, Submission to Congressional Task Force on Economic Growth in Puerto Rico; Coralaidee Jimenez, Submission to Congressional Task Force on Economic Growth in Puerto Rico.

[35] See 42 U.S.C. 701(c)(5).

[36] In the 113th Congress, the Senate Finance Committee approved S. 1871, the SGR Repeal and Medicare Beneficiary Access Act of 2013.  Section 323 of S. 1871, which did not ultimately become law, would have made the territories eligible for the F2F program.  See Senate Report 113-135, at page 56.

- The Task Force recommends that **Congress** consider amending the law authorizing the Family-to-Family Health Information Center Grant program to enable Puerto Rico and the other territories to participate in the program, in a manner that does not dilute the funding currently available to the states and the District of Columbia.

### D.  Maternal, Infant, and Early Childhood Home Visiting Program

The Maternal, Infant, and Early Childhood Home Visiting Program, also known as the Federal Home Visiting Program, is administered by the Health Resources and Services Administration (HRSA) within HHS.  The program supports home visiting services for families with young children who reside in communities that have concentrations of poor child health and other risk indicators.  Home visits are conducted by nurses, mental health clinicians, social workers, or others with specialized training.

The law does not specify how funds are to be allocated to eligible entities in the states and territories.  In practice, HRSA distributes Federal Home Visiting Program funds by both formula and competitive awards and, on its face, the funding formula treats states and territories the same.  Between Fiscal Year 2010 and Fiscal Year 2015, funding was distributed according to the relative share of children under age five in families at or below 100 percent of the federal poverty line living in each state and territory.  However, the poverty data are derived from the U.S. Census Bureau's Small Area Income Poverty Estimates (SAIPE), which are not available for the territories.  There was a $1 million funding minimum for state and territory grantees, and HRSA allocated this minimum level of funding to each of the territories from Fiscal Year 2011 through Fiscal Year 2015.

For Fiscal Year 2016, HRSA redesigned the funding allocation for formula grants.  About one-third of funding is still allocated based on the share of children under age five in families at or below 100 percent of the federal poverty line in each state and territory, using 2013 SAIPE data that are not available for the territories.  About two-thirds of funding is allocated based on the amount of competitive awards a state or territory received under the Federal Home Visiting Program between Fiscal Year 2013 and Fiscal Year 2015.  There continues to be a $1 million funding minimum for state and territory grantees, and each territory received the base allocation of $1 million in Fiscal Year 2016.

The Task Force makes the following recommendation:

- The Task Force recommends that the **Health Resources and Services Administration**, when allocating funds to Puerto Rico under the Federal Home Visiting Program, utilize an appropriate alternative source for child poverty data, such as the Puerto Rico Community Survey, given that the data source currently used by HRSA to make allocations—the U.S.

Census Bureau's Small Area Income Poverty Estimates (SAIPE)—does not include the territories.

## 2. Federal Tax Policy

### A. Federal Tax Policy Toward Individuals and Families

The Task Force examined federal tax policy toward individuals and families residing in Puerto Rico and the other U.S. territories.  The Task Force, which was directed by Section 409(g)(2) of PROMESA to recommend changes to federal law that could spur economic growth, reduce child poverty and attract investment to Puerto Rico, is making a specific recommendation related to the child tax credit.  The Task Force is also making a broader recommendation on the subject of federal tax policy toward individuals and families in the territories to help guide federal policymakers going forward.

Under current law, the child tax credit (CTC) allows a family to reduce its federal tax liability— the taxes owed before tax credits are applied—by a maximum of $1,000 per child.  The CTC phases out for higher-income families.[37]

The CTC is refundable, meaning that if the value of the credit exceeds the amount of tax a family owes, the family may be eligible to receive a full or partial refund of the difference.  The refundable portion of the credit is often called the additional child tax credit (ACTC).  Families may receive the child tax credit as a reduction in tax liability (the non-refundable portion of the credit), a refundable credit (the ACTC), or a combination of both.  For example, a family with two qualifying children and a tax liability of $1,500 may receive the $2,000 child tax credit ($1,000 per child) as a $1,500 reduction in their tax liability and a $500 refund.

In the states and the District of Columbia, the amount of the ACTC is generally calculated using the earned income formula.  Under this formula, a family may claim an ACTC equal to 15 percent of the family's earnings in excess of $3,000, not to exceed the maximum credit amount ($1,000 multiplied by the number of qualifying children).  For example, a three-child family with annual earnings of $20,000 would be eligible for an ACTC of $2,550:  [($20,000 - $3,000) x .15].

Families with three or more children in the states and the District of Columbia may choose to calculate the ACTC using either the earned income formula or an alternative formula.  The alternative formula is the family's federal payroll taxes (7.65 percent of earnings) minus the value of any earned income tax credit (EITC) the family received, not to exceed the maximum credit amount ($1,000 multiplied by the number of qualifying children).  In the relatively

---

[37] See Section 24 of the Internal Revenue Code.

infrequent event that the ACTC calculated under the alternative formula is larger than the ACTC calculated under the earned income formula, the larger credit can be claimed, but the credit can never exceed $1,000 per qualifying child.

Under current law, families in Puerto Rico with one child or two children are generally not eligible for the ACTC.  While families in Puerto Rico with three or more children are eligible for the ACTC, they must calculate their credit using the alternative formula, which caps the ACTC at the amount of annual federal payroll taxes the family pays.  This is in contrast to their stateside counterparts, who can calculate their credit using either the earned income formula or the alternative payroll tax formula.

Families in Puerto Rico with three or more children claim the ACTC by filing Form 1040-SS directly with the Internal Revenue Service within the U.S. Department of the Treasury.  The Form and accompanying instructions both make explicit that the ACTC can only be claimed by island families with three or more children.

The Task Force makes the following recommendations:

- The Task Force recommends that **Congress** amend Section 24 of the Internal Revenue Code to authorize otherwise eligible families in Puerto Rico with one child or two children to claim the additional child tax credit, with the amount of the credit equal to the amount of annual federal payroll taxes paid by the family or $1,000 per qualifying child, whichever is lower.[38]  This legislative change will provide the same treatment to families in Puerto Rico with one child or two children that is currently provided to island families with three or more children, reducing incentives for island families with less than three qualifying children to claim on Form 1040-SS that they have three or more qualifying children in order to receive the ACTC.  It has been estimated that this proposal could benefit about 355,000 newly-eligible families and 404,000 newly-eligible children in Puerto Rico, with an average credit for all Puerto Rico families of $770, which will help reduce child poverty on the island.

- Although the Task Force reached consensus on the child tax credit, the Task Force does not intend to foreclose debate on whether further modifications to federal tax policy toward individuals and families in Puerto Rico may be appropriate.  To the contrary, the Task Force recommends that **Congress** carefully consider this topic.  Potential options for examination include:  (1) authorizing Puerto Rico families to claim the additional child tax credit using the earned income formula, not merely the alternative payroll tax formula; (2) extending the

---

[38] The Task Force recommends that Congress make a functionally equivalent legislative change for American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands.

earned income tax credit to eligible Puerto Rico households,[39] and (3) providing federal wage subsidies to employees and employers in Puerto Rico.[40]

Because the Task Force received numerous recommendations to extend the earned income tax credit (EITC) to Puerto Rico, the Task Force will address this topic briefly even though no consensus was reached.  While there is some disagreement among Task Force members regarding the appropriateness of extending the EITC to workers in Puerto Rico, there is agreement that Puerto Rico's low labor force participation rate significantly contributes to the island's economic and fiscal problems.  Studies have shown that the EITC increases labor force participation and reduces child poverty, but may have other effects on work incentives in phase-out ranges.

As noted elsewhere in the report, members of the Task Force understand that residents of Puerto Rico are not required to pay federal income taxes on their Puerto Rico-source income.  However, like many of their fellow American citizens in the 50 states and the District of Columbia who receive the EITC and do not earn enough to incur a federal income tax liability, workers in Puerto Rico are subject to all federal payroll taxes.  Notwithstanding the current absence of consensus, members of the Task Force agree that extension of the EITC to Puerto Rico both poses challenges and presents opportunities, and recommends that Congress explore ways to minimize the challenges and maximize the opportunities.

### B.  Other Federal Tax Provisions

### I.  Cover Over of Rum Excise Tax Revenues to Puerto Rico and the U.S. Virgin Islands

Federal excise taxes collected on rum produced in Puerto Rico and transported to the states are covered over—paid—to the treasury of Puerto Rico, and federal excise taxes collected on rum produced in the U.S. Virgin Islands and transported to the states are covered over to the treasury of the U.S. Virgin Islands.  In addition, federal excise taxes collected on rum imported to the United States from foreign countries are covered over to Puerto Rico and the U.S. Virgin Islands pursuant to a formula established by the Alcohol and Tobacco Tax and Trade Bureau within the U.S. Department of the Treasury.[41]  The primary purpose of the cover-over program is to help

---

[39] See S. 2203, Earned Income Tax Credit and Child Tax Credit Equity for Puerto Rico Act of 2015 (114th Congress; Sen. Menendez); and H.R. 3553, Earned Income Tax Credit Equity for Puerto Act of 2015 (114th Congress; Rep. Pierluisi).

[40] See S. 3503, Economic Mobility for Productive Livelihoods and Expanding Opportunity (EMPLEO) Act (114th Congress; Sen. Rubio).

[41] See Section 7652 of the Internal Revenue Code.

the two territories provide essential public services.  The use of funding for public purposes is particularly critical now that the government of Puerto Rico is struggling to fund its health, education and public safety systems.

Federal excise taxes are imposed on rum at the generally applicable distilled spirits rate of $13.50 per proof gallon.[42]  Under current law, excise tax collections on imported rum, including rum produced in Puerto Rico and the U.S. Virgin Islands, are covered over to Puerto Rico and the U.S. Virgin Islands at the rate of $13.25 per proof gallon.  Of this amount, $10.50 per proof gallon is in permanent law and the remaining $2.75 per proof gallon requires periodic reauthorization by Congress as part of tax extenders legislation.  The additional $2.75 per proof gallon was most recently extended through December 31, 2016 as part of the Consolidated Appropriations Act, 2016 (P.L. 114-113).

The Task Force makes the following recommendations:

- The Task Force recommends that **Congress** make the full amount of the rum cover-over payment to Puerto Rico and the U.S. Virgin Islands permanent, rather than permanent in part and subject to tax extenders legislation in part.  The Task Force further recommends that Congress increase the cover-over payment from the current rate of $13.25 per proof gallon to the generally applicable distilled spirits rate, currently $13.50 per proof gallon.  At a minimum, the Task Force recommends that Congress extend the additional $2.75 per proof gallon component of the rum cover-over payment beyond 2016.  Failure to extend the provision will cause harm to Puerto Rico's (and the U.S. Virgin Islands') fiscal condition at a time when it is already in peril.

## II.    Domestic Production Activities in Puerto Rico

The domestic production activities deduction, also known as the domestic manufacturing deduction, was established as part of the American Jobs Creation Act of 2004 (P.L. 108-357).[43]  Under current law, Section 199 allows a company to receive a deduction equal to 9 percent of the taxable income that the company derives from "qualified production activities" within the United States.  This effectively reduces the top federal tax rate that a company will pay on such income from 35 percent to 32 percent.  "Qualified production activities" include, among other things: manufacturing; electricity, natural gas and water production; film production; and construction.  Overall, about one-third of corporate activity nationwide qualifies for the deduction.

---

[42] See Section 5001 of the Internal Revenue Code.

[43] See Section 199 of the Internal Revenue Code; see also Federal Tax Law And Issues Related To The Commonwealth Of Puerto Rico, Joint Committee on Taxation, September 28, 2015 (JCX-132-15).

Although the American Jobs Creation Act of 2004 did not authorize a company to receive the Section 199 deduction on income derived from qualified production activities within Puerto Rico, the Tax Relief and Healthcare Act of 2006 (P.L. 109-432) expanded Section 199 to include activities in Puerto Rico.  However, the provision extending the Section 199 deduction to Puerto Rico applies on a temporary basis and therefore requires periodic reauthorization by Congress through tax extenders legislation.  The provision has been extended five times since 2006, most recently in the Consolidated Appropriations Act, 2016 (P.L. 114-113), and is scheduled to expire on December 31, 2016.  The Section 199 deduction is only available to U.S. companies that operate in Puerto Rico in branch form, which—in contrast to U.S. companies that operate in Puerto Rico in subsidiary form—are subject to full U.S. tax on the income from those operations on an immediate basis.

The Task Force makes the following recommendation:

- As long as the Section 199 domestic production activities deduction remains part of U.S. tax law, the Task Force believes that it should apply in Puerto Rico, a U.S. jurisdiction home to American workers.  The Task Force recommends that **Congress** amend Section 199 so that it applies to Puerto Rico on a permanent basis.  At a minimum, the Task Force recommends that Congress—for the sixth time since 2006—extend the provision beyond 2016.  Failure to extend the provision will create a disincentive for existing and new U.S. businesses to conduct manufacturing operations in Puerto Rico, an outcome that Congress should seek to avoid.

### III.    Special Expensing Rules for Film and Television Productions

Section 181 of the Internal Revenue Code allows a U.S. taxpayer to immediately deduct the cost of a qualified film, television, or live theatrical production, up to $15 million (or $20 million in the case of a production in certain low-income or economically distressed areas).  This provision was most recently extended in the Consolidated Appropriations Act, 2016 (P.L. 114-113), and is scheduled to expire on December 31, 2016.  To be a "qualified production," 75 percent of the total compensation of the production must be "qualified compensation."[44]  The term "qualified compensation" is defined as "compensation for services performed in the United States by actors, directors, producers, and other relevant production personnel."[45]  The term "United States" means the 50 states and the District of Columbia, not Puerto Rico or the other U.S. territories.[46]

---

[44] See Section 181(d)(1).

[45] See Section 181(d)(3).

[46] See Treasury Regulation Section 1.181-3(d), September 30, 2011.

The Task Force makes the following recommendation:

- As long as Section 181 remains part of U.S. tax law, the Task Force recommends that **Congress** amend Section 181 to include Puerto Rico and the other territories within the definition of "United States."   The Task Force believes that Puerto Rico should have the same opportunity as the 50 states and the District of Columbia to generate economic activity and employment opportunities through film, television, and theatrical production, and notes that the ability to showcase local culture and scenery before global film and television audiences can significantly stimulate tourism.

### C.  Federal Tax Policy Toward Businesses

As long as Puerto Rico remains a U.S. territory, and not a state or a sovereign nation, there will be a vigorous debate regarding how businesses with activities in Puerto Rico should be taxed by the federal government.

This debate has historical, philosophical and public policy dimensions.  The debate is historical because there continues to be a dispute over the impact of a now-repealed provision in the Internal Revenue Code, the Section 936 "Puerto Rico and Possession Tax Credit," which was enacted in 1976 and fully phased out by 2006.

Section 936 provided tax preferences for territory activities, enabling U.S. corporations to pay preferred rates on income generated by their Puerto Rico affiliates, thereby creating a "substantial incentive for U.S. investment in [Puerto Rico]."[47]  Some assert that enactment of Section 936 was critical in promoting economic development in Puerto Rico and that its repeal was detrimental to economic growth and investment on the island.[48]  Others argue that the economic benefits for Puerto Rico of Section 936 were overstated and inefficient.  Critics of 936 point to a GAO study which found that tax benefits to corporations often exceeded wages paid, sometimes by a ratio of more than two to one.[49]  The GAO report noted that, while Section 936

---

[47] See Sean Lowry, Tax Policy and U.S. Territories: Overview and Issues for Congress, Congressional Research Service, October 7, 2016, at page 15; see also Federal Tax Law And Issues Related To The Commonwealth Of Puerto Rico, Joint Committee on Taxation, September 28, 2015 (JCX-132-15).

[48] See, e.g., Hon. Alejandro García Padilla, Submission to Congressional Task Force on Economic Growth in Puerto Rico; and Puerto Rico Private Sector Coalition, Submission #1 to Congressional Task Force on Economic Growth in Puerto Rico.

[49] See Puerto Rico and the Section 936 Tax Credit, Government Accounting [subsequently, Accountability] Office, June 8, 1993 (GAO-93-109), at pages 4, 5, 9 (observing that "[s]ignificant debate continues over the effectiveness of section 936 as an impetus for development in Puerto Rico," and noting "[c]oncerns about the tax benefits in relation to employment" on the island).

provided substantial incentive for U.S. investment in Puerto Rico, "an increasing portion of total income produced in Puerto Rico [went] to U.S. and foreign investors [rather] than to Puerto Rican residents."[50]   In light of these and other data, some economists have argued that the decline of manufacturing jobs in Puerto Rico coincided with the repeal of Section 936, but was primarily attributable to other factors, including automation and other technological advancements at manufacturing facilities, increased import competition from other countries, and the reduction in manufacturing employment nationwide.[51]

Naturally, the debate over previous and current federal business tax policies toward Puerto Rico affects the debate over what federal tax policy toward Puerto Rico should be pursued by the next Congress.   Speaking generally, those with more positive views toward Section 936 tend to look more favorably upon the prospect of a new tax incentive targeted at Puerto Rico, while those with more neutral or negative views toward Section 936 tend to look more skeptically upon the prospect of a new tax incentive aimed at the island.   Those in the latter category do not necessarily oppose a new federal tax policy to encourage investment in Puerto Rico, but prefer that it be a policy of general applicability designed to encourage investment in economically-distressed areas throughout the country, including but not limited to Puerto Rico.[52]

The Task Force makes the following recommendations:

- The Task Force believes that Puerto Rico is too often relegated to an afterthought in congressional deliberations over federal business tax reform legislation.   The Task Force recommends that **Congress** make Puerto Rico integral to any future deliberations over tax reform legislation.

- The Task Force recommends that **Congress** continue to be mindful of the fact that Puerto Rico and the other territories are U.S. jurisdictions, home to U.S. citizens or nationals, and that jobs in Puerto Rico and the other territories are American jobs.

---

[50]   See Puerto Rico and the Section 936 Tax Credit, Government Accounting [subsequently, Accountability] Office, June 8, 1993 (GAO-93-109), at page 12.

[51]   See, e.g., Arthur MacEwan and J. Tomas Hexner, Submission #6 to Congressional Task Force on Economic Growth in Puerto Rico.

[52]   See, e.g., Arthur MacEwan and J. Tomas Hexner, Submission #2 to Congressional Task Force on Economic Growth in Puerto Rico (urging Congress to enact legislation establishing "Investment Zones" in order to "supply a strong incentive for firms to establish new operations and expand existing operations in those economically depressed areas of the country"; noting that this legislation "would apply to the whole country as a national policy, [but] the benefits to Puerto Rico would be especially large").

- The Task Force is open to the prospect of **Congress** providing U.S. companies that invest in Puerto Rico with more competitive tax treatment as long as appropriate guardrails are designed to ensure the company is creating real economic activity and employment on the island.

## 3. Energy

On September 30th, the Task Force held a staff-level briefing with officials from the U.S. Department of Energy (USDOE) to discuss Puerto Rico's electricity generation and distribution system.  There is a consensus that the high cost and low reliability of electric power in Puerto Rico is one of the most serious challenges confronting households and businesses, and a significant obstacle to economic growth on the island.[53]

Puerto Rico has no conventional energy resources, and relies heavily on shipments of imported fuel to generate electricity.  According to the U.S. Energy Information Administration (EIA) profile on Puerto Rico, in 2015 Puerto Rico generated 51 percent of its electricity from petroleum, 31 percent from natural gas, 16 percent from coal, and 2 percent from renewable sources (predominantly wind, solar and hydropower).  The numbers provided by the Puerto Rico Electric Power Authority (PREPA) are different than the EIA numbers, and appear to indicate that Puerto Rico currently generates close to 62 percent of its electricity from petroleum and less than 19 percent from natural gas.  To place this in context, according to the EIA, in 2015 the 50 states and the District of Columbia generated 33 percent of their electricity from natural gas, another 33 percent from coal, 20 percent from nuclear, 13 percent from renewable sources, and only 1 percent from petroleum.[54]  Few, if any, observers question the conventional wisdom that Puerto Rico should take steps to reduce its disproportionate reliance on petroleum and increase its use of natural gas—of which the United States is now the world's largest producer—and renewable energy sources like solar power if economically viable.[55]

The price of electricity in Puerto Rico is high, while the ability of some residents of Puerto Rico—where the median annual income is $18,626—to pay is low.  According to the EIA, the average price of electricity sold to the residential sector in Puerto Rico between 2005 and 2015

---

[53] See, e.g., William C. Dudley, President and Chief Executive Officer, Federal Reserve Bank of New York, "Opportunities for Economic Growth in Puerto Rico," November 29, 2016.

[54] According to the EIA, American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands generate all or nearly all of their electricity from imported petroleum.

[55] See, e.g., the EIA profile of Hawaii ("In 2015, Hawaii generated more solar electricity per capita from distributed facilities than any other state, and solar energy from both utility-scale and distributed resources generated 35% of Hawaii's renewable electricity.").

was 20.5 cents per kilowatt hour, peaking at 30.6 cents per kilowatt hour in February 2013.[56]
Currently, the price of electricity for residential customers in Puerto Rico is higher than the price
of electricity in any of the 48 contiguous states, roughly the same as the price in Alaska, and
lower than the price in Hawaii (27.45 cents per kilowatt hour in August 2016).[57]

The price of electricity in Puerto Rico is also volatile, rising or falling based on the shifting price
of crude oil in the world market, whereas the price of electricity in the United States is relatively
stable.[58]  In addition to its high and variable cost, electricity in Puerto Rico is subject to periodic
supply disruptions.[59]

Puerto Rico's energy system is dominated by the Puerto Rico Electric Power Authority
(PREPA), a public corporation in deep financial distress.  PREPA owns and operates all but two
of the power plants in Puerto Rico and controls the island's transmission grid.  PREPA has often
operated inefficiently and been governed in an opaque manner.  Long overdue efforts are
underway to reform operations at PREPA and, while progress has been made, it is clear that
additional progress is required.[60]

Puerto Rico did not have an electricity regulatory body to oversee PREPA or regulate electricity
rates until May 2014, when a law was enacted establishing the Puerto Rico Energy Commission

---

[56] In this same time period, the average price of electricity sold to the residential sector in the 50 states
and the District of Columbia was 11.4 cents per kilowatt hour.

[57] See EIA, Rankings:  Average Retail Price of Electricity to Residential Sector, August 2016.

[58] See Report by the President's Task Force on Puerto Rico's Status, March 2011, at page 71 ("When the
price of oil spikes, as it did in the summer of 2008, the effect on businesses and other consumers is
devastating.  Those high and unpredictable energy costs have made the Island less desirable for
businesses, which, in turn, has contributed to a declining manufacturing base and increased
unemployment.  Moreover, Puerto Ricans have less disposable income because their utility bills are
among the highest in the nation.").

[59] For example, in late September 2016, a fire at a Puerto Rico Electric Power Authority (PREPA) power
plant in southern Puerto Rico left virtually all of its customer base of 1.5 million households without
power—some for several days—and caused major disruptions to the island's economy.

[60] See Testimony of Lisa Donahue, Hearing on "Exploring Energy Challenges and Opportunities Facing
Puerto Rico, House Committee on Natural Resources, Subcommittee on Energy and Mineral Resources,
January 12, 2016.

(PREC).[61]  The law required PREPA to prepare its first-ever Integrated Resource Plan (IRP), on terms established by PREC and subject to PREC's approval.[62]

The Task Force makes the following recommendations:

- The Task Force believes that the Puerto Rico Electric Power Authority's record of service has not inspired confidence among its customer base in Puerto Rico, and recommends that the **government of Puerto Rico** continue efforts to make operational reforms at PREPA, improve the efficiency of electricity generation and transmission, and diversify Puerto Rico's energy supply—all with the ultimate goal of making electric power more reliable and affordable.

- The Task Force recommends that **PREPA** and the **Puerto Rico Energy Commission** seek technical assistance from the U.S. Department of Energy, and recommends that the **U.S. Department of Energy** (USDOE) provide all authorized forms of technical and financial assistance.  The Task Force has been advised that PREPA and other government of Puerto Rico agencies have shown reluctance in the past to request technical assistance from USDOE, including during the September 2016 blackout, and the Task Force recommends that any such reluctance be set aside.

- In December 2014, Congress enacted the Fiscal Year Consolidated and Further Continuing Appropriations Act, 2015 (P.L. 113-235).  Section 9 of the law requires the Secretary of the Interior to appoint a team of technical, policy and financial experts to develop an "energy action plan" for each of the territories, including Puerto Rico.   In Section 505(d) of PROMESA, Congress reassigned responsibility for crafting the plan for Puerto Rico from the U.S. Department of the Interior to the U.S. Department of Energy.   The Task Force recommends that the **U.S. Secretary of Energy** appoint a team of experts as soon as practicable, but not later than the statutory deadline of March 27, 2017; that the team of experts prepare the energy action plan in a timely manner; that the U.S. Secretary of Energy publish the energy action plan on the U.S. Department of Energy's website; and that the U.S. Secretary of Energy annually update Congress on the efforts that Puerto Rico has made to implement the energy action plan, as required by statute.

---

[61] See Puerto Rico Law 57-2014, the "Puerto Rico Energy Transformation and RELIEF Act."

[62] On September 23, 2016, PREC issued its "Final Resolution and Order," disapproving the IRP submitted by PREPA, approving a modified IRP, ordering PREPA to modify the IRP in line with PREC's requirements, and ordering PREPA "to ensure that its future IRPs comply with its legal obligations and satisfy professional standards."  For the complete PREC docket on this matter, see here (CEPR-AP-2015-0002).

- The Task Force recommends that the **U.S. Department of Energy** assess whether Puerto Rico receives equitable treatment relative to other jurisdictions under grant programs for energy-related research and, if it does not, recommends that USDOE resolve any inequities.

## 4. Federal Statistical Programs

A federal statistical agency is an agency or unit of the executive branch whose primary activities are the collection and publication of information for statistical purposes. The principal federal statistical agencies include the:

- U.S. Census Bureau, within the U.S. Department of Commerce;
- Bureau of Economic Analysis (BEA), within the U.S. Department of Commerce;
- Bureau of Labor Statistics (BLS), within the U.S. Department of Labor;
- National Agricultural Statistical Service (NASS), within the U.S. Department of Agriculture;
- Economic Research Service (ERS), within the U.S. Department of Agriculture
- National Center for Education Statistics (NCES), within the U.S. Department of Education;
- Bureau of Justice Statistics (BJS), within the U.S. Department of Justice;
- National Center for Health Statistics (NCHS), within the Centers for Disease Control and Prevention, within the U.S. Department of Health and Human Services;
- Bureau of Transportation Statistics (BTS), within the U.S. Department of Transportation;
- National Center for Science and Engineering Statistics (NCSES), within the National Science Foundation; and
- U.S. Energy Information Administration (EIA), within the U.S. Department of Energy.

Responsibility for coordinating the federal statistical system rests with the Office of Statistical and Science Policy (SSP), within the Office of Information and Regulatory Affairs, within the Office of Management and Budget. SSP is led by the U.S. Chief Statistician.

The U.S. Chief Statistician seeks to ensure the effectiveness of the federal statistical system by, among other things, (1) establishing statistical policies and identifying priorities for improving statistical programs; (2) promoting integration across the federal statistical system by serving as chair of the Interagency Council on Statistical Policy, consisting of the principal statistical agencies; (3) annually preparing the "Statistical Programs of the United States Government" document, most recently released in September 2015 for Fiscal Year 2016; and (4) preparing the "Strengthening Federal Statistics" chapter of the "Analytical Perspectives" volume of the President's annual budget request to Congress.

As the "Strengthening Federal Statistics" chapter notes:

The ability of governments, businesses, and the general public to make informed choices about budgets, employment, investments, taxes, and a host of other important matters depends critically on the ready and equitable  availability of relevant, accurate, timely, and objective Federal statistics.  Taken together, the data produced by the decentralized Federal statistical system form a robust evidence base to support both public and private decision-making.

This view was echoed by William C. Dudley, the president and chief executive officer of the Federal Reserve Bank of New York, in a 2010 speech delivered in Puerto Rico:

The private and public sectors both need accurate, timely and comprehensive economic statistics to perform effectively.  It is impossible to make good decisions without a solid factual basis for those decisions.  For example, the government needs good economic information to develop effective fiscal, economic development and regulatory policy.  Likewise, to make the best production, investment and pricing decisions, businesses need accurate and timely information on things such as wages, income and prices.  Poor quality information increases uncertainty and this uncertainty inhibits well-considered risk-taking and investment decisions.

In its September 15th status update, the Task Force wrote as follows:

Like other observers, the Task Force is concerned about the relative lack of reliable data pertaining to certain aspects of the economic, financial, and fiscal situation in Puerto Rico, which are necessary for productive analyses that may lead to sound public policy recommendations.  Therefore, the Task Force intends to analyze the extent to which Federal statistical products that measure economic and financial activity in the states might also provide equivalent information for Puerto Rico and other territories, and the Task Force intends to explore ways in which any such data gaps can be responsibly closed.

On October 21st, the Task Force held a staff-level briefing with officials from three of the principal federal statistical agencies—the U.S. Census Bureau, the Bureau of Labor Statistics, and the National Agricultural Statistical Service.  On October 26th, the Task Force held a staff-level briefing with officials from the Bureau of Economic Analysis (along with officials from other divisions within the U.S. Department of Commerce).  The Task Force also communicated with the Bureau of Justice Statistics, which on September 14th sent a letter to a member of the Task Force regarding Puerto Rico's treatment under BJS statistical programs.  The Task Force received multiple written submissions that discuss this topic, including a letter from the executive director of the Puerto Rico Institute of Statistics.

Based on the information it obtained, the Task Force has confirmed that Puerto Rico—and, to an even greater extent, the four smaller U.S. territories, where sample sizes can pose a problem—are currently excluded from a considerable number of the statistical programs conducted by the principal federal statistical agencies, including some of the most important programs.

To help illustrate the point, **Appendix 3** contains a table prepared by the Task Force with the assistance of the U.S. Census Bureau that lists the main statistical programs (censuses and surveys) conducted by the Census Bureau, either on its own or in conjunction with another federal agency.  The table describes whether the program collects and publishes state-by-state information and, if so, whether Puerto Rico information is included as well.  If the program provides only national or regional level data, the table describes whether Puerto Rico is included in the national or regional totals.

The Task Force recognizes that a federal statistical agency may need to take a number of steps before it can include Puerto Rico in a particular statistical program from which it is presently excluded—including conducting a feasibility study, expending or reprogramming current agency funding or requesting additional funding from Congress, and obtaining cooperation and collaboration from local partners, such as the Puerto Rico Institute of Statistics and the Puerto Rico Planning Board.  The Task Force understands that there may be certain impediments to action and that the effort may need to proceed in incremental fashion.  However, the Task Force believes this to be a worthwhile endeavor that will benefit federal and local policymakers, current and potential investors, and the Puerto Rico public.

The Task Force makes the following recommendations:

- The Task Force recommends that the **U.S. Chief Statistician** place the subject of Puerto Rico's inclusion in federal statistical programs on the agenda of the Interagency Council on Statistical Policy, develop an action plan consisting of short-term, medium-term, and long-term objectives, and describe this action plan in the "Statistical Programs of the United States Government" document submitted annually to Congress.

- The Task Force recommends that the **Census Bureau** take all reasonable steps to include Puerto Rico in its federal statistical programs, including the quinquennial Census of Governments (and its associated annual and quarterly surveys and summaries regarding public employment and payroll, public pensions, state government tax collections, and state and local government finances);[63] the Survey of Business Owners and Self-Employed

---

[63] See, e.g., Federal Reserve Bank of New York, An Update on the Competitiveness of Puerto Rico's Economy, July 31, 2014, at page 11 (noting that "the Census of Governments does not survey Puerto

Persons (SBO); the Building Permits Survey (BPS), which is currently published monthly for the states but only annually for Puerto Rico; and the Quarterly Workforce Indicators (QWI).[64]

- Puerto Rico is excluded from Census Bureau statistical programs that provide information on housing, such as the American Housing Survey (AHS), the Construction Progress Reporting Survey (CPRS), the Housing Vacancy Survey (HVS), the Manufactured Housing Survey (MHS; conducted jointly with the U.S. Department of Housing and Urban Development), and the Value of Construction Put in Place Survey (VIP). The Task Force recommends that the **Census Bureau**, in coordination with the government of Puerto Rico, examine the feasibility of including Puerto Rico in some or all of these products, or identify alternative means of collecting and publishing reliable data on the housing market in Puerto Rico.

- The Task Force recommends that the **Census Bureau** ensure that the quinquennial Economic Census of Island Areas (IA), which does include Puerto Rico, is producing data that is roughly equivalent in terms of both substance and timing to the data produced by the quinquennial Economic Census, which does not include Puerto Rico. The Task Force further recommends that the Census Bureau assess whether it would be preferable to include Puerto Rico in the national Economic Census rather than the Census of Islands Areas.

- The Task Force recommends that the **Bureau of Labor Statistics** and the **Census Bureau** take all reasonable steps to include Puerto Rico and the other territories in the Current Population Survey (CPS), the primary source of labor statistics in the United States. The Task Force notes that Section 404 of PROMESA expresses the "Sense of Congress" that a study should be conducted to "determine the feasibility of expanding data collection to include Puerto Rico and the other United States territories" in the CPS and that, if necessary, the Census Bureau "should request the funding required to conduct this feasibility study as part of its budget submission to Congress for fiscal year 2018." The Task Force notes that BLS and the Census Bureau worked with the Task Force to begin to determine the feasibility and costs of such expansion.

- Puerto Rico's K-12 public education system falls short in numerous, troubling respects.[65] As described in the table in Appendix 2, funding for Puerto Rico is capped under various federal

---

Rico as part of its annual program to collect information on the fiscal policies of the states and their constituent localities").

[64] The Task Force notes that the Census Bureau recently added Puerto Rico to its web-based application, My Congressional District, which was established in 2003 as a way to provide policymakers and the public with easy access to Census Bureau statistics about each congressional district.

education programs; nevertheless, according to CRS, Puerto Rico still receives more federal education funding per public elementary and secondary school student than any state or the District of Columbia ($2,841 in school year 2012-2013).  Given the importance of education, the Task Force recommends that the **National Center for Education Statistics** (NCES) collect and publish data for Puerto Rico in the same manner that it collects and publishes data for the states, to the greatest extent possible.[66]

- Although the agricultural sector in Puerto Rico is relatively small, with about 17,000 of the one million employed individuals on the island working directly in "farming, forestry and fishing," the sector has grown in recent years according to local government statistics, and has the potential to expand further and create jobs.[67]  The National Agricultural Statistical Service includes Puerto Rico in the Census of Agriculture, which was last produced in 2012 and will next be produced in 2017.  The Task Force recommends that the **National Agricultural Statistical Service** include Puerto Rico in its relevant commodity surveys or that it identify an alternative method of producing reports on the island's agricultural sector on at least an annual basis.  The Task Force further recommends that NASS explore the feasibility of reestablishing a physical presence in Puerto Rico.

- As discussed elsewhere in this report, Puerto Rico has a higher homicide rate than any state, and the relative lack of public safety on the island undermines economic growth and quality of life.  Puerto Rico is excluded from most statistical programs sponsored by the Bureau of Justice Statistics, including programs that provide information on crime victims, identity theft, prisoners and prisons, probationers, parolees, criminal justice expenditures, and contacts between the police and the public.  The Task Force recommends that the **Bureau of Justice Statistics** take all reasonable steps to include Puerto Rico in its statistical programs.

- The National Survey on Drug Use and Health (NSDUH) is an annual survey funded by the Substance Abuse and Mental Health Services Administration (SAMHSA) within HHS, and it provides both state-level and national-level data on drug and substance abuse, among other

---

[65] See, e.g., Federal Reserve Bank of New York, Human Capital and Education in Puerto Rico, Liberty Street Economics, August 11, 2016; National Center for Education Evaluation and Regional Assistance, A Comparison of Two Methods of Identifying Beating-the-Odds High Schools in Puerto Rico, December 2016.

[66] To cite one instance where this does not occur, NCES provides a State Education Data Profile on its website for each state and the District of Columbia, but not for Puerto Rico or the other territories. Although NCES does provide information on Puerto Rico elsewhere on its website, for example here and here, the data furnished are not as extensive or user-friendly.

[67] See Statistical Appendix, Puerto Rico Planning Board's Fiscal Year 2015 Economic Report to the Governor and Legislative Assembly, at pages A-26, A-27, A-65; see also Danica Coto, Puerto Rico Finds Unexpected Source of Growth in Agriculture, Associated Press, September 28, 2016.

topics.  NSDUH data are used by multiple federal agencies, including by the National Guard Bureau to make annual allocations to state and territory national guards under the National Guard Counterdrug Program.  Puerto Rico and the other territories are excluded from the NSDUH.  The Task Force recommends that the **Substance Abuse and Mental Health Services Administration**, and the non-profit company it has selected to administer the NSDUH through Fiscal Year 2017, provide an update to the appropriate congressional committees on the status of its effort to include Puerto Rico and the other territories in this survey.

- Puerto Rico is excluded from a number of statistical programs conducted by the National Center for Health Statistics, such as the National Health Interview Survey, which is the principal source of information on the health of the U.S. population.  The Task Force recommends that **National Center for Health Statistics** take reasonable steps to include Puerto Rico and the other territories in its programs, particularly when state-level data are produced.

- As discussed elsewhere in this report, the high cost and unreliability of electric power in Puerto Rico is a challenge facing island households and businesses, hampering economic growth.  The Task Force notes that, while the U.S. Energy Information Administration website does provide information for Puerto Rico and the other territories in its "State Profiles" section, the information furnished for Puerto Rico is not as detailed or as up-to-date as the information furnished for the states.  The Task Force recommends that the **U.S. Energy Information Administration** work to close the remaining data gaps.

- In its numerous meetings with federal agencies, the Task Force heard that the Puerto Rico Institute of Statistics, which was established under Puerto Rico law in 2003 but did not begin operating until 2007, has emerged as a highly professional, autonomous, and apolitical organization that is bringing greater transparency to economic, financial and fiscal conditions on the island.  Recognizing that the government of Puerto Rico faces a difficult fiscal environment, the Task Force recommends that the **government of Puerto Rico** consider appropriating a level of funding to the Puerto Rico Institute of Statistics that is commensurate with its important responsibilities.  The Task Force also recommends that the **Institute of Statistics** continue to protect its independence and take all feasible steps to publish its products in English in addition to Spanish so these products can have the widest possible audience.

## 5.  Support for Small Businesses

The Small Business Administration (SBA) promotes the interests of small businesses.  SBA has 10 regional offices, and Puerto Rico—along with New York, New Jersey, and the U.S. Virgin

Islands—fall within Region II, which is based in New York.  SBA has a district office in Puerto Rico, which currently has 12 employees, and also covers the U.S. Virgin Islands.

On September 20th, the Task Force held a staff-level briefing with officials from the SBA.   In addition, the Task Force received numerous submissions via the email portal from small business owners in Puerto Rico, from trade organizations representing small businesses on the island, and from national-level associations with an interest in SBA programs, namely the National Association of Development Companies and the National Association of Government Guaranteed Lenders.

Small firms play a significant, and often underappreciated, role in Puerto Rico's economy. According to the Office of Advocacy at the SBA, about 80 percent of private sector workers in Puerto Rico are employed at small establishments, which is slightly higher than the percentage in the U.S. mainland.  Specifically, there are about 553,000 workers employed by about 45,000 small businesses.  Each year for the last decade or so, the number of Puerto Rico establishments that started up (hired at least one employee for the first time) has been less than the number of establishments that exited (went from having at least one employee to having none, and remained closed for at least a year).

The SBA administers a range of programs to support small businesses, including capital access programs to help small firms obtain loans and other forms of capital; procurement programs to help small firms compete more effectively for federal government contracts; and entrepreneurial development programs to provide small firms with training and technical assistance.

There are presumably many small businesses in Puerto Rico operating in the informal economy, and therefore not subject to regulation or taxation.  An objective of ongoing economic reforms in Puerto Rico should be to incentivize small firms to move from the informal to the formal economy, and it should be noted that SBA programs are only available to small firms operating in the formal economy.

## A.  SBA Capital Access Programs

Outside of its disaster assistance program, the SBA does not make direct loans to businesses. Instead, the agency typically guarantees loans made by approved private sector lenders to small firms that cannot obtain affordable credit elsewhere, or it makes direct loans to non-profit intermediaries that, in turn, make loans to small firms.  The SBA's largest loan programs include the 7(a) loan guaranty program, the 504/Certified Development Company (504/CDC) loan guaranty program, and the Microloan program.

The Task Force believes that, for a variety of structural and other reasons, these programs are not producing satisfactory results in Puerto Rico.  The Task Force believes that Congress and the SBA should take steps to improve the operation of these programs in Puerto Rico.  The Task Force further believes that these steps should be targeted, should safeguard the effective operation and financing of these programs on the national level, and should be temporary in duration, *expiring when the Oversight Board established by PROMESA terminates*.  The Task Force also believes these steps should be made applicable to the four other territories wherever feasible.

The Task Force makes the following recommendations:

- Under the 7(a) program, loans are made by SBA partners—mostly banks, but also some other financial institutions—and are partially guaranteed by the SBA.  Proceeds from 7(a) loans may be used to establish a new business or to operate, acquire, or expand an existing business.  The SBA's current guaranty rate is 85 percent for loans of $150,000 or less and 75 percent for loans greater than $150,000.  The Task Force recommends that **Congress** enact legislation to increase the guaranty rate and require a separate subsidy calculation for 7(a) loans made in Puerto Rico.

- The SBA generally assesses a fee on loans it guarantees under the 7(a) program, based on the loan's maturity date and the dollar amount guaranteed.  The lender initially pays the fee and may pass that expense on to the small business borrower at closing.  The Task Force recommends that **Congress** direct the SBA to waive or reduce this fee in the case of a lender who makes an approved 7(a) loan to a borrower located in Puerto Rico.

- The 504/CDC loan guaranty program utilizes Certified Development Companies, which are private, nonprofit corporations established to contribute to economic development within their communities.  Under the 504/CDC program, a commercial lender provides up to 50 percent of the financing, the CDC provides up to 40 percent of the financing (by issuing SBA-guaranteed debentures), and the small business contributes at least 10 percent of the financing—essentially a "down payment."  The Task Force recommends that, in the case of small businesses in Puerto Rico, **Congress** consider reducing the small business contribution and increasing the CDC contribution.

- Under the 504/CDC program, the SBA is authorized to charge CDCs five fees to help recoup the SBA's expenses, including a participation fee.  For their part, CDCs are authorized to charge borrowers a variety of fees, including a processing fee.  The Task Force recommends that Congress direct the SBA to waive the participation fee that the SBA charges to CDCs located in Puerto Rico and/or to waive the processing fee that those CDCs charge to borrowers on the island.

47

- Under the Microloan program, the SBA provides direct loans to qualified nonprofit intermediary lenders that, in turn, provide loans of up to $50,000 to small firms. Under current law, an intermediary in the Microloan program may not borrow more than $750,000 in the first year of participation in the program and, in later years, the intermediary's obligation to the SBA may not exceed an aggregate of $5 million. The Task Force recommends that **Congress** consider increasing that aggregate limit in the case of intermediaries located in Puerto Rico.

- In Fiscal Year 2016, the SBA received $25 million in appropriations from Congress to make grants to Microloan intermediaries to provide Microloan borrowers and prospective borrowers with technical assistance. Under current law (known as the "25/75 rule"), no more than 25 percent of Microloan technical assistance grant funding received by an intermediary from the SBA may be used by the intermediary to provide pre-loan assistance (assistance to a prospective Microloan borrower), as opposed to post-loan assistance (assistance to an approved Microloan borrower). The Task Force recommends that **Congress** authorize an intermediary in the Microloan program to use more than 25 percent of its SBA-provided technical assistance grants on pre-loan assistance if the intermediary provides at least 25 percent of its loans to small firms in Puerto Rico.

- Should the new lending authority recommended in this section be enacted, the Task Force recommends that the **SBA** and the **Government Accountability Office** conduct regular and rigorous oversight of the effectiveness of this expansion.

### B. SBA Procurement Programs

The federal procurement process is the process whereby federal agencies acquire supplies and services for the agency's use or benefit. Government-wide and agency-specific goals for the percentage of contract and subcontract dollars awarded to small businesses have long been part of the federal procurement process. Congress has enacted, and the SBA administers, various programs to help small firms obtain and perform federal contracts and subcontracts. These include the 8(a) program for businesses owned by persons who are socially and economically disadvantaged, the Historically Underutilized Business Zone (HUBZone) program, the Women-Owned Small Business program, and the Service-Disabled Veteran-Owned Small Business program. By some metrics, Puerto Rico ranks low with respect to its participation in the federal procurement process.[68]

---

[68] According to the 2016 edition of the Annual Review of Government Contracting, federal spending on procurement contracts totaled $439.6 billion in Fiscal Year 2015. The Annual Review includes a table that ranks all 56 U.S. jurisdictions—the 50 states, the District of Columbia, and the five territories—by the total dollar value of federal contracts performed within each jurisdiction in Fiscal Year 2015. Puerto Rico ranks 50th, with $430.6 million—$307 million in defense contracts and $123.6 million in non-defense contracts—performed on the island. The three states and three territories that fall below Puerto

48

The Task Force makes the following recommendations:

- The Task Force recommends that **Congress** consider establishing a contracting preference for small businesses in Puerto Rico with respect to federal contracts performed in Puerto Rico.[69]

- The SBA administers a mentor/protégé program. The program provides benefits to both the mentor firm and the protégé firm.  In the case of the protégé, the relationship is designed to help the protégé firm better compete for federal contracts and subcontracts, including through joint venture arrangements with the mentor firm, and to otherwise enhance the capabilities of the protégé firm.   Mentor firms can be businesses of any size that are in good financial standing and can impart knowledge to the protégé firm regarding general business operations and government contracting.   Protégé firms must meet certain criteria as well.   Typically, a mentor has one protégé at a time, but can have up to two or three if the mentor can demonstrate that the additional relationship(s) will not adversely affect the development of any of the protégé firms.  Current federal law prohibits a mentor from having more than three protégés.  The Task Force recommends that **Congress** authorize an exception to this three-protégé rule if the protégé firms are located in Puerto Rico or another territory.

---

Rico each has a smaller population than Puerto Rico.  When the total dollar value of federal contracts performed in each jurisdiction is calculated on a per capita basis, Puerto Rico ranks 55th, ahead of only American Samoa.  Furthermore, according to the Federal Procurement Data System, of the 571 federal contracts that were performed in Puerto Rico in Fiscal Year 2015, 346 (approximately 61 percent) were awarded to firms located outside of Puerto Rico.  The Task Force selected three states to serve as points of comparison, and asked CRS to run the searches of the Federal Procurement Data System.  Of the 30,501 federal contracts performed in Oregon—which has a similar-sized population to Puerto Rico—in Fiscal Year 2015, 5,445 (18 percent) were awarded to firms located outside of Oregon.  Of the 23,005 federal contracts performed in Mississippi in Fiscal Year 2015, 7,321 (32 percent) were awarded to firms located outside of Mississippi.  Of the 96,463 federal contracts performed in Washington State in Fiscal Year 2015, 13,271 (14 percent) were awarded to firms located outside of Washington.

[69] Congress has the authority to require federal agencies to preference local contractors in connection with the awarding of federal contracts under certain circumstances, and Congress has exercised that authority on occasion.  For example, the Robert T. Stafford Disaster Relief Act establishes a contracting preference for "organizations, firms, and individuals residing or doing business primarily in the area affected by [a] major disaster or emergency."  In addition, Section 15 of the Small Business Act requires that federal agencies give "priority" to small businesses that perform a substantial proportion of the production "within areas of concentrated unemployment or underemployment or within labor surplus areas" when setting aside contracts for small businesses.  The Task Force is concerned that, on a per capita basis, the total dollar value of federal contracts performed in Puerto Rico is less than in any U.S. jurisdiction other than American Samoa.  The Task Force is also concerned that, of the small number of federal contracts that are performed in Puerto Rico, about 6 of every 10 are awarded to firms outside of Puerto Rico.

### C.  Small Business Innovation Research and Technology Transfer Programs

The Small Business Innovation Research (SBIR) program is designed to increase the participation of small innovative companies in federally-funded research and development. Federal agencies with extramural R&D budgets of $100 million or more set aside a portion of these funds to finance an agency-run SBIR program that makes competitive awards to small businesses.   Currently, 11 federal agencies participate in the SBIR program.   Another competitive grant program, the Small Business Technology Transfer (STTR) program, facilitates the commercialization of university and federal R&D by small companies.   Federal agencies with extramural R&D budgets of $1 billion or more set aside a portion of these funds to finance an agency-run STTR program.  Currently, five agencies participate in the STTR program.  The SBA helps to coordinate the SBIR and STTR programs.

As of Fiscal Year 2014, federal agencies had made more than 133,000 awards totaling $33.7 billion under the SBIR and STTR programs.  However, according to the SBA's website, Puerto Rico firms have received only 30 awards (26 SBBR awards and 4 STTR awards) totaling $5.5 million, and no firms in any other territory have received any awards.  Each state has received many more awards than Puerto Rico.  Particularly in light of the number of science, technology, engineering and mathematics (STEM) professionals in Puerto Rico, the paucity of SBBR and STTR awards to small firms on the island is concerning.

In addition, the SBA administers the Federal and State Technology (FAST) partnership program, a competitive grant program that aims to help socially and economically disadvantaged firms compete in the SBIR and STTR programs.  The program began in Fiscal Year 2001, expired at the end of Fiscal Year 2005, and was reestablished in Fiscal Year 2010.  Pursuant to the FAST program, the SBA provides annual awards to state and local economic development agencies, business development centers, and colleges and universities, who use this funding to provide assistance to science-driven and technology-driven small businesses, including assistance to help them compete for SBIR and STTR awards.  FAST grantees are required to meet a local matching requirement, which ranges from 50 cents for every $1 in federal funding received (in the case of states and territories, such as Puerto Rico, with the fewest SBIR and STTR awards) to $1 dollar for every $1 in federal funding (in the case of states and territories with the most SBIR and STTR awards).  Since the FAST program was reestablished in 2010, two Puerto Rico entities have received grants—the InterAmerican University of Puerto Rico and the Puerto Rico Trade and Export Company, a government-owned corporation.  However, in Fiscal Year 2016, no Puerto Rico entity was awarded a FAST grant.

The Task Force makes the following recommendation:

- The Task Force recommends that **Congress** require the SBA to make an annual FAST partnership grant to a Puerto Rico grantee, and to waive the local matching requirement.  If the SBA cannot find a suitable grantee, the Task Force recommends that Congress require the SBA to use the funding to help small businesses in Puerto Rico navigate the SBIR and STTR process, from application, to award, to successful completion of each phase of the program.

### D.  SBA Disaster Assistance

The SBA provides assistance to help individuals and businesses affected by disasters.  Assistance is provided in the form of loans that must be repaid, rather than grants.  As distinct from the SBA's other lending programs, disaster assistance loans are made directly by the SBA to the borrower.

Under current law, the term "disaster" means a "sudden event which causes severe damage."  It can include events like hurricanes, earthquakes, tornadoes, fires, floods, droughts, oil spills, and civil disorders.[70]  The SBA's disaster loan program includes economic injury disaster loans (EIDLs).  EIDLs are available to businesses located in a declared disaster area, that have suffered substantial economic injury, are unable to obtain credit elsewhere, and are defined as small by SBA size regulations, which vary from industry to industry.  Substantial economic injury occurs where "the business concern is unable to meet its obligations as they mature or to pay its ordinary and necessary operating expenses."  The maximum loan amount for an EIDL is $2 million.  Loan proceeds can be used for working capital necessary to enable the business to alleviate the specific economic injury and to resume normal operations.  The loan can have a maturity of up to 30 years and has an interest rate of 4 percent or less.

Over the past year, the United States, including Puerto Rico and other territories, has been adversely affected by Zika, a mosquito-borne virus that has been linked to birth defects and other severe health problems.  To date, three U.S. territories—Puerto Rico, the U.S. Virgin Islands, and American Samoa—and two states—Florida and Texas—have experienced locally-acquired cases of Zika, and nearly every state and territory has experienced travel-associated cases of Zika.  Puerto Rico is, by far, the most affected U.S. jurisdiction.  According to the Centers for Disease Control and Prevention (CDC), as of early December, there were over 33,000 confirmed Zika cases in Puerto Rico.  The Puerto Rico Department of Health has placed the number of confirmed cases at over 35,000, including approximately 2,800 pregnant women, and the number of presumed cases at about 65,000.  According to the CDC, there are about 800 locally-transmitted cases in the U.S. Virgin Islands, about 185 locally-transmitted cases in Florida (plus

---

[70] See 3(k)(1) of the Small Business Act.

about 785 travel-associated cases), about 55 locally-transmitted cases in American Samoa, and one locally-transmitted case in Texas.

In response to this unprecedented outbreak, the CDC took the equally unprecedented step of issuing Level 2 travel advisories for U.S. citizens traveling domestically to Puerto Rico, the U.S. Virgin Islands, American Samoa, and parts of Miami-Dade County, Florida.[71] These Zika-related travel advisories have had an adverse economic impact, particularly in the travel and tourism sector, although it is difficult at this time to estimate the impact with precision.

- The Task Force recommends that **Congress** amend the definition of "disaster" in the Small Business Act to encompass "communicable diseases for which the federal government issues a travel alert or travel warning" in order to authorize the SBA, at the request of the governor of an affected U.S. state or territory, to issue a disaster declaration and make economic injury disaster loans (EIDLs) available to help small firms in that state or territory recover from any substantial economic injuries they have experienced as a result of health-related travel advisories, such as those issued by the CDC in connection with Zika.[72]

## 6. Supplemental Security Income

The Supplemental Security Income (SSI) program was enacted in 1972 and took effect in 1974.[73] SSI, which is administered by the Social Security Administration (SSA), is a cash assistance program that provides monthly benefits directly to low-income aged, blind, or disabled persons in the 50 states, the District of Columbia, and one U.S. territory—the Northern Mariana Islands.

To receive SSI benefits based on age, an individual must be at least 65 years old. To receive SSI benefits based on disability, an individual must meet the same definition of disability that applies under the Social Security Disability Insurance (SSDI) program. To receive SSI benefits based on blindness, an individual must have visual impairments meeting certain criteria. In addition to age, disability, or blindness, an individual must meet income and resource tests to qualify for SSI benefits.

Congress has not extended the program to four of the five U.S. territories—Puerto Rico, the United States Virgin Islands, Guam, and American Samoa. Instead, Puerto Rico, the U.S. Virgin

---

[71] CDC Travel Health Notice types are: Watch Level 1 (practice usual precautions); Alert Level 2 (practice enhanced precautions); and Warning Level 3 (avoid nonessential travel).

[72] See S. 3301, the Small Business Relief from Disease Induced Economic Hardship Act (114th Congress; Sen. Rubio).

[73] See Social Security Amendments of 1972 (P.L. 92-603).

Islands, and Guam participate in a federal program called Aid to the Aged, Blind and Disabled (AABD), which used to apply nationwide until it was replaced by the SSI program in the 50 states and the District of Columbia. American Samoa is not currently eligible to participate in either SSI or AABD.

While the SSI program is administered by SSA, the AABD program is administered by the Administration for Children and Families (ACF) within the U.S. Department of Health and Human Services. The AABD program operates as an annual grant, with the federal government providing funding to the local territory government, which in turn distributes it to eligible individuals. In the case of Puerto Rico, ACF provides the annual AABD grant to the Puerto Rico Department of the Family, which then distributes it to eligible individuals. Pursuant to Section 1118 of the Social Security Act, the AABD program includes a 25 percent territory government matching requirement, meaning that for every $100 in AABD benefits, the government of Puerto Rico must provide $25. There is a 50 percent territory government matching requirement with respect to administrative, as distinct from assistance, expenditures; for every $100 the government of Puerto Rico spends to administer the AABD program, it is reimbursed $50 by the federal government. By contrast, the SSI program has no state government matching requirement and the federal government pays the entire cost of the program, although certain state governments and the District of Columbia government voluntarily choose to provide a supplement to the federal benefit.

Puerto Rico and the other territories that participate in AABD are each subject to an overall annual federal funding cap set forth in Section 1108 of the Social Security Act. The four federal programs subject to the Section 1108 cap are: (1) the AABD program under Titles I, X, XIV, and XVI of the Social Security Act; (2) the Temporary Assistance for Needy Families (TANF) program under Title IV-A of the Social Security Act; (3) various child welfare funding streams under Title IV-E of the Social Security Act; and (4) the so-called Matching Grant under section 1108(b) of the Social Security Act. Section 1108(b) matching grants, which include a 25 percent territory government matching requirement, may be used for TANF, including child care, and/or Title IV-E programs.

The annual Section 1108 cap for Puerto Rico is $107,255,000, and has not been increased since enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (P.L. 104-193). The government of Puerto Rico decides how to use the federal funds among the four programs that are subject to the Section 1108 cap. However, the TANF program—an annual block grant—is capped at $71,562,501 for Puerto Rico pursuant to Section 403 of the Social Security Act. A territory may request funds less than its TANF cap and substitute claims from the other three programs to fill the deficit. In other words, there are two caps that operate in tandem with respect to the territories: the first is applicable to the cumulative amount of the four programs (the Section 1108 cap) and the second is applicable to the maximum amount of

the TANF grant (the Section 403 cap).  The two caps are not adjusted for inflation and have remained at their current levels since Fiscal Year 1997.  The effective funding cap after applying the basic TANF block grant is $35,692,499:  $107,255,000 - $71,562,501.

Based on a 2014 GAO report, and on information supplied to the Task Force by ACF, the federal government provides approximately $24 to $26 million annually to the Puerto Rico Department of the Family under the AABD program, which is used to provide benefits to approximately 34,000 to 38,000 individuals, who receive an average monthly benefit of approximately $74 to $77 per recipient, 25 percent of which is government of Puerto Rico funding.[74]

The GAO calculated that, if Puerto Rico were to be included in SSI, Puerto Rico beneficiaries would directly receive between $1.5 billion and $1.8 billion per year in federal funding (compared to the current $24-$26 million under AABD), 300,000 to 350,000 individuals would receive benefits (compared to the current 34,000-38,000 under AABD), and the average monthly benefit would be around $540 (compared to $74-$77 under AABD).  Under SSI, the government of Puerto Rico would have no matching requirement for benefit payments or administrative costs.

Over the years, numerous bills have been introduced in Congress to extend the SSI program to Puerto Rico and the other territories that are excluded from the program.[75]

Some argue against including Puerto Rico and the other territories in the SSI program, at least in part because such inclusion would require substantial new federal outlays through mandatory appropriations from the general fund, yet beneficiaries of the outlays would include residents of the territories who do not pay into the general fund because Congress has exempted residents of Puerto Rico and the other territories from paying federal taxes on income earned within their respective territories.  Of course, this argument would apply with equal force in the case of the Northern Mariana Islands, a territory to which Congress has extended the SSI program.

Others argue that it is not appropriate to exclude U.S. citizens living in the territories from the SSI program, especially considering that residents of the territories can simply relocate to the states and obtain full SSI benefits, and that virtually none of the 8.3 million SSI recipients earns sufficient income to owe federal income taxes.

---

[74] As a point of comparison, the average monthly AABD benefit in Guam is $150, the average monthly AABD benefit in the U.S. Virgin Islands is $176, the average monthly SSI benefit in the Northern Mariana Islands is $591, and the average monthly SSI benefit nationwide is $540.

[75] See, e.g., H.R. 1822, the Supplemental Security Income Equality Act (114th Congress; Rep. Pierluisi).

Some argue that SSI subjects beneficiaries to earnings and asset tests, which provide disincentives to saving and work activities.  Disincentives to work would impose further labor-market challenges in Puerto Rico, given the already poor labor force participation rate.

The Task Force makes the following recommendation:

- The Task Force believes that it is important for Congress to debate the adequacy of the AABD program in Puerto Rico.  The Task Force reviewed the historical record and was unable to identify a hearing conducted in the House or the Senate on this issue.  The Task Force recommends that **Congress** examine the costs and benefits of either:  (1) including Puerto Rico and the other territories in the SSI program with full benefits; (2) including Puerto Rico and the other territories in the SSI program with reduced benefits; (3) increasing the annual AABD grant provided to Puerto Rico and the other territories; (4) indexing the AABD and TANF caps to inflation; or (5) maintaining current law.  In any examination, incentives to work should be considered.

The Task Force found it challenging to obtain up-to-date, publicly-available information about the operation of the AABD program in Puerto Rico, including basic information about the number of AABD beneficiaries, eligibility requirements for receiving AABD benefits, the average monthly AABD benefit, and the differences between the AABD program and the SSI program.  As a result, the Task Force asked CRS to prepare a memorandum on this subject, and the Task Force has made that memorandum available to the public.[76]

The Task Force makes the following recommendation:

- The Task Force recommends that the **Administration for Children and Families**, working in conjunction with the Puerto Rico Department of Family, make publicly available—ideally on its website—a document that provides an up-to-date, detailed description of the AABD program in Puerto Rico and the other territories, in order to help federal policymakers better assess the AABD program.

## 7.  U.S. Department of Commerce

The Secretary of the U.S. Department of Commerce made a written submission to the Task Force.  On October 28th, the Task Force held a staff-level briefing with officials from the Office

---

[76] See William R. Morton, Cash Assistance for the Aged, Blind, and Disabled in Puerto Rico, Congressional Research Service, October 26, 2016; see also Robin Respaut, Deserted Island: The Disabled in Puerto Rico Fend for Themselves After Decades of U.S. Neglect, Reuters, December 9, 2016.

of the Secretary, the Bureau of Economic Analysis, the International Trade Administration, the Economic Development Administration, and the Minority Business Development Agency.

### A.  Bureau of Economic Analysis

The Bureau of Economic Analysis (BEA) prepares and publishes a wide variety of economic statistics.  BEA produces a quarterly estimate of U.S. gross domestic product (GDP), which covers only the 50 states and the District of Columbia, not the five U.S. territories.  In addition, BEA produces quarterly GDP estimates for each of the 50 states and the District of Columbia.  Moreover, since 2010, the BEA has been producing annual GDP estimates for each U.S. territory other than Puerto Rico, reaching back in time to cover 2002 to 2014.  In recent years, these territory estimates have been expanded to cover GDP by industry and compensation by industry.  The GDP estimates for the four territories are calculated by BEA pursuant to a Statistical Improvement Program funded by the Office of Insular Affairs (OIA) in the U.S. Department of the Interior, which has jurisdiction over the territories other than Puerto Rico.

In late 2010 and early 2011, pursuant to an August 2010 request made by the Secretary of the Puerto Rico Department of Economic Development and Commerce to the U.S. Secretary of Commerce and a recommendation contained in the March 2011 report by the President's Task Force on Puerto Rico, the BEA began an effort to help the government of Puerto Rico modernize its economic statistics programs.  In the autumn of 2011, BEA produced a report describing its efforts and making recommendations, including the recommendation that Puerto Rico change its featured measure of production from GNP to GDP.[77]  As a consequence of the change of administration in Puerto Rico in 2013, BEA stopped receiving cooperation from local officials and was unable to continue its provision of technical assistance for a period of years, and did not resume its work until 2015.  In total, BEA estimates that it has spent $350,000 in direct support to Puerto Rico, which it funded out of its core budget.

The Task Force makes the following recommendations:

- The Bureau of Economic Analysis currently publishes GDP estimates for each state, the District of Columbia, and every territory other than Puerto Rico.  The Task Force supports BEA's efforts to help the government of Puerto Rico modernize its economic statistics

---

[77] As described by BEA:  "GDP is the market value of goods and services produced by labor and property within a country's (or territory's) borders, regardless of nationality.  GNP is the market value of goods and services produced by labor and property supplied by resident producer units, regardless of where they are located.  For GNP, as long as the labor and property are supplied by Puerto Rican residents, they may be located either in Puerto Rico or abroad.  GDP refers to production taking place in Puerto Rico.  It is, therefore, the appropriate measure for much of the short-term monitoring and analysis of the Puerto Rican economy.  In particular, GDP is consistent in coverage with indicators such as employment, industry output, and investment in equipment and structures."

programs, including the methods used to measure the island's GDP (and GNP). However, the Task Force recommends that **BEA** should calculate GDP for Puerto Rico, just as BEA does for every other U.S. jurisdiction. The Task Force recognizes that a transition period will likely be required, during which BEA and the government of Puerto Rico may need to share data collection and calculation responsibilities pursuant to a hybrid model. The Task Force further recommends that, in the same way that the U.S. Department of Interior is funding BEA's efforts to estimate GDP for each of the smaller territories, the federal government should fund BEA's efforts to calculate GDP for Puerto Rico. Finally, the Task Force believes that BEA's longer-term objective should be to include the U.S. territories (collectively, home to about 3.8 million people), alongside the states and the District of Columbia, in BEA's *national-level* GDP estimates, which will require the territory-level GDP data to meet all of BEA's quality standards.

### B.  International Trade Administration

The International Trade Administration (ITA) seeks to boost foreign direct investment in the United States (including its territories) through the SelectUSA program and other programs; to help U.S. companies (including companies in the territories) increase their exports to foreign markets through the National Export Initiative and other programs; and to promote travel by foreign nationals to the United States (including its territories). ITA's National Travel and Tourism Office (NTTO) supports the U.S. travel and tourism industry. It is the principal liaison in the federal government to Brand USA, the non-profit, public-private partnership that serves as the destination marketing organization for the United States, including all territories. Brand USA aims to attract international visitors, which constitute the largest services export for the United States, through advertising campaigns; providing information on required documents, fees, and procedures; correcting misperceptions about U.S. entry policies; and assisting both rural and urban areas in bringing international tourists.

ITA does *not* promote domestic investment (including investment by stateside companies in Puerto Rico), interstate commerce (including commerce between the states and Puerto Rico) or interstate travel (including travel between the states and Puerto Rico).

With respect to foreign direct investment, notwithstanding Lufthansa Technik's 2014 decision to open a maintenance, repair and overhaul (MRO) facility in Puerto Rico, an achievement for which ITA deserves significant credit, foreign direct investment (FDI) in Puerto Rico appears to be minimal in recent years, based on state-by-state data from 2014 and 2015 in BEA's Survey of New Foreign Direct Investment in the United States.[78] It is difficult to measure FDI in Puerto Rico, since the government of Puerto Rico has not published relevant data since Fiscal Year

---

[78] See BEA's New Foreign Direct Investment in the United States, 2014 and 2015.

1984.[79]  The Task Force is advised that BEA is working to help the government of Puerto Rico resume collection of these data after a 30-year hiatus.

With respect to exports, the situation appears challenging as well.  According to the U.S. Census Bureau's foreign trade statistics, exports from Puerto Rico to foreign nations totaled $20.4 billion in Calendar Year 2015, while the Puerto Rico Institute of Statistics places the estimate somewhat lower at $17.5 billion.  Either way, this is a significant sum, but it is clear that the vast majority (over 90 percent) of these exports are from foreign subsidiaries of U.S. companies operating in the pharmaceutical product, organic chemical, and medical equipment and supply industries. Apart from these large multinational firms, Puerto Rico-based companies appear to export relatively little to foreign countries.  Small firms seem to fare particularly poorly.  In the November 2016 Puerto Rico Small Business Survey, released by the New York Federal Reserve Bank, 81 percent of firms surveyed say they derive no revenue from exports, 14 percent of firms derive less than 25 percent of their revenue from exports, 3 percent of firms derive 25 to 50 percent of their revenue from exports, 0 percent of firms derive 51 to 75 percent of their revenue from exports, and 2 percent of firms derive more than 75 percent of their revenues from exports. Moreover, based on the ambiguous phrasing of the question posed, it is possible—perhaps probable—that surveyed firms included sales to customers in the U.S. mainland within the definition of "exports."  If so, the actual export figures may be even worse than the survey suggests.

With respect to travel and tourism, they are an important component of Puerto Rico's economy, currently constituting about 7 percent of GNP.  However there is clearly room for significant improvement, particularly as it relates to visitors from foreign nations.  According to the government of Puerto Rico, the number of annual visitors to Puerto Rico over the last decade (2006 to 2015) has averaged about 4.6 million.  In 2015, there were about 5.0 million visitors who spent a total of $3.8 billion.  Of those 5.0 million visitors, 3.5 million (70 percent) were "tourists" and 1.5 million (30 percent) were "excursionists" who arrived to the island on cruise ships.  Of the 3.5 million tourists, 3.1 million (88 percent) came from the mainland U.S. and only 473,000 (12 percent) came from foreign countries.[80]

Based on the observations above, Puerto Rico is in significant need of the various services that ITA provides related to FDI, exports, and travel and tourism.

On the one hand, Puerto Rico should be an attractive location for capital investors (as well as for tourists).  The island has natural beauty, a superb climate, a rich culture, and a fascinating history.  Puerto Rico is part of the U.S. banking, currency, trade, and legal systems.  Puerto Rico

---

[79] See Puerto Rico Planning Board, Balance of Payments 2015, at page 19, note a.

[80] See Statistical Appendix, page A-38.

has access to U.S. markets, including—until recently—financial markets. It has free flows of labor and capital and participates in the U.S. trade regime with the rest of the world. It is strategically located in the Caribbean region, approximately 1,000 miles from both the southern United States and the Andean region of South America. Although Puerto Rico's elementary and secondary public school system requires reform, and migration to the states has taken a considerable toll on the available labor pool, both skilled and unskilled, there is still a large pool of well-educated professionals on the island. According to the Census Bureau, of Puerto Rico's population age 25 and older, 30.5 percent have a college or graduate degree, virtually the same percentage as in the states. Ninety-five percent of Puerto Rico residents speak Spanish at home and, while 77 percent profess to speak English "less than very well," there are many fully bilingual or proficient English speakers, particularly among the island's youth.

On the other hand, there are number of factors in Puerto Rico that tend to inhibit capital investment, including the government's fiscal challenges; poor financial reporting; the high cost of electricity and other utilities; a burdensome permitting system and other bureaucratic issues; a relatively high level of violent crime; labor market rigidities; complicated and often idiosyncratic tax policies; relatively weak infrastructure; and a high degree of politicization, which causes even productive investments, policies, and programs to be halted by one political party because they were instituted under the other political party.

The Task Force makes the following recommendations:

- The Task Force was advised by multiple federal agencies that the government of Puerto Rico has yet to establish a comprehensive economic development strategy that exploits the island's many comparative advantages, both intrinsic and acquired, and that endures after power passes from one local party to the other. The Task Force recommends that the **government of Puerto Rico** take this constructive criticism to heart.

- The Task Force recommends that the **International Trade Administration** take all reasonable steps to educate stakeholders in Puerto Rico about the multiple services that ITA provides, including by holding educational or technical assistance events in Puerto Rico. The Task Force is especially concerned about the relatively low level of export activity on the part of Puerto Rico firms, particularly small firms, and believes there is room for significant improvement in this area, if properly facilitated by ITA.

- The Task Force was advised by federal agencies that the government of Puerto Rico has a history of opening and operating trade offices in other nations to promote foreign direct investment, trade, and other commercial arrangements. The federal agencies observed that, while there is absolutely nothing inherently wrong with this practice, the government of Puerto Rico may not fully appreciate that it can obtain these services from the International

Trade Administration at little to no cost and with (presumably) equal or better results. The Task Force recommends that the **government of Puerto Rico** take additional steps to leverage the available resources and programs of ITA and carefully consider whether the economic benefits of operating trade offices in other nations outweigh the financial costs, particularly if the sought-for benefits can be realized by tapping into existing ITA resources and expertise.

- Adhering to the principle that it is difficult to improve what you cannot measure, the Task Force recommends that the **government of Puerto Rico** collect and publish annual statistics about foreign direct investment on the island, making sure to disaggregate the data so that investment from the U.S. mainland and investment from foreign nations are tabulated separately. The Task Force further recommends that any federal government statistical products that provide state-by-state data on foreign direct investment also include equivalent data on Puerto Rico and the other territories.

- The United States Travel and Tourism Advisory Board (TTAB) serves as the advisory body to the Secretary of Commerce on matters relating to the travel and tourism industry in the United States. The Board consists of up to 32 members appointed by the Secretary of Commerce, who typically serve for a two-year term. Members represent companies and organizations in the travel and tourism industry from a broad range of products and services, company sizes and geographic locations. The current board includes individuals from many states, including the president of the American Indian Alaska Native Tourism Association. The Task Force recommends that the **Secretary of Commerce** take reasonable steps to appoint at least one member who has special expertise on tourism in Puerto Rico and/or the other territories.

- The Task Force believes that more can be done to increase the relatively low level of travel and tourism in Puerto Rico by foreign nationals. The Task Force notes that the ITA's National Travel and Tourism Office (NTTO) conducts a Survey of International Air Travelers (SIAT). The SIAT provides key market intelligence on the characteristics of visitors to a U.S. jurisdiction. This information can then be used by the jurisdiction's tourism promotion body to develop targeted marketing strategies to attract visitors and help ensure they obtain the experience they desire. The Task Force has been advised that, despite efforts by NTTO, the SIAT is not conducted at the San Juan International Airport, evidently because of opposition from the airport's private operator. The Task Force believes the SIAT could provide valuable information to help Puerto Rico increase tourism from foreign nationals, and recommends that the **airport's private operator**, the **Puerto Rico Ports Authority**, and the **Puerto Rico Tourism Company** work with NTTO with the goal of authorizing the SIAT to be conducted at the San Juan International Airport on mutually-acceptable terms. The distribution and collection of surveys would be completed by the Puerto Rico Tourism Company (a public corporation), the airport staff, or a private sector company from Puerto

Rico.  The NTTO would supply the questionnaire (available in 12 languages) and pay for the entry, verification, processing, and publication of the data.  The NTTO would provide the survey results to a lead contact in Puerto Rico, and prepare an annual "Overseas Visitors to Puerto Rico" report for use by the Puerto Rico Tourism Company and others.

### C.  Economic Development Administration

The U.S. Economic Development Administration (EDA) describes itself as "the only federal government agency focused exclusively on economic development."   Through multiple competitive grant programs, the agency provides assistance to economically-distressed regions and areas.[81]  In Fiscal Year 2016, the EDA received $222 million for its programs and activities.

Between Fiscal Year 2010 and Fiscal Year 2015, EDA made over 4,100 grants totaling more than $1.7 billion to applicants throughout the United States.  In that time period, Puerto Rico applicants received 10 grants totaling $6.2 million, among the lowest of all jurisdictions.[82]

In Fiscal Year 2010, EDA made a $400,000 grant to the Puerto Rico Planning Board, which was used to develop a Comprehensive Economic Development Strategy (CEDS) for Puerto Rico. The CEDS was prepared by the CEDS Committee, which consists of representatives of the government of Puerto Rico, universities, non-profit organizations, and trade organizations.  The EDA approved the 2010 CEDS, and approved updates to the CEDS made by the CEDS Committee in 2012 and 2014.[83]  The CEDS Committee is currently in the process of preparing a new CEDS, which is expected to be released in early 2017, but could be delayed somewhat as a result of the forthcoming change in local administration.  Unlike the 2010 CEDS, EDA is not funding this effort through a grant, but is providing technical assistance to ensure that the new CEDS complies with all EDA guidelines.

EDA has six regional offices.  Puerto Rico is one of 16 jurisdictions covered by the Philadelphia Regional Office.   The EDA's Economic Development Representative for Puerto Rico is currently based in Philadelphia, not Puerto Rico.  An Economic Development Representative provides a variety of services, including offering technical assistance to potential applicants for EDA funding, monitoring the implementation of EDA-funded projects by grantees, and interacting with the CEDS Committee.

---

[81] EDA's main grant programs include:  Public Works (funded at $100 million in Fiscal Year 2016); Economic Adjustment Assistance ($35 million); Partnership Planning Assistance ($32 million); Regional Innovation Strategies ($15 million); Trade Adjustment Assistance ($13 million); and Technical Assistance ($10.5 million).

[82] See EDA, Annual Reports to Congress for Fiscal Year 2010 to Fiscal Year 2015, available here.

[83] EDA provided the Task Force with a copy of the 2010 and 2014 CEDS.

The Task Force makes the following recommendations:

- The Task Force is aware that EDA recently determined that its Economic Development Representative (EDR) for Puerto Rico can more effectively serve the island if the Representative is based in Puerto Rico, rather than in the Philadelphia Regional Office. The Task Force recommends to **EDA** that a Puerto Rico-based EDR begin work as soon as possible. The Task Force urges the Puerto Rico-based EDR to provide technical assistance to potential grantees and to identify projects on the island that may be suitable for EDA support. Similarly, the Task Force recommends to potential Puerto Rico-based applicants for EDA funding that they affirmatively seek technical assistance from EDA and incorporate feedback from EDA into their applications, a step that EDA says does not always occur. The Task Force believes that the ultimate objective should be to arrive at a point where the quantity of EDA grants to Puerto Rico-based applicants better corresponds with the size of Puerto Rico's population and the scale of its economic development needs.

- The Task Force was advised by multiple federal agencies that the government of Puerto Rico has yet to establish a comprehensive economic development strategy that exploits the island's many advantages. The 2017 Comprehensive Economic Development Strategy (CEDS) for Puerto Rico that the CEDS Committee is in the process of preparing, with technical assistance from EDA, could help in this regard. The Task Force recommends that the **CEDS Committee** obtain input from a diverse array of stakeholders, particularly from the private and non-profit sectors. The Task Force further recommends that that CEDS Committee, once the CEDS has been approved by EDA, make the CEDS available on-line and otherwise publicize the CEDS to stakeholders on the island, in the U.S. mainland, and abroad. The Task Force notes that, although the Puerto Rico Planning Board purports to provide a link to the current CEDS (last updated in 2014) on its website, the Task Force was unable to access the report. An economic development strategy document not accessible by the general public, potential and current investors in the island, and other stakeholders is of questionable utility, no matter how sound its contents might be.

- The Puerto Rico Department of Agriculture has advised the Task Force that over 80 percent of the food consumed in Puerto Rico is transported to the island from the U.S. mainland and from foreign countries. According to information provided to the Task Force, an extended disruption in maritime trade could result in Puerto Rico's supply of food being exhausted within a matter of weeks or less. The Task Force notes that, in Fiscal Year 2011, EDA made a $100,000 Economic Adjustment Assistance grant to the Hawaii State Office of Planning to develop a plan to improve Hawaii's agricultural sector and food distribution systems, with Hawaii contributing $100,000 in matching funds. In 2012, the Hawaii government released a three-volume report, with Volume 1 entitled "Increased Food Security and Food Self-

Sufficiency Strategy." The Task Force believes that a similar EDA-funded effort may be appropriate and valuable in the case of Puerto Rico and recommends to **EDA**, the **CEDS Committee**, and other stakeholders that they explore this possibility.

### D. Electronic Export Information

Under 13 U.S.C. Chapter 9 (Section 301 to Section 307), the U.S. Census Bureau—within the U.S. Department of Commerce—is responsible for collecting and publishing export trade statistics. The Census Bureau has issued regulations—15 CFR 30—to fulfill this responsibility. Except in specified instances, these regulations require an exporter to provide Electronic Export Information (EEI), which includes the identity of the exporter and detailed information regarding the exported product. While the Census Bureau uses the EEI solely for statistical purposes, other federal agencies use EEI to prevent unauthorized exports. EEIs are generally filed electronically through the Automated Export System (AES). EEIs are completed and filed by either the exporter (known as the U.S. Principal Party in Interest, or USPPI) or by the maritime or air carrier (the freight forwarder) transporting the goods.

EEI filings are required for shipments between the United States (including its territories) and a foreign nation, although EEI filings are not generally required for shipments from the United States to Canada.[84] EEI filings are not required for shipments between one U.S. state and another U.S. state.

With respect to shipments between the 50 states and a U.S. territory, the situation is more complex. For example:

- EEI filings *are* required for shipments from the states to Puerto Rico, and *are* required for shipments from Puerto Rico to the states.[85]

- EEI filings *are* required for shipments from the states (or from Puerto Rico) to the U.S. Virgin Islands, but are *not* required for shipments from the U.S. Virgin Islands to the states (or to Puerto Rico).[86]

- EEI filings are *not* required for shipments between the states and American Samoa, Guam, or the Northern Mariana Islands.[87]

---

[84] See 15 CFR 30.36.

[85] See 15 CFR 30.2(a)(1)(i)(A) and (B).

[86] See 15 CFR 30.2(a)(1)(i)(C).

[87] See 15 CFR 30.2(d)(2).

The U.S. territories are not foreign countries, and Puerto Rico—unique among the five territories—is within "the customs territory of the United States."[88]  Trade between the states and Puerto Rico is therefore more accurately described as interstate commerce than international commerce.

The Task Force received a written submission from the Express Association of America, which consists of the four largest express delivery service providers in the world—Deutsche Post DHL Group, FedEx, TNT and United Parcel Service (UPS).  The Express Association asserted the following:

> Requiring EEI filings is tantamount to placing a boundary that separates Puerto Rico from the United States to the detriment of the Island's economic well-being.  The EEI filing requirement adds a cost which increases the price of many goods purchased in Puerto Rico and imposes an unnecessary burden on interstate commerce, restricting the flow of trade within the United States.  As a result, some stateside companies simply decide not to ship their merchandise to Puerto Rico.  The EEI requirement is equally burdensome on companies exporting from Puerto Rico, particularly for small and medium sized business which do not have large brokerage and customs compliance staffs to generate the data.  [Bullet points in original removed].

The Task Force makes the following recommendation:

- The Task Force recommends that the **U.S. Department of Commerce**—in consultation with its internal departments and other stakeholders, such as the U.S. Census Bureau and the Bureau of Economic Analysis; other appropriate federal agencies; the Puerto Rico Institute of Statistics; the Puerto Rico Planning Board; and the trade community—conduct a thorough evaluation of its regulations requiring EEI filings for shipments between the states and Puerto Rico.  The Task Force is concerned about the possible adverse impact that required EEI filings may have on commerce between the states and Puerto Rico.  At the same time, as described elsewhere in this report, the Task Force is intent on ensuring that timely and reliable economic statistics are available for Puerto Rico.  The Task Force has been advised by federal officials that elimination of the EEI requirement may (1) negatively impact the ongoing, joint federal-local effort to modernize the methodology used to calculate Puerto Rico's gross domestic product (GDP) and other macroeconomic statistics, and (2) make it more difficult to measure trade between the states and Puerto Rico.  As part of the recommended evaluation, the Department of Commerce should identify and weigh the

---

[88] See 19 CFR 101.1.

benefits and costs of required EEI filings.  The Department should assess whether alternate datasets, such as the government of Puerto Rico's SURI system (Sistema Unificado de Rentas Internas), could be used with or without modification to achieve the same statistical objective, while imposing a lesser burden on commerce.  The recommended examination should also attempt to quantify any economic benefits that would be achieved by eliminating the EEI filing requirement.

## 8.  U.S. Department of the Treasury

### A.  CDFI Fund

The Community Development Financial Institutions Fund (CDFI Fund), an office within the Department of the Treasury, seeks to generate economic growth in low-income communities that lack access to capital, credit and financial services.  On October 4th, the Task Force held a staff-level briefing with the director of the CDFI Fund to discuss the Fund's programs and whether they are having their intended effects in Puerto Rico.

The CDFI Fund administers a number of competitive programs that invest in, train, and otherwise support CDFIs, including the core CDFI program, the Bank Enterprise Award program, and the Capital Magnet Fund.  CDFIs are banks, credit unions, loan funds, or venture capital providers that provide loans, investments, financial services, and technical assistance to individuals and businesses with the goal of promoting community development in underserved areas.[89]

Under the core CDFI program, the CDFI Fund provides two types of monetary awards though an annual competitive application process:  financial assistance awards up to $2 million and technical assistance awards up to $125,000.[90]  Under the Bank Enterprise Award (BEA) program, the CDFI Fund makes awards to FDIC-insured banks and thrifts on a competitive basis.  BEA program awardees are recognized for increasing their investments in certified CDFIs and their activities in economically-distressed communities.  BEA program awards are retrospective, rewarding applicants for activities they have already completed.[91]  Under the Capital Magnet

---

[89] There are nearly 1,000 certified CDFIs operating nationwide, but only six based in Puerto Rico, all loan funds.

[90] Since the inception of the CDFI program in 1994, the CDFI Fund has made about 3,000 FA and TA awards to CDFIs, totaling about $2 billion.  The CDFI Fund has made a total of five FA awards and three TA awards to Puerto Rico-based CDFIs, totaling $2.3 million, and has made no awards since 2009.  At least 9 CDFIs based in the states have made investments in Puerto Rico as well.

[91] Since the inception of the BEA program in 1994, no FDIC-insured bank in Puerto Rico has applied for a BEA.

Fund, the CDFI Fund makes competitive grants to CDFIs and non-profit housing organizations to finance affordable housing and other community revitalization projects.[92]

In addition, the CDFI Fund administers the New Markets Tax Credit (NMTC) program, which utilizes Community Development Entities (CDEs). CDEs are financial intermediaries through which private capital flows from investors to a qualified business located in a low-income community. Specifically, CDEs uses their authority to offer federal income tax credits to investors in exchange for the investors making equity investments in the CDE. The federal tax credit totals 39 percent of the original investment amount and is claimed over a period of seven years. Using the capital from these equity investments, CDEs can lend to and invest in businesses operating in low-income communities.[93]

While members of the Task Force agree on the ultimate goals of CDFI programs, members have varying views about the efficacy of the programs in achieving those objectives. In addition, some members of the Task Force have concerns about the adequacy of controls in CDFI programs.[94] Nevertheless, members of the Task Force agree that Puerto Rico should receive equitable opportunities under all CDFI Fund programs authorized and funded under current law.

The Task Force makes the following recommendations:

- The CDFI Fund website contains a "Searchable Awards Database." The database includes a user-friendly map. By clicking on any state or the District of Columbia, a visitor to the website receives a detailed summary of all CDFI Fund awards made to CDFIs and CDEs in that jurisdiction. Puerto Rico and the other territories are not included on the map, even though territory-based CDFIs and CDEs are eligible for all CDFI Fund programs. Similarly, the CDFI website contains a "NMTC Allocatee States Served" page, which features a map that also excludes Puerto Rico and the other territories. The Task Force recommends that the **CDFI Fund** update the maps on its website to include Puerto Rico and the other territories, and provide the same level of detailed award information for the territories that it provides for the states and the District of Columbia.

---

[92] No Puerto Rico-based CDFI or non-profit housing organization has received a Capital Magnet Fund award.

[93] Nationwide, there are approximately 6,000 certified CDEs, including 18 based in Puerto Rico. Beginning in 2002, the CDFI Fund has completed 13 NMTC allocation rounds. The Fund has made 1,032 allocation awards totaling $50.5 billion in tax credit allocation authority. Puerto Rico-based CDEs have received three allocations, one for $45 million in 2009, one for $10 million in 2009, and one for $70 million in 2016.

[94] See, e.g., New Markets Tax Credit:  Better Controls and Data Are Needed to Ensure Effectiveness, Government Accountability Office, July 10, 2014 (GAO-14-500).

- Although there are CDFIs based in the states that have made important investments in Puerto Rico, that does not diminish the need for additional Puerto Rico-based CDFIs that are familiar with Puerto Rico's particular economic and social needs and are focused exclusively on community development on the island.   Puerto Rico has among the fewest CDFIs per capita of any state, and *the* fewest CDFIs per capita when the population is limited to individuals living below the federal poverty level.   The Task Force recommends that the **CDFI Fund** take all reasonable steps to increase the number of CDFIs in Puerto Rico and the other territories, consistent with the House Appropriations Committee's language to that effect in the report accompanying the Financial Services and General Government Appropriations Act, 2017.[95]   The Task Force further recommends that the CDFI Fund, as part of its Capacity Building Initiative, conduct at least one outreach event in Puerto Rico in the near future, something the Fund has not done to date.   In addition, the Task Force recommends that the CDFI Fund continue its ongoing work with the U.S. Department of Commerce's Minority Business Development Agency, the Federal Reserve Bank of New York, the Opportunity Finance Network (a member-based organization of CDFIs), and other stakeholders to expand the number of CDFIs in Puerto Rico and to improve their capacity to apply for, obtain and make optimal use of CDFI Fund awards.   Finally, the Task Force notes that there are 11 credit unions in Puerto Rico that are insured by the National Credit Union Administration (NCUA) and that, in January 2016, the CDFI Fund and the NCUA signed a memorandum of understanding to streamline the process for low-income credit unions to be certified as CDFIs.   The Task Force recommends that the CDFI Fund take steps to educate the 11 NCUA-insured credit unions in Puerto Rico about the potential benefits of becoming a certified CDFI and about the process that exists for low-income credit unions to become certified on an expedited basis.

- Puerto Rico has fared poorly under the NMTC program to date, particularly in light of the fact that it has a higher poverty rate and unemployment rate than any state, making it precisely the kind of economically-distressed jurisdiction that the NMTC program is designed to assist.   The Task Force recognizes that this problem cannot be resolved from one day to the next, but rather requires determined efforts on the part of the CDFI Fund, current and potential Puerto Rico-based CDEs, and other stakeholders.   The CDFI Fund indicated in a memorandum to the Task Force that the preference that the Fund provides to applicants who commit to making "innovative use" of its NMTC allocation "serves as an incentive" for applicants to invest in states and territories, like Puerto Rico, that have historically received lower levels of NTMC-supported investments.   At this juncture, however, there is insufficient evidence to confirm that the "innovative use" preference is, in fact, having such an incentivizing effect.   Therefore, the Task Force recommends that the **CDFI Fund** include in its annual NMTC program award report any examples of allocation awards that were

---

[95] See page 19.

advanced through the NMTC review process as a result of the "innovative use" criteria.  By highlighting these success stories, the CDFI Fund could encourage future applicants to pursue development strategies in geographic areas that have been historically underserved by NMTC-supported investments as a means of being selected from a highly-competitive pool of applicants.

- The Task Force recommends that the **CDFI Fund** take steps to educate FDIC-insured banks in Puerto Rico about the potential benefits of applying for retrospective awards under the Bank Enterprise Award program, and reinvesting any award funding it receives into distressed communities on the island.  The Task Force further recommends that the CDFI Fund take steps to educate Puerto Rico-based CDFIs about the Capital Magnet Fund.

- The director of the CDFI Fund is advised by a 15-member Community Development Advisory Board.[96]  Six Board members represent federal agencies, while nine are private citizens appointed by the President.  Federal law requires that these nine individuals "be selected, to the maximum extent practicable, to provide for national geographic representation and racial, ethnic, and gender diversity."  No resident of Puerto Rico or any other territory has ever served on the Advisory Board.  The Task Force believes that the lending and community development issues in the territories are unique in certain respects, and that CDFI Fund leadership could benefit from the counsel of an Advisory Board member with specialized expertise in this area.  The Task Force recommends that the **CDFI Fund** make good-faith efforts to appoint an individual to the Community Development Advisory Board with personal experience and specialized expertise in the unique lending and community development issues facing U.S. territories.

### B. Technical Assistance to the Government of Puerto Rico

Beginning in Fiscal Year 2016, Congress has expressly authorized the U.S. Department of the Treasury to provide "technical assistance" to the government of Puerto Rico on "stabilizing and strengthening public financial management and financial management systems."[97]

On October 11th, the Treasury Department provided a staff-level briefing for some, but not all, members of the Task Force.  The Treasury Department indicated that it is currently using its technical assistance authority to help the government of Puerto Rico in the following five areas: (1) tax collection enforcement, (2) revenue forecasting and receipts estimation, (3) large taxpayer

---

[96] See 12 U.S.C. 4703.

[97] See Division E, Financial Services and General Government Appropriations Act, 2016, part of the Consolidated Appropriations Act, 2016 (P.L. 114-113); see also House Report 114-94, accompanying the Financial Services and General Government Appropriations Act, 2016, at page 11.

unit and general audit of taxpayers, (4) budget and cash management, and (5) information technology (tax administration).[98]

The Task Force makes the following recommendation:

- The Task Force recommends that **Congress** continue to provide the U.S. Department of the Treasury with the authority to provide technical assistance to the government of Puerto Rico, in order to help it stabilize and strengthen its financial management, financial management systems, and tax collection systems, with robust periodic reporting requirements. The Task Force recommends that the **Treasury Department** continue to provide technical assistance pursuant to this authority, and that the Treasury Department report to Congress on a regular basis regarding these efforts and the progress that is being made.

### 9. Investor Protection

On May 25, 2016, H.R. 5322, the U.S. Territories Investor Protection Act of 2016, was introduced in the House of Representatives.[99] The bill amends Section 6(a)(1) of the Investment Company Act of 1940 to terminate an exemption for investment companies located in Puerto Rico or any other U.S. territory. Under current law, such companies are exempt from registration under the Act provided that their shares are sold solely to the residents of the territory in which they are located. The bill provides a three-year safe harbor for investment companies that currently enjoy this exemption. Additionally, the bill authorizes the Securities and Exchange Commission (SEC) to further delay the effective date (that is, the end of the exemption) for a maximum of three years following the initial three year safe harbor.

H.R. 5322 was unanimously approved by the House Committee on Financial Services on June 16, 2016.[100] On July 11th, the full House approved H.R. 5322 by voice vote. On September 9th, an identical companion bill to H.R. 5322, S. 3467, was introduced in the Senate.[101]

---

[98] The Chairman of the Task Force, who is also the Chairman of the Senate Finance Committee, which has oversight and authorization responsibilities with respect to the Treasury Department, expresses his view that Treasury officials have chosen not to provide briefings requested by the Chairman regarding use of this technical assistance authority, or to explain why the Treasury Department has signed confidentiality agreements with two component units of the government of Puerto Rico, or to substantively respond to questions put forward by the Chairman. The Chairman expresses his view that this lack of transparency and accountability does not serve Congress or the people of Puerto Rico.

[99] H.R. 5322 was introduced by Rep. Nydia Velázquez of New York.

[100] See House Report 114-673.

[101] S. 3467 was introduced by Senator Robert Menendez of New Jersey and cosponsored by Senator Orrin Hatch of Utah.

The Task Force makes the following recommendations:

- The Task Force recommends that **Congress** pass the U.S. Territories Investor Protection Act of 2016. The Task Force believes that the original justification for the exemption of investment companies located in Puerto Rico and the other territories from the Investment Company Act of 1940 (namely, the logistical challenges associated with SEC personnel traveling to the territories in order to inspect investment companies) is no longer valid; that repealing this exemption will provide important protections for investors residing in the U.S. territories that they currently lack; and that the U.S. Territories Investor Protection Act of 2016 provides investment companies in the territories with sufficient opportunity to come into compliance, and therefore does not unduly burden those companies.

- Municipal securities are subject to rules set by the Municipal Securities Rulemaking Board (MSRB), a self-regulatory organization charged with regulating financial companies that sell, purchase and underwrite municipal securities. SEC Rule 15c2-12 requires that dealers, when underwriting certain municipal securities, ensure that the state or local government issuing the bonds agrees to disclose certain information to the MSRB on an ongoing basis. Timely disclosure helps investors make informed decisions about investments in municipal bonds, including instances in which material changes to an issuer's financial condition occur, and helps protect them against fraud involving the bonds. The Task Force observes that Puerto Rico has too often missed its continuing disclosure obligations to provide audited financial statements. Failure to meet such obligations may have contributed to an inability of all stakeholders to fully understand the nature and extent of Puerto Rico's economic and fiscal challenges in a timely manner. The Task Force encourages further debate in Congress about the efficacy of SEC and MSRB rules and regulations governing failures to meet disclosure requirements.

## 10. Public Safety

Violent crime in a jurisdiction harms quality of life, spurs migration, and hinders economic growth by creating an overall environment that is less conducive to business activity and investment.

According to the FBI's Uniform Crime Reporting program for 2015, Puerto Rico has a higher homicide rate—16.8 homicides per 100,000 inhabitants—than any U.S. state. The state with the highest homicide rate is Louisiana, at 10.3 homicides per 100,000 inhabitants. The number of homicides in Puerto Rico peaked in 2011, at 1,164—or 31.4 homicides per 100,000 residents. There was a steady downward trend in the following years, with 1,005 homicides in

2012, 902 homicides in 2013, 684 homicides in 2014, and 588 homicides in 2015.[102]  However, the number of homicides in 2016 exceeds the number in 2015, with over 630 homicides having occurred as of mid-December.

Many, if not most, of the homicides and other violent crimes in Puerto Rico are connected to the international narcotics trade.[103]  Puerto Rico is an important transshipment point for drug trafficking organizations transporting narcotics from South America, Central America and the Caribbean to the mainland United States.  Puerto Rico is also a final destination point for narcotics.

The Task Force makes the following recommendation:

- The Task Force recommends that **Congress** continue to exercise its oversight authority to ensure that federal agencies and departments—including the United States Attorneys, the Federal Bureau of Investigation, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the United States Marshals Service, United States Immigration and Customs Enforcement, the Transportation Security Administration, U.S. Customs and Border Protection, the United States Coast Guard, the Office of National Drug Control Policy (ONDCP), the Puerto Rico/U.S. Virgin Islands High Intensity Drug Trafficking Area (a law enforcement program funded by ONDCP), the National Guard Bureau, the Deputy Assistant Secretary of Defense for Counternarcotics and Global Threats, U.S. Northern Command (whose area of responsibility includes Puerto Rico and the U.S. Virgin Islands), and U.S. Southern Command (whose area of responsibility includes the nations of South America, Central America, and the Caribbean, as well as the air and sea approaches to Puerto Rico from the south)—are working in coordination with each another, and with local law enforcement officials, to reduce drug trafficking and associated violence in Puerto Rico and the neighboring U.S. Virgin Islands.

The ONDCP, a component of the Executive Office of the President, prepares and publishes the annual National Drug Control Strategy, which outlines the Administration's efforts to reduce the supply of, and demand for, illegal drugs.  ONDCP also prepares and publishes various reports that supplement the National Drug Control Strategy.  The Office of National Drug Control Policy Reauthorization Act of 2006 (P.L. 109-469) requires ONDCP to prepare a National Southwest Border Counternarcotics Strategy, and ONDCP has published four such strategy documents.  Likewise, the Northern Border Counternarcotics Strategy Act of 2010 (P.L. 111-356) requires ONDCP to prepare a Northern Border Counternarcotics Strategy, and ONDCP has

---

[102] These annual homicide statistics are from the Puerto Rico police, and—in certain cases—vary from statistics published by other sources.

[103] See Puerto Rico/U.S. Virgin Islands High Intensity Drug Trafficking Area, Drug Market Analysis 2011, September 2011, at page 4.

published two such strategy documents.  In House Report 113-72, which accompanied H.R. 2786, the Financial Services and General Government Appropriations Act, 2014, the House Appropriations Committee directed ONDCP "to develop a biennial Caribbean Border Counternarcotics Strategy, on terms equivalent to the existing Southwest Border Counternarcotics Strategy and the Northern Border Counternarcotics Strategy."  The joint explanatory statement accompanying H.R 3547, the Consolidated Appropriations Act, 2014—enacted as P.L 113-76 on January 17, 2014—expressly adopted this directive, but modified the time given to ONDCP to prepare the Caribbean Border Counternarcotics Strategy from 90 days from the date of enactment to 120 days from the date of enactment.  ONDCP published the Caribbean Border Counternarcotics Strategy on January 15, 2015.  Assuming ONDCP adheres to the congressional directive to publish the Caribbean Border Counternarcotics Strategy on a biennial basis, an updated strategy document will be published in 2017.

The Task Force makes the following recommendations:

- The Task Force recommends that **Congress** enshrine in permanent law—as distinct from a committee report accompanying a single-year appropriations bill—the requirement that ONDCP prepare and publish a Caribbean Border Counternarcotics Strategy, just as Congress has enshrined in permanent law the requirement that ONDCP prepare a National Southwest Border Counternarcotics Strategy and a Northern Border Counternarcotics Strategy.

- Whether or not Congress does enshrine this requirement in permanent law, the Task Force recommends that **ONDCP** update the Caribbean Border Counternarcotics Strategy every two years, and ensure that the strategy document places particular emphasis on reducing drug supply, drug demand and drug-related violence in Puerto Rico and the U.S. Virgin Islands, the two U.S. jurisdictions in the Caribbean region.

For over a century, federal law has provided that the collection of certain duties, taxes and fees in Puerto Rico by U.S. Customs and Border Protection (CBP)—or its predecessor agencies—are to be deposited in what is often referred to as the Puerto Rico Trust Fund.[104]  Pursuant to federal law and an implementing agreement between the federal government and the government of Puerto Rico, a significant portion of that revenue is used to fund certain federal operations in Puerto Rico, including the maritime operations of CBP's Office of Air and Marine Operations.  Because of a shortfall in the Puerto Rico Trust Fund due to reduced customs collections in Fiscal Year 2011, CBP closed a maritime unit in San Juan that, in prior years, had seized a significant quantity of illegal drugs.  CBP took this action because it interpreted current federal law to require that it use either the Puerto Rico Trust Fund or the CBP Salaries and Expenses appropriation, but not both, in order to fund its operations in Puerto Rico.  As a result, the Department of Homeland Security appropriations bill for Fiscal Year 2015 and Fiscal Year 2016

---

[104] See 48 U.S.C. 740 and 48 U.S.C. 795.

each include language authorizing CBP to supplement funding from the Trust Fund with general appropriations when necessary to maintain or to temporarily increase operations in Puerto Rico.

The Task Force makes the following recommendation:

- The Task Force recommends that **Congress** continue its current policy of providing CBP's Office of Air and Marine Operations with flexibility to use both the Puerto Rico Trust Fund and general appropriations to maintain or temporarily increase its operations in Puerto Rico.

## 11. Municipal Solid Waste Landfills

On October 14th, the Task Force held a staff-level briefing via phone with officials from the U.S. Environmental Protection Agency to discuss the subject of Puerto Rico's municipal solid waste landfills. Some members of the Task Force also met with representatives from Puerto Rico Limpio ("Clean Puerto Rico"), a Puerto Rico-based organization that has pursued an aggressive public campaign to raise awareness about the troubled state of Puerto Rico's landfills and about what Puerto Rico Limpio believes to be inadequate efforts on the part of EPA and the Puerto Rico Environmental Quality Board to address this matter. Although this issue falls somewhat outside of the Task Force's domain, the Task Force would be remiss if it did not discuss it briefly, given the risks to public health and the environment that appear to be posed by the status quo.

The Resource Conservation and Recovery Act of 1976 (RCRA) instituted the first federal permit program for hazardous waste management programs and prohibited open dumps. According to EPA's briefing to the Task Force and EPA's website, there used to be approximately 70 landfills in Puerto Rico, many of which were "open dumps" and were closed post-RCRA. Currently, there are "approximately 29 operating landfills in Puerto Rico, the majority of which are beyond capacity." Most of these landfills are owned by the government of the municipality in which the landfill is located, and operated by the municipal government or a private company.

EPA notes that the Puerto Rico Environmental Quality Board (EQB) has had primary responsibility for regulating solid waste landfills on the island since 1994, when EPA approved EQB's solid waste compliance and enforcement program. Since 2007, EPA has reached legal agreements with 12 municipal governments to improve landfill operations and to place those landfills on a schedule for closure, and EPA indicates that it is "continuing to assess landfills throughout Puerto Rico and to develop legal agreements where appropriate." EPA reached these legal agreements pursuant to Section 7003 of RCRA, which authorizes EPA to take appropriate action if the handling or storage of solid waste "may present an imminent and substantial endangerment to health or the environment." According to a chart provided to the Task Force by EPA, about 70 percent of Puerto Rico's landfills are in violation of 40 CFR 258, EPA's

regulations governing solid waste management, including a number of landfills that EPA has not yet scheduled for closure.

Puerto Rico Limpio argues that EPA's efforts are insufficient, and that the agency should move more quickly to close non-compliant landfills and even rescind its 1994 approval of EQB's solid waste program. EPA responds that it is not practical to immediately close most landfills in Puerto Rico (particularly since proper closure requires significant funding, something the government of Puerto Rico and the island's municipal governments lack); that rescinding its approval of EQB's solid waste program would not improve the situation; and that the agency is doing the most it can in light of all of the factual and legal circumstances.

The Task Force makes the following recommendation:

- The Task Force is concerned with the state of Puerto Rico's municipal solid waste landfills, and the potential impact on public health and the environment. The Task Force recommends that the committees of jurisdiction in **Congress** examine this issue, which has only recently attracted significant public attention, to determine whether there are additional steps that can and should be taken.

## 12. Arecibo Observatory

The National Science Foundation (NSF) owns the Arecibo Observatory, a scientific research and education facility located on 118 acres of federal land in west-central Puerto Rico. The Department of Defense funded construction of the Observatory in the early 1960s to study the ionosphere. In 1969, the facility was transferred from DOD to NSF and converted to a national research center, with operations led by Cornell University. In 2011, the cooperative agreement between Cornell University and NSF expired. Following a competition, a new cooperative agreement was awarded by NSF to SRI International, with sub-awards made to Universities Space Research Association and the Universidad Metropolitana (UMET). Together, these entities form the Arecibo Management Team, which maintains and operates the Observatory on behalf of NSF. The cooperative agreement has a five-year term, ending in September 2016, although the parties have agreed to extend the agreement through March 31, 2018.

The Observatory is a leading research institution, enabling research in space and atmospheric sciences, radio astronomy and solar system radar studies. The iconic feature of the Observatory is a 305-meter-diameter spherical radio telescope, which has been used to make significant contributions to astronomy. The telescope is recognized as an engineering landmark and scientists from all over the world compete to utilize it and its supporting facilities. Currently, the Observatory serves scientific communities in various fields, while also hosting an active education and public outreach program. Observatory infrastructure includes office and

laboratory buildings, instrumentation for astronomy and physics, and lodging facilities for visiting scientists.  The Observatory employs 128 people, including approximately 16 scientific staff, telescope operators, and support personnel.  Many academic and research staff remotely access the Observatory to conduct research at their home institutions in the U.S. and abroad.

The Observatory has shared the results of its scientific investigations with the public since the opening of the Angel Ramos Foundation Science and Visitor Center in 1997.  The visitor center provides science exhibits and a large auditorium, while the adjacent Angel Ramos Foundation Conference Center offers a classroom setting for workshops and professional meetings.  The visitor center receives approximately 20,000 students per year and offers a variety of STEM-related opportunities for schoolchildren, teachers, and university students.  As a result of the visitor center's role in making important research available to the public, it is included in the National Register of Historic Places (NRHP).  Approximately 90,000 tourists visit the Arecibo Observatory annually, with local guided services and tour bus operators from San Juan providing day trips to the facility for a $13 entrance fee.  The Observatory attracts tourism to the Municipality of Arecibo, where the annual per capita income is less than $10,000, and to the western part of Puerto Rico more generally.

The Observatory receives federal funding from NSF and the National Aeronautics and Space Administration (NASA).  In Fiscal Year 2016, NSF provided $8.2 million—with half provided by the NSF Division of Astronomical Sciences and half provided by the NSF Division of Atmospheric and Geospace Science—and NASA's Planetary Science Division provided $3.7 million.

NSF has indicated that it needs to reduce funding for the Observatory, and has set forth possible alternative courses of action.  On May 23, 2016, NSF published in the Federal Register a Notice of Intent to prepare an environmental impact statement.[105]  On October 28th, NSF released its Draft Environmental Impact Statement (DEIS).

The DEIS analyzes five action alternatives, in addition to a no-action alternative.  They are:  (1) collaboration with interested parties for continued science-focused operations (NSF's preferred alternative); (2) collaboration with interested parties for transition to education-focused operations; (3) mothballing of facilities; (4) partial deconstruction and site restoration; and (5) complete deconstruction and site restoration.

As NSF acknowledges, reducing or ending operations at the Observatory would have numerous adverse socioeconomic effects in Arecibo and in Puerto Rico more generally, impacting job-creating economic activity currently generated by researchers, students and tourists.  Moreover,

---

[105] See page 32349.

the Observatory is a unique STEM resource in a low-income U.S. jurisdiction that nonetheless manages to produce some of the top STEM professionals in the nation, and the Observatory's shuttering would come at a significant social and educational cost to the island.

The Task Force received two submissions regarding the Arecibo Observatory via the email portal. One is from the Angel Ramos Foundation, which emphasized the Center's STEM-related initiatives for students and researchers in Puerto Rico. The other is from the Universidad Metropolitana, which provided background on the Observatory and the Arecibo Management Team. Both submissions strongly opposed the decommissioning of the Observatory and recommended that operations be maintained or expanded instead.

The Task Force makes the following recommendation:

- The Task Force recognizes that the Arecibo Observatory is vital to Puerto Rico in a variety of ways, and believes that science-focused and education-focused operations should be continued at the site. The Task Force recommends that the **National Science Foundation**, in collaboration with other government and non-government stakeholders, take all feasible steps to achieve this result.

### 13. Former Naval Station Roosevelt Roads

The Naval Station Roosevelt Roads (NSRR), a large naval installation in northeastern Puerto Rico consisting of approximately 8,720 acres, closed on March 31, 2004 after supporting U.S. military operations for over 60 years.[106] The closure of a major military base can pose significant economic challenges to the surrounding communities, particularly in the short term, but it can also present substantial economic opportunities if the transition from military use to civilian use of the property is handled properly. A key role is played by the Local Redevelopment Authority (LRA)—an entity established by a state or local government, recognized by the Secretary of Defense through its Office of Economic Adjustment, and responsible for preparing and implementing the redevelopment plan for the former base.

In 2004, the government of Puerto Rico enacted a law creating an LRA for Roosevelt Roads. According to a publically-available source, the LRA consists of 11 staff members and has an annual budget of about $3 million, of which 56 percent is from the government of Puerto Rico, 41 percent is from the federal government, and 3 percent is generated by the LRA itself.

---

[106] See Report by the President's Task Force on Puerto Rico's Status, March 2011, at page 68-69; see also Naval Facilities Engineering Command, Former Naval Station Roosevelt Roads.

According to the LRA, the Department of Defense transferred 1,370 acres to the LRA in January 2012, and transferred 2,039 acres to the LRA in May 2013, for a total of 3,409 acres. The LRA has control of these lands and is able to execute redevelopment projects on nearly all of them. The transfer of lands from the Department of Defense to the LRA is now complete. (Of the remaining 5,000-plus acres of the former base, about 3,300 acres were transferred to the Puerto Rico Department of Natural and Environmental Resources and are being administered by the Puerto Rico Conservation Trust; the 1,600-acre airport was transferred to the Puerto Rico Ports Authority; a 140-acre beach was transferred to the municipality of Ceiba; 90 acres were transferred to other federal agencies; and a 30-acre hospital was transferred to the LRA.)

The redevelopment of NSRR has the potential to create many jobs and generate extensive economic activity in a geographic area of Puerto Rico that has high rates of unemployment and poverty. For example, the average 2015 unemployment rate in the municipality of Ceiba (population 12,000), where the NSRR is located, was 13.8 percent, while the unemployment rate in the neighboring municipalities of Naguabo (population 26,000) and Fajardo (population 33,000) was 13.3 percent and 14.8 percent, respectively.[107]

Recently, the federal government has taken steps to support the redevelopment of the NSRR. For example, in August 2015, the U.S. Small Business Administration (SBA) announced the designation of the NSRR as a Historically Underutilized Business Zone (HUBZone), which will enable small firms located within the former base to better compete for contracts to supply the federal government with goods and services. In addition, in June 2016 the federal government designated the NSRR as one of 22 "Promise Zones" throughout the United States. Promise Zones are federal-local partnerships in which economically-distressed areas receive priority access to federal investments and other forms of federal assistance.

Based on the foregoing, all of the pieces are in place for the former base to be redeveloped for the economic benefit of the people of Puerto Rico.

However, now that over 12 years have transpired since the base was closed and over three years have passed since the transfer of property from the Department of Defense to the LRA was completed, a candid assessment is in order. The effort to redevelop the former base has been slow. It has suffered from the same excessive degree of political interference that delays and disrupts far too many economic development projects in Puerto Rico. And it has been characterized by a redevelopment strategy that lacks coherence and consistency, shifting from one local administration to the next, and even from year to year within the same administration. To date, all of these efforts have resulted in the creation of less than 50 jobs.

---

[107] See generally Tri-City Partnership (consisting of the mayors of Ceiba, Naguabo and Fajardo), Submission to Congressional Task Force on Economic Growth in Puerto Rico.

The Task Force makes the following recommendation:

- The Task Force is concerned by the slow pace of the effort to redevelop the former Naval Station Roosevelt Roads (NSRR) for the economic benefit of the people of Puerto Rico. The Task Force believes a well-planned and well-executed redevelopment strategy has the potential to transform eastern Puerto Rico. The Task Force recommends that the **government of Puerto Rico,** working in conjunction with the Revitalization Coordinator established in Section 502 of PROMESA, elected leaders of the surrounding communities, federal government partners, and the private sector, prioritize the efficient and effective redevelopment of the NSRR. The Task Force urges the Local Redevelopment Authority responsible for overseeing the redevelopment effort to develop a sensible and sustained strategy.

## 14. Caño Martín Peña (Martín Peña Channel)

For approximately three decades, plans have been developed but not implemented to restore the Caño Martín Peña (Martín Peña Channel), a natural channel that connects the San Juan Bay with the San José Lagoon in metropolitan San Juan. The tidal flow between these two bodies of water and the flushing of the San José Lagoon has been impeded by persistent sedimentation and debris accumulation in the Caño. Many of the communities along the Caño lack sewer systems. Health studies have determined that frequent flooding in these communities is associated with high rates of gastrointestinal disease, asthma, and skin rashes among residents, particularly children. Habitat for fish and wildlife has also been lost due to water quality degradation.

Through the Water Resources Development Act of 2007 (WRDA), Congress provided a process for authorizing the restoration of Caño Martín Peña as a U.S. Army Corps of Engineers civil works project. On May 18, 2016, the Assistant Secretary of the Army for Civil Works signed a record of decision approving the final feasibility report and environmental impact statement for this project. The plan generally calls for the Corps of Engineers to dredge approximately 2.2 miles of the eastern half of the Caño to a width of 100 feet and a depth of 10 feet. The walls of the dredged Caño are to be constructed with concrete and steel. The project, once completed, will restore the natural tidal connection between the San Juan Bay and the San José Lagoon. Residents of the eight communities along the Caño would benefit from a healthy waterway, revitalized neighborhoods, and greater economic opportunities. Their homes and critical infrastructure in the area—including the runway for the San Juan International Airport adjacent to the San José Lagoon—would face reduced flood risks.

Obstacles to project construction, which is estimated to cost a total of $222 million, include the lack of an appropriation from Congress for the project; the limited ability of the non-federal

sponsor ENLACE, an entity of the government of Puerto Rico, to satisfy its cost sharing obligations; and legal considerations related to the relocation of households located in the project area.

The Task Force makes the following recommendation:

- The Task Force believes that the project to restore Caño Martín Peña can provide a significant return on investment for the federal government in terms of improving the economy, protecting public health, and restoring the natural environment in some of Puerto Rico's most distressed communities.  The Task Force recommends that the **U.S. Army Corps of Engineers** and the **non-federal sponsor ENLACE** finalize the Project Partnership Agreement (PPA) for the project as soon as feasible; that **Congress** consider appropriating funding to construct this project; and that **Congress** consider relaxing the cost-sharing obligations of the non-federal sponsor or otherwise taking steps to ensure that the government of Puerto Rico's fiscal crisis does not result in forward progress on this project being halted.

## 15.  Federal Interagency Advisory Council on Child Poverty

The Task Force notes a proposal made to the Task Force by the Boys and Girls Clubs of Puerto Rico and the Youth Development Institute (*Instituto de Desarrollo de la Juventud*) to temporarily establish a "Federal Interagency Advisory Council on Child Poverty," consisting of experts from inside and outside of government, that would examine and report to Congress on steps that can be taken at the federal level to reduce child poverty, with a particular emphasis on those U.S. jurisdictions—like Puerto Rico, where nearly 64 percent of young children live below the federal poverty level—that have persistently high rates of child poverty.  Under this proposal, a principal goal of the Council would be to help craft an overarching strategic framework to address multi-generational poverty.  The Task Force wishes to express its appreciation to the dedicated representatives of the Boys and Girls Clubs of Puerto Rico, who took the time to arrange for Task Force staff visiting the island to meet with families residing in government-provided housing in Puerto Rico, with unemployed and underemployed individuals seeking employment, and with other community members.  Individuals who are fourth-generation public housing residents underscore the need for efforts to improve economic opportunities in Puerto Rico and to address enduring child poverty on the island.

The Task Force makes the following recommendation:

- The Task Force recommends that the **federal government** consider establishing, either through congressional or executive action, a "Federal Interagency Advisory Council on Child

Poverty" or a functionally equivalent entity, which would examine and report to Congress on ways to address persistent child poverty in the United States, including its territories.

## 16. Unemployment Compensation Demonstration Project

The Unemployment Compensation (UC) program provides income support to eligible workers through the payment of UC benefits during a period of unemployment.  The UC system operates in each state, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.  Puerto Rico is considered a state under UC law.  The UC program is financed by federal taxes under the Federal Unemployment Tax Act (FUTA) and by state payroll taxes under the State Unemployment Tax Acts (SUTA).  These taxes are deposited in the appropriate accounts within the Unemployment Trust Fund (UTF).  Most businesses in the United States, including those in Puerto Rico, are subject to both state and federal unemployment taxes.  An estimated $5.8 billion in federal unemployment taxes and $40.9 billion in state unemployment taxes were collected in Fiscal Year 2016.

UC benefits are available for up to 26 weeks in most states, including Puerto Rico.  These benefits are mostly paid for by the state out of state unemployment taxes.  The federal government pays certain administrative costs only.

Federal law prescribes how a state may use its state unemployment taxes, generally requiring a state to utilize those taxes only to pay unemployment benefits.  However, as part of a bipartisan compromise to extend federal unemployment insurance, Section 2102 of the Middle Class Tax Relief and Job Creation Act of 2012 (P.L. 112-96) authorized states to use the revenues from their SUTA taxes for certain purposes other than paying benefits.  Specifically, Section 2102 authorized the U.S. Department of Labor to allow up to 10 states, including Puerto Rico, to conduct demonstration projects to improve and accelerate the reemployment of UC claimants.  Pursuant to these demonstration projects, states could provide subsidies for employer-provided training, such as wage subsidies, or provide direct disbursements, not to exceed the weekly benefit amount of an individual, to employers who hire individuals receiving UC to pay part of the cost of wages that exceed the individual's prior benefit level.  No demonstration project could be approved for more than three years and all projects were required to end by December 31, 2015.

It is generally agreed that Section 2102, and the April 2012 guidance that DOL issued to states regarding its implementation of that section, proved cumbersome and ultimately unworkable.  Only one state submitted an application, no state demonstration project was approved by DOL, and the program has now expired.  In 2014, legislation was introduced in the

U.S. House of Representatives to make various modifications to Section 2012 and to extend the demonstration project authority from December 31, 2015 to December 31, 2019.[108]

Proponents of allowing states to use UC benefits to subsidize employment assert that such initiatives can help unemployed workers receive job training and expedite reentry into the workforce.  Critics raise concerns over the "quality" of jobs in which participants are often placed and point to the low percentage of participants retained after the subsidy ends.[109]

The Task Force makes the following recommendation:

- Given that Puerto Rico has a higher unemployment rate and lower labor force participation rate than any state, the Task Force recommends that **Congress** consider the merits and demerits of legislation to authorize Puerto Rico to have greater flexibility in its use of Unemployment Compensation benefits for the purpose of increasing employment.

## 17. Administrative Order 346

Section 409(g)(3) of PROMESA requires the Task Force to examine the "economic effect" of Administrative Order 346, issued by the Secretary of the Puerto Rico Department of Health on February 9, 2016.[110]

The Order required manufacturers and distributors of "natural products" and "dietary supplements" to register with, and pay certain fees to, the government of Puerto Rico.  The Puerto Rico Secretary of Health characterized the Order as an effort to ensure the quality of products sold in Puerto Rico and to protect consumer health on the island.  Affected manufacturers and distributors asserted that the Order constituted administrative overreach, suffered from substantive and procedural defects, and was intended primarily to raise revenue for the government, rather than to protect public health.

On September 21, 2016, the Task Force received a letter from the Puerto Rico Secretary of Health.  The letter indicated that the Department of Health would issue an administrative order to place a 120-day "moratorium" on Administrative Order 346, draft a "new regulation" to replace

---

[108] See H.R. 2509, Flexibility to Promote Reemployment Act (114th Congress; Rep. Renacci).

[109] See Julie M. Whittaker, "Expediting the Return to Work: Approaches in the Unemployment Compensation Program," Congressional Research Service, May 1, 2013.

[110] For the English-language text of the Order, see National Products Association, Submission #1 to Congressional Task Force on Economic Growth in Puerto Rico.  For the Spanish-language text of the Order, see Council for Responsible Nutrition, Submission to Congressional Task Force on Economic Growth in Puerto Rico, Attachment #1.

the Order that complied with Puerto Rico law, and hold "public hearings" so that all affected parties could provide their "comments and recommendations."

On September 26th, Task Force staff held a phone conversation with the Secretary of Health and her advisors to discuss this subject.

The Task Force makes the following recommendation:

- If the Puerto Rico Department of Health does choose to replace Administrative Order 346 with a new regulation, the Task Force recommends to the **Puerto Rico Department of Health** that it follow through on the Secretary's pledge to hold public hearings on the proposed regulation so that all stakeholders, whether they support or oppose administrative action, can provide comments.  If a new regulation is approved, and if any affected party believes the regulation violates Puerto Rico or federal law, the Task Force notes that the affected party may avail itself of the local or federal courts in Puerto Rico, just as it could in any other U.S. jurisdiction.

## 18.  Puerto Rico's Political Status

Puerto Rico—along with American Samoa, Guam, the Northern Mariana Islands and the U.S. Virgin Islands—is an unincorporated territory of the United States.  As a territory, Puerto Rico is subject to Congress's plenary powers under the Territory Clause of the United States Constitution.[111]   The U.S. Supreme Court has held that, so long as Congress does not abridge the fundamental rights of individuals living in the territories, Congress can enact laws that treat the territories differently than the states if there is any rational basis for the differential treatment.  Puerto Rico and the other territories are treated differently than the states under a variety of federal programs.

Each of the five U.S. territories elects a single delegate to the U.S. House of Representatives, who (under current House rules approved by the membership of the House) can introduce legislation, serve on House committees, and vote on legislation at the committee stage.  However, the territorial delegates cannot vote on legislation on the floor of the House.  The territories do not elect U.S. senators.  The territories can—and, currently, each of the five territories does—participate in presidential primaries, but the territories cannot participate in the general election for president.

---

[111] See U.S. Constitution, Article IV, Section 3, Clause 2 (granting Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States").

The term "unincorporated" territory denotes that Puerto Rico retains the potential—legally speaking—to: become a state of the United States; become a sovereign nation, either fully independent from the United States or with a voluntary compact of free association with the United States; or maintain its current status.

As a practical matter, in order for Puerto Rico to change its political status, the people of Puerto Rico—through an exercise of their right to self-determination—must first request a change in status in a fair and impartial plebiscite.  If the people of Puerto Rico do request a change in status, the federal government would have to enact legislation to approve the requested change.

Puerto Rico has held four plebiscites on the territory's political status, each of which was conducted pursuant to Puerto Rico law.  These plebiscites were held in 1967, 1993, 1998, and 2012.

In January 2014, Congress enacted the Consolidated Appropriations Act, 2014 (P.L. 113-76).  The law includes an appropriation of $2.5 million to the State Elections Commission of Puerto Rico to be used for "objective, nonpartisan voter education about, and a plebiscite on, options that would resolve Puerto Rico's future political status."[112]   The House Committee on Appropriations' report explains this appropriation as follows:

> "Puerto Rico plebiscite.—The recommendation includes $2,500,000 for objective, nonpartisan voter education about, and a plebiscite on, options that would resolve Puerto Rico's future political status.  The funds provided for the plebiscite shall not be obligated until 45 days after the [United States] Department [of Justice] notifies the Committees on Appropriations that it approves of an expenditure plan from the Puerto Rico State Elections Commission for voter education and plebiscite administration, including approval of the plebiscite ballot.  This notification shall include a finding that the voter education materials, plebiscite ballot, and related materials are not incompatible with the Constitution and laws and policies of the United States."[113]

Section 402 of PROMESA states:  "Nothing in this Act shall be interpreted to restrict Puerto Rico's right to determine its future political status, including by conducting the plebiscite as authorized by Public Law 113–76."

The Task Force makes the following recommendation:

---

[112] See Consolidated Appropriations Act, 2014, at page 57.

[113] See House Report 113-171, at page 53.

- If the government of Puerto Rico conducts a plebiscite authorized and funded by Public Law 113-76, the Task Force recommends that **Congress** analyze the result of this plebiscite with care and seriousness of purpose, and take any appropriate legislative action.

## Appendix 1:  Submissions to Puerto Rico Task Force Email Portal

| Individual or Organization | Date of Submission | Attachment | | |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| Manuel Abreu | 8/5/16 | | | |
| Antonio M. Abradelo (Submission 1) | 9/16/16 | | | |
| Antonio M. Abradelo (Submission 2) | 9/17/16 | | | |
| ACME Team Agriculture, Inc. | 9/2/16 | | | |
| Aeronautical and Aerospace Institute of Puerto Rico | 9/15/16 | 1 | | |
| AFL-CIO | 9/2/16 | | | |
| AFSCME and UAW | 9/2/16 | | | |
| ALAS (The Alliance for Free Association) | 9/16/16 | | | |
| Alliance for Alternative Education | 10/14/16 | | | |
| Alliance for Healthcare Transformation | 10/13/16 | | | |
| Carlos Aleman | 8/4/6 | | | |
| Carlos Alicea | 9/18/16 | | | |
| Carmen Alicea | 8/8/16 | | | |
| Alvin Almodovar Molinary (Submission 1) | 8/7/16 | | | |
| Alvin Almodovar Molinary (Submission 2) | 8/19/16 | | | |
| Pedro L. Alvarado Reyes | 8/7/16 | | | |
| Angel Alvarez | 9/18/16 | | | |
| Raymond Amaral | 9/15/16 | | | |
| Ambac Assurance Corporation | 9/2/16 | | | |
| American Maritime Partnership | 9/2/16 | | | |
| Angel Ramos Foundation | 9/1/16 | | | |
| Anonymous | 9/15/16 | | | |
| Aqua Pura Sustainable Water Corporation | 10/14/16 | | | |
| Argos Productivity Solutions, Inc. | 10/22/16 (Late) | | | |
| Ariel Investment Management, LLC (Delaware) | 9/2/16 | | | |
| Ariel Investment Management, LLC (Puerto Rico) | 9/1/16 | | | |
| Emilio Arsuaga Garrido (Submission 1) | 8/6/16 | | | |
| Emilio Arsuaga Garrido (Submission 2) | 8/11/16 | | | |
| Emilio Arsuaga Garrido (Submission 3) | 8/13/16 | | | |
| Emilio Arsuaga Garrido (Submission 4) | 8/20/16 | | | |
| Emilio Arsuaga Garrido (Submission 5) | 9/2/16 | | | |
| Emilio Arsuaga Garrido (Submission 6) | 9/12/16 | | | |
| Emilio Arsuaga Garrido (Submission 7) | 9/13/16 | | | |
| Emilio Arsuaga Garrido (Submission 8) | 9/13/16 | | | |
| Emilio Arsuaga Garrido (Submission 9) | 10/16/16 (Late) | | | |
| David Ashe | 8/6/16 | | | |
| Asociación de Jubilados de la Universidad de Puerto Rico, Inc. | 9/1/16 | | | |
| Asociación Nacional de Tiendas de Autoservicio y Departamentales | 8/19/16 | | | |
| Associated General Contractors of America, Puerto Rico Chapter | 10/14/16 | 1 | | |

| | | | | |
|---|---|---|---|---|
| Association of Financial Guaranty Insurers (AFGI) | 9/2/16 | | | |
| Association of Information Technology Professionals, Puerto Rico Chapter | 9/2/16 | | | |
| Association of Primary Health Care in Puerto Rico, Inc. (ASPPR) | 9/2/16 | | | |
| Association of Private Colleges and Universities of Puerto Rico | 10/14/16 | | | |
| Aurorita | 8/7/16 | | | |
| Bacardi North America Corporation | 8/23/16 | | | |
| John Bacon | 10/5/16 | | | |
| Backyard Bondholders from Puerto Rico | 10/14/16 | | | |
| Pedro Barcelo | 9/8/16 | | | |
| Jaime Benson | 9/13/16 | | | |
| Luis Bermudez, Municipality of Vieques | 9/3/16 | 1 | | |
| Hon. David Bernier | 8/29/16 | | | |
| Edgar Berrios Collazo | 8/7/16 | | | |
| Fernando Betancourt | 8/15/16 | | | |
| Hon. Eduardo Bhatia | 9/1/16 | 1 | | |
| Birling Capital, LLC | 9/8/16 | | | |
| Roberto Bonilla Acosta | 8/7/16 | | | |
| Jason Borschow | 9/5/16 | | | |
| BRISA International | 8/31/16 | | | |
| Lisa Brown Masters | 10/3/16 | | | |
| Richard E. Brown | 8/30/16 | | | |
| Janeiri Burgos Rosario | 8/5/16 | | | |
| Jorge Bustelo | 8/27/16 | | | |
| Cámara de Comercio del Oeste de Puerto Rico | 8/27/16 | | | |
| CAMBIO Puerto Rico | 9/2/16 | | | |
| Campbell Soup Company | 8/18/16 | | | |
| Jorge M. Canellas Fidalgo | 9/2/16 | | | |
| Ignacio Canto (Submission 1) | 8/5/16 | | | |
| Ignacio Canto (Submission 2) | 8/8/16 | | | |
| Ignacio Canto (Submission 3) | 8/8/16 | | | |
| Ignacio Canto (Submission 4) | 8/10/16 | | | |
| Ignacio Canto (Submission 5) | 8/15/16 | | | |
| Raymond Capo | 8/10/16 | | | |
| Caras | 10/14/16 | | | |
| Caribbean CAGE, LLC | 9/7/16 | | | |
| José B. Carrion III | 10/14/16 | | | |
| Miguel A. Casellas Sastre (Submission 1) | 8/15/16 | | | |
| Miguel A. Casellas Sastre (Submission 2) | 8/15/16 | | | |
| Center for Budget and Policy Priorities (CBPP) (Submission 1) | 9/2/16 | | | |
| Center for Budget and Policy Priorities (CBPP) (Submission 2) | 9/28/16 | | | |
| Center for a New Economy (CNE) (Submission 1) | 8/22/16 | | | |
| Center for a New Economy (CNE) (Submission 2) | 10/14/16 | | | |
| Minerva Centevo | 8/30/16 | | | |
| Ricia Chansky | 10/6/16 | | | |
| Jose Chaparro | 8/4/16 | | | |
| Cobian Media | 9/1/16 | | | |
| Coca-Cola Company | 9/3/16 | | | |

| | | | | |
|---|---|---|---|---|
| Carlos Colon | 8/10/16 | | | |
| Carlos A. Colón De Armas | 9/2/16 | | | |
| Hector M. De Gracia Colon | 8/14/16 | | | |
| Gerald Colvin | 9/9/16 | | | |
| Computype, Inc. | 9/2/16 | | | |
| Congressional Hispanic Caucus | 9/9/16 | | | |
| ConPRmetidos | 9/8/16 | | | |
| Consultiva Internacional, Inc. | 8/23/16 | | | |
| Francis Coto | 8/5/16 | | | |
| Council for Responsible Nutrition | 10/14/16 | 1 | 2 | 3 |
| Council of Former Mayors of the New Progressive Party | 9/2/16 | | | |
| Mary Crespo | 8/10/16 | | | |
| Alan R. Crumley | 10/14/16 | | | |
| Arnaldo Cruz Colón | 8/5/16 | | | |
| CSA Group | 8/29/16 | | | |
| Oscar Cucurullo | 8/25/16 | | | |
| Cutting Edge Superconductors | 9/2/16 | | | |
| Wolfgang Daszynik | 9/11/16 | | | |
| Sally Devin | 9/2/16 | | | |
| Jose Diaz (Submission 1) | 8/22/16 | | | |
| Jose Diaz (Submission 2) | 8/24/16 | | | |
| Jose Diaz (Submission 3) | 8/30/16 | | | |
| Jose Diaz (Submission 4) | 9/1/16 | | | |
| Jose Diaz (Submission 5) | 9/1/16 | | | |
| Jose Diaz (Submission 6) | 9/13/16 | | | |
| Jose Diaz (Submission 7) | 9/13/16 | | | |
| Jose Diaz (Submission 8) | 9/13/16 | | | |
| Jose Diaz (Submission 9) | 9/30/16 | | | |
| Jose Diaz (Submission 10) | 9/30/16 | | | |
| Jose Diaz (Submission 11) | 10/11/16 | | | |
| Jose A. Diaz | 9/16/16 | | | |
| Roque Diaz | 8/5/16 | | | |
| Dennis Dinzeo | 8/7/16 | | | |
| Dipak | 10/14/16 | | | |
| DISH Network Puerto Rico LLC | 9/2/16 | | | |
| Sonia Domínguez | 9/2/16 | | | |
| James Dornacker | 9/13/16 | | | |
| Eaton | 9/2/16 | | | |
| EC Waste, LLC | 10/14/16 | | | |
| ENLACE Martín Peña | 10/14/16 | | | |
| Entrepreneurs for Puerto Rico | 10/11/16 | | | |
| Equipco, LLC | 9/2/16 | | | |
| Javier Espinosa | 8/6/16 | | | |
| Evertec | 10/14/16 | | | |
| Express Association of America | 10/12/16 | | | |
| Family Voices | 9/2/16 | | | |
| Hon. Antonio J. Fas-Alzamora | 10/13/16 | | | |

| | | | | |
|---|---|---|---|---|
| Edgar J. Febles | 8/15/16 | | | |
| Fabian Fejgielman | 9/7/16 | | | |
| Claribel Feliciano | 8/7/16 | | | |
| Miguel A. Ferrer | 9/8/16 | | | |
| Julio Figueroa | 8/6/16 | | | |
| Santos Figueroa Beltran | 8/8/16 | | | |
| Ana M. Flores Cuadrado (Submission 1) | 8/8/16 | | | |
| Ana M. Flores Cuadrado (Submission 2) | 8/22/16 | | | |
| Jorge A. Flores | 9/8/16 | | | |
| Raymond Flores | 9/8/16 | | | |
| Thomas Forester | 9/18/16 | | | |
| Foundation for Puerto Rico | 9/2/16 | | | |
| Dennis Freytes (Submission 1) | 8/11/16 | | | |
| Dennis Freytes (Submission 2) | 9/6/16 | | | |
| Alejandro Fuentes | 9/13/16 | | | |
| Fundacion Libertad | 9/2/16 | | | |
| Gallardo | 9/8/16 | | | |
| André M. Garcia (Submission 1) | 8/7/16 | | | |
| André M. Garcia (Submission 2) | 8/8/16 | | | |
| Arturo J. Garcia | 9/16/16 | | | |
| Idalia Garcia and Other Puerto Rico Small Business Owners | 9/2/16 | | | |
| Juan Garcia | 8/5/16 | | | |
| Hon. Alejandro Garcia Padilla (Governor of Puerto Rico) | 8/11/16 | | | |
| Gardy BR | 8/10/16 | | | |
| David Gaynor | 8/5/16 | | | |
| Ramón Gil | 10/14/16 | | | |
| Laureano A. Giraldez-Rodriguez | 8/10/16 | | | |
| Radames Gomez Rivera | 9/17/16 | | | |
| Roger P. Gonsalves | 8/5/16 | 1 | 2 | |
| Aura Gonzalez | 8/7/16 | | | |
| David Gonzalez and Annette Cedeño | 8/30/16 | | | |
| Giancarlo Gonzalez | 9/13/16 | | | |
| Guillermo Gonzalez | 8/14/16 | | | |
| Jorge Gonzalez Garcia (Submission 1) | 8/30/16 | | | |
| Jorge González Garcia (Submission 2) | 8/31/16 | | | |
| Jorge González Garcia (Submission 3) | 9/23/16 | | | |
| Juan Marcos Gonzalez (Submission 1) | 9/2/16 | | | |
| Juan Marcos Gonzalez (Submission 2) | 9/8/16 | | | |
| Harvey Gonzalez | 8/5/16 | | | |
| Mario Gonzalez | 9/3/16 | | | |
| Francisco R. Gonzalez-Colón | 9/2/16 | | | |
| Tomas Gonzalez | 8/4/16 | | | |
| Alfredo Gonzalez Martinez and Jose I. Alameda-Lozada | 8/10/16 | | | |
| Ydelio Gonzalez | 9/19/16 | | | |
| GreenLatinos | 9/2/16 | | | |
| Elias R. Gutierrez and Walter Ruiz | 9/16/16 | | | |

| | | | | |
|---|---|---|---|---|
| Yamilet Gutierrez | 8/6/16 | | | |
| Hugo Guzman | 8/12/16 | | | |
| Jose Enrique Guzman-Virella | 8/4/16 | | | |
| Patrick Harrigan | 9/8/16 | | | |
| Joseph W. Heiser | 9/2/16 | | | |
| Ivan D. Hernandez | 8/19/16 | | | |
| Hispanic Federation | 9/3/16 | | | |
| Holding Company Grupo Cooperativo Seguros Múltiples | 10/14/16 | | | |
| Hunt Development Group/Moss Construction Managers | 10/14/16 | | | |
| William O. Hurtado Santiago | 9/15/16 | | | |
| Igualdad | 9/2/16 | | | |
| Impactivo, LLC | 8/31/16 | | | |
| Frank D. Inserni (Submission 1) | 8/14/16 | | | |
| Frank D. Inserni (Submission 2) | 8/29/16 | | | |
| Juan Irizarry | 8/31/16 | | | |
| José M. Izquierdo Encarnación | 9/8/16 | | | |
| William Jaeger | 8/5/16 | | | |
| Glenn P. Jenkins | 10/11/16 | 1 | 2 | 3 |
| Carlos Jiménez | 8/30/16 | | | |
| Coralaidee Jiménez | 9/2/16 | | | |
| Marc Joffe | 9/2/16 | | | |
| Jubilee USA | 9/2/16 | | | |
| Junte de Asociaciones con Pensionados del Gobierno de Puerto Rico | 8/31/16 | | | |
| Cathy Kunkel et al, Institute for Energy Economics and Financial Analysis | 9/6/16 | 1 | | |
| Desmond Lachman, American Enterprise Institute | 8/17/16 | | | |
| Luis E. Lao Gonzalez | 9/2/16 | | | |
| Leadership Council of Aging Organizations | 10/14/16 | | | |
| Jeronimo Lectora (Submission 1) | 8/23/16 | | | |
| Jeronimo Lectora (Submission 2) | 9/1/16 | | | |
| Jeronimo Lectora (Submission 3) | 10/7/16 | | | |
| Jeronimo Lectora (Submission 4) | 10/14/16 | | | |
| Hon. Ricardo J. Llerandi Cruz | 9/6/16 | | | |
| Cate Long, Puerto Rico Clearinghouse | 9/6/16 | | | |
| Antonio M. Longo | 8/10/16 | | | |
| Carmen Lopez | 8/7/16 | | | |
| Carlos Lopez | 9/10/16 | | | |
| Franklin Lopez | 8/5/16 | | | |
| Hector Lopez Cardona | 8/10/16 | | | |
| Gilberto Lopez-Padro | 9/8/16 | | | |
| John Lugo Ruiz | 9/27/16 | | | |
| Arthur MacEwan and J. Tomas Hexner (Submission 1) | 8/25/16 | | | |
| Arthur MacEwan and J. Tomas Hexner (Submission 2) | 8/25/16 | | | |
| Arthur MacEwan and J. Tomas Hexner (Submission 3) | 8/25/16 | | | |
| Arthur MacEwan and J. Tomas Hexner (Submission 4) | 8/25/16 | | | |
| Arthur MacEwan and J. Tomas Hexner (Submission 5) | 8/25/16 | | | |
| Arthur MacEwan and J. Tomas Hexner (Submission 6) | 8/25/16 | | | |

| | | | | |
|---|---|---|---|---|
| Alfredo Machado | 9/7/16 | | | |
| Miguel A. Maldonado-Peña | 10/14/16 | | | |
| Hon. Kenneth Mapp (Governor of the U.S. Virgin Islands) | 10/12/16 | | | |
| Luis R. Marin | 8/28/16 | 1 | | |
| Raul Marrero | 8/10/16 | | | |
| David R. Martin | 9/6/16 | | | |
| Julio Mateo Rodriguez | 9/2/16 | | | |
| Maymijuan | 8/5/16 | | | |
| Mc367700 | 8/5/16 | | | |
| Mech-Tech College | 10/13/16 | | | |
| Medical Card System, Inc. | 9/2/16 | 1 | | |
| Edwin Melendez et al. (Submission 1) | 10/14/16 | | | |
| Edwin Melendez et al. (Submission 2) | 10/14/16 | | | |
| Luis Melendez | 8/6/16 | | | |
| Francisco Mendez | 10/14/16 | | | |
| Jan Carlos Miranda | 8/5/16 | | | |
| Military Retiree Community of Puerto Rico | 9/28/16 | | | |
| Rafael J. Molina | 8/5/16 | | | |
| Angel Montes | 8/5/16 | | | |
| Luis E. Morales Falcon | 8/15/16 | | | |
| Jaime Morales | 9/8/16 | | | |
| Manuel Morales | 9/29/16 | | | |
| Municipal Securities Rulemaking Board (MSRB) | 9/2/16 | | | |
| Jose J. Muñiz | 9/26/16 | | | |
| Harry Narvaez Munet | 8/13/16 | | | |
| National Association of Development Companies | 10/14/16 | | | |
| National Association of Government Guaranteed Lenders | 10/14/16 | | | |
| National Grocers Association | 9/2/16 | | | |
| National Products Association (Submission 1) | 9/6/16 | | | |
| National Products Association (Submission 2) | 9/6/16 | | | |
| National Products Association (Submission 3) | 9/6/16 | | | |
| National Products Association (Submission 4) | 9/6/16 | | | |
| National Products Association (Submission 5) | 9/6/16 | | | |
| National Taxpayers Union | 9/2/16 | | | |
| Manuel F. Navedo | 8/4/16 | | | |
| Cesar Negrette | 9/2/16 | | | |
| George R. Nethercutt | 10/14/16 | 1 | 2 | |
| NETS Educational Institution | 10/5/16 | | | |
| Non-Profit Community Service Organizations in Puerto Rico | 9/2/16 | | | |
| Rosario Ojeda (Submission 1) | 8/4/16 | | | |
| Rosario Ojeda (Submission 2) | 8/7/16 | | | |
| Luis Oliveras | 9/6/16 | | | |
| Jose Olmos | 9/1/16 | | | |
| Opportunity Finance Network | 10/14/16 | | | |
| Orlando | 9/7/16 | | | |
| Julita Ortiz | 8/7/16 | | | |
| Julio Ortiz | 9/8/16 | | | |

| | | | | |
|---|---|---|---|---|
| Jose Ortiz | 8/31/16 | | | |
| Juan J. Otero | 8/6/16 | | | |
| Dr. Hernan Padilla | 10/13/16 | | | |
| Johel Padilla | 8/6/16 | | | |
| Dr. Samuel Padilla et al. | 10/14/16 | | | |
| Carlos M. Padin Bibiloni | 9/2/16 | | | |
| Elena M. Pagán | 10/17/16 (Late) | | | |
| David Paitsel | 9/15/16 | | | |
| Paul Palen | 8/8/16 | | | |
| Parallel18 | 9/2/16 | | | |
| Mariano Parlato | 9/7/16 | | | |
| PathStone Corporation | 10/18/16 (Late) | | | |
| Efrain Pena | 8/8/16 | | | |
| Jose Perez Canabal | 9/12/16 | | | |
| Ignacio Pino | 8/4/16 | | | |
| Alex J. Pollock, American Enterprise Institute | 8/31/16 | | | |
| Ponce Health Science University | 9/2/16 | | | |
| Power Technologies Corporation | 10/13/16 | 1 | 2 | |
| Professional College of Engineers and Land Surveyors of Puerto Rico (CIAPR) | 9/2/16 | | | |
| Puerto Rican Diaspora for the University of Puerto Rico | 10/17/16 (Late) | | | |
| Puerto Rico Association of REALTORS | 9/2/16 | | | |
| Puerto Rico Association of Renewable Energy Producers | 9/2/16 | | | |
| Puerto Rico Bankers Association | 9/2/16 | | | |
| Puerto Rico Builders Association | 9/2/16 | | | |
| Puerto Rico Chamber of Commerce | 9/15/16 | 1 | 2 | |
| Puerto Rico Chapter of the American College of Cardiology | 10/14/16 | | | |
| Puerto Rico College of Healthcare Service Administrators | 9/16/16 | | | |
| Puerto Rico College of Physicians and Surgeons | 9/2/16 | | | |
| Puerto Rico Community Foundation | 9/2/16 | | | |
| Puerto Rico Community Pharmacies Association (Submission 1) | 10/24/16 (Late) | | | |
| Puerto Rico Community Pharmacies Association (Submission 2) | 10/24/16 (Late) | | | |
| Puerto Rico Conservation Trust | 8/18/16 | 1 | | |
| Puerto Rico District Export Council | 8/31/16 | | | |
| Puerto Rico Eastern Region Tri-City Partnership | 9/2/16 | | | |
| Puerto Rico Electric Power Authority | 9/2/16 | | | |
| Puerto Rico Electric Power Authority Bondholders | 9/2/16 | | | |
| Puerto Rico Equality Forum | 9/2/16 | | | |
| Puerto Rico Export Council | 10/14/16 | | | |
| Puerto Rico Farm Bureau | 10/14/16 | | | |
| Puerto Rico Fast Ferries, LLC | 10/14/16 | | | |
| Puerto Rico Food Marketing, Industry and Distribution Chamber (MIDA) | 9/2/16 | | | |

| | | | | |
|---|---|---|---|---|
| Puerto Rico Fundación Agenda Ciudadana | 9/2/16 | | | |
| Puerto Rico Gasoline Retailers Association | 8/29/16 | | | |
| Puerto Rico Healthcare Community | 8/4/16 | 1 | 2 | 3 |
| Puerto Rico Health Information Network | 9/2/16 | | | |
| Puerto Rico Hospital Association | 8/26/16 | | | |
| Puerto Rico Hotel & Tourism Association (Submission 1) | 9/2/16 | | | |
| Puerto Rico Hotel & Tourism Association (Submission 2) | 10/14/16 | | | |
| Puerto Rico Information Technology Cluster (PRITC) | 9/1/16 | | | |
| Puerto Rico Institute of Statistics | 9/2/16 | | | |
| Puerto Rico International Insurers Association | 9/6/16 | | | |
| Puerto Rico Limpio | 9/2/16 | | | |
| Puerto Rico Minority Supplier Development Council | 9/2/16 | | | |
| Puerto Rico Mutual Funds | 9/2/16 | | | |
| Puerto Rico Private Sector Coalition (Submission 1) | 9/2/16 | 1 | 2 | |
| Puerto Rico Private Sector Coalition (Submission 2) | 10/14/16 | | | |
| Puerto Rico Religious Leaders | 9/2/16 | | | |
| Puerto Rico Retailers Association | 9/2/16 | | | |
| Puerto Rico Science, Technology, and Research Trust | 9/2/16 | | | |
| Puerto Rico Senate Committee on Civil Rights, Citizen Participation and Social Economy | 9/2/16 | 1 | | |
| Puerto Rico Society of CPAs | 9/2/16 | | | |
| Puerto Rico Statehood Council (Submission 1) | 9/2/16 | | | |
| Puerto Rico Statehood Council (Submission 2) | 10/5/16 | | | |
| Puerto Rico Telecommunications Industry Alliance | 9/2/16 | | | |
| Puerto Rico Telecommunications Regulatory Board | 9/2/16 | | | |
| Puerto Rico United Retailers Association | 9/2/16 | | | |
| Puerto Rico-USA Foundation | 9/2/16 | 1 | | |
| Juan Carlos Puig (Submission 1) | 8/31/16 | | | |
| Juan Carlos Puig (Submission 2) | 10/9/16 | | | |
| Maggie Puig | 8/7/16 | | | |
| PUMA Energy Caribe, LLC | 9/2/16 | | | |
| William Radinson | 9/2/16 | | | |
| Gabriel Ramirez | 8/5/16 | | | |
| Gerardo Ramirez (Submission 1) | 8/4/16 | | | |
| Gerardo Ramirez (Submission 2) | 8/10/16 | | | |
| Jose B. Ramirez | 8/7/16 | | | |
| Miriam J. Ramirez (Submission 1) | 8/7/16 | | | |
| Miriam J. Ramirez (Submission 2) | 8/10/16 | 1 | | |
| Miriam J. Ramirez (Submission 3) | 8/14/16 | | | |
| Miriam J. Ramirez (Submission 4) | 8/30/16 | | | |
| Joselín E. Ramirez-Johnson | 8/4/16 | | | |
| Stuart J. Ramos | 8/7/16 | | | |
| Yamel Ramos | 9/16/16 | | | |
| Omar Y. Reyes Martínez | 9/7/16 | | | |
| Edwin Rivera | 9/2/16 | | | |
| Jorge A. Rivera | 8/5/16 | | | |
| Maria Isabel Rivera (Submission 1) | 9/8/16 | | | |

| | | | | |
|---|---|---|---|---|
| Maria Isabel Rivera (Submission 2) | 9/8/16 | | | |
| Miguel Rivera | 8/7/16 | | | |
| Frederick Rivera Clement (Submission 1) | 8/5/16 | | | |
| Frederick Rivera Clement (Submission 2) | 8/27/16 | | | |
| Olivia Rivera Quiñones | 8/9/16 | | | |
| Lester Rivera Rigau | 9/15/16 | | | |
| Manuel Rivera Rivera | 8/5/16 | | | |
| Mariano Robledo Diaz | 8/6/16 | | | |
| Francisco Rodriguez-Castro | 10/14/16 | | | |
| Jorge L. Rodriguez | 8/23/16 | | | |
| Sirio Rodriguez | 8/5/16 | | | |
| William Rodriguez | 8/6/16 | | | |
| Jose Rojas | 8/5/16 | | | |
| Maria del Carmen Roman | 8/7/16 | | | |
| Hon. Carlos Romero-Barceló | 9/2/16 | | | |
| Miguel A. Romero-Lugo | 10/10/16 | | | |
| Tavo Rosado | 8/7/16 | | | |
| Raul Eduardo Rosas (Submission 1) | 8/4/16 | 1 | | |
| Raul Eduardo Rosas (Submission 2) | 9/29/16 | | | |
| Raul Eduardo Rosas (Submission 3) | 10/4/16 | | | |
| Hon. Ricardo Rossello Nevares and Hon. Jenniffer Gonzalez-Colon | 8/29/16 | | | |
| Abelardo M. Ruiz | 8/6/16 | | | |
| Annette Ruiz | 8/7/16 | | | |
| Jose Samhan (Submission 1) | 8/7/16 | | | |
| Jose Samhan (Submission 2) | 8/7/16 | | | |
| Jose Samhan (Submission 3) | 9/4/16 | | | |
| Michele Sanchez | 9/17/16 | | | |
| Ramon A. Sanchez | 9/2/16 | | | |
| San Juan Tech Meetup | 9/1/16 | | | |
| Nelson R. Santana | 10/11/16 | | | |
| Zoilo G. Santana Sabino | 9/16/16 | | | |
| Joanna Santiago | 8/13/16 | 1 | | |
| Liliana Santiago | 8/7/16 | | | |
| Victor M. Santiago | 8/29/16 | | | |
| Carmen Santiago-Marrero | 8/5/16 | | | |
| Dave Santos | 8/5/16 | | | |
| SeaOne Caribbean, LLC | 8/26/16 | | | |
| Seaport Consultants Asia and Torrado Developments | 9/28/16 | | | |
| Hon. Lawrence "Larry" Seilhamer (Submission 1) | 10/10/16 | | | |
| Hon. Lawrence "Larry" Seilhamer (Submission 2) | 10/3/16 | | | |
| Nan Selman | 9/16/16 | | | |
| Semillero Ventures LLC | 9/2/16 | | | |
| Roberto J. Serralles | 9/12/16 | | | |
| Congressman Jose E. Serrano | 8/30/16 | | | |
| Ivan Serrano | 8/6/16 | | | |
| Servidores Públicos Unidos de Puerto Rico (Council 95) | 9/2/16 | | | |
| Sindicato de Policías Puertorriqueños | 9/2/16 | | | |

| | | | | |
|---|---|---|---|---|
| Gary C. Smith (Submission 1) | 9/2/16 | | | |
| Gary C. Smith (Submission 2) | 9/7/16 | | | |
| Gary C. Smith (Submission 3) | 9/23/16 | | | |
| Gary C. Smith (Submission 4) | 9/27/16 | | | |
| Society, Education, and Rehabilitation of Puerto Rico, Inc. (SER) | 9/2/16 | | | |
| Spaceinnova LLC | 9/1/16 | | | |
| Carlos Sumpter (Submission 1) | 8/4/16 | | | |
| Carlos Sumpter (Submission 2) | 8/15/16 | | | |
| Tavaosiris | 8/4/16 | | | |
| Rudy Thomassen | 9/6/16 | | | |
| T-Mobile | 10/14/16 | | | |
| Evelyn Tirado (Submission 1) | 8/4/16 | | | |
| Evelyn Tirado (Submission 2) | 8/4/16 | | | |
| Evelyn Tirado (Submission 3) | 8/4/16 | | | |
| Jorge L. Tirado | 10/12/16 | | | |
| Tourism Association of Rincon | 8/30/16 | | | |
| Loren Trigo Ferre | 9/23/16 | | | |
| United Automobile Importers Group | 10/14/16 | 1 | | |
| United Medical Corporation | 9/2/16 | | | |
| United Way of Puerto Rico | 9/1/16 | | | |
| U.S. Department of Commerce | 9/2/16 | | | |
| U.S. Department of Treasury and U.S. Department of Health and Human Services | 8/26/16 | | | |
| Kenneth Valle | 9/15/16 | | | |
| Alberto M. Varela | 8/24/16 | | | |
| Hon. Victor L. Vassallo | 9/25/16 | | | |
| Rafael Vazquez Leon | 8/17/16 | | | |
| Héctor L. Vélez Cruz | 10/14/16 | | | |
| Vieques Libre Corporation | 9/2/16 | | | |
| Ricardo Villa Guillen | 8/5/16 | | | |
| Manuel Villalon Silva | 8/5/16 | | | |
| Tom Vincent | 9/7/16 | | | |
| Miguel A. Vivaldi-Oliver | 9/2/16 | | | |
| Waste Reduction Technologies, LLC | 8/31/16 | | | |
| Eugene Weil | 10/14/16 | | | |
| Richard Weisskoff | 10/10/16 | | | |
| Christopher Young | 9/2/16 | | | |
| Congressman Don Young | 10/14/16 | | | |
| Youth Development Institute | 9/2/16 | 1 | | |
| Ismael Zapater | 9/2/16 | | | |
| Sergio Zeligman | 8/16/16 | | | |

94

## Appendix 2:  Federal Programs Under Which Puerto Rico Receives Differential Treatment

| Federal Programs Under Which Puerto Rico Receives Differential Treatment | | | |
|---|---|---|---|
| **Program** | **Federal Agency that Administers Program** | **Congressional Committees With Jurisdiction Over Program (114th Congress)** | **Description of Differential Treatment** |
| Supplemental Nutrition Assistance Program (SNAP)/Nutrition Assistance Program (NAP) | U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS) | House Committee on Agriculture<br><br>Senate Committee on Agriculture, Nutrition and Forestry | SNAP is designed to increase the food purchasing power of eligible low-income households so they can buy a nutritionally adequate diet.  The states, DC, Guam and the U.S. Virgin Islands participate in SNAP.  Maximum monthly benefit allotments are tied to the cost of purchasing a nutritionally adequate low-cost diet, as measured by the USDA-created and USDA-calculated Thrifty Food Plan (TFP).  Maximum allotments are standard across the 48 contiguous states and DC, but are higher in Alaska, Hawaii, Guam, and the U.S. Virgin Islands.  Puerto Rico, the CNMI and American Samoa do not participate in SNAP, although the 2014 Farm Bill authorized a pilot program that may result in the CNMI's inclusion in SNAP.  Effective in 1982, Congress ended Puerto Rico's participation in SNAP (then, the Food Stamp Program), which is an open-ended entitlement, and provided a nutrition assistance block grant, known as the Nutrition Assistance Program (NAP).  The NAP block grant is adjusted annually for inflation as measured by the change in the cost of the contiguous states' TFP.  In Fiscal Year 2016, the NAP block grant was $1.959 billion.  According to a June 2010 FNS report required by Congress, based on Fiscal Year 2009 funding levels, converting Puerto Rico from NAP to SNAP would increase the number of households that receive nutrition assistance by 15.3 percent, increase the average monthly benefit per household by 9.6 percent, and increase annual spending on benefits by $420 million. |
| Supplemental Nutrition Assistance Program Education (SNAP-Ed) | U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS) | House Committee on Agriculture<br><br>Senate Committee on Agriculture, Nutrition and Forestry | A goal of SNAP-Ed is to improve the likelihood that persons eligible for SNAP will make healthy choices within a limited budget.  The Healthy, Hunger-Free Kids Act of 2010 (P.L. 111–296) redesigned this program's funding, transitioning from (1) an open-ended funding stream for SNAP "state agencies" that put up matching funds to (2) a formula grant that provides an allocation for all SNAP "state agencies."  The authorizing statute allocates formula funding to "state agencies" and, under 7 U.S.C. 2012(r)-(s), Guam and the U.S. Virgin Islands (who participate in SNAP) are "state agencies," but Puerto Rico, the CNMI and American Samoa are not.  In Fiscal Year 2017, FNS will apportion $414 million in SNAP-Ed funding to the states, DC, Guam, and the U.S. Virgin Islands.  In Fiscal Year 2015, Puerto Rico used $516,000 of its NAP block grant for its Nutrition Education Program. |
| Title I-A: (1) Basic Grants, (2) Concentration Grants, (3) Targeted Grants, and (4) Education Finance Incentive | U.S. Department of Education (USDE) | House Committee on Education and the Workforce<br><br>Senate Committee on Health, | Title I-A authorizes aid to local educational agencies (LEAs) for the education of disadvantaged children.  Funds are allocated to LEAs via states using four different allocation formulas specified in statute:  (1) Basic Grants, (2) Concentration Grants, (3) Targeted Grants, and (4) Education Finance Incentive Grants.  Under each of the four formulas, Puerto Rico is treated as a state |

| | | | |
|---|---|---|---|
| Grants | | Education, Labor and Pensions | for determining grant amounts. However, there are special caps that apply to the amount of funding that Puerto Rico is able to receive. CRS has estimated that Puerto Rico's Fiscal Year 2016 Title I-A grants would be $51.9 million (12.7 percent) higher in the absence of these caps, increasing from $408 million to $460 million. |
| Title I-C: Migrant Education Programs | U.S. Department of Education (USDE) | House Committee on Education and the Workforce<br><br>Senate Committee on Health, Education, Labor and Pensions | Title I-C authorizes grants to state educational agencies (SEAs) for the education of migratory students. Funds are allocated by formula on the basis of each state's number of migratory students aged 3-21 and average per pupil expenditure (APPE) in the state. The allocation for Puerto Rico is based on the number of migratory children and a reduced APPE. Because Puerto Rico terminated its participation in the program in Fiscal Year 2006, CRS was unable to estimate how much funding for Puerto Rico might increase if a reduced APPE were not used. |
| Title I-D: Neglected, Delinquent and At-Risk Students Programs | U.S. Department of Education (USDE) | House Committee on Education and the Workforce<br><br>Senate Committee on Health, Education, Labor and Pensions | Title I-D authorizes a pair of programs intended to improve education for students who are neglected, delinquent, or at risk of dropping out of school. The funds appropriated for Title I-D are used to provide state grants. Under this formula, Puerto Rico is treated as a state with one exception related to the expenditure factor used to determine Puerto Rico's grant amount. CRS has estimated that Puerto Rico's Fiscal Year 2016 Title I-D grant of $1.0 million would be $828,000 in the absence of this exception, which is $174,000 lower. |
| Title III-A: English Language Acquisition Grants | U.S. Department of Education (USDE) | House Committee on Education and the Workforce<br><br>Senate Committee on Health, Education, Labor and Pensions | Title III-A is designed to help ensure that English learners (ELs) and immigrant students attain English proficiency. Formula grant allocations are made to states based on the proportion of ELs and immigrant students in each state relative to all states. Grants to Puerto Rico are capped at 0.5 percent of the total amount available for state grants. USDE estimated Puerto Rico's Fiscal Year 2016 Title III-A grant to be $3.4 million. CRS calculated that, if the cap were increased from 0.5 percent to 2.0 percent (rather than eliminated altogether), Puerto Rico's Title III-A grant would increase by $10.2 million, to $13.6 million. |
| Title IV-A: Student Support and Academic Enrichment Grants | U.S. Department of Education (USDE) | House Committee on Education and the Workforce<br><br>Senate Committee on Health, Education, Labor and Pensions | Title IV-A of the Every Student Succeeds Act (ESSA) authorizes Student Support and Academic Enrichment Grants to provide students with access to a well-rounded education, improve school conditions for student learning, and improve the use of technology. Funds are allocated via formula to state educational agencies (SEAs) based on their Title I-A grant amounts. The minimum state grant amount is 0.5 percent of the amount available to states. Puerto Rico's grant is capped at the minimum state grant amount. The block grant is authorized at $1.65 billion for Fiscal Year 2017. CRS used a funding level of $1.0 billion (the amount approved by the House Appropriations Committee) to estimate Fiscal Year 2017 grant amounts, and calculated that Puerto Rico's grant would be $4.9 million with the cap and $24.9 million without the cap, an increase of $20.1 million. |

| Title IV-B: 21st-Century Community Learning Centers | U.S. Department of Education (USDE) | House Committee on Education and the Workforce<br><br>Senate Committee on Health, Education, Labor and Pensions | The 21st Century Community Learning Centers program supports activities during non-school hours that offer academic enrichment and additional services, such as counseling and nutrition and health education, for school-aged children.  Funds may also be used to support expanded learning programs.  Formula grant allocations are made to states in proportion to their Title I-A grant amounts.  Because Puerto Rico's Title I-A grant amount is affected by special caps and other provisions that have the effect of reducing the grant amount Puerto Rico would otherwise receive, the amount of funding Puerto Rico receives under the 21st Century Community Learning Centers is less than the amount Puerto Rico would receive if its Title I-A grant amount was not reduced by special provisions.  CRS has estimated that Puerto Rico's Fiscal Year 2016 Title IV-B grants would be $4.1 million (14.1 percent) higher in the absence of these caps, increasing from $29.4 million to $33.5 million. |
|---|---|---|---|
| Title V-B: Rural Education Achievement Program | U.S. Department of Education (USDE) | House Committee on Education and the Workforce<br><br>Senate Committee on Health, Education, Labor and Pensions | Like Hawaii and DC, Puerto Rico is a "single LEA state"—meaning that the entire territory is considered one LEA.  To be eligible for funds under Title V-B, the locale code for each school in an LEA must be classified as rural according to the National Center for Education Statistics (NCES) classification system.  Since multiple schools in Puerto Rico are classified as non-rural, the territory is not eligible to receive Title V-B funds. |
| Title V-B: Rural and Low-Income School Program (Rural and Low-Income School Grant Program; RLIS) | U.S. Department of Education (USDE) | House Committee on Education and the Workforce<br><br>Senate Committee on Health, Education, Labor and Pensions | Like Hawaii and DC, Puerto Rico is a "single LEA state"—meaning that the entire territory is considered one LEA.  To be eligible for funds under Title V-B, the locale code for each school in an LEA must be classified as rural according to the National Center for Education Statistics (NCES) classification system.  Since multiple schools in Puerto Rico are classified as non-rural, the territory is not eligible to receive Title V-B funds. |
| Education for Homeless Children and Youths—Grants for State and Local Activities | U.S. Department of Education (USDE) | House Committee on Education and the Workforce<br><br>Senate Committee on Health, Education, Labor and Pensions | The Education for Homeless Children and Youths (EHCY) program authorized under the McKinney-Vento Homeless Assistance Act provides assistance to SEAs and LEAs to ensure that all homeless children and youth have equal access to the same free, appropriate public education that is provided to other children and youth.  Formula grant allocations are made to states in proportion to their Title I-A grant amounts with no hold harmless provisions applied. As Puerto Rico's Title I-A grant amount is affected by special caps and other provisions which have the effect of reducing the grant amount Puerto Rico would otherwise receive, the amount of funding Puerto Rico receives under the Homeless Education program is less than the amount Puerto Rico would receive if its Title I-A grant amount was not reduced by the Title I-A special provisions.  CRS used a funding level of $70 million to estimate Fiscal Year 2016 grant amounts, and calculated that Puerto Rico's grant would be $263,000 (14.6 percent) higher in the absence of these caps, increasing from $1.8 million to approximately $2.1 million. |
| TRICARE | U.S. Department of Defense (DOD) | House Committee on Armed Services<br><br>Senate Committee on Armed Services | TRICARE is the health care program of the U.S. Department of Defense Military Health System.  TRICARE has four main benefit plans:  a fee-for-service option (TRICARE Standard), a health maintenance organization option (TRICARE Prime), a preferred provider option (TRICARE Extra), and a Medicare wrap-around |

| | | | option for Medicare-eligible military retirees (TRICARE for Life). Military retirees are veterans who served on active duty for at least 20 years or were medically retired.  Under current law, military retirees in the territories are eligible for TRICARE Standard, but not TRICARE Prime.   This is because the territories are considered "overseas" locations for purposes of military health care services, and are therefore treated as the functional equivalent of foreign countries.  In the states, access to TRICARE Prime is available to retirees who reside in "Prime Service Areas," or PSAs.  According to a 2015 Department of Defense report to Congress, there are PSAs in 46 of the 50 states (the exceptions being Iowa, Minnesota, Vermont, and Wisconsin) and DC.  There are over 635,000 military retirees enrolled in TRICARE Prime nationwide, and approximately one million family members of retirees enrolled in TRICARE Prime, who also receive coverage under Prime.  The Department of Defense has the authority under current law to extend TRICARE Prime to some or all of the territories. |
|---|---|---|---|
| Supplemental Security Income (SSI)/Aid to the Aged, Blind, or Disabled (AABD) | SSI:  Social Security Administration (SSA)<br><br>AABD:   U.S. Department of Health and Human Services (HHS), Administration for Children and Families (ACF) | House Committee on Ways and Means<br><br>Senate Committee on Finance | SSI, administered by the SSA, provides monthly cash benefits to low-income aged, blind, or disabled persons in the 50 states, DC, and the Northern Mariana Islands.   In 2016, the maximum monthly SSI payment is $733 for an individual and $1,100 for a couple if both members are eligible for SSI.  In August 2016, the average monthly SSI payment was $540 for all recipients, $645 for children, $561 for working-age adults, and $435 for seniors. Congress has not extended the SSI program to Puerto Rico, which instead participates in AABD, administered by ACF within HHS. While SSI provides monthly benefits directly to eligible individuals, the federal government provides AABD funding to the Puerto Rico government, which distributes it to eligible individuals.  The Puerto Rico government must provide certain local matching funds.  Based on a 2014 GAO report, and on information supplied to the Task Force by ACF, the federal government provides approximately $24 to $26 million annually to the Puerto Rico government, which is used to provide benefits to approximately 34,000 to 38,000 individuals, who receive an average monthly benefit of approximately $74 to $77 per recipient.  The GAO calculated that, if Puerto Rico were included in SSI in Fiscal Year 2011, Puerto Rico beneficiaries would receive between $1.5 billion and $1.8 billion per year, 305,000 to 354,000 individuals would receive benefits, and the average monthly benefit would be around $540.    The Puerto Rico government would have no matching requirement for benefit payments or administrative costs.<br><br>NOTE REGARDING SOCIAL SERVICES FUNDING CAP: Puerto Rico is subject to an overall annual federal funding cap of $107,255,000 set forth in Section 1108 of the Social Security Act. The four federal programs subject to the Section 1108 cap are (1) *the AABD program*, (2) the Temporary Assistance for Needy Families (TANF) program, (3) various child welfare funding streams under Title IV-E of the Social Security Act, and (4) the Matching Grants to the territories under Section 1108(b) of the Social Security Act. |

| | | | |
|---|---|---|---|
| Temporary Assistance for Needy Families (TANF, Title IV-A of the Social Security Act) | U.S. Department of Health and Human Services (HHS), Administration for Children and Families (ACF) | House Committee on Ways and Means<br><br>Senate Committee on Finance | The TANF block grant provides federal grants to the states and territories for a wide range of benefits, services, and activities, including helping states and territories pay for cash welfare for needy families with children.  TANF generally applies to Puerto Rico and the other territories in the same manner as it applies to the states and DC, in terms of its purpose, flexibility to use federal grants, program requirements, and the computation of the TANF basic block grant (which, in Puerto Rico, is set at $71.6 million).  TANF's application to Puerto Rico and the other territories differs in that they are ineligible for certain TANF grants—supplemental grants (not currently applicable), contingency funds, and mandatory child care funds—that certain qualifying states may receive.  On the other hand, Puerto Rico and the other territories may receive special matching funds for TANF, child care, and Title IV-E foster care and permanency programs under Section 1108(b) of the Social Security Act.<br><br>NOTE REGARDING SOCIAL SERVICES FUNDING CAP:  Puerto Rico is subject to an overall annual federal funding cap of $107,255,000 set forth in Section 1108 of the Social Security Act.  The four federal programs subject to the Section 1108 cap are (1) the AABD program, (2) *the Temporary Assistance for Needy Families (TANF) program*, (3) various child welfare funding streams under Title IV-E of the Social Security Act, and (4) the Matching Grants to the territories under Section 1108(b) of the Social Security Act. |
| Temporary Assistance for Needy Families (TANF) Contingency Fund (Title IV-A of the Social Security Act) | U.S. Department of Health and Human Services (HHS), Administration for Children and Families (ACF) | House Committee on Ways and Means<br><br>Senate Committee on Finance | Only the 50 states and DC are eligible to receive funding under the TANF Contingency Fund; Puerto Rico and the other territories are not eligible.  See 42 U.S.C. 603(b)(7).  States qualify based on high unemployment, Supplemental Nutrition Assistance Program (SNAP) caseloads, and state expenditures above what was spent in Fiscal Year 1994. |
| Child Care Mandatory and Matching Funds of the Child Care and Development Fund (Title IV-A of the Social Security Act) | U.S. Department of Health and Human Services (HHS), Administration for Children and Families (ACF) | House Committee on Ways and Means<br><br>Senate Committee on Finance | Only the 50 states and DC are eligible to receive funding under the Child Care Mandatory and Matching Funds program; Puerto Rico and the other territories are not eligible.  See 42 U.S.C. 618(d).  There are two different mandatory child care funding streams: (1) "guaranteed" mandatory funds, and (2) mandatory matching funds.  Guaranteed mandatory funds are allocated to states based on the amount each state received for certain welfare-related child care programs in Fiscal Year 1994 or Fiscal Year 1995, or the average of Fiscal Year 1992-Fiscal Year 1994, whichever is greater.  Mandatory matching funds are distributed to states based on their relative share of children under age 13.  To receive their full share of mandatory matching funds, states must meet maintenance-of-effort and matching requirements. |
| Title IV-E Foster Care, Adoption Assistance, Guardianship Assistance Program (Title IV-E of the Social Security Act) | U.S. Department of Health and Human Services (HHS), Administration for Children and Families (ACF) | House Committee on Ways and Means<br><br>Senate Committee on Finance | Title IV-E of the Social Security Act entitles states and territories with an approved Title IV-E plan to reimbursement of part of their costs of providing foster care, adoption assistance, and kinship guardianship assistance on behalf of eligible children.  Puerto Rico is the only territory with an approved Title IV-E plan.  Federal Title IV-E support is offered on an open-ended basis to states, but is subject to the social services spending cap in Puerto Rico.  The share of federal Title IV-E support provided is 50 percent for program administration costs; 75 percent for program training |

| | | | |
|---|---|---|---|
| | | | costs; and the state or territory's Federal Medical Assistance Percentage (FMAP) for foster care maintenance, adoption assistance, and guardianship assistance payments. State FMAPs are recalculated annually and may vary from 50 percent to 83 percent; states with the highest per capita income relative to the nation receive lower federal support and vice versa. Puerto Rico's FMAP (as applied to Title IV-E) is fixed at 55 percent. For Fiscal Year 2015, Puerto Rico submitted federal Title IV-E foster care and adoption assistance claims of about $5.4 million, primarily for foster care, and received federal reimbursement of $2.8 million. Puerto Rico has not opted to provide Title IV-E guardianship assistance.<br><br>Federal eligibility rules for Title IV-E foster care include state/territory-specific income limits, tied to program rules in the now-defunct Aid to Families with Dependent Children (AFDC) program, as they existed in July 1996. A federal review of Puerto Rico's Title IV-E claims in 2003 indicated that the territory did not have procedures to properly limit Title IV-E claims to children meeting these IV-E foster care eligibility criteria. Puerto Rico's Title IV-E claims subsequently dropped to nearly zero. While Puerto Rico made corrections to its claiming system, for Fiscal Year 2015 it indicated that IV-E foster care maintenance payments were provided to just 252 children on an average monthly basis.<br><br>NOTE REGARDING SOCIAL SERVICES FUNDING CAP: Puerto Rico is subject to an overall annual federal funding cap of $107,255,000 set forth in Section 1108 of the Social Security Act. The four federal programs subject to the Section 1108 cap are (1) the AABD program, (2) the Temporary Assistance for Needy Families (TANF) program, (3) *various child welfare funding streams under Title IV-E of the Social Security Act,* and (4) the Matching Grants to the territories under Section 1108(b) of the Social Security Act. |
| Chafee Foster Care Independence Program, including Educational and Training Vouchers (Section 477 of the Social Security Act) | U.S. Department of Health and Human Services (HHS), Administration for Children and Families (ACF) | House Committee on Ways and Means<br><br>Senate Committee on Finance | The John H. Chafee Foster Care Independence Program (CFCIP) authorizes funding for states and territories to provide services to help youth make a successful transition from foster care to adulthood. Funding for this program is authorized as a capped entitlement to states and territories provided they have an approved Title IV-E foster care and adoption assistance plan. Annual mandatory funding is authorized at $140 million and is distributed by formula; the federal share of program costs is 80 percent. Funding for Chafee Educational and Training Vouchers (ETVs) is available to states and territories receiving Chafee grants and may be used to provide vouchers (valued at up to $5,000 per year) to support post-secondary education and training for youth who have aged out (or are expected to age out) of foster care. Annual funding is authorized on a discretionary basis and is distributed by formula to each state or territory that receives CFCIP funds; the federal share of program costs is 80 percent. For Fiscal Year 2015, Congress provided just over $43 million for the ETV program. Puerto Rico is the only territory with a Title IV-E plan and thus the only one receiving CFCIP and ETV funds. For Fiscal Year 2015, Puerto Rico's CFCIP allotment was $1,376,075 and its ETV allotment was $444,652. |

| | | | NOTE REGARDING SOCIAL SERVICES FUNDING CAP: Puerto Rico is subject to an overall annual federal funding cap of $107,255,000 set forth in Section 1108 of the Social Security Act. The four federal programs subject to the Section 1108 cap are (1) the AABD program, (2) the Temporary Assistance for Needy Families (TANF) program, (3) *various child welfare funding streams under Title IV-E of the Social Security Act*, and (4) the Matching Grants to the territories under Section 1108(b) of the Social Security Act. |
|---|---|---|---|
| Adoption and Legal Guardianship Incentive Payments (Section 473A of the Social Security Act) | U.S. Department of Health and Human Services (HHS), Administration for Children and Families (ACF) | House Committee on Ways and Means<br><br>Senate Committee on Finance | Adoption and Legal Guardianship Incentive Payments are awarded to states and territories (with a Title IV-E plan) that increase the rate at which children who cannot return home leave foster care to permanent adoptive families or legal guardians. Funding for incentive payments is authorized on a discretionary basis and awarded to states and territories based on their performance. For Fiscal Year 2016, Congress provided $38 million for these incentive payments. Puerto Rico is the only territory with a Title IV-E plan and thus the only one eligible for these incentive payments. For adoptions and legal guardianships finalized in Fiscal Year 2014, the most recent data publicly available, Puerto Rico received an incentive payment of $5,000.<br><br>NOTE REGARDING SOCIAL SERVICES FUNDING CAP: Puerto Rico is subject to an overall annual federal funding cap of $107,255,000 set forth in Section 1108 of the Social Security Act. The four federal programs subject to the Section 1108 cap are (1) the AABD program, (2) the Temporary Assistance for Needy Families (TANF) program, (3) *various child welfare funding streams under Title IV-E of the Social Security Act*, and (4) the Matching Grants to the territories under Section 1108(b) of the Social Security Act. |
| Section 1108(b) Matching Grants to the Territories (Section 1108(b) of the Social Security Act) | U.S. Department of Health and Human Services (HHS), Administration for Children and Families (ACF) | House Committee on Ways and Means<br><br>Senate Committee on Finance | Puerto Rico and the other territories qualify for Section 1108(b) Matching Grants based on having territorial government expenditures in excess of what the territory in question spent in Fiscal Year 1995. Section 1108(b) Matching Grants may be used for TANF, including child care, or Title IV-E foster care and permanency programs. Section 1108(b) Matching Grants include a 25 percent territory government matching requirement.<br><br>NOTE REGARDING SOCIAL SERVICES FUNDING CAP: Puerto Rico is subject to an overall annual federal funding cap of $107,255,000 set forth in Section 1108 of the Social Security Act. The four federal programs subject to the Section 1108 cap are (1) the AABD program, (2) the Temporary Assistance for Needy Families (TANF) program, (3) various child welfare funding streams under Title IV-E of the Social Security Act, and (4) *the Matching Grants to the territories under Section 1108(b) of the Social Security Act*. |

| Low-Income Home Energy Assistance Program (LIHEAP) | U.S. Department of Health and Human Services (HHS), Administration for Children and Families (ACF) | House Committee on Energy and Commerce; House Committee on Education and the Workforce<br><br>Senate Committee on Health, Education, Labor and Pensions | Under LIHEAP, the federal government makes annual grants to states and territories to operate home energy assistance programs for low-income households. The LIHEAP statute authorizes two types of funds: regular funds, which are allocated to all states using a statutory formula, and emergency contingency funds, which are allocated to one or more states at the discretion of the executive branch in cases of emergency. States and territories may use LIHEAP funds to help low-income households pay for heating and cooling costs, for crisis assistance, weatherization assistance, and services (such as counseling) to reduce the need for energy assistance.<br><br>The LIHEAP statute provides that at least 0.10 percent (one-tenth of 1.0 percent) but not more than 0.50 percent (one-half of 1.0 percent) of the total regular fund appropriation must be set aside for energy assistance in the five territories. Within that range, HHS sets the exact percentage of funds that goes to the territories. From the inception of the program in the early 1980s through Fiscal Year 2013, HHS established the set-aside at approximately 0.134 percent of regular funds. This percentage was based on the amount of funding that the territories received under LIEAP, the predecessor program to LIHEAP. In FY2014, HHS set aside 0.5 percent of funding for the territories, the first time that funding had reached the maximum allowed by the statute. This set-aside has continued in appropriations since Fiscal Year 2014. HHS apportions funds among the five territories based on population, with Puerto Rico receiving approximately 90 percent of funds. In Fiscal Year 2016, Puerto Rico received $15.1 million in LIHEAP funds. |
| Medical Assistance Program (Medicaid) | U.S. Department of Health and Human Services (HHS), Centers for Medicare and Medicaid Services (CMS) | House Committee on Energy and Commerce<br><br>Senate Committee on Finance | Medicaid is a joint federal-state program that finances the delivery of medical services for low-income individuals. The territories operate Medicaid programs under federal rules that differ from those applicable to the states and DC. For example, most of the eligibility and benefit requirements for the states and DC apply to the territories, but none of the territories cover all the mandatory eligibility groups and benefits. The federal matching rate (FMAP) in the states varies according to a state's per capita income and can range from 50 percent to 83 percent, while DC's FMAP is set by statute at 70 percent. The FMAP for the territories is generally set by statute at 55 percent. Federal Medicaid funding to the states and DC is open-ended, while the Medicaid programs in the territories are subject to federal spending caps (i.e., allotments) pursuant to Section 1108 of the Social Security Act (48 U.S.C. 1308), which are adjusted annually for inflation. Puerto Rico's Section 1108 cap was $335,300,000 in Fiscal Year 2016. The Patient Protection and Affordable Care Act (ACA; P.L. 111-148, as amended) provided $7.3 billion in additional Medicaid federal funding to the territories, available between July 1, 2011, and September 30, 2019, of which Puerto Rico received approximately $6.4 billion. In Fiscal Year 2016, Puerto Rico drew down approximately $1.63 billion in combined ACA funds ($1.3 billion) and Section 1108 funds ($335.3 million), not including federal funding for the Children's Health Insurance Program (CHIP), funding provided through Section 1935(e) of the Social Security Act, sometimes referred to as the enhanced allotment program |

| | | | |
|---|---|---|---|
| | | | (EAP), or funding for health information and technology. |
| State Medicaid Fraud Control Units (MFCU) | U.S. Department of Health and Human Services (HHS), Centers for Medicare and Medicaid Services (CMS) | House Committee on Energy and Commerce<br><br>Senate Committee on Finance | Section 1902(a)(61) of the Social Security Act requires each state and territory to operate an MFCU to investigate and prosecute Medicaid provider fraud and patient abuse or neglect under state law, unless the state or territory demonstrates to the satisfaction of the HHS Secretary that the operation of an MFCU would not be cost-effective,. Currently, all states (except North Dakota) and the District of Columbia have MFCUs. Provided that a state MCFU is certified (and recertified annually) by the Department of Health and Human Services Office of Inspector General, federal law provides for an enhanced federal medical assistance percentage (FMAP) for MFCUs. None of the five territories operates an MFCU, which is likely a result (at least in part) of the annual federal Medicaid funding cap that applies to the territories. None of the territories has sought or received a waiver from the Secretary. |
| State Health Insurance Assistance Program (SHIP) | U.S. Department of Health and Human Services (HHS), Administration for Community Living (ACL) | House Committee on Energy and Commerce<br><br>Senate Committee on Finance | In the Omnibus Budget Reconciliation Act of 1990 (OBRA 90; P.L. 101-508) Congress authorized and appropriated funding from the Medicare trust funds for a "beneficiary assistance program" to help Medicare beneficiaries receive Medicare, Medicaid, and other health-insurance services. The beneficiary assistance program was later renamed the State Health Insurance Assistance Program (SHIP) and administration of the SHIP program was officially transferred from CMS to the Administration for Community Living (ACL) in 2014.<br><br>SHIP funding is allocated to states through grants that are required to consider the percentage of Medicare beneficiaries in the state, the rural population, and state administration capacity. Section 119 of the Medicare Improvements for Patients and Providers Act of 2008 (MIPPA, P.L. 110-275) authorized additional appropriations for SHIPs and other outreach assistance programs under the Administration on Aging, a precursor to ACL. The additional MIPPA appropriation, $13 million annually in Fiscal Year 2016 and Fiscal Year 2017, are allocated based on a statutory formula that relies in part on the percentage of Medicare beneficiaries who are eligible, but do not receive, a low-income subsidy (LIS) through Medicaid. Under Medicaid law, LIS subsidy programs are optional for the territories and none of the territories offer LIS. Thus, territories are not eligible for the additional MIPPA SHIP funding. |

| Medicare Part A | U.S. Department of Health and Human Services (HHS), Centers for Medicare and Medicaid Services (CMS) | House Committee on Ways and Means<br><br>Senate Committee on Finance | Medicare Part A provides coverage for inpatient hospital, skilled nursing facility, home health, and hospice benefits. Eligible hospitals, including hospitals in Puerto Rico, that treat a certain share of low-income patients and are reimbursed under the Medicare Inpatient Prospective Payment System (IPPS) can receive additional payments—Medicare Disproportionate Share Hospital (DSH) payments—to offset the financial effects of treating such patients. Prior to the Patient Protection and Affordable Care Act (ACA; P.L. 111-148, as amended), DSH payments were provided by a single statutory formula that increased the IPPS reimbursement amount based on the disproportionate patient percentage (DPP). The DPP was based on a hospital's share of low-income patients, defined as the share of Medicare inpatient days for individuals entitled to federal Supplemental Security Income (SSI) benefits out of a hospital's total Medicare inpatient days (Medicare/SSI) plus the share of Medicaid inpatient days out of the hospital's total inpatient days.<br><br>The ACA modified DSH funding for Fiscal Year 2014 and thereafter, splitting DSH into two payments with separate methodologies:  (1) empirically justified DSH payments, which continue to be based on the traditional DPP but are reduced to 25 percent of the DSH payments that otherwise would have been provided in the absence of the ACA modification, and (2) uncompensated care payments, which are based on the most appropriate data available and, in the aggregate, are equal to the remaining 75 percent of the pre-ACA DSH amount. Currently, Medicare/SSI is a factor in calculating both payments. Residents of Puerto Rico are ineligible for SSI because the program is not available in the territory. The HHS Secretary, using administrative authority, modified the uncompensated care payment formula for Fiscal Year 2017 to use 14 percent of a Puerto Rico hospital's Medicaid days as a proxy for Medicare/SSI days, resulting in an estimated $12.9 million increase rather than an estimated $3.4 million decrease in total uncompensated care payments to hospitals in Puerto Rico in Fiscal Year 2017 in the absence of the new proxy. The Secretary did not use a proxy for Medicare/SSI in the empirically justified DSH payment formula, citing that the DPP is prescribed in statute for empirically justified DSH. See Social Security Act 1886(d)(5)(F)(vi). |
| Medicare Part B | U.S. Department of Health and Human Services (HHS), Centers for Medicare and Medicaid Services (CMS) | House Committee on Energy and Commerce; House Committee on Ways and Means<br><br>Senate Committee on Finance | Medicare Part B provides coverage for physicians' services, outpatient hospital services, durable medical equipment, outpatient dialysis, and other medical services.  Residents of every state and territory other than Puerto Rico who are receiving Social Security benefits are automatically enrolled in both Part A and Part B, and coverage begins the first day of the month they turn 65.  Because beneficiaries must pay a premium for Part B coverage, they have the option of turning this coverage down.  Disabled individuals who have received cash payments for 24 months under the Social Security disability programs are also automatically enrolled in Part B unless they decline such coverage.  Those individuals who are not automatically enrolled in Medicare—e.g., because they have not filed for Social Security benefits—must file an application for Medicare Part A and Part B with the Social Security Administration during their seven-month initial enrollment period (IEP), which begins three months before the month in which they |

| | | | |
|---|---|---|---|
| | | | turn 65. Beneficiaries who do not sign up for Part B during their IEP, or who drop it and sign up again later, may have to pay a late-enrollment penalty for as long as they are enrolled in Part B. Monthly premiums for Part B may go up 10 percent for each full 12-month period that one could have had Part B but did not sign up for it. Certain low-income beneficiaries may qualify for premium assistance from Medicaid through a Medicare Savings Program (MSP). Beneficiaries in an MSP are not subject to late-enrollment penalties regardless of when they signed up for Medicare.<br><br>Under federal statute, residents of Puerto Rico who receive Social Security benefits are automatically enrolled in Part A, but not Part B, when they turn 65. Rather, they need to sign up for Part B during their IEP or be subject to a penalty. The lack of an automatic Part B enrollment process in Puerto Rico has resulted in a disproportionate number of Puerto Rican Medicare beneficiaries paying the late-enrollment penalties. Because Puerto Rico does not have an MSP program, low-income beneficiaries subject to this penalty may be responsible for paying the full penalty amount in addition to their premiums. |
| Medicare Part D | U.S. Department of Health and Human Services (HHS), Centers for Medicare and Medicaid Services (CMS) | House Committee on Energy and Commerce; House Committee on Ways and Means<br><br>Senate Committee on Finance | Medicare Part D provides an outpatient prescription drug benefit, either through private prescription drug plans that offer only drug coverage or through Medicare Advantage prescription drug plans that offer coverage as part of broader, managed-care plans. In the states and DC, individuals with incomes up to 150 percent of the federal poverty level and assets below set limits are eligible for assistance with their Part D premiums and cost sharing, which is known as the Part D low-income subsidy (LIS). The states and DC make annual payments, known as clawback payments, to help cover the cost of LIS. Pursuant to federal statute, residents of the territories are not eligible for LIS. In lieu of LIS, federal law provides Medicaid funding to the territories to provide Medicaid coverage of prescription drugs for low-income Medicare beneficiaries. This funding, provided through Section 1935(e) of the Social Security Act, is sometimes referred to as the enhanced allotment program (EAP). Each territory government is required to match the Section 1935(e) funding at its regular Medicaid FMAP rate of 55 percent. This means for every dollar a territory spends on providing Medicaid coverage for prescription drugs to low-income Medicare beneficiaries, the territory draws down $0.55 from its allotted Section 1935(e) funding, up to annual limit. In Fiscal Year 2015, Puerto Rico received a Section 1935(e) allotment (i.e., the maximum amount of federal funds available for this purpose) of $44 million, but Puerto Rico used only $9 million of these funds as a result of the matching requirement. |
| Health Insurance Exchange Marketplace | U.S. Department of Health and Human Services (HHS), Centers for Medicare and Medicaid Services (CMS) | House Committee on Energy and Commerce; House Committee on Ways and Means<br><br>Senate Committee on Finance | The Patient Protection and Affordable Care Act (ACA; P.L. 111-148, as amended) requires health insurance exchanges to be established in every state and DC where individuals and small businesses purchase private health insurance coverage. States must have two types of exchanges: an individual exchange and a small business health options program exchange. Exchanges may be established either by the state itself as a state-based exchange or by the HHS Secretary as a federally-facilitated exchange. Persons who obtain coverage through the individual exchange may be eligible for financial assistance—premium tax credits and cost- |

| | | | sharing subsidies—from the federal government, and small businesses that use the small business exchange may be eligible for tax credits to assist businesses with the cost of providing health insurance coverage to employees.  Section 1323 of the ACA authorized each territory to elect to establish an exchange, but did not require a territory to do so.  A territory that did elect to establish an exchange could receive limited federal funding for the purpose of providing premium and cost-sharing assistance for individuals who enrolled in the exchange.  Section 1323 provided $1 billion to be available for this purpose beginning in 2014 and ending in 2019, with $925 million allocated to Puerto Rico and $75 million allocated among the four other territories.  If a territory did not establish an exchange, Section 1323 provides that the territory is entitled to an increase in Medicaid funds by the equivalent amount of its Section 1323 funding (in the case of Puerto Rico, $925 million).  No territory elected to establish an exchange and each instead received an increase in its Medicaid funding. |
|---|---|---|---|
| Family-to-Family Health Information Center Grant Program | U.S. Department of Health and Human Services (HHS), Health Resources and Services Administration (HRSA) | House Committee on Energy and Commerce<br><br>Senate Committee on Finance | The F2F program was established as part of the Family Opportunity Act, which was included in the Deficit Reduction Act of 2005 (P.L. 109-171).  Under the program, HRSA makes competitive grants to support Family-to-Family Health Information Centers.  Centers are primarily non-profit organizations run by families with children and youth with special health care needs, and they provide education, training, peer support, and expertise in navigating health care systems for other families of children and youth with special health care needs.  The law establishing the program makes grants available to support a single center in each of the 50 states and in DC, but not in the U.S. territories.  See 42 U.S.C. 701(c)(5).  The program is directly funded (not subject to the annual appropriations process) and the current annual appropriation is $5 million.  Funding is distributed equally among centers in each state and DC, with each center receiving about $95,000 per year, regardless of the state's population. |
| Federal Home Visiting Program<br><br>Also known as Maternal, Infant, and Early Childhood Home Visiting Program (MIECHV) | U.S. Department of Health and Human Services (HHS), Health Resources and Services Administration (HRSA) | House Committee on Ways and Means<br><br>Senate Committee on Finance | The Federal Home Visiting Program supports home visiting services for families with young children who reside in communities that have concentrations of poor child health and other risk indicators.  Home visits are conducted by nurses, mental health clinicians, social workers, or others with specialized training.  The law does not specify how state and territory grant funds are to be allocated to eligible entities.  In practice, HRSA distributes Federal Home Visiting Program funds by both formula and competitive awards and, on its face, the funding formula treats states and territories the same.  Between Fiscal Year 2010 and Fiscal Year 2015, funding was distributed according to the relative share of children under age five in families at or below 100 percent of the federal poverty line in each state.  The poverty data are derived from the U.S. Census Bureau's Small Area Income Poverty Estimates (SAIPE), which are not available for the territories.  There was a $1 million funding minimum for both state and territory grantees, and HRSA allocated the minimum level of funding to each of the territories from Fiscal Year 2011 through Fiscal Year 2015. |

106

| | | | For Fiscal Year 2016, HRSA redesigned the funding allocation for formula grants. About one-third of funding is allocated based on the share of children under age five in families at or below 100 percent of the federal poverty line in each state, again using 2013 SAIPE data that are not available for the territories. About two-thirds of funding is allocated based on the amount of competitive awards a state or territory received under the Federal Home Visiting Program between Fiscal Year 2013 and Fiscal Year 2015. There continues to be a $1 million funding minimum for both state and territory grantees, and the territories each received the base allocation of $1 million in Fiscal Year 2016. |
|---|---|---|---|
| Community Mental Health Services Block Grant (MHBG) | U.S. Department of Health and Human Services (HHS), Substance Abuse and Mental Health Services Administration (SAMHSA) | House Committee on Ways and Means<br><br>Senate Committee on Finance | The MHBG is a block grant program that distributes funds to states and territories according to a formula to support community mental health services for adults with serious mental illness and children with serious emotional disturbance. For states and DC, the MHBG allotment formula is based on the population at risk (weighted), the cost of providing services, and taxable resources. The minimum allotment is the amount that the state received in Fiscal Year 1998. Territories are funded pursuant to a different formula. Of MHBG funds appropriated annually, the law requires the HHS Secretary to reserve 1.5 percent for distribution to the territories. Funds are distributed among the territories in amounts proportional to their populations. The minimum allotment for the territories is $50,000. In Fiscal Year 2016, Puerto Rico received $6.5 million. See PHS Act 1918; 42 U.S.C. 300x-7. |
| Substance Abuse Prevention and Treatment Block Grants (SABG) | U.S. Department of Health and Human Services (HHS), Substance Abuse and Mental Health Services Administration (SAMHSA) | House Committee on Ways and Means<br><br>Senate Committee on Finance | The SABG is a block grant program that distributes funds to states and territories according to a formula for the purpose of supporting substance abuse prevention and treatment services. State and territories, in turn, may distribute funds to local government entities and non-profit organizations. For the states and DC, the SABG allotment formula is based on the MHBG formula and takes into account the population at risk (unweighted), the cost of services, and taxable resources. The minimum allocation is 0.375 percent of the SABG appropriation. Territories are funded pursuant to a different formula. Of SABG funds appropriated annually, the law requires the HHS Secretary to reserve 1.5 percent for distribution to the territories. Funds are distributed among the territories in amounts proportional to their populations. The minimum allotment for the territories is $50,000. In Fiscal Year 2016, Puerto Rico received $22.8 million. See PHS Act 1933; 42 U.S.C. 300x-33. |

| National Housing Trust Fund (HTF) | U.S. Department of Housing and Urban Development (HUD) | House Committee on Financial Services<br><br>Senate Committee on Banking, Housing, and Urban Affairs | The HTF was established by the Housing and Economic Recovery Act of 2008 (P.L. 110-289) to provide formula-based grants to states and territories to use for certain affordable housing activities, with a focus on producing rental housing for extremely low-income households.  The HTF is funded through contributions from two government-sponsored enterprises, Fannie Mae and Freddie Mac, rather than through appropriations.  The statute establishes a formula that takes into account certain factors related to rental housing for extremely low-income and very low-income households.  The statute also specifies a minimum allocation for the 50 states and DC of $3.0 million, but the minimum allocation does not apply to Puerto Rico and the other territories.  HUD announced the first state allocations from the HTF in May 2016, made from funds that were set aside by Fannie Mae and Freddie Mac during calendar year 2015.  Fifteen states received an amount greater than the minimum allocation of $3.0 million (and, of those 15, five have allocations above $4.0 million), while 35 states and DC received the minimum allocation of $3.0 million.  Puerto Rico received $326,000. |
| Pittman-Robertson Fund/Federal Aid in Wildlife Restoration (Wildlife Restoration, Basic Hunter Education, Enhanced Hunter Education) | U.S. Department of the Interior (DOI), Fish and Wildlife Service (FWS) | House Committee on Natural Resources<br><br>Senate Committee on Environment and Public Works | The Pittman-Robertson Wildlife Restoration Act (WRA) uses the proceeds from a federal excise tax (on pistols, revolvers, shells, cartridges, archery equipment) to fund matching grants to states and territories for projects to benefit wildlife resources and conduct hunter education programs, with revenues going into an account called the Wildlife Restoration Fund administered by FWS.  The appropriation of these funds is mandatory, indefinite spending.  Distribution of funding is by formula.  First, $8 million is set aside for Enhanced Hunter Education to construct or maintain public target ranges.  No more than one-sixth of 1.0 percent may be provided to each territory, while allocations to states are based on population. In Fiscal Year 2016, Puerto Rico and the other territories each received $13,400.  Next, one-half of the excise tax on pistols, revolvers, bows, and arrows (but not firearms) is set aside for Basic Hunter Education.  As before, no more than one-sixth of 1 percent may be provided to each territory, while allocations to states are based on population.  In Fiscal Year 2016, Puerto Rico and the other territories each received $204,230.  The remaining amount forms the bulk of the program for Wildlife Restoration.  No more than one-half of 1 percent may be provided to Puerto Rico (or one-sixth of 1 percent in the case of the other territories), while allocations to states are based on a formula involving numbers of licensed hunters and state acreage.   In Fiscal Year 2016, Puerto Rico received $2,881,535. |
| State Wildlife Grants (SWG) | U.S. Department of the Interior (DOI), Fish and Wildlife Service (FWS) | House Committee on Appropriations<br><br>Senate Committee on Appropriations | The SWG program provides matching funds to state and territory fish and wildlife agencies to develop and implement programs that benefit wildlife and their habitats.  Funding may be used to address a variety of conservation needs—such as research, fish and wildlife surveys, species restoration, habitat management, and monitoring—that are identified in a state or territory's Wildlife Action Plan.  A portion of the funds appropriated is for formula grants and the other portion is for competitive grants.  The program was created in P.L. 106-291 and further detailed in subsequent Interior appropriations laws; it has no separate |

| | | | authorizing statute and is a program that was originally created by the Appropriations Committees. With respect to the funds appropriated for formula grants, appropriations law provides that the allocation formula is based two-thirds on the population of each state and one-third on the land area of each state. No state may receive less than 1.0 percent or more than 5.0 percent of the amount allocated. Neither Puerto Rico nor DC may receive more than one-half of 1.0 percent, and the other territories may not receive more than one-fourth of 1.0 percent. In Fiscal Year 2016, Puerto Rico received $241,087 in SWG formula funding and $7,545 in competitive grants. |
|---|---|---|---|
| Dingell-Johnson Sport Fish Restoration Grants | U.S. Department of the Interior (DOI), Fish and Wildlife Service (FWS) | House Committee on Natural Resources<br><br>Senate Committee on Environment and Public Works | Excise taxes on fishing equipment, motorboat and small engine fuels, import duties, and interest are collected and appropriated from the Sport Fish Restoration and Boating Trust Fund. The Fund has a mandatory, permanent appropriation. The matching funds are made available to states and territories through grants, with funding allocated pursuant to a formula. Under Section 4 of the Dingell-Johnson Sportfish Restoration Act, no state may receive less than 1.0 percent or more than 5.0 percent of the amount allocated. Under Section 12 of the Act, neither Puerto Rico nor DC may receive more than 1.0 percent, and the other territories may not receive more than one-third of 1.0 percent. In Fiscal Year 2016, Puerto Rico received $3,555,272 in Sport Fish Restoration grants. (Eleven states also received the same allocation of one percent.) Five other subprograms are also included in this Fund; allocation is through competitive grants. In Fiscal Year 2016, Puerto Rico did not receive any of these grants. |
| Land and Water Conservation Fund, State Assistance Program | U.S. Department of the Interior (DOI), National Park Service (NPS) | House Committee on Natural Resources<br><br>Senate Committee on Energy and Natural Resources | The Land and Water Conservation Fund (LWCF) Act of 1965—enacted to help preserve, develop, and ensure access to outdoor recreation resources—created the Land and Water Conservation Fund. The Fund is currently authorized through September 30, 2018, to accrue revenues of $900 million annually from three specific sources: revenues from oil and gas leases on the Outer Continental Shelf (OCS), the federal motorboat fuel tax, and surplus property sales. A portion of the LWCF, administered by the NPS, provides matching grants to states, DC and the territories for recreation planning, acquisition of lands and waters, and facility development. To be eligible for a grant, a state or territory must prepare and update a statewide outdoor recreation plan. Under the statutory formula, a portion of the State Assistance appropriation is divided equally among 51 jurisdictions—(1) each of the 50 states and (2) the five territories and DC, which together are considered one state. This "state" share is divided among the five territories and DC in accordance with population. The remaining State Assistance appropriation is apportioned based on need, as determined by the Secretary of the Interior, taking into consideration factors in law, among others. For this purpose, the five territories and DC are each treated as separate states. In Fiscal Year 2016, Puerto Rico received a total of $1.3 million in LWCF funding under the state grant program. |
| Federal Aid-Highway Program (FAHP) | U.S. Department of Transportation (DOT), Federal Highway Administration (FHWA) | House: Committee on Transportation and Infrastructure; House Committee on Ways and Means (for tax | FAHP is an umbrella term for the separate highway programs administered by the FHWA. Under the 2015 surface transportation reauthorization act—FAST Act (P.L. 114-94)—most FAHP funding is distributed through the following formula-based programs: (1) National Highway Performance Program, (2) Surface Transportation Block Grant Program, (3) Highway Safety |

| | | issues) | Improvement Program, (4) Congestion Mitigation and Air Quality Improvement Program, (5) National Highway Freight Program, and (6) Metropolitan Planning Program.  The FAST Act provides for a single gross apportionment to each state and DC, which is then divided up among the various programs.  For purposes of apportioning federal-aid highway funds, Puerto Rico is not considered a state.  Instead, funds are authorized for a stand-alone program called the Puerto Rico Highway Program.  Under Section 1115 of the FAST Act, funding for the Puerto Rico Highway Program is authorized at $158 million annually from Fiscal Year 2016 through Fiscal Year 2020.  However, because Puerto Rico is subject to penalties under 23 U.S.C. Section 154 (Open Container Requirements), Section 158 (National Minimum Drinking Age), and Section 164 (Repeat Offenders driving while Intoxicated or driving under the influence), the $158 million is reduced (for Fiscal Year 2016, the reduction was approximately $15.7 million or about 10 percent).  Current law directs Puerto Rico Highway Program funding to be used as follows:  50 percent for purposes eligible under the National Highway Performance Program (essentially, on National Highway System roads in Puerto Rico), 25 percent for purposes eligible under the Highway Safety Improvement Program (for safety infrastructure), and 25 percent for any purpose allowable under the Highway title of the U.S. Code (Title 23).  The FAHP, as well as the Puerto Rico Highway Program, rely upon revenues from the Highway Account of the Highway Trust Fund, which is financed from a federal excise tax on motor fuels, as well as a federal tax on tires, truck and trailer sales, and heavy-vehicle use.  Federal law does not impose the excise tax on motor fuel, or the other federal taxes, in Puerto Rico. |
|---|---|---|---|
| | Senate Committee on Environment and Public Works; Senate Committee on Finance (for tax issues) | | |
| Motor Carrier Safety Assistance Program (MCSAP) | U.S. Department of Transportation (DOT), Federal Motor Carrier Safety Administration (FMCSA) | House Committee on Transportation and Infrastructure

Senate Committee on Commerce, Science, and Transportation | The Motor Carrier Safety Assistance Program (MCSAP) is a formula grant program that provides financial assistance to states and territories to reduce the number and severity of accidents and hazardous materials incidents involving commercial motor vehicles.  MCSAP grants are provided annually to the state's MCSAP lead agency, which is designated by the governor as the state motor vehicle safety agency responsible for administering the Commercial Vehicle Safety Plan within the state.  There are two categories of MCSAP grants:  Basic grants and Incentive grants.  Basic grants are distributed pursuant to a formula that involves highway miles, vehicle miles traveled, population, and special fuel consumption.  All states, DC, and the territories are eligible for Basic grants.  There is a 20 percent match requirement on the part of the state lead MCSAP agency, but the state lead MCSAP agency in the four territories other than Puerto Rico are exempt from this match requirement.  In addition, a state lead MCSAP agency may qualify for Incentive grants if it can demonstrate that its commercial vehicle safety program has shown improvement in certain areas.  Puerto Rico and the other territories are not currently eligible for Incentive grants, evidently because the safety performance and data quality factors on which the Incentive grants are based are not available for the territories.  In Fiscal Year 2016, Puerto Rico received an MCSAP Basic Grant of $1,146,134. |

| Growing States and High Density States Program | U.S. Department of Transportation (DOT), Federal Transit Administration (FTA) | House Committee on Transportation and Infrastructure<br><br>Senate Committee on Banking, Housing, and Urban Affairs | Under 49 U.S.C. 5340, funds are authorized from the Mass Transit Account of the Highway Trust Fund for two programs: the Growing State Formula Program (Section 5340(c)) and the High Density State Formula Program (Section 5340(d)). Funding from these two programs can be used by recipients for a wide variety of purposes, including capital projects, planning and, in certain circumstances, operating costs. The programs are authorized through Fiscal Year 2020. In Fiscal Year 2016, the Growing States Formula Program was authorized at $272.3 million and the High Density States Formula Program at $264.0 million. Funding for the Growing States Formula Program is apportioned among states based on the projected population of each state 15 years beyond the most recent decennial census. Funding is distributed to urbanized areas and rural areas within a state based on projections of the distribution of population. Funding for the High Density State Formula Program is apportioned to states with a population density greater than 370 persons per square mile. Currently, seven states qualify: Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, and Maryland. Funds are distributed within states to urbanized areas only. Puerto Rico, the other territories and DC are not included within the definition of "state" in 49 U.S.C. 5340(a) and are therefore ineligible for funding under both the Growing State Formula Program and the High Density State Formula Program. According to the 2010 decennial census, Puerto Rico has a population density of 478 persons per square mile, trailing only New Jersey (and DC). |

## Appendix 3:  Treatment of Puerto Rico Under Major U.S. Census Bureau Statistical Programs

| Table of Major U.S. Census Bureau Statistical Programs | | | | | |
|---|---|---|---|---|---|
| Name of Program | Other Federal Agency Involved? | Description of Program | Does program collect and publish state-by-state information? | If yes, is Puerto Rico included? | If no, is PR data collected and published as part of the national or regional totals? |
| Census of Governments (six associated annual surveys directly below) | No | The Census of Governments, which is conducted every five years, identifies the scope and nature of the nation's state and local government sector; provides benchmark figures of public finance and public employment; classifies local government organizations, powers, and activities; and measures federal, state, and local fiscal relationships. The Census of Governments is comprised of the following six surveys on this list:  Annual Survey of State Government Finance, Annual Survey of Local Government Finance, Annual Survey of Public Employment and Payroll, Annual Survey of Public Pensions, Annual Survey of School System Finances, Annual Survey of State Government Tax Collections.  The years ending in "2" and "7" for these annual surveys are considered the Census of Governments years, and data are collected from all governments units as compared with a sample of government units in the other years. | Yes | No | N/A |
| Annual Survey of State Government Tax Collections (STC) | No | Provides a summary of taxes collected by state for 5 broad tax categories and up to 25 tax subcategories. These tables and data files present the details on tax collections by type of tax imposed and collected by state governments. | Yes | No | N/A |
| Annual Survey of State Government Finances | No | Provides statistics on revenue, expenditure, debt, and assets (cash and security holdings) for state governments.   There are statistics for the 50 states and DC, as well as a national summary. | Yes | No | N/A |
| Annual Survey of Local Government Finances | No | Provides statistics on revenue, expenditure, debt, and assets (cash and security holdings) for local governments.  There are statistics for the 50 state areas and the District of Columbia, as well as a national summary. | Yes | No | N/A |
| Annual Survey of Public Employment & Payroll (APES) | No | Provides state and local government data on full-time and part-time employment, part-time hours worked, full-time equivalent employment, and payroll statistics. | Yes | No | N/A |

| Annual Survey of Public Pensions | No | Provides revenues, expenditures, financial assets, and membership information for the defined benefit public pensions. Data are shown for individual pension funds and systems as well as at the national, state, and local level. There were 299 state-administered funds and 6,000 locally-administered defined benefit public pension systems, all of which are represented here. | Yes | **No** | N/A |
|---|---|---|---|---|---|
| Annual Survey of School System Finances | National Center for Education Statistics (NCES) | Provides statistics about the finances of elementary and secondary public school systems. Education finance data include revenues, expenditures, debt, and assets of elementary and secondary public school systems. Statistics cover school systems in all states and DC. This survey is co-funded by the National Center for Education Statistics, which has a stake in the survey content and data products. | Yes | **No** | N/A |
| Decennial Census of Population and Housing | No | The Decennial U.S. Census counts every resident in the United States. It is mandated by Article I, Section 2 of the Constitution and takes place every 10 years. | Yes | Yes | N/A |
| Economic Census | No | The Economic Census is the U.S. Government's official five-year measure of American business and the economy for planning and key economic reports, and economic development and business decisions. The last Economic Census was conducted during the year ending December 2012. In October through December 2012, nearly 4 million businesses in America received an economic census form, including most businesses with paid employees. | Yes | **No**, but PR is included in the Economic Census of Islands Areas | No |
| Advance Monthly Retail Trade and Food Services Survey (MARTS) | No | Census conducts MARTS to provide an early estimate of monthly sales by kind of business for retail and food service firms located in the United States. Each month, questionnaires are mailed to approximately 4,700 employer firms selected from the larger Monthly Retail Trade Survey (MRTS). No questionnaires are mailed to firms in PR. | No | N/A | No |
| American Community Survey | No | Premier source for information about America's changing population, housing and workforce. | Yes | Yes, via equivalent Puerto Rico Community Survey | N/A |
| American Housing Survey (AHS) | Department of Housing and Urban Development (HUD) | AHS is sponsored by HUD and conducted by Census. The survey is the most comprehensive national housing survey in the United States. The AHS is conducted biennially between May and September in odd-numbered years. | No, AHS produces national and regional statistics; statistics for the 15 largest metropolitan areas; and statistics for other selected metropolitan | **No**, HUD has never chosen San Juan as one of the selected metro areas. | No, PR is not included in the sample design. |

| | | | areas (usually 10-15 each survey cycle). | | |
|---|---|---|---|---|---|
| American Time Use Survey (ATUS) | Department of Labor, Bureau of Labor Statistics (BLS) | ATUS measures the amount of time people spend doing various activities, such as paid work, childcare, volunteering, and socializing. ATUS data are collected via telephone interviews. Households that have completed their final (8th) month of the Current Population Survey (CPS) are eligible for the ATUS. | No | N/A | No, because PR households do not participate in the CPS. |
| Annual Capital Expenditures Survey (ACES) | No | ACES provides data on capital spending for new and used structures and equipment by U.S. nonfarm businesses. | No | N/A | No, businesses in PR and the other territories are excluded. |
| Annual Retail Trade Survey (ARTS) | No | Provides estimates on sales, e-commerce sales, end-of-year inventories, methods of inventory valuation, purchases, and operating expenses. | No | N/A | No |
| Annual Survey of Entrepreneurs (ASE) | Department of Commerce, Minority Business Development Agency (MBDA) | Provides estimates of number of firms, sales/receipts, annual payroll, and employment by gender, ethnicity, race, and veteran status. The ASE is a supplement to the Survey of Business Owners (SBO), which is conducted every five years as part of the Economic Census. ASE collection is electronic only. The estimate of the sample is approximately 290,000 employer businesses in operation during the survey year. Those selected for the survey receive an initial letter informing the respondents of their requirement to complete the survey. | No | N/A | No |
| Annual Survey of Manufactures (ASM) | No | Provides estimates on manufacturing activity, products, and location for the public and private sectors. | Yes | **No** | N/A |
| Annual Wholesale Trade Survey (AWTS) | No | Provides estimates on sales, e-commerce sales, end-of-year inventories, methods of inventory valuation, purchases, and operating expenses. The Monthly Wholesale Trade Survey (MWTS) and the AWTS work together to produce the most comprehensive data available on wholesale economic activity in the United States. | No | N/A | No |
| Boundary and Annexation Survey (BAS) | No | Census conducts the BAS annually to collect information about selected legally defined geographic areas. The BAS is used to update information about the legal boundaries and names of all governmental units in the United States. | Yes | Yes | N/A |

114

| Building Permits Survey (BPS) | No | Provides national, state, and local statistics on new privately-owned residential construction. Building permits data are collected from individual permit offices, most of which are municipalities. Data are also collected for PR and other U.S. territories, although these areas are excluded from the national statistics. | Yes | Yes, but data for states is published monthly an data for PR is published annually. | No |
|---|---|---|---|---|---|
| Business Dynamics Statistics (BDS) | No | Provides annual measures of business dynamics (such as job creation and destruction, establishment births and deaths, and firm startups and shutdowns) for the economy and aggregated by establishment and firm characteristics. | Yes | **No** | N/A |
| Business R&D and Innovation Survey (BRDIS) | National Science Foundation (NSF) | Provides data on R&D activities of companies operating in the United States, as well as statistics on the R&D workforce, intellectual property, technology transfer activities and innovation, which is useful to decision makers in both the public and private sectors.<br><br>A mail-out/mail-back sample survey of approximately 40,000 companies with 5 or more employees. Large companies with known R&D above $3 million from the previous survey cycle are selected each year from the Business Register. | Yes | **No,** PR companies are not included in the sample. | No |
| Commodity Flow Survey (CFS) | Bureau of Transportation Statistics (BTS) | The CFS, undertaken through a partnership between the Census Bureau and BTS, is conducted every 5 years (years ending in "2" and "7") as part of the Economic Census. The CFS produces data on the movement of goods in the United States, providing information on commodities shipped, their value, weight, and mode of transportation, as well as the origin and destination of shipments of commodities from manufacturing, mining, wholesale, and selected retail and services establishments. Beginning with the 2007 CFS, a sample of 100,000 establishments from the mining, manufacturing, wholesale, and selected retail industries is selected based on geographic location and industry. | Yes | **No** | N/A |
| Construction Progress Reporting Survey (CPRS) | No | Provides monthly estimates on the total dollar value of construction work done in the U.S. Composite estimates are based on mail-out/mail-back and interview surveys of selected construction projects and building owners, and estimates developed or compiled from other sources. These four surveys currently cover about 6,500 private nonresidential, 10,500 state and local, 1,500 multi-family, and 700 federal projects each month. | Yes. Statistics are available at the U.S. level monthly, and by division, region, and state annually for selected categories. | **No,** PR is excluded from state, regional and national totals. | N/A |

| Consumer Expenditure Survey (CE) | BLS | The CE program consists of the Quarterly Interview Survey and the Diary Survey, which provide information on the buying habits of American consumers, including data on their expenditures, income, and consumer unit (families and single consumers) characteristics. The survey data are collected for BLS by the Census Bureau. | Expenditures at the state level are not calculated or published, but geographic-specific data is published. | N/A | No |
| County Business Patterns | No | CBP is an annual series that provides subnational economic data by industry. This series includes the number of establishments, employment during the week of March 12, first quarter payroll, and annual payroll. This is not a survey, but rather a data product that relies on administrative records, the Company Organization Survey, and the Economic Census as inputs. PR is included in the CBP, although its data is published with the other territories in a separate file. | Yes | Yes | N/A |
| Current Population Survey (CPS) | BLS | The CPS is a monthly survey sponsored by BLS and conducted by the U.S. Census Bureau. It is the primary source of labor force statistics for the population of the United States. | Yes | **No** | N/A |
| Economic Census of Islands Area (IA) | No | The Economic Census of Island Areas is the U.S. Government's official five-year measure of businesses and the economy used for planning, economic development, and business decisions. The last Economic Census was conducted for the year ending in December 2012. The Census Bureau mailed a questionnaire to all employer firms in PR that were classified as in-scope for the Economic Census. The Census Bureau covered roughly 38,000 establishments in PR. Respondents were instructed to reply either by mail or on-line. A telephone follow-up was conducted to obtain information from selected firms that failed to report. The Economic Census of Island Areas covers the five US territories. Data collected include total sales, receipts or revenue, kind of business, legal form of organization, employment, annual and first quarter payroll, and class of customer. Hotels, and other lodging places report additional data on sources of receipts and number of accommodations. | Yes, separate statistics are published for PR and each of the other territories | Yes | N/A |
| Enterprise Statistics Program (ESP) | No | The Enterprise Statistics Program (ESP) collects enterprise level data from the Report of Organization Survey (also known as the Company Organization Survey, or COS). The COS is an annual survey whose purpose is to obtain current organization and operating information on large multi-establishment enterprises in order to maintain the Business Register (BR). The BR is a multi-relational database that contains a record for each | No | N/A | No |

| | | establishment that is located in the U.S. or Puerto Rico and has employees. | | | |
|---|---|---|---|---|---|
| Export Statistics | Bureau of Economic Analysis (BEA); U.S. Customs and Border Protection (CBP) | Provides detailed statistics on goods and services shipped to and from the U.S. and foreign countries. The United States Code, Title 13, requires this program. Participation is mandatory. This is covered under the International Trade Statistics Program. | Yes | Yes | N/A |
| Federal Audit Clearinghouse | Office of Management and Budget (OMB) | FAC operates on behalf of the Office of Management and Budget (OMB). Its primary purposes are to: distribute single audit reporting packages to federal agencies; support OMB oversight and assessment of federal award audit requirements; and maintain a public database of completed audits.  Data is collected from entities in PR that expend federal awards, but data is not used in national and/or regional totals. | No | N/A | No |
| Government Units Survey | No | Identifies local governments for the Census of Governments, from which PR is excluded, and provides selected data on local governments. Previously known as "Directory Survey of Local Governments." | Yes | **No** | N/A |
| Housing Vacancy Survey (HVS) | No | The HVS is a Census Bureau-sponsored section within the Current Population Survey questionnaire that is conducted to inform on vacant housing units.  It is not a stand-alone survey.  Provides current information on rental and homeowner vacancy rates, and characteristics of units available for occupancy. These data are used by public and private sector organizations to evaluate the need for new housing programs and initiatives. In addition, the rental vacancy rate is a component of the index of leading economic indicators and is thereby used by the Federal Government and economic forecasters to gauge the current economic climate.  Rental and homeowner vacancy rates and homeownership rates are available for the U.S., regions, states, and for the 75 largest Metropolitan Statistical Areas (MSAs). | Yes | **No** | No |

| Import Statistics | BEA; CBP | Provides detailed statistics on goods and estimates of services entering the U.S. from foreign countries. This is covered under the International Trade Statistics Program. | Yes | Yes | Yes |
|---|---|---|---|---|---|
| Longitudinal Employer-Household Dynamics (LEHD) | | Under the Local Employment Dynamics (LED) Partnership, states agree to share Unemployment Insurance earnings data and Quarterly Census of Employment and Wages (QCEW) data with the Census Bureau. The LEHD program combines these administrative data, additional administrative data and data from censuses and surveys creating statistics on employment, earnings, and job flows at detailed levels of geography and industry and for different demographic groups. The LEHD program uses these data to create partially synthetic data on workers' residential patterns. Data products released by LEHD include the Quarterly Workforce Indicators (QWI), the LEHD Origin Destination Employment Statistics (LODES), and Job-to-Job Flows (J2J). QWI is the most likely product to be available for PR in the short term. 49 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands have joined the LED Partnership, although the LEHD program is not yet producing public-use statistics for PR or the USVI.<br><br>Data have been collected from Puerto Rico but have not been published because of quality issues with the input files. Census is currently working with its partners in Puerto Rico to address these issues with input files. | Yes | **Not in practice**. | N/A |
| Manufactured Housing Survey | HUD | MHS is sponsored by HUD and collected by the Census Bureau, and provides data on shipments, prices and characteristics of new manufactured housing. Key statistics include "Shipments by State." Estimates of Average Sales Price of Manufactured Homes Sold or Intended for Sale for Residential Use are available at national, region, division, and state level annually and region level monthly. Estimates of Manufactured Home Shipments are available at the national and state level monthly. Estimates of shipped homes by status are available at the national level monthly. Estimates of selected characteristics of sold/placed homes are available by region. | Yes | **No** | No |
| Manufacturers' Shipments, Inventories, and Orders Survey (M3) | No | Provides monthly estimates on current economic conditions and indications of future production commitments in the manufacturing sector. | No | N/A | No |

| | | | | | |
|---|---|---|---|---|---|
| Manufacturers' Unfilled Orders Survey (M3UFO) | No | Collects data used to benchmark the new and unfilled orders information published in the monthly M3. | No | N/A | No |
| Manufacturing Energy Consumption Survey (MECS) | Department of Energy, Energy Information Administration (EIA) | Provides estimates on energy consumption in the manufacturing sector. | No | N/A | No |
| Medical Expenditure Panel Survey (MEPS) | Department of Health and Human Services, Agency for Healthcare Research and Quality (AHRQ) | MEPS is a set of large-scale surveys of families and individuals, their medical providers (doctors, hospitals, pharmacies, etc.), and employers across the United States. MEPS collects data on the specific health services that Americans use, how frequently they use them, the cost of these services, and how they are paid for, as well as data on the cost, scope, and breadth of health insurance held by and available to U.S. workers. | Yes | **No** | No |
| Monthly Retail Trade Survey (MRTS) | No | Provides monthly estimates on sales at retail and food services stores and inventories held by retail stores. | No | N/A | No |
| Monthly Wholesale Trade Survey (MWTS) | No | Provides monthly estimates of sales and inventories of wholesale trade industries. | No | N/A | No |
| National Ambulatory Medical Care Survey | CDC, National Center for Health Statistics (NCHS) | NAMCS is a national survey designed to meet the need for objective, reliable information about the provision and use of ambulatory medical care services in the United States. Findings are based on a sample of visits to non-federal employed office-based physicians who are primarily engaged in direct patient care. | No | N/A | No |
| National Health Interview Survey (NHIS) | NCHS | NHIS data are collected through personal household interviews. For over 50 years, the U.S. Census Bureau has been the data collection agent for the National Health Interview Survey. Survey results have been instrumental in providing data to track health status, health care access, and progress toward achieving national health objectives. An estimated 35,000 completed sample adult interviews and 12,000 completed sample child interviews are expected to be available annually for analysis in the redesigned NHIS. There are numerous data reports linked to—based on—NHIS. In the geographic classification of the U.S. population, states are grouped into the four regions used by the U.S. Census Bureau; PR is not included in any region. NCHS collects Vital Statistics (birth and death certificate data) for Puerto Rico through the National Vital Statistics System. But no information is collected in PR for other NCHS surveys. NCHS surveys target the resident civilian non-institutionalized population using the Census definition of this population which is defined as the 50 states and DC. The target population does not include persons residing | In general no, although there is state-by-state information for estimates of health insurance coverage and variation in health care service utilization. There is no PR-specific data. | **No** | No |

119

| | | | | | |
|---|---|---|---|---|---|
| | | outside the 50 states and DC. | | | |
| National Hospital Ambulatory Medical Care Survey (NHAMCS) | NCHS | The National Hospital Ambulatory Medical Care Survey (NHAMCS) is designed to collect data on the utilization and provision of ambulatory care services in hospital emergency and outpatient departments. Findings are based on a national sample of visits to the emergency departments and outpatient departments of non-institutional general and short-stay hospitals. | No, national and regional only. | N/A | No |
| National Sample Survey of Registered Nurses | Department of Health and Human Services (HHS) | Conducted every four years since 1977. The data from these periodic surveys provide the basis for evaluating trends and projection of the future supply of nursing resources. Sponsored by the Department of Health and Human Services' Health Resources and Services Administration (DHHS/HRSA), the NSSRN was last conducted by an organization other than Census in 2008. HRSA recently approached Census for the purposes of redesigning the survey, and it is anticipated that we will field the new version of the survey for the first time in January, 2018. | Yes | **No** | N/A |
| National Survey of Children's Health (NSCH) | HHS | Examines the physical and emotional health of children ages 0-17 years of age. | Yes | **No** | No |
| National Survey of College Graduates (NSCG) | National Science Foundation (NSF) | Biennial survey of college graduates residing in the United States. Sponsored by the National Science Foundation and conducted by the Census Bureau. The survey provides data on the number and characteristics of individuals with a bachelor's or higher degree, with a special focus on individuals with education and/or employment in science or engineering. NSF uses the information to prepare congressionally mandated biennial reports such as Women, Minorities and Persons with Disabilities in Science and Engineering and Science and Engineering Indicators. | In general, no. Although some state information was collected, the state-by-state estimates were not as reliable and were never published. | N/A | Yes. PR is included in the national total, but four other territories are not. |
| National Survey of Fishing, Hunting, and Wildlife-Associated Recreation | US Fish and Wildlife Service (FWS) | Partnership effort with the States and national conservation organizations, and has become one of the most important sources of information on fish and wildlife recreation in the United States. Quantifies the economic impact of wildlife-based recreation. Federal, State, and private organizations use this detailed information to manage wildlife, market products, and look for trends. The 2011 Survey is the twelfth in a series of surveys conducted about every 5 years since 1955. | Yes | **No** | No |

| Nonemployer Statistics | No | An annual series that provides subnational economic data for businesses that have no paid employees and are subject to federal income tax. The data consist of the number of businesses and total receipts by industry. Most nonemployers are self-employed individuals operating unincorporated businesses (known as sole proprietorships). This is not a survey, but rather a data product that primarily relies on administrative records as input. | Yes | **No** | N/A |
|---|---|---|---|---|---|
| Population Estimates | No | Produces estimates of the population for the United States, its states, counties, cities, and towns, as well as for Puerto Rico. | Yes | Yes | N/A |
| Population Projections | No | Population projections are typically based on an estimated population consistent with the most recent decennial census and are produced using the cohort-component method. The Census Bureau does not have a current set of state population projections and currently has no plans to produce them. PR residents are not included in the 2014 National Population Projection. However, PR projections have been done in the past in a separate program and may be done again in future. | Yes, but the data is old. | **No,** although PR is included in the projections prepared by Census as part of its International Database Program. | No, PR was not included in 2014 national population projection. |
| Puerto Rico Community Survey (PRCS) | No | Part of the Census Bureau's annual American Community Survey (ACS), customized for Puerto Rico. | Yes, PR only | Yes | Yes |
| Quarterly Financial Report (QFR) | No | Provides quarterly aggregate statistics on the financial results and position of U.S. corporations. | No | N/A | No |
| Quarterly Services Survey (QSS) | No | The only data source providing timely estimates of revenue and expenses for selected service industries. | No | N/A | No |
| Quarterly Summary of State and Local Government Tax Revenue (QTAX) | No | Provides quarterly estimates of state and local government tax revenue at a national level, as well as detailed tax revenue data for individual states. | Yes | **No** | N/A |
| Quarterly Survey of Plant Capacity Utilization (QPC) | Federal Reserve Board, Defense Logistics Agency (DLA) | Collects statistics on establishment operational status, value of actual production, estimated production attainable at full and emergency conditions, and reasons for operating at less than full production capacity. | No | N/A | No |
| Quarterly Survey of Public Pensions | No | Quarterly survey that provides national summary data on the revenues, expenditures, and composition of assets of the largest defined benefit public employee pension systems for state and local governments. This survey currently consists of a panel of 100 pension systems, which comprise 88.4 percent of financial activity among such entities, based on the 2012 Census of Governments. | No | N/A | No |

| Quarterly Workforce Indicators (QWI) | No | The QWI are a set of economic indicators including employment, job creation, earnings, and other measures of employment flows. The QWI are reported based on detailed firm characteristics (geography, industry, age, size) and worker demographics information (sex, age, education, race, ethnicity) and are available tabulated to national, state, metropolitan/micropolitan areas, county, and Workforce Investment Board (WIB) areas. | Yes | **No** | No |
| --- | --- | --- | --- | --- | --- |
| Rental Housing Finance Survey (RHFS) | HUD | Provides current and continuous measure of financial, mortgage and property characteristics of multifamily rental housing properties in the United States. | No, only national or regional statistics. | N/A | No |
| School Crime Supplement to the National Crime Victimization Survey (SCS/NCVS) | NCES; Bureau of Justice Statistics (BJS) | Created as a supplement to the National Crime Victimization Survey (NCVS), the SCS collects information about victimization, crime, and safety at school. The SCS is a national survey of approximately 6,500 students ages 12 through 18 in U.S. public and private elementary, middle, and high schools. None of the 6,500 students are from PR. | No | N/A | No |
| School Survey on Crime and Safety (SSOCS) | NCES | The primary source of school-level data on crime and safety for NCES. Over 3,000 public school principals are selected to receive the SSOCS questionnaire. None of the 3,000 public school principals selected to receive the SSOCS questionnaire are from PR. | No | N/A | No |
| Service Annual Survey (SAS) | No | Collects data from companies whose primary business is to provide services to individuals, businesses, and governments. Includes most personal, business, automotive, amusement and recreation, social welfare, health care, and other professional services.  This is a survey of approximately 72,000 selected service businesses with paid employees.  To be eligible for the list sample, service businesses must be in the Business Register List (BR), which contains all Employer Identification Numbers (EINs) for listed businesses and all locations of multi-establishment companies. | No | N/A | No |
| Small Area Health Insurance Estimates (SAHIE) | No | The SAHIE produces single-year estimates of health insurance coverage for all counties and states by detailed demographic and income groups. SAHIE data can be used to analyze geographic variation in health insurance coverage, as well as disparities in coverage by race/ethnicity, sex, age and income levels that reflect thresholds for state and federal assistance programs. | Yes | **No** | N/A |

| Small Area Income and Poverty Estimates (SAIPE) | No | SAIPE are produced for school districts, counties, and states. The main objective of this program is to provide updated estimates of income and poverty statistics for the administration of federal programs and the allocation of federal funds to local jurisdictions. Estimates for 2014 were released in December 2015. These estimates combine data from administrative records, post-censal population estimates, and the decennial census with direct estimates from the American Community Survey to provide consistent and reliable single-year estimates. These model-based single-year estimates are more reflective of current conditions than multi-year survey estimates. | Yes | **No** | N/A |
|---|---|---|---|---|---|
| Small Business Lending Survey | Federal Deposit Insurance Corporation (FDIC) | The survey will provide insight into many aspects of small business lending, including important (heretofore unavailable) nationally representative information on the general characteristics of small business borrowers to which the banks lend, the types of credit offered to small businesses (such as closed-end loans, lines-of-credit, and credit cards), and the relative importance of commercial lending activity for banks of different sizes and business models and banks with different levels of urban or rural presence. | No | N/A | No |
| State Government R&D Survey (SGRD) | NSF | The only source for comprehensive, uniform statistics regarding the extent of R&D activity performed and funded by departments and agencies in each of the nation's 50 state governments, the government of DC, and the government of Puerto Rico. | Yes | Yes | N/A |
| Statistics of U.S. Businesses (SUSB) | Small Business Administration (SBA) | Annual series that provides national and subnational data on the distribution of economic data by enterprise size and industry. SUSB covers most of the country's economic activity. Data are presented by geographic area, industry detail, and enterprise size. Annual data consist of number of firms, number of establishments, annual payroll, and employment during the week of March 12. In addition, estimated receipts data are included for years ending in 2 and 7. A compilation of data is extracted from the Business Register (BR). | Yes | **No**. All SUSB data are produced as cost-reimbursable special tabulations. There is no appropriated funding. | N/A |

| Survey of Business Owners and Self-Employed Persons (SBO) | No | The SBO provides the only comprehensive, regularly collected source of information on selected economic and demographic characteristics for businesses and business owners by gender, ethnicity, race, and veteran status. Estimates include the number of employer and nonemployer firms, sales and receipts, annual payroll, and employment. Data aggregates are presented by states, metropolitan and micropolitan statistical areas, counties, places, and employment and receipts size.<br><br>Businesses were eligible to be selected for this survey if they reported any business activity on any one of the following Internal Revenue Service tax forms: 1040 (Schedule C), 1065, (U.S. Return of Partnership Income), any one of the 1120 corporation tax forms, 941, (Employer's Quarterly Federal Tax Return), and 944, (Employer's Annual Federal Tax Return) | Yes | **No** | No |
|---|---|---|---|---|---|
| Survey of Construction (SOC) | HUD | Provides current national and regional statistics on starts, completions, and characteristics of new, privately-owned single-family and multifamily housing units and on sales of new single-family houses. HUD partially funds this survey.<br><br>BEA uses the estimates in development of the national income and product accounts. The Federal Reserve Board and Council of Economic Advisers use the estimates to determine the condition of the economy. HUD uses the estimates to develop and evaluate housing programs. Manufacturers use estimates to plan production schedules and establish market shares. Insurance companies use estimates to adjust rates and establish replacement costs. Financial institutions use data to estimate mortgage demand. | No, only national or regional statistics. | N/A | No |

124

| Survey of Income and Program Participation (SIPP) | No | SIPP collects data and measures change for many topics including: economic well-being, family dynamics, education, assets, health insurance, childcare, and food security. SIPP is a household-based survey designed as a continuous series of national panels. Each panel features a nationally representative sample interviewed over a multi-year period lasting approximately four years. SIPP is a source of data for a variety of topics and provides for the integration of information for separate topics to form a single, unified database. This allows for the examination of the interaction between tax, transfer, and other government and private policies. Government policy formulators depend heavily upon SIPP for information on the distribution of income and the success of government assistance programs. SIPP data provide the most extensive information available on how the nation's economic well-being changes over time.  The 2014 SIPP Panel began in February 2014 with a sample of approximately 53,000 households based on the 2010 decennial census.  Each household is interviewed four times. | Yes, although SIPP is primarily a national product, since the sample is usually too small for most states. | **No** | No |
| Survey of Market Absorption of New Multifamily Units (SOMA) | HUD | SOMA, sponsored by HUD, uses the Census Bureau's Survey of Construction (SOC) as its sampling base. Each month, a sample of residential buildings containing five or more units is selected for SOMA. Data are collected each month by the 12 Regional Offices of the Census Bureau. Interviews are conducted with the building manager, rental/sales agent, owner or builder. | No, only national or regional statistics. | N/A | No |
| Survey of Program Dynamics (SPD) | No | The Survey of Program Dynamics is a longitudinal, demographic survey designed to collect data on the economic, household, and social characteristics of a nationally representative sample of the U.S. population over time. | No | N/A | No |
| Telephone Point of Purchase Survey (TPOPS) | BLS | Collects data on where Americans are spending their money. The results of the TPOPS are used in the calculation of the Consumer Price Index (CPI). Participation in the TPOPS is based on random sampling.  PR is not considered as part of the CPI calculation. | No | N/A | No |
| Value of Construction Put in Place Survey (VIP) | No | Provides monthly estimates of the total dollar value of construction work done in the United States (the 50 states and DC). Covers construction work done each month on new structures or improvements to existing structures for private and public sectors (in the 50 states and DC). | Yes | **No** | N/A |