# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>    as representative of<br><br>The Commonwealth of Puerto Rico, et al.,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>The Financial Oversight and Management Board For Puerto Rico,<br><br>    as representative of<br><br>Puerto Rico Sales Tax Financing Corporation ("COFINA"),<br><br>        Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS<br>This Document relates to<br>COFINA Title III Case only |

## RESPONSE OF THE COFINA SENIOR BONDHOLDERS' COALITION TO THE OBJECTION OF BANK OF NEW YORK MELLON TO THE PROPOSED DISCLOSURE STATEMENT FOR THE COFINA PLAN OF ADJUSTMENT

---

[1] The Debtors in these Title III cases, along with each Debtor's respective bankruptcy case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT FACTUAL BACKGROUND.................................................................................2

ARGUMENT................................................................................................................................7

      A.     The Inclusion of the Consummation Costs in the Plan Is a Reasonable
            Exercise of Judgment by the FOMB......................................................................8

      B.     There Is No Unequal Treatment of Creditors in Violation of § 1123(a)(4)...........12

CONCLUSION...........................................................................................................................15

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (S.D.N.Y. 2007) .......................................................................................... 12

*In re Cajun Elec. Power Co-op., Inc.*,
150 F.3d 503 (5th Cir. 1998) ............................................................................................. 9

*In re CHC Group Ltd.*, *et al.*,
Case No. 16-BR-31854 (BJH) (Houser, J.) (Bankr. N.D. Tex. 2017) .................................. 14

*In re Fundacion Dr. Manuel de la Pila Iglesias, Inc.*,
No. BAP PR 10-041, 2011 WL 4592058 (B.A.P. 1st Cir. Mar. 22, 2011) ............................... 8

*In re Heron, Burchette, Ruckert & Rothwell*,
148 B.R. 660 (D.D.C. 1992) ............................................................................................. 14

*In re Leslie Fay Cos.*,
207 B.R. 764 (S.D.N.Y. 1997) ........................................................................................... 14

*In re Morad*,
328 B.R. 264 (BAP 1st Cir. 2005) ..................................................................................... 11

*In re Peabody Energy Corp.*,
582 B.R. 771 (E.D. Mo. 2017) ..................................................................................... 12, 14

*Lebron v. Mechem Fin.*,
27 F.3d 937 (3d Cir. 1994) ............................................................................................... 11

## Rules / Statutes

11 U.S.C. § 1123(a)(4) ......................................................................................................... 12
11 U.S.C. § 1125(a)(1) ........................................................................................................... 8
11 U.S.C. § 1125(b) .............................................................................................................7-8
Puerto Rico Oversight, Management and Economic Stability Act, 48 U.S.C. §§ 2101-
2241 ("PROMESA") ............................................................................................... *passim*

## Treatises

7 COLLIER ON BANKRUPTCY, ¶ 1123.01 (16th ed. 2018) .............................................................. 12
7 COLLIER ON BANKRUPTCY, ¶ 1129.02 (16th ed. 2018) ................................................................ 9

**Other Authorities**

Aswath Damodaran, DAMODARAN ON VALUATION Ch. 14  (2006)............................................... 12

Rawley Thomas and Benton E. Gup, THE VALUATION HANDBOOK:  VALUATION TECHNIQUES FROM TODAY'S TOP PRACTITIONERS Ch. 18 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

The COFINA Senior Bondholders' Coalition, by and through its undersigned counsel, files this response (the "Response") to the objection to the COFINA Disclosure Statement filed by the Bank of New York Mellon ("BNYM"), as Trustee (Dkt. 4210[1]) (The "BNYM Objection"), and state as follows:

## PRELIMINARY STATEMENT

1.      In connection with negotiation, execution, and consummation of the COFINA Plan of Adjustment, the Financial Oversight and Management Board for Puerto Rico (the "FOMB"), in the sound exercise of its judgment, intends to pay approximately $332 million in Consummation Costs (as defined below) to the signatories of the Amended and restated Plan Support Agreement (the "PSA"), executed as of September 21, 2018 (collectively, the "COFINA PSA Parties").  As explained further below (*see* paragraphs 10 and 18), this is a net incremental payment for COFINA PSA Parties of approximately $140 million, or approximately 1.5% of the total Allowed Bond Claims of the COFINA PSA Parties.

2.      These Consummation Costs are described in both the Disclosure Statement and the Plan of Adjustment.  BNYM, however, objects to the adequacy of these descriptions.  The COFINA Senior Bondholders' Coalition files this Response to provide additional details as to why the FOMB's decision to pay the Consummation Costs pursuant to the COFINA PSA was entirely reasonable given the tangible benefits provided to COFINA by the PSA Parties and why such a decision is consistent with both the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA") and the Bankruptcy Code.

---

[1]   Unless otherwise indicated, all docket entries refer to Case No. 17 BK 3283-LTS.

## RELEVANT FACTUAL BACKGROUND

3.      The COFINA Plan of Adjustment[2] is the anticipated conclusion to more than three years of fighting between competing creditors of COFINA and the Commonwealth of Puerto Rico and, at times, between creditors and the Puerto Rico Government itself.  Throughout this time, the COFINA PSA Parties have worked to defend COFINA's status as a separate instrumentality from the Government, and to shield COFINA from attempts to invade its property.  These efforts required extraordinary expense.  Indeed, the COFINA PSA Parties have expended well over $100 million dollars of their own resources to ensure that COFINA emerges from Title III as a solvent, financially secure and independent entity, free from the cloud of future challenges to the ownership of its assets.

4.      The attack on COFINA and its property rights began in earnest in November 2016.[3] From that moment on, and continuing to this very day, the COFINA PSA Parties have worked to defend COFINA and preserve value for all COFINA bondholders.  Though not exclusive, the following list describes the significant actions taken by the COFINA PSA Parties that have accrued to the benefit of COFINA and all COFINA bondholders:

- In March of 2017, certain COFINA PSA Parties intervened in an action brought by Commonwealth general obligation bondholders styled *Lex Claims, LLC, et al. v. The Commonwealth of Puerto Rico, et al.* ("*Lex Claims*"), Case No. 16-cv-02374 (FAB), Dkt. 78 (D.P.R. Nov. 4, 2016), that sought to invalidate the COFINA structure. The intervening COFINA PSA Parties filed motions for judgment on the pleadings defending the constitutionality of the COFINA structure.

---

[2]  Title III Plan of Adjustment of the Puerto Rico Sales Tax Financing Corporation, dated October 19, 2018 (Dkt. 4072) (the "Plan of Adjustment").  Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Plan of Adjustment.

[3]  Potential threats to COFINA's independent status and property began prior to the litigation, in June 2015, when the prior administration of Governor Garcia-Padilla announced that Puerto Rico's debt was unpayable and lumped COFINA's over-collateralized obligations with that of the Commonwealth Government.  COFINA's senior bonds, which had enjoyed an A+ rating prior to the announcement, several notches above the Commonwealth's general obligation bonds, dropped precipitously to junk bond territory before ultimately receiving a "D" rating for a defaulted bond.

2

- On May 2, 2017, certain COFINA PSA Parties filed a complaint against the Commonwealth government, commencing the action styled *Rodríguez Perelló*, *et al. v. Rosselló Nevares, et al.* ("*Rodríguez Perelló*"), Case No. 17-cv-01566 (FAB), Dkt. 1 (D.P.R. May 2, 2017).  The complaint sought to protect COFINA and COFINA bondholders against the diversion of COFINA property contemplated by the Commonwealth's Fiscal Plan and Fiscal Plan Compliance Law (Act 26 of 2017).

- In May of 2017, certain COFINA PSA Parties intervened in an adversary proceeding styled *The Bank of New York Mellon, as Trustee v. Puerto Rico Sales Tax Financing Corporation ("COFINA"), et al.* (the "*Interpleader*"), Adv. Proc. No. 17-ap-00133 (LTS).  Among the numerous arguments made in that proceeding, the COFINA PSA Parties defended the COFINA bondholders' property interests and the pledge by COFINA in favor of its bondholders in the face of an attempt to claw back funds held by BNYM.

- After COFINA filed its Title III petition, the COFINA PSA Parties became heavily involved in the negotiation of a procedure for resolving the dispute between the Commonwealth and COFINA over legal title to the sales and use taxes pledged to COFINA as security for COFINA's bondholders (the "Pledged Sales Tax").  The negotiated procedure was memorialized in the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Protocol") (Dkt. 996).

- Pursuant to the Protocol, the duly authorized agent of the Commonwealth commenced the adversary proceeding styled *The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as Agent of the Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico v. Bettina Whyte, as Agent of the Financial Oversight and Management Board for Puerto Rico as Representative of the Puerto Rico Sales Tax Financing Corporation* (the "*Commonwealth-COFINA Dispute*"), Adv. Proc. No. 17-ap-00257 (LTS), by filing a complaint on September 8, 2017 challenging the COFINA structure, its ownership over the Pledged Sales Tax, and the secured status of COFINA's bondholders.  The COFINA PSA Parties intervened in the proceedings, filed numerous counterclaims against the Commonwealth, and filed and argued motions for summary judgment—all in defense of the COFINA structure, COFINA's ownership of the Pledged Sales Tax, and the COFINA bonds.

- During and after summary judgment briefing in the *Commonwealth-COFINA Dispute*, the COFINA PSA Parties engaged in an intensive mediation process with the agents for the Commonwealth and COFINA.  As a result of these significant efforts, the agents reached an agreement that was memorialized in the *Terms and Conditions of Agreement in Principle to Resolve Commonwealth-COFINA Dispute* (the "Agreement in Principle") (Adv. Proc. No. 17-ap-00257 (LTS), Dkt. 486-1). Performance of the Agreement in Principle was conditioned upon, among other things, the Commonwealth Agent's satisfaction "that a sufficient number of holders

3

of COFINA debt will support COFINA's Title III plan of adjustment incorporating the settlement" (the "Support Requirement").  Agreement in Principle at 4.

- In the months that followed the filing of the Agreement in Principle, the COFINA PSA Parties participated around-the-clock in extensive mediation among COFINA creditors, The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and the FOMB that culminated in the PSA and the *Summary of Terms and Conditions* (the "Term Sheet"), both dated as of September 20, 2018.

5.      As the Court is aware, entering into a plan support agreement is not required by PROMESA or the Bankruptcy Code.  In the Chapter 9 and Chapter 11 context, however, such negotiated agreements are commonly used as a tool by the debtor to progress its case successfully towards conclusion.  Such agreements require extensive efforts and sacrifices by the creditor parties thereto, including the incurrence of expenses and the loss of liquidity and optionality with respect to their claims that are "locked up" to support a particular plan.

6.      In COFINA's case, a plan support agreement was even more important in order to satisfy the Support Requirement, an express condition of the independent Agents' Agreement in Principle, at a time of great uncertainty in the case.  In coordination with the mediation team, the FOMB and AAFAF, on behalf of COFINA, made the sound judgment that COFINA's case would be best advanced by entering into the COFINA PSA, which would require signatories to commit to support the COFINA Plan of Adjustment, assist with the Debtor's efforts to secure confirmation of that Plan of Adjustment (including the further negotiation and preparation of definitive agreements and ancillary documents), and to require any purchaser of bonds held by the COFINA PSA Parties to similarly agree to the Plan of Adjustment's treatment up through and including the termination date of the agreement, which can be extended at the discretion of the FOMB and AAFAF until as late as June 2019.

7.      In order to compensate the COFINA PSA Parties for the loss of liquidity and optionality associated with being bound to an agreement to support only one particular plan, and

4

in order to obtain a waiver by the COFINA PSA Parties of their right to seek reimbursement of their expenses through other means, the FOMB independently decided to reserve a fixed amount of cash from the disputed property to pay certain costs (the "Consummation Costs") to those creditors that had been actively participating in good-faith mediation efforts and were willing to bind themselves to the COFINA PSA by signing on or before August 7, 2018.  The Consummation Costs were thus contingent on the PSA Parties agreeing to forego certain rights that they would otherwise have.  These included "locking up" their bonds in support of the Plan of Adjustment for upwards of ten months, agreeing to only sell their bonds to another PSA party or to a third-party who agrees to sign a joinder to the PSA, making any bonds that a COFINA PSA Party subsequently purchases subject to the terms of the PSA, foregoing their right to seek substantial contribution claims to reimburse their expenses, and agreeing to support the Plan of Adjustment with ongoing efforts.

8.      It bears emphasizing that COFINA, alone among the Title III Debtors, does not have a statutory creditors' committee representing the interests of COFINA creditors.  Under section 1103(c)(3) of the Bankruptcy Code, made applicable to COFINA's case under section 301 of PROMESA, formulation of a plan is the function of a statutory committee, the expenses of which are entirely borne by the debtor.  Here, the COFINA PSA Parties served as the counterparty to the FOMB and AAFAF in negotiating the Plan of Adjustment and in ensuring the FOMB that it had significant creditor support for its proposed Plan of Adjustment.[4]

---

[4]     Under the Protocol, the Court appointed the COFINA Agent to represent the interests of the debtor COFINA.  However, the COFINA Agent's scope was limited to the *Commonwealth-COFINA Dispute* only.  The COFINA Agent was expressly prohibited from any involvement in the negotiation or formulation of a plan of adjustment for COFINA.  Furthermore, the COFINA Agent was not allowed to retain her own financial advisor and thus was required to rely upon advisors to the COFINA PSA Parties even in negotiating the settlement of the Commonwealth-COFINA Dispute.

9.      During lengthy and complex negotiations between the Government Parties and the

COFINA PSA Parties, supervised by three federal court judges acting as Court-appointed

mediators, the COFINA PSA Parties ultimately agreed to the conditions and covenants set forth in

the PSA by the deadline imposed by the Government Parties, including the imposition of

restrictions on the transfer of their bonds, which reduced the liquidity and optionality for their

bonds (and any subsequently acquired bonds) in relation to unrestricted bonds.  As consideration

for their efforts in facilitating satisfaction of the Support Requirement, and assisting to formulate

a Plan of Adjustment that has already obtained significant creditor support, and for the costs

incurred in connection with COFINA's Title III case (including the efforts of defending COFINA's

property interests and costs still being incurred in connection with finalization of definitive

agreements and ancillary documents), the FOMB and AAFAF soundly exercised their judgment

to agree to pay the COFINA PSA Parties the Consummation Costs.

10.      The amount of the Consummation Costs requires further clarification.  The gross

amount of cash being reserved by FOMB and AAFAF is equal to 2% of the approximate $17.6

billion in outstanding COFINA bonds (exclusive of the $1 billion that will be allocated to on-

island investors who choose to accept taxable bonds under the COFINA Plan of Adjustment).  This

amount was developed independently by FOMB and equates to roughly $332 million, which is the

number cited by BNYM.  In considering the "net" cost of paying the Consummation Costs to the

COFINA PSA Parties, however, BNYM and other interested parties should understand that the

COFINA PSA Parties hold roughly $9.62 billion[5] of the outstanding $17.6 billion in bond claims.

Thus, approximately $192 million of the Consummation Costs (2% of their collective $9.62 billion

_____

[5]   The total bond claims of each individual COFINA PSA Party is confidential information known only to
that party and the FOMB.  Based on information and belief, the aggregate total of all COFINA PSA Party bond claims
approximates $9.62 billion.

of bonds) would have been distributed to the COFINA PSA Parties in the absence of the Consummation Costs provision.  Thus, the Consummation Costs provision provides for a net incremental payment for COFINA PSA Parties of approximately $140 million.

11.     On October 19, 2018, the FOMB filed (i) the *Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (the "Settlement Agreement") (Dkt. 4067); (ii) the *Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Dkt. 4072); and (iii) the *Disclosure Statement for the Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* (the "Disclosure Statement") (Dkt. 4073).  The COFINA PSA Parties participated substantially in negotiating and drafting the Plan of Adjustment and Disclosure Statement and continue participating substantially, at their own expense, in drafting of various definitive agreements and ancillary documents (including the recently enacted legislation required as a condition to confirmation of the Plan of the Adjustment).

12.     It is estimated that the aggregate fees and expenses incurred by the COFINA PSA Parties in (i) defending the COFINA structure and the COFINA bonds beginning on the COFINA Title III filing date (May 5, 2017) through present and (ii) working with AAFAF and the FOMB to implement the Agreement in Principle and Settlement Agreement into the PSA, Term Sheet, Disclosure Statement, Plan of Adjustment, and new COFINA legislation are in excess of $100 million.

## ARGUMENT

13.     Section 1125(b) of the Bankruptcy Code, incorporated into this Title III case through section 301 of PROMESA, states that solicitation for a plan of adjustment may not be effectuated "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a

hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). The Bankruptcy

Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as

is reasonably practicable in light of the nature and history of the debtor and the condition of the

debtor's books and records . . . and a hypothetical investor typical of the holders of claims or

interests in the case, that would enable such a hypothetical investor of the relevant class to make

an informed judgment about the plan." 11 U.S.C. § 1125(a)(1); *see also In re Fundacion Dr.

Manuel de la Pila Iglesias, Inc.*, No. BAP PR 10-041, 2011 WL 4592058, at *6 (B.A.P. 1st Cir.

Mar. 22, 2011).

14.     In its objection, BNYM complains that the Disclosure Statement does not contain

any "reference to or analysis of actual fees and expenses incurred" by the COFINA PSA Parties.

BNYM Obj. at 8.  The BNYM Objection requests that amendments be added to the Disclosure

Statement that "disclose the factual circumstances and legal basis supporting payment of the

Consummation Costs to selected institutional investors and others and to the exclusion of all other

holders." *Id.*  The COFINA Senior Bondholders' Coalition understands that these objections are

being addressed by the FOMB.

15.     Nevertheless, the COFINA Senior Bondholders' Coalition submits that BNYM's

stated concerns regarding the Consummation Costs are unfounded, and the Consummation Costs

should be approved by the Court in connection with confirmation of the Plan of Adjustment.

    **A.**    **The Inclusion of the Consummation Costs in the Plan Is a Reasonable Exercise of Judgment by the FOMB**

16.     Ordinarily, the FOMB is not required to obtain Court approval with respect to the

use of a Title III debtor's property.  PROMESA § 305.  However, because the Plan of Adjustment

provides for COFINA's dispensation of its property, *i.e.*, the payment of Consummation Costs, the

Court is being asked to review the FOMB's decision.  *Id.* (permitting the Court to "interfere with

8

. . . any of the property or revenues of the debtor" if "the Oversight Board consents" or "the plan

so provides").  Though PROMESA does not say what standard the Court should use, the COFINA

Senior Bondholders' Coalition submits that the reasonableness standard—the same standard used

under the Bankruptcy Code where the Court's approval of such agreed costs is required by

statute—is appropriate.

17.     Though not incorporated into Title III—presumably because use of property by a

Title III Debtor does not require Court Approval[6]—Section 1129(a)(4) of the Bankruptcy Code

states that the Court may only confirm a plan if "[a]ny payment made or to be made by the

proponent, by the debtor, or by a person issuing securities or acquiring property under the plan,

for services or for costs and expenses in or in connection with the case, or in connection with the

plan and incident to the case, has been approved by, or is subject to the approval of, the court as

reasonable."  This section is applicable in the Chapter 11 context to payments made to pre-

confirmation creditors or interest holders for legal fees and expenses.  *See In re Cajun Elec. Power

Co-op., Inc.*, 150 F.3d 503, 513-15 (5th Cir. 1998) (recognizing that pre-confirmation payments

"for fees and expenses incurred . . . in connection with the confirmation and adversary proceeding"

were subject to a reasonableness test).  The Bankruptcy Code does not define "reasonable" but

courts have noted that "[w]hat constitutes a reasonable payment will clearly vary from case to

case."  *Id.* at 517;  *see* 7 COLLIER ON BANKRUPTCY ¶ 1129.02 (16th ed. 2018) (noting that if a

payment is found to be "reasonable in relation to other costs of the particular case, reasonable in

relation to other similar cases, or reasonable in relation to the fee structure of the entity requesting

payment," then the payment should be approved).

---

[6] Section 363 is similarly omitted from PROMESA § 301.

9

18.     There can be little doubt that the Consummation Costs at issue here are reasonable given the time, effort, and money expended by the COFINA PSA Parties for the benefit of COFINA and as consideration for the conditions, obligations, and covenants agreed to in the PSA. As an initial matter, BNYM incorrectly calculates the true value of the Consummation Costs. As described in the Disclosure Statement, the Consummation Costs equal 2% of the total allowable bond claims ($17.6 billion) minus $1 billion, or $332 million.  However, BNYM fails to account for the fact that roughly $9.62 billion of the $17.6 billion in total allowable bond claims are held or insured by  the COFINA PSA Parties.  In other words, even if there were no payment of Consummation Costs, and the amount set aside for the Consummation Costs were distributed to all bondholders *pro rata*, the COFINA PSA Parties would still receive $192 million (2% of their $9.62 billion in allowable bond claims).  The true Consummation Costs, therefore, are actually $140 million (or approximately 1.5% of the COFINA PSA Parties' total bond claims)—the difference between what the COFINA PSA Parties receive with the Consummation Costs payment ($332 million) and what they would receive without it ($192 million).

19.     As noted, the fees and expenses incurred or to be incurred by the COFINA PSA Parties in connection with development of the Plan of Adjustment for COFINA and their other efforts defending COFINA in the Title III case exceed $100 million.  At the very least, these fees, costs, and expenses have allowed the COFINA PSA Parties to provide the following benefits for COFINA and all of COFINA's creditors:

- They have defended the COFINA structure and COFINA's property rights in *Lex Claims*, *Rodríguez Perelló*, and the *Commonwealth-COFINA Dispute*[7];

---

[7]  Even the *Interpleader* action fought to preserve the relevance of key protections for COFINA and its creditors that were imbedded in the COFINA Enabling Act and COFINA Bond Resolution.

10

- They have coordinated with the FOMB to craft the Protocol governing and ultimately resolving the *Commonwealth-COFINA Dispute*;

- They have participated in mediation resulting in the Agreement in Principal, PSA, and ultimate Settlement Agreement of the *Commonwealth-COFINA Dispute*;

- They have assisted the Commonwealth and the FOMB in creating a confirmable Plan of Adjustment for COFINA, and assisted in the preparation of the necessary documents to effectuate the Plan of Adjustment; and

- They have assisted the Commonwealth and the FOMB in ensuring that the new COFINA legislation is consistent with the Plan of Adjustment.

20.     When considering all of these benefits to COFINA, as well as the additional rights given up by the COFINA PSA Parties, which include the limitation on their ability to sell the bonds, a waiver of the right to substantial contribution,[8] and an inability to object to the Plan of Adjustment, Consummation Costs of approximately $140 million are entirely reasonable. Put simply, the payment of the Consummation Costs is a critical component of the interlocking agreements set forth in the PSA.[9] The absence of the PSA could have resulted in a costly, contentious, and lengthy confirmation process for COFINA, with no certainty that a confirmable plan could be presented to creditors and the Court for approval, further delaying recoveries to creditors who have not received any payments on their bonds for more than 18 months. In consideration of these factors, the FOMB determined that it was an appropriate use of COFINA's

---

[8]   Given that the Plan—and substantial recovery for COFINA's creditors—likely would not exist without the work of the COFINA PSA Parties, the COFINA PSA Parties believed they would be entitled to substantial contribution and reimbursement of expenses under § 503 of the Bankruptcy Code, incorporated into these Title III proceedings through section 301 of PROMESA. The COFINA Senior Bondholders' Coalition submits that the Consummation Costs should still be approved because they would satisfy the substantial contribution test since the COFINA PSA Parties have provided "actual and demonstrable benefit" to COFINA and its creditors. *See, e.g.*, *Lebron v. Mechem Fin.*, 27 F.3d 937, 944 (3d Cir. 1994) ("In determining whether there has been a 'substantial contribution' pursuant to section 503(b)(3)(D), the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors." (internal quotation marks omitted)); *see also In re Morad*, 328 B.R. 264, 273 (BAP 1st Cir. 2005) (citing *Lebron*).

[9]   Indeed, without the Consummation Costs, it is unlikely that the Plan of Adjustment can be confirmed. The Support Requirement was a vital condition of the Agreement in Principle between the Commonwealth and COFINA agents in the *Commonwealth-COFINA Dispute*, and the payment of Consummation Costs was instrumental in obtaining sufficient support among COFINA creditors to the Agreement in Principle and Settlement Agreement.

property to secure the "lock ups," pay the Consummation Costs, and provide an opportunity for

COFINA to exit Title III as expeditiously as possible.

### B.    There Is No Unequal Treatment of Creditors in Violation of § 1123(a)(4)

21.    Contrary to BNYM's implication, the payment of Consummation Costs to the

COFINA PSA Parties does not violate § 1123(a)(4) of the Bankruptcy Code, which mandates that

"a plan shall . . . provide the same treatment for each claim or interest of a particular class . . . ."

11 U.S.C. § 1123(a)(4).[10]  BNYM is confusing equal treatment of *claims*, which is required under

§ 1123(a)(4), with equal treatment of *claimants*, which is not.  *See* 7 COLLIER ON BANKRUPTCY

¶ 1123.01 ("The equality addressed by section 1123(a)(4) extends only to the treatment of

members of the same class of claims and interests, and not to the plan's overall treatment of the

creditors holding such claims or interest . . . .  Creditors should not confuse equal treatment of

claims with equal treatment of claimants."); *see also In re Peabody Energy Corp.*, 582 B.R. 771,

781 (E.D. Mo. 2017) (same); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 249-50 (Bankr.

S.D.N.Y. 2007) ("[C]ourts have held that the statute does not require identical treatment for all

class members in all respects under a plan, and that the requirements of section 1123(a)(4) apply

only to a plan's treatment *on account of particular claims* or interests in a specific class—not the

treatment that members of the class may separately receive under a plan on account of the class

members' other rights or contributions." (emphasis in original)).

22.    Here, all *claims* will be treated the same under the COFINA Plan:  holders of senior

COFINA Bonds will receive a 93.01% recovery on their bonds while holders of subordinate

COFINA Bonds will receive a 56.41% recovery.  *See* Plan of Adjustment at 16, 23.  This is true

---

[10]   Section 1123(a)(4) of the Bankruptcy Code is incorporated into Title III proceedings through section 301
of PROMESA.

regardless of whether the holder is a retail investor, an institutional investor, or a COFINA PSA Party.  As discussed above, the payment of the Consummation Costs is intended to compensate the claimants for:  (i) the significant costs and expenses expended by the COFINA PSA Parties in order to achieve a confirmable plan in lieu of seeking substantial contribution; (ii) agreeing to "lock up" their bonds until possibly June 1, 2019—almost ten months after signing the PSA—and thus give up their rights to dispose of their bonds freely as and how they choose, reduce their bondholder rights vis-à-vis a non-PSA party, and accept the attendant risk of unfavorable market conditions[11]; and (iii) agreeing to support the COFINA Plan of Adjustment—another restriction not applicable to non-PSA parties.[12]

23.     It is the efforts and concessions made by the COFINA PSA Parties, as reflected in that PSA, that provides the consideration for the payment of Consummation Costs.  Indeed, unlike recoveries on the bond claims, the Consummation Costs go to the COFINA PSA Parties, regardless of whether the COFINA PSA Party ultimately keeps the bonds.  In other words, the payment is

---

[11]   Indeed, it is well-known that holding an illiquid asset decreases the value of an investment.  *See, e.g.*, Rawley Thomas and Benton E. Gup, THE VALUATION HANDBOOK: VALUATION TECHNIQUES FROM TODAY'S TOP PRACTITIONERS Ch. 18 (2009) ("It is important to identify the two components of the price risk faced by the buyer due to the lack of liquidity.  If the price of the asset goes down during the period of illiquidity and the realized price is lower than the price at which the asset was purchased, there is a realized loss.  This is the first component, and is well understood (Loss I).  Potentially, a second and much larger component of the price risk is the opportunity loss that occurs when the asset increases in price during the period of illiquidity, and then declines to a lower value by the time the asset can be liquidated (Loss II)."); Aswath Damodaran, DAMODARAN ON VALUATION Ch. 14 (2006) ("The notion that investors will pay less for illiquid assets than for otherwise similar liquid assets is neither new nor revolutionary. . . .  Both the theory and the empirical evidence suggest that illiquidity matters and that investors attach a lower price to assets that are more illiquid than to otherwise similar assets that are liquid.").  By agreeing to impose restrictions on their bonds, the COFINA PSA Parties are agreeing to make their current investments less valuable for the benefit of the COFINA, and thus for all of COFINA's creditors.

[12]   Notably, no creditor had been denied the opportunity offered to COFINA PSA Parties.  All creditors were given notice of the *Commonwealth-COFINA Dispute*, the motions to approve and/or object to the Protocol, to intervene in the *Commonwealth-COFINA Dispute*, and to file substantive and dispositive motions in the *Commonwealth-COFINA Dispute*.  *See, e.g.*, Dkts. 303, 544, 718, 719, 857, 868, 996; *see generally* Adv. Proc. No. 17-ap-00257-LTS.  That a creditor chose to forego the opportunity to participate in the process that led to the Plan of Adjustment, and now cannot receive a share of the Consummation Costs, does not violate § 1123(a)(4).  *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("[C]ourts have interpreted the 'same treatment' requirement to mean that all claimants in a class must have 'the same opportunity' for recovery. . . .  What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims.").

tied to the *claimant*, for the services rendered by the claimant, and does not travel with the underlying bonds.  Courts have consistently held that fees and payments paid to *claimants* for actions unrelated to the underlying bond claim do not run afoul of § 1123(a)(4).  *See, e.g.*, *In re Peabody*, 582 B.R. at 782 (finding no § 1123(a)(4) violation where certain parties within the class entered into a backstop commitment with the debtor because the agreement was both a benefit to the creditors and "an obligation and a commitment to refrain from trading"); *In re CHC Group Ltd.*, *et al.*, Case No. 16-BR-31854 (BJH) (Houser, J.) (Bankr. N.D. Tex. 2017), Dkt. 1794, at 10—11, 21 (finding that the plan of adjustment did not violate § 1123(a)(4) where "Plan Sponsors," which included "the beneficial holders, or investment advisors or managers for the account of such beneficial holders, of Senior Secured Notes . . . that have executed the Plan Support Agreement" received "payment of the Put Option Premium . . . in the form of additional New Convertible Second Lien Notes"); *In re Leslie Fay Cos.*, 207 B.R. 764, 791-92 (Bankr. S.D.N.Y. 1997) (agreeing that § 1123(a)(4) is not violated where certain equity holders received stock options because the stock options were given to management as a result of "arms-length bargained for consideration to ensure their needed cooperation in the reorganization effort" and not "'on account' of their prepetition equity interests"); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (D.D.C. 1992) (overruling objections based on § 1123(a)(4) because the "objectors fail to distinguish between a partner's treatment under the plan on account of a claim or interest and treatment for other reasons" and the "plan's provisions dealing with partner contributions, releases, and the permanent injunction have no connection to a partner's status as a claim or interest holder within a particular class").

24.      Finally, BNYM's "disparate treatment" argument rests on a faulty premise.  BNYM asserts that the Consummation Costs are paid from cash that is "shared collateral" of all

14

bondholders under the COFINA Bond Resolution.  BNYM Obj. at 6.  In fact, all of COFINA's property—including such cash—has long been subject to challenge as to ownership and the status of liens with respect thereto.  The fact that the means for implementing the Plan of Adjustment include deeming the property COFINA's property and reserving a portion of such property to pay the Consummation Costs does not mean the Consummation Costs could not have been deemed paid from the Commonwealth's compromised share instead.  For example, approximately $33 million of cash currently held at BNYM is being transferred to the Commonwealth to pay the Commonwealth's costs and expenses, and $40 million of cash currently held at the BNYM is being used to pay Tax Election Costs for on-island holders.  *See* Plan of Adjustment §§ 2.1(a), 15.1, and 15.2.  Consequently, it is the Plan of Adjustment and Settlement Agreement (as incorporated in the Plan of Adjustment) that resolves these disputes and determines the ownership of the disputed property and its use.

## CONCLUSION

For the foregoing reasons, the Court should approve the Disclosure Statement.

**[Signature Page Follows]**

15

DATED: November 16, 2018

Respectfully submitted,

REICHARD & ESCALERA, LLC

**By :** */s/ Rafael Escalera*
　　　　**Rafael Escalera**
　　　　USDC No. 122609
　　　　escalera@reichardescalera.com

　　　　**Sylvia M. Arizmendi**
　　　　USDC-PR 210714
　　　　arizmendis@reichardescalera.com

　　　　**Fernando Van Derdys**
　　　　USDC-PR 201913
　　　　fvander@reichardescalera.com

　　　　**Carlos R. Rivera-Ortiz**
　　　　USDC-PR 303409
　　　　riverac@reichardescalera.com

　　　　**Gustavo A. Pabón-Rico**
　　　　USDC-PR 231207
　　　　pabong@reichardescalera.com

　　　　255 Ponce de León Avenue
　　　　MCS Plaza, 10th Floor
　　　　San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART & SULLIVAN, LLP

**Susheel Kirpalani** (*pro hac vice*)
susheelkirpalani@quinnemanuel.com

**Daniel Salinas**
USDC-PR 224006
danielsalinas@quinnemanuel.com

**Eric Kay** (*pro hac vice*)
erickay@quinnemanuel.com

**Kate Scherling** (*pro hac vice*)
katescherling@quinnemanuel.com

**Darren M. Goldman** (*pro hac vice*)
darrengoldman@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

*Co-Counsel for the COFINA Senior Bondholders' Coalition*

16