UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-----------------------------------------------------------x

In re:                                                                      PROMESA
                                                                            Title III
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of                                      No. 17 BK 3283-LTS

THE COMMONWEALTH OF PUERTO RICO,                         (Jointly Administered)
et al.,

               Debtors.[1]

-----------------------------------------------------------x

NOTICE OF CORRESPONDENCE RECEIVED BY THE COURT

      The Court has received and reviewed the attached correspondence, described

below, from interested persons in the above-captioned cases. Certain information in the attached

correspondence is redacted to either (1) protect sensitive information or (2) exclude misleading

and incorrect information regarding the procedures associated with the submission of objections

to the proposed COFINA plan of adjustment. Although the Court cannot respond individually to

all of those who have expressed their thoughts or concerns, the Court is deeply mindful of the

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

impact of the fiscal crisis on lives, institutions, and expectations, and of the importance of the

issues that are raised in these unprecedented cases.

1.      Email dated December 7, 2018 from Alan Katz
2.      Email dated December 7, 2018 from James and Elizabeth Erickson
3.      Email dated December 7, 2018 from William Stockman
4.      Email dated December 9, 2018 from Shannon Jones
5.      Email dated December 10, 2018 from Anonymous
6.      Email dated December 10, 2018 from Armand Caraviello
7.      Email dated December 10, 2018 from Cecille Blondet-Passalacqua
8.      Email dated December 10, 2018 from Kathy and Richard Schacter
9.      Email dated December 10, 2018 from Mark Peterson
10.     Email dated December 10, 2018 from Stephen Vessels
11.     Email dated December 11, 2018 from Clifford Day
12.     Email dated December 11, 2018 from Mark Peterson
13.     Email dated December 12, 2018 from Anonymous
14.     Email dated December 12, 2018 from Anonymous
15.     Email dated December 12, 2018 from Carlos Alicea
16.     Email dated December 12, 2018 from Eugenio Almedina
17.     Email dated December 12, 2018 from Lorenzo
18.     Email dated December 12, 2018 from Luis Raul Saez
19.     Email dated December 12, 2018 from Maria J. Torres-Lopez
20.     Email dated December 12, 2018 from Reyner Cruz Quiles
21.     Email dated December 12, 2018 from Tania Padro
22.     Email dated December 12, 2018 from Wil Rodriguez
23.     Email dated December 12, 2018 from John DiMarco
24.     Email dated December 13, 2018 from Elisa Cruz-Torres
25.     Email dated December 13, 2018 from Juan Acevedo
26.     Email dated December 13, 2018 from Michelle Hidalgo
27.     Email dated December 13, 2018 from Rubén Colón
28.     Email dated December 13, 2018 from Jorge Schmidt


Dated:  December 13, 2018



**subordinate puerto bondholder**
**Alan Katz**   to: swaindprcorresp

12/07/2018 11:24 AM
Hide Details

From:
To:        swaindprcorresp@nysd.uscourts.gov

DEAR JUDGE SWAIN   I AM A RETIRED SCHOOL PRINCIPAL. I HAVE FOUR GRANDCHILDREN RANGING IN AGE FROM ONE TO TEN YEARS.
IN ORDER TO HELP PAY FOR THEIR COLLEGE EXPENSES  I BOUGHT THE PEURTO RICO SUBORDINATE ZERO CUPON BONDS WHICH WILL
MATURE WHEN THEY ARE OF COLLEGE AGE.
 I AM HEART BROKEN  FOR THEM WHEN I HEARD ABOUT THE PROPOSED PLAN OF ADJUSTMENT WHICH IS SELF DEALING AND JUST PLAIN
UNFAIR . IN MY OPINION A JUDGE IS A FAIR,REASONABLE OFFICIAL WHO CAN TURN EVIL INTO GOOD. MY GRANDCHILDREN WILL LOSE
MORE THAN HALF THEIR INVESTMENTS ....          PLUS BACK INTEREST IF THIS PROPOSED PLAN HAPPENS.  PLEASE JUDGE SWAIN DO
JUSTICE FOR THE SMALL PEOPLE AND FOLLOR THE RULE OF LAW.                                           SINCERELY,ALAN KATZ



**COFINA Subordinate**
Elizabeth and James Erickson    to: swaindprcorresp    12/07/2018 06:10 PM

From:  ███████████████████████████

To:    swaindprcorresp@nysd.uscourts.gov

We own one Senior COFINA Bond and several Subordinates.  As a small investor we understood that each bond was a promissory note to pay by the Puerto Rican Government.  We recognize that there has been significant damage from a hurricane and are sympathetic to this.  None of this, however, changes the promise of the note.  Never mind the large financial loss we will take with the Subordinates but how the world did someone arrive at the 54% number with none of the interest that we have waited 2 years to receive.  We have yet to see any justification why the Senior Bonds should receive interest and the subs should not.  We have been waiting for the interest "due" on these bonds just as the Seniors.  Never mind that Mellon is sitting on the funds to more than pay the interest.  It appears that someone (probably that dysfunctional Board) has decided to throw the sub-bond holders under the bus because it is the easy thing to do.  It may be easy and it may be expeditious but it may also be illegal and is certainly unfair and despicable  Judge Swain, you are better than this.  Be fair and reasonable to the subs - they have THE SAME PROMISE as the Seniors.  We believe that somewhere in the 80% with interest would be fair and get most of us out of

the large financial loss over what we paid to help finance the Territory.  Please look at this and apply some reason to the decision.  Regards,  James and Elizabeth Erickson.



**Puerto Rico General Obligation bond**

William Stockman   to: SwainDPRcorresp                          12/07/2018 01:40 PM

From:

To:       SwainDPRcorresp@nysd.uscourts.gov

My late father,Dr.R.P. Stockman had full faith in the workings of G.O. bonds.
Whether a bond in Tx, Wis., Or Puerto Rico.
He landed at Normandy, WWII, he died at 95 in 2015.
His $100,000.00 Puerto Rico G.O was supposed to be as safe as the faith he had in this country.
The bond is now in his irrevocable trust account.
He worked long, hard hour's to put the money together,( 80-90 hour's/ week)
I hope you are going to do the right thing and think of the small investor like my father.
  Your's truly, William R Stockman, trustee for Ronald P.Stockman irrevocable trust.



**Individual Retail Investor  - The Risky Precedent That Could be Set**

Shannon   to: swaindprcorresp                          12/09/2018 09:46 AM

From:  ████████

To:      swaindprcorresp@nysd.uscourts.gov

Judge Swain,

I am an individual investor who owns Puerto Rico Municipal Bonds.  The amount I own is very significant to me even though it is nothing compared to what the institutional investors work with.  Buying Municipal Bonds is a long-term fixed income type of investment for me.  This is probably the case for most of us small-time retail investors.  I am sure you know that if your decisions/rulings end up protecting only the institutional funds, it could severely hurt the smaller investors.  In addition, it could damage confidence in Municipal Bonds, in general, and tarnish the view of how the legal systems handles these issues.  It may even discourage small to medium sized funds from investing in Municipal Bonds, going forward.

I write this email to ask you to please consider fairness for the smaller retail investors in your very important decisions.  Without this consideration, the impact could be damaging to municipalities seeking funds in the future as well as conservative investors everywhere.

Thank you for your consideration.

Shannon Jones



**Objection to Cofina restructuring plan**

**engalbert**    to: swaindprcorresp

12/10/2018 09:59 AM
Hide Details

From: ███████████████████

To: swaindprcorresp@nysd.uscourts.gov

History: This message has been forwarded.

▼ 1 attachment



PUERTO RICO UPDATE-Dec3-2018.pdf

---

Dear Judge Swain, I object to the restructuring plan and am attaching the correspondence given to me by my financial advisors.


Sent from my Verizon, Samsung Galaxy smartphone



# PUERTO RICO UPDATE

**Seema Balwada, CFA**

**December 3, 2018**

# Will COFINA Subordinate Bondholders Accept or Reject the Proposed Plan of Adjustment?… Voting to Commence this Month…

On Tuesday November 20th Judge Swain who is overseeing the Title III Puerto Rico debt restructuring cases approved the disclosure statement covering the COFINA Plan of Adjustment. The Disclosure Statement covers the date of record, confirmation hearing notice, solicitation/recovery package, voting ballot, distribution procedures and various other procedures necessary to receive and tabulate the bondholder vote to either ACCEPT or REJECT the COFINA Plan of Adjustment.

The Judge made it very clear that the Court has only approved that the proposed procedures are a reasonable and appropriate means to provide bondholders a means to respond to the COFINA Plan of Adjustment. The Court ruling will allow bondholders to cast an informed ballot with respect to the proposed Plan of Adjustment. Judge Swain said the Court approval is subject to additional changes and supplemental disclosures. *The Judge made a point that the disclosure and procedure approval ruling made today is not in any way a ruling on any objections to the substance of the proposed Plan.*

Judge Swain stated, "The Court will consider the economics and structure of the proposed Plan of Adjustment as well as the legality of the elements of the Plan."

**All objections to the substance of the COFINA Plan of Adjustment and the Commonwealth COFINA settlement will be adjudicated at the Court hearing scheduled for January 16, 2019 in San Juan with formal rulings and decisions to follow.**

The Judge pointed out that the pro se objections made by some individual investors and many of the letters she received from individual investors object to the fact that a COFINA Plan of Adjustment is being proposed at this time. It appears that the Judge has received objections similar to objections GMS has received, that it is premature to file a Plan of Adjustment for a solvent COFINA that has sufficient revenues to pay all bondholders, especially since the Commonwealth, whose 2019 general fund budget is less than $9 billion is holding $12 billion of cash in various accounts, most of which is unpaid debt service. The Oversight Board has yet to provide audited financial statements that prove the Commonwealth's self-proclaimed bankruptcy is legitimate and the Commonwealth is truly insolvent.

The Judge said the Court has also received letters on the legality of the division of the pledged sales tax which by law is not available to the Commonwealth. The Plan of Adjustment ignores the law and makes 46% of the COFINA pledged revenue available to the Commonwealth. The Puerto Rico legislature also disregarded their previous law that gave COFINA bondholders the pledged COFINA revenue and passed a new law, which is not allowed under PROMESA and contract law. The new law that changes the existing Statutory Lien and allows the Commonwealth to confiscate 46% of COFINA pledged revenue. The 46% is predominately Subordinate COFINA bondholder money that is being confiscated.

Numerous letters were received by the Court objecting to Senior bondholders receiving a 93% recovery, including back interest/cash from the escrowed COFINA funds, while the Subordinate bondholders secured by the same Statutory Lien on pledged revenues sufficient to pay both Senior and Junior bondholders, receive a 56.4% recovery and no back interest from the $1.2 billion of COFINA escrow funds. The money in the fund is unpaid debt service owed all COFINA bondholders.

Letters have also brought attention to the fact Subordinate bondholders are mostly retail investors that are unorganized and therefore were not represented at the negotiating table. The Senior bondholders, mostly hedge funds, accumulated over the past year what they believe to be a sufficient amount of Subordinate bonds at distressed prices to control the negotiations and the vote. Along with the Commonwealth and the Financial Oversight Board the Senior bondholders authored the COFINA Plan of Adjustment by taking advantage of their position and acting in their own interest rather than in the interest of all COFINA bondholders. The mediation/negotiation should be deemed illegal as the participants are guilty of **self-dealing**. Based on the excellent treatment given to Seniors bondholders and the Commonwealth, **self-dealing** is the only conclusion that can be reached.

COFINA is a solvent and very successful entity, the Statutory Lien and pledged revenue covers both Senior and Subordinate bondholders. However Senior bondholders will receive a 93% plus cash recovery and Subordinate bondholders will only receive a 56.4% recovery and no cash. The Plan appears to have been manipulated, liens and laws appear to have been broken, the Plan is not fair to all stakeholders. A glaring inequity is U.S. Subordinate bondholders who live on the mainland will recover 56.4% of face value, while Puerto Rico Subordinate bondholders will recover 58.4% even though they are in the same class and own the same bonds. Therefore, according to PROMESA guidelines the Plan is illegal. The Court has a fiduciary responsibility to make sure all bondholders are treated fairly and those in the same class are treated equally.

It appears in order for the proposed settlement to be approved the Statutory Lien that covers Senior and Subordinate bondholders must be ruled legal. The Statutory Lien and COFINA structure are being used in the proposed Plan of Adjustment so the Statutory Lien and structure should be considered legal and valid.

Junior bondholders were not represented in the negotiations other than by mainland Senior bondholders who own a lesser amount of Junior bonds than they do Seniors. In addition, the escrowed debt service being held by the BNY Mellon is only being used to pay Senior bondholders legal expenses, back interest and a mediation fee of 2%, which is equal to over $320 million dollars, Subordinate bondholders are not receiving any of the escrowed funds.

The first 5.5% of COFINA revenues pledged to bondholders is around $1.3 billion. The 5.50% pledged was lowered to a Pledged Sales Tax Base Amount (PSTBA) of which 46% up to $425 million will now go to the Commonwealth leaving considerably less money to pay COFINA bondholders. In essence COFINA bondholders pledged revenue which was sufficient to pay all COFINA debt service has been illegally reduced. As a result Seniors will receive 93% of the adjusted funds available for COFINA debt service while mainland Subordinate bondholders will receive only 56.4% and Puerto Rico Subordinate bondholders for some unknown reason will receive 58.4%.

**The Commonwealth COFINA Plan of Adjustment settlement is premature and illegal for a number of reasons.**
- The Commonwealth has yet to produce acceptable Audited Financials to prove insolvency.
- The Financial Oversight Board has not been transparent, they have not allowed creditors a means of discovery to quantify the Oversight Board's assumptions of general revenue available to the Commonwealth to pay debt in their Fiscal Plans. To date the Board's financial assumptions have been

20% too low and essential services expense has never been addressed. No one knows Puerto Rico's real financial position.

- COFINA is not insolvent and debt adjustment was never negotiated in Title VI, a PROMESA prerequisite to enter Title III bankruptcy.
- Buying and selling of COFINA bonds by mediating/negotiating hedge funds and others with insider information was allowed to continue to take place until November 20, 2018, the bondholder date of record for eligibility to vote.
- Unethical, maybe illegal, buying and selling has allowed insider hedge funds to purchase bonds in order to manipulate the outcome of the vote to the detriment of Subordinate bondholders. In other words the negotiating parties may be guilty of **self-dealing.**
- Puerto Rico government has passed legislation that changes the 2006 law Act 91, which was the enabling law that created COFINA. Changing the law to the detriment of bondholders while bonds are outstanding is not legal under PROMESA, the takings clause of the U.S. Constitution and contract law.
- Unrepresented **secured** U.S. mainland Subordinate COFINA bondholders are victims of **self-dealing,** (Senior COFINA bondholders recovery 93%, **secured** mainland Subordinate COFINA bondholders recovery 56.4% and Puerto Rico Subordinate bondholders, represented by former government officials, will receive 58.4% recovery).
- To date the Court has not stopped the Financial Oversight Board debt restructuring negotiations from bypassing many prerequisites of PROMESA.

**COFINA BACKGROUND REFRESHER:** During the 2006 Puerto Rico financial crisis the Commonwealth created COFINA. Investors had lost confidence in the Puerto Rico government's ability to manage the finances of the Commonwealth. Since investors did not trust the Puerto Rico government the Commonwealth could not access the bond market at reasonable rates. The security and main components of COFINA bonds that attracted investors were a **Statutory Lien** on pledged Sales Tax revenue and the fact that this dedicated revenue source was not available under any circumstances to the Puerto Rico government, who had lost the trust of investors. The fact that the Puerto Rico government's intent was to protect bondholders when they established COFINA and the Statutory Lien is unquestionable. For the next 10 years the Puerto Rico government under 3 governors, legislatures and Department of Justices continued to assure COFINA bondholders and inform General Obligation bond investors that pledged COFINA revenues secured by a **Statutory Lien** were not available to the Commonwealth.

Most individual investors who purchased Subordinate COFINA bonds were aware the Puerto Rico government was not credible and the Commonwealth was in financial trouble. It is a matter of record that corruption, mistrust and mismanagement were the reason the secured COFINA structure had to be created. A structure was necessary that did not allow the Puerto Rico Treasury access to bondholder pledged revenue. The intent of the COFINA Statutory Lien was to make bondholders feel secure enough to lend money to Puerto Rico.

Most individuals purchased Subordinate COFINA bonds prior to when the U.S. Congress passed the Puerto Rico Oversight Management and Economic Stability Act (PROMESA). They bought the bonds for the following reasons.

A. A Priority Statutory Lien on pledged dedicated sales tax revenue that was more than sufficient to pay all COFINA debt. The dedicated revenue was unavailable to the government of Puerto Rico.
B. High investment grade rating when issued, "A+" second only to Senior COFINA bonds which were slightly higher rated by one notch "AA-". A long term Subordinate COFINA bond's market value was equivalent to around 1 to 2 points or 1 to 2% less than a similar Senior bond's market

value. (Under the proposed Plan the difference in recovery between Seniors and Subordinate bonds is around 40 points or 40%.)

C. Legal assurance from the Puerto Rico government that by law the Puerto Rico treasury did not have access to the pledged revenues and such was stated in Official Offering Statements for General Obligation (GO) and COFINA bonds issues.  The Puerto Rico government also was obligated to defend the COFINA bond structure, which they are now attacking.

D. The Commonwealth and its Agencies had to take all steps necessary to meet their obligations because up until June 2016, the Commonwealth did not have access to Chapter 9 bankruptcy or any form of debt adjustment. In June 2016 PROMESA was created as a mechanism to reduce Puerto Rico's debt by respecting bondholders rights, priority of payment and legal Liens.

**Unfortunately PROMESA and Title III have not been about respecting bondholders rights, the law and liens, it has evolved into innocent bondholders being forced to bailout the U.S. government and the corrupt Puerto Rico government. The COFINA settlement was driven by the Financial Oversight Board's fear of the risks and consequences associated with a court ruling in the Commonwealth vs. COFINA dispute that would have resulted in all COFINA bondholders being treated fairly. If an unfavorable ruling for the Commonwealth were allowed to happen it would not be possible for the Oversight Board to confiscate the Subordinate bondholders property. If the Commonwealth believed the Court would have ruled against current COFINA bondholders, Senior bondholders would not be receiving a 93% plus cash recovery. GMS believes the proposed Plan is a result of self-dealing.**

Many individuals who own Subordinate COFINA bonds have written Judge Swain stating various reasons, many mentioned in this UPDATE, why the proposed settlement is grossly unfair to Junior Lien bondholders. Unbelievably, contract law and legal Liens have been ignored. The proposal has changed the Statutory Lien and amount of dedicated pledged revenues available to pay COFINA bondholders, which is inconceivable in the annals of municipal bonds bankruptcies. Pledged revenues, that by law are not available to the Commonwealth, are being made available to the Commonwealth. The negotiating parties did not include a representative for U.S. mainland Subordinate bondholders, which is not equitable. What is really not equitable is Puerto Rican Subordinate bond investors that live on the Island, who do not pay U.S. income taxes, will receive a recovery of 58.4% while U.S. investors that live on the mainland and pay U.S. income taxes recover only 56.4%. The whole process is questionable and **self-dealing** by the negotiating parties appears evident.

*A detailed illustrative example of recovery for 50 Subordinate bonds is attached, the explanation below is a simplified example:*

An individual who lives on the mainland and holds $50,000 Subordinate bonds would receive $44,000 face value of new Senior bonds worth around $28,000 as follows: $21,000 face value of current interest bonds and $23,000 face value of 0% (zero interest) bonds as follows: Current interest bonds, $1,000 face value 4.50% bond due 2034, $7,000 face value of 4.55% bonds due 2040, $3,000 face value of 4.75% bonds due 2053, $10,000 face value of bonds 5% due 2058, total $44,000 face value, annual income $1,006. 0% (zero) interest bonds with a total present value of $7,112, which will amount to around $23,000 face value.

**Beside the overall inequity of a 56.4% recovery, a serious complaint from U.S. retail Subordinate bondholders that live on the mainland will be the poor marketability of the small odd lots of bonds they would receive in the exchange and the fact that Puerto Rico retai1 Subordinate bondholders will receive a 58.4% recovery all in a more marketable one block of $28,000 interest paying bonds and no zero coupon bonds.**

The Commonwealth's unemployment rate is around 8%, the lowest in decades. Sales tax revenues are at record levels. The Puerto Rico Treasury has $12 billion of cash in various accounts, the majority of this money is the result of not paying annual debt service for almost 3 years which amounts to around $3 billion a year. The Puerto Rico government has proposed to lower taxes, raise the minimum wage for government workers and is paying Christmas bonuses. **It appears Puerto Rico's <u>willingness</u> to pay its debt should be more in question than its <u>ability</u> to pay its debt.**

**If you have any questions or desire updated information contact your GMS Account Executive.**
**Information taken from sources deemed reliable. This update does not purport to include all available information.**
**Latest information is available on request. Member FINRA and SIPC.**



**Judgment made between Senior and Junior Bond Holders**

**Armand Caraviello**   to: swaindprcorresp

12/10/2018 08:21 PM
Hide Details

From: ████████████████████████

To: swaindprcorresp@nysd.uscourts.gov

Sent from my iPad

I am tremendously opposed to the difference between the Senior Bond Holders ( 93 % + interest ) and the Junior Bond Holders ( 56 % + no interest ). Who in his right mind would lead money with out equity or interest, it violates integrity and a legal agreement .

The gap between 93 % and 56 % is so unfair that the average person would reject this proposal. Please review this judgment and make it more equitable.

Armand V. Caraviello





December 10, 2018

Judge Laura Taylor Swain
**United States District Judge**
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

*Via e-mail: SwainDPRCorresp@nysd.uscourts.gov*

Honorable Laura Taylor Swain:

Espacios Abiertos is a not-for-profit, independent, non-partisan organization, created in 2014 to bring about long-term systemic change and socio-economic justice in Puerto Rico.

We write to you to share recent publications on the restructuring of the debt in Puerto Rico, authored by distinguished scholars Nobel laureate Joseph E. Stiglitz, Pablo Gluzmann, and Espacios Abiertos Non-Resident Senior Fellow Economist Martin Guzman. Both Stiglitz and Guzman, co-chair the Task Force on Debt Restructuring and Sovereign Bankruptcy at Columbia University's Initiative for Policy Dialogue and have been closely following the case of Puerto Rico.

Their work has brought to a global arena the case of Puerto Rico in the field of debt restructuring, and we believe their analysis, comments and conclusions should be noted by this Honorable Court. Especially considering that the viability of Puerto Rico's economy and the livelihood of over 3.3 million citizens for the next decades are at stake and, any Plan of Adjustment should be both reasonable in its assumptions and feasible given the current and expected economic situation in Puerto Rico.

These publications are:

P. Gluzmann, M. Guzman, J. Stiglitz, *An Analysis of Puerto Rico's Debt Relief Needs to Restore Debt Sustainability*, published by the National Bureau of Economic Research on November 2018.

M. Guzman, J. Stiglitz, Opinion piece on the COFINA deal published by Project Syndicate on November 15, 2018.

Respectfully,

Cecille Blondet-Passalacqua
Executive Director

# Disaster Capitalism Comes to Puerto Rico

*Nov 15, 2018* | **MARTIN GUZMAN** , **JOSEPH E. STIGLITZ**

NEW YORK – It has been more than a year since Hurricane Maria ravaged Puerto Rico, compounding the agony of a commonwealth that was already caught in an economic downward spiral. In addition to experiencing an out-migration crisis, the island sought what amounted to bankruptcy protection in May 2017. And under the US Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), a federal oversight board now oversees its finances.

Though Maria was a tragedy, it also created an opportunity to rewrite a flawed fiscal plan that had been certified by the oversight board in March 2017. That plan was supposed to restore the island's economic health while also providing money to creditors who were clamoring for repayment. But the plan was projected to depress economic activity even further, and failed to establish an appropriate basis for calculating how much debt restructuring Puerto Rico would need.

Sadly, the opportunity to right Puerto Rico's fiscal ship has not been seized. On the contrary, the oversight board recently certified a new fiscal plan and a deal with holders of bonds issued by the Puerto Rico Urgent Interest Fund Corporation (COFINA) that could put the island in a debt straitjacket indefinitely.

At $17.8 billion, the stock of COFINA bonds (which are backed by future sales-tax revenues) accounts for more than one-third of the total debt in the new fiscal plan. And the COFINA deal is itself part of a larger debt-restructuring effort that is based on an unrealistic assessment of the commonwealth's economic conditions. Simply put, the terms of the restructuring do not provide enough relief for Puerto Rico to be able to achieve future growth.

Under the new deal, Puerto Rico's annual debt payments would increase from $420 million in fiscal year 2019 to almost $1 billion in fiscal year 2041, implying an aggregate recovery rate of 75.5% of the amount owed. That is a very generous deal for COFINA bondholders. But if Puerto Rico's other bondholders are hoping to receive similar treatment, they should think again. As our computations show, if such a deal were to be implemented, there would be virtually nothing left for the other categories of bonds (assuming that the point of the debt restructuring is to restore the sustainability of the island's debt).

Thanks to the oversight board, COFINA bondholders will now be getting far more than what they could have expected last December, when Puerto Rican bonds bottomed out. Prices of both COFINA and general obligation bonds have steadily recovered, owing to a political game over disaster relief funds that has been playing out among the oversight board, the US Congress, and bondholders – a game that Puerto Rico's House of Representatives joined a few days ago when it passed a bill to allow for the COFINA deal.

As the old saying goes, funds are fungible. Even if all the money earmarked for disaster relief actually went where it was supposed to go, the injection of funds nevertheless frees up money elsewhere. Hence, the recent evolution of Puerto Rican bond prices reflects an expectation that the additional funds will go not to Puerto Ricans still suffering from the devastating effects of Maria, but rather to the commonwealth's creditors.

The oversight board's new fiscal plan is equally flawed. Based on new growth projections that are even more optimistic than those in the pre-Maria plan, the board assumes that the hurricane somehow provided a net positive shock to Puerto Rico. The new plan includes a relatively bright forecast for fiscal year 2019, and foresees economic growth and higher government revenue from then on, despite larger doses of fiscal austerity and declining federal aid.

It is hard to make sense of such assumptions, and harder still to accept that they could provide a good basis for computing Puerto Rico's actual repayment capacity. As Brad Setser of the Council on Foreign Relations explains, the oversight board justifies its optimism by assuming – implausibly, in our view – that the plan's proposed structural reforms for the 2021-2023 period will deliver extraordinarily large gains.

More realistically, the plan projects a steep decline in Puerto Rico's population, from 3.3 million today to 2.1 million by 2058. Yet while the oversight board tacitly recognizes that many citizens will have to leave for the US

mainland to find work, it expects output per worker to rise miraculously to compensate for the contraction of the labor force.

Despite a strong consensus among economists that Puerto Rico needs a radically different economic and debt-restructuring plan, the relevant policymakers do not seem to be listening. If the island's liabilities are not properly restructured, it will remain in a debt trap. As long as the money needed for investments is going to pay bondholders, sustained growth is impossible.

Given the state of Puerto Rico's economy after Maria, a much deeper restructuring is inevitable. But by pursuing its new fiscal plan and the COFINA deal, the oversight board has squandered valuable time, ensuring that Puerto Rico's decade-long struggle will both continue and grow worse.



### MARTIN GUZMAN
Writing for PS since **2014**
**12** Commentaries

Martin Guzman, a research associate at Columbia University Business School and an associate professor at the University of Buenos Aires, is a co-chair of the Columbia Initiative for Policy Dialogue Taskforce on Debt Restructuring and Sovereign Bankruptcy and a senior fellow at the Centre for International Governance Innovation (CIGI).



### JOSEPH E. STIGLITZ
Writing for PS since **2001**
**253** Commentaries

Joseph E. Stiglitz, a Nobel laureate in economics, is University Professor at Columbia University and Chief Economist at the Roosevelt Institute. His most recent book is *Globalization and Its Discontents Revisited: Anti-Globalization in the Era of Trump*.

http://prosyn.org/bJhu9lI;

On Point

Sections

Big Picture

Videos

Podcasts

Columnists

Archive

**Get our weekly newsletter**

your@email.com

Donate

Magazine

Subscribe

The PS Store

About Us

Careers

Contact

Syndication

Submission policy

---

© Project Syndicate - 2018Privacy PolicyTerms & ConditionsCookie Policy

NBER WORKING PAPER SERIES

AN ANALYSIS OF PUERTO RICO'S DEBT RELIEF NEEDS TO RESTORE DEBT
SUSTAINABILITY

Pablo A. Gluzmann
Martin M. Guzman
Joseph E. Stiglitz

Working Paper 25256
http://www.nber.org/papers/w25256

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
November 2018

We wish to thank Gustavo J. Bobonis, Deepak Lamba-Nieves, Sergio M. Marxuach, Daniel Santamaria Ots, Brad Setser, Zaakir Tameez, and Jennifer Wolff for valuable discussions; and four anonymous reviewers and participants of a seminar at the University of Puerto Rico Law School for useful comments. Usual caveats apply. Martin Guzman and Joseph Stiglitz are grateful to the Institute for New Economic Thinking for supporting their research agenda on debt crises resolution. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2018 by Pablo A. Gluzmann, Martin M. Guzman, and Joseph E. Stiglitz. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

An Analysis of Puerto Rico's Debt Relief Needs to Restore Debt Sustainability
Pablo A. Gluzmann, Martin M. Guzman, and Joseph E. Stiglitz
NBER Working Paper No. 25256
November 2018
JEL No. E61,E62,F34,H12,H63,H68

## ABSTRACT

This paper makes two contributions. First, we examine the macroeconomic implications of Puerto Rico's Fiscal Plan that was certified in March 2017 for fiscal years 2017-18 to 2026-27. Second, we perform a Debt Sustainability Analysis (DSA) that incorporates the expected macroeconomic dynamics implied by the Fiscal Plan in order to compute Puerto Rico's debt restructuring needs. We detect a number of flawed assumptions in the Fiscal Plan that lead to an underestimation of its contractionary effects on the island's economic activity. We conduct a sensitivity analysis of the expected macroeconomic dynamics implied by the plan that allows us to construct more realistic scenarios of Puerto Rico's debt restructuring needs. We show that the island's current debt position is unsustainable, and compute the necessary debt relief to restore sustainability under different sets of assumptions. The paper offers general insights for performing a macro-consistent DSA.

Pablo A. Gluzmann
CEDLAS (FCE-UNLP) & CONICET
Calle 6 777, La Plata
Buenos Aires, B1900TEN
Argentina
gluzmann@yahoo.com

Joseph E. Stiglitz
Uris Hall, Columbia University
3022 Broadway, Room 212
New York, NY  10027
and NBER
jes322@columbia.edu

Martin M. Guzman
Columbia University Business School
Economics Division
Uris Hall Room 126
3022 Broadway
New York, NY 10027
and University of Buenos Aires (IIEP-BAIRES)
mg3463@columbia.edu

1. INTRODUCTION

Puerto Rico's economy has been suffering a recession for more than a decade. The recession has led to a debt and economic crisis. On May 3, 2017, a bipartisan financial oversight and management board imposed by the US Congress in order to make the fiscal policy decisions for the island, and acting on behalf of the Commonwealth, filed a petition for the adjustment of Puerto Rico's debts in the Federal Court for the District of Puerto Rico under Title III of PROMESA, a federal law enacted by the US Congress to deal with Puerto Rico's debt crisis that provides a legal frameworks with elements that are similar to a bankruptcy law. The decision triggered the beginning of a debt restructuring process.

Puerto Rico's current situation is of the kind that calls for an analysis of debt sustainability. Assessing the sustainability of the debt position of a macroeconomic unit is a complex exercise for a number of reasons, that have been extensively discussed in the literature. Puerto Rico offers a relevant case in which to examine these issues, and we do so by performing a macro-consistent debt sustainability analysis (DSA) that builds on the insights from the theoretical literature, in order to provide guidance for the general practice of DSA.

Our contribution is thus twofold. First, we examine the macroeconomic implications of Puerto Rico's Fiscal Plan that has been approved for fiscal years 2017-18 to 2026-27, as it is a crucial element for a computation of Puerto Rico's debt restructuring needs. Second, we perform a macro-consistent Debt Sustainability Analysis (DSA) that incorporates the expected macroeconomic dynamics implied by the Fiscal Plan in order to compute the island's restructuring needs.

We stress two important caveats. First, we note that the computations included in this paper were performed before the hurricanes Irma and Maria hit Puerto Rico. We claim that the methodological and empirical analysis offered in this paper will serve as the basis to update the computations when more precise information on the costs of the hurricanes becomes available.

Second, this paper does not study the causes that led to the debt crisis. The reader interested in an analysis of the factors that contributed to the unsustainable growth of Puerto Rico's debt is referred to Caraballo-Cueto and Lara (2017), and the references therein. Caraballo-Cueto and Lara (2017) offer a thorough analysis that connects the evolution of Puerto Rico's debt to deindustrialization. The study points to the fragility of an economic model focused on tax-

incentivized industrialization as a major determinant of the unsustainable debt dynamics experienced by the island. The authors provide evidence that supports the hypothesis that a deindustrialization process, triggered by a change in US tax and trade policies and the subsequent failure of the island's government and private sector to adapt, led to a secular decline of the economic activity that was followed by a reduction in government revenues and increasing levels of debt.[2]

Besides this introduction, this paper includes five other sections. Section 2 introduces the conceptual framework that serves as the basis of our analysis of the Fiscal Plan and the computation of the debt restructuring needs. The conceptual analysis notes that a central aspect of any debt restructuring plan is the bi-directional causality between the debt policies and economic growth; the depth of the necessary restructuring depends on the economic growth prospects of the debtor, but at the same time the economic growth depends on the debt burden.   Absent macroeconomic policies that expand the aggregate demand, Puerto Rico will not recover; and if the economy does not recover, Puerto Rico will not be able to pay its creditors without imposing severe damages on its nearly 3.5 million residents. On the the other hand, a larger debt reduction would imply that the territory would have more resources for expansionary macroeconomic policies, making the recovery more feasible and full repayment of the restructured debt more likely.

Section 3 examines the Fiscal Plan certified in March 2017 for the period 2017-2026. It first discusses its assumptions. We claim that some of its critical assumptions are unsound and analyze their implications. We identify a number of core flaws in its design and perform a sensitivity analysis, with respect to the assumptions, for the fiscal multipliers and the effects of the structural reforms. This analysis suggests that the fall in real GNP over the next decade was likely to be significantly larger than what the plan had predicted.

Section 4 presents a computation of Puerto Rico's debt restructuring needs. We first demonstrate that the island's current debt position is unsustainable. Assuming the fiscal plan will be respected, absent a debt restructuring, the territory would be forced to sustain primary fiscal surpluses between 3.5% and 7.4% of GNP from 2027 onwards, forever. But pursuing such a fiscal surplus would lead to a contraction that would make the collection of the necessary tax revenues

---

[2] For a non-technical account of the evolution of events that preceded the debt crisis, see Guzman (2018).

to achieve it simply untenable, making the fiscal surplus unfeasible. We compute the necessary debt reduction to restore debt sustainability for different combinations of assumptions. We report the following main conclusions:

(i)    When we maintain the assumptions of the Fiscal Plan, we obtain that the necessary reduction of Puerto Rico's debt to restore debt sustainability will have to include a full cancellation of the interest payments that are scheduled not to be repaid in the Fiscal Plan, plus a face value reduction that will have to lie roughly between 45 and 65 percent of the current debt stock of $51.9 billions included in the Fiscal Plan.

(ii)    However, the relevant universe of the public sector's debt obligations may go beyond the debts included in the Fiscal Plan, as the sustainability of the public sector's debt may also depend on the sustainability of a large part of debt issued by other public entities that is not included in the Fiscal Plan. When we compute the necessary relief assuming that the relevant stock of debt corresponds to the total debt of the public sector[3], which increases the relevant stock to $72.2 billions, we obtain that the necessary reduction includes full cancellation of unpaid interest plus a face value reduction of between 60 and 73 percent of this alternative relevant stock of public debt.

(iii)    Under a more comprehensive range of assumptions for fiscal multipliers that includes both the assumption of the Fiscal Plan and other more realistic scenarios, and dismissing the unjustifiably optimistic positive assumed effects of the structural reforms on GNP growth for the period 2017-2026, we conclude that if the fiscal plan is implemented, the territory would need full cancellation of interest payments not scheduled for payment in the Fiscal Plan plus a face value reduction that lies between roughly 50 and 80 percent to restore debt sustainability – and again, the necessary reduction is larger if we take $72.2 billions instead of the just $51.9 billions included in the Fiscal Plan as the relevant universe of debt obligations.

Our computations are conservative, as we are not addressing how migration flows will be affected by the deeper depression that the fiscal plan is projected to generate, and more importantly, we are maintaining the fiscal plan's controversial assumption that the territory will

---

[3] Net of Children's Trust's and HFA's debts, the reason for excluding the debts of those two entities being that their payment is not the responsibility of residents of Puerto Rico.

somehow manage to achieve a steady state annual nominal GNP growth rate of 2.6% without having implemented any expansionary aggregate demand policies. Thus, the range of the values of necessary debt relief that we obtain must be considered as a lower-bound.

The structure of seniority will imply that not all bondholders will get the same discount. Our analysis does not study how the debt write-off will be distributed among bondholders, but simply provides a perspective on the macroeconomic needs. The distribution of losses will be determined by legal considerations that go beyond the object of this study.

We argue that in order to deal with the uncertainty that will underlie the implementation of the fiscal plan and the debt restructuring, the restructuring process could include GNP linked bonds that align debt payments with Puerto Rico's capacity to pay. By definition, these bonds improve the sustainability of the restructured debt and align the incentives of the debtor and the creditors such that the creditors would also benefit from a stronger recovery.

Finally, section 5 concludes with a summary of the policy implications of the analyses and findings of the paper for resolving Puerto Rico's social, economic, and debt crisis.

## 2. CONCEPTUAL FRAMEWORK

### 2.A PUBLIC DEBT SUSTAINABILITY AND MACROECONOMIC DYNAMICS

A public debt sustainability analysis must be able to answer the two following questions:

Q1. Is public debt sustainable with high probability?

Q2. If it isn't, what are the restructuring needs in order to restore debt sustainability?

Answering Q1 and Q2 requires a definition of the concept of debt sustainability. The economic definition of public debt sustainability refers to the capacity of the government to satisfy its intertemporal budget constraint (IBC) without resorting to a debt default. The IBC states that the present discounted value of primary fiscal surpluses has to be equal to the value of outstanding debt. Each trajectory of states is associated with an IBC. Formally, in an infinite time setup we can describe the IBC in one trajectory of states as:

$$d_t^* = \sum_{j=0}^{\infty}(1+r)^{-j}s_{t+j} \qquad\qquad \text{(IBC)}$$

which holds if and only if

$$\lim_{j\to\infty}\frac{1}{(1+r)^j}d_{t+j} = 0 \qquad\qquad \text{(TC)}$$

where the condition (TC) is known as the government's transversality condition, $d_t^* = (1+r)d_{t-1,t}$ denotes debt to output ratio at the start of period $t$, $s_t$ is the primary fiscal surplus to output ratio in period t, and $1+r=\frac{1+R}{1+g}$, where $R$ is the nominal interest rate and $g$ is the growth rate of output (for simplicity we denote them as constant). In the context of Puerto Rico, we will use GNP as the measure of output.

More generally, the definition of debt sustainability may also refer to other economic or non-economic principles that are meant to ensure an efficient functioning of debt markets and the respect human rights. For instance, debt could be considered unsustainable if full payment would entail the need to cut on essential public services.[4] Therefore, the satisfaction of the government's solvency condition is a necessary but not a sufficient condition for debt sustainability, as the territory's development needs have to be taken into account. Relatedly, defining debt sustainability also requires a definition of the relevant universe of creditors. Defining the universe of creditors in a public debt restructuring is different than in a corporate debt restructuring, as the creditors of a country need not be only the formal creditors but also the informal ones – as pensioners and workers.

PUBLIC DEBT AND MACROECONOMIC DYNAMICS

The objects of each side of the IBC are not independent. The capacity to collect revenues depends on the level of economic activity. In turn, the level of economic activity depends on fiscal policies. But the space of feasible fiscal policies depends on the debt burden. Formally, the primary fiscal surpluses that enter the IBC must be consistent objects that respect the functional relationship between fiscal policies, economic activity, and fiscal revenues. The consideration of these endogenous feedback effects in a system in which fiscal outcomes, the level of economic activity,

---

[4] The literature on the principles that should be respected in a restructuring process significantly grown over the last few years. For instance, see Blankenburg and Kozul-Wright (2016), Bohoslavsky and Goldmann (2016), Goldmann (2016), Guzman and Stiglitz (2016a, 2016b), Kolb (2006), Raffer (2016), and Li (2015).

and the borrowing costs are endogenous variables is central in any analysis of debt sustainability, and missing it leads to flawed estimates of the implications of debt policies.

Puerto Rico's deep and long-lasting downturn has put the economy into a demand-constrained regime. Such a situation calls for the application of macroeconomic policies that expand the aggregate demand – a basic principle of macroeconomic theory. Implementing expansionary macroeconomic policies requires the capacity for financing them. But a country that is in a demand-constrained regime and faces a debt burden that is unsustainable lacks the capacity for expansionary policies. Instead, the unsustainable debt position becomes a drag for economic growth. The logic is simple: when the debt position is perceived as unsustainable with a high probability, the cost of refinancing debt increases; this in turn increases the burden of interest payments, and decreases the available resources net of interest payments for financing public policies. Attempting to force full repayment under those conditions creates a destabilizing dynamic. The induced fiscal austerity decreases aggregate demand, which in the demand-constrained regime leads to a deeper recession, which in turn leads to a debt position perceived as even more unsustainable, and so on. Indeed, the idea that fiscal austerity could somehow restore debt sustainability in an already depressed economy, in times in which the private sector is also contracting, without contemplating the possibility of destabilizing contractionary spirals, is ill conceived and not aligned with sound macroeconomic theory or evidence.[5] The uncertainty created by an unresolved debt problem also deters new investment in the economy, so that in addition to the negative impact on aggregate demand there is an adverse effect on aggregate supply .[6][7]

Thus, in these circumstances—those prevailing today in Puerto Rico—the recovery of debt sustainability is a necessary condition for economic recovery:  There is no possibility of implementing the policies needed for macroeconomic recovery when debt is unsustainable. To restore debt sustainability, debt must be restructured—a restructuring that goes beyond just "reprofiling," e.g. changing the maturity of the obligations. Even creditors as a group may benefit

---

[5] See, for example, Jayadev and Konczal (2010, 2015), Auerbach and Gorodnichenko (2012a, 2012b, 2012c, 2012d); Eggertsson and Krugman (2012); Herndon, Ash, and Polish (2014), Jorda and Taylor (2013); see also the commentaries by Krugman (2010, 2013, 2015) and Stiglitz (2010a).
[6] See Krugman (1988a). The destabilizing dynamics at play in the context of a financial crisis has been thoroughly analyzed in the macroeconomics literature by seminal authors as Fisher (1933), Keynes (1936), Minsky (1977, 1992), Kindleberger (1978), Leijonhufvud (1981), Stiglitz and Heymann (2014), Koo (2003), and Eggertsson and Krugman (2014), among many others.
[7] In Puerto Rico, the sub-utilization of factors can rapidly turn into migration, a phenomenon that would not be captured by measures of intensity of use of the available factors of production.

from a restructuring, because the expansionary effects that it allows increases the size of the pie that is distributed among the claimants.[8]

We have just described the ex-ante effects of unsustainable debt—costs that are borne well before a default actually occurs.  In addition, there may be large costs which occur when the default actually occurs, and the anticipation of these costs themselves can have adverse effects in the present. The theoretical literature  suggests various channels through which debt defaults are associated with output losses as the result of, for example, reputational damage and international trade exclusion costs (e.g., Eaton and Gersovitz 1981; Bulow and Rogoff 1989; Cole and Kehoe 1998; Aguiar and Gopinath 2006; Arellano 2008).[9] However, the empirical literature suggests that the major costs have been those associated with the impact of defaults on domestic bondholders (Sandleris, 2016).[10] [11]

RELATIONSHIPS BETWEEN FISCAL POLICIES, REVENUES, AND GNP GROWTH: THE FISCAL MULTIPLIERS

The effects of the fiscal policies that are included in a macroeconomic plan depend on the size of fiscal multipliers, i.e. the parameters that describe the impact of fiscal policies on the level of economic activity. Thus, any fiscal plan must aim at making realistic assessments on the values of the fiscal multipliers.

There are different types of multipliers. The 'spending to output multiplier' refers to the effect of changes in public spending on output. The 'tax rate to output multipliers' refer to the effects of changes of different tax rates on output; from the tax multipliers, we can infer the values of the 'revenues to output multipliers', which indicate how a variation in fiscal revenues will affect output. Finally, the 'spending to revenues multipliers' indicates how a change in public spending will affect tax revenues through the effects that it will have on the endogenous tax bases.

---

[8] This claim has been demonstrated by Krugman (1988b), who demonstrates that the expected present discounted value of payments for creditors takes the shape of a Laffer curve as a function of the value of the debtor's total liabilities. The reason is that the probability of default, and thus the interest rate, is an increasing function of the debt burden. Sachs (1989) also emphasizes the potential welfare benefits of forgiving debt in a situation of debt overhang, in a model where both creditors and debtors can gain from a partial debt write-down, since an excessive debt stock and the prospect of large future debt repayments act as a tax on domestic investment and depress the present value of claims held by investors. Under those conditions, debt relief should be followed by a period of higher growth.

[9] The theoretical literature suggests, however, that the costs arising from the exclusion from financial markets may be less than is often feared, because capital markets are forward looking.  Indeed, by reducing existing debt obligations, a default may make lending to the country more attractive.  See Stiglitz (2010b).

[10] Debt restructuring renegotiations under insufficient legal frameworks for dealing with collective action problems also result in inefficient delays that reduce output (Benjamin and Wright 2009; Pitchford and Wright 2012).

[11] The literature also suggests that defaults have dire political consequences for incumbent governments and finance ministers (Borensztein and Panizza, 2009).

There is a sizable empirical literature that estimates different types of fiscal multipliers for different regions or countries, in different stages of the cycle, and with different methodologies. Although to our knowledge there are no precise estimates for Puerto Rico, the literature offers valuable insights for assessing what assumptions are sensible at the moment of studying the consequences of a fiscal plan for the island. This section offers a brief review of the main findings from that literature. Some of the finds of the empirical literature are that (i) fiscal multipliers are state-dependent;[12] (ii) there are negative endogenous feedback effects from fiscal contractions[13]; and (iii) fiscal multipliers depend on the exchange rate regime: Consistent with the predictions from economic theory, the empirical literature finds that they are larger in economies operating under predetermined exchange rates than under flexible exchange rates[14].

A simple corollary of the multipliers' state-dependence is that there is uncertainty about the values of multipliers in a particular economy at a particular time. Certainly, there is no precise knowledge about the correct distributions for the values of multipliers for Puerto Rico. Extrapolating values found for US regions or other economies may be of help, but an analysis for Puerto Rico must take into account that the territory is currently in a deep recession and faces the possibility of large out-migration, so that multipliers are likely to be larger than what is obtained for US regions in more "normal" recessions.

---

[12] Auerbach and Gorodnichenko (2012b, 2012c), using regime-switching models, estimate the effects of fiscal policies over the business cycle and find that fiscal policy is considerably more effective in recessions than expansions. They provide estimates for multipliers for disaggregate spending variables for US regions. Military spending has the largest multiplier: estimates range from 3.69, with standard error of 0.83 (Auerbach and Gorodnichenko, 2012c) to 1.67, with standard error of 0.72 (Auerbach and Gorodnichenko, 2012b). The estimates for non-defense spending multipliers range from 1.34, with standard error of 0.31, to 1.09, with the same standard error. These values demonstrate the effect of $1 of additional spending on output; for example, according to Auerbach and Gorodnichenko (2012c) an additional dollar of public spending in the non-defense sector increases output by $1.34. In the expansion, the defense spending multiplier changes sign: it ranges from -1.03, with standard error of 0.25 (Auerbach and Gorodnichenko, 2012c), to -0.43, with standard error of 0.24 (Auerbach and Gorodnichenko, 2012b). And the non-defense spending multiplier keeps the positive sign but the magnitudes are smaller: it ranges from 1.17, with standard error of 0.15 (Auerbach and Gorodnichenko, 2012c), to 1.03, with the same standard error (Auerbach and Gorodnichenko, 2012b). Auerbach and Gorodnichenko (2012a) also estimate fiscal multipliers for OECD economies. The effects in recessions are stronger for this group of economies: Their point estimate is that an increase of government purchases of $1 results in about $3.50 of added GDP when the economy is weak, with a 90 percent confidence interval running from 0.6 to 6.3. On the other hand, in times of a strong economy, added government purchases reduce GDP, according to the point estimate. The confidence interval for that estimate includes moderate positive values. In all those estimates, the effects of fiscal policies are not necessarily concentrated in one year, but can be accumulated over time. The IMF has also recognized the importance of considering the non-linear nature of multipliers (Blanchard and Leigh, 2013). This recognition received special attention as the calls for a reconsideration of the methodology for assessing debt sustainability and the assumptions on multipliers had intensified after the dramatic consequences that the underestimation of the impact of fiscal austerity had for Greece, and also for other European economies in distress (see Guzman and Heymann, 2015). Another estimate is provided by Nakamura and Steinsson (2014), who using historical data on military procurement to estimate the effects of government spending, obtain a so-called "open economy relative multiplier" of approximately 1.5 – the "open economy relative multiplier" estimates the effects on output that an increase in government spending in one region of the union relative to another, and differs from the "closed economy aggregate multiplier" that is estimated using aggregate US data. More recently, Chodorow-Reich (2017), based on an analysis of the American Recovery Reinvestment Act and of a survey of empirical studies, suggests that his "preferred" point estimate of the cross-sectional fiscal spending to output multiplier lies around 1.8.

[13] Auerbach and Gorodnichenko (2012b, 2012c) also offer evidence on the impulse-responses regarding the effects of an increase in public spending on tax revenues. For non-defense spending, the tax revenues response to an increase in $1 ranges from $0 to $1. See the Figure A.3 in the appendix of Auerbach and Gorodnichenko (2012c) and the Figure A.3 in the appendix of Auerbach and Gorodnichenko (2012b).

[14] See Ilzetki, Mendoza, and Végh (2012).

9

The uncertainty about the values of the multipliers has practical implications for an analysis of debt sustainability and for the study of the consequences of a fiscal plan. It makes sensitivity analysis with respect to the baseline assumptions an especially necessary part of the exercise. Our analysis will include a sensitivity analysis that refers to the ranges of estimates that we report in this section.

THE STOCHASTIC NATURE OF THE DSA

Given that any analysis is made under uncertainty, the implication is that the assessment of debt sustainability must be stochastic (see IMF, 2013; Celasun, Debrun, and Ostry, 2006; Consiglio and Zenios, 2015, 2017; Guzman and Heymann, 2015; Guzman and Lombardi, 2017). There may be multiple states of nature, and each state of nature will have a different associated intertemporal budget constraint.  This is why we assess debt sustainability from a stochastic perspective, requiring only that there the condition of debt sustainability holds *with a high probability.*

2.B EMPIRICAL EVIDENCE ON DEBT REDUCTION AND MACROECONOMIC PERFORMANCE

The empirical evidence is consistent with our earlier analysis suggesting that debt relief has beneficial economic effects for debtor countries. Reinhart and Trebesch (2016) examine the economic performance of debtor countries during and after sovereign debt relief operations, for samples that cover the periods 1920-1939 for defaults on official (government to government) debt and 1978-2010 for emerging markets defaults with private creditors. They find that per capita GDP increases 11 percent for emerging markets and 20 percent for advanced economies during the five years following a restructuring that results in exiting from the state of default. They also find a strong increase in average ratings for emerging markets – a result predicted by economic theory, as the market perceptions of debt sustainability should improve if the debt restructuring is effective in resolving the debt crisis. Besides, debt levels decline strongly following the exit of crises. Within five years, total government debt/GDP falls by 27 percentage points across emerging market episodes and by 22 percentage points in the sample of defaults with official creditors. However, they find that not every type of restructuring is associated with improvements in economic

performance and ratings: the effects are significant only in deals that involve face value reductions. Reprofiling deals, such as operations with maturity extensions and interest reductions, were not associated with improvements in economic performance.

Recent commentaries and research have made the mistake of looking at what has been the average in past restructurings as a guide for appropriate future debt policies (Edwards 2015a, 2015b). But what has been the norm in recent practice must instead be taken as representative of what is unacceptable. The amount of relief that distressed countries have obtained has generally been insufficient to resolve debt crises. Indeed, restructurings are coming in the form of "too little and too late" (cf. Guzman, Ocampo, and Stiglitz, 2016). From 1970 to 2010, between 49.9% and 60% of sovereign debt restructurings with private creditors were followed by another restructuring or default within 3 to 7 years, respectively (Guzman and Lombardi, 2017, based on data from Cruces and Trebesch, 2013), what suggests that restructuring processes have too often been ineffective at providing enough relief to restore debt sustainability with high probability.

Among the successful cases, two stand out – at least in terms of their magnitude and the attention they have received in the literature. One of them is the case of West Germany following World War II. West Germany obtained significant debt relief through the London Debt Agreement (LDA). The case is studied by Galofré-Vilà et al. (2016), who conclude that West Germany's spectacular recovery would have not been possible without the LDA. The significant debt write-down released resources for fiscal policies that allowed the pursuing of the public policies that the recovery required. Absent such a relief, West Germany would have been forced to obtain sizable fiscal surpluses that would not only have undermined the recovery, but would also have fostered political instability, potentially renewed geopolitical conflict, and ultimately be economically self-defeating.

The other case was Argentina's debt restructuring following the default of 2001 – the largest recorded sovereign default in history at the time. The country followed a strategy that resulted in significant debt relief (see Basualdo et al. (2015); Guzman (2016); Chodos (2016); and Cruces and Samples (2016) for details), which created space for fiscal policies that played a crucial role in the fast and large recovery that the country experienced following the default.[15] However,

---

[15] In a context of favorable international conditions and under the implementation of a policy of competitive and effectively multiple real exchange rates, GDP grew more than 8 percent on average from 2003 until the eruption of the global financial crisis in 2008 (see also Damill, Frenkel, and

the country also got immersed in a complex legal dispute with holdout bondholders – bondholders who decide to not cooperate in restructuring negotiations even when a large majority accepts the proposal of the debtor – including the so-called vulture funds who bought debt at a low fraction of its face value when it was already in default, sued the country in US courts seeking full payment and won, blocking the finalization of the restructuring process and also the country's access to international credit markets for more than a decade. The case is also telling of the complexities of resolving debt crisis under severe gaps in the legal frameworks.

Among the recent unsuccessful cases, Greece stands out. The case is extensively analyzed by Varoufakis (2016). The management of Greece's ongoing debt crisis is an example of *too little* and *too late*. After a few years of recession and of an unsustainable debt position, the country restructured its debt in 2012. But the restructuring was not effective to restore debt sustainability. It came with conditions of fiscal austerity imposed by the Troika that undermined the possibility of escaping the recession. The draconian demands have continued since then. The Troika later imposed a program for reducing Greece's public debt to GDP ratio that included a target of primary surplus of 3.5 percent of GDP for 2015, and 4.5 percent of GDP from 2015 onwards, forever. Predictably, such a program has not restored Greece to prosperity. The country continues to struggle, and throughout this period, opportunities have vanished for many Greeks. The unemployment rate was 7 percent in 2008 and skyrocketed since then, growing higher than 25 percent; it was 23 percent in 2016. Youth unemployment statistics are even more alarming. The youth unemployment rate peaked at 60 percent in 2013, then declined to 47 percent at the time of this study after many migrated or stopped looking for jobs.

### 2.C Projections

The model we employ for projecting the debt repayment capacity respects the functional relationships assumed by the Fiscal Plan. The growth rate of real GNP, $g_t^y$, is defined as

$$g_t^y = g_t^b + g_t^d + g_t^s$$

where $g^y$ is the real GNP growth, $g_t^b$ is the baseline real GNP growth rate, $g_t^d$ is the growth rate of real GNP that comes from fiscal policy measures, and $g_t^s$ is the growth rate in real GNP that

Rapetti (2015) for a more comprehensive description of the post-default dynamics, and Guzman, Ocampo, and Stiglitz (2018) for a description of the rationale of those policies and their importance in the Argentine post-default recovery). These conditions are markedly different than the ones Puerto Rico will face after its debt restructuring.

comes from structural reforms, in all cases between years $t-1$ and $t$. The growth rate of real GNP that comes from fiscal policy measures is given by

$$g_t^d = \frac{\Delta RGNP_t^d}{RGNP_{t-1}}$$

where $RGNP_t$ is the real GNP in year $t$, and

$$\Delta RGNP_t^d = \alpha_{Y,G} \Delta G_t + \alpha_{Y,T} \Delta T_t^C + \alpha_{Y,T} \Delta T_t$$

where $\alpha_{Y,G}$ is the public spending to real GNP multiplier and $\alpha_{Y,T;t}$ is the fiscal revenues to real GNP multiplier.

The component $\Delta T_t^C$ denotes the necessary change in tax revenues to compensate the initial variation due to the change in public spending in year $t$:

$$\Delta T_t^C = -\alpha_{T,G;t} \Delta G_t$$

where $\alpha_{T,G;t}$ is the public spending to fiscal revenues multiplier that denotes the endogenous feedback effect that a contraction of public spending creates on fiscal revenues through the fall in economic activity.[16]

Informed by the literature (see section 2.A above), we project the real and nominal GNP for each possible combination of the following parameters: $\alpha_{Y,G} = \{1, 1.34, 1.5, 2, 2.5, 3, 3.5\}$, $\alpha_{Y,T} = \{0, 0.5, 1, 1.34\}$, and $\varepsilon_{T,G} = \{0, 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7\}$ where $\varepsilon_{T,G}$ is the elasticity of fiscal revenues to public spending,

$$\varepsilon_{T,G} = -\alpha_{T,G;t} \frac{G_t}{T_t}$$

We are making a conservative assumption for the tax revenues to real GNP multiplier, under the premise that part of the increases in tax revenues will fall on agents with low marginal propensities to consume. Our projections would be more pessimistic if we chose the same range for $\alpha_{Y,T}$ as for $\alpha_{Y,G}$.[17]

---

[16] The latter multiplier includes the time sub-index t, because we assume constant values for the elasticities of fiscal revenues to public spending, hence the multiplier will vary over time with the variations in the fiscal revenues to public spending ratio.

[17] Not all the measures on the fiscal revenues side will lead to a reduction of Puerto Ricans' spending. For instance, while the Fiscal Plan plans to replace Act 154 by taxes that would achieve the current revenues over the next decade, if Act 154 was replaced with a tax that is paid by multinationals there would be no associated depressing effect on Puerto Rico's economy. Our conservative range of assumptions for the multiplier

The nominal GNP growth rate is denoted by $g^Y$, where

$$g_t^Y = g_t^y + \pi_t + g_t^y \pi_t$$

and where $\pi_t$ is the rate of inflation between years $t-1$ and $t$.

The real GNP in period $t$ is given by

$$RGNP_t = RGNP_{t-1}(1 + g_t^y)$$

and the nominal GNP in period $t$ is given by

$$NGNP_t = NGNP_{t-1}(1 + g_t^Y)$$

Our choice of parameters for the multipliers $\alpha_{Y,G}$, $\alpha_{Y,T}$, and the elasticity $\varepsilon_{T,G}$ results in 192 combinations of parameters that can be defined as "scenarios". We project real and nominal GNP for each of those 192 scenarios.

3. AN ANALYSIS OF THE FISCAL PLAN 2017-2026[18]

In this section, we examine the macroeconomic implications of Puerto Rico's Fiscal Plan that had been approved for fiscal years 2017-18 to 2026-27, as it is a crucial element for a computation of Puerto Rico's debt restructuring needs. The Fiscal Plan presented by the Government of Puerto Rico had been certified by the Oversight Board on March 13, 2017.

The plan includes a detailed path of policies, including spending and tax policies as well as structural reforms. It offers a projection of the effects of those policies on Puerto Rico's GNP for the ten-year period under a set of assumptions regarding the macroeconomic effects of fiscal policies, the effects of the structural reforms, the migration flows, the baseline growth rate of GNP (that describes the scenario that would prevail in absence of new policy measures), and the inflation rate.

---

of tax revenues on output accounts for the possibility of a less depressing effect of revenues measures relative to public spending measures. It must be noted, however, that there is uncertainty about Act 154 being replaced by a scheme that has no cost on Puerto Ricans. This will depend on Federal policies that are beyond Puerto Rico's reach, which adds a layer of uncertainty to the projections of the effects of the Fiscal Plan. This uncertainty is indeed a matter of major concern. Makoff and Setser (2017) explain that "how Puerto Rico will do so [Act 154 will eventually be replaced by a set of taxes that maintain current levels of revenue over the next 10 years] is a great mystery: nobody has explained how Puerto Rico will continue to collect the same amount of revenue from the tax-allergic multinational corporations if federal forbearance on credibility lapses." (p.23).

[18] For a non-technical summary of the findings presented in this section, see Guzman and Stiglitz (2017).

On the demand side, the program is characterized by fiscal contraction over the entire decade but mainly concentrated in years 2018 and 2019. Regarding the structural reforms, the plan features four packages that are classified as (i) improve the ease of business activity, (ii) improve capital efficiency, (iii) energy reform, and (iv) promoting economic development. The concrete measures include (textually reproduced from the approved Fiscal Plan, p. 23):

- Institute public policy measures aimed to attract new businesses, create new employment opportunities, and foster private sector employment growth to increase labor demand.

- Change welfare and labor incentives to encourage greater sector participation, thus increasing labor supply.

- Centralize, streamline, and modernize and expedite permitting processes; increase business friendly environmental and economic growth.

- Lower marginal tax rates and broaden the tax base; simplify and optimize the existing tax code to achieve gains in efficiency, ease of doing business and reducing tax evasion.

- Reduce unnecessary regulatory burdens to reduce the drag of government on the private sector.

- Augmenting competitiveness by investing in critical infrastructure and quality of public services in roads, ports, telecommunications, water and waste, knowledge services, and other strategically important sectors.[19]

- Leverage key public assets through long-term concessions to optimize quality of public infrastructure, services to public and sustainable operations and maintenance.

- Implement management system to boost development of critical projects through expedited processes.

- Leverage and facilitate expedited private sector investments in modern, cost- efficient, and environmentally compliant energy infrastructure; reform PREPA operations and services to clients; and allow for greater competition in energy generation.

- Promote productivity growth, attract FDI & incentivize investments in technology through collaboration with the private sector.

- Externalize the overseeing of marketing efforts & continuity under a single brand and as a unified front representing all of Puerto Rico's tourism components.

---

[19] Public investments do not only affect supply formation but also have demand multiplier effects.

Table 1, reproduced from the Fiscal Plan (p.10), summarizes the fiscal measures and the projections for the growth rate of nominal GNP.

Table 1

| ($MM) | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
| PR Nominal GNP Growth | (2.2%) | (2.8%) | (2.4%) | (0.5%) | (0.4%) | 0.3% | 1.0% | 1.6% | 2.1% | 2.6% | |
| Revenues before Measures [1] | $18,952 | $17,511 | $16,407 | $16,434 | $16,494 | $16,590 | $16,746 | $16,953 | $17,204 | $17,509 | $170,799 |
| Noninterest Exp. before Measures [1] | ($17,872) | ($18,981) | ($19,233) | ($19,512) | ($19,950) | ($20,477) | ($20,884) | ($21,310) | ($21,973) | ($22,316) | ($202,507) |
| Cash flows pre-Measures | $1,080 | ($1,470) | ($2,826) | ($3,077) | ($3,456) | ($3,886) | ($4,139) | ($4,357) | ($4,769) | ($4,807) | ($31,708) |
| Measures | | | | | | | | | | | |
| Revenue measures | -- | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897.1 |
| Expense measures | -- | 951 | 2,012 | 2,415 | 2,983 | 3,156 | 3,255 | 3,357 | 3,724 | 3,830 | 25,683.3 |
| Net impact of measures | -- | 1,875 | 3,393 | 3,799 | 4,515 | 4,789 | 4,995 | 5,108 | 5,491 | 5,615 | 39,580 |
| Cash flows post-Measures, before Debt Service | $1,080 | $404 | $567 | $722 | $1,059 | $903 | $857 | $751 | $722 | $808 | $7,873 |

Source: Fiscal Plan 2017-2026

The plan assumes a constant annual population growth rate of -0.2% for the entire period and an evolution of the inflation rate as described in Table 2.

Table 2

| Year | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| PR Annual Inflation Rate (%) | -0.2 | 1.2 | 1.0 | 1.0 | 1.1 | 1.3 | 1.5 | 1.5 | 1.6 | 1.6 |

Source: Fiscal Plan 2017-2026

As publicly reported, the plan assumes that the multiplier associated with fiscal contractions will be 1.34, which means that every dollar of contraction in the primary surplus will be associated with a fall in GNP of 1.34 dollars. The Fiscal Plan assumes baseline real GNP growth rates for the

decade as described in Table 3 (i.e. these are the growth rates that would have occurred, in the absence of the Plan's changes in policy).[20]

Table 3

| Year | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| Baseline Real GNP Growth (%) | -2.4 | -1.31 | -1.39 | -1.44 | -1.47 | -1.49 | -1.50 | -1.51 | -1.52 | -1.53 |

Source: Fiscal Plan 2017-2026

The plan also assumes that the effects of the structural reforms will kick in by 2022 and will make a contribution to real GNP growth as described in Table 4.

Table 4

| Year | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| Impact of structural reforms on real GNP growth (%) | 0 | 0 | 0 | 0 | 0 | 0.5 | 1 | 1.5 | 2 | 2.5 |

Source: Fiscal Plan 2017-2026

ANALYSIS OF THE FISCAL PLAN ASSUMPTIONS AND PROPOSALS

Our analysis of the fiscal plan detects a number of issues in its design:

(I) The plan is based on assumptions that are not aligned with economic theory or evidence, thus it fails to appropriately recognize the magnitude of the destabilizing dynamics that it would create.

(II) The plan falls short on presenting a debt restructuring and sustainability analysis, and as we have already explained, such an analysis is essential for making reasonable growth forecasts. Instead, it simply specifies what is the amount that must be repaid to creditors during the next decade, without being explicit about the longer-term obligations that the island will face and their sustainability.

We discuss each of these in turn. Specifically:

---

[20] These assumptions were made by the Fiscal Board and accepted by Puerto Rico's government.

1.  *The values of fiscal multipliers used for the GNP projections are overoptimistic.*

The value for the multiplier associated with the fiscal contraction of 1.34 is close to the lower-bound of the estimates corresponding to times of recession, as described in the review of the literature in section 3. That value corresponds to estimates for US regions in recessions,[21] but Puerto Rico is suffering a depression that is deeper than a "normal" recession.  Multipliers are likely to be larger for deep recessions.  This is especially so in the case of Puerto Rico, given the likely effect of a deep recession on migration.[22]  And even if the assumption is considered sensible, a robust plan needs to consider the consequences of deviations from it. It is not only the point estimate what matters, but also the distribution.

2.  *The endogenous feedback effects that the fall in economic activity would have on fiscal revenues are not taken into account.*

Ignoring the effects that the fall in economic activity would have on tax revenues leads to an underestimation of the contractionary impact of the proposed fiscal policies. Implicitly, the projections assume that the elasticity of public spending on tax revenues is zero – as tax revenues fall as the economy contracts, to meet the fiscal targets, public expenditures have to fall.  But this induced contraction of expenditures then has a further contractionary effect.  The Board's analysis seems to have ignored these feedback effects.[23]

3.  *The plan assumes that the territory will begin to experience a recovery starting in 2022 entirely because of structural reforms that mostly affect the supply side. This assumption goes against sound macroeconomic theory, because Puerto Rico's economy is a demand-constrained regime.*

In a supply-constrained regime, structural reforms that remove obstacles to supply formation will likely have expansionary effects. But Puerto Rico's economy is in a demand-constrained regime. Thus, the assumption that supply-side reforms will be the driver of economic recovery is not well-

---

[21] The definition of a recession comes from a calibration that is consistent with the duration of recessions according to the NBER business cycle dates since 1946.

[22] While migration is likely to reduce the need for certain categories of government expenditures, these effects are likely to be overwhelmed by the effects on the territory's income and tax revenues.

[23] If it did take those endogenous feedback effects into account, this would mean that the multiplier associated with the contraction in spending assumed by the plan is not 1.34 but lower.

founded. On the contrary, any spending-reducing reform as cuts in pensions will more likely deepen the recession in the short-term.

4. *The assumption on migration flows assume that migration pressures will not intensify with the projected contraction in economic activity*.

Puerto Rico's population has declined from approximately 3.8 million in 2000 to a little more than 3.4 million in 2016. Between 2010 and 2016, the annual rate of population contraction exceeded 1%, and reached 1.8% in 2016. A deeper recession – as anticipated by the Board's plan – will further decrease opportunities in the island, fueling more migration to the mainland. And yet the plan assumes that the migration flows will taper off, with the population declining by only 0.2% per year over the 2017-2026 period. This is an unrealistic assumption.[24]

An intensification of migration outflows as a result of the contractionary effects of the Plan would accelerate the fall in fiscal revenues. Then, to achieve the revenue targets stated in the Fiscal Plan, the adjustments would need to be larger – but that would trigger further contractions in economic activity and would increase the per capita burden for those remaining in the island, leading to a destabilizing dynamic that the Fiscal Plan fails to recognize.

5. *The plan does not present a proposal for debt restructuring*.

The plan simply states what is the amount that must be repaid to creditors during the next decade, but it falls short on the specifics of a restructuring plan as, for instance, on the amount of relief that the territory will have to obtain to restore debt sustainability. This is a mistake, because the possibilities that the territory will face in terms of fiscal policies are contingent on the restructuring it achieves; and those fiscal policies in turn will affect output, employment, migration, and tax revenues.

---

[24] Makoff and Setser (2017) provide a detailed analysis of Puerto Rico's migration dynamics in its recent history and argue that the Fiscal Plan's assumptions on migration over the next decade are off. In their words: "Something is off here. How does the economy drop by 12 percent over 10 years and the population by only two percent? How does the rate of net migration improve from its current run rate of -2 percent a year to only - 0.2 percent a year at the same time that the island is being hit by a significant cut in jobs and services? Absent a miraculous shift in household sentiment, Puerto Rico's population will certainly fall by more than the plan projects." (Makoff and Setser (2017), p.16.). They also observe that the Puerto Rico Institute of Statistics reported that the new Census Bureau outmigration projection for the next 10 years is 1.4 percent annually.

There is a sixth issue that deserves attention. The annual growth rates of nominal and real GNP are assumed to reach 2.6% and 1% respectively in 2026. It is not specified whether these assumptions correspond to a steady state.[25] Assumptions about future growth obviously affect the sustainability of the debt after 2026; market perceptions about debt sustainability obviously affect the interest rates the territory will have to pay; and this in turn affects (for reasons already explained) the territory's macroeconomics.

Finally, the exercise of projecting the effects of public policies needs to take into account that there is uncertainty about the values that the relevant parameters and the magnitude of the shocks that the island will experience. The sensitivity analysis, where changes in the assumptions are analyzed, must be part of the projection analysis. We next engage into such an exercise.

### PROJECTIONS: SENSITIVITY ANALYSIS

In order to address the limitations of the Fiscal Plan's forecasts, we conduct a sensitivity analysis of the expected implied macroeconomic dynamics. This allows us to construct more realistic scenarios of Puerto Rico's debt restructuring needs. We project the trajectories under alternative assumptions for fiscal multipliers described in Section 2.A above, maintaining the same assumptions of the Fiscal Plan for the trajectory of baseline real GNP growth and the annual inflation rates until 2026. We maintain those assumptions because our initial goal is to assess how the GNP projections react to changes in the values of the fiscal multipliers. We assume that the component of the fiscal primary balance that corresponds to the line "Measures" in Table 1 is the "unanticipated" component of the fiscal policy, to which the multipliers apply – the Fiscal Plan assumes the same.

Our choice of parameters for the multipliers $\alpha_{Y,G}$, $\alpha_{Y,T}$, and the elasticity $\varepsilon_{T,G}$ results in 192 combinations of parameters that can be defined as "scenarios". We project real and nominal GNP

---

[25] An additional concern, not analyzed in this study but in Makoff and Setser (2017), is that the baseline trend of Puerto Rico's economy may be worse than projected by the Fiscal Plan. They point out that while the Fiscal Plan takes a continued fall of the economy on its historic trend (about 1.5 percent a year since 2005) as the baseline scenario, this is a controversial assumption, "because the territory's historic downward trajectory likely would have been much worse if it were not for the billions of dollars injected into the economy through emergency federal transfers (Obamacare, the American Recovery Act stimulus and the backdoor transfer provided by the federal tax treatment of Act 154), the commonwealth's aggressive debt financings (primarily general obligation, "GO," and sales tax backed, "COFINA," bonds), and the depletion of Puerto Rico's public pension plan assets to pay benefits." (p.16).

for each of those 192 scenarios. Figure 1 shows the ranges of our projections, as well as and the Fiscal Plan's projections, for the real GDP, for two scenarios: in panel A, the Fiscal Plan's assumptions on the effects of structural reforms on GNP are maintained, while in panel B the comparison is made under the assumption that the Fiscal Plan's structural reforms have no effect on GNP.

Figure 1



Our projections strongly suggest that the Fiscal Plan's projections are overoptimistic. They lie on the most optimistic bound within the range of assumptions on the values of multipliers that are aligned with the empirical evidence. The magnitude of the differences between our range of projections and the projections of the Fiscal Plan is noticeably larger if we dismiss the positive effects that the structural reforms are assumed to have on GNP by the Plan.

And even under those optimistic assumptions, the plan falls into an "austerity trap": the magnitude of the targets for primary surpluses leads to a decrease in GNP over a decade that is larger than the reduction in the stock of debt, thus leading to an increase in the debt to GNP ratio by 2026. If there was no reduction in the debt principal, and if missed payments either of interest or principal were capitalized at zero interest rate, the total public debt to GNP ratio would rise from 1.09 in 2016 to 1.41 in 2026 in the scenario projected by the Fiscal Plan. (It is this "austerity trap" which has led to the dire outcomes in Greece, where, after its austerity program and after

successive debt restructurings, the debt GDP ratio is higher than it was in the beginning of the crisis.)

And as figure 2 shows, the magnitude of the austerity trap will likely be larger, as the projected debt to GNP ratio for 2026 is even larger in the large majority of the postulated scenarios.

Figure 2



**Panel A: Debt included in Fiscal Plan to GNP**
Assuming the Fiscal Plan's assumption on structural reforms hold

**Panel B: Debt included in Fiscal Plan to GNP**
Assuming structural reforms have no effect on GNP

**Panel C: Total Public Debt to GNP (net of Children's Trust and HFO)**
Assuming the Fiscal Plan's assumption on structural reforms hold

**Panel D: Total Public Debt to GNP (net of Children's Trust and HFO)**
Assuming structural reforms have no effect on GNP

Debt to GNP (Percentage)

■ Debt-to-GNP 2017    ▲ Debt-to-GNP 2026, Fiscal Plan Projection    ◆ Debt-to-GNP 2026, other scenarios

True, the lower-bound of our projections corresponds to projections that may be too pessimistic. Prospects will certainly be better if there is a restructuring that restores sustainability,

as the baseline growth rate of GNP would probably be larger if the debt position of the territory is perceived as sustainable by market participants. But our projections call the attention on the deeply negative consequences that the implementation of the Fiscal Plan could have for Puerto Rico's economy. And our projections still ignore the larger effects that the fall of economic activity could have on migration outflows. [26]

### 4.  A COMPUTATION OF PUERTO RICO'S DEBT RELIEF NEEDS

In this section, we perform a Debt Sustainability Analysis (DSA) that incorporates the expected macroeconomic dynamics implied by the Fiscal Plan in order to compute Puerto Rico's restructuring needs. The analysis includes a computation of the amount of debt relief that is required in order to restore Puerto Rico's public debt sustainability. More specifically, we compute the reduction in the value of Puerto Rico's public debt that would make full repayment of the restructured debt feasible, being consistent with the Fiscal Plan assumptions that the country will achieve a real GNP growth rate of 1 percent in 2026, and that will settle on that rate as a steady state.

Our DSA takes the premise that the Fiscal Plan will be respected. We assume that any discrepancy between the Fiscal Plan's GNP projections and realizations will be addressed in a way that respects the schedule of debt payments – or equivalently, the schedule of cash after measures available for debt service – established in the Fiscal Plan. Therefore, each projection will lead to the same face value of debt in 2026, because by construction we force the economy to do whatever it takes to reach the targets of fiscal revenues included in the Fiscal Plan. But each scenario will be associated with different GNP trajectories, as shown in figures 1 to 4. Thus, for each of the 192 scenarios that are defined by the assumed range of fiscal multipliers, we obtain a different value of the debt to GNP ratio for 2026, $d^i$, as depicted in figure 2.

For each of those 192 projected debt to GDP ratios, we need to respond the following questions:

---

[26] The fiscal plan does not specify whether the output growth baseline assumptions already incorporate the effects of a planned debt restructuring. If they do, the projections would be including the effects of a debt restructuring through the baseline assumptions instead of doing it through the macroeconomic multipliers that would be associated with the need for lower primary fiscal surpluses. If the baseline assumptions already incorporate the effects of an eventual restructuring, incorporating those effects in the macroeconomic multipliers would lead to an overestimation of the beneficial effects of a restructuring—they would be counted twice. It is possible though to replicate the analysis under alternative (less optimistic) baseline assumptions to deal with this possibility. All the codes for the projections are publicly available at http://espaciosabiertos.org/analisis-de-alivio-de-deuda-para-sostenibilidad-del-pais/

(a)  What path of primary fiscal surpluses would the economy require after 2027 to satisfy the government's IBC?

(b)  Is that path economically feasible?

(c)  If it is not, what is the size of the debt write-down that would make the satisfaction of the government's IBC feasible with high probability?

Answering these questions requires taking a stance on the relationship between fiscal policies and GNP growth. We use exactly the same functional form that is used for the projections of the Fiscal Plan, but as explained previously, we run the projections under a set of assumptions that include those of the Fiscal Plan as well as others, informed by the empirical literature.

To perform the computations required to answer questions (a) to (c), we make the following additional assumptions:


*Assumption i.* We take the value of the fiscal surplus to GNP ratio of 2026 as the new structural fiscal balance for year 2027 – the first year for which there is no information from the Fiscal Plan. This is an optimistic assumption—one that assumes that the reforms and policies included in the plan will be as effective as assumed and will remain in place after 2026. If anything, this assumption leads to an underestimation of Puerto Rico's debt relief needs –consistently with our strategy of making assumptions in each step of the analysis that imply that our computations of the debt relief needs must be interpreted as lower bounds.


*Assumption ii.* With the same goal of making our computations a representation of lower-bounds, we assume that the interest payments that are missed during the period 2017-2026 are capitalized after being rolled-over to 2027 at zero interest rate.


*Assumption iii.* We assume that by 2027 the economy will have already settled on a trend of real GNP growth rate of 1 percent, as predicted by the fiscal plan. We also assume that the inflation rate will settle on a trend of 1.6 percent per year after 2026 – which is the inflation rate the Fiscal Plan assumes for 2026. As discussed above, these are controversial assumptions. If the country does not implement policies that push aggregate demand, the real and nominal growth targets will

likely not be met. Again, the goal is to err on the underestimation side of relief needs rather than on the overestimation side.

*Assumption iv.* Finally, we assume that the nominal interest rate stabilizes at 6 percent after the restructuring, which corresponds to a scenario of a risk free nominal interest rate of 3 percent, recovery of sustainability with probability 95 percent, and recovery rate of 46 percent in case of default. The online appendix presents the sensitivity analysis regarding this assumption.[27]

THE DEBT STABILIZING PRIMARY FISCAL SURPLUS TO GNP RATIO

We search for the value of the debt stabilizing primary fiscal surplus to GNP ratio in a steady state situation. We denote this variable in scenario $i$ as $s^i$, and it is defined as

$$s^i = d^i \frac{(R - g^B)}{1 + g^B}$$

where $g^B$ is the steady state nominal GNP growth, and, as defined before, $d^i$ is the debt to GNP ratio in scenario $i$, and $R$ is the nominal interest rate that corresponds to the situation where debt has been stabilized. The debt stabilizing primary fiscal surplus denotes the value of the primary fiscal surplus as a ratio of GNP that must be achieved to satisfy the government's intertemporal budget constraint. But that value may or may not be feasible, i.e. it may or may not be achievable once we take into account the endogenous feedback effects between fiscal policies and economic performance.

Let $s^i_{2026}$ be the structural primary fiscal balance by the end of 2026 in scenario $i$, i.e. the new primary fiscal balance in absence of measures by the time the Fiscal Plan ends. From 2027 onwards, we do not take a stance on what component of the primary balance (revenues or spending) will have to be adjusted in order to achieve the target of primary surplus defined for each scenario. Therefore, we assume the same multipliers for tax revenues and public spending for

---

[27] http://espaciosabiertos.org/wp-content/uploads/2018/01/Online-Appendix-DSA-2018.01.pdf

26

each combination $i$: $\alpha_{Y,G}^i = \alpha_{Y,T}^i = \beta^i$. We redefine the function that determines the effects of fiscal contractions on real GNP growth as

$$g_t^{y,i} = g_t^b - \beta^i \Delta s_t^i \qquad\qquad (1)$$

which, as stated, is the same function used for the Fiscal Plan projections.[28]

Computing $s^i$ requires a series of iterations until the economy stabilizes on a path of constant nominal GNP growth and stable debt-to-GNP ratio.

The iteration process works as follows:

Step 1: Under the *Assumption ii*, we compute $d^i$ for each $i$ for 2026.

Step 2: For each $d_{2026}^i$, we compute $s^i$. If $s^i \neq s_{2026}$, the economy will not be in a steady state situation, and then we need to compute $g_{2027}^{i,Y}$, where $g_{2027}^{i,Y}$ is the nominal growth rate of GNP in scenario $i$. This will result in a new $d_{2027}^i$ that will differ from $d_{2026}^i$.

Step 3: For the new value of $d_{2027}^i$, we compute again the new $s^i$. If $s^i \neq s_{2027}$, then $g_{2027}^{i,Y} \neq g_{2027}^B$, and we need to compute $d_{2028}^i$.

Step 4 to N: This iteration will continue until $s_t^i = s_{t-1}^i$, with $g_{t-1}^{i,Y} = g_t^{i,Y} = g^B$. At that moment (step N), we get a constant $s^i$ that satisfies the government's IBC.[29]

*Results: The debt stabilizing primary fiscal surpluses to GNP and the evolution of debt to GNP ratios*

In the absence of restructuring, the debt included in the Fiscal Plan to GNP ratio would have to stabilize at values from 1.04 (when $\alpha_{G,Y} = 1.34$, $\alpha_{G,T} = 0$, $\alpha_{T,Y} = 0$) to 1.45 (when $\alpha_{G,Y} = 3.5$, $\alpha_{G,T} = 0.7$, $\alpha_{T,Y} = -1.34$), and the total public debt (net of Children's Trust and HFO) to

---

[28] For each public spending to real GNP multiplier, once we take into account the endogenous feedback effects from public spending contractions on tax revenues, we can find a lower associated value of $\beta^i$.

[29] In essence, this procedure computes the fixed point that satisfies both equation (1) and the intertemporal budget constraint associated with each scenario.

GNP ratio would have to stabilize at values from 1.38 to 2.04. The lower bound of 1.04 corresponds to $s = 0.035$, and the upper bound corresponds to $s = 0.074$. Under the Fiscal Plan assumptions, those ratios take values of 1.08 and 1.43 respectively, and in 2026 they take values of 1.04 and 1.36 respectively.

Therefore, in absence of any relief, Puerto Rico would need to achieve primary fiscal surpluses between 3.5% and 7.4% of GNP after the end of the Fiscal Plan, forever. Under the Fiscal Plan's assumptions, the primary surpluses after 2028 would have to be 3.5% or 4.7% of GNP, forever, depending on whether the relevant debt stock is the one included in the Fiscal Plan or the total public debt net of Children's Trust and HFO. Table 5 summarizes these findings.

Table 5: Debt-stabilizing primary fiscal surplus, $R = 0.06$, $g^B = 0.026$

| Scenarios | Measure of debt | Fiscal Plan assumptions on structural reforms | Mean | Minimum | Maximum |
|---|---|---|---|---|---|
| 192 | Total public debt net of Children's Trust and HFO | No | 5.8% | 4.9% | 7.4% |
| 192 | Debt included in Fiscal Plan | No | 4.3% | 3.7% | 5.2% |
| 192 | Total public debt net of Children's Trust and HFO | Yes | 5.3% | 4.6% | 6.7% |
| 192 | Debt included in Fiscal Plan | Yes | 3.9% | 3.5% | 4.7% |

ON THE FEASIBLE PRIMARY FISCAL BALANCE PATHS

The functional form (1) used for the Fiscal Plan projections relates the growth rate of GNP to the change in the primary surplus, but it does not relate it to the level of the primary surplus. Thus, according to their model, even if the government is forced to sustain primary surpluses of 7 percent of GNP forever, that would not affect the (growth) performance of the economy in the long term. The only period in which economic activity would be affected would be the one in which the large contraction to achieve the target of 7 percent occurs.

But such premise is, of course, not valid over the entire range of primary surplus levels. The need to maintain massive primary surpluses for a long time would have significant effects on the possibilities of the government to make investments in infrastructure, health, or human capital, or to implement other development policies. A draconian plan as requiring constant primary surpluses between 3.5 to 7.4 percent of GNP would entail drastic permanent cuts to spending in these areas, and that would have long term effects. The targets would likely be inconsistent with the baseline assumption of convergence to a real GNP growth rate of 1%. (Moreover, such

28

draconian measures would further encourage migration, making the growth targets even more unrealistic.)

The IMF DSA framework and its fan charts approach provide a helpful basis for complementing our analysis. IMF (2011) recognizes that sustained large surpluses are not common, and incorporates this constraint in its debt sustainability analyses; it reports that out of a sample of 87 countries, only 16 countries (less than 20 percent) sustained primary surpluses exceeding 5 percent of GDP for five years or longer. Some of these episodes of sustained large surpluses were related to specific conditions that are not easily applicable to most countries. Out of the 16 countries that recorded episodes of sustained surpluses, five had this performance in connection to exogenous factors—large increases in revenues related to natural resources (Botswana, Chile, Egypt, and Uzbekistan) or transfers arising from customs union membership (Lesotho). Episodes of sustained large surpluses in the absence of facilitating exogenous factors have been limited to 11 countries (13 percent of the sample). And a few of these countries ran large primary surpluses in the absence of a large debt burden (Denmark, New Zealand, Turkey). The ones that sustained surpluses exceeding 5 percent of GDP for five years or longer at times where debt levels were above 60 percent of GDP were Belgium, Canada, Dominica, Israel, Jamaica, Panama, Seychelles, and Singapore. And no country targeted those values forever.

Besides, there is no evidence that supports the premise that targeting those high primary fiscal surpluses has been associated with recoveries in situations of distress. Indeed, four of those eight economies faced situations that are significantly different from that of the debt distress Puerto Rico is facing (Belgium, Canada, Israel, and Singapore were in situations where austerity could ensure the sustainability of the public sector without triggering a self-defeating macroeconomic process.  For instance, Canada had the good fortune of having a flexible exchange rate regime and having its major trading partner, the US, experience a boom.). While Dominica combined a debt restructuring in 2004 with an average primary fiscal surplus of 3.9 percent of GDP for the period 2004-2008, it had only an average fiscal surplus of 1.19 during the decade that followed the restructuring; Jamaica has been keeping sizable primary fiscal surpluses since its last debt restructuring in 1990, on average of 7.48 of GDP, and the economy has suffered the consequences: the unemployment rate has kept at two digits for almost the entire period, and the government's debt to GDP ratio is at about the same levels now as in 1990, above 120 per cent; Panama combined two debt restructuring episodes in 1994 and 1996 with an average primary fiscal surplus of 1.08

29

percent of GDP in the decade that followed the latter restructuring; and Seychelles combined a debt restructuring in 2010 with an average primary fiscal surplus of 5.98 percent of GDP during the period 2010-2015 – in a context of significant increases in the prices of its exports.

Most important, the primary surplus is an endogenous outcome; if a country recovers due to the implementation of an appropriate mix of policies that include a debt restructuring, obtaining primary surpluses becomes a more likely outcome.

In summary, while there is no evidence that suggests that a country in a situation of debt distress, in a demand-constrained regime, can do well by avoiding a restructuring through the achievement of very large primary fiscal surpluses, there is evidence that long periods of large primary fiscal surpluses are very rare, and that a restructuring has been almost always ultimately unavoidable under those circumstances.

We conclude that if Puerto Rico's government needs to collect primary surpluses in the order of 3.5% to 7.4% of GNP after 2027 forever, this means that Puerto Rico's debt is almost surely unsustainable, and that it needs to be restructured to a level where the required path of primary fiscal surpluses becomes feasible.

COMPUTING THE NECESSARY DEBT RELIEF TO RESTORE DEBT SUSTAINABILITY

The debt position that can be deemed as sustainable with high probability depends on the path of fiscal policies that are considered feasible.

To compute the necessary relief to restore sustainability, we first compute the stabilizing debt to GNP ratio for values of $s$ from the value that corresponds to each of our projections for 2026, $s_{2026}$ (the range of these values goes from 0.012 to 0.016) to a maximum of 0.035. Next, we calculate the necessary relief for restoring sustainability as the difference between the debt to GNP ratio in scenario $i$ in 2026 and the stabilizing debt to GNP ratio for $s = \{s_{2026}, 0.015, 0.02, 0.025, 0.03, 0.035\}$.

We perform these computations for two groups of scenarios:

(i)     First, we assume that the Fiscal Plan's assumptions on the effects of the structural reforms on GNP hold.

(ii)    Second, we assume that the structural reforms stated in the Fiscal Plan have no effects on GNP growth during the period 2017-2026.

The results are summarized in figures 3 to 8 and in tables 6 to 11. The results show the necessary face value reduction in the different scenarios under analysis for restoring debt sustainability, assuming the debt service scheduled in the Fiscal Plan will be respected, and not taking into account the devastating effects of the hurricanes Maria and Irma as well as the effects of the Federal aid as a response to those natural disasters.

**Figure 3:** Necessary face value reduction under the Fiscal Plan assumption on the effects of structural reforms on GNP growth – Relevant debt: Debt included in Fiscal Plan



Table 6: Necessary face value reduction under the Fiscal Plan assumption on the effects of structural reforms on GNP growth, as % of total relevant debt – Relevant debt: Debt included in Fiscal Plan

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Min Face Value Reduction (% of total current public debt) | Max Face Value Reduction (% of total current public debt) | Face value reduction under Fiscal Plan multiplier assumptions |
|---|---|---|---|---|
| s2026 | 192 | 61.6 | 69.8 | 63.0 |
| 0.015 | 192 | 42.4 | 54.7 | 44.4 |
| 0.02 | 192 | 23.2 | 39.7 | 25.9 |
| 0.025 | 192 | 4.0 | 24.6 | 7.4 |
| 0.03 | 192 | 0.0 | 9.5 | 0.0 |
| 0.035 | 192 | 0.0 | 0.0 | 0.0 |

**Figure 4:** Necessary face value reduction under the Fiscal Plan assumption on the effects of structural reforms on GNP growth – Relevant debt: Total Public Debt Net of Children's Trust and HFO



Table 7: Necessary face value reduction under the Fiscal Plan assumption on the effects of structural reforms on GNP growth, as % of total relevant debt – Relevant debt: Total Public Debt Net of Children's Trust and HFO

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Min Face Value Reduction (% of total current public debt) | Max Face Value Reduction (% of total current public debt) | Face value reduction under Fiscal Plan multiplier assumptions |
|---|---|---|---|---|
| s2026 | 192 | 72.4 | 78.3 | 73.4 |
| 0.015 | 192 | 58.6 | 67.5 | 60.1 |
| 0.02 | 192 | 44.8 | 56.6 | 46.8 |
| 0.025 | 192 | 31.1 | 45.8 | 33.5 |
| 0.03 | 192 | 17.3 | 35.0 | 20.2 |
| 0.035 | 192 | 3.5 | 24.1 | 6.9 |

**Figure 5:** Necessary face value reduction under the assumption that structural reforms have no effects on GNP growth – Relevant debt: Debt included in Fiscal Plan



Table 8: Necessary face value reduction under the assumption that structural reforms have no effects on GNP growth, as % of total relevant debt – Relevant debt: Debt included in Fiscal Plan

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Min Face Value Reduction (% of total current public debt) | Max Face Value Reduction (% of total current public debt) | Face value reduction under Fiscal Plan multiplier assumptions |
|---|---|---|---|---|
| s2026 | 192 | 64.4 | 72.0 | 65.7 |
| 0.015 | 192 | 46.6 | 58.1 | 48.5 |
| 0.02 | 192 | 28.8 | 44.1 | 31.3 |
| 0.025 | 192 | 11.0 | 30.1 | 14.1 |
| 0.03 | 192 | 0.0 | 16.1 | 0.0 |
| 0.035 | 192 | 0.0 | 2.2 | 0.0 |

**Figure 6:** Necessary face value reduction under the assumption that structural reforms have no effects on GNP growth– Relevant debt: Total Public Debt Net of Children's Trust and HFO



Table 9: Necessary face value reduction under the assumption that structural reforms have no effects on GNP growth, as % of total relevant debt – Relevant debt: Total Public Debt Net of Children's Trust and HFO

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Min Face Value Reduction (% of total current public debt) | Max Face Value Reduction (% of total current public debt) | Face value reduction under Fiscal Plan multiplier assumptions |
|---|---|---|---|---|
| s2026 | 192 | 74.4 | 79.9 | 75.3 |
| 0.015 | 192 | 61.6 | 69.9 | 63.0 |
| 0.02 | 192 | 48.9 | 59.8 | 50.7 |
| 0.025 | 192 | 36.1 | 49.8 | 38.3 |
| 0.03 | 192 | 23.3 | 39.8 | 26.0 |
| 0.035 | 192 | 10.5 | 29.7 | 13.6 |

Figure 7: Sustainable debt under the Fiscal Plan assumption on the effects of structural reforms on GNP growth, in billions of $



Table 10: Sustainable debt under the Fiscal Plan assumption on the effects of structural reforms on GNP growth, in billions of $

35

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Sustainable Debt (Billions of USD) | | |
|---|---|---|---|---|
| | | Minimun | Maximun | Under government multiplier assumptions |
| s2026 | 192 | 15.7 | 19.9 | 19.2 |
| 0.015 | 192 | 23.5 | 29.9 | 28.8 |
| 0.02 | 192 | 31.3 | 39.9 | 38.5 |
| 0.025 | 192 | 39.2 | 49.8 | 48.1 |
| 0.03 | 192 | 47.0 | 59.8 | 57.7 |
| 0.035 | 192 | 54.8 | 69.8 | 67.3 |

Figure 8: Sustainable debt under the assumption that structural reforms have no effects on GNP growth, in billions of $



Table 11: Sustainable debt under the assumption that structural reforms have no effects on GNP growth, in billions of $

36

| Debt stabilizing primary surplus to GNP since 2027 | No. of scenarios | Sustainable Debt (Billions of USD) | | |
|---|---|---|---|---|
| | | Minimun | Maximun | Under government multiplier assumptions |
| s2026 | 192 | 14.5 | 18.5 | 17.8 |
| 0.015 | 192 | 21.8 | 27.7 | 26.7 |
| 0.02 | 192 | 29.0 | 37.0 | 35.7 |
| 0.025 | 192 | 36.3 | 46.2 | 44.6 |
| 0.03 | 192 | 43.5 | 55.4 | 53.5 |
| 0.035 | 192 | 50.8 | 64.7 | 62.4 |

To reach a conclusion on the necessary relief needs for Puerto Rico, we need to take a stance on the set of feasible values of $s$. Even under the most optimistic projections the economy is projected to have a lower GNP in 2026 than in 2016, and as was described above, the projected debt to GNP ratio absent a restructuring is projected to be larger. The Fiscal Plan projects the evolution of primary fiscal surplus to GNP ratios that is described in Table 12. Requiring a larger $s$ after 2027 than the values of $s_{2026}$ would not be a sensible stance; the economy is projected to be in worse in shape 2027 than at the moment we perform this analysis, hence being even more ambitious in terms of the fiscal targets would not lead to better outcomes than the ones projected for the next decade. Instead, being overly ambitious with the primary fiscal surplus targets would most likely lead to another lost decade after 2027.

Table 12: Fiscal Plan projections of primary fiscal surpluses to GNP ratio, 2017-2026

| Year | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| s | 0.0161 | 0.0107 | 0.0089 | 0.0114 | 0.017 | 0.0145 | 0.0137 | 0.0118 | 0.0112 | 0.0122 |

Source: Fiscal Plan 2017-2026

For a stable primary fiscal surplus after 2027 that takes values between $s_{2026}$ and 1.5 percent of GNP, the necessary debt reduction includes the full cancellation of interest payments not scheduled for repayment in the Fiscal Plan plus a face value reduction that under the Fiscal Plan assumptions would have to be between 44.4 percent and 63 percent if the relevant debt stock

is \$51.9 billions (table 6, column "Face value reduction under Fiscal Plan multiplier assumptions"), and between 60.1 percent and 73.4 percent if the relevant debt stock is \$72.2 billions (table 7, column "Face value reduction under Fiscal Plan multiplier assumptions"). Under a broader range of assumptions that include different values for the fiscal multipliers and under the assumption of no effects of structural reforms on GNP growth, the debt reduction would have to include the full cancellation of interest payments not included in the Fiscal Plan plus a face value reduction of between 46.6 and 72 percent if the relevant debt stock is the one included in the Fiscal Plan of \$51.9 billions (Table 8, column "Min Face Value Reduction" for $s = 0.015$ and column "Max Face Value Reduction" for $s = s_{2026}$, respectively), or between 61.6 and 79.9 percent if the relevant debt stock is the figure of \$72.2 billions that we achieve once we take into account other debts not included in the Fiscal Plan (Table 9, column "Min Face Value Reduction" for $s = 0.015$ and column "Max Face Value Reduction" for $s = s_{2026}$, respectively). Clearly, Puerto Rico needs substantial relief. But the interpretation of these results must take into account important caveats, to which we next turn our attention.

INTERPRETATION OF OUR RESULTS

Our computations show that in order to restore debt sustainability with high probability the restructuring will have to deliver a substantial reduction of Puerto Rico's debt. The figures we presented are "macroeconomic" figures that do not establish how the debt write-off should be distributed across the different bond series. And these are conservative estimates due to a number of reasons.

First, throughout we have kept all the computations the Fiscal Plan's assumption that annual real GNP growth will reach 1 percent in 2027, and we assume that this will correspond to a new steady state. But if the Fiscal Plan 2017-2026 is respected, for the reasons discussed in this study, getting to that state will be an unlikely outcome. If no expansionary aggregate demand policies are implemented to escape out of the current depression, the necessary relief to restore sustainability will have to be even larger. Puerto Rico has no debt service capacity today, and if it does not recover, it will not improve its payment capacity in the future either.

Second, as we described above, in every step of our analysis we made conservative assumptions as to err on the "too little" side of debt relief.

A final caveat is that we do not study how the write-off will be distributed, and this is an issue that will have macroeconomic effects. The expansionary effects of the restructuring will be increasing in the fraction of the write-off that falls on external bondholders, rather than on domestic bondholders, as the marginal propensity to spend in Puerto Rico's economy is lower for external than for domestic bondholders. The evidence supports this basic theoretical insight, as it shows that the macroeconomic costs of a default are increasing in the proportion of debt held by domestic residents (see Alessandro, 2011; Guembel and Sussman, 2014) and are highly related to the transmission through the balance sheets of domestic banks (cf. Gennaioli, Martin, and Rossi, 2014).[30]

## GNP LINKED BONDS

A non-contingent debt relief is always exposed to the risk that ex-post the relief ends being "too little" – harming the recovery – or "too much" – implying that creditors could have got more without undermining sustainability. To deal with the uncertainty that is present at the time of the restructuring, the debt restructuring could include GNP growth linked bonds, that relate the debt payments to the evolution of the territory's GNP. These instruments would improve sustainability, as the payments would be related to the payment capacity of the debtor; and they would also align the interests of creditors and the debtor, as both would benefit from a larger recovery. The economic rationale has been largely developed in the literature.[31]

Despite their virtues, the implementation of this type of contingent debt has not been straightforward. In practice, securities with a return linked to economic growth have been issued only in the context of a few debt restructurings, including those in Bulgaria (1994), Argentina (2005)[32], Greece (2012), and Ukraine (2015). To date, no advanced economy has issued growth-

---

[30] There are important binding constraints for designing a selective default strategy that requires targeting the bondholdings of foreigners, as these bonds are actively traded in secondary markets (see Broner, Martin, and Ventura, 2010; Broner and Ventura, 2011). However, the transfer from domestic bondholders to the territory that the restructuring would entail will still be expansionary in the short run if the government uses the funds for policies that have a larger macroeconomic expansionary effect. And the larger space for public policies can also have positive long-term consequences.

[31] See Borensztein and Mauro (2004) for a review, and Barr, Bush, and Pienkowski (2014) for a more recent contribution, as well as Robert Shiller's related proposal to create "macro markets" for GDP-linked securities (Shiller, 1993, 2003).

[32] Argentina implemented a variant of known as GDP warrants. But the results of the experiment were ambiguous. On the one hand, the warrants paid off extremely well, benefitting the creditors who kept them in their portfolios. But on the other hand, they were not well received by markets at the time of issuance. This may have had to do with their complex design, that made pricing difficult: the trigger for the payment was a threshold growth rate of GDP, but the formula for the amount of payments depended on the difference between the actual level of GDP and a threshold level (see Cruces and Samples (2016), Guzman (2016), and Benford, Best, and Joy (2016) for details).

indexed bonds in normal times. But the support in policy spheres has been increasing (Blanchard, Mauro, and Acalin, 2016).

5.   CONCLUSIONS

This paper made two main contributions that intend to shed light on the island's debt restructuring needs. First, we examined the consequences of the Fiscal Plan for the period 2017-2026 and identified a number of problems with its assumptions. Second, our analysis informs what are the actual restructuring needs of the country.

REFERENCES

Aguiar, Mark and Gita Gopinath (2006). "Defaultable Debt, Interest Rates and the Current Account." Journal of International Economics, 69, 64–83.

Alessandro, Mauro (2011). Three essays on sovereign debt and financial markets. MIT Doctoral Dissertation, Chapter 2.

Arellano, Cristina (2008). "Default Risk and Income Fluctuations in Emerging Economies." American Economic Review, 98(3), 690–712.

Auerbach, Alan, and Yuriy Gorodnichenko (2012a). "Fiscal Multipliers in Recession and Expansion," in Fiscal Policy after the Financial Crisis, edited by Alberto Alesina and Francesco Giavazzi (Chicago: University of Chicago Press).

Auerbach, Alan, and Yuriy Gorodnichenko (2012b). "Measuring the Output Responses to Fiscal Policy," American Economic Journal – Economic Policy, Vol. 4, pp. 1–27.

Auerbach, Alan, and Yuriy Gorodnichenko (2012c). "Measuring the Output Responses to Fiscal Policy," NBER Working Paper No. 16311.

Auerbach, Alan, and Yuriy Gorodnichenko (2012d). "Output Spillovers from Fiscal Policy," NBER Working Paper No. 18578.

Barr, David, Oliver Bush, and Alex Pienkowski (2014). "GDP-linked bonds and sovereign default." In Life After Debt (Joseph Stiglitz and Daniel Heymann, eds.), pp. 246-275. Palgrave Macmillan UK, 2014.

Basualdo, Eduardo, Pablo Manzanelli, Mariano Barrera, Andrés Wainer, and Leandro Bona (2015). "Deuda externa, fuga de capitales y restricción externa. Desde la última dictadura militar hasta la actualidad." CEFIDAR, Documento de Trabajo No. 68, Abril.

Benford, James, Thomas Best, and Mark Joy (2016). "Sovereign GDP-linked bonds." Bank of England, Financial Stability Paper No. 39, September.

Benjamin, David, and Mark L. J. Wright (2009). "Recovery Before Redemption: A Theory of Delays in Sovereign Debt Renegotiations."

Blanchard, Olivier and Daniel Leigh (2013). "Growth Forecast Errors and Fiscal Multipliers", IMF Working Paper, Research Department, WP/13/1.

Blanchard, Olivier, Paolo Mauro, and Julien Acalin (2016). "The Case for Growth-Indexed Bonds in Advanced Economies Today". Peterson Institute for International Economics Policy Brief 16-2.

Blankenburg, Stephanie and Richard Kozul-Wright (2016). "Sovereign Debt Restructurings in the Contemporary Global Economy: The UNCTAD Approach." Yale Journal of International Law.

Bohoslavsky, Juan Pablo (2016) Economic Inequality, Debt Crises and Human Rights, Yale Journal of International Law.

Borensztein, Eduardo, and Paolo Mauro (2004). "The case for GDP-indexed bonds." Economic Policy 19, No. 38: 166-216.

Borensztein, Eduardo, and Ugo Panizza (2009). "The Costs of Sovereign Default", IMF Staff Papers, Volume 56, Issue 4, pp 683–741.

Broner, Fernando, Alberto Martin, and Jaume Ventura (2010). "Sovereign risk and secondary markets." The American Economic Review 100, No. 4: 1523-1555.

Broner, Fernando, and Jaume Ventura (2011). "Globalization and risk sharing." The Review of Economic Studies 78, No. 1: 49-82.

Bulow, Jeremy and Kenneth Rogoff (1989). "A Constant Recontracting Model of Sovereign Debt." Journal of Political Economy, 97, 155–178.

Celasun, Oya, Xavier Debrun, and Jonathan Ostry (2006). "Primary Surplus Behavior and Risks to Fiscal Sustainability in Emerging Market Countries: A "Fan-Chart" Approach," International Monetary Fund Working Paper 06/67.

Chodorow-Reich, Gabriel (2017). "Geographic Cross-Sectional Fiscal Spending Multiplier: What Have We Learned?". NBER Working Paper No. 23577, July.

Chodos, Sergio (2016). "From the pari passu discussion to the Illegality of Making Payments", in Too Little, Too Late: The Quest to Resolve Sovereign Debt Crises, Columbia University Press. New York.

Cole, Harold L. and Patrick Kehoe (1998). "Models of Sovereign Debt: Partial versus General Reputations." International Economic Review, 39, 55–70.

Consiglio, Andrea, and Stavros A. Zenios (2015). "Risk management optimization for sovereign debt restructuring," Journal of Globalization and Development, 6, 181–213.

Consiglio, Andrea, and Stavros A. Zenios (2017). "Stochastic debt sustainability analysis for sovereigns and the scope for optimization modeling." Optimization and Engineering: 1-22.

Cruces, Juan Jose and Tim Samples (2016). "Settling Sovereign Debt's Trial of the Century." Emory International Law Review.

Cruces, Juan José, and Christoph Trebesch (2013). "Sovereign defaults: the price of haircuts", American Economic Journal: Macroeconomics, 5, 85–117.

Damill, Mario, Roberto Frenkel, and Martín Rapetti (2015). "Macroeconomic Policy in Argentina During 2002–2013." Comparative Economic Studies 57, No. 3: 369-400.

Eaton, Jonathan and Mark Gersovitz (1981). "Debt with Potential Repudiation: Theoretical and Empirical Analysis." Review of Economic Studies, 48, 289–309.

Edwards, Sebastian (2015a). "Sovereign default, debt restructuring, and recovery rates: was the Argentinean 'haircut' excessive?" Open Economies Review, 26, 839–67.

Edwards, Sebastian (2015b). "Argentina's Haircut as an Outlier." VoxEU, March 4.

Fisher, Irving (1933). "The debt-deflation theory of great depressions." Econometrica: Journal of the Econometric Society: 337-357.

Galofré-Vilà, Gregori, Martin McKee, Christopher M. Meissner, and David Stuckler (2016). "The Economic Consequences of the 1953 London Debt Agreement". National Bureau of Economic Research Working Paper No. 22557.

Gennaioli, Nicola, Alberto Martin, and Stefano Rossi (2014). "Sovereign default, domestic banks, and financial institutions." The Journal of Finance 69, No. 2: 819-866.

Goldmann, Matthias (2016). "Putting your Faith in Good Faith: A Principled Strategy for Smoother Sovereign Debt Workouts." Yale Journal of International Law.

Guembel, Alexander, and Oren Sussman (2009). "Sovereign debt without default penalties." The Review of Economic Studies 76, No. 4: 1297-1320.

Guzman, Martin (2016a). "Reestructuración de Deuda Soberana en una arquitectura financiera-legal con huecos." Revista Jurídica, Universidad de Puerto Rico.

Guzman, Martin (2016b). "An Analysis of Argentina's 2001 Default Resolution." Centre for International Governance Innovation Paper No. 110.

Guzman, Martin (2018). "Down for the Count?" Milken Institute Review, April 27. http://www.milkenreview.org/articles/down-for-the-count

Guzman, Martin, and Daniel Heymann (2015). "The IMF Debt Sustainability Analysis: Issues and Problems." Journal of Globalization and Development 6, No. 2: 387-404.

Guzman, Martin, and Domenico Lombardi (2017). "Assessing the Appropriate Size of Relief in Sovereign Debt Restructuring." Columbia Business School Research Paper No. 18-9.

Guzman, Martin, Jose Antonio Ocampo, and Joseph E. Stiglitz, eds. (2016). Too Little, Too Late: The Quest to Resolve Sovereign Debt Crises. Columbia University Press, New York.

Guzman, Martin, Jose Antonio Ocampo, and Joseph E. Stiglitz (2018). "Real Exchange Rate Policies for Economic Development." World Development, Vol. 110, pp.51-62.

Guzman, Martin and Joseph E. Stiglitz (2016a). "Creating a Framework for Sovereign Debt Restructuring that Works". In Too Little, Too Late: The Quest to Resolve Sovereign Debt Crises, Chapter 1. Columbia University Press.

Guzman, Martin and Joseph E. Stiglitz (2016b) "A soft law mechanism for sovereign debt restructuring based on the UN Principles", International Policy Analysis.

Guzman, Martin and Joseph E. Stiglitz (2017). "PROMESA's Dangerous Premises". Project Syndicate.

Hagan, Sean, Maurice Obstfeld, and Poul Thomsen (2017). "Dealing with Sovereign Debt—The IMF Perspective".   https://blogs.imf.org/2017/02/23/dealing-with-sovereign-debt-the-imf-perspective/

Herndon, Thomas, Michael Ash, and Robert Pollin (2014). "Does high public debt consistently stifle economic growth? A critique of Reinhart and Rogoff." Cambridge Journal of Economics 38, No. 2: 257-279.

Ilzetzki, Ethan, Enrique G. Mendoza, and Carlos A. Végh (2013). "How big (small?) are fiscal multipliers?" Journal of Monetary Economics 60, No. 2: 239-254.

IMF (2011). "Modernizing the Framework for Fiscal Policy and Public Debt Sustainability Analysis." Prepared by the Fiscal Affairs Department and the Strategy, Policy, and Review Department. Approved by Carlo Cottarelli and Reza Moghadam.

IMF (2013); "Staff Guidance Note for Public Debt Sustainability Analysis in Market-Access Countries". Approved by Siddharth Tiwari.

Jayadev, Arjun and Mike Konczal (2010). "The Boom not the Slump: The Right Time for Austerity." University of Massachusetts Boston, ScholarWorks at UMass Boston, Economics Faculty Publication Series.

Jayadev, Arjun, and Mike Konczal (2015). "Searching for Expansionary Austerity." University of Massachusetts Boston Working Paper.

Jordà, Òscar, and Alan M. Taylor (2013). "The time for austerity: estimating the average treatment effect of fiscal policy." Working Paper No. 19414. National Bureau of Economic Research.

Keynes, J. M. (1936). The general theory of employment, interest and money. London: Macmillan and Co., limited.

Kindleberger, Charles (1978). Manias, Panics, and crashes; a history of financial crises.

Krugman, Paul (1988a). "Market-based debt-reduction schemes." NBER Working Paper No. 2587.

Krugman, Paul (1988b). "Financing vs. forgiving a debt overhang." *Journal of Development Economics* 29, No. 3: 253-268.

Kolb, Robert (2006). "Principles as sources of international law (with special reference to good faith)." Netherlands International Law Review 53 (1): 1-36.

Krugman, Paul (2010). "Myths of austerity." The New York Times.

Krugman, Paul (2013). "How the Case for Austerity has Crumbled," The New York Review of Books, June 6.

Krugman, Paul (2015). "The Expansionary Austerity Zombie," The Conscience of a Liberal, The New York Times, November 20, 2015.

Koo, R. (2003). Balance sheet recession: Japan's struggle with uncharted economics and its global implications. John Wiley & Sons.

Leijonhufvud, Axel (1981). Information and coordination: essays in macroeconomic theory. Oxford University Press.

Li, Yuefen (2015). "The long march towards an international legal framework for sovereign debt restructuring." Journal of Globalization and Development 6, No. 2: 329-341.

Makoff, Gregory, and Brad Setser (2017). "Puerto Rico Update: PROMESA, Population Trends, Risks to the Fiscal and Economic Plan — and Now Maria". CIGI Paper No. 146.

Minsky, Hyman P. (1977). "The financial instability hypothesis: an interpretation of Keynes and an alternative to "standard" theory." Challenge 20, No. 1: 20-27.

Minsky, Hyman P. (1992). "The financial instability hypothesis."

Nakamura, Emi, and Jon Steinsson (2014). "Fiscal stimulus in a monetary union: Evidence from US regions." The American Economic Review 104, No.3: 753-792.

Pitchford, Rohan and Mark L. J. Wright (2012). "Holdouts in Sovereign Debt Restructuring: A Theory of Negotiation in a Weak Contractual Environment." Review of Economic Studies, 79, 812–837.

Raffer, Kunibert (2016). "Debts, Human Rights, and the Rule of Law: Advocating a Fair and Efficient Sovereign Insolvency Model". In Too Little, Too Late: The Quest of Resolving Sovereign Debt Crises, Columbia University Press, New York.

Reinhart, Carmen M., and Christoph Trebesch (2016). "Sovereign debt relief and its aftermath," Journal of the European Economic Association, 14, 215–51.

Sachs, Jeffrey (1989). "The Debt Overhang of Developing Countries." In Debt Stabilization and Development, edited by Guillermo A. Calvo, Ronald Findlay, Pentti Kouri, and Jorge Braga de Macedo. Basil Blackwell.

Sandleris, Guido (2016). "The Costs of Sovereign Default: Theory and Empirical Evidence". Economia, Volume 16, Number 2, Spring 2016, pp. 1-27.

Shiller, Robert J. (1993). Macro Markets: Creating Institutions for Managing Society's Largest Economic Risks. Clarendon Press, Oxford.

Shiller, Robert J. (2003). The New Financial Order: Risk in the 21st Century, Princeton University Press, Princeton, NJ.

Stiglitz, Joseph E. (2010a). "The dangers of deficit reduction." The Economists' Voice.

Stiglitz, Joseph E. (2010b).   "Sovereign Debt: Notes on Theoretical Frameworks and Policy Analyses," *Overcoming Developing Country Debt Crises,* B. Herman, J.A. Ocampo, and S. Spiegel, eds., Oxford: Oxford University Press, pp. 35-69

Stiglitz, Joseph, and Daniel Heymann, eds (2014). Life after debt: The origins and resolutions of debt crisis. Springer.

Varoufakis, Yanis (2016). "Greek Debt Denial". In Too Little, Too Late: The Quest to Resolve Sovereign Debt Crises, Guzman, Ocampo, and Stiglitz, eds., Chapter 5. New York: Columbia University Press.



**Puerto Rico bonds**
**Kathy Schachter**   to: swaindprcorresp@nysd.uscourts.gov

12/10/2018 05:46 PM
Hide Details

From:
To:          "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

We purchased Puerto Rico bonds in good faith.
We feel that we have not been treated in good faith.
It is our opinion that the courts should judge in favor of the bond holders that put their money in these bonds in good faith.
This is money that we worked hard to accumulate and need to be reimbursed according to the bond contract. We can't afford to lose this money as we are retired and not wealthy.
Kathy and Richard Schachter

Sent from Samsung tablet



**Puerto Rico Bonds**
**Mud Muncher**   to: swaindprcorresp@nysd.uscourts.gov

12/10/2018 11:19 AM
**Hide Details**

From:            ████████████████████████

To:              "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>
                 ████████████████████████████████████

History:         This message has been forwarded.

▼ 2 attachments

            

PUERTO RICO UPDATE-Dec3-2018.pdf  Example.pdf

Attn: Judge Swain
I have Puerto Rico bonds that are not paying.  Puerto Rico has the revenue to pay, but not the willingness to pay.
Please rule on this criminal activity.
Thank you
Mark Peterson
████████████



**Seema Balwada, CFA**

# PUERTO RICO UPDATE

December 3, 2018

# Will COFINA Subordinate Bondholders Accept or Reject the Proposed Plan of Adjustment?… Voting to Commence this Month…

On Tuesday November 20th Judge Swain who is overseeing the Title III Puerto Rico debt restructuring cases approved the disclosure statement covering the COFINA Plan of Adjustment. The Disclosure Statement covers the date of record, confirmation hearing notice, solicitation/recovery package, voting ballot, distribution procedures and various other procedures necessary to receive and tabulate the bondholder vote to either ACCEPT or REJECT the COFINA Plan of Adjustment.

The Judge made it very clear that the Court has only approved that the proposed procedures are a reasonable and appropriate means to provide bondholders a means to respond to the COFINA Plan of Adjustment. The Court ruling will allow bondholders to cast an informed ballot with respect to the proposed Plan of Adjustment. Judge Swain said the Court approval is subject to additional changes and supplemental disclosures. *The Judge made a point that the disclosure and procedure approval ruling made today is not in any way a ruling on any objections to the substance of the proposed Plan.*

Judge Swain stated, "The Court will consider the economics and structure of the proposed Plan of Adjustment as well as the legality of the elements of the Plan."

**All objections to the substance of the COFINA Plan of Adjustment and the Commonwealth COFINA settlement will be adjudicated at the Court hearing scheduled for January 16, 2019 in San Juan with formal rulings and decisions to follow.**

The Judge pointed out that the pro se objections made by some individual investors and many of the letters she received from individual investors object to the fact that a COFINA Plan of Adjustment is being proposed at this time. It appears that the Judge has received objections similar to objections GMS has received, that it is premature to file a Plan of Adjustment for a solvent COFINA that has sufficient revenues to pay all bondholders, especially since the Commonwealth, whose 2019 general fund budget is less than $9 billion is holding $12 billion of cash in various accounts, most of which is unpaid debt service. The Oversight Board has yet to provide audited financial statements that prove the Commonwealth's self-proclaimed bankruptcy is legitimate and the Commonwealth is truly insolvent.

The Judge said the Court has also received letters on the legality of the division of the pledged sales tax which by law is not available to the Commonwealth. The Plan of Adjustment ignores the law and makes 46% of the COFINA pledged revenue available to the Commonwealth. The Puerto Rico legislature also disregarded their previous law that gave COFINA bondholders the pledged COFINA revenue and passed a new law, which is not allowed under PROMESA and contract law. The new law that changes the existing Statutory Lien and allows the Commonwealth to confiscate 46% of COFINA pledged revenue. The 46% is predominately Subordinate COFINA bondholder money that is being confiscated.

Numerous letters were received by the Court objecting to Senior bondholders receiving a 93% recovery, including back interest/cash from the escrowed COFINA funds, while the Subordinate bondholders secured by the same Statutory Lien on pledged revenues sufficient to pay both Senior and Junior bondholders, receive a 56.4% recovery and no back interest from the $1.2 billion of COFINA escrow funds. The money in the fund is unpaid debt service owed all COFINA bondholders.

Letters have also brought attention to the fact Subordinate bondholders are mostly retail investors that are unorganized and therefore were not represented at the negotiating table. The Senior bondholders, mostly hedge funds, accumulated over the past year what they believe to be a sufficient amount of Subordinate bonds at distressed prices to control the negotiations and the vote. Along with the Commonwealth and the Financial Oversight Board the Senior bondholders authored the COFINA Plan of Adjustment by taking advantage of their position and acting in their own interest rather than in the interest of all COFINA bondholders. The mediation/negotiation should be deemed illegal as the participants are guilty of **self-dealing**. Based on the excellent treatment given to Seniors bondholders and the Commonwealth, **self-dealing** is the only conclusion that can be reached.

COFINA is a solvent and very successful entity, the Statutory Lien and pledged revenue covers both Senior and Subordinate bondholders. However Senior bondholders will receive a 93% plus cash recovery and Subordinate bondholders will only receive a 56.4% recovery and no cash. The Plan appears to have been manipulated, liens and laws appear to have been broken, the Plan is not fair to all stakeholders. A glaring inequity is U.S. Subordinate bondholders who live on the mainland will recover 56.4% of face value, while Puerto Rico Subordinate bondholders will recover 58.4% even though they are in the same class and own the same bonds. Therefore, according to PROMESA guidelines the Plan is illegal. The Court has a fiduciary responsibility to make sure all bondholders are treated fairly and those in the same class are treated equally.

It appears in order for the proposed settlement to be approved the Statutory Lien that covers Senior and Subordinate bondholders must be ruled legal. The Statutory Lien and COFINA structure are being used in the proposed Plan of Adjustment so the Statutory Lien and structure should be considered legal and valid.

Junior bondholders were not represented in the negotiations other than by mainland Senior bondholders who own a lesser amount of Junior bonds than they do Seniors. In addition, the escrowed debt service being held by the BNY Mellon is only being used to pay Senior bondholders legal expenses, back interest and a mediation fee of 2%, which is equal to over $320 million dollars, Subordinate bondholders are not receiving any of the escrowed funds.

The first 5.5% of COFINA revenues pledged to bondholders is around $1.3 billion. The 5.50% pledged was lowered to a Pledged Sales Tax Base Amount (PSTBA) of which 46% up to $425 million will now go to the Commonwealth leaving considerably less money to pay COFINA bondholders. In essence COFINA bondholders pledged revenue which was sufficient to pay all COFINA debt service has been illegally reduced. As a result Seniors will receive 93% of the adjusted funds available for COFINA debt service while mainland Subordinate bondholders will receive only 56.4% and Puerto Rico Subordinate bondholders for some unknown reason will receive 58.4%.

**The Commonwealth COFINA Plan of Adjustment settlement is premature and illegal for a number of reasons.**
- The Commonwealth has yet to produce acceptable Audited Financials to prove insolvency.
- The Financial Oversight Board has not been transparent, they have not allowed creditors a means of discovery to quantify the Oversight Board's assumptions of general revenue available to the Commonwealth to pay debt in their Fiscal Plans. To date the Board's financial assumptions have been

20% too low and essential services expense has never been addressed. No one knows Puerto Rico's real financial position.

- COFINA is not insolvent and debt adjustment was never negotiated in Title VI, a PROMESA prerequisite to enter Title III bankruptcy.
- Buying and selling of COFINA bonds by mediating/negotiating hedge funds and others with insider information was allowed to continue to take place until November 20, 2018, the bondholder date of record for eligibility to vote.
- Unethical, maybe illegal, buying and selling has allowed insider hedge funds to purchase bonds in order to manipulate the outcome of the vote to the detriment of Subordinate bondholders. In other words the negotiating parties may be guilty of **self-dealing.**
- Puerto Rico government has passed legislation that changes the 2006 law Act 91, which was the enabling law that created COFINA. Changing the law to the detriment of bondholders while bonds are outstanding is not legal under PROMESA, the takings clause of the U.S. Constitution and contract law.
- Unrepresented **secured** U.S. mainland Subordinate COFINA bondholders are victims of **self-dealing,** (Senior COFINA bondholders recovery 93%, **secured** mainland Subordinate COFINA bondholders recovery 56.4% and Puerto Rico Subordinate bondholders, represented by former government officials, will receive 58.4% recovery).
-  To date the Court has not stopped the Financial Oversight Board debt restructuring negotiations from bypassing many prerequisites of PROMESA.

**COFINA BACKGROUND REFRESHER:** During the 2006 Puerto Rico financial crisis the Commonwealth created COFINA. Investors had lost confidence in the Puerto Rico government's ability to manage the finances of the Commonwealth. Since investors did not trust the Puerto Rico government the Commonwealth could not access the bond market at reasonable rates. The security and main components of COFINA bonds that attracted investors were a **Statutory Lien** on pledged Sales Tax revenue and the fact that this dedicated revenue source was not available under any circumstances to the Puerto Rico government, who had lost the trust of investors. The fact that the Puerto Rico government's intent was to protect bondholders when they established COFINA and the Statutory Lien is unquestionable. For the next 10 years the Puerto Rico government under 3 governors, legislatures and Department of Justices continued to assure COFINA bondholders and inform General Obligation bond investors that pledged COFINA revenues secured by a **Statutory Lien** were not available to the Commonwealth.

Most individual investors who purchased Subordinate COFINA bonds were aware the Puerto Rico government was not credible and the Commonwealth was in financial trouble. It is a matter of record that corruption, mistrust and mismanagement were the reason the secured COFINA structure had to be created. A structure was necessary that did not allow the Puerto Rico Treasury access to bondholder pledged revenue. The intent of the COFINA Statutory Lien was to make bondholders feel secure enough to lend money to Puerto Rico.

Most individuals purchased Subordinate COFINA bonds prior to when the U.S. Congress passed the Puerto Rico Oversight Management and Economic Stability Act (PROMESA). They bought the bonds for the following reasons.

   A. A Priority Statutory Lien on pledged dedicated sales tax revenue that was more than sufficient to pay all COFINA debt. The dedicated revenue was unavailable to the government of Puerto Rico.
   B. High investment grade rating when issued, "A+" second only to Senior COFINA bonds which were slightly higher rated by one notch "AA-".  A long term <u>Subordinate</u> COFINA bond's market value was equivalent to around 1 to 2 points or 1 to 2% less than a similar <u>Senior</u> bond's market

value. (Under the proposed Plan the difference in recovery between Seniors and Subordinate bonds is around 40 points or 40%.)

C.  Legal assurance from the Puerto Rico government that by law the Puerto Rico treasury did not have access to the pledged revenues and such was stated in Official Offering Statements for General Obligation (GO) and COFINA bonds issues.  The Puerto Rico government also was obligated to defend the COFINA bond structure, which they are now attacking.

D.  The Commonwealth and its Agencies had to take all steps necessary to meet their obligations because up until June 2016, the Commonwealth did not have access to Chapter 9 bankruptcy or any form of debt adjustment. In June 2016 PROMESA was created as a mechanism to reduce Puerto Rico's debt by respecting bondholders rights, priority of payment and legal Liens.

**Unfortunately PROMESA and Title III have not been about respecting bondholders rights, the law and liens, it has evolved into innocent bondholders being forced to bailout the U.S. government and the corrupt Puerto Rico government. The COFINA settlement was driven by the Financial Oversight Board's fear of the risks and consequences associated with a court ruling in the Commonwealth vs. COFINA dispute that would have resulted in all COFINA bondholders being treated fairly. If an unfavorable ruling for the Commonwealth were allowed to happen it would not be possible for the Oversight Board to confiscate the Subordinate bondholders property. If the Commonwealth believed the Court would have ruled against current COFINA bondholders, Senior bondholders would not be receiving a 93% plus cash recovery. GMS believes the proposed Plan is a result of self-dealing.**

Many individuals who own Subordinate COFINA bonds have written Judge Swain stating various reasons, many mentioned in this UPDATE, why the proposed settlement is grossly unfair to Junior Lien bondholders. Unbelievably, contract law and legal Liens have been ignored. The proposal has changed the Statutory Lien and amount of dedicated pledged revenues available to pay COFINA bondholders, which is inconceivable in the annals of municipal bonds bankruptcies. Pledged revenues, that by law are not available to the Commonwealth, are being made available to the Commonwealth. The negotiating parties did not include a representative for U.S. mainland Subordinate bondholders, which is not equitable. What is really not equitable is Puerto Rican Subordinate bond investors that live on the Island, who do not pay U.S. income taxes, will receive a recovery of 58.4% while U.S. investors that live on the mainland and pay U.S. income taxes recover only 56.4%. The whole process is questionable and **self-dealing** by the negotiating parties appears evident.

*A detailed illustrative example of recovery for 50 Subordinate bonds is attached, the explanation below is a simplified example:*

An individual who lives on the mainland and holds $50,000 Subordinate bonds would receive $44,000 face value of new Senior bonds worth around $28,000 as follows: $21,000 face value of current interest bonds and $23,000 face value of 0% (zero interest) bonds as follows: Current interest bonds, $1,000 face value 4.50% bond due 2034, $7,000 face value of 4.55% bonds due 2040, $3,000 face value of 4.75% bonds due 2053, $10,000 face value of bonds 5% due 2058, total $44,000 face value, annual income $1,006. 0% (zero) interest bonds with a total present value of $7,112, which will amount to around $23,000 face value.

**Beside the overall inequity of a 56.4% recovery, a serious complaint from U.S. retail Subordinate bondholders that live on the mainland will be the poor marketability of the small odd lots of bonds they would receive in the exchange and the fact that Puerto Rico reta1l Subordinate bondholders will receive a 58.4% recovery all in a more marketable one block of $28,000 interest paying bonds and no zero coupon bonds.**

The Commonwealth's unemployment rate is around 8%, the lowest in decades. Sales tax revenues are at record levels. The Puerto Rico Treasury has $12 billion of cash in various accounts, the majority of this money is the result of not paying annual debt service for almost 3 years which amounts to around $3 billion a year. The Puerto Rico government has proposed to lower taxes, raise the minimum wage for government workers and is paying Christmas bonuses. **It appears Puerto Rico's <u>willingness</u> to pay its debt should be more in question than its <u>ability</u> to pay its debt.**

**If you have any questions or desire updated information contact your GMS Account Executive.**
**Information taken from sources deemed reliable. This update does not purport to include all available information.**
**Latest information is available on request. Member FINRA and SIPC.**

**Table 2B –** **Illustrative Example of $50,000 holdings of "First Subordinate" Existing Securities If You DO NOT Elect to Receive Taxable COFINA Bonds.**

| Determination of Recovery | | | Claim $ | Base Recovery % | Net Cash Recovery $ | Cash Available for Distribution | Total Recovery $ |
|---|---|---|---|---|---|---|---|
| COFINA Senior | | | - | 93.01% | - | - | |
| COFINA Subordinate | | | $50,000.00 | 56.41% | $28,205.00 | $- | $28,205.00 |
| Total | | | $50,000.00 | 56.41% | $28,205.00 | $- | $28,205.00 |

| Recovery In Bonds and Cash | |
|---|---|
| Total Par | $28,112.31 |
| Rounding Cash | 92.69 |
| Total Par & Rounding Cash | $28,205.00 |
| Cash Available for Distribution | - |
| Total Par, Rounding Cash & 2% Cash Fee | $28,205.00 |

**Summary of New Bond Terms**

| Current Interest Bond Terms | | | Capital Appreciation Bond Terms | | | | |
|---|---|---|---|---|---|---|---|
| Final Maturity | Rate | Par | Final Maturity | Yield | Initial Principal | Accreted Interest | Total Cash Flow |
| Total | | $21,000.00 | Total | | $7,112.31 | $15,849.96 | $22,962.27 |
| 2034 | 4.500% | 1,000.00 | 2024 | 4.250% | 779.71 | 220.29 | 1,000.00 |
| 2040 | 4.550% | 7,000.00 | 2027 | 4.375% | 679.83 | 320.17 | 1,000.00 |
| 2053 | 4.750% | 3,000.00 | 2029 | 4.375% | 623.46 | 376.54 | 1,000.00 |
| 2058 | 5.000% | 10,000.00 | 2031 | 4.500% | 562.81 | 437.19 | 1,000.00 |
| | | | 2033 | 4.500% | 514.88 | 485.12 | 1,000.00 |
| | | | 2046 | 5.375% | 2,502.17 | 7,283.70 | 9,785.87 |
| | | | 2051 | 5.625% | 1,449.45 | 6,726.95 | 8,176.40 |

| (7/1) Year | Yr# | Current Interest Bonds | | Capital Appreciation Bonds | | All Bonds | Rounding Cash | Cash Available for Distribution | Total Cash Flow | Cumulative Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Principal | Interest | Initial Principal | Accreted Interest | Principal & Interest | | | | |
| Total | | $21,000.00 | $30,900.67 | $7,112.31 | $15,849.96 | $74,862.94 | $92.69 | $- | $74,955.63 | |
| 2019 | 1 | - | 922.17 | - | - | 922.17 | 92.69 | - | 1,014.86 | 1,014.86 |
| 2020 | 2 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 2,020.86 |
| 2021 | 3 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 3,026.86 |
| 2022 | 4 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 4,032.86 |
| 2023 | 5 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 5,038.86 |
| 2024 | 6 | - | 1,006.00 | 779.71 | 220.29 | 2,006.00 | - | - | 2,006.00 | 7,044.86 |
| 2025 | 7 | - | 1,006.00 | - | - | 1,006.00 | - | , - | 1,006.00 | 8,050.86 |
| 2026 | 8 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 9,056.86 |
| 2027 | 9 | - | 1,006.00 | 679.83 | 320.17 | 2,006.00 | - | - | 2,006.00 | 11,062.86 |
| 2028 | 10 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 12,068.86 |
| 2029 | 11 | - | 1,006.00 | 623.46 | 376.54 | 2,006.00 | - | - | 2,006.00 | 14,074.86 |
| 2030 | 12 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 15,080.86 |
| 2031 | 13 | - | 1,006.00 | 562.81 | 437.19 | 2,006.00 | - | - | 2,006.00 | 17,086.86 |
| 2032 | 14 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 18,092.86 |
| 2033 | 15 | - | 1,006.00 | 514.88 | 485.12 | 2,006.00 | - | - | 2,006.00 | 20,098.86 |
| 2034 | 16 | 1,000.00 | 1,006.00 | - | - | 2,006.00 | - | - | 2,006.00 | 22,104.86 |
| 2035 | 17 | 1,000.00 | 961.00 | - | - | 1,961.00 | - | - | 1,961.00 | 24,065.86 |
| 2036 | 18 | 1,000.00 | 915.50 | - | - | 1,915.50 | - | - | 1,915.50 | 25,981.36 |
| 2037 | 19 | 3,000.00 | 870.00 | - | - | 1,870.00 | - | - | 1,870.00 | 27,851.36 |
| 2038 | 20 | 1,000.00 | 824.50 | - | - | 1,824.50 | - | - | 1,824.50 | 29,675.86 |
| 2039 | 21 | 1,000.00 | 779.00 | - | - | 1,779.00 | - | - | 1,779.00 | 31,454.86 |
| 2040 | 22 | 2,000.00 | 733.50 | - | - | 2,733.50 | - | - | 2,733.50 | 34,188.36 |
| 2041 | 23 | - | 642.50 | 227.47 | 539.58 | 1,409.55 | - | - | 1,409.55 | 35,597.91 |
| 2042 | 24 | - | 642.50 | 454.94 | 1,162.72 | 2,260.16 | - | - | 2,260.16 | 37,858.07 |
| 2043 | 25 | - | 642.50 | 454.94 | 1,250.84 | 2,348.28 | - | - | 2,348.28 | 40,206.35 |
| 2044 | 26 | - | 642.50 | 454.94 | 1,343.76 | 2,441.20 | - | - | 2,441.20 | 42,647.55 |
| 2045 | 27 | - | 642.50 | 454.94 | 1,441.74 | 2,539.18 | - | - | 2,539.18 | 45,186.73 |
| 2046 | 28 | - | 642.50 | 454.94 | 1,545.06 | 2,642.50 | - | - | 2,642.50 | 47,829.23 |
| 2047 | 29 | - | 642.50 | 161.05 | 639.95 | 1,443.50 | - | - | 1,443.50 | 49,272.73 |
| 2048 | 30 | - | 642.50 | 322.10 | 1,371.28 | 2,335.88 | - | - | 2,335.88 | 51,608.61 |
| 2049 | 31 | - | 642.50 | 322.10 | 1,467.86 | 2,432.46 | - | - | 2,432.46 | 54,041.07 |
| 2050 | 32 | - | 642.50 | 322.10 | 1,569.96 | 2,534.56 | - | - | 2,534.56 | 56,575.63 |
| 2051 | 33 | - | 642.50 | 322.10 | 1,677.90 | 2,642.50 | - | - | 2,642.50 | 59,218.13 |
| 2052 | 34 | 1,000.00 | 642.50 | - | - | 1,642.50 | - | - | 1,642.50 | 60,860.63 |
| 2053 | 35 | 2,000.00 | 595.00 | - | - | 2,595.00 | - | - | 2,595.00 | 63,455.63 |
| 2054 | 36 | 2,000.00 | 500.00 | - | - | 2,500.00 | - | - | 2,500.00 | 65,955.63 |
| 2055 | 37 | 2,000.00 | 400.00 | - | - | 2,400.00 | - | - | 2,400.00 | 68,355.63 |
| 2056 | 38 | 2,000.00 | 300.00 | - | - | 2,300.00 | - | - | 2,300.00 | 70,655.63 |
| 2057 | 39 | 2,000.00 | 200.00 | - | - | 2,200.00 | - | - | 2,200.00 | 72,855.63 |
| 2058 | 40 | 2,000.00 | 100.00 | - | - | 2,100.00 | - | - | 2,100.00 | 74,955.63 |

*Analysis is illustrative and does not factor in Section 103 Cash. Cash Available for Distribution is estimated. A portion of the bonds may be Taxable. Actual Allocation of New COFINA Bonds will vary and Actual Sinking Fund Redemptions will vary.

19



**Puerto Rico Sales Tax Cofina Proposed Plan of Adjustment - I Object**
**Stephen Vessels** to: swaindprcorresp

12/10/2018 05:18 PM
Hide Details

From:

To: swaindprcorresp@nysd.uscourts.gov

swaindprcorresp@nysd.uscourts.gov

To the Hon. Laura Taylor Swain,
I am writing to Object to the Proposed Plan of Adjustment for the Puerto Rico Sales Tax Cofina bondholders. I own 75,000 of CUSIP 74529JHP3 and 15,000 of CUSIP 74529JHU2, they both are the First Subs. I purchased these bonds after great consideration and research into the very specific protections with the Statutory Lien, No Claw Back provisions and a specific deposits to keep separated from the general fund. Knowing full well the politicians were bad managers. To my dismay, the interest is being withheld even when it's a solvent entity. How can one force a bankruptcy proceeding on a solvent entity? Its currently two years since I received an interest payment. Then in an even more egregious decision, How can there be such a difference in the proposed Seniors receiving 93 vs my First Sub of 56? Then the truly biggest insult, to enable those large institutional owners to steal the interest for themselves, even writing themselves a $300 million check for advising and legal fees. Shameful. The Seniors and the First Subs have the very same securitized structure. It's clear there is serious shenanigans and conflicts of interest. It also appears there is questions of their level of ownership of the Subordinated Sales Tax bonds two years ago to the present. They certainly don't represent the same interest of the Cofina First Sub bond holder. Those institutional entities colluded with the bond insurers for the best "overall" outcome for their overall interest and total recovery. They own General Obligation bonds, or Highway Transportation, or Government Bond Development Bank. They all don't own one position in First Sub bonds like myself. I have one in college and another going summer 2019 and I would sure like to have that money back. I know your court is overwhelmed with these decisions. A court is supposed to judge what is fair, much like a mother and a father do with their children. Please help me understand how 93 versus 56 is fair? But first you need tell me why this happens when there is over two times coverage of the debt interest payments on a very solvent entity with over ten years of operational history.
Sincerely,

**Stephen Vessels**



**Regarding the Restructuring of Puerto Rico Sub Sales Bonds**
**Clifford Day**  to: swaindprcorresp@nysd.uscourts.gov

12/11/2018 08:11 AM
Hide Details

From:

To:       "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

Dear Judge Swain,

I am a 70 year old married man who was forced into early retirement due to the economic recession several years ago. I was a clinical social worker most of my life. I never anticipated having to become a caretaker to my Alzheimer's stricken and blind 93 year old mother. Nor did I anticipate my wife having recently been diagnosed with Colon Cancer and now recovering from a major surgery with many post surgical issues. What I did anticipate was that my Puerto Rico Cofina Bonds were a safe investment due to the many promises and guarantees surrounding these bonds. What I did anticipate was that I could depend on the interest from these Bonds to help support my family.

As an owner of the Subordinate (Junior) bonds, I am beyond disappointed with respect to the inequities in the Proposed Plan between the Junior and Senior COFINA bondholders and as well as the Junior COFINA bondholders living in the States and those residing in Puerto Rico. It seems fundamentally unfair that the Junior bonds would be paid at a lesser rate than the Senior bonds.

I believed my investments were secure knowing they were guaranteed by a fund not accessible to anyone but the trustee for the bond holders, regardless of whether they were senior or junior obligations. This fund has more than enough cash to repay all bondholders regardless of their status. Making this fund available to non-COFINA bondholders violates the law not to mention its unfair distribution.

I urge you to reconsider the many inequities in the current plan before any plan is formally approved. The proposed COFINA Plan of Adjustment is blatantly unfair, unethical and illegal as reflected in the significantly different rates of overall recovery by bondholder class. It is clear that those with power and influence, such as Hedge funds, are ruling the roost with smaller retail investors such as myself bearing the brunt of an mean spirited and unfair financial resolution. I urge you to try and put yourself in the shoes of "all" bondholders.

Thank you for taking the time to read my letter.

Respectfully,

Clifford Day



**Puerto Rico**
**Mud Muncher**    to: swaindprcorresp@nysd.uscourts.gov

12/11/2018 02:31 PM
Hide Details

From:

To:          "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

Attn:Judge Swain
Please help me understand why Puerto Rico has not submitted a new fiscal budget plan.  If they can't satisfy there current bond debt why are they still getting pay raises and bonuses?
Thank you for your time.
Mark Peterson



**HONESTY- a Thing of the Past**

to: swaindprcorresp

12/12/2018 02:05 PM
Hide Details

From:

To:        <swaindprcorresp@nysd.uscourts.gov>



To Whom it May Concern:

This case is as full of holes as Swiss cheese.....................

But I think I know which way it is heading, what is a few twisted or broken laws along the way ?

Respectfully

A Holder of COFINA BONDS from Florida





**CALL TO ACTION FOR PUERTO RICO!**
atabex1977   to: swaindprcorresp

12/12/2018 08:55 PM
Hide Details

From:   ▮▮▮▮▮▮▮▮▮▮
To:     swaindprcorresp@nysd.uscourts.gov

I urge you to REJECT the agreement between Cofina bondholders and the Financial Oversight and Management Board as it will drag Puerto Rico into another economic crisis, due to the imposition of more austerity measures, cuts in public services and pensions, and would lead to a new debt default. Instead, we request a fair renegotiation of the agreements that are not burdensome for the country.

Puerto Rico is under the control of a Junta created by the US Congress. This Junta formed an agreement with COFINA, an illegal fund to pay bond-holders, that will further austerity measures against the Puerto Rican people. We need you to pose against this agreement, as it will succumb the Puerto Rican people to 40 years of further austerity measures to pay a debt the US Government refuses to audit.

For over 120 years Puerto Ricans have been left out of important decision making conversations and processes that affect them greatly.  We, the puertorricans in the US, the ones that can give a voice to the silenced people in PR, urge you to decide against this agreement. There has to be another way, the people of Puerto Rico should not have to pay for the corruption of the government and Wall Street.


Sent from my iPhone

**Puerto rico**
**Carlos Alicea**   to: swaindprcorresp

12/12/2018 05:53 PM
<u>Hide Details</u>

From:

To:        swaindprcorresp@nysd.uscourts.gov

Your honor judge swain
Am a U.S. army veteran with 2 deployments to irak in 14 years and I see everyday how Puerto Rico government steal our money.
They live good with a good salary that they don't deserve.
Please, do something to help us.

Spc alicea carlos



**Reject The Board's Agreement Please**
**Eugenio Almedina**   to: swaindprcorresp

12/12/2018 10:30 PM
Hide Details

From:      Eugenio Almedina ████████████

To:        swaindprcorresp@nysd.uscourts.gov

▼ 1 attachment



FB_IMG_1544671182217.jpg



**REJECT the agreement between Cofina bondholders and the Financial Oversight and Management Board**

**lorenzo**   to: swaindprcorresp@nysd.uscourts.gov

12/12/2018 09:24 AM
Hide Details

From:

To:        "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

REJECT the agreement between Cofina bondholders and the Financial Oversight and Management Board as it will drag Puerto Rico into another economic crisis, due to the imposition of more austerity measures, cuts in public services and pensions, and would lead to a new debt default. Instead, we request a fair renegotiation of the agreements that are not burdensome for the country.

---- WHY?
Puerto Rico is under the control of a Junta created by the US Congress. This Junta formed an agreement with COFINA, an illegal fund to pay bond-holders, that will further austerity measures against the Puerto Rican people. The judge in charge of approving this deal will render her decision on January 16, 2019. She needs to hear our message against this agreement, as it will succumb the Puerto Rican people to 40 years of further austerity measures to pay a debt the US Government refuses to audit.

For over 120 years Puerto Ricans have been left out of important decision making conversations and processes that affect them greatly.  We can change this! The Puerto Rican community needs Judge Taylor Swain to listen to them and their allies. We need her to hear from all of us before her next hearing, in which she will make her final decision about the Board and Cofina agreement.

#LosEmailsDeLaJunta
Mientras McKinsey actúa como el principal asesor estratégico de la Junta y ha cobrado más de $50 millones por ese rol, una subsidiaria de esa firma llamada MIO Partners es dueña de por lo menos $20 millones en bonos de Puerto Rico, específicamente de Cofina, según reveló recientemente The New York Times.
La firma también tiene millones de dólares invertidos en Whitebox Advisors, uno de los miembros de la Coalición Sénior de Bonistas de Cofina, cuyos bonos son respaldados por el IVU.

http://periodismoinvestigativo.com/2018/12/mckinsey-bonista-de-puerto-rico-y-principal-asesor-de-la-junta/



**Acuerdo con bonistas sobre Puerto Rico**
Luis R. Saez   to: swaindprcorresp@nysd.uscourts.gov

12/12/2018 09:14 PM
Hide Details

From:
To:        "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

Le pido que RECHACE el acuerdo entre los bonistas de Cofina y la Junta de Supervisión y Administración Financiera, ya que arrastrará a Puerto Rico a otra crisis económica, debido a la imposición de más medidas de austeridad, recortes en los servicios públicos y las pensiones, y generaría una nueva deuda. En su lugar, solicitamos una renegociación justa de los acuerdos que no son positivos para el país.

--- ¿POR QUÉ?
Puerto Rico está bajo el control de una Junta creada por el Congreso de los Estados Unidos. Esta Junta formó un acuerdo con COFINA, un fondo ilegal para pagar a los bonistas, que promoverá las medidas de austeridad contra el pueblo puertorriqueño. La jueza a cargo de aprobar este acuerdo emitirá su decisión al respecto el 16 de enero de 2019. Ella necesita escuchar nuestro mensaje en contra de este acuerdo, ya que sucumbirá al pueblo puertorriqueño por 40 años de nuevas medidas de austeridad para pagar una deuda del gobierno de los EE. UU. se niega a auditar.

Durante más de 120 años, los puertorriqueños se han quedado fuera de importantes conversaciones y procesos de toma de decisiones que los afectan enormemente. ¡Podemos cambiar esto! La comunidad puertorriqueña necesita que la Jueza Taylor Swain los escuche a ellos y a sus aliados. Necesitamos que ella reciba nuestros mensajes antes de su próxima audiencia, en la que tomará su decisión final sobre el acuerdo de la Junta y de Cofina. La audiencia será el 16 de enero a las 10:30 am en el Tribunal Federal de Puerto Rico.

Atentamente,

Luis Raul Saez

Sent from my iPhone



**Revoke the Deal**
**Diáspora en Resistencia**   to: swaindprcorresp

12/12/2018 02:25 AM
Hide Details

From: ███████████████████████████████

To:   swaindprcorresp@nysd.uscourts.gov

Please do not approve Cofina deal.

--
*Thank you for your time.*
*In solidarity,*
**María J. Torres-López**
**Gender Pronouns: She/Her/Hers**

████████████████████

Diáspora en Resistencia is a non-partisan coalition group.
*Sign my petition: https://www.change.org/p/governors-use-the-national-governors-association-to-create-awareness-about-p-r-crisis?*



### INTERNATIONAL CALL TO ACTION FOR PUERTO RICO!

**Reyner Cruz Quiles**   to: swaindprcorresp@nysd.uscourts.gov

12/12/2018 10:16 AM
Hide Details

From:

To:        "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

Honorable Judge Taylor Swain, please, REJECT the agreement between Cofina bondholders and the Financial Oversight and Management Board as it will drag Puerto Rico into another economic crisis, due to the imposition of more austerity measures, cuts in public services and pensions, and would lead to a new debt default. Instead, we request a fair renegotiation of the agreements that are not burdensome for the country.

Thank you,  Reyner Cruz Quiles.



**Reject COFINA Agreement**

to: swaindprcorresp@nysd.uscourts.gov

12/12/2018 09:40 AM
Hide Details

From:

To:     "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>

Dear Judge Swain,

This is a request to reject the COFINA Agreement proposed by the Fiscal Control board because it would drag Puerto Rico into another fiscal crisis, cause the imposition of more austerity measures, cuts in public service and pensions, and lead to a new debt default.

Thank you.

Tania Padró



**Cofina to rape Puerto Rico**
**Wil Rod**   to: swaindprcorresp

12/12/2018 09:20 AM
Hide Details

From:

To:        swaindprcorresp@nysd.uscourts.gov

Dear Judge Swain:
We in Puerto Rico remind you that the original PROMESA board are, in fact the self-appointed members who put the island into a partially ILLEGAL debt (UBS, Santander & Banco Popular) for personal and corporate profiteering. Please stop them from continuing the raping of Puerto Rico. We ask that you vote against the agreement with COFINA.
Please also be aware that former governor Fortuño is still involved (behind the curtains) helping the Fiscal Control Board.
Thank you for your consideration. Please keep up your good work.
Wil Rodriguez,

JOHN L DiMARCO



December 11, 2018

Honorable Judge Swain

Dear Judge Swain:

I write you on behalf of 3 Puerto Rico bond holders, myself John L DiMarco, my wife Deborah DiMarco and my daughter Anne Desmond. Collectively we own over 30 million dollars in face Puerto Rican bonds.

I write you to not only object to the proposed settlement but also share some insight from an investor rather than a trader or a hedge fund looking to likely make a short- term profit.

First point is that there is 1.2 billion dollars in the COFINA escrow fund which is interest due to the bondholders. We purchased the bonds in good faith expecting to earn the stated interest and the money is being withheld from us when in fact, we should be paid all our back interest. The fund is holding our money. These funds should in no way be used to negotiate a settlement on principal when in fact it is our money rightfully due to us. That money should be distributed separately and then negotiate a settlement from principal.

Second, the proposal is unfair to the subordinated bondholders on multiple points. The Senior bond holders are receiving 93% plus cash while the subordinate bond holders will receive 56.4% and no cash. How is that equitable when in fact, the fund has the money to pay everyone.

While the Senior bondholders are receiving coupon bonds, the subordinated bond holders will receive more than half of their bonds in zero coupon bonds that will not pay regular interest. Keep in mind that people like myself bought these bonds to receive regular tax- free income. Why are we receiving a bond in exchange that pays no interest? How is that equitable? To further highlight this point, when these bonds begin to trade, who will buy them and how can the value even be close to what the face value is? They likely will decline immediately causing more harm to the people like myself who bought the bonds in the first place to receive tax free income.

To add further insult to injury, why are U.S based mainland holders receiving 56.4% while the Puerto Rico bondholders owning the same class of bond receive 58.4% That is a 3.5% premium to what we are to receive in the proposal. Why should U.S. mainland investors be penalized for purchasing the same bond?

Concluding, it seems obvious that the sophisticated institutional investor who likely only invested to make a short- term profit is taking advantage of the unorganized mostly small retail investor. The settlement is being further distorted by penalizing the U.S. mainland investor even further.

I urge you to please act on the facts to achieve a fair compromise rather than penalize the individual investor who put up their money in good faith to receive an interest payment in return for that payment.  We ask that the Government act in the same good faith and pay us our interest due us, a reasonable settlement on our principal, the same type coupon bonds that we originally purchased and not be discriminate against from the Puerto Rico owners.

As the proposal stands, the Subordinated bondholders are really getting taken advantage of from the much more sophisticated, better organized institutional investor. I ask you to please treat us fairly.


Respectfully yours,

John L DiMarco
Deborah DiMarco
Anne Desmond



**Please REJECT the Proposed Agreement!**
**Elisa Cruz-Torres**   to: swaindprcorresp

12/13/2018 07:48 AM
Hide Details

From:   Elisa Cruz-Torres ▮▮▮▮▮▮▮▮▮▮
To:   swaindprcorresp@nysd.uscourts.gov

Judge Taylor Swain,

For over 120 years, Puerto Ricans have been left out of important decision making conversations and processes that affect them greatly. Please help Puerto Rico and it's citizens in changing this.

Give Puerto Rican's a voice by rejecting the agreement between Cofina bondholders and the Financial Oversight and Management Board at your Jan. 16 hearing. If passed, this agreement will drag Puerto Rico into another economic crisis, due to the imposition of more austerity measures, cuts in public services and pensions, and would lead to a new debt default. Instead, we request a fair renegotiation of the agreements that are not burdensome for the country.

Respectfully,

Elisa Cruz-Torres



**PR oversight Board**
**Jorge Schmidt**   to: swaindprcorresp

12/13/2018 10:04 AM
Hide Details

From:

To:      swaindprcorresp@nysd.uscourts.gov

Good morning Honorable Judge Taylor Swain

As American citizen born and live in Puerto Rico I'm concerned with all the process that the imposed oversight board is
doing with the local government. Recently is discussing an agreement related to Cofina bonds. This agreement is a bad
business to the people of Puerto Rico. This will place again in fiscal crisis to Puerto Rico in the next 10 to 15
years. I know that both bond holder and the people from Puerto Rico has to agree the re-negotiating of the debt, but
this should be fair for us. I'm not bond holder, I'm physician 54 years old and believe me that the over 100 taxes from
the government of Puerto Rico to all the people that we live in the island, is a very hard situation. A bad deal to us
will be the end of our society and will force the people to continue the migration to US. I beg you that you review the
deal and try to force a better more justice deal.

Thank you very much

Jorge Schmidt MD



**PUERTO RICO**
**Lcdo. Juan Acevedo**   to: swaindprcorresp@nysd.uscourts.gov

12/13/2018 08:39 AM
Hide Details

From:   "Lcdo. Juan Acevedo"
To:     "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>





**Puerto Rico FOMB COFINA Agreement**
**Michelle Hidalgo** to: swaindprcorresp

12/13/2018 09:07 AM
Hide Details

From:     Michelle Hidalgo
To:       swaindprcorresp@nysd.uscourts.gov

Judge Swain:

I understand the complex situation you are designated to solve in a comprehensive, humane and lawful manner.

I am a Puerto Rican woman living in the US and a US military officer who is deeply concerned in the way that the Fiscal Management Control Board (FOMB) is utilizing its assigned operational budget and how they have consistently requested a budget increase every year since the board was instituted.

I'm deeply concerned with the high levels of conflict of interest of the Board President, Mr. Carrión and Carlos García (former president of Puerto Rico's Government Bank- Banco Gubernamental de Fomento and his poor management while holding that position which created even more debt that benefit his previous employer, Santander Bank.

How can our US citizens of Puerto Rico trust these people to work in a fair and just manner?

As we can see, the COFINA agreement exposes our people to pay a debt for 40 years. The way this agreement has come about will greatly slow down the economic development of the island and it will further increase poverty levels of puertoricans living in the island and also, the massive numbers of Puertoricans moving out of the island will continue.

The COFINA agreement puts a burden on our youth. The austerity measures haven been and will continue to be brutal moreover; considering the government nor the FOMB have agreed to audit the debt and prosecute all implicated in illegal transactions. One must ask, is this justice? Is this fair? Is it ok that Mr. Carrión and Carlos García are members of the FOMB although they contributed directly or indirectly in creating the debt in the first place?

Teddy Roosevelt once warned us about the problem resulting from Corporations owning our government. Can justice be baught and paid for? Was this debt designed because the responsible who engineered it knew it would be put on the backs of the Puertorican people to pay just like it was put on the backs of the American people when the collapse of Wallstreet took place?

Please, ensure that mechanisms for auditing the debt are put in place, please stop the COFINA agreement and ensure a comprehensive method of debt restructuring that does not put any more burden on the backs of our american citizens of Puerto Rico already have to bear.

I have put my life on the line for this great nation and I have high hopes in that our Justice Systems will do us justice.

Very Respectfully,

Michelle M. Hidalgo



**Cofina Deal**
**Rubén Colón**   to: swaindprcorresp

12/13/2018 09:19 AM
Hide Details

From:

To:          swaindprcorresp@nysd.uscourts.gov

RECHACE el acuerdo entre los bonistas de Cofina y la Junta de Supervisión y Administración Financiera, ya que arrastrará a Puerto Rico a otra crisis económica, debido a la imposición de más medidas de austeridad, recortes en los servicios públicos y las pensiones, y generaría una nueva deuda. En su lugar, solicitamos una renegociación justa de los acuerdos que no son positivos para el país, luego de una auditoria forense.
RCM