## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## OBJECTION OF THE GMS GROUP, LLC
## TO SECOND AMENDED TITLE III PLAN OF ADJUSTMENT
## OF PUERTO RICO SALES TAX FINANCING CORPORATION
## <u>AND REQUEST FOR EVIDENTIARY HEARING</u>

**GODREAU & GONZALEZ LAW, LLC**
Rafael A. González Valiente
P.O. Box 9024176
San Juan, PR 00902-4176
787.726.0077 (office)
787.360.0787 (cell)
rgv@g-glawpr.com

142473249.6

**PERKINS COIE LLP**
Gary F. Eisenberg (pro hac vice application pending)
30 Rockefeller Plaza, 22nd Floor
New York, NY 10112
Telephone: (212) 262-6902
Facsimile: (212) 977-1632
Email: geisenberg@perkinscoie.com

*Attorneys for The GMS Group, LLC*

Dated:  December 21, 2018

The GMS Group, LLC ("GMS" or "Secured Creditor"), by way of objection to the

Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation

(the "Plan") respectfully shows the court as follows:

1.      GMS is the whole holder of in excess $500 million Subordinated COFINA bonds

(the "GMS Bonds") in approximately 5,000 retail client accounts, including approximately $40

million in GMS proprietary accounts (the "Proprietary Bonds"; together with the GMS Bonds

and similarly subordinated bonds, the "Subordinated Bonds"). The GMS and Proprietary Bonds

are held at Perishing LLC, a subsidiary of Bank of New York Mellon ("BNYM"), the indenture

trustee under the Subordinated Bonds (and related senior priority bonds).

2.      GMS and other similarly situated bondholders have been disenfranchised by the

Commonwealth of Puerto Rico and the Puerto Rico Sales Tax Financing Corporation

("COFINA").  This is happening while Puerto Rico and COFINA are taking GMS' property in

violation of the takings clause of the United States constitution.  There can be little doubt that,

had a private business issued the Subordinated Bonds with the repeated representations of Puerto

Rico on which it has turned its back in these proceedings, that private business would face severe

consequences - and would have no right to renounce its lien or otherwise vitiate the rights of the bondholders.

3.     To further their unconstitutional enterprise, the Commonwealth and COFINA (whose independence has been coopted on account of the same Oversight Board controlling the actions of both parties) are also depriving GMS and other similarly situated creditors of basic due process, denying them the equal protection of the laws, overlooking the most basic principles of fairness in a true adversary system and engaging in a process that will give any potential investor in Puerto Rico reason to think long and hard about whether it will wish to be the next confiscation victim.  The American citizens of Puerto Rico deserve better than this.

4.     GMS presumes that this Court is greatly disturbed by what has happened to date. More than a decade ago, Puerto Rico, reeling from financial difficulties for which surely the current holders of the Bonds can bear no blame, appears in hindsight to have snookered ordinary investors into bailing out Puerto Rico under false pretenses.  This was accomplished by Puerto Rico voting to create COFINA and legislatively enacting a transfer of sale tax revenues ("SUT") to COFINA.

5.     At the time Puerto Rico did this, neither Puerto Rico nor COFINA was eligible to be a debtor under Title 11 of the United States Code, either in Chapter 9 or Chapter 11.  Thus, the panorama of creditor rights, to which creditors knowingly are subject when they deal with entities that are eligible to be debtors under the Bankruptcy Code at the time of extension of credit, were not part of the panorama of legal realities against which the bondholders loaned money to COFINA.

6.     Indeed, it was precisely because of the ineligibility for relief under Title 11 that GMS and the other similarly situated bondholders could rely on their secured position not being

subject to attack by COFINA, Puerto Rico or any trustee as a preference under the Bankruptcy
Code.  They could rely on their secured position being the statutory lien that Puerto Rico
repeatedly proclaimed it to be, could rely on their receipt of the SUT not being subject to attack
as a preference and could rely on their interest in the SUT not being subject to a cutoff of after-
acquired property under Section 552 of the Bankruptcy Code (which at the time of course was
not applicable to or eligible to be invoked by COFINA or Puerto Rico).

7.      It is wrong for anyone to claim that bankruptcy legislation could have been
enacted post-issuance of the Bonds and the holders of the Bonds were subject to that risk.  That
is no more valid a position than asserting that Puerto Rico could legislatively abolish the liens it
granted after receiving the Bonds proceeds (or pass a law making it illegal to sue for takings
violations, which in substance is what the Oversight Board's control of both Puerto Rico and
COFINA has effectuated through the proposed Settlement Agreement).  This is clear from
longstanding United States Supreme Court precedent, which establishes uncontrovertibly that
liens are property rights protected by the fifth amendment to the Constitution - no matter how
badly a governmental body wants to impose the cost of its own financial mismanagement on the
holders of the liens.

8.      Further, Puerto Rico, a commonwealth, not a state, is even more subject than the
various states to the strict prohibitions against taking private property for public use without just
compensation and impairing contracts.

9.      When Puerto Rico enacted P.R. Laws Ann. tit. 13, §§ 11 and 12 (the "Statutory
Lien") and thereby made a present transfer of the sales tax revenues (the scope and nature of
which its legal authorities repeatedly confirmed), Puerto Rico became ineligible to undo that
transfer.  The same is true of COFINA.  Neither of them was entitled to benefit from any

subsequence statutory enactment that would purport to undo that transfer.  They cannot do this by their own statutory enactments, and even post-transfer statutory enactments by the United States Congress cannot override or be permitted to override the import of the takings clause, the equal protection clause or the due process clause of the United States Constitution.  All of those constitutional clauses (and not PROMESA, defined below) were part of the legal reality against which GMS and the other bondholders justifiably loaned money to a government and its affiliated entity, both of which should be held to the punctilio of commercial honor.

10.     Acting in such blatant derogation of constitutional provisions has to constitute a failure of good faith such that Section 1129(a)(3) of the Bankruptcy Code, made applicable to this proceeding pursuant to 48 U.S.C. 2161(a), cannot be met here.

11.     The Oversight Board of Puerto Rico, facing the stark reality of the takings claims validity that COFINA was asserting and the reality that the absence of a reorganization statute at the time it gladly took the proceeds of the Bonds after its representations about the security of the SUT prevented it from going back on its word, has improperly also controlled COFINA.  This has in essence contorted the genuine adversary nature of the litigation between COFINA and Puerto Rico, enabling COFINA to be coopted into relinquishment of rights where its subordinated holders of Bonds are being made the "fall guy."

12.     Indeed, the overreach by the Oversight Board is seemingly calculated to deprive the junior bondholders of the lien to which they are entitled, by manipulating the litigation in which that lien is supposed to be protected, so that their property can be expropriated for the benefit of a commonwealth that repeatedly demonstrates its financial ineptitude.

13.     Compounding the egregiousness of the Plan, one of the most central principals of bankruptcy law, namely full disclosure of a debtor's assets, is being ignored.  Audited financial

statements of COFINA and Puerto Rico have not been provided since 2015, before the enactment of PROMESA!

14.     GMS respectfully submits that the reason is obvious.  Were they to be provided, COFINA' s eligibility to be a debtor would be negated, which would negate the ability of Puerto Rico and COFINA to confirm a plan that in substance takes GMS' lien.

15.     The pervasiveness of the subversive collaboration between COFINA and Puerto Rico is highlighted by the fact that Section 926 of Title 11, made applicable to The Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), is being ignored.  The main premise of the lawsuit by Puerto Rico against COFINA seeking to avoid transfers of the sales tax revenues as preferences ignores the fact that preferential transfers for the benefit of bondholders cannot be avoided under Section 926.  Section 926(a) clearly provides:  "A transfer of property of the debtor to or for the benefit of any holder of a bond or note, on account of such bond or note, may not be avoided under section 547 of this title."  The Statutory Lien was patently for the benefit of the bondholders and thus seeking to avoid the Statutory Lien as a preference ignored a clear provision of Chapter 9, applicable to this proceeding by PROMESA. Thus, the entire course of action by Puerto Rico has been premised on simply ignoring a clear statutory mandate.

16.     Similarly, the plain language of the Statutory Lien enabling legislation makes it clear that the transfer of the sales tax revenues to COFINA was rendered the Statutory Lien a statutory lien.  This indisputable architecture of the bonds was recognized by COFINA in its original litigation positions.

17.     Again, the lawsuit by Puerto Rico flatly ignores this plain, clear statutory provision.  That cannot constitute good faith under the Bankruptcy Code.

18.     In fact, faced with the stark reality of the Statutory Lien and of Section 926, Puerto Rico instead manipulated control of its adversary, having its own Oversight Board orchestrate COFINA's abandonment of its position (that it was duty-bound to defend) that the Statutory Lien is unassailable.  As a result, the proposed settlement by COFINA has become a shameless act of surrender by COFINA forced upon it by its adversary's overseeing authority! Not since various states in the South sought to outlaw the NAACP from litigating adverse to those states have Americans witnessed such distortion of a true adversary systems.  See *NAACP v. Button*, 371 U.S. 415 (1963).

19.     The settlement, though, harms not COFINA, but the innocent junior bondholders such as GMS.  COFINA cannot be permitted to commit the financial equivalent of self-immolation when it is actually the destruction of its creditors' property that results.  This is all the more so where the statutory mandates indicate that such a result is impermissible.

## STATEMENT OF FACTS

*The Bonds and the Statutory Lien*

20.     During the 2006 Puerto Rico financial crisis, the Commonwealth created COFINA. Investors had lost confidence in the Puerto Rico government's ability to manage the finances of the Commonwealth. Since investors lost trust in the Puerto Rico government, the Commonwealth could not access the bond market at reasonable rates.

21.     The main components of COFINA bonds that attracted investors were the Statutory Lien (on dedicated pledged Sales Tax revenue) and the fact that this dedicated revenue source was not available under any circumstances to the Puerto Rico government.  At the time Puerto Rico transferred the dedicated pledged Sales Tax revenue, Puerto Rico and COFINA were ineligible for Title 11 relief.  This meant, among other things, that bondholders could buy the

bonds free and clear of payments to them and their liens being subject to attack as preferences or subject to termination post-bankruptcy filing.

22.    For the next ten years the Puerto Rico government under three governors, legislatures and Department of Justices continued to assure COFINA bondholders and inform General Obligation bond investors that pledged COFINA revenues secured by a Statutory Lien were not available to the Commonwealth.  See Declaration of Paul Konsig, dated December 19, 2018 at ¶9 ("Konsig Decl.").

23.    Most individual retail investors believed the Puerto Rico government was corrupt and in financial trouble.  Konsig Decl., Exh. C.  However, they purchased Subordinate COFINA bonds for the following reasons (*ibid*):

A Statutory Priority Lien on pledged dedicated sales tax revenue.

High investment grade rating "A+" second only to Senior COFINA bonds which were slightly higher rated by one notch "AA-". A long term subordinate COFINA bond's market value was equivalent to around 1 to 2 points or 1 to 2% less than a similar Senior bonds market value.

Assurance the Puerto Rico treasury or government did not have access to the pledged revenues and such was stated in Official Offering Statements for General Obligation (GO) and COFINA bonds issues. The Puerto Rico government also was obligated to defend the COFINA bond structure.

*The Commonwealth and its Agency must meet their obligations because they had no access to Chapter 9 bankruptcy.*

24.    The Statutory Lien permitted the issuance of lower interest rate bonds that allowed the Commonwealth to save between $1.1 billion to $2.2 billion in interest costs on the

over $16 billion of COFINA, which included almost $10 billion Junior COFINA bonds.  See
Konsig Decl., Exh. C.

*The Proceedings*

25.    In May 2017, under PROMESA, COFINA was placed in Title III bankruptcy
(dkt. no. 1 in the COFINA case) without the mandatory prerequisite Title VI negotiations.

26.    Unlike a regular Title 11 debtor, who must submit operating reports monthly,
COFINA and the Commonwealth have failed to issue any audited financial statements for any
period since fiscal year 2015.  See Konsig Decl., Exh. E.

27.    However, during this time, Puerto Rico has accumulated $12 billion in various
bond accounts and the Puerto Rico treasury account.  See Konsig Decl., Exh. L. It appears Puerto
Rico is not providing financials because audited financial would show the Commonwealth can
pay their entire debt.  That would call into question COFINA's solvency and eligibility to be a
debtor in a PROMESA proceeding.

28.    On or about September 8, 2017, the unsecured creditors committee
("Committee") as agent of the Commonwealth filed an adversary proceeding (the "Adversary
Proceeding") against COFINA.  The main thrust of the Adversary Proceeding was to attack the
validity of the transfer of revenues under the Statutory Lien.

29.    Two of the Committee's claims were that the Statutory Lien was avoidable as a
preference and that Section 552 of the Bankruptcy Code terminated the post-PROMESA filing
security interests of the Bondholders in the SUT.

30.    The Committee made these claims even though (a) preferences are not avoidable
under the sections of chapter 9 made applicable to PROMESA and (b) Puerto Rico itself for
years had reaffirmed the absolute nature of the transfer of the SUT, thus rendering the Statutory

Lien a statutory lien, not subject to avoidance in any proceeding of debt adjustment (or post-petition evisceration through Section 552). COFINA filed an answer to the Adversary Proceeding, asserting that Puerto Rico's position amounted to a request for this Court to sanction a massive constitutional violation by effectuating a taking of the property of the holders of the Bonds.

31.     Subsequently, the Commonwealth and COFINA announced that a settlement had been reached. However, that came about only after the Oversight Board in essence took over both sides of the litigation. Thus, instead of COFINA acting on behalf of the bondholders to whom it was liable, it was coopted into acting on behalf of the Oversight Board. That made the Adversary Proceeding litigation not genuinely adversarial - with the holders of the Bonds effectively disenfranchised (particularly since they were excluded from the mediation that produced the Settlement Agreement). The notion of a debtor being able to appoint its adversary's controlling governing actors is something foreign to the American justice system. Even in other bankruptcy cases involving a debtor and its wholly-owned affiliate, when there is a conflict of positions between them, the U.S. Trustee will appoint separate trustees, or at least ensure that the two parties have separate representations - precisely to avoid a perversion of genuine adversity like what is present here.

32.     During the Adversary Proceeding settlement negotiations, GMS and similarly situated subordinated bondholders were excluded from the confidential mediation of the Commonwealth-COFINA dispute. Not surprisingly, the proposed settlement and Plan provide for them to lose almost half of their face value. The exclusion of holders who are original purchasers and who only hold subordinated bonds deprived this process of one of the essentials of bankruptcy - the opportunity for interested parties to negotiate. Having others purport to

"negotiate" on behalf of other holders with whose interests those doing the negotiations are not aligned results in a sham negotiation.

33.     Institutional investors holding both Senior and Subordinate bonds they bought at very distressed prices, along with the Commonwealth and the Financial Oversight Board, confidentially negotiated the Plan of Adjustment. The negotiators are allowing Senior bondholders in some instances to double or even triple their investment and are giving the Commonwealth monies that by law is not available to them, the monies the Commonwealth will receive is the property of Subordinate bondholders.

34.     In August 2018 the Financial Oversight Board supported by the Puerto Rico government formally announced a Plan of Adjustment/Restructuring of COFINA debt. COFINA bondholders would receive new COFINA bonds secured by the same Statutory Lien that currently exists. Senior bondholders will receive a 93% plus cash recovery and Subordinate bondholders who are secured by the same Statutory Lien, will receive only a 56% recovery. COFINA bondholders will receive new COFINA bonds secured by the same Statutory Lien and law that guaranteed that pledged revenues were not available to the Commonwealth. It is very difficult for Subordinate bondholders to accept that a Court of law would approve such an unequitable the Plan of Adjustment.

35.     The Puerto Rico government promised and passed laws that assured all COFINA bondholders they are secured by a Statutory Lien on pledge revenues unavailable to the Commonwealth.  Recently, the Puerto Rico government disregarded PROMESA and passed a new law.  The new law gives the Puerto Rico government the ability to take $425 million annually from COFINA bondholders, mainly Subordinate bondholders. This is outrageous because the Puerto Rico government assured COFINA investors they would defend the Statutory

Lien if necessary. PROMESA states Puerto Rico cannot pass laws that infringe on the rights of Bonds holders.

36.     For 10 years Puerto Rico correctly stated payment on COFINA bonds is secure because the SUT was not subject to the reach of Puerto Rico - its status as COFINA's property (and therefore its encumbrance by the liens under the Bonds) was sacrosanct.  A governmental entity that makes such a statement determines property rights thereby.  Changing that position is a taking, just as surely as it would be a taking were the Commonwealth to vote to transfer title on real property to someone who does not now hold it.

37.     This is all the more so the case, given that Puerto Rico's course of conduct in these proceedings effectuates a violation of the doctrine of one's own acts.  As a result, to allow the Commonwealth and COFINA to contest the Statutory Lien would be contrary to the doctrine of one's own acts ("doctrina de actos propios").  The Puerto Rico Supreme Court has ruled that the doctrine of one's own acts ("doctrina de actos propios") was established to prohibit unjust enrichment and eliminate conduct contrary to the good faith which permeates the legal system. *Vivoni Farage v. Ortiz Carro*, 179 DPR 990 (2010).

38.     This means that Puerto Rico itself has set a standard of good faith that is bound to uphold itself as a matter of due process and basic fairness. As the entity that established this doctrine, Puerto Rico is bound by it.  Use of PROMESA to perpetrate an abnegation of the "doctrina de actos propios" is perhaps the epitome of lack of good faith.

39.     The irony is that new and future COFINA bonds will be [secured?] by the same Statutory Lien. The Oversight Board expects current Subordinate bondholders to accept a 56% recovery while they intend to offer future COFINA investors new Subordinate COFINA bonds at 100%. The Board and government seem to be out of touch with reality. There are very few, if

any, individual retail investors who will trust Puerto Rico again. As the late Herb Brooks (who coached the Miracle on Ice USA Olympic hockey team in 1980) was wont to say, fool me once, shame on you, fool me twice, shame on me.

## LEGAL ARGUMENT

### The Plan is Unconfirmable

40.     The Plan violates many basic principles of bankruptcy law, the Constitution and basic jurisprudence. However, brevity will be of benefit to the Court in helping to assess the plainly unconfirmable nature of the Plan.

**A.     The Plan Culminates a Violation of the Takings Clause**

41.     Puerto Rico conveyed the sales tax revenues to COFINA in 2006. At the time it did so, neither Puerto Rico nor COFINA was eligible to be a debtor under Title 11. That reality was a reality on which junior creditors did rely and were entitled to rely in purchasing the bonds that conveyed real money to COFINA and Puerto Rico. The subsequent financial ineptitude of COFINA and Puerto Rico is not a license to violate the takings clause or the contracts clause in an effort to cover up their own ineptitude.

42.     Sales tax revenues were conveyed by Puerto Rico to COFINA. That transfer cannot be undone once the bonds are issued because undoing it necessarily constitutes a taking of private property without compensation, as discussed below.

43.     Nor does the enactment of PROMESA make a difference. Congress, too, is bound by the fifth amendment. Puerto Rico cannot enlist Congress in violating an amendment to which Congress is also bound.

44.     The courts have routinely held that existing bankruptcy statutes are a legal reality against which creditors make decisions to enter into credit transactions. The logical corollary (enshrined in Supreme Court jurisprudence) is that the absence of such provisions at the time the

creditor makes an extension of credit prevents the enactment of a statutory change (post-extension of credit) where the effect is to appropriate monies from the creditor in favor of the debtor.  To conclude otherwise would be to negate the takings clause.  Such unconstitutional behavior cannot be tolerated ever, in any forum, by any court, period, the end.  Congress' "bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation."  *United States v. Security Industrial Bank*, 459 U.S. 70, 75 (1982) (citing *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935)).  It cannot be disputed that the "government must pay just compensation when it takes a lien - a right to receive money that is secured by a particular piece of property."  *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 2586, 2599 (2013).[1]  Confiscation of the Statutory Lien from the subordinated bondholders is such a taking.

45.     This is because failure to honor the transfer of the sales tax revenues constitutes appropriation of the sales tax revenues and appropriation of the lien of the junior bondholders, including GMS, on those very sales tax revenues.  That is a taking and this Court cannot ignore that.  *Security Industrial*, 459 U.S. 70 at 75 (quoting *Armstrong v. U.S.*, 364 U.S. 40, 48 (1960)). ("The total destruction by the government of all compensable value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment 'taking'"). Every single dollar of the lien expropriated from the junior creditors is a taking.  Leaving 56% behind does not change the fact that 44% has been taken.  The taking of that 44% is a taking that requires compensation.  Confirmation of a plan cannot circumvent that.  Enactment of PROMESA is not a license to confirm an unconstitutional plan.

---

[1]  A promise by Puerto Rico to pay in the future on account of its naked present taking does not satisfy the takings clause.

46. Congressional action that is applied retroactively to a lien pursuant to a bankruptcy law enactment also constitutes a taking. *Security Industrial*, 459 U.S. at 78. Thus, provisions of PROMESA that purports to apply bankruptcy benefits to COFINA and Puerto Rico can *only* be applied prospectively. It cannot be applied retroactively to negate the liens of the junior bondholders. To the extent they do so, those constitute takings and must be compensated fully.

47. The sham collusion between COFINA and Puerto Rico in an effort to circumvent the junior bondholders' takings claims cannot change this. The takings claim of GMS belongs to GMS. Taking that claim from GMS and purporting to assign COFINA the responsibility of litigating it and permitting COFINA to settle it in abrogation of the value of the takings claim to GMS is itself also a taking. Purporting to do so under guise of a court order is a shameless denial of due process of a law, to boot.[2]

48. Seen properly, PROMESA and the actions of COFINA and Puerto Rico before this Court show a concerted effort to ignore the Fifth Amendment, take the property of the junior bondholders and ignore the consequences - or impose them disproportionately on the holders of the Bonds.

---

[2] PROMESA conspicuously fails to provide that Section 943 of Title 11 is applicable to PROMESA. This particular section contains the following language at 11 U.S.C. § 943(b)(5): "Except to the extent of the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that on the effective date of the Plan each holder of a claim of a kind specified in Section 507(a)(2) of this title will receive on account of such claim cash equal to the allotted amount of such claim." Failure of PROMESA to include this provision only highlights the impermissible taking nature of the statute and the Plan. Even municipalities which are permitted to file for Chapter 9 have to pay their creditors unless holders themselves agree differently. For such a statute not to be made applicable to Puerto Rico and COFINA, while it is applicable to municipalities, also violates the equal protection clause. Puerto Rico's financial distress does not absolve it of the obligation to honor the takings clause of the fifth amendment any more than it would permit the Commonwealth to round up bondholders and beat them senseless until they would confess to the "crime" of holding the subordinated bonds (the right to be free of which is also protected by the fifth amendment).

49.     Even the language of PROMESA itself does not permit that.  Section 1129(a)(3) of the Bankruptcy Code, made applicable to this proceeding pursuant to 48 U.S.C §2161(a), requires that a plan, to be confirmed, be proposed in good faith and not by any means forbidden by law.  A taking in violation of the Constitution clearly is a means forbidden by law.  The Plan thus cannot be confirmed.

**B.     The Plan Has Not Been Proposed in Good Faith and Thus Fails to Comply with Section 1129(a)(3)**

50.     The sham collusion between COFINA and Puerto Rico is nothing more than a naked attempt to strip the junior bondholders of their lien protections for the benefit of creditors who do not have liens.  Everything done by COFINA and Puerto Rico in this case has been undertaken with a view towards denuding the junior bondholders' lien, covering that up with negotiations from which junior bondholders are excluded, and the effective surrender in the Adversary Proceeding by COFINA - a self-immolation orchestrated by the Oversight Board manipulatively controlling both sides of the same dispute (and thereby ignoring the real interests of the holders of the Bonds at stake, in derogation of the most fundamental principles of bankruptcy).

51.     These events include:

- The enactment of PROMESA notwithstanding that at the time the bonds were issued and the sales taxes transferred both COFINA and Puerto Rico were ineligible for Title 11 relief;

- Repeated confirmation by Puerto Rico and COFINA pre-PROMESA enactment that the transfer of the tax revenues to COFINA was valid, a central reality underlying the grant of the liens to the junior bondholders;

- Puerto Rico's initiation, through delegation to its unsecured creditors committee, of a lawsuit to attack the very transfer of the taxes it itself authorized and reconfirmed;

- Puerto Rico's assertion of preference and Section 552 post-property lien termination rights despite the clear statutory language in PROMESA that such

rights are not available to Puerto Rico or COFINA, given that the Statutory Lien is, in fact, a statutory lien;

- The participation in the litigation by COFINA by bondholders simultaneously holding both senior and junior bonds - an inherent conflict that prevents such holders from being representative of the junior bondholders, with the result that the junior bondholders are excluded from the negotiations.  Given that creditor negotiations are the essence of Title 11 plan negotiations, excluding the junior bondholders is particularly egregious.  Doing so while purporting to recognize holders of junior bonds who also simultaneously held senior bonds as representative of junior bondholders alone is particularly egregiously manipulative.  In essence, it makes the Adversary Proceeding not adversary at all; and

- A settlement that imposes all of the onus of the settlement on the junior bondholders as opposed to the senior bondholders.  This can be seen from the fact that, since the validly of the Statutory Lien is an all-or-nothing proposition, allowing senior bondholders to be treated as if they have a lien ahead of the junior bondholders when the existence of the lien would guarantee that the junior bondholders also are fully compensated only reinforces the manipulative and unfair nature of the settlement.

52.     It would be hard to conceive of a starker case of bad faith, particularly by a governmental body, than this.  Indeed, since the Plan violates the doctrine of one's own acts ("doctrina de actos proprios") that Puerto Rico itself has established, see *Vivoni Farage, supra*, 179 DPR 990 (2010), the egregiousness of the bad faith of Puerto Rico (and COFINA, having been coopted by the Oversight Board) is compounded, further compelling denial of confirmation of the Plan.

## C.     The Plan Improperly Releases Non-Debtors

53.     The Plan implements the proposed Settlement Agreement.  The Settlement Agreement, in turn, proposes to release claims of creditors (which includes GMS, because Puerto Rico's actions in this proceeding if successful would amount to a taking of GMS' property, as set forth above, and further because GMS and the other bondholders have claims against Puerto

Rico arising out the misrepresentations and fraud that Puerto Rico has committed by reneging on its promises in enacting the Statutory Lien).

54.     The releasees include "the COFINA Agent, COFINA, and its current and former officers, directors, agents, attorneys, employees, affiliates, advisors, consultants, and members, and any creditors or insurers of debt of COFINA."  See Settlement Agreement, Par. 5(b).

55.     The released claims include claims "in any way related to the COFINA structure (as it relates to the COFINA Pledged Taxes up to the COFINA Portion), the COFINA Pledged Taxes up to the COFINA Portion, or the Pre-FY2019 BNYM Deposits."

56.     Thus, the claims proposed to be released under the Settlement Agreement and the Plan include claims of GMS (a creditor) against non-debtor parties.  However, nothing in the Bankruptcy Code or PROMESA authorizes a release or discharge of non-debtor parties.  Section 944 of the Bankruptcy Code, made applicable to this proceeding by PROMESA, only provides for discharges of debtors.  In addition, Section 1123(b)(3) of the Bankruptcy Code, also made applicable to this proceeding by PROMESA, which provides the scope of what a plan may include, only authorizes "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  GMS' claims belong to it. To the extent any of its claims are asserted against a non-debtor, releasing those claims over GMS' objection is not authorized by PROMESA or the Bankruptcy Code.

57.     Indeed, such an action would amount to giving such a non-debtor party a discharge from a debt without being subject to any of the burdens or requirements of the Bankruptcy Code or PROMESA.  With respect to the automatic stay, courts routinely hold that it "does not encompass non-bankrupt codebtors who are jointly liable on a debt with the debtor." *In*

re *Lyons*, 177 B.R. 767, 770 (Bankr. N.D.N.Y. 1994), *aff'd*, 177 B.R. 772 (N.D.N.Y. 1995)

*citing Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986)).

58.     Just as the automatic stay does not stay claims against non-debtor parties, all the

more so, plans cannot discharge claims of non-debtor parties!  This is especially so when one

stops to consider that the debtor who obtains a discharge at least has to be subject to the

processes and procedures of bankruptcy.  An entity that does not do so is not entitled to a

discharge.  Doing so is naked theft and the raw confiscation of one non-debtor set of rights to be

gifted to another non-debtor.  Neither the Bankruptcy Code nor PROMESA authorizes this, and

if any statute did, that would also be a taking and a denial of due process.

59.     Indeed, such releases would represent a rawer and more naked abuse of power

than substantive consolidation of the Commonwealth or COFINA with any entity would

constitute.  And, courts have repeatedly cautioned that substantive consolidation itself is a

remedy that should be rarely invoked.  See, e.g., *In re Bonham*, 229 F.3d 750, 767 (9th Cir.

2000) (revealing consolidation should be used "sparingly"); *Union Sav. Bank v. Augie/Restivo

Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988) (indicating care

should be taken in applying substantive consolidation).  When a substantive consolidation

occurs, the assets and liabilities of the consolidated entities are combined and the claims of all of

the entities are treated from the combined assets.  *Ibid*.  However, that can only happen after

extensive findings that justify such a consolidation.

60.     Here, by contrast, non-debtors are being released from GMS claims without a

substantive consolidation, without any burden of bankruptcy being imposed on such entities and

without any regard to GMS' claims rights.  If substantive consolidation is to be used sparingly,

and only after extensive process and consideration, all the more so, naked discharge of one non-

debtor's claim against another non-debtor (which in substances amounts to a partial substantive consolidation) is even more impermissible.

61.     COFINA cannot, by abandoning its own claims, do so as to claims of other entities against other non-debtor parties.  The discharge sections of PROMESA and the Bankruptcy Code simply do not permit a non-debtor to receive a discharge of any claim against it without complying with the myriad sets of processes and procedures imposed on debtors.

**D.      The Plan Is Unfair and Inequitable and Thus Fails to Comply with Section 1129(b)(1)**

62.     Either the Statutory Lien is valid or it is not.  If it is, then taking 44% of the lien value from the subordinated bondholders is an impermissible taking and a disregard of Section 1129(b)(1) of the Bankruptcy Code made applicable to this proceeding by PROMESA.  If it is not, then awarding senior bondholders treatment as if they held a lien with higher priority than the subordinated bondholders is unfair and inequitable.

63.     The Plan fails to allow GMS to retain its lien on all revenues covered by the Statutory Lien, contrary to Section 1129(b)(2)(a)(i)(I) of the Bankruptcy Code.  This is obvious, or else the Plan would be proposing to allow GMS to retain its lien and to receive full payment on account of its bonds, since there is sufficient cash that Puerto Rico has escrowed to permit this payment in full to be made.

64.     Further, the Plan fails to provide for payment of "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property", contrary to Section 1129(b)(2) of the Bankruptcy Code (made applicable to this PROMESA proceeding).  GMS' lien on the SUT has a value equal to the amount of its bond claim.  Paying it less than that violates this section of the Bankruptcy Code.

65.     In addition, the Plan is unfair and inequitable.  Either the Statutory Lien is a statutory lien or it is not.  If it is, then each of GMS and each other subordinated bondholder is secured and should not be treated less favorably than senior bondholders.  If the Statutory Lien is not a lien, then both the senior bondholders and the subordinated bondholders are unsecured, and there is no basis for treating one class more favorably as if secured.

66.     This proposition should be self-evident.  Likely it would have been, had anyone during the mediation heard it expressed.  By excluding the holders of the Bonds from the mediation, those actors who sought to impose the cost of this restructuring on the holders of the Bonds did what they could to ensure that nobody heard this proposition.  However, they cannot bar GMS from objecting on this basis, and hopefully now the Court realizes that *el rey no tiene ropa*.

67.     GMS understands that a hearing has already been scheduled for January 16, 2019 to entertain the confirmation of the Plan.  GMS advisees that it will participate in the same and requests that it be an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, and to be supplemented at the hearing to consider confirmation of the Plan, GMS respectfully requests that the Court deny confirmation of the Plan.

Dated: New York, New York

December 21, 2018

**GODREAU & GONZALEZ LAW, LLC**

By: */s/  Rafael A. González Valiente*
Rafael A. González Valiente
P.O. Box 9024176
San Juan, PR 00902-4176
787.726.0077 (office)
787.360.0787 (cell)
rgv@g-glawpr.com

**PERKINS COIE LLP**

By:    */s/ Gary F. Eisenberg*
Gary F. Eisenberg
30 Rockefeller Plaza, 22nd Floor
New York, NY 10112
Ph. 212-262-6900
Email:  geisenberg@perkinscoie.com