## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

**JOINDER BY THE GMS GROUP, LLC TO OBJECTION OF INDIVIDUAL COFINA SUBORDINATE BONDHOLDER RESIDING IN THE 50 STATES WHO PURCHASED AT THE ORIGINAL OFFERING PRICES, TO CONFIRMATION OF PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA") PLAN, AND RESPONSE AND OPPOSITION TO COFINA'S THIRTEENTH OMNIBUS OBJECTION TO INDIVIDUAL CLAIM NO. 10701**

**GODREAU & GONZALEZ LAW, LLC**
Rafael A. González Valiente
P.O. Box 9024176
San Juan, PR 00902-4176
787.726.0077 (office)
787.360.0787 (cell)
rgv@g-glawpr.com

142661222.1

**PERKINS COIE LLP**
Gary F. Eisenberg (pro hac vice application pending)
30 Rockefeller Plaza, 22nd Floor
New York, NY 10112
Telephone: (212) 262-6902
Facsimile: (212) 977-1632
Email: geisenberg@perkinscoie.com

*Attorneys for The GMS Group, LLC*

Dated:  December 30, 2018

  The GMS Group, LLC ("GMS" or "Secured Creditor"), respectfully shows the Court as follows:

  1. On December 21, GMS filed an "Amended Objection of the GMS Group, LLC to Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation and Request for Evidentiary Hearing" with supporting exhibits (the "GMS Objection").  *See, Docket 4564*.

  2. On December 28, 2018, Peter C. Hein filed the "Objection of Individual COFINA Subordinate Bondholder Residing in the 50 States who Purchased at the Original Offering Prices, to Confirmation of Puerto Rico Sales Tax Financing Corporation ("Cofina") Plan, and Response and Opposition to COFINA's Thirteenth Omnibus Objection to Individual Claim No. 10701" (the "Hein Objection").  *See, Docket 4585*.

  3. In addition to, and without waiver or derogation of the GMS Objection, GMS hereby joins in and adopts the Hein Objection (a copy of which is attached hereto as Exhibit A) and intends to raise the points, arguments and authorities contained therein at the hearing to consider confirmation of the Plan and objections thereto.

Dated:  New York, New York

      December 31, 2018

                             **GODREAU & GONZALEZ LAW, LLC**

                             By: */s/  Rafael A. González Valiente*
                             Rafael A. González Valiente
                             P.O. Box 9024176
                             San Juan, PR 00902-4176
                             787.726.0077 (office)
                             787.360.0787 (cell)
                             rgv@g-glawpr.com

                             **PERKINS COIE LLP**

                             By:    */s/ Gary F. Eisenberg*
                               Gary F. Eisenberg
                               30 Rockefeller Plaza, 22nd Floor
                               New York, NY 10112
                               Ph. 212-262-6900
                               Email:  geisenberg@perkinscoie.com

Exhibit A

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

     Debtors.

| | |
|---|---|
| PROMESA | |
| Title III | |
| | |
| | |
| No. 17 BK 3283-LTS | |
| (Jointly Administered) | |

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION (COFINA),

     Debtor.

PROMESA
Title III

No. 17 BK 3284-LTS

-------------------------------------------------------------------x

**OBJECTION, OF INDIVIDUAL COFINA SUBORDINATE BONDHOLDER RESIDING IN
THE 50 STATES WHO PURCHASED AT THE ORIGINAL OFFERING PRICES, TO
CONFIRMATION OF PUERTO RICO SALES TAX FINANCING CORPORATION
("COFINA") PLAN, AND RESPONSE AND OPPOSITION TO COFINA'S
THIRTEENTH OMNIBUS OBJECTION TO INDIVIDUAL CLAIM NO. 10701**

December 27, 2018

# TABLE OF CONTENTS

Page

I.   **BACKGROUND ON INDIVIDUAL SUBORDINATE BONDHOLDINGS
     PURCHASED AT ORIGINAL OFFERING PRICES**..........................................................1

    A.   The COFINA subordinate bonds are secured by a lien on pledged sales tax
          revenues. ...............................................................................................................1

    B.   The COFINA subordinate bonds were highly rated, investment-grade bonds
          when sold. ..............................................................................................................2

    C.   The Official Statements and bond resolutions covenanted that there would be
          no modification of principal or interest rate without the consent of each
          bondholder. ............................................................................................................2

    D.   There was no dispute as to the validity of the lien on pledged sales tax
          revenues or the COFINA structure at the time the bonds were sold. ...........................3

    E.   Puerto Rico officials and counsel reaffirmed the validity of the lien and the
          COFINA structure for years after the bond sales...........................................................4

    F.   The Oversight Board itself has acknowledged that COFINA bonds are
          "secured by a statutory lien against pledged SUT revenue."........................................6

II.  **OBJECTIONS TO THE PROPOSED COFINA PLAN** .............................................7

    (1)  The proposed COFINA Plan is fundamentally unfair to, and discriminates
          against, individual COFINA bondholders in the 50 states, and also violates
          11 U.S.C. § 1123(a)(4) and PROMESA. ...................................................................8

        (A)  Improper and unlawful discrimination under the proposed Plan....................8

        (B)  Asserted justifications for the discrimination lack merit. ................................12

    (2)  The Court cannot confirm the Plan without first ruling upon whether the
          COFINA structure and lien are lawful, and if the COFINA structure and lien
          are lawful the COFINA bonds could and should be paid in accordance with
          their terms, which should result in full payment...........................................................13

    (3)  There is no justification for giving subordinated bondholders less
          consideration than senior bondholders in a compromise of any dispute over
          the validity of the COFINA structure and lien because even if there was a
          legitimate issue as to the validity of the COFINA structure and lien – and
          there is not – that challenge to the validity of the COFINA structure and lien
          would affect the security interests of the senior bondholders equally as the
          subordinate bondholders. ..........................................................................................16

    (4)  Provisions of the U.S. Constitution preclude confirmation or implementation
          of the proposed Plan.................................................................................................17

(A)  Abrogation of the liens and property and other rights of individual holders of COFINA subordinate bonds violates the Contract Clause. ............18

(B)  The taking of the liens and property and other rights of individual holders of COFINA subordinate bonds violates the Takings Clause. .............20

(C)  The proposed Plan violates basic principles of fairness as well as the Due Process, Equal Protection and Privileges and Immunities clauses of the U.S. Constitution. ...................................................................21

(D)  The objection and voting process that has been implemented violates basic principles of fairness and the Due Process rights of disadvantaged individual subordinate bondholders in the 50 states by unnecessarily impeding the ability of many of these individuals to object to and vote against the COFINA plan, which adversely impacts other objecting individual bondholders as well. ...............................................23

(E)  The Oversight Board was appointed in violation of the Appointments Clause and, thus, its actions, including its actions with respect to the filing of the Title III proceeding and with respect to the proposed Plan, are void..................................................................................................25

(5)  The proposed releases, injunctions against claims and exculpation provisions are objectionable. ...................................................................................25

(6)  Additional statutory bars to confirmation. ...............................................25

(A)  The proposed Plan does not comply with the provisions of Title 11 made applicable by 48 U.S.C. § 2161, as it must (48 U.S.C. § 2174(b)(1)). ........................................................................................25

(B)  The proposed Plan does not comply with the provisions of Title III, as it must (48 U.S.C. § 2174(b)(2)). ........................................................26

(C)  The Debtor is prohibited both by law and the U.S. Constitution from taking actions necessary to carry out the Plan (48 U.S.C. § 2174(b)(3)). ........................................................................................26

(D)  The Plan is not feasible and is not in the best interest of creditors, as required by 48 U.S.C. § 2174(b)(6). ....................................................26

III.  IF A REDUCTION OF COFINA DEBT IS LAWFUL, CONSTITUTIONAL AND TRULY NECESSARY, OTHER MORE REASONABLE AND EQUITABLE ALTERNATIVES ARE AVAILABLE ......................................................27

IV.  IT IS NEITHER REASONABLE NOR NECESSARY TO MODIFY THE COFINA BOND TERMS ......................................................................................28

A.  COFINA does not need a reduction or restructuring of the COFINA debt. ...............28

B.  Puerto Rico does not own the pledged sales tax revenue it seeks to take and, in any event, it would not be reasonable nor is it necessary to let Puerto Rico take property it does not own........................................................................................29

**V.     RESPONSE TO COFINA'S THIRTEENTH OMNIBUS OBJECTION**..........................**35**

      A.     Claim No. 10701 is not duplicative. ................................................................35

      B.     Request for re-scheduling of any in-person hearing on the Thirteenth Omnibus
            Objection to Claim 10701. ..............................................................................36

**VI.    CONCLUSION** ............................................................................................**36**

**OBJECTION, OF INDIVIDUAL COFINA SUBORDINATE BONDHOLDER RESIDING IN THE 50 STATES WHO PURCHASED AT THE ORIGINAL OFFERING PRICES, TO CONFIRMATION OF PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA") PLAN, AND RESPONSE AND OPPOSITION TO COFINA'S THIRTEENTH OMNIBUS OBJECTION TO INDIVIDUAL CLAIM NO. 10701**

I am an individual bondholder residing in the 50 states who purchased Puerto Rico Sales Tax Financing Corporation (a/k/a "COFINA") subordinate bonds in the original issuances of those bonds and at the original offering prices. My claim (No. 10701) was timely submitted.

I object to the confirmation of the proposed COFINA Plan on all available grounds, including but not limited to the grounds that the COFINA Plan improperly discriminates against individual bondholders in the 50 states, and is also fundamentally flawed, illegal, unconstitutional and at odds with basic principles of the rule of law and of fair dealing, as described below.

I also dispute the assertion in COFINA's Thirteenth Omnibus Objection (Docket 4417 at 59 and 70) that my claim No. 10701 is supposedly "duplicative of one or more master proofs of claim filed by the trustee of these bond(s)," for reasons set forth below, including those discussed in Section V. If an in-person hearing is required on the Omnibus Objection to my claim, I respectfully request that it be re-scheduled for the reasons explained in Section V.B below.

## I.     BACKGROUND ON INDIVIDUAL SUBORDINATE BONDHOLDINGS PURCHASED AT ORIGINAL OFFERING PRICES

I purchased COFINA subordinated bonds in 2010 and 2011 in the original offerings, at the original offering prices, based, inter alia, on the covenants and representations made by COFINA and Puerto Rico authorities in offering those securities. For me, as an individual purchaser at the time of the original offerings, this was **not** a speculative investment, as discussed below.

### A.     The COFINA subordinate bonds are secured by a lien on pledged sales tax revenues.

Both senior and subordinate bonds are secured by pledged sales tax revenues. *See, e.g.*, Series 2011A OS at 6-21, 24-33 ("Pledged Sales Tax"; "Security for the Series 2011A Bonds").

Both the senior bonds and the subordinate bonds are backed by the same legal structure. *See, e.g.*, Series 2011A OS at 6-21, 24-33 ("Pledged Sales Tax"; "Security for the Series 2011A Bonds").[1]

**B.    The COFINA subordinate bonds were highly rated, investment-grade bonds when sold.**

The COFINA subordinate bonds were offered and sold by the Puerto Rico Sales Tax Financing Corporation as investment-grade bonds with modest interest rates (*e.g.*, a coupon of 5.375% on the 2036 maturity of the series 2010C bonds). The subordinate COFINA bonds, at the time they were offered and purchased by me, were highly rated – the subordinate COFINA bonds at the time of sale were rated A+ (S&P), A1 (Moody's) and A+ (Fitch), solidly investment-grade ratings. *See* covers and "Ratings" sections of Official Statements for Series 2010C (6/24/2010) and 2011A (11/16/2011), which communicated those investment-grade ratings to prospective purchasers. Indeed, at the time of the original sales, the subordinate COFINA bonds were even higher rated than the Puerto Rico general obligation bonds.[2]

**C.    The Official Statements and bond resolutions covenanted that there would be no modification of principal or interest rate without the consent of each bondholder.**

The Official Statements and bond resolutions were explicit that no modification or amendment of the bond resolution or of the rights of the owners of bonds may permit a reduction in the principal amount (or compounded amount, it applicable) or the redemption price or the rate of interest "without the consent of each Bondholder affected thereby." *E.g.*, 2011A OS (11/16/2011) at

---

[1] The Official Statements are publicly available on the Municipal Securities Rulemaking Board's EMMA website. One can simply type in a CUSIP (*e.g.*, 74529JLH6 for the 2010C 2036 maturity, or 74529JMB8 for the 2011A-1 2041 maturity) to locate historical trade activity data and disclosure documents (such as the Official Statements). Or one can type in the name of the issuer to pull up a list of its issuances and other information. The Official Statements also appear on the "Tax Exempt Securities By Issuer – Government Development Bank for Puerto Rico" webpage; on that webpage scroll down to "Puerto Rico Sales Tax Financing Corporation (COFINA)"; after clicking on that item, scroll down to "Official Statements." The Court may (and should) take judicial notice of these and the other publicly available material referred to in this Objection.

[2] *See, e.g.*, Puerto Rico Series 2011D&E OS (6/29/2011), which reflect the ratings in 2011 for Puerto Rico GOs as BBB (S&P), A3 (Moody's), BBB+ (Fitch), which were lower rated than the COFINA subordinate bonds but still investment grade.

2

B-44; Puerto Rico Sale Tax Financing Corp., Amended and Restated Sales Tax Revenue Bond
Resolution, adopted 7/13/2007, amended 6/10/2009, Section 1002 (at page 70).[3]

> **D.   There was no dispute as to the validity of the lien on pledged sales tax
> revenues or the COFINA structure at the time the bonds were sold.**

Over $6.7 billion of senior COFINA bonds and over $9.1 billion of subordinate COFINA
bonds were issued over the course of a five-year period from 2007 to 2011. *See* Series 2011D OS
(12/1/2011) at 3 ¶ 4. During the course of that period of bond issuance, no one -- not the Puerto Rico
government, not general obligation bondholders, nor to my knowledge anyone else – challenged the
legal validity of the COFINA structure, which was materially similar to structures used by other
municipal issuers elsewhere in the country to enable a governmental authority to offer bonds with a
rating and security that was generally regarded by rating agencies and other market participants as
superior to that of an issuer's general obligation bonds. *See generally* "Commentary Puerto Rico:
Hard Case, Destabilizing Decision," Len Weisel-Varon and William Kannel, Bond Buyer,
4/19/2018, annexed as Exhibit B (pp. 11, 13-16) to claim 10701 filed 5/4/2018 (available on Prime
Clerk website by typing in claim number).

Indeed, Puerto Rico's Secretary of Justice (who acts as its AG) expressly opined on multiple
occasions, over many years, at the time each series of COFINA securities was sold, as to the legality
and constitutionality of the COFINA structure, and the fact Puerto Rico's Secretary Justice had so
opined was repeatedly referenced in the official statements issued by the Puerto Rico Sales Tax
Financing Corporation. *See, e.g.*, Series 2011A OS (11/16/2011) at 35-36.

---

[3] Section 1002 provides in pertinent part: "No such modification or amendment shall permit a
change in the terms of redemption or maturity of the principal (or Compounded Amount, if
applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the
principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the
rate of interest thereon **without the consent of each Bondowner affected thereby**, or shall reduce
the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds
or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any
such modification or amendment without the consent of all Bondowners, ...." (emphasis added).
(The bond resolution can be found on the "Tax Exempt Securities By Issuer – Government
Development Bank for Puerto Rico" webpage; scroll down to "Puerto Rico Sales Tax Financing
Corporation (COFINA)"; after clicking on that item, scroll down to "Bond Resolutions.")

The fact that the COFINA structure was legal and constitutional – as Puerto Rico repeatedly represented – also made sense because, at the time of the COFINA bond sales, the concept of dedicating and pledging particular tax revenues to pay particular bond issuances was well-recognized and accepted by municipal market issuers throughout the country, rating agencies and bond purchasers – as has been explained by Puerto Rico's own counsel, who noted that the COFINA structure was substantially the same as the Municipal Assistance Corporation for the City of New York structure that had been upheld by New York courts, and the New York State Thruway bond structure, as discussed below in Section I.E.

**E.      Puerto Rico officials and counsel reaffirmed the validity of the lien and the COFINA structure for years after the bond sales.**

Even after the 2007-2011 period in which the COFINA bond sales occurred, Puerto Rico officials continued to represent that the COFINA legal structure was legal and constitutional.  For example, on October 31, 2013, the Government Development Bank for Puerto Rico hosted an investor call to discuss the legal opinions, supporting the validity and legality of the COFINA structure, that had been delivered at the time of the bond sales by Puerto Rico Secretaries of Justice, Nixon Peabody as Bond Counsel and Pietrantoni Mendez & Alvarez LLC ("PMA") as Puerto Rico-based Underwriters' Counsel.

According to the then-interim President of the GDB Jose Pagan, speaking on that call:

> **COFINA's credit is bolstered by strong legal protections for bondholders. COFINA is the best-rated credit among Puerto Rico issuers and has historically been the most attractive and cost-effective source of financing for the Commonwealth.  U.S.-based Bond Counsel, P.R.-based Underwriters' Counsel and the Puerto Rico Secretary of Justice have provided, for each COFINA transaction (and we count 13 in total), opinions concluding that the Sales and Use Tax allocated to COFINA is not subject to "claw back" by GO bondholders under the PR Constitution.**
>
> **Importantly, the Secretary of Justice opinions enjoy broad bipartisan support, a rare thing in Puerto Rico:  four Secretaries of Justice, serving three different administrations (of alternating political parties), have issued opinions that the SUT allocated to COFINA is not subject to "claw back."**
>
>    --  Transcript of "Conference Call about COFINA Legal Opinions," October 31, 2013, available on the GDB's Investor Resources website, at 2 (emphasis added)

(type in "Puerto Rico Government Development Bank – Investor Presentations";
scroll down to "10-31-2013 Conference Call on COFINA Opinions").

According to Virginia Wong, partner at Nixon Peabody who acted as bond counsel for

COFINA Senior Sales 2011C and Senior Series 2011D bonds and who spoke on that investor call:

> The opinion … concludes that if the issues addressed by it are properly presented for judicial
> decision, a court would find that Act 91 validly transferred the Pledge Sales tax,
> including the right to receive the tax, to COFINA; the Pledge Sales tax does not constitute available
> resources for purposes of the Puerto Rico Constitutional Debt Priority Provision, and that Act
> 91 validly provides that the Pledge Sales Tax is not available for use by the Secretary of the
> Treasury. …
>
> We also reviewed COFINA's act, as amended as of the date of the 2011 opinion, in our
> analysis of the structure of COFINA's act in light of what other courts typically considered in
> deciding whether similar legislation had violated a state's constitutional appropriation
> provision. We focused on the facts identified by those courts as important, including the fact
> that **the legislation was designed specifically to comply with the well-recognized Special
> Fund Doctrine. …**
>
> **We reviewed the various opinions issued by the Secretary of Justice of Puerto Rico to
> COFINA, including the opinion relating to the 2011 C and D bonds. Those opinions
> conclude that the Pledge Sales Tax does not constitute available resources of the
> Commonwealth for purposes of the Constitution nor would they be available for use by
> the Secretary of the Treasury of the Commonwealth.**

–*Id.* at 3-4 (emphasis added).

And Manuel Pietrantoni, a partner with PMA, who acted as underwriters' counsel for the

COFINA Series 2011 C and D bonds, also spoke on that call to explain his firm's conclusion "that

the Pledge[d] Sales Tax would **not** constitute … 'available resources including surplus' for purposes

of the priority provisions of the Commonwealth general obligation bonds and notes included in

section 2 of article 6 of the Constitution or for purposes of section 8 of article 6 of the Constitution."

*Id.* at 4-5 (emphasis added).

Later in the call, another of Puerto Rico's bond counsel, John Bove of Nixon Peabody,

discussed how the COFINA structure was substantially the same as that established for the

**Municipal Assistance Corporation for the City of New York that was upheld by New York

courts** (*id.* at 6-7). And Puerto Rico bond counsel, Virginia Wong, emphasized that **"the COFINA

structure, it's really no different than you would see for any other revenue backed issuer**

around the country. You know, New York State [Thruway] has the same provisions. It's a
very common structure." (*id.* at 10, emphasis added).

And for years thereafter, the Government Development Bank for Puerto Rico in its "Investor
Resources Information" on its webpage for COFINA, has continued to emphasize that the Dedicated
Sales Tax Fund created by Puerto Rico legislation provided "security" for the COFINA bonds.
Thus, in 2015 Puerto Rico represented in pertinent part:

> The Puerto Rico Sales Tax Financing Corporation (by its Spanish acronym, COFINA) is an
> independent instrumentality of the Commonwealth of Puerto Rico, created by Act No. 91 of
> May 13, 2006, as amended, …
>
> **…. Security… Act 91 also created a Dedicated Sales Tax Fund, to be held and owned by
> COFINA separate and apart from the central government's General Fund,** and
> provided, among other things, that each fiscal year the first receipts of the Commonwealth's
> Sales Tax, in the amount specified in the law, be deposited in this special Dedicated Fund
> and applied to the payment of the Sales Tax Revenue Bonds.
>
> -- http://www.gdb-pur.com/investors_resources/cofina.html (website posting as of
> 7/24/2015) (for current webpage, type in "Government Development Bank for
> Puerto Rico – Tax-Exempt Securities by Issuer"; scroll down to "Puerto Rico
> Sales Tax Financing Corporation (COFINA)"; click and scroll down to
> "Security") (emphasis added).

Other examples of the repeated reaffirmations of the validity and legality of the COFINA
structure are collected in Case 17-03284 Docket #65 5/15/2017 at 2-6, 7-12 and the exhibits thereto,
to which the Court is respectfully referred.

> **F.      The Oversight Board itself has acknowledged that COFINA bonds are
>          "secured by a statutory lien against pledged SUT revenue."**

The Oversight Board itself acknowledged in a merits brief filed in March 2017 in the Court
of Appeals for the First Circuit that the COFINA bonds are "secured by a statutory lien against
alleged SUT revenue" and that "the COFINA enabling act makes clear that SUT income does not
constitute a resource 'available' to the Commonwealth." Specifically, this is what the Oversight
Board told the Court of Appeals:

> The Commonwealth Legislative Assembly established COFINA in 2006. The COFINA
> enabling act was designed to retire Commonwealth debt obligations payable solely from
> government budgetary appropriations. Among other things, it authorizes COFINA to
> "issu[e] bonds and utiliz[e] other financing mechanisms." 13 L.P.R.A. § 11a(b). The
> COFINA enabling act dedicated a certain percentage of the Commonwealth's SUT revenue

6

to COFINA to repay debts. 13 L.P.R.A. § 12. COFINA bonds are non-recourse bonds **secured by a statutory lien against pledged SUT revenue.** Importantly, **the COFINA enabling act makes clear that SUT income does not constitute a resource "available" to the Commonwealth.** 13 L.P.R.A. § 12. This "availability" of resources is a direct reference to Article VI, Section 8 of the Puerto Rico Constitution, … COFINA's bond offering documents accordingly disclose that SUT revenue is not an "available resource" for purposes of satisfying the public debt priority.

> – FOMB merits brief dated March 15, 2017 submitted to the First Circuit, annexed to FOMB motion to stay the Lex Claims, LLC action against then Gov. Padilla, Civil No 16-02374 (FAB), U.S. District Court for the District of Puerto Rico, Docket #211 (filed 3/15/2017), at 34-35 (pages 59 and 60 of 135) (emphasis added).

The Oversight Board also made the points that the sales tax revenue stream "was first transferred to COFINA" in 2006 (FOMB motion to stay at 2 (page 2 of 135) and that Lex Claims, LLC's belatedly asserted 2016 claim – seeking to invalidate the COFINA enabling act because it (allegedly) violates the Puerto Rico Constitution – "could have been brought years before." FOMB First Circuit brief at 33-34 (pages 58 of 135 to 59 of 135), but this claim had not been brought until 2016.

The Oversight Board and Puerto Rico should be estopped from now changing positions.

## II.    OBJECTIONS TO THE PROPOSED COFINA PLAN[4]

The proposed COFINA Plan improperly discriminates against individual bondholders in the 50 states, and is also fundamentally flawed, illegal, unconstitutional and at odds with basic precepts of the rule of law and fair dealing.

Proponents of the plan include Puerto Rico authorities (i) who are simply intent on reducing the debts Puerto Rico and its corporations and authorities incurred (without regard to the legal rights of bondholders or to the covenants and representations made by Puerto Rico authorities in the past), and (ii) who also seek to confer special benefits upon Puerto Rico residents not available under the proposed Plan to residents elsewhere in this country. Individual purchasers of the subordinated COFINA bonds residing in the 50 states – one group not represented in crafting the proposed plan –

---

[4] I reserve the right to correct, amend or supplement these objections, and to supplement the legal authorities and factual materials referenced herein. I also reserve the right to join in or address objections to the COFINA Plan filed or that may be filed by other persons.

are unfairly and unlawfully being left to bear disproportionate losses so that others can enjoy profits or disproportionate benefits.

The proposed COFINA Plan is simply not a lawful, constitutional or fair way to solve any problems that Puerto Rico now finds itself in. Among other things:

(1)     **The proposed COFINA Plan is fundamentally unfair to, and discriminates against, individual COFINA bondholders in the 50 states, and also violates 11 U.S.C. § 1123(a)(4) and PROMESA.**

11 U.S.C. § 1123(a)(4) (made applicable here by 48 U.S.C. § 2161(a) and compliance with which is required by 48 U.S.C. § 2174(b)(1)) provides:

> (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

>> (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

Informing the application to a Title III Plan of the "same treatment" provisions of Section 1123(a)(4), it is notable that even in the context of the Creditor Collective Action provisions of Title VI, PROMESA provides in 48 U.S.C. § 2231(d)(3)(E) that "[t]he Administrative Supervisor shall **not** place into separate Pools Bonds of the same Issuer that have identical rights in security or priority" (emphasis added).

Yet the proposed plan does discriminate, as discussed below.

(A)     **Improper and unlawful discrimination under the proposed Plan.**

(i)     **Added money for favored parties based on location of place of business, domicile or residence of an entity, an entity's owner or an individual.** Added and different consideration is made available to Puerto Rico individual and Puerto Rico institutional investors. *See, e.g.,* Disclosure Statement 9-10, 79 (Docket 4364 at 42 of 263 to 43 of 263; 112 of 263); $60 million is "set aside" for Puerto Rico Investors and Institutions (*id.* at xi, Docket 4364 at 17 of 263); "One Billion Dollars ($1,000,000,000)" will be "allocated to on-island investors who choose to accept taxable bonds under the Plan." *Id.* at 79 (Docket 4364 at 112 of 263).

8

A comparison of the difference between the consideration that may be elected by institutions and individuals resident in Puerto Rico versus those resident in the 50 states is also shown in Docket 4364 at pages 21 of 263 through 23 of 263: Puerto Rico investors owning subordinate COFINA bonds can elect to receive a 2% cash fee and one tranche of current interest bonds with a 2040 maturity. By contrast, non-residents of Puerto Rico get no cash fee and their distribution of securities is splintered up into four coupon maturities (going out to 2058) and seven CAB maturities (going out to 2051). Almost all of the repayment of principal to investors in the 50 states is back-loaded to 2046, 2051 and 2058.

So not only do Puerto Rico institutional and individual investors get the right to elect to receive more consideration, including cash, they also receive securities that all pay current interest, that have a shorter maturity and that are more liquid in the quantities that will be received by most individual holders in the 50 states. This discrimination in favor of Puerto Rico institutional and individual investors and against United States citizens residing in the 50 states enhances the value of the recovery to Puerto Rico investors and is unfair to subordinate bondholders in the 50 states. And what will happen in years after 2040, once "on-island" investors fully recover their principal? If the remaining bonds are largely in the hands of investors in the 50 states, the spectre of a second renege on obligations seems all too possible. Certainly it would be inappropriate for this Court to approve a Plan that sets up this incentive to "stiff the investors" in the 50 states.

This discrimination is unlawful favoritism to local Puerto Rico constituencies: By offering added and different consideration to Puerto Rico institutions and individuals (*see* Disclosure Statement at xi, xviii, 9-10, 79 (Docket 4364 at 17, 24, 42-43, 112 of 263)), the Plan has been crafted to attempt to assuage local Puerto Rico politicians and to purchase the support of Puerto Rico constituents and individuals for the Plan. Puerto Rico investors should get no more cash than investors in the 50 states, and they also should not get more desirable or more valuable shorter-term coupon securities as compared to the securities to be received by investors in the 50 states.

It is unlawful, unfair and inappropriate to give someone a preferential recovery because they reside in Puerto Rico or are a Puerto Rico institution. The fact that some "on island" investors – who

originally bought the same tax exempt COFINA securities as investors in the 50 states – may not be

subject to federal taxation may make taxable bonds with this added consideration acceptable to

them,[5] but the added and different consideration being given to them is unfair to individual investors

in the 50 states who do not share in the added consideration that is provided only to investors in

Puerto Rico. (Whatever the number of elections and thus the ultimate amount of the preference,

there will still be an improper preference to "on-island" institutions and individuals under the Plan.)

Indeed, under the proposed Plan, even a Puerto Rico institutional or individual investor who

bought in recent years at distressed prices – after challenges to the COFINA legal structure were

public – can still elect to receive added and different consideration above and beyond what is

provided to an individual investor in the 50 states who bought in the original offering at a time when

the bonds were highly rated and the COFINA structure was held out as solid and secure. Thus, the

added and different consideration for Puerto Rico investors may simply add to that favored local

investor's profit, while an individual investor in the 50 states of the same securities is faced with

massive losses under the proposed Plan.[6]

By contrast to the favoritization toward some bondholders, individual purchasers in the 50

states are being asked to take a 43.5% **loss** (*e.g.*, assume an original offering cost of $100,000 for

100,000 par, less projected recovery of $56,414 per $100,000 par). The lack of liquidity of the

splintered new bond interests, with long-dated maturities, that subordinate holders in the 50 states

---

[5] The FOMB acknowledges that many "on-island" investors are not subject to federal tax. *See* Docket 4569 pages 8-9 of 14.

[6] In addition, the way "Puerto Rico Investors" is defined (*see* Docket 4364, at 24 of 263) (i) a fund domiciled in Puerto Rico would apparently qualify as a "Puerto Rico Institution" even if the owners of interests in the fund all lived in Connecticut or Florida or any other place, and (ii) an entity based in Connecticut or Florida or any other place would qualify as a "Puerto Rico Investor" if its owners were natural persons who reside in Puerto Rico "for Puerto Rico personal income tax purposes." The possibility that some favored persons outside of Puerto Rico may nevertheless receive a preferential distribution is not just theoretical: on December 21, 2018 I received in the mail, at my New York address, from both Morgan Stanley and Merrill Lynch, Class 5 Election Notices directed to Puerto Rico Investors and Institutions. Apparently these Class 5 Election Notices are being widely mailed to bondholders at addresses outside of Puerto Rico. This is a tacit acknowledgment that people and funds without even a Puerto Rico address may qualify for the special Puerto Rico Investor or Institution treatment.

are to receive under the Plan may further reduce their recovery well below the supposed "projected" recovery. In addition, uncertainties described in the Disclosure Statement highlight that – unlike the cash going to only some favored parties – it is far from clear that the splintered new bond interests going to subordinate holders in the 50 states are worth even the nominal projected recovery amount of 56.414%. *See* Docket 4364 at 216-218 of 263, 223-231 of 263. And on top of this, the FOMB states that "there is no assurance" that the Internal Revenue Service will agree that the new COFINA bonds to be issued under the Plan will be tax-exempt. Docket 4569 at page 8 of 14 ¶ 7. So not only does the FOMB seek to unlawfully take the property of individual investors in the 50 states, the FOMB also proposes to press ahead with a restructuring even if investors in the 50 states thereby lose the tax exemption that the current COFINA securities receive. The FOMB's willingness to embark on a restructuring that could jeopardize the tax exempt status of bonds held by individual investors in the 50 states – while proposing favored treatment for Puerto Rico institutional and individual investors – underscores the unlawful discriminatory character of the proposed Plan.

(ii)     **Discriminatory distribution of cash held in trust.** Currently the bond trustee holds over $1.8 billion in cash (*see* 12/4/18 Notice to Holders from BNY Mellon as COFINA bond trustee, Annex A) (available on EMMA; type in the bond CUSIP, click on "Disclosure Document," scroll down to "Other event-based disclosures") – and SUT continues to be deposited into accounts held by the Trustee. COFINA is not insolvent, and if this Title III case had not been filed by the Oversight Board, all COFINA bonds could have been timely paid in full. The bond trustee has sufficient funds in hand, and continues to collect the funds, to pay all COFINA bondholders – senior and subordinate – the amounts they are due.

Yet instead of paying individual subordinate bondholders their proportionate share of the $1.8 billion plus cash-on-hand, it all goes to certain favored parties. There is no justification for this discriminatory distribution of cash-on-hand to some but not all bondholders, and, indeed, even to some who are not bondholders at all. For example, apparently the Plan proposes to pay, out of the cash held by the Trustee, $33 million to the Commonwealth for Commonwealth expenses, as well as $40 million for on-island holders. See Plan § 2.1(a). None of the discriminatory cash payments

11

should be made out of the cash held by the bond fund trustee.  It is no answer to say this reflects a
business judgment of FOMB.  FOMB is self-interested:  It is not acting in the interests of all
COFINA bondholders, including the individual subordinate bondholders in the 50 states.

Finally, the cash is not COFINA's money to dispose of as it wishes.  The funds held by the
bond trustee are "held in trust" for the COFINA bondholders, and under controlling Supreme Court
precedent (*e.g.*, *Begier* v. *IRS*, 496 U.S. 53, 59 (1990)), property that a debtor holds in trust for
another, and in which the debtor has no equitable interest, is not "property of the estate."  Thus, even
if COFINA were found to hold legal title to the funds held by the bond trustee, the equitable interest
belongs to the COFINA bondholders.  This point has been addressed in prior briefing in the Bank of
New York Mellon adversary proceeding, No. 17-133-LPS, *see* Docket #433, Mutual Fund Group
Motion for Summary Judgment, at 33-34 (pages 39 of 44 and 40 of 44), filed 11/6/2017; Mutual
Fund Group Reply, Docket #492, at 14-15 (pages 18 of 21 and 19 of 21), filed 1/5/2018.

**(B)** **Asserted justifications for the discrimination lack merit.**

It is no answer to say that this proposed Plan is what came out of a negotiation, mediation or
settlement process, because (among other things) (i) individual purchasers in the 50 states were not
represented in the process, (ii) there is no public record of what occurred in the mediation (indeed,
what transpired in the mediation is apparently confidential) and (iii) a mediation proceeding is by
definition not an adjudication of rights (much less rights of people not represented).  Thus, the fact
the current proposal came out of a negotiation, mediation or settlement process is entitled to no
weight or deference in evaluating objections by those who were not represented in that process.
(Others bondholders who negotiated the settlement, and the Puerto Rican authorities who negotiated
special benefits for institutions and individuals in Puerto Rico who are their constituents, have or are
seeking under the Plan to have their legal fees paid as purported administrative expense claims or as
consummation costs (Docket 4364 at 111 of 263 to 114 of 263); going forward, if there is to be any
settlement or mediation process, counsel should be appointed for the unrepresented individual

12

investors in the 50 states with their fees, too, to be paid on the same basis, but that has not to date
been done.)

It is also no answer to argue that the Plan separates holders of the same instruments into
separate classes, and thus supposedly each holder in each class is treated the same. It is
fundamentally unlawful and unfair to separate out some holders – based on residence – from others
and give them additional and different consideration. The discrimination effected by the proposed
COFINA plan not only violates 11 U.S.C. § 1123(a)(4) and PROMESA, but also violates (i) basic
principles of fairness that should govern a federal court adjudicating matters involving residents of
different locales in the United States, and (ii) the constitutional and statutory rights of individual
bondholders in the 50 states by discriminating against some individuals, in their treatment under the
Plan, based on their place of residence within the United States. *See* Section II.(4)(C) below.

In short, the law does not sanction the unfair treatment proposed here: The artifice of
dividing holders of bonds that currently have the same rights into separate "classes" in order to
discriminate between holders of the same securities, or giving some favored creditors the ability to
dictate – by voting, opting for preferred treatment not applicable to all bondholders or otherwise –
that they shall enjoy a greater recovery than other similarly situated holders of the same securities.[7]

**(2)     The Court cannot confirm the Plan without first ruling upon whether the
COFINA structure and lien are lawful, and if the COFINA structure and lien
are lawful the COFINA bonds could and should be paid in accordance with
their terms, which should result in full payment.**

What is the response of Puerto Rico's representatives to the fact that for over seven years,
when COFINA was selling $15 billion plus in bonds and collecting the money, Puerto Rico
authorities and attorneys repeatedly attested to the legal validity of the COFINA structure
established by Puerto Rico legislation and pointed out that the Puerto Rico legislation was "designed
specifically to comply with the well-recognized Special Fund Doctrine" (*see* Section I.D and I.E

---

[7] Even if PROMESA did permit the discrimination against individual bondholders in the 50 states
that the Plan proposes, the U.S. Constitution would prohibit such discrimination, as discussed in
Section II.(4), below.

above)?  Is it the position of Puerto Rico representatives that for years (when bonds were being sold and money was being collected) that everyone in Puerto Rico's government and the multiple counsel involved were "mistaken"?  And is it the position of the Puerto Rico representatives that, despite having made (and repeatedly reiterated) this supposed "mistake," now Puerto Rico should just keep much of the money its authorities received from individual investors in the 50 states?  In any society governed by the rule of law, this question should answer itself:  clearly, No, Puerto Rico should not and may not just keep the money invested by individual investors in the 50 states.

Moreover, underscoring the inappropriateness of the Commonwealth-COFINA "compromise" that underlies the proposed Plan – far disproportionally at the expense of individual subordinate bondholders in the 50 states – is the fact that the proposed new bonds to be issued to replace the old bonds essentially mimic the same COFINA structure.  Compare, *e.g.*, Series 2011A OS at 6-21, 24-33 with Disclosure Statement at "xx," 142-143 (Docket 4364 at 26, 175-176 of 263).

Indeed, the Oversight Board – which in 2017 itself told the First Circuit that the COFINA bonds were "secured by a statutory lien" (*see* Section I.F above) – used the same terminology – "secured by a statutory lien" – in its description in the COFINA 10/18/2018 fiscal plan of "the new COFINA Bonds" (*see* COFINA 10/18/2018 fiscal plan at 10 ¶ 2, Docket 4364-4 at 11 of 141).

Thus, there is no principled objection by Puerto Rico authorities to a COFINA-type structure. The present-day Puerto Rico authorities cannot seriously believe that a COFINA-type structure is illegitimate or illegal or violative of the Puerto Rico Constitution.  If they did, they would not propose to issue new bonds following essentially the same structure.

The Court under 48 U.S.C. § 2174(b)(6) must make a determination that

> (6)  the plan is feasible and in the best interests of creditors, which **shall require** the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan; … (emphasis added).

In addition, 48 U.S.C. § 2141(b)(1)(N) (requiring that a Fiscal Plan "shall" "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30,

14

2016") and § 2174(b)(7) (requiring that a Plan be "consistent with the applicable Fiscal Plan certified by the Oversight Board under subchapter II"), read together, effectively require that no Plan may be confirmed unless it respects "lawful liens." Other provisions of PROMESA also recognize the importance of protecting creditor liens. *See* 48 U.S.C. § 2195(a), which imposes liability on a transferee of a transfer "in violation of applicable law"; §§ 2194(k) and 2194(m)(5)(B).

Furthermore, to avoid a violation of the Fifth Amendment's Takings Clause, the Court may not construe PROMESA to eliminate property rights that existed before its enactment. *See United States* v. *Security Industrial Bank*, 459 U.S. 70, 81 (1982) ("No bankruptcy law shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress").[8]

In light of, inter alia, (i) Puerto Rico authorities, including the Secretary of Justice, repeatedly opining as to the legality and constitutionality of the COFINA structure at the time the bonds were sold, (ii) the proposed perpetuation of the substance of the COFINA structure under the Plan, (iii) the impact on municipal issuers and investors throughout the country who have employed similar structures were the COFINA structure invalidated, and (iv) the constraints imposed by the U.S. Constitution on an issuer's ability to sell $15 billion in debt attesting to its validity and then turn around to disavow that debt – it is hard to believe the courts would ultimately (after any appeals were taken) declare the COFINA structure invalid.

In any event, 48 U.S.C. § 2174(b)(6) – "shall require" – does not permit confirmation of a plan until that issue is decided.

It is no answer to say that litigating the validity of the COFINA structure and lien may now take some time. This Title III proceeding was filed in May 2017. Had the issue of validity been decided reasonably soon after that filing, the issue could have potentially been decided by now by

---

[8] The more specific direction of 48 U.S.C. § 2141(b)(1)(N) and § 2174(b)(7), as well as §§ 2194(k) and 2194(m)(5)(B) and § 2195(a), control on the matter here at issue over the more general language of § 2101.

the Puerto Rico Supreme Court or in the First Circuit, and be poised for U.S. Supreme Court review
(if certiorari were to be sought and granted).

Even if Puerto Rico's desire to get the COFINA money might be argued to be a reason to
expedite the determination of the issue of validity, Puerto Rico's desire to get the COFINA money is
not a justification for taking the property of bondholders who have a statutory lien that no court has
ruled to be invalid (much less in a final order as to which no further appeal can be taken).

It is also no answer to say that the validity of the COFINA structure and statutory lien is
disputed. The "New Bond Legislation" (Disclosure Statement Ex. F) and proposed Plan seek to
abrogate the rights of, and take the property of, bondholders who do not agree with a proposed
"compromise" in which many of the parties who negotiated the "compromise" profit but individual
bondholders in the 50 states suffer large losses. The proponents of the Plan have no right to foist a
settlement on bondholders who have a right under the Bond Resolution to their principal and interest
without reduction, and a statutory lien that no court has ruled to be invalid.

**(3)     There is no justification for giving subordinated bondholders less consideration
than senior bondholders in a compromise of any dispute over the validity of the
COFINA structure and lien because even if there was a legitimate issue as to the
validity of the COFINA structure and lien – and there is not – that challenge to
the validity of the COFINA structure and lien would affect the security interests
of the senior bondholders equally as the subordinate bondholders.**

While the senior bondholders may have a first right of payment if there are insufficient
revenues to COFINA from the sales tax, the fact is the SUT revenues are and continue to be more
than sufficient to cover the full debt service on both senior and subordinate COFINA bonds alike –
as, inter alia, the 12/4/18 Notice to Holders from BNY Mellon shows.

So if there is an issue over the validity of the COFINA structure and lien to be compromised,
it is an issue that affects senior and subordinate bondholders equally. Thus, as part of any
compromise of that issue, the consideration to subordinate bondholders should be increased to equal
the full amount of the consideration to senior bondholders, including the additional 2% of par cash
that some – but not all – bondholders (including some but not all subordinate bondholders) currently
receive out of the cash held by the bond trustee in trust for all bondholders.

(4)     **Provisions of the U.S. Constitution preclude confirmation or implementation of the proposed Plan.**

The Official Statements and bond resolution were explicit that no bondholder may have the principal amount or coupon rate of its bonds adjusted without its consent.  Specifically, the Official Statements provided that no modification or amendment of the bond resolution or of the rights of the owners of bonds may permit a reduction in the principal amount (or compounded amount, if applicable) or the redemption price or the rate of interest "without the consent of each Bondholder affected thereby."  *E.g.*, 2011A OS (11/16/2011) at B-44.  As discussed above, the Bond Resolutions were to the same effect.

However, the proposed COFINA plan violates these provisions of the Official Statements and bond resolutions and also abrogates and takes the liens and property and other rights of bondholders.

Under the Official Statements and bond resolutions and the law in existence at the time of the sale of the bonds to investors in the original offering – and at all times thereafter, at least prior to the enactment of PROMESA – there would be no question that other bondholders could not "vote" to abrogate the rights of individual purchasers of the subordinated bonds.  Much less what happened here.  The court must determine whether PROMESA – notwithstanding, inter alia, section 48 U.S.C. § 2141(b)(1)(N), which provides that "a Fiscal Plan … shall … (N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements … in effect prior to June 30, 2016" – allows this.  Unless the court so finds, there is no legal basis to abrogate the rights of individual purchasers in the original offering.

If PROMESA is interpreted as sanctioning what occurred here whereby it is proposed to modify the principal amounts or interest rates of bondholders (including those who purchased in the original offerings) who do not consent, and Puerto Rico seeks to abrogate the liens and property and other rights of bondholders in the 50 states who were not participants in the negotiations, the result would be violations of the Contracts Clause, Takings Clause, Due Process Clause and other provisions of the U.S. Constitution.  Furthermore, even if one hypothesized that PROMESA

permitted this, and that the Constitution did not prohibit this, this Court should not approve such a

grossly unfair and inequitable plan.

### (A) Abrogation of the liens and property and other rights of individual holders of COFINA subordinate bonds violates the Contract Clause.

The Contracts Clause of Article I of the U.S. Constitution provides that "[n]o State shall…

pass any… Law impairing the Obligation of Contracts[.]" U.S. Const. art. I, § 10, cl. 1. The

Contracts Clause prohibits states or the Commonwealth of Puerto Rico from enacting laws or

exercising powers that would permit borrowers (including the states or the Commonwealth) to

abrogate their debts at the expense of creditors.[9]

The Plan contemplates and is being implemented through actions of the Puerto Rico

legislature. *E.g.*, Docket 4364 at 140-141 and 140 & n.35 of 263 (referring to New Bond

Legislation), 163 of 263 and 175 of 263). The "New Bond Legislation" is Ex. F to the Disclosure

Statement (Docket 4364-6). The "New Bond Legislation" annexed to the Disclosure Statement is

express that it constitutes a law that impairs contractual obligations. Thus, the New Bond

Legislation itself – in its "Statement of Motives" – states that "[t]hese amendments will serve to

release the lien that holders of COFINA bonds currently have over approximately $17.5 billion of

previously pledged SUT revenues. These revenues will now be available for use by the Government

of Puerto Rico . . ." and that "this legislation will allow for the restructuring of the COFINA debt."

Docket 4364-6 at 3 of 27 to 4 of 27.

In addition, while the foregoing is dispositive, it is also notable that the Oversight Board

asserts it is "an entity within the territorial government" of Puerto Rico (Docket 4364 at 78 of 263),

---

[9] 48 U.S.C. § 737 provides that "The rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States." Notably, decisions by both the First Circuit (*e.g.*, *United Automobile, Aerospace, Agricultural Implement Workers* v. *Fortuño*, 633 F.3d 37, 41 n.3 (1st Cir. 2011)) and this Court (*e.g.*, *Ambac Assurance Corp.* v. *Commonwealth of Puerto Rico*, docket #156 in Adv. Proc. No. 17-159-LTS at 25-26 ("when a plaintiff brings suit against the State or the Commonwealth for impairing a contract that … ")) correctly assume that the Contract Clause prohibition applies to the Commonwealth of Puerto Rico.

and it is a proponent of the Plan and its determinations are conditions precedent to consummation of
the Plan (*e.g.*, Docket 4364 at 137 of 263). The fiscal plans – which are a condition precedent to the
confirmation and effectiveness of the Plan and are certified by the Oversight Board, *e.g.*, *id.* at 137
of 263, 139 of 263 – have the force of law and also constitute a "law" for purposes of the Contract
Clause. Among other things, the fiscal plans dictate to the Puerto Rico legislature what types of
budgets (48 U.S.C. § 2142) and other legislation (48 U.S.C. § 2144) the legislature may pass.

*United States Trust Co.* v. *New Jersey*, 431 U.S. 1 (1977) is instructive. The Supreme Court
ruled that the repeal of a statutory covenant that protected bondholders violated the Commerce
Clause. The Court stated that the state's "self-interest" militated against "complete deference to a
legislative assessment of reasonableness and necessity" (*id.* at 26), aptly observing that:

> A governmental entity can always find a use for extra money, especially when taxes
> do not have to be raised. If a State could reduce its financial obligations whenever it
> wanted to spend the money for what it regarded as an important public purpose, the
> Contract Clause would provide no protection at all. (*Id.*)

Here too, the Commonwealth is the self-interested beneficiary of the impairment of the
bondholders' contracts. The supposed "compromise," negotiated by, inter alia, representatives of
Puerto Rico entities (the Commonwealth and COFINA) would transfer property interests that
secured the COFINA bonds to the Commonwealth and would abrogate the property and contract
rights of subordinate bondholders (which, as noted above, include the covenant that principal and
interest may not be modified "without the consent of each Bondholder affected thereby") in order to
– as the Puerto Rico's legislature's "Statement of Motives" puts it – "allow for the restructuring of
the COFINA debt." *E.g.*, Docket 4364-6 at page 4 of 27.

The Supreme Court has been clear that a modification of a state's own financial obligations
may be constitutional only if it is both "reasonable and necessary to serve an important public
purpose." 431 U.S. at 25. The facts here – as discussed in Section IV below, and that would be
developed more fully in the course of any necessary discovery and evidentiary hearing – make plain

that the abridgement of subordinate bondholders' property and contract rights that the Plan would

effect is not reasonable and necessary.[10]

### (B) The taking of the liens and property and other rights of individual holders of COFINA subordinate bonds violates the Takings Clause.

The Takings Clause of the U.S. Constitution precludes taking private property for public use

without just compensation (Amt. V: "nor shall private property be taken for public use, without just

compensation"). Even apart from the Contract Clause prohibition and even if hypothetically the

proposed abrogation of bondholders' liens and property and other rights could be found to be

reasonable and necessary, the proposed Plan and the abrogation of subordinated bondholder liens

and property and other rights provided for in the Plan would constitute an impermissible taking.

The Supreme Court ruled in *United States* v. *Security Industrial Bank*, 459 U.S. 70, 75

(1982) that

> The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation. *Louisville Joint Stock Land Bank* v. *Radford, supra.* Thus, however "rational" the exercise of the bankruptcy power may be, that inquiry is quite separate from the question whether the enactment takes property within the prohibition of the Fifth Amendment.

Notably, the "New Bond Legislation" attached to the Disclosure Statement (Ex. F thereto)

concedes that property of COFINA bondholders is being taken:

---

[10] It is respectfully submitted that under *United States Trust Co.* v. *New Jersey*, 437 U.S. 1 (1977), Puerto Rico – which is self-interested in seeking money that does not even belong to it – bears the burden of demonstrating that the abrogation of the liens and property and other rights of COFINA subordinate bondholders proposed here is both reasonable and necessary. First Circuit case law does not compel a contrary result. Thus, two judges concurring in *United Automobile, Aerospace, Agricultural Implement Workers of America* v. *Fortuño*, 633 F.3d 37 (1st Cir. 2011), stated that in their view whether a plaintiff asserting a Commerce Clause violation bore the burden of proof was "unsettled" and "emphasize[d] that the outcome of *this* case need not turn on definitive resolution of the burden issue." *Id.* at 48-49 (Boudin & Howard, JJ., concurring) (emphasis in original); *see also id.* at 49 ("[T]he outcome of this case would be the same even if, contrary to the panel decision, the government bore the burden of proof on the justification issue."). And – as the opinion of Judge Boudin and Chief Judge Howard in *Fortuño* further observed, *id.* at 48 – the Supreme Court has suggested that the burden of establishing reasonableness and necessity lies with the government. *See United States Co.* v. *New Jersey*, 431 U.S. 1, 31 (1977) ("In the instant case the State has failed to demonstrate that repeal of the 1962 covenant was similarly necessary.").

20

... These amendments will serve to release the lien that holders of COFINA bonds currently have over approximately $17.5 billion of previously pledged SUT revenues. These revenues will now be available for use by the Government ... approximately $437.5 million per year ... will now be available to the Government ...

    -- Docket 4364-6 at 3 of 27.

This concession that property is being taken by legislation is by itself dispositive.

The fact that here Puerto Rico is proposing to take property "for itself" (*see* 459 U.S. at 77-78) only yet further underscores that the Takings Clause is violated. To say that a government can justify a taking by pointing to its asserted desire or need for money ("[t]hese revenues will now be available for use by the Government," Docket 4364 at 3 of 27) would leave the Takings Clause a dead letter. As the Supreme Court observed in the Contracts Clause context, "[a] government entity can always find a use for extra money, especially when taxes do not have to be raised" (*United States Trust Co.*, 431 U.S. at 26). And, a fortiori here, where Puerto Rico has just acted to lower taxes by $2 billion. *See* Section IV.B, Item (5), below.

    **(C)**     **The proposed Plan violates basic principles of fairness as well as the Due Process, Equal Protection and Privileges and Immunities clauses of the U.S. Constitution.**

The proposed Plan – which discriminates in favor of some persons (as discussed above) and against other persons (individual bondholders in the 50 states who were not represented in the process by which the proposed Plan was developed) – is fundamentally unfair and violates the constitutional rights of the disadvantaged persons.

I am a citizen of the United States. 48 U.S.C. § 737 expressly provides that "[t]he rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States."

Article IV, Section 2, clause 1, provides that "[t]he citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." Amendment V provides, in pertinent part, that "No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." Amendment XIV,

Section 1, provides in pertinent part that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

To begin with, despite the Bond Resolution and the Official Statements pursuant to which the bonds were sold being express that no modification of the rights of owners of bonds could effect a reduction in the principal amount or the rate of interest "without the consent of each Bondholder affected thereby" (*e.g.*, 2011A OS (11/16/2011) at B-44), Puerto Rico is now seeking to force through a plan to the detriment of those who bought in the original offerings when the securities were rated and sold as solidly investment-grade investments. Even if hypothetically the Contract and Takings Clauses did not preclude overriding each bondholder's right that its principal and interest rate not be modified without his or her consent, votes or elections by those who receive additional or different consideration than other bondholders are fundamentally conflicted, and Due Process as well as basic fairness precludes allowing such conflicted parties to, by their votes or elections, influence whether to impose a Plan on bondholders who are discriminated against under the Plan.

The fact that the Plan provides for discrimination against United States citizens who are individual bondholders in the 50 states based on place of residence constitutes a violation of the express language of Art. IV, Section 2, Clause 1, Amt. V and Amt. XIV, Section 1, quoted above, as well as a violation of principles of basic fairness.

Finally, as a matter of basic fairness as well as Due Process, one cannot accord any weight or deference to a proposed Plan that was negotiated through a secret mediation process in which the one group of bondholders that is disadvantaged – individual purchasers who reside in the 50 states – were not represented. At the very least, the Court should facilitate the designation of representatives from the individual bondholder community in the 50 states and make provision for them to have their counsel compensated (as the Court has done for other groups in the Title III cases). It ill-behooves Puerto Rico representatives and all of their multiple sets of counsel, all of whom are

22

seeking compensation for their legal fees and expenses, to say that they should have their legal fees
and other costs paid in this proceeding, but individual purchasers of the subordinate COFINA bonds
residing in the 50 states should not have the assistance of counsel who has an equal entitlement to
payment of its fees and be given a meaningful opportunity to participate in the negotiation and
structuring of any proposed settlement or plan.

**(D)** **The objection and voting process that has been implemented
violates basic principles of fairness and the Due Process rights
of disadvantaged individual subordinate bondholders in the
50 states by unnecessarily impeding the ability of many of
these individuals to object to and vote against the COFINA
plan, which adversely impacts other objecting individual
bondholders as well.**

Many individual bondholders who are confronted with a Notice of Hearing on Confirmation
of the Plan and procedures for objection to confirmation that purport to require service of objections
on a multitude of law firms or parties (*see* p. 5 ¶ 8 of printed notice), are going to be impeded in
efforts to object, or deterred from objecting altogether, by the practical burdens imposed on potential
individual objectors who do not have counsel, so any absence of, or imperfections in the filing or
service of, objections by individual bondholders can hardly be viewed as an endorsement of the
Plan. A much simpler objection process could have been offered, such as specifying that investors
could submit their objections by email to a designated email address at Prime Clerk, which could
then post the objections on the Court docket and thereby effect the electronic distribution to all
parties and others who use the Prime Clerk services. An individual bondholder should not have to
hire an attorney in Puerto Rico (or elsewhere) who has electronic filing privileges in the Puerto Rico
Bankruptcy Court in order to efficiently lodge their objection. At the very least, this Court should
not enforce the rigid procedures for objections set forth in the Notice.

Also, by the time the flash drive with the Disclosure Statement and other documents was
received by individuals in the 50 states, very little time remained for individuals to object. I received
a packet with a flash drive containing the proposed Plan, Disclosure Statement and other documents

from my brokers (Morgan Stanley and Merrill Lynch) on Monday, December 17, 2018.[11] That short

notice leaves seven business days – during the Christmas and New Year's holiday season – for an

individual bondholder to wade through voluminous materials (which they would have to review on

the flash drive or physically print out), to consider whether to consult with an attorney, and to

prepare and then serve objections. This very short time window for objections scheduled to coincide

with the Christmas – New Year's holiday season only further compounds the unfairness of the Plan

proponents pushing a discriminatory plan that disadvantages the individual bondholders in the

50 states, and underscores why rigid procedures for objections should not be enforced against

individual bondholders.

Even if particular individual bondholders in the 50 states could themselves manage to (more

or less) review the massive amount of material on the flash drive sent to bondholders, and submit

timely objections and ballots (or provide ballot instructions to their brokers), these individual holders

are still prejudiced. The number and amount of votes required for acceptance or rejection of the Plan

is computed on the basis of claims "actually voting to accept or reject" and "[t]here are no quorum

requirements." Docket 4364 at 56 of 263. So if most individual bondholders in the 50 states are just

overwhelmed by the volume of material on the flash drive and the extremely short time frame over

the holiday period which they have to object and vote, and thus do nothing, the Plan proponents

benefit since they will surely get their ballots in even if many individuals do not. In short, the

process followed unfairly benefits the Plan proponents and any vote is not going to fully reflect the

interests of individual bondholders in the 50 states.[12]

---

[11] I also received from Prime Clerk the Notice of Hearing on Confirmation – but without any copy
of the Plan or Disclosure Statement – on December 12, 2018, and I received from Prime Clerk the
Thirteenth Omnibus objection to my Claim, on December 17, 2018.

[12] The FOMB tacitly recognizes the problem with deadlines in the holiday period, yet sought by
motion to adjust only the deadline for elections (to benefit Puerto Rico investors) "due to the Puerto
Rico holiday season" (¶ 5), not the date for objections to confirmation (¶ 9). *See* Docket 4569 filed
12/26/18.

(E)    **The Oversight Board was appointed in violation of the
Appointments Clause and, thus, its actions, including its
actions with respect to the filing of the Title III proceeding and
with respect to the proposed Plan, are void.**

The Appointments Clause issue has previously been addressed in this Court and is before the

First Circuit Court of Appeals. *See* Disclosure Statement at 59-60, 62 (Docket 4364 at 92 of 263 to

93 of 263 and 95 of 263). The Court is respectfully referred to the prior briefing as to the

Appointments Clause violation. The Oversight Board's actions in relation to filing this Title III

case, the COFINA fiscal plans and the proposed Plan are void (*see Lucia* v. *SEC*, __ U.S. __ (2018),

slip op. at 12-13), and PROMESA is unconstitutional. For this reason alone, the Plan should be

rejected and the Title III case should be dismissed.

(5)    **The proposed releases, injunctions against claims and exculpation provisions are
objectionable.**

The proposed releases, injunctions against claims and exculpation provisions are objected to

as overly broad and also for other reasons, including for the reasons set forth elsewhere herein.

Without limiting this objection, (i) the proposed releases, injunctions against claims and exculpation

provisions cannot properly mandate the release or relinquishment of my rights and claims under the

Constitution over my objection (including my claims under the Constitution against the debtor),

(ii) any release of non-debtor parties is improper, and (iii) any release of the debtor is improper here,

particularly until all monies the debtor obtained from me are repaid, including accrued but not paid

interest.

(6)    **Additional statutory bars to confirmation.**

(A)    **The proposed Plan does not comply with the provisions of
Title 11 made applicable by 48 U.S.C. § 2161, as it must
(48 U.S.C. § 2174(b)(1)).**

The Plan does not comply with applicable provisions of 11 U.S.C. § 1129

including:

(i)    Noncompliance with 11 U.S.C. § 1129(a)(3):  Under the circumstances

described in these objections, it is apparent that the Plan has not been

25

proposed in good faith and the means by which the Plan has been put forward, the Plan itself and any implementation of the Plan, would also violate the U.S. Constitution, as described elsewhere in these Objections.

(ii)    Noncompliance with 11 U.S.C. § 1129(a)(8) and § 1129(b)(1): Among other things, the Plan discriminates unfairly (as described, inter alia, in Section II.(1) above; the Plan is not fair and equitable (for, inter alia, all the reasons described elsewhere in these Objections); and § 1129(b)(2)(A) – a provision to protect secured creditors made specifically applicable here under 48 U.S.C. § 2161(a) – is not complied with. Furthermore, even if Class 5 did vote to accept the Plan, for reasons described, inter alia, in Sections II.(4).D and E above, such acceptance would not be valid.

**(B)**    **The proposed Plan does not comply with the provisions of Title III, as it must (48 U.S.C. § 2174(b)(2)).**

These failures are described elsewhere in these Objections.

**(C)**    **The Debtor is prohibited both by law and the U.S. Constitution from taking actions necessary to carry out the Plan (48 U.S.C. § 2174(b)(3)).**

These prohibitions are described elsewhere in these Objections.

**(D)**    **The Plan is not feasible and is not in the best interest of creditors, as required by 48 U.S.C. § 2174(b)(6).**

The reasons the Plan is not feasible and not in the best interest of Creditors are described elsewhere in this Objection. Among other things, available remedies under the non-bankruptcy laws and constitution of Puerto Rico – as well as the U.S. Constitution – would result in a greater recovery – indeed, a complete recovery – for all COFINA bondholders. Had the validity of what the Oversight Board itself has described (*see* Section I.F above) as "a statutory lien against pledged SUT revenue"

26

and the COFINA structure been referred to the Puerto Rico Supreme Court, the lien would have been upheld by that Court or (if necessary) the U.S. Supreme Court.  Had this Court ruled on the validity of the statutory lien against pledged SUT revenue and the COFINA structure, the lien would have been upheld by this Court or (if necessary) the Court of Appeals for the First Circuit or (if necessary) the U.S. Supreme Court.  To date, no Court has ruled that what the Oversight Board itself described as "a statutory lien against pledged SUT revenues" or the COFINA structure is invalid (much less has there been a final judicial ruling as to which no appeal can be taken to that effect).  The uniform opinion of multiple Puerto Rico Secretaries of Justice, serving three different administrations (of alternating political parties), has been that the lien and COFINA structure are valid.  *See* Section I.E. above.

## III.   IF A REDUCTION OF COFINA DEBT IS LAWFUL, CONSTITUTIONAL AND TRULY NECESSARY, OTHER MORE REASONABLE AND EQUITABLE ALTERNATIVES ARE AVAILABLE

If one assumes, arguendo, that there is some necessity to reduce the amount of the COFINA debt, there are other alternatives that would be far more equitable so that individual investors who bought at the original offering price receive their money back, plus the accreted and unpaid accrued interest that is due to them, at the original coupon rates, until they are paid back.  Alternatively, the individual subordinate bondholders who bought at the original offering prices should at least receive the same amount as is currently provided for the senior bondholders, including the additional 2% of par cash, since the legality of the lien and validity of the COFINA structure issues being compromised affect all bondholders – senior and subordinate alike.

There are multiple ways to make available the funds to allow equal consideration to be paid to subordinate bondholders who bought at the original offering prices.  For example, (i) the duration of the proposed new bonds to be issued could be extended so that payments of the bonds are not cut off at some arbitrary future point (as is currently proposed), but rather could continue until

bondholders recover their original principal plus accreted and accrued but unpaid interest, and ongoing interest at the original coupon rates, and/or (ii) the portion of SUT revenues dedicated to pay new COFINA bonds could be increased over what the Plan proposes (*i.e.*, reduce the amount of the property belonging to COFINA bondholders that gets transferred to the Commonwealth) so that individual subordinate bondholders who bought at the original offering prices recover at least their original principal plus accreted and accrued but unpaid interest, and ongoing interest at the original coupon rates or, alternatively, at least consideration equal to that proposed to be distributed to the senior bondholders, including the additional 2% par of cash. Individual subordinate bondholders who were not part of the mediation and negotiation process never agreed to the transfer to the Commonwealth of their property that is proposed under the Plan and thus cannot be "bound" by the results of that mediation or negotiation process.

## IV. IT IS NEITHER REASONABLE NOR NECESSARY TO MODIFY THE COFINA BOND TERMS

### A. COFINA does not need a reduction or restructuring of the COFINA debt.

There is no legitimate necessity to reduce the COFINA debt in any event. While Puerto Rico authorities and the Oversight Board might want to reduce the COFINA debt, the existing sales tax revenues pledged to COFINA more than cover COFINA indebtedness. Typically the COFINA bond debt service is covered in approximately six months, such that the coverage is effectively two to one. COFINA is not itself insolvent and there is no legitimate reason or justification for pursuing the Title III process with respect to COFINA, even apart from the constitutional objections to what is occurring here. As discussed above in Section II.(2), unless and until there is a final judicial determination that the COFINA lien is not lawful, it must be respected. Thus, COFINA has no need to reduce or restructure its debt, and it would be manifestly unreasonable, unlawful and unconstitutional to impose such an unnecessary reduction or restructuring on COFINA bondholders.

28

I realize Puerto Rico and the Oversight Board have commissioned a number of (expensive) projections and analyses. These are, of course, dependent upon the assumptions made. Expensive consultants can skew analyses to produce a desired result.

But, notably, there do not appear to be any analyses discussed in the voluminous Disclosure Statement materials that even claim that – if the existing statutory lien on pledged sales tax revenues is honored – COFINA will be unable to pay its full existing debt service when due. Compare, *e.g.*, Disclosure Statement 131-133 (page 164 of 263 to 166 of 263). The COFINA fiscal plan attached to the Disclosure Statement also does **not** indicate that the pledged SUT revenues are inadequate to service the existing COFINA debt. Rather, the COFINA fiscal plan shows that the New Bond Legislation and the proposed Plan will take away pledged SUT revenues that otherwise (if not taken away) would be adequate to service COFINA debt. *See, e.g.*, 4364-4 at 27 of 141 and 29 of 141. The proposed Plan plainly is not in the "best interests" of, and not "fair and equitable" to, subordinate bondholders in the 50 states. What would be in the best interests of bondholders is to dismiss this Title III case and have debt service payments resume.

In any event, I object to any impairment or taking of my contract rights or property, including any impairment or taking based on projections of future revenues and expenses made by a hired consultant (or anyone else). If the Title III case is dismissed and debt service payments resume, one will find out in future years whether there is an issue as to the adequacy of the pledged SUT revenues based on what actually happens, as opposed to what some hired consultant projects. There is no justification for abrogating my contract rights or property based on projections about the future.

### B. Puerto Rico does not own the pledged sales tax revenue it seeks to take and, in any event, it would not be reasonable nor is it necessary to let Puerto Rico take property it does not own.

Absent a final judgment no longer subject to judicial review that Puerto Rico owns the pledged sales tax revenues, Puerto Rico's asserted need for "extra money" (as the Supreme Court put it in *United States Trust*) is legally irrelevant. Furthermore, even if Puerto Rico's asserted need for "extra money" could lawfully be considered, Puerto Rico cannot demonstrate that it would be both

29

reasonable and necessary to abrogate the bondholders' property interests and contract rights. Much is already in the record in these proceedings.[13] But by way of example only:

  **(1)**  One cannot look at the Puerto Rico debt per capita or debt service as a percent of government revenues and compare it to the debt represented by only the **state** debt obligations of taxpayers in the 50 states. The apples-to-apples comparison would be between (i) Puerto Rico debt per capita and debt service as a percentage of all Puerto Rico government revenues, as compared to (ii) combined state, local and federal debt per capita, and debt service as a percentage of each state's state and local revenues **and** proportional share of federal revenues.

  Puerto Rico itself made this point in its presentations to investors. Thus, for example, in the Commonwealth of Puerto Rico investor webcast on October 15, 2013 (Docket 3126-26 (filed 5/23/2018) at page 2 of 74 and page 58 of 74),[14] Puerto Rico was explicit that "any comparison of the public debt levels of Puerto Rico with the states should include state, local and federal debt" and that "If one factors in the federal debt load, PR would rank **last** in outstanding debt per capita among all US jurisdictions" (emphasis added), citing to US Bureau of the Census and the Government Development Bank for Puerto Rico as the source of the data.

  Indeed, according to Puerto Rico's own presentation to investors, per capita state and local debt in Puerto Rico of $15,956 was dramatically **lower** than the combined state, local and federal debt per capita of any of the 50 states. For example, Puerto Rico's per capita debt was only 28% the national average, and less than 30% (29.6%) of per capita debt even of a state like Mississippi with relatively low income levels for states in the 50 states. Stated differently, the national average of per capita state, local and federal debt was 3.57 times greater than per capita debt in Puerto Rico, and Mississippi's per capita state, local and federal debt was 3.37 times greater than per capita debt in Puerto Rico. *See* docket 3126-26 at 58 of 74 (or page 57 of the copy of the Presentation available on the internet).

---

[13] *See, e.g.*, Docket 3126, at 58 of 101 to 78 of 101 (filed 5/23/18) and the exhibits thereto.

[14] Also available by going to "Government Development Bank of Puerto Rico – Investor Presentations," scroll down to 10-15-2013, click on Presentations, go to page 57.

(2)     Any notion that Puerto Rican taxpayers bear some unreasonable tax burden as
compared to other jurisdictions is also not correct.  Most Puerto Rico taxpayers do not pay United
States federal taxes.  Any analysis of taxation levels must be done on an apples-to-apples basis.
When one compares the overall tax burden of Puerto Rico taxpayers to the combined state, local and
federal tax burdens on taxpayers in the 50 states, there are many states in which the combined state,
local and federal tax burden far exceeds that paid by Puerto Rico taxpayers.  For example, most
Puerto Rico residents are exempt from United States federal income tax (26 U.S.C. § 933) and the
top marginal individual rate in Puerto Rico is 33% (*see* PWC, "Puerto Rico – Individual Taxes on
Income"), but the top combined federal and state rate (including surcharges) in New York City is at
least 53.5% (37% federal + 12.7% NYS and NYC + 3.8% add-on net investment income tax), and
the top combined federal and state rate (including surcharges) in California is even higher.

In addition, KPMG (Puerto Rico's auditor, *see* Docket 4364-5 Ex. E page 5 of 42) has
reported that Puerto Rico's revenue from taxes as a percent of GDP was far lower than the OECD
country average (10.66% of GDP in Puerto Rico, versus an OECD country average of 33.19%
GDP).  While KPMG's report used 2011 data, presumably the most current then available, KPMG's
analysis highlights that Puerto Rico has considerable capacity to increase taxes if necessary to fund
any truly "essential" expenditures.  *See* Commonwealth of Puerto Rico Tax Reform Assessment
Project, Executive Summary Oct. 31, 2014, at 6 and 7 (tables 1 and 2) (available on the internet; type
in "KPMG Commonwealth of Puerto Rico Tax Reform Assessment Project").

Not only does Puerto Rico have significant additional debt capacity as compared to both the
50 states and OECD countries, but, in addition, Puerto Rico has a significant informal economy that
is not currently subject to effective taxation.  As Puerto Rico Commonwealth plans have noted,
"[a]bout one quarter of Puerto Rican workers participate in the informal economy …., a portion
substantially higher than any mainland state."  Docket 3126, page 63 of 101 and Ex. 1 at 35;
Docket 3126-1, page 43 of 145 (4/19/2018 Commonwealth fiscal plan).  Effective taxation on these
activities would increase Puerto Rico's tax revenue.

(3)     There may be legitimate needs and desires of residents of Puerto Rico that need to be addressed, whether it be police, education, medical care, or the like.  Puerto Rico officials and the Oversight Board could reallocate expenditures from some less essential purposes to cover what is truly essential.  Numerous current expenditures – ranging from hundreds of PR and consulting contracts costing hundreds of millions of dollars,[15] to hundreds of millions of dollars of Christmas bonuses,[16] to payments to Government employees who do not report to work[17] – are not truly "essential" by any standard.  These are just some examples.  The fact that Puerto Rico is spending money this way underscores that there is no need to abrogate the COFINA lien and take money that does not belong to Puerto Rico.

(4)     On top of all the government spending, one also has literally hundreds of millions of dollars of professional fees incurred in the Title III proceedings.  According to the Fee Examiner, through September 30, 2018 fees and expenses requested through the Title III review process total "more than $295 million" (docket #4370 at 3-4).  And that is not all:  There are also the expenses of

---

[15] For example, "since the start of fiscal year 2018, the government signed more than 400 contracts for media and public relations services, totaling over $400 million" (Eva Llorens Velez, Caribbean Business, 8/13/2018, "Puerto Rico CFO to review contract salaries, focus on local resources").

[16] Puerto Rico's governor announced on November 15, 2018 (in a press release posted on the AAFAF "other documents" section of its website) that Puerto Rico would again pay Christmas bonuses in 2018, reportedly in the amount of at least $85 million (Caribbean Business 12/5/2018, "Puerto Rico Gov. says he didn't defy fiscal board by paying a Christmas bonus").  With Christmas bonuses previously paid in 2017, 2016 and 2015 (after Puerto Rico first announced it was seeking to avoid payment of debt service), aggregate Christmas bonuses paid since Puerto Rico has sought to avoid payment of its debt would appear to be in the area of $400 million.  It is no answer for Puerto Rico to claim that these Christmas bonuses are statutorily required by Puerto Rico law, because of course payments to bondholders that are statutorily and constitutionally required to be paid have not been made.

[17] See, e.g., FAFAA Report as of June 30, 2018, prepared by Office of the Administration and Transformation of Human Resources, at 3, showing that even after the Christmas and New Year's holidays were over, "employees on holidays" (as distinct from "employees on vacation leave") ranged as high as 25.67% (at the end of March 2018), "employees on other leaves" ranged as high as 30.77% (week of January 7-13, 2018) and "employees for which attendance has not been confirmed" ranged as high as 26.79% (in the late January-early February 2018 time frame). aafaf.pr.gov/assets/oatrh-informes-asistencia-june-30-2018.pdf.  By comparison, the absence rate of employees in the 50 states for reasons other than illness or injury is in the area of approximately 1%. (See Labor force statistics from the current population survey, Bureau of Labor Statistics, www.bls.gov/cps/cpsaat47.htm, Household data annual averages ... 47.  Absences from work of employed full-time wage and salary workers by occupation and industry.)

32

the Oversight Board (budgeted at approximately $65 million per year for the current year, *see* FOMB – November 2018 monthly report (12/17/2018) (available on the FOMB website)). And the Commonwealth no doubt is incurring its own tens of millions of expenditures – even beyond professional fees reviewed by the Fee Examiner – related to the Title III process. If any need for "essential" expenditures really exists and is so compelling, why is this level of ongoing expense tolerated?

(5)     And, if the need is so compelling, then why did Puerto Rico recently lower taxes by $2 billion? *E.g.*, *Reuters*, "Puerto Rico Governor signs bill for $2 billion on tax relief," 12/10/18 (on Internet). Had Puerto Rico not taken advantage of the filing of Title III petitions and the suspension of debt service obligations to enact politically popular tax reductions, additional funds would be available for any still unmet and truly essential expenditures.

(6)     If controlling spending and refraining from the introduction of new tax cuts (even while failing to pay legally and constitutionally required debt service) is not enough, and if Puerto Rico authorities believe they still need more resources, Puerto Rico could change its policies to create a more hospitable business climate. The 2019 World Bank "Doing Business" report (available on the internet) ranks Puerto Rico (U.S.) (treated for this purpose by the World Bank as an "economy" separate from the rest of the U.S.) as #64 in the world. This is below Albania (#63), and far below Rwanda (#29). The U.S. itself is ranked #8. A more hospitable business climate could do much to increase Puerto Rico's resources available to provide services to its people. *See* "Doing Business 2019 – World Bank Group" (available on the internet), page 5.

(7)     The lack of reasonableness and necessity for taking COFINA bondholder property is underscored when one looks at Puerto Rico's current cash-on-hand. Puerto Rico and its instrumentalities recently reported bank account balances of $12.1 **b**illion – "billion" with a "**b**" – as of 10/31/2018, reported on 11/30/2018. (Go to "aafaf.pr.gov"; click on tab for "Publications & Reports"; click on "Summary of Bank Account Balances"; scroll down to "Summary of Account Balances"; click on "November 30, 2018 Summary" at 4 ("Executive Summary" page).) Puerto Rico's Department of Treasury reported a Treasury Single Account balance as of 12/7/2018 of $3.6

33

billion. (Go to "aafaf.pr.gov"; click on "Publications & Reports"; click on "December 18, 2018 –

Treasury Single Account … As of December 7, 2018," p. 6.)

Because Puerto Rico has used the Title III filings to unilaterally suspend debt payments,

Puerto Rico has not had the need to focus on what is essential versus what is simply politically

popular. Allowing pledged sales tax revenues to be diverted to the Commonwealth will only

compound the problems already caused by allowing Puerto Rico to continue to suspend debt

payments.

PROMESA should not be read to endorse what has occurred here – use, of what was

intended by Congress to be a "temporary" stay, by the Oversight Board and Puerto Rico as a sword

(not a shield) in their attempts to deprive bondholders of their property and other rights. Notably, 48

U.S.C. § 2194, in pertinent part, states as follows:

> **(k) Effect…**
>
> This section does **not** discharge an obligation of the Government of Puerto
> Rico or release, invalidate, or impair any security interest or lien securing such
> obligation. …
>
> **(m) Findings** Congress finds the following: …
>
> **(5)** Additionally, an immediate – **but temporary** – stay is essential to stabilize
> the region for the purposes of resolving this territorial crisis …
>
> **(B)** The stay is limited in nature and narrowly tailored to achieve the purposes
> of this chapter, including to ensure all creditors have a fair opportunity to
> consensually renegotiate terms of repayment based on accurate financial
> information that is reviewed by an independent authority, **or, at a minimum,
> receive a recovery from the Government of Puerto Rico equal to their
> best possible outcome absent the provisions of this chapter**.
>
> -- Emphasis added.

**(8)** Furthermore, the U.S. Congress could fund, or loan the money to cover, truly

essential expenditures if necessary (and could also set up a means of dealing with shortfalls in

pension funding, as Congress has done for others in the past); and Congress could also repeal

legislation like the Jones Act that increases shipping costs (and thus the cost of many goods

consumed on the island of Puerto Rico). However, to allow the continued suspension of legally –

and constitutionally – required debt service, to say nothing of allowing COFINA pledged sales tax revenues to be diverted to the Commonwealth, only creates the false impression among some that Puerto Rico's problems can be foist upon bondholders – including bondholders who bought in the original bond offerings pre-PROMESA – thereby reducing the incentive to take responsible steps to assist Puerto Rico.

* * *

There is much that Puerto Rico and U.S. officials can do to address any genuine needs that exist. But what the Puerto Rico officials – as well as the U.S. Congress and other government officials – cannot properly do, consistent with the Constitution, is decide that they will take money from bondholders who have a lawful lien on the funds and use that money to fund expenditures that are politically popular and deemed attractive by voters or that benefit favored consultants and others.[18]

## V.   RESPONSE TO COFINA'S THIRTEENTH OMNIBUS OBJECTION

### A.   Claim No. 10701 is not duplicative.

I dispute the assertion COFINA's Thirteenth Omnibus objection (Docket 4417 at 59 and 70) that my claim No. 10701 is supposedly "duplicative of one or more master proofs of claim filed by the trustee of these bond(s)." This is a conclusory assertion (to which I object) and is also not accurate. To my knowledge, the Trustee has not (at least of this date) submitted and asserted all of the claims made by me in claim No. 10701, which included all rights and claims under applicable law, including but not limited to the United States Constitution and the Puerto Rico Constitution, relating to the failure of the issuer, as well as the Puerto Rican and United States administrative, legislative, executive and judicial authorities to adhere to, and enforce the rule of law, including but not limited to all rights and claims to the return of monies paid by me as well as other rights and claims asserted in claim No. 10701. Furthermore, to my knowledge the Trustee has not (at least of this date) asserted all of the claims, responses, and objections to confirmation, on behalf of

---

[18] I reserve all rights, including all rights and claims against the United States.

purchasers in the original offerings COFINA subordinated securities, including me, that are described in Sections I through IV above. The material in Sections I through IV above is incorporated into my response to COFINA's Thirteenth Omnibus Objection.

**B.**     **Request for re-scheduling of any in-person hearing on the Thirteenth Omnibus Objection to Claim 10701.**

I note that the Thirteenth Omnibus Objection states that a hearing is scheduled for March 13, 2019. I am committed to a trip out of the country with my son on March 4 to March 18, 2019 for which we have made travel arrangements, and I may not have workable access to my email or to the internet during portions of this trip. I respectfully request that any in-person hearing on the Omnibus Objection to my claim No. 10701 – if an in-person hearing is necessary – be scheduled for a date on or before March 1, 2019 or after March 19, 2019 and that I be permitted to participate from the New York courtroom (or otherwise participate remotely). I have served my response to the Omnibus Objection in this document (in advance of the February 1, 2019 deadline for responses) in an effort to allow a hearing on my claim to occur either on or prior to March 1, 2019 or after March 19, 2019.

## VI.     **CONCLUSION**

The Court should (1) decline to confirm the proposed Plan, and (2) deny COFINA's Thirteenth Omnibus Objection to individual claim No. 10701.

As noted in Section V, since I will be out of the country traveling with my son in the March 4, 2019 to March 18, 2019 time frame, I request that any hearing on the Omnibus Objection to my claim be re-scheduled to be held on or before March 1, 2019 or after March 19, 2019.

December 27, 2018

Respectfully Submitted,

Peter C. Hein, Pro Se
101 Central Park West, Apt. 14E
New York, NY 10023
petercheinsr@gmail.com

36

## CERTIFICATE OF SERVICE

I have caused to be mailed a copy of this Objection, Of Individual Bond Holder Residing In The 50 States Who Purchased At The Original Offering Prices, To Confirmation of Puerto Rico Sales Tax Financing Corporation ("COFINA") Plan, and Response And Opposition To COFINA's Thirteenth Omnibus Objection To Individual Claim No. 10701, by first class mail to each of the parties or their attorneys on the attached service list.

Dated:  December 27, 2018

Peter C. Hein

Office of the United States Trustee for the District of
    Puerto Rico
Edificio Ochoa
500 Tanca Street, Suite 301
San Juan, Puerto Rico 00901
(re: In re: Commonwealth of Puerto Rico)

O'Neill & Borges LLC
250 Mutioz Rivera Ave.
Suite 800
San Juan, Puerto Rico 00918-1813
Attn: Hermann D. Bauer, Esq.

Marini Pietrantoni Muniz, LLC
MCS Plaza
255 Ponce de Leon Ave., Suite 500
San Juan, Puerto Rico 00901
Attn: Luis C. Marini-Biaggi, Esq.

Casillas, Santiago & Torres LLC
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901
Attn: Juan J. Casillas Ayala, Esq., and Alberto J.E. Arieses
    Negron Esq.

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
Attn: Catherine Steege, Esq., and Melissa Root, Esq.

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005
Attn: Dennis Dunne, Esq., and Atara Miller, Esq.

Proskauer Rose LLP
11 Times Square
New York, NY 10036
Attn: Martin J. Bienenstock, Esq., Brian Rosen, Esq.,
    Paul V. Possinger, Esq. Ehud Barak, Esq. and
    Maja Zeral, Esq.

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attn: John J. Rapisardi, Esq., Suzzanne Uhland, Esq.,
    and Diana M. Perez, Esq.

Paul Hastings LLP
200 Park Ave.
New York, NY 10166
Attn: Luc A. Despins, Esq., James Bliss, Esq., Andrew V.
    Tenzer, Esq., Michael E. Comerford, Esq., James
    Worthington, Esq. and G. Alexander Bongartz, Esq.

Jenner & Block LLP
919 Third Ave.
New York, NY 10022
Attn: Robert Gordon, Esq., and Richard Levin Esq.

Bennazar, Garcia & Milian, C.S.P.
Edificio Union Plaza
416 Ave. Ponce de Leon, PH-A
Hato Rey, Puerto Rico 00918
Attn: A.J. Bennazar-Zequeira, Esq.

Cadwalader, Wickersham & Taft
200 Liberty Street
New York, NY 10281
Attn: Mark Ellenberg Esq., Lary Stromfeld, Esq.,
    Ivan Loncar, Esq., and Casey Servais, Esq.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn: Marcia L. Goldstein, Esq., and Gabriel Morgan, Esq.

Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
New York, NY 10010
Attn: Susheel Kirpalani, Esq., and Eric Kay, Esq.

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn: Thomas Moers Mayer, Esq., Amy Caton, Esq., and
     Douglas Buckley, Esq.

McDermott, Will & Emery LLP
444 West Lake Street
Chicago, IL 60606
Attn: William P. Smith, Esq., David L. Taub, Esq., and
     Alexandra C. Scheibe, Esq.

White & Case LLP
200 South Biscayne Boulevard
Miami, FL 33131
Attn: John K. Cunningham, Esq., and
     Fernando de la Hoz, Esq.

Davis, Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Donald Bernstein, Esq., and Brian Resnick, Esq.

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019
Attn: Lawrence A. Larose, Esq., and Eric Daucher, Esq.

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn: Ira S. Dizengoff, Esq., and Philip C. Dublin, Esq.

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attn: Sandy Qusba, Esq., and Nicholas Baker, Esq.

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attn: Daniel A. Fliman, Esq.

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn: Andrew N. Rosenberg, Esq.

TO REUSE: Cover or mark through any previous shipping info

Align top of FedEx Express® shipping label here

PEEL HERE

PSIShip - FedEx Label

Origin ID: QNYA

FedEx
Express

BILL SENDER

From: (212) 403-1000
Peter C. Hein
Wachtell, Lipton, Rosen & Katz
51 w 52 street
28th Floor
New York, NY 10019
UNITED STATES

SHIP TO: (212) 403-1237

Clerk's Office
United States District Court
Room 150 Federal Building

San Juan, PR 00918
US

Ship Date: 27DEC18
ActWgt: 2.20 LB
CAD: 103938229/WSXI02750

REF: 70000.0221-0221
DESC-1: Letter and enclosures to Court
DESC-2:
DESC-3:
DESC-4:
EEI: NO EEI 30.37(a)
COUNTRY MFG: US
CARRIAGE VALUE:
CUSTOMS VALUE: 0.00 USD
T/C: S 010060648        D/T: S 010060648
SIGN: Peter C. Hein
PKG/VAT:
PKG/PAK

TRK# 7846 7830 6377
0430

XQ SIGA

FRI - 28 DE
INTL PRIOR

These commodities, technology, or software were exported from the United States in accordance with the export administration regulations. Diversion contrary to United States law is prohibited.

The Warsaw Convention may apply and will govern and in most cases limit the liability of Federal Express for loss or delay of or damage to your shipment. Subject to the conditions of the contract.

CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH
CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH

Express