# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.,<br><br>                Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## PLAN SUPPLEMENT AND PLAN RELATED
## DOCUMENTS OF PUERTO RICO SALES TAX FINANCING CORPORATION

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## Table of Contents[2]

| | |
|---|---|
| Exhibit A: | Master Trust Indenture (relates to issuance of COFINA Bonds) |
| Exhibit B: | First Supplemental Trust Indenture (relates to Master Trust Indenture) |
| Exhibit C: | Second Supplemental Trust Indenture (relates to Master Trust Indenture) |
| Exhibit D: | Form of Amended and Restated Bylaws of the Puerto Rico Sales Tax Financing Corporation |
| Exhibit E: | Instruction Agreement Regarding the Deposit of Certain Sales and Use Tax Revenues of the Puerto Rico Sales Tax Financing Corporation |
| Exhibit F: | COFINA Class 2 Trust (relates to Senior COFINA Bonds Claims (Ambac)) |
| Exhibit G: | Trust Agreement (relates to Senior COFINA Bonds Claims (National)) |
| Exhibit H: | Standard Terms to Trust Agreement (relates to Senior COFINA Bonds Claims (National)) |
| Exhibit I: | Schedule of Executory Contracts to be Assumed |
| Exhibit J: | Dealer Manager Agreement[3] |
| Exhibit K: | Fee Letter[4] |
| Exhibit L: | Proposed Members of the Board of Directors of Reorganized COFINA |

---

[2] The rights of all parties in interest, including, but not limited to, the Oversight Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority, COFINA, the other parties to the Amended & Restated Plan Support Agreement, and the Bank of New York Mellon (in its capacity as trustee and paying agent in connection with the Existing Securities and as proposed trustee and paying agent in connection with the COFINA Bonds), with respect to the form of documents contained in the Plan Supplement, are expressly preserved and the exercise or waiver of any consent rights are expressly preserved.

[3] The Dealer Manager Agreement is attached hereto for notice purposes only and is not incorporated into the Plan Supplement for consideration by the Court in connection with confirmation of the Plan.

[4] The Fee Letter is attached hereto for notice purposes only and is not incorporated into the Plan Supplement for consideration by the Court in connection with confirmation of the Plan.

## Exhibit A

**Master Trust Indenture**

DRAFT 12/31/18

<div style="text-align: center;">

**MASTER TRUST INDENTURE**[*]

**by and between**

**PUERTO RICO SALES TAX FINANCING CORPORATION**

**SUBJECT TO REVISION PENDING FINAL APPROVAL OF THE PLAN OF ADJUSTMENT**
**and**

**_____, as Trustee**

_____

*Dated as of _____, _____*
_____

</div>

---

[*] **SUBJECT TO REVISION PENDING FINAL APPROVAL OF THE PLAN OF ADJUSTMENT**

4848-8372-2614.22

Table of Contents (continued)

Page

ARTICLE I. DEFINITIONS AND INTERPRETATION ................................................3

    Section 1.01   Definitions ...........................................................................3
    Section 1.02   Rules of Construction ........................................................15

ARTICLE II. AUTHORIZATION AND ISSUANCE OF BONDS ...........................16

    Section 2.01   Authorization of Bonds.......................................................16
    Section 2.02   Provisions for Issuance of Bonds .......................................16
    Section 2.03   Supplemental Indentures....................................................18
    Section 2.04   Additional Indebtedness ....................................................19

ARTICLE III. GENERAL TERMS AND PROVISIONS OF BONDS ....................20

    Section 3.01   Place and Medium of Payment..........................................20
    Section 3.02   Legends..............................................................................21
    Section 3.03   CUSIP Numbers ................................................................21
    Section 3.04   Execution and Authentication ...........................................21
    Section 3.05   Interchangeability of Bonds...............................................21
    Section 3.06   Transfer and Registry.........................................................22
    Section 3.07   Transfer of Bonds..............................................................22
    Section 3.08   Regulations with Respect to Exchanges and Transfers ............22
    Section 3.09   Bonds Mutilated, Destroyed, Lost or Stolen .....................23
    Section 3.10   Book Entry Bonds .............................................................23
    Section 3.11   Preparation of Definitive Bonds; Temporary Bonds .................24

ARTICLE IV. REDEMPTION OF BONDS ...........................................................25

    Section 4.01   Authorization of Redemption .............................................25
    Section 4.02   Redemption at the Election of the Corporation...................25
    Section 4.03   Redemption Other Than at Corporation's Election ....................25
    Section 4.05   Notice of Redemption .......................................................26
    Section 4.06   Payment of Redeemed Bonds............................................27

ARTICLE V. STATUTORY LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS;
PLEDGED SALES TAX REVENUES AND APPLICATION THEREOF ................................28

    Section 5.01   Statutory Lien on Trust Estate ...........................................28
    Section 5.02   Establishment of Funds and Accounts ...............................28
    Section 5.03   Application of Bond Proceeds.............................................29
    Section 5.04   Application of Money in the Costs of Issuance Fund...............29
    Section 5.05   Deposit of COFINA Receipts in the COFINA Revenue Fund .................29
    Section 5.06   Application of COFINA Receipts .......................................31
    Section 5.07   Debt Service Fund .............................................................31
    Section 5.08   Arbitrage Rebate Fund ......................................................32
    Section 5.09   Debt Retirement Fund .......................................................33
    Section 5.10   Remainder Fund ................................................................33
    Section 5.11   Application of Money in Certain Funds for Retirement of Bonds.............33
    Section 5.12   Transfer of Investments .....................................................33

ARTICLE VI. SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS......................34

i

Table of Contents (continued)

Page

Section 6.01   Security for Deposits...................................................34
Section 6.02   Investment of Funds and Accounts Held by the Trustee............................34
Section 6.03   Liability for Investments..............................................35

ARTICLE VII. PARTICULAR COVENANTS...................................................35

Section 7.01   Payment of Principal and Interest ..................................................35
Section 7.02   Extension of Payment of Bonds ..................................................35
Section 7.03   Powers as to Bonds ..................................................36
Section 7.04   Further Assurance ..................................................36
Section 7.05   Accounts and Audits ..................................................36
Section 7.06   Creation of Liens ..................................................36
Section 7.07   Restricted Payments ..................................................36
Section 7.08   Offices for Payment and Registration of Bonds.....................................37
Section 7.09   Budget of Corporation Expenses ..................................................37
Section 7.10   Payment of Lawful Charges ..................................................37
Section 7.11   General ..................................................37
Section 7.12   Tax Exemption Covenant ..................................................37
Section 7.13   Rating On Substituted Collateral ..................................................37
Section 7.14   Covenants of the Commonwealth ..................................................38

ARTICLE VIII. CONCERNING THE TRUSTEE AND THE PAYING AGENT...................39

Section 8.01   Appointment and Acceptance of Trustee..........................................39
Section 8.02   Appointment and Acceptance of Paying Agents...................................39
Section 8.03   Responsibilities of Trustee and Paying Agents ..................................40
Section 8.04   Property Held in Trust ..................................................40
Section 8.05   Evidence on Which Fiduciaries May Act ..................................................40
Section 8.06   Compensation ..................................................42
Section 8.07   Permitted Acts ..................................................42
Section 8.08   Resignation of Trustee ..................................................43
Section 8.09   Removal of Trustee ..................................................43
Section 8.10   Successor Trustee and/or Paying Agent ..................................................43
Section 8.11   Transfer of Rights and Property to Successor Trustee.............................44
Section 8.12   Merger or Consolidation of the Trustee..........................................44

ARTICLE IX. SUPPLEMENTAL INDENTURES ..................................................45

Section 9.01   Modification and Amendment without Consent ....................................45
Section 9.02   Supplemental Indentures Effective with Consent of Bondholders ...........46
Section 9.03   General Provisions Relating to Supplemental Indentures ........................46

ARTICLE X. AMENDMENTS OF INDENTURE ..................................................47

Section 10.01        Powers of Amendment ..................................................47
Section 10.02        Consent of Bondholders ..................................................48
Section 10.03        Modifications by Unanimous Consent ..................................................48
Section 10.04        Mailing ..................................................48
Section 10.05        Exclusion of Bonds..................................................48
Section 10.06        Notation on Bonds ..................................................49

ii

Table of Contents (continued)

Page

ARTICLE XI. DEFAULTS AND REMEDIES ........................................................49

Section 11.01    Events of Default .................................................49
Section 11.02    No Acceleration with Respect to the Bonds ...............50
Section 11.03    [Enforcement of Remedies; Limitations ...................50
Section 11.04    Priority of Payments after Default .........................52
Section 11.05    Termination of Proceedings ................................53
Section 11.06    Bondholders' Direction of Proceedings ....................53
Section 11.07    Control by Holders of Bonds; Limitations .................53
Section 11.08    Actions by Trustee; Possession of Bonds by Trustee Not Required 54
Section 11.09    Waiver and Non–Waiver of Default .......................54
Section 11.10    Notice of Event of Default ................................54

ARTICLE XII. DEFEASANCE .............................................................54

Section 12.01    Defeasance .................................................54

ARTICLE XIII. EXECUTION OF INSTRUMENTS BY BOND HOLDERS  AND PROOF
OF OWNERSHIP OF BONDS ..............................................................57

Section 13.01    Evidence of Signatures of Bondholders and Ownership of Bonds 57

ARTICLE XIV. MISCELLANEOUS ........................................................57

Section 14.01    Preservation and Inspection of Documents ................57
Section 14.02    Money and Funds Held for Particular Bonds ..............57
Section 14.03    Cancellation of Bonds ....................................58
Section 14.04    No Recourse under Indenture or on the Bonds .............58
Section 14.05    Severability of Invalid Provision ........................58
Section 14.06    Parties of Interest .......................................58
Section 14.07    Certain Provisions Relating to Capital Appreciation Bonds. .........58
Section 14.08    Notices ...................................................59
Section 14.09    Headings ..................................................59
Section 14.10    Governing Laws ............................................59
Section 14.11    Signatures and Counterparts ..............................59
Section 14.12    Successors and Assigns ....................................59
Section 14.13    Conflicts. ................................................59

EXHIBIT A - CONFIRMATION ORDER

4848-8372-2614.22

# MASTER TRUST INDENTURE

**THIS MASTER TRUST INDENTURE,** dated as of _____, by and between **PUERTO RICO SALES TAX FINANCING CORPORATION**, a public corporation and instrumentality of the Commonwealth of Puerto Rico, constituting a corporate and political entity independent and separate from the Commonwealth of Puerto Rico (together with any successors thereto, the **"Corporation"**), and _____, as trustee (the **"Trustee"**).

The Corporation recites and represents to the Trustee for the benefit of the Bondholders that it has authorized this Indenture.

## R E C I T A L S

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. ("**PROMESA**"); pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017 and May 5, 2017, respectively, the Financial Oversight and Management Board (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to section 101(b) of PROMESA, filed petitions for relief for the Commonwealth of Puerto Rico and the Corporation pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing debt adjustment cases under title III of PROMESA (the "**Title III Cases**").

Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth of Puerto Rico and the Corporation, wherever located.

By entry of the order attached hereto as Exhibit A (the "**Confirmation Order**"), the Title III Court confirmed the Corporation's Plan of Adjustment (as defined below), the material components of which were the quieting of title to certain sales and use tax revenues pursuant to the final settlement between the Corporation and the Commonwealth of Puerto Rico (the "**Settlement**") and the restructuring of all claims against the Corporation and the Commonwealth of Puerto Rico relating to pre-existing indebtedness of the Corporation through, among other things, the issuance of Bonds (as defined below) pursuant to this Indenture.

On October 19, 2018, the Corporation and the Commonwealth of Puerto Rico entered into an agreement embodying the Settlement (the "**Settlement Agreement**"); contemporaneously with entry of the Confirmation Order, the Title III Court entered an order approving the Settlement in the Title III Case of the Commonwealth of Puerto Rico.

On November 15, 2018, in furtherance of the Settlement, the Commonwealth (as defined below) enacted Act 241-2018, amending Act 91-2006 (collectively, as so amended by Act 241-2018, the "**Act**"), which originally created the Corporation.

1

Pursuant to PROMESA, the Title III Court made the determinations set forth below in the Confirmation Order. [*DETERMINATIONS SET FORTH IN THE CONFIRMATION ORDER TO BE INSERTED VERBATIM*]

All things have been done which are necessary to make the Bonds, when executed by the Corporation and authenticated and delivered by the Trustee hereunder, the valid obligations of the Corporation, and to constitute this Indenture a valid trust indenture for the security of the Bonds, in accordance with the terms of this Indenture.

## NOW, THEREFORE, THIS INDENTURE WITNESSETH:

It is hereby covenanted and declared that all the Bonds are to be authenticated and delivered and the property subject to this Indenture is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Corporation does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit of all Bonds as follows:

This Indenture provides for the following transactions:

(a)      Issuance by the Corporation of its obligations to settle certain claims made by the Corporation's creditors, including claims relating to indebtedness previously issued by the Corporation under its Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended and restated on June 19, 2009, and to refund, refinance or defease any obligations issued hereunder which obligations, in accordance with the Act, are secured by a statutory first lien on the following (the "**Statutory Lien**"):

(i)      All right, title and interest of the Corporation in and to the Pledged Sales Taxes, including, without limitation, any moneys, income, revenues, accounts, contract rights or general intangibles derived therefrom; and

(ii)      Except for the Remainder Fund, the Operating Reserve Fund and the Arbitrage Rebate Fund, all of the Corporation's right, title and interest in money, securities and other assets on deposit with the Trustee in the funds and accounts created pursuant to this Indenture and any Supplemental Indenture

(collectively, the "**Trust Estate**");

(b)      Application of proceeds of such obligations, if any; and

(c)      The rights and remedies of the holders from time to time of the Corporation's obligations.

**IN TRUST NEVERTHELESS**, upon the terms and trusts herein set forth, the Trust Estate shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Bonds issued and to be issued hereunder, without preference, priority or distinction as to participation in the Statutory Lien, and the benefit and protection thereof of one Bond over or from

2

the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Bonds shall have the same right, lien and privilege under the Statutory Lien and this Indenture and shall be equally secured hereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST NEVERTHELESS,** that these presents are upon the express condition that if the Corporation or its successors or assigns shall well and truly pay or cause to be paid the Principal of such Bonds with interest, according to the provisions set forth in the Bonds, respectively and each of them or shall provide for the payment of Bonds by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 12.01 of this Indenture, when and as authorized by the provisions of Section 12.01 of this Indenture and shall also pay or cause to be paid all other sums payable hereunder by the Corporation, then these presents and the estate and rights granted hereby and by the Act shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Corporation and upon the payment of the cost and expenses thereof, shall duly execute, acknowledge and deliver to the Corporation such instruments of satisfaction or release as may be specified by the Corporation as necessary or proper to discharge this Indenture, including, if appropriate, any required discharge of record, and, subject to the provisions of the Act and the Plan of Adjustment, if necessary shall grant, reassign and deliver to the Corporation, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned by the Act, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Indenture shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Bonds are to be issued, authenticated and delivered, and that the Trust Estate and any other property or amounts subject to the Statutory Lien and pledged to the payment of the Bonds are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Corporation, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions.**   As used in this Indenture the following terms have the following meanings, unless a different meaning clearly appears from the context:

**"Accreted Value"** means, with respect to the Capital Appreciation Bonds, as of the date of calculation, the principal amount at initial issuance thereof, plus interest thereon to such date of calculation, capitalized semiannually on each Valuation Date at the accretion rate stated within the applicable Supplemental Indenture to maturity or prior redemption, assuming that between Valuation Dates such Accreted Value increases in equal daily amounts on the basis of a 360-day year of twelve 30-day months; ***provided, however***, that Accreted Value shall be, as of the time of the Corporation actually makes a Sinking Fund Installment payment or other payment required or permitted to be made on such Capital Appreciation Bond, reduced by the amount, if any, that such

3

payment exceeds accrued interest on such Capital Appreciation Bond from the prior Valuation Date.

"**Act**" has the meaning given to such term in the Recitals.

"**Additional Bonds Test**" has the meaning given to such term in Section 2.04 hereof.

"**Ancillary Agreements**" means the Indenture, the Confirmation Order, the Settlement Agreement, the Instructions Agreement, the Plan of Adjustment and any other agreement or instrument entered into by the Corporation or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan of Adjustment.

"**Arbitrage Rebate Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Authorized Officer**" means (a) in the case of the Corporation, the Executive Director, and when used with reference to any act or document also means any other person authorized by a resolution or the Corporation By-Laws to perform such act or execute such document, (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee within the corporate trust office specified in Section 14.08 (or any successor corporate trust office) customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred at the corporate trust office specified in Section 14.08 because of such person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture, and when used with reference to any act or document also means any other person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by–laws of the Trustee and (c) in the case of the Oversight Board, the Executive Director and any person authorized by a resolution of the Oversight Board or the Oversight Board's by-laws to act as an authorized officer of the Oversight Board for purposes of this Indenture.

"**Bankruptcy Laws**" has the meaning given to such term in Section 11.01(d).

"**Bond**" means any bond of the Corporation authorized and issued pursuant to Section 2.01 hereof and the applicable Supplemental Indenture.

"**Bondholder**", "**Holder of Bonds**" or "**Holder**" or any similar term, when used with reference to a Bond or Bonds, means the registered owner thereof; ***provided, however***, that for purposes of this Indenture, in the case of any Insured Bonds, the applicable Bond Insurer shall be treated as (i) the sole Holder of the Insured Bonds insured by such Bond Insurer for the purpose of consenting to any modification or amendment, exercising any voting right or privilege, giving any consent or direction, or taking any action that the Holders of such Insured Bonds are entitled to take pursuant to the provisions of this Indenture pertaining to defaults and remedies and the duties and obligations of the Trustee, and (ii) an additional Holder of the Insured Bonds insured by such Bond Insurer for purposes of receiving any notices or exercising any rights to inspect documents provided for under this Indenture.

4

"**Bond Insurance Policy**" means a municipal bond insurance policy, if any, issued by a Bond Insurer that guarantees payment of Principal of and interest on Insured Bonds.

"**Bond Insurer**" means the provider of a Bond Insurance Policy, if any, specified in a Supplemental Indenture.

"**Book Entry Bond**" means a Bond issued to and registered in the name of a Depository for the participants in such Depository.

"**Business Day**" means any day other than (a) a Saturday or a Sunday or a legal holiday or (b) a day on which banking institutions in San Juan, Puerto Rico or New York, New York, are required or authorized by law, regulation or executive order to be closed.

"**Capital Appreciation Bond**" means any Bond as to which interest is capitalized on each Valuation Date therefor and is stated to be payable only at the maturity or prior redemption thereof.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the applicable regulations thereunder.

"**COFINA Receipts**" means the proceeds of the COFINA Revenues received by the Trustee pursuant to the Act and the Instructions Agreement.

"**COFINA Revenue Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**COFINA Revenues**" means the Pledged Sales Taxes payable to the Corporation in accordance with Article 4.1 of the Act (*First Dollars Funding of COFINA Revenues*), in each Fiscal Year in the following amounts (which amounts are equal to fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed Income for each Fiscal Year):

| Fiscal Year | COFINA Revenues | Fiscal Year | COFINA Revenues |
|---|---|---|---|
| 2019 | $420,185,325 | 2039 | $920,677,791 |
| 2020 | 436,992,738 | 2040 | 957,504,902 |
| 2021 | 454,472,448 | 2041 | 992,525,000 |
| 2022 | 472,651,346 | 2042 | 992,525,000 |
| 2023 | 491,557,399 | 2043 | 992,525,000 |
| 2024 | 511,219,696 | 2044 | 992,525,000 |
| 2025 | 531,668,483 | 2045 | 992,525,000 |
| 2026 | 552,935,223 | 2046 | 992,525,000 |
| 2027 | 575,052,631 | 2047 | 992,525,000 |
| 2028 | 598,054,737 | 2048 | 992,525,000 |
| 2029 | 621,976,926 | 2049 | 992,525,000 |
| 2030 | 646,856,003 | 2050 | 992,525,000 |
| 2031 | 672,730,244 | 2051 | 992,525,000 |
| 2032 | 699,639,453 | 2052 | 992,525,000 |
| 2033 | 727,625,032 | 2053 | 992,525,000 |
| 2034 | 756,730,033 | 2054 | 992,525,000 |

4848-8372-2614.22

| | | | |
|---|---|---|---|
| 2035 | 786,999,234 | 2055 | 992,525,000 |
| 2036 | 818,479,203 | 2056 | 992,525,000 |
| 2037 | 851,218,371 | 2057 | 992,525,000 |
| 2038 | 885,267,106 | 2058 | 992,525,000 |

For each Fiscal Year following 2058 and until all Principal of, interest on, and any other amounts due on the Bonds have been paid in full or defeased in accordance with Section 12.01 below, "COFINA Revenues" shall include an amount equal to fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed Income for such Fiscal Year.

"**Commonwealth**" means the Commonwealth of Puerto Rico.

"**Confirmation Order**" has the meaning given to such term in the Recitals.

"**Corporation**" has the meaning given to such term in the Recitals.

"**Corporation By-Laws**" means the by-laws adopted by the Corporation's board of directors and in effect on the Effective Date of the Plan of Adjustment.

"**Corporation Expenses**" means all lawfully permitted costs, fees and expenses of the Corporation of any kind arising out of or incurred in connection with carrying out and administering its corporate purposes, powers and duties, including, without limitation: salaries, insurance premiums, fees, charges, expenses, regularly scheduled payments, indemnities and other similar charges payable to or for (a) auditing, legal, financial and investment advisory and other professional and consulting services, (b) fiduciaries, paying agents, transfer agents and other agents, (c) printing, advertisements and publication or other distribution of notices, (d) the governing body of the Corporation, and (e) any and all other fees, charges and expenses required or permitted to be incurred by the Corporation or required to be paid by the Corporation.

"**Costs of Issuance**" means the items of expense to be paid by the Corporation which are incurred prior to, upon and during a reasonable period of time after issuance of the Bonds of a Series, in each case in connection with the authorization, sale and issuance of the Bonds, which items of expense may include, but not be limited to, underwriting discount or fees, structuring fees, placement fees, document printing and reproduction fees, filing and recording fees, costs of credit ratings, initial fees and charges of the Trustee or a Depository, legal fees and charges, professional consultants' fees, fees and charges for execution, transportation and safekeeping of the Bonds, premiums, fees and charges for insurance on the Bonds, and other costs, charges and fees in connection with the foregoing.

"**Costs of Issuance Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Debt Retirement Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Debt Service Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

6

"**Debt Service Savings**" means for each Fiscal Year, the difference between (a) Principal and interest due on Bonds immediately prior to the issuance of Refunding Bonds and/or the purchase by the Corporation of Bonds in the open market and (b) Principal and interest due on Bonds that will remain Outstanding immediately after the issuance of such Refunding Bonds and/or the purchase by the Corporation of Bonds in the open market.

"**Defeasance Security**" means:

(a)     a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America;

(b)     any other US Government Obligation (including the interest component of REFCORP bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; **provided** that at the time an investment therein is made such US Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services; and

(c)     a Municipal Obligation (i) that is not subject to redemption prior to maturity other than at the option of the holder thereof or as to which irrevocable instructions have been given to the trustee or paying agent of such Municipal Obligation by the obligor thereof to give due notice of redemption and to call such Municipal Obligation for redemption on the date or dates specified in such instructions and such Municipal Obligation is not otherwise subject to redemption prior to such specified date other than at the option of the holder thereof, (ii) the timely payment of the principal or redemption price thereof and interest thereon is fully secured by a fund consisting only of cash or obligations described in clause (a) above, which fund may be applied only to the payment of such principal of and interest and redemption premium, if any, on such Municipal Obligation on the maturity date thereof or the redemption date specified in the irrevocable instructions referred to in clause (i) above, and (iii) that at the time an investment therein is made is rated in the highest senior unsecured rating category by at least two Rating Services; ***provided, however,*** that such term shall not mean any interest in a unit investment trust or mutual fund or in "CATS," "TIGRS" or "TRS".

"**Depository**" means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other person, firm, association or corporation designated in the Supplemental Indenture authorizing a Series of Bonds to serve as securities depository for Bonds of such Series, or any successor of any of the foregoing, as applicable.

"**Effective Date**" means the date that the Plan of Adjustment becomes effective in accordance with its terms and the Confirmation Order.

"**Electronic Means**" means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

**"Eligible Investments"** means any of the following obligations or securities that the Corporation is permitted to hold as an investment under the laws of the Commonwealth:

(a)  Defeasance Securities;

(b)  interest-bearing general obligations of the United States of America;

(c)  United States treasury bills and other non-interest bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Corporation a return on such investment in lieu of interest;

(d)  short-term discount US Government Obligations;

(e)  certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable US Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)  banker's acceptances of banks whose senior obligations are rated in the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)  commercial paper of banks whose senior obligations are rated in the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)  tax-exempt securities exempt from federal arbitrage provisions applicable to investments of proceeds of the Corporation's tax-exempt debt obligations, provided that such securities must be rated by at least two Rating Services (with one such Rating Service being S&P or Moody's) no less than AA (or equivalent) and no less than the rating on the Bonds, and provided, further, that any such securities must be in book-entry form through The Depository Trust Company or a comparable depository;

(i)  domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid; and

(j)  Investment Agreements that are fully collateralized by Eligible Investments.

**"EMMA"** means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board.

**"Event of Default"** has the meaning given to such term in Section 11.01 hereof.

**"Fiscal Year"** means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

8

"**Fitch**" means Fitch Ratings and its successors.

"**Fixed Income**" means, for Fiscal Year 2019, seven hundred eighty-three million, one hundred ninety-seven thousand, two hundred and fifty-one dollars ($783,197,251) and, for each subsequent Fiscal Year, the Fixed Income for the prior Fiscal Year plus four percent (4%) of such Fixed Income, up to the Maximum Amount. The Fixed Income for each Fiscal Year shall be funded from the first revenues collected from the Pledged Sales Taxes.

"**Government Entity**" means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

"**Indenture**" means this Master Trust Indenture as amended or supplemented from time to time by Supplemental Indentures in accordance with the terms and provisions hereof.

"**Initial Bonds**" means collectively (i) the Puerto Rico Sales Tax Financing Corporation Restructured Sales Tax Bonds, Series 2019A, as authorized to be issued by the First Supplemental Trust Indenture, dated as of even date herewith, by and between the Corporation and the Trustee and (ii) the Puerto Rico Sales Tax Financing Corporation Restructured Sales Tax Bonds, Series 2019B, as authorized to be issued by the Second Supplemental Trust Indenture, dated as of even date herewith, by and between the Corporation and the Trustee.

"**Instructions**" has the meaning given to such term in Section 8.05.

"**Instructions Agreement**" means that certain Instruction Agreement Regarding the Deposit of Certain Sales and Use Tax Revenues of the Puerto Rico Sales Tax Finance Corporation, dated as of _____, by and between the Corporation, the Trustee and the Department of Treasury.

"**Insured Bond**" means a Bond issued hereunder and designated as an Insured Bond in the Supplemental Indenture authorizing the issuance thereof.

"**Interest Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.02 hereof.

"**Interest Funding Requirement**" means, for each Fiscal Year, an amount equal to 100% of the interest due and payable on all Outstanding Bonds in such Fiscal Year and on the next succeeding July 1, excluding interest actually paid on the first day of such Fiscal Year and including any interest unpaid in prior Fiscal Years (and, for the avoidance of doubt, interest on any overdue interest) calculated based on a 360-day year consisting of twelve (12) 30-day months.

"**Interest Payment Date**" means each January 1 and July 1; provided, however, that with respect to the Initial Bonds that are not issued as Capital Appreciation Bonds, such term also includes the Effective Date.

"**Investment Agreement**" means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

9

"**KBRA**" means Kroll Bond Rating Agency Inc. and its successors.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such Bonds as of such date.

"**Maximum Amount**" means one billion eight hundred and fifty million dollars ($1,850,000,000.00).

"**Moody's**" means Moody's Investor Service, Inc. and its successors.

"**Municipal Obligation**" means an obligation of any state or territory of the United States of America, any political subdivision of any state or territory of the United States of America, or any agency, authority, public benefit corporation or instrumentality of such state, territory or political subdivision.

"**Operating Reserve Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Operating Reserve Fund Cap**" means an amount not to exceed $15,000,000.

"**Outstanding**", when used in reference to Bonds, means, as of a particular date, all such Bonds authenticated and delivered hereunder and under any applicable Supplemental Indenture except:

(k)      any Bonds canceled by the Trustee at or before such date;

(l)      any Bonds deemed to have been paid in accordance with Section 12.01 hereof;

(m)      any Bond canceled or paid pursuant to Section 3.09 and Section 4.06 hereof or any Bond in lieu of or in substitution for which another Bond, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.06 or Section 10.06 hereof; and

(d)      for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Bonds hereunder, any Bond deemed to not be Outstanding in accordance with Section 10.05 hereof.

"**Oversight Board**" has the meaning given to such term in the Recitals.

"**Paying Agent**" means, with respect to the Bonds of any Series, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Indenture.

"**Plan of Adjustment**" means the plan of adjustment consummated in connection with the Corporation's case under Title III of PROMESA, including the Confirmation Order entered by the Title III Court.

"**Pledged Sales Taxes**" means (a) the present and future revenues and collections generated by that portion of the Sales and Use Tax that corresponds, initially, to a tax rate of five and one-half percent (5.5%), subject to the right of the Commonwealth to provide Substituted Collateral in accordance with the Substitution Requirements, and (b) the Substituted Collateral, if any, provided by the Commonwealth in accordance with the Substitution Requirements.

"**Principal**" means collectively, the principal payment required to be made on a Bond on its final maturity date and each Sinking Fund Installment of a Bond due on a Principal Payment Date.

"**Principal Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.02 hereof.

"**Principal Funding Requirement**" means for each Fiscal Year, an amount equal to the sum of the Principal due on all Outstanding Bonds in such Fiscal Year and on the next succeeding Principal Payment Date, excluding Principal actually paid on the first day of such Fiscal Year and including any Principal unpaid in prior Fiscal Years.

"**Principal Payment Date**" means each July 1.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**Projected Pledged Sales Taxes**" means, with respect to proposed Subordinated Lien Bonds pursuant to Section 2.04 of this Indenture: (A) in the event that Subordinated Lien Bonds are being issued prior to Fiscal Year 2024, the projected amount of Pledged Sales Taxes calculated assuming the preceding Fiscal Year's collection of the Pledged Sales Taxes grow annually at the "sales and use tax" growth rates set forth for those subsequent years in the Commonwealth's certified fiscal plan, dated April 18, 2018, and (B) in the event that Subordinated Lien Bonds are being issued during Fiscal Year 2024 or thereafter, the projected amount of Pledged Sales Taxes calculated assuming that preceding Fiscal Year's collection of the Pledged Sales Taxes grow annually thereafter at a rate equal to the average annual "sales and use tax" growth rate for the preceding five (5) Fiscal Years.

"**PROMESA**" has the meaning given to such term in the Recitals.

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a)  a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

11

(b) a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(c) a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(d) the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Corporation; or

(e) a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that meet the applicable rating requirements set forth above.

**"Quarter in Interest"** means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such Bonds as of such date. In the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Bonds (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

**"Quarterly Funding Requirements"** has the meaning given to such term in Section 5.05(b) hereof.

**"Quarterly Installment"** has the meaning given to such term in Section 5.05(b) hereof.

**"Rating Confirmation"** means the written confirmation of each Rating Service to the effect that the rating assigned, without regard to any insurance or other credit enhancement, to

12

each of the Bonds rated by such Rating Service will remain unchanged and will not be withdrawn, suspended or reduced as a consequence of some act or occurrence.

**"Rating Service"** means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

**"Record Date"** means, when used in relation to the Bonds of a Series, the date specified as the record date for such Bonds in the Supplemental Indenture authorizing such Bonds.

**"Redemption Price"** when used with respect to a Bond, means the Principal amount of such Bond plus the applicable premium, if any, payable upon redemption prior to maturity thereof pursuant hereto or to the applicable Supplemental Indenture.

"**Refunding Bonds**" means any of the Bonds issued to refund, refinance or defease other Bonds in compliance with the provisions of Section 2.02 hereof.

**"Remainder Fund"** means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Restructuring Transaction**" means the transactions contemplated by, or in furtherance of, the Plan of Adjustment.

**"S&P"** means S&P Global Ratings and its successors.

**"Sales and Use Tax"** means the sales and use taxes imposed by the Commonwealth pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, known as the Internal Revenue Code for a New Puerto Rico.

**"Secretary of Treasury"** means the Secretary of Treasury of the Puerto Rico Department of Treasury.

**"Serial Bonds"** means the Bonds so designated in a Supplemental Indenture.

**"Series"** means with respect to Bonds, all of the Bonds authenticated and delivered on original issuance and pursuant hereto and to the Supplemental Indenture authorizing such Bonds as a separate Series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to Article III, Section 4.06 or Section 10.06 hereof, regardless of variations in maturity, interest rate, Sinking Fund Installments or other provisions.

**"Settlement"** has the meaning given to such term in the Recitals.

"**Settlement Agreement**" has the meaning given to such term in the Recitals.

**"Sinking Fund Installment"** means, as of any date of computation, the amount of money required to be paid on a single future July 1 for the retirement of any Bonds which mature after said future July 1, but does not include any amount payable by the Corporation by reason only of the maturity of a Bond.

13

"**Statutory Lien**" means the statutory first lien on the Trust Estate, as described in the recitals hereof, created under and imposed by Article 3.2 of the Act.

"**Subordinated Lien Bonds**" has the meaning given to such term in Section 2.04.

"**Substituted Collateral**" means all or a portion of a tax of general applicability throughout the Commonwealth that is enacted in accordance with the Act and this Indenture in full substitution of the Pledged Sales Tax or otherwise constitutes like or comparable security for the Bonds.

"**Substitution Requirements**" means (a) the enactment of legislation providing for Substituted Collateral that also provides (i) that the Substituted Collateral in an amount equal to the COFINA Revenues has been irrevocably transferred to and is owned solely and exclusively by the Corporation to the full extent provided under Article 2.2 of the Act, (ii) that on and after such transfer, such Substituted Collateral in an amount equal to the COFINA Revenues is not, and shall not constitute, "available resources" or "available revenues" of the Commonwealth as that term is used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution), (iii) for a lien on such Substituted Collateral in favor of the Trustee (for the benefit of the Holders of Bonds) to the full extent provided for under Article 3.2 of the Act, and (iv) that the Commonwealth and the Government Entities, if any, shall provide with respect to the Substituted Collateral, the covenants set forth in Article 3.3 of the Act with respect to the COFINA Revenues, (b) prior to the substitution of the Substituted Collateral, at least two Rating Services (with one such Rating Service being S&P or Moody's) shall confirm in writing that the ratings on the Bonds (without regard to bond insurance or other credit enhancement) will not be downgraded and will be rated no lower than A2/A (or equivalent) following the such substitution of the Substituted Collateral, (c) an opinion of Transaction Counsel delivered to the Trustee to the effect that (i) the substitution of the Substituted Collateral will not cause interest on the Tax Exempt Bonds to become includable in gross income for federal income tax purposes and (ii) the legislation providing for the provision of Substituted Collateral creates a valid pledge and a valid lien upon the right, title and interest of the Corporation in the Substituted Collateral in favor of the Trustee (for the benefit of the Holders of the Bonds) which it purports to create, subject only to the provisions of the Indenture permitting the withdrawal, payment, setting apart or appropriation thereof for the purposes and on the terms and conditions set forth in the Indenture and each applicable Supplemental Indenture; and (d) such other documents, if any, required by applicable law.

"**Supplemental Indenture**" means any indenture of the Corporation amending or supplementing this Indenture or any prior Supplemental Indenture executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

"**Tax Exempt Bond**" means any Bond as to which Transaction Counsel has rendered an opinion to the effect that interest on it is excluded from gross income for purposes of federal income taxation.

"**Term Bond**" means a Bond so designated in a Supplemental Indenture and payable from Sinking Fund Installments.

**"Title III Cases"** has the meaning given to such term in the Recitals.

**"Title III Court"** has the meaning given to such term in the Recitals.

**"Transaction Counsel"** means a nationally recognized bond counsel as may be selected by the Corporation for a specific purpose hereunder.

**"Trust Estate"** has the meaning given to such term in the granting clause of this Indenture; *provided, however*, that if Substituted Collateral is provided in compliance with the Substitution Requirements, then from and after the provision of such Substituted Collateral, clause (i) of the definition of Trust Estate in the granting clause of this Indenture shall be deemed to be references to such Substituted Collateral.

**"Trustee"** means the bank or trust company appointed as Trustee for the Bonds pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant hereto.

**"US Government Obligation"** means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

**"Valuation Date"** means with respect to any Capital Appreciation Bond, each January 1 and July 1; provided, however, that with respect to the Initial Bonds that are issued as Capital Appreciation Bonds, such term also includes the Effective Date.

**Section 1.02   Rules of Construction.**  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations and corporations, including public bodies as well as natural persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Indenture, refer to the Indenture. All references to Articles and Sections in this Indenture refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

**"$"** and **"dollars"** each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

4848-8372-2614.22

## ARTICLE II.

## AUTHORIZATION AND ISSUANCE OF BONDS

**Section 2.01   Authorization of Bonds.**  There are hereby authorized to be issued Bonds of the Corporation to be designated as "Restructured Sales Tax Bonds," which, in accordance with, and as provided by, Article 3.2 of the Act (and with respect to the Substituted Collateral, if any, pursuant to the legislation providing therefor in accordance with the terms and conditions of the Act and this Indenture) are secured by the Statutory Lien on the Trust Estate to secure the payment of the Principal and Redemption Price of and interest on all Outstanding Bonds. The Bonds shall be special obligations of the Corporation payable solely from the Trust Estate in the manner more particularly provided herein.  The aggregate principal amount of Bonds which may be executed, authenticated and delivered is not limited except as provided hereby and in the Plan of Adjustment and the terms and conditions authorized by the Corporation and set forth in the Ancillary Agreements.

The Bonds may, if and when authorized by the Corporation pursuant hereto and to one or more Supplemental Indentures, be issued in one or more Series and the Bonds of each Series shall contain an appropriate Series designation.

The Bonds shall not constitute a debt of the Commonwealth or of any Government Entity other than the Corporation. The Bonds shall not constitute indebtedness or an obligation of the Commonwealth or any subdivision thereof within the purview of any constitutional or statutory limitation or provision or a charge against the general credit or taxing powers, if any, of any of them but shall be payable solely from the Trust Estate, including, particularly, the COFINA Revenues.  The Corporation has no taxing power.

**Section 2.02   Provisions for Issuance of Bonds.**  The Corporation shall issue Bonds under this Indenture in accordance with, and upon receipt of, the written direction of the Secretary of Treasury; provided, however, that such direction may not conflict with the terms of this Indenture.  The issuance of the Initial Bonds and any Series of Refunding Bonds permitted to be issued hereunder shall be authorized by a Supplemental Indenture or Supplemental Indentures. The Bonds of a Series authorized to be issued shall be executed by the Corporation and delivered to the Trustee.  Such Bonds shall from time to time and in such amounts as directed by the Corporation be authenticated by the Trustee and by it delivered to or upon the order of the Corporation upon receipt of the consideration therefor and upon delivery to the Trustee of:

(a)      A copy of the Indenture and the Supplemental Indenture authorizing such Bonds, certified by an Authorized Officer of the Corporation;

(b)      A written order as to the delivery of such Bonds, signed by an Authorized Officer of the Corporation, describing the Bonds to be delivered, designating the person(s) to whom such Bonds are to be delivered and stating the consideration for such Bonds;

(c)      A certificate of an Authorized Officer of the Corporation stating that the Corporation is not, and, as a result of the issuance of such Bonds, will not:

16

(i)      be, in default in the performance of any of the covenants, conditions, agreements or provisions contained herein or in the Ancillary Agreements (to the extent affecting the issuance of the Bonds), or stating that after the issuance thereof the Corporation shall no longer be in default in the performance of any of the covenants, conditions, agreements or provisions contained herein; and

(ii)     violate the restrictions on the issuance of Bonds contained in the Ancillary Agreements.

(d)      For each issuance of Bonds (i) the written direction of the Secretary of Treasury to issue such Bonds and (ii) a certificate of the Secretary of Treasury stating that (A) the Commonwealth is not, and, as a result of the issuance of such Bonds, shall not be, in default in the performance of any of the covenants of the Commonwealth contained herein and in the Act or (B) after the issuance of such Bonds, the Commonwealth shall no longer be in default in the performance of any of the covenants of the Commonwealth contained herein and in the Act;

(e)      For each issuance of Refunding Bonds, a certificate of an Authorized Officer of the Corporation demonstrating that upon the issuance of such Series of Refunding Bonds:

(A)      the Corporation is not entitled to an increase in the COFINA Revenues;

(B)      the final maturity date of the Refunding Bonds is not later than July 1, 2058; and

(C)      upon the issuance of any Refunding Bonds:

(1)      Principal and interest due on Outstanding Bonds in the then-current and each future Fiscal Year immediately after the issuance of the Refunding Bonds shall be equal to or less than the Principal and interest due on Outstanding Bonds in the then-current and each future Fiscal Year immediately prior to such issuance; and

(2)      Debt Service Savings shall only be realized in the same Fiscal Years in which Principal of the Bonds and the interest thereon were refunded and/or purchased;

(f)      A certified copy of the resolution of the board of the Puerto Rico Fiscal Agency and Financial Advisory Authority (or any successor entity thereto, if any) approving the issuance of the Series of Bonds by the Corporation; provided, however, that if the Puerto Rico Fiscal Agency and Financial Advisory Authority is no longer in existence and has no successor, or if its successor is not required to approve the issuance of the applicable Series of Bonds, then no such resolution shall be required.

(g)      An opinion of Transaction Counsel to the effect that (i) the Indenture and the applicable Supplemental Indenture authorizing the Series of Bonds have been duly and lawfully authorized, executed and delivered by the Corporation; (ii) the Indenture and the applicable Supplemental Indenture are in full force and effect and are valid and binding upon the Corporation and enforceable in accordance with their terms; (iii) (a) if Substituted Collateral has not been provided in accordance with the Substitution Requirements and Section 3.3 of the Act, the Statutory Lien creates the valid pledge and the valid lien upon the right, title and interest of the

17

Corporation in the Trust Estate in favor of the Trustee (for the benefit of the Holders of Bonds) which it purports to create, subject only to the provisions of the Indenture permitting the withdrawal, payment, setting apart or appropriation thereof for the purposes and on the terms and conditions set forth in the Indenture and each applicable Supplemental Indenture or (b) if Substituted Collateral has been provided in accordance with the Substitution Requirements and Section 3.3 of the Act, the legislation providing for the provision of Substituted Collateral creates a valid pledge and a valid lien upon the right, title and interest of the Corporation in the Substituted Collateral in favor of the Trustee (for the benefit of the Holders of the Bonds) which it purports to create, subject only to the provisions of the Indenture permitting the withdrawal, payment, setting apart or appropriation thereof for the purposes and on the terms and conditions set forth in the Indenture and each applicable Supplemental Indenture; and (iv) the Corporation is duly authorized and entitled to issue such Series of Bonds and, upon the execution and delivery thereof and upon authentication by the Trustee, such Series of Bonds will be duly and validly issued and will constitute valid and binding special obligations of the Corporation entitled to the benefits of the Indenture; ***provided, however,*** that such opinion of Transaction Counsel may rely on the determinations of the Title III Court as set forth in the Confirmation Order; ***provided, further***, that such opinion of Transaction Counsel may be qualified to the extent that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

**Section 2.03   Supplemental Indentures.**  Each Supplemental Indenture authorizing the issuance of a Series of Bonds shall specify the following:

(a)     The authorized principal amount of such Series of Bonds;

(b)     The date or dates of the Bonds, the maturity date or dates and principal amounts of each maturity of the Bonds of such Series, the amount and date of each Sinking Fund Installment, as applicable, and which Bonds of such Series are Serial Bonds or Term Bonds, if any, and the Record Date or Record Dates of the Bonds of such Series;

(c)     The interest rate or rates, if any, on the Bonds of such Series and the first date on which interest on the Bonds of such Series shall be payable; ***provided, however,*** in no event shall a Holder of Bonds be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon) other than overdue interest that accrues at the regular non-penalty rate of the applicable Bond or interest accruing on such overdue interest at the regular non-penalty rate of the applicable Bond;

(d)     If all or a portion of the Bonds of such Series are Capital Appreciation Bonds, the Valuation Dates for such Bonds and the Accreted Value on each such Valuation Date;

(e)     The denomination or denominations of and the manner of numbering and lettering of the Bonds of such Series;

(f)     The Redemption Price or Redemption Prices, if any, and, subject to Article IV hereof, the redemption terms, if any, for the Bonds of such Series;

(g)     Provisions for the sale or exchange of the Bonds of such Series and for the delivery thereof;

(h)     The form of the Bonds of such Series and the form of the Trustee's certificate of authentication thereon, and whether any Bonds of such Series are to be issued as Book Entry Bonds and the Depository therefor;

(i)     Directions for the application of the proceeds of the Bonds of such Series;

(j)     If all or a portion of such Bonds will be issued as Insured Bonds, the terms and conditions for payment of such Insured Bonds under the applicable Bond Insurance Policy; ***provided, however,*** in no event shall the Holder of Insured Bonds or the Bond Insurer be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon); and

(k)     Any other provisions deemed advisable by an Authorized Officer of the Corporation not in conflict with the provisions hereof or of any Ancillary Agreement.

**Section 2.04   Additional Indebtedness.**  Following the issuance of the Initial Bonds, the Corporation may not incur any additional indebtedness except that the Corporation may issue or incur:

(a)     Refunding Bonds under and in compliance with the provisions hereof, including, particularly, Section 2.02(e); and

(b)     obligations under and in accordance with the requirements contained in Section 16.3 of the Plan of Adjustment ("**Subordinated Lien Bonds**"), which requirements are described in the next following paragraph (the "**Additional Bonds Test**").

The Corporation may issue Subordinated Lien Bonds for the benefit of, and with the consent of, the Commonwealth and for any lawful purpose of the Commonwealth, provided that (x) repayment of such Subordinated Lien Bonds shall be secured by a second lien that is subordinated in all respects, including, without limitation, in respect of payment, funding and remedies to the Bonds, with repayment of Subordinated Lien Bonds being secured by a subordinated second or more junior lien on the Pledged Sales Taxes; ***provided, however***, that repayment of the Subordinated Lien Bonds shall not be payable from the COFINA Revenues and (y) prior to the issuance thereof, the Secretary of Treasury and an Authorized Officer of the Corporation shall deliver a jointly executed certificate to the Trustee certifying that the following conditions are each satisfied:  (i) the Projected Pledged Sales Taxes equal or exceed one and one-half times (1.5x), in any succeeding Fiscal Year, the annual aggregate debt service due on the Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); (ii) the preceding Fiscal Year's collections from the Pledged Sales Taxes is equal to or greater than one and one-tenth times (1.10x) coverage of the maximum annual aggregate debt service due in any succeeding Fiscal Year on all Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); and (iii) the Subordinated Lien Bonds have a maturity not later than Fiscal Year 2058; ***provided, however***, that, subsequent to June 30, 2028, and subject to compliance with the foregoing Additional Bonds Test, final maturity beyond Fiscal Year 2058 shall be permissible for future Subordinated Lien Bonds.

4848-8372-2614.22

Any Subordinated Lien Bonds permitted to be issued by the Corporation hereunder and under the Act shall be issued pursuant to a separate bond resolution or bond indenture provided that the issuance thereof is authorized by the Additional Bonds Test set forth above and by the Commonwealth Legislature, which legislation shall establish, or provide for the establishment of, the terms of such Subordinated Lien Bonds and the purposes for which the proceeds of such Subordinated Lien Bonds may be used.  Notwithstanding anything to the contrary herein, any such Subordinated Lien Bonds issued by the Corporation shall not be secured by nor shall such Subordinated Lien Bonds be payable from the Trust Estate.

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF BONDS

**Section 3.01   Place and Medium of Payment.**  The Bonds shall be payable, with respect to interest, Principal and Redemption Price, in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except as otherwise provided in Section 4.06 hereof, upon presentation and surrender of Bonds, the Principal or Redemption Price of such Bonds shall be payable at the designated corporate trust office of the Trustee.  Interest on the Bonds shall be paid by check mailed to the registered owner thereof at the address thereof as it appears on the registry books of the Corporation or if authorized by the Supplemental Indenture authorizing a Series of Bonds by wire transfer to such registered owner of the Bonds of such Series.  For purposes of this Section, interest is payable on an Interest Payment Date to the registered owner of a Bond at the close of business on the Record Date for such Bond.  All payments of Principal or Redemption Price of or interest on Bonds shall specify the CUSIP number or numbers of the Bonds in connection with which such payment is made.

The Bonds of each Series shall be issued in the form of fully registered Bonds without coupons.

Bonds of each Series issued prior to the first Interest Payment Date thereof shall be dated as of the date specified in the Supplemental Indenture authorizing the issuance thereof.  Bonds of each Series issued on or subsequent to the first Interest Payment Date thereof shall be dated as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be an Interest Payment Date, in which case they shall be dated as of such date of authentication; ***provided, however,*** that if, as shown by the records of the Trustee, interest on the Bonds of any Series has not been paid as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, the Bonds of such Series issued in lieu of Bonds surrendered for transfer or exchange shall be dated as of the date through which interest has been paid in full on the Bonds surrendered or, if no interest has been paid on the Bonds surrendered since their authentication, as of the date of authentication of the surrendered Bonds.  Bonds of each Series shall bear interest from their date and shall bear interest on overdue interest at the interest rate of such Bonds, which shall capitalize on each Interest Payment Date. For the avoidance of doubt, if any Principal of, or accrued interest on, a Bond is not paid when due, such Principal and interest shall remain due and payable until paid.

All Bonds of each Series shall mature and/or have Sinking Fund Installments on July 1 of the year or years fixed by the Supplemental Indenture authorizing the issuance of such Bonds.

Interest on all Bonds (other than Capital Appreciation Bonds) shall be payable on each Interest Payment Date of each year.  The first installment of interest due on the Bonds of a Series may be for such period as the Corporation shall fix in the Supplemental Indenture authorizing the issuance thereof.

**Section 3.02   Legends.**   The Bonds may contain, or have endorsed thereon, such provisions, specifications and descriptive words not inconsistent herewith or with any Supplemental Indenture authorizing the same, as may be necessary or desirable and as may be determined by the Corporation prior to their delivery.  The Initial Bonds shall distinctively bear the following legend: "DETERMINED TO BE VALID BY THE CONFIRMATION ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO, ENTERED ON THE ___ DAY OF _____, 2019."

**Section 3.03   CUSIP Numbers.**   The Corporation shall provide for the assignment of CUSIP numbers for all Bonds and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Bondholders as a convenience to Bondholders; ***provided, however,*** that any such notice may state that no representation is made as to the correctness of such number either as printed on such Bonds or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Bond or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption.  The Corporation shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Bond of which the Corporation has knowledge.

**Section 3.04   Execution and Authentication.**   The Bonds shall be executed in the name of the Corporation by the manual or facsimile signature of an Authorized Officer thereof, and attested by the manual or facsimile signature of the Secretary or an Assistant Secretary of the board of the Corporation or other Authorized Officer of the Corporation, or in such other manner as may be permitted by law.  In case any one or more of the officers or employees who shall have signed any of the Bonds shall cease to be such officer or employee before the Bonds so signed shall have been actually authenticated and delivered by the Trustee, such Bonds may, nevertheless, be delivered as provided herein, and may be issued as if the persons who signed such Bonds had not ceased to hold such offices or be so employed.  Any Bond may be signed on behalf of the Corporation by such persons as at the actual time of the execution of such Bond shall be duly authorized or hold the proper office in or be employed by, the Corporation, although at the date of the Bonds such persons may not have been so authorized or have held such office or employment.

The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Indenture authorizing the issuance of such Bonds, executed manually by the Trustee.  Only such Bonds as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee.  Such certificate of the Trustee upon any Bond executed on behalf of the Corporation shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05   Interchangeability of Bonds.**   Bonds, upon surrender thereof at the designated corporate trust office of the Trustee with a written instrument of transfer satisfactory to

21

the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate principal amount of Bonds of the same Series, maturity and tenor of any other authorized denominations.

Section 3.06   **Transfer and Registry.**  So long as any of the Bonds remain Outstanding, the Corporation shall maintain and keep, or cause to be maintained and kept, at the designated corporate trust office of the Trustee, books for the registration and transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Corporation shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or transfer.  So long as any of the Bonds remain Outstanding, the Corporation shall make all necessary provisions to permit the exchange of Bonds at the designated corporate trust office of the Trustee.

Section 3.07   **Transfer of Bonds.**  Each Bond shall be transferable only upon the books of the Corporation, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Corporation or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Bond, the Corporation shall cause to be issued in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity and tenor as the surrendered Bond.

The Corporation and the Trustee may deem and treat the person in whose name any Outstanding Bond shall be registered upon the books of the Corporation as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the Principal or Redemption Price of and, subject to the provisions of Section 3.01 hereof with respect to Record Dates, interest on such Bond and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums paid, and neither the Corporation nor the Trustee shall be affected by any notice to the contrary.  The Corporation agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without negligence hereunder, in so treating such registered owner.

Section 3.08   **Regulations with Respect to Exchanges and Transfers.**  In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the Corporation shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions hereof.  All Bonds surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee.  For every such exchange or transfer of Bonds, whether temporary or definitive, the Corporation or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.  Notwithstanding any other provisions hereof, the cost of preparing each new Bond upon each exchange or transfer, and any other expenses of the Corporation or the Trustee incurred in connection therewith, shall be paid by the person requesting such exchange or transfer.  The Corporation shall not be obliged to make, or

22

cause to be made, any exchange or transfer of Bonds of any Series during the period beginning on the Record Date for such Bonds immediately preceding an Interest Payment Date on such Bonds and ending on such Interest Payment Date, or, in the case of any proposed redemption of Bonds of such Series, after the date immediately preceding the date notice of redemption has been mailed.

**Section 3.09   Bonds Mutilated, Destroyed, Lost or Stolen.**   In case any Bond shall become mutilated or be destroyed, lost or stolen, the Corporation in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, tenor and principal amount as the Bond so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for such Bond so destroyed, lost or stolen, upon filing with the Corporation evidence satisfactory to the Corporation and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Corporation and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Corporation and the Trustee may prescribe and paying such expenses as the Corporation and the Trustee may incur in connection therewith.   All Bonds so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Corporation.   In case any Bond which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Corporation may, instead of issuing a Bond in exchange or substitution therefor, pay or authorize the payment of such mutilated Bond upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Bond, upon the Holder thereof filing evidence satisfactory to the Corporation and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Corporation and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Corporation and the Trustee may prescribe and paying such expenses as the Corporation and the Trustee may incur in connection therewith.

**Section 3.10   Book Entry Bonds.**   Anything herein to the contrary notwithstanding, Bonds may be authorized and issued as Book Entry Bonds in accordance with the Supplemental Indenture authorizing such Bonds.

For all purposes of the Indenture the Holder of a Book Entry Bond shall be the Depository therefor and neither the Corporation nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Bond or to any direct or indirect participant in such Depository. Without limiting the generality of the foregoing, neither the Corporation nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Bond with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Bond, (b) the delivery to any participant of the Depository, the beneficial owner of such Bond or any other person, other than the Depository, of any notice with respect to such Bond, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Bond or any other person, other than the Depository, of any amount with respect to the Principal or Redemption Price of, or interest on, such Bond.   The Corporation and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Bond for the purpose of (x) payment of the Principal or Redemption Price of and interest on such Bond, (y) giving notices of redemption and of other matters with respect to such Bond, (z) registering transfers with respect to such Bond, and for all other purposes whatsoever.   The Trustee shall pay all Principal or Redemption Price of and interest

23

on such Bond only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Corporation's obligations with respect to such Principal or Redemption Price and interest to the extent of the sum or sums so paid.  No person other than the Depository shall receive a Bond or other instrument evidencing the Corporation's obligation to make payments of the principal or Redemption Price thereof and interest thereon.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Bond which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Bond to the Trustee; ***provided, however,*** that the Trustee shall maintain records as to each such payment and of the principal amount of such Bond Outstanding, which shall be binding on the Corporation and the Holders from time to time of such Bond.

The Corporation, without the consent of the Trustee, the beneficial owner of a Book Entry Bond or any other person, may terminate the services of the Depository with respect to a Book Entry Bond if the Corporation reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Bonds or (b) a continuation of the requirement that all of the Outstanding Bonds of like Series issued in book entry form be registered in the registration books of the Corporation in the name of the Depository, is not in the best interest of the beneficial owners of such Bonds, and the Corporation shall terminate the services of the Depository upon receipt by the Corporation and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Bonds for which the Depository is serving as Depository.

Upon the termination of the services of a Depository with respect to a Book Entry Bond, or upon the resignation of a Depository with respect to a Book Entry Bond, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Corporation following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Bonds shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names of the Bondholders transferring or exchanging such Bonds shall designate, in accordance with the provisions of Article III hereof.

**Section 3.11   Preparation of Definitive Bonds; Temporary Bonds.**  The definitive Bonds of each Series shall be lithographed or printed on steel engraved borders, except that Book Entry Bonds may be typewritten.  Until the definitive Bonds of any Series are prepared, the Corporation may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Bonds, but subject to the same provisions, limitations and conditions as the definitive Bonds, except as to the denominations thereof and as to exchangeability for registered Bonds, one or more temporary Bonds, substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in authorized denominations or any whole multiples thereof authorized by the Corporation, and with such omissions, insertions and variations as may be appropriate to such temporary Bonds.  The Corporation at its own expense shall prepare and execute and, upon the surrender at the designated corporate trust office of the Trustee of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds the

24

Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated corporate trust office of the Trustee, definitive Bonds of the same aggregate principal amount, Series and maturity as the temporary Bonds surrendered.  Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds issued pursuant hereto.

All temporary Bonds surrendered in exchange for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

## ARTICLE IV.

## REDEMPTION OF BONDS

**Section 4.01    Authorization of Redemption.**    Bonds subject to redemption prior to maturity pursuant hereto or to a Supplemental Indenture shall be redeemable, in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein or in the Supplemental Indenture authorizing such Series.

**Section 4.02    Redemption at the Election of the Corporation.**    In the case of any redemption of Bonds other than as provided in Section 4.03 hereof, the Corporation shall give written notice to the Trustee of its election to redeem, of the Series and of the principal amounts of the Bonds of each maturity of such Series to be redeemed.  Such notice shall be given not less than thirty-five (35) days prior to the redemption date.  The Series, maturities and principal amounts thereof to be so redeemed shall be determined by the Corporation in its sole discretion, subject to any limitations with respect thereto contained herein (including, without limitation, Section 4.04 below) or in the Supplemental Indenture authorizing such Series.  The Corporation shall pay to the Trustee on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee in the Debt Retirement Fund, is sufficient to redeem on the redemption date at the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, all of the Bonds to be so redeemed.

**Section 4.03    Redemption Other Than at Corporation's Election.**    Whenever by the terms hereof or of a Supplemental Indenture the Trustee is required to redeem Bonds through the application of mandatory Sinking Fund Installments, the Trustee shall select the Bonds of the Series and maturities to be redeemed in the manner provided in Section 4.04 hereof, give the notice of redemption and pay out of money available therefor the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, to the appropriate Paying Agents in accordance with the terms of this Article IV.

**Section 4.04    Selection of Bonds to be Redeemed.**    Unless otherwise provided in the Supplemental Indenture authorizing the issuance of Bonds of a Series, in the event of redemption of less than all of the Outstanding Bonds of like Series, maturity and tenor, the Trustee shall assign to each Outstanding Bond of the Series, maturity and tenor to be redeemed a distinctive number for each unit of the principal amount of such Bond equal to the lowest denomination in which the Bonds of such Series are authorized to be issued and shall select by lot, using such method of selection as it shall deem proper in its discretion, from the numbers assigned to such Bonds as many numbers as, at such unit amount equal to the lowest denomination in which the Bonds of

25

such Series are authorized to be issued for each number, shall equal the principal amount of such Bonds to be redeemed.  In making such selections the Trustee may draw the Bonds by lot (i) individually or (ii) by one or more groups, the grouping for the purpose of such drawing to be by serial numbers (or, in the case of Bonds of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued, by the numbers assigned thereto as in this Section 4.04 provided) which end in the same digit or in the same two digits.  In case, upon any drawing by groups, the total principal amount of Bonds drawn shall exceed the amount to be redeemed, the excess may be deducted from any group or groups so drawn in such manner as the Trustee may reasonably determine.  The Trustee may in its discretion assign numbers to aliquot portions of Bonds and select part of any Bond for redemption.  The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; ***provided, however,*** that only so much of the principal amount of each such Bond of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued shall be redeemed as shall equal the lowest denomination in which the Bonds of such Series are authorized to be issued for each number assigned to it and so selected.

For purposes of this Section 4.04, the lowest denomination in which a Capital Appreciation Bond is authorized to be issued shall be the lowest Accreted Value authorized to be due at maturity on such Bonds.

Notwithstanding the foregoing, in the event that a Depository shall be the registered owner of all of such Bonds of the Series being redeemed, if less than all of the Bonds of a particular Series are called for redemption, the Corporation shall select the maturity or maturities of such Series to be redeemed and the Depository, on behalf of the Trustee, shall select the Bonds within the same maturity of such Series to be redeemed by means of a random lottery and in any event in accordance with the applicable provisions of the Depository.

**Section 4.05   Notice of Redemption.**  Whenever Bonds are to be redeemed, the Trustee shall give notice of the redemption of the Bonds in the name of the Corporation which notice shall specify:  (a) the Bonds to be redeemed which shall be identified by the designation of the Bonds given in accordance with Article II hereof; (b) the maturity dates and interest rates or accretion rates of the Bonds to be redeemed and the date of such Bonds; (c) the numbers and other distinguishing marks of the Bonds to be redeemed, including CUSIP numbers; (d) the redemption date; (e) the Redemption Price, if then known; (f) with respect to each such Bond, the principal amount thereof to be redeemed; (g) that, except in the case of Book Entry Bonds, such Bonds will be redeemed at the designated corporate trust office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (h) that no representation is made as to the correctness of the CUSIP number either as printed on the Bonds or as contained in such notice and that an error in a CUSIP number as printed on a Bond or as contained in such notice shall not affect the validity of the proceedings for redemption; and (i) if the Corporation's obligation to redeem the Bonds is subject to conditions, a statement to that effect and of the conditions to such redemption.  Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Bond to be redeemed the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, and that, from and after such date, payment having been made or provided for, interest thereon shall cease to accrue.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption

26

date.  Such notice shall be sent by first class mail, postage prepaid (i) to the registered owners of the Bonds which are to be redeemed, at their last known addresses, if any, appearing on the registration books, and (ii) to the Bond Insurer (if any) insuring the Bonds to be redeemed, at the Bond Insurer's last known address, not more than ten (10) Business Days prior to the date such notice is given.  Upon giving such notice, the Trustee shall promptly certify to the Corporation that it has mailed or caused to be mailed such notice to the Holders of the Bonds to be redeemed in the manner provided herein.  Such certificate shall be conclusive evidence that such notice was given in the manner required hereby.  The failure of any Holder of a Bond to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Bonds.

The Trustee shall, if any of the Bonds to be redeemed are Book Entry Bonds, transmit a copy of the notice of redemption to the Depository for such Book Entry Bonds not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Bonds are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Bond and no such notice shall be required to be transmitted by the Corporation directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Corporation be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Bonds.  This paragraph shall not alter the Trustee's obligation to transmit a notice of redemption to the Bond Insurer as provided in the preceding paragraph.

**Section 4.06   Payment of Redeemed Bonds.**  Notice having been given by mail in the manner provided in Section 4.05 hereof, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, except as otherwise provided in Section 3.10 hereof upon presentation and surrender of such Bonds, at the office or offices specified in such notice, and, in the case of Bonds presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date; ***provided, however,*** that payment of the Redemption Price may be paid by wire transfer to such registered owner if so authorized in the Supplemental Indenture that authorized the Bonds of the Series to be redeemed.  If there shall be called for redemption less than all of the principal amount of a registered Bond, the Corporation shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the registered Bond so surrendered, Bonds of like Series, maturity and tenor in any of the authorized denominations. If, on the redemption date, money for the redemption of all Bonds or portions thereof of any like Series, maturity and tenor to be redeemed, together with interest accrued and unpaid thereon to the redemption date, shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, interest on the Bonds or portions thereof so called for redemption shall cease to accrue and such Bonds shall no longer be considered to be Outstanding hereunder.  If such money shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

## ARTICLE V.

## STATUTORY LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS; PLEDGED SALES TAX REVENUES AND APPLICATION THEREOF

**Section 5.01   Statutory Lien on Trust Estate.**   To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants, automatically, upon the issuance of the Bonds, the Statutory Lien on the Trust Estate in favor of the Trustee for the benefit of the Holders of the Bonds.  The Bonds shall be special obligations of the Corporation payable solely from and secured by the Statutory Lien on the Trust Estate.

Pursuant to the terms of Article 3.2 of the Act, no commingling of the Pledged Sales Taxes with any property of the Commonwealth, any Government Entity or any other Person shall limit, defeat, impair or interfere with the Statutory Lien.  The Statutory Lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Corporation or its assets irrespective of whether such Persons have notice of the Statutory Lien.

**Section 5.02   Establishment of Funds and Accounts.**   (a) The following funds and separate accounts within funds constituting a portion of the Trust Estate are hereby established and shall be held, in trust, and maintained by the Trustee:

> Costs of Issuance Fund;
> COFINA Revenue Fund;
> Debt Service Fund;
> > Interest Account; and
> > Principal Account; and
> Debt Retirement Fund

(b)      The Operating Reserve Fund is hereby established and shall be held by the Corporation, to be applied to the payment of Corporation Expenses. The Operating Reserve Fund shall be initially funded in accordance with the terms of the Plan of Adjustment.  The Operating Reserve Fund is not subject to the Statutory Lien and is not part of the Trust Estate.

(c)      The Arbitrage Rebate Fund is hereby established and created and shall be held by the Trustee for the benefit of the Corporation. The Arbitrage Rebate Fund is not subject to the Statutory Lien and is not part of the Trust Estate.

(d)      The Remainder Fund is hereby established and created and shall be held by the Trustee for the benefit of the Commonwealth or the Commonwealth's assignee or other designee. The Remainder Fund is not subject to the Statutory Lien and is not part of the Trust Estate.

(e)      For purposes of internal accounting, each such fund (other than the Remainder Fund) may contain one or more accounts or subaccounts, as the Corporation may deem proper. All money at any time deposited in any fund, account or subaccount created hereby or by any Supplemental Indenture or required hereby or thereby (other than the Remainder Fund) to be created shall be held in trust for the benefit of the Holders of Bonds, but shall nevertheless be disbursed, allocated and applied solely for the uses and purposes provided herein.

28

**Section 5.03   Application of Bond Proceeds.**  Upon the receipt of proceeds from the sale of a Series of Bonds, the Corporation shall apply such proceeds as specified in the Supplemental Indenture authorizing such Series.

Accrued interest, if any, received upon the delivery of a Series of Bonds shall be deposited in the Debt Service Fund unless all or any portion of such amount is to be otherwise applied as specified in the Supplemental Indenture authorizing such Series.

**Section 5.04   Application of Money in the Costs of Issuance Fund.**  (a) As soon as practicable after the delivery of each Series of Bonds, there shall be deposited into each account within the Costs of Issuance Fund the amount, if any, required to be deposited therein pursuant to the Supplemental Indenture authorizing such Series.

(b)       Except as otherwise provided in this Article V and in any applicable Supplemental Indenture, money in the Costs of Issuance Fund shall be used only to pay the Costs of Issuance of the Bonds payable by the Corporation.  Such payments shall be made by the Trustee upon the direction of an Authorized Officer of the Corporation that sets forth in reasonable detail the purpose of the payment, the amount of such payment and the name of the payee.  If such payment is to be made by bank wire, such direction shall include the routing and account numbers of the payee.  If such payment is to be made by check, such direction shall include the address of the payee. The Trustee shall rely fully on any such written direction delivered pursuant to this Section and shall not be required to make any investigation in connection therewith.

(c)       The money remaining in the Costs of Issuance Fund after paying or making provision in accordance with the direction of an Authorized Officer of the Corporation for the payments required to be made pursuant to paragraph (b) of this Section, including any Costs of Issuance then unpaid, shall be applied by the Trustee in the following order of priority:

First, to the Arbitrage Rebate Fund, the amount determined by the Corporation to be required to be deposited therein; and

Second, to the Debt Service Fund, any balance remaining therein.

**Section 5.05   Deposit of COFINA Receipts in the COFINA Revenue Fund.**  (a) Effective on the date of issuance of the Initial Bonds, subject to Sections 5.05(b) and (d) hereof and consistent with the terms of the Instructions Agreement, the Corporation shall direct the Secretary of Treasury to deposit all COFINA Revenues to the Trustee on behalf of the Corporation, in accordance with Article 4.1 of the Act (*First Dollars Funding of COFINA Revenues*) until all Bonds are fully paid or defeased in accordance with Section 12.01 below.

(b)       If, for any Fiscal Year commencing after June 30, 2024, the Trustee certifies to the Corporation and the Secretary of Treasury that the Quarterly Funding Requirements set forth in the next sentence are satisfied, then for each Fiscal Year thereafter (i) the Secretary of Treasury shall deposit the COFINA Revenues for such Fiscal Year with the Trustee in four installments (each, a "**Quarterly Installment**") commencing on July 1, October 1, January 1 and April 1 of the applicable Fiscal Year, which Quarterly Installments shall, subject to Section 5.05(d) below, be of an equal amount, and (ii) in each such quarter, until the Trustee has received the full Quarterly Installment for such quarter, the Secretary of Treasury shall deposit, on a daily basis, all COFINA

Revenues to the Trustee on behalf of the Corporation in accordance with Article 4.1 of the Act (*First Dollars Funding of COFINA Revenues*) and the Instructions Agreement.  For any Fiscal Year commencing after June 30, 2024, if within fifteen days of the commencement of such Fiscal Year the Trustee receives each of the following certificates (the "**Quarterly Funding Requirements**"), the Trustee shall certify to the Corporation and the Secretary of Treasury that the Quarterly Funding Requirements have been satisfied for such Fiscal Year:

> (A) certification of an Authorized Officer of the Oversight Board, or if the Oversight Board is no longer in effect, of the Secretary of Treasury, that the budgets of the Commonwealth for the current Fiscal Year and for the immediately preceding Fiscal Year are balanced;

> (B) certification of an Authorized Officer of the Corporation that (I) the Corporation is in compliance with its obligation to file its audited financial statements in accordance with its continuing disclosure obligations and (II) the Corporation is not in default in the performance of any of the covenants of the Corporation contained herein; and

> (C) certification of the Secretary of Treasury that (I) quarterly-funding of the COFINA Revenues is necessary to avoid the issuance of intra-Fiscal Year tax revenue anticipation notes by the Commonwealth, (II) the amount of Pledged Sales Taxes collected in the prior Fiscal Year was at least two times (2x) the COFINA Revenues for such Fiscal Year and (III) the Commonwealth is in compliance with its obligation to file its audited financial statements in accordance with its continuing disclosure obligations.

(c)     In the event that the Corporation directly receives any COFINA Receipts from the Secretary of Treasury, the Corporation shall promptly (and in no event later than two Business Days) following the receipt thereof transfer all such COFINA Receipts to the Trustee for deposit in the COFINA Revenue Fund.  All COFINA Receipts received by the Trustee shall be deposited no less frequently than required by the Instructions Agreement, if practicable, but in no event more than two (2) Business Days after receipt thereof by the Trustee, into the COFINA Revenue Fund and such amounts shall be applied by the Trustee to fund the deposits in the priority set forth in Section 5.06 below.

(d)     In the event that the Corporation or the Trustee receives Pledged Sales Taxes in a given Fiscal Year that exceed the COFINA Revenues for such Fiscal Year, such excess Pledged Sales Taxes shall be transferred by the Trustee or Corporation, as applicable, to the Secretary of Treasury promptly, and in no event more than five (5) Business Days after receipt of notice by the Trustee and the Corporation of such excess Pledged Sales Taxes; *provided, however*, that if such excess is not transferred to the Secretary of Treasury within such five (5) Business Day period, the Trustee and the Corporation shall be liable to the Secretary of Treasury for the accrued interest on such excess Pledged Sales Taxes from the date of initial receipt thereof by the Trustee or Corporation, as applicable.

(e)     If the Quarterly Funding Requirements have been satisfied and the Corporation or the Trustee receives Pledged Sales Taxes for a given Quarterly Installment in excess of the

Quarterly Installment of the COFINA Revenues, the immediately following Quarterly Installment shall be reduced by a like amount.

(f)     Once the Quarterly Funding Requirements have been satisfied, if the COFINA Receipts received in a quarter are insufficient to fully fund the Quarterly Installment for such quarter, then the Quarterly Installment for the next succeeding quarter shall be increased by an amount equal to such shortfall plus any shortfall in any prior Quarterly Installments.

**Section 5.06   Application of COFINA Receipts.** (a) Promptly (and in no event later than two Business Days) following the deposit of COFINA Receipts into the COFINA Revenue Fund, the Trustee shall withdraw from the COFINA Revenue Fund and transfer and apply such amounts as follows and in the following order of priority:

*First*: To the following accounts on a *pro rata* basis:

(i)     the Interest Account of the Debt Service Fund, in each Fiscal Year, an amount equal to the Interest Funding Requirement for such Fiscal Year; and

(ii)    the Principal Account of the Debt Service Fund, in each Fiscal Year, an amount equal to the Principal Funding Requirement for such Fiscal Year;

*Second*: Upon the direction of an Authorized Officer of the Corporation, to the Arbitrage Rebate Fund the amount set forth in such direction;

*Third*: To the Operating Reserve Fund, in each Fiscal Year, the amount certified by an Authorized Officer of the Corporation as being necessary to deposit to the Operating Reserve Fund such that the total amount on deposit in the Operating Reserve Fund in such Fiscal Year equals the Operating Reserve Fund Cap;

*Fourth*: Upon the direction of an Authorized Officer of the Corporation and with the consent of the Secretary of Treasury, to the Debt Retirement Fund, the amount set forth in such direction; and

*Fifth*: To the Remainder Fund, any remaining balance.

**Section 5.07   Debt Service Fund.** (a)  The Trustee shall pay out of the Debt Service Fund the Principal of and interest on all Outstanding Bonds as the same is due and payable.  Amounts paid to a Paying Agent for payments pursuant to this Section shall be irrevocably pledged to and applied to such payments.

(b)     Notwithstanding the provisions of this Section, the Corporation may, at any time but in no event less than thirty-five (35) days prior to the succeeding date on which a Sinking Fund Installment is scheduled to be due, direct the Trustee to purchase, with money on deposit in the Debt Service Fund, at a price equal to the Principal amount (with respect to Bonds that are not Capital Appreciation Bonds) or the Accreted Value (with respect to Capital Appreciation Bonds) thereof plus interest accrued and unpaid to the date of such purchase, Term Bonds to be redeemed from such Sinking Fund Installment; provided that the portion of such purchase price funded from the Principal Account shall not exceed the amount of the upcoming Sinking Fund Installment due

31

on such purchased bond and the portion of such purchase price funded from the Interest Account shall not exceed the amount of interest accrued and unpaid on such purchased bond to the date of such purchase; provided further that in the case of Capital Appreciation Bonds, no portion of the purchase price may be funded from the Interest Account.  Any Term Bond so purchased or otherwise purchased and delivered to the Trustee shall be canceled upon receipt thereof by the Trustee and evidence of such cancellation shall be given to the Corporation.  The Principal amount or Accreted Value, as applicable, of each Term Bond so canceled shall be credited against the Sinking Fund Installment due on such date.

(c)     If at the time the Trustee is required to make a withdrawal from the Debt Service Fund the moneys therein shall not be sufficient for such purpose, the Trustee shall withdraw the amount of such deficiency from the moneys on deposit in the Debt Retirement Fund and transfer the same to the Debt Service Fund.

(d)     Money in the Debt Service Fund on the last day of each Fiscal Year in excess of the Interest Funding Requirement and the Principal Funding Requirement for such Fiscal Year (which, for the avoidance of doubt, includes all amounts required to be paid on the next succeeding Principal Payment Date), including the income or interest earned on investment of money in the Debt Service Fund, shall be withdrawn and transferred first, to the Operating Reserve Fund, such amount, if any, as may be necessary to make the amount on deposit in such fund equal to the Operating Reserve Fund Cap for the next succeeding Fiscal Year and second, any excess remaining may at the direction of the Corporation either be retained therein or transferred to any other fund or account established pursuant hereto; ***provided, however***, that if no direction has been given by the Corporation, the excess on the last day of each Fiscal Year shall be transferred to the Remainder Fund.

**Section 5.08   Arbitrage Rebate Fund.**  The Trustee shall deposit to the Arbitrage Rebate Fund any money delivered to it by the Corporation for deposit therein and, notwithstanding any other provisions of this Article V, shall transfer to the Arbitrage Rebate Fund, in accordance with the directions of an Authorized Officer of the Corporation, money on deposit in any other funds or accounts held by the Trustee hereunder at such times and in such amounts as shall be set forth in such directions.

Money on deposit in the Arbitrage Rebate Fund shall be applied by the Trustee in accordance with the direction of an Authorized Officer of the Corporation only for the purpose of making payments to the Department of the Treasury of the United States of America at such times and in such amounts as the Corporation shall determine, based on an opinion of Transaction Counsel, to be required by the Code to be rebated to the Department of the Treasury of the United States of America.  Money which an Authorized Officer of the Corporation determines to be in excess of the amount required to be so rebated, shall be transferred (a) to the Debt Service Fund, if the amount then on deposit therein is less than the sum of the then applicable Interest Funding Requirement and the Principal Funding Requirement, and (b) to the extent not required to be deposited in the Debt Service Fund, may at the direction of the Corporation, either be retained therein or transferred to any other fund or account established pursuant hereto.

If and to the extent required by the Code, the Corporation shall periodically, at such times as may be required to comply with the Code, determine the amount required by the Code to be

rebated to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (a) transfer or direct the Trustee to transfer from any other of the funds and accounts held hereunder and deposit to the Arbitrage Rebate Fund, such amount as the Corporation shall have determined to be necessary in order to enable it to comply with its obligation to rebate money to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (b) pay out of the Arbitrage Rebate Fund to the Department of the Treasury of the United States of America the amount, if any, required by the Code to be rebated thereto.

Section 5.09   **Debt Retirement Fund.**   Money deposited in the Debt Retirement Fund in accordance with Section 5.06 above shall be applied, at the direction of an Authorized Officer of the Corporation, with the prior written consent of the Secretary of Treasury, in any subsequent Fiscal Year, to the purchase or redemption of Outstanding Bonds or to pay or make provision for payment of Outstanding Bonds in accordance with Section 12.01 of this Indenture.  In no event, however, may the Corporation call for redemption, contract to purchase or make provision for payment of Outstanding Bonds in accordance with Section 12.01 of this Indenture if at such time the amount on deposit in the Debt Service Fund is less than the sum of the Principal Funding Requirement and the Interest Funding Requirement for such Fiscal Year.  Notwithstanding the foregoing, money in the Debt Retirement Fund not required to pay the Redemption Price or purchase price of Bonds theretofore called for redemption or contracted to be purchased, together with interest accrued and unpaid to the redemption date, shall, at the direction of an Authorized Officer of the Corporation, be withdrawn from the Debt Retirement Fund and transferred to the Debt Service Fund or the Arbitrage Rebate Fund at any time money is required for the purposes of such funds.

Section 5.10   **Remainder Fund.**   Amounts deposited in the Remainder Fund shall be free and clear of the Statutory Lien and shall promptly be paid to or upon the order of the Secretary of Treasury; **_provided, however_**, in accordance with Section 3.2 of the Act, any amounts deposited into the Remainder Fund in contravention of the priority of deposits set forth in Section 5.06 above shall remain subject to the Statutory Lien and all such amounts shall immediately be deposited into the COFINA Revenue Fund and applied by the Trustee to fund the deposits in the priority set forth in Section 5.06 above.

Section 5.11   **Application of Money in Certain Funds for Retirement of Bonds.** Notwithstanding any other provisions hereof, if at any time the amounts held in the Debt Service Fund and the Debt Retirement Fund are sufficient to pay the Principal or Redemption Price of all Outstanding Bonds and the interest accrued and unpaid and to accrue on such Bonds to the next date of redemption when all such Bonds are redeemable, or to make provision pursuant to Section 12.01(b) hereof for the payment of the Outstanding Bonds at the maturity or redemption dates thereof, the Corporation may (a) direct the Trustee to redeem all such Outstanding Bonds, whereupon the Trustee shall proceed to redeem or provide for the redemption of such Outstanding Bonds in the manner provided for redemption of such Bonds hereby and by each Supplemental Indenture as provided in Article IV hereof, or (b) give the Trustee irrevocable instructions in accordance with Section 12.01(b) hereof and make provision for the payment of the Outstanding Bonds at the maturity or redemption dates thereof in accordance therewith.

Section 5.12   **Transfer of Investments.**   Whenever money in any fund or account established hereunder is to be paid in accordance herewith to another such fund or account, such

payment may be made, in whole or in part, by transferring to such other fund or account investments held as part of the fund or account from which such payment is to be made, whose value, together with the money, if any, to be transferred, is equal to the amount of the payment then to be made; *provided, however,* that no such transfer of investments would result in a violation of any investment standard or guideline applicable to such fund.

## ARTICLE VI.

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

**Section 6.01   Security for Deposits.**  All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Corporation and the Holders of the Bonds in such manner as may then be required by applicable federal or state laws and regulations regarding security, by Eligible Investments of a market value at least equal at all times to the amount of the deposit so held by the Trustee.  The Trustee shall have no obligation for the payment of interest on moneys properly held by it that are uninvested hereunder.

**Section 6.02   Investment of Funds and Accounts Held by the Trustee.**  (a)   Subject to the limitations set forth in this paragraph, money held hereunder, if permitted by law, shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the direction of an Authorized Officer of the Corporation given in writing.  Money in the Debt Service Fund shall only be invested in Eligible Investments of the type described in clause (a), (b), (c) or (d) of the definition of the term "Eligible Investments" set forth in Section 1.01 hereof and such investments shall mature no later than the date on which such moneys are required to be used to pay Principal of and interest on Bonds when due.

(b)      The Trustee may conclusively rely upon the Corporation's written instructions as to both the suitability and legality of the directed investments, except in the event that such instructions are contrary to the requirements explicitly contained herein.  Ratings of permitted investments shall be determined at the time of purchase of such permitted investments.  The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)      Obligations purchased or other investments made as an investment of money in any fund or account held under the provisions hereof shall be deemed at all times to be a part of such fund or account and the income or interest earned, profits realized or losses suffered by a fund or account due to the investment thereof shall be credited or charged, as the case may be, to such fund or account.

(d)      In computing the amount in any fund or account held by the Trustee under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)      Subject to the provisions hereof, the Corporation, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Corporation, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be

34

reinvested as provided in this Section.  Except as otherwise provided herein, such investments shall be sold at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the fund or account in which such investment is held.  The Trustee shall advise the Corporation in writing, on or before the fifteenth (15th) day of each calendar month, of the amounts required to be on deposit in each fund and account hereunder and of the details of all investments held for the credit of each fund and account in its custody under the provisions hereof as of the end of the preceding month and as to whether such investments comply with the provisions of paragraphs (a) and (b) of this Section.  The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the preceding month.  The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in each such fund and account in the previous month.

(f)     Although the Corporation recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Corporation hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.03   Liability for Investments.**  Neither the Corporation nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

## ARTICLE VII.

## PARTICULAR COVENANTS

The Corporation (and, as authorized by the Act, the Commonwealth with respect to Section 7.14 hereof) covenants and agrees with the Holders of the Bonds as follows:

**Section 7.01   Payment of Principal and Interest.**  The Corporation shall pay or cause to be paid every Bond, including interest thereon, on the dates and at the places and in the manner provided in the Bonds according to the true intent and meaning thereof.

**Section 7.02   Extension of Payment of Bonds.**  The Corporation shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or claims for interest by the purchase or funding of such Bonds or claims for interest or by any other arrangement and, in case the maturity of any of such Bonds or the time for payment of any such claims for interest shall be extended with the written consent of the Holders of such Bonds or claims, such Bonds, or claims for interest shall not be entitled, in case of any default hereunder, to the benefit hereof or of any Supplemental Indenture or to any payment out of any assets of the Corporation or the funds (except funds held in trust for the payment of particular Bonds or claims for interest pursuant hereto and to any Supplemental Indenture) held by the Trustee, except subject to the prior payment of the principal of all Outstanding Bonds the maturity of which has not been extended and of such portion of the interest on such Bonds as shall not be represented by such extended claims for interest.

35

**Section 7.03   Powers as to Bonds.**   Pursuant to the Act, the Corporation is duly authorized to create and issue the Bonds and to execute the Indenture and each Supplemental Indenture.  The Corporation further covenants that, except for the Statutory Lien granted under the Act, the Trust Estate is and shall be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto, prior to, or of equal rank with, or junior to, the Statutory Lien.  The Corporation further covenants that all corporate action on the part of the Corporation to that end has been duly and validly taken.  The Corporation further covenants that the Bonds and the provisions hereof and of each Supplemental Indenture are and shall be the valid and legally enforceable obligations of the Corporation in accordance with their terms and the terms hereof and of each Supplemental Indenture.  The Corporation further covenants that it shall not fail to at all times, to the extent permitted by law, defend, preserve and protect, or cause to be defended, preserved and protected, the Statutory Lien and all of the rights of the Trustee for the benefit of the Holders of Bonds under the Indenture and each Supplemental Indenture against all claims and demands of all persons whomsoever.

**Section 7.04   Further Assurance.**  The Corporation, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and the Statutory Lien, or which the Corporation may hereafter become bound to pledge or assign.

**Section 7.05   Accounts and Audits.**  The Corporation shall keep proper books of records and accounts (separate from all other records and accounts of the Commonwealth and other Government Entities), which may be kept on behalf of the Corporation by the Trustee, in which complete and correct entries shall be made of the accounts and its transactions relating to each Series of Bonds, which books and accounts, at reasonable hours and subject to the reasonable rules and regulations of the Corporation, shall be subject to the inspection of the Secretary of Treasury, the Trustee or of any Holder of a Bond or a representative of any of the foregoing duly authorized in writing.  The Corporation shall cause such books and accounts to be audited annually after the end of each Fiscal Year by a nationally recognized independent certified public accounting firm selected by the Corporation.  Annually within thirty (30) days after receipt by the Corporation of the report of such audit, a signed copy of such report shall be furnished to the Trustee, the Oversight Board, and the Commonwealth and posted with EMMA, cross-referenced to each original issuance CUSIP number applicable to the Bonds of which the Corporation has knowledge.

**Section 7.06   Creation of Liens.**  The Corporation shall not create or cause to be created any lien or charge on the Trust Estate; ***provided, however,*** that nothing contained herein shall prevent the Corporation from issuing Subordinated Lien Bonds in accordance with the Section 2.04(b) of this Indenture.  Further, except for Subordinated Lien Bonds and the Bonds, the Corporation shall not incur any other secured or unsecured indebtedness.

**Section 7.07   Restricted Payments.**  The Corporation shall not, directly or indirectly, make any payments or distributions of the COFINA Receipts or money in the funds and accounts established hereunder except in accordance with this Indenture.

Section 7.08   **Offices for Payment and Registration of Bonds.**  Unless all of the Bonds are Book Entry Bonds, the Corporation shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Bonds may be presented for payment, which office or agency may be at or through the designated corporate trust office of the Trustee. The Corporation may, pursuant to a Supplemental Indenture, designate an additional Paying Agent or Paying Agents where Bonds of the Series authorized thereby or referred to therein may be presented for payment.  The Corporation shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Bonds may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Bonds.  The provisions of this Section shall be subject to the provisions of Section 3.01 hereof.

Section 7.09   **Budget of Corporation Expenses.**   Annually, the Corporation's board shall adopt a budget prior to the start of each Fiscal Year of Corporation Expenses made or to be made for such Fiscal Year.  The budget of the Corporation Expenses may be amended by the Corporation, with the approval of the Corporation's board, from time to time.  Each such budget of the Corporation Expenses or amendment thereto shall be filed by the Corporation with the Trustee and shall be accompanied by a certificate signed by an Authorized Officer of the Corporation stating that such budget has been prepared and is filed in accordance with the provisions of this Section.

Section 7.10   **Payment of Lawful Charges.**   The Corporation shall pay all taxes and assessments or other municipal or governmental charges, if any, lawfully levied or assessed upon the Trust Estate, when the same shall become due.  The Corporation shall not create or suffer to be created any lien or charge upon any portion of the Trust Estate, except the Statutory Lien imposed by Article 3.2 of the Act and the statutory lien imposed on any Substituted Collateral.

Section 7.11   **General**.  The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions hereof in accordance with the terms of such provisions.

Upon the date of issuance of Bonds, all conditions, acts and things required by the Plan of Adjustment and the statutes of the Commonwealth and hereby to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds, shall exist, have happened and have been performed.

Section 7.12   **Tax Exemption Covenant.**   The Corporation covenants that it shall not take any action that would, or fail to take any action, if such failure would (a) cause the Corporation to either lose its status as an issuer of municipal obligations for federal income tax purposes or (b) cause interest on the Tax Exempt Bonds to become includable in gross income for federal income tax purposes and that it will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the Holders of any Tax Exempt Bonds shall be and remain excludable from gross income for federal income tax purposes.

Section 7.13   **Rating On Substituted Collateral**.  In the event that, as permitted pursuant to Section 3.3 of the Act, the Commonwealth elects to provide Substituted Collateral, the Corporation covenants to use its reasonable best efforts and to work in good faith to obtain best

37

ratings on the then Outstanding Bonds (which ratings shall, in any event, also comply with the Substitution Requirements), including but not limited to, promptly responding to requests for documents.

Section 7.14   Covenants of the Commonwealth.  The Commonwealth, with the intent to be contractually bound, has authorized the Corporation to include the following covenants in this Indenture for the benefit of the Holders of Bonds:

The Commonwealth shall not, and no Government Entity shall be authorized to, until all Bonds, together with the interest thereon, and all amounts and obligations hereunder and under the Ancillary Agreements, have been completely paid in cash in full or defeased in accordance with Section 12.01 hereof:

(a)     take any action that would (i) impair the Corporation's right to receive the COFINA Revenues, (ii) limit or alter the rights vested in the Corporation in accordance with the Plan of Adjustment to fulfill the terms of any agreements with the Holders of Bonds, (iii) materially and adversely impair the collection of the Pledged Sales Taxes in any Fiscal Year, or (iv) impair the rights and remedies of the Holders of the Bonds or the collateral security established under Article 3.2 of the Act;

(b)     reduce the Pledged Sales Taxes to a rate less than five and one-half percent (5.5%) unless, in connection with such reduction, the Corporation shall have received a Rating Confirmation from each of at least two of the Rating Services then providing a credit rating on the Outstanding Bonds at the request of the Corporation, with at least one such Rating Confirmation being provided by S&P or Moody's, that the rating of such Rating Service on the Bonds (without regard to bond insurance or other credit enhancement) will not be downgraded and will be at least A2/A category or higher following such reduction; provided, however, that, notwithstanding the foregoing, if the rate of the Pledged Sales Taxes is reduced below three percent (3%), then, in connection with such reduction, the Commonwealth shall comply with the Substitution Requirements;

(c)     impair, limit, restrict, rescind, delay or modify the rights or powers of the Corporation, the Trustee or the Holders under the Act or relating to the COFINA Revenues, or the Corporation's ability to meet its obligations to the Holders;

(d)     amend the Act to impair, limit, restrict, rescind, delay or modify any obligation or commitment of the Corporation to the Holders; or

(e)     limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the Pledged Sales Taxes;

provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to replace the portion of the Sales and Use Tax that corresponds to a tax rate of five and one-half percent (5.5%) with Substituted Collateral in accordance with the Substitution Requirements.

38

**Section 7.15   Corporate Existence**. To the extent permitted by law, the Corporation shall not take any action, or fail to take any action, the result of which would be the Corporation failing to keep in full effect its existence, rights, duties, obligations and franchises as a public corporation and governmental instrumentality of the Commonwealth under the laws of the Commonwealth, including, without limitation, the Act.   Without limiting the generality of the immediately preceding sentence, the Corporation shall not merge or consolidate, directly or indirectly, with any other legal person.

**Section 7.16   Separateness**. The Corporation shall operate as a legally separate entity from the Commonwealth (including all public corporations, agencies, and instrumentalities thereof) and all other legal persons and as a bankruptcy remote, single purpose entity (limited to the activities authorized in the Act). The Corporation shall (a) avoid commingling the COFINA Revenues and other assets of the Corporation with those of the Commonwealth or any other legal person; (b) keep the Corporation By-Laws separate and in full force and effect; (c) maintain separate financial statements, bank accounts, and books and records; (d) observe separate corporate governance, management and other formalities of the Corporation; (e) otherwise operate as an entity that is separate and distinct from all other legal persons, including, without limitation, the Commonwealth and its public corporations, agencies and instrumentalities; and (f) comply with the separateness covenants contained in the Corporation By-Laws.

**Section 7.17   Corporate Governance**.  The Corporation's board of directors shall consist of three (3) members appointed by the Governor of the Commonwealth, each of whom shall meet the fiduciary, independence and qualification standards set forth in the Act and the Corporation By-Laws, including, without limitation, that the directors may not be an officer, employee or director of the Commonwealth or any instrumentality thereof (other than the Corporation) and shall otherwise be qualified to serve on the board of directors.

**Section 7.18   Resignation of a Director.**  The Corporation shall provide written notice to the Trustee of the resignation of any member of the Corporation's board of directors within five (5) Business Days of receipt by the Corporation of written notice by such member of his or her resignation.

## ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

**Section 8.01   Appointment and Acceptance of Trustee.**  The Trustee, by its execution and delivery of this Indenture, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02   Appointment and Acceptance of Paying Agents.**  In addition to the Trustee, the Corporation may appoint one or more Paying Agents for the Bonds of any Series in the Supplemental Indenture authorizing such Bonds or in the manner provided herein or in such Supplemental Indenture or shall appoint such Paying Agent or Paying Agents prior to the authentication and delivery of the Bonds so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section

39

8.10 hereof for the appointment of a successor Paying Agent. Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Corporation and the Trustee.

**Section 8.03   Responsibilities of Trustee and Paying Agents.**  The recitals of fact contained herein and in each Supplemental Indenture and in the Bonds shall be taken as the statements of the Corporation and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof, of any Supplemental Indenture or of any Bonds, or in respect of the security afforded hereby or by each Supplemental Indenture, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to:  (i) the issuance of the Bonds for value; (ii) the application of the proceeds thereof except to the extent that such proceeds are received by it in its capacity as Trustee or Paying Agent; or (iii) the application of any money paid to the Corporation or others in accordance herewith and with each Supplemental Indenture except as to the application of any money paid to it in its capacity as Trustee or Paying Agent.  Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder and under each Supplemental Indenture except for its own negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and of each Supplemental Indenture and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein and in each Supplemental Indenture, and no implied covenants or obligations should be read into this Indenture against the Trustee.  If any Event of Default under this Indenture shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and shall use the same degree of care as a prudent person would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

**Section 8.04   Property Held in Trust.**  All money and securities conveyed to or held by the Trustee at any time pursuant to the terms hereof and of each Supplemental Indenture shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof and of each Supplemental Indenture.

**Section 8.05   Evidence on Which Fiduciaries May Act.**  The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties.  The Trustee and any Paying Agent may consult with counsel of its selection, who may or may not be of counsel to the Corporation, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder and under any Supplemental Indenture, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate

40

signed by an Authorized Officer of the Corporation. Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof and of the Supplemental Indenture upon the faith thereof, but in its discretion the Trustee or any Paying Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as it may deem reasonable. Except as otherwise expressly provided herein and in each Supplemental Indenture, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof and of any Supplemental Indenture by the Corporation to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Corporation by an Authorized Officer thereof.

The Trustee shall not be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated corporate trust office of the Trustee and such notice references the Bonds relative to which an Event of Default has occurred.

The Trustee may request that the Corporation deliver a certificate of an Authorized Officer of the Corporation setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Indenture, which certificate may be signed by any person authorized to sign an officer's certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon.

Notwithstanding the effective date of this Indenture or anything to the contrary in this Indenture, the Trustee shall have no liability or responsibility for any act or event relating to this Indenture which occurs prior to the date the Trustee formally executes this Indenture and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Bonds.

The Trustee shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Indenture and delivered using Electronic Means ("Instructions"); provided, however, that the Corporation shall provide to the Trustee an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Corporation whenever a person is to be added or deleted from the listing. If the Corporation elects to give the Trustee Instructions using Electronic Means and the Trustee in its discretion elects to act upon such Instructions, the Trustee's understanding of such Instructions shall be deemed controlling. The Corporation understands and agrees that the Trustee cannot determine the identity of the actual sender of such Instructions and that the Trustee shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Corporation

41

listed on the incumbency certificate provided to the Trustee have been sent by such Authorized Officer.  The Corporation shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee and that the Corporation and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Corporation.  The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction.  The Corporation agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Corporation; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06   Compensation.**  Unless otherwise provided, the Corporation shall pay to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder and under the applicable Supplemental Indenture, and also all reasonable and necessary expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder and under the applicable Supplemental Indenture.  The Corporation shall indemnify and save the Trustee and each Paying Agent harmless against any liabilities which it may incur in the acceptance, exercise and performance of its powers and duties hereunder and under the applicable Supplemental Indenture and which are not due to its negligence or willful misconduct.  None of the provisions contained herein or in any Supplemental Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other person employed to act hereunder.

The provisions of this Section shall survive termination of this Indenture and the resignation and removal of the Trustee.

**Section 8.07   Permitted Acts.**  The Trustee may become the owner of or may deal in Bonds as fully and with the same rights as if it were not such Trustee or a Paying Agent. The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Corporation or any committee formed to protect the rights of Holders of Bonds or to effect or aid in any reorganization growing out of the enforcement hereof or of the Bonds or any Supplemental Indenture whether or not such committee

42

shall represent the Holders of a Majority in Interest of the then Outstanding Bonds in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys appointed with due care.

**Section 8.08    Resignation of Trustee.**  The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder and under each Supplemental Indenture by giving not less than sixty (60) days written notice to: (a) the Corporation, and (b) the Holders of the Bonds by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books or, in the case of a Bond Insurer, at such Bond Insurer's last known address,  Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; *provided, however,* that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09    Removal of Trustee.**  The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondholders or by their attorneys-in-fact duly authorized and delivered to the Corporation. The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof or of any Supplemental Indenture with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Bonds.  No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.  A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof, shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Corporation.

**Section 8.10    Successor Trustee and/or Paying Agent.**  In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Corporation and the predecessor Trustee and/or Paying Agent; **provided, nevertheless,** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Bonds, at

43

their last addresses appearing on the registry books or, in the case of a Bond Insurer, at such Bond Insurer's last known address. Any successor Trustee and/or Paying Agent appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Corporation, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor. Any successor appointed under the provisions of this Section shall be a bank located in the State of New York having trust powers or a trust company organized under the laws of the State of New York or national banking association located in the State of New York having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby and by each Supplemental Indenture.

Neither the Corporation, the Commonwealth, any Government Entity nor any public corporation, agency or instrumentality of the foregoing nor any entity or person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11   Transfer of Rights and Property to Successor Trustee.**  Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Corporation, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder and under each Supplemental Indenture, with like effect as if originally appointed as Trustee. However, the Trustee then ceasing to act shall nevertheless, on request by the Corporation or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein. Should any deed, conveyance or instrument in writing from the Corporation be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Corporation.

**Section 8.12   Merger or Consolidation of the Trustee.**  Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger or consolidation to which it shall be a party or any company to which such Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank having trust powers or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance. In the event that such entity is not so

qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

# ARTICLE IX.

## SUPPLEMENTAL INDENTURES

**Section 9.01  Modification and Amendment without Consent.**  Notwithstanding any other provisions of this Article IX or Article X hereof, the Corporation and the Trustee may execute and deliver at any time or from time to time Supplemental Indentures for any one or more of the following purposes, and each such Supplemental Indenture shall become effective in accordance with its terms:

(a)      To provide for the issuance of a Series of Bonds under and in accordance with (and, for the avoidance of doubt, not in any way contrary to or inconsistent with) the provisions hereof and to prescribe the terms and conditions pursuant to which such Bonds may be issued, paid or redeemed;

(b)      To add additional covenants and agreements of the Corporation for the purpose of further securing the payment of the Bonds, provided such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Corporation or the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that such additional covenants and agreements shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(c)      To prescribe further limitations and restrictions upon the issuance of Refunding Bonds and Subordinated Lien Bonds by the Corporation which are not contrary to or inconsistent with the limitations and restrictions thereon theretofore in effect including the limitations and restrictions set forth in the Act, the Plan of Adjustment and the legislation enacted relating to the issuance of Subordinated Lien Bonds;

(d)      To surrender any right, power or privilege reserved to or conferred upon the Corporation by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Corporation or the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that same shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(e)      To confirm, as further assurance, the Statutory Lien, and the subjection to the Statutory Lien, of the Corporation's right title and interest in the Pledged Sales Taxes, or any other money, investments thereof or funds, provided that such further assurance shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(f)      To modify any of the provisions hereof or of any previously adopted Supplemental Indenture in any other respects, provided that such modifications shall not be effective until after all Bonds of any Series of Bonds Outstanding as of the effective date of such Supplemental Indenture shall cease to be Outstanding, and all Bonds issued under such Supplemental Indentures shall contain a specific reference to the modifications contained in such subsequent Supplemental Indenture; or

(g)     With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that any such modifications are not contrary to or inconsistent herewith as theretofore in effect, or to modify any of the provisions hereof or of any previous Supplemental Indenture in any other respect, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the next following paragraph, adversely affect the interests of the Bondholders in any respect.

Notwithstanding the above, no Supplemental Indenture authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Corporation and the Corporation has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Indenture will not adversely affect: (i) the excludability of interest on the Tax Exempt Bonds from gross income of the Holders for federal income tax purposes, and (ii) with respect to a modification or amendment made pursuant to paragraphs (b) – (g) above, the rights of the Holders of the Bonds in any other material respect.

**Section 9.02   Supplemental Indentures Effective with Consent of Bondholders.** The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Indenture, subject to the written consent of the Bondholders and the right of the Secretary of Treasury in accordance with and subject to the provisions of Article X hereof, such Supplemental Indenture to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation.

**Section 9.03   General   Provisions   Relating   to   Supplemental   Indentures.** The Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX, Article X or Section 7.04 hereof.  Nothing contained in this Article IX or Article X hereof shall affect or limit the rights or obligations of the Corporation to make, do, execute or deliver any Supplemental Indenture, act or other instrument pursuant to the provisions of Section 7.04 hereof or the right or obligation of the Corporation to execute and deliver to the Trustee or any Paying Agent any instrument elsewhere herein provided or permitted to be delivered to the Trustee or any Paying Agent.

A copy of every Supplemental Indenture, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01 and an opinion of Transaction Counsel stating that such Supplemental Indenture has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Corporation and enforceable in accordance with its terms.  The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Indenture shall become effective without the written consent of the Trustee.

The Corporation, as soon as practicable after a Supplemental Indenture changing, amending or modifying any provisions of this Indenture has become effective, shall give written notice thereof to each Rating Service then providing a rating on the Outstanding Bonds at the request of the Corporation and shall post a copy of such Supplemental Indenture on the Corporation's website and EMMA under the CUSIPs for the Outstanding Bonds.

# ARTICLE X.

## AMENDMENTS OF INDENTURE

**Section 10.01 Powers of Amendment.**  Except as provided in Section 9.01 hereof, any modification or amendment hereof and of the rights and obligations of the Corporation and of the Holders of the Bonds hereunder may only be made by a Supplemental Indenture, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Bonds Outstanding at the time such consent is given, or (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Bonds of each Series so affected and Outstanding at the time such consent is given; *provided, however,* that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series, maturity and tenor remain Outstanding, the consent of the Holders of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.  No such modification or amendment shall, without the prior written consent of the Holder of such Bond, permit a change in the provisions related to the timing or amount of any payment on the Bonds, including, without limitation, any change in the currency to be used to pay Principal of and interest on the Bonds, any change in the amount or date of any Sinking Fund Installment, payment of Principal or any other payment, the terms of redemption or maturity of the principal of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount or the Redemption Price thereof or in the rate of interest thereon.  Further, no such modification or amendment shall, without the prior written consent of the Holder of such Bond, reduce the percentages or otherwise affect the classes of Bonds the consent of the Holders of which is required to effect any such modification or amendment.  For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Bonds of such Series in any respect.  The Trustee may in its discretion reasonably determine whether or not, in accordance with the foregoing provisions, the Bonds of any particular Series or maturity would be affected by any modification or amendment hereof and any such determination shall be binding and conclusive on the Corporation and all Holders of Bonds.  If the Trustee does not make such a determination, the Trustee shall obtain an opinion of Transaction Counsel as to whether the Bonds of any particular Series or maturity would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Corporation and all Holders of Bonds.

In addition, no Supplemental Indenture shall be approved by the Corporation without the prior written consent of the Secretary of Treasury if such Supplement Indenture would amend or modify Sections 2.02, 2.04, 5.02(d), 5.05, 5.06, 7.05, 7.13, 7.14, 9.01(b) or 9.01(c) of this Indenture.  Further, no Supplemental Indenture shall be approved by the Corporation without the prior written consent of the Secretary of Treasury if such Supplemental Indenture would materially impair the Commonwealth's right to receive COFINA Receipts in accordance with Sections 5.10, 12.01(a) or 12.01(c) of this Indenture.  The Trustee and the Corporation shall be entitled to rely on an opinion of Transaction Counsel to the effect that such modification or amendment would not materially impair the Commonwealth's right to receive the COFINA Receipts in accordance with Sections 5.10, 12.01(a) or 12.01(c) of this Indenture.  Transaction Counsel shall inform the Trustee and the Corporation if Transaction Counsel is not able to deliver such opinion.

**Section 10.02  Consent of Bondholders.**  The Corporation may at any time execute and deliver a Supplemental Indenture making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section.  Upon the adoption of such Supplemental Indenture, a copy thereof, certified by an Authorized Officer of the Corporation shall be filed with the Trustee for the inspection of the Holders of Bonds.  A copy of such Supplemental Indenture (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Bonds for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Corporation to each affected Holder of Bonds.  Such Supplemental Indenture shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Bonds specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed as hereinafter in this Section provided.  Any such consent shall be binding upon the Holder of the Bonds giving such consent and on any subsequent Holder of such Bonds (whether or not such subsequent Holder has notice thereof).  At any time after the Holders of the required percentages of Bonds shall have filed their consent to the Supplemental Indenture, notice, stating in substance that the Supplemental Indenture has been consented to by the Holders of the required percentages of Bonds and will be effective as provided in this Section, shall be given to the Bondholders by mailing such notice to Bondholders.  The Corporation shall file with the Trustee proof of giving such notice.  Such Supplemental Indenture shall be deemed conclusively binding upon the Corporation and the Holders of all Bonds at the expiration of sixty (60) days after the filing with the Trustee of the proof of the mailing of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty day period; **provided, however**, that the Corporation during such sixty day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Indenture as it may deem expedient.

**Section 10.03  Modifications by Unanimous Consent.**  The terms and provisions hereof and the rights and obligations of the Corporation and of the Holders of the Bonds may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Corporation of a copy of a Supplemental Indenture certified by an Authorized Officer of the Corporation and the consent of the Holders of all of the Bonds then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04  Mailing**.  Any provision in this Article X for the mailing of a notice or other document to Bondholders shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Bonds then Outstanding at such person's address, if any, appearing upon the registry books of the Corporation, (b) to the Trustee, and (c) to the Bond Insurer at its last known address.

**Section 10.05  Exclusion of Bonds.**  Bonds owned or held by or for the account of the Corporation shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Corporation shall not be entitled with respect to such Bonds to give any consent or take any other action provided for herein.  At the time of any consent or other action taken hereunder, the Corporation shall furnish the Trustee a certificate of an Authorized Officer of the Corporation, upon which the Trustee may rely, describing all Bonds so to be excluded.

48

**Section 10.06 Notation on Bonds.**  Bonds delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Corporation and the Trustee as to such action, and in that case upon demand of the Holder of any Bond Outstanding at such effective date and upon presentation of his Bond for such purpose at the designated corporate trust office of the Trustee suitable notation shall be made on such Bond by the Trustee as to any such action.  If the Corporation or the Trustee shall so determine, new Bonds so modified as, in the opinion of the Trustee and the Corporation, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Bond then Outstanding shall be exchanged, without cost to such Bondholder, for Bonds of the same Series and maturity then Outstanding, upon surrender of such Bonds.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 Events of Default.**  An Event of Default shall exist hereunder and under each Supplemental Indenture (herein called "**Event of Default**") if:

(a)     Payment of the Principal or Redemption Price of any Bond shall not be made by the Corporation when the same shall become due and payable, either at maturity or by proceedings for redemption or otherwise; or

(b)     Payment of an installment of interest on any Bond shall not be made by the Corporation when the same shall become due and payable; or

(c)     The Corporation shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Bonds or in any Supplemental Indenture on the part of the Corporation to be performed and such default shall continue for sixty (60) days after written notice specifying such default and requiring same to be remedied shall have been given to the Corporation by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, unless, if such default is capable of being cured but is not capable of being cured within sixty (60) days, the Corporation has commenced to cure such default within sixty (60) days and does cure such default within ninety (90) days of the date the default initially occurred; or

(d)     The Corporation, pursuant to or within the meaning of any U.S., federal or Commonwealth insolvency, bankruptcy, reorganization, restructuring receivership or any other form of debtor relief law, including without limitation, PROMESA (collectively, "**Bankruptcy Laws**"):

(i)     commences proceedings to be adjudicated bankrupt or insolvent;

(ii)     consents to the institution of bankruptcy or insolvency proceedings against it;

(iii)   files, or consents to the filing of, a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law;

(iv)   consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or any substantial part of its property;

(v)   makes a general assignment for the benefit of its creditors;

(vi)   takes any corporate or similar action in furtherance of any of the foregoing; or

(e)   a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)   is for relief against the Corporation in a proceeding in which the Corporation is to be adjudicated bankrupt or insolvent;

(ii)   approves as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Corporation under any Bankruptcy Law;

(iii)   appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of the Corporation for all or any substantial part of the property of the Corporation;

(iv)   orders the liquidation, dissolution or winding up of the Corporation and the order or decree remains unstayed and in effect for 60 consecutive days; or

(f)   the Commonwealth defaults in the due and punctual performance of any of the covenants of the Commonwealth contained in Section 7.14 hereof; or

(g)   the Corporation permits the validity or effectiveness of this Indenture or the Bonds to be impaired, and such impairment affects the enforceability of or payments on the Bonds, or any person to be released from any covenants or obligations with respect to the Bonds; or

(h)   the Corporation shall default in the due and punctual performance of any of its covenants contained in Sections 7.02 and 7.06 hereof; or

(i)   the Corporation shall take any action or engage in any activity prohibited by Article 2.6 of the Act.

**Section 11.02 No Acceleration with Respect to the Bonds.**   There shall be no right of acceleration with respect to the Bonds.

**Section 11.03 Enforcement of Remedies.**

50

(a)        If an Event of Default occurs and is continuing, the Trustee shall make payments in accordance with Section 11.04 below.

(b)        If an Event of Default occurs and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall, proceed to protect and enforce its rights and the rights of the Holders by such of the following remedies as the Trustee shall deem most effective to protect and enforce such rights or such of the following remedies as Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall instruct:

  (i)        initiation of Proceedings to (A) collect all amounts due in respect of the Bonds limited, upon recovery thereunder, to the Trust Estate; (B) enforce any and all rights of the Holders, (C) enforce any covenant or agreement in this Indenture, or (D) enforce any other remedy or legal or equitable right vested in the Trustee or the Holders;

  (ii)        enforcement of the Statutory Lien and enforcement of the Corporation's rights or remedies in respect of the Trust Estate to the same extent as the Corporation; or

  (iii)        by action or suit in law or in equity to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondholders.

(c)        In any Proceedings brought by the Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders, and it shall not be necessary to make any Holder a party to any such Proceedings.

(d)        Subject to Article VIII hereof, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

In the enforcement of any remedy hereunder and under each Supplemental Indenture the Trustee shall be entitled to sue for, enforce payment of, and receive any and all amounts then, or during any default becoming, and at any time remaining, due from the Corporation for Principal or interest or otherwise under any of the provisions of the Indenture or of any Supplemental Indenture or of the Bonds, with interest on overdue payments of the Principal of or interest on the Bonds at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under any Supplemental Indenture and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Holders of such Bonds, and to recover and enforce judgment or decree against the Corporation but solely as provided herein, in any Supplemental Indenture and in such Bonds, for any portion of such amounts remaining unpaid, with interest, costs and expenses, and to collect in any manner provided by law, the money adjudged or decreed to be payable.

51

**Section 11.04  Priority of Payments after Default.**  If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee hereunder and under each Supplemental Indenture shall not be sufficient to pay the Principal of and interest on the Bonds as the same become due and payable, the money held by the Trustee hereunder and under each Supplemental Indenture together with any money then available or thereafter becoming available to pay the Principal of and interest on the Bonds, whether through exercise of the remedies provided for in this Article XI or otherwise, shall be applied (after payment of all amounts owing to the Trustee hereunder) as follows:

First:  *Pro rata*:

(A) To the payment to the persons entitled thereto of all installments of interest then due in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference; and

(B) To the payment to the persons entitled thereto of the unpaid Principal or Redemption Price of any Bonds which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any date, then to the payment thereof ratably, according to the amount of Principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

Second: To be applied by the Trustee to fund the deposits in the priority set forth in Section 5.06 above.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future.  The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Corporation, to any Holder of Bonds or to any other person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee.  Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date (which shall be on an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made, and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Bonds are Outstanding and unpaid shall be paid and applied in accordance with Section 5.06 hereof.

Section 11.05  **Termination of Proceedings.**  In case any proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Corporation, the Trustee and the Bondholders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been commenced.

Section 11.06  **Bondholders' Direction of Proceedings.**  Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Bonds shall have the right by an instrument in writing executed and delivered to the Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder and under each Supplemental Indenture, or exercising any trust or power conferred upon the Trustee hereunder, including the power to direct or withhold directions with respect to any remedy available pursuant to Section 11.03, provided, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof and of each Supplemental Indenture, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondholders not parties to such direction.

Section 11.07  **Control by Holders of Bonds; Limitations**†.  No Holder of any of the Bonds shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted hereby or to institute such action, suit or proceeding in its or their name, and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time (and in no event shall a delay of more than thirty (30) days be deemed reasonable for such purposes) after receipt thereof.  Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law.  Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that no one or more Holders of the Bonds secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all proceedings at law or in equity shall be instituted and maintained for the benefit of all Holders of the Outstanding Bonds.  Notwithstanding any other provision hereof, the Holder of any Bond shall have the right which is absolute and unconditional to receive payment of the Principal of (and premium, if any) and interest on such Bond on the stated maturity expressed in such Bond (or, in the case of redemption, on the redemption date or, in the case of interest, on the Interest Payment Date on

---

† NTD – The Confirmation Order should provide that Section 11.07 controls over any other provision contained in the Confirmation Order regarding collective action of Holders.

which such interest is due) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

**Section 11.08 Actions by Trustee; Possession of Bonds by Trustee Not Required.** All rights of action hereunder or under any of the Bonds secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Bonds or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Bonds to which such action relates, subject to the provisions hereof.

**Section 11.09 Waiver and Non–Waiver of Default**. No delay or omission of the Trustee or any Bondholder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein. Every power and remedy given by this Article XI to the Trustee and the Bondholders, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall waive any default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; ***provided, however,*** the Trustee may not waive any default if it has received a direction from not less than a Quarter in Interest of the Outstanding Bonds that such default may not be waived by the Trustee; ***provided, further,*** that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10 Notice of Event of Default**. The Trustee shall give notice of each Event of Default hereunder known to the Trustee to the Corporation and the Commonwealth, within ten (10) days after knowledge of the occurrence thereof and to the Holders of Bonds within thirty (30) days after knowledge of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice; ***provided, however***, that failure to provide notice to the Commonwealth of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Bondholders. In the case of the Holders of the Bonds, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders of Bonds, as the names and addresses of such Holders appear on the books for registration and transfer of Bonds as kept by the Trustee and to the Bond Insurer at its last known address.

**Section 11.11 Remedies Not Exclusive**. No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

## ARTICLE XII.

## DEFEASANCE

**Section 12.01 Defeasance.** (a)  If the Corporation shall pay or cause to be paid to the Holder of a Bond the Principal or Redemption Price of and interest thereon, at the times and in the

54

manner stipulated therein, herein, and in the applicable Supplemental Indenture, then all rights granted hereby and by the Act to such Bonds (including without limitation, the Statutory Lien) shall be discharged and satisfied.  In such event, the Trustee shall, upon the request of the Corporation, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Corporation, and all money or investments thereof held by it pursuant hereto and to the applicable Supplemental Indenture which are being held for the sole benefit of such Bonds and which are not required for the payment or redemption of Bonds of such Series shall be applied by the Trustee as follows: first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Corporation, second, to the Debt Service Fund, if the amount then on deposit therein is less than the sum of the then applicable Interest Funding Requirement and the Principal Funding Requirement, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of the Corporation, may either be retained therein or transferred to any other fund or account established pursuant hereto.

(b)     Bonds for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee (through deposit of money for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section.  All Outstanding Bonds of any Series or any maturity within a Series or a portion of a maturity within a Series shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

(i)     in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of such Bonds; and

(ii)     there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay when due the Principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be; and

(iii)     in the event said Bonds are not by their terms subject to redemption within the next succeeding sixty (60) days, the Corporation shall have given the Trustee, in form satisfactory to it, irrevocable instructions to give, as soon as practicable, by first class mail, postage prepaid, to the Holders of said Bonds at their last known addresses appearing on the registration books, a notice to the Holders of such Bonds that the deposit required by (ii) above has been made with the Trustee and that said Bonds are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which money is to be available for the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; and

55

(iv)      in the event of a defeasance of a Tax Exempt Bond, the Corporation shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Bond having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Indenture, (B) such defeasance is in accordance with the terms hereof and (C) such defeasance will not adversely affect the exclusion of interest on such Tax Exempt Bond from gross income for purposes of federal income taxation.

The Corporation shall give written notice to the Trustee of its selection of the Series and maturity payment of which shall be made in accordance with this Section.  The Trustee shall select the Bonds of like Series and maturity payment of which shall be made in accordance with this Section in the manner provided in Section 4.04 hereof.  Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; *provided, however,* that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due the Principal or Redemption Price, if applicable, of and interest to become due on said Bonds on and prior to such redemption date or maturity date hereof, as the case may be.  Any income or interest earned by, or increment to, the investment of any such money so deposited, shall, to the extent certified by the Trustee to be in excess of the amounts required hereinabove to pay the Principal or Redemption Price, if applicable, of and interest on such Bonds, as realized, shall be applied by the Trustee as follows:  first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Corporation, second, to the Debt Service Fund, if the amount then on deposit therein is less than the sum of the then applicable Interest Funding Requirement and the Principal Funding Requirement, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of the Corporation, may either be retained therein or transferred to any other fund or account established pursuant hereto.

(c)      Anything herein to the contrary notwithstanding, any money held by the Trustee or a Paying Agent in trust for the payment and discharge of any of the Bonds of a Series or the interest thereon which remain unclaimed for three (3) years after the date when all of the Bonds of such Series have become due and payable, either at their stated maturity dates or by call for earlier redemption, if such money was held by the Trustee or Paying Agent at such date, or for three (3) years after the date of deposit of such money if deposited with the Trustee or Paying Agent after said date when all of the Bonds of such Series become due and payable, or three (3) years after the date when the Principal or Redemption Price of or interest on the Bonds for which said money is held was due and payable, shall, at the written request of the Corporation, be repaid by the Trustee or Paying Agent to the Corporation as its absolute property and free from trust, and the Trustee or Paying Agent shall thereupon be released and discharged with respect thereto and the Holders of Bonds shall look only to the Corporation for the payment of such Bonds.

## ARTICLE XIII.

**EXECUTION OF INSTRUMENTS BY BOND HOLDERS
AND PROOF OF OWNERSHIP OF BONDS**

**Section 13.01 Evidence of Signatures of Bondholders and Ownership of Bonds.** Any request, consent or other instrument which the Indenture may require or permit to be signed and executed by a Holder or Holders of Bonds may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Bonds in person or by his or their attorneys duly appointed in writing.  Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any person of such Bonds, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Bondholder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. The corporation of the person or persons executing any such instrument on behalf of a corporate Bondholder may be established without further proof if such instrument is signed by a person purporting to be the president or a vice–president of such corporation with a corporate seal affixed and attested by a person purporting to be its secretary or an assistant secretary.

The ownership of Bonds and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books.  Any request, consent or vote of the owner of any Bond shall bind all future owners of such Bond in respect of anything done or suffered to be done or omitted to be done by the Corporation or the Trustee in accordance therewith.

**ARTICLE XIV.**

**MISCELLANEOUS**

**Section 14.01 Preservation and Inspection of Documents.**  All documents received by the Trustee from the Corporation or from Bondholders under the provisions hereof or of any Supplemental Indenture shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation any Bondholder and their agents and their representatives, any of whom may make copies thereof; *provided, however,* that with respect to inspection by a Bondholder a written request of such Bondholder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection. [SUBJECT TO REVIEW BY THE TRUSTEE - The Trustee shall provide account balances and other information reasonably requested to any Holder.]

**Section 14.02 Money and Funds Held for Particular Bonds.**  The amounts held by the Trustee or any Paying Agent for the payment of the Principal or Redemption Price of and interest on the Bonds due on any date with respect to particular Bonds shall, pending such payment, be set

57

aside and held in trust by it for the Holders of such Bonds entitled thereto, and for the purposes hereof such Principal or Redemption Price of and interest on such Bonds, due after such date thereof, shall no longer be considered to be unpaid.

**Section 14.03 Cancellation of Bonds.**  The Trustee or any Paying Agent shall forthwith cancel all Bonds which have been redeemed or paid and shall dispose of such Bonds in accordance with its customary procedures.  No such Bonds shall be deemed Outstanding Bonds hereunder and no Bonds shall be issued in lieu thereof.

**Section 14.04 No Recourse under Indenture or on the Bonds.**  All covenants, stipulations, promises, agreements and obligations of the Corporation contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Corporation and not of any member, officer or employee of the Corporation, and no recourse shall be had for the payment of the Principal or Redemption Price of or interest on the Bonds or for any claims based thereon, hereon or on the Supplemental Indenture against any member, officer or employee of the Corporation or any person executing the Bonds, all such liability, if any, being expressly waived and released by every Holder of Bonds by the acceptance of the Bonds.

**Section 14.05 Severability of Invalid Provision.**  If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein or in any Supplemental Indenture on the part of the Corporation or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of such Supplemental Indenture or of the Bonds.

**Section 14.06 Parties of Interest.**  Nothing herein or in any Supplemental Indenture adopted pursuant to the provisions hereof, expressed or implied, is intended to or shall be construed to confer upon or to give to any person or party other than the Corporation, the Trustee, the Paying Agents and the Holders and the Bond Insurer any rights, remedies or claims hereunder or by reason hereof or of any Supplemental Indenture or any covenant, condition or stipulation thereof.  All covenants, stipulations, promises and agreements herein or in any Supplemental Indenture contained by or on behalf of the Corporation shall be for the sole and exclusive benefit of the Corporation, the Trustee, the Paying Agents, the Holders and the Bond Insurer.  Any Bond Insurer of any Insured Bonds issued under this Indenture is an express third party beneficiary of this Indenture and of any applicable Supplemental Indenture.  Notwithstanding anything in this or any other section of the Indenture, the Commonwealth and the Secretary of Treasury are express third party beneficiaries of the Indenture.

**Section 14.07 Certain Provisions Relating to Capital Appreciation Bonds.**  For the purposes of receiving payment of the Redemption Price if a Capital Appreciation Bond is redeemed prior to maturity, the then current Accreted Value of such Bond shall be deemed to be its principal amount.  In computing the principal amount of Bonds held by the registered owner of a Capital Appreciation Bond in giving to the Corporation or the Trustee any notice, consent, request, or demand pursuant hereto for any purpose whatsoever, the Accreted Value of such Bond as at the immediately preceding Valuation Date shall be deemed to be its principal amount.

Notwithstanding any other provision hereof, the amount payable at any time with respect to the Principal of and interest on any Capital Appreciation Bond be equal to its Accreted Value thereof at such time plus redemption premium, if any.

**Section 14.08 Notices.**  Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto or to any Supplemental Indenture shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed:  in the case of the Corporation, to it to the attention of the Corporation's Executive Director with a copy to the Secretary of the Corporation's board, at _____; and in the case of the Trustee, addressed to it at the designated corporate trust office of the Trustee at _____; in the case of the Commonwealth, to the attention of the Secretary of Treasury at _____ or, in each case, to such other individual and at such other address as the person to be notified shall have specified by notice to the other persons.  Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

**Section 14.09 Headings.**  Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

**Section 14.10 Governing Laws.**  The Indenture and the Bonds shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction.

**Section 14.11 Retention of Jurisdiction of Title III Court.**  The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan of Adjustment, including, without limitation, with respect to the payment of the Bonds and the enforcement of the remedies set forth herein to the fullest extent permitted by law.  Any disputes, legal action, suit, or proceeding arising from or related to this Indenture or the Bonds (a) shall be brought in accordance with the terms of this Indenture in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 14.12 Signatures and Counterparts.**  This Indenture and each Supplemental Indenture may be executed and delivered in any number of counterparts, each of which shall be deemed to be an original, but such counterparts together shall constitute one and the same instrument.

**Section 14.13 Successors and Assigns.**  Whenever in the Indenture the Corporation is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Indenture contained by or on behalf of the Corporation shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

**Section 14.14 Conflicts.**  All resolutions or other proceedings of the Corporation or parts thereof in conflict herewith are repealed insofar as such conflict exists.

[Remainder of page intentionally left blank; signature page follows]

4848-8372-2614.22

      **IN WITNESS WHEREOF**, the parties hereto have executed this Indenture as of the date first written above.

<div style="margin-left:45%">

**PUERTO RICO SALES TAX FINANCING CORPORATION**


By: _____
Name:
Title:


_____, as Trustee


By: _____
Name:
Title:

</div>

4848-8372-2614.22

**<u>Exhibit B</u>**

**First Supplemental Trust Indenture**

DRAFT 12/31/18

**FIRST SUPPLEMENTAL TRUST INDENTURE**[*]

**by and between**

**PUERTO RICO SALES TAX FINANCING CORPORATION**

**and**

**_____, as Trustee**

_____

*Dated as of _____, 2019*

---

[*] **SUBJECT TO REVISION PENDING FINAL APPROVAL OF THE PLAN OF ADJUSTMENT.**

4843-5844-9273.11

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND AUTHORITY ....................................................................1

    Section 1.01    Definitions.................................................................................1
    Section 1.02    Rules of Construction ...............................................................2

ARTICLE II. THE SERIES 2019A BONDS.......................................................................3

    Section 2.01    Authorization, Designation and Series ..............................................3
    Section 2.02    Place of Payment ....................................................................3
    Section 2.03    Form, Denominations, Numbers and Letters .......................................3
    Section 2.04    Dating of Series 2019A Bonds ....................................................4
    Section 2.05    Record Date ..........................................................................4
    Section 2.06    Paying Agent .........................................................................4
    Section 2.07    Book Entry Bond Procedures........................................................4
    Section 2.08    CUSIP Numbers .....................................................................4
    Section 2.09    Application of Proceeds ............................................................4

ARTICLE III. SERIES 2019A CURRENT INTEREST BONDS ...........................................5

    Section 3.01    Maturity Dates, Principal Amounts and Interest Rates ...........................5
    Section 3.02    Interest Payments....................................................................5
    Section 3.03    Redemption Prices and Terms .....................................................5

ARTICLE IV. Series 2019A CAPITAL APPRECIATION BONDS .............................................8

    Section 4.01    Maturity Dates, Initial Principal Amounts, Maturity Values and
                             Accretion Rates .....................................................................8
    Section 4.02    Interest Accretion ...................................................................8
    Section 4.03    Redemption Prices and Terms .....................................................8

ARTICLE V. SPECIAL COVENANTS ............................................................................13

    Section 5.01    Tax Covenant .......................................................................13

ARTICLE VI. MISCELLANEOUS ................................................................................14

    Section 6.01    Limitation of Rights.................................................................14
    Section 6.02    Successors and Assigns ...........................................................14
    Section 6.03    Severability ..........................................................................14
    Section 6.04    Applicable Law ......................................................................14
    Section 6.05    Counterparts .........................................................................14
    Section 6.06    Amendments and Supplements....................................................14

i

## FIRST SUPPLEMENTAL TRUST INDENTURE

**THIS FIRST SUPPLEMENTAL TRUST INDENTURE**, is entered into as of _____, 2019, by and between **PUERTO RICO SALES TAX FINANCING CORPORATION**, a public corporation and instrumentality of the Commonwealth of Puerto Rico, constituting a corporate and political entity independent and separate from the Commonwealth of Puerto Rico (together with any successors thereto, the "**Corporation**"), and _____, as trustee (the "**Trustee**"), and supplements the Master Trust Indenture, dated as of _____, 2019, by and between the Corporation and the Trustee (the "**Master Indenture**").

## W I T N E S S E T H:

**WHEREAS**, the Corporation has determined that it is desirable at this time to authorize the issuance of its Puerto Rico Sales Tax Financing Corporation Restructured Sales Tax Bonds, Series 2019A in $_____ aggregate principal amount of the Series 2019A Current Interest Bonds (defined below) and $_____ aggregate principal amount at issuance of Series 2019A Capital Appreciation Bonds (defined below); and

**WHEREAS**, the Series 2019A Bonds are issued under and pursuant to the Master Indenture, and are, therefore, entitled to the security provided thereby (including, without limitation, the Statutory Lien on the Trust Estate) and all protections and covenants contained therein, all of which are incorporated into this First Supplemental Indenture as if set forth fully herein; and

**WHEREAS**, this First Supplemental Indenture is entered into to supplement the Master Indenture to provide for the issuance of the Series 2019A Bonds on a parity with Bonds hereafter issued; and

**WHEREAS**, the Corporation has taken all necessary action to make the Series 2019A Bonds, when authenticated by the Trustee and issued by the Corporation, valid and binding obligations of the Corporation and to constitute this First Supplemental Indenture a valid and binding instrument for the authorization of and security for the Series 2019A Bonds; and

**WHEREAS**, the Title III Court has made a binding determination that [_____].

**NOW, THEREFORE, WITNESSETH** that the Corporation does covenant and agree with the Trustee and with the Holders of the Series 2019A Bonds, as follows:

## ARTICLE I.

## DEFINITIONS AND AUTHORITY

**Section 1.01   Definitions.**  Capitalized terms used herein and not otherwise defined shall have the respective meanings accorded such terms in the Master Indenture.  In addition, the following terms shall have the following meanings herein unless the context otherwise requires:

"**Accreted Value Payments**" means, with respect to a Series 2019A Capital Appreciation Bond, all payments of Accreted Value to be made in accordance with Section 4.03 hereof, including, without limitation, the Sinking Fund Installment payments and the payment at stated maturity.

"**Authorized Denomination**" means, with respect to the Series 2019A Capital Appreciation Bonds, $1,000 principal amount in Maturity Value, or any integral multiple thereof, and with respect to Series 2019A Current Interest Bonds, $1,000 in Principal amount or any integral multiple thereof.

"**First Supplemental Indenture**" means this First Supplemental Trust Indenture, which supplements the Master Indenture to authorize the issuance of the Series 2019A Bonds.

"**Indenture**" means the Master Indenture, as supplemented by this Supplemental Indenture.

"**Master Indenture**" shall have the meaning set forth in the first paragraph of this First Supplemental Indenture.

"**Maturity Value**" means, with respect to a Series 2019A Capital Appreciation Bond, the Accreted Value due at stated maturity if no Accreted Value Payments on such Bond are paid prior to stated maturity.

"**Redemption Date**" means each date of redemption specified in Section 4.03(b) hereof for the redemption of Series 2019A Capital Appreciation Bonds.

"**Series 2019A Bonds**" means the Corporation's Restructured Sales Tax Bonds, Series 2019A authorized by the Master Indenture and this First Supplemental Indenture.

"**Series 2019A Capital Appreciation Bonds**" means the Series 2019A Bonds issued as Capital Appreciation Bonds, which have stated maturity dates of July 1, 2024, July 1, 2027, July 1, 2029, July 1, 2031, July 1, 2033, July 1, 2046 and July 1, 2051.

"**Series 2019A Current Interest Bonds**" means the Series 2019A Bonds issued as Current Interest Bonds, which have stated maturity dates of July 1, 2034, July 1, 2040, July 1, 2053 and July 1, 2058.

"**Series 2019A Tax Exempt Bonds**" means the Series 2019A Bonds issued as Tax Exempt Bonds, which are the Series 2019A Bonds [(i) stated to mature July 1, _____ with the CUSIP _____, (ii) stated to mature July 1, _____ with the CUSIP _____.]

"**Tax Certificate**" means the Tax Certificate dated the date of the original delivery of the Series 2019A Bonds relating to the requirements of certain provisions of the Code, as such certificate may from time to time be modified or supplemented in accordance with the terms thereof.

**Section 1.02   Rules of Construction.**  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and

- 2 -

vice versa, and words importing persons shall include firms, associations and corporations, including public bodies as well as natural persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the First Supplemental Indenture, refer to the First Supplemental Indenture. All references to Articles and Sections in this First Supplemental Indenture refer to the Articles and Sections hereof unless otherwise expressly stated. All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

### THE SERIES 2019A BONDS

**Section 2.01   Authorization, Designation and Series**.  The Series 2019A Bonds are hereby authorized as Series 2019A Current Interest Bonds to be issued in an aggregate principal amount of $_____ and Series 2019A Capital Appreciation Bonds in an aggregate principal amount at the time of issuance of $_____.  The Series 2019A Bonds are issued under the Master Indenture and this First Supplemental Indenture and secured by the Master Indenture, this First Supplemental Indenture and the Trust Estate (including, particularly, the Statutory Lien described within the Master Indenture). Such Series of Bonds are hereby designated as Term Bonds and shall be designated "Restructured Sales Tax Bonds, Series 2019A". The Series 2019A Bonds shall be comprised of the Series 2019A Current Interest Bonds and the Series 2019A Capital Appreciation Bonds.

**Section 2.02   Place of Payment**.  The Series 2019A Bonds shall be payable at the designated corporate trust office of the Trustee.  Interest on the Series 2019A Current Interest Bonds will be payable by the Trustee as provided in Section 3.01 of the Master Indenture, or at the option of any owner of $1,000,000 or more in aggregate Principal amount or Accreted Value (or combination of Principal amount and Accreted Value) of the Series 2019A Bonds, by wire transfer of immediately available funds to such bank in the continental United States as such owner requests in writing.

**Section 2.03  Form, Denominations, Numbers and Letters**.  The Series 2019A Current Interest Bonds shall be issued as fully registered Bonds in Authorized Denominations. The Series 2019A Capital Appreciation Bonds shall be issued as fully registered bonds with Maturity Values in Authorized Denominations.

Unless the Corporation shall otherwise direct, the Series 2019A Bonds shall be numbered and lettered "19AR–", followed by the number of the Bond.  The Series 2019A Bonds shall be numbered consecutively from one (1) upward.

Subject to the provisions of the Master Indenture, the form of the Series 2019A Current Interest Bonds and of the Trustee's Certificate of Authentication shall be substantially in the form

- 3 -

annexed hereto as Exhibit A. Subject to the provisions of the Master Indenture, the form of the Series 2019A Capital Appreciation Bonds and of the Trustee's Certificate of Authentication shall be substantially in the form annexed hereto as Exhibit B.

**Section 2.04   Dating of Series 2019A Bonds**.  The Series 2019A Bonds issued prior to the first Interest Payment Date shall be dated August 1, 2018.  Each Series 2019A Bond issued on or after the first Interest Payment Date shall be dated as provided in Section 3.01 of the Master Indenture.

**Section 2.05   Record Date**.  The Record Date for the Series 2019A Bonds shall be the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date or Principal Payment Date.  The Record Date for the payment of interest on the Effective Date shall be the Effective Date.

**Section 2.06   Paying Agent**.  The Trustee is hereby appointed Paying Agent for the Series 2019A Bonds, such appointment to be effective immediately upon the filing of this First Supplemental Indenture with the Trustee.

**Section 2.07   Book Entry Bond Procedures**.  Notwithstanding any other provision of this First Supplemental Indenture to the contrary, so long as any Series 2019A Bond is registered in the name of Cede & Co., as nominee of the Depository, all payments on such Series 2019A Bond, and all deliveries to be made and notices to be delivered with respect to such Series 2019A Bond, shall be made and given pursuant to the Depository's rules and procedures then in effect.

**Section 2.08   CUSIP Numbers**.  Neither the Corporation nor the Trustee shall be liable for any defect or inaccuracy in the CUSIP number as it appears on any Series 2019A Bond or in any notice of redemption.  The Corporation shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Series 2019A Bond of which the Corporation has knowledge.

**Section 2.09   Application of Proceeds**.  No deposit of proceeds shall be made in connection with the issuance of the Series 2019A Bonds.

# ARTICLE III.

## SERIES 2019A CURRENT INTEREST BONDS

**Section 3.01  Maturity Dates, Principal Amounts and Interest Rates**. The Series 2019A Current Interest Bonds shall bear interest at such rates and shall mature (subject to the provisions of this First Supplemental Indenture providing for optional and mandatory redemption) on July 1 of each year and in the amounts set forth below:[1]

| Year | Principal Amount* | Interest Rate |
|------|-------------------|---------------|
| 2034 | $  370,360,000 | 4.500% |
| 2040 | 2,958,332,000 | 4.550 |
| 2053 | 1,432,835,000 | 4.750 |
| 2058 | 4,242,890,000 | 5.000 |

*Preliminary, subject to change.

**Section 3.02  Interest Payments.** The Series 2019A Current Interest Bonds shall bear interest from the dated date thereof until paid (whether at maturity, prior redemption or after maturity following payment default by the Corporation), payable on the Effective Date and semiannually thereafter on each Interest Payment Date, at the rates provided above.  Interest on the Series 2019A Current Interest Bonds shall be computed on the basis of a 360-day year consisting of twelve 30-day months.  Interest shall accrue on overdue interest and Principal at the rates provided above, and shall compound on each Interest Payment Date.  All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2019A Current Interest Bonds shall be issued as fully registered bonds in Authorized Denominations.  If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

**Section 3.03  Redemption Prices and Terms**. The Series 2019A Current Interest Bonds shall be subject to redemption prior to maturity as provided in this Section 3.03.

(a)  *Optional Redemption*.  The Series 2019A Current Interest Bonds maturing on July 1, 2034 are subject to redemption prior to maturity on and after July 1, 2025, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption.

The Series 2019A Current Interest Bonds maturing on July 1, 2040, July 1, 2053 and July 1, 2058 are subject to redemption prior to maturity on and after July 1, 2028, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination)

---

[1] All numbers are subject to review.

on any Business Day, at a redemption price equal to the Principal amount thereof, plus accrued interest to the date fixed for redemption.

(b)      *Mandatory Redemption*.  The Series 2019A Current Interest Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed in Article IV of the Master Indenture, at the Redemption Price of one hundred per centum (100%) of the Principal amount of each Series 2019A Current Interest Bond or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption.   Unless none of the Series 2019A Current Interest Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Section 5.07(b) of the Master Indenture and of Section 3.03(c) hereof permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Corporation shall be required to pay for the retirement of the Series 2019A Current Interest Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2019A Current Interest Bonds:

$370,360,000[*]
Series 2019A Current Interest Bonds
maturing July 1, 2034

| Year | Amount[*] |
|------|-----------|
| 2033 | $ 52,302,000 |
| 2034[†] | 318,058,000 |

[*] Preliminary, subject to change.
[†] Stated maturity.

$2,958,332,000[*]
Series 2019A Current Interest Bonds
maturing July 1, 2040

| Year | Amount[*] |
|------|-----------|
| 2035 | $362,258,000 |
| 2036 | 409,826,000 |
| 2037 | 460,800,000 |
| 2038 | 515,383,000 |
| 2039 | 573,796,000 |
| 2040[†] | 636,269,000 |

[*]Preliminary, subject to change.
[†] Stated maturity.

- 6 -

$1,432,835,000[*]
Series 2019A Current Interest Bonds
maturing July 1, 2053

| Year | Amount[*] |
|------|-----------|
| 2052 | $699,797,000 |
| 2053[†] | 733,038,000 |

_____
[*] Preliminary, subject to change.
[†] Stated maturity.

$4,242,890,000[*]
Series 2019A Current Interest Bonds
maturing July 1, 2058

| Year | Amount[*] |
|------|-----------|
| 2054 | $767,858,000 |
| 2055 | 806,248,000 |
| 2056 | 846,563,000 |
| 2057 | 888,887,000 |
| 2058[†] | 933,334,000 |

_____
[*] Preliminary, subject to change.
[†] Stated maturity.

(c)    _Credit Against Sinking Fund Installments_.  There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on a Series 2019A Current Interest Bond entitled, as applicable, to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of such Series 2019A Current Interest Bond (A) purchased by the Corporation with moneys in the Debt Service Fund pursuant to Section 5.07(b) of the Master Indenture, (B) redeemed at the option of the Corporation pursuant to paragraph (a) of this Section, (C) purchased by the Corporation and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 12.01 of the Master Indenture.  Series 2019A Current Interest Bonds purchased pursuant to Section 5.07(b) of the Master Indenture shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.  Series 2019A Current Interest Bonds redeemed at the option of the Corporation, purchased by the Corporation (other than pursuant to Section 5.07(b) of the Master Indenture), or deemed to have been paid in accordance with Section 12.01 of the Master Indenture shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Corporation shall specify in a written direction of the Corporation delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2019A Current Interest Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2019A Current Interest Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 12.01 of the Master Indenture to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

- 7 -

## ARTICLE IV.

## SERIES 2019A CAPITAL APPRECIATION BONDS

**Section 4.01 Maturity Dates, Initial Principal Amounts, Maturity Values and Accretion Rates**.  The Series 2019A Capital Appreciation Bonds shall accrue and accrete interest at such rates and shall mature (subject to the provisions of this First Supplemental Indenture providing for optional and mandatory redemption) on July 1 of each year and in the Maturity Value set forth below:

| Maturity | Initial Accreted Value* | Maturity Value†* | Accrual/Accretion Rate |
|---|---|---|---|
| 2024 | $ 164,715,296.92 | $ 211,252,000.00 | 4.250% |
| 2027 | 243,239,774.85 | 357,795,000.00 | 4.375 |
| 2029 | 217,413,594.66 | 348,721,000.00 | 4.375 |
| 2031 | 252,931,879.29 | 449,409,000.00 | 4.500 |
| 2033 | 260,425,789.12 | 505,799,000.00 | 4.500 |
| 2046 | 1,095,005,777.09 | 4,813,847,000.00 | 5.375 |
| 2051 | 631,572,391.60 | 3,921,592,000.00 | 5.625 |

† "Maturity Value" reflects Accreted Value at maturity if no Accreted Value Payments are made prior to stated maturity.
* Preliminary, subject to change.

**Section 4.02 Interest Accretion.**  Interest on the Series 2019A Capital Appreciation Bonds shall accrue and accrete from their dated dates until paid (whether at maturity, prior redemption or after maturity following payment default by the Corporation).  Interest on the Series 2019A Capital Appreciation Bonds will not be paid on a current basis, but will be added to the Principal thereof in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Corporation).  See "Exhibit C - Table of Accreted Value for the Series 2019A Capital Appreciation Bonds" for the Accreted Values for Series 2019A Capital Appreciation Bonds on each Valuation Date, assuming all Accreted Value Payments on the Series 2019A Capital Appreciation Bonds are paid when due. All overdue amounts (and any interest thereon) shall remain due and payable until paid.

**Section 4.03 Redemption Prices and Terms**.  The Series 2019A Capital Appreciation Bonds shall be subject to redemption prior to stated maturity as provided in this Section 4.03.

(a) *Optional Redemption*.  The Series 2019A Capital Appreciation Bonds maturing on July 1, 2024 and on July 1, 2027 are not subject to optional redemption prior to stated maturity.

The Series 2019A Capital Appreciation Bonds maturing July 1, 2029 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day from July 1, 2028

- 8 -

through and including June 30, 2029 at a Redemption Price equal to 103% of the Accreted Value thereof on the date fixed for redemption.

The Series 2019A Capital Appreciation Bonds maturing July 1, 2031 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2028 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2028 through June 30, 2029 | 105% of Accreted Value |
| July 1, 2029 through June 30, 2031 | 103% of Accreted Value |

The Series 2019A Capital Appreciation Bonds maturing July 1, 2033 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2028 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2028 through June 30, 2031 | 107.5% of Accreted Value |
| July 1, 2031 through June 30, 2032 | 105% of Accreted Value |
| July 1, 2032 through June 30, 2033 | 103% of Accreted Value |

The Series 2019A Capital Appreciation Bonds maturing July 1, 2046 and July 1, 2051 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2028 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2028 through June 30, 2033 | 107.5% of Accreted Value |
| July 1, 2033 through June 30, 2038 | 105% of Accreted Value |
| July 1, 2038 through June 30, 2043 | 103% of Accreted Value |
| On or after July 1, 2043 | 100% of Accreted Value |

(b)     *Mandatory Redemption*.  The Series 2019A Capital Appreciation Bonds shall be subject to redemption, in part, through application of Sinking Fund Installments as herein provided, upon notice given as prescribed in Article IV of the Master Indenture, at the Redemption Price of one hundred per centum (100%) of the Principal amount of each Series 2019A Capital Appreciation Bond or portion thereof to be redeemed, plus accrued and accreted interest, if any, to the date of redemption.  Unless none of the Series 2019A Capital Appreciation Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Section 5.07(b) of the Master Indenture and of Section 4.03(c) hereof permitting amounts to be credited to part or all of any one or more Accreted Value Payments, there shall be due and the Corporation shall be required to pay for the retirement of the Series 2019A Capital Appreciation Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall

- 9 -

constitute a Sinking Fund Installment for retirement of such Series 2019A Capital Appreciation Bonds:

$211,252,000† Maturity Value
Series 2019A Capital Appreciation Bonds
maturing July 1, 2024

| Year | Initial Accreted Value† | Accreted Value at Redemption Date†* | Maturity Value†** |
|---|---|---|---|
| 2019 | $18,627,271.90 | $19,359,500.40 | $23,890,000.00 |
| 2020 | – | – | – |
| 2021 | 15,266,721.80 | 17,259,182.60 | 19,580,000.00 |
| 2022 | 29,863,672.71 | 35,211,258.33 | 38,301,000.00 |
| 2023 | 43,813,464.32 | 53,877,451.52 | 56,192,000.00 |
| 2024†† | 57,144,166.19 | 73,289,000.00 | 73,289,000.00 |

† Preliminary, subject to change.

* Equals the original principal amount, plus interest accreted to the stated Redemption Date.

** Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.

†† Stated Maturity.

$357,795,000† Maturity Value
Series 2019A Capital Appreciation Bonds
maturing July 1, 2027

| Year | Initial Accreted Value† | Accreted Value at Redemption Date†* | Maturity Value†** |
|---|---|---|---|
| 2025 | $69,297,111.39 | $ 93,480,715.64 | $101,933,000.00 |
| 2026 | 81,268,917.69 | 114,479,158.52 | 119,543,000.00 |
| 2027†† | 92,673,745.77 | 136,319,000.00 | 136,319,000.00 |

† Preliminary, subject to change.

* Equals the original principal amount, plus interest accreted to the stated Redemption Date.

** Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.

†† Stated Maturity.

- 10 -

$348,721,000[†] Maturity Value
Series 2019A Capital Appreciation Bonds
maturing July 1, 2029

| Year | Initial Accreted Value [†] | Accreted Value at Redemption Date[†**] | Maturity Value[†**] |
|------|---------------------------|---------------------------------------|---------------------|
| 2028 | $103,537,378.74 | $159,034,317.16 | $166,069,000.00 |
| 2029[††] | 113,876,215.92 | 182,652,000.00 | 182,652,000.00 |

[†]   Preliminary, subject to change.
*   Equals the original principal amount, plus interest accreted to the stated Redemption Date.
**   Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††]   Stated Maturity.

$449,409,000[†] Maturity Value
Series 2019A Capital Appreciation Bonds
maturing July 1, 2031

| Year | Initial Accreted Value [†] | Accreted Value at Redemption Date[†**] | Maturity Value[†**] |
|------|---------------------------|---------------------------------------|---------------------|
| 2030 | $121,928,846.83 | $207,212,530.21 | $216,643,000.00 |
| 2031[††] | 131,003,032.46 | 232,766,000.00 | 232,766,000.00 |

[†]   Preliminary, subject to change.
*   Equals the original principal amount, plus interest accreted to the stated Redemption Date.
**   Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††]   Stated Maturity.

$505,799,000[†] Maturity Value
Series 2019A Capital Appreciation Bonds
maturing July 1, 2033

| Year | Initial Accreted Value [†] | Accreted Value at Redemption Date[†**] | Maturity Value[†**] |
|------|---------------------------|---------------------------------------|---------------------|
| 2032 | $139,603,018.56 | $259,334,406.39 | $271,137,000.00 |
| 2033[††] | 120,822,770.56 | 234,662,000.00 | 234,662,000.00 |

[†]   Preliminary, subject to change.
*   Equals the original principal amount, plus interest accreted to the stated Redemption Date.
**   Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††]   Stated Maturity.

- 11 -

$4,813,847,000† Maturity Value
Series 2019A Capital Appreciation Bonds
maturing July 1, 2046

| Year | Initial Accreted Value † | Accreted Value at Redemption Date†* | Maturity Value†** |
|------|------|------|------|
| 2041 | $207,526,112.81 | $699,797,357.15 | $912,323,000.00 |
| 2042 | 196,807,044.00 | 699,799,716.00 | 865,200,000.00 |
| 2043 | 186,639,362.47 | 699,797,097.89 | 820,501,000.00 |
| 2044 | 176,997,136.64 | 699,795,027.20 | 778,112,000.00 |
| 2045 | 167,853,525.05 | 699,794,311.10 | 737,915,000.00 |
| 2046†† | 159,182,596.12 | 699,796,000.00 | 699,796,000.00 |

† Preliminary, subject to change.
* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
** Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

$3,921,592,000† Maturity Value
Series 2019A Capital Appreciation Bonds
maturing July 1, 2051

| Year | Initial Accreted Value † | Accreted Value at Redemption Date†* | Maturity Value†** |
|------|------|------|------|
| 2047 | $140,702,459.85 | $699,799,257.00 | $873,657,000.00 |
| 2048 | 133,109,274.45 | 699,796,905.21 | 826,509,000.00 |
| 2049 | 125,927,088.65 | 699,796,496.74 | 781,913,000.00 |
| 2050 | 119,131,422.85 | 699,794,473.51 | 739,717,000.00 |
| 2051†† | 112,702,145.80 | 699,796,000.00 | 699,796,000.00 |

† Preliminary, subject to change.
* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
** Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

(c) *Credit Against Sinking Fund Installments*. There shall be credited against and in satisfaction of the Accreted Value Payments payable on a Series 2019A Capital Appreciation Bond entitled to the payment of such Accreted Value Payments an amount equal to the Accreted Value on the Redemption Date of such Series 2019A Capital Appreciation Bond (A) purchased by the Corporation with moneys in the Debt Service Fund pursuant to Section 5.07(b) of the Master Indenture, (B) redeemed at the option of the Corporation pursuant to paragraph (a) of this Section, (C) purchased by the Corporation and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 12.01 of the Master Indenture. Series 2019A Capital Appreciation Bonds purchased pursuant to Section 5.07(b) of the Master Indenture shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section. Series 2019A Capital Appreciation Bonds redeemed at the option of the Corporation, purchased

- 12 -

by the Corporation (other than pursuant to Section 5.07(b) of the Master Indenture) and delivered to the Trustee for cancellation, or deemed to have been paid in accordance with Section 12.01 of the Master Indenture shall be applied in satisfaction, in whole or in part of one or more Accreted Value Payments payable on such dates as the Corporation shall specify in a written direction of the Corporation delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2019A Capital Appreciation Bonds entitled to such Accreted Value Payments may be given by the Trustee and the Accreted Value Payment due on each date specified in such direction shall be reduced by the Accreted Value on the Redemption Date of the Series 2019A Capital Appreciation Bonds so purchased, redeemed or deemed to have been paid in accordance with Section 12.01 of the Master Indenture to be applied in satisfaction of such Accreted Value Payments as set forth in such direction.

## ARTICLE V.

## SPECIAL COVENANTS

### Section 5.01   Tax Covenant.

(a)   *Tax Compliance*.  In order to maintain the exclusion from gross income for purposes of federal income taxation of interest on the Series 2019A Tax Exempt Bonds, the Corporation shall comply with the provisions of the Code applicable to the Series 2019A Tax Exempt Bonds necessary to maintain such exclusion, including without limitation the provisions of the Code which prescribe yield and other limits within which proceeds of the Series 2019A Tax Exempt Bonds are to be invested, and which, in certain circumstances, require the rebate of certain earnings on such amounts to the Department of the Treasury of the United States of America in accordance with Section 148(f) of the Code.  In furtherance of the foregoing, the Corporation shall comply with the Tax Certificate relating to the Series 2019A Tax Exempt Bonds.

(b)   *No Arbitrage Covenant*.  The Corporation shall not take any action or fail to take any action which would cause the Series 2019A Tax Exempt Bonds to be "arbitrage bonds" within the meaning of Section 148(a) of the Code; nor shall any part of the proceeds of Series 2019A Tax Exempt Bonds or any other funds of the Corporation be used directly or indirectly to acquire any investment property the acquisition of which would cause any Series 2019A Tax Exempt Bonds to be "arbitrage bonds" within the meaning of Section 148(a) of the Code.

(c)   *No Private Use or Private Loans*.  The Corporation shall not use any part of the proceeds of the Series 2019A Tax Exempt Bonds in a manner which would cause such Series 2019A Tax Exempt Bonds to be "private activity bonds" within the meaning of Section 141(a) of the Code.

(d)   *Survival*.  Notwithstanding any provision of this First Supplemental Indenture to the contrary, the obligation of the Corporation to comply with the requirements of this Section and Section 7.12 of the Master Indenture shall survive the payment, redemption or defeasance of any and all Series 2019A Tax Exempt Bonds.

## ARTICLE VI.

## MISCELLANEOUS

**Section 6.01   Limitation of Rights.**   Nothing in this First Supplemental Indenture expressed or implied is intended or shall be construed to confer upon, or to give or grant to, any person or entity, other than the Corporation, the Trustee, the Paying Agent and the registered owners of the Series 2019A Bonds, any right, remedy or claim under or by reason hereof or of the Master Indenture or any covenant, condition or stipulation hereof or of the Master Indenture, and all covenants, stipulations, promises and agreements in this First Supplemental Indenture or the Master Indenture contained by and on behalf of the Corporation shall be for the sole and exclusive benefit of the Corporation, the Trustee, the Paying Agent and the registered owners of the Series 2019A Bonds.

**Section 6.02   Successors and Assigns.**   This First Supplemental Indenture shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

**Section 6.03   Severability.**   If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Corporation or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions of the Master Indenture or of this Supplemental Indenture or of the Series 2019A Bonds.

**Section 6.04   Applicable Law.**   This First Supplemental Indenture shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction. Any disputes, legal action, suit, or proceeding arising from or related to the Indenture or the Bonds (a) shall be brought in accordance herewith by any party or its successors or assigns in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept jurisdiction, in any federal district court sitting in the Commonwealth and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 6.05   Counterparts.**   This First Supplemental Indenture may be executed in several counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

**Section 6.06   Amendments and Supplements.**   This First Supplemental Indenture may only be amended or supplemented in accordance with the provisions of Articles IX and X of the Master Indenture.

**IN WITNESS WHEREOF**, the Corporation and the Trustee have caused this First Supplemental Indenture to be executed in their respective corporate names by their duly authorized officers, all as of the date first above written.

**PUERTO RICO SALES TAX FINANCING CORPORATION**

By: _____

Name:

Title:

_____, as Trustee

By: _____

Name:

Title:

[First Supplemental Trust Indenture Signature Page]

EXHIBIT A

FORM OF SERIES 2019A CURRENT INTEREST BONDS

**DETERMINED TO BE VALID BY THE JUDGMENT AND CONFIRMATION ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO, ENTERED ON THE ___ DAY OF _____, 2019.**

AS PROVIDED IN THE INDENTURE REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE INDENTURE, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE INDENTURE TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:  19AR-___                                                                $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
PUERTO RICO SALES TAX FINANCING CORPORATION
RESTRUCTURED SALES TAX BONDS,
SERIES 2019A

| INTEREST RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| _____% | | August 1, 2018 | _____ |

Registered Owner:     CEDE & CO.

Principal Amount:     _____ DOLLARS

**FOR VALUE RECEIVED**, **PUERTO RICO SALES TAX FINANCING CORPORATION** (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, hereby promises to pay, but solely in

A-1

the manner and from the revenues and sources hereinafter provided, to the **REGISTERED OWNER** named above, or registered assigns, the **PRINCIPAL AMOUNT** stated above on the **MATURITY DATE** stated above (except to the extent that such Principal Amount due on the Maturity Date is reduced by prior redemption as provided in the Indenture), upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned, and to pay to the registered owner interest on such Principal Amount from the **DATED DATE** stated above at the **INTEREST RATE** per annum stated above until the Principal Amount is paid, payable on the Effective Date  and semiannually thereafter on each January 1 and July 1 (each, an "Interest Payment Date").   Interest shall accrue on overdue interest and Principal at the rate provided above, and shall compound on each Interest Payment Date.   Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of _____, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.  Payment of the interest hereon shall be payable by the Trustee as provided in Section 3.01 of the Master Indenture, or at the option of any owner of $1,000,000 or more in aggregate Principal amount or Accreted Value (or combination of Principal amount and Accreted Value) of the Series 2019A Bonds, by wire transfer to such registered owner at the wire transfer address in the continental United States to which such registered owner has not later than the Record Date immediately preceding such Interest Payment Date directed the Trustee to wire such interest payment.  The Record Date is the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date; provided, however, that the Record Date for the interest payable on the Effective Date is the Effective Date.  All overdue interest and Principal (and any interest accruing on such overdue amounts) shall remain due and payable until paid.

THE INDENTURE (HEREINAFTER DEFINED) PROVIDES THAT THE BONDS, INCLUDING THIS BOND, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE PROVIDED FOR SUCH PAYMENT.   THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

THIS BOND IS A SPECIAL OBLIGATION OF THE CORPORATION, PAYABLE SOLELY FROM THE TRUST ESTATE, WHICH TRUST ESTATE IS SECURED BY A STATUTORY LIEN IN ACCORDANCE WITH THE ACT. The Corporation does not have the power to pledge the credit, the revenues or the taxing power of the Commonwealth, and except as described in the preceding sentence, neither the credit, the revenues nor the taxing power of the Commonwealth or any subdivision thereof is pledged to the payment of any of the Bonds.  The Corporation has no taxing power.

This bond is one of a duly authorized issue of bonds of the Corporation designated as "Restructured Sales Tax Bonds, Series 2019A" (herein called the "Series 2019A Bonds"), issued in the aggregate principal amount upon original issuance of $[_____].  The Series 2019A Bonds are issued pursuant to a Master Trust Indenture by and between the Corporation and _____, as trustee (the "Trustee), dated as of _____ (the

"Master Indenture"), including as supplemented by a First Supplemental Trust Indenture, by and between the Corporation and the Trustee, dated as of _____ (the "First Supplemental Indenture", and together with the Master Indenture, collectively referred to herein as the "Indenture").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Indenture.

This Series 2019A Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Master Indenture for the purposes set forth in the Indenture.

The Series 2019A Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Indenture.  Notice of redemption shall be given as provided in the Indenture.

The Bonds are special obligations of the Corporation.  In accordance with the Act, the payment of the amounts due on the Bonds is secured by a statutory lien on the Trust Estate, as defined and provided in the Indenture.

Copies of the Indenture are on file at the office of the Corporation, and at the corporate trust office of the Trustee, and reference to the Indenture and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Master Indenture and subject to the conditions therein, the provisions of the Master Indenture or any Supplemental Indenture amendatory thereof or supplemental thereto may be modified or amended.

The Indenture provides that neither the directors of the Corporation nor any person executing Bonds shall be liable personally thereon or be subject to any personal liability solely by reason of the issuance thereof.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Indenture, the Plan of Adjustment and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2019A Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Indenture, to institute action to enforce the provisions of the Indenture or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Indenture.

This bond is transferable, as provided in the Indenture, only upon the books of the Corporation maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2019A Bond or Bonds in the same aggregate Principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor

A-3

as provided in the Master Indenture and upon the payment of the charges, if any, therein prescribed. The Corporation and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

**IN WITNESS WHEREOF, THE PUERTO RICO SALES TAX FINANCING CORPORATION** has caused this bond to be signed in its name and on its behalf by its Executive Director and attested by its Secretary (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2019A Bonds, all as of the Dated Date specified above.

PUERTO RICO SALES TAX FINANCING CORPORATION

By: _____
Name:
Title:

**ATTEST:**

By: _____
Name:
Title:

4843-5844-9273.11

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This bond is one of the Bonds described in the within mentioned Indenture and is one of the Restructured Sales Tax Bonds, Series 2019A, of the Puerto Rico Sales Tax Financing Corporation.

_____, as Trustee

By: _____
                Authorized Signatory

Date of authentication: _____, 2019

A-5

ASSIGNMENT

FOR VALUE RECEIVED:

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

| | |
|---|---|
| | _____ |

_____     Please print or typewrite name and address,
                                             including zip code, of transferee

the   within-mentioned   Bond   and   hereby   irrevocably   constitutes   and   appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated:  _____            _____

                                        NOTE: The signature to this assignment must
                                        correspond with the name as written on the within
                                        Bond in every particular, without alteration or
                                        enlargement or any change whatsoever.

                                        _____
                                        |                                            |
                                        |   Signature Guaranteed:                    |
                                        |                                            |
                                        |                                            |
                                        _____

A-6

EXHIBIT B

FORM OF SERIES 2019A CAPITAL APPRECIATION BONDS

**DETERMINED TO BE VALID BY THE JUDGMENT AND CONFIRMATION ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO, ENTERED ON THE ___ DAY OF _____, 2019.**

AS PROVIDED IN THE INDENTURE REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE INDENTURE, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE INDENTURE TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:  19AR-___                                                                    $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
PUERTO RICO SALES TAX FINANCING CORPORATION
RESTRUCTURED SALES TAX BONDS,
SERIES 2019A

| ACCRETION RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| _____ | _____ | August 1, 2018 | _____ |

Registered Owner:     CEDE & CO.

Principal Amount at Issuance:     _____ DOLLARS

Maturity Value[2]:     _____ DOLLARS

---

[2] Reflects Accreted Value at maturity if no Accreted Value Payments are made prior to stated maturity.

B-1

**FOR VALUE RECEIVED, PUERTO RICO SALES TAX FINANCING CORPORATION** (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, hereby promises to pay, but solely in the manner and from the revenues and sources hereinafter provided, to the **REGISTERED OWNER** named above, or registered assigns, the **MATURITY VALUE** stated above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Indenture), upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned. Interest on this bond shall accrete at the **ACCRETION RATE** set forth above and shall not be payable on a current basis but shall be compounded, and added to Principal, on the Effective Date and on each January 1 and July 1 (each, a "Valuation Date") such that the **PRINCIPAL AMOUNT AT ISSUANCE** specified above shall accrete to equal the **MATURITY VALUE** specified above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Indenture). Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of _____, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. All overdue Principal (and any interest accruing thereon) shall remain due and payable until paid.

THE INDENTURE (HEREINAFTER DEFINED) PROVIDES THAT THE BONDS, INCLUDING THIS BOND, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE PROVIDED FOR SUCH PAYMENT. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

THIS BOND IS A SPECIAL OBLIGATION OF THE CORPORATION, PAYABLE SOLELY FROM THE TRUST ESTATE, WHICH TRUST ESTATE IS SECURED BY A STATUTORY LIEN IN ACCORDANCE WITH THE ACT. The Corporation does not have the power to pledge the credit, the revenues or the taxing power of the Commonwealth, and except as described in the preceding sentence, neither the credit, the revenues nor the taxing power of the Commonwealth or any subdivision thereof is pledged to the payment of any of the Bonds. The Corporation has no taxing power.

This bond is one of a duly authorized issue of bonds of the Corporation designated as "Restructured Sales Tax Bonds, Series 2019A" (herein called the "Series 2019A Bonds"), issued in the aggregate Accreted Value upon original issuance of $[_____]. The Series 2019A Bonds are issued pursuant to a Master Trust Indenture by and between the Corporation and _____, as trustee (the "Trustee"), dated as of _____ (the "Master Indenture"), including as supplemented by a First Supplemental Trust Indenture, by and between the Corporation and the Trustee, dated as of _____ (the "First Supplemental Indenture", and together with the Master Indenture, collectively referred to herein

as the "Indenture").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Indenture.

This Series 2019A Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Master Indenture for the purposes set forth in the Indenture.

The Series 2019A Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Indenture.  Notice of redemption shall be given as provided in the Indenture.

The Bonds are special obligations of the Corporation.  In accordance with the Act, the payment of the amounts due on the Bonds is secured by a statutory lien on the Trust Estate, as defined and provided in the Indenture.

Copies of the Indenture are on file at the office of the Corporation, and at the corporate trust office of the Trustee, and reference to the Indenture and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Master Indenture and subject to the conditions therein, the provisions of the Master Indenture or any Supplemental Indenture amendatory thereof or supplemental thereto may be modified or amended.

The Indenture provides that neither the directors of the Corporation nor any person executing Bonds shall be liable personally thereon or be subject to any personal liability solely by reason of the issuance thereof.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Indenture, the Plan of Adjustment and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2019A Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Indenture, to institute action to enforce the provisions of the Indenture or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Indenture.

This bond is transferable, as provided in the Indenture, only upon the books of the Corporation maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2019A Bond or Bonds in the same aggregate Accreted Value, and of the same series, maturity and accretion rate, shall be issued to the transferee in exchange therefor as provided in the Master Indenture and upon the payment of the charges, if any, therein prescribed. The Corporation and the Trustee may treat and consider the person in whose name

4843-5844-9273.11

this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

**IN WITNESS WHEREOF, THE PUERTO RICO SALES TAX FINANCING CORPORATION** has caused this bond to be signed in its name and on its behalf by its Executive Director and attested by its Secretary (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2019A Bonds, all as of the Dated Date specified above.

**PUERTO RICO SALES TAX
FINANCING CORPORATION**

By: _____
Name:
Title:

**ATTEST:**

By: _____
Name:
Title:

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

     This bond is one of the Bonds described in the within mentioned Indenture and is one of the Restructured Sales Tax Bonds, Series 2019A, of the Puerto Rico Sales Tax Financing Corporation.

_____, as Trustee

By:  _____
              Authorized Signatory

Date of authentication: _____, 2019

B-5

## ASSIGNMENT

FOR VALUE RECEIVED:

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

|  |
|---|

_____

_____    Please print or typewrite name and address,
including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated:  _____        _____

NOTE: The signature to this assignment must
correspond with the name as written on the within
Bond in every particular, without alteration or
enlargement or any change whatsoever.

|  |
|---|
| Signature Guaranteed: |

B-6

## **Exhibit C**

**Second Supplement Trust Indenture**

DRAFT 12/31/18

---

## SECOND SUPPLEMENTAL TRUST INDENTURE[*]

**by and between**

## PUERTO RICO SALES TAX FINANCING CORPORATION

**and**

**_____, as Trustee**

_____

*Dated as of _____, 2019*

---

[*] **SUBJECT TO REVISION PENDING FINAL APPROVAL OF THE PLAN OF ADJUSTMENT**.

4829-3927-5396.6

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND AUTHORITY ..........................................................................1

    Section 1.01    Definitions ...............................................................................................1
    Section 1.02    Rules of Construction ............................................................................3

ARTICLE II. THE SERIES 2019B BONDS .................................................................................4

    Section 2.01    Authorization, Designation and Series ..................................................4
    Section 2.02    Place of Payment ...................................................................................4
    Section 2.03    Form, Denominations, Numbers and Letters ........................................4
    Section 2.04    Dating of Series 2019B Bonds ..............................................................4
    Section 2.05    Record Date ...........................................................................................4
    Section 2.06    Paying Agent .........................................................................................5
    Section 2.07    Book Entry Bond Procedures ................................................................5
    Section 2.08    CUSIP Numbers ...................................................................................5
    Section 2.09    Application of Proceeds ........................................................................5

ARTICLE III. SERIES 2019B CURRENT INTEREST BONDS ................................................6

    Section 3.01    Maturity Dates, Principal Amounts and Interest Rates ...........................6
    Section 3.02    Interest Payments ..................................................................................6
    Section 3.03    Redemption Prices and Terms ..............................................................6

ARTICLE IV. Series 2019B CAPITAL APPRECIATION BONDS ...........................................9

    Section 4.01    Maturity Dates, Initial Principal Amounts, Maturity Values and
                       Accretion Rates .....................................................................................9
    Section 4.02    Interest Accretion .................................................................................9
    Section 4.03    Redemption Prices and Terms ..............................................................9

ARTICLE V. SPECIAL COVENANTS .......................................................................................14

    Section 5.01    Tax Covenant ........................................................................................14

ARTICLE VI. MISCELLANEOUS ..............................................................................................19

    Section 6.01    Limitation of Rights ..............................................................................19
    Section 6.02    Successors and Assigns ........................................................................19
    Section 6.03    Severability ...........................................................................................19
    Section 6.04    Applicable Law .....................................................................................19
    Section 6.05    Counterparts ..........................................................................................20
    Section 6.06    Amendments and Supplements .............................................................20

i

## SECOND SUPPLEMENTAL TRUST INDENTURE

**THIS SECOND SUPPLEMENTAL TRUST INDENTURE**, is entered into as of _____, 2019, by and between **PUERTO RICO SALES TAX FINANCING CORPORATION**, a public corporation and instrumentality of the Commonwealth of Puerto Rico, constituting a corporate and political entity independent and separate from the Commonwealth of Puerto Rico (together with any successors thereto, the "**Corporation**"), and _____, as trustee (the "**Trustee**"), and supplements the Master Trust Indenture, dated as of _____, 2019, by and between the Corporation and the Trustee (the "**Master Indenture**").

## W I T N E S S E T H:

**WHEREAS**, the Corporation has determined that it is desirable at this time to authorize the issuance of its Puerto Rico Sales Tax Financing Corporation Restructured Sales Tax Bonds, Series 2019B in $_____ aggregate principal amount of the Series 2019B Current Interest Bonds (defined below) and $_____ aggregate principal amount at issuance of Series 2019B Capital Appreciation Bonds (defined below); and

**WHEREAS**, the Series 2019B Bonds are issued under and pursuant to the Master Indenture, and are, therefore, entitled to the security provided thereby (including, without limitation, the Statutory Lien on the Trust Estate) and all protections and covenants contained therein, all of which are incorporated into this Second Supplemental Indenture as if set forth fully herein; and

**WHEREAS**, this Second Supplemental Indenture is entered into to supplement the Master Indenture to provide for the issuance of the Series 2019B Bonds on a parity with Bonds hereafter issued; and

**WHEREAS**, the Corporation has taken all necessary action to make the Series 2019B Bonds, when authenticated by the Trustee and issued by the Corporation, valid and binding obligations of the Corporation and to constitute this Second Supplemental Indenture a valid and binding instrument for the authorization of and security for the Series 2019B Bonds; and

**WHEREAS**, the Title III Court has made a binding determination that [_____].

**NOW, THEREFORE, WITNESSETH** that the Corporation does covenant and agree with the Trustee and with the Holders of the Series 2019B Bonds, as follows:

## ARTICLE I.

## DEFINITIONS AND AUTHORITY

**Section 1.01   Definitions.**  Capitalized terms used herein and not otherwise defined shall have the respective meanings accorded such terms in the Master Indenture.  In addition, the following terms shall have the following meanings herein unless the context otherwise requires:

"**Accreted Value Payments**" means, with respect to a Series 2019B Capital Appreciation Bond, all payments of Accreted Value to be made in accordance with Section 4.03 hereof, including, without limitation, the Sinking Fund Installment payments and the payment at stated maturity.

"**Authorized Denomination**" means, with respect to the Series 2019B Capital Appreciation Bonds, $1,000 principal amount in Maturity Value, or any integral multiple thereof, and with respect to Series 2019B Current Interest Bonds, $1,000 in Principal amount or any integral multiple thereof.

"**Bond Insurer**" means Assured Guaranty Municipal Corp., a New York stock insurance company, or any successor thereto or assignee thereof.

"**Bond Insurer's Fiscal Agent**" means any designated agent of the Bond Insurer.

"**Certificate of Determination**" means that certain Certificate of Determination of an Authorized Officer of the Corporation referenced in Section 2.09 hereof.

"**Claim**" means any claim or enforcement proceeding arising from or related to a Series 2019B Bond in connection with an Insolvency Proceeding.

"**Indenture**" means the Master Indenture, as supplemented by this Supplemental Indenture.

"**Initial Holder**" means the Bond Insurer to the extent the Bond Insurer is the initial beneficial holder of the Series 2019 Bonds.

"**Insolvency Proceeding**" means any proceeding or the occurrence of an event described in Section 11.01(d) or (e) of the Master Indenture.

"**Insurance Policy**" means the insurance policy issued by the Bond Insurer guaranteeing the scheduled payment of principal of and interest on the Series 2019B Bonds when due.

"**Insured Bondholder**" means the registered owner of a Series 2019B Bond.

"**Insured Payment Date**" means an Interest Payment Date or Principal Payment Date on which the Principal of or interest on the Series 2019B Bonds is payable.

"**Master Indenture**" shall have the meaning set forth in the first paragraph of this Second Supplemental Indenture.

"**Maturity Value**" means, with respect to a Series 2019B Capital Appreciation Bond, the Accreted Value due at stated maturity if no Accreted Value Payments on such Bond are paid prior to stated maturity.

"**Policy Payment Account**": shall have the meaning given to such tem in Section 6.03(d) hereof.

- 2 -

"**Redemption Date**" means each date of redemption specified in Section 4.03(b) hereof for the redemption of Series 2019B Capital Appreciation Bonds.

"**Related Documents**" means the Indenture or any other transaction document, including any underlying security agreement.

"**Second Supplemental Indenture**" means this Second Supplemental Trust Indenture, which supplements the Master Indenture to authorize the issuance of the Series 2019B Bonds.

"**Series 2019B Bonds**" means the Corporation's Restructured Sales Tax Bonds, Series 2019B authorized by the Master Indenture and this Second Supplemental Indenture, which are insured by the Bond Insurer.

"**Series 2019B Capital Appreciation Bonds**" means the Series 2019B Bonds issued as Capital Appreciation Bonds, which have stated maturity dates of July 1, 2024, July 1, 2027, July 1, 2029, July 1, 2031, July 1, 2033, July 1, 2046 and July 1, 2051.

"**Series 2019B Current Interest Bonds**" means the Series 2019B Bonds issued as Current Interest Bonds, which have stated maturity dates of July 1, 2034, July 1, 2040, July 1, 2053 and July 1, 2058.

"**Series 2019B Tax Exempt Bonds**" means the Series 2019B Bonds issued as Tax Exempt Bonds, which are the Series 2019B Bonds [(i) stated to mature July 1, _____ with the CUSIP _____, (ii) stated to mature July 1, _____ with the CUSIP _____.]

"**Tax Certificate**" means the Tax Certificate dated the date of the original delivery of the Series 2019B Bonds relating to the requirements of certain provisions of the Code, as such certificate may from time to time be modified or supplemented in accordance with the terms thereof.

**Section 1.02   Rules of Construction.**  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations and corporations, including public bodies as well as natural persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Second Supplemental Indenture, refer to the Second Supplemental Indenture.  All references to Articles and Sections in this Second Supplemental Indenture refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

- 3 -

## ARTICLE II.

## THE SERIES 2019B BONDS

**Section 2.01   Authorization, Designation and Series**.  The Series 2019B Bonds are hereby authorized as Series 2019B Current Interest Bonds to be issued in an aggregate principal amount of $_____ and Series 2019B Capital Appreciation Bonds in an aggregate principal amount at the time of issuance of $_____.  The Series 2019B Bonds are issued under the Master Indenture and this Second Supplemental Indenture and secured by the Master Indenture, this Second Supplemental Indenture and the Trust Estate (including, particularly, the Statutory Lien described within the Master Indenture).  Such Series of Bonds are hereby designated as Term Bonds and shall be designated "Restructured Sales Tax Bonds, Series 2019B".  The Series 2019B Bonds shall be comprised of the Series 2019B Current Interest Bonds and the Series 2019B Capital Appreciation Bonds.

**Section 2.02   Place of Payment**.  The Series 2019B Bonds shall be payable at the designated corporate trust office of the Trustee.  Interest on the Series 2019B Current Interest Bonds will be payable by the Trustee as provided in Section 3.01 of the Master Indenture, or at the option of any owner of $1,000,000 or more in aggregate Principal amount or Accreted Value (or combination of Principal amount and Accreted Value) of the Series 2019B Bonds, by wire transfer of immediately available funds to such bank in the continental United States as such owner requests in writing.

**Section 2.03   Form, Denominations, Numbers and Letters**.  The Series 2019B Current Interest Bonds shall be issued as fully registered Bonds in Authorized Denominations. The Series 2019B Capital Appreciation Bonds shall be issued as fully registered bonds with Maturity Values in Authorized Denominations.

Unless the Corporation shall otherwise direct, the Series 2019B Bonds shall be numbered and lettered "19AR–", followed by the number of the Bond.  The Series 2019B Bonds shall be numbered consecutively from one (1) upward.

Subject to the provisions of the Master Indenture, the form of the Series 2019B Current Interest Bonds and of the Trustee's Certificate of Authentication shall be substantially in the form annexed hereto as Exhibit A.  Subject to the provisions of the Master Indenture, the form of the Series 2019B Capital Appreciation Bonds and of the Trustee's Certificate of Authentication shall be substantially in the form annexed hereto as Exhibit B.

**Section 2.04   Dating of Series 2019B Bonds**.  The Series 2019B Bonds issued prior to the first Interest Payment Date shall be dated August 1, 2018.  Each Series 2019B Bond issued on or after the first Interest Payment Date shall be dated as provided in Section 3.01 of the Master Indenture.

**Section 2.05   Record Date**.  The Record Date for the Series 2019B Bonds shall be the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date or Principal Payment Date.  The Record Date for the payment of interest on the Effective Date shall be the Effective Date.

- 4 -

**Section 2.06    Paying Agent**.  The Trustee is hereby appointed Paying Agent for the Series 2019B Bonds, such appointment to be effective immediately upon the filing of this Second Supplemental Indenture with the Trustee.

**Section 2.07    Book Entry Bond Procedures**.  Notwithstanding any other provision of this Second Supplemental Indenture to the contrary, so long as any Series 2019B Bond is registered in the name of Cede & Co., as nominee of the Depository, all payments on such Series 2019B Bond, and all deliveries to be made and notices to be delivered with respect to such Series 2019B Bond, shall be made and given pursuant to the Depository's rules and procedures then in effect.

**Section 2.08    CUSIP Numbers**.  Neither the Corporation nor the Trustee shall be liable for any defect or inaccuracy in the CUSIP number as it appears on any Series 2019B Bond or in any notice of redemption.  The Corporation shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Series 2019B Bond of which the Corporation has knowledge.

**Section 2.09    Series 2019B Bonds Subject to Mandatory Tender at the Option of the Initial Holder.**    In addition to being subject to mandatory and optional redemption as set forth herein, the Series 2019B Bonds shall, in the event the Bond Insurer becomes the Initial Holder, be subject to a mandatory tender for purchase by the Corporation, at the option of the Initial Holder. The purchase price of the Series 2019B Bonds so tendered shall be payable solely from the proceeds of a remarketing of such Series 2019B Bonds.  At the option of the Initial Holder, the Corporation agrees to remarket the Series 2019B Bonds as Insured Bonds with the principal amounts, maturities and interest rates, based on determinations of the applicable underwriter(s), such that the interest rates on the remarketed Series 2019A Bonds are the lowest interest rates necessary for such Series 2019B Bonds to be remarketed at their adjusted par amounts and the adjusted terms otherwise result in the Series 2019B Bonds being remarketed at the lowest aggregate yield; **provided, however,** that (a) the sum of the Principal Requirements and Interest Requirements on the remarketed Series 2019B Bonds due in any Fiscal Year shall not be greater than the sum of the Principal Requirements and Interest Requirement due in such Fiscal Year on the Series 2019B Bonds prior to such remarketing and (b) the remarketed Series 2019B Bonds may mature later than the Series 2019B Bonds prior to the remarketing, but in no event later than FY2058; **provided, further**, that such remarketed Series 2019B Bonds shall be subject to optional redemption at the same times and at the same redemption prices set forth in Section 3.03(a), in the case of Series 2019B Bonds remarketed as Current Interest Bonds and Section 4.02(a), in the case of Series 2019B Bonds remarketed as Capital Appreciation Bond. The principal amount, maturities and mandatory redemption provisions of and interest rates on the remarketed Series 2019B Bonds shall be evidenced by a Certificate of Determination signed by an Authorized Officer of the Corporation.

**Section 2.10    Application of Proceeds**.  [TO COME].

# ARTICLE III.

## SERIES 2019B CURRENT INTEREST BONDS

**Section 3.01   Maturity Dates, Principal Amounts and Interest Rates**. The Series 2019B Current Interest Bonds shall bear interest at such rates and shall mature (subject to the provisions of this Second Supplemental Indenture providing for optional and mandatory redemption) on July 1 of each year and in the amounts set forth below:[1]

| Year | Principal Amount[*] | Interest Rate |
|------|---------|----------|
| 2034 | $ 4,730,000 | 4.500% |
| 2040 | 37,783,000 | 4.550 |
| 2053 | 18,300,000 | 4.750 |
| 2058 | 54,190,000 | 5.000 |

_____
[*]Preliminary, subject to change.

**Section 3.02   Interest Payments.**  The Series 2019B Current Interest Bonds shall bear interest from the dated date thereof until paid (whether at maturity, prior redemption or after maturity following payment default by the Corporation), payable on the Effective Date and semiannually thereafter on each Interest Payment Date, at the rates provided above.  Interest on the Series 2019B Current Interest Bonds shall be computed on the basis of a 360-day year consisting of twelve 30-day months.  Interest shall accrue on overdue interest and Principal at the rates provided above, and shall compound on each Interest Payment Date.  All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2019B Current Interest Bonds shall be issued as fully registered bonds in Authorized Denominations.  If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

**Section 3.03   Redemption Prices and Terms**.  The Series 2019B Current Interest Bonds shall be subject to redemption prior to maturity as provided in this Section 3.03.

(a)   *Optional Redemption.*  The Series 2019B Current Interest Bonds maturing on July 1, 2034 are subject to redemption prior to maturity on and after July 1, 2025, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, at a redemption price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption.

The Series 2019B Current Interest Bonds maturing on July 1, 2040, July 1, 2053 and July 1, 2058 are subject to redemption prior to maturity on and after July 1, 2028, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination)

_____
[1] All numbers are subject to review.

4829-3927-5396.6

on any Business Day, at a redemption price equal to the Principal amount thereof, plus accrued interest to the date fixed for redemption.

(b)     *Mandatory Redemption.*  The Series 2019B Current Interest Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed in Article IV of the Master Indenture, at the Redemption Price of one hundred per centum (100%) of the Principal amount of each Series 2019B Current Interest Bond or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption.  Unless none of the Series 2019B Current Interest Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Section 5.07(b) of the Master Indenture and of Section 3.03(c) hereof permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Corporation shall be required to pay for the retirement of the Series 2019B Current Interest Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2019B Current Interest Bonds:

$4,730,000[*]
Series 2019B Current Interest Bonds
maturing July 1, 2034

| Year | Amount[*] |
|------|-----------|
| 2033 | $  668,000 |
| 2034[†] | 4,062,000 |

_____
[*] Preliminary, subject to change.
[†] Stated maturity.

$37,783,000[*]
Series 2019B Current Interest Bonds
maturing July 1, 2040

| Year | Amount[*] |
|------|-----------|
| 2035 | $4,627,000 |
| 2036 | 5,234,000 |
| 2037 | 5,885,000 |
| 2038 | 6,582,000 |
| 2039 | 7,329,000 |
| 2040[†] | 8,126,000 |

_____
[*]Preliminary, subject to change.
[†] Stated maturity.

$18,300,000[*]
Series 2019B Current Interest Bonds
maturing July 1, 2053

| Year | Amount[*] |
|------|-----------|
| 2052 | $8,938,000 |
| 2053[†] | 9,362,000 |

[*] Preliminary, subject to change.
[†] Stated maturity.

$54,190,000[*]
Series 2019B Current Interest Bonds
maturing July 1, 2058

| Year | Amount[*] |
|------|-----------|
| 2054 | $9,807,000 |
| 2055 | 10,297,000 |
| 2056 | 10,812,000 |
| 2057 | 11,353,000 |
| 2058[†] | 11,921,000 |

[*] Preliminary, subject to change.
[†] Stated maturity.

(c)      *Credit Against Sinking Fund Installments*.  There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on a Series 2019B Current Interest Bond entitled, as applicable, to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of such Series 2019B Current Interest Bond (A) purchased by the Corporation with moneys in the Debt Service Fund pursuant to Section 5.07(b) of the Master Indenture, (B) redeemed at the option of the Corporation pursuant to paragraph (a) of this Section, (C) purchased by the Corporation and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 12.01 of the Master Indenture.  Series 2019B Current Interest Bonds purchased pursuant to Section 5.07(b) of the Master Indenture shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.  Series 2019B Current Interest Bonds redeemed at the option of the Corporation, purchased by the Corporation (other than pursuant to Section 5.07(b) of the Master Indenture), or deemed to have been paid in accordance with Section 12.01 of the Master Indenture shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Corporation shall specify in a written direction of the Corporation delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2019B Current Interest Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2019B Current Interest Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 12.01 of the Master Indenture to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

- 8 -

## ARTICLE IV.

## SERIES 2019B CAPITAL APPRECIATION BONDS

**Section 4.01   Maturity Dates, Initial Principal Amounts, Maturity Values and Accretion Rates**.  The Series 2019B Capital Appreciation Bonds shall accrue and accrete interest at such rates and shall mature (subject to the provisions of this Second Supplemental Indenture providing for optional and mandatory redemption) on July 1 of each year and in the Maturity Value set forth below:

| Maturity | Initial Accreted Value[*] | Maturity Value[†*] | Accrual/Accretion Rate |
|---|---|---|---|
| 2024 | $  2,103,657.58 | $  2,698,000.00 | 4.250% |
| 2027 | 3,106,823.10 | 4,570,000.00 | 4.375 |
| 2029 | 2,776,890.84 | 4,454,000.00 | 4.375 |
| 2031 | 3,231,092.21 | 5,741,000.00 | 4.500 |
| 2033 | 3,326,639.68 | 6,461,000.00 | 4.500 |
| 2046 | 13,985,538.01 | 61,483,000.00 | 5.375 |
| 2051 | 8,066,672.40 | 50,088,000.00 | 5.625 |

[†]  "Maturity Value" reflects Accreted Value at maturity if no Accreted Value Payments are made prior to stated maturity.
[*]  Preliminary, subject to change.

**Section 4.02   Interest Accretion.**  Interest on the Series 2019B Capital Appreciation Bonds shall accrue and accrete from their dated dates until paid (whether at maturity, prior redemption or after maturity following payment default by the Corporation).  Interest on the Series 2019B Capital Appreciation Bonds will not be paid on a current basis, but will be added to the Principal thereof in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Corporation).  See "Exhibit C - Table of Accreted Value for the Series 2019B Capital Appreciation Bonds" for the Accreted Values for Series 2019B Capital Appreciation Bonds on each Valuation Date, assuming all Accreted Value Payments on the Series 2019B Capital Appreciation Bonds are paid when due. All overdue amounts (and any interest thereon) shall remain due and payable until paid.

**Section 4.03   Redemption Prices and Terms**.  The Series 2019B Capital Appreciation Bonds shall be subject to redemption prior to stated maturity as provided in this Section 4.03.

(a)   *Optional Redemption*.  The Series 2019B Capital Appreciation Bonds maturing on July 1, 2024 and on July 1, 2027 are not subject to optional redemption prior to stated maturity.

The Series 2019B Capital Appreciation Bonds maturing July 1, 2029 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day from July 1, 2028

- 9 -

through and including June 30, 2029 at a Redemption Price equal to 103% of the Accreted Value thereof on the date fixed for redemption.

The Series 2019B Capital Appreciation Bonds maturing July 1, 2031 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2028 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
| --- | --- |
| July 1, 2028 through June 30, 2029 | 105% of Accreted Value |
| July 1, 2029 through June 30, 2031 | 103% of Accreted Value |

The Series 2019B Capital Appreciation Bonds maturing July 1, 2033 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2028 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
| --- | --- |
| July 1, 2028 through June 30, 2031 | 107.5% of Accreted Value |
| July 1, 2031 through June 30, 2032 | 105% of Accreted Value |
| July 1, 2032 through June 30, 2033 | 103% of Accreted Value |

The Series 2019B Capital Appreciation Bonds maturing July 1, 2046 and July 1, 2051 are subject to redemption prior to stated maturity, at the election or direction of the Corporation, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2028 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
| --- | --- |
| July 1, 2028 through June 30, 2033 | 107.5% of Accreted Value |
| July 1, 2033 through June 30, 2038 | 105% of Accreted Value |
| July 1, 2038 through June 30, 2043 | 103% of Accreted Value |
| On or after July 1, 2043 | 100% of Accreted Value |

(b)    *Mandatory Redemption*.  The Series 2019B Capital Appreciation Bonds shall be subject to redemption, in part, through application of Sinking Fund Installments as herein provided, upon notice given as prescribed in Article IV of the Master Indenture, at the Redemption Price of one hundred per centum (100%) of the Principal amount of each Series 2019B Capital Appreciation Bond or portion thereof to be redeemed, plus accrued and accreted interest, if any, to the date of redemption.  Unless none of the Series 2019B Capital Appreciation Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Section 5.07(b) of the Master Indenture and of Section 4.03(c) hereof permitting amounts to be credited to part or all of any one or more Accreted Value Payments, there shall be due and the Corporation shall be required to pay for the retirement of the Series 2019B Capital Appreciation Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall

constitute a Sinking Fund Installment for retirement of such Series 2019B Capital Appreciation Bonds:

$2,698,000[†] Maturity Value
Series 2019B Capital Appreciation Bonds
maturing July 1, 2024

| Year | Initial Accreted Value [†] | Accreted Value at Redemption Date[†*] | Maturity Value[†**] |
|------|------|------|------|
| 2019 | $237,811.55 | $247,159.80 | $305,000.00 |
| 2020 | – | | – |
| 2021 | 194,927.50 | 220,367.50 | 250,000.00 |
| 2022 | 381,278.19 | 449,552.37 | 489,000.00 |
| 2023 | 559,831.78 | 688,425.58 | 718,000.00 |
| 2024[††] | 729,808.56 | 936,000.00 | 936,000.00 |

[†]  Preliminary, subject to change.
[*]  Equals the original principal amount, plus interest accreted to the stated Redemption Date.
[**] Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††] Stated Maturity.

$4,570,000[†] Maturity Value
Series 2019B Capital Appreciation Bonds
maturing July 1, 2027

| Year | Initial Accreted Value[†] | Accreted Value at Redemption Date[†*] | Maturity Value[†**] |
|------|------|------|------|
| 2025 | $885,138.66 | $1,194,038.16 | $1,302,000.00 |
| 2026 | 1,038,100.41 | 1,462,316.28 | 1,527,000.00 |
| 2027[††] | 1,183,584.03 | 1,741,000.00 | 1,741,000.00 |

[†]  Preliminary, subject to change.
[*]  Equals the original principal amount, plus interest accreted to the stated Redemption Date.
[**] Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††] Stated Maturity.

- 11 -

$4,454,000[†] Maturity Value
Series 2019B Capital Appreciation Bonds
maturing July 1, 2029

| Year | Initial Accreted Value[†] | Accreted Value at Redemption Date[†*] | Maturity Value[†**] |
|------|---------------------------|----------------------------------------|----------------------|
| 2028 | $1,322,358.66 | $2,031,154.44 | $2,121,000.00 |
| 2029[††] | 1,454,532.18 | 2,333,000.00 | 2,333,000.00 |

---

[†]  Preliminary, subject to change.
*  Equals the original principal amount, plus interest accreted to the stated Redemption Date.
**  Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††] Stated Maturity.

$5,741,000[†] Maturity Value
Series 2019B Capital Appreciation Bonds
maturing July 1, 2031

| Year | Initial Accreted Value[†] | Accreted Value at Redemption Date[†*] | Maturity Value[†**] |
|------|---------------------------|----------------------------------------|----------------------|
| 2030 | $1,557,295.27 | $2,646,552.49 | $2,767,000.00 |
| 2031[††] | 1,673,796.94 | 2,974,000.00 | 2,974,000.00 |

---

[†]  Preliminary, subject to change.
*  Equals the original principal amount, plus interest accreted to the stated Redemption Date.
**  Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††] Stated Maturity.

$6,461,000[†] Maturity Value
Series 2019B Capital Appreciation Bonds
maturing July 1, 2033

| Year | Initial Accreted Value[†] | Accreted Value at Redemption Date[†*] | Maturity Value[†**] |
|------|---------------------------|----------------------------------------|----------------------|
| 2032 | $1,783,029.44 | $3,312,255.61 | $3,463,000.00 |
| 2033[††] | 1,543,610.24 | 2,998,000.00 | 2,998,000.00 |

---

[†]  Preliminary, subject to change.
*  Equals the original principal amount, plus interest accreted to the stated Redemption Date.
**  Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
[††] Stated Maturity.

$61,483,000† Maturity Value
Series 2019B Capital Appreciation Bonds
maturing July 1, 2046

| Year | Initial Accreted Value † | Accreted Value at Redemption Date†* | Maturity Value†** |
|------|-------------------------|-------------------------------------|-------------------|
| 2041 | $2,650,480.44 | $8,937,666.60 | $11,652,000.00 |
| 2042 | 2,513,543.50 | 8,937,571.50 | 11,050,000.00 |
| 2043 | 2,383,658.13 | 8,937,434.31 | 10,479,000.00 |
| 2044 | 2,260,596.86 | 8,937,740.30 | 9,938,000.00 |
| 2045 | 2,143,904.75 | 8,938,104.50 | 9,425,000.00 |
| 2046†† | 2,033,354.33 | 8,939,000.00 | 8,939,000.00 |

† Preliminary, subject to change.
* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
** Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

$50,088,000† Maturity Value
Series 2019B Capital Appreciation Bonds
maturing July 1, 2051

| Year | Initial Accreted Value † | Accreted Value at Redemption Date†* | Maturity Value†** |
|------|-------------------------|-------------------------------------|-------------------|
| 2047 | $1,796,995.90 | $8,937,558.00 | $11,158,000.00 |
| 2048 | 1,700,043.80 | 8,937,659.64 | 10,556,000.00 |
| 2049 | 1,608,406.35 | 8,938,165.26 | 9,987,000.00 |
| 2050 | 1,521,600.40 | 8,938,091.44 | 9,448,000.00 |
| 2051†† | 1,439,625.95 | 8,939,000.00 | 8,939,000.00 |

† Preliminary, subject to change.
* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
** Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

(c)     *Credit Against Sinking Fund Installments*.  There shall be credited against and in satisfaction of the Accreted Value Payments payable on a Series 2019B Capital Appreciation Bond entitled to the payment of such Accreted Value Payments an amount equal to the Accreted Value on the Redemption Date of such Series 2019B Capital Appreciation Bond (A) purchased by the Corporation with moneys in the Debt Service Fund pursuant to Section 5.07(b) of the Master Indenture, (B) redeemed at the option of the Corporation pursuant to paragraph (a) of this Section, (C) purchased by the Corporation and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 12.01 of the Master Indenture.  Series 2019B Capital Appreciation Bonds purchased pursuant to Section 5.07(b) of the Master Indenture shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.  Series 2019B Capital Appreciation Bonds redeemed at the option of the Corporation, purchased

- 13 -

by the Corporation (other than pursuant to Section 5.07(b) of the Master Indenture) and delivered to the Trustee for cancellation, or deemed to have been paid in accordance with Section 12.01 of the Master Indenture shall be applied in satisfaction, in whole or in part of one or more Accreted Value Payments payable on such dates as the Corporation shall specify in a written direction of the Corporation delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2019B Capital Appreciation Bonds entitled to such Accreted Value Payments may be given by the Trustee and the Accreted Value Payment due on each date specified in such direction shall be reduced by the Accreted Value on the Redemption Date of the Series 2019B Capital Appreciation Bonds so purchased, redeemed or deemed to have been paid in accordance with Section 12.01 of the Master Indenture to be applied in satisfaction of such Accreted Value Payments as set forth in such direction.

## ARTICLE V.

## SPECIAL COVENANTS

### Section 5.01   Tax Covenant.

(a)   *Tax Compliance*.  In order to maintain the exclusion from gross income for purposes of federal income taxation of interest on the Series 2019B Tax Exempt Bonds, the Corporation shall comply with the provisions of the Code applicable to the Series 2019B Tax Exempt Bonds necessary to maintain such exclusion, including without limitation the provisions of the Code which prescribe yield and other limits within which proceeds of the Series 2019B Tax Exempt Bonds are to be invested, and which, in certain circumstances, require the rebate of certain earnings on such amounts to the Department of the Treasury of the United States of America in accordance with Section 148(f) of the Code.  In furtherance of the foregoing, the Corporation shall comply with the Tax Certificate relating to the Series 2019B Tax Exempt Bonds.

(b)   *No Arbitrage Covenant*.  The Corporation shall not take any action or fail to take any action which would cause the Series 2019B Tax Exempt Bonds to be "arbitrage bonds" within the meaning of Section 148(a) of the Code; nor shall any part of the proceeds of Series 2019B Tax Exempt Bonds or any other funds of the Corporation be used directly or indirectly to acquire any investment property the acquisition of which would cause any Series 2019B Tax Exempt Bonds to be "arbitrage bonds" within the meaning of Section 148(a) of the Code.

(c)   *No Private Use or Private Loans*.  The Corporation shall not use any part of the proceeds of the Series 2019B Tax Exempt Bonds in a manner which would cause such Series 2019B Tax Exempt Bonds to be "private activity bonds" within the meaning of Section 141(a) of the Code.

(d)   *Survival*.  Notwithstanding any provision of this Second Supplemental Indenture to the contrary, the obligation of the Corporation to comply with the requirements of this Section and Section 7.12 of the Master Indenture shall survive the payment, redemption or defeasance of any and all Series 2019B Tax Exempt Bonds.

**Section 5.02   Materially Adverse Actions.**  The Corporation and Trustee shall not enter into any agreement or take any action by which the rights of the Bond Insurer may be materially adversely impaired except upon obtaining the prior written consent of the Bond Insurer.

## ARTICLE VI.

## BOND INSURANCE PROVISIONS[2]

**Section 6.01   Applicability of Insurance Provisions.**  Notwithstanding any other provisions of the Indenture, the provisions of this Article VI shall govern with respect to all Series 2019B Bonds.

**Section 6.02   Nonpayment by the Issuer.**  The Bond Insurer shall be entitled to pay Principal or interest on the Series 2019B Bonds that become Due for Payment (as such term is defined in the Insurance Policy) but shall be unpaid by reason of Nonpayment by the Corporation (as such term is defined in the Insurance Policy) whether or not the Bond Insurer has received a Notice of Nonpayment (as such term is defined in the Insurance Policy) or a claim upon the Insurance Policy.

**Section 6.03   Insurance Payment Procedures.**  As long as the Insurance Policy shall be in full force and effect, the Corporation and the Trustee agree to comply with the following provisions:

(a)    If, on the third Business Day prior to an Insured Payment Date, there is not on deposit in the Debt Service Fund, after making all transfers and deposits required under the Indenture, moneys sufficient to pay the Principal of and interest on the Series 2019B Bonds due on such Insured Payment Date, the Trustee shall give notice thereof to the Bond Insurer and to the Bond Insurer's Fiscal Agent by telephone or telecopy of the amount of such deficiency by 12:00 noon, New York City time, on such Business Day.  If, by 12:00 noon New York City time on the second Business Day prior to the related Insured Payment Date, there continues to be a deficiency in the amount available to pay the Principal of and interest on the Series 2019B Bonds due on such Insured Payment Date, the Trustee shall make a claim under the Insurance Policy by 5:00 p.m. New York City time, and give notice to the Bond Insurer and the Bond Insurer's Fiscal Agent of the allocation of such deficiency between the amount required to pay interest on the Series 2019B Bonds and the amount required to pay the Principal of Series 2019B Bonds, by filing the form of Notice of Claim and Certificate delivered with the Insurance Policy; **provided, however**, that the Bond Insurer will not be required to make any payment to the extent that on the Insured Payment Date such deficiency of funds no longer exists.

(b)    The Trustee shall designate any portion of payment of Principal on Series 2019B Bonds paid by the Bond Insurer, whether by virtue of mandatory sinking fund redemption or maturity, on its books as a reduction in the Principal amount of Series 2019B Bonds registered to the then current Holder, whether DTC, its nominee or otherwise, and shall issue a replacement Bond to the Bond Insurer, registered in the name of Assured Guaranty Municipal Corp., in a

---

[2] This Article VI to be included only if Series 2019B Bonds are issued as Insured Bonds on the Effective Date.  If the Series 2019B Bonds are not issued as Insured Bonds on the Effective Date, the provisions of this Article VI shall be included in the Certificate of Determination referenced in Section 2.09 hereof.

4829-3927-5396.6

Principal amount equal to the amount of Principal so paid (without regard to authorized denominations); provided, however, that failure by the Trustee to so designate any payment or issue any replacement Bond shall have no effect on the amount of Principal or interest payable by the Corporation on any Series 2019B Bond or the subrogation rights of the Bond Insurer.

(c)     The Trustee shall keep a complete and accurate record of all funds deposited by the Bond Insurer into the Policy Payments Account (as defined below) and the allocation of such funds to payment of interest on and Principal of any Series 2019B Bond. The Bond Insurer shall have the right to inspect such records at reasonable times upon reasonable notice to the Trustee.

(d)     Upon payment of a claim under the Insurance Policy, the Trustee shall establish a separate special purpose trust account for the benefit of Insured Bondholders, which account shall be referred to herein as the "**Policy Payments Account**," over which the Trustee shall have exclusive control and sole right of withdrawal. The Trustee shall receive any amount paid under the Insurance Policy in trust on behalf of the Insured Bondholders and shall deposit any such amount in the Policy Payments Account and distribute such amount only for purposes of making the payments for which a claim was made. Such amounts shall be disbursed by the Trustee to the Insured Bondholders in the same manner as Principal and interest payments are to be made with respect to the Series 2019B Bonds. It shall not be necessary for such payments to be made by check or wire transfers separate from the check or wire transfer used to pay the Principal and interest with other funds available to make such payments. The Bond Insurer shall be entitled to receive the overdue interest that is payable on the Series 2019B Bonds, following the payment of any claims under the Insurance Policy.

(e)     Funds held in the Policy Payments Account shall not be invested by the Trustee and may not be applied to satisfy any costs, expenses or liabilities of the Trustee. Any funds remaining in the Policy Payments Account following an Insured Payment Date shall promptly be remitted to the Bond Insurer.

**Section 6.04   Subrogation.**   Amounts paid by the Bond Insurer under the Insurance Policy shall not be deemed paid pursuant to Section 12.01 of the Indenture or any other provision thereof or hereof or of the Series 2019B Bonds and the Series 2019B Bonds relating to such payments shall remain Outstanding and continue to be due and owing until paid by the Corporation in accordance with the Indenture. The Indenture shall not be discharged unless all amounts due or to become due to the Bond Insurer have been paid in full or duly provided for. In the event that the Bond Insurer makes any payment of Principal or interest on the Series 2019B Bonds, the Bond Insurer shall become subrogated to the rights of the recipients of such payments in accordance with the terms of the Insurance Policy (which subrogation rights shall also include the rights of any such recipients in connection with any Insolvency Proceeding). Each obligation of the Corporation to the Bond Insurer under the Indenture shall the survive discharge or termination thereof.

**Section 6.05   Bond Insurer as Holder.**   The Bond Insurer is deemed to be (i) the sole Holder of the Series 2019B Bonds for the purpose of consenting to any modification or amendment, exercising any voting right or privilege, giving any consent or direction, or taking any action that the Holders of such Series 2019B Bonds are entitled to take pursuant to the provisions of the Indenture pertaining to defaults and remedies and the duties and obligations of the Trustee,

- 16 -

and (ii) an additional Holder of the Series 2019B Bonds for purposes of receiving any notices or exercising any rights to inspect documents provided for under the Indenture.  In furtherance thereof and as a term of the Indenture and each Series 2019B Bond, the Trustee and each Insured Bondholder appoint the Bond Insurer as their agent and attorney-in-fact with respect to the Series 2019B Bonds and agree that the Bond Insurer may at any time during the continuation of any Insolvency Proceeding direct all matters relating to the Series 2019B Bonds in such Insolvency Proceeding, including without limitation, (A) all matters relating to any Claim, (B) the direction of any appeal of any order relating to any Claim, (C) the posting of any surety, supersedeas or performance bond pending any such appeal, and (D) the right to vote to accept or reject any plan of adjustment with respect to any Claim.  In addition, with respect to the Series 2019B Bonds, the Trustee and each Insured Bondholder delegate and assign to the Bond Insurer, to the fullest extent permitted by law, the rights of the Trustee and each Insured Bondholder in the conduct of any Insolvency Proceeding, including, without limitation, all rights to act as a party to an adversary proceeding or action with respect to any court order issued in connection with any such Insolvency Proceeding as it relates to the Series 2019B Bonds.  Remedies granted to the Bondholders shall expressly include a writ of mandamus.

Section 6.06   **Contractual Rights of the Bond Insurer**.  The Corporation and the Trustee acknowledge and agree that:

(a)      the rights granted to the Bond Insurer under the Indenture, this Second Supplemental Indenture, or any other Related Document to request, consent to or direct any action are rights granted to the Bond Insurer in consideration of its issuance of the Insurance Policy;

(b)      any exercise by the Bond Insurer of such rights is merely an exercise of the Bond Insurer's contractual rights and shall not be construed or deemed to be taken for the benefit, or on behalf, of the Insured Bondholders and such action does not evidence any position of the Bond Insurer, affirmative or negative, as to whether the consent of any other person is required in addition to the consent of the Bond Insurer; and

(c)      in determining whether any amendment, consent, waiver or other action to be taken, or any failure to take action hereunder or under the Indenture would adversely affect the security for the Series 2019B Bonds or the rights of the related Holders, the Trustee shall consider the effect of any such amendment, consent, waiver, action or inaction as if there were no Insurance Policy.

Section 6.07   **Bond Insurer as Third Party Beneficiary**.  To the extent that this Second Supplemental Indenture confers upon or gives or grants to the Bond Insurer any right, remedy or claim hereunder or under the Indenture, the Bond Insurer is intended to be and is hereby explicitly recognized as being a third–party beneficiary of such right, remedy or claim and may enforce any such right, remedy or claim conferred, given or granted hereunder or thereunder.

Section 6.08   **Notices, Etc.**  While the Insurance Policy is in effect, the Bond Insurer will be provided with copies of any notices to be provided by the Trustee pursuant to the Indenture. The Trustee shall notify the Bond Insurer of any failure of the Corporation to provide notices, certificates and other information under the Indenture.

- 17 -

**Section 6.09    Information to the Bond Insurer.**

(a)     In addition to other notices required under the Indenture, the Bond Insurer shall be provided with the following information by the Corporation or Trustee, as the case may be:

(i)     Prior notice of the advance refunding or redemption of any of the Series 2019B Bonds, including the principal amount, maturities and CUSIP numbers thereof;

(ii)     Notice of the resignation or removal of the Trustee and bond registrar and the appointment of, and acceptance of duties by, any successor thereto;

(iii)     Notice of the commencement of an Insolvency Proceeding;

(iv)     A full original transcript of all proceedings relating to the execution of any amendment, supplement, or waiver to the Related Documents;

(v)     All reports, notices and correspondence to be delivered to Bondholders under the terms of the Related Documents; and

(vi)     To the extent that the Corporation has entered into a continuing disclosure agreement, covenant or undertaking with respect to the Series 2019B Bonds, all information furnished pursuant to such agreements.

(b)     The Bond Insurer shall have the right to receive such additional information as it may reasonably request.

(c)     The Corporation shall permit the Bond Insurer to discuss the affairs, finances and accounts of the Corporation or any information the Bond Insurer may reasonably request regarding the security for the Series 2019B Bonds with appropriate officers of the Corporation and will use commercially reasonable efforts to enable the Bond Insurer to have access to the facilities, books and records of the Corporation on any Business Fay upon reasonable prior notice.

(d)     In no event shall a delay or failure by the Corporation to provide a notice required hereunder be an Event of Default under the Master Indenture.  The Trustee shall notify the Bond Insurer of any failure of the Corporation to provide notices, certificates and other information under the Indenture or other Related Documents.  In the event of any breach of the covenants contained in this Section 6.09, the Bond Insurer shall be entitled to specific performance of this Section 6.09.

**Section 6.10    Defeasance of Series 2019B Bonds.**  Notwithstanding anything in the Indenture (including Article XII thereof) to the contrary, unless the Bond Insurer otherwise approves, to accomplish defeasance of Series 2019B Bonds, the Corporation shall cause to be delivered (i) a report of an independent firm of nationally recognized certified public accountants or such other accountant as shall be acceptable to the Bond Insurer ("**Accountant**") verifying the sufficiency of the escrow established to pay the Insured Bonds in full on the maturity or redemption date ("**Verification**"), (ii) an escrow deposit agreement (the form of which shall be acceptable to the Bond Insurer), (iii) an opinion of nationally recognized bond counsel to the effect that the

- 18 -

Insured Bonds are no longer "Outstanding" under the Indenture and (iv) a certificate of discharge of the Trustee with respect to the Insured Bonds; each Verification and defeasance opinion shall be addressed to the Corporation, Trustee and Bond Insurer.  The Bond Insurer shall be provided with final drafts of the above-referenced documentation not less than three Business Days prior to the funding of the escrow.  Insured Bonds shall be deemed "Outstanding" under the Indenture unless and until they are in fact paid and retired or the above criteria are met.

**Section 6.11   Applicability of Article VI**.  The provisions of this Article VI shall govern notwithstanding anything to the contrary in the Indenture.

## ARTICLE VII.

## MISCELLANEOUS

**Section 7.01   Limitation of Rights.**   Nothing in this Second Supplemental Indenture expressed or implied is intended or shall be construed to confer upon, or to give or grant to, any person or entity, other than the Corporation, the Trustee, the Paying Agent, the Bond Insurer and the registered owners of the Series 2019B Bonds, any right, remedy or claim under or by reason hereof or of the Master Indenture or any covenant, condition or stipulation hereof or of the Master Indenture, and all covenants, stipulations, promises and agreements in this Second Supplemental Indenture or the Master Indenture contained by and on behalf of the Corporation shall be for the sole and exclusive benefit of the Corporation, the Trustee, the Paying Agent, the Bond Insurer and the registered owners of the Series 2019B Bonds.

**Section 7.02   Successors and Assigns.**   This Second Supplemental Indenture shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

**Section 7.03   Severability.**   If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Corporation or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions of the Master Indenture or of this Supplemental Indenture or of the Series 2019B Bonds.

**Section 7.04   Applicable Law.**   This Second Supplemental Indenture shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction. Any disputes, legal action, suit, or proceeding arising from or related to the Indenture or the Bonds (a) shall be brought in accordance herewith by any party or its successors or assigns in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept jurisdiction, in any federal district court sitting in the Commonwealth and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 7.05   Counterparts.**  This Second Supplemental Indenture may be executed in several counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

**Section 7.06   Amendments and Supplements.**  This Second Supplemental Indenture may only be amended or supplemented in accordance with the provisions of Articles IX and X of the Master Indenture.

**Section 7.07   Notice to the Bond Insurer.**  The notice address of the Bond Insurer is: Assured Guaranty Municipal Corp., 1633 Broadway, New York, New York 10019, Attention: Managing Director – Surveillance, Re: Policy No. [_____], Telephone:  (212) 974-0100; Telecopier: (212) 339-3556.  In each case in which notice or other communication refers to an Event of Default, then a copy of such notice or other communication shall also be sent to the attention of the General Counsel and shall be marked to indicate "URGENT MATERIAL ENCLOSED."

**IN WITNESS WHEREOF**, the Corporation and the Trustee have caused this Second Supplemental Indenture to be executed in their respective corporate names by their duly authorized officers, all as of the date first above written.

**PUERTO RICO SALES TAX FINANCING CORPORATION**

By:  _____

Name:

Title:

_____, as Trustee

By:  _____

Name:

Title:

[Second Supplemental Trust Indenture Signature Page]

EXHIBIT A

FORM OF SERIES 2019B CURRENT INTEREST BONDS

[ADD STATEMENT OF INSURANCE]

**DETERMINED TO BE VALID BY THE JUDGMENT AND CONFIRMATION ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO, ENTERED ON THE ___ DAY OF _____, 2019.**

AS PROVIDED IN THE INDENTURE REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE INDENTURE, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE INDENTURE TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:  19AR-___                                                                $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
PUERTO RICO SALES TAX FINANCING CORPORATION
RESTRUCTURED SALES TAX BONDS,
SERIES 2019B

| INTEREST RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| _____% | | August 1, 2018 | _____ |

Registered Owner:     CEDE & CO.

Principal Amount:      _____ DOLLARS

A-1

FOR VALUE RECEIVED, **PUERTO RICO SALES TAX FINANCING CORPORATION** (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, hereby promises to pay, but solely in the manner and from the revenues and sources hereinafter provided, to the **REGISTERED OWNER** named above, or registered assigns, the **PRINCIPAL AMOUNT** stated above on the **MATURITY DATE** stated above (except to the extent that such Principal Amount due on the Maturity Date is reduced by prior redemption as provided in the Indenture), upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned, and to pay to the registered owner interest on such Principal Amount from the **DATED DATE** stated above at the **INTEREST RATE** per annum stated above until the Principal Amount is paid, payable on the Effective Date  and semiannually thereafter on each January 1 and July 1 (each, an "Interest Payment Date").  Interest shall accrue on overdue interest and Principal at the rate provided above, and shall compound on each Interest Payment Date.  Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of _____, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.  Payment of the interest hereon shall be payable by the Trustee as provided in Section 3.01 of the Master Indenture, or at the option of any owner of $1,000,000 or more in aggregate Principal amount or Accreted Value (or combination of Principal amount and Accreted Value) of the Series  2019B Bonds, by wire transfer to such registered owner at the wire transfer address in the continental United States to which such registered owner has not later than the Record Date immediately preceding such Interest Payment Date directed the Trustee to wire such interest payment.  The Record Date is the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date; provided, however, that the Record Date for the interest payable on the Effective Date is the Effective Date.  All overdue interest and Principal (and any interest accruing on such overdue amounts) shall remain due and payable until paid.

THE INDENTURE (HEREINAFTER DEFINED) PROVIDES THAT THE BONDS, INCLUDING THIS BOND, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE PROVIDED FOR SUCH PAYMENT.  THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

THIS BOND IS A SPECIAL OBLIGATION OF THE CORPORATION, PAYABLE SOLELY FROM THE TRUST ESTATE, WHICH TRUST ESTATE IS SECURED BY A STATUTORY LIEN IN ACCORDANCE WITH THE ACT. The Corporation does not have the power to pledge the credit, the revenues or the taxing power of the Commonwealth, and except as described in the preceding sentence, neither the credit, the revenues nor the taxing power of the Commonwealth or any subdivision thereof is pledged to the payment of any of the Bonds.  The Corporation has no taxing power.

4829-3927-5396.6

This bond is one of a duly authorized issue of bonds of the Corporation designated as "Restructured Sales Tax Bonds, Series 2019B" (herein called the "Series 2019B Bonds"), issued in the aggregate principal amount upon original issuance of $[_____]. The Series 2019B Bonds are issued pursuant to a Master Trust Indenture by and between the Corporation and _____, as trustee (the "Trustee), dated as of _____ (the "Master Indenture"), including as supplemented by a Second Supplemental Trust Indenture, by and between the Corporation and the Trustee, dated as of _____ (the "Second Supplemental Indenture", and together with the Master Indenture, collectively referred to herein as the "Indenture").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Indenture.

This Series 2019B Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Master Indenture for the purposes set forth in the Indenture.

The Series 2019B Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Indenture.  Notice of redemption shall be given as provided in the Indenture.

The Bonds are special obligations of the Corporation.  In accordance with the Act, the payment of the amounts due on the Bonds is secured by a statutory lien on the Trust Estate, as defined and provided in the Indenture.

Copies of the Indenture are on file at the office of the Corporation, and at the corporate trust office of the Trustee, and reference to the Indenture and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Master Indenture and subject to the conditions therein, the provisions of the Master Indenture or any Supplemental Indenture amendatory thereof or supplemental thereto may be modified or amended.

The Indenture provides that neither the directors of the Corporation nor any person executing Bonds shall be liable personally thereon or be subject to any personal liability solely by reason of the issuance thereof.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Indenture, the Plan of Adjustment and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2019B Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Indenture, to institute action to enforce the provisions of the Indenture or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Indenture.

This bond is transferable, as provided in the Indenture, only upon the books of the Corporation maintained for that purpose at the corporate trust office of the Trustee by the

registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2019B Bond or Bonds in the same aggregate Principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the Master Indenture and upon the payment of the charges, if any, therein prescribed. The Corporation and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

**IN WITNESS WHEREOF, THE PUERTO RICO SALES TAX FINANCING CORPORATION** has caused this bond to be signed in its name and on its behalf by its Executive Director and attested by its Secretary (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2019B Bonds, all as of the Dated Date specified above.

PUERTO RICO SALES TAX FINANCING CORPORATION

By: _____
Name:
Title:

**ATTEST:**

By: _____
Name:
Title:

A-4

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

      This bond is one of the Bonds described in the within mentioned Indenture and is one of the Restructured Sales Tax Bonds, Series 2019B, of the Puerto Rico Sales Tax Financing Corporation.

_____, as Trustee

By: _____

                       Authorized Signatory

Date of authentication: _____, 2019

A-5

4829-3927-5396.6

<div align="center">ASSIGNMENT</div>

FOR VALUE RECEIVED:

_____

<div align="center">(Please print or typewrite name of undersigned transferor)</div>

hereby sells, assigns and transfers unto _____

_____

<div align="center">(Please insert Social Security or other tax identifying number of Transferee)</div>

<table>
<tr><td>
<br><br><br>
</td><td>_____</td></tr>
</table>

_____         Please print or typewrite name and address,
                                             including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints _____, attorney-in-fact, to transfer the same on the books of registry in the office of the Trustee, as registrar, with full power of substitution in the premises.

Dated:  _____         _____

                                     NOTE: The signature to this assignment must correspond with the name as written on the within Bond in every particular, without alteration or enlargement or any change whatsoever.

                                     _____
                                     |  Signature Guaranteed:                        |
                                     |                                               |
                                     |                                               |
                                     |                                               |
                                     _____

<div align="center">A-6</div>

EXHIBIT B

FORM OF SERIES 2019B CAPITAL APPRECIATION BONDS

[ADD STATEMENT OF INSURANCE]

**DETERMINED TO BE VALID BY THE JUDGMENT AND CONFIRMATION ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO, ENTERED ON THE ___ DAY OF _____, 2019.**

AS PROVIDED IN THE INDENTURE REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE INDENTURE, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE INDENTURE TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:  19AR-___                                                            $_____

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

PUERTO RICO SALES TAX FINANCING CORPORATION
RESTRUCTURED SALES TAX BONDS,
SERIES 2019B

| ACCRETION RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| _____ | _____ | August 1, 2018 | _____ |

Registered Owner:     CEDE & CO.

Principal Amount at Issuance:     _____ DOLLARS

Maturity Value[3]:     _____ DOLLARS

---

[3] Reflects Accreted Value at maturity if no Accreted Value Payments are made prior to stated maturity.

B-1

FOR VALUE RECEIVED, **PUERTO RICO SALES TAX FINANCING CORPORATION** (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, hereby promises to pay, but solely in the manner and from the revenues and sources hereinafter provided, to the **REGISTERED OWNER** named above, or registered assigns, the **MATURITY VALUE** stated above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Indenture), upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned. Interest on this bond shall accrete at the **ACCRETION RATE** set forth above and shall not be payable on a current basis but shall be compounded, and added to Principal, on the Effective Date and on each January 1 and July 1 (each, a "Valuation Date") such that the **PRINCIPAL AMOUNT AT ISSUANCE** specified above shall accrete to equal the **MATURITY VALUE** specified above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Indenture). Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of _____, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. All overdue Principal (and any interest accruing thereon) shall remain due and payable until paid.

THE INDENTURE (HEREINAFTER DEFINED) PROVIDES THAT THE BONDS, INCLUDING THIS BOND, SHALL BE PAYABLE SOLELY FROM THE TRUST ESTATE PROVIDED FOR SUCH PAYMENT. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR OF INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

THIS BOND IS A SPECIAL OBLIGATION OF THE CORPORATION, PAYABLE SOLELY FROM THE TRUST ESTATE, WHICH TRUST ESTATE IS SECURED BY A STATUTORY LIEN IN ACCORDANCE WITH THE ACT. The Corporation does not have the power to pledge the credit, the revenues or the taxing power of the Commonwealth, and except as described in the preceding sentence, neither the credit, the revenues nor the taxing power of the Commonwealth or any subdivision thereof is pledged to the payment of any of the Bonds. The Corporation has no taxing power.

This bond is one of a duly authorized issue of bonds of the Corporation designated as "Restructured Sales Tax Bonds, Series 2019B" (herein called the "Series 2019B Bonds"), issued in the aggregate Accreted Value upon original issuance of $[_____]. The Series 2019B Bonds are issued pursuant to a Master Trust Indenture by and between the Corporation and _____, as trustee (the "Trustee"), dated as of _____ _____ (the "Master Indenture"), including as supplemented by a Second Supplemental Trust Indenture, by and between the Corporation and the Trustee, dated as of _____ (the "Second Supplemental Indenture", and together with the Master Indenture, collectively referred to herein

as the "Indenture").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Indenture.

This Series 2019B Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Master Indenture for the purposes set forth in the Indenture.

The Series 2019B Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Indenture.  Notice of redemption shall be given as provided in the Indenture.

The Bonds are special obligations of the Corporation.  In accordance with the Act, the payment of the amounts due on the Bonds is secured by a statutory lien on the Trust Estate, as defined and provided in the Indenture.

Copies of the Indenture are on file at the office of the Corporation, and at the corporate trust office of the Trustee, and reference to the Indenture and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Master Indenture and subject to the conditions therein, the provisions of the Master Indenture or any Supplemental Indenture amendatory thereof or supplemental thereto may be modified or amended.

The Indenture provides that neither the directors of the Corporation nor any person executing Bonds shall be liable personally thereon or be subject to any personal liability solely by reason of the issuance thereof.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Indenture, the Plan of Adjustment and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2019B Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Indenture, to institute action to enforce the provisions of the Indenture or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Indenture.

This bond is transferable, as provided in the Indenture, only upon the books of the Corporation maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2019B Bond or Bonds in the same aggregate Accreted Value, and of the same series, maturity and accretion rate, shall be issued to the transferee in exchange therefor as provided in the Master Indenture and upon the payment of the charges, if any, therein prescribed. The Corporation and the Trustee may treat and consider the person in whose name

4829-3927-5396.6

this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

**IN WITNESS WHEREOF, THE PUERTO RICO SALES TAX FINANCING CORPORATION** has caused this bond to be signed in its name and on its behalf by its Executive Director and attested by its Secretary (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2019B Bonds, all as of the Dated Date specified above.

**PUERTO RICO SALES TAX
FINANCING CORPORATION**

By: _____
Name:
Title:

**ATTEST:**

By: _____
Name:
Title:

B-4

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This bond is one of the Bonds described in the within mentioned Indenture and is one of the Restructured Sales Tax Bonds, Series 2019B, of the Puerto Rico Sales Tax Financing Corporation.

_____, as Trustee

By: _____

Authorized Signatory

Date of authentication: _____, 2019

B-5

ASSIGNMENT

FOR VALUE RECEIVED:

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____        _____

Please print or typewrite name and address,
including zip code, of transferee

_____

the within-mentioned Bond and hereby irrevocably constitutes and appoints _____, attorney-in-fact, to transfer the same on the books of registry in the office of the Trustee, as registrar, with full power of substitution in the premises.

Dated:  _____        _____

NOTE: The signature to this assignment must correspond with the name as written on the within Bond in every particular, without alteration or enlargement or any change whatsoever.

Signature Guaranteed:

B-6

**<u>Exhibit D</u>**

**Form of Amended and Restated Bylaws
of the Puerto Rico Sales Tax Financing Corporation**

*Draft: December 30, 2018*

**FORM OF AMENDED AND RESTATED BYLAWS OF
THE PUERTO RICO SALES TAX FINANCING CORPORATION[1]**

## ARTICLE 1.    INTRODUCTION; LEGAL BASIS; PURPOSE OF BYLAWS

**1.1    Introduction.** The Puerto Rico Sales Tax Financing Corporation (the "Corporation") was created pursuant to Act No. 91-2006, as amended and in effect on the date hereof, presently known as the "Puerto Rico Sales Tax Financing Corporation Act" (the "Act"), as a public corporation and instrumentality of the Government of Puerto Rico, which constitutes a corporate and political entity independent and separate from the Government of Puerto Rico and any other government entity. Pursuant to the provisions of Act No. 241-2018, the Act was amended to provide that the Corporation's purpose will be limited to issuing Plan of Adjustment Bonds and owning and managing certain property in connection with the restructuring of the financial obligations of the Corporation pursuant to the Corporation Plan of Adjustment. In furtherance of its purpose, the Corporation has the powers and duties established pursuant to the Act. (Capitalized terms not defined herein are used as defined in the Act.)

**1.2    Legal Basis.** The Corporation's bylaws are hereby amended and restated by virtue of the powers vested in the Corporation and the Board (as defined herein) by Articles 2.4 and 2.5[2] of the Act.

**1.3    Purpose.** The purpose of these bylaws (as they may be amended from time to time, the "Bylaws") is to govern generally the manner in which the affairs and business of the Corporation are to be conducted and the manner in which the powers and duties granted to and imposed upon the Corporation by the Act shall be exercised and performed. Said affairs and business shall be conducted and said powers and duties shall be exercised and performed in accordance with, and shall be subject to the limitations set forth in, the Act, the Bylaws, and any and all resolutions and other actions heretofore or hereafter adopted or taken by the Board, in accordance with the Act and the Bylaws, and any and all rules and regulations heretofore or hereafter adopted by the Corporation.  In the event of any inconsistency or conflict between these Bylaws and the terms of the Act, the terms of the Act shall govern.

## ARTICLE 2.    OFFICIAL SEAL

The Official Seal of the Corporation shall be as impressed below.

Said seal may be affixed by an impression, printing, stamping, or by any other method of reproduction, and the Executive Director of the Corporation (the "Executive Director"), or any Director or officer duly authorized by resolution, may use the design of said seal upon such stationery, printed matter or other publications of the Corporation as may be convenient and appropriate.

---

[1] NTD:  Pursuant to the Plan of Adjustment, the new bylaws would be adopted by Reorganized COFINA's board of directors.

[2] NTD:  As renumbered by amendment.

## ARTICLE 3.   **BOARD OF DIRECTORS**

**3.1**   **General Powers**. The affairs of the Corporation shall be managed by the Board of Directors (the "Board," and each individual director thereof referred to herein as a "Director"). The Board shall determine compliance with the Corporation's stated purposes and limitations, and shall have the power and authority to do and perform all acts or functions not inconsistent with these Bylaws or the Act; provided, that, while any of the Plan of Adjustment Bonds are outstanding, the Corporation shall not be authorized to engage in or authorize the activities described in Article 2.6 of the Act, including that the Directors shall not vote to authorize the Corporation to commence a case under Title III of PROMESA or other similar restructuring process under applicable law subject to the provisions thereof.

**3.2**   **Designation**.  Pursuant to Article 2.7[3] of the Act, the Board shall be composed of three (3) Directors appointed by the Governor of Puerto Rico, as duly constituted from time to time, which shall satisfy the criteria described in Article 3.6 of these Bylaws.[4]

**3.3**   **Compensation of Directors**. The Board shall establish the compensation, if any, of the Directors from time to time; provided that the compensation shall at all times comply with applicable law and all agreements to which the Corporation is a party.  The initial compensation of the Directors shall be $50,000 per annum, plus reasonable out-of-pocket expenses.

**3.4**   **Committees.** The Board may designate one or more standing or special committees for specific purposes. Each committee shall consist of one (1) or more Directors. No committee is authorized to take any official action on behalf of the Board, unless expressly so authorized by the Board.

**3.5**   **Resignation**. Any Director may resign at any time by providing written notice to the Governor of Puerto Rico and the other Directors.

**3.6**   **Independence and Qualification Standards**. Every Director shall satisfy the following criteria:

    i.    must not be, or have been within the last two years, an officer, employee or director of any Government Entity other than the Corporation;

    ii.    must not be, or have been within the last two years, a partner or employee of a firm that is the Corporation's internal or external auditor, and must not have an immediate family member who is, or within the last two years was, a partner of such a firm, or who is a current employee of such a firm and personally works on the Corporation's audit;

---

[3] NTD:  As renumbered by amendment.
[4] NTD:  These bylaws will be adopted by the Board of Reorganized COFINA, so we have not provided for the bondholder recommendation process set forth in the statute.

iii.   must have executive experience in finance or with securities similar to the bonds issued by the Corporation; and

iv.   must meet all applicable legal requirements for serving on the Board.

**3.7**   **Meetings of the Board**.

1. <u>Regular Meetings</u>.  Regular meetings of the Board shall be held at least once every fiscal year on the day and hour previously agreed upon by the Board for the purpose of transacting such business as may come before the Board (including electing officers).

2. <u>Special Meetings</u>.  Special meetings of the Board shall be called by the Secretary at the written request, which may be provided through electronic forms of communication such as email, of any Director.  Such request shall state the purpose, place, date and time of the proposed special meeting.  Upon any such request, it shall thereupon be the duty of the Secretary to cause notice of such meeting to be given as hereinafter provided.

3. <u>Place of Meetings</u>.  Any meeting of the Board may be held at such place, either within or outside Puerto Rico, as may be determined from time to time by the Board (or, in the absence of a determination by the Board, the Chairperson of the Board or the Executive Director). Board meeting may be held telephonically if agreed to unanimously by all Directors.

4. <u>Notice of Meetings</u>.  The Secretary, in accordance with instructions of the Chairperson of the Board or the Executive Director or, in the case of a special meeting, the Director requesting such meeting, shall prepare and send written notice, which may be provided through electronic forms of communication such as email, of all meetings to each of the Directors. Each such notice shall state the time and place of the meeting and, in the case of a special meeting or if otherwise requested by a Directors, its purpose or the matters to be discussed (provided that the matters actually discussed at such meeting shall not be limited to those on the notice of such meeting so long as sufficient notice is given therefor in accordance with Article 3.7(8) below). Each such notice shall be given at least forty eight (48) hours before the date fixed for the meeting. Meetings may be held without prior 48-hour notice, provided that each of the Directors shall have provided a waiver of notice for said meeting. The attendance of a Director at any meeting shall constitute a waiver of notice of such meeting by such Director.

5. <u>Quorum; Voting</u>.  A majority of the Directors at the time serving shall constitute a quorum, and the affirmative vote of a majority of the Directors at the time serving shall be necessary for any action that the Board may take, except adjournment. Each Director shall be entitled to one (1) vote. In the event of a tie vote, the matter under consideration shall be reconsidered and voted upon at the next regular or special meeting of the Board. No vacancy in the membership of the Board shall impair the rights of a quorum to exercise all of the rights and perform all of the duties of the Board. Any Director present at a meeting shall not continue to transact business if the withdrawal of one or more Director results in there being less than a quorum.

3

6.  <u>Adjournment</u>.  Meetings of the Board may be adjourned if a quorum is present. If there is no quorum, meetings of the Board shall be adjourned by the Director present, or if no Directors are present, by the Secretary. Notice of any adjournment, including the time and place for the adjourned meeting, shall be given to the Directors who were not present at the time of the adjournment in accordance with the method prescribed above in Article 3.7(4) and need not be given to the Directors present at the time of the adjournment if the time and place thereof are announced at the meeting at which the adjournment is taken.

7.  <u>Attendance</u>.  The Board may permit the attendance at its meeting of any person or persons as it may deem desirable, provided that such persons shall have no vote.

8.  <u>Order of Business</u>. Any Director may raise any issue to be addressed at any general or special meeting by providing the other Directors at least forty eight (48) hours' written notice (which may be provided through electronic forms of communication such as email), of such issue, unless each of the Directors provides a waiver of notice for such issue.

**3.8**    **Minutes**.  The minutes of each meeting of the Board shall be under the custody of the Secretary (or such officer, agent or outside professional as may be designated by the Board) and shall include a record of all actions taken and all resolutions adopted by the Board. The minutes of each meeting of the Board shall be presented for approval by the Secretary. After approval, the minutes shall be signed by the Secretary.

**3.9**    **Chairperson**.  The Board shall elect a Chairperson from among its Directors. The Chairperson shall preside at all meetings of the Board. In the absence of the Chairperson, an Acting Chairperson, appointed by the Directors present, shall preside.

**3.10**    **Secretary**.  The Board shall elect a Secretary, who may be a Director or an officer or employee of the Corporation.  The Secretary shall act as clerk of all of the meetings of the Board, shall record all the proceedings of such meetings in a book for that purpose, shall give such notice as may be required of all such meetings, shall keep minutes of the meetings, shall record all votes and shall have custody of all books and records of the Board, and shall perform all duties incidental to the office of the Secretary and such other duties as may be assigned by the Board. At the commencement of the Board meeting, in the absence of the Secretary there, an Acting Secretary, appointed by the Directors present, may keep a record of the meeting and prepare minutes of the meeting.  The Secretary may retain such books and records electronically.

**3.11**    **Participation in Meetings by Teleconference or other Means**.  Directors may participate in a meeting of such Board or committee by means of telephone conference, videoconference or any other means of communications that provides for all persons participating in the meeting to hear each other simultaneously. Participation in a meeting pursuant to this provision will constitute attendance to such meeting.

**3.12**    **Written Action by Directors**.  Any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all Directors or such committee, as the case may be, consent to the action in writing, and the writing or writings are filed with the minutes of proceedings of the Board.

**3.13**   **Fiduciary Duty**.  The Directors shall owe a fiduciary duty to the Corporation, to such extent and scope as is consistent with Puerto Rico law and the Puerto Rico Constitution.

## ARTICLE 4.   OFFICERS OF THE CORPORATION

**4.1**   **The Executive Director**.  The Corporation shall have an Executive Director; provided that the Executive Director may be one of the Directors. The Corporation may also have a Deputy Executive Director, and such other officers as may be designated by the Board from time to time to perform such duties as may be designated by the Board.

**4.2**   **Election and Term of Office**.  The Executive Director shall be elected by the Board at any regular or special meeting of the Board. The Executive Director shall hold office until his or her successor shall have been elected. Except as otherwise provided herein, a permanent vacancy in any office may be filled by the Board.

**4.3**   **Removal of Executive Director by the Board**.  The Executive Director may be removed by the Board whenever in its judgment the best interests of the Corporation will be served thereby.

**4.4**   **Powers of the Executive Director**.  The powers of the Executive Director as generally described in these Bylaws shall be exercised personally by such officer or, under the supervision and control, by such officers, employees, or agents as the Executive Director, with approval of the Board, may delegate to or designate for that purpose. The Executive Director:

(a)  shall be responsible to the Board for the execution of the Corporation's policies and for the general supervision of the affairs and business of the Corporation, and shall exercise general supervision over the affairs, activities, officers, agents, employees and properties of the Corporation;

(b)  may sign any bonds, contracts or other instruments authorized by the Board to be executed, except in cases where the signing or execution thereof shall be expressly delegated by the Board or by these Bylaws to some other officer or agent of the Corporation, or shall be required by law to be otherwise signed or executed; and

(c)  in general, perform all duties incidental to the office of the Executive Director and such other duties as may be prescribed by the Board from time to time.

## ARTICLE 5.   PLAN OF ADJUSTMENT BONDS

The Corporation shall issue Plan of Adjustment Bonds in accordance the Act, the Plan of Adjustment and the Confirmation Order.

## ARTICLE 6.   INDEMNIFICATION

The Corporation shall indemnify and hold harmless any Director (and such Director's successors and assigns or legal representatives) or any officer or employee of the Corporation

(collectively the "Indemnified Parties" or individually, an "Indemnified Party") who was or is a party, or is threatened to be made a party, to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she is or was a Director or employee or officer of the Corporation to the full extent permitted by law, including against judgments, fines, penalties, amounts paid in settlement and expenses (including attorneys' fees) actually and reasonably incurred by any Indemnified Party) in connection with such claim, action, suit or proceeding, unless such Indemnified Party acted with bad faith or engaged in intentional misconduct and, with respect to any criminal action or proceeding, unless such Indemnified Party knew or should have known his or her conduct was unlawful. The termination of any act, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of "nolo contendere" or its equivalent, shall not, of itself, create a presumption that the person did not satisfy these standards.

In the defense of any pending or threatened claim, action, suit or proceeding referred to in this Article or in defense of any claim, issue or matter therein, an Indemnified Party shall be indemnified against expenses (including attorneys' fees and the fees and expenses of any experts or investigators) actually and reasonably incurred by him or her in connection therewith. Expenses (including attorneys' fees) actually and reasonably incurred in defending or investigating any claim action, suit or proceeding referred to in this Article shall be paid by the Corporation promptly upon receipt of a claim for such payment submitted by or on behalf of the Indemnified Party and in advance of the final disposition of such action, suit or proceeding, as authorized by the Board in the specific case, upon receipt of an agreement by or on behalf of the Indemnified Party to repay such amount, if it shall be ultimately determined that that such Indemnified Party is not entitled to be indemnified by the Corporation as authorized in this Article.

The Corporation, through its legal counsel, shall defend claims, actions, suits or proceedings brought against the Corporation, or any Indemnified Party. Promptly after receipt by an Indemnified Party under this Section of notice of the commencement of any action, such Indemnified Party will, if a claim in respect thereof is to be made against the Corporation under this Section, give written notice to the Corporation of the commencement thereof, but the omission to so notify the Corporation will not relieve the Corporation from any liability which it may have to any Indemnified Party otherwise than under this Section. The Corporation will assume the defense of any action against any Indemnified Party based upon allegations of any such loss, claim, damage, liability or action, including the retaining of counsel reasonably satisfactory to such Indemnified Party and the payment of counsel fees and all other expenses relating to such defense. Promptly after receipt by the Corporation of notice of the commencement of any action as to any Indemnified Party, the Corporation will give written notice of the commencement thereof to such Indemnified Party. Any Indemnified Party may retain separate counsel in any such action, claim or proceeding and may participate in the defense thereof which retention and participation shall be at the expense of such Indemnified Party, except that the Corporation shall bear the reasonable fees, costs and expenses of such counsel if (A) the use of counsel chosen by the Corporation to represent the Indemnified Party would present such counsel with a conflict of interest; (B) the actual or potential defendants in, or targets of, any such action include both an Indemnified Party and the Corporation, and the Indemnified Party shall have reasonably concluded that there may be legal defenses available to such Indemnified Party or other Indemnified Parties which are different from or additional to those available to the Corporation; (C) the Corporation shall not have

employed counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party within a reasonable time after notice of the institution of such action or proceeding; or (D) the Corporation shall authorize the Indemnified Party to employ separate counsel at the expense of the Corporation.  The Corporation will not, without the prior written consent of the Indemnified Parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the Indemnified Parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action, suit or proceeding.

Except as provided in the last paragraph of this Article 6 hereof, the right to indemnification accorded by this Article shall not limit any other right to indemnification to which any Indemnified Party may be entitled. Any rights hereunder shall inure to the benefit of the heirs, executors, administrators or other legal representative of any Director, officer or employee.

The indemnification provisions contained in this Article shall be deemed to be and shall constitute a contract between the Corporation and any person who qualifies as an Indemnified Party as described above.

Each Indemnified Party understands and agrees that all amounts, if any, owed by the Corporation pursuant to this Article 6 may solely be paid from the Operating Reserve Fund and the Remainder Fund established under the Bond Indenture.

## ARTICLE 7.    FISCAL YEAR

The fiscal year of the Corporation shall begin on the first (1st) day of July of each year and shall end on the thirtieth (30th) day of June of the succeeding year.

## ARTICLE 8.    BOOKS AND RECORDS

**8.1**    **Location**.  All existing and future books and records of the Corporation shall be kept in the Corporation's principal office or at such other place or places as the Board shall from time to time determine.  All books and records of the Corporation shall be maintained for the period required by the Corporation's record retention policy, but in no event less than the minimum period required by law.

**8.2**    **Form of Records**.  Any records maintained by the Corporation in the regular course of its business, including its books of account, and minute books, may be kept on, or be in the form of, punch cards, magnetic tape, photographs, microphotographs, or any other information storage device, provided that the records so kept can be converted into clearly legible form within a reasonable time.

**8.3**    **Audit**.  The books and accounts of the Corporation shall be audited by an independent certified public accountant or firm of certified public accountants at or as of the

close of each fiscal year.  The audit report shall be submitted to the Board as soon as practical after receipt.

## ARTICLE 9.    REPORTS

A designated officer of the Corporation, or a designated service provider to the Board shall submit to the Board any and all reports required to be provided to the holders of the Corporation's bonds pursuant to its continuing disclosure obligations, if any.

## ARTICLE 10.    ACCOUNTS AND REPORTS; CONTRACT FOR SHARED ASSETS/ EXPENSES

There shall be strict accountability of all funds and reporting of all receipts and disbursements of the Corporation.  The Board shall establish and maintain such procedures, funds and accounts as may be required by sound accounting practices or by the provisions of any resolution, the Bond Indenture and/or other documentation of the Corporation authorizing or relating to the issuance of the Plan of Adjustment Bonds.

The Corporation may contract with the Government or any other person or entity (public or private) for any expenses with such other person or entity (public or private) to lease assets or otherwise share with the authorized activities of the Corporation including, but not limited to, leasing of office space by the Corporation and use of employees of the Government or such person or entity (public or private) by the Corporation.  Any such contract with the Government or any Government Entity shall be entered into on an arm's-length basis on terms which are intrinsically fair and no less favorable than would be available from other third parties, and pursuant to written, enforceable agreements.

## ARTICLE 11.    CORPORATION AS A SEPARATE ENTITY

Notwithstanding anything herein to the contrary, to maintain the Corporation's status as a separate entity and to avoid any confusion or potential consolidation with any other entity, from the date of its formation until the repayment or defeasance in full of the Plan of Adjustment Bonds in accordance with the Bond Indenture, the Corporation's activities will conform with the following requirements:

**11.1**    its purpose shall be limited in accordance with Article 2.3 of the Act;

**11.2**    it shall engage only in the activities permitted by the Act;

**11.3**    shall conduct business only in its own name;

**11.4**    shall have independent directors in accordance with Article 3.6 hereof;

**11.5**    shall hold itself out to creditors and the public as a legal entity separate and distinct from all other legal persons, including, without limitation, the Government and all Government Entities (collectively, "Affiliates" and each, an "Affiliate");

8

**11.6**   shall enter into all transactions on an arm's-length basis;

**11.7**   shall comply with the limitations on the incurrence, guaranteeing or payment of debt limitations set forth in Article 2.6(b) of the Act;

**11.8**   shall not, except as may be consistent with any agreements to which the Corporation may be a party and consistent with the Act, commingle its funds or assets (including, without limitation, the COFINA Revenues) with those of any other legal persons, including, without limitation, its Affiliates;

**11.9**   shall (i) maintain its financial statements, accounting records and other entity documents separate from those of any other legal person; (ii) show, in its financial statements, its asset and liabilities separate and apart from those of any other legal person; and (iii) not permit its assets to be listed as assets on the financial statement of any of its Affiliates except as required by GAAP;

**11.10**   shall pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets, and shall maintain sufficient resources in light of its contemplated operations;

**11.11**   shall have no indebtedness other than indebtedness permitted by Article 2.3 of the Act;

**11.12**   shall not have any of its obligations guaranteed by any Affiliate except as may be provided by the Ancillary Agreements;

**11.13**   shall allocate fairly and reasonably any overhead expenses that are shared with any of its Affiliates, including, but not limited to, paying for shared office space and for services performed by any employee of an Affiliate;

**11.14**   shall maintain and use separate stationery, invoices and checks bearing its name and not bearing the name of any other entity unless such entity is clearly designated as being the Corporation's agent;

**11.15**   shall not pledge, create or record liens other than as permitted by Article 2.6(c) of the Act;

**11.16**   shall not dissolve, liquidate, sell or, except as permitted by the Act, otherwise transfer any or all of its properties (including the COFINA Revenues);

**11.17**   shall not form, acquire or hold any subsidiary;

**11.18**   has not permitted and shall not permit any Affiliate independent access to its bank account(s);

**11.19**   shall observe separate corporate governance, management and other formalities of the Corporation; and

**11.20**  shall otherwise operate as an entity that is separate and distinct from all other legal persons, including, without limitation, its Affiliates.

## ARTICLE 12.   <u>MISCELLANEOUS</u>

These Bylaws may be amended from time to time upon duly authorized action by the Board.  In case any provision in or obligation under these Bylaws shall be invalid, illegal or unenforceable under any law of the Government of Puerto Rico, the validity, legality and enforceability of the remaining provisions or obligations shall not in any way be affected or impaired thereby.

## ARTICLE 13.   <u>EFFECTIVENESS</u>

These Bylaws, which were approved by the Board on [●], 2019, shall be effective immediately upon the effectiveness of the Plan of Adjustment.

531369

**Exhibit E**

**Instruction Agreement Regarding the Deposit of Certain Sales and
Use Tax Revenues of the Puerto Rico Sales Tax Financing Corporation**

*Draft: December 31, 2018*

### INSTRUCTION AGREEMENT REGARDING THE DEPOSIT OF CERTAIN SALES AND USE TAX REVENUES OF THE PUERTO RICO SALES TAX FINANCING CORPORATION

This Instruction Agreement regarding the Deposit of Certain Sales and Use Tax Revenues of the Puerto Rico Sales Tax Financing Corporation (the "Agreement"), is executed in San Juan, Puerto Rico on [●] [●], 201[●] (the "Effective Date") by and between:

**AS PARTY OF THE FIRST PART: PUERTO RICO SALES TAX FINANCING CORPORATION** (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico created by Act No. 91-2006, as amended ("Act 91"), represented herein by its [●], [●].

**AS PARTY OF THE SECOND PART: THE PUERTO RICO DEPARTMENT OF TREASURY** (the "Department"), an executive department of the Commonwealth of Puerto Rico established by Section 6 of Article IV of the Constitution of the Commonwealth of Puerto Rico, represented herein by its [●], [●].

**AS PARTY OF THE THIRD PART:** [●] (the "Trustee"), but solely for purposes of agreeing to the notice and opportunity to object provisions in Section 6(e) hereof.

**AS PARTY OF THE FOURTH PART: THE PUERTO RICO FICAL AGENCY AND FINANCIAL ADVISORY AUTORITY** ("AAFAF" by its Spanish acronym), a public corporation and government instrumentality of the Commonwealth of Puerto Rico established by Act No. 2-2016, represented herein by its [●], [●], but solely for the purposes of agreeing to the provisions of Section 2(c) hereof.

**AS PARTY OF THE FIFTH PART: GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO** ("GDB"), a public corporation and government instrumentality of the Commonwealth of Puerto Rico established by Act No. [●], represented herein by its [●], [●], but solely for the purposes of agreeing to the provisions of Section 1(a) hereof.

### RECITALS

**WHEREAS**, the Government of Puerto Rico (the "Government") imposes the following sales and use taxes: (i) a sales and use tax at a rate of six percent (6%) (the "SUT"), comprised of a sales and use tax of 0.5% allocated to the Municipal Administration Fund pursuant to Act No. 18-2014, as amended, and the remaining portion of 5.5% allocated to the Government (the "State SUT"), (ii) a surcharge on the SUT of 4.5% of the sales price of a taxable item (the "Surcharge"), and (iii) a sales and use tax of 4% on certain services provided to other merchants and designated professional services (the "Services SUT" and together with the Surcharge, collectively, the "Additional SUT");

**WHEREAS**, on November 16, 2018, the Fiscal Oversight and Management Board for Puerto Rico ("FOMB") established pursuant to the provisions of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") filed with the U.S. District Court for

the District of Puerto Rico a Plan of Adjustment for the Corporation in the Corporation's proceeding under Title III of PROMESA (the "Corporation Plan of Adjustment");

**WHEREAS**, as required by the Corporation Plan of Adjustment, Act No. 241-2018 ("Act 241") was enacted to amend Act 91 and provides, among other things, that (i) the Corporation owns 53.65% of the Fixed Income (as defined in Act 91) (the "COFINA Revenues"), (ii) the COFINA Revenues are funded with the first dollars of the State SUT, and (iii) the Bonds (as defined in the hereinafter defined Indenture, the "Bonds") issued by the Corporation pursuant to the provisions of the Master Trust Indenture, dated [●],[●], by and between the Corporation and the Trustee (the "Indenture") are secured by a statutory first lien established pursuant to the provisions of Article 3.2 of Act 91;

**WHEREAS**, the Corporation Plan of Adjustment authorizes the Corporation to execute an agreement to provide for the collection and delivery to the Corporation or any third party designated by it of the portion of the State SUT owned by the Corporation;

**WHEREAS**, the Trustee is being name a party hereto solely for purposes of consent rights related to the instructions provided hereunder;

**WHEREAS**, the Department has implemented the Unified System of Internal Revenue (the "SURI") pursuant to which the SUT and Additional SUT returns shall be filed electronically and the collections attributable to each of the taxable items shall be reported;

**WHEREAS**, on April 1, 2016, the Department and Banco Popular de Puerto Rico ("BPPR") entered into a master agreement for the delivery of bank deposit and other banking services (the "Master BSA") in connection with the deployment and implementation of SURI and, as part of the Master BSA, opened BPPR account number 030-103630 (Gentax) (the "Tax Collections Account") to be used for the deposit and collection of all taxes, other than the SUT, collected by the Department;

**WHEREAS**, the Department and BPPR have amended or modified the Master BSA in order to accommodate certain new functions that have been added to SURI;

**WHEREAS**, BPPR has been providing certain services related to the receipt and deposit of the SUT and the Additional SUT pursuant to the provisions of that certain banking services contract, dated May 15, 2007 (the "Original Contract"), by and among BPPR, GDB and the Department, which was amended pursuant to a First Amendment to Banking Services Contract executed on October 5, 2007 (the "First Amendment"), a Second Amendment to Banking Services Contract executed on December 28, 2007 (the "Second Amendment"), and a Third Amendment to Banking Services Contract executed on June 18, 2009 (the "Third Amendment"), pursuant to which, among other things, the Corporation and GDB were added as parties to the Original Contract, and a letter agreement dated October 5, 2015 (the "Letter Amendment;" and together with the Original Contract, the First Amendment, the Second Amendment and the Third Amendment, the "Contract");

**WHEREAS**, in all cases, BPPR receives the collections corresponding to the SUT and delivers said collections to BPPR account number 022-294406 (the "SUT Account") and, from said funds, transfers the State SUT (as defined herein) to BPPR account number [●] (the "Conduit Account");

**WHEREAS**, the parties wish to execute this Agreement to provide for the collection and delivery of the State SUT in a manner that complies with the provisions of Act 91 (as amended by Act 241) and the Corporation Plan of Adjustment;

**NOW, THEREFORE**, in consideration of the premises and the mutual agreements of the parties herein, the appearing parties hereby agree as follows:

1. **Ownership and Control of the SUT Account.**

   a. The Corporation, GDB and the Department agree to provide BPPR with instructions to make the SUT Account jointly owned by the Corporation and the Department.  After the aforementioned instructions are provided, GDB will have no further interest, ownership or otherwise, with respect to, or over, the SUT Account.

   b. The Corporation and the Department agree to amend the Contract to provide that the Corporation's interest in the SUT Account is limited solely to the extent of its right, title, and interest in and to the COFINA Revenues.

   c. The Corporation and the Department also agree to amend the Contract to provide that the Department's interest in the SUT Account is limited solely to the extent of its right, title and interest in and to any and all funds that do not constitute COFINA Revenues.

2. **Transfer of SUT, Additional SUT and Commingled SUT Collections to the SUT Account.**

   a. The Corporation and the Department agree to provide BPPR instructions to continue delivering the SUT and Additional SUT to the SUT Account pursuant to the current provisions of the Contract.

   b. In addition to the delivery of SUT and Additional SUT to the SUT Account, the Department agrees to cause the delivery of consolidated payments of the SUT and any other type of tax ("Commingled SUT Collections") to the SUT Account.

    c.   Notwithstanding the foregoing, AAFAF and the Department agree to use their commercially reasonable efforts to implement the necessary steps to segregate the COFINA Revenues at the earliest possible point in the process.

**3.**  **Composition of the State SUT Funds.**

The State SUT deposited in the SUT Account is comprised of the following:

    a.   For each fiscal year, the Corporation owns the COFINA Revenues, which is equal in each fiscal year to the amount set forth in the table below and subject to the statutory first lien established by Section 3.2 of Act 91 and further described in the Act and the Indenture:

| Fiscal Year | COFINA Revenues | Fiscal Year | COFINA Revenues |
|---|---|---|---|
| 2019 | $420,185,325 | 2039 | $920,677,791 |
| 2020 | 436,992,738 | 2040 | 957,504,902 |
| 2021 | 454,472,448 | 2041 | 992,525,000 |
| 2022 | 472,651,346 | 2042 | 992,525,000 |
| 2023 | 491,557,399 | 2043 | 992,525,000 |
| 2024 | 511,219,696 | 2044 | 992,525,000 |
| 2025 | 531,668,483 | 2045 | 992,525,000 |
| 2026 | 552,935,223 | 2046 | 992,525,000 |
| 2027 | 575,052,631 | 2047 | 992,525,000 |
| 2028 | 598,054,737 | 2048 | 992,525,000 |
| 2029 | 621,976,926 | 2049 | 992,525,000 |
| 2030 | 646,856,003 | 2050 | 992,525,000 |
| 2031 | 672,730,244 | 2051 | 992,525,000 |
| 2032 | 699,639,453 | 2052 | 992,525,000 |
| 2033 | 727,625,032 | 2053 | 992,525,000 |
| 2034 | 756,730,033 | 2054 | 992,525,000 |
| 2035 | 786,999,234 | 2055 | 992,525,000 |
| 2036 | 818,479,203 | 2056 | 992,525,000 |
| 2037 | 851,218,371 | 2057 | 992,525,000 |
| 2038 | 885,267,106 | 2058 | 992,525,000 |

; provided, that for each fiscal year following 2058 and until all principal of, interest on, and any other amounts due on the Bonds have been paid or defeased in full in accordance with Section 12.01 of the Indenture, the COFINA Revenues shall include an amount equal to fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed Income (as defined in Act 91) for such fiscal year.

    b.   For each fiscal year, the Government owns any and all of the State SUT in excess of the COFINA Revenues, the Additional SUT and the non-SUT portion of the Commingled SUT Collections.  The Corporation agrees and acknowledges that it has no interest whatsoever over the funds on deposit in the SUT Account other than

the COFINA Revenues and that the Department will provide BPPR with instructions for the delivery of funds that do not constitute COFINA Revenues to those accounts that it may determine from time to time.

**4.   Delivery to the Corporation of the State SUT Funds deposited in the SUT Account.**

a.   The Corporation and the Department agree to instruct BPPR to continue delivering the State SUT to the Conduit Account and then to the Corporation's account number [●] at the [NAME OF TRUSTEE] ("Trustee Account") in the same manner that it currently does under the Contract until the amount of the COFINA Revenues for the corresponding fiscal year have been delivered to the Trustee Account.

b.   After having delivered an amount equal to the COFINA Revenues for the corresponding fiscal year to the Trustee Account, the Corporation and the Department agree to instruct BPPR to deliver or cause the delivery of collections attributable to the State SUT through June 30 of the corresponding fiscal year to the Trustee Account.

c.   If amounts deposited in the Trustee Account for a given fiscal year exceed the amount of COFINA Revenues for the applicable fiscal year, and such excess was not required to be so deposited under the Indenture, the Department shall so notify the Corporation and the Trustee, and the Corporation shall instruct the Trustee to return to the Department any and all amounts deposited in the Trustee Account in excess of the applicable COFINA Revenues.  In the event such amounts are not returned to the Department within seven (7) business days of the date of such notice by the Department, the Corporation and the Department shall instruct BPPR to reduce the COFINA Revenues for the following fiscal year by a like amount. If the Corporation and the Department determine to so reduce the COFINA Revenues for such year, they must give notice of such to the Trustee and include an explanation for such determination. Following such notice, the Trustee shall not return such excess and shall set off the amount of such excess against the portion reduced pursuant to the foregoing sentence.

d.   If at any time amounts are deposited in the Trustee Account that are not COFINA Revenues and which are not otherwise required to be paid by or on behalf of the Corporation under the Indenture, the Department shall so notify the Corporation and the Trustee, and if the Corporation and/or the Trustee fail to return such moneys to the Department within seven (7) business days of the date of such notice by the Department, the Corporation and the Department shall instruct BPPR to reduce the amount of COFINA Revenues to be delivered to the Trustee by a like amount and deliver such amounts to the Department. If the COFINA Revenues for such year are reduced, the Corporation and the Department must give notice of such to the Trustee and include an explanation for such determination. Following such notice, the Trustee shall not return such incorrectly deposited amounts and shall set off the amount of such against the portion reduced pursuant to the foregoing sentence.

**5.   Quarterly Funding of Trustee Account.**

a.   Upon satisfaction of the Quarterly Funding Requirements (as defined in the Master Indenture):

i. The COFINA Revenues shall be delivered to the Trustee Account in four equal installments (each, a "Quarterly Installment") commencing on each July 1, October 1, January 1 and April 1. In order to fund each Quarterly Installment, on each July 1, October 1, January 1 and April 1, the Corporation and the Department will instruct BPPR to begin delivering moneys constituting the COFINA Revenues necessary to fund the applicable Quarterly Installment until such time as the Quarterly Installment has been fully funded.

ii. If amounts deposited in the Trustee Account for a given fiscal quarter exceed the Quarterly Installment for such quarter, the immediately following Quarterly Installment shall be reduced by a like amount. If the State SUT received in a quarter is insufficient to fully fund the Quarterly Installment for such quarter, then the Quarterly Installment for such quarter shall be increased by an amount equal to such shortfall plus any shortfall in any prior Quarterly Installments.

iii. Once the corresponding Quarterly Installment has been delivered to the Trustee Account in a particular quarter, collections of State SUT received in such quarter in excess of such installment shall be delivered to those accounts as the Department may determine from time to time until such time as next installment is required to be delivered to the Trustee Account.

b. If at any time amounts are deposited in the Trustee Account that are not COFINA Revenues and which are not otherwise required to be paid by or on behalf of the Corporation under the Indenture, the Department shall so notify the Corporation and the Trustee, and if the Corporation and/or the Trustee fail to return such moneys to the Department within seven (7) business days of the date of such notice by the Department, the Corporation and the Department shall instruct BPPR to reduce the amount of COFINA Revenues to be delivered in the current quarter or, if the currently Quarterly Installment has already been fully funded, in the following quarter, to the Trustee by a like amount. If the COFINA Revenues for such quarter are reduced, the Corporation and the Department must give notice of such to the Trustee and include an explanation for such determination. Following such notice, the Trustee shall not return such incorrectly deposited amounts and shall set off the amount of such against the portion reduced by pursuant to the foregoing sentence.

6. **Miscellaneous**.

a. Binding Nature; No Third Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any person or entity, other than the parties, any rights or remedies under or by reason of this Agreement.

b. Governing Law. This Agreement shall be governed by the substantive laws of the Commonwealth of Puerto Rico, without regard to its conflict of laws rules.

c.  Entire Agreement.  This Agreement and the Indenture contains the entire agreement as to the matters contained herein between the parties, and supersedes all prior or contemporaneous agreements, contracts, promises or representations, whether written cofinaor oral, between the parties. Except for the Indenture, no subsequent or contemporaneous agreements, contracts, promises or representations regarding the subject matter hereof shall be binding and effective between the parties, unless set forth in writing and signed by authorized representatives of the parties.

d.  Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute one and the same instrument.

e.  Notices.   All notices, requests and other communications under this Agreement shall be in writing (including a writing delivered by facsimile or email transmission to the contact information provided below) and shall be deemed to have been duly given if delivered personally, or sent by overnight courier guaranteeing next day delivery, or by facsimile or electronic correspondence, addressed to each party's address included below or, in each case, to such other individual and at such other address as the person to be notified shall have specified by notice to the other persons. All such notices, requests and other communications shall be deemed to have been received on the date of delivery thereof, if delivered by hand, on the fifth day after the mailing thereof, if mailed, on the second day after the sending thereof, if by overnight courier, and when received, if faxed or sent by email.

If to the Department:                    If to the Corporation:

_____        _____
_____        _____
Attention:                                Attention:
Email:                                    Email:
Fax:                                      Fax:

If to the Trustee:

_____
_____
Attention:
Email:
Fax:

f.  Waivers and Amendment.  No amendment or waiver of any provision of this Agreement, or consent to any departure therefrom, shall be effective unless the same shall be in writing and signed by a duly authorized representative of each party hereto, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that the Trustee shall receive sixty (60) days' prior written notice of any proposed amendment or modification and may object to such proposed amendment or modification, in writing to the Corporation and the Department, within such sixty-day period solely on the basis

7

that entry into such amendment or modification would materially adversely affect the rights and interests of the bondholders under the Indenture and applicable law; *provided*, *further*, that if such objection is timely provided, then such amendment or modification shall be permitted only pursuant to an order of the Title III Court and any appellate court therefrom (or, in the event such court does not have or accept jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom, or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom), the entry of which may be sought on an expedited basis. No failure on the part of a party hereto to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, or shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law, the Indenture and the Corporation Plan of Adjustment.

g.  Invalid Provisions; Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable.  This Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or its severance from this Agreement.

h.  Headings.  The headings and titles to the articles, sections, and paragraphs of this Agreement are inserted for convenience only and shall not be deemed a part hereof or affect the construction or interpretation of any provision hereof.

i.  Assignability.  Neither this Agreement nor any rights and obligations hereunder may be transferred, assigned, pledged or hypothecated by any party hereto to any other person without the prior written consent of each party to this Agreement. Any assignment without such consent shall be null and void.

j.  No Agency.  This Agreement does not, and shall not be deemed or construed to, make any party the agent or legal representative of another party for any purpose whatsoever, and no party shall have the right or authority to assume or create any obligation or responsibility whatsoever, expressed or implied, on behalf of or in the name of another party.

k.  Representations and Warranties.  Each party represents to the others that it, and the person executing this Agreement on its behalf, has the power and authority to enter into this Agreement, and this Agreement is valid and binding and enforceable against it in accordance with its terms.

***[Signature Page Follows]***

8

**IN WITNESS HEREOF,** the parties herein have executed this Agreement by virtue of its authorized representatives on the date indicated above.

**PUERTO RICO SALES TAX FINANCING CORPORATION**

**TREASURY DEPARTMENT OF THE COMMONWEALTH OF PUERTO RICO**

By:_____

By:_____

Name:

Name:

Title:

Title:

**[TRUSTEE, solely for purposes of agreeing
to the notice and opportunity to object provisions of Section 6(e) hereof]**

By:_____

Name:

Title:

**[GOVERNMENT DEVELOPMENT BANK
FOR PUERTO RICO, solely for purposes
of agreeing to the provisions of Section 1(a) hereof]**

By:_____

Name:

Title:

**[FISCAL AGENCY AND FINANCIAL ADVISORY
AUTHORITY, solely for purposes
of agreeing to the provisions of Section 2(c) hereof]**

By:_____

Name:

Title:

540131

9

**<u>Exhibit F</u>**

**COFINA Class 2 Trust**

**DRAFT**

COFINA CLASS 2 TRUST

[_____]¹
(as Trustee),

Puerto Rico Sales Tax Financing Corporation
(as Depositor)

and

Ambac Assurance Corporation
(as Credit Support Provider)

---

¹ This draft remains subject to review and comment by the trustee and its counsel.

## TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS; CONSTRUCTION

SECTION 1.01. Definitions.................................................................................. 1
SECTION 1.02. Rules of Construction .............................................................. 10
SECTION 1.03. Article and Section References................................................ 10

## ARTICLE II

### DECLARATION OF TRUST;
### ISSUANCE OF UNITS

SECTION 2.01. Creation of Trust; Assignment of Trust Property ..................... 10
SECTION 2.02. Acceptance by Trustee............................................................ 12
SECTION 2.03. Agreement to Authenticate and Deliver Units......................... 12

## ARTICLE III

### TRUST POWERS; ADMINISTRATION OF THE TRUST PROPERTY

SECTION 3.01. Trust Property ......................................................................... 12
SECTION 3.02. Administration of the Trust...................................................... 12
SECTION 3.03. Taxable Collection Account ..................................................... 13
SECTION 3.04. Investment of Funds in the Collection Account ...................... 14

## ARTICLE IV

### DISTRIBUTIONS AND REPORTS TO CREDIT SUPPORT PROVIDER AND
### UNITHOLDERS

SECTION 4.01. Distributions............................................................................ 14
SECTION 4.02. Reports to Credit Support Provider and Unitholders............... 16
SECTION 4.03. Compliance with Tax Reporting and Withholding Requirements............ 17
SECTION 4.04. Preservation of Information, Communications to Unitholders................. 17

## ARTICLE V

### THE UNITS

SECTION 5.01. The Units................................................................................. 17
SECTION 5.02. Execution, Authentication and Delivery................................... 18
SECTION 5.03. Registration; Registration of Transfer and Exchange.............. 19
SECTION 5.04. Mutilated, Destroyed, Lost and Stolen Certificates................. 20

SECTION 5.05.   Persons Deemed Owners .................................................... 21
SECTION 5.06.   Cancellation ...................................................................... 21
SECTION 5.07.   Appointment of Paying Agent ............................................. 21
SECTION 5.08.   Authenticating Agent .......................................................... 22
SECTION 5.09.   Issuance and Transfer Restrictions ....................................... 23

## ARTICLE VI

### RIGHTS OF UNITHOLDERS AND CREDIT SUPPORT PROVIDER

SECTION 6.01.   Voting Rights with Respect to COFINA Bonds ..................... 24
SECTION 6.02.   COFINA Bond Sale ............................................................ 25
SECTION 6.03.   Distribution of COFINA Bonds ........................................... 26
SECTION 6.04.   Electing Ambac Prepetition Insured Bonds ........................... 26

## ARTICLE VII

### DEFAULT ON COFINA BONDS AND PERMITTED INVESTMENTS

SECTION 7.01.   Realization Upon Default ..................................................... 27

## ARTICLE VIII

### TRUST WIND-UP EVENTS; TERMINATION

SECTION 8.01.   Trust Wind-Up Events ......................................................... 27
SECTION 8.02.   Trust Property Made Available ............................................. 28

## ARTICLE IX

### CONCERNING THE TRUSTEE

SECTION 9.01.   Duties of Trustee ................................................................. 28
SECTION 9.02.   Certain Matters Affecting the Trustee .................................... 30
SECTION 9.03.   Limitation on Liability of Trustee ......................................... 31
SECTION 9.04.   Trustee Fees and Expenses; Limited Indemnification ............. 31
SECTION 9.05.   Eligibility Requirements for Trustee ..................................... 32
SECTION 9.06.   Resignation or Removal of the Trustee .................................. 32
SECTION 9.07.   Successor Trustee ................................................................ 33
SECTION 9.08.   Merger or Consolidation of Trustee ...................................... 33
SECTION 9.09.   Appointment of Co-Trustee ................................................. 33
SECTION 9.10.   Appointment of Office or Agency ........................................ 34
SECTION 9.11.   Representations and Warranties of Trustee ............................ 34
SECTION 9.12.   Limitation of Powers and Duties .......................................... 36

## ARTICLE X

### MISCELLANEOUS TERMS

SECTION 10.01.  Amendment of Trust Agreement ............................................................... 36
SECTION 10.02.  Counterparts ........................................................................................... 36
SECTION 10.03.  Limitation on Rights of Unitholders ........................................................ 36
SECTION 10.04.  Governing Law ....................................................................................... 37
SECTION 10.05.  Notices ................................................................................................... 37
SECTION 10.06.  Severability of Terms.............................................................................. 37
SECTION 10.07.  Notice to Credit Support Provider .......................................................... 38
SECTION 10.08.  No Recourse............................................................................................ 38
SECTION 10.09.  Third Party Beneficiary.......................................................................... 39

EXHIBIT A1       Class 2047 Unit Accretion Schedule

EXHIBIT A2       Class 2054 Unit Accretion Schedule

EXHIBIT B1       Form of Class 2047 Unit

EXHIBIT B2       Form of Class 2054 Unit

EXHIBIT C1       Form of Class 2047 Unit Global Security

EXHIBIT C2       Form of Class 2054 Unit Global Security

EXHIBIT D        Form of Transfer Certificate

SCHEDULE  1      COFINA Bonds

TRUST AGREEMENT made as of [_____], 2019 ("Trust Agreement") with respect to the COFINA CLASS 2 TRUST (the "Trust").

WHEREAS, the Trust has been formed by the Puerto Rico Sales Tax Financing Corporation (the "Depositor")  pursuant to the Plan of Adjustment and this Trust Agreement, and on behalf of the Electing Holders, for the purposes of (i) holding the Electing Ambac Prepetition Insured Bonds (as defined below), (ii) receiving the COFINA Bond Distributions (including the COFINA Bonds) from the Electing Holders, (iii) being the beneficiary of the Credit Support and (iv) issuing the Units;

WHEREAS, pursuant to the terms of the Plan of Adjustment, the Electing Holders have elected to deposit their COFINA Bond Distributions, including their COFINA Bonds, into the Trust;

WHEREAS, on the date hereof the Trust will issue Units to the Electing Holders on the terms and conditions specified herein;

WHEREAS, except for the establishment of the Trust and as may otherwise be expressly provided in this Trust Agreement, the Depositor shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof; and

NOW THEREFORE, [        ] (the "Trustee") for itself and its successors and assigns, hereby declares that it shall hold all the estate, right, title and interest in any property contributed to the Trust established hereunder in trust for the benefit of the Unitholders and the Credit Support Provider (as defined below) as provided herein and subject to the terms and provisions hereof.

ARTICLE I

Definitions; Construction

SECTION 1.01.    Definitions

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

"Accretion Schedule":  With respect to the Class 2047 Units, means the schedule set forth on Exhibit A1 hereto as it may be amended from time to time in accordance with the terms hereof and, with respect to the Class 2054 Units, means the schedule set forth on Exhibit A2 hereto as it may be amended from time to time in accordance with the terms hereof.

"Affiliate":  With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or

Page 1

indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Aggregate Unit Balance":  With respect to a particular Class and as of any date of determination the aggregate amount required to redeem such Class in full as of such date in accordance with the then current Accretion Schedule for such Class.

"Ambac Prepetition Insured Bonds": The Sales Tax Revenue Bonds, Series 2007A, Capital Appreciation Bonds due August 1, 2047 and the Sales Tax Revenue Bonds, Series 2007 Capital Appreciation Bonds due August 1, 2054 issued by COFINA under the Bond Resolution.

"Applicable Procedures": With respect to any transfer or exchange of a beneficial interest in any Global Security, the rules and procedures of the Depositary that apply to such transfer or exchange.

"Authenticating Agent":  The meaning specified in Section 5.08.

"Available Funds":  With respect to a Scheduled Final Redemption Date for a Class or Sinking Fund Distribution Date for the Class 2054 Units, all amounts available to the Trust on such date from the following sources (i) all amounts received by the Trustee on or with respect to the Trust Property other than any amount deposited in the Credit Support Collection Account, plus (ii) all investment income from Permitted Investments on the Taxable Funds minus (iii) any amounts reimbursable to the Trustee as Trustee Fees and under Section 9.02(ix), in each case on deposit in the Taxable Collection Account or Non-Taxable Collection Account on such date up to the Aggregate Unit Balance for such Class (in the case of the Scheduled Final Redemption Date for a Class) or the related Sinking Fund Distribution (in the case of a Sinking Fund Distribution Date for the Class 2054 Units), as applicable.

"Bond Counsel":  Nationally-recognized bond counsel as selected by COFINA.

"Bond Resolution":  That certain Amended and Restated Sales Tax Revenue Bond Resolution, adopted by COFINA on July 13, 2007, as amended and restated on June 19, 2009, and as supplemented pursuant to certain supplemental resolutions entered into thereunder or adopted pursuant thereto.

"Business Day":  Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Calculation Agent":  The agent making calculations as to the fair market value of the COFINA Bonds pursuant to Section 6.02(c).  The Calculation Agent shall be Ambac Assurance Corporation or, upon resignation of Ambac Assurance Corporation as Calculation Agent, the Trustee shall appoint another person to be the Calculation Agent.

"Certificate":  A definitive certificate in the form attached as <u>Exhibit B1</u> evidencing a Class 2047 Unit or <u>Exhibit B2</u> evidencing a Class 2054 Unit, in each case registered in the name of the holder thereof.

"Class":  The Class 2047 Units or Class 2054 Units.

"Class 2047 Global Security": One or more global certificates representing Class 2047 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of <u>Exhibit C1</u> attached hereto.

"Class 2047 Scheduled Final Redemption Date": August 1, 2047.

"Class 2047 Units": The meaning specified in Section 5.01(b).

"Class 2054 Scheduled Final Redemption Date": August 1, 2054.

"Class 2054 Global Security": One or more global certificates representing Class 2054 Units that are registered in the name of the Depositary or its nominee, bearing the Global Security Legend, and that is deposited with the Custodian, substantially in the form of <u>Exhibit C2</u> attached hereto.

"Class 2054 Units": The meaning specified in Section 5.01(b).

"Closing Date":  [_____], 2019.[2]

"Code":  The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"COFINA": The Puerto Rico Sales Tax Financing Corporation.

"COFINA Bond Agreements":  The Master Trust Indenture, dated as of [_____, 2019], between COFINA and [_____], as trustee and the First Supplemental Trust Indenture, dated as of [_____, 2019] between COFINA and [_____], as trustee.

"COFINA Bond Distributions":  The Senior COFINA Bond Distributions (as defined in the Plan of Adjustment), including the COFINA Bonds, that Electing Holders of a Senior COFINA Bond Claim (Ambac) have elected pursuant to the Plan of Adjustment to deposit into the Trust.

 "COFINA Bonds": The securities issued by COFINA pursuant to the Plan of Adjustment, that Electing Holders of a Senior COFINA Bond Claim (Ambac) have elected pursuant to the Plan of Adjustment to deposit into the Trust.  The aggregate amount of each series of COFINA Bonds deposited into the Trust on the date hereof is set forth on Schedule 1 hereto.

"Collection Account":  Collectively, the Taxable Collection Account, the Non-Taxable Collection Account and the Credit Support Collection Account.

"Corporate Trust Office":  The Trustee's offices at [_____] or such other addresses as the Trustee may designate from time to time by notice to the Unitholders and the Credit Support Provider.

---

[2] To be dated the Plan of Adjustment Effective Date.

"Credit Support":  The Ambac Financial Guaranty Insurance Policy No. 26827BE effective July 31, 2007 with respect to the Electing Ambac Prepetition Insured Bonds (and after giving effect to the reduction of the obligations of Ambac under such policy  occurring as a result of the cancellation of Ambac Prepetition Insured Bonds as a result of the election of non-Electing Holders pursuant to the Plan of Adjustment), and as may be adjusted from time to time as provided under the terms hereof, including with respect to (i) distributions as a result of redemptions or other repayments of the COFINA Bonds, (ii) payments made pursuant to distributions under this Trust Agreement other than those made from the Credit Support Collection Account, (iii) payments made on the Credit Support and (iv) distributions pursuant to Section 6.03.

"Credit Support Collection Account":  The meaning specified in Section 3.03.

"Credit Support Provider":  Ambac Assurance Corporation.

"Credit Support Provider Request":  A written order or request signed in the name of the Credit Support Provider and delivered to the Trustee.

"Currency":  Dollars.

"Custodian": The Trustee, as custodian with respect to the Global Securities, or any successor entity thereto.

"Deemed COFINA Bond Valuation Amount":  In connection with any distribution of underlying COFINA Bonds pursuant to Section 6.03(a) hereof, the value to be attributed to such COFINA Bonds determined by the Credit Support Provider and delivered to the Trustee based on either of the following methods as the Credit Support Provider may elect (i) the weighted average trading price of the particular type of COFINA Bonds to be distributed for the ten Business Day period immediately prior to the date the written notice from the Credit Support Provider is delivered (or if no trading occurred with respect to a particular type of COFINA Bond during such period, the weighted average trading price of such COFINA Bond for the ten Business Day period ending on the date of the last reported trade of such type of COFINA Bond) or (ii) the average price quoted by two or more brokers of national standing for a firm bid to purchase such type of COFINA Bond in an aggregate principal amount of $2,000,000.

"Delaware Trust Statute":  Chapter 38 of Title 12 of the Delaware Code.

"Depositary":  DTC or such other clearing agency as selected by the Trustee in accordance with Section 5.09.

"Depositor":  The meaning specified in the preamble hereto.

"Discretionary Distribution": The meaning specified in Section 4.01.

"Discretionary Distribution Date": Each date on which the Trustee is directed to make a Discretionary Distribution pursuant to Section 4.01 hereof.

"Distribution Date":  A Non-Taxable Bond Distribution Date, a Discretionary Distribution Date or a Sinking Fund Distribution Date.

"Dollar" or "$":  Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DTC":  The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"DTC Participant":  With respect to the Depositary, a Person who has an account with the Depositary or clears through or maintains a custodial relationship with a Person who has an account with the Depositary.

"Electing Ambac Prepetition Insured Bonds":  The Ambac Prepetition Insured Bonds beneficially owned by the Electing Holders.

"Electing Holder":  Each holder of a Senior COFINA Bond Claim (Ambac) who has elected to receive Units pursuant to the Plan of Adjustment.

"Eligible Account":  A non-interest bearing account, held in the United States in the name of the Trustee for the benefit of the Trust that is either a segregated account or segregated accounts maintained with (1) a Federal or State chartered depository institution that has (x) a rating of at least "A-1" and "A" by S&P and (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A2" by Moody's and a short-term rating of at least "P-1" by Moody's or (2)  with the corporate trust department of a federal or State-chartered deposit institution having a CR Assessment of at least "Baa3(cr)" by Moody's (or, if such institution does not have a CR Assessment, (x) a long-term unsecured credit rating of at least "Baa3" by Moody's or (y) a short-term rating of "P-1" by Moody's (and if rated "Baa3" by Moody's, such rating is not on watch for possible downgrade). Such institution shall have a combined capital and surplus of at least U.S.$200,000,000 (or the equivalent in any other currency).

"Exchange Act":  The U.S. Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated by the United States Securities and Exchange Commission thereunder.

"Executive Officer":  With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof.

"Extraordinary Trust Expense":  The meaning specified in Section 9.04(b).

"Funds":  The meaning specified in Section 4.01(i).

"Global Securities":  Individually and collectively, each of the Class 2047 Unit Global Security and the Class 2054 Unit Global Security.

"Global Security Legend": The legend set forth in Section 5.09(c)(iv).

"Maximum Reimbursable Amount":  An amount equal to $[_____].

"Moody's":  Moody's Investors Service, Inc.

"Non-Taxable Bonds": The COFINA Bonds indicated as "Non-Taxable" on Schedule 1 hereto, as may be adjusted from time to time as a result of (i) redemptions of the COFINA Bonds, (ii) COFINA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03 and (iv) a re-characterization of Non-Taxable COFINA Bonds as taxable by Bond Counsel or the Internal Revenue Service (in which case such re-characterized COFINA Bonds shall be considered Taxable Bonds from the date of such re-characterization going forward).

"Non-Taxable Bond Permitted Disposition Event":  With respect to any series of COFINA Bonds, the satisfaction of all of the following requirements:

(i)  The Credit Support Provider shall have instructed the Trustee in accordance with the notice requirements set forth in Section 10.05 hereof to dispose of some or all of such series of Non-Taxable Bonds;

(ii)  The Trustee shall have provided notice to Unitholders through facsimile or electronic mail and otherwise in accordance with the notice requirements set forth in Section 10.05 hereof (a) notifying Unitholders of the instruction of the Credit Support Provider described in clause (i) above and (b) requesting that any Unitholders objecting to such proposed disposition provide written notice of such objection to Trustee; and

(iii)  The Trustee shall not have received written objections with respect to such proposed disposition representing 10 percent or more of the amount of outstanding Units (determined as of the date of the notice described in clause (ii) above) within seven (7) Business Days of the date the notice provided in clause (ii) above is provided.

"Non-Taxable Bond Sale Event":  With respect to any series of Non-Taxable Bonds, the occurrence of either (i) a Non-Taxable Bond Threshold Event or (ii) a Non-Taxable Bond Permitted Disposition Event.

"Non-Taxable Bond Threshold Amount":  With respect to each series of Non-Taxable Bonds and as of any applicable determination date, (i) the price (*i.e.* par or accreted par, as applicable) set forth opposite such series of Non-Taxable Bonds on Schedule 2 hereto or (ii) the price that equates to a Yield to Maturity equal to or less than the Yield to Maturity set forth opposite such series of Non-Taxable Bonds on Schedule 2 hereto, calculated on a semi-annual payment, 30/360 day count convention.

"Non-Taxable Bond Threshold Event":  With respect to any series of Non-Taxable Bonds, the receipt by the Trustee of a notice by the Calculation Agent that the fair market value of such series of Non-Taxable Bonds exceeds the Non-Taxable Bond Threshold Amount for such series of Non-Taxable Bonds.

"Non-Taxable Collection Account":  The meaning specified in Section 3.03.

 "Non-Taxable Distribution Date": Each date on which a distribution is made from the Non-Taxable Collection Account.

 "Non-Taxable Funds":  All amounts received by the Trustee on or with respect to the Non-Taxable Bonds (including from any sale thereof).

"Officers' Certificate":  A certificate signed by an Executive Officer of the applicable Person, and delivered to the Trustee.

"Opinion of Counsel":  A written opinion of counsel, who may be counsel to the Credit Support Provider.

"Outstanding":  As of any date of determination, all Units theretofore authenticated and delivered under this Trust Agreement, except:

> (i)  Units theretofore canceled by the Unit Registrar or delivered to the Trustee for cancellation; and

> (ii) Units in exchange for or in lieu of which other Units have been authenticated and delivered pursuant to this Trust Agreement, unless proof satisfactory to the Trustee is presented that any such Units are held by a bona fide purchaser in whose hands such Units represent interests in the Trust.

"Oversight Board":  Financial Oversight and Management Board of Puerto Rico.

"Paying Agent":  The meaning specified in Section 5.07(a).

 "Permitted Investments":  All investments made by the Trustee at the direction of the Credit Support Provider for amounts in the Taxable Collection Account pursuant to Section 3.04 in any one or more of the following; provided, however, that each such obligation or security shall be held in the name of the Trustee on behalf of the Trust:  [TO COME]

"Person":  Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan of Adjustment": The COFINA Plan of Adjustment filed on October 19, 2018 with the Title III Court by the Oversight Board in the Title III Case, as amended, modified or supplemented from time to time.

"Predecessor Unit":  With respect to any particular Unit, every previous Unit evidencing all or a portion of the same interest as that evidenced by such particular Unit; and, for the purpose of this definition, any Unit authenticated and delivered under Section 5.04 in lieu of a lost, destroyed or stolen Unit shall be deemed to evidence the same interest as the lost, destroyed or stolen Unit.

"Proceeding":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Record Date":  With respect to any payment to be made on a Distribution Date, the Business Day that is [__] Business Days prior to such Distribution Date, other than in the case of the Scheduled Final Redemption Date, in which case the Record Date will be the Scheduled Final Redemption Date.

 "Responsible Officer":  With respect to the Trustee, any officer within the Corporate Trust Office of the Trustee, including any Vice President, Assistant Vice President, Secretary, Assistant Secretary or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer' knowledge of and familiarity with the particular subject.

"Scheduled Final Redemption Date":  The Class 2047 Scheduled Final Redemption Date or the Class 2054 Scheduled Final Redemption Date, as applicable, or such earlier redemption date as determined by the Credit Support Provider so long as the Credit Provider pays all amounts due under the Credit Support pursuant to Sections 3.02(b)(iv) and 4.01(d).

"Secretary of State":  The meaning specified in Section 2.01(a).

"Securities Act":  The U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated by the United States Securities and Exchange Commission thereunder.

"Security Issuer":  COFINA.

"Senior COFINA Bond Claim (Ambac)":  The meaning given to such term under the Plan of Adjustment.

"Sinking Fund Distribution Date":  With respect to the Class 2054 Units, each of August 1, 2048, August 1, 2049, August 1, 2050, August 1, 2051, August 1, 2052 and August 1, 2053.

"Sinking Fund Distributions":  With respect to each Sinking Fund Distribution Date for the Class 2054 Units, the amounts on the Accretion Schedule set forth on Exhibit A2 hereto as it may be amended from time to time in accordance with the terms hereof.[3]

"State":  Any one of the 50 states of the United States, the District of Columbia or its territories.

"S&P":  S&P Global Ratings.

"Taxable Bonds": The COFINA Bonds deposited into the Trust that are not Non-Taxable Bonds, as may be adjusted from time to time as a result of (i) redemptions of the COFINA Bonds, (ii) COFINA Bond sales pursuant to Section 6.02, (iii) distributions pursuant to Section 4.01 and Section 6.03 and (iv) a re-characterization of Non-Taxable COFINA Bonds as taxable

---

[3] Sinking fund installments will match amounts in the Ambac Prepetition Bonds.

by Bond Counsel or the Internal Revenue Service (in which case such re-characterized COFINA Bonds shall be considered Taxable Bonds from the date of such re-characterization going forward).

"Taxable Collection Account":  The meaning specified in Section 3.03.

"Taxable Funds":  All amounts received by the Trustee on or with respect to:  the Taxable Bonds and any Permitted Investments made with proceeds of such Taxable Bonds (including from any sale of either of the foregoing).

"Title III Case":  The meaning given to such term under the Plan of Adjustment.

"Title III Court":  The meaning given to such term under the Plan of Adjustment.

"Trust":  The trust created by this Trust Agreement.

"Trust Agreement":  The meaning specified in the preamble hereto.

"Trust Property":  The meaning specified in Section 3.01.

"Trust Termination Event": The meaning specified in Section 8.01.

"Trustee":  [_____], any successor trustee appointed pursuant to Sections 9.02 or 9.06, or any co-trustee appointed pursuant to Section 9.09, until a successor Person shall have become the Trustee pursuant to the applicable terms of this Trust Agreement, and thereafter "Trustee" shall mean such successor Person.

"Trustee Fee Letter":  A letter agreement dated on or before the Closing Date setting forth the fees and expenses of the Trustee.

"Trustee Fees":  The amount or amounts set forth in the Trustee Fee Letter.

"Unit Register" and "Unit Registrar":  As respectively defined in Section 5.03(a).

"Unitholder":  The Person in whose name a Unit is registered in the Unit Register on the applicable Record Date

"Units":  The securities authorized by, and authenticated and delivered under, this Trust Agreement and evidenced by a Certificate or Global Security with respect to the Class 2047 Units and the Class 2054 Units, as applicable.

"United States":  The United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"Yield to Maturity":  With respect to any series of COFINA Bond, the discount rate that equates the present value of future scheduled cash flows from such COFINA Bond to the current fair market value of such COFINA Bond.

Certain additional defined terms have the meanings assigned thereto in other terms hereof.

SECTION 1.02.    Rules of Construction

Unless the context otherwise requires:

(i)  a term has the meaning assigned to it;

(ii) an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

(iii) "or" is not exclusive;

(iv) the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, section or other subdivision;

(v) "including" means including without limitation; and

(vi) words in the singular include the plural and words in the plural include the singular.

SECTION 1.03.    Article and Section References

All article and section references used in this Trust Agreement, unless otherwise provided, are to articles and sections in this Trust Agreement.  Any reference to "this Section" appearing within a particular paragraph of a section is a reference to such section as a whole.

ARTICLE II

Declaration of Trust;
Issuance of Units

SECTION 2.01.    Creation of Trust; Assignment of Trust Property.

(a) The Trust is being created by the Depositor on the date hereof on behalf of the Electing Holders pursuant to the execution of this Trust Agreement and the filing by the Trustee of a Certificate of Trust of the Trust (the "Certificate of Trust") with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name "COFINA Class 2 Trust" in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the business of the Trust. It is the intention of the parties hereto that the Trust hereby created constitute a statutory trust under the Delaware Trust Statute and that this document constitute the governing instrument of the Trust.

 (b) Concurrently with the execution and delivery of this Trust Agreement pursuant to the Plan of Adjustment, the Trust shall receive (i) the Electing Ambac Prepetition Insured Bonds, (ii) the COFINA Bond Distributions (including the COFINA Bonds) and (iii) the benefit of the Credit Support.  In addition, the Trustee has established on or prior to the date hereof (x) the

Taxable Collection Account, (y) the Non-Taxable Collection Account, and (z) the Credit Support Collection Account.  Each Unitholder (which term shall for purposes hereof include any holder of a beneficial interest in a Global Security), by electing to receive Units (or beneficial interests therein) hereunder and any assignee thereof, agrees to treat, for U.S. federal, state and local income tax purposes, the COFINA Bond Distributions (including the COFINA Bonds) as having been received by such Unitholder prior to the formation of the Trust in a transaction that does not constitute a "recapitalization" of any of the outstanding debt obligations of COFINA pursuant to section 368(a)(1)(E) of the Code.

(c)  The Trustee shall have power and authority, and is hereby authorized and empowered to execute and file with the Secretary of State any certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State.  The office of the Trust shall be in care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and the Depositor.

(d) Notwithstanding anything appearing herein or elsewhere to the contrary, the obligations of the Trust under the Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Property, and following realization of the Trust Property and its reduction to zero, any claims of the Unitholders shall be extinguished.  The Units are not obligations of, and are not guaranteed by, the Depositor, and no recourse shall be had against the Depositor, against any officer, director, manager or employee of the Depositor, or against any of their respective successors or assigns, for the payment of any amounts payable under the Units or the payment or performance of any obligation of the Trust, the Trustee or the Credit Support Provider under or pursuant to this Trust Agreement.

(e) The recitals contained in this Trust Agreement and in the Units shall be taken as the statements of the Trust, and the Depositor assumes no responsibility for their correctness.  The Depositor makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Units.

(f) In purchasing any Units in certificated form, the purchaser shall be required to acknowledge, represent and agree, and in purchasing an interest in the Units represented by Global Security the purchaser shall be deemed to acknowledge, represent and agree, that none of the Depositor, any of its affiliates nor the Calculation Agent, is acting as a fiduciary or financial or investment advisor for purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Depositor, any of its affiliates or the Calculation Agent (or any representative of any of the foregoing).

(g) The Depositor shall not be accountable for the use or application by the Trust of the Units or the proceeds thereof or any moneys paid to the Trust pursuant to the provisions of this Trust Agreement.

(h) Neither the Depositor nor its affiliates will have the authority to act for, or to assume any obligation or responsibility on behalf of, the Trust.

(i) General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Depositor or its Affiliates.

(j) The Trust will not (A) operate or purport to operate as an integrated, single economic unit with respect to the Depositor or any other affiliated or unaffiliated entity; (B) see or obtain credit or incur any obligation to any third party based upon the assets of the Depositor or its Affiliates; or (C) induce any such third party to reasonably rely on the creditworthiness of the Depositor or any affiliated or unaffiliated entity in its dealings with the Trust.

SECTION 2.02.    Acceptance by Trustee.

The Trustee acknowledges receipt by it of (i) the Electing Ambac Prepetition Insured Bonds, (ii) the COFINA Bond Distributions (including the COFINA Bonds) and documents relating to the issuance of the COFINA Bonds and (iii) the benefit of the Credit Support, and declares that it will hold such assets and all other assets comprising the Trust Property in trust, for the benefit of all present and future Unitholders and the Credit Support Provider, in each case as provided herein, and for the purposes and subject to the terms and conditions set forth in this Trust Agreement, including the Trustee's obligations, as and when they may arise.

SECTION 2.03.    Agreement to Authenticate and Deliver Units.

The Trustee agrees and acknowledges that it will, concurrently with the deposit to and receipt by it of the property described in Section 2.02, cause to be executed, authenticated and delivered, as applicable, to each Electing Holder its Units in the form of a beneficial interest in the applicable Global Security.

ARTICLE III

Trust Powers; Administration of the Trust Property

SECTION 3.01.    Trust Property.

The "Trust Property" with respect to the Trust will consist of:  (i) the Electing Ambac Prepetition Insured Bonds; (ii) the COFINA Bond Distributions (including, without limitation, the cash portion thereof, the COFINA Bonds and all payments on or collections in respect of such COFINA Bonds); (iii) the benefit of the Credit Support; (iv) all Permitted Investments and all funds from time to time deposited in the Taxable Collection Account; (v) all funds from time to time deposited in the Non-Taxable Collection Account and the Credit Support Collection Account; and (vi) any other asset constituting a portion or proceeds of such Trust Property.

SECTION 3.02.    Administration of the Trust.

(a) The Trustee shall take such actions with respect to the Trust Property as directed by the Credit Support Provider pursuant to Article VI hereof and as otherwise expressly provided herein.  Each Electing Holder (by its election under the Plan of Adjustment and receipt of Units (or a beneficial interest therein)) and each other assignee thereof, consents to the provisions of this Agreement and authorizes the Trustee to follow any direction of the Credit Support Provider delivered under the terms of this Agreement.

(b) Subject to Article IX, the Trustee is hereby authorized to perform, and from time to time hereafter, shall perform only those acts which are described in this Trust Agreement as obligations of the Trustee.  Notwithstanding the generality of the foregoing, the Trustee is hereby specifically authorized to, and shall, do the following on behalf of the Trust:  (i) to issue the Global Securities and, if applicable, Certificates, evidencing Units; (ii) to establish and maintain the Taxable Collection Account, the Non-Taxable Collection Account and the Credit Support Collection Account hereunder; (iii) to accept delivery of the Electing Ambac Prepetition Insured Bonds, the COFINA Bond Distributions and the benefit of the Credit Support; (iv) to the extent Available Funds are insufficient to pay in full the Aggregate Unit Balance of a Class on its Scheduled Final Redemption Date, to draw on the Credit Support to the extent available on such applicable Scheduled Final Redemption Date in the amount of such insufficiency; (v) to the extent Available Funds are insufficient to pay the Sinking Fund Distribution on any Sinking Funding Distribution Date, to draw on the Credit Support to the extent available on such applicable Sinking Fund Distribution Date in the amount of such insufficiency; (vi) to make and dispose of Permitted Investments pursuant to Section 3.04; (vii) to liquidate the Trust pursuant to Article VIII; and (viii) to make distributions pursuant to Article IV.

(c) The Trustee shall not sell, assign, pledge or otherwise transfer the COFINA Bonds or any other Trust Property to any Person or Persons, except to a successor trustee as provided in Section 9.07 or as otherwise expressly permitted hereunder (including without limitation, Sections 6.02 and 6.03 hereto).  This section shall not be construed to prohibit transfers of the Units, or sale or substitution of Permitted Investments.

(d) The Trustee shall separately track all Taxable Funds and all Non-Taxable Funds including, without limitation, interest on the Non-Taxable Bonds and the portion of each Sinking Fund Distribution paid under the Credit Support and report to Unitholders and the Credit Support Provider pursuant to Section 4.02(a)(vi).

SECTION 3.03.   Taxable Collection Account.

Non-Taxable Collection Account; Credit Support Collection Account.

(a) The Trustee has established Eligible Accounts (i) to hold Taxable Funds (the "Taxable Collection Account"), (ii) to hold Non-Taxable Funds (the "Non-Taxable Collection Account") and (iii) to hold amounts received on account of the Credit Support (the "Credit Support Collection Account"), each held in trust for the benefit of the Unitholders and the Credit Support Provider, subject to the obligation of the Trust to pay the fees and expenses of the Trustee in the Trustee Fee Letter and Extraordinary Trust Expenses, all from proceeds held in the Collection Accounts listed in clauses (i) and (ii) above.  Each of the Taxable Collection Account, the Non-Taxable Collection Account and the Credit Support Collection Account shall be under the sole dominion and control of the Trustee.

(b) If, at any time, a formerly Eligible Account no longer fulfills the definition of Eligible Account, the Trustee shall within five (5) Business Days establish a new Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account, as applicable, meeting the conditions specified above and transfer any cash and any investments on deposit in

the Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account to such new Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account, and from the date such new Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account is established, it shall be the Taxable Collection Account, Non-Taxable Collection Account or Credit Support Collection Account under this Trust Agreement.

(c)  The Trustee shall give notice to the Credit Support Provider and, upon request, any Unitholder of the location of each Eligible Account constituting the Taxable Collection Account, the Non-Taxable Collection Account and the Credit Support Collection Account prior to any change thereof.

SECTION 3.04.    Investment of Funds in the Taxable Collection Account.

The Credit Support Provider may direct in writing the Trustee to (i) direct any depositary institution maintaining the Taxable Collection Account to invest the funds therein in one or more Permitted Investments or (ii) use funds on deposit in the Taxable Collection Account to purchase on behalf of the Trust Units through open market purchases (and the Trustee shall cancel all such purchased Units and the Applicable Aggregate Unit Balance for the Class or Classes purchased shall be reduced and the Accretion Schedule for the Class or Classes subject to the purchase shall be revised accordingly by the Trustee).  If the Credit Support Provider does not provide any investment directions to the Trustee, then the Trustee shall invest funds held in the Taxable Collection Account in the Permitted Investments specified in clause [(i)] of the definition thereof upon receipt of such funds.  Unless maturing or otherwise directed by the Credit Support Provider to be sold sooner, all Permitted Investments held by the Trust shall be liquidated on the Business Day prior to the Class 2054 Scheduled Final Redemption Date or such earlier date as directed by the Credit Support Provider.  Amounts in the Non-Taxable Collection Account and the Credit Support Collection Account shall not be invested pending distribution.

ARTICLE IV

Distributions and Reports to Credit Support Provider and Unitholders

SECTION 4.01.    Distributions.

(a) Within [3] Business Days of receiving any amount with respect to the Non-Taxable Bonds in the Non-Taxable Collection Account, including COFINA Bond sale proceeds received with respect to a Non-Taxable Bond pursuant to Section 6.02, the Trustee shall distribute such Non-Taxable Funds in the Non-Taxable Collection Account on a pro rata basis to each Unitholder in both Classes of Units.

(b) The Trustee shall provide notice to the Unitholders of the intent to make a Discretionary Distribution within [__] Business Days of receipt of the Credit Support Provider Request, which request shall be provided to the Trustee at least [__] Business Days prior to a Discretionary Distribution Date.  On each Discretionary Distribution Date, the Trustee shall distribute amounts directed by the Credit Support Provider in a Credit Support Provider Request from (i) proceeds received with respect to a Taxable Bond and from any Permitted Investments, (ii) sales of the

Taxable Bonds pursuant to Section 6.02 or (iii) any early payment made on the Credit Support by the Credit Support Provider in its sole discretion (each, a "Discretionary Distribution") to Unitholders pro rata by Class or, with respect to amounts under clause (iii) of this Section 4.01(b), as otherwise directed by the Credit Support Provider.

(c) On each Sinking Fund Distribution Date, the Trustee shall distribute the Available Funds in the amount of the Sinking Fund Distribution pro rata to each Unitholder of Class 2054 Units. To the extent the amounts available to be distributed from Available Funds would be insufficient to pay the Sinking Fund Distribution on a Sinking Fund Distribution Date, the Trustee shall make a claim on the Credit Support to the extent available in the amount of such insufficiency and, to the extent received, deposit such cash into the Credit Support Collection Account to make up any shortfall between the amount of Available Funds and the Sinking Fund Distribution to be made on such Sinking Fund Distribution Date and upon receipt thereof distribute such amounts pro rata to each Unitholder of Class 2054 Units.

(d) On each Scheduled Final Redemption Date, the Trustee shall distribute to each Unitholder of the related Class presenting and surrendering its applicable Units, directly or through its DTC Participant, and in each case delivering such release to the Trustee as the Trustee may require to save the Trustee and hold the Trustee harmless, its ratable share of the Available Funds.  Any funds not distributed on such Scheduled Final Redemption Date shall be set aside and held in trust for the benefit of Unitholders either (i) not presenting and surrendering their Units in the aforesaid manner or (ii) not delivering such release to the Trustee as the Trustee may require to save the Trustee and hold the Trustee harmless.  To the extent the amounts available to be distributed from Available Funds would be insufficient to pay the Aggregate Unit Balance of a Class on its Scheduled Final Redemption Date, the Trustee shall make a claim on the Credit Support to the extent available in the amount of such insufficiency and, to the extent received, deposit such cash into the Credit Support Collection Account to make up any shortfall between the amount of Available Funds and the Aggregate Unit Balance of the Class to be redeemed on such Scheduled Final Redemption Date and upon receipt thereof distribute such amounts.

(e) Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date notwithstanding the cancellation of such Unit upon any transfer or exchange subsequent to such related Record Date.

(f) Distributions on Units shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of Section 4.03 hereof, by wire transfer to an account designated in writing by a Unitholder.

(g) All distributions on the Class 2047 Units (whether or not such distributions are subject to any tax payable by or on behalf of the Trust or such Unitholder (or holder of a beneficial interest in a Global Security)) shall reduce the Aggregate Unit Balance of such Class by the gross amount (determined prior to giving effect to any reduction for such tax or withholding with respect thereto) of such distribution to such Class and shall result in an adjustment of the related Class Accretion Schedule as provided in Section 5.01 hereof.  Each reduction in the Accretion Schedule for such Class shall reduce the obligation of the Credit Support Provider under the Credit Support with respect to such Class.  On any date in which the Class 2047 Units receive

the amount required to be paid under Section 8.02 (or, if earlier, the Class 2047 Scheduled Final Redemption Date), such Class shall be deemed to be redeemed in full and no longer Outstanding hereunder and no further amounts shall be distributable on such Units from and after such time.

(h) All distributions on the Class 2054 Units (whether or not such distributions are subject to any tax payable by or on behalf of the Trust or such Unitholder (or holder of a beneficial interest in a Global Security)) shall reduce the next succeeding Sinking Fund Distribution and the Aggregate Unit Balance of such Class by the gross amount (determined prior to giving effect to any reduction for such tax or withholding with respect thereto) of such distribution to the Unitholders of the Class 2054 Units and shall result in an adjustment of the related Class Accretion Schedule as provided in Section 5.01 hereof. Each reduction in the Accretion Schedule for such Class shall reduce the obligation of the Credit Support Provider under the Credit Support with respect to such Class. On any date in which the Class 2054 Units receive the amount required to be paid under Section 8.02, such Class shall be deemed to be redeemed in full and no longer Outstanding hereunder and no further amounts shall be distributable on such Units from and after such time.

(i) If, prior to a Trust Termination Event, the Credit Support Provider has made a payment in respect of the Credit Support, the Credit Support provider shall be entitled to receive reimbursement of such amounts out of proceeds that would otherwise be paid by the Trust to Unitholders pursuant to this Section 4.01. Such reimbursement shall be made out of all available Non-Taxable Funds and Taxable Funds (in the aggregate, the "Funds") on a first-in, first-out basis, with the Funds being first applied to satisfy the reimbursement obligations set forth in this Section 4.01 prior to making any distribution to Unitholders or making any reinvestment of the Funds.

SECTION 4.02.   Reports to Credit Support Provider and Unitholders.

(a) On each Distribution Date the Trustee shall forward or cause to be forwarded to the Credit Support Provider and each Unitholder a statement setting forth:

(i)  the aggregate amount of such distribution to be made to Unitholders of each Class on such date;

(ii) the Aggregate Unit Balance of each Class after giving effect to the distribution to be made on such Distribution Date;

(iii) the cumulative amount of Extraordinary Trust Expense, if any, on such Distribution Date;

(iv) the cumulative amount of proceeds received in the Accounts since the prior Distribution Date and the sources thereof;

(v) the portion of each distribution made on such Distribution Date attributable to proceeds received from Taxable Bonds and Non-Taxable Bonds and from the Credit Support; and

(vi) the information required to be reported pursuant to Section 3.02(d).

Within a reasonable period of time after the end of each calendar year, the Trustee shall furnish to each Person who at any time during such calendar year was a Unitholder a statement containing the information set forth in this clause (a) with each such amount aggregated for such calendar year or the applicable portion thereof during which such Person was a Unitholder, which statement shall contain sufficient information to allow Unitholders to calculate their U.S. federal income tax liability with respect to the Units.

(b) The Trustee will deliver to Unitholders and the Credit Support Provider copies of all notices and communications it receives from the Security Issuer as they relate to the COFINA Bonds unless otherwise provided by the Security Issuer under EMMA as administered by the Municipal Securities Rulemaking Board.

SECTION 4.03.   Compliance with Tax Reporting and Withholding Requirements.

Unitholders (including for this purpose, the holders of beneficial interests in the Global Securities) will be responsible for the payment of all taxes with respect to the Trust Property. Each Electing Holder, and each holder of a beneficial interest in a Global Security, receiving a beneficial interest in the Units on the Closing Date (and each assignee thereof) will be responsible for providing the Trustee with a form W-8 or form W-9, as applicable, as well as providing written notice of any transfer or assignment of Units (or beneficial interests therein), including the date of such transfer, the amount of such transfer, and such other information reasonably requested by the Trustee as may be deemed necessary or advisable in order for the Trustee to provide tax reporting.  Neither the Depositor not the Trustee will be responsible for making any tax payments or tax reporting other than as set forth in this Trust Agreement.  The Trustee shall be responsible for all tax reporting obligations and withholding (if any) for the Trust and Unitholders consistent with the treatment of the Trust as a partnership and the Unitholders as partners (but subject further to the tax characterization described in Section 2.01), for purposes of the U.S. federal income tax, and any state and local taxes.  Such obligations shall include, but not be limited to, the timely filing of properly completed partnership returns and the partnership information returns and the timely provision of properly completed partner information statements.

[Standard partnership tax provisions and more detailed reporting to come]

SECTION 4.04.   Preservation of Information, Communications to Unitholders.

The Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of the Unitholders contained in the most recent list furnished to the Trustee by the Unitholders and the names and addresses of Unitholders received by the Trustee in its capacity as Unit Registrar.  The Trustee may destroy any list furnished to it as provided upon receipt of a new list.  Upon request, the Trustee shall provide the Credit Support Provider (but not any Unitholder) with a copy of the list.

ARTICLE V

The Units

SECTION 5.01.   The Units.

(a) The Units shall be issued in the form of and be represented by one or more Global Securities in the form of Exhibit C1 and Exhibit C2 and, as provided by the terms hereof and subject to Section 5.09, by definitive Certificates substantially in the form of Exhibit B1 and Exhibit B2. Units will be issued in minimum denominations of $[_____] and denominations of $[____] in excess thereof. All Units of the same Class shall be identical in all respects except for the denominations thereof. All Units of a Class issued under this Trust Agreement shall be in all respects equally and ratably entitled to the benefits to which such Class are entitled hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery. No additional interests in the Trust other than the Units shall be issued hereunder, except in accordance with Section 5.04.

(b) The Units issued under this Trust Agreement shall be in the form of two separate Classes: a class of Units with a mandatory redemption date of the Class 2047 Scheduled Final Redemption Date (the "Class 2047 Units") and a class of Units with a mandatory redemption date of the Class 2054 Scheduled Final Redemption Date (the "Class 2054 Units"). The Accretion Schedule for a Class shall be adjusted from time to time in connection with each distribution made on such Class. Such adjustment shall be based on the gross amount of each distribution and shall not take into account taxes, if any, which may be required to be withheld by the Trust or paid by any Unitholder. In connection with each distribution on a Class of Units, the Trustee shall provide to the Credit Support Provider a revised Accretion Schedule for such Class which gives effect, in accordance with the foregoing, to receipt of such distribution by such Class and calculates the remaining Accretion Schedule for such Class from and after the date of such distribution. Any such revised Accretion Schedule shall become effective hereunder upon written reasonable approval thereof by the Credit Support Provider.

(c) Unless and until it is exchanged in whole or in part for Certificates representing the individual Units represented thereby (as described in Section 5.09), a Global Security may not be transferred except as a whole by the Depositary for such Global Security to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor of such Depositary or a nominee of such successor.

SECTION 5.02.   Execution, Authentication and Delivery.

(a) Certificates and/or Global Securities evidencing Units shall be executed on behalf of the Trust by the Trustee by its President, its Treasurer, or one of its Vice Presidents, Assistant Vice Presidents or Trust Officers. The signature of any of these officers may be manual or facsimile. Certificates and Global Securities bearing the manual or facsimile signature of individuals who were at any time the proper officers of the Trustee shall be binding, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Certificates and/or Global Securities or did not hold such offices at the date of such Certificates and/or Global Securities.

(b) The Trustee shall not be required to authenticate any Certificates or Global Securities if the issuance of such Certificates or Global Securities pursuant to this Trust Agreement will adversely affect the Trustee's own rights, duties or immunities under this Trust Agreement.

(c) Each Certificate and Global Security shall be dated as of the date of its authentication.

(d) Subject to Section 5.08(c), no Unit shall be entitled to any benefit under this Trust Agreement or be valid or obligatory for any purpose, unless there appears on the applicable Certificate or Global Security a certificate of authentication substantially in the form as contained in the form of Certificate or Global Security attached to this Trust Agreement as Exhibit B1, Exhibit B2, Exhibit C1 or Exhibit C2 executed by the Trustee by the manual or facsimile signature of one of its authorized signatories, and such certificate upon any of the foregoing shall be conclusive evidence, and the only evidence, that the Unit represented thereby has been duly authenticated and delivered under this Trust Agreement and is entitled to the benefits of this Trust Agreement.

SECTION 5.03.    Registration; Registration of Transfer and Exchange.

(a) The Trustee shall cause to be kept a register for Units (the registers maintained in such office and in any other office or agency of the Trustee from which distributions are made being herein sometimes collectively referred to as the "Unit Register") in which, subject to such reasonable regulations as it may prescribe, a transfer agent and registrar (which may be the Trustee) (the "Unit Registrar") shall provide for the registration of Units and the registration of transfers and exchanges of Units. The Trustee is hereby initially appointed Unit Registrar for the purpose of registering Units and transfers and exchanges of Units as herein provided and the Trustee shall remain Unit Registrar for such purposes until the earlier to occur of (i) the resignation or termination of the Trustee and appointment of a successor trustee in accordance with Section 9.07, in which case such successor trustee shall assume the duties of Unit Registrar and (ii) the termination of the Trust and discharge of the Trustee's obligations under this Trust Agreement in accordance with the applicable terms of Article VIII; provided, however, that the Trustee may appoint one or more co-Unit Registrars upon notice to the Credit Support Provider and the Unitholders.

With respect to Units represented by Certificates (if applicable), upon surrender for registration of transfer of any Unit at the office or agency of the Unit Registrar, if the requirements of Section 8-401(1) of the Uniform Commercial Code are met to the Unit Registrar's satisfaction, and subject to the transfer restrictions set forth in Section 5.09 hereof, the Trustee shall execute, authenticate and deliver, in the name of the designated transferee or transferees, one or more new Units of any authorized denominations, of a like Aggregate Unit Balance.  All transfers of Units are subject to the approval of the Unit Registrar and the Unit Registrar shall not register any transfer of Units if such transfer would violate any provision of this Trust Agreement. Notwithstanding the foregoing, beneficial interests in a Global Security shall be transferable in accordance with the Applicable Procedures, as further described in Section 5.09(c) hereof.

(b) At the option of the Unitholder and at such Unitholder's expense, Certificates representing Units may be exchanged for other Certificates of any authorized denomination or denominations of like tenor and Aggregate Unit Balance upon surrender of the Certificates to be exchanged at the office or agency of the Trustee maintained for such purpose.  Whenever any Certificates are so surrendered for exchange, the Trustee shall execute, authenticate and deliver

the Certificates representing the Units that the Unitholder making the exchange is entitled to receive.

All Units issued upon any registration of transfer or exchange of Units shall be entitled to the same benefits under this Trust Agreement as the Units surrendered upon such registration of transfer or exchange.

(c) Every Unit represented by a Certificate presented or surrendered for registration of transfer or exchange shall be duly endorsed (and in the case of a transfer, accompanied by a written instrument of transfer substantially in the form of Exhibit D hereto), duly executed, by the Unitholder thereof or his attorney duly authorized in writing, [with such signature guaranteed by a commercial bank or trust company located, or having a correspondent located, in The City of New York or the city in which the Corporate Trust Office is located], or by a member firm of a national securities exchange, and such other documents as the Unit Registrar may require.

No service charge shall be required of a Unitholder for any registration of transfer or exchange of Units, but the Trustee may require payment by the Unitholders of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Units.

SECTION 5.04.  Mutilated, Destroyed, Lost and Stolen Certificates.

If (i) any mutilated Certificate is presented to the Unit Registrar or (ii) the Unit Registrar receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Unit Registrar such security or indemnity as it may require to save it and any Paying Agent harmless, and the Unit Registrar has not received notice that such Certificate (and the Units represented thereby) has been acquired by a bona fide purchaser, then, in each case, the Authenticating Agent shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, form, terms and principal amount, bearing an identifying number not used by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

Upon the issuance of any new Certificate under this Section, the [Trustee][Unit Registrar] may require the payment by the Unitholder of a sum sufficient to cover any tax or other governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee or Unit Registrar) connected therewith.

Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Property to the extent provided herein, whether or not the destroyed, lost or stolen Certificate shall be at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement equally and proportionately with any and all other Units of the related Class, if any, duly issued thereunder.

The terms of this Section shall apply, *mutatis mutandis*, with respect to the certificates representing the Global Securities, provided that any costs, taxes or expenses in connection

therewith or with respect to a required indemnity shall be borne by the Trustee and deemed an Extraordinary Trust Expense.

The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

SECTION 5.05.   Persons Deemed Owners.

Subject to Section 5.04 and except for the final distribution, the Trustee and any agent of the Trustee may treat the Person in whose name any Unit is registered as the owner of such Unit on the related Record Date for the purpose of receiving distributions on such Unit and for all other purposes whatsoever and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary.  All distributions made to any such Unitholder, or upon his order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys distributable upon such Unit.

SECTION 5.06.   Cancellation.

(a) All Units evidenced by Certificates surrendered for payment, redemption, transfer or exchange shall be delivered to the Trustee and shall be promptly canceled by the Trustee.  The Trustee (or, if different, the Unit Registrar) and no one else will cancel all such Units surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Units and the related Certificates in accordance with its customary procedures.  No Certificates evidencing Units shall be authenticated in lieu of or in exchange for any Units canceled as provided in this Section, except as expressly permitted by this Trust Agreement.

(b) At such time as all beneficial interests in a particular Global Security have been exchanged for COFINA Bonds pursuant to Section 6.03 hereof or for Certificates representing Units, or a Trust Termination Event has occurred with respect to all Units represented by a particular Global Security, such Global Security will be cancelled and destroyed by the Trustee in accordance with Section 5.06(a).

SECTION 5.07.   Appointment of Paying Agent.

(a) The Trustee may appoint one or more paying agents (each, a "Paying Agent") with respect to the Units.  Any such Paying Agent shall be authorized to make distributions to Unitholders pursuant to this Trust Agreement and shall report the amounts of such distributions to the Trustee.  The Trustee may remove the Paying Agent if the Trustee determines in its sole discretion that the Paying Agent shall have failed to perform its obligations under this Trust Agreement in any material respect or if the Paying Agent fails to satisfy the eligibility requirements set forth in paragraph (b) of this Section.  The Paying Agent shall initially be the Trustee.  Any Paying Agent shall be permitted to resign as Paying Agent upon 30 days' written notice to the Trustee.  In the event that the Trustee shall no longer be the Paying Agent, the Trustee shall appoint a successor or additional Paying Agent and shall provide written notice of such appointment to the Credit Support Provider and the Unitholders.  The Trustee shall cause each such Paying Agent to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee that it will hold all sums, if any, held by it for distribution to

Page 21

the Unitholders in an Eligible Account in trust for the benefit of the Unitholders entitled thereto until such sums shall be distributed to such Unitholders.  The Paying Agent shall return all unclaimed funds to the Trustee within two years from the time such funds were first eligible to be claimed and promptly upon removal shall also return all funds in its possession to the Trustee or a successor Paying Agent.

(b) [The Paying Agent shall at all times be a corporation or an association, the combined capital and surplus of which is at least $[_____] and the long-term debt obligations of which are rated in one of the four highest categories assigned long-term debt obligations by each of S&P's and Moody's, and is subject to supervision of examination by Federal or State authority.][4] If such corporation or association publishes reports of conditions at least annually, pursuant to combined capital and surplus of such corporation or association shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published.  In the event that at any time the Paying Agent shall cease to be eligible in accordance with the terms of this paragraph, the Paying Agent shall release all funds held by the Paying Agent to the Trustee and then resign immediately.  Upon such resignation, the Trustee shall act as Paying Agent until the appointment of a successor Paying Agent in accordance with paragraph (a) of this Section.

(c) The terms of Sections 9.01, 9.02, 9.03, 9.05 and 9.06 shall be applicable to any Paying Agent, *mutatis mutandis*.

(d) Any reference in this Trust Agreement to the Paying Agent shall include any co-paying agent unless the context requires otherwise.

SECTION 5.08.   Authenticating Agent.

(a) The Trustee may appoint any one or more Authenticating Agents (each, an "Authenticating Agent") with respect to the Units which shall be authorized to act on behalf of the Trustee in authenticating the Units in connection with the issuance, delivery and registration or transfer or exchange of the Units.  Whenever reference is made in this Trust Agreement to the authentication of Units by the Trustee, such reference shall be deemed to include authentication on behalf of the Trustee by an Authenticating Agent.  Each Authenticating Agent must be reasonably acceptable to the Credit Support Provider.

(b) Any institution succeeding to the corporate agency business of any Authenticating Agent shall continue to be an Authenticating Agent without the execution or filling of any power or any further act on the part of the Trustee or such Authenticating Agent.  An Authenticating Agent may at any time resign by giving notice of resignation to the Trustee, and the Credit Support Provider.  The Trustee may at any time terminate the agency of an Authenticating Agent by signing and delivering a notice of termination to such Authenticating Agent.  Upon receiving such a notice of resignation or upon a termination, or in case at any time an Authenticating Agent shall cease to be acceptable to the Trustee, the Trustee may appoint a successor Authenticating Agent.  Subsequent to any such removal or resignation of the Authenticating Agent, the Trustee shall act as Authenticating Agent until a successor

---

[4] Criteria TBD.

Authenticating Agent, if any, is appointed.  Any successor Authenticating Agent upon acceptance of its appointment hereunder shall become vested with all the rights, powers and duties of its predecessor hereunder, with like effect as if originally named as an Authenticating Agent.  The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services under this Section.  The provision of Sections 9.01, 9.02 and 9.03 shall be applicable to any Authenticating Agent, *mutatis mutandis*.

(c)  Pursuant to an appointment made under this Section, the Units may have endorsed thereon, in lieu of the Trustee certificate of authentication, an alternate certificate of authentication in substantially the following form:

This is one of the Units described in this Trust Agreement.

By:   _____
        as Authenticating Agent for the Trustee,

By:   _____
        Authorized Signatory

SECTION 5.09.   <u>Issuance and Transfer Restrictions</u>.

(a) The Units shall be issued on the Closing Date upon deposit of the Electing Ambac Prepetition Insured Bonds, the benefit of the Credit Support and the COFINA Bond Distributions into the Trust pursuant to the Plan of Adjustment and the due authentication by the Trustee of the Units in the form set forth in <u>Exhibit C1</u> and <u>Exhibit C2</u> attached hereto as applicable.

(b) No Unit shall be transferred except in accordance with the terms of Section 5.03 and this Section 5.09(b) or, if applicable, Section 5.09(c).  Each proposed transfer of a Unit shall not be effective until the transferor and transferee have provided the Trustee with a certificate of transfer in substantially the form of <u>Exhibit D</u> hereof and the acknowledgement of such certificate by the Trustee.  If, at any time, the Trustee learns that (i) a transfer of a beneficial interest in a Global Security shall have been made without the transferor complying with its obligations under Section 4.03 hereof or (ii) any of the representations or warranties provided by a potential transferee of any Certificate is false or that any agreement made therein has been violated, any transfer of such Unit (or beneficial interest therein) to such potential transferee shall be null and void ab initio.  The Trustee shall have such other powers to effect compliance with the terms of this Section 5.09 as it deems appropriate.

(c) With respect to any Units represented by Global Securities, the following terms shall apply:

(i)  The Units will be represented by one or more Global Securities registered in the name of the Depositary or its nominee. The Trustee initially appoints DTC to act as Depositary with respect to the Global Securities.

(ii) Any Global Security shall be exchangeable for Certificates registered in the name of Persons other than the Depositary or its nominee *only* if (A)(x) the Depositary is no longer willing or able to continue to act as a depositary *or* (y) the Depositary ceases to be an

Page 23

Exchange Act registered clearing agency *and* (B) the Trustee is unable to appoint a qualified successor within 120 days.  Upon the occurrence of (1) either event described in subclause (A) of the previous sentence *and* (2) the event described in subclause (B) of the previous sentence, Certificates representing Units shall be issued in exchange for any applicable Units represented by Global Securities in such names as the Depositary shall instruct the Trustee.  Upon such issuance, the Trustee shall register such Certificates in the name of, and cause the same to be delivered to, such Person or Persons (or the nominee thereof) consistent with Section 5.02.  In addition, the Trustee may (and at the direction of the Credit Support Provider shall) cause the entire beneficial interest in a Global Security held by a Person that is in breach of its obligations under Section 4.03 hereof to be converted into a definitive Certificate.  For the avoidance of doubt, any Unit authenticated and delivered in exchange for a Global Security or any portion thereof pursuant to this Section 5.09(c)(ii) shall be authenticated and delivered in the form of, and shall be, a Certificate.  A Global Security may not be exchanged for a Certificate other than as provided in this Section 5.09(c)(ii); provided, however, that Units may be transferred and exchanged as provided in Section 5.09(c)(iii).

(iii) The transfer and exchange of Units will be effected through the Depositary, in accordance with the provisions of this Trust Agreement and the Applicable Procedures.  Units may be transferred to Persons who take delivery thereof only in the form of a beneficial interest in the same Global Security.  No written orders or instructions shall be required to be delivered to the Unit Registrar to effect the transfers of beneficial interests in a Global Security described in this Section 5.09(c)(iii).

(iv) Any Global Security shall bear a legend in substantially the following form:

"This certificate is a Global Security (within the meaning of the Trust Agreement hereinafter referred to) and is registered in the name of a Depositary or a nominee of a Depositary.  This Global Security is exchangeable for Certificates registered in the name of a person other than the Depositary or its nominee only in the limited circumstances described in the Trust Agreement, and may not be transferred except as a whole by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary.  Unless this Global Security is presented by an authorized representative of The Depositary Trust Company ("DTC") to the Trustee (as defined in the Trust Agreement) or its agent for registration of transfer, exchange or payment, and any Global Security issued is registered in the name of Cede & Co. or such other name as may be requested by an authorized representative of DTC (and any payment is made to Cede & Co. or such other entity as may be requested by an authorized representative of DTC), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful inasmuch as the registered owner hereof, Cede & Co., has an interest therein."

ARTICLE VI

Rights of Unitholders and Credit Support Provider

SECTION 6.01.   <u>Voting Rights with Respect to COFINA Bonds</u>.

(a) Within two (2) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the COFINA Bonds, the Trustee shall deliver a copy of such notice to the Credit Support Provider.

(b) The voting and direction rights allocable to the owners of the COFINA Bonds pursuant to the terms thereof (including, without limitation, voting and direction rights in respect of remedies) will be allocated solely to the Credit Support Provider and no Unitholder shall have any right to direct the Trustee as to any voting or direction rights allocable to owners of the COFINA Bonds.  Upon the written request of the Credit Support Provider, the Trustee shall vote in accordance with any instruction set forth in such written request.  The Credit Support Provider may exercise its rights hereunder in its sole discretion.

SECTION 6.02.   COFINA Bond Sale.

(a) The Credit Support Provider may, in its sole discretion, at any time and from time to time, direct the Trustee to sell all or any portion of the Taxable Bonds and the applicable portion of the other Trust Property provided that: (i) any such sale is made for fair market value (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices as the Credit Support Provider shall deem appropriate and delivered to the Trustee) and (ii) all proceeds of such sales shall be deposited into the Taxable Collection Account for the benefit of Unitholders.  The Trustee shall have no obligation to determine whether the requirements of the foregoing clause (i) are satisfied and shall be entitled to rely on the information provided by the Credit Support Provider.  In the case of any sale of Taxable Bonds, the Trustee shall sell all or a portion of the Taxable Bonds, to the extent possible, at the price that equates to the lowest Yield to Maturity in the context of the market.  Each Unitholder (which term shall for purposes hereof include any holder of a beneficial interest in a Global Security), by electing to receive Units (or beneficial interests therein) hereunder and any assignee thereof, shall be deemed to have consented to the sale of the Taxable Bonds as directed by the Credit Support Provider from time to time as provided in this Section 6.02(a).

(b) The Trustee shall not sell any Non-Taxable Bonds except upon a Non-Taxable Bond Sale Event.  Upon the occurrence of a Non-Taxable Bond Sale Event with respect to one or more series of Non-Taxable Bonds, the Trustee shall sell such portion of the Non-Taxable Bonds to the extent subject to such Bond Sale Event, provided that: (i) any such sale is made for fair market value (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices) and (ii) all proceeds of such sales shall be deposited into the Non-Taxable Collection Account for the benefit of Unitholders.  In the case of any permitted sale of Non-Taxable Bonds hereunder, the Trustee shall sell such Non-Taxable Bonds, to the extent possible, at the price that equates to the lowest Yield to Maturity in the context of the market.

(c) The Calculation Agent shall monitor on at least a monthly basis (or more frequently as the Calculation Agent may determine) the fair market value of the Non-Taxable Bonds to determine whether the fair market value of any series of Non-Taxable Bonds exceeds the applicable Non-Taxable Bond Threshold Amount for such Non-Taxable Bonds.  The Calculation Agent shall promptly notify the Trustee if the fair market value of any series of

Non-Taxable Bonds (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices) exceeds the applicable Non-Taxable Bond Threshold Amount for such series of Non-Taxable Bonds.

(d)  Upon distribution pursuant to Section 4.01(a) of the proceeds of any sale of Non-Taxable Bonds, the applicable Aggregate Unit Balance shall be reduced, the Accretion Schedule for the Classes shall be revised by the Trustee, and the Trustee shall reduce accordingly all such Unitholders' interest in the Trust.

(e)  Upon any Discretionary Distribution pursuant to Section 4.01(b) of the proceeds of any sale of Taxable Bonds, the applicable Aggregate Unit Balance shall be reduced, the Accretion Schedule for the Classes shall be revised by the Trustee, and the Trustee shall reduce accordingly all such Unitholders' interest in the Trust.

SECTION 6.03.    Distribution of COFINA Bonds.

(a)  The Credit Support Provider may, in its sole discretion, at any time and from time to time, direct the Trustee to distribute all or a portion of the underlying COFINA Bonds to Unitholders, upon written notice from the Credit Support Provider to the Trustee and the Unitholders indicating the COFINA Bonds to be distributed, and the Trustee shall distribute such amount and type of COFINA Bonds indicated in such notice on a pro rata basis to the Unitholders.   Upon any such distribution described in the preceding sentence, the applicable Aggregate Unit Balance for the Class or Classes receiving such distribution shall be reduced by the Deemed COFINA Bond Valuation Amount and the Accretion Schedule for the Class or Classes receiving such distribution shall be revised by the Trustee accordingly.

(b)  The Credit Support Provider may, at its sole discretion, at any time and from time to time, agree with any Unitholder (which term for purposes of this clause (b) shall include any holder of a beneficial interest in a Global Security) to exchange such Unitholder's Units for a proportional percentage of the underlying COFINA Bonds (and cash and/or Permitted Investments then held by the Trust) and upon written notice from the Credit Support Provider to the Trustee indicating the amount of such COFINA Bonds to be released, the Trustee shall release such amount of COFINA Bonds (and, if applicable, cash and/or Permitted Investments) to such Unitholder.  In such event, such Unitholder shall execute a release, in form and substance satisfactory to the Credit Support Provider, releasing all rights and obligations owing to it under the Credit Support and against the Trust.  The exchange with such Unitholder shall not give rise to any right of any other Unitholder to request such an exchange or to receive any other consideration with respect to its Units.  Upon any such exchange the applicable Aggregate Unit Balance for such Class or Classes shall be reduced and the Accretion Schedule for the Class or Classes subject to such exchange shall be revised by the Trustee, subject to the approval of the Credit Support Provider, and the Trustee shall cancel all such exchanged Units (which cancellation, in the case of any Units represented by a Global Security, shall be effectuated by the Trustee by reducing the aggregate balance of Units comprising such Global Security).

SECTION 6.04.    Electing Ambac Prepetition Insured Bonds.

(a) Notwithstanding the deposit of the Electing Ambac Prepetition Insured Bonds in the Trust, the Electing Ambac Prepetition Insured Bonds shall not be cancelled (other than for tax purposes) and all rights and remedies under and in accordance with the Ambac Prepetition Insured Bonds, the Bond Resolution (other than with respect to the payment and other obligations of COFINA (including any lien granted as security under such Bond Resolution)) and the Credit Support shall be preserved and remain in full force and effect with respect to the Electing Ambac Prepetition Insured Bonds.  The Credit Support Provider shall  be deemed the sole holder of the Electing Ambac Prepetition Insured Bonds deposited in the Trust, including, without limitation, with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies.

(b) For the avoidance of doubt, the Ambac Prepetition Insured Bonds not beneficially owned by an Electing Holder shall be cancelled on the Closing Date and shall be deemed no longer outstanding for all purposes of the Bond Resolution.

(c) Each reference in this Agreement to the Accretion Schedule for a Class of Units being reduced shall be deemed to include a corresponding reduction to the Accretion Schedule for the related Electing Ambac Prepetition Insured Bonds and a corresponding reduction (without duplication) in the Credit Support as a result thereof.

ARTICLE VII

Default on COFINA Bonds and Permitted Investments

SECTION 7.01.    Realization Upon Default.

(a) The Trustee shall assert claims under the COFINA Bonds, or the Permitted Investments and the Credit Support, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder with respect to any default, at the direction of the Credit Support Provider with respect to the COFINA Bonds and the Permitted Investments in accordance with Article VI hereof.

 (b) If there is a breach, a default or an event of default (as defined in the COFINA Bond Agreements) with respect to any COFINA Bond or a breach, a default or an event of default (as defined in the applicable document pursuant to which the Permitted Investment was issued or by which it is governed) with respect to any Permitted Investment, and such breach, default or event of default is known to the Trustee, the Trustee shall give notice thereof to the Unitholders and the Credit Support Provider as promptly as practicable, and, in any event, within two (2) Business Days after such event of default becomes known to the Trustee.  If the Trustee receives notice of an anticipated payment default with respect to any COFINA Bond, the Trustee shall promptly give notice thereof to the Unitholders and the Credit Support Provider within 1 Business Day after receipt of such notice.

ARTICLE VIII

Trust Wind-Up Events; Termination

SECTION 8.01.    Trust Wind-Up Events.

Page 27

The obligations and responsibilities of the Trustee under this Trust Agreement (other than the obligations of the Trustee to provide reports and other information under this Trust Agreement and to make distributions to Unitholders as hereafter set forth) shall terminate and the Trust shall wind-up upon the earlier of (a) the Class 2054 Scheduled Final Redemption Date or (b) payment in full of the Aggregate Unit Balance for each Class of Units (a "Trust Termination Event").

SECTION 8.02.   Trust Property Made Available.

(a)  Except with respect to a Trust Termination Event occurring on the Class 2054 Scheduled Final Redemption Date, the Trustee shall provide notice to the Unitholders and the Credit Support Provider of the intent to effect a Trust Termination Event and that Unitholders should surrender their Units to the Trustee and deliver a release of such Unitholder's rights with respect to, and under, the Units in a form acceptable to the Trustee, for the greater of (x) their respective portion of the Aggregate Unit Balance of such Class or (y) their respective portion of any amount remaining in the Trust after making reimbursement payments required to be made to the Credit Support Provider for the amounts described in Section 8.02(b).  Such notice to the Unitholders and the Credit Support Provider shall also specify (i) the location and hours of the Corporate Trust Office at which Units should be presented and surrendered and (ii) that each Unitholder must supply wire instructions in writing with respect to any cash distribution.

(b)  Upon the occurrence of a Trust Termination Event on account of the Credit Support Provider making a payment with respect to the Credit Support (whether on the Class 2054 Scheduled Final Redemption Date or earlier), the Credit Support Provider shall be entitled to receive reimbursement of any amounts paid by the Credit Support Provider pursuant to the Credit Support to the extent not previously reimbursed.  The amount required to be reimbursed to the Credit Support Provider shall be paid from the proceeds of a sale of the remaining Trust assets or, at the election of the Credit Support Provider may be made in the form of COFINA Bonds having a fair market value (as evidenced by one or more bids provided by brokers of national standing or such other information as to current market prices) equal to the amount required to be paid to the Credit Support Provider pursuant to this Section 8.02(b).  Any excess proceeds in the Trust with respect to the COFINA Bonds remaining after the reimbursement to the Credit Support Provider pursuant to this Section 8.02(b) shall be distributed pro rata to Unitholders as of the date of the Trust Termination Event.

(c)  On the date on which both Classes of Units and the Credit Support Provider have received the amounts due them pursuant to Section 8.02(b), the Electing Ambac Prepetition Insured Bonds and the Credit Support shall be released and cancelled and the Credit Support Provider's obligations thereunder shall be deemed satisfied in full.

ARTICLE IX

Concerning the Trustee

SECTION 9.01.   Duties of Trustee.

(a) The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement.  Any permissive right of the Trustee enumerated in this Trust Agreement shall not be construed as a duty.

(b) The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Trust Agreement, shall examine them to determine whether they conform to the requirements of this Trust Agreement.  If any such instrument is found not to conform to the requirements of this Trust Agreement, the Trustee shall take action as it deems appropriate to have the instrument corrected, and if the instrument is not corrected to the Trustee's satisfaction, the Trustee will provide notice thereof to the Unitholders and the Credit Support Provider.

(c) No provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own misconduct; provided, however, that:

(i)  the duties and obligations of the Trustee shall be determined solely by the express terms of this Trust Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Trust Agreement, no implied covenants or obligations (except for a fiduciary duty to the beneficiaries of the Trust) shall be read into this Trust Agreement against the Trustee and, in the absence of negligence, bad faith or willful misconduct on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee that conform to the requirements of this Trust Agreement;

(ii) the Trustee shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii) except with respect to actions or duties required to be taken or performed, as applicable, by the Trustee under the express terms of this Trust Agreement, the Trustee shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers under this Trust Agreement if there is reasonable ground for believing that the repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it; provided, however, that the Trustee agrees that the indemnification under Section 9.04 will provide reasonable assurance against such risk or liability; and

(iv) in the event that the Paying Agent or the Unit Registrar shall fail to perform any obligation, duty or agreement in the manner or on the day required to be performed by the Paying Agent or Unit Registrar, as the case may be, under this Trust Agreement, the Trustee shall be obligated promptly upon its knowledge thereof to perform such obligation, duty or agreement in the manner so required.

SECTION 9.02.   Certain Matters Affecting the Trustee.

(a) Except as otherwise provided in Section 9.01:

(i)   the Trustee may request and rely upon and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed by the proper party or parties;

(ii) the Trustee may consult with counsel and any advice or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it under this Trust Agreement in good faith and in accordance with such advice or Opinion of Counsel;

(iii) except for the duties and obligations of the Trustee expressly created by this Trust Agreement (which for avoidance of doubt shall include matters for which the Credit Support Provider is entitled to direct the Trustee hereunder and for which this Section 9.02(a)(iii) shall not apply), the Trustee shall be under no obligation to exercise any of the discretionary trusts or powers vested in it by this Trust Agreement or to institute, conduct or defend any litigation thereunder or in relation thereto, at the request, order or direction of any of the Unitholders or the Credit Support Provider, pursuant to the terms of this Trust Agreement;

(iv) the Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Trust Agreement;

(v) the Trustee shall not be bound to make any investigation into the facts of matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, approval, bond or other paper or document believed by it to be genuine;

(vi) the Trustee may execute any of the trusts or powers or perform any duties under this Trust Agreement either directly or by or through agents or attorneys or a custodian or administrative agent;

(vii)    the Trustee shall not be personally liable for any loss resulting from the investment of funds held in any Collection Account pursuant to Section 3.03 and in investments directed pursuant to Section 3.04;

(viii)    the Trustee shall not be deemed to have notice or knowledge of any matter unless a Responsible Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the Units generally or this Trust Agreement; and

(ix)the Trustee shall have the power to reimburse itself for any unpaid Extraordinary Trust Expense actually incurred in accordance with the terms and conditions of this Trust Agreement prior to the distribution of funds or Trust Property to Unitholders.

(b) All rights of action under this Trust Agreement or under any of the Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Units, or the production thereof at the trial or other Proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the terms of this Trust Agreement.

SECTION 9.03.   Limitation on Liability of Trustee.

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement, the Units, or in any document issued in connection with the sale of the Units (other than the signature and authentication on the Units if done by Trustee).  Except as set forth in Section 9.11, the Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement, the Units (other than the signature and authentication on the Units if done by Trustee), any security or of any related document.  The Units do not represent interests in or obligations of the Trustee and the Trustee shall not be responsible or accountable for any tax, accounting or other treatment proposed to be applied to the Units or any interest therein except as expressly provided in this Trust Agreement.

SECTION 9.04.   Trustee Fees and Expenses; Limited Indemnification.

(a) As compensation for its regular and customary services and in payment of its regular and customary expenses under this Trust Agreement (including the reasonable compensation, expenses and disbursements of its counsel for regular and customary services hereunder) the Trustee shall be entitled to the Trustee Fees (which shall not be limited by any provision of law in regard to compensation or payment of a trustee of an express trust).[5]  For avoidance of doubt, the Depositor shall not be responsible for the Trustee Fees.

(b) The Trustee, the Calculation Agent and any director, officer, employee or agent of the Trustee or the Calculation Agent shall be indemnified and held harmless by the Trust against any loss, liability or expense incurred in connection with any Proceeding relating to this Trust Agreement or the Units or the performance of any of the Trustee's duties or the Calculation Agent's duties (as applicable) under this Trust Agreement, other than, (x) with respect to the Trustee, any loss, liability or expense (i) that constitutes a specific liability of the Trustee under this Trust Agreement or (ii) incurred by reason of willful misfeasance, bad faith or negligence in the performance of the Trustee's duties thereunder or by reason of reckless disregard of the Trustee's obligations and duties thereunder (such loss, liability or expense, other than as described in clauses (i) and (ii) of this sentence, "Extraordinary Trust Expense") and (y) with respect to the Calculation Agent, any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of the Calculation Agent's duties thereunder or by the reason of reckless disregard of the Calculation Agent's obligations and duties thereunder.  In the event the Trustee is not indemnified by the assets of the Trust, whether

---

[5] Fees TBD.

due to bankruptcy, insolvency or otherwise, pursuant to the first sentence of this paragraph, the Trustee shall nevertheless remain obligated to perform its duties under this Trust Agreement.

SECTION 9.05.   Eligibility Requirements for Trustee.

[The Trustee hereunder shall at all times be a bank or other financial institution organized and doing business under the laws of any State or the United States, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $[_____] and subject to supervision or examination by Federal or State authority, and the long-term debt obligations of which are rated in one of the four highest categories assigned long-term debt obligations by each of S&P and Moody's][6].  If such corporation or association publishes reports of conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation or association shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published.  In the event that at any time the Trustee shall cease to be eligible in accordance with the terms of this Section, the Trustee shall resign immediately in the manner and with the effect specified in Section 9.06.

SECTION 9.06.   Resignation or Removal of the Trustee.

(a) Subject to the last sentence of this paragraph (a), the Trustee may at any time resign and be discharged from the Trust by giving written notice thereof to the Credit Support Provider, the Depositor and to all Unitholders.  Upon receiving such notice of resignation, the Credit Support Provider shall as promptly as practicable (and in any event within 30 days after the date of such notice of resignation) appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee.  A copy of such instrument shall be delivered to the Depositor and the Unitholders by the Credit Support Provider.  If no such successor trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee for the Units.  Upon any appointment of a successor trustee pursuant to this paragraph (a), the resigning Trustee shall be solely liable for (i) the payment of such successor trustee's fees and expenses and (ii) provision of adequate indemnities satisfactory to such successor trustee (it being understood that the indemnification obligations of the Trust pursuant to Section 9.04(b) shall inure to the benefit of such successor trustee, but that any Extraordinary Trust Expense previously indemnified shall reduce the Maximum Reimbursable Amount with respect to such successor trustee on a dollar-for-dollar basis).  In the event that the Trustee fails to satisfy the conditions contained in clauses (i) and (ii) above, the Trustee may not resign pursuant to this paragraph (a).

(b) If at any time the Trustee shall cease to be eligible in accordance with the terms of Section 9.05 and shall fail to resign after written request therefor by the Credit Support Provider, or if at any time the Trustee shall become incapable of acting, shall have breached its obligations hereunder, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the

---

[6] Criteria TBD.

Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Credit Support Provider may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.  A copy of such instrument shall be delivered to the Depositor and the Unitholders by the Credit Support Provider.

(c)  Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the terms of this Section shall not become effective until acceptance of appointment by the successor trustee as provided in Section 9.07.

SECTION 9.07.   Successor Trustee.

(a) Any successor trustee appointed as provided in Section 9.06 shall execute, acknowledge and deliver to its predecessor trustee and the Credit Support Provider, with a copy to the Depositor, an instrument accepting such appointment under this Trust Agreement, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with the like effect as if originally named as trustee in this Trust Agreement.  The predecessor trustee shall deliver to the successor trustee the Trust Property and all documents and statements held by it under this Trust Agreement, and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.  No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the terms of Section 9.05.

(b) Upon acceptance of appointment by a successor trustee as provided in this Section, the Trustee shall transmit notice of the succession of such trustee under this Trust Agreement to all Unitholders in the manner provided pursuant to Section 10.05.

SECTION 9.08.   Merger or Consolidation of Trustee.

Any corporation or association into which the Trustee may be merged or converted or with which it may be consolidated or any corporation or association resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or association succeeding to the business of the Trustee, shall be the successor of the Trustee under this Trust Agreement, provided such corporation or association shall be eligible under the terms of Section 9.05, without the execution or filing of any paper or any further act on the part of any of the parties to this Trust Agreement, anything in this Trust Agreement to the contrary notwithstanding.

SECTION 9.09.   Appointment of Co-Trustee.

(a) Notwithstanding any other terms of this Trust Agreement, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any party of the Trust Property may at the time be located, the Trustee shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees, jointly with the Trustee, of all or any part of the Trust Property, and to vest in such

Person or Persons, in such capacity, such title to the Trust Property, or any part thereof, and, subject to the other terms of this Section, such powers, duties, obligations, rights and trusts as the Trustee and the Credit Support Provider may consider necessary or desirable.  No co-trustee under this Trust Agreement shall be required to meet the terms of eligibility as a successor trustee under Section 9.05 and no notice to Unitholders of the appointment of a co-trustee or co-trustees shall be required under Section 9.07.

(b) In the case of any appointment of a co-trustee pursuant to this Section, all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed by the Trustee, the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to such Trust Property or any portion thereof in any such jurisdiction) shall be exercised and performed by such co-trustee at the direction of the Trustee.

(c) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the co-trustees, as effectively as if given to each of them.  Every instrument appointing any co-trustee shall refer to this Trust Agreement and the conditions of this Article IX.  Each co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, jointly with the Trustee subject to all the terms of this Trust Agreement, specifically including every provision of this Trust Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee.  Every such instrument shall be filed with the Trustee.

(d) Any co-trustee may, at any time, constitute the Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Trust Agreement on its behalf and in its name.  If any co-trustee shall become incapable of acting, resign or be removed, all its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

SECTION 9.10.   Appointment of Office or Agency.

The Units may be surrendered for registration of transfer or exchange, and presented for the final distribution with respect thereto, and notices and demands to or upon the Trustee in respect of the Units and this Trust Agreement may be served at the Corporate Trust Office.

SECTION 9.11.   Representations and Warranties of Trustee.

(a) The Trustee represents and warrants that:

(i)  the Trustee is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(ii) the Trustee has full power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement and the Units and has taken all necessary action to authorize the execution, delivery and performance by it (or, with

Page 34

respect to the Units, by an Authenticating Agent on its behalf, if applicable) of this Trust Agreement and the Units;

(iii) the execution and delivery of this Trust Agreement and the Units by the Trustee and its performance of and compliance with the terms of this Trust Agreement and the Units will not violate the Trustee's articles of incorporation, association or other constitutive documents or By-laws or constitute a default under, or result in the breach or acceleration of, any material contract, agreement or other instrument to which the Trustee is a party or which may be applicable to the Trustee or any of its assets;

(iv) as of the Closing Date, each of this Trust Agreement and the Units has been duly executed and delivered by the Trustee (or, with respect to the Units, by an Authenticating Agent on its behalf, if applicable) and this Trust Agreement constitutes the legal, valid and binding obligation of the Trustee, enforceable in accordance with its terms, except as enforcement may be limited by the applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(v) the Trustee is not in violation, and the execution and delivery of this Trust Agreement and the Units by the Trustee and its performance and compliance with respective terms of this Trust Agreement and the Units will not constitute a violation, of any order or decree of any court or any order or regulation of any Federal, State, municipal or governmental agency having jurisdiction over the Trustee or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of the Trustee or its properties or on the performance of its duties thereunder;

(vi) there are no actions or proceedings against, or investigations of, the Trustee pending, or, to the knowledge of the Trustee, threatened, before any court, administrative agency or other tribunal (A) that could reasonably be expected to prohibit its entering into this Trust Agreement or to render the Units invalid, (B) seeking to prevent the issuance of the Units or the consummation of any of the transactions contemplated by this Trust Agreement or (C) that could reasonably be expected to prohibit or materially and adversely affect the performance by the Trustee of its obligations under, or the validity or enforceability of, this Trust Agreement or the Units; and

(vii)    no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Trustee of, or compliance by the Trustee with, this Trust Agreement or the Units, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date.

   (b) Within 30 days of the earlier of discovery by the Trustee or receipt of notice by the Trustee of a breach of any representation or warranty of the Trustee set forth in this Section 9.11 that materially and adversely affects the interests of the Unitholders, the Trustee shall promptly cure such breach in all material respects or resign.

SECTION 9.12.   Limitation of Powers and Duties.

The Trust is constituted solely for the purposes of acquiring and holding the Trust Property and issuing the Units.  The Trust shall not incur any debt and may not issue additional units except in accordance with Sections 5.03 and 5.04 hereof.  The Trustee is not authorized to acquire any other investments or engage in any activities not authorized in this Trust Agreement and, in particular, the Trustee is not authorized to sell, assign, transfer, exchange, pledge, set-off or otherwise dispose of any of the COFINA Bonds or interests therein, including to Unitholders (except upon termination of the Trust in accordance with Article VIII of this Trust Agreement and at the direction of the Credit Support Provider (including in accordance with Sections 6.02 and 6.03 hereof)).

ARTICLE X

Miscellaneous Terms

SECTION 10.01.   Amendment of Trust Agreement.

(a) This Trust Agreement may be amended from time to time by the Credit Support Provider and the Trustee without the consent of any of the Unitholders or any other Person, for any of the following purposes:  (i) to cure any ambiguity or to correct, clarify or supplement any provision in this Trust Agreement which may be defective or inconsistent with any other provision in this Trust Agreement; (ii) to evidence and provide for the acceptance of appointment under this Trust Agreement by a successor Trustee; (iii) to add or change any of the terms of this Trust Agreement as shall be necessary to provide for or facilitate the administration of the Trust, or (iv) upon delivery of an Officer's Certificate of the Trustee or an Opinion of Counsel, to the effect that such amendment will not adversely affect the interests of any Unitholder.

(b) Promptly after the execution of any such amendment or modification, the Trustee shall furnish a copy of such amendment or modification to each Unitholder and the Depositor.

(c)  This Trust Agreement may also be amended from time to time by the Credit Support Provider and the Trustee (in the case of the Trustee, acting with the consent of Unitholders representing more than 50% of the outstanding Aggregate Unit Balance of the Units) for any purpose not set forth in Section 10.01(a); provided, however, that no amendment shall, without the written consent of the Depositor, amend provisions of this Trust Agreement relating to the rights and obligations of the Depositor.

SECTION 10.02.   Counterparts.

This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

SECTION 10.03.   Limitation on Rights of Unitholders.

(a) The death or incapacity of any Unitholder shall not operate to terminate this Trust Agreement or the Trust Property, nor entitle such Unitholder' legal representatives or heirs to

claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Property, nor otherwise affect the rights, obligations and liabilities of the parties thereto or any of them.

(b) No Unitholder shall have any right to control the operation and management of any Trust Property, or the obligations of the parties thereto, nor shall anything in this Trust Agreement set forth, or contained in the terms of the Units, be construed so as to constitute the Unitholders from time to time as partners or members of an association; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the parties to this Trust Agreement pursuant to any provision thereof.

(c) No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Trust Agreement.

SECTION 10.04.  <u>Governing Law</u>.

This Trust Agreement and each Unit issued thereunder shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely therein without reference to such State's principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby, and the obligations, rights and remedies of the parties thereunder shall be determined in accordance with such laws.

SECTION 10.05.  <u>Notices</u>.

All directions, demands and notices under this Trust Agreement shall be in writing and shall be delivered to the offices of the Trustee specified below.  Any notice required to be given to a Unitholder will be given by facsimile to such number or by electronic mail at such address as may be provided to the Trustee or be mailed to the last address of such holder set forth in the applicable Unit Register or, in the case of the Global Securities, transmitted to the Depositary in accordance with its procedures.  Any notice so mailed within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given when given or mailed, whether or not the Unitholder receives such notice.  Notices given by facsimile will be effective upon confirmation (including electronic confirmation) of effective transmission.

**Trustee**: [_____]<sup>7</sup>

SECTION 10.06.  <u>Severability of Terms</u>.

If any one or more of the covenants, agreements or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements or terms shall be deemed severable from the remaining covenants, agreements or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other terms of this Trust Agreement or of the Units or the rights of the Unitholders thereof.

---

[7] Trustee to provide notice info.

SECTION 10.07.  Notice to Credit Support Provider.

(a) In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly to provide notice to the Credit Support Provider with respect to each of the following of which it has actual knowledge:

(i)  the resignation or termination of the Trustee;

(ii) all payments to Unitholders;

(iii) any change in the location of the Collection Account; and

(iv) the occurrence of a Non-Taxable Bond Sale Event.

In addition, the Trustee shall promptly furnish to the Credit Support Provider copies of each report to Unitholders described in Section 4.02.  Any notices to be given to the Credit Support Provider pursuant to this Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, emailed or mailed by first class mail, postage prepaid, or by express delivery service to the Credit Support Provider as specified below, or at such other address as the Credit Support Provider shall have most recently specified to the Trustee in writing.

**Credit Support Provider:**

Ambac Assurance Corporation
One State Street Plaza
New York, NY 10004
Attention: [Chief Risk Officer]
Telephone: (212) 658-7470
E-mail:  [dbarranco@ambac.com]
With a copy to General Counsel
Email: [sksenak@ambac.com]

(b) The Trustee shall promptly provide the Credit Support Provider with any additional information requested by the Credit Support Provider with respect to the Trust or the Trust Property.  Further, as necessary, the Trustee shall request from COFINA such information as the Credit Support Provider reasonably requests related to the COFINA Bonds and COFINA and shall thereafter provide such information to the Credit Support Provider.  The Trustee shall, upon request of the Credit Support Provider, provide an accounting of the Trust Property.

SECTION 10.08.  No Recourse.

Each Unitholder by accepting a Unit acknowledges that such Unitholder's Units represent interests in the Trust only and do not represent interests in or obligations of the Trustee, the Credit Support Provider, other than the Credit Support, or any Affiliate of the foregoing Persons and no recourse may be had against such Persons or their respective assets, except as may be expressly set forth in this Trust Agreement, the Credit Support or the Units.

SECTION 10.09.  <u>Third Party Beneficiary</u>.

Each party hereto hereby acknowledges that the Credit Support Provider shall be a third-party beneficiary of this Trust Agreement, entitled to enforce the provisions hereof as if a party hereto.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed by their respective officers thereunto duly authorized as of the date first above written.

[_____], as Trustee

By  _____

     Name:
     Title:

Puerto Rico Sales Tax Financing Corporation, as Depositor

By  _____

     Name:
     Title:

Acknowledging and Agreeing to the Calculation Agent obligations and to provisions related to the Credit Support by Ambac Assurance Corporation

By  _____

     Name:
     Title:

EXHIBIT A1

Class 2047 Unit Accretion Schedule

EXHIBIT A2

Class 2054 Unit Accretion Schedule

EXHIBIT B1

Form of Class 2047 Unit

EXHIBIT B2

Form of Class 2054 Unit

EXHIBIT C1

Form of Class 2047 Unit Global Security

EXHIBIT C2

Form of Class 2054 Unit Global Security

EXHIBIT D

Form of Transfer Certificate for Definitive Certificates

SCHEDULE 1

COFINA Bonds

SCHEDULE 2

Non-Taxable Bond Threshold Amounts

Current Interest Bonds

| Maturity | Par (US$) | Coupon (%) | Threshold Price / Yield to Maturity |
|----------|-----------|------------|-------------------------------------|
| 7/1/2034 | 375,090,000 | 4.500% | Par |
| 7/1/2053 | 1,451,135,000 | 4.750% | Par |
| 7/1/2058 | 4,297,080,000 | 5.000% | Par |

Capital Appreciation Bonds

| Maturity | Initial Value (US$) | Yield (%) | Threshold Price / Yield to Maturity |
|----------|---------------------|-----------|-------------------------------------|
| 7/1/2027 | 246,346,597.95 | 4.375% | Accreted Par |
| 7/1/2029 | 220,190,485.50 | 4.375% | Accreted Par |
| 7/1/2031 | 256,162,971.50 | 4.500% | Accreted Par |
| 7/1/2033 | 263,752,428.80 | 4.500% | Accreted Par |
| 7/1/2046 | 1,108,991,315.10 | 5.375% | Less than 5% Yield to Maturity |
| 7/1/2051 | 639,639,064.00 | 5.625% | Less than 5% Yield to Maturity |

## **Exhibit G**

**Trust Agreement**

**Draft**
**12/29/2018**

[COFINA [NAME OF SERIES] NATIONAL CUSTODIAL TRUST[1]]

———————————

TRUST AGREEMENT

among

Corporación del Fondo de Interès Apremiarte de Puerto Rico, whose name in English is the
PUERTO RICO SALES TAX FINANCING CORPORATION, as Depositor,

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,

[●],
as Trustee,

and

[●],
as Delaware Trustee

DATED AS OF

[●], 2019

———————————

---

[1] NTD: There shall be a separate Trust Agreement governing each series of COFINA 1.0 Bonds.

TABLE OF CONTENTS

Page

SECTION 1.      STANDARD TERMS ................................................................. [●]

SECTION 2.      DEFINED TERMS .................................................................... [●]

SECTION 3.      ORGANIZATION OF TRUST ................................................... [●]

SECTION 4.      NOTIONAL AMOUNT .............................................................. [●]

SECTION 5.      FORMS OF TRUST UNITS ....................................................... [●]

SECTION 6.      SCHEDULES ........................................................................... [●]

SECTION 7.      GOVERNING LAW; VENUE; JURY WAIVER ....................... [●]

SECTION 8.      INTENT OF PARTIES; ABSOLUTE SALE ............................. [●]

SECTION 9.      NON-PETITION ....................................................................... [●]

SECTION 10.     CERTAIN TERMS REGARDING THE DEPOSITOR ............... [●]


SCHEDULE I:        COFINA BONDS SCHEDULE

EXHIBIT A:         Form of Taxable Trust Unit Certificate
EXHIBIT B:         Form of Tax-Exempt Trust Unit Certificate
EXHIBIT C:         Form of Certificate of Trust
EXHIBIT D:         Form of Trustee Certification

TRUST AGREEMENT

THIS TRUST AGREEMENT, dated as of [●], 2019 (this "Agreement"), is hereby executed by and among Corporación del Fondo de Interès Aprémiarte de Puerto Rico, whose name in English is THE PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA" or the "Depositor"), NATIONAL PUBLIC FINANCE CORPORATION ("National"), [●], as trustee (the "Trustee") and [●], a Delaware banking corporation, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees") under this Agreement and the Standard Terms to Trust Agreement, dated as of [●], 2019 (the "Standard Terms"), all the provisions of which are incorporated herein and shall be a part of this Agreement as if set forth herein in full (this Agreement with the Standard Terms so incorporated, the "Trust Agreement").

PRELIMINARY STATEMENT

The parties are entering into this Agreement for purposes of forming the COFINA [Name of Series] National Custodial Trust, a Delaware statutory trust (the "Trust"). In furtherance of the structure approved in the COFINA Plan and in order to facilitate the implementation thereof, the Trust is being established by COFINA and the Trustees solely for the benefit of and on behalf of beneficial holders of Original COFINA Bonds (the "Original COFINA Bondholders") that (i) elect to receive Trust Units (as defined herein) pursuant to the election form distributed in connection with the solicitation of acceptances and rejections of the COFINA Plan and (ii) have not otherwise agreed to commute the National Insurance Policies on or prior to the Closing Date ("Electing Original COFINA Bond Holders"). Except for the establishment of the Trust and the deposit therein pursuant to the COFINA Plan at the election of the Original COFINA Bondholders, COFINA shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof. The Trustees shall file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware on the Effective Date. The Trust shall issue two classes of trust units to be known as the "Taxable Trust Unit" and the "Tax-Exempt Trust Unit" (collectively, the "Trust Units" and each holder of a Trust Unit, a "Unitholder"). Each Taxable Trust Unit shall be composed of a Taxable Trust Certificate and a Stub Certificate (Taxable Allocation), which will be held together as a single unit and will not be traded separately, and each Tax-Exempt Trust Unit shall be composed of a Tax-Exempt Trust Certificate and a Stub Certificate (Tax-Exempt Allocation), which will be held together as a single unit and will not be traded separately (the Taxable Trust Certificate, Stub Certificate (Taxable Allocation), Tax-Exempt Trust Certificate and Stub Certificate (Tax-Exempt Allocation), collectively, the "Trust Certificates"). Each Trust Unit shall have a separate CUSIP and shall be issued in global form and be transferable through the Depository.

**Section 1.      Standard Terms.**

The Trustees acknowledge that the Standard Terms prescribe certain obligations of the Trustees with respect to the Trust and the Trust Units. The Trustees agree to observe and perform such prescribed duties, responsibilities and obligations, and acknowledge that, except to the extent inconsistent with the provisions of this Agreement, the Standard Terms (including without limitation, the rights, protections, indemnities and immunities afforded to the Trustees thereunder) are and shall be a part of this Agreement to the same extent as if set forth herein in full.

**Section 2.**      <u>**Defined Terms.**</u>

With respect to the Trust Units and in addition to the definitions set forth in the Standard Terms, the following provisions shall govern the defined terms set forth below.  To the extent the meanings assigned to the defined terms set forth below are inconsistent with the meanings assigned to such terms in the Standard Terms, the meanings assigned herein shall control.  Capitalized terms used herein but not defined herein or in the Standard Terms shall have the meanings ascribed to them in the COFINA Plan.

"**Bankruptcy Code**": The Bankruptcy Reform Act of 1978, as amended from time to time, and as codified as 11 U.S.C. <u>Section 101</u> et seq.

"**COFINA National Custodial Trusts**": Each of the COFINA [Name of Series] National Custodial Trust, the COFINA [Name of Series] National Custodial Trust, the COFINA [Name of Series] National Custodial Trust, the COFINA [Name of Series] National Custodial Trust, the COFINA [Name of Series] National Custodial Trust, the COFINA [Name of Series National Custodial Trust and the COFINA [Name of Series] National Custodial Trust.

"**Confirmation Order**" The order of the Title III Court confirming the COFINA Plan in accordance with section 1129 of the Bankruptcy Code made applicable to the Title III Case pursuant to Sections 301 and 315 of PROMESA.

"**Delaware Trustee**":  [●], not in its individual capacity but solely in its capacity as Delaware Trustee hereunder, its successor in interest or any successor Delaware Trustee appointed as herein provided.

"**Distribution Date**":  Each date specified in the Bond Resolutions on which distributions of principal and interest on the COFINA Bonds are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"**Maturity Date**": [●], the Maturity Date of the Original COFINA Bonds.

"**Original COFINA Bonds**:" The [Series 2007A Senior Bonds due 2040], the [Series 2007A Senior Bonds due 2041], the [Series 2007A Senior Bonds due 2042], the [Series 2007A Senior Bonds due 2043], the [Series 2007A Senior Bonds due 2044], the [Series 2007A Senior Bonds due 2045], and the [Series 2007A Senior Bonds due 2046] issued by COFINA pursuant to the Bond Resolutions on [●].[2]

"**PROMESA**": The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq..

"**Taxable COFINA Bonds**": The [●] Bonds issued by COFINA on [●] pursuant to the Bond Resolutions dated [●], which are identified on the COFINA Bonds Schedule.

---

[2] NTD: There will be a separate Trust Agreement for each series of COFINA 1.0 bonds; to be deleted as applicable.

"**Tax-Exempt COFINA Bonds**": The [●] Bonds issued by COFINA on [●] pursuant to the Bond Resolutions dated [●], which are identified on the COFINA Bonds Schedule.

"**Trustee**":   [●], in its capacity as Trustee hereunder, its successor in interest or any successor trustee appointed as herein provided.

"**Trustees**":  The Delaware Trustee and the Trustee.

"**Trust Estate**":   The meaning given such term in the "Conveyances and Purchases" section hereof.

## Section 3.     Organization of Trust.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of a Certificate of Trust of the Trust (the "Certificate of Trust") with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name "[COFINA [Name of Series] National Custodial Trust]" in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust.  It is the intention of the parties hereto that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that this document constitutes the governing instrument of the Trust.  Notwithstanding any other provision of this Agreement to the contrary, the Trustees are hereby authorized and directed to, and shall, on the date hereof, execute and file the Certificate of Trust with the Secretary of State in the form attached as Exhibit C hereto. The Trustee shall have power and authority, and is hereby authorized and empowered to take all actions on behalf of the Trust as set forth in this Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and National.

## Section 4.     Notional Amount.

(a)  The aggregate Notional Amount of the Trust Units that may be executed and delivered under this Agreement is limited to the Compounded Amount as of the Closing Date of the Original COFINA Bonds deposited into the Trust.

(b) The aggregate Notional Amount of the Trust Units shall be allocated between Tax-Exempt Trust Units and Taxable Trust Units in the same proportion as the Tax-Exempt COFINA Bonds and Taxable COFINA Bonds, respectively, deposited into the Tax-Exempt Bond Account and Taxable Bond Account as of the Closing Date.

(c)  Each Tax-Exempt Trust Unit issued shall consist of one Tax-Exempt Trust Certificate and one Stub Certificate (Tax-Exempt Allocation), and the Notional Amount of each such (i) Tax-Exempt Trust Unit, (ii) Tax-Exempt Trust Certificate and (iii) Stub Certificate (Tax-Exempt Allocation) shall be the same.

3

(d) Each Taxable Trust Unit issued shall consist of one Taxable Trust Certificate and one Stub Certificate (Taxable Allocation), and the Notional Amount of each such (i) Taxable Trust Unit, (ii) Taxable Trust Certificate and (iii) Stub Certificate (Taxable Allocation) shall be the same.

**Section 5.**      **Forms of Trust Units.**

The Trust Units shall be substantially in the forms attached as <u>Exhibits A and B</u> hereto. Each Trust Unit shall have a separate CUSIP and shall be issued in global form and be transferable through the Depository.

**Section 6.**      **Schedules.**

<u>Schedule I</u> is attached hereto and incorporated herein by reference as contemplated herein or by the Standard Terms.

**Section 7.**      **Governing Law; Venue; Jury Waiver.**

THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE.   EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.   EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

WEIL:\96747648\12\64984.0005

**Section 8.**   **Intent of Parties**

(a) The parties hereto intend that, for all purposes, the transfer to the Trust of the COFINA Bonds and National Insurance Policy shall be, and shall be construed as, a transfer of the COFINA Bonds and National Insurance Policy on behalf of the Electing Original COFINA Bond Holders in lieu of a transfer of such assets to the Trust directly by the Electing Original COFINA Bond Holders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Closing Date, the Depositor will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Depositor's estate in the event of a liquidation, reorganization, or similar proceeding of the Depositor and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate.  The parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b) The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Depositor.

(c) Notwithstanding anything to the contrary in the Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Unitholders, National, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not and neither Trustee shall directly take any action that to its actual knowledge would violate any of the following):

   (i)     engage in any business or engage in any activity other than those activities expressly permitted under Section 2.03 of the Standard Terms and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in the Trust Agreement;

   (ii)    acquire or own any assets other than the Trust Estate or lease (as lessor) any assets;

   (iii)   fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including, but not limited to, in order to perform its obligations under the Trust Agreement;

   (iv)    fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

   (v)     fail to act solely in its own name or in the name of the Trustee through duly authorized agents in the conduct of its activities;

   (vi)    provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)     [have its debts or other obligations guaranteed by any other person or] hold itself out as responsible for the debts or other obligations of any other Person;

(viii)     commingle its assets or liabilities with those of any other Person;

(ix)     fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)     divert funds for any purpose other than as set forth in the Trust Agreement;

(xi)     enter into any contract, agreement or transaction with any Unitholders, the Depositor, National, principal or other affiliate of the Trust, or any shareholder, general partner, member, principal or affiliate thereof, except as expressly authorized herein;

(xii)     maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)     incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by the Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)     perform any duties or obligations of the Depositor or any other Person;

(xv)     make any loans or advances to any third party, including, without limitation, any Unitholder, Depositor or Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)     fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)     fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)     identify itself as a department or division of any other Person;

(xix)     fail to observe all formalities required of a Delaware statutory trust;

(xx)     fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however,

6

the foregoing shall not require the Depositor to sell any assets, or make any capital contribution, to the Trust;[3]

(xxi)     conduct any oral or written communication, including, without limitation, letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee;

(xxii)    (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing;

(xxiii)   supplement, modify, amend, restate, replace, waive or repeal this Section 8 or Sections 2.03, 2.04, 9.01 or 9.03 of the Standard Terms, or the definitions used in such Sections, in each case except for any supplement, modification, amendment or restatement of any such provision that (x) corrects any error and (y) would not (individually or together with other changes) be reasonably likely to cause the Trust to no longer be a "special purpose entity" in accordance with applicable law and standards; or

(xxiv)    supplement, modify, amend, restate, replace, waive or repeal any portion of this Trust Agreement or the Standard Terms except as expressly permitted by Section 9.01 of the Standard Terms.

(d) Failure of the Trust, the Depositor, National, any Unitholder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 8 shall not affect the status of the Trust as a separate legal entity nor cause the Trust to dissolve or terminate.

(e) To the extent that any provision of this Section 8 conflicts with, violates or otherwise is in contravention with any other provision of the Trust Agreement or the Standard Terms, the parties hereto and each Unitholder agree that the terms set forth in this Section 8 shall be controlling as expressly set forth herein.

---

[3] NTD: To be discussed.

WEIL:\96747648\12\64984.0005

**Section 9.** __Non-Petition.__  The Depositor, National, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Unitholders, by accepting a Trust Unit, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another person, the Trustee may file appropriate proofs of claim.

**Section 10.** __Certain Terms Regarding the Depositor.__  For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i)      The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Holders of the Trust Units shall be extinguished.  The Trust Units are not obligations of, and are not guaranteed by, the Depositor, and no recourse shall be had against any Officer, director, manager, employee, security holder or incorporator of the Depositor, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)      The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Depositor assumes no responsibility for their correctness. The Depositor makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)      In purchasing any Trust Units in certificated form, the purchaser shall be required to acknowledge, represent to and agree, and in purchasing any Book-Entry Beneficial Interests  in the Trust Units the purchaser shall be deemed to acknowledge, represent and agree, that none of the Depositor nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Depositor or any of its affiliates.

(iv)      The Depositor shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

WEIL:\96747648\12\64984.0005

**IN WITNESS WHEREOF**, the Depositor, National, the Trustee and the Delaware Trustee have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

<div align="right">

**PUERTO RICO SALES TAX FINANCING CORPORATION,**
As Depositor

By: _____
Name: _____
Its: _____


**NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION**

By: _____
Name: _____
Its: _____


[●],
As Delaware Trustee

By: _____
Name: _____
Its: _____


[●],
As Trustee

By: _____
Name: _____
Its: _____

</div>

9

## __SCHEDULE I__

**COFINA Bonds Schedule**

| Class Name | CUSIP | Tax-Exempt/Taxable | Compounded amount as of the Relevant Closing Date |
|---|---|---|---|
| [●] | [●] | [●] | [●] |
| [●] | [●] | [●] | [●] |

S-1

## EXHIBIT A

FORM OF TAXABLE TRUST UNIT CERTIFICATE

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST, AS DEFINED HEREIN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS CERTIFICATE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE DEPOSITOR, THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT IN RESPECT OF AN INDIRECT INTEREST IN THE NEW COFINA BONDS UNDERLYING THE UNITS.

WEIL:\96747648\12\64984.0005

[NAME OF TRUST]

Taxable Trust Unit Certificate No. __

Notional Amount: _____

CUSIP:  [●]

Each Taxable Trust Unit represented by this Certificate is one of a duly authorized issue of Certificates designated as the Taxable Trust Units (herein collectively called the "Units"), and representing a beneficial ownership interest in a portion (described below) of the Trust Estate created by the Trust Agreement referred to below.

Defined terms not otherwise defined in this Certificate shall have the meaning set forth in the Trust Agreement.

Each Unit consists of (in the same Notional Amount): (A) one Taxable Trust Certificate, which in turn represents an undivided beneficial ownership interest in the Taxable Bond Account created under the Trust Agreement,  and (B) one Stub Certificate (Taxable Allocation), which in turn represents an undivided beneficial ownership interest in the Stub Account (Taxable Allocation).

This certifies that CEDE & CO. is the registered owner of the Notional Amount of Taxable Trust Units evidenced by this Certificate.  Capitalized terms used but not defined herein have the meanings assigned to such terms in the Trust Agreement referred to below, which Agreement also contains rules as to construction that shall be applicable herein.

The Trust was created pursuant to a Trust Agreement (the "Trust Agreement") dated as of [●], 2019, by and among Corporación del Fondo de Interès Apremiarte de Puerto Rico, whose name in English is THE PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA" or the "Depositor"), NATIONAL PUBLIC FINANCE CORPPORATION ("National"), [●] as trustee (the "Trustee") and [●], as Delaware trustee (the "Delaware Trustee" which term includes any successor under the Trust Agreement and together with the Trustee, collectively the "Trustees"), and the Standard Terms to Trust Agreement, dated as of [●], 2019 (the "Standard Terms"), a summary of certain of the pertinent provisions of which is set forth hereinafter.  This Certificate is issued under and is subject to the terms, provisions and conditions of the Trust Agreement, to which Trust Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound. Distributions on this Certificate shall be made by the Paying Agent under the Trust Agreement.

This Certificate is issued under the Trust Agreement to which reference is hereby made for a statement of the respective rights thereunder of the Depositor, the Trustee, National and the Holder of the Certificate and the terms upon which the Certificate is executed and delivered.

This Certificate does not bear interest.  Distributions on this Certificate represent a combination of certain interest and principal payments made on the New COFINA Bonds issued

A-2

as non-tax-exempt for federal income tax purposes and certain other payments which have been assigned or contributed to the Trust Estate and may vary from period to period.

In certain circumstances [describe National's right to sell New COFINA Bonds from Trust and Unit Holder's right to elect receipt in kind, and effect on Notional Amount]

This Certificate is not subject to redemption by the Trust and is not subject to repurchase by the Trust at the option of the Holder of this Certificate.

The Holder, by its acceptance of this Certificate, agrees that it will look solely to the funds allocated pursuant to the Trust Agreement for distribution hereunder and that none of the Trustee or the Paying Agent in their individual capacities nor the Depositor is personally liable to such Holder for any amount payable under this Certificate or the Trust Agreement, subject in the case of the Trustee to any liability under the Trust Agreement, provided that the foregoing shall not prevent the Holder from appearing or litigating any such proceeding after it has been instituted.

The Holder, by its acceptance of this Certificate hereby agrees that (i) the Trust Agreement is executed and delivered by [●], not individually or personally, but solely as Trustee in the exercise of the powers and authority conferred upon and vested in it, and pursuant to instructions set forth therein, (ii) each of the representations, undertakings and agreements herein made on the part of the Trustee or the Trust is made and intended not as personal representations, undertakings or agreements of [●], (iii) nothing herein contained shall be construed as creating or imposing any liability upon [●], individually or personally, or the Depositor to perform any covenant, either express or implied, contained herein, all such liability, if any, is hereby expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and such waiver shall bind any third party making a claim by or through one of the parties hereto, and (iv) under no circumstances shall [●] or the Depositor be personally liable for the payment of any indebtedness or expenses of the Trust, or be personally liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under the Trust Agreement.

The Holder, by its acceptance of this Certificate, covenants and agrees that it will not at any time institute against the Depositor, National or the Trust, or join in any institution against the Depositor, National or the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to this Certificate or the Trust Agreement.

Distributions on this Certificate will be made as provided in the Trust Agreement by the Paying Agent by wire transfer to such Holder without the presentation or surrender of this Certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Paying Agent of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency maintained by the Unit Registrar for that purpose.

A-3

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Certificate has been executed by the manual signature of an authorized officer of the Trustee and the certificate of authentication hereon shall have been executed by an authorized officer of the Unit Registrar, or an authenticating agent by manual signature, this Certificate shall not entitle the Holder hereof to any benefit under the Trust Agreement or be valid for any purpose.

THIS CERTIFICATE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAWS PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

WEIL:\96747648\12\64984.0005

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and not in its individual capacity, has caused this Certificate to be duly executed.

[●]

By:  [●],
not in its individual capacity, but solely as Trustee

By: _____

    Authorized Signatory

Dated:  _____

CERTIFICATE OF AUTHENTICATION

This is the Certificate referred to in the within-mentioned Trust Agreement.

[●],
not in its individual capacity, but solely as Unit Registrar

By: _____

    Authorized Signatory

Dated:  _____

A-5

**[TRUST NAME]**

**REVERSE OF TAXABLE TRUST UNIT CERTIFICATE**

The Certificate does not represent an obligation of, or an interest in, National, the Trustee, or any Affiliates of each of them and no recourse may be had against any such parties or their assets, except as expressly set forth or contemplated herein or in the Trust Agreement.  In addition, this Certificate is not guaranteed by any governmental agency or instrumentality and is limited in right of payment to certain collections and recoveries with respect to the Trust Estate, all as more specifically set forth herein and under the Trust Agreement.  A copy of the Trust Agreement may be examined by any Holder upon written request during normal business hours at the principal office of the Trustee and at such other places, if any, designated by the Trustee.

The Trust Agreement and the Standard Terms may not be amended, waived or supplemented without the prior written consent of National.  The Trust Agreement and the Standard Terms may be amended, waived or supplemented from time to time by National and the Trustee without the consent of the Unitholders; provided, however, that no such amendment shall:

a)  reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Unitholder without the consent of the Holder of such Trust Unit;

b)  alter in any manner the treatment of any National Insurance Policy without the unanimous written consent of the Holders of all Trust Units then outstanding;

c)  alter in any manner the calculation or treatment of the Compounded Amount without the unanimous written consent of the Holders of all Trust Units then outstanding;

d)  amend Section 9.01 of the Standard Terms without the unanimous written consent of the Holders of all Trust Units then outstanding;

e)  adversely affect in any other respect the interest of the Holders of any Class of Trust Units in any manner other than as described in a), b), or c) without the consent of the Holders of Trust Units of such Class evidencing at least a majority of such Class (measured by outstanding Compounded Amount of the underlying Original COFINA Bonds;

f)  if such amendment affects the interests of the Unitholders of one or more Classes of Trust Units in any manner other than as described in (a), (b), or (c) and that is disproportionally adverse to the interests of the Unitholders of other Classes, the written consent of Holders of a majority of Trust Units of each Class of Trust Units (measured by outstanding Compounded Amount of the underlying Original COFINA Bonds) so affected; or

g)  reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

As provided in the Trust Agreement and subject to certain limitations therein set forth, including the limitations set forth in Article V of the Standard Terms, the transfer of this Certificate is registrable in the Certificate Register upon receipt by the Trustee of a Transferee Agreement and

the surrendering of this Certificate for registration of transfer at the offices or agencies of the Unit Registrar, accompanied by a written instrument of transfer in form satisfactory to the Unit Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon a new Certificate will be issued to the designated transferee.  The initial Unit Registrar appointed under the Trust Agreement is the Trustee.

No service charge will be made for any such registration of transfer or exchange, but the Trustee or the Unit Registrar may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith or any expense incurred thereby.

The Trustee, the Paying Agent, the Unit Registrar and any agent of the Trustee, the Paying Agent, or the Unit Registrar may treat the Holder hereof as the owner hereof for all purposes, and none of the Trustee, the Paying Agent, the Unit Registrar or any such agent shall be affected by any notice to the contrary.

The obligations and responsibilities created by the Trust Agreement and the Trust shall terminate upon the payment to the Holders of the Certificates of all amounts required to be paid to them pursuant to the Trust Agreement, the disposition of all property held as part of the Trust Estate and payment of any costs, expenses and indemnities due and owing to the Trustee under the Trust Agreement.

A-7

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s) and assign(s) and transfer(s) unto

_____

_____

     (Please print or type name and address, including postal zip code, of assignee and social security number or employer identification number)

_____

the within Certificate stating in the names of the undersigned in the Certificate Register and does hereby irrevocably constitute and appoint

_____

to transfer such Certificate in such Certificate Register of the Trust.

     I [we] further direct the Unit Registrar to issue a new Certificate of the same Class of like principal to the above-named assignee and deliver such Certificate to the following address:

_____

_____

Dated:_____

_____
     Signature by or on behalf of Assignor

_____
    Authorized Officer

_____
     Signature Guaranteed

_____

_____
    Name of Institution

     NOTICE: The signature(s) of this assignment must correspond with the name(s) on the face of this Certificate without alteration or any change whatsoever.  The signature must be guaranteed by a participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Program or the Stock Exchanges Medallion Program.  Notarized or witnessed signatures are not acceptable as guaranteed signatures.

A-8

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for the information of the Unit Registrar.

Distributions shall be made by wire transfer in immediately available funds to

_____

for the account  of

_____

account number _____ or, if mailed by check, to

_____

_____.

Applicable reports and statements should be mailed to

_____.

This information is provided by _____the

assignee named above, or _____ as its agent.

A-9

# EXHIBIT B

FORM OF TAX-EXEMPT TRUST UNIT CERTIFICATE

[To come]

WEIL:\96747648\12\64984.0005

## EXHIBIT C

### FORM OF CERTIFICATE OF TRUST OF
### [TRUST NAME]

THIS Certificate of Trust of [TRUST NAME] (the "Trust"), is being duly executed and filed by the undersigned, as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, Sections 3801 *et seq*.) (the "Act").

1.    NAME.   The name of the statutory trust formed hereby is "COFINA [[Name of Series] National Custodial Trust]."

2.    DELAWARE TRUSTEE.  The name and business address of the trustee of the Trust in the State of Delaware are [●].

3.    EFFECTIVE DATE.  This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

[●],
as Delaware Trustee

By:_____
Name:
Title:

[●],
as Trustee

By:_____
Name:
Title:

C-1

## **EXHIBIT D**

FORM OF TRUSTEE CERTIFICATION - UNDERLYING INSURED SECURITY

The undersigned hereby certifies as follows to PUERTO RICO SALES TAX FINANCING CORPORATION, as depositor (the "Depositor") with respect to the Bonds listed on Schedule I of the applicable Trust Agreement (the "COFINA Bonds"):

(1)  [●], as trustee (the "Trustee") of [NAME OF TRUST] (the "Trust") is in possession of a certificate evidencing the COFINA Bonds; or

(2)  The Trustee has received confirmation from the depository of such COFINA Bonds or a direct or indirect participant thereof that such COFINA Bonds are beneficially owned by the Trust for the benefit of the Unitholders.

Capitalized terms used but not defined herein have the meanings assigned to such terms in the [NAME OF TRUST]  Trust Agreement, dated as of [          ], 2019 by and among the Depositor, National Public Finance Guarantee Corporation, the Trustee, and [●], as Delaware trustee, which incorporates by reference the Standard Terms to Trust Agreement, dated as of [●], 2019.

[●],
as Trustee


By:_____
Name:
Title:

Date: [insert Closing Date]

D-1

**Exhibit H**

**Standard Terms to Trust Agreement**

# STANDARD TERMS

# TO

# TRUST AGREEMENT[1]

Corporación del Fondo de Interés Apremiante de Puerto Rico, whose name in English is The PUERTO RICO SALES TAX FINANCING CORPORATION, as Depositor,

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,

[●],
as Trustee,

and

[●],
as Delaware Trustee,

Custodial Trust Units

Dated as of [●], 2019

---

[1] Separate Standard Terms will be established for each Trust. The form is subject to Trustee comment in all respects.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ....................................................................................... 1

    Section 1.01.    Defined Terms. ............................................................... 1
    Section 1.02.    Other Definitional Provisions. ................................... 9

ARTICLE II TRUST ESTATE ................................................................................. 10

    Section 2.01.    Trust Assets. .................................................................. 10
    Section 2.02.    Acceptance by the Trustee. ......................................... 11
    Section 2.03.    Purpose, Activities of the Trust. ................................ 11
    Section 2.04.    Limitations of the Trust. ............................................. 12
    Section 2.05.    Voting Rights. .............................................................. 13

ARTICLE III ADMINISTRATION OF THE TRUST ............................................ 13

    Section 3.01.    Accounts. ...................................................................... 13
    Section 3.02.    Distributions. ............................................................... 14
    Section 3.03.    Sale of New COFINA Bonds. .................................... 15
    Section 3.04.    Adjustments to Compounded Amounts. .................. 16
    Section 3.05.    Payments on National Insurance Policies; Maturity. .............. 17

ARTICLE IV REPORTING/REMITTING TO SECURITYHOLDERS. ..................... 20

    Section 4.01.    Statements to Unitholders. ......................................... 20
    Section 4.02.    Compliance with Withholding Requirements. ........................ 21

ARTICLE V TRUST UNITS ................................................................................... 21

    Section 5.01.    The Trust Units. .......................................................... 21
    Section 5.02.    Book-Entry Certificates. ............................................ 22
    Section 5.03.    Registration of and Limitation on Transfers and Exchanges of Units. ................................................ 23
    Section 5.04.    No Obligation to Register. ......................................... 23
    Section 5.05.    Mutilated, Destroyed, Lost or Stolen Units. ........... 23
    Section 5.06.    Persons Deemed Owners. ........................................... 24
    Section 5.07.    Appointment of Paying Agent. ................................. 24

ARTICLE VI CONCERNING THE TRUSTEE ..................................................... 24

    Section 6.01.    Duties of Trustee. ....................................................... 24
    Section 6.02.    Certain Matters Affecting the Trustee. ..................... 25
    Section 6.03.    Trustee Not Liable for Trust Units or COFINA Bonds. ......... 28
    Section 6.04.    Trustee May Own Units. ............................................ 28

i

# TABLE OF CONTENTS
## (continued)

Page

Section 6.05.    Trustee's Fees and Expenses................................................ 29
Section 6.06.    Eligibility Requirements for Trustee, Successor Trustee,
    and Paying Agent. ................................................................ 30
Section 6.07.    Resignation and Removal of the Trustee. .............................. 30
Section 6.08.    Successor Trustee................................................................. 31
Section 6.09.    Merger or Consolidation of Trustee....................................... 32
Section 6.10.    Reserved............................................................................... 32
Section 6.11.    Appointment of Custodians. ................................................. 32
Section 6.12.    Trustee May Enforce Claims Without Possession of
    Certificates. ......................................................................... 32
Section 6.13.    No Recourse Against Trust Estate ......................................... 33

ARTICLE VII TERMINATION OF TRUST.................................................. 33

Section 7.01.    Termination; No Redemption Rights. .................................... 33
Section 7.02.    Procedure for Termination. ................................................... 33

ARTICLE VIII TAX PROVISIONS ............................................................. 34

Section 8.01.    Grantor Trust Provisions....................................................... 34
Section 8.02.    Characterization. .................................................................. 35
Section 8.03.    Grantor Trust Administration................................................ 35
Section 8.04.    Reports to Unitholders and Tax Authorities .......................... 36

ARTICLE IX MISCELLANEOUS PROVISIONS......................................... 37

Section 9.01.    Amendment of Trust Agreement. .......................................... 37
Section 9.02.    Counterparts. ........................................................................ 38
Section 9.03.    Limitation on Rights of Unitholders. ..................................... 38
Section 9.04.    Notices. ................................................................................ 40
Section 9.05.    Severability of Provisions. .................................................... 40
Section 9.06.    Third-Party Beneficiaries...................................................... 40
Section 9.07.    Acts of Unitholders. ............................................................. 41
Section 9.08.    Headings............................................................................... 41
Section 9.09.    No Waiver; Cumulative Remedies.......................................... 41
Section 9.10.    Merger and Integration.......................................................... 41
Section 9.11.    The Delaware Trustee ........................................................... 41

WEIL:\96713762\20\64984.0005

## RECITALS

Corporaciòn del Fondo de Interés Apremiante de Puerto Rico, whose name in English is THE PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA" or the "Depositor"), and NATIONAL PUBLIC FINANCE CORPORATION ("National") have entered into a Trust Agreement (the "Trust Agreement") with [●] as trustee (the "Trustee") and [●], a Delaware banking corporation, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees"), which Trust Agreement provides for the issuance of two Classes (as defined below) of owner trust units ("Trust Units") that in the aggregate evidence the entire beneficial ownership interest in the Trust Estate, each consisting of two certificates ("Certificates") of ownership interest of portions of the property owned by the Trust created by the Trust Agreement.  These Standard Terms are a part of, and are incorporated by reference into the Trust Agreement.

## STANDARD PROVISIONS

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations and warranties made in the Trust Agreement, COFINA, National and the Trustees agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01.  *Defined Terms.***

Except as otherwise specified herein or in the Trust Agreement or as the context may otherwise require, whenever used herein, the following words and phrases shall have the meanings specified in this Article.  Capitalized words and phrases used herein but not defined herein shall, when applied to a Trust, have the meanings set forth in or pursuant to the Trust Agreement.

"**Additional Payments**": Payments voluntarily deposited by National in its sole discretion to the Trust.

"**Adverse Trust Event**": has the meaning set forth in Section 8.03 hereof.

"**Affiliate**": Any person or entity controlling, controlled by or under common control with the Depositor, National or the Trustee, as the context may require.  "Control" means the power to direct the management and policies of a person or entity, directly or indirectly, whether through ownership of voting securities, by contract or otherwise. "Controlling" and "controlled" shall have meanings correlative to the foregoing.

"**Beneficial Owner**": With respect to any Trust Certificate, the Person who is registered as owner of that Certificate in the books of the Depository for that Trust

Certificate or in the books of a Depository Participant, or in the books of an indirect participant for which a Depository Participant acts as agent.

"**Bond Election**": As defined in <u>Section 3.03(b)</u> hereof.

"**Bond Resolutions**": (i) The Amended and Restated Sales Tax Revenue Bond Resolution adopted by COFINA on July 13, 2007, as amended on June 10, 2009, pursuant to which the Original COFINA Bonds were issued and (ii) the [NEW BOND RESOLUTIONS] adopted as of [●] pursuant to which the New COFINA Bonds were issued.

"**Bond Sale**": As defined in <u>Section 3.03(a)</u> hereof.

"**Business Day**": Any day that is not a Saturday, Sunday, holiday, or other day on which commercial banking institutions in the City of New York, the city of San Juan, Puerto Rico or the State of Delaware or, if different, the city and state in which the Corporate Trust Office is located are authorized or obligated by law or executive order to be closed.

"**Cash Election**": As defined in <u>Section 3.03(b)</u> hereof.

"**Cash Proceeds**": As defined in <u>Section 3.03(b)</u> hereof.

"**Claim Payments**": As defined in the Trust Agreement.

"**Class**": Means, as applicable, the Tax-Exempt Trust Units as a class, the Taxable Trust Units as a class, and, if required by the context, the Tax-Exempt Certificates as a class, the Taxable Certificates as a class, the Stub Certificates (Tax-Exempt Allocation) as a class, and/or the Stub Certificates (Taxable Allocation) as a class.

"**Closing Date**":  The Effective Date.

"**Code**": The Internal Revenue Code of 1986, as amended.

"**COFINA Bonds**": The Original COFINA Bonds together with the New COFINA Bonds.

"**COFINA Bonds Schedule**": The schedule of COFINA Bonds, which is attached to the Trust Agreement as Schedule I thereto, and which sets forth for the COFINA Bonds the following information:

> (a)      the CUSIP;

> (b)      in the case of New COFINA Bonds, whether such new COFINA Bonds are issued as Tax-Exempt COFINA Bonds or Taxable COFINA Bonds; and

> (c)      in the case of the Original COFINA Bonds, the Compounded Amount as of the Closing Date;

2

together with such additional information as may be reasonably requested by the Trustee.

"**COFINA Plan**": [The Second Amended Title III Plan of Adjustment of the Puerto Rico Sales Tax Financing Corporation, Case No. 17-03284-LTS, ECF No. 380, dated November 30, 2018].

"**COFINA Plan Distributions**": Any cash distribution allocable to Electing Original COFINA Bond Holders under the COFINA Plan, including Section 103 Cash, COFINA Cash Available for Distribution, and/or Rounding Amount Cash, each as defined in the COFINA Plan.

"**Compounded Amount**": The "Compounded Amount" as of the Closing Date shall be the Compounded Amount of the Original COFINA Bonds as of the Closing Date (as defined and calculated in the Bond Resolutions governing the Original COFINA Bonds) (and is agreed to be [●] million), which shall be allocated between the Compounded Amount (Tax-Exempt Allocation) (i.e., [●] million) and the Compounded Amount (Taxable Allocation) (i.e., [●] million) (proportionally based on the principal amount or accreted amount as of August 1, 2018 (the deemed issuance date) of Taxable COFINA Bonds and Tax-Exempt COFINA Bonds deposited in the Trust). Thereafter, each of the Compounded Amount (Taxable Allocation) and the Compounded Amount (Tax-Exempt) shall accrete at the same annual interest rate (i.e., [●]) implied in the definition of Compounded Amount for the Original COFINA Bonds (the "Implied Rate") and shall compound semi-annually in arrears, assuming a 360-day year consisting of twelve 30-day months, using the following formula: new Compounded Amount (as of a new date) = original Compounded Amount x (1 + Implied Rate/2) ^ (Days/180), where "Days" is the number of days (using the 360-day year/twelve 30-day months counting convention) from (and including) the date of the original Compounded Amount to (but excluding) the new date as of which the new Compounded Amount is being calculated. The Compounded Amount (Taxable Allocation) and Compounded Amount (Tax-Exempt Allocation), as the case may be, shall be reduced from time to time as set forth herein. On any date on which the Compounded Amount (Taxable Allocation) and Compounded Amount (Tax-Exempt Allocation), as the case may be, is reduced as set forth herein, such Compounded Amount, after giving effect to any such reduction(s) occurring on such date, will become the "original Compounded Amount" as set forth in the above formula and shall accrete and compound as set forth in such formula until the Maturity Date or until a subsequent reduction of such Compounded Amount as provided herein. Each Compounded Amount shall be calculated by the Trustee and published on a monthly basis as set forth in Section 4.01. Any published calculations of the Compounded Amount by the Trustee shall be made, in consultation with National, and, in the absence of any objection by National or any Unitholder within 30 days of the publication of such calculations, such calculations, absent manifest error, shall be final and binding. If within 30 days of the publication of such calculations, National or any Unitholder objects to such calculations, National or such Unitholder shall set forth in writing its objection, including the basis for such objection and the calculations which it believes to be correct, and if the Trustee agrees that its original calculations were in error the Trustee shall re-publish the calculations (allowing for objections as provided above). If the Trustee and either National or such Unitholder fail to

WEIL:\96713762\20\64984.0005

reach agreement as to the correct calculations, then National or such Unitholder shall be deemed to reserve its rights, either at the Maturity Date or earlier, to pursue any available legal remedy to attempt to enforce or clarify its rights or obligations under this agreement based on its  alternative calculations; provided that, if National or such Unitholder has not taken any action pursuant to the foregoing reservation of rights to pursue any available legal remedy and no formal legal proceeding is pending pursuant thereto at or prior to the Maturity Date or, if earlier, any distribution under Section 3.05, if any Compounded Amount is reduced to zero (and without prejudice to National's ability in any event to make a provisional payment of amounts under the National Insurance Policy), then the Trustee's calculation of the applicable Compounded Amount shall be final and binding.[2]

"**Compounded Amount (Taxable Allocation)**": The Compounded Amount of Original COFINA Bonds allocated to the Stub Account (Taxable Allocation).

"**Compounded Amount (Tax-Exempt Allocation)**": The Compounded Amount of the Original COFINA Bonds allocated to the Stub Account (Tax-Exempt Allocation).

"**Confirmation Order**": The order of the United States District Court for the District of Puerto Rico confirming the COFINA Plan in accordance with Section 314(b) of PROMESA and section 1129 of the Bankruptcy Code.

"**Corporate Trust Office**": The principal corporate trust office of the Trustee at which at any particular time its corporate trust business shall be administered.

"**Custodian**": The Trustee or the agent for the Trustee which shall hold all or a portion of the Trust Estate, or documents relating thereto, with respect to a specific Trust.

"**Delaware Trust Statute**": Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code § 3801 *et seq.,* as the same may be amended from time to time.

"**Delaware Trustee**": As defined in the Trust Agreement.

"**Depository**": The Depository Trust Company, or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act and the regulations of the SEC thereunder.

"**Depository Participant**":  A broker, dealer, bank, other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"**Distribution**": Any distribution to Unitholders made pursuant to Section 3.02.

"**Effective Date**": The effective date of the COFINA Plan.

---

[2] To mitigate risk, parties to agree to illustrative calculations and scenarios.

WEIL:\96713762\20\64984.0005

"**Electing Original COFINA Bond Holders**" the holders or beneficial owner of Original COFINA Bonds that (i) elect to receive Trust Units  pursuant to the election form distributed in connection with the solicitation of acceptances and rejections of the COFINA Plan and (ii) have not otherwise agreed to commute the National Insurance Policies on or prior to the Closing Date.

"**EMMA**" The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee.

"**Extraordinary Expenses**": As defined in Section 6.05(b) hereof.

"**Fee Agreement**": An agreement in the form attached hereto as Exhibit A providing for the Trustee's recovery from or reimbursement by the Trust of certain reasonable compensation, certain reasonable expenses, costs, and disbursements, and certain Extraordinary Expenses.

"**Fiscal Year**":  The fiscal year of the Trust shall be the calendar year.

"**Floor Price**": The minimum weighted average sale price required to be obtained for the Subject Bonds with respect to any Bond Sale, as determined by National.

"**Grantor Trust Provisions**": Subpart E of Subchapter J of Chapter 1 of the Code and Section 7701 of the Code, and final Treasury Regulations, published rulings, notices and announcement, promulgated thereunder, as the foregoing may be in effect from time to time.

"**Holders**" or "**Unitholders**": As of any date, the holders of Trust Units, as shown on the Unit Register maintained by the Unit Registrar as of such date.  In the case of any Trust Units issued in book-entry form, "Holders" or "Unitholders" shall include the Beneficial Owners thereof.

"**Insured Amount**": The Compounded Amount (Taxable Allocation) and the Compounded Amount (Tax-Exempt Allocation), as the case may be, as of the Maturity Date of the Original COFINA Bonds, after giving effect to accretion and reductions to the Compounded Amount as provided herein, which remains insured by the National Insurance Policies.

"**Insured Amount Election**": As defined in Section 3.05(b) hereof.

"**Maturity Date**": As defined in the Trust Agreement.

"**Maturity Election**": As defined in Section 3.05(b) hereof.

"**Maturity Notice**": As defined in Section 3.05(b) hereof.

"**Maturity Notice Period**": As defined in Section 3.05(b) hereof.

5

"**National Consummation Costs**": The portion of the distribution received by National pursuant to Section 3.3 of the COFINA Plan on the Effective Date as a Consummation Cost Party (as defined in the COFINA Plan) allocated to the Trust and each other COFINA National Custodial Trust based on the amount of Original COFINA Bonds outstanding on the Closing Date deposited into each such trust.

"**National Deferred Expenses**": Any Trustee Costs, Trust expenses or Additional Payments paid in cash to the Trust or the Trustee by National.

"**National Insurance Policies**": The insurance policies relating to the Original COFINA Bonds initially issued by (a) Financial Guaranty Insurance Company and subsequently novated to National or (b) MBIA Insurance Corporation and subsequently reinsured by National, in each case together with all agreements and other documents related thereto.

"**New COFINA Bonds**": The Taxable COFINA Bonds and Tax-Exempt COFINA Bonds.

"**Notice of Nonpayment**": As defined in Section 3.5(c).

"**Notional Amount**": With respect to any Class of Trust Units or Certificates, the amount of Trust Units and/or Certificates issued as provided in the Trust Agreement.

"**Officer**": When used with respect to the Trustees, any senior vice president, any vice president, any assistant vice president, any assistant treasurer, any trust officer, any assistant secretary in the Corporate Trust Office of the Trustees, or any other officer of the Trustees customarily performing functions similar to those performed by the persons who at the time shall be such officers, and also to whom with respect to a particular corporate trust matter such matter is referred because of such officer's knowledge of and familiarity with the particular subject. With respect to any other Person, the chairman of the board, the president, a vice president (however designated), the treasurer or controller.

"**Opinion of Counsel**": A written opinion of counsel, who may be counsel for any of the Unitholders, or any other nationally recognized counsel, as the case may be, in each case who is reasonably acceptable to the parties to whom it is delivered.

"**Original COFINA Bonds**": As defined in the Trust Agreement.

"**Paying Agent**": The paying agent appointed pursuant to Section 5.07 hereof.

"**Person**": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"**PROMESA**": The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq.

"**pro rata**": Unless otherwise stated, any pro rata payment or distribution made to, or any pro rata allocation of any cost or expense borne by, (i) Holders of Trust Units or Certificates of a certain Class shall be calculated based on the Notional Amount of Trust Units or Certificates of such Class outstanding and (ii) all Holders of Trust Units or Certificates without regard to Class shall be calculated based on the Compounded Amount of the Original COFINA Bonds underlying such Trust Units or Certificates (it being understood for such purpose that any pro rata allocation of distributions and Trustee Costs pursuant to Section 3.02(c)(i) and (ii) will be based on the initial Compounded Amounts underlying such Trust Units or Certificates on the Closing Date prior to giving effect to any other adjustments).

"**Requisite Unitholders**": With respect to any Trust, Holders of not less than twenty-five (25) percent (measured by the Compounded Amount of the underlying Original COFINA Bonds), of Taxable Trust Units or Tax-Exempt Trust Units, as applicable, in each case excluding, from both the numerator and the denominator, any Trust Units held by National. In the event that two or more groups of Unitholders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Unitholders with the greatest percentage of Taxable Trust Units or Tax-Exempt Trust Units (as measured in accordance with the immediately preceding sentence), as applicable, shall, to the extent of such conflict, be deemed to satisfy such requirement.

"**Sale Election**": As defined in Section 3.03(b) hereof.

"**Sale Notice**": As defined in Section 3.03(a) hereof.

"**Sale Notice Period**": As defined in Section 3.03(b) hereof.

"**SEC**": The Securities and Exchange Commission.

"**Securities Act**": The Securities Act of 1933, as amended.

"**Standard Terms**": These Standard Terms, as amended or supplemented, incorporated by reference into the Trust Agreement.

"**Stub Account (Taxable Allocation)**": As defined in Section 3.01(d) hereof.

"**Stub Account (Tax-Exempt Allocation)**": As defined in Section 3.01(b) hereof.

"**Stub Certificate (Taxable Allocation)**": A Certificate, each representing a pro rata interest in potential insurance payments pursuant to the National Insurance Policies in respect of the Original COFINA Bonds deposited into the Stub Account (Taxable Allocation) pursuant to Section 2.01(e) hereof.

"**Stub Certificate (Tax-Exempt Allocation)**": A Certificate, each representing a pro rata interest in potential insurance payments pursuant to the National Insurance Policies

7

in respect of the Original COFINA Bonds deposited into the Stub Account (Tax-Exempt Allocation) pursuant to Section 2.01(e) hereof.

**"Subject Bonds"**: As defined in Section 3.03(a) hereof.

**"Target Price"**: With respect to any Bond Sale, the then-current trading price of the Subject Bonds, as measured by the most recently available sale price for no less than [_____] of the Subject Bonds, as quoted on a nationally recognized exchange or a "bid" price on an electronic trading system such as Bloomberg LP posted within 10 Business Days prior to the date of the Sale Notice, or if no such price is available, a bona fide bid quote provided for no less than [●] of the Subject Bonds by an independent broker-dealer operating in the over-the-counter market.

**"Taxable Bond Account"**: As defined in Section 3.01(c) hereof.

**"Taxable COFINA Bonds"**: As defined in the Trust Agreement.

**"Taxable Trust Certificate"**: A Certificate, each represesnting a pro rata interest in the Taxable Bond Account.

**"Taxable Trust Unit"**: A Trust Unit comprising a Taxable Trust Certificate and a Stub Certificate (Taxable Allocation), issued by the Trust in the form of Exhibit A to the Trust Agreement.

**"Taxable Unitholder"**: A Holder of a Taxable Trust Unit, as shown on the Unit Register maintained by the Unit Registrar.

**"Tax-Exempt Bond Account"**: As defined in Section 3.01(a) hereof.

**"Tax-Exempt COFINA Bonds"**: As defined in the Trust Agreement.

**"Tax-Exempt Trust Certificate"**: A Certificate, each representing a pro rata interest in the Tax-Exempt Bond Account.

**"Tax-Exempt Trust Unit"**: A Trust Unit comprising a Tax-Exempt Trust Certificate and a Stub Certificate (Tax-Exempt Allocation) issued by the Trust in the form of Exhibit B to the Trust Agreement.

**"Tax-Exempt Unitholder"**: A Holder of a Tax-Exempt Trust Unit, as shown on the Unit Register maintained by the Unit Registrar.

**"Termination Notice"**: As defined in Section 7.02 hereof.

**"Treasury Regulations"**: Regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of regulations, including proposed or temporary regulations shall include analogous provisions of final Treasury Regulations as well as any successor or replacement Treasury Regulations.

WEIL:\96713762\20\64984.0005

"**Trust**": The trust formed pursuant to the Trust Agreement.

"**Trust Assets**": The assets specified in <u>Sections 2.01(a)</u> through <u>(e)</u> hereof, or any other securities, monies, proceeds or property received on account thereof or exchanged therefor, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

"**Trustee**": The bank or trust company identified as the Trustee in the Trust Agreement.

"**Trustees**": The Delaware Trustee and the Trustee.

"**Trust Assets Election**": As defined in <u>Section 3.05(b)</u> hereof.

"**Trustee Costs**": As defined in <u>Section 6.05(a)</u> hereof.

"**Trust Certificate**": Any Trust Certificate designated in the Trust Agreement.

"**Trust Estate**": The "Trust Estate" as defined in the Trust Agreement.

"**Trust Units**": As defined in the Trust Agreement.

"**Unit Register**" and "**Unit Registrar**": The register maintained and the registrar appointed pursuant to <u>Section 5.03</u> hereof.

"**U.S. Person**": A person who is a "United States person" within the meaning of <u>Section 7701(a)(30)</u> of the Code.

"**Voting Rights**": Any voting or control rights granted to holders of New COFINA Bonds pursuant to the Bond Resolutions providing for the issuance of such New COFINA Bonds.

"**Voting Rights Condition**": As defined in <u>Section 2.05</u> hereof.

**Section 1.02.   *Other Definitional Provisions.***

The words "hereof," "herein" and "hereunder" and words of similar import when used in these Standard Terms shall refer to these Standard Terms as a whole and not to any particular provision of these Standard Terms, and Section, subsection and Exhibit references are to these Standard Terms unless otherwise specified.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."  Any reference to any document in these Standard Terms shall be deemed to include any amendment, restatement, supplement or modification thereto.

WEIL:\96713762\20\64984.0005

## ARTICLE II

## TRUST ESTATE

**Section 2.01.** *Trust Assets.*

Pursuant to and in accordance with the Trust Agreement and the COFINA Plan, upon the Closing Date:

(a)     COFINA shall, on behalf of each of the Electing Original COFINA Bond Holders, deposit the New COFINA Bonds into the Trust.  The Trustee shall establish and maintain a Tax-Exempt Bond Account into which any Tax-Exempt COFINA Bonds shall be deposited, and a Taxable Bond Account into which any Taxable COFINA Bonds shall be deposited;

(b)     COFINA shall, on behalf of each of the Electing Original COFINA Bond Holders, deposit the COFINA Plan Distributions into the Trust;

(c)     The indenture trustee for the Original COFINA Bonds, on behalf of each of the Electing Original COFINA Bond Holders, and as required by and pursuant to Section 17.2 of the COFINA Plan and Paragraph [●] of the Confirmation Order, shall deposit the National Insurance Policies into the Trust;[3]

(d)     COFINA shall, on behalf of each of the Electing Original COFINA Bond Holders, deposit any and all agreements, documents and instruments relating to the National Insurance Policies that are within its control into the Trust;

(e)     All Original COFINA Bonds validly tendered by Electing Original COFINA Bond Holders shall be deposited by the Depository in the Trust.  The Original COFINA Bonds shall be allocated between and deposited into the Stub Account (Tax-Exempt Allocation) and Stub Account (Taxable Allocation) in the same proportion in which Tax-Exempt COFINA Bonds and Taxable COFINA Bonds (based on principal amount and accreted amount at August 1, 2018) are deposited into the Tax-Exempt Bond Account and Taxable Bond Account, respectively.  The Original COFINA Bonds deposited into the Trust shall not be cancelled and all rights and remedies under the existing Original COFINA Bonds and the applicable Bond Resolutions (other than payment obligations of COFINA and the continuation of any lien granted as security for such bonds) shall remain in full force and effect solely to the extent necessary to preserve any claims relating to the Original COFINA Bonds deposited in the Trust under the applicable National Insurance Policy. Such existing Original COFINA Bonds shall not form the basis for the assertion of any Claim against COFINA or Reorganized COFINA. The National Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect; and

---

[3] NTD: Effectuating language to be included with Confirmation Order

WEIL:\96713762\20\64984.0005

(f)     upon receipt of the National Consummation Costs, National shall, on behalf of each of the Electing Original COFINA Bond Holders, deposit the National Consummation Costs into the Trust on a pro rata basis.

**Section 2.02.   *Acceptance by the Trustee.***

(a)     By its execution of the Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all documents or instruments delivered to it or received by it from time to time with respect to the Trust Assets and all other assets included in the definition of Trust Estate in such Trust Agreement, in each case in trust for the exclusive use and benefit of all present and future Unitholders.  The Trustee represents and warrants that, except as expressly permitted by the Trust Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of the Trust Agreement, and (ii) it has not encumbered or transferred its right, title or interest in the Trust Estate.

(b)     With respect to the COFINA Bonds, the Trustee shall, on the Closing Date, deliver to the Depositor a certification substantially in the form of Exhibit D to the Trust Agreement certifying that it is either (i) in possession of a certificate evidencing the COFINA Bonds, or (ii) it has received confirmation from a depository of such COFINA Bonds or a direct or indirect participant thereof that the COFINA Bonds acquired by the Trust on such Closing Date are beneficially owned by the Trust for the benefit of the Unitholders.

(c)     Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

**Section 2.03.   *Purpose, Activities of the Trust.***

It is the intention of the parties hereto that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to the following:

(a)     accept the conveyance, assignment and transfer of the Trust Assets pursuant to the COFINA Plan;

(b)     create one or more sub-accounts in accordance with the terms of the Trust Agreement and these Standard Terms and pursuant to the COFINA Plan;

(c)     make claims and receive payments under the National Insurance Policies;

(d)     receive payments pursuant to the COFINA Plan;

(e)     receive Additional Payments;

(f)      issue one or more series of Taxable Trust Units or Tax-Exempt Trust Units (and corresponding Certificates) to holders of the Original COFINA Bonds that have elected to receive Trust Units and have not otherwise elected to commute the National Insurance Policies on or prior to the Effective Date in accordance with the terms of the Trust Agreement and these Standard Terms;

(g)      make distributions to the Unitholders in accordance with the terms of the Trust Agreement and these Standard Terms;

(h)      coordinate Unitholder communications through the Depository;

(i)      follow, accept or act upon any instruction or direction from National or the Requisite Unitholders, as applicable, in each case only as expressly permitted herein;

(j)      hold the assets included in the Trust Estate;

(k)      make public disclosures on EMMA and similar means of distribution;

(l)      make disclosures and share information with Bloomberg L.P. for disclosure on its trading platform and with other similar services; and

(m)      engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

**Section 2.04.  *Limitations of the Trust.***

(a)      Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee.  Neither COFINA or National nor any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee;

(b)      The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust.  Any such resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust;

(c)      The Trust will provide for its own operating expenses and liabilities from the Trust Assets.  General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to COFINA or National or their respective Affiliates (except indirectly, insofar as (i) National may own certain Trust Units and (ii) certain expenses of the Trust shall not reduce the Compounded Amount);

(d)      All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust;

12

(e)     There will be no guarantees made by the Trust with respect to obligations of COFINA or National or their respective Affiliates.  There will not be any indebtedness relating to borrowings or loans between the Trust and COFINA or National or their respective Affiliates; provided, that, National may own Trust Units;

(f)     The Trust will act solely in its own name or the Trustee's on its behalf and through its or the Trustee's duly authorized officers or agents in the conduct of its activities.  The Trust will not:  (i) operate or purport to operate as an integrated, single economic unit with respect to COFINA or National or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of COFINA or National or their respective Affiliates; or (iii) induce any such third party to reasonably rely on the creditworthiness of COFINA or National or any other affiliated or unaffiliated entity in its dealings with the Trust;

(g)     The Trust will maintain a Delaware Trustee with its office in the State of Delaware;

(h)     The Trust will not engage in any transaction with an affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

### Section 2.05.  *Voting Rights.*

(a)     National shall be deemed the sole holder of the Voting Rights with respect to the New COFINA Bonds held by the Trust, unless National: (i) is in default under any National Insurance Policy; or (ii) has become subject to, or has agreed to become subject to, regulatory, supervision, rehabilitation or liquidation (or similar) proceedings (each of the condition in clauses (i) and (ii), a "Voting Rights Condition");

(b)     Should any of the Voting Rights Conditions arise, the Voting Rights in respect of the New COFINA Bonds held by the Trust will be deemed to be held on a pro rata basis by the applicable Unitholders with respect to which such New COFINA Bonds relate and the Trustee shall take all actions reasonably necessary to facilitate such Unitholders' exercise of the Voting Rights;

## ARTICLE III

## ADMINISTRATION OF THE TRUST

### Section 3.01.  *Accounts.*

The Trustee shall establish and maintain the following accounts for the Trust to be held in trust for the benefit of the Unitholders:

(a)     <u>Tax-Exempt Bond Account</u>. An account into which the Trustee shall deposit the Tax-Exempt COFINA Bonds (or any other securities, monies, proceeds

or property received on account thereof or in exchange therefor) (the "Tax-Exempt Bond Account");

        (b)    Stub Account (Tax-Exempt Allocation). An account into which the Trustee shall deposit (i) a portion of Original COFINA Bonds (in the same proportion that the total amount of Tax-Exempt Trust Units issued on the Closing Date bear to the total amount of Trust Units issued on the Closing Date) and thereafter separately calculate the Compounded Amount (Tax-Exempt Allocation) with respect thereto and (ii) any payments of the corresponding Insured Amount pursuant to National Insurance Policies (the "Stub Account (Tax-Exempt Allocation)");

        (c)    Taxable Bond Account. An account into which the Trustee shall deposit Taxable COFINA Bonds (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "Taxable Bond Account"); and

        (d)    Stub Account (Taxable Allocation). An account into which the Trustee shall deposit (i) a portion of Original COFINA Bonds (in the same proportion that the total amount of Taxable Trust Units issued on the Closing Date bear to the total amount of Trust Units issued on the Closing Date) and thereafter separately calculate the Compounded Amount (Taxable Allocation) with respect thereto and (ii) any payments of the corresponding Insured Amount pursuant to National Insurance Policies (the "Stub Account (Taxable Allocation)").

        **Section 3.02.  *Distributions.***

        (a)    Tax-Exempt Distributions.  Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Holders of Tax-Exempt Trust Units, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New COFINA Bonds deposited in the Tax-Exempt Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs as of the date of distribution (such allocable portion based on the principal amount of any New COFINA Bonds that are current interest bonds underlying the Taxable Units and the Tax-Exempt Units).

        (b)    Taxable Distributions. Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Holders of Taxable Trust Units, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New COFINA Bonds deposited in the Taxable Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs as of the date of distribution (such allocable portion based on the principal amount of any New COFINA Bonds that are current interest bonds underlying the Taxable Units and the Tax-Exempt Units).

14

(c)      Other Distributions to All Unitholders.  The Trustee shall be required to and shall make the following distributions to all Unitholders on a pro rata "pass-through" basis promptly following receipt thereof by the Trustee, net of any outstanding Trustee Costs as of the date of distribution:

(i)      Any National Consummation Costs deposited in the Trust;

(ii)      Any COFINA Plan Distributions received by the Trustee; and

(iii)      Any Additional Payments received by the Trustee.

**Section 3.03.** *Sale of New COFINA Bonds.*

(a)      At any time and from time to time prior to the Maturity Date, so long as National (i) is not in default under the National Insurance Policies and (ii) has not agreed to and has not become subject to regulatory supervision, rehabilitation or liquidation (or similar) proceedings, National shall have the right to instruct the Trustee to sell, in a minimum principal amount (or, with respect to capital appreciation bonds, a minimum current compounded amount) of $[●],000,000, any New COFINA Bonds (or any other securities or property received on account thereof or in exchange therefor) (the "Subject Bonds") that are part of the Trust Assets for cash (a "Bond Sale").  Prior to any Bond Sale, National will notify the Trustee of the intended Bond Sale and will direct the Trustee to deliver through the Depository a sale notice (the "Sale Notice") to all applicable Unitholders (i.e. Tax-Exempt Unitholders with respect to Subject Bonds held in the Tax-Exempt Bond Account or Taxable Unitholders with respect to Subject Bonds held in the Taxable Bond Account).

(b)      The Sale Notice will include (i) a statement identifying the Subject Bonds, the principal amount (or, with respect to capital appreciation bonds, current compounded amount) of Subject Bonds to be sold, the applicable Target Price and Floor Price and (ii) a statement regarding the right of each applicable Unitholder to elect to receive either (A) in-kind delivery of a pro rata share of the Subject Bonds (the "Bond Election") or in lieu thereof (B) a pro rata share of the actual net cash proceeds ("Cash Proceeds") from the Bond Sale (with respect to the Subject Bonds that are not subject to the Bond Election), provided the weighted average price obtainable for the Subject Bonds (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) is equal to or greater than the Floor Price (the "Cash Election" and, together with the Bond Election, the "Sale Elections").  Upon receiving such Sale Notice, Unitholders will have at least five (5) Business Days to make their Sale Elections through the Depository (the "Sale Notice Period"). [4]

(c)      Following the Sale Notice Period,

---

[4] NTD: Sale mechanics subject to Trustee input.

WEIL:\96713762\20\64984.0005

(i)      If any applicable Unitholders make Bond Elections, an amount of Subject Bonds representing a proportion of the Subject Bonds equivalent to such Unitholders' aggregate pro rata ownership of all applicable Trust Units shall be reserved from the Bond Sale and shall instead be distributed pro rata to each such Unitholder making a Bond Election (any such distribution to be rounded down to the nearest minimum denomination, with any reduction as a result of such rounding down to be distributed to such Unitholders in cash);

(ii)      Applicable Unitholders who made Cash Elections and/or did not make a Bond Election will promptly receive a pro rata share of Cash Proceeds from the sale of Subject Bonds (not subject to a Bond Election), less any Cash Proceeds distributed as a result of rounding in accordance with Section 3.03(c)(i) to Unitholders making Bond Elections;

(iii)      If the Trustee is unable to agree, prior to executing the sale of any of the Subject Bonds, to a sale of all Subject Bonds not subject to a Bond Election for a weighted average price (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) equal to or greater than the Floor Price, the Trustee shall not sell or distribute any Subject Bonds, the Bond Sale shall be cancelled, and the Trustee shall send a notice, at the sole cost of National, to the applicable Unitholders through the Depository stating that such Bond Sale was cancelled, after which any future sale of the Subject Bonds shall be required to be made pursuant to a new Sales Notice.

**Section 3.04.  *Adjustments to Compounded Amounts.***

(a)      Each Distribution made on or prior to the Maturity Date to Tax-Exempt Unitholders or Taxable Unitholders shall result in a deemed simultaneous dollar-for-dollar reduction of the Compounded Amount (Tax-Exempt Allocation) or the Compounded Amount (Taxable Allocation), as the case may be, as of the date such Distribution, in an amount equal to such Distribution.  For the purposes of such reduction, ninety percent (90%) of any deduction from any Distribution in respect of Trustee Costs shall be treated as if such amounts deducted were paid to the applicable Unitholders in cash as part of the Distribution and shall reduce the applicable Compounded Amount accordingly; provided, however, that the fees of Norton Rose Fulbright US LLP up to a maximum of $750,000 and Kramer Levin Naftalis & Frankel LLP up to a maximum of $175,000 incurred in connection with the negotiation and documentation of the Trust Agreement and these Standard Terms, and the fees of Orrick, Herrington & Sutcliffe LLP incurred in connection with issuing an Opinion of Counsel related to the tax treatment of the Trust shall be treated as Trustee Costs and deducted from Distributions, but one hundred percent (100%) of such deductions from Distributions shall be treated as if such amounts deducted were paid to the applicable Unitholders in cash as part of the Distribution and shall reduce the applicable Compounded Amount accordingly. On account of the costs and expenses incurred by National in connection with the negotiation and documentation of the Trust Agreement and these Standard Terms, the Compounded Amount shall be reduced by $750,000 on the

16

Closing Date.[5] For the avoidance of doubt, except as expressly provided herein, National's obligation to pay the Compounded Amount as and when due shall, in all cases, continue to accrete at the same rate to the date that National makes payments to the Trustee.

(b)     Any Bond Sale resulting in a distribution of Cash Proceeds or Subject Bonds to Tax-Exempt Unitholders or Taxable Unitholders, as the case may be, shall result in a deemed simultaneous dollar-for-dollar reduction of the Compounded Amount (Tax-Exempt Allocation) or the Compounded Amount (Taxable Allocation), as the case may be, as of the date the Cash Proceeds of such Bond Sale are distributed by the Trustee to the applicable Unitholders, in an amount equal to the aggregate Cash Proceeds from such Bond Sale distributed to the applicable Unitholders; for such purposes the aggregate Cash Proceeds shall be calculated as if each applicable Unitholder that took actual delivery of Subject Bonds had received the same amount of cash per Unit as a Unitholder that made a Cash Election, or if all applicable Unitholders participating in the Bond Sale made a Bond Election, the aggregate Cash Proceeds shall be calculated as if each Unitholder made a Cash Election and all Subject Bonds were sold at a net price equal to the Target Price.

### Section 3.05.  *Payments on National Insurance Policies; Maturity.*

(a)     <u>Payments Prior to Maturity Date.</u> At any time prior to the Maturity Date, if the Compounded Amount (Tax-Exempt Allocation) or the Compounded Amount (Taxable Allocation), as the case may be, is reduced to zero, (i) the Stub Certificates (Taxable-Exempt Allocation) or the Stub Certificates (Taxable Allocation), as applicable, shall be cancelled; (ii) the related National Insurance Policies shall be indefeasibly cancelled; (iii) any remaining Trust Assets in the Tax-Exempt Bond Account or the Taxable Bond Account, as applicable, shall be distributed on a pro rata basis to Tax-Exempt Unitholders or Taxable Unitholders, as applicable; provided, however, that if any National Deferred Expenses or Trustee Costs remain outstanding, such distribution shall be net of the National Deferred Expenses and Trustee Costs allocable to Tax-Exempt Unitholders or Taxable Unitholders (based on proportional share), which shall be paid to National and/or the Trustee, as applicable, or if cash is not available to satisfy in full such outstanding National Deferred Expenses or Trustee Costs, each applicable Unitholder may elect to pay in cash its applicable pro rata share of such National Deferred Expenses and Trustee Costs prior to the receipt of its share of remaining Trust Assets in the Tax-Exempt Bond Account or the Taxable Bond Account, as applicable, or instruct the Trustee to liquidate all or a portion of such Trust Assets and satisfy the applicable National Deferred Expenses or Trustee Costs out of such Trust Assets prior to such distribution; and (iv) upon satisfaction of and payment to National and/or the Trustee of the proportional share of any outstanding National Deferred Expenses or Trustee Costs, the Tax-Exempt Trust Units and Tax-Exempt Trust Certificates, or the Taxable Trust Units and Taxable Trust Certificates, as applicable, shall be cancelled and upon

---

[5] The aggregate amount of costs and expenses for Norton Rose Fulbright US LLP, Kramer Levin Naftalis & Frankel LLP, Orrick, Herrington & Sutcliff LLP, and National set forth in this Section 3.04(a) shall reduce the Compounded Amount proportionally across the various Trusts.

cancellation of all Units the Trust shall terminate in accordance with the provisions of Article IX hereof.

(b)     Payments at Maturity Date.  If the Compounded Amount (Tax-Exempt Allocation) and/or the Compounded Amount (Taxable Allocation) at the Maturity Date is expected to be greater than zero, no later than thirty (30) calendar days and no earlier than thirty-five (35) calendar days prior to the Maturity Date, National shall direct the Trustee to deliver through the Depositary a notice of maturity (the "Maturity Notice") in the form attached hereto as Exhibit B to all applicable Unitholders. The Maturity Notice will include (i) a statement identifying the Maturity Date and (ii) a statement regarding the right of each Unitholder to elect to receive either (A) a pro rata share of the Insured Amount corresponding to the Compounded Amount (Tax-Exempt Allocation) and/or Compounded Amount (Taxable Allocation), as applicable, at the Maturity Date to be paid to the Trustee by National (the "Insured Amount Election") or (B) in-kind delivery of a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account or the Taxable Bond Account, as applicable, net of any outstanding National Deferred Expenses and Trustee Costs (the "Trust Assets Election" and, together with the Insured Amount Election, the "Maturity Election").  Following delivery of the Maturity Notice, each applicable Unitholder shall have until the fifth Business Day prior to the Maturity Date to make a Maturity Election through the Depository (the "Maturity Notice Period").

(c)     At least five (5) Business Days prior to the Maturity Date (but not greater than ten (10) Business Days prior to the Maturity Date) the Trustee shall deliver a notice, in the form attached hereto as Exhibit C (a "Notice of Nonpayment"), to National if there are insufficient funds in (i) the Taxable Bond Account and Stub Account (Taxable Allocation) to satisfy the Insured Amount of the Stub Certificate (Taxable Allocation) and (ii) the Tax-Exempt Bond Account and Stub Account (Tax-Exempt Allocation) to satisfy the Insured Amount of the Stub Certificate (Tax-Exempt Allocation).  National agrees that such notice provided by the Trustee constitutes a valid notice "from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made" (as stated in the applicable National Insurance Policy) or a "Notice of Nonpayment" (as defined in the applicable National Insurance Policy).  National further agrees that the amount set forth in such notice (if calculated in accordance with the definition of "Compounded Amount" included herein) shall satisfy the requirement under the National Insurance Policy that National receive "evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment."

(d)     On the Maturity Date (or the settlement of any pending Bond Sale, if later), after giving effect to any Distribution made on the Maturity Date or any pending Bond Sale:

(i)     National shall pay to the Trustee, and the Trustee shall distribute to all Unitholders who made Insured Amount Elections and/or did not make Trust Assets Elections, a pro rata share of the Insured Amount

18

corresponding to the applicable Compounded Amount, following which National shall be entitled to the corresponding pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account and/or the Taxable Bond Account, as applicable, net of any Trustee Costs, which such Unitholders would have received had they made a Trust Assets Election; and

(ii)     To the extent any Unitholders made Trust Assets Elections, the Trustee shall distribute to all such Unitholders, a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account or the Taxable Bond Account, as applicable, net of any outstanding National Deferred Expenses and Trustee Costs, which shall be paid to National and the Trustee, respectively, provided if cash is not available to satisfy in full such outstanding National Deferred Expenses and Trustee Costs, each applicable Unitholder may elect to pay in cash its applicable pro rata share of such National Deferred Expenses and Trustee Costs prior to the receipt of its share of remaining Trust Assets in the Tax-Exempt Bond Account or the Taxable Bond Account, as applicable, or instruct the Trustee to liquidate all or a portion of such Trust Assets and satisfy the applicable National Deferred Expenses and Trustee Costs out of such Trust Assets prior to such distribution, following which National shall be deemed to have paid to such Unit Holders their pro rata share of the Insured Amount corresponding to the applicable Compounded Amount as if they had made an Insured Amount Election.

(iii)     Upon payment and distribution of such amounts or Trust Assets, as applicable, in accordance with Sections 3.05(d)(i) and (ii) hereof, (i) the Units shall be cancelled; (ii) the related National Insurance Policies shall be indefeasibly cancelled; and (iii) the Trust shall terminate in accordance with the provisions of Article VII hereof.

(e)     For the avoidance of doubt, it is expressly understood and agreed that to the extent the principal amount on the Maturity Date of Original COFINA Bonds placed in the Stub Account (Tax-Exempt Allocation) or the Stub Account (Taxable Allocation) exceeds the Compounded Amount (Tax-Exempt Allocation) or the Compounded Amount (Taxable Allocation), as the case may be, as of the Maturity Date, or to the extent Compounded Amount (Tax-Exempt Allocation) or the Compounded Amount (Taxable Allocation) is reduced to zero prior to the Maturity Date, the principal amount at maturity of the Original COFINA Bonds will be deemed to be reduced or cancelled to the extent of such excess, and any obligations of National pursuant to the National Insurance Policies will be deemed modified and/or cancelled accordingly.

(f)     If and to the extent that National fails to make any payment at the time, in the amount and in the manner set forth herein, the Trustee shall take all necessary or desirable actions to enforce the applicable National Insurance Policy against National (including, to the extent applicable, as and when directed by the Requisite Unitholders as set forth in Section 6.01 hereof).

(g)      For the purposes of drawing under the applicable National Insurance Policy (and for all other purposes under the applicable National Insurance Policy), National acknowledges and agrees that:

(i)      the Trustee is authorized and directed to take such action and provide such documents, including, without limitation, a Notice of Nonpayment, in order to make a demand for payment under the National Insurance Policy;

(ii)      the Compounded Amount at the Maturity Date shall constitute the "Insured Amounts" as defined in the applicable National Insurance Policy or the amount that is "Due for Payment but is unpaid by reason of Nonpayment by the Issuer as stated in the applicable National Insurance Policy;

(iii)      the entry of the Confirmation Order, the election by the Electing Original COFINA Bond Holders and the entry into the Trust Agreement, shall, (x) satisfy any requirement that the Fiscal Agent (as defined in the applicable National Insurance Policy) receive "evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall" upon the payment to such Unitholder of its pro rata share of amounts or Trust Assets described in Section 3.05(d) "vest in" National, and (y) satisfy any requirement that the owner (as defined in the applicable National Insurance Policy) "present and surrender … such Obligations or … appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect" upon the payment to such Unitholder of its pro rata share of amounts or Trust Assets described in Section 3.05(d) "the appointment of the Insurer as Agent for such owners of Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations" and are "in a form satisfactory to U.S. Bank Trust National Association;" and

(iv)      the Unitholders have the right to direct the Trustee to take, and the Trustee is authorized to take any actions under, provide such documents under and to enforce, pursue or recover claims under or in respect of, the National Insurance Policies as set forth in Section 6.01 hereof; and, in the event of any failure by the Trustee to act upon the direction of the Requisite Unitholders to take any action to enforce, pursue or recover claims, each Unitholder is authorized to direct the Trustee to take any actions to enforce the obligations of National owed to the Trust under the National Insurance Policies.  For purposes of this Section 3.05(g)(iv) and any corresponding direction to enforce the National Insurance Policies as set forth in Section 6.01 hereof, all Units owned or held by National shall be disregarded.

## ARTICLE IV

## REPORTING/REMITTING TO SECURITYHOLDERS

**Section 4.01.   *Statements to Unitholders.***

On a monthly basis, the Trustee shall prepare and post a statement to EMMA, in the form attached hereto as Exhibit D, and upon request, deliver such statement by mail to any Unitholder, setting forth:

      (a)      With respect to the Tax-Exempt Bond Account and the Taxable Bond Account:

            (i)      distributions made from each such account during the month and during the year to date (on an aggregate and per unit basis); and

            (ii)      the principal amount as of the month end of New COFINA Bonds held in each such account (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per unit basis).

      (b)      With respect to the Stub Account (Tax-Exempt Allocation) and the Stub Account (Taxable Allocation):

            (i)      the Compounded Amount (Tax-Exempt Allocation) and Compounded Amount (Taxable Allocation) at month end (on an aggregate and per unit basis);

            (ii)      a reasonably detailed reconciliation of the Compounded Amount (Tax-Exempt Allocation)  and Compounded Amount (Taxable Allocation) at month end compared to the prior month end.

      (c)      Any other distributions made to Unitholders.

      (d)      Any required tax reporting for such period.

**Section 4.02.   *Compliance with Withholding Requirements.***

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to Unitholders that the Trustee reasonably believes are applicable under the Code.  The consent of Unitholders shall not be required for such withholding.  In the event the Trustee does withhold any amount from payments to any Unitholder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to such Unitholders the amount withheld.  Any amounts withheld shall be treated as a distribution of cash to the Unitholder in the amount of the withholding and shall thereby reduce amounts otherwise distributable to such Unitholder.  If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

WEIL:\96713762\20\64984.0005

## ARTICLE V

## TRUST UNITS

**Section 5.01.   *The Trust Units.***

The Trust Units shall be designated in the Trust Agreement.  Unless otherwise specified in the Trust Agreement, the Trust Units in the aggregate will represent the entire beneficial ownership interest in the Trust Estate.  The Trust Units will be substantially in the forms annexed to the Trust Agreement.  Unless otherwise provided in the Trust Agreement, the Trust Units will be issuable in book-entry form, in denominations of authorized Notional Amounts as described in the definition thereof. Each Trust Unit will share ratably in all rights of the related Class.

Upon original issue, the Trust Units shall be executed and delivered by the Trustee and the Trustee shall cause the Trust Units to be authenticated by the Unit Registrar to or upon the order of [the Depositor][6] upon receipt by the Trustee of the documents specified in <u>Section 2.02</u>.  The Trust Units shall be executed and attested by manual signature on behalf of the Trustee by an authorized Officer.  Trust Units bearing the manual signatures of individuals who were at any time the proper Officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Trust Units or did not hold such offices at the date of such Trust Units.  No Trust Unit shall be entitled to any benefit under the Trust Agreement or be valid for any purpose, unless there appears on such Trust Unit a certificate of authentication as set forth on such certificate executed and attested by manual signature on behalf of the Unit Registrar by a duly authorized Officer of the Unit Registrar, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Trust Unit has been duly authenticated and delivered hereunder.  All Trust Units shall be dated the date of their execution.

**Section 5.02.   *Book-Entry Certificates.***

(a)     The Trust Units will be represented initially by one or more book-entry certificates registered in the name designated by the Depository.  The Trustee may for all intents and purposes (including the making of payments on the Trust Units) deal with the Depository as the authorized representative of the Beneficial Owners of the Trust Units for as long as those Trust Units are registered in the name of the Depository.  The rights of Beneficial Owners of the Trust Units shall be limited to those established by law and agreements between such Beneficial Owners and the Depository and Depository Participants.  Requests and directions from, and votes of, the Depository, as Holder, shall not be deemed to be inconsistent if they are made with respect to different Beneficial Owners.  Subject to <u>Section 5.03</u> below, a Trust Unit may not be transferred by the

---

[6] To be discussed.

WEIL:\96713762\20\64984.0005

Depository except to another Depository that agrees to hold the Trust Unit for the account of the respective Depository Participants and Beneficial Owners.

(b)     The Trustee will not have any liability to any person for any aspect of the records relating to or payment made on account of Beneficial Owners of the Trust Units held by the Depository, for monitoring or restricting any transfer of beneficial ownership in a Trust Unit or for maintaining, supervising or reviewing any records relating to such Beneficial Owners.

**Section 5.03.** *Registration of and Limitation on Transfers and Exchanges of Units.*

The Trustee shall cause to be kept at its Corporate Trust Office a Unit Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Trust Units and of transfers and exchanges of Trust Units as provided in the Trust Agreement and these Standard Terms.  The Trustee will initially serve as Unit Registrar for the purpose of registering Trust Units and transfers and exchanges of Trust Units as herein provided.

Subject to Section 5.04, upon surrender for registration of transfer of any Trust Unit at the Corporate Trust Office of the Trustee or at any other office or agency of the Trustee maintained for such purpose, the Trustee shall execute and the Unit Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Trust Units of the same Class of a like aggregate Notional Amount.

At the option of the Unitholders, each Trust Unit may be exchanged for other Trust Units of the same Class with a like aggregate Notional Amount and in authorized denominations, upon surrender of such Trust Unit to be exchanged at any such office or agency.  Whenever any Trust Units are so surrendered for exchange, the Trustee shall execute and cause the Unit Registrar to authenticate and deliver the Trust Units which the Unitholder making the exchange is entitled to receive.  Every Trust Unit presented or surrendered for transfer or exchange shall (if so required by the Trustee) be duly endorsed by, or be accompanied by a written instrument of transfer in the form satisfactory to the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge to the Unitholders shall be made for any transfer or exchange of Trust Units, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Trust Units.

All Trust Units surrendered for transfer and exchange shall be destroyed by the Unit Registrar.

The Trustee will cause the Unit Registrar (unless the Trustee is acting as Unit Registrar) to provide notice to the Trustee of each transfer of a Trust Unit, and will provide the Trustee with an updated copy of the Unit Register on January 1 of each year.

WEIL:\96713762\20\64984.0005

**Section 5.04.   *No Obligation to Register.***

The Trustee is not obligated to register or qualify any Trust Unit under the Securities Act or any other securities laws.

**Section 5.05.   *Mutilated, Destroyed, Lost or Stolen Units.***

If (a) any mutilated Trust Unit is surrendered to the Trustee or the Unit Registrar, or the Trustee and the Unit Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Trust Unit, and (b) there is delivered to the Trustee and the Unit Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of actual knowledge by the Trustee or the Unit Registrar that such Trust Unit has been acquired by a bona fide purchaser, the Trustee shall execute and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Trust Unit, a new Trust Unit of the same Class and of like tenor.  Upon the issuance of any new Trust Unit under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Certificate Registrar) connected therewith.  Any replacement Trust Unit issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust, as if originally issued, whether or not the destroyed, lost or stolen Trust Unit shall be found at any time.

**Section 5.06.   *Persons Deemed Owners*.**

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

**Section 5.07.   *Appointment of Paying Agent.***

The Trustee shall serve as the initial Paying Agent hereunder and thereafter, may appoint any other Paying Agent for the purpose of making distributions to Unitholders; provided, however, that any replacement Paying Agent shall be required to meet the eligibility requirement set forth in <u>Section 6.06</u> and shall not increase the Trustee Costs hereunder.  The Trustee shall cause such Paying Agent to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee that such Paying Agent will hold all sums held by it for the payment to Unitholders in trust for the benefit of the Unitholders entitled thereto until such sums shall be paid to the Unitholders.  All funds remitted by the Trustee to any such Paying Agent for the purpose of making distributions shall be paid to Unitholders as soon as practicable following receipt thereof by the Paying Agent and any amounts not so paid shall be returned as soon as practicable to the Trustee.

# ARTICLE VI

## CONCERNING THE TRUSTEE

**Section 6.01.   *Duties of Trustee.***

Every provision of the Trust Agreement and these Standard Terms relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VI.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement and no implied covenants or obligations shall be read into the Trust Agreements against the Trustee.

The Trustee shall (at the direction of the Requisite Unitholders) take all necessary or desireable actions to enforce the National Insurance Policies against National as set forth herein.

The Trustee shall deliver to all Unitholders copies of all notices and written communications received from COFINA as they relate to the COFINA bonds.

Except as provided in Section 6.02 hereof, no provision of the Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act or willful misconduct; *provided, however,* that:

(a)    The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(b)    The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Holders of Trust Units entitled to at least 25% of the Voting Rights (or such other percentage as may be specified herein) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New COFINA Bonds or exercising any trust or power conferred upon the Trustee with respect to the New COFINA Bonds, under the Trust Agreement;

(c)    The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the National Insurance Policies or exercising any trust or power conferred upon the Trustee with respect to the National Insurance Policies, under the Trust Agreement; and

(d)    Any determination of gross negligence or bad faith of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

WEIL:\96713762\20\64984.0005

### Section 6.02.  *Certain Matters Affecting the Trustee.*

(a)     The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties.  Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, rely upon a certificate of an Officer of the appropriate Person whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by the Trust Agreement or to institute, conduct or defend any litigation thereunder or in relation thereto at the request, order or direction of any of the Unitholders, pursuant to the provisions of the Trust Agreement, unless such Unitholders shall have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Trust Agreement and these Standard Terms;

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Holders of Trust Units entitled to at least 25% of the Voting Rights of each applicable Class; *provided, however,* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of the Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

WEIL:\96713762\20\64984.0005

(g)    The Trustee may execute any of the trusts or powers under the Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under the Trust Agreement;

(h)    Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 6.01;

(i)    The Trustee shall not be deemed to have notice of any matter unless one of its Officers has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, the Depositor, the Trust or the Trust Agreement;

(j)    None of the provisions of the Trust Agreement or these Standard Terms shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)    Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)    The permissive rights of the Trustee to perform any discretionary act enumerated in the Trust Agreement or these Standard Terms shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence or willful misconduct;

(m)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)    The Trustee shall have no duty (A) to see to any recording, filing, or depositing of the Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to the Trust Agreement and these Standard Terms

27

believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of the Trust Agreement, these Standard Terms or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under the Trust Agreement or these Standard Terms, and shall have a duty only to accept such collateral or funds delivered to it in accordance with the Trust Agreement and these Standard Terms;

(q)     In connection with its preparation of any required tax reporting for Beneficial Owners of the Trust Units, the Trustee shall, if necessary, (i) on a quarterly basis for each calendar year, request one Depository participant list, (ii) on an annual basis, contact each Depository participant identified on the Depository participant lists and request such Beneficial Owner information as shall be necessary to permit the Trustee to prepare the applicable tax return for such calendar year, and (iii) to the extent that a participant provides partial or incomplete Beneficial Owner information, make a second and final attempt to contact the participant or such Beneficial Owner (to the extent such Beneficial Owner's contact information has been provided to the Trustee) to obtain such additional information in order to permit the Trustee to prepare the applicable tax return for such Beneficial Owner for that calendar year; and

(r)     All rights of action under the Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Trust Units, subject to the provisions of the Trust Agreement.

**Section 6.03.   *Trustee Not Liable for Trust Units or COFINA Bonds.***

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement and in the Trust Units.  The Trustee makes no representations or warranties as to the validity or sufficiency of the Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Trust Units) or of the COFINA Bonds or related document.  The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the COFINA Bonds or deposited in or withdrawn from the Trust in accordance with the Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Sections 3.01 and 3.02.  The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the Bond Resolutions.

**Section 6.04.   *Trustee May Own Units.***

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

**Section 6.05.   *Trustee's Fees and Expenses.*** [7]

(a)     Pursuant to the Fee Agreement, the Trustee shall be entitled to receive from the Trust (i) reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by it in the execution of the trusts created under the Trust Agreement and in the exercise and performance of any of the powers and duties thereunder of the Trustee and (ii) reimbursement for all reasonable expenses, costs and disbursements incurred or made by the Trustee in accordance with any of the provisions of the Trust Agreement (including but not limited to the fees, expenses and disbursements of its counsel and of all persons not regularly in its employ), in each case to the extent set forth in such fee agreement (the "<u>Trustee Costs</u>").  All such Trustee Costs shall be made pursuant to the terms of the Fee Agreement and may be reimbursed to the Trustee in accordance with the provisions of <u>Section 3.02</u> hereof.

(b)     In addition, the Trustee (including in its capacities as the Unit Registrar and Paying Agent) shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Unitholders against COFINA, the Trust, or the Trustee except for proceedings, litigation or enforcement actions that relate to the Trustee's grossly negligent action, grossly negligent failure to act or its own willful misconduct (the "<u>Extraordinary Expenses</u>").  The Trustee may make withdrawals from the Trust to pay or reimburse itself the amount of any Extraordinary Expenses, up to a payment limit of $[●] in the aggregate for the COFINA National Custodial Trusts of Extraordinary Expenses in any calendar year or pro rata portion thereof in the case of the initial and the final years of the Trust based upon the portion of the applicable calendar year in which the Trust exists; provided, however, that the Trustee shall not have any obligation to incur additional Extraordinary Expenses in excess of such annual limit unless it has received reasonable security or indemnity for such additional Extraordinary Expenses; and provided, further, that if the Trustee does incur any additional Extraordinary Expenses in excess of such annual limit in any calendar year, nothing herein shall prohibit it from being reimbursed for such Extraordinary Expenses in any subsequent calendar year, to the extent of funds available for such reimbursement as provided hereunder and subject to the payment limit of $[●] applicable for each such subsequent calendar year or such pro rata portion thereof in the case of the initial and final years of the Trust.

---

[7] NTD: Treatment of Trustee Costs and Extraordinary Expenses to be discussed.

WEIL:\96713762\20\64984.0005

(c)      For the avoidance of doubt, the Depositor shall not be liable for any Trustee Costs or Extraordinary Expenses.

**Section 6.06.  *Eligibility Requirements for Trustee, Successor Trustee, and Paying Agent.***

The Trustee, any successor Trustee, and any successor Paying Agent shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the Depositor or National; (ii) is neither affilliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is regularly acting as a trustee in the municipal finance market.  If such corporation publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published.  In case at any time any Trustee, successor Trustee, or successor Paying Agent shall cease to be eligible in accordance with the provisions of this Section, such Trustee, successor Trustee, or successor Paying Agent shall resign immediately in the manner and with the effect specified in Section 6.07.

**Section 6.07.  *Resignation and Removal of the Trustee.***

(a)      The Trustee may at any time resign and be discharged from the trusts created pursuant to a Trust Agreement by giving [30] Business Days written notice, which shall be posted to EMMA by the Trustee.   Upon receiving such notice of resignation, National shall promptly appoint a successor trustee meeting the requirements set forth in Section 6.06 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee.  A copy of such instrument shall be delivered to the Unitholders and posted to EMMA by the successor trustee.  If no successor trustee shall have been so appointed and have accepted appointment within 30 Business Days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee.

(b)      If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 6.06 and shall fail to resign after written request therefor by National or the Requisite Unitholders, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then National or the Requisite Unitholders may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

30

(c)     National, with the written consent of the Requisite Unitholders, may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, signed by such Holder or its attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 6.08 hereof.   The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the outgoing Trustee, including without limitation, the costs and expenses incurred in connection with any such succession.

Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 6.08 hereof and (ii) payment of all costs, expenses and indemnities (other than Extraordinary Expenses) due and owing to the outgoing Trustee, including without limitation, the costs and expenses incurred in connection with any such succession.   The fees and expenses of any successor trustee appointed in connection with the removal of the Trustee shall be the sole responsibility of the Unitholder requesting such removal, including without limitation, the costs and expenses incurred in connection with any such succession.

The compensation for any successor trustee shall be paid in substantially the same manner as compensation was paid to the predecessor trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 6.07, the rights, benefits, protections and indemnities afforded to the Trustee under this Article VI shall continue to the benefit of the retiring Trustee.

### Section 6.08.   *Successor Trustee.*

Any successor trustee appointed as provided in Section 6.07 shall execute, acknowledge and deliver to the Unitholders and to the predecessor trustee an instrument accepting such appointment under the Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor thereunder, with the like effect as if originally named as trustee therein.   The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under the Trust Agreement and the Unitholders and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

31

No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of this Section 6.06 hereof.

Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under the Trust Agreement and (b) mail notice of the succession of such trustee under the Trust Agreement to all Holders of Trust Units at their addresses as shown in the Unit Register.

### Section 6.09.   *Merger or Consolidation of Trustee.*

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to the business of the Trustee, shall be the successor of the Trustee under the Trust Agreement provided such corporation shall be eligible under the provisions of Section 6.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

### Section 6.10.   *Reserved.*

### Section 6.11.   *Appointment of Custodians.*

The Trustee may appoint one or more Custodians to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement.  The appointment of any Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee.  Subject to Article VI, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Unitholders.  Each Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least [$10,000,000] and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate.  Any such Custodian may not be an Affiliate of the Depositor or National.  The Trustee is responsible for the fees and expenses of any Custodian appointed hereunder.

### Section 6.12.   *Trustee May Enforce Claims Without Possession of Certificates.*

All rights of action and claims under the Trust Agreement or the Certificates may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee.  Any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders in respect of which such judgment has been recovered.

### Section 6.13.   *No Recourse Against Trust Estate*

WEIL:\96713762\20\64984.0005

The Trustees' rights to claim indemnification for losses that they may incur with respect to the Trust Agreement (incorporating these Standard Terms) and each other document contemplated by the foregoing to which either of the Trustees is a party shall be set forth in a separate indemnification agreement. Notwithstanding anything to the contrary set forth in the Trust Agreement (incorporating these Standard Terms), the Trustees shall not be entitled to recourse for any such losses against any assets that are part of the Trust Estate, including assets on any accounts administered by the Trustees under the Trust Agreement from time to time, by way of set-off, any other deduction or withdrawal or otherwise.

## ARTICLE VII

## TERMINATION OF TRUST

**Section 7.01.   *Termination; No Redemption Rights.***

Upon the indefeasible cancellation or other indefeasible termination of the relevant National Insurance Policy, the Trust (including the respective obligations and responsibilities under the Trust Agreement of the Trustee and National) shall terminate upon (i) the pro rata payment or distribution to the Unitholders of all amounts or Trust Assets (including the New COFINA Bonds) held by or on behalf of the Trustee and required hereunder to be so paid or distributed in accordance with the provisions of Section 3.05 hereof, (ii) payment in full of any Trustee Costs due and owing to the Trustee under the Trust Agreement and these Standard Terms, (iii) payment in full of any National Deferred Expenses due and owing to National under the Trust Agreement and these Standard Terms and (iv) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of the Trust Agreement have been complied with. In no event shall the Trust be terminated or the COFINA Bonds be redeemed (except in the case of a redemption of the New COFINA Bonds permitted under the terms of the Bond Resolutions) or otherwise released from the Trust Estate without the prior express written consent of National if either (i) the relevant National Insurance Policy has not been indefeasibly terminated or (ii) National has not been indefeasibly paid in full for any amounts owed pursuant to the COFINA Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

**Section 7.02.   *Procedure for Termination.***

During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice by letter to the Unitholders specifying: (a) the anticipated final distribution date; (b) that the final payment of the Trust Units will be made upon presentation and surrender of Trust Units at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurance of such final distributions, the conditions to termination of the Trust have been

33

satisfied and that it intends to terminate the Trust (a "Termination Notice").  The Trustee shall provide a copy of the Termination Notice to the Unit Registrar at the time such Termination Notice is given to Unitholders.

If the Requisite Unitholders do not object in writing within 30 days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trustee shall be dissolved, wound up, and terminated.

Upon the dissolution, wind up and termination of the Trust and the Trust Agreement, the Trustee or Delaware Trustee is authorized to file a certificate of cancellation with the Secretary of State.

# ARTICLE VIII

## TAX PROVISIONS

### Section 8.01.  *Grantor Trust Provisions.*

The Trustee, the Depositor, the Unitholders (by their acceptance of the Trust Units and Book-Entry Beneficial Interests) and National each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit.  In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (B) the Trust is formed to facilitate direct investment in the Trust Assets and the existence of multiple classes of ownership interests is incidental to that purpose, and (c) the Trustee (at the direction of National and/or the Requisite Unitholders with respect to each Class), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.   The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Unitholder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.  The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement.  The Trustee and National each agree that they shall not take any action that would result in the Trust failing to be

WEIL:\96713762\20\64984.0005

characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

### Section 8.02.  *Characterization.*

Each Unitholder acknowledges and agrees to treat the Trust Units and the Book-Entry Beneficial Interests as undivided interests in the Trust Estate.

### Section 8.03.  *Grantor Trust Administration.*

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Unitholders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Unitholders.  The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust under the Grantor Trust Provisions.  The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Unitholders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "Adverse Trust Event"), unless the Trustee has obtained or received an Opinion of Counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Unitholders) to the effect that the contemplated action will not result in an Adverse Trust Event.  None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act.  The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

### Section 8.04.  *Reports to Unitholders and Tax Authorities*

(a)     The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority.

(b)     Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that,

35

based on a change in applciable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust.  In no event shall the Trustee or the Depositor be liable for any liabilities, costs or expenses of the Trust or the Unitholders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to any act or omission by the Trustee in breach of its obligations under this Trust Agreement.

(c)     If any tax is imposed on the Trust, such tax, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) shall be charged to and payable by: (i) the Trustee, if such tax arises out of or results from a breach by the Trustee of any of its obligations under this Trust Agreement; or (ii) (A) in the case of taxes relating to Trust Assets held in the Taxable Bond Account or the Stub Account (Taxable Allocation), the Unitholders of the Taxable Trust Units on a pro rata basis, (B) in the case of taxes relating to Trust Assets held in the Tax-Exempt Bond Account or the Stub Account (Tax-Exempt Allocation), the Unitholders of the Tax-Exempt Trust Units on a pro rata basis, and (C) in the case of any other taxes, the Unitholders on a pro rata basis; provided that in each case the Trustee shall be authorized to withhold the applicable amounts from Distributions on the applicable Trust Units and pay such amounts to the applicable taxing authority and that any amounts so withheld and paid to the applicable taxing authority shall be deemed to have been been paid as a Distribution to the applicable Unitholders.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)     All taxes due and payable on any amounts payable to a Unitholder with respect to a Trust Unit shall be that Unitholder's  sole responsibility.

(f)     For the purposes of this Article VIII of these Standard Terms and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to Holder, Unitholder, or Beneficial Owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes.  By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Articles, Sections, or provisions hereof.

# ARTICLE IX

## MISCELLANEOUS PROVISIONS

**Section 9.01.   *Amendment of Trust Agreement.***

The Trust Agreement and these Standard Terms may not be amended, waived or supplemented without the prior written consent of National.  The Trust Agreement and these Standard Terms may be amended, waived or supplemented from time to time by National and the Trustee without the consent of the Unitholders; provided, however, that no such amendment shall:

(a)      reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Unitholder without the written consent of the Holder of such Trust Unit;

(b)      alter in any manner the treatment of any National Insurance Policy without the written consent of each Holder of Trust Units affected;

(c)      alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Holder of Trust Units affected;

(d)      amend this Section 9.01 without the consent of the Holder of each Trust Unit;

(e)      adversely affect in any other material respect the interests of the Holders of any Class of Trust Units in any manner other than as described in (a), (b), or (c) without the consent of the Holders of Trust Units of such Class evidencing at least a majority of such Class (measured by the Compounded Amount of the underlying Original COFINA Bonds);

(f)      if such amendment affects the interests of the Unitholders of one or more Classes of Trust Units in any manner other than as described in (a), (b), or (c) and that is disproportionally adverse to the interests of the Unitholders of other Classes, the written consent of Holders of a majority of Trust Units of each Class of Trust Units (measured by the Compounded Amount of the underlying Original COFINA Bonds) so affected; or

(g)      reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

Prior to executing any amendment permitted by this Article IX, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of

WEIL:\96713762\20\64984.0005

Counsel and an Officer's Certificate stating that the execution of such amendment is authorized or permitted by the Trust Agreement and that all conditions precedent have been met.  The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under the Trust Agreement, these Standard Terms or otherwise.

Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Unitholder and shall post a copy of such amendment to EMMA.

The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Unitholders shall be subject to such reasonable regulations as the Trustee may prescribe.

### Section 9.02.   *Counterparts.*

The Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

### Section 9.03.   *Limitation on Rights of Unitholders.*

The death or incapacity of any Unitholder shall not operate to terminate the Trust Agreement or the Trust, nor entitle such Unitholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Unitholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Unitholders from time to time as partners or members of an association; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the parties to the Trust Agreement pursuant to any provision hereof.

Except with respect to enforcement of the applicable National Insurance Policies in accordance with the terms hereof, no Unitholder shall have any right by virtue of any provision of the Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to the Trust Agreement, unless the Holders of Trust Units entitled to at least 25% of the Voting Rights of each Class affected shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Trust Agreement, and the Trustee, for 15 days after its receipt of such request shall have neglected or refused to institute any such action, suit or proceeding.  It is understood and intended, and expressly covenanted by each Unitholder with every other Unitholder and the Trustee, that no one or more Holders of Trust Units shall have any right in any manner whatever by virtue of any provision of the Trust Agreement to affect, disturb

WEIL:\96713762\20\64984.0005

or prejudice the rights of the Holders of any other Trust Units, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under the Trust Agreement, except in the manner therein provided and for the equal, ratable and common benefit of all Unitholders.  For the protection and enforcement of the provisions of this Section, each and every Unitholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.  Nothing in this paragraph shall be construed to limit in any manner the ability of any party to the Trust Agreement (notwithstanding the ownership by such party of Trust Units) to institute any suit, action or proceeding upon or under or otherwise with respect to the Trust Agreement or to enforce in any manner its rights as a party thereunder.

In the event that an authorized officer of the Trustee receives a request for its consent to any amendment, modification or waiver of these Standard Terms, the Trust Agreement or any other document thereunder or relating thereto, or receives any other solicitation for any action with respect to the COFINA Bonds or National Insurance Policies, the Trustee shall mail a notice of such proposed amendment, modification, waiver, solicitation or action to each of the Unitholders within five (5) days of receipt thereof.  The Trustee shall request instructions from the Unitholders as to whether or not to consent to or vote to accept such amendment, modification, waiver, solicitation or action.

The Trustee shall consent or vote proportionally in accordance with the written direction of the Holders of Trust Units; provided, however, that the Trustee shall not:

(a)     without the prior written consent of any Unitholder, consent or affirmatively vote on behalf of such Unitholder on any matter that would: (i) terminate the Trust, (ii) except as expressly provided herein, sell some or all of the assets of the Trust; (iii) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Unitholders under any National Insurance Policy; and

(b)     without the prior written consent of National, consent or affirmatively vote on any matter that would amend, modify or waive any agreement in such a manner as to adversely impact National.  Any such determination as to whether any such amendment, modification or waiver adversely impacts National shall be made in the sole and absolute discretion of National and such determination shall be promptly provided by notice to the Trustee and the Unitholders.  The Trustee shall not be liable to any Unitholder or any other Person for refusing to consent or affirmatively vote on such a matter in accordance with such written direction of National.

**Section 9.04.   *Notices.***

All demands and notices under the Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, or by express delivery service, to (a) in the case of the Trustee if the Trustee is [●], the notice address for the Trustee is [●].  If the Trustee is not [●], the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Trustee, [(b) in the case of the Delaware Trustee, if the Delaware Trustee is

WEIL:\96713762\20\64984.0005

[●], the notice address for the Delaware Trustee is [●].  If the Delaware Trustee is not [●], the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Delaware Trustee], and (c) in the case of the Depositor, [●], or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Depositor.  Any notice required or permitted to be mailed to a Unitholder shall be given by first-class mail, postage prepaid, or by express delivery service, at the address of such Holder as shown in the Unit Register.  Notice may also be delivered by email in accordance with a separate side letter agreement entered into between the parties.  Any notice so mailed within the time prescribed in the Trust Agreement shall be conclusively presumed to have been duly given, whether or not the Unitholder receives such notice.  A copy of any notice required to be telecopied hereunder also shall be mailed to the appropriate party in the manner set forth above.  A copy of any notice given hereunder to any other party shall be delivered to the Trustee.

### Section 9.05.   *Severability of Provisions.*

If any one or more of the covenants, agreements, provisions or terms of the Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of the Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of the Trust Agreement or of the Trust Units or the rights of the Holders thereof.

### Section 9.06.   *Third-Party Beneficiaries.*

National, the Unitholders and their successors and assigns shall be third-party beneficiaries of the provisions of these Standard Terms and the Trust Agreement.  For the avoidance of doubt, beneficial holders of Trust Units are third party beneficiaries to the extent necessary to allow them to enforce the applicable National Insurance Policies as set forth herein.  Nothing in these Standard Terms or the Trust Agreement, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Unitholders and National, any benefit or any legal or equitable right, remedy or claim under these Standard Terms or the Trust Agreement.

### Section 9.07.   *Acts of Unitholders.*

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Trust Agreement or these Standard Terms to be given or taken by Unitholders or a class of Unitholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Unitholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of the Trust Agreement and these Standard Terms and conclusive in favor of the Trustee.  The fact and date of the execution by any Person of any

WEIL:\96713762\20\64984.0005

such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Unit Register.

Section 9.08. *Headings.*

Section and subsection headings in these Standard Terms are included herein for convenience of reference only and shall not constitute a part of these Standard Terms for any other purpose or be given any substantive effect.

Section 9.09. *No Waiver; Cumulative Remedies.*

No failure to exercise and no delay in exercising, on the part of any party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 9.10. *Merger and Integration.*

These Standard Terms and the Trust Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by the Trust Agreement and these Standard Terms.

Section 9.11. *The Delaware Trustee*

(a)     The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirement of Section 3807(a) of the Delaware Statutory Trust Act that the Trust have at least one trustee with a principal place of business in the State of Delaware. It is understood and agreed by the parties hereto that the Delaware Trustee shall have none of the duties or liabilities of the Trustee or any other trustees.

(b)     The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Delaware Statutory Trust Act. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Unitholders, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Agreement. The Delaware Trustee shall have no liability for the acts or omissions of the Trustee or any other trustees.

(c)     The Delaware Trustee may be removed by National with the written consent of the Requisite Unitholders upon thirty days prior written notice to the Delaware Trustee. The Delaware Trustee may resign upon thirty days prior written

41

notice to National.  No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably acceptable to National, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware.  If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, National or the Unitholders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the party bringing the petition.

(d)     Any Person into which the Delaware Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Delaware Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor Delaware Trustee under the Trust Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto, except as may be required by applicable law, provided that such resulting or successor entity otherwise satisfies the requirements set forth herein to serve as Delaware Trustee.

(e)     The Trustee shall be responsible for the payment of any fees or expenses of the Delaware Trustee.  The Delaware Trustee shall be entitled to all of the same rights, protections, indemnities and immunities under the Trust Agreement and with respect to the Trust as the Trustee; however, any such indemnification shall be made pursuant to the terms of a separate indemnification agreement and shall not be payable from the Trust Estate.  No amendment or waiver of any provision of the Trust Agreement which adversely affects the Delaware Trustee shall be effective against it without its prior written consent.

WEIL:\96713762\20\64984.0005

| Summary report: Litéra® Change-Pro TDC 10.1.0.800 Document comparison done on 12/28/2018 3:49:12 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://WEILDMS/WEIL/96713762/14 | |
| **Modified DMS:** iw://WEILDMS/WEIL/96713762/15 | |
| **Changes:** | |
| Add | 86 |
| Delete | 121 |
| Move From | 1 |
| Move To | 1 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 209 |

## <u>Exhibit I</u>

**Schedule of Executory Contracts to be Assumed**

- Master Agreement for Delivery of Deposit and Banking Services, dated as of April 1, 2016, (as amended, restated, supplemented, or otherwise modified from time to time), by and among the Puerto Rico Department of the Treasury, Banco Popular de Puerto Rico, and COFINA.

## **Exhibit J**

**Dealer Manager Agreement**

**DEALER MANAGER AGREEMENT**

December 18, 2018

Puerto Rico Fiscal Agency and Financial Advisory Authority
San Juan, Puerto Rico

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

On January 18, 2017, the Governor of Puerto Rico enacted the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, Act No. 2-2017, which established the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") as a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), with legal existence and fiscal and administrative autonomy, separate and independent from the Commonwealth and its instrumentalities and political subdivisions. Act No. 2-2017 authorizes AAFAF to act as the fiscal agent, financial advisor, and reporting agent for all entities of the Government of Puerto Rico, including the Puerto Rico Sales Tax Financing Corporation ("COFINA").

On May 5, 2017, at the request of the Governor of Puerto Rico, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") filed a voluntary petition for relief for COFINA pursuant to section 304(a) of the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016) ("PROMESA"), in the United States District Court for the District of Puerto Rico (the "Title III Court"), thereby commencing a case under Title III of PROMESA for COFINA (the "Title III Case").

On June 1, 2017, the Title III Court entered an order approving the employment of Prime Clerk LLC ("Prime Clerk") to act as the official solicitation agent in COFINA's Title III Case and to provide any other services in connection with balloting and solicitation on plans of adjustment. Prime Clerk is the only court-approved solicitation agent in COFINA's Title III Case.

On September 20, 2018, AAFAF and COFINA (by AAFAF as its authorized signatory) entered into that certain Amended and Restated Plan Support Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Amended PSA"), by and among the Oversight Board, AAFAF, COFINA, certain holders and insurers of COFINA's "Senior" and "First Subordinate" bonds, and Bonistas del Patio, Inc. Pursuant to Part II.Q of the term sheet attached as Exhibit C to the Amended PSA (the "Plan Term Sheet"), COFINA and AAFAF must use their "reasonable best efforts, including, without limitation, by, directly or indirectly, actively coordinating with, and promptly responding to inquiries from, any and all persons or entities, including dealers, to ensure the comprehensive outreach to Puerto Rico Investors and Puerto Rico Institutions holding existing COFINA securities regarding such holders' right to elect to receive a

Taxable Bond Distribution and to ensure the dissemination of complete and accurate information regarding such election to such holders."

On November 26, 2018, the Oversight Board, as representative for COFINA in its Title III Case, filed the Second Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (the "Plan of Adjustment") and a proposed disclosure statement for the Plan of Adjustment (the "Disclosure Statement") in the Title III Case. On November 30, 2018, the Oversight Board filed a "corrected" version of the Plan of Adjustment in the Title III Case.

By order entered November 29, 2018 (the "Disclosure Statement Order"), the Title III Court determined that the Disclosure Statement contains adequate information under applicable law and may be sent to holders of claims against COFINA to solicit their votes on, and elections of the form of distribution to be received under, the Plan of Adjustment.

The Disclosure Statement Order provides that the Oversight Board, as representative of COFINA in its Title III Case, must cause Prime Clerk to mail the appropriate solicitation packages to all known holders of claims in voting classes under the Plan of Adjustment. The Disclosure Statement Order establishes a deadline of 6:00 p.m. (Atlantic Standard Time) on January 8, 2019 (as may be extended by the Title III Court from time to time, the "Voting Deadline"), as the date and time by which Holders must submit their ballots and election forms to Prime Clerk.

This Dealer Manager Agreement (this "Agreement") will confirm the understanding among (i) COFINA, a public corporation and instrumentality of the Commonwealth, constituting a corporate entity independent and separate from the Commonwealth, (ii) AAFAF (together with COFINA, the "Commonwealth Parties"), (iii) Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), (iv) Barclays Capital Inc. ("Barclays"), (v) Jefferies LLC ("Jefferies"), and (vi) J.P. Morgan Securities LLC ("JPM, " and together with Merrill Lynch, Barclays, and Jefferies, the "Dealer Managers"), pursuant to which the Commonwealth Parties have retained the Dealer Managers, on the terms and subject to the conditions set forth herein, in connection with the solicitation of votes (the "Solicitation") from holders of Existing Securities (as listed in Exhibit G to the Disclosure Statement) to accept or reject the Plan of Adjustment, including in connection with the performance of the Commonwealth Parties' obligations under Part II.Q of the Plan Term Sheet and the exchange of certain Existing Securities for COFINA Bonds (as defined in the Plan of Adjustment) in accordance with procedures and upon the terms described in the Disclosure Statement Order and Solicitation Documents (the "Exchange"). All references to the Dealer Managers shall be deemed to include Merrill Lynch, Barclays, Jefferies, and JPM.

The "Solicitation Documents" will consist of the Disclosure Statement, the Plan of Adjustment, the Confirmation Hearing Notice (as defined in the Disclosure Statement), and, as applicable with respect to any Holder, a Ballot (as defined in the Disclosure Statement), an Election Notice (as defined in the Disclosure Statement), a W-9 Form or W-8 BEN form, and the Class 6 Notice (as defined in the Disclosure Statement) (each as amended from time to time).

Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Solicitation Documents. All references to "Holders" shall be references to holders of the Existing Securities.

The Effective Date of the Plan of Adjustment shall be referred to herein as the "Closing Date."

SECTION 1.    *Engagement*.  Subject to the terms and conditions set forth herein:

(a)    The Commonwealth Parties hereby retain the Dealer Managers, and subject to the terms and conditions hereof, the Dealer Managers agree to act as the exclusive Dealer Managers to the Commonwealth Parties in connection with the Solicitation and the Exchange until the Voting Deadline, unless the Solicitation and the Exchange is earlier terminated in accordance with the terms specified in the Solicitation Documents, *provided that* the Dealer Managers agree to continue to cooperate with and provide support to the Commonwealth Parties as requested in connection with closing the transactions contemplated by the Solicitation Documents until the Closing Date. Each of the Dealer Managers agrees that it will not publicly disseminate any written information other than the Solicitation Documents and customary Bloomberg communications (which shall be consistent with the Solicitation Documents) to the Holders in connection with the Solicitation or the Exchange without the prior written consent of the Commonwealth Parties (which consent will not be unreasonably withheld).

(b)    The Commonwealth Parties authorize the Dealer Managers, in accordance with applicable law, governmental regulations, court rules and orders (including the Disclosure Statement Order) and in accordance with their respective customary practices and consistent with industry practice, to communicate generally regarding the Solicitation and the Exchange with the Holders and their authorized agents in connection with the Solicitation and the Exchange.

(c)    The Commonwealth Parties acknowledge and agree that the Dealer Managers have been retained solely to provide services with respect to the Solicitation and Exchange, as set forth herein.  The Commonwealth Parties also acknowledge and agree that, in their capacity as Dealer Managers, each of Merrill Lynch, Barclays, Jefferies, and JPM shall act as an independent contractor, on an arms-length basis under this Agreement, with duties solely to the Commonwealth Parties and that nothing contained herein or the nature of each of the Dealer Managers' services hereunder is intended to create or shall be construed as creating an agency or fiduciary relationship between each of the Dealer Managers (or any of their respective affiliates), any of the Commonwealth Parties (or their respective affiliates, directors, officers, employees, or creditors), or any other person. The Commonwealth Parties also acknowledge that (i) none of Merrill Lynch, Barclays, Jefferies, and JPM shall be deemed to act as a partner, joint venturer, or agent of, or a member of a syndicate or group with, any of the Commonwealth Parties or any of their affiliates in connection with the Solicitation and the Exchange, and none of the Commonwealth Parties nor any of their affiliates shall be deemed to act as the agent of Merrill Lynch, Barclays, Jefferies, or JPM and (ii) no securities broker, dealer, bank, trust company, or nominee shall be deemed to act as the agent of any of the Dealer Managers, or any of their respective affiliates, or as the agent of any of the Commonwealth Parties or any of their affiliates, and the Dealer Managers shall not be deemed to act as the agent of any securities broker, dealer, bank, trust company, or nominee. In connection with the Solicitation and the Exchange and the process and various steps leading to the Solicitation

3

and the Exchange, each of the Dealer Managers is and has been acting solely as a principal and is not the municipal advisor, financial advisor, agent, or fiduciary of the Commonwealth Parties or their affiliates, directors, officers, employees, creditors, or any other person (irrespective of whether Merrill Lynch, Barclays, Jefferies, or JPM has provided other services or is currently providing other services to the Commonwealth Parties on other matters). None of Merrill Lynch, Barclays, Jefferies, and JPM shall have any liability in tort, contract, or otherwise to the Commonwealth Parties or any of their affiliates or to any other person for (a) any act or omission on the part of any securities broker, dealer, bank, trust company, or nominee or any other person or (b) performing its services as Dealer Manager, in each case, except (i) to the extent that such liability is finally judicially determined by a court of competent jurisdiction to have resulted from the violation of applicable law, governmental regulations, or any court rule or order (including the Disclosure Statement Order), the gross negligence, or the willful misconduct of such Dealer Manager, and (ii) except as otherwise provided for in Annex A hereto.

(d)     The Commonwealth Parties expressly disclaim any agency or fiduciary relationship with Merrill Lynch, Barclays, Jefferies, or JPM hereunder. The Commonwealth Parties understand that the Dealer Managers, and their respective affiliates, are not municipal advisors and are not providing (nor are the Commonwealth Parties relying on the Dealer Managers, or their respective affiliates for) tax, regulatory, legal, or accounting advice. The Commonwealth Parties acknowledge that they have consulted with their own financial and/or municipal, legal, accounting, tax, and other advisors, as applicable, to the extent they have deemed appropriate. The rights and obligations that any of the Commonwealth Parties may have to the Dealer Managers, or their respective affiliates under any credit or other agreement, are separate from the Commonwealth Parties' respective rights and obligations under this Agreement and will not be affected in any way by this Agreement. Each Dealer Manager may, to the extent they deem appropriate, retain the services of any of its affiliates to assist the Dealer Managers, as applicable, in providing their services hereunder and share with any such affiliates any information made available by or on behalf of the Commonwealth Parties.

(e)     The Commonwealth Parties acknowledge that the Dealer Managers, and their respective affiliates, are engaged in a broad range of securities activities and financial services. In the ordinary course of the Dealer Managers' business, Merrill Lynch, Barclays, Jefferies, or JPM, or their respective affiliates (i) may at any time hold positions, and may trade or otherwise effect transactions, for Merrill Lynch's, Barclays', Jefferies', or JPM's own account or the accounts of customers, as applicable, in securities of COFINA, its affiliates or any other entity that may be involved in the transactions contemplated hereby and (ii) may at any time be providing or arranging financing and other financial services to entities that may be involved in this transaction.

(f)     Each of the Dealer Managers agrees, in accordance with its customary practices and consistent with industry practice for investment banking concerns of national standing and in accordance with applicable law, governmental regulation and court rules and orders (including the Disclosure Statement Order) and the terms of the Solicitation and the Exchange, to perform those services in connection with the Solicitation and the Exchange as are customarily performed by dealer managers, as applicable, in connection

4

with similar transactions of a like nature, including, without limitation, using all reasonable efforts (i) to provide outreach to Puerto Rico Investors and Puerto Rico Institutions holding Existing Securities regarding such Holders' right to elect to receive a Taxable Bond Distribution, (ii) to communicate generally regarding the Solicitation and the Exchange with securities brokers, dealers, banks, trust companies, and nominees, and other Holders, and (iii) to participate in meetings with Holders.

(g)     The Commonwealth Parties hereby authorize the Dealer Managers to communicate with the Solicitation Agent with respect to matters relating to the Solicitation and the Exchange, and either COFINA or AAFAF, as appropriate, shall request The Depository Trust Company ("DTC"), New York, New York, to provide the Dealer Managers with copies of the records or other lists showing the names and addresses of, and principal amounts of Existing Securities held by, the Holders of record on the Voting Record Date and, to the extent reasonably available, the Holders as of such date. COFINA or AAFAF, as appropriate, shall provide the Dealer Managers or use its commercially reasonable efforts to cause the Bank of New York Mellon Trust Company, N.A., as trustee for the Existing Securities (collectively, the "Existing Securities Trustee") and the applicable Book-Entry Transfer Facility (as defined below) to provide the Dealer Managers with copies of the records or other lists showing the names and addresses of, and principal amounts of Existing Securities held by, the Holders as of the Voting Record Date and on such subsequent dates as are reasonably requested by the Dealer Managers and undertake, from and after such date, to use its reasonable efforts to cause the Existing Securities Trustee to notify the Dealer Managers of all transfers of Existing Securities as of such subsequent dates as are reasonably requested by the Dealer Managers, such notification consisting of the name and address of the transferor and transferee of any Existing Securities and the date of such transfer. On or prior to the date of this Agreement, COFINA and AAFAF will have made appropriate arrangements, to the extent applicable, with the applicable Book-Entry Transfer Facility and the Depositary to allow for the book-entry movement of the Existing Securities between depositary participants and the applicable Book-Entry Transfer Facility on the Closing Date. Each of the Dealer Managers agrees to use such information only in connection with the Solicitation and the Exchange, and not to furnish such information to any persons except in connection with the Solicitation and the Exchange. DTC, Euroclear and Clearstream, as applicable, are referred to herein, each in their individual capacity, as a "Book-Entry Transfer Facility."

(h)     COFINA authorizes the Dealer Managers to use the Solicitation Documents delivered on or after the date hereof in connection with the Solicitation and the Exchange in the manner consistent with the Solicitation Documents and the Disclosure Statement Order.

(i)     Each of the Commonwealth Parties agrees to advise the Dealer Managers promptly after becoming aware of (i) the occurrence of any event which, in the reasonable judgment of such Commonwealth Party or its counsel, could cause or require the Oversight Board to withdraw, rescind or modify the Solicitation Documents; (ii) any determination to withdraw, rescind, or terminate the Solicitation or the Exchange; (iii) the issuance by any court or regulatory authority of any comment or order or the taking by any court or regulatory authority of any other action concerning the Solicitation or the Exchange (and,

5

if in writing, will promptly furnish the Dealer Managers with a copy of any such comment or order); (iv) any material adverse developments in connection with the Solicitation or the Exchange; and (v) any other information relating to the Solicitation, the Exchange, the Solicitation Documents, or this Agreement which the Dealer Managers may from time to time reasonably request.

(j)     If, between the date of this Agreement and the Voting Deadline, (A) an event occurs of which the Commonwealth Parties have knowledge such that an amendment may be required to the Solicitation Documents, the Commonwealth Parties will promptly notify the Oversight Board and the Dealer Managers or (B) the Oversight Board notifies the Commonwealth Parties of the need to amend the Solicitation Documents, the Commonwealth Parties will promptly notify the Dealer Managers of the same.

(k)     Except as otherwise required by law, regulation or any judicial proceeding, COFINA will not refer to the Dealer Managers in any material in connection with the Solicitation or the Exchange, other than in the Solicitation Documents or as approved in writing by the Dealer Managers.  Each of the Dealer Managers agrees that it will not make any statements in connection with the Solicitation or the Exchange other than the statements that are set forth in, or are derived from and consistent with, the Solicitation Documents without the prior written consent of COFINA (which consent shall be determined only after consultation with the Dealer Managers).

(l)     An independent registered municipal advisor (as defined in SEC Rule 15Ba1-1(d)(3)(vi)) has been engaged to advise the Commonwealth Parties in connection with the Solicitation and the Exchange, and the Commonwealth Parties acknowledge that in connection with the provision of the services under this Agreement, the Dealer Managers (other than JPM) have informed the Commonwealth Parties that they are relying on the exemption provided under SEC Rule 15Ba1-1(d)(3)(vi) for the participation by an independent registered municipal advisor.

(m)     In accordance with the Disclosure Statement Order, by no later than the Solicitation Mailing Date, the Balloting Agent is responsible for distributing the appropriate Solicitation Documents to all known Holders identified in the Disclosure Statement Order as Holders entitled to receive the Solicitation Documents. Thereafter, to the extent practicable until the Voting Deadline, the Balloting Agent is responsible for using its reasonable best efforts to cause copies of such materials to be made available upon request (made pursuant to procedures set forth in the Disclosure Statement Order) to each person who is or becomes a Holder.

(n)     The Commonwealth Parties agree that once the Voting Deadline has passed, the Dealer Managers shall have no further obligations under this Agreement or with respect to the Solicitation and Exchange, *provided that* the Dealer Managers agree to continue to cooperate with and provide support to the Commonwealth Parties as requested in connection with closing the transactions contemplated by the Solicitation Documents until the Closing Date.

SECTION 2.    *Compensation and Expense Reimbursement*.  Unless the Title III Court orders otherwise, on the Effective Date, the Dealer Managers (other than any Dealer Manager with respect to which this Agreement has been terminated before the Effective Date), as compensation for their services as the Dealer Managers in connection with the Solicitation and the Exchange, shall be paid the fees and (except as set forth in Section 3(d) hereof) expenses as set forth in that certain Fee Letter, dated the date hereof, executed by AAFAF, COFINA, the Dealer Managers and the Commonwealth (the "Fee Letter").

SECTION 3.    *Termination; Withdrawal*.

(a)    Subject to Section 9 hereof, this Agreement shall terminate upon the earlier of (i) the termination or withdrawal of the Solicitation and the Exchange, (ii) the termination of this Agreement by COFINA or AAFAF with respect to a Dealer Manager terminated for Cause pursuant to Section 3(b) hereof, (iii) the withdrawal by a Dealer Manager pursuant to Section 3(c) hereof, and (iv) the date that is 180 days from the date hereof.

(b)    Subject to Section 9 hereof, this Agreement may be terminated by COFINA or AAFAF with respect to a Dealer Manager for Cause. For purposes hereof, the term "Cause" shall mean either (i) a final, firm, and non-appealable judicial determination that a Dealer Manager acted with negligence or willful misconduct in the performance of its services under this Agreement, (ii) if a Dealer Manager abandons its assignment hereunder, or (iii) any termination pursuant to Act No. 2-2018, as amended from time to time, as a result of a Dealer Manager or any of its respective employees providing services to the Commonwealth Parties pursuant to this Agreement, having been convicted or having plead guilty in a criminal proceeding in a state or federal court for charges related to the public treasury, the public trust, a public function, or a fault that involves public funds or property. If this Agreement is terminated by COFINA or AAFAF pursuant to this Section 3(b) with respect to only one Dealer Manager, such termination shall not affect this Agreement with respect to the other Dealer Managers.

(c)    Subject to Section 9 hereof, this Agreement may be terminated by any Dealer Manager with respect to such Dealer Manager, in such Dealer Manager's sole and absolute discretion, without any liability or penalty to such Dealer Manager or other indemnified party at any time upon written notice to COFINA, if (i) at any time during the Solicitation or the Exchange, any stop order, restraining order, injunction, or denial of an application for approval has been issued and not thereafter stayed or vacated, or any proceeding, litigation, or investigation has been initiated, with respect to or otherwise affecting the Solicitation or the Exchange or any other action or transaction contemplated by the Solicitation Documents or this Agreement, which such Dealer Manager believes renders it inadvisable for it to continue to act hereunder, or (ii) COFINA has breached, in any material respect, any of its representations, warranties, or covenants contained herein or its obligations under the Disclosure Statement and the Disclosure Statement Order (including, but not limited to, the conditions set forth in Sections 4 and 7 hereof); *provided* that the termination of this Agreement pursuant to this Section 3(c) by only one Dealer Manager shall not affect this Agreement with respect to the other Dealer Managers.

(d)    If this Agreement is terminated in accordance with this Section 3 (other than pursuant to Section 3(b) with respect to the Dealer Manager affected thereby), COFINA will

reimburse the Dealer Managers for their reasonable expenses and costs pursuant to Section 2 hereof through the date of such termination promptly after such date.

(e)     The termination of this Agreement in accordance with this Section 3 will in no way prohibit the Commonwealth Parties from continuing to exercise their respective rights and perform their respective obligations under the Amended PSA and to pursue and obtain confirmation of the Plan of Adjustment, nor does it adversely affect the rights of Merrill Lynch under the terms of this Agreement.

SECTION 4.     *Representations and Warranties by COFINA*.

COFINA hereby represents, warrants, and covenants to the Dealer Managers, as of the date hereof and as of the Closing Date, that:

(a)     *Organization of COFINA*.     COFINA is a public corporation and government instrumentality of the Commonwealth, duly created and validly existing under Act No. 91-2006, as amended.

(b)     *COFINA Approvals*. COFINA has taken all necessary action to authorize the execution, delivery, and performance by COFINA of this Agreement and the Amended PSA, and the execution, delivery, and performance by COFINA hereof have been duly authorized pursuant to a resolution of the Board of Directors of COFINA, which resolution is in full force and effect and has not been amended or repealed.

(c)     *Legal, Valid and Binding*. COFINA has duly executed and delivered this Agreement, and assuming the due authorization, execution, and delivery thereof by the other parties hereto, this Agreement constitutes legal, valid, and binding obligations of COFINA, enforceable in accordance with its terms, except as the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles and except as rights to indemnification and contribution hereunder may be limited by applicable law.

(d)     *No Material Breach*.  Except as described in the Solicitation Documents and subject to the Title III Court issuing the Confirmation Order, (i) COFINA is not in breach of or default under the Disclosure Statement or the Disclosure Statement Order, and (iii) COFINA's compliance with and performance of its obligations herein will not conflict with, violate or result in a breach of or constitute a default under the Disclosure Statement and Disclosure Statement Order.

(e)     *No Conflict with Money Laundering Laws*.  As described in the Solicitation Documents, COFINA as originally established in 2006, was authorized to use a portion of the SUT Revenues to pay or finance, in whole or in part, or fund: (i) certain appropriation backed debt outstanding as of June 30, 2006 payable to the Government Development Bank for Puerto Rico ("GDB") and the Puerto Rico Public Finance Corporation ("PFC"); and (ii) certain Commonwealth expenses. During 2009, the Legislative Assembly expanded the purposes of COFINA to authorize COFINA to pay or finance, in whole or in part, or fund: (i) the debt of the Secretary of the Treasury of the Commonwealth (the

8

"Secretary of the Treasury") with GDB in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for fiscal year 2009, (ii) certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth GO Bonds (as defined below), and any debt of the Commonwealth outstanding as of December 31, 2008, that did not have a source of repayment or was payable from budgetary appropriations, (iii) a portion of the accounts payable to suppliers of the Commonwealth, (iv) operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) operational expenses of the Commonwealth for fiscal year 2012, to the extent included in the annual budget of the Commonwealth, (vi) that certain Puerto Rico Economic Stimulus Fund, (vii) that certain Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) that certain Economic Cooperation and Public Employees Alternatives Fund.  As a result, the financial recordkeeping and reporting systems implemented by COFINA were not designed to comply with the requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the money laundering statutes of other applicable jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines issued, administered or enforced by any governmental agency (collectively, the "Money Laundering Laws").  To the knowledge of COFINA, no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving COFINA or any of its subsidiaries with respect to the Money Laundering Laws is pending or threatened.

(f)     *No Conflict with Sanctions Laws*.  Neither COFINA nor, to the knowledge of COFINA, any director, officer, agent, employee, or affiliate of COFINA, is currently the subject or target of any U.S. sanctions administered or enforced by the Office of Foreign Assets Control of the U.S. Treasury Department, the U.S. Department of Commerce, the U.S. Department of State, the United Nations Security Council, the European Union, or Her Majesty's Treasury of the United Kingdom, or other relevant sanctions authority (collectively, "Sanctions").

(g)     *No Violation of FCPA*.  As described in the Solicitation Documents, COFINA, as originally established in 2006, was authorized to use a portion of the SUT Revenues to pay or finance, in whole or in part, or fund: (i) certain appropriation backed debt outstanding as of June 30, 2006 payable to the Government Development Bank for Puerto Rico ("GDB") and the Puerto Rico Public Finance Corporation ("PFC"); and (ii) certain Commonwealth expenses. During 2009, the Legislative Assembly expanded the purposes of COFINA to authorize COFINA to pay or finance, in whole or in part, or fund: (i) the debt of the Secretary of the Treasury of the Commonwealth (the "Secretary of the Treasury") with GDB in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for fiscal year 2009, (ii) certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth GO Bonds (as defined below), and any debt of the Commonwealth outstanding as of December 31, 2008, that did not have a source of repayment or was payable from budgetary appropriations, (iii) a portion of the accounts payable to suppliers of the Commonwealth, (iv) operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) operational expenses of the Commonwealth for fiscal year 2012,

to the extent included in the annual budget of the Commonwealth, (vi) that certain Puerto Rico Economic Stimulus Fund, (vii) that certain Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) that certain Economic Cooperation and Public Employees Alternatives Fund.  As a result, the policies and procedures implemented by COFINA were not designed to ensure compliance with the requirements of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (collectively, the "FCPA").  To the knowledge of COFINA, none of COFINA, nor any director, officer, agent, employee, is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of the FCPA, including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA.

(h)      *No Additional Compensation*.  Except as contemplated by this Agreement or as described in the Solicitation Documents or as may be required pursuant to one or more orders of the Title III Court with respect to Prime Clerk, COFINA has not paid or agreed to pay to any person any compensation for the solicitation of votes by Holders pursuant to the Solicitation.

(i)      *COFINA is not an "Investment Company"*.  COFINA is not, and after consummation of the transactions contemplated by the Solicitation Documents and issuance and delivery of the COFINA Bonds, will not be as of the Closing Date, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 5.      [*Reserved*.]

SECTION 6.      *Conditions and Obligations of the Dealer Managers*.  The obligation to act as Dealer Managers shall at all times be subject, in the Dealer Managers' discretion, to the conditions that:

(a)      all representations and warranties of COFINA herein are true and correct as of the date hereof, and all other statements of COFINA are true and correct in all material respects as of the date hereof;

(b)      the Dealer Managers shall receive on the date hereof a certified copy of the Disclosure Statement Order;

(c)      no court with competent jurisdiction has issued a final, non-appealable decision invalidating the Puerto Rico Sales Tax Financing Corporation Act;

(d)      no stop order, restraining order, or injunction has been issued by, and no litigation has been commenced before, any agency, court, or other governmental body of any jurisdiction, on or after the date hereof, with respect to the Solicitation and the Exchange, any of the transactions in connection with, or contemplated by, the Solicitation

Documents, or this Agreement, which the Dealer Managers or their legal counsel in good faith believes makes it inadvisable for the Dealer Managers to continue to render services pursuant hereto; and

(e)       on the Closing Date, COFINA has delivered a certificate to the Dealer Managers, dated such date, of an authorized officer of COFINA, solely in his or her capacity as such, to the effect that:

(i)       the representations and warranties of COFINA set forth in this Agreement are true and correct as if made on and as of such date, and COFINA has performed all its respective covenants and agreements and satisfied all its respective conditions to be performed or satisfied at or prior to such date;

(ii)       COFINA has given all notices, if any, required pursuant to Section 2(j) hereof; and

(iii)       to the best knowledge of COFINA, after due inquiry, neither the Solicitation nor any of the other transactions contemplated hereby or by the Solicitation Documents has been enjoined (temporarily or permanently).

All such documents, certificates, schedules, or instruments delivered pursuant to this Agreement will comply with the provisions hereof only if they are reasonably satisfactory in all material respects to the Dealer Managers and their counsel.

SECTION 7.    *Covenants of COFINA.*  COFINA further covenants and agrees with the Dealer Managers as follows:

(a)       *Notice of Amendments and Supplements.*  Prior to the Voting Deadline, COFINA will use its commercially reasonable efforts to provide the Dealer Managers with advance written notice of any amendment or supplement to the Solicitation Documents and its consent to the filing of such amendment or supplement. The Dealer Managers, may, in their sole and absolute discretion, waive in writing the performance by COFINA of the foregoing covenant or extend the time for performance thereof.

(b)       *Blue Sky Compliance.*  To the extent applicable, COFINA shall cooperate with the Dealer Managers and counsel for the Dealer Managers to qualify or register (or to obtain exemptions from qualifying or registering) all or any part of the COFINA Bonds for offer and sale under the securities laws of the several states of the United States, shall comply with such laws and shall continue such qualifications, registrations and exemptions in effect so long as required for the distribution of the COFINA Bonds.  COFINA will advise the Dealer Managers promptly of the suspension of the qualification or registration of (or any such exemption relating to) the COFINA Bonds for offering, sale or trading in any jurisdiction or any initiation or threat of any proceeding for any such purpose; provided, however, that in no event shall COFINA be required to take any action which would subject it to general or unlimited service of process in any jurisdiction in which it is not now so subject, and COFINA will advise the Dealer Managers immediately of receipt by such party of any written notification with respect to the suspension of the qualification of the COFINA Bonds for sale in any jurisdiction or the initiation or threat of any proceeding for that purpose.

SECTION 8.    *Indemnification.*  In consideration of the engagement hereunder, COFINA shall indemnify and hold the Dealer Managers harmless to the extent set forth in Annex A hereto, which provisions are incorporated by reference herein and constitute a part hereof. Annex A hereto is an integral part of this Agreement and shall survive any termination, expiration, or cancellation of this Agreement.

SECTION 9.    *Survival.*  The agreements contained in this Section 9 and in Sections 1(b) and (c), 2, 3, 8, 10 and 11 hereof and Annex A hereto and the representations and warranties of COFINA set forth in Sections 4 hereof shall survive any termination, expiration, or cancellation of, this Agreement, any completion of the engagement provided by this Agreement, or any investigation made on behalf of the Commonwealth Parties, the Dealer Managers, or any Indemnified Person and shall survive the termination of the Solicitation.

SECTION 10.    *Governing Law Provisions.*  THIS AGREEMENT AND ANY CLAIM, CONTROVERSY, OR DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF; PROVIDED THAT ANY ISSUES ADDRESSING THE FIDUCIARY OR STATUTORY DUTIES OF THE COMMONWEALTH PARTIES OR THEIR EMPLOYEES, OFFICERS, OR GOVERNING BOARDS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PUERTO RICO.

(a)    *Consent to Jurisdiction*.  Each of the parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement (or the transactions contemplated hereby) brought by any party or its successors or assigns shall be brought in the Title III Court or, in the event such court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereto (collectively, the "Puerto Rico Courts"), and each of the parties hereby irrevocably submits to the exclusive jurisdiction of the Puerto Rico Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement. Each of the parties agrees not to commence any proceeding relating hereto or thereto except in the Puerto Rico Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Puerto Rico Court. Each of the parties further agrees that notice as provided in Section 12 shall constitute sufficient service of process and the parties further waive any argument that such service is insufficient. Each of the parties hereby irrevocably and unconditionally waives and agrees not to assert that (i) a proceeding in the Title III Court is brought in an inconvenient forum, (ii) the venue of such proceeding is improper, or (iii) that the Title III Court and any appellate court from any thereof lacks jurisdiction over such proceeding or any party thereto.

(b)    *Waiver of Immunity*.  Each party irrevocably waives, to the fullest extent permitted by applicable law, all immunity (whether on the basis of sovereignty or otherwise) from jurisdiction and service of process to which it might otherwise be entitled in the Puerto Rico Courts, and each party will not raise or claim or cause to be pleaded any such immunity, including, without limitation, any immunity pursuant to the United States Foreign Sovereign Immunities Act of 1976, as amended.

(c)   *Waiver of Jury Trial*. THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 11.   *Notices.*   Except as otherwise expressly provided in this Agreement, whenever notice is required by the provisions of this Agreement to be given, such notice shall be in writing addressed as follows and effective when received:

If to AAFAF:

> Puerto Rico Fiscal Agency and Financial Advisory Authority
> Roberto Sánchez Vilella (Minillas) Government Center
> Stop 22
> San Juan, Puerto Rico 00907
> Attention:  Christian Sobrino Vega, CEO & President

with a copy to (which shall not constitute notice):

> O'Melveny & Myers LLP
> 7 Times Square
> New York, NY 10036
> Attention:  John Rapisardi, Esq.;
>             Suzzanne Uhland, Esq.

If to COFINA:

> Puerto Rico Sales Tax Financing Corporation
> Roberto Sánchez Vilella (Minillas) Government Center
> San Juan, Puerto Rico 00940
> Attention:  Mohammad Yassin, Executive Director

with a copy to (which shall not constitute notice):

> O'Melveny & Myers LLP
> 7 Times Square
> New York, NY 10036
> Attention:  John Rapisardi, Esq.;
>             Suzzanne Uhland, Esq.

If to the Dealer Managers:

> Merrill Lynch, Pierce, Fenner & Smith Incorporated
> The Hearst Building
> 214 North Tryon Street, 21st Floor
> Charlotte, NC 28255
> Fax:  (980) 388-0830

13

Attention:  Liability Management Group

Barclays Capital Inc.
745 7th Ave.
New York, New York 10019
Attention: Municipal Sales

Jefferies LLC
520 Madison Avenue, 3rd Floor
New York, NY 10022
Fax:  646-786-5457
Attention: Municipal Underwriting

J.P. Morgan Securities LLC
383 Madison Avenue
3rd Floor
New York, NY 10179
Attention: Public Finance Debt Capital Markets

with a copy to

Merrill Lynch, Pierce, Fenner & Smith Incorporated
50 Rockefeller Plaza
NY1-050-12-02
New York, NY 10020
Fax:  (646) 855-5958
Attention:  High Grade Transaction Management/Legal

SECTION 12.  *Advertisements.*   The Commonwealth Parties agree that the Dealer Managers shall have the right to place advertisements in financial and other newspapers and journals at their own expense describing their services to each of the Commonwealth Parties hereunder, subject to applicable law, governmental regulations, and court rules and orders (including the Disclosure Statement Order) and subject to the Commonwealth Parties' prior approval, which approval may be withheld in any Commonwealth Party's sole discretion.

SECTION 13.  *Miscellaneous.*

(a)    This Agreement contains the entire agreement between the parties relating to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto. This Agreement may not be amended or modified except by a writing executed by each of the parties hereto. Section headings herein are for convenience only and are not a part of this Agreement.

(b)    This Agreement is solely for the benefit of the Commonwealth Parties, the Dealer Managers, and the Indemnified Persons, to the extent set forth in Annex A hereto and their respective successors, heirs, and assigns, and no other person shall acquire or have any rights under or by virtue of this Agreement, provided, that each of Merrill Lynch, Barclays, Jefferies, and JPM,

may, with prior notice to the Commonwealth Parties, assign its rights and obligations under this Agreement to any other registered broker-dealer wholly-owned by Bank of America Corporation, Barclays Capital Inc., Jefferies LLC  and JPMorgan Chase &Co., respectively, to which all or substantially all of such Dealer Manager's investment banking or related business may be transferred following the date of this Agreement.

(c)     Subject in each case to the provisions of the Confidentiality Agreement, dated March 29, 2017, between Merrill Lynch and AAFAF, Merrill Lynch may share any information or matters relating to the Commonwealth Parties, the Solicitation, the Exchange, and the transactions contemplated hereby with its affiliates and such affiliates may likewise share information relating to the Commonwealth Parties, the Solicitation and the Exchange with Merrill Lynch.

(d)     Subject in each case to the provisions of the Confidentiality Agreement, dated May 7, 2018, between Barclays and AAFAF, acting on behalf of itself and as representative of the Commonwealth, Barclays may share any information or matters relating to the Commonwealth Parties, the Solicitation, the Exchange, and the transactions contemplated hereby with its affiliates and such affiliates may likewise share information relating to the Commonwealth Parties, the Solicitation, and the Exchange with Barclays.

(e)     Subject in each case to the provisions of the Confidentiality Agreement, dated May 1, 2018, between JPM and AAFAF, acting on behalf of itself and as representative of the Commonwealth, JPM may share any information or matters relating to the Commonwealth Parties, the Solicitation, the Exchange, and the transactions contemplated hereby with its affiliates and such affiliates may likewise share information relating to the Commonwealth Parties, the Solicitation, and the Exchange with JPM.

(f)     Subject in each case to the provisions of the Confidentiality Agreement, dated May 23, 2018, between Jefferies and AAFAF, acting on behalf of itself and as representative of the Commonwealth, Jefferies may share any information or matters relating to the Commonwealth Parties, the Solicitation, the Exchange, and the transactions contemplated hereby with its affiliates and such affiliates may likewise share information relating to the Commonwealth Parties, the Solicitation, and the Exchange with Jefferies.

(g)     If any term, provision, covenant, or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable or against public policy, the remainder of the terms, provisions, covenants, and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired, or invalidated. The parties shall endeavor in good faith negotiations to replace the invalid, void, or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, void, or unenforceable provisions.

(h)     This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which, taken together, will constitute one and the same instrument.

[Remainder of page intentionally left blank]

15

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the Dealer Managers the enclosed duplicate originals hereof, whereupon this letter shall become a binding agreement between us.

Very truly yours,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
    Name: CAROL E REIN
    Title: MANAGING DIRECTOR

BARCLAYS CAPITAL INC.

By: _____
    Name:
    Title:

JEFFERIES LLC

By: _____
    Name:
    Title:

J.P. MORGAN SECURITIES LLC

By: _____
    Name:
    Title:

[Signature Page to the Dealer Manager Agreement]

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the Dealer Managers the enclosed duplicate originals hereof, whereupon this letter shall become a binding agreement between us.

Very truly yours,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
    Name:
    Title:

BARCLAYS CAPITAL INC.

By: _____
    Name: Luis Alfaro
    Title: Managing Director

JEFFERIES LLC

By: _____
    Name:
    Title:

J.P. MORGAN SECURITIES LLC

By: _____
    Name:
    Title:

       If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the Dealer Managers the enclosed duplicate originals hereof, whereupon this letter shall become a binding agreement between us.

Very truly yours,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED


By: _____
    Name:
    Title:

BARCLAYS CAPITAL INC.


By: _____
    Name:
    Title:

JEFFERIES LLC


By: _____
    Name:  Nic Malas
    Title:   Managing Director

J.P. MORGAN SECURITIES LLC


By: _____
    Name:
    Title:

[Signature Page to the Dealer Manager Agreement]

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the Dealer Managers the enclosed duplicate originals hereof, whereupon this letter shall become a binding agreement between us.

Very truly yours,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
　　　Name:
　　　Title:

BARCLAYS CAPITAL INC.

By: _____
　　　Name:
　　　Title:

JEFFERIES LLC

By: _____
　　　Name:
　　　Title:

J.P. MORGAN SECURITIES LLC

By: _____
　　　Name: Henry Reyes
　　　Title: Managing Director

[Signature Page to the Dealer Manager Agreement]

Accepted and agreed to
as of the date first written above:

PUERTO RICO FISCAL AGENCY AND
FINANCIAL ADVISORY AUTHORITY

By: _____
Name: Jose Santiago
Title: COO & Deputy Executive Director

PUERTO RICO SALES TAX FINANCING CORPORATION

By: _____
Name:  Mohammad Yassin
Title:   Executive Director

[Signature Page to Dealer Manager Agreement]

# ANNEX A

To Dealer Manager Agreement,
dated December 18, 2018 (the "Agreement"), among
Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays Capital Inc., Jefferies LLC and
J.P. Morgan, Puerto Rico Fiscal Agency and Financial Advisory Authority, and Puerto Rico
Sales Tax Financing Corporation

Section 1. *Indemnification of the Dealer Managers.*   Subject to Section 9 of this Agreement, COFINA shall indemnify and hold harmless the Dealer Managers, their respective affiliates and their respective officers, directors, employees, agents and controlling persons (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and reasonable expenses (collectively, "Losses"), joint or several, to which any such Indemnified Person may become subject under the Securities Act, the Exchange Act or other federal or state statutory law or regulation, or at common law or otherwise (including in settlement of any litigation, if such settlement is effected with the written consent of COFINA), insofar as such Losses arise out of or are based upon (a) any untrue statement or alleged untrue statement of a material fact contained in the Solicitation Documents, or in any amendment, or the omission or alleged omission to state therein a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, (b) any breach by COFINA of any representation or warranty as of the date such representation or warranty is given or failure to comply with any of the agreements set forth in the Agreement, (c) in whole or in part upon any failure of COFINA to perform its obligations hereunder or under law; or (d) any act or failure to act or any alleged act or failure to act by the Dealer Managers in connection with, or relating in any manner to, the transactions contemplated by the Solicitation Documents or in any amendment or supplement to any of the foregoing, and which is included as part of or referred to in any loss, claim, damage, liability or action arising out of or based upon any matter covered by clause (a) above, *provided* that COFINA shall not be liable under this clause (d) to an Indemnified Person to the extent that a court of competent jurisdiction shall have determined by a final judgment that such Losses resulted directly from any such acts or failures to act undertaken or omitted to be taken by such Indemnified Person through its gross negligence or willful misconduct; and to reimburse the Dealer Managers and each such director, officer, employee or controlling person for any and all expenses (including, subject to Section 3 hereof, the fees and disbursements of counsels chosen by the Merrill Lynch, Barclays, Jefferies or JPM) as such expenses are reasonably incurred by the Dealer Managers or such director, officer, employee or controlling person in connection with investigating, defending, settling, compromising or paying any such loss, claim, damage, liability, expense or action; provided, however, the foregoing indemnity agreement  shall not extend to any names and addresses of the Dealer Managers as provided in the Solicitation Documents (collectively, the "Dealer Managers' Information"); provided, further, that the obligations of COFINA shall not apply to the first $5,000,000.00 of Losses and expenses incurred in the aggregate by the Dealer Managers that could otherwise be paid or reimbursed under this indemnity agreement.

Section 2.  *Indemnification of COFINA*.  Each of the Dealer Managers agrees to indemnify and hold harmless COFINA and each of its officers, directors, employees and agents, and each person, if any, who controls COFINA within the meaning of the Securities Act or the Exchange Act, against any loss, claim, damage, liability, or expense, as incurred, to which COFINA or any

such officer, director, employee, or agent or controlling person may become subject, under the Securities Act, the Exchange Act, or other federal or state statutory law or regulation, or at common law or otherwise (including in settlement of any litigation, if such settlement is effected with the written consent of the Dealer Managers), but only to the extent that such loss, claim, damage, liability or expense (or actions in respect thereof as contemplated below) arises out of or is based upon any untrue statement or alleged untrue statement of a material fact contained in the Solicitation Documents or any amendment or supplement thereto, or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the Solicitation Documents or any amendment or supplement thereto, with respect to the Dealer Managers' Information applicable to such Dealer Manager; and to reimburse COFINA and each such officer, director, employee, agent, or controlling person for any and all expenses (including the fees and disbursements of counsel) as such expenses are reasonably incurred by COFINA or such, officer, director, employee, agent, or controlling person in connection with investigating, defending, settling, compromising or paying any such loss, claim, damage, liability, expense or action. COFINA hereby acknowledges that the only Dealer Managers' Information are any names and addresses of the Dealer Managers as provided in the Solicitation Documents. The indemnity agreement set forth in this Section 2 shall be in addition to any liabilities that any of the Dealer Managers may otherwise have.

Section 3.  *Notifications and Other Indemnification Procedures.*  Promptly after receipt by an indemnified party under this Annex A of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party under this Annex A, notify the indemnifying party in writing of the commencement thereof, but the omission so to notify the indemnifying party will not relieve it from any liability which it may have to any indemnified party for contribution or otherwise than under the indemnity agreement contained in this Annex A or to the extent it is not prejudiced as a proximate result of such failure. In case any such action is brought against any indemnified party and such indemnified party seeks or intends to seek indemnity from an indemnifying party, the indemnifying party will be entitled to participate in and, to the extent that it shall elect, jointly with all other indemnifying parties similarly notified, by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel reasonably satisfactory to such indemnified party; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that a conflict may arise between the positions of the indemnifying party and the indemnified party in conducting the defense of any such action or that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assume such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties.  Upon receipt of notice from the indemnifying party to such indemnified party of such indemnifying party's election so to assume the defense of such action and approval by the indemnified party of counsel, the indemnifying party will not be liable to such indemnified party under this Annex A for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof unless (i) the indemnified party shall have employed separate counsel in accordance with the proviso to the next preceding sentence (it being understood, however, that the indemnifying party shall not be liable for the expenses of more than one separate counsel (together

with local counsel), approved by the indemnifying party (Merrill Lynch, Barclays, Jefferies and JPM, in the case of Sections 2 and 5 hereof), representing the indemnified parties who are parties to such action) or (ii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of commencement of the action, in each of which cases the fees and expenses of counsel shall be at the expense of the indemnifying party.

Section 4.  *Settlements.*  The indemnifying party under this Section 4 shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party against any loss, claim, damage, liability or expense by reason of such settlement or judgment.  Notwithstanding the foregoing sentence, if at any time an indemnified party shall have requested an indemnifying party to reimburse the indemnified party for fees and expenses of counsel as contemplated by this Annex A, the indemnifying party agrees that it shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by such indemnifying party of the aforesaid request and (ii) such indemnifying party shall not have reimbursed the indemnified party in accordance with such request or disputed in good faith the indemnified party's entitlement to such reimbursement prior to the date of such settlement.  No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement, compromise or consent to the entry of judgment in any pending or threatened action, suit or proceeding in respect of which any indemnified party is or could have been a party and indemnity was or could have been sought hereunder by such indemnified party, unless such settlement, compromise or consent (i) includes an unconditional release of such indemnified party from all liability on claims that are the subject matter of such action, suit or proceeding and (ii) does not include any statements as to or any findings of fault, culpability or failure to act by or on behalf of any indemnified party.

Section 5.  *Contribution.*  If the indemnification provided for in Sections 1 and 2 hereof is for any reason held to be unavailable to or otherwise insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities or expenses referred to therein in excess of $5,000,000.00, then each indemnifying party shall contribute to the aggregate amount paid or payable by such indemnified party, as incurred, as a result of any losses, claims, damages, liabilities or expenses referred to therein (i) in such proportion as is appropriate to reflect the relative benefits received by COFINA, on the one hand, and each of the Dealer Managers, on the other hand, in connection with the transaction contemplated hereby (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of COFINA, on the one hand, and each of the Dealer Managers, on the other hand, in connection with the statements or omissions or inaccuracies in the representations and warranties herein which resulted in such losses, claims, damages, liabilities or expenses, as well as any other relevant equitable considerations.  The relative benefits received by COFINA, on the one hand, and each of the Dealer Managers, on the other hand, in connection with the Solicitation and the Exchange shall be deemed to be in the same respective proportions as the aggregate principal amount of the COFINA Bonds proposed to be issued by COFINA bears to the applicable aggregate fees paid or to be paid to the Dealer Managers.

The amount paid or payable by a party as a result of the losses, claims, damages, liabilities and expenses referred to above shall be deemed to include, subject to the limitations set forth in Sections 1 and 2 hereof, any legal or other fees or expenses reasonably incurred by such party in connection with investigating or defending any action or claim.  The provisions set forth in Section 3 hereof with respect to notice of commencement of any action shall apply if a claim for contribution is to be made under this Section 5; *provided*, *however*, that no additional notice shall be required with respect to any action for which notice has been given under Section 3 hereof for purposes of indemnification.

COFINA and the Dealer Managers agree that it would not be just and equitable if contribution pursuant to this Section 5 were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in this Section 5.

Notwithstanding the provisions of this Section 5, none of the Dealer Managers shall be required to contribute any amount in excess of the aggregate amount of fees actually received by such Dealer Manager under the Agreement.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11 of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.  For purposes of this Section 5, each director, officer and employee of each of the Dealer Managers and each person, if any, who controls each of the Dealer Managers within the meaning of the Securities Act and the Exchange Act shall have the same rights to contribution as the Dealer Managers, and each director of COFINA, and each person, if any, who controls COFINA with the meaning of the Securities Act and the Exchange Act shall have the same rights to contribution as COFINA.

Capitalized terms used but not defined in this Annex A have the meanings assigned to such terms in the Agreement.

**<u>Exhibit K</u>**

**Fee Letter**

**Fee Letter**

December 18, 2018

Puerto Rico Fiscal Agency and Financial Advisory Authority
San Juan, Puerto Rico

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Department of Treasury of the Commonwealth of Puerto Rico
San Juan, Puerto Rico

Ladies and Gentlemen:

On January 18, 2017, the Governor of Puerto Rico enacted the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, Act No. 2-2017, which established the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") as a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), with legal existence and fiscal and administrative autonomy, separate and independent from the Commonwealth and its instrumentalities and political subdivisions. Act No. 2-2017 authorizes AAFAF to act as the fiscal agent, financial advisor, and reporting agent for all entities of the Government of Puerto Rico, including the Puerto Rico Sales Tax Financing Corporation ("COFINA").

Reference is made to the Dealer Manager Agreement, dated the date hereof (including the exhibits and other attachments thereto, the "DMA") among AAFAF, COFINA (by AAFAF as its authorized signatory), Merrill Lynch, Barclays, Jefferies and JPM. Except as otherwise indicated herein, terms used but not defined in this letter agreement (this "Fee Letter") shall have the meanings assigned thereto in the DMA. This Fee Letter is the "Fee Letter" referred to in the DMA.

1.    <u>Role of the Dealer Managers</u>. With respect to the Solicitation and Exchange (collectively, the "COFINA Transactions"), Merrill Lynch shall serve as the lead dealer manager and Barclays, Jefferies and JPM shall serve as co- dealer managers. The Dealer Managers are not and will not be deemed for any purpose to be acting as agents, joint ventures or partners of each other

For purposes of league table credit, as determined by Securities Data Corporation, for the COFINA Transactions, Merrill Lynch will be allotted 60% of the aggregate principal amount of the Existing Securities exchanged on the Effective Date for the COFINA Bonds (or otherwise retired in accordance with the Plan of Adjustment) and Barclays will be allotted 40% of the aggregate principal amount of the Existing Securities exchanged on the Effective Date for the COFINA Bonds (or otherwise retired in accordance with the Plan of Adjustment).

2.    <u>Fees and Expenses</u>. Subject to the terms and conditions of the DMA,

<u>(a) Fees/Commissions</u>.

(i)   Unless the Title III Court orders otherwise, the Commonwealth of Puerto Rico (the "Commonwealth") shall pay, or cause to be paid, on the Effective Date of the current Plan of Adjustment or on the effective date of any subsequent plan of adjustment of COFINA if the effective date of such subsequent plan of adjustment occurs within 12 months of the execution of this Fee Letter and the DMA is not terminated for Cause before such date, to Merrill Lynch a structuring fee (the "Structuring Fee") in an amount equal to 0.035% of the aggregate principal amount of the Existing Securities ($17,512,573,537.70) exchanged on the Effective Date for the COFINA Bonds (or otherwise retired in accordance with the Plan of Adjustment or any subsequent amended plan of adjustment of COFINA).  If the Effective Date of the Plan of Adjustment or any subsequent plan of adjustment of COFINA does not occur within 12 months of the execution of this Fee Letter, the Commonwealth shall not be obligated to pay the Structuring Fee.

(ii)  Unless the Title III Court orders otherwise, the Commonwealth shall pay, or cause to be paid, on the Effective Date of the current Plan of Adjustment, to the Dealer Managers an aggregate fee (the "Solicitation Fee") equal to 0.150% of the aggregate principal amount of the Securities ($17,512,573,537.70) exchanged on the Effective Date for the COFINA Bonds (or otherwise retired in accordance with the Plan of Adjustment). Merrill Lynch will receive 50% of the Solicitation Fee, Barclays will receive 30% of the Solicitation Fee,

Jefferies will receive 10% of the Solicitation Fee and JPM will receive 10% of the Solicitation Fee.  For the avoidance of doubt, if the Effective Date of the current Plan of Adjustment does not occur, the Commonwealth shall not be obligated to pay the Solicitation Fee and COFINA will be entitled to negotiate a new dealer manager agreement in connection with any subsequent plan of adjustment of COFINA.

(iii) If the Effective Date of the Plan of Adjustment or any subsequent plan of adjustment of COFINA does not occur within 12 months of the execution of this Fee Letter, the Commonwealth shall not be obligated to pay the Structuring Fee or the Solicitation Fee.

(b) Reimbursement of Expenses. Unless the Title III Court orders otherwise, the fees set forth in Section 2(a) above and all costs and expenses in accordance with this Section 2(b) associated with the COFINA Transactions shall be paid by the Commonwealth to the Dealer Managers on the Effective Date upon the submittal, if required by law, of the appropriate invoices. These expenses will include, but are not limited to, expenses relating to the preparation, printing and delivery of any Solicitation Documents, any trustee, depositary, fiscal agent, transfer agent, information agent, solicitation agent or registrar's fees (and counsel to any of the foregoing), listing and filing fees, roadshow expenses, and the fees and expenses of accountants, auditors, experts, appraisers, rating agencies, legal counsel and other advisors to or agents of the Commonwealth Parties and other expenses customary for these types of transactions.  Unless the Title III Court orders otherwise, to the extent that the Dealer Managers or any of their respective affiliates incur any such expenses on behalf of AAFAF, COFINA or the Commonwealth in carrying out their responsibilities, the Commonwealth shall reimburse the applicable Dealer Manager for such expenses on the Effective Date. In addition, in carrying out their responsibilities, the Dealer Managers or their respective affiliates may incur some out-of-pocket expenses of their own. These expenses typically include, but are not limited to, the fees and expenses of legal counsel to the Dealer Managers (provided that reimbursement for the fees and expenses of such legal counsel shall be limited to one firm for the Dealer Managers, which the parties agree shall be Squire Patton Boggs, with the fees and expenses of any other legal counsel retained by any of the Dealer Managers to be borne by the applicable Dealer Manager and not reimbursed by the Commonwealth), travel, lodging and transportation costs incurred by representatives of Merrill Lynch, Barclays, Jefferies and JPM, or their respective affiliates to participate in meetings, road show or other investor presentations, and other expenses associated with its due diligence activities. The Commonwealth agrees to reimburse the applicable Dealer Manager for any such expenses on the Effective Date, unless the Title III Court orders otherwise. Any expense for which a reimbursement is requested shall be reasonable, documented and necessary and consistent with AAFAF's policies and regulations, and any expense in excess of $5,000.00 shall be authorized in writing and in advance by AAFAF. The parties agree that to the extent that the Commonwealth is required to reimburse the Dealer Managers for their legal counsel and the Dealer Managers receive a benefit, including without limitation, a discount, credit or other accommodation, from such Dealer Managers' counsel based on the fees such counsel may receive on account of their relationship with the Dealer Managers or their respective affiliates, including, without limitation, fees paid in accordance with this Section, such discount credit or accommodation shall be reflected in the amount that the Commonwealth is required to reimburse.

(c) Payments Generally. All amounts herein are stated in U.S. dollars and all payments under this Fee Letter (or any order of the Title III Court) shall be paid in immediately available funds in U.S. dollars, without condition or deduction for any counterclaim, defense, recoupment or setoff, and free and clear of any tax, withholding, assessment or other governmental charge (with appropriate gross-up for withholding taxes required by law), except for those as may be required under Act No. 48- 2013, as amended, and under the Puerto Rico Internal Revenue Code of 2011 and its regulations. When invoicing the Commonwealth, the Dealer Managers will estimate an allocation of fees between those relating to activities undertaken outside Puerto Rico and constituting gross income from sources within Puerto Rico. Payments to the Dealer Managers under this Fee Letter in connection with the COFINA Transactions shall be payable on the Effective Date of the Plan of Adjustment, and upon the submittal of the appropriate invoices.

Invoices must also include a written certification stating that no officer or employee of AAFAF, COFINA or the Commonwealth will derive or obtain any benefit or profit of any kind from this Fee Letter. Invoices that do not include this certification will not be accepted. This certification must read as follows:

"We certify to the best of its knowledge and belief under penalty of nullity that no public servant of the Puerto Rico Fiscal Agency and Financial Advisory Authority, the Puerto Rico Sales Tax Financing Corporation or the Commonwealth of Puerto Rico will derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the

delivery of goods or for the Services provided is the agreed-upon price that has been negotiated with an authorized representative of the Puerto Rico Fiscal Agency and Financial Advisory Authority. The total amount shown on this invoice is true and correct. The services have been rendered, and no payment has been received."

3.      Other.

(a)  AAFAF hereby represents to the Dealer Managers that AAFAF is authorized to enter into this Agreement pursuant to Section 5(d)(vi) of Act 2-2017.

(b) Each of the Dealer Managers acknowledges and agrees, severally and not jointly, that it may be required, if not conflictive, to provide all or some of the services under the DMA directly to any entity of the Executive Branch with which AAFAF subscribes an interagency agreement or by direct disposition of the Office of the Chief of Staff of the Governor of Puerto Rico, with notice to the AAFAF, in which case, such services will be provided under the same terms and conditions set forth in the DMA. For purposes of this provision, the term "entity of the Executive Branch" includes all agencies of the Government of Puerto Rico, as well as instrumentalities, public corporations and the Governor's Office.

(c) Each of the Dealer Managers, severally and not jointly, certifies that, to the best of its knowledge and belief, as of the date hereof, neither it nor any of its employees set forth on Schedule A hereto (collectively, the "DM Employees") have been convicted or have been found guilty in any Puerto Rico or United States Federal court for any of the crimes included under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, any of the crimes listed in Articles 250 through 266 of Act No. 146-2012, as amended, known as the Puerto Rico Penal Code, any of the crimes under Act No. 2-2018 or any other felony that involves misuse of public funds or property, including, but not limited to the crimes mentioned in Article 6.8 of Act No. 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico ("Act No. 8-2017"). Furthermore, neither the Dealer Managers nor the DM Employees has knowledge of any of the foregoing being the subject of any investigation in either a civil or a criminal procedure in a state or federal court, for criminal or civil charges related to the Puerto Rico public treasury, the Puerto Rico public trust, a Puerto Rico public function, or a fault that involves public funds or property in Puerto Rico. If the status of either of the Dealer Managers or the DM Employees with regards to the charges previously mentioned should change at any time during the term of the DMA, the applicable Dealer Manager shall notify AAFAF promptly. The failure to comply with this responsibility shall permit AAFAF to terminate the DMA for "Cause" as referenced in Section 2 above and set forth in Section 3(b) of the DMA.

In addition to the foregoing, Act No. 2-2018 requires that any person or entity who wishes to be granted a contract with any municipality, agency, instrumentality or public corporation of the Government for the rendering of services must submit a sworn statement signed before a notary public stating neither it, nor its president or member of the board of directors nor any DM Employee has been convicted or has plead guilty to any of the crimes listed under Article 6.8.3 of Act No. 8-2017 or any of the crime included in Act No. 2-2018.

If the status of any DM Employee of any of the Dealer Managers pursuant to the DMA with respect to this certification should change at any time during the term of the engagement, the applicable Dealer Manager shall notify AAFAF promptly, and AAFAF shall have the remedies provided in the aforementioned acts, including the right to terminate the DMA for "Cause."

(d) Each of the Dealer Managers, severally and not jointly, also certifies that, to the best of its knowledge and belief, none of the DM Employees receives any kind of individual compensation from any agency, instrumentality, public corporation or municipality of the Government of Puerto Rico.

(e) Each of the Dealer Managers, severally and not jointly, agrees that it may not subcontract any entity to provide any type of service related to the DMA without AAFAF's prior written consent. AAFAF acknowledges that the Dealer Managers can retain legal counsel and such retention shall not constitute subcontracting hereunder.

(f) The Dealer Managers shall be responsible for paying: (i) all applicable income taxes in accordance with any and all applicable income tax laws and (ii) any corresponding contributions to the Social Security Administration. Notwithstanding the foregoing, the Commonwealth shall deduct and withhold one point five percent (1.5%) of the gross amounts paid to the Dealer Managers under this Fee Letter in accordance with Article I of Act No. 48-2013, as

amended, if applicable.

(g) Each of the Dealer Managers, severally and not jointly, certifies that (i) each of the DM Employees recognizes and agrees that it shall be bound by and comply with all applicable provisions of the Code of Ethics for Contractors, Suppliers, and Applicants for Economic Incentives of the Government of Puerto Rico (known in Spanish as "*Código de Ética para Contratistas, Suplidores y Solicitantes de Incentivos Económicos del Gobierno de Puerto Rico*"), Chapter III of Act No. 2-2018 and that each of the DM Employees has received a copy of Act 2-2018 and the Enabling Act of the Office of Government Ethics of Puerto Rico, Act No. 1 of January 3, 2012, as amended, and agrees to abide and comply with their applicable provisions, (ii) as of the date of this Agreement, no conflict of interest under the Code of Ethic exists for any of the DM Employees and (iii) the applicable Dealer Manager shall promptly notify AAFAF of any conflict of interest with respect to any of the DM Employees after learning of such conflict.

(h) The parties acknowledge that no Dealer Manager will receive any payment for the services rendered under the terms of this Fee Letter until this Fee Letter has been registered at the Office of the Comptroller of Puerto Rico, as required by Act No. 18 of October 30, 1975, as amended.

(i) Each of the Dealer Managers, severally and not jointly, certifies that to the best of its knowledge and belief, that at the execution of this Fee Letter it has submitted such income tax returns in Puerto Rico during the past five years as are required by law, and that, except as described below, it has no outstanding debts or has a payment plan in place with the Government of Puerto Rico for income taxes or real or chattel property taxes. Each of the Dealer Managers, severally and not jointly, also certifies that, to the best of its knowledge and belief, that it does not have outstanding debts regarding its payment of unemployment insurance premiums, workers' compensation payments or Social Security for chauffeurs in Puerto Rico. Each of the Dealer Managers, severally and not jointly, further certifies and warrants that it does not have any debt or legal procedures to collect child support payments registered with the Child Support Administration (known in Spanish as "*Administración para el Sustento de Menores*", and hereinafter referred to by its acronym, "ASUME"). In compliance with this clause (i), each of the Dealer Managers, severally and not jointly, certifies that at the execution of this Fee Letter it has presented to AAFAF the corresponding certification issued by ASUME. Furthermore, each of the Dealer Managers, severally and not jointly, certifies that it is in compliance with Act No. 168-2000, as amended, known as the "Act for the Improvement of Family Assistance and for the Support of the Elderly". In the event that either of the Dealer Managers is under a court or administrative order directing it to provide financial support or to fulfill any obligation under the above- mentioned Act, it further certifies and warrants that it is in compliance with said obligations. The Government of Puerto Rico has identified an outstanding debt owed to Puerto Rico in the amount of $17,774.02 for sales/use taxes for six tax periods between December 2015 and to November 2016 relating to penalty and interest on late filed returns and Merrill Lynch is in the process of resolving this issue and making payment to Puerto Rico for this debt.

To the extent required, the Dealer Managers, severally and not jointly, certify that they are not required to obtain a waiver from any Puerto Rico government entity prior to or in connection with the execution of this Fee Letter or that, to the extent any such waiver is required, the same has been obtained by the Dealer Managers prior to the execution of this Fee Letter.

(j) Pursuant to Act No. 237, enacted on August 31, 2004, each of the Dealer Managers, severally and not jointly, accepts that it is knowledgeable of the rules of ethics that apply to its business and the services to be provided under the DMA and assumes responsibility for its own actions.

(k) The execution of this Fee Letter shall not generate any rights for the Dealer Managers or their respective employees providing services pursuant to the DMA to receive any benefits that the officers or employees of AAFAF, the Government of Puerto Rico or of any agency, instrumentality or municipality of Puerto Rico may be entitled to as officers or employees of AAFAF or the Government of Puerto Rico pursuant to law or regulation including, but not limited to, vacation and sick leave, workmen's compensation, or any other such benefits.

(l) This Fee Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. This Fee Letter may not be amended or waived except by an instrument in writing signed by each of the parties hereto. This Fee Letter may be executed in any number of counterparts, each of which shall be an original and all of which when taken together shall constitute one agreement. Delivery of an executed signature page of this Fee Letter by facsimile or electronic communication shall be effective as delivery of a manually executed counterpart hereof. This Fee Letter, the DMA and the Confidentiality Agreement are the only agreements that have been entered into between us with respect to the

services to be provided hereunder, and set forth the entire understanding of the parties with respect thereto.

(m) The Commonwealth certifies that funds for the payments to be made by the Commonwealth under this Fee Letter come from budgeted allocations. The Commonwealth hereby agrees and certifies that all disbursements for payments required to be made by the Commonwealth under this Fee Letter shall be made from account number 111-025-1640-006-2019.

(n) Sections 10 and 11 of the DMA are hereby incorporated by reference into this Fee Letter.

* * *

[*Remainder of page intentionally left blank*]

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the Dealer Managers the enclosed duplicate originals hereof, whereupon this letter shall become a binding agreement between us.

Very truly yours,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____

Name:  CAROL E REIN

Title:  MANAGING DIRECTOR

BARCLAYS CAPITAL INC.

By: _____

Name: _____

Title: _____

JEFFERIES LLC

By: _____

Name: _____

Title: _____

J.P. MORGAN SECURITIES LLC

By: _____

Name: _____

Title: _____

[Signature Page to the Fee Letter]

       If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the Dealer Managers the enclosed duplicate originals hereof, whereupon this letter shall become a binding agreement between us.

Very truly yours,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____

    Name:

    Title:

BARCLAYS CAPITAL INC.

By: _____

    Name: Luis Alfaro

    Title: Managing Director

JEFFERIES LLC

By: _____

    Name:

    Title:

J.P. MORGAN SECURITIES LLC

By: _____

    Name:

    Title:

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the Dealer Managers the enclosed duplicate originals hereof, whereupon this letter shall become a binding agreement between us.

Very truly yours,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
    Name:
    Title:

BARCLAYS CAPITAL INC.

By: _____
    Name:
    Title:

JEFFERIES LLC

By: _____
    Name:   Nic Malas
    Title:    Managing Director

J.P. MORGAN SECURITIES LLC

By: _____
    Name:
    Title:

[Signature Page to the Fee Letter]

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to the Dealer Managers the enclosed duplicate originals hereof, whereupon this letter shall become a binding agreement between us.

Very truly yours,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
    Name:
    Title:

BARCLAYS CAPITAL INC.

By: _____
    Name:
    Title:

JEFFERIES LLC

By: _____
    Name:
    Title:

J.P. MORGAN SECURITIES LLC

By: _____
    Name: Henry Reyes
    Title: Managing Director

[Signature Page to the Fee Letter]

Accepted and agreed to as of the date
first written above:

PUERTO RICO FISCAL AGENCY AND
FINANCIAL ADVISORY AUTHORITY

By: _____
   Name: Jose Santiago
   Title:  COO & Deputy Executive Director

PUERTO RICO SALES TAX FINANCING CORPORATION

By: _____
   Name: Mohammad Yassin
   Title:   Executive Director

COMMONWEALTH OF PUERTO RICO

By: _____
   Name:
   Title:

[Signature Page to Fee Letter]

Accepted and agreed to as of the date
first written above:


PUERTO RICO FISCAL AGENCY AND
FINANCIAL ADVISORY AUTHORITY


By: _____
    Name: Jose Santiago
    Title:  COO & Deputy Executive Director

PUERTO RICO SALES TAX FINANCING CORPORATION


By: _____
    Name: Mohammad Yassin
    Title:   Executive Director


COMMONWEALTH OF PUERTO RICO


By: _____
Name:
Title:   TERESITA FUENTES
    SECRETARY
    PR TREASURY


[Signature Page to Fee Letter]

## SCHEDULE A

**Merrill Lynch Employees**

Matt Radley
Andrea Garrido-Lecca
Maxim Volkov
Augustin Cygiel
Ricardo DeBedout
Diego Espinal
Gabriel Rabello
Carol Rein
Jorge F. Rodriguez
Geoffrey Hoyes
Amanda Urban
Gabriel Facquet
Tyler Purcell
Ralph Saggiomo
Ed Sisk
Christine Walsh

**Barclays Employees**

Joe Verrillo
Dan Rourk
Steve Milano
Anthony Pino
Karan Shah
Arras Korogluyan
Ryan Karmel
Rajiv Patel
James Henn
Robert Hillman
Luis Alfaro
Robert Taylor

**Jefferies Employees**

Kym Arnone
Nic Malas
Jose Perez-Riera
Amanda Lee
Roy Carlberg
J.R. McDermott
Cindy Ashmore
Leon Bijou

**JPM Employees**

Henry Reyes
Eugenio Alarcon
Nathaniel Johnson
Sean Saroya
Annie Marinaro
Marshall Kitain
Bianca Stivelman
Issam Al-Mamlouk

## <u>Exhibit L</u>

**Proposed Members of the Board of Directors of Reorganized COFINA**

- Alex Zyngier
- Daniel Heimowitz
- Richard ("Rick") Kolman