**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al* Debtors[1] | PROMESA Title III<br><br>Case No. 17-BK-03283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of,<br><br>THE PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>      Debtor. | PROMESA Title III<br><br>No. 17 BK 3284-LTS |

**OBJECTION OF PROSOL-UTIER TO CONFIRMATION OF THE SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF THE DEBTS OF PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA") [Case No. 17-3284, Docket Entry No. 380]**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND .............................................................................................................. 8

      PROSOL-UTIER ................................................................................................. 9

      COFINA................................................................................................................ 10

STANDARD OF REVIEW .............................................................................................. 12

ARGUMENT ................................................................................................................... 15

  A.    COFINA Plan lacks compliance with the provisions of the Bankruptcy
       Code as made applicable to these proceedings by Section 301 of
       PROMESA................................................................................................. 15

      1.    COFINA Plan is not proposed "in good faith". ....................................... 15

  B.    "The COFINA Plan is not feasible and in the best interests of creditors"
       because debtor cannot make payments under the plan and provide "future
       public services at the level necessary to its viability as a municipality." ............ 17

      1.    There is not "a reasonable likelihood that the plan will achieve a
         result consistent with the objectives and purposes of the
         Bankruptcy Code" considering the "governmental nature and
         obligations" of a municipal debtor........................................................... 17

      2.    The COFINA Plan does not "meet the special needs of a municipal
         debtor."....................................................................................................... 17

      3.    The COFINA Plan neglects the need of Debtors to remain in
         existence rather than liquidate, and the need to continue providing
         public services......................................................................................... 18

  C.    COFINA Plan is "forbidden by law" or requires that any legislative,
       regulatory, or electoral approval necessary under applicable law in order
       to carry out any provision of the plan has been obtained, or such provision
       is expressly conditioned on such approval........................................... 27

  D.    COFINA Plan disregards Section 201 of PROMESA that requires that the
       fiscal plan shall "provide a method to achieve fiscal responsibility and
       access to the capital markets" and "ensure the funding of essential public
       services"................................................................................................... 28

E.     COFINA Plan disregards Section 314(b)(7) of PROMESA that states that the plan must be *consistent* with the applicable fiscal plan certified by the FOMB under Title II. ............................................................................ 29

CONCLUSION ................................................................................................... 31

APPENDIX ......................................................................................................... 33

Exhibit 1 ............................................................................................................ 33

Expert report of José Israel Alameda-Lozada, Ph.D. ("Dr. Alameda"), professor of Economics and Economic Planning at the University of Puerto Rico, Mayagüez Campus. ............................................................................................................ 33

Exhibit 2 ............................................................................................................ 33

Dr. Alameda Academic Curriculum Vitae.......................................................... 33

Exhibit 3 ............................................................................................................ 33

Declaration of José Israel Alameda Lozada, Ph.D., in support of Objection to Confirmation of Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation ("COFINA") [Case No. 17-3284, Docket Entry No. 380] ............................................................................................................ 33

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*In re Addison Cmty. Hosp. Auth.*,
   175 B.R. 646, 650 (Bankr. E.D. Mich. 1994) ................................................... 14, 18

*In re Connector 2000 Ass'n*,
   447 B.R. 752, 766 (Bankr. D.S.C. 2011) .......................................................... 14, 17

*In re Madison Hotel Assocs.*,
   749 F.2d 410, 4225 (7th Cir. 1984) ........................................................... 13, 17, 18

*In re Mount Carbon Metro. Dist.*,
   242 B.R. 18, 41 (Bankr. D. Colo. 1999) ........................................ 12, 13, 14, 17, 18

*In re Richmond Unified Sch. Dist.*,
   133 B.R. 221, 225 (Bankr. N.D. Cal. 1991) ..................................................... 14, 17

*Newhouse v. Corcoran Irrigation Dist.*,
   114 F.2d 690, 690–91 (9th Cir. 1940) ...................................................................... 14

**Statutes**

11 U.S.C. § 1129(a)(3).......................................................................................... 12, 15, 27

48 U.S.C. § 2141(b)(1) ............................................................................................ 6, 14, 28

48 U.S.C. § 2141(b)(1)(A),(B),(G),(J).................................................................... 5, 28, 29

48 U.S.C. § 2141(b)(1)(B) .......................................................................................... 14, 28

48 U.S.C. § 2141(b)(1)(B), (C) and (D) ......................................................................... 28

48 U.S.C. § 2161 (b)(5) .................................................................................................... 5

48 U.S.C. § 2161(a) ................................................................................................... 12, 15

48 U.S.C. § 2174............................................................................................................. 15

48 U.S.C. § 2174(b) ........................................................................................................ 12

48 U.S.C. § 2174(b)(3) ................................................................................ 13, 27

48 U.S.C. § 2174(b)(5) ................................................................................ 13, 27

48 U.S.C. § 2174(b)(6) ................................................................................ 13, 17

48 U.S.C. § 2174(b)(7) ...................................................................................... 29

Act 241-2018, Act to amend Act No. 91 of 2006, Puerto Rico Sales Tax Financing Corporation
Act; Act No. 116 of 2013 and Act No. 44 of 1988. .................................................. 4

Act No. 91 of May 13, 2006; Puerto Rico Sales Tax Financing Corporation Act, as amended, 13
L.P.R.A. sec. 11(a) et seq. ........................................................................... 10

## Other Authorities

Blix and Sellin, *Uncertainty bands for inflation forecasts,* Sveriges Riksbank Working Paper
Series, No. 65 Provided in Cooperation with: Central Bank of Sweden, Stockholm. Available
at www.econstor.eu/bitstream/10419/83036/1/76864125X.pdf ............................... 30

Brad Setser, *Will the Proposed Restructuring of COFINA Bonds Assure Puerto Rico's Return to
Debt Sustainability?* COUNCIL ON FOREIGN RELATIONS (Sept. 27, 2018) Available at
https://www.cfr.org/blog/will-proposed-restructuring-cofina-bonds-assure-puerto-ricos-return-
debt-sustainability?sp_mid=57452461&sp_rid=bWFyay5sZXZpbnNvbkBzZWl1Lm9yZwS2.
................................................................................................................. 25

Government Development Bank for Puerto Rico, Investor Resources, Puerto Rico Sales Tax
Financing Corporation (COFINA), available at
http://www.gdb.pr.gov/investors_resources/cofina.html.  Last accessed on November 13,
2018. .......................................................................................................... 10

Harold Toro, *Inequality in Puerto Rico*, *ReVista, Harvard Review of Latin America*.
https://revista.drclas.harvard.edu/book/inequality-puerto-rico ................................... 6

Joanisabel González, *Error en el cálculo de las pensiones en el plan fiscal,* Endi.com (Nov. 20,
2018) available at
https://www.elnuevodia.com/noticias/tribunales/nota/errorenelcalculodelaspensionesenelplanfi
scal-2460896/ ............................................................................................. 7, 16

José A. Delgado, La Junta acude a la administración Trump para la liberación de fondos.
Endi.com (December 14, 2018), available at
https://www.elnuevodia.com/noticias/locales/nota/lajuntaacudealaadministraciontrumpparalali
beraciondefondos-2465567/ ........................................................................... 8, 16

Oxford Living Dictionary, *Consistent,* Oxford University Press, available at
https://en.oxforddictionaries.com/definition/consistent.......................................................... 29

Pablo Gluzmann, Martin Guzman, and Joseph Stiglitz, *An Analysis of Puerto Rico's Debt Relief
Needs to Restore Debt Sustainability* ESPACIOS ABIERTOS (Jan. 2018), at 4. Available at
http://www.shankerinstitute.org/sites/shanker/files/PR_DSA-
2018.01%20Guzman%20Stiglitz.pdf. ................................................................................... 24

United States Government Accountability Office, *Puerto Rico: Factors Contributing to the Debt
Crisis and Potential Federal Actions to Address Them* (May 2018), at 38. Available at
https://www.gao.gov/products/GAO-18-387.......................................................................... 11

COMES NOW PROSOL-UTIER: (1) Capítulo Autoridad de Carreteras ("HTA Chapter"); (2) Capítulo Instituto de Cultura Puertorriqueña ("ICP Chapter"); (3) Capítulo Oficina del Procurador del Veterano ("OPV Chapter"); (4) Capítulo de Oficina Desarrollo Socioeconómico y Comunitario ("ODSEC Chapter") y (5) Capítulo de Jubilados ("Retirees Chapter") (Collectively known as "PROSOL-UTIER"), submit this objection to the November 26, 2018 *Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3284, Docket Entry No. 380].

## PRELIMINARY STATEMENT

1. PROSOL-UTIER opposes the confirmation of the Second Amended Title III Plan of Adjustment for Puerto Rico Sales Tax Financing Corporation ("COFINA Plan"). The COFINA Plan is mainly based in the settlement of the Commonwealth-Puerto Rico Sales Tax Financing Corporation dispute proposed by the Financial Oversight and Management Board for Puerto Rico ("FOMB") that is pending of approval by this Honorable Court ("COFINA Settlement") [Docket Entry 4067]. PROSOL-UTIER, timely filed and objection to the COFINA Settlement [Docket Entry 4251].[2]

2. PROSOL-UTIER opposition to the COFINA Settlement is based in the fact that it is not in the best interest of the Commonwealth of Puerto Rico, is not in compliance with PROMESA and results in a direct injury to the People of Puerto Rico, particularly, to PROSOL-UTIER members and retirees. Therefore, the COFINA Settlement could not be a legal, appropriate or reasonable base for the confirmation of the COFINA Plan.

3. Now PROSOL-UTIER opposes the confirmation of the COFINA Plan based on substantive considerations regarding compliance with PROMESA and the reliability of the Fiscal

---

[2] All the factual and legal arguments of PROSOL-UTIER's Opposition to the COFINA Settlement [Docket Entry 4251] are hereby incorporated by reference to form part of this Objection to Confirmation or the COFINA Plan.

Plans for the Commonwealth of Puerto Rico and COFINA.  Judicial evaluation of the validity of

the actions of the FOMB under Title II of PROMESA is finally ripe. At page 21 of the *Opinion

and Order* of February 27, 2018, in the case *Ambac Assurance Corporation v. Commonwealth of

Puerto Rico*, *Adv. Proc. 17-159*-LTS, this Court expressed the following:

> Under PROMESA's statutory framework, it is only at the plan confirmation stage
> that the Court determines whether a proposed plan of adjustment **complies with,
> among other things, the provisions of Title 11 of the United States Code which
> have been made applicable to these cases by Section 301 of PROMESA and
> the relevant provisions of PROMESA.** See PROMESA § 314. [Emphasis added]

4.  PROSOL-UTIER opposes the COFINA Plan founded in the conclusions of the expert

report of José Israel Alameda-Lozada, Ph.D. ("Dr. Alameda"), professor of Economics at the

University of Puerto Rico, Mayagüez Campus and Professional Economic Planner, that is attached

as **Exhibit 1** ("the Study"). The Study concludes that the Commonwealth of Puerto Rico and

COFINA Fiscal Plans (collectively "Fiscal Plans") do not comply with PROMESA, among other

things, for lack of a definition of the term "essential services", they are not economically feasible

and lack scientific reliability to develop dependable revenue and expenditures projections that are

indispensable to address the confirmation of the COFINA Plan. Those requisites are basic and

mandatory elements to comply with the provisions of Sections 201 and 314 of PROMESA.[3]

5.  Dr. Alameda has refuted the reliability of the COFINA Plan and the sustainability of

the debt restructuring for Puerto Rico's sales tax-backed bonds. In essence, Dr. Alameda concludes

that it can be reliably foreseen that the COFINA Plan will bring many unreasonable and negative

economic and social consequences for Puerto Rico, **that this Honorable Court is now in the

position to prevent**, such as the impairment of the resources available to pay for essential services

and for the pensions of more than 167,000 retirees.

---

[3] 48 U.S.C. §§ 2141 and 2161

6.   Dr. Alameda's findings could be summarized in the following: (1) the COFINA Plan is uncertain and totally unreliable; (2) the COFINA Plan cannot be consistent with the Fiscal Plans because they are uncertain and totally unreliable; (3) the Fiscal Plans and the COFINA Plan are not feasible; (4) the Fiscal Plans and the COFINA Plan do not ensure the funding of essential public services;  (5) the Fiscal Plans and the COFINA Plan do not provide adequate funding for public pension systems; (6) the Fiscal Plans and the COFINA Plan do not provide for the elimination of structural deficits; and, (7) before or after 2034, the Fiscal Plans and the COFINA Plan will lead Puerto Rico to another default of payment in the bondholders obligations. In sum, the Fiscal Plans are not economically feasible and lack scientific reliability to develop dependable revenue and expenditures projections, which are indispensable to address the confirmation of the COFINA Plan.

7.   According to Dr. Alameda's conclusions, the People of Puerto Rico assume all the risks in the COFINA Plan. Alameda concluded that the COFINA Plan 40 years' time frame is a very long-rage full of unforeseen circumstances that affect the feasibility of the plan; it is also highly uncertain and risky for SUT collection forecasts considering that the economy has been in a decade-long slump and will continue with marginal or negative growth for the next 40 years. Dr. Alameda also points out that even the Fiscal Plan itself recognizes a deficit for year 2035, which rises the certainty of another default in debt payments, forcing more cuts to public pensions and essential services, as well as other austerity measures. Furthermore, he states that the growth rates of nominal GNP and consumption Expenditures are unrealistic and extremely optimistic. Also, he ponders that the FOMB's conventional assumption that the U.S. economy is the main driver of Puerto Rico's economy is no longer valid and that the FOMB ignores other relevant and applicable theories such as the Circular Cumulative Causation. Dr. Alameda emphasized that in order to be

reliable, the plan has to consider different economic models instead of a single value. Also, the Study points to the fact that the COFINA Plan does not consider the recent Tax Reform regarding the B2B rate and the SUT and that its time frame is inconsistent with the Fiscal Plan's time frame. Dr. Alameda questions the impact of relying on the Federal Disaster Relief funds as a growth factor when most of such funds have been assigned to non-local firms and they will have no positive impact in the local economy; also, the FOMB has no contingency plan to achieve economic goals should the timing and arrival of such funds be affected. Finally, Dr. Alameda concludes that reducing COFINA's payments to its bondholders would result in availability of resources to the General Funds of the Commonwealth, which means more revenues that could be allocated to fund essential services as required by Section 201 of PROMESA.

8.   It is particularly important the fact that the COFINA Plan does not comply with Section 314 (b)(5) of PROMESA that requires that any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval.[4] The COFINA Settlement and Plan required the enabling Act 241-2018 to amend the Puerto Rico Sales Tax Financing Corporation Act. Currently, this Act is the subject of civil law suit questioning the constitutionality of its provisions based on procedural, substantive and constitutional grounds.[5] Therefore, the COFINA enabling Act, although formally approved, suffers from uncertainty or potential annulment of its provisions. This requires the Honorable Court to deny the confirmation of the plan until the dispute over the validity of Act 241-2018 is finally decided.

---

[4] 48 U.S.C. 2161 (b)(5)
[5] *Manuel Natal-Albelo, et als, v. Commonwealth of Puerto Rico, et al,* Civil No. SJ2018CV10569.

9.  One of the main failures of the Fiscal Plans and the COFINA Plan is that the FOMB has repeatedly declined to define the term "essential services" in order to adequately protect them, as it is required by Section 201 of PROMESA.[6] Section 201 of PROMESA mandates specific criteria for the Commonwealth's Fiscal Plan, including that the plan has to provide for estimates of revenues and expenditures in conformance with agreed accounting standards and must identify and ensure the funding of essential services.[7] The Commonwealth's Fiscal Plan certified by the FOMB, on its face, does not comply with such requirement. It makes no attempt to identify essential services, such as education, health and public safety. Thus, the confirmation of the COFINA Plan creates a hazard and an invasion to the legally protected interest of the appearing parties. These and other violations of PROMESA within the fiscal plan process are necessarily repeated in the COFINA Plan, since PROMESA also prescribes that a Title III plan of adjustment cannot be confirmed unless it complies with the fiscal plan.[8] Absent a definition of which services should be protected as essential, there is no way to comply with the COFINA Settlement and Plan without immediately or eventually impairing those services such as health, education and public safety, among others.

10. The Puerto Rico Sales and Use Tax ("SUT") is a vital revenue for the Commonwealth of Puerto Rico that is crucial to comply with the estimates of revenues and expenditures in conformance with agreed accounting standards and to ensure the funding of essential services.[9]

11. The FOMB predicts that more than 5.5% of the population will migrate in the next five years. The migration and declining birth rate will further reduce the Island's population, thus declining consumption of goods and services taxable by the SUT. These conditions will

---

[6] 48 U.S.C. § 2141(b)(1)(A),(B),(G),(J).
[7] *Id.*
[8] 48 U.S.C. § 2141
[9] 48 U.S.C. § 2161 (b)(5)

undoubtedly reduce the amounts of SUT collected for every year this outmigration continues. The FOMB also predicts that the Commonwealth's tax-backed revenues are not expected to rise any faster than that low GNP growth rate.

12. The excessive payments to the new COFINA bondholders with the reduced cash flow caused by the decrease in taxable consumption would divert funds that Puerto Rico urgently needs for reconstructing its economy and satisfying the needs of its people. Moreover, the COFINA Settlement would padlock in these exorbitant payments for decades to come. By giving COFINA a "first dollars" claim on the SUT, it would increase the risk of a substantial decline in tax revenues of the Commonwealth of Puerto Rico.

13. Moreover, under the COFINA Plan, payments would escalate by 4% a year, far outstripping the projected long-term growth rate of Puerto Rico's economy and its tax revenues.

14. Given its dreadful and well-known poverty, its unreliable and unstable infrastructure, and its meager growth rate, Puerto Rico has urgent social and economic needs making the Commonwealth of Puerto Rico dependent on all available resources to protect essentials services, labor unions contracts, retirees' pensions, regular governmental operations and, at least, for a minimum capability for debt service to pay other secured, priority and unsecured creditors. This, in order to achieve fiscal targets and access to capital markets at affordable cost.[10]

15. The SUT has a regressive negative impact on Puerto Rico's economy, because rich and poor pay the same amount in taxes for the goods and services they consume, thus increasingly widening the gap of inequality that is already un unacceptable levels.[11] Therefore, any revenue gap

---

[10] 48 U.S.C. § 2141(b)(1)
[11] *See* Harold Toro, *Inequality in Puerto Rico*, *ReVista, Harvard Review of Latin America*, available at https://revista.drclas.harvard.edu/book/inequality-puerto-rico. Last accessed November 14, 2018.

could not be cover increasing the percent of the SUT, because it would worsen the dire circumstances of the population.

16. As of this moment, the Commonwealth has been able to pay the retirement system pensions from the general fund account because it is still not paying bondholders. Accordingly, the Commonwealth pays benefits from the Commonwealth's general account under a "pay-as-you-go" system. *See* October 23, 2018 *New Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity* ("Fiscal Plan") at 29, 119.   The FOMB projects that such "paygo" pension payments will consume a substantial portion of the Commonwealth's general fund. *See id.* at 119-20. However, the COFINA Plan will reduce substantially the revenues available to cover for retirees' payments and other bonds and general unsecured debt. Particularly, when the FOMB disclosed a few weeks ago that the pension obligations of the Commonwealth Fiscal Plan were underestimated by 3,500 billion dollars.[12] This mistake warrants a new reformulation of the Fiscal Plan, thus the COFINA Plan is no not confirmable without knowing the consequences of such mistake.

17. The Commonwealth's ability to pay pensions will change dramatically when the debt service to COFINA bondholders begins and will worsen with the required debt services to general obligation bonds ("GO") when the plan of adjustment of the Commonwealth is confirmed. This will create an enormous burden on the feasibility of this essential payments, surely condemning retirees to permanent misery.

18. Many economists in Puerto Rico, including Dr. Alameda, foresee that the economic crisis in the Island will worsen. Even the FOMB's Executive Director, Natalie Jaresko, admitted that any prolonged delay in the delivery of the funds destined for the recovery and reconstruction

---

[12] Joanisabel González, *Error en el cálculo de las pensiones en el plan fiscal,* Endi.com (Nov. 20, 2018) available at https://www.elnuevodia.com/noticias/tribunales/nota/errorenelcalculodelaspensionesenelplanfiscal-2460896/

of the Island, after the catastrophe caused by hurricane María, can alter the fiscal plan.[13] The SUT depends on consumption. If the economic crisis of Puerto Rico worsens and the revenues decrease, there would not be enough funds available to cover the Commonwealth's essential services, fund pension plans and cover operation costs. If there is no surplus for the debt services, the FOMB will implement more budget cuts that would further impair essential services and government operations, condemning the economy to a death spiral.

19. If this Plan is confirmed, the COFINA bondholders' pressure to receive payment according to the terms of the settlement would make the Commonwealth default in other obligations or in its payments according to the plan of adjustment. This, in turn, jeopardizes the Title III proceedings since the outcome of a default is the dismissal of the case.

20. The Fiscal Plans call for profound austerity "measures" and "reforms" that will inexorably cause agony across wide sectors of Puerto Rico's population, especially for its most defenseless residents. The FOMB projects that, even if all these measures were implemented, Puerto Rico would still fall into structural deficits in coming years. Condemning the Island to decades of unreasonable COFINA payments will only heighten the risk of a future insolvency. **This Honorable Court should reject the proposed settlement and deny confirmation of the COFINA Plan and spare the People of Puerto Rico from more economic and social suffering and despair.**

## BACKGROUND

21. On November 11, 2018, the FOMB submitted the Second Amended Title III Plan of Adjustment for Puerto Rico's Sales Tax Financing Corporation [Docket Entry No. 4392].  The

---

[13] José A. Delgado, La Junta acude a la administración Trump para la liberación de fondos. Endi.com (December 14, 2018), available at
https://www.elnuevodia.com/noticias/locales/nota/lajuntaacudealaadministraciontrumpparalaliberaciondefondos-2465567/

8

Plan is based mainly in the COFINA Settlement to which PROSOL-UTIER timely opposed [Docket Entry 4251]. All the factual and legal arguments of PROSOL-UTIER's Opposition to the COFINA Settlements are hereby incorporated by reference and form part of this Objection to the Confirmation of the COFINA Plan.

**PROSOL-UTIER**

22. The Unión de Trabajadores de la Industria Eléctrica y Riego, ("UTIER" by its Spanish acronym), was founded in the early 1940´s and it is one of four labor unions that represent the Puerto Rico Electric Power Authority ("PREPA") employees. Since its beginnings, UTIER's mission has been to protect and defend PREPA's workers, as well as negotiate collective bargaining agreements on their behalf.

23. PROSOL-UTIER, on the other hand, is UTIER's Solidarity Program with other public service workers. PROSOL-UTIER's purpose is to carry and promote UTIER's values in advocating for worker's rights through collective bargaining for workers in governmental agencies other than PREPA. It is composed of five (5) Chapters known as follows: (1) Capítulo Autoridad de Carreteras ("HTA Chapter"), with approximately 500 members; (2) Capítulo Instituto de Cultura Puertorriqueña ("ICP Chapter"), with approximately 100 members; (3) Capítulo Oficina del Procurador del Veterano ("OPV Chapter"), with approximately 12 members; (4) Capítulo de Oficina Desarrollo Socioeconómico y Comunitario ("ODSEC Chapter"), with approximately 35 members; and (5) Capítulo de Jubilados ("Retirees Chapter") with approximately 180 members, all collectively known as "PROSOL-UTIER". This accounts for a total of approximately 827 members that are employees of the Commonwealth of Puerto Rico or its instrumentalities or retirees and will be directly affected by the Commonwealth's determinations in the Title III proceedings.

9

24. PROSOL-UTIER members are also participants of the Employees' Retirement System of the Commonwealth, a covered territorial instrumentality, subject to the pension reform according to the Fiscal Plan of the Commonwealth. Thus, the appearing labor unions and retirees are parties in interest and creditors of the Commonwealth that will be severely affected by the approval of the proposed COFINA Plan decades to come.

## COFINA

25. COFINA is an independent instrumentality of the Commonwealth of Puerto Rico, created by Act No. 91 of May 13, 2006, as amended, for the specific purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth of Puerto Rico outstanding as of June 30, 2006. Such obligations were payable to the Governmental Development Bank ("GDB") and the Puerto Rico Public Finance Corporation ("PFC") and were previously payable solely from government budgetary appropriation.[14]

26. The bonds issued under resolutions adopted by COFINA's board of directors will be payable from and secured by a security interest created by the resolution in a specified portion of the newly created sales tax. In 2006, the Commonwealth's legislature enacted legislation approving for the first time in Puerto Rico a sales and use tax ("SUT"). The SUT was 5.5% for the benefit of the central government and a separate 1.5% for the benefit of municipalities of Puerto Rico. Act 91 also created a Dedicated Sales Tax Fund, to be held and owned by COFINA separate and apart from the central government's general fund, and provided, among other things, that each fiscal year the first receipts of the Commonwealth's Sales Tax, in the amount specified in the law, be deposited in this special Dedicated Fund and applied to the payment of the Sales Tax Revenue

---

[14] Government Development Bank for Puerto Rico, Investor Resources, Puerto Rico Sales Tax Financing Corporation (COFINA), available at http://www.gdb.pr.gov/investors_resources/cofina.html.  Last accessed on November 13, 2018.

Bonds. The legislature imposed a SUT on a broad range of goods and services, *see* Fiscal Plan *id.* at 18, and authorized COFINA to issue bonds payable from a dedicated portion of that tax, known as the Pledged Sales Tax Base Amount ("PSTBA"). The SUT revenues are held in an account at Bank of New York-Mellon ("BNYM"). *See id.* at 15-16. A 2007 resolution by COFINA, amended in 2009, fixes the amount of the PSTBA. *See id.* at 15-17. In FY2019, the PSTBA will be $783.2 million, and it will grow by 4% a year after that, until reaching a cap of $1.85 billion in FY2041. *See id.* at 9. On July 1, 2015, the total SUT was increased to 11.5% through enacted legislation.

27. From 2007 through 2011, COFINA issued bonds each year. *See id.* at 81. Although proposed as a means to repay debt, the COFINA bond proceeds were also used to finance ongoing government operations.[15] Now, COFINA owes approximately $17.6 billion to its bondholders. *See* Docket Entry No. 4067, at 15-16. That is less than 40% of Puerto Rico's approximately $45 billion in net tax-supported debt, *see* Fiscal Plan at 35, and less than a quarter of Puerto Rico's $70 billion in overall financial debt, *see id.* at 7.

28. After the enactment of PROMESA, on May 5, 2017, the FOMB filed a Title III petition for COFINA.

29. On November 11, 2018, the FOMB submitted the Second Amended Title III Plan of Adjustment for Puerto Rico's Sales Tax Financing Corporation [Docket Entry No. 4392]. The Plan is based mainly in the COFINA Settlement to which PROSOL-UTIER timely opposed [Docket Entry 4251].

---

[15] *See* United States Government Accountability Office, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them* (May 2018) (hereafter, "GAO Report"), at 38. Available at https://www.gao.gov/products/GAO-18-387. Last access November 13, 2018.

## **STANDARD OF REVIEW**

30. The FOMB has the burden of proof to move this Honorable Court to confirm the COFINA Plan. In the context of Chapter 9 cases, see *In re Mount Carbon Metro. Dist.* (1999, BC DC Colo) 242 BR 18, 17 Colo Bankr Ct Rep 108; metropolitan district failed to meet its burden of satisfying confirmation requirements of 11 U.S.C. § 943(b)(1), (2) and (7) by preponderance of evidence, since plan was not feasible, where it was not suitable vehicle for district to repay its pre-petition debts and provide future public services; in determining that plan was not proposed in good faith, totality of circumstances must be considered, including fact that the role of Bankruptcy Court in Chapter 9 is to supervise reorganization process and is limited in plan confirmation process to disapproving or approving municipality's proposed plan.

31. Section 314 of PROMESA states the requirements for confirmation of a plan of adjustment of debts.[16] The first requirement is that the plan complies with the provisions of the Bankruptcy Code as made applicable to these proceedings by Section 301 of PROMESA.[17] As such, Section 301 of PROMESA incorporates some of the provisions of Section 1129 of the Bankruptcy Code for Chapter 11 cases.

32. Section 1129(a)(3) of the Bankruptcy Code, as incorporated by Section 301 of PROMESA, allows a court to confirm a plan of adjustment of debts only if the debtor proposed a plan "in good faith and not by any means forbidden by law".[18] Since PROMESA is a new law created by Congress specifically for the economic crisis in Puerto Rico (although it is applicable to other territories as well), there is no judicial precedent to rely on. However, for those provisions of the Bankruptcy Code incorporated by PROMESA, the Chapters 9 and 11 precedents can be a

---

[16] 48 U.S.C. § 2174(b)
[17] 48 U.S.C. § 2161(a)
[18] 11 U.S.C. § 1129(a)(3)

persuasive source, considering, though, the uniqueness of the proceedings under PROMESA. In the context of Chapter 11 cases, courts have found good faith when there is "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[19] However, in Chapter 9 cases, courts have applied this text while acknowledging that they must consider the "governmental nature and obligations" of a municipal debtor.[20] Very few courts have elaborated on the good faith requirement. For example, where a plan proposed by a metropolitan taxing district appeared to benefit one creditor, a developer in the district, to the detriment of the other creditors, the court found bad faith because it viewed the plan as a ploy to "harness a governmental entity's taxing power for private profit."[21]

33. Section 314(b)(3) of PROMESA also requires that for the court to confirm a plan of adjustments the debtor cannot be prohibited by law from taking any action necessary to carry out the plan.[22] Moreover, Section 314(b)(5) of PROMESA requires that any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval.[23]

34. Furthermore, according to Section 314(b)(6) of PROMESA the court can confirm a plan if "the plan is feasible and in the best interests of creditors".[24] This requires the court to "consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan".[25] In the context of a Chapter 9 case, which is analogous to the Title III proceedings of the

---

[19] *In re Madison Hotel Assocs.*, 749 F.2d 410, 4225 (7th Cir. 1984) (quoting *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D. Cal. 1985)).
[20] *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999)
[21] *In re Mount Carbon*, 242 B.R. at 42.
[22] 48 U.S.C. § 2174(b)(3)
[23] 48 U.S.C. § 2174(b)(5)
[24] 48 U.S.C. § 2174(b)(6)
[25] *Id.*

Commonwealth, a plan is feasible if the court finds that the debtor can make payments under the plan and provide **"future public services at the level necessary to its viability as a municipality."**[26]

35. Regarding the "best interest" requirement, municipal bankruptcy law does not seek to distribute a municipality's monetary value to its creditors.[27] Therefore, the Chapter 9 best interests test is not based on the value of municipal assets. Courts interpret the Chapter 9 best interests test to require only that "a proposed plan provide a better alternative for creditors than what they already have,"[28] meaning that the creditors would fare better under the plan than they would outside of bankruptcy. Courts have interpreted the legislative history of Chapter 9 to imply that municipal bankruptcy law was not designed to balance the rights of the municipal debtor and its creditors but rather "to meet the special needs of a municipal debtor."[29] Those special needs include the need to remain in existence rather than liquidate,[30] and the need to continue providing public services.[31] The same interpretation can be applied to these Title III proceedings under PROMESA since Section 201 of PROMESA requires that the fiscal plan shall "provide a method to achieve fiscal responsibility and access to the capital markets"[32] (remain its existence rather than liquidate) and "ensure the funding of essential public services"[33] (continue providing public services).

---

[26] *In re Mount Carbon*, 242 B.R. at 35; *see also In re Connector 2000 Ass'n*, 447 B.R. 752, 766 (Bankr. D.S.C. 2011) (finding the plan to be feasible because the municipal debtor would be able to pay its plan obligations and maintain its operations). [Emphasis added]

[27] *See Newhouse v. Corcoran Irrigation Dist.*, 114 F.2d 690, 690–91 (9th Cir. 1940) (explaining that because a municipal bankruptcy is very different from that of a private entity, the business bankruptcy principle that an entity's assets should be applied to its debts in bankruptcy is inapplicable in a municipal bankruptcy).

[28] *In re Mount Carbon*, 242 B.R. at 34.

[29] *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991)

[30] *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 650 (Bankr. E.D. Mich. 1994)

[31] *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999)

[32] 48 U.S.C. § 2141(b)(1)

[33] 48 U.S.C. § 2141(b)(1)(B)

36. Another important requirement of Section 314(b)(7)[34] of PROMESA is that the plan must be consistent with the applicable fiscal plan certified by the FOMB under Title II.

## ARGUMENT

37. As a threshold issue, the FOMB has the burden of proof of establishing that the plan is confirmable under Section 314 of PROMESA.[35] However, the FOMB has not submitted or announced expert testimony to validate the conclusions of the Fiscal Plans and the COFINA Plan. Without expert testimony, it is impossible for this District Court to evaluate the applicable criteria for confirmation and compliance with PROMESA, particularly with Sections 201 and 314.[36] Under these circumstances, this District Court should deny confirmation of the COFINA Plan.

**A. COFINA Plan lacks compliance with the provisions of the Bankruptcy Code as made applicable to these proceedings by Section 301 of PROMESA.[37]**

**1. COFINA Plan is not proposed "in good faith". [38]**

38. According to Dr. Alameda's study, the Fiscal Plans and the COFINA Plan are fundamentally flawed and do not reflect the scientific standards applicable and necessary to achieve PROMESA's goals according to Sections 201 and 314. The assumptions and projections of the Fiscal Plans and the COFINA Plan are unrealistic, unreliable, extremely optimistic and totally out of phase; therefore, totally incompatible or discordant. For instance, Fiscal Plans are projecting revenues for a five-year period and the COFINA Plan for 40 years. Moreover, they are

---

[34] 48 U.S.C. § 2141
[35] 48 U.S.C. § 2141 and 2174.
[36] 48 U.S.C. § 2141. Judicial evaluation of the validity of the actions of the FOMB under Title II of PROMESA is finally ripe. At page 21 of the *Opinion and Order* of February 27, 2018, in the case *Ambac Assurance Corporation v. Commonwealth of Puerto Rico*, *Adv. Proc. 17-159*-LTS, this Court expressed the following:

> Under PROMESA's statutory framework, it is only at the plan confirmation stage that the Court determines whether a proposed plan of adjustment **complies with, among other things, the provisions of Title 11 of the United States Code which have been made applicable to these cases by Section 301 of PROMESA and the relevant provisions of PROMESA.** See PROMESA § 314. [Emphasis added]

[37] 48 U.S.C. § 2161(a)
[38] 11 U.S.C. § 1129(a)(3)

not attuned with basic applicable economics scientific principles necessary to make forecasts of long periods of time. Additionally, the FOMB has recently acknowledged two catastrophic faults that warrants immediate and substantial amendments to the Fiscal Plans and the COFINA Plan: (1) The real influx and timing of federal funds is going to substantially affect growth projections;[39] and (2) pension obligations were underestimated by 3,500 billion dollars.[40] These documents must be substantially modified before any confirmation hearing of the COFINA Plan, because they do not concur with the real circumstances and, moreover, are neither reliable nor feasible.

39. Dr. Alameda's findings could be summarized in the following: (1) the COFINA Plan is uncertain and totally unreliable; (2) the COFINA Plan cannot be consistent with the Fiscal Plans because they are uncertain and totally unreliable; (3) the Fiscal Plans and the COFINA Plan are not feasible; (4) the Fiscal Plans and the COFINA Plan do not ensure the funding of essential public services;  (5) the Fiscal Plans and the COFINA Plan do not provide adequate funding for public pension systems; (6) the Fiscal Plans and the COFINA Plan do not provide for the elimination of structural deficits; and, (7) before or after 2034, the Fiscal Plans and the COFINA Plan will lead Puerto Rico to another default of payment in the bondholders obligations. In sum, the Fiscal Plans are not economically feasible and lack scientific reliability to develop dependable revenue and expenditures projections, which are indispensable to address the confirmation of the COFINA Plan.

40. Notwithstanding those evident mistakes, the FOMB is ignoring the dire consequences for Puerto Rico of such unnecessary fast pace to confirm a flawed plan. The excessive haste to

---

[39] José A. Delgado, La Junta acude a la administración Trump para la liberación de fondos. Endi.com (December 14, 2018), available at https://www.elnuevodia.com/noticias/locales/nota/lajuntaacudealaadministraciontrumpparalaliberaciondefondos -2465567/
[40] Joanisabel González, *Error en el cálculo de las pensiones en el plan fiscal,* Endi.com (Nov. 20, 2018) available at https://www.elnuevodia.com/noticias/tribunales/nota/errorenelcalculodelaspensionesenelplanfiscal-2460896/

confirm the COFINA Plan makes the FOMB commit fundamental errors that will cost too much suffering to Puerto Rico. Such rush to reach agreements and confirm plans for adjusting debts is not a reasonable basis to proceed under Title III considering that they are dealing with a nation populated by American citizens. This frenzy could be indicative that the motivations are unrelated to compliance with the requirements of PROMESA. The FOMB has not demonstrated the minimum candor of accepting these mistakes and to pray for this Honorable Court for the postponement of the confirmation process of the COFINA Plan until all the documents are amended and corrected to be credible, reliable and in compliance with PROMESA.

41. Given the vast resources and advisors that the FOMB is using to purportedly comply with its fiduciary duties under PROMESA and the abusive cost burden that Puerto Rico is suffering in that endeavor, pretending the confirmation of such a defective plan of adjustment of debt **constitutes bad faith that makes the COFINA Plan unconfirmable.**

**B.** **"The COFINA Plan is not feasible and in the best interests of creditors"** [41] **because debtor cannot make payments under the plan and provide "future public services at the level necessary to its viability as a municipality."** [42]

    **1.** **There is not "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code"** [43] **considering the "governmental nature and obligations" of a municipal debtor.** [44]

    **2.** **The COFINA Plan does not "meet the special needs of a municipal debtor."** [45]

---

[41] 48 U.S.C. § 2174(b)(6)

[42] *In re Mount Carbon*, 242 B.R. at 35; *see also In re Connector 2000 Ass'n*, 447 B.R. 752, 766 (Bankr. D.S.C. 2011) (finding the plan to be feasible because the municipal debtor would be able to pay its plan obligations and maintain its operations).

[43] *In re Madison Hotel Assocs.*, 749 F.2d 410, 4225 (7th Cir. 1984) (quoting *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D. Cal. 1985)).

[44] *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999)

[45] *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991)

### 3. The COFINA Plan neglects the need of Debtors to remain in existence rather than liquidate,[46] and the need to continue providing public services.[47]

42. PROMESA is a new law created by Congress specifically for the economic crisis in Puerto Rico (although it is applicable to other territories as well), and there is no judicial precedent to rely on. However, for those provisions of the Bankruptcy Code incorporated by PROMESA, Chapters 9 and 11 precedents can be a persuasive source, considering, though, the uniqueness of the proceedings under PROMESA. In the context of Chapter 11 cases, courts have found good faith when there is "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[48]   However, in Chapter 9 cases, courts have applied this text while acknowledging that they must consider the **"governmental nature and obligations" of a municipal debtor.**[49]

43. The Commonwealth of Puerto Rico and COFINA are governmental institutions that could not be liquidated. In the case of the Commonwealth, it also has the fundamental constitutional obligation of providing its residents of the Puerto Rico of essential services to maintain a reasonable standard of living. That is why Section 201 of PROMESA acknowledged those obligations and requires that the fiscal plans should enforce the protections of essential services, pensions systems, and achieve fiscal responsibility and access to capital markets at affordable cost. Unfortunately, the FOMB has not even complied with defining what essential services are. Therefore, there is no reliable determination of what are the essential functions of the government that must be preserved above the obligations with the bondholders.

---

[46] *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 650 (Bankr. E.D. Mich. 1994)
[47] *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999)
[48]  *In re Madison Hotel Assocs.*, 749 F.2d 410, 4225 (7th Cir. 1984) (quoting *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D. Cal. 1985)).
[49] *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999)

44. That is why the expenditures and revenues projections over a long term of the Fiscal Plans and the COFINA Plan should be reliable, but as established without a doubt by Dr. Alameda, they are not. Therefore, the FOMB has no idea of the real expectations of responsibility of maintaining the **"governmental nature and obligations" of a municipal debtor.**

45. According to Dr. Alameda's conclusions, the People of Puerto Rico assume all the risks in the COFINA Plan:

a.  The COFINA Plan of Adjustment of Debt will be effective for the next 40 years. This is a very long-range time frame, and too many unforeseen circumstances will be coming that would affect the feasibility for compliance of the plan. The Fiscal Plans have been designed under an implicit assumption of complete certainty; any margin of error has been taken away without any reasonable explanation.

b.  Any 40 years long run forecast of SUT collections from the FOMB, is highly uncertain, because Puerto Rico's economy faces an economic secular stagnation.

c.  The COFINA Plan saddles Puerto Rico with escalating debt payments for the next 40 years, even though the economy has been in a decade-long slump and will continue with marginal or negative growth for the next 40 years. The Fiscal Plans admitted this economic downturn.

d.  The Commonwealth Fiscal Plan forecasted a primary deficit for year 2035; rising the certainty of defaulting debt payment and, again, forcing new cuts to public pensions and essential services, as well as other austerity measures.

e.  The growth rates of nominal GNP and Consumption Expenditures have, in paper, the long-run capacity to repay COFINA bondholders, but they are unrealistic and so far, extremely optimistic. Overly optimistic assessments of those prospects are a sure recipe for failure.

19

f.  The FOMB insists in the conventional assumption that the U.S. economy is the main driver of Puerto Rico's economic growth, which is no longer valid nor realistic due to secular stagnation.

g.  The FOMB's economic foundations and policies ignored the Circular Cumulative Causation theory that refers to pervasive effects of any initial changes in relevant variables such as loss in population and governmental cuts of essential services.

h.  A significant flaw of the FOMB's projections is that they are based only in one scenario or a single value, especially when the forecasting endeavor for a 40-years horizon is so risky. To be reliable, when projecting in such a long range, it is necessary to design different economic models to assess long run uncertainty.

i.  On December of 2018, the government enacted a Tax Reform which reduced the rate to B2B and the SUT rate to 7% for prepared foods (See Table 7 of the Study). The COFINA Fiscal Plan does not consider the effects of such Tax Reform in the forecasted values.

j.  Both Fiscal Plans focused narrowly over its timeframe range (until 2023) despite that the COFINA Agreement to Bondholders ranged a longer timeframe up to FY 2058.  The COFINA Fiscal Plans skipped relevant circumstances beyond 2024, especially when most of the Federal Funds for Disaster Relief will be exhausted by that time. The timeframe of the Fiscal Plans and the COFINA Plan are inconsistent, thus fail to establish a foundation for its feasibility and the reliability of the projections.

k.  Timing and pace of the influx of Federal Disaster Relief funds is uncertain and just for 5 years, while Medicaid funding is temporarily for the next two years. The FOMB's Executive Director, Natalie Jaresko admitted that any prolonged delay in the delivery of the funds destined for the recovery and reconstruction of the island, after the catastrophe

20

caused from September 20, 2017 by hurricane María, can alter the Fiscal Plans. The effectiveness as a growth factor of the Federal Disaster Relief funds is also in question. Most of those funds have been assigned to non-local firms which are capturing over 90% of them. Those funds will leave Puerto Rico with none or little positive impact in the local economy. Furthermore, given the uncertainty of the arrival and timing of the Federal Funds for Disaster Relief, the FOMB has no contingency plan to achieve the economic goals pursued in the Certified Fiscal Plan. Such economic uncertainty and the fragility of the assumptions and projections of the FOMB has led to several versions of the Fiscal Plan and there will be a continuous need to keep amending the Fiscal Plan once it is evident that its goals have not been met.

l. It would be irresponsible to expect the short-term Federal Disaster Relief funds to last and support a rising debt service burden for over 40 years. Indeed, federal budget transfers are due to fall off a cliff in just five years. Moreover, the Island's economic growth will be impeded by poor demographics, as the economically active population will likely continue to move to the mainland in search of better opportunities and access to essential services.

m. With Puerto Rico's limited ability to repay at the long run, a generous agreement with one set of bondholders necessarily reduces what the Commonwealth can reasonably offer to other bondholders and claimants and to cover for essential services and retirees. The sustainability of Puerto Rico's debt restructuring needs to be assessed comprehensively, not by looking narrowly at each piece of a bigger puzzle.

n. The effects of a waning economy will result in a constant yearly reduction in SUT revenues for the Commonwealth. By giving COFINA a "first dollars" claim on the SUT, it will increase the risk of a substantial decline in tax revenues of the Commonwealth of Puerto

21

Rico. Over the 40 years term of the COFINA Plan almost 1 billion dollars of the Commonwealth's SUT funds will be lost. (See Table 11 of the Study)

o. Reducing COFINA's payments to its bondholders would result in the availability of more resources to the General Funds of the Commonwealth, and consequently, more revenues that could be allocated to finance essential services and other governmental obligations for the population and the pension liabilities as required by Section 201 of PROMESA.

46. The FOMB recognized Puerto Rico's crucial demographics problems but ignores its real consequences. Less population means a diminished workforce; thus, Puerto Rico's economy will struggle to grow. Over the past decade, its GNP has shrunk by 20%. The FOMB projects that in the long-term, the Island's economy will grow, but at an anemic rate. It also foresees that the Commonwealth's tax-backed revenues are not expected to rise any faster than that low GNP growth rate. These conditions will undoubtedly reduce the amounts of SUT collected for every year this outmigration continues.

47. Because the Island's tax-revenues are expected to grow no faster than nominal GNP, the growing payments to COFINA will inevitably siphon off one billion dollars of the Commonwealth's scarce revenues; money that could otherwise be used to cover essential services, repair roads, build infrastructure, pay pensions, fund healthcare, and meet the countless other pressing needs of the Puerto Rican people.

48. For example, as of this moment, the Commonwealth has been able to pay the retirement system pensions from the general fund account because right now it is not paying bondholders. The Commonwealth pays benefits under a "pay-as-you-go" system. However, the proposed COFINA Plan would reduce substantially the revenues available to cover for retirement system

22

payments. The FOMB projects that such "paygo" pension payments will consume a substantial portion of the Commonwealth's general fund.

49. This ability to pay pensions would change dramatically with the beginning of debt service to COFINA bondholders and will certainly worsen with the obligation of debt services to GO bonds with the confirmation of the Commonwealth's plan of adjustment. This will create an enormous burden on the feasibility of these essential payments, surely condemning retirees to misery.

50. The COFINA Plan would bind the Commonwealth to unaffordable payments for decades, until all the new COFINA bondholders are paid. That would not be until 2058, at the earliest. Those payments could stretch beyond 2058 if an economic or climate catastrophe occurs, resulting in the 5.5% SUT providing less than the required COFINA payment in one or more years, forcing the Commonwealth to make additional payments plus compounded interest. Under these circumstances, the government would have to choose between funding essential services, payments to retirees or bondholders and other creditors. This dilemma would certainly result in choosing essential services and pensions, forcing a new and more costly default.

51. The COFINA Plan does not consider the detrimental effect on the necessary revenues of the Commonwealth, nor the injurious effects on the appearing parties, or similar parties, and the People of Puerto Rico. This, sidestepping the fundamental fiduciary and legal duty of the FOMB to protect essential services and avoid the devastating consequences of increasing the suffering of the People by intensifying the austerity measures already in place or projected, in order to comply with an unpayable plan of adjustment that is just a portion of an unbearable debt.

52. This Court should reject the proposed COFINA Plan because it gives too much to bondholders and leaves too little tax revenue to meet other obligations, funding for essential services and pension payments that are critical needs of Puerto Rico's people.

53. If Puerto Rico and its people are going to have any realistic expectation of reconstructing the Island's economy, accessing capital markets in the future, and achieving some modicum of prosperity, the Commonwealth's existing bond debt needs to be cut deeply. As the FOMB acknowledges, Puerto Rico has a "staggering debt burden" that demands "comprehensive restructuring." *See* Fiscal Plan 11, 13.

54. The COFINA Plan cannot be interpreted as a solution that makes indispensable cuts to the debt. The sustainability of Puerto Rico's debt requires a cut in the magnitude of at least 50 to 80 percent.[50] The Plan reduces COFINA's claimed portion of the PSTBA by less than 47%.[51] The proposed Plan simply does not cut the debt enough even under this conservative estimate. Such a shy reduction of a significant portion of the Commonwealth's bond debt is simply inconsistent with what Puerto Rico and its people need to achieve a meaningful fresh start in these reorganization proceedings.

55. Perhaps the FOMB could argue in a reasonable way in favor of the Plan if Puerto Rico had no bond debt other than COFINA and if the COFINA debt service remained constant in real terms over time. **But neither of these things is correct.**

---

[50] In a recent study of Puerto Rico's debt, Columbia University economist and Noble prize-winner Joseph Stiglitz and his co-authors concluded that "the most conservative estimate of the territory's relief needs" would include full cancellation of interest payments on bonds "plus 50 to 80 percent of face value reduction." Pablo Gluzmann, Martin Guzman, and Joseph Stiglitz, *An Analysis of Puerto Rico's Debt Relief Needs to Restore Debt Sustainability* ESPACIOS ABIERTOS (Jan. 2018), at 4. Available at http://www.shankerinstitute.org/sites/shanker/files/PR_DSA-2018.01%20Guzman%20Stiglitz.pdf. Accessed on November 13, 2018.

[51] That reduction becomes even smaller when one factors into the Commonwealth-COFINA percentage split COFINA's capture of nearly all of the $1.2 billion in pre-2019 deposits in the BNYM account.

24

56. The Ad Hoc Group of General Obligation ("GO") Bondholders, who hold a significant portion of Puerto Rico's bond debt, claim that their bonds have a priority secured by Puerto Rico's constitution. *See, e.g.,* Docket Entry No. 16 in *Bank of New York Mellon v. COFINA et.al*, Adv. Proc. No. 17-00133-LTS; *see also* Docket Entry No. 4079. COFINA constitutes a significant but still small portion of the Island's existing $45 billion in tax-backed bond debt of a total $70 billion bond debt, plus almost 50 billion dollars in pension liabilities and an undetermined unsecured amount. These reorganization proceedings will undoubtedly result in Puerto Rico having to pay substantial amounts to bondholders other than COFINA. If the GO bondholders would receive a payout comparable to the COFINA bondholders, where would the money come from to pay both groups, as well as the essential services, retirees, other bondholders and general unsecured creditors?[52] The Plan urged here irresponsibly forges an obligation to COFINA's new bondholders that would leave Puerto Rico with little or nothing to cover for essential services, retirees and its other bond debt and unsecured creditors.

57. The commitment to COFINA is reckless even when one considers only FY2019. But the proposed Plan will become even more unaffordable with time. As the PSTBA escalates by 4% per year, the burden of payments to COFINA will rise inexorably, until reaching a peak of nearly $1 billion in FY2041, and then continuing at that level through FY2058 (and possibly beyond). *See* Docket Entry No. 4068, at 197. This steady enlargement of the required COFINA payments by 4% per year would far outpace the weak growth of the Puerto Rican economy, whose nominal

---

[52] *See* Brad Setser, *Will the Proposed Restructuring of COFINA Bonds Assure Puerto Rico's Return to Debt Sustainability?* COUNCIL ON FOREIGN RELATIONS (Sept. 27, 2018) (hereinafter "Setser") (the GO bondholders "will no doubt argue for a mirror image deal that would raise Puerto Rico's debt service to $2 billion"). Available at https://www.cfr.org/blog/will-proposed-restructuring-cofina-bonds-assure-puerto-ricos-return-debt-sustainability?sp_mid=57452461&sp_rid=bWFyay5sZXZpbnNvbkBzZWl1Lm9yZwS2. Accessed on November 13, 2018. Stetser, an economist who is a fellow for international economics at the Council on Foreign Relations, served as deputy assistant secretary for international economic analysis in the U.S. Treasury. *See* https://www.cfr.org/expert/brad-w-setser.

long-term GNP growth the FOMB projects at 1.6%.  *See* Fiscal Plan, at 32. Even that projected

scanty growth assumes the FOMB's "measures" and "reforms" are fully implemented, and that its

projections are accurate.  This is an economic expectation that has been questioned by the most

respectful economists of Puerto Rico and from abroad.

58. As explained above, even if Puerto Rico's tax revenues continue as projected, the

proposed Plan imposes an unsustainable burden.  But, of course, the long-term projection of future

performance of Puerto Rico's economy, and the tax revenues it generates, are highly uncertain and

unreliable. Puerto Rico has a history of overestimating tax revenues.  The odds are that in the

decades between now and 2058, one or more macroeconomic catastrophes or natural disasters will

devastate Puerto Rico, flattening both its economy and its tax revenues.  But because the COFINA

Plan provides that COFINA be paid "first dollars" from the 5.5% SUT, *see* Docket Entry No. 4067,

at 91, it shields the COFINA bondholders from the risks of the Island's future economic

underperformance, placing that risk squarely on the Commonwealth.  Moreover, rather than

offering the Commonwealth and its people any relief in the event of an unforeseen catastrophe,

the COFINA Plan would make the Commonwealth responsible for making up any missed

payments, plus compounded interest.  *See* Docket Entry No. 4068, at 178.

59. The Commonwealth agreed to a Plan that is not in the best interest of the

Commonwealth and the Puerto Rican people.  Puerto Rico's elected leaders have had a notorious

track record of undertaking obligations to bondholders that the Island cannot afford. And now, the

FOMB, in proposing a Plan to COFINA that is impossible to comply with, joins this horrible

tradition of Puerto Rico's political class of dilapidating the little resources available to provide for

essential services and retirees. This proposed Plan, is a perfect example of that reckless approach

that landed Puerto Rico in the debt crisis in the first place. **This Court should not allow it to happen again here.**

**C. COFINA Plan is "forbidden by law"[53] or requires that any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval.[54]**

60. The Bankruptcy Code and PROMESA requires that the Plan is not forbidden by law and that any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval.[55] However, as particularly detailed in this document, the Fiscal Plans and the COFINA Plan fail in the imperative compliance with Section 1129(a)(3) of the Bankruptcy Code and Sections 201 and 314 of PROMESA, thus the COFINA Plan is unconfirmable.

61. Moreover, confirming the COFINA plan under the circumstances detailed in this document is not only unreasonable, but also, a jump into the emptiness of futility, because in a near future, the Supreme Court of Puerto Rico could rule that the COFINA enabling Act is unconstitutional. The constitutionality of Act 241 of November 15, 2018 is being challenged before the First Instance Court of Puerto Rico, San Juan Part, in the case *Manuel Natal-Albelo, et als, v. Commonwealth of Puerto Rico, et al*, Civil No. SJ2018CV10569. In this case, Representative Manuel Natal-Albelo and the rest of the appearing parties are challenging Act 241-2018 which corresponds to an amendment to Act 91-2006 that created COFINA (13 L.P.R.A. secs 11(a) et seq.). Pursuant to Act 241-2018, amendments to Act 91-2006 were adopted to make viable

---

[53] 11 U.S.C. § 1129(a)(3)
[54] 48 U.S.C. § 2174(b)(3); 48 U.S.C. § 2174(b)(5)
[55] 48 U.S.C. § 2174(b)(5)

the execution of the COFINA Agreement. The basis of the constitutional challenge is that the statute is unconstitutional because as part of the legislative process, the Regulations of the House of Representatives were breached and the constitutional rights of the Plaintiffs, and particularly of Representative Natal-Albelo, were violated. Among those constitutional rights there are the right to free speech and to vote set forth in the Constitution of the Commonwealth of Puerto Rico and the Constitution of the United States of America. To the extent that Act 241-2018 is necessary to execute the COFINA Plan, and to the extent it may be declared unconstitutional by the Puerto Rico Courts, the plan of adjustment of debts cannot be confirmed.

62. Moreover, as Dr. Alameda stated with scientific basis in the Study, both the Certified Fiscal Plans and the Plan of Adjustment of COFINA are not compliant with the provisions of Section 201(b)(1) of PROMESA that requires the Fiscal Plan to ensure the funding of essential public services, provide adequate funding for public pension systems and provide for the elimination of structural deficits.[56]

**D. COFINA Plan disregards Section 201 of PROMESA that requires that the fiscal plan shall "provide a method to achieve fiscal responsibility and access to the capital markets"[57] and "ensure the funding of essential public services".[58]**

63. One of the main failures of the Fiscal Plans and the COFINA Plan is that the FOMB has repeatedly declined to define the term "essential services" in order to adequately protect them, as it is required by Section 201 of PROMESA.[59] Section 201 of PROMESA mandates specific criteria for the Commonwealth's fiscal plan, including that the plan has to provide for estimates of

---

[56] See 48 U.S.C. § 2141(b)(1)(B), (C) and (D)
[57] 48 U.S.C. § 2141(b)(1)
[58] 48 U.S.C. § 2141(b)(1)(B)
[59] 48 U.S.C. § 2141(b)(1)(A),(B),(G),(J).

revenues and expenditures in conformance with agreed accounting standards and must identify and ensure the funding of essential services.[60] The Commonwealth's fiscal plan certified by the FOMB, on its face, does not comply with such requirement. It makes no attempt to identify essential services, such as education, health and public safety. Thus, the confirmation of the COFINA Plan creates a hazard and an invasion to the legally protected interest of the appearing parties.  These and other violations of PROMESA within the fiscal plan process are necessarily repeated in the COFINA Plan, since PROMESA also prescribes that a Title III plan of adjustment cannot be confirmed unless it complies with the fiscal plan.[61] Absent a definition of what services should be protected as essential, there is no way to comply with the COFINA Settlement and Plan without immediately or eventually impairing those services such as health, education and public safety, among others.

**E.  COFINA Plan disregards Section 314(b)(7)[62] of PROMESA that states that the plan must be *consistent* with the applicable fiscal plan certified by the FOMB under Title II.**

64. According to Oxford Living Dictionaries, *consistent* means: acting or done in the same way over time, especially so as to be fair or accurate; unchanging in nature, standard, or effect over time; (of an argument or set of ideas) not containing any logical contradictions; compatible or in agreement with something.[63]

---

[60] *Id.*
[61] 48 U.S.C. § 2141
[62] 48 U.S.C. § 2174(b)(7);
[63]     Oxford    Living    Dictionary,    *Consistent,*    Oxford    University    Press,    available    at
https://en.oxforddictionaries.com/definition/consistent, Last accessed January 1, 2018.

65. The COFINA Plan was not done in the same way or unchanging in nature, contains logical contradictions and is not in agreement with the Fiscal Plans. Therefore, does not comply with Section 314(b)(7) of PROMESA.

66. Dr. Alameda's findings clearly establish that the Fiscal Plans focused on their projections narrowly over its timeframe range (until 2023) despite that the COFINA Agreement to Bondholders in which the COFINA Plan is based ranged a longer timeframe up to FY 2058. The COFINA Fiscal Plan skipped relevant circumstances beyond the year 2024, among many, especially that most of the Federal Funds for Disaster Relief will be exhausted by that time. The timeframe of the Fiscal Plans and the COFINA Plan are inconsistent, thus they fail to establish a strong foundation for its feasibility and the reliability of the projections that are indispensable for the confirmation by this Honorable Court.

67. There could not be any consistency upon so much uncertainty and unreliability. Dr. Alameda, at pages 45-46 of the Study, points out several observations that need to be considered when examining the consistency of the COFINA Plan with the Fiscal Plan as required by Section 201 of PROMESA:

> A longer timeframe forecast period generates higher standard errors, which means higher degree of uncertainty. Such uncertainty would be reflected in the forecasted values; the more uncertainty, then, a wider width of the forecasting errors. Blix and Sellin (1998) stated that the degree of uncertainty should also reflect how it is compared to historical periods or previous forecast rounds.[64] This uncertainty can arise from the key assumptions in the independent variables or even in the specification of any forecasting model(s). The behavior of these variables is subject to a great number of risk factors or elements at the long run, driving the forecaster to a black hole.
>
> The baseline projections presented by the FOMB, which served as a crucial technical support to the COFINA Agreement, represented a midrange of possible outcomes for the local economy and the U.S. economy. But considerable uncertainty surrounds any

---

[64] Blix and Sellin, *Uncertainty bands for inflation forecasts,* Sveriges Riksbank Working Paper Series, No. 65 Provided in Cooperation with: Central Bank of Sweden, Stockholm. Available at www.econstor.eu/bitstream/10419/83036/1/76864125X.pdf.

projections for two reasons. First, the local and the U.S. economy, are highly complex and they would be affected by many economic and technical factors that are difficult to predict. Second, future legislation is likely to alter the paths of federal spending and revenues, but also local legislation. Climate changes also impose to Puerto Rico and the East Coast of United States an unpredictable future for socio-economic damages and infrastructure scenarios.

Given such uncertainties, the COFINA Agreement, running under a 40-years ahead of economic conditions and overwhelming risky elements, jeopardizes the resources allocated for public services.

68. Furthermore, on December of 2018 the government enacted a Tax Reform which reduced the rate to B2B and the SUT rate to 7% for prepared foods (See Table 7 of the Study). The COFINA Fiscal Plans do not consider the effects of such Tax Reform in the forecasted values.

## CONCLUSION

The Commonwealth of Puerto Rico and COFINA Fiscal Plans do not comply with PROMESA, among other things, for lack of a definition of the term "essential services", and they are not consistent nor economically feasible for lack of scientific reliability to develop dependable revenue and expenditures projections that are indispensable to address the confirmation of the COFINA Plan. Those requisites are basic and mandatory elements to comply with the provisions of Sections 201 and 314 of PROMESA. Dr. Alameda has refuted the reliability of the COFINA Plan and the sustainability of the debt restructuring for Puerto Rico's sales tax-backed bonds. The COFINA Plan will bring many unreasonable and negative economic and social consequences for Puerto Rico, **that this Honorable Court is now in the position to prevent**, such as the impairment of the resources available to pay for essential services and for the pensions of more than 167,000 retirees.

For the foregoing reasons, the Court should deny the confirmation of the COFINA Plan. In Ponce, Puerto Rico, this 2nd day of January 2019.

31

Respectfully submitted,

/s/Rolando Emmanuelli Jiménez
USDC: 214105

/s/Jessica E. Méndez Colberg
USDC: 302108

Bufete Emmanuelli, C.S.P.
P.O. Box 10779
Ponce, Puerto Rico 00732
Tel.: 787-848-0666
Fax: 1-787-841-1435
E-mail: rolando@bufete-emmanuelli.com
jessica@bufete-emmanuelli.com
notificaciones@bufete-emmanuelli.com

**WE HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and Standard Parties. Paper copies have been mailed pursuant to Section II of the *Seventh Amended Notice, Case Management and Administrative Procedures*:

(i) Chambers of the Honorable Laura Taylor Swain (two copies shall be delivered to the chambers):
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Suite No. 3212
New York, New York 10007-1312;

(ii) Office of the United States Trustee for Region 21
Edificio Ochoa, 500 Tanca Street, Suite 301
San Juan, PR 00901-1922

/s/Rolando Emmanuelli Jiménez
USDC: 214105

/s/Jessica E. Méndez Colberg
USDC: 302108

## **APPENDIX**

### **Exhibit 1**

**Expert report of José Israel Alameda-Lozada, Ph.D. ("Dr. Alameda"), professor of Economics and Economic Planning at the University of Puerto Rico, Mayagüez Campus.**

### **Exhibit 2**

**Dr. Alameda Academic Curriculum Vitae**

### **Exhibit 3**

**Declaration of José Israel Alameda Lozada, Ph.D., in support of Objection to Confirmation of Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation ("COFINA") [Case No. 17-3284, Docket Entry No. 380]**