IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

---

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD OF PUERTO RICO,

    As representative of

THE COMMONWEALTH OF PUERTO RICO, et al.,

    Debtors[1].

PROMESA
Title III

No. 17 BK 3283-LTS

---

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD OF PUERTO RICO,

    As representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION,

    Debtor.

PROMESA
Title III

No. 17 BK 3284-LTS

---

**OBJECTION OF MARK ELLIOTT, INDIVIDUALLY AND D/B/A ELLIOTT ASSET MANAGEMENT, TO ENTRY OF AN ORDER APPROVING THE SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF PUERTO RICO SALES TAX FINANCING CORPORATION.**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III and the last four (4) digits of each Debtor's federal tax identification numbers, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK3567-LTS) (Last Four Digits of Federal Tax ID:3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case N. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title II case numbers are listed as a bankruptcy case number due to software limitations).

1

Mark Elliott ("Elliott"), individually and d/b/a Elliott Asset Management ("EAM"), as a creditor and as a party in interest by virtue of his/its investment in Junior bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA") and the potential for direct and adverse pecuniary harm, hereby objects to entry of an order approving the Debtor's *Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (the "Plan"). As further discussed herein, Elliott objects to the Plan because (i) The proposed settlement plan ignores the threshold issue of what are "available resources"; therefore the Plan is premature and should be rejected (ii) the plan should be rejected because it violates 48 U.S.C. §2174 (b)(6), in that the plan is not feasible and not in the best interests of creditors because there exist available remedies under non-bankruptcy laws and the constitution of the territory which would result in greater recovery for the creditors than is provided by the plan, (iii) the proposed plan strips Junior bondholders of constitutionally protected property rights without just compensation, (iv) the Plan treats Senior and Junior COFINA bondholders differently, even though there is adequate pledged security to repay fully both classes equally, (v) the Senior bondholders and Mediating Team (the "Senior Coalition"), which claims to represent Junior bondholder interests in settlement negotiations, is conflicted by virtue of holding positions in both Senior, Junior, and GO bonds, (vi) general obligation bondholders have no basis to challenge COFINA bondholders' lien on SUT revenue, (vii) approval of the plan sets an untenable precedent and will have grave consequences for the bond market generally and the Commonwealth in particular.

In support of this Objection, Elliott states as follows:

**ELLIOTT'S OBJECTIONS TO THE PLAN**

I. **The Proposed Settlement Plan (the "Plan") Ignores the Threshold Issue of What Are "Available Resources"; Therefore, the Plan is Premature and Should Be Rejected.**

1. COFINA's Enabling Act specifically states that revenue deposited into the Dedicated Sales Tax Fund shall not "constitute resources available to the Commonwealth of Puerto Rico." 13 L.P.R.A. §3.

2. Since GO bondholders claim the opposite, that the SUT is an available resource, the threshold question is whether the SUT is an "available resource" for the Commonwealth of Puerto Rico to pay its debts.

3. Based on a plain reading of the statute, the answer is unequivocally no, the SUT dedicated to securing the COFINA bonds is not an "available resource" under Puerto Rican law.

4. This threshold issue should be decided by this Court prior to ANY agreement of ANY bondholder interested.

5. The consequence of not addressing this issue now is that Puerto Rico will at best suffer depressed bond values or, at worst, be locked out of the bond market altogether, which is contrary to the mandates of PROMESA and the obligations of the Oversight Board. See 48 U.S.C. §2128.

6. This issue must be fully litigated and decided before any settlement plan is put forth.

7. Finally, issuing new Senior bonds, whatever the value, solves nothing. The bonds are still backed by the same tranche of SUT taxes, but with no clarity on whether the Commonwealth has access to that tranche for payment of other, non-COFINA, liens in the future.

8. Thus, the newly created bonds will likely be valued as any other unsecured investment of Puerto Rico.

9. Therefore, the Plan should be rejected.

**II. The Plan Should Be Rejected Because It Violates 48 U.S.C. §2174 (b)(6), in That the Plan is Not Feasible and Not in The Best Interests of Creditors Because There Exist Available Remedies Under Non-Bankruptcy Laws and the Constitution of The Territory Which Would Result in Greater Recovery for The Creditors Than is Provided by the Plan.**

10. Under the PROMESA statute, Chapter 20 of Title 48 of the United States Code, the Oversight Board was created to provide a method for a covered territory to achieve fiscal responsibility and to access the capital markets. 48 U.S.C. §2121(a).

11. The Oversight Board has the responsibility, at the appropriate time, to file a plan of adjustment of the debts of the debtor. 48 U.S.C. §2172(a).

12. The court shall confirm the plan if, among other things, "the plan is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." 48 U.S.C. 2174(b)(6).

13. Here, for all of the reasons stated herein, the Plan is not in the best interests of the creditors. That is, the Plan is good for only two classes of creditors, Senior and GO bondholders, but comes at the expense of and to the detriment to Junior bondholder claims.

14. Further, there are available remedies, outside of this Title III case, which would result in greater recovery for the creditors.

4

15. The Plan calls for Senior bondholders, many of whose bonds are callable and many (but not all) tax-free, to receive new bonds at only a five percent (5%) discount, (with a two percent [2%] "bonus" for voting for the plan).

16. The new Senior bonds under the Plan are non-callable, triple tax-free (interest not subject to state/city and federal tax) bonds which will pay almost five percent (5%) interest, non-callable for seven (7) or more years.

17. Junior bondholders, whose bonds are predominantly tax free, are now expected to agree to a 44% discount in exchange for the new Senior bonds, even though the bonds were validly secured by the SUT and the SUT is not an available resource of the Commonwealth.

18. There is a valid and fair alternative to the Plan, though, which would save the Commonwealth money and treat all COFINA bondholders equally, as they rightfully should be. This alternative was outlined in part in the refinancing provisions of the 5 June 2018 agreement in principle. Adv. Proc. No. 17-00257-LTS, Docket entry No. 484.

19. First, GO bondholders should not share in the SUT; the SUT is legitimately earmarked as security for COFINA bonds. This fact is beyond legal argument as it is explicit in the statue. 13 L.P.R.A. §12.

20. Once the legal status of COFINA bonds is established, bond ratings should increase, AAA for Senior bonds and AA-AA+ for Juniors.

21. Then, since most COFINA bonds are callable, the Commonwealth can immediately call the existing bonds (paying approximately six percent (6%) interest) and, at the same time, issue new bonds with a new, triple tax-free bonds at a presumably lower interest rate.

22. In the end, the Commonwealth would save money on interest while satisfying 100% of its statutory obligations and, further, avoid disparate treatment of bondholders.

23. Therefore, the Plan should be rejected.

### III. The Proposed Plan Strips Junior Bondholders of Constitutionally Protected Property Rights Without Just Compensation.

24. The "bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation. United States v. Securities Industrial Bank, 459 U.S. 70, 75 (1982).

25. The Taking Clause prohibits the U.S. Government from taking "private property…for public use…without compensation. U.S. Const. Amend V.

26. Where, as here, a regulation (such as approval of a bankruptcy plan) goes "too far", it amounts to a regulatory taking which strips all value from the lien. See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922) ["The general rule at least is, that while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking.].

27. COFINA bonds, pursuant to COFINA's Enabling Act, are secured by specific SUT revenue.

28. Every bond indenture clearly states that COFINA's statutory lien on the SUT is not an "available resource" for Puerto Rico to repay General Obligation ("GO") bondholder claims.

29. The Plan contemplates favorable financial treatment of both (GO) bondholders and Senior bondholders at the expense of Junior bondholders.

30. In fact, Senior bondholders only face a proposed five percent (5%) decrease to the value of their bonds according to the Plan, but this loss is not an accurate representation because the new Senior bonds will come with call protection for 7 years at five percent (5%) interest and tax-free status.

6

31. Senior bondholders who are residents of the Commonwealth will face only a three percent (3%) decrease with the two percent (2%) "bonus", a further sign of an arbitrary and discriminatory Plan proposed by a conflicted Senior Coalition.

32. These new features will give existing Seniors, whose bonds were taxable and immediately callable, over one-hundred percent (100%) recovery in terms of value.

33. GO holders stand to gain forty-six and thirty-five hundredth percent (46.35%) of the five and a half percent (5.5%) total SUT revenue, even though GO bondholders should not be entitled to share in the SUT revenue (more on this later)!

34. Incredibly, though, the Plan forces Junior bondholders to take a proposed 44% discount on the value of their bonds. For many, if not most, bondholders, this decrease would render their bonds worthless; a taking without just compensation.

35. In contrast to Senior "losses" (which in reality amount to a gain in value), Junior losses will be even greater than forty-four percent (44%).

36. According to the Plan, in addition to taking a fifty-six percent (56%) haircut, Juniors will also lose out on the accrued interest being held in escrow. No other class of creditors will come close to the sacrifice demanded of Junior bondholders.

37. Put simply, Junior bondholders face the prospect under the plan of recovering nearly valueless property rights in COFINA bonds without adequate compensation.

38. In the words of the Supreme Court in *Pennsylvania Coal Co.*, "In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders (quoting Spade v. Lynn & Boston R.R. Co. 172 Mass. 488, 489). We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant

7

achieving the desire by a shorter cut that the constitutional way of paying for the change." Pennsylvania Coal, *supra* at 416.

39. The misfortunes of the Commonwealth and GO bondholders should not justify the taking of COFINA's secured portion of the SUT taxes, nor should it justify the Senior's limited proposed "losses" and GO's unwarranted and illegal gains.

40. Seniors are not "losing" anything under the proposed plan.

41. GO's are benefitting where it is clear they should not.

42. The Senior's "loss" and the GO's gain comes at the expense of rendering Junior bonds valueless.

43. For these reasons, the Plan should be rejected.

IV. **The Plan Treats Senior and Junior COFINA Bondholders Differently, Even Though There Is Adequate Pledged Security to Repay Fully Both Classes.**

44. Statutory liens backed by municipal revenue arise by force of law as opposed to a contract or judicial decree.

45. In fact, the "essence" of a statutory lien is "the need, or lack of need, for an agreement or judgment to create the lien." Peaje Investments, LLC v. The Financial Oversight and Management Board of Puerto Rico, 899 F.3d 1, 10 (1st Cir P.R. 2018) citing 2 Collier on Bankruptcy, ¶101.53 (16th Ed.).

46. COFINA was created "for the purpose of issuing bonds and utilizing other financing mechanisms." 13 L.P.R.A. §11a(a).

47. The COFINA Enabling act provides that a percentage of the Commonwealth's SUT is the property of COFINA. 13 L.P.R.A. §12.

8

48. Pursuant to its Enabling Act, issued $17.6 billion worth of bonds, split between Senior and Junior Bondholders, and secured those bonds by the first proceeds of a newly created SUT.

49. The status of Senior COFINA bondholders as opposed to Junior COFINA bondholders was initially sold to investors such that in the event the pledged SUT revenues could not cover all the outstanding bonds, both Senior and Junior, the Senior bondholders would get priority of payment, dollar for dollar, at the expense of Junior bondholder.

50. In this case, though, there exists a sufficient tranche of pledged SUT such that 100% of bondholders, both Senior and Junior alike, should be entitled to recover 100% of the value of those bonds.

51. Further, there has been no evidence presented by any party that the SUT tranche is in any way insufficient or that COFINA is insolvent.

52. Therefore, the treatment of BOTH the Senior and Junior under the Plan should be equal. As currently put forth, the Plan is wholly at odds with the Enabling legislation of COFINA and the promise of security that was sold to investors; that is, where there exists adequate pledged SUT, BOTH Senior and Junior bondholders should recover no less than one hundred percent (100%) of the bond's original value.

**V.     The Senior Bondholders and Mediating Team (the "Senior Coalition"), Which Claims to Represent Junior Bondholder Interests in Settlement Negotiations, is Conflicted by Virtue of Holding Positions in Both Senior and Junior Bonds.**

53. The structure of COFINA bonds necessarily requires two independent parties negotiating on behalf of their respective constituencies.

54. Junior COFINA bondholders outnumber Senior bondholders in terms of sheer number of bonds issued by approximately one third and in terms of net amount invested.

55. The demographics of Junior bondholders also differs from Senior bondholders. The majority of Junior investors are island natives and smaller, "mom and pop", investor groups and individuals, such as Elliott and EAM.

56. The Senior Coalition, on the other hand, is composed of much larger institutions which can organize and respond to challenges from General Obligation bondholders, among others.

57. Ironically, the Senior Coalition holds an aggregate of $1.78 billion in Junior bonds which were purchased, in most cases, at deeply discounted prices during August of 2017 to 2018 when prices on COFINA junior bonds fell to their lowest levels.

58. The Senior Coalition members who bought in at these levels now stand to profit tremendously.

59. It is important to understand, though, that the bonds' value only decreased because of the actions and fraudulent statements of the Senior Coalition and GO bondholders regarding the validity of COFINA and the willingness to negotiate.

60. The large institutional investors who make up the Senior Coalition took advantage of the depressed bond market (that they fraudulently created). These investors now stand to benefit because of their own self-dealing.

61. As if not conflicted enough, the Senior Coalition also has a position in GO bonds. In fact, the first proposed Plan of Adjustment gave GO bondholders ownership of Junior pledged funds and cash – certainly a consequence of the Senior Coalition's conflicted position in both Senior, Junior, and GO bonds.

62. Seniors also previously attempted to evade the automatic stay, accelerate their own payments, and seize cash earmarked for Juniors.

63. The fact is Senior Coalition members are, and always have been, negotiating for the best outcome for themselves at the expense of the average Junior bondholder.

64. The average Junior bondholder did not approve of, nor consent to, the Senior Coalition's representation in settlement negotiations, nor would they have agreed had they understood the extent of the conflict of interest of the Senior Coalition.

65. The Senior Coalition, which was purportedly acting on behalf of ALL COFINA bondholders, both Senior and Junior, will profit greatly from the reduced price for Junior bonds the Senior Coalition agreed to accept in the Plan.

66. The average Junior bondholder did not, and does not, have the ability to organize and participate in, nor were average Junior bondholders even advised of, the settlement proceedings.

67. Further, even when individual Junior bondholders attempted to interject, they were met with resistance from the purported "representatives" of Junior bondholders, the Senior Coalition.

68. For all practical purposes the Plan as proposed, which favors Senior bondholders at the expense of Juniors, is a product of the Senior Coalitions conflicted negotiating position.

69. Unlike other distressed bond settlements, in this case the SUT is, for now, unimpaired save for this negotiated settlement.

70. Therefore, any agreement or Plan which creates a different recovery for each class of bondholders is not equitable and is disproportionately unfair to (in this case) the Junior bondholders.

71. Moreover, the Plan provides for a "bonus" payment to those bondholders who vote for this Plan, and a further bonus of two-percent (2%) par if the affirmatively voting bondholder lives on the island.

72. This "bonus" is nothing more than a bribe to entice those less sophisticated bondholders to go along with what is clearly a Senior/GO bondholder windfall at the expense of the Juniors.

73. Finally, the Senior Coalition and GOs now want to be paid out of the tranche of (mostly) Junior money currently held in Bank of New York to pay for the negotiating of the settlement, a settlement which, and this cannot be overstated, favors GO bondholders (who are not entitled to COFINA's dedicated SUT revenue) and Senior bondholders (who have equal priority rights with Juniors where there is adequate revenue) at the expense of Junior bondholders.

74. Junior bondholders did not participate in the settlement negotiations, were not invited to the negotiations, and, in many cases (Elliott included), were explicitly told by representatives of the Senior Coalition that they were not representing Junior interests. Juniors had the ability, in theory, to join the Coalition, but must agree to accept a lower percentage prior to joining the Coalition.

75. Thus, the Plan should be rejected and reformed to treat both classes of COFINA bonds equitably.

## VI. General Obligation Bondholders Have No Basis to Challenge COFINA Bondholders' Lien on SUT Revenue.

76. As stated above, COFINA's statutory lien on its portion of the SUT is not an available resource for Puerto Rican GO bondholders.

77. Further, the Puerto Rican Constitution gave its legislature the power and authority to enact legislation "to deal with grave emergencies that clearly imperil the public health or safety or essential services." Article II, Section 18, Constitution of the Commonwealth of Puerto Rico.

78. COFINA's enabling legislation prohibits COFINA from bankruptcy or bankruptcy-like actions and, more importantly, obligate the Commonwealth to defend its structure. It is ironic

12

that the Commonwealth passed legislation which it now seeks to declare unconstitutional because of its own financial mismanagement.

79. Puerto Rico's financial crisis, beginning long before the more recent natural disasters, certainly qualifies as a "grave emergency…". Puerto Rican governmental entities were shuttered. The only way forward was COFINA.

80. Because of the crisis and the resulting inability of Puerto Rico to obtain loans, COFINA was created in order to gain access to the capital markets at an affordable rate.

81. The legislation creating COFINA, and the powers granted to COFINA, are legitimate and trump GO's ability to reach SUT revenue securing COFINA bonds.

82. Therefore, the Plan should be rejected.

**VII.  Approval of the Plan Sets an Untenable Precedent and Will have Grave Consequences for the Bond Market Generally and the Commonwealth in Particular.**

83. SUT revenue stream is strong and looks to continue its strong position into the future.

84. Because of this strong revenue stream, it stands to reason that COFINA bonds should retain their superior ratings into the future.

85. That has not been the case recently; the rating agencies have downgraded COFINA bonds to reflect the potential risk to COFINA's legal structure (thus infringing on bondholder's constitutional rights).

86. The uncertainty of the bond's security position was brought about not by COFINA's legal structure (the legality of which should be beyond argument); rather, it was the Commonwealth's continuous financial mismanagement of its financial affairs that led GO bondholders to question its legitimacy.

87. In fact, COFINA and the benefits it brought to the island (and its bond investors, COFINA and GO alike) went unchallenged for over ten (10) years; COFINA allowed the Commonwealth to access capital markets heretofore unavailable.

88. Recent natural disasters did not cause the financial distress of the Commonwealth, and it should not be the basis for overruling the legality of the secured COFINA bonds.

89. The ramifications of potential confirmation of this Plan have had, and will continue to have, dire consequences for the securitized bond markets throughout the United States.

90. Interest rates have and will continue to increase, municipal bankruptcies will increase, and government borrowing costs have and will continue to rise, endangering their ability to provide and maintain essential services, leading to tax increases and/or reductions in services, not just in the Commonwealth but throughout the United States.

91. The marketability of the new bonds has and will continue to decrease because of the lack of confidence in Puerto Rico's secure bond market.

92. Smaller investors, those holding between 5,000 and 1M lots of COFINA bonds, will be decimated. Consider, for example, that trading of bonds in 5,000 lots has experienced decreases in value of over twenty (20) percent recently due to the prospect of this Plan being confirmed.

93. After the Commonwealth's reorganization under the Plan, small investors selling small lots can expect to suffer losses, of over fifty percent (50%) because of the lack of marketability of sub 5,000 bond lots, especially fractions of single bond lots which will result from the proposed plan of adjustment. This loss is in addition to the forty-six percent (46%) loss proposed under this Plan.

94. Many of these small investors are retirees who will have no choice to sell (their income will be insufficient) at such deeply discounted prices.

95. In sum, taxpayers will suffer; small investors will suffer; Puerto Rico will suffer.

96. The Commonwealth and GO bondholders should be estopped from now challenging the validity of the COFINA bonds when the structure has existed, and the Commonwealth has benefitted from its existence, for over a decade. That they are now doing so is nothing more than a fraudulent attempt to circumvent the tenants of the U.S. Constitution and the law of the Commonwealth of Puerto Rico.

97. For these reasons, the Plan should be rejected.

## CONCLUSION

In light of the above, the Plan should be rejected in its entirety, unless and until the threshold constitutional and statutory issues are resolved. The Plan treats Junior bondholders unfairly; that is to say, Senior and General Obligation bondholders are favored at the expense of only the Junior bondholders. The Senior Coalition, which claimed to represent all COFINA bondholders, negotiated a settlement which benefitted its conflicted constituent members; large institutions holding Senior, Junior, and GO bonds acquired at substantially discounted prices as a result of the instant litigation. Therefore, on behalf of myself and my business, I respectfully request that the Court deny approval of the Plan as stated.

Dated this 27th day of December 2018.

_____
MARK ELLIOTT, individually and as principal of
Elliott Asset Management
One International Place, Suite 1400
Boston, Massachusetts 02110

16