## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | |
| Debtors.[1] | |
| IN RE: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3284-LTS |
| as representative of | |
| PUERTO RICO SALES TAX FINANCING<br>CORPORATION (COFINA), | |
| Debtor. | |

## DECLARATION OF
## DANIEL P. GOLDBERG

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

I, Daniel P. Goldberg, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

## I.   INTRODUCTION & QUALIFICATIONS

1.      I have been asked to opine as to a reasonable range of defense costs, both for attorneys' fees and other expenses, in connection with the defense of claims that may be brought by Whitebox and Ambac against BNYM (all as defined below).  As described more fully below, I estimate to a reasonable degree of certainty that the reasonable range of BNYM's defense costs would be between approximately $25 million and $40 million.

2.      It is important to note at the outset that litigation inherently is uncertain, and it is impossible to predict with certainty what any given case will cost to litigate, when the lawyers are billing by the hour, which is the standard method of billing today.  That is, the process is adversarial by design, so opposing counsel often undertake tasks that are unpredicted.  It is impossible to know in advance how any given court will rule on any given issue, which could have the effect of increasing or decreasing the amount of work necessary for the case (e.g., allowing more or fewer depositions, granting or denying motions to compel large productions).  Adversaries can be more or less aggressive.  Aggressive adversaries can increase the cost of litigation materially, as every negotiation tends to be more combative, there tends to be more motion practice, and generally speaking there tends to be less cooperation and compromise.  Because these and other variables exist, actual costs could be higher or lower.

3.      I am a founding partner, and current managing partner, of the law firm Holwell Shuster & Goldberg LLP, which is based in New York City.  I have over twenty-three years of experience as a commercial litigator, and prior to founding Holwell Shuster & Goldberg in 2012, I was a partner at White & Case LLP and Kasowitz, Benson, Torres & Friedman LLP.  I graduated from Trinity College in 1989 with a Bachelor of Arts degree in Economics and Political Science.  I graduated *magna cum laude* from Pace University School of Law in 1995, where I was an editor on the Pace Law Review.  A copy of my biography from my firm's website is attached as Exhibit A.

4.      I have been recognized in my field of commercial litigation by various publications for achievement in the legal profession.  I have been named a Litigation Trailblazer by the *National Law Journal* in 2018, a Litigation Star by *Benchmark Litigation*, and have been recognized by *New York Super Lawyers* for each of the past nine years (2010-2018) as being among the top 5% of business litigators in New York.

5.      As managing partner at Holwell Shuster & Goldberg, I am responsible for running the day-to-day operations of the firm.  I have been in this role since the firm's founding in February 2012.  My responsibilities include, among other things, setting rates for the firm's lawyers and other timekeepers, structuring fee arrangements with clients, and setting and managing case budgets.  I regularly review case budgets and negotiate fee arrangements not just for the cases over which I have primary responsibility, but also for the firm's matters generally, and have been doing so since the firm's founding.  In this role, I review, negotiate, and approve every non-standard fee arrangement entered into by the firm.  Part of that process entails analyzing what a litigation would cost if the engagement were on a standard hourly fee arrangement.  Over the course of my career, I have prepared and analyzed countless litigation

budgets, fee estimates, and alternative fee arrangements, all of which involve assessing what a litigation would cost on an hourly basis.

6.      I have represented in litigation a number of financial institutions in their role as trustee, including in the context of residential mortgage-backed securities, loan agreements, and other forms of securitizations and indentures.  In these matters, I have been involved in, and most of the time the person responsible for, crafting the litigation budget for the trustee.  I also have represented noteholders in litigation with trustees concerning disputes about the operation of the trust indenture.  In sum, I have significant experience, over many years, litigating disputes about trust indentures.

7.      I have authored two publications within the past ten years:

a.      "Commercial Arbitration:  Expeditious Resolution, or Wormhole of Unpredictability?," New York Law Journal (March 23, 2015).

b.      "Civil Litigation in the U.S. – A Primer For The Non-U.S. Litigant" – Praxisschrift "Innovation und international Rechtspraxis-Rechtsprobleme entstehen nicht im Horsaal" zum 50.  Geburtstag von Prof. Dr. Wolfgang Zankl (facultas.wuv Universitatsverlag, 2009).

8.      I have not testified in the last four years as an expert, either at deposition or at trial.

9.      I am being paid by the hour for my involvement in this matter, and my current hourly rate is $1075.  No part of my compensation is contingent on the outcome of this matter.

10.     In my work on this matter, I have consulted with members of my team at Holwell Shuster & Goldberg.  Those partners and associates include Hon. Richard J. Holwell (ret.), Hon. James M. McGuire (ret.), Brendon DeMay, and Evan H. Stein.

## II.     BACKGROUND

11.     The following background discussion is based on my and my team's review of various court filings and assumptions I have been given.  I include this background for context only, and I am not offering an opinion with respect to the factual underpinnings of the matter or the strengths and weaknesses of any potential claims or defenses.

### A.      The Parties

12.     I understand The Bank of New York Mellon ("BNYM") is the trustee under the Amended and Restated Sales Tax Revenue Bond Resolution (as amended and supplemented, the "Resolution"), adopted on July 13, 2007, by the Puerto Rico Sales Tax Financing Corporation ("COFINA").  COFINA is a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") constituting a corporate and political entity independent and separate from the Commonwealth.  I understand that, as more fully described below, pursuant to the Resolution, COFINA issued bonds that were to be repaid using portions of Puerto Rico sales and use tax revenues (collectively, the "Bonds").

13.     Whitebox Multi-Strategy Partners, L.P., Whitebox Asymmetric Partners, L.P., Whitebox Institutional Partners, L.P., and Pandora Select Partners, L.P. (together, "Whitebox") have alleged they are limited partnerships that are or were holders of one or more series of Bonds.

14.     Ambac Assurance Corporation ("Ambac") has alleged it is an insurer of, and a holder of, certain of the Bonds.

**B.     The Resolution and the Bonds**

15.     I understand the underlying dispute concerns bonds issued by COFINA under the Resolution.  I further understand there are two types of bonds: (i) "current interest" bonds ("CIBs") and (ii) "capital appreciation" bonds ("CABs").  Further, each type has senior bonds ("Senior CIBs" and "Senior CABs") and subordinated bonds ("Subordinate CIBs" and "Subordinate CABs").  I understand interest on the CIBs is payable in cash throughout the life of the Resolution, whereas interest on the CABs is capitalized and paid (generally) only at maturity or an earlier redemption or acceleration.  The Subordinate CIBs and the Subordinate CABs (together, the "Subordinate Bonds") carry higher interest rates but have a lien priority that is subordinate to the Senior CIBs and the Senior CABs (together, the "Senior Bonds").  BNYM is the sole trustee appointed under the Resolution for all types and series of the Bonds.

16.     I understand there are allegations of various events of default under the Resolution and that the Resolution provides mechanisms for the declaration of such events of default.  Likewise, I understand the Resolution provides a "waterfall" for how funds are to be distributed to holders upon an event of default.

17.     I understand BNYM argues that the Resolution limits BNYM's duties in various ways.  Of note here, I understand BNYM contends it has no obligation to perform any act that would cause it to incur expense or liability for itself.  Further, BNYM contends that, under the Resolution, it has no obligation to act on a request or direction of registered holders unless the registered holders offer BNYM security or indemnity satisfactory to BNYM to cover the costs, expenses and liabilities associated with such request or direction.  Section 1211 of the Resolution provides that New York law governs the rights, duties, privileges, and immunities of BNYM.

18.     I understand BNYM contends the Resolution provides BNYM with a right to payment of fees and expenses secured by a charging lien and right of indemnification.  Specifically, BNYM argues section 804 of the Resolution requires COFINA to "pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution . . . and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution."  In addition, BNYM argues that, pursuant to section 804, COFINA "agrees to indemnify and save the Trustee harmless against any loss, liability or expenses . . . arising out of or in connection with the acceptance or administration of the trust or trusts [thereunder], including the costs and expenses of defending itself against any claim . . . asserted by . . . any

Bondowner or any other Person . . . or liability in connection with the exercise or performance of any of its powers or duties [thereunder] . . . ."

19.     In addition, I understand BNYM contends the Resolution provides BNYM with a first priority right to payment of its fees, expenses and liability incurred as trustee for the Bonds. BNYM argues that the indenture provides for a distribution waterfall, after an Event of Default, that makes provision for the payment of all reasonable expenses of BNYM necessary to protect the interests of the holders, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by BNYM in the performance of its duties.  In other words, BNYM contends the Resolution requires that money must be set aside to pay its costs for actions it undertakes under the Resolution, which BNYM contends includes litigation costs.

### C.     The PROMESA Petitions

20.     I understand the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") provides for, among other things, a court-supervised restructuring process.

21.     I am advised that on May 3, 2017, the "Oversight Board" filed a petition for relief on behalf of the Commonwealth under Title III of PROMESA in the United States District Court for the District of Puerto Rico.  *In re The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico*, Case No. 17-bk-3283-LTS.

22.     I am advised further than on May 5, 2017, the Oversight Board filed a petition for relief on behalf of COFINA under Title III of PROMESA in the United States District Court for the District of Puerto Rico.  *In re The Financial Oversight and Management Board for Puerto Rico as representative of Puerto Rico Sales Tax Financing Corporation (COFINA)*, Case No. 17-bk-3284-LTS.

### D.     The Whitebox and Ambac Lawsuits

23.     BNYM contends that the Commonwealth's enactment of the Fiscal Plan Compliance Law marked the first time that the Commonwealth defaulted under the Resolution. Whitebox and/or Ambac, on the other hand, contend there were prior defaults and Events of Default under the Resolution.

### 1.     The Whitebox Lawsuit

24.     I understand that on April 12, 2017, Whitebox sued BNYM in New York State court.  *Whitebox Multi-Strategy Partners, L.P. et al., v. Bank of New York Mellon Corp.*, 651969/2017 (Sup. Ct. N.Y. Cnty. Apr. 12, 2017) (the "Whitebox Lawsuit").  I am advised that on May 18, 2017, BNYM removed the Whitebox Lawsuit to the United States District Court for the Southern District of New York,[2] and the Court, upon BNYM's motion, transferred the case to the District of Puerto Rico.[3]

---

[2] Case No. 17 Civ. 3750 (LTS).
[3] Adv. Proc. No. 17-AP-143-LTS.

25.    Whitebox alleges in its complaint that BNYM is liable because it failed to declare at least five alleged defaults and alleged Events of Default under the Resolution as a result of certain statements and decisions made by the Commonwealth and the Oversight Board, starting in September 2015.[4]  Whitebox alleges that BNYM operated under a conflict of interest given the differences between the types of Bonds.

26.    Whitebox asserts six causes of action for negligence/breach of trust, breach of fiduciary duty, waste, breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment.  Whitebox contends that BNYM's conduct has caused it to suffer "millions of dollars in damages," which are not specified.[5]

### 2.    The Ambac Lawsuit

27.    I understand that on May 2, 2017, Ambac sued BNYM in New York State court. *Ambac Assurance Corp. v. The Bank of New York Mellon*, 652356/2017 (Sup. Ct. N.Y. County May 2, 2017) (the "Ambac Lawsuit" and together with the Whitebox Lawsuit, the "Lawsuits").  I am advised that on May 19, 2017, BNYM removed the Ambac Lawsuit to the United States District Court for the Southern District of New York.[6]  On May 22, 2017, Ambac filed a First Amended Complaint.

28.    Ambac alleges that BNYM breached its duties by failing to declare Events of Default in seven separate circumstances, starting in September 2015.[7]  Ambac claims, in the main, that BNYM acted contrary to the interests of Ambac by failing to declare Events of Default under the Resolution and to accelerate the Senior Bonds, and by continuing to make interest payments on the Subordinate CIBs, which Ambac claims lessened the amount of money available to pay senior holders.  Like Whitebox, Ambac alleges that BNYM operated under a conflict of interest given the differences between the types of Bonds.

29.    Ambac asserts six causes of action for breach of fiduciary duty, breach of contract, breach of the implied covenant, gross negligence/breach of trust, declaratory judgment, and injunctive relief.  Ambac also alleges that BNYM's conduct has caused Ambac to "suffer millions of dollars in damages,"[8] which are not specified.

### E.    The Interpleader Action

30.    I understand that on May 16, 2017, BNYM commenced an adversary proceeding for interpleader and declaratory relief (the "Interpleader Action") because certain holders of beneficial interests in the Bonds, insurers of the Bonds, and COFINA had asserted competing claims to funds held by BNYM in trust under the terms of the Resolution.[9]

---

[4] Whitebox Compl. ¶ 52.
[5] Whitebox Compl. at 25.
[6] Case No. 17 Civ. 3804 (LTS).
[7] Ambac Compl. ¶ 6.
[8] Ambac Compl. at 38.
[9] *The Bank of New York Mellon, as Trustee v. Puerto Rico Sales Tax Financing Corporation ("COFINA"), et al.*, Adv. Proc. No. 17-133-LTS (D.P.R.).

**F.      The Settlement Agreement and the Plan**

31.     I am advised that on September 8, 2017, the Creditors' Committee, as agent for the Commonwealth (the "Commonwealth Agent"), commenced an adversary proceeding to prosecute the so-called "Commonwealth-COFINA Dispute" (i.e., the dispute regarding ownership of the sales and use taxes securing repayment of the Bonds).  I understand that the Commonwealth Agent and Bettina Whyte (the "COFINA Agent") participated in mediation that resulted in an agreement to settle, *inter alia*, the Commonwealth-COFINA Dispute (the "Settlement Agreement").[10]  I understand that Whitebox and Ambac have agreed to the Settlement Agreement and that the Plan incorporates the Settlement Agreement.

1.      **Section 2.1(c):  Litigation Dismissal**

32.     Section 2.1(c) of the Plan provides:

On the Effective Date . . . , (1) BNYM shall make distributions as set forth herein, . . . (3) the Interpleader Action shall be dismissed, with prejudice, and all other Claims and Causes of Action asserted, or that could have been asserted, therein shall be dismissed, with prejudice, and the funds deposited in connection therewith shall be distributed in accordance with the terms and provisions of the Plan, and (4) except with respect to Claims and Causes of Actions asserted, or that could have been asserted, by Ambac or Whitebox, whether sounding in contract or tort, against BNYM in the Ambac Action or the Whitebox Actions, respectively, for gross negligence, willful misconduct or intentional fraud, the Actions shall be dismissed, with prejudice, and Claims and Causes of Action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice.

33.     I understand that as a result, upon the Effective Date of the Plan, (i) except as determined pursuant to Section 19.5 of the Plan, BNYM must distribute pursuant to the Plan the disputed funds it holds, (ii) BNYM's claim for declaratory relief in the Interpleader, as well as its motion for partial summary judgment in that proceeding, will be dismissed with prejudice, and (iii) any claims for gross negligence, willful misconduct, and intentional fraud that Whitebox and Ambac could have asserted against BNYM in the Lawsuits are carved out and survive the dismissal of actions as provided in the Plan.

2.      **Effect on BNYM's Rights and Protections Under the Resolution**

34.     I understand BNYM contends that its indemnification rights and similar protections survive the Plan.  That is, while the Plan generally terminates and cancels the Resolution, BNYM contends that the Plan preserves BNYM's rights to indemnity and coverage of its costs, its liens, and its priority as to such indemnity and costs, subject to section 19.5 of the Plan.

---

[10] *Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, ECF No. 377-1 in 17-3284-LTS, at 21 (Nov. 30, 2018) (the "Plan").

3.     **Section 19.5:  Holdback Determination**

35.     Section 19.5 of the Plan provides:

> **Delivery of Distributions**: [A]ll distributions are subject to the Lien and priority rights of the trustees; provided, however, that, notwithstanding the foregoing or anything contained in the Plan to the contrary, including, without limitation, Sections 19.6(ii) and 19.13 hereof, except as set forth in the following proviso, no distribution to be made pursuant to the Plan, either through the Disbursing Agent or BNYM as trustee of the Existing Securities, may be withheld as a result of, or on account of, the claims, causes of action and damages being asserted, or which could have been asserted, in the Ambac Action and the Whitebox Actions; and provided, further, that, **with respect to Ambac and Whitebox and the Ambac Action and the Whitebox Actions, respectively, at the Confirmation Hearing, the Title III Court shall determine (a) what amount, if any, shall be either (i) withheld by the Disbursing Agent or BNYM as trustee for the Existing Securities or (ii) posted by Ambac and Whitebox as collateral for the reimbursement of fees and expenses which may be incurred by BNYM in connection with the defense of the Ambac Action and the Whitebox Actions**, and (b) whether BNYM shall be reimbursed by Ambac and Whitebox for the incurrence of any such fees and expenses from either the holdback amount or collateral posted and referred to in the preceding subsection (a) on a current basis or upon entry of a Final Order in connection with the Ambac Action and the Whitebox Actions.[11]

36.     My opinions are based on my understanding of the facts—including the Plan and the releases—as those facts exist today, and I reserve the right to supplement or amend my opinion in the event the facts change.

## III.     THE ANTICIPATED LITIGATION WITH WHITEBOX AND AMBAC

### A.     Overarching Considerations

37.     At the outset, I believe it will be helpful to provide some context for my analysis of BNYM's likely costs of defending the Lawsuits (as the complaints may be revised pursuant to Section 19.5 of the Plan, the "Anticipated Litigation").

38.     First, I understand that BNYM has but a single opportunity, in advance, to set a holdback.  As a result, prudence dictates that all reasonably possible litigation contingencies be reserved for to ensure that BNYM receives the benefit of its bargained-for indemnification rights.  If the holdback is too low and is not sufficient to cover BNYM's reasonable defense costs, then BNYM will be saddled with costs that it was never expected to bear.  By contrast, if BNYM's reasonable defense costs end up being lower than the amount of the holdback, I understand the remainder is returned.  Relatedly, I understand that the holdback is not a blank check; Whitebox and Ambac may challenge *ex post* through an appropriate procedure whether BNYM's actual litigation spend was reasonable.  My analysis does not assume that any defense

---

[11] Plan, § 19.5 (emphasis added).

costs for contingencies that are fanciful (even if hypothetically possible) will be incurred; rather, my analysis attempts to account for reasonably possible litigation contingencies, under the premise that if those contingencies are not accounted for now, then BNYM will never have another opportunity to secure its full indemnity.

39.     Second, the stakes are high, both in terms of dollars and also in terms of reputation, as the claims allege or will likely allege gross negligence, willful misconduct, and intentional fraud.  Accordingly, the Anticipated Litigation is reasonably viewed as a serious threat to the core of the corporate trust business.  The issues raised in the Anticipated Litigation appear to be wide-ranging and consequential.  That is, the Anticipated Litigation implicates the requirements for Bondowners to compel BNYM to act, the standing of beneficial owners, the duties undertaken by BNYM, the standard of conduct applicable to BNYM, enforceability of the Resolution, and the limitations on liabilities and other principles that customarily protect indenture trustees in the performance of their duties.  In short, Whitebox's and Ambac's accusations go to the heart of the corporate or indenture business relationship.

40.     I further understand that Whitebox and Ambac have refused to state the amount—either generally or specifically—of damages they seek in their respective cases.  I am advised that Reed Smith has asked counsel for Whitebox and Ambac—as recently as November 29, 2018—for a statement of their claimed damages and, again, neither Whitebox nor Ambac provided that information.  Given this refusal, and their persistence in pursuing their claims despite the higher bar with which they are now confronted, I have concluded that it is prudent to assume that they are seeking substantial amounts from BNYM.

### B.     The Anticipated Reed Smith Team is Appropriate and Reasonable

41.     Given the importance and potential effect of the Anticipated Litigation, any reasonable trustee would defend itself using a team of lawyers with substantial experience and capabilities.  I have been asked to assume that BNYM has engaged a team of lawyers, identified below, from the law firm of Reed Smith LLP.  Biographies for each of these attorneys are attached hereto as Exhibit B.  As set forth below, in my opinion, the attorneys on the Reed Smith team are highly qualified, the proposed staffing is appropriate under the circumstances, and the hourly rates are reasonable.

#### 1.     Litigation Attorneys

42.     I have been asked to assume that the litigation team will be led by David Schlecker, Neil Gray, and Louis Solomon.  Based on my review of their CVs and my understanding of their experience, I conclude that Messrs. Schlecker and Gray are highly experienced in prosecuting and defending complex commercial litigation matters, including adversary and other matters arising out of or in connection with restructuring proceedings.  Mr. Schlecker is a partner with 35 years of experience, and Mr. Gray is a partner with nearly 20 years of experience.  I understand Messrs. Schlecker and Gray have been involved in and handling COFINA-related issues since early 2017, and they are well-acquainted with the Interpleader Action and the broader Title III proceedings.

43.     Based on my review of his CV, I conclude that Mr. Solomon is a highly experienced and particularly capable trial lawyer.  He has nearly 40 years of experience and is Reed Smith's U.S. Head of International Litigation.  I understand he has tried over 50 complex commercial cases.  More specifically, I understand he has extensive experience with litigation matters involving restructuring, including trials in bankruptcy and district court for Multicanal,[12] Cablevision,[13] and Aguas.[14]  Mr. Solomon has tried a dozen cases involving nine- or ten-figure controversies.

44.     I have been asked to assume that Messrs. Schlecker, Gray, and Solomon will receive assistance from one special counsel, one senior associate, and at least two junior associates.  I understand that two of these attorneys—Nancy Savitt and Joseph Teig—have prior experience working on various aspects of the Interpleader Action and the broader Title III proceedings, and I conclude that experience should result in efficiencies in the defense of the Anticipated Litigation.

### 2.   Bankruptcy Attorneys

45.     I have been asked to assume that the litigation team will be advised and assisted by restructuring attorneys Eric Schaffer, Kurt Gwynne, and Luke Sizemore—the Reed Smith attorneys who have taken the lead in representing BNYM in connection with the bankruptcy-related aspects of the Title III proceedings, including the confidential mediation process and the Interpleader Action.

46.     Based on my review of his CV, Mr. Schaffer has decades of experience representing indenture trustees in restructurings and other major disputes, and I conclude that his participation here is reasonable.  Based on my review of his CV, Mr. Gwynne is a highly experienced restructuring attorney, and I conclude his experience should add value in a dispute like this one that is connected to a historic bankruptcy.  Additionally, Messrs. Schaffer and Gwynne are Fellows of the American College of Bankruptcy and are recognized by, among others, Chambers USA America's Leading Lawyers for Business.  Based on my review of his CV, Mr. Sizemore is a partner who has extensive experience representing indenture trustees in bankruptcy matters, and I conclude his participation here is reasonable.

47.     I understand that Messrs. Schaffer and Gwynne have extensive experience in the highly specialized representation of indenture trustees on defaulted debt, both in and out of bankruptcy proceedings.  As a result of that experience, they necessarily are familiar with defenses arising under indentures and with issues such as standing, causation, damages, duty of care, no-action clauses, and other issues arising in litigation with beneficial holders.  In addition, they have been involved in the Title III matter to this point, and BNYM should be able to gain efficiencies through their continued involvement.  Accordingly, they, along with Mr. Sizemore, appear to be well-placed to provide efficient guidance to the litigation team on matters concerning the Resolution, the Plan, and other topics.

---

[12] *In re Multicanal S.A.*, Nos. 04-10280 (ALG), 04-10523 (ALG) (Bankr. S.D.N.Y.).

[13] *In re Cablevision S.A.*, No. 04-15697 (SMB) (Bankr. S.D.N.Y), No. 04 Civ. 7278 (SWK) (S.D.N.Y.).

[14] *Aguas Lenders Recovery Grp., LLC v. Suez, S.A.*, No. 06 Civ. 7873 (RLC), *on appeal*, 585 F.3d 696 (2d Cir. 2009) (vacating and remanding in favor of Mr. Solomon's client).

### 3.    Post-Trial and Appellate Attorneys

48.    I have been asked to assume that, in the event of an appeal in the Anticipated Litigation, BNYM will rely on appellate practitioners, led by Reed Smith partner Jim Martin.  I understand Mr. Martin has specialized in appellate law for more than 35 years, and is a fellow and former president of the American Academy of Appellate Lawyers.  I have been asked to assume that Mr. Martin will be assisted by partner Brian Sutherland and associate Patrick Yingling, both of whom have extensive experience in briefing and arguing appeals in federal and state courts.

### 4.    Staffing and Rates

49.    I have been asked to assume that the anticipated hourly billing rates and Reed Smith team members are as follows:[15]

| Attorney | Title | Anticipated Hourly Billing Rate |
|---|---|---|
| David Schlecker | Partner | $1,030 |
| Neil Gray | Partner | $965 |
| Louis Solomon | Partner | $1,545 |
| Eric Schaffer | Partner | $1,170 |
| Kurt Gwynne | Partner | $990 |
| Luke Sizemore | Partner | $675 |
| Nancy Savitt | Special Counsel | $790 |
| Joseph Teig | Associate | $865 |
| Jason Brown | Associate | $515 |
| Melissa Brown | Associate | $515 |
| Jim Martin | Partner | $1190 |
| Brian Sutherland | Partner | $765 |
| Patrick Yingling | Associate | $625 |

---

[15] I am using the specific attorneys listed here for estimation purposes.  It is not unusual in complex litigation of extended duration that changes in the team are necessary.

50.      In my opinion, Reed Smith's proposed staffing is reasonable for a complex and high-stakes litigation such as the one at issue.  As a general matter, litigation teams should include a mix of senior and junior attorneys so that tasks can be handled by someone with the appropriate level of experience, both to deliver quality representation and also to manage costs by having more junior lawyers perform tasks that do not require higher levels of experience and expertise.  In my opinion, the proposed mix of partners, experienced counsel and associates, and junior associates is reasonable and appropriate.  Moreover, I believe the size of the team is reasonable given the complexity of the Anticipated Litigation and given that it actually involves two lawsuits.  In particular, I believe that a litigation team of three litigation partners, one special counsel, and three associates, with input from knowledgeable bankruptcy partners as needed, is appropriate and does not reasonably implicate concerns regarding overstaffing.  I also conclude that, in the event of an appeal, adding appellate lawyers to the team would be reasonable.  In my experience, in appellate litigation it is often advisable to bring in new lawyers with specific appellate expertise, as well as a fresh perspective to analyze, brief, and argue an appeal.  At the same time, those lawyers should work closely with trial counsel so that the trial team's deep familiarity with the nuances of the case is harnessed effectively.  I conclude that adding a small group of appellate lawyers from within the same firm as trial counsel is reasonable.

51.      In my opinion, Reed Smith's hourly rates are reasonable.  In general, the above rates are broadly similar to, if not lower than, the rates charged by sophisticated New York lawyers in complex commercial matters such as this one.  Of course, although hourly rates for more-experienced attorneys are generally higher than rates for younger attorneys, the higher rate is intended to compensate for the attorney's greater skill and experience.

52.      For my analysis, I have estimated a blended hourly rate for all attorneys.  In particular, I expect that the special counsel and associates as a group will devote more time to the matter than will the partners as a group because the associates will execute time-consuming day-to-day tasks in which the partners will have less engagement.  Therefore, the lower rates of special counsel and associates should receive more weight than the higher rates of partners.  A straight unweighted average of the hourly rates in the above table would yield an average rate of $895.  Overall, my analysis uses a blended hourly rate of $800, which I derived by determining the average hourly rate of partners, the average hourly rate of non-partner lawyers, and weighting the two averages based on the number of hours I estimate partners will spend versus the number of hours I estimate non-partner lawyers will spend on the matter.

53.      As an additional check on the reasonableness of Reed Smith's rates, I compared Reed Smith's rates with rates charged in similar matters.  To perform that comparison, members of my team provided me with rates charged by other law firms for their work in the Puerto Rico Title III matter.  When the rates were not in 2018 dollars, those figures were converted to 2018 dollars, which my team did using U.S. Bureau of Labor statistics regarding prices for Legal Services.[16]  I conclude that Reed Smith's rates are in line with other rates charged in the Title III

---

[16] *See* U.S. Bureau of Labor Statistics, "Legal services in U.S. city average, all urban consumers, not seasonally adjusted," *at* https://beta.bls.gov/dataViewer/view/timeseries/CUUR0000SEGD01 (last visited Dec. 26, 2018).  To convert pre-2018 rates, one can divide the latest index figure (368.049 for November 2018) by the index figure for the original rate's month.  For example, the index figure for January 2010 is 284.964, and therefore a rate of $450 per hour in January 2010 would be equivalent to $581.20 per hour in November 2018 dollars ((368.049/284.964) * 450).

matter.  For example, Paul Hastings LLP represents the Unsecured Creditors Committee, and its blended hourly rate exceeded $930 in 2017—or $994 in 2018 dollars—which is significantly higher than the blended hourly rate for Reed Smith attorneys that I utilize.[17]

54.     As another example, Reed Smith's rates are lower than the rates charged by Willkie Farr & Gallagher LLP ("Willkie") as counsel for Bettina M. Whyte as COFINA Agent. For partners in 2017, Willkie billed a blended hourly rate of $1,324.99 minus a 5% discount, which comes to approximately $1,340 in 2018 dollars; that rate is much higher than an unweighted rate for Reed Smith's partners ($1,041.25).[18]  For associates in 2017, Willkie billed a blended hourly rate of $762 minus 5%, or $770 in 2018 dollars; that rate is much higher than the average rate for Reed Smith's associates, which would be $662.  Willkie's co-counsel—Klee, Tuchin, Bogdanoff & Stern LLP—similarly charges partner/associate rates that exceed Reed Smith's ($1050 for partners (or $1118 in 2018 dollars) and $775 for associates ($825 in 2018 dollars)).[19]

55.     As another example, Reed Smith's rates are lower than or in line with the rates charged by Jenner & Block LLP ("Jenner") as counsel to the Official Committee of Retired Employees of the Commonwealth of Puerto Rico.[20]  For partners in 2017, Jenner billed a blended hourly rate of $973, or $1,036 in 2018 dollars; that rate is not materially different from the average rate for Reed Smith's partners.  For associates in 2017, Jenner billed a blended hourly rate of $661, or $704 in 2018 dollars; that rate is not materially different from the average rate for Reed Smith's associates.[21]  I therefore conclude that Reed Smith's rates in the Anticipated Litigation are lower than or in line with other rates charged in the broader Title III matter.

56.     As another check on the reasonableness of Reed Smith's rates, members of my team conducted a reasonable search of public dockets for fees charged by law firms in other recent, high-stakes bankruptcies.  I looked at various fees charged in the Lehman Brothers bankruptcy in New York (08-bk-13555, Bankr. S.D.N.Y.) and the Energy Future Holdings bankruptcy that is ongoing in Delaware (14-bk-10979, Bankr. D. Del.).  I conclude that Reed Smith's rates here are consistent with the rates of similarly experienced firms in those sophisticated matters.  For example, the range of Reed Smith's partner rates ($675–1,545) is in line with the range of partner rates charged by Paul Hastings in Lehman ($823–1,409 in 2018 dollars); Milbank Tweed Hadley & McCloy LLP in Lehman ($738–1,390); Simpson Thacher & Bartlett LLP in Lehman ($1055–1,354); Fried, Frank, Harris, Shriver & Jacobson LLP in Lehman ($1,146–1,250); Gibson, Dunn & Crutcher LLP in Lehman ($764–1,258); Bingham

---

[17] Paul Hastings is charging $1,149 per hour for 12 partners, $1,086 per hour for 6 counsel, and $739 per hour for 18 associates.  *See* Docket No. 2040.  Weighting those figures results in a blended rate of $933.50 [(1149*12 + 1086*6 + 739*18) / 36 = 933.5].  Because Paul Hastings has staffed significantly more associates and counsel than partners, Paul Hastings is acting consistent with my assumption that the rate for associates should receive more weight than the rate for partners.

[18] *See* Docket No. 2031.

[19] *See* Docket No. 2032.

[20] *See* Docket No. 2050.

[21] Some firms' hourly rates I conclude are not fairly comparable because they reflect a volume discount that I understand was given in exchange for obtaining the representation in such a significant matter (e.g., Proskauer Rose LLP) or are for local counsel or other additional counsel (Bennazar Garcia & Milian CSP; Munger Tolles & Olson LLP; Luskin, Stern & Eisler LLP).

McCutchen LLP in Lehman ($878–1,250); Dechert LLP in Lehman ($847–1,256); Kasowitz Benson Torres & Friedman LLP in Lehman ($945–1,219); Quinn Emanuel Urquhart & Sullivan LLP in Lehman ($542–1,262); Cravath, Swaine & Moore LLP in Energy Future ($990–1,400); Sullivan & Cromwell LLP in Energy Future ($1,140–1,295); Jenner in Energy Future ($900–1,300); Kirkland & Ellis LLP in Energy Future ($665–1,745); and Proskauer Rose LLP in Energy Future ($875–1,495), among others.[22]

57.     Similarly, the range of Reed Smith's associate rates ($515–865) is in line with the range of associate rates charged by Paul Hastings in Lehman ($439–1,025 in 2018 dollars); Milbank Tweed Hadley & McCloy LLP in Lehman ($286–933); Simpson Thacher & Bartlett LLP in Lehman ($469–914); Fried, Frank, Harris, Shriver & Jacobson LLP in Lehman ($481–786); Gibson, Dunn & Crutcher LLP in Lehman ($420–844); Bingham McCutchen LLP in Lehman ($457–872); Dechert LLP in Lehman ($457–835); Cravath, Swaine & Moore LLP in Energy Future ($490–870); Sullivan & Cromwell LLP in Energy Future ($460–865); Jenner in Energy Future ($650–725); Kirkland & Ellis LLP in Energy Future ($450–905); and Proskauer Rose LLP in Energy Future ($395–825), among others.[23]  Although no two cases are exactly the same, these matters are broadly comparable in terms of the sophistication required of the lawyers.  I do not intend to imply that these matters are precisely comparable in every respect, though it bears noting that firms do not generally charge different rates for the same lawyer in different bankruptcies; a lawyer's rate tends to be a lawyer's rate for all of his or her matters. The rates charged in these other bankruptcies do give me additional comfort that Reed Smith's rates for the Anticipated Litigation are reasonable.

58.     In sum, it is my opinion that the Reed Smith attorney team described above includes a reasonable composition of experience and seniority.  I also conclude that Reed Smith's hourly billing rates are in line with, if not materially lower than, the billing rates of similarly experienced attorneys handling similar complex litigation, including, for example, numerous firms and attorneys representing parties in the Commonwealth-COFINA Dispute.

###     C.     Adequately Defending BNYM Against the Anticipated Litigation Will Entail Substantial Costs

59.     Below, I set forth estimates of attorneys' fees and litigation expenses that BNYM could reasonably be expected to incur in defending the Anticipated Litigation.  I prepared the fee estimates by estimating, based on my experience, the amount of time that partners and associates might reasonably spend on a variety of categories of litigation tasks in a matter such as this one. I then applied a blended hourly rate of $800 to the resulting totals, creating a lodestar for each category of tasks.  As noted above, I calculated the blended hourly rate by determining the average partner rate, the average non-partner rate, and then weighting the two based on the number of hours I estimate each category of lawyer will spend on the matter.  Exhibit C sets forth the breakdown of estimated hours and lodestar by category.  Exhibit D sets forth additional detail regarding the estimated hours in each category.

---

[22] *See In re Lehman Brothers Holdings Inc.*, No. 08-13555 (SCC) (Bankr. S.D.N.Y), ECF Nos. 29278, 29238, 28948, 29138, 29401, 29210, 29192, 29234, 29236; *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del.), ECF Nos. 12983, 13002, 12985, 13019, 13021.
[23] *See id.*

60.     These estimates are expressed as ranges because it is not possible, in advance, to predict with precision the amount of costs that will be incurred.  In this matter, some ranges are necessarily broad because the case is at an early stage; indeed the claims are inchoate because the complaints in the Lawsuits do not yet include the expected allegations of intentional fraud. Moreover, I have generally expressed these ranges in round numbers to avoid too strong a sense of precision.

61.     My discussion below is organized generally according to the "Uniform Task-Based Management System Litigation Code Set" issued by the American Bar Association.  See American Bar Association, Litigation Code Set (June 8, 2018), at https://www.americanbar.org/ groups/litigation/resources/uniform_task_based_management_system/litigation_code_set/ (last visited Dec. 27, 2018).

### 1.    Case Assessment, Development, and Administration

62.     In my experience, successfully defending complex litigation like the Anticipated Litigation requires significant efforts and resources to ensure—from the outset and over the life of the case—that fact and legal issues are adequately anticipated, investigated, analyzed, and prosecuted, that appropriate outside resources are assessed and those resources are retained, and that the client is kept apprised of the progress of the litigation to enable it to make effective decisions.

63.     Based on my experience in complex litigation matters, my opinion is that BNYM will reasonably spend approximately $1–2.25 million (1400–2700 hours) on case assessment, development, and administration over the life of the Anticipated Litigation.

#### a.     Fact Investigation

64.     I understand that several members of the anticipated trial team have been involved to varying degrees in the ongoing Title III proceedings and the events leading to the Title III filing by COFINA.  To a certain extent, that knowledge may result in efficiencies in the Anticipated Litigation.  But the Anticipated Litigation will still require significant pre-discovery investigation, analysis, and strategy development tailored to the facts and scope of the Anticipated Litigation.  Counsel will need to conduct a series of interviews and meetings, and to collect, preserve, and review documents to determine facts from the perspective of the client and others.

65.     Substantial factual investigation regarding Whitebox and Ambac's alleged damages will be required.  I have been asked to assume that Whitebox and Ambac traded in the Bonds during the Title III proceeding.  The factual scenarios involving their alleged damages caused by up to seven alleged Events of Default over two years and the effects of, among other things, their bond trading and agreement to the global settlement will be a very complex endeavor.

66.     In my opinion, the above efforts are necessary to develop a proper strategy and plan for the defense of the Anticipated Litigation.

b.      Analysis/Strategy

67.     In my experience, analysis of factual and legal issues from the outset of litigation and over the life of the case is integral to developing a holistic and effective approach to defending the case.  The initial and ongoing analysis and strategy development is not only critical, but also time-consuming.

68.     I understand there are myriad legal issues that trial counsel may have to analyze.  For example, I have been asked to assume that the Anticipated Litigation might present complex choice of law questions.  The trial team may have to analyze, strategize, and potentially address through briefing what law applies—to the case overall and, as applicable, to discrete issues.  Is New York law applicable to the entire dispute?  Does Puerto Rico law play a role?  Or perhaps the law of the jurisdiction where Whitebox and Ambac purchased Bonds or where the seller sold the Bonds?  I have been asked to assume that the Whitebox entities were formed in the British Virgin Islands, the Cayman Islands, and New York, and have offices in Minnesota.  Meanwhile, the Bonds were issued and payable in Puerto Rico.  The location of the assignors of Whitebox or Ambac might implicate choice of law issues as well.  In my experience, choice of law issues can be complex and require deep analysis.  And if the choice of law analysis requires that the law of a jurisdiction other than New York should apply, then the lawyers might need to start from scratch and analyze that jurisdiction's laws in detail when applying them to the facts of the Anticipated Litigation.

69.     Trial counsel also may have to analyze other legal and factual issues.  I have been asked to assume that such issues might include jurisdiction, standing, venue, removal, sufficiency of process, compliance with the Resolution, and the sufficiency of Whitebox's and Ambac's respective claims (including the existence and causation of damages).

c.      Experts/Consultants

70.     In my experience, identifying the issues that may require expert testimony—and the experts most capable of and appropriate for addressing those issues—is often a sensitive endeavor that requires care and thoughtfulness.  Experts can provide valuable insight into, among other areas, specific areas of discovery that may be integral to his or her analysis.  It is prudent to budget for the identification of and discussions with subject matter experts at the outset.

71.     As discussed further, below, I understand from trial counsel that as many as four testifying and/or non-testifying experts may be necessary for each side.

d.      Other Case Assessment and Administration

72.     In my experience, complex litigation like the Anticipated Litigation requires an immense amount of coordination and communication.  Trial counsel may be expected to manage and accomplish the entirety of the workload described herein, within the constraints of a court-imposed schedule, in a professional and efficient manner.  Moreover, trial counsel will need to ensure that they consistently and coherently communicate the litigation work plan, strategy, and status to appropriate individuals at BNYM (internal counsel, relevant business-side employees, BNYM's Board, etc.) and other relevant parties, including, for example, other counsel, experts,

auditors, and court personnel.  Doing so requires a considerable amount of case administration that, in my experience, is often underestimated when preparing a good-faith estimation of fees.

2.   <b>Pleadings and Pre-Trial Motions</b>

73.     Based on my experience in and knowledge of complex litigation matters, my opinion is that BNYM could reasonably spend approximately $4–5.5 million (5000–7000 hours) on tasks related to pre-trial pleadings and motions over the life of the Anticipated Litigation. This figure is reasonable in the context of the Anticipated Litigation.

a.   Pleading Stage (Motions to Dismiss, Answer, and Responsive Claims)

74.     The pleading stage sets the foundation for a lawsuit, and for that reason the pleadings and related motions tend to receive a great deal of attention from the lawyers involved.

75.     In light of the release contained in the Plan, I expect the pleadings will be revised. The Plan allows Ambac and Whitebox to proceed with claims only for gross negligence, willful misconduct, and intentional fraud.  The complaints filed in 2017, however, do not include claims of intentional fraud.  Thus, at the outset, I expect Whitebox and Ambac will amend their complaints—or join in a consolidated amended complaint—to assert causes of action for one or more of gross negligence, willful misconduct, and intentional fraud.

76.     Although I believe it likely that some of the factual allegations that appear in the now-stayed complaints may carry over to the amended complaint(s), trial counsel may nevertheless have to analyze those claims anew in light of the new legal theories.  Based on that analysis, BNYM will determine whether to proceed with an answer or a motion to dismiss. Before filing any answer, BNYM also will need to assess whether to assert counterclaims.

77.     *Motion to Dismiss*.  I have been asked to assume that BNYM might file a motion to dismiss the operative Ambac and Whitebox complaints, and that assumption is reasonable in my view given the general prevalence of such motions.  In complex commercial litigation, post-answer motions for judgment on the pleadings are less common, but not unheard of.

78.     To begin, based on my review of the current complaints, the most obvious ground for a motion to dismiss is that Ambac and Whitebox fail to plead facts sufficient to show that an earlier Event of Default occurred that BNYM failed to declare or notice, and I would expect BNYM to make such a motion.  Aside from opining that the making of such a motion would be reasonable, I express no view here regarding that motion's likelihood of success.  Further, I understand from trial counsel that there are a number of other issues that may need to be examined at this stage, including, without limitation, whether Whitebox and Ambac have capacity and/or standing to sue as beneficial holders (or, in Ambac's case, as a "Beneficiary") rather than registered owners (or "Bondowners"), or whether capacity and/or standing to assert rights and claims was actually transferred at the time Whitebox and Ambac purchased Bonds.  I am aware that similar "capacity" and/or standing issues have been litigated in other cases involving trust indentures, so it appears reasonable to explore whether those arguments apply here.  Additional potential grounds for a motion to dismiss might become apparent after Ambac and Whitebox file the new operative complaints.

79.     Often, a motion to dismiss does not conclude the end of pleading-stage motion practice.  In particular, when courts grant a motion to dismiss, the court might grant leave to amend the complaint.  Such an amendment likely would trigger another motion to dismiss, and any fee estimate should account for that possibility.

80.     Motions to dismiss can be time-intensive and expensive.  Although aspects of the Event of Default issues should be less time-intensive in light of the work that already has been done, BNYM might need to start from scratch on the "capacity" and/or standing issues and other potential issues.  BNYM will need to research the relevant law and analyze how it applies to the facts.  BNYM will then need to draft and revise an opening brief and a reply brief, as well as prepare for any oral argument.  In my experience, a motion to dismiss requires strategic thinking from the team as a whole, and responsibility for the entirety of the motion cannot be delegated to merely a few lawyers.

81.     If the Anticipated Litigation proceeds in New York state court, I expect that any decision on a motion to dismiss would be appealed to the Appellate Division because New York State court practice allows interlocutory appeals as of right.  Additionally, after the intermediate appellate decision, the losing party usually seeks leave to appeal to the Court of Appeals.  Depending on the nature of the Appellate Division order, the losing party might be able to seek leave to appeal twice; first from the Appellate Division and then, if unsuccessful, from the Court of Appeals itself, which increases costs.  If leave to appeal is granted, the matter would be briefed and argued anew in the Court of Appeals.  If the Anticipated Litigation proceeds in federal court, and if a pre-answer motion to dismiss is denied, that decision might be the subject of a request for an interlocutory appeal, though such requests are not granted with regularity.

82.     *Answer.*  If the operative pleading survives a motion to dismiss, if one is made, trial counsel will have to engage in the time-consuming task of preparing an answer, appropriate affirmative defenses, and potentially counterclaims.  (Though I offer no opinion on whether a motion to dismiss will be granted, solely for purposes of budgeting, I assume that such a motion will be made, but ultimately denied.)  My review of the allegations of the now-stayed complaints leads me to believe that the process of drafting, finalizing, and serving an answer or answers will require significant investigation and consultation with BNYM.  For example, the amended Ambac complaint is 47 pages long, and the 164 numbered paragraphs often contain argumentative allegations that need to be analyzed carefully and responded to with precision after consulting with BNYM.  Indeed, in current practice, it no longer is sufficient simply to "deny" a complaint paragraph with multiple factual allegations, mixed with argumentation.  Each discrete factual assertion needs to be parsed, and responded to individually.

83.     In addition to responding to the Ambac and Whitebox fact allegations, I have been asked to assume that BNYM might assert counterclaims and/or third-party claims.  Such claims are not uncommon in complex commercial litigation.  The basis for a counterclaim or third-party claim is sometimes apparent at the outset of a case, but sometimes it will arise in the middle of discovery, requiring an amended answer.  I understand there are several issues trial counsel currently intends to assess in the Anticipated Litigation.  Before asserting such claims, BNYM would need to learn the relevant facts if not yet known, research the relevant law, analyze how the law applies to those facts, and consider the claims in light of the litigation strategy as a whole.  If such claims are dismissed with leave to replead, then BNYM would need

to expend additional resources to investigate the facts and bolster the claims before amending the answer.  Without opining on the merits of such claims, I believe it is reasonable for BNYM to expend the resources necessary to evaluate potential counterclaims and/or third-party claims.

84.     *Motion to Strike Counterclaims and/or Motion to Dismiss Third-Party Claims*.  In the event BNYM asserts counterclaims against Ambac/Whitebox or third-party claims against non-parties, I would expect that Ambac/Whitebox or such non-parties would seek to strike or dismiss, respectively, such claims.  At this stage, it is difficult to predict the bases for such motions, but it seems reasonable to assume that, when opposing such motions, the team would be able to rely on work conducted when assessing the viability of the counterclaims or third-party claims at the time the answer was prepared (as discussed above).  On the other hand, a motion to strike or dismiss might cast the claims in a new light and require significant original research and analysis.  In any event, the opposition to such a motion would need to be drafted and revised, and counsel would need to prepare for a potential oral argument.  If leave to amend the counterclaim or third-party claim is granted, then BNYM could expect another round of briefing.  As with a motion to dismiss, as discussed above, an interlocutory appeal could be brought, particularly if the case is heard in New York State court.

b.     Court Mandated Conferences

85.     There are numerous occasions over the life of a complex case where parties must engage in conferences mandated by the court, including status conferences, scheduling conferences, pre-motion conferences, and other pretrial conferences.  Each court-mandated conference requires preparation to ensure that the trial team is consistently and appropriately pursuing its case objectives and strategy.  Moreover, judges sometimes require the parties to file short submissions in advance of these conferences, as well as confer with opposing counsel to identify outstanding issues or brewing disputes.  Depending on the venue of the Anticipated Litigation, it is possible that these conferences may, at least from time to time, take place in Puerto Rico, and therefore add costs.  Likewise, many judges require lead trial counsel to appear at conferences, which means more senior lawyers may need to attend, which also increases costs.

c.     Dispositive Motions, Including Summary Judgment

86.     A variety of dispositive motions might be appropriate based on the allegations and facts presented and the judgment of the trial team.  Besides the pleading motions discussed above, parties typically file pretrial motions for summary judgment or partial summary judgment.

87.     In my experience, post-discovery summary judgment motions require massive resources—both professional and financial—and the costs associated with them can easily be underestimated.  First and foremost, post-discovery motions for summary judgment require time-intensive scouring of the factual record, including both documents and deposition transcripts.  In general, the analysis of the record is an iterative process; a document or bit of testimony might appear insignificant at first glance, but its importance might come into focus after further analysis of other issues, which might then require some—and perhaps considerable—re-analysis.  This process is normal and is part of any reasonable litigation effort in a complex commercial case.

88.     Second, lawyers must also research the applicable law and analyze how it applies to the facts.  Again, that process frequently results in the facts being recast in a different light, requiring some amount of fresh analysis of the record.

89.     Third, the documentation associated with summary judgment motions can be voluminous and costly to prepare.  In many jurisdictions, the party seeking or opposing summary judgment must create detailed statements of undisputed facts or responses thereto.  Summary judgment motions are regularly accompanied by lengthy declarations that must be drafted, reviewed, finalized, and executed.  If a summary judgment motion implicates expert issues, the experts might prepare supporting or opposing declarations as well.  The motions and briefs themselves must be drafted, reviewed, revised, and finalized.  BNYM, as the presumptive moving party, would need to prepare both an opening brief and a reply brief.

90.     Fourth, although even a single summary judgment motion is resource-intensive, there is a reasonable likelihood of more than one such motion here, resulting in double or triple the costs (or more).  To the extent the Anticipated Litigation continues as two distinct cases, there very well may be summary judgment motions in both.  And it is certainly possible that there will be cross-motions for summary judgment.  Accordingly, as a practical matter, there could be as many as four summary judgment motions to address.  And even if the Anticipated Litigation proceeds as one consolidated case, the claims by the two plaintiffs are distinct, and so there could be either multiple summary judgment motions, or single motions with a broader scope.  Either way, the post-discovery summary judgment phase of this dispute is likely to be intricate and expensive.

91.     Fifth, oral argument on summary judgment motions can be a significant undertaking, and the costs of oral argument tend to increase as the complexity of the issues increases.  Counsel must be fluent in the relevant legal arguments and the details of important precedents.  Counsel must also be deeply familiar with the factual record as a whole, which of course can be extensive.  Often, judges permit or prefer slide decks to accompany a summary judgment argument, and those presentations take time to prepare and revise.  In a complex matter like this, where the stakes of summary judgment are high, I also would expect counsel to participate in one or more moot sessions to prepare for oral argument.

92.     Sixth, as a general matter, because summary judgment can be the highest-stakes pretrial phase of a case, in my experience it is common for many of the lawyers on the team to participate in setting the strategy and reviewing the briefing.  This dynamic tends to increase costs, but it plays an important role in ensuring that the issues are explored fully and that multiple different perspectives are incorporated into the team's analysis.  As relevant here, I would expect that senior lawyers on the team, as well as the bankruptcy lawyers on the team, would be more involved than they would be in, for example, day-to-day discovery matters.

93.     Seventh, if the Anticipated Litigation proceeds in New York State court, there is a reasonable likelihood that any summary judgment ruling would be appealed to the Appellate Division.  As with a motion to dismiss, the party that loses the intermediate appeal might reasonably seek leave to appeal to the Court of Appeals, which might require two rounds of briefing, plus another round of briefing and argument in the Court of Appeals if leave is granted.

d.     Other Written Motions and Submissions

94.     In my experience, a number of non-dispositive motions can arise over the duration of a complex civil lawsuit.  Based on my review of and understanding of the procedural and factual history of the Whitebox and Ambac actions, the Anticipated Litigation is no different.

95.     Here, there is reasonable ground to believe that the parties will engage in non-dispositive motion practice.  For example, I am informed that Whitebox and Ambac have reserved their rights to move to remand their actions back to New York state court, and I have been asked to assume that they might proceed with such a motion.[24]  Speaking broadly, some remand motions are straightforward, while others raise complex issues of federal jurisdiction.  I do not opine here on the likelihood of success of any remand motion.  If the actions remain in federal court, the parties might reasonably brief motions to transfer venue given that the Whitebox case is in the District of Puerto Rico and the Ambac case is in the Southern District of New York.

96.     In addition, litigants file a wide variety of pretrial motions that often are difficult to foresee at the outset of a litigation.  These can include motions to change the parties—such as motions for substitution, joinder, or intervention; motions to extend a deadline; motions for a stay; motions to certify an interlocutory appeal in federal court; motions to seal; motions to enlarge a page limit; motions for sanctions; and motions to disqualify counsel, among many others.  Some of these motions can be more contentious and complex than others.  I express no opinion whether such motions would be appropriate in the Anticipated Litigation or whether such motions would succeed.  Rather, I note merely that such motions are not uncommon—and are not costless—but can be difficult to predict with precision.  To account for such miscellaneous motions that arise in a complex commercial case, however, is prudent.

3.     **Discovery**

97.     Based on my experience in and knowledge of complex litigation matters, my opinion is that BNYM will spend approximately $8.25–12.75 million (13000–20000 hours) on discovery over the life of the Anticipated Litigation.  This figure is reasonable in the context of the Anticipated Litigation and the scope and complexity of the contested issues.  As discussed further below, these estimates presume conservatively that certain document-review tasks will be conducted by lower-cost discovery attorneys rather than associates.

a.     Fact Discovery

98.     In my experience, fact discovery is often the most expensive component of complex litigation, save for trial.

99.     Based on my review of the Lawsuits, the background described above, and assumptions provided to me, fact discovery will involve not only the parties (Whitebox, Ambac, and BNYM), but also numerous third parties, including the parties' financial advisers,

---

[24] Alternatively, Whitebox and Ambac might seek to file new actions in state court; BNYM might then remove the action(s) to federal court, and Whitebox and Ambac might move to remand back to state court.

government parties (e.g., the Commonwealth and other governmental entities or bodies), and other beneficial holders and their advisers (e.g., senior bondowners, subordinate bondowners, and General Obligation bondowners).  I expect that the parties' experts will participate in certain of that fact discovery.  In my opinion, fact discovery in the Anticipated Litigation may be broad in scope, time consuming, and is likely to involve numerous discovery disputes that may require the expenditure of significant resources.

100.    As a general matter in high-stakes commercial litigation, fact discovery tends to be contentious, even if cordial, and parties tend to pursue the full amount of discovery to which they are entitled under the applicable rules.  I have no reason to believe this matter will be any different.  Indeed, I am aware that Ambac in 2017 issued a set of fifty-four broadly worded document requests to BNYM (including a request for "All Documents concerning COFINA"), and that even the streamlined fact discovery in the Interpleader Action resulted in discovery motions before Magistrate Judge Dein.  I also infer that Whitebox and Ambac will prosecute their claims against BNYM with fervor, as evidenced, at least in part, by their negotiation of the litigation carveout in section 2.1(c) of the Plan noted above.

101.    At the outset of discovery, the parties likely will meet and confer to discuss the anticipated scope and subject of discovery, potential areas of dispute, initial disclosures, a plan for the preservation and collection of documents and other information (including electronically stored information), and a reasonable schedule for the conduct and completion of fact discovery.  In my experience, these processes rarely result in a narrowing of the scope of anticipated discovery.

102.    I understand that certain limited discovery in the Interpleader Action was conducted in 2017 but that such discovery did not address the alleged 2015 and 2016 Events of Default and did not include any depositions of BNYM, Whitebox, or Ambac.  I also understand that the 2017 discovery was intended to be somewhat more extensive but was curtailed in light of Hurricane Maria.  My analysis presumes that the parties would not unnecessarily duplicate discovery that already has been conducted.

i.    Written Discovery

103.    Based on my experience in complex commercial litigation, I estimate the Anticipated Litigation will involve multiple rounds of document demands, interrogatories, and requests for admissions, as well as numerous non-party subpoenas.  Each item of written discovery addressed from BNYM to other parties and non-parties mandates a lengthy process of drafting before the discovery is propounded, followed by an analysis of responses and objections from, and a meet and confer process with, the responding party.  Conversely, written discovery propounded to BNYM will require the additional steps of drafting responses and objections and working with the client to identify, collect, process, review, and produce responsive documents.

104.    In addition, as noted above, I have been asked to assume that BNYM will pursue at least eight non-party subpoenas against government and private entities.  These will require drafting, service, analysis and negotiation of responses and objections, meeting and conferring, and motions practice (including motions to compel and/or responses to motions to quash).

105.    As a logistical matter, written discovery often involves the negotiation with parties or non-parties of protective orders or similar agreements, which can be a time-consuming process and can sometimes lead to motion practice.

ii.    Document Production and Review

106.    I have been asked to assume that fact discovery will focus on, at a minimum, the following areas:

- **Bond ownership**:  Including (i) the bonds held by Whitebox and Ambac—both historically and currently—and specifically by whom, in what capacity, and how the bonds are or were registered, (ii) all agreements relating to the purchase, sale, transfer, or exchange of any interest in the Bonds by Whitebox and Ambac, including dates of purchase or sale, CUSIPs, prices, past or present purchasers, owners, or holders, and any changes over time; and (iii) rights or claims of Whitebox and Ambac with respect thereto.

- **Purchase Price / Timing / Confirmation / Gains / Losses**:  Including (i) the price at which Whitebox or Ambac would purchase or sell Bonds at any time and/or the timing of any such purchase(s); (ii) the effect of Whitebox's or Ambac's purchase of Bonds; (iii) confirmations, trading tickets, and account statements; (iv) gains and/or losses from any purchases, sales, transfers, or exchanges of any interest in the Bonds; (v) any post-default purchases or sales of Bonds; and (vi) any obligations of Whitebox and Ambac to others.

- **Events of Default**:  Including (i) all alleged Events of Default concerning the Bonds and Whitebox's and Ambac's knowledge, communications, strategies, and similar information regarding the same; (ii) issues concerning direction and indemnification under the Resolution; and (iii) any consent of Bond insurers, or lack thereof.

- **Standard of Care**:  Including (i) whether BNYM had any duties beyond those specifically set forth in the Resolution, (ii) the nature and scope of such duties and their relation to the Resolution, (iii) the standing of Whitebox and Ambac to invoke such duties, and (iv) the requirements for Whitebox and Ambac to invoke such duties.

- **Causation**:  Including, without limitation, Whitebox's and Ambac's voluntary settlement of claims.

- **Calculation or Assessment of Damages**:  Including (i) Whitebox's and Ambac's entitlement to damages, either pursuant to the Resolution or pursuant to any other basis, for each of the seven alleged Events of Default; (ii) the proper method for measuring any damages purportedly resulting from BNYM's conduct; (iii) communications with (including analyses prepared for or by) third parties retained, engaged, or consulted by Whitebox or Ambac, or anyone on behalf of Whitebox or Ambac, to assist in identifying and/or calculating any damages; (iv)

- 22 -

communications with insureds regarding damages; (v) appraisal(s) or valuation(s) of the value of Bonds held by Whitebox and Ambac; (vi) the amount of damages to which Whitebox or Ambac is allegedly entitled as a result of BNYM's conduct; (vii) federal, state, and/or local tax returns evidencing Whitebox's and Ambac's investment in or recovery or profit from the Bonds; and (viii) other tax and accounting issues.

- **Damages Reductions**:  Including (i) amounts paid to Whitebox and Ambac pursuant to the Plan; (ii) waiver or release of rights or claims by Whitebox and Ambac in connection with the Plan; and (iii) Ambac's rehabilitation process.

- **Lawsuit**:  Including (i) Whitebox's and Ambac's respective motivations for pursuing litigation against BNYM and their lack of good faith; and (ii) Whitebox's and Ambac's litigation history.

- **Ambac Rehabilitation**: Ambac is undergoing a process of rehabilitation in Wisconsin that might add further complexity to the analysis of its financial situation.

107.     For each of these areas of discovery, BNYM will have to review the documents and privilege logs produced by the plaintiffs and third parties.  Where appropriate, BNYM could challenge privilege determinations and address deficiencies in the productions, each of which requires detailed document review, meet-and-confers and exchanges of correspondence.  Motion practice, moreover, is far from uncommon.

108.     In addition, Whitebox and Ambac certainly will propound discovery on BNYM. As noted, Ambac already issued fifty-four broad document requests in the Ambac Lawsuit in 2017.  After all objections are addressed in the meet-and-confer process, BNYM will have to interview witnesses, collect potentially responsive documents, review the documents for privilege and for responsiveness in light of objections, and produce discoverable documents. BNYM also will need to prepare a privilege log.  Document productions frequently are followed by complaints from the requesting party that the productions were insufficient, and those complaints must be addressed and resolved, which sometimes requires additional review or even collection.  In my experience, the document production process is exceptionally time- and resource-consuming, and in a matter of this size will involve thousands of hours of time at considerable expense.  Additionally, I have been asked to assume that some documents might be in Spanish, requiring internal and/or external translators for both the review of documents in anticipation of production and the review of documents received from other parties and non-parties.

109.     In both offensive and defensive document review in the era of electronic discovery, documents must be hosted and viewed on an electronic document database.  The documents are then reviewed and tagged based on numerous substantive criteria established by the litigation team.  In offensive discovery, documents often are reviewed more than once to ensure that key documents do not slip through the cracks, which is always a risk in a case with voluminous discovery materials.  In defensive discovery, documents similarly are reviewed more than once to ensure that the attorneys are complying with discovery rules and ethical obligations

to produce responsive documents and to ensure that documents are not slipping through the cracks. Privilege reviews often require more than one review, and some privilege determinations are difficult and require input from senior attorneys and the client. Document productions must be checked and double-checked to ensure consistency—for example, to ensure that different versions of the same email chain all are produced or not produced, or all marked privileged or not privileged, or that redactions are consistent across all versions of an email chain. Although technology assists in this effort, technology often imposes its own costs and delays, and email technology is largely responsible for the vast increase in discovery costs in recent years.

110.     One final note concerning budgeting for document review, both offensive and defensive. It is not unusual for firms to use specialized lawyers to review documents, at a lower hourly rate. Though generally I use the $800 blended hourly rate discussed above, for the initial document review work, I used a rate of $350 per hour.

### iii.     Fact Depositions

111.     I have been asked to assume there will be 40 fact depositions (roughly ten for each plaintiff, the defendant, and third parties). In my experience in high-stakes commercial litigation, that number is not out of the ordinary and is reasonable in light of the complexity of the issues here.

112.     The deposition process requires review of relevant documents, analysis and strategy, preparation of outlines and exhibits, deposition preparation (for both offensive and witness preparation for defensive), actual deposition time, and post-deposition follow up.

### b.     Expert Discovery

113.     As noted above, the Anticipated Litigation will require expert assistance and testimony from a number of experts—both testifying and non-testifying. The first step in the process is to identify, research, interview, and retain potential experts. I have accounted for those associated costs in the "Case Assessment" section above. *See supra* III.C.1.c. Once experts are engaged, the expert discovery process will require, at a minimum, (i) preparation, review, and discussion concerning expert disclosures (e.g., reports and supporting documentation) by each party pertaining to each testifying expert, (ii) a review of all reports and preparation, review, and discussion of rebuttal reports, (iii) preparing to take or defend the deposition of each testifying expert, (iv) any rebuttal report or other supplementation that may be required, and (v) motion practice to the extent necessary. In my experience, the effort and cost for counsel and the experts to perform these tasks adequately is extensive.

114.     I have been asked to assume that expert testimony may include (i) trust administration, (ii) the appropriate standard of care against which BNYM's conduct should be measured, and (iii) damages. Based on my review of the Lawsuits, that assumption appears reasonable. In addition, based on the damages issues described above, I would expect that expert issues regarding damages would be particularly complex and would require additional time and analysis. By contrast, expert issues regarding trust administration and standards of care should be relatively less time-consuming. It is entirely possible that one or more experts may be required with respect to other issues that may become apparent during the conduct of the

litigation, and, as noted above, parties may need to engage non-testifying experts as well.  As a result, it is reasonable to assume that each side will require at least four experts, resulting in at least eight associated depositions.  At this stage, I assume that Ambac and Whitebox will share their experts, but if they choose not to do so, then BNYM's expert would need to respond to each, and there would be additional depositions, which would increase costs accordingly.

c.      Discovery motions

115.     In my experience in complex litigation of the type contemplated herein, a number of disputes are bound to occur concerning the parties' fact and expert discovery obligations, the scope of fact and expert discovery, privilege and work-product, and the sufficiency of the parties' document productions and other disclosures.  It is reasonable in this context to assume the parties will engage in motion practice regarding those issues.

116.     As noted above, and based on my review of the Lawsuits and my observations regarding Ambac's other litigations concerning RMBS trusts, it is my opinion that Whitebox and Ambac will zealously pursue discovery disputes when necessary.  Likewise, in view of the potential consequences to BNYM's business, BNYM will likely vigorously litigate discovery disputes against plaintiffs and third parties when necessary.  This is likely to involve motions to compel the production or supplementation of BNYM's, Whitebox's, and Ambac's fact and expert disclosures, and to compel the testimony of one or more witnesses.  Such motions would be preceded by extensive meet-and-confers between the parties, written correspondence between the parties, legal research, letters or briefs to the court, and conferences or hearings with the court or an appointed discovery arbiter.  In my experience, nonparties often resist subpoenas, and I would expect nonparties like bondowners and financial advisers to aggressively move to quash or constrain the scope of any subpoenas served on them, resulting in additional disputes and motions.

117.     Although it is my experience that most courts will first place a burden on the parties to attempt to resolve discovery disputes before seeking the court's intervention, the degree to which the court will be hands-on or hands-off cannot be predicted in advance.

d.      Other Discovery

118.     In my experience, fact and expert discovery in complex litigation is fraught with unanticipated issues that require counsel's time and resources.  Here, in particular, where there is no operative pleading, the calculation methodology for the alleged damages is unknown, and where discovery is likely to be broad, it is difficult to assess all the document review and production challenges, issues concerning fact and expert depositions, and potential discovery disputes that might arise.  Here, I estimated that ten lawyers will each spend between 0.5 hours and 1.0 hours per week over three years on discovery matters not specifically addressed above.

4.      **Trial Preparation & Trial—Liability/Damages**

119.     Trials are expensive.  In my experience, preparing for and conducting a trial requires myriad tasks to be performed simultaneously by the trial team.  In this matter, I estimate BNYM might reasonably spend approximately $4–6.25 million (5000–7750 hours) for trial, including all pre-trial preparation and proceedings and post-trial submissions.

- 25 -

a.      Written Motions and Submissions

120.     Although requirements vary by venue, it is reasonable to budget for the preparation of, and the analysis and response to, an adversary's motions *in limine*, exhibit lists, jury instructions, deposition designations, pretrial memoranda, pre-trial orders, witness lists, and the like.

121.     To take one example, the preparation of exhibit lists is a time-consuming matter. In addition to the hundreds if not thousands of deposition exhibits, all produced documents need to be subject to key word searches and analysis to determine if they should be listed.  This is particularly important because some judges preclude the introduction of exhibits that were not listed, and others require motion practice before determining whether to permit the use of non-listed exhibits.  Once the exhibits are selected, they need to be arranged and a written list, including a description of each document, needs to be created.  Exhibit lists are then exchanged. Upon receipt of the adversary's list, the Trustee will need to determine which documents appear only on the adversary's list, and confirm that the other documents are complete and accurate versions of the Trustee's exhibits.  For the new documents, each will need to be analyzed to determine whether the Trustee will need to designate additional exhibits to respond to these documents.  They will additionally need to be analyzed to determine whether to lodge objections thereto, and if so, to determine the appropriate objections as to each so they can be entered on a chart for submission to the court.  Similarly, in my experience, preparing deposition designations—and objecting to the other side's designations and responding to the other side's objections—is a painstaking and time-consuming task.

122.     Other documents are more substantive and time-consuming.  Pre-trial briefs can be extensive.  Motions *in limine* can be hotly contested.  Well-conceived jury instructions are essential, and they often require considerable legal research and strategic thinking.

b.      Fact Witnesses

123.     Trial counsel must review the fact record extensively to determine which witnesses to present at trial.  Each of the Trustee's witnesses will need to be prepared for live testimony, which involves reviewing the salient documents, analyzing the witness's knowledge in the context of the case as a whole, preparing outlines, anticipating the cross the witness will face, and meeting with the witness to prepare him or her for trial.  Prep sessions with each witness can take anywhere from a few hours to several days.  Internal preparation prior to the witness's actual preparation sessions can take many additional days.  Direct examinations need to be prepared and properly organized, with each exhibit to be used identified and covered with the witness.  To the extent third parties are testifying live, their testimony too needs to be prepared for in the same way as any other witness.  Trial counsel also need to determine if particular witnesses will be appearing through deposition designations.  For each of those witnesses, the deposition testimony needs to be reviewed, and salient designations need to be made.  As noted above, the adversary will be engaging in the same process, and once deposition designations are exchanged, trial counsel will need to review the adversary's designations both to determine whether to cross-designate additional testimony, and also whether and on what bases to object to specific designations.  Trial counsel also must prepare cross-examination of the adversary's fact witnesses, including locating precise impeaching/corroborating documentary

evidence in the event the witness does not recall or contradicts his or her prior testimony, which is also a time-consuming task.

### c. Expert Witnesses

124.    I believe it is reasonable to assume that all eight of the presumed experts will testify.  Here, I have been asked to assume a jury trial, where the experts' direct examinations will be live.  Because experts are not limited to their personal knowledge and can be asked questions touching on their field of expertise, the preparation of experts for testimony takes a great deal of time.  Trial counsel themselves need to learn the subject matter such that they can anticipate the cross-examination and work with the expert to prepare for it.  Trial counsel also need to prepare for and conduct the cross-examination of the opposing experts. Even where the party's experts assist trial counsel with preparing for the cross-examination of the adversary's expert witnesses, the trial counsel conducting the cross-examination must have a sufficient command of the subject matter that they can respond appropriately as the testimony is given.

### d. Mock Trial, Jury Exercises

125.    In a complex, high-stakes case such as this one, in my experience trial counsel often will engage in jury analysis and mock trials.  Analyzing the jury pool and preparing for and conducting one or more mock trials is an effective method of honing the presentation to more effectively try the case before a jury.  The mock trials require trial counsel to analyze not only their case but also their adversary's so that both sides can be presented effectively before the mock jury.

### e. Trial

126.    I have been asked to assume a ten-day jury trial.  Based on my understanding of the Anticipated Litigation, that assumption is conservative.  A trial day, particularly with juries, can consist of as little as approximately four or five hours of trial time.  Likewise, with jury trials, everything takes a bit longer, as judges generally are quite careful about the information that is exposed to the jury, and there are fewer "short cuts" to take than with a bench trial.  In other words, bench trials can involve written direct testimony, or merely the submission of exhibits, and other techniques to lessen the amount of actual courtroom time needed.  In short, this appears to be a complex multi-party dispute with a number of intricate legal and factual issues—a ten-day jury trial is a conservative estimate.

127.    Another point to consider when it comes to cost is that the amount of time spent in the actual courtroom might be limited on daily basis, but that does not affect how long the lawyers work.  Generally speaking, in my experience, during commercial trials the trial team works long hours, seven days per week.

### f. Post-Trial Motions and Submissions

128.    After a jury trial in a complex matter, post-trial motions are common.  Motions challenging the verdict and/or seeking a new trial require combing through the trial record (transcripts and exhibits) and require legal research.  If the judgment awards damages or other mandatory relief, I would expect the other party to file a motion for a stay pending appeal.

5.      **Trial Preparation & Trial In the Event of a Retrial**

129.      In a complex case, the number and weight of issues in dispute often lead to hotly contested appeals, and it is prudent to consider that the appellate court might remand for a new trial.  It is particularly appropriate to account for this possibility as BNYM gets only one opportunity under the Plan to establish a litigation reserve.  As noted, if the reserve is not depleted, Whitebox and Ambac will receive the remainder at the conclusion of the litigation.  If the reserve is too low because it did not account for the contingency of a second trial, however, BNYM may be without recourse.

130.      All of the steps above would be necessary with respect to the second trial as well. However, because the parties will have had the benefit of having gone through the trial process once before, some of the steps will likely consume fewer resources.  Nevertheless, given the time that generally elapses between initial trial testimony and a decision on any appeal (let alone the commencement of the second trial), both the trial team and the witnesses will need to reacquaint themselves with the evidence and to prepare to testify and to try the case.

131.      I have estimated $2–3 million for the second trial, which represents approximately half the hours as compared to the first trial, based on the conservative assumption that there may be some overlap between the first and second trials as well as some narrowing of issues.

132.      Of course, if the second trial raises new evidentiary or legal issues, or involves additional exhibits or witnesses, the contours of the second trial (including pre-trial preparation and post-trial motions and submissions) may well be different from the initial trial, and the above estimate would be understated.

6.      **Appeal from First Trial**

133.      In a complex, high-stakes matter such as this, a post-judgment appeal is all but assured.  In my experience, post-trial appeals are more time-consuming than appeals on a motion to dismiss or a motion for summary judgment.  Based on my experience, BNYM could reasonably incur approximately $750,000–1 million in fees (900–1400 hours) on tasks related to a first post-judgment appeal.

134.      On the procedural end, courts require the preparation and submission of either or both of a record on appeal or a joint appendix.  To prepare a joint appendix, for example, the parties need to review the entire record to determine which documents must be included, and which documents it may be advisable to include, in the record or appendix.  In a complex case such as this one, trial exhibits might reasonably number in the hundreds, if not over a thousand, and each will need to be reviewed for inclusion in whole or in part.  All deposition designations similarly will need to be reviewed, as will the entirety of the trial transcript.  The process is an iterative one, with one party adding new documents or portions thereof in response to the documents designated by its adversary, and so on.  Once the contents of the joint appendix are agreed upon, the appellant will then need to ensure that it is compiled correctly, which in a complex case can be quite time consuming, given both the volume of documents and the need to ensure that all excerpting is done accurately.

135.     Substantively, the first step—regardless whether BNYM will be an appellant or appellee—is to review the district court's decision and develop an appellate strategy.  The trial team and the appellate team should each be involved in this crucial threshold process.  Additionally, in my experience all material legal and evidentiary issues that were decided before or during trial also will need to be analyzed to determine which, if any, should be raised on appeal or cross-appeal.

136.     Once a universe of appellate issues is identified, the process of analysis, research, and strategic thinking culls the issues that will ultimately appear in the briefing.  Drafting the brief requires care and patience.  While much of the legal research can be done by more junior members of the team in the first instance, the senior attorneys need to know the law and to analyze the cases upon which the arguments rely.  The appellate team also will need to review and analyze all cases cited by the adversary and the trial court.

137.     If BNYM is the appellant or cross-appellant, then reply briefs will have to be drafted going through a similar process.  Typically, less time may be needed for the reply brief than the main brief.  For example, the review of the facts may likely be more limited and focused on correcting misstatements in the adversary's brief and clarifying or re-iterating salient points from the main brief.

138.     Finally, the lead appellate counsel will need to prepare for oral argument.  This should be a team effort, with junior members assisting in the preparation, and with the trial team helping to moot the lead appellate counsel.

### 7.     **Appeal from Second Trial**

139.     If there is a second trial, it is only reasonable to assume there could be an appeal following that trial as well.

140.     All of the steps above would be necessary on the second appeal as well.  However, because the parties will have had the benefit of having gone through the appeal process after trial once before, some of the steps may consume fewer resources.  Of course, if the second trial raises new evidentiary or legal issues, or involves additional exhibits or witnesses, the contours of the appeal may well be different from the initial appeal.

141.     Based on my experience, I estimate $375,000–550,000 (450–700 hours) for an appeal after the second trial, based on the assumption that there may be some overlap between the first and second appeals.  Based on my experience, that assumption and that budget are reasonable.

### 8.     **Other Cost Categories**

142.     As with all large, complex litigations, there may be additional expenses beyond the legal fees and expenses charged by the attorneys at Reed Smith.  Set forth below is my estimation of those additional fees and expenses, which in total range from $4.5 million to $8 million.

a.     Expert Fees

143.    I expect there would be at least four experts retained by Reed Smith and/or BNYM in the defense of this case.  In my experience, expert fees for the non-damages experts in cases such as these usually total in the low six figures.  Damages experts needing to do meaningful quantitative analysis (as appears the case here) can cost several times more.

b.     Paralegal Fees

144.    Competent paralegals greatly assist the attorneys in litigating successfully and cost-effectively.  And because paralegals can perform difficult tasks that require skill and attention to detail, but not a law degree, they can free up attorneys to focus on legal tasks.  During discovery or during trial, paralegals often must work just as many hours, if not more, as the attorneys.  Over the life of the litigation, assuming an hourly rate of $300, I estimate a total of $1.35–2 million in reasonable paralegal work.

c.     Local Counsel Fees and Costs

145.    Based on my review of this matter, I am assuming that BNYM will require local counsel in Puerto Rico.  To the extent the Anticipated Litigation is venued in Puerto Rico, local counsel's involvement will be significant.  However, even if the cases are not venued there, local counsel will be needed to assist with discovery of numerous non-parties that reside in Puerto Rico.  I estimate that local counsel fees and disbursements would range from $250,000 to $500,000.

d.     Additional Document Review (E-Discovery)

146.    Based on discussions with my team and my understanding of the case, significant amounts of documents likely will be produced by the parties and nonparties.  Currently, the only way to store, maintain and initially review a large volume of documents is by using an e-discovery vendor or by having defense counsel with e-discovery capabilities.  Either way, those costs can be significant.  I estimate those costs to range from $500,000 to $1,000,000.

e.     Deposition Costs

147.    Deposition costs include transcript fees from the court reporter and video fees from the videographer.  Today, those fees tend to total approximately $3,000–4,000 per deposition, for a total of $144,000–192,000 across 48 depositions.  Other deposition costs include translator fees, the cost of copying (and sometimes shipping) exhibits, conference-room rental fees for out-of-town depositions, and travel costs for out-of-town depositions.  Without knowing the number of depositions that will not occur in New York, I cannot reliably estimate these costs and have not included them in my totals, yet they do exist and might need to be incurred.

f.     Jury Consultants and Mock Trial

148.    Given the significance of the Anticipated Litigation to BNYM from both a monetary and reputational standpoint, the retention of jury consultants and mock trial consultants

would be reasonable.  In my experience, such consultant fees can be substantial.  I estimate those fees to range from $500,000 to $1,000,000, not including the attorneys' fees related to the jury consulting and mock trial work.

### g.    Puerto Rico Venue Additional Costs

149.    In the event the Anticipated Litigation is venued in Puerto Rico, there may be additional costs, not including local counsel fees.  These costs include travel (airfare, local transportation); lodging for counsel and staff for hearings, depositions and trial; court reporter fees; translation services for Spanish documents and witnesses; and meals.  I estimate those expenses to be from $300,000 to $600,000.

### h.    Miscellaneous Expenses

150.    Because it is not possible to anticipate every expense that might arise in litigation, it is reasonable to include an amount for expenses not specifically identified.  This is particularly warranted in this case because BNYM will not have the ability to be reimbursed for such expenses once the holdback amount is determined.  I believe that a reasonable amount for miscellaneous expenses is $125,000–250,000.

### D.    The Overall Amount Anticipated to Fund BNYM's Defense of the Anticipated Litigation is Reasonable

151.    Based on the foregoing analysis, in my opinion BNYM's defense costs for the Anticipated Litigation with a reasonable degree of certainty could total approximately $25–40 million, with a midpoint at approximately $32.5 million.

## IV.    MY INVESTIGATION OF COMPARABLE LITIGATIONS SUPPORTS THE REASONABLENESS OF THE OVERALL AMOUNT

152.    As a check on the reasonableness of the above estimate, I compared it to the amount of fees expected to be incurred in similar litigation.  In particular, I am aware that more than a dozen cases pending in state and federal courts involve alleged failures by trustees of structured-finance trusts to take appropriate action in response to alleged events of default.  Those cases were filed by sophisticated institutional investors—including Ambac—against several large corporate trust businesses.  Members of my team conducted a reasonable search of the public dockets for those cases to determine if any information regarding defense costs is available.  Members of my team also provided me with information concerning the length of discovery in those cases.  Although information regarding defense costs in such cases was limited, I conclude based on available information that the above estimate for this case is lower than or at least in line with defense costs expected to be incurred in such cases against trustees.

153.    In one such case—the action commenced by BlackRock against Wells Fargo— fees are expected to meet or exceed $50 million.  *See BlackRock v. Wells Fargo*, No. 656587/2016 (Sup. Ct. N.Y. Cnty.) (the "BlackRock State Action").  In the BlackRock State Action, the trustee conducted an analysis that is similar to my assignment here:  it set a reserve from trust funds by estimating future litigation expenses that would be incurred in defending the litigation.  That project was necessary because, while the suit was pending, Wells Fargo was

informed that 11 of the affected trusts would be dissolved and their funds distributed to investors, even though the suit against Wells Fargo regarding its conduct relating to those trusts would continue.  Accordingly Wells Fargo disclosed on June 26, 2017 that, to ensure that funds would be available to reimburse its estimated future litigation expenses, it had withheld "approximately $50 million" from the trusts' distributions to cover its estimated defense costs.  *See PIMCO Absolute v. Wells Fargo*, No. 654743/2017 (Sup. Ct. N.Y. Cnty.), Dkt. 29 at 4.[25]

154.     Wells Fargo had a good basis to estimate its future litigation expenses at $50 million.  At the time of its estimate, Wells Fargo had been defending a related suit for more than 30 months in federal court regarding substantially identical allegations involving other similar trusts.  *See BlackRock Allocation Target Shares:  Series S. Portfolio et al. v. Wells Fargo Bank, N.A.*, No. 14-cv-9371-KPF-SN (S.D.N.Y.) (the "BlackRock Federal Action").[26]  The bulk of first-party discovery (and significant third-party discovery) in the federal action had been completed when Wells Fargo made its $50 million reserve estimate for future expenses in the state action.[27]  *See BlackRock State Action*, Dkt. 147 at 2.  In addition, the parties in the federal action by then had submitted substantial briefing on various fact discovery disputes, on parameters for expert discovery, and in connection with Wells Fargo's motion to dismiss.

155.     Wells Fargo's estimate presents a useful, though hardly dispositive, comparator here.  Like the plaintiffs in the BlackRock litigations, Ambac and Whitebox allege that BNYM failed to fulfill duties governed by complex trust agreements, including failing to respond to purported defaults and events of default, and that BNYM was improperly motivated as the result of alleged conflicts of interest.  *Compare BlackRock State Action*, Dkt. 130 (Amended Complaint) ¶¶ 1-12, *with Ambac Assurance Corp. v. The Bank of New York Mellon*, No. 17 Civ. 3804, Dkt. 8 (S.D.N.Y.) (First Amended Complaint) ¶¶ 1-15 *and Whitebox Multi-Strategy Partners, L.P. v. Bank of New York Mellon Corp.*, No. 651969/2017, Dkt. 1 (Complaint) ¶¶ 1-6. Both sets of cases also involve the question of what constitutes "gross negligence" and/or "willful misconduct" in the corporate trust context.  *Compare BlackRock State Action*, Dkt. 130 ¶ 54, *and PIMCO*, Dkt. 2 ¶¶ 8, 17-18, *with* Ambac Compl. ¶¶ 131-35, *and* Whitebox Compl. ¶¶ 92, 98, 114.  Like the parties in the BlackRock actions, the parties in the Ambac and Whitebox

---

[25] The plaintiffs' complaint in *PIMCO* alleged that Wells Fargo had set aside $57.2 million and, after including amounts for additional trusts, alleged that Wells Fargo had set aside over $94 million in total for RMBS-related litigation expenses.  *PIMCO*, Dkt. 2 ¶¶ 6-7 & n.3.  Plaintiffs in *PIMCO* challenged Wells Fargo's authority to create such a reserve, but the court granted Wells Fargo's motion to dismiss, and the plaintiffs filed a notice of appeal.  The parties have reached a proposed settlement of all the related actions, pursuant to which the *PIMCO* action will be dismissed.  As part of its proposed settlement with the BlackRock plaintiffs, Wells Fargo agreed to release $70 million that had been set aside to defend underlying litigations.  *BlackRock State Action*, Dkt. 147, at 3 & n.2.  To be conservative, I have not relied upon these higher reserve figures in my comparison analysis.

[26] Originally, the *BlackRock State Action* and *BlackRock Federal Action* were a single case.  *See BlackRock State Action*, Dkt. 150 at 5 (explaining that the federal court declined to exercise supplemental jurisdiction over certain trusts, which caused the suit to be split into the two actions).

[27] *See, e.g.*, *BlackRock Federal Action*, Dkt. 271 (order extending document discovery deadline for certain items to December 19, 2016, reflecting that all other document discovery was to have been completed by November 11, 2016); Dkt. 284 (submission reflecting extension of fact deposition deadline to February 28, 2017); Dkt. 386 (order extending deadline for FRCP 30(b)(6) depositions to May 1, 2017); Dkt. 480 (plaintiff's letter, reflecting only one open issue with respect document productions from certain third parties as of June 9, 2017); Dkt. 481 (plaintiff's letter reflecting requests for certain additional discovery from Wells Fargo and third parties as of June 13, 2017).

litigations will need to engage in lengthy and costly discovery, including expert discovery, along with accompanying discovery disputes and motion practice.  These cases also will require briefing on multiple motions, including motions to dismiss, for summary judgment, and motions *in limine* prior to trial.  Wells Fargo likely faced the prospect of significant reputational harm in the event of an unfavorable decision, leading it to incur or budget for the expenses necessary to prevent such harm.  In light of the reputational risks BNYM faces here, as discussed above, I similarly expect BNYM to incur the expenses necessary to prevent such harm.

156.    Although there are certain differences between the BlackRock actions and the Anticipated Litigations, those differences should not be overstated.  For example, while the BlackRock actions involved multiple trusts, in my experience the bulk of the litigation costs are likely incurred in the first trust, the issues and witnesses generally overlap between trusts, and the marginal costs of litigating similar claims across additional trusts in the same action would have diminished with each added trust.

157.    The estimated $50 million cost of defending the BlackRock action does not appear to be an outlier; such cases commonly require years of discovery and involve contentious discovery disputes.  *See, e.g.*, *Royal Park Investments v. Deutsche Bank Nat'l Tr. Co.*, No. 14-cv-04394 (S.D.N.Y.) (20 months from complaint to substantive decision on motion to dismiss, 18 months from decision to close of fact discovery).  A full survey of timelines in similar cases is unnecessary; the above discussion amply supports the conclusion that the lawyer time required in the BlackRock litigation—and the accompanying reserve of $50 million for defense costs—is not out of the ordinary in high-stakes litigation alleging that trustees failed to take appropriate action in response to purported events of default.

158.    Overall, my analysis of recent, high-stakes litigation against trustees in event-of-default disputes lends further support to the conclusion that the above estimate of defense costs in the Anticipated Litigation is reasonable.  The litigations are sufficiently similar that they provide helpful points of comparison.

## V.    CONCLUSION

159.    To a reasonable degree of certainty, I believe the range of estimated fees and expenses to defend the Anticipated Litigations is between approximately $25 million and $40 million, with a midpoint of approximately $32.5 million.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 2, 2019

_____
Daniel P. Goldberg