UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

    Debtors.

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

---------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION (COFINA),

    Debtor.

PROMESA
Title III

No. 17 BK 3284-LTS

---------------------------------------------------------------x

**SUPPLEMENT TO OBJECTION, OF INDIVIDUAL COFINA SUBORDINATE BONDHOLDER RESIDING IN THE 50 STATES WHO PURCHASED AT THE ORIGINAL OFFERING PRICES, TO CONFIRMATION OF PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA") PLAN SCHEDULED FOR HEARING JANUARY 16, 2019, AND RESPONSE AND OPPOSITION TO COFINA'S THIRTEENTH OMNIBUS OBJECTION TO INDIVIDUAL CLAIM NO. 10701**

December 31, 2018

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

A. DOCKETING OF MY 12/27/2018 OBJECTION (DOCKET 4585 IN 17 BK-3283-LTS) ...................................................................................................................................1

B. SUPPLEMENTATION OF MY 12/27/2018 OBJECTION (DOCKET 4585) ....................2

    SUPPLEMENT TO SECTION II.(2) (Pp. 13-16) ................................................................2

        (2) The Court cannot confirm the Plan without first ruling upon whether the COFINA structure and lien are lawful, and if the COFINA structure and lien are lawful the COFINA bonds could and should be paid in accordance with their terms, which should result in full payment. ..................................................................................................2

    SUPPLEMENT TO SECTION II.(4).(B) (Pp. 20-21) ..........................................................3

        (B) The taking of the liens and property and other rights of individual holders of COFINA subordinate bonds violates the Takings Clause. ...............3

    SUPPLEMENT TO SECTION II.(4).(C) (Pp. 21-23) ..........................................................4

        (C) The proposed Plan violates basic principles of fairness as well as the Due Process, Equal Protection and the Privileges and Immunities Clauses of the U.S. Constitution. ....................................................................4

            1. The force of 48 U.S.C. § 737 ................................................................4

            2. Privileges and Immunities (Article IV, Section 2, Clause 1) ................5

            3. Privileges and Immunities (Fourteenth Amendment) ...........................8

            4. Equal Protection and Due Process .........................................................8

            5. Dormant Commerce Clause ...................................................................9

    SUPPLEMENT TO SECTION II.(6).(C) (Pp. 25-27) ........................................................11

        (C) The Debtor is prohibited both by law and the U.S. Constitution from taking actions necessary to carry out the Plan (48 U.S.C. § 2174(b)(3)). ...........................................................................................11

C. REFERENCE TO ARGUMENTS AND RECORD MATERIALS SET OUT IN OTHER OBJECTIONS .........................................................................................................12

RESERVATION OF RIGHTS AND OTHER MATTERS.........................................................15

## Preliminary Statement

This Supplement is being filed

(1) to request the docketing of my Objection filed 12/27/18 (Docket 4585 in 17 BK-3283-LTS) as an objection to confirmation of the proposed COFINA Plan (17 BK 3284-LTS, Docket 380 (filed 11/30/18); *see also id.* Docket 377 (filed 11/30/18), currently scheduled for hearing on January 16, 2019;

(2) to supplement my Objection filed 12/27/18 (Docket 4585 in 17 BK-3283-LTS); and

(3) to reference additional arguments and record materials set out in other Objections filed to date, and the exhibits thereto, in further support of my Objection.

### A. DOCKETING OF MY 12/27/2018 OBJECTION (DOCKET 4585 IN 17 BK-3283-LTS)

My Objection was filed with the Court on December 28, 2018 at Docket 4585 in 17 BK-3283-LTS (referred to herein as "12/27/2018 Objection"). However, the description in the docket does not appear to reflect the fact that my Objection is an objection to confirmation of the proposed COFINA Plan of Adjustment (17 BK 3284-LTS, Docket 380 (filed 11/30/18) (*see also id.* Docket 377 (filed 11/30/18)) that was the subject of the Notice dated December 5, 2018 that I received by mail on December 17, 2018 (see 12/27/18 Objection at 23-24), and for which a confirmation hearing is scheduled for January 16, 2019. Docket entry 4585 currently describes my filing as simply responding to COFINA's omnibus objection to my claim (Claim No. 10701). This is despite the fact that – on the face of my Objection – it states that my Objection is to confirmation of the Plan (before also stating that it is a response to COFINA's omnibus objection to my claim).

To avoid a situation where my Objection is not considered by the Court at the January 16, 2019 hearing because of an incorrect docket description, I request that Docket entry 4585 be clarified to ensure that my Objection to confirmation of the Plan is considered at the January 16, 2019 confirmation hearing.

B. **SUPPLEMENTATION OF MY 12/27/2018 OBJECTION (DOCKET 4585)**

For ease of reference, the supplemental material is presented below under headers that follow the organization of my 12/27/2018 Objection.

**SUPPLEMENT TO SECTION II.(2) (Pp. 13-16)**

(2) **The Court cannot confirm the Plan without first ruling upon whether the COFINA structure and lien are lawful, and if the COFINA structure and lien are lawful the COFINA bonds could and should be paid in accordance with their terms, which should result in full payment.**

As discussed in the 12/27/2018 Objection, 48 U.S.C. § 2174(b)(6) – "shall require" – does not permit confirmation of a plan until the issue of whether the COFINA structure and lien are lawful is decided.

It appears that briefing on motions for summary judgment presenting that issue for decision by the Court is complete, and thus the issue could be resolved promptly. *See* Adv. Proc. 17-00257-LTS Docket 434 (4/10/18 Minute Order). The Court is respectfully referred to the papers already in this Court's record submitted by the COFINA agent and other parties supporting the validity of the lien, and the exhibits thereto, which are referred to herein as further support for my Objections to the proposed Plan. These papers include the papers filed (i) by the COFINA agent in Adv. 257, including papers at Docket 310, 312, 316, 317, 329, 357, 358, 359, 360, 393; (ii) by the Mutual Fund Group in Adv. 257, including papers at Docket 313, 318, 319, 331, 367, 369, 394, 395; (iii) by the Senior Bondholders Coalition in Adv. 357, including papers filed at Docket 306, 307, 309, 332, 375, 376, 388, 389; and (iv) by Ambac in Adv. 257, including papers filed at Docket 325, 370.

Notably, it is not just the COFINA bondholders who assert that they have a lien over pledged SUT revenues – the Puerto Rico Legislature, in its "Statement of Motives" for the New Bond Legislation, **concedes** this point, stating that "[t]hese amendments will serve to release **the lien that holders of COFINA bonds currently have….**". *See* 12/27/2018 Objection p. 18, *citing*, Docket 4364-6 at 3 of 27 to 4 of 27.

Respectfully, in light of the multiple Constitutional infirmities with the proposed Plan (as chronicled in the 12/27/18 Objection and in this Supplement), not only is it mandatory that this

Court first rule on whether the COFINA statutory lien is valid, but since neither Plan proponents nor this Court can override the Constitutional rights of objecting bondholders, the most expeditious path to any resolution here will be to first rule on the validity of the statutory lien (and the issues arising under the U.S. Constitution that any challenge to the lien may raise).

### SUPPLEMENT TO SECTION II.(4).(B) (Pp. 20-21)

**(B) The taking of the liens and property and other rights of individual holders of COFINA subordinate bonds violates the Takings Clause.**

The following discussion presents additional authorities that further support the fact that the Plan would result in a violation of the Takings Clause:

(i) In *Armstrong v. United States*, 364 U.S. 40, 44-49 (1960), the Supreme Court was explicit that the Government's termination of a contract with a prime contractor shipbuilder, and insistence on the conveyance to the Government of all completed and uncompleted work and materials, constituted a taking of the materialmen's liens of the subcontractors which were thereby destroyed. The Court reasoned that the taking occurred "because the Government for its own advantage destroyed the value of the liens." *Id.* at 48. The Court emphasized that:

> The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation **was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.** A fair interpretation of this constitutional protection entitle these lienholders to just compensation here. (*Id.* at 49, emphasis added).

Here, too, even if Puerto Rico's asserted needs are asserted as a justification for taking the liens and property, contract and other rights of individual subordinate bondholders, the Takings Clause would be violated.

(ii) The Court in *Nollan v. California Coastal Commission*, 483 U.S. 825, 835 n.4 (1987), cited this point from *Armstrong* in observing that if the Government's conditioning of a building permit on the property owner providing a public access easement had "singled out" the property owners "to bear the burden of California's attempt to remedy" issues of maintaining beach views and preventing beach congestion, "although they had not contributed to it more than other

-3-

coastal landowners," the state's action might violate the Equal Protection Clause as well as the Takings Clause. *Id.* at 835 n.4.

### SUPPLEMENT TO SECTION II.(4).(C) (Pp. 21-23)

    (C)    **The proposed Plan violates basic principles of fairness as well as the Due Process, Equal Protection and the Privileges and Immunities Clauses of the U.S. Constitution.**

The following discussion supplements and expands upon the authorities cited in my 12/27/2018 Objection (Docket 4585, filed 12/28/2018), Section II.(4).(C) on pages 21-23:

As set forth in the 12/27/18 Objection, the fact that the Plan provides for discrimination against United States citizens who are individual bondholders in the 50 states based on place of residence constitutes a violation of the express language of Art. IV, Section 2, Clause 1, Amt. V and Amt. XIV, Section 1, as well as a violation of principles of basic fairness.

While no more is required to establish the fundamental Constitutional violations inherent in the proposed Plan and the actions of the Commonwealth's legislature and officials, COFINA and the Oversight Board in relation thereto, several of the multiple Constitutional doctrines contained in these provisions have been the subject of Supreme Court case law that is instructive.

    1. **The force of 48 U.S.C. § 737**. To begin, the Supreme Court in *Mullaney* v. *Anderson*, 342 U.S. 415 (1952), struck down an Alaska license fee that discriminated between residents and non-residents as violative of Article IV, Section 2 of the Constitution. In its opinion, the Court noted that in 1947 Congress had enacted 48 U.S.C. § 737 "'so as to leave no doubt that there may be no discrimination against citizens of the United States who are not residents of Puerto Rico'" (quoting prepared remarks to the Senate upon the presentation of amendments to the Organic Act of Puerto Rico by Senator Butler, then chairman of the Committee on Public Lands and, per the Supreme Court, the manager of the bill in the U.S. Senate). 342 U.S. at 419-420 n.2.[1] The Supreme Court went on to note that the Senate Committee on Public Lands had "expressed dissatisfaction that

---

[1] *See* 93 Cong. Rec. Part 8 at 10402, col. 3 (July 26, 1947) (available on the internet).

'Legislation in Puerto Rico has discriminated against nonresident American citizens.'"[2] *Id.* Yet – despite the express Congressional words-of-one-syllable admonition that 48 U.S.C. § 737 represents – the COFINA Plan proponents now propose to turn the clock back to the pre-1947 era and sanction discrimination against "nonresident American citizens" (342 U.S. at 420 n.2).

2. **Privileges and Immunities (Article IV, Section 2, Clause 1)**. The "Privileges and Immunities" Clause of Article IV, Section 2 has been repeatedly applied by the Supreme Court to preclude discrimination against non-residents in business and commercial endeavors. By way of example only, *see Toomer* v. *Witsell*, 334 U.S. 385 (1948) ("it was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State" *id.* at 396; the Court also noted that the constitutional prohibition applies to prohibit discrimination whether based on status of a "citizen" or of a "resident," *id.* at 397).

Particularly pertinent is *Hicklin* v. *Orbeck*, 437 U.S. 518 (1978), in which the Supreme Court struck down Alaska's attempt to provide a hiring preference to Alaska residents over nonresidents as violative of the Privileges and Immunities Clause of Article IV, Section 2. The Supreme Court in *Hicklin* stated that the purpose of the Privileges and Immunities clause was:

> "**to place the citizens of each State upon the same footing with citizens of other states, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States**; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; **and it secures to them in other States the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this.**" *Id.* at 524 (*quoting Paul* v. *Virginia*, 8 Wall. 168, 180 (1869) (emphasis added)).

---

[2] Senate Report 422, 80th Cong., 1st Sess. at 3-4 (July 2, 1947) was very direct on this point, stating that "Legislation in Puerto Rico has discriminated against nonresident American citizens", and that "The purpose of this addition is to assure that citizens of the United States not residing in Puerto Rico will have the same treatment in Puerto Rico as local residents."

-5-

While *Hicklin* noted that theoretically Alaska's preference toward its residents might potentially avoid the constitutional infirmity if the State shows "'that non-citizens constitute a peculiar source of the evil at which the statute is aimed'" (437 U.S. at 526), plainly no such showing has been – or could be – made here, especially as to individual purchasers of COFINA bonds in the original offerings in the 50 states, who purchased based on, inter alia, the covenants and representations made by COFINA and Puerto Rico authorities, as described in my 12/27/18 Objection Section I, pp. 1-7. Such individual buyers from the 50 states can hardly be said to constitute "a peculiar source of the evil", any more than could such a spurious charge be leveled against individual purchasers in the original offerings who are resident in Puerto Rico.

Moreover, as in *Hicklin*, the discrimination in favor of "on-island" investors and against the nonresident individual purchasers in the original offering from the 50 states "does not bear a substantial relationship to the particular 'evil'". 437 U.S. at 527. Thus, under the Plan, a Puerto Rico "on-island" institution or fund gets a preference, including the preference cash and the potentially marketable one-tranche of shorter-term 2040 maturity coupon bonds. *See* 12/27/2018 Objection at 8-11.

Even if a Puerto Rico institution or fund bought their bonds at depressed prices after Puerto Rico and COFINA sought to disavow their obligations, and file Title III proceedings, under the Plan that Puerto Rico institution or fund will still get the preference.

The truly pernicious effect of the "on-island" preference is evident when one considers that the subordinate COFINA bonds dropped as low as less than 10% of par or less (*e.g.*, as was the case with the 5.5% coupon Series 2010C maturing 2040, CUSIP 74529JLL7). So there could be a fund – now favored by the COFINA settlement – that may have paid as little as 10% of par for some of its subordinate bonds, but that will now receive consideration valued in the plan at 56.414 cents per dollar of par for those subordinate bonds.[3]

---

[3] Trading price data is publicly available on the EMMA website maintained by the Municipal Securities Rulemaking Bond. Type in the CUSIP, click on "Trade Activity," and scroll back in time for historical day-by-day price data for prior years, going back to the inception of the issuance.

Even if one assumes the on-island fund purchased at a price level above the bottom of the market – for example, the price levels prevailing in May or June 2017 – the fund would still profit enormously from the Plan, while individual investors in the 50 states who purchased at the time of the original bond offerings will suffer large losses under the Plan. Thus, assume a $1,000,000 investment by a fund in COFINA subordinate securities, at prices averaging 22% of par for the subordinate. The fund would have a cost of $220,000 for its $1,000,000 par subordinate, yet will receive $564,140 under the Plan, a 156% **profit**. Add to that the added consideration provided preferentially to "on-island" investors – which becomes yet added profit for the "on-island" fund.

Meanwhile, individual purchasers in the 50 states are being forced to take at least a 43.5% loss (*e.g.*, assume an original offering cost of $100,000 for 100,000 par, less projected recovery of $56,414 per $100,000 par). And the lack of liquidity of the splintered new bond interests that subordinate bondholders in the 50 states are to receive under the Plan may yet further reduce their recovery to well **below** the supposed "projected" recovery. In addition, the uncertainties described in the Disclosure Statement underscore that – unlike the cash and the one traunche of coupon shorter-term maturity bonds going to only favored "on-island" parties – it is far from clear that the splintered new bond interests going to subordinate holders in the 50 states are worth even the nominal projected recovery amount of 56.414%. *See* Docket 4364 at 216-218 of 263, 223-231 of 263.

Other examples of the pernicious effect of the discriminatory preference abound. For example, as set out in the 12/27/2018 Objection (p. 10 n.6), in light of how "Puerto Rico Investors" is defined (*see* Docket 4364, at 24 of 263), a fund domiciled in Puerto Rico would apparently qualify as a "Puerto Rico Institution" even if the owners of interests in the fund all lived in New York, or Connecticut, or Florida or any other place. Furthermore, if bonds held by a New York investor are bought by a "Puerto Rico Institution" (as defined) on November 19, 2018 (the day before the November 20, 2018 record date for voting), do bonds that did not qualify for the on-island preference suddenly qualify for the on-island preference in the hands of the new ("on-island") owner?

To say these preferences for "on-island" investors pass muster under Article IV, Section 2, Clause 1, Amendment V and Amendment XIV would render those provisions of the Constitution a dead letter.

3. **Privileges and Immunities (Fourteenth Amendment)**. The 14th Amendment's Privileges and Immunities clause has also been invoked by the Supreme Court. For example, *Saenz v. Roe*, 526 U.S. 489 (1999), which involved a California limit on AFDC benefits, capping new residents for their first year in California at the level of benefits they would have received in their prior state of residence. *Saenz* held the California statute violated the 14th Amendment's Privileges and Immunities Clause. In so ruling, the *Saenz* Court noted that **(i)** Article IV, Section 2's Privileges and Immunities Clause "removes 'from the citizens of each State the disabilities of alienage in the other States," *id.* at 501; **(ii)** "Congress may not authorize the States to violate the Fourteenth Amendment" (nor the Equal Protection Clause), *id.* at 507 & n.21 and at 508; **(iii)** Congress' legislative powers "may not be exercised in a way that violates other specific provisions of the Constitution ..." (*id.* at 508); and **(iv)** "the Citizenship Clause of the Fourteenth Amendment expressly equates citizenship with residence" (*id.* at 506).

4. **Equal Protection and Due Process**. Alternatively, the proposed Plan's discrimination violates the Equal Protection Clause. For example, in *Shapiro v. Thompson*, 394 U.S. 618 (1969) – later cited with approval in *Saenz* (526 U.S. at 498-500) – the Supreme Court ruled that it violated the Equal Protection Clause for a state to make a distinction between welfare applicants according to whether they had lived in the state for one year, noting that such a classification "would seem irrational and unconstitutional", and, furthermore, that the constitutionality of such a distinction "must be judged by the stricter standard of whether it promotes a *compelling* state interest". Under that standard, the Supreme Court ruled that the classification of welfare applicants according to whether they had lived in the state for one year or less "clearly violates the Equal Protection Clause". *Id.* at 638.

The distinction in the proposed Plan between institutions and individuals in Puerto Rico versus individuals and institutions in the 50 states is similarly invalid. All subordinated bondholders

-8-

bought bonds with the same rights, terms and provisions. All subordinated bondholders thus have the same contract rights under those bonds, as well as the same rights under the U.S. Constitution's Contracts Clause and Takings Clause that preclude the attempted imposition of the COFINA Plan over their objections. There is no legitimate basis for the pernicious discrimination against investors in the 50 states that the Plan proposes.

It is no answer to say that the proposed discrimination is not only a feature of actions by the Puerto Rico legislature and Puerto Rico authorities, but is also discrimination assertedly authorized by (some unspecified) section of PROMESA. As the U.S. Supreme Court made clear in *Shapiro*, "Congress may not authorize States to violate the Equal Protection Clause". 394 U.S. at 641.

Furthermore, in *Shapiro*, the Court invalidated not only the state laws and actions as unconstitutional, but also invalidated a waiting-period requirement in the District of Columbia that had been adopted by Congress as an exercise of federal power. The Supreme Court ruled that the discrimination effected by this Congressional act violated the Due Process Clause of the Fifth Amendment, because "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process'". 394 U.S. at 641-642.

**5. Dormant Commerce Clause**. Related here to the Plan's violation of the Privileges and Immunities Clause is that the Plan also runs afoul of the dormant Commerce Clause. The Supreme Court has long recognized the inter-relationship between the Privileges and Immunities Clause and the dormant Commerce Clause. *See, e.g.*, *Ward v. Maryland*, 79 U.S. 418, 430-31 (1870). Here, COFINA chose to sell the bonds in the original offerings in commerce to citizens across the United States. As the Court recently observed in *Comptroller v. Wynne*, 135 S. Ct. 1787, 1794 (2015), "[u]nder our precedents, the dormant Commerce Clause precludes States from 'discriminat[ing] between transactions 'on the basis of some interstate element'." While *Wynne* involved discriminatory tax treatment, the overarching anti-discrimination principle applies with equal force to the proposed discrimination and preferential distributions here to "on-island" bondholders.

-9-

The Court's 2015 decision in *Wynne* cites (135 S. Ct. at 1799) an earlier decision, *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U.S. 564 (1997) which is also instructive. In *Camps Newfound*, the Court held that an otherwise generally applicable state property tax violates the Commerce Clause of the Constitution, Art. I, § 8, cl. 8, because its exemption for property owned by charitable institutions excluded organizations operated principally for the benefit of nonresidents. *Id.* at 567.

In so holding, the Court noted that the dormant Commerce Clause prohibition on discrimination could not be side-stepped by artful phasing: "To allow a State to avoid the strictures of the dormant Commerce Clause by the simple device of labeling its discriminatory tax a levy on real estate would destroy the barrier against protectionism that the Constitution provides." *Id.* at 575.

The Court also emphasized that preferences to residents were unlawful, unconstitutional discrimination: "We have 'consistently ... held that the Commerce Clause ... precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom.'" *Id.* at 576.

And the Court's concluding message powerfully underscored the importance of the dormant Commerce Clause:

> the facts of this particular case, viewed in isolation, do not appear to pose any threat to the health of the national economy. Nevertheless, history, including the history of commercial conflict that preceded the Constitutional Convention as well as the uniform course of Commerce Clause jurisprudence animated and enlightened by that early history, provides the context in which each individual controversy must be judged. **The history of our Commerce Clause jurisprudence has shown that even the smallest scale discrimination can interfere with the project of our Federal Union.** As Justice Cardozo recognized, to countenance discrimination of the sort that Maine's statute represents would invite significant in-roads on our "national solidarity". (*Id.* at 595, emphasis added)[4]

---

[4] Congress has plainly not expressly sanctioned the discrimination proposed here so as to remove the dormant Commerce Clause violation. Indeed, the only specific admonition in PROMESA – that in Title VI, 48 U.S.C. § 2231(d)(3)(E) – is, as noted, that bonds "of the same Issuer that have identical rights in security or priority" are **not** to be separated into separate categories. *See* 12/27/2018 Objection p. 8.

-10-

\* \* \*

In short, under multiple Constitutional doctrines, the discrimination based on residence in favor of "on-island" investors and against subordinate bondholders in the 50 states that is proposed in the Plan is plainly unconstitutional, whether that discrimination occurs by or at the behest of the Puerto Rico legislature, Puerto Rico government officials, the Oversight Board, Congress (through PROMESA) or this Court. My Constitutional rights – including my Contract Clause and Takings Clause rights as well – are not rights that can turn on the whim of a "vote" of Class 5 (even putting aside the questions of whether votes of conflicted post-PROMESA purchasers of subordinate bonds at deep discounts, who now will profit with even a low level of recovery under a plan, should be disqualified, and of whether individual bondholders in the 50 states are effectively disenfranchised by the burdensome process for objection and voting, see 12/27/18 Objection II.(4).(D), pp. 23-24). The whole point of our founders in establishing these Constitutional rights is that there are certain rights that cannot be abrogated by "vote" (or by executive or legislative dictate).

For this reason alone, the Plan cannot be confirmed. Among other things, all participants in this proceeding (including the Court) are bound to comply with the U.S. Constitution and cannot proceed with a Plan in violation of the Constitution. Plus, PROMESA itself precludes approval of an unlawful plan, *e.g.*, 48 U.S.C. § 2174(b)(3), as discussed below.

## SUPPLEMENT TO SECTION II.(6).(C) (Pp. 25-27)

**(C) The Debtor is prohibited both by law and the U.S. Constitution from taking actions necessary to carry out the Plan (48 U.S.C. § 2174(b)(3)).**

The 12/27/18 Objections, asserted in Docket 4585, and the Objections further discussed elsewhere herein – and which include Objections based on provisions of the U.S. Constitution – cannot be side-stepped by the artifice of the Plan proponents purporting to divide subordinated bondholders who bought and own COFINA subordinate bonds "that have identical rights in security or priority" (*cf.* 48 U.S.C. 2231(d)(3)(E)) into supposed separate classes, with one class being "on-island" bondholders who elect preferential treatment, and a different class including individual

-11-

investors in the 50 states. As discussed in 12/27/18 Objection at 8, 48 U.S.C. § 2231(d)(3)(E) should inform the application – for purposes of PROMESA – of the "same treatment" provisions of Section 1123(a)(4).

But however the Court resolves the issue of statutory construction, the U.S. Constitution applies to limit what the governmental actors can do in this case. The Contract Clause cannot be violated – yet it will be if the contract rights of subordinate bondholders in the 50 states, including their contract right that prohibits modification of the principal or interest date on their bonds without their consent, are not respected. *See, e.g.*, 12/27/18 Objection I.C (pp. 2-3) and II.(4).(A), pp. 18-20. The liens and property and other rights of subordinated bondholders in the 50 states cannot be "taken for public use, without just compensation," Amt. V. *See, e.g.*, 12/27/18 Objection II.(4).(B), pp. 20-21. And the plan cannot discriminate against subordinate bondholders in the 50 states and in favor of "on-island" investors. See 12/27/18 Objection II.(4).(C), pp. 21-23 and the above supplemental discussion of applicable Supreme Court case law.

In light of these Constitutional hurdles, as well as the other considerations discussed in the 12/27/18 Objection and herein, ruling upon whether the COFINA structure and lien are lawful – see 12/27/18 Objection II.(2) at pp 13-16 – is not only legally required but, respectfully, is the only path forward that does not face an insuperable Constitutional hurdle.

## C. REFERENCE TO ARGUMENTS AND RECORD MATERIALS SET OUT IN OTHER OBJECTIONS

The Court is respectfully referred, in support of my Objection, to arguments and record materials in other objections to the COFINA Plan that have been or will be filed, including the following:[5]

---

[5] I believe the legal argument and factual information in the below-referenced objections by others are generally supportive of, and consistent with, my positions in my Objection and this Supplement. To the extent there is any inconsistency, I would rely upon the legal arguments and facts as I have presented them.

(1) Amended Objection of the GMS Group (Docket 4564) filed 12/26/18, and the declaration and exhibits submitted or to be submitted in support thereof (including Docket 4564-1 et seq.)

(2) Objection of Mark Elliott, individually and d/b/a Elliott Asset Management. (I understand this Objection has been or will be filed; however, I have not yet seen it on the Court docket.)

The Court is also respectfully referred to the arguments and record materials submitted by various subordinate bondholders (some of which are collected in the Objection of Stephen T. Mangiaracina (Docket 4481, filed 12/14/18)). I do not personally adopt all portions of this material, and the tone and nature of presentation in some cases differs from how I would present the case for rejecting the plan.

However, the Court should consider the strong opposition of these subordinate bondholders, a number of whom submitted detailed analyses. Individual subordinate bondholders – particularly those who bought years prior to the enactment of PROMESA and prior to COFINA's and Puerto Rico's commencement of efforts to avoid their debt and the filing of these Title III cases – should not be required to retain Puerto Rico (or other) counsel or to navigate an unnecessarily burdensome process to object in order to have their objections to the violations of their contractual, statutory and constitutional rights heard and considered by this Court.[6]

---

[6] As noted in 12/27/18 Objection, II.(4).(D), a much simpler objection process could have been offered, but was not. The practical obstacles that an individual bondholder in the 50 states would face in trying to serve and file an objection in accordance with the procedures set out in the Notice mailed to bondholders was brought home to me as I sought to send my Objection to the Court on December 27, 2018. The printed December 5, 2018 Notice in the packet I received on December 17, 2018 simply states (in ¶ 8) that an objection must be filed, together with proof of service, with the Court to be actually received before 5 p.m. Atlantic Standard Time on January 2, 2019. However, no address for the Court is specified in ¶ 8.d of the Notice. Going back to ¶ 2 of the Notice, the location of the January 16, 2019 hearing is specified but that address (150 Carlos Chardon Avenue) is different than the Clerk's Office address I found on a different notice, relating to COFINA's Thirteenth Omnibus Objection, which on page 5 lists two different addresses for the Clerk's Office ("Room 150 Federal Building" and "150 Chardon Avenue, Federal Building"). I then went to the website for the U.S.D.C. for the District of Puerto Rico and initially found references to two different court locations. Since it was not clear which location I should send my Objection to, I clicked on a link to "PROMESA" on the website to look for phone numbers, but I could not reach anyone when I called the specified number during business hours (there was a recorded message). I

Why should Puerto Rico authorities and the Oversight Board, who triggered a steep decline in bond prices by seeking to avoid COFINA's debt and by filing this Title III proceeding, and the funds who took advantage of the price declines that Puerto Rico authorities and the Oversight Board had triggered to buy up large quantities of bonds at depressed prices (such that they profit at even low recovery levels under a Plan) – all of whom propose to have their legal fees paid as administrative expenses or "consummation costs" – be heard, but not these individual investors, whose contractual, statutory and constitutional rights are at issue?

Respectfully, the Court should consider the letters and emails attached to Docket 4481, including 10/24/18 letter of Maria Mercedes Navia (Docket 4481 page 9); 9/4/2018 letter of Seema Balwada (Docket 4481 page 12); and then beginning Docket 4481 page 191: 12/4/2018 email from Martin & Marilyn Feldman; 11/16/2018 letter from Seema Balwada; 12/3/2018 email from Leopold Montanaro; 12/4/2018 email from Adam Jacobs; 12/4/2018 email from Jack Girton; 12/4/2018 email from Gerard Reynolds; 12/4/2018 email from Larry Hollrah; 12/4/2018 email from Larry Kenna; 12/4/2018 email from Manley; 12/4/2018 email from Mike Steets; 12/4/2018 email from Robert Ackerman and Roberta Shiffman; 12/4/2018 email from Ron Reed; 12/4/2018 email from Sion Zerah; 12/5/2018 email from Craig Hayes; 12/6/2018 email from Julian Roberts; 12/6/2018 email from Jane Walmsley; and 12/6/2018 email from Leslie Pokrass.

Other subordinate bondholders have also submitted letters that are now in the public Court docket, and thus have been effectively submitted to the Court and disseminated to all counsel in this case. Among these are: Docket 4567 at pages 44-46 of 151 (filed 12/26/18), letter dated 12/20/2018 from Travis A. Knadle; Docket 4494 at 14-19 of 46, letter dated 12/13/2015 from Teresa Volmar Swany and what appear to be family members; Docket 3680 (filed 7/24/2018) at 3-5 of 30, letter dated 6/20/2018 from Maria Mercedes Navia; Docket 3680 (filed 7/24/18) at 6-9 of 30, letter dated 6/21/2018 from Eric R. Cohen; Docket 3680 at 10-12 of 30, letter dated 6/22/2018 from Seema

---

finally found a phone number that turned out to be the Clerk's Office and when I called that number I finally got clear information on where to send my Federal Express. If I had this difficulty, only imagine the difficulties for the ordinary lay investor.

Balwada; Docket 3680 at 25-30, letter or email from Mark Elliott; Docket 4348 (filed 11/20/18) at 12 of 1000, email from Seymour Finder; Docket 4348 at 13-14 of 1000, letter dated 10/22/2018 from Iliana Paz Castellanos; Docket 4348 (filed 11/20/2018) at 18-22 of 1000, letter dated 10/29/2018 from Seema Balwada; Docket 4348 at 23 of 1000, letter dated 11/2/2018 from Donna Wright.

I may not agree with everything these subordinate bondholders have said in their letters and emails, but, respectfully, since their individual contractual, statutory and constitutional rights are at issue, I believe they have a right to be heard – without the expense of having an attorney able to electronically file in Puerto Rico or overcoming what I suspect for most is a real practical barrier of having to serve 20+ people on the service list and deliver their objections by air courier to the Court in Puerto Rico by the day after the Christmas-New Year's holiday period. That is why I am referencing their letters in my Objection with Docket and page numbers to facilitate the Court's review of them, and requesting as part of my Objection that the Court consider them too.

## RESERVATION OF RIGHTS AND OTHER MATTERS

As noted in the 12/27/2018 Objection (p. 7 n.4), I reserve the right to further correct, amend or supplement these objections, and to further supplement the legal authorities and factual materials referenced herein. I also reserve the right to join in or address other objections to the COFINA Plan that have been filed or that may be filed by other persons. In light of the time exigencies inherent in the limited time to object allowed – over the Christmas and New Year's holiday period – and the other circumstances described in 12/27/18 Objection Section II.(4).(D), pp. 23-24 and herein, it is respectfully submitted that my reservation of rights is reasonable.

While the factual matter referred to in my Objection is all publicly available and readily locatable (as discussed or source-referenced in my Objection), I also stand ready to supply the Court with hard copies or PDF copies by email, if requested.

Finally, it is not clear to me if I would be permitted to participate in the January 16, 2019 hearing from New York via webcast, video or teleconference from Your Honor's New York courtroom (or some other location in New York). If that is feasible, I would like to have that

opportunity. But, if not, I respectfully request that the Court consider the 12/27/2018 Objection and this Supplement and the documents and other materials referred to or cited herein. I respectfully reserve and preserve all of my rights, including my rights under the U.S. Constitution.

December 31, 2018

                                      Respectfully Submitted,

                                      */s/ Peter C. Hein*

                                      Peter C. Hein, Pro Se
                                      101 Central Park West, Apt. 14E
                                      New York, NY 10023
                                      petercheinsr@gmail.com