NEW ISSUE – BOOK-ENTRY ONLY

RATINGS (see RATINGS herein):   S&P: **A+**
Moody's: **A1**
Fitch: **A+**

$734,795,573.95
## Puerto Rico Sales Tax Financing Corporation
### Sales Tax Revenue Bonds, First Subordinate Series 2011A
Consisting of

$397,758,386.20 Series 2011A-1      $337,037,187.75 Series 2011A-2

**Dated:** Date of Delivery                                                    **Due:** August 1, as shown on the inside cover pages

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, First Subordinate Series 2011A (the "Series 2011A Bonds"), to refund certain outstanding bonds of the Corporation and provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied to cover operating expenses of the Commonwealth, as described herein. Concurrently with the issuance of the Series 2011A Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2011B (the "Series 2011B Bonds" and, together with the Series 2011A Bonds, the "First Subordinate Series 2011 Bonds"). The Series 2011B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Series 2011A Bonds is not contingent upon the issuance of the Series 2011B Bonds. The Corporation also proposes to issue in the near future additional Sales Tax Revenue Bonds, Senior Series in the United States taxable and tax-exempt markets and in Puerto Rico pursuant to separate official statements. See PLAN OF FINANCING. The issuance of the First Subordinate Series 2011 Bonds is not contingent upon the issuance of such additional bonds. The Series 2011A-2 Bond are not being offered to the public.

**The First Subordinate Series 2011 Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales and use tax imposed by the Commonwealth. The First Subordinate Series 2011 Bonds are subordinate in payment priority to the Corporation's outstanding Senior Bonds and Parity Obligations (as defined herein) and additional senior bonds that may be issued by the Corporation, as described herein. The First Subordinate Series 2011 Bonds are on a parity in payment priority with the outstanding First Subordinate Bonds (as defined herein), and additional first subordinate bonds that may be issued or first subordinate obligations that may be incurred by the Corporation, as described herein. The Bank of New York Mellon acts as trustee (the "Trustee") under the Resolution. See *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.***

The Series 2011A Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Series 2011A Bonds on the records of The Depository Trust Company and its participants. The Series 2011A Bonds are being issued as Current Interest Bonds and Capital Appreciation Bonds. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest payment dates, interest rates, prices and approximate yields of the Series 2011A Bonds. Prospective investors should consider the information set forth in RISK FACTORS before investing.

**This cover page contains information for quick reference only. It is *not* a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision.**

*In the opinion of Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Corporation and the Commonwealth, interest on the Series 2011A-1 Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Bond Counsel is further of the opinion that interest on the Series 2011A-1 Bonds is exempt from state, Commonwealth and local income taxation. See TAX MATTERS herein.*

**The Series 2011A Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2011A Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

*The Series 2011A Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, withdrawal or modification of the offer without notice, and the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico, as Underwriters' Counsel. It is expected that the Series 2011A Bonds will be delivered through The Depository Trust Company on or about November 23, 2011*

### Citigroup

| | | |
|---|---|---|
| Barclays Capital | Goldman, Sachs & Co. | Wells Fargo Securities |
| BMO Capital Markets | BofA Merrill Lynch | Jefferies & Company |
| J.P. Morgan | Morgan Stanley | Ramirez & Co. Inc. |
| Raymond James | RBC Capital Markets | UBS FS Puerto Rico |
| BBVAPR MSD | FirstBank PR Securities | Oriental Financial Services |
| Popular Securities | Santander Securities        Scotia MSD | VAB FINANCIAL |

November 16, 2011

**$734,795,573.95**
**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds, First Subordinate Series 2011A**

### $397,758,386.20 First Subordinate Series 2011A-1

#### $355,030,000 Current Interest Bonds[*]

| Maturity August 1 | Amount | Interest Rate | Yield | CUSIP Numbers[†] |
|---|---|---|---|---|
| 2043 | $175,030,000 | 5.00% | 5.10 | 74529JLX1 |
| 2043 | 180,000,000 | 5.25 | 5.05%[‡] | 74529JLY9 |

#### $42,728,386.20 Capital Appreciation Bonds[§]

| Maturity August 1 | Initial Principal Amount | Maturity Amount | Approximate Yield | CUSIP Numbers[†] |
|---|---|---|---|---|
| 2023 | $22,402,071.30 | $41,055,000 | 5.25% | 74529JLZ6 |
| 2024 | 10,470,396.75 | 20,715,000 | 5.45 | 74529JMA0 |
| 2032 | 2,864,054.90 | 10,130,000 | 6.20 | 74529JMC6 |
| 2033 | 4,548,759.25 | 17,465,000 | 6.30 | 74529JMD4 |
| 2041 | 2,443,104.00 | 16,320,000 | 6.50 | 74529JMB8 |

### $337,037,187.75 First Subordinate Series 2011A-2[**]

#### $337,037,187.75 Capital Appreciation Bonds[§]

| Maturity August 1 | Initial Principal Amount | Maturity Amount | Approximate Yield | CUSIP Numbers[†] |
|---|---|---|---|---|
| 2043 | $46,272,935.00 | $409,495,000 | 7.00% | 74529JMG7 |
| 2044 | 47,997,950.00 | 455,000,000 | 7.00 | 74529JMH5 |
| 2045 | 53,230,902.00 | 540,525,000 | 7.00 | 74529JMJ1 |
| 2046 | 46,662,748.70 | 507,590,000 | 7.00 | 74529JMK8 |
| 2047 | 43,739,450.30 | 509,665,000 | 7.00 | 74529JML6 |
| 2048 | 38,093,106.10 | 475,510,000 | 7.00 | 74529JMM4 |
| 2049 | 32,902,826.10 | 439,995,000 | 7.00 | 74529JMN2 |
| 2050 | 28,137,269.55 | 403,055,000 | 7.00 | 74529JMP7 |

---

[*] Interest on the Current Interest Bonds will be payable semi-annually on each February 1 and August 1, commencing on February 1, 2012.

[†] Copyright, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

[‡] Priced at the stated yield to the August 1, 2021 optional redemption date at a redemption price of 100%. See *Redemption - Optional Redemption of Current Interest Bonds* under THE SERIES 2011A BONDS herein.

[§] Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semi-annually on each February 1 and August 1, commencing on February 1, 2012, and will be payable at maturity (or earlier redemption).

[**] The Corporation is issuing the Series 2011A-2 Bonds in order to refund the Corporation's Sales Tax Revenue Bonds, Junior Subordinate Series 2011A (the "Outstanding Junior Subordinate Bonds") in the aggregate principal amount of $327.5 million. The Outstanding Junior Subordinate Bonds were issued according to the provisions of Act No. 96 of June 16, 2011, in an aggregate principal amount of $327.5 million and were purchased by the Puerto Rico Infrastructure Financing Authority ("PRIFA") and the Government of Puerto Rico Employees Retirement System (the "Employees Retirement System"). The Series 2011A-2 Bonds are not being offered to the public and will be delivered solely to PRIFA and the Employees Retirement System.

**In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Series 2011A Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Series 2011A Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover pages and said offering price may be changed from time to time by the Underwriters.**

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than Puerto Rico Sales Tax Financing Corporation (the "Corporation"), is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Corporation or the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Corporation since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2011A Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Series 2011A Bonds and other documents herein do not purport to be complete. Reference is made to said laws, resolutions, the Series 2011A Bonds and other documents for full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Corporation or the Trustee.

**The Series 2011A Bonds have not been registered under the Securities Act of 1933, as amended, in reliance upon exemptions contained in such act. The registration or qualification of the Series 2011A Bonds in accordance with applicable provisions of laws of the states in which the Series 2011A Bonds have been registered or qualified and the exemption from registration or qualification in other states cannot be regarded as a recommendation thereof. Neither these states nor any of their agencies have passed upon the merits of the Series 2011A Bonds or the accuracy or completeness of this Official Statement. Any representation to the contrary may be a criminal offense.**

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS IN THIS OFFICIAL STATEMENT

Certain statements included or incorporated by reference in this Official Statement constitute projections or estimates of future events, generally known as forward-looking statements. These statements are generally identifiable by the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions. The achievement of certain results or other expectations contained in such forward-looking statements involves known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. The Corporation does not plan to issue any updates or revisions to those forward-looking statements if or when changes in their expectations, or event, conditions or circumstances on which such statements are based, occur.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................ 1
   The Corporation .................................................... 1
   Sales and Use Tax ................................................. 2
   Dedicated Sales Tax Fund ..................................... 2
   The Resolution ..................................................... 2
   Outstanding Bonds and Parity Obligations ........... 3
   Source of Payment and Security for the Bonds ..... 5
PLEDGED SALES TAX ............................................ 6
   Commonwealth Sales Tax Revenues .................... 6
   Commonwealth Sales Tax Collections and Projections ...... 8
   Collections by Source ......................................... 11
   Economic Indicators ........................................... 12
   Dedicated Sales Tax Fund ................................... 14
   Pledged Sales Tax Base Amount ........................ 14
   Procedures for the Collection and Deposit of the Pledged
     Sales Tax in the Dedicated Sales Tax Fund ........ 16
   Commonwealth Sales Tax Enforcement Initiatives ....... 18
THE SERIES 2011A BONDS ..................................... 21
   General ............................................................... 21
   Redemption ........................................................ 22
   Book-Entry Only System ..................................... 23
SECURITY FOR THE SERIES 2011A BONDS ........... 24
   General ............................................................... 24
   Commonwealth Non-Impairment Covenant ........ 24
   Property Pledged for the Payment of the Series 2011A
     Bonds ............................................................ 25
   Outstanding Bonds and Parity Obligations .......... 25
   Subordination Provisions of the First Subordinate Bonds 26
   Subordination Provisions of the Junior Subordinate
     Bonds ............................................................ 27
   Funds and Accounts under the Resolution ............ 27
   Additional Bonds, Refunding Bonds and Other
     Obligations .................................................... 30
   Commonwealth's Authority to Cover Deficiencies ....... 33
RISK FACTORS ...................................................... 34
   Economic Conditions Could Affect Commonwealth Sales
     Tax Revenues ................................................ 34
   Legislative Assembly Authority over the Commonwealth
     Sales Tax ....................................................... 34
   Certain Constitutional Considerations Relating to Act 91 35

**Page**

   Limited Nature of Ratings; Reductions, Suspension or
     Withdrawal of a Rating ................................... 36
   Limited Nature of Remedies ............................... 37
AGGREGATE DEBT SERVICE REQUIREMENTS ........ 38
PLAN OF FINANCING ............................................ 41
   Overview ............................................................ 41
   Estimated Sources and Uses of Funds for the Series
     2011A-1 Bonds .............................................. 42
   Estimated Sources and Uses of Funds for the Series
     2011A-2 Bonds .............................................. 42
THE CORPORATION ............................................... 43
   Other Obligations of the Corporation ................... 43
TAX MATTERS ...................................................... 44
   Federal Income Taxes ......................................... 44
   State Taxes ........................................................ 44
   Original Issue Discount ....................................... 45
   Original Issue Premium ...................................... 45
   Ancillary Tax Matters ........................................ 45
   Changes in Law and Post Issuance Events ............ 46
   Series 2011A-2 Bonds ........................................ 46
RATINGS .............................................................. 46
LEGALITY FOR INVESTMENT ................................ 47
VERIFICATION OF MATHEMATICAL
   COMPUTATIONS ............................................... 47
UNDERWRITING ................................................... 47
LEGAL MATTERS .................................................. 49
CONTINUING DISCLOSURE .................................... 49
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
   RICO ................................................................ 51
MISCELLANEOUS ................................................. 51

APPENDIX A – Commonwealth Economic Information ...A-1
APPENDIX B – Summary of Certain Definitions and
   Provisions of the Resolution .............................. B-1
APPENDIX C – Proposed Form of Approving Opinion of
   Bond Counsel to the Corporation ....................... C-1
APPENDIX D – Book-Entry Only System ....................D-1
APPENDIX E – Table of Compounded Amounts for
   Capital Appreciation Bonds ............................... E-1

i

[THIS PAGE INTENTIONALLY LEFT BLANK]

## $734,795,573.95
## Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2011A

Consisting of

$397,758,386.20 Series 2011A-1                    $337,037,187.75  Series 2011A-2

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA"), which includes the cover page, the inside cover pages, the table of contents and the appendices, sets forth certain information in connection with the issuance and sale by the Corporation of its $734,795,573.95 Sales Tax Revenue Bonds, First Subordinate Series 2011A consisting of $397,758,386.20 Sales Tax Revenue Bonds, First Subordinate Series 2011A-1 (the "Series 2011A-1 Bonds") and $337,037,187.75 Sales Tax Revenue Bonds, First Subordinate Series 2011A-2 (the "Series 2011A-2 Bonds" and, together with the Series 2011A-1 Bonds, the "Series 2011A Bonds"). Concurrently with the issuance of the Series 2011A Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2011B (the "Series 2011B Bonds" and, together with the Series 2011A Bonds, the "First Subordinate Series 2011 Bonds"). The Series 2011B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Series 2011A Bonds is not contingent upon the issuance of the Series 2011B Bonds. The Corporation also proposes to issue in the near future additional Sales Tax Revenue Bonds, Senior Series in the United States taxable and tax-exempt markets and in Puerto Rico pursuant to separate official statements. See PLAN OF FINANCING. The issuance of the First Subordinate Series 2011 Bonds is not contingent upon the issuance of such additional bonds. The Series 2011A-2 Bonds are not being offered to the public.

Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

**The Corporation**

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of the Commonwealth (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 5, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009, as amended ("Act 7"), and Act No. 18, approved May 22, 2009 (collectively, "Act 91"). The Corporation receives half of the Commonwealth Sales Tax (as defined below) (2.75% out of a total sales tax of 5.5%, as described below) and is authorized to use such portion of the Commonwealth Sales Tax to pay or finance, in whole or in part, or fund: (i) certain debt obligations of the Commonwealth payable solely from Commonwealth budgetary appropriations and outstanding as of June 30, 2006 (the "2006 Appropriation Debt"); (ii) the debt of the Secretary of the Treasury of the Commonwealth ("Secretary of the Treasury") with Government Development Bank for Puerto Rico ("Government Development Bank") in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for Fiscal Year 2008-2009, (iii) certain financing granted to the Secretary of the Treasury by Government Development Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iv) a portion of the accounts payable to suppliers of the Commonwealth, (v) operational expenses of the Commonwealth for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, (vi) operational expenses of the Commonwealth for Fiscal Year 2011-2012, to the extent included in the annual budget of the Government of Puerto Rico, (vii) the Puerto Rico Economic Stimulus Fund, (viii) the Commonwealth

Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (ix) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the "Authorized Uses"). See THE CORPORATION.

**Sales and Use Tax**

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006 ("Act 117"), the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% for the benefit of the Commonwealth and an additional and separate rate of 1.5% for the benefit of municipalities of the Commonwealth (the tax at the 5.5% rate herein called the "Commonwealth Sales Tax").

**Dedicated Sales Tax Fund**

Act 91 established the Dedicated Sales Tax Fund, a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each Fiscal Year, whichever is greater: (i) a minimum fixed amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth Sales Tax collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) and the denominator of which is the rate of such Commonwealth Sales Tax (at present, 5.5%; the amount resulting from such multiplication is sometimes referred to herein as the "2.75% formula") (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). See "*Dedicated Sales Tax Fund*" under PLEDGED SALES TAX.

In each Fiscal Year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2011 is $595,165,542. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or for any of the Authorized Uses. See "*Dedicated Sales Tax Fund*" and "*Pledged Sales Tax Base Amount*" under PLEDGED SALES TAX.

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is so deposited before any collections of Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

**The Resolution**

The First Subordinate Series 2011 Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, an Eighteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2011A Bonds (the "Eighteenth Supplemental Resolution") and a Nineteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2011B Bonds (the "Nineteenth Supplemental Resolution") (the General Resolution, as supplemented by the Eighteenth Supplemental Resolution and the Nineteenth Supplemental Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on November 16, 2011, pursuant to which The Bank of New York Mellon acts as trustee (the "Trustee"). For a summary of the Resolution, see *Appendix B – Summary of Certain Definitions and Provisions of the Resolution*.

2

**Outstanding Bonds and Parity Obligations**

*General*

Prior to the issuance of the First Subordinate Series 2011 Bonds, the Corporation had outstanding $13.765 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $699.8 million accreted on existing capital appreciation bonds and convertible capital appreciation bonds as of November 1, 2011. The Corporation's outstanding bonds consist of senior, first subordinate and junior subordinate bonds.

The Corporation's outstanding senior bonds consist of the following: (i) Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds"), and (v) Sales Tax Revenue Bonds, Senior Series 2009C (the "Senior Series 2009C Bonds" and, together with the Series 2007A Bonds, the Series 2007B Bonds, the Series 2007C Bonds and the Series 2008A Bonds, the "Outstanding Senior Bonds").

The Corporation's outstanding first subordinate bonds consist of the following: (i) Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), (ii) Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), (iii) Sales Tax Revenue Bonds, First Subordinate Series 2010A (the "Series 2010A Bonds"), (iv) Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds"), (v) Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds"), and (vi) Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2009A Bonds, Series 2009B Bonds, Series 2010A Bonds, Series 2010C Bonds, and the Series 2010D Bonds, the "Outstanding First Subordinate Bonds").

The Corporation's outstanding junior subordinate bonds consist of Sales Tax Revenue Bonds, Junior Subordinate Series 2011A (the "Outstanding Junior Subordinate Bonds") in the aggregate principal amount of $327.5 million. The Outstanding Junior Subordinate Bonds will be refunded by the Series 2011A-2 Bonds. The Series 2011A-2 Bonds will have the same maturity value, yield and maturity date as the Outstanding Junior Subordinate Bonds and for purposes of the information set forth herein under the caption AGGREGATE DEBT SERVICE REQUIREMENTS, the debt service on the Outstanding Junior Subordinate Bonds is shown as debt service on first subordinate bonds.

The Series 2011A-1 Bonds are being issued to cover certain operating expenses of the Commonwealth for fiscal year 2012 and to refund certain outstanding First Subordinate Bonds (the "Series 2011A-1 Refunded Bonds"). Concurrently with the issuance of the Series 2011A Bonds, the Corporation is issuing the Series 2011B Bonds. The Series 2011B Bonds will be issued in order to refund certain First Subordinate Bonds (the "Series 2011B Refunded Bonds" and, together with the Series 2011A-1 Refunded Bonds and the Outstanding Junior Subordinate Bonds, the "Refunded Bonds").

After giving effect to the issuance of the First Subordinate Series 2011 Bonds and the refunding of the Refunded Bonds, the Corporation will have $14.126 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the Resolution, of which $5.176 billion aggregate initial principal amount consists of Outstanding Senior Bonds (plus $521 million accreted on existing capital appreciation bonds as of November 1, 2011), and $8.951 billion aggregate initial principal amount consists of Outstanding First Subordinate Bonds (plus $170.7 million accreted on existing capital appreciation bonds and convertible capital appreciation bonds as of November 1, 2011).

3

The Corporation currently also has outstanding one interest rate swap agreement in an aggregate notional amount of $136 million, which was entered into under the General Resolution in connection with certain variable rate bonds included in the Series 2007A Bonds, with ongoing quarterly payments thereunder (but not termination payments) secured on a parity with the Outstanding Senior Bonds (the "Outstanding Parity Obligations").

Additionally, the Corporation intends to issue approximately $1.1 billion of additional Sales Tax Revenue Bonds, Senior Series 2011C and $81 million of additional Sales Tax Revenue Bonds, Senior Series 2011D (collectively, the "Senior Series 2011 Bonds") for the purpose of repaying outstanding 2006 Appropriation Debt and to cover the cost of terminating certain swap agreements associated with such 2006 Appropriation Debt. See PLAN OF FINANCING.

*Outstanding Senior Bonds and Outstanding Parity Obligations*

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional senior bonds may be issued (the "Additional Senior Bonds" and, together with the Outstanding Senior Bonds, the "Senior Bonds"), and additional parity obligations may be incurred (the "Additional Parity Obligations" and, together with the Outstanding Parity Obligations, the "Parity Obligations"), under the Resolution subject to the applicable additional bonds test described herein and solely to either finance the payment, retirement or defeasance of the 2006 Appropriation Debt, or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS and PLAN OF FINANCING.

*Outstanding First Subordinate Bonds*

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Senior Bonds and the Parity Obligations. Pursuant to this authority, the Corporation will issue the First Subordinate Series 2011 Bonds, apply the net proceeds thereof for one or more of the Authorized Uses, and grant, for the payment of the First Subordinate Series 2011 Bonds, a security interest in the Pledged Sales Tax subordinate to the security interest of the holders of the Senior Bonds and the Parity Obligations and on a parity with the security interest of the holders of the Outstanding First Subordinate Bonds.

The First Subordinate Series 2011 Bonds, the Outstanding First Subordinate Bonds and all additional bonds issued on a parity therewith ("Additional First Subordinate Bonds" and, together with the First Subordinate Series 2011 Bonds and the Outstanding First Subordinate Bonds, the "First Subordinate Bonds"), and all obligations incurred on a parity therewith (the "First Subordinate Obligations"), will be secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and the Parity Obligations, and will be payable from the Pledged Sales Tax remaining after providing for the payment of debt service on Senior Bonds and Parity Obligations, as required by the Resolution. Moreover, owners of the First Subordinate Bonds and obligees of First Subordinate Obligations are not entitled to declare a default under the Resolution until all amounts due and payable on the Senior Bonds and Parity Obligations have been paid in full. See "*Subordination Provisions of the First Subordinate Bonds*" and "*Funds and Accounts Under the Resolution*" under SECURITY FOR THE BONDS. The Resolution permits the issuance of additional bonds subordinate to the First Subordinate Bonds (the "Additional Subordinate Bonds" and, together with the First Subordinate Bonds, the "Subordinate Bonds") and the incurrence of obligations subordinate to the First Subordinate Obligations (the "Additional Subordinate Obligations" and, together with the First Subordinate Obligations, the "Subordinate Obligations").

*Outstanding Junior Subordinate Bonds*

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Second Subordinate Bonds and the Second Subordinate Obligations. Pursuant to this authority, the Corporation issued the Outstanding Junior Subordinate Bonds, applied the net proceeds thereof to cover operating expense of the Commonwealth for fiscal year 2012, and granted, for the payment of the Outstanding Junior Subordinate Bonds, a security interest in the Pledged Sales Tax subordinate to the security interest of the holders of the Senior Bonds and the Parity Obligations and the First Subordinate Bonds and the First Subordinate Obligations. According to the provisions of Act No. 96 of June 16, 2011, the Corporation issued the Outstanding Junior Subordinate Bonds in an aggregate principal amount of $327.5 million and such bonds were purchased by the Puerto Rico Infrastructure Financing Authority ("PRIFA") and the Government of Puerto Rico Employees Retirement System (the "Employees Retirement System").

The Corporation will refund the Outstanding Junior Subordinate Bonds with the Series 2011A-2 Bonds. The Series 2011A-2 Bonds will have the same maturity value, yield and maturity date as the Outstanding Junior Subordinate Bonds. The Series 2011A-2 Bonds are not being offered to the public and will be delivered solely to PRIFA and the Employees Retirement System. To the extent the Corporation refunds the Outstanding Junior Subordinate Bonds, no bonds or obligations of the Corporation will be outstanding that are subordinate to the First Subordinate Bonds and First Subordinate Obligations.

**Source of Payment and Security for the Bonds**

**The Senior Bonds, the Subordinate Bonds, the Junior Subordinate Bonds and all other additional bonds issued (collectively, the "Bonds") and the Parity Obligations, the Subordinate Obligations, and the Junior Subordinate Obligations and all other obligations incurred (collectively, the "Obligations") under the Resolution will be payable solely from, and secured (on a senior or subordinate basis, as applicable) by a security interest granted under the Resolution in the Pledged Property, consisting primarily of the Pledged Sales Tax.**

**The First Subordinate Series 2011 Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the First Subordinate Series 2011 Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

Brief descriptions of the Corporation, the security for the Series 2011A Bonds, the terms of the Series 2011A Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Corporation or the Trustee.

## PLEDGED SALES TAX

### Commonwealth Sales Tax Revenues

*General.* Act No. 117 amended the Puerto Rico Internal Revenue Code of 1994, as amended, to provide, among other things, for a general sale and use tax of 5.5% imposed by the Commonwealth on the sale of a wide range of goods and delivery of various services. Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for non-prepared foods) and limitations as those provided for the Commonwealth Sales Tax.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth Sales Tax or the Municipal Sales Tax.

*Articles Subject to Tax.* The Commonwealth Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The Commonwealth Sales Tax applies to a broad range of items, including, among others, the following items: (a) clothing and accessories, (b) land and mobile phone service, cable TV and internet access, (c) furniture and appliances, (d) electronics, (e) any tangible good not otherwise exempted, (f) alcoholic beverages and tobacco products, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, general maintenance services, among others, (i) all non-prescription medicines and nutritional supplements, and (j) cement (used in construction and retail sales).

*Exempted Articles.* The Commonwealth Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, (ix) boats and heavy equipment, and (x) local sales of goods to be used as raw materials for manufactured goods, whether or not bound for export. Act No. 208 of the Legislative Assembly, approved on October 20, 2011 ("Act No. 208"), added an exemption from Commonwealth Sales Tax and Municipal Sales Tax to the following: (i) the Science, Technology and Research Trust of Puerto Rico, a quasi-public entity created to promote economic development through investment in fields related to science, technology and research; and (ii) machinery, equipment, parts and accessories used by (a) experimental laboratories dedicated to any activity related to technological research and development and (b) renewable energy research and development projects performed within the Puerto Rico Science, Technology and Research District during their 15 year exemption period; provided, that machinery does not include the following: (1) all construction materials and prefabricated buildings, (2) all electric material and water pipes contained within a building, (3) lubricants, grease, wax and paints not related to the manufacturing process, (4) lighting posts and bulbs installed in parking areas, and (5) water treatment facilities and electric sub-stations. The Treasury Department currently does not support any proposal to exempt any additional goods or services from the application of the Commonwealth Sales Tax.

*Exemption During Emergency Periods.* Act No. 163 of the Legislative Assembly, approved on November 9, 2007, amended Act 117 to, among other things, exempt certain goods and services from the application of the Commonwealth Sales Tax during a state of emergency declared by the Governor. On September 22, 2008, the Governor signed Executive Order 2008-44 declaring a state of emergency in

Puerto Rico as a result of severe flooding in the southern portion of Puerto Rico. The Treasury Department believes that the reduction in Commonwealth Sales Tax revenues for the months of October and November 2008 was due, in part, to this four and a half day tax holiday. The Treasury Department currently does not support the declaration of sales tax holidays that could reduce Commonwealth Sales Tax revenues. Instead, the Treasury Department believes that extraordinary events, such as natural disasters, can be better addressed by providing direct government assistance to those affected either through direct transfers or through the provisions of additional services in the affected communities.

*Back to School Sales Tax Holiday.* Act No. 111 of the Legislative Assembly of Puerto Rico, approved on July 15, 2008, created the Back to School Tax Free Holiday, during which certain items are exempt from the Commonwealth Sales Tax. During each calendar year, the tax holiday takes place during a three-day period in July designated by the Secretary of the Treasury prior to June 1 of such calendar year. If the Secretary of the Treasury does not designate such three-day period, then the tax holiday takes place from July 15 to July 17 of such calendar year. This tax holiday occurred for the first time during Fiscal Year 2009-2010. The Treasury Department believes that the decline of $7.6 million in Commonwealth Sales Tax collections for August 2009 as compared to collections for August 2008 was primarily due to this sales tax holiday (the effect of the tax holiday is reflected in the collections received by the Treasury Department during the month of August, which is the month in which July sales are reported by the merchants and retailers). On May 18, 2011, the Treasury Department designated July 15 to July 17 as the three-day period during which this tax holiday took place during Fiscal Year 2011-2012.

*Commonwealth Tax Reform.* As part of the government's efforts to promote economic growth and job creation while preserving the path towards achieving fiscal stability, in Fiscal Year 2010-2011 the Commonwealth enacted legislation that implemented a comprehensive reform of the Commonwealth's tax system. The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010 ("Act No. 171"), provided for the following changes with respect to the Commonwealth Sales Tax: (i) reduced the electronic filing and payment requirement threshold to include merchants with a volume of sales equal to or greater than $200,000 instead of $500,000; (ii) authorized the Secretary of the Treasury to change the electronic filing and payment requirement threshold by means of administrative action; (iii) created a new penalty for failure to file a Commonwealth Sales Tax return or failure to file electronically, if required, equal to the higher of (a) 10% of the amount of Commonwealth Sales Tax required to be deposited with the Treasury Department and (b) $100; (iv) created a new penalty equal to $20,000 for failure to install, obstruct or not use the electronic point of sale system required by the Treasury Department (described below); and (v) exempted IVU Loto (as defined below) prizes (currently equal to one prize of $5,000, one prize of $1,000 and eight prizes of $500 per bi-weekly drawings) from the payment of income, excise and sales and use taxes.

The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), also known as the Internal Revenue Code for a New Puerto Rico, repealed the Puerto Rico Internal Revenue Code of 1994. Act No. 1 included the changes implemented by Act No. 171 to the Commonwealth Sales Tax system and generally maintained the Commonwealth Sales Tax and Municipal Sales Tax statutory framework. Act No. 1 made the following changes applicable to the Commonwealth Sales Tax: (i) exempted boats and heavy equipment from the Commonwealth Sales Tax and imposed an excise tax on these items in order to facilitate enforcement by the Treasury Department and promote compliance among taxpayers; (ii) required promoters of events to endorse admission tickets and post a bond to secure payment of the Commonwealth Sales Tax; (iii) authorized Treasury Department agents to make purchases at retailers and merchants in order to assess compliance with the Commonwealth Sales Tax and impose administrative fines to the extent such retailer or merchant fails to deposit the Commonwealth Sales Tax with the Treasury Department; (iv) granted the Secretary of the Treasury the same powers to enforce the

7

Commonwealth Sales Tax that it currently enjoys in enforcing excise taxes; and (v) reestablished the resellers credit to the original 6%, which was previously limited to 5.9%. The Treasury Department expects that the exemption for boats and heavy equipment will represent an aggregate loss of approximately $3.3 million in annual collections of Commonwealth Sales Tax.

**Commonwealth Sales Tax Collections and Projections**

The Commonwealth Sales Tax went into effect on November 15, 2006. Since the inception of the sales tax and up until April 2010, the Treasury Department had been reporting its sales tax collection data on a modified cash basis. This meant that the collection figures for any particular month represented the sales taxes corresponding to sales made by merchants and retailers and Commonwealth Sales Tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month. See *Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund*" below for a description of the reporting and collections procedures utilized by the Treasury Department. As an example, the sales tax reported by the Treasury Department for November 2006 related to sales made and taxes collected by merchants and retailers during November 2006 and remitted to the Treasury Department during December 2006. On May 4, 2010, the Treasury Department announced that it would change its reporting method and would begin to record and report its sales tax collection in the month in which the Treasury Department received that sales tax from the merchants and retailers. This change was effective for Fiscal Year 2009-2010. This change did not affect in any way the amount of the Pledged Sales Tax, the method of collecting such sales tax, the amount of taxes required to be deposited nor the process of depositing the Pledged Sales Tax in the Dedicated Sales Tax Fund.

Except as otherwise noted, the sales tax information discussed below is based on historical Commonwealth Sales Tax collections per month utilizing for all Fiscal Years the new reporting method adopted by the Treasury Department in May 2010.

Total Commonwealth Sales Tax collections from December 2006 through October 2011 were approximately $5.44 billion, an average of $93 million per month.

The following table shows historical collections since inception of the Commonwealth Sales Tax until Fiscal Year 2010-2011 under the current reporting method, which was implemented beginning in Fiscal Year 2009-2010. Under the current reporting method, the figures for the initial estimate of collections are only available beginning in Fiscal Year 2009-2010.

**Commonwealth Sales Tax – Collection History by Fiscal Year**
(Dollars in Millions)

| Fiscal Year | Actual Collections | Initial Estimate[1] | Monthly Average | Pledged Sales Tax Base Amount |
|---|---|---|---|---|
| 2007 | $ 617.9 | N/A | $95.1 | N/A |
| 2008 | 1,142 | N/A | 95.1 | $185.0 |
| 2009[2] | 1,090 | N/A | 90.9 | 192.4 |
| 2010[3] | 1,094 | $1,153 | 91.1 | 550.3 |
| 2011[4] | 1,123 | 1,216 | 93.6 | 572.3 |

---

[1]   These figures represent the initial estimate of Commonwealth Sales Tax collections made for budgeting purposes prior to the beginning of the fiscal year.

[2]   The decline in sales tax collections compared to the prior fiscal year is primarily attributed to the temporary sales tax holiday resulting from the Governor's declaration of an emergency in response to severe flooding in the southern portion of Puerto Rico and the general economic slowdown.

[3]   The difference between estimated and actual collections is primarily attributed to the previously mentioned back-to-school sales tax holiday and prevailing economic conditions.

[4]   The difference between estimated and actual collections is primarily attributed to the delay in the implementation of the point of sale system.

*Fiscal Year 2011-2012.* Commonwealth Sales Tax collections for the four month period ended October 31, 2011, totaled $368.9 million, or an average of $92.2 million per month. Such collections year-to-date are $6.5 million below the Treasury Department's estimate of $375.4 million, or 1.7%, but $12.2 million, or 3.4%, above collections for the same period in Fiscal Year 2010-2011. The Treasury Department believes that the difference between their original estimate and actual collections is due to the delay in the implementation of the point of sale system. Commonwealth Sales Tax revenue projections for Fiscal Year 2011-2012 are $1.366 billion. This projection represents an increase of 22% compared to estimated collections for Fiscal Year 2010-2011. This projected increase is based principally on the expected effect of the implementation of the point-of-sale electronic system discussed below under *"Commonwealth Sales Tax Enforcement Initiatives"* and an increase in personal income of 3.1% currently projected by the Planning Board. Whether sales tax collections meet this projection is uncertain and depends upon general economic conditions and taxable sales activity for Fiscal Year 2011-2012, as well as upon compliance levels, the successful implementation of the new point-of-sale electronic system throughout the Commonwealth, and the results of other enforcement efforts, among other factors.

Revenues from the Commonwealth Sales Tax are dependent on economic conditions in the Commonwealth. A continued downturn in the economy may negatively impact Commonwealth Sales Tax collections. See *"Economic Conditions Could Affect Commonwealth Sales Tax Revenues"* under RISK FACTORS.

The following tables and graph show historical Commonwealth Sales Tax collections per month utilizing for all fiscal years the new reporting method adopted by the Treasury Department in May 2010. Under the new reporting method, which was effective beginning in Fiscal Year 2009-2010, sales tax collections are recorded in the month in which the sales tax is received by the Treasury Department from the merchant and retailer. Previous reports prepared by the Treasury Department prior to May 2010 recorded the sales tax collections in the month in which such taxes were collected by the merchant and retailer. To permit comparisons of Fiscal Year 2009-2010 with prior fiscal years, in the table and graph below sales tax figures for all months prior to July 2009 have been moved forward one month from the month in which they had been previously reported by the Treasury Department (for example, the figures previously reported in November 2006 appear below reported in December 2006):

### Sales and Use Tax – Collection History by Month
(Dollars in Thousands)

| | Fiscal Year | | | | | |
|---|---|---|---|---|---|---|
| | 2006-2007 | 2007-2008 | 2008-2009 | 2009-2010 | 2010-2011 | 2011-2012 |
| July | - | $ 95,460 | $ 97,526 | $ 94,382 | $ 95,910 | $ 96,652 |
| August | | 96,100 | 95,592 | 88,000 | 90,418 | 92,332 |
| September | - | 90,181 | 91,353 | 84,100 | 86,698 | 89,279 |
| October | - | 86,163 | 77,788 | 83,775 | 83,698 | 90,621 |
| November | - | 93,751 | 86,191 | 85,120 | 88,602 | N/A |
| December | $ 50,200[1] | 96,170 | 91,996 | 95,075 | 97,277 | N/A |
| January | 110,000 | 121,251 | 119,836 | 118,476 | 123,358 | N/A |
| February | 95,000 | 89,798 | 85,763 | 88,942 | 90,818 | N/A |
| March | 86,200 | 86,486 | 84,608 | 82,538 | 88,439 | N/A |
| April | 96,400 | 89,355 | 88,065 | 93,415 | 93,664 | N/A |
| May | 85,700 | 93,487 | 88,788 | 85,469 | 88,469 | N/A |
| June | 94,400 | 103,331 | 82,854 | 94,296 | 95,518 | N/A |
| **Total** | $617,900 | $1,141,533 | $1,090,360 | $1,093,588 | $ 1,122,869 | $368,884 |
| **Monthly Average** | $ 95,062 | $ 95,128 | $ 90,863 | $ 91,132 | $ 93,572 | $ 92,221 |

[1]   Reflects collections for sales made between November 15 and November 30.  The sales tax became effective on November 15, 2006.

Source:  Treasury Department



Source:  Treasury Department

10

**Collections by Source**

The chart below illustrates the composition of Commonwealth Sales Tax collections attributable to sales made during Fiscal Year 2010-2011 (actual receipts by the Treasury Department from July 2010 thru June 2011). Of the $1.123 billion in collections, approximately 52% were from retail trade activity (including general merchandise, clothing and accessories, supermarkets and convenience stores, landscaping and construction materials, health and personal services, auto parts and other retail), 13% from prepared foods, bars and full service restaurants, 12% from information and telecommunications, 9% from wholesale trade, and 3% from manufacturing, among other categories.

**Commonwealth Sales Tax Collections
by Source for Fiscal Year 2010-2011**

Source: Treasury Department

**Economic Indicators**

According to the Corporation, gross national product ("GNP") and personal consumption expenditures are the economic indicators that correlate most closely with the level of sales of goods and services in the Commonwealth and, consequently, Commonwealth Sales Tax collections. The accompanying table provides the annual growth rates within each decade since 1947 for GNP and personal consumption expenditures, together with the annual growth rates experienced over those time periods within the three major components of personal consumption (services, non-durable goods and durable goods).

**Compounded Annual Growth Rates for**
**Gross National Product and Personal Consumption Expenditures**
(Based upon Current Dollar Data)

| Periods | Gross National Product | Personal Consumption Expenditures | Personal Consumption Expenditures by Category | | |
|---|---|---|---|---|---|
| | | | Services | Non-Durable Goods | Durable Goods |
| 1947-49 | 5.49% | 3.24% | 6.41% | 1.42% | 8.36% |
| 1950-59 | 7.21% | 6.54% | 7.02% | 5.73% | 10.20% |
| 1960-69 | 9.53% | 9.17% | 10.19% | 7.87% | 11.90% |
| 1970-79 | 7.91% | 9.94% | 10.53% | 9.51% | 10.06% |
| 1980-89 | 6.07% | 5.78% | 7.15% | 4.87% | 5.37% |
| 1990-99 | 5.88% | 5.54% | 6.68% | 4.21% | 6.31% |
| 2000-09 | 4.23% | 4.37% | 5.33% | 4.20% | 0.71% |
| 2009-10 | 0.49% | 1.56% | 1.25% | 1.87% | 1.94% |
| 1947-2010 | 7.52% | 7.44% | 8.63% | 6.57% | 7.87% |

Source: Planning Board

**Historical Components of Personal Consumption Expenditures and GNP**
(Measured in Current Dollars)



Source: Government Development Bank

The graphs below show that since 1947, current personal consumption expenditures have never recorded an annual decline.  Also, since 1947 constant personal consumption expenditures (excluding the impact of inflation) experienced negative growth during seven periods.  Although recessionary conditions have persisted in Puerto Rico during the last three years, current personal consumption expenditures have grown by an annual average of 3.2% during this period.

### Personal Consumption Expenditures and GNP
(Current Dollars)



Source: Government Development Bank

### Personal Consumption Expenditures and GNP
(Constant Dollars)



Source: Government Development Bank

Personal consumption expenditures in Puerto Rico have been bolstered by federal transfer payments to individuals, which have increased from $9.2 billion in Fiscal Year 2004-2005 to $16.0 billion in Fiscal Year 2009-2010, inclusive of one-time U.S. 2008 stimulus law transfers. Over the past fourteen years these transfers have not been negatively affected by economic downturns. The amount of federal transfers to individuals is equal to about 28% of personal consumption expenditures in Fiscal Year 2009-2010 and support consumer spending and the overall economy. These federal transfers consist principally of social security, nutritional assistance programs, veterans' benefits and U.S. Civil Service pensions. See *"The Economy – Personal Income"* in *Appendix A – Commonwealth Economic Information* for a breakdown of Puerto Rico personal income statistics by source.

**Dedicated Sales Tax Fund**

*Dedicated Sales Tax Fund.* Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank.

*Pledged Sales Tax.* The Pledged Sales Tax consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the Pledged Sales Tax Base Amount, and (ii) the 2.75% formula.

**Pledged Sales Tax Base Amount**

The Pledged Sales Tax Base Amount for Fiscal Year 2011-2012 is $595,165,542. The Pledged Sales Tax Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Act 91 defines the Pledged Sales Tax Base Amount as the sum of the "Original Base Amount" and the "Additional Base Amount." The Original Base Amount for Fiscal Year 2011-2012 is $216,423,834 and increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000.

The "Additional Base Amount" for Fiscal Year 2011-2012 is $378,741,709. The Additional Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4%, until the Fiscal Year (2041) in which the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000 ("Maximum Year"). Pursuant to Act 91, the Additional Base Amount for each Fiscal Year after the Maximum Year will be reduced by that amount necessary so that the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000.

After Fiscal Year 2041, the Pledged Sales Tax Base Amount remains fixed at $1,850,000,000.

The following table shows the legally required increase of the Pledged Sales Tax Base Amount until Fiscal Year 2058, the last maturity date of the outstanding Bonds:

**Annual Pledged Sales Tax Base Amount**

| Fiscal Year ended June 30 | Original Base Amount | Additional Base Amount | Pledged Sales Tax Base Amount |
|---|---|---|---|
| 2010 | $ 200,096,000 | $ 350,168,000 | $ 550,264,000 |
| 2011 | 208,099,840 | 364,174,720 | 572,274,560 |
| 2012 | 216,423,834 | 378,741,709 | 595,165,542 |
| 2013 | 225,080,787 | 393,891,377 | 618,972,164 |
| 2014 | 234,084,018 | 409,647,032 | 643,731,051 |
| 2015 | 243,447,379 | 426,032,914 | 669,480,293 |
| 2016 | 253,185,274 | 443,074,230 | 696,259,504 |
| 2017 | 263,312,685 | 460,797,199 | 724,109,885 |
| 2018 | 273,845,193 | 479,229,087 | 753,074,280 |
| 2019 | 284,799,000 | 498,398,251 | 783,197,251 |
| 2020 | 296,190,960 | 518,334,181 | 814,525,141 |
| 2021 | 308,038,599 | 539,067,548 | 847,106,147 |
| 2022 | 320,360,143 | 560,630,250 | 880,990,393 |
| 2023 | 333,174,549 | 583,055,460 | 916,230,008 |
| 2024 | 346,501,530 | 606,377,678 | 952,879,209 |
| 2025 | 360,361,592 | 630,632,785 | 990,994,377 |
| 2026 | 374,776,055 | 655,858,097 | 1,030,634,152 |
| 2027 | 389,767,098 | 682,092,421 | 1,071,859,518 |
| 2028 | 405,357,781 | 709,376,118 | 1,114,733,899 |
| 2029 | 421,572,093 | 737,751,162 | 1,159,323,255 |
| 2030 | 438,434,976 | 767,261,209 | 1,205,696,185 |
| 2031 | 455,972,375 | 797,951,657 | 1,253,924,033 |
| 2032 | 474,211,271 | 829,869,723 | 1,304,080,994 |
| 2033 | 493,179,721 | 863,064,512 | 1,356,244,234 |
| 2034 | 512,906,910 | 897,587,093 | 1,410,494,003 |
| 2035 | 533,423,187 | 933,490,577 | 1,466,913,763 |
| 2036 | 554,760,114 | 970,830,200 | 1,525,590,314 |
| 2037 | 576,950,519 | 1,009,663,408 | 1,586,613,926 |
| 2038 | 600,028,539 | 1,050,049,944 | 1,650,078,483 |
| 2039 | 624,029,681 | 1,092,051,942 | 1,716,081,623 |
| 2040 | 648,990,868 | 1,135,734,019 | 1,784,724,887 |
| 2041 | 674,950,503 | 1,175,049,497 | 1,850,000,000 |
| 2042 | 701,948,523 | 1,148,051,477 | 1,850,000,000 |
| 2043 | 730,026,464 | 1,119,973,536 | 1,850,000,000 |
| 2044 | 759,227,522 | 1,090,772,478 | 1,850,000,000 |
| 2045 | 789,596,623 | 1,060,403,377 | 1,850,000,000 |
| 2046 | 821,180,488 | 1,028,819,512 | 1,850,000,000 |
| 2047 | 854,027,708 | 995,972,292 | 1,850,000,000 |
| 2048 | 888,188,816 | 961,811,184 | 1,850,000,000 |
| 2049 | 923,716,369 | 926,283,631 | 1,850,000,000 |
| 2050 | 960,665,024 | 889,334,976 | 1,850,000,000 |
| 2051 | 999,091,625 | 850,908,375 | 1,850,000,000 |
| 2052 | 1,039,055,289 | 810,944,711 | 1,850,000,000 |
| 2053 | 1,080,617,501 | 769,382,499 | 1,850,000,000 |
| 2054 | 1,123,842,201 | 726,157,799 | 1,850,000,000 |
| 2055 | 1,168,795,889 | 681,204,111 | 1,850,000,000 |
| 2056 | 1,215,547,725 | 634,452,275 | 1,850,000,000 |
| 2057 | 1,264,169,634 | 585,830,366 | 1,850,000,000 |
| 2058 | 1,314,736,419 | 535,263,581 | 1,850,000,000 |

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is reached before any collections of Commonwealth Sales Tax are deposited in the Commonwealth General Fund.

After an amount equal to the Pledged Sales Tax Base Amount has been deposited in the Dedicated Sales Tax Fund and transferred to the Revenue Account established under the Resolution, all Commonwealth Sales Tax collections are required to be allocated between the Corporation and the Treasury Department so as to give effect to the 50/50 split between the Corporation and the Treasury Department that is contemplated by Act 91 (2.75% of the total 5.5% Commonwealth Sales Tax to each), by (i) transferring Commonwealth Sales Tax collections to the Treasury Department until it has received an amount equal to the Pledged Sales Tax Base Amount, and (ii) thereafter, transferring 50% of all collections to the Revenue Account established under the Resolution and 50% to the Treasury Department.

Act 91 also provides that, if the amounts deposited to the credit of the Dedicated Sales Tax Fund are insufficient to pay principal of or interest on Bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to Bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation, for deposit in the Dedicated Sales Tax Fund as additional Pledged Sales Tax, from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which are in excess of the Pledged Sales Tax amount applicable to such Fiscal Year.

**Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund**

Pursuant to that certain banking services agreement by and among the Treasury Department, Government Development Bank, the Corporation and Banco Popular de Puerto Rico, a commercial banking institution in the Commonwealth ("Banco Popular") (the "Banking Services Agreement"), Banco Popular is responsible for the processing of the Commonwealth Sales Tax and certain Municipal Sales Tax returns and the collection of moneys and deposit thereof into the various accounts of the Government Development Bank, the Corporation and the Treasury Department, among other things.

In order to comply with the Dedicated Sales Tax Fund deposit requirements of Act 91, the Banking Services Agreement provides as follows:

- Each month, on or prior to the 10th day, the merchant or retailer files the return and pays the Municipal Sales Tax and the Commonwealth Sales Tax collected by the merchant during the prior month to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- First Data, Banco Popular and the Authorized Collectors are required to transfer any Commonwealth Sales Tax and Municipal Sales Tax payments received from merchants or retailers on a daily basis directly to a joint Government Development Bank and Corporation account at Banco Popular (the "Sales Tax Account").

- Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Dedicated Sales Tax Fund (an account at Banco Popular's Trust Department in the name of the Corporation) all Commonwealth

16

Sales Tax collections. In each Fiscal Year, Banco Popular first transfers on a daily basis all moneys on deposit in the Dedicated Sales Tax Fund to the Trustee until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account. All subsequent Commonwealth Sales Tax collections are transferred to the Treasury Department until such time as it has received an amount equal to the Pledged Sales Tax Base Amount. Thereafter, Banco Popular is required to transfer 50% of each dollar of Commonwealth Sales Tax collected to the Trustee for deposit in the Revenue Account and the other 50% to the Treasury Department account at Government Development Bank. See *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.

The accompanying diagram illustrates the collection and deposit process described above. For a description of the flow of funds under the Resolution after deposit in the Revenue Account, see *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.



**Third,** remaining revenues, if any, split 50%/50% between Trustee and General Fund

(1) Includes 1.5% Municipal Sales Tax.
(2) Excludes 1.5% Municipal Sales Tax.

*Collections by Merchants and Retailers.* Merchants and retailers are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant or retailer must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant or retailer as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant or retailer to fines. The Secretary of the Treasury may require that the merchant or retailer post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted no later than the 10th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury.

*Tax Return Filings by Merchants and Retailers.* Each merchant and retailer is required to file a monthly return detailing all taxable transactions for the prior month no later than the 10th day of each month. As of August 2011, all merchants and retailers with a volume of sales equal to or greater than

$200,000 are required to file their return electronically. The Treasury Department reports that, as of October 31, 2011, 92% of the collections from the Commonwealth Sales Tax are received electronically, an increase from 64.5% in December 2006. As of August 2011, 241,625 merchants and retailers were required to file a monthly return, out of which 81,749 merchants and retailers are currently filing their monthly returns. This difference may be attributed in part to merchants and retailers that have (a) failed to (i) file a monthly return because no sales taxes were withheld during the respective month or (ii) terminate their Merchants' Registration Certificate upon ceasing operations in Puerto Rico, or (b) been required to file monthly returns in the past but are no longer required to do so because their sales have fallen below the reporting threshold.

*Collections by Large Merchants and Retailers.* Large merchants and retailers collect the majority of the Commonwealth Sales Tax. Approximately 33.4% of the Commonwealth Sales Tax is collected by 20 merchants or retailers that represent a diverse range of businesses. Commonwealth Sales Tax collections among the top 20 merchants grew 12% from Fiscal Year 2007-2008 to Fiscal Year 2010-2011. Among the top 20, which include nationally recognized and local companies, there are approximately four mobile phone companies, ten discount retailers and three fast food companies.

**Commonwealth Sales Tax Enforcement Initiatives**

The Treasury Department has undertaken various initiatives directed towards increasing Commonwealth Sales Tax collections through the implementation of enforcement and compliance programs. The Secretary of the Treasury has indicated that the sales tax is the prime enforcement priority due to the potential for improvement in collections and the resulting tax revenue increase. According to a study published in March 2009 by the College of Certified Public Accountants Foundation, it was estimated that at that time the Treasury Department was only collecting approximately 52% of the potential Commonwealth Sales Tax revenues. As further discussed below, the Treasury Department estimates that in Fiscal Year 2011-2012 it will collect an additional $200 million in annually recurring Commonwealth Sales Tax revenue through the implementation of its enforcement programs.

As part of these revenue raising initiatives, the Treasury Department has undertaken various enforcement programs, such as the implementation of a voluntary disclosure program that provides taxpayers that meet certain criteria the opportunity to pay taxes and interests owed on unreported income and, in certain circumstances, avoid the payment of surcharges and penalties. Under this program, which began on July 1, 2009, the Treasury Department has reviewed 568 cases and collected approximately $64.2 million. In May 2010, the Treasury Department also began to deliver letters to taxpayers identified by the tax intelligence program to encourage the use of the voluntary disclosure program. As of October 15, 2010, the Treasury Department had sent approximately 7,900 letters and had received responses from 2,000 taxpayers. Moreover, the Treasury Department sent 1,000 additional letters in March 2011 and 2,200 additional letters in April 2011 as a second notice to taxpayers that did not respond to the first letter of May 2010.

The Treasury Department has also implemented programs geared towards the use of technology to detect noncompliance. For example, the Treasury Department completed in November 2010 the integration of its general computer systems with the sales tax database in order to better detect noncompliance. The Treasury Department has also implemented a program whereby its officers use hand held scanning devices to cross-check merchant licenses. Recently, the Treasury Department discontinued the use of the hand held scanning devices and will provide tablet computers to its agents, beginning in December 2011, that will allow them to review a broader range of compliance criteria, such as merchant licenses, Commonwealth Sales Tax sales and point of sale system compliance.

On September 28, 2010, the Treasury Department signed an agreement for the implementation of a new point of sale system that is intended to strengthen its sales tax enforcement efforts. The system is designed to: (i) transmit daily to the Treasury Department information on all sales tax transactions; (ii) reconcile transmitted transactional information with information reported by merchants; (iii) provide wireless transmission devices for use by street vendors; and (iv) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets (the "IVU Loto"). The Treasury Department began a two phase implementation of this new point of sale system in December 1, 2010, through a pilot program in which 200 merchants in the Municipality of Ponce were selected to participate. The second phase, which includes the initial implementation of the point of sale system throughout the island, started in March 2011. Implementation of the new system is expected to be completed by the end of Fiscal Year 2011-2012 and is expected to increase sales tax collections by $200 million during the first year. As of November 7, 2011, the point of sale devices captured approximately 187.4 million transactions which resulted in sales of $4.4 billion and Commonwealth Sales Tax collections of $155.6 million. The Treasury Department adopted regulations on December 14, 2010 requiring that all qualifying merchants register for participation in the point of sale system program on or prior to April 30, 2011. As of October 27, 2011, 191,037 locations had registered in the program and 59,884 of such locations will be required to acquire and use the new point of sale system.

The Treasury Department has begun to detect inconsistencies between the information captured by the point of sale system and that reported by merchants and retailers. The principal inconsistencies are: (i) merchants and retailers that report sales through the point of sale system but do not file monthly returns, (ii) sales reported through the point of sale system are higher than those reported in the monthly returns, (iii) cash credits claimed through the point of sale system are equal to the sales reported, and (iv) merchants and retailers are not reporting cash sales. In order to address these possible instances of non-compliance, the Treasury Department has created a task force consisting of fiscal auditors and agents from the Sales and Use Tax Bureau and the Tax Evasion Bureau. The fiscal auditors are responsible for investigating inconsistencies reported by the point of sale system, determine tax deficiencies and issue preliminary deficiency notices. The agents of the Sales and Use Tax Bureau provide assistance to the fiscal auditors in connection with any additional information requirements and visit merchants and retailers to investigate the status of their permits and point of sale systems. Finally, the agents from the Tax Evasion Bureau are responsible for investigating any tax crimes discovered by the fiscal auditors and/or agents from the Sales and Use Tax Bureau. As a result of this initiative, as of October 5, 2011, the Treasury Department had identified approximately 33,481 unfiled monthly returns and sent notices to approximately 5,125 merchants and retailers. As of October 31, 2011, approximately 1,181 merchants and retailers had responded to the notices and approximately 2,577 unfiled monthly returns were filed resulting in taxable sales reported of approximately $24.7 million and sales and use tax collections of $1.4 million. Merchants and retailers that filed monthly returns reporting no sales will receive a deficiency notice and all other merchants and retailers that have not responded will be referred to a fiscal auditor or the Tax Evasion Bureau.

In addition, the Treasury Department established "IVU Alerta" in order to enhance Commonwealth Sales Tax compliance. The "IVU Alerta" is an internet and telephone hotline through which customers and merchants can report violations related to the Commonwealth Sales Tax. This initiative started in November 29, 2010 and, as of November 4, 2011, has received 5,610 complaints, which 4,229 have been investigated resulting in fines of approximately $5.5 million.

The Treasury Department is also focused on strengthening its enforcement workforce. It has increased staffing levels in its Enforcement and Compliance Bureaus by approximately 349 employees (including the 125 tax collection agents assigned to the call center mentioned below), which has enabled it to increase the number of unannounced field audits of businesses and merchants to ensure greater compliance with Commonwealth Sales Tax requirements. It has equipped a call center staffed by 125 tax

collection agents responsible for contacting merchants by telephone or electronically and following up on collection efforts. The call center began operations on February 24, 2010 and, as of November 3, 2011, has produced approximately $57.5 million in collections. The Treasury Department is also providing additional training and updated equipment to its auditors in order to conduct more effective audits. From July 2009 through August 2011, 3,179 cases pertaining to the Commonwealth Sales Tax were referred to the Audit Bureau, including 411 cases with a high probability of Commonwealth Sales Tax non-compliance identified through the tax intelligence program. As of August 2011, the Audit Bureau has completed 1,260 audits, which include 101 completed audits of cases identified through the tax intelligence program, and assessed approximately $34.5 million in deficiencies.

In February 2009, the Treasury Department resumed unannounced visits to businesses and merchants. As of October 2011, the Treasury Department had visited 99,924 businesses and merchants and imposed approximately $23.2 million in fines for non-compliance with Commonwealth Sales Tax requirements. In addition, the Treasury Department is also making unannounced visits to ensure proper installation of the point of sale system, verify that businesses and merchants are complying with IVU Loto requirements and provide assistance to businesses and merchants in connection with the implementation of the IVU Loto.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act 7, require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

In January 2010, the Treasury Department commenced implementing certain additional sales tax enforcement measures. The Treasury Department began to enforce a provision of Act 117 that allows the Secretary to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month following the occurrence of the taxable event. The Treasury Department has identified potential violations of this provision of Act 117 by more than 1,000 merchants and retailers, which could face revocation of their exemption certificates for a twelve month period. The Treasury Department will also begin to seize the assets of businesses that are delinquent on their sales tax payments.

One additional initiative consists of establishing tax liens pursuant to the procedures of Act No. 12 of January 20, 2010 ("Act 12"), which enables the creation of tax liens through an expedited process. As of October 2011, the Treasury Department has established 16,000 liens in favor of the Commonwealth over approximately $742.5 million in assets.

The Treasury Department is in the process of entering into agreements with various municipalities in order to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts. The Treasury Department believes that joining efforts with the municipalities, which must enforce the Municipal Sales Tax, will result in higher collections. The Treasury Department has entered into this type of agreement with the municipalities of San Juan, Caguas, Las Piedras and Barceloneta and is currently working with other municipalities that have expressed

interest in entering into similar agreements. As of October 2011, these efforts have resulted in 993 visits to merchants and the imposition of $621,500 in fines.

There can be no assurance that the Treasury Department's enforcement initiatives will be successful in materially increasing the rate of compliance with the Commonwealth Sales Tax laws or the amount of the Commonwealth Sales Tax collected.

## THE SERIES 2011A BONDS

**General**

The Series 2011A Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $734,795,573.95. The Series 2011A Bonds will be issued as current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"). The Current Interest Bonds and the Capital Appreciation Bonds will be issued in the principal amounts, bearing interest at the rates, or compounding at the yields (in the case of the Capital Appreciation Bonds), paying interest on the dates, and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover pages of this Official Statement.

The Series 2011A Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (or maturity amount in the case of the Capital Appreciation Bonds). Interest on the Series 2011A Bonds will be computed on the basis of a 360-day year of twelve 30-day months. The Series 2011A Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below and in *Appendix D*. Certificated Series 2011A Bonds will not be available for distribution to investors. Transfers of ownership, and payment on the Series 2011A Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "*Book-Entry Only System*" below.

The Corporation may issue additional bonds that are senior to the First Subordinate Series 2011 Bonds for the purposes described in *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS. Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds subordinate to the Outstanding Senior Bonds and on a parity with the Outstanding Subordinate Bonds, including the First Subordinate Series 2011 Bonds. See "*Additional Bonds, Refunding Bonds and Other Obligations*" under SECURITY FOR THE BONDS.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Compounded Amount thereof.

*Current Interest Bonds.* Interest on the Current Interest Bonds will accrue from their date of delivery and will be payable semi-annually to maturity (or earlier redemption) on each February 1 and August 1, commencing on February 1, 2012.

*Capital Appreciation Bonds.* Interest on the Capital Appreciation Bonds will compound from their date of delivery. Interest on the Capital Appreciation Bonds will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on February 1, 2012 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption. See *Appendix E — Table of Compounded Amounts for Capital Appreciation Bonds.*

**Redemption**

*Optional Redemption of Current Interest Bonds*. The Current Interest Bonds are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2021, at a redemption price equal to 100% of the principal amount of the Current Interest Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

*Make-whole Optional Redemption of the Capital Appreciation Bonds*. The Capital Appreciation Bonds are subject to redemption prior to maturity, in whole or in part, at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, at any time on or after August 1, 2016, at a redemption price equal to the greater of: (i) 100% of the Compounded Amount, and (ii) the sum of the present values of the remaining scheduled payments of debt service on the Bonds to be redeemed, discounted on a semiannual basis, assuming a 360-day year consisting of twelve 30-day months, at the Applicable Tax-Exempt Municipal Bond Rate plus 0.30%.

The "Applicable Tax-Exempt Municipal Bond Rate" for any Capital Appreciation Bond to be redeemed will be the Comparable AAA General Obligations yield curve rate for the remaining weighted average maturity date of such Bond as published by Municipal Market Data. If no such yield curve rate is established for the applicable year, the Comparable AAA General Obligations yield curve rate for the two published maturities most closely corresponding to the applicable year will be determined, and the Applicable Tax-Exempt Municipal Bond Rate will be interpolated or extrapolated from those yield curve rates on a straight-line basis. This rate is made available daily by Municipal Market Data and is available to its subscribers through its internet address: www.tm3.com.

In calculating the Applicable Tax-Exempt Municipal Bond Rate, should Municipal Market Data no longer publish the Comparable AAA General Obligations yield curve rate, the Applicable Tax-Exempt Municipal Bond Rate will equal the Consensus Scale yield curve rate for the applicable year. The Consensus Scale yield curve rate is made available daily by Municipal Market Advisors and is available to its subscribers through its internet address: www.theconsensus.com.

The Applicable Tax-Exempt Municipal Bond Rate shall be calculated on the fifth business day preceding the redemption date.

*Notice of Redemption*. In the event any Series 2011A Bonds are called for redemption, the Corporation will give the Trustee notice at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Series 2011A Bonds as described above, to the registered owners of the Series 2011A Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however*, that failure to give such notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Series 2011A Bonds or portions thereof for which proper notice was given. If a notice of redemption is unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Series 2011A Bonds or portions thereof so called for redemption at the place or places of payment, such Series 2011A Bonds or such portion will be redeemed.

The notice of redemption will (a) specify the (i) Series 2011A Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which will be the principal office of the Trustee), and if less than all of the

Series 2011A Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Series 2011A Bonds, and the portions of the Series 2011A Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Series 2011A Bonds or portions thereof to be redeemed will cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof will cease to increase).

Any notice of optional redemption of Series 2011A Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on such Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice of redemption will specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and interest on the Series 2011A Bonds called for redemption or such portions thereof if any condition so specified is not satisfied or if any such other event does not occur. Notice of such rescission will be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee will give notice of such rescission to affected Owners of the Series 2011A Bonds at least one (1) Business Day prior to the scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and premium, if any, and interest on the Series 2011A Bonds (or portions thereof) to be redeemed, then the Series 2011A Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof will cease to increase), and will no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

**Book-Entry Only System**

*Appendix D* to this Official Statement contains information concerning DTC and DTC's book-entry only system. The information contained in *Appendix D* to this Official Statement has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Series 2011A Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Series 2011A Bonds; (ii) confirmation of ownership interest in the Series 2011A Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series 2011A Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Series 2011A Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Series 2011A Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Series 2011A Bonds. See *Appendix D - Book-Entry Only System*.

## SECURITY FOR THE SERIES 2011A BONDS

**General**

Pursuant to the Resolution, the Series 2011A Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property. The Series 2011A Bonds are subordinate in payment priority to the Senior Bonds and Parity Obligations and on a parity in payment priority with the First Subordinate Bonds and First Subordinate Obligations. The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations. The Resolution permits the issuance of bonds or notes with a payment priority that is senior to, or on a parity with, or subordinate to, the Series 2011A Bonds. Only Senior Bonds and the Parity Obligations will be senior to the Series 2011A Bonds. The Corporation contemplates issuing additional Sales Tax Revenue Bonds, Senior Series, as discussed under PLAN OF FINANCING.

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2011A Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2011A Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with holders of its Bonds until said Series 2011A Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

The Commonwealth has also agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2011A Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2011A Bonds, that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91; provided, that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirement set forth in the related authorizing bond documents of the Corporation.

The Corporation has covenanted in the Resolution that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law; have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

**Property Pledged for the Payment of the Series 2011A Bonds**

Pledged Property consists of (i) all Revenues (as discussed below), and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds, Accounts (other than the Costs of Issuance Account and the Rebate Account) and Subaccounts (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of any Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property described in clauses (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The First Subordinate Series 2011 Bonds do not have any Debt Service Reserve requirement. None of the Outstanding Senior Bonds or Outstanding Subordinate Bonds have any Debt Service Reserve requirement.

Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bond, but only for purpose of such payment and not for other purposes of the Resolution, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and the Rebate Account) or Subaccount (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Outstanding Bonds and Parity Obligations**

Prior to the issuance of the First Subordinate Series 2011 Bonds, the Corporation had outstanding $13.765 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $699.8 million accreted on existing capital appreciation bonds and convertible capital appreciation bonds as of November 1, 2011. The Corporation's outstanding bonds consist of senior, first subordinate and junior subordinate bonds.

The Corporation's Outstanding Senior Bonds, which represent $5.176 billion in aggregate initial principal amount, consist of the following: (i) the Series 2007A Bonds, issued pursuant to the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, (ii) the Series 2007B Bonds, issued pursuant to the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, (iii) the Series 2007C Bonds, issued pursuant to the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007, (iv) the Series 2008A Bonds, issued pursuant to the Fourth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 18, 2008, and (v) the Senior Series 2009C Bonds, issued

pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009.

The Corporation currently also has Outstanding Parity Obligations in an aggregate notional amount of $136 million.

All Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional Senior Bonds may be issued, and Additional Parity Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to finance the payment, retirement or defeasance of the 2006 Appropriation Debt or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations. The Corporation contemplates issuing additional Sales Tax Revenue Bonds, Senior Series, as discussed under PLAN OF FINANCING.

After the issuance of the First Subordinate Series 2011 Bonds and the refunding of the Refunded Bonds, the Corporation's Outstanding First Subordinate Bonds will represent $8.951 billion in aggregate initial principal amount, consisting of the following: (i) the Series 2009A Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009, (ii) the Series 2009B Bonds, issued pursuant to the Eighth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 17, 2009, (iii) the Series 2010A Bonds, issued pursuant to the Twelfth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on January 28, 2010, (iv) the Series 2010C Bonds, issued pursuant to the Fourteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (v) the Series 2010D Bonds, issued pursuant to the Fifteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (vi) the Series 2010E Bonds, issued pursuant to the Sixteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (vii) the Series 2011A Bonds, issued pursuant to the Eighteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on November 16, 2011, and (viii) the Series 2011B Bonds, issued pursuant to the Nineteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on November 16, 2011.

The Corporation currently has outstanding $327.5 million aggregate initial principal amount of Junior Subordinate Bonds issued to PRIFA and the Employees Retirement System pursuant to the Seventeenth Supplemental Resolution adopted by the Board of Directors of the Corporation on June 23, 2011. The Corporation expects to refund the Outstanding Junior Subordinate Bonds with the Series 2011A-2 Bonds. The Series 2011A-2 Bonds will have the same maturity value, yield and maturity date as the Outstanding Junior Subordinate Bonds.

**Subordination Provisions of the First Subordinate Bonds**

The First Subordinate Bonds are secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and Parity Obligations and are payable from the Pledged Sales Tax. As a result, the First Subordinate Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and any Parity Obligations, as provided in the Resolution. Moreover, the First Subordinate Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full.

Additional First Subordinate Bonds may be issued, and Additional First Subordinate Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and

solely to provide funds for the Authorized Uses or to refund or refinance for savings Senior Bonds, Parity Obligations, Subordinate Bonds or Subordinate Obligations.

**Subordination Provisions of the Junior Subordinate Bonds**

The Junior Subordinate Bonds are secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations, the Second Subordinate Bonds and the Second Subordinate Obligations and are payable from the Pledged Sales Tax. As a result, the Junior Subordinate Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations, the Second Subordinate Bonds and the Second Subordinate Obligations, as provided in the Resolution. Moreover, the Junior Subordinate Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations, the Second Subordinate Bonds and the Second Subordinate Obligations have been paid in full.

Additional subordinate bonds may be issued under the Resolution subject to the provisions of the Resolution, solely to provide funds for the Authorized Uses or to refund or refinance for savings Senior Bonds, Parity Obligations, Subordinate Bonds or Subordinate Obligations.

The Corporation expects to refund the Outstanding Junior Subordinate Bonds with the Series 2011A-2 Bonds. The Series 2011A-2 Bonds will have the same maturity value, yield and maturity date as the Outstanding Junior Subordinate Bonds. To the extent the Corporation refunds the Outstanding Junior Subordinate Bonds, no bonds or obligations of the Corporation will be outstanding that are subordinate to the First Subordinate Bonds and First Subordinate Obligations.

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Project Fund" and the following accounts and subaccounts in such Fund: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account (which shall contain a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds and separately for Series of Tax-Exempt Bonds in such class and Taxable Bonds in such class), a Debt Service Reserve Account (established for each Class of Bonds), a Redemption Account, and a Rebate Account (containing a Subaccount for each Series of Bonds), each to be held by the Trustee. All such Accounts and Subaccounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received must be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Receipts in respect of interest paid on Senior Bonds and First Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority:

(1)     to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap);

(2)     to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Senior) related to the Senior Bonds and Parity Obligations;

(3)     to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

(4)     to each Debt Service Account established for First Subordinate Bonds and First Subordinate Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

(5)     to each Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

(6)     to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

(7)     to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

(8)     if an amount at least equal to the Accrued 12/15 Month Obligation (Senior) and Accrued 12/15 Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, is on deposit in the Debt Service Accounts pursuant to clauses (2), (4) and (6) above, the balance on deposit in the Revenue Account, if any, may be applied, upon written direction of the Corporation to the Trustee in the following priority:

(a)     to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to clauses (2) and (4) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then

(b)     at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, or (iv) released to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Under the Resolution, the following terms have the following meanings:

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Subordinate Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

The following chart illustrates the flow of funds under the Resolution after the Commonwealth Sales Tax is collected and transferred to the Trustee (see *"Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund"* under PLEDGED SALES TAX):



*No Debt Service Reserve deposit requirement currently exists.

### Additional Bonds, Refunding Bonds and Other Obligations

Act 91 provides that the Corporation shall not authorize a bond issue unless the Executive Director or a designated officer of the Corporation certifies that the principal and interest of the Corporation's bonds to be issued, plus the principal and interest of all outstanding bonds of the

Corporation (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated), payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation corresponding to each such Fiscal Year plus any Build America Bonds Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year.

The Resolution permits the issuance of Bonds (a) to provide funds for any of the Authorized Uses, (b) to refund or otherwise prepay any Bonds issued under the Resolution, or (c) for any other purpose set forth under Act 91, as amended from time to time.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Outstanding Senior Bonds and Parity Obligations) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Outstanding Senior Bonds and Parity Obligations and on a parity with or subordinate to such Subordinate Bonds).

The Resolution requires that no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate), and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

### All Bonds, Parity Obligations and Subordinate Obligations

(a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (a) for each such Fiscal Year at least equals 102% of the amount in clause (b) hereof for each such Related August 2 Computation Period;

### Additional Requirements — Senior Bonds and Parity Obligations

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity

Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

    B.  (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

    C.  No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement — First Subordinate Bonds and First Subordinate Obligations*

    D.  *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement — Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the coverage test contained in the supplemental resolution setting forth the terms and conditions of the applicable Second Subordinate Bonds or Second Subordinate Obligations.

Under the Resolution, "Related August 2 Computation Period" means with respect to calculations to be made under the Resolution in connection with the issuance of Senior Bonds or First Subordinate Bonds or incurrence of Parity Obligations or First Subordinate Obligations, the 12-month period (or, as applicable, 15-month period) commencing on August 2 in such Fiscal Year of issuance or incurrence and, as the context requires, commencing on August 2 in the related succeeding Fiscal Years.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the Resolution.

Owners of Subordinate Bonds and obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

If the Commonwealth Sales Tax collections deposited in the Dedicated Sales Tax Fund in a given Fiscal Year are less than the applicable Pledged Sales Tax Base Amount for such Fiscal Year, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth to include in the Commonwealth's recommended budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed above. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

## RISK FACTORS

*Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Series 2011A Bonds as well as other information contained in this Official Statement. The following discussion of risk factors is not meant to be a complete list of risks associated with the purchase of the Series 2011A Bonds and does not necessarily reflect the relative importance of various factors. Potential purchasers of Series 2011A Bonds are advised to consider the following factors, among others, and to review the other information in this Official Statement in evaluating an investment in the Series 2011A Bonds. Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Series 2011A Bonds. There can be no assurance that other risk factors will not become material in the future.*

### Economic Conditions Could Affect Commonwealth Sales Tax Revenues

The amount of future Commonwealth Sales Tax revenues depends upon various factors, including economic conditions in the Commonwealth. Economic conditions in the Commonwealth have reflected numerous cycles of growth and recession. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. For more information regarding the economic conditions of the Commonwealth, see *Appendix A – Commonwealth Economic Information*. There can be no assurance that historical data related to economic conditions in the Commonwealth are predictive of future trends.

### Legislative Assembly Authority over the Commonwealth Sales Tax

Section 2 of Article VI of the Constitution of the Commonwealth (the "Puerto Rico Constitution") states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances. There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax. See *"Commonwealth Sales Tax Revenues"* and *"Commonwealth Sales Tax Collections and Projections"* under PLEDGED SALES TAX.

Article 5(c) of Act 91 states that the Commonwealth has agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds or provides credit enhancement, sources of payment or liquidity for such Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired. The Commonwealth has also agreed that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation. Article 5(c) of Act 91 also provides that no amendment to Act 91 shall impair any

obligation or commitment of the Corporation. See "*Commonwealth Non-Impairment Covenant*" under SECURITY FOR THE BONDS.

The Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

**Certain Constitutional Considerations Relating to Act 91**

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute "available resources" of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the First Subordinate Series 2011 Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2011 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. In connection with the issuance of each series of Outstanding Senior Bonds and First Subordinate Bonds, the then Secretary of Justice issued an opinion reaching the same conclusion (the "Secretary of Justice Opinions").

The Supreme Court of Puerto Rico has not addressed the constitutional issues covered in the 2011 Opinion and the Secretary of Justice Opinions and could reach a different conclusion. The Supreme Court of Puerto Rico, however, has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. The Supreme Court of Puerto Rico has also stated that deference to the Legislative Assembly should be especially high in matters involving the use of public funds and the regulation of the economy, and that in these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest.

In connection with the issuance of the First Subordinate Series 2011 Bonds, Bond Counsel and Underwriters' Counsel have each opined to the Corporation that if the appropriate issues are properly presented for judicial decision, a court would hold that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury.

The opinions of Bond Counsel and Underwriters' Counsel described above expressly note that a court's decision regarding the matters upon which they are opining would be based on such court's own analysis and interpretation of the factual evidence before it and applicable legal principles. Thus, if a court reached a different result than that expressed in such opinions, such as that the exclusion of the Pledged Sales Tax from the definition of available resources for purposes the Constitutional Debt Priority Provisions is unconstitutional, it would not necessarily constitute reversible error. Consequently, the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, are the opinions of Bond Counsel and Underwriters' Counsel as to the proper result to be reached by a court applying existing legal rules to the facts properly found after appropriate briefing and argument and, in addition, are not a guarantee, warranty or representation, but rather reflect the informed professional judgment of Bond Counsel and Underwriters' Counsel as to specific questions of law.

To the extent that a court determines that the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds, including the First Subordinate Series 2011 Bonds. Should such application be required, the ratings on the Bonds may be adversely affected.

**Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating**

Any rating assigned to the Series 2011A Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Series 2011A Bonds on their respective maturity or mandatory redemption dates. Any rating of the Series 2011A Bonds is not a recommendation to purchase, hold or sell such Series 2011A Bonds and such rating will not address the marketability of such Series 2011A Bonds, their market price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Corporation or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the Series 2011A Bonds.

Finally, the Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

**Limited Nature of Remedies**

The Series 2011A Bonds are subordinate to the Senior Bonds and the Parity Obligations and are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full. See "*Subordination Provisions of the Bonds*" under SECURITY FOR THE BONDS. In the event the owners of the Series 2011A Bonds shall be entitled to declare a default, the payment of the Series 2011A Bonds by the Corporation cannot be accelerated, except for the application of funds held by the Trustee for the benefit of the holders of the Series 2011A Bonds on the date such default is declared.

## AGGREGATE DEBT SERVICE REQUIREMENTS

The following table sets forth the debt service schedule for the Outstanding Senior Bonds and Parity Obligations, the Outstanding First Subordinate Bonds, the Series 2011B Bonds, and the Series 2011A Bonds, as of August 1 of each year, including the principal of the Bonds to be redeemed by mandatory redemption and excluding the Refunded Bonds:

| August 1 | Payments on Outstanding Senior Bonds and Outstanding Parity Obligations[1] | Payments on Outstanding Subordinate Bonds[1][2][3] | Total Debt Service on Series 2011B Bonds | Series 2011A Bonds | | | Total Annual Debt Service[2] |
|---|---|---|---|---|---|---|---|
| | | | | Principal | Interest[4][5] | Debt Service[5] | |
| 2011 | $ 177,212,926 | $ 369,311,645 | - | - | | | $ 546,524,570 |
| 2012 | 177,212,926 | 355,813,478 | $ 1,594,492 | - | $ 2,760,632 | $ 2,760,632 | 537,381,528 |
| 2013 | 177,212,926 | 375,924,048 | 314,641 | - | 5,733,735 | 5,733,735 | 559,185,350 |
| 2014 | 177,212,926 | 396,141,405 | 2,314,585 | - | 5,090,030 | 5,090,030 | 580,758,945 |
| 2015 | 177,212,926 | 407,441,405 | 2,314,585 | - | 18,201,500 | 18,201,500 | 605,170,416 |
| 2016 | 177,212,926 | 434,012,655 | 2,314,585 | - | 18,201,500 | 18,201,500 | 631,741,666 |
| 2017 | 177,212,926 | 461,319,325 | 2,314,585 | - | 18,201,500 | 18,201,500 | 659,048,336 |
| 2018 | 177,212,926 | 489,714,800 | 2,314,585 | - | 18,201,500 | 18,201,500 | 687,443,811 |
| 2019 | 177,212,926 | 519,244,175 | 2,314,585 | - | 18,201,500 | 18,201,500 | 716,973,186 |
| 2020 | 177,212,926 | 547,919,594 | 2,314,585 | - | 18,201,500 | 18,201,500 | 745,648,604 |
| 2021 | 177,212,926 | 532,198,250 | 2,314,585 | - | 18,201,500 | 18,201,500 | 729,927,261 |
| 2022 | 181,942,926 | 539,616,950 | 2,314,585 | - | 18,201,500 | 18,201,500 | 742,075,961 |
| 2023 | 184,113,226 | 558,433,175 | 2,314,585 | $22,402,071 | 36,854,429 | 59,256,500 | 804,117,486 |
| 2024 | 259,097,926 | 581,050,325 | 2,314,585 | 10,470,397 | 28,446,103 | 38,916,500 | 881,379,336 |
| 2025 | 304,651,226 | 596,509,075 | 2,314,585 | - | 18,201,500 | 18,201,500 | 921,676,386 |
| 2026 | 319,309,926 | 623,648,837 | 2,314,585 | - | 18,201,500 | 18,201,500 | 963,474,848 |
| 2027 | 333,337,426 | 649,577,155 | 2,314,585 | - | 18,201,500 | 18,201,500 | 1,003,430,666 |
| 2028 | 352,878,526 | 676,830,272 | 2,314,585 | - | 18,201,500 | 18,201,500 | 1,050,224,883 |
| 2029 | 369,740,487 | 706,152,250 | 2,314,585 | - | 18,201,500 | 18,201,500 | 1,096,408,822 |
| 2030 | 387,153,667 | 722,364,392 | 14,164,585 | - | 18,201,500 | 18,201,500 | 1,141,884,145 |
| 2031 | 404,688,595 | 753,177,405 | 13,102,085 | - | 18,201,500 | 18,201,500 | 1,189,169,585 |
| 2032 | 422,921,795 | 785,933,005 | 1,153,085 | 2,864,055 | 25,467,445 | 28,331,500 | 1,238,339,385 |
| 2033 | 441,880,695 | 810,782,068 | 1,153,085 | 4,548,759 | 31,117,741 | 35,666,500 | 1,289,482,347 |
| 2034 | 461,600,180 | 841,874,818 | 1,153,085 | - | 18,201,500 | 18,201,500 | 1,322,829,582 |
| 2035 | 482,111,345 | 874,619,818 | 20,543,085 | - | 18,201,500 | 18,201,500 | 1,395,475,747 |
| 2036 | 503,444,330 | 909,682,340 | 3,154,500 | - | 18,201,500 | 18,201,500 | 1,434,482,670 |
| 2037 | 486,103,395 | 938,618,038 | - | - | 18,201,500 | 18,201,500 | 1,442,922,932 |
| 2038 | 507,593,360 | 976,147,811 | - | - | 18,201,500 | 18,201,500 | 1,501,942,672 |
| 2039 | 142,560,982 | 1,030,002,191 | - | - | 18,201,500 | 18,201,500 | 1,190,764,673 |
| 2040 | 140,477,975 | 1,059,650,610 | - | - | 18,201,500 | 18,201,500 | 1,218,330,085 |
| 2041 | 673,482,975 | 1,077,167,210 | - | 2,443,104 | 32,078,396 | 34,521,500 | 1,785,171,685 |
| 2042 | 700,472,975 | 1,046,368,410 | - | - | 18,201,500 | 18,201,500 | 1,765,042,885 |
| 2043 | 728,542,975 | 197,750,000 | - | 401,302,935 | 381,423,565 | 782,726,500 | 1,709,019,475 |
| 2044 | 757,732,975 | 186,375,000 | - | 47,997,950 | 407,002,050 | 455,000,000 | 1,399,107,975 |
| 2045 | 788,097,975 | - | - | 53,230,902 | 487,294,098 | 540,525,000 | 1,328,622,975 |
| 2046 | 819,672,975 | - | - | 46,662,749 | 460,927,251 | 507,590,000 | 1,327,262,975 |
| 2047 | 852,507,975 | - | - | 43,739,450 | 465,925,550 | 509,665,000 | 1,362,172,975 |
| 2048 | 886,663,066 | - | - | 38,093,106 | 437,416,894 | 475,510,000 | 1,362,173,066 |
| 2049 | 922,181,201 | - | - | 32,902,826 | 407,092,174 | 439,995,000 | 1,362,176,201 |
| 2050 | 959,121,096 | - | - | 28,137,270 | 374,917,730 | 403,055,000 | 1,362,176,096 |
| 2051 | 997,538,585 | - | - | - | - | - | 997,538,585 |
| 2052 | 1,037,491,756 | - | - | - | - | - | 1,037,491,756 |
| 2053 | 1,079,043,813 | - | - | - | - | - | 1,079,043,813 |
| 2054 | 1,122,257,975 | - | - | - | - | - | 1,122,257,975 |
| 2055 | 1,167,202,556 | - | - | - | - | - | 1,167,202,556 |
| 2056 | 1,213,947,975 | - | - | - | - | - | 1,213,947,975 |
| 2057 | 1,198,845,475 | - | - | - | - | - | 1,198,845,475 |
| Total | $24,539,754,484 | $22,031,371,936 | $93,366,003 | $734,795,574 | $4,008,182,323 | $4,742,977,897 | $51,407,470,319 |

(1) Includes accreted interest on outstanding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds. A portion of the interest is capitalized in 2012.

(2) These figures are reduced by the (i) 35% Build America Bonds subsidy on the Series 2010D Bonds, (ii) 45% Recovery Zone Economic Development Bonds subsidy on the Series 2010E Bonds, and (iii) interest that was capitalized through the issuance of the Series 2010C Bonds due in fiscal year 2011 and 2013 and include accreted interest on Capital Appreciation Bonds.

(3) After giving effect to the issuance of the Series 2011 Bonds and the refunding of the Refunded Bonds.

(4) Includes interest accreted on outstanding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds.

(5) These figures are reduced by interest that was capitalized.

### Pro-Forma Commonwealth Sales Tax Revenues and Debt Service Coverage

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 4% in Commonwealth Sales Tax collections, which is the rate used to calculate sales tax growth for one of the additional bonds tests included in the Resolution. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Revenues at a 4% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[1] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2011[5] | $1,122,656,758 | $177,212,926 | $369,311,645 | $546,524,570 | 2.05 |
| 2012 | 1,167,567,274 | 210,076,377 | 360,168,602 | 570,244,979 | 2.05 |
| 2013 | 1,214,274,294 | 224,850,008 | 381,972,424 | 606,822,433 | 2.00 |
| 2014 | 1,262,849,682 | 227,546,984 | 403,546,020 | 631,093,004 | 2.00 |
| 2015 | 1,313,368,174 | 228,379,073 | 427,957,490 | 656,336,563 | 2.00 |
| 2016 | 1,365,907,496 | 228,062,958 | 454,528,740 | 682,591,698 | 2.00 |
| 2017 | 1,420,548,482 | 228,060,153 | 481,835,410 | 709,895,563 | 2.00 |
| 2018 | 1,477,375,202 | 228,062,008 | 510,230,885 | 738,292,893 | 2.00 |
| 2019 | 1,536,475,086 | 228,062,283 | 539,760,260 | 767,822,543 | 2.00 |
| 2020 | 1,597,939,063 | 230,102,296 | 568,435,679 | 798,537,974 | 2.00 |
| 2021 | 1,661,861,699 | 277,769,946 | 552,714,335 | 830,484,281 | 2.00 |
| 2022 | 1,728,341,341 | 303,569,146 | 560,133,035 | 863,702,181 | 2.00 |
| 2023 | 1,797,480,273 | 278,246,422 | 620,004,260 | 898,250,682 | 2.00 |
| 2024 | 1,869,384,867 | 311,897,347 | 622,281,410 | 934,178,757 | 2.00 |
| 2025 | 1,944,165,753 | 354,522,177 | 617,025,160 | 971,547,337 | 2.00 |
| 2026 | 2,021,937,984 | 366,241,177 | 644,164,922 | 1,010,406,099 | 2.00 |
| 2027 | 2,102,821,216 | 380,733,404 | 670,093,240 | 1,050,826,644 | 2.00 |
| 2028 | 2,186,939,892 | 395,508,804 | 697,346,357 | 1,092,855,162 | 2.00 |
| 2029 | 2,274,423,432 | 409,908,214 | 726,668,335 | 1,136,576,549 | 2.00 |
| 2030 | 2,365,406,431 | 427,310,570 | 754,730,477 | 1,182,041,047 | 2.00 |
| 2031 | 2,460,028,873 | 444,840,257 | 784,480,990 | 1,229,321,247 | 2.00 |
| 2032 | 2,558,436,335 | 463,078,457 | 815,417,590 | 1,278,496,047 | 2.00 |
| 2033 | 2,660,780,222 | 482,032,357 | 847,601,653 | 1,329,634,010 | 2.00 |
| 2034 | 2,767,217,994 | 521,591,842 | 861,229,403 | 1,382,821,245 | 2.00 |
| 2035 | 2,877,913,407 | 524,763,007 | 913,364,403 | 1,438,127,410 | 2.00 |
| 2036 | 2,993,036,771 | 564,622,242 | 931,038,340 | 1,495,660,582 | 2.00 |
| 2037 | 3,112,765,206 | 598,669,382 | 956,819,538 | 1,555,488,920 | 2.00 |
| 2038 | 3,237,282,917 | 623,359,348 | 994,349,311 | 1,617,708,659 | 2.00 |
| 2039 | 3,366,781,480 | 634,211,969 | 1,048,203,691 | 1,682,415,661 | 2.00 |
| 2040 | 3,501,460,129 | 671,863,087 | 1,077,852,110 | 1,749,715,197 | 2.00 |
| 2041 | 3,641,526,072 | 702,021,112 | 1,111,688,710 | 1,813,709,822 | 2.01 |
| 2042 | 3,787,194,804 | 730,208,775 | 1,064,569,910 | 1,794,778,685 | 2.11 |
| 2043 | 3,938,690,439 | 759,457,787 | 980,476,500 | 1,739,934,287 | 2.26 |
| 2044 | 4,096,246,056 | 789,892,900 | 641,375,000 | 1,431,267,900 | 2.86 |
| 2045 | 4,260,104,058 | 821,534,137 | 540,525,000 | 1,362,059,137 | 3.13 |
| 2046 | 4,430,516,543 | 854,452,837 | 507,590,000 | 1,362,042,837 | 3.25 |
| 2047 | 4,607,745,694 | 852,507,975 | 509,665,000 | 1,362,172,975 | 3.38 |
| 2048 | 4,792,064,181 | 886,663,066 | 475,510,000 | 1,362,173,066 | 3.52 |
| 2049 | 4,983,755,580 | 922,181,201 | 439,995,000 | 1,362,176,201 | 3.66 |
| 2050 | 5,183,114,812 | 959,121,096 | 403,055,000 | 1,362,176,096 | 3.81 |
| 2051 | 5,390,448,594 | 997,538,585 | - | 997,538,585 | 5.40 |
| 2052 | 5,606,075,910 | 1,037,491,756 | - | 1,037,491,756 | 5.40 |
| 2053 | 5,830,328,507 | 1,079,043,813 | - | 1,079,043,813 | 5.40 |
| 2054 | 6,063,551,398 | 1,122,257,975 | - | 1,122,257,975 | 5.40 |
| 2055 | 6,306,103,401 | 1,167,202,556 | - | 1,167,202,556 | 5.40 |
| 2056 | 6,558,357,682 | 1,213,947,975 | - | 1,213,947,975 | 5.40 |
| 2057 | 6,820,702,338 | 1,198,845,475 | - | 1,198,845,475 | 5.69 |

(1)  Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,080 in Fiscal Year 2009-2010 increasing by 2% annually).

(2)  Debt service for the year ending and including August 1. Debt service is based on outstanding Senior Bonds and Parity Obligations and assumes an additional issuance of Sales Tax Revenue Bonds, Senior Series in Fiscal Year 2011-2012 in the principal amount of approximately $1.1 billion. The proceeds of such additional Sales Tax Revenue Bonds, Senior Series will be used to refund certain bonds issued by the Puerto Rico Public Finance Corporation and terminating certain related interest rate swap agreements. Debt service is net of capitalized interest, Build America Bonds and Recovery Zone Economic Development Bonds subsidy. Actual principal and interest requirements will vary based on the actual principal and interest on the additional Sales Tax Revenue Bonds, Senior Series.

(3)  Debt service for the year ending and including August 1. Debt service is based on all outstanding First Subordinate Bonds and First Subordinate Obligations after the issuance of the First Subordinate Series 2011 Bonds and the refunding of the Refunded Bonds. Debt service is net of capitalized interest, Build America Bonds and Recovery Zone Economic Development Bonds subsidy.

(4)  Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5)  Commonwealth Sales Tax collections for 2011 were $1,122,869,000.

39

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond and First Subordinate Bond debt service and Parity Obligation payments. This table assumes a growth rate of 1.61%, which is the rate needed to achieve a minimum 1.0x debt service coverage in all years. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Collection at a 1.61% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | First Subordinate Bond Debt Service[3] | Total Debt Service | Pro-forma Debt Service Coverage[4] |
|---|---|---|---|---|---|
| 2011[5] | $1,122,656,758 | $177,212,926 | $369,311,645 | $546,524,570 | 2.05 |
| 2012 | 1,140,751,752 | 210,076,377 | 360,168,602 | 570,244,979 | 2.00 |
| 2013 | 1,159,138,397 | 224,850,008 | 381,972,424 | 606,822,433 | 1.91 |
| 2014 | 1,177,821,395 | 227,546,984 | 403,546,020 | 631,093,004 | 1.87 |
| 2015 | 1,196,805,523 | 228,379,073 | 427,957,490 | 656,336,563 | 1.82 |
| 2016 | 1,216,095,633 | 228,062,958 | 454,528,740 | 682,591,698 | 1.78 |
| 2017 | 1,235,696,658 | 228,060,153 | 481,835,410 | 709,895,563 | 1.74 |
| 2018 | 1,255,613,608 | 228,062,008 | 510,230,885 | 738,292,893 | 1.70 |
| 2019 | 1,275,851,576 | 228,062,283 | 539,760,260 | 767,822,543 | 1.66 |
| 2020 | 1,296,415,736 | 230,102,296 | 568,435,679 | 798,537,974 | 1.62 |
| 2021 | 1,317,311,345 | 277,769,946 | 552,714,335 | 830,484,281 | 1.59 |
| 2022 | 1,338,543,746 | 303,569,146 | 560,133,035 | 863,702,181 | 1.55 |
| 2023 | 1,360,118,366 | 278,246,422 | 620,004,260 | 898,250,682 | 1.51 |
| 2024 | 1,382,040,721 | 311,897,347 | 622,281,410 | 934,178,757 | 1.48 |
| 2025 | 1,404,316,416 | 354,522,177 | 617,025,160 | 971,547,337 | 1.45 |
| 2026 | 1,426,951,146 | 366,241,177 | 644,164,922 | 1,010,406,099 | 1.41 |
| 2027 | 1,449,950,698 | 380,733,404 | 670,093,240 | 1,050,826,644 | 1.38 |
| 2028 | 1,473,320,951 | 395,508,804 | 697,346,357 | 1,092,855,162 | 1.35 |
| 2029 | 1,497,067,881 | 409,908,214 | 726,668,335 | 1,136,576,549 | 1.32 |
| 2030 | 1,521,197,558 | 427,310,570 | 754,730,477 | 1,182,041,047 | 1.29 |
| 2031 | 1,545,716,153 | 444,840,257 | 784,480,990 | 1,229,321,247 | 1.26 |
| 2032 | 1,570,629,932 | 463,078,457 | 815,417,590 | 1,278,496,047 | 1.23 |
| 2033 | 1,595,945,265 | 482,032,357 | 847,601,653 | 1,329,634,010 | 1.20 |
| 2034 | 1,621,668,625 | 521,591,842 | 861,229,403 | 1,382,821,245 | 1.17 |
| 2035 | 1,647,806,587 | 524,763,007 | 913,364,403 | 1,438,127,410 | 1.15 |
| 2036 | 1,674,365,835 | 564,622,242 | 931,038,340 | 1,495,660,582 | 1.12 |
| 2037 | 1,701,353,158 | 598,669,382 | 956,819,538 | 1,555,488,920 | 1.09 |
| 2038 | 1,728,775,456 | 623,359,348 | 994,349,311 | 1,617,708,659 | 1.07 |
| 2039 | 1,756,639,739 | 634,211,969 | 1,048,203,691 | 1,682,415,661 | 1.04 |
| 2040 | 1,784,953,131 | 671,863,087 | 1,077,852,110 | 1,749,715,197 | 1.02 |
| 2041 | 1,813,722,871 | 702,021,112 | 1,111,688,710 | 1,813,709,822 | 1.00 |
| 2042 | 1,842,956,314 | 730,208,775 | 1,064,569,910 | 1,794,778,685 | 1.03 |
| 2043 | 1,872,660,933 | 759,457,787 | 980,476,500 | 1,739,934,287 | 1.08 |
| 2044 | 1,902,844,323 | 789,892,900 | 641,375,000 | 1,431,267,900 | 1.33 |
| 2045 | 1,933,514,200 | 821,534,137 | 540,525,000 | 1,362,059,137 | 1.42 |
| 2046 | 1,964,678,406 | 854,452,837 | 507,590,000 | 1,362,042,837 | 1.44 |
| 2047 | 1,996,344,907 | 852,507,975 | 509,665,000 | 1,362,172,975 | 1.47 |
| 2048 | 2,028,521,799 | 886,663,066 | 475,510,000 | 1,362,173,066 | 1.49 |
| 2049 | 2,061,217,309 | 922,181,201 | 439,995,000 | 1,362,176,201 | 1.51 |
| 2050 | 2,094,439,795 | 959,121,096 | 403,055,000 | 1,362,176,096 | 1.54 |
| 2051 | 2,128,197,751 | 997,538,585 | - | 997,538,585 | 2.13 |
| 2052 | 2,162,499,807 | 1,037,491,756 | - | 1,037,491,756 | 2.08 |
| 2053 | 2,197,354,733 | 1,079,043,813 | - | 1,079,043,813 | 2.04 |
| 2054 | 2,232,771,439 | 1,122,257,975 | - | 1,122,257,975 | 1.99 |
| 2055 | 2,268,758,980 | 1,167,202,556 | - | 1,167,202,556 | 1.94 |
| 2056 | 2,305,326,557 | 1,213,947,975 | - | 1,213,947,975 | 1.90 |
| 2057 | 2,342,483,517 | 1,198,845,475 | - | 1,198,845,475 | 1.95 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,080 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is based on outstanding Senior Bonds and Parity Obligations and assumes an additional issuance of Sales Tax Revenue Bonds, Senior Series in Fiscal Year 2011-2012 in the principal amount of approximately $1.1 billion. The proceeds of such additional Sales Tax Revenue Bonds, Senior Series will be used to refund certain bonds issued by the Puerto Rico Public Finance Corporation and terminating certain related interest rate swap agreements. Debt service is net of capitalized interest, Build America Bonds and Recovery Zone Economic Development Bonds subsidy. Actual principal and interest requirements will vary based on the actual principal and interest on the additional Sales Tax Revenue Bonds, Senior Series.

(3) Debt service for the year ending and including August 1. Debt service is based on all outstanding First Subordinate Bonds and First Subordinate Obligations after the issuance of the First Subordinate Series 2011 Bonds and the refunding of the Refunded Bonds. Debt service is net of capitalized interest, Build America Bonds and Recovery Zone Economic Development Bonds subsidy.

(4) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(5) Commonwealth Sales Tax collections for 2011 were $1,122,869,000.

The Corporation believes that personal consumption expenditures and GNP are the economic indicators that correlate most closely to sales of goods and services that represent the sales tax base. While historical trends do not necessarily predict future performance, from Fiscal Year 1947 to Fiscal Year 2010, the average annual growth rate in personal consumption expenditures (nominal) was 7.6%. Moreover, the annual average growth rate in personal consumption expenditures (nominal) during the last decade, which experienced two recessions, was 4.7%. During Fiscal Year 2010, which constitutes the fourth consecutive year showing a reduction in gross national product, personal consumption expenditures (nominal) grew by 3.1% while Commonwealth Sales Tax revenues grew by 0.3% as compared to Fiscal Year 2009. The average annual growth rate of Commonwealth Sales Tax collections from Fiscal Year 2008 (the first full fiscal year after the implementation of the Commonwealth Sales Tax in November 2006) to Fiscal Year 2011 has been -0.61%.

## PLAN OF FINANCING

### Overview

The Corporation anticipates using the proceeds of Series 2011A Bonds, together with other funds available to the Corporation, to (i) refund prior to maturity certain of its First Subordinate Bonds and the Outstanding Junior Subordinate Bonds on the redemption dates and at the redemption prices set forth below plus accrued interest to the redemption dates, (ii) refund a portion of the interest (but not the principal) payable on February 1, 2012 on certain Sales Tax Revenue Bonds, First Subordinate Series 2009A as set forth below, (iii) provide funds to the Commonwealth for the Authorized Uses, (iv) pay capitalized interest on the Series 2011A-1 Bonds, and (v) pay the cost of issuance of the Series 2011A Bonds.

| Refunded Bonds | Principal Amount to be Refunded | Interest Rate | Maturity Date | Redemption Price (% of Par) | Redemption Date |
|---|---|---|---|---|---|
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | $6,410,000 | 4⅝ | 08/01/2016 | - | - |
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | 10,255,000 | 5 | 08/01/2017 | - | - |
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | 10,660,000 | 5 | 08/01/2018 | - | - |
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | 8,080,000 | 5¼ | 08/01/2019 | - | - |
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | 11,210,000 | 5⅜ | 08/01/2020 | 100 | 08/01/2019 |
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | 1,725,000 | 5½ | 08/01/2028 | 100 | 08/01/2019 |
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | 4,440,000 | 6¼ | 08/01/2029 | 100 | 02/01/2014 |

| Refunded Bonds (Interest Only) | Maturity Date | Interest Rate | Refunded Interest |
|---|---|---|---|
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | 08/01/2019 | 5⅛% | $1,003,275 |
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | 08/01/2037 | 5¼ | 10,493,750 |
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | 08/01/2039 | 6⅜ | 6,375,000 |
| Sales Tax Revenue Bonds, First Subordinate Series 2009A | 08/01/2042 | 6 | 603,450 |

**Estimated Sources and Uses of Funds for the Series 2011A-1 Bonds**

**Sources**

| | |
|---|---:|
| Principal Amount of the Series 2011A-1 Bonds ........................ | $397,758,386.20 |
| Original Issue Discount............................................................. | (33,521.30) |
| Other Available Sources............................................................. | 1,726,405.64 |
| **Total Sources** ...................................................................... | $399,451,270.54 |

**Uses**

| | |
|---|---:|
| Deposit to the Project Fund ....................................................... | $276,000,000.00 |
| Deposit to the Escrow Fund ...................................................... | 84,336,559.25 |
| Capitalized Interest..................................................................... | 35,217,791.05 |
| Underwriters' Discount and Other Costs of Issuance[1] ............. | 3,896,920.24 |
| **Total Uses**............................................................................. | $399,451,270.54 |

[1] Includes legal, printing and other financing expenses.

The Corporation will deposit a portion of the net proceeds of the Series 2011A-1 Bonds with the Trustee, as escrow agent, under the terms of an escrow deposit agreement. Such amount of net proceeds of the Series 2011A-1 Bonds will be invested in Government Obligations, the principal of and interest on which when due will provide moneys sufficient to pay the principal of or the redemption price of the Refunded Bonds to be refunded with a portion of the proceeds of the Series 2011A-1 Bonds and the interest coming due on such Refunded Bonds through their date of redemption or maturity date, as applicable.

Upon that deposit with the Trustee, those Refunded Bonds will, in the opinion of Bond Counsel, no longer be outstanding under the provisions of the Resolution and such Refunded Bonds will thereupon be defeased. In rendering the foregoing opinion, Bond Counsel will rely on the report of Samuel Klein and Company, Certified Public Accountants, as verification agent, dated the date of delivery of the Series 2011A-1 Bonds, relating to the verification of certain mathematical computations with respect to the moneys and Government Obligations deposited with the escrow agent under the terms of the escrow deposit agreement.

**Estimated Sources and Uses of Funds for the Series 2011A-2 Bonds**

The Series 2011A-2 Bonds will be delivered solely to PRIFA and the Employees Retirement System in satisfaction of the payment of the redemption price on the Outstanding Junior Subordinate Bonds. Upon delivery of the Series 2011A-2 Bonds, the Outstanding Junior Subordinate Bonds will be deemed paid in full and will no longer be outstanding under the Resolution.

Additionally, the Corporation intends to issue on or about December 13, 2011, approximately $1.1 billion of the Senior Series 2011 Bonds for the purpose of repaying outstanding 2006 Appropriation Debt and covering the cost of terminating certain swap agreements associated with such 2006 Appropriation Debt. The Senior Series 2011 Bonds are being issued after the First Subordinate 2011 Bonds in order to maximize the amount of net proceeds for the Corporation of the Senior Series 2011 Bonds. No assurance can be given that any such Sales Tax Revenue Bonds, Senior Series will be issued for such purposes.

## THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of issuing bonds and utilizing other financing mechanisms to provide funds to the Commonwealth for the Authorized Uses. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes. The Corporation is also known by an acronym of its Spanish name — "COFINA." Act 91 transfers present and future collections of the Pledged Sales Tax to the Corporation in exchange for, and in consideration of, the Corporation's commitment to provide funds for the Authorized Uses from the net proceeds of the bonds issued by the Corporation and other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

| Member | Commencement of Term | Expiration Date |
|---|---|---|
| Marcos Rodríguez-Ema, Chairman | January 15, 2009 | September 23, 2015 |
| Juan Carlos Batlle, Vice Chairman | March 2, 2011 | September 23, 2012 |
| Manuel H. Dubón, Esq. | February 2, 2009 | September 23, 2012 |
| Juan E. Rodríguez Díaz, Esq. | February 20, 2009 | September 23, 2012 |
| Eduardo R. Emanuelli | May 11, 2011 | September 23, 2015 |
| Jesús F. Méndez | May 18, 2011 | September 23, 2014 |
| Eugenio L. Torres | July 5, 2011 | September 23, 2014 |

Certain officers of Government Development Bank have been appointed officers of the Corporation. Currently, Mr. José Otero, Executive Vice President and Director of Financing, Investments and Treasury for Government Development Bank, is the Corporation's Executive Director. Mr. Ignacio Canto, Vice President and Treasurer of Government Development Bank, is the Corporation's Assistant Executive Director. Mrs. Zulema Martinez, General Counsel to Government Development Bank, is the Corporation's General Counsel.

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

**Other Obligations of the Corporation**

In addition to the Outstanding Senior Bonds, the Outstanding Parity Obligations and the Outstanding First Subordinate Bonds, the Corporation has borrowed money, and incurred obligations, that are not secured under the Resolution. As of August 31, 2011 the Corporation had repaid all obligations that were not secured under the Resolution.

The Corporation is also a party to certain forward delivery swap agreements, effective on February 1, 2012, in an aggregate notional amount of $907 million. Pursuant to the terms of the agreements, on the effective date, the Corporation would begin making payments of 3.95% to the counterparties in return for 67% of LIBOR until its maturity on August 1, 2040. Under present market pricing, pursuant to the swap agreements, if the Corporation were to terminate the swaps on February 1, 2012, the Corporation would be required to make a termination payment. The Corporation's obligations under the swap agreements, including its obligation to make a termination payment, are subordinate to the Senior Bonds, the Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations. However, the swap agreements would become Parity Obligations under the Resolution to the extent the Corporation issues bonds that meet certain requirements set forth in such swap agreements, and the swap

agreements are in compliance with the additional bonds tests set forth in the Resolution and are each considered a Qualified Hedge under the Resolution. The Corporation expects to terminate this swap agreement in connection with the issuance of the Senior Series 2011 Bonds, the proceeds of which will be used to repay certain outstanding 2006 Appropriation Debt and the termination payment associated with the termination of this swap agreement.

In connection with the Corporation's termination in November 2008 of an interest rate exchange agreement with a notional amount of $218 million relating to the Corporation's Sales Tax Revenue Bonds, Series 2007A, the Corporation made a termination payment to its counterparty. The counterparty has asserted to the Corporation that it is entitled to recover a termination payment in excess of that paid by the Corporation, plus interest at a default rate. The Corporation's management believes that any resolution of this dispute would not have a material adverse impact on the amount of Revenues available to pay debt service on the Corporation's bonds.

## TAX MATTERS

### Federal Income Taxes

The Internal Revenue Code of 1986, as amended (the "Code"), imposes certain requirements that must be met subsequent to the issuance and delivery of the Series 2011A-1 Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Series 2011A-1 Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Series 2011A-1 Bonds. Pursuant to the Bond Resolution and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 (the "Tax Certificate"), the Corporation and the Commonwealth have covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Series 2011A-1 Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Corporation and the Commonwealth have made certain representations and certifications in the Bond Resolution and the Tax Certificate. Bond Counsel will not independently verify the accuracy of those representations and certifications.

In the opinion of Nixon Peabody LLP, Bond Counsel, under existing law and assuming compliance with the aforementioned covenant, and the accuracy of certain representations and certifications made by the Corporation and the Commonwealth described above, interest on the Series 2011A-1 Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Interest on the Series 2011A-1 Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.

### State Taxes

Bond Counsel is also of the opinion that, under existing statutes, interest on the Series 2011A-1 Bonds is exempt from state, Commonwealth and local income taxation. Bond counsel expresses no opinion as to other state, Commonwealth or local tax consequences arising with respect to the Series 2011A-1 Bonds.

44

**Original Issue Discount**

Bond Counsel is further of the opinion that the difference between the principal amount at maturity of the Series 2011A-1 Bonds (other than the Premium Bonds, as defined below) (the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for federal income tax purposes to the same extent as interest on the Series 2011A-1 Bonds. Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment. Owners of the Discount Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Discount Bonds.

**Original Issue Premium**

The Series 2011A-1 Bonds maturing on August 1, 2043 bearing interest at a rate of 5.25% (the "Premium Bonds") are being offered at prices in excess of their principal amounts. An initial purchaser with an initial adjusted basis in a Premium Bond in excess of its principal amount will have amortizable bond premium which is not deductible from gross income for federal income tax purposes. The amount of amortizable bond premium for a taxable year is determined actuarially on a constant interest rate basis over the term of each Premium Bond based on the purchaser's yield to maturity (or, in the case of Premium Bonds callable prior to their maturity, over the period to the call date, based on the purchaser's yield to the call date and giving effect to any call premium). For purposes of determining gain or loss on the sale or other disposition of a Premium Bond, an initial purchaser who acquires such obligation with an amortizable bond premium is required to decrease such purchaser's adjusted basis in such Premium Bond annually by the amount of amortizable bond premium for the taxable year. The amortization of bond premium may be taken into account as a reduction in the amount of tax-exempt income for purposes of determining various other tax consequences of owning such Series 2011A-1 Bonds. Owners of the Premium Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Premium Bonds.

**Ancillary Tax Matters**

Ownership of the Series 2011A-1 Bonds may result in other federal tax consequences to certain taxpayers, including, without limitation, certain S corporations, foreign corporations with branches in the United States, property and casualty insurance companies, individuals receiving Social Security or Railroad Retirement benefits, and individuals seeking to claim the earned income credit. Ownership of the Bonds may also result in other federal tax consequences to taxpayers who may be deemed to have incurred or continued indebtedness to purchase or to carry the Series 2011A-1 Bonds.

Commencing with interest paid in 2006, interest paid on tax-exempt obligations such as the Series 2011A-1 Bonds is subject to information reporting to the Internal Revenue Service (the "IRS") in a manner similar to interest paid on taxable obligations. In addition, interest on the Series 2011A-1 Bonds may be subject to backup withholding if such interest is paid to a registered owner that (a) fails to provide certain identifying information (such as the registered owner's taxpayer identification number) in the manner required by the IRS, or (b) has been identified by the IRS as being subject to backup withholding.

Bond Counsel is not rendering any opinion as to any Federal tax matters other than those described in the opinions attached as Appendix C. Prospective investors, particularly those who may be subject to special rules described above, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the Series 2011A-1 Bonds, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

**Changes in Law and Post Issuance Events**

Legislative or administrative actions and court decisions, at either the federal or state level, could have an adverse impact on the potential benefits of the exclusion from gross income of the interest on the Series 2011A-1 Bonds for Federal or state income tax purposes, and thus on the value or marketability of the Series 2011A-1 Bonds. This could result from changes to Federal or state income tax rates, changes in the structure of Federal or state income taxes (including replacement with another type of tax), repeal of the exclusion of the interest on the Series 2011A-1 Bonds from gross income for Federal or state income tax purposes, or otherwise. For example, in September, 2011, the President released legislative proposals that would, among other things, subject interest on tax-exempt bonds (including the Series 2011A-1 Bonds) to a federal income tax for taxpayers with incomes above certain thresholds for tax years beginning after 2012. It is not possible to predict whether any legislative or administrative actions or court decisions having an adverse impact on the Federal or state income tax treatment of holders of the Series 2011A-1 Bonds may occur. Prospective purchasers of the Series 2011A-1 Bonds should consult their own tax advisers regarding the impact of any change in law on the Series 2011A-1 Bonds.

Bond Counsel has not undertaken to advise in the future whether any events after the date of issuance and delivery of the Series 2011A-1 Bonds may affect the tax status of interest on the Series 2011A-1 Bonds. Bond Counsel expresses no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Series 2011A-1 Bonds, or the interest thereon, if any action is taken with respect to the Series 2011A-1 Bonds or the proceeds thereof upon the advice or approval of other counsel.

**Series 2011A-2 Bonds**

Bond counsel expresses no opinion as to any Federal, state, Commonwealth or local tax consequences with respect to the Series 2011A-2 Bonds.

**RATINGS**

The Series 2011A Bonds have been assigned ratings of "A+" by Standard & Poor's Ratings Services ("S&P"), "A1" by Moody's Investors Service ("Moody's"), and "A+" by Fitch Ratings ("Fitch"). These ratings only reflect the respective opinions of such rating agencies.

Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Series 2011A Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, see *"Limited Nature of Ratings; Reductions, Suspension or Withdrawal of Ratings"* under RISK FACTORS. The Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

## LEGALITY FOR INVESTMENT

The Series 2011A Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Samuel Klein and Company, Certified Public Accountants, will verify from the information provided to them the mathematical accuracy as of the date of the delivery of the Series 2011A Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the Defeasance Obligations and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal, interest and call premium payment requirements, if any, of the Refunded Bonds, and (2) the computations of yield on both the Defeasance Obligations and the Series 2011A Bonds contained in such schedules used by Bond Counsel in its determination that the interest on the Series 2011A Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Series 2011A Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Series 2011A-1 Bonds described on the inside cover pages of this Official Statement at an aggregate purchase price of $395,067,385.03 reflecting a net original issue discount of $33,521.30 and an underwriters' discount of $2,657,479.87, and to reoffer such Series 2011A-1 Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Series 2011A-1 Bonds may be offered and sold to certain dealers (including dealers depositing such Series 2011A-1 Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Series 2011A-1 Bonds if any Series 2011A-1 Bonds are purchased. The Series 2011A-2 Bonds are not being offered to the public and will be delivered solely to PRIFA and the Employees Retirement System.

The Underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Corporation, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Corporation.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor

network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Series 2011A Bonds.

Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation, and Barclays Capital Inc. established a strategic alliance in May of 2009, which enables Pershing LLC to participate as a selling group member and a retail distributor for all new issue municipal bond offerings underwritten by Barclays Capital Inc., including the Bonds offered hereby. Pershing LLC will receive a selling concession from Barclays Capital Inc. in connection with its distribution activities relating to the Series 2011A Bonds.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers. Compensation with respect to the underwriting of the securities will be allocated between them.

Wells Fargo Securities, LLC has entered into a joint underwriting agreement with Scotia MSD to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the joint underwriting agreement and in compliance with applicable rules, compensation with respect to the underwriting of the applicable securities will be allocated between the firms. Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

BMO Capital Markets GKST Inc. has entered into an alliance agreement (the "Alliance Agreement") with VAB Financial LLC, under which the parties shall provide services and advise each other in matters related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the Alliance Agreement and in compliance with any applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Series 2011A Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Series 2011A Bonds as consideration for their professional services.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Series 2011A Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings at the original issue prices. Pursuant to the Dealer Agreement, CS&Co. will purchase Series 2011A Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Series 2011A Bonds that CS&Co. sells. JPMSI has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the

agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advice to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Series 2011A Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Series 2011A Bonds as part of the consideration for their professional services.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets Corporation ("RBC") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Series 2011A Bonds as part of the consideration for their professional services.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Series 2011A Bonds are subject to the approval of Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Series 2011A Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed upon for the Underwriters by their counsel, Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

To the extent that Rule 15c2-12 (the "Rule") of the Securities and Exchange Commission ("SEC") promulgated under the Securities Exchange Act of 1934, as amended (the "1934 Act"), requires underwriters (as defined in the Rule) to determine, as a condition to purchasing the Series 2011A Bonds, that the Corporation will make such covenants, the Corporation will covenant as follows:

The Corporation shall provide:

(a)        within 305 days after the end of each Fiscal Year, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), (i) the Corporation's audited financial statements, (ii) information regarding actual receipts of the Pledged Sales Tax received by the Corporation, and (iii) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information; and

(b)        in a timely manner, not in excess of ten business days after the occurrence of the event, to the MSRB through EMMA, notice of any of the following events with respect to the Bonds: (1) principal and interest payment delinquencies; (2) non-payment related defaults, if material; (3) unscheduled draws

on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Series 2011A Bonds, or other material events affecting the tax status of the Series 2011A Bonds; (7) modifications to rights of security holders (including Beneficial Owners, of the Series 2011 A Bonds, if material; (8) bond calls, if material; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Series 2011A Bonds, if material; (11) rating changes; (12) tender offers; (13) bankruptcy, insolvency, receivership, or similar proceedings of the Corporation; (14) the consummation of a merger, consolidation or acquisition involving the Corporation or the sale of substantially all of the assets of the Corporation, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; (15) the appointment of a successor or additional trustee, or the change of name of a trustee, if material; and (16) failure by the Corporation to comply with clause (a) above.

With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2011A Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under THE BONDS above, (ii) the only open issue is which Series 2011A Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Series 2011A Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

Event (13). According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Series 2011A Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation evidence of ownership and a written notice of and request to cure such breach, the Corporation shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is

made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Corporation (such as, but without limitation, the Corporation's financial advisor or bond counsel); or

(b)    all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Corporation elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Corporation became obligated to make annual disclosure of certain financial information in accordance with the Rule in an offering that took place in 2007. The Corporation has been in compliance with its continuing disclosure obligations each year in accordance with the Rule.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Series 2011A Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2011A Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended beneficiary of some of the Authorized Uses to be funded with proceeds of the Series 2011A Bonds.

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Series 2011A Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o

Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: Executive Director.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the summary of the book-entry system for the Bonds (*Appendix D*), and the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix E*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and the information appearing under the heading UNDERWRITING, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

**PUERTO RICO SALES TAX FINANCING CORPORATION**

By:         /s/ José R. Otero Freiria
                  Executive Director

**APPENDIX A**

## COMMONWEALTH OF PUERTO RICO
### ECONOMIC INFORMATION

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which correlate most closely with the level of consumption of goods and services in the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables that may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or the future level of Commonwealth Sales Tax revenues.

### General

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. The population of San Juan, the island's capital and largest city, was 381,931 in 2010 compared to 434,374 in 2000.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5% and the government was shut-down during the first two weeks of May. For fiscal years 2008 and 2009, the real gross national product contracted by 2.9% and 4.0%, respectively. For fiscal year 2010, preliminary reports indicate that the real gross national product contracted by 3.8%. The Puerto Rico Planning Board (the "Planning Board") projects a decrease in real gross national product of 1.0% for fiscal year 2011 and an increase of 0.7% for fiscal year 2012.

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are gross national product ("GNP") and personal consumption expenditures. Personal income is also indicative of the level of sales of goods and services in the Commonwealth. These factors, in turn, are affected by other variables such as the price of oil and employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

### Personal Income

Nominal personal income, both aggregate and per capita, has shown a positive average growth rate from 1947 to 2010. In fiscal year 2010, aggregate personal income was $60.4 billion ($50.0 billion at 2005 prices) and personal income per capita was $15,203 ($12,592 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $16.0 billion in fiscal year 2010 ($14.0 billion in fiscal year 2009). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10.4 billion, or 65% of the transfer payments to individuals in fiscal year 2010 ($9.8 billion, or 70.1%, in fiscal year 2009). The remainder of the federal transfers to individuals is

represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

The following table shows the personal income for the five fiscal years ended June 30, 2010.

### Commonwealth of Puerto Rico
### Personal Income
### (in millions of dollars)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **$2010^{(1)}$** |
| Employees' compensation | | | | | |
| Business, household and nonprofit institutions | $20,566.2 | $20,702.9 | $21,107.1 | $20,572.1 | $20,480.6 |
| Government | 8,424.2 | 8,584.9 | 8,762.2 | 9,047.4 | 8,275.6 |
| Other | 1,036.7 | 946.4 | 999.4 | 1,123.8 | 1,137.4 |
| Total Employees' compensation | $30,027.1 | $30,234.2 | $30,868.8 | $30,743.3 | $29,893.7 |
| | | | | | |
| Less: Contributions for social insurance | | | | | |
| Employees | 2,241.9 | 2,221.2 | 2,167.5 | 2,213.4 | 2,192.7 |
| Employers | 3,167.1 | 3,074.1 | 3,066.0 | 3,202.7 | 3,081.7 |
| Total Contributions for social insurance | $5,409.0 | $5,295.3 | $5,233.4 | $5,416.1 | $5,274.4 |
| | | | | | |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,832.3 | $2,219.8 | $2,334.2 | $2,429.8 | $2,465.1 |
| Dividends of domestic corporations | 304.3 | $322.1 | $351.9 | $355.6 | $272.0 |
| Miscellaneous income and dividends received from abroad | 13.4 | 9.9 | 17.1 | 7.8 | 8.4 |
| Rental income of persons | 4,387.4 | 5,529.0 | 5,829.7 | 6,702.3 | 6,906.2 |
| Personal interest income | 3,725.1 | 2,820.5 | 2,719.0 | 2,810.8 | 2,420.6 |
| Total Proprietors' income | $11,262.5 | $10,901.3 | $11,251.9 | $12,306.3 | $12,072.3 |
| | | | | | |
| Transfer Payments | | | | | |
| Commonwealth government and municipalities | 3,390.7 | 3,569.5 | 4,040.6 | 4,470.4 | 4792.3 |
| Federal government | 9,725.9 | 10,327.1 | 12,279.3 | 13,537.3 | 15,633.0 |
| U.S. state governments | 17.6 | 22.7 | 24.1 | 35.6 | 44.8 |
| Business | 1,184.9 | 1,741.0 | 2,301.1 | 2,392.2 | 2,745.7 |
| Other nonresidents | 642.6 | 610.0 | 591.7 | 493.6 | 493.6 |
| Total transfer payments | $14,961.8 | $16,270.3 | $19,236.8 | $20,929.1 | $23,709.4 |
| | | | | | |
| Total Personal Income | $50,842.3 | $52,110.4 | $56,124.1 | $58,562.6 | $60,400.9 |

(1) Preliminary figures.
Source: Planning Board

A-2

**Personal Consumption**

During Fiscal Year 2010, at current prices, personal consumption amounted to $57.2 billion, representing an increase of $1.7 billion, or 3.1%, from Fiscal Year 2009. This increase was based on a 3.8% increase in nondurable goods (40.1% of personal consumption), 3.9% increase in durable goods (9% of personal consumption), and 2.5% increase in services (50.9% of personal consumption). At constant 2005 prices, personal consumption increased 0.6% from Fiscal Year 2009. Real consumption expenditures in durable goods, however, decreased by 0.5%. The decline in expenditures of durable goods is characteristic of economies in recession.

The following table shows personal consumption expenditures by product for the five fiscal years ended June 30, 2010.

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2006 | 2007 | 2008 | 2009 | 2010[1] |
| Food | $ 6,982.2 | $ 7,315.0 | $ 7,913.5 | $ 8,467.5 | $ 8,556.9 |
| Alcoholic beverages and tobacco products | 1,765.8 | 1,783.1 | 1,704.7 | 1,784.2 | 1,903.9 |
| Clothing and accessories | 3,084.9 | 3,528.0 | 3,530.7 | 3,556.6 | 3,265.0 |
| Personal care | 984.6 | 1,031.0 | 1,157.1 | 1,212.0 | 1,439.4 |
| Housing | 7,499.7 | 8,065.8 | 8,568.6 | 9,011.3 | 9,221.2 |
| Household operations | 5,929.2 | 6,479.0 | 6,914.3 | 6,831.5 | 6,748.7 |
| Medical care and funeral expenses | 8,007.2 | 8,434.8 | 9,394.4 | 9,898.0 | 10,665.9 |
| Business services | 3,035.5 | 3,103.0 | 3,021.7 | 3,074.3 | 3,079.7 |
| Transportation | 6,325.3 | 6,079.8 | 6,236.3 | 5,488.1 | 6,088.5 |
| Recreation | 4,810.3 | 4,935.0 | 4,865.7 | 4,810.5 | 4,858.6 |
| Education | 1,819.5 | 1,776.6 | 1,826.3 | 1,928.6 | 1,955.6 |
| Religious and nonprofit organizations, not elsewhere classified | 505.9 | 439.2 | 435.4 | 488.3 | 439.9 |
| Foreign travel | 1,608.9 | 1,616.9 | 1,653.9 | 1,531.4 | 1,614.4 |
| Miscellaneous purchases | 704.1 | 819.5 | 858.4 | 860.9 | 972.3 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | 53,063.1 | 55,406.7 | 58,081.0 | 58,943.3 | 60,810.0 |
| Less: Expenditures in Puerto Rico by nonresidents | 3,403.1 | 3,457.4 | 3,580.1 | 3,520.1 | 3,647.9 |
| Total Personal Consumption Expenditures | $49,660.0 | $51,949.3 | $54,500.9 | $55,423.2 | $57,162.1 |

(1) Preliminary figures.
Source: Planning Board.

A-3

**Gross National Product**

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2010.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30,**

|  | 2006 | 2007 | 2008 | 2009 | 2010 [1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $56,732 | $59,521 | $61,665 | $62,678 | $63,292 |
| Real gross national product – $ millions (2005 prices) | $54,027 | $53,400 | $51,832 | $49,775 | $47,898 |
| Annual percentage increase (decrease) in real gross national product (2005 prices) | 0.5% | (1.2)% | (2.9)% | (4.0)% | (3.8)% |
| U.S. annual percentage increase in real gross national product (2005 prices) | 2.9% | 1.7% | 2.5% | (3.5)% | 0.4% |

---

[1]  Preliminary.
[2]  In current dollars.
*Sources:* Puerto Rico Planning Board and IHS-Global Insight.

A-4

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1990, and the forecast of the growth rate for fiscal years 2011 and 2012.



Sources: Puerto Rico Planning Board & IHS-Global Insight.

*   Estimate for Puerto Rico from the Puerto Rico Planning Board (Mar-2011).
**  Estimate for U.S. from IHS-Global Insight (Oct-2011).

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like the BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2010 shown in this Report are preliminary until the revised figures for fiscal year 2010 and the preliminary figures of fiscal year 2011 are released and the forecast for fiscal year 2012 is revised.

Certain information regarding current economic activity, however, is available in the form of the Government Development Bank – Economic Activity Index (the "EAI"), a coincident indicator of ongoing economic activity. This index, shown in the following table and published by Government Development Bank for Puerto Rico ("GDB") since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power consumption, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product. The

A-5

average contraction rate of the index for fiscal year 2011 was 2.9%, after a reduction of 5.6% for fiscal year 2010. For the first quarter of fiscal year 2012, this index decreased by 1.2%. The month of September 2011, however, reflected the smallest year-over-year reduction in the EAI since October 2006.



*Economic Forecast for Fiscal Years 2011 and 2012*

On March 2011, the Planning Board released its revised gross national product forecast for fiscal year 2011 and its gross national product forecast for fiscal year 2012. The Planning Board revised its gross national product forecast for fiscal year 2011 from a projected growth of 0.4% to a contraction of 1.0%, both in constant dollars. The Planning Board's revised forecast for fiscal year 2011 took into account the estimated effects on the Puerto Rico economy of the Government's fiscal stabilization plan, the impact of the initial phase of the tax reform, the disbursement of funds from the American Recovery and Reinvestment Act of 2009 ("ARRA"), the continuation of the fiscal stabilization plan, and the activity expected to be generated from the Government's local stimulus package. The revised forecast also considered the effect on the Puerto Rico economy of general and global economic conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2012 projects an increase in gross national product of 0.7% in constant dollars. The Planning Board's forecast for fiscal year 2012 took into account the estimated effect of the projected growth of the U.S. economy, tourism activity, personal consumption expenditures, federal transfers to individuals and the acceleration of investment in construction due to the Government's local stimulus package and the establishment of public-private partnerships. It also took into account the disbursement of the remaining ARRA funds, and the continuation of the implementation of the tax reform.

A-6

*Fiscal Year 2010*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2010 indicate that real gross national product decreased 3.8% (an increase of 1.0% in current dollars) over fiscal year 2009. Nominal gross national product was $63.3 billion in fiscal year 2010 ($47.9 billion in 2005 prices), compared to $62.7 billion in fiscal year 2009 ($49.8 billion in 2005 prices). Aggregate personal income increased from $58.6 billion in fiscal year 2009 ($49.8 billion in 2005 prices) to $60.4 billion in fiscal year 2010 ($50.0 billion in 2005 prices), and personal income per capita increased from $14,786 in fiscal year 2009 ($12,558 in 2005 prices) to $15,203 in fiscal year 2010 ($12,592 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2010 averaged 1,102,700, a decrease of 65,500, or 5.6%, from the previous fiscal year. The unemployment rate for fiscal year 2010 was 16.0%, an increase from 13.4% for fiscal year 2009.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008, when the average price of the West Texas Intermediate oil barrel (WTI) increased by 53.1% to reach an average of $97.0/bbl. Although the situation improved significantly during fiscal year 2009, with a decline of 28.1% in the price of the WTI, oil prices remained at relatively high levels, at an average of $69.7/bbl, and the impact of the increases of previous years were still felt in fiscal year 2009. Nevertheless, during fiscal year 2010, the average price of the WTI increased by 7.9% to $75.2/bbl, which put more pressure on internal demand. On the other hand, the continuation of the difficulties associated with the financial crisis kept short-term interest rates at historically low levels, but this did not translate into a significant improvement in the construction sector due to the high level of inventory of residential housing units.

*Fiscal Year 2009*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2009 indicate that real gross national product decreased 4.0% (an increase of 1.6% in current dollars) over fiscal year 2008. Nominal gross national product was $62.7 billion in fiscal year 2009 ($49.8 billion in 2005 prices), compared to $61.7 billion in fiscal year 2008 ($51.8 billion in 2005 prices). Aggregate personal income increased from $56.1 billion in fiscal year 2008 ($49.6 billion in 2005 prices) to $58.6 billion in fiscal year 2009 ($49.7 billion in 2005 prices), and personal income per capita increased from $14,217 in fiscal year 2008 ($12,557 in 2005 prices) to $14,786 in fiscal year 2009 ($12,558 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 4.1% compared to 1,217,500 for fiscal year 2008. At the same time, the unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the corresponding contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The dramatic increase to record levels in the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent

improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The global financial crisis promoted lower interest rates that were reflected in the local market, but those rates did not improve the conditions in the construction sector.

## Overview of the Commonwealth's Fiscal Condition

*Fiscal Imbalance and Fiscal Stabilization Plan.* Since 2000, the Commonwealth has experienced an imbalance between its General Fund total revenues and expenditures. The imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between total revenues from non-financing sources of $7.583 billion and total expenditures of $10.890 billion. In January 2009, the Government of Puerto Rico ("Government") began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth bonds. The fiscal stabilization plan, which was generally contained in Act No. 7 of March 9, 2009, as amended ("Act 7"), sought to achieve budgetary balance, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) certain financial measures.

The Government estimates that the fiscal stabilization plan's operating expense reduction measures have resulted in annual savings of approximately $837 million, and that the tax revenue enforcement measures, and the temporary and permanent revenue raising measures resulted in additional revenues of $420 million during fiscal year 2011.

The principal financial measure taken has been a bond issuance program through the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym), to which the Commonwealth allocated a portion of the sales and use tax. The proceeds from the COFINA bond issuance program (such proceeds are deposited in an account referred to herein as the "Stabilization Fund" managed by GDB) have been used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2008 through 2011 (and will be used in fiscal year 2012 to cover operating expenses included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below. During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA.

Another financial measure taken has been the restructuring of a portion of the Commonwealth's debt service on the Commonwealth's general obligation bonds and bonds of the Public Buildings Authority ("PBA") that are guaranteed by the Commonwealth and are payable from Commonwealth budget appropriations. During fiscal year 2010, the Commonwealth refinanced $512.9 million of interest accrued during such fiscal year on the Commonwealth's general obligation bonds and $164.5 million of interest accrued during such fiscal year on PBA bonds. During fiscal year 2011, the Commonwealth refinanced $490.9 million of interest accrued during such fiscal year and principal due on July 1, 2011 on the Commonwealth's general obligation bonds. During fiscal year 2011, PBA also used a line of credit from GDB to make payments of approximately $147.8 million of interest accrued during such fiscal year on its Commonwealth guaranteed bonds, which line of credit was refinanced with the proceeds of a series of Commonwealth guaranteed bonds issued by PBA.

A-8

During fiscal year 2012, the Government expects to refinance approximately $537.4 million of principal due in and interest to accrue during such fiscal year on the Commonwealth's general obligation bonds and approximately $153.8 million of interest to accrue during such fiscal year on Commonwealth guaranteed PBA bonds.

*Results for Fiscal Year 2009.* General Fund total revenues for fiscal year 2009 were $7.583 billion (this amount excludes approximately $126.7 million of revenues attributable to the Electronic and Traditional lotteries, which are not included in General Fund revenues on a budget basis), representing a decrease of $775.5 million, or 9.3%, from fiscal year 2008 revenues. Total expenditures for fiscal year 2009 were approximately $10.890 billion, consisting of $9.927 billion of total expenditures and approximately $962 million of other uses. Total expenditures of $10.890 billion represented an increase of approximately $1.402 billion, or 14.8%, of original budgeted expenditures and exceeded total General Fund revenues (excluding other financing sources) by $3.306 billion, or 43.6%.

During fiscal year 2009, the Government also faced an aggregate cash shortfall of $1.153 billion that, when added to the deficit, resulted in approximately $4.459 billion in excess expenditures and cash shortfall. The difference between General Fund revenues and total expenditures for fiscal year 2009 was principally paid from proceeds of COFINA bond issues and the restructuring of the corpus account of the Puerto Rico Infrastructure Financing Authority ("PRIFA") pursuant to the fiscal stabilization plan.

*Results for Fiscal Year 2010.* General Fund total revenues for fiscal year 2010 were $7.593 billion (this amount excludes approximately $122.8 million of revenues attributable to the Electronic and Traditional lotteries, which are not included in General Fund revenues on a budget basis), representing an increase of $9.8 million from fiscal year 2009 revenues. The principal changes in sources of revenues from fiscal year 2009 included a decrease in the sales and use tax received by the General Fund of $256.8 million due to the assignment to COFINA of an additional 1.75% of the 5.5% Commonwealth sales and use tax. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $227.8 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan. Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Total expenditures for fiscal year 2010 were $10.369 billion (which included $216 million of expenditures related to a Government local stimulus program), consisting of (i) $9.640 billion of total expenditures and (ii) $728 million of other financing uses. Total expenditures of $10.369 billion exceeded General Fund total revenues (excluding other financing sources) by $2.775 billion, or 36.6%. Excluding the debt service amounts that were refinanced, total expenditures for fiscal year 2010 were approximately $9.691 billion and exceeded General Fund total revenues (excluding other financing sources) by $2.098 billion, or 27.6%. Approximately $2 billion of this amount is related to (i) transitory expenses related to the implementation of the expense-reduction measures included in the fiscal stabilization plan ($1 billion) and (ii) additional expenses ($1 billion) incurred only in fiscal year 2010 (these expenses, which will not be incurred in subsequent fiscal years, are a result of the expense reduction plan being implemented under Act 7). The difference between revenues and expenses for fiscal year 2010 was covered principally by proceeds from a COFINA bond issue.

*Preliminary Results for Fiscal Year 2011.* Preliminary General Fund total revenues for fiscal year 2011 (from July 1, 2010 to June 30, 2011) were $8.165 billion (this amount includes approximately $101.9 million of revenues attributable to the Electronic and Traditional lotteries), an increase of $449.3 million, or 5.8%, from $7.716 billion of net revenues for the same period in the prior fiscal year (this amount includes approximately $122.8 million of revenues attributable to the Electronic and Traditional

lotteries), and an increase of $31 million from the revised estimate of net revenues, which took into account the effect of the tax reform discussed below under "Tax Reform."

The increase in General Fund total revenues is mainly due to an increase of $170.1 million in tax withholdings from non-residents and the collection of $677.8 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 of October 25, 2010, as amended ("Act No. 154") as part of the tax reform. This increase was partially offset by a decrease of $407 million and $18.5 million in collections from income tax on individuals and entertainment machine licenses, respectively. The decrease in individual income taxes is due to the tax relief provided to individual taxpayers as part of the tax reform and to current economic conditions. The Government had expected that the decrease in General Fund net revenues as a result of the tax relief provided to taxpayers as part of the tax reform would be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154. For fiscal year 2011, the first five monthly excise tax payments (from February through June 2011) amounted to $677.6 million, which was consistent with the Government's projection of collections from the excise tax. The Government's expectations with respect to the impact of the tax reform on fiscal year 2011 revenues were met.

Preliminary General Fund total expenses for fiscal year 2011 amounted to $9.153 billion, which excludes $638.7 million of debt service amounts that were refinanced, and exceeded General Fund total revenues (excluding other financing sources) by $988 million, or 12.1%. The difference between preliminary revenues and expenses for fiscal year 2011 was covered principally by proceeds from a COFINA bond issue and proceeds of bonds issued to refinance debt service payments.

*Budget for Fiscal Year 2012*

On July 1, 2011, the Governor signed the Commonwealth's central government budget for fiscal year 2012. The adopted budget provides for General Fund total revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes estimated revenues of $8.650 billion and $610.0 million in additional revenues from proceeds of COFINA bond issues.

The principal changes in General Fund revenues under the fiscal year 2012 budget compared to the fiscal year 2011 budget are accounted for mainly by the projected collections from the new temporary excise tax under Act No. 154 (discussed below under "Tax Reform") (up $969.0 million), sales and use taxes (up $125.0 million), non-resident withholding taxes (up $29 million), alcoholic beverage taxes (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed Authority bonds which are expected to be refinanced during fiscal year 2012. See "Commonwealth's Fiscal Imbalance" above. The budgeted total expenditures for fiscal year 2012 are $110 million, or 1.2%, higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $1.109 billion, or 10.7%, lower than total expenditures of $10.369 billion for fiscal year 2010.

The principal changes in General Fund expenditures by program in the fiscal year 2012 budget compared to the fiscal year 2011 budget are mainly due to increases in public safety and protection (up $80.1 million), education (up $131.4 million), economic development (up $106.4 million), transportation (up $10.2 million), special pension contributions (up $85.8 million), contribution to municipalities (up

$28.5 million), and decreases in general obligation bonds debt service (down $21.5 million), welfare (down $22.0 million), health (down $209.2 million), and governmental management (down $51.2 million).

Budgeted expenditures and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations.

*Preliminary Results for the First Three Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit.* Preliminary General Fund revenues for the first three months of fiscal year 2012 (from July 1, 2011 to September 30, 2011) were $1.696 billion, an increase of $129.3 million, or 8.25%, from $1.567 billion of revenues for the same period in the prior fiscal year and a decrease of $33.3 million, or 1.9%, from the revised estimate of revenues of $1.729 billion made in September 2011. The increase in General Fund revenues for the first three months of fiscal year 2012, compared to the same period in the prior fiscal year, is mainly due to the collections of $478 million from the new temporary excise tax under Act No. 154, which was not in effect during the first three months of fiscal year 2011. This increase was partially offset by a decrease in collections from individual and corporate income taxes of $115 million and $75 million, respectively.

Preliminary General Fund total expenses (on a cash basis) for the first three months of fiscal year 2011 amounted to $1.858 billion, which is $13.5 million, or 1%, lower than $1.872 billion of budgeted expenditures for the same period. The lower expenditures are mainly due to timing differences in disbursements for general government expenditures of $29.4 million, safety and protection of $6.3 million and welfare of $4.5 million. These lower expenditures were partially offset by increased expenditures in health of $26 million and transportation and communication of $2.4 million. The difference between preliminary revenues for the first three months of fiscal year 2012 was covered principally by funds on deposit in the Stabilization Fund and the issuance of tax revenue anticipation notes by the Commonwealth.

The deficit for fiscal year 2012 is projected to be approximately $610 million, which excludes approximately $691.2 million of debt service payments on Commonwealth general obligation bonds and Commonwealth guaranteed PBA bonds that will be refinanced. In addition, the Office of Management and Budget has indicated that the sectors of health and safety carry risk of budget overruns for fiscal year 2012 as they are undergoing operational changes that were not considered during the preparation of the budget for that fiscal year.

*Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with budget appropriations from the Commonwealth's General Fund. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.8 billion, $7.1 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer

and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was approximately $749 million, $274 million and $7.8 million, respectively. For fiscal year 2012, the funding shortfall is expected to be $741 million, $287 million and $8.5 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest preliminary actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems. As a result of the increases in employer contributions to the Employees Retirement System and the Teachers Retirement System adopted in July 2011, as described below, the Administrator of the Retirement Systems projects that the period before depletion of the assets of these two systems will be extended by three to four years.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010 and $121.6 million for fiscal year 2011, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

Because of its multi-year fiscal imbalances mentioned above, the Commonwealth has been unable and is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three Government retirement systems, in February 2010, the Governor established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010.

As a result of the special commission's report and the Government's analysis, the Governor submitted two bills to the Legislative Assembly to address in part the retirement systems' financial condition. One of such bills was enacted as Act No. 96 of June 16, 2011 ("Act No. 96"). On June 23, 2011, in accordance with Act No. 96, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Development Fund (the "Corpus Account"), which is under the custody and control of the Puerto Rico Infrastructure Financing Authority ("PRIFA") were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

The second bill submitted by the Governor was enacted as Act No. 114 of July 5, 2011 and Act No. 116 of July 6, 2011 ("Act 116"). These Acts provide an increase in employer contributions to the Employee Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. The additional employer contributions for fiscal year 2012 have been included in the approved budget for such fiscal year. With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provides that the increases for fiscal years 2012, 2013 and 2014 will be paid for by the Commonwealth from the General Fund budget, representing approximately $6.3 million, $12.8 million and $19.7 million in fiscal years 2012, 2013 and 2014, respectively.

In addition to these measures, on August 8, 2011, the Board of Trustees of the Employees Retirement System adopted a new regulation regarding the rules relating to the concession of personal loans to its members, which, among other changes, lowers the maximum amount of those loans from $15,000 to $5,000. This change is expected to gradually improve the Employees Retirement System's liquidity.

*Economic Reconstruction Plan*

In fiscal year 2009, the administration began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. The Commonwealth was awarded approximately $6.8 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in education, healthcare and infrastructure, among others. As of October 14, 2011, the Commonwealth had disbursed $5.5 billion in ARRA funds, or 78.8%, of awarded funds.

The administration has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan*

The administration has also developed the *Strategic Model for a New Economy*, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The administration also enacted Acts No. 82 and 83 of July 19, 2010, which provide for a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies. Moreover, the administration adopted a comprehensive tax reform (described below) that takes into account the Commonwealth's current financial situation.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for the establishment of public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. During fiscal year 2010, the administration engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the administration published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. As of September 30, 2011, the administration had completed the concession of toll roads PR-22 and PR-5 and short-listed proponents for the Luis Muñoz Marín International Airport and school infrastructure projects.

The administration has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout the Island. These projects, some of which are ongoing, include tourism and urban redevelopment projects.

*Tax Reform*

In February 2010, the Governor established a committee to review the Commonwealth's income tax system and propose a comprehensive tax reform directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform.

The tax reform was intended to be revenue positive. It consisted of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), was projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) the Puerto Rico Office of Management and Budget ("OMB") certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that the General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

A-14

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to the Commonwealth's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed on a controlled group member's acquisition from another group member of certain personal property manufactured or produced in Puerto Rico and certain services performed in Puerto Rico (at a declining rate from 4% for 2011 to 1% for 2016), and (iv) an expansion of taxation rules that characterize certain income of non-resident corporations, partnerships and individuals as effectively connected with the conduct of a trade or business in Puerto Rico and therefore subject to Puerto Rico income tax. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154. In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act No. 154 and $5.6 billion for the six-year period that the excise tax is in place.

The first monthly excise tax payment was due in February 2011. The collections for the first ten monthly excise tax payments (from February through October 2011) were $1.325 billion. These amounts are consistent with the Government's projection of collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act No. 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act No. 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. It is the position of the Government that the excise tax is a tax imposed in substitution of the generally imposed income tax and that, as such, under Section 903 of the United States Internal Revenue Code of 1986, as amended, U.S. taxpayers can claim a foreign tax credit for amounts paid.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax

after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act No. 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act No. 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act No. 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

**Employment and Unemployment**

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2011 averaged 1,077,000, a decrease of 2.3% compared to previous fiscal year; and the unemployment rate averaged 15.9%. During the first three months of fiscal year 2012, total employment averaged 1,064,200, a decline of 1.0% with respect to the same period of the prior year; and the unemployment rate decreased to 16.0%.

The following table presents annual statistics of employment and unemployment for fiscal year 2007 through fiscal year 2011, and the average figures for the first two months of fiscal year 2012. These employment figures are based on the Household Survey, which includes self-employed individuals and agriculture employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agriculture employment in Puerto Rico represented 1.6% of total employment in fiscal year 2011.

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | (Annual Average) | | | |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010 | 1,313 | 1,103 | 210 | 16.0 |
| 2011 | 1,287 | 1,077 | 204 | 15.9 |
| 2012[3] | 1,267 | 1,064 | 203 | 16.0 |

[1] Totals may not add due to rounding.
[2] Unemployed as percentage of labor force.
[3] Average figures for the first three months of fiscal year 2011 (July 2011 through September 2011).

*Source:* Department of Labor and Human Resources – Household Survey

**Economic Performance by Sector**

From fiscal year 2007 to fiscal year 2010, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2010.

**Commonwealth of Puerto Rico
Gross Domestic Product by Sector and Gross National Product[1]
(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | **2007** | **2008** | **2009** | **2010[1]** |
| Manufacturing | $37,637 | $40,234 | $44,019 | $44,641 |
| Service[2] | 40,190 | 41,372 | 40,333 | 41,472 |
| Government[3] | 8,585 | 8,762 | 9,047 | 8,276 |
| Agriculture | 430 | 519 | 506 | 553 |
| Construction[4] | 2,027 | 2,032 | 1,818 | 1,658 |
| Statistical discrepancy | (464) | (312) | (512) | (340) |
| Total gross domestic product[5] | $88,405 | $92,606 | $95,211 | $96,261 |
| Less: net payment abroad | (28,884) | (30,941) | (32,534) | (32,969) |
| Total gross national product[5] | $59,521 | $61,665 | $62,678 | $63,292 |

[1] Preliminary.
[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4] Includes mining.
[5] Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

A-17

The following table presents annual statistics of average employment based on NAICS for fiscal years 2007 to 2011.

## Commonwealth of Puerto Rico
### Non-Farm, Payroll Employment by Economic Sector[1]
### (persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010[2] | 2011 |
| Natural resources and construction | 64,700 | 59,675 | 49,067 | 35,917 | 28,683 |
| Manufacturing | | | | | |
|    Durable goods | 45,417 | 43,100 | 39,242 | 34,792 | 33,650 |
|    Non-durable goods | 62,442 | 60,950 | 57,483 | 53,483 | 50,967 |
| Sub-total | 107,858 | 104,050 | 96,725 | 88,275 | 84,617 |
| Trade, transportation, warehouse, and Utilities | | | | | |
|    Wholesale trade | 33,267 | 33,717 | 33,267 | 32,533 | 31,508 |
|    Retail trade | 133,750 | 130,883 | 127,492 | 126,242 | 125,217 |
|    Transportation, warehouse, and utilities | 16,992 | 16,742 | 15,692 | 14,550 | 14,208 |
|      Sub-total | 184,008 | 181,342 | 176,450 | 173,325 | 170,933 |
| Information | 22,642 | 21,442 | 20,217 | 18,767 | 19,067 |
| Finance | 49,108 | 48,483 | 48,492 | 45,883 | 44,717 |
| Professional and business | 108,800 | 108,150 | 103,333 | 102,492 | 107,567 |
| Educational and health | 105,225 | 108,550 | 109,992 | 111,108 | 113,192 |
| Leisure and hospitality | 73,567 | 73,408 | 70,933 | 70,850 | 70,300 |
| Other services | 18,242 | 17,367 | 16,667 | 15,750 | 15,583 |
| Government[3] | 298,125 | 297,742 | 300,708 | 277,333 | 263,717 |
| Total non-farm | 1,032,275 | 1,020,208 | 992,583 | 939,700 | 918,375 |

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2] Preliminary.

[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product and the second largest in terms of real gross national product. The Planning Board figures show that in fiscal year 2010 manufacturing generated $44.6 billion, or 46.4%, of gross domestic product. Manufacturing, however, only generated $15.8 billion, or 24.9%, of real gross national product in fiscal year 2010. During fiscal year 2011, payroll employment for the manufacturing sector was 84,617, a decrease of 4.1% compared with fiscal year 2010. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2011, the average hourly manufacturing wage rate in Puerto Rico was approximately 66.6% of the average mainland U.S. rate.

A-18

Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has had, and Act 154 may have, a long-term impact on local manufacturing activity.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2010.

## Commonwealth of Puerto Rico
## Gross Domestic Product by Manufacturing Sector[1]
## (in thousands at current prices)

| | Fiscal Years Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2007 | 2008 | 2009 | 2010[1] |
| Food | $1,083,300 | $822,008 | $ 1,018,486 | $ 1,040,339 |
| Beverage and Tobacco Products | 924,900 | 1,243,200 | 1,197,325 | 1,203,142 |
| Textile Mills | 2,200 | 1,295 | 975 | 791 |
| Textile Product Mills | 13,200 | 13,438 | 12,072 | 12,418 |
| Apparel | 200,700 | 252,062 | 270,251 | 296,192 |
| Leather and Allied Products | 17,000 | 19,982 | 22,052 | 21,997 |
| Wood Products | 23,600 | 22,011 | 18,809 | 20,228 |
| Paper | 70,600 | 66,066 | 66,233 | 69,664 |
| Printing and Related Support Activities | 124,400 | 118,525 | 111,416 | 109,457 |
| Petroleum and Coal Products | 370,900 | 94,986 | 355,598 | 353,757 |
| Chemical | 27,016,500 | 29,338,802 | 31,013,076 | 31,384,322 |
| Plastics and Rubber Products | 121,700 | 117,556 | 111,835 | 119,614 |
| Nonmetallic Mineral Products | 284,900 | 218,469 | 198,717 | 197,925 |
| Primary Metals | 101,900 | 150,693 | 138,708 | 139,063 |
| Fabricated Metal Products | 239,200 | 247,860 | 227,572 | 209,446 |
| Machinery | 217,500 | 234,410 | 196,456 | 213,689 |
| Computer and Electronic Products | 4,217,200 | 4,462,560 | 6,308,916 | 6,384,137 |
| Magnetic and Optical | - | - | - | - |
| Electrical Equipment, Appliances and Components | 510,900 | 657,298 | 639,313 | 593,777 |
| Transportation Equipment | 78,000 | 77,560 | 66,111 | 61,243 |
| Furniture and Related Products | 65,500 | 56,439 | 47,045 | 47,761 |
| Miscellaneous | 1,955,500 | 2,018,693 | 1,998,060 | 2,162,405 |
| Total gross domestic product of manufacturing sector[2] | $37,636,600 | $40,233,913 | $44,019,025 | $44,641,368 |

[1] Preliminary.
[2] Totals may not add due to rounding.

*Source:* Planning Board

A-20

The following table presents annual statistics of average manufacturing employment by industry based on NAICS for fiscal years 2007 to 2011.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Manufacturing Employment by Industry Group*
### (persons age 16 years and over)

| Industry group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010[1] | 2011[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 3,825 | 3,758 | 3,058 | 2,500 | 2,133 |
| Fabricated metal products | 5,675 | 5,375 | 4,908 | 4,042 | 3,583 |
| Computer and electronic | 10,092 | 8,600 | 7,042 | 5,708 | 5,867 |
| Electrical equipment | 6,617 | 6,658 | 5,867 | 5,058 | 5,033 |
| Miscellaneous manufacturing | 12,292 | 11,967 | 11,975 | 11,675 | 11,400 |
| Other durable goods manufacturing | 6,917 | 6,742 | 6,392 | 5,808 | 5,633 |
| Total – durable goods | 45,417 | 43,100 | 39,242 | 34,792 | 33,650 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 12,183 | 11,725 | 11,383 | 11,592 | 11,600 |
| Beverage and tobacco products manufacturing | 3,258 | 3,267 | 3,133 | 3,275 | 2,983 |
| Apparel manufacturing | 7,708 | 9,633 | 9,825 | 8,808 | 8,108 |
| Chemical manufacturing | 30,467 | 27,900 | 25,042 | 22,392 | 21,425 |
| Plastics and rubber products | 2,200 | 1,983 | 1,967 | 1,867 | 1,567 |
| Other non-durable goods manufacturing | 6,625 | 6,442 | 6,133 | 5,550 | 5,283 |
| Total – non-durable goods | 62,442 | 60,950 | 57,483 | 53,483 | 50,967 |
| | | | | | |
| Total manufacturing employment | 107,858 | 104,050 | 96,725 | 88,275 | 84,617 |

* Totals may not add due to rounding.
[1] Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 32,700 from fiscal year 2005 to fiscal year 2011. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment stabilized around 118,000 jobs, but the acceleration in job losses reappeared in fiscal year 2006 with the sector experiencing another drop of 4.0%. For fiscal years 2007, 2008, 2009, 2010 and 2011, manufacturing employment decreased by 4.2%, 3.5%, 7.0%, 8.7% and 4.1%, respectively. For the first three months of fiscal year 2012, the sector lost an average of 4,300 jobs, or 5.0%, compared to the same period of the previous year. Given that this sector used to pay, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly

electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector continues to face increased international competition. As patents on pharmaceutical products manufactured in Puerto Rico expire and the production of such patented products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2010, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.1%, while payroll employment in this sector decreased at an average annual rate of 0.9% between fiscal years 2007 and 2011. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, but first in its contribution to real gross national product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2010, the service sector generated $41.5 billion, or 43.1%, of gross domestic product, while it generated $36.3 billion, or 57.3%, of real gross national product. Trade, information services, education and health services, finance, insurance and real estate and rentals experienced growth in fiscal year 2010, as measured by gross domestic product and by gross national product at current prices. Transportation, professional and technical, and management services experienced a contraction in fiscal year 2010, as measured by gross domestic product and gross national product at current prices. Service-sector employment decreased from 561,592 in fiscal year 2007 to 541,358 in fiscal year 2011 (representing 58.9% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2011 represents a decrease of 0.6% compared to the prior fiscal year. For the first three months of fiscal year 2012, average service-sector employment was 532,476, an increase of 0.5% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of June 30, 2011, there were eleven commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of June 30, 2011 were $73.7 billion, as compared to $75.5 billion as of December 31, 2010. On April 30, 2010, the OCFI closed three commercial banks and the FDIC was named receiver. On the same date, the FDIC entered into loss share purchase and assumption agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks including the assumption of all of the deposits. To

date, the amount of jobs lost as a result of these consolidations has not been significant. The administration expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA") and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $5.5 billion as of June 30, 2011, as compared to $6.0 billion on December 31, 2010. Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $14.3 billion as of June 30, 2011, as compared to $14.2 billion as of December 31, 2010 according to the OCFI.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of June 30, 2011, there were 31 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $43.6 billion, an increase from $40.6 billion in total assets as of December 31, 2010. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7.6 billion in assets as of June 30, 2011, a slight increase from $7.5 billion as of December 31, 2010.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following table sets forth gross domestic product for the service sector for fiscal years 2007 to 2010.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector***
**(in millions at current prices)**

|  | Fiscal Years ended June 30 | | | |
|---|---|---|---|---|
|  | **2007** | **2008** | **2009** | **2010**[1] |
| Wholesale trade | $ 2,751.6 | $ 2,950.9 | $ 2,934.8 | $ 2,984.0 |
| Retail trade | 4,471.4 | 4,569.4 | 4,614.5 | 4,723.7 |
| Transportation and warehousing | 968.3 | 978.5 | 908.6 | 891.0 |
| Utilities | 2,214.4 | 2,118.0 | 1,971.9 | 1,943.8 |
| Information | 2,466.5 | 2,363.1 | 2,306.4 | 2,359.2 |
| Finance and insurance | 6,694.3 | 7,120.4 | 5,174.7 | 5,543.2 |
| Real Estate and rental | 11,685.7 | 12,064.2 | 13,030.8 | 13,318.3 |
| Professional and business | 3,112.5 | 3,183.6 | 3,132.0 | 3,246.5 |
| Education and health | 3,592.5 | 3,786.2 | 4,125.7 | 4,278.5 |
| Leisure and hospitality | 1,861.5 | 1,874.7 | 1,783.3 | 1,828.1 |
| Other services | 371.6 | 119.3 | 112.3 | 115.9 |
| Total | $40,190.3 | $41,371.9 | $40,333.2 | $41,471.8 |

*Source*: Puerto Rico Planning Board

The following table sets forth employment for the service sector for fiscal years 2007 to 2011.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector***
**(thousands of persons age 16 and over)**

|  | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2010[1] | 2011[1] |
| Wholesale trade | 33,267 | 33,717 | 33,267 | 32,533 | 31,508 |
| Retail trade | 133,750 | 130,883 | 127,492 | 126,242 | 125,217 |
| Transportation, warehouse and utilities | 16,992 | 16,742 | 15,692 | 14,550 | 14,208 |
| Information | 22,642 | 21,442 | 20,217 | 18,767 | 19,067 |
| Finance | 49,108 | 48,483 | 48,492 | 45,883 | 44,717 |
| Professional and business | 108,800 | 108,150 | 103,333 | 102,492 | 107,567 |
| Educational and health | 105,225 | 108,550 | 109,992 | 111,108 | 113,192 |
| Leisure and hospitality | 73,567 | 73,408 | 70,933 | 70,850 | 70,300 |
| Other services | 18,242 | 17,367 | 16,667 | 15,750 | 15,583 |
| Total | 561,592 | 558,742 | 546,083 | 538,175 | 541,358 |

---

* Totals may not add due to rounding.
[1] Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

For fiscal year 2011, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,906,900, an increase of 5.7% over the number of persons registered during the same period of fiscal year 2010. The average occupancy rate in tourist hotels during fiscal year 2011 was 68.9%, a decrease of 0.3% from the prior fiscal year. Also, during fiscal year 2011, the average number of rooms available in tourist hotels increased by 5.8% to 11,509 rooms compared to the same period of fiscal year 2010.

During the first month of fiscal year 2012, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 234,200, an increase of 18.4% over the number of persons registered during the same period of fiscal year 2011. The average occupancy rate in tourist hotels during the first month of fiscal year 2012 was 80.2%, a decrease of 0.7% from the prior fiscal year. Also, during the first month of fiscal year 2012, the average number of rooms available in tourist hotels increased by 4.1% to 12,056 rooms compared to the same period of fiscal year 2011.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. For fiscal year 2011, employment in hotels and other lodging facilities increased by 2.3% to 12,700 jobs. Nevertheless, for the first three months of fiscal year 2012, the average decrease in employment in hotels and other lodging facilities was 2.9% as compared to the same period for the prior fiscal year. According to the Payroll Survey, employment in the leisure and hospitality sector was 70,300 for fiscal year 2011, a decrease of 0.8% over employment for fiscal year 2010. For the first three months of fiscal year 2012, employment decreased by 3.6% to 68,500 compared to the same period of the prior fiscal year.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2010.

**Commonwealth of Puerto Rico**
**Tourism Data[1]**

**Number of Visitors**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 | 1,277,749 | 1,232,010 | 2,272,778 | 4,782,537 |
| 2010[5] | 1,347,487 | 1,193,549 | 2,331,393 | 4,872,429 |

**Total Visitors' Expenditures**
**(in millions)**

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008 | 1,526.3 | 194.3 | 1,814.3 | 3,535.0 |
| 2009 | 1,464.4 | 173.7 | 1,834.8 | 3,472.8 |
| 2010[5] | 1,546.1 | 168.6 | 1,883.5 | 3,598.2 |

---

[1]  Only includes information about non-resident tourists registering in tourist hotels.  They are counted once even if registered in more than one hotel.

[2]  Includes visitors in guesthouses.

[3]  Includes cruise ship visitors and transient military personnel.

[4]  Includes visitors in homes of relatives, friends, and in hotel apartments.

[5]  Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the Dr. Pedro Rosselló González Convention Center, the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, that includes hotels, restaurants, office space, and housing.  The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments.  The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees.  A 500 room hotel located next to the convention center commenced operations at the end of November 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico.  The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events.  The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy.  It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of

the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

In fiscal year 2010, the government (state and local) accounted for \$8.3 billion, or 8.6%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing 248,800 workers (state, including public corporations, and local), or 27.1% of total, non-farm, payroll employment in fiscal year 2011. From fiscal year 2007 to fiscal year 2011, state and municipal government employment averaged approximately 272,300. During fiscal year 2010, state and municipal government employment decreased by 24,900 jobs, or 8.7%. According to the payroll survey, the distribution of the job reductions during fiscal year 2010 was 20,600 jobs in the state government and approximately 4,200 jobs in municipal government. During fiscal year 2011, state and municipal government employment decreased by 11,900 jobs, or 4.6%, during fiscal year 2010. According to the payroll survey, the distribution of the job reductions during fiscal year 2011 was 12,000 jobs in the state government and an increase of approximately 100 jobs in municipal government. During the first three months of fiscal year 2012, government employment increased by 2.8% from the previous fiscal year, or by an average of 6,900 jobs, due to recent increases in state government.

As discussed previously, Act 7 established, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act 7 provided that, for a period of two years after its enactment, collective bargaining agreements that had already expired or that would expire while the law is in effect and that relate to public employees may not be renegotiated or renewed. Certain individuals and labor organizations have challenged in court the validity of some of the provisions of Act 7.

### Transportation

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain. On December 22, 2009, the Federal Aviation Administration ("FAA") approved the Ports Authority's preliminary application to participate in the FAA's airport public-private partnership pilot program. During fiscal year 2010, the PPP Authority engaged a team of advisors and in June 2010 published the related desirability and convenience study, which is required for the establishment of a public-private partnership. On July 5, 2011 the PPP Authority published its "Request for Qualifications to Acquire a Concession to Finance, Operate, Maintain and Improve the Luis Muñoz Marín International Airport". On August 8, 2011, the PPP Authority and the Puerto Rico Ports Authority received statements of qualifications from twelve (12) from world-class consortia and, on September 23, 2011, it published a

short-list of six consortia. The PPP Authority expects to publish the Request for Proposals for the Airport during October 2011 and to select a winning bidder in the first quarter of calendar 2012.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

The island's major cities are connected by a modern highway system, which, as of December 31, 2009, totaled approximately 4,636 miles and 12,045 miles of local streets and adjacent roads. The highway system comprises 389 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,058 miles of tertiary highways and roads serving local, intra-regional traffic. On September 22, 2011, the PPP Authority and the Highways and Transportation Authority completed the procurement for a concession of toll roads PR-22 and PR-5.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Port of the Americas Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009. A third development phase, which entails a public investment of $84.4 million, is ongoing through September 2011. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. Since its peak in fiscal year 2000, real construction investment has declined at an average annual growth rate of 8.7%. Such rates of interest started to decrease significantly in fiscal year 2005, as a consequence of the current contraction of the local economic activity. During the last four fiscal years (from fiscal year 2007 to 2010) real construction investment decreased at an average annual rate of 17.0%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 16.8%.

Public investment has been an important component of construction investment. During fiscal year 2010, approximately 49.3% of the total investment in construction was related to public projects, which represents an increase in its share of total construction investment compared to 37.9% in fiscal year 2000. The total value of construction permits decreased 29.2% in fiscal year 2010 as compared to fiscal year 2009, and total sales of cement decreased by 5.0% between 2010 and 2011. During the first semester of fiscal year 2012, the total value of construction permits decreased by 22.6%. Average payroll employment in the construction sector during fiscal year 2011 was 28,700, a reduction of 20.1% from fiscal year 2010. During the first three months of fiscal year 2012, payroll employment in the construction sector averaged 29,000, a further reduction of 7.3% for the same period in fiscal year 2011.

A-27

Total construction investment for fiscal year 2010 decreased in real terms by 18.8%, following a 22.2% real decline in fiscal year 2009. The Planning Board expects a further construction investment decrease of 7.8% in real terms for fiscal year 2011. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. Public investment was primarily in housing, schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During fiscal year 2010, the number of construction permits decreased 15.2%, while the total value of construction permits dropped by 29.2% compared to fiscal year 2009. During the first six months of fiscal year 2011, the total value of construction permits decreased by 22.6%. These figures are consistent with cement sales, which declined by 26.3% in fiscal year 2010 and by 5.0% in 2011, respectively, reaching levels not seen in almost three decades. During the first three months of fiscal year 2012, cement sales decreased by 3.7% from the previous fiscal year.

On September 2, 2010, the Governor signed Act 132. Act 132 was designed primarily to stimulate the Puerto Rico real estate market, which in recent years has been suffering from lower sales, rising inventories, falling median prices and increased foreclosure rates. Pursuant to the provisions of Act 132, the Government has provided tax and transaction fee incentives to both purchasers and sellers of new and existing residential properties, as well as commercial properties with sale prices that do not exceed $3 million. The incentives provided by Act 132 were effective from September 1, 2010 through June 30, 2011, and were subsequently extended until October 31, 2011 by Act No. 115 of July 5, 2011. Certain permanent incentives are also available for rental housing. On November 1, 2011, the Government approved Act 216, which provides incentives similar to the ones available under Act 132 and establishes an orderly transition to gradually reduce those incentives without disrupting the functioning of the housing market in Puerto Rico. The incentives provided by Act 216 are limited to residential real property and are effective from November 1, 2011 to December 31, 2012, with certain reductions after December 31, 2011 and June 30, 2012. New incentives are also available for property that constitutes the seller's principal residence, as defined in Act 216.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2010, gross income from agriculture was $822 million, an increase of 3.8% compared with fiscal year 2009.

The administration supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

A-28

**Higher Education**

During the six decades from 1950 to 2010, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

## Commonwealth of Puerto Rico
## Trend in College Enrollment

| | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,539,000 | 50.5% |
| 2000 | 428,893[2] | 176,015 | 41.0% | 27,143,454[2] | 14,791,000 | 54.5% |
| 2001 | 429,366[3] | 184,126 | 42.9% | 28,001,302[3] | 15,312,298 | 54.7% |
| 2002 | 425,479[3] | 190,776 | 44.8% | 28,488,500[3] | 15,927,986 | 55.9% |
| 2003 | 420,074[3] | 199,842 | 47.6% | 28,912,095[3] | 16,611,710 | 57.5% |
| 2004 | 414,098[3] | 206,791 | 49.9% | 29,285,846[3] | 16,911,486 | 57.7% |
| 2005 | 406,548[3] | 208,032 | 51.2% | 29,404,797[3] | 17,272,043 | 58.7% |
| 2006 | 400,529[3] | 209,547 | 52.3% | 29,540,873[3] | 17,487,481 | 59.2% |
| 2007 | 396,056[3] | 225,402 | 56.9% | 29,733,951[3] | 17,758,872 | 59.7% |
| 2008 | 395,503[3] | 227,546 | 57.5% | 30,090,148[3] | 18,248,133 | 60.6% |
| 2009 | 394,800[3] | 235,618 | 59.7% | 30,412,035[3] | 19,102,814 | 62.8% |

[1] Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2] Based on census population as of April 1 of the stated year.
[3] Estimated population (reference date July 1 of the stated year).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2010-2011 was approximately 61,630 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2009-2010 of

approximately 183,673 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income

A-30

derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

### Green Energy Incentives Program

On July 19, 2010 the Legislative Assembly enacted Act No. 83 of July 19, 2010, also known as the "Green Energy Incentives Act", to encourage the production of renewable energy on a commercial scale. The activities eligible for tax exemption under the Green Energy Incentives Act include businesses engaged in the production and sale of green energy on a commercial scale for consumption in Puerto Rico, a producer of green energy, the installation of machinery and equipment for the production of green energy, and property used for the production of green energy.

Companies qualifying under the Green Energy Incentives Act can benefit from a simplified income tax system: an income tax rate of 4% and a withholding tax rate of 12% on royalty payments, license fees and rental payments to non-Puerto Rico resident companies. In addition, Green Energy Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sale and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

Under the Green Energy Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%. Moreover, the Green Energy Incentives Act creates a rebate program of up to 6% of the acquisition, installation, and related costs of the physical plant and the machinery and equipment of small and medium green energy projects located in Puerto Rico. In the case of large scale green energy projects developed in Puerto Rico, the Green Energy Incentives Act creates a renewal green energy certificates program.

### Tourism Incentives Program

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Puerto Rico Tourism Development Act of 2010 (the "Tourism Development Act") provides partial exemptions from income, property, and municipal license taxes for a period of ten years. The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects. To date, the Fund has

provided direct loans and financial guarantees in the aggregate of approximately $1.368 billion for loans made or bonds issued to finance the development of twenty-one tourism projects representing 4,744 new hotel rooms and a total investment of approximately $2.135 billion.

*Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Act in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. As of this date, no legislation has been approved by either House of Congress of the United States. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

On September 22, 2011, HR No. 3020 was presented in the U.S. Congress House of Representatives, which allows corporations organized under the laws of Puerto Rico which derive fifty percent (50%) or more of their gross income from Puerto Rico sources to elect to be treated as domestic U.S. corporations for almost all provisions of the U.S. Code, including Section 243 of the U.S. Code pertaining to the dividends received deduction. By way of exception, the electing Puerto Rico corporations would not consider as part of their gross income for federal income tax purposes income derived from sources within Puerto Rico.

APPENDIX B

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the thirteenth sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-3

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is

not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of the Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute

Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

        (i)      Government Obligations;

        (ii)     Defeased Municipal Obligations;

        (iii)    certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) and (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of

the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)     a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)     (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

      (i)     Defeasance Obligations;

      (ii)    Defeased Municipal Obligations;

(iii)     public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)     direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)     direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)     prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)     shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)     bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)     repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)     investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)     any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

(i)     any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

(ii)     Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

(iii)     Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

(iv)     Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007 of the Resolution;

(v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)     as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded.  Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

　　　　　1.　　　　All Revenues.

　　　　　2.　　　　All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

　　　　　3.　　　　The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Section 1201 and 1203 of the Resolution.

　　　　　4.　　　　Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

5.        Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by

the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds.  Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond,

"Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to Section 203 of the Resolution and the applicable Series Resolution.

**Related August 2 Computation Period** shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Pledged Sales Tax received by the Corporation or the Trustee.

    2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test contained in Section 710 of the Resolution or other purposes of the Resolution.

    3.    Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

4. Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution subject to the provisions of Sections 1201 and 1203 of the Resolution.

5. Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2 of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

B-17

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

**Summary of Certain Provisions of the Resolution**

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

**Resolution to Constitute Contract (Section 103)**

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

**Authorization of Bonds (Section 201)**

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

**Special Provisions for Refunding Bonds (Section 203)**

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

        (i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

        (ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued only upon compliance with Section 710.

**Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)**

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

**Qualified Hedges (Section 206)**

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments") and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

B-21

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

### Costs of Issuance Account and Capitalized Interest Account (Section 503)

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

B-23

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

> (i) setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

> (ii) stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Such amounts may include, but not be limited to, proceeds of Bonds and Build America Bond Tax Credit Receipts. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation

thereof, including the Corporation, for the prior payment by any such entity for, costs of the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

> (i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

> (ii)     stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

1.     All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

B-25

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without

B-26

notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)     Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)     Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

(iii)     Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)     Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)     Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the

Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the

amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate

and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i) amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii) amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

(iii) amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv) amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

**Rebate Account (Section 510)**

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the

credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified

Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available

B-34

resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

### Creation of Liens (Section 707)

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

### Accounts and Reports (Section 708)

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

### Tax Matters (Section 709)

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within

the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

1.     No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(1) (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

*Additional Requirements—Senior Bonds and Parity Obligations*

A.     (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.     (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.  No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate

Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

> *Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2. In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3. The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the

requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

## Responsibilities of Trustee (Section 802)

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance

B-39

with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such

loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

### Certain Permitted Acts (Section 805)

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

### Resignation of Trustee (Section 806)

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

### Removal of Trustee (Section 807)

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

### Appointment of Successor Trustee (Section 808)

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in

principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

## Supplemental Resolutions (Article IX)

### *Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

      (i)    to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

      (ii)    to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

      (iii)    to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iv)    to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)    to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)    to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)    to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)    to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)    to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)    as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)    to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)    to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating

to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the

percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

### Events of Default and Remedies (Article XI)

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided*, that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate

B-45

Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to he payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

B-47

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

### Termination of Proceedings (Section 1104)

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

### Bondowners' Direction of Proceedings (Section 1105)

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

### Limitation on Rights of Bondowners (Section 1106)

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no

one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the

books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Obligations deposited as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Obligations the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

Neither Defeasance Obligations nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Obligations, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Obligations deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Obligations maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date

when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

**Moneys Held for Particular Bonds (Section 1203)**

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

**Preservation and Inspection of Documents (Section 1204)**

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

**No Personal Liability (Section 1206)**

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

**Governing Law (Section 1211)**

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

**APPENDIX C**

## PROPOSED FORM OF APPROVING OPINION OF
## BOND COUNSEL TO THE CORPORATION



NIXON PEABODY LLP
ATTORNEYS AT LAW

437 Madison Avenue
New York, New York 10022-7001
(212) 940-3000
Fax: (212) 940-3111

November __, 2011

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $397,758,386.20 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2011A-1 (the "Series 2011A-1 Bonds") and its $337,037,187.75 aggregate principal amount of Sales Tax Revenue Bonds, First Subordinate Series 2011A-2 (the "Series 2011A-2 Bonds" and, together with the Series 2011A-1 Bonds, the "Bonds").

The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution, adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented prior to the date hereof (the "General Resolution"), and an Eighteenth Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Bonds (the "Bond Resolution, " and together with the General Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on November 16, 2011. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are limited obligations of the Corporation payable solely from, and secured by a pledge and assignment of, the Pledged Sales Tax derived from a portion of the Commonwealth Sales Tax (to the extent received by the Trustee under the Resolution), undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, and other Revenues (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution. The Bonds are First Subordinate Bonds under the Resolution and are subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, and on a parity with other First Subordinate Bonds and First Subordinate Obligations currently outstanding and to be issued under the terms of the Resolution, all as provided in the Resolution.

Puerto Rico Sales Tax Financing Corporation                              November __, 2011
                                                                                              Page 2

The Bonds are being issued to provide funds for the purposes provided in Article 2 of Act 91.

The Bonds are dated, mature, are redeemable prior to maturity, are payable and bear interest or accrete in value in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in the denominations set forth in the Bond Resolution and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

As Bond Counsel we have examined (i) Act 91, (ii) certified copies of the proceedings of the Corporation authorizing the issuance of the Bonds, (iii) the Resolution, and (iv) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      Act 91 is valid in all respects material to the matters covered by this opinion.

2.      The Corporation is duly constituted and validly existing as a public corporation and instrumentality of the Commonwealth, constituting a corporate and political entity independent and separate from the Commonwealth, with the corporate power and authority to adopt the Resolution and issue the Bonds.

3.      The proceedings of the Corporation in connection with the authorization, issuance and sale of the Bonds have been validly and legally taken.

4.      Act 91 and such proceedings show lawful authority for the issuance and sale of the Bonds by the Corporation.

5.      As authorized by Act 91 and by said proceedings, the Resolution has been duly adopted by the Corporation and constitutes the legal, valid, binding and enforceable obligation of the Corporation.

6.      The Bonds have been duly authorized, executed and delivered by the Corporation and constitute legal, valid, binding and enforceable obligations of the Corporation payable from and secured by a pledge of the Pledged Property, subordinate in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

7.      The Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation) and neither the Commonwealth nor its public instrumentalities (other than the Corporation) shall be responsible for the payment of the Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth shall not be pledged.

C-2

Puerto Rico Sales Tax Financing Corporation                          November __, 2011
                                                                                    Page 3

    8.      The Internal Revenue Code of 1986 (the "Code") sets forth certain requirements which must be met subsequent to the issuance and delivery of the Series 2011A-1 Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Series 2011A-1 Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Series 2011A-1 Bonds. Pursuant to the Bond Resolution and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 of even date herewith (the "Tax Certificate"), the Corporation and the Commonwealth have covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Series 2011A-1 Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Corporation and the Commonwealth have made certain representations and certifications in its Bond Resolution and Tax Certificate. We have not undertaken to independently verify the accuracy of those certifications and representations.

    Under existing law, assuming compliance with the aforementioned tax covenants and the accuracy of the aforementioned representations and certifications, interest on the Series 2011A-1 Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. We are also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Interest on the Series 2011A-1 Bonds is, however, included in the adjusted current earnings of certain corporations for purposes of computing the alternative minimum tax imposed on such corporations.

    9.      The difference between the principal amount at maturity of the Series 2011A-1 Bonds (other than Series 2011A-1 Bonds maturing on August 1, 2043 bearing interest at a rate of 5.25%) (the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for Federal income tax purposes to the same extent as interest on the Series 2011A-1 Bonds. Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment.

    10.     The interest on the Series 2011A-1 Bonds is exempt from state, Commonwealth and local income taxation.

    Except as stated in paragraphs 8, 9 and 10 above, we express no opinion as to any other Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds. Furthermore, we express no opinion as to any Federal, state, Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

    It is to be understood that the rights of the holders of the Bonds and the enforceability thereof and of the Resolution may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

C-3

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX D

# BOOK-ENTRY SYSTEM

**The Depository Trust Company**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Series 2011A Bonds. The Series 2011A Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Series 2011A Bond certificate will be issued for each stated maturity of the Series 2011A Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE SERIES 2011A BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE SERIES 2011A BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES 2011A BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a S&P rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of Series 2011A Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2011A Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2011A Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2011A Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners

will not receive certificates representing their ownership interests in the Series 2011A Bonds, except in the event that use of the book-entry system for the Series 2011A Bonds is discontinued.

To facilitate subsequent transfers, the Series 2011A Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Series 2011A Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2011A Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2011A Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series 2011A Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Series 2011A Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Series 2011A Bonds documents. For example, Beneficial Owners of Series 2011A Bonds may wish to ascertain that the nominee holding the Series 2011A Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Series 2011A Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Series 2011A Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2011A Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Series 2011A Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee, on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Series 2011A Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in

the event that a successor depository is not obtained, Series 2011A Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, Security certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE SERIES 2011A BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE SERIES 2011A BONDS.

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX E

## TABLE OF COMPOUNDED AMOUNTS FOR CAPITAL APPRECIATION BONDS

| Date | CABs Due 2023 | CABs Due 2024 | CABs Due 2032 | CABs Due 2033 | CABs Due 2041 | CABs Due 2043 | CABs Due 2044 | CABs Due 2045 | CABs Due 2046 | CABs Due 2047 | CABs Due 2048 | CABs Due 2049 | CABs Due 2050 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/23/2011 | $2,728.30 | $2,527.25 | $1,413.65 | $1,302.25 | $ 748.50 | $ 565.00 | $ 527.45 | $ 492.40 | $ 459.65 | $ 429.10 | $ 400.55 | $ 373.90 | $ 349.05 |
| 2/1/2012 | 2,755.15 | 2,553.05 | 1,430.05 | 1,317.60 | 757.60 | 572.40 | 534.35 | 498.80 | 465.65 | 434.70 | 405.80 | 378.80 | 353.60 |
| 8/1/2012 | 2,827.45 | 2,622.65 | 1,474.40 | 1,359.10 | 782.25 | 592.45 | 553.05 | 516.30 | 481.95 | 449.90 | 420.00 | 392.05 | 366.00 |
| 2/1/2013 | 2,901.70 | 2,694.10 | 1,520.10 | 1,402.90 | 807.65 | 613.20 | 572.40 | 534.35 | 498.80 | 465.65 | 434.70 | 405.80 | 378.80 |
| 8/1/2013 | 2,977.85 | 2,767.50 | 1,567.25 | 1,446.10 | 833.90 | 634.65 | 592.45 | 553.05 | 516.30 | 481.95 | 449.90 | 420.00 | 392.05 |
| 2/1/2014 | 3,056.00 | 2,842.95 | 1,615.80 | 1,491.65 | 861.00 | 656.85 | 613.20 | 572.40 | 534.35 | 498.80 | 465.65 | 434.70 | 405.80 |
| 8/1/2014 | 3,136.25 | 2,920.40 | 1,665.90 | 1,538.60 | 889.00 | 679.85 | 634.65 | 592.45 | 553.05 | 516.30 | 481.95 | 449.90 | 420.00 |
| 2/1/2015 | 3,218.55 | 3,000.00 | 1,717.55 | 1,587.10 | 917.90 | 703.65 | 656.85 | 613.20 | 572.40 | 534.35 | 498.80 | 465.65 | 434.70 |
| 8/1/2015 | 3,303.05 | 3,081.75 | 1,770.80 | 1,637.10 | 947.70 | 728.30 | 679.85 | 634.65 | 592.45 | 553.05 | 516.30 | 481.95 | 449.90 |
| 2/1/2016 | 3,389.75 | 3,165.70 | 1,825.70 | 1,688.65 | 978.50 | 753.75 | 703.65 | 656.85 | 613.20 | 572.40 | 534.35 | 498.80 | 465.65 |
| 8/1/2016 | 3,478.75 | 3,252.00 | 1,882.30 | 1,741.85 | 1,010.30 | 780.15 | 728.30 | 679.85 | 634.65 | 592.45 | 553.05 | 516.30 | 481.95 |
| 2/1/2017 | 3,570.05 | 3,340.60 | 1,940.65 | 1,796.70 | 1,043.15 | 807.45 | 753.75 | 703.65 | 656.85 | 613.20 | 572.40 | 534.35 | 498.80 |
| 8/1/2017 | 3,663.60 | 3,431.65 | 2,000.80 | 1,853.30 | 1,077.05 | 835.70 | 780.15 | 728.30 | 679.85 | 634.65 | 592.45 | 553.05 | 516.30 |
| 2/1/2018 | 3,759.95 | 3,525.15 | 2,062.85 | 1,911.70 | 1,112.05 | 864.95 | 807.45 | 753.75 | 703.65 | 656.85 | 613.20 | 572.40 | 534.35 |
| 8/1/2018 | 3,858.65 | 3,621.20 | 2,126.80 | 1,971.90 | 1,148.20 | 895.25 | 835.70 | 780.15 | 728.30 | 679.85 | 634.65 | 592.45 | 553.05 |
| 2/1/2019 | 3,959.95 | 3,719.90 | 2,192.70 | 2,034.05 | 1,185.50 | 926.60 | 864.95 | 807.45 | 753.75 | 703.65 | 656.85 | 613.20 | 572.40 |
| 8/1/2019 | 4,063.90 | 3,821.25 | 2,260.70 | 2,098.10 | 1,224.05 | 959.00 | 895.25 | 835.70 | 780.15 | 728.30 | 679.85 | 634.65 | 592.45 |
| 2/1/2020 | 4,170.55 | 3,925.40 | 2,330.75 | 2,164.20 | 1,263.85 | 992.55 | 926.60 | 864.95 | 807.45 | 753.75 | 703.65 | 656.85 | 613.20 |
| 8/1/2020 | 4,280.05 | 4,032.35 | 2,403.00 | 2,232.35 | 1,304.90 | 1,027.30 | 959.00 | 895.25 | 835.70 | 780.15 | 728.30 | 679.85 | 634.65 |
| 2/1/2021 | 4,392.40 | 4,142.25 | 2,477.50 | 2,302.70 | 1,347.30 | 1,063.25 | 992.55 | 926.60 | 864.95 | 807.45 | 753.75 | 703.65 | 656.85 |
| 8/1/2021 | 4,507.70 | 4,255.10 | 2,554.30 | 2,375.20 | 1,391.10 | 1,100.50 | 1,027.30 | 959.00 | 895.25 | 835.70 | 780.15 | 728.30 | 679.85 |
| 2/1/2022 | 4,626.05 | 4,371.05 | 2,633.50 | 2,450.05 | 1,436.30 | 1,139.00 | 1,063.25 | 992.55 | 926.60 | 864.95 | 807.45 | 753.75 | 703.65 |
| 8/1/2022 | 4,747.45 | 4,490.15 | 2,715.15 | 2,527.20 | 1,483.00 | 1,178.85 | 1,100.50 | 1,027.30 | 959.00 | 895.25 | 835.70 | 780.15 | 728.30 |
| 2/1/2023 | 4,872.10 | 4,612.55 | 2,799.30 | 2,606.85 | 1,531.20 | 1,220.15 | 1,139.00 | 1,063.25 | 992.55 | 926.60 | 864.95 | 807.45 | 753.75 |
| 8/1/2023 | 5,000.00 | 4,738.20 | 2,886.10 | 2,688.95 | 1,580.95 | 1,262.85 | 1,178.85 | 1,100.50 | 1,027.30 | 959.00 | 895.25 | 835.70 | 780.15 |
| 2/1/2024 | | 4,867.35 | 2,975.55 | 2,773.65 | 1,632.35 | 1,307.05 | 1,220.15 | 1,139.00 | 1,063.25 | 992.55 | 926.60 | 864.95 | 807.45 |
| 8/1/2024 | | 5,000.00 | 3,067.80 | 2,861.00 | 1,685.40 | 1,352.80 | 1,262.85 | 1,178.85 | 1,100.50 | 1,027.30 | 959.00 | 895.25 | 835.70 |
| 2/1/2025 | | | 3,162.90 | 2,951.15 | 1,740.15 | 1,400.15 | 1,307.05 | 1,220.15 | 1,139.00 | 1,063.25 | 992.55 | 926.60 | 864.95 |
| 8/1/2025 | | | 3,260.95 | 3,044.10 | 1,796.75 | 1,449.15 | 1,352.80 | 1,262.85 | 1,178.85 | 1,100.50 | 1,027.30 | 959.00 | 895.25 |
| 2/1/2026 | | | 3,362.05 | 3,140.00 | 1,855.10 | 1,499.85 | 1,400.15 | 1,307.05 | 1,220.15 | 1,139.00 | 1,063.25 | 992.55 | 926.60 |
| 8/1/2026 | | | 3,466.25 | 3,238.90 | 1,915.40 | 1,552.35 | 1,449.15 | 1,352.80 | 1,262.85 | 1,178.85 | 1,100.50 | 1,027.30 | 959.00 |
| 2/1/2027 | | | 3,573.75 | 3,340.95 | 1,977.65 | 1,606.70 | 1,499.85 | 1,400.15 | 1,307.05 | 1,220.15 | 1,139.00 | 1,063.25 | 992.55 |
| 8/1/2027 | | | 3,684.50 | 3,446.15 | 2,041.95 | 1,662.90 | 1,552.35 | 1,449.15 | 1,352.80 | 1,262.85 | 1,178.85 | 1,100.50 | 1,027.30 |
| 2/1/2028 | | | 3,798.75 | 3,554.70 | 2,108.30 | 1,721.15 | 1,606.70 | 1,499.85 | 1,400.15 | 1,307.05 | 1,220.15 | 1,139.00 | 1,063.25 |
| 8/1/2028 | | | 3,916.50 | 3,666.70 | 2,176.80 | 1,781.35 | 1,662.90 | 1,552.35 | 1,449.15 | 1,352.80 | 1,262.85 | 1,178.85 | 1,100.50 |
| 2/1/2029 | | | 4,037.90 | 3,782.20 | 2,247.55 | 1,843.70 | 1,721.15 | 1,606.70 | 1,499.85 | 1,400.15 | 1,307.05 | 1,220.15 | 1,139.00 |
| 8/1/2029 | | | 4,163.10 | 3,901.35 | 2,320.60 | 1,908.25 | 1,781.35 | 1,662.90 | 1,552.35 | 1,449.15 | 1,352.80 | 1,262.85 | 1,178.85 |
| 2/1/2030 | | | 4,292.15 | 4,024.25 | 2,396.05 | 1,975.05 | 1,843.70 | 1,721.15 | 1,606.70 | 1,499.85 | 1,400.15 | 1,307.05 | 1,220.15 |
| 8/1/2030 | | | 4,425.20 | 4,151.00 | 2,473.90 | 2,044.15 | 1,908.25 | 1,781.35 | 1,662.90 | 1,552.35 | 1,449.15 | 1,352.80 | 1,262.85 |
| 2/1/2031 | | | 4,562.40 | 4,281.75 | 2,554.30 | 2,115.70 | 1,975.05 | 1,843.70 | 1,721.15 | 1,606.70 | 1,499.85 | 1,400.15 | 1,307.05 |
| 8/1/2031 | | | 4,703.80 | 4,416.65 | 2,637.35 | 2,189.75 | 2,044.15 | 1,908.25 | 1,781.35 | 1,662.90 | 1,552.35 | 1,449.15 | 1,352.80 |
| 2/1/2032 | | | 4,849.65 | 4,555.75 | 2,723.05 | 2,266.40 | 2,115.70 | 1,975.05 | 1,843.70 | 1,721.15 | 1,606.70 | 1,499.85 | 1,400.15 |
| 8/1/2032 | | | 5,000.00 | 4,699.25 | 2,811.55 | 2,345.75 | 2,189.75 | 2,044.15 | 1,908.25 | 1,781.35 | 1,662.90 | 1,552.35 | 1,449.15 |
| 2/1/2033 | | | | 4,847.30 | 2,902.90 | 2,427.85 | 2,266.40 | 2,115.70 | 1,975.05 | 1,843.70 | 1,721.15 | 1,606.70 | 1,499.85 |
| 8/1/2033 | | | | 5,000.00 | 2,997.25 | 2,512.80 | 2,345.75 | 2,189.75 | 2,044.15 | 1,908.25 | 1,781.35 | 1,662.90 | 1,552.35 |
| 2/1/2034 | | | | | 3,094.70 | 2,600.75 | 2,427.85 | 2,266.40 | 2,115.70 | 1,975.05 | 1,843.70 | 1,721.15 | 1,606.70 |
| 8/1/2034 | | | | | 3,195.25 | 2,691.80 | 2,512.80 | 2,345.75 | 2,189.75 | 2,044.15 | 1,908.25 | 1,781.35 | 1,662.90 |
| 2/1/2035 | | | | | 3,299.10 | 2,786.00 | 2,600.75 | 2,427.85 | 2,266.40 | 2,115.70 | 1,975.05 | 1,843.70 | 1,721.15 |
| 8/1/2035 | | | | | 3,406.35 | 2,883.50 | 2,691.80 | 2,512.80 | 2,345.75 | 2,189.75 | 2,044.15 | 1,908.25 | 1,781.35 |
| 2/1/2036 | | | | | 3,517.05 | 2,984.45 | 2,786.00 | 2,600.75 | 2,427.85 | 2,266.40 | 2,115.70 | 1,975.05 | 1,843.70 |
| 8/1/2036 | | | | | 3,631.35 | 3,088.90 | 2,883.50 | 2,691.80 | 2,512.80 | 2,345.75 | 2,189.75 | 2,044.15 | 1,908.25 |
| 2/1/2037 | | | | | 3,749.35 | 3,197.00 | 2,984.45 | 2,786.00 | 2,600.75 | 2,427.85 | 2,266.40 | 2,115.70 | 1,975.05 |
| 8/1/2037 | | | | | 3,871.20 | 3,308.90 | 3,088.90 | 2,883.50 | 2,691.80 | 2,512.80 | 2,345.75 | 2,189.75 | 2,044.15 |
| 2/1/2038 | | | | | 3,997.05 | 3,424.70 | 3,197.00 | 2,984.45 | 2,786.00 | 2,600.75 | 2,427.85 | 2,266.40 | 2,115.70 |
| 8/1/2038 | | | | | 4,126.95 | 3,544.55 | 3,308.90 | 3,088.90 | 2,883.50 | 2,691.80 | 2,512.80 | 2,345.75 | 2,189.75 |
| 2/1/2039 | | | | | 4,261.05 | 3,668.65 | 3,424.70 | 3,197.00 | 2,984.45 | 2,786.00 | 2,600.75 | 2,427.85 | 2,266.40 |
| 8/1/2039 | | | | | 4,399.55 | 3,797.05 | 3,544.55 | 3,308.90 | 3,088.90 | 2,883.50 | 2,691.80 | 2,512.80 | 2,345.75 |
| 2/1/2040 | | | | | 4,542.55 | 3,929.95 | 3,668.65 | 3,424.70 | 3,197.00 | 2,984.45 | 2,786.00 | 2,600.75 | 2,427.85 |
| 8/1/2040 | | | | | 4,690.15 | 4,067.50 | 3,797.05 | 3,544.55 | 3,308.90 | 3,088.90 | 2,883.50 | 2,691.80 | 2,512.80 |
| 2/1/2041 | | | | | 4,842.60 | 4,209.85 | 3,929.95 | 3,668.65 | 3,424.70 | 3,197.00 | 2,984.45 | 2,786.00 | 2,600.75 |
| 8/1/2041 | | | | | 5,000.00 | 4,357.20 | 4,067.50 | 3,797.05 | 3,544.55 | 3,308.90 | 3,088.90 | 2,883.50 | 2,691.80 |
| 2/1/2042 | | | | | | 4,509.70 | 4,209.85 | 3,929.95 | 3,668.65 | 3,424.70 | 3,197.00 | 2,984.45 | 2,786.00 |
| 8/1/2042 | | | | | | 4,667.55 | 4,357.20 | 4,067.50 | 3,797.05 | 3,544.55 | 3,308.90 | 3,088.90 | 2,883.50 |
| 2/1/2043 | | | | | | 4,830.90 | 4,509.70 | 4,209.85 | 3,929.95 | 3,668.65 | 3,424.70 | 3,197.00 | 2,984.45 |
| 8/1/2043 | | | | | | 5,000.00 | 4,667.55 | 4,357.20 | 4,067.50 | 3,797.05 | 3,544.55 | 3,308.90 | 3,088.90 |
| 2/1/2044 | | | | | | | 4,830.90 | 4,509.70 | 4,209.85 | 3,929.95 | 3,668.65 | 3,424.70 | 3,197.00 |
| 8/1/2044 | | | | | | | 5,000.00 | 4,667.55 | 4,357.20 | 4,067.50 | 3,797.05 | 3,544.55 | 3,308.90 |
| 2/1/2045 | | | | | | | | 4,830.90 | 4,509.70 | 4,209.85 | 3,929.95 | 3,668.65 | 3,424.70 |
| 8/1/2045 | | | | | | | | 5,000.00 | 4,667.55 | 4,357.20 | 4,067.50 | 3,797.05 | 3,544.55 |
| 2/1/2046 | | | | | | | | | 4,830.90 | 4,509.70 | 4,209.85 | 3,929.95 | 3,668.65 |
| 8/1/2046 | | | | | | | | | 5,000.00 | 4,667.55 | 4,357.20 | 4,067.50 | 3,797.05 |
| 2/1/2047 | | | | | | | | | | 4,830.90 | 4,509.70 | 4,209.85 | 3,929.95 |
| 8/1/2047 | | | | | | | | | | 5,000.00 | 4,667.55 | 4,357.20 | 4,067.50 |
| 2/1/2048 | | | | | | | | | | | 4,830.90 | 4,509.70 | 4,209.85 |
| 8/1/2048 | | | | | | | | | | | 5,000.00 | 4,667.55 | 4,357.20 |
| 2/1/2049 | | | | | | | | | | | | 4,830.90 | 4,509.70 |
| 8/1/2049 | | | | | | | | | | | | 5,000.00 | 4,667.55 |
| 2/1/2050 | | | | | | | | | | | | | 4,830.90 |
| 8/1/2050 | | | | | | | | | | | | | 5,000.00 |

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

[This Page Intentionally Left Blank]